### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DAVID J. NASTRI, ESQ., | : | |
| | : | DKT No.: 3:23-cv-00056-JBA |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| KATIE DYKES, in her official capacity only, | : | |
| | : | |
| Defendant. | : | January 17, 2023 |

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND, IN THE ALTERNATIVE, TO CONSOLIDATE THE PRELIMINARY INJUNCTION HEARING WITH THE TRIAL ON THE MERITS

The Plaintiff, David J. Nastri, Esq., respectfully submits this memorandum of law in support of his emergency motion for a temporary restraining order and a preliminary injunction and, in the alternative, to consolidate the preliminary injunction hearing with the trial on the merits. He emphasizes to the Court that he does not seek *ex parte* relief, but that he does seek expedited relief pursuant to Local Rule 7(a)6 to protect his Second Amendment rights.

This case challenges Connecticut's *de facto* designation of its state parks and forests as "sensitive places," which enables it to prohibit law-abiding citizens from carrying handguns for the purpose of self-defense – a purpose protected by the Second Amendment's unqualified command. Connecticut's designation is porous at best. It hosts four public firing ranges at four Connecticut state forests, and, every year, it invites countless hunters bearing firearms and archery equipment into Connecticut state forests and parks. Both activities result in the voluminous discharge of firearms and other weapons. Connecticut, however, prohibits law-abiding individuals who possess state-

issued pistol permits from carrying their pistols and revolvers for the purpose of defending themselves during a confrontation in state parks and forests – an activity that would result in far fewer shots fired than hunting or target shooting.

The United States Supreme Court reshaped Second Amendment law entirely in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (Jun. 23, 2022), and it specifically rejected New York's attempt to justify its laws under a broad "sensitive places" exception to the Second Amendment that would have covered most cities in the United States. Connecticut's prohibition on carrying handguns in state parks and forests, however, would have failed even New York's broad "sensitive place" exception. There is no way that it can survive a "sensitive places" analysis that applies *Bruen* faithfully.

The substantive burden also does not fall on Nastri's shoulders even though he bears a procedural burden at this juncture. *Bruen* unequivocally places the burden of justifying firearms regulations on the government, which must show a "a well-established and representative historical analogue…" to its modern regulations. *Id*. at 2133. History overwhelmingly points toward the unconstitutionality of Connecticut's prohibition.

So does common sense. David Nastri has held his Connecticut pistol permit for over thirty years. He defended his country and state faithfully as a combat veteran. He continues to be a responsible and giving member of his community. He is equally capable of responsibly carrying a handgun for the purpose of self-defense as a hunter is capable of carrying a shotgun for the purpose of hunting. So is every other law-abiding Connecticut citizen. It is nonsensical for Connecticut to take the position that it is protecting public safety by prohibiting Nastri and other law-abiding citizens from carrying a handgun for self-defense in a state park or forest but giving hunters relatively laissez-fair access.

2

Connecticut's prohibition – contained in Conn. Agencies Regs. § 23-4-1(c) – defies common sense and violates the Second Amendment. Nastri asks the Court to speedily halt its enforcement and the Defendant's unconstitutional deprivation of his Second Amendment rights.

## FACTUAL BACKGROUND

No party disputes that the state of Connecticut takes its environmental responsibilities seriously and that everyone benefits from its conservation policy:

> to conserve, improve and protect [the state's] natural resources and environment and to control air, land and water pollution in order to enhance the health, safety and welfare of the people of the state… and to manage the basic resources of air, land and water to the end that the state may fulfill its responsibility as trustee of the environment for the present and future generations.

Conn. Gen. Stat. § 22a-1.

Maintaining state parks and forests "are an important part of the state's conservation responsibilities," and the Connecticut Department of Energy & Environmental Protection (DEEP) – overseen by Defendant Dykes – maintains approximately 139 state parks and forests. *State v. Ball*, 260 Conn. 275, 284-85 (2002); Dk 1, ¶ 6. The Connecticut Supreme Court has found that "[f]rom time immemorial, the state's uninhabited and undeveloped land traditionally has been used for hiking, picnicking, camping, hunting, trapping and fishing." *Ball*, 260 Conn. at 284. *Ball* found that "[t]he state has conserved and managed its undeveloped land primarily for these traditional purposes, subject to some public safety restrictions." *Id*. at 284-85.

*Ball*'s finding on the traditional use of state parks and forests has not changed despite twenty years elapsing. "Connecticut's state parks and forests remain open for a wide variety of recreational activities, including hiking, camping, hunting, fishing, and

picnicking." Dkt. 1, ¶ 10. The DEEP does not utilize a permit system to control entrance to state parks and forests although it does require permits to engage in certain types of recreation – e.g., hunting, fishing, or camping. *Id.* at ¶ 11. Instead, Connecticut opens its state parks and forests daily for public use between sunrise and sunset by law. *See* Conn. Agencies Regs. § 23-4-1(a).

## I.     Connecticut's Porous Ban On Firearms In State Parks And Forests.

Connecticut prohibits the carrying of firearms, archery equipment, and other weapons in state parks and forests unless the DEEP specifically authorizes their carrying. Conn. Agencies Regs. § 23-4-1(c). If a person violates this regulation, they face two types of punishment. First, the DEEP may fine a person up to $35. Conn. Agencies Regs. § 23-4-5. Second, the DEEP possesses the authority to arrest and evict a violator from a park or a forest for up to twenty-four hours immediately upon their arrest or citation for the infraction. *Id.* If a person is convicted of violating Conn. Agencies Regs. § 23-4-1(c) under the procedures established in Conn. Gen. Stat. § 51-164n, Defendant Dykes retains the authority to ban the convicted violator from entering a state park or forest for up to one year. Conn. Gen. Stat. § 23-4.

This ban on firearms and other weapons is porous and selective though. Connecticut permits the carrying of firearms, archery equipment, and other weaponry for the purpose of hunting in state parks and forests within multiple seasons throughout the year. Dkt. 1, ¶ 17. Among the firearms that Connecticut permits individuals to carry to hunt are .22 caliber rimfire handguns. *Id.* Connecticut, however, does not permit non-hunting members of the public who possess valid Connecticut pistol permits to carry handguns for the purpose of self-defense while using state parks or forests. *Id.* at ¶ 18.

4

Defendant Dykes and her subordinates confirmed this state of the law when Nastri inquired. *Id*. at ¶ 19. On November 18, 2022, he sent an email inquiry to Defendant Dykes asking her to clarify whether Conn. Agencies Regs. § 23-4-1(c) was a specific provision to regulate hunting and whether there were other rules permitting him to carry a handgun in Connecticut state parks and forests if he held a valid Connecticut pistol permit. *Id*. at ¶ 19. Deputy DEEP Commissioner Mason Trumble responded to Nastri's email at Defendant Dykes' request on November 22, 2022, directing him to a web link containing a 2020 legislative research report entitled "Carrying Handguns in Connecticut State Parks or Forests." *Id*. at ¶ 20. Despite the report specifically disclaiming that it was not a legal opinion, Defendant Dykes and Mr. Trumble have adopted it as the official legal opinion and binding policy of the state of Connecticut by providing it to Nastri as the answer to his questions. *Id*. at ¶ 21. The report confirmed that a person may legally possess a handgun in a state park or forest "only when carrying the handgun for hunting small game… or participating in other authorized activities, such as at a firearms range or during a hunter education class." *Id*. at ¶ 22.

Nastri emailed Mr. Trumble back later that same day to highlight for him *New York State Rifle and Pistol Association v. Bruen*, 142 S.Ct. 2111 (Jun. 23, 2022). *Id*. at ¶ 23. He asked Mr. Trumble to convey his request to Defendant Dykes to take immediate steps to amend Conn. Agencies Regs. 23-4-1(c) to bringing it into compliance with *Bruen* and permit the carrying of handguns in state parks and forests for the purpose of self-defense. *Id*. at ¶ 23. Neither Defendant Dykes nor Mr. Trumble acknowledged receipt of Nastri's email, and Defendant Dykes has made no effort to amend Conn. Agencies Regs. § 23-4-1(c).

