**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| DAVID J. NASTRI, ESQ. | : | 3:23-CV-00056 (JBA) |
| *Plaintiff*, | : | |
| | : | |
| v. | : | |
| | : | |
| KATIE DYKES, in her official capacity, | : | |
| *Defendant* | : | MARCH 30, 2023 |

**OPPOSITION TO MOTION**
**FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................ 1

II.  FACTUAL BACKGROUND................................................................................ 4

  A.   Modern public parks emerged during the mid-1800s in response to abrupt social changes ............................................................................................................... 4

  B.   From the beginning, modern public parks banned firearms............................... 6

  C.   Connecticut's State parks and forests, and the 100-year-old firearm prohibition............ 7

III. PROCEDURAL BACKGROUND ....................................................................... 8

IV.  ARGUMENT......................................................................................................... 9

  A.   Threshold legal principles .................................................................................. 9

    1.   Plaintiff's motion is subject to a heightened standard. ............................ 9

    2.   Plaintiff's challenge is facial rather than as-applied, and he cannot show that § 23-4-1(c) is invalid in all of its applications. ..................................................... 10

    3.   *Bruen* only partially altered the legal standard applicable to Second Amendment claims. ..................................................................................................... 11

  B.   Plaintiff has not shown a "clear" and "substantial" likelihood of succeeding on his claim that § 23-4-1(c) is facially invalid. ................................................................. 11

    1.   Plaintiff has not shown that the Second Amendment covers his proposed conduct of carrying firearms onto State parks and forests. ........................................... 12

    2.   Section 23-4-1(c) is consistent with the Nation's history of firearm regulation..... 36

  C.   Plaintiff has failed to satisfy the remaining preliminary injunction factors. .................. 50

    1.   Plaintiff has not demonstrated that he will be irreparably harmed by being unable to go to two Connecticut state parks without a firearm. .................................... 50

    2.   The equities and public interest weigh heavily against enjoining § 23-4-1(c), particularly during the busiest season for use of State parks and forests......................... 50

V.   CONCLUSION ................................................................................................... 54

I.   **INTRODUCTION**

In 1914, Connecticut State park and forest system was established to provide people and their families with places of peace, respite, and quiet enjoyment, where they could come together to relax and enjoy nature.  To ensure that our parks and forests lived up to these ideals, the State has carefully regulated visitors' conduct and how they use those lands.  Among those regulations, the State has—for more than 100 years—generally prohibited visitors from carrying firearms.

The injunctive relief Plaintiff seeks in this case would upend that history and alter the nature of our State park and forest system.  Plaintiff, who apparently could easily avoid the prohibition if he wanted to—he admits that he visits select parks and forests occasionally and purely for recreation—claims that § 23-4-1(c) of the Regulations of Connecticut State Agencies violates the Second Amendment on its face.[1]  He bases this claim on *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) ("*Bruen*").  But *Bruen* does not support the sweeping interpretation Plaintiff gives it.  *Bruen* struck down a law that effectively amounted to a total, geographical ban on carrying arms in public (absent a showing of particularized need)—quite the opposite of § 23-4-1(c), which is limited to discrete, recreational locations people only visit when they choose to.  *Bruen* does not hold that such a restriction even implicates the Second Amendment, much less violates it.  Certainly *Bruen* does not justify the extraordinarily sweeping preliminary relief Plaintiff seeks.

Moreover, Plaintiff seeks this relief without providing this Court with any historical foundation to substantiate his claims.  The State park and forest system is large and diverse, with 142 locations reaching all corners of the State and consisting of historic locations, hiking trails, a

---

[1] The Commissioner has simultaneously moved to dismiss this lawsuit for lack of standing because Plaintiff has failed to allege that he has standing.

Dinosaur park, beaches, and countless others.  Plaintiff submits virtually no evidence (other than a verified Complaint) to justify immediately permitting guns in all those locations.  As noted below, he has failed to even adequately brief certain key issues.  The Commissioner, by contrast, has presented declarations from five fact witnesses, three experts, and hundreds of pages of historical material.  Although the Commissioner continues to research and compile historical sources, the substantial record she has already produced demonstrates that the firearm prohibition is consistent with history and tradition, protects the safety of those who visit our parks and forests, and preserves our parks and forests for what they have been for 100 years:  places of peace, inclusion, and quiet enjoyment for all people.  That is more than enough to defeat a facial challenge, particularly at the preliminary injunction stage.

Plaintiff's motion cannot prevail.  He cannot show a clear and substantial likelihood that he will succeed on the merits of his claim, for several reasons.  First, Plaintiff brings a facial rather than as-applied challenge, and cannot establish that § 23-41(c) is invalid in all of its applications; indeed, he has made no real attempt to do so.

Second, Plaintiff  has not satisfied his threshold burden under *Bruen* of showing that the plain text of the Second Amendment covers his proposed course of conduct, i.e., carrying guns into State parks and forests.  In fact, he has not even adequately briefed the question.  The Court should deny his motion on that basis alone.  In any event, the text and history of the Second Amendment demonstrate that it does not confer a right to carry firearms onto lands that the State owns and is operating in a proprietary capacity for the public enjoyment.  The Supreme Court has long recognized that the State has the right, just as any private landowner, to prohibit the conduct that would undermine either the public use for which the lands were dedicated, or the State's proprietary/financial interests in the land.  Here, permitting a general right to carry would

undermine both, as amply demonstrated by the declarations of the Commissioner's five fact witnesses and historical sources.  Moreover, State parks and forests qualify as "sensitive places" where firearms may be altogether prohibited, as numerous courts have recognized.

Third, even if Plaintiff's conduct were covered by the Second Amendment, which it is not, Plaintiff's claim would still fail because § 23-4-1(c) is consistent with the Nation's historical tradition of firearm regulation.  The Commissioner has presented historical examples of dozens of laws across 24 States and the federal government dating from before and after the Fourteenth Amendment was adopted in 1868.  Those laws are virtually (if not literally) identical to § 23-4-1(c): they prohibit carrying firearms in public parks, and do so for the same reasons.  Although that evidence alone satisfies *Bruen*, it is especially compelling under the circumstances of this case because "modern" public parks—i.e., specifically designated places of peace and refuge—did not exist until the "park movement" started in the mid-1800s.  Thus, § 23-4-1(c) and its historical analogues responded to an "unprecedented societal concern[]," which entitles them to even greater weight under *Bruen*.  142 S. Ct. at 2111.  And as best the Commissioner can tell, no one questioned the constitutionality of those laws for more than 150 years.  Moreover, even if that evidence were somehow not enough, § 23-4-1(c) is relevantly similar to other historical regulations dating back to the Founding that prohibit firearms in similar situations, such as places where people gather for recreation, situations where firearms would cause a terror, educational institutions, and others.  All of this evidence, which is further bolstered by the opinions of three expert witnesses, demonstrates that Plaintiff cannot establish a clear or substantial likelihood of succeeding on his claim under *Bruen*.

Lastly, Plaintiff's motion fails on the other preliminary injunction elements.  He has not shown irreparable harm, or that the balance of the equities weighs in favor of an injunction.  In

fact, the equities weigh decisively against him.  Suddenly removing the firearm prohibition could upend the ecosystem that had developed around our parks and forests in the century since the prohibition was imposed.  Two school superintendents whose districts utilize them for educational purposes testify they would stop (or strongly consider stopping) using them.  One state official testifies about the impact that a general right to carry could have on the State's marketing and tourism efforts.  Two more officials testify about how permitting firearms would impact the nature and use of these locations, and place a substantial burden on divisions that are already notoriously short-staffed to figure out how to make the necessary regulatory changes to accommodate this new right to carry.  And all of this would be done on an immediate, preliminary basis, without any opportunity to plan ahead, and could then be reversed once again and returned to the century-old status quo if Plaintiff cannot prevail at a full trial on the merits.

Rather than risk such outcomes, the Court should deny Plaintiff's motion and permit him a full opportunity to prove his case at a full trial on the merits.

## II.   FACTUAL BACKGROUND

### A.  Modern public parks emerged during the mid-1800s in response to abrupt social changes

During the 1700's and through the time of the Founding, public parks as we know them today did not exist.  *Cornell Dec.* at ¶ 30; *Glaser Dec.* at ¶¶ 12; *Young Dec.* at ¶ 10.  In fact, colonists in that era thought of nature in mostly negative terms—as "deserted," "savage," "desolate," and "barren"—and few searched for "what today we would call 'the wilderness experience.'"  W. Cronon, *The Trouble with Wilderness; or, Getting Back to the Wrong Nature* (1996) at 8.[2]  The few publicly owned "parks" that did exist—including the Boston Common,

---

[2]The Commissioner has attached secondary sources for the Court's convenience.

established in the 1630s—were merely used for grazing and mustering the militia. *Cornell Dec.* ¶¶ 30-31; N. Shoked, *Property Law's Search for a Public*, 97 Wash. U.L. Rev. 1517, 1557-58 (2020).

"But by the end of the nineteenth century, all this had changed." Cronon at 9. The urbanization of America in the 1800s caused people to seek refuge from cramped inner-city life. *Young Dec.* ¶ 21; *Glaser Dec.* ¶ 19. Cities were increasingly viewed as socially degraded, noisy, polluted, and crime ridden places, in contrast to the natural and virtuous rural America. *Young Dec.* ¶ 10, 21-22; *Cornell Dec.* ¶ 33.

In response to those newly developing societal concerns, public parks as we know them today began to emerge in the mid-1800s. *Cornell Dec.* ¶ 39; *Young Dec.* ¶ 10; *Glaser Dec.* ¶ 25. Created by Frederick Law Olmsted in 1858, New York City's Central Park was among the first and most influential public parks in the nation. *Young Dec.* ¶ 19; *Glaser Dec* ¶ 26. Olmsted's vision was revolutionary. He thought of parks with romanticism, as refuges from urban life with picturesque, natural landscapes that would improve peoples' mental health and quality of life and bring people together across socioeconomic backgrounds. *Young Dec.* ¶¶ 10-11, 22; *Glaser Dec.* ¶¶ 13-14. Most importantly, the environment had to be serene. *Young Dec.* ¶ 25. Olmsted viewed public parks as landscapes or drawings that would inspire no negative thoughts. *Id.* For Olmsted and others like him, parks were machines for reforming society. *Id.* ¶ 26.

Olmsted's Central Park symbolized the start of the "park movement." *Young Dec.* ¶¶ 10, 19; *Cornell Dec.* ¶ 33; *Glaser Dec.* ¶ 29. Public parks began emerging in cities and localities across America throughout the late-1800s and early-1900s. *Glaser Dec.* ¶¶ 25-31; *Young Dec.* ¶ 19. At the time, many parks were municipally owned. *Glaser Dec.* ¶ 36. But as their prevalence

increased, by the early-1900s states had begun acquiring lands and setting them to use consistent with Olmsted's vision. *Cornell Dec.* ¶ 36; *Tyler Dec.* ¶ 25 and Exhibit 111 at p. 3.

**B.   From the beginning, modern public parks banned firearms.**

As public parks emerged, "[f]rom the outset the regulations governing these spaces prohibited firearms." *Cornell Dec.* ¶ 40; *see also id.* ¶¶ 34-35.  Firearms were wholly inconsistent with the notion of parks as pristine places of inclusion and refuge from urban life. *Young Dec.* ¶ 10.  Olmsted's Central Park thus stated clearly and conspicuously in the first version of its 1858 rules:  "All persons are forbidden . . . [t]o carry fire-arms."  Exhibit 1.  Those rules were imposed to "prompt proper behavior and decorum" in the park. *Young Dec.* ¶ 26.  And they were "posted in conspicuous locations that would be easily seen by all visitors."  C. Brenwall, *The Central Park: Original Designs for New York's Greatest Treasure* 26 (2019).

Consistent with Central Park, public parks all over the country began prohibiting firearms. *Cornell Dec.* ¶ 40.  Although additional research may well disclose more regulations, dozens of laws prohibited firearms in at least 14 States by 1900, and in 24 States by 1921. *See generally* Exhibits 1-68.[3]  And once the park movement took hold on the national level, Yellowstone National Park banned firearms in 1897.  Exhibit 69 at 1; *Cornell Dec.* ¶ 37; *see also Glaser Dec.* ¶ 27 (explaining influence of park movement on national level).  Once a national rule-making commission was established, firearms were banned from all national parks in 1936. *See* Exhibit 69 at 72 (*citing* 1 Fed. Reg. 671, 673-74 (June 27, 1936)).  That national ban was in place for more

---

[3]For the Court's convenience, the Commissioner has included a table listing the historical firearm regulations by exhibit number, including the relevant language from each regulation.

than 70 years.[4]  As best Defendant can tell, for 150 years since these parks first began banning firearms in 1858, no one challenged those regulations as unconstitutional.

### C.  Connecticut's State parks and forests, and the 100-year-old firearm prohibition.

The park movement did not take hold on the State level in Connecticut until the early 1900s. In 1913, the Connecticut General Assembly formed the first State Park Commission ("Commission") to begin acquiring properties to be set aside for public enjoyment.  *Tyler Dec.* ¶ 26.  Today, the State owns 110 parks and 32 forests in all corners of the State.  *Tyler Dec.* ¶ 35.

