# Exhibit 130

Doc ID:   000717850016 Type: LEASE
BK **472** PG **731-746**

First American Title Ins. Co.
National Comm. Services Division
800 Boylston Street, Suite 2820                    1t
Boston, MA 02199
Attn: Jo-Ann Allan, Esq.

Doc ID:   000727510016 Type: LEASE
BK **473** PG **660-675**

## AMENDED AND RESTATED LEASE AGREEMENT

This Amended and Restated Lease Agreement (this "Lease Agreement" or "Lease") is entered into by and among **THE WINDSOR LOCKS CANAL COMPANY**, a Connecticut corporation (hereinafter referred to as "Lessor"), **THE STATE OF CONNECTICUT**, acting by and through the Commissioner of Energy and Environmental Protection pursuant to Conn. Gen. Stat. §22a-25 (hereinafter referred to as "Lessee"), and **BC MONTGOMERY MILL LLC**, a Connecticut limited liability company (hereinafter referred to as "Ground Tenant"), for the purposes and in accordance with the stipulations and conditions set forth herein.

### WITNESSETH:

WHEREAS, Lessor wishes to provide safe access to the general public for recreational purposes on certain of Lessor's property situated in the Towns of Suffield and Windsor Locks, Connecticut, namely, a ten-foot wide surface approximately 4-1/2 miles long (hereinafter referred to as the "Towpath"), and more particularly shown in part as "Windsor Locks Canal Trail" on Exhibit A attached hereto. Unless the context indicates otherwise, as used in this Lease Agreement the term "Towpath" includes the surface of the graveled accessway from the northern locks of the Windsor Locks Canal to the "Park Entrance and Shared Driveway", located at the south end of the Towpath, the surface over said locks, and the surface of the bridge over Stony Brook, all as shown on Exhibit A.

WHEREAS, Lessor, as ground lessor, and Ground Tenant, as ground lessee, are parties to that certain Ground Lease dated December  26 , 2017, as amended, restated, replaced, supplemented or otherwise modified from time to time (hereinafter referred to as the "Ground Lease") whereby Lessor leases to Ground Tenant that certain real property located in Windsor Locks, Connecticut, as more particularly described on Exhibit C attached hereto (the "Ground Leased Property");

WHEREAS, pursuant to the terms and conditions of the Ground Lease, Ground Tenant will redevelop, construct, operate and maintain an approximately 160-unit residential development on the Ground Leased Property; and

WHEREAS, a portion of the Towpath is located within the Ground Leased Property and the parties wish to confirm each party's respective rights and obligations with respect to the Towpath and Lessee's use thereof.

NOW THEREFORE, for ten dollars ($10.00) and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties to this Lease hereby agree as follows:

1. In consideration of the mutual promises contained within this Lease, Lessor grants to Lessee, its agents, contractors, employees and invitees, including members of the public using the Towpath for recreational purposes, the present lease of and non-exclusive right to use and occupy the Towpath in the manner set forth herein.

2. Lessee, its agents, contractors, employees and invitees, including members of the public using the Towpath for recreational purposes, shall have a non-exclusive right of access from Connecticut Route 140 (a/k/a Bridge Street) over certain real property of Lessor, and may park cars and non-commercial trucks in up to twelve (12) non-exclusive parking spaces in the "Southern Parking Lot", all as shown in Exhibit A.

3. As used in this Lease Agreement, the terms "recreation" and "recreational purposes" shall mean walking, jogging, bicycling, access for fishing on the Connecticut River and other similar recreational activities.

98631183.11
98631183.13

4. Lessor shall charge no rent to Lessee for the use of the Towpath or the 12 non-exclusive parking spaces in the parking lot shown on Exhibit A. No fee shall be charged by Lessee or Lessor to any member of the public for using the parking areas or the Towpath for recreational purposes.

5. The term of this Lease Agreement shall begin on the date of approval by the Attorney General of the State of Connecticut, as evidenced by the date on the Attorney General's signature page hereto, and shall continue for five (5) years thereafter unless: (i) terminated pursuant to paragraphs 6 or 7 below; or (ii) Lessor and Lessee mutually agree in writing that it shall expire sooner. This Lease Agreement shall automatically renew for successive terms of five years unless terminated by either party upon sixty (60) days written notice prior to the end of the initial term, or any subsequent renewal term.

6. Lessee shall be in default under this Lease Agreement if any of the following occurs, provided however that the Lessee shall have a period of sixty (60) days from the date of receipt of said notice to rectify or cure the condition or conditions cited in the written notice or, if such cure cannot be completed within such sixty (60) day period, such period of time reasonably necessary rectify or cure such condition(s), provided Lessee has diligently commenced efforts to rectify or cure such condition(s) during such sixty (60) day period:

    a. Any event or occurrence which results from authorized use of the Towpath and which causes material and unreasonable deterioration in the overall water quality of the Windsor Locks Canal, including without limitation the dumping of debris into the said Canal;
    b. Repeated violations of the rules established by the Lessee and Lessor and posted by Lessee under paragraph 18 of this Lease Agreement; or
    c. A breach by Lessee of any of the other terms and conditions of this Lease.

Following any such default by Lessee at any time during the initial term, or any subsequent renewal term, Lessor may, upon Lessor's provision of thirty (30) days advance written notice to Lessee, terminate this Lease Agreement.

