## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

DAVID J. NASTRI, ESQ.                          :                    3:23-CV-00056 (JBA)
    *Plaintiff,*                                    :
                                                                     :
             v.                                     :
                                                                  :
KATIE DYKES, in her official capacity,         :
    *Defendant*                                    :

## DECLARATION OF SAUL CORNELL

I, Saul Cornell, declare that the following is true and correct:

1.      I have been asked by the Office of the Attorney General for the State of Connecticut to provide an expert opinion on the history of firearms regulation in the Anglo-American legal tradition, with a particular focus on how the Founding era understood the right to bear arms, as well as the understanding of the right to bear arms held at the time of the ratification of the Fourteenth Amendment to the United States Constitution.  In *N.Y. State Rifle & Pistol Association, Inc. v. Bruen*, the U.S. Supreme Court underscored that text, history, and tradition are the foundation of modern Second Amendment jurisprudence.  This modality of constitutional analysis requires that courts analyze history and evaluate the connections between modern gun laws and earlier approaches to firearms regulation in the American past.  This declaration explores these issues in some detail.  Finally, I have been asked to evaluate the law at issue in this case, § 23-4-1 of the Regulations of Connecticut State agencies, particularly regarding its connection to the tradition of firearms regulation in American legal history.

2.     This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

**BACKGROUND AND QUALIFICATIONS**

3.     I am the Paul and Diane Guenther Chair in American History at Fordham University.  The Guenther Chair is one of three endowed chairs in the history department at Fordham and the only one in American history.  In addition to teaching constitutional history at Fordham University to undergraduates and graduate students, I teach constitutional law at Fordham Law School.  I have been a Senior Visiting research scholar on the faculty of Yale Law School, the University of Connecticut Law School, and Benjamin Cardozo Law School.  I have given invited lectures, presented papers at faculty workshops, and participated in conferences on the topic of the Second Amendment and the history of gun regulation at Yale Law School, Harvard Law School, Stanford Law School, UCLA Law School, the University of Pennsylvania Law School, Columbia Law School, Duke Law School, Pembroke College Oxford, Robinson College, Cambridge, Leiden University, and McGill University.[1]

4.     My writings on the Second Amendment and gun regulation have been widely cited by state and federal courts, including the majority and dissenting opinions in *Bruen*.[2]  My scholarship on this topic has appeared in leading law reviews and top peer-reviewed legal history journals.  I authored the chapter on the right to bear arms in *The Oxford Handbook of the U.S. Constitution* and co-authored the chapter in *The Cambridge History of Law in America* on the Founding era and the Marshall Court, the period that includes the adoption of the Constitution and the

---

[1] For a full *curriculum vitae* listing relevant invited and scholarly presentations, *see* Attachment 1 to this declaration.

[2] *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).

Second Amendment.[3]  Thus, my expertise not only includes the history of gun regulation and the right to keep and bear arms, but also extends to American legal and constitutional history broadly defined.  I have provided expert witness testimony in *Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, No. 14-cv-02850 (D. Colo.); *Chambers, v. City of Boulder*, No. 2018 CV 30581 (Colo. D. Ct., Boulder Cty.), *Zeleny v. Newsom*, No. 14-cv-02850 (N.D. Cal.), and *Miller v. Smith*, No. 2018-cv-3085 (C.D. Ill.); *Jones v. Bonta*, 3:19-cv-01226-L-AHG (S.D. Cal.); *Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.); *Worth v. Harrington,* No. 21-cv-1348 (D. Minn.); *Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB (S.D. Cal.); *Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB (S.D. Cal.). *Renna v. Bonta*, No. 20-cv-2190 (S.D. Cal.); *Boland v. Bonta*, No. 8:22-cv-1421-CJC-ADS (C.D. Cal.); *Rupp v. Bonta*, No. 8:17-cv-746-JLS-JDE (C.D. Cal.); *B&L Productions, Inc. v. Newsom,* No. 21-cv-1718-AJB-DDL (S.D. Cal.); *NAGR v. Campbell*, No. 1:22-cv-11431-FDS (D. Mass.); *NAGR v. Lamont*, No. 3:22-cv-0118 (D. Conn.).

**RETENTION AND COMPENSATION**

5.    I am being compensated for services performed in the above-entitled case at an hourly rate of $750 per hour for reviewing materials, participating in meetings, and preparing reports; $1000 per hour for depositions and court appearances; and a flat fee of $500 per day for travel.  My compensation is not contingent on the results of my analysis or the substance of any testimony.

**BASIS FOR OPINION AND MATERIALS CONSIDERED**

6.    The opinion I provide in this report is based on my review of the amended complaint filed in this lawsuit, my review of the law at issue in this lawsuit,

---

[3] Saul Cornell, *The Right to Bear Arms*, in THE OXFORD HANDBOOK OF THE U.S. CONSTITUTION 739–759 (Mark Tushnet, Sanford Levinson & Mark Graber eds., 2015); Saul Cornell & Gerald Leonard, *Chapter 15: The Consolidation of the Early Federal System*, *in* 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 518–544 (Christopher Tomlins & Michael Grossberg eds., 2008).

my education, expertise, and research in the field of legal history.   The opinions contained herein are made pursuant to a reasonable degree of professional certainty.

7.     A review of the relevant history demonstrates that firearms have been extensively regulated in modern American parks for as long as these public spaces have existed.   The goals of repose, relaxation, and recreation were the defining feature of modern American parks. In contrast to earlier public spaces, including the Boston Common (America's first public park) modern-style parks only merged in the middle of the nineteenth century.   Beginning with New York's Central Park, American municipalities, states, and eventually the federal government itself, set aside park lands for  purposes that made it necessary to exclude firearms. Nothing about the subsequent history of these places has changed this fundamental fact. Accordingly, Connecticut's rules prohibiting guns in parks is consistent with the long history of gun regulation in America.

**THE HISTORICAL INQUIRY**

8.     Justice Kavanaugh underscored a key holding of *Heller* in his *Bruen* concurrence:  "Like most rights, the right secured by the Second Amendment is not unlimited.   From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."

9.     One overarching principle regarding firearms regulation does emerge from this period and it reflects not only the common law assumptions familiar to the Founding generation, but it is hard-wired into the Second Amendment itself.   As Justice Scalia noted in *Heller*, and Justice Thomas reiterated in *Bruen*, the original Second Amendment was a result of interest balancing undertaken by the people themselves in framing the federal Constitution and the Bill of Rights. Although "free-standing balancing"  by judges is precluded by *Heller*, the plain meaning of the text

recognizes a role for regulation explicitly and further asserts that actions inimical to the "security of a free state" fall outside of the scope of the right instantiated in the text.[4] Thus, from its outset the Second Amendment recognizes both the right to keep and bear arms and the right of the people to regulate arms to promote the goals of preserving a free state. An exclusive focus on rights and a disparagement of regulation is thus antithetical to the plain meaning of the text of the Second Amendment. Although rights and regulation are often cast as antithetical in the modern gun debate, the Founding generation saw the two goals as complimentary.

10. Comparing the language of the Constitution's first two amendments and their different structures and word choice makes this point crystal clear. The First Amendment prohibits "abridging" the rights it protects. In standard American English in the Founding era, to "abridge" meant to "reduce." Thus, the First Amendment prohibits a diminishment of the rights it protects. The Second Amendment's language employs a very different term, requiring that the right to bear arms not be "infringed."[5] As explained below, in Founding-era American English, the word "infringement" meant to "violate" or "destroy." In short, when read with the Founding era's interpretive assumptions and legal definitions in mind, the two Amendments set up radically different frameworks for evaluating the rights they enshrined in constitutional text. Members of the Founding generation would have understood that the legislature could regulate the *conduct* protected by the Second

---

[4] *Heller* at 597.

[5] The distinction emerges clearly in a discussion of natural law and the law of nations in an influential treatise on international law much esteemed by the Founding generation: "Princes who infringe the law of nations, commit as great a crime as private people, who violate the law of nature," J.J. BURLAMAQUI, THE PRINCIPLES OF NATURAL LAW (Thomas Nugent trans., 1753) at 201. This book was among those included in the list of important texts Congress needed to procure, *see* Report on Books for Congress, [23 January] 1783," *Founders Online,* National Archives, https://founders.archives.gov/documents/Madison/01-06-02-0031.

Amendment and comparable state arms bearing provisions as long such regulations did not destroy the underlying *right*.

11.    John Burn, author of an influential eighteenth-century legal dictionary, illustrated the concept of infringement in the context of his discussion of violations of rights protected by the common law.  Liberty, according to Burns, was not identical to that "wild and savage liberty" of the state of nature.  True liberty, by contrast, only existed when individuals created civil society and enacted laws and regulations that promoted *ordered* liberty.  Regulation was the indispensable correlate of rights in Founding era constitutionalism.[6]

12.    Similarly, Nathan Bailey's *Dictionarium Britannicum* (1730) defined "abridge" as to "shorten," while "infringe" was defined as to "break a law."[7]  And his 1763 *New Universal Dictionary* repeats the definition of "abridge" as "shorten" and "infringe" as "to break a law, custom, or privilege."[8]  Samuel Johnson's *Dictionary of the English Language* (1755) defines "infringe" as "to violate; to break laws or contracts" or "to destroy; to hinder."[9]  Johnson's definition of "abridge" was "to shorten" and "to diminish" or "to deprive of."[10]   And Noah Webster's *An American Dictionary of the English Language* (1828) largely repeats Johnson's definitions of "infringe" and "abridge."[11]  Although today these two terms are  conflated by some, the meanings of abridge and infringe were and remain distinct concepts. The

---

[6] *Liberty,*  A NEW LAW DICTIONARY (1792) *See also,* Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 LAW & CONTEMP. PROBS. 31, 32–33 (2020)

[7] *Abridge*, DICTIONARIUM BRITANNICUM (1730).

