## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DAVID J. NASTRI, ESQ., | : | No. 3:23-cv-00056 (JBA) |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| KATIE DYKES, | : | |
| *Defendant* | : | |

## <u>DECLARATION OF THOMAS TYLER</u>

I, Thomas Tyler, declare as follows:

## I.     **Background**

1. I have been an employee of the Connecticut Department of Energy and Environmental Protection ("DEEP") for approximately 30 years.

2. Currently, I am the Director of DEEP's Division of State Parks and Public Outreach ("Parks Division"). I have held that position since 2009. The Parks Division has primary operational authority over the State's park and forest system.

3. In the capacity as Director for the Parks Division, I am responsible for the day to day management of all aspects of our system of state parks and state forest recreation areas, including staffing, budgeting, operations oversight, and other facets of the Division's programs. I have supervisory authority over several subdivisions within the Parks Division, including the public outreach programs designed to increase community engagement with our forest and park system, and 83 full-time employees, plus between 500 and 600 seasonal employees each year.

4. Prior to becoming Director of the Parks Division, I worked from 2007 to 2009 as Director of DEEP's Office of Constituent Affairs and Land Management. In that capacity, I oversaw and was involved in a number of agency programs, including all aspects of the state's open space acquisition and property management programs, including extensive involvement with review, analysis and negotiations related to all real property transactions, records, deed restrictions and other related documents

5. From 1997 to 2007, I worked as a Legislative Program Manager in the DEEP (then the DEP) Commissioner's Office.  In that capacity, I worked closely with the past five Commissioners and represented the agency before the General Assembly on a wide range of issues and policy initiatives relating to DEEP, including the State's environmental and conservation efforts, and State parks and forests.

6. From 1987 to 1997, I worked in the private  sector with a government relations firm, serving as a lobbyist and association manager for a wide range of clients.

7. From 1982 to 1987, I worked for DEP as a State Park Patrolman in several parks in the greater Hartford area.

8. Throughout my 30 years of experience with DEEP, I have become familiar with DEEP's organization, mission, and personnel.  I have also become familiar with the nature, characteristics, and history of our State park and forest system, as well as the rules, regulations, and policies that are in place

to ensure that our parks and forests are safe, functioning, and enjoyable for all members of the public and their families.

9.  I have also become familiar with, and have overseen, several of DEEP's family outreach programs related to the park and forest system, including the very successful No Child Left Inside® Program; the ParkConneCT program in conjunction with CT Department of Transportation; First Day Hikes in collaboration with the National Association of State Park Directors; the Great Park Pursuit program; the Sky's the Limit family hiking program, and many others.

10. I have experience related to policies involving our state park and forest system, including advocacy for change and new initiatives, including the creation of the Passport to the Parks program, and the discussions that led to the successful effort to amend our state's Constitution to better protect State open space lands, among other initiatives.

11. I am aware of this lawsuit, have reviewed the Amended Complaint ("Complaint") filed by David Nastri ("Plaintiff") in this matter, and am familiar with the claims and allegations of the Complaint.

12. The testimony in this Declaration is based upon my personal knowledge, which I have obtained through a combination of my training, observations, and work experiences in my various positions with DEEP; from reviewing relevant documents, rules, regulations, and historical sources of information regarding DEEP and the State's parks and forests, and in speaking with

colleagues within and outside DEEP who themselves are knowledgeable about the subjects discussed herein.  Any information I obtained from those outside sources is consistent with my own understanding.

## II.    DEEP

### A.    Organization

13. DEEP is a Connecticut State Agency that was established on July 1, 2011, with the consolidation of the Department of Environmental Protection, the Department of Public Utility Control, and various energy policy staff from other areas of state government.  *See* https://portal.ct.gov/DEEP/About/About-Us.

14. DEEP has statutory authority to acquire and set aside lands for public use, and to control and manage our State park and forest system.  *See e.g.* Conn. Gen. Stat. §§ 23-4, 23-5, and 23-8.

15. Three bureaus within DEEP have a role in  overseeing the operations of State parks and forests. The Bureau of Outdoor Recreation (BOR) has primary responsibility for their management, while the Bureau of Natural Resources and the Bureau of Financial and Support Services also have responsibility for some aspects of their management.

16. BOR has three divisions, the Parks Division, of which I am Director, the Environmental Conservation Police Division ("EnCon"), and the Boating Division.

17. The Parks Division has operational responsibility over the State park and forest system, and is responsible for the majority of the park and forest system's operations.

18. EnCon provides the majority of the security and public protection services within State parks and forests.  EnCon officers are trained police officers appointed by the Commissioner of DEEP to enforce the state's fish and game, boating, recreational vehicle, and state park and forest laws and regulations. Additionally, EnCon officers have the authority to enforce various other criminal laws and have the same general enforcement powers as other police officers.  *See e.g.* Conn. Gen. Stat. § 26-6.

**B.    DEEP's mission**

19. DEEP's mission, among other things, is to conserve, improve, and protect the natural resources and environment of the State of Connecticut, and to foster Connecticut's economy and create jobs.  *See* https://portal.ct.gov/DEEP/About/About-Us.

20. DEEP operates on the recognition that Connecticut has a proud legacy of leadership in natural resource conservation and environmental protection, which provides both a high quality of life for residents and a strategic advantage for Connecticut's economic future.  DEEP continually strives to build on that proud legacy by strengthening the economic advantages our State enjoys through, among other things, abundant natural resources, first-

class outdoor recreation opportunities, and a healthy environment. *See*
https://portal.ct.gov/DEEP/About/DEEP-Strategic-Goals.

