# Secondary Sources

# SECOND-AMENDMENT SENSITIVE PLACES: PROTECTING DEMOCRATIC COMMUNITY AND COMMERCE

*Joseph Blocher & Reva B. Siegel*[*]©

98 NYU L. Rev. (*forthcoming* 2023)

## Abstract

Governments have long banned guns in places where weapons threaten activities of public life. The Supreme Court reaffirmed this tradition of "sensitive places" regulation in *District of Columbia v. Heller*, and it has become a central Second Amendment battleground in the aftermath of *New York State Rifle & Pistol Association v. Bruen*.

This Article surveys the historical practice of restricting weapons in sensitive places as it considers the modern locational restrictions that *Bruen* authorizes. Governments traditionally have protected activities against weapons threats in sites of governance and education—places where bonds of democratic community are formed and reproduced. We show how *Bruen*'s analogical method allows government to protect against weapons threats in new settings, so long as these location restrictions respect historical tradition both in terms of "why" and "how" they burden the right to keep and bear arms. The tradition of locational restrictions to preserve the bonds of democratic community is not limited to sites of governance and education, but could encompass other places where those bonds are formed, sustained, and strengthened, including sites of commerce and transportation.

*Bruen* focuses on past practice for guidance in determining the scope of Second Amendment rights and regulation, while—by principle and by example—sanctioning change in weapons and the laws that regulate them. *Bruen* does not require the selective approach to constitutional change that both proponents and critics attribute to the decision. Just as *Bruen* extends the right of self-defense to weaponry of twenty-first century, we show that the decision also recognizes democracy's competence to protect places of public gathering against weapons threats of the twenty-first century. The history this Article surveys illustrates that this nation has long regulated weapons to protect public life; it counters the selective constitutional memory advocates invoke to justify

[*] Lanty L. Smith '67 Professor of Law, Duke Law School; Nicholas deB. Katzenbach Professor of Law, Yale Law School. For comments on the draft, we thank Jack Balkin, Jacob Charles, Patrick Charles, Saul Cornell, Mark Frassetto, Jamal Greene, Darrell Miller, Brennan Rivas, Eric Ruben, and Andrew Willinger. For exceptional research help, we thank Josh Hochman and Connor Bell.

Electronic copy available at: https://ssrn.com/abstract=4355024

arguments for protecting gun rights expansively while striking down most gun regulation.

A concluding section extends the Article's reading of *Bruen* beyond locational restrictions to cases striking down the law that prohibits persons subject to a domestic violence restraining order from possessing a weapon. These cases illustrate how judges employ the analogical method to strike down gun regulations they could uphold under *Bruen*, and justify their decisions by appeal to a constitutional memory of the founding as a time devoid of weapons regulation. This Article challenges this constitutional memory as a contemporary construction that legitimates a deregulatory Second Amendment of recent invention.

## INTRODUCTION

As *New York State Rifle & Pistol Association v. Bruen*[1] has called into question many gun laws that were upheld in the wake of *District of Columbia v. Heller*,[2] a previously obscure portion of *Heller* has become central to Second Amendment litigation. In *Heller*, the Supreme Court noted that "nothing in our opinion should be taken to cast doubt on . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings . . ."[3] *Bruen* affirmed the constitutionality of such locational restrictions, while announcing a new historical test for identifying additional "sensitive places." Applying that test, district courts have already struck down—for supposed lack of historical support—prohibitions on guns in places of worship,[4] libraries, museums, bars,[5] subways, domestic violence support centers, summer camps, and zoos.[6]

Why? Does *Bruen* condemn every gun regulation that deviates from past practice? *Bruen* explained that history is an anchor[7]; yet cautioned that Americans are not limited to copying the past. The Constitution is not a script for *Groundhog Day*.[8] Through its analogical method, *Bruen* explicitly sanctions gun regulations

---

[1] 142 S. Ct. 2111 (2022).

[2] 554 U.S. 570, 626 (2008).

[3] *Id.* at 626.

[4] Hardaway v. Nigrelli, No. 22-CV-771 (JLS), 2022 WL 11669872, at *1 (W.D.N.Y. Oct. 20, 2022).

[5] Koons v. Reynolds, No. CV 22-7464 (RMB/EAP), 2023 WL 128882, at *13 (D.N.J. Jan. 9, 2023).

[6] The challenge to New York's law has generated a series of opinions striking down some restrictions and upholding others. Antonyuk v. Bruen, __ F.Supp.3d __, 2022 WL 3999791 (N.D.N.Y. Aug. 31, 2022) (hereinafter *Antonyuk I*); Antonyuk v. Hochul, __ F.Supp.3d __, 2022 WL 5239895 (N.D.N.Y. Oct. 6, 2022) (hereinafter *Antonyuk II*); Antonyuk v. Hochul, __ F.Supp.3d __, 2022 WL 16744700, at *2 - *3 (N.D.N.Y. Nov. 7, 2022) (hereinafter *Antonyuk III*).

[7] *See infra* Part II.

[8] *Groundhog Day* is a movie in which a television weatherman becomes trapped in a time

Electronic copy available at: https://ssrn.com/abstract=4355024

not within the understanding or practice of those who ratified or incorporated the Second Amendment. The decision extended constitutional protection to classes of weapons whose lethality was unfathomed by the Amendment's framers,[9] as well as to shall-issue licensing regimes that had no direct analogue at the time of the Second Amendment's ratification.[10] In short, the Court has explained that the Second Amendment protects forms of weaponry, and forms of community, that did not exist at the time of its ratification.[11] Judges need not find "historical *twin*[s]."[12] We show how *Bruen*'s analogical method can extend the longstanding tradition of restricting weapons in government buildings and schools to other places of public gathering that play an important role in maintaining and sustaining democratic community.

*Bruen*'s historical-analogical method asks whether modern locational restrictions are "relevantly similar'" to historical forebears.[13] As we argue in Part II, to identify "new and analogous sensitive places,"[14] *Bruen* requires the analogizer to demonstrate that these places are similar to antecedents in respect of (1) *why* the government has regulated weapons in the past and (2) *how* government has burdened the right to bear arms in self defense in those past cases.

Under the analogical method, might any of the sensitive-places restrictions thus far invalidated be relevantly similar to those enumerated in *Heller* and *Bruen*? Why have governments traditionally imposed locational restrictions at the sites the Court has specifically approved as sensitive: "schools

---

loop forcing him to relive February 2d repeatedly. Synopsis of Groundhog Day, Internet Movie Database, http://www.imdb.com/title/tt0107048/synopsis (last visited February 2, 2023).

[9] *Bruen*, 142 S. Ct. at 2132 ("Much like we use history to determine which modern 'arms' are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding. When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge.")..

[10] *See Bruen*, 142 S. Ct. at 2138 n.9 (noting that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes"); *id.* at 2162 (Kavanaugh, J., concurring) (underscoring that "shall-issue licensing regimes are constitutionally permissible"; *see also* Nelson Lund, Bruen*'s Preliminary Preservation of the Second Amendment,* 23 FED. SOC. REV. 279 (2022) (noting that "*Bruen* opinion itself does not consistently apply its own stated test" and "does not provide so much as a shred of evidence that any kind of licensing requirements had ever been imposed on the general population before the 20th century"); Adam M. Samaha, *Is* Bruen *Constitutional? On the Methodology that Saved Most Gun Licensing,* 98 N.Y.U. L. REV. (forthcoming 2023) (noting the apparent inconsistency between *Bruen*'s historical method and its approval of shall-issue licensing).

[11] *See infra* Part III.

[12] *Bruen*, 142 S. Ct. at 2133.

[13] *Id.* at 2132 (quoting Cass R. Sunstein, *On Analogical Reasoning,* 106 HARV. L. REV. 741, 773 (1993)); *see also id.* at 745 ("The major challenge facing analogical reasoners is to decide when differences are relevant.").

[14] *Bruen*, 142 S. Ct. at 2133-34.

Electronic copy available at: https://ssrn.com/abstract=4355024

and government buildings" in *Heller*[15]; "legislative assemblies, polling places, and courthouses" in *Bruen*[16]? The principle that connects these places cannot be limited to formal actions of governance like voting and lawmaking, given that Justice Scalia's opinion in *Heller* specifically includes "schools" as well. Excluding weapons from these places of public gathering creates and protects a public sphere for democratic dialogue, democratic governance, and the reproduction of *democratic community* in which people can relate freely, without intimidation or coercion of the kind that the presence of weapons threatens.

The principle that governments can use locational restrictions to protect core activities of democratic community is not simply "consistent with this Nation's historical tradition of firearm regulation" as *Bruen* requires.[17] We show that it is *derived* from that very historical tradition. In prior work we have demonstrated that *Heller* relies on a common law history that affirms government authority to "protect valued civic activities and the ability of all citizens to live free of terror and intimidation."[18] This Article explains how the body of laws that *Heller* termed "sensitive places" restrictions vindicates these concerns, preserving not only individual lives, but the public sphere on which a democracy depends—domains of public gathering that extend beyond legislative assemblies, polling places, and courthouses. Even strong advocates of Second Amendment rights recognize that securing places of public gathering against gun threats frees people to participate in the democratic public sphere.[19]

We do not suggest that sustaining democratic community is the *only* value that can validate location-based gun restrictions to protect places of public gathering. As we show, there are historical antecedents for using locational restrictions to protect commerce; and protecting commerce and transportation are essential to creating and sustaining democratic community.[20] Yet our account could also work alongside other explanations that scholars and judges have identified—albeit prior to *Bruen*, and thus not yet tested by its method— especially those that focus on whether a given place is central to certain

---

[15] *Heller*, 554 U.S. at 626.

[16] *Bruen*, 142 S. Ct. at 2133. In *Bruen* the Court reiterated that schools and government buildings were sensitive places. *Id.*

[17] *Id.* at 2126

[18] Joseph Blocher & Reva B. Siegel, *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under* Heller, 116 Nw. U. L. Rev. 139, 176 (2021).

[19] *See* Beth Reinhard, *DeSantis Wanted To Ban Guns At Event, But Not to Be Blamed, Emails Show*, Wash. Post., Feb. 10, 2023 at 12:26 p.m.EST, https://www.washingtonpost.com/politics/2023/02/10/desantis-campaign-emails-gun-free-event (reporting that the governor's campaign wanted weapons banned from his victory celebration but, to preserve the Governor's reputation as a supporter of gun rights, urged the city to take responsibility for the firearms ban); Joe Hernandez, *Guns Are Banned During Trump's Upcoming Speech at the NRA Conference*, NPR, May 25, 2022 at 10:48 ET, https://www.npr.org/2022/05/25/1101181842/nra-trump-speech-guns-banned-houston.

[20] *See infra* Section III.B.

Electronic copy available at: https://ssrn.com/abstract=4355024

governmental or constitutionally protected activities.[21] Others point to the government's role as a proprietor,[22] or to places where the government has effectively taken over the role of security guard.[23]

The nation is still figuring out how to make best sense of *Bruen* and its analogical method. Judges are criticizing the decision's demand for historical analogies,[24] as are leading originalists.[25] Even as *Bruen*'s analogical method licenses and guides change, *Bruen* affords judges immense discretion in deciding what change is constitutional.[26] *Bruen* authorizes the reading of Second Amendment law we lay out in this Article. Yet *Bruen* also contains passages that judges can invoke to strike down public safety regulation that secures places of public gathering on which democratic community and the exercise of constitutional rights depends.

In response, this Article focuses attention on the exercise of discretion *Bruen* confers on judges. In particular, we caution against selective updating, in which the judge interprets the right to self defense in ways that recognize technological change while tethering government's competence to regulate

---

[21] Darrell A. H. Miller, *Constitutional Conflict and Sensitive Places*, 28 WM. & MARY BILL RTS. J. 459, 466 (2019) (noting that "part of the answer" of what makes places sensitive is "they are the locus of the production of other kinds of public goods protected by other kinds of constitutional rights, and that the protection of the character of these types of institutions justifies limits on private firearms"); *see also* Brief of the League of Women Voters as Amicus Curiae in Support of Respondents at 17, *Bruen*, 142 S. Ct. 2111 (No. 20-843) ("this Court and others have upheld laws that maintain the public's confidence in core governmental objectives").

[22] *See, e.g.*, Bonidy v. U.S. Postal Service, 790 F.3d 1121, 1126 (10th Cir. 2015); United States v. Class, 930 F.3d 460, 465 (D.C. Cir. 2019); Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, U.C.L.A. L. REV. 1443, 1475 (2009) (noting that there is "both precedent and reason for allowing the government acting as proprietor extra power to restrict the exercise of many constitutional rights on its property").

[23] *See, e.g.*, David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 203, 290 (2018); Volokh, *supra* note 22, at 1526. *But see* Carina Bentata Gryting & Mark Anthony Frassetto, NYSRPA v. Bruen *and the Future of the Sensitive Places Doctrine: Rejecting the Ahistorical Government Security Approach*, 63 B.C.L. Rev. E-Supp. I.-60 (2022).

[24] Ariane de Vogue, *DOJ Says Judge Doesn't Need to Hire Historian to Understand Supreme Court Gun Ruling*, CNN (Dec. 13, 2022), https://www.cnn.com/2022/12/13/politics/supreme-court-historian-gun-ruling/index.html.

[25] Randy E. Barnett & Lawrence B. Solum, "Originalism after *Dobbs*, *Bruen*, and *Kennedy*: The Role of History and Tradition" at p. 23 (Jan. 27, 2023) https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4338811 ("*Bruen* involves both originalist and nonoriginalist elements. The core holding of *Bruen* rests on an originalist foundation, but the historical analogue test is an implementing rule that is not justified by originalist reasoning.").

[26] Albert W. Alschuler, "Twilight-Zone Originalism: The Supreme Court's Peculiar Reasoning in *New York State Pistol & Rifle Association v. Bruen*" (Jan. 19, 2023), https://ssrn.com/abstract=4330457; Jacob D. Charles, "The Dead Hand of a Silent Past: *Bruen*, Gun Rights, and the Shackles of History" at 6 (Jan. 23, 2023), https://ssrn.com/abstract=4335545. .

Electronic copy available at: https://ssrn.com/abstract=4355024

weapons to fixed and antiquated standards adopted before technological and social change.[27] Judges hostile to gun regulation can use selective updating of this kind to invalidate weapons laws—for example by characterizing a historical analogue as dissimilar to a current regulation and striking down the current law as an "outlier[ ] that our ancestors would never have accepted."[28] Whether the case involves locational restrictions, or a law prohibiting weapons possession by those subject to a domestic violence restraining order, as this case did, the claim persists: Our Constitution binds us to a time when Americans carried weapons free of regulation.

By contrast, we show that *Bruen*'s analogical method authorizes change in gun regulation and thus allows for more consistent and evenhanded updating of weapons and the laws that regulate them; and we illustrate how this might work in the case of locational restrictions. This Article's examination of locational restrictions under *Bruen* thus serves both practical and critical ends. The historical analogues we identify provide grounds for upholding laws that secure public gatherings against weapons threats under *Bruen*'s test. At the same time, we demonstrate that Americans long ago regulated guns. This simple fact may be counterintuitive to some, who are convinced that "back then" there were guns but scarcely any gun laws, and that the only faithful, original reading of the Second Amendment is deregulatory.[29] These are twenty-first century assumptions, neither compelled by the Constitution nor by the Court's decision

---

[27] Judges applying *Bruen*'s analogical method engage in veiled, valued-based interpretation through selective updating, much as judges import value through selective adherence to originalist method. *See* Richard H. Fallon, "Selective Originalism and Judicial Role Morality" (Feb. 3, 2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4347334 (observing that self-professed originalists do not consistently adhere to their own method and that "it takes only realism, not cynicism, to recognize that the modern Justices who are regularly identified as originalist are also conservative and that they seldom rely on originalist premises to support conclusions that they would find ideologically uncongenial"); Robert Post & Reva Siegel, *Originalism as a Political Practice: The Right's Living Constitution*, 75 FORDHAM L. REV. 545, 563 (2006) ("Thomas's originalism selectively chooses elements of the nation's constitutional past to enforce; it also actively reinterprets the integral thrust of American constitutional history so as to render it compatible with contemporary conservative beliefs.").

[28] United States v. Rahimi, No. 21-11001, 2023 WL 1459240, at *10 (5th Cir. Feb. 2, 2023) (striking down the federal law prohibiting gun possession by those subject to a domestic violence protective order) (quoting *Bruen*, 142 S. Ct. at 2132). For discussion, see *infra* Section III.C. For the judge's political views about guns, see *infra* note 156.

[29] *Cf.* Randy E. Barnett & Nelson Lund, *Implementing* Bruen, LAW & LIBERTY (Feb. 6, 2023), https://lawliberty.org/implementing-bruen/:

> Because of the felt imperative to uphold gun laws, we expect to see lower courts engaging in result-oriented manipulation of history. *Bruen* itself did so when it reaffirmed *Heller*'s approval of bans on guns in "sensitive places." But there was no tradition of such bans in America during the Founding Era. *Bruen* defended *Heller*'s pronouncement by alluding to a couple of narrow laws, one from a seventeenth-century colony and one from a 1776 state constitution. If that's all it takes to construct a historical tradition, we can expect to see some very creative analogizing from judges who don't value the right to bear arms or the original meaning of the Constitution.

Electronic copy available at: https://ssrn.com/abstract=4355024

Case 3:23-cv-00056-JBA   Document 23-20   Filed 03/30/23   Page 8 of 316

in *Bruen*.

What this Article shows is that both the Constitution and *Bruen* permit government to pursue its core historical purposes of protecting persons from physical injury and securing the preconditions of democratic community. We have done our best to identify how government officials interested in regulating weapons in sensitive places might apply *Bruen*'s analogical method to continue traditions of public safety regulation whose roots can be traced to the Founding era. In the process we demonstrate—contrary to those who invoke constitutional memories of the nation as a land of unconstrained gun rights—that we are a nation of gun rights and gun regulation, even if experience at the time of the Constitution's founding and the Fourteenth Amendment's ratification differed in fundamental particulars from our own day.   At stake in the debate over the historical record and how we relate to it are fundamental questions of national identity.

The Article's structure is straightforward. Part I explains how *Bruen* has increased the practical importance of location-based restrictions and describes the Court's new historical-analogical approach to evaluating their constitutionality. Part II explores the two primary principles of similarity identified by the Court—the "why" and "how" of historical restrictions—and shows that the historical record of place-based restrictions supports broad regulatory authority to protect not just individuals' lives but democratic community itself. Finally, in Part III, we employ *Bruen*'s analogical method to show that sensitive-places regulation is not limited to sites of governance and education, but could extend to other places where those bonds are formed and strengthened, including sites of commerce and transportation. Just as *Bruen* extends the right of self-defense to weaponry of twenty-first century, *Bruen* recognizes democracy's competence to protect places of public gathering against weapons threats of the twenty-first century.

## I. *Bruen*'s Impact on Sensitive Places

In *Bruen*, the Court struck down a New York law requiring that individuals seeking concealed-carry permits for handguns demonstrate that they have "proper cause." In doing so, the Court called into question similar laws in other states that together governed about a quarter of the country's population.[30] But the Court also emphasized that states can still utilize other contemporary forms of gun regulation, including "shall issue" licensing laws that rely on more objective criteria.[31]

By striking down good-cause permit requirements, *Bruen* increased the

---

[30] Adam Liptak, *Supreme Court Strikes Down New York Law Limiting Guns in Public*, N.Y. TIMES (Jun. 23, 2022), https://www.nytimes.com/2022/06/23/us/supreme-court-ny-open-carry-gun-law.html.

[31] *See* supra note 10 and sources cited therein.

Electronic copy available at: https://ssrn.com/abstract=4355024

relevance of locational regulations: rules that restrict *where* guns can be carried. In a world where the class of concealed carriers has expanded beyond those who had to show "good cause," some states might conclude that the risks of allowing guns in certain public places—bars, for example—are correspondingly higher. A similar dynamic unfolded after *Heller* struck down Washington, D.C.'s municipal handgun ban, as the District responded in part by enacting a variety of locational restrictions, including a prohibition against firearms on public transportation (which is the subject of a post-*Bruen* Second Amendment challenge[32]).

Unsurprisingly, then, the regulatory response to *Bruen*—and ensuing Second Amendment litigation[33]—has largely focused on enumerating locations where guns are forbidden. Soon after *Bruen*, New York amended its laws to remove the good cause requirement, provide new application requirements, and list additional gun-free zones.[34] The latter now include not only polling places, courts, and schools, but also businesses serving alcohol, museums, places of public transportation, libraries, health care facilities, and Times Square. New Jersey followed suit a few months later, significantly expanding its own list of gun-free locations.[35]

How should courts evaluate the constitutionality of these restrictions? As *Bruen* recognized, after *Heller* "the Courts of Appeals … coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny."[36] In fact, that framework was adopted by every federal court of appeals to consider the question,[37] and under it, "historical meaning enjoy[ed] a privileged interpretive role."[38] Existing sensitive places doctrine evolved under this two-part framework.

But *Bruen* held that a privileged interpretive role for history is not enough,

---

[32] Paul Duggan, *Gun Owners Sue D.C., Demanding to Carry Firearms on Metro,* WASH. POST (June 30, 2022), https://www.washingtonpost.com/dc-md-va/2022/06/30/lawsuit-guns-dc-metro-buses.

[33] *See supra* notes 4-6 and sources cited therein.

[34] Concealed Carry Improvement Act, 2022 N.Y. Sess. Laws ch. 317.

[35] Tennyson Donyéa, *New Jersey Gov. Murphy Signs Law Upping Requirements for Concealed Carry*, WHYY.org (Dec. 22, 2022), https://whyy.org/articles/new-jersey-concealed-carry-restrictions-law-murphy.

[36] *Bruen*, 142 S. Ct. at 2125.

[37] *See* Worman v. Healey, 922 F.3d 26, 33 (1st Cir. 2019), *cert. denied*, 141 S. Ct. 109 (2020); Libertarian Party of Erie Cnty. v. Cuomo, 970 F.3d 106, 127 (2d Cir. 2020), *cert. denied*, 2021 WL 2519117 (U.S. June 21, 2021); Ass'n of N.J. Rifle & Pistol Clubs Inc. v. Att'y Gen. N.J., 974 F.3d 237, 242 (3d Cir. 2020); Harley v. Wilkinson, 988 F.3d 766, 769 (4th Cir. 2021); Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 194, 206 (5th Cir. 2012); United States v. Green, 679 F.3d 510, 518 (6th Cir. 2012); Kanter v. Barr, 919 F.3d 437, 442 (7th Cir. 2019); Young v. Hawaii, 992 F.3d 765, 783 (9th Cir. 2021); United States v. Reese, 627 F.3d 792, 800–801 (10th Cir. 2010); GeorgiaCarry.Org, 687 F.3d at 1260, n. 34; United States v. Class, 930 F.3d 460, 463 (D.C. Cir. 2019); *see also* United States v. Adams, 914 F.3d 602 (8th Cir. 2019) (acknowledging but not adopting the framework).

[38] United States v. Masciandaro, 638 F.3d 458, 470 (4th Cir. 2011).

Electronic copy available at: https://ssrn.com/abstract=4355024

and that whenever a challenged restriction falls within the Amendment's coverage, a challenged gun regulation must be tied to antecedent traditions of firearm regulation:

> To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."[39]

As the majority recognized—indeed, repeatedly emphasized—application of this new methodology requires not simply identifying historical examples but making analogies.

## II. The Historical Why and How of Sensitive Places

The *Bruen* Court suggested some principles of relevant similarity to guide its historical-analogical approach: "While we do not now provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment, we do think that *Heller* and *McDonald* point toward at least two metrics: *how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense."[40] Citing *Heller* and *McDonald*'s emphasis on individual self-defense as the central component of the right to keep and bear arms, the Court said that "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry."[41] In conducting this comparison, the Court emphasized, the laws do not have to be "*twin*[s]": "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster."[42]

To know the range of the government's authority to enact locational restrictions, then, we must consult the historical record to distill both the reasons for such restrictions (the "why") and their effect (the "how"). The precise contours of *Bruen*'s analogical test remain unclear—the Court appears to formulate different versions of the test—but the opinion identifies why and how

---

[39] *Bruen*, 142 S. Ct. at 2126 (internal citation omitted); *see also id.* at 2129-30 ("When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'").

[40] *Id.* at 2132-33 (emphasis added).

[41] *Id.* at 2118 (internal citations, quotation, and emphasis omitted).

[42] *Id.* (internal citations, quotation, and emphasis omitted).

Electronic copy available at: https://ssrn.com/abstract=4355024

as "central considerations,"[43] and so we focus on them here. That task, rather than the simple enumeration of specific locations, is the heart of the sensitive places inquiry.

### A.  Why

The first of *Bruen*'s analogical metrics focuses on "why" historical and modern gun laws burden the right to self-defense.[44] Obviously the prevention of physical harm is one reason, as the majority seems to recognize.[45]

But it is also important to note that weapons laws—including sensitive place restrictions—historically were used not only to preserve life but, as we have shown in prior work, to protect the public peace and democratic self-governance.[46] As the Georgia Supreme Court put it in an 1874 decision involving that state's locational restrictions: "The preservation of the public peace, *and* the protection of the people against violence, are constitutional duties of the legislature, and the guarantee of the right to keep and bear arms is to be understood and construed in connection and in harmony with these constitutional duties."[47]

As this passage illustrates, the Georgia court construed the right to bear arms in connection with the legislature's duty to regulate weapons not only against violence but in the interest of preserving public peace. Regulating weapons was not a limitation on freedom, but instead was an expression of collective self-governance[48] and *a prerequisite of democracy itself.* Legislatures enacted sensitive-place restrictions protecting against weapons threats the areas where people met or mingled to form democratic community.

This principle finds wide-ranging expression in the historical record. For example, public carry restrictions have applied in government buildings since at least the mid-seventeenth century. In 1647, the Maryland state legislature prohibited armed individuals from coming "into the house of Assembly (while

---

[43] *Id.*

[44] *Id.*

[45] *Id.* at 2148-49.

[46] *See* Blocher & Siegel, *supra* note 18; Reva B. Siegel & Joseph Blocher, *Why Regulate Guns?*, 48 J.L. MED. & ETHICS 11, 11 (2020); Joseph Blocher & Reva Siegel, *Guns Are a Threat to the Body Politic*, THE ATLANTIC (March 8, 2021, 1:03 PM), https://www.theatlantic.com/ideas/archive/2021/03/guns-are-threat-body-politic/618158.

[47] Hill v. State, 53 Ga. 472, 476-77 (1874) (emphasis added).

[48] *See generally* WILLIAM J. NOVAK, THE PEOPLE'S WELFARE: LAW & REGULATION IN NINETEENTH-CENTURY AMERICA 10-15 (1996) (observing that "self-government was part of a broader, more substantive understanding of the freedoms and obligations accorded citizens as contributing members of self-regulating communities. . . . No community was deemed free without the power and right of members to govern themselves, *that is*, to determine the rules under which the locality as a whole would be organized and regulated" and chronicling the "deluge of laws and ordinances passed by states and municipalities regulating American life between 1787 and 1877").

Electronic copy available at: https://ssrn.com/abstract=4355024

the howse is sett) . . . upon peril of such fine or censure as the house shall thinks fit."[49] About a century later, Virginia enacted a statute barring most individuals from "com[ing] before the Justices of any Court, or other of their Minister of Justice, doing their office, with force and arms."[50] During Reconstruction and the late nineteenth century, Georgia and Missouri imposed similar restrictions in courthouses.[51] All of these can be understood as protecting sites of self-government.

Polling places and other electoral sites have a particularly significant history of gun prohibition. Many restrictions were adopted amid concerns about violence and intimidation in the democratic process—whether between Loyalists and Patriots in the Revolutionary era or between white supremacists and Black citizens during Reconstruction.

As early as 1776, Delaware's Constitution provided: "To prevent any violence or force being used at the said elections, no person shall come armed to any of them."[52] This provision was enacted against a backdrop of conflict between Loyalists and Patriots that made elections highly unstable and, at times, violent.[53] Other states soon followed Delaware. In 1787, New York provided that "no person by force of arms nor by malice or menacing or otherwise presume to disturb or hinder any citizen of this State to make free election."[54] In 1797, New Jersey passed a law barring "any candidate" at "any such election, or previous thereto" from "appear[ing] at such election with any weapons of war, or staves, or bludgeons, or use any threats, that may lead to put any of the candidates or voters in fear of personal danger . . ."[55] New Jersey's law came amid both fabricated and credible threats of election maladministration and corruption, particularly in the state's first elections under the new U.S.

---

[49] 1647 Md. Laws 216; *see* Brief of Amicus Curiae The Independent Institute In Support of Petitioners, *New York State Rifle & Pistol Ass'n v. Bruen*, 2022 WL 2251305 (June 23, 2022). The state revised this statute three years later to cover "either of the houses," once the unicameral legislature separated into two houses. 1650 Md. Laws 273.

[50] 1786 Va. Acts 33, ch. 21.

[51] Georgia's statute prohibited deadly weapons at "any Court of justice." R. H. CLARK, THE CODE OF THE STATE OF GEORGIA 818 (1873) (§ 4528).  Missouri's prohibited concealed carriage "into any court room during the sitting of court . . ." 1883 Mo. Laws 76, An Act To Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri. Broader restrictions were adopted for the same purpose, including General Sickle's well-known General Order No. 10. *See, e.g.*, Headquarters Second Military District, General Orders No. 10 (Apr. 11, 1867), *in* A POLITICAL MANUAL FOR 1867, 202, 204 (D.C., Philp & Solomons 1867) ("The practice of carrying deadly weapons, except by officers and soldiers in the military service of the United States, is prohibited. The concealment of such weapons on the person will be deemed an aggravation of the offence.").

[52] DEL. CONST, art. 28 (1776).

[53] HAROLD B. HANCOCK, THE LOYALISTS OF REVOLUTIONARY DELAWARE 48–50 (1977).

[54] Act of Jan. 26, 1787, 1787 N.Y. Laws 345, ch. 1.

[55] An Act to Regulate the Election of Members of the Legislative Council and General Assembly, Sheriffs and Coroners, in This State, ch. DCXXXIV, 1796 N.J. Laws 171.

Electronic copy available at: https://ssrn.com/abstract=4355024

Constitution in 1789, widely believed to be marred by fraud.[56]

During Reconstruction, at least four more states passed similar statutes. In 1870, following major incidents of racialized political violence,[57] Louisiana prohibited the carrying of a "dangerous weapon, concealed or unconcealed, on any day of election during the hours the polls are open, or on any day of registration or revision of registration, within a distance of one-half mile of any place of registration or revision of registration."[58] That same year, Tennessee forbade "any qualified voter or other person attending any election" to "carry about his person, concealed or otherwise" any "deadly or dangerous weapon,"[59] and Texas prohibited weapons at "any election precinct."[60] In Texas's case, the restrictions came amid concerns from Republicans about intimidation of Black voters.[61]

In 1873, Georgia prohibited deadly weapons at "any election ground, or precinct . . ."[62] After Reconstruction, Missouri and Maryland passed similar statutes. In a statute specific to Calvert County, Maryland banned the carriage of firearms "on the days of election and primary election, within three hundred yards of the polls, secretly or otherwise."[63] Missouri prohibited the carriage of

---

[56] CARL E. PRINCE, NEW JERSEY'S JEFFERSONIAN REPUBLICANS: THE GENESIS OF AN EARLY PARTY MACHINE 1789 – 1817, at 8 (1967); *see also* Campbell Curry-Ledbetter, Note, *Women's Suffrage in New Jersey 1776-1807: A Political Weapon,* 21 GEO. J. GENDER & L. 705, 717 (2020) ("Election and voter fraud were rampant in early New Jersey elections. The legislative proceedings of the era were filled with petitions complaining of voter fraud in local elections, and elections were frequently overturned after allegations of corruption."); Richard P. McCormick, *New Jersey's First Congressional Election, 1789: A Case Study in Political Skulduggery,* 6 WILL. & MARY QUARTERLY 237, 244 (1949) (noting "reports of … voters being pressured at the polls").

[57] *See* Lorraine Boissoneault, *The Deadliest Massacre in Reconstruction-Era Louisiana Happened 150 Years Ago,* SMITHSONIAN MAG. (Sept. 28, 2018), https://www.smithsonianmag.com/history/story-deadliest-massacre-reconstruction-era-louisiana-180970420; James G. Dauphine, *The Knights of the White Camelia and the Election of 1868: Louisiana's White Terrorists; A Benighting Legacy,* 30 J. LA. HIST. ASS'N 173 (1989); Michael Stolp-Smith, *New Orleans Massacre (1866),* BLACKPAST (Apr. 7, 2011), https://www.blackpast.org/african-american-history/new-orleans-massacre-1866.

[58] An Act to Regulate the Conduct and to Maintain the Freedom of Party Election, 1870 La. Acts 159–60, § 73. Texas had a similarly broad half-mile restriction that applied when polls were open. *See* Carrying Arms About Elections, Act Aug. 23, 1876, p. 311, § 25.

[59] 1869-70 Tenn. Pub. Acts 23-24, ch. 22, § 2.

[60] 1870 Tex. Gen. Laws 63, An Act Regulating The Right To Keep And Bear Arms, ch. 46, § 1. Intermediate appellate courts in Texas reviewed convictions under this statute and did not contest its constitutionality. See Cooper v. State, 10 S.W. 216, 216 (Tex. Ct. App. 1888); Burns v. State, 38 S.W. 204 (Tex. Ct. Crim. App. 1896).

[61] Brennan Gardner Rivas, *An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-1900,* 121 SW. HIST. QUARTERLY 285, 299 (2018) ("Many local special elections in the years leading up to 1873 overwhelmingly favored Democrats because armed, white paramilitary groups took over polling places and intimidated black voters . . .").

[62] CLARK, *supra* note 51, at 818 (§ 4528).

[63] John Prentiss Poe, Maryland Code: Public Local Laws, Adopted by the General Assembly

concealed weapons at "any election precinct on any election day . . ."[64] Missouri's Supreme Court upheld that law in *State v. Wilforth*, invoking the "weight of authority" of state court opinions that had previously upheld restrictions on concealed carry.[65]

A similar history of locational restriction is evident in schools—one of the places that *Heller*, *McDonald*, and *Bruen* all recognize as sensitive.[66] Education is an activity like voting and legislating in which the bonds that constitute democratic community are formed and reproduced. This link between education and democracy was one that the founding generation recognized.[67]

The history of gun regulation at schools traces back to at least the mid-seventeenth century. In 1655, Harvard College barred students from having a "[g]un in his or theire chambers or studies, or keeping for theire use anywhere else in the town."[68] As early as the mid-eighteenth century, Yale College had a similar prohibition on students "keep[ing] a Gun or Pistol, or Fir[ing] one in the College-Yard or College."[69] The University of Virginia's rule book from 1825 was little different.[70] A variety of other educational institutions, from women's colleges to public universities to private schools, did the same.[71] Oakland

---

of Maryland, March 14, 1888, at 604 (1888) (§ 71).

[64] 1883 Mo. Laws 76, An Act To Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri.

[65] 74 Mo. 529, 531 (Mo. 1881); *see also* State v. Shelby, 2 S.W. 468, 469 (Mo. 1886) (declining to disturb that precedent).

[66] *See, e.g,* note 15 and accompanying text.

[67] Osamudia James, *Risky Education*, 89 GEO. WASH. L. REV. 667, 719 (2021). Many of the Founders—including John Adams, Benjamin Franklin, Thomas Jefferson, James Madison, and George Washington—explicitly connected education and democracy. *See, e.g.,* MASS. CONST. (1780) (written by John Adams) ("[W]isdom and knowledge . . . diffused generally among the body of the people [are] necessary for the preservation of their rights and liberties."); Letter from James Madison to W.T. Barry (Aug. 4, 1822), https://www.loc.gov/resource/mjm.20_0155_0159/?sp=1&st=text ("[A] people who mean to be their own Governors, must arm themselves with the power which knowledge gives."); *see also* N.Y. Rifle & Pistol Ass'n, Inc. v. Bruen, No. 20-843, Brief of the League of Women Voters as Amicus Curiae in Support of Respondents, at 4-5 (noting that schools and government buildings are both "public settings that house activities vital to a functioning democratic society, including election-related activities").

[68] Allen Rostron, *The Second Amendment on Campus*, 14 GEO. J.L. & PUB. POL'Y 245, 255 (2016) (quoting A COPY OF THE LAWS OF HARVARD COLLEGE 1655, at 10 (1876)).

[69] 2 FRANKLIN BOWDITCH DEXTER, BIOGRAPHICAL SKETCHES OF THE GRADUATES OF YALE COLLEGE WITH ANNALS OF THE COLLEGE HISTORY MAY 1745–MAY 1763, at 8 (1896).

[70] *Meeting Minutes of University of Virginia Board of Visitors 4–5 Oct. 1824*, ROTUNDA (1824), https://rotunda.upress.virginia.edu/founders/default.xqy?keys=FOEA-print-04-02-02-4598 ("No student shall, within the precincts of the University, introduce, keep, or use any spirituous or vinous liquors, keep or use weapons or arms of any kind or gun-powder.")

[71] *The Statutes of Dickinson College* 22-23 (1830) (prohibiting students from keeping any "gun, firearms or ammunition, sword-dirk, sword-cane, or any deadly weapon whatever"); *The Laws of Kemper College, Near St. Louis, Missouri* 9 (1840) ("No Student shall keep arms of any sort, or keep or fire powder on the College premises."); *The Minutes of the Senatus Academicus 1799–1842*, at 86

Electronic copy available at: https://ssrn.com/abstract=4355024

College's prohibition is notable for its inclusion of language establishing the purpose of its rule. It noted its aim to bar "immoral conduct" and "neglect of study," and as part of its mission of ensuring students would "consider themselves and each other as young gentlemen associated for purposes of mutual improvement," they must "avoid[] all turbulence, rudeness and violence."[72]

States also passed laws in the late nineteenth century barring public carriage of firearms in schools. The first of these was in Texas in 1870, which prohibited weapons at "any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct … or any other public assembly."[73] The Texas Supreme Court upheld the statute.[74] Similar prohibitions followed in Mississippi in 1878, Missouri in 1879, Oklahoma in 1893, and Arizona in 1901.[75] Municipalities enacted similar laws. Huntsville, Alabama, for example, barred individuals from going armed into "any school room or place where people are assembled for educational, literary, or social purposes . . ."[76]

The foregoing history demonstrates the centrality of protecting democratic community as a reason for regulating guns in specific places—a *why*, in *Bruen*'s framework. This value is served by all the historical antecedents recognized in *Bruen* and *Heller*, linking the protection of "legislative assemblies, polling places, and courthouses"[77] against weapons threats to the protection of "schools and

---

("[N]o student shall be allowed to keep any gun, pistol, Dagger, Dirk sword cane or any other offensive weapon in College or elsewhere[.]"); Annals Of Education And Instruction For The Year 1837 185 (Alcott & Woodbridge, Eds.) (1837); *Documenting the American South*, Univ. of N.C., (providing text of Acts of the General Assembly and Ordinances of the Trustees, for the Organization and Government of the University of North-Carolina (1838)); *Laws of Waterville College, Maine* 11 (1832) ("No Student shall keep firearms, or any deadly weapon whatever."); Laws & Regulations of the College of William & Mary 4, 19 (1830) (forbidding its students "to keep, or to have about their person, any dirk, sword or pistol").

[72] *Constitution and Laws of the Institution of Learning Under the Care of the Mississippi Presbytery* 10 (1831) (prohibiting "duelling, or aiding or abetting it" and "wearing or carrying a dirk or other deadly weapon").

[73] 1870 Tex. Gen. Laws 63, *An Act Regulating The Right To Keep And Bear Arms*, ch. 46, § 1.

[74] English v. State, 35 Tex. 473, 479 (Tex. 1871).

[75] 1878 Miss. Laws 176, An Act To Prevent The Carrying Of Concealed Weapons And For Other Purposes, § 4; R.H. Thompson, The Annotated Code of the General Statute Laws of the State of Mississippi 327, § 1030 (1892);  John A. Hockaday et al., Revised Statutes of the State of Missouri 1879, at 224 (1879) (§ 1274); 1883 Mo. Laws 76, An Act To Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri; *Revised Statutes of Arizona Territory* 1252 (1901) (§ 387); W. A. McCartney et al., Statutes of Oklahoma, 1893 Being a Compilation of All the Laws Now in Force in the Territory of Oklahoma 504 (1893) (art. 45, § 7).

[76] An Ordinance in Relation to Carrying Deadly Weapons, § 1, in The Revised Ordinances of the City of Huntsville, Missouri 58 (Huntsville, Mo., Herald Print 189; *see also* Darrell A.H. Miller, *Institutions and the Second Amendment*, 66 Duke L.J. 69 (2016).

[77] *Bruen*, 142 S. Ct. at 2133.

Electronic copy available at: https://ssrn.com/abstract=4355024

government buildings."[78] As we will see, in the framers' day and in our own times, governments seeking to protect democratic community against weapons threats have enacted locational restrictions to secure the public at these and other sites.

### B.  How

The second part of *Bruen*'s historical-analogical test directs attention to "how" historical gun laws burdened the right to armed self-defense. That burden must then be compared to that imposed by the modern gun regulation. Analyzing sensitive place restrictions through this lens presents some conceptual challenges. After all, within a sensitive place where guns are prohibited, the burden on armed self-defense is total.[79] But that cannot be dispositive, since *Heller*, *McDonald*, and *Bruen* all agree that such burdens are permissible in sensitive places.[80] What principles, then, can be gleaned from the historical record?

A first principle is that legislatures enacted, and courts accepted, sensitive place restrictions that burdened the right to the extent needed to effectuate the regulatory interest. In some cases burdens on individual gun-owners were of short duration—as might arguably be true of a polling place restriction that requires persons to give up their gun while voting—while other laws concerned activities that could extend for much longer periods. The school restrictions above, for example, disarmed students on campus. Several laws forbade weapons public carrying in places of public speech, assembly, and worship generally, as well as in several specific places where democratic community is formed and strengthened. Georgia, for example, forbade weapons at "any place of public worship, or any other public gathering in this State."[81] Several other states and territories followed in the later nineteenth century. Oklahoma Territory, for example, listed "any . . . place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any party or social gathering . . ."[82]

---

[78] *Id.* (quoting *Heller*, 554 U.S. 570, 626 (2008)).

[79] To be clear, sensitive place restrictions are not prohibitions on self-defense itself, and only a small proportion of self-defense incidents involve the use of a weapon. Eric Ruben, *Law of the Gun: Unrepresentative Cases and Distorted Doctrine*, 107 Iowa L. Rev. 173, 201-02 (2021) (discussing the rarity of lawful defensive gun uses).

[80] *Heller*, 554 U.S. at 626; *McDonald*, 561 U.S. at 786; *Bruen*, 142 S. Ct. at 2133-34.

[81] Clark, *supra* note 51, at 818 (§ 4528).

[82] W. A. McCartney et al., Statutes of Oklahoma, 1893 Being a Compilation of All the Laws Now in Force in the Territory of Oklahoma 504 (1893) (art. 45, § 7). For further examples, see, e.g., Revised Statutes of Arizona Territory 1252 (1901) (§ 387) (banning guns at a similar set of public gatherings); 1883 Mo. Laws 76, An Act To Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri (same); John A. Hockaday et al.,

Electronic copy available at: https://ssrn.com/abstract=4355024

Consider the many settings of public gathering protected from weapons threats by Oklahoma, Arizona, and Missouri in the nineteenth century. Given the breadth of these precedents, what were and are the limits on the burdens that locational restrictions can impose on gun owners? *Bruen* rules out locational restrictions that would "eviscerate" the right, such as a declaration that an entire metropolitan area is "sensitive":

> [E]xpanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly. Respondents' argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense that we discuss in detail below. Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a "sensitive place" simply because it is crowded and protected generally by the New York City Police Department.[83]

This suggests that the burden should be evaluated against a much larger denominator, and that prohibitions in particular places are permissible so long as, in the aggregate, they do not "eviscerate" the right to armed self-defense, and the right to public carry *Bruen* recognizes in a particular community or jurisdiction.

A second principle that emerges from these cases is that courts and legislatures balanced burdens on armed self-defense with public safety interests, rather than treating individual self-defense as a trump. This *historical* interest-balancing is precisely what *Heller* and *Bruen* direct courts to consider, instead of engaging in their own "independent means-end scrutiny."[84] According to the Court, "the Second Amendment is the 'product of an interest balancing *by the people*,' not the evolving product of federal judges. Analogical reasoning requires judges to apply faithfully the balance struck by the founding generation to modern circumstances, …. It is not an invitation to revise that balance through means-end scrutiny."[85] This is not a rule against balancing; it is a direction to consider the balance struck by history.[86]

---

REVISED STATUTES OF THE STATE OF MISSOURI 1879, at 224 (1879) (§ 1274) (same).

[83] *Bruen*, 142 S. Ct. at 2134 (internal citation omitted)

[84] *Id.* at 2133 n.7

[85] *Id.* (quoting *Heller*, 554 U.S. at 625).

[86] On *Bruen*'s own reading of the history on this point, see Will Baude, *Of Course the Supreme Court Needs to Use History. The Question is How.*, WASH. POST (Aug. 8, 2022) ("[I]n *Bruen*, the court refused to allow any kind of 'interest balancing' of gun rights against public safety. But deeper historical research might support such balancing after all. At the Founding and during Reconstruction, many constitutional rights were subject to regulation in the name of the public good. Such arguments could support more regulation of Second Amendment rights than the court suggests."); Saul Cornell, *Cherry-Picked History and Ideology-Driven Outcomes:* Bruen*'s Originalist Distortions*, SCOTUSBLOG (Jun. 27, 2022), https://www.scotusblog.com/2022/06/cherry-

Electronic copy available at: https://ssrn.com/abstract=4355024

In conducting this balancing, some courts characterized gun-owners' interest in carrying guns *into sensitive places* as minimal, and perhaps even illegitimate—implying that any legally relevant "burden" was minor or negligible. For example, in 1871, the Texas supreme court upheld the state's sensitive places law on the grounds that it was "in conflict with no higher law."[87] The court continued, "[I]t appears to us little short of ridiculous that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are congregated together."[88] In another case, the Texas court of appeals upheld the statute's categorical prohibition on arms in schools, even where danger was imminent and self-defense interests might be thought to trump:

> Nor does it matter how much or with what good reason I may be in dread of an immediate and pressing attack upon my person from a deadly enemy; the imminence of such danger affords no excuse in my wearing deadly weapons to church, or in a ball-room, or other places mentioned [such as a "schoolroom"] where his attack may be made and the lives of innocent people there assembled placed in jeopardy or sacrificed.[89]

Similarly, Georgia's state supreme court upheld that state's prohibition on deadly weapons at "any election ground, or precinct,"[90] effectively minimizing the legitimacy of a gun owner's interest in carrying a gun at such places:

> The practice of carrying arms at courts, elections and places of worship, etc., is a thing so improper in itself, so shocking to all sense of propriety, so wholly useless and full of evil, that it would be strange if the framers of the constitution have used words broad enough to give it a constitutional guarantee.[91]

---

picked-history-and-ideology-driven-outcomes-bruens-originalist-distortions; and George F. Will, *The Supreme Court's Gun Ruling Is a Serious Misfire*, WASH. POST (Jun. 23, 2022), https://www.washingtonpost.com/opinions/2022/06/23/supreme-court-gun-ruling-misfire ("[T]here is an American tradition even older than the nation of striking a 'delicate balance between the Second Amendment's twin concerns for self-defense and public safety.'" (quoting an amicus brief filed in *Bruen* by former federal appellate judge J. Michael Luttig and others supporting the constitutionality of New York's law on originalist grounds)).

[87] English v. State, 35 Tex. 473, 478 (1871).

[88] *Id.* at 479.

[89] Owens v. State, 3 Tex. App. 404, 407 (Tex. Ct. App. 1878); *see also* Alexander v. State, 11 S.W. 628, 628 (Tex. Ct. App. 1889) ("The law does not in terms accord to them such a privilege, and, without a clearly expressed exception in such case, this court will not sanction a defense the effect of which would be to authorize every school–teacher in the state to carry prohibited weapons upon his person in our school–rooms.").

[90] CLARK, *supra* note 51, at 818 (§ 4528).

[91] Hill v. State, 53 Ga. 472, 474 (Ga. 1874).

Electronic copy available at: https://ssrn.com/abstract=4355024

The court stated that in "concerts, and prayer-meetings, and elections," "the bearing of arms of *any* sort, is an eye sore to good citizens, offensive to peaceable people . . . and a marked breach of good manners."[92]

On the other side of the ledger, courts recognized that *other* people's rights and interests are in play in sensitive places, and that locational restrictions on guns are a way to coordinate various public goods.[93] In the same Georgia case, the court emphasized:

> The right to go into a court-house and peacefully and safely seek its privileges, is just as sacred as the right to carry arms, and if the temple of justice is turned into a barracks, and a visitor to it is compelled to mingle in a crowd of men loaded down with pistols and Bowie-knives, or bristling with guns and bayonets, his right of free access to the courts is just as much restricted as is the right to bear arms infringed by prohibiting the practice before courts of justice.[94]

These historical examples confirm that legislatures have long had authority to impose burdens—sometimes significant ones—on gun-owners in particular places.[95] In doing so, legislatures and courts struck a balance between the right to armed self-defense and important regulatory interests like public safety.

## III. *Bruen* and Analogical Method

Having derived these principles to guide sensitive places analysis under *Bruen*, in this final Part we show how the government, employing analogical reasoning, could enact locational restrictions beyond specific locations of formal governance and education already enumerated in *Heller* and *Bruen*, extending to places of civic life such as parades and sites of commerce and mass transportation. *Bruen* turns to history not as a limit, but instead to guide courts in defining the scope of gun rights and regulation in circumstances where the kinds of weapons and conditions of democratic community have evolved beyond those in the experience of the Constitution's ratifiers.

### A. *Building Democratic Community in New Places*

Roughly two weeks after *Bruen* was decided, residents of Highland Park, Illinois, gathered for a July Fourth parade. At 10:15 that morning, a gunman began firing on them with a semiautomatic rifle. Seven people were killed,

---

[92] *Id.* at 476.

[93] Miller, *supra* note 21.

[94] *Hill*, 53 Ga. at 477-78.

[95] The fact that these prohibitions were total is particularly notable given that legislatures *could* have written locational rules that restricted but did not ban guns—and indeed did so in other contexts. *See infra* notes 126-127 and accompanying text.

Electronic copy available at: https://ssrn.com/abstract=4355024

dozens more physically injured, and countless more traumatized by the carnage, including a toddler orphaned by the murder of both parents.[96] Illinois prohibits firearms at "any public gathering" licensed by the government.[97] A gun-owner wishing to carry a gun at next year's July Fourth parade argues that this restriction violates his right to armed self-defense. How should the case be resolved under *Bruen*?

No sensible reading of the Second Amendment would require the grieving and traumatized community of Highland Park to permit guns at its next July Fourth parade. Analyzing the constitutionality of such a restriction through the lens of sensitive places doctrine opens various interpretive possibilities.

One approach would be to uphold the Highland Park restriction on the basis of historical antecedents restricting guns at public assemblies. Georgia's representative law, for example, prohibited guns at "any … public gathering in this State."[98] And in a 1905 case the Georgia Supreme Court upheld the conviction of an individual who brought a firearm to a Fourth of July gathering, finding that "[t]he wholesome purpose of this statute would be much limited by putting a narrow construction upon the expression 'any other public gathering.' A barbecue on the fourth of July, at which the public is assembled in considerable numbers, constitutes a public gathering within the meaning of the statute."[99] It is not clear whether this would be sufficient, given the substantial uncertainty that *Bruen* has introduced. The historical research necessary to identify these examples might not be possible, especially on a briefing schedule,[100] or a judge might require a higher quantity of laws to demonstrate a "tradition."[101]

But public assembly laws—or those specifically addressing parades, for

---

[96] *These are the Victims of the Fourth of July Parade Shooting in Highland Park*, CHI. TRIB. (July 9, 2022), https://www.chicagotribune.com/news/ct-highland-park-victims-20220705-tgcgdx5bqbfzrakhzf6jian634-list.html.

[97] 720 ILCS 5/24-1(a)(8).

[98] CLARK, *supra* note 51, at 818 (§ 4528); *see also supra* notes 81-82 and accompanying text (discussing Georgia's law and similar restrictions in other states and territories).

[99] Wynne v. State, 123 Ga. 566, 51 S.E. 636, 637 (1905); *id.* ("The purpose of Pen. Code 1895, § 342, is to protect the public against the danger arising from allowing persons to carry deadly weapons to courts of justice, or election grounds or precincts, or places of public worship, or any other public gathering in this state.").

[100] Def. Distributed v. Bonta, No. CV 22-6200-GW-AGRX, 2022 WL 15524977, at *5 n.9 (C.D. Cal. Oct. 21, 2022) ("[T]here is no possibility this Court would expect Defendants to be able to present the type of historical analysis conducted in *Bruen* on 31 days' notice (or even 54 days' notice)."), *adopted*, No. CV 22-6200-GW-AGRX, 2022 WL 15524983 (C.D. Cal. Oct. 24, 2022).

[101] *See, e.g.*, Firearms Policy Coalition v. McCraw, __ F.Supp.3d __, 2022 WL 3656996, at *11 (N.D. Tex. Aug. 25, 2022) ("The [h]istorical record before the Court establishes (at most) that between 1856 and 1892, approximately twenty jurisdictions (of the then 45 states) enacted laws that restricted the ability of those under 21 to 'purchase or use firearms.' "); *Antonyuk II*, 2022 WL 5239895, at *9 ("[T]he Court generally has looked to instances where there have been three or more such historical analogues.").

Electronic copy available at: https://ssrn.com/abstract=4355024

example—are not the only historical basis to which Highland Park might turn. *Bruen* admonishes courts not to look for "historical *twin*[s],"[102] but to instead compare modern and historical laws based on "why" and "how" they restricted the right to keep and bear arms. Such an analysis must also be conducted with regard to how the modern and historical laws were "justified,"[103] and not with a singular focus on *where* they applied. We have illustrated one such justification in detail above: Many location-based historical gun restrictions protected democratic community and the formation of a shared civic life, not simply individual, physical lives. Precisely because those laws played a similar role to the Highland Park restriction, they, too, can be mustered to support its constitutionality. For example, the Court has specifically approved as constitutional the tradition (described above[104]) of prohibiting guns in schools,[105] which it has recently described as "nurseries of democracy."[106] Restricting guns in such places can thus be understood as an effort to protect and promote democratic community itself—the same values that are at stake in a July Fourth parade, since recalling and honoring the nation's war of independence cultivates a sense of pride and belonging that connects present and past generations.[107] The point is that schools and parades are, to borrow *Bruen*'s analogical framework, relevantly similar in respect of the "why"—of the interest served by restricting guns.[108]

Sensitive place restrictions have a special role in preserving democratic community because the protection of physical public spaces—the spaces that comprise a community—is a prerequisite to democracy.[109] These are the spaces where individuals from different walks of life can come together, break down or understand lines of difference, and build a common belief in a shared civic life. They are the spaces where voluntary associations conduct their business,

---

[102] *Bruen*, 142 S. Ct. at 2133.

[103] *Id.* at 2126.

[104] *See supra* notes 67-76 and accompanying text.

[105] *Heller*, 554 U.S. at 626.

[106] Mahanoy Area Sch. Dist. v. B. L. by & through Levy, 141 S. Ct. 2038, 2046 (2021); *see also* Brown v. Bd. of Educ., 347 U.S. 483, 493 (1954) (noting that education is "the very foundation of good citizenship").

[107] Celebrating public holidays transmits stories of the nation's birth and values across generations. Benedict Anderson famously described nations as "imagined communities" that served as a "way of linking fraternity, power and time meaningfully together." BENEDICT ANDERSON, IMAGINED COMMUNITIES: REFLECTIONS ON THE ORIGIN AND SPREAD OF NATIONALISM 36 (2006). These communities are constituted through forms of collective memory, "stories about the nation's past experience to clarify the meaning of the nation's commitments, to guide practical reason, and to help express the nation's identity and values." Reva B. Siegel, *The Politics of Constitutional Memory*, 20 GEO. J. L. & PUB. POL. 19 (2022).

[108] *Bruen*, 142 S. Ct. at 2132-33.

[109] John R. Parkinson, *Does Democracy Require Physical Space?*, *in* DOES TRUTH MATTER? 101 (2009) (arguing "public space matters because of the *functional necessity* of physical arenas for democratic action"); *see also* ROBERT PUTNAM, BOWLING ALONE 337 (2000) (quoting John Dewey: "Democracy must begin at home, and its home is the neighborly community.").

Electronic copy available at: https://ssrn.com/abstract=4355024

where "social and civic skills are learned—'schools for democracy.'"[110] They might also be the places where people gather to communicate concerns, to advocate, and to mobilize.[111] History shows that armed crime and terror in these vital public spaces can directly or indirectly suppress voter turnout and other forms of democratic participation.[112] The protection of these spaces is therefore critical to democracy, just like the protection of a legislative assembly itself. And the principle it gives us, under *Bruen*, is that the protection of democratic community is a central rationale for sensitive place restrictions.[113]

Crucially, *Bruen*'s analogical method explicitly *rejects* antiquarian replication of antecedent gun laws. The government must "identify a well-established and representative historical *analogue*, not a historical *twin*."[114] Indeed, the Court made plain its understanding that sensitive-places restrictions *can continue to evolve*. That does not mean that anything goes, of course—the Court asserted that, for example, it would be unconstitutional permanently to designate *all* of Manhattan a sensitive place.[115] But the hypothetical the Court discussed is wildly more expansive than imposing gun restrictions at a public gathering. A court could well characterize the "why" of the Highland Park regulation as "limiting guns at public events and places that build community ties," bringing it within the tradition of sensitive places regulation discussed above—including the restriction of guns in school buildings. The antecedent statute for a sensitive place restriction for the Highland Park Fourth of July parade could therefore be a law/tradition of restricting weapons at public gatherings or schools or both.

### B.  *"Fairs and Markets": Community, Commerce, and Transportation*

Historical analysis of weapons regulations often begins, chronologically, with the Statute of Northampton, enacted in 1328 during the reign of Edward III:

> [N]o man great nor small, of what condition soever he be, except the king's servants in his presence, and his ministers in executing of the king's precepts, or of their office, and such as be in their company assisting them, and also [upon a cry made for arms to keep the peace,

---

[110] PUTNAM, *supra* note 109, at 338.

[111] JOHN R. PARKINSON, DEMOCRACY & PUBLIC SPACE: THE PHYSICAL SITES OF DEMOCRATIC PERFORMANCE 149 (2012).

[112] *See, e.g.*, Brennan Gardner Rivas, The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930, at 73 (May 2019) (Ph.D. dissertation, Texas Christian University) (on file with author) (stating that the kinds of locations and events protected by the Texas 1871 law were the very ones that most frequently became targets of Klan or other white vigilante intimidation and violence for the purpose of Black voter suppression).

[113] *Cf.* Kopel & Greenlee, *supra* note 23, at 205 ("Protecting government deliberation from violent interference is the core of the sensitive places tradition.").

[114] *Id.* at 2133.

[115] *See supra* text at note 83 and accompanying text.

Electronic copy available at: https://ssrn.com/abstract=4355024

and the same in such places where such acts happen,] be so hardy to come before the King's justices, or other of the King's ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure.[116]

The degree to which the Statute broadly prohibited public carrying of weapons has been the subject long-running scholarly and legal debate,[117] but for purposes of sensitive place restrictions we think it particularly notable that "fairs" and "markets"—places of significant community life at the time—were singled out for protection *alongside* political figures like justices and ministers. Some colonial governments incorporated this language directly into their statutes.[118]

Security of commerce is an element of democratic community, as our forebears clearly appreciated.[119] "The Framers of the 1787 Constitution … believed that commercial relations between different parts of the country would foster national connection and social cohesion," and viewed "commerce as intercourse that produces social cohesion."[120]

Although we do not thoroughly explore the matter here, we suspect that protecting commerce from weapons threats was an important part of the "this Nation's historical tradition of firearm regulation."[121] Some states had statewide locational restrictions that prohibited weapons in places "where persons are assembled for amusement"—with that location listed alongside bans on weapons in the vicinity of a polling place.[122]

Tennessee restricted guns at fairs, with these places of commerce represented as places of "public assembly." Its sensitive-place restriction

---

[116] Statute of Northampton, 1328, 2 Edw. 3, c. 3 (Eng.).

[117] Blocher & Siegel, *When Guns Threaten the Public Sphere, supra* note at 18, 165-67 (describing the debate about Northampton).

[118] *See* 1786 Va. Laws 33, ch. 21, An Act Forbidding and Punishing Affrays; FRANCOIS XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH CAROLINA 60-61 (Newbern 1792).

[119] Jack M. Balkin, *Commerce*, 109 MICH. L. REV. 1, 17 (2010) ("Many eighteenth-century thinkers believed that commercial relations fostered tolerance and understanding, smoothed over social, religious, and cultural differences, brought refinement of manners, and, in the long run, political and social peace.").

[120] *Id.*

[121] *Bruen*, 142 S. Ct. at 2126 (internal citation omitted); *see also id.* at 2129-30 ("When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'").

[122] *See* W. A. McCartney et al., Statutes of Oklahoma, 1893 Being a Compilation of All the Laws Now in Force in the Territory of Oklahoma 504 (1893) (art. 45, § 7); Revised Statutes of Arizona Territory 1252 (1901) (§ 387).

Electronic copy available at: https://ssrn.com/abstract=4355024

prohibited gun possession at "any fair, race course, or other public assembly of the people."[123] Fairs and places of public assembly feature people gathered in physically crowded circumstances, and in circumstances of exchange and intercourse that sustain social bonds of community.[124] Elsewhere, we see places of commerce treated as public places in *Maupin v. State*, where the Tennessee supreme court affirmed conviction under a statute prohibiting arms at a mill despite the fact that the defendant worked and slept at the mill, because "[t]he mill was a public place,—a place to which customers were constantly invited and daily expected to go. In such a place a man, though he be the proprietor, may not lawfully carry pistols concealed about his person."[125]

Many historical restrictions on gun displays and use (not carriage *per se*) specifically singled out various places of commerce like hotels, saloons, groceries, and the like, such as an 1886 New Mexico law imposing special penalties on those who "unlawfully draw, flourish or discharge a rifle, gun or pistol within the limits of any settlement in this territory, or within any saloon, store, public hall, dance hall or hotel, in this territory."[126] To be clear, these particular restrictions were not total prohibitions—their "how" was different, as it were, from the bans discussed above.[127] But they do potentially suggest a common "why"—a special focus on protecting sites of the commercial activity that itself is an element of democratic community.

As with some of the school examples recounted above, we would expect that private actors imposed many of the locational restrictions on weapons in places of commerce.[128] Evidence of such restrictions should still be probative

---

[123] 1869-70 Tenn. Pub. Acts 23-23, ch. 22, § 2.

[124] New Jersey and New York invoked similar lines of argument in litigation over their sensitive-place restrictions on certain transportation vehicles. *See* Defendants' Brief in Opposition to Plaintiffs' Motion for a Temporary Restraining Order at 37, Siegel v. Platkin, No. 22-CV-7463 (KMW), 2023 WL 185512 (Jan. 13, 2023) ("The concerns that animate regulating firearms-carry on a crowded bus are not relevantly different from those supporting prohibitions on firearms-carry at . . . '[f]airs . . .'"); State Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction at 65, *Antonyuk III* ("A subway, bus, or airport is sensitive in the same way as a 'fair or market[],'" or "'a fair, race course, or other public assembly of the people . . .'" (internal citations omitted)).

[125] 89 Tenn. 367, 369 (1890).

[126] New Mexico: 1886 N.M. Laws 56, An Act to Prohibit the Unlawful Carrying and Use of Deadly Weapons, ch. 30, § 4. *See also* 1883 Wis. Sess. Laws 841. vol. 2, An Act to Revise, Consolidate and Amend the Charter of the City of Neenah, Approved March 14, 1873, and the Several Acts Amendatory Thereof, ch. 184, tit. 12, § 162 (referring to "any saloon, shop, store, grocery, hall, church, school house, barn, building or other place within said city"); Revised Ordinances of the City of Fort Worth, Texas 113-114, An Ordinance defining and punishing affrays and Disturbances of the Peace, . . .§ 2. (1879) (referring to "any public road, street or alley, inn, tavern, store, grocery, workshop, or any place to which people resort for purposes of business, recreation, or amusement").

[127] *See supra* notes 52-76 and accompanying text.

[128] *See, e.g.,* Austin Charles Rhodes, "Good Saloon, Bad Saloon, Saloons in Wichita, Kansas 1865-1881" at 30, M.A., Hist., Wichita St. Univ. (2010) ("[A] saloon would not have stayed in

under *Bruen*'s historical-analogical test, especially considering the degree to which the relevant sites—the historical antecedents—were privately controlled. Historical evidence of schools as sensitive places, for example, should include private schools, considering that *Heller* cites education as a site of sensitive place regulation[129] and there was no official system of public education at the Founding.[130]

We expect that many historical analogues for locational restrictions on weapons in transportation were also likely private—for example, sites of mass transit,[131] which have been the subject of Second Amendment litigation in the wake of *Bruen*.[132] Certainly it is crucial to have further historical research regarding specific public and private restrictions of guns in sites of transit— omnibuses, railways, ferries, depots, stations, and the like. Evidence of locational restrictions in these transit settings could be extended via analogical reasoning to support contemporary locational restrictions on weapons in such places as subways, trains, and airplanes.

Even as research on these transit antecedents is ongoing, we think that some public authorities might argue for extending sensitive-place restrictions via analogical reasoning from government buildings and schools directly to subways, trains, and airplanes. Freedom of travel and confidence in the security of transportation is necessary to sustain the bonds of community. Locational restrictions on weapons in government buildings and schools are relevantly similar to locational restrictions in subways, trains, and airplanes in why and how they burden the right to bear arms.  Both build bonds of democratic community, and only temporarily burden the right to bear arms.

### C.  Building Democratic Community for New Rights-Holders, and in New Ways

What kind of deference to the past does fidelity to the Constitution require? *Bruen*'s analogical method understands the Second Amendment through an

---

business very long if there were bar fights that smashed bottles and glasses every day. Furthermore, it was rare for a person to start a fight or pull a gun in a saloon and make it out without being arrested.").

[129] *See supra* text at note 15.

[130] *See* JOHANN N. NEEM, DEMOCRACY'S SCHOOLS: THE RISE OF PUBLIC EDUCATION IN AMERICA (2017) (tracing development of public school system to the antebellum era and connecting it to goals of national democratic identity).

[131] *See* George M. Smerk, *Urban Mass Transportation: From Private to* Public to Privatization, 26 TRANSPORTATION J. 83, 83 (1986) ("The transit industry in the United States . . . started in 1830 with the advent of the first omnibus service in New York City. From the beginnings of the horse-drawn omnibus and, shortly thereafter, the development of street railways, transit in the United States was a private, competitive enterprise."); DAVID. E. NYE, ELECTRIFYING AMERICA: SOCIAL MEANINGS OF A NEW TECHNOLOGY, 1880-1940, at 90 (1990) ("How were the hundreds of American street railways built? The majority were private, not public, ventures.").

[132] *See supra* note 6.

Electronic copy available at: https://ssrn.com/abstract=4355024

historical lens, yet allows government to regulate guns in new ways. As the Court observed: "Fortunately, the Founders created a Constitution—and a Second Amendment—'intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs.'"[133] The majority's citation to *McCulloch v. Maryland* counsels against rigid readings of the analogical method; the opinion disclaims being a "straightjacket."[134]

Yet judges have invoked *Bruen*'s call for analogies and the discretion it confers upon them to strike down democratically enacted legislation in ways that are not required by *Bruen* without offering any account—much less a cogent one—of what kinds of change the Constitution sanctions and what kinds of change the Constitution refuses to recognize.[135] We think such an account is owed when judges are striking down democratically enacted laws under an analogical method expressly designed to sanction changes in the form of gun regulation over time, so long as the law respects "why" and "how" regulation has burdened the use of weapons in our nation' s past.

Just as the means of self-defense evolves in history,[136] so do a society's methods of sustaining and securing community. Legislators must be able to take this kind of change into account. Nothing in the Constitution denies legislators modern tools needed to preserve community bonds and protect the public sphere any more than the Constitution denies individuals modern means to defend themselves and their families.

In short, while the Court has interpreted the Second Amendment as mandating fidelity to a tradition, it did not require blind deference to specific past practices. Traditions are living. We observe that the Court's embrace of change under the Second Amendment includes but is not limited to technological change; it also includes change in understandings of community.

Consider race. The Court's gun rights cases have always reasoned about the rights of Blacks to bear arms as equal to the rights of whites, and shown little interest in tying access to guns to the racially discriminatory history and traditions of the American people during slavery or Reconstruction.[137] Justice Thomas employs originalist interpretation to *protest* an American history and

---

[133] *Id.* at 2132 (quoting McCulloch v. Maryland, 4 Wheat. 316, 415 (1819)). On translation across contexts in fidelity to the original understanding, see Lawrence Lessig, *Fidelity in Translation*, 71 TEX. L. REV. 1165 (1993).

[134] *Bruen*, 142 S. Ct. at 2133.

[135] *See supra* notes 4-6 and accompanying text.

[136] *Bruen*, 142 S. Ct. at 2132 (recounting the Court's holding in *Heller* that "even though the Second Amendment's definition of "arms" is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense").

[137] *See, e.g.*, CAROL ANDERSON, THE SECOND: RACE AND GUNS IN A FATALLY UNEQUAL AMERICA 25-38 (2021); Patrick J. Charles, *Racist History and the Second Amendment: A Critical Commentary*, 43 CARDOZO L. REV. 1343 (2022); Mark Anthony Frassetto, *The Nonracist and Antiracist History of Firearms Public Carry Regulation*, 74 SMU L. REV. FORUM 169, 180 (2021); Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, U.C. DAVIS LAW REVIEW 10 (2022).

Electronic copy available at: https://ssrn.com/abstract=4355024

tradition of racism in the regulation of arms, not to venerate and entrench it.[138] The Court has recognized that as We the People evolves in history, who counts as a rights-bearing member of the community under Second Amendment evolves as well.

Yet, as of this writing, several courts have declared unconstitutional Section 922(g)(8), the 1994 federal law prohibiting gun possession by persons subject to a domestic violence restraining order.[139] Strikingly, in neither of the two most prominent decisions did judges attempt to determine whether license afforded to violence within family relations at the founding and during American history was the kind of social relationship that the Constitution should entrench and protect against change.

In *United States v. Perez-Gallan*, Judge David Counts reasoned that the general societal problem of intimate partner violence has existed from before the founding, and until the 1970s, the American legal system barely took formal legal action in response.[140] The judge recognized that legislatures historically disarmed "dangerous" people, but found that domestic abusers were not regarded as such.[141] For Judge Counts, that meant that under the history-and-tradition method espoused by *Bruen*, the "domestic violence prohibitor" was unconstitutional because it broke with the nation's traditional response of inaction.[142] (Observe that the tradition of inaction Judge Counts celebrates depended on women's disfranchisement;[143] 922(g)(8) was enacted only after women had the political voice to secure its passage.)

A few months later, in *United States v. Rahimi*,[144] a panel of the Fifth Circuit including Judges Cory Wilson, James Ho, and Edith Jones also struck down

---

[138] *See* McDonald v. City of Chicago, 561 U.S. 742, 856 (2010) (Thomas, J., concurring) (urging the Court to overrule major parts of the *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36 (1873), and *United States v. Cruikshank*, 92 U.S. 542 (1875), and holding out the right to bear arms as a symbolic repudiation of the history of racist mob violence that spanned the Reconstruction era to the 1960s, and recounting lynchings from 1882 to 1968).

[139] United States v. Rahimi, No. 21-11001, 2023 WL 1459240 (5th Cir. Feb. 2, 2023); United States v. Combs, No. CR 5:22-136-DCR, 2023 WL 1466614, at *1 (E.D. Ky. Feb. 2, 2023); United States v. Perez-Gallan, No. PE:22-CR-00427-DC, __ F.Supp.3d __, 2022 WL 16858516 (W.D. Tex. Nov. 10, 2022).

[140] *Perez-Gallan*, 2022 WL 16858516 at *4.

[141] *Id.* at *11.

[142] *Id.* at *10 ("*Bruen* is clear: if a challenged regulation addresses a 'general societal problem that has persisted since the 18th century,' and 'earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional.'" (quoting *Bruen*, 142 S. Ct. at 2131)).

[143] State v. Philpotts, 2022-Ohio-3155, ¶ 8, 194 N.E.3d 371, 373 (Ohio 2022) (Brunner, J., dissenting) (emphasis in original) ("'[T]he glaring flaw in any analysis of the United States' historical tradition of firearm regulation in relation to Ohio's gun laws is that no such analysis could account for what the United States' historical tradition of firearm regulation *would have been* if women and nonwhite people had been able to vote for the representatives who determined these regulations.").

[144] 2023 WL 1459240 (filed February 2, 2023)

Electronic copy available at: https://ssrn.com/abstract=4355024

922(g)(8). Though purporting to apply the analogical method, their interpretation of *Bruen*, filed on Groundhog Day,[145] reads the Constitution as a script for Groundhog Day.[146]

In *Rahimi*, the Fifth Circuit held that to enact the domestic violence prohibitor, the government would need to find historical analogues relevantly similar to 922(g)(8) in terms of why and how they burdened the right; it recognized laws at the time of ratification disarmed "dangerous" people (for example, those unwilling to take an oath of allegiance, slaves, and Native Americans)[147] but held that 922(g)(8) was not relevantly similar because "[t]he purpose of these [historical] 'dangerousness' laws was the preservation of political and social order, not the protection of an identified person from the specific threat posed by another"[148] and so struck down the law disarming those under protective orders for domestic violence as an "outlier[ ] that our ancestors would never have accepted."[149]

It takes a special kind of narrow legal mind to describe 922(g)(8) as protecting persons from threats but *not* as protecting "political and social order." Of course the statute does both. By disarming persons subject to restraining orders and protecting persons from violence threatened by an intimate partner, Congress acted to create a new "political and social order"—one that repudiated the old common law belief that a man had authority to "correct" subordinate members of the household, including his wife. Blackstone's *Commentaries on the Laws of England* [150] stated that husbands could exercise over their wives "domestic chastisement, in the same moderation that a man is allowed to correct his servants or children . . ."[151]   Even after law repudiated a husband's prerogative to chastise, the criminal law remained reticent to police violence between intimates as it did violence between other persons.[152] The states' refusal to intervene and disarm abusers has long been tied to traditional gender status roles in which a woman was viewed as a dependent of her abuser rather than an equal and independent member of the community. Government response to violence between intimates only began to shift in the 1970s as this system of

---

[145] *See id.*

[146] *Cf.* note 8.

[147] *Id.* at *7.

[148] *Id.* at *8.

[149] United States v. Rahimi, No. 21-11001, 2023 WL 1459240, at *10 (5th Cir. Feb. 2, 2023) (striking down the federal law prohibiting gun possession by those subject to a domestic violence protective order) (quoting *Bruen*, 142 S. Ct. at 2132).

[150] 1 WILLIAM BLACKSTONE, COMMENTARIES. On Blackstone's authority, see Lea VanderVelde, *Servitude and Captivity in the Common Law of Master-Servant: Judicial Interpretations of the Thirteenth Amendment's Labor Vision Immediately After Its Enactment*, 27 WM. & MARY BILL RTS. J. 1079, 1079 (2019), https://scholarship.law.wm.edu/wmborj/vol27/iss4/5

[151] BLACKSTONE, *supra* note 151, at 444.

[152] *See* Reva B. Siegel, *"The Rule of Love": Wife Beating as Prerogative and Privacy*, 105 YALE L.J. 2117 (1996).

Electronic copy available at: https://ssrn.com/abstract=4355024

gender hierarchy began slowly to break down.[153] The very goal of 922(g)(8) was thus not only to protect persons but to create a "political and social order" in which women as well as men are entitled to the equal protection of the civil and criminal law.[154]

Does the Second Amendment require Congress to reason about the sexes and respond to dangerousness on the basis of the old common law assumptions "that a husband, as master of his household, could subject his wife to corporal punishment of 'chastisement' so long as he did not inflict permanent injury upon her?"[155] The Fifth Circuit's claim that 922(g)(8) lacks antecedents is a classic exemplar of judges hiding behind the analogical method to choose amongst gun laws in ways that are not compelled by *Bruen* itself. Instead, as Judge Wilson's opinion in *Rahimi* illustrates, they are ventriloquizing historical sources with their own values.[156] True, the *Bruen* Court's ode to history and traditions encourages uncritical deference to status-based reasoning of the past of the kind on display in *Perez-Gallan* and *Rahimi*.[157] That said, there is nothing in *Bruen* that requires federal judges to expose domestic partners—and others[158]—to this heightened risk of gun violence.[159]

Given how emphatically the Roberts Court has modeled the importance of enforcing twenty-first century—rather than eighteenth- or nineteenth-century—understandings of racial status in defining gun rights,[160] we think *Perez*

---

[153] *Id.*

[154] *See* Robin West, *Toward an Abolitionist Interpretation of the Fourteenth Amendment*, 94 W. VA, L, REV. 222 (1991). *See also* Blocher & Siegel, *When Guns Threaten the Public Sphere, supra* note at 18, at 190-93 (describing physical and non-physical stakes of DV-linked gun restrictions).

[155] Siegel, *supra* note 152, at 2118 (citation omitted).

[156] Judge Wilson, author of the opinion, made clear in an NRA questionnaire—filed as part of a run for office in Mississippi—that he opposes most gun regulation, including universal background checks. Cory Wilson, *2015 Mississippi Candidate Questionnaire*, NAT'L RIFLE ASS'N OF AM. POL. VICTORY FUND (May 21, 2015), https://afj.org/wp-content/uploads/2020/01/Wilson-Attachments-p450-453.pdf. *see also* Reva B. Siegel, *Memory Games: Dobbs's Originalism as Anti-Democratic Living Constitutionalism—and Some Pathways for Resistance*, 101 TEX. L. REV. at * 9(forthcoming 2023) https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4179622 ("Originalist judges ventriloquize historical sources.").

[157] *See* Reva B. Siegel, *How "History and Tradition" Perpetuates Status:* Dobbs *on Abortion's Nineteenth-Century Criminalization*, 60 HOUS. L. REV. (forthcoming 2023).

[158] *See* Lisa B. Geller, Marisa Booty, & Cassandra K. Crifasi, *The Role of Domestic Violence in Fatal Mass Shootings in the United States, 2014–2019*, 8 INJURY EPIDEMIOLOGY 38 (2021) (finding that 59.1% of mass shootings between 2014 and 2019 were DV-related and in 68.2% of mass shootings, the perpetrator either killed at least one partner or family member or had a history of DV).

[159] *See Statistics*, NAT'L COAL. AGAINST DOMESTIC VIOLENCE, https://ncadv.org/STATISTICS ("The presence of a gun in a domestic violence situation increases the risk of homicide by 1000%.").

[160] *See* Danny Li, Note, Bruen *and the Antisubordinating Second Amendment*, 132 YALE L.J. (forthcoming 2023) (showing how *Bruen* adopts racial justice claims made by gun rights scholars and advocates over the past few decades).

Electronic copy available at: https://ssrn.com/abstract=4355024

*Gallan* and *Rahimi* are clearly wrong to insist on enforcing the Second Amendment with traditional-status-based understandings of citizenship rights. Congress and the states can regulate guns with our twenty-first century understanding of We the People. *Bruen* does not require legislators to regulate guns based on premises of slavery, Jim Crow, the legal doctrine of marital unity, or separate spheres any more than it limits the Second Amendment's protection of weapons of self-defense to muskets and bayonets or weapons regulations to those existing at the time of the founding. *Bruen*, after all, approved shall-issue licensing laws without even identifying a historical antecedent.[161]

These cases involving the domestic violence prohibitor show the range of discretion that courts—including the Supreme Court—have when it comes to recognizing or blocking change, including broadening social equality. We may well learn that the Roberts Court only invokes values of equality under the Second Amendment to serve the cause of expanding gun rights,[162] but the Court has not yet decided a case making that crystal clear. Until it does, legislators may surely premise sensitive-place regulation on an evolving understanding of equal citizenship, much as the Court has reasoned about the case of gun rights.

CONCLUSION

We have shown here that, even under *Bruen*'s historical test, governments retain broad authority to use locational gun restrictions both to protect lives and democratic community. That authority to enact sensitive place restrictions is not limited narrowly to specific buildings where elections and formal lawmaking take place. It extends to other sites of democratic community, including schools, and could encompass other locations where those bonds are formed and strengthened, including sites of commerce and transportation. There is a thick tradition of regulating places and public gatherings to protect democratic community. In some cases, early location restrictions can supply specific historical analogues; in others, they may support contemporary locational restrictions because they share aims and thus satisfy *Bruen*'s "why" metric.

We have shown that *Bruen* sanctions change in many ways: expressly through its analogical method, by examples that extend the right to new weapons and recognize new modes of regulation, and by principle as the Court affirms contemporary understandings of equal citizenship that can alter the shape of gun rights and regulation.

---

[161] *See* supra note 10 and sources cited therein.

[162] *See* Khiara M. Bridges, *The Supreme Court 2021 Term Foreword: Race in the Roberts Court*, 136 HARV. L. REV. 23, 31 (2022) ("The Court 'protects' people of color only when it serves conservative ends. In *Dobbs* and *Bruen*, the protectionist rationale justified the reversal of *Roe* and an expansive interpretation of the Second Amendment; hence, the Court invoked it."). Justice Thomas has been particularly insistent about the expansion of Second Amendment rights as a remedy for histories and traditions of racist violence. *See, e.g.*, McDonald v. City of Chicago, 561 U.S. 742, 856 (2010) (Thomas, J., concurring).

Electronic copy available at: https://ssrn.com/abstract=4355024

Yet it is already evident that some judges are using *Bruen* as a shield to justify mix-and-match updating that extends rights protection to AR-15s and other forms of high-powered weaponry while cabining the exercise of democratic will to competencies and conceptions of equal citizenship that are 250 years old. Neither Constitution nor the *Bruen* decision mandates this reading, and judges who assert it are reasoning from their own, twenty-first century, values.

\* \* \*

Electronic copy available at: https://ssrn.com/abstract=4355024




The Trouble with Wilderness: Or, Getting Back to the Wrong Nature
Author(s): William Cronon
Source: *Environmental History,* Vol. 1, No. 1 (Jan., 1996), pp. 7-28
Published by: Forest History Society and American Society for Environmental History
Stable URL: http://www.jstor.org/stable/3985059
Accessed: 20/06/2013 13:19

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at
http://www.jstor.org/page/info/about/policies/terms.jsp

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of
content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms
of scholarship. For more information about JSTOR, please contact support@jstor.org.



*Forest History Society* and *American Society for Environmental History* are collaborating with JSTOR to
digitize, preserve and extend access to *Environmental History.*

http://www.jstor.org



# The Trouble with Wilderness

### or,

### Getting Back to the Wrong Nature

## William Cronon

THE TIME HAS COME TO RETHINK WILDERNESS.

This will seem a heretical claim to many environmentalists, since the idea of wilderness has for decades been a fundamental tenet—indeed, a passion—of the environmental movement, especially in the United States. For many Americans wilderness stands as the last remaining place where civilization, that all too human disease, has not fully infected the earth. It is an island in the polluted sea of urban-industrial modernity, the one place we can turn for escape from our own too-muchness. Seen in this way, wilderness presents itself as the best antidote to our human selves, a refuge we must somehow recover if we hope to save the planet. As Henry David Thoreau once famously declared, "In Wildness is the preservation of the World."[1]

But is it? The more one knows of its peculiar history, the more one realizes that wilderness is not quite what it seems. Far from being the one place on earth that stands apart from humanity, it is quite profoundly a human creation—indeed, the creation of very particular human cultures at very particular moments in human history. It is not a pristine sanctuary where the last remnant of an untouched, endangered, but still transcendent nature can for at least a little while longer be encountered without the contaminating taint of civilization. Instead, it is a product of that civilization, and could hardly be contaminated by the very stuff of which it is made. Wilderness hides its unnaturalness behind a mask that is all the more beguiling because it seems so natural. As we gaze into the mirror it holds up for us, we too easily imagine that what we behold is Nature when in fact we see the reflection of our own unexamined longings and desires. For this reason, we mistake ourselves when we

Excerpted from *Uncommon Ground: Toward Reinventing Nature*, edited by William Cronon. Copyright © 1995 by William Cronon. Reprinted with permission of the publisher, W. W. Norton & Company, Inc.

This content downloaded from 140.142.113.138 on Thu, 20 Jun 2013 13:19:45 PM
All use subject to JSTOR Terms and Conditions

suppose that wilderness can be the solution to our culture's problematic relationships with the nonhuman world, for wilderness is itself no small part of the problem.

To assert the unnaturalness of so natural a place will no doubt seem absurd or even perverse to many readers, so let me hasten to add that the nonhuman world we encounter in wilderness is far from being merely our own invention. I celebrate with others who love wilderness the beauty and power of the things it contains. Each of us who has spent time there can conjure images and sensations that seem all the more hauntingly real for having engraved themselves so indelibly on our memories. Such memories may be uniquely our own, but they are also familiar enough be to be instantly recognizable to others. Remember this? The torrents of mist shoot out from the base of a great waterfall in the depths of a Sierra canyon, the tiny droplets cooling your face as you listen to the roar of the water and gaze up toward the sky through a rainbow that hovers just out of reach. Remember this too: looking out across a desert canyon in the evening air, the only sound a lone raven calling in the distance, the rock walls dropping away into a chasm so deep that its bottom all but vanishes as you squint into the amber light of the setting sun. And this: the moment beside the trail as you sit on a sandstone ledge, your boots damp with the morning dew while you take in the rich smell of the pines, and the small red fox—or maybe for you it was a raccoon or a coyote or a deer—that suddenly ambles across your path, stopping for a long moment to gaze in your direction with cautious indifference before continuing on its way. Remember the feelings of such moments, and you will know as well as I do that you were in the presence of something irreducibly nonhuman, something profoundly Other than yourself. Wilderness is made of that too.

And yet: what brought each of us to the places where such memories became possible is entirely a cultural invention. Go back 250 years in American and European history, and you do not find nearly so many people wandering around remote corners of the planet looking for what today we would call "the wilderness experience." As late as the eighteenth century, the most common usage of the word "wilderness" in the English language referred to landscapes that generally carried adjectives far different from the ones they attract today. To be a wilderness then was to be "deserted," "savage," "desolate," "barren"—in short, a "waste," the word's nearest synonym. Its connotations were anything but positive, and the emotion one was most likely to feel in its presence was "bewilderment" or terror.[2]

Many of the word's strongest associations then were biblical, for it is used over and over again in the King James Version to refer to places on the margins of civilization where it is all too easy to lose oneself in moral confusion and despair. The wilderness was where Moses had wandered with his people for forty years, and where they had nearly abandoned their God to worship a golden idol.[3] "For Pharaoh will say of the Children of Israel," we read in Exodus, "They are entangled in the land, the wilderness hath shut them in."[4] The wilderness was where Christ had struggled with the devil and endured his temptations: "And immediately the Spirit driveth him into the wilderness. And he was there in the wilderness for forty days tempted of Satan; and was with the wild beasts; and the angels ministered unto him."[5] The "delicious Paradise" of John Milton's Eden was surrounded by "a steep wilderness, whose hairy sides / Access denied" to all who sought entry.[6] When Adam and Eve were driven from that

This content downloaded from 140.142.113.138 on Thu, 20 Jun 2013 13:19:45 PM
All use subject to JSTOR Terms and Conditions

garden, the world they entered was a wilderness that only their labor and pain could redeem. Wilderness, in short, was a place to which one came only against one's will, and always in fear and trembling. Whatever value it might have arose solely from the possibility that it might be "reclaimed" and turned toward human ends—planted as a garden, say, or a city upon a hill.[7] In its raw state, it had little or nothing to offer civilized men and women.

But by the end of the nineteenth century, all this had changed. The wastelands that had once seemed worthless had for some people come to seem almost beyond price. That Thoreau in 1862 could declare wildness to be the preservation of the world suggests the sea change that was going on. Wilderness had once been the antithesis of all that was orderly and good—it had been the darkness, one might say, on the far side of the garden wall—and yet now it was frequently likened to Eden itself. When John Muir arrived in the Sierra Nevada in 1869, he would declare, "No description of Heaven that I have ever heard or read of seems half so fine."[8] He was hardly alone in expressing such emotions. One by one, various corners of the American map came to be designated as sites whose wild beauty was so spectacular that a growing number of citizens had to visit and see them for themselves. Niagara Falls was the first to undergo this transformation, but it was soon followed by the Catskills, the Adirondacks, Yosemite, Yellowstone, and others. Yosemite was deeded by the U.S. government to the state of California in 1864 as the nation's first wildland park, and Yellowstone became the first true national park in 1872.[9]

By the first decade of the twentieth century, in the single most famous episode in American conservation history, a national debate had exploded over whether the city of San Francisco should be permitted to augment its water supply by damming the Tuolumne River in Hetch Hetchy valley, well within the boundaries of Yosemite National Park. The dam was eventually built, but what today seems no less significant is that so many people fought to prevent its completion. Even as the fight was being lost, Hetch Hetchy became the battle cry of an emerging movement to preserve wilderness. Fifty years earlier, such opposition would have been unthinkable. Few would have questioned the merits of "reclaiming" a wasteland like this in order to put it to human use. Now the defenders of Hetch Hetchy attracted widespread national attention by portraying such an act not as improvement or progress but as desecration and vandalism. Lest one doubt that the old biblical metaphors had been turned completely on their heads, listen to John Muir attack the dam's defenders. "Their arguments," he wrote, "are curiously like those of the devil, devised for the destruction of the first garden—so much of the very best Eden fruit going to waste; so much of the best Tuolumne water and Tuolumne scenery going to waste."[10] For Muir and the growing number of Americans who shared his views, Satan's home had become God's own temple.

The sources of this rather astonishing transformation were many, but for the purposes of this essay they can be gathered under two broad headings: the sublime and the frontier. Of the two, the sublime is the older and more pervasive cultural construct, being one of the most important expressions of that broad transatlantic move-

This content downloaded from 140.142.113.138 on Thu, 20 Jun 2013 13:19:45 PM
All use subject to JSTOR Terms and Conditions

ment we today label as romanticism; the frontier is more peculiarly American, though it too had its European antecedents and parallels. The two converged to remake wilderness in their own image, freighting it with moral values and cultural symbols that it carries to this day. Indeed, it is not too much to say that the modern environmental movement is itself a grandchild of romanticism and post-frontier ideology, which is why it is no accident that so much environmentalist discourse takes its bearings from the wilderness these intellectual movements helped create. Although wilderness may today seem to be just one environmental concern among many, it in fact serves as the foundation for a long list of other such concerns that on their face seem quite remote from it. That is why its influence is so pervasive and, potentially, so insidious.

To gain such remarkable influence, the concept of wilderness had to become loaded with some of the deepest core values of the culture that created and idealized it: it had to become sacred. This possibility had been present in wilderness even in the days when it had been a place of spiritual danger and moral temptation. If Satan was there, then so was Christ, who had found angels as well as wild beasts during His sojourn in the desert. In the wilderness the boundaries between human and nonhuman, between natural and supernatural, had always seemed less certain than elsewhere. This was why the early Christian saints and mystics had often emulated Christ's desert retreat as they sought to experience for themselves the visions and spiritual testing He had endured. One might meet devils and run the risk of losing one's soul in such a place, but one might also meet God. For some that possibility was worth almost any price.

By the eighteenth century this sense of the wilderness as a landscape where the supernatural lay just beneath the surface was expressed in the doctrine of the *sublime*, a word whose modern usage has been so watered down by commercial hype and tourist advertising that it retains only a dim echo of its former power.[11] In the theories of Edmund Burke, Immanuel Kant, William Gilpin, and others, sublime landscapes were those rare places on earth where one had more chance than elsewhere to glimpse the face of God.[12] Romantics had a clear notion of where one could be most sure of having this experience. Although God might, of course, choose to show Himself anywhere, He would most often be found in those vast, powerful landscapes where one could not help feeling insignificant and being reminded of one's own mortality. Where were these sublime places? The eighteenth century catalog of their locations feels very familiar, for we still see and value landscapes as it taught us to do. God was on the mountaintop, in the chasm, in the waterfall, in the thundercloud, in the rainbow, in the sunset. One has only to think of the sites that Americans chose for their first national parks—Yellowstone, Yosemite, Grand Canyon, Rainier, Zion—to realize that virtually all of them fit one or more of these categories. Less sublime landscapes simply did not appear worthy of such protection; not until the 1940s, for instance, would the first swamp be honored, in Everglades National Park, and to this day there is no national park in the grasslands.[13]

Among the best proofs that one had entered a sublime landscape was the emotion it evoked. For the early romantic writers and artists who first began to celebrate it, the sublime was far from being a pleasurable experience. The classic description is that of William Wordsworth as he recounted climbing the Alps and crossing the Simplon

This content downloaded from 140.142.113.138 on Thu, 20 Jun 2013 13:19:45 PM
All use subject to JSTOR Terms and Conditions

Pass in his autobiographical poem *The Prelude*. There, surrounded by crags and waterfalls, the poet felt himself literally to be in the presence of the divine—and experienced an emotion remarkably close to terror:

> The immeasurable height
> Of woods decaying, never to be decayed,
> The stationary blasts of waterfalls,
> And in the narrow rent at every turn
> Winds thwarting winds, bewildered and forlorn,
> The torrents shooting from the clear blue sky,
> The rocks that muttered close upon our ears,
> Black drizzling crags that spake by the way-side
> As if a voice were in them, the sick sight
> And giddy prospect of the raving stream,
> The unfettered clouds and region of the Heavens,
> Tumult and peace, the darkness and the light—
> Were all like workings of one mind, the features
> Of the same face, blossoms upon one tree;
> Characters of the great Apocalypse,
> The types and symbols of Eternity,
> Of first, and last, and midst, and without end.[14]

This was no casual stroll in the mountains, no simple sojourn in the gentle lap of nonhuman nature. What Wordsworth described was nothing less than a religious experience, akin to that of the Old Testament prophets as they conversed with their wrathful God. The symbols he detected in this wilderness landscape were more supernatural than natural, and they inspired more awe and dismay than joy or pleasure. No mere mortal was meant to linger long in such a place, so it was with considerable relief that Wordsworth and his companion made their way back down from the peaks to the sheltering valleys.

Lest you suspect that this view of the sublime was limited to timid Europeans who lacked the American know-how for feeling at home in the wilderness, remember Henry David Thoreau's 1846 climb of Mount Katahdin, in Maine. Although Thoreau is regarded by many today as one of the great American celebrators of wilderness, his emotions about Katahdin were no less ambivalent than Wordsworth's about the Alps.

> It was vast, Titanic, and such as man never inhabits. Some part of the beholder, even some vital part, seems to escape through the loose grating of his ribs as he ascends. He is more lone than you can imagine....Vast, Titanic, inhuman Nature has got him at disadvantage, caught him alone, and pilfers him of some of his divine faculty. She does not smile on him as in the plains. She seems to say sternly, why came ye here before your time? This ground is not prepared for you. Is it not enough that I smile in the valleys? I have never made this soil for thy feet, this air for thy breathing, these rocks for thy neighbors. I cannot pity nor fondle thee here, but forever relentlessly drive thee hence to where I *am* kind. Why seek me where I have not called thee, and then complain because you find me but a stepmother?[15]

This content downloaded from 140.142.113.138 on Thu, 20 Jun 2013 13:19:45 PM
All use subject to JSTOR Terms and Conditions

This is surely not the way a modern backpacker or nature lover would describe Maine's most famous mountain, but that is because Thoreau's description owes as much to Wordsworth and other romantic contemporaries as to the rocks and clouds of Katahdin itself. His words took the physical mountain on which he stood and transmuted it into an icon of the sublime: a symbol of God's presence on earth. The power and the glory of that icon were such that only a prophet might gaze on it for long. In effect, romantics like Thoreau joined Moses and the children of Israel in Exodus when "they looked toward the wilderness, and behold, the glory of the Lord appeared in the cloud."[16]

But even as it came to embody the awesome power of the sublime, wilderness was also being tamed—not just by those who were building settlements in its midst but also by those who most celebrated its inhuman beauty. By the second half of the nineteenth century, the terrible awe that Wordsworth and Thoreau regarded as the appropriately pious stance to adopt in the presence of their mountaintop God was giving way to a much more comfortable, almost sentimental demeanor. As more and more tourists sought out the wilderness as a spectacle to be looked at and enjoyed for its great beauty, the sublime in effect became domesticated. The wilderness was still sacred, but the religious sentiments it evoked were more those of a pleasant parish church than those of a grand cathedral or a harsh desert retreat. The writer who best captures this late romantic sense of a domesticated sublime is undoubtedly John Muir, whose descriptions of Yosemite and the Sierra Nevada reflect none of the anxiety or terror one finds in earlier writers. Here he is, for instance, sketching on North Dome in Yosemite Valley:

> No pain here, no dull empty hours, no fear of the past, no fear of the future. These blessed mountains are so compactly filled with God's beauty, no petty personal hope or experience has room to be. Drinking this champagne water is pure pleasure, so is breathing the living air, and every movement of limbs is pleasure, while the body seems to feel beauty when exposed to it as it feels the campfire or sunshine, entering not by the eyes alone, but equally through all one's flesh like radiant heat, making a passionate ecstatic pleasure glow not explainable.

The emotions Muir describes in Yosemite could hardly be more different from Thoreau's on Katahdin or Wordsworth's on the Simplon Pass. Yet all three men are participating in the same cultural tradition and contributing to the same myth: the mountain as cathedral. The three may differ in the way they choose to express their piety—Wordsworth favoring an awe-filled bewilderment, Thoreau a stern loneliness, Muir a welcome ecstasy—but they agree completely about the church in which they prefer to worship. Muir's closing words on North Dome diverge from his older contemporaries only in mood, not in their ultimate content:

> Perched like a fly on this Yosemite dome, I gaze and sketch and bask, oftentimes settling down into dumb admiration without definite hope of ever learning much, yet with the longing, unresting effort that lies at the door of hope, humbly prostrate before the vast display of God's power, and eager to offer self-denial and renunciation with eternal toil to learn any lesson in the divine manuscript.[17]

This content downloaded from 140.142.113.138 on Thu, 20 Jun 2013 13:19:45 PM
All use subject to JSTOR Terms and Conditions

Muir's "divine manuscript" and Wordsworth's "Characters of the great Apocalypse" were in fact pages from the same holy book. The sublime wilderness had ceased to be a place of satanic temptation and become instead a sacred temple, much as it continues to be for those who love it today.

But the romantic sublime was not the only cultural movement that helped transform wilderness into a sacred American icon during the nineteenth century. No less important was the powerful romantic attraction of primitivism, dating back at least to Rousseau—the belief that the best antidote to the ills of an overly refined and civilized modern world was a return to simpler, more primitive living. In the United States, this was embodied most strikingly in the national myth of the frontier. The historian Frederick Jackson Turner wrote in 1893 the classic academic statement of this myth, but it had been part of American cultural traditions for well over a century. As Turner described the process, easterners and European immigrants, in moving to the wild unsettled lands of the frontier, shed the trappings of civilization, rediscovered their primitive racial energies, reinvented direct democratic institutions, and thereby reinfused themselves with a vigor, an independence, and a creativity that were the source of American democracy and national character. Seen in this way, wild country became a place not just of religious redemption but of national renewal, the quintessential location for experiencing what it meant to be an American.

One of Turner's most provocative claims was that by the 1890s the frontier was passing away. Never again would "such gifts of free land offer themselves" to the American people. "The frontier has gone," he declared, "and with its going has closed the first period of American history."[18] Built into the frontier myth from its very beginning was the notion that this crucible of American identity was temporary and would pass away. Those who have celebrated the frontier have almost always looked backward as they did so, mourning an older, simpler, truer world that is about to disappear forever. That world and all of its attractions, Turner said, depended on free land—on wilderness. Thus, in the myth of the vanishing frontier lay the seeds of wilderness preservation in the United States, for if wild land had been so crucial in the making of the nation, then surely one must save its last remnants as monuments to the American past—and as an insurance policy to protect its future. It is no accident that the movement to set aside national parks and wilderness areas began to gain real momentum at precisely the time that laments about the passing frontier reached their peak. To protect wilderness was in a very real sense to protect the nation's most sacred myth of origin.

Among the core elements of the frontier myth was the powerful sense among certain groups of Americans that wilderness was the last bastion of rugged individualism. Turner tended to stress communitarian themes when writing frontier history, asserting that Americans in primitive conditions had been forced to band together with their neighbors to form communities and democratic institutions. For other writers, however, frontier democracy for communities was less compelling than frontier freedom for individuals.[19] By fleeing to the outer margins of settled land and society—so the story ran—an individual could escape the confining strictures of civilized life. The mood among writers who celebrated frontier individualism was almost always nostalgic; they lamented not just a lost way of life but the passing of the heroic men

This content downloaded from 140.142.113.138 on Thu, 20 Jun 2013 13:19:45 PM
All use subject to JSTOR Terms and Conditions

who had embodied that life. Thus Owen Wister in the introduction to his classic 1902 novel *The Virginian* could write of "a vanished world" in which "the horseman, the cow-puncher, the last romantic figure upon our soil" rode only "in his historic yester-day" and would "never come again." For Wister, the cowboy was a man who gave his word and kept it ("Wall Street would have found him behind the times"), who did not talk lewdly to women ("Newport would have thought him old-fashioned"), who worked and played hard, and whose "ungoverned hours did not unman him."[20] Theodore Roosevelt wrote with much the same nostalgic fervor about the "fine, manly qualities" of the "wild rough-rider of the plains." No one could be more heroically masculine, thought Roosevelt, or more at home in the western wilderness:

> There he passes his days, there he does his life-work, there, when he meets death, he faces it as he has faced many other evils, with quiet, uncomplaining fortitude. Brave, hospitable, hardy, and adventurous, he is the grim pioneer of our race; he prepares the way for the civilization from before whose face he must himself disappear. Hard and dangerous though his existence is, it has yet a wild attraction that strongly draws to it his bold, free spirit.[21]

This nostalgia for a passing frontier way of life inevitably implied ambivalence, if not downright hostility, toward modernity and all that it represented. If one saw the wild lands of the frontier as freer, truer, and more natural than other, more modern places, then one was also inclined to see the cities and factories of urban-industrial civilization as confining, false, and artificial. Owen Wister looked at the post-frontier "transition" that had followed "the horseman of the plains," and did not like what he saw: "a shapeless state, a condition of men and manners as unlovely as is that mo-ment in the year when winter is gone and spring not come, and the face of Nature is ugly."[22] In the eyes of writers who shared Wister's distaste for modernity, civilization contaminated its inhabitants and absorbed them into the faceless, collective, con-temptible life of the crowd. For all of its troubles and dangers, and despite the fact that it must pass away, the frontier had been a better place. If civilization was to be redeemed, it would be by men like the Virginian who could retain their frontier virtues even as they made the transition to post-frontier life.

The mythic frontier individualist was almost always masculine in gender: here, in the wilderness, a man could be a real man, the rugged individual he was meant to be before civilization sapped his energy and threatened his masculinity. Wister's con-temptuous remarks about Wall Street and Newport suggest what he and many others of his generation believed—that the comforts and seductions of civilized life were especially insidious for men, who all too easily became emasculated by the femininizing tendencies of civilization. More often than not, men who felt this way came, like Wister and Roosevelt, from elite class backgrounds. The curious result was that fron-tier nostalgia became an important vehicle for expressing a peculiarly bourgeois form of antimodernism. The very men who most benefited from urban-industrial capital-ism were among those who believed they must escape its debilitating effects. If the frontier was passing, then men who had the means to do so should preserve for them-selves some remnant of its wild landscape so that they might enjoy the regeneration and renewal that came from sleeping under the stars, participating in blood sports,

This content downloaded from 140.142.113.138 on Thu, 20 Jun 2013 13:19:45 PM
All use subject to JSTOR Terms and Conditions

and living off the land. The frontier might be gone, but the frontier experience could still be had if only wilderness were preserved.

Thus the decades following the Civil War saw more and more of the nation's wealthiest citizens seeking out wilderness for themselves. The elite passion for wild land took many forms: enormous estates in the Adirondacks and elsewhere (disingenuously called "camps" despite their many servants and amenities), cattle ranches for would-be rough riders on the Great Plains, guided big-game hunting trips in the Rockies, and luxurious resort hotels wherever railroads pushed their way into sublime landscapes. Wilderness suddenly emerged as the landscape of choice for elite tourists, who brought with them strikingly urban ideas of the countryside through which they traveled. For them, wild land was not a site for productive labor and not a permanent home; rather, it was a place of recreation. One went to the wilderness not as a producer but as a consumer, hiring guides and other backcountry residents who could serve as romantic surrogates for the rough riders and hunters of the frontier if one was willing to overlook their new status as employees and servants of the rich.

In just this way, wilderness came to embody the national frontier myth, standing for the wild freedom of America's past and seeming to represent a highly attractive natural alternative to the ugly artificiality of modern civilization. The irony, of course, was that in the process wilderness came to reflect the very civilization its devotees sought to escape. Ever since the nineteenth century, celebrating wilderness has been an activity mainly for well-to-do city folks. Country people generally know far too much about working the land to regard *un*worked land as their ideal. In contrast, elite urban tourists and wealthy sportsmen projected their leisure-time frontier fantasies onto the American landscape and so created wilderness in their own image.

There were other ironies as well. The movement to set aside national parks and wilderness areas followed hard on the heels of the final Indian wars, in which the prior human inhabitants of these areas were rounded up and moved onto reservations. The myth of the wilderness as "virgin," uninhabited land had always been especially cruel when seen from the perspective of the Indians who had once called that land home. Now they were forced to move elsewhere, with the result that tourists could safely enjoy the illusion that they were seeing their nation in its pristine, original state, in the new morning of God's own creation.[23] Among the things that most marked the new national parks as reflecting a post-frontier consciousness was the relative absence of human violence within their boundaries. The actual frontier had often been a place of conflict, in which invaders and invaded fought for control of land and resources. Once set aside within the fixed and carefully policed boundaries of the modern bureaucratic state, the wilderness lost its savage image and became safe: a place more of reverie than of revulsion or fear. Meanwhile, its original inhabitants were kept out by dint of force, their earlier uses of the land redefined as inappropriate or even illegal. To this day, for instance, the Blackfeet continue to be accused of "poaching" on the lands of Glacier National Park that originally belonged to them and that were ceded by treaty only with the proviso that they be permitted to hunt there.[24]

The removal of Indians to create an "uninhabited wilderness"—uninhabited as never before in the human history of the place—reminds us just how invented, just

This content downloaded from 140.142.113.138 on Thu, 20 Jun 2013 13:19:45 PM
All use subject to JSTOR Terms and Conditions

**16**  Environmental History

how constructed, the American wilderness really is. To return to my opening argument: there is nothing natural about the concept of wilderness. It is entirely a creation of the culture that holds it dear, a product of the very history it seeks to deny. Indeed, one of the most striking proofs of the cultural invention of wilderness is its thoroughgoing erasure of the history from which it sprang. In virtually all of its manifestations, wilderness represents a flight from history. Seen as the original garden, it is a place outside of time, from which human beings had to be ejected before the fallen world of history could properly begin. Seen as the frontier, it is a savage world at the dawn of civilization, whose transformation represents the very beginning of the national historical epic. Seen as the bold landscape of frontier heroism, it is the place of youth and childhood, into which men escape by abandoning their pasts and entering a world of freedom where the constraints of civilization fade into memory. Seen as the sacred sublime, it is the home of a God who transcends history by standing as the One who remains untouched and unchanged by time's arrow. No matter what the angle from which we regard it, wilderness offers us the illusion that we can escape the cares and troubles of the world in which our past has ensnared us.[25]

This escape from history is one reason why the language we use to talk about wilderness is often permeated with spiritual and religious values that reflect human ideals far more than the material world of physical nature. Wilderness fulfills the old romantic project of secularizing Judeo-Christian values so as to make a new cathedral not in some petty human building but in God's own creation, Nature itself. Many environmentalists who reject traditional notions of the Godhead and who regard themselves as agnostics or even atheists nonetheless express feelings tantamount to religious awe when in the presence of wilderness—a fact that testifies to the success of the romantic project. Those who have no difficulty seeing God as the expression of our human dreams and desires nonetheless have trouble recognizing that in a secular age Nature can offer precisely the same sort of mirror.

Thus it is that wilderness serves as the unexamined foundation on which so many of the quasi-religious values of modern environmentalism rest. The critique of modernity that is one of environmentalism's most important contributions to the moral and political discourse of our time more often than not appeals, explicitly or implicitly, to wilderness as the standard against which to measure the failings of our human world. Wilderness is the natural, unfallen antithesis of an unnatural civilization that has lost its soul. It is a place of freedom in which we can recover the true selves we have lost to the corrupting influences of our artificial lives. Most of all, it is the ultimate landscape of authenticity. Combining the sacred grandeur of the sublime with the primitive simplicity of the frontier, it is the place where we can see the world as it really is, and so know ourselves as we really are—or ought to be.

But the trouble with wilderness is that it quietly expresses and reproduces the very values its devotees seek to reject. The flight from history that is very nearly the core of wilderness represents the false hope of an escape from responsibility, the illusion that we can somehow wipe clean the slate of our past and return to the tabula rasa that supposedly existed before we began to leave our marks on the world. The dream of an unworked natural landscape is very much the fantasy of people who have never themselves had to work the land to make a living—urban folk for whom food comes from

This content downloaded from 140.142.113.138 on Thu, 20 Jun 2013 13:19:45 PM
All use subject to JSTOR Terms and Conditions

a supermarket or a restaurant instead of a field, and for whom the wooden houses in which they live and work apparently have no meaningful connection to the forests in which trees grow and die. Only people whose relation to the land was already alienated could hold up wilderness as a model for human life in nature, for the romantic ideology of wilderness leaves precisely nowhere for human beings actually to make their living from the land.

This, then, is the central paradox: wilderness embodies a dualistic vision in which the human is entirely outside the natural. If we allow ourselves to believe that nature, to be true, must also be wild, then our very presence in nature represents its fall. The place where we are is the place where nature is not. If this is so—if by definition wilderness leaves no place for human beings, save perhaps as contemplative sojourners enjoying their leisurely reverie in God's natural cathedral—then also by definition it can offer no solution to the environmental and other problems that confront us. To the extent that we celebrate wilderness as the measure with which we judge civilization, we reproduce the dualism that sets humanity and nature at opposite poles. We thereby leave ourselves little hope of discovering what an ethical, sustainable, *honorable* human place in nature might actually look like.

Worse: to the extent that we live in an urban-industrial civilization but at the same time pretend to ourselves that our *real* home is in the wilderness, to just that extent we give ourselves permission to evade responsibility for the lives we actually lead. We inhabit civilization while holding some part of ourselves—what we imagine to be the most precious part—aloof from its entanglements. We work our nine-to-five jobs in its institutions, we eat its food, we drive its cars (not least to reach the wilderness), we benefit from the intricate and all too invisible networks with which it shelters us, all the while pretending that these things are not an essential part of who we are. By imagining that our true home is in the wilderness, we forgive ourselves the homes we actually inhabit. In its flight from history, in its siren song of escape, in its reproduction of the dangerous dualism that sets human beings outside of nature—in all of these ways, wilderness poses a serious threat to responsible environmentalism at the end of the twentieth century.

By now I hope it is clear that my criticism in this essay is not directed at wild nature per se, or even at efforts to set aside large tracts of wild land, but rather at the specific habits of thinking that flow from this complex cultural construction called wilderness. It is not the things we label as wilderness that are the problem—for nonhuman nature and large tracts of the natural world *do* deserve protection—but rather what we ourselves mean when we use the label. Lest one doubt how pervasive these habits of thought actually are in contemporary environmentalism, let me list some of the places where wilderness serves as the ideological underpinning for environmental concerns that might otherwise seem quite remote from it. Defenders of biological diversity, for instance, although sometimes appealing to more utilitarian concerns, often point to "untouched" ecosystems as the best and richest repositories of the undiscovered species we must certainly try to protect. Although at first blush an apparently more "scientific" concept than wilderness, biological diversity in fact invokes many of the same sacred values, which is why organizations like the Nature Conservancy have been so quick to employ it as an alternative to the seemingly fuzzier and

This content downloaded from 140.142.113.138 on Thu, 20 Jun 2013 13:19:45 PM
All use subject to JSTOR Terms and Conditions

**18**  Environmental History

more problematic concept of wilderness. There is a paradox here, of course. To the extent that biological diversity (indeed, even wilderness itself) is likely to survive in the future only by the most vigilant and self-conscious management of the ecosystems that sustain it, the ideology of wilderness is potentially in direct conflict with the very thing it encourages us to protect."[6]

The most striking instances of this have revolved around "endangered species," which serve as vulnerable symbols of biological diversity while at the same time standing as surrogates for wilderness itself. The terms of the Endangered Species Act in the United States have often meant that those hoping to defend pristine wilderness have had to rely on a single endangered species like the spotted owl to gain legal standing for their case—thereby making the full power of the sacred land inhere in a single numinous organism whose habitat then becomes the object of intense debate about appropriate management and use.[27] The ease with which anti-environmental forces like the wise-use movement have attacked such single-species preservation efforts suggests the vulnerability of strategies like these.

Perhaps partly because our own conflicts over such places and organisms have become so messy, the convergence of wilderness values with concerns about biological diversity and endangered species has helped produce a deep fascination for remote ecosystems, where it is easier to imagine that nature might somehow be "left alone" to flourish by its own pristine devices. The classic example is the tropical rain forest, which since the 1970s has become the most powerful modern icon of unfallen, sacred land—a veritable Garden of Eden—for many Americans and Europeans. And yet protecting the rain forest in the eyes of First World environmentalists all too often means protecting it from the people who live there. Those who seek to preserve such "wilderness" from the activities of native peoples run the risk of reproducing the same tragedy—being forceably removed from an ancient home—that befell American Indians. Third World countries face massive environmental problems and deep social conflicts, but these are not likely to be solved by a cultural myth that encourages us to "preserve" peopleless landscapes that have not existed in such places for millennia. At its worst, as environmentalists are beginning to realize, exporting American notions of wilderness in this way can become an unthinking and self-defeating form of cultural imperialism.[28]

Perhaps the most suggestive example of the way that wilderness thinking can underpin other environmental concerns has emerged in the recent debate about "global change." In 1989 the journalist Bill McKibben published a book entitled *The End of Nature*, in which he argued that the prospect of global climate change as a result of unintentional human manipulation of the atmosphere means that nature as we once knew it no longer exists.[29] Whereas earlier generations inhabited a natural world that remained more or less unaffected by their actions, our own generation is uniquely different. We and our children will henceforth live in a biosphere completely altered by our own activity, a planet in which the human and the natural can no longer be distinguished, because the one has overwhelmed the other. In McKibben's view, nature has died, and we are responsible for killing it. "The planet," he declares, "is utterly different now."[30]

This content downloaded from 140.142.113.138 on Thu, 20 Jun 2013 13:19:45 PM
All use subject to JSTOR Terms and Conditions

But such a perspective is possible only if we accept the wilderness premise that nature, to be natural, must also be pristine—remote from humanity and untouched by our common past. In fact, everything we know about environmental history suggests that people have been manipulating the natural world on various scales for as long as we have a record of their passing. Moreover, we have unassailable evidence that many of the environmental changes we now face also occurred quite apart from human intervention at one time or another in the earth's past.[31] The point is not that our current problems are trivial, or that our devastating effects on the earth's ecosystems should be accepted as inevitable or "natural." It is rather that we seem unlikely to make much progress in solving these problems if we hold up to ourselves as the mirror of nature a wilderness we ourselves cannot inhabit.

To do so is merely to take to a logical extreme the paradox that was built into wilderness from the beginning: if nature dies because we enter it, then the only way to save nature is to kill ourselves. The absurdity of this proposition flows from the underlying dualism it expresses. Not only does it ascribe greater power to humanity that we in fact possess—physical and biological nature will surely survive in some form or another long after we ourselves have gone the way of all flesh—but in the end it offers us little more than a self-defeating counsel of despair. The tautology gives us no way out: if wild nature is the only thing worth saving, and if our mere presence destroys it, then the sole solution to our own unnaturalness, the only way to protect sacred wilderness from profane humanity, would seem to be suicide. It is not a proposition that seems likely to produce very positive or practical results.

And yet radical environmentalists and deep ecologists all too frequently come close to accepting this premise as a first principle. When they express, for instance, the popular notion that our environmental problems began with the invention of agriculture, they push the human fall from natural grace so far back into the past that all of civilized history becomes a tale of ecological declension. Earth First! founder Dave Foreman captures the familiar parable succinctly when he writes,

> Before agriculture was midwifed in the Middle East, humans were in the wilderness. We had no concept of "wilderness" because everything was wilderness and *we were a part of it*. But with irrigation ditches, crop surpluses, and permanent villages, we became *apart from* the natural world.... Between the wilderness that created us and the civilization created by us grew an ever-widening rift.[32]

In this view the farm becomes the first and most important battlefield in the long war against wild nature, and all else follows in its wake. From such a starting place, it is hard not to reach the conclusion that the only way human beings can hope to live naturally on earth is to follow the hunter-gatherers back into a wilderness Eden and abandon virtually everything that civilization has given us. It may indeed turn out that civilization will end in ecological collapse or nuclear disaster, whereupon one might expect to find any human survivors returning to a way of life closer to that celebrated by Foreman and his followers. For most of us, though, such a debacle would be cause for regret, a sign that humanity had failed to fulfill its own promise and failed to honor its own highest values—including those of the deep ecologists.

This content downloaded from 140.142.113.138 on Thu, 20 Jun 2013 13:19:45 PM
All use subject to JSTOR Terms and Conditions

In offering wilderness as the ultimate hunter-gatherer alternative to civilization, Foreman reproduces an extreme but still easily recognizable version of the myth of frontier primitivism. When he writes of his fellow Earth Firsters that "we believe we must return to being animal, to glorying in our sweat, hormones, tears, and blood" and that "we struggle against the modern compulsion to become dull, passionless androids," he is following in the footsteps of Owen Wister.[33] Although his arguments give primacy to defending biodiversity and the autonomy of wild nature, his prose becomes most passionate when he speaks of preserving "the wilderness experience." His own ideal "Big Outside" bears an uncanny resemblance to that of the frontier myth: wide open spaces and virgin land with no trails, no signs, no facilities, no maps, no guides, no rescues, no modern equipment. Tellingly, it is a land where hardy travelers can support themselves by hunting with "primitive weapons (bow and arrow, atlatl, knife, sharp rock)."[34] Foreman claims that "the primary value of wilderness is not as a proving ground for young Huck Finns and Annie Oakleys," but his heart is with Huck and Annie all the same. He admits that "preserving a quality wilderness experience for the human visitor, letting her or him flex Paleolithic muscles or seek visions, remains a tremendously important secondary purpose."[35] Just so does Teddy Roosevelt's rough rider live on in the greener garb of a new age.

However much one may be attracted to such a vision, it entails problematic consequences. For one, it makes wilderness the locus for an epic struggle between malign civilization and benign nature, compared with which all other social, political, and moral concerns seem trivial. Foreman writes, "The preservation of wildness and native diversity is *the* most important issue. Issues directly affecting only humans pale in comparison."[36] Presumably so do any environmental problems whose victims are mainly people, for such problems usually surface in landscapes that have already "fallen" and are no longer wild. This would seem to exclude from the radical environmentalist agenda problems of occupational health and safety in industrial settings, problems of toxic waste exposure on "unnatural" urban and agricultural sites, problems of poor children poisoned by lead exposure in the inner city, problems of famine and poverty and human suffering in the "overpopulated" places of the earth — problems, in short, of environmental justice. If we set too high a stock on wilderness, too many other corners of the earth become less than natural and too many other people become less than human, thereby giving us permission not to care much about their suffering or their fate.

It is no accident that these supposedly inconsequential environmental problems affect mainly poor people, for the long affiliation between wilderness and wealth means that the only poor people who count when wilderness is *the* issue are hunter-gatherers, who presumably do not consider themselves to be poor in the first place. The dualism at the heart of wilderness encourages its advocates to conceive of its protection as a crude conflict between the "human" and the "nonhuman" — or, more often, between those who value the nonhuman and those who do not. This in turn tempts one to ignore crucial differences *among* humans and the complex cultural and historical reasons why different peoples may feel very differently about the meaning of wilderness.

This content downloaded from 140.142.113.138 on Thu, 20 Jun 2013 13:19:45 PM
All use subject to JSTOR Terms and Conditions

Why, for instance, is the "wilderness experience" so often conceived as a form of recreation best enjoyed by those whose class privileges give them the time and resources to leave their jobs behind and "get away from it all"? Why does the protection of wilderness so often seem to pit urban recreationists against rural people who actually earn their living from the land (excepting those who sell goods and services to the tourists themselves)? Why in the debates about pristine natural areas are "primitive" peoples idealized, even sentimentalized, until the moment they do something unprimitive, modern, and unnatural, and thereby fall from environmental grace? What are the consequences of a wilderness ideology that devalues productive labor and the very concrete knowledge that comes from working the land with one's own hands?[37] All of these questions imply conflicts among different groups of people, conflicts that are obscured behind the deceptive clarity of "human" vs. "nonhuman." If in answering these knotty questions we resort to so simplistic an opposition, we are almost certain to ignore the very subtleties and complexities we need to understand.

But the most troubling cultural baggage that accompanies the celebration of wilderness has less to do with remote rain forests and peoples than with the ways we think about ourselves—we American environmentalists who quite rightly worry about the future of the earth and the threats we pose to the natural world. Idealizing a distant wilderness too often means not idealizing the environment in which we actually live, the landscape that for better or worse we call home. Most of our most serious environmental problems start right here, at home, and if we are to solve those problems, we need an environmental ethic that will tell us as much about *using* nature as about *not* using it. The wilderness dualism tends to cast any use as *ab*-use, and thereby denies us a middle ground in which responsible use and non-use might attain some kind of balanced, sustainable relationship. My own belief is that only by exploring this middle ground will we learn ways of imagining a better world for all of us: humans and nonhumans, rich people and poor, women and men, First Worlders *and* Third Worlders, white folks and people of color, consumers and producers—a world better for humanity in all of its diversity and for all the rest of nature too. The middle ground is where we actually live. It is where we—all of us, in our different places and ways—make our homes.

That is why, when I think of the times I myself have come closest to experiencing what I might call the sacred in nature, I often find myself remembering wild places much closer to home. I think, for instance, of a small pond near my house where water bubbles up from limestone springs to feed a series of pools that rarely freeze in winter and so play home to waterfowl that stay here for the protective warmth even on the coldest of winter days, gliding silently through streaming mists as the snow falls from gray February skies. I think of a November evening long ago when I found myself on a Wisconsin hilltop in rain and dense fog, only to have the setting sun break through the clouds to cast an otherworldly golden light on the misty farms and woodlands below, a scene so unexpected and joyous that I lingered past dusk so as not to miss any part of the gift that had come my way. And I think perhaps most especially of the blown-out, bankrupt farm in the sand country of central Wisconsin where Aldo Leopold and his family tried one of the first American experiments in ecological restoration, turning ravaged and infertile soil into carefully tended ground where the

This content downloaded from 140.142.113.138 on Thu, 20 Jun 2013 13:19:45 PM
All use subject to JSTOR Terms and Conditions

human and the nonhuman could exist side by side in relative harmony. What I celebrate about such places is not *just* their wildness, though that certainly is among their most important qualities; what I celebrate even more is that they remind us of the wildness in our own backyards, of the nature that is all around us if only we have eyes to see it.

Indeed, my principal objection to wilderness is that it may teach us to be dismissive or even contemptuous of such humble places and experiences. Without our quite realizing it, wilderness tends to privilege some parts of nature at the expense of others. Most of us, I suspect, still follow the conventions of the romantic sublime in finding the mountaintop more glorious than the plains, the ancient forest nobler than the grasslands, the mighty canyon more inspiring than the humble marsh. Even John Muir, in arguing against those who sought to dam his beloved Hetch Hetchy valley in the Sierra Nevada, argued for alternative dam sites in the gentler valleys of the foothills—a preference that had nothing to do with nature and everything with the cultural traditions of the sublime.[38] Just as problematically, our frontier traditions have encouraged Americans to define "true" wilderness as requiring very large tracts of roadless land—what Dave Foreman calls "The Big Outside." Leaving aside the legitimate empirical question in conservation biology of how large a tract of land must be before a given species can reproduce on it, the emphasis on big wilderness reflects a romantic frontier belief that one hasn't really gotten away from civilization unless one can go for days at a time without encountering another human being. By teaching us to fetishize sublime places and wide open country, these peculiarly American ways of thinking about wilderness encourage us to adopt too high a standard for what counts as "natural." If it isn't hundreds of square miles big, if it doesn't give us God's-eye views or grand vistas, if it doesn't permit us the illusion that we are alone on the planet, then it really isn't natural. It's too small, too plain, or too crowded to be *authentically* wild.

In critiquing wilderness as I have done in this essay, I'm forced to confront my own deep ambivalence about its meaning for modern environmentalism. On the one hand, one of my own most important environmental ethics is that people should always be conscious that they are part of the natural world, inextricably tied to the ecological systems that sustain their lives. Any way of looking at nature that encourages us to believe we are separate from nature—as wilderness tends to do—is likely to reinforce environmentally irresponsible behavior. On the other hand, I also think it no less crucial for us to recognize and honor nonhuman nature as a world we did not create, a world with its own independent, nonhuman reasons for being as it is. The autonomy of nonhuman nature seems to me an indispensable corrective to human arrogance. Any way of looking at nature that helps us remember—as wilderness also tends to do—that the interests of people are not necessarily identical to those of every other creature or of the earth itself is likely to foster *responsible* behavior. To the extent that wilderness has served as an important vehicle for articulating deep moral values regarding our obligations and responsibilities to the nonhuman world, I would not want to jettison the contributions it has made to our culture's ways of thinking about nature.

This content downloaded from 140.142.113.138 on Thu, 20 Jun 2013 13:19:45 PM
All use subject to JSTOR Terms and Conditions

If the core problem of wilderness is that it distances us too much from the very things it teaches us to value, then the question we must ask is what it can tell us about *home*, the place where we actually live. How can we take the positive values we associate with wilderness and bring them closer to home? I think the answer to this question will come by broadening our sense of the otherness that wilderness seeks to define and protect. In reminding us of the world we did not make, wilderness can teach profound feelings of humility and respect as we confront our fellow beings and the earth itself. Feelings like these argue for the importance of self-awareness and self-criticism as we exercise our own ability to transform the world around us, helping us set responsible limits to human mastery—which without such limits too easily becomes human hubris. Wilderness is the place where, symbolically at least, we try to withhold our power to dominate.

Wallace Stegner once wrote of

> the special human mark, the special record of human passage, that distinguishes man from all other species. It is rare enough among men, impossible to any other form of life. *It is simply the deliberate and chosen refusal to make any marks at all....* We are the most dangerous species of life on the planet, and every other species, even the earth itself, has cause to fear our power to exterminate. But we are also the only species which, when it chooses to do so, will go to great effort to save what it might destroy.[39]

The myth of wilderness, which Stegner knowingly reproduces in these remarks, is that we can somehow leave nature untouched by our passage. By now it should be clear that this for the most part is an illusion. But Stegner's deeper message then becomes all the more compelling. If living in history means that we cannot help leaving marks on a fallen world, then the dilemma we face is to decide what kinds of marks we wish to le ve. It is just here that our cultural traditions of wilderness remain so important. In the broadest sense, wilderness teaches us to ask whether the Other must always bend to our will, and, if not, under what circumstances it should be allowed to flourish without our intervention. This is surely a question worth asking about everything we do, and not just about the natural world.

When we visit a wilderness area, we find ourselves surrounded by plants and animals and physical landscapes whose otherness compels our attention. In forcing us to acknowledge that they are not of our making, that they have little or no need of our continued existence, they recall for us a creation far greater than our own. In the wilderness, we need no reminder that a tree has its own reasons for being, quite apart from us. The same is less true in the gardens we plant and tend ourselves: there it is far easier to forget the otherness of the tree.[40] Indeed, one could almost measure wilderness by the extent to which our recognition of its otherness requires a conscious, willed act on our part. The romantic legacy means that wilderness is more a state of mind than a fact of nature, and the state of mind that today most defines wilderness is *wonder*. The striking power of the wild is that wonder in the face of it requires no act of will, but forces itself upon us—as an expression of the nonhuman world experienced through the lens of our cultural history—as proof that ours is not the only presence in the universe.

This content downloaded from 140.142.113.138 on Thu, 20 Jun 2013 13:19:45 PM
All use subject to JSTOR Terms and Conditions

Wilderness gets us into trouble only if we imagine that this experience of wonder and otherness is limited to the remote corners of the planet, or that it somehow depends on pristine landscapes we ourselves do not inhabit. Nothing could be more misleading. The tree in the garden is in reality no less other, no less worthy of our wonder and respect, than the tree in an ancient forest that has never known an ax or a saw—even though the tree in the forest reflects a more intricate web of ecological relationships. The tree in the garden could easily have sprung from the same seed as the tree in the forest, and we can claim only its location and perhaps its form as our own. Both trees stand apart from us; both share our common world. The special power of the tree in the wilderness is to remind us of this fact. It can teach us to recognize the wildness we did not see in the tree we planted in our own backyard. By seeing the otherness in that which is most unfamiliar, we can learn to see it too in that which at first seemed merely ordinary. If wilderness can do this—if it can help us perceive and respect a nature we had forgotten to recognize as natural—then it will become part of the solution to our environmental dilemmas rather than part of the problem.

This will only happen, however, if we abandon the dualism that sees the tree in the garden as artificial—completely fallen and unnatural—and the tree in the wilderness as natural—completely pristine and wild. Both trees in some ultimate sense are wild; both in a practical sense now depend on our management and care. We are responsible for both, even though we can claim credit for neither. Our challenge is to stop thinking of such things according to set of bipolar moral scales in which the human and the nonhuman, the unnatural and the natural, the fallen and the unfallen, serve as our conceptual map for understanding and valuing the world. Instead, we need to embrace the full continuum of a natural landscape that is also cultural, in which the city, the suburb, the pastoral, and the wild each has its proper place, which we permit ourselves to celebrate without needlessly denigrating the others. We need to honor the Other within and the Other next door as much as we do the exotic Other that lives far away—a lesson that applies as much to people as it does to (other) natural things. In particular, we need to discover a common middle ground in which all of these things, from the city to the wilderness, can somehow be encompassed in the word "home." Home, after all, is the place where finally we make our living. It is the place for which we take responsibility, the place we try to sustain so we can pass on what is best in it (and in ourselves) to our children.[41]

The task of making a home in nature is what Wendell Berry has called "the forever unfinished lifework of our species." "The only thing we have to preserve nature with," he writes, "is culture; the only thing we have to preserve wildness with is domesticity."[42] Calling a place home inevitably means that we will *use* the nature we find in it, for there can be no escape from manipulating and working and even killing some parts of nature to make our home. But if we acknowledge the autonomy and otherness of the things and creatures around us—an autonomy our culture has taught us to label with the word "wild"—then we will at least think carefully about the uses to which we put them, and even ask if we should use them at all. Just so can we still join Thoreau in declaring that "in Wildness is the preservation of the World," for *wild*ness (as opposed to wilderness) can be found anywhere: in the seemingly tame fields and

This content downloaded from 140.142.113.138 on Thu, 20 Jun 2013 13:19:45 PM
All use subject to JSTOR Terms and Conditions

woodlots of Massachusetts, in the cracks of a Manhattan sidewalk, even in the cells of our own bodies. As Gary Snyder has wisely said, "A person with a clear heart and open mind can experience the wilderness anywhere on earth. It is a quality of one's own consciousness. The planet is a wild place and always will be."[43] To think ourselves capable of causing "the end of nature" is an act of great hubris, for it means forgetting the wildness that dwells everywhere within and around us.

Learning to honor the wild—learning to remember and acknowledge the autonomy of the other—means striving for critical self-consciousness in all of our actions. It means the deep reflection and respect must accompany each act of use, and means too that we must always consider the possibility of non-use. It means looking at the part of nature we intend to turn toward our own ends and asking whether we can use it again and again and again—sustainably—without its being diminished in the process. It means never imagining that we can flee into a mythical wilderness to escape history and the obligation to take responsibility for our own actions that history inescapably entails. Most of all, it means practicing remembrance and gratitude, for thanksgiving is the simplest and most basic of ways for us to recollect the nature, the culture, and the history that have come together to make the world as we know it. If wildness can stop being (just) out there and start being (also) in here, if it can start being as humane as it is natural, then perhaps we can get on with the unending task of struggling to live rightly in the world—not just in the garden, not just in the wilderness, but in the home that encompasses them both.

*William Cronon is Frederick Jackson Turner Professor of History, Geography, and Environmental Studies at the University of Wisconsin, Madison. He is the author of* Changes in the Land: Indians, Colonists, and the Ecology of New England *(Hill and Wang, 1983) and* Nature's Metropolis: Chicago and the Great West *(W. W. Norton, 1991), which was awarded the Bancroft Prize in American History. Cronon also edited* Uncommon Ground: Toward Reinventing Nature *(W. W. Norton, 1995), from which this excerpt is taken.*

---

## Notes

1. Henry David Thoreau, "Walking," *The Works of Thoreau*, ed. Henry S. Canby (Boston, Massachusetts: Houghton Mifflin, 1937), p. 672.
2. *Oxford English Dictionary*, s.v. "wilderness"; see also Roderick Nash, *Wilderness and the American Mind*, 3rd ed. (New Haven, Connecticut: Yale Univ. Press, 1982), pp. 1-22; and Max Oelschlaeger, *The Idea of Wilderness: From Prehistory to the Age of Ecology* (New Haven, Connecticut: Yale Univ. Press, 1991).
3. Exodus 32:1-35, KJV.
4. Exodus 14:3, KJV.
5. Mark 1:12-13, KJV; see also Matthew 4:1-11; Luke 4:1-13.
6. John Milton, "Paradise Lost," *John Milton: Complete Poems and Major Prose*, ed. Merritt Y. Hughes (New York: Odyssey Press, 1957), pp. 280-81, lines 131-42.

This content downloaded from 140.142.113.138 on Thu, 20 Jun 2013 13:19:45 PM
All use subject to JSTOR Terms and Conditions

7. I have discussed this theme at length in "Landscapes of Abundance and Scarcity," in Clyde Milner et al., eds., *Oxford History of the American West* (New York: Oxford Univ. Press, 1994), pp. 603-37. The classic work on the Puritan "city on a hill" in colonial New England is Perry Miller, *Errand into the Wilderness* (Cambridge, Massachusetts: Harvard Univ. Press, 1956).

8. John Muir, *My First Summer in the Sierra* (1911), reprinted in *John Muir: The Eight Wilderness Discovery Books* (London, England: Diadem; Seattle, Washington: Mountaineers, 1992), p. 211.

9. Alfred Runte, *National Parks: The American Experience*, 2nd ed. (Lincoln: Univ. of Nebraska Press, 1987).

10. John Muir, *The Yosemite* (1912), reprinted in *John Muir: Eight Wilderness Discovery Books*, p. 715.

11. Scholarly work on the sublime is extensive. Among the most important studies are Samuel Monk, *The Sublime: A Study of Critical Theories in XVIII-Century England* (New York: Modern Language Association, 1935); Basil Willey, *The Eighteenth-Century Background: Studies on the Idea of Nature in the Thought of the Period* (London, England: Chattus and Windus, 1949); Marjorie Hope Nicolson, *Mountain Gloom and Mountain Glory: The Development of the Aesthetics of the Infinite* (Ithaca, New York: Cornell Univ. Press, 1959); Thomas Weiskel, *The Romantic Sublime: Studies in the Structure and Psychology of Transcendence* (Baltimore, Maryland: Johns Hopkins Univ. Press, 1976); Barbara Novak, *Nature and Culture: American Landscape Painting, 1825-1875* (New York: Oxford Univ. Press, 1980).

12. The classic works are Immanuel Kant, *Observations on the Feeling of the Beautiful and Sublime* (1764), trans. John T. Goldthwait (Berkeley: Univ. of California Press, 1960); Edmund Burke, *A Philosophical Enquiry into the Origin of Our Ideas of the Sublime and Beautiful*, ed. James T. Boulton (1958; Notre Dame, Indiana: Univ. of Notre Dame Press, 1968); William Gilpin, *Three Essays: On Picturesque Beauty; on Picturesque Travel; and on Sketching Landscape* (London, England, 1803).

13. See Ann Vileisis, "From Wastelands to Wetlands" (unpublished senior essay, Yale Univ., 1989); Runte, *National Parks*.

14. William Wordsworth, "The Prelude," bk. 6, in Thomas Hutchinson, ed., *The Poetical Works of Wordsworth* (London, England: Oxford Univ. Press, 1936), p. 536.

15. Henry David Thoreau, *The Maine Woods* (1864), in *Henry David Thoreau* (New York: Library of America, 1985), pp. 640-41.

16. Exodus 16:10, KJV.

17. John Muir, *My First Summer in the Sierra*, p. 238. Part of the difference between these descriptions may reflect the landscapes the three authors were describing. In his essay, "Reinventing Common Nature: Yosemite and Mount Rushmore—A Meandering Tale of a Double Nature," Kenneth Olwig notes that early American travelers experienced Yosemite as much through the aesthetic tropes of the pastoral as through those of the sublime. The ease with which Muir celebrated the gentle divinity of the Sierra Nevada had much to do with the pastoral qualities of the landscape he described. See Olwig, "Reinventing Common Nature: Yosemite and Mount Rushmore—A Meandering Tale of a Double Nature," *Uncommon Ground: Toward Reinventing Nature*, ed. William Cronon (New York: W. W. Norton & Co., 1995), pp. 379-408.

18. Frederick Jackson Turner, *The Frontier in American History* (New York: Henry Holt, 1920), pp. 37-38.

This content downloaded from 140.142.113.138 on Thu, 20 Jun 2013 13:19:45 PM
All use subject to JSTOR Terms and Conditions

19. Richard Slotkin has made this observation the linchpin of his comparison between Turner and Theodore Roosevelt. See Slotkin, *Gunfighter Nation: The Myth of the Frontier in Twentieth-Century America* (New York: Atheneum, 1992), pp. 29-62.

20. Owen Wister, *The Virginian: A Horseman of the Plains* (New York: Macmillan, 1902), pp. viii-ix.

21. Theodore Roosevelt, *Ranch Life and the Hunting Trail* (1888; New York: Century, 1899), p. 100.

22. Wister, *Virginian*, p. x.

23. On the many problems with this view, see William M. Denevan, "The Pristine Myth: The Landscape of the Americas in 1492," *Annals of the Association of American Geographers* 82 (1992): 369-85.

24. Louis Warren, "The Hunter's Game: Poachers, Conservationists, and Twentieth-Century America" (Ph.D. diss., Yale University, 1994).

25. Wilderness also lies at the foundation of the Clementsian ecological concept of the climax. See Michael Barbour, "Ecological Fragmentation in the Fifties" in Cronon, *Uncommon Ground*, pp. 233-55, and William Cronon, "Introduction: In Search of Nature," in Cronon, *Uncommon Ground*, pp. 23-56.

26. On the many paradoxes of having to manage wilderness in order to maintain the appearance of an unmanaged landscape, see John C. Hendee et al., *Wilderness Management*, USDA Forest Service Miscellaneous Publication No. 1365 (Washington, D.C.: Government Printing Office, 1978).

27. See James Proctor, "Whose Nature?: The Contested Moral Terrain of Ancient Forests," in Cronon, *Uncommon Ground*, pp. 269-97.

28. See Candace Slater, "Amazonia as Edenic Narrative," in Cronon, *Uncommon Ground*, pp. 114-31. This argument has been powerfully made by Ramachandra Guha, "Radical American Environmentalism: A Third World Critique," *Environmental Ethics* 11 (1989): 71-83.

29. Bill McKibben, *The End of Nature* (New York: Random House, 1989).

30. McKibben, *The End of Nature*, p. 49.

31. Even comparable extinction rates have occurred before, though we surely would not want to emulate the Cretaceous-Tertiary boundary extinctions as a model for responsible manipulation of the biosphere!

32. Dave Foreman, *Confessions of an Eco-Warrior* (New York: Harmony Books, 1991), p. 69 (italics in original). For a sampling of other writings by followers of deep ecology and/or Earth First!, see Michael Tobias, ed., *Deep Ecology* (San Diego, California: Avant Books, 1984); Bill Devall and George Sessions, *Deep Ecology: Living as if Nature Mattered* (Salt Lake City, Utah: Gibbs Smith, 1985); Michael Tobias, *After Eden: History, Ecology, and Conscience* (San Diego, California: Avant Books, 1985); Dave Foreman and Bill Haywood, eds., *Ecodefense: A Field Guide to Monkey Wrenching*, 2nd ed. (Tucson, Arizona: Ned Ludd Books, 1987); Bill Devall, *Simple in Means, Rich in Ends: Practicing Deep Ecology* (Salt Lake City, Utah: Gibbs Smith, 1988); Steve Chase, ed., *Defending the Earth: A Dialogue between Murray Bookchin & Dave Foreman* (Boston, Massachusetts: South End Press, 1991); John Davis, ed., *The Earth First! Reader: Ten Years of Radical Environmentalism* (Salt Lake City, Utah: Gibbs Smith, 1991); Bill Devall, *Living Richly in an Age of Limits: Using Deep Ecology for an Abundant Life* (Salt Lake City, Utah: Gibbs Smith, 1993); Michael E. Zimmerman et al., eds., *Environmental Philosophy: From Animal Rights to Radical Ecology* (Englewood Cliffs, New Jersey: Prentice-Hall, 1993). A useful survey of the different factions of radical environmentalism can be found in Carolyn Merchant, *Radical Ecology: The Search for a Livable World* (New York: Routledge, 1992). For a very

This content downloaded from 140.142.113.138 on Thu, 20 Jun 2013 13:19:45 PM
All use subject to JSTOR Terms and Conditions

interesting critique of this literature (first published in the anarchist newspaper *Fifth Estate*), see George Bradford, *How Deep is Deep Ecology?* (Ojai, California: Times Change Press, 1989).

33. Foreman, *Confessions of an Eco-Warrior*, p. 34.

34. Foreman, *Confessions of an Eco-Warrior*, p. 65. See also Dave Foreman and Howie Wolke, *The Big Outside: A Descriptive Inventory of the Big Wilderness Areas of the U.S.* (Tucson, Arizona: Ned Ludd Books, 1989).

35. Foreman, *Confessions of an Eco-Warrior*, p. 63.

36. Foreman, *Confessions of an Eco-Warrior*, p. 27.

37. See Richard White, "'Are You an Environmentalist or Do You Work for a Living?': Work and Nature," in Cronon, *Uncommon Ground*, pp. 171-85. Compare its analysis of environmental knowledge through work with Jennifer Price's analysis of environmental knowledge through consumption. It is not much of an exaggeration to say that the wilderness experience is essentially consumerist in its impulses.

38. Compare with Muir, *Yosemite*, in *John Muir: Eight Wilderness Discovery Books*, p. 714.

39. Wallace Stegner, ed., *This Is Dinosaur: Echo Park Country and Its Magic Rivers* (New York: Knopf, 1955), p. 17 (italics in original).

40. Katherine Hayles helped me see the importance of this argument.

41. Analogous arguments can be found in John Brinckerhoff Jackson, "Beyond Wilderness," *A Sense of Place, a Sense of Time* (New Haven, Connecticut: Yale Univ. Press, 1994), pp. 71-91, and in the wonderful collection of essays by Michael Pollan, *Second Nature: A Gardener's Education* (New York: Atlantic Monthly Press, 1991).

42. Wendell Berry, *Home Economics* (San Francisco, California: North Point, 1987), pp. 138, 143.

43. Gary Snyder, quoted in *New York Times*, "Week in Review," 18 September 1994, p. 6.

This content downloaded from 140.142.113.138 on Thu, 20 Jun 2013 13:19:45 PM
All use subject to JSTOR Terms and Conditions

# CONSTITUTIONAL CONFLICT AND SENSITIVE PLACES

Darrell A. H. Miller[*]

INTRODUCTION

In 2008, with the *District of Columbia v. Heller* decision, the Supreme Court of the United States held for the first time that the Second Amendment protects an individual's right to keep and bear arms for personal purposes like self-defense in the home.[1] One of the most opaque portions of that decision stated that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on . . . laws forbidding the carrying of firearms in *sensitive places* such as schools and govern-ment buildings."[2]

The "sensitive places" doctrine is still being refined. Courts have held that uni-versity facilities are sensitive places, as are university events,[3] along with national parks (even when closed),[4] and the parking lots of rural post offices.[5] Churches and other houses of worship also appear to qualify[6] as do—perhaps—libraries, muse-ums, day-care facilities, and hospitals.[7] However, other courts have struck down, on

*   Melvin G. Shimm Professor of Law, Duke Law School. Thanks to Timothy Zick, William & Mary Law School, and the *William & Mary Bill of Rights Journal* for inviting me to the March 15–16, 2019 Symposium *Constitutional Rights: Intersections, Synergies, and Conflicts*. Thanks to Joseph Blocher and Jake Charles for looking over a draft of this Article, to Cas Laskowski at Duke's Goodson Law Library for her professional and responsive work on short notice, and to Donovan Stone for superb research assistance.

[1]   554 U.S. 570, 629, 636 (2008).

[2]   *Id.* at 626 (emphasis added).

[3]   DiGiacinto v. Rector & Visitors of George Mason Univ., 704 S.E.2d 365, 370 (Va. 2011).

[4]   United States v. Masciandaro, 638 F.3d 458, 460 (4th Cir. 2011).

[5]   Bonidy v. U.S. Postal Serv., 790 F.3d 1121, 1125 (10th Cir. 2015).

[6]   GeorgiaCarry.Org, Inc. v. Georgia, 687 F.3d 1244, 1264 (11th Cir. 2012) ("[T]he pre-existing right codified in the Second Amendment does not include protection for a right to carry a firearm in a place of worship against the owner's wishes.").

[7]   Ezell v. City of Chicago, 70 F. Supp. 3d 871, 885 (N.D. Ill. 2014), *aff'd in part, rev'd in part,* 846 F.3d 888 (7th Cir. 2017) ("Therefore, the City's regulation requiring ranges to be lo-cated at least 500 feet away from residential zoning districts, schools, day-care facilities, places of worship, premises licensed for the retail sale of liquor, children's activities facilities, libraries, museums, or hospitals is constitutional."). *Ezell* did not strike down the finding of sensitive places as much as suggest that the designation of sensitive places could not reduce the available acreage for firing ranges to 2.2% of city's total acreage out of 10.6% available for business, commercial, and manufacturing. *Ezell*, 846 F.3d at 894.

Second Amendment grounds, regulations that prohibit guns in the vicinity of bars,[8] hydro-electric dams,[9] and city parks.[10]

Recently, the matter of sensitive places arrived—almost literally—at the doorstep of the United States Supreme Court. In *United States v. Class*, the United States Court of Appeals for the D.C. Circuit addressed whether a parking lot near Congress quali-fies as a sensitive place. Rodney Class parked in a lot north of the Botanical Gar-dens, "approximately 1,000 feet from the entrance to the Capitol [Building] itself," with two pistols and a rifle in his car.[11] Federal prosecutors charged Class with violating the federal statute prohibiting firearms on Capitol Building grounds.[12] Class claimed the Second Amendment guaranteed him a right to take his firearms into the parking lot.[13] After some procedural maneuvering, including a trip to the Supreme Court on an unrelated issue,[14] the case returned to the D.C. Circuit.[15]

The Circuit upheld the conviction.[16] While granting that the right to keep and bear arms extends beyond the home, the court reiterated that the right is not limitless.[17] One of those limitations is the sensitive places doctrine.[18] And "there are few, if any, govern-ment buildings more 'sensitive' than the 'national legislature at the very seat of its operations.'"[19] The opinion noted the particular safety needs of government workers going to and from the Capitol and the government's right as a property owner—same as any private property owner—to exclude firearms.[20] These rationales—safety and the government as proprietor—are fairly conventional justifications for the sensitive places doctrine.[21]

---

[8]   Some of these cases pertain to "buffer-zones" and some to prohibitions on firearms in parking lots. *See, e.g.*, United States v. Class, 930 F.3d 460, 464 (D.C. Cir. 2019) (holding that the parking lot outside the United States Capitol building was "sufficiently integrated with the Capitol for *Heller's* sensitive place exception to apply"); *Ezell*, 846 F.3d at 895–96 (holding that "limiting shooting ranges to manufacturing districts and distancing them from the multiple and various uses listed in the buffer-zone rule" is unconstitutional).

[9]   Morris v. U.S. Army Corps of Eng'rs, 60 F. Supp. 3d 1120, 1125 (D. Idaho 2014).

[10]   People v. Chairez, 104 N.E.3d 1158, 1177 (Ill. 2018) (striking down prohibition on "pos-sessing a firearm within 1000 feet of a public park").

[11]   *Class*, 930 F.3d at 462 (D.C. Cir. 2019); United States v. Class, 38 F. Supp. 3d 19, 22 (D.D.C. 2014).

[12]   40 U.S.C. § 5104(e)(1) (2012).

[13]   *Class*, 930 F.3d at 462–63.

[14]   *See* Class v. United States, 138 S. Ct. 798, 801–02 (2018).

[15]   *Class*, 930 F.3d at 460.

[16]   *Id.* at 462.

[17]   *Id.* at 463 (citing, inter alia, Wrenn v. District of Columbia, 864 F.3d 650, 657–58 (D.C. Cir. 2017)).

[18]   *Id.*

[19]   *Id.* (citing Jeannette Rankin Brigade v. Chief of Capitol Police, 421 F.2d 1090, 1093 n.3 (D.C. Cir. 1969)).

[20]   *Id.* at 464.

[21]   *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An*

Class went further though. Echoing many gun-rights advocates, he argued a place cannot be sensitive if the government (or some other person) has abandoned the role of providing security therein.[22] "[U]nlike inside Capitol buildings, which have extensive security barriers and armed guards at the entrances," Class argued, there was no security in the parking lot.[23] That lack of security makes the parking lot a magnet for gun-toting criminals, and hence a "prototypical location where one would most likely need to exercise a right to self-defense."[24]

The court rejected this definition, which would have effectively limited sensitive places to only those sites that provide adequate security.[25] "[W]e do not look to the 'level of threat' posed in a sensitive place," the court noted, observing that schools and government buildings, like post offices, are open to the public and often lack special security measures.[26] What makes a place sensitive is "the people found there" or the "activities that take place there."[27]

The *Class* court confirmed a deep truth of the emerging sensitive places doctrine—ensuring safety is a sufficient, but not a necessary, reason to prohibit firearms in some places.[28] The balance of this Article will explore what it means for a place to be sensitive, not out of a concern for safety, but because of "the people found there" or the "activities that take place there."[29] Ultimately, I conclude that one way to make sense of that portion of the sensitive places doctrine is to recognize that some places are sensitive because they are sites of conflict between constitutional values.

In order to understand this model of sensitive places, one must accept two related aspects of rights. First, rights are not always trumps.[30] They frequently are tools to foster and maintain institutions that facilitate a distinctive socio-political culture.[31] Second, rights are not absolute; they can conflict.[32] Sensitive places are,

---

*Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443, 1446–47, 1461, 1473 (2009).

[22] *Class*, 930 F.3d at 464–65.

[23] Supplemental Opening Brief of Appellant at 24, 930 F.3d 460 (D.C. Cir. 2019) (No. 15-3015), 2018 WL 3007944, at \*24; *see also* Supplemental Reply Brief of Appellant at 4, United States v. Class, 930 F.3d 460 (D.C. Cir. 2019) (No. 15-3015), 2018 WL 3609036, at \*4 ("[T]he Maryland Avenue parking lot—far from being a place where gun regulations are presumptively lawful—is an area where Second Amendment rights are at their zenith.").

[24] *Id.* (citing Volokh, *supra* note 21, at 1527).

[25] *Class*, 930 F.3d at 464–65.

[26] *Id.* at 465.

[27] *Id.* (quoting GeorgiaCarry.Org, Inc. v. Georgia, 764 F. Supp. 2d 1306, 1319 (M.D. Ga. 2011), *aff'd*, 687 F.3d 1244 (11th Cir. 2012)).

[28] *See id.* at 464–65.

[29] *GeorgiaCarry.Org*, 764 F. Supp. 2d at 1319.

[30] *See* Richard H. Pildes, *Why Rights Are Not Trumps: Social Meaning, Expressive Harms, and Constitutionalism*, 27 J. LEGAL STUD. 725, 731–32 (1998).

[31] *See generally id.* (describing how courts can use these too).

[32] *See* Mark D. Rosen, *When Are Constitutional Rights Non-Absolute?*, McCutcheon, *Conflicts, and the Sufficiency Question*, 56 WM. & MARY L. REV. 1535, 1538 (2015).

among other things, sites where these rights-enabled and enabling institutions collide.[33] For purposes of this Article, I will focus on conflicts between the right to keep and bear arms and the rights to free exercise of religion, freedom of speech in the educational context, the fundamental right to vote, and to assemble peaceably in the public square. However, this list is not definitive: one can imagine a number of other constitutional rights—like parental rights or the right to privacy—that may come into play as well.

This Article builds on my prior work, which has explored an institutional approach to Second Amendment questions, but has not elaborated on the topic of constitutional conflict.[34] Part I explains the ways in which rights are not trumps, but instead produce institutions that facilitate and constrain certain kinds of rights-enabled behavior.[35] Part II explores how rights can come into conflict with each other in three areas of concern: free exercise of religion as it relates to places of worship; freedom of speech as it relates to schools, universities and the academy; the fundamental right to vote; and freedom of speech, assembly and petition as it relates to the public square.[36] Part III sketches how courts can adjudicate the sensitive places doctrine using this model.[37]

## I. THE INSTITUTIONAL AND STRUCTURAL APPROACH TO RIGHTS

Over twenty years ago, Richard Pildes observed that the "rights as trumps" framework was not descriptively accurate of American constitutional practice.[38] Rights are frequently conceived as a trump card, a way for individuals to prevail over majoritarian preferences or other utilitarian considerations.[39] But that's only half-true. Rights, he said, "are better understood as means of realizing certain collective interests" and the content of rights are, in turn, "defined with reference to those interests."[40] Rights do protect individuals, but that is not all they do. They also "realize the interests of others, including the construction of a political culture with a specific kind of character."[41]

Pildes suggested that we protect rights to produce certain "public goods" necessary for a functioning liberal democracy.[42] Conceiving of them as "trumps" against

---

[33] *See* discussion *infra* Part II.

[34] For more on this topic, see generally JOSEPH BLOCHER & DARRELL A. H. MILLER, THE POSITIVE SECOND AMENDMENT: RIGHTS, REGULATION, AND THE FUTURE OF *HELLER* (2018); Darrell A. H. Miller, *The Expressive Second Amendment, in* GUNS IN LAW 48 (Austin Sarat et al. eds., 2019); Darrell A. H. Miller, *Institutions and the Second Amendment*, 66 DUKE L. J. 69 (2016) [hereinafter Miller, *Institutions*].

[35] *Infra* Part I.

[36] *Infra* Part II.

[37] *Infra* Part III.

[38] Pildes, *supra* note 30, at 725, 729.

[39] *See* RONALD DWORKIN, TAKING RIGHTS SERIOUSLY 81, 85 (1977).

[40] Pildes, *supra* note 30, at 731.

[41] *Id.*

[42] *Id.* (citing JOSEPH RAZ, *Rights and Individual Well-Being, in* ETHICS IN THE PUBLIC DOMAIN: ESSAYS IN THE MORALITY OF LAW AND POLITICS 37–38 (1994)).

any assertion of a government justification is not an accurate description of our constitutional practice, and, according to Pildes, not normatively desirable either.[43] Instead, rights constrain the kinds of justifications that count in adjudication.[44] Justifications that work against the public good the right is supposed to produce are illegitimate; justifications that work to assist the production of the public good are presumably constitutional.[45] For instance, a regulation on speech that frustrates a central goal of speech—the communication of political information—is typically thought to be illegitimate.[46] Similarly, regulations on firearms that frustrate a central goal of the right to keep and bear arms—safety—are also illegitimate.[47]

The public goods that rights provide, in turn, may foster various social institutions, and rights in this context can be best understood as "surrogates for defining an institutional space with a particular character."[48] Those institutions have various degrees of thickness.[49] We may think of some kinds of institutions—those that are specified by the constitutional text, or necessarily implied by it—as one specific kind of institution.[50] For example, Congress and the Presidency are institutions textually specified by the Constitution, but contain all kinds of sub-constitutional laws, conventions, rules, and norms that permit them to function and to resolve differences.[51]

Of course, not all constitutional institutions are necessarily governmental. Restrictions on the power to coin money presume a monetary system.[52] The freedom of religious expression implies recognition of religious organizations.[53] These kinds of institutions are recognizable for how they distribute authority or resources, how they provide rules, decision-making structures, and norms for behavior, and how they recognize and discipline leaders, members, and outsiders.[54] Other, thinner institutions may arise from social practices that have become so unquestioned and habitual that their justification appears almost invisible.[55] Thicker institutions with

[43] *Id.* at 729–31.

[44] *Id.* at 729; *see also* TIMOTHY ZICK, THE DYNAMIC FREE SPEECH CLAUSE 19 (2018) (discussing alternatives to rights-as-trumps).

[45] Pildes, *supra* note 30, at 734 ("Government can infringe on rights for reasons consistent with the norms that characterize the common goods that those rights are meant to realize, but when government infringes rights for reasons inconsistent with these common goods, it violates individual rights.").

[46] *See, e.g.*, Texas v. Johnson, 491 U.S. 397, 399 (1989).

[47] *See, e.g.*, District of Columbia v. Heller, 554 U.S. 629, 636 (2008).

[48] Pildes, *supra* note 30, at 739.

[49] *See* Miller, *Institutions*, *supra* note 34, at 91.

[50] *See id.*

[51] *See* Curtis A. Bradley & Neil S. Siegel, *After Recess: Historical Practice, Textual Ambiguity, and Constitutional Adverse Possession*, 2014 SUP. CT. REV. 1, 1–2 (2014); *see also* NLRB v. Noel Canning, 573 U.S. 513, 518, 522–23 (2014).

[52] *See* JOHN R. SEARLE, THE CONSTRUCTION OF SOCIAL REALITY 35 (1995).

[53] *See* Miller, *Institutions*, *supra* note 34, at 101–02.

[54] *See id.* at 88.

[55] *See id.* at 91–92.

a private or quasi-private character, can also empower citizens, contribute to representative government and act as a check on state-dominated institutions.[56]

Institutions do not remain isolated, but often form what Douglass North called an "interdependent web of an institutional matrix" that can be reinforcing, so that "the individual right becomes more structure-like."[57] Alternatively, rights bearing and constraining institutions can become antagonistic, which then demands other decision-making structures, organizations, and protocols to administer those rights.[58] For example, the Fifth and Fourteenth Amendments' guarantees of procedural due process demand some kind of apparatus to provide some type of hearing, including the personnel, rules, norms, and protocols to provide that process.[59] These due process institutions may themselves come into conflict with other rights-enabled and enabling institutions—like the press or judicial campaigns—that in turn demand another set of decision-making structures to resolve.

Scholars have spent the last two decades elaborating on the ways that rights do not operate as trumps, but instead are interpreted to enable a certain kind of political society.[60] Jud Campbell has remarked that this kind of well-ordered liberty, in which rights are not atomistic self-referential trumps, would have been extremely familiar to the Framers of the original constitution.[61] As he says, the entire Enlightenment notion of natural rights presupposed that they were retained to make government function better; they were individual yes—but subject to collective definition and control.[62] Matt Adler has noted that rights are not trumps, but instead are better conceived as tools to make governments supply the right kinds of reasons for their regulations.[63] They are, in his terms, rights against certain kinds of rules.[64] Jeremy Waldron has discussed that rights can generate a multiplicity of duties that have both a negative and positive character.[65] And Jamal Greene has endorsed the idea of adjusting the rights-as-trumps frame due to its inability to deal with conflict, and its tendency to "favor rhetoric over judgement, simplicity over context, homogeneity over diversity."[66]

---

[56] *See* Ozan O. Varol, *Structural Rights*, 105 GEO. L.J. 1001, 1034 (2017).

[57] *Id.* at 1030 (quoting DOUGLASS C. NORTH, INSTITUTIONS, INSTITUTIONAL CHANGE AND ECONOMIC PERFORMANCE 95 (1990)).

[58] *Id.* at 1032–33.

[59] This is a slightly modified example from Varol. *See id.* at 1026–27.

[60] *See infra* notes 61–66 and accompanying text.

[61] *See* Jud Campbell, *Republicanism and Natural Rights at the Founding*, 32 CONST. COMMENT. 85, 86–87 (2017).

[62] *Id.*

[63] *See* Matthew D. Adler, *Rights Against Rules: The Moral Structure of American Constitutional Law*, 97 MICH. L. REV. 1, 15 (1998).

[64] *Id.* at 13–14 ("What violates X's constitutional right, what she has a constitutional right against, is . . . a rule with the wrong predicate or history.").

[65] Jeremy Waldron, *Rights in Conflict*, 99 ETHICS 503, 511 (1989) ("A duty to refrain from interfering with someone's freedom is likely to be accompanied by a 'positive' . . . duty on other agents to protect people from such interference.").

[66] Jamal Greene, *Rights as Trumps?*, 132 HARV. L. REV. 28, 34 (2018).

Scholars interested in the development of specific constitutional institutions have built on the rights-are-not-trumps intuition. For example, Paul Horwitz has identified First Amendment institutions—like universities—that facilitate and effectuate First Amendment values.[67] Other scholars have noted how the Press Clause of the First Amendment contemplates something other than a right to speech or access to a particular technology; it assumes maintenance of an institution called *the Press* that performs functions and enjoys privileges distinct from other categories of speakers.[68] Richard Garnett and Douglas Laycock among others have discussed the same with respect to religious institutions.[69]

Timothy Zick has discussed how First Amendment doctrine designates certain kinds of public spaces—sidewalks, public streets, and parks—essential First Amendment institutions that facilitate the communication of ideas.[70]

Joseph Blocher and I have written how the Second Amendment right to keep and bear arms may be understood within an institutional framework as well—even after *Heller* subordinated the militia as an organizing principle for the right.[71] In that context, the Second Amendment is not concerned with self-defense simpliciter, but the maintenance of public safety, and the institutions designed to provide and manage that kind of public good.[72]

## II. SENSITIVE PLACES AND CONSTITUTIONAL CONFLICT

Accepting that rights do not always function as trumps helps to make sense of the puzzling passage in *Heller* that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings."[73] This notion of a "sensitive place" is still largely undefined. What precisely makes a place sensitive? It cannot be solely a matter of congestion in the school. Presumably it is as legal to prohibit a gun in a class of five people as a class of five hundred. Nor is it necessarily

---

[67] *See* Paul Horwitz, *Universities as First Amendment Institutions: Some Easy Answers and Hard Questions*, 54 UCLA L. REV. 1497, 1500–01, 1503–04 (2007).

[68] *See* David A. Anderson, *The Origins of the Press Clause*, 30 UCLA L. REV. 455, 493 (1983); Sonja R. West, *Favoring the Press,* 106 CALIF. L. REV. 91, 127 (2018) ("While the Court has been reluctant to embrace distinct constitutional rights and protections for the press, it has, nonetheless, frequently recognized and celebrated the unique role the press play in our constitutional democracy.").

[69] *See* Richard W. Garnett, *A Hands-Off Approach to Religious Doctrine: What Are We Talking About?*, 84 NOTRE DAME L. REV. 837, 837–39 (2009); Douglas Laycock, *Church and State in the United States: Competing Conceptions and Historic Changes*, 13 IND. J. GLOBAL LEGAL STUD. 503, 504–05 (2006).

[70] Timothy Zick, *Property as/and Constitutional Settlement*, 104 NW. U. L. REV. 1361, 1427 (2010) ("The public forum doctrine provides that existing public streets, parks, and sidewalks are held in trust for purposes of expressive activities.").

[71] BLOCHER & MILLER, *supra* note 34, at 3.

[72] *See id.*

[73] District of Columbia v. Heller, 554 U.S. 570, 626 (2008).

that the school is on government property: a private school is just as much a school as a public one. Further, as the *Class* case confirms, safety alone does not completely justify carving out these sensitive places.[74] Indeed, it is an article of faith among many gun rights advocates that those places where guns are forbidden are the places where they are most necessary.[75]

A part of the answer must be that these places are sensitive because they are the locus of the production of other kinds of public goods protected by other kinds of constitutional rights, and that the protection of the character of these types of institutions justifies limits on private firearms. It is not that the "'the people found there' or the 'activities that take place there'"[76] are less deserving or needing of protection, nor is it that the people in these places or the activities that occur there are not at risk of violence. Instead, as between the safety private gun ownership is supposed to provide and other constitutional values in our constitutional system, these places should be gun-restricted for them to effectively produce the public goods and political culture we also consider valuable.

So, what kind of institutions may qualify as a sensitive place under this kind of model? Religious institutions, educational institutions, political institutions, and the public square all come to mind: although this model of sensitive places may include other kinds of institutions that advance other kinds of constitutional rights.[77] I reiterate, though, that this model of sensitive places explains how a place can be sensitive *despite* the issue of safety not *because* of it. The inside of a commercial airliner can still be a sensitive place without a supporting theory of the constitutional right to travel.

*A. Religious Institutions*

Religious institutions are one kind of sensitive place, although *Heller* does not identify them as such.[78] The First Amendment guarantees freedom of religious expression,[79] and in many traditions religious expression happens in groups. Religious organizations and institutions enhance—even make possible—the kind of religious expression a person's faith tradition may demand.[80] In addition, religious institutions are sites of idea generation, social and individual development, learning,

---

[74]   United States v. Class, 930 F.3d 460, 464 (D.C. Cir. 2019).

[75]   *See* Miller, *Institutions*, *supra* note 34, at 82 & n.76.

[76]   *Class*, 930 F.3d at 465 (quoting GeorgiaCarry.Org, Inc. v. Georgia, 764 F. Supp. 2d 1306, 1319 (M.D. Ga. 2011), *aff'd*, 687 F.3d 1244 (11th Cir. 2012)).

[77]   For example, to the extent that matters of privacy and substantive due process are concentrated in medical facilities, we may think of hospitals and other medical treatment facilities as constitutional rights-enabled and enabling institutions.

[78]   *See generally Heller*, 554 U.S. 570.

[79]   U.S. CONST. amend. I.

[80]   *Cf. Matthew* 18:20 (King James) ("For where two or three are gathered together in my name, there I am in the midst of them."); *Quran* 62:9 (Yusuf Ali) ("O you who believe! When the call is proclaimed to prayer on Friday (the Day of Assembly), hasten earnestly to the Remembrance of Allah, and leave off business (and traffic): That is best for you if you but knew!").

the transmission of tradition, and the development of commitment.[81] Churches and their related activities receive an amount of deference and autonomy that is unusual in other contexts.[82] As Paul Horwitz has written, "If any institution is a candidate for treatment as a First Amendment institution, it is the church."[83]

Many, but not all, of these traditions presume that free exercise and physical threat are incompatible.[84] Consequently, many of the regulations surrounding religious facilities have tried to maintain their character as places of refuge, tranquility and repose, and as havens from violence.[85]

For example, religious institutions as places of sanctuary predate the modern era and is as deeply rooted as any other tradition in Western culture.[86] In fact, the idea of sanctuary arose out of the need to maintain public order and to protect individuals from private violence, typically at the hands of a victim's family or clan.[87] The sanctuary of the church was so significant in pre-conquest England that early codes punished breach of church peace more heavily than breach of the King's peace.[88]

Lawmakers throughout Western history have attempted to preserve the special institutional features of places of worship by banning weapons from them and their vicinity.[89] In Nordic countries, those entering a church were to leave their weapons in a stone vestibule known as the *vapenhus.*[90] Both Henry IV and Henry VIII issued

---

[81]  *See* PAUL HORWITZ, FIRST AMENDMENT INSTITUTIONS 192 (2013).

[82]  For example, courts use a different yardstick when determining whether a church official is a "minister" than it may use for an official of a labor union. *See* Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC, 565 U.S. 171, 189 (2012) (noting that the First Amendment "gives special solicitude to the rights of religious organizations" and observing that freedom of religion guarantees a right for a religious organization to "select its own ministers").

[83]  HORWITZ, *supra* note 81, at 192.

[84]  *But cf.* Tagore v. United States, 735 F.3d 324, 329–30, 332 (5th Cir. 2013) (discussing the ceremonial knives known as "Kirpans" worn by Sikhs).

[85]  *See* Paul Wickham Schmidt, *Refuge in the United States: The Sanctuary Movement Should Use the Legal System*, 15 HOFSTRA L. REV. 79, 93 (1986) (noting that the idea of sanctuary within a city or religious building "appeared as a mitigating response to the rather harsh rule of blood vengeance" in operation in ancient times); *see also* Deyton v. Keller, 682 F.3d 340, 347 (4th Cir. 2012) ("[T]his crime would be equally offensive at a synagogue, mosque, or any other house of worship. . . . [H]ouses of worship must be refuges for those seeking guidance, peace, comfort, and religious fellowship without fear of criminal intimidation."); Hart v. State, 15 S.E. 684, 685 (Ga. 1892) ("The manifest purpose of [prohibiting sale of intoxicating liquor near churches] is to secure peace, tranquility and good order at and around these places devoted to divine worship.").

[86]  *See* Jorge L. Carro, *Sanctuary: The Resurgence of an Age-Old Right or a Dangerous Misinterpretation of an Abandoned Ancient Privilege?*, 54 U. CIN. L. REV. 747, 759 (1986).

[87]  *Id.* at 756 (noting that sanctuary laws "were primarily concerned with the problem of feud and the maintenance of public order").

[88]  *Id.* at 753.

[89]  *See infra* notes 90–93 and accompanying text.

[90]  STEPHEN A. MITCHELL, WITCHCRAFT AND MAGIC IN THE NORDIC MIDDLE AGES 185 (2011).

laws that prohibited arms in churches.[91] And under roughly contemporaneous regulations, those seeking sanctuary in churches had to shed themselves of weapons.[92] The famous case of *Rex v. Knight* involved a Protestant zealot who was charged with taking his weapons into a church.[93]

This is not to say the historical sources are unmixed on the issue. Some colonial governments for a time required male adults to take firearms to church.[94] However, these kinds of requirements were geared toward a society still beset by sometimes hostile indigenous people or during periods of war.[95] Overall, it is fair to say that the instinct to protect houses of worship from weapons—rather than with weapons—is long and well-established.[96] This instinct certainly seems to have become the predominant form of legislation in the middle of the nineteenth century.[97]

---

[91]   4 Hen. 4, c. 29 (1402) ("It is ordained and established, That from henceforth no [Man] be armed nor bear defensible Armour to [. . . Churches nor Congregations,] () in the same"); 26 Hen. 8, c. 6, § 3 (1534) ("[N]o psone or psonnes . . . shall bringe or beare or cause to be brought or borne . . . to any . . . churche . . . any bill, longebowe, crosbowe, handgon, swerde, staffe, daggare, halberde, morespike, speare, or any other maner of weapon.") (addressing arms bearing in Wales).

[92]   *See* THOMAS JOHN DE' MAZZINGHI, SANCTUARIES 15 (Stafford, J. Halden & Son, 1887) (those seeking sanctuary "were not to carry any sword or other weapon, except their meat knives, and those only at their meals").

[93]   Sir John Knight's Case (1686) 87 Eng. Rep. 75, 76 (KB). The significance of Knight's acquittal by a jury is subject to some scholarly debate. *Compare* JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 104–05 (1994), *with* Tim Harris, *The Right to Bear Arms in English and Irish Historical Context, in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT 23 (Jennifer Tucker et al. eds., 2019), *and* Patrick J. Charles, *The Second Amendment in Historiographical Crisis: Why the Supreme Court Must Reevaluate the Embarrassing "Standard Model" Moving Forward*, 39 FORDHAM URB. L.J. 1727, 1831–33 (2012).

[94]   *See, e.g.*, Act of Feb. 27, 1770, sec. 1, 1800 Ga. Laws 157 ("Every male white inhabitant of this province . . . who is or shall be liable to bear arms in the militia . . . and resorting, on any Sunday or other times, to any church, or other place of divine worship within the parish . . . shall carry with him a gun, or pair of pistols."); *see also* Act XLI, 1642–43 Va. Acts, *in* 1 HENING'S STATUTES AT LARGE 263 (Hening ed., New York, R. & W. & G. Bartow 1823) ("[*I*]*t is enacted and confirmed* that masters of every family shall bring with them to church on Sondays one fixed and serviceable gun with sufficient powder and shott vpon penalty of ten pound of tobacco for every master of a family so offending . . . ."). This Virginia provision appears to be more in the style of a militia regulation than a specific requirement to come to church armed.

[95]   *AD 1622: Powhatan Chiefdom Resists English Settlement in Virginia*, https://www.nlm .nih.gov/nativevoices/timeline/203.html [https://perma.cc/F6FP-JUZ8] (last visited Dec. 4, 2019); *see also Treaty of Augusta*, GA. ARCHIVES, https://vault.georgiaarchives.org/digital /collection/adhoc/id/1590.

[96]   *See supra* notes 86–89 and accompanying text.

[97]   Georgia, for example, abrogated its prior requirement to carry weapons to church and forbade it in 1870. Act of Oct. 18, 1870, 1870 Ga. Laws 421 ("[N]o person in the State of

In 1877, Virginia prohibited any person from "carrying any gun, pistol, bowie-knife, dagger, or other dangerous weapon, to any place of worship while a meeting for religious purposes is being held at such place, or without good and sufficient cause therefor" and forbade anyone from carrying "any such weapon on Sunday at any place other than his own premises" or pay a minimum twenty-dollar fine.[98] Texas and the then-territory of Oklahoma also prohibited the carrying of weapons "into any church or religious assembly."[99] Missouri did as well,[100] albeit, perhaps, with an exception for police officers on duty.[101]

To the Georgia Supreme Court in 1874, the idea of carrying firearms into a house of worship was socially incomprehensible, and certainly not within the original understanding of any right to keep and bear arms:

> The practice of carrying arms at courts, elections and places of worship, etc., is a thing so improper in itself, so shocking to all sense of propriety, so wholly useless and full of evil, that it would be strange if the framers of the constitution have used words broad enough to give it a constitutional guarantee.[102]

Four years later, in an otherwise gun-friendly opinion, the Arkansas Supreme Court echoed the sentiment: "No doubt in time of peace, persons might be prohibited from wearing war arms to places of public worship, or elections."[103]

In the District of Columbia, Chief Judge Cranch, riding circuit in 1834, while reviewing an indictment of a man charged with disturbing a congregation by force of arms, noted that the principle was ecumenical: "Every religious sect is equally protected by our laws. Every congregation assembled for the public social worship

---

Georgia be permitted or allowed to carry about his or her person any dirk, bowieknife, pistol or revolver, or any kind of deadly weapon, to . . . any place of public worship . . . .").

[98]   Ch. 6, sec. 21, 1877 Va. Acts 305.

[99]   Act of Aug. 12, 1870, ch. 46, 1870 Tex. Crim. Stat. 1322; *see also* Terr. Okla. Stat. ch. 25, art. 47, § 7 (1890) (prohibiting "any person, except a peace officer" from bearing any offensive or defensive weapon in "any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes").

[100]   Act of Mar. 26, 1874, 1879 Mo. Laws 224 (carrying deadly weapons, etc.).

[101]   *Id.*; Huntsville, Mo., Ordinance in Relation to Carrying Deadly Weapons (July 12, 1844) (prohibiting any person, except police officers or those with good cause, to go armed "into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes"); *see also* Joplin, Mo. Code § 1201 (1917) (prohibiting any person from bringing "a dangerous or deadly weapon" into a church, school, or into a public assembly place).

[102]   Hill v. State, 53 Ga. 472, 475 (1874).

[103]   Wilson v. State, 33 Ark. 557, 560 (1878).

of God is, at least, a lawful meeting, and as much under the protection of the law as a political meeting for the exercise of the right of election."[104]

This notion of all houses of worship as places free from violence and threats of violence was reiterated in the Fourth Circuit just this decade.[105] In reviewing a habeas petition by armed robbers of a church congregation, the state trial court remarked that:

> [I]f there's one place in the whole world that you ought to have the right to feel like . . . for just a few minutes you can put the dangers of the world away and that you can step to some degree of peace and solitude and serenity with some degree of safety it would be in a church.[106]

The Fourth Circuit agreed, observing that this desire is not confined to a certain creed: "Religious services are particularly intimate moments regardless of the faith being observed. . . . [T]his crime would be equally offensive at a synagogue, mosque, or any other house of worship."[107] That the arms are those of a private party are not necessarily dispositive: "[A]lthough the Constitution explicitly protects the right to the free exercise of religion from state interference, the government has long taken a role in protecting citizens from private deprivations of their constitutional rights as well."[108]

Although the law has changed in reaction to church shootings, a number of states still forbid firearms in places of public worship.[109] This sense that places of worship should be free from weapons and violence is reflected in modern polling.[110] Overwhelming majorities of people object to private firearms in churches and other sites of religious expression.[111]

*B. Educational Institutions*

Schools and universities are also First Amendment institutions, tasked with training children and young adults how to become responsible public citizens. Schools are something more than a concentration of young people, or a place where

---

[104]   United States v. Brooks, 24 F. Cas. 1244, 1245 (C.C.D.D.C. 1834).

[105]   Deyton v. Keller, 682 F.3d 340, 348 (4th Cir. 2012).

[106]   *Id.* at 342 (quoting sentencing remarks of N.C. Superior Court Judge James L. Baker, Jr.).

[107]   *Id.* at 347.

[108]   *Id.* at 346–47 (citing Griffin v. Breckenridge, 403 U.S. 88, 91 (1971)).

[109]   *See, e.g.*, MICH. COMP. LAWS ANN. § 750.234d(1)(b) (West 2019) (prohibiting firearms from houses of worship, but permitting it where the presiding official or officials allow it); UTAH CODE ANN. § 76-10-530 (West 2019).

[110]   Julia A. Wolfson et al., *U.S. Public Opinion on Carrying Firearms in Public Places*, 107 AM. J. PUB. HEALTH 929, 929–30, 932 (2017).

[111]   *Id.*; *see also* Matthew Brown, *Poll: Americans United Against Guns in Churches*, DESERET NEWS (Aug. 15, 2012), https://www.deseret.com/2012/8/15/20505566/poll-americans -united-against-guns-in-churches [https://perma.cc/7VZ7-KCUE] (last visited Dec. 4, 2019).

students are lodged—they are a place where all kinds of conventions, rules, and norms give the idea of school social meaning.[112]

The speech environment that schools foster also has a purpose. As the Court emphasized, "[P]ublic education must prepare pupils for citizenship in the Republic . . . . It must inculcate the habits and manners of civility as values in themselves conducive to happiness and as indispensable to the practice of self-government in the community and the nation."[113] To that end, vigilant protection of First Amendment freedoms in school and university settings is essential because "[t]he classroom is peculiarly the 'marketplace of ideas.'"[114] Nothing less than "[t]he Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas . . . ."[115]

Educational institutions are places where a free exchange of ideas in an orderly and civil manner is essential. Paul Horwitz has written extensively how schools and universities are "training grounds for public discourse" and the place "where ideas begin."[116] It is why students possess protections for their speech in school and why universities and other institutions of higher education can engage in the kind of content and viewpoint discrimination that would be unacceptable by any other government entity.[117] The justification for the doctrine is that educational institutions are also "unique speech institutions with their own marketplace [of ideas]-enhancing internal norms."[118] Where school and university regulations "improve, not limit, the free flow of information and ideas" then institutional deference is warranted.[119]

To effectuate that goal there is a long history of forbidding firearms in educational institutions. Harvard University banned students from having guns on campus sometime around 1655.[120] The University of Virginia's 1825 student rule book forbade students from having firearms.[121] Mississippi prohibited students from carrying

---

[112] *See* Richard W. Garnett, *Do Churches Matter? Towards an Institutional Understanding of the Religion Clauses*, 53 VILL. L. REV. 273–74, 285 (2008); Pildes, *supra* note 30, at 740–41.

[113] Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 681 (1986) (quoting C. BEARD & M. BEARD, NEW BASIC HISTORY OF THE UNITED STATES 228 (1968)).

[114] Keyishian v. Bd. of Regents of Univ. of State of N.Y., 385 U.S. 589, 603 (1967).

[115] *Id.*

[116] HORWITZ, *supra* note 81, at 107.

[117] For example, public universities do not have to accept young-earth creationists in their biology departments or Holocaust deniers into their history departments. *See* Oller v. Roussel, No. 6:11-CV-002207, 2014 WL 4204836, at *6–7 (W.D. La. Aug. 22, 2014) (holding there was no violation of tenured professor's free speech right when he was reassigned because of his promotion of creationism and vaccine-autism link).

[118] Joseph Blocher, *Institutions in the Marketplace of Ideas*, 57 DUKE L.J. 821, 877 (2008).

[119] *Id.* at 880.

[120] Allen Rostron, *The Second Amendment on Campus*, 14 GEO. J.L. & PUB. POL'Y 245, 255 (2016) ("[N]oe students shall be suffered to have [a g]un in his or theire chambers or studies, or keeping for theire use anywhere else in the town.") (quoting a copy of the LAWS OF HARVARD COLLEGE 1655, at 10 (1876)).

[121] *Id.* at 257 ("No student shall, within the precincts of the University, introduce, keep, or use any spirituous or vinous liquors, keep or use weapons or arms of any kind or gun-powder.")

concealed weapons, and required administrators to punish students who violated the law.[122] Missouri, Texas, and the Oklahoma territory all prohibited firearms in school rooms and places where persons assemble for "educational, literary, or social purposes."[123] The Virginia Supreme Court has recognized the special place of the university as an educational institution in upholding restrictions on firearms on its state university campuses.[124]

Private weapons can undermine this essential role of the school as a First Amendment institution. There is some evidence that highly policed schools suffer worse learning outcomes, decreased participation by the community in school affairs, and lack the trust of teachers and administrators.[125] Fear of violence may lead to absenteeism or "self-help" techniques, like students bringing private firearms to school, that can exacerbate problems with fulfilling academic tasks.[126] In another study of university students, researchers found that both non-gun owners and gun owners, including those who possess guns for purposes of safety believed that allowing guns on campus would have a harmful effect on classroom debate and the learning environment.[127] And, as with religious institutions, there tends to be lopsided opposition to carrying firearms into schools and universities among the public.[128]

*C. Political Institutions*

Political parties, and the associated structures (elections, polling places, and voting) are Fifth, Fourteenth, and Fifteenth Amendment institutions, and perhaps, also First

---

(quoting ENACTMENTS BY THE RECTOR & VISITORS OF THE UNIVERSITY OF VIRGINIA FOR CONSTITUTING, GOVERNING AND CONDUCTING THAT INSTITUTION 9 (1825)).

[122] David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 205, 251 n.166 (2018).

[123] Act of Mar. 26, 1879, 1879 Mo. Laws 224 (carrying deadly weapons, etc.); Terr. Okla. Stat. ch 25, art. 47, § 7 (1890) (public buildings and gatherings) (prohibiting "any person, except a peace officer" from bearing any offensive or defensive weapon in "any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes"); Act of Aug. 12, 1870, ch. 46, 1870 Tex. Gen. Laws 68.

[124] DiGiacinto v. Rector & Visitors of George Mason Univ., 704 S.E.2d 365, 365, 370 (Va. 2011) ("[T]he statutory structure establishing [George Mason University] is indicative of the General Assembly's recognition that it is a sensitive place, and it is also consistent with the traditional understanding of a university.").

[125] Bryan R. Warnick & Ryan Kapa, *Protecting Students from Gun Violence*, 19 EDU-CATIONNEXT, 23, 26–27 (2019). However, it is possible that this is merely a correlation and there's no causation.

[126] *See* SHANNON WOMER PHANEUF, SECURITY IN SCHOOLS: ITS EFFECT ON STUDENTS 61–64 (2009).

[127] James A. Shepperd et al., *The Anticipated Consequences of Legalizing Guns on College Campuses*, 5 J. THREAT ASSESSMENT & MGMT. 21, 29 (2018).

[128] *See* Wolfson et al., *supra* note 110, at 929, 932, 935.

Amendment institutions.[129] The Court has noted that "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."[130] Part of that history of keeping order is curtailing weapons in polling places and during elections.

The tradition goes back to the founding of the nation. Delaware's Constitution of 1776 specifically forbade any private person from coming armed to an election, prohibited militias from drilling during elections, and outlawed any "battalion or company" coming within a mile of a polling place for twenty-four hours before or after the election.[131] The purpose of the restriction was plainly stated: "To prevent any violence or force being used at the said elections . . . ."[132] In 1776, Maryland delegates passed a substantially similar resolution, for similar reasons—to ensure fair elections on forming a new government after independence.[133] New York enacted a law in 1787 that provided that "all elections shall be free and that no person by force of arms nor by malice or menacing or otherwise presume to disturb or hinder any citizen of this State to make free election upon pain of fine and imprisonment and treble damages to the party grieved."[134]

These kinds of regulations were common in the nineteenth century as well. Tennessee prohibited all deadly weapons from the site of elections.[135] In 1870, Louisiana made it unlawful to carry any "dangerous weapon, concealed or unconcealed, on any day of election during the hours the polls are open, or on any day of registration or revision of registration, within a distance of one-half mile of any place of registration or revision of registration."[136] Maryland had a similar provision,[137] as

---

[129] *But cf.* HORWITZ, *supra* note 81, at 254 ("I am not persuaded election law *should* be considered a First Amendment institution.").

[130] Storer v. Brown, 415 U.S. 724, 730 (1974); *see also* Spirit Lake Tribe v. Benson Cty., No. 2:10-CV-095, 2010 WL 4226614, at *5 (D.N.D. Oct. 21, 2010) ("[T]here simply is no more essential duty of a democratic government than to provide open, fair elections that are accessible to all eligible voters.").

[131] DEL. CONST. art. 28 (1776), *in* THE FEDERAL AND STATE CONSTITUTIONS, COLONIAL CHARTERS AND OTHER ORGANIC LAWS OF THE UNITED STATES 277 (2d ed. 2001).

[132] *Id.*

[133] PROCEEDINGS OF THE CONVENTIONS OF THE PROVINCE OF MARYLAND, HELD AT THE CITY OF ANNAPOLIS IN 1774, 1775, & 1776 185 (1836) ("And to prevent any violence or force being used at the said elections, no person shall come armed to any of them, and that no muster of the militia be made on the day on which any of the said elections shall be held . . . nor shall any soldiers in the pay of this province be suffered to collect at the time and place of holding any of the said elections, so as in any manner to impede the freely and convenient carrying on such elections.").

[134] Act of Jan. 26, 1787, ch. 1, 1787 N.Y. Laws 345 (elections to be free).

[135] Act of Dec. 1, 1869, ch. 22, sec. 2, 1869 Tenn. Pub. Acts 108 (prohibiting dangerous weapons at elections).

[136] Act of Mar. 16, 1870, sec. 73, 1870 La. Acts 159.

[137] Act of Apr. 16, 1874, ch. 250, 1874 Md. Laws 336 ("[I]t shall not be lawful for any person

did Texas and Georgia.[138] The Oklahoma territory prohibited the taking of firearms into "any political convention."[139] The Missouri Supreme Court said that its regulation prohibiting weapons at polling places was "in perfect harmony with the constitution."[140] And, as specified before, the Georgia Supreme Court considered bringing firearms to sites of elections particularly obnoxious.[141]

Efforts to protect political institutions are not confined to the nineteenth century. In 1911, special legislation for Knoxville, Tennessee, prohibited any "officer of Election or Commissioner of Election" to be "in, at, or near any ballot box or voting precinct during any election or the canvassing of the returns armed with pistol, gun, or other deadly weapon."[142]

In the pre–Voting Rights Act era, the Court was particularly concerned with protecting political institutions, including political parties, from private action, particularly racial discrimination.[143] In The White Primary Cases,[144] the Court found that the private discrimination of white party members was sanctionable through the Fourteenth and Fifteenth Amendments.[145] With passage of the Voting Rights Act of 1965, Congress utilized the Fourteenth and Fifteenth Amendment enforcement power to protect voters from intimidation.[146] For example, this Act was used to force the Republican National Committee to enter into a consent decree in the 1980s for

---

in Kent, Queen Anne's or Montgomery counties to carry, on the days of election, secretly or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy, or bludgeon . . . .").

[138]   Ga. Code § 4528 (1873) ("No person in this State is permitted or allowed to carry about his or her person any dirk, Bowie-knife, pistol or revolver, or any kind of deadly weapon, to . . . any election ground . . . ."); 1895 Tex. Crim. Stat. 93 (carrying arms about elections) ("If any person . . . shall carry any gun, pistol, bowieknife or other dangerous weapon, concealed or unconcealed, on any day of election, during the hours the polls are open, within the distance of one-half mile of any poll or voting place, he shall be punished . . . .").

[139]   Terr. Okla. Stat. ch. 25, art. 47, § 7 (1890).

[140]   State v. Shelby, 2 S.W. 468, 469 (Mo. 1886).

[141]   See Hill v. State, 53 Ga. 472, 475 (1874); see also Wilson v. State, 33 Ark. 557, 560 (1878).

[142]   Act of July 1, 1911, ch. 498, sec. 45, 1911 Tenn. Priv. Acts 1431 (Records of Election Commissioner).

[143]   See Martin L. Levy, The Texas White Primary Cases, 33 T. MARSHALL L. REV. 223, 224–25 (2007).

[144]   3 RONALD D. ROTUNDA & JOHN E. NOWAK, TREATISE ON CONSTITUTIONAL LAW 729 (3d ed. 1999) (citing, inter alia, Terry v. Adams, 345 U.S. 461 (1953); Smith v. Allwright, 321 U.S. 649 (1944); States v. Classic, 313 U.S. 299 (1941); Nixon v. Condon, 286 U.S. 73 (1932); Nixon v. Herndon, 273 U.S. 536 (1927)).

[145]   Id. ("In this sequence of cases the Supreme Court steadily loosened the constitutional requirements of state action in order to protect the effectiveness of the voting franchise.").

[146]   52 U.S.C. § 10101(b) (2012 & Supp. V 2018) ("No person, whether acting under color of law or otherwise, shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to vote or to vote as he may choose.").

allegedly intimidating minority voters on election day through "ballot security measures" involving armed off-duty sheriffs and police officers posted in predominately minority precincts.[147]

Certainly, there were periods in American history where armed parties descended onto polling places or marched during election. Sometimes to thwart the franchise—typically when the ballot was in the hands of an African American[148]—and sometimes to protect it.[149] That said, these kinds of private threats during elections are more often understood as manifestations of a political pathology rather than vindications of a constitutional right.[150] The overwhelming legal response in United States' history has been to reduce the opportunity for coercion during elections, rather than enable it.[151]

### D. The Public Square

The public square is a kind of First Amendment institution; designed for the people to be better able to exercise related rights to assemble "to speak" and to petition the government.[152] The idea of a right to peaceably assemble presumes two things: first, that there is an actual space for such an assembly to occur,[153] and second, that such assemblages must be peaceable, as opposed to disorderly.[154]

As to the first presumption, the Court has repeatedly emphasized that there are certain places like public streets and public parks that have "'immemorially' been open to the public for the purpose of communicating and assembling."[155] And, although the Court has not directly held that governments are required to provide places for people to assemble for purposes of speech,[156] it has indicated that if all

---

[147] Democratic Nat'l Comm. v. Republican Nat'l Comm., 671 F. Supp. 2d 575, 619, 622–23 (D.N.J. 2009), aff'd, 673 F.3d 192 (3d Cir. 2012).

[148] See, e.g., JOHN DITTMER, LOCAL PEOPLE: THE STRUGGLE FOR CIVIL RIGHTS IN MISSISSIPPI 1–2 (1994) (relating story of Medgar Evers and his brother who were turned away by an armed crowd at the polling place).

[149] See, e.g., id.; MICHAEL W. FITZGERALD, THE UNION LEAGUE MOVEMENT IN THE DEEP SOUTH 2 (1989).

[150] See Kate Keller, Why Are There Laws That Restrict What People Can Wear to the Polls?, SMITHSONIAN (June 15, 2018), https://www.smithsonianmag.com/history/why-are-there-laws-restrict-what-people-can-wear-polls-180969381 [https://perma.cc/3MCT-UW7K].

[151] Id.

[152] I am aware that these rights have generally merged into one indistinct right of free expression, with all the resulting conceptual problems that it generates. See ZICK, supra note 44, at 77.

[153] See id. at 19.

[154] U.S. CONST. amend. I.

[155] ZICK, supra note 44, at 122 (quoting Hague v. Comm. for Indus. Org., 307 U.S. 496, 515 (1939)); see also Schenck v. Pro-Choice Network of W.N.Y., 519 U.S. 357, 377 (1997) ("[S]peech in public areas is at its most protected on public sidewalks, a prototypical example of a traditional public forum.").

[156] But cf. Hague v. Comm. for Indus. Org., 307 U.S. 496, 515 (1939) ("Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the

public spaces are abolished, private places may take on a public character so as to perform that function. For example, in *Marsh v. Alabama*, the Supreme Court held that a company town that had assumed most of the functions of public government with respect to traditional public forum had to permit a woman to distribute religious literature on its property.[157] It could not take refuge in the idea that it was simply a private company.[158] "Whether a corporation or a municipality owns or possesses the town the public in either case has an identical interest in the functioning of the community in such manner that the channels of communication remain free."[159]

Second, those assemblages that do occur must be peaceable and lawful, as opposed to riotous and unlawful.[160] Efforts to deter unlawful assemblies have a long history in Anglo-American jurisprudence. During the Tudor era, for example, Henry VII began to specify the crime of unlawful assembly to counter "the practice for the gentry, who were on bad terms with each other, to go to market at the head of bands of armed retainers."[161] Lord Coke's famous *Semayne's Case*, which articulated the "castle doctrine" in English Law, also noted that a man cannot assemble his friends and neighbors to accompany him armed to the market to prevent violence.[162] And Chief Justice Holt in 1707 remarked that three armed men coming out of an alehouse was sufficient to constitute a riot.[163]

These kinds of regulations to secure the public peace are bolstered by general prohibitions on armaments in places like fairs and markets—places one would think part of the "immemorial" custom of public forums. For example, the 1328 Statute of Northampton forbade riding armed "nor to go nor ride armed by night nor by day, in fairs, markets."[164] During the reign of Henry IV, there existed a decree that "no [Man] be armed nor bear defensible Armour to [Merchant Towns Churches nor Congregations], in the same, nor in the Highways, in Affray of the Peace or the King's Liege People."[165] The need to prevent armed individuals in public spaces continued into the eighteenth century. William Hawkins in *Pleas of the Crown* included among the

---

public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.").

[157]   326 U.S. 501, 502, 505–07 (1946).

[158]   *Id.* at 502–03.

[159]   *Id.* at 507.

[160]   *See* Keller, *supra* note 150.

[161]   2 JAMES F. STEPHEN, A HISTORY OF THE CRIMINAL LAW OF ENGLAND 385 n.9 (London, R. Clay, Sons, & Taylor 1883) ("It is obvious that no civilised government could permit this practice, the consequence of which was at the time that the assembled bands would probably fight and certainly make peaceable people fear they would fight.").

[162]   Semayne's Case (1604) 77 Eng. Rep. 194, 195 (KB).

[163]   *See* Mark Anthony Frassetto, *To the Terror of the People: Public Disorder Crimes and the Original Public Understanding of the Second Amendment*, 43 S. ILL. U.L.J. 61, 79 (2018) ("If *three* come out of an ale house and go armed, it is a riot." (quoting Queen v. Soley (1707) 88 Eng. Rep. 935, 937 (QB)).

[164]   Statute of Northampton 1328, 2 Edw. 3 c.3 (Eng.).

[165]   4 Hen. 4, c. 29 (1403).

things that are likely to strike terror in the people (and thereby disturb the peace) "the Shew of Armour."[166]

General Sickles is famous in gun rights circles for his General Order 1, which provided that "[t]he constitutional rights of all loyal and well disposed inhabitants to bear arms, will not be infringed."[167] But he's also the author of General Order 7, which prohibited any "[o]rganizations of white or colored persons bearing arms, or intend[ing] to be armed" from assembling, parading, patrolling, or making arrests.[168] The case of *Presser v. Illinois* upheld a law that prohibited private groups from openly parading with firearms, aside from the organized militia.[169] Modern doctrines concerning the public square uphold regulations that require protestors remain with their signs to avoid them being "turned into weapons or used to conceal dangerous items."[170] It seems hard to imagine that regulations to prevent signs from being turned into weapons couldn't be applicable to actual weapons.[171]

Of course, there's no general due process right to state protection from private violence.[172] That said, the public square seems unique. First, as discussed already, the idea of a right to peaceably assemble presumes both a space to gather and a certain level of order at that gathering.[173] The "heckler's veto" doctrine prohibits governments from punishing the speaker because of the threatened disorder of the audience.[174] Nor can the speaker be charged security and police costs that are indexed to the anticipated violent reaction of the audience.[175] It appears the speaker cannot be forced to internalize the costs of threatened disorder either directly (by arresting the speaker) or indirectly (by charging the speaker higher fees).[176]

---

[166] Frassetto, *supra* note 163, at 79 (quoting 1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 157 (1716)).

[167] 1 WALTER L. FLEMING, DOCUMENTARY HISTORY OF RECONSTRUCTION 208 (1906).

[168] *Id.* at 211.

[169] 116 U.S. 252, 253–54 (1886); *see also* District of Columbia v. Heller, 554 U.S. 570, 621 (2008) ("[The Second Amendment] does not prevent the prohibition of private paramilitary organizations.").

[170] White House Vigil for ERA Comm. v. Clark, 746 F.2d 1518, 1534 (D.C. Cir. 1984) (concluding the regulations "clearly satisfy this element of the time, place and manner test").

[171] Eric Tirschwell & Alla Lefkowitz, *Prohibiting Guns at Public Demonstrations: Debunking First and Second Amendment Myths After Charlottesville*, 65 UCLA L. REV. DISCOURSE 172, 189 (2018) ("[E]lected officials have wide latitude within the First and Second Amendments to prohibit and punish the open carry of weapons where such conduct is likely to intimidate, alarm, or terrify the public, or cause civil disorder.").

[172] *See* DeShaney v. Winnebago Cty. Dep't Soc. Servs., 489 U.S. 189, 195 (1989) ("But nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasions by private actors.").

[173] *See supra* notes 152–54 and accompanying text.

[174] *See* Cox v. Louisiana, 379 U.S. 536, 542–44 (1965); Edwards v. South Carolina, 372 U.S. 229, 229–34 (1963).

[175] *See* Forsyth Cty. v. Nationalist Movement, 505 U.S. 123, 125–27, 136–37 (1992).

[176] *See id.* at 123; *Cox*, 379 U.S. at 536; *Edwards*, 372 U.S. at 229.

It is possible that the speaker could be forced to bear the security costs. The government could abandon the speaker to the threats of a hostile audience or force him to provide his own security.[177] But that could have a chilling effect on speech. That the source of the chill is private (the audience) is not necessarily dispositive. Monica Youn has articulated a "[c]hilling effect doctrine . . . [that] expands the category of constitutionally cognizable injuries to encompass claims of deterrence, whether that deterrence results from governmental or private actions, from legal or illegal retaliation."[178] She recognizes that there is not a fully worked out theory of positive First Amendment rights.[179] But to the extent there is an inchoate one in First Amendment doctrine, the right of peaceable assembly appears to be a good place to begin refining it.[180] It involves both an affirmative right to have a space and, when married to the heckler's veto cases, a right to have a space of a certain social character. Other nations with provisions comparable to the right to peaceably assemble understand that it comes with some affirmative right to protection from private violence.[181] American doctrine on the issue could edge in the same direction.

To say there is a positive First Amendment right in the public square is not to concede that the justification is solely about the safety of either the speaker or of the audience. The doctrine operates whether or not having more firearms in the public square makes everyone safer and whether the assemblage of persons is three or thirty thousand. The doctrine of sensitive places in the public square is not concerned so much with whether the individuals that attend such gatherings are safer or less safe, it is concerned with whether the costs on other margins—the opportunity to participate in public life, to engage others in public spaces with your ideas, to express unpopular opinions—are undermined by the presence of private firearms in that space.

---

[177] *See* Frederick Schauer, *Costs and Challenges of the Hostile Audience*, 94 NOTRE DAME L. REV. 1671, 1683 (2019) (discussing these and other questions as gaps in the doctrine).

[178] Monica Youn, *The Chilling Effect and the Problem of Private Action*, 66 VAND. L. REV. 1473, 1475 (2013).

[179] *See* Timothy Zick, *Arming Public Protests*, 104 IOWA L. REV. 223, 253 (2018) (stating that because allowing firearms into the public square falls within the state's police power, and the private behavior is permitted, "[t]his sort of expressive 'chill' argument is not cognizable").

[180] *See* Lillian R. BeVier, *The First Amendment on the Tracks: Should Justice Breyer Be at the Switch?*, 89 MINN. L. REV. 1280, 1285 (2005) ("The public forum doctrine is the only significant exception to the consistent view that the Amendment does not give citizens affirmative claims to government's resources.").

[181] *See* Dinah Shelton, *The Boundaries of Human Rights Jurisdiction in Europe*, 13 DUKE J. COMP. & INT'L L. 95, 137 (2003) ("The right to freedom of assembly [in Europe] may also require positive measures to ensure that others do not interfere with the exercise of the right to freedom of assembly."); *see also* Stephen Gardbaum, *The Myth and the Reality of American Constitutional Exceptionalism*, 107 MICH. L. REV. 391, 454 (2008) (noting that the European Court of Human Rights "has also held that freedom of assembly requires positive action, including effective police protection, to ensure the right may be exercised").

III. RESOLVING CONSTITUTIONAL CONFLICT IN SENSITIVE PLACES DOCTRINE

Thus far I have identified four places that can credibly be deemed sensitive for reasons unrelated to safety. These places are sensitive because they are traditionally or culturally the site for exercise of rights associated with religion, speech, or political engagement. As such, they can conflict with other kinds of constitutional rights, and their institutions that facilitate those rights, including the right to keep and bear arms.

But identifying a point of constitutional conflict does not say how that conflict should be resolved. A person may want to take her firearm into a school or church because of a legitimate fear of ambush there. At the same time, students or worshipers may find their ability to effectively learn or worship hampered—perhaps even negated—by the presence of the firearm.[182] A group may want to assemble armed at a polling precinct because of a reasonable fear that they will be confronted by armed members of another party or by racist terrorists. Simultaneously, voters may forego their right to vote because they feel intimidated by the presence of firearms near the polling booth.

A regulation on firearms in these places can conceivably stymie one constitutional value—the Second Amendment's value of safety[183]—and elevate another—the free exercise of religion, the development of knowledge, the mechanics of representative government, or the free exchange of ideas. Any candid assessment of the sensitive places doctrine must recognize this possibility.

The sensitive place designation potentially trades safety for something else. It is, in the language of John Graham and Jonathan Wiener, a "risk versus risk" scenario.[184] Banning firearms in these sensitive places generates one kind of risk; allowing them generates another.[185] The current approach to firearms and the Second Amendment is frequently afflicted with a "pathological perspective" that seeks to prevent the worst outcomes of any firearm regulation[186] and typically takes into account only

---

[182]  *Cf.* Matthew C. Ward, *Guns, Violence and Identity on the Trans-Appalachian American Frontier*, *in* A CULTURAL HISTORY OF FIREARMS IN THE AGE OF EMPIRE 17, 19 (Karen Jones et al. eds., 2013) (describing gun use by Quakers or Mennonites as "anathema").

[183]  This Article assumes as true the highly disputed empirical proposition that the private carrying of firearms in a certain place leads to better safety for the individual and for the society, a proposition that is not at all self-evident.

[184]  John D. Graham & Jonathan Baert Wiener, *Confronting Risk Tradeoffs*, *in* RISK VS. RISK: TRADEOFFS IN PROTECTING HEALTH AND THE ENVIRONMENT 1, 3 (John D. Graham & Jonathan Baert Wiener eds., 1995).

[185]  *Cf. id.*

[186]  This can range from fear that an individual will not have a weapon necessary for self-defense when she needs it, to fear of total government-ordered confiscation of private weapons. For more on this approach in other areas, see ADRIAN VERMEULE, THE CONSTITUTION OF RISK 41 (2014) (discussing Vincent Blasi, *The Pathological Perspective and the First Amendment*, 85 COLUM. L. REV. 449, 449–50 (1985)).

one dimension of risk—personal safety.[187] This myopic view blinds policymakers and judges to other kinds of risks.[188]

A more comprehensive view of gun regulation would understand that there are risks in all directions. Allowing firearms in schools not only affects safety, it also affects the First Amendment function that schools have come to perform. The same thing could be said for guns in churches, polling places, and the public square. Of course, decisions have to be made, and accounting for all risks would be nearly impossible. However, to the extent that constitutional law performs a risk-managing function, the kinds of risks the Constitution itself contemplates seems deserving of particular consideration.

This next section briefly lays out a taxonomy of constitutional conflicts. It then discusses methods that courts can resolve them within the sensitive places doctrine.

*A. A Taxonomy of Conflicts*

When I speak of the constitutional conflict I mean to include both what we may think of as "the big-C constitution" and the "small-c constitution." The big-C constitution is the written document—the text we think of when someone says "the Constitution."[189] It's devilishly hard to formally amend; its 7,591 words (or, more accurately, a fraction of that) is the stuff of Supreme Court cases, elite litigation, and intense media interest.[190] I include in the big-C constitution all the various Supreme Court interpretations and constructions of constitutional text that we call "doctrine," understanding that not everyone agrees that such sources qualify.[191]

The small-c constitution are the statutes, regulations, norms, customs and other kinds of institutions that "constitute" the political community in some sense.[192] What makes them "constitutional" is their entrenched nature and their capacity to reflect "sociopolitical commitment[s]."[193] Although scholars differ on specific examples of the small-c constitution, there tends to be agreement that legislation like the Civil Rights Act of 1964 and the Voting Rights Act of 1965 (at least portions of it) reflect fundamental social and political commitments that, while not requiring two-thirds

---

[187] *See id.* at 11.

[188] *Id.*; *see also* Darrell A.H. Miller, *Fear and Firearms*, 52 TULSA L. REV. 553, 564–65 (2017).

[189] *See* Thomas W. Merrill, *Interpreting an Unamendable Text*, 71 VAND. L. REV. 547, 595 (2018) (discussing WILLIAM N. ESKRIDGE, JR. & JOHN FEREJOHN, A REPUBLIC OF STATUTES: THE NEW AMERICAN CONSTITUTION (2010)).

[190] *See id.* (The big-C constitution "is the document whose interpretation is at issue in cases we identify as presenting formal claims of constitutional law.").

[191] *See* Ernest A. Young, *The Constitution Outside the Constitution*, 117 YALE L.J. 408, 413 (2007).

[192] *See* Karl N. Llewellyn, *The Constitution as an Institution*, 34 COLUM. L. REV. 1, 28–30 (1934).

[193] *See* Daryl J. Levinson, *Parchment and Politics: The Positive Puzzle of Constitutional Commitment*, 124 HARV. L. REV. 657, 701 (2011).

of both houses of Congress and three-fourths of the states to change, would require an enormous amount of political effort to alter or abolish.[194]

For purposes of this Article, I also regard the legislative products of constitutional politics part of the small-c constitution as well. These small-c constitutional statutes are efforts of legislators to enact policy in a self-consciously constitutional register. For example, although the non-discrimination provisions of the Civil Rights Act of 1964 are authorized by the Commerce Clause, it sounds in the constitutional values of non-subordination and equal protection of the Thirteenth and Fourteenth Amendments.[195] Similarly, although nothing in the Second Amendment or *Heller* requires concealed carry, numerous concealed carry proposals are expressed and understood as sounding in the right to keep and bear arms.[196] Some of these legislative products are not as entrenched or as socially accepted as others, but to the extent they seek the status of the Civil Rights Act of 1964, we may think of them as constitutionally aspirational.

Because the barriers for changing the small-c constitution are comparatively low, it is often the target of norm entrepreneurs—policymakers, social activists, and legislators—interested in constitutional change. Eventually, some of these small-c constitutional changes become doctrinal changes to the big-C constitution. For example, the equal protection principles in the Civil Rights Act of 1866 eventually influenced the interpretation of the Fourteenth Amendment.[197] Experiments with direct election of United States Senators eventually ripened into the Seventeenth Amendment.[198] The same kind of process appears current efforts to recognize sexual orientation protections in employment,[199] and, relevant to this discussion, efforts to anchor all kind of gun rights protections into the Constitution.[200]

The first kind of conflict we may call big-C constitutional conflicts. Big-C constitutional conflicts occur where both sides have a textual or doctrinal hook for

---

[194] *See id.*; Young, *supra* note 191, at 427 (considering the entrenchment of the Social Security Act). Of course, current events cast doubt on how deeply entrenched many of these small-c statutes, not to mention constitutional norms and customs actually are.

[195] *See, e.g.*, Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 276 (1964) (Black, J., concurring) ("In view of the Commerce Clause it is not possible to deny that the aim of protecting interstate commerce from undue burdens is a legitimate end. In view of the Thirteenth, Fourteenth and Fifteenth Amendments, it is not possible to deny that the aim of protecting Negroes from discrimination is also a legitimate end.").

[196] *See* U.S. CONST. amend. II; District of Columbia v. Heller, 554 U.S. 570, 574–77 (2008).

[197] GEORGE RUTHERGLEN, CIVIL RIGHTS IN THE SHADOW OF SLAVERY: THE CONSTITUTION, COMMON LAW, AND THE CIVIL RIGHTS ACT OF 1866, at 70 (2013).

[198] David A. Strauss, *The Irrelevance of Constitutional Amendments*, 114 HARV. L. REV. 1457, 1496–98 (2001).

[199] *Cf.* EEOC v. R.G. & G.R. Harris Funeral Homes, Inc., 884 F.3d 560, 566–67 (6th Cir. 2018), *cert. granted,* 139 S. Ct. 2049 (2019); Hively v. Ivy Tech. Cmty. Coll., 853 F.3d 339 (7th Cir. 2017).

[200] Reva B. Siegel, Comment, *Dead or Alive: Originalism As Popular Constitutionalism in* Heller, 122 HARV. L. REV. 191, 201–02 (2008).

their rights claim, and the courts must decide which claim takes priority.[201] Free Exercise and Establishment Clause conflicts tend to have this kind of feature.[202] For purposes of "sensitive places" doctrine, an example of a big-C constitutional conflict would be something like a prohibition on firearms at the polling station. A place to cast ballots free from coercion is necessarily implied by the fundamental right to vote and some kind of right to carry firearms may be presumed by the Second Amendment. A voter may feel that inviting private firearms in the polling station infringes on her fundamental right to vote; a firearm carrier may feel that prohibiting a private firearm in a polling station violates her fundamental right to bear arms for self-defense.

The second kind of conflict we may call big-C versus small-c constitutional conflicts. These are conflicts where governments have issued regulations that speak in a constitutional register, but are not themselves directly required by Supreme Court doctrine. The numerous "pro-gun/anti-gun control" laws passed in state legislatures as well as proposed federal legislation (like concealed-carry reciprocity) fall within this category.[203] For example, a number of states have provisions that require employers to permit firearms onto their property, typically parking lots, and some forbid employers to inquire about the firearm ownership of their employees.[204] These kinds of regulations implicate both takings jurisprudence under the Fifth Amendment,[205] rights of speech[206] or religious expression[207] under the First Amendment, and, perhaps, Second Amendment rights for associations to designate who may be armed, or a corollary right not to keep and bear arms.[208]

---

[201]   It is also possible that a right can be self-limiting in that one kind of exercise of the right may defeat another. To the extent the Second Amendment is concerned with aggregate safety, for example, decisions that lower aggregate safety may be thought of as examples of conflicts internal to one right.

[202]   *See, e.g.*, Lynch v. Donnelly, 465 U.S. 668, 672–73 (1984) (emphasizing that the Establishment and Free Exercise Clauses are in constant balance—the state cannot establish religion, but total separation may lead to free exercise concerns).

[203]   *See, e.g.*, Sanya Mansoor, *Texas Enacts 9 Pro-Gun Laws Just 1 Day After Odessa Mass Shooting*, TIME (Sept. 9, 2019, 10:24 AM), http://www.time.com/5645637/texas-gun-laws-el -paso-shooting/ [https://perma.cc/3TQA-AP5F]; Laura Santhanam, *How States Have Moved to Make Gun Laws While Congress Is Deadlocked*, PBS NEWS HOUR (Aug. 8, 2019, 9:28 PM), https://www.pbs.org/newshour/health/how-states-have-moved-to-make-gun-laws-while-con gress-is-deadlocked [https://perma.cc/22KW-WKQ8].

[204]   *See, e.g.*, ARIZ. REV. STAT. ANN. § 12-781 (2019); COLO. REV. STAT. § 18-12-214 (2019); VA. CODE ANN. § 15.2-915 (2019).

[205]   Fla. Retail Fed'n, Inc. v. Att'y Gen. Fla., 576 F. Supp. 2d 1281, 1289 (N.D. Fla. 2008) (rejecting a takings claim).

[206]   *See* Wollschlaeger v. Governor of Fla., 848 F.3d 1293, 1300–02 (11th Cir. 2017) (striking down parts of a regulation that prohibited physicians from asking their patients about firearms in the home).

[207]   *See* GeorgiaCarry.Org, Inc. v. Georgia, 687 F.3d 1244, 1264 (11th Cir. 2012).

[208]   *See generally* Joseph Blocher, *The Right Not To Keep and Bear Arms*, 64 STAN. L. REV. 1 (2012).

The third kind of conflict represents small-c constitutional conflicts. These are conflicts in which the constitutional valence of the legislation is apparent or implied, but no court has concluded that the policy is required by the big-C constitution. For example, many states have religious freedom restoration acts (RFRAs) that protect religious organizations from neutral rules of general applicability.[209] The legislature must show that the generally applicable rule is narrowly tailored to serve a compelling government interest.[210] Some of the states that have state-level RFRAs also tend to have extremely liberal pro-gun legislation.[211] To the extent these kinds of conflicts are solely statutory, it may be that one can resort to ordinary principles of statutory harmonization to resolve them.[212]

### B. Resolving Conflicts and Sensitive Places

When rights conflict judges must decide how to address them. What kind of tools can a judge use to address these conflicts? One tool would be to approach the matter categorically, perhaps using something like text, history, and tradition to supply the answer. Another tool may be more prudential, incorporating what we may think of as a sliding scale of constitutionality, adjusted for the constitutional interests at issue and their related effects. Although this Article cannot address all the permutations of constitutional conflicts, I will discuss these options with a few examples.

### 1. A Categorical Approach

A court could aim to resolve these conflicts in some kind of categorical fashion, perhaps relying on analogies from text, history, and tradition or on some kind of longstanding practice. In *McDonald v. City of Chicago*, Justice Scalia in his concurrence specified that the scope of the right is determined by the kinds of regulations

---

[209] *See, e.g.*, *State Religious Freedom Restoration Acts*, NAT'L CONF. OF STATE LEGISLATURES (May 4, 2017), http://www.ncsl.org/research/civil-and-criminal-justice/state-rfra-statutes .aspx [https://perma.cc/24U7-3JBP] (compiling a list of the 21 states that enacted state RFRAs).

[210] Virginia's statute, for example, states that "[n]o government entity shall substantially burden a person's free exercise of religion even if the burden results from a general rule of applicability . . . ." VA. CODE ANN. § 57-2.02(B) (2019). The way the state can avoid this is by showing "the application of the burden . . . is (i) essential to further a compelling government interest *and* (ii) the least restrictive means at furthering that interest." *Id.* (emphasis added).

[211] *Compare Gun Laws in the U.S., State by State—Interactive*, GUARDIAN (Jan. 16, 2013), https://www.theguardian.com/world/interactive/2013/jan/15/gun-laws-united-states [https:// perma.cc/GAL3-YS4F] (comparing all 50 state gun laws), *with State Religious Freedom Restoration Acts, supra* note 209.

[212] *See, e.g.*, Morton v. Mancari, 417 U.S. 535, 551 (1974) ("[W]hen two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.").

that exist traditionally; the constitutionality of a regulation is dependent upon its pedigree.[213] In this model, a court's designation that a place is sensitive is to conclude there's no right to keep and bear arms in that place.[214]

If that's the case then the institutions I've discussed—houses of worship, universities, polling places, and the public square—have long been places of firearm regulation.[215] The implication is that any balancing between safety and risks along other constitutionally inflected margins—like speech or the fundamental right to vote—have been made already in defining the exception. One need not determine if prohibiting firearms from the inside of churches *really* makes them safer, or even if the religious expression in the church is *really* harmed by the presence of firearms. All that is necessary is to determine the factual predicates for the category—whether we are dealing with a church or a school, or some other category of sensitive place. This categorical approach is one courts frequently use to address constitutional conflicts.[216] They define the right in such a way as to avoid the conflict altogether.[217]

The constitutional character of the sensitive place then provides a rule of relevance for analogical reasoning for places and activities that do not strictly count as a school or church or polling station. That is, the relevant consideration of whether something is "like" a school, or church, or other sensitive place is not whether it is made of bricks or wood, it is whether the place is understood sociologically and legally as an institution charged with producing a similar type of constitutional good.

For example, consider guns at a public lecture hall or at a tent-revival meeting in a park. If, as I've argued here, a school or a house of worship is a sensitive place because of its First Amendment character, then the question is whether the function of these other places and activities is sufficiently similar to fall within the category. A public lecture hall may not technically be a "school" but its role as a place where people congregate to exchange ideas, to debate and to engage in the transmission of learning, may be sufficient to qualify it as a sensitive place. Similarly, although a revival meeting in a tent may not technically qualify as a "church," there may be First Amendment activity related to worship that makes such a site sensitive in a relevant constitutional sense.[218]

---

[213]   McDonald v. City of Chicago, 561 U.S. 742, 802 (2010) (Scalia, J., concurring) ("The traditional restrictions go to show the scope of the right.").

[214]   Granting, as always, that there's exceptions for necessity in any set of rules.

[215]   *See* discussion *supra* Part II.

[216]   *See, e.g.*, Greene, *supra* note 66, at 74.

[217]   *Id.* at 73 (noting that the modern Court's approach to rights conflicts is to assume them away); *see also* Niels Petersen, *How to Compare the Length of Lines to the Weight of Stones: Balancing and the Resolution of Value Conflicts in Constitutional Law*, 14 GERMAN L.J. 1387, 1401–02 (2013) (discussing this maneuver in American constitutional jurisprudence).

[218]   I want to reiterate, again, that such places could be sensitive for purposes of physical safety as well, but this analysis presumes that even if the physical safety issue was irrelevant, some other factor could still make a place sensitive.

A second, more difficult issue, is what happens when one of these institutions attempts to assert First Amendment rights against a small-c constitutional claim to keep and bear arms.

Some states, for instance, recognize that there's no federal Second Amendment right to enter into a library with a firearm, but pass legislation or interpret state law to permit firearms in libraries notwithstanding.[219] The same thing has happened with other sensitive places like polling stations and churches.[220]

In these cases, it is possible the rights of the library as a First Amendment institution would operate not only as a shield but as a sword. In that circumstance, the special function of the library as a First Amendment institution would permit it to raise a claim against such legislation, similar perhaps, to the way state universities or municipal corporations have occasionally asserted First Amendment rights on behalf of their members or themselves.[221]

### 2. The Prudential Approach

Courts can also opt to address these conflicts in a more prudential manner. In this model, one may decide that a place is sensitive, but for reasons that are more contextual and consequential than categorical. In other words, the arguments for or against the designation may be more in determining the actual effect of the exercise of the right on other kinds of rights, rather than determining whether the facts fit within a particular preset category of sensitive places.[222]

In this model of deciding rights versus rights claims, someone claiming a Second Amendment right to carry a firearm to a public protest, for instance, would not need to show how traditional that activity was; nor would the defendants seeking

---

[219] *See, e.g.*, *Gun Laws in the U.S., State by State—Interactive*, *supra* note 211; *see also* Capital Area Dist. Library v. Michigan Open Carry, Inc., 826 N.W.2d 736, 747 (Mich. Ct. App. 2012) ("The [Michigan] Legislature . . . has expressly prohibited local government regulation of firearms and ammunition generally in cities, villages, townships, and counties, including in their libraries.").

[220] *See, e.g.*, GA. CODE ANN. § 16-11-127 (2019).

[221] *See* Cty. of Suffolk v. Long Island Lighting Co., 710 F. Supp. 1387, 1390 (E.D.N.Y. 1989) ("A municipal corporation, like any corporation, is protected under the First Amendment in the same manner as an individual."), *aff'd*, 907 F.2d 1295 (2d Cir. 1990); Nadel v. Regents of Univ. of Cal., 34 Cal. Rptr. 2d 188, 197 (1994) ("[R]egarding the point that extension of First Amendment protection to government is inconsistent with the notion that the constitution protects citizens from government rather than government from citizens, our best answer is that if the unfettered interchange of ideas is a central concern of the First Amendment, then application of the First Amendment to government speech [in this context] . . . promotes government's contribution to the marketplace of ideas."); *cf.* Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 312 (1978) (suggesting there's a First Amendment academic "freedom of a university to make its own judgments as to education").

[222] For more on the distinctions between these kinds of approaches, see Joseph Blocher, *Categoricalism and Balancing in First and Second Amendment Analysis*, 84 N.Y.U. L. REV. 375 (2009).

to enjoin such behavior need to show how traditional it was to prohibit firearms from the public square.

Instead, the briefing may center on the impact of a time, place, and manner regulation on the person's claim of safety; the defendant would then brief the impact of allowing firearms on the willingness of persons to assemble, to voice unpopular opinions, or to express themselves in a place where private firearms are permitted.[223] They may also discuss how permitting firearms by one group leads to the necessity of another group to think about arming themselves, and the overall affect of that prisoners' dilemma on the speech interests of the parties, and the rights of the public to receive the communication.

The brute, and unsatisfying, analysis for this kind of interright conflict would be simply to ascribe some kind of quantitative value to the conflicting rights and resolve them accordingly.[224] A more refined version may prioritize court-enforced rights in the big-C constitution as superior to a small-c constitutional right, so that a core application of First Amendment rights would outweigh any product of constitutional politics. A still-more refined version may be to understand that some kinds of rights-denominated small-c constitutional products are designed to "count" more than what we may otherwise think as a non-rights consideration. So we may say that a regulation promoted self-consciously to protect the First Amendment institutional interests of the public square, or schools, for example, may count for more than a non-rights based general police power interest in the weighing calculus.[225]

However, the problem with that kind of approach, is that, as Jeremy Waldron has noted, rights tend to generate duties, or "waves of duty."[226] In his example, if an individual's free speech rights are sufficient to impose a duty on government not to censor the speaker, "it is likely also to be sufficiently important to generate other duties: a duty to protect those who make speeches in public from the wrath of those disturbed by what they say," or a duty to allocate time, place, and manner restrictions that ensure that everyone has a chance to appeal to the same audience.[227] Does it make sense to talk about a right to free exercise of religion without talking about churches or mosques; or a right to peaceably assemble without a public place where such

---

[223] See Luke Morgan, Note, *Leave Your Guns at Home: The Constitutionality of a Prohibition on Carrying Firearms at Political Demonstrations*, 68 DUKE L.J. 175, 213 (2018) ("If the Second Amendment cannot categorically exclude guns from places where truth-seeking debate reaches its peak intensity, then the First and Second Amendments are fundamentally incompatible.").

[224] Waldron, *supra* note 65, at 515 (imagining a hypothetical where "we allow a right to life to be worth five rights to free speech, or whatever").

[225] This idea shares some relationship to Fred Schauer's notion of rights as a devaluer of non-rights considerations; except in this case, a right-based justification for a regulation enhances its value. *See* Frederick Schauer, *Proportionality and the Question of Weight*, *in* PROPORTIONALITY AND THE RULE OF LAW: RIGHTS, JUSTIFICATION, AND REASONING 177 n.18 (Grant Huscroft et al. eds., 2014).

[226] Waldron, *supra* note 65, at 509.

[227] *Id.* at 510.

assembly can take place? A simple quantitative accounting of one right versus another cannot account for all the duties that one right generates which may also conflict with other duties. Neither is it a solution to consign these duties to a subordinate role in the small-c constitution, because, as I've discussed previously, rights in the big-C constitution may of necessity create the duties and institutions that make them possible.

A more refined version of the prudential approach, then, may be to discern what Waldron calls the "internal relation" between two conflicting rights and to resolve them by reference to that relation.[228] So, for example, to the extent that gun owners may want to carry guns to protests to protect their right to speak on unpopular topics, and others may want to ban guns at protests because of their threat to those taking unpopular positions; the internal relation prioritizes that right that best effectuates the ability to speak on unpopular topics.[229]

CONCLUSION

Justice Breyer in his *Heller* dissent pounced on the majority's declaration that guns could be limited in sensitive places, like schools. "Why these?," he wrote.[230] This Article is an attempt to answer that question. Places are sensitive, not necessarily because of physical safety alone, but because sensitive places are where gun rights come into conflict with other public goods generated by other institutions enabled by other kinds of constitutional rights. As the doctrine after *Heller* develops, and as legislators expand all the places and manners in which guns can be carried, we are certain to discover that there will be more and more areas where the basic conflict won't be rights versus regulation, but rights versus rights.

---

[228] *Id.*

[229] *See id.* at 518.

[230] District of Columbia v. Heller, 554 U.S. 570, 721 (2008) (Breyer, J., dissenting).

# IMPLEMENTING THE RIGHT TO KEEP AND BEAR ARMS FOR SELF-DEFENSE: AN ANALYTICAL FRAMEWORK AND A RESEARCH AGENDA

## Eugene Volokh[*]

*How should state and federal constitutional rights to keep and bear arms be turned into workable constitutional doctrine? I argue that unitary tests such as "strict scrutiny," "intermediate scrutiny," "undue burden," and the like don't make sense here, just as they don't fully describe the rules applied to most other constitutional rights.*

*Rather, courts should separately consider four different categories of justifications for restricting rights: (1) Scope justifications, which derive from constitutional text, original meaning, tradition, or background principles; (2) burden justifications, which rest on the claim that a particular law doesn't impose a substantial burden on the right, and thus doesn't unconstitutionally infringe it; (3) danger reduction justifications, which rest on the claim that some particular exercise of the right is so unusually dangerous that it might justify restricting the right; and (4) government as proprietor justifications, which rest on the government's special role as property owner, employer, or subsidizer.*

*I suggest where the constitutional thresholds for determining the adequacy of these justifications might be set, and I use this framework to analyze a wide range of restrictions: "what" restrictions (such as bans on machine guns, so-called "assault weapons," or unpersonalized handguns), "who" restrictions (such as bans on possession by felons, misdemeanants, noncitizens, or 18-to-20-year-olds), "where" restrictions (such as bans on carrying in public, in places that serve alcohol, or in parks, or bans on possessing in public housing projects), "how" restrictions (such as storage regulations), "when" restrictions (such as waiting periods), "who knows" regulations (such as licensing or registration requirements), and taxes and other expenses.*

INTRODUCTION ................................................................................................................ 1445
I.   A FRAMEWORK FOR THINKING ABOUT CONSTITUTIONAL
     RIGHTS DOCTRINE .................................................................................................. 1448
     A.  Scope ............................................................................................................. 1449
         1.  Text ........................................................................................................ 1449

\*    Gary T. Schwartz Professor of Law, UCLA School of Law (volokh@law.ucla.edu). Many thanks to Amy Atchison, Cheryl Kelly Fischer, John Frazer, Wesley Gorman, Gene Hoffman, June Kim, Michael O'Shea, Tammy Pettinato, Stephanie Plotin, Vicki Steiner, C.D. Tavares, Vladimir Volokh, and John Wilson for their help.

         2.   Original Meaning.......................................................................1450
         3.   Tradition ..................................................................................1450
         4.   Background Legal Principles ....................................................1451
         5.   Why It's Helpful to Distinguish Scope-Based Restrictions From
              Burden-Based Restrictions or Reducing-Danger-Based Restrictions.......1453
    B.   Burden .............................................................................................1454
         1.   Generally...................................................................................1454
         2.   In Right-to-Bear-Arms Cases....................................................1456
         3.   Risks and Benefits of a Burden Threshold ...............................1459
    C.   Danger Reduction............................................................................1461
         1.   Per Se Invalidation, at Least for Especially Serious Burdens....................1462
         2.   The Two Versions of Strict Scrutiny ........................................1464
              a.   The Shape of the Underlying Factual Debate ..................1465
              b.   The Consequences for Strict Scrutiny .............................1467
              c.   Intermediate Scrutiny .......................................................1470
              d.   Different Levels of Danger-Reduction Showings for Different
                   Levels of Burden................................................................1471
    D.   Government Proprietary Role...........................................................1473
II.  APPLYING THE FRAMEWORK TO VARIOUS GUN-CONTROL LAWS ...........1475
    A.   "What" Bans: Bans on Weapon Categories.......................................1475
         1.   Scope ........................................................................................1475
              a.   The "Usually Employed in Civilized Warfare" Test.........................1476
              b.   The "Descended From Historically Personal-Defense
                   Weapons" Test...................................................................1477
              c.   The "of the Kind in Common Use" "by Law-Abiding Citizens
                   for Lawful Purposes" Test.................................................1478
              d.   An Unusual Dangerousness Test........................................1481
         2.   Burden .......................................................................................1483
         3.   Danger Reduction .....................................................................1487
         4.   A Quick Review of Weapons Bans.............................................1488
         5.   A Special Case: "Personalized Gun" Mandates.........................1491
    B.   "Who" Bans: Bans on Possession by Certain Classes of People......................1493
         1.   The Bans ...................................................................................1493
         2.   Burden .......................................................................................1496
         3.   Scope and Danger Reduction ....................................................1497
         4.   Bans Justified by Individualized Finding of Likely Past Criminal
              Behavior or Future Danger .......................................................1498
         5.   Bans Without Individualized Findings of Likely Past Violence
              or Future Danger ......................................................................1503
              a.   Side Effects of Attempts to Disarm the Dangerous: Bans
                   on Gun Possession by People Subject to Restraining Orders
                   Without Findings of Misconduct or Dangerousness.........................1503
              b.   Proxies for Likely Inadequate Judgment: Bans on Gun
                   Possession by Under-18-Year-Olds, the Mentally Ill, Mentally
                   Retarded, the Drug-Or-Alcohol-Addicted,
                   and 18-to-20-Year-Olds....................................................1508

      c.   Bans on Gun Possession by Noncitizens ..........................................1513
C.  "Where" Bans: Prohibition on Possession in Certain Places ...........................1515
    1.   Bans on All Gun Carrying .........................................................................1516
    2.   Bans on Concealed Carry, Revisited........................................................1521
    3.   Bans on Carry Into Places Where Alcohol Is Served or Sold..................1524
    4.   Bans on Carry Into Places With Effective Security Screening
        and Internal Security, Such as Airports and Courthouses ......................1526
    5.   Bans on Carrying in Other Privately Owned Places ................................1527
    6.   Bans on Carrying Within One Thousand Feet of a School....................1528
    7.   Bans on All Gun Possession on Government Property (Setting
        Aside Streets and Sidewalks) ....................................................................1529
D.  "How" Restrictions: Rules on How Guns Are to Be Stored ...........................1534
    1.   Requirements That Guns Be Stored Locked or Unloaded .....................1534
E.  "When" Restrictions: Rules on Temporarily Barring People From
    Possessing Guns ...........................................................................................1535
    1.   Restrictions on Possession While Intoxicated........................................1535
    2.   Restrictions on, or Sentence Enhancements for, Possessing
        Firearms While Possessing Drugs or Committing Another Crime ..........1536
    3.   Waiting Periods.........................................................................................1538
F.  Taxes, Fees, and Other Expenses ....................................................................1542
G.  Restrictions on Sellers ....................................................................................1545
H.  "Who Knows" Restrictions: Government Tracking Regulations,
    Including Nondiscretionary Licensing, Background Checks,
    Registration, and Ballistics Tracking Databases ..............................................1545
CONCLUSION ................................................................................................................1549

## INTRODUCTION

The Second Amendment, the Supreme Court has held, secures an individual right to keep and bear arms for self-defense.[1]  Whether or not the federal right will be applied to the states, at least forty state constitutions secure a similar right.[2]  But how should courts translate this right into workable constitutional doctrine?

---

1.    District of Columbia v. Heller, 128 S. Ct. 2783, 2799 (2008).  It might also secure an individual right to keep and bear arms for other purposes as well, but that is a topic outside the scope of this Article.

2.    Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 TEX. REV. L. & POL. 191, 192 (2006).  The number will likely rise to at least forty-one in 2010, when Kansas voters consider recasting the Kansas rights to bear arms as a clearly individual-rights provision. *See* Kan. S. Con. Res. 1611, 2009 Sess. (Kan. 2009), *available at* http://www.kslegislature.org/bills/ 2010/2009_1611.pdf (placed on the ballot by a 39–1 vote in the state senate and by a 116–9 vote in the state house).  And the number might be increased by one more, to include Virginia, if one takes the view of a 2006 Virginia Attorney General's opinion, Va. Op. Att'y Gen. No. 05-078 (2006) (treating the Virginia Constitution's right to bear arms as individual).  *But cf.* 1993 Va. Op. Att'y

In this Article, I offer a few thoughts towards answering this question (chiefly in Part I), and apply those thoughts to some areas in which the question needs answering (chiefly in Part II). I sometimes offer my views on how particular gun-rights controversies should be resolved, but more often I just suggest a structure for analyzing those controversies and chart an agenda for future research.

In particular, I argue that the question should not be whether federal or state right-to-bear-arms claims ought to be subject to strict scrutiny, intermediate scrutiny, an undue burden standard, or any other unitary test.[3] Rather, as with other constitutional rights, courts should recognize that there are four different categories of justifications for a restriction on the right to bear arms.

1. *Scope.*  A restriction might not be covered by the constitutional text, the original meaning of the text, the traditional understanding of what the text covers, or the background legal principles establishing who is entitled to various rights.

2. *Burden.*  A restriction might only slightly interfere with rightholders' ability to enjoy the benefits of the right, and thus might be a burden that doesn't rise to the level of unconstitutionally "infring[ing]" the right.

3. *Danger Reduction.*  A restriction might reduce various dangers (in the case of arms possession, chiefly the dangers of crime and injury) so much that the court concludes that even a substantial burden is justified. This is where talk of intermediate scrutiny or strict scrutiny would normally fit, though, as Part I.C argues, such labels likely obscure more than they reveal.

---

Gen. 13 (concluding that "judicial interpretation of the Second Amendment . . . applies equally to" the Virginia right to bear arms provision, and concluding, given the federal Second Amendment caselaw of the time, that this meant that the Virginia right to bear arms was only a collective right). And it might rise by one more if Hawaii's right to bear arms is interpreted as an individual right, a matter that is not settled.  *See* State v. Mendoza, 920 P.2d 357, 367 (Haw. 1996).

3.   *See, e.g.,* Sayoko Blodgett-Ford, *The Changing Meaning of the Right to Bear Arms,* 6 CONST. L.J. 101, 172–73 (1995) (calling for strict scrutiny of state gun restrictions and intermediate scrutiny of federal gun restrictions); Brannon P. Denning & Glenn H. Reynolds, *Telling* Miller's *Tale: A Reply to David Yassky,* LAW & CONTEMP. PROBS., Spring 2002, at 113, 120 (suggesting that government regulation of machine guns may be constitutional if it "survive[s] strict scrutiny," and seemingly accepting strict scrutiny as the generally proper test for gun controls); Mark Tushnet, *Permissible Gun Regulations After* Heller*: Some Speculations About Method and Outcomes,* 56 UCLA L. REV. 1425, 1426 (2009) (predicting that courts "will circle around a standard of review akin to either rational basis with bite or intermediate scrutiny, and that the Supreme Court . . . will use rational basis with relatively weak bite"); Gerard E. Faber, Jr., Casenote, Silveira v. Lockyer*: The Ninth Circuit Ignores the Relevance and Importance of the Second Amendment in Post-September 11th America,* 21 T.M. COOLEY L. REV. 75, 89 (2004) ("Had the court recognized an individual right to bear arms, the [California assault-weapon ban] would be subject to strict scrutiny, a far more demanding standard.").

4. *Government as Proprietor.* The government might have special power stemming from its authority as proprietor, employer, or subsidizer to control behavior on its property or behavior by recipients of its property.

Paying attention to all four of these categories can help identify the proper scope of government authority. For instance, even if some kinds of gun bans are presumptively unconstitutional, under something like strict scrutiny or a rule of per se invalidity, it doesn't follow that less burdensome restrictions must be judged under the same test. Conversely, the conclusion that certain kinds of restrictions should be upheld even when they might not pass muster under a demanding form of review shouldn't lead courts to entirely reject that demanding review for all restrictions.[4]

Breaking down the possible elements of the constitutional test into these categories can also tell us which analogies from one restriction to another are sound. For example, if the limitation on minors' possessing guns is a matter of scope—stemming from the background legal principle that minors' constitutional rights are narrower than adults' rights—this would suggest that the validity of bans on possession by minors offers little support for bans on possession of handguns by 18-to-20-year-olds.[5] On the other hand, if the limitation is a matter of the danger posed by ownership by relatively immature people, then the analogy between under-18-year-olds and 18-to-20-year-olds becomes more plausible.

And laying out these categories can help us notice and evaluate analogies to other constitutional rights. Many of the disputes that arise in the context of gun control debates are similar to those arising in other fields, such as free speech, abortion rights, and property rights. Consider, for instance, debates about whether the presence of ample alternative means for self-defense should justify a restriction on one means,[6] whether gun possession may be taxed,[7] or whether waiting periods are constitutional.[8] Understanding exactly why these types of restrictions are upheld or struck down elsewhere can inform the discussion about how they should be treated where gun rights are involved.

* * *

---

4.   *Cf.* Tushnet, *supra* note 3, at 1428–29 (implicitly assuming that courts will adopt a unitary test, and concluding that courts will opt for a deferential test rather than strict scrutiny, "because of concern that such a standard [strict scrutiny] imperils too many well-established . . . gun regulations" such as "[t]he ban on possession of guns by convicted felons").

5.   *See infra* Part II.B.5.b.

6.   *See infra* Part I.B.

7.   *See infra* Part II.F.

8.   *See infra* Part II.E.3.

A few notes on the limits of this Article: First, let me repeat that this Article offers a framework for gun rights doctrine, and a research agenda for further inquiry about the constitutionality of some particular gun controls. It does not offer an exhaustive analysis of each regulation, or an answer about which regulations are sound. But I hope the framework, and some brief sketches of how the framework would apply in each area, will prove useful to those who are working on such questions.

Second, the Article focuses solely on the right to keep and bear arms for self-defense. The constitutional provisions I discuss may have other components,[9] for instance a right to keep arms that would deter government tyranny, or in seven states a "right to keep and bear arms . . . for hunting and recreational use."[10] But those components are left for other articles.

Third, the framework that the Article proposes would lead to the upholding even of some laws that I think are unlikely to do much good, and may even do some harm. But not all unwise laws are unconstitutional; and, conversely, not all that is constitutionally permitted should in fact be implemented.

Fourth, the Article tries to discuss the right to bear arms under both the federal Constitution (whether or not the right is eventually incorporated against the states) and state constitutions. But state constitutions often have different wording and different histories: For instance, a general discussion of whether waiting periods are constitutional says little about the Florida right-to-bear-arms provision, which expressly authorizes a three-day waiting period.[11] Nonetheless, broadly discussing a multistate law of the right to bear arms—or of search and seizure, civil jury trial rights, and other constitutional rights—can be helpful, so long as we recognize that there may be differences among states significant enough to override any general theoretical framework we develop.

## I.    A FRAMEWORK FOR THINKING ABOUT CONSTITUTIONAL RIGHTS DOCTRINE

Say a restriction is challenged under a constitutional rights provision, such as the freedom of speech, the right to jury trial, the right to marry, or the right to keep and bear arms. There are at least four general categories of reasons why the restriction might be upheld.

---

9.    *See* District of Columbia v. Heller, 128 S. Ct. 2783, 2801 (2008).
10.    DEL. CONST. art. I, § 20; NEB. CONST. art. I, § 1; NEV. CONST. art. I, § 11(1); N.M. CONST. art. II, § 6; N.D. CONST. art. I, § 1; W. VA. CONST. art. III, § 22; WIS. CONST. art. I, § 25.
11.    FLA. CONST. art. I, § 8.

A.  Scope

Sometimes, a constitutional right isn't violated by a restriction because the restriction is outside the terms of the right as set forth by the constitution. The restriction may still implicate some of the central concerns that prompted the recognition of the right, but the constitutional text, the original meaning, or our understanding of background constitutional norms may lead us to conclude that the right is narrower than its purposes may suggest.

1.  Text

This is clearest when the right is expressly textually limited: If someone seeks a jury trial in a federal case in which an injunction is requested, he will lose because an injunction demand doesn't constitute a "suit[ ] at common law."[12] Much could still be said for a jury trial in such cases as a policy matter, but the constitutional text forecloses such arguments in Seventh Amendment cases.

Likewise, the First Amendment's protection of "freedom of speech" may well—for functional and original meaning reasons—extend to symbolic expression.[13] But at some point conduct may be so different from "speech" that it will not be protected, for instance when the conduct isn't in a conventionally expressive medium and isn't intended to or likely to convey a particular message.[14]

Similarly, a restriction on carrying concealed weapons can't violate the Colorado state constitutional right to keep and bear arms, which expressly states, "nothing herein contained shall be construed to justify the practice of carrying concealed weapons."[15] And a hypothetical Connecticut ban on gun possession by noncitizens can't violate the Connecticut Constitution, which secures a right to bear arms to "[e]very citizen."[16]

---

12.    U.S. CONST. amend. VII.

13.    *See* Eugene Volokh, *Symbolic Expression and the Original Meaning of the First Amendment*, 97 GEO. L.J. 1057 (2009).

14.    *See, e.g.*, Rumsfeld v. Forum for Academic & Institutional Rights, Inc., 547 U.S. 47, 65–67 (2006).

15.    COLO. CONST. art. II, § 13; Douglass v. Kelton, 610 P.2d 1067, 1069 (Colo. 1980); *see also* Watson v. Stone, 4 So. 2d 700, 701–03 (Fla. 1941) (concluding that then-existing provision that "the Legislature may prescribe the manner in which [arms] may be borne" allowed the legislature to require a license to carry a weapon in public); *cf.* State v. Grob, 690 P.2d 951, 953–54 (Idaho 1984) (applying a state constitutional clause authorizing the legislature to provide "minimum sentences for crimes committed while in possession of a firearm," and punish illegal "use of a firearm").

16.    CONN. CONST. art. I, § 15.

2. Original Meaning

Those who believe that original meaning is relevant to constitutional interpretation (including those who see it as relevant but not dispositive) may also find a right's scope to be limited by the original meaning.[17] Thus, for instance, the Jury Trial Clause has been interpreted to exclude "petty crimes"—despite the text's reference to "all criminal prosecutions"—because such an exception has apparently been accepted from the late 1700s to the present.[18] Similarly, the criminal procedure amendments have been interpreted to not apply to military justice, or to the detention of enemy combatants.[19] And *District of Columbia v. Heller* interpreted "arms" in light of what the Court saw as the Framing-era meaning of the term.[20]

3. Tradition

Some, especially Justice Scalia, view tradition as an important source of a right's scope. This could be because traditions that start near the Framing are evidence of original meaning.[21] Or it could be because "the principles adhered to, over time, by the American people"[22] are independently constitutionally relevant (though not necessarily dispositive, for instance if they clash with clear textual command or clearly demonstrated original meaning). In Justice Scalia's words,

> The provisions of the Bill of Rights were designed to restrain transient majorities from impairing long-recognized personal liberties. They did not create by implication novel individual rights overturning accepted political norms. Thus, when a practice not expressly prohibited by the text of the Bill of Rights bears the endorsement of a long tradition of open, widespread, and unchallenged use that dates back to the beginning of the Republic, we have no proper basis for striking it down. Such a venerable and accepted tradition is not to be laid on the examining

---

17. *See, e.g.*, Klein v. Leis, 795 N.E.2d 633 (Ohio 2003) (relying on an originalist argument about the Ohio Constitution's right-to-bear-arms provision, which had been reenacted in 1874); State v. Willis, 100 P.3d 1218 (Utah 2004) (same as to the Utah provision, enacted in 1984); King v. Wyo. Div. of Criminal Investigation, 89 P.3d 341, 351–52 (Wyo. 2004) (same as to the Wyoming provision, enacted in 1889).

18. *See* District of Columbia v. Clawans, 300 U.S. 617, 624 (1937); Felix Frankfurter & Thomas G. Corcoran, *Petty Federal Offenses and the Constitutional Guaranty of Trial by Jury*, 39 HARV. L. REV. 917, 969–70 (1926).

19. Hamdi v. Rumsfeld, 542 U.S. 507 (2004); Johnson v. Eisentrager, 339 U.S. 763 (1950).

20. 128 S. Ct. 2783, 2816–17 (2008).

21. *See, e.g.*, Printz v. United States, 521 U.S. 898, 905–16 (1997); Marsh v. Chambers, 463 U.S. 783, 791–92 (1983).

22. Rutan v. Republican Party of Ill., 497 U.S. 62, 96 (1990) (Scalia, J., dissenting).

table and scrutinized for its conformity to some abstract principle of First Amendment adjudication devised by this Court. To the contrary, such traditions are themselves the stuff out of which the Court's principles are to be formed. They are, in these uncertain areas, the very points of reference by which the legitimacy or illegitimacy of *other* practices are to be figured out. When it appears that the latest "rule," or "three-part test," or "balancing test" devised by the Court has placed us on a collision course with such a landmark practice, it is the former that must be recalculated by us, and not the latter that must be abandoned by our citizens. I know of no other way to formulate a constitutional jurisprudence that reflects, as it should, the principles adhered to, over time, by the American people, rather than those favored by the personal (and necessarily shifting) philosophical dispositions of a majority of this Court.[23]

Likewise, the Court has held that tradition is relevant by itself—even when it isn't evidence of original meaning—in determining which rights, whether substantive or procedural, are protected by the Due Process Clause.[24] And of course Burkeans, and those with Burkean tendencies (which judges tend to possess as a professional norm), tend to see tradition as a presumptive guide.

There has been less written about tradition as a guide to constitutional meaning than about original meaning as a constitutional guide. I suspect more scholars and judges think original meaning is presumptively normatively binding than think the same about tradition (as opposed to just following tradition because they tend to follow precedent). And I myself am not sure what to think about tradition as an independently binding constitutional norm. But it is a possible source for defining the scope of a constitutional right, especially given that the traditionalist Justice Scalia is the author of *Heller* and that *Heller*'s approval of "longstanding" (but not Framing-era) restraints on felons and of concealed carry laws is consistent with Justice Scalia's broader endorsement of tradition.

4.   Background Legal Principles

Constitutional rights are drafted against a background of legal principles, often ones that aren't tied to the particular right. The freedom of speech,

---

23.    *Id*. at 95–96 (footnote omitted); *see also* Michael W. McConnell, *Tradition and Constitutionalism Before the Constitution*, 1998 U. ILL. L. REV. 173 (defending a similar approach in which tradition has independent constitutional significance); Michael W. McConnell, *The Right To Die and the Jurisprudence of Tradition*, 1997 UTAH L. REV. 665, 682–85 (likewise).

24.    Washington v. Glucksberg, 521 U.S. 702, 720–22 (1997); Medina v. California, 505 U.S. 437, 445–47 (1992).

56 UCLA LAW REVIEW 1443 (2009)

for instance, generally doesn't include a right to speak on others' property, even though such speech is indeed restricted through government action (trespass law).[25] The freedom to hire a lawyer doesn't include a right to pay him with money that isn't rightly your own.[26] Likewise, the right to bear arms doesn't apply to possession of arms on private property against the property owner's wishes.[27] Nor does it preclude the seizure of arms, alongside other property, in satisfaction of a money judgment against the owner, though some states do indeed statutorily exempt some weapons from such execution.[28]

One could argue that such actions are constitutional because trespassing or failing to satisfy judgments is so harmful that those laws trump the freedom of speech or the right to keep and bear arms. But I don't think that's right. Laws aimed at stopping greater harms, such as the risk of violence or interference with national war efforts, often don't trump those constitutional rights.[29] Rather, the actions described above are constitutional because constitutional rights have always been understood as involving a right to use one's own property to accomplish one's goal, not the property of others or the property that lawfully becomes that of others as a result of a lawsuit.[30] This is the background legal principle against which the rights have been enacted and interpreted.

The same is true as to who counts as a rightholder: Prisoners lose many constitutional rights, surely including the right to bear arms,[31] alongside much of their Fourth Amendment rights and Free Speech Clause rights.[32] That's not said in the text of the Constitution, but it's widely accepted as a background legal principle that was likely embodied in the original meaning and in longstanding tradition.

---

25. *See* Hudgens v. NLRB, 424 U.S. 507 (1976). A few state courts take a different view under their state constitutions, but they are a small minority, *see* State v. Viglielmo, 95 P.3d 952, 963–64 (Haw. 2004) (discussing cases), and even those decisions apply only to a small set of private property (chiefly large shopping malls), *see* Golden Gateway Ctr. v. Golden Gateway Tenants Ass'n, 29 P.3d 797, 810 (Cal. 2001).

26. Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 626 (1989).

27. *See, e.g.,* Winters v. Concentra Health Servs., Inc., No. CV075012082S, 2008 WL 803134, at *4 (Conn. Super. Ct. Mar. 5, 2008).

28. *See, e.g.,* An Act to Protect the Owners of Firearms, Jan. 26, 1869 (noting in the preamble that the act is partly justified by concerns about constitutional rights), *quoted in* MATTHEW P. DEADY & LAFAYETTE LANE, THE ORGANIC AND OTHER GENERAL LAWS OF OREGON 613 (Portland, E. Semple 1874) (codified as to the substance at OR. REV. STAT. § 18.362 (2007)).

29. *See, e.g.,* New York Times Co. v. United States (Pentagon Papers Case), 403 U.S. 713 (1971); Brandenburg v. Ohio, 395 U.S. 444 (1969).

30. *See, e.g., Caplin & Drysdale,* 491 U.S. at 626.

31. *See, e.g.,* State v. Barnes, 708 P.2d 414 (Wash. Ct. App. 1985).

32. *See, e.g.,* Thornburgh v. Abbott, 490 U.S. 401 (1989).

Minors have some constitutional rights, like many aspects of the freedom of speech, but they don't have the right to sexual autonomy or to access sexually themed publications, and they have weaker versions of other rights, such as the right to marry or the right to abortion.[33] Noncitizens found outside the U.S. are seen as lacking Fourth Amendment rights;[34] the same logic would necessarily strip them of Second Amendment rights. Enemy combatants lack most constitutional rights,[35] though they have some due process rights once they are captured.[36]

All these scope restrictions reflect background legal principles reasonably assumed to be part of the original meaning of the right to bear arms, or of its meaning as traditionally understood. And this is so even if the principles were usually discussed or assumed in the context of rights generally, rather than being discussed with regard to the right to bear arms specifically.

5.   Why It's Helpful to Distinguish Scope-Based Restrictions From Burden-Based Restrictions or Reducing-Danger-Based Restrictions

Because scope-based restrictions often flow from particular drafting decisions, there is less need for courts to logically reconcile them with other restrictions, and less justification for arguing by analogy from those restrictions to others. If, for instance, courts rely on a danger reduction argument to conclude that a concealed carry ban is constitutional, that might well set a precedent for other restrictions justified by a desire to reduce danger (for instance, waiting periods for acquiring guns). But if courts conclude that a concealed carry ban is constitutional because the state constitution expressly excludes concealed carry from the right to bear arms, or because that has been seen as a traditional limitation on the right, that conclusion should offer little room for arguments by analogy. So long as neither the text nor tradition allows waiting periods, the textual or traditional endorsement of concealed carry bans offers little support for waiting periods.

---

33.   *See infra* Part II.B.5.b.

34.   United States v. Verdugo-Urquidez, 494 U.S. 259 (1990).

35.   *See, e.g.*, Johnson v. Eisentrager, 339 U.S. 763, 784 (1950) (arguing that it can't be the case that "during military occupation irreconcilable enemy elements, guerrilla fighters, and 'were-wolves' could require the American Judiciary to assure them freedoms of speech, press, and assembly as in the First Amendment, right to bear arms as in the Second, security against 'unreasonable' searches and seizures as in the Fourth, as well as rights to jury trial as in the Fifth and Sixth Amendments," since "[s]uch extraterritorial application of organic law would have been so significant an innovation in the practice of governments that, if intended or apprehended, it could scarcely have failed to excite contemporary comment").

36.   Hamdi v. Rumsfeld, 542 U.S. 507 (2004).

B.   Burden

1.   Generally

A restriction may also be justified on the grounds that it imposes a less than substantial burden on the exercise of a right, and therefore doesn't unconstitutionally "infringe[ ]" the right even though it regulates the right's exercise.[37] The mildness of the burden, the argument would go, means that it's unnecessary for the government to prove that the law would indeed likely materially reduce some harm. Rather, the mildly burdensome law would be treated as categorically constitutional, at least so long as it is not outright irrational.

We see this approach in many constitutional doctrines. The government may require that people get a marriage license, and pay a modest amount for it, because these minor restrictions do not infringe the right to marry; the heightened scrutiny that's applied to substantial burdens on the right to marry isn't applied here.[38] More controversially, the government may require that a woman seeking an abortion be given certain information and that she wait twenty-four hours before the procedure because the Court has concluded that these are not "substantial obstacle[s]" to her exercising her right to get an abortion.[39] Similarly, religious freedom provisions that secure a substantive right to religious exemptions apply only to "substantial burden[s]" on religious practice.[40]

We likewise see a substantial burden threshold in the lower scrutiny applied to content-neutral restrictions on speech that regulate only the "time, place, or manner" of speech and leave open "ample alternative channels" for

---

37.    U.S. CONST. amend. II.

38.    See *infra* note 428; *see also* Boy Scouts of Am. v. Dale, 530 U.S. 640, 683–84 (2000) (concluding that only a law that "serious[ly] burden[s]" or "significant[ly]" "affect[s]" or "substantial[ly] restrain[s]" a group's ability to express its views should be seen as violating the right of expressive association).

39.    Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 885–87 (1992) (opinion of O'Connor, Kennedy, and Souter, JJ.). I don't agree with the claim in Tushnet, *supra* note 3, at 1436, that "[t]o the extent that one can extract something from the abortion cases, it is that the undue-burden standard might require rational basis with bite, intermediate scrutiny, or more likely something in between." Rather, I read *Casey* as saying that if the law imposes a substantial burden—an inquiry that focuses on the magnitude of the burden, not the importance or legitimacy of the government interest—it is per se unconstitutional, and that if it doesn't impose a substantial burden (and isn't intended to impose a substantial burden), it is judged only under the rational basis test and is thus almost always constitutional.

40.    See, e.g., Shepherd Montessori Ctr. Milan v. Ann Arbor Charter Twp., 746 N.W.2d 105, 106 (Mich. 2008). For an excellent treatment of substantial burden thresholds, see Alan Brownstein, *How Rights Are Infringed: The Role of Undue Burden Analysis in Constitutional Doctrine*, 45 HASTINGS L.J. 867 (1994).

expression.[41]  The availability of ample alternative channels makes the restrictions into lesser burdens than a broader ban would be.  The restrictions' content neutrality provides a natural political check on their growth, since people with many different views will be affected by them; this political check will likely limit the risk that a particular kind of speech will be subjected to many small burdens that will add up to a larger burden.[42]  And the restrictions' content neutrality makes the burden qualitatively less troubling to the Justices, because the restrictions aren't contrary to the equality norm that the Justices have sensibly read into the Free Speech Clause.[43]

As Part I.C.2.d below notes, the time, place, and manner inquiry requires *some* showing that even laws that impose only small burdens will reduce danger.  In this respect, the time, place, and manner test is different from the substantial burden tests mentioned in the preceding paragraph.  But it is still similar to those other tests in that it requires an inquiry into the magnitude of the burden in deciding what kind of danger reduction showing, if any, must be made.

Many of the cases upholding restrictions on low-value or no-value speech—such as false statements of fact, obscenity, fighting words, and child pornography—also reason that the restrictions impose only a slight burden on the values that the Free Speech Clause protects.[44]  When the Court says that "there is no constitutional value" in false statements of fact, obscenity, or fighting words, it's suggesting that restrictions on such speech do not materially interfere with the marketplace of ideas, democratic self-government, or even constitutionally valuable self-expression, and thus do not substantially burden free speech rights.[45]

---

41.    Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989).

42.    *See* Eugene Volokh, *Speech as Conduct: Generally Applicable Laws, Illegal Courses of Conduct, "Situation-Altering Utterances," and the Uncharted Zones*, 90 CORNELL L. REV. 1277, 1305–10 (2005).

43.    *Id.* at 1304–05.

44.    *See*, *e.g.*, Gertz v. Robert Welch, Inc., 418 U.S. 323, 340 (1974) (explaining the false statements of fact exception by reasoning that "there is no constitutional value in false statements of fact," because they do not "materially advance[ ] society's interest in 'uninhibited, robust, and wide-open' debate on public issues"); Paris Adult Theatre I v. Slaton, 413 U.S. 49 (1973) (doing likewise for the obscenity exception); Chaplinsky v. New Hampshire, 315 U.S. 568 (1942) (doing likewise for the fighting words exception); New York v. Ferber, 458 U.S. 747 (1982) (doing likewise for the child pornography exception).

45.    *Gertz*, 418 U.S. at 340.  Some of these First Amendment decisions may also be partly "scope" cases, for instance when they rely on assertions about the historical exclusion of obscenity from constitutional protection, *see*, *e.g.*, Roth v. United States, 354 U.S. 476, 482–85 (1957), or danger reduction cases, *see*, *e.g.*, *Ferber*, 458 U.S. at 749, 757.  But much speech that can cause comparable harms remains protected, on the premise that it is valuable, that restricting it would therefore substantially burden public debate, and that the speech therefore must be protected despite the harm it might cause.  *See* Eugene Volokh, *Freedom of Speech, Permissible Tailoring and Transcending*

56 UCLA LAW REVIEW 1443 (2009)

2.   In Right-to-Bear-Arms Cases

A similar inquiry into the magnitude of the burden on a constitutional right is visible in *Heller*'s discussion of why the handgun ban is unconstitutional.  Consider, for instance, the Court's distinction between unconstitutional handgun bans and potentially constitutional gun safety laws: "Nothing about [Framing-era] fire-safety laws"—the laws that the dissent points to as evidence that the right to bear arms should be read as allowing handgun bans—"undermines our analysis; they do not remotely burden the right of self-defense as much as an absolute ban on handguns.  Nor, correspondingly, does our analysis suggest the invalidity of laws regulating the storage of firearms to prevent accidents."[46]  Likewise, in distinguishing the handgun ban from colonial laws that imposed minor fines for unauthorized discharge of weapons, the Court pointed out that "[t]hose [colonial] laws provide no support for the severe restriction in the present case."[47]

Earlier in the opinion, the Court similarly justified striking down the handgun ban on the grounds that the ban is a "severe restriction."  In the process, the Court favorably quoted an old case distinguishing permissible "regulati[on]" from impermissible "destruction of the right" and from impermissible laws that make guns "wholly useless for the purpose of defence."[48]  The Court did not discuss what analysis would be proper for less "severe" restrictions, likely because it had no occasion to.  But its analysis suggested that the severity of the burden was important.

And the Court's explanation of why the handgun ban is unconstitutional even if long guns are allowed is likewise consistent with an inquiry into how substantially a law burdens the right to bear arms:

> It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed.  It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon.  There are many reasons that a citizen may prefer a handgun for home defense: It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a

---

*Strict Scrutiny*, 144 U. PA. L. REV. 2417 (1996).  It is largely the perceived lesser value of false statements, fighting words, and the like that makes the restrictions into lesser burdens on free-speech interests, and thus makes the restrictions constitutional.

46.   District of Columbia v. Heller, 128 S. Ct. 2783, 2819–20 (2008).

47.   *Id.* at 2820.

48.   *Id.* at 2818.

> burglar with one hand while the other hand dials the police. Whatever
> the reason, handguns are the most popular weapon chosen by Americans
> for self-defense in the home, and a complete prohibition of their use
> is invalid.[49]

The Court is pointing out that handguns are popular for a reason: For many
people, they are the optimal self-defense tool, and bans on handguns make
self-defense materially more difficult. The handgun ban, then, is a material
burden on the right to bear arms in self-defense.

Parts of the Court's analysis do focus on whether the law bans "an entire
class of 'arms,'" or whether handguns are actually popular, which might seem
like inquiry into something other than the magnitude of the burden on
self-defense.[50] Likewise, in free speech law, the Court has sometimes asked
whether a law bans an "entire medium of expression."[51]

But on its own, asking whether the law bans "an entire class of 'arms'"
or an "entire medium" of expression can't yield a determinate answer. How
can we decide whether, say, a hypothetical ban on revolvers bans "an entire
class of 'arms'" or only a subclass of the broader class of handguns? How can
we decide whether a ban on possessing firearms with obliterated serial num-
bers bans "an entire class of 'arms'" or only a subclass?[52] How can we decide
whether a ban on window signs (unconstitutional) or residential picketing
(constitutional) bans an "entire medium" of expression or only a subclass of
the broader medium of signs or demonstrations?[53]

For example, say a law banned black or silver handguns (or purely
mechanical handguns) and required all new handguns to be fluorescent
orange (or electronic and personalized to be fired only by the owner). The

---

49.    *Id.* at 2818 (citations omitted).

50.    The same is true of the reasoning in the decision affirmed in *Heller*, *Parker v. District of
Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007). *Parker* reasoned:

> The District contends that since it only bans one type of firearm, "residents still have access to
> hundreds more," and thus its prohibition does not implicate the Second Amendment because
> it does not threaten total disarmament. We think that argument frivolous. It could be
> similarly contended that all firearms may be banned so long as sabers were permitted. Once it
> is determined—as we have done—that handguns are "Arms" referred to in the Second
> Amendment, it is not open to the District to ban them. *See* [State *v.* Kerner, 107 S.E. 222,
> 225 (N.C. 1921)] ("To exclude all pistols . . . is not a regulation, but a prohibition, of . . . 'arms'
> which the people are entitled to bear."). Indeed, the pistol is the most preferred firearm in the
> nation to "keep" and use for protection of one's home and family.

51.    *See* City of Ladue v. Gilleo, 512 U.S. 43, 55 (1994); *see also* Capitol Square Review &
Advisory Bd. v. Pinette, 515 U.S. 753, 803 (1995) (Stevens, J., dissenting).

52.    *See* United States v. Marzzarella, 595 F. Supp. 2d 596, 599 (W.D. Pa. 2009)
(concluding, in my view correctly, that such a ban "imposes a burden on gun ownership that is
practically negligible when compared to the District of Columbia's complete ban on operable
firearms within the home").

53.    *Gilleo*, 512 U.S. at 55; Frisby v. Schultz, 487 U.S. 474 (1988).

constitutionality of this law should not be much affected by the historical or esthetic circumstance of whether black and silver handguns, or mechanical handguns, are the most popular form of weapon, or are seen as a separate "class of 'arms.'" Rather, the "entire medium" and "entire class" formulations should be seen as shorthand proxies for an inquiry into the functional magnitude of the restriction: whether the measures "significantly impair the ability of individuals to communicate their views to others,"[54] or whether they significantly impair the ability of people to protect themselves.

Many state right-to-bear-arms cases likewise look to the magnitude of the burden on self-defense. Some do so only loosely, by asking whether a restriction is a "reasonable regulation" or a prohibition.[55] This is probably the dominant test in the state cases, and it does seek to sort at least the most severe burdens (prohibitions) from less severe ones, though many cases tend to set the unconstitutionality threshold very high—allowing anything short of a prohibition—with a vague additional requirement of "reasonableness," whatever that might mean.[56] But other cases are more explicit, upholding gun controls unless they "materially burden" the right to bear arms in self-defense,[57] or unless they "frustrate the purpose" of the right to bear arms, which is to say substantially burden people's ability to defend themselves.[58]

As the previous subsection suggests, we can also borrow from the First Amendment time, place, and manner restriction test, and articulate the substantial burden inquiry as an inquiry into the presence of "ample alternative channels" for exercising the right.[59] While a restriction on certain gun types might be justifiable as a manner restriction that leaves open ample alternative

---

54.    *Gilleo*, 512 U.S. at 55; *id.* at 55 n.13 (quoting Geoffrey Stone, *Content-Neutral Restrictions*, 54 U. CHI. L. REV. 46, 57 (1987)).

55.    *See, e.g.*, Mosher v. City of Dayton, 358 N.E.2d 540, 543 (Ohio 1976).

56.    For an absurd example of how high the unconstitutionality threshold has at times been set, see *State v. Wilburn*, 66 Tenn. 57 (1872). *Andrews v. State*, 50 Tenn. (3 Heisk.) 165 (1871), struck down a statute banning open carrying of handguns, on the grounds that the state right to bear arms provision protected such carrying. But in *Wilburn*, the court upheld a similar statute because it had exactly one exception—for army pistols carried "openly in [one's] hands." *Wilburn*, 66 Tenn. at 62. A requirement that, to carry a gun, one must constantly have it in one's hands, is obviously a very serious burden on the right, one that makes exercise of the right largely impractical. Yet the court nonetheless upheld the requirement as a permissible "regulat[ion]." *Id.*

57.    *See, e.g.*, Lacy v. State, 903 N.E.2d 486, 490 (Ind. Ct. App. 2009) (upholding a ban on switchblades because it does not "materially burden" the right to bear arms for self-defense).

58.    Dano v. Collins, 802 P.2d 1021, 1022 (Ct. App. Ariz. 1990), *review granted*, Jan. 15, 1991, *review dismissed as improvidently granted*, 809 P.2d 960 (Ariz. 1991).

59.    *See, e.g.*, *Gilleo*, 512 U.S. at 56–57 (quoting Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984)).

channels,[60] a ban on carrying guns in public can't be justified as a place restriction: It leaves people without ample alternative means of defending themselves in public places.[61]

3.   Risks and Benefits of a Burden Threshold

One difficulty with a substantial burden threshold, of course, is that people will disagree about the normative question of how large a burden must be to qualify as substantial (or whatever other term one uses for such thresholds, such as "grave" or "serious"). Still, the problems with determining whether a burden is substantial should be less than the problems with defining "reasonableness" or "balancing." Among other things, the substantiality inquiry requires comparisons along a single dimension—a judgment of how much a law's interference with self-defense compares to benchmark interferences considered by past cases—rather than a balancing of incommensurable quantities such as burden and danger reduction.[62] (Such balancing is also often called for under reasonableness tests, if the tests ask whether the burden the law imposes is reasonable in light of its benefits.) But there's no doubt that there'll be controversy about the substantiality inquiry, just as there's controversy about how large a burden on abortion rights must be to qualify as substantial,[63] or about how ample the alternative channels left open by content-neutral time, place, or manner speech restrictions must be.[64]

Another difficulty is that people will disagree about the empirical question of just how much of a burden a particular restriction will impose. The answer should often be fairly clear,[65] and this estimate should often be easier than

---

60.   *Cf., e.g.,* United States v. Marzzarella, 595 F. Supp. 2d 596, 606 (W.D. Pa. 2009) (suggesting that a ban on the possession of guns with obliterated serial numbers should be judged under a standard comparable to that "applicable to content-neutral time, place and manner restrictions," and upholding it partly because it "le[ft] open ample opportunity for law-abiding citizens to own and possess guns within the parameters recognized by *Heller*").

61.   *See infra* Part II.C.1; *see also* Eugene Volokh, Time, Place, and Manner Restrictions, in Free Speech Law and Elsewhere (unpublished work in progress, on file with author).

62.   *See* Eugene Volokh, *Freedom of Speech, Shielding Children, and Transcending Balancing,* 1997 SUP. CT. REV. 141, 167–94.

63.   *Compare, e.g.,* Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 886–87 (1992) (opinion of O'Connor, Kennedy, and Souter, JJ.) (holding that a 24-hour waiting period for abortions is not a substantial burden on the right to abortion), *with id.* at 937 (Blackmun, J., dissenting) (arguing that it is a substantial burden).

64.   *Compare, e.g.,* Members of the City Council v. Taxpayers for Vincent, 466 U.S. 789, 812 & n.30 (1984) (holding that a ban on posting leaflets on city-owned utility poles left open ample alternative channels, though the alternatives were likely considerably more expensive), *with id.* at 819 (Brennan, J., dissenting) (arguing that this did not leave open ample alternative channels).

65.   See, for instance, the discussion of weapon category bans in Part II.A.

estimates of whether a gun control law will reduce the danger of gun crime and gun injury. Estimating the burden on self-defense will require considering how a particular hypothetical defense scenario is likely to play out under different regulatory schemes—for instance, how self-defense with a shotgun might be harder than self-defense with a handgun—as well as having a rough sense for how often the scenario will occur. Estimating the burden will not, however, require predicting how many criminals will comply with the law (always hard to measure or even guess) or trying to separate causation from mere correlation in empirical studies. Nonetheless, I should again acknowledge that the judgment about just how much a law will interfere with self-defense will sometimes be difficult and controversial.

Finally, a third difficulty is the danger that many small, less-than-substantial burdens will aggregate into a substantial burden. In the words of an 1822 court decision striking down a ban on carrying concealed handguns, "if the act be consistent with the constitution, it can not be incompatible with that instrument for the legislature, by successive enactments, to entirely cut off the exercise of the right of the citizens to bear arms."[66] This might be one reason that the Court has generally concluded that content-based speech restrictions are constitutionally suspect even when they impose only slight burdens on communication.[67] But courts can avoid this, I think, by considering each burden together with others, and asking (for instance) whether the remaining legal classes of guns—or legal means of carrying guns—indeed provide ample channels for self-defense that are pretty much as good as those that would have been offered by the prohibited guns.[68]

More importantly, though, despite these difficulties, I don't think courts are at all likely to reject the burden threshold and take the view that any gun restriction is an unconstitutional infringement of the right. As noted above, restrictions on other rights are often held constitutional if the burden is seen as not substantial. The exceptions tend to be equality rights, such as racial or sexual equality, or equality of ideas where content-based speech restrictions are involved; but I expect that judges will treat the right to bear

---

66.    Bliss v. Commonwealth, 12 Ky. (2 Litt.) 90, 92 (1822); *see also* Eugene Volokh, *The Mechanisms of the Slippery Slope*, 116 HARV. L. REV. 1026, 1105–14 (2003) (discussing "small change tolerance slippery slopes").

67.    *See* Volokh, *supra* note 42, at 1305–10.

68.    *Cf.* Arnold v. City of Cleveland, 616 N.E.2d 163, 173 (Ohio 1993) (acknowledging that "the city . . . would have violated [the right to bear arms] if it had banned *all* firearms," and concluding that there is no reason to think "that by banning certain firearms ['assault weapons'] 'there is no stopping point' and legislative bodies will have 'the green light to completely ignore and abrogate an Ohioan's right to bear arms'").

arms more like the liberty rights, which tend to be subject to a substantial bur-
den threshold, than like the equality rights, which are not.

Judges also seem especially likely to adopt a substantial burden threshold
as to the right to bear arms because judges are rightly worried about gun crime
and gun injury, and are likely to want to leave legislatures with some latitude
in trying to fight crime in ways that interfere little with lawful self-defense. A
substantial burden threshold would give legislatures the power to experiment
without requiring a court to estimate the effectiveness of the law in prevent-
ing future crime and injury—estimation that Part I.C argues is likely to be
especially hard. .

Finally, the mantra that not all regulations are prohibitions has been
commonplace in American right-to-bear-arms law for over 150 years,[69] with
only a few departures.[70] The judges who are most likely to take at least a
moderately broad view of the right—judging by *Heller*, usually the more
conservative judges—are also the judges who are most likely to take such
traditions seriously.

So courts are likely to look at the degree to which a gun control law
burdens self-defense, and are likely to uphold laws that impose only a mod-
est burden. The best way to protect self-defense rights, I think, is to acknowledge
that courts are likely to find slight burdens to be constitutional, to focus on
defining the threshold at which the burden becomes substantial enough to be
presumptively unconstitutional, and to concretely evaluate the burdens
imposed by various gun restrictions.

C.   Danger Reduction

The government often tries to justify substantial burdens on constitutional
rights by arguing that such burdens significantly reduce some grave danger.
Courts sometimes accept this by saying that a constitutional right may be
restricted when the restriction is necessary to serve a compelling government
interest, or is substantially related to an important government interest. But
such phrases often obscure more than they reveal. The real inquiry is into
whether and when a right may be substantially burdened in order to materi-
ally reduce the danger flowing from the exercise of the right, and into what
sort of proof must be given to show that the substantial restriction will indeed
reduce the danger.

---

69.   *See, e.g.*, Owen v. State, 31 Ala. 387 (1858).
70.   For one such departure, see *Bliss*, 12 Ky. (2 Litt.) at 91–92.

1.   Per Se Invalidation, at Least for Especially Serious Burdens

To begin with, certain kinds of restrictions are unconstitutional even when they seem likely to substantially reduce some grave dangers. I discuss this in detail elsewhere,[71] but clear examples are offered by the right to trial by criminal jury, the right to counsel, and some similar rights: Even if mandating bench trials, for instance, were necessary to effectively serve a compelling government interest in most effectively punishing and preventing certain crimes, the jury trial right still couldn't be abrogated.

There are, of course, some scope limits on the jury trial right stemming from the original meaning of the provision, for instance as to criminal trials in petty cases (even though the government interest in making such trials cheaper and quicker is probably not compelling),[72] or as to the enforcement of military law against military combatants.[73] But once a particular situation is found to be within the historical scope of the jury trial right, a jury trial must be afforded, even if mandating bench trials were the most effective way to reduce the danger posed by certain kinds of criminals.

The same is true for some kinds of especially burdensome speech restrictions[74] or interferences with the autonomy of religious institutions.[75] Though the Court sometimes uses the language of strict scrutiny in such cases, many of its decisions can only be explained as applying a principle that certain kinds of burdens on speech rights or religious institutions are per se unconstitutional.[76]

*District of Columbia v. Heller* implicitly adopted such a rule of per se invalidation of especially severe burdens, I think, when it struck down the handgun ban. In the heart of the Court's analysis of the ban's validity, Justice Scalia wrote:

> Under any of the standards of scrutiny that we have applied to enumerated constitutional rights [except the rational basis test], banning from the home "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family," would fail constitutional muster.

---

71.   *See* Eugene Volokh, Beyond Strict Scrutiny: Per Se Invalidation of Certain Kinds of Burdens on Certain Constitutional Rights (unpublished work in progress, on file with author).

72.   *See* sources cited *supra* note 18.

73.   *See* sources cited *supra* note 19.

74.   *See* Eugene Volokh, *Freedom of Speech, Permissible Tailoring and Transcending Strict Scrutiny*, 144 U. PA. L. REV. 2417 (1996).

75.   *See* Eugene Volokh, *A Common-Law Model for Religious Exemptions*, 46 UCLA L. REV. 1465, 1496 (1999).

76.   *See* Volokh, *supra* note 71.

Few laws in the history of our Nation have come close to the severe restriction of the District's handgun ban. . . .

. . . .

The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad. . . . The Second Amendment . . . [, l]ike the First, . . . is the very *product* of an interest-balancing by the people—which Justice Breyer would now conduct for them anew. And whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home. . . .

. . . .

. . . [T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table. These include the absolute prohibition of handguns held and used for self-defense in the home. Undoubtedly some think that the Second Amendment is outmoded in a society where our standing army is the pride of our Nation, where well-trained police forces provide personal security, and where gun violence is a serious problem. That is perhaps debatable, but what is not debatable is that it is not the role of this Court to pronounce the Second Amendment extinct.[77]

Absent here is any inquiry into whether the law is necessary to serve a compelling government interest in preventing death and crime, though handgun ban proponents did indeed argue that such bans are necessary to serve those interests and that no less restrictive alternative would do the job.[78] The Court concludes that "the enshrinement of constitutional rights necessarily takes" "severe restriction[s]" "off the table," and that the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." The statement that "Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home 'the most preferred firearm in the nation to "keep" and use for protection of one's home and family,' would fail constitutional muster" suggests that even tests such as intermediate or

---

77.   District of Columbia v. Heller, 128 S. Ct. 2783, 2817–22 (2008) (citations omitted).

78.   *See, e.g.*, Brief of the American Academy of Pediatrics et al. as Amici Curiae in Support of Petitioners at 5, District of Columbia v. Heller, 128 S. Ct. 2783 (2008) (No. 07-290), 2008 WL 157189.

strict scrutiny are in practice rules of per se invalidation of laws that suffi-
ciently "severely" burden the right.

The matter might be different if it came to some truly extraordinary
danger.[79]  The rules the Bill of Rights sets forth should cover the great
majority of risks, but it's not clear that such rules—developed with an eye
towards ordinary dangers—can deal with dangers that are hundreds of times
greater.[80]  This is why the usual Fourth Amendment rules related to suspicionless
home searches might be stretched in cases involving the threat of nuclear
terrorism.[81]  It's why we continue to have a debate about the propriety of
torture in the ticking nuclear time bomb scenario.[82]  It's why, in a somewhat
different context, the Constitution provides for the suspension of habeas
corpus in cases of rebellion or invasion.[83]  And it's why courts are and probably
should be willing to reduce normal free speech protections when it comes to
the publication of information that can help readers build nuclear bombs or
create smallpox epidemics.[84]

But while this rationale may justify, for instance, bans on the possession
of arms of mass destruction or surface-to-air-missiles, those bans are already
outside the scope of the right as defined by *Heller*,[85] and are in any event not
substantial burdens on self-defense.[86]  The right to keep and bear weapons
that are roughly as dangerous as civilian firearms will definitionally exclude
the extraordinarily dangerous weapons.  And while it will indeed protect
ordinarily dangerous guns, this ordinary danger is precisely what the right to
bear arms expressly contemplates.

2.   The Two Versions of Strict Scrutiny

A different approach to danger reduction arguments is sometimes
implemented using the strict scrutiny test: Rights may indeed be substantially

---

79.   *See* Richard H. Fallon, Jr., *Strict Judicial Scrutiny*, 54 UCLA L. REV. 1267, 1271, 1304
(2007) (noting that "[o]ne stringent version [of the Court's strict scrutiny test] allows infringements
of constitutional rights only to avert catastrophic or nearly catastrophic harms").

80.   *See* Eugene Volokh, *Crime-Facilitating Speech*, 57 STAN. L. REV. 1095, 1209–12 (2005).

81.   *See, e.g.*, Michael Stokes Paulsen, *The Constitution of Necessity*, 79 NOTRE DAME L.
REV. 1257, 1279 (2004).

82.   *See, e.g.*, ALAN DERSHOWITZ, WHY TERRORISM WORKS 141, 158–63 (2002); Oren
Gross, *Are Torture Warrants Warranted? Pragmatic Absolutism and Official Disobedience*, 88 MINN.
L. REV. 1481 (2004); Christopher Slobogin, *The World Without a Fourth Amendment*, 39 UCLA L.
REV. 1, 48–49 (1991). *See generally* TORTURE: A COLLECTION (Sanford Levinson ed., 2004).

83.   U.S. CONST. art. I, § 9, cl. 2.

84.   *See supra* note 80.

85.   *See infra* Part II.A.1.

86.   *See infra* Part II.A.2 (discussing machine gun bans).

burdened, the claim goes, so long as the burden is genuinely necessary to serve a compelling government interest.  Where other less restrictive means can serve the compelling interest pretty much equally, the more restrictive means will be unnecessary and therefore unconstitutional.  But where only the more restrictive means can provide the reduction of danger that the government seeks, those means will indeed be constitutional.[87]

### a.    The Shape of the Underlying Factual Debate

The difficulty is that we often won't know if the proposed law is really necessary to reduce various dangers.  And this is especially true as to the right to keep and bear arms: People notoriously disagree about whether gun control laws will indeed reduce total injury and crime, especially since such evaluations require one to predict both (1) the possible decrease in injury and crime stemming from the controls and (2) the possible increase in injury and crime stemming from the interference with lawful self-defense.

Gun control proponents argue that only banning guns, or removing guns from certain places, or limiting guns in other ways will prevent certain kinds of crimes.  And they suggest that lawful self-defense isn't really that effective, or that it won't be much interfered with by the proposals (even fairly burdensome ones, such as bans on public carrying of handguns).

Gun control opponents argue that the gun restrictions largely won't disarm those who misuse guns, since the misusers are criminals who won't comply with gun laws any more than they comply with laws banning robbery, rape, or murder.[88]  And they argue that any possible slight decline in injuries caused by people who do comply with gun laws, or in accidental injuries or in suicides (to the extent suicides are legitimately weighed against lawful self-defense) will be more than offset by the increase in crime and injury stemming from lost opportunities for effective self-defense.

Scientific proof of any of these theories is very hard to get.  There are no controlled experiments that can practically and ethically be run.  "Natural experiments" stemming from differences in policies and in gun ownership rates among different cities, states, or countries are subject to many confounding factors, such as culture and background crime rates.  Many studies purport to show some statistically significant effects, even controlling for

---

87.    *See* Volokh, *supra* note 74, at 2422, 2431.
88.    *Cf.* Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton, 536 U.S. 150, 169 (2002) (expressing skepticism that a permit requirement for door-to-door political solicitors would reduce the danger that criminals will pose as solicitors).

various factors. But many other studies argue the contrary, and point to failures to control for other important factors.

Thus, for instance, some claim that international comparisons show that private gun ownership is strongly correlated with homicide rates.[89] Even if true, this isn't proof that laws reducing gun ownership will reduce the danger, since the correlation doesn't prove a causal relationship, given the possibility of uncontrolled-for confounding cultural factors. Moreover, even if high private gun ownership did cause high homicide rates, it's not clear that banning or otherwise restricting guns would be effective in reducing the danger:[90] Perhaps any reduction will primarily affect law-abiding citizens and won't disarm the criminals who are causing the crime.

And beyond this, the most comprehensive recent study of the subject, reviewing twenty-one Western countries, including the U.S., found no statistically significant correlation between gun ownership levels and total homicides or suicides.[91] Perhaps such a correlation, or even causation, does exist but is hidden by random noise; the study doesn't disprove the empirical case for gun control. But the study's results do highlight the weaknesses of previous studies that found significant correlations in smaller samples, and claimed to therefore support the empirical case for gun control.

More strikingly, even much simpler questions, such as how often guns are used in self-defense, remain unanswered, with studies from credible sources yielding results that differ by a factor of thirty. Leading gun control criminologist Gary Kleck conducted a survey in the 1990s that yielded an estimate of roughly 2.5 million per year.[92] The National Criminal Victimization Survey conducted a survey in the 1990s, based on which it estimated the total at 80,000 per year.[93] Another leading gun control criminologist, Phil Cook, conducted a survey that yielded raw numbers quite close to Kleck's 2.5 million. But Cook's bottom

---

89.    Nicholas Dixon, *Why We Should Ban Handguns in the United States*, 12 ST. L. U. PUB. L. REV. 243, 248 (1993); Martin Killias, *International Correlations Between Gun Ownership and Rates of Homicide and Suicide*, 148 CAN. MED. ASS'N J. 1721, 1723 (1993).

90.    *See* David B. Kopel, *Peril or Protection? The Risks and Benefits of Handgun Prohibition*, 12 ST. LOUIS U. PUB. L. REV. 285, 294–319, 344–49, 353–59 (1993).

91.    Martin Killias et al., *Guns, Violent Crime, and Suicide in 21 Countries*, 43 CAN. J. CRIMINOLOGY 429 (2001). The study did show a correlation between gun ownership levels and some categories of gun homicide and gun suicide, but that doesn't show that lower gun ownership is correlated with reduced danger: If the total homicide and suicide rate remains the same, but gun homicides or suicides are replaced by an equal number of nongun homicides or suicides—for instance, because a decrease in gun homicides is offset by an increase in nongun homicides that would have otherwise been prevented by self-defense using guns, or because suicides shift from guns to other highly lethal means—the total harm remains the same.

92.    Gary Kleck & Mark Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense With a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150, 184–86 (1995).

93.    MICHAEL R. RAND, U.S. DEP'T OF JUSTICE, GUNS AND CRIME 1, 2 (1994).

line was that the numbers might be skewed by unreliable reporting, and that the actual number is unknown and possibly unknowable.[94]

Those are just two examples, but they are characteristic of the field. A National Research Council 2004 report, *Firearms and Violence: A Critical Review*, reports that there is basically no sound scientific data supporting either gun control or gun decontrol proposals (such as broadened availability of concealed carry permits).[95] The same is true of the Centers for Disease Control 2005 report, *Firearms Laws and the Reduction of Violence: A Systematic Review*.[96] Both reports do argue that with the proper research design, statistically reliable results could indeed be obtained.[97] But given that we don't have adequate results after at least thirty-five years of serious work on the matter, it's not clear that even a fresh research agenda will yield definitive conclusions any time soon.

### b.    The Consequences for Strict Scrutiny

Because of this uncertainty, the application of strict scrutiny to gun controls ends up turning on how courts evaluate empirical claims of likely danger reduction. Courts might take a few different approaches in their evaluations.

1. One approach would be to require some substantial scientific proof to show that a law will indeed substantially reduce crime and injury (and that other alternatives, such as liberalizing concealed carry, won't do the job). The Court has at times suggested that this was a necessary part of strict scrutiny,[98] and lower courts have as well. For instance, courts have struck down bans on the distribution to minors of works that contain violent (but

---

94.  *See* PHILIP J. COOK & JENS LUDWIG, GUNS IN AMERICA: RESULTS OF A COMPREHENSIVE NATIONAL SURVEY ON FIREARMS OWNERSHIP AND USE 68–76 (1996); *cf.* Tom W. Smith, *A Call for a Truce in the DGU War*, 87 J. CRIM. L. & CRIMINOLOGY 1462, 1462–69 (1997) (describing the debate, and suggesting that the right answer is somewhere in the mid-to-high hundreds of thousands).

95.  *See* NAT'L RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW 7–8 (2004); *see also* Tushnet, *supra* note 3, at 1427 ("[I]t is quite difficult to show with any moderately persuasive social-science evidence that discrete and moderate gun regulations . . . do much if anything to advance public policies favoring reduction in violence, reduction in gun violence, reduction in accidents associated with guns, or pretty much anything else the public thinks the regulations might accomplish.").

96.  Robert A. Hahn et al., *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 AM. J. PREV. MED. 40, 59 (2005) ("Review of eight firearms laws and law types found insufficient evidence to determine whether the laws reviewed reduce (or increase) violence.").

97.  *See* NAT'L RESEARCH COUNCIL, *supra* note 95, at 7–9; Hahn et al., *supra* note 96, at 59, 61.

98.  *See, e.g.*, Nixon v. Shrink Mo. Gov't PAC, 528 U.S. 377, 391–93 (2000) (applying something short of strict scrutiny, but not far short).

not sexual) imagery. Though the government has argued that the bans are necessary to serve the compelling interest in reducing crime, courts have generally demanded strong social science proof of this, and have rejected existing studies as methodologically inadequate.[99]

If courts accept such an approach in right-to-bear-arms cases (at least ones involving a substantial burden), then this test will likely be tantamount to per se invalidation: As the National Research Council and Centers for Disease Control reports point out, such scientific proof of effectiveness is absent.[100]

2. Another approach to ostensibly strict scrutiny would be to simply require a logically plausible theory of danger reduction that many reasonable people believe. This test would likely uphold virtually any gun control law, including a total ban on all guns: One can make a logically plausible argument that anything short of complete gun prohibition will fail to prevent thousands of crimes and killings.

Even a total handgun ban, for instance, would leave people able to kill their housemates with rifles and shotguns, or illegally take those guns out of the house for criminal purposes (perhaps with the barrels illegally sawn down for greater concealability). Only a complete gun ban would prevent that harm. And, the argument would go, guns are so rarely used for self-defense that the loss of valuable self-defense will be more than compensated for by the gain in crime and injury prevention. Proven? Absolutely not. Correct? Not in my view. But logically plausible? Yes, given a certain view of likely behavior by criminals and by law-abiding citizens.

Some laws might be hard to support if a logically plausible theory were required: For instance, as I argue in Part II.A.2, so-called "assault weapons" are not materially more dangerous than other kinds of weapons, so anyone who is denied an "assault weapon" will almost certainly substitute another gun that is equally lethal. It's therefore hard to see how assault weapons bans will do much to reduce danger of crime or injury.[101] But many people, including many legislators, obviously don't share my view; and I expect many judges will find these other views to be at least credible. So this sort of strict scrutiny will in practice be little different from a rational basis test.

---

99.    See, e.g., Video Software Dealers Ass'n v. Schwarzenegger, 556 F.3d 950, 962–64 (9th Cir. 2009); Am. Amusement Mach. Ass'n v. Kendrick, 244 F.3d 572, 578–79 (7th Cir. 2001) (Posner, J.).

100.    See supra notes 95–97 and accompanying text.

101.    Even Charles Krauthammer, a noted supporter of gun bans and of the assault weapons ban in particular, acknowledged as much. See Charles Krauthammer, Disarm the Citizenry. But Not Yet., WASH. POST, Apr. 5, 1996, at A19.

3. Finally, courts could rely on their own common sense judgments of when a particular law will likely reduce danger, and demand empirical evidence only when a litigant is promoting a view that doesn't comport with the court's common sense judgment.[102] The Court and lower courts have at times used this approach in strict scrutiny cases,[103] for instance upholding some restrictions that restrict adult access to sexually themed speech in the name of protecting minors' psychological well-being without any scientific evidence that access to such speech will indeed harm the minors.[104]

Such an approach would yield results in gun control cases that are impossible to predict. And it's hard to see why this approach would have much to recommend it, given that there's little reason why judges' intuitions about the danger of guns would be particularly reliable.

I should acknowledge that this sort of approach has been applied in some areas of free speech law, and I can't say the sky has fallen from this sort of decisionmaking. Perhaps such intuitive decisionmaking is in some measure inevitable, where deference to the legislature is undesirable because a constitutional right is involved and where insistence on empirical proof is unappealing because such proof is often unavailable.

---

102. Consider, for instance, *State v. Brown*, 859 N.E.2d 1017 (Ohio Ct. App. 2006), which involved a law requiring that concealed carry licensees traveling in cars have their guns either holstered and in plain sight on the person, or stored in a locked glove compartment or case. The Ohio state right-to-bear-arms rule asks courts to decide whether a regulation is "reasonable," something that requires more than the extremely deferential federal rational basis test. *See* Arnold v. City of Cleveland, 616 N.E.2d 163, 171 (Ohio 1993). The majority upheld the law as "reasonable," on the grounds that "[t]hese restrictions reduce the possibility of the loaded firearm being acquired by a third person" and "alert[ approach police] officer[s] that a loaded firearm in the vehicle." *Brown*, 859 N.E.2d at 1020. The dissent concluded that the law was not "reasonable," because "the majority's views are contrary to common sense and physical realities" because "[a] third person can just as readily reach out and grab a firearm from a driver's unlocked holster as he can take that firearm from a closed [but unlocked] glove compartment" and "the real risk to law enforcement officers . . . is the criminal element, who do *not* bother with such matters as permits, visible holsters, or closed glove compartments." *Id.* at 1022 (Grendell, J., concurring and dissenting in part). With no requirement of scientific evidence, the case became a battle of the judges' intuitions.

103. *See, e.g.*, Burson v. Freeman, 504 U.S. 191, 207–08 (1992) (plurality opinion). See also *Nixon*, 528 U.S. at 391, which reasoned that "[t]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised"; *Nixon* applied a standard that was somewhat less demanding than strict scrutiny, but my sense is that the quote from *Nixon* also expresses how the Court has behaved in cases such as *Burson* and *Sable Communications of Cal., Inc. v. FCC*, 492 U.S. 115 (1989).

104. *See, e.g.*, *Sable Communications*, 492 U.S. 115; Crawford v. Lundgren, 96 F.3d 380 (9th Cir. 1996); Dial Info. Servs. Corp. of N.Y. v. Thornburgh, 938 F.2d 1535 (2d Cir. 1991); Info. Providers' Coal. for Def. of the First Amendment v. FCC, 928 F.2d 866 (9th Cir. 1991); Am. Booksellers v. Webb, 919 F.2d 1493 (11th Cir. 1990).

But it's nonetheless hard to see this level of judicial discretion as particularly appealing, at least outside areas that are viewed as largely peripheral to the constitutional right that's involved. And the strength of modern free speech protection, at least where content-based restrictions on core protected speech are involved, has chiefly stemmed from the Court's adopting a per se invalidation regime even while it talks about strict scrutiny.[105]

c.    Intermediate Scrutiny

Intermediate scrutiny, the other common test used to evaluate reducing-danger arguments, is likely to suffer from the same problems as strict scrutiny.

In principle, intermediate scrutiny differs from strict scrutiny in two ways. First, intermediate scrutiny allows restrictions that serve merely important and not compelling government interests.[106] That's unlikely to be relevant to gun controls, since virtually every gun control law is aimed at serving interests that would usually be seen as compelling—preventing violent crime, injury, and death.[107]

Second, intermediate scrutiny allows restrictions that are merely substantially related to the government interest rather than narrowly tailored to it. In one prominent intermediate scrutiny context—the scrutiny applicable to restrictions on commercial advertising—this has played out as a requirement that the law be merely a "reasonable fit" with the government interest rather than that it be the least restrictive means of serving the interest.[108]

But applying this lower tailoring requirement would likely yield the same problems discussed in the previous subsections. If the substantial relationship or the reasonable fit has to be proven through social science, such proof would likely be as unavailable or unpersuasive as it would be if the court applied strict scrutiny. If the substantial relationship or reasonable fit claim has to be merely intuitively persuasive to reasonable legislators, that requirement would nearly always be satisfied. And if the claim has to be intuitively persuasive to the reviewing judge, there's little reason to think that the judge's intuitions are going to be particularly sound.[109]

---

105.    See Volokh, *supra* note 74, at 2425–38, 2452–54.

106.    See, e.g., United States v. Virginia, 518 U.S. 515, 533 (1996); Bd. of Trs. of State Univ. of N.Y. v. Fox, 492 U.S. 469, 478 (1989).

107.    Cf., e.g., *Sable Communications*, 492 U.S. at 126 (treating the prevention of physical and even psychological injury to minors as a compelling interest).

108.    See, e.g., *Fox*, 492 U.S. at 480.

109.    Consider, for instance, *United States v. Schultz*, No. 1:08-CR-75-TS, 2009 U.S. Dist. LEXIS 234 (N.D. Ind. Jan. 5, 2009), which involved the federal felon-in-possession ban as applied to someone who had been convicted only of felony failure to pay child support. The court

d.   Different Levels of Danger-Reduction Showings for Different Levels
of Burden

So far, I've talked about "low burden" justifications separately from
"preventing danger" justifications.  But a court could demand different levels
of preventing danger arguments to justify different degrees of burden.

For instance, where content-neutral speech restrictions are involved,
restrictions that impose severe burdens (because they don't leave open ample
alternative channels) must be judged under strict scrutiny, but restrictions
that impose only modest burdens (because they do leave open ample alterna-
tive channels) are judged under a mild form of intermediate scrutiny.[110]  Ballot
access regulations are likewise subject to strict scrutiny if they "impose a
severe burden on associational rights," but to a much weaker level of scrutiny
if they "impose[ ] only modest burdens."[111]

On the other hand, in some areas meaningful scrutiny is reserved only
for restrictions that impose a sufficiently grave burden, and remaining restric-
tions are subject to minimal rationality review.  That, for instance, is what is
done with the right to abortion after *Planned Parenthood v. Casey*:[112]  If the law

concluded that the Equal Protection Clause required intermediate scrutiny, even of a restriction
on possession by felons.  But the court quickly upheld the law under intermediate scrutiny because
"[p]ersons who have committed felonies are more likely to commit crimes than those who have
not," *id.* at \*15–16, and because the defendant's claim that "[t]here is no empirical data suggesting
that persons convicted of non-violent felonies . . . are more likely to seek guns or use them than
other, non-convicted person" lacked a sufficient "factual basis" that would "persuade[ the court]
that these factual assertions are correct." *Id.* at \*16 n.6.

Thus, the court largely relied on its intuitions that the recidivism rates for criminals generally
(a statistic that the court did cite, *see id.* at \*16 n.4 (citing BUREAU OF JUSTICE STATISTICS, U.S.
DEP'T OF JUSTICE, RECIDIVISM OF PRISONERS RELEASED IN 1994 1 (2002), *available at* http://www.
ojp.usdoj.gov/bjs/pub/pdf/rpr94.pdf)) also apply to *violent* recidivism—the sort that might be in some
measure prevent a gun possession ban—by *non-violent* felons, including ones guilty only of failure to
pay child support.  Perhaps that's so, on the grounds that people who break one law are materially
more likely to break others, even very different ones.  Perhaps it's not.  But all the court had to rely on was
its intuition.

The court also separately concluded that "the challenged statute still substantially relates to the
important governmental objective of public safety," *id.* at \*16 n.6 (quoting Response to
Government's Reply at 2, United States v. Schultz, No. 1:08-CR-75-TS, 2009 U.S. Dist. LEXIS
234 (N.D. Ind. Jan. 5, 2009) (No. 1:08-CR-75)), even if nonviolent felons don't have a higher
gun crime rate than violent felons.  But that was not legally sound, since if a law is so substantially
overinclusive—if it covers millions of nonviolent felons, whose actions don't implicate the government
interest, together with violent felons, whose actions do implicate the interest—then it would fail
intermediate scrutiny. *See, e.g.*, Supreme Court of N.H. v. Piper 470 U.S. 274, 285 n.19 (1985);
Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y., 447 U.S. 557, 569–70 (1980);
Craig v. Boren, 429 U.S. 190, 199–02 (1976).

110.   *See generally* Geoffrey R. Stone, *Content-Neutral Restrictions*, 54 U. CHI. L. REV. 46 (1987).
111.   Wash. State Grange v. Wash. State Republican Party, 128 S. Ct. 1184, 1191–92 (2008).
112.   505 U.S. 833 (1992).

is seen as imposing a "substantial obstacle" to a woman's getting an abortion (or having the purpose to impose such a substantial obstacle), then it's categorically invalidated, but if it is seen as imposing merely a minor burden, then it's upheld unless it is seen as simply irrational.[113] Likewise, under religious accommodation regimes, whether the *Sherbert/Yoder*-era[114] Free Exercise Clause regime or the regimes in those states in which the state constitutions are interpreted to track *Sherbert* and *Yoder*, a substantial burden led to a weak form of strict scrutiny, while minor burdens led to minimal rationality review.[115]

There are thus many possible options for the right to bear arms. The Court could adopt a *Casey*-like undue burden test, under which substantial burdens are struck down but less-than-substantial burdens are upheld. The Court could adopt a test under which substantial burdens are struck down but less-than-substantial burdens are still evaluated under a mild form of intermediate scrutiny. The Court could adopt a test under which very serious burdens are categorically struck down, substantial but less serious burdens are evaluated under some demanding form of strict scrutiny, and less-than-substantial burdens are evaluated under a mild intermediate scrutiny. Or it could adopt some other mix.

My sense is that there'll be plenty of trouble getting courts to adopt meaningful scrutiny even of substantial burdens.[116] The chances of getting courts to adopt meaningful scrutiny of mild burdens are thus very low; judges are understandably reluctant to strike down democratically enacted laws, especially ones that are both aimed at crime control and seen as imposing little burden on law-abiding citizens. Nor do I see much to be gained from requiring such modest scrutiny when the burden on self-defense is indeed slight. It's probably best for courts (and for those who are recommending doctrine to courts) to save their energy and their willingness to fight a battle

---

113.    *See id.* at 877 (opinion of O'Connor, Kennedy, and Souter, JJ.) ("A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus."); Gonzales v. Carhart, 550 U.S. 124, 158 (2007) (concluding that abortion procedure regulations that don't "impose an undue burden" on the right to an abortion need only have a "rational basis"). The plurality did state that a law could also be unconstitutional if it is *intended* to impose a substantial burden, presumably even if it fails to do so. *See Casey*, 505 U.S. at 877. But in any event, if the abortion restriction does not impose a substantial burden, and is not intended to impose such a burden, it is judged under rational basis scrutiny.

114.    Sherbert v. Verner, 374 U.S. 398 (1963); Wisconsin v. Yoder, 406 U.S. 205 (1972).

115.    *See, e.g.,* Jimmy Swaggart Ministries v. Bd. of Equalization, 493 U.S. 378 (1990).

116.    *See, e.g.,* Brannon P. Denning & Glenn H. Reynolds, Heller, *High Water(mark)? Lower Courts and the New Right to Keep and Bear Arms*, 60 HASTINGS L.J. (forthcoming 2009) (manuscript at pt. II, on file with author) (discussing how the right to bear arms has been read quite narrowly even after *Heller*).

with the legislative and executive branches for those situations where the law does indeed substantially burden self-defense.

D.   Government Proprietary Role

A restriction might also be justified because the government is acting not as sovereign—outlawing, taxing, or imposing liability on private citizens' behavior—but as subsidizer, landlord, employer, and the like.  This distinction has been most clearly developed in free speech cases: If I wear a jacket with a vulgarity printed on it, the government may not throw me in prison, but it likely may fire me from my government job, especially if I wear the jacket to work.[117]  It might even be able to bar such jackets from certain "nonpublic forum" property.[118]

Likewise, the government may not criminalize abortions, but it may bar them from government-owned hospitals, or even from hospitals built on land leased from the government.[119]  The government as employer has more power to search its employees' offices than it does to search private citizens' offices, and more power to search people entering government buildings than it does to search people entering private buildings.[120]  The government as employer has more power to restrict its employees' choices to send their children to private schools than it does as to private citizens' choices.[121]  The same is likely true for other rights, such as the right to marry, or the right to religious freedom under state constitutions that follow the *Sherbert/Yoder* model.[122]

Some might argue that such restrictions are permissible because they are not that burdensome, given that people can still exercise the right (for instance, get an abortion) off government property.[123]  Or some might argue that the government has an especially strong reason for imposing the restriction (for instance, the desire to keep government workplaces running smoothly).

---

117.   *See* Waters v. Churchill, 511 U.S. 661, 672 (1994) (plurality opinion).
118.   *See* Int'l Soc'y for Krishna Consciousness, Inc. (ISKCON) v. Lee, 505 U.S. 672, 678–79 (1992) (holding that content-based restrictions are permitted on government "nonpublic forum" property, so long as they are reasonable and viewpoint-neutral).
119.   Webster v. Reproductive Health Servs., 492 U.S. 490 (1989).
120.   *See, e.g.*, O'Connor v. Ortega, 480 U.S. 709 (1987).
121.   *E.g.*, Fyfe v. Curlee, 902 F.2d 401, 405 (5th Cir. 1990) (applying the government employee free speech analysis from *Pickering v. Bd. of Ed.*, 391 U.S. 563 (1968)); Stough v. Crenshaw County Bd. of Educ., 744 F.2d 1479, 1480–81 (11th Cir. 1984) (likewise).
122.   *See, e.g.*, Montgomery v. Carr, 101 F.3d 1117 (6th Cir. 1996); Eugene Volokh, *Intermediate Questions of Religious Exemptions—A Research Agenda With Test Suites*, 21 CARDOZO L. REV. 595, 635 (1999).
123.   *See, e.g.*, *Webster*, 492 U.S. at 509.

But many of the decisions are most plausibly explained by a judgment that even burdensome restrictions may be more restricted by the government as proprietor than by the government as sovereign, even when the government interest is the same. For instance, insulting labor picketing (for instance, with signs calling strikebreakers "scabs" or "traitors") outside a government office, or similarly unpleasant public-issue picketing, might affect employees' morale more than would one coworker's rudeness. The picketing, though, is generally protected, even when it substantially hurts morale; the coworker speech (on the job or even off the job) is often unprotected.[124]

And having such separate standards for different government roles may well make sense, both to give the government more power when it comes to accomplishing its democratically determined goals on its property and with its wage payments, and to keep this power from bleeding over to controls of private citizens' behavior on private property. Draft office employees shouldn't be able to interfere with office morale by telling their colleagues that the draft is slavery, or interfere with office efficiency more broadly by telling would-be registrants the same. But similarly morale-reducing speech by picketers outside the door, or by influential media commentators or political leaders, should be protected despite its effect on draft office efficiency.[125] A unitary standard might overprotect speech by employees but, just as likely, it might end up underprotecting speech by private citizens.

For some classes of government property the government might not have special powers acting as proprietor. Free speech doctrine, for instance, treats the government acting as proprietor of "traditional public fora"—chiefly public sidewalks and public parks—the same as the government acting as sovereign.[126] Fourth Amendment doctrine generally applies to public sidewalks to the same extent that it applies to unenclosed places on private property. The First and Fourth Amendments might also apply to the inside of public housing, much the same way as they apply to privately owned homes.[127] And constitutional rights that inherently involve government

---

124.   See, e.g., Connick v. Myers, 461 U.S. 138 (1983); see also Waters v. Churchill, 511 U.S. 661, 674 (1994) (plurality opinion) ("The restrictions [on speech imposed by the government as employer] are allowed not just because the speech interferes with the government's operation. Speech by private people can do the same, but this does not allow the government to suppress it.").

125.   See Robert C. Post, Constitutional Domains: Democracy, Community, Management 234–35, 237 (1995) (discussing the constitutional foundation for giving the government some extra power when it is acting as manager of its own property).

126.   See, e.g., ISKCON v. Lee, 505 U.S. 672, 678 (1992).

127.   See, e.g., Pratt v. Chicago Hous. Auth., 848 F. Supp. 792 (N.D. Ill. 1994) (holding that the Fourth Amendment barred warrantless sweeps through public housing projects); Resident Action Council v. Seattle Hous. Auth., 174 P.3d 84 (Wash. 2008) (evaluating restriction on public housing residents' posting materials on the outside of their apartment doors the same way

adjudicative processes, such as the right to a jury trial, are naturally not diminished by the government's owning the courtroom. Nonetheless, there is both precedent and reason for allowing the government acting as proprietor extra power to restrict the exercise of many constitutional rights on its property.

This suggests that separate government-as-proprietor standards may likewise be proper for the right to keep and bear arms, whether in government buildings, by government employees, in government-owned parks, in government-owned housing, and so on.[128] Some constraints on government power as proprietor may also be proper, since people's need for self-defense can remain even on government property. And it may well be that for some of this property (such as public housing or national parks) the constitutional analysis should be no different than on private property. But there is little reason to assume that the rule should always be precisely the same whether the gun possession is on private property or on government-owned property.

## II.   APPLYING THE FRAMEWORK TO VARIOUS GUN-CONTROL LAWS

This framework, I hope, can help us analyze a wide range of gun control laws—and the analyses can help us reflect on whether the framework is helpful.

### A.   "What" Bans: Bans on Weapon Categories

#### 1.   Scope

Let me begin with bans on categories of weapons, weapons parts, or ammunition: machine guns, .50 caliber weapons, handguns, semiautomatic "assault weapons," cheap and supposedly low-quality "Saturday Night Specials," magazines with room for more than 10 rounds, nonfirearms such as knives and billy clubs, or nonlethal defensive devices such as stun guns (e.g., Tasers) or irritant sprays (e.g., pepper spray). Such bans naturally raise a scope question: What sorts of "arms" are protected by the right to keep and bear arms?

---

the U.S. Supreme Court had evaluated restriction on private residents' rights to post materials in their windows). *Resident Action Council* involved the outside of public housing units, but its reasoning would apply at least as forcefully to speech inside such units.

128.    *See infra* Part II.C.7.

a.    The "Usually Employed in Civilized Warfare" Test

Some early cases took the view that "arms" covered only arms that were "usually employed in civilized warfare,"[129] "in distinction from those which are employed in quarrels and brawls and fights between maddened individuals."[130] Under this definition, some 1800s cases read the right as excluding, among other things, daggers, "sword-cane[s]," and "belt or pocket pistol[s] or revolver[s]."[131]

This, however, is not the meaning that makes the most sense for a right to keep and bear arms that is at least partly aimed at protecting self-defense. Nor is it the textual meaning: As *Heller* pointed out, arms in the late 1700s generally meant "weapons of offence, or armour of defence,"[132] or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another."[133]

Nor have I seen any evidence that a more limited definition became solidly accepted in the subsequent decades, as new state constitutions were adopted; some courts did take the "civilized warfare" view, but many did not.[134] And functionally, if the right protects arms used for self-defense, it's not clear why such defensive arms should be limited to those that are also used in civilized warfare. *Heller* expressly rejected the notion that "only those weapons useful in warfare are protected,"[135] and while *Heller* isn't dispositive of the

---

129.    Aymette v. State, 21 Tenn. (2 Hum.) 154, 158 (1840); Fife v. State, 31 Ark. 455, 458 (1876) (quoting *Aymette*, 21 Tenn. (2 Hum.) at 158).

130.    *Fife*, 31 Ark. at 459 (citing 2 JOEL PRENTISS BISHOP, COMMENTARIES ON THE CRIMINAL LAW § 124 (3d ed. 1865)).

131.    *Id.* (citing Andrews v. State, 50 Tenn. (3 Heisk.) 165 (1871)); *see also Aymette*, 21 Tenn. (2 Hum.) at 161; Tenn. Op. Att'y Gen. No. 08-19 (2008) (following Tennessee precedent to conclude that "switchblades, sword canes, and pocket pistols" are not covered by the right to bear arms). *But see Andrews*, 50 Tenn. (3 Heisk.) at 187 (suggesting that the "pistol known as the repeater is a soldier's weapon" and is therefore constitutionally protected even under the "civilized warfare" test); Glasscock v. City of Chattanooga, 11 S.W.2d 678 (Tenn. 1928) (relying on *Andrews* to strike down a ban on carrying "any pistol"); English v. State, 35 Tex. 473, 476 (1872) (applying the "arms of a militiaman or soldier" test, but concluding that "holster pistols" qualify).

132.    District of Columbia v. Heller, 128 S. Ct. 2783, 2791 (2008) (quoting 1 SAMUEL JOHNSON, DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 1773)).

133.    *Id.* at 2791 (quoting 1 TIMOTHY CUNNINGHAM, A NEW AND COMPLETE LAW DICTIONARY (2d ed. 1771)). This casts doubt on the conclusion in *Walker v. State*, 222 S.W.3d 707, 711 (Tex. App. 2007), that body armor isn't covered by the right to bear arms. Nonetheless, *Walker's* upholding of the ban on felons' possessing body armor might still be constitutional on the theory that felons are excluded from the scope of the right to bear arms, see *infra* Part II.B.4; United States v. Bonner, No. CR 08-00389 SBA, 2008 WL 4369316, at *4 (N.D. Cal. Sept. 23, 2008).

134.    *See, e.g.*, Owen v. State, 31 Ala. 387 (1858); Nunn v. State, 1 Ga. 243 (1846); State v. Jumel, 13 La. Ann. 399 (1858).

135.    128 S. Ct. at 2815.

meaning of state constitutional provisions, I expect it to be influential,[136] and the reasons just given suggest that it was correct.

b.   The "Descended From Historically Personal-Defense Weapons" Test

The Oregon courts have taken the view that "arms" covers only those weapons that, "as modified by [their] modern design and function, [are] of the sort commonly used by individuals for personal defense" at or before the time the Oregon Constitution was adopted in 1859.[137]

This doesn't fix the technology at the 1859 level: A switchblade, for instance, was held to be a protected weapon even though it contains a spring that knives in 1859 didn't possess.[138]  But the Oregon Court of Appeals has essentially concluded that, to be protected, a modern weapon must be a "technological advancement" on an 1859-era personal-defense weapon, rather than a "modification[ ]" of a more modern military weapon.[139]  In particular, the court held that semiautomatic weapons—including but not limited to the "assault weapons" at issue in that case—don't qualify as constitutionally protected arms.[140]  Revolvers and other guns, on the other hand, would qualify for constitutional protection.

The trouble with this kind of reasoning is that all civilian firearms are in some ways both modifications of military firearms and technological advancements on past civilian firearms.  A semiautomatic handgun or rifle, for instance, can correctly be described as a technological advancement on the ordinary revolver or rifle owned by 1859 Oregonians.[141]  At the same time, modern civilian semiautomatic handguns can also be described as a modification of military weapons.  Semiautomatics are built on the concept that the recoil caused by the firing of one round can automatically load the next round, a concept that's also at the heart of automatic weapons.[142]

---

136.    *See* Denning & Reynolds, *supra* note 116, at pt. III.D.

137.    State v. Delgado, 692 P.2d 610, 612 (Or. 1984).

138.    *Id.*

139.    Or. State Shooting Ass'n v. Multnomah County, 858 P.2d 1315, 1319–22 (Or. Ct. App. 1993).

140.    *Id.* at 1319.

141.    Firearms designers in the 1800s had to solve a fundamental problem: How does one easily allow multiple shots, whether at enemy soldiers or civilian attackers, without the need to manually reload or even manually chamber a new round?  The revolver, invented in the early 1800s, was one popular solution to that problem, but the rotating cylinder was inherently limited in capacity, so designers kept looking for new technological advancements, and found one in the semiautomatic.

142.    The military has long been an early adopter of much new firearms technology, and the first broadly used fully automatic military weapon was likely the Maxim gun, developed for military use in the 1880s; semiautomatic civilian weapons quickly followed, by 1893.  MERRILL LINDSAY, ONE HUNDRED GREAT GUNS 196–97 (1967); POLLARD'S HISTORY OF FIREARMS 294

Most guns labeled "assault weapons" today are semiautomatic versions of more modern automatic weapons, rather than of the late 1800s varieties.[143] But there too one could equally describe them as technological advancements on earlier civilian handguns and rifles, especially the late 1800s semiautomatics, as well as modifications of military weapons. Civilian and military small arms technology have always developed hand in hand.

Nor is the Oregon Court of Appeals' alternative formulation, which asks "whether the drafters would have intended the constitutional protection to apply if they had envisioned the technological advancements and the reasons for which those advancements were made,"[144] particularly helpful. I tend to agree with the Oregon Court of Appeals' dissenting opinion that, under this very test, semiautomatics would be protected. "It is hard to conceive that the pioneer family facing an attacking foe would have chosen the one shot ball and powder musket over a firearm that gave them the ability to fire repeatedly,"[145] and it's hard to conceive that Oregonians' representatives would have treated the more effective firearm as not falling within the constitutional term "arms."

In any case, the Oregon Court of Appeals' test seems to me to be a largely indeterminate inquiry. We have some equipment, such as legal dictionaries and contemporaneous sources, for figuring out the 1791 or 1859 meanings of particular legal terms. But it's hard to see how we can reliably guess what legislators in 1859 would have done had they envisioned certain changes in weapons technology.

c.   The "of the Kind in Common Use" "by Law-Abiding Citizens for Lawful Purposes" Test

*Heller* defines arms to exclude "weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns."[146] Some

---

(Claude Blair ed., 1983); *see generally* David B. Kopel, Clayton E. Cramer & Scott G. Hattrup, *A Tale of Three Cities: The Right to Bear Arms in State Supreme Courts*, 68 TEMP. L. REV. 1177, 1199–1200 (1995) (faulting the Oregon test on similar grounds). (The Gatling gun, patented in 1862, was crank-operated and thus was probably not technically an "automatic weapon" as the term is now understood. LINDSAY, *supra*, at 196; POLLARD'S HISTORY OF FIREARMS, *supra*, at 293.)

    143.    *See* GARY KLECK, TARGETING GUNS: FIREARMS AND THEIR CONTROL 110 (1997).

    144.    *Or. State Shooting Ass'n*, 858 P.2d at 1320.

    145.    *Id.* at 1327 (Edmonds, J., concurring in part and dissenting in part).

    146.    District of Columbia v. Heller, 128 S. Ct. 2783, 2815–16 (2008).

state cases have used similar definitions.[147]  But it's not quite clear how this test is to be applied, for six reasons.

1. *Typical possessor vs. is possession typical?*  It's not clear whether "typically possessed by law-abiding citizens for lawful purposes" requires that the typical possessor of the weapon be a law-abiding citizen with lawful purposes, or that possession of the weapon be a typical (that is, common) practice.[148]  The two are different, since a rare weapon that is overwhelmingly used for lawful purposes (e.g., an expensive or antique hunting rifle) would fit the first definition—its typical possessor would likely be a lawful hunter—and not the second, since possession of it would be highly atypical.  My sense is that the first definition, focusing on the characteristics of the typical possessor, is the more natural reading of the phrase.  Yet the phrase is offered as an interpretation of *United States v. Miller*'s "arms . . . of the kind in common use" language, which supports the second definition, focusing on how typical possession is.

2. *Uncertainty about the typical possessor.*  It will often not be clear who might be the typical possessor of the weapon; one can hardly do a survey of owners of a particular kind of gun, asking them whether they possess it for lawful purposes.  Nor is perceived utility for self-defense and hunting a good proxy for whether a gun is "typically possessed by law-abiding citizens for lawful purposes," given that collecting and recreational shooting are "lawful purposes."  Gun collecting may seem like a strange hobby to many, but likely about a million law-abiding Americans engage in it.[149]  So while few people would choose (for instance) a semiautomatic version of an AK-47 rifle for home defense or for hunting, this doesn't tell us whether its "typical[ ] possess[or]" is a criminal or a law-abiding collector.

3. *Definition of weapon category.*  How common a weapon is depends on how specifically it is defined.  Handguns are in common use, but particular brands of handguns are less common, and some are uncommon, simply because they come from small companies or are of unusual caliber or design.  Likewise, some so-called "assault weapons" are indeed not that commonly owned;[150] semiautomatic versions of the AK-47 rifle, for instance, likely make

---

147.   *See, e.g.,* Lacy v. State, 903 N.E.2d 486, 492 (Ind. Ct. App. 2009); City of Akron v. Williams, 172 N.E.2d 28, 30 (Ohio Mun. Ct. 1960); State v. Kessler, 614 P.2d 94, 99 (Or. 1980) (likewise); Burks v. State, 36 S.W.2d 892, 894 (Tenn. 1931); State v. Duke, 42 Tex. 455, 458 (1875).

148.   *See* State v. Graves, 700 P.2d 244, 248 (Or. 1985) (likewise noting that the phrase "commonly used [for a certain purpose]" can mean either "generally or usually used" for that purpose in the sense of most users' having that purpose, or "frequently used" in the sense of the use being frequent).

149.   *See* COOK & LUDWIG, *supra* note 94, at 39 tbl.4.6.

150.   *See* Jim Stewart & Andrew Alexander, *Assault Weapons Muscle in on the Front Lines of Crime, reprinted in* FIREPOWER: ASSAULT WEAPONS IN AMERICA (1989) (reporting on BATF's

up a small fraction of the total gun stock owned by law-abiding citizens. But the same could equally be said of virtually any specific kind of gun, except the most popular.

4. *Uncertainty about gun stocks.* There are also no censuses of weapons. Surveys give us an approximate sense of how many households own guns generally, or handguns in particular,[151] but they don't give us many more details than that. Nor does gun tracing data help, because there's no reason to think that traced guns are even close to a representative sample of all guns. Guns found at crime scenes are disproportionately likely to be traced, so guns that are more popular with law-abiding citizens will be underrepresented, as would more expensive guns that are less likely to get left behind.[152] And we're even more in the dark about the prevalence of nearly all weapons other than guns, such as fighting knives and billy clubs.

5. *Defensive devices that are often not owned as weapons.* Some defensive weapons aren't primarily owned as weapons; a home defender may pick up a sharp kitchen knife when no other weapon is close to hand.[153] Knives and baseball bats are very common, but knives and baseball bats owned specifically for defensive purposes are doubtless much less so. Which then should count for the "in common use"/"typically possessed . . . for lawful purposes" inquiry?

6. *The difficulty with a "dangerous and unusual weapons" test.* Heller does seem to offer one clue to what its test might mean—that the weapons ought not be "dangerous and unusual":

> We also recognize another important limitation on the right to keep and carry arms. *Miller* said, as we have explained, that the sorts of weapons protected were those "in common use at the time." We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons." See 4 Blackstone 148–149 (1769); [other treatises and cases].[154]

---

guess about assault weapon prevalence); *see* Tenn. Op. Att'y Gen. No. 89-54 (1989) (opining that an assault weapons ban would be constitutional because assault weapons are not "the usual arms of the citizen of the country").

151.    *See, e.g.,* KLECK, *supra* note 143, at 112–18, 141–42 (1997) (citing data suggesting that only 5 percent or less of all privately owned guns fall in the category of "'assault weapons'").

152.    *Id.* at 112.

153.    The National Crime Victimization Survey (NCVS) reports that non-gun weapons are used defensively more often than are guns. *See* data run on 1992–2005 NCVS datasets by Joe Doherty of the UCLA School of Law (on file with author). The NCVS might capture only a small fraction of defensive actions, *see* KLECK, *supra* note 143, at 152–53, so the comparison is only suggestive, not dispositive. But the data shows that non-gun defensive actions are not uncommon in absolute terms, and suggests that they are not uncommon even when compared to defense with guns.

154.    District of Columbia v. Heller, 128 S. Ct. 2783, 2817 (2008) (citations omitted).

But the sources *Heller* cites—some of which say "dangerous *and* unusual weapons" and some of which say "dangerous *or* unusual weapons"[155]—don't really discuss what sorts of weapons could historically be *possessed*. As *Heller* admitted, the historical tradition is focused on carrying, and carrying only in the circumstances where the carrying is so open that it is "terrifying."[156] The cited Blackstone passage, which the other treatises and cases closely echo,[157] makes this clear:

> The offence of *riding* or *going armed*, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land; and is particularly prohibited by the statute of Northampton, 2 Edw. III. C. 3 upon pain of forfeiture of the arms, and imprisonment during the king's pleasure: in like manner as, by the laws of Solon, every Athenian was finable who walked about the city in armour.[158]

Even carrying normally dangerous arms was punishable if it was done in a way that indicated a likely hostile intent, perhaps simply by the unusualness of the behavior, as in the Athenian example. Conversely, even possessing unusually dangerous weapons at home wouldn't be covered if the weapons were hidden at home and thus were not terrifying to observers.

### d.   An Unusual Dangerousness Test

My main point in this Article is to identify questions and possible answers, not to propose any definitive solutions. Nonetheless, I'd like to offer a possible interpretation of "arms" that might be relatively consistent with the concerns expressed in *Heller*, with the bottom-line conclusion that *Heller* endorsed (no protection for sawed-off shotguns and machine guns), and with many aspects of *Heller*'s language.

As I noted above, whether a weapon is in common use depends a lot on how generally one defines the weapon: for instance, as a handgun generally, or as a Glock 17 in particular. At the same time, if one says that a form of arms is protected if weapons of *this general level of practical dangerousness*[159] are in common use, the answer is more definite. This is especially so if one further

---

155.    *See, e.g.*, WILLIAM BLACKSTONE, 4 COMMENTARIES *148–49 (using "or") (emphasis added).
156.    *Id.*
157.    *State v. Lanier*, 71 N.C. 288, 288–89 (1874), didn't itself involve weapons, but it mentioned "the offence of going armed with dangerous or unusual weapons" in passing and cited *State v. Huntley*, 25 N.C. (3 Ired.) 418 (1843), which followed the Blackstone passage.
158.    BLACKSTONE, *supra* note 155, at *148–49.
159.    I say "practical dangerousness" to focus on dangerousness as the weapon is likely to be used in a typical criminal or defensive shooting, as opposed to the hypothetical dangerousness in the hands of a perfect marksman.

refines this (though at the expense of moving a little further beyond *Heller*'s language) to whether this weapon is no more practically dangerous than what is in common use among law-abiding citizens.[160]

Machine guns are more dangerous in their likely effects than are those guns that are in common use among law-abiding citizens. They not only fire very quickly, but they are harder to shoot in a discriminating way, at least in their fully automatic mode.[161]

Likewise, short-barreled shotguns are practically more dangerous than the kinds of guns that are in common use among law-abiding citizens, because they combine a lethality close to that of a shotgun—at least at the short distances characteristic of the typical criminal attack—with a concealability close to that of a handgun.

On the other hand, if we're talking about a particular sort of handgun that is not materially more dangerous than a typical handgun would be, then it would qualify as a type of arm covered by the constitutional provisions. This is so even if this particular variety happened to be rare (for instance, because it came from a small or new manufacturer). And this decision wouldn't require speculation—and speculation is all that it could be—about whether the typical owner of the handgun is a criminal or a law-abiding citizen.

This test (is the weapon not more materially dangerous than what is in common use among law-abiding citizens?) would thus be consistent with *Heller*'s examples, and would use the elements *Heller* pointed to—common use, unusualness, dangerousness, and use by law-abiding citizens for lawful purposes—though in a somewhat different mixture from the one *Heller* set forth. Not a perfect way of reading a case, but, for the reasons given above, there might not be a perfect way of reading *Heller* on this point.

This leaves one more question: What happens when a particular type of arm—for instance a knife or billy club, or nonlethal weapon such as a stun gun or pepper spray—is *less* dangerous than the guns that are in common use?

I'm inclined to agree with the Oregon courts—and some other recent authorities—in concluding that these should be considered arms alongside

---

160.    *Cf.* Rinzler v. Carson, 262 So. 2d 661, 665–66 (Fla. 1972) (upholding a machine gun ban on the grounds that the legislature "can determine that certain arms or weapons may not be kept or borne by the citizen," when they are "too dangerous to be kept in a settled community by individuals, and . . . which, in times of peace, find[ their] use by . . . criminal[s]").

161.    Because each shot generates recoil that moves the gun barrel, and because the fully automatic firing makes it impossible to aim again after each shot, a machine gun's shots tend to cover a much larger area than a non-automatic weapon's shots would. A shotgun also has a considerable spread, but shotgun pellets go a considerably shorter distance than do machine gun bullets.

guns.[162]  First, the literal definition of arms isn't limited to firearms, and laws
from the Framing era used arms to refer both to firearms and to non-firearm
weapons.[163]  Second, if one purpose of the right is to preserve people's ability
to use weapons in self-defense, it's hard to see why only the more lethal self-
defense weapons should qualify as arms and be protected by the right.  And
third, many devices other than firearms, even if not necessarily designed as
weapons, are indeed commonly used by law-abiding citizens for self-defense,
just because those devices (clubs, knives, and the like) are often the only
things at hand when the need for self-defense arises.[164]

2.   Burden

     As I said, bans on particular kinds of arms naturally raise a scope question;
but the analysis shouldn't be limited to this question only.  Among other things,

---

162.   *See, e.g.*, State v. Delgado, 692 P.2d 610 (Or. 1984) (striking down a ban on possessing and
carrying switchblades); State v. Blocker, 630 P.2d 824 (Or. 1981) (striking down a ban on carrying
billy clubs in public); State v. Kessler, 614 P.2d 94 (Or. 1980) (striking down a ban on possessing
of billy clubs); Barnett v. State, 695 P.2d 991 (Or. Ct. App. 1985) (striking down a ban on
possessing blackjacks); *see also* Hill v. State, 53 Ga. 472, 474–75 (1874) (taking the view that
"swords" and "bayonets" are protected because they "are recognized in civilized warfare"); *Ex parte*
Thomas, 97 P. 260, 262, 265 (Okla. 1908) (following *Hill* and finding likewise); City of Akron v.
Rasdan, 663 N.E.2d 947 (Ohio Ct. App. 1995) (treating a ban on public carrying of knives as implicat-
ing the right to bear arms, though concluding that the ban was a "reasonable regulation" and thus
did not violate the constitutional provision); 1986 Fla. Op. Att'y Gen. 2 (concluding that stun
guns qualify as "arms" under the state right-to-bear-arms provision); *cf.* City of Seattle v. Montana, 919
P.2d 1218, 1222 (Wash. 1996) (noting the question of whether knives are protected but not reaching
it); Concealed Handgun Permits, Alaska Op. Att'y Gen. (Inf.) 209 (1994) (suggesting that the
Alaska courts may conclude that knives are protected, though not making a definitive prediction).
*But see* State v. Kerner, 107 S.E. 222, 224 (N.C. 1921) ("[None of a] 'bowie knife, dirk, dagger,
slung-shot, loaded cane, brass, iron or metallic knucks or razor or other deadly weapon of like
kind' . . . except 'pistol' can be construed as coming within the meaning of the word 'arms' used in the
constitutional guaranty of the right to bear arms.").
      Those decisions that reject constitutional protection for non-firearms tend to do so on the grounds
that those weapons are customarily used for criminal purposes—an approach that I argue against
above—and not on the grounds that "arms" necessarily covers only firearms.  *See, e.g.*, Lacy v. State,
903 N.E.2d 486, 492 (Ind. Ct. App. 2009) (holding that switchblades are unprotected because they "are
primarily used by criminals and are not substantially similar to a regular knife or jackknife"); State
v. Swanton, 629 P.2d 98, 98 (Ariz. Ct. App. 1981) (holding that nunchakus are not arms, because "arms" is
limited to "such arms as are recognized in civilized warfare and not those used by a ruffian, brawler or
assassin"); People v. Brown, 235 N.W. 245, 246–47 (Mich. 1931) (upholding a ban on, among other
things, blackjacks, because they are "too dangerous to be kept in a settled community by individuals"
and their "customary employment by individuals is to violate the law," but concluding that the
legislature may not ban arms which "by the common opinion and usage of law-abiding people, are
proper and legitimate to be kept upon private premises for the protection of person and property," and
stressing in the law's defense that the law "does not include ordinary guns, *swords*, revolvers, or other
weapons usually relied upon by good citizens for defense or pleasure" (emphasis added)).
163.   *See* District of Columbia v. Heller, 128 S. Ct. 2783, 2791 (2008).
164.   *See supra* text accompanying note 153.

banning some categories of arms might not substantially burden people's right to self-defense, because the remaining categories will be pretty much as effective without being materially harder to use or materially more expensive.[165]

This is clearest when we look at bans on so-called "assault weapons." Such bans have been hotly controversial, but the dispute about them is largely symbolic. The laws generally define assault weapons to be a set of semiautomatic weapons (fully automatic weapons have long been heavily regulated, and lawfully owned fully automatics are very rare and very expensive[166]) that are little different from semiautomatic pistols and rifles that are commonly owned by tens of millions of law-abiding citizens. "Assault weapons" are no more "high power" than many other pistols and rifles that are not covered by the bans.[167] Definitions of assault weapons reflect this functional similarity: They often focus on features that have little relation to dangerousness, such as folding stocks, pistol grips, bayonet mounts, flash suppressors, or (for assault handguns but not assault rifles) magazines that attach outside the pistol grip or barrel shrouds that can be used as hand-holds.[168]

It's therefore hard to see how assault weapons bans would do much to decrease crime, since even a criminal who complies with the ban could easily find an unbanned gun that is as criminally useful as the unbanned gun, and is

---

165.    This doesn't resolve the matter under state constitutions that protect a "right to keep and bear arms . . . for hunting and recreational use," *see supra* note 10, or under any right to keep and bear arms to deter government tyranny, to the extent such a right is recognized under some constitutional provision. But those aspects of the right to bear arms are outside the scope of this Article.

166.    *See, e.g.*, KLECK, *supra* note 143, at 108–10; Rusty Marks, *Machine Guns Rumble Mountains, Shinnston Range Attracts Shooters of Automatic Arms*, CHARLESTON GAZETTE (W. Va.), June 19, 2004, at 1A ("Fully automatic weapons cost anywhere from a few thousand dollars to tens of thousands of dollars each, and there are stiff federal licensing fees that must be paid by machine gun owners.").

167.    *See, e.g.*, KLECK, *supra* note 143, at 121–24 (explaining why that notion is mistaken).

168.    *See, e.g.*, Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 110102(b), 108 Stat. 1796, 1997 (1994) (expired 2004, *id.* § 110105(2)). Even Carl Bogus, one of the leading supporters of broad gun control (including a near-total ban on handgun possession in large cities) and a former member of the Brady Campaign board, agrees that the focus on these features is "largely cosmetic," Carl T. Bogus, *Gun Control and America's Cities: Public Policy and Politics*, 1 ALB. GOV'T L. REV. 440, 463, 468 n.189, 469 (2008). Likewise, Charles Krauthammer, a proponent of total handgun bans, labeled the assault weapons ban "phony gun control," and said, "The claim of the advocates that banning these 19 types of 'assault weapons' will reduce the crime rate is laughable. . . . Dozens of other weapons, the functional equivalent of these 'assault weapons,' were left off the list and are perfect substitutes for anyone bent on mayhem." Krauthammer, *supra* note 101. A statute that restricts guns that take large capacity fixed-size magazines, and restricts interchangeable large capacity magazines—as the 1994 Act did only in small part—might have noncosmetic effects, though I doubt it. *See* Bogus, *supra*, at 469; *infra* pp. 1487–88. But any focus on pistol grips and the like is sure to have no material effect on crime.

as dangerous to victims as is the banned gun.[169]  The class of assault weapons is indeed not "typical," at least in the sense of common use.[170]  But there is no reason to think that most assault weapons owners have them for criminal purposes.  And assault weapons are not more dangerous than the usual gun, which in my view makes them fit within the category of "arms."

Nonetheless, the availability of close substitutes for assault weapons—the very reason why assault weapons bans are unlikely to work—also makes it hard to see how assault weapons bans would materially interfere with self-defense,[171] at least given definitions such as those in the 1994 federal statute.[172]  And the reasons the Court gave for why handgun bans are impermissible—that handguns are "easier to hold and control (particularly for persons with physical infirmities), easier to carry, easier to maneuver in enclosed spaces, [or easier to handle while] still hav[ing] a hand free to dial 911"—do not apply to assault weapons bans: Assault weapons are no more

---

169.   *See generally* David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381, 388–401 (1994).

170.   *See supra* note 150.

171.   *See, e.g.*, Robertson v. City & County of Denver, 874 P.2d 325, 333 (Colo. 1994) (upholding the assault weapons ban because it was not an "onerous restriction," given that "there are literally hundreds of alternative ways in which citizens may exercise the right to bear arms in self-defense" and "the barriers . . . created [by the law] do not significantly interfere with this right"); Benjamin v. Bailey, 662 A.2d 1226, 1232–35 (Conn. 1995) (upholding the assault weapons ban because the right to bear arms secures only a right to possess weapons adequate for self-defense, not any weapons that one might choose, and the assault weapons ban "does not frustrate the core purpose" of the right to bear arms); Arnold v. City of Cleveland, 616 N.E.2d 163, 173 (Ohio 1993) (upholding the assault weapons ban but noting need "to allow for the practical availability of certain firearms for purposes of hunting, recreational use and protection"); Nelson Lund, *The Past and Future of an Individual's Right to Bear Arms*, 31 GA. L. REV. 1, 71 (1996) (agreeing that assault weapons bans would not materially interfere with self-defense, but concluding that they should be struck down because they are irrational); Kopel et al., *supra* note 142, at 1211–12 (likewise).

172.   Because the term "assault weapon" has no inherent technical definition, it's in principle possible for virtually any firearm to be so labeled by a legislature.  Thus, for instance, the proposed Assault Weapons Ban and Law Enforcement Protection Act of 2007, H.R. 1022, 110th Cong., § 3(a) (2007) (proposing 18 U.S.C. § 921(a)(30)(L)), defined "assault weapon" to include (among other things) "a firearm based on the design of such a firearm, that is not particularly suitable for sporting purposes, as determined by the Attorney General.  In making the determination, there shall be a rebuttable presumption that a firearm procured for use by the United States military or any Federal law enforcement agency is not particularly suitable for sporting purposes, and a firearm shall not be determined to be particularly suitable for sporting purposes solely because the firearm is suitable for use in a sporting event."  Nearly all handguns might have been labeled "assault weapons" under this proposed law, on the theory that they are not "particularly suitable for sporting purposes" in the sense of hunting, that the possibility of using them for target shooting doesn't count because "a firearm shall not be determined to be particularly suitable for sporting purposes solely because the firearm is suitable for use in a sporting event" and that their primary purpose is defensive rather than sporting.  Such a ban would be broad enough to substantially burden people's ability to defend themselves, and the analysis in the text—which rests on the much narrower scope of most past and present assault weapon bans—would not apply.

useful for self-defense than are many other handguns, rifles, and shotguns that aren't prohibited by assault weapons bans.[173]  Assault weapons bans might well be pointless, and might offend gun owners who want the freedom to choose precisely what sorts of guns they own.  But this need not make assault weapons bans unconstitutional, if the courts focus on whether the law substantially burdens self-defense.

Nor can one draw much from the Court's conclusion in the Free Speech Clause context that "one can[not] forbid particular words without also running a substantial risk of suppressing ideas in the process."[174]  Though this is likely true as to particular words, the Court has concluded that certain means of expression—such as residential picketing, or the use of sound trucks—can indeed be forbidden without running a substantial risk of suppressing ideas.[175] Not all restrictions on the use of some devices to exercise a constitutional right are unconstitutional burdens on that right.  And it's likewise possible to forbid certain kinds of guns without running a substantial risk of materially interfering with the ability to use arms in self-defense.[176]

As Part I.C.2.d pointed out, in a few constitutional fields—for instance, the review of content-neutral speech restrictions—even mild burdens on a right are judged under a relatively deferential form of intermediate scrutiny; it is possible that assault weapons bans would fail even that mild scrutiny.  But, for the reasons discussed in Part I.C.2.d, it seems unlikely that courts will adopt anything more than rational basis scrutiny for minor burdens on self-defense. And while it is conceivable that bans that focus on matters such as pistol grips or bayonet mounts might fail rational basis scrutiny,[177] I doubt that this

---

173.   District of Columbia v. Heller, 128 S. Ct. 2783, 2818 (2008) (explaining why handguns may make more convenient self-defense tools than long guns).

174.   Cohen v. California, 403 U.S. 15, 26 (1971).

175.   See, e.g., Frisby v. Schultz, 487 U.S. 474 (1988); Kovacs v. Cooper, 336 U.S. 77 (1949), reaffirmed by Ward v. Rock Against Racism, 491 U.S. 781, 796 (1989).

176.   The dissenting opinion in Arnold, 616 N.E.2d at 176 (Hoffman, J., dissenting), takes the view that any "outright prohibition of possession"—including "possession of certain types of arms"—"as opposed to mere regulation of possession" must be judged under "strict scrutiny."  But it doesn't explain why a requirement that people use one category of arms instead of another virtually equivalent category of arms should be viewed as a presumptively unconstitutional "prohibition" or "infringe[ment]," id. at 176, 177, even though the requirement does not materially interfere with keeping arms for self-defense.  And it requires a judgment about what constitutes a "type[ ] of arms" that is often indeterminate, see supra text accompanying note 51.

177.   See Kasler v. Lungren, 72 Cal. Rptr. 2d 260 (1998) (concluding that challengers should be able to introduce evidence to show that a ban is irrational), rev'd sub nom. Kasler v. Lockyer, 2 P.3d 581 (Cal. 2000); Kasler, 2 P.3d at 605–06 (Kennard, J., concurring in part and dissenting in part) (likewise); Kopel, supra note 169, at 381 (arguing that assault weapons bans fail the rational basis test).

would happen, given the deference given to legislative factual judgments under minimum rationality review.[178]

This is also why a machine gun ban shouldn't be seen as violating the right to keep and bear arms for self-defense, even setting aside the Court's conclusion that machine guns aren't arms. Machine guns are no more useful for self-defense than are nonautomatic guns in all but a tiny fraction of civilian uses.[179]

3.   Danger Reduction

Finally, some weapons bans might materially reduce various dangers to law-abiding citizens; consider, for instance, the ban on private possession of surface-to-air missiles. But this sort of ban would be independently justifiable through a scope argument: The weapons are certainly much more dangerous and uncommon than the machine guns and short-barreled shotguns that *Heller* concluded were outside the scope of "arms." More broadly, it's hard to imagine any such weapon that is unusually dangerous but that would fit within the scope of "arms" as *Heller* defined it.

That, of course, leaves the normally dangerous weapons, such as handguns, rifles, and shotguns. These weapons are indeed dangerous, and some people believe that entirely banning them will materially diminish the danger of crime and death.

But as *Heller* correctly concluded, right to bear arms provisions embody the judgment that the danger posed by private ownership of the normally dangerous weapons is justified by the benefits of gun ownership for, among other things, private self-defense. This is much like the constitutional judgment that the danger posed by First-Amendment-protected speech praising violence, or by criminals who are harder to catch as a result of the Fourth Amendment or harder to prosecute as a result of the Fifth and Sixth Amendments, is justified by the benefits that those constitutional provisions

---

178.   *See* Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 469–70 (1981) (setting forth a rule of extreme deference to legislatures' factual conclusions); *Kasler*, 2 P.3d 581 (upholding an assault weapons ban under the rational basis test); Robertson v. City & County of Denver, 874 P.2d 325 (Colo.1994) (likewise).

179.   Even when several people are attacking you, a semiautomatic pistol or even a revolver will let you fire several times within a few seconds, and likely remain more accurate than a fully automatic weapon. The firing of the first round from a fully automatic will cause recoil that throws off the accuracy of all subsequent rounds during the same trigger-pull. *See supra* Part II.A.1.d. Moreover, the fully automatic firing mode can empty the magazine in under a second, which would leave you unable to aim and shoot more. (Machine guns are useful in warfare, where you might need to lay down a field of fire, but that almost never arises in civilian self-defense.) So machine guns create extra hazard to passersby without providing any real self-defense benefits.

yield. So it seems to me that if a weapon is within the scope of "arms," because it is not unusually dangerous, avoiding-danger arguments can't be used to justify bans on such weapons.

4.   A Quick Review of Weapons Bans

This allows us to quickly go through some commonly proposed weapons bans, though much of what follows has already been foreshadowed above.

a. *Handguns* are of course protected arms under *Heller*; and, as *Heller* correctly concludes, a handgun ban so interferes with many people's ability to defend themselves that it constitutes a grave burden.[180] Some old cases that use the "civilized warfare" test for the scope of arms have concluded that handguns may indeed be banned,[181] but as I've argued above, this is not a sound test for rights provisions that cover self-defense purposes; and in any event, modern militaries do routinely use handguns.

b. *Machine guns, short-barreled shotguns*, and still more dangerous military weapons (such as surface-to-air missiles or grenade launchers) are outside the scope of "arms," and may thus be banned.[182] Moreover, such bans do not substantially burden the right to keep and bear arms for self-defense.[183]

c. *Short-barreled or otherwise sawed-off rifles* would likely be arms simply because they aren't materially different from handguns, which certainly qualify as arms. A handgun is just a very short-barreled rifle (some rifles even have pistol grips), and it's hard to see why a short-barreled rifle would be materially more dangerous than the even more concealable handgun. But for the same reason it's hard to see why a ban on short-barreled rifles would materially burden the right to keep and bear arms in self-defense, when handguns remain available.[184]

---

180.   *Accord* State v. Kerner, 107 S.E. 222, 225 (N.C. 1921) (dictum) (concluding that a total ban on handguns would be unconstitutional). *But see* State v. Bolin, 662 S.E.2d 38, 39 (S.C. 2008) (concluding that a ban on handguns didn't substantially burden the right to bear arms, though only in the course of evaluating a handgun ban that was limited to 18-to-20-year-olds).

181.   *E.g.*, *Ex parte* Thomas, 97 P. 260, 262–64 (Okla. 1908). *Bolin*, 662 S.E.2d at 39, held that a ban on under-21-year-olds' possessing handguns didn't violate the right to bear arms because it "[did] not prevent a person under the age of 21 from possessing other types of guns"; but as I note *infra* note 280, I think *Heller* was correct in concluding that handgun bans impose a substantial burden on the right to bear arms, even when people remain free to possess rifles or shotguns.

182.   *See, e.g.*, Carson v. State, 247 S.E.2d 68, 73 (Ga. 1978) (upholding ban on short-barreled shotguns); State v. LaChapelle, 451 N.W.2d 689, 691 (Neb. 1990) (same); State v. Fennell, 382 S.E.2d 231, 233 (N.C. Ct. App. 1989) (same).

183.   *See* 51 N.C. Op. Att'y Gen. 60, 65 (1981) (concluding machine guns aren't covered by the right to bear arms because they are "not a weapon designed for the general use of the populace").

184.   *See, e.g.*, CAL. PENAL CODE §§ 12278, 12280 (West Supp. 2009) (banning .50 caliber rifles); State v. Astore, 258 So. 2d 33, 34 (Fla. Dist. Ct. App. 1972) (upholding ban on short-barreled rifles).

d. *Assault weapons bans* would generally be constitutional, if the right is seen as unconstitutionally infringed only when a law substantially burdens self-defense. Semiautomatic assault weapons are functionally virtually identical to other semiautomatics, and are as much arms as are other semiautomatics.[185] But bans on such weapons don't substantially burden the right to keep and bear arms for self-defense, precisely because equally useful guns remain available. Such a ban would be unconstitutional only if the courts conclude that even less-than-substantial burdens on self-defense must be justified by some showing of likely reduction of danger, or unless courts conclude that assault weapons bans are entirely irrational.[186]

e. Bans on *silencers* and *.50 caliber ammunition* would also likely be constitutional because they don't materially burden self-defense.[187]

f. *Large-capacity magazine bans* are a closer question.[188] A gun with a larger than usual capacity magazine is in theory somewhat more lethal than a gun with a 10-round magazine (a common size for most semiautomatic handguns), but in practice nearly all shootings, including criminal ones, use many fewer rounds than that.[189] And mass shootings, in which more rounds are fired, usually progress over the span of several minutes or more.[190] Given that removing a magazine and inserting a new one takes only a few seconds, a mass murderer—especially one armed with a backup gun—would hardly be stymied by the magazine size limit. It's thus hard to see large magazines as materially more dangerous than magazines of normal size.

Still, these same reasons probably mean that the magazine size cap would not materially interfere with self-defense, if the cap is set at 10 or so rather than materially lower. First, recall that until recently even police officers would routinely carry revolvers, which tended to hold only six rounds. Those revolvers were generally seen as adequate for officers' defensive needs, though of course there were times when more rounds are needed. Second, the ability to switch magazines in seconds, which nearly all semiautomatic weapons possess, should suffice for the extremely rare instances when more rounds were needed (though to take advantage of this, the defender would have to make a habit of carrying both the gun and a spare magazine).

---

185. *See supra* Part II.A.2.
186. *See supra* p. 1486.
187. *See* People v. Brown, 235 N.W. 245 (Mich. 1931) (upholding ban on silencers).
188. *Cf. id.* (upholding ban on magazines that have room for more than sixteen rounds); City of Cincinnati v. Langan, 640 N.E.2d 200 (Ohio Ct. App. 1994) (upholding ban on rifle magazines that have room for more than 10 rounds).
189. *See* KLECK, *supra* note 143, at 119–20.
190. *See id.* at 144.

g. Bans on *small, relatively cheap guns* (including so-called "Saturday-Night Specials") might be unconstitutional substantial burdens if the alternatives that they leave would be materially more expensive.[191] What extra expense qualifies as "material" is of course hard to tell, but as Part II.F discusses, this is not a constitutionally insurmountable problem. Similar issues arise with regard to regulations of abortion, speech, the right to marry, and the like. Moderate fees, and regulations that indirectly impose moderate cost increases, are generally seen as permissible burdens, but at some point the fee becomes sufficient to make the law into an unconstitutional burden.

h. Bans on *knives* or *billy-clubs* would, under the framework I propose, count as restrictions on arms. The question would be whether the ban substantially burdens people's ability to defend themselves—quite possible, given that firearms tend to be much more expensive than knives and clubs, and given that clubs may be preferred by some defenders precisely because they are less lethal than firearms[192]—and whether there's some credible danger reduction argument in favor of restricting knives and clubs when guns are protected.[193]

i. Bans on *shotguns* should be unconstitutional, even if handguns are available. Many people keep a shotgun rather than a handgun for home defense, and many self-defense experts recommend shotguns.[194] With shotguns, there is less chance of missing, and their great lethality makes them even more effective at scaring away home invaders.

As *Heller* points out, handguns are for many people easier to store, easier to handle, harder to take away, and easier to hold with one hand while calling 911 with the other.[195] But this just reflects that handguns may be materially more effective self-defense weapons for some people in some contexts while shotguns may be materially more effective self-defense weapons for others (something that can't be said as to assault weapons, which are almost

---

191.   *See infra* Part II.F for a discussion of when taxes and indirect cost increases substantially burden the right to bear arms.

192.   See the discussion in Eugene Volokh, *Nonlethal Self-Defense, (Almost Entirely) Nonlethal Weapons, and the Rights to Keep and Bear Arms, Defend Life, and Practice Religion*, 62 Stan. L. Rev. (forthcoming 2010) (manuscript pt. III), *available at* http://www.law.ucla.edu/volokh/nonlethal.pdf, about why bans on nonlethal weapons may substantially burden people's right to bear arms in self-defense, even when firearms are allowed. The same analysis would in considerable measure apply to bans on weapons such as clubs, which are more lethal than stun guns and pepper sprays but much less so than firearms or knives.

193.   See the discussion in *id.* (manuscript pt. II.A), about the arguments for banning nonlethal weapons but allowing firearms (arguments that are not irrational, though in my view quite unpersuasive); some of the same arguments would apply to bans on knives and clubs.

194.   *See generally* Massad Ayoob, *Legends and Myths of the Home Defense Shotgun*, Guns, May 2000, at 16; Firearms Tactical Institute, Tactical Briefs #10 (Oct. 1998), http://www.firearmstactical.com/briefs10.htm.

195.   District of Columbia v. Heller, 128 S. Ct. 2783, 2818 (2008).

entirely interchangeable with their non-assault cousins). Allowing only shotguns would substantially burden some people's rights to defend themselves, while allowing only handguns would substantially and similarly burden other people's rights.

j. Bans on *electric stun guns and irritant sprays* are dealt with in a separate article.[196]

5.   A Special Case: "Personalized Gun" Mandates

Some have urged laws requiring that all new guns be personalized—designed so they can be fired only by an authorized user. Such personalization could, for instance, use fingerprint technology or wireless sensing of whether the user is wearing some electronic identification ring. In theory, if personalized guns became common, child gun accidents would become rare, and perhaps gun theft would become somewhat rarer, too. (I say "somewhat" because many thieves or resellers of stolen guns will likely know how to disconnect the electronics in a way that leaves the gun operational.) What's more, this could happen without compromising people's ability to defend themselves, something that distinguishes such proposals from handgun bans, carry bans, and locked storage requirements.[197]

Whether these requirements are constitutional should, I think, turn on whether they make guns materially more expensive, slower to fire, or unreliable. Say, for instance, that a personalized gun costs $1000, often fails to fire until after many seconds of fumbling, or requires monthly battery changes and is unusable if the battery isn't changed. Or say the gun receives its "OK to fire" signal through wireless radio from a ring worn by the owner, and there are cheap devices that would jam such transmissions and would thus let criminals effectively disarm any defender. Requiring that such guns be used—as opposed to the more robust mechanical guns that are now common—would substantially burden self-defense. So if personalization requirements are upheld, they would have to be upheld under a danger reduction theory, if such a theory is accepted as a justification for substantial burdens on self-defense.

On the other hand, say the extra cost is relatively modest, the technology is highly reliable, and the batteries are extremely long-lived (or perhaps have an audible alarm reminding a user that they need replacing), or the gun is

---

196.   *See* Volokh, *supra* note 192.
197.   *See generally* Cynthia Leonardatos, Paul H. Blackman & David B. Kopel, *Smart Guns/Foolish Legislators: Finding the Right Public Safety Laws, and Avoiding the Wrong Ones,* 34 CONN. L. REV. 157 (2001).

56 UCLA LAW REVIEW 1443 (2009)

designed so that, if the electronics fails, the gun is left operational as a mechanical weapon. (This sort of low cost / high reliability outcome seems quite possible as the technology matures.) Then the requirement probably wouldn't be a substantial burden, and should be upheld.

One possible way of estimating whether personalized gun requirements substantially burden self-defense is by looking at what police departments are doing.[198] Police officers can especially benefit from carrying personalized guns, because about 10 percent of all police officer fatalities involving shootings happen with the officer's own weapon.[199] Sometimes the shooter might have his own weapon and might use the officer's weapon just to make tracing harder; but sometimes the shooter starts out unarmed and seizes the gun from the officer in a struggle. If the officer has a personalized gun, the officer's life could be saved.

At the same time, police officers are also vulnerable to many of the reliability risks associated with switching from proven mechanical technology to new and unproven electronic technology. They don't want guns that fail to fire at the critical moment, or that can be disabled electronically.

So if police departments are ready to use personalized guns, and the personalizing technology doesn't increase the gun cost too much, then requiring such guns for civilians probably won't substantially burden civilian self-defense just as it won't substantially burden law enforcement. But if personalized guns aren't reliable enough for police departments, then requiring them would likewise impose a substantial burden on civilian self-defense (though some civilians might still choose to accept this substantial burden in order to get other benefits, for instance if they have small children at home and estimate that the danger of the child's accidentally misusing the gun is higher than the danger of the gun's being unusable at the crucial moment).

One state, New Jersey, has actually enacted a law mandating that, within roughly two and a half years after "personalized handguns" become "available for retail sales," sales of other handguns will be prohibited in New Jersey.[200] But while the law is triggered only when the Attorney General finds that personalized handguns are about as reliable as mechanical handguns,[201] the law

---

198.    For a related approach as to the definition of "arms" more broadly, and not just as to the burden inquiry, see Michael P. O'Shea, *The Right to Defensive Arms After District of Columbia v. Heller*, 111 W. VA. L. REV. 349, 391–93 (2009).

199.    UNIFORM CRIME REPORTING PROGRAM, FBI, LAW ENFORCEMENT OFFICERS KILLED AND ASSAULTED 14 (1998), *available at* http://www.fbi.gov/ucr/killed/98killed.pdf (1989–98 data).

200.    N.J. STAT. ANN. §§ 2C:58-2.4, 2C:58-2.5 (West 2005).

201.    *Id.* § 2C:39-1(dd) ("No make or model of a handgun shall be deemed to be a 'personalized handgun' unless the Attorney General has determined, through testing or other reasonable means, that the handgun meets any reliability standards that the manufacturer may require for its commercially

nonetheless doesn't apply to guns sold to the police until a separate commission endorses police use.[202] This may breed some skepticism about whether the Attorney General's initial finding of reliability is itself entirely reliable.

The law also doesn't consider the guns' affordability. In principle, the ban on selling unpersonalized handguns could be triggered even when personalized handguns cost many thousands of dollars. So there's some reason to suspect that the New Jersey ban on unpersonalized handguns, when it takes effect, might indeed substantially burden the right to keep and bear arms in self-defense. But it's impossible to tell until the personalized handguns exist, and their reliability and cost can be assessed.

B.   "Who" Bans: Bans on Possession by Certain Classes of People

1.   The Bans

Federal law bans gun possession by people guilty of certain illegal conduct—felonies, unlawful drug use, illegal presence in the U.S., or misdemeanor domestic violence.[203] Some laws cover other kinds of misdemeanors,[204] and include misdemeanants released on probation.[205]

---

available handguns that are not personalized or, if the manufacturer has no such reliability standards, the handgun meets the reliability standards generally used in the industry for commercially available handguns.").

202.   *Id.* § 2C:58-2.5(b), (d).

203.   18 U.S.C. § 922(g) (2006).

204.   *See, e.g.*, 720 ILL. COMP. STAT. ANN 5/24-3.1(a)(2) (West 2003 & Supp. 2008) (barring possession of any gun by 18-to-20-year-olds if they have "been convicted of a misdemeanor other than a traffic offense"); MASS. ANN. LAWS ch. 140, §§ 129B(1)(e), 131(d)(i)(e), ch. 94C, §§ 32L, 34 (LexisNexis 2007) (barring possession of any firearms by anyone who had ever been convicted of any drug crime (except possession of one ounce or less of marijuana), though allowing rifle and shotgun possession for people guilty only of nonviolent drug possession after five years pass from the end of their term of imprisonment, probation, or parole supervision); N.J. STAT. ANN. § 2C:58-3(c)(1), :1-4 (West 2005) (barring possession of any firearms by anyone who has ever been convicted of a crime that carries a maximum sentence of over six months in jail); DAYTON, OHIO, CODE OF ORDINANCES §§ 138.11, 138.14(C), (D) (2009) (banning possession of any firearms by anyone with "more than one conviction of any offense involving drunkenness within one year prior to his/her application for firearm owner's identification card" or anyone "with more than one conviction of disorderly conduct, or the state equivalent of such offense, within two years prior to his/her application for firearm owner's identification card"). *See* Mosher v. City of Dayton, 358 N.E.2d 540, 544 (Ohio 1976) (Celebrezze, J., dissenting) (noting that the city ordinance upheld by the majority banned possession by people with more than one conviction in the preceding year as to drunkenness or drug abuse); OHIO REV. CODE ANN. § 2923.13(A)(3) (West 2006) (banning possession even by misdemeanants convicted of "illegal possession" of "any drug of abuse," though leaving courts discretion to lift this restriction under OHIO REV. CODE ANN. § 2923.14 (West 2006) if "[t]he applicant has led a law-abiding life since his discharge or release [from imprisonment, probation, and parole], and appears likely to continue to do so").

Federal law also bans gun possession by people who are the targets of protective orders, which are generally assumed to rest on a finding (by a preponderance of the evidence[206]) that the subject has acted violently, or poses a credible threat of violence.[207]   And federal law bans the transfer of guns to anyone who is under indictment for a felony, which generally just requires a grand jury finding (usually in a nonadversarial proceeding) of probable cause to believe the person is guilty.[208]  Some states ban gun possession, and not just gun acquisition, by people who are under indictment;[209] federal law does the same as to people indicted for murder, kidnapping, or various sex crimes, including possession of child pornography.[210]

Federal law essentially forbids nonimmigrant aliens from possessing guns.[211] Some states ban gun possession by all noncitizens.[212]

Federal law and the laws of many states also largely ban gun possession by under-18-year-olds (though possession of long guns is often allowed with

---

205.    See, e.g., State v. Hopkins, No. 2005AP1482-CR, 2005 WL 2739081, at *3 (Wis. Ct. App. Oct. 25, 2005) (upholding no-firearms probation conditions for someone who pled guilty to misdemeanor theft and misdemeanor trespass to dwelling, because the defendant "might graduate from non-violent, albeit intrusive, anti-social acts to things more serious" and because the defendant's "taste of not being able to have a gun may spur him to mend his ways and become a wholly law-abiding member of our community").  As a general matter, the constitutional rights of probationers may generally be restricted about as much as the constitutional rights of inmates. See, e.g., Johnson v. State, 659 N.E.2d 194, 200 (Ind. Ct. App. 1995).

206.    See, e.g., IND. CODE ANN. § 34-26-5-9(f) (LexisNexis 2008); Sinclair v. Daly, 672 S.E.2d 672, 673–74 (Ga. Ct. App. 2009); Uttaro v. Uttaro, 54 Mass. App. 871, 873 (2002).

207.    See 18 U.S.C. § 922(d)(8) (2006); United States v. Emerson, 270 F.3d 203, 261–62 (5th Cir. 2001).

208.    18 U.S.C. § 922(d)(1), (n).

209.    See, e.g., HAW. REV. STAT. ANN. § 134-7(b) (LexisNexis 2006); OHIO REV. CODE ANN. § 2923.13 (West 2006); WASH. REV. CODE ANN. § 9.41.040(2)(A)(IV) (West Supp. 2009); State v. Winkelman, 442 N.E.2d 811, 814 (Ohio Ct. App. 1981) (upholding such a ban, though noting that it imposes only a "temporary limitation," with provision for relief "[s]hould the temporary limitation work an undue hardship upon the indicted party"), overruled on other grounds, State v. Frederick, Nos. CA88-07-111, CA88-07-118, 1989 WL 80493, at *3 (Ohio Ct. App. July 17, 1989).

210.    18 U.S.C. § 3142(c)(1)(B)(viii) (2006).

211.    See 18 U.S.C. § 922(g)(5)(B).  In this discussion, I'll omit minor exceptions, such as for noncitizens with certain hunting licenses or ones who are engaged in targetshooting.

212.    See, e.g., MASS. ANN. LAWS ch. 140, § 130 (LexisNexis 2007).  Guam also bans gun possession by any noncitizens, GUAM CODE ANN. tit. 10, § 60108(b)(2) (1993), and a federal statute extends the entire Bill of Rights (except the Tenth Amendment) to Guam, 48 U.S.C.A. § 1421b(u) (West 2003).  The Guam noncitizen possession ban may thus be challenged without resolving whether the Second Amendment binds the states via the Fourteenth Amendment.  But see United States v. Lewis, Crim. No. 2008-45, 2008 WL 5412013, at *4 (D.V.I. Dec. 24, 2008) (reasoning, in my view unpersuasively, that a similar federal statute extending the Bill of Rights to the Virgin Islands only extended the same Second Amendment right as applies against state governments, and thus didn't secure an individual right to bear arms because the Second Amendment has not been incorporated against states).

the permission of a parent or guardian).[213]  New York City bars gun possession by 18-to-20-year-olds as well;[214] Illinois bars gun possession by 18-to-20-year-olds, except with the permission of a parent, and sometimes not even then.[215] And many other states bar handgun possession by 18-to-20-year-olds.[216]  Federal law doesn't ban such possession, but it does bar gun dealers from selling handguns to 18-to-20-year-olds, which makes handguns available to 18-to-20-year-olds only by the good graces of a nondealer third party who is willing to sell to them.

Finally, government employers may sometimes ban both on-duty[217] and off-duty[218] gun possession by employees.  I will not discuss this further in this Article, but I flag it here as a question for further research: How much extra power should the government as an employer have to control gun possession

---

213.   *See, e.g.*, Dozier v. State, 709 N.E.2d 27, 31 (Ind. Ct. App. 1999) (upholding ban on possession of a handgun by under-18-year-olds).

214.   N.Y. PENAL LAW § 400.00 (McKinney 2008)  (providing minimum age of 21 for license to possess a handgun); N.Y. CITY ADMIN. CODE § 10-303 (1996) (providing that licenses to possess a rifle or a shotgun must be issued if the applicant is 21 or above and satisfies certain other criteria); NYPD, Permits | Rifle/Shotgun Permit Information, http://www.nyc.gov/html/nypd/html/permits/rifle_licensing_information.shtml (last visited May 20, 2009) (asserting that no license to possess a rifle or a shotgun will be issued to under-21-year-olds).

215.   430 ILL. COMP. STAT. ANN. §§ 65/2(a)(1), 65/4(a)(2)(i) (West Supp. 2008), bars gun ownership or possession by under-21-year-olds unless they have the written consent of a parent or guardian, and the parent or guardian is not himself disqualified from owning guns.  This entirely bars 18-to-20-year-olds from possessing a gun if their parents are dead, or if the living parent or parents are felons, nonimmigrant aliens, mental patients, or otherwise disqualified from owning a gun in Illinois.  It also conditions other 18-to-20-year-olds' rights on the permission of their parents, something that is not normally done with regard to the exercise of constitutional rights by adults.

216.   *See, e.g.*, CONN. GEN. STAT. ANN. §§ 29-34, -36f (West 2003 & Supp. 2008); *see also* N.M. STAT. § 30-7-2.2 (2004) (banning possession of handguns by anyone under nineteen).

217.   *See* Ariz. Op. Att'y Gen. No. 101-011 (2001) (opining that such a restriction should be constitutional).

218.   *See, e.g.*, Simons v. Gillespie, 2008 WL 3925157 (C.D. Ill. Aug. 1, 2008) (noting possibility of constitutional problem with a police department's barring an employee "from possessing or carrying firearms without prior authorization from the Chief of Police"); Nassau County (N.Y.) District Attorney, Assistant District Attorney Applicant Information & Instruction Form 5, http://www.nassaucountyny.gov/agencies/DA/Docs/PDF/AppInfoForms.pdf (last visited Feb. 26, 2009) ("I understand that assistant district attorneys are not permitted to apply for a handgun permit nor own or possess a handgun while employed by the Nassau County District Attorney.  Any exception to this policy must be in writing and approved by the District Attorney.").  For a case that should be easy, because it involved a less than substantial burden on self-defense, see *Lally v. Dep't of Police*, 306 So. 2d 66 (La. Ct. App. 1974), in which the court upheld a police department rule that when police officers carry guns off-duty, the guns they carry must be .38s or .357s.

by its employees, and if one seeks analogies from other fields, such as free speech law, how can such analogies be sensibly drawn?[219]

## 2.   Burden

An individual right to keep and bear arms for self-defense is substantially burdened whenever an individual is entirely barred from owning a gun, or even entirely barred from owning a handgun.[220]  It is a mistake to treat such total bans as "relatively minor" restrictions,[221] or assume that there's no infringement of the right to bear arms simply because non-firearm "arms" are available.[222]  Perhaps such total bans are ultimately found to be justifiable burdens, but they are certainly substantial burdens.

---

219.    The First Amendment analogy would be to *Pickering v. Board of Ed.*, 391 U.S. 563 (1968), which held that a government employer was constrained by the Constitution in firing an employee for his speech, but that the employer may nonetheless fire the employee if the speech is sufficiently potentially disruptive to its mission, and to *Waters v. Churchill*, 511 U.S. 661, 677 (1994) (plurality opinion), which held that a government employer may make such a judgment based on the facts as it reasonably believes them to be.  It seems to me that *Connick v. Myers*, 461 U.S. 138 (1983), which held that there ought to be no First Amendment scrutiny of discipline based on speech on matters of purely private concern, is not analogous here.  First, it is hard to see how a "private concern"/"public concern" line would apply to the right to keep and bear arms in self-defense.  Second, the *Connick* Court's underlying rationale, which is that allowing a First Amendment claim whenever an employment decision was made based partly on private-concern speech would turn a vast range of employment decisions into federal lawsuits, *id.* at 147, doesn't apply to the right to keep and bear arms (at least off the job), since very few government employment decisions would normally turn on the exercise of that right.  For a similar analogy to *Pickering* as to a different constitutional right, see the cases involving government employees' rights to send their children to private schools, cited *supra* note 121.

220.    *See supra* Part I.B.2.

221.    *See* State v. Owenby, 826 P.2d 51, 53 (Or. Ct. App. 1992) (upholding ban on gun possession by the mentally ill on the grounds that it was a "relatively minor" restriction).

222.    See *People v. Swint*, which defended a ban on gun possession by felons this way:

We also note that while [the Michigan Constitution] ensures a Michigan citizen's right to keep and bear "arms," that term is not defined.  Black's Law Dictionary (6th ed.), p. 109, defines "arms" as "[a]nything that a man wears for his defense, or takes in his hands as a weapon."  While [the statute] only precludes a former felon's use, possession, receipt, sale or transportation of a "firearm," it is silent regarding other "weapons."  Arguably, [the statute] does not completely foreclose defendant's constitutional right to bear "arms," i.e., nonfirearm weapons, in defense of himself. . . . "[A]s long as our citizens have available to them *some types of weapons* that are adequate reasonably to vindicate the right to bear arms in self-defense, the state may proscribe the possession of other weapons without infringing on" the constitutional right to bear arms.  Accordingly, we find that the constitutional right to bear arms contained in [the Michigan Constitution] does not guarantee defendant the right to possess a firearm after defendant is convicted of a felony.

572 N.W.2d 666, 670–71 (Mich. Ct. App. 1997) (citation omitted).  But non-gun weapons are not "adequate reasonably to vindicate the right to bear arms in self-defense" at anywhere near the effectiveness of firearms.  *Id.* at 671.  A ban on felons' possession of guns, if it is to be upheld, should be upheld despite its burden on self-defense, not because it doesn't much burden self-defense.

Some of the statuses that trigger the laws—minority, alienage, being under indictment, being a felon in those states that allow for restoration of civil rights some years after the conviction—are temporary, and may expire in years or even months. But denying people the ability to defend themselves with firearms for that long remains a substantial burden on self-defense. To be upheld, then, the bans must be justified either by a scope argument (that the constitutional right explicitly or implicitly excludes the prohibited class of people) or by a danger reduction argument (that people in the prohibited class are so unusually dangerous that even a total ban on their gun possession is constitutional).

### 3.  Scope and Danger Reduction

Naturally, the scope and danger reduction arguments are often related, because any textual or original-meaning limitations on who possesses the right will often stem from the perception that certain people aren't trustworthy enough to possess firearms. The Idaho right to bear arms, for instance, enacted in its current form in 1978, expressly states that the provision shall not "prevent the passage of legislation providing penalties for the possession of firearms by a convicted felon."[223]

Even provisions that do not have such explicit language might have been enacted with a background assumption that some people are not entitled to the full range of constitutional rights. Consider, for instance, the rights of minors. Though no right-to-bear-arms provision expressly excludes minors, it seems likely that such provisions were enacted with an understanding that minors might not have the same constitutional rights as adults. This background understanding likely reflects a judgment that minors aren't mature enough to fully appreciate the consequences of their actions, a judgment that could apply to minors' potential dangerousness to others, as well as to themselves.

At the same time, the scope and danger reduction justifications are importantly different. For one, they look to two different kinds of authorities. Scope justifications rest on a conclusion that some past authorities responsible for the scope of the constitutional provision—usually those who enacted the provision, but possibly those who maintained a particular tradition throughout American history—view certain people as untrustworthy (presumably because they are dangerous). Danger reduction justifications rest on a conclusion that the legislature and the reviewing court view certain people as untrustworthy, notwithstanding a constitutional text, original meaning,

---

223.   IDAHO CONST. art. I, § 11.

and historical tradition that would secure the constitutional rights of those people as much as the rights of the rest of us.

Relatedly, scope justifications are less subject to being extended by analogy. If felon bans are upheld on the grounds that felons have historically been seen as outside the scope of various constitutional rights, then felon bans would offer a poor analogy for bans on possession by misdemeanants (even violent misdemeanants), or people who are under indictment and thus haven't yet been convicted. Scope arguments that exclude those categories of people would have to be made independently, and the prohibition on possession by felons would offer only a weak analogy.

But if felon bans are upheld on the grounds that felons pose an unusual danger to society, then many other categories of people might be seen as posing a comparable danger. This is especially so because many felonies are nonviolent crimes and their perpetrators probably pose a comparatively small danger of gun violence. If this small danger is enough to support a reducing danger argument in favor of a gun ban, then a wide range of other people could likewise be disarmed on a reducing danger theory.

I'm not sure which theory is right, though my instincts push me towards scope justifications, precisely because scope justifications are less likely to be broadened by analogy. But in any event, the decision about which theory to use is important.

4.    Bans Justified by Individualized Finding of Likely Past Criminal
      Behavior or Future Danger

We therefore need more research on the historical scope limitations on the right to bear arms.

a. *Felons.* As to bans on gun possession by felons, the question is likely to be academic: *Heller* expressly held that such bans are constitutional. Nor did it distinguish between people convicted of violent felonies and those convicted of, say, fraud. Dozens of state court decisions likewise take the view that felons (even those convicted of nonviolent felonies) lack a constitutional right to keep and bear arms.[224]

---

224.    *See, e.g.,* Mason v. State, 103 So. 2d 341, 343 (Ala. 1958) (Coleman, J., dissenting); Morgan v. State, 943 P.2d 1208 (Alaska Ct. App. 1997); People v. Blue, 544 P.2d 385 (Colo. 1975); State v. Brown, 571 A.2d 816 (Maine 1990); People v. Swint, 572 N.W.2d 666 (Mich. Ct. App. 1997); State v. Ricehill, 415 N.W.2d 481 (N.D. 1987); *see also* United States v. Schultz, 2009 U.S. Dist. LEXIS 234 (N.D. Ind. Jan. 5, 2009) (rejecting a Second Amendment argument as to someone convicted of felony refusal to pay child support). For the few dissenting views, see *United States v. Abner*, 2009 WL 103172 (M.D. Ala. Jan. 14, 2009) (concluding that the federal ban on gun possession by felons "has a strikingly large scope—a scope that might be arguably called into question by a fair reading of *Heller's* rationale"); *Posey*

Felons may need arms for lawful self-defense just as much as the rest of us do.  Moreover, bans on felon possession of firearms also affect their law-abiding spouses, girlfriends and boyfriends, and other housemates: Those people might be unable to safely possess guns in their homes because of the possibility that their felon housemate will be seen as "constructive[ly] possess[ing]" the gun,[225] and that they themselves will therefore be seen as criminally aiding this illegal possession.[226]  Nonetheless, the understandable worry about felon recidivism probably makes it unlikely that the settled law on the subject will change, though a few judges have expressed some dissenting views.[227]

---

*v. Commonwealth*, 185 S.W.3d 170, 183–84 (Ky. 2006) (Scott, J., concurring in part and dissenting in part); *State v. Amos*, 343 So. 2d 166, 170  (La. 1977) (Calogero, J., dissenting); *Britt v. State*, 649 S.E.2d 402, 410 (N.C. Ct. App. 2007) (Elmore, J., dissenting); *City of Akron v. Williams*, 172 N.E.2d 28, 31 (Ohio Mun. Ct. 1960); *Long v. State*, 339 S.W.2d 215, 219 (Tex. Crim. App. 1960) (Davidson, J., dissenting).  Some cases suggest that there is a constitutional right for a felon to pick up or borrow a gun for immediate self-defense, though not to possess it for defending himself against unspecified future threats.  *E.g.*, Conaty v. Solem, 422 N.W.2d 102, 104 (S.D. 1988).  Finally, *People v. Ford*, 568 P.2d 26, 28 (Colo. 1977), suggests that felons generally have a right to possess guns, so long as they can show that the "purpose in possessing weapons was the defense of . . . home, person, and property," but later cases suggest that this applies only when there was a specific threat to which the felon was responding.  *See, e.g.*, People v. Barger, 732 P.2d 1225, 1226 (Colo. App. 1986).

225.     *Cf.* ALASKA STAT. § 11.61.200(a)(10) (2008) (expressly barring felons from "resid[ing] in a dwelling knowing that there is a firearm capable of being concealed on one's person or a prohibited weapon in the dwelling," though providing an exception for felons who get an apparently discretionary "written authorization to live in a dwelling in which there is a concealable weapon described in this paragraph from a court of competent jurisdiction or from the head of the law enforcement agency of the community in which the dwelling is located").  There are limits on the constructive possession doctrine, for instance if the housemate keeps the gun locked in a combination-locked safe.  But such practices can substantially burden the housemate's gun possession, both by making guns hard to access in an emergency and by increasing the cost, especially for long guns that require large safes.

226.     This is especially likely in jurisdictions which allow criminal liability for aiding criminal conduct whenever the defendant knowingly aids another's conduct, without a further requirement that the defendant purposefully aid the conduct.  *Compare, e.g.*, IND. CODE ANN. § 35-41-2-4 (West 2004) ("A person who knowingly or intentionally aids . . . another person to commit an offense commits that offense."); W. VA. CODE § 17C-19-1 (2004) (likewise); WYO. STAT. ANN. § 6-1-201(a) (2007) (likewise); Backun v. United States, 112 F.2d 635 (4th Cir. 1940) (treating knowing help as aiding and abetting); People v. Spearman, 491 N.W.2d 606, 610 (Mich. Ct. App. 1992) (likewise), *overruled as to other matters by* People v. Veling, 504 N.W.2d 456 (Mich. 1993), *with* ALA. CODE § 13a-2-23 (2004) (defining only intentional aiding as aiding and abetting); COLO. REV. STAT. ANN. § 18-1-603 (West 2008) (likewise); 18 PA. CONS. STAT. ANN. § 306 (West 2004) (likewise); TEX. PENAL CODE ANN. § 7.02 (Vernon 2004) (likewise); United States v. Pino-Perez, 870 F.2d 1230, 1235 (7th Cir. 1989) (likewise); United States v. Peoni, 100 F.2d 401 (2d Cir. 1938) (likewise).  *See generally* Grace E. Mueller, Note, *The Mens Rea of Accomplice Liability*, 61 S. CAL. L. REV. 2169 (1988).  They might also be civilly liable for possessing a firearm where a felon might be able to access it.  *Compare* Estate of Heck v. Stoffer, 786 N.E.2d 265, 270–71 (Ind. 2003) (holding that parents of a fugitive may be liable for leaving their gun where it was available for the fugitive to steal, logic that would apply equally to nonfugitive convicted felons), *with* Lelito v. Monroe, 729 N.W.2d 564, 567 (Mich. Ct. App. 2006) (holding, in a civil lawsuit, that felon-in-possession statutes "impose no duty on the felon's friends, family, neighbors, etc. . . . to suppress their own lawful access to firearms when a felon is present").

227.     *See supra* note 224.

b. *"[Non-]Peaceable Citizens."*  The more practically important question concerns extensions of the ban from felons to violent misdemeanants[228] and to nonviolent misdemeanants.[229]  Some historical references say that the right to keep and bear arms encompassed only "peaceable citizens" or "virtuous citizens,"[230] and some recent scholarship and recent government arguments suggest that this justifies restrictions that go beyond felons and at least to violent misdemeanants.[231]  The question is whether this was indeed a historically understood limitation.

c. *People Found Dangerous by Preponderance of the Evidence or Under a Probable Cause Standard.*  A related question would be the extent to which this historical exclusion of the nonpeaceable or nonvirtuous has covered those who haven't been criminally convicted—or, if one focuses on the preventing danger theory, to what extent it should cover them.  May the right to bear arms be restricted simply based on a finding by a preponderance of the evidence that the target poses a danger of violence?[232]  What if the finding is at a hearing conducted without notice to the target?[233]  May the right be restricted on a finding of probable cause by a grand jury handing down an indictment, a context where the defendant has no opportunity even to introduce exculpatory

---

228.   *See, e.g.*, 18 U.S.C. § 922(g)(9) (2006) (banning possession by people convicted of domestic violence misdemeanors); United States v. Li, No. 08-CR-212, 2008 U.S. Dist. LEXIS 100867, *6 (E.D. Wis. Sept. 22, 2008) (upholding § 922(g)(9)); Mosher v. City of Dayton, 358 N.E.2d 540, 543 (Ohio 1976) (upholding ban on possession by violent misdemeanants).

229.   *See supra* note 204.

230.   *See* 2 BERNARD SCHWARTZ, THE BILL OF RIGHTS: A DOCUMENTARY HISTORY 681 (1971) (quoting Samuel Adams' proposal for a right-to-bear-arms constitutional amendment, made during the Massachusetts Ratifying Convention, which would have limited protection to "peaceable citizens"); *id.* at 665 (discussing a proposal for a right-to-bear-arms constitutional amendment, made during the Pennsylvania Ratifying Convention, which would have limited the right to exclude disarming "for crimes committed, or real danger of public injury from individuals"); *see, e.g.*, State v. Hirsch, 114 P.3d 1104, 1131 (Or. 2005) (using these sources as a justification for upholding bans on gun possession by felons); Don B. Kates, Jr., *The Second Amendment: A Dialogue*, LAW & CONTEMP. PROBS., Spring 1986, at 143, 146 (likewise); Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 TENN. L. REV. 461, 480 (1995) (likewise).

231.   *See* Don B. Kates & Clayton E. Cramer, The Second Amendment: Scope and Criminological Considerations 17–18, http://works.bepress.com/clayton_cramer/3 (last visited Apr. 5, 2009) (so arguing); *Li*, 2008 U.S. Dist. LEXIS 100867, at *6 (quoting the government's argument).

232.   *See, e.g.*, Kampf v. Kampf, 603 N.W.2d 295, 298 n.3 (Mich. Ct. App. 1999); *see also* Nelson Lund, *The Ends of Second Amendment Jurisprudence: Firearms Disabilities and Domestic Violence Restraining Orders*, 4 TEX. REV. L. & POL. 157, 189 (1999) ("[A] strong case can be made for upholding that part of [18 U.S.C.] § 922(g)(8) that imposes a firearms disability on persons who are under a domestic violence restraining order because a court has found that they represent a credible threat to the physical safety of their domestic partner or child.").

233.   *Kampf*, 603 N.W.2d at 297.

evidence? Two courts have held such a restriction violates the right to bear arms, but two others have held otherwise.[234]

   d. *People Found "Unsuitable" by Police Departments.* Massachusetts law provides that people may get or keep permits to carry handguns—which are also required for simple possession of handguns at home—only so long as the police department finds them to be "suitable person[s]."[235] The police department may make this judgment based on its own conclusions about the person's likely past misconduct or future dangerousness, with only a highly deferential review by judges.[236] Police departments have in fact sometimes revoked such licenses based on charges that had been "dismissed or otherwise

---

234. *Compare* United States v. Arzberger, Nos. 08 Cr. 894 (AKH), 08 Mag. 1876 (JCF), 2008 WL 5453739, at *10–11 (S.D.N.Y. Dec. 31, 2008) (holding that a mandatory no-firearms condition for pretrial release of people accused of possessing child pornography was unconstitutional, in the absence of "an independent judicial determination" of "whether such a condition [was] reasonably necessary in his case to secure the safety of the community"), *and* United States v. Kennedy, No. CR08-354-RAJ-JPD, 2008 WL 5517643 (W.D. Wash. Nov. 25, 2008) (same), *with* State v. Winkelman, 442 N.E.2d 811 (Ohio Ct. App. 1981) (upholding such a ban, though noting that it imposes only a "temporary limitation," with provision for relief "[s]hould the temporary limitation work an undue hardship upon the indicted party"), *overruled on other grounds by* State v. Frederick, Nos. CA88-07-111, CA88-07-118, 1989 WL 80493 (Ohio Ct. App. July 17, 1989), *and* State v. In, 18 P.3d 500, 503 (Utah Ct. App. 2000) (also stating that such a ban is constitutional, but without a detailed explanation).

   *State v. Spiers,* 79 P.3d 30 (Wash. Ct. App. 2003), struck down a ban on *ownership* of guns while under indictment, but partly because other laws that allowed a ban on *possession* of guns under those circumstances were "sufficient to protect public safety":

> It should be kept in mind that, separate from the challenged ownership provision, the State may prohibit a defendant from possessing guns.   RCW 9.41.040(1)(b)(iv) (contains prohibition on possession that is unchallenged here); CrR 3.2(d)(3) (on showing that defendant poses substantial danger). Thus, in analyzing Spiers's rights, this court examines whether it is reasonably necessary to prohibit Spiers's gun ownership rights in addition to his gun possession rights.

*Id.* at 34–35. But while the first cited provision covers anyone "free on bond or personal recognizance pending trial, appeal, or sentencing for a serious offense as defined in RCW 9.41.010," WASH. REV. CODE ANN. § 9.41.040(1)(b)(iv) (West 2003) (current version at WASH. REV. CODE ANN. § 9.41.040(2)(a)(iv) (West Supp. 2009)), the second is limited to situations where there is "a showing that there exists a substantial danger that the accused will commit a violent crime or that the accused will seek to intimidate witnesses, or otherwise unlawfully interfere with the administration of justice," WASH. SUP. CT. CRIM. R. 3.2(d)(3) (West Supp. 2009). It is therefore not clear to what extent the *Spiers* court approved of bans on possession by all indictees, by those indicted for serious offenses (a fairly large category defined in WASH. REV. CODE ANN. § 9.41.010(12) (West 2003), which covers both violent offenses and some nonviolent offenses), or by those who "pose[ ] substantial danger."

235.   MASS. ANN. LAWS. ch. 140, § 131 (LexisNexis 2007).

236.   Chief of Police of Shelburne v. Moyer, 453 N.E.2d 461, 464 (Mass. App. Ct. 1983) (providing that a police chief's decision may be set aside only if it is "arbitrary, capricious, or an abuse of discretion").

resolved without a finding of guilt"[237] and on unadjudicated criminal complaints that "never ended in convictions [and] that . . . were essentially all brought by one person."[238] The denials or revocations are also sometimes based in part on whether the "person habitually associates with persons who violate the law or otherwise engage in inappropriate behavior, including verbal behavior"[239] or on whether the person "refused to cooperate in the police investigation concerning . . . several shooting incidents."[240]

Other states have similar rules, whether as to permits to possess firearms or permits to carry them; some provide for de novo review by courts,[241] while in others courts review police decisions deferentially, and set them aside only if they are found to be arbitrary or capricious.[242] Do such decisions have to involve a more concrete finding of dangerousness than just a conclusion that the person is not "a suitable person"? Does there have to be some judgment using an explicit quantum of proof, such as by a preponderance of the evidence? Moreover, should such decisions be reviewed de novo by the judiciary, as is required in some constitutional contexts?[243] This too bears further investigation.

---

237.    Tucci v. Police Dep't of Wareham, No. 07-P-1409, 2008 WL 2595923, at *1–2 (Mass. App. Ct. July 2, 2008) (upholding revocation of permit); see also Stavis v. Carney, No. Civ.A. 99-349-A, 2000 WL 1170090, at *8 (Mass. Super. Ct. July 31, 2000) (noting the revocation of permit but not reaching a final conclusion on the merits).

238.    Roddy v. Leominster Dist. Court, No. 03457, 2005 WL 2539851, at *2 (Mass. Super. Ct. Sept. 2, 2005) (upholding revocation of permit).

239.    Stavis, 2000 WL 1170090, at *7.

240.    Brief of the Defendant-Appellee, Godfrey v. Fritts, No. 91-P-1460, at 9 (Mass. App. Ct. Apr. 7, 1992) (listing this as the "sole[]" reason for the revocation of the license); Godfrey v. Chief of Police of Wellesley, 616 N.E.2d 485, 488 (Mass. App. Ct. 1993) (upholding the revocation). The police had been investigating a series of shootings in town, and had gotten tips that the shootings might have been committed by Godfrey's brother using Godfrey's gun. Brief of the Defendant-Appellee, supra, at 4–5. But the government's brief in the case specifically declined to point to any finding by the police department that Godfrey had likely committed any crime, or had been complicit in his any crime on his brother's part. Rather, it asserts that "All that the Chief knew is that Godfrey declined at all relevant times to answer any questions whatsoever as a part of the Department's ongoing investigation into the incidents," id. at 13; see also id. at 9, 16, and that this sufficed as a justification for the license revocation.

241.    See, e.g., Heindlmeyer v. Ottawa County Concealed Weapons Licensing Bd., 707 N.W.2d 353, 361 (Mich. Ct. App. 2005); Kozerski v. Steere, 433 A.2d 1244, 1245 (N.H. 1981); Weston v. State, 286 A.2d 43, 47 (N.J. 1972); Moats v. Pennsylvania State Police, 782 A.2d 1102, 1104–05 (Pa. Commw. Ct. 2001).

242.    See, e.g., Snowden v. Handgun Permit Review Bd., 413 A.2d 295, 298–99 (Md. Ct. Spec. App. 1980); Denora v. Safir, 711 N.Y.S.2d 900, 900 (App. Div. 2000).

243.    Compare, e.g., Jacobellis v. Ohio, 378 U.S. 184, 190 n.6 (1964) (lead opinion by Brennan, J.) ("Even in judicial review of administrative agency determinations, questions of 'constitutional fact' have been held to require de novo review."); Crowell v. Benson, 285 U.S. 22, 60 (1932) (taking a similar view); Simonson v. Iowa State University, 603 N.W.2d 557, 561 (Iowa 1999) (likewise), with NLRB v. Gissel Packing Co., 395 U.S. 575, 620 (1969) (providing for deferential review of expert agency's decisions restricting speech of employers or unions); Hamdi v. Rumsfeld,

e. *People found to be physically incapable of safely using firearms.* A few statutes limit gun possession by those who are seen as too "physical[ly] infirm[ ]" to "safe[ly] handl[e]" firearms.[244] I have seen virtually no cases or commentary on this, though one case, *In re Breitweiser*, suggests that sometimes this standard might be misapplied to handicapped people who are capable of safely using weapons but require special adaptive tools for doing so.[245]

5.   Bans Without Individualized Findings of Likely Past Violence
     or Future Danger

        a.   Side Effects of Attempts to Disarm the Dangerous: Bans
             on Gun Possession by People Subject to Restraining Orders
             Without Findings of Misconduct or Dangerousness

New Jersey law prohibits gun possession by "any person whose firearm is seized pursuant to the 'Prevention of Domestic Violence Act of 1991' and whose firearm has not been returned."[246] This was likely aimed at people whose firearm hadn't been returned because of a finding of domestic violence, made by a preponderance of the evidence in a civil proceeding.

But in *M.S. v. Millburn Police Department*,[247] a New Jersey appellate court held this applied more broadly, to anyone whose firearm has not been returned.[248] M.S. and his wife had both filed domestic violence complaints against each other, and each had agreed to have restraining orders issued against the other. The prosecutor sought the forfeiture of M.S.'s guns, and "M.S. signed a consent judgment, permitting him to sell the five weapons to a registered firearms dealer,"[249] without admitting guilt. Some time after he sold his firearms, the restraining orders were vacated, and apparently no finding as to any violence

---

542 U.S. 507, 534 (2004) (providing for some deference to a military tribunal's determination that someone was an enemy combatant).

244.   *See* N.J. STAT. ANN. § 2C:58-3(c)(3) (West 2005); GUAM CODE ANN. tit 10, § 60108(b)(7) (1993). For similar provisions in statutes limiting the issue of concealed carry licenses, *see also* ARK. CODE ANN. § 5-73-309(4) (2005); FLA. STAT. ANN. § 790.06(2)(c) (West 2007); KAN. STAT. ANN. § 75-7c04(a)(3) (Supp. 2008); LA. STAT. ANN. § 40:1379.3(C)(5) (2008); MISS. CODE ANN. § 45-9-101(2)(c) (2004); NEB. REV. STAT. § 69-2432(3) (2003); WYO. STAT. ANN. § 6-8-104(b)(iii) (2007).

245.   2007 WL 845916, at *1 (N.J. Super. Ct. App. Div. Mar. 22, 2007) (upholding trial court's reversal of a police department's decision to deny someone a permit to possess a shotgun for hunting, because he was "partially paralyzed," had "limited use of his left arm and hand," and had "partially limited" "left side peripheral vision").

246.   N.J. STAT. ANN. § 2C:58-3(c)(8) (citation omitted).

247.   930 A.2d 481, 484 (N.J. Super. Ct. App. Div. 2007), *rev'd*, 962 A.2d 515 (N.J. 2008).

248.   *Id.*

249.   *Id.* at 482.

on M.S.'s part was ever made.[250]  Nonetheless, because M.S.'s firearms hadn't been returned—with no finding or admission of M.S.'s likely guilt—M.S. was permanently barred from having guns under New Jersey law.

The following year, the New Jersey Supreme Court reversed the ruling, concluding that the statute should be read as applying only when the firearms aren't returned because of a finding or admission of guilt.[251]  This basically places the New Jersey law on a similar footing with laws that bar gun possession based on a restraining order entered upon a finding of past violence or future danger.[252]  But for over a year, New Jersey law appeared to bar certain people from possessing guns even without any such finding.

The same might sometimes happen under the federal statute that bans possession of guns by people subject to restraining orders.  The federal statute applies when the order

> (B) restrains such person from harassing, stalking, or threatening an intimate partner . . . or child . . . , or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and
>
> (C) (i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or
>
> (ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury.[253]

The use of "or" between (C)(i) and (C)(ii) suggests that the law could bar gun possession even when there is no finding of a credible threat or of past violence, and all that is present is a prohibition on "use, attempted use, or threatened use of physical force."

And a judge might not think much about issuing an order barring the use of injury-causing force even without a finding of threat or past misconduct: After all, such force is already generally illegal (setting aside self-defense, which would likely be implicitly exempted), so why not prohibit it?[254]  In such

---

250.  *Id.* at 482–83; *see* Video of Oral Argument (No. A-80-07) (Sept. 23, 2008), *available at* http://njlegallib.rutgers.edu/supct/args/A_80_07.php (not noting any finding of violence on M.S.'s part).

251.  M.S. v. Millburn Police Dep't, 962 A.2d 515, 524–25 (N.J. 2008).

252.  Though not exactly the same footing, because the New Jersey law's prohibition is permanent—much like a prohibition based on a criminal conviction—and not just for the duration of the restraining order.

253.  18 U.S.C. § 922(g)(8) (2006).

254.  *See* Pearson v. Pearson, 488 S.E.2d 414, 428 (W. Va. 1997) (Workman, C.J., dissenting) (noting that "[b]oilerplate mutual restraining orders" that bind both partners are "all too often" issued "without a proper evidentiary foundation," perhaps because "[o]n first glance, they seem harmless").

a case, barring firearms possession solely because the order exists, unbacked by any findings of dangerousness or misbehavior, must violate the right to bear arms.

Some courts that have considered the federal statute quoted above have concluded that no-use-of-force orders will indeed be based on a factual finding of threat:

> Congress legislated against the background of the almost universal rule of American law that for a temporary injunction to issue: "There must be a likelihood that irreparable harm will occur. Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant. Thus, a preliminary injunction will not be issued simply to prevent the possibility of some remote future injury. A presently existing actual threat must be shown. However, the injury need not have been inflicted when application is made or be certain to occur; a strong threat of irreparable injury before trial is an adequate basis."
>
> We conclude that Congress in enacting section 922(g)(8)(C)(ii) proceeded on the assumption that the laws of the several states were such that court orders, issued after notice and hearing, should not embrace the prohibitions of paragraph (C)(ii) unless such either were not contested or evidence credited by the court reflected a real threat or danger of injury to the protected party by the party enjoined.[255]

Some states (perhaps many or even almost all) might only authorize such orders when some finding of threat or past violence has been made.[256] And some might demand a persuasive showing of violent conduct precisely because they want to avoid improperly restricting a person's right to bear arms.[257]

On the other hand, at least some courts seem willing to enter orders simply based on "verbal[ ] abus[e]" that consists of "insulting and foul language [used] to humiliate and degrade."[258] Likewise, even statutes that ostensibly

---

255.　United States v. Emerson, 270 F.3d 203, 262 (5th Cir. 2001) (emphasis, footnote, and citation omitted).

256.　*See id.* at 262–63 (concluding that Texas law so requires); *see also* In re Marriage of Yates, 148 P.3d 304, 317 (Colo. App. 2006); M.B. v. H.B., No. CS02-04668, 2003 WL 22265053, at *4–5 (Del. Fam. Ct. May 2, 2003); Murphy v. Okeke, 951 A.2d 783, 790 (D.C. 2008); Uttaro v. Uttaro, 768 N.E.2d 600, 604 (Mass. App. Ct. 2002); *Pearson*, 484 S.E.2d at 424.

257.　*See* M.B., 2003 WL 22265053, at *4; *see also* Moore v. Moore, 657 S.E.2d 743, 747–48 & nn.3–4 (S.C. 2008).

258.　Green v. Green, No. 269, 1997 WL 67315 (Del. Oct. 14, 1997) (upholding such an order, and summarily rejecting the target's state right-to-bear-arms claim, even though the Delaware Constitution expressly secures a right to bear arms in self-defense). See also *Lujan ex rel. Lujan v. Casados-Lujan*, 87 P.3d 1067, 1068–69, 1071 (N.M. Ct. App. 2003), which issued such an order based on a stepmother's "continuous verbal abuse and belittlement" of her 14-year-old stepson (though also mentioning a possible implicit threat "inasmuch as [the wicked stepmother] was always bragging about hitting people, and [the stepson] was fearful that she would hit him"). The court concluded that "the language . . . could be interpreted as symbolizing an aggressiveness and threat of physical and emotional domination that comes well within the provisions of [N.M. REV.

require a finding of domestic violence could be satisfied simply by "a communi-cation . . . in offensively coarse language" made "with purpose to harass,"[259] or based on "making annoying telephone calls, directly or indirectly destroying personal property and 'contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the other party . . . .'"[260]   And under the Vermont statute, a person's supposed future dangerousness could be determined not just based on the person's past unlawful conduct, but also based on the person's past lawful use of nondeadly force to defend property.[261]

Moreover, the physical conduct required for the statutes (which of course only require a showing by a preponderance of the evidence) may often be quite ambiguous.  In one case, for instance, the target of the order "grabbed [the petitioner's] arm" and then "stormed out."[262]  In another, the target of the order was found to have "[p]hysically blocked [a] pathway to prevent [the petitioner] from entering the house" and "subjected [the petitioner] to extreme psychological abuse."[263]

In a third, a domestic protective order was issued against a woman who quickly backed out from a driveway when the petitioner and his son were in the way on a small riding mower, and "stopped within a few feet" of the petitioner and the son—possibly a threat but possibly just an incident of unsafe driving.[264]  Moreover, the order applied to the driver's husband as well

STAT. § 40-13-2](C)(2), (4), and (10)," a statute that defined "domestic abuse" to include incidents that result in "severe emotional distress," "a threat causing imminent fear of bodily injury," and "harassment."  The *Lujan* court noted that "the special commissioner told Respondent that she would not be subject to firearms restrictions," 87 P.3d at 1071, but this seems to have been a misstatement on the commissioner's part: 18 U.S.C. § 922(g)(8) would indeed apply in such a situation, *see* Lujan v. Casados, No. D0117DV200200105 (N.M. Super. Ct. Feb. 25, 2002) (order of protection) (expressly prohibiting the use or threat of force that would result in bodily injury, which would trigger § 922(g)(8), and expressly noting to the target that "federal law prohibits you from possessing or transporting firearms or ammunition while this order is in effect").

259.    N.J. STAT. ANN. §§ 2C:25-19(a)(13), 2C:25-29, 2C:33-4 (West 2005).

260.    *See, e.g.*, Anderson v. Weakland, No. A104837, 2004 WL 1574529, at *2–3 (Cal. Ct. App. July 14, 2004) (upholding a domestic protective order that expressly barred firearms possession, expressly asserting that such orders can be issued based on "abuse" short of "physical abuse or bodily injury," and giving the material quoted in the text as examples of what could constitute "abuse").

261.    Raynes v. Rogers, 955 A.2d 1135, 1139–40 (Vt. 2008).

262.    Saladino v. Harms, No. 05-1785, 2006 WL 1897166, at *1 (Iowa Ct. App. July 12, 2006).

263.    Kie v. McMahel, 984 P.2d 1264, 1267 (Haw. Ct. App. 1999).  These were the only incidents of "domestic abuse" that the court found.

264.    Acosta v. Wilder, No. D041293, 2004 WL 206288 (Cal. Ct. App. Feb. 4, 2004).  The targets of the order, the Acostas, had apparently been the subject of a campaign of harassment on petitioner Wilder's part, including "intimidating the Acostas' son, repeatedly telephoning the Acosta residence, making threats, and stating racial and disparaging statements about the Acostas."  *Id.* at *2.  (A restraining order was also issued against Wilder.)  This may have led the court to assume that the driver's behavior was deliberate retaliation; but such an inference is hard to reliably draw.

as to the driver herself, though there was no finding of any violence on the husband's part. In another case, though reversed on appeal, a judge issued a restraining order against a woman based simply on her briefly remaining at a party in her boyfriend's apartment after he had ordered her to go; she had just learned of the boyfriend's infidelity while at the party, started to cry and yell at the unfaithful boyfriend, and then did not obey his order to "Get the F[expletive] out of [the] house."[265]

Other courts allow the issuance of restraining orders when the target has long been out of the state or even out of the country—or perhaps even has always lived outside the state and the country—and was thus outside what would normally be the court's jurisdiction under the Due Process Clause.[266] Such nonresidents might find it too burdensome to return to defend themselves against the factual allegations, one common explanation for why personal jurisdiction is generally required in the first place.[267] A finding of past violence or future threat may thus be based on a one-sided presentation in a context where the legal system would otherwise not treat the defendant's rights as being forfeited by a decision not to appear.

It thus seems to me that there might well be cases in which the right to bear arms is denied to the targets of restraining orders even in the absence of a credible finding of threat or violence. Whether this is true needs further research. And if the research reveals that such prohibitions are indeed sometimes imposed, it seems to me that they would likely be unconstitutional. It's hard to see how the scope of the right to bear arms can be understood as excluding people simply because they're subject to a court order that has been entered with no finding of past violence or future dangerousness.[268]

---

265.   *See* Murphy v. Okeke, 951 A.2d 783, 786 (D.C. 2008) (describing the circumstances); *id.* at 790–91 (reversing the order).

266.   *See* Bartsch v. Bartsch, 636 N.W.2d 3 (Iowa 2001). *But see* T.L. v. W.L., 820 A.2d 506 (Del. Fam. Ct. 2003).

267.   18 U.S.C. § 922(g)(8)(A) (2006) applies only to orders "issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate," but doesn't specifically require that the court had personal jurisdiction over the person.

268.   *See* Lund, *supra* note 232, at 163 (taking the same view).

b. Proxies for Likely Inadequate Judgment: Bans on Gun Possession by Under-18-Year-Olds, the Mentally Ill, Mentally Retarded, the Drug-Or-Alcohol-Addicted, and 18-to-20-Year-Olds

*Scope and Burden*. Many (but not all) states generally ban gun possession by under-18-year-olds,[269] though such states tend to have exceptions for hunting and target shooting with a parent's permission. These laws are serious burdens on the ability of under-18-year-olds to defend themselves. Older minors are just as likely to be violently attacked as are younger adults (and much more so than older adults), and 12-to-17-year-old girls are substantially more likely to be raped than young adult women.[270] Moreover, both male and female minors are often without adult protection, whether at home or in public places.

Nonetheless, it is also highly plausible that even older minors are more likely to misuse their guns, chiefly because their capacities for impulse control and thoughtful judgment haven't fully matured. This avoiding danger argument is of course the justification for age cutoffs for various decisions, whether decisions that may jeopardize the minors' own safety, or ones (such as about driving or drinking) that may jeopardize third parties.[271] And because the

269. *See, e.g.*, CAL. PENAL CODE §§ 12072, 12078 (Deering Supp. 2009) (banning selling or giving a firearm to a minor, except as to loans of no more than thirty days with the parent's permission, or longer loans for limited reasons that don't include self-defense). For examples of the minority view generally allowing possession of handguns by under-18-year-olds, see MONT. CODE ANN. § 45-8-344 (2007) (age 14) and VT. STAT. ANN. tit. 13 § 4008 (1998) (age 16). *See also* N.Y. PENAL LAW §§ 265.00(3), 265.05, 400.00 (McKinney 2008) (setting the age at 16 for long guns); N.C. GEN. STAT. §§ 14-269.7, -316 (2007) (setting the age at 12 for long guns).

270. BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, CRIMINAL VICTIMIZATION IN THE UNITED STATES, 2006 STATISTICAL TABLES, tbl.4 (2006), http://www.ojp.usdoj.gov/bjs/pub/pdf/cvus06.pdf. The equal or higher victimization of older minors compared to adults applies even if one focuses only on victimization by strangers. *See id.* at tbls.4, 29.

271. The driving age is generally 16 rather than 18, even though many more 16- and 17-year-olds die in car accidents than in gun accidents, gun suicides, or gun homicides, but this lower driving age is likely a concession to the practical reasons why parents want children to have cars (especially to travel to work and school), and not a considered judgment that 16-year-olds are generally mature enough to be entrusted with a wide range of adult responsibility where the use of deadly weapons is involved. *See* Insurance Inst. for Highway Safety, *US Licensing Systems for Young Drivers*, May 2009, http://www.iihs.org/laws/pdf/us_licensing_systems.pdf (summarizing driving ages in various states, with thirty-three pegged at exactly age 16 and forty-six being between age 15½ and age 16½); Nat'l Ctr. for Injury Prevention & Control, Ctrs. for Disease Control & Prevention, WISQARS Leading Causes of Death Reports, 1999–2006, http://webappa.cdc.gov/sasweb/ncipc/leadcaus10.html (last visited May 6, 2009) (2001–05 data for 16-to-17-year-olds) (reporting about 35 fatal gun accidents, 260 gun suicides, and 500 gun homicides per year); NAT'L SAFETY COUNCIL, INJURY FACTS 104 (2009) (reporting that there were 700 16-year-old drivers and 1100 17-year-old drivers involved in fatal accidents in 2007, though the total number of deaths caused would be a little less than 1800 since the 1800 double-counts accidents in which two 16- or 17-year-old drivers were involved but only one fatality resulted); E-mail from Lyn Cianflocco, National Highway Traffic Safety Administration, to Cheryl Kelly Fischer, UCLA Law Library (Mar. 24, 2009,

drafters of the Second Amendment likely saw this danger, it also seems to me that such bans on gun possession by minors can be justified by a scope argument: Minors generally have, and historically have had, lesser constitutional rights than do adults,[272] and the same should apply to the right to possess deadly weapons.[273]

---

12:09 PST) (on file with author) (reporting, using 2007 data, a total of 844 "fatalities in motor vehicle traffic crashes involving at least one 16 year old driver" and 1408 where at least one 17-year-old was involved).

272.    Minors, for instance, generally don't have the constitutional right to sexual autonomy, to marry, or to beget children, and are limited in their abortion rights. *See* Lawrence v. Texas, 539 U.S. 558, 578 (2003) (recognizing adults' right to sexual autonomy and implicitly adults' right to beget children, but specifically noting that the case did not involve minors); Hodgson v. Minnesota, 497 U.S. 417 (1990) (holding that minors have narrower abortion rights than do adults); Kirkpatrick v. Eighth Judicial Dist. Court *ex rel.* County of Clark, 64 P.3d 1056, 1060 (Nev. 2003) (holding that minors do not have the right to marry); *In re* R.L.C., 643 S.E.2d 920 (N.C. 2007) (likewise as to sexual autonomy and implicitly the right to beget children). For a rare decision to the contrary, see *B.B. v. State*, 659 So. 2d 256 (Fla. 1995), holding that 16-year-olds have a constitutional right to have sex with each other, though not with adults.

The law's support for parental control over their minor children, something that would be a grave interference with liberty as to adults, tracks that. *See, e.g.,* CAL. WELF. & INST. CODE § 601 (West 2008) (threatening a child "who persistently or habitually refuses to obey the reasonable and proper orders or directions of his or her parents, guardian, or custodian" with being adjudged a "ward of the court"); MINN. STAT. ANN. § 609.06 subdiv. 1(6) (West 2003) (exempting reasonable force used by parents from criminal assault law); *id.* § 609.255 (West 2003) (defining false imprisonment to exclude conventional parental restraint of children); Brekke v. Wills, 23 Cal. Rptr. 3d 609, 613 (Ct. App. 2005) (upholding an injunction barring a sixteen-year-old girl's ex-boyfriend, whom her mother considered a bad influence, from contacting her, partly on grounds that injunction helped protect "[mother's] exercise of her fundamental right as parent to direct and control her daughter's activities"); L.M. v. State, 610 So. 2d 1314 (Fla. Dist. Ct. App. 1992) (affirming the lower court's order, as condition of juvenile's probation, that he obey his mother); MODEL PENAL CODE § 3.08 (Proposed Official Draft 1962) (providing that parents' use of force is justified when done for "the purpose of safeguarding or promoting the welfare of the minor").

The same is in some measure true for explicitly secured rights, such as free speech rights, at least where it comes to sexually themed expression. *See* Ginsberg v. New York, 390 U.S. 629, 636–37 (1968). And the law has long allowed children to be adjudged delinquent and basically imprisoned through the juvenile justice system, without the standard constitutional guarantees applicable to criminal proceedings. *See* McKeiver v. Pennsylvania, 403 U.S. 528, 545–51 (1971). This has been rationalized on the grounds that the proceedings are civil rather than criminal, *see, e.g.,* Ex Parte Crouse, 4 Whart. 9 (Pa. 1839), but it was precisely the presumed incapacity of the child that justified such civil proceedings.

On the other hand, when it comes to criminal prosecutions as opposed to juvenile court proceedings, minors have apparently generally had the same constitutional rights as adults. *See* EDWARD W. SPENCER, A TREATISE ON THE LAW OF DOMESTIC RELATIONS § 628, at 549 (1911). And some sorts of constitutional rights, such as the right to have some judicial hearing before any imprisonment, including through the juvenile justice system, have apparently also been long extended to minors. *See, e.g.,* SILAS JONES, AN INTRODUCTION TO LEGAL SCIENCE 63 (New York, J.S. Voorhies 1842).

273.    *See, e.g.,* Glenn v. State, 72 S.E. 927 (Ga. Ct. App. 1911) (upholding ban on carry license for under-18-year-olds). I suggest in Volokh, *supra* note 192, that the result might be different for generally nondeadly weapons, such as pepper spray or stun guns.

For related reasons, I suspect that those whose judgment is seen as compromised by mental illness,[274] mental retardation, or drug or alcohol addiction[275] have historically been seen as less than full rightholders, alongside those whose judgment is compromised by youth.[276] But again, some solid historical research would be more helpful than either scholars' or judges' speculation.

But what about 18-to-20-year-olds? The New York City ban on all gun ownership by 18-to-20-year-olds surely qualifies as a substantial burden.[277] So must the Illinois law, which bans gun ownership by 18-to-20-year-olds whose parents are dead, felons, or nonresident aliens, and conditions other 18-to-20-year-olds' rights on their parents' permission.[278] And under *Heller*, the same should be true for the more common restrictions on handgun ownership and acquisition by 18-to-20-year-olds:[279] The availability of long guns as a self-defense option wouldn't undo the "sever[ity of the] restriction," for the same reasons that it didn't do so in *Heller*.[280]

---

274.   *See, e.g.*, United States v. McRobie, No. 08-4632, 2009 WL 82715 (4th Cir. Jan. 14, 2009) (upholding 18 U.S.C. § 922(g)(4) (2006), which bans gun possession by persons committed to a mental institution, by citing *Heller*'s approval of bans on possession by "the mentally ill"); Foss v. Town of Mansfield, No. 03-P-1457, 2004 WL 2150984 (Mass. App. Ct. Sept. 17, 2004) (upholding revocation of handgun license based on the licensee's depression, which led to a suicide threat and brief hospitalization).

275.   *See* State v. Oaks, 594 S.E.2d 788, 793 (N.C. Ct. App. 2004) (striking down court order permanently barring firearms possession by a person who had admitted to habitually using marijuana, on the grounds that "we cannot affirm an order that apparently presumes that he will always be an unlawful user of controlled substances, and therefore may never possess firearms").

276.   For instance, the sufficiently mentally ill may have conservators appointed for them, and thus be stripped of the right to dispose of their property. Their criminal trials may be delayed while they are incompetent, despite the Speedy Trial Clause. *See, e.g.*, United States v. Mills, 434 F.2d 266, 271 (8th Cir. 1970); Langworthy v. State, 416 A.2d 1287, 1293–94 (Md. Ct. Spec. App. 1980). Sex with those who are so mentally ill or mentally retarded that they can't fully appreciate the consequences of their actions may likely be criminalized, *see, e.g.*, Lawrence v. Texas, 539 U.S. 558 (2003) (repeatedly stressing the rights of "consenting adults"); Anderson v. Morrow, 371 F.3d 1027, 1032–33 (9th Cir. 2004) ("The *Lawrence* Court held that the Due Process Clause of the Fourteenth Amendment protects the right of two individuals to engage in fully and mutually consensual private sexual conduct. The holding does not affect a state's legitimate interest and indeed, duty, to interpose when consent is in doubt."), even though similar bans on competent adults would interfere with the right to have children and the right to sexual autonomy.

277.   *See supra* note 215.

278.   *See id.*

279.   *See supra* notes 215–216 and accompanying text.

280.   The South Carolina Supreme Court did hold that a ban on handgun possession by under-21-year-olds didn't violate the state constitutional right to bear arms, "because persons under the age of 21 have access to other types of guns." State v. Bolin, 662 S.E.2d 38, 39 (S.C. 2008). (The court went on to still strike down the ban, because it violated S.C. CONST. art. XVII, § 14, which provided that "[e]very citizen who is eighteen years of age or older . . . shall be deemed *sui juris* and endowed with full legal rights and responsibilities." *Id.* at 39–40.) But I think *Heller* has the better view here, for reasons given in Part II.A.4; courts should recognize that handgun bans impose a substantial burden on state constitutional rights to keep and bear arms in self-defense as well as on the federal right.

Yet regardless of the burden, there is also the scope question: Should constitutional rights be seen as fully vesting at age 18, or at age 21, in keeping with the historical tradition of 21 being the age of majority? The rule that majority begins at 21 endured until the early 1970s,[281] so most right-to-bear-arms provisions were thus enacted while 18-to-20-year-olds were technically treated as minors.[282] And the same issue arises as to other rights as well: Consider, in the First Amendment context, a recent proposal to set 21 as the age of consent for being filmed or photographed naked or in sexual contexts,[283] and the possibility that this is already the law in Mississippi and as to under-19-year-olds in Nebraska.[284] Consider the Nebraska requirement of parental consent for marriage of under-19-year-olds.[285] Or consider the Alaska law barring possession of marijuana by under-19-year-olds even though the Alaska Supreme Court has interpreted the Alaska Constitution's right to privacy as securing adults' right to possess small quantities of marijuana at home.[286]

I'm skeptical about this argument, because the pre-1970s cases that I've seen involving lesser constitutional rights for minors—lesser free speech rights, lesser religious freedom rights, and lesser criminal procedure rights—involved age cutoffs of 18 or less.[287] Whatever setting the age of majority at 21 might

---

281.    *See* Larry D. Barnett, *The Roots of Law*, 15 AM. U. J. GENDER SOC. POL'Y & L. 613, 681–86 (2007). A few states had the age of majority set at 18 for women, but 21 for men. *Id.* In the early 1970s, almost all the states lowered the age of majority to 18. *Id.*

282.    The exceptions are Alaska, Delaware, Maine, Nebraska, Nevada, New Hampshire, North Dakota, West Virginia, and Wisconsin, which enacted right-to-bear-arms provisions (or in the cases of Alaska and Maine, an expressly individual right-to-bear-arms provision) for the first time after the age of majority was decreased, and Florida, Idaho, Louisiana, New Mexico, and Utah, which substantially revised the texts of their individual right-to-bear-arms provisions after the age of majority was decreased. *See* Volokh, *supra* note 2. Note that in one of these states, Nebraska, the age of majority is 19 rather than 18. NEB. REV. STAT. § 43-2101 (2004).

283.    Garance Franke-Ruta, *Age of Innocence Revisited*, WALL ST. J., May 4, 2007, at W11.

284.    Mississippi law provides that "[t]he term 'minor,' when used in any statute, shall include any person, male or female, under twenty-one years of age," and then bans encouraging minors to participate in pornography production. MISS. CODE ANN. §§ 1-3-27, 97-3-54.1(1)(c) (2005). Nebraska bans encouraging minors to participate in pornography production, NEB. REV. STAT. §§ 28-707, 28-831 (Supp. 2006), and defines "minor" to be under 19 unless otherwise specified, NEB. REV. STAT. § 43-2101 (2004); State v. Johnson, 695 N.W.2d 165, 174–75 (Neb. 2005); *cf.* NEB. REV. STAT. § 28-807 (1995) (defining "minor" to "mean any unmarried person under the age of eighteen years," but limiting the definition to § 28-807 through § 28-829, the sections having to do with the distribution or display of pornography to minors).

285.    *See* NEB. REV. STAT. §§ 42-105, 43-2101 (2004).

286.    Allam v. State, 830 P.2d 435 (Alaska Ct. App. 1992) (upholding such a law).

287.    *See* McKeiver v. Pennsylvania, 403 U.S. 528 (1971) (age 18 for proceedings in juvenile court without a jury under one statute, *see* PA. STAT. ANN. § 243(2) (West 1965) (repealed 1972) and age 16 under another, *see* N.C. GEN. STAT. § 110-21 (1943) (repealed 1973)); Ginsberg v. New York, 390 U.S. 629 (1968) (age 17 for receipt of sexually themed materials); Prince v. Massachusetts, 321 U.S. 158 (1944) (age 18 for girls, 12 for boys, for the right to sell literature—including literature that one felt a religious obligation to distribute—on public streets); Abe Fortas, *Equal*

have meant for purposes such as contracting, parental authority, and the like, it seems not to have affected those other constitutional protections. At the same time, for much of our nation's history, the right to contract was seen as an important constitutional guarantee, and that right was not fully secured to 18-to-20-year-olds. The matter of the historical constitutional rights of 18-to-20-year-olds warrants more research.

*Danger reduction.* The 18-to-20-year-old issue illustrates the importance of figuring out precisely why the less controversial restrictions on the under-18-year-olds and the mentally infirm are constitutional. If the reason for upholding the ban on possession by under-18-year-olds is the historical scope of constitutional rights, then that reason probably will not carry over to other age groups. It certainly wouldn't carry over to, say, 22-year-olds. (In St. Louis, one can't carry a gun on a public street until one is 23.[288]) And it wouldn't even carry over to 18-to-20-year-olds, unless they were historically not seen as full rightsholders for the purposes of most constitutional rights, or of the right to keep and bear arms in particular.

But if the ban on possession by under-18-year-olds is upheld under a danger reduction argument, which is to say based on the plausible but unproven speculation that banning possession by 17-year-olds will diminish crime in a way that somehow outweighs the diminution in 17-year-olds' legitimate ability to defend themselves, then that argument could easily be applied more broadly. Most obviously, the same argument could be made, about as plausibly, about 18-year-olds or even 22-year-olds. There's a reason why auto insurance companies charge higher rates all the way up to age 25. And gun death rates remain within 10 percent of their age 18 levels into the late 20s,[289] though the need for self-defense remains high then as well.

Moreover, the danger reduction argument could equally justify similar bans for any demographic group that can plausibly be seen as potentially more dangerous. Presumably race-based restrictions and likely even sex-based restrictions would violate the Equal Protection Clause,[290] though of course violent

---

*Rights—for Whom?*, 42 N.Y.U. L. REV. 401, 406 (1967) (age 18 for delinquency adjudications through the juvenile justice system, which generally omitted many constitutional protections).

288.    Missouri law only allows people age 23 and above to get a license to carry concealed firearms, MO. ANN. STAT. § 571.101(2)(1) (West Supp. 2009), and St. Louis bars all open carrying of firearms on public streets, ST. LOUIS, MO., REV. CODE § 15.130.040 (2008).

289.    Nat'l Ctr. for Injury Prevention & Control, Ctrs. for Disease Control & Prevention, WISQARS Injury Mortality Reports, 1999–2006, http://webappa.cdc.gov/sasweb/ncipc/mortrate10_sy.html (last visited Apr. 5, 2009) (select injury cause "firearm," years 1999 to 2006, custom age range 15 to 39, output group "age").

290.    *See, e.g.*, Craig v. Boren, 429 U.S. 190 (1976) (finding a denial of equal protection in a law allowing 18-to-20-year old women, but not men, to purchase 3.2 percent beer).

crime is highly correlated with sex, and in considerable measure with race.[291] But similar arguments could also be made about people who live in especially high-crime cities, or who don't have high school degrees, or who have other possible demographic correlates of gun misuse.

It seems to me that these danger reduction arguments ought to be rejected. At least absent overwhelming statistical evidence, I don't think that any class of mentally competent adults should be denied constitutional rights based on their demographic characteristics, as opposed to things they have personally done. But in any event, this question, and the relationship between the rights of 17-year-olds, 20-year-olds, and 22-year-olds, illustrates the importance of distinguishing restrictions justified by the scope of the right from those justified by a danger reduction rationale.

c.   Bans on Gun Possession by Noncitizens

If bans on gun ownership by noncitizens are constitutional, they have to be constitutional on scope grounds. Reducing-danger grounds will not work: Noncitizens with guns are no more dangerous than citizens with guns.[292]

As to some jurisdictions' right-to-bear-arms provisions, the scope question is clear. Some states expressly secure the right only to citizens.[293]

Others expressly secure the right to any person; consider, for instance, the Colorado provision: "The right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when thereto legally summoned, shall be called in question . . . ."[294] The phrase "no person" is clear and broad.[295] The Colorado and Michigan Supreme Courts have indeed relied on state right-to-bear-arms provisions to strike down bans on gun possession by noncitizens.[296]

But some constitutional provisions, including the Second Amendment, secure a "right of the people." And the Court held in *United States v. Verdugo-*

---

291.   *See, e.g.*, BUREAU OF JUSTICE STATISTICS, *supra* note 270, at tbls.38, 40.

292.   If anything, noncitizens face a slightly greater deterrent than citizens do, because they risk deportation as well as criminal punishment if they misuse their guns. A very few noncitizens pose special national security threats, but those people—saboteurs and terrorists—are precisely the ones who would have the least trouble evading gun laws.

293.   *See, e.g.*, ALA. CONST. art. I, § 26; ARIZ. CONST. art. II, § 26; ARK. CONST. art. II, § 5.

294.   COLO. CONST. art. II, § 13.

295.   The right to keep and bear arms when "legally summoned" to "aid . . . the civil power" is limited to those whom the government chooses by law to summon, and might thus exclude noncitizens (and others). But the right to keep and bear arms in defense of home, person, and property is not so limited.

296.   People v. Nakamura, 62 P.2d 246 (Colo. 1936); People v. Zerillo, 189 N.W. 927, 928 (Mich. 1922) (interpreting a provision that "[e]very person has a right to bear arms for the defense of himself and the state").

*Urquidez*[297] that "the people" (as opposed to "person") is a "term of art" that "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."[298]  Likewise, *Heller* described "the people" as referring "to all members of the political community"—"not an unspecified subset," but also not persons who are outside the political community.[299]

I'm inclined to say that "the right of the people" should be read in the Second Amendment the same way it has been read in the First and Fourth Amendments: as including the nation's lawful guests, though not applying to those who are largely unconnected with the country, for instance because they are aliens in foreign countries,[300] or perhaps because they are illegally present in the United States.[301]  The right to bear arms is in part aimed at self-defense, something valuable to all people and not just to citizens.  Given that the American constitutional tradition generally secures individual rights to citizens as well as noncitizens (though not to people in foreign countries), the Second Amendment right to bear arms in self-defense should be treated the same way.

But whether or not I'm right on this, the scope of the phrase "the people" is the key question here.  Resolving the matter by just asserting that the law is a regulation rather than a prohibition, as the Utah Supreme Court did in a

---

297.    494 U.S. 259 (1990).

298.    *Id.* at 265.

299.    District of Columbia v. Heller, 128 S. Ct. 2783, 2790–91 (2008).  *Heller* also repeatedly spoke of the right of the people to bear arms as a right of "citizens," *see* United States v. Guerrero-Leco, No. 3:08cr118, 2008 WL 4534216, at *1 & n.2 (W.D.N.C. Oct. 6, 2008) (stressing this in holding that illegal aliens aren't covered by the Second Amendment), but this alone means little.  "Citizen" is often used casually to mean any person, especially contrasted with a government official.  *Heller* itself said, for instance, that "we do not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for *any purpose,*" 128 S. Ct. at 2799, even though the First Amendment has long been read as applying to noncitizens.  Bridges v. Wixon, 326 U.S. 135, 148 (1945).  Likewise, the Court has discussed the Sixth Amendment as "protect[ing] a right of citizens," Doggett v. United States, 502 U.S. 976 (1991), even though it expressly applies to any "accused" and has always been understood as covering noncitizen criminal defendants as well as citizens.  *See also* United States v. Gouveia, 467 U.S. 180, 195 (1984) (same as *Doggett*); Berkemer v. McCarty, 468 U.S. 420, 435 n.22 (1984) (speaking of "a citizen's Fifth Amendment rights," though the relevant Fifth Amendment clause speaks generally of the right of "any person").  None of this suggests that "citizen" always means "person"; it plainly doesn't.  But it does suggest that the Court may casually speak of the rights of "citizens," in a case in which citizenship status is not at issue, without deliberately choosing to limit the right to citizens to the exclusion of aliens.

300.    *See, e.g., Verdugo-Urquidez,* 494 U.S. at 274–75 (holding that the Fourth Amendment does not apply to aliens in foreign countries).

301.    *See* United States v. Boffil-Rivera, No. 08-20437-CR-Graham/Torres, 2008 U.S. Dist. LEXIS 84633 (S.D. Fla. Aug. 12, 2008) (holding that the Second Amendment does not protect illegal aliens); *Guerrero-Leco,* 2008 WL 4534216 (likewise).

cursory decision,[302] would be a mistake; so would concluding that disarming noncitizens is somehow necessary to materially reduce danger of crime or injury.

Finally, I should note that it's possible that state laws that discriminate against noncitizens when it comes to gun possession or gun carrying might violate the Equal Protection Clause, which has been interpreted as requiring strict scrutiny of some (but not all) state discrimination against noncitizens.[303] But I leave that question to others.

C.   "Where" Bans: Prohibition on Possession in Certain Places

Many laws prohibit most people from possessing guns in certain places, such as on all public streets, in bars, in parks, and in public housing projects.[304] Naturally, these laws are by definition lesser burdens than are total bans on possession. But they are nonetheless serious burdens: Whenever people are in the prohibited places—places where they have a right to be, and often have a practical need to be—they are barred from protecting themselves with a firearm.

And of course people's ability to protect themselves elsewhere is no substitute for their ability to protect themselves where they are. Some rights, such as free speech, may be only slightly burdened by laws that bar speech in some places but allow it in many other places. But self-defense has to take place wherever the person happens to be. Nearly any prohibition on having arms for self-defense in a particular place (I note some exceptions below) is a substantial burden on the right to bear arms for self-defense. Perhaps the burden can be justified on scope or danger reduction grounds,[305] but it is indeed a serious burden.

---

302.   State v. Vlacil, 645 P.2d 677 (Utah 1982).

303.   See Pratheepan Gulasekaram, *Aliens With Guns: Equal Protection, Federal Power, and the Second Amendment*, 92 IOWA L. REV. 891 (2007), for an extended treatment. State courts have split on the Equal Protection Clause question. For decisions holding that bans on noncitizen gun possession or carrying violate the Equal Protection Clause, see *People v. Rappard*, 28 Cal. App. 3d 302, 305 (Ct. App. 1972) (concealed carry); *Chan v. City of Troy*, 559 N.W.2d 374, 376–77 (Mich. Ct. App. 1996) (possession); *State v. Chumphol*, 634 P.2d 451 (Nev. 1981) (concealed carry). For decisions upholding such bans, see *Patsone v. Pennsylvania*, 232 U.S. 138, 143 (1914) (possession); *State v. Vlacil*, 645 P.2d 677, 679–81 (Utah 1982) (possession); *State v. Hernandez-Mercado*, 879 P.2d 283, 287–90 (Wash. 1994) (possession).

304.   Some of these exempt certain categories of people, such as bodyguards, or give the police discretion to give certain people licenses; but the laws remain broad bans on public possession by those people who aren't fortunate enough to be exempted or licensed.

305.   *See* Volokh, *supra* note 61.

1.   Bans on All Gun Carrying

*Heller* stated that bans on concealed carry of firearms are so traditionally recognized that they must be seen as constitutionally permissible.[306] This tradition does indeed go back to 1813 and the following decades, at least in some Southern and border states, as well as in Indiana,[307] and by the end of the 19th century the constitutionality of such bans had become pretty broadly accepted.[308] A few state court cases have struck down such bans,[309] but most courts have upheld them, and many state constitutions expressly authorize them.

The same cannot, however, be said about general bans on carrying firearms in public, which prohibit open as well as concealed carrying. *Heller* expressly concluded that "the right to . . . bear arms" referred to carrying arms.[310] Ten state

---

306.   *See* District of Columbia v. Heller, 128 S. Ct. 2783, 2816 (2008).

307.   *See* CLAYTON E. CRAMER, CONCEALED WEAPON LAWS OF THE EARLY REPUBLIC 143–52 (1999).

308.   *See, e.g.*, Robertson v. Baldwin, 165 U.S. 275, 281–82 (1897):

> The law is perfectly well settled that . . . the 'Bill of Rights[' was] not intended to lay down any novel principles of government, but simply to embody certain guaranties and immunities which we had inherited from our English ancestors, and which had, from time immemorial, been subject to certain well-recognized exceptions, arising from the necessities of the case. In incorporating these principles into the fundamental law, there was no intention of disregarding the exceptions, which continued to be recognized as if they had been formally expressed. Thus, . . . the right of the people to keep and bear arms (Article 2) is not infringed by laws prohibiting the carrying of concealed weapons . . . .

309.   See the Indiana, Kentucky, Vermont, and West Virginia cases cited *infra* note 312.

310.   128 S. Ct. at 2793; *see also* O'Shea, *supra* note 198, at 377–79.

Michael C. Dorf, *Does Heller Protect a Right to Carry Guns Outside the Home?*, 59 SYRACUSE L. REV. 225, 231–33 (2008), makes what is essentially a scope argument for "confin[ing]" the right to bear arms "to home possession," based on "the fact that the Court's individual rights jurisprudence more broadly treats the home as special." But the cases that article cites, *Stanley v. Georgia*, 394 U.S. 557 (1969), *Griswold v. Connecticut*, 381 U.S. 479 (1965), and *Lawrence v. Texas*, 539 U.S. 558, 562 (2003), are inapposite. *Stanley* protected home possession even of material—obscenity—that the Court had, earlier and later, said lacks constitutional value. *See, e.g.*, Paris Adult Theatre I v. Slaton, 413 U.S. 49, 67 (1973); Roth v. United States, 354 U.S. 476, 484 (1957). Nothing in *Stanley* suggests that constitutionally valuable speech can only be possessed in the home, and not in public; *Stanley* sets forth a narrow form of extra protection for obscenity, not a reason for restriction of constitutionally valuable speech. *Stanley* thus offers no analogy for restriction of guns in public, when those guns can be used for constitutionally valuable self-defense.

Likewise, *Griswold* and *Lawrence* dealt with conduct (sex and contraception) that has throughout American history been restricted to private places; moreover, restricting such conduct to private places doesn't materially burden the values that the Court pointed to as justifying recognition of the right—people remain free to plan their reproductive lives, engage in martial intimacy, and use sex to create intimate relationships even if they must do so in private. Barring the possession of guns for self-defense in public, on the other hand, does seriously burden the ability to defend oneself, for the reasons discussed in the following pages: Self-defense at home is no substitute for self-defense on a public sidewalk when the sidewalk is where you are attacked; having sex at home is for nearly all of us an adequate substitute for having sex on the sidewalk. And of course the legal tradition, both the constitutional tradition I note below and the broader tradition of legally

constitutions strongly imply this, by protecting "bear[ing] arms" but expressly excluding "carrying concealed weapons."[311]  Other constitutions don't mention carrying as such, but they do use the word "bear."  And many courts applying state constitutional provisions have held or suggested that carrying in public is generally constitutionally protected,[312] though some courts have disagreed.[313]

---

allowed carrying (though often with a license requirement), has been to allow gun possession in most public places but to forbid sex in most public places.  In this respect, original meaning and tradition both point to treating gun rights very differently from sexual rights.

311.   COLO. CONST. art. II, § 13; IDAHO CONST. art. I, § 11; KY. CONST. § 1; LA. CONST. art. I, § 11; MISS. CONST. art. III, § 12; MO. CONST. art. I, § 23; MONT. CONST. art. II, § 12; N.M. CONST. art. II, § 6; N.C. CONST. art. I, § 30; OKLA. CONST. art. II, § 26; *see also* TENN. CONST. art. I, § 26 (authorizing the legislature to "regulate the wearing of arms with a view to prevent crime," which suggests that "bear[ing] arms" includes "wearing" them, which is to say carrying them in public, though subject to regulations); TEX. CONST. art. I, § 23 (same).

312.   For cases or attorney general opinions holding or suggesting that there is a right to carry openly, see *State v. Reid*, 1 Ala. 612, 619 (1840) (dictum), *reaffirmed*, *Hyde v. City of Birmingham*, 392 So. 2d 1226, 1228 (Ala. Crim. App. 1980); *Dano v. Collins*, 802 P.2d 1021 (Ariz. Ct. App. 1990), *review granted but later dismissed as improvidently granted*, 809 P.2d 960 (Ariz. 1991); *Nunn v. State*, 1 Ga. 243 (1846), *reaffirmed*, Strickland v. State, 72 S.E. 260, 264 (Ga. 1911); *In re Brickey*, 70 P. 609 (Idaho 1902); Holland v. Commonwealth, 294 S.W.2d 83, 85 (Ky. 1956) (dictum); *State v. Chaisson*, 457 So. 2d 1257 (La. Ct. App. 1984); *City of Las Vegas v. Moberg*, 485 P.2d 737 (N.M. Ct. App. 1971); *State v. Kerner*, 107 S.E. 222 (N.C. 1921); *State v. Nieto*, 130 N.E. 663, 664 (Ohio 1920) (dictum), *reaffirmed*, *Klein v. Leis*, 795 N.E.2d 633, 638 (Ohio 2003); *Glasscock v. City of Chattanooga*, 11 S.W.2d 678 (Tenn. 1928); *State ex rel. City of Princeton v. Buckner*, 377 S.E.2d 139 (W. Va. 1988); La. Op. Att'y Gen. No. 80-992 (1990); Wisconsin Department of Justice Advisory Memorandum (Apr. 20, 2009), http://www.doj.state.wi.us/news/files/FinalOpenCarryMemo.pdf.  For cases holding the right extends even to carrying a concealed weapon, though perhaps regulated through a nondiscretionary licensing regime, see *Kellogg v. City of Gary*, 562 N.E.2d 685, 705 (Ind. 1990); *Schubert v. DeBard*, 398 N.E.2d 1339 (Ind. Ct. App. 1980); *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90 (1822), *abrogated as to concealed carry but not as to open carry by* KY. CONST. of 1850, art. XIII, § 25; *State v. Rosenthal*, 55 A. 610, 610–11 (Vt. 1903); *State v. Vegas*, Case No. 07 CM 687 (Cir. Ct. Milwaukee County Sept. 24, 2007), *available at* http://www.law.ucla.edu/volokh/vegas.pdf (concluding that under *State v. Hamdan*, 665 N.W.2d 785 (Wis. 2003), the right to bear arms may include the right to concealed carry in some narrow circumstances, especially where the person is engaging in dangerous activity such as delivering pizzas in high-crime areas).  Oregon courts take the view that the right extends to carrying weapons openly, but allows restrictions on carrying loaded guns, so long as the law allows the carrying of both an unloaded gun and ammunition.  *See* State v. Delgado, 692 P.2d 610, 614 (Or. 1984) (striking down total ban on carrying switchblade knives); Barnett v. State, 695 P.2d 991 (Or. Ct. App. 1985) (per curiam) (striking down a total ban on carrying blackjacks); State v. Boyce, 658 P.2d 577, 578–79 (Or. Ct. App. 1983) (upholding a requirement that handguns be carried unloaded).

*Chaisson* struck down a very limited carrying ban—one that applied only while hunting frogs at night—but its reasoning suggested that there was a constitutional right to carry for self-defense (including self-defense against alligators).  457 So. 2d at 1259; *see also* State v. Chandler, 5 La. Ann. 489, 490 (1850) (taking this view with regard to the Second Amendment).  *City of Lakewood v. Pillow*, 501 P.2d 744 (Colo. 1972), also struck down a carry ban because it was broad enough to ban gun stores, ban people "from transporting guns to and from such places of business," and ban people from "possess[ing] a firearm in a vehicle or in a place of business for the purpose of self-defense"; the court concluded that "[s]everal of these activities are constitutionally protected," which suggests that carrying in a car might have been protected.  *Id.*  This is consistent with the

Such protection, of course, makes sense when the right is (at least in part) a right to keep and bear arms in self-defense: Often, people need to defend themselves against robbers, rapists, and killers outside and not just in the home.[314]  Two-thirds of all rapes and sexual assaults, for instance, happen outside the victim's home, and half happen outside anyone's home.[315]  The percentages are even greater for robberies and assaults.[316]  So a ban on carrying weapons outside the home—especially in places that one practically needs to frequent, such as the streets on the way to work or to buy groceries—is a serious burden on the right, more so than the ban on handgun possession struck down in *Heller* (which would have at least left open some possibility of self-defense with shotguns or rifles).

Some states ban unlicensed carrying of loaded weapons, even when they are carried openly, but allow the carrying of unloaded weapons.  A few courts have upheld such laws on the grounds that they let a would-be defender carry both the weapon and ammunition, and load it when needed.[317]  But seconds count when one is attacked, especially in public, where one might not have the warnings that are sometimes available in the home (the breaking window, the barking dog, the alarm).  While loading a gun may take only several seconds, especially if the ordinance allows the carrying of loaded

---

Colorado right to bear arms' express exclusion of "the practice of carrying concealed weapons," COLO. CONST. art. II, § 13, which suggests that carrying weapons unconcealed would be presumptively protected.

All these cases speak of carrying in most public places; they often leave room for restrictions on carrying in particular places, such as businesses that serve liquor, churches, or polling places. *See infra* note 342.

313.   *See* City of Cape Girardeau v. Joyce, 884 S.W.2d 33 (Mo. Ct. App. 1994); Pierce v. State, 275 P. 393 (Okla. Crim. App. 1929); Commonwealth v. Ray, 272 A.2d 275, 278–79 (Pa. Super. Ct. 1970), *vacated* 292 A.2d 410 (Pa. 1972); Masters v. State, 685 S.W.2d 654 (Tex. Crim. App. 1985) (per curiam); *see also In re* Bastiani, 2008 WL 5455690, at *2 (N.Y. County Ct. Dec. 15, 2008) (applying Second Amendment). *But see* Cockrum v. State, 24 Tex. 394, 401–02 (1859) (taking the view that the right to bear arms includes the right to carry them); Galloway v. State, 69 S.W.2d 89, 90 (Tex. Crim. App. 1933) (per curiam) (likewise).

314.   *See* Robert Dowlut & Janet A. Knoop, *State Constitutions and the Right to Keep and Bear Arms*, 7 OKLA. CITY U. L. REV. 177, 215–16 (1982); Lund, *supra* note 171, at 73–74.

315.   BUREAU OF JUSTICE STATISTICS, *supra* note 270, at tbl.61.

316.   *Id.*

317.   *E.g.*, *Boyce*, 658 P.2d at 578–79.

magazines so long as the magazine is outside the weapon,[318] those will often be seconds that the defender doesn't have.[319]

So these laws are substantial burdens on the right to defend oneself, and carrying arms is within the scope of the right, alongside home possession. The question is whether bans on carrying can be justified on a rationale that they avert so much danger that the restriction on self-defense is an acceptable price to pay. I don't believe they can.

To begin with, bans on carrying loaded weapons that let people carry ammunition as well as a gun seem unlikely to avert much danger. An enraged driver can generally quickly load a weapon, even while driving,[320] and several seconds' delay will likely be less of a barrier to an attacker (who usually gets to choose the moment of attack) than to a defender. A would-be armed robber could load a weapon in seconds before going into a liquor store, so that he won't be committing a gun crime pretty much until he's actually committing the robbery itself. And while a ban on loaded carry might avert some gun accidents, it seems to me that preventing gun accidents—which are over ten times less common than deliberate gun injuries[321]—would not justify such a serious loss of self-defense rights.

Bans on carrying loaded weapons that require people to carry the guns or ammunition in locked cases might do more to prevent road rage killings, or to increase the chances that a would-be gun criminal is caught after he removes the gun from a locked case but before he is about to use it. But they seem unlikely to prevent the great majority of gun crime, which is committed by criminals who ignore gun laws just as they ignore other laws[322] and

---

318.    The ordinance in *Boyce* applied whenever a person carried a loaded magazine together with an unloaded gun, *see* PORTLAND, OR., MUNICIPAL CODE § 14A.60.010(B) (2009), but some such statutes only apply when the ammunition is physically present in or attached to the gun, *see, e.g.*, CAL. PENAL CODE §§ 12001(a)(1), (c), (j), 12031(a)(1), (g) (West 2000 & Supp. 2009); People v. Clark, 53 Cal. Rptr. 2d 99, 104 (Ct. App. 1996); Case Alert Memorandum From Paul R. Coble, Law Firm of Jones & Mayer, to All California Police Chiefs and Sheriffs, (Dec. 4, 2008), http://www.hoffmang.com/firearms/carry/CPOA-Client-Alert-12042008.pdf.

319.    A requirement that one carry the gun unloaded would be much more burdensome than the requirement that one carry only a 6- or 8-round magazine, and reload if that magazine is emptied, *see supra* pp. 1487–88. The initial loading would be required whenever the gun is needed for self-defense; the reloading would be required only in the very rare circumstances, *see id.*, when more than six or eight rounds are needed.

320.    Not while driving very safely, but presumably those enraged enough to contemplate shooting would be enraged enough to depart from the safest course of driving conduct.

321.    Nat'l Ctr. for Injury Prevention & Control, *supra* note 289 (intent or manner of the injury "unintentional," cause or mechanism of the injury "firearm," years 1999 to 2005); *id.* (intent or manner of the injury "homicide," cause or mechanism of the injury "firearm," years 1999 to 2005).

322.    *Cf.* Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton, 536 U.S. 150, 169 (2002) (rejecting the government's argument that a licensing requirement for door-to-door noncommercial solicitors was necessary to stop criminals who might pretend to be such solicitors, by

who are unlikely to be stopped and arrested for a gun law violation by the police before the crime is committed.

And such bans would essentially deny people the ability to defend themselves in public places using firearms—the tools that are likely to be the most effective for self-defense, and that the criminal attackers are already likely to possess. That seems to me to be an unacceptable burden on a constitutionally protected right, even if one in principle accepts some power to substantially burden self-defense in order to reduce danger of crime or injury. As the National Academy of Sciences and Centers for Disease Control reports suggest, a regime in which pretty much all law-abiding citizens can get licenses to carry concealed guns has not been shown to cause any increase in net crime or death.[323]

This having been said, I must acknowledge that my guesses about the degree to which such laws block lawful and effective self-defense, and the degree to which they prevent criminal attacks, are indeed just guesses. I've read a lot of criminological work on guns, and I designed and four times taught a seminar on firearms regulation policy, which mostly focused on the criminological data. But given the lack of empirical data, an educated guess is all I see available in this field.

My inclination in such situations is to defer to the constitutional judgment embodied in the right to bear (not just to keep) arms, and more broadly to a presumption that people should be free to have the tools they need for self-defense until there is solid evidence that possession of those tools will indeed cause serious harm. And, as I noted above, many courts have taken the same view by holding that there is a constitutional right to openly carry weapons; *Heller*'s discussion of the phrase "keep and bear" points in the same direction. Still, I expect that this will be a major area of debate in courts in the coming years.

---

pointing out that criminals would likely just shift to pretending to "ask for directions or permission to use the telephone" or to "pos[ing] as surveyers [sic] or census takers"); McIntyre v. Ohio Elec. Comm'n, 514 U.S. 334, 352–53 (1995) (rejecting the government's argument that a ban on anonymous speech was necessary to prevent fraud and libel, by pointing out that the defrauders and libelers would likely not abide by the requirement that they sign their true names, and would instead "use false names and addresses in an attempt to avoid detection").

323.    NAT'L RESEARCH COUNCIL, *supra* note 95, at 150; Hahn et al., *supra* note 96, at 54. Even Philip Cook, probably the leading American pro-gun-control criminologist, takes the view that "Whether the net effect of relaxing concealed-carry laws is to increase or reduce the burden of crime, there is good reason to believe that the net [change] is not large," and that concealed carry permit holders "are at fairly low risk of misusing guns, consistent with the relatively low arrest rates observed to date for permit holders." Philip J. Cook, Jens Ludwig & Adam M. Samaha, *Gun Control After Heller: Threats and Sideshows From a Social Welfare Perspective*, 56 UCLA L. REV. 1041, 1082 (2009). This should be at least as true as to a regime that allowed open carry, perhaps with a nondiscretionary licensing scheme (much like the nondiscretionary licensing scheme that Cook is discussing when he refers to concealed carry permit holders).

2.   Bans on Concealed Carry, Revisited

To be sure, any discussion of open carry rights has a certain air of unreality. In many places, carrying openly is likely to frighten many people, and to lead to social ostracism as well as confrontations with the police.[324] Most people are aware that many neighbors own guns, and even that many people are licensed to carry concealed guns and many others carry them illegally,[325] but this abstract knowledge doesn't cause much worry. But when a gun is visible, it occupies people's attention in a way that statistical realities do not. This is likely to deter many people from carrying a gun.[326]

There is indeed an "open carry movement" of people who deliberately wear guns openly, as a means of trying to normalize such behavior and of making a statement in favor of gun possession.[327] But this is like people who wear T-shirts that say "I had an abortion."[328] A few people choose to disclose such facts to make a political point. Yet most people are reluctant to make such disclosures, and would be reluctant to engage in the underlying behavior if they had to publicly disclose it.

And the Court has recognized that requirements of disclosure to the government may substantially burden constitutional rights when they trigger

---

324.   *See* State v. Hamdan, 665 N.W.2d 785, 809 (Wis. 2003) ("Requiring a storeowner who desires security *on his own business property* to carry a gun openly or in a holster is simply not reasonable. Such practices would alert criminals to the presence of the weapon and frighten friends and customers."). And the risk of frightening others would remain even when someone is carrying outside his property, though *State v. Cole*, 665 N.W.2d 328, 344 (Wis. 2003), holds that this burden on the right is justifiable when the carrying is outside one's business.

325.   In Texas, for instance, over 300,000 people have concealed carry licenses. *See* Texas Department of Public Safety, Demographic Information (Jan. 5, 2009), http://www.txdps.state.tx.us/administration/crime_records/chl/PDF/ActLicAndInstr/ActiveLicandInstr2008.pdf. In Florida, the number is over 500,000. *See* Florida Department of Agriculture and Consumer Services, Number of Licensees by Type, http://licgweb.doacs.state.fl.us/stats/licensetypecount.html (last visited May 11, 2009). This is only about 1.5–3 percent of the adult population, but chances are that someone in Texas or Florida will come across a concealed carry licenseholder every day.

326.   One piece of evidence for this is that, in states that allow concealed carry, 1 to 4 percent of the adult population gets a license. *See, e.g., supra* note 325. But in states that allow only open carry, open carry appears to be much rarer. As in *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958)—where the Court found a First Amendment problem with the government's forcing the NAACP to list its members—"it is not sufficient to answer . . . that whatever repressive effect compulsory [self-identification of gun carriers] follows not from state action but from private community pressures. The crucial factor is the interplay of governmental and private action, for it is only after the initial exertion of state power represented by the [open-carry requirement] that private action takes hold." *Id.* at 463.

327.   *See, e.g.,* Donna Lewinwand, *Four States Considering Open-Carry Gun Laws*, USA TODAY, Feb. 12, 2009, at 3A; OpenCarry.org, A Right Unexercised Is a Right Lost, http://opencarry.org (last visited Mar. 6, 2009).

328.   *See, e.g.,* Mary Bowers, *Getting It Off Your Chest*, GUARDIAN (U.K.), Apr. 23, 2008, (Comment & Features), at 16.

social pressure that deters constitutionally protected behavior. For instance, the right to anonymous speech and anonymous group membership stems largely from concerns that mandated identification of speakers will lead to a risk of ostracism and police harassment, and will thus deter speech.[329] Likewise, banning concealed carry in public places, coupled with the social pressures against open carry, will likely deter many people from carrying guns in public places altogether—and will thus substantially burden their ability to defend themselves.

What's more, the historical hostility to concealed carry strikes me as inapt today. The classic argument was captured well by the Richmond, Virginia Grand Jury in 1820:

> On Wearing Concealed Arms
>
> We, the Grand Jury for the city of Richmond, at August Court, 1820, do not believe it to be inconsistent with our duty to animadvert upon any practice which, in our opinion, may be attended with consequences dangerous to the peace and good order of society. We have observed, with regret, the very numerous instances of *stabbing*, which have of late years occurred, and which have been owing in most cases to the practice which has so frequently prevailed, of *wearing dirks*: Armed in *secret*, and emboldened by the possession of these deadly weapons, how frequently have disputes been carried to fatal extremities, which might otherwise have been either amicably adjusted, or attended with no serious consequences to the parties engaged.
>
> The Grand Jury would not recommend any legislative interference with what they conceive to be one of the most essential privileges of freemen, the right of carrying arms: But we feel it our duty publicly to express our abhorrence of a practice which it becomes all good citizens to frown upon with contempt, and to endeavor to suppress. We consider the practice of carrying arms secreted, in cases where no personal attack can reasonably be apprehended, to be infinitely more reprehensible than even the act of stabbing, if committed during a sudden affray, in the heat of passion, where the party was not previously armed for the purpose.
>
> We conceive that it manifests a hostile, and, if the expression may be allowed, a *piratical* disposition against the human race—that it is derogatory from that open, manly, and chivalrous character, which it should be the pride of our countrymen to maintain unimpaired—and that its

---

329. *See, e.g.*, Buckley v. Am. Constitutional Law Found., Inc., 525 U.S. 182, 199 (1999); McIntyre v. Ohio Elec. Comm'n, 514 U.S. 334, 341–42 (1995); NAACP *v. Alabama ex rel. Patterson*, 357 U.S. at 462–63.

Police stops of someone who is carrying openly might not be ill-motivated the way that police harassment of unpopular speakers might be: A police officer might be reasonably interested in a visibly armed person's intentions, even if being openly armed isn't a crime. But the burden on the exercise of constitutional rights stemming from such police reaction remains present.

> fatal effects have been too frequently felt and deplored, not to require
> the serious animadversions of the community. Unanimously adopted.
>         JAMES BROWN, Foreman.[330]

Carrying arms, the theory went, was "one of the most essential privileges of freemen," but "open, manly, and chivalrous" people wore their guns openly, "for all the honest world to feel."[331] Carrying a gun secretly was the mark of "evil-disposed men who seek an advantage over their antagonists."[332] And requiring that people carry openly imposed no burden on self-defense, precisely because open carry was so common that it wasn't stigmatized.

Today, open carrying is uncommon, and many law-abiding people naturally prefer to carry concealed (in the many states where it is legal). Concealed carrying is no longer probative of criminal intent. If anything, concealed carrying is probably more respectful to one's neighbors, many of whom are (sensibly or not) made uncomfortable by the visible presence of a deadly weapon. Nor is there any particular reason to think that concealed carrying increases lethal quarrels by suckering people into thinking that they can safely argue with a person who they think is unarmed. We should be aware now that strangers might well be armed, whether lawfully or not. And the very people who are most likely to turn an argument into a gunfight—for example, gang members—are probably especially unlikely to comply with an open-carry-or-no-carry mandate.

So it seems unlikely that there's a credible danger reduction case to be made for mandating that carrying be done openly rather than concealed—except insofar as one argues that all carrying is dangerous, and that mandating open carry is good precisely because it will deter carrying even by the law-abiding. Yet that is an argument that the right to bear arms in self-defense should foreclose. If my analysis in the previous section is correct, and a right to bear arms generally includes the right to carry, then it ought to include the right to carry concealed.

I must acknowledge, though, that longstanding American tradition is contrary to this functional view that I outline. For over 150 years, the right to bear arms has generally been seen as limited in its scope to exclude concealed carry. Constitutional provisions enacted after this consensus emerged

---

330.   *On Wearing Concealed Arms*, DAILY NAT'L INTELLIGENCER, Sept. 9, 1820, at 2 (paragraph breaks added).

331.   WILLIE NELSON, *Pancho & Lefty*, on PANCHO & LEFTY (Sony Records 1990) ("Pancho was a bandit boy / his horse was fast as polished steel / He wore his gun outside his pants / for all the honest world to feel"). This is a modern source, of course, but one that also captures well the 1800s sentiments.

332.   State v. Smith, 11 La. Ann. 633 (1856).

were likely enacted in reliance on that understanding. If *Heller* is correct to read the Second Amendment in light of post-enactment tradition and not just Founding-era original meaning, this exclusion of concealed carry would be part of the Second Amendment's scope as well.[333] And if the Second Amendment is incorporated via the Fourteenth Amendment, its scope as against the states might well be properly defined with an eye towards how the right to bear arms was understood in 1868,[334] when the concealed-carry exception was apparently firmly established.

There is a response to be made against this scope argument: The historical exclusion, the response would go, was contingent on the social conventions of the time—the social legitimacy of open carry, and the sense that concealed carry was the behavior of criminals—and this exclusion is no longer sustainable now that the conventions are different.[335] If this response is persuasive, then for the reasons I argue above a ban on concealed carry should indeed be seen as a presumptively unconstitutional substantial burden on self-defense. But overcoming the scope objection would be an uphill battle, as *Heller* itself suggests.

3.   Bans on Carry Into Places Where Alcohol Is Served or Sold

Many states ban carrying weapons into places where alcohol is served or sold.[336] This generally includes restaurants and sometimes even convenience stores, and not just bars.[337]

---

333.   *See* District of Columbia v. Heller, 128 S. Ct. 2783, 2815–17 (2008).

334.   *See, e.g.*, Akhil Reed Amar, *The Second Amendment: A Case Study in Constitutional Interpretation*, 2001 UTAH L. REV. 889, 907–09.

335.   Under this view, the right to bear arms should now be read as protecting concealed carry, albeit perhaps with a shall-issue licensing scheme, *see infra* Part II.H, though not necessarily protecting open carry, which unduly worries observers and can be prohibited without interfering with people's ability to defend themselves by concealed carry. Some states in fact allow licensed concealed carry, and make licenses broadly available to law-abiding adults, but ban open carry. *See, e.g.*, ARK. CODE ANN. §§ 5-73-301, -309, -315 (Supp. 2007) (providing for broadly available licenses to carry concealed firearms); ARK. CODE ANN. § 5-73-120 (2005) (otherwise banning the carrying of firearms, including open carrying).

336.   *See, e.g.*, State v. Dees, 669 P.2d 261, 264 (N.M. Ct. App. 1983) (upholding this as a reasonable regulation); Clark v. State, 527 S.W.2d 292, 294 (Tex. Ct. App. 1975) (doing likewise); Second Amendment Found. v. City of Renton, 668 P.2d 596 (Wash. Ct. App. 1983) (likewise); Tenn. Op. Att'y Gen. No. 04-020 (2000) (taking the view that such a regulation is constitutionally permissible).

337.   *See, e.g.*, State v. Lake, 918 P.2d 380, 382–83 (N.M. Ct. App. 1996) (upholding such a law even when "sales of liquor were not permitted at the time [the gun carrier] was in the store and he did not intend to purchase or possess alcohol within the store," using a tenuous argument based on the hypothetical risk that some other patron may be drunk and come back to the store while the gun carrier is there).

It also strips people of the ability to have a gun present for self-defense not just at the restaurant, store, or bar, but also on the way to and from their cars (or their homes, for those who walk or take public transportation). A gun might be comparatively unnecessary for people who want to go into a restaurant, because a rape or an assault inside the establishment might be relatively unlikely. But an attack outside the restaurant, on the way to the car, may be much more likely, especially if the restaurant has no parking lot of its own, or if the jurisdiction bars firearms even from alcohol licensees' parking lots;[338] the tools for self-defense are therefore more necessary on the way from the restaurant to the car. And given that there's no sign that restaurants, bars, and convenience stores are likely to set up some sort of gun check or locker system, a ban on gun carrying in such places is likely to disarm the law-abiding on their ways to and from these places as well as inside them.

So the burden here seems fairly substantial: To remain able to defend oneself, one has to avoid not just bars but a wide range of restaurants and stores. It's much less substantial than the burden imposed by laws that prohibit all carrying in public places, because it applies to many fewer places. But in and on their way immediately to and from those places, law-abiding citizens are stripped of the ability to bear arms in self-defense.

So the question is again whether the law might still be justified on the theory that it reduces danger. But here any such judgment is even more speculative than it usually is. I'm pretty sure that there's no good data on (1) the number of gun crimes that happen within places that serve alcohol, (2) the number of such gun crimes that are committed by people who are likely to comply with gun control laws, (3) the number of accidental gun injuries in such places, (4) the number of defensive gun uses that happen inside such establishments, or on the way from the establishment to a parking place, in those jurisdictions that allow the carrying of guns in such establishments, or (5) comparative crime rates in states that do and don't allow such carrying, controlling for various possible confounding factors.

We can guess that guns are more likely to be abused by drunk people, but not how often. We can guess that some of this abuse will be by people who would comply with gun control laws when sober, and thus not carry the gun into the bar—though we can also guess that much will be by people who

---

338.    *Compare, e.g.,* CITY OF BATON ROUGE & EAST BATON ROUGE PARISH, LA. CODE OF ORDINANCES § 13:95.3(a), (c) (2009) (banning guns from the premises of places "where alcoholic beverages are sold and/or consumed on the premises," and specifically including parking lots) *with* MICH. COMP. LAWS ANN. § 28.425o(1)(d), (3) (West Supp. 2009) (banning guns from the premises of bars or taverns "where the primary source of income of the business is the sale of alcoholic liquor by the glass and consumed on the premises," but specifically excluding parking lots).

wouldn't comply with gun control laws at all. We can guess that guns will sometimes be needed for lawful self-defense on the way to and from such places, and possibly even in such places, but again not how often. It really is all guesswork when it comes to the danger reduction argument, especially as to this less studied sort of restriction.

4.  Bans on Carry Into Places With Effective Security Screening and Internal Security, Such as Airports and Courthouses

In a few places, there is pretty thorough protection, through a combination of effective security screening using metal detectors, a substantial law enforcement presence, and the presence of many law-abiding citizens who would witness any crime. This is why violent crime inside airport security cordons, and inside courthouses that screen for weapons, seems to be rare (though of course not unheard of, especially since some extremely violent and determined criminals could steal weapons from police officers and marshals).[339]

In such places, a ban on civilian weapons seems likely to be a modest burden on lawful self-defense, perhaps low enough to fall below the constitutional threshold.[340] Most supposed "gun-free zones" are zones in which guns are outlawed but in which criminals still find it easy to have them. But the post-security-screening areas of courthouses and airports may indeed be nearly gun-free zones (as far as civilian possession is concerned),[341] and largely crime-free zones.

This having been said, I should note that the problem raised in the previous subsection—that banning guns in a place also prevents people from having guns available on their way to and from the place—is present here, too. Given this, the "insubstantial burden" argument should only apply to those courthouses and airports that provide lockers for gun storage. If such lockers aren't provided, the justification for gun possession restriction would have to flow from the "government as proprietor" argument (discussed below) or from a danger reduction argument.

---

339.  *See, e.g.,* Shaila Dewan, *Suspect Kills 3, Including Judge, at Atlanta Court,* N.Y. TIMES, Mar. 12, 2005, at A1.

340.  *See, e.g.,* United States v. Davis, No. 05-50726, 2008 U.S. App. LEXIS 26934 (9th Cir. Nov. 21, 2008) (upholding conviction for carrying a gun onto an airplane); Minich v. County of Jefferson, 919 A.2d 356, 360–61 (Pa. Commw. Ct. 2007) (upholding county's decision to ban members of the public from bringing guns into a courthouse).

341.  I say "nearly" because no security system is foolproof. *See, e.g.,* Jeannette Rivera-Lyles et al., *Man Sneaks 14 Guns Into Jet's Cabin at OIA,* ORLANDO SENTINEL, Mar. 7, 2007, at A1.

5.    Bans on Carrying in Other Privately Owned Places

Some jurisdictions ban, and sometimes have long banned, carrying guns into certain kinds of places, such as schools (including private schools), churches, polling places, and the like.[342]  *Heller* similarly, though rather cryptically, endorsed "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings."[343]  *Heller* didn't discuss whether this would be limited to public schools and government buildings, in which case the law might be justified by the government's power as proprietor (discussed two subsections below).  But the general reference to schools (which on its face includes private schools), and the description of places as "sensitive" rather than just government-owned, at least leaves open the possibility that *Heller* is endorsing such prohibitions on carrying into "sensitive" privately owned buildings.

These laws substantially burden self-defense.  While violent crime against adults on private school and church property is fairly rare, it is not unheard of, especially once one includes open spaces such as parking lots.[344]  The question must be whether the carry bans might nonetheless be justified because of (1) the historical exclusion of certain places from the right to bear arms, or (2) some sufficient evidence that the prohibition on gun carrying in those places will considerably reduce the aggregate danger of crime and injury (taking into account the decline in lawful self-defense opportunities).  It seems to me that future research should focus on those questions, rather than dismissing the burden on the right to bear arms as immaterial, or just assuming that the language in *Heller* gives the government carte blanche to ban guns in schools, government buildings, or other places.

---

342.    *See* Isaiah v. State, 58 So. 2d 53, 56 (Ala. 1912) (McClellan, J., concurring); Strickland v. State, 72 S.E. 260, 264 (Ga. 1911); Hill v. State, 53 Ga. 473 (1874); State v. Shelby, 2 S.W. 468 (Mo. 1886), *characterizing* State v. Wilforth, 74 Mo. 528 (1881); State v. Kerner, 107 S.E. 222, 225 (N.C. 1921); Walter v. State, 16 Ohio C.C. (n.s.) 523, 524 (Cir. Ct. 1905); Andrews v. State, 50 Tenn. (3 Heis.) 165 (1871); English v. State, 35 Tex. 473, 478–79 (1872); Weapon Searches in Courthouses, Alaska Op. Att'y Gen. (Inf.) 241 (1991).

343.    128 S. Ct. 2783, 2816–17 (2008); *see also* William Van Alstyne, *The Second Amendment and the Personal Right to Arms*, 43 DUKE L.J. 1236, 1254 (1994) (defending a broad view of the right to bear arms, but suggesting that restrictions on carrying guns "in courtrooms or in public schools" are constitutional).

344.    *See, e.g.*, Kristin Bender, *Suspect Faces Trial in Wife's Shooting at Oakland Church*, OAKLAND TRIB., Mar. 14, 2008.

6.   Bans on Carrying Within One Thousand Feet of a School

The federal Gun-Free School Zones Act bans gun possession, except
on private property, within one thousand feet of any school.[345]  The Act
exempts possession by those with a state gun license,[346] but many states allow
unlicensed open carry,[347] Alaska and Vermont allow unlicensed concealed
carry,[348] many states don't give someone an option to get a gun possession license,
and many more don't allow 18-to-20-year-olds to get concealed carry
licenses.[349]  In these states, gun carrying on public streets and sidewalks within
one thousand feet of a school is effectively barred by federal law.[350]

California and Wisconsin laws likewise prohibit open carrying within one
thousand feet of a school, even when the gun is unloaded.[351]  (Outside those
zones, California law generally allows unloaded open carry,[352] and Wisconsin

---

345.   18 U.S.C.A. §§ 921(a)(25), 922(q) (West 2000 & Supp. 2008).  An earlier version of the
Act was struck down on Commerce Clause grounds by *United States v. Lopez*, 514 U.S. 549 (1995), but
the statute was reenacted to prohibit possession of a "firearm that has moved in or that otherwise affects
interstate or foreign commerce," and this has since been upheld against a Commerce Clause challenge,
*see, e.g.*, United States v. Dorsey, 418 F.3d 1038 (9th Cir. 2005).  For the rare case considering the
constitutionality of the Act under the Second Amendment, see *United States v. Lewis*, Crim. No. 2008-
45, 2008 WL 5412013, at *2 (D.V.I. Dec. 24, 2008) ("It is beyond peradventure that a school zone, where
Lewis is alleged to have possessed a firearm, is precisely the type of location of which *Heller* spoke.
Indeed, *Heller* unambiguously forecloses a Second Amendment challenge to that offense under any level
of scrutiny."); Government's Opposition to Defendant's Motion to Suppress at 2, United States v.
Lewis, Crim. No. 2008-45, 2008 WL 5412013 (D.V.I. Dec. 24, 2008) (noting that the gun was found in
the car defendant was driving, with no mention that the car was actually being driven on school property).
346.   18 U.S.C. §§ 922(q)(2)(B)(i)–(ii) (2006).
347.   *See* NAT'L RIFLE ASS'N INST. FOR LEGISLATIVE ACTION, COMPENDIUM OF STATE
FIREARM LAWS (2003), http://www.nraila.org/media/misc/Compendium.htm.
348.   *See* NAT'L RIFLE ASS'N INST. FOR LEGISLATIVE ACTION, FACT SHEET: RIGHT-TO-
CARRY (2008), http://www.nraila.org/Issues/FactSheets/Read.aspx?ID=18.
349.   Montana tries to avoid the effect of the federal law by providing, in MONT. CODE ANN.
§ 45-8-360 (2007), that "[i]n consideration that the right to keep and bear arms is protected and
reserved to the people in Article II, section 12, of the Montana constitution, a person who has not been
convicted of a violent, felony crime and who is lawfully able to own or to possess a firearm under the
Montana constitution is considered to be individually licensed and verified by the state of Montana
within the meaning of the provisions regarding individual licensure and verification in the federal Gun-
Free School Zones Act."  This, though, likely doesn't exempt Montanans from the federal Act, which
seems to require some individualized investigation for each license: 18 U.S.C. § 922(q)(2)(B)(ii) (2006)
exempts license-holders only if "the law of the State or political subdivision requires that, before an
individual obtains such a license, the law enforcement authorities of the State or political subdivision
verify that the individual is qualified under law to receive the license."
350.   One can fault the federal government for this, or fault the state governments for not
providing an easy licensing system that allows people to get licenses that would exempt them from
federal law.  But in any event, gun carrying is indeed banned within one thousand feet of schools in
those states, albeit by a combination of federal and state legal regimes.
351.   CAL. PENAL CODE § 626.9 (West Supp. 2009); WIS. STAT. ANN. § 948.605 (West 2008).
352.   *See supra* note 318.

law generally allows even loaded open carry.[353]) Louisiana law in effect prohibits carrying by 18-to-20-year-olds within one thousand feet of a school or university, except in a car, and provides that "[l]ack of knowledge that the prohibited act occurred . . . within one thousand feet of school property shall not be a defense."[354] In Aurora (Illinois), carrying of firearms, stun guns, and even pepper spray is banned within one thousand feet of a school or university.[355]

These school zone statutes substantially burden people's ability to defend themselves. Many people live and work within one thousand feet of schools, and may need to defend themselves in that area even if they never set foot on school property. I know of no longstanding tradition of treating several blocks around a school as a "sensitive place[ ]" in which people are stripped of their right to keep and bear arms in self-defense, including at night when self-defense is most necessary and school is not even in session. And if a reducing danger argument is inadequate to justify gun bans on public streets generally (see Part II.C.1), it's hard to see how it would be adequate to justify gun bans on public streets within several blocks of a school.

7.   Bans on All Gun Possession on Government Property (Setting Aside Streets and Sidewalks)

Some government-run housing projects impose lease conditions barring tenants from possessing any guns in their apartments.[356] Illinois allows firearms

---

353.   *See* NAT'L RIFLE ASS'N INST. FOR LEGISLATIVE ACTION, *supra* note 347.

354.   LA. REV. STAT. ANN. § 14:95.2(A), (C)(5), (E) (2004). The law applies to people of all ages, but excludes carrying under a concealed handgun permit; such permits are unavailable to 18-to-20-year-olds, LA. REV. STAT. ANN. § 40:1379.3(C)(4) (2008). The law exempts "[a]ny constitutionally protected activity which cannot be regulated by the state, such as a firearm contained entirely within a motor vehicle," LA. REV. STAT. ANN. § 14:95.2(C)(5), but this just means that 18-to-20-year-olds may carry near a school only if the right to bear arms is read as protecting such carrying. There is also an exception for university students possessing firearms in their dormitory rooms, or on their way to or from their cars. *Id.* § 14:95.2(C)(8).

355.   AURORA, ILL., CODE OF ORDINANCES § 29-43(a)(4), (12) (2009).

356.   *See, e.g.*, Doe v. Portland Hous. Auth., 656 A.2d 1200, 1201 (Me. 1995) (holding such a lease condition to be preempted by state firearms law); Stipulation Re Settlement, Doe v. S.F. Hous. Auth., No. 3:08-cv-03112-THE (N.D. Cal. June 27, 2008) (agreeing to eliminate such a lease condition); Richmond Tenants Org., Inc., v. Richmond Redevelopment & Hous. Auth., 751 F. Supp. 1204 (E.D. Va. 1990) (upholding such a lease condition against a statutory challenge, but not considering the Virginia Constitution's right to bear arms), *aff'd*, 947 F.2d 942, 1991 WL 230214 (4th Cir. 1991) (unpublished); H.R. 4062, 103d Cong. (1994) (proposing that public housing tenants be allowed to vote on whether to ban gun possession in the projects in which they live); S.B. 730, Gen. Assem., Jan. Sess. (Conn. 1995) (proposing ban on gun possession in public housing); Tex. Op. Att'y Gen. DM-71 (1991) (concluding such a lease condition is barred by state law); Robert Dowlut, *Bearing Arms in State Bills of Rights, Judicial Interpretation, and Public Housing*, 5 ST. THOMAS L. REV. 203, 212–14 (1993) (describing and criticizing such a policy in Chicago); Lloyd L. Hicks, *Guns in Public Housing: Constitutional Right or Prescription for Violence?*,

in public housing, but bans stun guns.[357] Aurora (Illinois) bans possession in public housing of firearms, stun guns, and even pepper spray.[358] Louisiana and Lincoln (Nebraska) domestic violence shelters ban both guns and stun guns.[359] Guns are also banned on other government property,[360] including places where the risk of crime may be quite substantial, such as government-owned parks (both city parks and national parks).[361] How much extra power should the government's role as proprietor give it in such situations?[362]

I don't know what the right answer is, but I can point to two wrong or at least incomplete answers. The first comes from a court that used a danger reduction rationale to uphold a ban on gun possession in public housing projects:

> While the right to possess arms is acknowledged within the Michigan Constitution, this right is subject to limitation. Jurisprudence in this state has consistently maintained the right to keep and bear arms is not absolute. This Court has determined that "the constitutionally guaranteed right to bear arms is subject to a reasonable exercise of the police power." The state has a legitimate interest in limiting access to weapons.

---

4 J. AFFORDABLE HOUSING & COMMUNITY DEV. L. 153, 163 (1995) (discussing these policies without closely analyzing the constitutional question).

357.    *See* 720 ILL. COMP. STAT. ANN. §§ 5/24-1(a)(10) (West 2003); Volokh, *supra* note 192 (discussing how the right to bear arms, as well as other rights, should apply to restrictions on stun gun possession and irritant spray possession).

358.    AURORA, ILL., CODE OF ORDINANCES § 29-43(a)(4), (12).

359.    LA. ADMIN. CODE tit. 4, § 1729(B)(3)(c)(iv) (2009); LINCOLN, NEB., MUN. CODE § 9.36.140 (2008).

360.    *See, e.g.*, Estes v. Vashon Maury Island Fire Prot. Dist. No. 13, No. 55950-8-I, 2005 WL 2417641 (Wash. Ct. App. Oct. 3, 2005) (upholding a ban on possession by visitors to fire stations).

361.    In 2006, for instance, there were 11 homicides in national parks, *see Crime in National Parks*, WASH. POST, Feb. 28, 2008, *available at* http://www.washingtonpost.com/wp-dyn/content/graphic/2008/02/28/GR2008022800363.html, though there were only 13.2 million overnight stays. *See* U.S. CENSUS BUREAU, STATISTICAL ABSTRACT OF THE UNITED STATES: 2009, tbl.1212 (2009), http://www.census.gov/compendia/statab/tables/09s1212.pdf; National Park Serv., Director's Order #82: Public Use Data Collecting and Reporting Program, http://www.nps.gov/policy/DOrders/DO-82draft.htm (last visited Apr. 5, 2009) (defining overnight stay as "[o]ne night within a park by a visitor"). If even two of the homicides were of overnight visitors (a subject on which we can only speculate, since the National Park Service doesn't collect data on whether the victims were overnight visitors), this would yield an annualized homicide rate of 5.5 per 100,000 people per year, roughly comparable to a national rate of 5.7 per 100,000 people per year. FBI, U.S. DEP'T OF JUSTICE, CRIME IN THE UNITED STATES tbl.1 (2006), http://www.fbi.gov/ucr/cius2006/data/table_01.html; E-mail From Amy Atchison, UCLA Law Library to Author (Feb. 6, 2009, 14:51 PST) (on file with author) (reporting on Atchison's conversation with the National Park Service).

362.    *See* Mich. Coal. for Responsible Gun Owners v. City of Ferndale, 662 N.W.2d 864, 871 (Mich. Ct. App. 2003) (suggesting that the government might be able to "create gun-free zones," in case involving ban on possession in city buildings, but not definitively reaching the constitutional question because it found the ordinance was preempted); Tenn. Op. Att'y Gen. No. 04-020, at *2 (2004) (concluding that "the State has authority to prohibit or regulate the possession and use of firearms on property that it owns").

> It is recognized that public housing authorities have a legitimate interest in maintaining a safe environment for their tenants. Infringements on legitimate rights of tenants can be justified by regulations imposed to serve compelling state interests which cannot be achieved through less restrictive means. Restrictions on the right to possess weapons in the environment and circumstances described by plaintiff are both in furtherance of a legitimate interest to protect its residents and a reasonable exercise of police power. This is particularly true given defendant's failure to make any allegation she feels physically threatened or in danger as a resident of plaintiff's complex necessitating her possession of a weapon to defend herself.[363]

This can't be a sound argument, because it doesn't explain why public housing projects are any different from private housing, where the right to keep and bear arms is indeed protected under the Michigan Constitution.[364] After all, the right to bear arms is constitutionally protected even though the government has a legitimate interest in "maintaining a safe environment" for everyone, and there are few "environment[s] and circumstances" in which guns lose their dangerousness.[365]

---

363. Lincoln Park Hous. Comm'n v. Andrew, No. 244259, 2004 WL 576260, at *3 (Mich. Ct. App. Mar. 23, 2004) (citations omitted).

364. MICH. CONST. art. 1, § 6, provides, "Every person has a right to keep and bear arms for the defense of himself and the state," which clearly includes an individual self-defense right. *See also* People v. Zerillo, 189 N.W. 927, 929 (Mich. 1922) (using this provision to strike down a ban on gun possession by noncitizens).

365. The same criticism applies to the Maine Superior Court's conclusion that a ban on gun possession in public housing is constitutional. Doe v. Portland Hous. Auth., No. CV-92-1408, 1993 Me. Super. LEXIS 359 (Me. Super. Ct. Dec. 29, 1993), *rev'd on statutory grounds*, 656 A.2d 1200 (Me. 1995). There too the court's reasoning would have equally upheld gun prohibitions imposed even on private property (not just government-owned property), though perhaps limited to dangerous apartment buildings: The court reasoned that the ban was a "reasonable . . . regulation" given that (1) the housing complexes "have unique tendencies for violence and even criminal behavior that specially threaten the health, safety and welfare of the residents," stemming from "the congregate closeness of the living arrangements and the resulting relationships among the residents[, which] tend to generate an atmosphere of volatility," and (2) the special complexes for "senior citizens and the disabled" house many people who have "mental or emotional problems" which leads "to assault, vandalism, rowdyism and similar disturbances." *Id.* at *19, 21–22. But it's hard to see how the Maine Constitution's expressly individual right to bear arms could rightfully be denied to non-criminal, non-mentally-ill people simply because they have the poor fortune to live around dangerous people—precisely the scenario where the right to bear arms is most useful to a law-abiding citizen.

Certain kinds of guns and ammunition may be especially dangerous in apartment buildings, whether publicly or privately owned, because the apartments are separated by only a single wall; this increases the risk that a bullet would injure or kill a neighbor. But this concern has never been seen as justifying total bans on all gun possession in all apartment buildings. And it would in any case not justify bans on shotguns, which fire small pellets that are highly unlikely to go through a wall or retain their lethality even if they do. Likewise, it wouldn't justify bans on handguns that are loaded with special frangible ammunition, which is designed to similarly not go through walls.

The second wrong (or at least incomplete) approach comes from the Oregon Attorney General's opinion that a ban on gun possession in public housing would be unconstitutional:

> It is well settled that the government may not condition entitlement to public benefits, whether gratuitous or not, upon the waiver of constitutional rights that the government could not abridge by direct action. The United States Supreme Court has repeatedly upheld that principle under the United States Constitution. . . .
>
> . . . Although the Oregon Supreme Court has not ruled on the issue directly, from [various state court] authorities we believe that, if faced squarely with the question, the court would hold that this "unconstitutional condition" principle applies under the Oregon Constitution. . . .
>
> Eligibility for low-income housing provided by a housing authority plainly is a public benefit or privilege. Subject to certain federal limitations, a housing authority lawfully may condition eligibility for low-income housing on satisfaction of income criteria and other factors designed to ensure that only responsible tenants reside in that housing. However, we conclude that a housing authority may not require an otherwise-eligible individual to surrender rights under article I, section 27 in order to obtain low-income housing.[366]

The problem here is that, though all the cases cited by the Oregon Attorney General indeed rejected government demands that someone waive a constitutional right to get a benefit, many other cases uphold such demands.[367] A plea bargain may be conditioned on a waiver of the right to trial. Welfare benefits, or membership on a high school sports team, may be conditioned on a waiver of some parts of the recipient's rights to be free from searches without probable cause.[368] A government paycheck may be conditioned on a promise not to reveal certain things the employee learns in confidence.[369]

More broadly, the government may sometimes refuse to allow the exercise of constitutional rights on its property, especially setting aside traditionally open places such as parks and sidewalks. It could, for instance, insist that abortions not be performed in government-owned hospitals.[370] It could bar a wide range of speech in government buildings.[371]

---

366. 46 Or. Op. Att'y Gen. 122, 127–28 (1988) (citation omitted).

367. *See* Ark. Op. Att'y Gen. No. 94-093 (1994) (expressing uncertainty about whether a ban on firearms in public housing would be unconstitutional, but not discussing the government's proprietary rights).

368. *See* Vernonia School Dist. 47J v. Acton, 515 U.S. 646 (1995) (discussing public high school athletes); Wyman v. James, 400 U.S. 309 (1971) (discussing welfare recipients).

369. *See* Snepp v. United States, 444 U.S. 507 (1980).

370. *See* Webster v. Reproductive Health Servs., 492 U.S. 490 (1989); *see also* Nordyke v. King, 563 F.3d 439, 460 (9th Cir. 2009) (citing *Harris v. McRae*, 448 U.S. 297, 315–16 (1980),

Public housing might be treated specially, because it is a home as well as a government building,[372] or because it is the sort of government benefit that is unusually important to those who use it. This has been the view of cases striking down at least certain kinds of speech restrictions[373] and search and seizure policies in public housing.[374] But still, while the Oregon Attorney General probably reached the right result in concluding that public housing authorities can't require their tenants to surrender the right to bear arms, the unconstitutional conditions analysis in that opinion too categorically rejects the government-as-landlord claim, just as the Michigan opinion quoted above too categorically rejects the constitutional right claim.

It's not clear to me how other public property should be treated: Should the government be allowed to ban guns on government-owned recreational land, whether a city park or a national park, either by insisting that people who want to use the land must waive their right to bear arms, or by otherwise concluding that there is no right to bear arms in such places?[375] As a condition of going onto a public university campus, which might have a considerable amount of open space and parking areas where crime is not uncommon?[376] In public university dorm rooms, where one state attorney general's opinion suggests gun possession is constitutionally protected?[377] As a condition of going onto a public primary or secondary school campus, or into a government office building, especially when this requires walking unarmed through a potentially dangerous parking structure? Courts need to work out a government-as-proprietor doctrine for the right to bear arms much as they have done for the freedom of speech.

---

which held that the government could refuse to fund abortions using government money, for the proposition that the government should have broad authority to restrict arms possession on government property, at least "where high numbers of people might congregate").

371.   *See* Int'l Soc'y for Krishna Consciousness (ISKCON) v. Lee, 505 U.S. 672 (1992).

372.   *Cf.* 46 Or. Op. Att'y Gen. 122, 131–32 (1988) (concluding that it is probably permissible to ban visitors to public housing from bringing guns).

373.   *E.g.*, Resident Action Council v. Seattle Hous. Auth., 174 P.3d 84 (Wash. 2008) (striking down ban on posting material on the outside of one's apartment door).

374.   *E.g.*, Pratt v. Chicago Hous. Auth., 848 F. Supp. 792 (N.D. Ill. 1994) (holding that warrantless searches for guns in public housing units are likely unconstitutional, and silently assuming that the Fourth Amendment rules are the same in publicly owned housing as they are in other homes).

375.   *See, e.g.*, *Nordyke*, 563 F.3d at 460 (taking the view that at least those parks "where high numbers of people might congregate" are "sensitive places" where the government may indeed ban private gun carrying).

376.   Va. Op. Att'y Gen. No. 05-078 (2006) (ban on carrying concealed weapons by university students and employees is permissible, though not discussing possession in dorm rooms).

377.   La. Op. Att'y Gen. No. 94-131 (1994) (suggesting that Second Amendment protects university student's right to possess guns in dorm rooms).

D.   "How" Restrictions: Rules on How Guns Are to Be Stored

1.   Requirements That Guns Be Stored Locked or Unloaded

The D.C. gun ban required that even long guns be stored locked and unloaded.[378] Other states require that all guns be stored locked if minors under a certain age (often sixteen) can access them.[379]

Such laws substantially burden self-defense. Even if the gun can be unlocked in several seconds (something such laws generally allow[380]), a defender might not have those seconds.[381]

The laws are aimed at danger reduction, especially to children. And it is plausible that the storage requirements will prevent some suicides, accidents, or even crimes by children.[382] But it is also plausible that they will prevent life-saving defensive actions by adults, including defensive actions that save the very children whom the law is trying to protect. The empirical evidence is unsettled.[383]

So it's hard to see how one can definitively either say that the substantial burden is justified by the danger that the laws reduce, or dismiss, the possibility that the laws will indeed materially reduce aggregate crime and injury. As in the other examples, much depends on what kind of showing of danger reduction—empirical proof, mere plausibility, or something in

---

378.   D.C. CODE § 7-2507.02 (2001).

379.   See, e.g., CONN. GEN. STAT. § 29-37i (2003); 46 Or. Op. Att'y Gen. No. 122, 131 (1988) (suggesting this would be constitutional, at least as to housing projects—though maybe more broadly—and as to children under 16).

380.   See, e.g., CONN. GEN. STAT. § 29-37i. But see District of Columbia v. Heller, 128 S. Ct. 2783, 2818–19 (2008) (taking the view that the D.C. law did not allow such actions even when self-defense was necessary, and thus presumably allowed guns to be kept at home only to be used at target ranges or for hunting).

381.   See supra Part II.C.1. Fla. Op. Att'y Gen. 2000-42 (2000), opines that "[a] requirement that gun owners secure their firearms with a gun lock would not appear to interfere with that right [to bear arms]," but doesn't explain why this is so. When someone is woken in the middle of the night when an intruder is breaking into his house, even the few seconds it takes to unlock the lock may indeed be a substantial "interfere[nce]" with "[t]he right of the people to keep and bear arms in defense of themselves," FLA. CONST. art. I, § 8(a).

382.   See Heller, 128 S. Ct. at 2819–20 (acknowledging the Framing-era laws restricting the storage of gunpowder in order to prevent fire, and noting that the Court's analysis does not "suggest the invalidity of laws regulating the storage of firearms to prevent accidents," but not discussing exactly what sorts of regulations would remain valid and what sorts would be too burdensome to be constitutional).

383.   See NAT'L RESEARCH COUNCIL, supra note 95, at 217–20 (noting the conflict in the studies, and concluding that "until independent researches can perform an empirically based assessment of the potential statistical and data related problems, the credibility of the existing research cannot be assessed").

between[384]—is treated as sufficient justification, if substantial burdens can indeed be justified by a danger reduction argument.

E.   "When" Restrictions: Rules on Temporarily Barring People From Possessing Guns

1.   Restrictions on Possession While Intoxicated

Many states bar possession of a firearm while intoxicated. Now a drunk man may need self-defense as much as the rest of us, and perhaps even more.[385] But he is also especially likely to endanger innocent people—whether bystanders or people whom he mistakenly identifies as threatening him—and he is especially unlikely to successfully defend himself.[386] And to the extent that the scope of the right to bear arms has historically excluded the mentally infirm, there seems to be little reason to treat those who are briefly mentally infirm as a result of intoxication differently from those who are permanently mentally infirm as a result of illness or retardation.[387]

A difficulty would arise if the law covered not just gun handling or carrying, but gun possession in the home while the homeowner is home and intoxicated. If every gun owner becomes a felon when he drinks too much at home, or must somehow find a friend who will soberly store the gun elsewhere on such occasions,[388] then millions of people will be felons.[389]

---

384.   *See supra* Part I.C.2.b.

385.   *Cf.* Robinson v. Pioche, Bayerque & Co., 5 Cal. 460, 460 (1855).

386.   *But see* Beckett v. People, 800 P.2d 74, 83 (Colo. 1990) (Kirshbaum, J., dissenting) (asserting a constitutional right to pick up a gun for immediate self-defense even when intoxicated).

387.   For cases holding that the right to bear arms doesn't apply to carrying or possession on the person while intoxicated, see *Gibson v. State*, Nos. A-6082, A-6162, 1997 WL 14147 (Alaska Ct. App. Jan. 17, 1997) (holding that the right does not apply to possession on the person while intoxicated, as applied in the home, but reserving the question whether this would apply to constructive possession); *People v. Garcia*, 595 P.2d 228, 230–31 & n.4 (Colo. 1979) (likewise as to possession on the person while intoxicated, but noting that mere ownership doesn't suffice under the statute for possession, and that possession must be determined by looking at "the proximity of the defendant to the firearm," "the ordinary place of storage of the firearm," "the defendant's awareness of the presence of the firearm," and "locks or other physical impediments which preclude ready access to the firearm"); *City of Salina v. Blaksley*, 72 Kan. 230 (1905) (holding that the right does not apply as to carrying while intoxicated); *State v. Shelby*, 2 S.W. 468 (Mo. 1886) (likewise as to carrying while intoxicated); *State v. Rivera*, 853 P.2d 126, 130 (N.M. 1993) (likewise as to possessing "on the person, or in close proximity thereto, so that the weapon is readily accessible for *use*" while intoxicated); *State v. Kerner*, 107 S.E. 222, 225 (N.C. 1921) (dictum) (likewise as to carrying while intoxicated); *State v. Paolantonio*, No. KS-2006-0262A, 2006 WL 2406735 (R.I. Super. Aug. 15, 2005) (likewise as to carrying while intoxicated).

388.   Something many friends might be reluctant to do, for instance if they have children at home and no gun safe, or if they are worried that the requester is trying to hide a gun that had been used in crime.

It's not entirely clear how this problem fits with the constitutional framework outlined above.  My inclination is to say that while there may be a strong enough tradition of treating the mentally infirm as too unreliable to possess guns, and the tradition might extend to treating the temporarily mentally infirm as similarly too unreliable, the tradition likely doesn't extend to a usually sober person's possession of a gun in his home while he's drunk.  I would also think that requiring gun owners to refrain from normally accepted social drinking practices, to do all their serious drinking outside the home, or to temporarily move their guns outside their homes on party nights creates a substantial burden.  But at the same time people can avoid or sharply decrease this burden by entirely or largely refraining from a behavior that, while legal and socially acceptable, is hardly necessary or praiseworthy; perhaps that should affect our judgment about the burden's substantiality.

Fortunately we can largely avoid this issue, at least for now, since nearly all the statutes on the subject cover only "carry[ing]" or "personal possession."[390] The one exception that I've seen, the Missouri statute stating that a person is guilty of a crime if he knowingly "[p]ossesses or discharges a firearm or projectile weapon while intoxicated,"[391] is likely just inartfully drafted: Though accompanying statutes use "possesses" broadly, likely broadly enough to include storing inside one's home,[392] this statute is labeled "Unlawful use of weapons," and generally covers discharging, carrying, or brandishing a weapon (or setting a spring gun).  I expect that Missouri courts would therefore narrowly interpret "possesses" in this statute, as covering only having on one's person and not simply having a gun stored somewhere in the home.

2.    Restrictions on, or Sentence Enhancements for, Possessing Firearms While Possessing Drugs or Committing Another Crime

Many states ban possession of guns while possessing drugs or committing a crime.  If read broadly, these could be seen as "when" restrictions, prohibiting all gun possession during the commission of a crime.

---

389.    Such people are of course unlikely to be caught unless they misuse their guns while drunk. But some of them might be caught: Imagine, for instance, that someone with a grudge against an ex-lover or an ex-boss calls the police to accurately report that the person is drunk and is known to keep a gun in the home.  And if the answer to that hypothetical is that the police rightly would not investigate this unless there was evidence the person was actually a danger to others, then this just reinforces the notion that a law banning possession while intoxicated is too broad.

390.    See, e.g., CONN. GEN. STAT. § 53-206d (2007); IDAHO CODE ANN. § 18-3302B (2004).

391.    MO. ANN. STAT. § 571.030.1(5) (West 2008).

392.    E.g., id. § 571.020.1 (banning possession of classes of weapons, including machine guns).

The right to keep and bear arms in lawful self-defense doesn't include the right to use those arms in a crime.[393] And this would include using the guns in ways short of firing or even brandishing them (for instance, by carrying them in case one wants to fire or brandish them, which might well embolden the criminal and deter others who know that this criminal is armed).

On the other extreme, keeping a gun for self-defense in a way that's unconnected to the crime should generally be seen as the exercise of one's constitutional right[394]—consider, for instance, a person who possesses a gun for home defense while engaged in consensual sex with someone under the age of consent, or while committing a fraud at work.

One can hypothesize ways in which even this sort of gun possession could help one commit a crime, for instance to resist arrest in the event that one is caught, or to threaten witnesses or coconspirators should such a threat be necessary. But so long as such possible misuse of a gun is entirely speculative, and not part of either the defendant's behavior during the crime or clearly planned future behavior, those hypotheses shouldn't suffice to turn constitutionally protected behavior into criminal behavior. And the exercise of constitutionally protected rights in ways that are unconnected with criminal conduct generally can't be used to enhance the sentence for such criminal conduct.[395]

This in fact is how many courts have analyzed this, in the "nexus" line of cases: When a gun is not possessed on the person, gun possession can only be treated as criminal or used to enhance a sentence if there is an adequate connection between the possession and the crime.[396] In particular, "mere proximity or mere constructive possession is insufficient to establish that a defendant was armed at the time the crime was committed": "[T]he weapon must be easily accessible and readily available for use," "whether to facilitate the commission of the crime, escape from the scene of the crime, protect

---

393.    *See, e.g.*, District of Columbia v. Heller, 128 S. Ct. 2783, 2812–13 (2008) (endorsing the statement in *United States v. Cruikshank*, 92 U.S. 542, 553 (1876), that the Second Amendment protected a right to possess guns for "a lawful purpose"); United States v. Jackson, 555 F.3d 635, 636 (7th Cir. 2009); United States v. Bowers, No. 8:05CR294, 2008 WL 5396630, at *2 (D. Neb. Dec. 23, 2008); Cockrum v. State, 24 Tex. 394, 401–03 (1859); State v. Daniel, 391 S.E.2d 90, 97 (W. Va. 1990).

394.    *See, e.g.*, Biddinger v. State, 846 N.E.2d 271, 278 (Ind. Ct. App. 2006) (holding that mere possession of a firearm may not be used as an aggravating factor at sentencing).

395.    *See* Dawson v. Delaware, 503 U.S. 159 (1992).

396.    People v. Atencio, 878 P.2d 147, 150 (Colo. Ct. App. 1994); State v. Blanchard, 776 So. 2d 1165, 1174 (La. 2001); State v. Gurske, 118 P.3d 333, 335 (Wash. 2005) (one in a long line of Washington state cases on the subject); *see also* Brewer v. Commonwealth, 206 S.W.3d 343, 347–48 (Ky. 2006) (relying partly on the right to bear arms in holding that a firearm may not be forfeited based on the owner's conviction of a crime unless there's a nexus between the firearm and the crime).

contraband or the like, or prevent investigation, discovery, or apprehension by the police."[397] This test is far from perfectly clear, and needs more scholarly attention. But it seems like a reasonable first cut aimed at making sure that criminals are punished for their criminal behavior, and not for their constitutionally protected behavior.

3.   Waiting Periods

Some jurisdictions require a "cooling-off" period before a gun may be delivered to the purchaser.[398] Others apply this only to handguns.[399] The rationale for such laws is to prevent impulsive killings or suicides by people who are angry or despondent and who might calm down after a few days.

It's hard to see how handgun-only cooling-off periods will materially reduce danger of impulsive crime or injury. It's as easy to commit suicide with a shotgun as with a handgun,[400] and for a crime of passion a shotgun will often be equally effective, too. Though long guns are not as concealable as handguns, and are thus worse for daily carrying or for inconspicuously possessing while waiting for passersby to rob, they can be quite sufficient for a crime of passion, for which they can be concealed briefly under a coat or in a bag. All-gun waiting periods might in principle be effective, if the buyer is an otherwise law-abiding citizen who wouldn't just turn to the black market instead. But even that has not been proven; as with so many "danger reduction" arguments, the social science evidence on the effectiveness of cooling-off periods is inconclusive.[401]

Other states delay people's ability to receive a gun, or to get a license that's required to receive or possess a gun, in order to give the police time to

---

397.   *Gurske*, 118 P.3d at 335–36.

398.   CAL. PENAL CODE §§ 12071(b)(3)(A), 12072(c)(1) (Deering Supp. 2009); HAW. REV. STAT. ANN. § 134-2(e) (LexisNexis Supp. 2008); 720 ILL. COMP. STAT. ANN. 5/24-3(A)(g) (West 2003); R.I. GEN. LAWS. §§ 11-47-35(a)(i), -35.1, -35.2 (Supp. 2008); LEGAL COMMUNITY AGAINST VIOLENCE, REGULATING GUNS IN AMERICA: AN EVALUATION AND COMPARATIVE ANALYSIS OF FEDERAL, STATE AND SELECTED LOCAL GUN LAWS 134 (2008), http://www.lcav.org/library/reports_analyses/regulating_guns.asp.

399.   *See* FLA. STAT. ANN. § 790.0655(1) (West Supp. 2009); IOWA CODE ANN. § 724.20 (West 2003); MD. CODE ANN., PUB. SAFETY §§ 5-123, 5-124 (LexisNexis 2003); MINN. STAT. ANN. § 624.7132, subdivs. 4, 12 (West 2003); N.J. STAT. ANN. §§ 2C:58-2a(5)(a), -3f (West 2005); S.D. CODIFIED LAWS § 23-7-9 (2006); WIS. STAT. ANN. § 175.35(2)(d), (2g)(c) (West 2006); LEGAL COMMUNITY AGAINST VIOLENCE, *supra* note 398, at 134–35. The Maryland and Minnesota laws also cover so-called "assault weapons," but not most rifles and shotguns. CONN. GEN. STAT. ANN. § 29-37a (West 2003) covers only long guns, not handguns.

400.   Consider Ernest Hemingway and Kurt Cobain. Each year, over 30 percent of the gun suicides for which a specific gun type is reported in *Injury Facts* are shotgun suicides, and over 10 percent are rifle suicides. *See* NAT'L SAFETY COUNCIL, INJURY FACTS 17 (1999) (1994–96 data).

401.   *See* Hahn et al., *supra* note 96, at 52.

perform a more thorough background check.  The times on this vary dramatically—two days in Wisconsin (only for handguns), up to thirty days in Massachusetts (for all firearms), and up to six months in New York (only for handguns).[402]  The federal background check is generally instant, but can take several days to complete if someone with the same name as the applicant is on the prohibited list.[403]  Are these waiting periods substantial burdens on self-defense?[404]

In one way, they are: A person covered by the waiting period is entirely unable to defend himself for days, weeks, or (in New York) months.  An attack that requires self-defense can happen during the waiting period just as easily as it can happen during other times.

Moreover, in some situations, the attack may be especially likely during the waiting period: A person's attempt to buy a gun may be prompted by a specific threat, one that could turn into an actual attack in a matter of days or hours.  If a woman leaves an abusive husband or boyfriend, who threatens to kill her for leaving, she may need a gun right away[405] and not ten days or six months later.

On the other hand, being disarmed for 0.1 percent of one's remaining life[406] is less of a burden than being disarmed altogether.  And waiting periods have been found to be constitutionally permissible as to other rights.  The Supreme Court has upheld—over heated dissent—a 24-hour waiting period for abortions, justified by a cooling-off rationale.[407]  A short-lived Ninth Circuit decision that recognized a right to assisted suicide said that "reasonable, though

---

402.   *See* N.Y. PENAL LAW §§ 265.00.3, 400.00 (McKinney 2008); MASS. ANN. LAWS ch. 140, § 129B(3) (LexisNexis 2007); WIS. STAT. ANN. § 175.35(2) (West 2006).  Of course, both the background check and the cooling off period rationale only make sense when the buyer doesn't already own a gun (or if the buyer doesn't already own a handgun, assuming the check is focused on handguns).  If the buyer already owns a gun, then any possible benefit in delaying his acquisition of another gun is likely to be vanishingly slight.  *See generally* GARY KLECK, POINT BLANK: GUNS AND VIOLENCE IN AMERICA 333 (1991).

403.   *See, e.g.*, U.S. DEP'T OF JUSTICE, OFFICE OF JUSTICE PROGRAMS, BACKGROUND CHECKS FOR FIREARM TRANSFERS, 2005, at 4 (2006).

404.   *Compare* Ky. Op. Att'y Gen. No. 2-271 (1982) (stating a waiting period is constitutional, without detailed discussion), *and* Tenn. Op. Att'y Gen. No. 89-34 (1989) (likewise), *with* State v. Kerner, 107 S.E. 222, 225 (N.C. 1921) (rejecting license requirement for carrying a gun because of a risk that one may immediately need to carry a gun in circumstances that leave one no time to get a permit).

405.   *See, e.g.*, 137 CONG. REC. 10,288, 10,291 (1991) (discussing an incident in which a woman, Bonnie Elmasri, wanted to buy a gun after a death threat from her husband, was told there was a 2-day waiting period, and was killed the next day, together with her two sons, by her husband); Inge Anna Larish, *Why Annie Can't Get Her Gun: A Feminist Perspective on the Second Amendment*, 1996 U. ILL. L. REV. 467, 496.

406.   That's what fourteen days ends up approximately being, for a person of average age.

407.   Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833 (1992).

56 UCLA LAW REVIEW 1443 (2009)

short, waiting periods to prevent rash decisions" would be constitutional,[408] and the Oregon assisted suicide statute indeed provides a 15-day waiting period.[409]

Likewise, a waiting period is often required for sterilization,[410] though there might well be a constitutional right to undergo sterilization as part of one's right to control one's procreation.[411] In many states it takes from one to five days to get a marriage license,[412] though I know of no cases considering whether this violates the right to marry.[413]

The Supreme Court has also held that a state may require people to register to vote fifty days before the election,[414] for much the same investigatory reasons that are offered for some background-check-based waiting periods. Cities are generally allowed to require that demonstration and parade permit applications be filed some days in advance.

On the other hand, there are substantial limits on how long a waiting period can be, and on when such waiting periods may be imposed. Lower courts have suggested the upper bound for demonstration and parade permits might be three or four days.[415] Forty-eight-hour waiting periods for abortions have been found to pose "substantial burdens," even though *Casey* upheld a twenty-four-hour waiting period.[416] Even where prisoners and military members are involved—a context where the government generally has very broad

---

408.   Compassion in Dying v. Washington, 79 F.3d 790, 833 (9th Cir. 1996).

409.   OR. REV. STAT. § 127.840 (2007).

410.   *E.g.*, 42 C.F.R. § 441.253(d) (2007) (requiring a 30-day waiting period for sterilizations for which federal payment is provided).

411.   *See, e.g.*, *In re* Grady, 426 A.2d 467 (N.J. 1981) (so holding).

412.   *See* ALASKA STAT. §§ 25.05.091, 25.05.161 (2008) (three days, unless the court waives the waiting period); 750 ILL. COMP. STAT. ANN. 5/207 (West Supp. 2009) (one day, unless the court waives the waiting period); WIS. STAT. ANN. § 765.08 (West 2008) (5 days, unless the county clerk waives the waiting period).

413.   *See* In re Kilpatrick, 375 S.E.2d 794, 795 n.1 (W. Va. 1988) (noting that a challenge to a three-day waiting period was made but was not addressed in the brief and was therefore waived).

414.   Burns v. Fortson, 410 U.S. 686, 687 (1973) (upholding the requirement but suggesting that "the 50-day registration period approaches the outer constitutional limits in this area").

415.   *See, e.g.*, Douglas v. Brownell, 88 F.3d 1511, 1523–24 (8th Cir. 1996) (striking down a requirement of 5 days' notice); Grossman v. City of Portland, 33 F.3d 1200, 1204–07 (9th Cir. 1994) (striking down a requirement of 7 days' notice for demonstrations, when requirement covered even small groups); NAACP v. City of Richmond, 743 F.2d 1346, 1356–57 (9th Cir. 1984) (striking down a requirement of 20 days' notice and suggesting that the upper bound might be as low as two or three days). Lower courts have also suggested that permit requirements would be impermissible for groups of a few people, who don't materially implicate the city's interests in traffic control or adequate policing. *Douglas*, 88 F.3d at 1524; *Grossman*, 33 F.3d at 1206–08; Rosen v. Port of Portland, 641 F.2d 1243, 1248 n.8 (9th Cir. 1981) (holding that even a 24-hour notice requirement would be unconstitutional for small groups).

416.   *See* Planned Parenthood of Middle Tenn. v. Sundquist, 38 S.W.3d 1, 24 (Tenn. 2000).

authority—lower courts have struck down six-month and one-year waiting periods before a soldier or an inmate may marry.[417]

And lower courts have also suggested that even if some substantial advance notice may normally be required for demonstration permits, there has to be a special exception for spontaneous expression occasioned by breaking events.[418] Likewise, there has to be a special exception to abortion waiting periods for medical emergencies.[419] This would suggest that a similar exception might have to be required for handgun permits when the applicant can point to a specific, recently occurring threat—such as the applicant's leaving an abusive boyfriend who threatened to kill her if she left.[420]

These other constitutional rights are not perfect analogies. A three-day delay in voting, marrying, or demonstrating won't leave you unprotected against a deadly attack. Conversely, erroneously authorizing someone to vote when he's a convicted felon is less likely to cause serious harm than erroneously authorizing that same person to buy a gun. Nonetheless, this catalog of decisions at least suggests that (1) waiting periods on the exercise of constitutional

417.   *See* United States v. Nation, 9 C.M.A. 724, 727 (1958) ("For a commander to restrain the free exercise of a serviceman's right to marry the woman of his choice for six months just so he might better reconsider his decision is an arbitrary and unreasonable interference with the latter's personal affairs which cannot be supported by the claim that the morale, discipline, and good order of the command require control of overseas marriages."); Carter v. Dutton, No. 93-5703, 1994 WL 18006, at *1 (6th Cir. Jan. 21, 1994) (noting trial court decision striking down a one-year waiting period for marriages between inmates and non-inmates).

418.   *See, e.g.*, Church of the Am. Knights of the Ku Klux Klan v. City of Gary, 334 F.3d 676, 682 (7th Cir. 2003). *See generally* Shuttlesworth v. City of Birmingham, 394 U.S. 147, 163 (1969) (Harlan, J., concurring) ("[T]iming is of the essence in politics. It is almost impossible to predict the political future; and when an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all. To require Shuttlesworth to submit his parade permit application months in advance would place a severe burden upon the exercise of his constitutionally protected rights.").

419.   *See, e.g.*, Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 880 (1992); Women's Med. Prof'l Corp. v. Voinovich, 130 F.3d 187, 203 (6th Cir. 1997); Planned Parenthood of Del. v. Brady, 250 F. Supp. 2d 405 (D. Del. 2003).

420.   *Cf., e.g.*, FLA. STAT. ANN. § 790.33(2)(d)(6) (West 2007) (exempting from the waiting period, which would normally be up to 3 days, "[a]ny individual who has been threatened or whose family has been threatened with death or bodily injury, provided the individual may lawfully possess a firearm and provided such threat has been duly reported to local law enforcement"); MINN. STAT. ANN. § 624.7132 subdiv. 4 (West 2003) (providing that "the chief of police or sheriff may waive all or a portion of the five business day waiting period in writing if the chief of police or sheriff finds that the transferee requires access to a pistol or semiautomatic military-style assault weapon because of a threat to the life of the transferee or of any member of the household of the transferee"); OHIO REV. CODE ANN. § 2923.1213 (West 2006 & Supp. 2008) (providing for a temporary emergency license to carry a concealed weapon when the applicant provides a sworn statement "that the [applicant] has reasonable cause to fear a criminal attack upon the [applicant] or a member of the [applicant's] family, such as would justify a prudent person in going armed," or other evidence of such a threat); *cf.* 18 U.S.C. § 922(s)(1)(B) (2006) (exempting transferees from the waiting period for gun purchases if they stated that they "require[ ] access to a handgun because of a threat to the life of the transferee or any member of the household of the transferee"; this was in effect during the pre-instant-background check era, *see id.* § 922(t)(1)).

rights need not always be seen as unconstitutional, and (2) courts are and should be willing to decide which waiting periods are excessive.

F.    Taxes, Fees, and Other Expenses

Taxes on guns and ammunition, or gun controls that raise the price of guns and ammunition, or bans on inexpensive firearms would be substantial burdens if they materially raised the cost of armed self-defense. (The $600 tax discussed by Cook, Ludwig & Samaha,[421] justified by an assertion that "keeping a handgun in the home is associated with at least $600 per year in externalities," is one example; a proposed Illinois requirement that gun owners be required to buy a $1 million insurance policy is another.[422]) "The poorly financed [self-defense] of little people," like their "poorly financed causes,"[423] deserves constitutional protection as much as the self-defense of those who can afford technologically sophisticated new devices or high new taxes. This is true whether the tax or expensive control is imposed on gun owners directly, or on gun sellers or manufacturers, just as a restriction on abortion can be a substantial burden even if it's imposed on doctors and not on the women who are getting the abortions.[424]

High gun taxes should remain presumptively impermissible even if they are based on some (doubtless controversially calculated) estimate of the public

---

421.    Cook, Ludwig & Samaha, *supra* note 323, at 1085; *see also* Philip J. Cook & Jens Ludwig, *The Social Costs of Gun Ownership*, 90 J. PUB. ECON. 379, 389–90 (2006) (suggesting that such a tax might vary from $100 to $1800 per household).

422.    *See* Ill. H.B. 0687, 96th Gen. Assem., Reg. Sess. (2009).

423.    *See* Martin v. City of Struthers, 319 U.S. 141, 146 (1943) (striking down ban on door-to-door solicitation, partly on the grounds that "[d]oor to door distribution of circulars is essential to the poorly financed causes of little people"); *see also* City of Ladue v. Gilleo, 512 U.S. 43, 57 (1994) (striking down ban on display of signs at one's home, partly on the grounds that "[r]esidential signs are an unusually cheap and convenient form of communication. Especially for persons of modest means or limited mobility, a yard or window sign may have no practical substitute").

424.    *See* Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (applying substantial burden analysis to a requirement that an abortion be performed by a physician rather than by a physician's assistant); Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 886 (1992) (controlling opinion of O'Connor, Kennedy, and Souter, JJ.) (applying the substantial burden analysis to a recordkeeping restriction imposed on abortion providers); *id.* at 884–85 (applying the substantial burden analysis to a requirement that various information be given to the patient by physicians and not by the physicians' staff); Jackson Women's Health Org. Inc. v. Amy, 330 F. Supp. 2d 820, 824–26 (S.D. Miss. 2004) (finding a substantial burden on women's rights to an abortion in a state law that barred any place other than a hospital or a licensed ambulatory care facility from performing abortions). *But see* Caswell & Smith v. State, 148 S.W. 1159, 1161, 1163 (Tex. Civ. App. 1912) (upholding—in my view incorrectly—a 50 percent gross receipts tax on the sale of pistols, simply on the grounds that the law "does not infringe or attempt to infringe the right on the part of the citizen to keep and bear arms," including "the right to carry a pistol openly," and reasoning even that "absolute[ ] prohibit[ion]" of the business of selling pistols would be constitutional).

costs imposed by the average handgun: Such an average—like the cost of an insurance policy—takes into account both the very low cost stemming from guns that are always properly used by their owners, and the very high cost stemming from guns that are used in crime. The law-abiding owners thus are not just being required to "internalize the full social costs of their choices,"[425] even if you take into account as a "cost" the possibility that any gun will be stolen by a criminal. They are also being required to internalize the social costs of choices made by criminal users of other guns—much as if, for instance, all speakers were charged a tax that would be used to compensate those libeled by a small subset of speakers, or were required to buy a $1 million libel insurance policy before speaking.

Nonetheless, some modest taxes might not amount to substantial burdens, as a review of taxes and fees on other constitutional rights illustrates. Taxes based on the content of speech are unconstitutional, regardless of their magnitude.[426] But this is a special case of the principle that discrimination based on certain kinds of characteristics—race, sex, religiosity, or the content or viewpoint of speech—is unconstitutional. Setting aside these special areas of constitutionally forbidden discrimination, and setting aside poll taxes, which were constitutional until the Twenty-Fourth Amendment forbade them, other kinds of taxes, fees, and indirect costs imposed on the exercise of constitutional rights are often permissible.

The government may require modest content-neutral fees for demonstration permits or charitable fundraising permits, at least if the fees are tailored to defraying the costs of administering constitutionally permissible regulatory regimes.[427] The same is true for marriage license fees[428] and filing fees for political candidates (though the Court has held that the right to run for office is in some measure protected by the First Amendment).[429] The same is doubtlessly true of costs involved in getting permits to build on your own property, a right protected by the Takings Clause.[430]

425.   Cook, Ludwig & Samaha, *supra* note 323, at 1085.

426.   *See, e.g.*, Ark. Writers' Project, Inc. v. Ragland, 481 U.S. 221 (1987).

427.   *E.g.*, Sullivan v. City of Augusta, 511 F.3d 16, 35–36 (1st Cir. 2007) (demonstrations); National Awareness Found. v. Abrams, 50 F.3d 1159, 1167 (2d Cir. 1995) (charitable fundraising); Stonewall Union v. City of Columbus, 931 F.2d 1130, 1137 (6th Cir. 1991) (demonstrations).

428.   *See, e.g.*, Boynton v. Kusper, 494 N.E.2d 135, 138 (Ill. 1986) (striking down a $10 tax on marriage licenses, aimed at funding services for victims of domestic violence, but stressing in dictum that this part of the license fee "has no relation to the county clerk's service of issuing, sealing, filing, or recording the marriage license"); D'Antoni v. Comm'r, N.H. Dep't of Health & Human Servs., 917 A.2d 177, 183 (N.H. 2006) (upholding a $38 marriage license fee because the fee was less than the "incidental expenses related to issuing the licenses").

429.   Lubin v. Panish, 415 U.S. 709 (1974).

430.   *See* Lucas v. S.C. Coastal Council, 505 U.S. 1003 (1992).

Likewise, regulations of the right to abortion are not rendered unconstitutional simply because they increase the cost of an abortion. The Court so held when upholding a 24-hour waiting period even though it required some women in states with very few abortion providers to stay in a hotel overnight or miss a day of work,[431] and when upholding viability testing requirements that might have marginally increased the cost of an abortion.[432] So long as the extra costs don't amount to "substantial obstacle[s]" to a woman's getting an abortion, they are constitutional.[433]

At the same time, when a cost is high enough to impose a substantial obstacle to the exercise of a right for a considerable number of people,[434] it is unconstitutional. This is likely also true when a cost goes materially beyond the cost of administering the otherwise permissible regulatory scheme.[435] And if a law substantially burdens rightholders who are relatively poor, an exemption would likely be constitutionally required.[436]

I acknowledge that any such regime necessarily creates linedrawing problems and poses the danger that a genuinely substantial burden will be missed by judges who are deciding how much is too much. But, first, there is ample precedent for such tolerance for modest fees in other constitutional rights contexts, and it thus seems neither likely nor normatively appealing for the courts to conclude that the right to bear arms is more protected than these other rights. Second, the caselaw from those other areas can provide guideposts for the linedrawing process. And third, the caselaw from those other areas (as well as the general logic of the substantial burden threshold) supports a constitutional requirement that poor applicants be exempted from fees—say, fees that dramatically increase the cost of a new gun, or that are required for periodic reregistration of an old gun—that are substantial for them even if relatively minor for others.

---

431.   Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 886 (1992) (plurality opinion of O'Connor, Kennedy, and Souter, JJ.).

432.   Webster v. Reproductive Health Servs., 492 U.S. 490, 517–20 (1989) (plurality opinion); *id.* at 529–30 (O'Connor, J., concurring in part and concurring in the judgment).

433.   *Casey*, 505 U.S. at 886.

434.   *See, e.g.*, *id.* at 874, 886.

435.   *See, e.g.*, Sullivan v. City of Augusta, 511 F.3d 16, 38 (1st Cir. 2007); E. Conn. Citizens Action Group v. Powers, 723 F.2d 1050, 1056 (2d Cir. 1983); Fernandes v. Limmer, 663 F.2d 619, 633 (5th Cir. 1981); *see also* Murdock v. Pennsylvania, 319 U.S. 105, 113–14 (1943) (so suggesting); Cox v. New Hampshire, 312 U.S. 569, 577 (1941) (likewise).

436.   *See* Lubin v. Panish, 415 U.S. 709, 718–19 (1974) (requiring exemption from filing fee for indigent political candidates); Cent. Fla. Nuclear Freeze Campaign v. Walsh, 774 F.2d 1515, 1523 (11th Cir. 1985) (same as to demonstration permit fee).

G.   Restrictions on Sellers

The right to keep and bear arms in self-defense protects those who would use the arms in self-defense, not those who would sell such arms. Similarly, the right to an abortion protects those women who want abortions, not abortion providers. The freedom of speech protects speakers and listeners, not sellers of the paper or computer hardware that make certain kinds of speech possible.[437]

Restrictions on the sales transactions that enable the exercise of these constitutional rights should be evaluated based on whether they impose a substantial burden on the exercise of the protected right.[438] A ban on gun sales, or a heavy tax on such sales, would be unconstitutional,[439] just as a ban on engaging in the business of providing abortions would be, because it would make it much harder for would-be gun owners to get guns. But laws allowing gun sales only by particular kinds of sellers or in particular places would not be unconstitutional unless they actually make guns substantially costlier or harder to get.

H.   "Who Knows" Restrictions: Government Tracking Regulations, Including Nondiscretionary Licensing, Background Checks, Registration, and Ballistics Tracking Databases

Governments impose various tracking regulations on arms possession or carrying—nondiscretionary licensing regimes (either for possession or carrying),[440] instant background checks, registration requirements,[441] serial number

---

437.   The right to speak does protect bookstores, but only because they themselves (unlike the paper sellers or computer sellers) are seen as speaking by distributing material that they want to distribute.

438.   *See* District of Columbia v. Heller, 128 S. Ct. 2783, 2816–17 (2008) (stating that "laws imposing conditions and qualifications on the commercial sale of arms" are constitutional); Or. Att'y Gen. Op. Request OP-5881 (1985) (concluding that ban on non-dealer transfers to people who aren't "personally known" to seller, and bans on non-dealers engaging in the business of selling guns, would be constitutional).

439.   *Compare* Caswell & Smith v. State, 148 S.W. 1159, 1161, 1163 (Tex. Civ. App. 1912) (upholding a 50 percent gross receipts tax on the sale of pistols, simply on the grounds that the law "does not infringe or attempt to infringe the right on the part of the citizen to keep and bear arms," including "the right to carry a pistol openly," and reasoning even that "absolute[ ] prohibit[ion]" of the business of selling pistols would be constitutional), *with* Dowlut & Knoop, *supra* note 314, at 215 (arguing that *Caswell & Smith* was wrong, on the grounds that the tax was "confiscatory"), *and* Stephen P. Halbrook, *The Right to Bear Arms in Texas: The Intent of the Framers of the Bill of Rights*, 41 BAYLOR L. REV. 629, 683 (1989) (likewise).

440.   *See, e.g.*, City of University Heights v. O'Leary, 429 N.E.2d 148 (Ohio 1981) (4–3) (upholding identification card requirement for nonresidents); Mosher v. City of Dayton, 358 N.E.2d 540 (Ohio 1976) (upholding such a requirement for possession); Photos v. City of Toledo, 250 N.E.2d 916 (Ohio Ct. Com. Pl. 1969) (same). *But see* O'Leary, 429 N.E.2d at 153 (Celebrezze, C.J., dissenting)

requirements,[442] requirements that guns be test-fired and the marks they leave on bullets recorded,[443] or requirements that all new semiautomatic guns must "microstamp" the ejected brass with the gun's serial number.[444]  If the regulations contain some restrictions, such as waiting periods, fees, or denials of licenses to certain people (either as a class or in government officials' discretion[445]), those might be substantial burdens.  But the tracking regulation itself is not much of a burden on self-defense; a person is just as free to defend himself with a registered gun as he would be if the gun were unregistered.[446]

In one high-profile area of constitutional law, such requirements are indeed forbidden: Most speakers don't need to get licenses, or register their speech, or submit their typewriters for testing so that their anonymous works can be tracked back to them.  Likewise, tracking requirements for abortions would likely be unconstitutional.[447]

---

(arguing that the requirement should be struck down because the law should "require that all limitations [on the right to keep and bear arms] not only be reasonable, but also necessary").

441.    See, e.g., State v. Mendoza, 920 P.2d 357 (Haw. 1996) (upholding such a requirement); 50 N.C. Op. Att'y Gen. No. 69, 70 (1981) (stating registration of handguns would be constitutional, because it would be "reasonable" and "would not prohibit the right to keep and bear arms"); see also State v. Hamlin, 497 So. 2d 1369 (La. 1986) (upholding registration requirement for shotguns with barrel of less than eighteen inches).

442.    See, e.g., State v. Comeau, 448 N.W.2d 595 (Neb. 1989) (upholding ban on defacing serial number); United States v. Marzzarella, 595 F. Supp. 2d 596 (W.D. Pa. 2009) (likewise).

443.    These are sometimes called "ballistic fingerprinting," but this is likely too optimistic a term: The pattern of marks that a gun creates can apparently be changed quite easily, see Eugene Volokh, Crime-Facilitating Speech, 57 STAN. L. REV. 1095, 1117 & n.100 (2005), though one might guess that a substantial number of criminals will nonetheless fail to do this.

444.    Such microstamping would in principle make it easier to find which gun was used in a shooting, if the brass were found at the crime scene.  See, e.g., CAL. PENAL CODE § 12126(b)(7) (West Supp. 2009); Cook, Ludwig & Samaha, supra note 323, at 1090.  It is unlikely that this will practically do much to fight crime, since people who anticipate using guns for criminal purposes will just buy either an older semiautomatic or a revolver; revolvers don't eject the brass after firing, so microstamping requirements for them would be useless.  But perhaps microstamping might catch some criminals, for instance people who bought the gun for lawful purposes and thus didn't worry about microstamping, or chose a new semiautomatic (perhaps because they liked the semiautomatic's greater capacity, which is usually ten or more rounds as opposed to six to eight rounds for a typical revolver) but then used it for criminal purposes without having the time to buy another gun.

445.    See, e.g., Dowlut & Knoop, supra note 314, at 216–17 (reasoning that state constitutions should be read to protect open carrying of a weapon even without a license, but on the grounds that "licensing officials can be very creative in frustrating applicants" and that the exercise of constitutional rights "'cannot be made subject to the will of the sheriff'" (quoting People v. Zerillo, 189 N.W. 927, 928 (Mich. 1922))).

446.    Cf. Reynolds, supra note 230, at 481 (defending licensing laws and background checks on originalist grounds); Don B. Kates, Jr., Handgun Prohibition and the Original Meaning of the Second Amendment, 82 MICH. L. REV. 204, 265 (1983) (likewise).

447.    See, e.g., Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 900–01 (1992) (suggesting that reporting requirements are constitutional to the extent they "respect a patient's confidentiality and privacy").

But this is not the normal rule for constitutional rights. Even speakers may sometimes need to register or get licensed. Parade organizers may be required to get permits.[448] Gatherers of initiative signatures may be required to register with the government,[449] and so may fundraisers for charitable causes, though such fundraising is constitutionally protected.[450] People who contribute more than a certain amount of money to a candidate may be required to disclose their identities to the candidate, who must in turn disclose those identities to the government;[451] lower courts have held the same as to people who contribute to committees that support or oppose ballot measures.[452] The contribution disclosure requirements have been judged (and upheld) under a moderately strong form of heightened scrutiny; the other disclosure requirements have been upheld under lower level of scrutiny.

Likewise, the Constitution has been interpreted to secure a right to marry, but the government may require that people get a marriage license. The Takings Clause bars the government from requiring people to leave their land unimproved and thus valueless, but the government may require a building permit before improvements are made.

People have a right to vote, under all state constitutions and, in practice, under the federal Constitution, but they may be required to register to vote. Whom they voted for has been kept secret, at least for a hundred years, but whether they voted and what party they belong to is known to the government, and is often even a matter of public record. Many of these requirements are instituted to prevent crime (chiefly fraud) or injury (such as the injury stemming from unsafe construction).

This of course leaves the question of what the right to bear arms is most like: those rights for which government tracking can't be required, or those rights for which it can be. I'm inclined to think that it is more like the trackable rights, and that it is the untrackable rights that are the constitutional outlier.

The rule barring licensing requirements for many kinds of speakers is in large part historical, stemming from an era when such licenses were discretionary and used to control which viewpoints might be expressed. It persists largely because of a continuing concern that some viewpoints may be so unpopular with the government or the public that people who are known to convey

---

448.   *See, e.g.*, Cox v. New Hampshire, 312 U.S. 569 (1941).
449.   *See, e.g.*, Buckley v. Am. Constitutional Law Found., Inc., 525 U.S. 182, 191–92 (1999).
450.   *See, e.g.*, Riley v. Nat'l Fed'n of the Blind of N.C., Inc., 487 U.S. 781 (1988).
451.   *See, e.g.*, Buckley v. Valeo, 424 U.S. 1 (1976).
452.   *See, e.g.*, Cal. Pro-Life Council, Inc. v. Randolph, 507 F.3d 1172 (9th Cir. 2007).

those viewpoints will face retaliation.[453]  Even so, some kinds of speakers may have to identify themselves to the government, when the speech poses serious concerns about fraud or corruption.  The same worry about retaliation, coupled with a longstanding tradition of privacy of medical records, likely provides the cause for the no tracking rule for abortions.

Gun owners as a group have faced some hostility from the government and the public, but gun ownership is very common behavior, and there's safety in numbers: It seems unlikely that the government will retaliate against the tens of millions of gun owners in the country, who represent 35 to 45 percent of all American households.  Gun carrying is both rarer and, if required to be done openly, more likely to viscerally worry observers.[454]  But mere gun ownership, if disclosed to the government rather than to the public at large,[455] is not likely to yield a harsh government reaction, and registration require-ments are thus unlikely to deter ownership by the law-abiding.

It's true that certain kinds of guns are rare and especially unpopular.  But as I've argued above, the right to bear arms in self-defense should be understood as protecting a right to own some arms that amply provide for self-defense, not a right to own any particular brand or design of gun.  (In this respect, it differs from the right to speak, which includes the right to convey the particular viewpoint one wishes to convey.  Many kinds of arms are fungible for self-defense purposes in a way that viewpoints are not fungible for free speech purposes.)

It is not impossible that the government will want to go after gun owners, chiefly to confiscate their guns.  This could happen if the government shifts to authoritarianism, and thus doesn't care about constitutional constraints and at the same time wants to seize guns in order to diminish the risk of violent resistance.  Or it could happen if a future Supreme Court concludes the indi-vidual right to bear arms is not constitutionally protected, and Congress enacts a comprehensive gun ban.[456]

---

453.    *See, e.g.,* Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton, 536 U.S. 150, 166–67 (2002).

454.    *See supra* Part II.C.2.

455.    I set aside the question whether making gun ownership or concealed carry license records public under state open records acts might be unconstitutional. *See generally* Kelsey M. Swanson, Comment, *The Right to Know: An Approach to Gun Licenses and Public Access to Government Records,* 56 UCLA L. REV. 1579 (2009).

456.    This could also happen if the right to bear arms isn't incorporated against the states, and a state doesn't have a right-to-bear-arms provision; in that case, though, the right to bear arms should not stand in the way of registration and confiscation, precisely because there is no constitutional right to bear arms in the state.  And it could happen if the right to bear arms isn't incorporated, and a state repeals its right-to-bear-arms provision after registration is implemented (or if a federal constitutional amendment is enacted to repeal the Second Amendment).  But a court ought not prohibit registration on right-to-bear-arms grounds for fear that the people will later repeal the right to bear arms; the people

Some have argued that the Free Speech Clause ought to be interpreted from a "pathological perspective," with an eye towards creating a doctrine that would serve free speech best even in those times when the public, the government, and the courts are most hostile to unpopular speakers.[457] Should the Second Amendment be interpreted the same way?

Here we may be getting to a topic that's outside the scope of this Article, because it requires us to think about whether the Second Amendment retains a deterrence-of-government-tyranny component as well as a self-defense component. I'm inclined to be skeptical of the ability of private gun ownership to constrain the government in truly pathological times. I'd like to think that an armed citizenry would provide a material barrier to such pathologies, but I doubt that this would in fact be so, especially given the size and power of modern national government. Nonetheless, figuring this out requires thinking through the deterrence-of-government-tyranny rationale, something I have not done for this Article.

For now, I'll leave things at this: The tracking requirements likely don't themselves impose a substantial burden on the right today. Such tracking requirements aren't generally unconstitutional as to other rights, though they are sometimes unconstitutional as to some rights. And the key question is the extent to which current doctrine should be crafted with an eye towards a future time when the doctrine or government practice may be very different than it is today.

## CONCLUSION

Right-to-bear-arms controversies will likely arise especially often after *District of Columbia v. Heller*. It is possible that judges will respond to them simply by deciding intuitively what counts as a reasonable regulation, as state courts have often done with regard to state right-to-bear-arms controversies.

My hope, though, is that courts can do better, and decide the questions more reflectively—by looking closely at the scope of the right, at the burden the regulation imposes, at evidence on whether the regulation will actually reduce danger of crime and injury (and at the normative arguments about what sorts of evidence, if any, should suffice), and at any special role the government may be playing as proprietor. It's hard to predict what answers the courts will give, or to be confident that the answers will be the right ones. But at least it would be a good start for courts to ask the right questions.

---

are entitled to change the Constitution, and the current Constitution ought not be read as entrenching itself against future constitutional amendments.

457.   *See, e.g.*, Vincent Blasi, *The Pathological Perspective and the First Amendment*, 85 COLUM. L. REV. 449 (1985).

# PROPERTY LAW'S SEARCH FOR A PUBLIC

## NADAV SHOKED[*]

ABSTRACT

*Public spaces—streets, sidewalks, parks, plazas, squares, and the like— form a major component of the physical environment. Therefore, disputes over the use and management of these spaces abound. Courts analyze each such dispute individually through the prism of the discrete property law doctrine that appears applicable. The result is a hodgepodge of inconsistent rulings that too often ignore the common normative principles implicated in all debates over public spaces. This Article advances a general framework for the legal treatment of public spaces. It argues that, at heart, every dispute over the use of a public space requires the law to answer one fundamental question: Who, in the case at hand, should be deemed the "public" actually holding the implicated public right? After all, the "public" is not a recognized legal entity. The law identifies disparate bodies that might stand for the "public" in a specific case—and accordingly be empowered to dictate the uses of the relevant public right. The options include the local government, the public at large, specific individuals, or a set of common law strictures. The Article constructs a test courts should employ when, in a given dispute over the use of a public space, they must pick among these alternatives. It does so by isolating the core normative concern animating the common law doctrines that deal with public spaces. The concern the Article identifies is the notion that some public spaces, but not others, have a natural use, and must thus be treated uniquely. In light of this core principle the Article develops an operative test to identify the "public" that should be afforded control over a given public space. Under the test, a court must determine whether a contested public space has a natural use, and if it does, how clearly defined that use is, who the actors funding the use are, and how trustworthy is the government when transacting in the space. To illustrate the test's utility, it is employed to identify the pertinent publics that should control public rights in two of the most commonplace public spaces: parks and sidewalks.*

---

\* Professor of Law, Northwestern University Pritzker School of Law. For invaluable comments on drafts of this article and for fruitful conversations about the ideas the article incorporates, I am grateful to David Dana, Nestor Davidson, Anna di Robilant, Nate Ela, Oren Kriegel, Timothy Mulvaney, Richard Schragger, Joseph Singer, and Laura Underkuffler. I also benefitted from the input of participants at the faculty workshop at Northwestern University School of Law, and at the Property Works in Progress Conference at Boston University School of Law. Finally, I am very thankful to Joey Becker, Thomas Lis, and Elliot Louthen who provided exceptional assistance in research.

TABLE OF CONTENTS

INTRODUCTION ..................................................................................1518
I. THE LAW OF PUBLIC SPACES ..........................................................1528
    A. *Different Rights* .....................................................................1529
    B. *Different Publics* ...................................................................1532
II. WHO SHOULD THE PUBLIC BE ........................................................1542
    A. *The Law of Public Spaces' Normative Theme* .............................1543
    B. *Picking the Public in Light of the Law's Normative Theme* ..........1549
III. WHO SHOULD THE PUBLIC BE: EXAMPLES....................................1555
    A. *The Public in Parks* ...............................................................1556
    B. *The Public on the Sidewalk* .....................................................1561
CONCLUSION ....................................................................................1574

INTRODUCTION

The former President and First Lady picked the site for the future Obama Presidential Center at the conclusion of a competition pitting against each other four proposals hailing from three different cities.[1] The winning bid singled out for the Center's location Jackson Park in Chicago's Hyde Park neighborhood,[2] the area President Obama once represented in the Illinois state legislature. An ecstatic mayor and city council approved the project in 2015.[3] The project faced a legal challenge, however. A public interest group dedicated to the protection of open spaces has questioned the project's legality.[4] The group contends that Jackson Park, originally designed in 1870 by the famed architects Frederick Law Olmsted and Calvert Vaux, is subject to the public trust doctrine. Spaces governed by that doctrine must remain publicly owned and open—free, that is, of structures.[5] The common law developed this venerable doctrine in the context of ownership rights in navigable waters and submerged land.[6] The central question the parties to the Presidential Center litigation and the many intervening amici curiae—

---

1.     Julie Bosman & Mitch Smith, *Chicago Wins Bid to Host Obama Library*, N.Y. TIMES (May 12, 2015), https://www.nytimes.com/2015/05/13/us/chicago-president-obama-library.html [https://perma.cc/7WYB-9YTY].
2.     Act of Feb. 24, 1869, § 4, 1869 Ill. Laws 358, 359–60.
3.     CHI., ILL., ORDINANCE § O2015-192 (2015).
4.     Complaint, Protect Our Parks, Inc. v. Chi. Park Dist., 368 F. Supp. 3d 1184 (N.D. Ill. 2019) (No. 18-cv-3424).
5.     *See infra* notes 135–142 and accompanying text.
6.     *See infra* notes 144–145 and accompanying text.

counting among them all existing U.S. presidential libraries,[7] all major Chicago museums,[8] and numerous law professors[9]—debate is whether the public trust doctrine also covers a park. If it does, the Presidential Center is doomed. For structures may not be erected on public trust land.[10]

Other than timing, this case appears to share very little with another set of cases that has emerged recently: litigation over electric scooters. Electric scooters began appearing on city streets—starting in Santa Monica, California, and spreading to other cities in the United States and elsewhere[11]—in September 2017.[12] Companies operating the service—first those dedicated solely to scooters, such as Lime and Bird, then those with broader transportation portfolios, such as Lyft and Uber—invite users to download a smartphone app which allows the user to locate an available scooter on a city's sidewalk and unlock it.[13] The user rides the unlocked scooter, and then drops it off when she arrives at her destination—leaving the scooter on the sidewalk to be located, and then unlocked, by the next user. Operators of the service have been embroiled in legal battles ever since its introduction.[14] Upon the scooters' first appearance, many cities issued cease-and-desist letters requiring that the scooters be removed from their

---

7.    Brief of Thirteen Presidential Foundations as Amici Curiae in Support of Defendants' Motion for Judgment on the Pleadings, Protect Our Parks, Inc. v. Chi. Park Dist., 368 F. Supp. 3d 1184 (N.D. Ill. 2019) (No. 18-cv-3424).

8.    Brief of Amici Curiae the Eleven Park Museums in Support of Defendants' Motion to Dismiss or for Judgment on the Pleadings, Protect Our Parks, Inc. v. Chi. Park Dist., 368 F. Supp. 3d 1184 (N.D. Ill. 2019) (No. 18-cv-3424).

9.    Brief of Property Law Professors as Amici Curiae in Support of Defendants, Protect Our Parks, Inc. v. Chi. Park Dist., 368 F. Supp. 3d 1184 (N.D. Ill. 2019) (No. 18-cv-3424).

10.   The fact that the city will retain ownership rights to the land and merely lease it to the Obama Foundation, CHI., ILL., ORDINANCE § SO2018-7136 (2018), is thus immaterial, according to the plaintiffs.

11.   Megan Rose Dickey, *The Electric Scooter Wars of 2018*, TECHCRUNCH (Dec. 23, 2018, 2:05 PM), https://techcrunch.com/2018/12/23/the-electric-scooter-wars-of-2018/ [https://perma.cc/Z65W-M CK2].

12.   Noah Smith, *Sudden Appearance of Electric Scooters Irks Santa Monica Officials*, WASH. POST (Feb. 10, 2018, 6:18 PM), https://www.washingtonpost.com/national/sudden-appearance-of-electr ic-scooters-irks-santa-monica-officials/2018/02/10/205f6950-0b4f-11e8-95a5-c396801049ef_story.ht ml [https://perma.cc/2JJT-BLCC]; Dara Kerr, *Lyft's Electric Scooters Hit the Streets of Santa Monica*, CNET (Sept. 17, 2018, 4:03 PM), https://www.cnet.com/news/lyfts-electric-scooters-hit-the-streets-of-santa-monica.

13.   Smith, *supra* note 12; Kerr, *supra* note 12.

14.   The companies have also been subject to a few private lawsuits, mostly focusing on issues of product liability. *See, e.g.*, Borgia v. Bird Rides, Inc., No. CV 18-9685-DMG, 2019 WL 3814280 (C.D. Cal. Aug. 13, 2019).

sidewalks.[15] Several criminal prosecutions ensued,[16] and some cease-and-desist letters were challenged in court.[17] Operators have further disputed more recent city ordinances that regulate the scooters' access to sidewalks or cap their overall number.[18] Operators argue that cities lack the power to thereby unilaterally control sidewalks.[19] Cities respond by pointing at their general authorization to police sidewalks and by raising public nuisance tort claims against the operators.[20]

The Presidential Center and electric scooters disputes seem wholly unrelated. Courts clearly treat them as such. They involve disparate legal doctrines—the public trust doctrine in the case of the Center,[21] a city's regulatory powers (and public nuisance law)[22] in the case of the scooters.

---

15.   *See, e.g.*, Cease and Desist Letter from Theresa Costonis, Metro. Attorney, Metro. Gov't of Nashville & Davidson Cty., to Bird Rides, Inc. (May 8, 2018), https://media.bizj.us/view/img/1089561 2/5-8-18-letter-to-m-shaw201805081518.pdf [https://perma.cc/PZW7-HRRH]; Faith E. Pinho & Ethan May, *Bird Scooters Are Being Removed from Indianapolis. Here's What Could Happen Next*, INDIANAPOLIS STAR (July 12, 2018, 3:54 PM), https://www.indystar.com/story/news/2018/07/12/bird-scooters-removed-indianapolis-streets-follow-lime/780201002/ [https://perma.cc/6TTM-3ZAQ]; Rob Wile, *Scooter Companies Pulling out of Miami Just Weeks After Making Their Debut*, MIAMI HERALD (June 21, 2018, 7:00 AM), https://www.miamiherald.com/news/business/technology/article213523839. html [https://perma.cc/U484-2RWR].

16.   Press Release, City of Santa Monica, City Attorney Files Criminal Complaint Against Illegal Business Operations by Bird Rides, Inc. (Dec. 7, 2017), https://www.santamonica.gov/press/2017/12/07 /city-attorney-files-criminal-complaint-against-illegal-business-operations-by-bird-rides-inc [https://pe rma.cc/3RYM-HVJU]; *Bird Rides, Inc. Takes Plea Deal and Will Pay $300,000*, SANTA MONICA DAILY PRESS (Feb. 14, 2018, 2:17 PM), https://www.smdp.com/bird-rides-inc-takes-plea-deal-and-will-pay-300000/164437 [https://perma.cc/NY5F-RVBB]; Ivan Moreno, *Cities Grappling with How to Deal with Electric Scooters*, CHI. SUN-TIMES (July 12, 2018, 9:23 PM), https://chicago.suntimes.com/2018/7/ 12/18409176/cities-grappling-with-how-to-deal-with-electric-scooters [https://perma.cc/96XY-WWN L] (reporting that Nashville sued and then impounded all of Bird's scooters).

17.   Erin Lisch, *Lime Complying with Cease-and-Desist, but Bird Says Scooters Will Stay*, RTV6 (July 7, 2018, 3:36 PM), https://www.theindychannel.com/news/local-news/indianapolis/lime-to-pull-s cooters-off-indy-streets-following-cease-and-desist-letter [https://perma.cc/7YXX-4EKC] (reporting on Bird's challenge to Indianapolis's cease-and-desist letter).

18.   Andrew Giambrone, *Scooter and Bike Companies Say D.C.'s New Rules for Dockless Vehicles Are Too Restrictive*, CURBED WASH. DC (Nov. 17, 2018, 10:23 AM), https://dc.curbed.com/20 18/11/17/18098426/dc-scooters-dockless-bikes-rules-cap-pushback [https://perma.cc/Q4ZS-JZY7].

19.   *See* Moreno, *supra* note 16 (reporting that Bird argues that Milwaukee and Indianapolis could not treat the scooters as illegal).

20.   City of Milwaukee v. Bird Rides, Inc., No. 18-CV-1066-JPS, 2018 WL 5775920 (E.D. Wis. Nov. 2, 2018) (dismissing, on jurisdictional grounds, Milwaukee's suit against Bird where the city justified its fine and forfeiture request through a public nuisance theory).

21.   A similar lawsuit against an expansion of a museum into a park—the American Museum of Natural History in New York's Central Park—was pursued under a different legal theory. Plaintiffs relied, in a failed effort, on specific statutes that they claimed mandated certain procedures and reviews be followed. *In re* Cmty. United to Protect Theodore Roosevelt Park v. City of New York, 98 N.Y.S.3d 576, 577 (N.Y. App. Div. 2019).

22.   A public nuisance is a violation of a legal right common to the public as a whole. RESTATEMENT (SECOND) OF TORTS § 821(B) (AM. LAW INST. 1979). Under the traditional common law public nuisance claims could only be brought by public officials, and still today almost all suits are brought by state or city officials. JOSEPH WILLIAM SINGER, PROPERTY 124 (5th ed. 2017).

Yet, this Article will argue, behind the distinct doctrinal headings lurks a common, and foundational, question that must be settled in both the Presidential Center case and in the scooter cases.

Irrespective of their distinct doctrinal guises, in both courts are confronted with a stark choice. If the federal court in Illinois refuses to apply the public trust doctrine to the public space contested there—parks—it will thereby grant the power to draw the scope of allowable activities in that type of public space to the local government (i.e., the city will decide what structures can be built in parks). If, conversely, the court applies the public trust doctrine to parks, common law strictures will determine that scope (i.e., the court will decide which structures may, under the common law doctrine, be built in parks). If courts approve of cities' attempts to ban electric scooters from the relevant public space—sidewalks—cities will be allowed to set the contours of allowable activities on that public space. If, conversely, courts accept the operators' position, courts will allow private actors—individuals and businesses using the space—to make that determination.

In other words, in these disputes courts must decide who holds the power to determine to what use, or uses, a public space will be put. A court must identify who, or what, is the "public" in a public space—the "public" that should actually control the public right in that space.

And these two specific disputes are mere examples. The one question identified through them animates *any* case involving a public space. The disputes surrounding the Obama Presidential Center and the electric scooters are emblematic of prevalent, and ceaseless, conflicts over the design and regulation of public spaces—particularly when uses change or new uses are introduced. While current courts and commentators often conceive of each such dispute separately, applying to it the particular doctrinal set of rules implicated therein,[23] the resolution of each and every

---

23.   The most prominent example of the tendency to analyze each relevant doctrine individually is the academic fascination with the public trust doctrine. The many works addressing the public trust doctrine attempt to explain that doctrine as a unique legal tool, or to expand its reach precisely because it is allegedly so unique. Therefore, these efforts inevitably largely isolate the doctrine from other legal doctrines and approaches to public spaces. *See, e.g.*, William D. Araiza, *Democracy, Distrust, and the Public Trust: Process-Based Constitutional Theory, the Public Trust Doctrine, and the Search for a Substantive Environmental Value*, 45 UCLA L. REV. 385, 422 (1997); James L. Huffman, *A Fish out of Water: The Public Trust Doctrine in a Constitutional Democracy*, 19 ENVTL. L. 527, 543 (1989); Alexandra B. Klass, *Modern Public Trust Principles: Recognizing Rights and Integrating Standards*, 82 NOTRE DAME L. REV. 699 (2006); Alexandra B. Klass, *Fracking and the Public Trust Doctrine: A Response to Spence*, 93 TEX. L. REV. 47 (2015); Eric Pearson, Illinois Central *and the Public Trust Doctrine in State Law*, 15 VA. ENVTL. L.J. 713 (1996); Symposium, *The Public Trust Doctrine: 30 Years Later*, 45 U.C. DAVIS L. REV. 663 (2012).

one of these disputes involves the need to answer that one basic inquiry identified here.

That question—who should have the power to set the course for the given public space—is raised, for example, in disputes about the power of the city to remove statues commemorating Confederate soldiers and leaders from streets and squares over the state's objections[24] or those of the soldiers' descendants;[25] in disputes over the power of private entities or neighborhood groups to place works of art of their choosing in the street or park;[26] in disputes over the power of a city to bar an owner from placing his name or logo, in huge lettering, on a skyscraper facing the city's most prominent public space;[27] in disputes over a city's power to force an owner to maintain a large advertisement sign atop a building once that sign has become closely associated with the city's skyline;[28] and more. Once we acknowledge the fact that all such disputes involve the same task of identifying the entity that should control the public space—and once we

---

24.    One example is the suit filed by Norfolk against Virginia, challenging the state statute barring cities from removing Confederate monuments. The city argues that the "monument is the City's speech" rather than the state's speech, and thus the state, by interfering in it, restricts the city's First Amendment rights. Complaint for Declaratory and Injunctive Relief ¶ 3, City of Norfolk v. Virginia, No. 2:19-cv-436 (E.D. Va. Aug. 19, 2019). On state statutes preempting cities from removing Confederate monuments, see Zachary Bray, *Monuments of Folly: How Local Governments Can Challenge Confederate "Statue Statutes,"* 91 TEMP. L. REV. 1 (2018).

25.    The Fifth Circuit has held that the Sons of Confederate Veterans lack standing to challenge the decision by the University of Texas at Austin and by the city of San Antonio to remove Confederate monuments. Rejecting their claim for a First Amendment injury, the court explained that "[t]he fundamental and fatal flaw with Plaintiffs' argument is that they conflate agreeing with speech with authoring speech." It gave short shrift to the argument that the plaintiffs were "among the intended beneficiaries" of the "public charitable gifts" that these monument were. It dismissed these arguments as "red herrings." McMahon v. Fenves, 946 F.3d 266, 272–73 (5th Cir. 2020).

26.    Zachary Small, *How Paparazzi Dogs and Rabbitgirl Conquered New York City Streets*, N.Y. TIMES (Jan. 3, 2019), https://www.nytimes.com/2019/01/03/arts/design/gillie-marc-schattner-sydney-a ustralia-art-paparazzi-dogs.html [https://perma.cc/79VS-HCP7] (debating public-private partnerships' power to choose specific works of art—that many deem subpar—to be placed in public spaces in New York City).

27.    Emily Badger, *Donald Trump Just Inspired Chicago to Rewrite the Rules on Absurdly Large Building Signs*, WASH. POST (Sept. 25, 2014, 10:49 AM), https://www.washingtonpost.com/news/wonk/wp/2014/09/25/donald-trump-just-inspired-chicago-to-rewrite-the-rules-on-absurdly-large-building-sig ns/ [https://perma.cc/6A5G-6JSU] (discussing Chicago's failed attempt to block the Trump Organization from placing a twenty-foot-high sign bearing the name on his hotel overlooking the Chicago River).

28.    Ellie French, *City Commission Votes to Give Citgo Sign Landmark Status*, BOS. BUS. J. (Nov. 13, 2018, 8:06 PM), https://www.bizjournals.com/boston/news/2018/11/13/city-commission-votes-to-g ive-citgo-sign-landmark.html [https://perma.cc/52R6-RMJT] (discussing the Boston Landmark Commission decision to landmark the Citgo sign located in Kenmore Square, thereby mandating its continued presence even after the owner of the building's planned redevelopment); *see also* David W. Dunlap, *Pepsi-Cola Sign in Queens Gains Landmark Status*, N.Y. TIMES (Apr. 12, 2016), https://www.nytimes.com/2016/04/13/nyregion/pepsi-cola-sign-in-queens-gains-landmark-status.html [https://perma.cc/77VZ-JPJP] (discussing New York City's decision to protect from removal or alteration a famous mid-century publicity sign).

develop a principled manner of approaching that task—disputes over public spaces can be resolved in a more consistent, and rational, manner.

By approaching this task, and highlighting the stakes involved, this Article promotes a more sophisticated appreciation of the legal treatment of public spaces. Such better understanding is of the utmost importance. For public space is all around us. Not a day goes by during which the average individual does not interact with at least one public space. Merely by leaving their home, a person is confronted by the street. Even when staying indoors, the public space is inescapable—views and noises will likely invade any private space. Public spaces mold our lives—our public and private lives both.

Accordingly, over the past decades, and with enhanced urgency in the last few years, commentators in a variety of fields have tackled these spaces' treatment.[29] Following Jane Jacobs's pivotal study of cities, which tied their vitality to "[t]he ballet of the good city sidewalk,"[30] scholars in sociology, psychology, and economics, as well as planners and designers, have all investigated the nature of sidewalks and other public spaces.[31] They have produced a multitude of recommendations respecting the form such spaces should take and the uses to which they ought to be dedicated if public spaces are to foster better cities—and better lives for city dwellers.[32] Pedestrian malls, greenery, public art, central squares fostering communal interaction, open vistas, bike lanes, and other suggestions have, thanks to these authors' work, become staples of popular thought and practice respecting the shape of our public spaces.

These highly impactful works from the social studies and the arts often leave one inescapable inquiry unaddressed, however. They overlook the question of how the decision to act on these suggestions—to maintain green

---

29.   Z. Muge Akkar, *Questioning the "Publicness" of Public Spaces in Postindustrial Cities*, 16 TRADITIONAL DWELLINGS & SETTLEMENTS REV. 75, 75 (2005) ("Public spaces . . . have become the subject of renewed concern among design professionals and researchers for more than two decades.").

30.   JANE JACOBS, THE DEATH AND LIFE OF GREAT AMERICAN CITIES 50 (Vintage Books ed. 1992).

31.   *See, e.g.*, STEPHEN CARR ET AL., PUBLIC SPACE (1992); Mark Francis, *The Making of Democratic Streets*, *in* PUBLIC STREETS FOR PUBLIC USE 23, 24–28 (Anne Vernez Moudon ed., 1987); Ali Madanipour, *Public Space in the City*, *in* DESIGN PROFESSIONALS AND THE BUILT ENVIRONMENT: AN INTRODUCTION 117 (Paul Knox & Peter Ozolins eds., 2000); FRANCIS TIBBALDS, MAKING PEOPLE-FRIENDLY TOWNS: IMPROVING THE PUBLIC ENVIRONMENT IN TOWNS AND CITIES (1992); SHARON ZUKIN, THE CULTURES OF CITIES 49–78 (1995); Anastasia Loukaitou-Sideris, *Privatisation of Public Open Space: The Los Angeles Experience*, 64 TOWN PLAN. REV. 139 (1993); Ali Madanipour, *Dimensions of Urban Public Space*, 1 URB. DESIGN STUD. 44 (1995); Ali Madanipour, *Why Are the Design and Development of Public Spaces Significant for Cities?*, 26 PLAN. & DESIGN 879 (1999); Don Mitchell, *Introduction: Public Space and the City*, 17 URB. GEOGRAPHY 127 (1996).

32.   For a recent review, see ERIC KLINENBERG, PALACES FOR THE PEOPLE: HOW SOCIAL INFRASTRUCTURE CAN HELP FIGHT INEQUALITY, POLARIZATION, AND THE DECLINE OF CIVIC LIFE (2018).

spaces, to place a work of public art, to close a street to traffic, to preserve vistas, etc.—is to be made and implemented.[33] Yet that question—the *legal* question—is, as the Presidential Center and electric scooters examples highlight, unavoidable for the realization of any real-world proposal pertaining to public spaces.

As those examples further illustrate, the question involves more than the mere allocation of ownership rights. Laypeople, lawmakers, and commentators too often assume that the main task of property law with respect to public spaces is to determine which spaces are public and which are private.[34] Once the label of public—as opposed to private—is affixed to the space, most of the law's work is, supposedly, done.[35] That, however, simply is not the case in the examples provided above. The law clearly, and unquestionably, deems both the park and the sidewalks at issue in these disputes as publicly owned.[36] Yet in order to actually settle the disputes, the law must do more; it must decide who that public owning the property actually is.

This core theoretical insight of the Article builds on, and connects, important strands in two bodies of literature: property theory and local government law. Property theory, for more than a century, has focused on

---

33. When debating the "publicness" of public spaces, non-legal works, naturally, address other, non-legal concerns. For example, they ask whether public space's design and location augment stratification and gentrification, whether they serve a homogenous public and promote social filtering, and highlight the control over public uses now exercised through surveillance technologies. *See, e.g.*, Akkar, *supra* note 29, at 75–76; Stanley I. Benn & Gerald F. Gaus, *The Public and the Private: Concepts and Action*, *in* PUBLIC AND PRIVATE IN SOCIAL LIFE 3, 6 (Stanley I. Benn & Gerald F. Gaus eds., 1983); Mike Davis, *Fortress Los Angeles: The Militarization of Urban Space*, *in* VARIATIONS ON A THEME PARK: THE NEW AMERICAN CITY AND THE END OF PUBLIC SPACE 154 (Michael Sorkin ed., 1992).

34. The first work to note the limits of the traditional, binary privately owned versus publicly owned approach was Carol Rose, *The Comedy of the Commons: Custom, Commerce, and Inherently Public Property*, 53 U. CHI. L. REV. 711, 720 (1986). In this highly important work Rose argued that there are two forms of public property: one owned by the government, another, "inherently public property," owned by the general public. She thus accurately expanded the traditional category of public property beyond the too constrictive private versus public distinction. However, this work too is focused on the specific ownership labels affixed to property—while somewhat expanding the number of labels—rather than on powers of control. Further significant work in this field was done by Joseph Kearney and Thomas Merrill, who reviewed the old public dedication doctrine, which the modern common law abandoned, to highlight the promise and limits of a legal regime empowering specific individuals—but not others—to enforce public rights. They note how this approach diverges from current academic thinking which tends to assume that the public is a unitary category wholly distinct from the private. Joseph D. Kearney & Thomas W. Merrill, *Private Rights in Public Lands: The Chicago Lakefront, Montgomery Ward, and the Public Dedication Doctrine*, 105 NW. U. L. REV. 1417, 1524 (2011).

35. Compare with Joan Williams, *The Rhetoric of Property*, 83 IOWA L. REV. 277, 297 (1998) (criticizing practitioners and scholars of property while noting that "[l]abeling something as property does not predetermine what rights an owner does or does not have in it").

36. Steven G. Gey, *Reopening the Public Forum—From Sidewalks to Cyberspace*, 58 OHIO ST. L.J. 1535, 1543 (1998) ("Of course, parks and sidewalks were . . . [public] property . . . .").

deconstructing the concept of private ownership.[37] The starting point is often found in Wesley Hohfeld's celebrated assertion that ownership is not a unitary legal institution that conveys the same (and absolute) rights on all owners of all assets at all times.[38] Rather, private property is a bundle of rights—a diverse and flexible assortment of entitlements leaving owners with varying powers and obligations that might change across owners and things owned.[39] As part of the explosion in sophisticated writing about property theory over the past two decades,[40] some scholars have tried to pinpoint the most important right in the ownership bundle, and to survey the variance in its potency across different settings.[41] Many scholars have zeroed in on the owner's right to exclude others from her land, stressing that said entitlement enables the owner to set the contours for the land's use.[42] One important recent contribution summarized such efforts by characterizing private property as the power to "set[] the agenda" for an asset.[43]

This Article imports into the realm of public property a version of that line of thinking: the main task of the law of public property is to identify those actors who may set an agenda for public assets. It suggests that the

---

37.  Thomas C. Grey, *The Disintegration of Property*, 22 NOMOS: PROPERTY 69, 69 (1980).

38.  Wesley Newcomb Hohfeld, *Fundamental Legal Conceptions as Applied in Judicial Reasoning*, 26 YALE L.J. 710, 710–11, 743–44 (1917).

39.  *See, e.g.*, Edward L. Rubin, *Due Process and the Administrative State*, 72 CALIF. L. REV. 1044, 1086 (1984) ("[P]roperty is simply a label for whatever 'bundle of sticks' the individual has been granted.").

40.  *See generally, e.g.*, Gregory S. Alexander, *Property's Ends: The Publicness of Private Law Values*, 99 IOWA L. REV. 1257 (2014); Abraham Bell & Gideon Parchomovsky, *Reconfiguring Property in Three Dimensions*, 75 U. CHI. L. REV. 1015, 1015 (2008); Nestor M. Davidson, *Standardization and Pluralism in Property Law*, 61 VAND. L. REV. 1597 (2008); Hanoch Dagan, *The Craft of Property*, 91 CALIF. L. REV. 1517 (2003); Lee Anne Fennell, *Adjusting Alienability*, 122 HARV. L. REV. 1403 (2009); Thomas W. Merrill & Henry E. Smith, *The Property/Contract Interface*, 101 COLUM. L. REV. 773 (2001); Francisco J. Morales, Comment, *The Property Matrix: An Analytical Tool to Answer the Question, "Is This Property?,"* 161 U. PA. L. REV. 1125, 1129 (2013); Eduardo M. Peñalver, *Property as Entrance*, 91 VA. L. REV. 1889, 1893 (2005); Carol M. Rose, *The Moral Subject of Property*, 48 WM. & MARY L. REV. 1897 (2007); Joseph William Singer, Essay, *Democratic Estates: Property Law in a Free and Democratic Society*, 94 CORNELL L. REV. 1009 (2009).

41.  *See, e.g.*, Thomas W. Merrill & Henry E. Smith, Essay, *What Happened to Property in Law and Economics?*, 111 YALE L.J. 357, 359 (2001) (tracing the worrisome rise of the modern legal economists' view of property as simply a list of rights, and advocating instead for a return to the conception of property as a distinctive in rem right); Thomas W. Merrill & Henry E. Smith, *Optimal Standardization in the Law of Property: The* Numerus Clausus *Principle*, 110 YALE L.J. 1, 8 (2000) (explaining that property is different since it has a core and as a result only certain property rights can be created).

42.  *See* J. E. PENNER, THE IDEA OF PROPERTY IN LAW 71 (1997); Adam Mossoff, *What Is Property? Putting the Pieces Back Together*, 45 ARIZ. L. REV. 371, 439 (2003); Thomas W. Merrill, *Property and the Right to Exclude*, 77 NEB. L. REV. 730, 731 (1998); Henry E. Smith, *Property as the Law of Things*, 125 HARV. L. REV. 1691, 1699 (2012).

43.  Larissa Katz, *Spite and Extortion: A Jurisdictional Principle of Abuse of Property Right*, 122 YALE L.J. 1444, 1450 (2013).

ownership-focused approach to public property rights ought to be supplemented with, if not supplanted by, a version of this agenda-setting-focused approach.

This move will also connect the public property literature to the theoretical literature in the field of local government law. There, commentators stress that local power is a diverse concept that can be, and is, wielded by an exceptionally wide, and widening, group of actors.[44] Local government law is a framework for allocating decision-making powers over public services and assets among governments operating on different levels—state and local.[45] As recent writers explain, these levels themselves are also incredibly diverse internally. The local—as the alternative to the state—can be a city,[46] a county,[47] a special district,[48] or a school district.[49] It can consist of elected officials or administrators.[50] It can accommodate, in addition to these local level officers, micro-local level players of differing formal standings—a neighborhood referendum, a community board, etc.[51]

Local government law thus not only determines what should be left to local, as opposed to state, level decision-making; it must also decide what, or who, is the "local" empowered to make the local decision. The idea that a key component of local government law is identifying the "local" appropriate for each case should be transported to property law's thinking about public property—the task at hand is to identify the "public" appropriate in each case.

The notion whereby singling out a space as subject to a public right is merely the first step in the analysis—whose following, more important step is identifying the relevant public—can thereby enrich our theoretical understanding of the concept of public property. It also aids in solving practical doctrinal challenges. The insight promoted here will refocus legal disputes on the meaningful question they involve—and away from the unhelpful issues currently preoccupying courts. For example, the important question should not be whether a park on which a presidential center is suggested has ever been submerged under water (and hence the public trust doctrine, under its historical reading, should be applied to it).[52] Rather, it

---

44.   *See generally* Nadav Shoked, *The New Local*, 100 VA. L. REV. 1323 (2014).
45.   GERALD E. FRUG ET AL., LOCAL GOVERNMENT LAW, at xiii (6th ed. 2015).
46.   *See, e.g.*, Gerald E. Frug, *The City as a Legal Concept*, 93 HARV. L. REV. 1057, 1059 (1980).
47.   Michelle Wilde Anderson, *Mapped Out of Local Democracy*, 62 STAN. L. REV. 931 (2010).
48.   Nadav Shoked, *Quasi-Cities*, 93 B.U. L. REV. 1971 (2013).
49.   Nadav Shoked, *An American Oddity: The Law, History, and Toll of the School District*, 111 NW. U. L. REV. 945 (2017).
50.   Nestor M. Davidson, *Localist Administrative Law*, 126 YALE L.J. 564 (2017).
51.   Richard Briffault, *The Rise of Sublocal Structures in Urban Governance*, 82 MINN. L. REV. 503, 508 (1997); Shoked, *supra* note 44.
52.   *See supra* notes 6–10 and accompanying text.

should be whether it is sensible to enable a city through its democratic processes to decide to which uses a park would be put.[53] In addition to thereby isolating the true inquiry involved in such cases, the Article offers courts tools to tackle that inquiry. It develops tests that can be employed to determine who, or what, should have the power to direct the uses of a public space, such as a park: the local government, the public at large, an individual private owner, or a set of specific common law strictures.

These tests for settling specific disputes will be derived from the considerations that have historically animated the common law in its dealings with public spaces. A myriad of common law rules determine what spaces can become public and how. The key theme the Article uncovers as holding together the historical and doctrinal experience of these diverse common law rules is the focus on discerning whether a given, contested public space has a "natural" or "innate" use.[54] The Article thus suggests adopting this question as a criterion for also settling disputes over the use of public spaces. If a public space does not have such a use, then a court should refrain from intervening. Decisions respecting the space's management, and potential changes to it, should be left to the relevant local government, as the public's democratically elected representative.[55] Only if, conversely, the public space does have a natural or innate use, should the court consider inserting itself into disputes over the space's management. In these situations the court ought to evaluate the role and interests of the local government, the public at large, and those individual residents uniquely invested in the specific public space.[56] In arbitrating the contest between these actors over decision-making powers in a public space that has an innate use, the court should consider the breadth of the space's innate use (and its concomitant susceptibility to multiple interpretations), the identity of the parties liable to pay for maintaining the space, and finally, the potential for disinterested governmental decision-making in the specific circumstances.[57]

To establish this test and thereby complete its doctrinal, normative, and theoretical tasks, the Article proceeds as follows. Part I maps out our law of public spaces as constructed by different elements of property law. It explains that the law must always first determine the scope of a public right and then identify the "public" controlling that right. Summarizing and bringing together existing doctrines often understood separately, the

---

53.   *See infra* Part III.A.
54.   *See infra* Part II.
55.   *See infra* Part II.
56.   *See infra* Part II.
57.   *See infra* Part II.

organizational framework that Part I offers should be useful to future lawmakers and analysts independently of the value of the normative review that follows. Part II turns to the normative exploration and draws on the doctrines surveyed in Part I to isolate the considerations that must affect the law when it attempts to designate the "public" that should control a given public right. To illustrate the utility of the criteria thereby developed, Part III applies the tests to the cases of parks and sidewalks—thus reconsidering the challenges presented by the disputes over the Presidential Center and the electric scooters that launched the discussion.

## I. THE LAW OF PUBLIC SPACES

In the modern market system, public rights are conceived as lying at the margins: the system prioritizes, and is sustained by, private property.[58] Property law doctrines thus focus on defining private rights and regulating conflicts between them;[59] when public powers are considered, it is mostly as part of property law's effort to police the risks these powers allegedly pose to private property.[60] As a result, much of the law's work in defining public rights is achieved through scattered doctrines, some of them only addressing the issue indirectly. To promote the Article's goal of providing a better explanation of the law of public spaces, this Part assembles all these doctrines in an attempt to identify the overall structure they put in place. It argues that all the different property doctrines dealing with public spaces— some of them never before even perceived as dealing with public spaces— define those spaces by providing answers to two queries.

The first inquiry the law must address with respect to each and every space pertains to the degree of publicness assigned to it. After the law thereby determines the public right's strength, it must then decide how that right is to be filled with specific substance: the law needs to identify the person or entity empowered to define and manage the public right's specific uses.

The law first draws the external strength of the public right—it defines the right—and then it empowers a person or entity to define the internal contents of that public right—it defines the public.

---

58.   RICHARD A. POSNER, THE ECONOMICS OF JUSTICE 70–72 (1983).
59.   SINGER, *supra* note 22, at 2.
60.   *Id.* at 686.

## A. Different Rights

Any discussion of public spaces must commence with their definition. Unlike Roman law, the modern common law does not have a body of law specifically dealing with public spaces qua public spaces.[61] It does not, therefore, readily provide a unitary definition for such spaces. Perhaps the most famous illustration of this lacuna is found in the refusal of the courts—including the U.S. Supreme Court—to conclusively identify "public" spaces that, unlike "private" spaces, must be open to individuals exercising their First Amendment free speech rights.[62]

This legal attitude, generating inconsistent results and frustrating many,[63] is in fact, however, in line with the position of most social scientists and planners. Works in those fields insist that the "publicness" of a space is a matter of degree.[64] Spaces that are absolutely public are rare, as most spaces can be placed on a private to public spectrum.[65]

This spectrum is embodied in the scheme the property doctrines relevant to such spaces produce. The regime these laws institute can best be understood as granting to the public entitlements of varying strengths to the benefits of different spaces. The greater the portion of a specific land's fruits—in economic terms, the land's rents—to which the public holds a legal right, the more public that space is rendered.[66] The public's right to a space's rents can take one of three forms. The most robust public right is assured through ownership—since ownership supplies the owner, here the public, with all the residual rents from an asset. The least robust public rights are assured when the public has no entitlement to any rents from an asset but can block the asset's owner from deriving a certain rent from the asset. In between are public rights affording the public some, albeit limited and specific, rents from an asset. Translating these options into formal legal categories, the public may have fee ownership rights in an asset (the

---

61.   Daniel R. Coquillette, *Mosses from an Old Manse: Another Look at Some Historic Property Cases About the Environment*, 64 CORNELL L. REV. 761, 801–03 (1979) (discussing Roman law); Rose, *supra* note 34, at 720–21 (unearthing the distinct historical doctrines the common law has separately employed starting in the nineteenth century to recognize properties that lie outside the realm of private property).

62.   *See, e.g.*, David Dana & Nadav Shoked, *Public, by Necessity*, 13 SEATTLE J. FOR SOC. JUST. 341, 360–64 (2014).

63.   *See infra* note 181 and accompanying text.

64.   *See, e.g.*, MARGARET KOHN, BRAVE NEW NEIGHBORHOODS: THE PRIVATIZATION OF PUBLIC SPACE 11–12 (2004).

65.   Neil Smith & Setha Low, *Introduction: The Imperative of Public Space*, *in* THE POLITICS OF PUBLIC SPACE 1, 1 (Setha Low & Neil Smith eds., 2006).

66.   *See, e.g.*, YORAM BARZEL, ECONOMIC ANALYSIS OF PROPERTY RIGHTS 3–9 (2d ed. 1997) (defining property as "residual claimancy," meaning that the owner is the one who gets the residual value after all other claims are satisfied).

strongest public right);[67] it might have an easement in an asset—rights of access to, or use of, an asset owned by a private owner (a weaker public right);[68] or it might benefit from a restriction—through a negative easement or a regulation—placed on the right of an owner to freely use her asset (the weakest public right).[69]

Public fee ownership is the most straightforward form of a public right to a space. It is also inherently the most encompassing. Although ownership's specific definition is hotly contested, it is undoubtedly the most robust property entitlement the law awards.[70] If the public holds the fee interest over a space, the public's standing is equivalent to that of the homeowner in her home. The public will thus hold the residual right to all the land's benefits.[71] Among the quintessential examples of spaces over which the public owns a fee interest, we often count city hall, public roads, or land submerged under water.[72]

But the public might have rights in a certain road, or in the beach fronting the water, even without owning a fee interest therein.[73] Properties that are privately owned by one person can be subject to another person's right to access them: one neighbor can hold a right of way—an easement—over the land of the other neighbor.[74] The same is true when the public is concerned: the public might hold an easement over privately owned land. As compared to a fee interest, an easement is less comprehensive. It is the right to do something—one specific thing—on someone else's land.[75] Thus, the holder of an easement—be it the neighbor or the public—is, unlike the holder of a fee interest, prohibited from altering the nature of her right, or from expanding it beyond its existing contours.[76] The fee owner of a road might have the power to replace the road with a yard; the owner of an easement over the road does not have that power.[77] She can only drive or walk along

---

67. *See infra* notes 70–72 and accompanying text.

68. *See infra* notes 73–81 and accompanying text.

69. *See infra* notes 82–88 and accompanying text.

70. SINGER, *supra* note 22, at 3 (contesting the idea of ownership as an absolute right, portraying it instead as the fullest bundle of rights that the law will recognize).

71. Thomas W. Merrill, *The Property Strategy*, 160 U. PA. L. REV. 2061, 2067 (2012) (arguing that ownership entails "residual managerial authority" and "residual accessory rights").

72. *See, e.g.*, *infra* notes 145–146 and accompanying text.

73. Lewis v. Jones, 1 Pa. 336, 337 (1845) ("[T]he right to the soil of a highway resides in the proprietor of the land over which it has been laid; and that the citizen has no more than a license to pass along it with carriages and cattle; an abuse of which, like the abuse of any other license given, not by the party, but by the law, makes him a trespasser . . . .").

74. SINGER, *supra* note 22, at 178.

75. *Id.*

76. *See, e.g.*, McCarthy v. City of Syracuse, 46 N.Y. 194, 199 (1871) (explaining that the owner of the street, not the public holding an easement over it, held the right to excavate below it).

77. Hartford v. Gilmanton, 146 A.2d 851, 853 (N.H. 1958).

the road. Rights of passage through streets are the typical example for a public easement. [78] The historical right to roam that some systems recognize,[79] and rights to hunt that are still protected in many states,[80] are also examples of traditional public easements. More recently courts have similarly recognized public rights of access, for specific purposes, to private beaches.[81]

The intuitive notion of a public right involves one of the two forms of right just reviewed: a publicly held fee interest or a publicly held easement, empowering the public to do many things (in the case of a fee right), or one thing (in the case of an easement right), in a given space. A somewhat less discussed form of public right, however, does not include such a freedom to act awarded to the public. While the typical right—public or otherwise—takes the shape of the ability to do something on land, a right can also consist of the ability to block someone else from doing something on their land or to force them to do something there. [82] Thus a negative easement, for example, might empower an owner to stop her neighbor from building a second floor that will block the views from the owner's house; or a covenant might empower the owner to force the neighbor to maintain that neighbor's yard or pay homeowners association fees.[83] The public similarly can, and does, enjoy such rights to interfere with another owner's freedom. Historic preservation regulations (barring an owner from altering her landmarked building) [84] or conservation easements (prohibiting an owner from disturbing the natural or scenic values of her land)[85] are examples.[86] The public does not own,[87] or even have a right to enter, the landmarked building

---

78.    S. H. Kress & Co. v. City of Miami, 82 So. 775, 775 (Fla. 1919) (quoting Lord Mansfield's statement that "the king has nothing but the passage for himself and his people; but the freehold and all profits belong to the owner of the soil").

79.    *See* John A. Lovett, *Progressive Property in Action: The Land Reform (Scotland) Act 2003*, 89 NEB. L. REV. 739 (2011).

80.    *See* Mark R. Sigmon, *Hunting and Posting on Private Land in America*, 54 DUKE L.J. 549 (2004).

81.    *See, e.g.*, Matthews v. Bay Head Improvement Ass'n, 471 A.2d 355 (N.J. 1984).

82.    SINGER, *supra* note 22, at 226.

83.    *Id.* at 227–28.

84.    The Supreme Court approved of historic preservation ordinances in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978).

85.    A conservation easement is "a qualified real property interest [contributed] to a qualified organization exclusively for conservation purposes." 26 C.F.R. § 1.170A-14(a) (2018). The earliest use of conservation easements was to protect the scenic views from highways. They are still mostly used to preserve open spaces. *See* 4 RICHARD R. POWELL, POWELL ON REAL PROPERTY § 34A.02 (Michael Allan Wolf ed., 2018).

86.    Another example is ordinances that create an inability to down "heritage" trees on your own land. *See, e.g.*, HIGHLAND PARK, ILL., ORDINANCE § 94.403 (2009).

87.    Therefore, the use of a landmarked historic building can later on be changed by the private owner. *See* Teachers Ins. & Annuity Ass'n v. City of New York, 623 N.E.2d 526, 530 (N.Y. 1993).

or the nature preserve.[88] It still, however, controls, to some degree, those spaces' uses, and, at least allegedly, derives a benefit from the fact that certain uses (namely, development) are prohibited there. Hence, these, too, are public rights in a space.

## B. Different Publics

Public rights in property thus differ in strength: from the all-encompassing fee interests, through the more partial easements, to the most limited negative easements or regulations. Regardless of its location on this strength continuum, a given public right, like any other right, must be filled with specific content. Fee ownership can translate into many different modes of developing the owned land; an easement, such as a right of way, can be employed in different fashions (for example, travel by pedestrians versus by cars) and for different purposes (for example, for ingress and egress purposes alone versus for recreational purposes); a negative easement or regulation restricting another's use of her land can bar (or not bar) different activities. Furthermore, even once initially defined, the manner of employment of any of the rights need not be constant—it might be allowed to change over time. The desired pattern of development of the land held under a fee interest can perhaps shift (say from open space to residential development); the easement's uses or purposes can expand (say adding cars to pedestrians and recreation to ingress and egress); a negative easement or regulation restricting the development of a lot can be adjusted or lifted (in exchange for consideration or to allow a development desirable to both parties). After a right has been recognized and protected from outsiders, that is, the law must still determine the modes and goals of its exercise, and the ability to alter these later on.

For private rights this challenge—of filling a right with specific contents—is normally not particularly taxing. It is for the right's owner to set the agenda for its use—subject to agreements with others and to any other existing legal restrictions.[89] The right-holder is a specific person (real or legal) and it is for her—subject to the law—to choose what to do with her right, once that right is recognized.[90] For public rights, however, this move is more complicated. Decisions respecting the use of a right are to be made

---

88.   *E.g.*, Nicholas Caros, Note, *Interior Landmarks Preservation and Public Access*, 116 COLUM. L. REV. 1773, 1796–97 (2016) (explaining that the New York City historic preservation ordinance does not allow the commission, probably, to force owners to permit the public's entry into protected interiors).

89.   Larissa Katz, *Exclusion and Exclusivity in Property Law*, 58 U. TORONTO L.J. 275, 287 (2008) (explaining the role of the owner as setting an agenda subject to obligations such as a covenant).

90.   *Id.* at 289–90 (arguing that private ownership is the power to set an agenda for a resource).

by the right's holder, and the holder of the right in these cases is the public. But who or what exactly is "the public"?

"Publics are queer creatures. You cannot point to them, count them, or look them in the eye."[91] The problem is particularly daunting from a legal perspective, as no legal category plainly corresponds to the term "public." So, in the case of each and every one of the public rights just described— public fee ownership, public easement, public restriction—what is the "public"? Identifying the holder of the "public" right over a space, the "public" that can then determine the right's mode of employment, is not a straightforward task. Works in cultural studies and the social sciences attest to its difficulty. Some scholars view the definition of the public as the result of a political or class struggle.[92] Others present it as the collective product of negotiation and coordination.[93] Still other scholars insist on the recognition of a counterpublic—a subculture requiring its own public spaces.[94] Certain commentators thus conclude that there simply is no general idea of the public: the public is whatever people in a particular place and context think it is.[95]

The law, perhaps unsurprisingly, concurs: it does not assume a unitary and fixed concept of a public. It does not even engage the task of identifying the public directly. The law only touches upon the task indirectly when setting the ways in which the public rights described in the preceding section are acquired. In those situations, the law simply cannot avoid the task. Doctrines governing the creation of a right must identify the act necessary for the right's creation; in the process, they also have to identify the actor responsible for the creation. Accordingly, the doctrines regulating the acquisition of a *public* right inescapably discern a *public*—the specific actor creating that right. Therefore, through a review of these doctrines we can ascertain the different publics the law currently recognizes.

Public rights can be acquired in four different ways: by governmental act, through a market conveyance, following the passage of time, and automatically. Each of these modes operates through specific legal doctrines which can generate public rights of different strength stripes (fee, easement, restriction), though not necessarily of all strength stripes (for example, the passage of time cannot result, in American law, in a restriction).[96] Each also,

91.   MICHAEL WARNER, PUBLICS AND COUNTERPUBLICS 7 (2002).
92.   DAVID HARVEY, REBEL CITIES: FROM THE RIGHT TO THE CITY TO THE URBAN REVOLUTION 67–68 (2012).
93.   ELINOR OSTROM, GOVERNING THE COMMONS: THE EVOLUTION OF INSTITUTIONS FOR COLLECTIVE ACTION 58–102 (1990).
94.   WARNER, *supra* note 91, at 56–57.
95.   *Id.* at 11.
96.   SINGER, *supra* note 22, at 205–06.

as shall be seen now as the four will be reviewed in turn, imagines a different "public."

The first, and perhaps most intuitive, way through which the public acquires property is through an act of the government—the entity that is the public's organized form.[97] American law endows government with two powers that enable it to generate public property rights: eminent domain and the police power. The eminent domain power allows the government to take, for a public use, property from a private owner in exchange for just compensation.[98] The power can thus be used to acquire public fee interests or public easements.[99] The police power authorizes the government to regulate the uses of land without compensating the affected owner.[100] Through the police power the government can thus place public restrictions, such as historic preservation ordinances, on private land.[101]

Both these powers are wholly governmental: the government exercises the eminent domain and police powers and acquires any resultant rights. The Supreme Court has repeatedly stated that the determination whether to turn to the eminent domain power is the government's alone to make.[102] Thus a court will not second-guess the government's decision to acquire property through eminent domain.[103] Plaintiffs arguing that the government's decision is wrong-headed, or that the specific taking will not serve a truly public goal (for example, when used for economic development) will normally fail.[104] Similarly, individual petitioners cannot force the government to take property to create a road they deem desirable.[105] The rule is even clearer with respect to the police power: the constitutional nondelegation doctrine bars governments from transferring to

---

97.   Abraham Bell & Gideon Parchomovsky, Essay, *The Uselessness of Public Use*, 106 COLUM. L. REV. 1412, 1426 (2006).

98.   U.S. CONST. amend. V.

99.   For examples of the use of the eminent domain power to acquire a fee interest in a park, see W. Chi. Park Comm'rs v. W. Union Tel. Co., 103 Ill. 33 (1882); Crystal Lake Park Dist. v. Consumers Co., 145 N.E. 215 (Ill. 1924); Wright v. Walcott, 131 N.E. 291 (Mass. 1921); Cty. Court of St. Louis Cty. v. Griswold, 58 Mo. 175 (1874); Brooklyn Park Comm'rs v. Armstrong, 45 N.Y. 234 (1871). For examples of a taking of land for highways, see 3 HERBERT THORNDIKE TIFFANY, THE LAW OF REAL PROPERTY § 924 (3d ed. 1939); VT. STAT. ANN. tit. 19, § 712 (2017) (empowering towns to take property for laying highways). For examples of taking of an easement, see City of Rockland v. Johnson, 267 A.2d 382 (Me. 1970); Hartford v. Gilmanton, 146 A.2d 851, 853 (N.H. 1958).

100.   *See, e.g.*, Nadav Shoked, *The Reinvention of Ownership: The Embrace of Residential Zoning and the Modern Populist Reading of Property*, 28 YALE J. ON REG. 91, 103 (2011).

101.   Penn Cent. Transp. Co. v. New York City, 438 U.S. 104, 125 (1978).

102.   *See, e.g.*, Berman v. Parker, 348 U.S. 26 (1954).

103.   Haw. Hous. Auth. v. Midkiff, 467 U.S. 229, 243 (1984) ("[O]ur cases make clear that empirical debates over the wisdom of takings—no less than debates over the wisdom of other kinds of socioeconomic legislation—are not to be carried out in the federal courts.").

104.   Kelo v. City of New London, 545 U.S. 469, 484 (2005).

105.   3 TIFFANY, *supra* note 99, § 924.

others the police power.[106] Government may not permit other entities to create or enforce public restrictions.[107] Consequently, the "public," for purposes of acquiring public rights through government power (eminent domain or police power), is, perhaps unsurprisingly, the government.

That is not necessarily the case where other doctrines generating public rights are concerned. The second manner of creating a public right is through a market conveyance. Eminent domain and the police power are doctrines that may force an owner to part ways with a right for the benefit of the public, but an owner can also choose to do so of her own volition. She can convey a property right to the public as a gift or in the course of an exchange. Gifts of a fee or easement right to the public[108] are regulated through the doctrine of dedication.[109] A dedication is a donation of an owner's property to the public's use.[110] It thus consists of an offer by the owner and an acceptance by the public.[111]

Since a dedication is grounded in the offer an owner makes, its contours are defined in that offer.[112] The granting owner defines the right created: she sets the uses to which the gifted public right will be put, and she might add

---

106. A. L. A. Schechter Poultry Corp. v. United States, 295 U.S. 495 (1935).

107. N. Am. Commercial Co. v. United States, 171 U.S. 110, 137 (1898) ("[G]overnmental powers cannot be contracted away . . . .").

108. At its inception the dedication doctrine only allowed for the grant of easements to the public for use of highways and bridges. The first case mentioning the term dedication is *Lade v. Shepherd*, (1732) 2 Str. 1004, 93 Eng. Rep. 997 (KB). American courts expanded the doctrine, applying it to squares and parks: the first such application was in *Pomeroy v. Mills*, 3 Vt. 279 (1830); *see also* EMORY WASHBURN, A TREATISE ON THE AMERICAN LAW OF EASEMENTS AND SERVITUDES 208 (4th ed. 1885) (declaring that result can be assumed to form part of the country's common law). American courts thus enabled the dedication not only of easements, but also of fee interests. As the Supreme Court explained, "[i]f this is the doctrine of the law applicable to highways, it must apply with equal force, and in all its parts, to all dedications of land to public uses." President, Recorder & Trs. of Cincinnati v. Lessee of White, 31 U.S. 431, 437–38 (1832).

109. A special doctrine is necessary since the law makes it impossible for an owner to convey property rights to the public through a normal conveyance. For a conveyance of land to be valid, the law requires that it detail both the identity of the land's current owner and the identity of that to whom ownership is transferred: identifiable grantors and grantees. *See, e.g.*, Durbin v. Bennett, 31 F. Supp. 24, 26 (E.D. Ill. 1939) (omission of grantee invalidates transaction under Illinois law); Henniges v. Paschke, 84 N.W. 350, 351 (N.D. 1900); Brugman v. Charlson, 171 N.W. 882 (N.D. 1919); State v. McGee, 204 N.W. 408, 409 (Iowa 1925). Since, by definition, the public is not an identifiable person or entity, a conveyance to "the public," or to the residents of an area, is invalid. Hunt v. Tolles, 52 A. 1042, 1045 (Vt. 1902); City of Ardmore v. Knight, 270 P.2d 325, 327–28 (Okla. 1954). Hence the law required the special doctrine of dedication.

110. City of Fairfield v. Jemison, 218 So. 2d 273, 275 (Ala. 1969).

111. Miller v. Fowle, 206 P.2d 1106, 1106, 1108 (Cal. Ct. App. 1949) ("Dedication is a matter of contract requiring an offer and an acceptance.").

112. Lambright v. Trahan, 322 S.W.3d 424, 431 (Tex. App. 2010).

restrictions and conditions.[113] Courts hold that the grantor's intent controls, and thus the terms of the dedication will be strictly construed.[114] If, for example, an owner dedicates land for use as a street alone, the local government may not convert that area to another use;[115] if that granting owner specifies that railcars may not use the street, a rail may not be added;[116] if the dedicating owner orders that the land serve as a park, the construction of a fire house will be enjoined;[117] if she instructs that the donated public facility be freely accessed, fees—even if necessary—cannot be charged.[118]

To complete a dedication, the offer the owner makes must be accepted. The recipient of a dedication is the public at large[119]—rather than any individual[120] or entity,[121] such as the government.[122] But the government accepts the offer on the public's behalf,[123] and can thus, like the offering

---

113.   Lynchburg Traction & Light Co. v. City of Lynchburg, 128 S.E. 606, 609 (Va. 1925) ("Dedication of a highway is a mere gift to the public, and the donor may annex thereto any restriction or condition he pleases, not inconsistent with or repugnant to the gift. Otherwise, there would be no gift. The donee cannot dictate the terms of the gift. He can accept or not, as he pleases. If he accepts unconditionally, he thereby agrees to perform the conditions annexed to the gift.").

114.   Lander v. Vill. of S. Orange, 279 A.2d 633, 637 (N.J. 1971).

115.   Dunnick v. Stockgrowers Bank of Marmouth, 215 N.W.2d 93, 97 (Neb. 1974) (Newton, J., concurring).

116.   *Lynchburg Traction & Light Co.*, 128 S.E. at 610. Similarly, if the corporation developing a seaside resort dedicated land to public use as open space so as not to block residences' ocean view, the government that accepted the dedication on those terms could not later on propose structures on that land. Poole v. Comm'rs of Rehoboth, 80 A. 683 (Del. Ch. 1911); *see also* Attorney Gen. v. Vineyard Grove Co., 64 N.E. 75 (Mass. 1902).

117.   Quinn v. Dougherty, 30 F.2d 749, 752 (D.C. Cir. 1929) (holding that where land and a view of the sea from a certain bluff above land have been acquired by the public by dedication, the local government cannot license structures on land beneath bluff that obstruct the view); Hill v. Borough of Belmar, 127 A. 789 (N.J. 1925).

118.   *Lander*, 279 A.2d at 639.

119.   In this manner a dedication differs from other conveyances (grants and typical gifts): the law normally requires that a recipient in a conveyance be identified. Magnolia Mem'l Gardens, Inc. v. Denton, 317 So. 2d 38, 42 (Miss. 1975).

120.   Roma Dev. Corp. v. Jones, 115 N.Y.S.2d 189, 192 (N.Y. Sup. Ct. 1952).

121.   Cent. Veterans' Ass'n of Stamford v. City of Stamford, 101 A.2d 281, 283–84 (Conn. 1953). An exception recognized by American courts is that a particular religious group or church could be the recipient of a dedication. *See, e.g.*, Comm'rs of Wyandotte Co. v. First Presbyterian Church, 1 P. 109 (Kan. 1883).

122.   *Lander*, 279 A.2d 633 (explaining that the government cannot be the recipient of a dedication).

123.   The dedication may be accepted through a formal act of the relevant authority, say through a municipal ordinance. McBroom v. Jackson Cty., 154 So. 3d 827, 836 (Miss. 2014). Acceptance can also be expressed through the less formal governmental act of simply assuming jurisdiction over the space—for example, possessing or maintaining it—or "some [other] act which unequivocally shows an intent to assume jurisdiction over the thing dedicated." De Castello v. City of Cedar Rapids, 153 N.W. 353, 355 (Iowa 1915).

owner, define the dedicated rights in the deed accepting the dedication.[124]

The same is true when public rights are created through more straightforward private conveyances: a private gift to the government (rather than to the public at large as in a dedication) or a deal with the government.[125] The parties to the transaction—the granting individual and the grantee government—create the right: they define the right the public acquires and its contours.[126] Conservation easements are a useful example. An owner grants a conservation easement to the government or to a designated charitable organization in exchange for a federal tax benefit.[127] The terms of the conservation easement created—the specific developments it bars—are defined in the state statute permitting such easements' creation and in the federal tax code providing the consideration for the grant of a conservation easement.[128] The transfer of a conservation easement typifies the inevitable dynamics of any transaction: the parties to the transaction prescribe its terms. Thus, under the laws regulating the acquisition of public rights through market transfers—a dedication or a typical conveyance—the "public" is both the government and, often to a still greater extent, the original private owner initiating the transfer.[129]

The third mode of creating public rights—the passage of time—introduces yet another notion of the "public." Market conveyances, like those just reviewed, are the archetypical manner in which property rights are transferred in our property law system. But the system also recognizes transfers resulting not from such agreements of the parties involved, but from the passage of time.[130] Through adverse possession, an individual or

---

124.   *See, e.g.*, Miller v. Fowle, 206 P.2d 1106, 1107–08 (Cal. Ct. App. 1949) (the developer of a subdivision that straddled the boundary between the cities of Oakland and Berkeley offered to dedicate a street therein, and while the offer was accepted by Oakland, it was rejected by Berkeley).

125.   Government enjoys the power held by all market participants to purchase property. United States v. Fox, 94 U.S. 315, 315–16 (1876) (explaining that "the power of acquiring property for public purposes in any part of the country, by all the usual methods known to the law, is an essential attribute" of a government's sovereignty); *see also* VT. STAT. ANN. tit. 19, § 26 (2017) (empowering government to buy land for highways). Thus it can also accept a gift from a landowner. City of Norfolk v. Meredith, 132 S.E.2d 431, 434–35 (Va. 1963).

126.   *See, e.g.*, People *ex rel.* Bd. of Park Comm'rs v. Common Council of Detroit, 28 Mich. 228, 240 (1873) (discussing the municipal acquisition of lands for one of Detroit's important parks); Holt v. City Council of Somerville, 127 Mass. 408, 410 (1879) (same).

127.   26 C.F.R. § 1.170A-14(c) (2018) (qualifying the donation of a conservation easement as tax deductible); *see also* Janet L. Madden, *Tax Incentives for Land Conservation: The Charitable Contribution Deduction for Gifts of Conservation Easements*, 11 B.C. ENVTL. AFF. L. REV. 105 (1983).

128.   *See* 4 POWELL, *supra* note 85, § 34A.03.

129.   In a dedication, the intent of the grantor might enjoy an elevated status as compared to the intent of the government. Unlike when public rights are acquired through eminent domain or purchase, in the dedication context the terms will be construed against the governmental grantee. Lander v. Vill. of S. Orange, 279 A.2d 633, 637 (N.J. 1971).

130.   SINGER, *supra* note 22, at 140.

entity can lose her fee ownership rights in a piece of land to another individual or entity who has been possessing the land for a statutorily-set number of years.[131] As any other entity, the government can gain in this manner the property that its agents have possessed for a lengthy time.[132] For example, if a municipal office building encroaches on neighboring privately owned land, the government can obtain fee title to that land through adverse possession.[133]

The passage of time can also, however, generate public rights of a different sort—and with a different notion of the public. Although courts have traditionally held that only identifiable actors can resort to an adverse possession claim,[134] the common law has allowed the general public—the quintessential unidentifiable actor—to acquire certain rights through the passage of time by relying on doctrines other than adverse possession.[135] The most notable doctrines employed for this purpose have been implied dedication, which generates fee interests in the public, and prescriptive easement, which generates public easement rights.[136]

---

131.   *Id.*

132.   10 EUGENE MCQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 28.15 (3d ed. 1999) ("A municipality, like an individual, may acquire title to land by adverse possession, where the elements necessary for the establishment of such a right are present, and where the adverse possession may be deemed to be the official act of the municipal corporation." (footnotes omitted)).

133.   *See, e.g.*, Levering v. City of Tarpon Springs, 92 So. 2d 638, 638 (Fla. 1957) (municipal waterworks mistakenly constructed partially on private land); Johnson v. City of Mt. Pleasant, 713 S.W.2d 659, 664 (Tenn. Ct. App. 1985) (same); Morgan v. Cherokee Cty. Bd. of Educ., 58 So. 2d 134, 135 (Ala. 1952) (school building); Roche v. Town of Fairfield, 442 A.2d 911, 917 (Conn. 1982) (allowing for adverse possession of a beach, because it was not just a use by the unorganized public, but by the organized city that maintained the beach, placed life-guards there, etc.). Courts have held that the government acquisition of private property through adverse possession does not constitute an unconstitutional taking. City of Des Plaines v. Redella, 847 N.E.2d 732, 737 (Ill. App. Ct. 2006); Stickney v. City of Saco, 770 A.2d 592, 603 (Me. 2001); Weidner v. State, 860 P.2d 1205, 1209 (Alaska 1993). The one outlier is *Pascoag Reservoir & Dam v. Rhode Island*, 217 F. Supp. 2d 206, 227 (D.R.I. 2002), *aff'd on other grounds*, 337 F.3d 87 (1st Cir. 2003).

134.   *Roche*, 442 A.2d at 916 ("[T]he unorganized public cannot acquire rights by prescription."); 3 TIFFANY, *supra* note 99, § 1193 ("The public cannot, strictly speaking, acquire rights by prescription."). The traditional reasoning is that possession by the general public—unlike possession by an identifiable government unit—can never meet certain elements required for a successful adverse possession claim, such as hostility and exclusivity. Hostile possession implies that the owner could have sued the possessor in trespass seeking her removal. But the "public" is an indeterminate entity and thus cannot be sued. JON W. BRUCE & JAMES W. ELY, JR., THE LAW OF EASEMENTS AND LICENSES IN LAND § 4:39 (2019); Note, *Dedication of Land to the Public*, 14 HARV. L. REV. 59, 65 (1900).

135.   RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 2.18 cmt. f (AM. LAW. INST. 2000).

136.   The doctrine of custom, recognized in a very small number of states, performs a similar function in a less formal manner. The leading case recognizing a public right to use private property based on custom is *State ex rel. Thornton v. Hay*, 462 P.2d 671 (Or. 1969). The court found that the public had used the dry-sand area of a beach above the high-water mark "according to an unbroken custom running back in time as long as the land has been inhabited." *Id.* at 676–77. The case's impact has been limited. Another Oregon court refused to expand the theory to areas above the dry-sand. State

The theories animating these two doctrines diverge. The doctrine of prescriptive easements is grounded in the notion that over time a non-permissive use of land (such as passage over it) matures into a right.[137] Implied dedication, for its part, is grounded in the notion that an owner can express her desire to award rights to the public, through dedication, not only by making an explicit offer as discussed above, but also implicitly, for example by acquiescing to repeated public use of her property.[138]

Still, in most states the two doctrines have, over time, come to be applied in a similar, if not wholly identical, manner.[139] The most recent Restatement thus recommends discarding the implied dedication doctrine in this regard, and sole reliance on the prescriptive easement doctrine.[140] Clearly, the doctrines now focus on the same one element. In current law, the key element allowing the public to acquire a right through either of the two doctrines is proof that members of the public have been using a private owner's land in a distinct manner for a long period of time.[141] Once such a pattern of consistent use by the general public is established, the public is awarded the permanent right to continue that specific use.[142]

---

Highway Comm'n v. Bauman, 517 P.2d 1202 (Or. App. 1974). Only four other jurisdictions adopted expressly some version of the custom theory in beach access and use cases. United States v. St. Thomas Beach Resorts, 386 F. Supp. 769 (D.V.I. 1974); City of Daytona Beach v. Tona-Rama, Inc., 294 So. 2d 73 (Fla. 1974); Cty. of Hawaii v. Sotomura, 517 P.2d 57 (Haw. 1973); *In re* Application of Ashford, 440 P.2d 76 (Haw. 1968); Moody v. White, 593 S.W.2d 372 (Tex. Civ. App. 1979). The Texas Supreme Court has more recently disapproved of the doctrine. Severance v. Patterson, 370 S.W.3d 705, 728 (Tex. 2012). Other states explicitly rejected it. Smith v. Bruce, 244 S.E.2d 559 (Ga. 1978); Dep't of Nat. Res. v. Mayor of Ocean City, 332 A.2d 630 (Md. 1975).

137.   Originally, English courts based adverse possession and prescriptive easements on a fiction of a "lost grant." But American law—as English law—has mostly abandoned the theory. 7 JAMES L. BROSS ET AL., THOMPSON ON REAL PROPERTY § 60.03(b)(6)(ii) (David A. Thomas ed., 2d ed. 2006); *see, e.g.*, Elmer v. Rodgers, 214 A.2d 750, 752 (N.H. 1965) (rejecting the "lost grant" theory of prescription, and finding that the true policy behind prescription is the "stabilization of long continued property uses," similar to the policy underlying adverse possession); *see also* Hunt Land Holding Co. v. Schramm, 121 So. 2d 697, 700 (Fla. Dist. Ct. App. 1960).

138.   City of Norfolk v. Meredith, 132 S.E.2d 431, 434 (Va. 1963) (finding that intent to dedicate land "may be implied from [the landowner's] actions and the long use of his land by the public").

139.   Clay Alger, *Use Interrupted: The Complicated Evolution of Utah's Highway Dedication Doctrine*, 2008 UTAH L. REV. 1613, 1621.

140.   RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 2.18 cmt. f.

141.   For examples of continued public use serving to establish dedication, see Stecklein v. City of Cascade, 693 N.W.2d 335, 339 (Iowa 2005); Hollywood, Inc. v. Zinkil, 403 So. 2d 528, 535 (Fla. Dist. Ct. App. 1981); UTAH CODE ANN. § 72-5-104(2)(a) (West 2020) ("A highway is dedicated and abandoned to the use of the public when it has been continuously used as a public thoroughfare for a period of 10 years."). For examples of such use generating a public right of way through prescriptive easement, see Thorsteinson v. Largaud, 284 P. 92, 93 (Wash. 1930); Dutton v. Slayton, 593 P.2d 1071, 1072 (N.M. 1979); Zakutansky v. Kanzler, 634 N.E.2d 75, 81 (Ind. Ct. App. 1994); State *ex rel.* Game, Forestation & Parks Comm'n v. Hull, 97 N.W.2d 535, 535 (Neb. 1959).

142.   *See, e.g.*, COLO. REV. STAT. ANN. § 43-2-201(1)(c) (West 2019) ("The following are declared to be public highways: . . . All roads over private lands that have been used adversely without interruption

In other words, through its past use the general public dictates the creation of a permanent public right and its contours. The public's use defines, for example, the line and width of a road acquired through continued use.[143] It similarly sets the purposes for which the right gained over a space can be put: if the public, for example, is found to have established a right over a beach through a long-practice of fishing there, the resultant permanent right is restricted to fishing, and would not include camping or driving.[144] As these examples illustrate, under the doctrines governing the acquisition of public rights through the passage of time, the "public" creating rights is the public at large.

A fourth, and final, mechanism for creating public rights exists—and it has its own definition of the "public." The three mechanisms reviewed so far are all ways in which private property becomes subjected to public rights. Governmental act, market conveyance, and the passage of time are manners through which private property is wholly or partially transformed into public property. But the common law also recognizes a group of properties that need not be transformed into public: properties that are automatically public.[145] This unique result is achieved through the public trust doctrine.[146] Lands that the doctrine covers must remain public and cannot be transferred to private parties.[147] They are held by the government—but only as a trustee.[148] The beneficiary of the interest in the land, and thus its true owner, is the public at large.[149] Consequently, the government (unlike a typical property owner) cannot freely convey assets it holds under the public trust doctrine.[150] Since it holds them "in trust in

---

or objection on the part of the owners of such lands for twenty consecutive years . . . ."); Dunnick v. Stockgrowers Bank of Marmouth, 215 N.W.2d 93, 97 (Neb. 1974) ("[T]he nature of public rights in a highway acquired by prescriptive use should be equated with those flowing from an implied dedication of the land as a road or highway.").

143.   4 TIFFANY, *supra* note 99, § 1211. The public's original use, for example, determines whether the side ditches are included in the public right of way. Bd. of Sup'rs of Tazewell Cty. v. Norfolk & W. Ry. Co., 91 S.E. 124, 128–29 (Va. 1916).

144.   Margit Livingston, *Public Access to Virginia's Tidelands: A Framework for Analysis of Implied Dedications and Public Prescriptive Rights*, 24 WM. & MARY L. REV. 669, 689–91 (1983).

145.   Perhaps a better term is "inherently public" which was coined in an important work by Carol Rose, who uses it in a slightly broader way. Rose, *supra* note 34, at 713.

146.   At least one state allows for property to be deemed automatically public through another doctrine. In Minnesota, a public cartway is automatically created to serve landlocked lands under certain conditions. MINN. STAT. § 164.08, subdiv. 2 (2014).

147.   Ill. Cent. R.R. Co. v. Illinois, 146 U.S. 387, 453 (1892).

148.   Joseph L. Sax, *Is Anyone Minding Stonehenge? The Origins of Cultural Property Protection in England*, 78 CALIF. L. REV. 1543, 1558 (1990) ("[P]ublic trust properties reflect profoundly important traditions, sharing both the notion of inalienable rights inhering in the community as a collectivity, and the concept of owner as trustee . . . .").

149.   Rung v. Shoneberger, 2 Watts 23, 25–26 (Pa. 1833) (explaining that government's ownership of square is "qualified"; city is "trustee" for the public's "use").

150.   State v. Cleveland & Pittsburgh R.R. Co., 113 N.E. 677, 682 (Ohio 1916).

perpetuity for the free and unimpeded use of the general public,"[151] it can only transfer these properties in a manner that promotes the trust's goals.[152]

The two decisions relevant to the acquisition of public trust properties—what properties are subject to the doctrine and when can such properties be transferred away from the public—are dictated by the common law.[153] English courts first developed the public trust doctrine and applied it to tidal waters and the land they submerge.[154] Starting in the nineteenth century many American courts, interpreting the common law, expanded the doctrine to any navigable waters.[155] More recently, some courts have also deemed varying portions of the beach fronting such waters to be public trust properties.[156] One court broadened the doctrine to cover water even when used as a resource,[157] and at least one other appeared willing to recognize a park as subject to the public trust.[158] Starting in the 1970s, commentators have called for even further expansion of the common law doctrine to cover other spaces: for example environmental resources,[159] or publicly enjoyed views.[160] Different courts have thus applied the doctrine to different spaces, and some advocates are urging courts to apply it to still other spaces.

A similar diversity of attitudes characterizes judicial decisions respecting the occasions when land recognized as subject to the public trust can be transferred away to private uses. Thus, for example, one court found that land subject to the public trust could be developed as a football stadium

---

151. Hope M. Babcock, *Using the Federal Public Trust Doctrine to Fill Gaps in the Legal Systems Protecting Migrating Wildlife from the Effects of Climate Change*, 95 NEB. L. REV. 649, 674 (2017).

152. Hope M. Babcock, *Should* Lucas v. South Carolina Coastal Council *Protect Where the Wild Things Are? Of Beavers, Bob-o-Links, and Other Things that Go Bump in the Night*, 85 IOWA L. REV. 849, 888–98 (2000).

153. *See* Union Square Park Cmty. Coal., Inc. v. N.Y.C. Dep't of Parks & Recreation, 8 N.E.3d 797, 801 (N.Y. 2014) (explaining that under the public trust doctrine, "it is for the courts to determine what is and is not a park purpose"); Kearney & Merrill, *supra* note 34, at 1523–24.

154. Richard J. Lazarus, *Changing Conceptions of Property and Sovereignty in Natural Resources: Questioning the Public Trust Doctrine*, 71 IOWA L. REV. 631, 635–38 (1986).

155. Joseph D. Kearney & Thomas W. Merrill, *The Origins of the American Public Trust Doctrine: What Really Happened in* Illinois Central, 71 U. CHI. L. REV. 799, 828 (2004).

156. SINGER, *supra* note 22, at 88–89.

157. Nat'l Audubon Soc'y v. Superior Court, 658 P.2d 709, 724 (Cal. 1983) (en banc). More recently, a lower California court applied the doctrine to groundwater as well. Envtl. Law Found. v. State Water Res. Control Bd., No. 34-2010-80000583, 2014 WL 8843074, at *7 (Cal. Super. Ct. July 15, 2014). The Hawaii Constitution explicitly subjects water resources to the doctrine, HAW. CONST. art. XI, §§ 1, 7, and courts have recognized a broad rule of standing allowing citizens to sue, 'O Haleakala v. Bd. of Land & Nat. Res., 317 P.3d 27, 46 (Haw. 2013).

158. *See* Paepcke v. Pub. Bldg. Comm'n of Chi., 263 N.E.2d 11 (Ill. 1970).

159. Joseph L. Sax, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention*, 68 MICH. L. REV. 471, 489 (1970).

160. Hope Babcock, *Is Using the Public Trust Doctrine to Protect Public Parkland from Visual Pollution Justifiable Doctrinal Creep?*, 42 ECOLOGY L.Q. 1 (2015).

serving an NFL team,[161] while another found that that same kind of land could not be developed as a private university campus.[162] In light of such decisions, commentators note that the public trust doctrine lacks any discernable standards despite its pretenses at objectivity.[163] At the end of the day it confers almost full control on courts.[164] Courts, at their own discretion, decide what properties become public under the public trust doctrine and which of those must always remain public. This compelling realist insight notwithstanding, the public trust doctrine still imagines the public interest in certain properties as defined by a set of specific common law strictures.[165] Since such supposed strictures, in a common law system, are judge-made, some level of inconsistency, and even mistake, might be inevitable. Still the "public" responsible for the acquisition of public rights through the public trust doctrine is a set of common law dictates—as filtered by judges.

Each of the four different modes of creating public rights—governmental act, market conveyance, passage of time, and properties that are automatically public—thus identifies a different actor as the right's creator. They thereby suggest to us the different options that might stand for the "public" in a public right: the government, a specific private actor, the public at large, or common law strictures. The law imagines a varied number of publics for the diverse public rights—fee, easement, restriction—it recognizes. But which of these publics should be chosen in a given case to hold the public right at issue after its creation? What logic should be guiding the law in making the choice among the different legal publics? Those are the questions I turn to next.

## II. WHO SHOULD THE PUBLIC BE

Part I's description of the law of public spaces established that aside from determining what types of rights the public can hold—a relatively straightforward task as those rights track recognizable private property law categories—the law must also determine who the "public" holding those rights is. That assignment is more challenging. The different entities capable

---

161. Friends of the Parks v. Chi. Park Dist., 786 N.E.2d 161, 170 (Ill. 2003) (explaining that although the private NFL team will benefit from using a stadium, the public will enjoy it as well and thus the public trust doctrine is not violated).

162. Lake Mich. Fed'n v. U.S. Army Corps of Eng'rs, 742 F. Supp. 441, 445 (N.D. Ill. 1990) (explaining that although the public will benefit from certain elements of the project, such as a beach, the primary beneficiary will be the university that will enlarge its campus).

163. Kearney & Merrill, *supra* note 34, at 1523–24.

164. *Id.*

165. Charles F. Wilkinson, *The Public Trust Doctrine in Public Land Law*, 14 U.C. DAVIS L. REV. 269, 315 (1980).

of standing for the "public" can, as was established, be discerned through an examination of the disparate doctrines governing the creation of public property rights. But those doctrines do not necessarily dictate who the "public" holding the public rights—once they are created—should be. The doctrines reviewed tell us who the "public" holding a public right might be, not who it should be in a given public space. Disputes like those surrounding the Presidential Center or the electric scooters mentioned in the Introduction involve spaces where the public rights have already been created. Indeed, in these and most similar cases, the public right at issue was created a long time ago.[166] The right's ancient source does not represent a particularly useful factor in settling a contemporary dispute over who should hold the right and set its uses.

At the same time, the normative themes animating the doctrines for public rights' original acquisition can instruct us on the relevant considerations that should be taken into account when settling current disputes over existing public rights. This Part thus first isolates the normative considerations animating the laws governing the creation of public spaces as just reviewed, and then relies on those normative considerations to develop a principled test for determining who the "public" that controls the use of an existing public right should be.

A. The Law of Public Spaces' Normative Theme

The central doctrines that constitute our law of public spaces as surveyed in Part I appear wholly disparate: covering different spaces, generating different rights, mandating different modes of acquisition, and identifying different publics. Still, despite all these differences, it is perhaps not particularly surprising that certain common themes, or concerns, can be detected pervading all of them; after all, the doctrines share a subject matter—public spaces. The most salient of these normative themes, this Section will argue, is the notion that certain spaces subject to public rights— but not other spaces similarly subject to public rights—have a specific use that is inescapable and innate to them.

The public trust doctrine, with which the preceding Part concluded its exploration into the American law of public spaces, is a convenient starting point for an exploration into the normative principles animating that body of law. The legal determination that some spaces are automatically public, and also, consequently, must at all times be put to a given, and unchanging,

---

166.   Jackson Park, the site of the presidential library, was created as a public space in 1869. *See supra* note 2. Sidewalks in America were created as public spaces in the late nineteenth century. *See infra* note 285 and accompanying text.

use, is a glaring exception to the general pattern of our legal system. Almost everywhere else, that system is deeply committed to the free flow of assets.[167] The public trust doctrine materializes as a strikingly unique mechanism, put in place specifically to serve the public's rights.[168] The rationales behind such a radical doctrine thus inevitably shed light on the allegedly vital principles the law aims to achieve by creating public rights.

The public trust doctrine's dramatic choice to single out certain properties as necessarily public has been ascribed to several factors. Some commentators view the doctrine as expressing the notion that certain properties—navigable waters, for example—are particularly important and thus cannot be put to a private use.[169] A nuanced version of this argument explains that these properties are so intrinsically vital for a citizen's well-being that, by its very nature, a free society mandates their availability to each and every citizen.[170] Other writers opine that the doctrine gives voice to a healthy skepticism respecting governmental actions that shift certain properties from one use to another.[171] Another scholar notes that the doctrine identifies spaces that are "most valuable when used by indefinite and unlimited numbers" of people, especially those spaces necessary for commerce, an activity bringing forth infinite returns to expanding participation.[172]

One core thread runs through all these different accounts. If certain properties are of particular importance, if they are necessary for a free society, if governmental decisions to reallocate them are prone to be dubious, if they are put to their most beneficial use when shared, it is only because those properties have a core, innate, and almost natural use to which they must be dedicated. Otherwise, any claim that they have a uniquely important function would be incoherent.

This core assumption that aids, as suggested here, in explaining the public trust doctrine's normative underpinnings is apparent when reviewing the doctrine's historical development. Judges originally focused the doctrine on waterways since they viewed these as subject to a specific, innate—indeed, literally natural—use: navigation and fishing.[173] Bodies of water were naturally created, and humans put them to those specific uses inherent to their nature. Thus, courts could intuitively—and plausibly—

---

167.   Kearney & Merrill, *supra* note 155, at 800 ("The public trust doctrine[ is] a jarring exception of uncertain dimensions . . . .").
168.   *Id.*
169.   Sax, *supra* note 159, at 484–85.
170.   Martin v. Waddell's Lessee, 41 U.S. 367, 414 (1842).
171.   Sax, *supra* note 159, at 490.
172.   Rose, *supra* note 34, at 774.
173.   *See supra* notes 144–145.

hold that these spaces were never intended to be put to any other use. Courts could then proceed to conclude that government was barred not only from turning these spaces private, but also from interfering in any other way with their "natural" uses.[174]

For this same reason, modern courts have been reluctant to expand the number of properties covered by the public trust doctrine to spaces that, unlike navigable waters, might not have a limited and clear natural use;[175] or to expand the uses of properties protected by the doctrine to include recreation, which unlike fishing and navigation, might not so easily be deemed a natural or innate use of navigable waters.[176] At the heart of the public trust doctrine, therefore, is the principle that the uses which are made of certain specific public properties must be related to certain natural uses that are peculiar to those properties.[177]

This logic is, as noted, perhaps easiest to grasp in the context of the public trust doctrine because the uses of space that the doctrine targets could always be imagined as dictated literally by nature. But the idea's pertinence does not hinge on a given public space's being a natural resource. The rationale that certain properties have specific inherent public uses can, and does, similarly set the contours of public rights created by the other acquisition doctrines reviewed in Part I, doctrines that are not limited in their application to natural resources.

Dedication law provides an illustration. As seen, the individual granting the space to the public defines the dedication's terms: the rights granted to the public, their breadth, and goals.[178] If the dedicator remains silent, however, courts have held that the public gains the right to use the dedicated property to the full extent to which that type of property would be commonly used.[179] The natural, or intrinsic, use of the dedicated public space thus serves as a default.

---

174.  *See supra* notes 144–145.

175.  *See supra* notes 144–145.

176.  *See* SINGER, *supra* note 22, at 89 (discussing most courts' decision to not include recreation among the public uses that must be allowed under the doctrine).

177.  Sax, *supra* note 159, at 477.

178.  *See supra* notes 109–116 and accompanying text.

179.  Harvey v. Bell, 732 S.W.2d 138, 141 (Ark. 1987) (holding that since owner dedicated sewage line to the public she cannot object to a neighbor's hookup to that line as that is the natural use of such dedicated property); 26 C.J.S. *Dedication* § 77 (1956) ("Unless there are reservations, the general public . . . has the right to use dedicated property to the full extent to which such easements are commonly used."); Biglin v. Town of W. Orange, 217 A.2d 135, 138 (N.J. 1966) (holding that a pool can be built on land dedicated as a recreational field since pools are normally understood as fully consistent with recreational uses).

It does still more. The dedicated space's intrinsic use can even void a condition in a dedication that patently contradicts that intrinsic use.[180] Courts have insisted that while the dedicator can make reservations to her dedication—limiting future public uses or keeping in herself certain use rights over the dedicated space—these reservations must not prohibit specific public uses commonly understood as inevitable in that space.[181] If they do, the reservations are held void as contradicting the purpose of the dedication.[182] The condition cannot be "inconsistent with or repugnant to the gift."[183] Thus, for example, courts have repeatedly clarified that a dedication of a highway cannot contain a limitation on the public's right to travel there or on current or future functions—such as lighting or drainage— that are assumed to form an inherent and inevitable outgrowth of that intrinsic use.[184]

The guiding principle that certain public properties—but not other public properties—have a natural or intrinsic use is also responsible for the basic architecture of the rules for acquiring public rights through the passage of time. As Part I noted, the common law did not allow the public at large to acquire fee interests through the passage of time (via adverse possession) but did allow for the acquisition of easements in such a manner (via prescription). The difference was genereated by the doctrines' diverging attitudes towards an exclusivity requirement. A successful adverse possession claim requires exclusive possession by the claimant—a requirement that the general public, which by definition is non-exclusive,

---

180.   Lynchburg Traction & Light Co. v. City of Lynchburg, 128 S.E. 606, 609 (Va. 1925) ("[T]he donor may annex [to a dedication of a highway] any restriction or condition he pleases, *not inconsistent with or repugnant to the gift.*" (emphasis added)).

181.   4 TIFFANY, *supra* note 99, § 1111 ("But the dedication of property for the purpose of a highway carries the right to public travel and also to the use for all present and future agencies commonly adopted by public authority for the benefit of the people, such as sewer, water, gas, lighting, and telephone systems, and a condition in a deed of dedication prohibiting such uses or circumscribing the future freedom of action of the authorities to devote the street to the wants and convenience of the public is void as against public policy or as inconsistent with the grant; and this is also true of a condition against any grant of a right or franchise to use the street for street railway purposes." (footnote omitted)).

182.   Vill. of Grosse Pointe Shores v. Ayres, 235 N.W. 829, 832 (Mich. 1931) ("A condition in a deed of dedication prohibiting the uses above stated or circumscribing the future freedom of action of the authorities to devote the street to the wants and convenience of the public is void, as against public policy or as inconsistent with the grant."); City of Camdenton v. Sho-Me Power Corp., 237 S.W.2d 94, 98–99 (Mo. 1951) (holding that a city could not abide by a reservation to a dedication of a street preserving in the grantors the right to locate, build, maintain, and operate sewer, telephone, light and power lines, water mains, outlets, and connections for them along, through, or under certain roads).

183.   *Lynchburg Traction & Light Co.,* 128 S.E. at 609.

184.   Timberlake Plantation Co. v. Cty. of Lexington, 431 S.E.2d 573, 575 (S.C. 1993); *Ayres,* 235 N.W. at 832; Kuehn v. Vill. of Mahtomedi, 292 N.W. 187, 191 (Minn. 1940).

cannot satisfy.[185] Conversely, in the common law, a successful prescriptive easement claim generally need not meet the exclusivity requirement.[186]

The seemingly technical distinction in doctrinal requirements was actually grounded in the distinct nature of the rights. The logic generating the exclusivity requirement in one doctrine but not the other is that a fee interest, given its nature, cannot be shared, while a right of way, given its nature, can. To illustrate: two strangers cannot easily live in the same house but they can easily drive on the same road.[187]

The difference in the nature of the pertinent spaces is responsible for the doctrinal distinction. That distinction then produces clear and important consequences for the realm of public rights' acquisition. Thus, for example, highways are perceived as naturally suitable for passage by the public, and hence the law deems them—but not other spaces—as potential targets for public rights' acquisition through the passage of time.[188]

The law's emphasis on the notion that certain public rights have specific uses that are inherent to them, discerned in the acquisition doctrines reviewed so far in this Section, has also impacted the law governing the other mode of acquiring public rights: government action. The Supreme Court's eminent domain jurisprudence, allowing the government to condemn property for diverse uses, has always been justified by the claim that the property the government takes has no one specific, inescapable, public use.[189] Thus, the government is free, according to existing doctrine, to employ confiscated property for economic development purposes—not just for traditional public uses—and to collaborate in so doing with private entities.[190] Had the Court ever been persuaded that the public rights the Constitution imagined as created via eminent domain must have specific, innate uses, it would have had to step in to define the specific and limited public uses to which government must employ confiscated properties.[191] Yet the Court has explicitly, and consistently, refused to do so.[192]

The conviction that some public spaces do not have only one particular use that is inherent to them, and that therefore government enjoys freedom to delineate the uses of those public spaces, has impacted another field of constitutional law. Courts have heavily relied on this idea when issuing First

---

185.   SINGER, *supra* note 22, at 148. At a minimum exclusivity requires excluding the title owner, but since the owner is a member of the public a use by the public does not exclude her.

186.   *Id.* at 204.

187.   *Id.*

188.   4 TIFFANY, *supra* note 99, § 1211.

189.   *See supra* notes 101–105 and accompanying text.

190.   Berman v. Parker, 348 U.S. 26, 33–34 (1954).

191.   Kelo v. City of New London, 545 U.S. 469, 514 (2005) (Thomas, J., dissenting).

192.   *See supra* notes 101–105 and accompanying text.

Amendment rulings.[193] While the Supreme Court's jurisprudence setting the government's power to limit freedom of speech rights in public spaces is famously muddled—generating closely contested decisions and a seemingly endless stream of disputes in the lower courts[194]—one clear animating notion can be found pervading it. The Court has been rather consistent in its statements to the effect that a public space must always be kept open to speech only if it is the type of space whose natural character invites and accommodates free public expression.[195]

In accordance, the Court has held that only some government-owned properties are to be recognized as "quintessential public forums" which must be open to any member of the public seeking to exercise her free expression rights.[196] Other public properties are not subject to such constitutional regulation. Different approaches have been suggested to ascertain whether a given public space is, in its very nature, a public forum, and thus inherently susceptible to free speech: the place's traditional use,[197] its objective character,[198] its physical similarity to places dedicated to a certain use,[199] public expectations,[200] and more. But in one way or another, the notion that certain public places are naturally or inherently accommodating for a specific activity—here, speech—while others are not, has guided decisions in the field.[201] It has led courts to distinguish, for example, highway rest-stops,[202] airport terminals,[203] and public transit vehicles,[204] from sidewalks. The latter are spaces where speech is a natural activity and hence must be allowed under the Constitution, whereas the former, so courts hold, are not. Courts further hold that once a public space, such as the sidewalk, has such a natural function, the government cannot

---

193. For an overview of key rulings, their background, and reasoning, see Robert C. Post, *Between Governance and Management: The History and Theory of the Public Forum*, 34 UCLA L. REV. 1713 (1987).

194. Gey, *supra* note 36, at 1555 ("The . . . public forum doctrine may not be the most fractured area in modern constitutional law, but it comes close.").

195. Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 650–51 (1981) (explaining that each public space will be judged in accordance with its "special attributes," especially the "nature and function of the particular forum involved").

196. Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983).

197. Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 680 (1992).

198. United States v. Kokinda, 497 U.S. 720, 737–38 (1990) (Kennedy, J., concurring).

199. *Int'l Soc'y for Krishna Consciousness, Inc.*, 505 U.S. at 698–99 (Kennedy, J., concurring).

200. *See* Edward J. Neveril, *"Objective" Approaches to the Public Forum Doctrine: The First Amendment at the Mercy of Architectural Chicanery*, 90 NW. U. L. REV. 1185, 1212 (1996).

201. Grayned v. City of Rockford, 408 U.S. 104, 116 (1972) ("The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place . . . .").

202. Sentinel Commc'ns Co. v. Watts, 936 F.2d 1189, 1195–96 (11th Cir. 1991).

203. *Int'l Soc'y for Krishna Consciousness, Inc.*, 505 U.S. 672.

204. Lehman v. City of Shaker Heights, 418 U.S. 298, 306 (1974) (Douglas, J., concurring in the judgment).

take away that function by simply passing a law purporting to render that space closed or to transfer it to a private entity.[205]

First Amendment jurisprudence, which, as noted at Part I's outset, is perhaps the most salient legal battlefield for the struggle to define and govern public spaces, thus illustrates the degree to which the normative principle whereby some—but not other—public spaces have one specific use that is innate, defined, and inevitable, permeates the law of public spaces.

### B. Picking the Public in Light of the Law's Normative Theme

The concerns the doctrines that are responsible for public rights' creation give voice to inevitably embody the core normative priorities of the law of public spaces. These concerns should thus inform the legal approach determining who holds public rights in those spaces once they are created, and, accordingly, how disputes surrounding these rights are to be settled. These normative concerns should, that is, dictate the answer to the question this Article poses: who should "the public" be in any given public space?

The key principle the preceding Section discerned among the concerns molding the doctrines that regulate the acquisition of public rights was that some public spaces, but not others, have a specific, innate public use. That insight will accordingly now be translated into an operative test that can identify, in a given case, the public that is to be adjudged the holder of an existing public right.

The typical dispute over the uses of a public space materializes, as seen in the Introduction, when a new use of the space is launched. A court that must then resolve a challenge to a government policy respecting that new or changed use (a policy introducing the use, allowing it, or banning it) should employ a two-step test. The first step of the proposed test is rather straightforward, given the preceding normative discussion: a court must ascertain whether the given public space has one specific use that is inherent to it. As the Supreme Court's holdings in the eminent domain cases clarify, no grounds can be found to interfere with a government's decision respecting a specific public property if that specific property does not have a natural, or innate, use.[206]

Unless such a use can be identified, why should political processes be upended? In the absence of an objective metric that an innate use can provide for assessing the government's decision, the democratically elected

---

205. Hicks v. Commonwealth, 548 S.E.2d 249, 254 (Va. Ct. App. 2001), *aff'd in part*, 563 S.E.2d 674 (Va. 2002), *rev'd sub nom.* Virginia v. Hicks, 539 U.S. 113 (2003).

206. *See supra* notes 189–194 and accompanying text.

government's judgment should not be second-guessed.[207] If no independent criterion exists, neither the courts, nor the public at large, nor any individual, can be assumed to hold better insight into the optimal use of the public right than that which the local government has. The government is the public's elected representative and thus enjoys democratic legitimacy that the other entities lack.[208] For this reason it should be the default decision-maker for the public. This is, after all, the general attitude of American constitutional law: courts only substantively assess the decisions of a democratically elected government if there is some clear, predetermined standard those decisions could be said to breach.[209]

This constitutional theory is already embedded in the law of public spaces. As seen earlier, the law only interferes with the government's freedom of action when creating public rights—insisting that some such rights are held by the government in trust and must remain public, or that a certain condition appended to a dedication the government accepts be ignored—if the relevant right is such that it must be put, given its nature and character, to a specific use.[210]

The same should apply when the law considers the management of a public right once it is created. In determining the uses of public assets the government should not be replaced in its typical role as the public's representative  when the asset at-hand cannot be said to have some specific innate use from which no rational deviation is imaginable. If the public right has no specific use to which it must be put, the "public" holding and managing it should, that is, be the democratically elected local government.

If, on the other hand, the relevant public space does have one specific use that is natural, inherent, or innate to it, limits on the local government's decision-making powers can be justified—and a court has objective grounds for interfering. The court is in possession of a benchmark against which to evaluate the government's decision: the court should protect the space's inherent use. Specifically, it must, in such cases, decide how much leeway to grant the government in interpreting the innate use, or in adjusting that

---

207.  *See, e.g.*, Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 544 (2005) (criticizing and overruling an older test for assessing a governmental taking that required judicial approval of the goals of a property's regulation, because it "would empower—and might often require—courts to substitute their predictive judgments for those of elected legislatures and expert agencies").

208.  JOHN HART ELY, DEMOCRACY AND DISTRUST: A THEORY OF JUDICIAL REVIEW 75–77 (1980).

209.  Under traditional living constitution notions, the court should interfere in specific cases identified as involving the failure of the political process. United States v. Carolene Prods. Co., 304 U.S. 144, 152 n.4 (1938). Under originalism, a court must intervene when a statute contradicts a specific clause of the Constitution, as understood by the drafters. *See, e.g.*, District of Columbia v. Heller, 554 U.S. 570, 584 (2008).

210.  *See supra* notes 173–177, 180–184 and accompanying text.

use to new conditions. This second step of the legal analysis (relevant only in cases where a natural use can be identified for the space) should, like the first step, be designed in light of the overall normative concern animating this field of law. That concern—with the specific intrinsic uses associated with certain public rights—can generate at least three factors relevant for determining the expanse of the government's discretion in managing properties that have one specific public use that is intrinsic to them.

One inevitable factor is the breadth of the specific innate use of the contested public right. Not all uses (innate or not) are created equal. Some are rather narrow (say, fishing) while others are wide or somewhat opaque (say, recreation). The latter inevitably can be subject to more than one reasonable interpretation (recreation may or may not include camping, for example). The more flexible and open to contending readings the specific use that is intrinsic to the public space, the more hesitant the court should be before intervening. As noted, the space's inherent use serves as the basis for judicial intervention in the management of the underlying public right. Hence if that use is rather unclear, the court lacks clear grounds for aggressively intervening in the democratic process. This suggested approach is an outgrowth of American law's general attitude. Cases where there is more than one legitimate public decision to be made are the quintessential instances where a court accords a realm of reasonableness within which a democratically elected government can act freely. [211] Conversely, courts are much more willing to step in, and assess the wisdom of the government's action, when the applicable legal order leaves little room for multiple readings.[212] Accordingly, in disputes over public spaces, courts should employ common law strictures to embody the public in interpreting the relevant public right's intrinsic or natural use when that use is narrow and well-defined.

The second factor for this stage of the analysis has to do with costs. A court should be willing to expand the discretion allowed the government in interpreting a public space's seemingly inevitable use when the government actually pays the price of sustaining the public space. Public spaces are not costless. Like any other space, they must be maintained and at times repaired.[213] The maintenance and repair costs of certain public spaces can be rather substantial. Furthermore, the costs of maintaining some public

---

211.   The famous case announcing this approach is *West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 391, 393 (1937).

212.   An example is found in the treatment of government action in torts law. Government often enjoys tort immunity when its acts involve an element of discretion and choice, United States v. Gaubert, 499 U.S. 315, 322 (1991), but not when it or its employees have "no rightful option but to adhere to [a] directive." Berkovitz v. United States, 486 U.S. 531, 536 (1988).

213.   Nadav Shoked, *The Duty to Maintain*, 64 DUKE L.J. 437, 441 (2014).

spaces can fall squarely and almost fully on the government alone.[214] The legal doctrines reviewed in Part I acknowledge, and account for, this fact. For example, the law of dedication mandates that a government accept—or agree to the acceptance of—a dedication.[215] Courts added this requirement due to the worry that individual dedicators or specific members of the public desiring to accept a dedication will saddle the government with the costs of maintaining a space that serves them—but not the rest of the public.[216] They will in this fashion offload on the public the costs of maintaining a space that while technically public, is of particular private benefit to them alone.[217] This concern is born of the overall theme this Part detected throughout the law of public spaces: not all public spaces have an inherent use beneficial to all public members.

The concern respecting the government's need to carry a space's maintenance costs is present when a new use of the public right in that space, or a suggestion to reinterpret its existing intrinsic uses, is introduced. New uses of the space might increase the costs of maintaining the public space. Therefore, if the government is destined to bear the brunt of those costs it should be afforded more of a say in determining whether the new uses are to be allowed. As the entity actually footing the bill for the public right, it should be considered the relevant "public" for that right and hold more power over it.

Conversely, if the government does little to finance the maintenance of a public space that has an inherent use, its position should not be prioritized. If the public space is of the sort that requires little by way of maintenance, the public at large, rather than the government, might be the right entity to

---

214. Steven Siegel, *The Promise of a Public Commons in New Communities in the United States: Toward a Qualified Constitutional Right of a Subdivision Developer to Dedicate Streets and Parks to a Municipality as a Means to Challenge Local Government Policies Requiring Privatization of New Subdivisions and as a Means to Ensure Public Streets and Parks in New Communities*, 29 J. LAND USE & ENVTL. L. 277, 294–95 (2014).

215. The requirement is either created expressly in statutes or by operation of the common law. *See, e.g.*, Brumbaugh v. Cty. of Imperial, 184 Cal. Rptr. 11 (Ct. App. 1982); City of Louisville v. Louisville Scrap Material Co., 932 S.W.2d 352 (Ky. 1996); Broussard v. Jablecki, 792 S.W.2d 535 (Tex. App. 1990); City of Easton v. Koch, 31 A.2d 747 (Pa. Super. Ct. 1943); Bd. of Cty. Comm'rs v. Lavington, 14 P.2d 493 (Colo. 1932).

216. *See, e.g.*, Bradford v. Nature Conservancy, 294 S.E.2d 866, 874 (Va. 1982).

217. For similar reasons, the New York courts added the same requirement when interpreting statutes allowing the creation of public roads through prescription. Despite the relevant law only requiring continued use, the courts demand that the road has been "kept in repair or taken in charge" by the local government. *In re* Marchand v. N.Y. State Dep't of Envtl. Conservation, 973 N.E.2d 1270, 1271 (N.Y. 2012).

hold decision-making powers over the space.[218] The "public" for such public spaces should thus be the public at large. Similarly, if the public space is of the sort that is mostly maintained by specific individuals—adjoining owners (as might sometimes be the case with beach properties) or the original dedicator (as when a dedicator commits not only land to the public but also funds for its maintenance)—those individuals might be the best situated to make determinations respecting the public space's management.[219] For such public spaces, specific individuals might be the most appropriate "public" deemed the holder of the public right.[220]

Another, third and final, factor should affect the choice of a "public" for a public right that has a specific use innate to it. An inevitable consideration demarcating the latitude awarded a government in its handling of public resources is that government's trustworthiness. A dose of skepticism towards the government's asserted good intentions—the suspicion that in a given case it is not acting to promote the public good, but rather the good of a specific, well-positioned private group—permeates much of the law of public spaces.[221] Many courts have interpreted the public trust doctrine in this vein.[222] They have been much more willing to fall back on the public trust doctrine in circumstances where the risk of government corruption in the handling of the relevant public assets is elevated.[223] Similarly, in its most recent eminent domain decision, the Supreme Court stressed that any use of that governmental power to acquire property must be thoroughly scrutinized to verify that the government is not covertly acting on behalf of some private or corporate interest.[224] Government must therefore, the Court insisted,

---

218. *See* 11A McQUILLIN, *supra* note 132, § 33.45 (discussing the opposite scenario, where "the place offered to be dedicated may be one which, because of location or other reasons, would be a burden rather than a benefit to the municipality, or else the benefits would be slight in comparison to the burden. In such a case, the imposition of liability on the municipality without its consent is apparently unjust").

219. *See* Grabnic v. Doskocil, No. 2002-P-0116, 2005 Ohio App. LEXIS 2703, at *15 (Ct. App. June 10, 2005) (noting that dedication of a driveway would not "make[] sense," in view of the fact that the driveway "would be a dead end road leading up to a single street address" and "would be nothing more than a private drive maintained at the municipality's expense").

220. This suggestion is in line with claims whereby effective regulation of public spaces is assured when those individuals—neighboring owners—who are most affected by it are the only ones granted the power to enforce restrictions on its use. *See* Kearney & Merrill, *supra* note 34, at 1524.

221. *E.g.*, Sax, *supra* note 159, at 560 (arguing that the function which courts perform in such cases is to promote equality of political power for a disorganized and diffuse majority by remanding appropriate cases to the legislature).

222. Robbins v. Dep't of Pub. Works, 244 N.E.2d 577, 580 (Mass. 1969) (interpreting the doctrine as a tool to assure that decisions respecting resources reflect the general will, rather than the interests of a few).

223. Sax, *supra* note 159, at 491 (explaining that the model courts appear to have embraced requires that a court look skeptically at programs which infringe upon broad public uses in favor of narrower ones).

224. Kelo v. City of New London, 545 U.S. 469, 491 (2005) (Kennedy, J., concurring).

show that the governmental taking of property is done in the context of a broader public plan.[225] Otherwise, the Court instructed, a reviewing court should suspect that the confiscation is a mere transfer of an asset from one private party to another private party—with only the pretext of a public interest.[226]

This suspicion of the government's motives reflects the core normative theme of public spaces law reviewed throughout this Part. The more inescapable the public use of a certain space, the more government ought to be mistrusted if it attempts to transfer that space to a private user.[227] If the current use of the public property is (allegedly) inescapable, a heightened burden of proof should be placed on the government trying to, in essence, escape that use. An identification of an asset with an inherent use conveys a notion of permanence, while elected officials, even if not corrupt, sometimes only consider short-term returns. The court, which, unlike elected officials, has a long time horizon, can assure stability and adherence to a supposedly stable intrinsic use.[228]

Misgivings about the government's motivations should, therefore, inform courts' identification of the holder of powers over a public space that has certain intrinsic uses. In cases of particular risk of dubious governmental behavior, courts should refrain from identifying the government as the public's representative. Specifically, if there are distinct private beneficiaries to a governmental decision respecting a given public space, a court should be willing to meaningfully review the government's decision and interject on behalf of the public at large. Situations in which abutting owners stand to derive a disproportionate benefit from a public space (or from a specific activity allowed or disallowed therein) serve as examples. So do cases where private infrastructure, serving a specific corporate entity and not the general public, is allowed on the public space free of charge. In such and similar circumstances, courts should mistrust the government. To protect the public's specific natural use of the space, they should define the "public" holding the relevant public rights in these cases as the public at large.

In sum, this Section's analysis suggests that in light of the normative theme reigning over the law of public spaces, a two-step test is necessary for ascertaining who the public holding a given public right should be. A

---

225. A similar requirement is sometimes applied when government agencies make decisions respecting public trust assets. *E.g.*, State v. Pub. Serv. Comm'n, 81 N.W.2d 71 (Wis. 1957).

226. *Kelo*, 545 U.S. at 478.

227. Sax, *supra* note 159, at 565.

228. On the courts' long time horizon, see, for example, Matthew C. Stephenson, *Legislative Allocation of Delegated Power: Uncertainty, Risk, and the Choice Between Agencies and Courts*, 119 HARV. L. REV. 1035, 1047 (2006).

court should commence by determining whether the given public right has one use that is inherent, natural, or intrinsic to it. If it does not, the democratically elected local government should be deemed the "public." If the right does have a natural use, the court should proceed to the next step, where it should consider three factors. First, the breadth of the space's intrinsic use: the narrower that use, the more willing the court should be to reject the identification of the government with the "public" and to resort to common law strictures in determining the public space's uses. Second, the identity of the entity bearing the costs of maintaining the public right: if those costs are substantial then either the government or individual owners—whichever of the two shoulders those costs—should have a strong claim to be the public holding the public right. Third, the degree of faith in government decision-making: if low, then the public at large should be adjudged the public holding the public right.

A final clarifying comment respecting the test developed in this Part of the Article is in order before we turn to actually applying it. The test heavily relies—almost solely relies—on the notion that certain uses of public spaces are innate or natural. As noted earlier, this notion does not assume that certain uses are dictated by "nature." The identification of a use as intrinsic, inherent, or innate is itself intrinsically, inherently, and innately social and cultural. A use is inescapable only given a specific set of social or legal precepts that govern at a given time or place. Thus nothing bars an innate use from changing over time, and from some individuals contesting the alleged innateness (or indeed, incontestablility) of that use. Still, even with these caveats, many times a use perceived by society as innate to a space, one that the vast majority of observers view as uncontestable, can be identified—as the examples the next Part discusses show. Such common perceptions, although there is nothing natural to them, should be given legal weight.

### III. WHO SHOULD THE PUBLIC BE: EXAMPLES

The test just suggested for identifying the "public" in a given public space is in line with the normative concerns of the existing laws of public spaces. But is it also effective in solving real world legal problems? This final Part of the Article aims to show that it is. The Part uses the framework developed in Part II to analyze the two disputes reviewed in the Introduction, respecting the Obama Presidential Center and the electric scooters. Through that exercise, it also clarifies more generally the legal

standing of two of the most important public spaces we have: parks and sidewalks.

## A. The Public in Parks

The park is a quintessential public space, and the public's right in most parks is of the fee type.[229] The public owns the park.[230] But who is that "public" owning the park? As noted earlier, that is precisely the question the federal court must decide as it contemplates the dispute surrounding the Obama Presidential Center. In contending that the Center cannot be built on publicly owned parkland, the plaintiffs argue that the "public" controlling the land and determining what uses can be made of the rights therein is not the city—which has approved the project—but rather the strictures of the common law.[231]

To settle such a dispute—to identify the "public" relevant here: the city or a set of common law rules—we must first ask, in light of the framework developed in Part II, whether the contested public space has one specific use that is inherent to it. This Section will review, in order, first the ever-changing societal views respecting the role of parks, then the character of the debates that typically engulf the choice of park functions, and finally judicial decisions dealing with parks. Based on all of these it will conclude that the answer to that question is no. Hence the democratically elected local government should be deemed the public holding the public rights in the park.

The history of parks in America illustrates just how diverse societal views respecting the role and potential uses of parks have always been. The modern idea of the park emerged in the nineteenth century. Before, to the extent open spaces that were not privately owned existed in the midst of human settlements, such spaces consisted of grazing areas open to all.[232] Perhaps the most famous example for this kind of park space is the Boston

---

229. Sarah Schindler, *The "Publicization" of Private Space*, 103 IOWA L. REV. 1093, 1095 (2018) ("The mention of urban public space might bring to mind a variety of images: a grand public park like San Francisco's Golden Gate Park . . . .").

230. Of course, private parks also exist, but these are of no concern to this Article. The degree of government involvement with such parks might be relevant in other contexts. *See, e.g.*, Evans v. Newton, 382 U.S. 296, 301 (1966) (holding that the existence of a segregated park that benefitted from city involvement was unconstitutional under the Fourteenth Amendment because the mere transfer of title from public to private hands did not instantly erase an established tradition of government involvement in the property).

231. *See supra* notes 4–10 and accompanying text (discussing the plaintiff's claim) and notes 145–164 and accompanying text (discussing the public trust doctrine on which that claim is based).

232. ROY ROSENZWEIG & ELIZABETH BLACKMAR, THE PARK AND THE PEOPLE: A HISTORY OF CENTRAL PARK 4 (1992).

Common—the "first public park in the United States"—which was used by locals as a cows' pasture for two hundred years starting with colonization in the 1630s.[233]

Thereafter the nature of that park and others changed. In the mid-nineteenth century, as industrialization, mass immigration, and urbanization began changing the American landscape, many artists, policy-makers, and reformers were harkening back to the old rural days.[234] They thus introduced the concept of the city park as an antidote to the era's urban realities.[235] The park they imagined was an attempt to recreate a pastoral idyll. Hence, it was to be used for quiet contemplation of nature.[236] New York City's Central Park, designed by Olmsted and Vaux in 1858, embodied that idea: the park contained meadows and winding paths, natural components such as rocks and trees (none of them indigenous), and was intentionally rendered inhospitable to active pursuits.[237]

Soon enough though, by the turn of the twentieth century, that notion of the park—as a locus for passive appreciation of nature—was losing steam.[238] In the Progressive Era, social reformers and planners, drawing on the new academic fields of sociology, psychology, and anthropology, and on advances in the health studies,[239] began arguing that parks should provide urban dwellers with opportunities to exercise and engage in sporting activities.[240] The proliferation of playgrounds, the addition of baseball diamonds, swimming-pools, and other such amenities to major parks—including to Central Park as reimagined by the uber-planner Robert Moses—reflected these new ideas respecting the optimal uses of parks.[241]

---

233. BOS. LANDMARKS COMM'N, BOSTON COMMON: BOSTON LANDMARKS COMMISSION STUDY REPORT 17 (1977), https://www.cityofboston.gov/images_documents/Boston_Common_Study_Report_4_tcm3-32547.pdf [https://perma.cc/4FCU-SRCT]; NAT'L PARK SERV., BOSTON COMMON, https://www.nps.gov/nr/travel/massachusetts_conservation/boston_common.html [https://perma.cc/3QR9-R4S9] ("[Boston Common is c]onsidered the oldest public park in the United States . . . .").

234. LEO MARX, THE MACHINE IN THE GARDEN: TECHNOLOGY AND THE PASTORAL IDEAL IN AMERICA 3–4 (35th Anniversary ed. 2000) (exploring the contrasting images of industry and nature in nineteenth-century American literature and arguing that cultural concerns over the decline of wilderness led to the proliferation of the idea that technology is an intrusion into a pristine yet vanishing nature).

235. Geoffrey Blodgett, *Frederick Law Olmsted: Landscape Architecture as Conservative Reform*, 62 J. AM. HIST. 869, 878 (1976).

236. Galen Cranz, *Changing Roles of Urban Parks*, 22 LANDSCAPE 9, 9, 11 (1978).

237. ROSENZWEIG & BLACKMAR, *supra* note 232, at 131 (explaining that the design of Central Park rested on a "belief in the moral superiority of a natural aesthetic").

238. *Id.* at 374.

239. On the rise of the social sciences and their effects, see THOMAS L. HASKELL, THE EMERGENCE OF PROFESSIONAL SOCIAL SCIENCE: THE AMERICAN SOCIAL SCIENCE ASSOCIATION AND THE NINETEENTH-CENTURY CRISIS OF AUTHORITY (1977); EDWARD A. PURCELL, JR., THE CRISIS OF DEMOCRATIC THEORY: SCIENTIFIC NATURALISM & THE PROBLEM OF VALUE 15–30 (1973).

240. Cranz, *supra* note 236, at 12–15.

241. ROSENZWEIG & BLACKMAR, *supra* note 232, at 392–95.

Later still, as the postwar decades were marred by suburbanization, racial and economic segregation, and social alienation, scholars began advocating for the role of parks as spaces for interaction between strangers—interaction between people of different backgrounds.[242] In the past two decades, similar emphasis has been put on parks' capacity to allow varied constituencies to experience art.[243]

Summarizing some of these observations, one prominent history of the park movement in the United States offers a useful typology identifying at least four distinct eras, each with its own view of the public park's role. When the modern park emerged in 1850 it was first imagined as the "pleasure ground."[244] Then in 1900 a shift occurred to the "reform park" idea which ruled through 1930,[245] when it was displaced by the "recreation facility" view.[246] By 1965 the "open-space system" came to dominate American parks.[247]

The many sharply distinct visions for parks that kept (and keep)[248] replacing each other in quick succession throughout American history refute the notion that parks have only one use that is intrinsic to their nature.[249] The idea is further belied by the public controversies that have materialized over the years respecting parks' uses. Should alcohol be consumed in a park?[250] Should vehicles enter?[251] Should recreational facilities be

---

242.  *See, e.g.*, Gerald E. Frug, *City Services*, 73 N.Y.U. L. REV. 23, 92–93 (1998).

243.  *See, e.g.*, Asmara M. Tekle, *Rectifying These Mean Streets: Percent-for-Art Ordinances, Street Furniture, and the New Streetscape*, 104 KY. L.J. 409, 410–11 (2016).

244.  GALEN CRANZ, THE POLITICS OF PARK DESIGN: A HISTORY OF URBAN PARKS IN AMERICA 3 (1982).

245.  *Id.* at 61.

246.  *Id.* at 101.

247.  *Id.* at 135.

248.  The author of the typology of park visions has more recently claimed that starting in the 1990s a fifth model of the park began emerging: the "sustainable park." Unlike the previous models whose concerns were mostly social, this notion of the park is geared toward addressing ecological problems. Galen Cranz & Michael Boland, *Defining the Sustainable Park: A Fifth Model for Urban Parks*, 23 LANDSCAPE J. 102, 102 (2004).

249.  A similar illustration is provided by the complicated history of the National Park System. As commentators have noted, even the original congressional act creating the system defined for it multiple—and conflicting—goals and uses. Much debate has, for example, surrounded the choice between the two goals of conservation and enjoyment. *See, e.g.*, Denise E. Antolini, *National Park Law in the U.S.: Conservation, Conflict, and Centennial Values*, 33 WM. & MARY ENVTL. L. & POL'Y REV. 851, 855–57 (2009).

250.  *See, e.g.*, ROSENZWEIG & BLACKMAR, *supra* note 232, at 254–56 (discussing such a debate in Central Park).

251.  Jeffery C. Mays, *Central Park's Scenic Drives Will Soon Be Car-Free*, N.Y. TIMES (Apr. 20, 2018), https://www.nytimes.com/2018/04/20/nyregion/central-park-car-ban.html [https://perma.cc/AL L7-2WRZ] (discussing the gradual closing of many of Central Park's drives).

constructed?[252] Should food establishments be made available?[253] Should political and ethnic groups erect monuments commemorating their heroes?[254] Should music festivals take over for a weekend?[255] Should a portion of the park be converted into a dog-friendly park?[256] These questions illustrate not only the range of uses to which parks might be put, but also, and perhaps more importantly, the absence of any objective metric that can be used to pick among such potential uses. As one designer notes, the "uncertainty about the meaning of parks"[257] entails the reality that "in contemporary practice the word 'park' [is] applie[d] to an almost indiscriminate range of properties."[258] The potential questions respecting the proper uses of this wide range of properties are political, economic, or social in nature. They form precisely the type of questions that are for the relevant community to settle through the political process.[259]

And indeed, when courts have been forced to intervene in social disputes over park uses, they have largely refused to set any sort of clear-cut legal benchmark for what is a park use. Courts have had to contend with the problem of defining park uses in cases where a specific statute or a specific act of dedication created a park and mandated that that park only be put to "park uses." When a city attempted to introduce a new use into the park, a

---

252. Allison Wrabel, *Amenities for Future Park Debated*, DAILY PROGRESS (Oct. 19, 2017), https://www.dailyprogress.com/amenities-for-future-park-debated/article_df38181d-26fe-5fb0-a3c7-bbfc3fa1cc20.html [https://perma.cc/2ZDR-MLPC] (discussing a local debate over construction of Scout center in an Albemarle County, Virginia park).

253. *See, e.g.*, Lisa W. Foderaro, *Debate Over Park Eateries Is Older than Aged Wine*, N.Y. TIMES (Mar. 8, 2014), https://www.nytimes.com/2014/03/08/nyregion/debate-over-park-eateries-is-older-than-aged-wine.html [https://perma.cc/29M3-PQ9J] (discussing the debate over a proposed restaurant in New York City's Union Square Park in light of earlier such debates).

254. *See, e.g.*, ROSENZWEIG & BLACKMAR, *supra* note 232, at 328–32 (discussing the competition between groups over placing monuments and statues in Central Park); *see also* Pleasant Grove City v. Summum, 555 U.S. 460, 471–72 (2009). The Court cites an example from New York City, where following the controversy generated in 1876 when the city rejected the proposed placement of a donated monument to honor Daniel Webster, the city adopted rules governing the acceptance of artwork for permanent placement in city parks. The Court also notes that across the country, "municipalities generally exercise editorial control over donated monuments through prior submission requirements, design input, requested modifications, written criteria, and legislative approvals of specific content proposals." *Id.* at 471–72 (quoting Brief of Amicus Curiae International Municipal Lawyers Association in Support of Petitioners at 21, *Pleasant Grove City*, 555 U.S. 460 (No. 07-665)).

255. *See, e.g.*, Leonor Vivanco, *Alderman: I Don't Support Riot Fest's Return to Humboldt Park*, CHI. TRIB. (Apr. 30, 2015, 12:50 PM), https://www.chicagotribune.com/news/redeye-humboldt-park-riot-fest-damage-20150429-story.html [https://perma.cc/D6BP-GH32] (discussing the debate over the use of a city park for a three-day music festival).

256. Justin Laurence, *Lakeview's Luxurious Dog Park Plan Thrills Pet Owners, but Older Neighbors Say No Way*, BLOCK CLUB CHI. (Dec. 9, 2019, 9:22 AM), https://blockclubchicago.org/2019/12/09/lakeviews-luxurious-dog-park-plan-thrills-pet-owners-but-older-neighbors-say-no-way/?mc_cid=3f99552a57&mc_eid=2b20f93100 [https://perma.cc/P2ZN-BBVB].

257. CRANZ, *supra* note 244, at viii.

258. *Id.* at ix.

259. United States v. Carolene Prods. Co., 304 U.S. 144, 152 n.4 (1938); ELY, *supra* note 208.

court had to decide whether that new use qualified as "a park use." In such circumstances, courts have almost universally interpreted the phrases "park use" or "park purpose" broadly to encompass practically any use.

A few examples illustrate. The Pennsylvania court approved the construction, in a park, of a little league baseball field,[260] of a golf course,[261] and of an auditorium for entertainment events charging admission fees;[262] the New Jersey court a clubhouse and concessions for tennis, bicycling, and boating;[263] the California court a library[264] and a parking garage;[265] the Illinois court a pool;[266] and the U.S. Court of Appeals for the Ninth Circuit the leasing of floating homes and lakefront cottages.[267] The New York court, sanctioning the opening of a private restaurant in a space dedicated to park uses alone, explicitly eschewed the use of any standard—even a "flexible standard"—for determining what uses count as park uses.[268] While, the court explained, in light of a specific state statute, "it is for the courts to determine what is and is not a park purpose . . . the [relevant local government body] enjoys broad discretion to choose among alternative valid park purposes."[269] That court also explained elsewhere that since a park's potential uses are so plentiful, a "mere difference of opinion" as to "proper and appropriate utilization" will never suffice to overturn the government's decision.[270] The New Jersey court simply concluded that parks are a broad category that "may be thought of as a combination of open space, facilities for physical activities and accommodations for other recreation and entertainment[,] and playgrounds" and hence courts are willing "to approve a wide variety of uses as within [a park's] dedicated purpose."[271] This conclusion clearly reflects the general attitude among courts. Courts have consistently refused to pinpoint one specific use as the inevitable park use.

Throughout American urban history, societal and professional visions for the design and uses of parks have been subject to constant change; the disputes over proper park uses have always been unamenable to objective,

260. Shields v. City of Philadelphia, 176 A.2d 697 (Pa. 1962).
261. Cohen v. Samuel, 80 A.2d 732 (Pa. 1951).
262. Bernstein v. City of Pittsburgh, 77 A.2d 452 (Pa. 1951).
263. Hill v. Borough of Collingswood, 88 A.2d 506 (N.J. 1952).
264. Spires v. City of L.A., 87 P. 1026 (Cal. 1906).
265. Save Our Heritage Org. v. City of San Diego, 187 Cal. Rptr. 3d 754 (Ct. App. 2015).
266. Nichols v. City of Rock Island, 121 N.E.2d 799 (Ill. 1954).
267. Idaho v. Hodel, 814 F.2d 1288 (9th Cir. 1987).
268. Union Square Park Cmty. Coal., Inc. v. N.Y.C. Dep't of Parks & Recreation, 8 N.E.3d 797, 801 (N.Y. 2014).
269. Id.
270. 795 Fifth Ave. Corp. v. City of New York, 205 N.E.2d 850, 851 (N.Y. 1965).
271. Lander v. Vill. of S. Orange, 279 A.2d 633, 638 (N.J. 1971).

as opposed to policy-driven, sorting; and courts have repeatedly refused to identify any set of preordained and mandatory park uses. The "strictest" definition of a park that the law can provide is "a piece of ground inclosed for purposes of pleasure, exercise, amusement or ornament."[272] A place whose functions are so open-ended cannot be said to have a single innate or intrinsic use. "The functions that parks have aimed to fulfill are not natural or inevitable."[273] Thus, the democratically elected government should be allowed to pick among the wide array of uses that might be made of a park. Such a government can accordingly opt to have a Presidential Center there, and that choice cannot be impeded on any principled grounds. In light of the test this Article developed, in that specific case and in the case of parks in general, the relevant "public" holding the public rights should be the local government.[274]

## B. The Public on the Sidewalk

Alongside the case of the Presidential Center, the Introduction presented a second example of a new use launched into an existing public space: electric scooters on sidewalks. Like the park, and perhaps even more so, the sidewalk is a central and well-established public space. Sidewalks are among the most commonplace public spaces.[275] The public often holds a fee

---

272. Perrin v. N.Y. Cent. R.R. Co., 36 N.Y. 120, 124 (1867).

273. CRANZ, *supra* note 257, at 239.

274. Throughout this discussion, I assumed that the relevant government making decisions respecting the park is the local, rather than state, government. That assumption is grounded in the common practices of American states. Thus, for example, the Chicago Park District is authorized, under statute, to control Jackson Park. *See supra* note 2. Furthermore, the state legislature has specifically empowered it to erect and operate a presidential center. 70 ILL. COMP. STAT. ANN. 1290/1 (West 2017). Nonetheless, since in American law the local government is a creature of the state, Hunter v. City of Pittsburgh, 207 U.S. 161, 178–79 (1907), the state can, by statute, preempt any local decision. Under very specific circumstances, decisions respecting parks might be shielded from such intervention. In some states, local governments might enjoy home rule immunity shielding decisions about their parks from state intervention, if these decisions are found to be "purely local." *See generally* Nadav Shoked, *Cities Taxing New Sins: The Judicial Embrace of Local Excise Taxation,* 79 OHIO ST. L.J. 801, 822–23 (2018). Additionally, certain decisions respecting some city parks might be deemed proprietary, rather than governmental, and such decisions are similarly protected. *See* Bd. of Comm'rs v. Lucas, 93 U.S. 108, 115 (1876). Arguably, there are good reasons to prefer city, over state, action in this specific field—given how "local" a park is. But both these doctrinal and normative questions are beyond the scope of this Article. The question here was whether the government—any government—should hold the power over the public space. The choice was not between governments, but between government, the public at large, individual owners, or the court. For these purposes, the specific identity of the democratically elected government matters little.

275. WILFRED OWEN, THE ACCESSIBLE CITY 95 (1972) ("The space devoted to streets usually represents the largest portion of publicly owned urban land.").

interest in them, and if not, an easement.[276] Because it is such a prevalent space, disputes surrounding the management of public rights on the sidewalk are prone to arise, especially when new uses are introduced, as with the electric scooters. In such instances, the power of the government to regulate—or itself introduce—those new uses is challenged. These disputes thus press in stark fashion the question of who is the "public" holding the public rights on sidewalks. Part II suggested that this question be answered through a two-pronged test. As will be seen now, unlike with parks, the task of identifying the public holding the public rights in sidewalks involves both steps of the analysis—since sidewalks, unlike parks, do have an intrinsic use.

Sidewalks are a space that most people would intuitively associate with at least one innate, indeed inevitable, use: pedestrian movement. One example for this common intuition was provided very recently. Residents of a major city began complaining that delivery companies block passage on the sidewalk when using it to sort packages, the numbers of which have been soaring given the proliferation of online shopping. [277] But this association of the sidewalk with pedestrian movement is anything but new. It has characterized sidewalks throughout their existence. As will be seen now, that association can easily be discerned in the sidewalk's history, is apparent in the elements of the law of public spaces reviewed in Part I pertinent to the sidewalk, and finally has manifested itself in recent federal court decisions.

The first comprehensive law authorizing the paving of sidewalks throughout a city was passed by the British Parliament in 1766.[278] The London Paving and Lighting Act[279] was a response to the disorder of the then-existing system, where each owner was responsible for the paving and

---

276.  *See, e.g.*, Paige v. Schenectady Ry. Co., 70 N.E. 213, 215 (N.Y. 1904) (comparing Dutch law, under which the public acquired a fee to the road, to English law, under which an easement was acquired).

277.  *See* Matthew Haag & Winnie Hu, *1.5 Million Packages a Day: The Internet Brings Chaos to N.Y. Streets*, N.Y. TIMES (Oct. 28, 2019), https://www.nytimes.com/2019/10/27/nyregion/nyc-amazon-delivery.html [https://perma.cc/7L4A-P8C7].

278.  The first sidewalks appeared around 2000 to 1990 BC in Central Anatolia. Some ancient Greek and Roman cities also had sidewalks. SPIRO KOSTOF, THE CITY ASSEMBLED: THE ELEMENTS OF URBAN FORM THROUGH HISTORY 191, 209 (1992). With the fall of Rome, however, sidewalks disappeared and in the Middle Ages pedestrians did not have a separate space on the street. ANASTASIA LOUKAITOU-SIDERIS & RENIA EHRENFEUCHT, SIDEWALKS: CONFLICT AND NEGOTIATION OVER PUBLIC SPACE 15 (2009). It was not until the mid-nineteenth century that sidewalks were reintroduced in continental Europe. LARRY R. FORD, THE SPACES BETWEEN BUILDINGS 155 (2000).

279.  London Paving and Lighting Act 1766, 6 Geo. 3 c. 26.

maintenance of the portion of the street fronting his property.[280] The result was different paving materials and patterns along the same sidewalk and no separation between the sidewalk and the road where horses and horse-drawn vehicles traversed. [281] Consequently, movement on the sidewalk was challenging—and indeed dangerous—for pedestrians.[282] The Paving Act's goal was to remedy the situation: to facilitate pedestrian movement by assuring uniformity.[283] The Act thus authorized the City of London to create footways throughout the city's streets, to pave them with Purbeck stone (the thoroughfare in the middle was generally cobblestone), and to raise them above the street level with curbs.[284] A century later, and across the ocean, when American municipalities began providing sidewalks in the late nineteenth century, they entertained the same motivation: "one use, walking for transportation, became the primary purpose for which the sidewalks were constructed. . . . [T]he pedestrian became the public for whom the sidewalks were being provided."[285]

The common law as it developed ever since these original English and American paving acts has similarly subscribed to the idea that sidewalks are devoted to free pedestrian movement.[286] As noted in Part II, land dedicated for a sidewalk cannot be made subject to a reservation by the dedicator—despite the latter's normal freedom of contract—that would limit public passage.[287] Such a limitation is deemed inconsistent with the purpose of the dedication or against public policy.[288] A limit on pedestrian movement on the sidewalk, the common law thus believes, goes against the nature of the sidewalk as a public space.[289] Another reflection of this idea is found in the law of prescriptive easements: such easements are created through

---

280. The first step towards reform was made four years earlier in the Westminster Paving Act of 1762, which created a commission with responsibility for the street. Westminster Paving Act 1762, 2 Geo. 3. c. 21.

281. JERRY WHITE, LONDON IN THE EIGHTEENTH CENTURY: A GREAT AND MONSTROUS THING (2013).

282. JERRY WHITE, CITY RIVALRIES AND THE MODERNISATION OF EIGHTEENTH-CENTURY LONDON, 1720–1770, at 10 (2011).

283. *Id.* at 20.

284. The Act largely achieved this goal. A guidebook from 1820 praises the new mode of paving delivering "great benefit" since before the streets were "extremely inconvenient to passangers." SAMUEL LEIGH, LEIGH'S NEW PICTURE OF LONDON 90 (4th ed. 1820).

285. LOUKAITOU-SIDERIS & EHRENFEUCHT, *supra* note 278, at 17.

286. *See also* NICHOLAS BLOMLEY, RIGHTS OF PASSAGE: SIDEWALKS AND THE REGULATION OF PUBLIC FLOW 3 (2011) (arguing that the sidewalk is now understood by courts and other government actors through a "pedestrianism" prism and thus "[t]he role of the authorities, using law as needed, is to . . . ensure that the primary function of the sidewalk is sustained: that being the orderly movement of pedestrians from point a to point b").

287. *See supra* notes 170–172 and accompanying text.

288. Vill. of Grosse Pointe Shores v. Ayres, 235 N.W. 829, 832 (Mich. 1931).

289. Elizabeth City v. Banks, 64 S.E. 189 (N.C. 1909).

continued public passage on a space, as noted, and can terminate if the public ceases to pass through the space.[290] The law assumes that the public easement has one core use—public movement—and once that use disappears, the easement might be adjudged abandoned with it.[291]

The common law's deep committment to this position, revealed in both the dedication and prescriptive easement doctrines, whereby sidewalks are meant for walking, affected other elements of the law as well, including trespass. Courts would hold that a person who stopped on the sidewalk in front of a man's house and addressed that man abusively was committing trespass—although the speaker stayed on the public sidewalk. Such a person was held to be diverging from the natural use of the pertinent public space—walking through it.[292] Courts similarly authorized any person who was seeking to use a given road for passage to remove obstructions others had placed there.[293]

The common law's devotion to the view of sidewalks as inherently and inescapably dedicated to walking might now even form part of American constitutional law. Federal courts have always held that this inherent role of the sidewalk could justify the placement of limits on constitutional rights. Thus courts have consistently ruled that the sidewalk's natural function of facilitating pedestrian movement could justify time, place, and manner restrictions on the exercise of otherwise constitutionally protected rights of protest.[294] Similarly, the D.C. Circuit Court of Appeals held in 2019 that an 1892 statute pronouncing it illegal to "crowd, obstruct, or incommode" the sidewalk was not unconstitutionally vague, despite the clearly opaque standards it established, given the prohibition's purpose, which easily aligned with the "common sense" goal of protecting the "prerogative[]" of the public to "walk" on the sidewalk.[295]

At least one federal court has been willing to go further still, and endow the function of the sidewalk as a space for walking with the imprimatur of a constitutional right. In a recent decision, the U.S. Sixth Circuit Court of Appeals struck down Memphis's policy of preventing all persons from walking on the sidewalks of Beale Street—the city's main entertainment

---

290.  3 TIFFANY, *supra* note 99, § 930.

291.  Normally, abandonment also requires a subjective intent to vacate the right, but prolonged nonuse can serve as evidence for such intent. Some courts hold that an easement acquired by prescription can be lost by nonuse alone—an intent to abandon need not be shown. *See, e.g.*, People v. Ocean Shore R.R., 196 P.2d 570, 579 (Cal. 1948).

292.  Adams v. Rivers, 11 Barb. 390 (N.Y. Gen. Term 1851).

293.  Inhabitants of Arundel v. M'Culloch, 10 Mass. (10 Tyng) 70 (1813).

294.  *See* Pomicter v. Luzerne Cty. Convention Ctr. Auth., 939 F.3d 534, 544 (3d Cir. 2019).

295.  Agnew v. Gov't of the D.C., 920 F.3d 49, 58 (D.C. Cir. 2019) (quoting Act of July 29, 1892, ch. 320, 27 Stat. 322, 323).

district—on weekends starting at about 3:00 a.m.[296] The court regarded the policy as interfering with the right to travel locally that is protected under the Due Process Clause of the Fourteenth Amendment.[297] For the court, blocking people from passing through the sidewalk contradicted the sidewalk's role and the most basic rights individuals must enjoy in that public space. This special nature of the sidewalk as a distinct public space with an innate use served the court to distinguish the litigated dispute from earlier cases where governments were allowed to block access to specific neighborhoods or regulate the uses of roads.[298]

Whether or not other courts follow the Sixth Circuit's holding, and irrespective of its doctrinal merits, the decision expresses an idea detectable throughout the legal treatment of the sidewalk ever since its modern rebirth: the sidewalk is a public space that has an intrinsic use.[299] Thus, in accordance with the test this Article offers, the public holding the rights over the sidewalk, and freely deciding how to employ those rights, cannot by default simply be the local government (otherwise, the government would always be authorized to close the sidewalk to pedestrian movement). To figure out who, if not necessarily the government, that public should be, we must turn to consider the three factors identified in Part II as necessary for the second stage of the analysis: the breadth of the contested public space's natural use, the identity of the entity bearing the costs of maintaining it, and the degree of faith in government decision-making respecting the specific space.

The first factor is the breadth, or flexibility, of the public space's intrinsic use. Although the natural use of the sidewalk—pedestrian movement—is, as noted, clear, it is a rather broad use, one allowing for multiple variations. No unequivocal definition of an interference with that use can be devised, and thus many uses can be added to the sidewalk without undermining the sidewalk's natural use.[300] Consider the example of Memphis's Beale Street. As noted, the Sixth Circuit held that blocking pedestrians from entering the sidewalk there was an interference with the sidewalk's natural use.[301] At the same time, Memphis has special rules for the use of Beale Street's sidewalks

---

296. Cole v. City of Memphis, 839 F.3d 530 (6th Cir. 2016).
297. The court of appeals recognized that right earlier in the case of *Johnson v. City of Cincinnati*, 310 F.3d 484, 495 (6th Cir. 2002).
298. *Cole*, 839 F.3d at 537.
299. In a recent decision, the Second Circuit found that since the sidewalk's central function is to facilitate pedestrian movement, a local law regulating street vendors should be interpreted as meant to limit interference with pedestrian movement, and that that goal is a legitimate one. Crescenzi v. City of New York, 939 F.3d 511 (2d Cir. 2019).
300. *See also* Brown v. Louisiana, 383 U.S. 131, 157 (1966) (arguing that unlike a public building, the public street is inevitably the locus of many activities and does not require a special regime).
301. *Cole*, 839 F.3d at 537.

which have been allowed to stand. The city barricades the sidewalk thereby allowing only movement by foot;[302] it specifically prohibits panhandling;[303] it empowers a local association to designate spaces on that sidewalk where the peddling of goods is allowed;[304] and it permits vendors to sell, and patrons to carry, alcoholic beverages on that sidewalk.[305] The permission granted to these uses reflects the reality whereby not all, or even most, uses immediately and inevitably interfere with the public sidewalk's natural use—pedestrian movement.[306] Indeed, had the opposite been true, bicycles, slow walkers, runners, groups or couples, public art or furniture, and side vegetation as well, should have all been forbidden from entering the sidewalk.[307]

These examples illustrate the fact that individuals clearly do not perceive the sidewalk as dedicated for only one single use from which no deviation is allowed. If the law insisted on ordaining that it must so be, it would defeat those expectations. It would promote a normatively undesirable regime defeating the diverse "valued shared ends" members of society assign to the sidewalk. The law would deactivate the diverse and legitimate civil rights claims made to the sidewalk.[308]

The Supreme Court's First Amendment jurisprudence concurs. The Court has always insisted that the sidewalk is the quintessential public forum for exercise of free speech rights precisely because expressive activities there do not inherently interfere with the space's otherwise natural use—pedestrian movement.[309] That is not the case with respect to other public spaces with a natural use.[310] The sidewalk and its natural use—pedestrian movement—are thus held to be distinctly different in this regard from, for example, the road or highway and their natural use—vehicle movement.[311] Almost all diverging activities interfere with the highway's

---

302.   *Id.* at 533.
303.   MEMPHIS, TENN., MUNICIPAL CODE § 6-56-3 (2006).
304.   *Id.* § 6-56-5.
305.   *Id.* §§ 7-4-15(C)(4), 7-8-23.
306.   Allen v. City of Boston, 34 N.E. 519, 519 (Mass. 1893) (explaining that "the owner of the land over which a highway is laid retains his right in the soil for all purposes which are consistent with the full enjoyment of the easement acquired by the public").
307.   *See, e.g.,* MEMPHIS, TENN., MUNICIPAL CODE § 11-24-10 (2010) (allowing for riding a bike on the sidewalk); *id.* § 11-24-11 (allowing for the parking of a bike on the sidewalk).
308.   BLOMLEY, *supra* note 286, at 28, 109.
309.   Schneider v. New Jersey, 308 U.S. 147, 160 (1939).
310.   *See* Grayned v. City of Rockford, 408 U.S. 104, 116 (1972); Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 651 (1981); Brown v. Louisiana, 383 U.S. 131, 157 (1966).
311.   Cox v. Louisiana, 379 U.S. 536, 554–55 (1965) ("Nor could one, contrary to traffic regulations, insist upon a street meeting in the middle of Times Square at the rush hour as a form of freedom of speech or assembly. Governmental authorities have the duty and responsibility to keep their streets open and available for movement.").

natural use, as their introduction could block, or greatly obstruct, vehicle movement.[312] That is simply untrue with respect to pedestrian movement on the sidewalk.[313] The sidewalk can—and in American law, thankfully does—suffer other activities that do not necessarily inhibit its intrinsic use as a space for walking.

Apart from being antithetical to a ban on walking [314] —and thus accounting for the Sixth Circuit's decision—the natural use of sidewalks does not generate a precise and unambiguous list of prohibitions on sidewalk uses.[315] Thus, courts cannot rely on a set of common law strictures to monopolize all decision-making powers respecting such uses. Since the natural use of the sidewalk is broad and receptive of multiple interpretations, the democratically elected government cannot be said to flat-out lack the power to regulate the sidewalk.

This conclusion that the first factor precipitates, need not imply, however, that the government is the only entity that should enjoy the power to determine what additional uses—beyond pedestrian passage—are acceptable on the sidewalk. The remaining two factors of the test Part II developed may indicate that other publics could be conceived as holding the public rights on the sidewalk alongside the government. Indeed, they might intimate that the role of those publics should even trump, in certain circumstances, that of the government.

The second factor Part II suggested is the identity of the actor bearing the costs of maintaining the public space. This factor weighs against recognizing the local government as the sole "public" holding the public right to the sidewalk. Local governments cover little of the expense of maintaining sidewalks. They may mandate the laying of sidewalks, but ever since the inception of these mandates in the nineteenth century, abutting owners funded the actual construction of sidewalks.[316] As the New York Court of Appeals put it in one early case, "It is not expected, and cannot be required, that the [city] shall itself forthwith employ laborers to clean all the walks, and so accomplish the object by a slow and expensive process, when

---

312.  *See, e.g.*, City of Evanston v. City of Chicago, 664 N.E.2d 291, 299 (Ill. App. Ct. 1996) (mandating removal of guardrail median installed by defendant city in center of street marking boundary between the two cities).

313.  Hartford v. Gilmanton, 146 A.2d 851, 853 (N.H. 1958) (explaining that land subject to public easement can be put to many uses not inconsistent with public pedestrian passage).

314.  Swinson v. Cutter Realty Co., 156 S.E. 545 (N.C. 1931).

315.  *See, e.g.*, McCarthy v. City of Syracuse, 46 N.Y. 194, 199 (1871) (explaining that owner could excavate underneath the sidewalk, since the only prohibition generated by the public right to the sidewalk was against direct interference with the right of way).

316.  LOUKAITOU-SIDERIS & EHRENFEUCHT, *supra* note 285, at 18–19.

the result may be effected more swifty [sic] and easily by imposing that duty upon the citizens."[317]

Still today, Memphis, for example, outsources all the costs of constructing and maintaining sidewalks to private parties. In new streets, the builder of the lot must construct a sidewalk where the lot fronts the street in accordance with the city's specifications.[318] Owners must then repair, maintain, and clean existing sidewalks abutting their property.[319] Other cities similarly provide that it is "the duty of the owner of any property fronting on a public street to keep the sidewalk in front thereof in good repair and condition."[320] Cities routinely require the abutting owner or occupant to remove snow and ice from the sidewalk.[321] Furthermore, many cities now allow area businesses to form micro-local associations—such as business improvement districts—to better maintain the sidewalks fronting their businesses and otherwise improve them.[322] Such associations collect special taxes from area businesses to, for example, expand sidewalk sanitation services, fix broken sidewalks, and place public furniture or art on the sidewalk.[323] Private individuals do not just participate in the maintenance of sidewalks in these formal, legally-mandated, ways. Ethnographers have found that such maintenance and even policing work is sometimes performed by street vendors and even panhandlers occupying the sidewalk.[324]

The government normally still carries some of the sidewalk's maintenance costs due to its role as supervisor of the abutting owners or businesses. It might be held liable for injuries pedestrians sustain on a sidewalk when it failed to enforce a maintenance ordinance on those owners.[325] The local government's supervisory power might also subject it to federal and state statutory duties to render the sidewalk accessible to persons with disabilities.[326] But since the government is responsible for only some of the costs of maintaining the sidewalk, there is no reason to deem the local government—and only the local government—the "public" in this public space, to the exclusion of other publics. The individual owners who

---

317.   Taylor v. City of Yonkers, 11 N.E. 642, 642 (N.Y. 1887).
318.   MEMPHIS, TENN., MUNICIPAL CODE § 12-28-2 (2012).
319.   *Id.* § 12-28-5.
320.   S.F., CAL., ADMIN. CODE § 1.52 (2010).
321.   CHI., ILL., MUNICIPAL CODE § 10-8-180 (2015).
322.   Richard Briffault, *A Government for Our Time? Business Improvement Districts and Urban Governance*, 99 COLUM. L. REV. 365, 366 (1999).
323.   *Id.* at 394–95.
324.   MITCHELL DUNEIER, SIDEWALK 231–52 (1999).
325.   3 CHESTER JAMES ANTIEAU, ANTIEAU ON LOCAL GOVERNMENT LAW § 37.05 (Sandra M. Stevenson ed., 2d ed. 2019).
326.   Barden v. City of Sacramento, 292 F.3d 1073, 1076 (9th Cir. 2002).

maintain the sidewalk abutting their homes or businesses might also be reasonably considered the relevant "public."[327] Alternatively, since all members of the public end up participating in the maintenance of the sidewalk—as each maintains the sidewalk area closest to where they reside—perhaps the public at large is the best "public" to be designated the holder of public rights in the sidewalk.

The third and final factor of the test Part II suggested for discerning the public in spaces with an innate use might aid in distributing the relative roles between these two publics—individual owners and the public at large—and the local government, which the first factor identified as another relevant public on the sidewalk. The final factor focuses on the likelihood of governmental disinterested decision-making respecting the public space that has one specific intrinsic use.

Decisions to transact in public rights to sidewalks might raise concerns about the government's motivations—though only in certain situations. Whenever the government transacts in public assets or rights, some uneasiness respecting the decision arises.[328] Risks of incompetence or corruption are inevitably present.[329] These risks might be heightened when the public asset traded is the sidewalk. Sidewalks and streets might be valuable properties to some private actors. Such actors might enjoy disproportionate economic or political powers, and, therefore, the transfer of rights to them might appear suspicious. As scholars explain, these risks are alleviated in situations where government transactions are routine and governed by standard procedures.[330] Thus, in cases where the local government has specific rules for the grant of the relevant right in the sidewalk,[331] and a schedule of fees,[332] little reason exists to question the democratically elected government's judgement. Such cases are those involving, for example, licensing the placement of publicity signs[333] or café

---

327. The abutting owner's duties towards the sidewalk are not limitless. Perhaps most important, as a general rule, she is not, solely by reason of being an abutter, liable for injuries suffered there—unless a statute or ordinance explicitly holds her so. The mere presence of an ordinance mandating construction or maintenance of the sidewalk does not suffice. *See* C. P. Jhong, Annotation, *Liability of Abutting Owner or Occupant for Condition of Sidewalk*, 88 A.L.R.2d 331 (1963).

328. Max Schanzenbach & Nadav Shoked, *Reclaiming Fiduciary Law for the City*, 70 STAN. L. REV. 565, 571–72 (2018).

329. *Id.* at 567–68.

330. *Id.* at 632–33.

331. *See, e.g.*, CHI., ILL., MUNICIPAL CODE § 10-28-015 (2016) (detailing the procedure for application and issuance of permit to use sidewalk).

332. *Id.* § 10-28-017 (2010) (detailing the fees for different uses of sidewalk).

333. *Id.* § 10-28-064 (2015).

tables,[334] allowing temporary closures for special events,[335] or issuing rights for an overhanging canopy.[336]

Conversely, cases of one-off governmental deals, extraordinary transactions with an identified, and strong, market player, are generally conceived as meriting a closer review.[337] The government should be treated with some distrust when it sells rights on the sidewalk that are more expansive than the ordinary licenses just described. The most troubling cases are probably those involving deals in which the government sells the rights to above- or below-ground utility lines.[338] Similar suspicions are justified when portions of the sidewalk are permanently vacated for the benefit of some adjacent business or development.[339] Cases of this persuasion are much likelier to materialize in a city's center, or in commercial areas, where the sidewalk is a valuable economic resource.

In such cases the government should not be automatically assumed to be the public right's custodian. Rather, a court should intervene to secure the public at large's rights in the space's natural uses. For that purpose, any such extraordinary deal should be scrutinized to assess the quality of the government's decision-making process—so as to verify that the interests of the public at large were the guiding standard—and to assure that the consideration paid is fair.[340]

Governmental misuse of public rights in sidewalks is sometimes, but not always, a possibility. In most mundane dealings with these spaces, the democratically elected government can be trusted, and thus there is no need to replace it in its role as the public holding the rights in these public spaces. However, in extraordinary deals, especially those involving sidewalks in commercial areas, the public at large should be the primary public designated the public right's holder.

At this concluding point, with the analysis of the two-step test for identifying the public in sidewalks complete, the problem of the electric

---

334. *Id.* § 10-28-805 (2018).

335. *Id.* § 10-8-335 (2018).

336. *Id.* § 10-28-240 (2010).

337. Schanzenbach & Shoked, *supra* note 328, at 630.

338. *See* Cammers v. Marion Cablevision, 354 N.E.2d 353, 356 (Ill. 1976) (explaining why the case of a utility using the underground of a sidewalk does not benefit the public at large, but rather that utility and its customers).

339. *See, e.g.,* Swinson v. Cutter Realty Co., 156 S.E. 545 (N.C. 1931); Chapman v. City of Lincoln, 121 N.W. 596 (Neb. 1909); Schopp v. City of St. Louis, 22 S.W. 898 (Mo. 1893). A recent example from Chicago involved the city's deal with the Chicago Cubs whereby the city vacated certain sidewalks as the team renovated Wrigley Field. *See* Carrie Muskat, *Cubs, City Complete Deal for Wrigley Renovations*, MLB.COM (Apr. 15, 2013, 2:30 PM), http://wap.mlb.com/chc/news/article/20130 41544830862/?locale=en_US [https://perma.cc/TVL6-FGXY].

340. Schanzenbach & Shoked, *supra* note 328, at 629–31.

scooters can be revisited. Since sidewalks have a use traditionally deemed natural—pedestrian passage—the government should not automatically be deemed the "public" holding the public rights over them. Since that natural use is open to distinct interpretations though, the court should not employ a set of common law strictures to replace the democratically elected government in the role of the "public"—as long as the government is not flat out banning pedestrian passage.

Thus, courts should not strike down governmental measures to regulate electric scooters: the operators' claim that the government lacks the power to regulate sidewalks is untenable.[341] Cities themselves should also refrain from making this assumption—which some of them have made—that they lack the power to ban the scooters.[342]

Several cities appear to have realized that they do hold the relevant power, and have taken action to limit scooter companies. Cities alledgely act to protect pedestrians, and the disparate regulatory means they adopt highlight again the many distinct ways in which the sidewalks' innate use—walking—can be defined and protected. Nashville, for example, limits the time and areas where the scooters can be operated.[343] Indianapolis charges the companies a fee and bans the use of scooters on the sidewalk—and their parking on sidewalk ramps.[344] In a scooter law adopted by the legislature—but recently vetoed by the Governor—the state of New York attempted to generally prohibit scooters from using the sidewalk, delegating the power to permit such use (and to regulate operators in general) to individual local governments.[345] And finally, most American cities that allow scooters to operate within their boundaries limit the number of licenses accorded each operator and adjust it based on the operator's performance and public complaints.[346]

---

341.   For this claim and the surrounding dispute, see *supra* note 16.

342.   James Briggs, *Indianapolis Sets New Rules on Electric Scooters – Including Fees and Fines*, INDIANAPOLIS STAR (July 16, 2018, 10:14 PM), https://www.indystar.com/story/money/2018/07/16/indianapolis-sets-new-rules-electric-scooters/782630002/ [https://perma.cc/65J3-XMEX].

343.   Yihyun Jeong, *Metro Council Rejects Electric Scooter Ban in Nashville*, TENNESSEAN (Aug. 20, 2019, 10:19 PM), https://www.tennessean.com/story/news/2019/08/20/nashville-rejects-ban-electric-scooters-metro-council-vote/2062869001/ [https://perma.cc/MRZ6-TX5S].

344.   Briggs, *supra* note 342.

345.   S.B. 5294, 2019-2020 Gen. Assemb., Reg. Sess. § 1242(5)(b) (N.Y. 2019). The borough of Manhattan though, is the one local government in the state—in this case, a county—not allowed to authorize a scooter rental service.

346.   *See, e.g.*, CITY OF CHI., CITY OF CHICAGO REQUIREMENTS FOR SCOOTER SHARING EMERGING BUSINESS PERMIT PILOT PROGRAM (June 7, 2019), https://www.chicago.gov/content/dam/city/depts/cdot/Misc/EScooters/EScootersPilotProgramTerms_06-07-19.pdf [https://perma.cc/KR3G-TTVA] (Chicago); Madeleine Pauker, *Bird to Pull 250 Scooters Out of Santa Monica as Lyft and Jump Enlarge Fleets*, SANTA MONICA DAILY PRESS (July 17, 2019, 9:07 AM), https://www.smdp.com/bird-t

Yet despite this justified propensity to regulate the scooters, cities sometimes still appear somewhat unsure about the actual source of their power to enact the regulations controlling the scooter providers' use of the sidewalk. When Milwaukee attempted to regulate the scooters, it argued that the Wisconsin vehicle registration requirement statute covered scooters and thus prevented their operation on its streets (since they were not registered). The scooter operator sued, contending that this was a convoluted interpretation of the statute.[347] The state legislature concurred: it amended the vehicle registration law to clarify that scooters are not subject to it. But concurrently the legislature also explicitly empowered cities to approve the operation of the companies and to designate spaces where scooters' use is prohibited.[348]

The authority of local governments, in Wisconsin and elsewhere, to act to regulate scooters on the sidewalks should not, as the analysis above showed, have been questioned. Special efforts to find some existing statute to which, in some creative way, local governments' authority to act in this realm can be tied, are probably unnecessary.

Still, though unquestionably desireable given this Article's test, the local government's discretion in acting on the sidewalk might justifiably be constricted at times—and private actors or the public at large deemed the "public" holding the relevant public rights there—since, as seen, the government does not foot most of the bill for maintaining sidewalks. Similarly, and as also seen earlier in this Section, when entering certain transactions on the sidewalk the government's judgment might be tainted. Thus, if local governments reach deals with electric scooter operators, allowing them to freely park scooters on the sidewalk, a court should review those deals' terms to safeguard the public at large's interests, especially if the consideration the operators pay appears particularly inadequate or the process particularly fraught. So far, the deals American cities have struck

---

o-pull-250-scooters-out-of-santa-monica-as-lyft-and-jump-enlarge-fleets/177509 [https://perma.cc/G2 G2-BEVB] (Santa Monica). Milwaukee, following multiple complaints that scooters were using the sidewalks—in violation of city ordinance—even halted the whole program. Alana Watson, *Milwaukee City Officials Halt Scooter Pilot Program*, WIS. PUB. RADIO (Aug. 2, 2019, 4:20 PM), https://www.w pr.org/milwaukee-city-officials-halt-scooter-pilot-program [https://perma.cc/KA4U-9HWE]. It has since been reinstated with new caps on the scooters' number to ensure compliance with the sidewalk regulation. Marisa Peryer, *Milwaukee Expected to Approve Two More E-Scooter Companies, Bird and Spin*, MILWAUKEE J. SENTINEL (Aug. 10, 2019, 11:18 AM), https://www.jsonline.com/story/news/local/ milwaukee/2019/08/10/two-more-e-scooter-operators-bird-and-spin-poised-hit-streets/1975406001/ [ht tps://perma.cc/ES5D-6KP7].

347.   Molly Dill, *City Of Milwaukee Settles Bird Electric Scooter Lawsuit*, BIZTIMES (May 9, 2019, 12:00 AM), https://biztimes.com/city-of-milwaukee-settles-bird-electric-scooter-lawsuit/ [https:// perma.cc/3925-KKMC].

348.   S.B. 152, 104th Leg., Reg. Sess. § 90 (Wis. 2019) (enacted).

with scooter operators have been rather stringent in their conditions—these were mostly pilot programs—so concerns have not been raised; indeed, complaints have mostly been lodged by the unsatisfied operators, rather than by public members.[349] An example for such a deal that appears to clearly favor the public can be found in Indianapolis, where the fees the city charges from the scooter operators are dedicated to enforcement of the recently enacted scooter rules—rather than to the city's enrichment.[350]

But the possibility that concerns respecting cities' favorable treatment of the providers will materialize in the future should not be disregarded.[351] Such concerns might lead to a need to designate the public at large the relevant public for the public space. A claim recently brought against the city of San Diego might indicate the validity of such concerns. Plaintiffs argue that by not regulating the scooters on San Diego's sidewalks the city neglected its duty and is thus liable for injuries pedestrians, hit by scooters, have endured.[352] The claim might have credence given the analysis provided here. Since the sidewalk does have an intrinsic use, and since the government might at times be suspect of dubious behavior respecting the sidewalk's use—especially when major corporate players, such as the scooter providers, are involved—its discretion to act, or not act, should be limited. For while many times the local government can be deemed the

---

349. *See, e.g.*, City of Santa Monica, Shared Mobility Device Pilot Program Administrative Regulations (Sept. 25, 2018), https://www.smgov.net/uploadedFiles/Dep artments/PCD/Transportation/SM-AdminGuidelines_9-25-2018.pdf [https://perma.cc/RNG3-CPFL]; Charlie Wojciechowski, *Dockless E-Scooters Hit Streets of Chicago*, NBC5Chicago (Dec. 12, 2018), https://www.nbcchicago.com/news/local/Dockless-Electric-Scooters-Join-Chicagos-Transportation-Sy stem----502636421.html [https://perma.cc/4LGN-ERMA] (reporting that Chicago is conducting a pilot electric scooter program on the South Side, allowing scooters to operate on the streets during certain summer festivals to evaluate where the new technology could go next); Ethan May & Crystal Hill, *After More than 20 Injuries in September, Scooter Rule Enforcement Begins in Indianapolis*, Indianapolis Star (Oct. 5, 2018, 9:18 AM), https://www.indystar.com/story/news/2018/10/05/bird-lime-scooters-indianapolis-safety-enforcement-spotlight/1419495002/ [https://perma.cc/N8FY-E4C6]; Denver Dep't of Transp. & Infrastructure, Transit Amenity Program — Dockless Mobility Vehicle Pilot Permit Program (Nov. 2019), https://www.denvergov.org/content/denvergov/en/trans portation-infrastructure/programs-services/dockless-mobility.html [https://perma.cc/D6JF-55QV]; *see also* Nat'l Ass'n of City Transp. Officials, NACTO Policy 2018: Guidelines for the Regulation and Management of Shared Active Transportation (July 2018), https://nacto.org/ wp-content/uploads/2018/07/NACTO-Shared-Active-Transportation-Guidelines.pdf [https://perma.cc/ M7QZ-PAND] (suggesting a set of best practices for cities).

350. Briggs, *supra* note 342.

351. Indeed, in a very recent complaint, plaintiffs in San Diego have accused the city of striking an agreement with the scooter operators that commercializes the sidewalk for private profit and ignores the city's duty to keep the sidewalk accessible to people with disabilities. Complaint, Montoya v. City of San Diego, No. 3:19-cv-00054 (S.D. Cal. Jan. 9, 2019).

352. David Garrick, *San Diego Preparing Defense Against Four Scooter Injury Lawsuits*, San Diego Union-Trib. (Mar. 28, 2019, 4:19 PM), https://www.sandiegouniontribune.com/news/politics/st ory/2019-03-28/san-diego-preparing-defense-against-four-scooter-injury-lawsuits [https://perma.cc/9Y FQ-PUCN].

appropriate "public" holding and controlling the public rights on the sidewalk, there are easily imaginable circumstances where that should not be the case.

<div align="center">CONCLUSION</div>

As this Article is being edited, the case of the Obama Presidential Center, which launched its discussion, continues its march through the litigation process. In February 2019 the federal court for the District of Northern Illinois issued its decision on the motion to dismiss the lawsuit against the Obama Presidential Center.[353] In that preliminary order ostensibly dealing with the plaintiffs' standing alone,[354] the court adopted the complaint's premise. The court established the plaintiffs' standing to sue based on a public trust theory.[355] It ruled that the public trust doctrine covers Jackson Park and hence the public interest in the park is held by the public at large, not the government.[356] Consequently, whenever the government proposes a change to the park it interferes with the individual interests of each and every resident of Chicago. Accordingly, any local taxpayer enjoys standing to challenge such a governmental proposal.[357]

That preliminary decision encapsulated both the descriptive and the normative insights of this Article. The formal doctrinal issue at hand was standing, yet the court in fact proceeded to ascertain who the public holding the public interest in the park was. The court thus explicitly acknowledged the descriptive fact about the law that this Article promoted: settling disputes over public rights is not an exercise in identifying public spaces, but an exercise in identifying publics.

In undertaking this exercise, however, the court forwent a principled normative approach. With little doctrinal grounding, and with no policy analysis, it went ahead and characterized the public holding rights in the park as the public at large.[358] It did not consider this move's ramifications or logic, or courts' ability to act upon it.

This Article showed that this need not be the case. A consistent and rational approach, drawing on the history, structure, and normative

---

353. Protect Our Parks, Inc. v. Chi. Park Dist., 368 F. Supp. 3d 1184 (N.D. Ill. 2019).
354. *Id.* at 1191.
355. *Id.* at 1193–95.
356. *Id.*
357. *Id.*
358. The court merely cited one case as authority: *Friends of the Parks v. Chicago Park District*, 160 F. Supp. 3d 1060 (N.D. Ill. 2016). That, however, was a lower court ruling in a preliminary stage of a litigation that never proceeded. That ruling supplied no doctrinal backing for its conclusion—other than an obiter in *Paepcke v. Public Building Commission*, 263 N.E.2d 11, 18 (Ill. 1970). No other American authority supports the court's conclusion. *See supra* notes 153–160 and accompanying text.

rationales of the law of public spaces, can be applied to disputes over public spaces. If applied to the case of the Obama Presidential Center, that approach would have generated a result that is the opposite of the one the court reached in its procedural holding: one that would have viewed the government as the only relevant public in all cases involving parks.[359] Under the analysis suggested here, the government's decision could not have been challenged to begin with.

Granted, an unprincipled identification of the public in a public space, such as the one made by the district court in its procedural decision, might not inevitably lead to a misguided substantive resolution of a given dispute. Entertaining a challenge that should never have been heard does not always conclude with that challenge's acceptance. Thus, in its later summary judgement order on the merits, the court did approve the Presidential Center.[360] But an unprincipled identification of the public will, inevitably, always open the door for an arbitrary, and pernicious, form of legal analysis. The district court thus only reached its substantive decision after insisting on establishing clear statutory intent to allow buildings in the park.[361] It only acceded to a relatively deferential standard of judicial review under the public trust doctrine because the relevant public park was not submerged at the time of Illinois statehood.[362] These findings sit on flimsy doctrinal foundations, and their normative justification is flimsier still. Most troublingly, they set a dangerous precedent for future cases where a federal court could mindlessly intervene in governmental decisions respecting parks' management. Hopefully, the federal court of appeals, now hearing the case, will not endorse these findings.[363]

Irrespective of the eventual fate of the Obama Center, that case represents only one—albeit exceptionally prominent—example. Many other cases about public spaces exist, and still many others will exist in the future. If these cases, which collectively mold the public spaces that

---

359.   *See supra* Part III.A.

360.   Protect Our Parks, Inc. v. Chi. Park Dist., 385 F. Supp. 3d 662, 692 (N.D. Ill. 2019).

361.   *Id.* at 678.

362.   *Id.* The court held that land currently submerged under water is subject to the most demanding review, that land that was previously—at or after the time of statehood—submerged is subject to an intermediary level of review, and parkland that was not submerged, such as Jackson Park, to a lax standard of review. The latter, according to the court, involves solely verification of sufficient legislative intent. If this test implies complete deference to the legislature, it could be interpreted as expressing the position this Article promotes, at least with respect to some parklands. *See id.* at 676–78.

363.   An appeal has been filed with the Seventh Circuit Court of Appeals. *See* Opening Brief of Plaintiffs-Appellants, Protect Our Parks, Inc. v. Chi. Park Dist., No. 19-2308 (7th Cir. Oct. 25, 2019); Oral Argument, *Protect Our Parks, Inc.*, No. 19-2308 (7th Cir. May 21, 2020), http://media.ca7.uscourts .gov/sound/external/mn.19-2308.19-2308_05_21_2020.mp3.

surround us all, are to be treated in a coherent and informed manner, more attention must be paid to the concerns this Article raised.

# *NYSRPA v. BRUEN* AND THE FUTURE OF THE SENSITIVE PLACES DOCTRINE: REJECTING THE AHISTORICAL GOVERNMENT SECURITY APPROACH

CARINA BENTATA GRYTING*

MARK ANTHONY FRASSETTO**

**Abstract**: On November 3, 2021, the Supreme Court heard oral arguments in *New York State Rifle & Pistol Ass'n v. Bruen*, a Second Amendment case challenging New York's concealed carry licensing system. The justices' questions focused not only on who may obtain a license to carry a firearm in public, but also where those with a license may or may not bring their weapons. These questions acknowledged that the Court's decision in *District of Columbia v. Heller* provided a carveout for firearms restrictions in "sensitive places," providing "schools and government buildings" as just two examples. In the fourteen years since *Heller*, state and federal courts have upheld firearms restrictions in a number of locations under the sensitive places doctrine. However, in anticipation of a wave of sensitive places litigation following the *Bruen* decision, several conservative scholars now seek to limit the doctrine to only those locations protected by strict government security measures, such as metal detectors and security guards. This article demonstrates that such an approach is inconsistent with our nation's history of regulating public carry and both historical and present-day case law, including *Heller*.

## INTRODUCTION

On November 3, 2021, the Supreme Court heard oral arguments in *New York State Rifle & Pistol Ass'n v. Bruen*, a Second Amendment case challeng-

© 2022, Carina Bentata Gryting & Mark Anthony Frassetto. All rights reserved.

* Constitutional Law Fellow, Everytown for Gun Safety; B.A. Washington University in St. Louis, J.D. Harvard Law School.

** Deputy Director Second Amendment History and Scholarship, Everytown for Gun Safety; B.A. Marquette University, J.D. Georgetown University Law Center.

The Authors would like to thank Professor Joseph Blocher, Professor Jake Charles, Professor Eric Ruben, Professor Saul Cornell, Janet Carter, William Taylor, and Eric Tirschwell for their helpful comments. The Authors would also like to thank the staff of the *Boston College Law Review*'s *Electronic Supplement* for their insightful comments, tireless work, and attention to detail. Any errors or omissions remain our own. The views expressed in this article are solely those of the authors and do not necessarily represent those of Everytown for Gun Safety.

ing New York's concealed carry licensing system.[1] The justices' questions focused not only on *who* may obtain a license to carry a firearm in public, but also *where* those with a license may or may not bring their weapons. For example, the justices posed several hypotheticals to counsel as to whether the state could restrict firearms on university campuses or in the New York City subway, sports stadiums, bars, or Times Square. These questions referred to what is known as the "sensitive places" doctrine, which originated in the Court's decision in *District of Columbia v. Heller*.[2] Although *Heller* involved a firearms restriction within the home, the Court provided some guidance as to firearms restrictions in public, stating that "nothing in our opinion should be taken to cast doubt on . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings."[3] Based on this passage, the lower courts have upheld firearms restrictions in locations that they have determined to be particularly sensitive. These cases have relied upon various factors in determining whether a place is sensitive, such as the presence of vulnerable people, historical prohibitions, or potential conflicts with other constitutional rights.[4] Still, in the more than a decade since *Heller*, doctrinal development of the sensitive places standard has been fairly limited.

If the Court's decision in *Bruen* strikes down New York's law and limits states' ability to restrict public carry, questions about the scope of the sensitive places doctrine would move to the fore, as a wave of Second Amendment challenges to location-based firearms restrictions are almost certain to follow. In anticipation of future litigation over sensitive places, the right-wing Independent Institute filed an amicus brief in *Bruen*, arguing that a location should only be deemed sensitive if the government provides strict security measures such as metal detectors and security guards.[5] Under this extremely high standard, this brief argued that the government must provide a level of security similar to that of airport terminals in order to designate a location as sensitive. This narrow view appeared to gain traction with Justice Alito, who posed the following question to petitioners' counsel at oral argument:

> So starting with that, could we analyze the sensitive place question
> by asking whether this is a place where the state has taken alterna-
> tive means to safeguard those who frequent that place? If it's a—if
> it's a place like a courthouse, for example, a government building,

---

[1] Transcript of Oral Argument at 32, 34, N.Y. State Rifle & Pistol Ass'n v. Bruen, No. 20-843 (U.S. Nov. 3, 2021).

[2] District of Columbia v. Heller, 554 U.S. 570, 626 (2008).

[3] *Id.*

[4] *See infra* notes 41–49 and accompanying text (exploring the post-*Heller* case law on the sensitive places doctrine).

[5] Brief for the Independent Institute as Amici Curiae Supporting Petitioners at 22, N.Y. State Rifle & Pistol Ass'n v. Bruen, No. 20-843 (U.S. July 20, 2021).

*Boston College Law Review* [Vol. 63:E. Supp.

where everybody has to go through a magnetometer and there are security officials there, that would qualify as a sensitive place. Now that doesn't provide a mechanical answer to every question, and—but it—would that be a way of analyzing—of beginning to analyze this?[6]

In a recent Volokh Conspiracy blog post, NRA-affiliated scholar Stephen Halbrook similarly advocated for a sensitive-places standard based on metal detectors and security guards.[7] Under Halbrook's proposal, only areas like "an airport terminal on the other side of TSA screening" would qualify as sensitive places.[8]

This standard is inconsistent with our nation's history of regulating public carry and both historical and present-day case law, including *Heller*.[9] Historically, "sensitive places" have never been limited to locations where the government has searched everyone entering the location. This article will show that the "metal detector and security guard" principle for identifying sensitive places is inconsistent with the original public understanding of the Second Amendment, both at its ratification and at its incorporation via the Fourteenth Amendment.

## I. THE HISTORICAL SCOPE OF THE SENSITIVE PLACES DOCTRINE

Historically, the sensitive places doctrine has gone well beyond the narrow category suggested by Justice Alito's question and advocated by Halbrook.[10]

Starting at the beginning, laws in ancient Athens, which influenced both English and Founding Era American thought, broadly prohibited weapons-carrying in populous urban areas.[11] The English Parliament took a similar approach in 1285, when it prohibited carrying weapons in the City of London at night, stating that, "none [should] be so hardy to be found going or wandering

---

[6] Transcript of Oral Argument, *supra* note 1, at 32.

[7] *See* David Kopel, *The Sensitive Places Issue in* New York Rifle, REASON.COM: THE VOLOKH CONSPIRACY (Nov. 8, 2021), https://reason.com/volokh/2021/11/08/the-sensitive-places-issue-in-new-york-rifle/ [https://perma.cc/R7DU-7A25] (discussing Stephen Halbrook's analysis of the Supreme Court's focus during oral arguments on the standard for permissible exclusion based on the sensitive place doctrine).

[8] *Id.*

[9] District of Columbia v. Heller, 554 U.S. 570, 626–27 (2008). Schools and government buildings rarely have metal detectors or security guards screening entry and requiring such to qualify for the sensitive places doctrine would remove most of these categories from inclusion. *See* Brief for the Independent Institute as Amici Curiae, *supra* note 5, at 22 (advocating to limit the sensitive places doctrine with these qualifiers).

[10] *See* Kopel, *supra* note 7.

[11] *See* 1 JOHN POTTER, THE ANTIQUITIES OF GREECE 170 (1722) (quoting the Law of Solon: "[h]e shall be fined, who is seen to walk the City-Streets with a sword by his Side, or having about him other Armour, unless in the case of exigency"); 4 WILLIAM BLACKSTONE, COMMENTARIES *148–49 (citing POTTER, *supra*).

about the [s]treets of the City, after [c]urfew tolled at St. Martins le Grand, with Sword or Buckler, or other arms for doing Mischief, or whereof evil suspicion might arise; *nor any in any Manner*, unless he be a great Man or other lawful Person of good repute, or their certain Messenger."[12]

In 1328, the Statute of Northampton forbade "go[ing] nor rid[ing] armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere, upon pain to forfeit their Armour to the King, and their bodies to Prison at the King's pleasure."[13] Although the statute was a broad prohibition on publicly carrying weapons ("in no part elsewhere"), it singled out "fairs, markets" and "in the presence of the Justices or other Ministers" as areas of special concern.[14] In 1402, a law titled "Welshmen shall not be armed" required that "no [person dwelling or residing within Wales] be armed nor bear defensible Armour to [Merchant Towns Churches nor Congregations,] in the same nor in the Highways, in Affray of the Peace or the King's Liege People, upon Pain of Imprisonment, and to make Fine and Ransom at the King's Will; except those which be lawful Liege People to our Sovereign Lord the King."[15] In 1534 Henry VIII forbade the carrying of any "hand-gun, sword, staff, dagger, halberd, morespike, spear or any other weapon, privy coat or armour defensive" by any "person or persons dwelling or residing within Wales . . . to any town, church, fair, market, or any other congregation, except it be upon the hue and outcry."[16]

Like in England and Wales, many colonies and states had broad restrictions on carrying weapons in public. For example, in the late 18th century, Virginia and North Carolina enacted prohibitions similar to the Statute of Northampton.[17] More specific sensitive-places restrictions existed at or soon after the Founding—for example, in 1776 Delaware and Maryland forbade weapons at election grounds,[18] and in 1810, the University of Georgia prohib-

---

[12] Statutes for the City of London, 13 Edw. (emphasis added).

[13] Statute of Northampton, 2 Edw. 3, c. 3 (1328) (Eng.). *See generally* Patrick J. Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review*, 60 Clev. St. L. Rev. 1 (2012) (analyzing the historical context of the Statute of Northampton).

[14] Statute of Northampton, 2 Edw. 3, c. 3.

[15] 4 Hen. 4, c. 29 (1402) (Eng.) (second alternation in original). Wales was a separate principality under the authority of the English monarch until the 1535 Act of Union.

[16] 26 Hen. 8, c. 6, § 3 (1534) (Eng.).

[17] *See* An Act Forbidding and Punishing Affrays, 1786 Va. Laws 35; François-Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina 60–61 (Newbern, Editor's Press 1792).

[18] Del. Const. of 1776, art. 28 ("To prevent any violence or force being used at the said elections, no person shall come armed to any of them . . . ."); *see* Darrell A.H. Miller, *Constitutional Conflict and Sensitive Places*, 28 Wm. & Mary Bill Rts. J. 459, 473 (2019) (citing Proceedings of the Conventions of the Province of Maryland, Held at the City of Annapolis in 1774, 1775, and 1776 (1836)). Other states enacted restrictions on weapons at election grounds in the 19th century. *See, e.g.*, 1869–70, Tenn. Pub. Acts 23 (making it unlawful for any person "attending any election" to carry a pistol or other dangerous weapon); 1870 Ga. Laws 421 (prohibiting carrying pistol

*Boston College Law Review* [Vol. 63:E. Supp.

ited students from possessing firearms on campus.[19] In 1824, the University of Virginia Board of Visitors issued the following rule: "No student shall, within the precincts of the University . . . keep or use weapons or arms of any kind, or . . . appear in school with . . . any weapon . . . ."[20] Notably, James Madison, who authored the Second Amendment, and Thomas Jefferson attended the board meeting, providing strong evidence that they did not view a prohibition of guns on campus as a violation of any right to bear arms.[21]

These restrictions expanded during the Reconstruction era—the most relevant period for determining the constitutionality of state laws[22]—when a number of states adopted prohibitions in locations such as churches, schools, and public gatherings. For example, in 1870, Texas prohibited carrying in any "church or religious assembly, any school-room or other place where persons are assembled for educational, literary, or scientific purposes, or into a ball room, social party, or other social gathering . . . or any other public assembly."[23] A year earlier, Tennessee had prohibited carrying guns at "any election . . . fair, race course, or other public assembly of the people."[24] Similarly, in 1870, Georgia prohibited guns at "a court of justice or an election ground or precinct, or any place of public worship, or any other public gathering in this State."[25] In 1877, Virginia prohibited weapons in churches or carried on Sundays.[26] And in 1883 Missouri prohibited carrying firearms at:

---

or other deadly weapon to "any election ground or precinct"); 1870 La. Acts 159(making it unlawful to carry any gun or other dangerous weapon on election day, while polls are open); 1886 Md. Laws 315 (outlawing in Calvert County to carry any gun within 300 yards of polls on election days).

[19] The Minutes of the Senatus Academicus 1799–1842, at 84, 86 (Nov. 27, 1799) (transcription available at University of Georgia Libraries), https://www.libs.uga.edu/hargrett/archives/senatus/senatus%20academicus%201799-1811.pdf [https://perma.cc/7RJR-9JYR].

[20] *See* University of Virginia Board of Visitors Minutes 6–7 (Oct. 4–5, 1824) (transcription available at Encyclopedia Virginia), https://encyclopediavirginia.org/entries/university-of-virginia-board-of-visitors-minutes-october-4-5-1824/ [https://perma.cc/5ATK-2357]; *see also* LAWS OF THE UNIVERSITY OF NORTH CAROLINA 9 (Raleigh, J. Gales & Son 1829) (ebook) ("No student shall keep a dog, or fire arms, or gunpowder. He shall not carry, keep, or own at the College, a sword, dirk, sword-cane, or any deadly weapon; nor shall he use fire arms without permission from some member of the Faculty.").

[21] Olivia Li & The Trace, *When Jefferson and Madison Banned Guns on Campus*, THE ATLANTIC (May 6, 2016), https://www.theatlantic.com/politics/archive/2016/05/when-jefferson-and-madison-banned-guns-on-campus/481461/ [https://perma.cc/89VF-9TCX].

[22] Mark Anthony Frassetto, *Judging History: How Judicial Discretion in Applying Originalist Methodology Affects the Outcome of Post-*Heller *Second Amendment Cases*, 29 WM. & MARY BILL RTS. J. 413, 421–27 (2020) (discussing how federal circuit courts have handled the issue and arguing for looking to Reconstruction when assessing the scope of incorporated rights); *see* Transcript of Oral Argument, *supra* note 1, at 8 (discussing whether to look to Founding or Reconstruction for analyzing scope of rights incorporated by the 14th Amendment).

[23] An Act Regulating the Right to Keep and Bear Arms, 1870 Tex. Gen. Laws 63.

[24] 1869–70, Tenn. Pub. Acts 23.

[25] An Act to Preserve the Peace and Harmony of the People of this State, and for Other Purposes, 1870 Ga. Laws 421; *see also* An Act to Amend Section 1274, Article 2, Chapter 24 of the Revised Statutes of Missouri, Entitled "Of Crimes and Criminal Procedure," 1883 Mo. Laws 76.

[26] 1877 Va. Acts 305.

> [A]ny church or place where people have assembled for religious
> worship, or into any school room or place where people are assem-
> bled for educational, literary or social purposes, or to any election
> precinct on any election day, or into any court room during the sit-
> ting of court, or into any other public assemblage of persons met for
> any lawful purpose other than for militia drill.[27]

Similar restrictions were enacted in Oklahoma in 1890,[28] and Arizona in
1901,[29] which, in addition to prohibitions in churches, schools, and social
gatherings, prohibited guns at any "circus, show or public exhibition" and any
place where intoxicating liquors are sold.[30]

   None of these locations match Justice Alito's proposed restrictive criteri-
on of limiting "sensitive places" to locations where "the state has taken alter-
native means to safeguard those who frequent that place."[31] Indeed, it is diffi-
cult to imagine what such places would have been, in an era when even loca-
tions such as the White House were open to the public without serious security
provisions.[32] Halbrook identifies historical prohibitions on guns at election
precincts as supportive of the metal detector and security guard approach to
sensitive places.[33] This is a questionable claim considering even today few
election precincts–or, for that matter, few schools and government buildings–
host these heightened security measures. It is also inconsistent with the histori-
cal record. For example, Delaware's 1776 constitutional prohibition on carry-

---

[27] An Act to Amend Section 1274, Article 2, Chapter 24 of the Revised Statutes of Missouri,
Entitled "Of Crimes and Criminal Procedure," 1883 Mo. Laws 76.

[28] Crimes and Punishment, § 7, 1890 Okla. Sess. Laws 496 (prohibiting guns at "any church or
religious assembly, any school room or other place where persons are assembled for public worship,
for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition
of any kind . . . or into any ball room, or to any party or social gathering, or to any election, or to any
place where intoxicating liquors are sold, or to any political convention, or to any other public assem-
bly").

[29] Crimes and Punishments, §§ 387; 391, 1901 Ariz. Sess. Laws 1252–53 (prohibiting guns at any
"church or religious assembly, any school room, or other place where persons are assembled for
amusement or for educational or scientific purposes, or into any circus, show or public exhibition of
any kind, or into a ball room, social party or social gathering, or to any election precinct, on the day or
days of any election, or to any other place where people may be assembled to minister or to perform
any other public duty, or to any other public assembly").

[30] *Id.* at 1252; *see also* Brief of the Cities of Columbus, Cincinnati, Akron, Dayton, Lima and
Toledo as Amici Curiae Supporting Appellees at 14, State v. Weber, 168 N.E.3d 468 (Ohio 2019)
(No. 2019-0544) (discussing the history of regulating guns and alcohol).

[31] Transcript of Oral Argument, *supra* note 1, at 32.

[32] Katie Zezima, *People Used to Be Able to Walk into the White House. Legally.*, WASH. POST
(Sept. 23, 2014), https://www.washingtonpost.com/news/post-politics/wp/2014/09/23/people-used-to-
be-able-to-walk-into-the-white-house-legally/ [https://perma.cc/M2UM-VHND] ("Despite being open
to the public, there was very little security at the White House until a drunk man threw rocks at Presi-
dent John Tyler . . . . Abraham Lincoln . . . stationed guards at the White House. After the Civil War,
however, security measures dropped off.").

[33] *See* Kopel, *supra* note 7.

ing arms at polling places applied not just to individuals but also the state militia, which was banned from mustering on election days or coming within a mile of polling locations on the days before and after elections.[34]

Reconstruction-era courts upheld restrictions on public carry without considering whether the specified locations had heightened security measures in place. Instead, courts focused on the fact that these locations were particularly unsuitable for carrying deadly weapons. In 1871, in *Andrews v. State*, the Tennessee Supreme Court said: "a man may well be prohibited from carrying his arms to church, or other public assemblage, as the carrying them to such places is not an appropriate use of them."[35] Similarly, in 1873, in *English v. State*, the Texas Supreme Court stated: "We confess it appears to us little short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance, into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are congregated together."[36] In upholding the state's 1870 law regulating carrying in populated places, the Georgia Supreme Court stated: "The practice of carrying arms at courts, elections and places of worship, etc., is a thing so improper in itself, so shocking to all sense of propriety, so wholly useless and full of evil, that it would be strange if the framers of the constitution have used words broad enough to give it a constitutional guarantee."[37]

Furthermore, in the 19th century most states had strict laws regulating the carrying of weapons generally, not just in sensitive places. Many northern states broadly prohibited public carry absent a specific threat to a person's safety.[38] Most other states broadly prohibited the carrying of concealed firearms, which effectively functioned as a prohibition on all forms of carry because carrying arms openly was socially unacceptable.[39] Together, these laws would have prohibited the carrying of firearms in a broad and inclusive range

[34] DEL. CONST of 1776, art. 28; *see also, e.g.*, An Act to Amend the Charter of the City of Knoxville, Tenn., 1911 Tenn. Priv. Acts 1431 ("[T]hat no officer of Election or Commissioner of Election shall be in, at, or near any ballot box or voting precinct during any election or the canvassing of the returns armed with pistol, gun, or other deadly weapon . . . .").

[35] 50 Tenn. (3 Heisk.) 165, 182 (1871).

[36] 35 Tex. 473, 478–79 (1873).

[37] Hill v. State, 53 Ga. 472, 475 (1874).

[38] *See* Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J.F. 121, 125–26 (2015), https://www.yalelawjournal.org/pdf/Ruben-Cornell_PDF_jiipxsss.pdf [https://perma.cc/2V5Z-CVTT] (explaining the Supreme Court's analysis of nineteenth century case law).

[39] Mark Anthony Frassetto, *The Myth of Open Carry*, 55 DAVIS L. REV. (forthcoming 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4008510 [https://perma.cc/G3PR-968U].

of sensitive places as they generally prohibited the carrying of firearms everywhere.[40]

None of these historical laws or cases support limiting the sensitive places doctrine solely to locations secured by the government. The laws covered effectively all places where people gathered with catch-all phrases like "other social gathering," "any other public assembly," and "any other public gathering," as well as locations critical to democracy, such as courts and polling places And the courts upholding those laws recognized that it was the nature of the location–either its solemn function as a court, election-ground, or place of worship, or the fact of being a place where "ladies and gentlemen are congregated together"—that made those locations inappropriate for weapons.

## II. POST-*HELLER* CASE LAW ON SENSITIVE PLACES

The approach raised by Justice Alito also fails to comport with the post-*Heller* case law on sensitive places in state and federal courts. In fact, the United States Court of Appeals for the D.C. Circuit explicitly rejected the metal detector and security guard approach in a recent case, *United States v. Class.* In determining that a parking lot outside the Capitol building was a sensitive place, the court rejected the defendant's attempt to distinguish the unprotected parking lot from other government property that is protected by security or not accessible to the public.[41] As the court explained, this approach would be contrary to *Heller* itself:

> For this inquiry, we do not look to the "level of threat" posed in a sensitive place. Many "schools" and "government buildings"—the paradigmatic "sensitive places" identified in *Heller I*—are open to the public, without any form of special security or screening. In an unsecured government building like a post office or school, the risk of crime may be no different than in any other publicly accessible building, yet the *Heller I* opinion leaves intact bans on firearm possession in those places.[42]

---

[40] *See* Joseph Blocher, *Firearms Localism*, 123 YALE L.J. 82, 100 (2013) (discussing how permit regulations could be very restrictive on access to gun ownership in certain locations). States were not the only entities regulating the carrying of firearms in public; many municipalities also either prohibited or substantially regulated public carry. *See id.* (exploring common types of municipal regulation of weaponry).

[41] United States v. Class, 930 F.3d 460, 465 (D.C. Cir. 2019).

[42] *Id.*

Instead of designating locations as "sensitive" based on the security measures in place, the court explained that locations are deemed sensitive based on "the people found there" or the "activities that take place there."[43]

In the years since the Supreme Court decided *Heller*, federal and state courts have upheld prohibitions in not only government buildings and schools, but also churches,[44] university buildings and campus events,[45] national parks,[46] United States Postal Service parking lots,[47] and county fairgrounds,[48] among others. In upholding firearms restrictions in these locations, courts did not ask only whether the government provided specific security measures. Instead, they examined a variety of factors that could make a location particularly unsuitable for public carry, such as the likelihood that children are present, the use of a location for large public gatherings, whether the property is privately owned or owned by the government, and whether it is a location where people gather to engage in expressive or other constitutionally-protected conduct.[49]

CONCLUSION

A single, all-encompassing sensitive places theory—one that covers such disparate places as courthouses, ballrooms, schools, bars, racetracks, protests, and election precincts—is challenging to articulate. The concerns that would support prohibiting guns in places where alcohol is consumed are very different from those justifying prohibiting guns at public lectures or election precincts. The number of potential targets, the nature of the activity, and the increased risk of conflict all seem to be relevant in the historical determination that an area constitutes a sensitive place.

That said, the history and case law clearly show that a sensitive places doctrine based solely on the presence of enhanced governmental security measures—such as metal detectors and security guards–is inconsistent with both the historical understanding of the Second Amendment and the approach taken by modern courts.

---

[43] *Id.* (quoting GeorgiaCarry.Org, Inc. v. Georgia, 764 F. Supp. 2d 1306, 1319 (M.D. Ga. 2011), *aff'd*, 687 F.3d 1244 (11th Cir. 2012)).

[44] *GeorgiaCarry.Org, Inc*, 687 F.3d at 1266 (permitting restriction on carrying firearms in a private place of warship).

[45] DiGiacinto v. Rector & Visitors of George Mason Univ., 704 S.E.2d 365, 368 (Va. 2011).

[46] United States v. Masciandaro, 638 F.3d 458, 459–60 (4th Cir. 2011).

[47] Bonidy v. U.S. Postal Serv., 790 F.3d 1121, 1123 (10th Cir. 2015); *see also* United States v. Dorosan, 350 F. App'x 874, 875–76 (5th Cir. 2009) (affirming a conviction for bringing a handgun onto United States Postal Service property).

[48] Nordyke v. King, 563 F.3d 439, 460 (9th Cir. 2009), *vacated*, 611 F.3d 1015 (9th Cir. 2010).

[49] *See* Miller, *supra* note 18, at 465 (providing further discussion on the application of the sensitive places doctrine in locations involving other constitutional rights—such as the rights to free speech, free exercise of religion, and the right to vote).

The approach to sensitive places Justice Alito raised is out of step with history. An originalist approach to the Second Amendment would reject limiting sensitive places to locations protected by government security. Instead, the approach Judge Griffith advanced in *Class*—which considers "the people found" or the "activities that take place" at a location when determining its sensitive status—is much more clearly tied to historical tradition and the post-*Heller* case law.[50]

**Preferred citation:** Carina Bentata Gryting & Mark Anthony Frassetto, NYSRPA v. Bruen *and the Future of the Sensitive Places Doctrine: Rejecting the Ahistorical Government Security Approach,* 63 B.C. L. REV. E. SUPP. I.-60 (2022), http://lawdigitalcommons.bc.edu/bclr/vol63/iss9/12/.

The purpose of the *Boston College Law Review*'s *Electronic Supplement* is to provide a platform to publish shorter and topical pieces—without the constraints usually imposed on content published in print journals—and, thereby, to give authors the opportunity to connect with a wider audience in a more timely manner.

---

[50] United States v. Class, 930 F.3d 460, 465 (D.C. Cir. 2019) (quoting GeorgiaCarry.Org, Inc. v. Georgia, 764 F. Supp. 2d 1306, 1319 (M.D. Ga. 2011), *aff'd*, 687 F.3d 1244 (11th Cir. 2012)).

A CONSIDERATION OF

# THE JUSTIFYING VALUE

OF A

# PUBLIC PARK.

---

PREPARED AT THE REQUEST OF THE AMERICAN SOCIAL SCIENCE
ASSOCIATION, AND READ AT ITS MEETING IN SARATOGA, 1880.

---

By FREDERICK LAW OLMSTED.

---

BOSTON:
TOLMAN & WHITE, PRINTERS, 383 WASHINGTON STREET.
1881.

Generated on 2023-03-28 20:49 GMT  /  https://hdl.handle.net/2027/hvd.32044027407667
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
HARVARD UNIVERSITY

7

reflections of translucent and opaque foliage over rippling water, and full of poetic mystery, — of beauty such as no painter can render. I have seen such a shore so changed that the water lay dead upon a wall of raw stone, capped by an inclined plane of turf; all possible architectural beauty lost through meaningless meanderings; all value which might have been in simple breadth of turf, destroyed by pinning it down with prim pegs of living spruce and arbor vitæ. And this result I have heard praised as park-like.

Therefore, I had begun my paper (which I now reach) with some observations on this point, recalling the fact that while the few public properties which had the name of park with us, twenty-five years ago, did not differ from others known as greens, commons, or yards; yet the word had a meaning by no other so well given. Scores of times I have heard plain country people, Northern and Southern, Eastern and Western, describe something they had seen as "park-like," or "pretty as a park," or as "a perfect natural park." It might be Blue Ridge table-lands, oak openings further west, mesquit-grass prairies beyond the Trinity, or passages of the Genessee Flats or Connecticut Bottoms. What did the word mean? Nothing in the least practical. It reported nothing of the soil, of the water-power, of quarries or quartz lodes. It told of a certain influence of *conditions solely of scenery*, — soothing and reposeful influences. If we trace back this use of the word, it will carry us to the immigrations of the early part of the seventeenth century, before the replanting of English parks *under* the urgings of Evelyn, the Royal Society and the Admiralty, when there were generally broader spaces of greensward within them, and yet more of spacious seclusion from all without than even at present.

I beg that this significance of the word may be kept in mind a little while.

Twenty-five years ago we had no parks, park-like or otherwise, which might not better have been called something else. Since then a class of works so *called has* been undertaken which, to begin with, are at least spacious, and which hold possibilities of all park-like qualities. Upon twenty of these works in progress, there has been thus far expended upwards of forty millions of dollars, — well nigh if not fully fifty millions, — and this figure *does not* tell the whole story of cost, as I will later show. Considering that in none of the towns making this outlay the necessity of a park was a little while ago at all felt, a remarkable progress of public demand is thus

Generated on 2023-03-28 20:51 GMT  /  https://hdl.handle.net/2027/hvd.32044027407667
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
HARVARD UNIVERSITY

8

manifested.   It will be found the more remarkable when it is considered that, in all Europe, but one notable public park had been laid out in the first half of this century ; that this was formed on ground previously a royal hunting park, not by the government of the town, not by taxing the town, and not with an eye single to the town's advantage.   But to see the full significance of the fact it is further necessary to consider that within the same period, since 1850, as many parks have been laid out for the people of large towns in Europe as with us, and that the area which has been for the first time legally and definitely appropriated to that end is larger there than here.   What has been secured for London alone is of greater extent than all the town parks of America together.*   At the same time there has been a radical change in the management of many of the old parks.

Allow me to use the term *park movement*, with reference to what has thus recently occurred on both continents.   With us, it dates from Mr. Downing's writings on the subject in 1849.   But these could not have obtained the public attention they did, nor have proved the seed of so large a harvest, but for their timeliness, and a condition of expectancy in the soil upon which they fell.

Our first act of park legislation was in 1851.   In 1853, the first Commissioners for the Central Park entered upon their duties.   It was only in the latter year that some ill-considered steps were taken toward supplying Paris with its first public park.   It was not till 1855 that Mr. Alphand came from Bordeaux, and gave the work its final form and impetus.   A little earlier, three small park undertakings had been entered upon in England, the leading one under the direction of Paxton, afterwards Sir Joseph.   I know of none in Germany, Italy or Belgium ; but a few years afterward, I saw in each of these countries evidence that, about the same time, planting and gardening for the public benefit had taken new life.

Parks have plainly not come as the direct result of any of the great inventions or discoveries of the century.   They are not, with us, simply an improvement on what we had before, growing out of a general advance of the arts applicable to them.   It is not evident that the movement was taken up in any country from any other, however it may have been influenced or accelerated.   It did not run like a fashion.   It would seem rather to have been a common, spontaneous movement of that sort which we conveniently refer to the " Genius of Civilization."

\*Chiefly in recent action in respect to Epping Forest.

Generated on 2023-03-28 20:51 GMT  /  https://hdl.handle.net/2027/hvd.32044027407667
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by    Original from HARVARD UNIVERSITY


Property as Government in Eighteenth-Century America: The Case of New York City

Author(s): Hendrik Hartog

Source: *The Journal of Legal Studies* , Jun., 1981, Vol. 10, No. 2 (Jun., 1981), pp. 305–348

Published by: The University of Chicago Press for The University of Chicago Law School

Stable URL: https://www.jstor.org/stable/723982

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at https://about.jstor.org/terms



*The University of Chicago Law School* and *The University of Chicago Press* are collaborating with JSTOR to digitize, preserve and extend access to *The Journal of Legal Studies*

# PROPERTY AS GOVERNMENT IN EIGHTEENTH-CENTURY AMERICA: THE CASE OF NEW YORK CITY

*HENDRIK HARTOG\**

## INTRODUCTION

FOR 150 years it has been the central premise of local government law that legitimate governmental action is always distinctively public in character. The most eminent modern student of local government law has written that: "We know perfectly well, granting that there are intermediate hard cases, how to distinguish governmental from nongovernmental *powers* and *forms of organization:* governments are distinguished by their acknowledged, lawful authority—not dependent on property ownership—to coerce a territorially defined and imperfectly voluntary membership by acts of regulation, taxation, and condemnation."[1] The most eminent local government lawyer of an earlier generation declared that the distinction between public and private spheres could not be "too much emphasized"[2] and founded his conception of a properly public institution on its total dependence on a legislative delegation of public authority.[3] The assumption that local governments act as governments only to the extent they decisively separate themselves from the world of the marketplace and demonstrate their independence from private sources of power and wealth lies deep within our collective perceptions of the political and legal nature of communities in America.[4] We all "know" that private wealth corrupts public authority and that the

* Assistant Professor of Law, Indiana University School of Law, Bloomington. I am indebted to Michael Grossberg, Morton Keller, William Nelson, and Susan Willey for reading and commenting on earlier versions of this paper.

[1] Frank I. Michelman, States' Rights and States' Roles: Permutations of "Sovereignty" in National League of Cities v. Usery, 86 Yale L. J. 1165, 1167 (1977) (fn omitted).

[2] John F. Dillon, Treatise on the Law of Municipal Corporations 70 (1872).

[3] *Id.* at 70-76 and *passim.*

[4] See Frank I. Michelman & Terence Sandalow, Materials on Government in Urban Areas (1970), particularly at 155-97.

[*The Journal of Legal Studies*, Volume X, June 1981]
© 1981 by The University of Chicago. 0047-2530/81/1002-0006$01.50

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

boundaries of local authority are properly defined by the public power of the state.[5]

Indeed, the notion of an antinomic relationship between public and private, the belief in a sharp division of our conceptual universe into mutually exclusive spheres, has often appeared as a natural and inevitable fact of legal life. In the case of New York City, this "fact" had been established by 1826. That year Judge Savage of the New York Supreme Court ruled that the capacity of the Corporation of the City of New York to "purchase and hold, sell and convey real estate, in the same manner as individuals" was absolutely unrelated to its activities as the government of the city.[6] Governance was defined by the Corporation's powers and duties as an agent of the state legislature; as a public institution, the Corporation had no right to make any contract or agreement that would "control or embarrass" its legislative responsibilities. Public welfare—the goal of governmental action—could only be secured through delegations of the public power of the sovereign state of New York.

By the second quarter of the nineteenth century such attitudes had already become a kind of conventional wisdom. Even today it remains difficult to formulate an alternative perception of the appropriate relationship between governmental action and political sovereignty.[7] Yet, half a century before the *Brick Presbyterian Church* case of 1826, an assertion of the distinctively public and unpropertied character of New York City's government would have been incomprehensible to those who ran that government. In prerevolutionary New York City, governmental action was based not on power derived from the provincial legislature, but on the property rights granted to the city government by its royal charter. Property authorized and legitimated the actions of the city; property, in fact, permitted New York City's government to act in ways that were beyond the reach of other, unchartered or unpropertied local governments. It was the estate granted in its charters that shaped New York's relatively autonomous relationship with external political authority. Likewise, it was the active use of "private" wealth that allowed eighteenth-century city government to satisfy the wants of a growing commercial city. How property became a tool of city government and how the propertied actions of New York City could be justified within the political culture of eighteenth-century America are the subjects of this essay.

---

[5] People v. Morris, 13 Wend. 325 (N.Y. Sup. Ct. 1835); Hunter v. City of Pittsburgh, 207 U.S. 161 (1907); Hendrik Hartog, Because All the World Was Not New York City: Governance, Property Rights, and the State in the Changing Definition of a Corporation, 1730-1860, 28 Buffalo L. Rev. 91, 92-96 (1979).

[6] Brick Presbyterian Church v. Mayor of New York, 5 Cow. 538 (N.Y. 1826).

[7] But see Gerald Frug, The City as a Legal Concept, 93 Harv. L. Rev. 1057 (1980).

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

Case 3:23-cv-00056-JBA   Document 23-20   Filed 03/30/23   Page 267 of 316

## I.  Reading the Charter

### A.  The Properties of the Charter

Let us begin with the fact that legally New York City was a corporation.[8] It might be supposed that, as a corporation, New York City has always been the same. In 1731 as in 1981 New York City was ''an artificial person or legal entity created by or under the authority of the laws of a state or nation . . . a body politic . . . regarded as having a personality and existence distinct from that of its several members.''[9] Yet the constancy of that definition should not mislead us. As a legal entity, New York City underwent radical changes. The law-dictionary definition only hides the depth of the conceptual transformation. In 1826 Judge Savage regarded New York City primarily as a member of a general category of agencies of public welfare; an eighteenth-century judge, by contrast, could only have looked to the chartered foundations of a propertied corporation. When our imaginary eighteenth-century judge searched for authority to justify action by the institution, he would have had to turn to the charters which created the city as a corporation. There was no general category of public institutions. There were only the particular powers granted to the singular institution of the city of New York by the various charters culminating in the Montgomerie Charter of 1730.

To modern eyes the Montgomerie Charter is an awkward, prolix, and repetitious document. The language is archaic, the structure mystifying. It begins by reciting and incorporating the city's previous English charters of 1686 (the Dongan Charter) and 1708 (the Cornbury ferry grant). It finishes by announcing that the city will be free from any liability for the use or misuse of powers or properties *not* granted by the charters.[10] Throughout, it contains a seemingly disorganized series of grants from the crown to the Corporation.

The need for a new charter arose because of the ''diverse Questions Doubts Opinions Ambiguities Controversies and Debates'' concerning the validity of the previous two charters, neither of which had been under royal seal.[11] The purpose of the Montgomerie Charter therefore was both

---

[8]  Throughout I shall indiscriminately use ''the Corporation,'' ''the city,'' or ''New York City,'' as referents for ''The Mayor, Aldermen and Commonalty of the City of New York.'' Note that I am thereby equating the city with the Corporation. I demonstrate that this is a plausible equation in Part Two of this essay.

[9]  Black's Law Dictionary 409 (rev'd 4th ed. 1968).

[10]  For more on the significance of this release from liability see text at notes 44 & 45 *infra.*

[11]  Colonial Laws of New York from the Year 1664 to the Revolution 575, 596-97 (J. B. Lyon edition 1894) [hereinafter cited as Colonial Laws]. [Copies of the Montgomerie charter

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

to confirm what had been previously granted or acquired by the city and to provide new powers and rights. ''Considering that the Strength and Encrease of our good Subjects in that our frontier province of New York does in a greater measure depend upon the wellfare and property of our said City wherein the Trade and Navigation thereof are chiefly and principally carried on,'' the charter was drafted ''to give Encouragement to the said City Inhabitants and Citizens and to remove utterly abolish and wholly take away all and all manner of Causes Occasions and matters whereupon Such Questions Doubts Opinions Ambiguities Controversies or Debates . . . may or can arise.''[12]

What it granted can be divided into three categories. There were first the incidents of corporate existence itself. The Mayor, Alderman, and Commonalty were made ''by force of these presents'' one body corporate and politic, with perpetual succession, the capacity to get, receive, and possess all forms of property, to give, grant, let, or assign the same, and to sue and be sued in courts of law ''in as full and ample manner and form as any of our other Liege Subjects of our Said Province.'' The charter made the City a singular individual, a person like other persons capable of holding property both within and without the city limits[13] and a person with a tangible and specific shape. New York City was given a head in the creation of a structure of elective and appointive officers; it received a body in the identification of the commonalty—the freeman and freeholders of the city—with the interests of the Corporation. No free citizen of the city could be compelled to serve on any jury, fill any office, or discharge any public duty to any local government outside of the city. His only local responsibilities were to the Corporation. Only the Corporation could claim his allegiance.[14]

Secondly, and to city leaders most importantly, the charters confirmed and extended the corporate estate of the city. External threats to the title of the city had provided the impetus to petitions for a new charter. In 1708 it was the attempt by Cornelius Sebring of Brooklyn to establish a competing ferry across the East River in derogation of alleged rights of the city; in 1730 it was the petition of Cornelius Van Horne to the Governor for a grant of a waterlot out beyond low water mark to build dock facilities.[15] In both of these cases city leaders gained the secure title they had sought.

---

are available in James Kent, The Charter of the City of New York . . . (1836, 1851); Colonial Charters, Patents, and Grants to the Communities Comprising the City of New York (Jerrold Seymann ed. 1939); and in many other editions published in the eighteenth and nineteenth centuries, as well as in the colonial laws. References throughout will be to Colonial Laws.]

[12] Id.

[13] Id. at 581, 587, 597.

[14] Id. at 602-11, 615-16.

[15] 2 Minutes of the Common Council of the City of New York 1675-1776, at 341-45 (8 vols.

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

The Montgomerie Charter gave them more than that, however. All the "waste and common land" of Manhattan Island, which at the time included most of the island north of what is now Canal Street, all the land under water surrounding the island as far as low water mark plus an extra 400 feet beyond low water mark around the southern end of the island, a ferry monopoly, all of the waterfront on the Long Island shore opposite the city were granted in fee simple absolute to the Corporation of the city of New York.

In addition, the Montgomerie Charter granted to the city what might be regarded as a hodgepodge of public governmental powers. A common council was given the power to pass such ordinances or by-laws "which to them or the greater part of them Shall Seem to be good usefull or necessary for the good rule and government of the body corporate."[16] Specifically, the Charter authorized that body to pass regulations "for the further publick good common proffit trade and better government and rule of the Said City and for the better preserving governing disposing letting and Setting of the Land Tenements possessions and hereditaments goods and Chattels" of the Corporation.[17] The common council could investigate and pass on the election of all officers of the Corporation (except for the mayor who was appointed by the governor).[18] It also had authority to lay out and open streets, to run and regulate the markets of the city, to regulate and license individuals in a variety of trades, and to appoint inspectors for various goods.[19] The mayor of the city was made the clerk of the market and the water bailiff for the harbor, in both cases with the authority to collect all fees and rents without any need to account to the agents of the crown.[20] The charter granted to the Corporation general authority to erect and fill houses of correction (Bridewells), almshouses, and jails. It also created two courts, both manned by officers of the Corporation sitting as justices of the peace, one a court of general sessions of the peace to hear criminal offenses, the other a court of common pleas or Mayor's Court for civil actions. Each court was created with the authority to act "as fully and freely and intirely and in as ample manner and form as Justices of the peace of us and our Heirs and Successors anywhere within that part of our Kingdom of great Britain called England."[21]

_____

1905) [hereinafter cited as Common Council] (ferry); 3 Common Council 221, 271-72, 278 (petition of Cornelius Van Horne).

[16] 2 Colonial Laws 610.
[17] *Id.* at 611.
[18] *Id.* at 612.
[19] *Id.* at 613-17.
[20] *Id.* at 618-19.
[21] *Id.* at 620-23.

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

## B.   Property and the Creation of Autonomy

What sort of an entity did the charter ''create''? The corporation created by the charter resembled no modern governmental entity. More to the point, it resembled few governmental entities in eighteenth-century North America. In the province of New York only Albany also governed by virtue of a charter. No more than seventeen communities in all of colonial America ever received corporate charters. Indeed, the Dongan Charter of 1686 had been granted to give concrete affirmation by central authority of the special status of New York City. According to his instructions from the Duke of York, Governor Dongan was to draft a charter which would grant the city, ''immunities and privileges beyond what other parts of my territory doe enjoy.''[22]

Even as a corporation among other corporations, New York City was a singular institution. Like many historical statements, this seems paradoxical until one realizes that it is actually tautological. For in the eighteenth century what else could a corporation be but a singular institution? Corporations were chartered with particular rights, properties, privileges, and immunities to serve particular purposes. There was no general categorization of different corporate entities. The often noted confusion of Blackstone's discussion of corporations was an accurate reflection of the corporate landscape of eighteenth-century England. To Blackstone, ''lay corporations'' included the king, towns and cities, manufacturing and commercial concerns like the ''trading companies of London,'' churchwardens, the college of physicians and company of surgeons in London, the Royal Society, the society of antiquaries, Oxford, and Cambridge.[23] Each of these, as well as a great variety of others, was defined not by its membership in a general category, but by its particular property rights and privileges, by the specific terms of its charter.

So, New York was not a member of a general category of municipal corporations sharing its status with Albany and Philadelphia.[24] It was a particular institution defined by what it had been granted in its charter. That New York City received ''all the waste and common land of Manhattan Island,'' while Albany had been granted the monopoly of the fur trade and the right to buy land from the Indians, served less to join them in a common category of propertied corporate communities than to distinguish them by the specific natures of their respective grants.[25]

---

[22] Marcus Benjamin, Thomas Dongan and the Granting of the New York Charter, 1682-86, in Memorial History of the City of New York 411 (James Grant Wilson ed. 1892).

[23] 1 William Blackstone, Commentaries, 459 (facsimile of 1st ed., Univ. of Chicago 1979).

[24] See Judith M. Diamondstone, Philadelphia's Municipal Corporation 1701-1776, 90 Penn. Mag. of Hist. and Bio. 183-201 (1966).

[25] Compare the Dongan Charter to Albany, 1 Colonial Laws 195-216, with the Dongan

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

Our concern thus should be less with corporate nature in the abstract than with the function of property in the creation of a corporate personality. Just as we say that an object is described by its properties, so in the eighteenth century a person—whether an institution or a human being—was described by his or her or its property.[26] It was property, not the political act of incorporation, which gave New York City and other boroughs their political character.[27]

In the seventeenth and eighteenth centuries, property, then, was a guarantee of independence. Without it there was no protection from "the political dependence upon others which constitutes corruption."[28] The autonomy that property made possible was not simply a form of resistance to interference. It was closely tied to the very possibility of an individualized personality, to a classical notion of citizenship. Property made it possible for a person to shape an identity rather than to be shaped by external forces.

This notion contained an implicit tension. On the one hand, property was seen as control and as a way to resist change imposed by external authority. But property also implied change and instrumental action, the shaping of an individual future. Yet change in and of itself was no virtue. It was closely linked with instability and corruption and the disorder of the English Civil Wars. All of the negative attributes of change were closely identified with the crown and with central authority. The problem for local governments, as for all persons who wished to retain their autonomy, was to lay a basis for freedom from centralized control, to protect themselves from externally imposed "innovation."[29]

Not all forms of property served equally well to guarantee the autonomy of the individual. Real property, by its permanence and its creation of a spatial analogue for personal autonomy, had a preferred posi-

---

Charter to New York City incorporated into the Montgomerie Charter, 2 Colonial Laws, 575-90.

[26] Indeed, it was their landholdings which had first driven medieval towns to seek charters from the crown in the fourteenth century. See Colin Platt, The English Medieval Town 129, 142 (1976).

[27] Indeed, Thomas Madox had taken great pains in *Firma Burgi* to demonstrate that incorporation could not define or determine the relationships between boroughs and the crown. There were important advantages held by incorporated towns over unincorporated communities, but those advantages related to the internal governance and commerce of cities, not to their partial autonomy within the eighteenth-century polity. Local autonomy, insofar as it existed, was a reflection of the property held by boroughs. Thomas Madox, Firma Burgi 37 ns. (1726).

[28] J. G. A. Pocock, Politics, Language, and Time 92 (1973).

[29] Consider the words of Recorder Treby, defending the City of London against the *quo warranto* action by the Crown in 1682:

". . . all innovations (as this must certainly be a very great one) are dangerous."
8 Howell's State Trials 1039, 1143.

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

tion.[30] But all types of property that were not transitory or easily aliena-ble, that were in some measure permanently identifiable with the identity of an individual might protect autonomy. When the Dongan Charter of 1686 spoke of New York City as ''an Antient City'' that had ''antiently been a body Politick and Corporate'' and when it confirmed all of the ''Liberties privileges ffranchises rights Royalties ffree Customs Jurisdic-tions and Immunities which they . . . antiently had held,''[31] the effect was to assert the Corporation's preexisting claim to properties for which there was no formal grant or charter, to assert title by prescription. But pre-scriptive title was not simply an archaic alternative to adverse possession. A prescriptive right—an anciently held right—was a virtuous, a politi-cally significant right. It was a form of property that could be interposed against change and corruption. It was property that articulated the per-sonality of the holder.[32]

The English history of New York City prior to the granting of the Montgomerie Charter in 1730 was marked by a continuing tension be-tween the desires of the members of the Corporation for new and greater grants from provincial and royal authorities and their inclination to assert forms of preexisting or prescriptive title. Consider two episodes in the history of New York City's claim on the ferry franchise. In September 1683, prior to the Dongan Charter, the Mayor and Aldermen submitted to Governor Dongan one of a number of petitions in which they asked for confirmation of a variety of ''privileges'' of the Corporation, including the franchise in ferries to Long Island. The governor responded with some exasperation at the unending stream of demands made on him by the Corporation (''that he much wondered [that] having lately granted almost every particular of a large and considerable petition Lately preferred by [the] preceeding Mayor [and] aldermen he should so suddenly Receive another petition ffrom [the] present Magistrates''), and he denied many of the city's requests. In particular he restricted the city's rights over ferries ''in any other place but what is already,'' seemingly a denial of the city's right to a franchise—a monopoly—in the ferry to Long Island. A com-mittee was immediately appointed by the common council to entreat the

[30] Pocock, *supra* note 28, at 91; See also the wish-list of New York City in the petition for a new charter in which real property grants—the extension of the bands and limits of the city to 400 feet beyond low water mark, the ferry franchise, and all the docks, ships, and wharves with cranage and wharfage—are given priority over all other things to be desired from the Crown. 4 Common Council, *supra* note 15, at 6-7 (1730).

[31] 2 Colonial Laws 575, 577.

[32] On the political significance of customary and prescriptive forms of tenure see E. P. Thompson, The Grid of Inheritance; in Family and Inheritance 328-60 (Jack Goody, Joan Thirsk, & E. P. Thompson eds. 1976). For the later history of title by prescription, see Morton Horwitz, The Transformation of American Law 43-47 (1977).

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

governor to remove such restrictions. In March of the following year the restrictions imposed by the governor's letter were removed. They were, wrote Dongan, intended merely as "directions not as Tenure."[33] Tenure—the property right in the ferry franchise—was held by the Corporation as a preexisting right, beyond the reach of central authority.

In January 1708 Cornelius Sebring of Kings County (Brooklyn) petitioned then Governor Cornbury to be granted the right to run a ferry from his farm on Long Island to the city in competition with the Corporation. The petition was underwritten by forty individuals who believed "that such a ferry would be of a considerable advantage to the City & County if the Prises for Transportacon be not excessive," and the challenge was taken very seriously by the Corporation which immediately remonstrated to the governor. "[T]he inhabitants of the city and corporation," have "peaceably and quietly Possess'd and Enjoy'd" the various rights and properties granted to them by both the English and the Dutch for over seventy years, "to the great increase of her Majestys Revenue and the Sencible Growth and Advancement of her Majestys said City and Province." Among those various properties, the ferry between the city and Long Island had a preeminent place. The Corporation had spent much in erecting several public buildings that rendered service "commodious." No one had ever complained about the service. The profits had always been applied to the government of the city and were "the only considerable Income left to support the public buildings Bridges Goals Landing places fire and Candle for their Watches, Sallaryes of their officers Bellmen &c, and to defray the other publick and necessary Charges of the Said City." But, the competing ferry proposed by Sebring "for his own private Lucre and gain" would "make Considerable Improvements to Ruine and destroy the present ferry the Chief Income and Support of this Corporation." Therefore, because "you [Cornbury] will Ever prefer the publick welfare of so Loyall and Considerable a People as this Corporation," the petition of Sebring should be rejected.[34]

The argument made by the Corporation—successfully one might add—was that its rights in the ferry were not simply those of a private owner, but rather of a piece with its existence as a flourishing and useful governmental institution. Governance and ownership were intertwined in the conception of the ferry franchise. The city had been shaped by its seventy years of possession of an exclusive franchise, and the "improvements" that might result from competition would destroy this element of its personality.

[33] 1 Common Council 111, 121, 127.

[34] 3 Edmond B. O'Callaghan, Documentary History of the State of New York 25-26 (1849); 2 Common Council 341-44.

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

The common council proceeded to petition Cornbury for an enlargement and an absolute confirmation of the grant to the Corporation. By securing both "all the Vacant and unappropriated Ground on Nassaw Island [Long Island] from High water to Low water marke fronting unto this City" and an exclusive franchise in the ferry, the city hoped to prevent competition from future Cornelius Sebrings and "to hinder and prevent that priviledge and Liberty which divers persons now take of Transporting themselves and goods to and from the Island of Nassaw over the Said River without Coming to or Landing at the usual and accustomed place where the said ferry Boats are kept and Appointed to the great loss and damage of the petitioners."[35]

The result was the Cornbury Charter, which granted the city all the real property it had requested (the exclusive franchise and the shoreline of Long Island), but which refused to forbid residents from transporting themselves across the river. The ferry, began the Cornbury charter, was held by the city under "diverse antiant Charters and grants by diverse former Governours and Commanders in chief of our said Province." But the profits thereof had declined because of the inability of the city to control and exclude competition.[36] Thus the enlargement of the grant by the 1708 charter only made effectual and secure the preexisting ancient claim. But the right of residents of Long Island to transport themselves across the harbour was itself an ancient preexisting right, a prescriptive easement in the property of the corporation. It was, one might say, formative of the personality and the autonomy of the inhabitants of Long Island and, therefore, as inviolate as the title of the Corporation.

The rights granted in the charters of the city of New York did not belong to some archetypal archaic world of customary tenure and hazy group personality. To the contrary, those rights need to be located in an age of great legal change and conflict. Prescriptive, customary forms of tenure were under constant attack throughout the eighteenth century. As E. P. Thompson has written, "Small victories . . . in defence of customary practice, were won here and there. But the campaign itself was always lost."[37] The grants made in the charters to the Corporation of the city of New York derived their authority less from the references to "antient" practices than from the fact that those charters transformed preexisting claims into rights held by the city in fee simple absolute, the absolute property of the Corporation.[38]

[35] *Id.*

[36] 2 Colonial Laws, 591.

[37] Thompson, *supra* note 32, at 348.

[38] For example, the waste and vacant land of Manhattan Island, first granted to the city in the Dongan Charter of 1686, became the "commons" of the city. But the grant of that vast

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

The ability of property to determine the autonomy of a corporation rested, moreover, not on some timeless ''essence'' of corporateness; rather, it was fixed by the peculiar history of borough charters, franchises, and privileges in the last twenty years of the seventeenth century. In 1680, Charles II began a campaign to change the face of Parliament by forcing the boroughs to return less whiggish representatives. The strategy adopted was to threaten an action *quo warranto* to compel the boroughs to come to court to defend themselves against charges of misuser of their franchises if they would not agree to terms with the crown. The lynchpin of this strategy, at least according to later ''whig'' historians, was the famous *quo warranto* action that was actually brought against the city of London, a seat of opposition sentiment. London would be compelled to return its charter to the crown, to give up all its chartered properties through the action; the case would ''reduce the City of London to the status of a small village, . . . place its government entirely in its [the Crown's] own hands and . . . strip it of all rights and privileges.'' [39]

In the short run, the strategy worked. Judgment was given for the crown (although the city never actually gave up its charter), and most other boroughs quickly capitulated and returned their charters to the crown. By early 1688, however, a desperate James II was forced to issue ''A Proclamation for restoring Corporations to their Ancient Charters, Liberties, Rights and Franchises.'' [40] And after the Glorious Revolution the arguments of Recorder Treby and Pollexfen for the London Corporation became enshrined as constitutional gospel.

The year 1688 ''sanctified'' the privileges of English boroughs by making them into unquestionable ''vested rights.'' [41] In England this meant that borough officers might become increasingly corrupt in their use of corporate property and separate corporate rights in the wealth of the

---

''commons,'' extending over the greater portion of Manhattan Island, gave no use-rights in that land to the inhabitants of the city. The commons was considered part of the estate of the Corporation, as a corporation. Unlike some contemporary boroughs in England, freemen held no ''right of common''—no right to pasture their animals, gather firewood, and so forth—as a privilege of their freemanship. See the examples collected by Frederick W. Maitland in Township and Borough 197 (1899). The common council, acting for the Corporation, managed its estate to the exclusion of any ''common'' rights; to the Corporation the commons was simply a large piece of real estate absolutely owned. And through the first seventy-five years of the eighteenth century the common council leased plots, prosecuted trespassers, and tore down encroachments, all to the end of conserving the value of the property. See 1 Common Council 403; 2 Common Council 97-98, 113, 127, 129, 258-59; 3 Common Council 229-30, 240-41, 245.

[39] Jennifer Levin, The Charter Controversy in the City of London, 1660-1688, and Its Consequences 2 (1969); see also Michael Landon, The Triumph of the Lawyers (1970).

[40] 8 Howell's State Trials 1039, 1277-78.

[41] Frederick W. Maitland, Trust and Corporation, in Selected Essays 217 (1936).

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

community from any perceivable public purpose, yet remain beyond any form of central control.[42] The central government responded by shifting much of the governmental responsibilities—the public services —of local government to statutory commissions and other derivative agencies, making boroughs as irrelevant as possible to the necessary processes of local government. But full intervention into borough life had to await the formulation of a conception of corporate personality that was not dependent on property rights, had to await the separation of the sanctified "connection between corporateness and privilege."[43]

The language used in the Montgomerie Charter of 1730 must be regarded as a direct legacy of the charter controversies of the 1680s. The last five pages of the document declared that the Crown would never sue New York City in an action *"quo warranto."* The properties granted by the charter were held in fee simple absolute, beyond the reach of attacks for misuser; the city was free to use them as it pleased. Nor would other properties, however acquired and however used in the past by the Corporation, raise an action *"quo warranto."*[44] Indeed, one might argue that one purpose of the charter was to assure the autonomy of the city in the manner of an eighteenth-century English borough, as an institution whose properties were sacrosanct. "[B]y these presents," by the various grants of property contained in the charter, the charter drafters proposed to constitute New York City as "a free City of itself."[45] Unlike London, the city of New York could never have claimed perpetual existence as a basis of legitimacy, for it had an identifiable point of origin. But it no longer needed to assert the "antient" quality of its privileges. In the wake of the Glorious Revolution, rights granted by the crown in a formal charter would be sufficient to make New York "a free city of itself."

This is not to say that there were not important theoretical and practical limitations on the autonomy of the corporation. The charter should not be read as creating a complete blueprint for governance. In a variety of ways, the city of New York remained dependent on the provincial government. Two limitations in particular should be mentioned. The governor retained the right to appoint the mayor, and the provincial legislature was the only body capable of ordering direct taxation. In the first case one must presume that the retention of the power of appointment by the governor was consciously intended as a limitation on the autonomy of the city; indeed,

---

[42] Consider, for example, the member of the Cambridge Corporation who thought, "that the property [of the corporation] belonged *bona fide* to the corporation and that they had a right to do what they pleased with their own." Maitland, *supra* note 38, at 12-13.

[43] Maitland, *supra* note 41, at 217.

[44] 2 Colonial Laws 635-39.

[45] *Id.* at 597.

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

the petition of the common council to Montgomerie for a new charter in 1730 had specifically asked for the power to elect a mayor.

The second limitation presents a more ambiguous picture. On the one hand, it is hard to imagine a more direct denial of local autonomy than for central authority to retain absolute control of taxation. On the other hand, until the 1760s direct taxation was only rarely used by the Corporation as a revenue source.[46] There were only four occasions between 1731 and 1750 when the need for revenue was so great that city officials had to seek authorization from the legislature to lay a tax.[47] Rents and other corporate revenues were usually sufficient for the purposes of municipal governance, and we might guess that the existence of a ''freely disposable income'' from the properties it had been granted gave the Corporation concrete affirmation of its autonomous status within the province.[48]

Still, in many respects the city remained the ''political child of the province.''[49] Authorization to repair or build new streets always came from the provincial legislature, as did a variety of police regulations; ferriage rates and other rate structures were usually set outside the city. The Mayor's Court, which one might assume would have retained a separate style of decision making, by the 1730s had become simply a court of common pleas for the city whose decisions and practices were largely indistinguishable from those of county courts elsewhere.[50] It is not at all clear whether these restrictions on the autonomy of the city developed in opposition to the articulated interests of city officials. We might suspect that most of the legislation was passed at the instigation of the representatives from the city. There is in any case a growing recognition among historians of colonial New York political life that from the time that English control of the province was secured New York City dominated the political life of the province.[51] Still, the government of the city was closely integrated with the general governance of the province, and the autonomy granted by the charter was always partial and incomplete.

The very political theory which joined property with political autonomy also placed limits on that joinder. Property gave a corporation the right to

[46] George William Edwards, New York as an Eighteenth Century Municipality 197-99 (1917) [hereinafter cited as Edwards, Municipality].

[47] 2 Colonial Laws 1061-63; 3 Colonial Laws 158-62, 542, 619-20.

[48] Maitland, *supra* note 41, at 204-05.

[49] Jacob Judd, New York: Municipality and Province, in Aspects of Early New York Society and Politics 2 (J. Judd & I. Polishook eds. 1974).

[50] Herbert A. Johnson, The Advent of Common Law in Colonial New York, in Law and Authority in Colonial America 83 (George A. Bilias ed. 1965); see generally Select Cases of the Mayors Court of New York City (R. B. Morris ed. 1935).

[51] See Robert C. Ritchie, The Duke's Province (1977).

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

control its own affairs free of systematic external interference. But that autonomy was always derivative and dependent. Property rights did not justify disobedience. To the contrary, Locke had written "that every man that has any possessions or enjoyment of any part of the dominions of any government does thereby give his tacit consent and is as far forth obliged to obedience to the laws of that government, during such enjoyment, as anyone under it."[52] New York City may have been a "free city of itself," but it was "of itself" only in relation to those areas of governance defined by its property rights, and even there its dominion could never be severed from the intermittent interference of central authority.

On the other hand, the eighteenth-century chartered city of New York was not a municipal corporation, at least not as we would understand the term today. In his classic discussion of New York City as an eighteenth-century municipality, George William Edwards wrote:

> But we must remember that as an eighteenth-century municipality it was merely an agent of the provincial government, devised, as Goodnow aptly says, "for the discharge of those functions interesting the state government which demanded local treatment." It is therefore always necessary to be mindful of this dependent position of a municipal corporation as we view its relations to the provincial government.[53]

He was wrong. Intermittent intervention by the legislature did not define the nature of the Corporation. Property did. The property rights of the eighteenth-century city were not tangential to the nature of the institution. As defined and described in the Montgomerie Charter they were what constituted its corporate personality. Today we may know "perfectly well" how to distinguish governmental from nongovernmental in terms of the use and ownership of property, but in the eighteenth century our task would have been complicated by the peculiar presence of propertied "governmental" corporations like the Mayor, Aldermen, and Commonalty of the city of New York.

## II.   PROPERTY AND GOVERNANCE IN PREREVOLUTIONARY NEW YORK

### A.   The Business of a Corporation

Earlier students of the institutional history of eighteenth-century New York have regarded the property acquired under the charters of the city as important only for the revenue it provided for the administration of city affairs. In so doing they underestimated the important role corporate property played in creating distinctive forms of municipal governance. Of

---

[52] John Locke, The Second Treatise on Government, § 119.
[53] Edwards, Municipality, *supra* note 46, at 34.

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

course the need for new revenue offers one explanation for the common council's decision to apply for new grants in a new charter in the 1720s.[54] And the income from corporate property did assume a significant place in municipal finances throughout the prerevolutionary period: making taxes little needed until the 1750s, keeping the tax rate low thereafter, and giving the city ready collateral whenever it needed to borrow funds.[55] But the existence of a freely disposable income scarcely exhausted the uses of property in the life of the Corporation. As we have seen, the property granted by the city's charters legitimated and defined a sphere of local autonomy; property rights guaranteed the individuality of the city. The estate of the city also created a possibility of planning, growth, and innovation on a scale unavailable to unchartered and unpropertied local governments, a possibility at least partially realized in the practice of government in New York City. The relative autonomy created by the

[54] During the decade prior to the reception of the Montgomerie Charter the revenue of the city declined from a high of 731 pounds in 1722 to an average well below 300 pounds. See David Valentine, Financial History of the City of New-York, from the Earliest Period, in Valentine's Manual of the Corporation of the City of New-York 506 (1859). And it was a perception that only a new charter could provide new revenue for the Corporation that seems to have spurred the common council to apply to the governor of the province. For more on this, see text at notes 88-90 infra.

[55] The most complete and reliable account of the finances of the eighteenth-century city is in Edwards, Municipality, supra note 46, at 190-205. Edwards offers the following tale of the returns from the revenue-bearing properties and franchises of the Corporation:

MUNICIPAL REVENUE FROM FRANCHISES AND PROPERTIES IN POUNDS,
OVER FIVE-YEAR PERIODS

| | Ferries | Docks | Markets | Lands | Waterlots | Buildings | Licenses |
|---|---|---|---|---|---|---|---|
| 1730 . . . | £246 | . . . | . . . | £ 28 | . . . | . . . | £ 91 |
| 1735 . . . | 243 | . . . | . . . | 5 | £ 33 | £ 2 | 89 |
| 1740 . . . | 307 | £ 73 | . . . | 7 | 65 | 2 | . . . |
| 1745 . . . | 370 | 90 | £105 | 7 | 68 | 2 | 194 |
| 1750 . . . | 455 | 110 | 159 | 7 | 99 | 5 | 180 |
| 1755 . . . | 650 | 305 | 190 | 40 | 142 | 50 | 172 |
| 1760 . . . | 650 | 500 | 245 | 122 | 196 | 50 | 524 |
| 1765 . . . | 800 | 550 | 385 | 501 | 225 | 100 | 180 |
| 1770 . . . | 970 | 690 | 250 | 374 | 460 | 60 | 230 |

Id. at 191. (Slightly different figures for 1740 may be found in Valentine, supra note 54, at 507.)

Although Edwards argues the case for the growing dependence of the city on tax powers that could only be delegated by the provincial legislature, even he concedes that, "For many years the returns from the revenue-bearing properties and franchises of the corporation were barely sufficient to meet expenses." Id. See also Edward Durand, The Finances of New York City 7-40 (1898); George Ashton Black, Municipal Ownership of Land on Manhattan Island (1891); and Sidney I. Pomerantz, New York: An American City 1783-1803 (2d ed. 1965).

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

Montgomerie Charter and its predecessors was not meant simply as protection from external interference; it also bestowed a freedom to act. In effect, the charter constituted a license to initiate change, a liberation from the commitment to a consensually determined status quo that characterized most local government in provincial America.[56] The property rights granted in the Montgomerie Charter were granted in pursuit of the goal of creating a major seaport in New York City. In protecting the Corporation of the city of New York from the harm of externally imposed change, the charter also laid the basis for internally instituted innovation.

This position would sharply separate the institutional history of eighteenth-century New York City from two major interpretations of the history of the American city. One interpretation, closely identified with the writings of Sam Bass Warner, asserts that the history of the American city has always been shaped by a culture of privatism. American cities were the products not of community planning or public initiative but of the individual decisions of individualistic Americans. ''[T]he physical forms of American cities, their lots, houses, factories, and streets have been the outcome of a real estate market of profitseeking builders, land speculators, and large investors.''[57] Government has always been inadequate; indeed, it usually has been irrelevant to the main processes of growth and change. According to Warner, even before the Revolution the sphere of public action was limited and separated from the economic life of the American city.

By contrast, another interpretation, one most recently restated by Jon Teaford, views the early American city as a reflection of the regulatory traditions and practices of the medieval English borough. The chartered corporation was introduced into the colonies as a way of controlling and fostering commercial life. Until the Revolution, American city government—with the exception of the unchartered ''town'' of Boston—had no proper sphere of activity but the regulation of economic activity.[58]

These two interpretations offer dramatically different perspectives on our urban past.[59] They converge, however, in their general picture of

---

[56] See Part II-C *infra*.

[57] Sam Bass Warner, The Private City: Philadelphia in Three Periods of Its Growth 4 (1968).

[58] Jon Teaford, The Municipal Revolution in America (1975). One finds here strong echoes of the perspective of the authors of the institutional studies of urban government that flourished in the early twentieth century. See, for example, Robert Francis Seybolt, The Colonial Citizen of New York City (1918), subtitled, A Comparative Study of Certain Aspects of Citizenship Practice in Fourteenth Century England and Colonial New York City.

[59] According to Teaford, the postrevolutionary era witnessed the triumph of a ''public welfare'' theory of urban governance which entirely eclipsed the earlier commercial focus of the premodern chartered corporation. Warner, more pessimistic, argued that there is a

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

mid-eighteenth-century urban governance. According to Teaford, the spread of libertarianism during the middle years of the eighteenth century weakened the regulatory control of municipal corporations and necessitated a partial withdrawal by urban authorities from their traditional fields of primary authority. In a few cases their attention shifted to newer areas of health and safety regulation and public works. But in other cases, municipal corporations ''reacted to change with lethargy and indifference.''[60] The middle of the eighteenth century should, therefore, be regarded as a transitional period when urban government was separated from an increasingly private market economy but had not yet fixed on a modern conception of its role in urban life.

Warner undoubtedly would agree with that characterization of eighteenth-century practice, although for him the absence of a proper public role is a more or less permanent feature of American cities. The Philadelphia of Revolutionary America that is his model of a ''private city'' had

a regime of little government. Both in form and function the town's government advertised the lack of concern for public management of the community. The municipal corporation of Philadelphia, copied from the forms of an old English borough, counted for little. . . .

By modern standards the town was hardly governed at all.[61]

To both Teaford and Warner the chartered corporate governments of early modern America were fast becoming—or had already become—anachronisms irrelevant to the communities they were presumably intended to serve.

Philadelphia provides the model of eighteenth-century corporate government for both Teaford and Warner, and they may have correctly identified features of Philadelphia's corporate life that typified eighteenth-century American municipal behavior generally. In several respects, however, the government of New York City was very different from that of Philadelphia. New York's Corporation remained inextricably identified with the city it was chartered to govern. While the ''close'' corporation of Philadelphia effectively excluded most residents of the city from participation in its affairs, the Montgomerie Charter made the Corporation of New York into a classically ''open'' organization. Anyone might be admitted as a freeman, as a politically active member of the Corpora-

---

depressing continuity in America urban history defined by our continuing commitment to a culture of privatism. A moment's reflection suggests the truism that both positions might be—and probably are—equally true as perspectives on our urban past.

[60] Teaford, *supra* note 58, at 56.

[61] Warner, *supra* note 57, at 10.

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

tion.[62] In 1731 the cost of becoming a freeman of the city was set at three pounds for merchants or shopkeepers and twenty shillings for craftsmen, but the common council could and did grant the privilege gratis to any resident who could not pay.[63] The result was that in New York City "the Commonalty" of the Corporation became in effect the entire populace of the city, or at least the white male populace, while in Philadelphia "the Commonalty" of the Corporation was a distinct community, a particular identifiable elite, within the larger city.

Throughout the eighteenth century, moreover, the Corporation of New York remained the government of all aspects of city life subject to public control. Unlike what was the case in Philadelphia, there were no statutory authorities in New York. Even most voluntary associations were under Corporation sponsorship. Where public action was necessary, it occurred under the auspices of the Corporation, or it did not occur at all. And well into the nineteenth century New Yorkers could speak of "our Corporation" when they referred to the government of their city.[64] The separation of government from corporation that seems to have characterized eighteenth-century Philadelphia occurred much later in New York City.

The issue is not, though, the marginal differences between Philadelphia and New York City. The issue is how one ought to evaluate the utility and effectuality of corporate government in eighteenth-century America. Was New York City "a regime of little government" like Warner's Philadelphia, or was it rather a regime whose government can only be understood if we put aside our conventional expectations about the nature of a public sphere?

Teaford has used what he calls a "content analysis" of ordinances to argue that there was a moderate decline in the concern with commercial regulation in cities throughout provincial America. By his calculations, where 54 percent of New York City's ordinances dealt with trade or commerce in 1707, only 47.6 percent did so in 1773.[65] But all forms of legislative activity—and ordinances in particular—have weaknesses

---

[62] Milton Klein, Democracy and Politics in Colonial New York, in The Politics of Diversity: Essays in Honor of Colonial New York 20-25 (Milton M. Klein ed. 1974), Beverly McAnear, The Place of the Freeman in Old New York, 21 N.Y. Hist. 418 (1940).

[63] 4 Common Council 96-97; for the equivalent rates for 1702 and 1751 see 2 Common Council 198-99; and 5 Common Council 326.

[64] See Charles E. Rosenberg, The Cholera Years 17 (1962).
This is not to deny that eighteenth-century New Yorkers could distinguish their individual interests from that of the Corporation whenever the two diverged. When Cornelius Sebring applied to the crown's officials for a grant of a competing ferry, prior to the grant of the ferry franchise in 1708, his petition was accompanied by a supporting letter from a number of residents of the city. 3 O'Callaghan, supra note 34, at 256.

[65] Teaford, supra note 58, at 18-52.

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

when used to define the concerns of a governmental institution.[66] Teaford's statistics in fact unquestionably understate the disinterest of the midcentury common council of New York City in commercial regulation. If one looks at the minutes of the council, the record of its ordinary activity, it becomes apparent that trade regulation consumed a miniscule proportion of the worktime of the council. Of some 97 entries into the minutes in 1737, no more than 9 can in any way be characterized as dealing with the regulation of trade and commerce, and in the case of 4 entries it is unclear whether the measures ordered by the council were intended to achieve goals of the promotion or control of economic life in

---

[66] Teaford's expectation that an analysis of the subject matter of ordinances would reveal the nature of a corporation is, I think, fundamentally flawed as a research strategy:

(*a*) Legislative activity is inherently ambiguous. Is legislation passed because legislators feel the need to act in a particular area or is legislation passed as a substitute for action, as a form of symbolic politics? The fact that Philadelphia passed almost no new ordinances between 1740 and 1776 might stand as easily as evidence for the effectiveness of its regulatory structure as for Teaford's presumption of a quiescent government. There is moreover no way from Teaford's narrative to learn anything about enforcement patterns. Is legislation passed because it is expected to validate ideological presuppositions of what a municipal corporation ought to be doing? It might be, in fact, that the by-laws of the corporations Teaford has studied reveal the survival of an archaic ideology of a commercial community long after the actual practice of local government in those communities has changed in rather dramatic ways.

(*b*) Even on its own terms there is reason to question Teaford's statistics. His tables represent a "title" or subject matter analysis of corporate by-laws rather than a "content analysis." He assumes that titles of ordinances reflect the content of those ordinances, but in eighteenth-century New York City that was certainly not the case. What New Yorkers referred to as the "nuisance" ordinance was entitled, "A Law for paving and cleaning the Streets, Lanes and Alleys within the city of New-York, and for preventing Nuisances within the same." By 1763 it had seventeen sections, including rules on disposal of manure and offal, wages for cartmen, restrictions on the location of tanneries, dyers, starchmakers, and slaughterhouse, ("because the Health of the Inhabitants of this City, does in a great Measure depend upon the purity of the Air of that City") as well as a prescription of the dates during which shellfish might be sold in the city. New York City legislators had not yet "learned" the modern rule of legislative drafting that there should be only a single subject for each title of legislation. The number of by-laws passed in particular areas of concern probably does not reflect the actual incidence of attention by the Common Council. And the percentages Teaford gives may bear no relationship to the actual content of legislation. It appears, for example, that most trade regulation by-laws consisted of a single section. If one factored in the disparate sections of the nuisance ordinance and of other public regulations, the percentages of his tables would have been very different. Public or health regulation might have seemed at all times a weightier part of the business of the corporation. What is a law is an unavoidable question for anyone who writes legal history.

(*c*) Finally, reliance on ordinances creates the false impression that the proper business of a government is necessarily some form of regulation. For Teaford the history of the municipal corporation in America is one of the choice between trade regulation and health and safety regulation. But it is equally possible that government might be concerned with different questions or, more precisely, might be pursuing governmental ends through nonregulatory techniques. Teaford's methodology forces him to consider that which is nonregulatory in the affairs of an eighteenth-century city as almost necessarily nongovernmental.

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

the city, or were intended for some other governmental purpose.[67] Similarly, in 1767 only 11 of 157 entries had anything to do with commercial regulation.[68]

Indeed, we may wonder if the "medieval" notion of a city as an exclusive, monopolistic, commercial community had any legal significance in the life of the Corporation of the city of New York after the reception of the Montgomerie Charter. The members of the common council made no attempt to preserve city trade for city residents, much to the dismay of local retailers—particularly butchers and fresh produce vendors—who felt victimized by the "Country People who rented stalls in city markets and undersold the local competition.[69] Consider also the oath given to newly admitted freemen. In 1707 the common council had authorized a version which closely paralleled a fourteenth-century oath used by the corporation authorities of the city of London.[70] Among other things it ordered the new freeman to warn the mayor whenever he heard of "Forreigners" (or nonresidents) buying or selling within the city boundaries, forbade him from suing any other freeman of the city in a court outside of the city, and prescribed the terms under which he would take and care for apprentices.[71] In 1731, after the reception of the new charter, the council drew up a new oath which eliminated all references to the commercial life of the city and to the particular significance of city boundaries in establishing a commercial community.[72] The city as a government was separated from the older perception of a city as an economic unit. And this latter version remained the "oath" of the city throughout the prerevolutionary period.

There remained throughout this period a rhetorical identification of the Corporation with the commercial life of the city.[73] Petitions to the com-

---

[67] 4 Common Council 361-410.

[68] 7 Common Council 51-105.

[69] See the Petition of Israel Harsfield, Timothy Harsfield, Richard Green, and other Butchers, in Petition File, 1735 (N.Y. Municipal Archives and Records Center (MARC)). The solution offered by the common council was to give resident butchers a discount rent to their market stalls.

One reason why the city stopped trying to exclude nonresidents from the economic life of the city was that a growing number of residents depended on the trade of the nonresidents. Whenever restrictions against country people were too stringent, there would be complaints that the regulation depressed business. See Petition of Francis Koffler, an innkeeper who farmed the ferry, Petition File, 1766.

[70] Seybolt, *supra* note 58.

[71] N.Y. Historical Society, Collections 460-61 (1885).

[72] 4 Common Council 121.

[73] See Petition of Sundry Persons dwelling and residing and being owners of the Houses and Lots of Ground near and adjacent to Burling's Slip, Petition File, 1766; see also Petition of the Inhabitants of Crown Street, Petition File, 1767.

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

mon council continued to ask for varieties of commercial franchises and privileges, which usually were justified by reference to the commitment to commercial growth that was said to unite the members of the Corporation.[74] And as Teaford suggests, there are some indications of a new rhetorical concern for public health and safety regulation in the records of the period.[75] Still, the desire for regulation—whether public health related or commercial—should not be exaggerated. Questions of ''public,'' noncommercial regulation were raised no more frequently before the common council than were questions of commercial regulation. In both 1737 and in 1767 the minutes of the council record only nine entries that were even arguably concerned with health and safety.

It is clear that by 1730 the Corporation of the city of New York could no longer be defined as the embodiment of a commercial community. But neither was it a public welfare agency on the order of a nineteenth-century municipal corporation. What, then, was its proper business? How may its concerns be described?

From the perspective of the citizens of the city who petitioned to the Corporation the answer was unmistakable. The proper business of the Corporation was the management, care, and disposal of its real estate. Approximately 60 percent of the petitions sampled between 1730 and 1770 concerned the property rights of the Corporation. Between 1765 and 1767 the figure rose to nearly 75 percent. Petitioners petitioned for abatement of their rents to the Corporation,[76] for a new lease,[77] for a right to farm the ferry.[78] The Reformed Protestant Dutch Church asked for a lot in the commons because their present cemetery was full.[79] Merchants and others would on occasion ask permission to clean or improve or repair or ''encroach'' on some piece of city property, usually a pier or a slip.[80] Most of all, petitions to the common council revolved around requests to the Corporation for grants of waterlots, grants of the land under water surrounding the settled part of the city up to 400 feet beyond low water mark.

---

[74]  See Petition of Cornelius Van Vorst, Petition File, 1765.

[75]  See Petition of Joseph Simson, Petition File, 1755.

[76]  Petition of Francis Koffler, Petition File, 1766.

[77]  Petition of John Kelly (slaughterhouse), Petition File, 1736; Jocobus Rickman (room in Commons for Brick Kiln), Petition File, 1747; Petition of Isaac Delameter (small house), Petition File 1756; Petition of Nicholas Bayard (slaughterhouse), Petition File, 1767.

[78]  Petition of Cornelius Van Vorst, Petition File, 1766.

[79]  Petition of the Minister *et al.* of the Reformed Protestant Dutch Church, Petition File, 1766; see also the Petition of the Minister *et al.* of the English Presbyterian Church, Petition File, 1766.

[80]  Petition of William Cornell, lessee of ferry, Petition File, 1737; Petition of sundry individuals living near Clarke's Slip, *id.*; Petition that the encroachment made by Robert Munro on the slip may be permitted to continue, as it is more convenient, Petition File, 1766.

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

Petitioners "inclined to make considerable improvements"[81] to those waterlots asked for grants on terms discussed in detail in the next section. But petitions for waterlots were frequently followed by counterpetitions attempting to dissuade the council from making a particular grant to a particular individual or set of individuals. Counterpetitions might argue that the Corporation was violating its own customary procedures for making grants, "That the Custom and Practice of this Corporation with Respect to granting their Water Lotts, so far as the Petitioners are Acquainted therewith, has ever been to give the preference to those, who held the Lotts fronting the River."[82] Or the counterpetition might set out a claim of title in theory superior to that of the original petitioner(s).[83] The point is not that these petitions should determine our sense of the nature of the eighteenth-century Corporation. Rather these petitions demonstrate what part of the business of the Corporation provoked the interest—more precisely, the self-interest—of its citizens.[84] It was the property of the Corporation, not its economic regulatory powers nor its public-welfare regulatory powers, that claimed the attention of eighteenth-century New Yorkers.

The minutes of the common council also reflect a continuing preoccupation with the management of the corporate estate. In both 1737 and in

[81] See Petition of Jacob Brewerton, Petition File, 1765. See also the petition of Elizabeth Richards and others, who presented on May 22, 1761:
". . . that their houses front that part of the East River Commonly called Hunter's Bay which was become a great Nuisance by the Settlement therein of all kinds of Garbage, Filth and Dirt . . . and that the water between the East and West Piers is become so shallow as to render the same useless and greatly detrimental to the Health of the Petitioners . . . and therefore conceived that the filling up the same Water Lots would greatly add to the Ornament of the City as well as the conveniency of the Harbor, prayed that the said Mayor Aldermen and Commonalty would be favourably pleased to grant to them the said water lots so far into the said East River as the Present Wharfs on the East and West sides extend under such reasonable rents etc. as should be thought fit and reasonable."
Elizabeth Richards was one of several active women merchants who actively sought and secured waterlots in the mid-eighteenth century. See the Corporation Grant to Elizabeth Sharpas, spinster, August 23, 1939, Grant Book B (MARC); see also Jean P. Jordan, Women Merchants in Colonial New York, 58 New York History 412-39 (1977).

[82] Petition of Owners of lots in Montgomery and Out Ward, Petition File, 1765. There were, on the other hand, limits to the kinds of protests the council would entertain. Mr. Brownjohn protested against the Corporation appropriating a waterlot fronting his lot for the use of a slip, to which the Council responded, "this Board conceiving the same to be an insolent and impertinent paper did thereupon unanimously resolve and ORDER that the same be thrown under the table and the same is thrown under the table accordingly." 7 Common Council 27 (1766).

[83] See the various petitions protesting the waterlots proposed to be distributed in "rotten row" in 1766. Petition File, 1766.

[84] See also the controversy over waterlots in 1753 conducted in the Independent Reflector 118-27, 151-56 (Milton Klein ed. 1963) [hereinafter cited without cross reference as The Independent Reflector].

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

1767, property decisions were much the most important substantive area of council concern. If we ignore the routine, nondiscretionary business of the Corporation (entries into the minutes for warrants to the mayor to pay the accounts and the salaries owed by the Corporation, entries warranting tax collections and auditing accounts, and entries for certification of elections and the swearing in of officers), it is evident just how important the corporate estate was in the work of the Corporation. In 1737 fully one-third of all the discretionary entries in the minutes dealt with property owned by the Corporation; in 1767 nearly 50 percent of these entries were concerned with the management of the corporate estate. Neither trade regulation nor public (noncommercial) regulation or other action ever constituted more than 20 percent of the business of the council in these years. If the minutes of the common council are to be believed, it was the concerns of a property owner that best defined the business of the Corporation of the city of New York.

This description of the Corporation at first glance may seem very similar to Teaford's picture of Philadelphia in the years prior to the American Revolution. His Philadelphia was a city government that "neglected both the traditional tasks of trade regulation and the newer duties of safety and public works" in order to concentrate its efforts on managing corporate properties.[85] In so doing, according to Teaford, the Corporation of Philadelphia ignored its governmental responsibilities. Likewise, we might say, the Corporation of the city of New York, as the government of the city, devoted an inordinate amount of time to its corporate—its private—property. But in New York that "obsession" with corporate property did not lead to a separation of the concerns of the community from those of the Corporation. A paradox? Why should New Yorkers have regarded as their legitimate government an institution whose attention was firmly fixed on its own private property interests?

One could argue either that New Yorkers of the time wanted a lethargic and neglectful government, or that it is we and not the Corporation of the city of New York that have neglected its true governmental functions. Both positions may be true. It may be that New Yorkers preferred a city in which individuals were dependent on their own resources, preferred at least a version of Warner's "private city." But without losing sight of the commitment of city leaders to private economic growth, it is the other perspective that demands our attention here, one that views the management of a corporate estate as a mode of public planning and governance. Such a perspective insists that we put aside later assumptions as to the irreconcilability of property concerns with governmental action and of

---

[85] Teaford, *supra* note 58, at 56.

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

THE JOURNAL OF LEGAL STUDIES

what constitutes the proper business of a public institution. The Corporation of the city of New York spent most of its time managing its property; yet it remained the government of the city.[86] What we need to understand is how property offered the city of New York a legitimated structure of action within the constraints of Anglo-American political and legal theory.

### B.   Planning by Granting

In the 45 years between the reception of the Montgomerie Charter and the beginning of the American Revolution, disposing of the waterlots of the lower city was unquestionably the dominant property-related concern of the officers of the Corporation.[87] Indeed, insofar as property management properly characterized the government of the prerevolutionary city, a waterlot grant perhaps should be regarded as an appropriate symbol of that government. The waterlots were the only new parcel of property granted to the city under the 1730 charter, and it appears that their absence was the main reason why the members of the common council decided to seek a new charter in the 1720s. The first time the ''need'' for a new charter was mentioned in the minutes of the council was in 1722 after Gerritt Vanhorne had petitioned the Governor of the province for a grant of ''all the land that may be Gained out of the East River [between Maiden Lane Slip and the end of Wall Street] . . . to extend to the Said River two hundred foot with Liberty to Erect Buildings, Cranes, Stairs, etc. And to Receive the Profits and Wharfage thereof.'' The Common Council remonstrated to the Governor as to ''the great prejudice the Granting thereof may be to the Publick in General and this Corporation in Particular,'' and then decided that it had better itself petition for a new charter that would include a grant of all the land that might be gained out of the harbor, plus ''Such other Privileges Franchises and Immunities as are Usually Granted to Cities and Towns Corporate in England.''[88] In every

---

[86] In demonstrating that public purposes shaped the management of New York's corporate estate, all that might be shown is the exceptionality and isolation of New York City within the world of eighteenth-century local government. It is possible that New York's Dutch heritage separates the history of New York City from the rest of provincial America. See Jan de Vries, Barges and Capitalism: Passenger Transportation in the Dutch Economy, 1632-1839, in 21 Afdeling Agrarische Geschiednis (Wageningen), Bijdragen 33-398 (1978). But historians of English local government also stress the importance of corporate property in the life of eighteenth-century municipal corporations. For a case study of a relatively ''activist'' use of property see the discussion of Liverpool in Francois Vigier, Change and Apathy (1970). The other, more common image of corporate lethargy and quiescence is presented in R. W. Greaves, The Corporation of Leicester 1689-1836 (1970); and Malcolm I. Thomis, Politics and Society in Nottingham, 1785-1835 (1969).

[87] See, for example, 4 Common Council 25-211, for the years 1731 to 1734.

[88] 3 Common Council 271-78. The origins of this conflict begin in 1720, 3 Common Council 221.

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

petition thereafter to the royal authorities the waterlots headed the wish list of the Corporation.[89] And as soon as the new charter was secured and confirmed, the council set about the difficult business of granting away the lands under water and the right to develop the emerging waterfront of the growing city.[90]

Still, it might seem that a waterlot grant is a peculiar focus for a discussion of the uses of a corporate estate in planning and governance. One might in fact suspect that the process of disposing of the most valuable property owned by the Corporation at nominal quitrents ought rather to be regarded as the antithesis of active governmental planning. The disposal of the waterfront of New York City bears a suspicious resemblance to the disposal of the public domain by the federal government during the nineteenth century, which, as every student of American history knows, delivered up the development of the West to private speculator control. And students of the history of New York City have usually judged the waterlot grants made by the eighteenth-century Corporation in similarly harsh terms, when they regarded them at all. John W. Reps, the leading historian of American city planning, sees eighteenth-century New York City as a prime example of an unplanned city.[91] George W. Edwards concluded that the city acted ''with utter disregard for the future'' in allowing its rich riparian rights to fall into the hands of private individuals.[92] Another historian speculates that ''perhaps the government simply anticipated New York's growth by abandoning in advance any influence over it.[93]

Historians have often viewed these grants as typifying the corruption of the Corporation—an earlier version of the shame of the city.[94] Relying on a 1753 ''exposé'' in William Livingston's *Independent Reflector* they have concluded that waterlot grants were nothing but a series of ''shady land deal[s] by which some local business- men, in collusion with the City

---

[89] 4 Common Council 5-8, 19-22.

[90] The centrality of waterlots in the plans of the Corporation is underscored by the fact that in 1730 Van Horne was bribed to withdraw his petition to the Governor with a promise that when a new charter was obtained he would get a 400-foot lot instead of the 200-foot lot he had petitioned for. See 4 Common Council 25. The promise was fulfilled in 1734. 4 Common Council 211. See also Corporation Grant to Cornelius Van Horne, July 26, 1734, Grant Book B (MARC). It appears that Van Horne was the only grantee throughout the prerevolutionary period to receive a lot that extended more than 200 feet into the river.

[91] John W. Reps, The Making of Urban America 150-54 (1965).

[92] Municipality, *supra* note 55, at 150.

[93] Josef W. Konvitz, Cities and the Sea: Port City Planning in Early Modern Europe 65 (1978).

[94] Edwards, Municipality, *supra* note 46, at 150-51; Milton Klein, Introduction, to The Independent Reflector 30; Carl Bridenbaugh, Cities in Revolt 39 (rev. ed. 1970).

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

Council, planned to get valuable shore- line property for a song.''[95] A letter with commentary in that paper revealed a series of transactions by which council members themselves were to receive grants to waterlots at a low consideration without public bidding, on the assumption that because the council members owned the lots fronting the waterlots they therefore owned the preemptive right to purchase these waterlots whenever the city decided to convey them. As Livingston noted, it was ''incredible'' that a majority of the council ''should join in so iniquitous a Concession.'' After all, ''Does Contiguity of Land infer a Right?'' The business of making waterlot grants was nothing but an institutionalized abuse of power, a way for corrupt council members to ''lavish, in manifest Violation of their Trust, the Property of the City, to enrich and gratify a few Individuals.''[96] To label it a form of city planning would be to rob language of meaning.

Yet one may wonder. Those historians who have allowed the *Independent Reflector* to shape their vision of the waterlot grants appear not to have read the grants themselves. Neither have they considered the significance of a later issue of the *Independent Reflector* in which a correspondent argued that the situation revealed in the earlier issue was not an exceptional abuse of power.

> But further, Sir, excepting a few Instances, it has invariably been the Practice of the Corporation, to grant the Water Lots to particular Petitioners, upon Terms agreed on between them, and not at Vendue [public auction]. In these Grants, the Preference has generally been given to the Proprietors of the Upland, contiguous to the Water Lots.[97]

Livingston responded that although he would concede that perhaps the petitioners were not acting improperly in relying on a ''common Practice,'' still they had ''no more Colour for pretending, that the Contiguity of their Lands, entitles them to what belongs to the City, than to the Lands of any adjoining Neighbors.'' The expectations created by a common practice did

> indeed place the Conduct of the Petitioners in a more favourable Light; but render that of the Corporation . . . the more inexcusable and unjust. Have former Corporations made a Practice of giving the Lands of the City, it should be an Inducement to their Successors, to obliterate the Remembrance of those Transgressions, by a more inviolable Attachment to their Duty.[98]

Looked at from the twin perspectives of whig political theory and of a

[95]  Klein, Introduction, to The Independent Reflector 30.
[96]  The Independent Reflector 124.
[97]  *Id.* at 153.
[98]  *Id.* at 155.

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

"Blackstonian" theory of exclusive property rights Livingston was clearly correct in his general condemnation of the conduct of the Corporation.[99] But neither whig political theory nor a theory of property rights founded on the absolute power of a possessor to exclude accurately reflected the legal world of eighteenth-century New York City.[100] Whether or not waterlot grant petitioners ought to have presumed that contiguity created a legitimate interest in the real estate of the city, those with land fronting waterlots certainly did make such a presumption. In their view, sale by public auction would have constituted a deprivation of their own property rights. Practically every successful petition for a waterlot grant was premised on the fact that the petitioner's land fronted on a waterlot.[101]

A long petition to the common council in 1765 put the case forcefully for the propriety of a practice of private sale. Those who owned land fronting the East River, wrote the petitioners, have looked upon their right to purchase the contiguous waterlots as a practice of "long and almost invariable usage and custom:"

[They] have been so far enfluenced by that Consideration, as to look upon it, like a Sort of unalienable Priviledge belonging to their Estates, and hence in their Transfers from one to another, the Price and Value of those Estates, has been by that means, proportionally increased.

The petitioners insisted that they did not mean to imply that the Corporation was "bound never to depart from a rule of this Kind;" they did, however, insist that the council should "be tender of the Rights of Individuals" when the effect of deviating from the "rule" would be to "diminish the Value of every Estate that is now held, under this particular Circumstance."[102]

In effect the petitioners argued that they had a property interest in the water rights owned by the city, perhaps on the order of the right every property owner has to prevent the existence of a nuisance on his or her neighbor's property, or a right of first refusal. But we should be careful not to make this expectancy interest appear more precise than in fact it

---

[99]  See Klein, Introduction, to The Independent Reflector 1-50.

[100]  Nor should it be seen as a direct and accurate reflection of the legal world of eighteenth-century England. See E. P. Thompson, Whigs and Hunters (1976); id., *supra* note 32, at 328-60; Daniel Boorstin, The Mysterious Science of the Law (1941).

[101]  Where it didn't, a grant of a waterlot was preceded by a grant of the contiguous land. See for example the Release of Lot . . . to Anthony Rutgers, July 24, 1766, Grant Book C (MARC) (of the land between high and low water mark) followed immediately by a Corporation Grant of the waterlot. *Id.*

[102]  Petition of Sundry Persons Owners & Proprietors of Lotts of Ground situate in Montgomery and the Out Ward of the City of New York—fronting the East River, Petition File, 1765.

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

was. The Corporation had the power to appropriate a waterlot to public uses—such as a public slip or dock—without offering any compensation to the contiguous owner.[103] Moreover, if the owner of the frontage was unable or unwilling to take the waterlot on the terms set by the Corporation, the common council might transfer the right in the waterlot to another, perhaps at public sale.[104] Indeed, it appears that the owner of the frontage owned nothing personally; the interest was appurtenant to the land he or she held. Even the petitioners quoted in the previous paragraph conceded that their "priviledge" was inalienable and belonged to their estates.[105]

It is impossible to say whether the process of making waterlot grants was corrupt or not. It is difficult even to decide what it would have meant in the context of the general political culture of eighteenth-century New York to call the process corrupt.[106] We can assume that waterlot grants were usually made to the rich and powerful of the city who in many cases were also members of the common council. Still, the obligations imposed through the terms of those grants were so severe as to make it unlikely that anyone but a relatively rich person would have had any interest in receiving a waterlot grant. More important, even a "corrupt" process may succeed as a planning tool. The problem of governance that the granting process was designed to solve was how to expand and develop the port facilities of the city. To understand how waterlot grants effected goals of commercial expansion and growth, we shall have to put aside juridical questions of the guilt or innocence of corporate grantees and corporate officers and look to the grants themselves: what they conveyed away from the city and what they required of the grantees.[107]

---

[103] See entry 7 Common Council 27 (1766). Two petitions from the file of 1766 revealed the fears of some individuals that if all the waterlots were granted away in Rotten Row (which was being developed at that time) there would be no place left for any "public edifice"—for an exchange or a market; both petitions asked that the common council reserve space for the use of the public.

[104] See 4 Common Council 212 (1734), where the common council acted on the petition of Jacob Goelet and Abraham Van Wyck, the executors of André Teller. They had petitioned for and been granted a waterlot for the use of Teller's daughter. The grant had included a covenant for "Docking Out the same within a Certain Limited time, which Neither the Said Child nor we the Executors are Capable of performing." And the "privilege" of the grant was transferred to Stephan Bayard.

[105] Petition File, 1766.

[106] See Stanley N. Katz, Newcastle's New York (1968).

[107] The following discussion of the provisions of the waterlot grants conveyed by the Corporation is based on a reading of all copies of the grants held by the New York Historical Society (NYHS) (about 50 in number) and a more selective examination of grants from the official Grant Books (primarily from Books B and C) held in the Municipal Archives and Records Center (MARC). All grants of the Corporation, including those found in the New York Historical Society, were recorded in full in the Grant Books of the Corporation (A through F) and can be found arranged in chronological order.

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

PROPERTY AS GOVERNMENT IN EIGHTEENTH-CENTURY AMERICA  333

During the prerevolutionary period waterlots were granted out at intermittent and irregular intervals. In 1772 the Corporation made 29 waterlot grants. In five other years, 15 or more grants were made. But most years the number of grants never exceeded three.[108] Usually grants were made to groups of neighboring landowners. Either the city waited for such a group of neighbors to come forward with a plan for the development of a particular part of the waterfront, or the Corporation developed a plan and then solicited petitions for grants from contiguous landowners, or the process involved elements of both alternatives. Without more research into the real estate concerns and plans of the city's commercial elite, it is impossible to say where the original impetus for making the grants came from.[109] In any event, the process culminated in a grant which both memorialized the agreement between the Corporation and the grantee and constituted the conveyance of the waterlot. The conveyance was recorded in a "Grant Book" of the Corporation, and the grantee received title to the land lying under the water of his grant.

Typically, a grantee received a lot that extended 200 feet into the East River[110] from "low water mark"[111] or (what was usually the same thing) the border of the grantee's own lands. The breadth of the waterlot was determined by the breadth of the grantee's frontage and ranged from a low of 16 feet[112] to a high of 116 feet.[113] Along with title, grantees uniformly received the eventual right to charge rent for the use by merchants and shipowners of the docks, wharves, and piers that would be constructed on the lot. It was this potential rental value—the right to collect dockage, wharfage, pierage, slippage, cranage, and so forth—that constituted the main incentive to apply for a grant. Every conveyance of the city's waterlots hinged on the transfer of the "profits and advantages" that were appurtenant to the lots.

Quitrents for these grants, payable annually on March 25, could be as little as one peppercorn or as much as eight pounds, five shillings. In general the amount of the quitrent was figured on an equal per foot of breadth rate for all grants made in a particular area at a particular time,

[108] See the "Location Index" in Corporation of the City of New York, Indexes to Water Grants, 1686-1904 (manuscript at MARC).

[109] There is nothing in Virginia D. Harrington, The New York Merchant on the Eve of the Revolution (1935), on speculation in city lands. For a later period see 2 Kenneth Porter, John Jacob Astor, Business Man 910-52 (1931).

[110] Until after the Revolution relatively few grants were made along the Hudson because of the fear that ships moored along its docks might be damaged by ice floes.

[111] In the wake of the Dongan Charter of 1686, the Corporation had granted away most of the lots between high and low water marks which had as a result been filled in. "Low water mark" thus often meant the end of a lot bordering on the river.

[112] Corporation Grant to T. Jeffreys, April 19, 1735, Grant Book B (MARC).

[113] Corporation Grant to S. Farmer, July 24, 1766, Ellison Family Papers (NYHS).

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

334                    THE JOURNAL OF LEGAL STUDIES

which rate might vary through our period from a low of four pence per foot of breadth[114] to the high of three shillings per foot charged to a group of grantees who received title to grants by Coenties Slip between 1772 and 1775.[115] The quitrents did not constitute the major cost to the grantees, however; no one ever seems to have complained that his quitrent was too high, although they regularly complained to the common council about the burdensome nature of their grants. The actual cost to the grantee in purchasing a waterlot was hidden in long, complicated, and highly formalized provisions of the grant.

Along with their lots and their potential profits, grantees accepted a set of restrictive covenants which ran with the land and which determined the precise ways in which the real estate would be developed. Satisfying the terms of these covenants was the major consideration paid by grantees. Almost uniformly the city required grantees to build two streets or wharves, one at either end of the length of their lots and each parallel to the river. These streets were to be constructed and paved by the grantees at their own expense, were to be dedicated and applied to the use of the public, and were to be maintained in perpetuity for the benefit of the public and the city by the grantee, his assigns or heirs.

Additional responsibilities specific to a particular grant usually were added. When in 1758 the Corporation granted to Oliver Delancey a large lot on the Hudson in trust for the children of Sir Peter Warren, the deed included covenants for the construction of a forty-foot wide wharf or street on the inside boundary of the lot, a forty-foot wharf or street on the outside of the lot, a fifteen-foot wharf to run from Cortlandt Street to the river which would front a slip to be made and left by Delancey which would itself be dedicated to public use, plus two posts which were to be put on the latter wharf twenty feet from one another as an aid for boats that would dock there. Moreover, it was stipulated that ''all profits, fees, perquisites, and Emoluments arising or accruing from the wharf or street'' running by the slip, ''shall be taken and received by the Mayor Aldermen and Commonalty'' of the city. These covenants had to be satisfied within seven years or the Corporation would repossess; the waterlot might again become part of the estate of the Corporation. And until those terms were

---

[114] Corporation Grant to Oliver Delancey, March 13, 1758, Delancey Deeds (NYHS) and Corporation Grant to Henry Bogart, May 15, 1739, Grant Book B (MARC), Corporation Grant to Elizabeth Sharpas, August 23, 1739, Grant Book B, MARC.

[115] Corporation Grant to Hendrick Remsen, July 10, 1772, NYC Deeds, Box 8 (NYHS); Corporation Grant to Peter Jay, July 10, 1772, NYC Deeds, Box 8 (NYHS); Corporation Grant to James Van Cortlandt, Augustus Van Cortlandt and Frederick Van Cortlandt, February 3, 1773, NYC Deeds, Box 8 (NYHS); Corporation Grant to Elizabeth Delancey, April 29, 1773, BV Delancey Deeds, 1731-1784 (NYHS); Corporation Grant to Nicholas Gouvernor, March 21, 1775, Gouvernor Family Papers (NYHS).

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

entirely satisfied the children of Sir Peter Warren could not profit from the development of their lot.[116]

Many grants included an obligation to construct a public space of some kind in addition to the streets at front and rear which were a uniform part of almost every grant. Frequently the grantee agreed to construct and maintain a public slip—the space between two piers—to dredge it and make sure that at all times it would be usable for deep water ships. All boats were ''to have free liberty to load and unload goods, wares, merchandizes,'' at the slip. And the Corporation was to have ''all profits, fees, perquisites, and emoluments'' arising from the use of the side of the piers or streets that were directly contiguous to the slip.[117] Other grants insisted on the construction of an extra dock, a bulkhead, or a third street.

At times the size and complexity of the ''public works'' required by the Corporation would be on such a scale as to necessitate joint enterprise by groups of merchants or neighbors. This was the case in 1772 and 1773 when a number of merchants applied for waterlots on the east side of Coenties Slip.[118] The city insisted that any grant would be contingent on the construction of a large and costly public ''basin'' which forced the merchants to develop a formula for distributing the costs of the project. ''[I]f Grants . . . should be obtained,'' wrote the applicants, ''it would be necessary for them . . . to raise sundry large sums of Money in order to comply with the Terms upon which such Grants would probably be made and that as some of them . . . would derive a greater Advantage from the said Grants than others and of consequence ought to bear a greater proportion of the Expence,'' it was decided that the task of ascertaining ''the several and respective Proportions of the whole Charge'' should be given over to arbitrators. These decided that both the costs of construction and maintenance and the eventual profits (the wharfage) should be divided in proportion to the breadth of the respective lots, and their report became a contract binding the parties.[119]

The available records do not indicate how frequently grantees redistributed the costs of construction among themselves through private

---

[116] Corporation Grant to Oliver Delancey, March 13, 1758, Delancey Deeds (NYHS).

[117] See for example, Corporation Grant to Henry Van Borson, July 23, 1737, Grant Book B (MARC).

[118] Corporation Grant to Hendrick Remsen, July 10, 1772, NYC Deeds, Box 8 (NYHS); Corporation Grant to James Van Cortlandt, Augustus Van Cortlandt and Frederick Van Cortlandt, February 3, 1773, NYC Deeds, Box 8 (NYHS); Corporation Grant to Peter Jay, July 10, 1772, NYC Deeds, Box 8 (NYHS); Corporation Grant to Elizabeth Delancey, April 29, 1773, BV Delancey Deeds, 1731-1784 (NYHS); Corporation Grant to Nicholas Gouvernor, March 21, 1775, Gouvernor Family Papers (NYHS).

[119] Arbitrators Report, bound with Corporation Grant to James Van Cortlandt, et al, February 3, 1773, NYC Deeds, Box 8 (NYHS).

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

agreements of this kind. But the very existence of such agreements demonstrates the inadequacy of a simple equation of waterlot grants with municipal corruption. Of course grantees applied for grants, anxiously worked out financing arrangements that would allow them to meet the terms imposed by the city, and usually abided by those terms for reasons which presumably had something to do with long-term economic advantage and gain. Grantees expected to benefit from their grants. And it may be that many of the recipients of grants got their waterlots because of their influence over and connections with the city council. But to look only to the private *cui bono* without at the same time considering the benefit to the city and its corporate entity is to lose sight of the calculated ways in which grants of property could function as instrumentalities of governmental action. The terms of the grants were shaped by the long-term interest of the city in a developed and expanded waterfront. It was up to the grantees to work out ways of meeting the terms set by the Corporation.

The control the Corporation exercised over granted waterlots was not limited to setting affirmative and executory duties. Grants often included restrictions on the timing of a development.[120] In some cases they required construction of a project at some relatively distant point in the future, tying the actions of the waterlot holder to the future growth of the city or to some other contingent event. In the case of the ''basin'' grants of the 1770s the Corporation insisted that at the end of twenty years or as soon as the basin was filled in, the grantees would have to build a third street of 45 feet in width ''so far as the right of the Mayor Aldermen and Commonalty extends.''[121] Thirty-three years earlier Henry Bogart had similarly covenanted

that whenever hereafter it shall happen that three or more of the freeholders and Owners of the Lotts of Land and WaterLotts in the Neighborhood . . . shall Conclude and agree together to Erect and make wharfes and streets thereon and wharfe out and fill up the Same for better Improvement thereof into Hudsons River . . . that he the said Henry Bogart . . . at his . . . own proper Cost Charge and Expence shall wharfe out behind his said Ground and Lott . . . as far as the Neighborhood shall wharfe out and fill up behind their own Lotts.[122]

If the terms of the grant were fulfilled—that is, if the quitrent was paid every year, the covenanted streets, wharves, and other public facilities were constructed within the period of time set out in the deed, and all ''public'' parts of the property were properly maintained—then the Cor-

---

[120] Corporation Grant to Cornelius Vanhorne, July 26, 1734, Grant Book B (MARC).
[121] Corporation Grant to Hendrick Remsen, July 10, 1772, NYC Deeds, Box 8 (NYHS).
[122] Corporation Grant to Henry Bogart, May 15, 1739, Grant Book B (MARC).

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

poration for its part covenanted that it would guarantee the good title of the grantee and warranted that he or she should be able to have the ''quiet enjoyment'' of the property in perpetuity.[123] More pertinently to the presumed wants of the grantees, the Corporation also always covenanted that ''in consideration of [the grantee and his or her heirs and assigns] . . . maintaining and keeping in repair the streets and wharfs before mentioned [they] shall and lawfully may at all times and from time to time for ever hereafter fully and freely have use enjoy take and hold to their own proper use and uses all manner of wharfage cranage benefits advantages and emoluments growing arising or accruing by or from the said wharf fronting the East River.''

But if the terms of the deed were not satisfied by the grantee, then the document gave the Corporation a number of sanctions. Nonpayment of rent would give the Corporation the right to distrain the goods and possessions of the grantee. Ten days after the due date for payment of the quitrent, the agents of the city could enter onto the waterlot and ''bear lead drive and carry away'' all the movable property of the grantee until the rent had been paid. In some of the grants, moreover, the Corporation retained a right of entry as a further direct sanction against an unsatisfactory grantee. Under such a grant, a grantee who had not paid his rent or who had not properly built wharves, streets, or whatever, within the time period set out in the deed thereby gave to the Corporation the right to ''Reenter'' the property ''and the same to have again, Retain, Repossess and Enjoy as their former Estate.'' Such a right of entry created a future interest in the waterlot that was retained by the Corporation even as it conveyed title to the grantee. And ultimately the fee simple received by the grantee was made conditional on the satisfaction of the covenants; failure by the grantee in meeting the Corporation's terms might result in a forfeiture to the Corporation.[124]

But in most cases the Corporation evidently saw no need to create a possibility of a forfeiture.[125] The fact that a grantee who had not fulfilled the terms of his or her grant could not collect wharfage, slippage, pierage,

---

[123] Such a warranty was uniform in grants made before the Revolution.

[124] See Corporation Grant to Gerrardus Duyckinck, July 26, 1734, Grant Book B (MARC).

[125] The Corporation in 1734 began by granting its waterlots with conditional rights of entry. But after 1735 most grants did not contain a right-of-entry provision. But see Corporation Grant to Abraham Mesier, July 4, 1760, Grant Book C (MARC); Corporation Grant to Robert Leake, August 1, 1763, Grant Book C, (MARC); Corporation Grant to Nicholas Roosevelt, March 7, 1765, Grant Book C, (MARC); Corporation Grant to Cornelius P. Low, October 28, 1765, Grant Book C, (MARC). It appears that the right of entry became a bargaining tool used by the city and grantees in exchange for larger grants (see the Low grant), or lower quitrents.

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

cranage, and other fees for the use by others of the facilities constructed on the lot was sanction enough. Only a satisfactory grantee could profit by his investment in a waterlot.

The waterlot grants made by the city allowed it to shape, control, and profit from the development of the waterfront of the settled city, without any obligation to finance that development. This was not, however, a hidden form of ''municipal socialism.'' Planning through the disposal of waterlot grants by necessity would be an incremental process, dependent in every instance on private market forces. Only a merchant who expected to profit quickly and substantially from investment in a waterlot grant could be expected to seek or to accept such a deed. Under such a system of control, the construction of waterfront facilities would not move ahead of demand.

In the eighteenth century, as in every period of New York's history prior to the rise of the skyscraper, the seaport of the city dominated the shape of the city. Views of the city inevitably placed its harbor in the foreground, and travellers' accounts dwelt on New York's shipping facilities. Descriptions typically began with an account of the ''multitude of Shipping with which it [the city] is thronged,''[126] and continued with a comparison of the relative advantages and development of the ports of New York and Philadelphia. Doctor Alexander Hamilton ''saw more shipping in the harbour'' of New York,[127] and Peter Kalm thought ''New York probably carries on a more extensive commerce than any town in the English North American provinces,'' although ''Boston and Philadelphia however come very close to it.''[128] Travellers agreed that the port was ''a good one.'' Ships of any tonnage could lie in at the docks and wharves, and the facilities were sufficient to meet the demand. All boats could load and unload at dockside without the aid of lighters.[129] Moreover, travellers and boosters alike thought that New York's salt water port gave the city a definite advantage over Philadelphia's location on a fresh water river which because it froze ''During the Severity of Winter . . . is locked up from all marine Correspondence with the rest of the World, and thus, necessarily for several Months every Year, exposed to an almost total Stagnation of Trade.'' By contrast, ''No Season prevents our

[126] Thomas Pownall, A Topographical Description of the Dominions of the United States of America (Being a Revised and Enlarged Edition of [A] Topographical Description of such Parts of North America as are Contained in the (Annexed) Map of the Middle British Colonies, & c. in North America) 43 [1784] (Lois Mulkearn ed. 1949).

[127] Gentlemen's Progress. The Itinerarium of Dr. Alexander Hamilton. 1744, at 44 (Carl Bridenbaugh ed. 1948).

[128] 1 Peter Kalm's Travels in North America 124 (Adolph Benson ed. 1937) [hereinafter cited as Kalm].

[129] 1 Kalm 133; Gentlemen's Progress, *supra* note 127, at 39.

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

[New York's] Ships from launching into the Ocean and pursuing their Traffick—The Depth of Winter scarce obstructs our Commerce, and during its greatest Severity, an equal unrestrained Activity runs thro' all Ranks, Orders and Employments."[130]

But as of 1770, and indeed throughout the eighteenth century, shipping tonnage arriving and clearing in New York City lagged well behind other major colonial ports.[131] Carl Bridenbaugh and other historians have argued that New York's comparative and competitive failure resulted from the policies of its government. The mayor and common council "failed to provide their city with all the facilities it needed,"[132] and "No town was so poorly equipped to care for its shipping as New York."[133] They may be correct in their condemnation of the actions of the city, although their evidence is impressionistic and their judgment ultimately founded on the misperception that waterlot grants were unrestricted gifts of property. But the causal relationship between governmental land use planning and economic growth and change remains a most controversial and largely unexplored area of economic and historical research.[134] And it is beyond the scope of this study to say whether New York's technology of planning constituted the most efficient choice available.

What can be said is that the waterlot grants made by the Corporation changed the face of the city. Over the last two-thirds of the eighteenth century, the harborside facilities of New York were transformed. Two full blocks were reclaimed out of the East River. The city had once ended at Pearl Street; by the end of the century Front Street had become the southeastern border of lower Manhattan.[135] Perhaps the city would have grown at the same or even a greater rate had some other form of planning or port development been in effect. It is a certainty, however, that waterlot grants were used, as they were designed, to provide New York City with the streets, wharves, and port facilities of a growing seaport.[136]

---

[130] The Independent Reflector 436; 1 William Smith, The History of the Province of New-York, 201-02 [1757] (M. Kammen ed. 1972) 1 Kalm at 133; Pownall, *supra* note 126, at 45.

[131] Robert G. Albion, The Rise of New York Port 5 (1939).

[132] Gentlemen's Progress, *supra* note 127, at 39; Konvitz, *supra* note 93, at 65.

[133] Carl Bridenbaugh, Cities in the Wilderness 328 (1955).

[134] The central text on the problem is J. Willard Hurst, Law and Economic Growth (1964).

[135] See the maps collected in I. Phelps Stokes, The Iconography of Manhattan Island (1915-1928).

[136] To say that the waterlot grants served to provide needed port facilities for the growing city is not to say that they may not also have created new health hazards for a town which had once prided itself on its healthful environment. See Cadwallader Colden to Dr. John Mitchell, November 7, 1745 (writing in the wake of an attack of yellow fever on the city), Colden Papers, vol. 8, NYHS Collections 329-30 (1934); see also The Independent Reflector 434-55 (on the "putrid stench" of Rotten Row).

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

### C.  The Governmental Theory of a Waterlot Grant

It is important to underscore the peculiar nature of the waterlot grants made by the Corporation in the years after the reception of the Montgomerie Charter. If we look at them as the conveyances of a private landowner, they seem to violate several fundamental tenets of the law regarding real covenants. They specified affirmative obligations on the estate of the grantee that not only radically limited the uses to which he or she might put the lot, but also directed the actual shape of its development. Insofar as the satisfaction of those covenants was ensured through a clause granting the Corporation a right of entry whenever the grantee should fail to meet the terms set out in the deed, they were effectively transformed into conditions subsequent; and the grant became a grant of a fee simple subject to a condition subsequent rather than a fee simple absolute. But treatise writers from Coke on had emphasized that conditions subsequent were not to be favored in the law.[137] And even when—as was more frequently the case in the grants made by the Corporation—only the right to take the profits from the waterlots was made conditional on the performance of the covenants in the grant, those conveyances still merged or "confused" covenants with conditions in ways that property lawyers would have found profoundly unsettling.[138]

Looked at as the planning tools of a municipal government the waterlot grants are equally perplexing. Here we have the Corporation of the city of New York with absolute ownership of the most important real estate in the city of New York; it controlled a central resource for the commercial development of the community. Yet it chose to act, if at all, through indirection. The Corporation might have planned the design of the waterfront of the city and then implemented that scheme, directly. Instead, it granted away the property and then compelled its grantees to develop their grants according to Corporation directives. The structure of action thereby created would appear to be an open invitation to inefficiency and corruption. And it is no wonder that historians of city planning might have viewed the actions of the Corporation as a wholesale surrender of its proper responsibility.

Nor can it be argued that the Corporation negotiated the kinds of grants it made because that was the only kind of grant any member of the common council could have imagined making. The Corporation of course could have simply disposed of the waterlots and thereby given up control over the development of the waterfront. Indeed at an earlier time, the city

---

[137] See 4 Kent, Commentaries on American Law 127-28 (2d ed. 1832).

[138] See the arguments of Alexander Hamilton and Robert Troup in Mayor v. Scott, 1 Caines Rep. 543, 548 (N.Y. Sup. Ct. 1804).

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

had made relatively unrestricted grants of the waterlots between high and low water marks that it received under the Dongan Charter of 1686.[139] And throughout the prerevolutionary period, whenever Corporation authorities chose for one reason or another to sell an occasional lot out of the commons, the grant memorializing the conveyance lacked any of the covenants or conditions that characterized the city's waterlot grants.[140] One can only surmise that waterlot grants were drafted in their particular form because the governing members of the Corporation intended to control the development of the waterfront of the city. But again, if control and authority were what the Corporation of the city of New York was after, why did it choose this way of achieving it? Liverpool, after all, provided an alternative model of an English city that had developed its corporate estate directly by building a great and usable waterfront facility.[141]

We do not and probably cannot know why city authorities chose in the early 1730s to adopt the policy of making waterlot grants to individuals willing to develop their lots in accordance with the strict directives of the Corporation. But it is possible to understand what made such a policy attractive and plausible. The structure of action revealed in the waterlot grants may constitute a unique and attractive form of public action in an eighteenth-century political culture in which all direct forms of public action were constitutionally suspect. Liverpool, the model for the Webbs of an activist municipal corporation, stood alone throughout the eighteenth century. Other English commercial cities, notably Bristol and London, found it impossible to follow Liverpool's example and develop their waterfronts directly.[142] By contrast, the use of land grants as planning tools had roots in an English planning tradition that stretched back to the new towns created by Edward I in the thirteenth century.[143] Waterlot

---

[139] On September 7, 1692, the Corporation made grants of lots between high and low water mark to William Morris, Hephanus Van Cortlandt and Dirrick Van Den Bergh. Each agreed to pay one peppercorn per year quitrent and to construct and maintain one street thirty feet in breadth on the inside of the lot. Failure to perform the latter covenant on time would result in a fine of twenty shillings for every month's delay, but the profits were not made contingent on the completion of the project. In fact, the city covenanted that the grantees had an absolute right to the profits and that the Corporation would make good any losses suffered by the grantees. Grant Book A (MARC). See also George Ashton Black, Municipal Ownership of Land on Manhattan Island 21, 27 (1891), who argues that after 1686 the lots between high and low water mark from Wall Street to Beekman's Slip were sold at public auction in fee simple absolute without the reservation of a quitrent.

[140] See, e.g., Release of the Corporation to William Walderon, September 24, 1731, NY City Deeds, Box 4 (NYHS); Counterpart of 33 year lease to Ann Aerison, April 24, 1771, Grant Book C (MARC).

[141] 2 Sidney Webb & Beatrice Webb, The Manor and the Borough 481-91 [1908] ("England Local Government vols. 2-3,'' 1963 ed.); Vigier, *supra* note 86, at 40-43.

[142] Webb, *supra* note 141, at 460-1 (Bristol), 690 (London).

[143] John W. Reps, Tidewater Towns 1-22 (1972).

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

grants that covenanted action by their recipients offered the city a way to initiate change without doing violence to some of the central tenets of eighteenth-century political culture. Waterlot grants were a legitimate form of governmental action. Their use demonstrated a form of governmental power given to the Corporation through the property rights contained in the Montgomerie Charter that was unavailable to the unchartered local governments of eighteenth-century America.

In eighteenth-century terms the best answer to the question of what the purpose of government should be would have been that government ought to do little; its role was to make certain that others did as they ought to. One could not separate public from private action. Just as a "public" institution had "private" rights, so private individuals had public obligations. The primary function of government was to enforce the peace of the community; to maintain the order of society by insisting that private individuals fulfilled their public responsibilities.[144]

There was, as a result, little that one could consider direct governmental action or service. Governments did not act so much as they ensured and sanctioned the actions of others. The characteristic forms of "public" action were not street cleaners or road-building crews, but rather ordinances obliging residents to clean the portions of streets abutting their houses or presentments against the selectmen of a town (or a group of neighbors) for failing to maintain or repair a road or highway.[145] Or, in New York City's case, public action took the form of a lease or grant of corporation property.

The problem of governance in New York City, as everywhere in provincial America, was to shift the burden of action to private individuals. One useful way of reading the ordinances of an eighteenth-century corporation is as a way of organizing private action. New York City's ordinance to pave and clean the streets, for example, had nothing to do with the "bureaucratic" problem of providing a public service. Mobilizing an army of public servants would never have occurred to the members of the common council; indeed, it would have been definitive of *their* notion of corrupt government. Rather, the ordinance was a list of things that homeowners could or could not do in the care of their streets, in the care of that portion of the streets that fronted their properties.[146]

---

[144] This argument is spelled out in greater detail in Hendrik Hartog, The Public Law of a County Court; Judicial Government in Eighteenth Century Massachusetts, 20 Am. J. Legal Hist. 282-329 (1976). For an examination of the dependence of whig-republican theory on the existence of an active and virtuous public, see J. G. A. Pocock, The Machiavellian Moment (1975).

[145] Maitland, Township and Borough (1898); see also Vigier, *supra* note 86, at 54-55.

[146] New York City, Laws, Orders, and Ordinances (November 18, 1731), c. 22; New York City, Laws, Statutes, Ordinances, and Constitutions (1749), c. 14; New York City, Laws, Statutes, Ordinances and Constitutions (1763), c. 14. See note 67 *supra*.

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

Even when governmental action involved the city's own corporate estate, the role of the city was usually limited to a supervisory and directive one. If a slip had to be cleaned, the landowners whose property abutted the slip would be ordered to clean it at their own cost. In 1737 a grand jury presented the public pier near Fly Market as a nuisance because it was "so narrow that [it] often proves Very dangerous as to Carts passing and Repassing both in Respect to grown People as well as Children," and the members of the jury ordered the residents living near the market to petition the common council for permission to enter onto the Corporation's property in order to widen the pier.[147] When in the same year William Cornell, the lessee of the ferry, complained that the disrepair of the markethouse at Clarke's Slip was cutting into his business by discouraging "Country People" from coming to the city, he did not conclude his petition as we might have expected by asking the Corporation to maintain its property properly. Instead, he asked the common council to order the neighbors of the markethouse to repair it (an order which was preempted by a petition by those very neighbors who volunteered to enlarge and improve the markethouse).[148] No one, it seems, even contemplated asking the Corporation to take care of its own property directly.

At one level, the insistence that action be conducted by private individuals might be regarded as a substitute for a nonexistent public bureaucracy. Public action depended on the participation of a local public.[149] But that insistence was as deeply tied to the belief that government ought not to bear the costs of action. Perhaps the most striking manifestation of that belief from our perspective lay not in what we might consider local government at all but in the presumption in criminal courts throughout colonial America that defendants ought to pay the fees and costs for their trials irrespective of whether or not they were acquitted.[150] We can also see that belief reflected in many elements of the practice of the common council of the city of New York prior to the second half of the eighteenth century. Virtually every order the council made was premised on the conviction that whatever was going to be done the Corporation would not pay for it. Lessees of the Corporation—whether of the ferry, the public docks, or land in the commons—held their leases subject to their willingness to assume all liability for repairs or improvements.[151] The very oath taken by

---

[147] 4 MCC 403 (The petition of the residents was, not surprisingly, granted.)

[148] Petition File, 1737 (MARC).

[149] A similar argument is developed for Massachusetts in William E. Nelson, The Americanization of the Common Law 13-35 (1975); and in John P. Reid, In a Defiant Stance: The Conditions of Law in Massachusetts Bay, The Irish Comparison, and the Coming of the American Revolution (1977).

[150] Julius Goebel, Jr. & T. Raymond Naughton, Law Enforcement in Colonial New York 731-48 (1944); Hartog, *supra* note 144, at 320, 326-27.

[151] The responsibility of the lessee of the ferry for all repairs led to constant petitions

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

a freeman made his obligation to avoid imposing costs on the Corporation second only to his responsibility to maintain the property of the Corporation.[152]

Indeed, one might argue that the estate granted in the charters was less important to the Corporation as a way of generating revenue than as a tool of governance that vitiated the need for revenue. Of course the corporate property gave the city an income freed from the restrictions of dependence on the provincial assembly, thus providing a partial and temporary substitute for tax revenues. But the waterlots and other parcels of corporate property also offered city authorities the opportunity to act without *any* costs of municipal administration. As we have seen, the Corporation uniformly required waterlot grantees to build streets or wharves at the front and at the rear of their holdings. These covenants should be read as meaning exactly what they say. The city was not simply reserving a portion of the granted lands for public uses, nor was it merely assessing the costs of street construction. These covenants meant that the city would do nothing, the waterlot holders everything. It was the waterlot grantees who would build and finance the public streets by the side of the harbor of New York City.

The government of New York was a government which acted by delegation, a government committed to a policy of externalizing the costs of action, yet, at the same time, a government lacking most of the powers of coercion and enforced obedience of the modern state. Neither the "watch," nor the constabulary, nor the sheriff and his deputies constituted what we would consider a police force. Compared to the monopoly on legitimate violence of the modern positivist state, government at every level in eighteenth-century America was relatively ineffectual. In this regard the government of New York City was indistinguishable from other local governments. Public action was possible only to the extent that a government could enlist the support and involvement of a local constituency.[153]

---

asking for reduction or abatement on the rent in order to meet the costs of maintenance or repair of the docks from which the ferry left. Frequently the Corporation granted those petitions, and in a sense the Corporation did therefore "pay" for repairs. But the Corporation was far less concerned with the size of its revenue than with the avoidance of all direct responsibility for action.

[152] 4 Common Council 121 (1731).

[153] See for example, the Petition of the Vestrymen, Petition File, 1755 (MARC), who asserted that the keeper of the almshouse did not perform the duties of his station and behaved in a surly and abusive manner to justices of the peace and vestrymen. If he were not fired immediately the vestrymen threatened that they would not attend to their monthly meetings "with that Alacrity and Chearfullness as they would Willingly do for the Publick Good."

This content downloaded from
132.174.255.179 on Thu, 23 Feb 202, 01 Jan 1976 12:34:56 UTC
All use subject to https://about.jstor.org/terms

Dependence on the participation of a local public meant that most local governments operated with a very limited range of objectives. Governments pursued consensus as the only legitimate basis for action; when consensus was unachievable, governments did nothing. Others have written of the committed and conscientious parochialism of local government in the province of New York, and some historians have concluded that all forms of government in eighteenth-century America sought to preserve a consensually determined status quo.[154] But different publics might come to differing conclusions as to the proper sphere of public action. And in New York the members of the common council could legitimately—within the terms of the political culture—direct the actions of the city towards change, planning, and development. New York City was preeminently a commercial city, whatever ambiguities there may have been in the definition of the role of government within that conception of the community. Shipowning was widely dispersed throughout the population of the city;[155] virtually every family in the city was involved in seaborne commerce. The development of the waterlots of the city were not merely for the benefit of a small elite. In effect the terms of the grants provided a form of redistribution from the wealthy to the larger community of the city, which would bear none of the costs of development. The fortunes of nearly everyone in the small city of New York would ride on the quality and the quantity of the city's harbor facilities.[156] And while William Livingstone thought that the Corporation's dealings in making waterlot grants meant that council members would eventually "experience the Resentment of an injur'd People, at a Time when they are most solicitous about the popular Esteem,"[157] it may be that he was wrong. The Corporation may have used its corporate estate in ways that accurately reflected the desires of its constituents.

In any event, the property rights granted New York City through its charters allowed it to achieve governmental objectives that were beyond the reach of unpropertied local governments. Instead of mere sanctions against failures of performance, the city could offer leases, licenses, and

[154] See Patricia U. Bonomi, Local Government in Colonial New York: A Base for Republicanism in Colonial New York Society and Politics 29 (J. Judd & I. Polishook eds. 1974); William Nelson, The Eighteenth-Century Background of John Marshall's Constitutional Jurisprudence, 76 Michigan L. Rev. 893-960 (1978); Michael Zuckerman, Peaceable Kingdoms (1970); Sung Bok Kim, Landlord and Tenant in Colonial New York (1978).

[155] Bruce Wilkenfeld, The New York City Shipowning Community, 1715-64, 37 American Neptune 50-65 (1977).

[156] The significance of shipping facilities to a city whose population never exceeded 22,000 in the colonial period would be of a piece with the significance to a modern university town of the school's legislative appropriation or the level of student enrollment.

[157] The Independent Reflector 156.

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

grants to private individuals willing to implement various city-defined goals. New York City did not itself build streets, fill in swampland, or dig wells; the public works projects that characterized nineteenth-century urban government would have been incomprehensible to the city fathers of eighteenth-century New York. Yet it could act. Where a county court could only indict a town or individual for failing to maintain a street or bridge, New York's property gave it a way of building streets and bridges; the property of the city allowed it to plan and initiate action without doing violence to the basic premises of eighteenth-century governance.

The waterlot grants of New York City thus typify the singular governmental authority of a propertied corporation. Their terms made possible a form of capital investment and development without a reliance on the exactions of the tax gatherer or the exertions of a public bureaucracy. They suggest the possibility that even within the terms of a political culture opposed to publicly instituted change and innovation, a propertied corporation could control the continuing evolution of the shape of a community. In a world of governance in which the enforcement of public policy (indeed its very formulation) was *prima facie* corrupt absent public consensus, in which instrumental public action was inherently suspect,[158] the waterlot grants of the city constituted a technology of public action that was *prima facie* legitimate and proper. It was not a standing army or a police force that gave effect to the decisions of the city government; it was the hallowed operation of English property law. The fact that the Corporation held its property as a private landowner made it possible for the city to delegate to private individuals major responsibility for the construction of its commercial heart without at the same time abandoning control over that process.

## Conclusion

After the middle of the eighteenth century there are signs that the political assumptions of local governance in America were beginning to change. More and more governmental activity was made directly chargeable to the New York City Corporation. In 1755 the common council made a standing rule that whenever repairs to public wharves were necessary, the aldermen and assistants of the ward where the wharves were located should proceed immediately to contract out the work and charge the costs to the Corporation.[159] And by 1767 a group of merchants might

---

[158] See John Phillip Reid, In Legitimate Stirps: The Concept of "Arbitrary," the Supremacy of Parliament and the Coming of the American Revolution, 5 Hofstra L. Rev. 459-99 (1977); Bernard Bailyn, The Origins of American Politics (1968).

[159] 1 Stokes, *supra* note 135, at 197.

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

petition the Corporation about the sorry state of Beekman's Slip with the expectation that the common council would respond by appointing a committee with power to correct the situation directly, placing the whole cost on the Corporation.[160] Indeed, the growing dependence of the city on the taxing powers of the provincial assembly because of the city's increasing inability to finance its work out of corporate income may be one indication of increased willingness to internalize within the government the costs of action.[161]

Perhaps the theoretical underpinnings of local governance in colonial America were beginning to fall away. There is some evidence of what might be called a bureaucratization of public affairs elsewhere. And there are clear indications of a new dependence on public authority.[162]

Yet the scope of public activity did not grow; there is no evidence of a general reevaluation of the legitimacy of direct public action. The increased willingness of the Corporation to assume the costs of maintaining corporate property may rather indicate that the common council was increasingly conscious of a problematic separation of the estate of the Corporation from the general government of the city. After the Revolution, consciousness of that separation would grow, eventually becoming a central obsession of the American law of municipal corporations. But in the 1750s, 60s, and 70s the dichotomous relationship of public power and private wealth was at most only a subterranean theme in the institutional history of New York City. New York City continued to govern through its corporate estate. Waterlot grants remained at the center of the city's governmental business right up until the city was abandoned to the British in 1776.

The waterlot grants of New York City were one solution to the problem of how an eighteenth-century commercial city could develop its commercial facilities. Such activity may be a prototypical example of the "privatism" that we so deplore in modern life: the subsidization of private gains by public agencies and the definition of social goals in terms of private advantage. But from a less presentist perspective, waterlot grants offered the possibility of achieving positive governmental goals at a time when there was no theory of direct governmental action. How do you get

[160] 7 Common Council 77-79.

[161] Edwards, Municipality, *supra* note 46, at 35, 190-205; it is important to note that after 1750 criminal courts also increasingly made the costs of trial a governmental responsibility. Goebel and Naughton, Law Enforcement in Colonial New York, 731-748, Hartog, Public Law of a County Court . . . , 326-7.

[162] See generally, Kenneth Lockridge, Social Change and the Meaning of the American Revolution, 6 J. Soc. Hist. 403 (1973), Douglas Jones, The Strolling Poor, Transiency in 18th Century Massachusetts, 8 J. Soc. Hist. 28 (1975), Hartog, *supra* note 144, at 282; James A. Henretta, The Evolution of American Society, 1700-1815, at 119-57 (1973).

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

348                    THE JOURNAL OF LEGAL STUDIES

something done if you do not know how or, rather, if you cannot conceive of doing it yourself? You get someone else to do it for you. In colonial America and in Georgian England most local governments could only get those things done that had always been done, or that had at least always been supposed to be done, since the only sanction available was punishment for not acting. One cannot after all punish someone for not doing what he or she was not obliged to do. On the other hand, a chartered city with a substantial estate could use its wealth to achieve goals, to induce change, even in the absence of a commitment to direct governmental action. The promised reward of the waterlot (and its profits) gave the city the power to coerce grantees to do things that they were not obliged as citizens to do. And ultimately our interest in the practice of government in eighteenth-century New York City is defined by that possibility of action, by the ways in which the seemingly distinct public and private spheres were united in the achievement of positive governmental goals.

This content downloaded from
132.174.255.179 on Thu, 23 Feb 2023 15:57:59 UTC
All use subject to https://about.jstor.org/terms

# Overview:
# "Infringed or Abridged"

> The freedom of opinion is one of the inalienable rights of man, and one of the great gifts of his creator; it is a privilege which no human power ought to infringe, and no state of society unnecessarily to abridge.
> Alexander Hamilton, 1812[1]

The first amendment is stronger than the second amendment. This point sometimes gets lost in the public discourse, especially when an all-or-nothing interpretation of the second amendment is being boosted. But as Alexander Hamilton understood, there is a key difference in how the two amendments are worded.

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or *abridging* the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.[2]

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be *infringed*.

In the first amendment, Congress may not even *abridge*—lessen—the freedoms of speech, press, and assembly. In the second amendment, Congress may not go so far as to *infringe*—break or destroy—a right to bear arms.

The key difference is the difference between the word *abridge* and the word *infringe*. Anyone who looks up the words in English dictionaries used in 1789—and for centuries before 1789—can find what the framers would have found. For all the centuries leading up to the Constitutional Convention in 1787 and the first federal Congress in 1789, the English word *infringe* meant to break, to violate. It still does; we still call "breaking the law" and "violating copyright" infringements. The word *abridge* meant to limit. It still does. A difference in degree can become a difference in kind, and abridgement severe enough could become infringement, but it is essential to understand that to abridge something—a power, a privilege, even a right—was qualitatively different in 1789 from infringement.

The difference is that we can abridge a right without infringing it. As the framers understood, human rights have human limits. A society can

11

take customary and reasonable action against offenses and abuses. We can limit a right without destroying it, a line brightly and clearly drawn in the quotation from Hamilton.

Pointedly, the creators of the first ten amendments declined to say that the right to bear arms cannot be "abridged." If they had wanted to say so, they could have. They also had access to a large warehouse of longstanding English phrases that would have put bearing arms beyond the reach of law, if they had wanted to do so. But they chose to word the second amendment in a way that allows regulating. Congress is debarred only from violating, and the framers did not suggest that ordinances regulating weapons would violate anything. Such ordinances existed at the time. Nor does the second amendment say or imply that any and every abridgement is an infringement. That position in 1789 would have upended a century of political philosophy following Thomas Hobbes, John Locke, and David Hume among others.

For accurate understanding of the Bill of Rights, it is essential to use dictionaries and documents that existed when the Bill of Rights was written. The difference between the words *abridge* and *infringe* is findable. If this approach looks startling, it need not. One can combine political philosophy with practicality.

The framers were mostly admirable men—outside the abomination of slavery, of which they themselves knew the evil—but they were still fallible human beings, as they themselves knew. Along with a reasonable awareness of self and others, they supported reasonable self-interest. It is ridiculous to argue that they endowed the public with an unlimited, absolute right to take up arms against them. During the first federal Congress in 1789, there had already been a Shays' Rebellion, and a bloody revolution was beginning in France, inspired by the American Revolution, as members were aware. They hoped for better, not for a repeat. Witnessing events in France firsthand, Thomas Jefferson wrote to a friend, "A great political revolution will take place in your country, and that without bloodshed." "A king with 200,000 men at his orders, is disarmed by the force of the public opinion and the want of money."[3] Obviously, Jefferson's prediction was inaccurate. But his optimism accurately reflects the founders' non-avid view of bloodshed.

No records from the Constitutional Convention and the first federal Congress suggest that delegates welcomed a prospect of getting shot at by their own people. Recognizing the possibility of a future rebellion, they did as little as possible to encourage one. As the founders engaged proudly in setting up a new government—some of them having risked their lives, their fortunes, and their sacred honor for it—they left no suggestion that they looked forward to seeing it dismantled. No delegate claimed that firearms attested the vitality of basic freedoms or that unauthorized force vindicated the rights of humankind. More to the point, they did not

Overview: "Infringed or Abridged"

leave taking up arms against the new government lawful or constitutional. They did not protect taking arms against judges or members of Congress or citizens voting in an election. To the contrary, the new American government outlawed both force and fraud.

An operating principle was "just rights." Throughout the seventeenth and eighteenth centuries, the phrase "just rights" was used by the framers and their forebears, in England and America, too many times to count. The Pennsylvania Assembly wrote about "just rights" to the governor in the 1750s.[4] The Continental Congress used it to try to induce British troops to desert—mostly unsuccessfully—in the 1770s.[5] The phrase was used privately and publicly—in letters, histories, commentaries, sermons, speeches. George Washington, John Adams, Benjamin Franklin, Thomas Jefferson, and James Monroe used it in private letters. "My first wish is for a restoration of our just rights," Jefferson wrote John Randolph in August, 1775.[6] Publicly, protesting against British treatment of Ethan Allen in January, 1776, Jefferson wrote, "When necessity compelled us to take arms against Great Britain in defence of our just rights," Americans had considered their British adversaries "brave and civilized."[7] But, Jefferson said, Americans changed their good opinion when the British shipped Ethan Allen to England in chains. He proposed that a captured British general be clapped into irons to see how it felt.

In the 1770s, leading up to the American Revolution, the phrase "just rights" circulated in print every year.[8] Americans protesting measures by king and Parliament spelled out that not just any rights were being violated. Americans were not squabbling over bagatelles. They were not demanding limitless license. They were not complaining about a reasonable abridgement of natural right, necessary to join in civil society. They were protecting their *just* rights. And on the other side of the line, British authorities denied infringing anyone's just rights.

Again, a big difference between the first two amendments is that the framers did not choose "shall not be abridged" for the second amendment. One way to draw the line between just rights and arbitrary power, or between a just right and excessive license, was to differentiate between abridgement and infringement. In political philosophy, *infringe* and *abridge* could both be applied to powers. Both were applied to royal authority and prerogatives, state powers, and laws. Both were also applied to rights. They applied to individual rights, common or special liberties, and privileges.

Thus, one difference between *infringe* and *abridge* is that only abridgement can be applied positively. *Infringe* could mean breaking a law or treaty or contract as well as violating rights. *Abridge* could mean abridging power or privilege, or it could mean abridging ordinary rights to enable people to live together in society. Either way, there was good abridgement;

13

there was no such thing as good infringement. Abridgement of individual rights for the sake of living in human society was not infinitely elastic—a just right would be important enough to safeguard—but it did mean an acceptable give-and-take.

The two terms are logically connected, as a British writer in 1733 made clear.

> In the first place then, I shall very readily agree, that the Test Act has set the Dissenters upon a different foot from the rest of the Society: the conclusion they draw from hence is, that their natural Privileges are infringed. If they say diminished, I allow that likewise to be true, for every Man's natural Privileges (such I mean as are his Rights in a State of Nature) are no doubt abridged exceedingly by his Entrance into Society: But when infringe implies to abridge unjustly, this I deny absolutely to be their case.[9]

A full and fair discussion of the first and second amendments to the U.S. Constitution will acknowledge the differences between the two. While public discourse in 2019 may confuse abridging and infringing, the eighteenth century differentiated clearly between them, as in the statement quoted from John Perceval (1711-1770), First Lord of the Admiralty, whose family tree included a sixteenth-century dictionary author and a seventeenth-century founder of Georgia.

When Congress sent the amendments to the states for ratification in 1789, the amendments applied the words *infringe* and *abridge* to different rights. Freedom of opinion and of conscience are unalienable. As Hamilton and Perceval recognized, some rights are unalienable—not something to carry around in the hand or advertise for sale on Craigslist or sell out of the trunk of the car. Unlike the natural rights of self-defense and discipline, freedom of opinion and of conscience cannot be partly given over to society to handle (unless someone tries to expand them to include, for example, human sacrifice). They shall not be abridged. This is one of the differences between infringing and abridging. Abridgement could be in the common good; infringement cannot. Changes and trends over time may have obscured these differences in the twenty-first century, but in the age of the Constitutional Convention, writers from John Adams to Noah Webster were familiar with it.

The difference itself is simple enough: an abridgement of rights pushed far enough becomes infringement, but not every abridgement is infringement. Nor does every abridgement of lawful powers infringe the law. And yet, by the end of the twentieth century, this clear distinction became obscured in America. In fact, it became so obscured that even a prominent law professor could confuse the action words of the first and second amendments:

14

Overview: "Infringed or Abridged"

> Despite its plausibility as a textual matter, the narrow interpretation of "prohibiting" should therefore, be rejected, and the term should be read as meaning approximately the same as "infringing" or "abridging."[10]

Look at the difference between Alexander Hamilton, publishing in 1812, and Professor Michael W. McConnell, published in the *Harvard Law Review* in 1990. It tells the story in a nutshell: in recent years, the "infringed" of the second amendment has too often been misconstrued as a synonym for the "abridging" of the first amendment.

The nutshell is not the whole story, of course. Hence this book. This introductory chapter presents the overview. First, the two action words *infringe* and *abridge* are different English words, with different meanings. (For convenience, the words will usually be discussed as *infringe* and *abridge*. However, discussion should be understood to refer to all forms— all tenses, the infinitive, use as participles or nouns—*to infringe* and *to abridge*, *infringed* and *abridged*, *infringement* and *abridgement*, etc.). It is essential to clarify that in the eighteenth century the words *abridge* and *infringe* were distinct and separate, that they had always been distinct and separate, and that to claim that the eighteenth century considered them synonyms will always be an anachronism. The two words never meant the same thing. While it is difficult to prove a negative, the evidence is clear. From the beginning of dictionaries in English through 1789, never at any time did English define infringement and abridgement to mean the same thing.

Therefore, no matter how absolutist some weapons supporters may feel, the second amendment itself is not absolutist. This point can be supported by analysis of the words—in simplest terms, by looking at the English the writers used. A view of the right to bear arms as limitless, sweeping, and absolute is contradicted by the vocabulary in which the Bill of Rights was written. In eighteenth-century English, and earlier, 'even to the meanest intelligence' as dictionary authors rather tactlessly used to put it, *abridge* was to limit; *infringe* was to break. Historical documentation for the distinction is voluminous and unassailable. The straightforward way to find it is to use English dictionaries, including ones used by the founders themselves. This is not to say that dictionaries were the only place the two words were defined differently. Their difference shows up in public documents and private letters from the eighteenth century. But dictionaries provide valuable evidence of the customary use. Chapter 2 discusses the history of the two words in dictionaries, which also show how their usage evolved over ten centuries.

A millennium of English dictionaries is not cherry-picking. The distinction between definitions of *infringe* and *abridge* is clear and consistent in English-language dictionaries from the eighth century to the ratification of the Bill of Rights, from Old English (Anglo-Saxon) through the eighteenth century. *Infringe* was destructive; *abridge* became constructive. Every dictionary that included *infringing* defined it as violating or breaking

15

something, as in the famous Dr. Johnson's definition, "To violate; to break laws or contracts"; "To destroy; to hinder."[11] There are no exceptions in the entire history of English dictionaries before 1789. Dictionaries also used *infringe* to define other words for unacceptable, destructive acts—to violate, to break. Whether defined as a main entry (headword) itself, or used to define other words, *infringe* in all forms meant destruction. Either as infringement of a power, an authority—a law, a treaty, a constitution—or as infringement of a right, it remained destructive. To infringe a contract or treaty is to break it; to infringe a right is to destroy it.

The development of abridging as a concept was more complex. The linguistic history of infringement had no early turning points; abridgement had several. Before 1600, if dictionaries included the term *abridged* at all, the word referred to editing. *Abridged* meant condensed, synopsized, or shortened, as in abridged histories or abridgements of law like dictionary author and lawyer John Rastell's 1527 *Abridgment of the Statutes* of England. In the seventeenth and eighteenth centuries, and especially approaching 1789, more dictionaries in English included public-policy definitions for *abridge*. It was still a synonym for acts considered acceptable, necessary, often beneficial—to lessen, to limit, to contract. But now it went beyond editorial work. In philosophy and history, abridgement meant abridgement of power. Then it came to mean a voluntary abridgement of rights to form a society.

The difference still shows in contracts, as well as in social compact. A signed contract cannot usually be abridged; legitimate changes involve a codicil or rewriting the whole, where after-the-fact changes are breach. Abridging power or privilege, on the other hand, is not only possible but a good idea, and voluntary abridgement of individual rights to join in human society is beneficial. The consequence of voluntary abridgements of individual freedom is human society, as in the 1789 United States. However, abridgement of rights pushed to the point of infringement—as in 1774 America—was clearly a negative. When *abridge* came to refer to political acts, public policy, the difference between infringement and abridgement became overt. Infringing rights or laws was bad; abridging individual license or excess power was good. All of this is supported by Dr. Samuel Johnson's eighteenth-century dictionary.

To discuss Samuel Johnson's dictionary is not to imply that the eighteenth century used the words *infringe* and *abridge* with some abrupt innovation, unique to the era. Johnson's *Dictionary* aligned with the history of previous English dictionaries. The seventeenth and eighteenth centuries produced larger dictionaries and more dictionaries than ever before, but again, the words *abridge* and *infringe* were semantically separate before and after the period. They stayed semantically separate, from the eighth century through the next eleven centuries. While the language of the U.S. Constitution developed from English usage in its own time, the language, like the Constitution, was the development of more than a millennium.

# Joining the terms

While infringed and *abridged* are and were different, in political philosophy they became logically connected. Where infringement always meant a wrong, the more subtle concept of abridgement evolved in meaning over centuries. Only in the seventeenth and eighteenth centuries, as human population increased, political philosophy branched out, and more attention was devoted in print to the concepts of rights and liberty, did abridging come to be used as Locke, Dr. Johnson, and the U.S. founders used it. As a limit but not a violation, in a careful distinction from infringing, it was juxtaposed with infringing in an English binomial—"infringed or abridged."

That the key action words in our first two amendments were a traditional binomial may need to be relearned now. Aside from a word-sleuth like Bill Bryson or a prominent scholar of U.S. history like Douglas Brinkley, most people would not recognize "infringed or abridged" as a traditional phrase. But it was. The two terms were paired in government, law, and policy, because their contrasting meanings complement each other. Rather than trace all the significant uses of *infringe* and *abridge* in English and American public documents, demonstrating their differences, in this book the trail will be narrowed to their use together as a binomial. The binomial is a good way to track their use in American public documents. To explain their difference—limited reasonably and voluntarily, versus limited to the breaking point—it is quicker and clearer to show that they became juxtaposed in political thought. Chapter 3 discusses the use of the infringe-or-abridge binomial in Britain and in America.

My theory is that such binomial phrases in English have been used, for millennia, for protection. This is the one theoretical aspect of the discussion. The dictionary definitions and the public and private documents using *infringe* and *abridge* are fact. The use of binomial phrases in legal documents from Anglo-Saxon to the present is fact, a matter of record. It is my inference that the binomial phrases used in government, law, and policy, including "infringed or abridged," were intended as protection.

# Change and misunderstanding

Words change. As *abridge* changed in the eighteenth century, *infringe* changed in the nineteenth century. Previously, *infringe* had been the clearer term, and even today the dictionary definition has not entirely changed. But in the nineteenth century, usage shifted. It softened, began

*Common Sense in the Second Amendment*

to be replaced by "infringe upon," lost its force. It was never used again in constitutional amendments after the second amendment. Chapter 4 deals with the changing usage of "infringed" over time and with its replacement in constitutional amendments by "denied or abridged." The binomial "denied or abridged" had its own history in public documents in America. As with earlier, traditional binomials, the purpose was protection of rights. In the U.S., the "denied or abridged" binomial has been used unambiguously to protect the right to vote.

Regrettably, when the traditional binomial was lost, its protection was lost. Chapter 5 deals with the loss of the infringed-or-abridged binomial, and the results. One result of losing the protective binomial in English is that we have had even some federal judges misconstruing the second amendment. Somehow, recent research on the second amendment seldom mentions English vocabulary in 1789 or pre-1789 definitions of *infringe*. We have had public exhortations to look at the original Constitution and to discover the founders' intent, yet little attention has gone to eighteenth-century language where it counts most. Rather than defining terms, most debate during the last thirty years has focused on militia membership versus non-membership, individual versus collective rights, new constitutional amendments versus repealing the second amendment, etc. 'Originalism,' 'strict construction,' and a 'structural constitution' developed political influence some years ago, but those views still have not translated into a thorough look at the precise but accessible terms *abridge* and *infringe*, in the eighteenth century and earlier, in the first two amendments. Given the stakes for the public when armed force is used, it is high time to take a careful look.

18