## II.    David J. Nastri, Esq.

The undersigned did not handpick a plaintiff for this action, but, if he had, he would have been hard-pressed to find a better member of his community than David Nastri. Nastri is a combat veteran, a financial advisor, an attorney, a kidney donor, and an active participant in his community. *Id.* at ¶ 25. His life is a veritable timeline of sacrifice and service to his nation and his community, and he has established a record of more than 30 years as a law-abiding and peaceable Connecticut citizen.

Nastri earned his Master's in Business Administration (M.B.A.) in 2001 from Quinnipiac University. *Id.* at ¶ 30. As a financial advisor, he currently holds four FINRA licenses, including a Series 7, a Series 63, a Series 66, and a Life & Health license. *Id.* at ¶ 29. In addition to passing the rigorous background checks required for these licenses, Nastri holds a clean disciplinary record for all of his financial licenses. *Id.* at ¶ 29.

His appetite for learning and ultimately giving back to his community did not stop there though. Nastri returned to school and earned his law degree in 2018 from Quinnipiac University. *Id.* at ¶ 30. He subsequently became an attorney duly licensed to practice law in Connecticut on November 2, 2018, and he remains in good standing with no record of a disciplinary history. *Id.* at ¶ 30. Since obtaining his law license, Nastri has represented numerous veterans in a pro bono capacity in Veterans' Administration matters during what spare time he has left over from his day job as a financial advisor. *Id.* at ¶ 31.

Nastri's service to his fellow citizens, community, and nation has been long and enduring.

In 2001, Nastri donated one of his kidneys to a local schoolteacher to save her life. *Id.* at ¶ 26.

In 2009-2010, Nastri deployed to Afghanistan as a Staff Sergeant in the 1st Battalion, 102nd Infantry Regiment, Connecticut Army National Guard in support of Operation Enduring Freedom. *Id.* at ¶ 27. During his deployment, Nastri saw combat, and he earned several awards during his military service, including the Afghanistan Campaign Medal with a Campaign Star, the Army Good Conduct Medal, and the Louisiana Emergency Service Medal. *Id.* at ¶ 27. He received an honorably discharged in March 2012. *Id.* at ¶ 27.

Nastri has held a Connecticut pistol permit for approximately 30 years in good standing since receiving it, and he completed all of the safety training associated with obtaining it. *Id.* at ¶ 32. In addition to the civilian training that he received when he obtained his pistol permit, Nastri received comprehensive training from the United States Army during his military service on the safe and effective use of firearms, including handguns, and he was required to demonstrate proficiency in their safe and effective use under combat conditions. *Id.* at ¶ 28. He subsequently used that training in combat. *Id.* at ¶ 28.

Nastri enjoys using Connecticut state parks and forests on a regular basis throughout the year. *Id.* at ¶ 33. He enjoys hiking with his girlfriend at Sleeping Giant State Park in Hamden, Connecticut and Naugatuck State Forest when they have time. *Id.* at ¶ 33. He intends to continue his usage of Connecticut state parks and forests in the immediate and foreseeable future for the same purpose, and he seeks to carry a handgun at those times for the purpose of self-defense. *Id.* at ¶ 34.

## III.    The Nature Of Connecticut State Parks And Forests

As discussed previously, the Connecticut Supreme Court has strongly emphasized the undeveloped nature of Connecticut's state parks and forests and its importance to the

state's conservation policy. *State v. Ball*, 260 Conn. 275, 284-85 (2002). Even though *Ball* was decided twenty years ago, nothing has changed about the undeveloped nature of Connecticut's state parks and forests.

The DEEP has worked hard to establish trails in many of its state parks and forests in a way that is consistent with its policy objective to preserve natural habitats and undeveloped land. Dkt. 1, ¶¶ 35-36. Trails facilitate recreational activities ranging from hiking and wildlife observation to horseback riding and bicycle riding. *Id*. at ¶ 35. They also facilitate access to state parks and forests for hunting and fishing. *Id*. at ¶ 35. To preserve natural habitats and undeveloped land though, Connecticut's state parks and forests typically offer limited access points and parking for motor vehicles. *Id*. at ¶ 36. Thus, a person may have to traverse a mile or more of trail before they can access a roadway or another vehicular exit from a state park or forest. *Id*. at ¶ 36.

Sleeping Giant State Park and Naugatuck State Forest are perfect examples of this design.

Sleeping Giant State Park has been a Connecticut state park since 1924. *Id*. at ¶ 37. Located in Hamden, Connecticut, it consists primarily of an approximately 32-mile "backcountry trail system" that features various scenic attractions. *Id*. at ¶ 37. It also offers wildlife spotting, picnicking, a cross country ski trail, camping, fishing, and rock climbing. *Id*. at ¶ 37. The DEEP's official map of Sleeping Giant State Park shows that there is no motor vehicle access to the center of Sleeping Giant State Park. *Id*. at ¶ 38. Instead, motor vehicles can only access the park through strategically placed trail head parking locations around the park's perimeter. *Id*. at ¶ 38.

While this orientation, its history, and its natural features have made Sleeping Giant State Park one of the most popular parks in Connecticut, the orientation renders it difficult for first responders, including law enforcement, to promptly aid someone who needs help. *Id*. at ¶ 39. Depending on where someone is in the park, first responders may be forced to navigate miles of rough and mountainous terrain on foot to reach the person seeking help. *Id*. at ¶ 39. In other words, it is easy to imagine situations where response times from first responders to a call for help could exceed half an hour or more. *Id*. at ¶ 39.

Naugatuck State Forest offers similar recreational opportunities. *Id*. at ¶ 40. Covering an area of land that touches Cheshire, Hamden, Naugatuck, Oxford, and Beacon Falls, it offers opportunities ranging from hunting and target shooting to mountain biking and snowmobiling. *Id*. at ¶ 40. It, however, is smaller in sized than Sleeping Giant State Park. *Id*. at ¶ 41.

Its smaller size does not relieve it of the same problems that Sleeping Giant State Park has. Like Sleeping Giant State Park, the DEEP's official map shows that the Naugatuck State Forest is accessible to motor vehicles through numerous parking areas at the trail heads around its perimeter. *Id.* at ¶ 41. Even though it is more accessible to motor vehicles than Sleeping Giant State Park, Naugatuck State Forest still contains portions of the forest where first responders would need to traverse a mile or more on foot to respond to a call for help, necessitating a longer response time. *Id*. at ¶ 41.

Finally, Naugatuck State Forest is unique in the sense that it hosts one of the state's four public firing ranges – the High Rock Cooperative Shooting Range. *Id*. at ¶ 42.

Located inside the Naugatuck State Forest, the public can access the range to shoot pistols, revolvers, and other firearms. *Id*. at ¶ 42.

## LEGAL STANDARD

To obtain a preliminary injunction under Fed. R. Civ. P. 65, the moving party must establish "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (internal quotation marks and citation omitted). Additionally, the moving party must show "that the public interest would not be disserved by the issuance of [the] injunction." *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010) (internal quotation marks omitted).

Districts courts within the Second Circuit apply the same legal standard governing preliminary injunctions to temporary restraining orders. *See Lazor v. University of Connecticut*, 560 F.Supp.3d 674, 677 (2021).

## ARGUMENT

Since the Supreme Court decided *Bruen*, Second Amendment challenges have typically focused on obvious questions that arise under the Second Amendment exceptions that *Bruen* and its predecessors have declined to cast doubt on.[1] These typical challenges also revisit issues that have been litigated previously and where the arguments and justifications for the challenged laws are relatively clear even though

---

[1] *Heller*, 554 U.S. at 626-627 (citing bans on felons and the mentally ill possessing firearms, the sensitive places exception, the dangerous and unusual weapons exception, and laws regulating the conditions and qualifications on the commercial sale of arms,); *Bruen*, 142 S.Ct. at 2157 (Alito, J. concurring) (emphasizing that *Bruen* did not disturb the exceptions recognized by *Heller*).