From the beginning, the Park Commission embraced Olmsted's vision of parks; indeed, Olmsted was directly connected to the early municipal parks in Connecticut.  *See Glaser Dec.* ¶ 28.  Like Olmsted, Albert Turner, field secretary of the Park Commission, "emphasize[d] a state park's purpose as one of public mental health, an essential refuge from the stresses of modern urban life."  *Glaser Dec.* ¶ 49.  *Tyler Dec.* ¶¶ 24-25.  In the Park Commission's first report in 1914, Turner wrote, regarding the purpose of developing the Connecticut system:  "At the end of a week or a month or a year, or in some cases possibly a lifetime, the city sights and sounds and pavements become unbearable, and a rest and contrast become as necessary as sleep at night."  Exhibit 57 at 22.

That continues today.  The Park Commission became what is now DEEP, and State parks and forests continue to serve as places of respite and quiet enjoyment, where all people, particularly children and families, can escape modern technology and reconnect with nature.  *Tyler Dec.* ¶¶ 32,

---

[4]The federal government attempted to remove the prohibition in 2008, in favor of a rule permitting visitors to possess firearms in national parks if they were permitted to do so under State law.  A federal court enjoined that proposed change, finding that it violated the National Environmental Protection Act.  *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 6 (D.D.C. 2009).  The change was eventually implemented successfully, and took effect in 2010.  *GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*, 788 F.3d 1318, 1326 n.6 (11th Cir. 2015); *see also* 54 U.S.C. § 104906.

52, 58, 89(b).  Schools utilize them for curricula and school-sponsored events.  *Id.* ¶¶ 44, 46, 58(f); *see generally Highsmith Dec.; Benigni Dec.*  And the law enforcement arm—the Environmental Conservation Police ("EnCon")—specifically avoids confrontations with visitors so as to foster the image of "park ranger" rather than police.  *Lewis Dec.* ¶ 16(c).

Following the many other states, the Park Commission quickly banned firearms.  In 1914, Turner urged the Park Commission to adopt rules and regulations prohibiting visitors from engaging in conduct that "interfere[s] with the rights or enjoyment of others," which "would involve the prohibition of firearms."  Exhibit 57 at 29; *Glaser Dec.* ¶ 41.  The Park Commission formally banned firearms in State parks as early as 1918, in a notice posted in all locations, which stated:  "[T]he use of firearms or having them in your possession is forbidden . . . ."  *Glaser Dec.* ¶ 41 and Exhibit 63.

That prohibition has remained in place continuously ever since.  It was republished in a similar 1924 notice and in regulations promulgated in the 1940s.  *Tyler Dec.* ¶¶ 83-84, 88; Exhibits 68, 104 and 105.  The prohibition is currently contained in § 23-4-1(c), which provides in relevant part:  "Hunting or carrying of firearms, archery equipment or other weapons, including but not limited to air rifles and slingshots, is not permitted in any state park or forest except as authorized by [DEEP]."

## III.   PROCEDURAL BACKGROUND

On January 14, 2023, Plaintiff brought this lawsuit under 42 U.S.C. § 1983, claiming that § 23-4-1(c) violates the Second Amendment as incorporated to the States by the Fourteenth Amendment.  Plaintiff does not allege that he has been detained, arrested, prosecuted or evicted from a State park or forest for violating the firearm prohibition.  Instead, he alleges that he has a valid carry permit and wishes to carry his handgun into "Connecticut State parks and forests" when

he uses them for recreational purposes.  *Am. Compl.*, ¶¶ 37-38.  Plaintiff states that he "uses Connecticut state parks and forests on a regular basis throughout the year—most often during the summer," and that he "enjoys hiking with his girlfriend" at Sleeping Giant State Park and Naugatuck State Forest "when their schedules permit."  *Id*. at ¶ 33.

Plaintiff challenges § 23-4-1(c) as being facially invalid.  He does not seek relief specific to himself or tailored to the two parks he mentions, but instead seeks declaratory relief and a State-wide permanent injunction "barring [Defendant] from enforcing . . . § 23-4-1(c)" in its entirety.  *Id*., Prayer for Relief.  Plaintiff repeats that request for facial, state-wide relief in his amended motion for preliminary injunction, which is presently before the Court.[5]  *Mtn*. at 40.

## IV.   ARGUMENT

### A.   Threshold legal principles

#### 1.   Plaintiff's motion is subject to a heightened standard.

A Plaintiff seeking to preliminary enjoin a longstanding state regulation carries a heavy burden.  He must "demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction.  [He] also must show that the balance of equities tips in his . . . favor."  *Libertarian Party v. Lamont*, 977 F.3d 173, 176-77 (2d Cir. 2020) (citations omitted; internal quotation marks omitted).  And because Plaintiff's motion seeks to upset rather than preserve the status quo by enjoining a longstanding firearm prohibition, "the standard is particularly exacting: a district court may enter a mandatory preliminary injunction against the government only if it determines that, in addition

---

[5]Plaintiff simultaneously moved for a temporary restraining order, which this Court denied without prejudice.  ECF No. 15.

to demonstrating irreparable harm, the moving party has shown a 'clear' or 'substantial' likelihood of success on the merits."[6]  *Id.*

### 2.  Plaintiff's challenge is facial rather than as-applied, and he cannot show that § 23-4-1(c) is invalid in all of its applications.

In determining whether Plaintiff has shown a substantial likelihood of success, it is important to keep in mind that Plaintiff has brought a facial challenge to § 23-4-1(c).  As noted above, he makes that clear in his amended complaint and motion for preliminary injunction that he is not seeking relief as applied to him.  But regardless of how Plaintiff frames his requested relief, hi challenge ***must*** be facial because he has brought it on a pre-enforcement basis.  *New York State Rifle & Pistol Ass'n. v. Cuomo*, 804 F.3d 242, 265 (2d Cir. 2015); *Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third & Fourth Depts.*, 852 F.3d 178, 184 (2d Cir. 2017).  Facial challenges are "the most difficult challenges to mount successfully[.]"  *United States v. Salerno*, 481 U.S. 739, 745 (1987).  "[T]he challenger must establish that no set of circumstances exists under which the [law] would be valid.  The fact that the [law] might operate unconstitutionally under some conceivable set of circumstances is insufficient . . . ."  *Id.*; *United States v. Decastro*, 682 F.3d 160, 168 (2d Cir. 2012), *cert. denied*, 568 U.S. 1902 (2013).

Preliminarily, Plaintiff focuses his facial challenge only on § 23-4-1(c)'s general ban on the "carrying of firearms" in State parks and forests.  He does not contest its application to "hunting," "archery equipment," or "other weapons," which necessarily would include weapons qualifying as "dangerous and unusual" that are outside the scope of the Second Amendment.

---

[6]Plaintiff cites the wrong standard.  He argues that he need only demonstrate a "likelihood of success on the merits" or "sufficiently serious questions" as to the merits.  *Mtn.* at 10, 11, 14-15.  But that "less rigorous" standard applies only when the movant seeks injunctive relief that would merely uphold the status quo, i.e., a "prohibitory" injunction, and is inapplicable here. *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30, 35 n.4 (2d Cir. 2010).

*Bruen*, 142 S. Ct. at 2128.  By not challenging those applications, Plaintiff effectively concedes that the regulation has at least some valid applications.  That alone is fatal to his facial claim.  Moreover, there are additional reasons, discussed below, why Plaintiff's facial claim fails.

### 3. *Bruen* only partially altered the legal standard applicable to Second Amendment claims.

In *Bruen*, the Supreme Court struck down a law that required law abiding citizens to show an individualized need to carry a handgun for self-defense in New York.  142 S. Ct. at 2150.  In so doing, the Court began by addressing the two-step framework adopted by the circuit courts for analyzing Second Amendment claims.  Under step one of that framework, the circuits determined whether the challenged law regulates activity falling outside the scope of the right to bear arms as originally understood based on historical evidence.  *Id.* at 2126.  If the regulated conduct fell outside the scope of the right, "the analysis can stop there; the regulated activity is categorically unprotected."  *Id.*  If the regulated conduct were protected, the courts proceed to the second step and applied some level of means-end scrutiny.  *Id.*

*Bruen* endorsed step-one of the predominant framework as "broadly consistent" with *District of Columbia v. Heller*, 554 U.S. 570 (2008), but rejected the second step as "one step too many."  142 S. Ct. at 2127.  Instead, the Court ruled that, when the regulated conduct is covered by the plain text of the Second Amendment, "the government must affirmatively prove that its firearm regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."  *Id.*

### B. Plaintiff has not shown a "clear" and "substantial" likelihood of succeeding on his claim that § 23-4-1(c) is facially invalid.

Plaintiff's facial challenge fails under both prongs of *Bruen*.  He has not shown that the Second Amendment covers the regulated conduct, which in this case is carrying a handgun into

11

State parks and forests without the State's permission.  And even if he had met that burden, § 23-4-1(c) is consistent with the Nation's historical tradition of firearm regulation.

> **1.  Plaintiff has not shown that the Second Amendment covers his proposed conduct of carrying firearms onto State parks and forests.**

The Second Amendment provides:  "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." Under *Bruen*, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," requiring the State to then justify its regulation by showing it is consistent with historical tradition.  Because "the Second Amendment . . . codified a ***pre-existing*** right," the Court's analysis of whether the text covers particular conduct must be informed "by the historical background of the Second Amendment . . ."  *Heller*, 554 U.S. at 592 (emphasis added); *see NRA v. Bondi*, No. 21-12314, 29 Fla. L. Weekly Fed. C 2285, 2023 U.S. App. LEXIS 5672, at *6 (11th Cir. Mar. 9, 2023).

*Bruen* therefore places the burden ***on Plaintiff*** to establish that the Second Amendment's plain text covers his proposed course of conduct.[7] *Def. Distributed v. Bonta*, 2022 WL 15524977, 2022 U.S. Dist. LEXIS 195839, at *8 (C.D. Cal. Oct. 21, 2022) (*Bruen* was "crystal clear" initial burden is on plaintiffs, and collecting cases); *see also Reese v. BATFE*, 2022 WL 17859138, 2022 U.S. Dist. LEXIS 230140, at *13 n.66 (W.D. La. Dec. 21, 2022); *Ocean State Tactical, LLC v. Rhode Island*, 2022 WL 17721175, 2022 U.S. Dist. LEXIS 227097, at *4 (D.R.I. Dec. 14, 2022);

---

[7] Placing the initial burden on Plaintiff is consistent with how other constitutional rights are analyzed.  *E.g. Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022) (First Amendment rights); *Burg v. Gosselin*, 591 F.3d 95, 97 (2d Cir. 2010) (Fourth Amendment); *Kansas v. Hendricks*, 521 U.S. 346, 361 (1997) (Ex Post Facto Clause).

*Baird v. Bonta*, 2022 WL 17542432, 2022 U.S. Dist. LEXIS 221461, at *14 (E.D. Cal. Dec. 7, 2022).

Plaintiff has not met that burden.   As a threshold matter, however, Plaintiff mischaracterizes what his proposed course of conduct is for purposes of the textual analysis under prong one of *Bruen*.  He identifies the conduct as "the bearing of a pistol or revolver for personal protection in the event of a confrontation," and states that *Bruen* and *Heller* have already held that the Second Amendment protects that conduct.  *Mtn.* at 15-16.  But Plaintiff frames the conduct too generally.  *See United States v. Reyna*, 2022 WL 17714376, 2022 U.S. Dist. LEXIS 225896, at *9 (N.D. Ind. Dec. 15, 2022) ("for step one to have any meaning, the regulated conduct must be defined specifically").   The proposed conduct cannot be carrying a handgun for self-defense because § 23-4-1(c) does not prohibit that conduct.[8]   Indeed, Connecticut permits public carry "within the state," Gen. Stat. § 29-28(b), and *Bruen* acknowledged (including once by name) that Connecticut's statutes adequately accommodated the general right to carry in public for self-defense.  142 S. Ct. at 2123 n.1; *id.* at 2138 n.9; *id.* at 2161 (Kavanaugh, J., concurring).

Instead, § 23-4-1(c) merely prohibits firearms in State parks and forests—discrete destinations that people do not visit unless they choose to.  Plaintiff himself admits he goes only on occasion—when he and his girlfriend's "schedules permit"— purely for purposes of recreation. *Am. Compl.*, ¶¶ 19, 33, 34.  "When a state bans guns merely in particular places . . . a person can preserve an undiminished right of self-defense by not entering those places."  *United States v. Class*, 930 F.3d 460, 465 (D.C. Cir. 2019) (*quoting Moore v. Madigan*, 702 F.3d at 933, 940 (7th Cir. 2012) (Posner, J.)).   Section 23-4-1(c) thus does not implicate the general right to carry

---

[8] *E.g. Oakland Tactical Supply, LLC v. Howell Twp.*, 2023 WL 2074298, 2023 U.S. Dist. LEXIS 27686, at *8-9 (E.D. Mich. Feb. 17, 2023) (rejecting framing of relevant conduct as too general where law did not cover that conduct).

established in *Bruen*. Plaintiff is free to keep and bear arms for self-defense, at home and in public, without running afoul of § 23-4-1(c). If he does not want to be without his handgun in case of confrontation, he does not need to attend a State park or forest, and can "simply choos[e] to recreate elsewhere." *GeorgiaCarry.Org, Inc. v. United States Army Corps of Eng'rs*, 212 F. Supp. 3d 1348, 1364 (N.D. Ga. 2016) ("*GeorgiaCarry.Org III*").