Further, if the provisions of Conn. Gen. Stat. §§52-557f through 52-557i, inclusive, are repealed or amended in any way so as to increase Lessor's liability for injury to person or property in connection with the authorized use of the Towpath, Lessor shall have the right to terminate this Lease Agreement upon written notice to Lessee at any time after the effective date of such repeal or amendment. Upon termination of this Lease Agreement pursuant to this paragraph, Lessor shall, at no cost to Lessee, so inform the public by appropriate signage and publication of notice in newspapers having general circulation in the area, and all of Lessee's obligations hereunder, including the obligation to carry insurance, shall on such effective date become void and unenforceable against Lessee.

7. Notwithstanding the foregoing, the Lessee may terminate this Lease for the convenience of the State upon sixty (60) days prior written notice to the Lessor.

8. Lessor and Lessee shall allow public use of the Towpath for recreational purposes from April 1 through November 15 during daylight hours of each year during this Lease. During such times the public may obtain access to the Towpath from the locations shown on the attached Exhibit A. From November 16 through March 31 of each year of this Lease, Lessee shall, by means of appropriate signage paid for by the Lessee and approved by Lessor, inform the public that the Towpath is closed to public access. The Lessor's approval of such signage will not be unreasonably withheld or delayed. Notwithstanding the foregoing, the portion of the Towpath that is located within the Ground Leased Parcel shall be open year round except for permitted closures in accordance with the terms and conditions of this Lease.

9. If at any time, Lessee or Lessor determines that there exists at or near the Towpath a significant hazard to public safety or to the integrity of the Towpath or the waters of the state, Lessee shall immediately close the Towpath to public access and so inform the public by appropriate signage and publication of notice in newspapers having general circulation in the area, at no cost to the Lessor. As soon as is practicable after closing the Towpath under this paragraph, Lessee shall inform Lessor of such closure. Except for hazards attributable to Lessor, its affiliates, agents, employees, contractors or invitees (which Lessor shall abate at its own expense), Lessee shall, at its own expense, abate the hazard at no cost to the Lessor. Once Lessee has abated the hazard to Lessor's reasonable satisfaction, Lessee may reopen the Towpath to public access. If the Lessee elects not to abate the hazard, then Lessor may terminate this Lease.

10. If at any time, Lessor determines that, for building renovation or re-construction purposes, there exists at or near the Towpath a significant hazard to public safety, or to the integrity of the Towpath or the waters of the State, Lessor shall immediately close the Towpath to public access and so inform the public by appropriate signage and publication of notice in newspapers having general circulation in the area, at no cost to Lessee. As soon as is practicable after determining the existence of a hazard under this paragraph, Lessor shall inform Lessee of the closure of the Towpath and provide Lessee with an estimate for the duration of the closure. As soon as Lessee and Lessor determine that the hazard no longer exists, the Lessor shall reopen the Towpath to public access. Any damages or hazards attributable to the Lessor's building renovation or re-construction, shall be abated by Lessor at no cost to the Lessee. If the Lessor elects not to abate the hazard, then Lessee may terminate this Lease. Lessee hereby acknowledges and agrees that the Towpath will be closed during Ground Tenant's initial construction activities undertaken in accordance with the terms and conditions of the Ground Lease, which construction is expected to continue until approximately April 1, 2019. Notwithstanding the immediately preceding sentence, Lessee and Ground Tenant may mutually agree to permit public access to the Towpath during Ground Tenant's initial construction period provided that and as a condition to any such access (i) Lessor has not terminated this Lease in accordance with Section 22, and (ii) Lessee has obtained updated insurance in accordance with Section 22 and delivered evidence of same to Lessor and Ground Tenant.

11. Except for damage attributable to Lessor, Lessee shall, at its own expense, make such repairs and undertake such maintenance of the Towpath as necessary to assure the safety of persons using the Towpath for recreational purposes.

12. Each year before the Towpath is opened to public access on April 1, Lessee shall clean, inspect, and, as necessary, repair the Towpath to assure that the surface is reasonably safe for recreational purposes, at the Lessee's expense. Lessee will notify Lessor of said repairs.

13. Lessee shall be entitled to install along the Towpath signage relating to rules for public use issued under paragraph 18 below, and to historical and other matters of public interest.

14. The leasehold granted hereby is limited to the Towpath and the above-described parking rights and does not grant any right to use adjacent properties of the Lessor for any purpose other than fishing access to the canal waters that abut the Towpath.

15. Lessor reserves the right to use the Towpath for its business purposes and the right to allow its affiliates, agents, employees, contractors, tenants, and subtenants to use the Towpath at any time for such purposes, provided that in so using the Towpath Lessor and its affiliates, agents, employees, and contractors shall not endanger or unreasonably interfere with anyone using the Towpath for recreational purposes.

16. Lessee and its agents, employees, and contractors may enter the Towpath at any time with persons, vehicles, and equipment to install, maintain or repair the Towpath, or for law enforcement purposes.

17. Lessee may not erect any permanent structure on the Towpath without Lessor's written approval, which will not be unreasonably withheld or delayed.

18. Lessee may from time to time establish rules governing the public use of the Towpath, provided such rules are not inconsistent with any provision of this Lease Agreement. Lessee shall provide a copy of any such rules to Lessor.  These rules may not be construed as regulations.

19. Lessee may, by any means Lessee deems appropriate, publicize any rules established under Paragraph 18, at no cost to the Lessor.

20. Except as otherwise provided herein, signs or other material shall not be affixed to any structures or improvements of the Lessor on the Towpath without Lessor's written permission, which shall not be unreasonably withheld or delayed.