[8] *Abridge*, NEW UNIVERSAL DICTIONARY (1763).

[9] *Infringe*, DICTIONARY OF THE ENGLISH LANGUAGE (1755).

[10] *Abridge*, DICTIONARY OF THE ENGLISH LANGUAGE (1755).

[11] *Abridge*, *Infringe*, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828).

Founding generation was far more nuanced in distinguishing between the differences between these two terms and modern efforts to recover the original meaning of the scope of the Second Amendment must acknowledge this basic principle rooted in constitutional text.

13.    For the framers, ratifiers, and other relevant legal actors in the Founding era, regulation, including robust laws, was not understood to be an "infringement" of the right to bear arms, but rather the necessary foundation for the proper exercise of that right as required by the concept of ordered liberty.[12]

**CHANGE AND CONTINUITY IN EARLY AMERICAN FIREARMS REGULATION**

14.    Guns have been regulated from the dawn of American history.[13]  At the time *Heller* was decided, there was little scholarship on the history of gun regulation and a paucity of quality scholarship on early American gun culture.[14]  Fortunately, a burgeoning body of scholarship has illuminated both topics, deepening scholarly understanding of the relevant contexts needed to implement *Bruen*'s framework.[15] The common law that Americans inherited from England always acknowledged that the right of self-defense was not unlimited but existed within a well-delineated jurisprudential framework.  The entire body of the common law was designed to

---

[12] Dan Edelstein, *Early-Modern Rights Regimes: A Genealogy of Revolutionary Rights*, 3 CRITICAL ANALYSIS L. 221, 233–34 (2016).  *See generally* GERALD LEONARD & SAUL CORNELL, THE PARTISAN REPUBLIC: DEMOCRACY, EXCLUSION, AND THE FALL OF THE FOUNDERS' CONSTITUTION, 1780s–1830s, at 2; Victoria Kahn, *Early Modern Rights Talk*, 13 YALE J.L. & HUMAN. 391 (2001) (discussing how the early modern language of rights incorporated aspects of natural rights and other philosophical traditions); Joseph Postell, *Regulation During the American Founding: Achieving Liberalism and Republicanism*, 5 AM. POL. THOUGHT 80 (2016) (examining the importance of regulation to Founding political and constitutional thought).

[13] Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & CONTEMP. PROBS. 55 (2017).

[14] *Id.*

[15] Ruben & Miller, *supra* note 19, at 1.

preserve the peace and the right of self-defense existed within this larger framework.[16]  Statutory law, both in England and America functioned to further secure the peace and public safety.  Given these indisputable facts, the right to keep and bear arms was never understood to prevent government from enacting a broad range of regulations to promote the peace and maintain public safety.

15.     The response of states  in the early Republic to the emergence of new firearms that threatened the peace was a plethora of new laws.  In short, when faced with changes in technology, consumer behavior, and faced with novel threats to public safety, the individual states enacted laws to address these problems.   In every instance apart from a few outlier cases in the Slave South, courts upheld such limits on the unfettered exercise a right to keep and bear arms.  The primary limit identified by courts in evaluating such laws was the threshold question about infringement: did the law negate the ability to act in self-defense.[17]   In keeping with the clear imperative hard-wired into the Second Amendment, states singled out weapons that posed a particular danger for regulation or prohibition.  Responding in this fashion was entirely consistent with Founding-era conceptions of ordered liberty and the Second Amendment.

16.     The metric used by early American courts drew on the plain meaning of the text of the Second Amendment and its many state analogs.[18]  Regulation and limits were permissible as long as they did not render the right nugatory. Moreover, limits on guns in areas that were sensitive continued to define firearms regulation.

---

[16] Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 L. & CONTEMP. PROBS. 11 (2017).

[17] On southern gun rights exceptionalism, see Eric M. Ruben & Saul Cornell, *Firearms Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J. F. 121, 128 (2015).

[18] *State* v. *Reid,* 1 Ala. 612, 612 (1840).

THE POLICE POWER AND FIREARMS REGULATION

17.    The 1776 Pennsylvania Constitution, the first revolutionary constitution to assert a right to bear arms, preceded the assertion of this right by affirming a more basic rights claim: "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same."[19]  The phrase "internal police" had already become common, particularly in laws establishing towns and defining the scope of their legislative authority.[20]  By the early nineteenth century, the term "police" was a fixture in American law.[21]  Thus, an 1832 American encyclopedia confidently asserted that police, "in the common acceptation of the word, in the U. States and England, is applied to the municipal rules, institutions and officers provided for maintaining order, cleanliness &c."[22]  The Founding era's conception of a basic police right located in legislatures was transmuted during the Marshall Court's era into the judicial doctrine of the police power and would become a fixture in American law.

18.    The power to regulate firearms and gunpowder has always been central to the police power and historically was shared among states, local municipalities, and the federal government when it was legislating conduct on federal land and in

---

[19] PA. CONST. OF 1776, Ch. I, art iii.

[20] For other examples of constitutional language similar to Pennsylvania's provision, N.C. CONST. OF 1776, DECLARATION OF RIGHTS, art. II; VT. CONST. OF 1777, DECLARATION OF RIGHTS, art. IV.  For other examples of this usage, *see* An Act Incorporating the residents residing within limits therein mentioned, *in* 2 NEW YORK LAWS 158 (1785) (establishing the town of Hudson, NY); An Act to incorporate the Town of Marietta, *in* LAWS PASSED IN THE TERRITORY NORTHWEST OF THE RIVER OHIO 29 (1791).  For later examples, *see* 1 STATUTES OF THE STATE OF NEW JERSEY 561 (rev. ed. 1847); 1 SUPPLEMENTS TO THE REVISED STATUTES. LAWS OF THE COMMONWEALTH OF MASSACHUSETTS, PASSED SUBSEQUENTLY TO THE REVISED STATUTES: 1836 TO 1849, INCLUSIVE 413 (Theron Metcalf & Luther S. Cushing, eds. 1849).

[21] ERNST FREUND, THE POLICE POWER: PUBLIC POLICY AND CONSTITUTIONAL RIGHTS 2, n.2 (1904).

[22] 10 ENCYCLOPEDIA AMERICANA 214 new edition (Francis Lieber ed.).

buildings.[23]  The adoption of the Constitution and the Bill of Rights did not deprive states of their police powers.  Indeed, if it had, the Constitution would not have been ratified and there would be no Second Amendment today.  Ratification was only possible because Federalists offered Anti-Federalists strong assurances that nothing about the new government threatened the traditional scope of the individual state's police power authority, including the authority to regulate guns and gun powder.[24]

19.   Federalists and Anti-Federalists bitterly disagreed over many legal issues, but this one point of accord was incontrovertible.  Brutus, a leading Anti-Federalist, emphatically declared that "[I]t ought to be left to the state governments to provide for the protection and defense [sic]of the citizen against the hand of private violence, and the wrongs done or attempted by individuals to each other . . . ."[25]  Federalist Tench Coxe concurred, asserting that: "[t]he states will regulate and administer the criminal law, exclusively of Congress."  States, he assured the American people during ratification, would continue to legislate on all matters related to the police power "such as unlicensed public houses, nuisances, and many other things of the like nature."[26]  State police power authority was at its pinnacle in matters relating to guns or gun powder.[27]

---

[23] Harry N. Scheiber, *State Police Power*, in 4 ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 1744 (Leonard W. Levy et al. eds., 1986).

[24] Saul Cornell, THE OTHER FOUNDERS: ANTIFEDERALISM AND THE DISSENTING TRADITION IN AMERICA, 1788-1828 (1999).

[25] Brutus, *Essays of Brutus VII*, reprinted in 2 THE COMPLETE ANTIFEDERALIST 358, 400–05 (Herbert J. Storing ed., 1981).

[26] Tench Coxe, A Freeman, *Pa. Gazette*, Jan. 23, 1788, reprinted in FRIENDS OF THE CONSTITUTION: WRITINGS OF THE "OTHER" FEDERALISTS 82 (Colleen A. Sheehan & Gary L. McDowell eds., 1998).

[27] CORNELL, *supra* note 33.