21. In furtherance of these missions, DEEP has established five "strategic goals"
    to guide the agency's work. Those strategic goals include: (1) Safeguarding,
    enhancing, and promoting Connecticut's environment and natural resources
    in order to support our quality of life, stewardship responsibilities, and long-
    term economic competitiveness; (2) promoting environmental justice by
    applying principles of equity, diversity, and inclusion to our policy
    development and implementation; and (3) investing in staff to continue
    delivering on our mission during a time of significant anticipated staff
    attrition. *See* https://portal.ct.gov/DEEP/About/DEEP-Strategic-Goals.

22. As discussed in greater detail below, our State parks and forests are an
    indispensable part of DEEP's strategic goals.

## III.   CONNECTICUT'S STATE PARKS AND FORESTS

### A.   History of State park and forest system

23. In 2013, in celebration of the 100 year anniversary of the State's park and
    forest system, DEEP published "Connecticut State Parks, A Centennial
    Overview 1913-2013" (hereinafter, "Centennial Overview"). I led the
    Centennial Committee that was created to implement strategies to highlight
    the history of our State park and forest system and worked closely with the
    author of the Centennial Overview to develop its content. The Centennial
    Overview describes the history and development of Connecticut's park and

forest system.  A true and accurate copy of the Centennial Overview is included as Exhibit 111.

24. The Centennial Overview accurately describes the history of the State park and forest system.

25. Since the 1860s, city parks had been growing in popularity across Connecticut, as residents increasingly sought reprieve from the inner-city lifestyle, but at that time there were no State-owned parks or forests.  *See Centennial Overview* at p. 3.

26. In 1913, with authorization from the Connecticut General Assembly, the Governor appointed a State Park Commission to facilitate the acquisition of State park properties.  A copy of the enabling legislation that created the State Park Commission—Chapter 230 of the 1913 Public Acts ("An Act establishing a State Park Commission")—is included as Exhibit 131.

27. In 1914, the State Park Commission acquired its first land, approximately 4 acres in Westport, Connecticut, which would become Sherwood Island State Park.

28. In 1921, the State Park Commission became known as the State Park and Forest Commission ("Commission"), to reflect its authority over state forests.

29. Over the ensuing decades, the Commission acquired more properties, through a series of acquisitions and donations, and the State park and forest system continued growing.  *Id.* at 19-21.

30. In 1971, the Commission was merged into the newly created Department of Environmental Protection, which is now DEEP.

31. As of 2013 when DEEP published the Centennial Overview, 450 million people had visited Connecticut's State parks since 1919 when counting began, and every person in Connecticut was within a 15 minute drive of a park property. *See Centennial Overview* at 25.

32. Many of the properties the State acquired as part of the park and forest system were granted or donated by private entities. Many of those land grants conditioned the transfer on the State's agreement to certain terms, including using the land for particular purposes, or prohibiting certain uses. Significant time and resources would need to be invested to research all of these many grants and donations to determine if the possession of firearms is prohibited based on the constraints of the donation.

33. As an example, the State acquired a parcel of land in 1969 as a gift from Frank S. Butterworth, which became part of Sleeping Giant State Park. The deed conditions the gift on the State's agreement to a number of conditions, including that "[t]he use of firearms shall be forever prohibited thereon." The deed is publicly available on the Hamden land records. A true and accurate copy of the 1969 deed is included as Exhibit 106.

34. DEEP is bound by any conditions or restrictions imposed on land grants to the State.

**B.    Current State park and forest system, and general uses.**

35. Currently, Connecticut is home to 110 State parks and 32 State forests. A full list is available on DEEP's website at: https://portal.ct.gov/DEEP/State-Parks/Listing-of-State-Parks.

36. The total acreage of Connecticut's State park and forest system is approximately 255,000 acres (approximately 35,000 acres for state parks and approximately 220,000 acres for state forests). Connecticut itself is over 3.5 million acres.

37. The State parks and forest system is owned by the State, with some exceptions, and the State holds and operates the properties in trust for the benefit of the public, as required by law. *See e.g.* Conn. Gen. Stat. §§ 23-4 and 23-5.

38. The parks and forest are located in all areas of the State. The Commission did that by design so that every Connecticut resident could access one or more of these locations without traveling long distances, enhancing accessibility and quality of life. Exhibit 110 is a map of Connecticut's parks and forests. It is available on DEEP's website at: https://ctdeep.maps.arcgis.com/apps/webappviewer/index.html?id=950da678b13b458ba4cbe5687e902c19&ncliNav=|.

39. The current mission of the Connecticut State park system is to provide natural resource-based public recreational opportunities and education opportunities to the public by providing a system of recreation areas, environmental centers, and nature centers that provide access to and

understanding of Connecticut's historic and cultural heritage and natural resources.  In addition, the mission of our park and forest system includes preserving the natural beauty of Connecticut lands, and encouraging communities and families to come together through a shared appreciation of nature and the environment.

40. With respect to the nature and uses of our State parks and forests, it varies substantially by location, and it would be impracticable to discuss each location in detail in this Declaration.  Certain individual State parks or forests are discussed in greater detail below.  Most State parks and forests are situated for multiple uses and often contain some combination of beaches, camping grounds, picnicking areas, hiking trails, forested areas, historic sites, and other attractions.