*Bruen* requires them to be reshaped in substantial ways. This case, however, places Nastri in a unique predicament. He clearly shows irreparable harm and that an injunction would serve the public interest, but he is left to guess at what Connecticut's attempted justification will be, which enables the state to create a justification for the sole purpose of litigation if it chooses to.

Connecticut's prohibition on the carrying of handguns in state parks and forests for the purpose of self-defense[2] has never been the subject of a legal challenge to the best of the undersigned's knowledge, and the dearth of challenges deprives Nastri of any previous notice of what Connecticut's legal justification for the prohibition is. The prohibition's regulatory history is equally unhelpful. The undersigned has devoted hours to searching the Connecticut Law Journal[3] for a statement of purpose that sheds light on the specific prohibition. While a more general statement of purpose may exist as to the purpose of state park and forest rules, no specific statement on the purpose of the prohibition exists to the best of his knowledge and research. Thus, Nastri is left to guess as to Connecticut's justification and legal rationale for the prohibition.

The procedural posture of Nastri's motion for an injunction requires him to show a likelihood of success on the merits, but the substantive legal standard that *Bruen* establishes places the burden on Defendant Dykes to demonstrate the prohibition's constitutionality as discussed in greater detail below. *Bruen*, 142 S.Ct. at 2133. Since Nastri is forced to guess as to how Dykes will attempt to carry her constitutional burden,

---

[2] Conn. Agencies Regs. § 23-4-1(c)

[3] Similar to the requirements of the federal Administrative Procedure Act (APA), Connecticut agencies that engage in rulemaking must follow the Connecticut Uniform Procedure Act (UAPA). Prior to its adoption of the eRegulations system – *see* Conn. Gen. Stat. § 4-168(a), Connecticut agencies were required to provide notice of proposed rulemaking and a statement of purpose in the Connecticut Law Journal. *See e.g.*, Conn. Public Act No. 88-317, § 3.

he believes that Dykes will attempt to justify the regulation under the "sensitive places" exception, and he focuses the entirety of his substantive argument below on why the "sensitive places" exception is inapplicable in this case.

Out of an abundance of caution though, Nastri submits to the Court that none of the other Second Amendment exceptions recognized by *Heller* apply. He is not a felon or mentally ill by virtue of his continued holding of a Connecticut pistol permit for over thirty years. Dkt. 1, ¶ 32. The activity that he seeks to engage in does not constitute a commercial sale of a firearm. Dkt. 1, ¶ 32. Finally, *Heller* and *Bruen* clearly foreclose a conclusion that handguns – the only weapons that Nastri seeks to carry in state parks and forests for the purpose of self-defense[4] – are "dangerous and unusual weapons." *Heller*, 554 U.S. at 629 ("Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid"); *Bruen*, 142 S.Ct. at 2143 ("Whatever the likelihood that handguns were considered 'dangerous and unusual' during the colonial period, they are indisputably in 'common use' for self-defense today. They are, in fact, 'the quintessential self-defense weapon'") (internal citation and quotation marks omitted).

Thus, the only conceivable Second Amendment exception for Defendant Dykes to justify Conn. Agencies Regs. § 23-4-1(c) under is the "sensitive places" exception. The other activities involving the voluminous and anticipated discharge of much more powerful firearms that Connecticut allows in its state parks and forests renders any attempt to argue that the "sensitive places" exception justifies Conn. Agencies Regs. § 23-4-1(c) borderline frivolous as Nastri shows below. Both the law and common sense

---

[4] *See* Dkt. 1, ¶ 34.

overwhelmingly favor Nastri here, and, for the reasons that follow, he asks the Court to enjoin Defendant Dykes from enforcing Conn. Agencies Regs. § 23-4-1(c), which, in turn, will prevent him from suffering irreparable harm and will serve the public interest.

I.  **Nastri Is Entitled To A Presumption Of Irreparable Harm At This Stage And There Is Good Cause To Expedite Consideration Of His Emergency Motion For A Temporary Restraining Order And A Preliminary Injunction.**

To show irreparable harm, Nastri must show that, absent a preliminary injunction, he will "suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). "Whether there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Id*. at 118-19. Courts, however, will presume that a movant has established irreparable harm when the movant's claim involves the alleged deprivation of a constitutional right. *Am. Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015).

There is no question that Nastri is entitled to the presumption of irreparable harm. He claims a constitutional right to keep and bear a pistol or revolver for the purposes of self-defense outside the home, including within the confines of state parks and forests. The Supreme Court has twice established that the Second Amendment's text protects the right to keep and bear arms in case of confrontation. *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111, 2127 (Jun. 23, 2022); *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). Conn. Agencies Regs. § 23-4-1(c) directly infringes upon this well-established Second Amendment right.

13

Every day that passes where Connecticut prohibits Nastri from carrying a handgun for the purpose of self-defense in state parks and forests is an injury that money cannot remedy. In fact, the law itself would not permit a monetary remedy unless the Court or a higher court rewrote the principles underlying civil rights litigation entirely. Sovereign immunity would bar Nastri from bringing monetary damages claims against the state of Connecticut, and qualified immunity would bar damages claims against Defendant Dykes in her individual capacity. In other words, declaratory and injunctive relief is the only meaningful remedy that Nastri has. He should not be required to wait for it, especially in a case where Defendant Dykes bears the heavy burden of proving the constitutionality of Conn. Agencies Regs. § 23-4-1(c) and is highly unlikely to carry that burden. For these reasons, Nastri submits that he has met his burden to establish good cause for expedited and emergency relief under Local Rule 7(a)6.

## II. Nastri Demonstrates A Likelihood Of Success On The Merits Or Sufficiently Serious Questions Going To The Merits That Make Them A Fair Ground For Litigation.

### A. The Supreme Court Has Established A New Constitutional Standard For Evaluating Firearms Regulations.

On June 23, 2022, the U.S. Supreme Court drastically reshaped Second Amendment jurisprudence in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (Jun. 23, 2022). The central portion of its holding abrogated the use of tiers of "means-end" scrutiny – e.g., strict scrutiny – that American courts have habitually used to assess constitutional rights claims since the famous footnote four of *United States v. Carolene Products Co.*, 304 U.S. 144 (1938), and it replaced it with a textual and historical analysis. While *Bruen*'s textual and historical analysis places the ultimate burden on Defendant Dykes to justify the laws and conduct at issue here, Nastri carries

14

his burden to show either "likelihood of success on the merits" or "sufficiently serious questions going to the merits to make them a fair ground for litigation" at this stage.

*Bruen* explicitly rejects "means-end" scrutiny and the two-step test employed by the circuit courts[5] as being inconsistent with *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742 (2010):

> Despite the popularity of this two-step approach, it is one step too many. Step one of the predominant framework is broadly consistent with Heller, which demands a test rooted in the Second Amendment's text, as informed by history. But Heller and McDonald do not support applying means-end scrutiny in the Second Amendment context.

*Bruen*, 142 S.Ct. at 2127. Instead, *Bruen* holds that, under *Heller* and *McDonald*, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*.

*Bruen*'s analysis starts with the Second Amendment's text: "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id*. at 2126. The individual conduct that the Second Amendment's plain text protects is "the individual right to possess and carry weapons in case of confrontation that does not depend on service in the militia." *Id*. at 2127 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008)) (internal quotation marks omitted). As *Bruen* indicates, the Second Amendment's text and history left "no doubt" that the "Second Amendment confers an individual right to keep and bear arms." *Id*. at 2127 (quoting *Heller*, 554 U.S. at 595) (internal quotation marks omitted).

There is absolutely no question that Nastri seeks to exercise the precise right contemplated and protected by the Second Amendment and affirmed in both *Heller* and

---

[5] *See*, e.g., *New York State Rifle and Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015).

*Bruen*: the bearing of a pistol or revolver for personal protection in the event of a confrontation. Thus, there is no question that the Second Amendment's plain text encompasses his conduct.

Relying on *Heller*, *Bruen* then turned to the historical understanding and tradition. It acknowledged that the Second Amendment does not confer unlimited rights, and it cited the fact that, "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id*. at 2128 (quoting *Heller*, 554 U.S. at 626) (internal quotation marks omitted). Thus, it requires courts to assess "whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding" through "reasoning by analogy – a commonplace task for any lawyer or judge." *Id*. at 2131, 2132. It contemplates two types of cases: the straightforward cases and "other cases implicating unprecedented societal concerns or dramatic technological changes." *Id*. at 2131-32.