Accordingly, Plaintiff cannot rest his textual argument on the simple assertion that he wants to carry his gun in public for self-defense, as the *Bruen* plaintiffs could. He must instead demonstrate that the Second Amendment covers the conduct that § 23-4-1(c) actually prohibits: carrying firearms onto State parks and forests—State-owned property that the State operates for a dedicated public purpose and in a proprietary capacity. *See United States v. Tallion*, 2022 WL 17619254, 2022 U.S. Dist. LEXIS 225175, at *13 (D. Md. Dec. 12, 2022) ("the question is whether the Second Amendment includes a right to carry weapons onto government complexes like the NIH campus"); *GeorgiaCarry.Org III*, 212 F. Supp. 3d at 1360 (question for textual analysis was "whether, in 1791, there was a widely accepted right to carry firearms on Defendant Army Corps' property").

And *Bruen* is not controlling on that question. Although the Court held in *Bruen* that "the Second Amendment guarantees a ***general*** right to public carry," it never suggested that that right extends to every location accessible to the public. 142 S. Ct. 2135 (emphasis added). Indeed, because *Bruen* involved a jurisdiction-wide restriction, it did not need to go that far: "[W]e do not undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment." 142 S. Ct. at 2134 (*quoting Heller*, 554 U.S. at 626); *see also id.* at 2128 (noting that "the right secured by the Second Amendment is not unlimited"). And elsewhere *Bruen* expressly indicated that at least some locations were outside of its scope. *Id.* at 2133 (noting that it "had no occasion to

comprehensively define" the kinds of "sensitive places" where firearms could be "altogether prohibited"). Thus, "*Bruen* does not alter the conclusion that the location the regulation affects remains relevant to assessing whether the Second Amendment covers the conduct." *Tallion*, 2022 U.S. Dist. LEXIS 225175, at *18-19; *see also GeorgiaCarry.Org III*, 212 F. Supp. 3d at 1360 n.8. Indeed, pre-*Bruen* cases had held that the Second Amendment confers a general right to carry in public, yet concluded that locational restrictions limited to certain government property open to the public fell outside the scope of that right. *Class*, 930 F.3d at 465 (government-owned parking lot open to public); *GeorgiaCarry.Org III*, 212 F. Supp. 3d at 1364-65 (assuming for purposes of argument that right to carry extended beyond the home).[9]

Accordingly, Plaintiff cannot simply rely on *Bruen*. He must affirmatively establish that the Second Amendment confers a right to carry guns onto State parks and forests. He has not met that burden. First, because Plaintiff provides no substantive legal or historical analysis in support of his argument, the Court should deny his motion outright. Second, even if the Court were to consider the argument, the Second Amendment does not confer a right to carry arms onto State parks and forests because (1) the State has the right to exclude arms from lands it owns and operates for a dedicated public purpose, particularly when the State is acting in a proprietary capacity; (2) the State's parks and forests are sensitive places under established precedent; and (3) the text of the Second Amendment is not implicated by locational restrictions cabined to places of recreation.

---

[9]Notably, because *Class* and *GeorgiaCarry.Org III* were decided on the basis of "step one" (a textual and historical analysis of the Second Amendment's scope), which *Bruen* endorsed as "broadly consistent" with *Heller*, 142 S. Ct. at 2127, those cases and others like them remain good law. *E.g. United States v. Burgess*, 2023 WL 179886, 2023 U.S. App. LEXIS 873, at *14 (6th Cir. Jan. 13, 2023); *United States v. Nevens*, 2022 WL 17492196, 2022 U.S. Dist. LEXIS 222892, at *6 n.4 (C.D. Cal. Aug. 15, 2022); *United States v. Posey*, 2023 WL 1869095, 2023 U.S. Dist. LEXIS 22005, at *19 (N.D. Ind. Feb. 9, 2023); *United States v. Minter*, 2022 WL 10662252, 2022 U.S. Dist. LEXIS 190390, at *8 (M.D. Pa. Oct. 18, 2022); *United States v. Hunter*, 2022 WL 17640254, 2022 U.S. Dist. LEXIS 224359, at *5 (N.D. Ala. Dec. 13, 2022).

> a. **Plaintiff has failed to support his argument with any substantive legal or historical analysis, and the Court should deny his motion outright.**

In determining whether the plain text of the Second Amendment covers a proposed course of conduct, courts have generally engaged in a "methodological" "canvass[ing] [of] the historical record"—from the 1600s through and after the Founding—to understand the meaning of the text and the limits of the right to bear arms. *E.g. Bruen*, 142 S. Ct. at 2127-28; *Wrenn v. District of Columbia*, 864 F.3d 650, 656-62 (D.C. Cir. 2017); *Moore*, 702 F.3d at 935 ("The parties and the amici curiae have treated us to hundreds of pages of argument, in nine briefs.  The main focus of these submissions is history.").  Plaintiff, by contrast, devotes exactly two sentences to this issue.  He simply cites *Heller* and *Bruen*, which, as noted above, were narrow holdings addressing jurisdiction-wide bans, and do not hold that the text of the Second Amendment covers the proposed conduct of carrying arms onto State premises operated for a dedicated public purpose.  *Mtn.*, 15-16.  As demonstrated below, that is a complex, nuanced question meriting thoughtful consideration.  Two conclusory sentences are wholly insufficient and fail to provide this court with a historical record for consideration of key issues in this case.  *See Bruen*, 142 S. Ct. at 2130 n.6 (noting that "[c]ourts are . . . entitled to decide a case based on the historical record compiled by the parties").

The Court is under no obligation to consider inadequately briefed arguments.  *Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001).  It should be especially reluctant to do so here, where the case implicates far-reaching constitutional questions regarding the scope of the right to bear arms.  *See Gonzalez v. City of Schenectady*, 728 F.3d 149, 160 (2d Cir. 2013) (noting that Supreme Court has cautioned courts not to consider constitutional issues where briefing is inadequate).  For example, in *GeorgiaCarry.Org II*, 788 F.3d 1318, the Eleventh Circuit affirmed the district court's

16

preliminary ruling that the regulated conduct—bringing guns onto government property—fell outside the scope of the Second Amendment based on the inadequate record and argumentation presented to it. 788 F.3d at 1327. The court noted that the parties failed to "provide[] any historical evidence to inform our analysis" regarding the scope of the Second Amendment, and refused to perform that historical analysis sua sponte because it raised "difficult question that deserve the full benefit of our adversarial system." *Id.*; *accord Calderone v. City of Chicago*, 979 F.3d 1156, 1163 (7th Cir. 2020) (refusing to consider whether Second amendment protects right to discharge firearm because "[t]he parties have not adequately briefed the contours of the right," beyond plaintiff's general assertion that he has a "right to carry and possess a firearm for self-defense").

Under Plaintiff's view, plaintiffs would merely have to assert a desire to carry for self-defense in any location, and the burden would shift automatically to the State to justify its firearm regulation without any showing that the specific conduct is actually protected by the Second Amendment. Neither *Bruen* nor *Heller* endorse that approach. Moreover, Plaintiff seeks to invoke that unlimited right to carry to strike down a century-old firearm prohibition in 142 parks and forests across the State, which would have a dramatic impact on their use and operation, as set forth in greater detail below. The Court should not wade into these unsettled constitutional questions with this much at stake—particularly at the preliminary injunction stage—where Plaintiff has not adequately briefed the issue. The Court should deny Plaintiff's motion outright. It was his burden to establish that the Second Amendment covered his proposed course of conduct. His facile assertions are insufficient.[10] *See Bruen*, 142 S. Ct. at 2130 n.6 ("[c]ourts are thus entitled to decide a case based on the historical record compiled by the parties").

---

[10] Nor would it be sufficient for Plaintiff to raise new arguments in his reply brief, depriving the Commissioner of an adequate opportunity to develop a factual record in response. *See, e.g., Cadoret v. Sikorsky Aircraft Corp.*, 323 F. Supp. 3d 319, 326 n.7 (D. Conn. 2018) (Arterton, J.).

      **b.   The Second Amendment does not confer a right to carry arms onto premises the State owns and operates for a dedicated public purpose, particularly when the State is acting in a proprietary capacity.**

The Second Amendment right to bear arms does not nullify the rights of property owners to exercise dominion and control over their property.  In *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012) ("*GeorgiaCarry.Org I*"), *cert. denied*, 568 U.S. 1088 (2013), the Eleventh Circuit held that the Second Amendment did not confer a right to carry arms onto private property (places of worship) without the owner's permission.  The court surveyed the American and English history demonstrating the right of property owners to exercise exclusive dominion and control over their land.  *Id.* at 1262.  In light of that history, the court concluded that "[a]n individual's right to bear arms as enshrined in the Second Amendment, whatever its full scope, certainly must be limited by the equally fundamental right of a private property owner to exercise exclusive dominion and control over its land."  *Id.*

That rationale applies here, for several reasons.  ***First***, although most of the land comprising the State park and forest system is State-owned, some is privately-owned.  *Tyler Dec.* ¶ 101.  For instance, the Windsor Locks Canal State Park Trail is owned by the Windsor Locks Canal Co., which has leased the land to the State for public use.  *Id.*  That lease agreement expressly provides that the State "may from time to time establish rules governing the public use of the [land]"—an authorization that plainly would encompass a firearm prohibition.  Exhibit 130 at 4 ¶ 18.  The authorization to prohibit firearms on this property came not from the State but a private entity.  Plaintiff plainly does not have a right to carry arms onto private lands against the wishes of the landowner. *GeorgiaCarry.Org I*, 687 F.3d at 1262.  Because Plaintiff's challenge is facial, he cannot show that § 23-4-1(c) is unconstitutional in all of its applications.  It is constitutional at least as to these privately-owned lands.

**_Second_**, § 23-4-1(c) is constitutional as to the State-owned lands because the State has the same right as private property owners to regulate conduct on public lands dedicated for a public purpose.  "[T]he government, 'no less than a private owner of property,' retains the 'power to preserve the property under its control for the use to which it is lawfully dedicated.'" *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018) (*quoting Adderley v. Florida*, 385 U.S. 39, 47-48 (1966)) (emphasis added).  Thus, "the government may bar from its facilities certain speech that would disrupt the legitimate governmental purpose for which the property has been dedicated." *Consol. Edison Co. v. Pub. Serv. Comm'n*, 447 U.S. 530, 538 (1980); *see Lehman v. Shaker Heights*, 418 U.S. 298, 302 (1980) (public transportation system that rented space for commercial advertising did not have to accept political advertising, since that could jeopardize long-term interests of venture); *Adderley*, 385 U.S. at 48 (no First Amendment right to protest on jailhouse grounds); *Greer v. Spock*, 424 U.S. 828,836 (1976) ("no generalized constitutional right to make political speeches or distribute leaflets" at military base, including areas open to public); *c.f. Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 448, 451 (1988) (Free Exercise Clause "cannot be understood" as allowing individuals to dictate how government "conduct[s] its own internal affairs" regarding its use of public lands).

Those free speech cases are instructive because "*Heller* repeatedly compared" the First and Second Amendments when ascertaining the scope of the right to bear arms.  *Bruen*, 142 S. Ct. at 2130.  Indeed, consistent with those cases—and sometimes directly citing them—numerous courts have recognized that the general right to bear arms for self-defense does not extend to government lands held open for a public purpose.  *See Class*, 930 F.3d at 464 (*citing Adderley*, 385 U.S. at 47); *GeorgiaCarry.Org III*, 212 F. Supp. 3d at 1363; *Bonidy*, 790 F.3d at 1126; *Nordyke v. King*, 563

F.3d 439, 459 (9th Cir. 2009), *aff'd*, 681 F.3d 1041 (9th Cir. 2012) (en banc), *cert. denied*, 568 U.S. 1085 (2013).