21. When this Lease Agreement expires or is terminated, Lessee shall, at its own expense and if so requested by Lessor, remove in a good and workmanlike manner any structures or signage or other improvements which Lessee may have placed on the Towpath at any time.

22. Lessee shall, at its cost, continue to maintain commercial liability insurance with limits of at least $5,000,000.00 per occurrence and $5,000,000.00 in the aggregate (subject to a $4,000,000.00 self-insured retention) plus $5,000,000.00 of umbrella/excess liability insurance naming both Lessor and Ground Tenant as additional insureds . Lessee shall deliver to Lessor and Ground Tenant a copy of an insurance certificate evidencing the insurance requirements on an annual basis and certificates shall also be provided to Lessor and Ground Tenant for renewal policies no later than thirty (30) days prior to the renewal date of the insurance policies.  Lessee hereby acknowledges and agrees that Lessor has informed Lessee that the above-required insurance is inadequate for Lessee's and the public's continued use of the Towpath because Lessor is not fully defended and held harmless on a first dollar basis from and against any and all claims, losses, costs or liabilities arising out of or relating to the Towpath and use thereof.  As such Lessee agrees to explore changes or enhancements to the above insurance and/or other alternatives that may be satisfactory to Lessor; provided, however, that in no event will Lessee be required to indemnify, defend, or hold harmless Lessor or Ground Tenant, purchase insurance on behalf of Lessor or Ground Tenant, or perform any other action that would be a violation of Lessee's sovereign immunity.  Lessor and Lessee agree that the Towpath shall not be re-opened to public access unless and until Lessee obtains insurance and/or provides other alternatives that are satisfactory to Lessor in Lessor's sole discretion.  If Lessee has not obtained such insurance and/or provided other acceptable alternatives to Lessor by October 1, 2019 or any earlier date that public access to the Towpath is sought under Section 10 of this Lease, then, in either case, Lessor may terminate this Lease by providing ten (10) days' prior written notice to Lessee, with a copy to Ground Tenant.  Upon delivery of any such termination notice by Lessor this Lease shall automatically terminate and Lessor may record a notice or affidavit on the appropriate land records to evidence such termination.  If this Lease is not terminated by Lessor in accordance with this Section 22, upon written request of any party to this Lease, all parties agree to confirm in writing that this Lease remains in full force and effect and to amend this Section 22 accordingly.

23. If, during the term of this Lease Agreement, Lessor grants or renews a leasehold or other interest in Lessor's property outside of the Towpath (or inclusive of the Towpath but subject to Lessee's rights under this Lease) to a person other than Lessee, the instrument granting such interest shall reserve to persons using the Towpath for the

recreational purposes described in Paragraph 3 of this Lease the right to park cars and noncommercial trucks in the parking areas more particularly described in Paragraph 2. Such instrument shall also reserve to Lessee and its agents, employees, and independent contractors the right to park in said parking areas in connection with Lessee's responsibilities and privileges under this Lease Agreement.

24. Lessee shall at its own expense keep the Towpath in as neat and clean a condition as practicable. Nothing herein shall be construed as granting Lessor any right or privilege relating to Lessee's budget allocation process or decisions or its allocation of personnel or other resources.

25. Neither this Lease Agreement, nor any right granted herein, may be assigned or transferred by Lessee to a private enterprise.

26. Lessor and Lessee shall cooperate with each other and the public law enforcement agencies having jurisdiction over Lessee's leasehold interest in the Towpath, to restrict the use of the Towpath to the activities and times prescribed herein, it being the primary responsibility of Lessee to enforce those restrictions.

27. Whenever under the provisions of this Lease Agreement notice must or may be given to a party, notice shall be given by certified mail, return receipt requested, or by recognized overnight courier, and addressed to the following:

| For the Lessee: | For the Lessor: |
|---|---|
| Director of State Parks & | The Windsor Locks Canal Co. |
| Office of the Commissioner | c/o Ahlstrom-Munksjo USA Inc. |
| State of CT DEEP | Attn: Treasury Department |
| 79 Elm Street | 2 Elm Street |
| Hartford, CT 06106 | Windsor Locks, CT 06096 |

With a copy to:
The Windsor Locks Canal Co.
c/o Ahlstrom-Munksjo USA Inc.
Attn: Legal Department
2 Elm Street
Windsor Locks, CT 06096

For the Ground Tenant:
BC Montgomery Mill LLC
c/o Beacon Communities Development LLC
Two Center Plaza, Suite 700
Boston, MA 02108
Attention: Dara Kovel

With a copy to:
Nixon Peabody LLP
100 Summer Street
Boston, MA 02110
Attention: Paul E. Bouton, Esq.

Either party to this Lease may change its address for notice at any time by providing written notice to the other party in accordance with this paragraph.

28. This Lease Agreement grants no rights to any person with respect to any portion of the Windsor Locks Canal Service Road or other property of the Lessor, other than the Windsor Locks Canal Trail, the Northern and Southern Parking Lots, and non-exclusive access rights by all parties from Connecticut Route 140 (a/k/a Bridge Street) over the Park Entrance and Shared Driveway, all as shown on Exhibit A.

29. Nothing in this Lease Agreement shall be construed as a waiver, modification, or mitigation of the protections provided to Lessor by Conn. Gen. Stat. §52-557g.

30. This Lease Agreement will only become binding on the State upon approval of same by the Attorney General of the State of Connecticut.