RECONSTRUCTION AND THE EXPANSION OF STATE POLICE POWER TO
REGULATE FIREARMS (1863-1877)

20.    Founding-era constitutions treated the right of the people to regulate
their internal police separately from the equally important right of the people to bear
arms.   These two rights were separate in the Founding era but were mutually
reinforcing:  both rights were exercised in a manner that furthered the goal of ordered
liberty.   Reconstruction-era constitutions adopted a new textual formulation of the
connection between these two formerly distinct rights, fusing the two together as one
single constitutional principle.  This change reflected two profound transformations
in American politics and law between 1776 and 1868.  First, the judicial concept of
police power gradually usurped the older notion of a police right grounded in the idea
of popular sovereignty.  As a result, state constitutions no longer included positive
affirmations of a police right.  Secondly, the constitutional "mischief to be remedied"
had changed as well.  Constitution writers in the era of the American Revolution
feared powerful standing armies and sought to entrench civilian control of the
military.  By contrast, constitution writers in the era of the Fourteenth Amendment
were no longer haunted by the specter of tyrannical Stuart Kings using their standing
army to oppress American colonists.   In place of these ancient fears, a new
apprehension stalked Americans:  the proliferation of especially dangerous weapons
and the societal harms they caused.

21.    The new language state constitutions employed to describe the right to
bear arms enacted during Reconstruction responded to these changed circumstances
by adopting a new formulation of the venerable right codified in 1776, linking the
right to bear arms inextricably with the states broad police power to regulate conduct
to promote health and public safety.[28]   For example, the 1868 Texas Constitution

―――――――――――

[28] Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth
Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War
America*, 55 U.C. DAVIS L. REV. 65 (2022).

included new language that underscored the indissoluble connection that Anglo-American law had long recognized between the right to keep and bear arms and regulation of guns.  "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the government, under such regulations as the Legislature may prescribe."[29]  Nor was Texas an outlier in this regard.  Sixteen state constitutions adopted during this period employed similarly expansive language.[30]  Millions of Americans living in the newly organized western states and newly reconstructed states of the former confederacy adopted constitutional provisions that reflected this new formulation of the right to bear arms.  Thus, millions of Americans were living under constitutional regimes that acknowledged that the individual states' police power authority over firearms was at its apogee when regulating guns.[31]

22.     This expansion of regulation was entirely consistent with the Fourteenth Amendment's emphasis on the protection of rights and the need to regulate conduct that threatened the hard-won freedoms of recently free people of the South and their Republican allies.

23.     Indeed, the passage of the Fourteenth Amendment was premised on the notion that the individual states would not lose their police power authority to the federal government.  The author of Section One of the Fourteenth Amendment, John

---

[29] TEX. CONST. OF 1868, Art. I, § 13; for similarly expansive constitutional provision enacted after the Civil War, *see* IDAHO CONST. OF 1889, art. I, § 11 ("The people have the right to bear arms for their security and defense; but the legislature shall regulate the exercise of this right by law."); UTAH CONST OF 1896, art. I, § 6 ("[T]he people have the right to bear arms for their security and defense, but the legislature may regulate the exercise of this right by law.").

[30] Cornell, *supra* note 28, at 75–76.

[31] Andrew Willinger, *The Territories Under Text, History, and Tradition*, 101 WASH. U. L. REV. (forthcoming, 2023); Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. DAVIS L. REV. ONLINE 65  (2021).

Bingham, reassured voters that the states would continue to bear the primary responsibility for "local administration and personal security."[32]

24.    It would be difficult to understate the impact of this new paradigm for gun regulation on post-Civil War legislation.  Across the nation legislatures took advantage of the new formulation of the right to bear arms included in state constitutions and enacted a staggering range of new laws to regulate arms.  Indeed, the number of laws enacted skyrocketed, increasing by over four hundred percent from antebellum levels.[33]  Not only did the number of laws increase, but the number of states and localities passing such laws also expanded.[34]

25.    Henry Campbell Black, the author of *Black's Law Dictionary*, described the police power as "inalienable" and echoed the view of a long line of jurists who noted that the scope of the power was not easily defined and the determination of its limits was best left to courts on a case-by-case basis.[35]  Indeed, even the most ardent critics of the police power, such as conservative legal scholar Christopher G. Tiedeman, acknowledged that "police power of the State extends to the protection of the lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the State."[36]

---

[32] John Bingham, *Speech*, CINCINNATI DAILY GAZETTE (Sept. 2, 1867), as quoted in Saul Cornell and Justin Florence, *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation*, 50 SANTA CLARA L. REV. 1043, 1058 (2010).

[33] *See* Spitzer, *supra* note 37, at 59–61 tbl. 1.

[34] *Id.*

[35] HENRY CAMPBELL BLACK, HANDBOOK OF CONSTITUTIONAL LAW, 334–344 (2d ed., 1897).

[36] CHRISTOPHER G. TIEDEMAN, A TREATISE ON THE LIMITATIONS OF THE POLICE POWER IN THE UNITED STATES 4–5 (1886) (citing *Thorpe v. Rutland R.R.*, 27 Vt. 140, 149-50 (1854)).

26.     The laws enacted during Reconstruction underscore the fact that robust regulation of firearms during Reconstruction was not a novel application of the police power, but an expansion and continuation of antebellum practices. Moreover, these efforts illustrated a point beyond dispute: the flexibility inherent in police power regulations of guns.   American states had regulated arms since the dawn of the republic and Reconstruction simply renewed America's commitment to the idea of well-regulated liberty.

## *IN TERROREM*: LIMITS ON PUBLIC CARRY:  FROM THE FOUNDING ERA TO RECONSTRUCTION

27.     In 1795, Massachusetts enacted its own version of the ancient English Statute of Northampton. The law forbade anyone who "shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth."[37] This was a common gloss on the Statute of Northampton used in many of the popular English Justice of the Peace manuals of the previous century. It framed the prohibition in terms of traveling with offensive weapons. As was true for all criminal acts in the eighteenth century there was no modern *mens rea* requirement to establish evil intent. The mere act of carrying the prohibited item evidenced the necessary intent needed to prove criminality.  The Massachusetts law invoked the concept of *in terrorem populi*. The terror requirement under Anglo-American law was also shaped by the same common law assumptions.   There was no need to demonstrate that a particular act or actor created a subjective experience of terror, the appropriate legal standard in this period of history was inferred from the prohibited act itself. By violating the King's Peace, and later after the American Revolution, the people's peace, the criminal act inspired terror.[38]

---

[37] Asahel Stearns & Lemuel Shaw, THE GENERAL LAWS OF MASSACHUSETTS 454 (Theron Metcalf ed., 1823).
[38] Cornell, *supra* note 38.

28.    The terror requirement under common law, including American common law, has often been read with a modern bias, leading some to assert, erroneously, that only action with specific evil intent was prohibited. This reading is neither consistent with the text of the Statute of Northampton nor later American variants of it.  When read in the context of criminal law norms appropriate to the eighteenth century, the meaning of this legal term of art does not support the modern subjective psychological model of *mens rea* and its focus on actual intent. The notion of intent undergirding criminal law in this period was objective, not subjective. Intent was inferred from the illegal act.  These were crimes against the peace and as such the mere act of arming was the cause of the terror.[39]

29.    In his influential treatise on criminal law, Joe Prentis Bishop summarized the strong continuities between English and American law regarding dangerous weapons. "The same thing has, moreover has been very properly held in the United States; and so here, whether we receive the English statute or not, we hold criminal by our common law the going or riding about armed, with unusual and dangerous weapons, to the terror of the people."[40] The key determinant of legality

---

[39] Mark Anthony Frassetto, *To the Terror of the People: Public Disorder Crimes the Original Public Understanding of the Second Amendment*, 43 S. ILL. U.L. J. 61, 79 (2018).  *See* George Fletcher, RETHINKING CRIMINAL LAW 208 (1978); Guyora Binder, *supra* note 12, at 139–42. Many discussions of the terror requirement read backward from the 19th century subjective standard that eventually emerged and replaced the earlier objective view of *mens rea. See, e.g.*, Eugene Volokh, *The First and Second Amendments*, 109 COLUM. L. REV. SIDEBAR 97, 101 (2009) (erroneously taking the holding in *State v. Huntley*, 25 N.C. 418, 423 (1843), as dispositive of earlier Anglo-American criminal law, using a method that essentially reads history backwards). *Huntley* was part of a broader movement away from this earlier tradition and therefore does not illuminate Founding era ideas.).

[40]    Joel Prentis Bishop, 2 COMMENTARIES ON CRIMINAL LAW 2nd ed. (1859) at 678; John Bouvier 1 A LEGAL DICTIONARY 2nd ed., (1843) at 660. The term dangerous and unusual was not conjunctive, but a Latinate construction familiar to early American lawyers, hendiadys. Thus, the best rendering of the term

according to this view was the probability that a particular weapon would provoke a terror and undermine the peace.

## FIREARM REGULATIONS IN PUBLIC PARKS

30.    There were no modern-style parks in the era of the Second Amendment. The oldest urban public space in America, the Boston Common (1634), was used primarily as a pasture, a place of execution, and site for the militia to muster and drill.[41]  Yet, even when used for militia purposes these public spaces were tightly regulated. Massachusetts prohibited coming to muster with a loaded firearm.[42]

31.    The   Boston  commons  and   other  similar  urban  spaces  during  the Founding era shared little with modern parks. There was no need in the sparsely settled colonies to set aside areas for preservation or recreation given that the population of the colonies was expanding rapidly and remained largely hemmed in by various Indian nations reluctant to cede any further territory to Europeans. Moreover, by the time of the adoption of the Second Amendment the nation was still 90% rural and majority of the population was engaged in some type of agricultural pursuit.[43]

---

would be unusually dangerous. For the importance of this concept to Founding era law, see  Bray *supra* note 10.