41. Most of the State parks and forests include some form of structure.  DEEP manages roughly 1000 buildings across the State park and forest system. Although it varies widely depending on location, the structures include bathrooms, pavilions, camp offices, nature centers, gift shops, indoor exhibits, and many others.  Some locations also contain historic structures, including but not limited to Gillette Castle (Gillette Castle State Park), the Heublein Tower (Talcott Mountain State Park), the Ellie Mitchell Pavilion (Rocky Neck State Park), the Eolia Mansion (Harkness Memorial State Park), and the observation tower (Sleeping Giant State Park).

42. Of the State's parks and forests, 22 locations include designated swimming areas.  A list of the designated swimming areas is available on DEEP's website at:  https://portal.ct.gov/DEEP/State-Parks/Recreation-Information/Swimming---CT-State-Parks-and-Forests.

43. In terms of the activities people engage in at our State parks and forests, it again varies widely by location, and cannot feasibly be detailed in full in this Declaration.  Broadly speaking, the activities include, but are not limited to, sightseeing, hiking, picnicking and grilling, swimming, sunbathing, special events including weddings, bird watching and various scientific and educational activities, skiing, hunting, biking, fishing, and scuba diving.

44. Our parks and forests serve a variety of education purposes and programs that are utilized by families, children, teachers, and schools across the state, as detailed further below.

45. Individuals have also used our State parks and forests to engage in political activities.  For instance, a State Senate Candidate held a campaign kick-off event at one of the rental pavilions at Hammonasset Beach State Park.

46. Youth sporting event are held in State parks and forests.  For instance, there are a number of high school and collegiate cross-country meets held across the state.

C.    Attendance

47. Our State parks and forests are among Connecticut's most popular attractions and recreational destinations for both in-state and out-of-state residents.

48. The Parks Division includes the State Parks Public Outreach unit ("Public Outreach"), which offers a variety of programs to encourage public use of our State parks and forests.  Public Outreach also helps develop and implement education programs provided at various State parks and forests.  Certain of those programs are discussed in greater detail below.

49. DEEP estimates that, in 2022, approximately 17 million people visited Connecticut's State parks and forests.

50. That estimation is based upon a number of factors.  Certain parks, such as Hammonasset Beach State Park, collect data points that contribute to the estimate, including vehicle counters in the roadway and camper registration information.  Other locations provide estimates based upon the observations of the park supervisor.  Other, smaller facilities are not included in the estimate.

51. Millions of people visit Connecticut parks and forests from other states. DEEP estimates that roughly 20% of visitors are from out of state.

52. The number of estimated State park and forest visitors in 2022 has increased dramatically, approximately 75%, from recent years, from approximately 9 to 10 million in 2019 to roughly 17 million today.

53. Recent census data from 2022 approximates Connecticut's population to be 3.6 million. *See*

   https://www.census.gov/quickfacts/fact/table/CT/PST045222#PST045222.

54. State parks and forests can become very crowded, particularly in summer months. In fact, some locations reach capacity limits on certain days. How crowded it gets varies widely by location, season, and numerous other factors, and is often difficult to predict. The most densely populated parks are generally beaches and designated swimming areas, including Hammonasset Beach State Park, Gardner Lake State Park, Squantz Pond State Park, Rocky Neck State Park, and Sherwood Island State Park.

55. It is not uncommon during summer months that certain of our more popular locations will have to close down for exceeding capacity, and not accept more visitors. Examples include Hammonasset Beach State Park, which is discussed in further detail below, and various other designated swimming areas.

56. Even parks and forests that cover vast acreages of land frequently become crowded because visitors tend to congregate in isolated areas that are most scenic or popular. For instance, even though Sleeping Giant State Park contains a vast network of land and hiking trails, it is common for the Looking Tower to become crowded because of its location and the scenic benefits, sometimes shoulder to shoulder distance. The same is true of numerous other State parks and forests that contain particular areas where

visitors tend to congregate, including Scantic River State Park, Dinosaur State Park, Harkness Memorial State Park, Rocky Neck State Park, Squantz Pond State Park, Millers Pond State Park, Cockaponset State Forest, Wadsworth Falls State Park, Mount Tom State Park and many others.

57. Although DEEP does not keep statistics of our visitors' demographics, a substantial portion of the visitors to our parks and forests are families. Millions of children visit our State parks and forests every year.

58. Service to families and children is integral to DEEP's mission.  Families and children are the target audience of our State parks and forests.  Marketing efforts and programming are often promoted and targeted toward children and families.  To provide only a few examples:

    a. In 2006, DEEP launched the No Child Left Inside Program ("NCLI"). NCLI "is a promise to introduce children to the wonder of nature," to increase their own health and well-being, foster appreciation for environmental conservation, and preserve the beauty of Connecticut. DEEP describes NCLI and its purpose and ideals on its website, accessible at: https://portal.ct.gov/NCLI/About-NCLI/Our-Mission. Part of the premise of NCLI is that "[t]oday's children have become disconnected from nature," and instead of enjoying nature are often "playing video games, surfing the web, watching TV and texting. [NCLI] provides the necessary opportunity for children to unplug from technology and unearth the vast opportunities that Connecticut's State

Parks and Forests have to offer."  DEEP welcomes all residents to "take the [NCLI] pledge," which includes:  "I pledge to defend the right of all children and every family to play in a safe outdoor environment. I will encourage and support opportunities for them to exercise their right . . . ."  NCLI is described on DEEP's webpage at: https://portal.ct.gov/NCLI/About-NCLI/Our-Mission.

b.  NCLI is comprised of several programs, including the Great Park Pursuit Family Adventure Program, which "encourages families to get back outside and explore" with multiple weeks of guided family trips to different state parks and forests, including nature centers, museums, and historic buildings.  *See* https://portal.ct.gov/NCLI/Great-Park-Pursuit/GPP-Landing-Page.  Countless families participate in these programs.