*Bruen* describes the straightforward cases as follows:

> For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id*. at 2131.

When a court considers "modern regulations that were unimaginable at the founding," however, *Bruen* requires the Defendants to identify "a well-established and

representative historical analogue…" to its modern regulations. *Id*. at 2133. To determine whether the analogue is representative and "relevantly similar under the Second Amendment," *Bruen* provides courts with "at least two metrics" that "are [the] *central* considerations when engaging in an analogical inquiry" from *Heller* and *McDonald*: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. at 2132-33 (internal quotation marks and citations omitted) (emphasis in original).

*Bruen* indicates that the historical inquiry must focus on the scope of constitutional rights that "they were understood to have *when the people adopted them*." *Id*. at 2136 (internal quotation marks and citations omitted) (emphasis in original). It cautions courts to focus on common law practices that "prevailed up to the period immediately before and after the framing of the Constitution" and contemporary history in the immediate post-enactment period. *Id*. at 2136-37 (internal quotation marks and citations omitted). In particular, *Bruen* cautions courts "against giving postenactment history more weight than it can rightly bear," and it describes mid-to-late 19th century evidence as confirmation of the original public meaning instead of being of independent significance. *Id*. at 2136-37.

*Bruen* closes its instructions on these more complex cases with two cautions to courts. First, it expressly forbids courts from entertaining or engaging in "independent means-end scrutiny under the guise of an analogical inquiry." *Id*. at 2133 n.7. Second, while *Bruen* does not require the Defendant Dykes to "identify… a historical *twin*" or "a dead ringer" as a historical analogue, it also does not permit courts to "uphold every modern law that remotely resembles a historical analogue… because doing so risks endorsing outliers that our ancestors would never have accepted." *Id*. at 2133 (internal quotation marks, citations, and alteration marks omitted) (emphasis in original).

**B. The Second Amendment Permits States To Prohibit The Possession Of Firearms In "Sensitive Places," But State Parks And Forests Are Not "Sensitive Places."**

Nastri does not dispute that there is a well-established and representative historical analogue that permits states to prohibit the possession and carrying of firearms in "sensitive places." *See Heller*, 554 U.S. at 626-627 (recognizing longstanding "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings…"); *Bruen*, 142 S.Ct. at 2133 (same). Nastri, however, does dispute any contention by Defendant Dykes that state parks and forests are "sensitive places."

Although the Supreme Court declined to "comprehensively define 'sensitive places'" in *Bruen*, it did not leave courts without any guidance though. During briefing and argument in *Bruen*, New York proposed a definition of "sensitive places" as "all places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." *Id*. at 2133 (quoting New York's brief) (internal quotation marks and citations omitted). The Supreme Court rejected this definition as being far too broad and being without a historical basis. *Id*. at 2134. Additionally, it found that such a definition "would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense…."*Id*. at 2134.

Digressing briefly, Conn. Agencies Regs. § 23-4-1(c) does not even meet the broad standard that New York proposed and *Bruen* rejected. Nastri's verified complaint clearly demonstrates that law-enforcement and other public safety professionals are not presumptively available in state parks and forests and that their response times could take a half hour or more at the very least. Dkt. 1, ¶¶ 35-41. In other words, law enforcement protection and assistance is virtually non-existent in Connecticut state parks

and forests.[6]  People also do not typically congregate in state parks and forests. They may encounter each other in common areas or on trails, but their interactions are a far cry from the congregation that occurs at the local supermarket where carrying pistols and revolvers for self-defense is permissible and protected. Conn. Agencies Regs. § 23-4-1(c)'s failure to meet even a rejected "sensitive places" standard bodes ill for its ability to satisfy one consistent with *Bruen*.

Returning to the point of the *Bruen* methodology, the Supreme Court recognized that the 18th and 19th-century historical record yielded few places where governments banned the possession of weapons. *Bruen*, 142 S.Ct. at 2133 (listing "legislative assemblies, polling places, and courthouses" as "sensitive places"). Thus, *Bruen* instructed courts to use "analogies" to these "historical regulations of 'sensitive places' to determine [whether] modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id*. at 2133 (emphasis in original).

State parks and forests do not even remotely resemble the well-established historical "sensitive places" analogues *Bruen* cites. Those analogues shared a common feature. They only covered places where the core functions of government or self-government took place. Core government functions do not take place in the wilderness. Virtually every government in the United States has established a central building or

---

[6] Even if it was, the right to self-defense takes on additional importance in light of *Deshaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189 (1989) and *Town of Castle Rock, Colo. V. Gonzales*, 545 U.S. 748 (2005). *Deshaney* and *Castle Rock* unequivocally establish that law enforcement and government officials have no obligation "to protect the life, liberty, and property of [their citizens] against invasion by private actors." *Deshaney*, 489 U.S. at 195; *Castle Rock*, 545 U.S. 748 (holding that the Fourteenth Amendment does not require police officers to enforce the law or arrest someone who violates the law). In other words, even the presence of law enforcement officers does not guarantee their safety or that law enforcement officers will act to protect them when they are the potential victims of a violent crime.

location in which to conduct its core functions. That includes the federal capitol, the state capitals, federal and state legislative buildings, municipal city and town halls, and courthouses. Conversely, the undeveloped and remote nature of Connecticut's state parks and forests are the furthest thing imaginable from a place where core government functions take place. No one would expect to find members of the Connecticut Supreme Court doing their best Judge Roy Bean impressions by dispensing justice over a stump in one of Connecticut's state parks or forests just like Judge Bean regularly did over a whiskey barrel in his Texas saloon.

Since state parks and forests are not remotely analogous to the well-established and representative historical analogues of "sensitive places," Nastri demonstrates a strong likelihood of prevailing on the merits of his claim.

### 1. The American historical tradition of "sensitive places" were rare and typically covered places where the core functions of government took place.

The "sensitive places" doctrine lacks a clear historical starting point. The Supreme Court has rightfully cautioned that medieval history is ill-suited for interpreting the Second Amendment. *See Bruen*, 142 S.Ct. at 2139. Nastri concedes nothing though by acknowledging that ancient history does, at least foundationally, inform the historical tradition of "sensitive places." The Founding Fathers, however, rejected ancient history and even colonial history in some instances as being too weak in formulating the Second Amendment. Thus, the United States' "sensitive places" doctrine is informed, but not controlled, by pre-Founding Era history.

Marcus Tullus Cicero, the great Roman statesman and lawyer who was influential on both English and American legal thought, provided a timeless example of the need for

a "sensitive places" doctrine. Titus Annius Milo selected Cicero – one of Rome's greatest orators – to deliver his closing argument to a jury stacked by his political opponents when he faced trial for murdering a political rival, Publius Clodius Pulcher. While Cicero's Milo Oration stands as one of the greatest defenses of the principle of self-defense in human history, Cicero himself never gave the oration at Milo's trial due to armed intimidation from Clodius' friends. Marcus Tullius Cicero, Speech in Defence of Titus Annius Milo (52 B.C.), in 3 ORATIONS OF MARCUS TULLIUS CICERO 204-05 (Charles Duke Yonge trans., rev. ed. 1899). The stacked jury subsequently convicted Milo, and the tribunal exiled him.