The same result must obtain here.  As emphasized in the Park Commission's first report in 1914, Connecticut acquired its parks and forests for the specific purpose of dedicating them for the public's quiet use and enjoyment, to provide people with places of refuge and peace.  *Glaser Dec.* ¶ 41; Exhibit 57 at 22 (purpose of parks is to provide "rest and contrast" from "city sights and sounds").  Those ideals persist today.  The Park Commission became what is now DEEP, *Tyler Dec.* ¶ 30, and DEEP is statutorily obligated to preserve the natural beauty of those lands and to maintain them for public use and benefit.  Conn. Gen. Stat. §§ 23-4a, 23-5a, 23-8 (setting policy for park and forest public uses); *see generally Tyler Dec.*, ¶¶ 19-22 (describing DEEP's mission); *see also* Conn. Gen. Stat. § 23-4(a) (authorizing Commissioner to promulgate regulations "for the maintenance of order, safety . . . and the preservation of the natural beauty").  And the State parks and forests continue to serve as places of respite and quiet enjoyment, where all people, particularly children and families, can escape modern technology and reconnect with nature.  *Tyler Dec.* ¶¶ 32, 52, 58, 89(b).  Indeed, many of the State's acquisitions of park and forest properties from donors expressly require the State to utilize the land for those purposes.  *Id.* ¶¶ 32-34.

Firearms are inconsistent with those dedicated purposes because they "interfere with the rights or enjoyment of others," *Glaser Dec.* ¶ 41 (*quoting* Exhibit 57 at 28-29), and have therefore been generally prohibited as early as 1918.  *Id.*; Exhibit 63.  Firearms would undermine the nature of our parks and forests as places of peace and quiet enjoyment, how people perceive them, and how DEEP operates and maintains them.  *See Tyler Dec.* ¶¶ 95-96; *Lewis Dec.* ¶ 17.  In fact, at least one donation of land to the State—a parcel making up part of Sleeping Giant State Park— conditions the gift on the State's agreement that "[t]he use of firearms shall be forever prohibited

thereon." *Id.* ¶ 33 (*quoting* Exhibit 106).  The State is bound by that condition.  *Id.* ¶ 34.  Because a general right to carry firearms would undermine the public purpose for which State parks and forests were dedicated, the State—"no less than a private owner of property"—has the right to prohibit visitors from carrying firearms on its lands.[11]  *See Hague v. C.I.O.*, 307 U.S. 496, 515 (1939) (noting that "other activities" prohibited by Boston Common ordinance, including prohibition on discharging firearms, "doubtless might be regulated or prohibited as respect their enjoyment in parks").

***Third***, the State's authority to exclude firearms is especially strong under the unique circumstances of this case because its park and forest system bears many of the same attributes as a private enterprise.  "[T]he fact that the government is acting in a proprietary capacity, analogous to that of a person managing a private business, is often relevant to constitutional analysis. The government often has more flexibility to regulate when it is acting as a proprietor (such as when it manages a post office) than when it is acting as a sovereign (such as when it regulates private activity unconnected to a government service)."  *Bonidy*, 790 F.3d at 1126; *see Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 598 (2008) (collecting cases).  The Supreme Court has applied this distinction in numerous contexts.  *Reeves, Inc. v. Stake*, 447 U.S. 429, 439 (1980) (Commerce Clause); *Bldg. & Constr. Trades Council v. Associated Builders & Contrs.*, 507 U.S. 218, 227 (1993) (preemption); *Lehman*, 418 U.S. at 304 (free speech).

---

[11]If anything, a government landowner's right to exclude firearms is even stronger than a private landowner's under these circumstances because, "[u]nlike private ent[ities], government is vested" with the affirmative "responsibility of protecting the health, safety, and welfare of its citizens." *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 342-43 (2007).  As Saul Cornell testifies, the founders did not intend the Second Amendment to abrogate those powers.  *See generally Cornell Dec.* ¶¶ 17-26.

The Second Amendment is no different.  *See* E. Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense*, 56 UCLA L. Rev. 1443, 1474-75 (2009).  In *Bonidy*, the Tenth Circuit upheld a firearm ban on U.S. Postal Service property, emphasizing that, "[a]s a government-owned business acting as a proprietor rather than as a sovereign, the USPS has broad discretion to govern its business operations according to the rules it deems appropriate."  790 F.3d at 1126.  Unlike the bans struck down in *Heller* and *McDonald*, which "applied directly to every citizen within the respective jurisdictions," the regulation at issue in *Bonidy* "applies only to discrete parcels of land owned by the [USPS], and affects private citizens only insofar as they are doing business with the USPS on USPS property."  *Id.* at 1126-27.

The same is true of our State park and forest system.  They are places serving a particular public need, and DEEP operates them to be financially viable and self-sustaining.  They generate millions of dollars each year, from parking fees, admission fees, events, movie productions, camping, and many others.  *See Tyler Dec.* ¶ 63.  The revenue generated from these sources goes into DEEP's Passport to the Parks account, and makes up approximately 21% of the Parks Division's annual budget, and goes toward paying the expenses for parks and forests.  *Tyler Dec.* ¶ 63.  Parks and forests are also central to the State's multi-billion dollar tourism industry.  *Anthony Dec.* ¶¶ 13-16; *Tyler Dec.* ¶ 64.  They are among the State's most marketable commodity and are featured in approximately 90% of state tourism advertisements.[12]  *Anthony Dec.* ¶¶ 16-23.

Permitting firearms in State parks and forests would likely diminish attendance, particularly among children and families, and may cause people to gravitate toward private

---

[12]In 2011, University of Connecticut commissioned a study on the economic and non-economic benefits our State parks and forests provide, and concluded in an extensive report that they create millions in additional revenue and hundreds of millions in "consumer surplus," taking into account qualify of life benefits.  *See Tyler Dec.* ¶ 64 and Exhibit 107.

attractions, most of which prohibit firearms. *Tyler Dec.* ¶ 95. That would "diminish the revenue that our parks and forests generate, which could in turn contribute further to already-existing resources and staffing issues." *Id.* It could also erode the State's ability to market its parks and forests as welcoming places of peace and inclusion for families and children, harming the State's overall tourism efforts.[13] *Anthony Dec.* ¶ 24.

It cannot reasonably be disputed that if a private entity operated a park or forest and provided similar services, it could prohibit firearms in order to maximize those efforts. The State should have that same ability when engaging in the same conduct. *See Bldg. & Const. Trades*, 507 U.S. at 231-32 (allowing government to act under Constitution "where analogous private conduct would be permitted"); *Lehman*, 418 U.S. at 304 (no requirement to permit political advertisements in public transit because "[r]evenue earned from long-term commercial advertising could be jeopardized" by them). It is nonsensical to say that, when operating a vast park and forest system in a proprietary capacity for a dedicated public use, the State lacks the authority to make decisions integral to that dedicated use like whether firearms can be freely carried by anyone in that space. When the State chooses to offer a service—such as public parks and forests—and someone chooses to enter, they do so on the owner's terms. The Second Amendment does not constrain the owner's conduct under those circumstances.

**_Fourth_**, historical evidence bears out that the Founders did not intend the Second Amendment to abrogate State landowners' right to prohibit firearms from their lands. In particular, the Property Clause of Art. IV, § 3, of the United States Constitution provides that "Congress shall

---

[13]To be clear, the Commissioner is **_not_** arguing "State interest" or urging for some form of means-end scrutiny. Rather, the Commissioner is explaining the **_nature_** of the State's use of the parks and forest system and why that use should not be treated any differently from that of a private owner for purposes of determining whether the Second Amendment applies.

have Power to dispose of and make **all needful Rules and Regulations** respecting the Territory or other Property belonging to the United States . . . ."  (emphasis added).  The Clause gives Congress power over federal lands that is "without limitations," and "plenary."  *Kleppe v. New Mexico*, 426 U.S. 529, 539 (1976); *Cal. Coastal Com v. Granite Rock Co.*, 480 U.S. 572, 593 (1987); *United States v. Gardner*, 107 F.3d 1314, 1318 (9th Cir. 1997) (government may "administer its federal lands anyway it chooses").  It authorizes Congress to legislate for the "***protection of the public***" who might enter, especially against those actions that would tend to "***exclude or frighten***" other visitors.  *Camfield*, 167 U.S. at 525 (emphasis added).  That would certainly permit firearm regulations.  Indeed, courts have relied upon the Property Clause to conclude that there is no right to carry arms onto government property.  *United States v. Dorosan*, 350 Fed. App'x 874, 875 (5th Cir. 2009) (per curiam); *see also United States v. Masciandaro*, 638 F.3d 458, 473 (4th Cir.), *cert. denied*, 565 U.S. 1058 (2011).[14]  The Property Clause is thus strong evidence the Framers did not envision the right to bear arms as abrogating the right of governmental landowners to protect the safety of their patrons.  The State, as a landowner, has the same right as the federal government to set conditions on its land.

There is also a robust history demonstrating that drafters knew and understood the critical importance of upholding the public purpose for which lands are dedicated, and thus would not have intended the Second Amendment to abrogate the State's authority to prohibit conduct that

---

[14]The Court in *Masciandaro* ultimately rejected the Second Amendment challenge to the firearm prohibition by applying a form of means-end scrutiny.  The Commissioner acknowledges that that is no longer the proper standard following *Bruen*.  The Commissioner submits, however, that the decision in *Masciandaro* would have been the same even had it not used means-end scrutiny—given its reference to the government's "plenary power" to impose safety regulations on its own lands—and remains persuasive authority for the proposition that government landowners' interest in exercising dominion over their lands is outside the scope of the Second Amendment.

24

would undermine those purposes.  "Land may be dedicated to pious and charitable purposes, as well as for public ways, commons and other easements in the nature of ways, so as to conclude the owner who makes the dedication. This is the general doctrine. . . . Public highways and sites for court-houses, churches and other public buildings, are familiar instances of the application of the principle." *Hunter v. Trustees of Sandy Hill*, 6 Hill 407, 411-412 (1844) (citations omitted); *Pawlet v. Clark*, 13 U.S. (9 Cranch) 292, 335-36 (1815) (describing lands granted to municipality by the state as being dedicated to pious or educational uses, consistent with donor and legislative intent); *Abbott v. Mills*, 3 Vt. 521, 527 (1831) ("In Sullivan's history of land titles, he speaks of burying places, training fields, and common landing places, as having been originally laid out for these purposes, and consecrated to these uses, and as public immunities, or common privileges."); *Pearsall v. Post*, 20 Wend. 111, 119 (1838) ("[I]t seems to be well settled by the Supreme Court of the U.S., by several courts in the neighboring States . . . that dedications of land for religious and charitable purposes, as well as for public ways, and squares, commons, parks, and other easements in nature of ways, are to be upheld").

Historically, a state's authority to regulate conduct on its lands is strongest on lands dedicate to quiet use and enjoyment.  Conflicts over competing public uses, as well as the intrusion of private claims on public lands, persisted for courts throughout the late 19th and early 20th centuries.  As courts considered the nature of ownership of public lands in various contexts, a common theme is evident: certain public lands possessed an inherently "higher purpose" not found in public highways. "That the legislature has the power to authorize the taking of land already applied to one public use, and devote it to another, is unquestionable." *Evergreen Cemetery Asso. v. New Haven*, 43 Conn. 234, 242 (1875).  However, "[i]t will be presumed that land applied to one public use should not be taken and devoted to another use inconsistent with the first unless

there is a necessity for it." *Id.*  For instance, "[t]he same land cannot properly be used for burial lots and for a public highway at the same time. The two uses are inconsistent with each other, and the one practically excludes the other." *Id.*, 243.

Thus, the courts recognized that uses otherwise permissible on a public highway, would be repugnant to the dedicated use of other grounds possessing a higher purpose.  For instance, "[a] cemetery includes not only lots for depositing the bodies of the dead, but also avenues, walks, and grounds for shrubbery and ornamental purposes.  All must be regarded alike as consecrated to a public and sacred use.  The idea of running a public street, regardless of graves, monuments and the feelings of the living, through one of our public cemeteries, would be shocking to the moral sense of the community and would not be tolerated except upon the direst necessity." *Evergreen Cemetery Asso.*, 43 Conn. at 243.

That belief extended to public parks.  Even where the public's precise interest in a public park were not defined by deed, courts have recognized parks as carrying values distinct from other public spaces, like highways.  Thus, courts in several jurisdictions have enjoined the construction of public streets through public parks.  In *Jacksonville v. Jacksonville R. Co.*, the Illinois Supreme Court observed that "[s]treets and a public square are donated. . . . The one was designed for the purpose of travel; and the right of passage over the streets, in any mode not to destroy their usefulness, was given by the plat.  The square was intended for beauty and adornment, and for the health and recreation of the public.  A dedication must always be construed with reference to the object with which it was made.  The donors never could have intended that this ground should be used as a street." *Jacksonville v. Jacksonville R. Co.*, 67 Ill. 540, 543 (1873); *see also Vill. of Riverside v. MacLain*, 210 Ill. 308, 324 (1904) (citing cases from Kansas, Massachusetts, Minnesota, and Missouri in support of holding that "[w]here such a tract has been dedicated, and

accepted as a public park, and adjudicated to be such, the municipality has no power to convert any portion of it into a public highway, because such use is inconsistent with and destructive of its use as a park.").