31. This Lease Agreement is further subject to the terms and conditions set forth and contained in Exhibit B, attached hereto and made a part hereof.

32. Upon the approval of this Lease Agreement by the Attorney General of the State of Connecticut, the following agreements shall be deemed and are hereby terminated:
    a. Lease Agreement dated June 20, 2007, recorded in the Town of Windsor Locks at Volume 369, Page 306 (which this Lease Agreement amends and restates in its entirety);
    b. Any and all previously existing leases or other agreements between Lessor and Lessee, pertaining to the subject matter of this Lease Agreement, whether oral or written and whether recorded or unrecorded.

33. Lessee hereby acknowledges that Ground Tenant has assumed all obligations and liabilities of Lessor under this Lease for the portion of the Towpath located within the Ground Leased Property, which areas are more particularly shown on Exhibit A attached hereto. Lessee hereby agrees to look solely to Ground Tenant for performance of Lessor's obligations to the extent related to the portion of the Towpath located within the Ground Leased Property. Ground Tenant, by joining in this Lease, hereby acknowledges that it shall perform all the terms, covenants and conditions of this Lease which are to be performed by Lessor to the extent related to the portion of the Towpath located within the Ground Leased Property. Notwithstanding such assumption by Ground Tenant, Lessor shall be entitled to all rights and protections afforded under this Lease including, without limitation, all consent and termination rights. In no event will Ground Tenant have the right to terminate this Lease Agreement. Lessee hereby consents to Ground Tenant's right, at Ground Tenant's sole cost and expense, to (i) use the Towpath for vehicular and pedestrian access and for utility service, (ii) improve the Towpath in its current location in connection with the construction of certain improvements permitted under the Ground Lease including, but shall not be limited to, paving of the Towpath and installation of lighting and railings along the Towpath, and (iii) remove the existing fence that currently prohibits access from Bridge Street to the Towpath during winter months; provided that none of the foregoing will unreasonably interfere with Lessee's rights as set forth in this Lease Agreement.

34. Subject to the restriction on Lessee's right to assign this Lease, this Lease shall be binding upon and inure to the benefit of each of the parties hereto and their respective successors and assigns.

35. This Lease may be executed in any number of counterparts, each of which shall be deemed to be an original, and all such counterparts shall constitute one agreement.

[SIGNATURE PAGES FOLLOW]

Signed in the Presence of:

**BC MONTGOMERY MILL LLC**

By: Beacon Montgomery Mill LLC, its Managing Member

By: Beacon Communities Corp., its Sole Member

Witness: Thacher Tiffany

By: _____
Name: TIMOTHY J COWLES
Title: Vice President

Witness: Emily H. Bouton

Commonwealth
STATE OF MASSACHUSETTS )
                        )  ss.   Boston
COUNTY OF SUFFOLK       )

The foregoing instrument was acknowledged before me this 19th day of December, 2017 by Timothy J. Cowles, as Vice President, duly authorized by Beacon Communities Corp., sole member of Beacon Montgomery Mill LLC, managing member of BC Montgomery Mill LLC, a Connecticut limited liability company on behalf of the company.

_____
~~Commissioner of the Superior Court~~
Notary Public
My commission expires: August 24, 2018

EMILY H. BOUTON
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires On
August 24, 2018

98631183.11

IN WITNESS WHEREOF, the parties have set their hands.

Signed in the Presence of:                    **THE WINDSOR LOCKS CANAL COMPANY**

Witness: Donna DeCoteau          By: _____
                                      Its (title) President

Witness: Jean Sonick

Witness: Donna DeCoteau          By: _____
                                      Its (title) Secretary

Witness: Jean Sonick


STATE OF CONNECTICUT )
                     ) ss. Windsor Locks
COUNTY OF HARTFORD   )


The foregoing instrument was acknowledged before me this 19th day of December, 2017 by
Matthew Spaulding, as President          , duly authorized by The Windsor
Locks Canal Company, a Connecticut corporation on behalf of the corporation.

                                    _____ Amy N Welliver
                                    Commissioner of the Superior Court
                                    Notary Public
                                    My commission expires: September 30, 2021

STATE OF CONNECTICUT )

                                 ) ss. Windsor Locks

COUNTY OF HARTFORD   )

The foregoing instrument was acknowledged before me this 19th day of December, 2017 by David T. Pluta , as Secretary , duly authorized by The Windsor Locks Canal Company, a Connecticut corporation on behalf of the corporation.

Amy N Welliver

Commissioner of the Superior Court
Notary Public
My commission expires: September 30, 2021

Signed in the Presence of:

**STATE OF CONNECTICUT**
Department of Energy and Environmental Protection

Witness: CARMEN Colon

By: _____
Robert J. Klee
Commissioner

Witness: Rosalynn Grzywski

STATE OF CONNECTICUT  )
                       )  ss. Hartford
COUNTY OF HARTFORD     )

The foregoing instrument was acknowledged before me this 19th day of December, 2017, by Robert J. Klee, Commissioner Department of Energy and Environmental Protection, State of Connecticut, on behalf of the State.