[41] Steven R.  Pendery, *Probing the Boston Common*  43 ARCHAEOLOGY (1990) at  42–47; Suzanne Scheld et. al,  RETHINKING URBAN PARKS: PUBLIC SPACE AND CULTURAL DIVERSITY (2009) at 19-20; Michael Rawson, . EDEN ON THE CHARLES: THE MAKING OF BOSTON ( 2014) at 73.

[42]  RECORDS   OF   THE   GOVERNOR   AND   COMPANY   OF   THE MASSACHUSETTS BAY IN NEW ENGLAND (1853) at 98 and 1866 Mass. Acts 197, An Act Concerning The Militia, § 120. The prohibition on bringing a loaded gun to muster stretches from 1632 to 1866.

[43] Forrest McDonald, E PLURIBUS UNUM: THE FORMATION OF THE AMERICAN REPUBLIC, 1776-1790, (1965) at 72; Peter C. Mancall, *Economic History of the United States: Precolonial and Colonial Periods* OXFORD RESEARCH ENCYCLOPEDIA OF ECONOMICS AND FINANCE. 26 Apr. 2021; Accessed            24            Mar.            2023.

32.     The creation of parks as we now know them began in the middle of the nineteenth century and was influenced by the slow impact of romanticism and  the Transcendentalist ideas of visionaries such as Henry David Thoreau.  Parks emerged along side other changes in American society, including urbanization and industrialization. The modern conception of parks as places of relaxation, repose, and recreation gradually inspired a new attitude toward nature and public spaces.  This new  vision inspired urban planners, landscape architects, and government officials to embark upon an ambitious set of policies that led to the creation of new parks across much of the nation.

33.     By the middle of the nineteenth century these new public spaces, best exemplified by New  York's  Central Park,  had become places of refuge from the congestion, grime, and stresses of city life. The creation of large urban public parks in the 1850s posed new challenges for those eager to preserve the peace and public safety: among the pressing issues were  the regulation of firearms.[44]  The expansion of urban parks, the creation of new state parks, and eventually the involvement of the federal government in land preservation intensified in the post-Civil period. All of these ventures drew inspiration from visionaries, most notably Frederick Olmstead, a pioneering American landscape architect, journalist, social critic, and public administrator.[45]

34.     As Table One makes clear millions of Americans, including the entire population of the nation's five largest cities, lived  under a firearms regulatory regime that prohibited firearms in parks.  During the era of the Fourteenth Amendment

---

https://oxfordre.com/economics/view/10.1093/acrefore/9780190625979.001.0001/acrefore-9780190625979-e-480.

[44] Galen Cranz, *The Politics of Park Design: A History of Urban Parks in America* (1989) at 19.
[45] Witold Rybczynski, A CLEARING IN THE DISTANCE: FREDERICK LAW OLMSTED AND AMERICA IN THE NINETEENTH CENTURY (1999).

there was little disagreement that state and local governments had the authority under the police power to regulate and prohibit guns in parks.

Table One:  Post Civil War Limits on Public Carry in the Nation's Five Largest Cities:

| Rank | City | Population (1900)[46] | Date of Law | Gun Prohibition in Parks |
|---|---|---|---|---|
| 1 | N.Y. | 3,437,202 | 1858 | X |
| 2 | Chicago | 1,698,575 | 1873 | X |
| 3 | Phila. | 1,293,697 | 1868 | X |
| 4 | St. Louis | 575,238 | 1881 | X |
| 5 | Boston | 560,892 | 1886 | X |

35.    Nor were such bans limited to the nation's largest municipalities.[47]  For example, by 1872, San Francisco had enacted an ordinance prohibiting guns in its parks  in the city of Boulder and St. Paul.[48] Statutes prohibiting possession of arms in these important public spaces were enacted in major urban areas of every region of the nation. As Table One vividly illustrates, limits on arms in public parks was the norm in America in the era of the Fourteenth Amendment.

36.    There was a close connection between the urban park movement and the rise of state parks. Frederick Olmsted, the primary architect behind New York's Central Park,  also took a leading role in the creation of  California's Yosemite State

---

46 1 U.S. CENSUS OFF., CENSUS REPORTS 1xix tbl. XXII (1901).

47 *See, e.g.*, A Digest of the Laws and Ordinances of the City of Philadelphia from the Year 1701 to the 21 Day of June, 1887. (1887) at 513; The Revised Municipal Code of Ohio (1899) at 196;  Report of the Board of Park Commissioners of the City of Rochester, N.Y.: 1888 to 1898. (1898) at 98; The Municipal Code of the City of Spokane, Washington: Comprising the Ordinances of the City ... Revised to October 22, 1896  (1896) at 316;; Annual Report of the Park Commissioners of the City of Lynn for the Year Ending (1893) at 45; Charter and Ordinances of the City of New Haven: Together with Legislative Acts Affecting Said City (1898) at 293; A Digest of the Acts of Assembly Relating to and the General Ordinances of the City  Pittsburgh (1897) at 496; The Revised Ordinances of the City of Danville (1883);   Law and Ordinances governing the Village of Hyde Park (1875). The Municipal Code of Chicago (1881) at 391.

48 San Francisco Municipal Reports  (1874) at 499; Ordinances of the City of Boulder, 157, (1899); Proceedings of the Common Council of the City of Saint Paul (1892)  at 133.

Park in the 1860s. Although Congress ceded the land to the state, persistent problems with managing it led to the state to return control of the park to the federal government several decades later. The federal government's decision to create Yellowstone in 1872 added yet another type of park to the America's roster of public spaces.[49]

37.     The federal government also passed laws limiting firearms in its parks. Such regulations are especially important because federal lands were indisputably governed by the Second Amendment, irrespective of the incorporation doctrine.[50]   In 1893, the Secretary of the Interior underscored the danger posed by firearms in parks when he wrote this about Yellowstone, an "Absolute prohibition of firearms in the park is recommended."[51] The federal government decision to adopt this approach is especially important because federal lands were indisputably governed by the Second Amendment irrespective of incorporation doctrine.[52]

38.     During the same period a variety of other laws aimed at limiting arms in polling places, schools, and other important public venues where people gathered were also enacted by Reconstruction era governments.[53] The aim of these laws was to preserve the peace and enable civil society to function in the South.

---

[49] Ney C. Landrum, THE STATE PARK MOVEMENT IN AMERICA: A CRITICAL REVIEW (2013). On the creation of Yellowstone, see https://www.loc.gov/collections/national-parks-maps/articles-and-essays/yellowstone-the-first-national-park/

[50] Report of the Department of the Interior ... [with Accompanying Documents](1899) at 499 and Report of the Secretary of the Interior for the Fiscal Year (1900) at 125.

[51] The Abridgment: Containing Messages of the President of the United States to the Two Houses of Congress with Reports of Departments and Selections from Accompanying Papers (1893) at 618.

[52] *Supra* Willinger, note 31.

[53] *See, e.g.*, 1890 Okla. Laws 495, art. 47, sec. 7 ("It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or

**CONCLUSION**

39.    The emergence of modern style parks in the middle of the nineteenth century was response to profound changes in American society, particularly urbanization. These places of rest, repose, and recreation were designed to offer Americans places to escape the increasingly chaotic world they encountered in the expanding cities of the nineteenth century.

40.    From the outset the regulations governing these spaces prohibited firearms.  State parks were motivated by similar impulses.  Indeed, Frederick Olmsted, one of the leading landscape architects of the period  who took a prominent rule in designing urban parks also took an active part  in helping to create early state and federal parks.  When the federal government organized the first national parks, it carried forward this tradition, and tightly regulated the carriage of arms in public lands.

41.    Given that arms have been extensively regulated, and in many instances prohibited in parks since their creation, Connecticut's statutes limiting guns in parks are well within the long historical tradition of firearms regulation in America.

---

public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any  political  convention,  or  to  any  other  public  assembly,  any  of  the  weapons designated in sections one and two of this article.").

Pursuant to 28 U.S.C. § 1746, I, Saul Cornell, state under penalty of perjury that the foregoing declaration is true and accurate to the best of my knowledge, information, and belief.