c.  NCLI includes numerous other programs for children and families that involve state parks and forests.  Those programs are described on DEEP's website at:  https://portal.ct.gov/NCLI/About-NCLI/Our-Programs.

d.  In furtherance of NCLI's mission to encourage family and youth utilization of our parks and forests, NCLI also includes an annual program that provides day passes at the main library branch of each town in Connecticut.  Those day passes waive entrance fees for two adults and up to 4 children aged 12 and under for any centers or

historical buildings located in a State park of forest, with certain

exceptions.  The program is described on DEEP's website located at:

https://portal.ct.gov/NCLI/Parks/No-Child-Left-Inside-Library-Pass.

e.  Nature centers are another feature of State parks and forests that are

focused on enrichment for children and families in safe and

comfortable environment.  For example, Meigs Point Nature Center

(Hammonasset Beach State Park) and Dinosaur State Park have

nature centers that cater to thousands of children each year.

f.  There are hundreds of school field trips to State parks and forests each

year. DEEP encourages such school field trips and provides resources

to schools on its website to encourage and facilitate those trips,

including at:  https://portal.ct.gov/DEEP/Education/Field-Trip-Sites,

and https://portal.ct.gov/DEEP/Education/Education.  There were more

than 200 bus permits granted to various locations in 2022, most of

which were for school groups.  However, that estimate only captures

permits for buses with seating capacity of 30 or more passengers, and

at those locations and times of the year when permits are required.

Mini buses (between 12 and 30 passengers) are not required to obtain

a bus permit before arriving at park or forest, and therefore are not

accounted for in that estimate.  Groups visiting by bus must secure a

permit at least 14 days prior to the visit, but groups may secure a

permit up to 11 months in advance of the visit, and often secure their

permit several months in advance.  DEEP's bus permitting policies are set forth on its website at: https://portal.ct.gov/DEEP/State-Parks/Bus-Permits-and-Fees#:~:text=Requests%20for%20a%20bus%20permit,the%20State%20Parks%20Division%20office.&text=Saturday%20and%20Sunday%3A%209%20am%20%2D%2012%20pm.

g.  DEEP also offers a Youth Group Camping Program to non-profit organizations that are sponsored by or affiliated with a school, church, or recognized youth organization, and that have a demonstrated interest in work with youth, generally aged 18 and under.  The program is described on DEEP's website at: https://portal.ct.gov/DEEP/State-Parks/Camping/Youth-Group-Camping---CT-State-Parks-and-Forests.

**D. Revenue generated by State parks and forests**

59. The public image of State parks and forests helps the system draw visitors and in turn support the system's programming and maintenance.

60. State parks and forests generate revenue in a number of different ways, including but not limited to:  (1) camping fees; (2) special events including weddings; (3) licenses; (4) parking fees; (5) admission fees and concessions; (6) special use permits, such as film productions; (7) rental fees; and (8) bus permits.

61. Revenue is also generated through the Passport to the Parks program
    ("Passport program"), which began in 2018.  *See* Conn. Gen. Stat. § 23-15.
    Under the Passport program, people who arrive at any State park or forest in
    a vehicle registered in Connecticut are no longer required to pay any parking
    fees.  In exchange, the General Assembly passed a law increasing the cost of
    motor vehicle registration fees for every resident by $5 per year.  Out-of-state
    visitors are still required to pay parking fees, and visitors with Connecticut
    registrations are still required to pay admissions or other non-parking fees
    charged by the particular location.  The purpose of the Passport program is to
    make State parks and forests more accessible to Connecticut residents, to
    encourage residents to use them and to provide a more stable funding
    mechanism for the operation of our State parks and forests.  The Passport
    program is described on DEEP's website, available at:
    https://portal.ct.gov/DEEP/State-Parks/Passport-to-the-Parks.

62. The State's authority to generate revenue from parks and forests is
    established by statute and regulation.  *See e.g.* Conn. State Agency Regs., §§
    23-4-7 *et seq.*; Conn. Gen. Stat. § 23-15, *et seq.*

63. Last year, the State generated roughly $4.5 million from parking, camping,
    admission, and other fees.  That reflects approximately 21% of the Parks
    Division's $21 million budget.  Another approximately 60% of our budget
    comes from the additional registration fees charged as part of the Passport

program, and the remaining approximately 20% comes from the General Fund.

64. Our State park and forest system is also a critical component of the State's overall marketing and tourism efforts.  DEEP has a large online presence, which it uses to provide information to the public and build enthusiasm for our parks and forests, including Facebook, Instagram, Twitter, and YouTube pages devoted to our parks and forests.  DEEP also works with the Office of Tourism, which is part of the Connecticut Department of Economic and Community Development, to further these marketing and tourism efforts through commercials and advertisements on television and other means. Many of our State's Tourism promotions feature our State parks and forests. In 2011, the University of Connecticut conducted a study of the economic benefits of the State's park and forest system.  A true and accurate copy of the report generated from that study is included as Exhibit 107.

## E.   Staffing and funding of the State parks and forest system

65. In order to organize the State's operations of its parks and forests, DEEP has divided the State into two districts:  Eastern and Western.  Both districts consist of a district supervisor and several underlying park and forest supervisors.  The park and forest supervisors are each responsible for a management unit.  Within each management unit's boundaries are a collection of State parks and forests.  The frontline employees in each management unit provide the daily grounds-keeping and maintenance of the

parks and forests, and are responsible for ensuring the overall cleanliness , safety and efficient operation of their management unit properties.