Cicero's prominence as a Roman legal thinker endured through the Dark Ages and the Middle Ages, and his work influenced much of western legal thought. Thus, it is no stretch to say that the context of the Milo oration influenced western thought pertaining to the "sensitive places" doctrine and the need to ensure the orderly and just operation of core government functions.[7]

Medieval English regulations addressed the same problem that Cicero encountered in the Milo trial. In 1313, the English Parliament took steps to protect legislative assemblies, enacting a statute that provided "in all parliaments, treaties, and other assemblies which should be made in the realm of England for ever, every man shall come without all force and armour, well and peaceably." 7 Edw. 2, 170 (1313). Later, the 1328 Statute of Northampton ("the Statute") provided protections to the King's ministers and officers, including the English Courts. The Statute came into being during a time of

---

[7] The Supreme Court has held that chaos that falls far short of the armed intimidation present in the Milo trial violates a criminal defendant's due process right to a fair trial. *Sheppard v. Maxwell*, 384 U.S. 333, 336 (1966). *Sheppard* plainly establishes that the need to protect core government functions by treating the places in which critical government business is conducted as "sensitive" is not simply limited to weapons and armed intimidation of participants. Instead, the free and just operation of core government functions depends on an orderly environment and the preclusion of chaos.

turmoil. *Bruen*, 142 S.Ct. at 2139. After Edward II was deposed by force and Edward III took the throne, England descended into a state of anarchy and rebellion, and knights and commoners alike ravaged the land in a general "spirit of insubordination." *Id*. The Statute sought to restore order and respect for royal authority by prohibiting Englishmen from coming

> before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring[ing] no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere, upon pain to forfeit their Armour to the King, and their Bodies to Prison at the King's pleasure.

*Id*. at 2139 (quoting 2 Edw. 3 c. 3 (1328).

While *Bruen* held that the Statute has little bearing on the modern interpretation of the Second Amendment, *id*. at 2139-2142, the Statute still builds upon the Milo trial example as one of the earliest examples of a "sensitive places" regulation and its policy goal to ensure the unfettered operation of core government functions.

*Bruen*'s caution as to the Statute is well-placed. From the earliest days of English colonies in America, the American colonial tradition of the right to bear arms broke radically from their English counterparts. It began when King James I issued the English-speaking-world's first written guarantee of a right to obtain, keep, and bear arms in the 1606 Virginia Charter. David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 229 (2018). The 1620 New England Charter carried an identical guarantee. *Id*. at 229-30. Since the geographical scope of these charters covered the entire area of the original thirteen American States, the early colonists enjoyed a greater right to bear arms than their English counterparts did. *Id*. at 230.

The American tradition not only contained a right to obtain, keep, and bear arms, but it also contained compulsory firearms possession laws. Every American school child should be familiar with the image of the Pilgrims carrying muskets to church, but the Court does not need to rely merely on historical imagery. The colonial record is replete with laws mandating that men bring their arms to churches and public meetings.[8] Other laws went further, requiring men to carry arms when they traveled and when they came to court.[9]

Restrictions on the places where firearms could be carried in the colonial and Founding Eras were few and far between. For instance, not even the classification of legislatures as "sensitive places" appears to have a firm foundation in colonial and Founding Era regulations. Maryland and Delaware[10] were the only two colonies and states that prohibited the carrying of arms into legislative assemblies. *See* 1647 Md. Laws 216 ("[N]oe one shall come into the howse of Assembly (whilst the howse is sett) with any weapon upon perill of such fine or censure as the howse shall thinke fit"); 1650 Md. Laws

---

[8] *See, e.g.,* 1 WILLIAM WALLER HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE 173 (1808) (1632 Virginia statute providing that "ALL men that are fittinge to beare armes, shall bringe their pieces to the church"); *id.* at 263 (1632 Virginia statute providing that "masters of every family shall bring with them to church on Sundays one fixed and serviceable gun with sufficient powder and shott"); *id.* (1643 Virginia statute requiring that "masters of every family shall bring with them to church on Sundays one fixed and serviceable gun with sufficient powder and shott"); 2 *id.* at 126 (similar 1676 Virginia law); 1 RECORDS OF THE COLONY OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, IN NEW ENGLAND 94 (John Russell Bartlett ed., 1856) ("noe man shall go two miles from the Towne unarmed, eyther with Gunn or Sword; and that none shall come to any public Meeting without his weapon."); 19 (part 1) THE COLONIAL RECORDS OF THE STATE OF GEORGIA 137-40 (Allen D. Candler ed., 1904) (1770 Georgia statute imposing fines on militiamen who went to church unarmed). See *also* JOHNSON ET AL., *supra* note 1, at 183-85 (Connecticut, Massachusetts Bay, Maryland, South Carolina).

[9] 1 HENING, at 127 (1809) (1623 Virginia law providing "That no man go or send abroad without a sufficient partie will armed."); *id.* at 173 (similar 1632 Virginia law); 2 *id.* at 126 (1676 Virginia law that "all people" be "required to goe armed" to church and court "for their greate security"). JOHNSON ET AL., *supra* note 1, at 183-85 (Massachusetts Bay, Plymouth, Rhode Island, Maryland).

[10] Delaware also established laws to prevent the armed intimidation of voters. DEL. CONST. art. 28 (1776) (prohibiting the carrying of arms to polling places and militia musters in the days around election day if they occurred within a mile of a polling place). This regulation, however, appears to be the only one of its type during the colonial and Founding Eras.

273 ("That none shall come into eyther of the houses whilst they are sett, with any gun or weapon upon perill of such fine or censure as the howses shall thinke fit." "Orders made & agreed vppon by the Assembly for the better ordering of Both Howses"); DEL. CONST, art. 28 (1776). The United States Congress did not prohibit the carrying of arms in both houses, and Representative Preston Brook's historical beating of anti-slavery Senator Charles Sumner did not culminate in just the near-death of Senator Sumner. Brooks then threatened Representative Calvin Chaffee who responded by buying a revolver and openly displaying it on his desk in the House to the approbation of his colleagues. David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 235 n.112 (2018).

While Nastri does not challenge prohibitions on the carrying of arms in legislative buildings and no decision issued by this Court or any other court on the merits of his case will cast doubt on the legislative prohibitions common today, Nastri submits this example to show just how different the American tradition of what were considered "sensitive places" was from its English antecedent. The laws and regulations that he discusses above were the only "sensitive places" regulations in the colonial and Founding Eras.[11] Thus, assuming *arguendo* Maryland's and Delaware's regulations could supply a well-established and representative historical analogue for any sort of regulation,[12] they would only supply that analogue for buildings where core government functions took place –

---

[11] Other laws from the colonial and Founding Era could be construed to be sensitive places laws only with great effort. For instance, Justice Breyer's dissent in *Heller* focused on a 1782 Boston fire prevention law that prohibited bringing loaded guns into buildings or possessing them within the buildings. *Heller*, 554 U.S. at 685-86 (Breyer, J., dissenting). The *Heller* majority rejected Justice Breyer's view of the law and characterized it as a fire protection law. *Id.* at 631-32.

[12] *Bruen* requires more than isolated examples. *See Bruen*, 142 S.Ct. at 2153 (requiring more than a single statute and a pair of state-court decisions to justify New York's regulation).

legislative assemblies, courts, executive buildings, and polling places. They do not supply a well-established and representative historical analogue for other places.

Reconstruction Era history also does not supply a well-established and representative historical analogue for a broader definition. As *Bruen* discussed at length, the former Confederate states entered a state of chaos similar to that addressed by the Statute of Northampton. *Bruen*, 142 S.Ct. at 2152-53; *see also McDonald v. City of Chicago, Ill.* 561 U.S. 742, 772 (2010). Both *Bruen* and *McDonald* emphasized evidence submitted in the Congressional record that showed armed bands of former Confederate soldiers perpetrating all sorts of violent outrages on the newly free blacks and Southern states' efforts to disarm blacks to leave them at the mercy of these bands. *Bruen*, 142 S.Ct. at 2152-53; *McDonald*, 561 U.S. at 772. Congress's regulatory response was to take emphatic steps to protect blacks' right to bear arms through the Freedmen's Bureau and the Fourteenth Amendment. *Bruen*, 142 S.Ct. at 2151.

The former Confederate states who chose to regulate these ravages functionally enacted "sensitive place" laws although they usually took the form of "time" restrictions rather than "sensitive places" regulations. In 1870, Louisiana prohibited people from carrying arms in public at all on election day and within half a mile of a voter registration place. 1870 La. Acts 159-60.