In *Williams v. Gallatin*, the New York Court of Appeals considered whether a proposed lease of portions of New York's Central Park, for use by a private company unduly interfered with its status as a public park. 229 N.Y. 248, 250-51 (1920). It concluded it did. In so determining, the Court examined the nature and purpose of the land and noted that a "park" is "a pleasure ground set apart for recreation of the public, to promote its health and enjoyment. . . . It need not and should not be a mere field or open space . . . ." *Id.* at 253. After surveying several states, and with reference to common law doctrines that had been recognized throughout the 19th century, the Court held that under New York law, any deviation from those core park purposes, however laudable, was only under a grant of authority from the legislature, explaining: "[N]o objects, however worthy, such as court houses and school houses, which have no connection with park purposes, should be permitted to encroach upon it without legislative authority plainly conferred, even when the dedication to park purposes is made by the public itself and the strict construction of a private grant is not insisted upon." *Williams*, 229 N.Y. at 253. "The legislative will is that Central Park should be kept open as a public park . . . . It must be kept free from intrusion of every kind which would interfere in any degree with its complete use for this end." *Id.*, 254. It went on to conclude that the private company's proposed use of the lease, though intended to "promote the safety of mankind," was only remotely related to the purpose of the system of the public parks, which was "to provide means of innocent recreation and refreshment for the weary mind and body." *Id.*

Implicit in that holding is the notion that when the legislature was conferred with such authority, it enjoyed significant discretion in expanding and preserving the uses of the park consistent with the purposes it designated. *See Hartford v. Maslen*, 76 Conn. 599, 611 (1904) ("[C]ontrol of public parks belongs primarily to the State. . . . Municipalities in controlling and managing such public parks act as governmental agencies, exercising an authority delegated by the State, and are always subject to legislative control.")  Thus, in the case of the Boston Common, the Massachusetts legislature retained its overarching control of public parks even though management had been delegated to the city. *Commonwealth v. Davis*, 162 Mass. 510, 511 (1895) *aff'd Davis v. Massachusetts*, 167 U.S. 43, 46 (1897) (citing Dillon, Mun. Corp. (4th ed.) §§ 393, 407, 651, 656, 666; *Brooklyn Park Commissioners v. Armstrong*, 45 N.Y. 234, 243, 244 (1871)). Likewise, courts recognized that the government possessed the authority to regulate individual behavior or narrow public uses.  *See Commonwealth v. Davis*, 162 Mass. At 511; *see also Price v. Plainfield,* 40 N. J. L. 612, 613 (1878) (While "a park in a city means to the sense of every person a place open to every one. . . . Restrictions as to . . . behavior of those entering are conceivable . . . .").

Throughout the 19th century, the nature of the government's ownership in a particular piece of property was the central consideration in determining the validity of government action restricting the use of the land.  For instance, in *Davis v. Massachusetts*, the defendant had been arrested for giving a sermon on Boston Commons, in violation of a local ordinance that provided: "No person shall, in or upon any of the public grounds, make any public address, discharge any cannon or firearm, expose for sale any goods, wares or merchandise, erect or maintain any booth, stand, tent or apparatus for the purposes of public amusement or show, except in accordance with

a permit from the mayor." 167 U.S. 43, 46 (1897).[15]  The Court looked to underlying proprietary interests to determine the permissible scope of government action, and in so doing evidenced the prevailing view of the time: that the government possessed the authority to regulate public parks in a manner consistent with the park's dedication to public use—including, incidentally, the power to ban the discharge of firearms. *See id.* at 46-47.

On review, the record before the Court did not include "any proof whatever as to the nature of the ownership in the common from which it can be deduced that the plaintiff in error had any particular right to use the common apart from the general enjoyment which he was entitled, as a citizen, to avail of along with others and to the extent only which the law permitted. On the contrary, the legislative act and the ordinance passed in pursuance thereof, previously set out in the statement of facts, show an assumption by the State of control over the common in question." *Id.*  The *Davis* Court recognized that the state's general power to close public lands to public use altogether included the lesser power to restrict the particular uses of the lands. *Id.* at 47 ("When no proprietary right interferes the legislature may end the right of the public to enter upon the public place by putting an end to the dedication to public uses. So it may take the less step of limiting the public use to certain purposes.").  At the time, to the extent that general power was limited, at all, it was by proprietary rights, not individual rights.  *See id.*

While *Davis* may no longer be instructive on the proper application of the free speech doctrine, its reasoning does illustrate the common historical understanding that a state has authority to set conditions on the use of land when acting as grantee or trustee of the land.  Then as today, a

---

[15] Notably, the constitutionality of the portion of the ordinance's restriction of firearms was not specifically before the Court.  Moreover, the Court's holding—that the ordinance did not unconstitutionally infringe on the defendant's free speech rights—was made prior to the development of the public forum doctrine.

court examines the purpose to which the public land has been dedicated, whether the condition imposed on the use of that land is consistent to that dedicated purpose, and whether relevant conduct is consistent with the dedicated purpose and attendant condition.  The restriction must support the use.  If the government is empowered to designate a particular purpose or use of land, it follows that the government is empowered to enact restrictions it deems necessary to effectuate that purpose, including restrictions on individual rights that would otherwise be entitled to full constitutional protections elsewhere. *Greer*, 424 U.S. at 848; *State v. Ball*, 260 Conn. 275, 283-84 (2002) (undeveloped state parks and forests are not public forums under the First Amendment). Then, as now, "a legislature's greater power necessarily includes a lesser one." *Sims v. New London*, 738 F. Supp. 638, 645 (D. Conn. 1990) (citing *Posadas de Puerto Rico Assocs. v. Tourism Co.*, 478 U.S. 328, 345-46 (1986).

These cases demonstrate that an individual's right to use property must be considered with reference to the property on which it is exercised.  *Bruen* does not hold otherwise.  *Bruen* does not support the proposition that the right to public carry protected by the Second Amendment extends to all lands deemed "public," regardless of the historic restrictions on those lands put in place in accordance with donor intent and legislative action.  In light of historic distinctions between public uses of land, *Bruen's* qualified embrace of a "general public right to carry" can only be construed in recognition of the fact that historically those "general" rights fell away quickly on certain lands, particularly government lands reserved for specific public uses—like parks.

The Second Amendment therefore does not confer a right to carry guns onto State parks and forests, and Plaintiff's motion must be denied.

### c. The State's parks and forests are sensitive places.

*Bruen* did not alter the "'longstanding'" understanding that firearms can be "altogether prohibited" in sensitive places.[16]  142 S. Ct. at 2133 (quoting *Heller*, 554 U.S. at 626).  *Bruen* listed, as examples of sensitive places, schools, government buildings, legislative assemblies, polling places, and courthouses, but made clear that that list was not exhaustive.  142 S. Ct. at 2133; *see also Heller*, 554 U.S. at 627 n.26.  *Bruen* otherwise did not provide a definition of sensitive places.  Pre-*Bruen* cases, however, which remain good law, have recognized that "places are sensitive for purposes of the Second Amendment because of the people found there or the activities that take place there."  *Class*, 930 F.3d at 465 (quotation marks omitted).  In determining whether a location is a sensitive place, courts consider various factors such as: ***(1) the likelihood of children being present there or its association with an academic setting***; *see, e.g., Bruen*, 142 S. Ct. at 2133 (listing school as sensitive places); *Siegel v. Platkin*, 2023 WL 1103676, 2023 U.S. Dist. Lexis 15096, at *28-29, 35 (D.N.J. Jan 30, 2023)(concluding that "playgrounds" and "youth sports events" were sensitive places because they "[fell] within the sphere of schools"); *Christopher v. Ramsey County*, 2022 WL 3348276, 2022 U.S. Dist. Lexis 144159, at *13 n.3 (D. Minn. Aug. 12, 2022)(observing that various courts "have held that a place that gathers large crowds and has many children present is a sensitive place"); ***(2) whether gatherings of large groups of people might congregate there***; *see, e.g., Nordyke*, 563 F.3d at 459-60 (holding that "County-owned parks, recreational areas, historic sites . . . and the County fairgrounds" were sensitive places, in part, because they "are gathering places where high numbers of people might

---

[16] *Bruen* did not indicate whether a sensitive places analysis is more properly conducted as part of the first (textual scope) or second (historical analogue) prongs.  A more cogent reading is that it implicates the first, which is consistent with pre-*Bruen* caselaw.  *E.g. Class*, 930 F.3d at 463; *Bonidy*, 790 F.3d at 1125; *Warden*, 697 F. Supp. 2d at 1229.  But even if it applies to part two of the *Bruen* rubric, the result would be the same:  § 23-4-1(c) is constitutional.

congregate")(quotation marks omitted); *(3) the existence of security or safety concerns*; *see, e.g.,* *Class*, 930 F.3d at 464; and *(4) whether the government owns the property at issue*.[17]  *Id.*

The State's parks and forests in this case are sensitive places.  At the outset, numerous courts have held that parks and similar recreational areas are sensitive places in which firearms could be prohibited.  *E.g.*, *GeorgiaCarry.Org. III*, 212 F. Supp. 3d at 1366; *Warden v. Nickels*, 697 F. Supp. 2d 1221, 1229 (W.D. Wash. 2010); *United States v. Masciandaro*, 648 F. Supp. 2d 779, 790 (E.D. Va. 2009), *aff'd*, 638 F.3d 458; *Zaitzeff v. City of Seattle*, 484 P.3d 470, 479 (Wash. Ct. App.).

Applying the above factors confirms that conclusion here.  **_First_**, millions of children visit State parks and forests every year with their families, for a variety of activities.  *Tyler Dec.* ¶ 57.  Indeed, DEEP promotes parks and forests specifically to families, and operates numerous programs designed to encourage children and youth engagement with parks and forests.  *Tyler Dec.* ¶ 58.  That is particularly true of locations like Hammonasset Beach State Park and Dinosaur State Park.  *Id.* ¶¶ 111-21.  Indeed, schools regularly utilize these locations for educational purposes, sporting events, and academic and summer programming.  *Tyler Dec.* ¶ 58; *Benigni Dec.* ¶¶ 13-16; *Highsmith Dec.* ¶¶ 22-28.  And at least one Town sends children to such locations for summer programming.  *Highsmith Dec.* ¶ 32.  The regular presence of children at the locations within the ambit of § 23-4-1(c) illustrates that State parks and forests are sensitive places in accordance with *Bruen* and established precedent.  **_Second_**, people congregate for social, recreational, and related purposes in various locations within the ambit of § 23-4-1(c), including

---

[17] These factors generally align with those identified by legal scholars.  *See, e.g.*, Carina Gryting & Mark Frassetto, NYSRPA v. Bruen and the Future of the Sensitive Places Doctrine: Rejecting the Ahistorical Government Security Approach, 63 B.C. L. Rev. E. Supp. I-60, I-68 (2022); Darrell A.H. Miller, Constitutional Conflict and Sensitive Places, 28 Wm. & Mary Bill Rts. J. 459, 460 (2019).

Hammonasset Beach State Park, Dinosaur State Park, Fort Trumbull, and Harkness Memorial State Park. *Tyler Dec.* ¶¶ 111-29; *see, e.g., Nordyke*, 563 F.3d at 459-60.  Over the past few years, our parks and forests average 17 million visitors each year, and those numbers have been steadily growing. *Tyler Dec.* ¶¶ 49, 52.  Many locations can become extremely crowded, especially during peak months and in those specific areas where main attractions are located. *Id.* at ¶¶ 54-56.  It is not infrequent that some locations will reach capacity and have to deny additional visitors. *Id.* at ¶ 55.  Beaches in particular can become extremely crowded.  One photograph of Hammonasset Beach State Park demonstrates how crowded it can get on a busy day. *Id.* ¶ 114; Exhibit 115.

**_Third_**, the crowds, locations like beaches where no firearm storage is available, varying uses like camping, and the presence of alcohol in most locations, create unique security and safety concerns. *Tyler Dec.* ¶ 94 *Lewis Dec.* ¶ 17.  **_Fourth_**, the State owns and operates the parks and forests in a proprietary capacity. *Class*, 930 F.3d at 464.  These factors compel the conclusion that State parks and forests are sensitive places.[18]

Plaintiff incorrectly argues that sensitive places are limited to "places where the core functions of government or self-government [take] place." *Mtn.* at 19.  Courts have rejected similar attempts to frame sensitive places that narrowly. *See, e.g., United States v. Power*, 2023 U.S. Dist.

---

[18]Moreover, as argued below, guns have been prohibited from parks and forests since their inception—i.e., the mid-1800s.  Plaintiff fails to cite to a *single case* contesting the lawfulness of such restrictions.  To the best of the Commissioner's knowledge, disputes concerning firearms prohibitions in federal and/or state parks and forests did not begin until the early 2000s. *See, e.g., Georgiacarry.org, Inc.*, 212 F. Supp. 3d 1348; *Warden*, 697 F. Supp. 2d 1221; *Masciandaro*, 648 F. Supp. 2d 779.  As of 2012, "[n]o court ha[d] held that the Second Amendment encompasse[d] a right to bears arms within state parks." *Embody v. Ward*, 695 F.3d 577, 581 (6th Cir.), cert. denied, 568 U.S. 1048 (2012).  Here, this Court should "assume it settled" that state parks and forests are sensitive places because Americans did not dispute the lawfulness of firearms prohibitions in such locations until recently. *See Bruen*, 142 S. Ct. at 2133 ("assum[ing] it settled" that various locations were sensitive places partially because the Court was "aware of no disputes regarding the lawfulness of such prohibitions").