Commissioner of the Superior Court
Notary Public  Mary Lu Kramer
My commission expires: 8/28/2018

**STATUTORY AUTHORITY**
Conn. Gen. Stat. §22a-25

**APPROVED**
George Jepsen
Attorney General

By: ~~Joseph Rubin~~
~~Associate Attorney General~~
Robert W Clark
Asst Atty General

Date: 12/21/17

DESCRIPTION OF TOWPATH

## EXHIBIT A



WINDSOR LOCKS CANAL TRAIL
WINDSOR LOCKS, CT
DECEMBER 12, 2017

## EXHIBIT B

For purposes of this Exhibit B, the following terms are defined as follows:

1. "Commission" means the Commission on Human Rights and Opportunities;
2. "Contract" and "contract" mean the Amended and Restated Lease Agreement and include any extension or modification of the Amended and Restated Lease Agreement, Contract or contract;
3. "Contractor" and "contractor" mean, collectively, the Lessor and Ground Tenant and includes their respective successors or assigns;
4. "Gender identity or expression" means a person's gender-related identity, appearance or behavior, whether or not that gender-related identity, appearance or behavior is different from that traditionally associated with the person's physiology or assigned sex at birth, which gender-related identity can be shown by providing evidence including, but not limited to, medical history, care or treatment of the gender-related identity, consistent and uniform assertion of the gender-related identity or any other evidence that the gender-related identity is sincerely held, part of a person's core identity or not being asserted for an improper purpose.
5. "good faith" means that degree of diligence which a reasonable person would exercise in the performance of legal duties and obligations;
6. "good faith efforts" shall include, but not be limited to, those reasonable initial efforts necessary to comply with statutory or regulatory requirements and additional or substituted efforts when it is determined that such initial efforts will not be sufficient to comply with such requirements;
7. "marital status" means being single, married as recognized by the state of Connecticut, widowed, separated or divorced;
8. "mental disability" means one or more mental disorders, as defined in the most recent edition of the American Psychiatric Association's "Diagnostic and Statistical Manual of Mental Disorders", or a record of or regarding a person as having one or more such disorders;
9. "minority business enterprise" means any small contractor or supplier of materials fifty-one percent or more of the capital stock, if any, or assets of which is owned by a person or persons: (1) who are active in the daily affairs of the enterprise, (2) who have the power to direct the management and policies of the enterprise, and (3) who are members of a minority, as such term is defined in subsection (a) of Connecticut General Statutes §32-9n; and
10. "public works contract" means any agreement between any individual, firm or corporation and the State or any political subdivision of the State other than a municipality for construction, rehabilitation, conversion, extension, demolition or repair of a public building, highway or other changes or improvements in real property, or which is financed in whole or in part by the State, including, but not limited to, matching expenditures, grants, loans, insurance or guarantees.
11. "State" means the Lessee.
12. "Claims" means all actions, suits, claims, demands, investigations and proceedings of any kind, open, pending or threatened, whether mature, unmatured, contingent, known or unknown, at law or in equity, in any forum.
13. "Contractor Parties" means the Lessor's members, directors, officers, shareholders, partners, managers, principal officers, representatives, agents, servants, consultants, employees or any one of them or any other person or entity with whom the Lessor is in privity of oral or written contract and the Lessor intends for such other person or entity to perform under the Agreement in any capacity.

### EXECUTIVE ORDERS

This Contract is subject to the provisions of Executive Order No. Three of Governor Thomas J. Meskill, promulgated June 16, 1971, concerning labor employment practices, Executive Order No. Seventeen of Governor Thomas J. Meskill promulgated February 15, 1973, concerning the listing of employment openings and Executive Order No. Sixteen of Governor John G. Rowland promulgated August 4, 1999, concerning violence in the workplace, all of which are incorporated into and are made a part of the Contract as if they had been fully set forth in it. The Contract may also be subject to the applicable parts of Executive Order No. 14 of Governor M. Jodi Rell, promulgated April 17, 2006, concerning procurement of cleaning products and services and to Executive Order No. 49 of Governor Dannel P. Malloy, promulgated May 22, 2015, mandating disclosure of certain gifts to public employees and contributions to certain candidates for office. If Executive Order 14 and/or Executive Order 49 are applicable, they are deemed to be incorporated into and are made a part of the Contract as if they had been fully set forth in it. At the Contractor's request, the State shall provide a copy of these orders to the Contractor.

### NON-DISCRIMINATION

(a) For purposes of this Section, the terms "Contract" and "contract" do not include a contract where each contractor is (1) a political subdivision of the state, including, but not limited to, a municipality, (2) a quasi-public agency, as defined in Conn. Gen. Stat. Section 1-120, (3) any other state, including but not limited to any federally recognized Indian tribal governments, as defined in Conn. Gen. Stat. Section 1-267, (4) the federal government, (5) a foreign government, or (6) an agency of a subdivision, agency, state or government described in the immediately preceding enumerated items (1), (2), (3), (4) or (5).

(b) (1) The Contractor agrees and warrants that in the performance of the Contract such Contractor will not discriminate or permit discrimination against any person or group of persons on the grounds of race, color, religious creed, age, marital status, national origin, ancestry, sex, gender identity or expression, intellectual disability, mental disability or physical disability, including, but not limited to, blindness, unless