Executed:  March 29, 2023
Redding, CT

*Saul Cornell*

_____

Saul Cornell

# Attachment 1

# Saul Cornell

Paul and Diane Guenther Chair in American History
Department of History
Fordham University
441 East Fordham Road ✳ Bronx, NY 10458 ✳ 203 826-6608 (c) ✳ scornell1@fordham.edu

| Education | | | |
|---|---|---|---|
| 1989 | University of Pennsylvania | Ph.D. | Dissertation: "The Political Thought and Culture of the Anti-Federalists" |
| 1985 | University of Pennsylvania | MA | History |
| 1982 | Amherst College | BA | History - Magna Cum Laude |
| 1980-81 | University of Sussex, Brighton, England | | |

| Teaching Experience | | |
|---|---|---|
| 2009-2020 | Guenther Chair in American History | Fordham University |
| 2011-2022 | Adjunct Professor of Law | Fordham Law School |
| 2005-2008 | Professor of History | The Ohio State University |
| 1997-2005 | Associate Professor, History | The Ohio State University |
| 1995 | Thomas Jefferson Chair | University of Leiden, The Netherlands |
| 1991-1997 | Assistant Professor, History | The Ohio State University |
| 1989-1991 | Assistant Professor, History | College of William and Mary |

## Fellowships and Grants

- 2019-2020 The Gilder Lehrman Center for the Study of Slavery, Resistance, and Abolition, Yale University
- 2018-2019 Senior Research Scholar in Residence, Floersheimer Center for Constitutional Democracy, Cardozo Law School
- 2014 Senior Research Scholar in Residence, University of Connecticut Law School
- 2011 Senior Research Scholar in Residence, Yale Law School
- 2003-2008 Joyce Foundation, Second Amendment Center Grant, $575,000
- 2003-2004 NEH Fellowship
- 2002-2005 Department of Education, Teaching American History Grant, Historyworks, $2,000,000
- 2002 Gilder-Lehrman Fellowship
- 2001-2002 Joyce Foundation Planning Grant, $40,000
- 2001 American Council of Learned Societies (ACLS)
- 1999-2000 Betha Grant, Batelle Memorial Endowment, Ohio Teaching Institute, $100,000
- 1998 Thomas Jefferson Memorial Foundation, Research Fellowship
- 1995 Thomas Jefferson Chair in American Studies, Fulbright Lecturing Award
- 1994 Ohio State University Seed Grant
- 1993 Ohio State University Special Research Assignment
- 1992 Ohio State University Grant-In-Aid
- 1989-1991 NEH Post-Doctoral Fellow, Institute of Early American History and Culture

| Prizes and Awards |
|---|

- 2006 Langum Prize in Legal History 2006
- 2006 History News Network, Book of the Month
- 2006 History News Network, Top Young Historian
- 2001 Society of the Cincinnati, History Book Prize, a Triennial Award for the Best Book on the American Revolutionary Era
- 2000 Choice Outstanding Academic Book

| Book Publications |
|---|

The Partisan Republic:  Democracy, Exclusion, and the Fall of the Founders Constitution
New Histories of American Law, series eds., Michael Grossberg and Christopher Tomlins (Cambridge University Press, 2019)  [With Gerald Leonard]

The Second Amendment On Trial:  Critical Essays on District of Columbia v. Heller
(University of Massachusetts Press,  2013) [with Nathan Kozuskanich]

Visions of America: A History of the United States [co-authored with  Jennifer Keene and Ed O'Donnell] (First edition, 2009),( second edition 2013) (third edition, 2016)

"A Well Regulated Militia": The Founding Fathers and the Origins of Gun Control (Oxford University Press, 2006) (paperback edition  2008)

Whose Right to Bear Arms Did the Second Amendment Protect?  (Bedford/St. Martins Press, 2000)  (Paperback 2000)

The Other Founders:  Anti-Federalism and the Dissenting Tradition in America, 1788-1828  (Institute of Early American History and Culture, University of North Carolina Press, 1999)  (paperback edition 2001)

Editor, Retrieving the American Past:  Documents and Essays on American History, (Pearson, 1994-2008)

## Scholarly Articles, Book Chapters, and  Essays:

"History and Tradition or Fantasy  and Fiction: Which Version of the Past  Will the Supreme Court Choose in NYSRPA  v. Bruen?," 49 Hastings Constitutional  Law Quarterly (2022): 145-177.

"The Long Arc of Arms Regulation in Public: From Surety to Permitting,1328–1928," 55  University  of California, Davis Law Review  (2022): 2545-2602

"'Infants' and Arms Bearing in the Era of the Second Amendment:  Making Sense of the Historical Record," 40 Yale Law & Policy Review Inter Alia 1 (2021)

"The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America" 55  University of California, Davis Law Review Online (2021): 65-90.

"President Madison's Living Constitution: Fixation, Liquidation, and Constitutional Politics in the Jeffersonian Era", 89 Fordham Law Review (2021): 1761-1781.

"History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel Under Anglo-American Law, 1688–1868," 83 Law and Contemporary Problems (2020): 73-95

"Reading the Constitution, 1787–91: History, Originalism, and Constitutional Meaning." Law and History Review 37 (2019): 821–45

"Constitutional Mythology and the Future of Second Amendment Jurisprudence after *Heller*," in Firearms and Freedom: The Second Amendment in the Twenty-First Century Controversies in American Constitutional Law Series (Routledge, 2017): 8-24

"The Right to Keep and Carry Arms in Anglo-American Law, Preserving Liberty and

Keeping the Peace," 80 Law and Contemporary Problems (2017): 11-54

"Half Cocked':  The Persistence of Anachronism and Presentism in the Academic Debate over the Second Amendment," 107 Northwestern Journal of Criminal Law 107 (2017): 203-218

"The 1790 Naturalization Act and the Original Meaning of the Natural Born Citizen Clause: A Short Primer on Historical Method and the Limits of Originalism," Wisconsin Law Review Forward 92 (2016)

"Constitutional Meaning and Semantic Instability: Federalists and Anti-Federalists on the Nature of Constitutional Language," in special issue on "The Future of Legal History," American Journal of Legal History 56 (2016): 21-29

"Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context," Yale Law Journal Forum 125 (2015-16):121-135 [with Eric Ruben]

"Originalism As Thin Description: An Interdisciplinary Critique" Fordham Law Review *Res Gestae* 84 (2015): 1-10

"The Right to Bear Arms," The Oxford Handbook of the US Constitution, eds., Mark Tushnet, Sanford Levinson, and Mark Graber (2015): 739-759

"Conflict, Consensus & Constitutional Meaning: The Enduring Legacy of Charles Beard" Constitutional Commentary 29 (2014): 383-409

"Meaning and Understanding in the History of Constitutional Ideas: the Intellectual History Alternative to Originalism" Fordham Law Review 82 (2013): 721-755

"The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities" Fordham Urban Law Journal 39 (2012): 1695-1726

"Evidence, Explanation, and the Ghost of Charles Beard" William & Mary Quarterly 69 (2012): 393-4

"Idiocy, Illiteracy, and the Forgotten Voices of Popular Constitutionalism: Ratification and the Ideology of Originalism" William & Mary Quarterly 69 (2012): 365-368

"The People's Constitution v. The Lawyer's Constitution: Popular Constitutionalism and the Original Debate Over Originalism," Yale Journal of Law and the Humanities 23 (2011): 295-337

"St. George Tucker's Lecture Notes, The Second Amendment, and Originalist Methodology: A Critical Comment," Northwestern University Law Review 103 (2009): 406-416

"Heller, New Originalism, and Law Office History: 'Meet the New Boss, Same as the Old Boss'" <u>UCLA Law Journal</u> 56 (2009): 1095 -1125

"Originalism on Trial: The Use and Abuse of History in District of Columbia v. Heller" <u>Ohio-State Law Journal</u> 69 (2008): 625-640

"Consolidation of the Early Federal System," Chapter 10 of the <u>Cambridge</u> History of American Law (Cambridge University Press, 2008) [With Gerry Leonard]

"The Ironic Second Amendment" <u>Albany Government Law Review</u> 2 (2008): 292-311.

"The Original Meaning of Original Understanding: A Neo-Blackstonian Critique," <u>Maryland Law Review</u> (2008): 101-115

"Mobs, Militias, and Magistrates:  Popular Constitutionalism During the Whiskey Rebellion," <u>Chicago-Kent Law Review</u> (2007): 883-903

"The Second Amendment and Early American Gun Regulation:  a Closer Look at the Evidence," <u>Law and History Review</u> (2007): 197-204

"St. George Tucker and the Second Amendment: Original Understandings and Modern Misunderstandings," <u>William and Mary Law Review</u> 47 (2006): 1123-55

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, the Lessons of History," <u>Stanford Law and</u> <u>Policy Review</u> (2006): 571-596

"Well Regulated: The Early American Origins of Gun Control," <u>Fordham Law Review</u> 73 (2004):  487-528 [With Nathan DeDino]

"Beyond the Myth of Consensus: The Struggle to Define the Right to Bear Arms in the Early Republic," in <u>Beyond the Founders: New Essays on the Political</u> History of the Early Republic (UNC Press, 2005)

"A New Paradigm for the Second Amendment," <u>Law and History Review</u> 22 (2004): 161-7

"Gun Laws and Policies:  A Dialogue," Focus on Law Studies: Teaching about Law in the Liberal Arts (American Bar Association, 2003)

"The Militia Movement," <u>Oxford Companion to American Law</u> (Oxford University Press, 2002)

"Don't Know Much About History: The Current Crisis in  Second Amendment Scholarship," <u>Northern Kentucky Law Review</u> (2003)

"A Right to Bear Quills or Kill Bears? A Critical Commentary on the Linkage between the 1st and 2nd Amendment in Recent Constitutional Theory," in <u>The Limits of Freedom</u> <u>in A Democratic Society</u> (Kent State University Press, 2001)

"The Irony of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional History," in <u>American Law Ways and Folkways</u> (Odense University Press, Denmark 2001)

"Commonplace or Anachronism: The Standard Model, The Second Amendment, and the Problem of History in Contemporary Constitutional Theory," <u>Constitutional Commentary</u> (1999): 221-246

"Mere Parchment Barriers?  Anti-Federalists, the Bill of Rights, and the Question of Rights Consciousness," in <u>Government Proscribed:  The Bill of Rights</u> (University of Virginia Press, 1998): 175-208