66. The Parks Division currently has 83 full-time employees.  That is a substantial decrease over the past approximately 40 years, when the Parks Division had more than 200 employees.  DEEP  also hires many temporary seasonal workers, especially during peak attendance months, during the summer.

67. Over that same 40-year time period, annual attendance has increased dramatically, from roughly an estimated 6 million annual visitors to an estimated 17 million today.

68. Lack of adequate staffing and resources has been an ongoing issue at DEEP and in our State park and forest system.  As noted above, one of DEEP's strategic goals is to continue delivering on our mission despite anticipated staff attrition.

69. As Director of the Parks Division, I regard current, and potential future, staffing and funding shortages as the biggest challenge that DEEP faces in terms of managing our parks and forests and keeping them functioning, clean, and safe.

70. Recent changes to the budget and management of the State park and forest system have increased the need for the system to be competitive in a crowded recreation marketing space, and to be economically prudent and financially self-sustaining.

71. In 2013, the Legislative Program Review and Investigations Committee of the Connecticut General Assembly authorized a study of the State's park and forest system with a focus on funding of the state park system, its revenues and expenditures, and the adequacy of funding to support short term and long term goals.  The Committee issued its report on January 23, 2014 ("2014 Committee Report").  A true and accurate copy of that report is included as Exhibit 114.

72. Among other things, the 2014 Committee Report found (1) that the State parks and forests system had "become heavily reliant on the state's General Fund, with little directive or incentive to focus on revenue generating activities," (2) that there had been decreases in paid attendance, (3) that "[s]taffing levels are down and have reached a critical point regarding operations," (4) that "[p]lanning for the state park system has defaulted to 'crisis management,'" and (5) that "[e]ither an increase in funding and staffing or a decrease in services is necessary for continued adequate park operations in the long term."   *Id.* at 1.

73. I am familiar with the 2014 Committee Report and the above findings, and believe that those findings accurately conveyed the issues in our park and forest system as they existed at that time.

74. At the time of the 2014 Committee Report, the State's parks and forests were, for the most part, reliant upon General Fund money.  Generally, State parks and forests did not retain the revenue that they generated; the money instead

went into the General Fund.  Certain individual locations were permitted to retain revenues generated from renting special event facilities, but the vast majority of the revenue generated went into the General Fund.

75. The staffing and funding shortages remain issues today, although certain actions have been taken to help alleviate the funding deficit.  First, DEEP now receives the revenue that State parks and forests generate from their various sources, which are discussed below.  Second, the Passport program began in 2018.

76. Currently, the revenue generated by parks and forests, as well as the additional registration fees under Passport, goes into the Passport account, and those funds are used to pay the large majority of all of the expenses of our park and forest system.  *See* Conn. Gen. Stat. § 23-15.  Approximately 80% of expenses are paid from the Passport program account funds.  The remainder of expenses is paid from the General Fund.

77. Therefore, the more revenue generated by our parks and forests, the more capacity the Parks Division will have for expenses, and to maintain the quality of our parks and forests.  If the revenue generated were to decrease, that could have an impact on our ability to maintain our parks and forests.

E.      **Regulations of use of state parks and forests**

1.      **Firearms**

78. Conn. Gen. Stat. § 23-4(a) authorizes the DEEP Commissioner to adopt regulations, in accordance with chapter 54, for the maintenance of order, safety and sanitation upon the lands under the Commissioner's control.

79. Pursuant to that authorization, the Commissioner has adopted § 23-4-1 of the Regulations of Connecticut State Agencies.  Section 23-4-1 contains many of the regulations and restrictions for use of the State parks and forests.

80. DEEP's firearm regulation is contained in subsection (c) of § 23-4-1, which provides:  "Hunting or carrying of firearms, archery equipment or other weapons, including but not limited to air rifles and slingshots, is not permitted in any state park or forest except as authorized by [DEEP].  All carrying or use of weapons is subject to applicable provisions of the Connecticut General Statutes and regulations adopted thereunder."

81. DEEP's rules and regulations relating to firearm use are published annually in the Connecticut Hunting and Trapping Guide.  A true and accurate copy of the 2023 version of the Guide ("2023 Guide") is included as Exhibit 108. Other than certain permitted uses of firearms related to hunting and target shooting, which are discussed in further detail below, and which are themselves subject to numerous locational and other restrictions, DEEP does not permit visitors to carry firearms in State parks or forests absent specific authorization.  The only instances that I am aware of where DEEP permitted individuals to carry firearms into a State Park occurred during Revolutionary and Civil War reenactments at Putnam Memorial, Fort Trumbull and Fort

Griswold Battlefield State Parks.  Individuals participating in those reenactments had black powder period reproduction firearms  and cannons, but DEEP did not authorize the live firing of the weapons and were subject to various safety rules.

82. The public is put on notice of these restrictions regarding the ability to use and/or carry firearms in State parks and forests.  The regulations are available online, including through DEEP's website.  *See* https://portal.ct.gov/DEEP/Hunting/2023-Connecticut-Hunting-and-Trapping-Guide.  The Hunting and Trapping Guide is also published annually and made available on DEEP's website.  *See id.*  In addition, there are kiosks positioned on-site at  locations throughout our State park and forest system that list the applicable regulations, including the firearm prohibition.