Maryland focused on regulating two problematic counties. In 1874, it banned the carrying of weapons on election day in Kent County. 2 PUBLIC LOCAL LAWS OF MARYLAND, ARTICLES 11-24, at 1457 (King Bros, ed. 1888). In 1886, it banned the carrying of arms within 300 yards of polling places on election day in Calvert County. 1886 Md. Laws 315.

In 1873, Texas prohibited the carrying of weapons within half a mile of a polling place during election hours. 2 A DIGEST OF THE LAWS OF TEXAS, CONTAINING THE LAWS IN FORCE, AND THE REPEALED LAWS ON WHICH RIGHTS REST, FROM 1754 TO 1874, CAREFULLY ANNOTATED 1317-18 (4th ed. 1874).

These regulations, sounding in the "sensitive places" doctrine, received their first judicial endorsement in 1874 when the Georgia Supreme Court upheld a statute prohibiting the carrying of weapons into a court. *State v. Hill*, 53 Ga. 472 (1874). Without citing Cicero's Milo example or the Statute of Northampton, the Georgia Supreme Court ensured that a similar situation would not happen in its courts in no uncertain terms:

> [T]he right to go into a court-house and peacefully and safely seek its privileges, is just as sacred as the right to carry arms, and if the temple of justice is turned into a barracks, and a visitor to it is compelled to mingle in a crowd of men loaded down with pistols and Bowie-knives, or bristling with guns and bayonets, his right of free access to the courts is just as much restricted as is the right to bear arms infringed by prohibiting the practice before courts of justice.

*Id*. at 477-78.

While it is true that other states in the Reconstruction Era attempted broad classifications of "sensitive places," those classifications escaped meaningful Second Amendment review by virtue of the Supreme Court's decision in *United States v. Cruikshank*, 92 U.S. 542 (1875), which declined to incorporate the Bill of Rights against the states. For instance, in 1869, Tennessee prohibited the carrying of pistols and various other dangerous or deadly weapons to polling places and "any fair, race course, or other public assembly of the people." PUBLIC STATUTES OF THE STATE OF TENNESSEE, SINCE THE YEAR 1858: BEING IN THE NATURE OF A SUPPLEMENT TO THE CODE 108 (2d ed. Supp. 1872).

Texas enacted several laws in the 1870s that at least partially attempted "sensitive places" regulation. In 1870, it banned the carrying of all firearms at election places, "any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly," churches, schools, and private social events. 1870 Tex. Laws 63.

Broad laws of both the Tennessee and Texas vintage, however, implicate both First and Second Amendment implications due to their broad coverage of spontaneous private gatherings at a bare minimum. Since these sorts of laws did not become subject to Second Amendment scrutiny until 2010 by way of *McDonald v. City of Chicago, Ill*. 561 U.S. 742 (2010), they provide little support for a broad "sensitive places" exception to the Second Amendment.

At best, the historical record supports a conclusion that places where the core functions of government and self-government took place were "sensitive" because the survival of the United States as a constitutional republic depended on free expression and unfettered access to justice. Thus, historical laws properly protected voting, legislative debate, and courts of law in a manner consistent with the Second Amendment. As *Bruen* noted, they, however, did not grant states broad authority to declare virtually any area a sensitive place. *Bruen*, 142 S.Ct. at 2133.

Thus, this limited "sensitive places" tradition favors Nastri's argument that state parks and forests cannot be declared "sensitive places."

**2. The modern addition of schools as a "sensitive places" exception is a narrow one that comports with the "core government functions" definition and does not justify a broader definition.**

Like the "sensitive place" restrictions discussed above, colonial and Founding Era history and tradition does not supply many examples of blanket prohibitions on carrying firearms in schools. It, however, does supply ample evidence that schools were places where a core government function occurred, supporting Nastri's contention that their modern addition to the "sensitive places" doctrine does not expand the definition of "sensitive places" but confirms the "core government function" standard.

The historical record of arms prohibitions at American schools begins in 1824 at the University of Virginia. Founded by Thomas Jefferson and others, the student body soon gave Jefferson and his fellow members of the Board of Visitors, including James Madison, much grief by rioting, carousing, firing guns in the air, and shooting at each other. David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 249-50 (2018). The Board responded by banning students, but not faculty or other employees, from keeping or carrying weapons on campus. *Id*.

In 1878, Missouri prohibited students from carrying concealed weapons at any university, college, or school. *See* 1878 Miss. Laws 176. Its prohibition, however, did not prohibit students from openly carrying weapons, and it did not prohibit faculty members or staff employees from carrying concealed weapons. *Id*.

Obviously, as discussed previously, Texas banned the carrying of arms to schools in 1870 – a ban that is similar to modern school regulations. 1870 Tex. Laws 63. The

28

historical record, however, is bare of support for widespread examples of prohibiting firearm possession in schools.

The lack of specific historical examples does not doom the classification of schools as "sensitive places" though if they can properly be said to be carrying out a core government function. The historical record provides ample historical support for the principle that schools carry out core government functions.

Connecticut's own history is instructive and exemplary. In 1650, Connecticut's General Court[13] adopted a law requiring every township to hire a schoolmaster. *See Horton v. Meskill*, 172 Conn. 615, 647 (1977). This law followed the Massachusetts colony's groundbreaking shift in the American treatment of education in the General School Law of 1642. The Massachusetts law – virtually identical to the Connecticut law – shifted the duty of education from the clergy and parents to state and municipal governments and parents. Massachusetts then reinforced its 1642 law and this shift with the famous Old Deluder Satan Law of 1647. Other American colonies quickly followed suit like Connecticut did, and, as *Horton* notes, the "same basic educational system has continued to this date, the state recognizing that providing for education is a state duty and function…." *Id*. at 647. Thus, Connecticut has codified the right to an education in Article Eighth of the Connecticut Constitution and, in that same constitutional text, has imposed a constitutional duty upon the Connecticut General Assembly to provide free and public education to all Connecticut children. *Id*. at 647.

Both Massachusetts' and Connecticut's histories demonstrate that, because education became a state duty, schoolhouses became places where core government

---

[13] The General Court was the name for the General Assembly in 1650. *Horton*, 172 Conn. at 647.

functions are carried out – either by state or municipal governments. Thus, their classification as "sensitive places" comfortably meets the definition of "sensitive places" as places where core government functions occur, and their addition to the modern doctrine of "sensitive places" does not support a definition for "sensitive places" broader than the "core government function" definition.

### 3. English gaming laws operated as disarmament laws, not as "sensitive places" laws.

In introducing the Bill of Rights to Congress, James Madison criticized the English Declaration of Rights for being too weak in several respects – first, that it was a statute that could be overridden and that it was too narrow in the protections that it offered. James Madison, *Notes for Speech in Congress Supporting Amendments*, June 8, 1789, in THE ORIGIN OF THE SECOND AMENDMENT 645 (David E. Young ed., 1991). Madison offered particularly harsh criticism for the English protection of the right to bear arms because it was limited only to Protestants. *Id*.

Prominent legal commentators echoed Madison in their post-Founding work, and they specifically criticized English gaming laws as being the inspiration for a far broader American tradition of the right to bear arms. St. George Tucker's 1803 annotated edition of William Blackstone's Commentaries[14] began the criticism:

> Whoever examines the forest and game laws in the British code, will readily perceive that the right of keeping arms is effectually taken away from the people of England. The commentator himself [Blackstone] informs us, Vol. II, p. 412, "that the prevention of popular insurrections and resistance to government by disarming the bulk of the people, is a reason oftener meant than avowed by the makers of the forest and game laws."

---

[14] *Heller* characterizes Tucker's Blackstone as "the most important early American edition of Blackstone's Commentaries…."

WILLIAM BLACKSTONE, 1 COMMENTARIES 143-44 n.41 (St. George Tucker ed., Lawbook Exchange, Ltd. 1996) (1803).

> Tucker did not rest there:

> In England, the people have been disarmed, generally, under the specious pretext of preserving the game: a never failing lure to bring over the landed aristocracy to support any measure, under that mask, though calculated for very different purposes. True it is, their bill of rights seems at first view to counteract this policy: but the right of bearing arms is confined to protestants, and the words suitable to their condition and degree, have been interpreted to authorise the prohibition of keeping a gun or other engine for the destruction of game, to any farmer, or inferior tradesman, or other person not qualified to kill game. So that not one man in five hundred can keep a gun in his house without being subject to a penalty.