LEXIS 4226, at \*19-21 (D. Md. Jan. 9, 2023); *Tallion*, 2022 U.S. Dist. LEXIS 225175, at \*21-22.

In fact, Plaintiff's own formulation of the law that schools are sensitive places because "education became a *state duty*" would compel the conclusion that State parks and forests are sensitive places. *Mtn.* at 29.  Maintenance of the parks and forests is required by statute, and is therefore similarly a "state duty."   Conn. Gen. Stat. § 23-8(a); Conn. Gen. Stat. § 22a-1.   Finally, the fact that Connecticut's state parks and forests allow hunting or target shooting does not affect the sensitive places analysis.  *See Mtn.* at 33-36.  The ability to hunt or target shoot in specified locations, which is highly regulated, "does not compromise" the concerns discussed above about bringing firearms into crowded parks and beaches. *See GeorgiaCarry.Org III,* 212 F. Supp. 3d at 1366 (lake properties, partially used for recreational purposes, were sensitive places despite "[d]esignated hunting and sport shooting areas").

Accordingly, this Court should conclude that the State's parks and forests are sensitive places where firearms may be altogether prohibited.  At the very least, however, certain individual parks and forests should be recognized as sensitive places, which defeats Plaintiff's facial challenge.  Hammonasset Beach State Park and Dinosaur State Park are two such parks, which attract many visitors, including children, and can become densely populated, as the photographs depict. *Tyler Dec.* ¶¶ 111-27; Exhibits 115 and 132 (photographs).  So, too, are the historic and tourist attractions like Fort Griswold, Fort Trumbull, and Gillette Castle, *id.* ¶¶ 124-29, and Harkness Memorial State Park, which is a popular destination for weddings and private functions. *Id.* ¶¶ 122-23.  Plaintiff's failure to address the multitude of uses and diversity of Connecticut's State parks and forests—especially the above locations—underscores that he has not demonstrated a clear or substantial likelihood of proving that § 23-4-1(c) is "unconstitutional in all of its

applications, or at least that it lacks a plainly legitimate sweep." *Decastro*, 682 F.3d at 168 (internal quotation marks omitted).

### d. The Second Amendment is not implicated by locational restrictions cabined to places of recreation.

Unlike the First and Fourteenth Amendments, which prohibit laws "***abridging*** the freedom of speech" or that "***abridge*** the privileges or immunities of citizens," the Second Amendment provides that the right to keep and bear arms "shall not be ***infringed***." (emphasis added).  We must presume that the Founders' use of the word "infringed" was deliberate, and that it signifies a different meaning than when they used variations of "abridge" in other amendments. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 265-66 (1990) (relying on Framers' use of different terms in different provisions to ascertain intent).  "Every word [in the Constitution] appears to have been weighed with the utmost deliberation, and its force and effect to have been fully understood." *Williams v. United States*, 289 U.S. 553, 573 (1933).  Thus, "[i]t cannot be presumed that any clause in the constitution is intended to be without effect."  *Marbury v. Madison*, 5 U.S. 1 (1 Cranch) 137, 174 (1803).

Indeed, as Saul Cornell testifies, the terms "abridge" and "infringe" had different meanings in the Founding era.  *Cornell Dec.* ¶¶ 10-12.  Essentially, "abridge" meant to "reduce," even to a small degree, whereas "infringe" required something more, to "violate" or "destroy."  *Id.* ¶ 10. Thus, as one scholar wrote when discussing the Founders' use of the terms as they were understood at the time, "an abridgement of rights pushed far enough becomes an infringement, but not every abridgement is infringement." M. Burns, *Common Sense in the Second Amendment:  Eighteenth-Century English and the U.S. Bill of Rights*, 14 (2020).  Although it is unclear when a locational restriction may rise to the level of an infringement, the Court does not need to answer that question in order to resolve this case.  If the distinction between "infringe" and "abridge" means anything,

35

and this Court must presume that it does, *Williams*, 289 U.S. at 573, at the very least a restriction cabined to a discrete location where people go for recreational or educational purposes does not qualify as an infringement.

That conclusion is consistent with *Heller*, *McDonald*, and *Bruen*, all of which involved restrictions that effectively applied uniformly across the entire jurisdiction that therefore infringed on conduct that was protected by the Second Amendment.  It is also consistent with the principle, recognized in a case addressing a firearm restriction in a location plaintiff visited for recreation, that "what may ordinarily be a constitutional incursion falls outside an individual's constitutional rights when such incursion is the result of an individual's voluntary actions."  *Georgiacarry.Org III*, 212 F. Supp. 3d at 1164 (*citing Wyman v. James*, 400 U.S. 309, 317-18 (1971)).

### 2. Section 23-4-1(c) is consistent with the Nation's history of firearm regulation.

Even if the Second Amendment did cover Plaintiff's proposed course of conduct—which it does not—§ 23-4-1(c) is nonetheless constitutional because "it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2127.  Applying that standard, courts must "reason[] by analogy," that is, determine whether the modern regulation is "relevantly similar" to historical ones.  *Id.* at 2132.  Although the Court in *Bruen* declined to "provide an exhaustive survey of the features that render regulations relevantly similar," it did identify "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense."  *Id.* at 2132-33.  Thus, "whether modern and historical regulations impose a comparable burden," and "whether that burden is comparably justified" are "central considerations" for determining whether a historical analogue is relevantly similar.  *Id.* at 2133.

This analogical reasoning "is [not] a regulatory straitjacket . . . ."  *Id.*, 2133.  It "requires only that the government identify a well-established and representative historical ***analogue***, not a

historical *twin*.  So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster."  *Id.* at 2133 (emphasis in original). Further, the "historical tradition" can be shown with only a few number of analogues, at least where there is no other overwhelming affirmative evidence of an enduring tradition to the contrary. *See Antonyuk v. Hochul*, 2022 U.S. Dist. LEXIS 182965, at *21 (N.D.N.Y. Oct. 6, 2022) (*Antonyuk II*) (rejecting "majority of states" standard and noting that "three or more such historical analogues" may be enough); *c.f. Bruen*, 142 S. Ct. at 2154 (refusing to give "disproportionate weight to a single state statute and a pair of state-court decisions" that "contradicts the overwhelming weight of other evidence") (quotation marks omitted).  And that tradition can be established with local and municipal (rather than state/federal) restrictions.  Indeed, at least one court upheld a law *based entirely* on local-level restrictions.  *Frey v. Nigrelli*, 2023 WL 2473375, 2023 U.S. Dist. LEXIS 42067, at *36 (S.D.N.Y. Mar. 13, 2023) ("[d]efendants are able to establish in their papers that there is a historical tradition of firearm regulations . . . at the municipal and town level"); *id.* at 39 ("the Court finds no issue" in relying on municipal restrictions).

Finally, *Bruen* requires a "more nuanced approach"—i.e., even greater flexibility—when the modern law addresses an "unprecedented societal concerns" that did not exist at the time of the founding.  142 S. Ct. at 2131.  In such cases, it is sufficient for the state to "identify[] historical laws that have a similarity of purpose to the modern regulation, even if the historical analogue regulated a different subject."  *Frey*, 2023 U.S. Dist. LEXIS 42067, at *53.

Applying these principles, § 23-4-1(c) passes muster.

a. **The Commissioner has produced 69 laws from the Reconstruction Era and beyond prohibiting firearms in parks that are effectively identical to § 23-4-1(c), which is dispositive.**

Ten years before the Fourteenth Amendment was ratified, Olmsted's Central Park opened in 1858.  Central Park's rules stated clearly and conspicuously:  "All persons are forbidden . . . [t]o carry fire-arms."  Exhibit 1.  Olmsted imposed the prohibition to "prompt proper behavior and decorum" in the park, *Young Dec.* ¶ 26, and to realize his vision of public parks serving as places of serenity and refuge from dark and troubling city life.  *Id.* ¶ 10.

As Olmsted's vision spread and modern public parks began emerging around the country, so too did firearm restrictions.  *Cornell Dec.* ¶ 40; *see also id.* ¶¶ 34-35.  Around the time the Fourteenth Amendment was ratified, laws were passed prohibiting firearms in public parks in the five most populous cities in the Nation: New York City (1858), Philadelphia (1868), Chicago (1873), St. Louis (1881), and Boston (1886).  *Cornell Dec.* ¶ 34; Exhibits 1, 3, 10, 11, 14.  Dozens of laws prohibited firearms in public parks in at least 14 States by 1900, and in at least 24 States by 1921.  *See generally* Exhibits 1-68.  Once the park movement took hold on the federal level, Yellowstone National Park imposed a ban in 1897.  Exhibit 69 at 1; *Cornell Dec.* ¶ 37; *see also Glaser Dec.* ¶ 27 (explaining influence of park movement on national level).  And when a national rule-making commission was established, firearms were banned from all national parks in 1936.  Exhibit 69 at 72.

Although additional research may disclose even more regulations, the point is clear:  as public parks emerged, "[f]rom the outset the regulations governing these spaces prohibited firearms."  *Cornell Dec.* ¶ 40.  Millions of people lived under these bans, which were "enacted in major urban areas of every region of the nation."  *Id.* ¶ 35.  Carrying restrictions in these locations was "the norm in America in the era of the Fourteenth Amendment."  *Id.*

38

These historical regulations regulate firearms in the same way that § 23-4-1(c) does (by prohibiting carrying), and do so for the same reasons (preserving the quiet enjoyment of the land as places of peace and refuge).  The Park Commission's early bans on firearms in Connecticut drew from the same values that motivated Olmsted and the broader park movement.  *Glaser Dec.* ¶¶ 28, 49.  *Tyler Dec.* ¶¶ 24-25.  Those values continue to motivate DEEP's enforcement of § 23-4-1(c) today.  *Tyler Dec.* ¶¶ 32, 52, 58, 89(b); *Lewis Dec.* ¶¶ 16(c), 17.  Those historical regulations are thus not merely analogues to § 23-4-1(c), but "twins."  Moreover, they reflect a widespread tradition of firearms regulation, unbroken since Reconstruction.  And the fact that none of these regulations—federal, state, or local—were challenged as unconstitutional for 150 years demonstrates that no one from the Reconstruction era believed they violated the Second Amendment. *See Bruen*, 142 S. Ct. at 2133 (noting that although 'the historical record yields relatively few" sensitive places where firearms could be altogether prohibited, "we are also aware of no disputes regarding the lawfulness of such prohibitions," and can "therefore assume it settled that these locations were 'sensitive places'"); *id.* at 2137 ("where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision").  Finally, it bears repeating that many of these laws were imposed immediately following ratification of the Fourteenth Amendment.  As *Bruen* instructs, post-enactment history can be a "critical tool" of constitutional interpretation because it "can liquidate [and] settle the meaning" of disputed constitutional terms, particularly where—as in this case—that post-enactment history is not contradicted by other, more persuasive evidence.  142 S. Ct. at 2136-37.

Thus, as Professor Cornell testifies, § 23-4-1(c) "limiting guns in parks are well within the long historical tradition of firearms regulation in America." *Cornell Dec.* ¶ 41.  Plaintiff's motion should be denied on that basis alone.

> **b. Public parks developed in response to unprecedented societal concerns unforeseen at the time of the Founding.**

"[C]ases implicating unprecedented societal concerns . . . require a more nuanced approach" because "[t]he regulatory challenges posed by firearms today are not always the same as those" present in 1791 or 1868.  *Bruen*, 142 S. Ct. at 2132.

This case squarely implicates that principle.  At the time of the Founding, public parks as we know them today did not exist, and people generally did not have the same regard for nature or the wilderness.  Cronon at 8; *Cornell Dec.* at ¶ 30; *Glaser Dec.* at ¶¶ 12; *Young Dec.* at ¶ 10.  The "parks" that did exist were mainly used for grazing and mustering the militia.[19]  *Cornell Dec.* ¶¶ 30-31.  It was not until the mid-1800s that urbanization took hold and people began seeking refuge from city life.  *Young Dec.* ¶ 10, 21-22; *Cornell Dec.* ¶ 33.  In response to that newly developing need, Olmsted designed Central Park and the modern public parks began taking off.  *Young Dec.* ¶¶ 10, 19;  *Cornell Dec.* ¶ 33; *Glaser Dec.* ¶ 29.

The growth of public parks across the Nation, as serene places of refuge from city life, was nothing less than a ***movement***.  *Young Dec.* ¶ 10 (""the American park movement launched in the 1850s" because of a "social transformation").  As Olmsted himself wrote in 1881:  "Twenty-five years ago [in 1856] we had no parks, park-like or otherwise, which might not better have been called something else. . . .  Allow me to use the term ***park movement***, with reference to what has thus recently occurred [in Europe and North America]."  F. Olmsted, *The Justifying Value of a*

---

[19]Notably, although the Boston Common was used for mustering the militia, Massachusetts prohibited coming to muster with a loaded firearm.  *Cornell Dec.* ¶ 30.