it is shown by such Contractor that such disability prevents performance of the work involved, in any manner prohibited by the laws of the United States or of the State of Connecticut; and the Contractor further agrees to take affirmative action to insure that applicants with job-related qualifications are employed and that employees are treated when employed without regard to their race, color, religious creed, age, marital status, national origin, ancestry, sex, gender identity or expression, intellectual disability, mental disability or physical disability, including, but not limited to, blindness, unless it is shown by the Contractor that such disability prevents performance of the work involved; (2) the Contractor agrees, in all solicitations or advertisements for employees placed by or on behalf of the Contractor, to state that it is an "affirmative action-equal opportunity employer" in accordance with regulations adopted by the Commission; (3) the Contractor agrees to provide each labor union or representative of workers with which the Contractor has a collective bargaining Agreement or other contract or understanding and each vendor with which the Contractor has a contract or understanding, a notice to be provided by the Commission, advising the labor union or workers' representative of the Contractor's commitments under this section and to post copies of the notice in conspicuous places available to employees and applicants for employment; (4) the Contractor agrees to comply with each provision of this Section and Connecticut General Statutes §§46a-68e and 46a-68f and with each regulation or relevant order issued by said Commission pursuant to Connecticut General Statutes §§46a-56, 46a-68e and 46a-68f; and (5) the Contractor agrees to provide the Commission on Human Rights and Opportunities with such information requested by the Commission, and permit access to pertinent books, records and accounts, concerning the employment practices and procedures of the Contractor as relate to the provisions of this Section and Connecticut General Statutes §46a-56. If the contract is a public works contract, the Contractor agrees and warrants that he will make good faith efforts to employ minority business enterprises as subcontractors and suppliers of materials on such public works projects.

(c)   Determination of the Contractor's good faith efforts shall include, but shall not be limited to, the following factors:  The Contractor's employment and subcontracting policies, patterns and practices; affirmative advertising, recruitment and training; technical assistance activities and such other reasonable activities or efforts as the Commission may prescribe that are designed to ensure the participation of minority business enterprises in public works projects.

(d)   The Contractor shall develop and maintain adequate documentation, in a manner prescribed by the Commission, of its good faith efforts.

(e)   The Contractor shall include the provisions of subsection (b) of this Section in every subcontract or purchase order entered into in order to fulfill any obligation of a contract with the State and such provisions shall be binding on a subcontractor, vendor or manufacturer unless exempted by regulations or orders of the Commission. The Contractor shall take such action with respect to any such subcontract or purchase order as the Commission may direct as a means of enforcing such provisions including sanctions for noncompliance in accordance with Connecticut General Statutes §46a-56; provided if such Contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the Commission, the Contractor may request the State of Connecticut to enter into any such litigation or negotiation prior thereto to protect the interests of the State and the State may so enter.

(f)   The Contractor agrees to comply with the regulations referred to in this Section as they exist on the date of this Contract and as they may be adopted or amended from time to time during the term of this Contract and any amendments thereto.

(g)   (1) The Contractor agrees and warrants that in the performance of the Contract such Contractor will not discriminate or permit discrimination against any person or group of persons on the grounds of sexual orientation, in any manner prohibited by the laws of the United States or the State of Connecticut, and that employees are treated when employed without regard to their sexual orientation; (2) the Contractor agrees to provide each labor union or representative of workers with which such Contractor has a collective bargaining Agreement or other contract or understanding and each vendor with which such Contractor has a contract or understanding, a notice to be provided by the Commission on Human Rights and Opportunities advising the labor union or workers' representative of the Contractor's commitments under this section, and to post copies of the notice in conspicuous places available to employees and applicants for employment; (3) the Contractor agrees to comply with each provision of this section and with each regulation or relevant order issued by said Commission pursuant to Connecticut General Statutes §46a-56; and (4) the Contractor agrees to provide the Commission on Human Rights and Opportunities with such information requested by the Commission, and permit access to pertinent books, records and accounts, concerning the employment practices and procedures of the Contractor which relate to the provisions of this Section and Connecticut General Statutes §46a-56.

(h)   The Contractor shall include the provisions of the foregoing paragraph in every subcontract or purchase order entered into in order to fulfill any obligation of a contract with the State and such provisions shall be binding on a subcontractor, vendor or manufacturer unless exempted by regulations or orders of the Commission. The Contractor shall take such action with respect to any such subcontract or purchase order as the Commission may direct as a means of enforcing such provisions including sanctions for noncompliance in accordance with Connecticut General Statutes §46a-56; provided, if such Contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the Commission, the Contractor may request the State of Connecticut to enter into any such litigation or negotiation prior thereto to protect the interests of the State and the State may so enter.

## FORUM AND CHOICE OF LAW

The parties deem the Contract to have been made in the City of Hartford, State of Connecticut. Both parties agree that it is fair and reasonable for the validity and construction of the Contract to be, and it shall be, governed by the laws and court decisions of the State of Connecticut, without giving effect to its principles of conflicts of laws. To the extent that any immunities provided by Federal law or the laws of the State of Connecticut do not bar an action against the State, and to the extent that these courts are courts of competent jurisdiction, for the purpose of venue, the complaint shall be made returnable to the Judicial District of Hartford only or shall be brought in the United States District Court for the District of Connecticut only, and shall not be transferred to any other court, provided, however, that nothing here constitutes a waiver or compromise of the sovereign immunity of the State of Connecticut. The Contractor waives any objection which it may now have or will have to the laying of venue of any Claims in any forum and further irrevocably submits to such jurisdiction in any suit, action or proceeding.

## SOVEREIGN IMMUNITY

The parties acknowledge and agree that nothing in the Contract shall be construed as a modification, compromise or waiver by the State of any rights or defenses of any immunities provided by Federal law or the laws of the State of Connecticut to the State or any of its officers and employees, which they may have had, now have or will have with respect to all matters arising out of the Contract. To the extent that this section conflicts with any other section, this section shall govern.

## SPECIAL CONDITIONS

The Contractor shall execute and deliver to the State a "Nondiscrimination Certification". Said Certification shall be retained in the files of the Lessor and Lessee.