"Moving Beyond the Great Story: Post-Modern Prospects, Post-Modern Problems, A Forum on Robert Berkhofer, Jr. Beyond the Great Story" American Quarterly (1998): 349-357

"The Anti-Federalists," in The Blackwell Companion to American Thought, eds., James Kloppenberg (London, 1995)

"The Bill of Rights," in The Blackwell Companion to American Thought, eds., James Kloppenberg (London, 1995)

"Splitting the Difference: Textualism, Contexualism, and Post-Modern History," American Studies (1995): 57-80

"Canon Wars II:  The Return of the Founders," Reviews in American History 22 (1994): 413-417

"Moving Beyond the Canon of Traditional Constitutional History: Anti-Federalists, the Bill of Rights and the Promise of Post-Modern Historiography," Law and History Review (1994): 1-28

"Early American History in a Post-Modern Age," William and Mary Quarterly 50 (1993): 329-341

"Liberal Republicans, Republican Liberals?:  The Political Thought of the Founders Reconsidered," Reviews in American History 21 (1993):  26-30

"Politics of the Middling Sort:  The Bourgeois Radicalism of Abraham Yates, Melancton  Smith, and the New York Anti-Federalists," in New York in the Age of the Constitution (New York Historical Society, 1992): 151-175

"Aristocracy Assailed:  Back-Country Opposition to the Constitution and the Problem of Anti-Federalist Ideology," Journal of American History (1990): 1148-1172

"The Changing Historical Fortunes of the Anti-Federalists," Northwestern University Law Review (1989): 39-73

"Reflections on the `Late Remarkable Revolution in Government,' Aedanus Burke and Samuel Bryan's Unpublished History of the Ratification of the Federal Constitution," The Pennsylvania Magazine of History and Biography (1988): 103-130

## Book Reviews:

- Journal of American History
- William and Mary Quarterly
- American Studies Journal of the Early Republic
- Pennsylvania Magazine of History and Biography
- American Quarterly
- American Journal of Legal History
- Law and History Review

## Journal Manuscript Referee:

- Journal of American History
- William and Mary Quarterly
- Diplomatic History
- Pennsylvania Magazine of History and Biography
- Law and History Review
- Harvard Law Review

- <u>Stanford Law Review</u>
- <u>Yale Law Journal</u>

**Book Manuscript Reviewer:**

- University Press of Virginia
- University of North Carolina Press
- Stanford University Press
- University of Massachusetts Press
- Oxford University Press
- Cambridge University Press
- University of Michigan Press
- Harvard University Press

**Invited Lectures:**

"Race, Regulation, and Guns: The Battleground in the Debate Over the Second Amendment," Haber/Edelman Lecture:  University of Vermont,  Fall 2021

"Second Amendment Myths and Realities," University of Tampa, Honors College Symposium, November 30, 2018.

"The Common Law and Gun Regulation: Neglected Aspects of the Second Amendment Debate,"  Guns in Law, Amherst College, Law Justice and Society (2016)

"The New Movement to End Gun Violence." UCLA Hammer Museum (2016)

"No Person May Go Armed": A Forgotten Chapter in the History of Gun Regulation" The Elizabeth Battelle Clark Legal History Series, Boston University College of Law, 2016

Legacy Speaker Series:  "Guns in the United States," University of Connecticut (2016) "How does the Second Amendment Apply to Today?"

American Constitution Society/ Federalist Society Debate, Tulane Law School, New Orleans (2016)

"The Second Amendment and The Future of Gun Regulation: Forgotten Lessons From U.S. History," Constitution Day Lecture, Goucher College, (2015)

Keynote Lecture: "The Second Amendment and American Cultural Anxieties:  From Standing Armies to the Zombie Apocalypse" Firearms and Freedom: The Relevance of the Second Amendment in the Twenty First Century, Eccles Center, British Library (Spring 2015)

"Narratives of Fear and Narratives of Freedom:  A Short Cultural History of the Second Amendment," Comparing Civil Gun Cultures: Do Emotions Make a Difference? Max Plank Institute, Berlin (2014)

"History and Mythology in the Second Amendment Debate," Kollman Memorial Lecture, Cornell College, Iowa (Spring, 2013)

"Will the Real Founding Fathers Please Stand Up or Why are so few Historians Originalists" Constitution Day Lecture, Lehman College, Fall 2011

"Lawyers, Guns, and Historians: The Second Amendment Goes to Court," SHEAR/HSP Public Lecture, Philadelphia, July, 2008

The Robert H. and Alma J. Wade Endowment Lecture, Kentucky Wesleyan University, "The Early American Origins of Gun Control" (2006)

"Jefferson, Mason, and Beccaria:  Three Visions of the Right to Bear Arms in the Founding Era," Bill of Rights Lecture, Gunston Hall Plantation, Fairfax, VA   (2003)

"A New Paradigm for the Second Amendment," Finlay Memorial Lecture, George Mason University, (2001)

"Academic Gunsmoke:  The Use and Abuse of History in the Second Amendment Debate," Cadenhead Memorial Lecture, University of Tulsa, (2000)

"Why the Losers Won: The Rediscovery of Anti-Federalism in the Reagan Years," Thomas Jefferson Inaugural Lecture, University of Leiden, Netherlands, (1995)

## **Presentations:**

"From Ideology to Empiricism: Second Amendment Scholarship After Heller, " Hastings Constitutional Law Quarterly Symposium, Heller at Ten, January 18, 2019

"Firearms and the Common Law Tradition,"  Aspen Institute, Washington, DC (2016)

"The Original Debate over Original Meaning Revisited, " British Group in EarlyAmerican History, Annual Meeting,  Cambridge, England (2016)

"Second Amendment Historicism and Philosophy"  The Second Generation of Second Amendment Scholarship" Brennan Center, NYU 2016

"The Reception of the Statute of Northampton in Early America:  Regionalism and the Evolution of Common Law Constitutionalism" OIEAHC and the USC/Huntington Library Early Modern Studies Institute May 29–30, 2015

"The Right to Travel Armed in Early America: From English Restrictions to Southern Rights," British Group in Early American History, Annual Conference Edinburgh, Scotland (2014)

"Progressives, Originalists, and Pragmatists:  The New Constitutional Historicism and the Enduring Legacy of Charles Beard," Charles Beard, Economic Interpretation and History, Rothmere Center, Oxford University (2012)

CUNY Early American Seminar, "The People's Constitution v. the Lawyer's Constitution," 2011

Roundtable : "The Work of J.R. Pole," SHEAR , Philadelphia, Pennsylvania 2011)

"The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?" Bearing Arms, Policy, Policing, and Incorporation After Heller, Santa Clara Law School (2010)

"Re-envisioning Early American History,"  American Historical Association Annual Meeting, San Diego (2010)

"The Ironic Second Amendment"  Firearms, the Militia, and Safe Cities: Merging History, Constitutional Law and Public Policy,  Albany Law School ( 2007)

"*District of Columbia* v. *Heller*  and the Problem of Originalism,"  University of Pennsylvania Constitutional Law Workshop, Philadelphia ( 2007)

"Progressives and the Gun Control Debate,"  American Constitution Society, Harvard Law School, (2006)

"The Problem of Popular Constitutionalism in Early American Constitutional Theory," American Association of Law Schools, Annual Conference (2006)

"Popular Constitutionalism and the Whiskey Rebellion," Symposium on Larry Kramer's The People Themselves, Chicago-Kent Law School  (2005)

Roundtable Discussion on the Second Amendment and Gun Regulation,  NRA/ GMU Student's For the Second Amendment Symposium  (2005)

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History,"  Gun Control: Old Problems, New Problems, Joint Conference Sponsored by the John Glenn Institute and Stanford Law School (2005)

"Original Rules for Originalists?"  University of Minnesota Law School (2005)

"The Fourteenth Amendment and the Origins of the Modern Gun Debate," UCLA, Legal History Workshop (2004)

"Beyond Consensus, Beyond Embarrassment: The Use and Abuse of History in the Second Amendment Debate," American Society of Legal History, Austin, TX  (2004)

"Armed in the Holy Cause of Liberty: Guns and the American Constitution," NYU Legal History Colloquium (2004)

"Digital Searches and  Early American History,"  SHEAR  Brown University  (2004)

"Well Regulated: The Early American Origins of Gun Control," The Second Amendment and the Future of Gun Regulation," Joint Conference Sponsored by the John Glenn Institute and Fordham Law School, New York (2004)

"Minuteman, Mobs, and Murder: Forgotten Contexts of the Second Amendment," Department of History, University of California Berkeley (2003)

"History vs. Originalism in the Second Amendment Debate,"  Federalist Society/ American Constitution Society, George Washington University Law School, Washington D.C.  (2003)

"Self-defense, Public Defense, and the Politics of Honor in the Early Republic," Lake Champlain Early American Seminar, Montreal (2003)

"The Ironic Second Amendment"  "Gun Control:  Controversy, Social Values, and Policy," University of Delaware Legal Studies Conference, Newark, Delaware (2003)

"Individuals, Militias, and the Right to Bear Arms:  The Antebellum Debate Over Guns," Institute for Legal Studies, University of Wisconsin School of Law (2004)