83. I have searched historical records for the history of the State's regulation of firearms in its parks and forests, and discovered a 1924 version of the "Guide to Connecticut State Parks and Forests" (hereinafter, "1924 Guide"), published by the State Park and Forest Commission, which at that time had legal authority over State parks and forests.  The 1924 Guide states in relevant part:  "The use of firearms or having them in possession is forbidden . . . ."  A true and accurate copy of the relevant portions of the 1924 Guide are included as Exhibit 68.

84. The Commission, at that time, had operational authority over the State parks and forests and in the regulation of conduct at those locations.  Therefore, the

1924 Guide reflects the State-wide policy concerning firearms in State parks and forests.

85. Although the 1924 Guide is thus far the earliest evidence of a State-wide firearm prohibition in parks and forests that I have been able to find, it is possible that additional research will reveal similar restrictions being in effect as early as 1914, when the Commission completed its first acquisition.

86. In 1902, Hartford passed an ordinance making it unlawful "[t]o discharge or carry firearms" in parks that it owned or that were under its control. *See* Exhibit 34.

87. The 1924 Guide was not available online or through an electronic source. Instead, I searched for the physical copy in our historical archives and photocopied the relevant pages.

88. Further, my research has not disclosed any evidence that the firearm prohibition in the 1924 Guide was not in place continuously. For example, I have discovered copies of regulations passed by the Commission in 1949, which provide in § 153-2-3 that "[h]unting or carrying of firearms is not permitted in any State Park or Forest recreational area except at predetermined times in such areas as set aside by the State Park and Forest Commission and when posted for such purposes and subject to the rules and regulations set forth by the Connecticut Board of Fisheries and Game." That same regulation is reflected in a 1951 version of the Park Patrolman's

Manual.  True and accurate copies of the 1949 regulations and the 1951 manual are included as Exhibits 104 and 105.

89. DEEP's prohibition on the carrying of firearms serves multiple different purposes.

    a. First, giving individuals a general right to carry handguns into state parks and forests would raise a number of general safety concerns. Those safety concerns are heightened depending on the particular location, and certain individual locations are discussed in greater detail below.  Generally speaking, our parks and forests can get crowded, particularly in the summer months.  Discharging a firearm, even for self-defense purposes, in a State park or forest outside a designated hunting area would create a safety hazard for other parkgoers.  Furthermore, the safety concerns are further heightened considering the presence of alcohol at many of our locations, the potential conflict, confusion, or outrage that seeing a firearm could cause among visitors, and the inability at many of our locations— particularly our beaches and designed swimming areas—to properly store firearms while using the park.

    b. Second, giving individuals a general right to carry firearms may change the way people view our parks and forests.  Our locations have always been understood to be  places of peace and quiet enjoyment, where individuals, families, and children can go to enjoy the outdoors.

Our parks and forests are also designed to foster a sense of community, bring people together around a shared history and pride in our state's natural beauty, and provide numerous educational benefits for children and surrounding schools.  Generally prohibiting the carrying of firearms subject to very limited exceptions, as detailed below, gives our visitors peace of mind and makes them secure in knowing that our parks and forests are safe and welcoming to all.

c. Third, DEEP's general prohibition on firearms supports its ability to enforce its regulations on hunting.  Restricting the use and carrying of firearms for specified hunting purposes during certain seasons furthers EnCon's ability to enforce laws and regulations pertaining to the lawful killing and protection of animals in our State parks and forests. Authorizing a general right to carry a handgun in a state park or forest could adversely impact EnCon's ability to enforce the laws and regulations pertaining to the lawful killing or protection of animals, especially due to staff shortages within that Division of DEEP.

### 2.   DEEP's other regulations of use

90. Hunting is permitted only in select few locations, and is strictly regulated:

a. Similar to the firearm restriction, § 23-4-1(c) prohibits hunting in all state parks or forests except as authorized by DEEP.

b. DEEP permits hunting only in certain specific parks and forests.  A list of the parks and forests where some form of hunting is permitted is

contained on DEEP's website, accessible at:

https://portal.ct.gov/DEEP/State-Parks/Explore/Hunting.

c. However, even in the locations where hunting is permitted, hunting is subject to numerous regulations, which are location dependent. Generally, there are restrictions as to the particular season when hunting can take place, the particular areas of a park of forest where hunting may take place, the type of game that may be hunted, and the kind of weapons that may be used for the hunting. Hunters must also have any appropriate firearms registrations and licenses, and hunting licenses, as required by Connecticut law.

d. A comprehensive listing of all hunting seasons and pertinent regulations is published annually, currently contained in the 2023 Guide.

e. There are some general restrictions that apply to all hunting. For instance, it is strictly prohibited to hunt with, to shoot, or to carry a loaded firearm, within 500 feet of any building occupied by people or domestic animals, or used for storage of flammable material. *Id.* at 12.

f. Rifles and handguns using ammunition larger than .22 caliber rimfire is prohibited in all State-owned parks and forests. *Id.*

g. There are numerous other rules and restrictions DEEP has imposed related to hunting, which are all set forth in the 2023 Guide.

91. Alcohol:

1. Under § 23-4-1(e), alcohol is prohibited in any beach and boardwalk area of all State parks and forests.  As to other areas, alcohol is generally permitted, except for the locations specifically listed in § 23-4-1(e) where alcohol is banned in the entire park.  Naugatuck State Forest, Sleeping Giant State Park, Dinosaur State Park, or Hammonasset Beach State Park, which are discussed in greater detail below, are not among the locations where alcohol is entirely prohibited.

2. Because DEEP does not have the staff or capacity to generally oversee or regulate consumption in those places where alcohol is permitted, it is possible that individuals may consume large amounts of alcohol. That is most frequently the case in those locations that provide for picnicking and also in camping areas.