Appendix to Vol. 1, Part D, p. 300.

> William Rawle – President Washington's original choice to serve as the first Attorney General – similarly denounced English gaming laws:

> In most of the countries of Europe, this right does not seem to be denied, although it is allowed more or less sparingly, according to circumstances. In England, a country which boasts so much of its freedom, the right was secured to protestant subjects only, on the revolution of 1688; and it is cautiously described to be that of bearing arms for their defence "suitable to their conditions, and as allowed by law." ... An arbitrary code for the preservation of game in that country has long disgraced them. A very small proportion of the people being permitted to kill it, though for their own subsistence, a gun or other instrument, used for that purpose by an unqualified person, may be seized or forfeited. Blackstone, in whom we regret that we cannot always trace the expanded principles of rational liberty, observes however, on this subject, that the prevention of popular insurrections and resistance to government by disarming the people, is oftener meant than avowed by makers of forest and game laws.

WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA 121-23 (1825).

> The colonial and Founding Era historical record yields one 1721 Pennsylvania statute that mimicked the English gaming laws that Tucker and Rawle harshly criticized.

That statute prohibited individuals who owned less than 50 acres of land from hunting in the "woods" or undeveloped and unowned land. 1721 Pa. Laws 254, 256. Pennsylvania, however, repealed this provision of its laws in 1760. *See* JOHN W. PURDON, A DIGEST OF THE LAWS OF PENNSYLVANIA FROM THE YEAR ONE THOUSAND SEVEN HUNDRED TO THE TWENTY-FIRST DAY OF MAY, ONE THOUSAND EIGHT HUNDRED AND SIXTY-ONE 534 (9th ed. 1862).

The absence of restrictive gaming laws in the colonial and Founding Eras and the harsh criticism that English gaming laws received for being pretextual disarmament statutes easily dispels any claim that conservation or gaming laws either fit into the "sensitive places" exception to the Second Amendment or stand as an appropriate Second Amendment exception in their own right under the *Bruen* standard.

Any such claim by Defendant Dykes regarding Conn. Agencies Regs. § 23-4-1(c) would face a tougher factual hurdle though. Connecticut criminalizes negligent hunting. *See* Conn. Gen. Stat. § 53a-217e. Negligent hunting in the fourth degree is, among other things, the "possession of a loaded hunting implement at a time of day when hunting is not allowed." Conn. Gen. Stat. § 53a-217e(e). To stack the deck in any prosecution for negligent hunting, the statute establishes that the mere possession "by any person of a loaded hunting implement while at or leaving an area where a reasonable person would believe the objective was to take wildlife shall be prima facie evidence of hunting…." Conn. Gen. Stat. § 53a-217e(i). The statute defines a "loaded hunting implement" as a

> A) a rifle or shotgun with a live round in the chamber or in a magazine which is attached to such rifle or shotgun, a muzzle-loaded firearm with the percussion cap in place, or a flintlock firearm with powder in the pan, (B) a bow and arrow with an arrow notched on the bow, (C) a drawn crossbow with a bolt in place, or (D) a high velocity air gun that is charged with a projectile in the chamber or in a magazine that is attached to such air gun….

Conn. Gen. Stat. § 53a-217e(a)(3).

Conspicuously absent from the definition of a "loaded hunting implement" is the mention of pistols or revolvers – the arms that Nastri wishes to carry for self-defense in state parks and forests. Since Connecticut does not classify pistols or revolvers as hunting implements, any claim by Defendant Dykes that Conn. Agencies Regs. § 23-4-1(c) is a conservation or gaming law would fail before it got started.

Instead, Conn. Agencies Regs. § 23-4-1(c) is a naked attempt to prohibit law-abiding citizens such as Nastri from protecting themselves by exercising their Second Amendment right to bear arms. It cannot be justified under any Second Amendment exception recognized in *Heller* and *Bruen*, and the weight of the historical evidence does not support the adoption of a new Second Amendment exception.

### 4. Common sense does not support the classification of locations where Connecticut permits the voluminous discharge of firearms as "sensitive places."

Common sense deals the most telling blow to Conn. Agencies Regs. § 23-4-1(c)'s constitutionality. Connecticut routinely allows the possession of firearms within state parks and forests for purposes other than a person's desire to carry a weapon for self-defense – i.e., hunting or target shooting. It expects that state park and forest patrons will discharge those firearms in the course of those activities – sometimes in a voluminous fashion. Even though it considers these activities – both the possession and the voluminous discharges – to be appropriate, Connecticut considers the carrying of pistols and revolvers for self-defense to be inappropriate in state parks and forests even though shots fired for self-defense may be rare and isolated. This contradiction defies common sense.

Connecticut operates four public shooting ranges in its state parks and forests that are open to the public all year. Dkt. 1, ¶ 42. On any given day depending on the traffic, patrons could collectively fire more than 10,000 rounds from pistols, rifles, and shotguns at those ranges. Patrons will come and go from the shooting ranges with weapons of all kinds, including weapons such as a 12-gauge shotgun that are far more powerful than a pistol or a revolver. Connecticut expects that they will follow the law, and almost all of them do. So will law-abiding citizens such as Nastri who desire to carry firearms for self-defense.

Similarly, Connecticut hosts extensive hunting seasons in the spring and fall.[15] It permits hunters into its state parks and forests to hunt a wide variety of game with archery equipment, muzzleloaders, and shotguns. Apart from reasonable safety restrictions pertaining to discharging hunting equipment near buildings, trails, and roadways, Connecticut gives hunters leeway to use every portion of its state parks and forests. It expects that hunters will not be as unlucky as the undersigned and will routinely engage in the discharge of their firearms and archery equipment to take game during the hunting seasons. Connecticut also expects hunters to follow the law, and almost all of them do. So will law-abiding citizens such as Nastri who desire to carry firearms for self-defense.

Connecticut's stance in permitting the possession of firearms and their voluminous discharge for purposes other than self-defense belies the notion that its state parks and forests are "sensitive places." "Sensitive places" do not permit members of the public to freely carry weapons within their confines for any purpose. For instance, per the Court's own policy, the undersigned would be required to contact the U.S. Marshal responsible

---

[15] https://portal.ct.gov/-/media/DEEP/hunting_trapping/pdf_files/SeasonSummary2023.pdf

for courthouse security or one of his deputies and arrange for a safety check of a firearm that he intends to present as an exhibit in a trial and the Marshal is then required to report to the Clerk that the weapon is safe.[16] Connecticut, however, not only invites the public to enter state parks and forests with firearms and to use them, but it also does nothing to ensure that the public complies with the prohibition on firearms possession prior to entering state parks and forests. In other words, Connecticut treats state parks and forests as anything but a "sensitive place."

Finally, the comparison between the permitted possession and discharge of firearms for purposes other than self-defense and the possession of firearms for self-defense renders Conn. Agencies Regs. § 23-4-1(c) even more nonsensical. Unlike a hunter or a recreational shooter, a person carrying a pistol or revolver does not enter a state park or forest with the intention of spending most of their time within its confines with a loaded weapon in their hands and the intention of discharging it like a hunter or recreational shooter does. Instead, a law-abiding citizen such as Nastri will keep his loaded firearm securely and safely holstered on his person – ready as a last resort in the case of a confrontation. In other words, a law-abiding citizen does not enter a state park or forest with the intention or hope of having to use his pistol or revolver in a violent confrontation. He enters the state park or forest for peaceful recreation, not to pick a showdown at the O.K. Corral. If a confrontation should happen, a law-abiding citizen will only use a firearm as a last resort. Thus, law-abiding citizens such as Nastri pose far less of a danger, disturbance, or any other evil that Connecticut seeks to prevent than hunters and recreational shooters.

---

[16] https://www.ctd.uscourts.gov/sites/default/files/Weapons%20Policy_Redacted.pdf

Thus, in addition to the strong legal arguments that Nastri presents, common sense overwhelmingly favors his success on the merits of this case. He asks the Court to apply history, the law, and common sense and find that he has shown a likelihood of success on the merits of his claims.