*Public Park* (1881) at 7-8 (emphasis in original).  Olmsted explained that his notion of parks was revolutionary, not an incremental development of existing ideas:  "Parks have plainly not come as the direct result of any of the great inventions or discoveries of the century.  They are not, with us, simply an improvement on what we had before, growing out of general advance of the arts applicable to them."  *Id.*

The present case is therefore a clear example of a case implicating "unprecedented societal concerns" that "require[s] a more nuanced approach."  *Bruen*, 142 S. Ct. at 2131.  And it bears repeating that once public parks started emerging around 1858, firearm prohibitions followed. They were in effect in some of the most populous and influential cities in the Nation right around when the Fourteenth Amendment was adopted, rapidly increased in numbers in the years immediately following, and no one questioned their constitutionality.

### c.   Firearm regulations from the Founding era are relevantly similar to § 23-4-1(c).

Although public parks, as Olmstead envisioned them, did not exist prior to the mid-1800s, there are ample historical analogues from before that time that are "relevantly similar" to § 23-4-1(c), taking into account that the park restrictions addressed an unprecedented societal concern. *See Frey*, 2023 U.S. Dist. LEXIS 42067, at *53 (such laws need only "a similarity of purpose").

There are multiple sets of such laws.  __*First*__, there is a long history of regulating carrying arms in locations that share similar attributes to Connecticut's State parks and forests, namely, places where people gather for social and recreational purposes.   England's Statute of Northampton of 1328 prohibited individuals from "go[ing]" or "rid[ing]" armed in places like "'Fairs'" and "'Markets.'"  *Bruen*, 142 S. Ct. at 2139 (quoting the Statute of Northampton).

Virginia and North Carolina enacted similar laws by the 1790s.[20]  Exhibits 78 and 80.  Other states passed similar laws generally prohibiting firearms in public and social gatherings.  *See, e.g.,* Exhibits 82 (1831 Louisiana); 83 (1869 Tennessee); 84 (1870 Georgia); 86 (1870 Texas); 88 (1874 Missouri); 93 (1882 New Orleans); 95 (1889 Arizona); 96 (1889 Idaho); 97 (1890 Oklahoma).

There is therefore a long and widespread tradition of prohibiting the carrying of arms in discrete locations used for gathering and recreation.[21]  And § 23-4-1(c) is relevantly similar to such historical analogues because it reduces the chances of a bullet—intentionally or not—striking someone within a crowd gathered at a State park or forest.  Section 23-4-1(c) also diminishes risks of individuals expressing their displeasure at the sight of a gun (a potential provocation) or mass hysteria that may follow from mere presence of a firearm.  *See, e.g., Hill*, 53 Ga. at 476 (noting that presence of a gun in a crowd "is not only a provocation to a breach of the peace, but dangerous to human life").  And state supreme courts upheld several of these laws soon after they were enacted, reflecting a general understanding that such laws do not violate the Second Amendment. *Hill v. State*, 53 Ga. 472, 475 (1874); *Andrews v. State*, 50 Tenn. 165, 182 (1871); *English v. State*, 35 Tex. 473, 478-79 (1872); *Alexander v. State*, 27 Tex. Ct. App. 533, 537 (1889); *Owens v. State*,

---

[20]Notably, around this time, Virginia and North Carolina accounted for 28 percent of the American population.  *See* Richard L. Forstall, Dept. of Commerce, Population of States and Counties of the United States 1790-1990, p.4 (available at extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www2.census.gov/library/publications/de cennial/1990/population-of-states-and-counties-us-1790-1990/population-of-states-and-counties- of-the-united-states-1790-1990.pdf).

[21]In addition, from 1820 through the Reconstruction Era, five states enacted laws prohibiting soldiers or militiamen from bringing loaded firearms like pistols on "parade."  *See* Exhibits 125-129.  These prohibitions reinforce historical firearms bans in locations where people congregated for social, recreational, or educational purposes by underscoring, that lawmakers believed that loaded firearms—even while possessed by those with military training—could be prohibited from locations where people would congregate together, even for military training.

3 Tex. Ct. App. 404, 407 (1878).  The above statutes thus provide an additional basis for concluding that § 23-4-1(c) is consistent with the Nation's history of firearm regulation.

**_Second_**, "laws enacted in the years immediately before and after the Second Amendment's adoption also aimed to neutralize people who were armed in ways that could cause alarm." *United States v. Rowson*, 2023 WL 431037, 2023 U.S. Dist. LEXIS 13832, at *61 (S.D.N.Y. Jan. 26, 2023) (collecting laws, including 1786 Virginia statute providing that "no man [shall] go nor ride armed by night nor by day . . . in terror of the Country"; 1795 Massachusetts statute requiring justices of the peace, "upon [the] view of such Justice," to arrest "all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth"; 1801 Tennessee statute requiring a "judge or justice, on his own view," to require surety from anyone who "shall publicly ride or go armed to the terror of the people" or "privately carry any . . . pistol . . . to the fear or terror of any person"; 1821 Maine statute providing that disturbers of the peace or "such as shall ride or go aimed offensively, to the fear or terror of the good citizens of this State").

"Taken together, as *Bruen* synopsized, these statutes reflect[] the 'by-now-familiar thread' of laws prohibiting 'bearing firearms in a way that spreads 'fear' or 'terror' among the people." *Rowson*, 2023 U.S. Dist. LEXIS 13832, at *62-63 (quoting *Bruen*, 142 S. Ct. at 2145).  Although *Bruen* held that these laws were not relevantly similar to a general ban on carrying arms in public, they **_are_** relevantly similar to firearm prohibitions in modern parks, which are designed to ensure that these locations retain their tranquil and passive atmosphere.  Firearms were prohibited in such locations **_specifically because_** they caused fear and terror and evoked the very kinds of feelings people were trying to escape.  It cannot reasonably be disputed that the presence of firearms in

Hammonasset Beach State Park on a crowded day or in Dinosaur State Park would not engender fear or terror among fellow visitors.  Such laws are therefore relevantly similar to § 23-4-1(c).

*Third*, § 23-4-1(c) is relevantly similar to the historical analogues banning arms in various educational settings because it prohibits firearms in distinct locations in furtherance of protecting children from harm and helping nurture the academic growth of students without the potential chilling effect that guns might have on a learning environment.  *See Warden*, 697 F. Supp. 2d at 1229 ("a city-owned park where children and youth recreate is a 'sensitive place'" in part because there is "no logical distinction between a school on the one hand and a community center where educational and recreational programming for children is also provided on the other"); *Zaitzeff v. City of Seattle*, 484 P.3d 470, 479 (Wash. Ct. App.) (noting that, although *Heller* did "not list parks as sensitive areas, the public safety concerns underlying the sensitive area distinction also apply here, particularly the concern about protecting children"), *cert. denied*, 498 P.3d 478 (2021), *cert. denied*, 142 S. Ct. 1123 (2022).

Public and private universities in America imposed the earliest firearms bans, beginning in approximately 1655.  *See* Miller, Constitutional Conflict and Sensitive Places, 28 Wm. & Mary Bill Rts. J. at 471-72.  Originally, the universities imposed the prohibitions themselves.  See Exhibits 118-124.  But states began passing similar laws not long after 1868.  For example, in 1870, Texas prohibited handguns in "any school-room or other place where persons are assembled for educational, literacy, or scientific purposes[.]"  Exhibit 86; *see also* Exhibit 88 (similar 1874 Missouri law).  Within two years, the Texas Supreme Court confirmed the statute's constitutionality.  *See English*, 35 Tex. at 478-79.  Around this same time, similar firearms prohibitions in schools and related academic settings existed in other states.  See Exhibits 90 (1878 Mississippi); 91 (1879 Missouri); 95 (1889 Arizona); 97 (1890 Oklahoma); 103 (1907 Montana).

Connecticut's history of gun violence in educational settings is so pronounced, and has had such a profound impact, that regulations designed to ease those concerns are unassailable.

**_Fourth_**, § 23-4-1(c) is relevantly similar to historical analogues regulating hunting, especially on another's property, which generally restricted hunting to certain time periods and required a landowner's consent.  For example, a Pennsylvania law enacted in 1721 subjected a person to a fine if such person "shall presume . . . **_to carry any gun_** or hunt on the improved or inclosed lands of any plantation other than his own" without the owner's consent (emphasis added).  Exhibit 71; *see also id.* (prohibiting certain individuals who "shall . . . carry any gun, or hunt in the woods or unenclosed lands" without permission).  New Jersey passed a similar law in 1722, as did Louisiana, Kentucky, and North Carolina in the 1860s.  Exhibits 72-76.  As with those historical laws, § 23-4-1(c) helps ensure that EnCon can enforce its hunting and conservation laws. *Tyler Dec.* ¶ 89(c); *Lewis Dec.* ¶ 18.  Thus, § 23-4-1(c) is relevantly similar to the above hunting restrictions.

**_Finally_**, the historical record from 1328 through the Reconstruction era demonstrates that firearms were prohibited in, among other places, schools, legislative assemblies, courthouses, public gatherings, and other related public forums.  Two common threads run through this historical record: (1) insulating public forums where individuals exercise other constitutional rights, including their right to communicate and assemble with one another, from the chilling effects of firearms; *see* Darrell A.H. Miller, Constitutional Conflict and Sensitive Places, 28 Wm. & Mary Bill Rts. J. 459, 478 (2019) (quotation marks omitted); and (2) "protecting against weapons threats the areas where people met or mingled to form democratic community."  Joseph Blocher & Reva B. Siegel, Second-Amendment Sensitive Places: Protecting Democratic Community and Commerce, 98 N.Y.U. L. Rev. at 10 (forthcoming 2023); *see also id. at* 4.

45

Preliminarily, "public parks . . . have 'immemorially' been open to the public for the purpose of communicating and assembling."  Darrell A.H. Miller, Constitutional Conflict and Sensitive Places, 28 Wm. & Mary Bill Rts. J. 459, 475 (2019) (quotation marks omitted).  Millions of visitors use Connecticut's State parks and forests for recreational, educational, and related purposes.  *Tyler Dec.* ¶ 39.  People assemble together in these locations for school field trips, picnicking, youth group camping, socializing on crowded beaches, and various other reasons.  In doing so at such locations, they communicate with one another freely, and § 23-4-1(c)—like the above historical analogues—helps to ensure that firearms will not stifle the free flow of ideas or otherwise deter people from assembling in such locations.[22]  *See Hill*, 53 Ga. at 477 ("One [constitutional] guarantee is not to swallow up all others, but each is to be construed reasonably in reference to its plain intent, and in reference to . . . other rights guaranteed to the people.")

Relatedly, Connecticut's state parks and forests strengthen the bonds of democratic society. *See* Joseph Blocher & Reva B. Siegel, Second-Amendment Sensitive Places: Protecting Democratic Community and Commerce, 98 N.Y.U. L. Rev. at 29 (forthcoming 2023) (noting that sensitive place restrictions "could encompass other locations where [the bonds of democratic community] are formed and strengthened"); *see also id.* at 10, 14, 20.  As noted above, Connecticut's present day State parks and forests find their roots in 1913.  Chapter 230 of the 1913 Public acts authorized the State Park Commission—the forerunner to DEEP—to acquire land "for the benefit of the public" and "for purposes of public recreation, or for the preservation of natural beauty or historic association[.]"  Chapter 230, § 4, of the 1913 Public Acts.  Among other things,

---

[22]It is important to note that nothing about § 23-4-1(c) eviscerates Plaintiff's right to armed self-defense because he need not visit a state park or forest—he simply chooses to visit them. Thus, the present circumstances are unlike *Bruen*.  *Cf.* 142 S. Ct. at 2134 (New York's sensitive places argument would have made all of Manhattan a sensitive place).

this broadly meant that the State could acquire land for public use and enjoyment.  *See id.*; Conn. Gen. Stat. § 23-8(a)(contemporary provision).

But such legislation cannot be divorced from the broader, national movement of which it was a part.  As explained above, and as Professors Glaser and Young testify, these modern parks were created for the purpose of improving physical and mental health, bridging socioeconomic gaps, and generally improving society. Our State parks and forests drew from and were directly inspired by the values that imbued that broader movement.  Thus, State parks and forests—by design—strengthen the bonds that hold democratic society together.  Accordingly, they are sensitive places, and § 23-4-1(c) is relevantly similar to the aforementioned historical analogues because its general ban on firearms from State parks and forests eliminates the "intimidation or coercion of the kind that the presence of weapons threatens" in a place intended for "the reproduction of democratic community[.]" Joseph Blocher & Reva B. Siegel, Second-Amendment Sensitive Places: Protecting Democratic Community and Commerce, 98 N.Y.U. L. Rev. at 4 (forthcoming 2023)(emphasis omitted).