**EXHIBIT C**

**DESCRIPTION OF GROUND LEASED PROPERTY**

That certain parcel of land located between the westerly side of the Connecticut River and the easterly side of the Windsor Locks Canal, in the Town of Windsor Locks and State of Connecticut, and being shown as "Lease Agreement Area to BC Montgomery Mill, LLC, Total Area = 336,111 SF ± =7.7 ± AC," on a plan entitled "Data Accumulation Plan, Lease Agreement Area Over Land of the Windsor Locks Canal Company, Prepared for BC Montgomery Mill, LLC, 25 Canal Bank Road, Windsor Locks, Connecticut," prepared by Fuss & O'Neill, dated November 30, 2017, and recorded with the Clerk of the Windsor Locks on 𝒟𝑒𝒸., 𝟤𝟫, 2017, as Plan No. 𝟣𝟩𝟩𝟦𝟧 / 𝟣𝟩𝟩𝟧, and bounded and described thereon as follows:

Beginning at the southwest corner of the herein described lease area and labeled as "POB Lease Area" on the referenced plan;

Thence running N2°12'23"E a distance of: 6.21' to a point;

Thence running N19°47'37"W a distance of: 6.46' to a point;

Thence running N1°19'13"E a distance of: 149.84' to a point;

Thence running N6°59'03"E a distance of: 22.69' to a point;

Thence running N47°17'03"E a distance of: 5.10' to a point;

Thence running N2°17'03"E a distance of: 175.07' to a point;

Thence running N42°42'57"W a distance of: 5.93' to a point;

Thence running N2°47'16"E a distance of: 16.05' to a point;

Thence running N85°31'38"E a distance of: 1.66' to a point;

Thence running N2°48'53"E a distance of: 199.76' to a point;

Thence running N1°23'33"E a distance of: 72.06' to a point;

Thence running N2°47'16"E a distance of: 88.99' to a point;

Thence running N2°17'03"E a distance of: 125.71' to a point;

Thence running N3°36'07"E a distance of: 36.55' to a point;

Thence running N2°19'35"E a distance of: 34.60' to a point;

Thence running N0°06'28"E a distance of: 43.15' to a point;

Thence running N2°44'46"E a distance of: 32.47' to a point;

Thence running N3°39'54"E a distance of: 67.09' to a point;

Thence running N1°24'49"E a distance of: 44.26' to a point;

Thence running N3°19'31"E a distance of: 28.51' to a point;

Thence running N1°45'47"E a distance of: 64.13' to a point;

Thence running N1°16'40"E a distance of: 24.45' to a point;

Thence running N1°32'16"E a distance of: 34.29' to a point;

Thence running N1°15'01"E a distance of: 32.21' to a point;

Thence running N0°10'17"W a distance of: 22.26' to a point;

Thence running N1°45'20"E a distance of: 25.45' to a point;

Thence running N1°01'50"E a distance of: 41.75' to a point;

Thence running N2°35'50"E a distance of: 21.81' to a point;

Thence running N3°17'37"E a distance of: 29.77' to a point;

Thence running N3°04'55"E a distance of: 33.19' to a point;

Thence running N4°06'02"E a distance of: 33.81' to a point;

Thence running N3°22'20"E a distance of: 16.65' to a point;

Thence running N3°34'29"E a distance of: 9.49' to a point;

Thence running S87°47'51"E a distance of: 252' +- to the ordinary high water line of the Connecticut River;

Thence running in a generally southwesterly direction along the ordinary high water line of the Connecticut River a distance of 720' +- to a point at the northeast corner of Parcel 4C;

Thence running in a generally southwesterly direction along the ordinary high water line of the Connecticut River a distance of 110 +- to a point at the northeast corner of Parcel 4B;

Thence running in a generally southwesterly direction along the ordinary high water line of the Connecticut River a distance of 112' +- to a point at the northeast corner of Parcel 4A;

Thence running in a generally southwesterly direction along the ordinary high water line of the Connecticut River a distance of 112' +- to a point at the northeast corner of Parcel 3;

Thence running in a generally southwesterly direction along the ordinary high water line of the Connecticut River a distance of 258' +- to a point at the northeast corner of Parcel 2;

Thence running in a generally southwesterly direction along the ordinary high water line of the Connecticut River a distance of 32' +- to a point at the northeast corner of Parcel 1;

Thence running in a generally southwesterly direction along the ordinary high water line of the Connecticut River a distance of 245' +- to a point at the southeast corner of Parcel 1;

Thence running N86°46'08"W a distance of 198' +- to the point at the southwest corner of Parcel 1

Thence continuing N86°38'38"W a distance of 14.16' to the point and place of beginning of the herein described lease area, and labeled as POB Lease Area on the referenced plan

Said proposed lease having an area of 336,111 square feet +-, or 7.7 acres +-.

Received for Record at Windsor Locks, Ct
On 12/28/2017 At 4:45:33 pm

Received for Record at Windsor Locks, Ct
On 01/29/2018 At 10:43:46 am

# Exhibit 131

the state, the same power with respect to criminal matters and the enforcement of the laws relating to intoxicating liquors and gaming, as sheriffs, police, or constables have in their respective jurisdictions. Said department shall render assistance, when requested, if practicable, to any sheriff or chief or superintendent of police in any part of the state. Whenever the state policemen shall not be engaged in any specific work as provided for in this section, they shall, under such rules as may be made by said commissioners, and under the direction of said superintendent, use their best endeavors to prevent crime, preserve the peace of the state, and secure the detection, arrest, and conviction of offenders.