"Guns in the British Atlantic World: New Research, New Directions" Society for the Historians of the Early American Republic, Ohio State University (2003)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment," American Bar Foundation, Chicago (2003)

"The Changing Meaning of the Armed Citizen in American History," "Americanism Conference," Georgetown University  (2003)

"A New Paradigm for the Second Amendment?"  Supreme Court Historical Society, Washington, D.C. (2002)

"Constitutional History as Cultural History: The Case of the Second Amendment" European American Studies Association, Bordeaux,  France (2002)

"Don't Know Much About History: The Current Crises in Second Amendment Scholarship," Salmon P. Chase College of Law, Symposium, "The Second Amendment Today," (2002)

"History, Public Policy, and the Cyber-Age: Gun Control Policy after the Emerson Decision," Sanford Institute of Public Policy, Duke University (2002)

"Constitutional History After the New Cultural History: The Curious Case of the Second Amendment," Society of the Historians of the Early American Republic, Baltimore (2001)

Roundtable Discussion, "The State of Second Amendment Scholarship," American Historical Association (2001)

"Armed in the Holy Cause of Liberty: Critical Reflections on the Second Amendment Debate," Vanderbilt University Law School (2001)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment,"  Boston University Law School, (2000)

"The Current State of Second Amendment Scholarship," National Press Club Washington, D.C. American Bar Association,  (2000)

"Taking the Hype out of Hyper-Text, Or What Should Textbook Companies Being Doing for us on the Web," OAH  St. Louis, Missouri (1999)

"The Ironies of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional Theory," European American Studies Association, Lisbon, Portugal (1998)

"Deconstructing the Canon of American Constitutional History" American Society of Legal History, Seattle, Washington (1998)

"Beyond Meta-narrative: The Promise of Hypertext," American Studies Association, Seattle, Washington (1998)

"Text, Context, Hypertext," American Historical Association, Washington D.C. (1998)

"Jefferson and Enlightenment," International Center for Jefferson Studies, Charlottesville, VA, (1998)

"Copley's Watson and the Shark: Interpreting Visual Texts with Multi-media Technology," American Studies Association, Washington, D.C. (1997)

"Multi-Media and Post-Modernism," H-Net Conference, Technology and the Future of History, East Lansing, Michigan (1997)

Comment on Jack Rakove's Original Meanings, Society of the Historians of the Early Republic, State College, PA (1997)

"Teaching with Multi-Media Technology," Indiana University, spring 1997 "Constitutional History from the Bottom Up:  The Second Amendment as a Test Case," McGill University, Montreal, Canada (1996)

"Just Because You Are Paranoid, Does Not Mean the Federalists Are Not Out to Get You:  Freedom of the Press in Pennsylvania," University of Pennsylvania (1995)

"Multi-Media and Post-Modernism: The Future of American Studies?" Lecture, Erasmus University, Rotterdam, Netherlands (1995)

"Post-Modern American History?  Ratification as a Test Case," St. Cross College, Oxford University, Oxford, England (1994)

"The Other Founders,"  NYU Legal History Seminar," NYU Law School (1994)

"Reading the Rhetoric of Ratification,"  paper presented at "Possible Pasts:  Critical Encounters in Early America," Philadelphia Center for Early American Studies, Philadelphia, PA (1994)

"American Historiography and Post-Modernism," Organization of  American Historians, Atlanta, GA (1994)

"The Anti-Federalist Origins of Jeffersonianism,"  Columbia  Seminar on Early American History (1994)

"American History in a Post-Modern Age?" American Historical Association, San Francisco, CA (1994)

"Post-Modern Constitutional History?"  Indiana University School of Law,  Bloomington, IN (1993)

Participant, Institute of Early American History and Culture, planning conference, "New Approaches to Early American History," Williamsburg, VA (1992)

"Mere Parchment Barriers?  Federalists, Anti-Federalists and the Problem of Rights Consciousness," American Studies Association, Baltimore, MD (1991)

"James Madison and the Bill of Rights:  a comment on papers by Jack Rakove, Ralph Ketcham and Max Mintz," Organization of American Historians and Center for the Study of the Presidency Conference, "America's Bill of Rights at 200 Years,"  Richmond, VA, (1991)

Symposium participant, "Algernon Sidney and John Locke:  Brothers in Liberty?" Liberty  Fund Conference, Houston, TX  (1991)

"Mere Parchment Barriers?  Antifederalists, the Bill of Rights and the Question of Rights Consciousness," Capitol Historical Society, Washington, D.C. (1991)

"Anti-Federalism and the American Political Tradition," Institute of Early American History and Culture Symposium, Williamsburg, VA  (1989)

---

### Interviews, Editorials, Essays, Podcasts:

- "Clarence Thomas' Latest Guns Decision Is Ahistorical and Anti-Originalist"
  SLATE June 24, 2022

- Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions," SCOTUSblog (Jun. 27, 2022, 5:05 PM),

- "The Right Found a New Way to Not Talk About a School Shooting," SLATE May 25, 2022
- "The Horror in New York Shows the Madness of the Supreme Court's Looming Gun Decision," *Slate* May 19, 2022
- "Guns, Guns Everywhere: Last week's subway Shooting was Horrifying. If the Supreme Court Creates a National Right to Carry, the Future will be Worse,"  New York Daily News Apr 17, 2022
- "The Supreme Court's Latest Gun Case Made a Mockery of Originalism"  *Slate* November 10, 2021
- "'Originalism' Only Gives the Conservative Justices One Option On a Key Gun Case," *Washington Post,* November 3, 2021
- "Neither British Nor Early American History Support the Nearly Unfettered Right to Carry Arms," *Slate* November 02, 2021
- "Will the Supreme Court Create Universal Concealed Carry Based on Fantasy Originalism?" *Slate* November 1, 2021
- "Biden was Wrong About Cannons, but Right About the Second Amendment," *Slate* June 29, 2021
- "Barrett and Gorsuch Have to Choose Between Originalism and Expanding Gun Rights," *Slate* April 29, 2021 Slate
- "What Today's Second Amendment Gun Activists Forget: The Right Not to Bear Arms," *Washington Post*, January 18,  2021
- "Could America's Founders Have Imagined This?" *The New Republic*, December 20, 2019
- "Don't Embrace Originalism to Defend Trump's Impeachment" *The New Republic*, December 5, 2019
- "The Second-Amendment Case for Gun Control" *The New Republic*, August 4, 2019
- "The Lessons of a School Shooting—in 1853" *Politico*, March 24, 2018.
- "Originalism and the Second Amendment in *District of Columbia v. Heller*," *University of Chicago Law Review*, Podcast, Briefly 1.9, Wed, 04/11/2018
- "Sandy Hook and the Original Meaning of the Second Amendment," *Time* December, 2017
- "The State of the Second Amendment," National Constitution Center, Podcast October, 2017
- "Gun Anarchy and the Unfree State: The Real History of the Second Amendment," *The Baffler On-line* October 2017
- "Five Types of Gun Laws the Founding Fathers Loved*" Salon* October 22, 2017
- "Half Cocked," *Book Forum* April 2016
- "Let's Make an Honest Man of Ted Cruz. Here's how we Resolve his "Birther" Dilemma with Integrity" *Salon* January 23, 2016
- "Guns Have Always Been Regulated,"  *The Atlantic Online* December 17, 2015
- "The Slave-State Origins of Modern Gun Rights" *The Atlantic Online*  30, 2015 [with Eric Ruben]
- PBS, "Need to  Know: 'Debating the Second Amendment: Roundtable'" April 26, 2013
- "All Guns are not Created Equal"  Jan 28, 2013 *Chronicle of Higher Education* [with Kevin Sweeney]

- "What the 'Right to Bear Arms' Really Means" *Salon* January 15, 2011 "Elena Kagan and the Case for an Elitist Supreme Court," *Christian Science Monitor* May 20, 2010
- "Gun Points," *Slate*, March 8, 2010 (With Justin Florence, and Matt Shors)
- "What's Happening to Gun Control," To the Point, NPR. March 11, 2010
- "Getting History Right," *National Law Journal*, March 1, 2010
- "History and the Second Amendment," *The Kojo Nnamdi Show* , WAMU (NPR) March 17, 2008
- "The Court and the Second Amendment," *On Point* with Tom Ashbrook, WBUR (NPR) March 17, 2008
- "Aim for Sensible Improvements to Gun Regulations," *Detroit Free Press,* April 29, 2007
- "A Well Regulated Militia," *The Diane Rehm Show*, WAMU (NPR) Broadcast on Book TV ( 2006)
- "Taking a Bite out of the Second Amendment," *History News Network*, January 30, 2005
- "Gun Control," Odyssey, Chicago NPR September 8, 2004
- "Loaded Questions," *Washington Post Book World* February 2, 2003
- "The Right to Bear Arms," Interview *The Newshour,* PBS May 8, 2002
- "Real and Imagined," *New York Times*, June 24, 1999

## Other Professional Activities

- Editorial Board, <u>Constitutional Study</u>, University of Wisconsin Press (2014-present)
- Advisory Council, Society of Historians of the Early American Republic (SHEAR) (2007-2009)
- Program Committee, Annual Conference, Society of the Historians of the Early American Republic, Philadelphia, PA 2008
- Editorial Board, <u>American Quarterly</u> (2004-2007)
- Director, Second Amendment Research Center, John Glenn Institute for Public Service and Public Policy, 2002- 2007
- Fellow, Center for Law, Policy, and Social Science, Moritz College of Law, Ohio State University 2001- 2004
- Local Arrangements Committee, Annual Conference, Society of the Historians of the Early American Republic, Columbus, OH 2003
- Project Gutenberg Prize Committee, American Historical Association, 2004, 2002
- Program Committee, Annual Conference, Society of the Historians of the Early Republic, 2001
- Co-Founder Ohio Early American Studies Seminar
- NEH Fellowship Evaluator, New Media Projects, Television Projects
- Multi-media Consultant and Evaluator, National Endowment for the Humanities, Special, Projects, Division of Public Programs, Grants Review Committee (1999)

## Court Citations, Amicus Briefs and Expert Witness Reports

### US Supreme Court:

<u>N.Y. State Rifle & Pistol Ass'n v. Bruen,</u> 597 U.S. __, 50 2022 U.S. Lexis 3055 (2022)

N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. __, 26, 28, 45, 47 2022 U.S. Lexis 3055 (2022) (Breyer, J. dissenting)

McDonald v. City of Chicago, Ill., 561 U.S. 742, 900, 901 n.44  (2010) (Stevens, J., dissenting).