3. DEEP has many incidents of individuals consuming alcohol and becoming disorderly, including in locations where alcohol is prohibited.

92. Target shooting:

a. Trap or target shooting on any State property or public hunting area is strictly prohibited unless that area is a designated shooting range.

b. There are 4 State-owned public shooting ranges:

   i. Glastonbury Public Shooting Range (Meshomasic State Forest, in Glastonbury, CT)

   ii. High Rock Cooperative Shooting Range (Naugatuck State Forest, in Naugatuck, CT)

      iii.  Wooster Mountain State Park Cooperative Shooting Range

           (Wooster Mountain State Park, in Danbury, CT)

      iv.  Nye Holman Field Archery Range (Nye Holman State Forest, in

           Tolland, CT)

  c.  Shooting ranges are subject to numerous safety and other restrictions.

     One example of safety range rules is set forth on DEEP's website and

     is accessible at:  https://portal.ct.gov/DEEP/Hunting/Glastonbury-

     Shooting-Range

## IV. IMPACT OF PERMITTING PARK AND FORESTS VISITORS TO CARRY FIREARMS

93. Permitting park and forest visitors to carry firearms would have a negative impact on our park and forest system operations.

94. First, permitting visitors to carry handguns in our parks and forests would cause immense safety concerns throughout our system of State parks and forests.  Often, our beaches, campgrounds, nature centers, and historic locations, among many others, become crowded.  Increased visitation in recent years has only led to them becoming more crowded.  Many of our visitors are families and children.  Allowing firearms in these locations would create many challenges for ensuring that firearms were safely stored, and could lead to confusion, conflict, and/or outrage between guests when they see someone with a firearm.  The mere sight of a gun by visitors could ultimately lead to chaotic circumstances or hysteria among park or forest guests, and the potential for confusion and conflict is exacerbated because in the large

majority of our parks and forests, visitors are permitted to consume alcohol. *See* Conn. State Agency Regs. § 23-4-1(e).  Given the many people who visit our parks and forests, discharging a firearm in those locations would be a safety hazard for those around because, unlike in the designated hunting zones where sufficient space is guaranteed, it is very possible a shot that missed the intended target could strike another person or multiple people.

95. Second, permitting visitors to carry handguns on their person inside State parks and forests will alter the nature of our parks and forests and the way people view them.  Our parks and forests are meant to provide people and their families with places they can go to enjoy the outdoors and socialize and congregate together in peace, with the knowledge that people are not carrying firearms.  In addition, DEEP's current firearm prohibition aligns with the policy of many other of Connecticut's large tourist attractions, and once word got around that firearms were generally permitted in State parks and forests, visitors may be less likely to come to our locations.  That would detract from DEEP's mission of encouraging public engagement with our parks and forests, and could diminish the revenue that our parks and forests generate, which could in turn contribute further to already-existing resources and staffing issues.

96. Third, if visitors were permitted to carry firearms, DEEP and the Parks Division would have to consider changes to other rules and regulations in order to accommodate the safety concerns created by the carrying rule.  We

would have to consider altering the regulation generally permitting alcohol consumption in our parks and forests.  We would also have to consider promulgating new regulations regarding storage, carry limitations in particular locations or buildings.  Personnel would also be an issue.  We currently have only 52 EnCon officers stationed in three geographical districts across the State, and may require additional security if firearms were permitted, and make alterations to the standard training they and any seasonal employees receive to include additional safety and active shooter training.

97. There are many other alterations to rules and regulations that DEEP/Parks Division may have to consider.

98. Implementing such changes would not be possible overnight and would require substantial lead time.  Additionally, it would be difficult if not impossible to effectively complete these changes on a State-wide basis, particularly given the limited staff that Parks Division and EnCon has.  Indeed, some of the changes we would need to consider—like altering the alcohol rules, for example—would require formal regulatory rulemaking, which can be a lengthy process.  Similarly, undoing or altering any changes to DEEP's rules and/or regulations could not happen overnight.

99. Permitting firearms in our State parks and forests would also likely violate deed restrictions imposed on the State as a condition for acquiring the properties to begin with.  As noted above, at least one grant document

relating to a parcel in Sleeping Giant State Park provides that "[t]he use of firearms shall be forever prohibited thereon."  If individuals were generally allowed to carry firearms in State parks or forests, DEEP would need to search through all records pertaining to deed restrictions imposed upon the state to assess whether such a general right to carry a firearm would violate other deed restrictions like the one specifically addressing Sleeping Giant State Park.  That process would require considerable time and resources, and it would be unclear how or if DEEP and the State would be able to comply with such deed restrictions.  Such inability or impracticability to comply with such deed restrictions could result in subsequent litigation addressing the designated use of the State parks or forests subject to such deed restrictions, which, in turn, could result in additional costs or burdens to the State.

100.    I am also concerned that permitting visitors to carry handguns will impact our ability to retain existing employees, and to recruit and hire new employees.  A general right to carry in parks and forests may influence someone's willingness to work in that environment.

101.    The State does not own every location within the State park and forest system.  For example, the Windsor Locks Canal State Park Trail is owned by the Windsor Locks Canal Co., and it is leased to the State for public use.  A true and accurate copy of that lease agreement is included as Exhibit 130.

## V.    INDIVIDUAL PARK CONSIDERATIONS

### A.    Sleeping Giant State Park

102.     Sleeping Giant State Park ("Sleeping Giant") is one of the State's most

popular State parks.  It is adjacent to Quinnipiac University—one of

Connecticut's well-known private universities.