## III.   The Public Interest Will Be Served By The Issuance Of Emergency Or Preliminary Injunctive Relief.

The Supreme Court stated in *Bruen* that "[t]he Second Amendment is the *very product* of an interest balancing by the people and it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense." *Bruen*, 142 S.Ct. at 2131 (internal citations and quotation marks omitted) (emphasis in original). Thus, it "demands" courts' "unqualified deference." *Id*. at 2131.

As Nastri has shown above, Defendant Dykes cannot and will not meet her constitutional burden. There is no well-established and representative, historical analogue to Conn. Agencies Regs. § 23-4-1(c). Instead, there is ample evidence demonstrating that such laws were virtually non-existent in colonial, antebellum, and post-14th Amendment-ratification eras.

Conn. Agencies Regs. § 23-4-1(c) reduces the Second Amendment's protections to those of a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Id*. at 2156 (internal quotation marks and citations omitted). It permits the extensive use of firearms in state parks and forests for hunting and recreational shooting, but not for the primary purpose protected by the Second Amendment: self-defense. Thus, it contradicts the very public interest that the Second Amendment establishes.

Emergency or preliminary injunctive relief would preserve, protect, and uphold the public interest articulated in the Second Amendment. At the same time, it would not disturb any other conservation or gaming law that does not violate the Second amendment. Thus, the public interest favors injunctive relief in this case.

IV. **If the Court Is Disinclined To Grant Emergency Or Preliminary Injunctive Relief, Consolidation Of The Preliminary Injunction Hearing With The Trial On The Merits Is Appropriate because The Case's Legal Issues Predominate Over The Factual Issues.**

Fed. R. Civ. P. 65(a)(2) permits the Court to advance the trial on the merits of a permanent injunction and consolidate it with a preliminary injunction hearing. The rule's purpose is to provide "a means of ensuring prompt consideration of the full merits of the plaintiffs' claims rather than the 'likelihood' of their success." *Able v. United States*, 44 F.3d 128, 132 (2d Cir. 1995), *vacated on other grounds*, 88 F.3d 1280 (2d. Cir. 1996). The rule also furthers judicial economy by avoiding "the repetition of evidence at trial…," expediting final determinations of sensitive issues, and avoiding "piecemeal vindication of civil rights…" claims. *Norwalk Core v. Norwalk Bd. of Ed.*, 298 F.Supp. 203 (D.Conn. 1968). Additionally, in considering whether to advance a trial on the merits of a permanent injunction, this Court (Bryant, J.) has considered the potential damages that might result from a delay in resolving the merits. *See Maxum Petroleum Inc. v. Hiatt*, 2016 WL 5496283, at *2 (D.Conn. 2016).

Expediting discovery and advancing the trial on the merits of this action is more appropriate in this action than it was in *Hiatt* and similar to the advancement of the trial on the merits in *Able*. In *Hiatt*, Judge Bryant found that expediting discovery and a trial on the merits was appropriate in a lawsuit between two petroleum competitors because of

37

the "potential damages resulting from the disclosure of confidential business information and trade secrets" subject to a restrictive covenant. *Id*. at *2.

In *Able*, "six gay or lesbian members of the armed forces" filed a lawsuit against the federal government claiming that the newly enacted "Don't Ask, Don't Tell" law – then-codified at 10 U.S.C. § 654 – and its accompanying regulations violated their constitutional rights under the Fourteenth Amendment's Equal Protection Clause and the First Amendment. *Able*, 44 F.3d at 130. Based on statements made by the plaintiffs outside of the lawsuit and the lawsuit itself, the Department of Defense initiated investigations against one plaintiff and discharge proceedings against two others. *Id*. at 130. While the Second Circuit held that the district court had erred in the standard that it applied to the "success" element of the preliminary injunction standard, it left the preliminary injunction in place to preserve the plaintiffs' facial constitutional challenges. *Id*. at 132. Instead, the Second Circuit held that the legal issues predominated over a largely-completed factual record and "that the important questions raised in [the] case should not be left unanswered by the courts any longer than necessary." *Id*. at 132-33. Thus, it ordered a trial on the merits within three months of its decision. *Id*. at 133.

Like *Able*, this case involves questions of significant public importance. The Supreme Court stated in *Bruen* that "[t]he Second Amendment is the *very product* of an interest balancing by the people and it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense." *Bruen*, 142 S.Ct. at 2131 (internal citations and quotation marks omitted) (emphasis in original). Determining the Second Amendment's scope and protecting Nastri and other similarly situated individuals' rights is of the utmost public importance, particularly here where the delay of

relief only contributes to the injury that Nastri incurs as a regular Connecticut state forest and park user.

This case also bears a critical distinction from *Hiatt*. Judge Bryant did not find that a presumption of irreparable harm was applicable, but she still expedited discovery and consolidated the trial with the preliminary injunction hearing to limit potential damages. *Hiatt*, 2016 WL 5496283, at *2. In cases involving alleged deprivations of constitutional rights, however, it is well-established that a presumption of irreparable harm applies. *Am. Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015).

This is such a case. Every day that Nastri is subject to Defendant Dykes' enforcement of Conn. Agencies Regs. § 23-4-1(c) deprives him of his Second Amendment rights and constitutes an irreparable constitutional injury. He will never receive the opportunity to exercise his constitutional rights on those days. Monetary damages are unavailable and insufficient to remedy that injury. Thus, this case's speedy resolution is appropriate to ensure that Nastri is relieved from Defendant Dykes' unconstitutional deprivation of Nastri's constitutional rights.

Finally, the relevant evidence in this case will largely be the same for a preliminary injunction hearing as it will be for a trial. The relevant category of evidence is historical laws and analogues. *Bruen*, 142 S.Ct. at 2132 ("When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge…"). *Bruen* specifically places the responsibility upon the parties to compile the required historical record – *id*. at 2130 n.6 – and it cautions courts not to engage in "independent means-end scrutiny under the guise of an analogical inquiry." *Id*. at 2133 n.7. To prevail on the

merits, Defendant Dykes must "identify a well-established and representative historical analogue…" to Conn. Agencies Regs. § 23-4-1(c). *Id*. at 2133.

These principles limit the necessary and relevant record to legal questions instead of complex factual questions that would ordinarily take months of discovery to fully develop the answers to. As Nastri has demonstrated by way of this motion, his counsel has compiled that historical record in a matter of days. The parties will not uncover new evidence in this action after an ordinary period of discovery. They will likely present the same evidence as they will for a preliminary injunction hearing. Thus, expediting discovery and consolidating the trial on the merits with the preliminary injunction hearing will promote judicial efficiency and efficiently resolve this case.

All of the factors that traditionally inform a Fed. R. Civ. P. 65(a)(2) decision weigh in favor of expediting discovery and consolidating the trial on the merits of a permanent injunction with the preliminary injunction hearing here. Thus, Nastri respectfully asks the Court to order the expedition of discovery and to set a speedy trial date for this matter.

<u>**CONCLUSION**</u>

Thus, for the foregoing reasons, Nastri respectfully asks the Court to issue a temporary restraining order and a preliminary injunction prohibiting Defendant Dykes from enforcing Conn. Agencies Regs. § 23-4-1(c)'s prohibition on the carrying of pistols and revolvers in Connecticut state parks and forests.

The Plaintiff,

By: /s/ Cameron L. Atkinson /s/
Cameron L. Atkinson, Esq.
(ct31219)
ATKINSON LAW, LLC
122 Litchfield Rd., Ste. 2
P.O. Box 340
Harwinton, CT 06791
Telephone: 203.677.0782
Email: catkinson@atkinsonlawfirm.com

## **CERTIFICATION OF SERVICE**

The Defendant has not appeared in this matter yet. The undersigned has identified her appropriate legal representatives though and will provide them with copies of it immediately after he has verified that it has been electronically filed on the foregoing date. He will provide notice to the Court as soon as he has confirmed their receipt of the foregoing.

/s/ Cameron L. Atkinson /s/