### d.  This Court should not follow non-binding decisions from other district courts.

Notwithstanding our Nation's robust history of firearms regulations in parks and other historical analogues that are relevantly similar to § 23-4-1(c), some courts have enjoined firearms prohibitions in public parks in light of *Bruen*.  *See, e.g., Siegel v. Platkin*, 2023 U.S. Dist. Lexis 15096, *Antonyuk v. Hochul*, 2022 WL 4367410, 2022 U.S. Dist. Lexis 201944, (N.D.N.Y. Nov. 7, 2022), appeal filed, Nos. 22-2908 & 22-2972 (argued March 20, 2023).  This Court should not be persuaded by such decisions.

Preliminarily, *Siegel* and *Antonyuk* are factually distinguishable for at least two important reasons.  ***First***, both decisions involved broad legal challenges to comprehensive statutory schemes

under accelerated briefing schedules which, in turn, hindered the ability of the state defendants to present the Courts with a historical tradition of firearms regulation pertaining to public parks. For example, in *Siegel*, the Court focused on six historical analogues pertaining to public parks. 2023 U.S. Dist. Lexis 15096, at *29-30. The Court in *Antonyuk* considered four statutes and eight municipal regulations pertaining to firearms prohibitions in public parks or places of public gathering, along with several laws prohibiting firearms in schools. 2022 U.S. Dist. Lexis 201944, at *184-85. The Commissioner, by contrast, has provided this Court with approximately seventy regulations specifically prohibiting firearms in public parks that were enacted between 1858 to 1936, six laws regulating hunting that were enacted by various states between 1721 and 1869, and twenty-seven laws addressing sensitive places that were enacted by various states between 1776 and 1907. Put simply, the record presented by the Commissioner more than sufficiently demonstrates an established tradition that was representative of the Nation. *Cf. Antonyuk*, 2022 U.S. Dist. Lexis 201944, at *191. **_Second_**, *Antonyuk* is factually distinguishable because the Court there based its decision, in part, on the fact that historical analogues "would not appear to apply to those modern parkgoers who are there to *take a break from* education, not further pursue it." 2022 U.S. Dist. Lexis 201944, at *189 (emphasis in original). Here, by contrast, schools utilize State parks and forests, including places like Sleeping Giant State Park and Hammonasset Beach State Park, for school-sponsored activities and educational opportunities. *Hightower Dec.* ¶¶ 23, 27; *Benigni Dec.* ¶ 14-16.

Siegel and Antonyuk are also legally distinguishable for at least three reasons. **_First_**, neither *Siegel* nor *Antonyuk* control whether Plaintiff has met his burden of demonstrating that the specific proposed course of conduct that he wants to engage in is covered by the Second Amendment; notably, neither decision squarely confronted the proprietary-interest argument that the

Commissioner advances.  *See, e.g., Siegel*, 2023 U.S. Dist. Lexis 15096, at *27; *Antonyuk*, 2022 U.S. Dist. Lexis 201944, at *182-83.  __*Second*__, both decisions effectively treated the Second Amendment as imposing a "regulatory straightjacket" on firearms prohibitions in public parks and did not consider how the unprecedented societal concerns brought about by the modern parks movement should impact the analysis.  *See Bruen*, 142 S. Ct. at 2132.  __*Third*__, both decisions incorrectly downplayed the significance that a robust consensus of municipal ordinances can have in determining whether a challenged firearms regulation is consistent with our Nation's historical tradition of firearms regulation, especially with respect to firearms regulations in parks.  *See, e.g., Antonyuk*, 2022 U.S. Dist. LEXIS 201944, at *16-17; *id.* at *186.  The modern parks movement began at the localized, municipal level, blossomed into a national measure by the federal government, and then grew into a state-level initiative by the early 1900s.  Considering this evolution, the localized, municipal ordinances shed considerable light on the Nation's understanding of the Second Amendment within the context of public parks like those falling within the ambit of § 23-4-1(c).  *See, e.g., Frey*, 2023 U.S. Dist. Lexis 42067, at *37-39 (denying preliminary injunction, in part, due to municipal and town ordinances and "find[ing] no issue in considering the abundance of examples provided by the Defendants regarding the existence of municipal gun regulations from 1750 to the late 19th century").   Here, the Commissioner has provided this Court with numerous ordinances from across the country—and from some of the most populated cities at the time—that are virtually identical (i.e., "dead ringer[s]" under *Bruen*) to § 23-4-1(c) that were enacted during the modern parks movement.  This Court should not discount their significance under the circumstances of this case.

**C.   Plaintiff has failed to satisfy the remaining preliminary injunction factors.**

This Court should deny Plaintiff's motion for a preliminary injunction for the additional reasons that he has neither shown (1) irreparable harm nor (2) that the equities and the public interest weigh in favor of granting his motion. *See Libertarian Party*, 977 F.3d at 176 (discussing movant's burden).

**1.   Plaintiff has not demonstrated that he will be irreparably harmed by being unable to go to two Connecticut state parks without a firearm.**

Plaintiff argues that the alleged violation of his Second Amendment rights entitles him to a "presumption of irreparable harm." *Mtn.* at 13.  That is incorrect; "'[i]n the Second Circuit . . . [the] presumption of irreparable harm arising from a constitutional violation is not automatic." *Frey v. Nigrelli*, 2023 U.S. Dist. Lexis 42067, at *62 (S.D.N.Y. March 13, 2023) (*quoting Joglo Realties, Inc. v. Seggos*, 2016 U.S. Dist. Lexis 113057, at *49 (E.D.N.Y. August 23, 2016)). Rather, to show irreparable injury based on an alleged violation of his Second Amendment rights, "'[P]laintiff must show a likelihood of success on the merits.'" *Id.* (quoting *Turley v. Giuliani*, 86 F. Supp. 2d 291, 295 (S.D.N.Y. 2000).  As stated above, Plaintiff has failed to do that.  So he fails on this element as well.

**2.   The equities and public interest weigh heavily against enjoining § 23-4-1(c), particularly during the busiest season for use of State parks and forests.**

Plaintiff has failed to demonstrate that the equities and public interest factors, which "merge when the Government is the opposing party," weigh in favor of granting the injunction. *Nken v. Holder*, 556 U.S. 418, 435 (2009).   In balancing the equities, this Court must "explor[e] the relevant harms to applicant and respondent, as well as the interests of the public at large." *Hartford Courant Co., LLC v. Carroll*, 986 F.3d 211, 224 (2d Cir. 2021)(quotation marks omitted). Plaintiff requests an "extraordinary and drastic remedy" that this Court should not grant unless

Plaintiff, "by a *clear showing*, carries the burden of persuasion." *Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007) (per curiam) (emphasis in original; internal quotation marks omitted).

Notwithstanding his heavy burden, Plaintiff pays, at best, lip service to the balance of the equities and public interest factors, which, as best as the Commissioner can tell, distills to the following: (1) the Second Amendment "'is the very product'" of an interest balancing (quoting *Bruen*); (2) he is likely to succeed on his constitutional claim; and (3) a preliminary injunction "would not disturb any other conservation or gaming law that does not violate the Second [A]mendment."[23] *See Mtn.* at 36-37.  Plaintiff's perfunctory arguments are inadequate considering the relief he seeks.  *See Tolbert*, 242 F.3d at 75; *see also Taylor*, 2023 U.S. App. LEXIS 3512, at *10-11.

In any event, Plaintiff's limited assertions underscore the weakness of his position, especially when weighted against the imminent impact that enjoining enforcement of § 23-4-1-(c) would have.  Preliminarily, the State would "'suffer[ ] a form of irreparable injury'" by enjoining enforcement of § 23-4-1-(c).  *See, e.g., Our Wicked Lady LLC v. Cuomo*, 2021 WL 915033, 2021 U.S. Dist. Lexis 44505, at *17 (S.D.N.Y. March 9, 2021) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)).

Additionally, granting the preliminary injunction would adversely impact the public's interests and lead to various inequities—circumstances which weigh heavily in favor of denying Plaintiff's motion.  For example, if individuals were allowed to carry firearms in State parks and forests, some schools would cancel various school field trips or academic programs taking place in State parks and forests.  *Highsmith Dec.* ¶¶ 24-25; *Benigni Dec.* ¶¶ 21-24.   Indeed, the

---

[23]Plaintiff bears the burden of establishing entitlement to the extraordinary remedy he seeks.  He cannot raise new arguments in reply in support of his motion.  *See, e.g., Cadoret*, 323 F. Supp. 3d at 326 n.7.

Superintendent of Hamden Public Schools would "not allow [Hamden] students to participate" in the Quinnipiac University Advancing Diversity in Science Program, which took place at Sleeping Giant State Park in 2022 and which might take place there this Spring.  *Highsmith Dec.* ¶¶ 23-26. Allowing firearms in State parks and forests "would, in effect, deny [Hamden] students an opportunity to take advantage of any educational program taking place" in such locations. *Highsmith Dec.* ¶ 25.  Moreover, if individuals could carry firearms in State parks and forests, schools would notify parents of this development, and such news, in turn, could cause parents not to allow their children to attend school field trips or school-sponsored events taking place in State parks and forests.  *Highsmith Dec.* ¶ 30; *Benigni Dec.* ¶ 21(c).  And if parents did not allow their children to attend such activities, it mighty adversely impact school staffing and programming on days when school field trips are planned. *Benigni Dec.* ¶ 21(e).

The presence of firearms in State parks and forests could also lead to fewer individuals visiting state parks and forests (due to safety concerns or otherwise), and this would adversely impact the state's financial interests.  *Tyler Dec.* ¶ 95.  Notably, the presence of firearms would lead to confusion and conflict among visitors, and calls to 911.  *Tyler Dec.* ¶¶ 94, 117.  This is significant because State parks and forests are a key marketing and tourist asset for the State. *Anthony Dec.* ¶ 16.  Approximately 90% of the State's marketing efforts promote State parks and/or forests in some capacity.  *Anthony Dec.* ¶ 17.  And if an "incident occurred involving the discharge or display of a firearm in a State park or forest," fewer individuals would likely want to engage in common recreational activities in such locations and could cause the State to alter its marketing efforts to "put people at ease about visiting State parks and forests[.]"  *Anthony Dec.* ¶ 24(a) and (b).

Relatedly, the presence of firearms in State parks and forests could lead to additional public safety concerns related to the presence of guns in crowded areas, including serious injury or death caused by the discharge of a firearm.  *Tyler Dec.* ¶ 94.  Because of this, DEEP would consider implementing various safety precautions or other responsive measures in all State parks and forests, including imposing additional bans on alcohol and other substances, despite a lack of staffing and resources to implement adequately those changes. *Tyler Dec.* ¶ 96-98.  These safety precautions or other responsive measures could not be implemented over night and, relatedly, could not be undone overnight if the preliminary injunction were reversed on appeal or if Plaintiff failed to prevail at a trial on the merits.  *Id.*; *Lewis Dec.* ¶¶ 19-20.

Moreover, allowing individuals to carry firearms in State parks and/or forests would raise considerable questions regarding the lawfulness and/or ability of the State to abide by deed restrictions prohibiting the presence of guns on specified state park and forest lands obtained by the State through donations.  *Tyler Dec.* ¶ 99.  Indeed, one such deed restriction applicable to Sleeping Giant State Park expressly states that "[t]he use of firearms shall be forever prohibited thereon."  *Id.* (*quoting* Exhibit 106).  Granting Plaintiff's motion for a preliminary injunction would require that DEEP conduct a comprehensive review of any applicable deed restrictions and, thereafter, take any appropriate responsive measures to address the ability of the State to abide by such deed restrictions, which could include potential litigation.  *Id.*

Lastly, Plaintiff actively exercises his right to armed self-defense in other locations and "abides by the laws and rules that govern where he may carry [his handgun]."  *Am. Compl.*, ¶ 36.  Plaintiff need not visit State parks and/or forests for recreational hiking with his girlfriend—he simply chooses to do so.  His own allegations illustrate that his right to armed self-defense remains intact in such other locations.

On balance, Plaintiff's motion should be denied because the equities and the public interest weigh heavily against granting his extraordinary request.

## V.   CONCLUSION

For all of the above reasons, this Court should deny Plaintiff's extraordinary request to preliminarily enjoin § 23-4-1(c).

<div style="margin-left:40%">

Respectfully submitted,

DEFENDANT-COMMISSIONER
KATIE DYKES

WILLIAM TONG
ATTORNEY GENERAL

</div>

BY:    */s/ Timothy J. Holzman*
        Timothy J. Holzman (ct30420)
        Blake T. Sullivan (ct30289)
        Thadius L. Bochain (ct31367)
        Assistant Attorneys General
        Attorney General's Office
        165 Capitol Avenue
        Hartford, CT 06106
        860-808-5020 (phone)
        860-808-5347 (fax)
        Timothy.Holzman@ct.gov
        Blake.Sullivan@ct.gov
        Thadius.Bochain@ct.gov
        Attorneys for the Commissioner

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 30, 2023 a copy of the foregoing was electronically filed. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

<div align="center"></div>

*/s/ Timothy J. Holzman*
Assistant Attorney General