*Repeal.*

SEC. 9. Sections 3094 and 3096 of the general statutes are hereby repealed.

SEC. 10. This act shall take effect from its passage.

Approved, June 6, 1913.

[Substitute for House Bill No. 317.]

CHAPTER 229.

An Act concerning the Removal of the Highway Commissioner.

*Be it enacted by the Senate and House of Representatives in General Assembly convened:*

*Repeal.*

SECTION 1. Sections three, four, five, and six of chapter 298 of the public acts of 1911 are hereby repealed.

SEC. 2. So much of any act as was repealed by section six of chapter 298 of the public acts of 1911 is hereby reenacted.

SEC. 3. This act shall take effect from its passage.

Approved, June 4, 1913.

[House Bill No. 1129.

CHAPTER 230.

An Act establishing a State Park Commission.

*Be it enacted by the Senate and House of Representatives in General Assembly convened:*

*Establishment of state park commission. Appointment and terms of office of members.*

SECTION 1. The governor on or before July 1, 1913, shall appoint six persons who shall constitute a board to be known as the state park commission. The members of this commission shall hold office, two for the term of two years, two for the term of four years, and two for the term of six years beginning with the first day of September, 1913. Biennially

1107

thereafter the governor, with the advice and consent of the senate, shall appoint as aforesaid two commissioners to hold office for the term of six years beginning with September first in the year of their appointment; and if any vacancy occurs in said commission the governor shall in like manner appoint a commissioner for the unexpired portion of the term in which the vacancy occurs. The members of said commission shall serve without compensation, but their traveling and other necessary expenses shall be paid by the state. In addition to the members of said commission so chosen the state forester shall be ex officio a member of said commission.

SEC. 2. Said commission shall annually choose one of its members to be chairman and may from time to time appoint a clerk and such other employees, including engineers, architects, and custodians, as it may deem necessary to carry out the purposes of this act. Said commission may determine the duties and compensation of such appointees. Said commission shall have a suitable office where its maps, plans, documents, records, and accounts shall be kept, subject to public inspection at reasonable times. On or before the first day of December in each year said commission shall make a report of its proceedings to the general assembly, with a statement of its receipts and disbursements. It shall be the duty of said commission, in connection with its report to the next general assembly, to present a comprehensive plan with maps, surveys, and estimates for the establishment of permanent public reservations. *Powers and duties of commission.* *Annual reports to general assembly.*

SEC. 3. Said commission shall have charge and supervision of all lands acquired by the state, as public reservations, for the purposes of public recreation or the preservation of natural beauty or historic association, except such lands as may be placed by law in the charge and under the supervision of other commissions or officials. *Commission to have charge of certain lands.*

SEC. 4. Said commission shall have power to acquire, maintain, and make available to the public open spaces for recreation and to act with local authorities. Said commission may take in the name of the state and for the benefit of the public, by purchase, gift, or devise, lands and rights in land for public open spaces, or take bonds for the conveyance thereof, and may preserve and care for such public reservations, and in the discretion of the commission and upon such terms as it may approve, such other open spaces within this state as may be entrusted, given, or devised, to the state by the United States or by cities, towns, corporations, or individuals for the purposes of public recreation, or for the preservation of natural beauty or historic association, provided said commission shall not take or contract to take by purchase any land or other property for an amount or amounts beyond such sum or sums as shall have been appropriated or contributed therefor. *Commission to have power to acquire, maintain, etc., spaces for recreation.*

1108

114

Powers of
comptroller.

SEC. 5.  The comptroller is hereby authorized, with the approval of said commission, to receive and hold in trust for the state, exempt from taxation, any grant or devise of land or rights in land and any gift or bequest of money or other personal property made for the purposes of this act, and shall preserve and invest any funds so received in such securities as trustees are permitted to invest in.  Such invested funds shall be known as the state park fund, and shall be used and expended under the direction of said commission and subject to its orders.

Authorizing trans-
fer of the care
and control of
certain open
spaces, to towns
and commission.

SEC. 6.  Any town or other municipality is hereby authorized to transfer the care and control of any open spaces owned or controlled by it to the state park commission upon such terms and for such periods as may be mutually agreed upon, or to enter into any agreement with said commission for the joint care or preservation of open spaces within or adjacent to such town or municipality, and said commission may in like manner transfer the care and control of any open spaces controlled by it to any local public authorities upon such terms and for such periods as may be agreed upon.

Powers of com-
mission, concern-
ing making of
rules and regu-
lations, for safety,
order, etc.

SEC. 7.  Said commission shall have power, with the approval of the governor, to make and alter rules and regulations for the maintenance of order, safety, and sanitation upon the lands in its control and for the protection of trees and other property and the preservation of the natural beauty thereof, and to affix penalties not exceeding a fine of twenty dollars for violation of such rules and regulations.  Such rules and regulations shall be posted in conspicuous places upon such lands.

Appropriation.

SEC. 8.  The following sums are hereby appropriated to be paid out of any money in the treasury not otherwise appropriated for the object specified for the two fiscal years ending September 30, 1915:  For the state park commission for the ordinary expenses of said commission and salaries and wages of its clerk, engineers, and other employees, five thousand dollars; for the state park commission for the acquisition of lands for state reservation, twenty thousand dollars.

SEC. 9.  This act shall take effect from its passage.

Approved, June 7, 1913.

# Exhibit 132