McDonald v. City of Chicago, Ill., 561 U.S. 742, 914, 933 (2010) (Breyer, J., dissenting).

D.C. v. Heller, 554 U.S. 570, 666 n.32, 671, 685 (2008) (Stevens, J., dissenting).

## **Federal Courts:**

Jones v. Bonta, United States Court of Appeals, Ninth Circuit. May 11, 2022 --- F.4th ---- 2022 WL 1485187.

Duncan v. Bonta, United States Court of Appeals, Ninth Circuit. November 30, 2021 19 F.4th 1087 2021

Young v. Hawaii, 992 F.3d 765, 785-86 (9th Cir. 2021) (en banc).

Kanter v. Barr, 919 F.3d 437, 446 n.6, 457, 462, 464 (7th Cir. 2019) (Barrett, J., dissenting).

Medina v. Whitaker, 913 F.3d 152, 159 (D.C. Cir.), cert. denied sub nom. Medina v. Barr, 140 S. Ct. 645 (2019).

Young v. Hawaii, 896 F.3d 1044, 1066 (9th Cir. 2018), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Young v. Hawaii, 896 F.3d 1044, 1077 (9th Cir. 2018) (Clifton, J., dissenting), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Teixeira v. Cty. of Alameda, 873 F.3d 670, 684–85 (9th Cir. 2017).

Kolbe v. Hogan, 813 F.3d 160, 175 (4th Cir. 2016), on reh'g en banc, 849 F.3d 114 (4th Cir. 2017).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 348 (3d Cir. 2016).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 370–71, 371 n.17, 372 n.19 (3d Cir. 2016) (Hardiman, J., concurring).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 389 n.85, 405 n.187 (3d Cir. 2016) (Fuentes, J., concurring).

Peruta v. Cty. of San Diego, 824 F.3d 919, 935 (9th Cir. 2016).

Peruta v. Cty. of San Diego, 742 F.3d 1144, 1185, 1188 (9th Cir. 2014) (Thomas, J., dissenting).

Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 714 F.3d 334, 342 n.19, 343 n.23 (5th Cir. 2013) (Jones, J., dissenting).

Kachalsky v. Cty. of Westchester, 701 F.3d 81, 95 & n.21 (2d Cir. 2012).

Moore v. Madigan, 702 F.3d 933, 935 (7th Cir. 2012).

Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 200, 202–03 (5th Cir. 2012).

United States v. Carpio-Leon, 701 F.3d 974, 980 (4th Cir. 2012).

United States v. Greeno, 679 F.3d 510, 519 (6th Cir. 2012).

United States v. Yancey, 621 F.3d 681, 684 (7th Cir. 2010).

United States v. Rene E., 583 F.3d 8, 12, 15–16 (1st Cir. 2009).

Miller v. Sessions, 356 F. Supp. 3d 472, 481 (E.D. Pa. 2019).

Grace v. D.C., 187 F. Supp. 3d 124, 138 n.11 (D.D.C. 2016).

Powell v. Tompkins, 926 F. Supp. 2d 367, 386 (D. Mass. 2013), aff'd, 783 F.3d 332 (1st Cir. 2015).

United States v. Tooley, 717 F. Supp. 2d 580, 589–591 (S.D.W. Va. 2010), aff'd, 468 F. App'x 357 (4th Cir. 2012).

United States v. Boffil-Rivera, No. 08-20437-CR, 2008 WL 8853354, 6 (S.D. Fla. Aug. 12, 2008), report and recommendation adopted sub nom.

United States v. Gonzales-Rodriguez, No. 08-20437-CR, 2008 WL 11409410 (S.D. Fla. Sept. 22, 2008), aff'd sub nom.

United States v. Boffil-Rivera, 607 F.3d 736 (11th Cir. 2010).

## **State Courts:**

Norman v. State, 215 So. 3d 18, 30 & nn.11–12 (Fla. 2017).

Posey v. Com., 185 S.W.3d 170, 179–180 (Ky. 2006).

Posey v. Com., 185 S.W.3d 170, 185 n.3 (Ky. 2006) (Scott, J., concurring).

State v. Craig, 826 N.W.2d 789, 796 (Minn. 2013).

People v. Handsome, 846 N.Y.S.2d 852, 858 (N.Y. Crim. Ct. 2007).

Zaatari v. City of Austin, No. 03-17-00812-CV, 2019 WL 6336186, 22 (Tex. App. Nov. 27, 2019) (Kelly, J., dissenting).

State v. Roundtree, 2021 WI 1, 395 Wis. 2d 94, 952 N.W.2d 765

State v. Christen, 2021 WI 39, 958 N.W.2d 746


Amicus Briefs:

Amicus Brief, Harper v. Moore, No. 21-1271 (U.S. Supreme Court, 2022)  [ISLT and Gerrymandering]

Amicus Brief KOX V. STATE OF GEORGIA, SUPREME COURT STATE OF GEORGIA Case No. S23A0167 [Second Amendment and Campus Carry]

Amicus Brief, NYSRPA v. Bruen, No. 20-843 (U.S. Supreme Court, 2021) [2nd Amendment]

Amicus Brief, Young v. State of Hawaii  N O . 12-17808 (9th Cir. 2020) [2nd Amendment]

Amicus Brief, Gould v. Morgan, No. 17-2202 (1st Cir. 2018) [2nd Amendment]

Amicus Brief, Flanagan vs. Becerra, Central District of California Case  (2018) [2nd Amendment]

Amicus Brief, Gill v. Whitford (US Supreme Court, 2017)  [Partisan Gerrymandering]

Amicus Brief, Woollard v Gallagher, (4th Cir. 2013) [Second Amendment]

Amicus Brief *Heller v. District of Columbia* [Heller II] (US Court of Appeals for D.C.) (2010) [2nd Amendment]

Amicus Brief, *McDonald* v. *City of Chicago* (US Supreme Court,2010) [14th Amendment]

Amicus Brief, *District of Columbia* v. *Heller* (US Supreme Court 2008) [2nd Amendment]

Amicus Brief, *Silvera*  v. *Lockyer*, case on appeal( 9th  Circuit 2003) [2nd Amendment]

Amicus Brief, *Emerson* v. *U.S.* case on appeal (5th Circuit 1999) [2nd Amendment]

Pro-bono Historical Consultant State of Ohio, *McIntyre* v. *Ohio*, (U.S. Supreme Court, 1995) [1st Amendment]


## Expert Witness Reports

*Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, 14-cv-02850 (D. Colo.).

*Chambers, et al., v. City of Boulder*, 2018 CV 30581 (Colo. D. Ct. City of Boulder, filed June 14, 2018).

*Zeleny v. Newsom*, 14-cv-02850 (N.D. Cal.).

*Miller, et al v. Smith, et al.*, 2018 cv 3085 (C.D. Ill.).

*Jones v. Bonta United States* Court of Appeals, --- F.4th ---- , 2022 WL 1485187 (9th Cir., May 11, 2022).

*Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.).

*Worth v. Harrington,* 21-cv-1348 (D. Minn.).


## Law Review Symposia Organized

### Second Amendment:

 "The Second Amendment and the Future of Gun Regulation: Historical, Legal, Policy, and Cultural Perspectives," 73 *Fordham L. Rev*. 487 (2004).

"Gun Control: Old Problems, New Paradigms"  17 *Stan. L. & Pol'y Rev*. 671 (2006).

"A Symposium on Firearms, the Militia and Safe Cities: Merging History, Constitutional Law and Public Policy," 1 *Alb. Gov't L. Rev.* 292 (2008).

"The 2nd Amendment at the Supreme Court: "700 Years of History" and the Modern Effects of Guns in Public," 55 *U.C. Davis L. Rev.* 2545 (2022).

### New Originalism:

"The New Originalism" 82 *Fordham L. Rev.* 721 (2013).

"Historians and the New Originalism: Contextualism, Historicism, and Constitutional Meaning"84 *Fordham L. Rev.* 915 (2015).