103.     A 1.5 mile hiking trail leads to a stone observation tower, which is on

the top of Mt. Carmel.  The observation tower provides a scenic view of Long

Island Sound.  Visitors may freely walk into the observation tower.

104.     A true and accurate copy of the observation tower is included as

Exhibit 112.

105.     Because of the scenic view from the observation tower, it is a location

in Sleeping Giant that tends to attract the most visitors, and during a peak

season, people can be almost shoulder to shoulder.

106.     Sleeping Giant is a popular destination for families, children, and

students from Quinnipiac University and other school children under the age

of 18, as is the observation tower.

107.     Sleeping Giant also contains a campground, as it is one of the locations

of the Youth Group Camping program, discussed above.

108.     Permitting firearms would create a safety hazard in Sleeping Giant, or

portions thereof, given its popularity with children, families, and schools,

particularly in the close quarters of the observation tower.

### B.     Naugatuck State Forest

109.     Naugatuck State Forest ("Naugatuck") is a forested area that is

popular for its multi-use trails.

34

110.    Because of its scenic hiking and its youth group campground, Naugatuck is a popular destination for children and families.

### C.    Hammonasset Beach State Park

111.    Hammonasset Beach State Park ("Hammonasset")  consists of over two miles of beach, a boardwalk, concessions, the Meigs Point Nature Center, picnic shelters, large camping grounds, and other facilities.

112.    Hammonasset Beach State Park ("Hammonasset") is the most visited location in our State park and forest system and—with the exception of casinos—is generally regarded as the largest tourist attraction in the State.

113.    Approximately 3 million people come each year to Hammonasset.

114.    Hammonasset frequently gets very crowded, particularly during summer months.  A photograph that fairly and accurately depicts Hammonasset on a crowded day is included as Exhibit 115.  It is not uncommon for Hammonasset to become that crowded, particularly during peak summer months, and for the beach to reach visitor capacity at times.

115.    The Meigs Point Nature Center is located within the park and is available free of charge.  The nature center includes a large building consisting of four main rooms of exhibits, each with their own theme: beach, water, air, and woods.  It consists of numerous live exhibits of animals from those locations, including turtles, snakes, frogs, salamanders, birds, butterflies and moths, fresh and saltwater tanks.  The nature center also contains a large outdoor garden.

116.     The nature center is extremely popular for families, children, and

school field trips.  The nature center is often used for children's birthday

parties, and there are various educational and other children's programs that

take place there.

117.     Permitting firearms in Hammonasset Beach State Park would create

considerable safety risks.  The park is frequently crowded, including with

families, children, and school groups.  In addition, the beach would present

unique security concerns because people are frequently leaving their

belongings to go into the water and engage in other beach-related activities.

That could result in people leaving their firearms unattended, perhaps in

plain view, and perhaps not properly stored.  This could cause confusion,

conflict, and outrage among guests, and various calls to 911.  Additionally,

alcohol is permitted at Hammonasset Beach State Park, which exacerbates

the risks of that occurring.

**D.     Dinosaur State Park**

118.     Dinosaur State Park consists of two miles of nature trails and the

Exhibit Center, a large building consisting of numerous prehistoric exhibits,

as well as a giftshop, including one of the largest tracks of fossilized dinosaur

footprints in North America.  The tracks are believed to have been made by

Dilophosaurus.

119.     Dinosaur State Park charges an admission fee in order to enter the

Exhibit Center.

120.     Dinosaur State Park is frequently visited by families, children, and school field trips.

121.     Additional information about Dinosaur State Park is available here: Dinosaur State Park (ct.gov).  A true and accurate photograph depicting the Exhibit Center is included as Exhibit 132.

### E.     Harkness Memorial State Park

122.     Harkness Memorial State Park ("Harkness") contains the historic Eolia Mansion, which is a popular destination for weddings, private parties, seminars, conferences, and other functions.  Additional information about Harkness Memorial State Park is available here: https://www.harkness.org/about-the-park/.

123.     Individuals may rent the mansion by paying a fee.

### F.     Gillette Castle State Park

124.     Gillette Castle State Park is a popular destination that contains hiking trails, camp grounds, picnicking areas, and the historic Gillette Castle.

125.     Visitors pay to purchase tickets to tour the castle.

126.     Gillette Castle State Park is a popular destination for events including weddings.

127.     Gillette Castle State Park is frequently visited by families, children, and school field trips.

### G.     Fort Griswold Battlefield State Park & Fort Trumbull State Park

128.     Fort Griswold, situated on the Thames River in Groton, CT, is the site of the historic Battle of Groton Heights, where British Forces during the American Revolutionary War, commanded by Benedict Arnold, captured the Fort and massacred 88 of the Fort's defenders.  It is a tourist destination for various individuals and occasionally the location for school field trips.

129.     Fort Trumbull State Park, situated on the Thames River in New London, CT, served as a location for various military forts, schools, and research facilities for various branches of the United States Military and was first built to protect New London Harbor from attacks from the British.  The Fort later became part of our Nation's coastal defense system.  Today, the site holds a visitor center, depicts over 225 years of military history and technological advances from the Revolutionary War to the Cold War, and it is visited frequently by tourists and school field trips, among others.  True and accurate copies of photographs of the Fort Trumbull location are included as Exhibit 117.

Pursuant to 28 U.S.C. § 1746, I, Thomas Tyler, state under penalty of perjury that the foregoing declaration is true and accurate to the best of my knowledge, information, and belief.

Executed: _Mar. 30_, 2023

_Thomas J. Tyler_
Thomas Tyler