# Unreported Decisions

 Positive
As of: March 29, 2023 4:48 PM Z

## *Def. Distributed v. Bonta*

United States District Court for the Central District of California

October 21, 2022, Decided; October 21, 2022, Filed

CV 22-6200-GW-AGRx

**Reporter**

2022 U.S. Dist. LEXIS 195839 *; 2022 WL 15524977

Defense Distributed v. Robert Bonta, et al.

**Subsequent History:** Adopted by, Injunction denied by *Def. Distributed v. Bonta, 2022 U.S. Dist. LEXIS 198110 (C.D. Cal., Oct. 24, 2022)*

## Core Terms

regulation, firearms, preliminary injunction, plain text, irreparable, injunctive relief, provisions, bear arms, covers, prevailing, merits, rights

**Counsel:** For Defense Distributed, a Texas corporation |, Second Amendment **[*1]** Foundation, Plaintiffs: Brett William Johnson, LEAD ATTORNEY, Snell and Wilmer LLP, Phoenix, AZ USA; Derek C Flint, PRO HAC VICE, Cameron James Schlagel, Michael B Reynolds, Snell and Wilmer LLP, Costa Mesa, CA USA.

For Robert Bonta, in his official capacity as California Attorney General |, Luis Lopez, in his official capacity as Director of the California Bureau of Firearms |, Defendants: Sean Clinton Woods, LEAD ATTORNEY, CAAG - Office of Attorney General of California, San Francisco, CA USA.

For Robert Bonta, in his official capacity as California Attorney General |, Defendant: Sean Clinton Woods, LEAD ATTORNEY, CAAG - Office of Attorney General of California.

**Judges:** GEORGE H. WU, UNITED STATES DISTRICT JUDGE.

**Opinion by:** GEORGE H. WU

## Opinion

**CIVIL MINUTES - GENERAL**

**PROCEEDINGS: IN CHAMBERS - TENTATIVE RULING ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION [14]**

Attached hereto is the Court's Tentative Ruling on Plaintiff's Motion [14] set for hearing on October 24, 2022 at 8:30 a.m.

### I. Introduction/Background

On August 31, 2022, Defense Distributed ("DD") and the Second Amendment Foundation filed this lawsuit against Robert Bonta, in his official capacity as California Attorney General, **[*2]** and Luis Lopez, in his official capacity as Director of the California Bureau of Firearms (collectively, "Defendants"). The operative complaint in the action is now the First Amended Complaint for Declaratory and Injunctive Relief ("FAC"), with DD listed as the sole plaintiff in the action. *See* Docket No. 13. The FAC contains the following four claims for relief: 1) "*42 U.S.C. § 1983* Action for Deprivation of Plaintiff's Rights under *U.S. Const. amends. II* and *XIV*;" 2) "*42*

_U.S.C. § 1983_ Action for Deprivation of Plaintiff's Rights under _U.S. Const. amends. I_ and _XIV_;" 3) "_42 U.S.C. § 1983_ Action for Deprivation of Plaintiff's Right to Equal Protection under _U.S. Const. amend. XIV_;" and 4) "_Supremacy Clause, U.S. Const. art. VI_."

Generally speaking, this action concerns the California Legislature's passage of two provisions. The first is Assembly Bill 1621, 2021-2022 Reg. Sess. ("AB 1621"), which amended or added multiple provisions of the Penal Code, and which took effect immediately upon the Governor's signature on June 30, 2022. AB 1621, _inter alia_, prohibits any persons in the State of California — other than federally-licensed firearms manufacturers or importers — from using, possessing, selling, or transferring a computerized numerical code ("CNC") milling machine that has a sole or primary purpose of manufacturing firearms.[1] AB 1621 § 25; _Cal. Pen. Code § 29185_. The **[*3]** second item of legislation is Section 2 of Senate Bill 1327, 2021-2022 Reg. Sess. ("SB 1327") — enacted on July 22, 2022, and set to go into effect on January 1, 2023. SB 1327, _inter alia_, makes anyone who seeks declaratory or injunctive relief to prevent enforcement of any statute, ordinance, rule, regulation or any other law that "regulates or restricts firearms" potentially "jointly and severally liable to pay the attorney's fees and costs of the prevailing party," with anyone seeking such declaratory or injunctive relief themselves not eligible for such prevailing-party status, and the government given up to three years after the conclusion of the litigation in which to seek to recoup its fees if it is deemed the "prevailing party." _See_ FAC ¶¶ 40,

59, 61-62, 64;[2] _Cal. Civ. Proc. Code § 1021.11_.

DD's theory on its _Second Amendment_ claim is that "the text of the _Second Amendment_, which guarantees 'the right of the people to keep and bear Arms,' implicitly includes the right to acquire and manufacture firearms." FAC ¶ 76 (quoting _U.S. Const. amend. II_). DD alleges that "laws that restrict the tools and parts used for the self-manufacture of firearms are inconsistent with the Nation's historical tradition of firearms regulation," _id._ ¶ 36, and that the provisions **[*4]** of AB 1621 are just such laws. According to the FAC, "CNC milling machines are the modern-day manifestation of firearm milling technology, technology that has never before been regulated in American history." _Id._ ¶ 6. "Modern-day CNC milling is a standard machining process that employs computerized controls and rotating cutting tools to precisely remove material from a workpiece to produce a custom-designed part or product." _Id._ ¶ 10. DD sells, among other things, the "Ghost Gunner," a "general-purpose [CNC] milling machine . . . that gives purchasers the ability to complete unfinished frames and receivers for various types of firearms, including the AR-15, AR-308, M1911, and AK-47." _Id._ ¶ 1. "Because the materials provided by [DD] often do not have serial numbers and are not licensed with the federal government, they may be used to make what are popularly known by the moniker 'ghost guns.'" _Id._ ¶ 17.

On September 23, 2022, DD moved for a preliminary injunction, asking that the Court enjoin Defendants (and any others in active concern or participation with them) from enforcing _California Penal Code sections_

---

[1] FAC ¶ 1 states that: "Defense Distributed sells a product called the Ghost Gunner [which] is a general-purpose Computerized Numerical Code milling machine." _See_ Docket No. 13.

[2] The FAC's third and fourth causes of action are both tied to DD's challenge to SB 1327, not to the challenge to AB 1621 and the Penal Code provisions it added. _See_ FAC ¶¶ 101-105, 107-108; _see also_ Docket No. 14, at 2:11-18.

29180(f), 29185, 30400, 27530(a), and 18010(d), as enacted by AB 1621, and from enforcing Section 2 of SB 1327.

## II. Discussion

Under _Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)_, to obtain injunctive relief, **[*5]** DD must show that it "is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." _Id. at 20_; _see also Vivid Entm't, LLC v. Fielding, 774 F.3d 566, 577 (9th Cir. 2014)_. In the wake of _Winter_, the Ninth Circuit also still employs a lesser, "sliding-scale" approach. Under that latter construct, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." _Arc of Cal. v. Douglas, 757 F.3d 975, 983 (9th Cir. 2014)_ (omitting internal quotation marks) (quoting _Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011)_).[3] "In each

_____

[3] It is not dispositive here, but this Court continues to believe that the Ninth Circuit's resurrection of its "sliding-scale" approach was problematic in the wake of _Winter_. In _American Trucking Associations, Inc. v. City of Los Angeles, 559 F.3d 1046 (9th Cir. 2009)_, the Ninth Circuit made clear that the Supreme Court's _Winter_ decision had announced the applicable standard governing injunctive relief: "To the extent that our cases have suggested a lesser standard [than that announced in _Winter_], they are no longer controlling, or even viable." _Id. at 1052_. In making that announcement, the _American Trucking_ panel cited directly, as an example of "a lesser standard," to a pin-cited page of its earlier decision in _Lands Council v. Martin, 479 F.3d 636 (9th Cir. 2007)_, in which it had earlier set forth both the "possibility of irreparable injury" standard that _Winter_ specifically addressed _and_ the Ninth Circuit's sliding scale approach. _See id. at 639_. It is a commonplace observation that one three-judge panel of the Ninth Circuit — such as the panel in _Alliance for Wild Rockies_

case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." _Winter, 555 U.S. at 24_ (quoting _Amoco Prod. Co. v. Gambell, 480 U.S 531, 542, 107 S. Ct. 1396, 94 L. Ed. 2d 542 (1987)_). "A preliminary injunction is an extraordinary remedy never awarded as of right." _Id._

The Court will deny DD's motion. In brief, the Court would find that, given the purpose of California's regulation, the "balance of equities" and "public interest" are not so one-sided in DD's favor as DD appears **[*6]** to believe — even if DD _was_ able to demonstrate a likely violation of Second Amendment rights. As to AB 1621 and the Penal Code provisions it introduced, the Court does not believe DD has demonstrated _at this time_ a likelihood that it will prevail on the merits of its Second Amendment claim (or even that there are "serious questions going to the merits" on that issue) and, necessarily, it therefore has not demonstrated a likelihood of irreparable injury. As to SB 1327, Defendants have made it clear that they have no intention of enforcing its provisions against DD — _i.e._, seeking attorneys' fees and costs pursuant to that authority — in connection with this litigation. Whatever that might or might not mean with regard to mootness and/or standing, that is not the issue here — for purposes of a preliminary injunction motion, it means that DD faces no likely irreparable harm/injury.

## A. AB 1621

_____

_v. Cottrell, 632 F.3d 1127, 1131-35 (9th Cir. 2011)_, that seemingly first-revived the "sliding scale" approach — may not overrule an earlier three-judge panel in the absence of intervening controlling Supreme Court precedent. _See United States v. Mayer, 560 F.3d 948, 964 (9th Cir. 2009)_. Although, on this point, the water is not just under-the-bridge but by now, likely far, far, out to sea, so far as this Court is aware the Ninth Circuit has never attempted to address this issue head-on.

DD's case for why AB 1621 and the Penal Code provisions it introduced in California violate the _Second Amendment_ is based upon its belief that Defendants must demonstrate historical analogues that justify the type of regulation at-issue. Specifically, it believes that the Supreme Court's decision this year in _New York State Rifle & Pistol Association, Inc. v. Bruen, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022)_, requires that showing as part of **[*7]** the applicable analysis. Unfortunately for DD, the Court does not share that reading of _Bruen_.

In _Bruen_, the Supreme Court "h[e]ld that _when the Second Amendment's plain text covers an individual's conduct_, the Constitution presumptively protects that conduct." _142 S. Ct. 2111, 2126, 213 L. Ed. 2d 387 (2022)_ (emphasis added). In _that_ situation, if a government seeks to justify its regulation, it "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the _Second Amendment's_ 'unqualified command.'" _Id._[4]

The Supreme Court, perhaps concerned that it had not already been clear enough (and/or that its interim discussion of analysis in _District of Columbia v. Heller, 554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008)_ had potentially distracted the reader), later "sum[med]" up its

---

[4] No reasonable person would dispute that the type of regulation at issue in _Bruen_ — a limitation on an individual's "right to carry handguns publicly for their self-defense" via issuance of "public-carry licenses only when an applicant demonstrates a special need for self-defense," _142 S. Ct. at 2122_ — is completely different than what is at issue here. _See also District of Columbia v. Heller, 554 U.S. 570, 628, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008)_ (considering District of Columbia's handgun ban); _McDonald v. City of Chicago, Ill., 561 U.S. 742, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010)_ (considering laws similar to District of Columbia's).

analysis, and "reiterate[d] that the standard for applying the _Second Amendment_ is as follows: _When the Second Amendment's plain text covers an individual's conduct_, the Constitution presumptively protects that conduct. The government must _then_ justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." _Id. at 2129-30_ (emphases added). Then, when actually applying **[*8]** the analysis it had deemed proper, the first thing _Bruen_ undertook was to "turn to whether _the plain text of the Second Amendment_ protects [the two individual plaintiffs'] proposed course of conduct — carrying handguns publicly for self-defense." _Id. at 2134_ (emphasis added). The Court had "little difficulty concluding that it does," in part because "[n]othing in _the Second Amendment's_ text draws a home/public distinction with respect to the right to keep and bear arms." _Id._ (emphasis added); _see also id. at 2135_ (concluding that "[t]he _Second Amendment's_ plain text thus presumptively guarantees [the individual plaintiff's] a right to 'bear' arms in public for self-defense" before proceeding on to determine whether New York could show that its "proper-cause requirement" was "consistent with this Nation's historical tradition of firearm regulation"); _id. at 2141 n.11_ ("[A]gain, because the _Second Amendment's_ bare text covers petitioners' public carry, the respondents here shoulder the burden of demonstrating that New York's proper-cause requirement is consistent with the _Second Amendment's_ text and historical scope.") (emphases added). Whatever else may be said of _Bruen_, these parts of the opinion are crystal-clear (as the Court's review of post-_Bruen_ case law applying _Bruen_ largely supports).[5] _See also, e.g., Nat'l Ass'n for Gun_

---

[5] Notwithstanding the clarity this Court perceives, even Defendants appear to be somewhat confused about _Bruen's_ import, at least in one instance. They at least initially describe _Bruen_ as having "held that courts must apply a standard 'rooted in the _Second Amendment's_ text, as informed by

2022 U.S. Dist. LEXIS 195839, *8

*Rights, Inc. v. City of San Jose,    F.Supp.3d   , 2022 U.S. Dist. LEXIS 138385, 2022 WL 3083715, *8 (N.D. Cal. Aug. 3, 2022)* ("If the conduct **[\*9]** at issue is covered by the text of the *Second Amendment*, the burden then shifts to the government to show why the regulation is consistent with the Nation's historical traditional of firearm regulation . . . ."); *Young v. Hawaii, 45 F.4th 1087, 1092 (9th Cir. Aug. 19, 2022)* (*en banc* Order) (O'Scannlain, J., dissenting); *Firearms Policy Coalition, Inc. v. McCraw,    F.Supp.3d   , 2022 U.S. Dist. LEXIS 152834, 2022 WL 3656996, *8 (N.D. Tex. Aug. 25, 2022)*; *Rigby v. Jennings,    F.Supp.3d   , 2022 U.S. Dist. LEXIS 172375, 2022 WL 4448220, *5 (D. Del. Sept. 23, 2022)*; *United States v. Price,*

*F.Supp.3d   , 2022 U.S. Dist. LEXIS 186571, 2022 WL 6968457, *2, 6 (S.D. W. Va. Oct. 12, 2022).*[6] DD's reading of the decision to the contrary, *see* Docket No. 16, at 6:22-25 ("Though the Supreme Court did explain that '[w]hen the *Second Amendment's* plain text covers an individual's conduct, the Constitution presumptively protects that conduct,' it did not subordinate the historical analysis as a contingent second step.") (quoting *Bruen, 142 S. Ct. at 2131*), is not possible to square with these passages.

Though it leads with a recognition of the primacy of *Bruen's* "plain text" point, *see* Docket No. 14, at 19:20-21, DD seeks in its opening brief to jump ahead in the analysis to a historical/tradition assessment (and to jump ahead in *Bruen* to that decision's discussion of how to conduct such an assessment). *See id.* at 19:23-24:27. But it has effectively attempted to avoid the necessary threshold consideration — does the "*Second Amendment's* plain text" cover the issue here? No, it plainly does not. AB 1621 has nothing to do with "keep[ing] **[\*10]** or "bear[ing]" arms. *See Bruen, 142 S. Ct. at 2127* (noting that *Heller* employed a "textual analysis" to focus on the *Second Amendment* language's "normal and ordinary meaning" as a guarantee of an individual right "to possess and carry weapons") (quoting *Heller, 554 U.S. at 576-77, 592*); *id. at 2134* ("*Heller* further confirmed that

history.'" Docket No. 15, at 11:21-22 (quoting *Bruen, 142 S. Ct. at 2127*). But the passage of *Bruen* they quote concerns *Bruen's* description of what *Heller* "demands," not what *Bruen* itself "held" (which, as noted above, is plain-text analysis *first, then* history *if necessary*). DD picks up on Defendants' misstep, arguing in its Reply that "the Supreme Court in *Bruen* unambiguously held that the *Second Amendment* analysis consists of a single step where the Court interprets the scope of the *Second Amendment's* textual guarantee, informed by history and tradition." Docket No. 16, at 3:14-17. Again, unless the Court misunderstands the "plain text" meaning of "unambiguously," it cannot fathom how DD could reach this conclusion. Certainly, DD's decision to omit the phrase "plain text" aids its ends, but the means are fatally-flawed.

Yes, the Supreme Court did say — again, after *repeatedly* making clear that the "plain text" inquiry was a threshold inquiry — that "[t]he test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the *Second Amendment's* text and historical understanding." DD mysteriously locates that quotation on page 2126 of *Bruen* (to pick just one, the word "understanding" appears nowhere on page 2126), *see* Docket No. 16, at 6:25-27, when it actually appears on page 2131, much later in the decision (a placement that actually means something, given the course/progress of *Bruen's* analysis). *Bruen* saying — on page 2131 — that it had to consider text and historical understanding reveals two things — 1) it actually *did* need to consider both "text" and "historical understanding" in that case given the nature of the regulation in question, and 2) the quoted sentence cannot possibly be understood as meaning that the "text" of the *Second Amendment* is informed by a "historical understanding," at least not without rendering the Supreme Court's repeated reference to "plain text" entirely meaningless.

---

[6] The Third Circuit Court of Appeal's recent statement that "the Supreme Court [in *Bruen*] recently instructed us to closely scrutinize *all* gun restrictions for a historically grounded justification," *Frein v. Pennsylvania State Police, 47 F.4th 247, 254 (3d Cir. 2022)* (emphasis in original), is, quite simply, wrong. That is, unless *Bruen* means something other than what it quite-plainly says (although, considering that what we deal with here is the *Second Amendment*, perhaps this is no longer accepted as a persuasive criticism). As a "pin-cite" (to three pages of text) for its attempt to reflect the law, the *Frein* decision cites only to that portion of *Bruen* that begins *after Bruen* has — *repeatedly* — made it clear that a "plain text" assessment comes *before* any historical analysis is necessary. *See id.* (citing *Bruen, 142 S. Ct. at 2131-33*).

the right to "bear arms" refers to the right to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket . . . .").

"To determine whether the *Second Amendment's* plain text covers an individual's conduct, courts must first identify and delineate the specific course of conduct at issue, which in *Bruen* was 'carrying handguns publicly for self-defense.'" *Nat'l Ass'n for Gun Rights, 2022 U.S. Dist. LEXIS 138385, 2022 WL 3083715, at *8* (quoting *Bruen, 142 S. Ct. at 2134*). Under DD's own characterization of the Penal Code provisions introduced via AB 1621, what is at issue here is a ban on "self-manufacture of firearms" and a prohibition on "the sale of the tools and parts necessary to complete the self-manufacturing process." Docket No. 14, at 1:26-2:1; *see also id.* at 9:8-9 (referring to a *Second Amendment* right [of law-abiding citizens] to craft and build their own personal firearms"). Try as you might, you will not find a discussion of those concerns (or any such "right(s)") in the "plain text" of the *Second Amendment. See U.S. Const. amend. II* ("A well regulated Militia, being necessary to the security of a **[*11]** free State, the right of the people to keep and bear Arms, shall not be infringed.").[7]

DD "implicitly" recognizes this, because it argues that the *Second Amendment's* recognition of a right "to keep and bear arms" "implicitly includes the right to acquire and manufacture firearms" and "necessarily involves the right to purchase" arms. Docket No. 14, at 19:4-6 (internal quotation marks omitted) (quoting *Andrews v. State, 50 Tenn. 165, 178 (1871)*). DD seemingly perceives a penumbra. *See* Docket No. 16, at 9:9-11 (criticizing Defendants' "painfully literal

approach [because it] ignores the fundamental principal [*sic*] that when analyzing the text of an amendment, 'certain unarticulated rights are implicit in enumerated guarantees'") (quoting *Richmond Newspapers v. Virginia, 448 U.S. 555, 579-80, 100 S. Ct. 2814, 65 L. Ed. 2d 973 (1980)*). But whether or not it does so, its analysis is quite-clearly not a "plain text" analysis, required under *Bruen*.[8] Even beyond that point, DD has not pointed to any clear regulation in AB 1621 of any perceived rights concerning the acquisition or purchase of "arms."

Much as DD would like to move history and tradition forward in the course of relevant analysis under *Bruen*, its attempt does not survive a careful, and intellectually-honest, reading of that decision. In the end, as Defendants argue, "under *Bruen*, the burden **[*12]** does not shift to the government to support the regulations with a historical analysis, and [DD's] *Second Amendment* challenge" — at least for purposes of this motion — "fails at the threshold stage of the inquiry." Docket No. 15, at 17:28-18:2.[9]

---

[7] Query how — if DD was correct about how the *Second Amendment's* plain text should be read and *Bruen* should be applied in the history of self-manufacture — *any* serialization requirement of firearms could be Constitutional.

[8] The Court does not find the recent conclusion to the contrary by a District of Delaware court, relying entirely (at least so far as citations go) only on a pre-*Bruen* Seventh Circuit decision dealing with implied rights to acquire- and maintain-proficiency in the use of firearms, to be persuasive. *See Rigby v. Jennings, F.Supp.3d , 2022 U.S. Dist. LEXIS 172375, 2022 WL 4448220, *8 (D. Del. Sept. 23, 2022)* ("Similarly, here, the right to keep and bear arms implies a corresponding right to manufacture arms. Indeed, the right to keep and bear arms would be meaningless if no individual or entity could manufacture a firearm. Thus, if possessing untraceable firearms is protected by the *Second Amendment*, then so too is manufacturing them.") (citing *Ezell v. City of Chicago, 651 F.3d 684, 704 (7th Cir. 2011)*). Defendants' observation about DD's motion is a point that could equally be made about *Rigby* — "[DD] produces no authority that the right to own a machine used to manufacture one's own arms is encompassed by the plain text of the *Second Amendment*, which says nothing about 'self-manufacture or assembly' of one's own firearms." Docket No. 15, at 14:23-25.

[9] Even if DD were somehow able to clear the threshold consideration made clear in *Bruen*, it filed this case on August

DD — and apparently certain other courts — would like to treat the Supreme Court's *Bruen* opinion as a "word salad," choosing an ingredient from one side of the "plate" and an entirely-separate ingredient from the other, until there is nothing left whatsoever other than an entirely-bulletproof and unrestrained *Second Amendment*.[10] That is not how precedent works; it is not even how language works (let alone salad, in most instances). Under the analytical framework established in *Bruen*, DD has not demonstrated at this time either a "likelihood" of prevailing on the merits or even a "reasonable probability of success" in connection with its case against AB 1621. *See* Docket No. 14, at 18:15-21. If there is some other non-*Bruen* framework that could give life to its challenge to AB 1621, DD has not yet identified/defined it. With no demonstration of a likely *Second Amendment* violation at this point, no irreparable harm is likely. DD therefore cannot satisfy either of the two (arguably-) appropriate tests for preliminary **[*13]** injunctive relief, and its motion insofar as AB 1621 is concerned is denied.

## B. SB 1327

DD challenges SB 1327 on right-to-petition, substantive due process, equal protection, and

*Supremacy Clause* grounds. As to this aspect of DD's case and its request for a preliminary injunction, the Court has no need or cause to consider whether or not Section 2 of SB 1327 is constitutionally-infirm/whether DD has a likelihood of prevailing upon that point.[11] This is because DD has to be able to demonstrate "immediate threatened harm/injury" in order to warrant a preliminary injunction. *See Caribbean Marine Servs. Co., Inc. v. Baldridge, 844 F.2d 668, 674 (9th Cir. 1988)* (noting that, in demonstrating irreparable injury, "[a] plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief"); *see also Midgett v. Tri-County Metro. Transp. Dist. of Or., 254 F.3d 846, 850-51 (9th Cir. 2001)* ("This court already has rejected the argument that a determination that a plaintiff has suffered sufficient injury to support standing logically requires the court to conclude that the plaintiff necessarily has demonstrated a sufficient fear of immediate and substantial injury to warrant an injunction.").

Defendants have made clear that they "have informed [DD] that they will **[*14]** not seek attorneys' fees or costs from [DD] or its attorneys pursuant to [Section 2 of SB 1327] in connection with this action." Docket No. 15, at 1:9-11; *see also id.* at 9:19-23; Declaration of S. Clinton Woods in Support of Defendants' Opposition to Motion for Preliminary Injunction, Docket No. 15-1, ¶¶ 3-5 & Exh. A. Given Defendants' statements in documents filed with the Court, it is almost certain that any later court considering a contrary plan would hold Defendants to their word under principles of

---

31, 2022, the FAC on September 21, 2022, and this motion on September 23, 2022. In order to even be able to assess whether or not DD could demonstrate a "likelihood" of prevailing on the merits — again, under a hypothetical manner of analysis that most-definitely does *not* apply under *Bruen* — there is no possibility this Court would expect Defendants to be able to present the type of historical analysis conducted in *Bruen* on 31 days' notice (or even 54 days' notice). DD obtaining a preliminary injunction — at least as to AB 1621 — on October 24, 2022, was wishful-thinking, at-best, for at least that reason.

[10] Such approach would contrary to the actual language of the *Second Amendment* which provides that "A *well-regulated* militia, being necessary to the security of a free State . . . . [emphasis added]."

---

[11] The Court would note that, but for Defendants' commitment not to pursue attorneys' fees or costs from DD or its attorneys pursuant to Section 2 of SB 1327 in connection with this action, it would entertain reservations as to SB 1327's impact on DD's *First Amendment* rights.

judicial estoppel. *See, e.g., Bock v. Washington, 33 F.4th 1139, 1145 (9th Cir. 2022)* (observing that "[w]hen 'a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position'" and noting that one factor to consider in deciding whether to apply the doctrine is whether "'the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped'") (quoting *New Hampshire v. Maine, 532 U.S. 742, 749-51, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001)*); *United States v. Kim, 806 F.3d 1161, 1167 (9th Cir. 2015)* ("[T]he judicial estoppel doctrine . . . prevents the offending party from gaining an unfair advantage by his litigation tactics."); *Wagner v. Prof'l Eng'rs in Cal. Gov't, 354 F.3d 1036, 1047 n.10 (9th Cir. 2004)* (approving of application of judicial estoppel **[*15]** in connection with litigant's "strategic decision"). As a result, the Court does not believe that DD has demonstrated the threat of immediate injury that is necessary to issue the extraordinary remedy of a preliminary injunction. *See, e.g., Boardman v. Pac. Seafood Grp., 822 F.3d 1011, 1022 (9th Cir. 2016)* ("This Court has ruled that '[s]peculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction. A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief.'") (quoting *Caribbean Marine, 844 F.2d at 674*).

Potentially-realizing that Defendants' firm offer does not aid its present motion, in its Reply DD immediately attempts — indeed, in the first line of text in the Reply — to cast the maneuver solely in "mootness" terms and, just a few lines later, via standing principles. *See* Docket No. 16, at 3:4 ("Defendants attempt to moot Plaintiff's SB 1327 challenge . . . ."); *id.* at 3:8-10 ("Plaintiff has Article III standing to challenge SB 1327 because Defendants' representations in this case do not preclude the State from seeking attorneys' fees in a subsequent action."). Whatever Defendants' position **[*16]** might mean with respect to any mootness/standing considerations is not an issue this Court needs to decide on this DDinitiated motion for a preliminary injunction, notwithstanding Defendants' attempt to also argue that point in opposition to the motion.

Because DD cannot show it will likely suffer irreparable harm or injury because of Section 2 of SB 1327, it cannot meet the applicable preliminary injunction test(s). The motion is therefore denied in this respect.

## III. Conclusion

Whatever the above discussion might mean for the future of DD's case, a preliminary injunction is an "extraordinary remedy." For the reasons set forth above, DD simply has not made a case for its issuance here. The Court therefore denies the motion.

## PROCEEDINGS: PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION [14]

Plaintiff Defense Distributed's Motion for Preliminary Injunction ("Motion") came on for hearing before this Court. After considering the moving and opposition papers plus concomitant evidentiary submissions, the pleadings, and the oral argument of counsel, the Court adopts its Tentative Ruling (*see* ECF No. 19) as its final decision on the Motion and DENIES Plaintiff's request for a preliminary injunction.

In further response **[*17]** to an argument made by Plaintiff's counsel at the hearing, the Court already explained in-detail in both its

Tentative Ruling and at oral argument why it reads *New York State Rifle & Pistol Association, Inc. v. Bruen, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022)*, as asking the "plain text" question before there is a determination that any history need be consulted, using multiple examples from the discussion in *Bruen* itself to justify that understanding. In part, Plaintiff responded that *Bruen* clearly ended the "two-step approach" that had been employed post-*Heller* and post-*McDonald* and, in that process, stated that it was "one step too many." That is no doubt true. But as the Court reads *Bruen*, that move to a "single-step" process only applies in situations where the plain text of the *Second Amendment* covers an individual's conduct that a government has attempted to regulate. That is — as also explained in the Tentative Ruling and at oral argument — not the situation here. The regulation at issue in *Bruen* (and *Heller* and *McDonald*, for that matter) has nothing to do with California's legislative efforts (*i.e.*, AB 1621) here. As a result, while the "single-step" discussion is an almost-certainly accurate assessment of *Bruen*, it is merely an interesting, academic debate so far as this case is concerned. It has no controlling effect here.

**End of Document**

⚠️ Caution
As of: March 29, 2023 4:59 PM Z

# *Reese v. BATFE*

United States District Court for the Western District of Louisiana, Lafayette Division

December 21, 2022, Decided; December 21, 2022, Filed

CASE NO. 6:20-CV-01438

**Reporter**
2022 U.S. Dist. LEXIS 230140 *; __ F.Supp.3d __; 2022 WL 17859138

CALEB REESE, ET AL. VERSUS BUREAU OF
ALCOHOL TOBACCO FIREARMS & EXPLOSIVES, ET
AL.

**Subsequent History:** Appeal filed, 01/13/2023

## Core Terms

handguns, firearms, regulation, restrictions, summary
judgment, courts, militia, arms, individual plaintiff, gun,
Plaintiffs', weapons, rights, full scope, Organizational,
ammunition, Ban, historical evidence, motion to dismiss,
federal law, bear arms, law-abiding, protects, reasons,
sales, nineteenth century, age group, analogue,
forgoing, licensed

## Case Summary

### Overview

HOLDINGS: [1]-Plaintiffs, individuals and organizations,
established standing to challenge federal laws
prohibiting federal firearms licensees (FFLs) from selling
handguns or handgun ammunition to persons aged 18
to 20 because the laws caused those persons a
concrete, particularized injury—i.e., the injury of not
being able to purchase handguns from FFLs; [2]-
Although the *Second Amendment's* plain text protected
the ability of 18 to 20-year-olds to directly purchase
handguns from FFLs, the government adequately
demonstrated that the challenged laws were consistent
with the Nation's historical tradition of firearm regulation.

### Outcome
Motions to dismiss or for summary judgment granted in
part and denied in part.

## LexisNexis® Headnotes

Civil Procedure > ... > Defenses, Demurrers &
Objections > Motions to Dismiss > Failure to State
Claim

Evidence > Burdens of Proof > Allocation

### *HN1*[📥] Motions to Dismiss, Failure to State Claim

Motions filed under *Fed. R. Civ. P. 12(b)(1)* permit a
party to challenge a court's subject-matter jurisdiction to
hear a case. A district court may dismiss an action for
lack of subject-matter jurisdiction on any one of three
separate bases: (1) the complaint alone; (2) the
complaint supplemented by undisputed facts evidenced
in the record; or (3) the complaint supplemented by
undisputed facts, as well as the court's resolution of
disputed facts. The burden of proof is on the party
asserting jurisdiction. At the motion to dismiss stage,
this requires a plaintiff to allege a plausible set of facts
establishing jurisdiction.

Civil
Procedure > ... > Justiciability > Standing > Injury in
Fact

Constitutional Law > ... > Case or
Controversy > Standing > Elements

### *HN2*[📥] Standing, Injury in Fact

Standing—i.e., the power of the court to entertain the
suit—is the threshold question in every federal case.
Article III of the United States Constitution limits the
jurisdiction of federal courts to Cases and
Controversies. Standing to sue is a jurisprudential
doctrine used to ensure federal courts do not exceed

their limited authority over cases and controversies. Standing limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong. In its simplest terms, the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. The irreducible constitutional minimum of standing consists of three elements which the plaintiff must satisfy: (1) the plaintiff suffered an injury in fact—i.e., a concrete and particularized invasion of a legally protected interest; (2) the injury is fairly traceable to the challenged conduct of the defendant, which means there must be a causal connection between the injury and the conduct complained of; and (3) it is likely (as opposed to merely speculative) that the injury will be redressed by a favorable judicial decision. Further, a plaintiff must have standing for each claim asserted and for each form of relief sought.

*Fed. R. Civ. P. 12(b)(6)* are appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim. Such a motion admits the facts alleged in the complaint, but challenges plaintiff's rights to relief based upon those facts. To overcome a *Rule 12(b)(6)* motion, a complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face. The plausibility standard is met when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Although a complaint does not need detailed factual allegations, it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that merely offers labels and conclusions or a formulaic recitation of the elements will not suffice, nor will a complaint that merely tenders naked assertions devoid of further factual enhancement.

Civil Procedure > ... > Justiciability > Standing > Third Party Standing

Constitutional Law > ... > Case or Controversy > Standing > Particular Parties

Constitutional Law > ... > Case or Controversy > Standing > Third Party Standing

*HN3*[ ] **Standing, Third Party Standing**

An association has standing to bring suit on behalf of its members if: (1) its individual members would have standing to sue in their own right; (2) the association seeks to vindicate interests germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of the individual members.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

*HN4*[ ] **Motions to Dismiss, Failure to State Claim**

Motions to dismiss for failure to state a claim pursuant to

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

*HN5*[ ] **Motions to Dismiss, Failure to State Claim**

When deciding a *Fed. R. Civ. P. 12(b)(6)* motion, the court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff. However, this tenet does not apply to conclusory allegations, unwarranted deductions, or legal conclusions couched as factual allegations, as such assertions do not constitute well-pleaded facts. In considering a *Rule 12(b)(6)* motion, the district court generally must limit itself to the contents of the pleadings, including attachments thereto. One exception to this rule is that district courts may permissibly refer to matters of public record.

Civil Procedure > Judgments > Summary Judgment > Burdens of Proof

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

Civil Procedure > Judgments > Summary Judgment > Entitlement as Matter of Law

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine

2022 U.S. Dist. LEXIS 230140, *230140

Disputes

Civil Procedure > ... > Summary
Judgment > Entitlement as Matter of Law > Legal
Entitlement

HN6[⬇] Summary Judgment, Burdens of Proof

A party is entitled to summary judgment if it shows that
there is no genuine dispute as to any material fact and
that it is entitled to judgment as a matter of law. A
genuine issue of material fact exists when the evidence
is such that a reasonable jury could return a verdict for
the non-moving party. When seeking summary
judgment, the movant bears the initial responsibility of
demonstrating the absence of an issue of material fact
with respect to those issues on which the movant bears
the burden of proof at trial. However, where the
nonmovant bears the burden of proof at trial, the movant
may merely point to an absence of evidence, thus
shifting to the non-movant the burden of demonstrating
by competent summary judgment proof that there is an
issue of material fact warranting trial.

Civil Procedure > Judgments > Summary
Judgment > Burdens of Proof

Evidence > Inferences & Presumptions > Inferences

Civil Procedure > ... > Summary
Judgment > Entitlement as Matter of Law > Genuine
Disputes

Civil Procedure > ... > Summary
Judgment > Burdens of Proof > Nonmovant
Persuasion & Proof

Civil Procedure > Judgments > Summary
Judgment > Entitlement as Matter of Law

HN7[⬇] Summary Judgment, Burdens of Proof

The opposing party may not create a genuine dispute
simply by alleging that a dispute exists. Rather, the
opponent must cite to particular parts of materials in the
record, or show that the materials cited do not establish
the absence or presence of a genuine dispute, or that
an adverse party cannot produce admissible evidence
to support the fact. *Fed. R. Civ. P. 56(c)(1)*. When
reviewing a motion for summary judgment, the court
must disregard all evidence favorable to the moving
party that the jury is not required to believe, and should

give credence to the evidence favoring the nonmoving
party as well as that evidence supporting the moving
party that is uncontradicted and unimpeached.
Credibility determinations, assessments of the probative
value of the evidence, inferences drawn from the facts
and the like are not to be considered on summary
judgment, as those are matters to be decided by the
factfinder at trial.

Constitutional Law > Bill of Rights > Fundamental
Rights > Right to Bear Arms

HN8[⬇] Fundamental Rights, Right to Bear Arms

District of Columbia v. Heller determined that the
*Second Amendment* codified a pre-existing, individual
right, belonging to law-abiding, responsible citizens, that
encompasses the possession of handguns in the home
for self-defense.

Constitutional Law > Bill of Rights > Fundamental
Rights > Right to Bear Arms

HN9[⬇] Fundamental Rights, Right to Bear Arms

In New York State Rifle & Pistol Association, Inc. V.
Bruen, the Supreme Court held that the *Second
Amendment* protects the right of ordinary, law-abiding,
adult citizens to carry handguns for self-defense outside
of the home.

Constitutional Law > Bill of Rights > Fundamental
Rights > Right to Bear Arms

HN10[⬇] Fundamental Rights, Right to Bear Arms

When the *Second Amendment's* plain text covers an
individual's conduct, the Constitution presumptively
protects that conduct. To justify its regulation, the
government may not simply posit that the regulation
promotes an important interest. Rather, the government
must demonstrate that the regulation is consistent with
this Nation's historical tradition of firearm regulation.
Only if a firearm regulation is consistent with this
Nation's historical tradition may a court conclude that
the individual's conduct falls outside the *Second
Amendment's* unqualified command. Thus, if a
challenged regulation prohibits conduct that is protected
by the *Second Amendment*, courts must examine

2022 U.S. Dist. LEXIS 230140, *230140

whether the regulation is consistent with the Nation's historical tradition of firearm regulation. To accomplish this task, courts are to look to relevantly similar historical regulations for a proper analogue. There need only be a well-established and representative historical analogue, not a historical twin. Two of the metrics courts may use in determining whether regulations are relevantly similar are how and why the regulations burden a law-abiding citizen's right to armed self-defense.

Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

*HN11*[⤓]  **Fundamental Rights, Right to Bear Arms**

The first inquiry is whether the conduct at issue falls within the scope of the *Second Amendment* right, which is determined by looking to whether the law harmonizes with the historical tradition associated with the *Second Amendment* guarantee.

Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

Evidence > Burdens of Proof > Allocation

*HN12*[⤓]  **Fundamental Rights, Right to Bear Arms**

Once it is shown that the conduct is protected by the *Second Amendment*, the government bears the burden of justifying the regulation by showing it is consistent with the Nation's historical tradition of firearm regulations.

Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

*HN13*[⤓]  **Fundamental Rights, Right to Bear Arms**

While the Supreme Court has not yet provided an exhaustive historical analysis of the full scope of the *Second Amendment*, District of Columbia v. Heller did discuss some of its outer contours: Like most rights, the right secured by the *Second Amendment* is not unlimited.

Constitutional Law > Bill of Rights > Fundamental

Rights > Right to Bear Arms

*HN14*[⤓]  **Fundamental Rights, Right to Bear Arms**

The *Second Amendment* does not extend to all types of weapons, but rather, only those typically possessed by law-abiding citizens for lawful purposes. The licensing requirements for public carry used by the majority of states likely pass constitutional muster, as those shall-issue regimes utilize objective criteria designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens.

Evidence > Types of Evidence > Documentary Evidence > Affidavits

*HN15*[⤓]  **Documentary Evidence, Affidavits**

*18 U.S.C.S. § 922(b)(1)* makes it unlawful for any federally licensed firearms dealer to sell or deliver any firearm or ammunition other than a shotgun or rifle, or ammunition for a shotgun or rifle, to any individual who the licensee knows or has reasonable cause to believe is less than twenty-one years of age. *18 U.S.C.S. § 922(c)(1)* provides that a federally licensed firearms dealer may sell a firearm to a person who does not appear in person at the licensee's business premises only if the transferee submits to the transferor a sworn statement attesting that, in the case of a handgun, he or she is 21 or older.

Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

*HN16*[⤓]  **Fundamental Rights, Right to Bear Arms**

While federal law prohibits the direct purchase of handguns from federal firearms licensees (FFLs) by persons aged 18 to 20, such persons may still possess and use handguns, they may receive handguns as gifts, and they may purchase handguns through unlicensed, private sales. Further, 18 to 20-year-olds enjoy the full scope of rights under the *Second Amendment* with regard to long guns—i.e., they may possess, use and purchase long guns, and ammunition for long guns, directly from FFLs.

Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

2022 U.S. Dist. LEXIS 230140, *230140

_HN17_[ ]  **Fundamental Rights, Right to Bear Arms**

While sales restrictions do not explicitly infringe the right to "keep or bear Arms," a complete restriction on the sale of firearms could effectively gut the right to own or possess firearms by foreclosing the ability of the people to legally purchase firearms.

**Counsel:** For Caleb Reese, Firearms Policy Coalition Inc, _Second Amendment_ **[*1]** Foundation, Louisiana Shooting Association, Emily Naquin, Plaintiff: George J Armbruster, III, LEAD ATTORNEY, Armbruster & Assoc, Lafayette, LA; David H Thompson, PRO HAC VICE, Cooper & Kirk, Washington, DC; John William Dillon, PRO HAC VICE, Dillon Law Group, Carlsbad, CA; Joseph G S Greenlee, PRO HAC VICE, Firearms Policy Coalition, Sacramento, CA; Peter A Patterson, PRO HAC VICE, Cooper & Kirk, Washington, DC; Raymond Mark DiGuiseppe, PRO HAC VICE, DiGuiseppe Law Firm, Southport, NC; William V Bergstrom, PRO HAC VICE, Cooper & Kirk, Washington, DC.

For Bureau of Alcohol Tobacco Firearms & Explosives, Regina Lombardo, In her official capacity as Acting Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives, Merrick Garland, in his official capacity on behalf of U S Attorney General, Defendant: Daniel Riess, LEAD ATTORNEY, U S Dept of Justice (L St), Washington, DC.

For Giffords Law Center to Prevent Gun Violence, Amicus: Timothy R W Kappel, LEAD ATTORNEY, Wells & Kappel, New Orleans, LA.

**Judges:** ROBERT R. SUMMERHAYS, UNITED STATES DISTRICT JUDGE. MAGISTRATE JUDGE WHITEHURST.

**Opinion by:** ROBERT R. SUMMERHAYS

# Opinion

### MEMORANDUM RULING

This suit is brought **[*2]** to relitigate the constitutionality of federal laws prohibiting federally licensed firearms dealers from selling handguns or handgun ammunition to persons aged 18 to 20.[1] Plaintiffs Caleb Reese and

Emily Naquin ("Individual Plaintiffs") are citizens of the United States and the State of Louisiana and are between the ages of 18 and 21.[2] Plaintiffs Firearms Policy Coalition, Inc., The _Second Amendment_ Foundation, and Louisiana Shooting Association ("Organizational Plaintiffs") allege that their members include persons under the age of 21, as well as federally licensed firearms retailers—_i.e._ federal firearms licensees ("FFLs")—some of whom reside in the Western District of Louisiana.[3] The Organizational Plaintiffs bring this suit on behalf of their "individual members who would purchase handguns and handgun ammunition from lawful retailers, and [their] member FFL handgun retailers who would sell handguns and handgun ammunition to adults under the age of twenty-one, but are prohibited from doing so by the Handgun Ban enforced by Defendants."[4] The Individual Plaintiffs allege that they are members of each of the forgoing organizations.[5]

Plaintiffs seek a declaratory judgment that the challenged **[*3]** laws are facially unconstitutional, as well as injunctive relief, arguing the challenged laws violate the _Second Amendment_ in that they "prevent law-abiding, responsible adult citizens under age twenty-one" from purchasing handguns from FFLs (Count I).[6] Alternatively, Plaintiffs seek a declaratory judgment that the laws are unconstitutional as applied to 18 to 20-year-old women, as well as injunctive relief (Count II).[7] Plaintiffs further seek "nominal damages for constitutional injuries caused by Defendants Lombardo's and Garland's enforcement of the Handgun Ban and resulting deprivation of Plaintiffs' _Second Amendment_ rights."[8] Plaintiffs acknowledge the Fifth Circuit in _National Rifle Association of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives_ ("_NRA_") held that the forgoing laws are constitutional, but they bring

---

[1] _See_ _18 U.S.C. § 922(b)(1)_ and _(c)(1)_; _27 C.F.R. §§ 478.99(b)(1)_, _478.96(b)_, and _478.124(a)_ and _(f)_.

[2] A third individual plaintiff, Joseph Granich, voluntarily withdrew his claims. ECF Nos. 41, 44.

[3] ECF No. 29 at 4-6, ¶¶ 9-11.

[4] _Id._ at ¶ 9; _see also_ ¶¶ 10-11.

[5] _Id._ at pp. 3, 4; ¶¶ 6, 8 .

[6] _Id._ at 17-21, 23-24.

[7] _Id._ at 21-23, 24.

[8] _Id._ at 7, 24.

2022 U.S. Dist. LEXIS 230140, *3

this suit "as a good faith attempt to change the law."[9]

The parties have filed dispositive cross-motions which are ripe for adjudication. Specifically, Defendants—Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), Regina Lombardo (Acting Director of the ATF),[10] and Merrick B. Garland (Attorney General of the United States)—have filed a motion [*4] to dismiss for lack of subject matter jurisdiction and for failure to state a claim, or alternatively, for summary judgment on all claims.[11] Plaintiffs have filed a motion for partial summary judgment, seeking judgment in their favor on Count II.[12]

I.

**JURISDICTION**

The Court begins with jurisdiction. Defendants assert Plaintiffs have failed to establish Article III standing, and therefore seek dismissal of all claims pursuant to *Rule 12(b)(1)*.[13] **HN1**[↑] Motions filed under *Rule 12(b)(1)* permit a party to challenge a court's subject-matter jurisdiction to hear a case. A district court may dismiss an action for lack of subject-matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts, as well as the court's resolution of disputed facts.[14] The burden of proof is on the party asserting jurisdiction.[15] At the motion to dismiss stage, this requires a plaintiff to allege "a plausible set of facts establishing jurisdiction."[16]

**HN2**[↑] Standing—*i.e.*, "the power of the court to entertain the suit"—is the "threshold question in every federal case."[17] Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" [*5] and "Controversies."[18] Standing to sue is a jurisprudential doctrine used to ensure federal courts do not exceed their limited authority over cases and controversies.[19] Standing "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong."[20] In its simplest terms, "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."[21] The "irreducible constitutional minimum" of standing consists of three elements which the plaintiff must satisfy: (1) the plaintiff suffered an injury in fact—*i.e.*, a concrete and particularized invasion of a legally protected interest; (2) the injury is fairly traceable to the challenged conduct of the defendant, which means there must be a causal connection between the injury and the conduct complained of; and (3) it is likely (as opposed to merely speculative) that the injury will be redressed by a favorable judicial decision.[22] Further, a plaintiff must have standing for each claim asserted and for each form

---

[9] ECF No. 29 at 3, ¶ 4 (citing *NRA of Am., 700 F.3d 185, 191 (5th Cir. 2012)*, abrogated by *New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S.Ct. 2111, 213 L. Ed. 2d 387 (2022)*). The original briefing in this matter was filed prior to the issuance of *Bruen*, which abrogated *NRA* in part, as discussed in Section III(A), *infra*.

[10] The Court notes that Steven M. Dettelbach was sworn in as the Director of the ATF on July 13, 2022. *See* https://www.atf.gov/about-atf/executive-staff/director#:~:text=Steven%20Dettelbach,Mr. (last visited Nov. 10, 2022).

[11] ECF No. 32. Giffords Law Center to Prevent Gun Violence has filed an amicus curiae brief in support of Defendants' motion. ECF No. 40; *see also* ECF No. 39.

[12] ECF No. 49.

[13] ECF No. 35 at 13-16.

[14] *Ramming v. United States, 281 F.3d 158, 161 (5th Cir.*

[*2001*]); *Willoughby v. U.S. Dept. of the Army, 730 F.3d 476, 479 (5th Cir. 2013)*.

[15] *McMahon v. Fenves, 946 F.3d 266, 270 (5th Cir. 2020)*; *Ramming at 161*.

[16] *McMahon at 270* (quoting *Physician Hosps. of Am. v. Sebelius, 691 F3d 649, 652 (5th Cir. 2012)*).

[17] *Warth v. Seldin, 422 U.S. 490, 498, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975)*.

[18] *Susan B. Anthony List v. Driehaus, 573 U.S. 149, 157, 134 S. Ct. 2334, 189 L. Ed. 2d 246 (2014)* (quoting *U.S. Const., Art. III, § 2*).

[19] *Spokeo, Inc. v. Robins, 578 U.S. 330, 337-38, 136 S. Ct. 1540, 194 L. Ed. 2d 635 (2016)*; *Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)*.

[20] *Spokeo at 338*.

[21] *Warth at 498*.

[22] *Spokeo at 338, 339*; *see also Lujan at 560*.

of relief sought.[23] HN3[↑]  An association has standing to bring suit on behalf of its members if: (1) its individual members would have [*6] standing to sue in their own right; (2) the association seeks to vindicate interests germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of the individual members.[24]

Here, Defendants contend the Individual Plaintiffs lack standing to sue because they have failed to plead an "imminent injury traceable to Defendants."[25] Defendants contend the Individual Plaintiffs have an available option under federal law for obtaining a handgun—*i.e.*, their parents or guardians may lawfully purchase handguns from FFLs and gift them to the Individual Plaintiffs—and therefore Plaintiffs suffer no injury traceable to Defendants sufficient to confer standing.[26] According to Defendants, the Individual Plaintiffs "may not manufacture injury" by forgoing "legally available means by which they may obtain handguns."[27] As to the claims asserted by the Organizational Plaintiffs on behalf of their members between the ages of 18 and 20, Defendants contend they lack standing because those members do not have standing to sue in their own right for the reasons previously set forth.[28] As to the claims asserted by the Organizational Plaintiffs on [*7] behalf of their member FFLs, Defendants argue standing is absent because Plaintiffs have failed to adequately plead injury in fact. Specifically, Defendants contend that the Organizational Plaintiffs' allegation that but-for the challenged restrictions, they would sell handguns and handgun ammunition to persons aged 18 to 20, does not identify an injury that is sufficiently concrete and particularized to satisfy standing requirements.[29]

_____

[23] *Los Angeles v. Lyons, 461 U.S. 95, 105, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983)*; *El Paso County, Texas v. Trump, 982 F.3d 332, 338 (5th Cir. 2020)*.

[24] *Students for Fair Admissions, Inc. v. Univ. of Texas at Austin, 37 F.4th 1078, 1084 (5th Cir. 2022)*; *Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd., 627 F.3d 547, 550 (5th Cir. 2010)*.

[25] ECF No. 35 at 14

[26] *Id.* at 14-15.

[27] *Id.*

[28] *Id.* at 15.

[29] *Id.* at 16 (quoting *Lujan, 504 U.S. at 560*). Defendants additionally note Plaintiffs do not identify any member who

Defendants concede the Fifth Circuit rejected these arguments in *NRA*.[30]

In *NRA*, suit was brought challenging the same laws on the same grounds by the same category of persons— *i.e.*, individual plaintiffs between the ages of 18 and 20, and the NRA on behalf of its 18 to 20-year-old members and on behalf of its FFL members.[31] The Fifth Circuit found plaintiffs had standing to sue, reasoning:

> The government is correct that the challenged federal laws do not bar 18-to-20—year—olds from possessing or using handguns. The laws also do not bar 18-to-20—year—olds from receiving handguns from parents or guardians. Yet, by prohibiting FFLs from selling handguns to 18-to-20-year—olds, the laws cause those persons a concrete, particularized injury—i.e., [*8] the injury of not being able to purchase handguns from FFLs. Standing may be satisfied by the presence of at least one individual plaintiff who has demonstrated standing to assert the contested rights as his own. Having established [the individual plaintiff's] standing and the NRA's associational standing on behalf of its 18-to-20—year—olds members, we need not discuss the NRA's associational standing on behalf of its FFL members.[32]

Here, Individual Plaintiffs assert that but for the challenged laws, they would be eligible to purchase handguns from FFLs and would in fact do so.[33] Organizational Plaintiffs submit sworn declarations attesting that their members include the Individual Plaintiffs, as well as FFLs located in Louisiana who would sell handguns to persons under age 21, but are prohibited from doing so due to the challenged

_____

was allegedly "frustrated from selling any particular handgun to any person," nor do Plaintiffs account for the fact that "parents or others can purchase handguns directly from licensed dealers" as gifts for minors in their care. *Id.*

[30] *Id.* at 14 n.4. Defendants lodge this argument to preserve it for appellate purposes. *Id.*

[31] *NRA, 700 F.3d at 188*.

[32] *Id. at 191-92* (internal citations, quotation marks, alterations and footnotes omitted); *see also NRA of Am., Inc. v. McCraw, 719 F.3d 338, 344 n.3 (5th Cir. 2013)*.

[33] ECF No. 29 at 7-8, 9-10; *see also* ECF No. 50-1 at 3-4 (Declaration of Emily Naquin).

restrictions.[34] Defendants do not dispute the forgoing factual allegations. Because the Fifth Circuit has rejected the standing arguments presented in this case, the Court finds Plaintiffs have established standing. Accordingly, Defendants' motion is denied to the extent it seeks dismissal pursuant to *Rule 12(b)(1)*.

II.

STANDARD OF REVIEW

**A. Motion to Dismiss—*Rule 12(b)(6)***

 **[*9]** *HN4*[↑] Motions to dismiss for failure to state a claim pursuant to *Rule 12(b)(6)* are appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim.[35] Such a motion "admits the facts alleged in the complaint, but challenges plaintiff's rights to relief based upon those facts."[36] To overcome a *Rule 12(b)(6)* motion, a complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face.[37] The plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[38] Although a complaint does not need detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."[39] A pleading that merely offers "labels and conclusions" or "a formulaic recitation of the elements" will not suffice,[40] nor will a complaint that merely tenders "naked assertions devoid of further factual enhancement."[41] *HN5*[↑] When deciding a *Rule 12(b)(6)* motion, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff."[42] However, this tenet does not apply to conclusory allegations, unwarranted deductions, or legal conclusions couched as factual allegations, as such assertions do not constitute "well-pleaded facts."[43] In considering a *Rule 12(b)(6)* motion, the district court generally "must limit itself to the contents of the pleadings, including attachments thereto."[44] One exception to this rule is that district courts "may permissibly refer to matters of public record."[45]

**B. Motion for Summary Judgment—*Rule 56***

*HN6*[↑] A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[46] "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party."[47] As summarized by the Fifth Circuit:

When seeking summary judgment, the movant bears the initial responsibility of demonstrating the

---

[34] ECF No. 50-1 at 6, 8, 10.

[35] *Ramming, 281 F.3d at 161*.

[36] *Id. at 161-62*.

[37] *Harold H. Huggins Realty, Inc. v. FNC, Inc., 634 F.3d 787, 796 (5th Cir. 2011)*.

[38] *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*; *see also* *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)* ("Factual allegations must be enough to raise a right to relief above the speculative level," and not merely create "a suspicion [of] a legally cognizable right of action.") (quoting 5 C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE § 1216, pp. 235-36 (3d ed. 2004)).

[39] *Id*.

[40] *Twombly, 550 U.S. at 555*.

[41] *Iqbal, 556 U.S. at 678* (internal quotation marks, alterations omitted) (quoting *Twombly at 557*).

[42] *In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007)* (internal quotation marks omitted); *see also* *Iqbal at 679* ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.")

[43] *Twombly at 555*; *Iqbal at 678*.

[44] *Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 498 (5th Cir. 2000)*.

[45] *Cinel v. Connick, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994)*; *see also* *Test Masters Educational Services, Inc. v. Singh, 428 F.3d 559, 570 n.2 (5th Cir. 2005)*.

[46] *Fed. R. Civ. P. 56(a)*.

[47] *Quality Infusion Care, Inc. v. Health Care Service Corp., 628 F.3d 725, 728 (5th Cir. 2010)*.

2022 U.S. Dist. LEXIS 230140, *9

absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. However, where the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial.[48]

*HN7*[↑] The opposing party may not create a genuine dispute simply by alleging that a dispute exists. Rather, the opponent must cite "to particular parts of materials in the record," or show that "the materials cited do not [*10] establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."[49] When reviewing a motion for summary judgment, "the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party as well as that evidence supporting the moving party that is uncontradicted and unimpeached."[50]  Credibility determinations, assessments of the probative value of the evidence, inferences drawn from the facts and the like are not to be considered on summary judgment, as those are matters to be decided by the factfinder at trial.[51]

III.

APPLICABLE LAW

A. Constitutional Framework

The *Second Amendment*, adopted in 1791, provides: "A

_____

[48] *Lindsey v. Sears Roebuck and Co., 16 F.3d 616, 618 (5th Cir.1994)* (internal citations omitted).

[49] *Fed. R. Civ. P. 56(c)(1)*; *see also id.* at *(c)(3)* (the court need only consider the cited materials, although it is permitted to consider other materials in the record as well).

[50] *Roberts v. Cardinal Servs., Inc., 266 F.3d 368, 373 (5th Cir. 2001)*.

[51] *See e.g. Man Roland, Inc. v. Kreitz Motor Exp., Inc., 438 F.3d 476, 478 (5th Cir. 2006)*; *Int'l Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1263 (5th Cir. 1991)*.

well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."[52]  For more than two hundred years after its adoption, scant jurisprudence existed discussing this right.[53] But in 2008 in *District of Columbia v. Heller*, the Supreme Court issued the first of a trilogy of rulings interpreting the *Second Amendment*.[54]  *HN8*[↑] *Heller* determined that the *Second Amendment* codified [*11] a pre-existing, individual right, belonging to "law-abiding, responsible citizens," that encompasses the possession of handguns in the home for self-defense.[55] Based upon this determination, the Supreme Court struck down a D.C. ordinance banning "handgun possession in the home" as unconstitutional.[56] Two years later in *McDonald v. City of Chicago*, the Supreme Court held that "the *Due Process Clause of the Fourteenth Amendment* incorporates the *Second Amendment* right recognized in *Heller*" against the States.[57]  *HN9*[↑] This year in *New York State Rifle & Pistol Association, Inc. v. Bruen*, the Supreme Court held that the *Second Amendment* protects the right of "ordinary, law-abiding, adult citizens" to carry handguns for self-defense outside of the home.[58]

_____

[52] *U.S. Const. amend. II*.

[53] *See e.g.* Andrew White, *In Defense of Self and Home: The Problems with Limiting Second Amendment Rights for Young Adults Based on Their Age*, *90 U. Cin. L. Rev. 1241, 1241 (2022)*; Zachary S. Halpern, *Young Guns: The Constitutionality of Raising the Minimum Purchase Age for Firearms to Twenty-One*, *63 B.C. L. Rev. 1421, 1429-30 (2022)*.

[54] *District of Columbia v. Heller, 554 U.S. 570, 595, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008)*.

[55] *Id. at 635*.

[56] *Id.*

[57] *McDonald v. City of Chicago, 561 U.S. 742, 791, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010)*.

[58] *New York State Rifle & Pistol Association, Inc. v. Bruen, 142 S.Ct. 2111, 2134, 213 L. Ed. 2d 387*; *id. at 2123, 2156* (finding a New York law, which required applicants for public carry permits to demonstrate "proper-cause"—defined by New York authorities as a special need for self-protection distinguishable from that of the general community—before issuance of such permits, violates the constitutional rights of "citizens with ordinary self-defense needs from exercising their right to keep and bear arms.")

Following the issuance of *Heller*, eleven courts of appeal, including the Fifth Circuit, adopted a two-step framework for evaluating firearms regulations.[59] The first step of that framework required the government to justify a challenged law by showing that it "regulates activity falling outside the scope of the right as originally [*12] understood," based upon its "historical meaning."[60] If the government was successful in demonstrating the regulated conduct fell beyond the Amendment's original scope, the analysis ended, as the regulated activity was categorically unprotected.[61] But if the historical evidence was inconclusive or suggested that the regulated activity was not categorically unprotected, the examination proceeded to step two.[62] At step two, courts analyzed whether the challenged law survived the appropriate level of means-end scrutiny.[63] *Bruen* abrogated the two-step inquiry adopted by the courts of appeal. Although *Bruen* found step one of the predominant framework to be "broadly consistent with *Heller*," it found that step two was "one step too many."[64] *HN10*[⬆] *Bruen* then "made the constitutional standard endorsed in *Heller* more explicit,"[65] and announced the following standard for evaluating modern firearms regulations:

> [W]hen the *Second Amendment's* plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this [*13] Nation's

historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the *Second Amendment's* "unqualified command."[66]

Thus, if a challenged regulation prohibits conduct that is protected by the *Second Amendment*, courts must examine whether the regulation is consistent with the Nation's historical tradition of firearm regulation. To accomplish this task, courts are to look to "relevantly similar" historical regulations for a "proper analogue."[67] There need only be "a well-established and representative historical *analogue*, not a historical *twin*."[68] Two of the metrics courts may use in determining whether regulations are relevantly similar are "how and why the regulations burden a law-abiding citizen's right to armed self-defense."[69]

---

[59] *Bruen at 2127 n.4*; *NRA, 700 F.3d at 194*.

[60] *Bruen at 2126*; *HN11*[⬆] *see also* *NRA at 194* ("[T]he first inquiry is whether the conduct at issue falls within the scope of the *Second Amendment* right," which is determined by looking to "whether the law harmonizes with the historical tradition associated with the *Second Amendment* guarantee.")

[61] *Bruen at 2126*; *see also* *NRA at 195*.

[62] *Bruen at 2126*.

[63] *Bruen at 2126-27*; *see also* *NRA at 195* ("If the law burdens conduct that falls within the *Second Amendment's* scope, we then proceed to apply the appropriate level of means-ends scrutiny.")

[64] *Bruen at 2126-27*.

[65] *Bruen at 2134*.

[66] *Bruen at 2126* (quoting *Konigsberg v. State Bar of Cal., 366 U.S. 36, 50 n.10, 81 S. Ct. 997, 6 L. Ed. 2d 105 (1961)*); *see also* *Bruen at 2129-30*. *Bruen* did not state which party bears the burden of showing the *Second Amendment's* plain text covers an individual's conduct, likely because that issue was not in dispute. *Bruen at 2134* ("It is undisputed that petitioners . . . —two ordinary, law-abiding, adult citizens—are part of 'the people' whom the *Second Amendment* protects.") However, it would seem that the challenger of a firearm restriction bears the initial burden of showing the challenged conduct is protected by the *Second Amendment*. *Bruen* *HN12*[⬆] instructed that once it is shown that the conduct is protected by the *Second Amendment*, the government bears the burden of justifying the regulation by showing it is consistent with the Nation's historical tradition of firearm regulations. It stated that this standard "accords with how we protect other constitutional rights," such as the *First Amendment*, to which *Heller* repeatedly compared the right to keep and bear arms." *Id. at 2130*. That same analogy would place the initial burden of showing the challenged conduct is covered by the *Second Amendment* on the challenger. *See e.g.* *Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293 n.5, 104 S. Ct. 3065, 82 L. Ed. 2d 221 (1984)*; *Voting for America, Inc. v. Steen, 732 F.3d 382, 388 (5th Cir. 2013)*.

[67] *Bruen at 2132*; *see also* *id. at 2133* (noting the absence of historical disputes regarding the lawfulness of a firearm prohibition may be evidence of constitutional permissibility).

[68] *Id. at 2133* ("So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.")

[69] *Id.*

2022 U.S. Dist. LEXIS 230140, *13

*Bruen* warned that "not all history is created equal."[70] Because *Heller* determined the *Second Amendment* codified a pre-existing right "inherited from our English ancestors," both *Heller* and *Bruen* found "English history dating from the late 1600s, along with American colonial views leading up to the founding," [**14] to be of particular relevance.[71] *Bruen* additionally found historical tradition post-ratification through the early nineteenth century to be highly relevant to the extent it was not "*inconsistent* with the original meaning of the constitutional text."[72] Finally, while *Bruen* considered historical evidence from Reconstruction through the late nineteenth century, it emphasized evidence from that period was used "as mere confirmation" of the Court's earlier conclusions.[73] The Supreme Court acknowledged that this "historical analysis can be difficult," as it requires "resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it."[74] Accordingly, courts may choose and indeed are "entitled to decide a case based on the historical record compiled by the parties," because "in our adversarial system of adjudication, we follow the principle of party presentation."[75]

HN13[↑] While the Supreme Court has not yet provided an "exhaustive historical analysis . . . of the full scope of the *Second Amendment*," *Heller* did discuss some of its outer contours:

> Like most rights, the right secured by the *Second Amendment* is not unlimited. From Blackstone through the 19th-century cases, commentators [**15] and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and

for whatever purpose. For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the *Second Amendment* or state analogues. Although we do not undertake an exhaustive historical analysis today of the full scope of the *Second Amendment*, nothing in our opinion should be taken to cast doubt on longstanding prohibitions of the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.[76]

The Court explained that it identified this list of "presumptively lawful regulatory measures only as examples," and not as an exhaustive list.[77] In his concurring opinion in *Bruen*, Justice Alito reiterated that the Court's holding "decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun," nor does it "expand the categories of people who may lawfully possess a gun, and federal law generally . . . [**16] bars the sale of a handgun to anyone under the age of 21, §§ 922(b)(1), (c)(1)."[78]

**B. The Challenged Firearms Restrictions**

Following a multi-year inquiry into violent crime, Congress passed the Omnibus Crime Control and Safe Streets Act of 1968.[79] The preamble declares that "the ease with which any person can acquire firearms other than a rifle or shotgun (including . . . juveniles without

---

[70] *Id. at 2136*.

[71] *Id. at 2127* (quoting *Heller, 554 U.S. at 599*).

[72] *Id. at 2137* (quoting *Heller v. D.C., 670 F.3d 1244, 1274 n.6, 399 U.S. App. D.C. 314 (D.C. Cir. 2011)* (Kavanaugh, J., dissenting)).

[73] *Id.*

[74] *Id. at 2130* (alteration omitted) (quoting *McDonald, 561 U.S. at 803-04* (Scalia, J., concurring)).

[75] *Id. at 2130 & n.6* (alteration omitted); *see also id. at 2150* ("Of course, we are not obligated to sift the historical materials for evidence to sustain New York's statute. That is respondents' burden.")

---

[76] *Heller, 554 U.S. at 626-27* HN14[↑] ] (internal citations omitted) (additionally noting the *Second Amendment* "does not extend to all types of weapons, but rather, only those typically possessed by law-abiding citizens for lawful purposes"); *see also Bruen at 2138 n.9* (indicating the licensing requirements for public carry used by the majority of states likely pass constitutional muster, as those "shall-issue" regimes utilize objective criteria "designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." (internal quotation marks omitted)).

[77] *Heller at 627 n.26*; *see also id. at 627* (additionally noting private ownership of military-style weapons and short-barreled shotguns had long been forbidden).

[78] *Bruen at 2157-58*.

[79] *NRA, 700 F.3d at 198*.

the knowledge or consent of their parents or guardians . . . ) is a significant factor in the prevalence of lawlessness and violent crime in the United States. . . ."[80] The congressional investigation found that "concealable weapons" had "been widely sold by federally licensed importers and dealers to emotionally immature, or thrill-bent juveniles and minors prone to criminal behavior."[81] Through the Act, Congress sought to address this and other safety issues relating to firearms without placing "any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trap shooting, target shooting, personal protection, or any other lawful activity."[82] In furtherance of these goals, Congress enacted restrictions prohibiting sales of handguns to persons **[\*17]** under age twenty-one by FFLs—*i.e.*, "safety-driven, age-based categorical restrictions on handgun access."[83]

*HN15*[⬆] *18 U.S.C. § 922(b)(1)* makes it unlawful for any federally licensed firearms dealer "to sell or deliver . . . any firearm or ammunition . . . other than a shotgun or rifle, or ammunition for a shotgun or rifle, to any individual who the licensee knows or has reasonable cause to believe is less than twenty-one years of age." *18 U.S.C. § 922(c)(1)* provides that a federally licensed firearms dealer "may sell a firearm to a person who does not appear in person at the licensee's business premises . . . only if . . . the transferee submits to the transferor a sworn statement" attesting that, in the case of a handgun, he or she is 21 or older. The forgoing statutes are implemented by regulations that similarly restrict handgun sales to individuals aged 21 or older.[84] *HN16*[⬆] Thus, while federal law prohibits the direct purchase of handguns from FFLs by persons aged 18 to 20, such persons may still possess and use handguns,

they may receive handguns as gifts, and they may purchase handguns through unlicensed, private sales.[85] Further, 18 to 20-year-olds enjoy the full scope of rights under the *Second Amendment* with regard to long guns—*i.e.*, they **[\*18]** may possess, use and purchase long guns, and ammunition for long guns, directly from FFLs.[86]

## IV.

### APPLICATION

#### A. Facial Challenge—Count I

In light of *Bruen*, the questions this Court must answer are: (1) whether the *Second Amendment's* plain text protects the ability of 18 to 20-year-olds to directly purchase handguns from FFLs, and if so, then (2) whether the challenged restrictions are consistent with the Nation's historical tradition of firearm regulation. Defendants contend 18 to 20-year-olds do not enjoy the full scope of protection granted by the *Second Amendment*, relying primarily upon the findings of the Fifth Circuit in *NRA*.[87] Plaintiffs disagree and rely upon the arguments of the dissenting opinion to the denial of en banc review of *NRA* ("*NRA II*").[88] Following the issuance of *Bruen*, Plaintiffs filed a Notice of Supplemental Authority asserting that in light of *Bruen*, their facial challenge "is no longer controlled by *NRA* and the Court can and should grant summary judgment in favor of Plaintiffs."[89] Defendants respond that "the Fifth Circuit's conclusions and the relevant historical analogues discussed in *NRA*" satisfy the *Bruen* test, and therefore judgment in their favor remains warranted.[90]

---

[80] *Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, § 901(a)(2), 82 Stat. 197, 225 (1968)*.

[81] *Id.* at § 901(a)(5) and *(6), 82 Stat. 197, 225-26*. As used in the Act, the term "minor" refers to persons under the age of 21, while the term "juvenile" refers to persons under the age of 18. *NRA at 199 n.11*.

[82] *Id.* at *§ 901(b), 82 Stat. 197, 226*.

[83] *NRA at 199*. At the time of the Act's passage, the age of majority at common law was 21. *Id. at n.11*.

[84] *See* *27 C.F.R. §§ 478.99(b)(1)*, *478.96(b)*, and *478.124(a)*, *(f)*.

---

[85] *NRA at 189-90*.

[86] *18 U.S.C. § 922(b)(1)* and *(c)(1)*.

[87] ECF No. 35 at 18, 20-27.

[88] ECF No. 50 at 18-23 (citing *NRA v. BATFE ("NRA II"), 714 F.3d 334, 335 (5th Cir. 2013)* (Jones, J., dissenting) (joined by Judges Jolly, Smith, Clement, Owen and Elrod)).

[89] ECF No. 62 at 1. As Plaintiffs' motion solely seeks summary judgment on their as-applied challenge (Count II), any grant of summary judgment in Plaintiffs' favor on their facial challenge would necessarily issue *sua sponte*.

[90] ECF No. 63 at 3.

Neither party requested leave **[*19]** to file supplemental briefing.

With respect to the first question that the Court must address under *Bruen*, the statute and regulations at issue here do not explicitly restrict the rights of 18 to 20-year-olds to "keep and bear Arms," as they do not restrict this age group from owning, possessing, or carrying handguns for self-defense.[91] **HN17**[⬆]] Nevertheless, while sales restrictions do not explicitly infringe the right to "keep or bear Arms," a complete restriction on the sale of firearms could effectively gut the right to own or possess firearms by foreclosing the ability of "the people" to legally purchase firearms. The statute and regulations here, in contrast, do not impose a total ban on the sale of firearms. They do not prevent this age group from receiving handguns as gifts from parents or guardians, nor do they prohibit this age group from purchasing handguns in "private sales" from non-FFL sellers. They also do not prohibit this age group from purchasing long-guns from FFLs. On the other hand, the statute and regulations at issue could effectively foreclose certain members of this age group from acquiring handguns if they do not have a parent or guardian available to provide **[*20]** them a handgun, or they do not have access to a private sale. Moreover, the panel decision in *NRA* appears to assume that the restrictions at issue implicate this age group's *Second Amendment* rights, even though the panel ultimately decided that the regulations did not violate the protections of the *Second Amendment*. Out of an abundance of caution, the Court will assume that the statute and regulations at issue proscribe conduct covered by the plain text of the *Second Amendment*. The Court therefore turns to the historical prong of the *Bruen* analysis: whether the restrictions at issue are "consistent with the Nation's historical tradition of firearm regulation."[92]

Although the Fifth Circuit's opinion in *NRA* was issued before *Bruen* and employs the "two-step" analysis rejected by *Bruen*, the *NRA* court considered and analyzed the historical backdrop of the restrictions at

issue here. In *NRA*, the individual and organizational plaintiffs challenged the same laws at issue in this case on the same grounds—*i.e.*, whether *§ 922(b)* and *(c)* "burden conduct that is protected by the *Second Amendment*."[93] The Court found that the pre-Revolution and founding-era historical record showed "a variety of gun safety regulations were on the books." **[*21]** [94] One type of such regulations were "laws disarming certain groups and restricting sales to certain groups" for reasons of public safety.[95] For example, laws were enacted "that confiscated weapons owned by persons who refused to swear an oath of allegiance to the state or to the nation," because despite the fact that "these Loyalists were neither criminals nor traitors," American legislators determined that permitting such persons to keep and bear arms posed a potential danger.[96] Other laws confiscated weapons from law-abiding slaves and freedmen.[97] The court discussed that during this era, there existed the "classical republican notion that only those with adequate civic 'virtue' could claim the right to arms," and that "[o]ne implication of this emphasis on the virtuous citizen is that the right to arms does not preclude laws disarming the unvirtuous citizens (i.e., criminals) or those who, like children or the mentally imbalanced, are deemed incapable of virtue."[98] In light of the fact that the age of majority from the founding-era until the 1970s was 21, the court concluded:

> If a representative citizen of the founding era conceived of a "minor" as an individual who was unworthy of the *Second Amendment* guarantee, **[*22]** and conceived of 18-to-20-year—

---

[91] In contrast, the Texas state statute at issue in *Firearms Pol'y Coal., Inc. v. McCraw* prohibited law-abiding 18 to 20-year-olds from carrying handguns for self-defense outside the home. *No. 4:21-CV-1245-P, 2022 U.S. Dist. LEXIS 152834, 2022 WL 3656996 (N.D. Tex. Aug. 25, 2022)*. Applying *Bruen*, the district court held that the conduct proscribed by the Texas statute is protected by the *Second Amendment*.

[92] *Bruen at 2126*.

[93] *NRA, 700 F.3d at 200*.

[94] *Id.*

[95] *Id.* (additionally identifying "safety laws regulating the storage of gun powder, laws keeping track of who in the community had guns, laws administering gun use in the context of militia service . . . , [and] laws prohibiting the use of firearms on certain occasions and in certain places . . . .") (citations omitted).

[96] *Id.* (citations omitted).

[97] *Id.* (citations omitted); *see also Range v. Attorney Gen. United States, 53 F.4th 262, 274-81 (3d Cir. 2022)*.

[98] *Id. at 201* (alteration in original) (quoting *Don B. Kates & Clayton E. Cramer, Second Amendment Limitations and Criminological Considerations, 60 Hastings L.J. 1339, 1359-60 (2009)*); *see also Range at 273 & nn. 15, 16*.

olds as "minors," then it stands to reason that the citizen would have supported restricting an 18-to-20-year—old's right to keep and bear arms.[99]

The court then examined the historical traditions of the nineteenth century, finding "[a]rms-control legislation intensified" during this period, and that by the end of that century, "nineteen States and the District of Columbia had enacted laws expressly restricting the ability of persons under 21 to purchase or use particular firearms."[100] It further noted that courts and commentators of this era found such laws "comported with the _Second Amendment_ guarantee."[101]

Like Plaintiffs in this matter, the plaintiffs in _NRA_ argued that the right to purchase firearms from FFLs must vest at age 18 because, at the time of the founding, 18 to 20-year-olds were required to serve in the militia, and militia duty necessarily implies the right to purchase firearms.[102] In addressing this argument, the panel, citing _Heller_, reiterated that "the right to arms is not co-extensive with the duty to serve in the militia."[103] It then found that "in some colonies and States, the minimum [*23] age of militia service either dipped below age 18 or crept to age 21, depending on legislative need."[104] It further noted that "the 1792 Militia Act gave States discretion to impose age qualification on service, and several States chose to enroll only persons age 21 or over, or required parental consent for persons under 21."[105] Based upon this historical fluctuation, the panel rejected plaintiffs' "militia-based claim that the right to purchase arms must fully vest

precisely at age 18—not earlier or later."[106]

After conducting its survey of historical traditions at step one, the court concluded:

> We have summarized considerable evidence that burdening the conduct at issue—the ability of 18-to-20-year—olds to purchase handguns from FFLs—is consistent with a longstanding, historical tradition which suggests that the conduct at issue falls outside the _Second Amendment's_ protection. At a high level of generality, the present ban is consistent with a longstanding tradition of targeting select groups' ability to access and to use arms for the sake of public safety. More specifically, the present ban appears consistent with a longstanding tradition of age-and safety-based restrictions on the ability [*24] to access arms. In conformity with founding-era thinking, and in conformity with the views of various 19th-century legislators and courts, Congress restricted the ability of minors under 21 to purchase handguns because Congress found that they tend to be relatively immature and that denying them easy access to handguns would deter violent crime. . . .
>
> . . . .
>
> To be sure, we are unable to divine the Founders' specific views on whether 18-to-20-year—olds had a stronger claim than 17-year—olds to the _Second Amendment_ guarantee. The Founders may not even have shared a collective view on such a subtle and fine-grained distinction. The important point is that there is considerable historical evidence of age-and safety-based restrictions on the ability to access arms. Modern restrictions on the ability of persons under 21 to purchase handguns . . . seem, to us, to be firmly historically rooted.
> Nonetheless, we face institutional challenges in conducting a definitive review of the relevant historical record. Although we are inclined to uphold the challenged federal laws at step one of our analytical framework, in an abundance of caution, we proceed to step two.[107]

At step two (which, as previously noted, was abrogated [*25] by _Bruen_), the Court remained

---

[99] _Id. at 201-02_.

[100] _Id. at 202_ (internal citation omitted).

[101] _Id. at 203_ (citing Thomas M. Cooley, _Treatise on Constitutional Limitations_, 740 n.4 (5th ed. 1883); _State v. Callicutt, 69 Tenn. 714 (1878)_; _Coleman v. State, 32 Ala. 581, 582-83 (1858)_); _see also_ _Range at 279-81_.

[102] ECF No. 50 at 20; _NRA, 700 F.3d at 204 n.17_.

[103] _NRA at n.17_ (citing _Heller, 554 U.S. at 589-94_).

[104] _Id._ The Court acknowledges the dissent in _NRA II_ takes issue with this particular statement and contends that "both of the examples offered for this proposition [by the majority] are wrong." _NRA II, 714 F.3d at 341_.

[105] _Id._

[106] _Id._

[107] _Id. at 203-04_ (internal citations omitted).

convinced that the challenged laws are constitutional under the _Second Amendment_.[108]

The dissent in _NRA II_ forcefully argues that the challenged laws do not comport with the _Second Amendment_. The dissent asserts that the panel erred "in rummaging through random 'gun safety regulations' of the 18th century and holding that these justify virtually any limit on gun ownership."[109] In the dissent's view, when "properly relevant historical materials" are consulted, it is indisputable that "the right to keep and bear arms belonged to citizens 18 to 20 years old at the critical period of our nation's history."[110] According to the dissent, in the colonial era, the obligation to serve in the militia and the duty to possess arms generally began at the age of sixteen.[111] "At the time of the _Second Amendment's_ passage, or shortly thereafter, the minimum age for militia service in every state became eighteen."[112] The 1792 Militia Act required 18-year-olds "to be available for service, and militia members were required to furnish their own weapons."[113] In the dissent's view, because "minors were in the militia _and, as such_, they were required to own their own weapons," any argument that 18 to 20-year-olds were not considered "to have [*26] full rights regarding firearms" is inconceivable.[114]

Like the panel in _NRA_, the Court has been "unable to divine" whether the Founders "shared a collective view" as to the full scope of the _Second Amendment_ guarantee, and more particularly, whether their collective view was that persons between the ages of 18 and 20 enjoyed the full scope of its protection. Therefore, the Court has relied primarily upon the parties' pleadings and briefs in addressing the historical prong of its _Bruen_ analysis. As noted, the parties' presentations here essentially involve advocating for the adoption of either the panel opinion in _NRA_, or the dissenting opinion in _NRA II_. Both the panel in _NRA_ and

the dissent in _NRA II_ examined the issue from a historical perspective. The diverging conclusions reached by the opposing camps largely depends upon the level of generality employed. The panel in _NRA_ emphasized that "gun safety regulation" was commonplace from colonial times through the nineteenth century; the dissent in _NRA II_ focused closely on the minimum age for militia service in the founding era.

While the panel opinion in _NRA_ issued pre-_Bruen_ and therefore did not employ _Bruen's_ exact approach, the Court [*27] finds that the panel's discussion of the historical record in _NRA_ satisfies the _Bruen_ test, as _Bruen_ instructs that there need only be "a well-established and representative historical analogue, not a historical twin."[115] The panel cited historical evidence that the Founders likely would not have been of the opinion that minors enjoy the full scope of rights encompassed in the _Second Amendment_; they cited historical evidence that the Founders believed the _Second Amendment_ did not curtail legislators' ability to disarm or restrict access to firearms by particular groups thought to be without "civic virtue"; and they cited historical evidence that safety-based restrictions were not thought to violate the _Second Amendment_.[116] The panel confirmed its initial conclusions by looking to nineteenth century laws restricting access to firearms by those under the age of 21. The "why" of these historical restrictions was that governing authorities deemed

---

[108] _Id. at 204, 211_.

[109] _NRA II at 339_ (quoting _NRA at 200_).

[110] _Id._

[111] _Id. at 340_.

[112] _Id._

[113] _Id. at 339_.

[114] _Id. at 342_.

---

[115] _Bruen at 2133_.

[116] Such findings comport not only with the classical republican notion of "civic virtue," but also with the patriarchal model of the family that dominated from colonial times through the end of the nineteenth century, in which children were viewed as the property of the patriarch subject to his absolute authority, and not as persons with full agency. _See e.g._ Barbara Bennett Woodhouse, "_Who Owns the Child?": Meyer and Pierce and the Child as Property_, _33 Wm. & Mary L. Rev. 995, 1037-40 (1992)_; Saul Cornell, _"Infants" and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record_, 40 Yale L. & Pol'y Rev. Inter Alia 1 (2021); Barbara Bennett Woodhouse, _The Constitutionalization of Children's Rights: Incorporating Emerging Human Rights into Constitutional Doctrine_, _2 U. Pa. J. Const. L. 1, 20 (1999)_; Thomas R. Young, _Historical perspective on children's legal rights_, 1 Leg. Rts. Child. Rev. 3D § 1:2 (3d ed.); _c.f. Morse v. Frederick, 551 U.S. 393, 418-19, 127 S. Ct. 2618, 168 L. Ed. 2d 290 (2007)_ (Thomas, J. dissenting) ("As originally understood, the Constitution does not afford students a right to free speech in public schools.").

these categories of persons as dangerous to public safety; the "how" was by prohibiting their access to dangerous weapons. Likewise, with regard to the laws challenged in this suit, Congress has deemed unfettered access to handguns by 18 to 20-year-olds to be a danger to public safety, and it has **[*28]** therefore restricted the ability of such persons to independently purchase handguns from FFLs. Essentially then, for these reasons set forth by the Fifth Circuit in *NRA*, the Court holds that the *Second Amendment* does not protect the ability of 18 to 20-year-olds to purchase handguns from federal firearms licensees, and therefore the Court dismisses Count I.

### B. Remaining Claims

In the alternative, Plaintiffs seek a declaratory judgment that the challenged laws are unconstitutional as applied to 18 to 20-year-old women (Count II), solely arguing that the challenged restrictions do not meet means-end scrutiny as applied to this sub-class. As discussed, step two of the former appellate test (*i.e.*, means-end scrutiny) was abrogated by *Bruen*. Rather, the standard announced in *Bruen* for evaluating whether a firearm restriction violates the *Second Amendment* applies to Plaintiffs' as-applied challenge—if the *Second Amendment's* plain text protects the ability of 18 to 20-year-old females to directly purchase handguns from FFLs, then the **[*29]** government must show the restriction is consistent with the Nation's historical tradition of firearm regulation.[117] For the reasons already discussed, the Court finds that to the extent the *Second Amendment* protects the challenged conduct, the government, by relying on the panel decision in *NRA*, has adequately demonstrated that the challenged laws are consistent with the Nation's historical tradition of firearm regulation. Accordingly, the Court dismisses Count II.

Finally, to the extent Plaintiffs seek "nominal damages for constitutional injuries caused by Defendants Lombardo's and Garland's enforcement of the Handgun Ban," Plaintiffs have waived that claim. Plaintiffs do not address the merits of that claim in the underlying briefing, and in a footnote, they state that they "do not contest dismissal" of their "individual-capacity claims

against Defendants for nominal damages."[118] Accordingly, Plaintiffs' claim for nominal damages is dismissed.

**V.**

### CONCLUSION

For the reasons set forth in this Ruling, "Defendants' Motion to Dismiss Plaintiffs' Amended Complaint or for Summary Judgment" is GRANTED IN PART and DENIED IN PART.[119] Specifically, the motion is DENIED to the extent Defendants seek dismissal pursuant to **[*30]** *Rule 12(b)(1)* for lack of jurisdiction; the motion is GRANTED to the extent Defendants seek dismissal pursuant to *Rule 12(b)(6)* for failure to state a claim. The Motion for Partial Summary Judgment filed by Plaintiffs is DENIED.[120]

THUS DONE in Chambers on this 21st day of December, 2022.

/s/ Robert R. Summerhays

ROBERT R. SUMMERHAYS

UNITED STATES DISTRICT JUDGE

### ORDER

For the reasons set forth in the Memorandum Ruling issued this date,

IT IS HEREBY ORDERED that Plaintiffs' Motion for Partial Summary Judgment [ECF No. 49] is DENIED.

IT IS FURTHER ORDERED that Defendants' "Motion to Dismiss Plaintiffs' Amended Complaint or for Summary Judgment" [ECF No. 32] is GRANTED IN PART and DENIED IN PART. Specifically, the motion is DENIED to the extent Defendants seek dismissal pursuant to *Rule 12(b)(1)* for lack of jurisdiction; the motion is GRANTED to the extent Defendants seek dismissal pursuant to *Rule 12(b)(6)* for failure to state a claim, and this suit is DISMISSED WITH PREJUDICE.

---

[117] *Bruen at 2126*; *Bucklew v. Precythe, 139 S.Ct. 1112, 1127-28, 203 L. Ed. 2d 521 (2019)* (the same substantive constitutional analysis applies to facial and as-applied challenges).

[118] ECF No. 50 at 10 n.1.

[119] ECF No. 32.

[120] ECF No. 49.

THUS DONE in Chambers on this 21st day of December, 2022.

/s/ Robert R. Summerhays

ROBERT R. SUMMERHAYS

UNITED STATES DISTRICT JUDGE

---

**End of Document**

⚠️ Caution
As of: March 29, 2023 5:03 PM Z

## *Ocean State Tactical, LLC v. Rhode Island*

United States District Court for the District of Rhode Island

December 14, 2022, Decided; December 14, 2022, Filed

No. 22-CV-246 JJM-PAS

**Reporter**
2022 U.S. Dist. LEXIS 227097 *; 2022 WL 17721175

OCEAN STATE TACTICAL, LLC; JONATHAN HIRONS; JAMES ROBERT GRUNDY; JEFFREY GOYETTE; and MARY BRIMER, Plaintiffs, v. STATE OF RHODE ISLAND; COLONEL DARNELL S. WEAVER; and PETER NERONHA, Defendants.

**Subsequent History:** Appeal filed, 01/18/2023

## Core Terms

magazines, firearms, self-defense, weapons, Arms, Ban, wounded, shootings, rounds, bullets, gun, dead, handguns, plaintiffs', permanent, reload, semiautomatic, killed, ammunition, dictionary, regulation, fired, likelihood of success, irreparable harm, merits, valid exercise of police power, preliminary injunction, declaration, shooter, courts

**Counsel:  [\*1]** For Ocean State Tactical, LLC, doing business as, Big Bear Hunting and Fishing Supply, Jonathan Hirons, James Robert Grundy, Jeffrey Goyette, Mary Brimer, Plaintiffs: Dane Evan Ardente, I, Kelly, Souza & Parmenter, P.C., Providence, RI; Michael A. Kelly, Kelly, Souza, Rocha & Parmenter PC, Providence, RI.

For State of Rhode Island, Colonial Darnell S. Weaver, In their Official Capacity as the Superintendent of the Rhode Island State Police, Peter F. Nerhona, In their Official Capacity as the Attorney General for the State of Rhode Island, Defendants: Keith David Hoffmann, Rhode Island Office of the Attorney General, Providence, RI; Sarah Rice, RI Department of Attorney General, Providence, RI.

For Firearms Policy Coalition, Amicus: Cody J. Wisniewski, PRO HAC VICE, Firearms Policy Coalition, Las Vegas, NV; Joseph Greenlee, PRO HAC VICE, FPC Action Foundation, Las Vegas, NV; Thomas W. Lyons, III, Strauss, Factor, Laing & Lyons, Providence, RI.

**Judges:** John J. McConnell, Jr., Chief United States District Judge.

**Opinion by:** John J. McConnell, Jr.

## Opinion

### MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Court Chief Judge.

Four gun owners and a registered firearms dealer (collectively, "plaintiffs") have **[\*2]** come to this Court challenging a six-month-old Rhode Island law that prohibits the possession of Large Capacity Feeding Devices[1] ("LCMs"), which turn firearms into multiple-shot weapons. The legislation was passed on June 21, 2022, with a grace period of 180 days, by which time all those in possession of such devices must have (a) permanently modified them to be incapable of holding more than ten rounds; or (b) divested themselves of them by selling them to a federally registered dealer or turning them in to law enforcement. *R.I. Gen. Laws § 11-47.1-3(b)* ("LCM Ban"). Although the law does not address other dispositions, its delayed effective date

---

[1] Large Capacity Feeding Devices are typically referred to as Large Capacity Magazines or High-Capacity Magazines. The plaintiffs refer to them as "Standard Capacity Magazines." The Court refers to them as LCMs. They are defined by *R.I. Gen. Laws § 11-47.1-2*, which became effective upon its passage on June 21, 2022, as "a magazine, box, drum, tube, belt, feed strip, or other ammunition feeding device which is capable of holding, or can readily be extended to hold, more than ten (10) rounds of ammunition to be fed continuously and directly therefrom into a semi-automatic firearm." Tubes which hold exclusively .22 caliber ammunition are explicitly excluded.

2022 U.S. Dist. LEXIS 227097, *2

until December 18, 2022 allowed those owning such magazines to lawfully move them from the state by transporting them to a place where the owner could lawfully possess them or by selling them to an out of state firearms dealer. The LCM Ban declares unlawful possession after December 18, 2022 a felony. *Id.* § 11-47.1-3(a).

The plaintiffs, suing the State of Rhode Island, its Attorney General, and its Superintendent of State Police ("the State"), mount three constitutional challenges: (a) that the statute violates the *Second Amendment* (Count I); (b) that the statute's command amounts to a "taking" of the **[*3]** magazines without just compensation, in violation of the *Fifth Amendment* (Counts II and III); and (c) that the statute violates the *Fourteenth Amendment's* guarantee of Due Process in that its terms are vague and its reach is not justified by the police power of the State (Count IV).[2] These allegations, and their invocation of *p28 U.S.C. §§ 1343(a)(3)*, *1983*, *1988* to redress a deprivation of rights under color of state law, successfully call on the federal question jurisdiction of this Court under *28 U.S.C. § 1331*.

The plaintiffs moved for a preliminary injunction that the defendants oppose. ECF No. 8.[3] Both sides have submitted extensive briefs, accompanied by evidentiary declarations from a number of expert witnesses. They agreed the Court would accept those submissions as evidence in lieu of an evidentiary hearing. On November 5, 2022, the Court heard oral arguments. This Memorandum and Order follows and, for the reasons stated, the Court denies preliminary injunctive relief.[4]

_____

[2] Both the *Second Amendment* and *Fifth Amendment* arguments are technically *Fourteenth Amendment* challenges, as the *Second* and *Fifth Amendments* control state action only because they are incorporated into the *Fourteenth Amendment*. *McDonald v. City of Chicago, 561 U.S. 742, 778, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010)* (*2nd Amendment*) and *Chicago, B. & Q. R. Co. v. Chicago, 166 U.S. 226, 239, 17 S. Ct. 581, 41 L. Ed. 979 (1897)* (due process taking). They are referred to throughout this opinion as simply "*Second Amendment*" and "*Fifth Amendment*" claims.

[3] With consent of both parties, the Court on August 18, 2022, converted the Motion for Temporary Restraining Order (ECF No. 8) to a Motion for Preliminary Injunction.

[4] While the State has challenged Article III standing, the Court finds that the plaintiffs have standing. The individuals have declared that they own firearms whose possession will be outlawed if the LCM Ban is not overturned before December 18th. ECF Nos. 8B, 22D, 22E. The statute imposes an

In summary, the Court finds that the plaintiffs lack a likelihood of success on the merits, that they will not suffer irreparable harm if the law is allowed to take effect, and that the public interest is served by denying injunctive relief. Specifically, regarding **[*4]** the merits, the plaintiffs have failed in their burden to demonstrate that LCMs are "Arms" within the meaning of the *Second Amendment's* text. Moreover, even were they "arms," the plaintiffs have failed to prove that LCMs are weapons relating to self-defense. There is no *Second Amendment* violation from the LCM Ban because of those two shortfalls of persuasion. The Court must therefore consider the LCM Ban outside the core of *Second Amendment* protection. The Court further finds that the statute is not vague. Because the LCM Ban is a valid exercise of police power, there is no "taking" requiring just compensation and, consequently, no violation of the *Fifth Amendment*. The Rhode Island General Assembly passed, and the Governor signed, legislation to lower the risk of harm that results from the availability of devices that assist someone intent on murdering large numbers of people. This common-sense public safety legislation does not implicate the *Second Amendment* and violates no one's constitutional rights.

# I. BACKGROUND

*Chapter 47 of Title 11 of the Rhode Island General Laws*, known as the "Firearms Act," has long regulated the type of firearms that may be lawfully possessed in Rhode Island. Some weapons have been banned altogether, such as sawed-off shotguns and machine guns.[5] Still others are lawful only when carried by **[*5]** persons licensed to possess them or in limited specified locations such as target shooting areas or the home. *R.I. Gen. Laws §§ 11-47-8* (license or permit except to keep at home), *11-47-10* (target range). Some people

_____

affirmative duty on them to modify those weapons or relieve themselves of possession. The retail plaintiff has alleged a clear economic injury through his claim that his inventory of LCMs now cannot be sold. ECF No. 8C. Other courts have found that plaintiffs have standing with respect to similar statutes and similar challenges. *See, e.g., N.Y. State Rifle and Pistol Ass'n Inc. v. Cuomo, 990 F. Supp. 2d 349, 358 (W.D.N.Y. 2013)*, *rev'd in part on other gnds.*, *804 F.3d 242 (2d Cir. 2015)* (standing by virtue of ownership of large-capacity magazines and intention, but for the ban, to purchase them).

[5] *See* State's Memorandum for a more complete catalog of prohibited weapon-related items. ECF No. 19 at 7-8.

are excluded altogether from possessing firearms. *Id.* §§ 11-47-5 (possession by felons), 11-47-6 ("mental incompetents" and "drug addicts"), 11-47-7 (undocumented immigrants).

On June 21, 2022, Rhode Island amended Chapter 47.1 to prohibit additional weaponry that had become popular additions to the arsenals of some individuals relatively recently and have been employed in recent mass shootings. For example, Chapter 47 added to its list of prohibited items "ghost guns," which are guns that lack serial or any other identifying numbers, *Id.* § 11-47-2(8);[6] "3D print[ed]" guns, which are assembled under computer control from computer files, *Id.* § 11-47-2(1);[7] and "bump-fire stocks" which, by replacing a

---

[6] The obliteration of serial numbers has been prohibited in Rhode Island for some time. "Ghost guns," however, are privately made weapons that *never* had a serial number, nor any other identifying information on any of the parts. Joseph Greenlee, a historian cited frequently by the plaintiffs, maintains that there was historically an unrelated practice of building guns, but the use of the phrase "ghost guns" is of recent origin. Jake Charles, *Ghost Guns, History, and the Second Amendment*, Duke Center for Firearms Law (Apr. 27, 2022) https://firearmslaw.duke.edu/2022/04/ghost-guns-history-and-the-second-amendment/ . The parts are sold in kits, accompanying an "unfinished frame," and are easily assembled. *What are Ghost Guns?*, Brady: United Against Gun Violence: Resources, https://www.bradyunited.org/fact-sheets/what-are-ghost-guns (last visited Nov. 15, 2022). They cannot be traced. *Id.* Ghost guns were used in at least four mass shootings in California: in 2013 (Santa Monica), 2017 (Tehama County), 2019 (Santa Clarita), and Saugus (2019). Carter Evans, *Santa Monica Shooter Built His Own Weapon*, CBS News (June 14, 2013, 8:12 PM), https://www.cbsnews.com/news/santa-monica-shooter-built-his-own-weapon/ ; *Tehama [*6] County Rampage Puts Spotlight on Homemade 'Ghost Guns'*, KRON4 News (Nov. 16, 2017, 8:42 PM), https://www.kron4.com/news/tehama-county-rampage-puts-spotlight-on-homemade-ghost-guns/ ; Dakin Andone, *The Gunman in the Saugus High School Shooting Used a 'Ghost Gun,' Sheriff Says*, CNN (Nov. 21, 2019, 3:52 PM), https://www.cnn.com/2019/11/21/us/saugus-shooting-ghost-gun/index.html ; Alain Stephens, *Officials Confirm Santa Clarita Shooter Used A Ghost Gun*, LAist (Nov. 20, 2019, 2:45 PM), https://laist.com/news/feds-investigating-whether-saugus-santa-clarita-shooter-used-ghost-gun .

[7] 3D guns first appeared for popular consumption, according to *The New Republic*, when a "25 year old gun activist named Cody Wilson uploaded his open-design plans to the internet in 2013. Kim Kelly, *The Rise of the 3D Printed Gun*, The New Republic: The Soapbox (May 21, 2020), https://newrepublic.com/article/157753/rise-3d-printed-gun .

semiautomatic weapon's standard stock with one that does not require a trigger-pull between rounds, makes the firearm function similarly to a machine gun, *Id.* § 11-47-2(4).[8]

None of the foregoing prohibitions is challenged here. But, when it amended Chapter 47, the General Assembly enacted § 11-47.1-1 et seq., which specifically ban LCMs. Rhode Island was not alone in doing so. In the wake of recent mass shootings, many of which have occurred in schools, a number of states have enacted limitations on the capacity of magazines that enable a firearm to fire multiple rounds. While the maximum number of rounds permitted in a single magazine varies, the majority of states with bans prohibited the sale or possession of any magazine containing more than ten rounds. ECF No. 22-1, Ex. B, at 2 (internal pagination).[9] For the uninitiated which, until this case appeared on its docket, the Court considered itself magazines are devices holding extra ammunition and are inserted into and removed from the frame of the firearm, much as an extra [*7] battery-pack gets swapped in and out of a battery-operated tool, like a leaf blower, for example. "Reloading," in this context, means removing an empty magazine and substituting it with a full one.[10] The process may be as simple as

---

By the time the U. S. Department of State closed the site down, more than 100,000 people had downloaded them and virtually any 3D printer at home could be used to assemble them." *Id.*

[8] The Department of Justice banned bump stocks in the wake of the 2017 massacre that killed 58 people in Las Vegas. Luis Gomez, *A Brief History of Bump Stocks Leading up to the Ban by the Trump Administration*, The San Diego Union-Tribune: The Conversation (Dec. 18, 2018, 3:15 PM), https://www.sandiegouniontribune.com/opinion/the-conversation/sd-brief-history-bump-stocks-before-they-were-banned-20181218-htmlstory.html . The shooter there, using weapons with bump stocks attached, "sprayed" bullets into the crowd. *Id.* This article claims that about the time bump stocks were temporarily (and mistakenly, it later maintained) approved by the ATF, videos of them first appeared on YouTube, showing viewers how to rig a semiautomatic rifle "to fire continuously with a single pull of the trigger." *Id.*

[9] Where indicated, page numbers refer to the internal pagination of the document cited. Where that is not indicated, page numbers refer to the electronically assigned page numbers of the filed document. This distinction is made necessary because of the filing of multiple documents in the same electronic filing, particularly by the plaintiffs.

[10] The declarations and exhibits from the parties, the briefs of the parties, and some published material the Court has

pressing a button to eject the spent magazine, in order to push a new one in. ECF No. 22-1, Ex. B at n.33.

The reader should have at least a cursory understanding of handguns and how they operate. Handguns are built with an internal mechanism that holds the bullets. They may be revolving cylinders or fixed chambers. "A 'magazine' is a vehicle for carrying ammunition. It can be either integral to the gun or detachable." ECF No. 22-1, Ex. B at n.2. The handguns that use magazines are built with slots into which the magazines are inserted. Magazines became prevalent around the mid-nineteenth century. ECF No. 22-1, Ex. A at 36. "Most pistols sold in the United States come equipped with magazines that hold between 10 and 17 rounds." ECF No. 22-1, Ex. B at 3 (internal pagination). "Most modern semi-automatic firearms, whether handguns or semi-automatic rifles like AR-15s, use detachable box magazines." ECF No. 19-3 at ¶ 5.

When a multiple-round [*8] device like an LCM is attached, a handgun becomes a "semiautomatic" weapon, meaning that it is capable of rapidly firing several bullets, one right after another. However, the gun still requires a trigger-pull for each round fired. *Semiautomatic*, MERRIAM-WEBSTER (Dec. 8, 2022), https://www.merriamwebster.com/dictionary/semiautom atic . Nevertheless, a semiautomatic weapon can fire at rates of 300 to 500 rounds per minutes. *Kolbe v. Hogan, 849 F.3d 114, 136 (4th Cir. 2017)* (en banc). A fully automatic weapon, such as a machine gun, differs from a semiautomatic weapon in that only one trigger-pull is necessary to release a barrage of bullets that are then sprayed continuously from the barrel until a manual action is taken to stop them.

As described *infra*, there is no legacy provision in the LCM Ban and thus, on the day it is effective, those who already possess such magazines will be guilty of a felony. The law, however, granted a 180-day period for those individuals to avoid that predicament. These individuals can modify the magazine to a lower capacity, they can sell or transfer the magazine to a person or

location where it is lawful, or they can surrender it to law enforcement. The plaintiffs maintain that the whole LCM Ban—lock, [*9] stock and barrel—violates the *Second Amendment* as an unconstitutional restriction on gun ownership and the *Fifth Amendment* because it is a "taking" without just compensation by forcing "the mandatory dispossession" of previously lawful LCMs. ECF No. 12 at 4.

## II. STANDARD OF REVIEW

"A request for a preliminary injunction is a request for extraordinary relief." *Cushing v. Packard, 30 F.4th 27, 35 (1st Cir. 2022)*. "To secure a preliminary injunction, a plaintiff must show '(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest.'" *NuVasive, Inc. v. Day, 954 F.3d 439, 443 (1st Cir. 2020)* (quoting *Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003)*). As the Court examines how this case measures up against these criteria, it is mindful that "the first two factors, likelihood of success and of irreparable harm, [are] 'the most important' in the calculus." *Bruns v. Mayhew, 750 F.3d 61, 65 (1st Cir. 2014)* (quoting *Gonzalez-Droz v. Gonzalez-Colon, 573 F.3d 75, 79 (1st Cir. 2009)*).[11]

In evaluating whether the plaintiffs have met the most important requirement of likelihood of success on the merits, a Court must keep in mind that the merits need not be "conclusively determine[d];" instead, at this stage, decisions "are to be understood as statements of probable outcomes only." *Akebia Therapeutics, Inc. v. Azar, 976 F.3d 86, 93 (1st Cir. 2020)* (partially quoting *Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 6 (1st Cir. 1991)*). "To [*10] demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success — rather, they must establish a

---

unearthed on its own, provide explanations to the unfamiliar of how these weapons and their accessories work. Facts such as how a magazine works, *when undisputed*, are presented by the Court largely without citation. Any facts *found* by the Court from disputed assertions carry citations to where in the record they are supported. In addition, the Court has taken care to cite outside sources—articles not cited by the parties—only for non-controversial and presumably undisputed matters. The facts on which the Court actually relies are gleaned from the evidentiary submissions of the parties.

---

[11] Some courts have held that certain preliminary injunctions are "disfavored" and that a plaintiff seeking one of those has an even "heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors." *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado, 916 F.3d 792, 797 (10th Cir. 2019)* (stating that an injunction that "grants all the relief that the moving party could expect from a trial win" falls into the disfavored category). In this case, the plaintiffs seek a declaration that the statute is unconstitutional and an injunction against its enforcement, precisely the relief sought on the merits.

'strong likelihood' that they will ultimately prevail." *Sindicato Puertarriqueno de Trabajadores, SEIU Local 1996 v. Fortuno, 699 F.3d 1, 10 (1st Cir. 2012)* (per curiam).

## III. DISCUSSION

### A. The Second Amendment and Magazines

#### 1. Background on the Second Amendment

The Court finds that the plaintiffs have failed to show that their claim that the LCM Ban violates the *Second Amendment* enjoys a likelihood of success. The *Second Amendment*, which protects the right to bear arms, is intended at its core to safeguard the individual's right to self-defense. For the reasons discussed below, the Court finds that the plaintiffs have not demonstrated that LCMs are "Arms" within the textual meaning of the Amendment, nor have they demonstrated that LCMs are weapons of self-defense. LCMs therefore fall outside the embrace of any guarantee the *Second Amendment* confers.

In the twin cases of *Heller v. District of Columbia, 554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008)*, and *NY State Rifle & Pistol Assoc., Inc. v. Bruen, U.S. , 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022)*, the Supreme Court instructs us that a *Second Amendment* approach to the constitutionality of a weapons restriction must entail a journey into America's history. Courts must examine not only the text itself, but the historical context in which the text was written. *See Heller, 554 U.S. 570*; *Bruen*, 142 S. Ct. There are questions that the Court needs to answer in order to follow the analytical **[*11]** path dictated by *Bruen*. For the most part, those answers are found only after a historical analysis. For example, are LCMs even "Arms" within the embrace of the *Second Amendment's* text? If so, are they by virtue of their function central to the "core" right to self-defense inside *or* outside the home? In assessing the constitutionality of a restriction, courts must inquire whether LCMs were in common use during the relevant historical period and whether they were unusual and dangerous. *See Bruen, 142 S. Ct.*

In both *Heller* and *Bruen*, the five-justice majorities undertook their own historical analyses. Both majority opinions are replete with direct references to ancient tomes and original research.[12] As Justice Breyer noted in his *Bruen* dissent, "[t]he majority in *Heller* undertook 40 pages of textual and historical analysis." "Two years later, [however,] 21 English and early American historians (including experts at top universities) told us in *McDonald v. Chicago* ... [that historical analysis was] wrong." *Bruen, 142 S. Ct. at 2177-78* (internal citations omitted). He warned that *Bruen's* reliance almost exclusively on history for constitutional interpretation "will pose a number of practical problems ... especially acute in the lower **[*12]** courts."

> Lower courts — especially district courts — typically have fewer research resources, less assistance from *amici* historians, and higher caseloads than we do. They are therefore ill equipped to conduct the type of searching historical surveys that the Court's approach requires.

*Id. at 2179*. Nevertheless, the majority commands this Court to undertake such an analysis.

There is another difference beyond resources between

---

[12] Note, for example, these references:

> William Blackstone, for example, wrote that Catholics convicted of not attending service in the Church of England suffered certain penalties, one of which was that they were not permitted to "keep arms in their houses." 4 Commentaries on the Laws of England 55 (1769) (hereinafter Blackstone); see also 1 W. & M., ch. 15, § 4, in 3 Eng. Stat. at Large 422 (1689) ("[N]o Papist ... shall or may have or keep in his House ... any Arms ..."); 1 W. Hawkins, Treatise on the Pleas of the Crown 26 (1771) (similar).

*Heller, 554 U.S. at 584*.

> Henry VIII issued several proclamations decrying the proliferation of handguns, and Parliament passed several statutes restricting their possession. See, *e.g.*, 6 Hen. 8 c. 13, § 1 (1514); 25 Hen. 8 c. 17, § 1 (1533); 33 Hen. 8 c. 6 (1541); Prohibiting Use of Handguns and Crossbows (Jan. 1537), in 1 Tudor Royal Proclamations 249 (P. Hughes & J. Larkin eds. 1964)....

> Similarly, James I considered **[*13]** small handguns—called "dags"—"utterly unserviceable for defence, Militarie practise, or other lawful use." A Proclamation Against Steelets, Pocket Daggers, Pocket Dagges and Pistols (R. Barker printer 1616). But, in any event, James I's proclamation in 1616 "was the last one regarding civilians carrying dags,"

*Bruen, 142 S. Ct. at 2140*.

2022 U.S. Dist. LEXIS 227097, *13

the Supreme Court and district courts, however, that redounds to our benefit. Unlike the Supreme Court, trial courts have the ability to receive evidence and rely on that evidence to find facts that support the legal reasoning and lead to conclusions. *Bruen* itself was decided on no factual record. *See id.* The district court had granted a motion to dismiss in what was then known as *State Rifle & Pistol Assn., Inc. v. Beach*, which, of course, took allegations at their face value. *NY State Rifle & Pistol Assn., Inc. v. Beach, 354 F. Supp. 3d 143 (N.D.N.Y. 2018)*. Even more significantly, the issue raised by the plaintiffs in the case was the *very same* that had previously been rejected by the Second Circuit six years earlier in *Kachalsky v. County of Westchester, 701 F.3d 81 (2d Cir. 2012)*. The only purpose in litigating *Beach* was to get another Second Circuit rejection of plaintiff's *Second Amendment* theory so that the plaintiffs could try to bring the issue up to the United States Supreme **[*14]** Court. They forthrightly acknowledged to the district court that "the result they seek is contrary to *Kachalsky*, [they] do not dispute that the precedential effect of its holding binds [the district court], and [they] have not advanced any other factual allegations suggesting legally plausible claims." *Beach, 354 F. Supp. 3d at 149*. Thus, dismissal was granted as a matter of law without the development of a factual record. *Id.* The Second Circuit then summarily affirmed. *N.Y. State Rifle & Pistol Assn., Inc. v. Beach, 818 Fed. Appx. 99 (2d Cir. 2020)* (Mem).

Unlike the *Bruen* Court, this Court *has* an evidentiary record upon which to base its findings.[13] The parties agreed to submit documentary declarations and exhibits in lieu of an evidentiary hearing, and the Court has pored over them. Both parties have retained expert historians to inform the Court's factfinding. The curricula vitae ("CVs") of some of the experts are before the Court as are their writings directed at pivotal factual disputes, and both parties have submitted additional helpful exhibits. While this Court professes no independent scholarly historical knowledge, it does have solid experience in resolving disputes between experts. Parties, in both civil and criminal cases, routinely rely on expertise in topics well beyond the ken **[*15]** of any particular factfinder to decide contested issues of fact. For example, does a criminal defendant have a mental disorder that is sufficient to excuse her from criminal responsibility? Was a steel slab made defectively and

did that defect cause it to give way? Did a product infringe on a pre-existing patent by employing the same basic design? Without any expertise in psychiatry, metallurgy, or industrial design, courts regularly resolve factual disputes between expert witnesses, and they do so relying on tried-and-true, conventional considerations related to credibility and reliability.

In the ordinary course of an opinion, the Court might examine the applicable law before addressing the facts to which it would then apply that law. In this case, however, it is useful to discuss the facts, and the Court's assessment of the evidence before it, before engaging in the *Heller/Bruen* analysis.

## 2. The Court's Findings of Fact

In the procedural posture of a motion for preliminary injunction, the Court does not have to make final findings of fact. Instead, an examination of all the evidence and consideration of the expertise of those proffering opinions occurs in the framework of an inquiry **[*16]** into whether the plaintiffs have shown a *likelihood* that their experts' opinions will be accepted. In that context, the Court has, in considering the evidence, asked itself basic questions that courts pose all the time and, indeed, direct juries to employ when making decisions based on expert opinions. These questions include: what are the experts' respective qualifications? Are their opinions intelligible to a lay judge or jury? Is there other evidence that casts doubt on the opinions or corroborates them? *See Woodman v. United States, ___ F. Supp. 3d ___, 2022 U.S. Dist. LEXIS 82144, 2022 WL 1444529, *2 (D.N.H. May 6, 2022)* (plaintiffs non-specialist expert's opinion given less weight than others because his testimony was contradicted by treating providers). Do the opinions appear to have sufficient support? *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 84 (1st Cir. 1998)* (whether articles relied on by expert were published and subject to peer review was an indicum of the reliability of the expert's opinion). Are they based on sufficient data? *Malden Transp., Inc. v. Uber Techs., Inc., 404 F. Supp. 3d 404, 423 (D. Mass. 2019)* (expert's opinion unreliable where he excluded major variables). And did the expert approach the problem objectively or with a partisan bias? *See Collazo-Santiago v. Toyota Motor Corp., 149 F.3d 23, 28 (1st Cir. 1998)* (jury could find defendant's expert not a disinterested witness because he was a former employee of the defendant and testified often on its behalf).

---

[13] The State noted in its opening Memorandum that no court has developed a full evidentiary record concerning LCMs post-*Bruen*. ECF No. 19 at 2 (internal pagination).

Case 3:23-cv-00056-JBA   Document 23-21   Filed 03/30/23   Page 34 of 226

Page 7 of 23
2022 U.S. Dist. LEXIS 227097, *16

In this case, the credentials **[\*17]** of the proffered experts weigh heavily in the Court's view of which opinions to accept where there is a conflict. The Court must discount to some extent the declaration of both the plaintiffs' experts because neither has been engaged in relevant *neutral* scholarly research.

    • Ashley Hlebinsky, a historian versed in the history of firearms, is a private consultant. Her only academic appointments seem to have been a decade ago as a course-specific teaching assistant at the University of Delaware, while she received both her Bachelor's and Master's in American History from that institution. She is a co-founder and senior fellow of the University of Wyoming's College of Law's Firearms Research Center.[14] She has extensive experience in firearms museums and appears to be very active in the National Shooting Sports Foundation. She has many published pieces, the majority of which have appeared in niche magazines such as *American Frontiersman, Recoil Magazine*, and *Glock Magazine*. ECF No. 22-1 at 35-37. One of the disadvantages of relying on documentary submissions is that the Court has no opportunity to explore the nature of an expert's research or how politically neutral or advocacy-oriented her **[\*18]** prior work has been. The Court can only take at face value an expert's CV. Matthew Larosier, the plaintiffs' second expert, was at the time he wrote the article a legal researcher employed by the CATO Institute, a public policy thinktank. His submission is entitled "Losing Count: The Empty Case for 'High-Capacity' Magazine Restrictions," that appeared in CATO's Legal Policy Bulletin's July 17, 2018, issue. ECF No. 22-2. The submission's only note "about the author" reveals that he is a former legal associate. ECF No. 22-2 at 59. CATO lists several fellows whom it terms "scholars," but Mr. Larosier is not one of those, nor is he identified as an "adjunct scholar" or as an "expert" fellow, formerly or presently. *Experts: Fellows*, CATO INST., https://www.cato.org/people/fellows (last visited Dec. 13, 2022). The Court has no information about his background or credentials, except that he seems to no longer be associated with CATO. Beyond that, while the CATO Institute is a well-known repository of research, it is not a neutral actor in the raging gun control vs. gun rights debate. Its website proclaims that it exists to "promote libertarian ideas in policy debates." *About*, CATO INST., **[\*19]** https://www.cato.org/about (last visited Nov. 22, 2022). Thus, while the Court casts no aspersions on Mr. Larosier's scholarship, his report does not carry the indicia of reliability of a scholarly article published in a respected peer-review forum.[15] *See, e.g., Ruiz-Troche, 161 F.3d at 84* (exposure to peer review demonstrates "a measure of acceptance of the methodology within the scientific community"). Nor has the Court been provided with a CV for him. "Though DACO cries foul due to the court's 'gratuitous swipe' at Dr. Logan's bona fides, such credibility determinations are the prerogative — indeed, the duty — of the district judge in a bench trial." *Texaco P. R., Inc. v. Dep't of Consumer Affairs ("DACO"), 60 F.3d 867, 878 n.5 (1st Cir. 1995)* (finding such where appellant's expert was "intimate[ly] involve[d]" with one of the parties). The State's historians are more traditional neutral academics.

---

[14] While the aim of the Center will be to promote academic research, it has yet to be formally founded, according to an article authored by Ms. Hlebinsky. The Center is "going through the University of Wyoming's approval process...." but apparently is not yet formally affiliated. Ms. Hlebinsky does not appear to have a faculty appointment at the College of Law. *Faculty: College of Law*, UNIV. **[\*21]** OF WYOMING, https://www.uwyo.edu/law/directory/ (last visited Dec. 13, 2022). The Center does not appear to have a website of its own, nor is it listed as a Department on the University of Wyoming's website, but the article appears under the auspices of the United States Concealed Carry Association (USCCA). Ashley Hlebinsky, *University of Wyoming Law School's Firearms Research Center*, U.S. CONCEALED CARRY ASS'N (Apr. 27, 2022), https://www.usconcealedcarry.com/blog/firearms-research-center/ . The USCCA on its website solicits members with the following pitch: "Let's face it: There are people who HATE the fact that you and I carry guns. They're determined to teach us a lesson just for exercising our inalienable God-given right to self-defense." *Are You Prepared to Face Our "Justice" System?*, U.S. CONCEALED CARRY ASS'N, https://www.deltadefense.com/offers/5f6c9c07df964/join-the-uscca-today?tID=61e9a2b6538f0 (last visited Dec. 13, 2022). Ms. Hlebinsky's biases are obvious.

---

[15] Mr. Larosiere's opinion strikes the Court as flawed for another reason. He opens the section on "Legal Background and Constitutional Concerns" by describing *Heller* as protecting "arms in 'common use,' ... which would cover the 20-round magazines that are standard equipment for a significant portion of weapons currently in lawful use." ECF No. 22-B at 46. The *Second Amendment* extends, he declares, "to all instruments that constitute bearable arms in common use...." *Id.* at 47. In describing *Heller* that way, he completely untethers it from the required use for self-defense.

2022 U.S. Dist. LEXIS 227097, *19

• Randolph Roth, an expert in the history of crime, is a Distinguished Professor of History and Sociology at The Ohio State University. He received his B.A. from Stanford University and his Ph.D. from Yale University, both in History. He has taught at several institutions and was an Assistant Professor of History at Grinnell College for seven years before moving to Ohio State. His two books were published **[*20]** by Cambridge University Press and the Belknap Press of Harvard University. Like Ms. Hlebinsky, Prof. Roth has published a number of articles, but, unlike hers, his have appeared primarily in scholarly journals. ECF No. 19-1 at 4-8. Michael Vorenberg is a tenured Associate Professor of History at Brown University, previously an assistant professor at The State University of New York at Buffalo, and before that, a post-doctoral fellow and lecturer at Harvard University. His A.B., A.M., and Ph.D. were all awarded by Harvard University. He has published three books and contributed to well over a dozen more. While there is no contest of numbers here, his writings have appeared primarily in academic texts, and his list of fifty-seven lectures during the last two decades, generally in university settings, is impressive. ECF No. 19-2 at 4-13. Dennis Baron is a professor of English and Linguistics at the University of Illinois. His Ph.D. was obtained from the University of Michigan and his Master's from Columbia University. A Professor Emeritus now, he taught for 47 years, wrote ten published books and contributed chapters to twenty-two more. ECF No. 19-7 at 4-16.[16]

The opinions offered by the experts for both parties, and the Court's reaction to them, are discussed below, as relevant.

_____

[16] The State has presented the opinions of two other experts relevant to factual issues. Edward Troiano is Chief of the Bureau of Criminal Identification and Investigation, R.I. Office of the Attorney General, and is a former Special Agent for the Bureau of Alcohol, Tobacco, Firearms, and Explosives. ECF No. 19-3. Megan L. Ranney, M.D. is a Professor of Emergency Medicine at Brown University Medical School, as well as Professor of Behavioral and Social Sciences and Health Services, Policy, and Practice at the Brown University School of Public Health. ECF No. 19-10. Because these two experts have expressed opinions that are not directly contradicted by the plaintiffs' experts, the Court need not choose between them. It suffices to say that their credentials show them to be well-qualified to render the opinions they hold.

### 3. Legal Landscape of the *Second Amendment*

The pertinent application of the *Second Amendment* begins with *District of Columbia v. Heller*, which concerned a challenge to the prohibition of handguns in the District of Columbia.[17] Specifically, the plaintiff, a D.C. special police officer, claimed a *Second Amendment* right to possess such firearms in his home without registering or licensing them. *Heller, 554 U.S. at 575-76*. The Court held that the prefatory words "[a] well-regulated Militia, being necessary to the security of a free State," did not confine the Amendment's protection to those connected to military or law enforcement. *Id. at 627-28*. Instead, the Court held, the Amendment protected the right of the unaffiliated individual to protect herself. *Id. at 628-29*.

The right established in *Heller*, however, was not without context or limitation. Instead, the right of the individual is circumscribed by the "use [of handguns] for self-defense in the home." *Id. at 636*. The Amendment was not adopted, the **[*22]** majority made clear, "to protect the right of citizens to carry arms for *any sort* of confrontation...." *Id. at 595*. Rather, the right was understood historically to be tied to "the right of having and using arms for self-preservation and defence." *Id. at 594* (citing, *inter alia*, 1 BLACKSTONE, 140). In addition, the Court cautioned, nothing in *Heller* was intended to confer a right to "keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id. at 626*.

The holding of *Heller* was relatively narrow. It linked the right to possess firearms tightly to self-defense and the home, but even in the home it did not confer unlimited freedom to the gunowner. In particular, the majority cautioned, only those weapons "in common use at the time" are entitled to *Second Amendment* protection, and in particular, that would not include "weapons that are most useful in military service...." *Id. at 627*. Laws promoting safety, such as those regulating storage could coexist with the Amendment so long as they did not "burden the right of self-defense." *Id. at 632*. The Court specifically eschewed "cast[ing] doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the

_____

[17] The D.C. law also regulated certain aspects of maintaining other weapons, such as long guns that had to be kept unloaded and either disassembled or locked. *Heller, 554 U.S. at 575*.

carrying of firearms [*23] in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id. at 626-27*. And in granting relief to Heller, it directed that "the District [of Columbia] must permit him to register his handgun and must issue him a license to carry it in the home," *Id. at 635*, thus implicitly validating at least in concept both registration and licensing schemes.

That *Heller* was specifically concerned with protecting an individual's right to exercise self-defense in her home was confirmed two years later in *McDonald v City of Chicago, 561 U.S. 742, 749-50, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010)*, the case that held the *Second Amendment* applicable to the states through the *Fourteenth Amendment*. *McDonald* was decided by a Court almost identical to the one issuing the *Heller* opinion. The five-justice majority remained the same and, in the minority, retiring Justice David H. Souter had been replaced by Justice Sonia M. Sotomayor.

*McDonald* granted *certiorari* on the single question of "[w]hether the *Second Amendment* right to keep and bear arms is incorporated as against the States by the *Fourteenth Amendment's Privileges or Immunities* or *Due Process Clauses*." *McDonald v. Chicago*, No. 08-1521, 2009 WL 1640363, at *1 (June 9, 2009) (Petition for Writ of Certiorari). In answering "Yes," the Court did not address the scope of *Heller* but merely considered whether its holding was binding on the states. [*24] The plaintiffs had asserted only a right to be free from state restriction on the ability to "keep handguns in their homes for self-defense," *McDonald, 561 U.S. at 750*, and that is all that was decided. The discussion of incorporation itself reflected the Court's long-held view that the application of incorporated rights to the states is identical with that when applied to the Federal Government. *Id. at 765*.

*McDonald* described *Heller* as holding "that the *Second Amendment* protects the right to keep and bear arms for the purpose of self-defense...." *Id. at 749-50*. "[W]e stressed [in *Heller*] that the right was also valued because the possession of firearms was thought to be essential for self-defense. As we put it, self-defense was 'the *central component* of the right itself.'" *McDonald, 561 U.S. at 787* (quoting *Heller, 554 U.S. at 599*) (emphasis in original). More than a decade passed before the Court addressed the *scope* of *Heller*, and the scope of the *Second Amendment* protection in *N.Y. State Rifle & Pistol Assoc., Inc. v. Bruen*.

In the interim, the Circuit Courts of Appeals were busy applying *Heller*. They were near-unanimous on two things. First, they agreed that *Heller* conferred maximum protection only with respect to the exercise of self-defense in the home. Second, as to the world outside the home, *Heller* determined [*25] that intermediate scrutiny was appropriate, requiring only that those statutes be "substantially related" to a compelling government interest and that there be a reasonable fit between that interest and the means outlined in the statute to advance it. The First Circuit applied *Heller* first in *Gould v. Morgan, 907 F.3d 659 (1st Cir. 2018)*, reviewing a challenge to the state licensing statute as implemented by the cities of Boston and Brookline. *Id. at 662*. The plaintiffs sought the right to carry firearms generally. *Id. at 664*. While allowing unrestricted possession in the home, the licenses issued for public carry were restricted at the discretion of the municipality, which made determinations based on the purported purpose of carrying the firearm, such as an individualized need for self-defense, employment, hunting, or target practice. *Id*.

The question posed in *Gould* was precisely that later answered—differently—in *Bruen*: "Does the *Second Amendment* protect the right to carry a firearm outside the home for self-defense?" *Id. at 666*.[18] In answering the question in the negative, the First Circuit employed the same construct adopted by its sister Circuits. *Id. at 668-69*. This construct used a two-step analysis that determined first "whether the challenged law burdens conduct that falls within the [*26] scope of the *Second Amendment's* guarantee."[19] *Id*. This first step "is a

_____

[18] The second question put to the Court was, if the answer to the first were "yes," may the granting of a license be conditioned on an applicant's showing a particularized need to defend herself beyond that of the general public—i.e., a "good reason (beyond a generalized desire for self-defense) for carrying a firearm outside the home?" *Id*.

[19] The two-step analytic paradigm adopted in *Gould* was identical to that adopted by nearly all the Circuit Courts of Appeals. *See Gould, 907 F.3d at 668-69* (citing *Kachalsky v. Cty. of Westchester, 701 F.3d 81, 93 (2d Cir. 2012)*); *Drake v. Filko, 724 F.3d 426, 429 (3d Cir. 2013)*; *Woollard v. Gallagher, 712 F.3d 865, 874 (4th Cir. 2013)*; *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of ATFE (NRA), 700 F.3d 185, 194-95 (5th Cir. 2012)*; *United States v. Greeno, 679 F.3d 510, 518 (6th Cir. 2012)*; *Ezell v. City of Chicago, 651 F.3d 684, 703-04 (7th Cir. 2011)*; *Young v. Hawaii, 896 F.3d 1044, 1051 (9th Cir. 2018)*; *United States v. Reese, 627 F.3d 792, 800-01 (10th Cir. 2010)*; *Heller v. Dist. Of Columbia (Heller II), 670 F.3d 1244, 1252-53, 399 U.S. App. D.C. 314 (D.C. Cir. 2011)*. "*Bruen*

backward-looking inquiry, which seeks to determine whether the regulated conduct 'was understood to be within the scope of the right at the time of ratification.'" _Id. at 669_ (quoting _United States v. Chester, 628 F.3d 673, 680 (4th Cir. 2010)_). The second step, if the desired conduct falls _outside_ the "core" and some regulation is therefore permitted, is to decide what level of scrutiny must be brought to bear upon the regulation. _Id._ The Circuit Courts of Appeals, including the First Circuit, again acting in harmony, determined that intermediate scrutiny was appropriate. _Gould, 907 F.3d at 668-69_; _see supra_ at n. 13 (citing cases from other circuits).

In _Bruen_, the Supreme Court bluntly cast aside the reasoned analysis of all these Circuit Courts of Appeals. While acknowledging that "the Courts of Appeals have coalesced around a 'two-step' framework for analyzing _Second Amendment_ challenges that combines history with means-end scrutiny," _Bruen, 142 S. Ct. at 2125_, the high court nonetheless "decline[d] to adopt that two-part approach." _Id. at 2126_. In its place, the Court raised a presumptive umbrella of protection whenever "the _Second Amendment's_ plain text covers **[*27]** an individual's conduct...." _Id._ Rather than looking at the scope of the _right_ to determine whether a statute such as the LCM Ban is constitutional (and then applying a means-end analysis), the focus is on the _restriction_ to determine whether it is "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." _Id. at 2127_.[20]

Although _Bruen_ did not purport to define the parameters

_____

resoundingly repudiated the 'two-step analysis' widely embraced in the lower courts.... As the last decade of experience shows, the lower courts have in virtually every case used the two-part test to balance away _Second Amendment_ rights." Mark W. Smith, _NYSRPA v. Bruen: A Supreme Court Victory for the Right to Keep and Bear Arms — and a Strong Rebuke to "Inferior Courts_," 2022 Harvard. J. Law & Pub. Pol'y Per Curiam 24, at *6 (2022).

[20] _Bruen_ did not appear out of the blue in 2022. In 2015, Justice Clarence Thomas, who would ultimately write the majority opinion in _Bruen_, joined by the late Justice Antonin G. Scalia, dissented from a denial of _certiorari_ in an opinion that hinted at what would become the _Bruen_ analysis. _Friedman v. City of Highland Park, Ill., 577 U.S. 1039, 136 S. Ct. 447, 193 L. Ed. 2d 483 (2015)_ (Thomas, J., dissenting). The ultimate question under _Heller_, Justice Thomas wrote, is "whether the law bans types of firearms commonly used for a lawful purpose — regardless of whether alternatives exist." _Id. at 449_ (citing _Heller, 554 U.S. at 627-29_).

of lawful purposes, it stressed that "individual self-defense is 'the _central component_' of the _Second Amendment_ right." _Id. at 2133_ (quoting _McDonald, 561 U.S. at 767_). The _Bruen_ opinion opens with the declaration that "[W]e . . . now hold, consistent with _Heller_ and _McDonald_, that the _Second_ and _Fourteenth Amendments_ protect an individual's right to carry a handgun _for self-defense outside the home." Id. at 2122_ (emphasis added). This Court's focus, therefore, must be on whether the LCM Ban unduly impairs the right of an individual to engage in self-defense. That this is the primary focus of the _Second Amendment_ analysis is the constant refrain of _Bruen_—e.g., "[w]e therefore turn to whether the plain text of the _second Amendment_ protects [plaintiffs'] proposed course of conduct — carrying handguns publicly for self-defense." _Id. at 2134_. And, later, "[t]he _Second Amendment's_ plain text thus presumptively **[*28]** guarantees petitioner[] a right to 'bear' arms in public for self-defense." _Id. at 2135_.

## 4. Magazines Do Not Constitute "Arms"

The threshold issue in this _Second Amendment_ analysis must be whether a detachable magazine is "Arms" within the meaning of the text of the Constitution.[21] The Amendment on its face protects only "the right of the people to keep and bear Arms, [which] shall not be infringed." If a magazine is not encompassed by "Arms," it falls outside the protection of the _Second Amendment_.[22] In the First Circuit, Courts address this question on a nearly blank slate. In _Worman v. Healey, 922 F.3d 26 (1st Cir. 2019)_, which upheld a ban on

_____

[21] It is worth noting now that Rhode Island's statute avoids the pitfall of being directed against the _firearm_ and not the magazine. Some other states' statutes "proscribe weapons that are 'capable of accepting' a large-capacity magazine, however defined." ECF No. 22-B. That language, according to plaintiffs' expert Matthew Darosiere, is problematic because many weapons designed to use limited magazines will actually accept large-capacity magazines instead. ECF No. 22-1 at 44-45. Rhode Island's statute prohibits the LCM because of what it _does_, not the firearm for what it _could do_.

[22] The Court discusses separately, _infra_, whether LCMs fail to achieve _Bruen's_ protection because they are not weapons of self-defense. In fact, two issues—"arms" and "self-defense" — are related, as _Bruen_ states, "even though the _Second Amendment's_ definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments _that facilitate armed self-defense." Bruen, 142 S. Ct. at 2132_ (emphasis added).

LCM's and assault rifles pre-*Bruen*, the First Circuit "assume[d], without deciding, that the proscribed weapons have some degree of protection under the *Second Amendment*." *Id. at 30*.[23]

There appear to be no Circuit Courts of Appeals holding that LCMs are not "Arms." Some, like *Worman*, have assumed *arguendo* that they are. This issue, that large-capacity magazines are entirely outside of *Second Amendment* protection for the independent reason that such magazines constitute firearms "accessories" rather than protected "Arms," was raised by *amici* in *New York State Rifle & Pistol Ass'n v. Cuomo, 804 F.3d 242, 263 n. 127 (2d Cir. 2015)*. Like the First Circuit, the Second Circuit found **[*29]** it sufficient to "proceed on the assumption that these laws ban weapons protected by the *Second Amendment*" because it upheld the prohibition of LCMs.[24] *Id. at 257*. In *Kolbe v. Hogan*, the Fourth Circuit reviewed and vacated a panel decision that had declared magazines protected "Arms" without addressing that issue, finding LCMs not protected by the *Second Amendment* for other reasons. *Kolbe v. Hogan, 849 F.3d 114, 136, 137 n.12 (4th Cir. 2017)* (en banc).

Courts that have held that LCMs *are* "Arms" have for the most part equated LCMs with bullets and, by doing so, have been able to declare that LCMs are an integral part of firearms such that the weapons are useless without them. Thus, they reason, LCMs must be protected as "Arms" in the same way that the firearms themselves are. Although it is their burden to show that large-capacity magazines fall within the purview of *Second Amendment*, the plaintiffs offer no expert opinion on the meaning of the word "Arms." Instead, the plaintiffs simply assert that "without the magazine, many weapons would be useless" (ECF No. 32 at 7) and rely on *Duncan v. Becerra, 970 F.3d 1133, 1146 (9th Cir. 2020)*, *rev'd*, *Duncan v. Bonta, 19 F.4th 1087, 1096 (9th Cir. 2021)* (en banc), which stated that "[f]irearm magazines are 'arms' under the *Second Amendment*" because "[w]ithout a magazine, many weapons would be useless." The plaintiffs' reliance on the panel

decision in *Duncan* **[*30]** in light of its reversal *en banc* is suspect. What is more concerning, though, is that the panel opinion engaged in no textual or historical analysis of the word "Arms." Further, this Court finds the panel opinion's equation of "magazines" with "bullets" unpersuasive.[25] The Ninth Circuit also noted that the statement, "without a magazine, Ethel weapon would be useless," is not really true. Without *bullets*, a firearm would be useless. But a firearm can fire bullets without a detachable magazine, and in any event, a firearm does not need a magazine containing more than ten rounds to be useful.

The analysis under *Bruen* is twofold. First, the plain text itself must he examined; second, the Court can consider the historical context to discern what would have been the meaning accepted at the time. To assist our analysis, we turn first to *Heller*:

> Before addressing the verbs "keep" and "bear," we interpret their object: "Arms." The 18th-century

---

[23] The issue of whether LCMs are "Arms" at all was raised only by *amici* in *Worman*, and explicitly for that reason, although terming it a "clever" argument, the Court declined to consider it. *Worman, 922 F.3d at 33 n.3*.

[24] The Second Circuit did strike down the provision of the statute that forbade the *loading* of a magazine with more than seven rounds, but it upheld the restriction on the *capacity* of the LCM at ten rounds. *New York State Rifle & Pistol Ass'n, 804 F.3d at 269*.

[25] Indeed, *Duncan* specifically relied on its previous holding in *Jackson v. City and Cty. of San Francisco, 746 F.3d 953, 967 (9th Cir. 2014)*, which applied the *Second Amendment* to bullets. *Jackson*, however, noted the lack of historical evidence in the record. The *Duncan* court relied on *Jackson* without recognizing the distinction between bullets and magazines, between ammunition and the *holder* of ammunition. Moreover, the judgment in *Duncan* was vacated and rehearing *en banc* was granted. *Duncan v. Becerra, 988 F.3d 1209 (9th Cir. 2021)*. On rehearing, the district court was reversed, *Duncan v. Bonta, 19 F.4th 1087, 1096 (9th Cir. 2021)* (en banc), the Court holding that the ban "outlaws no weapon, but only limits the size of the magazine that may be used with firearms...." While there is no discussion of whether magazines are included under "Arms," the Ninth Circuit's description of the complete ban on large-capacity magazines as "outlaw[ing] no weapon" is consistent with finding a magazine an accessory, not itself a firearm. In any event, the current status of *Duncan* is that it has been remanded again to the district court post-*Bruen*. *Duncan v. Bonta, 49 F.4th 1228 (9th Cir. 2022)* (Mem).

*Fyock v. City of Sunnyvale, 25 F. Supp. 3d 1267, 1276 (N.D. Cal. 2014)*, upon which the State relies, did not distinguish between magazines and ammunition. It reasoned that if "magazines and ammunition" were not Arms, any state could endrun *Heller* by banning them. The Court did not recognize any difference between bullets and the container from which they are fed into the firearm. *Fyock*, however, ultimately refused to preliminarily enjoin the ban on LCMs, and that decision was affirmed with no discussion of whether LCMs are "Arms." *Fyock v. Sunnyvale, 779 F.3d 991 (9th Cir. 2015)*.

meaning is no different from the meaning today. The 1773 edition of Samuel Johnson's dictionary defined "arms" as "[w]eapons of offence, or armour of defence." 1 Dictionary of the English Language 106 (4th ed.) (reprinted 178) (hereinafter Johnson). Timothy Cunningham's important 1771 legal dictionary defined "arms" as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." 1 A New and Complete Law Dictionary; see also N. Webster, American Dictionary of the English Language 1828) (reprinted 1989) **[\*31]** (hereinafter Webster) (similar).

*Heller, 554 U.S. at 581*. Whether LCMs were in existence in the 18th century is of little concern. *Heller* teaches that "the *Second Amendment* extends prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id. at 582*. But *Heller* is of little help in resolving whether LCMs are "Arms." *Heller* dispensed quickly with the discussion of the meaning of "Arms," as there was little question that the handguns at issue there were "weapons of offence." It is less clear that a magazine is such a weapon because, while it is something that a person "takes into his hands," it is not a "thing . . . useth in wrath to *cast at or strike* another." *Heller, 554 U.S. at 582* (emphasis added). In this Court's view, LCMs, like other accessories to weapons, are not used in a way that "cast[s] at or strike [s] another." What one judge has said of silencers is equally apt when applied to LCMs: they "generally have no use independent of their attachment to a gun" and "you can't hurt anybody with [one] unless you hit them over the head with it." *United States v. Hasson, No. GJH-19-96, 2019 U.S. Dist. LEXIS 160498, 2019 WL 4573424, at \*2 (D. Md. Sept. 20, 2019)*, aff'd, *26 F.4th 610 (4th Cir. 2002)*, cert. den. 214 L. Ed. 2d 137, 2022 WL 6572217 (Oct. 11, 2022); *accord United States v. Cox, 906 F.3d 1170, 1186 (10th Cir. 2018)* ("A silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defence.')").

This **[\*32]** is where it is useful to turn to the opinion of historians and linguists. In interpreting the word "Arms," we look to the word's ordinary meaning, "guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.'" *Heller, 554 U.S. at 577*. To the ordinary reader, magazines themselves are neither firearms nor ammunition. They are *holders* of ammunition, as a quiver holds arrows, or a tank holds

water for a water pistol, or a pouch probably held the stones for David's sling.[26]

The plaintiffs' expert Ashley Hlebinsky, a firearms historian, seems to agree with the characterization of a magazine as less of a weapon and more of a *holder* of ammunition: She wrote, "[a] magazine is a container, detachable or fixed, that holds ammunition while it feeds into a repeating firearm." ECF No. 22-1 at 8 ¶ 12. The fact that a magazine is an *attachment* to a firearm, rather than a necessary or integral part of the firearm itself, is acknowledged by her in the following language: "In the periods being discussed, there are repeating firearms that do not use magazines, such as revolvers, which use a rotating **[\*33]** cylinder." *Id.* Neither Ms. Hlebinsky nor the plaintiffs' other proffered expert addresses whether a magazine is encompassed by the definition of "Arms."[27]

In this case, only the State has supported its argument with historical analysis. The Court finds credible the state's expert, Prof. Dennis Baron, a professor of linguistics with an emphasis on "historical language usage," and accepts his opinion. According to Prof. Baron, there was a clear distinction between "Arms" and "accoutrements" from the founding era through the period following ratification of the *Fourteenth Amendment*. The word "Arms" was a general term for weapons such as swords, knives, rifles, and pistols, but it did not include ammunition, ammunition containers, flints, scabbards, holsters, or "parts" of weapons such as the trigger, or a cartridge box. The reader is referred to State's Exhibit G for a detailed analysis, but Prof Baron points out that in the 18th Century, bullets were

───────────────

[26] This view accords with the way at least some gun manufacturers themselves understand "magazines." As the State points out, "Modern firearms manufacturers often do not list magazines under "gun parts" but under firearms "accessories" sections of their websites. ECF Nos. 19 at 30 (internal pagination), 19-4.

[27] Ms. Hlebinsky's opinion is confined, in her words, to the technology of repeaters and magazine-fed repeaters, the relationship between civilian and military weaponry, and the history of regulation. *Id.* at 1, 3-4. The plaintiffs' expert Matthew Larosier focused on the history of restrictions, the plaintiffs' vagueness argument that asserts a lack of common understanding for "high capacity," and an argument that high-capacity magazines render firearms safer than other firearms because they have a greater likelihood of malfunctioning. His assertion that magazines are "Arms" was supported only by citation to *Duncan v. Becerra*, which, as the Court has noted *supra* at note 25, was reversed.

2022 U.S. Dist. LEXIS 227097, *33

kept in cartridge boxes or cases, called "accoutrements," and the word "magazine," which was used at that time to mean "storehouse" did not come to mean a compartment holding ammunition until the late 19th Century.

For the purposes of a **[\*34]** preliminary injunction, it suffices for the Court to conclude that the plaintiffs have failed to meet their burden of establishing that LCMs are "Arms" within the textual meaning of the *Second Amendment*.

**5. LCMs Are Not Instruments of Self-Defense**

There is simply no credible evidence in the record to support the plaintiffs' assertion that LCMs are weapons of self-defense and there is ample evidence put forth by the State that they are not.[28] This Court has

---

[28] In *Worman v. Healey*, the constitutionality of restrictions on the possession of LCMs (and assault rifles) was squarely presented to the First Circuit. *Worman, 922 F.3d at 26*. *Worman* was abrogated by *Bruen*, which rejected its use of a two-step intermediate tier scrutiny standard, but its significance to this case is that *Worman* sidestepped the question of whether LCMs were weapons of self-defense. It

> assume[d] without deciding that [assault weapons and LCMs] have some degree of protection under the *Second Amendment*. We further assume, again without deciding, that the Act [prohibiting them] implicates the core *Second Amendment* right of self-defense in the home by law-abiding, responsible individuals.

*Id. at 30*. While the First Circuit posed the question of "whether the proscribed weapons are in common use for lawful purposes like self-defense," it specifically eschewed the need "to plunge into this factbound morass." *Id. at 35*. The *Worman* analysis did not depend upon an answer to the question because it went on to determine, applying the pre-*Bruen* ends-means balancing, that any burden on the right of self-defense was minimal. "Viewed as a whole, the record suggests that wielding the proscribed weapons for self-defense within the home is tantamount to using a sledgehammer to crack open the shell of a peanut." *Id. at 37*.

*Bruen* does not allow the Court to balance the extent of an intrusion into a *Second Amendment* protected right against the strength of the public interest served by the LCM Ban or the closeness of the means of the statute and its end. The Court cannot, like *Worman*, conclude that the impairment is "modest" and "the fit between [legislative] interests and the restrictions imposed by the Act is both close and reasonable." Instead, any intrusion into a right protected by the *Second Amendment*

painstakingly examined the evidence put forth by the plaintiffs on this point and finds it wanting.[29] On the

---

thrusts us into the territory of justifying the regulation as one historically placed on similar weapons. That latter issue is hotly contested between the parties.

[29] The plaintiffs' evidentiary package consists of the following: Ex. 8-1A is the statute. Ex. 8-1B is the Affidavit of Plaintiff Jonathan Hirons who owns a number of LCMs but makes no reference at all to their use. Ex. 8-1C is the Affidavit of Andre Mendes, principal of the retailer plaintiff, which describes an inventory that includes LCMs but makes no reference to their use by him or his customers. Ex. 22-1A is the Declaration of expert Ashley Hlebinsky, a firearms historian. While Ms. Hlebinsky provides an extensive history of firearm development, use, and regulation in the founding era specifically, she offers no discussion at all about what LCMs were actually used for. In her discussion of the development of target shooting, for example, she mentions rifles and, in passing, "repeaters of all sorts" in models "indicating sporting vs. military variants." *Id.* at 11 ¶ 17. She particularly elaborates on the interchangeability between civilian and military uses for weapons, *Id.* at ¶ 18, but fails to connect any of that information to the use of LCMs in self-defense. Her exposition on the development of repeating firearms is similarly lacking. *Id.* at 12 ¶ 21. The closest Ms. Hlebinsky comes to linking LCMs to lawful use is a quotation from William F. "Buffalo Bill" Cody who pronounced Winchesters his favorite for "hunting or Indian fighting." *Id.* at 19 ¶ 31. In short, Ms. Hlebinsky's report does nothing to inform the discussion of whether LCMs are in any way connected to the purpose of self-defense. Ex. 22-1B is an article written by Researcher Matthew Larosiere, then of the Cato Institute. It challenges restrictions on LCMs. It asserts that "[d]efensive uses of firearms can preserve human life," *Id.* at 43. Nowhere does Mr. Larosiere discuss the actual use of LCMs in self-defense. The only empirical data he offers concerns the lower percentage of "hits" novice shooters have compared to more experienced shooters. "That [, he argues,]combined with the fact that an assailant is rarely stopped by a single bullet, makes magazine capacity all the more important for the effective defensive use of firearms." *Id.* at 52. Mr. Larosiere presents only one anecdote of a victim of an attempted ambush firing 12 times at his assailants. *Id.* at 52-53. Ex. 22-1C is a brochure entitled "The Best Duck Hunting Shotguns of 2022." Ex. 22-1D is an Affidavit of a plaintiff firearms dealer directed primarily at the allegation of "vagueness" of the term "permanent" modification. It does not mention self-defense. ECF No. 22-1, Ex. E is a second Affidavit of Plaintiff Jonathan Hiron, elaborating on his plans should the injunction not issue and the difficulty of modifying the plastic magazines he owns.

The Plaintiffs attempted to file an additional affidavit from Mr. Worthy, introducing new factual allegations, after the deadline for submissions had expired, without requesting permission to do so. ECF No. 23. The affidavit was signed two days before

other hand, the State's experts address the question head-on. Edward Troiano, who spent 25 years as a Special Agent for the Bureau of Alcohol, Tobacco & Firearms ("ATF"), and now is the Chief of the Rhode Island Bureau of Criminal Identification and Investigation, conducted a review of self-defense incidents in Rhode Island in which a semiautomatic firearm was used. That review, combined with the awareness of firearm investigations that his job requires, led him to assert that he is "unaware of any incident in which a civilian has ever fired as many as 10 rounds in self-defense." ECF No. 19-3 ¶ 10. In contrast, LCMs have "frequently" been used [*35] by persons committing criminal offenses "in the course of their criminal conduct." *Id.*

The Court finds credible the submission of Prof. Michael Vorenberg, a historian with expertise particularly concerning the Civil War and Reconstruction periods. Prof. Vorenberg offered the direct opinion that "high-capacity firearms during the era were understood to be weapons of war or anti-insurrection, not weapons of individual self-defense." ECF No. 19-2 at 16 ¶ 3. Veterans who retained them after their military service had concluded possessed the same understanding. *Id.* at 25 ¶ 21.

> If [owners of LCMs] along with their weapons were transported by a time machine back to the Reconstruction-era South, they would find themselves suspected of being outlaws by law enforcement officers. If they then gathered together into organized companies, they would be considered insurrectionary militias, which [*36] is precisely how the Ku Klux Klan was regarded during Reconstruction by the U.S. army, the state militias, and other legitimate, pro-Union law enforcement officials.

ECF No. 19-2 at 63 ¶ 99.

In its supplemental memorandum, the plaintiffs fail to discuss whether there is a link between LCMs and the use of firearms for self-defense. They argue vociferously that LCMs were "in common use" (ECF No. 32 at 3 (citing *Bruen, 142 S. Ct. at 2143*)), but their argument is untethered from the concept of self-defense. Instead, the plaintiffs proceed on the premise that "[t]he *Second Amendment's* protection extends to those sorts of weapons that are in common use, and typically

---

the hearing but not filed until the day before the hearing. The defendants' Motion to Exclude the Affidavit (ECF No. 24) is GRANTED.

possessed by law abiding citizens for lawful purposes at the time." ECF No. 32 at 3. The selective citation ignores the sentences in *Bruen* that *immediately* follow what the plaintiffs cite: "Whatever the likelihood that handguns were considered 'dangerous and unusual' during the colonial period, they are indisputably in 'common use' *for self-defense today*. They are, in fact, 'the quintessential *self-defense* weapon.'" *Bruen, 142 S. Ct. at 2143* (emphasis added) (citation omitted).

The Court finds, on the evidence submitted, that the plaintiffs have failed to establish that they have a likelihood of [*37] success in demonstrating that LCMs are weapons of self-defense, such that they would enjoy *Second Amendment* protection.

## 6. Historical Tradition

*Bruen* sets forth the standard for analyzing *Second Amendment* claims: "When the *Second Amendment's* plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id. at 2129-30*. The parties vehemently dispute whether LCMs were in common usage at various historical times. They talk at length about long guns and repeaters. *See generally* ECF No. 19-1 (State's expert Roth) and ECF No. 22-1 (plaintiffs' expert Hlebinsky). And in doing so, they disagree on *which* historical era is most appropriate to examine: the "founding era" or the "reconstruction era." The *Second Amendment* itself was drafted during the former; however, it was made applicable to the states only through the adoption, during the Reconstruction era, of the *Fourteenth Amendment*.

The Court has already, for reasons expressed *supra* made clear that it finds the plaintiffs' proffered experts less credible than those of the State, and it could resolve the historical tussle by simply crediting the latter and rejecting [*38] the former on this point. But a simpler path is available which, while also looking to the record, is more straightforward.

Because of its holding that LCMs are neither "Arms" within the meaning of the *Second Amendment's* text, nor weapons of "self-defense," the Court need not investigate whether the LCM Ban's restrictions are consistent with the regulations of history, regardless of which historical period is more apt. The Court does not have to choose a historical backdrop, because the

2022 U.S. Dist. LEXIS 227097, *38

overwhelming evidence before it is that at *no* time were LCMs considered "Arms," nor were they used in any significant way for self-defense. They were not then, and they are not today.

What remains, then, is where the Court goes in its analysis after it has found that LCMs deserve no "presumptive protection" under the *Second Amendment*. *Bruen, 142 S. Ct. at 2135*. Does it examine the restriction using a routine rational basis analysis? Is there any basis for turning to intermediate scrutiny, not for the now-abrogated rationale of *Worman*,[30] but because weapons that are neither "Arms" nor used for self-defense deserve some favorable treatment anyway like a contender who fails to win a ribbon but nonetheless deserves honorary mention?

The answer, it seems, is that the Court's **[\*39]** *Second Amendment* analysis simply ends here. It has found that because LCMs appear to be neither "Arms" nor weapons related to self-defense, they are entitled to no presumptive protection under the *Second Amendment*. On Count I, therefore, the plaintiffs have failed to demonstrate a likelihood of success on the merits so as to warrant preliminary injunctive relief.

## B. Banning High-Capacity Magazines and Takings Without Just Compensation

## 1. Background on Takings

The plaintiffs contend that the LCM Ban amounts to a "taking without just compensation" in violation of the *Fifth* and *Fourteenth Amendments to the United States Constitution* because it forces them to divest themselves of any LCMs designed to hold more than ten rounds of ammunition. While compliance with the LCM Ban does prohibit continued physical possession of LCMs, the statute gives LCM owners four options from which to choose by December 18, 2022. They may modify the magazine's capacity to hold ten or fewer rounds, they may sell the offending LCM to a registered gun dealer, they may transport the offending gun to a place where it is lawfully possessed, or they may forfeit the LCM to a law enforcement entity. The statute provides no

payment in the event of forfeiture.

The parties dispute the prevalence of magazines that **[\*40]** cannot be converted to lower capacity, but the Court need not resolve this dispute and accepts that there are some LCMs that cannot be modified.[31] Even assuming that the only way to comply with the statute for some plaintiffs vis-à-vis some weaponry is to forfeit them, the Court finds that no "taking" within the meaning of the *Fifth Amendment* has occurred and there is, therefore, no entitlement to "just compensation."

There are two types of "takings" that may require compensation. First, there is a physical taking where property is appropriated by the government for public use. *Murr v. Wisconsin, 137 S. Ct. 1933, 1942, 198 L. Ed. 2d 497 (2017)*. This type of taking is accomplished by direct seizure or "the functional equivalent of a practical ouster of the owner's possession." *Id.* A second type of "taking," deemed a regulatory taking, is accomplished when the owner is deprived of all economic or productive use of the product. *Id. at 1942-43*.

More than a century ago, the United States Supreme Court declared that "[a] prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit." **[\*41]** *Mugler v. Kansas, 123 U.S. 623, 669, 8 S. Ct. 273, 31 L. Ed. 205 (1887)*.

> The exercise of the police power by the destruction of property which is itself a public nuisance, or the prohibition of its use in a particular way, whereby its value becomes depreciated, is very different from taking property for public use, or from depriving a person of his property without due process of law.

*Id.; Fesjian v. Jefferson, 399 A.2d 861, 866 (D.C. 1979)* (holding that a "proper exercise of police power to prevent a perceived public harma does not require compensation"). "Property seized and retained pursuant to the police power is not taken for a 'public use' in the context of the *Takings Clause*." *Akins v. United States, 82 Fed. Cl. 619, 622 (Fed. Cl. 2008)* (quoting *AmeriSource Corp. v. United States, 525 F.3d 1149, 1152 (Fed. Cir. 2008)*). If legislation is a valid exercise of police power, "the fact that it deprives the property of its

---

[30] *Worman* chose intermediate scrutiny because it found the Massachusetts ban "implicated" the right to possess weapons of self-defense but did not "heavily burden" that right. *Worman, 922 F.3d at 38*.

[31] None of the plaintiffs through their affidavits professes to own an LCM that definitively cannot be modified.

most beneficial use does not render it unconstitutional." *Goldblatt v. Town of Hempstead, N.Y., 369 U.S. 590, 592, 82 S. Ct. 987, 8 L. Ed. 2d 130 (1962)*.

The plaintiffs attempt to characterize the LCM Ban as a "physical taking," in order to avoid the valid police power doctrine, and cite *Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 102 S. Ct. 3164, 73 L. Ed. 2d 868 (1982)*. In *Loretto*, the Supreme Court held that the installation of cable equipment on private property was a valid exercise of police power but nonetheless required just compensation. *Loretto* is restricted, however, only to concrete takings, not use restrictions: "Although this Court's most recent **[*42]** cases have not addressed the precise issue before us, they have emphasized that physical *invasion* cases are special and have not repudiated the rule that any permanent physical *occupation* is a taking." *Id. at 432* (emphasis in original). While the LCM Ban does include a forfeiture option, it does so as one option among several, not as a compelled taking. The gunowner has a series of other options she may exercise, at least two of which modification and transfer to a state where LCMs are not banned—allow retention of the LCM and substantial beneficial use. Sale to a registered gun dealer is another option that gives the owner beneficial use. Only as a last resort—and only if the gun owner voluntarily eschews other options—might one choose forfeiture. That recourse to forfeiture is possible does not turn the LCM Ban into a physical taking and *Loretto* is not applicable here.

Thus, the Court returns to the doctrine that a regulatory restriction that is a valid exercise of police power does not entitle the property owner to compensation. In order to constitute a valid exercise of police power, legislation is required (A) to serve the public interest, (B) the means must be reasonably designed to accomplish **[*43]** the purpose, and (C) they must not be unduly oppressive upon individuals. *Goldblatt, 369 U.S. at 594-95*.

## 2. Public Interest

On top of an epidemic of violence in American society there has been layered the ultra-lethal pathogen of mass murders—shootings in which multiple people are killed and, often, dozens of others injured.[32] The

shootings are the acts usually of a single stranger,[33] mowing down random bystanders in the line of fire only because of where they happened to be at a tragic moment in time. On August 1, 1966, Charles Whitman climbed twenty-eight stories to the observation deck of the main building on the campus of The University of Texas at Austin and began indiscriminately shooting at people below. He fired for ninety-six minutes, killing fourteen and wounding thirty-one others. At the time, such murders seemed unthinkable. David Montgomery, *Texas Marks '66 Sniper Attack as University Prepares for 'Campus Carry' Law*, NEW YORK TIMES (July 30, 2016), https://www.nytimes.com/2016/07/31/us/university-of-texas-marks-sniper-attack-with-memorial-and-new-gun-law.html . But while the Texas sniper is often considered the first of the modern wave of mass shootings, a New Jersey man mowed down thirteen people with **[*44]** a semiautomatic weapon in 1949. David M. Zimmer, *America's First Mass Shooting: 70 Years Ago, A WWII Veteran Killed 13 of His Neighbors*, USA TODAY (Aug. 28, 2019), https://www.usatoday.com/story/news/nation/2019/08/2 8/wwii-veteran-became-americas-first-mass-shooter-1949/2139054001/ .

At the time of this writing, what is more unthinkable is that mass murders have become a weekly—and sometimes daily—event. For example, on Sunday, November 13, a University of Virginia student opened fire on a bus, killing three of his classmates and leaving a fourth seriously wounded. Six days later, on Saturday, November 19, a shooter opened fire at a gay and lesbian nightclub in Colorado Springs, killing five and injuring twenty-five others. Three days later, a Walmart employee in El Paso walked into a break room and started shooting at fellow employees, killing six and

_____

same place at the same time. By that definition, there have been more than 600 mass shootings in 2022 as of November, an average of 1.8 per day. There have been thirty-six mass murders in the same time period, shootings in which at least four people are killed. *Gun Violence Archive 2022: Charts and Maps*, GUN VIOLENCE ARCHIVE, https://www.gunviolencearchive.org/ (last visited Nov. 28, 2022). The number has more than doubled since 2014 and increased by 50% from 2019 to 2020. *Id.*

[33] The mass shootings and killings that occupy our attention are those of a lone shooter. American history contains numerous instances of mass shootings perpetrated by mobs, *e.g.*, Nat Turner's rebellion, Bloody Monday in Louisville, and the massacres of countless unarmed Native Americans. ECF No. 19-1 at 50 ¶ 34.

_____

[32] Mass shootings are defined by the Gun Violence Archive as a shooting in which at least four people are wounded in the

wounding at least six more. According to *The Washington Post*, "[n]ot a single week in 2022 has passed without at least four mass shootings." HIER Ledur, *There Have been More than 600 Mass Shootings So Far in 2022*, WASHINGTON POST (Nov. 23, 2022, 11:49 AM), https://www.washingtonpost.com/nation/2022/06/02/mass-shootings-in-2022/ **[*45]** .

The events are referred to now simply by shorthand name, which sadly is enough without elaboration to bring the grizzly details to mind. Remember just a few: San Ysidro, California (July 18, 1984, twenty-one dead and nineteen wounded); Columbine, Colorado (Apr. 20, 1999, thirteen dead and twenty-four wounded); Edmond, Oklahoma (Aug. 20, 1986, fourteen dead and six injured); Red Lake, Minnesota (Mar. 21, 2005, seven dead); Virginia Polytechnic Institute, Blacksburg, Virginia (Apr. 16, 2007, thirty-two killed and seventeen wounded); Bingham, New York (Apr. 3, 2009, thirteen dead and four wounded); Fort Hood, Texas (Nov. 5, 2009, thirteen dead and thirty-one injured); Oakland, California (Apr. 2, 2012, seven dead and three wounded); Cinemark Century Theater in Aurora, Colorado (July 20, 2012, twelve killed and fifty-eight wounded); Sandy Hook Elementary in Newtown, Connecticut. (Dec. 14, 2012, twenty-six dead and two wounded); Marysville, Washington (Oct. 24, 2014, four dead and four wounded); San Bernardino, California (Dec. 2, 2015, fourteen killed and twenty-two wounded); Pulse Night Club in Orlando, Florida (June 12, 2016, forty-nine dead and fifty-three wounded); Dallas, Texas (July **[*46]** 7, 2016, five dead and eleven injured); Las Vegas, Nevada (Oct. 1, 2017, fifty-eight dead and 850 wounded); Sutherland Springs, Texas (Nov. 5, 2017, twenty-six dead and twenty wounded); Stoneham-Douglas High School in Parkland, Florida (Feb 14, 2018, seventeen dead and seventeen wounded); Santa Fe, Texas (May 18, 2018, ten dead and thirteen wounded); Temple of Life Synagogue in Pittsburgh, Pennsylvania (Oct. 27, 2018, eleven dead and six wounded); Midland-Odessa, Texas (Aug. 31, 2019, seven killed and twenty-five injured).[34] And then there

was Uvalde, Texas, where video cameras inside Robb Elementary School on May 24, 2022, allowed a stunned and horrified public to watch 376 law enforcement officers stand by while a lone gunman murdered twenty-one victims, mostly children, in a seventy-five-minute massacre; eighteen more, also mostly children, were wounded. Six weeks later, a shooter opened fire on a July 4th parade in Highland Park, Illinois, killing seven people and wounding thirty.

The asserted governmental interest of public safety stemming from mass gun murders could not be more undeniably compelling.

### 3. Reasonably Designed to Accomplish the Purpose

The prohibition against LCMs is a reasonable response to the public safety interest of the state. Indeed, it is "substantially related to the promotion of the general welfare." *Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 138, 98 S. Ct. 2646, 57 L. Ed. 2d 631 (1978)*. While a ban on LCMs does not prevent mass shootings, it unquestionably makes them less deadly.[35]

_____

timeline/?_ga=.2.137769844.599227537.1669671525-424901157.1669671525 ; Mark Berman, *'I'm Not Gonna Lay Here and Just Get Shot:' Survivors Describe the Terror and Chaos of Las Vegas Massacre*, WASHINGTON POST (May 17, 2018), https://www.washingtonpost.com/news/post-nation/wp/2018/05/16/im-not-gonna-lay-here-and-just-get-shot-survivors-describe-the-terror-and-chaos-of-las-vegas-massacre/ ; *A Study of Active Shooter Incidents in the United States*, U.S. DEPT. OF JUSTICE BULLETIN (Sept. 16, 2013); Zach Despart, *"Systemic Failures" in Uvalde Shooting Went Far Beyond Local Police, Texas House Report Details*, THE TEXAS TRIBUNE (July 17, 2022), https://www.texastribune.org/2022/07/17/law-enforcement-failure-uvalde-shooting-investigation/ ; Christine Hauser & Livia Albeck-Ripka, *Victims of Highland Park Shooting Sue Gun Maker and Retailers*, NEW YORK TIMES (Sep. 29, 2022), https://www.nytimes.com/2022/09/29/us/highland-park-shooting-victims-lawsuit.html ; (ECF No. 19-11); Campbell Robertson, Christopher Mele & Sabrina Tavernise, *11 Killed in Synagogue Massacre; Suspect Charged with 29 Counts*, N.Y. TIMES (Oct. 27, 2018), https://www.nytimes.com/2018/10/27/us/active-shooter-pittsburgh-synagogue-shooting.html .

_____

[34] Sources: Matthew Lynch, *Definitive List of School Shootings in The United States In The 21st Century*, THE EDVOCATE (June 8, 2022) https://www.theedadvocate.org/definitive-list-of-school-shootings-in-the-united-states-in-the-21st-century/ ; Mandi Cai, *Texas has had eight mass shootings in the past 13 years, while lawmakers have steadily loosened restrictions on carrying **[*47]** firearms*, THE TEXAS TRIBUNE (Nov. 12, 2019) https://apps.texastribune.org/features/2019/texas-10-years-of-mass-shootings-

[35] The analogy to automobiles and speed limits comes to mind. Imposing a national highway speed limit of fifty-five miles per hour in 1974 did not eliminate accidents, but it made them significantly less deadly. *Long Term Effects of Repealing the National Maximum Speed Limit in the United States*, AM J. PUB. HEALTH, at 1626-31 (Sept. 2009) (noting that in the year

As the District of Columbia Circuit Court said in its consideration of *Heller* after remand, LCMs are designed to "shoot multiple human targets very rapidly" and to "allow the shooter to spray-fire from the hip position." *Heller II, 670 F.3d at 1262-63*. An LCM may be designed for quick reloading, [*48] but logic dictates that any reloading time saves lives.

The plaintiffs rebut by minimizing estimated reloading time, to two or three seconds, in an attempt to shrink its life-saving impact.[36] "Such a minuscule difference in practical fire rate would be unlikely to have any appreciable effect on lethality." ECF No. 22-1 at 50. But the Court finds as fact that in those two or three seconds a child—or two children, or even three—may escape the fire of a mad person. In Las Vegas, one young woman who got up and ran during a moment's pause was able to get as far as the door before being shot in the arm. Berman, *supra* note 34. Others describe running for cover in the few pauses where the shooter reloaded. ECF No. 19-1 at 23 (citing Natalie Bruzda, *Veteran's Quick Reactions Saved Lives During Las Vegas Shooting*, LAS VEGAS REV. J. (Nov. 10, 2017)) (internal pagination). A gunman's need to reload twice using three ten-round magazines instead of a single thirty-round magazine, clearly saves lives. It is undisputed that requiring a pause in the shooting saves lives. This assertion is based on society's experience with what is now a catastrophic number of these incidents, not merely conjecture. In Tucson, while two bystanders [*49] tackled the gunman, a sixty-one-year-old woman wrestled a fresh magazine from him as he tried to reload.[37] In California, twelve people were able

to escape out the back window of the bar while the gunman paused to reload.[38] As the *en banc* Fourth Circuit observed in *Kolbe v. Hogan*, the use of ten-round magazines instead of LCMs would afford "six to nine chances" for bystander intervention for every 100 rounds fired. *Kolbe, 849 F.3d at 128*.

The plaintiffs' estimate of "two seconds" to reload a new magazine presumably assumes ideal circumstances. In reality, however, "[m]any criminals are not practiced in changing magazines, and the stress of a confrontation can also increase the time to change a magazine ... allowing valuable moments for victims or law enforcement to act." ECF No. 19-3, Affidavit of Edward Troiano ¶ 13.

The reduction of how many rounds can be shot in a given time period, due to the need to reload, serves public safety in [*50] another way as well. "[C]riminals' use of large capacity magazines increases the likelihood of their indiscriminate fire resulting in a strike, or multiple strikes, to a victim." *Id.* Because bullets "can travel through the walls of homes and even car doors, [and] the use of large capacity magazines in criminal activity also increases the risk that innocent bystanders will be injured." *Id.*

The more shots fired, the greater the number of people wounded, the more bullets that hit a single person, the more serious the injuries, and the less able emergency rooms are to treat them or save lives. The state has supplied a declaration of Dr. Megan Ranney, an expert in the field of emergency medicine with impeccable credentials. She received her A.B. *summa cum laude* from Harvard College, her medical degree from Columbia University, and a Master of Public Health from Brown University. She is a Diplomate of the American Board of Emergency Medicine and a Fellow of the American College of Emergency Medicine. Her awards, appointments, and publications in peer-reviewed journals, reflecting original research in this field, are

---

after enactment, fatalities were reduced by 16.4%).

[36] The plaintiffs also argue that, because LCMs are complex machinery, they are subject to jamming and breakdowns. These fortuitous events allow victims to escape, making firearms fitted with LCMs *safer* in the plaintiffs' opinion than those with lower-capacity chambers. "One can argue that true high-capacity magazines would be 'safer' in a mass shooting situation than multiple low-capacity magazines." ECF No. 22-1 at 50. The plaintiffs omit mentioning the irony of this position: what they point to as a fatality-reducing event that they would rely on to promote safety happens only occasionally, but it is *exactly* what the legislation tries to achieve by plan and design — a pause in the shooting.

[37] Jessica Hopper et al., *Heroes of Tucson Shooting: 'Something Had to Be Done'*, ABC NEWS (Jan. 10, 2011), https://abcnews.go.com/US/heroes-rep-gabrielle-giffords-shooting-tucson-arizona-subdued/story?id=12580345  ;  Kevin Dolak & Justin Weaver, *Women Wrestled Fresh Ammo Clip*

*from Tucson Shooter as He Tried to Reload*, ABC News (Jan. 9, 2011), https://abcnews.go.com/Politics/patricia-maisch-describes-stopping-gunman-reloading/story?id=12577933 .

[38] *California Bar Shooting: Witnesses Describing Escaping as Gunman Reloaded*, CBS Mornings (Dec. 7, 2018), https://www.cbsnews.com/news/borderline-bar-shooting-thousand-oaks-california-12-dead-witnesses-describe-gunman-storming-in/ ; *Witnesses on "Utter chaos" and Escape from California Bar Shooting*, CBS News (Nov. 8, 2018), https://www.cbsnews.com/video/witnesses-on-utter-chaos-and-escape-from-california-bar-shooting/ .

numerous. ECF No. 19-10 at 4-71.

The State has submitted the credible evidence **[*51]** of Dr. Ranney's first-person description of care and treatment of gunshot wounds that takes the reader into the trauma rooms of an emergency medicine facility. It describes, from the arrival of the ambulances to the patient outcomes, a play-by-play of treatment procedures. The ability to spray a crowd with bullets results in more injuries per person, and "cases with multiple bullet wounds are more complex, have a higher likelihood of injury that requires surgical intervention, and have a higher likelihood of death in the emergency department." *Id.* at 2 ¶ 8.

> Trying to simultaneously stop the blood loss from a lacerated liver, spleen, and lung is much more complex than addressing a single such injury. Internal organs bleed a lot; a heart with a hole in it doesn't work; blood in the lungs makes us unable to get enough oxygen to the body; and we simply can't stem all of these at the same time, even with multiple physicians in the room.

*Id.* at 3 ¶ 10. When there are multiple victims arriving at the same time, the inability to treat adequately is exacerbated. From her practice for the past fourteen years as an attending physician in emergency medicine at both Miriam and Rhode Island Hospitals **[*52]** she reports, "I have worked evenings when the number of patients arriving in the emergency department with gunshot wounds stretches our staff, our number of available operating rooms, and even our number of blood supplies available." *Id.* at ¶ 11.

The data provided by Dr. Ranney, while in her estimation are still sparse, nonetheless support the direct connection between employment of LCMs and increased injuries, both in number and seriousness. Among the explicit findings were that cases in which LCMs were used "had an average of 11.8 deaths per incident (compared with 7.3 per incident when a large-capacity magazine was not used.)." ECF No. 19-J at 78-79. In Tucson, Arizona, the shooter who wounded U.S. Representative Gabby Giffords fired thirty-one rounds, *each* of which found a human target, resulting in six dead and twelve injured—an average of 1.6 bullets hitting each person. ECF No. 22A ¶ 49. One preeminent researcher in this field has estimated that "restrictions on magazine capacity would decrease the number of deaths in mass shootings by 11-15%." *Id.* (citing Koper, C.S., *Assessing the Potential to Reduce Deaths and Injuries From Mass Shootings through Restrictions on Assault Weapons* **[*53]** *and Other High-Capacity*

*Semiautomatic Firearms*, CRIMINAL PUB. POL'Y 2020, Vol. 19, 147-170); *see also* ECF No. 22A, Affidavit of Randolph Ross ¶ 46 ("[T]he development of semiautomatic rifles and handguns dramatically increased the number killed or wounded in mass shootings from 1966 to the present.").[39]

Beyond the feeble argument that the Court described *supra* at note 36, the plaintiffs have nothing to say to rebut this argument, save for the suggestion that the reloading time is so *de minimus* that any loss of life or bloodshed it achieves is *de minimus* as wel1.[40] The Court rejects that assertion: the eleven children who escaped the Sandy Hook massacre during an apparent reloading[41] are compelling evidence that the LCM Ban is a reasonable public safety regulation designed to reduce harm to society.

### 4. Not Unduly Oppressive on Individuals

---

[39] From 1966 to the present, mass shootings with non-semiautomatic weapons resulted in an average of 5.4 persons killed. The use of a semiautomatic handgun raised that to 6.5—an additional person dead; and the use of a semiautomatic rifle produced an average of 9.2 persons killed—an increase of 50%. The number of those wounded was even more dramatically affected. The use of non-semiautomatic weapons produced an average of 3.9 wounded (but not killed); use of a semiautomatic handgun increased the number wounded by more than 50% to 5.8, and the use of a semiautomatic rifle nearly *tripled* the number of people wounded, to an average of 11.0. ECF No. 22A ¶ 46. "[W]ith extended magazines, semiautomatic rifles cause an average of 299 percent more deaths and injuries than regular firearms, and semiautomatic handguns 184 percent more than regular firearms. In combination, semiautomatic firearms and extended magazines are extraordinarily lethal." *Id.* at ¶ 48.

[40] The plaintiffs' expert declared, "Such a minuscule difference in practical fire rate would be unlikely to have any appreciable effect on lethality." ECF No. 22-1 at 50.

[41] Corky Siemaszko, *Want to Save Lives in Mass Shootings? Ban Large-Capacity Magazines, Researchers Say*, NBC NEWS (Oct. 17, 2019), https://www.nbcnews.com/news/us-news/want-save-lives-mass-shootings-ban-large-capacity-magazines-researchers-n1066551 . Nine children had managed to run out of Classroom 10, and two had escaped to the classroom's restroom. ECF No. 6 at 15. In one of the two classrooms in which children were massacred, three separate 30-round magazines were found; one had twenty-four rounds in it, one had ten, and the third was empty. Eighty empty casings were found on the classroom floor. *Id.* at 26.

2022 U.S. Dist. LEXIS 227097, *53

The statute clearly has an adverse impact on individuals who own LCMs. It places a burden on them to disengage from the weapon, by modifying it, selling it, transporting it elsewhere, giving it away, or forfeiting it. The Court considers this burden minor. It **[*54]** is not at all clear, at least from the evidence the plaintiffs have offered, that it is impossible to modify the LCMs in current use to accept fewer than eleven rounds. While the plaintiffs assert that, they have given the Court no way to quantify the resulting "injury": which, exactly, are the magazines that cannot be modified? How many of them are in use in Rhode Island? Even if there are some, at a cost as little as under $14.95 for some thirty-round magazines (ECF No. 19-4 at 15, 30), it does not seem much of a burden even if they must be discarded in favor of another, lower-capacity one. The same failure of proof affects the plaintiffs' assertion that there are certain handguns that can *only* accept an LCM and cannot accommodate a lower-capacity magazine made by any manufacturer. The plaintiffs have submitted no data to support that assertion. "The impracticability of any particular option, such as the alleged lack of a market for these [large-capacity] magazines, the burden in removing these magazines from the state, or the lack of guidance on what constitutes a permissible permanent modification does not transform the regulation into a physical taking. *Wiese v. Becerra, 306 F. Supp. 3d 1190, 1198 (E.D. Cal. 2018)*. Nor does a physical modification **[*55]** of an LCM to accept no more than 10 rounds "destroy[s] the functionality." *Id.; see Goldblatt, 369 U.S. at 592* (a valid exercise of police power does not become a "taking" even if it "deprives the property of its most beneficial use").

To the extent that the statute, by prohibiting LCMs, diminishes the shooting ability of the person holding the firearm, it is truly *de minimus*. The law puts no limit on the number of ten-round magazines an owner may have at her feet at any one time. The ground can be littered with magazines that, in the aggregate, give the recreational shooter dozens, or even hundreds, of bullets to fire. It is worth noting again that there is no evidence that any person has ever had any need to fire more than ten rounds in self-defense. But even if such an occasion existed, by the plaintiffs' own admission, the reloading process is so quick and easy, it would seem hardly burdensome for a person to fire thirty rounds from three ten-round capacity magazines instead of two fifteen-round capacity magazines or a single thirty-round device. If this is even a burden at all, it pales in comparison to the substantial nature of the public safety interest at stake.

## 5. Conclusion

The Court finds the LCM **[*56]** Ban to be a valid exercise of the police power. Statutes similar to Rhode Island's, which outlaw possession of LCMs with no provision for compensation, have been upheld against Takings Cause challenges, as have a number of laws prohibiting particularly deadly firearm accessories. *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney General New Jersey, 910 F.3d 106, 124-25 (3d Cir. 2018)*, vac. on other gnds sub nom, Ass'n of N.J. Rifle & Pistol Clubs, Inc., v. Bruck, 142 S. Ct. 2894, 213 L. Ed. 2d 1108 (June 30, 2022) (LCMs);[42] *Duncan v. Bonta, 19 F.4th at 1112* (California statute similar to Rhode Island's); *Wiese v. Becerra, 306 F. Supp. 3d at 1198* (California prohibition of LCMs); Cf. *Akins, 82 Fed. Cl. at 622-23* (no taking by the ATF's classification of a certain weapon as a "machine gun," thus prohibiting its sale to civilians); *Fesjian, 399 at 866 (D.C. 1979)* (*Firearm Control Act of 1975* prohibiting registration of machine guns not a *5th Amendment* taking); *Maryland Shall Issue v. Hogan, 353 F. Supp. 3d 400, 417 (D. Md. 2018)* (ban of bump stocks and other rapid-fire trigger activators not a taking); *McCutchen v. United States, 14 F.4th 1355, 1368 (Fed. Cir. 2021)* (inclusion of bump stocks in category of prohibited machine guns not a taking, even though ATF changed its position); *Mitchell Arms, Inc. v. United States, 26 Cl. Ct. 1, 5 (1992)*, aff'd, 7 F.3d 212 (Fed. Cir. 1993), cert. den., 511 U.S. 1106, 114 S. Ct. 2100, 128 L. Ed. 2d 662 (1994) (declaration by ATF that semiautomatic assault-type rifles were not suitable for "sporting" purposes, which made them not importable, not a taking); *Roberts v. Bondi, No. 8:18-cv-1062-T-33TGW, 2018 U.S. Dist. LEXIS 141261, 2018 WL 3997979, at *3 (M.D. Fla. 2018)* (prohibition of bump stocks not a taking); *Rupp v. Becerra, No. 8:17-cv-00746-MLS-JDE, 2018 WL 2138452, at *8 (C.D. Cal. May 9, 2018), rem. for cons. of Bruenth Cir. June 28, 2022)* (prohibition of "bullet buttons," which allowed a quick detaching and replacement of magazine, used in San Bernardino 2015 mass shooting to shoot thirty-six people in less than **[*57]** four minutes, not a taking).

---

[42] While a number of these decisions have either been implicitly abrogated by *Bruen* because of their *Second Amendment* "intermediate scrutiny" holdings, or remanded for reconsideration, *Bruen* did not address a "takings" argument and therefore cast no doubt on the integrity of these decisions on that account. Indeed, *certiorari* was not granted to address the takings portion of the Second Circuit's decision.

For these reasons, the Court finds the LCM Ban to be a valid exercise of police power, and therefore not a taking that would implicate *Fifth Amendment* protection. The plaintiffs have failed to show the likelihood of success of their *Fifth Amendment* claims.

## C. The Rhode Island Statute and Due Process and Vagueness

The plaintiffs challenge the LCM Ban with two direct *Fourteenth Amendment* arguments: that it violates due process and that it is vague in its failure to define what constitutes "permanent modification" of an LCM to accept no more than ten bullets. ECF No. 8 at 13-14. They claim by affidavit and in their memorandum that they are in a "tough corner" where they have to choose between forfeiture without compensation or modification without knowing exactly whether the modification that they choose will be sufficient.

It is unclear to the Court upon which theory of due process the plaintiffs are proceeding, although presumably it is substantive due process. To the extent that the plaintiffs challenge the rationality or capriciousness of the LCM Ban, the Court has found it is a valid exercise of police power. *See supra*. Moreover, the First Circuit has already ruled that a similar Massachusetts **[*58]** restriction on LCMs survived intermediate scrutiny. *Worman, 922 F.3d at 26*.

The Court sees nothing vague about the statutory language. The necessary modification is defined in the statute itself as "such that [the magazine] cannot hold more than ten rounds of ammunition." Permanent in ordinary parlance uniformly means ,c • m a way that continues without changing or ending; in a way that is not brief or temporary." *Permanently*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/permanently (last visited Dec. 14, 2022). It means "lasting for a long time or for all time in the future." *Permanent*, OXFORD ADVANCED LEARNER'S DICTIONARY, https://www.oxfordlearnersdictionaries.com/us/definition/english/permanent_1#:~:text=permanent ,adjective,future%3B%20existing%20a11%20the%20time (last visited Dec. 14, 2022). It is defined similarly in dictionaries of common usage. "Lasting for a long time or forever." *Permanent*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/permanent (last visited Dec 14, 2022).

This statute "provide[s] people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Hill v. Colorado, 530 U.S. 703, 732, 120 S. Ct. 2480, 147 L. Ed. 2d 597 (2000)*. And it is hard to see how it could encourage "arbitrary **[*59]** and discriminatory enforcement." *Id.* There seems no discretion for a law enforcement officer to exercise in a way that abuses power: either a given magazine has a place to insert an eleventh bullet or it does not. The plaintiffs have provided no evidence that modifying an LCM could leave a law enforcement officer unable to discern how many bullets it will accept.

At the least, the plaintiffs have failed to carry their burden of demonstrating a likelihood of success with their direct *Fourteenth Amendment* arguments.

## D. Irreparable Injury and Balance of the Harms

In addition to demonstrating a likelihood of success on the merits, a plaintiff seeking a preliminary injunction must show that, without the requested relief, she will suffer irreparable harm.[43] "'Irreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan, 397 F.3d 56, 76 (1st Cir. 2005)* (finding that imminent foreclosure qualified as irreparable injury). In this case, the plaintiffs claim several potential injuries. The plaintiffs first cite *Flower Cab Co. v. Petitte, 685 F.2d 192, 194-95 (7th Cir. 1982)*, for the proposition that "[a] violation of 'personal' constitutional **[*60]** rights is a per-se irreparable harm where the protected right has been personal and the violation non-compensable." ECF No. 22 at 34. That may be, but the essence of the injury here is clearly economic. Indeed, by virtue of their *Fifth Amendment Takings Clause* argument, the individual plaintiffs virtually concede that there exists "just compensation" for their being deprived of their LCMs or for firearms that cannot use any magazine but an LCM.

---

[43] As the Court has found insufficient likelihood of success on the merits, it need not examine the other factors relevant to the issuance of a preliminary injunction. *Ryan v. U.S. Immigration & Customs Enf't, 974 F.3d 9, 18 (1st Cir. 2020)* (quoting *New Comm Wireless Servs. v. Sprintcom, Inc., 287 F.3d 1, 9 (1st Cir. 2002)*) ("If the movant 'cannot demonstrate that he is likely to succeed in his ques, the remaining factors become matters of idle curiosity."). The Court has continued beyond the first step, however, in order to provide the parties with a complete opinion.

2022 U.S. Dist. LEXIS 227097, *60

The injury alleged by the firearms dealer is entirely economic—an inventory that can no longer be lawfully sold and, perhaps, lost profits on what may have been future sales of the prohibited LCM. Plaintiff Jonathan Hirons alleges he would suffer irreparable harm by having to forfeit his LCMs—a compensable event. ECF No. 8-1, Ex. B. He also complains that he would become a felon if he did not dispossess himself of his LCMs. But, like any "if it were not assizes-time" statement,[44] the harm does not come to pass if he complies with the statute. "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II, Ltd. P'ship v. Blinds to Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004)*. The retail plaintiff alleges any number of harms—all economic injuries: **[*61]** financial harm from being unable to sell LCMs in-store, loss of business revenue from selling LCMs, having to find another business location from which to sell LCMs in-store, and the inability to sell models for which lower-capacity magazines are made. ECF No. 8-1 at 11-15.

None of these feared consequences constitutes irreparable harm. Besides, the Court in fashioning its Order is ensuring that any forfeited magazines be retained in a safe manner so that they may be returned to their owners if a permanent injunction is granted in the future. *See San Francisco Veteran Police Officers Ass'n v. City & Cty. of San Francisco, 18 F. Supp. 3d 997, 1005 (N. D. Cal. 2014)* ("In the event that plaintiffs prevail on the merits, however, the City and County of San Francisco is ordered to return plaintiffs' surrendered magazines back to them."). Any plaintiff who is confident of ultimate victory may ensure that the loss of enjoyment of her LCM is temporary by choosing forfeiture and safekeeping of the weapon.

To the extent that the plaintiffs complain that their right to self-defense may be imperiled, the Court is persuaded by the Declaration of Rhode Island Bureau of Criminal Identification and Investigations Chief Edward Troiano that an occasion in which a victim threatened with violence might need to rapidly **[*62]** fire that eleventh, twelfth, or twentieth bullet is so speculative as to be non-existent. In Mr. Troiano's experience, from 1994 to the present, confirmed by his review of self-defense incidents, there has not been "any incident in

which a civilian has ever fired as many as 10 rounds in self-defense." ECF No. 22-C ¶ 10. Rhode Island is not alone with no incidents of self-defense use of LCM-equipped firearms. *Kolbe, 849 F.3d at 127* ("neither the plaintiffs nor Maryland law enforcement officials could identify a single incident in which a Marylander has ... needed to fire more than ten rounds, to protect herself."). *See also Worman, 922 F.3d at 37* ("[N]ot one of the plaintiffs or their six experts could identify ... even a single example of a self-defense episode in which ten or more shots were fired."). *See Oregon Firearms Fed'n, Inc. v. Brown, No. 2:22-cv-01815-1M, 2022 U.S. Dist. LEXIS 219391, 2022 WL 17454829, at *11 (D. Ore. Dec. 6, 2022)* (NRA Armed Citizen Database found more than ten bullets fired by self-defender only twice in 736 incidents).

Finally, to the extent that the plaintiffs or other recreational gun enthusiasts might somehow enjoy firing dozens of rounds in quick succession, that is hardly impaired. Nothing prevents such people from having dozens of lower-capacity magazines at their feet, allowing them to spray as many bullets as they like, with **[*63]** only the inconvenience of—as the plaintiffs concede—two seconds at a time to reload. That momentary interruption is not the kind of irreparable harm required for a preliminary injunction to issue.

Against what the Court has found is an absence of irreparable harm on the part of the plaintiffs, it must still consider the hardship to the nonmovant if enjoined and the impact of the Court's decision, either way, on the public interest. *Ryan, 974 F.3d at 18*. Earlier, the Court examined the tightness of the relationship between the LCM Ban and public safety, finding that in a mass shooting incident every pause to reject a spent magazine and load a new one represents the opportunity to preserve a specific life—or more than one. That finding need not be embellished here. Suffice it to say that in very real terms, the plaintiffs' proffered harm caused to them by an injunction pales in comparison to the unspeakable devastation caused by mass shooters wildly spraying bullets without end into a crowd of bystanders. Rhode Island has yet to suffer the kind of massacre that occurred just across our border at Sandy Hook Elementary. But, if and when it does, at least while this lawsuit is pending, the State is entitled **[*64]** to enforcement of *R.I. Gen. Laws § 11-47.1-1 et seq.*

---

[44] The phrase is reported to come from *Tuberville v. Savage*, 1 Mod. Rep. 3, 86 ER 684 (1669); it refers to a conditional event that is avoided if the condition does not occur.

## IV. CONCLUSION

It is not entirely accurate to say that the victims of mass shootings are chosen randomly. True, they are random in that their identities are usually not known to the shooter, and it appears to matter not to the shooter whether the next one killed is a particular person or the woman standing next to him. But in actuality, victims have not been chosen randomly. They have been chosen because they were attending synagogue in Pittsburgh or church in Sutherland Springs. Or because they were sitting in an elementary school classroom in Newtown or a high school classroom in Parkland. Or because they were at a concert in Las Vegas or a nightclub in Orlando. They were not chosen because of anything they did, but because of what they represented to a particular person with a gun and a lot of ammunition.

Consistent with its obligation to protect public safety, but consonant with its fealty to the Constitution, the Rhode Island General Assembly has responded with, among other firearms regulations, the LCM Ban. It is perhaps inevitable that Rhode Island will one day be the scene of a mass shooting. The LCM Ban is a small but measured attempt to mitigate the potential **[*65]** loss of life by regulating an instrument associated with mass slaughter. It prohibits a device that itself is neither "Arms" nor embraced by the core right to self-defense. The LCM Ban is reasonable, it is measured, and the plaintiffs have failed to persuade the Court that it is likely unconstitutional.

The motion for preliminary injunction (ECF No. 8) is DENIED.[45]

IT IS SO ORDERED:

/s/ John J. McConnell, Jr.

John J. McConnell, Jr.

Chief Judge

United States District Court

_____

[45] The defendants Attorney General and Rhode Island State Police Superintendent shall make arrangements with state and local law enforcement to preserve in safe and undamaged condition any LCMs turned in by citizens in compliance with the LCM Ban so that they may be returned to their owners should the plaintiffs ultimately prevail on the merits. If the plaintiffs do not prevail, the Court and parties will work together to ensure a grace period during which owners may make arrangements to direct a disposition of their LCMs out of safe keeping in a way that complies with the statute.

December 14, 2022

_____

End of Document

⚠️ Caution
As of: March 29, 2023 5:04 PM Z

# *Baird v. Bonta*

United States District Court for the Eastern District of California

December 7, 2022, Decided; December 8, 2022, Filed

No. 2:19-cv-00617-KJM-AC

**Reporter**

2022 U.S. Dist. LEXIS 221461 *; __ F.Supp.3d __; 2022 WL 17542432

Mark Baird and Richard Gallardo, Plaintiffs, v. Rob Bonta in his official capacity as Attorney General of the State of California, et al., Defendants.

**Subsequent History:** Appeal filed, 01/05/2023

**Prior History:** *Baird v. Becerra, 2020 U.S. Dist. LEXIS 158195, 2020 WL 5107614 (E.D. Cal., Aug. 28, 2020)*

## Core Terms

preliminary injunction, handguns, firearms, licensing, injunction, regulation, openly, public interest, merits, cases, status quo, concealed, burdens, parties, carrying, harms, district court, irreparable, training, loaded, public safety, restrictions, succeed, facial, tips, gun

## Case Summary

### Overview

HOLDINGS: [1]-Plaintiffs have not shown the balance of harms and public interest favor a preliminary injunction because the harm they seek to avoid was compliance with an objective permitting scheme pursuant to *Cal. Penal Code § 25850* and *Cal. Penal Code § 26350*, and concealing any handguns carried in public. Thus, plaintiffs' motion for a preliminary injunction was denied.

### Outcome
Motion denied.

## LexisNexis® Headnotes

Civil Procedure > ... > Injunctions > Grounds for

Injunctions > Balance of Hardships

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

Civil Procedure > ... > Injunctions > Grounds for Injunctions > Public Interest

*HN1*[⚓] **Grounds for Injunctions, Balance of Hardships**

To obtain relief to enjoin, plaintiffs must show the balance of equities tips in their favor and a preliminary injunction is in the public interest, among other things.

Criminal Law & Procedure > Criminal Offenses > Weapons Offenses > Possession of Weapons

Governments > Local Governments > Ordinances & Regulations

Governments > Local Governments > Property

*HN2*[⚓] **Weapons Offenses, Possession of Weapons**

*Cal. Penal Code § 25850* makes it a crime to carry a loaded firearm on the person or in a vehicle while in any public place or on any public street in an incorporated city or in any public place or on any public street in a prohibited area of unincorporated territory. *Cal. Penal Code § 25850(a)*. *Cal. Penal Code § 26350* makes it a crime to carry an exposed and unloaded handgun on the person or in a vehicle in several public places, such as on a public street in an incorporated city or city and county. *Cal. Penal Code § 26350(a)(1)*, *§ 26350(a)(2)*.

2022 U.S. Dist. LEXIS 221461, *221461

Criminal Law & Procedure > Criminal
Offenses > Weapons Offenses > Possession of
Weapons

Governments > Local Governments > Employees &
Officials

*HN3*[🔻]  **Weapons   Offenses,   Possession   of
Weapons**

*Cal. Penal Code § 25850* and *Cal. Penal Code § 26350*
are subject to several exceptions. For example, a peace
officer or any honorably retired peace officer can openly
carry a handgun in many circumstances. *Cal. Penal
Code § 25900*, *Cal. Penal Code § 26361*. A licensed
hunter can openly carry unloaded handguns to and from
a hunting expedition. *Cal. Penal Code § 26366*.

Civil Procedure > Pleading &
Practice > Pleadings > Amendment of Pleadings

Civil
Procedure > ... > Pleadings > Complaints > Require
ments for Complaint

*HN4*[🔻]  **Pleadings, Amendment of Pleadings**

The  general  rule  is  that  an  amended  complaint
supersedes the original complaint and renders it without
legal effect.

Governments > Courts > Authority to Adjudicate

*HN5*[🔻]  **Courts, Authority to Adjudicate**

A federal court must ensure it has jurisdiction even if the
parties voice no doubts.

Civil
Procedure > ... > Justiciability > Standing > Injury in
Fact

Constitutional Law > ... > Case or
Controversy > Standing > Elements

*HN6*[🔻]  **Standing, Injury in Fact**

Several limits on the court's jurisdiction are derived from
the  Constitution's  references  to  Cases  and

Controversies in U.S. Const. art. III. One of these limits
is  constitutional  standing.  To  have  standing,  plaintiffs
must  have  (1)  suffered  an  injury  in  fact,  (2)  that  is  fairly
traceable  to  the  challenged  conduct  of  the  defendant,
and  (3)  that  is  likely  to  be  redressed  by  a  favorable
judicial  decision.  They  must  satisfy  these  requirements
for  each  claim  they  assert  and  for  each  form  of  relief
they seek.

Constitutional Law > ... > Case or
Controversy > Constitutionality of
Legislation > Standing

*HN7*[🔻]  **Constitutionality of Legislation, Standing**

Plaintiffs may seek to amend their complaint to bring an
as-applied  challenge  if  they  choose,  but  only  if  the
amendment  would  show  at  least  one  plaintiff  had
standing  to  challenge  the  statutes  as  applied  at  the  time
the case began.

Civil Procedure > ... > Injunctions > Grounds for
Injunctions > Balance of Hardships

Civil
Procedure > Remedies > Injunctions > Preliminary
& Temporary Injunctions

Civil Procedure > ... > Injunctions > Grounds for
Injunctions > Public Interest

*HN8*[🔻]  **Grounds  for  Injunctions,  Balance  of
Hardships**

To  obtain  a  preliminary  injunction,  plaintiffs  must
establish  four  things  by  a  clear  showing,  they  are  likely
to  succeed  on  the  merits,  they  are  likely  to  suffer
irreparable  harm  in  the  absence  of  preliminary  relief,  the
balance  of  equities  tips  in  their  favor,  and  an  injunction
is  in  the  public  interest.  Alternatively,  serious  questions
going  to  the  merits  and  a  balance  of  hardships  that  tips
sharply  towards  the  plaintiff  can  support  issuance  of  a
preliminary  injunction,  so  long  as  the  plaintiff  also  shows
that  there  is  a  likelihood  of  irreparable  injury  and  that  the
injunction  is  in  the  public  interest.  When  the  party
opposing  an  injunction  is  the  state,  as  is  true  in  this
case,  the  balance  of  equities  and  public  interests  merge.

Civil

2022 U.S. Dist. LEXIS 221461, *221461

Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

**HN9[↓] Injunctions, Preliminary & Temporary Injunctions**

Preliminary injunctions are ordinarily intended merely to preserve the relative positions of the parties until a trial on the merits can be held. When a plaintiff asks to change the status quo rather than preserve it, district courts exercise greater caution. To obtain an injunction that instructs an opposing party to change its behavior, thus altering the status quo, a plaintiff must show extreme or very serious damage will occur unless the requested injunction is granted. Such affirmative pretrial relief is not appropriate in doubtful cases.

Constitutional Law > Bill of Rights > Fundamental Rights > Right to Bear Arms

**HN10[↓] Fundamental Rights, Right to Bear Arms**

When the *Second Amendment's* plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

Civil Procedure > ... > Injunctions > Grounds for Injunctions > Likelihood of Success

Evidence > Burdens of Proof > Allocation

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Scope

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

**HN11[↓] Grounds for Injunctions, Likelihood of Success**

When a plaintiff moves for a preliminary injunction in a *First Amendment* case, there is a tension between the plaintiff's burden of showing it is likely to succeed on the merits and the government's ultimate burden of justifying its speech-restrictive law at trial. The parties' burdens create the same tension, the plaintiff must show it is likely to succeed on the merits, but the

government must ultimately justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Unless the government justifies the restriction under the standard that would apply at trial, the plaintiff is deemed likely to prevail. In this limited way, the burdens at the preliminary injunction stage track the burdens at trial.

Civil Procedure > ... > Injunctions > Grounds for Injunctions > Balance of Hardships

Evidence > Burdens of Proof > Allocation

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

Civil Procedure > ... > Injunctions > Grounds for Injunctions > Irreparable Harm

**HN12[↓] Grounds for Injunctions, Balance of Hardships**

In a motion for preliminary injunction, the plaintiffs bear the burden of proof, they must show they are likely to suffer irreparable harm absent a preliminary injunction, and they must show the balance of harms and public interests favor a preliminary injunction.

Civil Procedure > ... > Injunctions > Grounds for Injunctions > Balance of Hardships

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

Civil Procedure > ... > Injunctions > Grounds for Injunctions > Public Interest

**HN13[↓] Grounds for Injunctions, Balance of Hardships**

A court cannot enter a preliminary injunction if the moving party does not show the balance of equities tips in its favor, and an injunction is in the public interest.

Governments > State & Territorial Governments > Licenses

2022 U.S. Dist. LEXIS 221461, *221461

*HN14*[⬇]  **State & Territorial Governments, Licenses**

A person who could not obtain a license to carry a concealed handgun, due, for example, to a lack of good moral character or refusal to complete a course of training, could circumvent the state's laws by carrying the same gun openly. *Cal. Penal Code § 26150(a)(1), (4)*.

Civil Procedure > ... > Injunctions > Grounds for Injunctions > Balance of Hardships

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

Civil Procedure > ... > Injunctions > Grounds for Injunctions > Public Interest

*HN15*[⬇]  **Grounds for Injunctions, Balance of Hardships**

A court may not enter a preliminary injunction unless the moving party shows the balance of harms and public interest weigh in its favor. Public safety is part of that balance.

Civil Procedure > ... > Injunctions > Grounds for Injunctions > Irreparable Harm

*HN16*[⬇]  **Grounds for Injunctions, Irreparable Harm**

Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

*HN17*[⬇]  **Injunctions, Preliminary & Temporary Injunctions**

In a motion for a preliminary injunction, the moving plaintiff must persuade the court that the benefits of a potential mistake outweigh the costs. Courts hesitate when those costs are likely far-reaching, difficult to estimate, and potentially deadly.

Governments > Courts > Authority to Adjudicate

*HN18*[⬇]  **Courts, Authority to Adjudicate**

When a plaintiff asks to change the status quo rather than preserve it, district courts must exercise greater caution. The status quo means the last, uncontested status which preceded the pending controversy.

**Counsel:** **[*1]** For Mark Baird, Richard Gallardo, Plaintiffs: Christopher Richard Cosca, LEAD ATTORNEY, Cosca Law Corporation, Sacramento, CA; Amy L. Bellantoni, PHV, PRO HAC VICE, The Bellantoni Law Firm, PLLC, Scarsdale, NY.

For Xavier Becerra, in his official capacity as Attorney General of the State of California, Defendant: R. Matthew Wise, LEAD ATTORNEY, Office Of The Attorney General, Sacramento, CA.

**Judges:** Kimberly J. Mueller, CHIEF UNITED STATES DISTRICT JUDGE.

**Opinion by:** Kimberly J. Mueller

# Opinion

ORDER

While this case is pending, plaintiffs Mark Baird and Richard Gallardo ask the court to enjoin two California laws that impose criminal liability on people who carry handguns openly in public. *HN1*[⬆] To obtain that relief, they must show the balance of equities tips in their favor and a preliminary injunction is in the public interest, among other things. *Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)*. They have not, so **their motion is denied**. In addition, they have not shown they have standing to pursue all of the claims in their complaint. Their complaint is **dismissed in part for lack of jurisdiction on the court's own motion**, as explained in detail below.

## I. BACKGROUND

Baird and Gallardo would like to carry loaded handguns openly for self-defense outside their homes. *See* **[*2]** Second Am. Compl. ¶ 3, ECF No. 68; Baird Decl. ¶ 5, ECF No. 65-1; Gallardo Decl. ¶ 6, ECF No. 65-2. In this

action they challenge two California criminal statutes imposing criminal liability on those who carry handguns openly in public. HN2[⬇] First, *California Penal Code section 25850* makes it a crime to carry "a loaded firearm on the person or in a vehicle while in any public place or on any public street in an incorporated city or in any public place or on any public street in a prohibited area of unincorporated territory." *Cal. Penal Code § 25850(a)*. Second, *Penal Code section 26350* makes it a crime to carry "an exposed and unloaded handgun" on the person or in a vehicle in several public places, such as on a "public street in an incorporated city or any county." *Id. § 26350(a)(1), (a)(2)*.[1]

HN3[⬇] These general prohibitions are subject to several exceptions. For example, a "peace officer or any honorably retired peace officer" can openly carry a handgun in many circumstances. *Id. §§ 25900, 26361*. A licensed hunter can openly carry unloaded handguns to and from a "hunting expedition." *Id. § 26366*. People can also keep firearms in their homes and businesses. *See Peruta v. Cty. of San Diego, 824 F.3d 919, 925 (9th Cir. 2016)* (en banc), *abrogated in part on other grounds by N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022)*. These are, again, just examples; there are several other exceptions in the Penal Code. *See, e.g., Cal. Penal Code §§ 26361-26392*.[*3] *see also Peruta, 824 F.3d at 925-26* (summarizing several exceptions). Federal laws also exempt certain current and former federal officers from some of California's prohibitions. *See 18 U.S.C. §§ 926B, 926C*.

In addition to these exceptions, a person can apply "for a license to carry a pistol, revolver, or other firearm capable of being concealed upon the person." *Cal. Penal Code § 26155(a); see also Cal. Penal Code § 26150*. Local city and county law enforcement agencies administer this licensing regime. *See id. §§ 26150, 26155*. Applicants must live in the relevant city or county, complete a training course, and be "of good moral character." *Id. §§ 26150(a)(1)-(4), 26155(a)(1)-(4)*. The statutes formerly imposed a "good cause" requirement as well, but earlier this year, after the Supreme Court struck down a similar requirement in

---

New York, the California Attorney General—the defendant in this case—instructed prosecutors not to enforce that part of the licensing statute. *See* Office of the Attorney General, Legal Alert (June 24, 2022) (citing *Bruen, 142 S. Ct. 2111*).[2]

The Penal Code sections giving local authorities the power to issue licenses define a two[*5] part system. *See id. §§ 26150(b), 26155(b)*. City and county law enforcement agencies in any California county can issue licenses to carry a concealed handgun on the person. *Id. §§ 26150(b)(1), 26155(b)(1)*. But in counties with a population [*4] of less than 200,000, authorities can also issue licenses to carry handguns "loaded and exposed in only that county." *See id. §§ 26150(b)(2), 26155(b)(2)*.

Baird and Gallardo filed this case in 2019. *See generally* Compl., ECF No. 1. They sought declaratory and injunctive relief and moved for a preliminary injunction. *See* Compl. at 55-58 (prayer for relief); First Mot. Prelim. Inj., ECF No. 14. The court denied that motion. *See generally* Prev. Order, ECF No. 33. Although Baird and Gallardo then raised serious questions about whether California's firearms regime violated the *Second Amendment*, they did not show the balance of interests tipped sharply in their favor, as the court found would have been necessary to obtain a preliminary injunction. *See id.* at 5-10. The court noted, however, that a number of appeals pending in the Ninth Circuit raised similar questions, so the court permitted Baird and Gallardo to renew their motion if the circuit eventually issued a decision favoring their position. *See id.* at 10. The court also dismissed several of their claims with leave to amend. *See id.* at 10-18.

The Ninth Circuit then issued its opinion in *Young v. Hawaii, 992 F.3d 765 (9th Cir. 2021)* (en banc), which upheld a Hawaii firearm licensing scheme against a similar constitutional [*5] challenge. The plaintiffs amended their complaint. *See generally* Am. Compl., ECF No. 34. They also moved again for a preliminary injunction. Mot. Prelim. Inj., ECF No. 40. In response, the state moved for summary judgment. ECF No. 56. Before the court could resolve those motions, however, the Supreme Court granted the petition for certiorari in *Bruen*, so the parties jointly requested a stay while *Bruen* was pending. ECF No. 58. After the Supreme Court issued its decision in *Bruen*, it also vacated the Ninth Circuit's decision in *Young*, see *142 S. Ct. 2895,*

---

[1] The Penal Code lists three places: "(A) A public place or public street in an incorporated city or city and county. (B) A public street in a prohibited area of an unincorporated area of a county or city and county. (C) A public place in a prohibited area of a county or city and county." *Cal. Penal Code §§ 26350(a)(1)(A)-(C), (a)(2)(A)-C*.

[2] https://oag.ca.gov/system/files/media/legal-alert-oag-2022-02.pdf (last visited Dec. 7, 2022).

213 L. Ed. 2d 1108 (2022), and the Ninth Circuit then remanded the case to the district court for further proceedings, *45 F.4th 1087 (2022)*. This court then lifted the stay here, the plaintiffs renewed their motion for a preliminary injunction, and amended their complaint. *See generally* Second Am. Compl., ECF No. 68; Mot., ECF No. 65.[3]

In both their complaint and motion, Baird and Gallardo ask the court to enjoin the enforcement of *Penal Code sections 26350* and *25850* "against individuals who carry a handgun open and exposed in public throughout the State of California." Mot. at 2; *see also* Second Am. Compl. at 17. They do not ask for any relief related to concealed handguns. The state opposes their motion, *see generally* Opp'n, ECF No. **[*6]** 69, which is now fully briefed, *see generally* Reply, ECF No. 73. The court submitted the motion after hearing oral arguments on November 4, 2022. At the hearing, Amy Bellantoni appeared for Baird and Gallardo. Ryan Davis and R. Matthew Wise appeared for the state.

## II. JURISDICTION

"The first question, as always, is whether this court has jurisdiction." *Tomer v. Gates, 811 F.2d 1240, 1242 (9th Cir. 1987)* (per curiam). The state does not argue this court lacks jurisdiction. *See* Status Rep. at 5, ECF No. 72. **HN5**[↑] But a federal court must ensure it has jurisdiction even if the parties voice no doubts. *See Summers v. Earth Island Inst., 555 U.S. 488, 499, 129 S. Ct. 1142, 173 L. Ed. 2d 1 (2009)*.

**HN6**[↑] Several limits on this court's jurisdiction are derived from the Constitution's references to "Cases" and "Controversies" in Article III. *See DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352, 126 S. Ct. 1854, 164 L. Ed. 2d 589 (2006)*. One of these limits is constitutional standing. *Spokeo, Inc. v. Robins, 578 U.S. 330, 338, 136 S. Ct. 1540, 194 L. Ed. 2d 635 (2016)*. To have standing, plaintiffs "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be

redressed by a favorable judicial decision." *Id.* They must satisfy these requirements for each claim they assert and for each form of relief they seek. *DaimlerChrysler, 547 U.S. at 352*.

Baird and Gallardo have standing to contest the state law generally in a facial challenge. *See United States v. Salerno, 481 U.S. 739, 745, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987)* (describing facial challenges). They contend **[*7]** the *Second Amendment* countenances no limitations on their right to carry handguns openly in public, and they claim the *Second Amendment* precludes California's scheme of prohibitions, exceptions, and licenses for carrying handguns openly in public. *See* Second Am. Compl. ¶ 8; Baird Decl. ¶ 7; Gallardo Decl. ¶ 7. They describe their right to carry loaded handguns openly in public as "God-bestowed," as a right they can exercise without "permission from the government, licensing, or any other action," and as a right the *Second Amendment to the United States Constitution* protects against "any encroachment." Second Am. Compl. ¶ 8 (emphasis omitted). At hearing, their counsel described this facial challenge as their principal or primary claim. Baird and Gallardo have standing to assert this facial claim: they are subject to the challenged Penal Code sections, and an injunction or declaration would relieve them of these constraints.

Although Baird and Gallardo have standing to assert these broad facial challenges, and although their counsel focused on their challenges at the hearing on their current motion, their complaint can also be interpreted as asserting claims that are more specific to their personal circumstances. Each lives in a county with a population **[*8]** of less than 200,000, meaning the local permitting authorities have authority to issue permits to carry loaded handguns openly in those jurisdictions. *See* Baird Decl. PP 2, 7; Gallardo Decl. PP 2, 7; *Cal. Penal Code §§ 26155(b)(2), 26150(b)(2)*. Baird and Gallardo argue, however, that there is no way to apply for such a permit in practice. *See* Baird Decl. ¶ 7; Gallardo Decl. ¶ 7. They also suspect their local sheriffs' offices would deny their applications outright even if they could apply. *See* Baird Decl. ¶ 7; Gallardo Decl. ¶ 7. In this sense, their complaint raises a challenge to the state's statutes as applied. *See Calvary Chapel Bible Fellowship v. Cty. of Riverside, 948 F.3d 1172, 1177 (9th Cir. 2020)* ("How the statute has been interpreted and applied by local officials is the province of an as28 applied challenge . . . .").

The court does not have jurisdiction over an as-applied

---

[3] The parties agree the pending motion for a preliminary injunction should be evaluated on the basis of the claims and allegations in the operative Second Amended Complaint. **HN4**[↑] The court treats the operative complaint as the controlling pleading. *See Lacey v. Maricopa Cty., 693 F.3d 896, 927 (9th Cir. 2012)* (en banc) ("[T]he general rule is that an amended complaint super[s]edes the original complaint and renders it without legal effect . . . .").

challenge along these lines. Baird and Gallardo have not shown they have standing to assert claims on behalf of people who live in larger counties. *Cf., e.g., Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343-44, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977)* (discussing third-party standing); *Washington v. Trump, 847 F.3d 1151, 1160 (9th Cir. 2017)* (per curiam) (same). As for their claim that licensing authorities would reflexively deny all open-carry permit applications, they have brought this case against the wrong defendant. They have sued the state's Attorney General, but California **[*9]** does not give its Attorney General authority to issue permits. As a result, Baird and Gallardo have not shown a favorable decision would redress their alleged injury. They do not have standing to assert any as-applied challenges. *See Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt., 606 F.3d 1058, 1074 (9th Cir. 2010)* (reaching same conclusion in case against wrong agency). Their complaint is dismissed to this extent. *HN7*[⬆] Plaintiffs may seek to amend their complaint to bring an as-applied challenge if they choose, but only if the amendment would show at least one plaintiff had standing to challenge the statutes as applied at the time the case began. *See Northstar Fin. Advisors Inc. v. Schwab Invs., 779 F.3d 1036, 1043-48 (9th Cir. 2015)*.

## III. PRELIMINARY INJUNCTION

### A. Legal Standard

*HN8*[⬆] To obtain a preliminary injunction, Baird and Gallardo must establish four things "by a clear showing": they are "likely to succeed on the merits," they are "likely to suffer irreparable harm in the absence of preliminary relief," "the balance of equities tips in [their] favor," and "an injunction is in the public interest." *City & Cty. of San Francisco v. United States Citizenship & Immigr. Servs., 944 F.3d 773, 788-89 (9th Cir. 2019)* (emphasis omitted) (first quoting *Mazurek v. Armstrong, 520 U.S. 968, 972, 117 S. Ct. 1865, 138 L. Ed. 2d 162 (1997)* (per curiam); then quoting *Winter, 555 U.S. at 20*). "Alternatively, 'serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff **[*10]** also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest.'" *Id. at 789* (quoting *All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011)*). When the party opposing an injunction is the state, as is true in this case, the balance of equities and

public interests "merge." *E.g., Nken v. Holder, 556 U.S. 418, 435, 129 S. Ct. 1749, 173 L. Ed. 2d 550 (2009)*; *Roman v. Wolf, 977 F.3d 935, 940-41 (9th Cir. 2020)* (per curiam).

*HN9*[⬆] Preliminary injunctions are ordinarily intended "merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch, 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981)*. When a plaintiff asks to change the status quo rather than preserve it, district courts exercise greater caution. *See Garcia v. Google, Inc., 786 F.3d 733, 740 (9th Cir. 2015)* (en banc). To obtain an injunction that instructs an opposing party to change its behavior, thus altering the status quo, a plaintiff must show "extreme or very serious damage" will occur unless the requested injunction is granted. *Doe v. Snyder, 28 F.4th 103, 111 (9th Cir. 2022)* (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co., 571 F.3d 873, 879 (9th Cir. 2009)*). Such affirmative pretrial relief is not appropriate in "doubtful" cases. *Garcia, 786 F.3d at 740* (quoting *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr., 636 F.3d 1150, 1160 (9th Cir. 2011)*).

The parties advance conflicting arguments about their respective burdens. For the first part of the *Winter* test, showing a likelihood of success on the merits, Baird and Gallardo argue their only burden is to prove their conduct "falls within the plain language of the *Second Amendment*." Reply at 1. If so, then in their view, the state must "show **[*11]** that the challenged regulations are consistent with this Nation's historical traditions of firearm regulation." *Id.* The state acknowledges it must ultimately "put forth the relevant historical evidence to prevail at final judgment." Opp'n at 12. It also argues, however, that Baird and Gallardo must "show that they are likely to prevail on the merits," a task the state describes as impossible given the uncertainties of history, the expertise and time required to study that history, and how fundamentally *Bruen* changes *Second Amendment* law. *See id.* at 12-13.

The parties cite no Ninth Circuit or Supreme Court authority allocating the parties' burdens for preliminary injunction motions in a post-*Bruen Second Amendment* challenge. This court is aware of no such authority. The Supreme Court did not reach that question in *Bruen* because the district court had dismissed the complaint for failure to state a claim. *See generally 354 F. Supp. 3d 143 (N.D.N.Y. 2018)*, *aff'd, 818 F. App'x 99 (2d Cir. 2020)*, *rev'd, 142 S. Ct. 2111, 213 L. Ed. 2d 387*.

The Supreme Court's opinion in *Bruen* does, however, signal the path forward. The Court first rejected the two-part test lower courts had previously adopted. *See 142 S. Ct. at 2126-30.* *HN10*[⬆] It settled instead on an historical test: "When the *Second Amendment's* plain text covers an individual's conduct, the Constitution presumptively protects that **[\*12]** conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id. at 2129-30.* The Court justified this rule in part by comparing it to the rules it has adopted for *First Amendment* claims. *See id. at 2130.* By drawing this connection, the Supreme Court was not broadly pronouncing that the government's burdens in *Second Amendment* cases mirror its burdens in *First Amendment* cases. The Court's analogy nevertheless suggests *First Amendment* cases can offer insights about the parties' burdens when a plaintiff alleges a law or regulation violates the *Second Amendment.*

Federal appellate decisions in *First Amendment* cases do in fact offer useful insights. *HN11*[⬆] When a plaintiff moves for a preliminary injunction in a *First Amendment* case, there is a tension between the plaintiff's burden of showing it is likely to succeed on the merits and the government's ultimate burden "of justifying its speech-restrictive law" at trial. *Thalheimer v. City of San Diego, 645 F.3d 1109, 1115 (9th Cir. 2011), overruled in part on other grounds by Bd. of Trustees of Glazing Health & Welfare Tr. v. Chambers, 941 F.3d 1195 (9th Cir. 2019)* (en banc); *see also Ashcroft v. A.C.L.U., 542 U.S. 656, 666, 124 S. Ct. 2783, 159 L. Ed. 2d 690 (2004).* Under the Supreme Court's decision in *Bruen*, the parties' burdens create the same tension: the plaintiff must show it is likely to succeed on the merits, but the government must ultimately "justify its regulation by demonstrating that it is consistent with **[\*13]** the Nation's historical tradition of firearm regulation." *142 S. Ct. at 2129-30.* The Supreme Court and the Ninth Circuit have alleviated this tension in *First Amendment* cases by essentially accelerating the government's obligations. *See A.C.L.U., 542 U.S. at 666; Thalheimer, 645 F.3d at 1116.* Unless the government "justifies the restriction" under the standard that would apply at trial, the plaintiff is "deemed likely to prevail," *A.C.L.U., 542 U.S. at 666.* In this limited way, "the burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 429, 126 S. Ct. 1211, 163 L. Ed. 2d 1017 (2006).*

The similarities between the test adopted in *Bruen* and

the government's burden in *First Amendment* cases suggest strongly that the Supreme Court would require the government, not the plaintiffs, to identify historical analogs in response to a motion for a preliminary injunction in *Second Amendment* cases. Other district courts have assumed this is so. *See, e.g., Rigby v. Jennings, ___ F. Supp. 3d ___, No. 21-1523, 2022 U.S. Dist. LEXIS 172375, 2022 WL 4448220, at \*8 (D. Del. Sept. 23, 2022)* (finding plaintiffs were likely to succeed on the merits after finding defendants had not demonstrated challenged statutes were consistent with historical tradition); *Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose, ___ F. Supp. 3d ___, No. 22-00501, 2022 U.S. Dist. LEXIS 138385, 2022 WL 3083715, at \*4 (N.D. Cal. Aug. 3, 2022)* (generalizing rule to all "cases where the government bears the burden as to the ultimate question of the challenged law's constitutionality" in *Second Amendment* challenge); *see also Antonyuk v. Hochul, ___ F. Supp. ___, No. 22-0986, 2022 U.S. Dist. LEXIS 182965, 2022 WL 5239895, at \*12 (N.D.N.Y. Oct. 6, 2022)* (adopting this scheme in response to motion for temporary restraining order).

California **[\*14]** argues otherwise, citing *Ramos v. Wolf.* *See* Opp'n at 12 (citing *975 F.3d 872 (9th Cir. 2020)*). In *Ramos*, the plaintiffs alleged the President had adopted a racially discriminatory immigration policy in violation of the *Equal Protection Clause*. *See id. at 883.* The district court granted the plaintiffs' motion for a preliminary injunction, *See id. at 884-87,* but the Ninth Circuit reversed, *Id. at 899.* In the Circuit's assessment, there was "no evidentiary support for the conclusion" that the policy change "was motivated by racial animus." *Id.* The Circuit emphasized that the plaintiffs could succeed on their *Equal Protection Clause* challenge at trial only by offering "proof of racially discriminatory intent or purpose." *Id. at 896* (alterations omitted) (quoting *Village of Arlington Heights v. Metro. Housing Development Corp., 429 U.S. 252, 265, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977)*). Here, by contrast, the government would bear the burden of proof at trial to show its regulations are justified by history and tradition. *See Bruen, 142 S. Ct. at 2130.* *Ramos* is not controlling, and the plaintiffs' differing burdens at trial in that case deprive the Circuit's reasoning of persuasive force.

*HN12*[⬆] In sum, for the first part of the preliminary injunction test, Baird and Gallardo must show they are likely to prove "the *Second Amendment's* plain text covers" conduct regulated by *California Penal Code sections 25850* and *26350*. *Bruen, 142 S. Ct. at 2129-30.* If they do, the state bears the burden to show it is likely to "justify its regulation by demonstrating **[\*15]**

that it is consistent with the Nation's historical tradition of firearm regulation." *Id. at 2130*. In all other respects, the plaintiffs bear the burden of proof: they must show they are likely to suffer irreparable harm absent a preliminary injunction, and they must show the balance of harms and public interests favor a preliminary injunction. *See Winter, 555 U.S. at 20*.

## B. Discussion

It is not necessary to decide whether California's Penal Code restricts conduct within the *Second Amendment's* plain text under *Bruen* or whether the challenged Penal Code sections are within the nation's historical tradition of firearms regulation. Nor is it necessary to decide whether Baird and Gallardo would suffer irreparable harm if the court does not enter a preliminary injunction. As explained below, they have not shown the balance of harms and public interest favor a preliminary injunction.

*HN13*[↑] A court cannot enter a preliminary injunction if the moving party does not show "the balance of equities tips in [its] favor," and "an injunction is in the public interest." *Winter, 555 U.S. at 20*. *Winter* itself illustrates this point forcefully. The plaintiffs alleged the U.S. Navy had not adequately considered how harmful its training exercises were to marine mammals. *See Id. at 15-17*. They brought claims **[*16]** under a collection of federal environmental protection laws. *See id. at 16-17*. When the case reached the Supreme Court, it turned on one question: how to balance the harms and public interest. *See id. at 20-31*. The Supreme Court did not "address the underlying merits." *Id. at 31*. It also assumed without deciding the plaintiffs would suffer an irreparable harm. *See id. at 23-24*. The Court vacated the preliminary injunction because the district and circuit courts had "significantly understated the burden the preliminary injunction would impose on the Navy's ability to conduct realistic training exercises, and the injunction's consequent adverse impact on the public interest in national defense." *Id. at 24*. The Court also concluded a permanent injunction along the same lines would have been an abuse of discretion as well, even if the plaintiffs eventually prevailed on the merits. *See id.* at 32.

Turning back to this case, Baird and Gallardo argue that without an injunction, they and others in California will be denied the constitutional right to carry handguns openly in public. *See* Mem. at 9; Reply at 6. They claim that without an injunction, they cannot defend themselves with handguns in public and will lose the peace of mind that comes with **[*17]** carrying a handgun. *See* Mem. at 9. These arguments overstate the harms they will likely suffer without a preliminary injunction. Baird and Gallardo will not be without a means to defend themselves with handguns in public while the case is pending. They and others in California may carry concealed handguns in public. If a person cannot rely on one of the many exceptions to the Penal Code's general prohibitions, as Baird and Gallardo each can, then that person may apply for a license, which California now issues under objective criteria.

The Supreme Court left no doubt in *Bruen* that it was not deciding whether states could regulate firearms using objective criteria like those California now imposes. The Court strongly implied that objective criteria and "shall-issue" licensing regimes are constitutional. The majority explained in the margin that "nothing" in the Court's opinion "should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes." *142 S. Ct. at 2138 n.9*. "[I]t appears that these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction **[*18]** are, in fact, 'law-abiding, responsible citizens.'" *Id.* (quoting *District of Columbia v. Heller, 554 U.S. 570, 635, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008)*).

Separate concurring opinions by three Justices in *Bruen* reinforce this point. Justice Alito, who joined the majority's opinion, underscored that the Court had decided "nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun." *Id. at 2157* (Alito, J., concurring). Nor had the Court "disturbed anything that [it] said in *Heller* or *McDonald v. Chicago, 561 U.S. 742, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010)*, about restrictions that may be imposed on the possession or carrying of guns." *Id.* Justice Kavanaugh, who also joined the majority opinion, wrote similarly in a separate concurring opinion:"[T]he 6 States including New York [and California] potentially affected by today's decision may continue to require licenses for carrying handguns for self-defense so long as those States employ objective licensing requirements like those used by the 43 shall-issue States." *Id. at 2162* (Kavanaugh, J., concurring). In Justice Kavanaugh's view, the Court's opinion in *Bruen* does not prohibit states from "requir[ing] a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible **[*19]** requirements." *Id.* The Chief Justice joined Justice Kavanaugh's opinion. *Id. at 2161*.

2022 U.S. Dist. LEXIS 221461, *19

In short, six Justices took care to explain why the Court's opinion did not bar the vast majority of states from continuing to enforce their firearms licensing regimes. Two of the Justices whose votes were necessary to make up the six-member majority also wrote specifically that states like New York and California could continue using background checks and imposing training requirements, among other criteria. As a result, in this case, the only harm most people will likely face absent a preliminary injunction is (1) a requirement to obtain a license, which requirement the majority did not question in *Bruen* and (2) having to conceal any handguns they may wish to carry in public.

Baird and Gallardo have not shown that this harm outweighs the harms that would likely result from an immediate preliminary injunction. If California cannot enforce *sections 25850* and *26350* against those who carry handguns openly in public, then it would lose its primary means of limiting public handgun carrying to "ordinary, law-abiding citizens." *Bruen, 142 S. Ct. at 2122*. *HN14*[⬆] A person who could not obtain a license to carry a concealed handgun—due, for example, to a lack of "good moral [*20] character" or refusal to complete a "course of training"—could circumvent the state's laws by carrying the same gun openly. *See Cal. Penal Code § 26150(a)(1)*, *(4)*.

California also cites an unrebutted declaration from a former police chief and past president of the California Police Chiefs Association, who opines that "restrictions on the open carry of firearms greatly enhance public safety." Raney Decl. P21, ECF No. 69-2. In his opinion, based on "39 years of law-enforcement experience" and other work, "the restrictions on the open carry of firearms in California have been critical to the safety of law-enforcement officers, our communities, and those people who would want to openly carry firearms in public." *Id.* PP 2, 22. To that same end, the state also cites academic research showing violent crime, property crime, and murder rates are higher in states that impose fewer restrictions on firearm carrying in public. *See* Opp'n at 18-19. The plaintiffs offer no countervailing evidence to show, for example, that crime rates are the same or lower when firearms regulations are relaxed. They instead criticize the cited studies as focusing on concealed firearms, whereas their complaint focuses on open carry alone. *See* Reply [*21] at 9. These criticisms limit the state's evidence, but they do not eliminate its persuasive force. *See, e.g.*, Wise Decl. Ex. 4 at 7-13 (collecting theories of increased violent crime, including some that do not depend on whether guns are concealed). The plaintiffs bear the burden to prove an

injunction is in the public interest, and they have offered no countervailing evidence, so the cited studies weigh against issuing a preliminary injunction despite their limitations.

Baird and Gallardo argue public safety concerns such as these are irrelevant, citing the Supreme Court's observation that many constitutional rights carry "controversial public safety implications." *Bruen, 142 S. Ct. at 2126 n.3* (quoting *McDonald, 561 U.S. at 783* (plurality op.)). Under *Bruen*, the state could not defend its laws at trial by arguing they advance a compelling state interest in public safety. *See id. at 2127* (rejecting "means-end scrutiny in the *Second Amendment* context"). *HN15*[⬆] But Baird and Gallardo are not seeking final judgment; rather, they are seeking a preliminary injunction, and the Supreme Court has held that a court may not enter a preliminary injunction unless the moving party shows the balance of harms and public interest weigh in its favor. *See Winter, 555 U.S. at 20, 32*. Public safety is part of that balance. [*22]

*HN16*[⬆] Finally, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King, 567 U.S. 1301, 1303, 133 S. Ct. 1, 183 L. Ed. 2d 667 (2012) (Roberts, J., in chambers)* (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co., 434 U.S. 1345, 1351, 98 S. Ct. 359, 54 L. Ed. 2d 439 (1977)* (Rehnquist, J., in chambers)).

This court denied Baird's and Gallardo's previous motion for a preliminary injunction for similar reasons. *See* Order (Aug. 31, 2020) at 8-10, ECF No. 33. As this court wrote in its previous order, preliminary assessments of the merits can turn out to be incorrect. *See id.* at 9; *see also Tracy Rifle & Pistol LLC v. Harris, 118 F. Supp. 3d 1182, 1193 (E.D. Cal. 2015)*, aff'd, *637 F. App'x 401 (9th Cir. 2016)*. *HN17*[⬆] The moving plaintiff must persuade the court that the benefits of a potential mistake outweigh the costs. *See Tracy, 118 F. Supp. 3d at 1193*. Courts hesitate when those costs are likely far-reaching, difficult to estimate, and potentially deadly. *See id.* Baird and Gallardo ask the court to force California to allow anyone to carry a loaded handgun openly in public without a permit while they attempt to prove the state's licensing regime is unconstitutional. They have not shown such a broad injunction would serve the public interest.

The affirmative character of the plaintiffs' proposal advises caution as well. *HN18*[⬆] As noted above,

when a plaintiff asks to change the status quo rather than preserve it, district courts must exercise **[\*23]** greater caution. *See, e.g., Garcia, 786 F.3d at 740.* "The status quo means the last, uncontested status which preceded the pending controversy." *Id. at 740 n.4* (quoting *N.D. ex rel. Parents v. Haw. Dep't of Educ., 600 F.3d 1104, 1112 n.6 (9th Cir. 2010)*). This case began in 2019; California's current regime had been operative since 2012, so the existing regime is the status quo." *Compare 2010 Cal. Stats. Ch. 711, §§ 6,* 10 (S.B. 1080) (West), *with* Compl., ECF No. 1. As explained above, the preliminary injunction Baird and Gallardo propose would upend that regime. This is so even if their injunction could be described as "prohibitive" in that it would prohibit certain criminal prosecutions; what matters is whether the injunction preserves or alters the status quo. *See, e.g., Doe, 28 F.4th at 111* (rejecting recharacterization of changes to status quo as "prohibitory"); *see also Schrier v. Univ. Of Co., 427 F.3d 1253, 1260 (10th Cir. 2005)* ("It not at all difficult to envision situations where a mandatory injunction would preserve the status quo and a prohibitory injunction would alter the status quo." (citation omitted)).

For these reasons, Baird and Gallardo must show this is not a "doubtful" case and that the preliminary injunction they propose is necessary to avoid "extreme or very serious damage." *Doe, 28 F.4th at 111* (quoting *Marlyn Nutraceuticals, 571 F.3d at 879*). They have not done so; as explained above, the harm they seek to avoid is a (1) compliance with an objective **[\*24]** permitting scheme and (2) concealing any handguns carried in public. This is also a "doubtful" case. Deciding whether the state's laws are constitutional will require a difficult investigation and careful consideration of historical firearm regulations. Opp'n at 12 (citing Schrag Decl., *Miller v. Becerra*, No. 19-1537 (S.D. Cal. Aug. 29, 2022), ECF No. 129-1). The Ninth Circuit's extensive discussion of historical open-carry regulations in *Young* has been vacated, so it is no longer the binding law in this circuit. And as Justice Barrett pointed out in her concurring opinion in *Bruen*, a number of "unsettled questions" and a "scholarly debate" further complicate this historical exercise. *See 142 S. Ct. at 2163* (Barrett, J., concurring). This court is indeed "ill equipped to conduct the type of searching historical surveys that the [Supreme] Court's approach requires." *Id. at 2179* (Breyer, J., dissenting). Baird and Gallardo have not proven it would be better to upend the status quo than leave it in place while the court adjudicates their claims.

Because Baird and Gallardo have not shown their proposed preliminary injunction would serve the public interest, and because their proposal does not appropriately balance the likely harms, their motion is denied. *See Winter, 555 U.S. at 20, 32*.

## IV. CONCLUSION AND [\*25]  ORDER TO SHOW CAUSE

The Second Amended Complaint is **dismissed in part for lack of subject matter jurisdiction** as explained in section II above. The motion for a preliminary injunction (ECF No. 65) is **denied**.

On the court's own motion, to facilitate the court's considerations of any obligations it has following *Bruen*, the parties are **ordered to show cause within thirty days** why the court should not appoint its own expert witness to collect and survey evidence of the "historical tradition that delimits the outer bounds of the right to keep and bear arms," *Bruen, 142 S. Ct. at 2127*, as relevant to this case, *see Fed. R. Evid. 706(a)*. In their responses, each party may submit nominations of potential experts if they wish. *See id.* The parties may also address the court's tentative observation that an appointed expert could provide a more thorough, rigorous, and balanced perspective than those the parties have offered to date. *Cf., e.g., United States v. Bullock, No. 18-cr-165, 2022 U.S. Dist. LEXIS 203513, 2022 WL 16649175, at \*2-3 (S.D. Miss. Oct. 27, 2022)* (ordering similarly in felony case based on *18 U.S.C. § 922* charge with motion to dismiss pending, after identifying and summarizing "a serious disconnect between the legal and historical communities")[4]; *but cf., e.g., United States v. Kelly, No. 22-0037, 2022 U.S. Dist. LEXIS 215189, 2022 WL 17336578, at \*3 (M.D. Tenn. Nov. 16, 2022)* (in criminal prosecution, observing "[p]ending gun cases must be decided, which means, now, that they **[\*26]** must be decided through the methodology set forth in *Bruen*, whether the courts are actually well-suited to that inquiry or not.").

IT IS SO ORDERED.

DATED: December 7, 2022.

/s/ Kimberly J. Mueller

CHIEF UNITED STATES DISTRICT JUDGE

_____

[4] The parties have not yet filed their responses to the court's order in *Bullock*; it appears the responses currently are due by December 12, 2022.

2022 U.S. Dist. LEXIS 221461, *26

---

**End of Document**

 Caution
As of: March 29, 2023 5:04 PM Z

## *United States v. Reyna*

United States District Court for the Northern District of Indiana, South Bend Division

December 15, 2022, Decided; December 15, 2022, Filed

CAUSE NO. 3:21-CR-41 RLM-MGG

**Reporter**
2022 U.S. Dist. LEXIS 225896 *; 2022 WL 17714376

UNITED STATES OF AMERICA v. JOSE REYNA

**Subsequent History:** Appeal filed, 02/07/2023

## Core Terms

gun, serial number, regulate conduct, regulation, handgun, self-defense, guilty plea, plain text, obliterated, firearm, law-abiding, weapons, mere possession, argues, lawful purpose, arms, indictment, motion to dismiss, facial challenge, deserialized, possession of a firearm, challenged regulation, sentencing, possessed

**Counsel:** **[*1]** For Jose Reyna, Defendant: Scott J Frankel - FCD, LEAD ATTORNEY, Federal Community Defenders Inc - SB/IN, South Bend, IN; Chad Pennington - FCD, Federal Community Defenders Inc - Ham/IN, Hammond, IN.

For United States of America, Plaintiff: Frank E Schaffer, LEAD ATTORNEY, US Attorney's Office - SB/IN, South Bend, IN; Nathaniel L Whalen, LEAD ATTORNEY, US Attorney's Office - Ham/IN, Hammond, IN.

**Judges:** Robert L. Miller, Jr., United States District Judge.

**Opinion by:** Robert L. Miller, Jr.

## Opinion

OPINION AND ORDER

Jose Reyna was indicted with one count of possession of a firearm with an obliterated serial number in violation of *18 U.S.C. § 922(k)*. Mr. Reyna entered a guilty plea and moved to dismiss the criminal case just before

sentencing. He argues that *§ 922(k)* violates the *Second Amendment to the U.S. Constitution* in light of *New York State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022)*. After briefing from the parties, the court held oral arguments on December 5. The court denies Mr. Reyna's motion to dismiss [Doc. 28] because the plain text of the *Second Amendment* doesn't reach a handgun without a serial number.

BACKGROUND[1]

St. Joseph County Police Department officers pulled Jose Reyna over on February 17, 2021, because of a defective headlight. Mr. Reyna presented the officers with a picture ID but not a driver's license. His car smelled of marijuana. **[*2]** The officers searched his car and found a handgun with the serial number scratched off as well as marijuana and other supplies suggestive of marijuana distribution.

Mr. Reyna was arrested and agents of the Bureau of Alcohol, Tobacco, Firearms and Explosives eventually interviewed him. Mr. Reyna told the ATF officers that he sells marijuana and carried the handgun to protect himself. He admitted to having scratched off the handgun's serial number with a knife and described instances when he fired the gun to scare of adversaries when drug deals had gone sour.

A grand jury indicted Mr. Reyna on one count of possession of a firearm with an obliterated serial number in violation of *18 U.S.C. § 922(k)*. The indictment charged Mr. Reyna with unlawful possession on or about February 17, 2021. At that time, he had one adult misdemeanor conviction and one juvenile

---

[1] The court takes these facts from the presentence investigation report prepared by the U.S. Probation Office for Mr. Reyna's sentencing. [Doc. 22]. Mr. Reyna pleaded guilty to the offense and later filed a notice of no objection to the presentence investigation report. [Doc. 21].

misdemeanor adjudication. Mr. Reyna was in state custody when indicted and was arrested on the federal warrant about one year later in May 2022. He pleaded guilty without a plea agreement and was to be sentenced on October 19.

Mr. Reyna filed this motion to dismiss on October 17. Mr. Reyna argues that his case should be dismissed because *§ 922(k)* violates the *Second Amendment* [*3] . He contends that *§ 922(k)* regulates possession of firearms, which is covered by the *Second Amendment's* plain text, and that the government hasn't shown, and can't show, that such a regulation is consistent with our nation's history and tradition of firearm regulation. *See N.Y. State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022)*.

STANDARD OF REVIEW

A defendant ordinarily must move to dismiss an indictment for failure to state an offense in a pretrial motion, *Fed. R. Crim. P. 12(b)(3)(B)(v)*, but a court can consider an untimely motion if the defendant shows good cause. *Fed. R. Crim. P. 12(c)(3)*. A defendant can withdraw a guilty plea after entering a guilty plea and before sentencing if "the defendant can show a fair and just reason for requesting the withdrawal." *Fed. R. Crim. P. 11(d)(2)(B)*. Guilty pleas "should not lightly be withdrawn," but can be withdrawn for factual or legal innocence or if the defendant didn't enter a plea knowingly and voluntarily. *United States v. Brown, 973 F.3d 667, 715 (7th Cir. 2020)*.

ANALYSIS

Mr. Reyna argues that his entire case must be dismissed because the statute he was charged with and to which he pleaded guilty impermissibly burdens the *Second Amendment* right to keep and bear arms. He raises this argument in light of *New York State Rifle & Pistol Assoc'n v. Bruen, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022)*, which was decided shortly before he entered a guilty plea, and which clarified how courts are to evaluate *Second Amendment* challenges to gun regulations. If his argument is correct and *§ 922(k)* violates the *Second Amendment*, his claim to legal innocence is fair and just reason for him to withdraw his guilty plea and for the court to grant his motion to dismiss the indictment. The government argues that because *N.Y. State Rifle* was decided before [*4] Mr. Reyna entered his guilty plea, this isn't the sort of case

in which constitutional law changes between a guilty plea and sentencing. *See United States v. Mays, 593 F.3d 603, 607 (7th Cir. 2010)*. This is no reason to dismiss Mr. Reyna's motion without reaching the merits: successfully showing that *§ 922(k)* is unconstitutional would show that his guilty plea wasn't knowing or voluntary, which is itself good reason to grant a motion to withdraw his guilty plea and then dismiss the case.

Before *N.Y. State Rifle*, courts coalesced around a two-step test for *Second Amendment* challenges to gun regulations. *Id. at 2125-2126*. This two-step test first asked whether the regulated conduct was within the *Second Amendment's* scope. Id. If so, courts applied some form of means-ends scrutiny to the challenged regulation. Id.

The *N.Y. State Rifle* decision eliminated means-ends scrutiny and clarified that *Second Amendment* challenges are based on the *Second Amendment's* text as well as history and tradition. *Id. at 2129-2130*. A regulation doesn't offend the *Second Amendment* if the *Second Amendment's* plain text doesn't cover the regulated conduct. Id. If the *Second Amendment's* plain text covers the regulated conduct, the conduct is presumptively protected, and the government bears a burden of showing that the regulation is consistent with history and tradition. Id. Only if the government affirmatively shows that the regulation is equivalent or analogous [*5] to well-established historical regulations can the regulation survive *Second Amendment* scrutiny. *Id. at 2127, 2130*.

Mr. Reyna argues that *§ 922(k)*'s regulated conduct is presumptively protected because the *Second Amendment's* plain text covers it, and that the government hasn't shown that *§ 922(k)* is consistent with history and tradition. The government responds that *§ 922(k)*'s regulated conduct isn't covered by the *Second Amendment's* plain text, for a few different reasons, and that if *§ 922(k)* regulates protected conduct, the regulation is justified by various laws regulating guns and gunpowder.

The parties raise as a threshold issue whether Mr. Reyna can bring a facial challenge to *§ 922(k)*. To succeed on a facial challenge, a party must show that a statute is unconstitutional in all applications. *City of L.A. v. Patel, 576 U.S. 409, 415, 418, 135 S. Ct. 2443, 192 L. Ed. 2d 435 (2015)*. Mr. Reyna contends that "*§ 922(k)* is unconstitutional in all of its applications because it cannot satisfy the Bruen test." [Doc. 37]. The government argues that Mr. Reyna is barred from

2022 U.S. Dist. LEXIS 225896, *5

bringing a facial challenge, relying on *Baer v. Lynch, 636 F. App'x 695, 697 (7th Cir. 2016)*. The defendant in *Baer* argued that statutes banning firearm possession by felons who are no longer dangerous facially violated the *Second Amendment*. Id. The court rejected this argument, explaining that "*Second Amendment* claims cannot rest on a facial overbreadth challenge . . . . [Defendant] cannot challenge the [*6] federal and state statutes on the ground that they 'may conceivably be applied unconstitutionally to others, in other situations.'" Id. (citing *United States v. Skoien, 614 F.3d 638, 645 (7th Cir. 2010)* (en banc); *Broadrick v. Oklahoma, 413 U.S. 601, 610, 93 S. Ct. 2908, 37 L. Ed. 2d 830 (1973)*).

Unlike the defendant in *Baer v. Lynch*, Mr. Reyna's facial argument doesn't depend on whether applying the law to some subset of people other than him might violate the *Second Amendment*, so it's not a facial overbreadth argument. His facial challenge requires showing that every application of the law is unconstitutional. That's the sort of argument Mr. Reyna can bring, so Mr. Reyna's motion doesn't fail for being a facial challenge. *See City of L.A. v. Patel, 576 U.S. at 415* (explaining that a *Second Amendment* facial challenge was allowed in *District of Columbia v. Heller, 554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008)*).

*Whether the Second Amendment's Plain Text Covers § 922(k)'s Regulated Conduct*.

The first step of a *Second Amendment* challenge is deciding whether the regulated conduct falls within the scope of the *Second Amendment's* plain text. *N.Y. State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. at 2129-2130*.

The *Second Amendment* reads in full, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." *U.S. Const. amend. II*. The *Second Amendment's* plain meaning depends on how voters at the time of ratification would understand the normal meaning of words and phrases, as well as the idiomatic meaning of words and phrases. *District of Columbia v. Heller, 554 U.S. 570, 576-577, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008)*.

The text, read as a whole, "guarantee[s] the individual [*7] right to possess and carry weapons in case of confrontation." *Id. at 592*. Keeping arms means the right to possess arms for self-defense in the home, *id. at 628-629*, and carrying arms means the right to

possess arms for self-defense in public. *N.Y. State Rifle, 142 S. Ct. at 2122*. *Second Amendment* rights are individually held, as indicated most clearly by the text's reference to "the people," *District of Columbia v. Heller, 554 U.S. at 579-581*. But the plain text also reveals that the *Second Amendment* has limits; the very same phrase that indicates an individual right — "the people" — also limits the *Second Amendment* right to members of the political community and excludes criminals. *Id. at 580; Range v. Att'y Gen. U.S., 53 F.4th 262, 266, 284 (3d Cir. 2022)* (per curiam) (citing *N.Y. State Rifle, 142 S. Ct. at 2131*); *see also United States v. Yancey, 621 F.3d 681, 684-685 (7th Cir. 2010)*. The *Second Amendment's* text doesn't protect keeping and bearing any weapon in every way possible. *District of Columbia v. Heller, 554 U.S. at 626-627*. A weapon generally is covered if a person can carry it, *N.Y. State Rifle v. Bruen, 142 S. Ct. at 2132*, but not if the weapon is uncommon or unusually dangerous or not typically used by law-abiding people for lawful purposes. *Id. at 2128*. (citing *District of Columbia v. Heller, 554 U.S. at 626, 627; United States v. Miller, 307 U.S. 174, 179, 59 S. Ct. 816, 83 L. Ed. 1206, 1939-1 C.B. 373 (1939)*).

The first step under *N.Y. State Rifle* asks about the regulated conduct, so the court must determine how specifically or generally to define *§ 922(k)'s* regulated conduct: is it mere "possession of a firearm" or "possession of a firearm *with an obliterated serial number*"?

Mr. Reyna argues that *§ 922(k)* regulates mere possession. He relies on *United States v. Price, No. 2:22-cr-00097, 2022 U.S. Dist. LEXIS 186571 (S.D. W. Va. Oct. 12, 2022)*, which sustained a *Second Amendment* challenge to *§ 922(k)*. The *Price* court [*8] reasoned that *§ 922(k)* regulated mere possession because a person could lawfully purchase or transfer a firearm, but that person suddenly becomes a criminal under *§ 922(k)* if the serial number is destroyed. Id. at *7-8. The court used the example of a father who lawfully purchases a firearm and then destroys the serial number. The example continues with the daughter, who lawfully receives the gun from her father and displays it in his memory. She, too, unlawfully possesses the gun because its serial number is obliterated. Neither of them was made a criminal for destroying a serial number or for an unlawful purchase or transfer, so it's their possession that's regulated.

The government objects to this line of reasoning, arguing that such a reading is artificially narrow. The government relies on part on *United States v. Holton,*

No. 3:21-CR-0482-B, 2022 U.S. Dist. LEXIS 200327, at *9 (N.D. Tex. Nov. 3, 2022). The Holton court focused on how a serial number doesn't relate to the conduct protected in Heller and N.Y. State Rifle — a serial number is unrelated to handgun possession in the home and handgun possession in public. The government further argues that Mr. Reyna could possess other guns with serial numbers under § 922(k), so mere possession of a firearm can't be the regulated conduct.[2]

Reading § 922(k)'s regulated conduct as mere possession [*9] is inconsistent with how the Supreme Court evaluates Second Amendment challenges. In Heller, the challenged regulation prohibited handgun possession in the home, so the Court defined the regulated conduct as handgun possession in the home. District of Columbia v. Heller, 554 U.S. at 628. In N.Y. State Rifle, the challenged regulation prohibited publicly carrying a handgun, so the Court defined the regulated conduct as publicly carrying a handgun. N.Y. State Rifle v. Bruen, 142 S. Ct. at 2134. In neither case did the Supreme Court distill the challenged regulation to so abstract a level as mere possession or mere carrying of a firearm.

Nor would it make sense to define regulated conduct as mere possession in light of the comparator — the Second Amendment's plain text. If § 922(k)'s regulated conduct is mere possession, any number of other challenged regulations would similarly boil down to mere possession, then promptly and automatically proceed to Step Two. For Step One to have any meaning, the regulated conduct must be defined specifically enough that it can meaningfully compare to the Second Amendment's plain text — a plain text that is more complex than mere possession. To do otherwise would be to compare the regulated conduct to the Second Amendment's bare and oversimplified text — keeping and bearing arms, without the original public meaning emphasized in Heller [*10] and N.Y. State Rifle.

Having concluded that § 922(k)'s regulated conduct is "possession of a firearm with an obliterated serial number" and not "mere possession," the court turns its inquiry to whether the Second Amendment's plain text covers that conduct. Mr. Reyna argues that possession of a gun with an obliterated serial number is protected because such a gun can still be used for self-defense. Prohibiting possession of deserialized guns reduces his access to the universe of guns that can be used for self-defense. The government argues that the only purpose of a deserialized gun is to evade the law; law-abiding citizens ordinarily don't use deserialized guns for lawful purposes, keeping a serial number doesn't reduce a gun's usefulness for self-defense, and obliterating a serial number doesn't make a gun more useful for self-defense. "With or without a serial number, a pistol is still a pistol." United States v. Marzzarella, 614 F.3d 85, 94 (3d Cir. 2010).

The Heller Court made clear that the Second Amendment excludes "those weapons not typically possessed by law-abiding citizens for lawful purposes." District of Columbia v. Heller, 554 U.S. at 625 (discussing short-barreled shotguns in United States v. Miller, 307 U.S. 174, 59 S. Ct. 816, 83 L. Ed. 1206, 1939-1 C.B. 373 (1939)); see also id. at 623 ("Miller stands only for the proposition that the Second Amendment right, whatever its nature, extends only to certain types of weapons."). This limit on the Second Amendment right [*11] arises from the Second Amendment's text; the Heller Court explained that the plain meaning of "militia" and the relationship between the Second Amendment's operative clause and prefatory clause show that the Second Amendment protects common weapons used for lawful purposes. Id. at 624-625. This limitation comes from the text of the Second Amendment, so whether a particular type of gun is typically used by law-abiding citizens for lawful purposes is a proper question at the first step of the N.Y. State Rifle analysis.[3]

_____

[2] Although it plays no role in today's decision, it's worth remembering that Mr. Reyna's possession of this particular firearm was, at least when he wasn't dealing marijuana, perfectly legal. It was his own obliteration of the serial number that turned the firearm into something else.

[3] Nothing in N.Y. State Rifle undermines Heller's discussion of textual limits on types of firearms. The N.Y. State Rifle Court applied Heller and purported to clarify, not change, its methodology. N.Y. State Rifle v. Bruen, 142 S. Ct. at 2128-2129; id. at 2131 ("The test that we set forth in Heller and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."); id. at 2134 ("Having made the constitutional standard endorsed in Heller more explicit, we now apply that standard to New York's proper-cause requirement."); id. at 2138 ("Under Heller's text-and-history standard, the proper-cause requirement is therefore unconstitutional."); see also id. at 2161 (Kavanaugh, J., concurring) ("The Court employs and elaborates on the text, history, and tradition test that Heller and McDonald require for evaluation whether a government regulation infringes on the Second Amendment.").

Guns with obliterated serial numbers belong to "those weapons not typically possessed by law-abiding citizens for lawful purposes" so possession of such guns isn't within the *Second Amendment's* scope. *District of Columbia v. Heller, 554 U.S. at 625*. Guns with obliterated serial numbers are useful for criminal activity because identifying who possessed a firearm is more difficult when the serial number is destroyed. *United States v. Marzzarella, 614 F.3d 85, 98 (3d Cir. 2010)*. By using a gun without a serial number, a criminal ensures he has a greater higher likelihood of evading justice. Id. Mr. Reyna might be right that a deserialized gun is just as useful for self-defense as a gun with its serial number intact, but that doesn't suggest that deserialized guns are typically used by law-abiding citizens for lawful purposes. A law-abiding **[*12]** citizen who uses a gun for self-defense has no reason to prefer a deserialized gun to a gun with serial number intact. That a law-abiding citizen could use a gun with an obliterated serial number for lawful self-defense isn't evidence that guns with obliterated serial numbers are *typically* used by law-abiding citizens for lawful self-defense.

Mr. Reyna's objection that *§ 922(k)* reduces the pool of guns available to him for self-defense doesn't change the outcome. Prohibiting possession or use of a particular type of gun might bring a regulation within the *Second Amendment's* scope if the class of firearms is defined by its functionality. For instance, in *Heller*, the government argued that banning all handguns was permissible because a would-be gun owner could still possess some other type of gun, like a rifle. *District of Columbia v. Heller, 554 U.S. at 629*. The Court rejected that argument because of handguns' characteristics that make them helpful and common for lawful self-defense:

> It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon. There are many reasons that a citizen may prefer a handgun for home defense: It is easier to store in a location that is readily accessible **[*13]** in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police. Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid.

*District of Columbia v. Heller, 554 U.S. at 629*.

While the prohibition in *Heller* applied to a class of guns defined by characteristics that brought them within the *Second Amendment's* scope (they are useful and common for lawful self-defense), the *§ 922(k)* prohibition applies to a class of guns defined solely by a nonfunctional characteristic: the serial number. *See United States v. Marzzarella, 614 F.3d at 94* ("Furthermore, it also would make little sense to categorically protect a class of weapons bearing a certain characteristic wholly unrelated to their utility. *Heller* distinguished handguns from other classes of firearms, such as long guns, by looking to their functionality.") (citing *District of Columbia v. Heller, 554 U.S. at 629*).

That *§ 922(k)*'s regulated conduct is outside scope of the *Second Amendment* is enough to decide Mr. Reyna's challenge to his indictment and guilty plea. Mr. Reyna's motion to dismiss must be dismissed on this basis so the court declines **[*14]** to consider whether the government's evidence of historical gun and gunpowder regulations justify *§ 922(k)*.

CONCLUSION

The *Second Amendment* right to keep and bear arms doesn't extend to arms that aren't typically possessed by law-abiding citizens for lawful purposes. Law-abiding citizens don't typically possess firearms with obliterated serial numbers for lawful purposes, so Mr. Reyna's indictment and guilty plea don't offend the *Second Amendment*. Accordingly, the court DENIES Mr. Reyna's motion to dismiss. [Doc. 28]. The court will schedule Mr. Reyna's sentencing hearing by separate order.

SO ORDERED.

ENTERED: December 15, 2022

/s/ Robert L. Miller, Jr.

Judge, United States District Court

🛈 Cited
As of: March 29, 2023 5:07 PM Z

## *United States v. Tallion*

United States District Court for the District of Maryland, Southern Division

December 12, 2022, Decided; December 13, 2022, Filed

Criminal Case No. 8:22-po-01758-AAQ

**Reporter**
2022 U.S. Dist. LEXIS 225175 *; 2022 WL 17619254

UNITED STATES OF AMERICA v. TERRY A. TALLION

## Core Terms

firearms, regulation, places, carrying, schools, weapons, on, plain text, courts, armed, lower court, prohibitions, self-defense, suggests, handgun, campus, carry a weapon, argues, dicta, constitutional right, government property, individual rights, carry a firearm, polling place, bear arms, comparable, forbidding, analogues, spaces, cases

**Counsel:** **[*1]** Terry A Tallion, Defendant, Pro se, Somerset, PA.

For Terry A Tallion, Defendant: Rosana E Chavez, LEAD ATTORNEY, Office of the Federal Public Defender, Greenbelt, MD.

For USA, Plaintiff: Ellen E. Nazmy, LEAD ATTORNEY, US Attorneys Office, Greenbelt, MD USA; Jason Daniel Medinger, LEAD ATTORNEY, Office of the United States Attorney, Baltimore, MD.

**Judges:** Ajmel A. Qureshi, United States Magistrate Judge.

**Opinion by:** Ajmel A. Qureshi

## Opinion

### MEMORANDUM OPINION

This case concerns the alleged possession of a firearm on government property in violation of *45 C.F.R. § 3.42(g)*. Before the Court is Defendant Terry A. Tallion's Motion to Dismiss (ECF No. 11). For the reasons discussed below, Mr. Tallion's Motion to Dismiss shall be DENIED.

### BACKGROUND

According to the United States' allegations against him, on March 20, 2022, Defendant Terry A. Tallion drove to the National Institutes of Health ("NIH") and attempted to enter the West Drive Patient's Entrance as a visitor to the Clinical Center. ECF No. 11, at 2. Before Mr. Tallion was admitted, NIH security officers recovered a handgun from the center console of his car. *Id.* at 2. Mr. Tallion was then arrested and issued a citation for violating *45 C.F.R. § 3.42(g)*. ECF No. 1. He was subsequently released. ECF No. **[*2]** 11, at 2.

On June 21, 2022, Mr. Tallion had his initial appearance. ECF No. 2. On August 10, 2022, Mr. Tallion filed a Motion to Dismiss, arguing that the *Second Amendment* protects his conduct. ECF No. 11. The Government filed a Response to Mr. Tallion's Motion on August 30, 2022. ECF No. 15. Mr. Tallion filed a Reply to the Government's Response on September 29, 2022. ECF No. 16. A bench trial is currently scheduled for December 20, 2022. ECF No. 13.

### LEGAL STANDARD

Under *Federal Rule of Criminal Procedure 12*, the court should dismiss criminal charges "where there is an infirmity of law in the prosecution[,]" including where the underlying statute is unconstitutional. *United States v. Engle, 676 F.3d 405, 415 (4th Cir. 2012)*. Mr. Tallion argues that *§ 3.42(g)* is facially unconstitutional because it infringes on behavior the *Second Amendment* protects. ECF No. 11, at 2. "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno, 481 U.S. 739, 745, 107 S. Ct. 2095, 95 L. Ed. 2d 697*

2022 U.S. Dist. LEXIS 225175, *2

*(1987)*.

## DISCUSSION

Mr. Tallion has challenged *45 C.F.R. § 3.42(g)*, arguing that the regulation is unconstitutional under the Supreme Court's recent decision in *New York State Rifle & Pistol Association, Inc. v. Bruen, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022)*. In pertinent part, *45 C.F.R. § 3.42(g)* states:

> No person other than a specifically authorized police officer shall possess firearms, **[*3]** explosives, or other dangerous or deadly weapons or dangerous materials intended to be used as weapons either openly or concealed [on the campus of NIH].

*45 C.F.R. § 3.42(g)*.

## I. The Law after *Bruen*

The *Second Amendment* states, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." *U.S. Const. amend. II*. Over the last two decades, three Supreme Court cases have interpreted the *Second Amendment* to provide individual protections to possess and use firearms: *District of Columbia v. Heller, 554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008), McDonald v. City of Chicago, Ill., 561 U.S. 742, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010)*, and *New York State Rifle & Pistol Association, Inc. v. Bruen, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022)*. In *Heller*, the Court found that the *Second Amendment* protected an individual's right to keep and bear arms. *554 U.S. at 595*. In *McDonald*, the Court held that the *Second Amendment* applies to the states through the *Fourteenth Amendment's Due Process Clause*. *561 U.S. at 767-68*. After *Heller* and *McDonald*, Courts of Appeals generally applied a two-step test to determine whether a challenged law was constitutional:

> [t]he first question is whether the challenged law imposes a burden on conduct falling within the scope of the *Second Amendment's* guarantee. This historical inquiry seeks to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification. If it was not, then the challenged law is valid. If the challenged regulation burdens conduct that was

within the scope of the *Second Amendment* as historically understood, then **[*4]** we move to the second step of applying an appropriate form of means-end scrutiny.

*Woollard v. Gallagher, 712 F.3d 865, 875 (4th Cir. 2013)* (citing *United States v. Chester, 628 F.3d 673, 680 (4th Cir. 2010)*). This two-step test was abrogated in *Bruen*, which rejected the lower courts' use of means-end testing and interest balancing. *142 S. Ct. at 2129-30*. Instead, the Court instructed lower courts to focus on history — first, asking whether the statute prohibits conduct that is protected by the *Second Amendment's* plain text. If the statute prohibits protected conduct, it is presumptively unconstitutional unless the Government can show that the limitation is "consistent with the Nation's historical tradition of firearm regulation." *Id. at 2130*. The test requires analogical reasoning, asking lower courts to thread the needle between "[upholding] every modern law that remotely resembles a historical analogue" and striking down all laws that lack a precise historical twin. *Id. at 2133*.

Perhaps aware that the abrogation of the two-step test would raise some questions regarding the constitutionality of existing firearm regulations, the Court was careful to incorporate certain familiar paths for regulating weapons. *See United States v. Minter, No. 3:22-CR-135, 2022 U.S. Dist. LEXIS 190390, 2022 WL 10662252, at *3 (M.D. Penn. Oct. 18, 2022)* ("The Supreme Court in *Bruen* took great effort to not undermine its prior decisions in *Heller* and *McDonald* and to repeatedly underscore the continued validity of **[*5]** those decisions."); *2022 U.S. Dist. LEXIS 190390, [WL] at *4* ("This observation in *Bruen* is entirely consistent with *Heller's* recognition of the legality of . . . 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings . . . '" (quoting *Heller, 554 U.S. at 626-627*)).

For example, *Bruen, McDonald*, and *Heller* preserved the idea that the government could "[impose] conditions and qualifications on the commercial sale of arms." *Bruen, 142 S. Ct. at 2162* (Kavanaugh, J., concurring) (quoting *McDonald, 561 U.S. at 786*, and *Heller, 554 U.S. at 626-27*). This structure "makes sense because commercial regulations that apply only to manufacturers and sellers do not implicate an individual's right of possession." *United States v. Price, No. 2:22-cr-00097, 2022 U.S. Dist. LEXIS 186571, 2022 WL 6968457, at *2 (S.D. W. Va., Oct. 12, 2022)*. A district court addressing one of these laws post-*Bruen* held that the "natural reading of 'keep and bear arms' does not include the

ability to sell or transfer firearms unrestricted," so commercial regulations do not impede rights covered under the *Second Amendment's* plain text. *United States v. Tilotta, No. 3:19-cr-04768-GPC, 2022 U.S. Dist. LEXIS 156715, 2022 WL 3924282, at *6 (S.D. Cal. Aug. 30, 2022)*.

Additionally, and more relevant to this case, the Court in *Bruen* affirmed the use of the "sensitive places" doctrine. When explaining the new test, the Court specifically reaffirmed "'longstanding' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings[,]'" discussed in *Heller. Bruen, 142 S. Ct. at 2133* (quoting *Heller, 554 U.S. at 626*). The **[*6]** court validated such laws because "[a]lthough the historical record yields relatively few 18th-and 19th-century 'sensitive places' where weapons were altogether prohibited - *e.g.*, legislative assemblies, polling places, and courthouses — we are also aware of no disputes regarding the lawfulness of such prohibitions." *Bruen, 142 S. Ct. at 2133*. *Bruen* called for courts going forward to apply analogical reasoning to places beyond schools and government buildings, resulting in an expansive, but not limitless interpretation of what a sensitive place could be. Accordingly, while the Court rejected New York's argument that all places of public congregation could be considered sensitive places, the Court encouraged lower courts to "use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* Notably, the Court declined to "comprehensively define" sensitive places, only saying that New York had gone too far. *Id. at 2133-34*. In his concurrence, Justice Kavanaugh also highlighted the language in *Heller* and *McDonald* affirming the constitutionality of longstanding laws "forbidding the carrying **[*7]** of firearms in sensitive places such as schools and government buildings" and noting that the Court "identif[ies] these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id. at 2162* (Kavanaugh, J., concurring).

What little case law there is interpreting the "sensitive places" doctrine suggests an understanding of sensitive places in the context of firearms regulation extending beyond the specific types of government facilities which the Court named. Before *Bruen*, courts upheld charges for carrying weapons onto federal facilities in part justified by *Heller*. In *United States v. Giraitis*, the court upheld *18 U.S.C. § 930(e)(1)*, which barred carrying dangerous weapons into Federal court facilities. *127*

*F.Supp.3d 1, 3 (D.R.I. 2015)*. In so holding, the court cited to the language in *Heller* describing "government buildings as 'sensitive places' where firearm possession has historically been regulated." *Id.* (citing *Heller, 554 U.S. at 626*). Similarly, in *United States v. Dorosan*, the court upheld *39 C.F.R. § 232.1*, which barred carrying dangerous weapons onto postal property, because, in part, it fell within *Heller's* accepted longstanding prohibition on carrying firearms in sensitive places. *No. 08-042, 2008 U.S. Dist. LEXIS 49628, 2008 WL 2622996, at *6 (E.D. La. June 30, 2008)*. As the court said, *Heller* did not implicate or invalidate "gun control **[*8]** regulations banning possession of 'arms' *on federal property*." *Id.* Rather, *Heller* focused on laws that amounted to total bans and left ample space for regulations that "[fall] within the *Heller* Court's category and non-exhaustive list of [accepted] longstanding prohibitions on carrying firearms - *i.e.*, 'sensitive places such as schools and government buildings.'" *Id.* (quoting *Heller, 554 U.S. at 626*). As discussed *supra*, this is the language that *Bruen* specifically quoted, affirming that the reasoning in these two cases remains valid after *Bruen*.

Post-*Bruen* case law has been consistent on this point. After the Court struck down New York's licensing and regulation scheme in *Bruen*, the state passed a new law incorporating the Court's guidance. In pertinent part, the new law restrains the right to carry a firearm in "any place owned or under the control of federal, state or local government, for the purpose of government administration, including courts." *NY Penal § 265.01-e(2)(a)*. This new scheme was challenged in *Antonyuk v. Hochul*, in which plaintiffs alleged that the new regulation was also unconstitutional. *No. 1:22-cv-0986 (GTS/CFH), 2022 U.S. Dist. LEXIS 182965, 2022 WL 5239895 (N.D.N.Y. Oct. 6, 2022)*. The court denied an application for a TRO against the portion of the law prohibiting firearms in government buildings, finding such **[*9]** a limitation was permissible because "the Supreme Court has already expressly acknowledged the permissibility of these restrictions." *2022 U.S. Dist. LEXIS 182965, [WL], at *14* (citing *Bruen, 142 S. Ct. at 2133*).

The court's decision in *Antonyuk* also suggests that laws regulating government buildings may not require lower courts to engage in the same level of historical analysis as for other types of firearm regulations.[1] While the

_____

[1] Some courts which have found that *Bruen* did not invalidate regulations prohibiting the possession of firearms by persons

2022 U.S. Dist. LEXIS 225175, *9

court found defendants had not met their burden on other parts of the law because they failed to provide historical analogues, the court did not require comparable analogues for government buildings because of the express acknowledgements in *Heller* and *Bruen*. *See 2022 U.S. Dist. LEXIS 182965, [WL] at *14* ("Fortunately, the Court need not collect in a footnote citations to the many historical analogues restraining the right to carry a firearm in 'any place owned or under the control of federal, state or local government, for the purpose of government administration, including courts' . . . . This is because the Supreme Court has already expressly acknowledged the permissibility of these restrictions."). The court used a similar standard to deny a TRO against the State's prohibition on carrying firearms in polling places without a robust historical showing. *See 2022 U.S. Dist. LEXIS 182965, [WL] at *15* ("Just **[\*10]** as common in the historical record as the exception for government buildings . . . is the exception for locations

_____

with prior felony convictions have likewise found that a robust historical analysis was not required. *See Minter, 2022 U.S. Dist. LEXIS 190390, 2022 WL 10662252, at *4* ("[T]he Court here need not engage in an original analysis of whether the *Second Amendment's* plain text covers the possession of a firearm by a felon . . . where the Supreme Court in *Bruen* has already signaled the answer to this question."); *Price, 2022 U.S. Dist. LEXIS 186571, 2022 WL 6968457, at *8* ("I do not find it necessary to engage in the historical analysis test articulated in *Bruen* as to *18 U.S.C. § 922(g)(1)*. Rather, I am convinced that the Supreme Court left generally undisturbed the regulatory framework . . . in *Heller* and *McDonald*. [Defendant] essentially argues that *Bruen* should be taken to 'cast doubt on longstanding prohibitions on the possession of firearms by felons,' which is a marked departure from *McDonald* and *Heller* that was specifically not taken by the Supreme Court in *Bruen*."); *United States v. Jackson, No. 21-51 (DWF/TNL), 2022 U.S. Dist. LEXIS 164604, 2022 WL 4226229, at *2 (D. Minn. Sept. 13, 2022)* ("While Jackson would like this Court to scrutinize the history of felon-in-possession statutes, such examination is unnecessary at this time."). *But see Range v. Attorney General United States, 53 F.4th 262, 271 (3rd Cir. 2022)* ("*Bruen* still requires us to assess whether the Government has demonstrated through relevant historical analogues that *§ 922(g)(1)* 'is consistent with this Nation's historical tradition of firearm regulation.'"). However, courts have engaged in a robust historical analysis to strike down laws that prohibited individuals from possessing firearms if they had been indicted, but not yet convicted, of a crime. *See United States v. Stambaugh, No. CR-22-00218-PRW-2, 2022 U.S. Dist. LEXIS 206016, 2022 WL 16936043, at *3-6 (W.D. Okla. Nov. 14, 2022)*; *United States v. Holden, No. 3:22-CR-30 RLM-MGG, 2022 U.S. Dist. LEXIS 212835, 2022 WL 17103509, at *4-5 (N.D. Ind. Oct. 31, 2022)*.

being used as a polling place . . . (internal quotation marks omitted)).[2]

## II. Application

In his Motion to Dismiss, Mr. Tallion argues that the conduct prohibited by *§ 3.42(g)* is protected by the *Second Amendment's* plain text, that there is insufficient historical tradition barring individuals from possessing firearms in government buildings like NIH, and the "sensitive places" doctrine is merely unsupported dicta. ECF No. 11, at 9-13. In response, the Government argues both that the United States has plenary power to set the rules for what occurs on in its property and, in the alternative, that Mr. Tallion's challenge fails under the test established in *Bruen* because there is extensive regulation of firearms in government buildings that the Supreme Court has upheld. ECF No. 15, at 1-2. After evaluating the challenged regulation in the context of the law described above, I agree with the United States' second argument.

## A. The Plenary Power of the United States Does Not Allow It to Ignore Constitutional Rights.

The United States' primary argument, that its **[\*11]** plenary power "wholly undermines the defendant's claim and should end the matter", overstates its position. ECF No. 15, at 1; *see also id.*, at 5 ("As the landowner, the government has the *absolute* right to exclude and manage persons on its lands.") (emphasis added). Neither of the *Second Amendment* cases the United States cites support this broad-sweeping proposition. Rather, the fact that the alleged infraction occurred on government property was an additional basis to define "sensitive places" to include the property at issue, *see United States v. Class, 930 F.3d 460, 464, 442 U.S. App. D.C. 257 (D.C. Cir. 2019)* ("In sum, because the Maryland Avenue lot has been set aside for the use of government employees, is in close proximity to the

_____

[2] The court later denied the plaintiffs' motion for a preliminary injunction against the pieces of the regulation prohibiting concealed carrying of a firearm in "any place owned or under the control of federal, state or local government, for the purpose of government administration," finding that Plaintiffs lacked standing since none of them alleged an intention to carry concealed weapons in any of the listed locations in the immediate future. *Antonyuk v. Hochul, No. 1:22-cv-0986 (GTS/CFH), 2022 U.S. Dist. LEXIS 201944, 2022 WL 16744700, at *11-12 (N.D.N.Y. Nov. 7, 2022)*.

Capitol building, and is on land owned by the government, we consider the lot as a single unit with the Capitol building, and conclude that the lot is a "sensitive" place where firearms prohibitions are presumptively lawful."), or one of multiple reasons which together established that the government had an interest in the regulation for the purposes of a balancing test. *See United States v. Masciandaro, 638 F.3d 458, 473 (4th Cir. 2011)* (noting that the government's ownership interest in the property supports its position that it has a substantial interest in regulating the property as required to satisfy **[*12]** intermediate scrutiny).

Likewise, the sole case from outside the *Second Amendment* context involving constitutional rights that the United States cites turned on the scope of the constitutional right at issue, not the sweeping proposition that the United States may ignore constitutional rights if they do so on federal property. *See Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439, 449, 108 S. Ct. 1319, 99 L. Ed. 2d 534 (1988)* ("In neither case . . . would the affected individuals be coerced by the Government's action into violating their religious beliefs; nor would action either governmental action penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens."). In fact, the Supreme Court in *Lyng* went on to specifically reject the United States' present argument, explaining that had the government taken other actions, they would be prohibited even if the action occurred on federal land. *See id. at 453* ("The Constitution does not permit government to discriminate against religions that treat particular physical sites as sacred, and a law prohibiting the Indian respondents from visiting the Chimney Rock area would raise a different set of constitutional questions.").

None of the other cases from other contexts that the United States cites support **[*13]** the broad proposition the government advances. The cases concerned whether the Constitution provided a source of authority for the regulation at issue, *Kleppe v. New Mexico, 426 U.S. 529, 539-40, 96 S. Ct. 2285, 49 L. Ed. 2d 34 (1976)*, *United States v. City and County of San Francisco, 310 U.S. 16, 19, 60 S. Ct. 749, 84 L. Ed. 1050 (1940)*, or did not involve an alleged infringement upon an individual's or a group's constitutional rights. *See Utah Power and Light Co. v. United States, 243 U.S. 389, 411, 37 S. Ct. 387, 61 L. Ed. 791 (1917)* (explaining that the defendants had "been occupying and using reserved lands of the United States without its permission and contrary to its laws"); *Camfield v. United States, 167 U.S. 518, 522, 17 S. Ct. 864, 42 L. Ed. 260 (1897)* (involving defendants' enclosure of "public lands of the United States to the amount of 20,000 acres, and there is nothing tending to show that they had any claim or color of title to the same, or any asserted right thereto under a claim made in good faith under the general laws of the United States"); *United States v. Moriello, 980 F.3d 924, 933 (4th Cir. 2020)* ("Moriello summarily asserts that '[t]he challenged regulations interfere with [her] rights as a private citizen to disregard unwarranted exercise of authority.' (internal citations omitted)).

**B. Mr. Tallion's Behavior May Not Be Covered Under the Plain Text of the *Second Amendment*.**

Under *Bruen*, the first step is to determine whether the *Second Amendment's* plain text covers the conduct at issue. In this case, the question is whether the *Second Amendment* includes a right to carry weapons onto government complexes like the NIH campus. **[*14]**

Mr. Tallion argues that the *Second Amendment* covers his conduct because it secures the right of the people to keep and bear arms; since Mr. Tallion is a person and was carrying a handgun, a "quintessential 'arm' for *Second Amendment* purposes," he says his conduct is protected. ECF No. 11, at 10 (citing *Heller, 554 U.S. at 628-39*). Mr. Tallion alleges that, after *Bruen*, the right to bear arms "naturally encompasses public carry" since the purpose of the Amendment is to "guarantee[] an individual right to possess and carry weapons in case of confrontation, and confrontation can surely take place outside the home." ECF No. 11, at 10-11 (citing *Bruen, 142 S. Ct. at 2134*). In response, the Government argues that Mr. Tallion's conduct is not covered by the *Second Amendment* because, as interpreted by *Heller* and *Bruen*, the *Second Amendment* protects a right to "carry a firearm for protection in the general public" and that Mr. Tallion was carrying a firearm onto a "highly regulated, closely-scrutinized, heavily guarded government research facility" rather than in public. ECF No. 15, at 8.

It is not clear that the *Second Amendment* provides for the expansive reading that Mr. Tallion proposes — that a person is covered by the Amendment so long as they allege they were carrying a firearm, regardless of time, place and circumstance. **[*15]** In *Heller*, the Court found that the natural meaning of "bear" for the purpose of the *Second Amendment* was to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the

2022 U.S. Dist. LEXIS 225175, *15

purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *Heller, 554 U.S. at 584* (citing *Muscarello v. United States, 524 U.S. 125, 143, 118 S. Ct. 1911, 141 L. Ed. 2d 111* (Ginsburg, J., dissenting)). The *Heller* Court cited this definition in service of asserting an individual's right to bear arms outside of the context of military service. *Heller, 554 U.S. at 585-86*. As described in *McDonald*, the ultimate right recognized in *Heller* was the right to "possess a handgun in the home for the purpose of self-defense." *McDonald, 561 U.S. at 791. See also Bruen, 142 S. Ct. at 2133* ("As we stated in *Heller* and repeated in *McDonald*, 'individual self-defense is 'the *central component*' of the *Second Amendment* right.'") (quoting *McDonald, 561 U.S. at 767, Heller, 554 U.S. at 599*). In *Bruen*, the Court instructed lower courts to analyze whether a regulation "impose[s] a comparable burden on the right of armed self-defense." *Bruen, 142 S. Ct. at 2133*. Given this language, it is apparent the Court is primarily concerned about total prohibitions that leave individuals unable to have firearms for self-defense, particularly in — but not limited to — their homes. *See id. at 2135* ("Although we remarked in *Heller* that the need for armed self-defense is perhaps 'most acute' in the home, we **[\*16]** did not suggest that the need was insignificant elsewhere." (internal citations omitted)).

While *Bruen* changed the applicable test, the opinion left room for states to regulate the types of weapons people could have and where they could have them. For example, in *United States v. Hoover*, the court held that the *Second Amendment* did not protect the possession of unregistered firearm conversion devices, because the right therein does not protect weapons not typically possessed by law-abiding citizens for lawful purposes. *No. 3:21-cr-22(S3)-MMH-MCR, 2022 U.S. Dist. LEXIS 190258, 2022 WL 10524008, at \*13 (M.D. Fla. Oct. 18, 2022)*. In so holding, the court relied on that fact that *Bruen* did not overturn *Heller*, in which the Court recognized the importance of "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" and noted that every circuit that had addressed the issue post-*Heller* held that there was no *Second Amendment* right to possess a machine gun. *Id.* This case suggests that *Bruen* did not create an unfettered *Second Amendment* right to carry any type of firearm.

Congruently, *Heller* did not create an unfettered right to carry a gun anywhere. Applying *Heller*, the Fourth Circuit found limitations on carrying firearms in public to be permissible under the *Second Amendment* using the two-step test common before *Bruen. See Woollard, 712 F.3d at 868* (upholding Maryland's requirement **[\*17]** that one must have a "good and substantial reason" to transport a weapon in public). *Woollard* does not provide a concise definition of what constitutes "public," either including or excluding government spaces. Indeed, it is perhaps because of *Heller*'s clear directive that few courts have addressed the constitutionality of regulating firearms on government property. *See Giraitis, 127 F.Supp.3d 1; Dorosan, 2008 U.S. Dist. LEXIS 49628, 2008 WL 2622996*, discussed *supra*.

While Mr. Tallion cites to *Woollard* for the contention that any place outside of the home is the "public" and thus protected by the *Second Amendment*, ECF No. 16, at 10, the court in *Woollard* explicitly noted that the issue in that case was not as broad as Mr. Tallion claims. Instead, the court characterized the defendant's argument as something narrower — whether there was a right to obtain a handgun permit "subject to lawful restrictions on carrying firearms in certain public locations." *Woollard, 712 F.3d at 878, n.7*. The party challenging the restriction in *Woollard* explicitly "acknowledge[d] that, included in the *Heller* Court's examples of '(presumptively lawful regulatory measures),' are 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings.'" *Id*. This language, as well as the limited discussion associated with it, suggests a lack of **[\*18]** controversy: after *Heller*, laws forbidding firearms on government property were broadly accepted as permissible.

This makes sense, given the narrower impact such laws have on individuals when compared with laws completely prohibiting the possession of firearms in any public or private space. As the Supreme Court wrote in *Bruen*, the laws struck down in *Heller* and *McDonald* were total bans on firearms. *See 142 S. Ct. at 2131* ("One of the District's regulations challenged in *Heller* 'totally ban[ned] handgun possession in the home.'"); *McDonald, 561 U.S. at 750* ("The city of Chicago (City) and the village of Oak Park, a Chicago suburb, have laws that are similar to the District of Columbia's, but Chicago and Oak Park argue that their laws are constitutional because the *Second Amendment* has no application to the States."). Contrary to Mr. Tallion's assertions, *§ 3.42(g)* is not a total prohibition on firearm possession comparable in geographic scope to those the Court struck down in *Heller* and *McDonald*. ECF No. 11, at 9. Rather, *§ 3.42(g)* operates as a partial restriction limiting the places in which a person can carry a firearm. Mr. Tallion points to no language in any of the decisions that suggests the right to bear defined

in *Heller* includes a right to carry weapons onto federal property: such a contention **[*19]** falls directly in conflict with the language in *Heller* preserving firearm regulations in sensitive places.

*Bruen* does not alter the conclusion that the location the regulation affects remains relevant to assessing whether the *Second Amendment* covers the conduct. While *Bruen* acknowledged that an individual's right to carry handguns for their self-defense extends, to some degree, to public spaces, *142 U.S. at 2134-35*, as discussed above, the Court specifically exempted regulations barring the carrying of firearms in sensitive places.

Ultimately, although the plain text of the *Second Amendment* does not distinguish government buildings from the general public, the Court's express protection of laws preventing carrying firearms in sensitive places suggests that "a right to carry handguns publicly" may not extend to the highly regulated context of federal facilities. As this case can be disposed of under prong two of the test in *Bruen*, I need not determine whether the plain text of the *Second Amendment* includes a right to carry firearms onto federal campuses like NIH.

### C. § 3.42(g) is Consistent with Historical Regulations Preventing Carrying Weapons onto Government Property.

Even assuming the plain text of the *Second Amendment* covers Mr. Tallion's conduct, his challenge fails because the **[*20]** Supreme Court has found laws like *§ 3.42(g)* to be consistent with the nation's historical regulation of firearms.

The second step of the *Bruen* analysis is to determine whether *§ 3.42(g)* is consistent with the United States' historical tradition of regulating firearms. If a statute or regulation implicates conduct that is protected by the *Second Amendment*, then that statute is presumptively unconstitutional unless the Government can show that "it is consistent with the Nation's historical tradition of firearm regulation." *Bruen, 142 S. Ct. at 2130*.

As noted above, Justice Thomas's majority opinion in *Bruen* reaffirmed *Heller* and *McDonald*: the government retains the ability to regulate firearms and prevent their carrying in certain sensitive areas, including, but not limited to, schools and government buildings. Because there were "no disputes regarding the lawfulness" of prohibitions on carrying weapons in sensitive places like

schools and government buildings, the Court concluded that "these locations were 'sensitive places' where arms carrying could be prohibited consistent with the *Second Amendment*." *Id. at 2133*. As the Court explained, the problem with the challenged law in *Bruen* was not that the State sought to apply the prohibition to a government building which lacked a precise **[*21]** historical twin, but rather that the State attempted to rely on the sensitive places doctrine to prohibit the carrying of firearms in all public places. *Id. at 2134* ("[E]xpanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly.").

Mr. Tallion encourages a narrow viewing of this language, suggesting that the "sensitive places" doctrine is limited to sites that "host core government operations, such as legislative assemblies, polling places, and courthouses." ECF No. 16, at 2. This argument is based on a misreading of *Bruen*. While it is true that "legislative assemblies, polling places, and courthouses" are listed as sensitive places in *Bruen*, it does not follow that those are the only permissible sensitive places. Rather, the Court specifically listed those places as examples of historical analogues justifying the exclusion of firearms from schools and government buildings, and encouraged lower courts to engage in similar analogical reasoning when determining whether regulations affecting spaces beyond schools and government buildings are constitutionally permissible. **[*22]** *Bruen, 142 S. Ct at 2133*. In essence, the Supreme Court has already engaged in the analogical reasoning regarding schools and government buildings which Mr. Tallion now asks this Court to conduct anew.

There is no language in any of the three major decisions that purports to limit the "sensitive places" doctrine, as Mr. Tallion argues, to "core" government functions. Mr. Tallion instead cites to, among other things, an amicus brief filed in *Bruen* by the Independent Institute suggesting that the early statutes focused on core functions of government. ECF No. 11, at 19 (citing *United States v. Bruen*, No. 20-843, Brief for Independent Institute as *Amicus Curiae*, at 7). However, that language was not incorporated into *Bruen*.[3]

---

[3] Likewise, Mr. Tallion relies on unincorporated portions of a law review article which the Court in *Bruen* cited. ECF No. 16, at 16. According to the article, "bans that apply to all government buildings do not" have historical precedent. *Id.*

Even if it were, a closer review of the amicus brief reveals that it would not support Mr. Tallion's case. The Independent Institute distinguished between areas where the government conducts "core functions of government" and "zones where government bureaucrats conduct ministerial affairs" on the basis that the latter "do not provide comparable assurances of security as are typically seen in the latter." ECF No. 15-2, at 7-8, n. 4; *see also id.* at 13 ("With America's Declaration of Independence **[*23]** from Britain, gun-free zones expanded slightly to meet the changing times. They were, however, still limited to areas in which the government provided the requisite security to compensate for the deprivation of the self-defense right."). The NIH campus, as the United States explains, does provide such assurances of security. NIH is a closed campus with limited entry points, each of which is monitored by police officials who inspect each vehicle upon entrance and allow entry only during certain time periods. ECF No. 15-1, at 1-2; ECF No. 15-3, at 1-3. As part of such, drivers are required to present their driver's license and open the trunk and/or hood of their car. ECF No. 15-1, at 2. Once on campus, employees and visitors must continue to wear their identification prominently at all times while on campus. ECF No. 15-3, at 5. Although Mr. Tallion attempts to compare NIH to the areas at issue in *Bruen*, all areas of public congregation, given the specific security measures at NIH, I cannot accept that these differences in security "make no difference." ECF No. 16, at 19.

Mr. Tallion further suggests that the "sensitive places" doctrine is mere dicta and thus is not binding on lower courts. **[*24]** ECF No. 11, at 13. Mr. Tallion is correct that some language quoted in *Bruen* can be categorized as dicta, and courts are "not bound by dicta or separate opinions of the Supreme Court." *Myers v. Loudoun Cnty. Pub. Schs., 418 F.3d 395, 406 (4th Cir. 2005).* However, the Fourth Circuit has emphasized that "[w]e routinely afford substantial, if not controlling deference to dicta from the Supreme Court." *Hengle v. Treppa, 19 F.4th 324, 347 (4th Cir. 2021)* (citing *Manning v.*

*Caldwell, 930 F.3d 264, 281 (4th Cir. 2019)* (en banc)); *McCravy v. Metro. Life. Ins. Co., 690 F.3d 176, 181 n.2 (4th Cir. 2012)* ("[W]e cannot simply override a legal pronouncement endorsed just last year by a majority of the Supreme Court."). Contrary to Mr. Tallion's assertions, the discussion of "sensitive places" is neither "peripheral" nor "cursory," but rather reflects the considered judgement of majorities in three Supreme Court opinions. *See* ECF No. 11, at 13 ("Where the Supreme Court's discussion of an issue is 'peripheral or 'cursory,' courts need not defer to it.") (citing *Hengle, 19 F.4th at 347*). The language addressing the constitutionality of regulations regulating the commercial sale of firearms could be similarly categorized as dicta, yet courts have upheld these and similar regulations on the basis of the Supreme Court's language.[4] *See Tilotta, 2022 U.S. Dist. LEXIS 156715, 2022 WL 3924282, at *3.*

Given the clear language in *Bruen* and the consensus adopted by other district courts on comparable issues, there **[*25]** is no need for this Court to conduct an historical analysis anew. It is clear that the Supreme Court has left undisturbed regulatory schemes preventing individuals from carrying firearms into government buildings such as the NIH campus. Accordingly, *§ 3.42(g)* does not violate the *Second Amendment*.

## CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Mr. Tallion's Motion to Dismiss be DENIED. A separate Order shall issue.

/s/ Ajmel A. Quereshi

United States Magistrate Judge

Date: December 12, 2022

ORDER

Pending before the Court is Defendant Terry A. Tallion's Motion to Dismiss (ECF No. 11). For the reasons set forth in the accompanying Memorandum Opinion, it is

---

(quoting David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms, 13 CHARLESTON L. REV. 205, 289 (2018)*). Again, regardless of what the article may have said, the Court in *Bruen* did not adopt this language or include this language in its decision. Rather, even if relatively few places in the 18th and 19th centuries may have banned firearms altogether, the Court used analogical reasoning to conclude that prohibitions on firearms in sensitive places such as schools and government buildings are lawful.

---

[4] *See also Range, 53 F.4th at 271* (upholding prohibition on possession of firearms based, in part, on similar language in *Heller*, *McDonald* and *Bruen*); *Price, 2022 U.S. Dist. LEXIS 186571, 2022 WL 6968457, at *8* ("Relying on the same dicta in the wake of *Bruen*, at least nine federal district courts have rejected constitutional challenges to *Section 922(g)(1)*.").

2022 U.S. Dist. LEXIS 225175, *25

this **12th** day of **December, 2022**, hereby

**ORDERED**, Defendant Terry A. Tallion's Motion to Dismiss (ECF No. 11) is **DENIED**.

Date: December 12, 2022

/s/ Ajmel A. Quereshi

United States Magistrate Judge

---

**End of Document**

 Neutral

As of: March 29, 2023 4:50 PM Z

## *Siegel v. Platkin*

United States District Court for the District of New Jersey, Camden Vicinage

January 30, 2023, Decided; January 30, 2023, Filed

Civil No. 22-7464 (RMB/AMD)

**Reporter**

2023 U.S. Dist. LEXIS 15096 *; __ F.Supp.3d __; 2023 WL 1103676

AARON SIEGEL, et al., Plaintiffs, v. MATTHEW PLATKIN, et al., Defendants.

**Prior History:** *Koons v. Reynolds, 2023 U.S. Dist. LEXIS 3293, 2023 WL 128882 (D.N.J., Jan. 9, 2023)*

## Core Terms

firearms, handguns, regulation, casino, places, Plaintiffs', carrying, restrictions, private property, self-defense, facilities, concealed, provisions, beaches, public park, Zoo, playgrounds, temporary restraining order, schools, preliminary injunction, plain text, demonstrating, declarations, covers, entertainment, museums, licensed, temporarily, restaurant, analogues

**Counsel:** **[*1]** On behalf of Plaintiffs: Daniel L. Schmutter, Hartman & Winnicki, P.C., Ridgewood, NJ.

On behalf of New Jersey State Defendants: Angela Cai, Deputy Solicitor General, Jean Reilly, Assistant Attorney General, David Chen, Deputy Attorney General, Amy Chung, Deputy Attorney General, Viviana Hanley, Deputy Attorney General, Chandini Jha, Deputy Attorney General, Samuel L. Rubinstein, Deputy Attorney General, Office of the New Jersey Attorney General, Trenton, New Jersey.

**Judges:** Renée Marie Bumb, United States District Judge.

**Opinion by:** Renée Marie Bumb

## Opinion

**BUMB, United States District Judge**:

This matter comes before the Court upon the Motion for a Temporary Restraining Order and Preliminary Injunction by individual plaintiffs Aaron Siegel, Jason Cook, Joseph Deluca, Nicole Cuozzo, Timothy Varga, Christopher Stamos, Kim Henry, and the Association of New Jersey Rifle and Pistol Clubs, Inc. (collectively, the "Plaintiffs" or "Siegel Plaintiffs") against Defendants Matthew Platkin in his official capacity as Attorney General of New Jersey and Patrick J. Callahan in his official capacity as Superintendent of the New Jersey Division of State Police (the "State" or "Defendants"). On December 23, 2022, Plaintiffs filed a **[*2]** Motion for a Temporary Restraining Order and Preliminary Injunction (the "Motion"). [Docket No. 8]

In addition to opposing the Motion, Defendants filed an Emergency Motion for Consolidation before the Honorable Karen M. Williams, U.S.D.J. [Docket No. 7.] Judge Williams held a hearing on January 12, 2023, and thereafter granted the Motion to Consolidate, in part. This matter has now been consolidated into *Koons v. Reynolds, __ F.Supp.3d __, Case No. 22-CV-7464, 2023 U.S. Dist. LEXIS 3293, 2023 WL 128882 (D.N.J. Jan. 9, 2023)*, a case brought

by individual plaintiffs Ronald Koons, Nicholas Gaudio, and Jeffrey Muller, *Second Amendment* Foundation, Firearms Policy Coalition, Inc., Coalition of New Jersey Firearm Owners, and New Jersey *Second Amendment* Society (together, the "Koons Plaintiffs") against the New Jersey Attorney General, Matthew J. Platkin, Superintendent of the New Jersey State Police, Patrick Callahan and County Prosecutors William Reynolds (Atlantic County Prosecutor), Grace C. Macaulay (Camden County Prosecutor), and Annemarie Taggart (Sussex County Prosecutor) (together, the "Koons Defendants").

On January 5, 2023, this Court heard oral argument on the Koons Plaintiffs' separate Motion for a Temporary Restraining Order. Like the Siegel Plaintiffs here, the Koons Plaintiffs challenged New Jersey's recently enacted legislation. **[*3]** By Opinion and Order dated January 9, 2023, this Court agreed with the Koons Plaintiffs and entered an Order temporarily restraining the Koons Defendants, their officers, agents, servants, employees and attorneys from enforcing several provisions of *Chapter 131 of the 2022 Laws of New Jersey*, to wit, Section 7(a), Subparts 12, 15, 17, and 24, and Section 7(b)(1).

Unlike the Koons Plaintiffs, the Siegel Plaintiffs also assert challenges to additional "sensitive place" designations, as well as other new requirements applicable to concealed carry permit holders in Chapter 131. On January 26, 2023, the Court held oral argument on the Siegel Plaintiffs' Motion. For the reasons set forth below, the Motion will be granted, in part, and denied, in part.

## I. BACKGROUND

The legislation at issue here, Chapter 131, was enacted in response to the United States Supreme Court decision in New York State

Rifle & Pistol Ass'n, Inc. v. Bruen, which held "that the *Second* and *Fourteenth Amendments* protect an individual's right to carry a handgun for self-defense outside the home." *597 U.S. ___, 142 S.Ct. 2111, 2122, 213 L. Ed. 2d 387 (2022)*. The Bruen Court struck down a New York statute that required an applicant for a concealed carry permit to demonstrate "proper cause," and acknowledged the unconstitutionality of analogous statutes in other states that required a "showing of **[*4]** some additional special need," such as New Jersey's law requiring that an applicant show "justifiable need" to obtain a license to carry. Id. at 2124 n.2.

In response to Bruen, the New Jersey Legislature passed sweeping legislation. On December 22, 2022, New Jersey Governor Phil Murphy signed into law Chapter 131 of the 2022 Laws of New Jersey that imposed a new set of requirements, many of which became effective immediately, including declaring certain locations as "sensitive places" where handguns are prohibited even by licensed carriers, as well as a ban on carrying functional guns in vehicles.

The Koons Plaintiffs, licensed carriers, alleged that the newly-enacted legislation was unconstitutional as to several provisions; however, they did not challenge most provisions of the legislation. The Siegel Plaintiffs, both licensed carriers and those in the process of obtaining licenses to carry, are not so surgical. Both sets of Plaintiffs, however, contend that the legislation saps the Bruen ruling of any significance, as it makes the lawful carrying of arms effectively impossible in almost all of New Jersey.

## A. Plaintiffs' Complaint

Plaintiffs challenge Chapter 131 on several constitutional grounds, **[*5]** including deprivation of Plaintiffs' rights under the

_Second_ and _Fourteenth Amendments_ (Count One), _Equal Protection_ (Count Two) and _Due Process_ (Count Three) under the _Fourteenth Amendment_, and various _First Amendment_ challenges (Counts Four, Five, and Six).[1] [Docket No. 1 (the "Complt."), at 47-58.] According to Plaintiffs, the new legislation "renders nearly the entire State of New Jersey a 'sensitive place' where handgun carry is prohibited." [_Id._ ¶ 49.] They challenge fifteen Section 7 restrictions (unlike the _Koons_ Plaintiffs who challenged five restrictions) that prohibit carrying a handgun in a location classified by the state legislature as a "sensitive place," including a vehicle. Plaintiffs also seek to invalidate New Jersey laws that pre-date the newly enacted legislation, including statutes and regulations limiting firearms at parks, schools, casinos, and gaming properties. See N.J.S.A. 2C: 39-5(e); _N.J.A.C. 7:2-2.17(b)_; _N.J.A.C. 13:69D-1.13_; _N.J.A.C. 7:25-5.23 (a)_, _(c)_, _(f)_, _(i)_, and _(m)_ as unconstitutional sensitive place designations in light of the Supreme Court's dictate in Bruen. Finally, Plaintiffs challenge several of the permitting requirements, insurance requirements (Section 4), and fee increases (Sections 2 and 3) included in Chapter 131, but those challenges are not part of this emergent

Motion for temporary restraints. [*6] Because the parties' arguments, particularly those by Defendants, essentially mirror the arguments previously presented to this Court in _Koons_, the Court incorporates many of its applicable findings, as set forth below, from its earlier Opinion of January 9, 2023.

## B. Plaintiffs' Motion for a Temporary Restraining Order

First, Plaintiffs seek to immediately and temporarily enjoin enforcement of Section 7(a) of the legislation, as it relates to the following enumerated "sensitive places":[2]

1. Subpart 6 (prohibiting handguns "within 100 feet of a place for a public gathering, demonstration or event is held for which a government permit is required, during the conduct of such gathering, demonstration or event");
2. Subpart 9 (prohibition on carrying handguns at a zoo only[3] );
3. Subpart 10 (prohibiting handguns at "a park, beach, recreation facility or area or playground owned or controlled by a State, county or local government unit, or any part of such a place, which is designated as a gun free zone by the governing authority based on considerations of public safety");[4]

4. Subpart 11 (prohibiting handguns "at youth sports events, as defined in N.J.S.5: 17-1, during and immediately preceding in following the conduct of [*7] the event . . .");

---

[1] Plaintiffs contend that Chapter 131 "creates a costly and onerous obstacle to the exercise of the right to bear arms - one with no precedent in American history." [Complt. ¶ 59.] More specifically, in Count One of their Complaint, Plaintiffs assert _Second Amendment_ claims against most (beyond those challenged in the Koons case) of the "sensitive place" provisions in Section 7, as well as certain permitting provisions in Sections 2 and 3. Count 2 asserts Equal Protection claims against Section 8's exemptions for judges, prosecutors and attorneys general and Section 7 (a)(24)'s private property default rule. Count 3 asserts void-for-vagueness claims against certain provisions of Sections 2, 5, and 7, including (5)(a)(5) which makes it a crime of the fourth degree to engage in an "unjustifiable display of a handgun." Count 4 asserts a _First Amendment_ challenge again Section 7(a)(24). Count 5 asserts a _First Amendment_ challenge against certain permitting provisions in Section 3. Count 6 asserts a _First Amendment_ claim under Section 7(a)(12).

[2] Those provisions indicated with an asterisk ("*") were also challenged (and restrained by this Court) in _Koons_.

[3] Plaintiffs have not sought temporary restraints as to any of the other "sensitive places" expressly listed in Subpart 9, namely any "nursery school, pre-school, or summer camp."

[4] Relatedly, Plaintiffs challenge _N.J.A.C. 7:22.17(b)_.

5. *Subpart 12 (prohibiting handguns in "a publicly owned or leased library or museum");

6. *Subpart 15 (prohibiting handguns in "a bar or restaurant where alcohol is served, and any other site or facility where alcohol is sold for consumption on the premises");

7. *Subpart 17 (prohibiting handguns in "a privately or publicly owned and operated entertainment facility within this State, including but not limited to a theater, stadium, museum, arena, racetrack or other place where performances, concerts, exhibits, games or contests are held");

8. Subpart 18 (prohibiting handguns at "a casino and related facilities, including but not limited to appurtenant hotels, retail premises, restaurant and bar facilities, and entertainment in recreational venues located within the casino property);[5]

9. Subpart 20 (prohibiting handguns at "an airport or public transportation hub");

10. Subpart 21 (prohibiting handguns at "a health care facility, including but not limited to a general hospital, special hospital, mental psychiatric hospital, public health center, diagnostic center, treatment center, rehabilitation center, extended care facility, skilled nursing home, nursing home, intermediate [*8] care facility, tuberculosis hospital, chronic disease hospital, maternity hospital, outpatient clinic, dispensary, assisted living center, home health care agency, residential treatment facility, or residential healthcare facility");

11. Subpart 22 (prohibiting handguns in a "facility licensed or regulated by the Department of Human Services, Department of Children and Families or Department of Health, other than a health care facility, that provides addiction or

mental health treatment or support services)

12. Subpart 23 (prohibiting handguns at " a public location being used for making motion picture or television images for theatrical, commercial or educational purposes, during the time such location is being used for that purpose") ; and

13. *Subpart 24 (prohibiting handguns in "private property, including but not limited to residential, commercial, industrial, agricultural, institutional or undeveloped property, unless the owner has provided express consent or has posted a sign indicating that it is permissible to carry on the premises a concealed handgun with a valid and lawfully issued permit under _N.J.S.2C:58-4_, provided that nothing in this paragraph shall be construed to affect the authority [*9] to keep or carry a firearm established under _subsection e. of N.J.S.2C:39-6_").

_2022 N.J. Laws c. 131_.

Also in Section 7(a), Plaintiffs challenge Subpart 7, which prohibits handguns "in a school, college, university or other educational institution," because, they contend, the restriction could apply to multi-use properties that offer classes and the like might fall under the umbrella of this restriction. Id. Because they fear they will be exposed to criminal liability for carrying concealed in these multi-purpose properties, Plaintiffs challenge this restriction as well.

Moreover, Plaintiffs (like the Koons Plaintiffs) challenge Section 7(b) of the legislation that imposes an additional "sensitive place" ban on functional firearms in vehicles, and more specifically, making it a fourth degree offense to transport or carry a firearm "while in a vehicle in New Jersey, unless the handgun is unloaded and contained in a closed and securely fastened case, gunbox, or locked

---

[5] Relatedly, Plaintiffs challenge _N.J.A.C. § 13:69D-1.13_.

unloaded in the trunk of the vehicle." *Id.* The maximum sentence for this crime is 18 months' imprisonment. *See* N.J.S.A. §§ 2C:43-6(a)(4). Like the Koons Plaintiffs, Plaintiffs here point out the unconstitutional effect of Section 7(b): that licensed handgun carriers such as themselves now must transport a handgun in a vehicle **[*10]** the same way as someone who does not have a permit to carry from the State.

Finally, Plaintiffs seek a temporary restraining order barring the enforcement of several statutes and regulations that existed before Bruen was decided to the extent they restrict the type of ammunition a person may possess while in the woods, fields, marshlands, or on the water, or while hunting various game. Those are N.J.A.C. 7:25-5.23(m), N.J.A.C. 7:25-5.23(i), N.J.A.C. 7:25-5.23(a),(c), and (f) (to the extent they restrict the type of ammunition a person may possess while In the woods, fields, marshlands, or on the water, or while hunting various game and N.J.A.C. 7:25-5.23(f)(5)(requiring firearms to be unloaded and enclosed in a securely fastened case when in a motor vehicle). (Collectively the "Fish and Game Restrictions").

## C. Plaintiffs' Declarations, Backgrounds, and Daily Routines

In support of their request, Plaintiffs have submitted the sworn declarations of each individual Plaintiff. [See Docket No. 8.] Below, the Court has highlighted certain averments by some of the individual Plaintiffs most central to resolving the pending Motion.

Plaintiff Siegel, a handgun permit holder, lives in Hopatcong, New Jersey and is a registered nurse and a volunteer New Jersey Medical Reserve Corps. [Docket No. **[*11]** 8-2 ¶ 2-4.] He previously served as an Emergency Medical Technician, and in the course of his employment works "variously at medical offices and medical boarding homes." [Id. ¶ 7-

8.] Prior to the passage of Chapter 131, he frequently carried his handgun in the course of his medical work. [Id. ¶ 9.] He frequently hikes and walks his dog in public parks and publicly owned beaches. [Id. ¶ 11.] He takes his son to Tae Kwan Do classes at a martial arts school located in a strip mall and takes his son to participate in youth Tae Kwan Do competitions. [Id. ¶ 12.] He also frequently takes his son to "museums throughout New Jersey, the public library, the Turtle Back Zoo in West Orange, New Jersey and the Van Saun Zoo in Paramus, New Jersey." [Id. ¶ 13.] Every year he takes his son deer hunting. [Id. ¶ 15.] They go to movie theaters frequently. [Id. ¶ 16.] He "sometimes" attends New Jersey Devils Hockey games at the Prudential Center in Newark, New Jersey and, in doing so, "sometimes" takes the bus or train. [Id. ¶ 17.] He enjoys trips to the casinos in Atlantic City, New Jersey and dining out. [Id. ¶¶ 1819.] "From time to time" he drives his friends and family to the Newark Airport. [Id. ¶ **[*12]** 20.] Now that the law is in effect, he avers, he can carry his handgun "virtually nowhere outside [his] home." [Id. ¶ 45.]

Plaintiff Cook, a Handgun Carry Permit holder, is the general manager of a pharmacy in Willingboro, New Jersey. [Docket No. 8-3 ¶ 3.] He obtained a handgun carry permit because he is concerned about the area where he works, "which is an area that experiences elevated levels of crime." [Id. ¶ 6.] Similar to the other Plaintiffs, prior to the passage of Chapter 131, he carried his firearm to almost everywhere he went including medical appointments where he did not need to disrobe. [Id. ¶ 7.] Several times per month, he enjoys walking trails in State parks, and during the summer, the public beaches of the State. [Id. ¶ 8.] Several times per year, he enjoys "the Popcorn Park Zoo in Forked River, New Jersey, the Adventure Aquarium in Camden, New Jersey, and Jenkinson's Aquarium in Point Pleasant Beach, New Jersey. [Id. ¶ 11.]

2023 U.S. Dist. LEXIS 15096, *12

He enjoys dining out, going to the Atlantic City casinos, the theater, and Atco Dragway racetrack at Waterford Township, New Jersey. [Id. 1517.] He avers because of the extensive prohibitions set forth in Chapter 131, he "can carry [his] handgun **[*13]** virtually nowhere outside [his] home." [Id. ¶ 11.]

Plaintiff DeLuca, a Handgun Carry Permit holder, is an automotive repair mechanic in Marlton, New Jersey. [Docket No. 8-4 ¶ 3.] He avers many of the same routines and concerns similar to Plaintiffs Siegel and Cook.

Plaintiff Cuozzo, a firearms owner who is applying for Handgun Carry Permit, lives in New Egypt, New Jersey and is a member of the Bible Baptist Church there. [Docket No. 8-5 ¶¶ 36.] He is applying for his carry permit because he recognizes the violent crime that can take place anywhere including in places of worship. [Id. ¶ 5.]

Plaintiff Varga, a firearms owner who is applying for a Handgun Carry Permit, lives in Wall Township, New Jersey and is a Deacon of the Grace Bible Church there . [Docket No. 8-6 ¶¶ 1-3.] He is applying for his carry permit because, like Plaintiff Cuozzo, he recognizes the violent crime that can take place anywhere, including in places of worship. [Id. ¶ 5.] His church also has a "meager" budget for security. [Id. ¶ 17.]

Plaintiff Stamos, a Handgun Permit Holder, lives in Bayonne, New Jersey and is a data analyst. [Docket No. 8-7 ¶¶ 24.] He annually accompanies his wife to the Paddle the Peninsula event **[*14]** at 16th Street Park in Bayonne and enjoys the park several times per year. [Id. ¶ 67.] From "time to time" he takes his nephew to the park and the Cottage Street Park, but he has refrained from carrying his handgun to these parks because of the legislation. [Id. ¶ 9.]

Plaintiff Henry resides in Pemberton, New Jersey. She does not own and firearm but desires to apply for one. [Docket No. 8-8 ¶¶ 89.] She is a single mother of two children and lives "in constant fear from death threats from [her] ex-boyfriend." [Id. ¶ 9.]

### D. Defendants' Response

Defendants oppose the Motion, arguing first that Plaintiffs fail to establish Article III injury redressable by the issuance of a temporary restraining order. [See Docket No. 15 ("Defs.' Opp'n").] They argue that each Plaintiff has failed to establish a sufficiently imminent injury, and therefore, that standing is lacking such that the Court's jurisdiction is defective. [Id. at 1121.]

As to the merits of the Motion, Defendants contend that many of the provisions Plaintiffs challenge "fall outside the scope of the *Second Amendment* entirely." [Id. at 1.] Even if covered by the *Second Amendment*, Defendants also assert that the challenged provisions are supported by a historical tradition of firearm **[*15]** regulation consistent with the dictates of Bruen. [Id.] Defendants put the restrictions for which they claim there are supporting historical analogues into four categories: (1) locations for Government and constitutionally-protected activity; (2) locations where crowds gather; (3) locations where vulnerable or incapacitated people gather; and (4) private property without express permission of the property owner.[6]

## II. LEGAL STANDARD

*Federal Rule of Civil Procedure 65* governs the

---

[6] The Court reiterates its observation made in Koons that while the State dedicates a significant portion of its opposition discussing the benefits of firearms regulations, the Bruen Court was clear that this Court shall not venture into or consider interest balancing in this context.

issuance of temporary restraining orders and preliminary injunctions. In the Third Circuit, the four requirements Plaintiffs must satisfy to obtain the emergent injunctive relief sought are familiar ones:

> (1) a reasonable probability of eventual success in the litigation, and (2) that [they] will be irreparably injured ... if relief is not granted.... [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

_Reilly v. City of Harrisburg, 858 F.3d 173, 176 (3d Cir. 2017)_, as amended (June 26, 2017) (citing _Del. River Port Auth. v. Transamerican Trailer Transport, Inc., 501 F.2d 917, 919-20 (3d Cir. 1974)_ (citations omitted)). The Third Circuit has also made clear that "[p]reliminary injunctive **[*16]** relief is 'an extraordinary remedy' and 'should be granted only in limited circumstances.'" _Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004)_ (quoting _American Tel. & Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427 (3d Cir.1994)_). Temporary restraining orders have the same requirements and are "stay-put orders ... designed to maintain the status quo during the course of proceedings. They 'function[ ], in essence as an automatic preliminary injunction.'" _J.O. ex rel. C.O. v. Orange Twp. Bd. of Educ., 287 F.3d 267, 272 (3d Cir. 2002)_ (quoting _Drinker v. Colonial Sch. Dist., 78 F.3d 859, 864 (3d Cir.1996)_). However, relevant for purposes of appeal, "a party cannot be a prevailing party if the interim relief received is not merit-based." _Id. at 273_ (citations omitted).

## III. ANALYSIS

## A. Standing

For there to be a case or controversy before this Court under Article III, Plaintiffs must first satisfy their burden to establish standing. Plaintiffs must show "(i) that [they] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief. _TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2203, 210 L. Ed. 2d 568 (2021)_ (citing _Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)_). As this Court found in Koons, the State's demand that Plaintiffs allege a future, concrete time and date as to when they will visit each of Chapter 131's enumerated "sensitive places" is too demanding. After all, risk of future harm is sufficient "so long as the risk of harm is sufficiently **[*17]** imminent and substantial." _Id. at 2210_ (citations omitted). "[T]he injury required for standing need not be actualized. A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct." _Davis v. Fed. Election Comm'n, 554 U.S. 724, 734, 128 S. Ct. 2759, 2769, 171 L. Ed. 2d 737 (2008)_. The State is correct that Plaintiffs must demonstrate standing as to each claim. Id. However, once one plaintiff is found to have standing as to a claim, the Court need not inquire as to the standing of other plaintiffs on that claim for purposes of the Motion. See _Board of Education of Independent School District No. 92 of Pottawatomie County v. Earls, 536 U.S. 822, 826 n.1, 122 S. Ct. 2559, 153 L. Ed. 2d 735 (2002)_.

The Court now takes the opportunity to clarify its standing analysis. Both the Koons Plaintiffs and Siegel Plaintiffs allege, generally, that they have visited the challenged "sensitive places" in the past. However, the Court is not satisfied that the threat of criminal penalty for not

abiding by the requirements of Chapter 131 is *imminent* based on such allegations alone. What distinguishes the limited, challenged "sensitive places" in Koons from longer list of challenged places here is that in Koons the sensitive places were not only "generally open to the public and where ordinary persons like Plaintiffs would be expected to frequent upon occasion," but also places where the Koons Plaintiffs **[*18]** visited as part of their ordinary, daily routines. *Koons, 2023 U.S. Dist. LEXIS 3293, 2023 WL 128882, at *24*. Thus, the Court could determine from the Koons Plaintiffs' sworn declarations that the threat of criminal penalty was imminent if the Court did not temporarily enjoin enforcement of the applicable provisions. Conversely, here there is no imminent threat of criminal penalty in places infrequently visited by Plaintiffs' or locations where Plaintiffs make plans far in advance to visit and thus, are not likely to be a part of or "happened upon" as part of the Plaintiffs' ordinary, daily routines.

As to the other two standing requirements, four of the Plaintiffs (Siegel, Cook, DeLuca, and Stamos) have concealed carry permits and have sufficiently shown that the threatened injury they would suffer (*i.e.*, the threat of criminal prosecution) is redressable by judicial relief, and that each Defendant is a proper party for the reasons stated in their Complaint, affidavits, motion papers, and oral argument. [See Docket Nos. 8, 8-1, 8-2, 8-3, 8-7.] However, as noted earlier, unlike the Koons Plaintiffs who challenged a narrow category of sensitive places that are a part of their daily, ordinary life (public libraries and museums, bars/restaurants **[*19]** where alcohol is served, entertainment facilities, in vehicles, and on private property such as businesses), the Siegel Plaintiffs challenge far more restrictions. The Court now examines standing as to the challenged restrictions.

### i. The Overlapping "Sensitive Places" Restrained in Koons

As in Koons, each of four Plaintiffs who hold permits to carry handguns has submitted a sworn declaration that prior to Chapter 131, he exercised his carry permit in his day-to-day life, which included regularly going (typically by vehicle) to public libraries and museums, bars/restaurants where alcohol is served, entertainment facilities, and on private property such as commercial businesses. [Id.] Similar to what the Court found in Koons, the Siegel Plaintiffs' Complaint is that, at least as to these provisions, the restrictions are "so sweeping and comprehensive so as to make it largely impossible for most people to carry a handgun during the course of their typical day." [Complt. ¶ 55.] Each Plaintiff also has averred credible threats of prosecution, and there has been nothing presented to this Court to suggest that Defendants do not intend to enforce this legislation. Thus, the Court finds that, **[*20]** as holders of concealed carry permits, these Plaintiffs have standing to pursue the current relief as to Sections 7(a) Subparts 12(public libraries and museums), 15 (bars or restaurants where alcohol is served), 17 (entertainment facilities), and 7(a)(24)(private property), as well as 7(b)(1)( vehicles).

### ii. Zoos and Medical/Treatment Facilities

Plaintiff Siegel avers that he frequently visits two specific zoos in New Jersey, namely, "the Turtle Back Zoo in West Orange, New Jersey and the Van Saun Zoo in Paramus, New Jersey." [Docket No. 8-3 ¶ 13.] Plaintiff DeLuca avers that "[f]rom time to time" he enjoys Cape May Zoo. [Docket No. 8-4 ¶ 8.] Similarly, Plaintiff Cook visits the Popcorn Park Zoo in Forked River, New Jersey. With respect to the long list of medical/treatment facilities at Subparts 21 and 22, Plaintiff Siegel, who works as a nurse practitioner and previously

served as an EMT, makes these same kinds of specific allegations in relation to his standing; naming Skylands Urgent Care in Lake Hopatcong, New Jersey, and Free Clinic Newton, in Newton, Jersey as the facilities where he works.

However, the Defendants are correct that this level of specificity in Plaintiffs' declarations, without more, creates **[*21]** a traceability or redressability issue as to zoos, and medical or treatment facilities. What is conspicuously absent from Plaintiffs' declarations are allegations that but for Chapter 131, Section 7(a), Subparts 9, 21, and 22, they would conceal carry at Turtle Back Zoo, Van Saun Zoo, Cape May Zoo, Popcorn Park Zoo, Skylands Urgent Care, and Free Clinic Newton. In fact, the Court even suspects that several of these places maintain policies prohibiting firearms outright, in which case, Plaintiffs certainly would not be able to claim they would carry at these institutions "but for" Chapter 131.[7] Plaintiff Siegel also avers that he visits the homes of his patients in the course of his work, but the provision that addresses this aspect is Section 7(a)(24)'s broad prohibition against having firearms on all private property unless express permission is given by the owner (which Plaintiffs have standing to challenge, no doubt). Because of this traceability issue,[8] the Court finds that

---

[7] As to Subparts 20 and 21, the Court notes that even if Plaintiff Cook had standing based on a "guns allowed" policy at either Skylands Urgent Care or Free Clinic Newton, the relief he seeks — invalidating the entirety of both subparts — is overbroad. At most, Plaintiff Cook could challenge only those types of medical facilities he works at (*e.g.*, a clinic) and not the many other types of medical facilities listed (*e.g.*, a mental psychiatric hospital, rehabilitation center, nursing home, tuberculosis hospital, dispensary, etc.).

[8] To be sure, the same traceability issue was not present in Koons. The limited challenges to the sensitive place restrictions there clearly involved locations that were not only clearly a part of at least one of the Koons Plaintiffs' daily lives, but also because those provisions swept so broadly and applied to hundreds of locations (*e.g.*, anywhere that serves

Plaintiffs have failed to show standing to challenge these three provisions in this Motion for temporary restraints.

### iii. Airports and Movie Sets

With respect to the challenge to airports and movie sets, Plaintiffs' averments as to **[*22]** standing are also lacking. Such locations are clearly not locations where Plaintiffs frequent as part of their ordinary, daily lives. The Court also finds that averments of a past encounter, without more, do not establish that a revisit or reencounter is imminent. In fact, only two of the Plaintiffs declare that they have ever previously encountered a movie being filmed out in public, and *if* they encountered such a scene again, they would likely be deterred from carrying their handgun.

As to airports, Plaintiff Siegel declares that "[f]rom time to time" he drives his friends and family and drops them off and pick them up from Newark Airport. [Docket No. 8-2 ¶ 20.] This does not swear a sufficiently a concrete intention to go in the immediate future. Plaintiff Cook's Declaration fares no better as he swears that "[a]t least once per month," he drives his family members and drops them off or picks them up at Newark Airport or Atlantic City Airport. This does not set forth an intent to conceal carry in the immediate future. [Docket No. ¶ 18.] Air travel does not appear to be a part of any of the Plaintiffs' daily lives, but instead, depends on the lives and plans of others, to wit, their **[*23]** families and friends. Thus, the Court will also deny the Motion with respect to these specific provisions for lack of standing.

### iv. Fish and Game Restrictions

---

alcohol) judicial relief obviously alleviated the Plaintiffs' threatened injury.

2023 U.S. Dist. LEXIS 15096, *23

Plaintiffs also lack standing to seek emergency restraint of the Fish and Game Restrictions pre-dating Bruen. At most, Plaintiff Siegel alleges he goes deer hunting with his son annually. [Docket No. ¶ 15.] Yet, deer season in New Jersey is in the late autumn and early winter. N.J. DEP'T ENV'T PROT., N.J. FISH & WILDLIFE, *Deer Season and Regulations*, https://dep.nj.gov/njfw/hunting/deer-season-and-regulations/ (last updated Jan. 13, 2023). Thus, there is no imminent threat.

**v. Public Gatherings and Events**

At oral argument, Plaintiffs withdrew their application for a temporary restraining order as to Section 7(a)(6), prohibiting handguns "within 100 feet of a place for a public gathering, demonstration or event is held for which a government permit is required, during the conduct of such gathering, demonstration or event." The parties generally agree that Plaintiffs' averments as to public gatherings are limited to past attendance, and the Defendants expressed a concern that such a public gathering or event might not even occur during the relatively **[*24]** short TRO phase of litigation. [Tr. at 51.] However, because Plaintiffs were willing to withdraw their Motion as to this "sensitive place," Defendants withdrew their standing challenge for purposes of the longer, PI phase.[9]

**vi. Remaining Challenged "Sensitive Places"**

As to the remaining challenged provisions, the Court is satisfied that Plaintiffs have standing because such places are clearly part of at least one Plaintiffs' daily life.

With regard to parks and beaches,[10] the Court is satisfied that such places are part of several of the Plaintiffs' daily lives. Plaintiff Siegel avers that he frequently hikes and walks in public parks near his home; he also goes to publicly owned beaches including the Wildwood, New Jersey beach. [Docket No. 8-2 ¶ 11.] Plaintiff Cook enjoys walking trails in State parks several times per month. [Docket No. 8-3 ¶ 8.] Plaintiff DeLuca "regularly" enjoys walking his dog in State parks and on public beaches. [Docket No. 8-4 ¶ 7.]

With regard to youth sports events, Plaintiff Siegel declares that takes his son to Tae Kwan Do classes at a martial arts school near his home and he takes his son to participate in youth Tae Kwan Do competitions. [Docket No. 8-2 **[*25]** ¶ 11.]

With regard to casinos, Plaintiff Cook avers that "[o]nce per month" he enjoys trips to the casinos in Atlantic City. [Docket No. 8-2 ¶ 15.] Although a close call, the Court finds that this is sufficient to have standing for purposes of temporary relief. Further, Plaintiff DeLuca weekly visits a friend and must traverse through the waters owned by a casino. [Docket No. 8-4 ¶ 11.]

Like the Court found in Koons, these remaining "sensitive places" in Chapter 131 are places where these Plaintiffs ordinary routines often take them. They require little planning, and are integrated into the Plaintiffs' daily lives, as their Declarations demonstrate. As a result, they have shown an immediate threat of injury if they were to resume carrying

---

[9] The Court finds Plaintiffs' void for vagueness argument convincing but leaves the issue for another day. Moreover, it seems Plaintiffs would be unduly burdened, or even unable, to determine whether a particular public gathering or event is one for which a government permit is required.

---

[10] As in Koons, the Court reserves on the definitive question as to whether it should parse each "sensitive place" in the relevant provisions of the statute to find standing. However, Plaintiffs raise a good point that the legislature made an intentional decision as to how to group the sensitive places enumerated in the respective subparts of Section 7(a).

their concealed handguns with them as they did prior to the law's enactment. Having determined that Plaintiffs have standing as to some of the challenged restrictions, the Court turns next to the merits of the Motion.

## B. Likelihood of Success on the Merits and Bruen's Dictate of Historical Tradition

With respect to the challenged provisions of New Jersey law for which Plaintiffs have met their standing burden, the Court next considers Plaintiffs' likelihood **[*26]** of success on the merits.

The analysis by which the Court determines this prong is familiar to the parties. The Supreme Court in Bruen, in making "the constitutional standard endorsed in Heller more explicit," clarified that:

> the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The Government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition.

Bruen, 142 S. Ct. at 2129-30. The Court's role is a straightforward one: first, does the conduct being challenged fall within the text of the Second Amendment? If so, is there historical support for the conduct being restricted? Defendants must justify the provisions of Chapter 131 by "demonstrat[ing] that the regulation is consistent with this Nation's historical tradition of firearm regulation." Bruen, 142 S. Ct. at 2126.[11]

---

[11] By stating that Defendants must justify the regulation at issue, the Court does not mean to shift the burden that Plaintiffs have to obtain injunctive relief. Rather, it is a factor that this Court considers as to whether Plaintiffs have met their burden as to the likelihood of success on the merits prong.

## i. Subpart 10 (Parks, Beaches, Recreation Facilities, and Playgrounds); N.J.A.C § 7:2-2.17(b)

Section 7(a)(10) prohibits the carry of a firearm onto "a park, beach, recreation facility or area or playground owned or controlled by a State, county or local government unit, or any part of such a place, which is designated as a gun free zone by the governing authority based on considerations **[*27]** of public safety." 2022 N.J. Laws c. 131 § 7(a)(10). Plaintiffs contend that Subpart 10 violates their right to public carry.[12]

First, the Second Amendment's plain text covers the conduct in question (carrying a firearm in public for self-defense in the places identified in Subpart 10), so the threshold inquiry articulated in Bruen is met. As a result, Defendants must be able to rebut the presumption of protection against this regulation by demonstrating that the regulation is consistent with this Nation's historical tradition of firearm regulation. The Court proceeds in reverse order.

To begin, this Court will not grant the restraints Plaintiffs seek with respect to playgrounds. In Bruen and Heller, the Supreme Court expressly identified restrictions at certain sensitive places (such as schools) to be well-settled, even though the 18th-and 19th-century evidence has revealed few categories in number. Bruen, 142 S.Ct. at 2133 (citing Heller, 554 U.S. at 626)). The inference, the Court suggested, is that some gun-free zones are simply obvious, undisputed, and

---

[12] Plaintiffs also claim that an existing New Jersey law similarly restricts their right to public carry, as the statute prohibits the possession of firearms and other weapons "while on State Park Service property without the specific approval of the Superintendent or designee." [Pls.' Br. at 14 (quoting N.J.A.C. § 7:2-2.17(b)).] Because such law involves the same analysis as Subpart 10, the Court addresses them together.

2023 U.S. Dist. LEXIS 15096, *27

uncontroversial. These are: (a) certain government buildings (such as legislative assemblies or courthouses or where the Government is acting within the heartland of its authority), (b) polling places, and (c) schools. Id. Bruen [*28] further instructs courts to consider analogies to such sensitive places when considering whether the Government can meet its burden of showing that a given regulation is constitutionally permissible. Id.

Here, Defendants subsume playgrounds within their discussion of historical statutes that regulate firearms where crowds gather and where the vulnerable or incapacitated are located. [See Defs.' Opp'n at 34-35.] Unfortunately, Defendants neither point to a particular or analogous prohibition on carrying firearms at playgrounds nor provide a more meaningful analysis, despite this Court's persistent invitation. In particular, Defendants have done no analysis to answer the question Bruen leaves open: is it "settled" that this is a location where firearms-carrying could be prohibited consistent with the _Second Amendment_? Where the right to self-defense and sensitive place designations can be read in harmony under the _Second Amendment_? For that matter, nor have Plaintiffs. This issue must be explored at the preliminary injunction stage. Despite these shortcomings, the Court concludes that schools and playgrounds intersect, that is, playgrounds fall within the sphere of schools. Therefore, under Bruen, the Court "can assume [*29] it settled" that playgrounds are a "sensitive place." See Bruen, 142 S.Ct. at 2133. Accordingly, because Plaintiffs cannot meet their burden as to their challenge to playgrounds in Subpart 10, the Motion will be denied as to playgrounds.

Second, the Court considers "recreational facilities," another exceptionally broad catch-all. Defendants again situate their discussion of the historical evidence supporting a restriction on carrying firearms at such facilities under the banner of laws that restrict firearms where crowds gather and where the vulnerable or incapacitated are located. The Court observes that Defendants rely upon the same historical evidence that they invoked in Koons to support Subpart 17 (entertainment facilities). But the Court already explained why such evidence should be rejected. See _Koons v. Reynolds, 2023 U.S. Dist. LEXIS 3293, 2023 WL 128882, at *14-*15_. Finding that there is no reason to reach a different application here, the Court will grant Plaintiffs' Motion as to this restriction of Subpart 10 with respect to such facilities.

Third, the Court considers public beaches. Defendants have not come forward with any historical evidence at all to suggest that the right to public carry for self-defense on beaches is within our history or tradition, nor have Defendants [*30] put forward an analogue from which this Court could conclude that Subpart 10 is constitutional with respect to beaches. Without more, the Court finds that Plaintiffs' have shown a likelihood of success on the merits as to beaches. Bruen, 142 S.Ct. at 2130.

Fourth and finally, the Court considers public parks, which requires greater discussion as the State has provided something more for the Court to consider. Defendants cite to the following as historical analogues for the State's authority to restrict firearms in parks that are publicly owned or controlled. First, Defendants rely upon a Central Park Ordinance in New York from 1861. [See Defs.' Opp'n at 35 (citing Fourth Annual Report of the Commissioners of the Central Park 106 (1861)).] In that Ordinance, the Board of Commissioners of Central Park forbade all persons "[t]o carry firearms or to throw stones or other missiles within [the park]." The Ordinance set forth other prohibited activities as well, such as no climbing or walking up on the wall; no

livestock; entry by gateways only; and no injury to any parts of the park. [Id.] Defendants also cite to an Ordinance regarding Fairmount Park in Philadelphia. [See id. (citing Acts of Assembly Relating to [*31] Fairmount Park 18 (1870) ("No persons shall carry fire-arms, or shoot birds in the Park, or within fifty yards thereof, or throw stones or missiles therein.")).] The other provisions are similar to those of the Central Park Ordinance. Finally, Defendants present evidence that firearms were prohibited in parks in St. Louis, Missouri (1881), Chicago, Illinois (1881), St. Paul, Minnesota (1888), and Pittsburgh, Pennsylvania (1893).[13] Id.

The Court acknowledges that Defendants have attempted to comply with Bruen insofar as they have introduced several historical analogues from which this Court could conclude that Subpart 10 accords with our historical tradition of firearm regulation, as it relates to public parks. However, because Defendants' evidence is not convincing for at least three reasons, the Court will temporarily enjoin the prohibition on carrying in public parks. First, the statutes Defendants cite all refer to public parks *in a city* (*i.e.*, New York, Philadelphia, St. Louis, Chicago, St. Paul, and Pittsburgh). Thus, while there may be some historical precedent for restricting public carry in parks located in densely populated areas, Subpart 10 goes [*32] much further. It forbids firearms in any park "owned or controlled by a State, county or local government unit." *2022*

N.J. Laws c. 131 § 7(a)(10). The New Jersey State Park Service alone "administers over 452,000 acres of land comprising parks, forests, historic sites, and other recreation areas." N.J. DEP'T ENV'T PROT., N.J. STATE PARK                                                    SERV., https://www.nj.gov/dep/parksandforests/ (last updated Jan. 26, 2023). Accordingly, the evidence cited does not support the sweeping proposition that New Jersey may prohibit law-abiding firearm owners from carrying their firearms in *all* public parks; Subpart 10 is not constitutional as drafted.

Second, Defendants' city laws do not establish a historical *tradition* of restricting firearms in all public parks because the practice of restricting firearms in city parks is not representative of the nation. Accord *Antonyuk v. Hochul, F.Supp.3d , 2022 U.S. Dist. LEXIS 201944, 2022 WL 16744700, at *67 (N.D.N.Y. Nov. 7, 2022)*. Six cities do not speak for, what was by 1893, 44 states. [Pls.' Reply Br. at 19-20.] Under Bruen, the state's evidence is not sufficient for the broader proposition that carrying firearms can be forbidden in all public parks in the State of New Jersey.

Third, it is worth noting that even before Bruen, other courts have recognized that overbroad restrictions on carrying a firearm in or near public parks for self-defense may [*33] violate the *Second Amendment*. See, e.g., *People v. Chairez, 2018 IL 121417, 423 Ill. Dec. 69, 104 N.E.3d 1158, 1176 (Ill. 2018)* (ruling that prohibition on carrying a firearm within 1,000 feet of a public park is unconstitutional and observing that "the State [of Illinois] conceded at oral argument that the 1000-foot firearm restriction zone around a public park would effectively prohibit the possession of a firearm for self-defense within a vast majority of the acreage in the city of Chicago because there are more than 600 parks in the city"); *Bridgeville Rifle & Pistol Club v. Small, 176 A. 3d 632, 654 (Del. 2017)* (finding that, under

---

[13] As in Koons, there is uncertainty regarding whether the key time period for this Court's analysis of historical evidence is when the *Second Amendment* was adopted (*i.e.*, 1791) or when the *Fourteenth Amendment* was adopted (*i.e.*, 1868). [Compare Pls.' Br. at 37-38, with Defs.' Opp'n at 40-41 n.24.] "Because New Jersey's lack of support for its newly enacted legislation fails in either time period, . . . at this stage the Court need not decide this issue that had been left unresolved in Bruen." *Koons, 2023 U.S. Dist. LEXIS 3293, 2023 WL 128882, at *12 n.13* (citing *Bruen, 142 S. Ct. at 2163* ("Here, the lack of support for New York's law in either period makes it unnecessary to choose between them.") (Barrett, J., concurring)).

Delaware's Constitution, the State's designation of public parks as gun-free zones did "not just infringe—but destroy[ed]—the core . . . right of self-defense for ordinary citizens").

In light of these cases, and the reasons identified above, the Court finds that Defendants' have not put forward sufficient evidence at this juncture to justify their regulation of firearms in public parks. The analogous, existing restriction of _N.J.A.C §7:2-2.17(b)_, which requires the "specific approval" of the State Park Service to public carry on State Park Service lands, must be temporarily enjoined for the same reason. Accordingly, the Court finds that Plaintiffs have met their burden at this stage of showing a likelihood of success that the restrictions **[*34]** of Subpart 10 are unconstitutional as to public parks, beaches, and recreational facilities; they have not shown a likelihood of success with respect to playgrounds.

### ii. Subpart 11 (Youth Sports Events)

Plaintiffs also challenge Section 7(a), subpart 11, which bans handguns "at youth sports events, as defined in _N.J.S.A. 5:17-1_, during and immediately preceding and following the conduct of event." _2022 N.J. Laws c. 131 § 7(a)(11)_.[14] As defined in _Section 5:17-1(a)_, a "youth sports event" means "a competition practice or instructional event involving one or more interscholastic sports teams or sports teams organized pursuant to a nonprofit or similar charter or which are member teams in a league organized by or affiliated with a county or minutes or recreation."

First, the _Second Amendment's_ plain text covers the conduct in question (carrying a

concealed handgun for self-defense in public).

"_Bruen_ made clear that schools are paradigmatic sensitive locations where firearms can be banned." [Defs.' Opp'n at 35.] However, just as they argue with respect to playgrounds, Defendants also argue that the standard should be more broadly applied to any place where "great numbers of defenseless people (e.g., children) gather." [Id. at 36.]

As discussed above, the Supreme Court has recognized the permissibility **[*35]** of a restriction when it applies to "schools." See _Bruen, 142 S. Ct. at 2133_; _Heller, 554 U.S. at 626_. As the Court in _Heller_ stated, "[n]othing in our opinion should be taken to cast doubt on long-standing prohibitions on ... laws forbidding the carrying of firearms in sensitive places such as ... schools"). _Heller, 554 U.S. at 626_. Unfortunately, again, Defendants have done no meaningful analysis to answer the question as to whether this is a location that already is—or should be considered—settled, as _Bruen_ discusses. Both sides will need to explore this issue more fully at the preliminary injunction stage. For purposes of this Motion, the Court concludes that schools and youth sports events intersect, that is, youth sports events fall within the sphere of schools. Therefore, under _Bruen_, the Court "can assume it settled" that youth sports events are a "sensitive place." See _Bruen_, 142 S.Ct. at 2133. Accordingly, because Plaintiffs cannot meet their likelihood of success burden regarding their challenge to the youth-sports-events restriction, this part of the Motion is denied.

### iii. Subpart 12 (Public Libraries and Museums)

Section 7(a), subpart 12 bans handguns in "a publicly owned or leased library or museum." _2022 N.J. Laws c. 131_. First, the _Second_

---

[14] For reasons not clear to this Court, Plaintiffs challenge this restriction but not the restriction regarding "summer camps" in Section 7(a)(9).

*Amendment's* plain text covers the conduct in question (carrying a concealed handgun for **[\*36]** self-defense in public). For similar reasons set forth by this Court in Koons, the Court finds that the historical analogues provided by the State are not sufficient to rebut the presumption of *Second Amendment* protection.

Defendants point out that this Court appeared to have overlooked the scope of New Jersey's law when it stated that the restriction "does not limit libraries and museums to government-owned ones." [Docket No. 25 ("Defs.' Suppl. Br."), at 7 n.3.] It is true that the Court did, but that does not change the Court's conclusion. Defendants contend that the *Second Amendment* does not limit the Government's right to exclude from its own property those persons who do not conform with conditions of their license. [Defs.' Suppl. Br. at 7.] But this argument shortcuts their obligation under Bruen by claiming that the State may prohibit the carrying of handguns on government property as the owner. Nothing in the approach Bruen dictates says that the analysis depends upon whether or not the State is the owner of the property. Nothing in Bruen allows that. The cases that Defendants rely upon predate Bruen. Those cases also applied intermediate scrutiny in considering whether the Government could show that the regulation **[\*37]** was substantially related to the achievement of an important governmental interest. *Bruen, 142 S. Ct. at 2127*. This is now precluded and is no longer the test.

If the Government had to prove prior to *Bruen* that the regulation was narrowly tailored to achieve a compelling governmental interest, and after Bruen it must prove that the regulation is consistent with historical tradition, then what is clear is that the fact that whether the Government is the proprietor is not relevant before and after Bruen. Under the State's theory, any property it owned could be designated as gun-free. Yet, no one could seriously contend, for example, that the State could impose a gun-free highway system simply because it owns the infrastructure. Thus, before a state's regulation can pass constitutional master, it must satisfy Bruen regardless of whether the Government is the proprietor. Defendants have failed to rebut the presumption that *Second Amendment* protection applies here. The Court finds that Plaintiffs have therefore met their burden of showing that they will likely succeed in showing that this restriction is unconstitutional based upon the lack of historical evidence offered by the State.

### iv. Subpart 15 (Bars, Restaurants, Where Alcohol [\*38] is Served)

Subpart 15 bans handguns in "a bar or restaurant where alcohol is served, and any other site or facility where alcohol is sold for consumption on the premises." *2022 N.J. Laws c. 131 § 7(a)*. First, the *Second Amendment's* plain text covers the conduct in question (carrying a concealed handgun for self-defense in public). As a result, Defendants must rebut the presumption of protection against this regulation by demonstrating that the regulation is consistent with this Nation's historical tradition of firearm regulation. Defendants make the same arguments here that they did in Koons. Since nothing has changed since the Court's Opinion and Defendants have not offered any additional historical analogues despite this Court's instruction, the Court finds for the same reasons expressed in Koons that Plaintiffs have met their burden of showing that they are likely to succeed on their constitutional challenge as to this provision.

### v. Subpart 17 (Entertainment Facilities)

The Court repeats its impression noted in Koons, that is, subpart 17 of the statute is exceptionally broad, which makes it is a criminal offense to carry handguns in "a privately or publicly owned and operated entertainment facility within this State, including **[\*39]** but not limited to a theater, stadium, museum, arena, racetrack or other place where performances, concerts, exhibits, games or contests are held." _2022 N.J. Laws c. 131 § 7(a)._

First, the _Second Amendment's_ plain text covers the conduct in question (carrying a concealed handgun for self-defense in public). As a result, Defendants must rebut the presumption of protection against this regulation by demonstrating that the regulation is consistent with this Nation's historical tradition of firearm regulation. Defendants make the same arguments here that they did in Koons, nothing has changed since the Court's Opinion, and Defendants have not offered any additional historical analogues since then, despite this Court's invitation. Accordingly, for the reasons the Court expressed in Koons, Plaintiffs have met their burden of showing that they are likely to succeed on their constitutional challenge as to this provision.

## vi. Subpart 18 (Casinos); _N.J.A.C. § 13:69D-1.13_

Section 7(a), Subpart 18 prohibits firearms in "a casino and related facilities, including but not limited to appurtenant hotels, retail premises, restaurant and bar facilities, and entertainment and recreational venues located with the casino property." _2022 N.J. Laws c. 131 § 7(a)(18)._ Similarly, _N.J.A.C. § 13:69D-1.13_ prohibits firearms in casinos by establishing a default **[\*40]** exclusionary rule, similar in structure to Subpart 24 (private property), which is discussed below. See _infra_

§ III.B.vii. _Section 13:69D-1.13(a)_ provides the following:

> No person, including the security department members, shall possess or be permitted to possess any pistol or firearm within a casino or casino simulcasting facility without the express written approval of the Division provided that employees and agents of the Division may possess such pistols or firearms at the discretion of the director of the Division. At the request of the casino licensee's security department and upon its notification to the State Police, a law enforcement officer may, in an emergency situation, enter a casino or casino simulcasting facility with a firearm.

_N.J.A.C. § 13:69D-1.13(a)._ Additionally, the law provides that, to obtain permission from the Division of Gaming Enforcement to possess a firearm at a casino, the individual must demonstrate that: (1) "He or she has received an adequate course of training in the possession and use of such pistol or firearm"; (2) "He or she is the holder of a valid license for the possession of such pistol or firearm"; and (3) "There is a compelling need for the possession of such pistol or firearm within the **[\*41]** casino or casino simulcasting facility." Id. _§ 13:69D-1.13(b)._ Finally, the law provides that casino licensees must post a conspicuous sign stating the following: "By law, no person shall possess any pistol or firearm within the casino or casino simulcasting facility without the express written permission of the Division of Gaming Enforcement." Id. _§ 13:69D-1.13(c)._ Plaintiffs contend that Subpart 18 violates their right to public carry, [see Pls.' Br. at 36-38], and they argue that _N.J.A.C. § 13:69D-1.13_ is unconstitutional for the same reason, [see id. at 14-15]. Accordingly, they ask the Court to temporarily enjoin both laws.

First, the _Second Amendment's_ text plainly

covers the conduct in question (carrying a firearm in public for self-defense, at casinos), so the threshold question is met. See *Bruen 142 S. Ct. at 2126, 2129-30* ("When the *Second Amendment's* plain text covers an individual's conduct, the Constitution presumptively protects that conduct."). Accordingly, the burden to justify Subpart 18 and *N.J.A.C. § 13:69D-1.13* rests with Defendants. See id. at 2130 ("The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.").

Defendants have not come forward with strong historical evidence that the State may prohibit firearms at casinos or related **[*42]** facilities. Defendants point to the same statutes restricting firearms "where crowds gather," but the Court has already discussed, and distinguished, such evidence above. See supra §§ III.B.i (recreational facilities), III.B.v (entertainment facilities). It is not any more convincing as applied here. Because the State has not met its burden of showing that Subpart 18 or *N.J.A.C. § 13:69D-1.13* is within our Nation's historical tradition of firearm regulation, under Bruen the Court must temporarily enjoin such laws. See *142 S. Ct. at 2130*.

The Court will make a few additional observations. *Section 13:69D-1.13* reflects a blend of firearm regulation principles that have come into focus in this litigation thus far. The law represents a default rule forbidding a firearm owner from carrying his or her firearm at a designated location (*i.e.*, casinos), unless he or she has obtained permission to do so (here, it is "express written approval" from the Division of Gaming Enforcement). *N.J.A.C. § 13:69D-1.13(a)* (emphasis added). A default exclusionary rule for all casino licensees that situates approval authority in a government entity cannot cohere with the *Second*

*Amendment* test articulated in Bruen. The law wrests from casino licensees the power to exclude (or permit) firearms on their property. **[*43]** Additionally, *Section (b)* articulates threshold requirements that an individual must meet for the Division of Gaming Enforcement to approve a request to public carry at a casino. While the State of New Jersey may certainly condition the approval of a license to carry a firearm on any number of rational requirements, see Bruen, 142 S.Ct. at 2157 ("[Bruen] decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun") (Alito, J., concurring), it may not empower bureaucrats with the discretion to thereafter restrict the exercise thereof based on their assessment of an individual's "compelling need for the possession of such pistol or firearm." *N.J.A.C. § 13:69D-1.13(b)*. Finally, casino licensees are free to restrict firearms on their property, see *GeorgiaCarry.Org, Inc. v. Georgia, 687 F.3d 1244, 1264 (11th Cir. 2012)*, and the conspicuous notice is an established method of accomplishing that goal. But the State may not compel casino licensees to prohibit firearms on their property, nor to post a notice to accomplish the same. *N.J.A.C. § 13:69D-1.13(c)*. For these additional reasons, the Court temporarily enjoins *N.J.A.C. § 13:69D-1.13*.

Ultimately, Plaintiffs have met their burden of demonstrating a likelihood of success on the merits of their challenge to Subpart 18 and *N.J.A.C. § 13:69D-1.13*.

### vii. Subpart 24 (Private Property Unless Indicated [*44] Otherwise by Owner)

Subpart 24 of the statute deals with private property, which is broadly defined as:

  [P]rivate property, including but not limited

to residential, commercial, industrial, agricultural, institutional or undeveloped property, unless the owner has provided express consent or has posted a sign indicating that it is permissible to carry on the premises a concealed handgun with a valid and lawfully issued permit under N.J.S.A. 2C:58-4, provided that nothing in this paragraph shall be construed to affect the authority to keep or carry a firearm established under subsection e. of N.J.S.A. 2C:39-6.

2022 N.J. Laws c. 131 § 7(a)(24).

First, the plain text of the Second Amendment covers the conduct in question, so the threshold inquiry articulated in Bruen is met. See 142 S. Ct. at 2126, 2129-30 ("When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."). Accordingly, the burden to justify Subpart 24 rests with Defendants. See id. at 2130 ("The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."). Defendants make the same arguments that they did in Koons to justify Subpart 24 and offer no additional historical analogues. For the same reasons that this Court rejected Defendants' [*45] arguments in Koons, it rejects them here.

Likewise, the Court rejects as unpersuasive Defendants' supplemental arguments claiming that the Court erred in its prior analysis. First, Defendants argue that the Court's conclusion in Koons as to Subpart 24 "springs from its mistaken premise that the Second Amendment 'presumes the right to bear arms on private property' that belongs to another." [Defs.' Suppl. Br. at 6.] No such presumption exists, they claim, because Bruen only held that "'the Second Amendment's plain text . . . presumptively guarantees . . . a right to bear

arms in public for self-defense.'" [Id. (citing Bruen, 142 S. Ct. at 2135).] Drawing a distinction thus, Defendants seek to persuade this Court that the Second Amendment's text does not cover the right to public carry on someone else's private property, notwithstanding the Government's historical evidence. [Id.] At Oral Argument, Defendants doubled down and insisted that Bruen's articulation of the right makes evident that self-defense "in public" necessarily excludes private property, ostensibly because one cannot be "in public" on private lands. [See Tr. at 67 ("And there's no question that whether or not it's a private residence or a small business or any other private property, that's not [*46] what the Court was talking about when it said [']in public.[']"); see also id. at 67-76.] Second, they state that "there is simply no support in precedent for the idea that there is a presumptive right enshrined in the Constitution to bear arms on someone else's private property simply because the carrier does not know, and did not try to ascertain, whether the owner would consent." [Defs.' Suppl. Br. at 6.] And third, Defendants argue that the Court misread or overlooked their historical evidence. [Id. at 10-11.] The Court addresses each point in turn.

First, in their argument lurks a paralogism. The Second Amendment's text draws no distinction between one's right to bear arms for self-defense on either public or private property. Rather, as the Court confirmed in Bruen, the "textual elements" of the Second Amendment confirm that the right to "keep and bear arms" "outside the home" refers to one's right to "'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person.'" 142 S. Ct. at 2134 (quoting Heller, 554 U.S. at 584). Addressing the confrontation concern, this definition naturally encompasses one's right to public [*47] carry

on another's property, unless the owner says otherwise. After all, the _Second Amendment_ in no way "abrogated the well[-]established property law, tort law, and criminal law that embodies a private property owner's exclusive right to be king of his own castle." _GeorgiaCarry.Org, Inc. v. Georgia, 687 F.3d 1244, 1264 (11th Cir. 2012)_ (collecting historical citations). In other words, "the pre-existing right codified in the _Second Amendment_ does not include protection for a right to carry a firearm in a place . . . _against the owner's wishes_." Id. (emphasis added). Thus, because the _Second Amendment_ covers the conduct at issue, it is presumptively protected, unless Subpart 24 is consistent with this Nation's historical tradition of firearms regulation. _Bruen, 142 S. Ct. at 2135_.

Furthermore, Defendant's principal argument—that Bruen held the plain text of the _Second Amendment_ guarantees the right to bear arms in _public_, and therefore _public_ means _not private_—is wishful thinking. Bruen does not so hold. In discussing the right to carry, the Supreme Court distinguished between the need for self-defense in the home versus in public. And while the Court recognized that the need for self-defense is perhaps "most acute" in the home, it did not hold that the need was insignificant "elsewhere," or "outside the home." _Bruen, 142 S. Ct. at 2135_ (quoting _Heller, 554 U.S. at 628_). In fact, the Court **[*48]** observed that if the _Second Amendment_ applied only to the home, half of the Amendment would be nullified. Id. at 2134-35. By similar reasoning, if the _Second Amendment_ applied only to _publicly_-owned property, half of the Amendment (or more) would be nullified. In our state, the vast majority of property is privately owned.

Next, Defendants' second point is a misdescription of this Court's analysis. In Koons, the Court did not find that there is a

presumptive right to bear arms on someone else's private property simply _because_ the firearm carrier did not try to ascertain whether the land owner would consent. Instead, this Court applied the analytical structure endorsed in Bruen and concluded that (a) the _Second Amendment's_ text plainly protected the Koons plaintiffs' right to public carry for self-defense, including on the private property of others, unless the owners state otherwise (_i.e._, "that a rebuttable presumption to carry exists"), and (b) Defendants' purported historical evidence fell short of establishing that Subpart 24 is consistent with our history and tradition of firearms regulations. _Koons, 2023 U.S. Dist. LEXIS 3293, 2023 WL 128882, at *16_. As the Court further explained, a regulation that mandates a lawful permit holder "try to ascertain" the owner's consent transforms the presumption **[*49]** in favor of allowing the right to bear arms into a presumption against that right. Defendants are, "in essence, criminalizing the conduct that the Bruen Court articulated as a core civil right." Id.

Finally, Defendants' position has no basis in this country's history and tradition of firearms regulation. Generally, the historical practice of establishing sensitive place designations—or "gun-free zones"—has centered on a few distinct locations: (a) government buildings (such as legislative assemblies or courthouses or where the State is acting within the heartland of its authority), (b) polling places, and (c) schools. Bruen, 142 S.Ct. at 2133-34 (citing _Heller, 554 U.S. at 626_); see also Brief of Indep. Inst. as Amicus Curiae in Support of Petitioners at 7-8, Bruen, 142 S.Ct. 2111 (No. 20-843) (hereinafter, "Brief of Indep. Inst."). In the colonial and Founding era in particular, restrictions on the right to carry firearms in public appears to have been quite limited. The "'settlers had the liberty to carry their privately-owned arms openly or concealed in a peaceable manner,' and nine of the thirteen original colonies declined to regulate the

keeping or bearing of arms whatsoever." Brief of Indep. Inst., supra, at 12 (citing STEPHEN P. HALBROOK, THE RIGHT TO BEAR ARMS: A CONSTITUTIONAL RIGHT OF THE PEOPLE OR A PRIVILEGE OF THE RULING CLASS? 109 (2021)). Following Independence from Britain and **[*50]** throughout the 19th Century, some states began to experiment with gun-free zones, but aside from the categories outlined above, many of these restrictions were short-lived. See Brief of Indep. Inst., supra, at 11-17. Here, Defendants' rehash the same arguments regarding a 1771 New Jersey law and an 1865 Louisiana law that the Court analyzed, and disposed of, in Koons. [Defs.' Suppl. Br. at 10-11; see *2023 U.S. Dist. LEXIS 3293, 2023 WL 128882, at *17*.] They have provided no persuasive reason for this Court to reconsider its conclusions today.

In the end, Plaintiffs have met their burden of showing that they will likely succeed in proving that Subpart 24 is unconstitutional.

## viii. Section 7(b) (Functional Firearms in Vehicles)

Section 7(b) of Chapter 131 makes a vehicle essentially a prohibited sensitive place "unless the handgun is unloaded and contained in a closed and securely fastened case, gunbox, or locked unloaded in the trunk of the vehicle." *2022 N.J. Laws c. 131*. First, the *Second Amendment's* plain text covers the conduct in question (carrying a concealed handgun for self-defense in public). As a result, Defendants must be able to rebut the presumption of protection against this regulation by demonstrating that the regulation is consistent with this Nation's historical tradition of firearm regulation. Defendants make the same **[*51]** arguments that they did in Koons and offer no additional historical analogues. For the same reasons this Court rejected Defendants' arguments in Koons, it rejects them here.

Plaintiffs have met their burden of showing that they will likely succeed in proving that this provision is unconstitutional.

## ix. Subpart 7 (Multi-Purpose Facilities Relating to Schools)

Finally, Plaintiffs seek immediate relief against the State's restrictions on multi-use properties. In the lead-in to the enumerated list of "sensitive places" in Section 7(a) of Chapter 131, the statute also specifies that is applies "in any of the following places, including in or upon any part of the buildings, grounds, or parking area of..." *2022 N.J. Laws c. 131*. Another New Jersey statute, pre-dating Bruen, makes it a crime to "enter upon any part of the buildings or grounds of any school, college, university, or other education institution." *N.J.S.A. 2C:39-5(e)*. Plaintiffs' argument goes that, read in connection with Section 7(a)(7) which prohibits firearms in "a school, college, university or other educational institution," the restriction could include properties or places where "classes" that Plaintiffs attend. For example, Plaintiff Siegel is concerned that his presence at his son's Tae Kwon Do classes in **[*52]** a strip mall might fall within the restricted location.

At oral argument, the State alleviated Plaintiffs concerns that the law would be enforced against them in this unpredictable manner. Although the legislature did not include a new set of definitions as part of Chapter 131's long list of "sensitive places," there should be no doubt that the notion of what is and what is not a "school" for purposes of New Jersey law remains unchanged:

> THE STATE: [W]hat I can tell you is this: The school, college, university or other educational institution language has existed in *Section 2C:39-5* for at least 30 years. And [P]laintiffs have never challenged it before, at least these

plaintiffs as far as I know. So it cannot be a genuine issue to say I'm confused now by what the word "school" means. I will tell Your Honor that we think "school" means the meaning that it has in other parts of the New Jersey code. So it means places where people are regulated by other things that schools must have.

[Tr. at 30.] Going through the other classes Plaintiffs expressed a concern about being able to attend with their firearms (motorcycle classes, firearms training, Sunday school within a church, Tae Kwon Do, and bagpipe lessons), **[*53]** the State conceded that none of these classes fell within the tradition legal definition as to what constitutes a "school." [Tr. at 32.]

With respect to properties that have both restricted and non-restricted uses, the State clarified that other parts of the statute contain applicable exceptions as to common grounds:

> Section 7(d) talks about how a person would not be in violation if they're traveling along a public right-of-way that touches or crosses any of the places enumerated as sensitive, if they abide by the other carry provisions, you know, like carrying it on a holster and all that, which plaintiffs don't challenge.

[Tr. at 25.] Thus, Chapter 131 is only appliable in buildings or the part(s) of a building that have a restricted use, and thus, are a "sensitive place" when used as such. Further, the law excepts shared, public grounds, which includes parking areas and walkways.

Accordingly, the Court will deny the Motion as to Plaintiffs' challenges concerning multiuse property as moot.

## C. Plaintiffs Have Met the Requirements for Emergent Relief

Plaintiffs have made a strong showing of irreparable harm if the emergent relief is not granted. As discussed above, Plaintiffs have made a strong showing **[*54]** of constitutional injury given their *Second Amendment* rights as secured by the *Fourteenth Amendment*. This Court also agrees that "[i]n cases alleging constitutional injury, a strong showing of a constitutional deprivation that results in noncompensable damages ordinarily warrants a finding of irreparable harm." *A.H. by & through Hester v. French, 985 F.3d 165, 176 (2d Cir. 2021)*. Defendants argue that violation of constitutional rights is insufficient to show irreparable harm. [Defs.' Opp'n at 23 (arguing that "neither the Supreme Court nor the Third Circuit has ever expanded Elrod to cover all alleged violations of constitutional rights"). However, Defendants' argument mischaracterizes the harm that Plaintiffs allege. Plaintiffs do not allege a bare constitutional deprivation, but that they fear the threat of severe criminal penalties if they choose to exercise their *Second Amendment* rights. Even if constitutional deprivations are not *per se* irreparable injuries, the threat of prosecution for engaging in constitutionally protected conduct certainly is. Thus, the Court is satisfied that the first and second requirements for emergent relief have been met.

Finally, the Court finds that temporary restraints will only impact individuals who have already gone through the State's vetting process to obtain **[*55]** a concealed carry permit, so other interested parties will not be harmed if the requested relief is granted. After all, "neither the Government nor the public generally can claim an interest in the enforcement of an unconstitutional law." *Am. C.L. Union v. Ashcroft, 322 F.3d 240, 251 n.11 (3d Cir. 2003)*, aff'd and remanded, *542 U.S. 656, 124 S. Ct. 2783, 159 L. Ed. 2d 690 (2004)*. The Court also finds that the State's interest, the possibility of harm, and the public interest all tip in a favor of granting Plaintiffs

the relief they seek as to the applicable laws discussed above.

Further, Plaintiffs are excused from giving security because the Court is satisfied that there is no risk that a Defendant will sustain "costs and damages" if "found to have been wrongfully enjoined or restrained" pursuant to _Fed. R. Civ. P. 65(c)_. The Court also finds that based on the showing made by Plaintiffs, good cause exists to extend the duration of this Temporary Restraining Order beyond fourteen (14) days pursuant to _Fed. R. Civ. P. 65(b)(2)_. Thus, this Temporary Restraining Order will be in effect pending a hearing on Plaintiff's motion for a preliminary injunction (which shall occur as expeditiously as possible once a briefing schedule for such motion has been set).

## IV. CONCLUSION

Plaintiffs have demonstrated a probability of success on the merits of their _Second Amendment_ challenge **[*56]** to certain provisions of Chapter 131 Section 7(a), specifically: Subparts 10 (parks, beaches, and recreational facilities/areas), 12 (public libraries or museums), 15 (bars, restaurants, and where alcohol is served), 17 (entertainment facilities), 18 (casinos), and 24 (private property); Section 7(b)'s ban on functional firearms in vehicles; and related pre-Bruen New Jersey statutes—_N.J.A.C. 7:2-2.17(b)_ and _N.J.A.C. 13:69D-1.13_. The State may regulate conduct squarely protected by the _Second Amendment_ only if supported by a historical tradition of firearm regulation. Here, Defendants cannot demonstrate a history of firearm regulation to support these challenged provisions for which they have demonstrated Article III standing. The threat of criminal prosecution for exercising their _Second Amendment_ rights, as the holders of valid permits from the State to conceal carry handguns, constitutes irreparable injury on

behalf of Plaintiffs, and neither the State nor the public has an interest in enforcing unconstitutional laws.

Accordingly, good cause exists, and the Court will **GRANT**, in part, and **DENY**, in part, the Motion for temporary restraints. [Docket No. 8.] An accompanying Order of today's date shall issue.

January 30, 2023

Date

/s/Renée Marie Bumb

Renée Marie Bumb

United States District Judge

## ORDER

**BUMB, United [*57] States District Judge**

As set forth in the accompanying Opinion of today's date, Plaintiffs have made the requisite showing for emergent temporary relief as to certain provisions of Chapter 131 of the 2022 Laws of New Jersey. As such, the Plaintiffs' Motion for a Temporary Restraining Order AND Preliminary Injunction is **GRANTED**, in part; **DENIED**, in part; and the Court **RESERVES** its decision as to the Plaintiffs' Motion for a Preliminary Injunction. [Docket No. 8.] Accordingly,

**IT IS** on this **30th** day of **January 2023**, hereby

**ORDERED** that Defendants, as well as their officers, agents, servants, employees, and attorneys (and any other persons in active concert or participation with them) are **TEMPORARILY RESTRAINED** from enforcing the following provisions of Chapter 131 of the 2022 Laws of New Jersey: Section 7(a), subparts 10 (except for playgrounds), 12, 15, 17, 18, and 24, and Subsection 7(b)(1), as well

as related New Jersey statutes *N.J.A.C. 7:22.17(b)* and *N.J.A.C. 13:69D1.13*; and it is further

**ORDERED** that Plaintiffs are **EXCUSED** from giving security; and it is further

**ORDERED** that this Temporary Restraining Order shall **REMAIN IN EFFECT** pending a hearing and ruling on Plaintiffs' Motion for a Preliminary Injunction [Docket No. 8]; and it is further

**ORDERED** that the parties shall meet and confer regarding an expedited **[*58]** discovery and briefing schedule for Plaintiffs' preliminary injunction motion and propose such schedule to the Court within ten (10) days from the date hereof.

/s/Renée Marie Bumb

Renée Marie Bumb

U.S. District Judge

No *Shepard's* Signal™
As of: March 29, 2023 5:06 PM Z

## *Christopher v. Ramsey Cnty.*

United States District Court for the District of Minnesota

August 12, 2022, Decided; August 12, 2022, Filed

Civil No. 21-2292 (JRT/ECW)

**Reporter**

2022 U.S. Dist. LEXIS 144159 *; 2022 WL 3348276

REVEREND TIM CHRISTOPHER, et al., Plaintiffs, v. RAMSEY COUNTY, et al., Defendants.

## Core Terms

mandamus, municipality, firearms, motion to dismiss, declaratory judgment, Fairgrounds, injunctive relief, pistols, compelling interest, regulation, attend, public corporation, cause of action, writ petition, promulgated, carrying, rights, arms

**Counsel:** **[*1]** Andrew Stephen Dosdall and Scott M. Flaherty, TAFT STETTINIUS & HOLLISTER LLP, Minneapolis, MN, for plaintiffs.

David R. Marshall, Leah C. Janus, and Pari McGarraugh, FREDRIKSON & BYRON, PA, Minneapolis, MN, for State Agricultural Society, defendant.

**Judges:** JOHN R. TUNHEIM, United States District Judge.

**Opinion by:** JOHN R. TUNHEIM

## Opinion

### ORDER GRANTING THE DEFENDANT'S MOTION TO DISMISS

In 2021 the State Agricultural Society (the "Society"), which oversees the Minnesota State Fair, promulgated Rule 1.24 prohibiting fairgoers from carrying firearms on the Fairgrounds during the State Fair. Plaintiffs Reverend Tim Christopher and Sarah Hauptman both obtained tickets for the 2021 Minnesota State Fair, but chose not to attend, or were not allowed to attend, because they refused to do so without their firearms. Christopher, Hauptman, and the Minnesota Gun Owners Caucus (collectively, "Plaintiffs") brought an action in state court against the Society. The Plaintiffs seek a writ of mandamus compelling the Society to revoke Rule 1.24 and a declaratory judgment under Minnesota's Uniform Declaratory Judgment Act. They also allege constitutional claims under *42 U.S.C. § 1983* and a breach of contract claim. Because the Plaintiffs' Petition for a Writ of Mandamus **[*2]** and claim for declaratory judgment are procedurally defective, the Court will grant the Society's Motion to Dismiss those claims. Because the Plaintiffs fail to show that the Society violated their constitutional rights, the Court will grant the Society's Motion to Dismiss the *§ 1983* claim. And because the Plaintiffs cannot establish the illegality of the Rule 1.24, the Court will grant the Society's Motion to Dismiss the Breach of Contract claim.

### BACKGROUND

### I. FACTS

The Society is a public corporation created by the Minnesota Legislature. (Am. Compl. at ¶¶ 27, 28, Oct. 15, 2021, Docket No. 1-4); *See generally Minn Stat. § 37.01* (establishing the Society). The Society manages the Minnesota State Fair and the State Fairgrounds. *Id.* State law permits the Society to make bylaws, ordinances, and rules "consistent with law which it considers necessary or proper for the government of the fairgrounds and all fairs to be held on them, and for the protection, health, safety, and comfort of the public on the fairgrounds." *Minn. Stat. § 37.16*. Violating the Society's rules, bylaws, or ordinances is a misdemeanor. *Id.*

Prior to the 2021 State Fair, the Society posted on the State Fair website that fairgoers were prohibited from bringing any weapons, **[*3]** including pistols, to the Fair. (*Am. Compl.* at ¶¶ 78-80.) On August 17, 2021, after the Plaintiffs filed their Complaint, the Society officially promulgated Rule 1.24, which denied admission to the

2022 U.S. Dist. LEXIS 144159, *3

Fair to persons possessing personal pistols, even if possessed in compliance with Minnesota law. (*Id.* at ¶ 40.)

Both Christopher and Hauptman are licensed gun owners who frequently carry their pistols on their persons but did not attend the 2021 State Fair. (*Id.* at ¶¶ 7-8, 62.) Christopher did not attend the State Fair because he could not bring his firearm with him while Hauptman attempted to attend the State Fair while carrying her firearm but was denied entry. (*Id.* at ¶¶ 61, 62, 86.)

## II. PROCEDURAL HISTORY

The Plaintiffs filed suit in state court alleging that the Society, Ramsey County, and the Ramsey County Sheriff, violated their rights by promulgating Rule 1.24 and alleging that the Society violated the Minnesota Data Practices Act. (Compl. Oct. 15, 2021, Docket No. 1-1.)[1] Plaintiffs requested declaratory and injunctive relief and a preliminary injunction. (*Id.*) The state court denied the motion for a preliminary injunction. (Decl. of Pari I. McGarraugh, Ex. 27, Oct. 15, 2021, Docket No. 2-27.) The Plaintiffs **[*4]** then filed an Amended Complaint, removing the Data Practices Act allegation and adding a claim under *42 U.S.C. § 1983*. (See Am. Compl.) Thereafter, the Defendants removed the action to federal court. (Notice of Removal, Oct. 15, 2021, Docket No. 1.) The Society now moves to dismiss all of the Plaintiffs' claims. (Mot. to Dismiss, Oct. 22, 2021, Docket No. 5.)

## DISCUSSION

## I. STANDARD OF REVIEW

In reviewing a motion to dismiss under *Federal Rule of Civil Procedure 12(b)(6)*, the Court considers all facts alleged in the complaint as true to determine if the complaint states a "claim to relief that is plausible on its face." *Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009)* (quoting *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*). "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal, 556 U.S. at 678*. The Court construes the complaint in the light most favorable to the plaintiff, drawing all inferences in the plaintiff's favor. *Ashley Cnty. v. Pfizer, Inc., 552 F.3d 659, 665 (8th Cir. 2009)*. Although the Court accepts the complaint's factual allegations as true and construes the complaint in a light most favorable to the plaintiff, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986)*. In other words, a complaint "does not need detailed factual allegations" **[*5]** but must include more "than labels and conclusions, and a formulaic recitation of the elements" to meet the plausibility standard. *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. When considering a motion to dismiss, the Court generally must ignore materials outside the pleadings, but it may consider some materials that are part of the public record or do not contradict the complaint, as well as materials that are necessarily embraced by the pleadings. *Miller v. Redwood Toxicology Lab'y, Inc., 688 F.3d 928, 931 (8th Cir. 2012)*.

## II. ANALYSIS

Plaintiffs contend that Minnesota law preempts the Society's ability to promulgate any firearm restrictions. "The Legislature of the state of Minnesota recognizes and declares that the *Second Amendment of the Unites States Constitution* guarantees the fundamental, individual right to keep and bear arms." *Minn. Stat. § 624.714, subd. 22*. The Legislature made it a crime to hold or possess a pistol on or about their person without first obtaining a permit to carry a pistol. *Minn. Stat. § 624.714, subd. 1*. The Legislature further barred any "sheriff, police chief, governmental unit, government official, government employee, or other person or body acting under color of law or governmental authority" from changing, modifying, or supplementing the criteria and procedures to obtain a permit or to limit the exercise of the permit to carry. *Id.* at *subd. 23*.

Minnesota has multiple statutes that **[*6]** restrict the authority of certain other governmental institutions from regulating firearms. Pertinent here are *Sections 624.717* and *471.633*. *Section 471.633* reads:

> The legislature preempts all authority of a home rule charter or statutory city including a city of the first class, county, town, municipal corporation, or

---

[1] Plaintiffs have since voluntarily dismissed Ramsey County and the Ramsey County Sheriff from the action. (Order Granting Dismissal Without Prejudice, Dec. 22, 2021, Docket No. 31).

other governmental subdivision, or any of their instrumentalities, to regulate firearms, ammunition, or their respective components to the complete exclusion of any order, ordinance or regulation by them except that: (a) a governmental subdivision may regulate the discharge of firearms; and (b) a governmental subdivision may adopt regulations identical to state law.

*Minn. Stat. § 471.633*.

*Section 624.717* reads:

Sections 624.711 to 624.716 shall be construed to supersede municipal or county regulation of the carrying or possessing of pistols and the regulation of Saturday night special pistols.

*Minn. Stat. § 624.717*.

Plaintiffs assert several claims seeking to establish that the Rule 1.24 is invalid because it is preempted and because it is unconstitutional. The Court will grant the Society's Motion to Dismiss the Plaintiffs' claims because they are procedurally invalid and constitutionally unfounded.

## A. PETITION FOR WRIT OF MANDAMUS

"Mandamus is an extraordinary remedy that is available only to compel a **[*7]** duty clearly required by law." *N. States Power Co. v. Minnesota Metro. Council, 684 N.W.2d 485, 491 (Minn. 2004)* (cleaned up). Accordingly, to state a claim for mandamus relief, a plaintiff must allege that "the defendant: (1) failed to perform an official duty clearly imposed by law, (2) that, as a result, the [plaintiff] suffered a public wrong specifically injurious to the [plaintiff]; and (3) that there is no other adequate legal remedy." *Id.* The Plaintiffs' Petition for a Writ of Mandamus is procedurally improper because it requests the Court to order government officials to **refrain from action**, whereas mandamus is used to order government officials to **take action**. *State ex re. Sholes v. University of Minnesota, 236 Minn. 452, 54 N.W.2d 122, 129 (Minn. 1952)* (distinguishing mandamus and injunctive relief). Even viewing the Complaint in the light most favorable to the Plaintiffs, it contains no factual allegations that support a reasonable inference that there is no other adequate legal remedy—the appropriate legal remedy to prohibit action is injunctive relief.

The Plaintiffs attempt to argue that the distinction between mandamus and injunctive relief is immaterial because the Minnesota Supreme Court has previously granted mandamus to prohibit unlawful official action and modified the relief requested where mandamus was procedurally inappropriate. *Sholes, 54 N.W.2d, at 129* **[*8]** ; *Inter Fac. Org. v. Carlson, 478 N.W.2d 192, 193 (Minn. 1991)*. Plaintiffs cite *Sholes* for the contention that an analysis of the form of relief sought with a writ of mandamus is not demanding. In *Sholes*, the Minnesota Supreme Court states, "[w]e need not labor the contention of [defendant] that mandamus is not the proper remedy to control the exercise of its discretionary power or legislative function." *Id.* Moreover, the Plaintiffs assert that the writ of mandamus at issue in *Sholes* "in part, 'prohibit[ed] the use of the University of Minnesota property and facilities in aiding one religion, all religions, or preferring one religion over another, or aiding or permitting any religious activities on the university campus.'" (Pls.' Mem. Opp. Mot. Dismiss, at 21, Nov. 29,2021, Docket No. 23) (quoting *Sholes, 54 N.W.2d at 129*). However, the beginning of the sentence clearly states that the writ commanded the defendant to "adopt and enforce rules and regulations . . . prohibiting the use of the University of Minnesota property" as such. *Sholes, 54 N.W.2d at 129*. The *Sholes* opinion does not blur the distinction between mandamus relief (commanding the defendant to do something) and injunctive relief (commanding the defendant to refrain from doing something).

Plaintiffs also cite a Minnesota Supreme Court case in which the plaintiff brought an action in the form of a petition for a writ of mandamus when the appropriate procedural avenue was a claim for declaratory judgment. *Inter Fac. Org. v. Carlson, 478 N.W.2d 192, 193 (Minn. 1991)*. The Court stated, "[w]hile the petition and the relief it requests are procedurally inappropriate, we nevertheless decline to remand this matter for further proceedings . . . because of the untoward delay which would result. Instead, we modify the trial court's decision, recasting it as a judicial declaration[.]" *Id. Carlson* is distinguishable because no untoward delay will result from the Court dismissing the Plaintiffs' petition as procedurally unsound. Moreover, as discussed below, the Plaintiffs' Complaint fails to adequately allege a cause of action to support a declaratory judgment action. Therefore, the Court will grant the Society's Motion to Dismiss the Petition for a Writ of Mandamus because the petition is procedurally

2022 U.S. Dist. LEXIS 144159, *8

defective.[2]

## B. DECLARATORY [*9] JUDGMENT

"A complaint requesting declaratory relief must present a substantive cause of action that would be cognizable in a nondeclaratory suit." *Weaveewood, Inc. v. S. & P Home Investment, LLC, 821 N.W.2d 576, 579 (Minn. 2012)*; *Ryan v. Hennepin Cty., 224 Minn. 444, 29 N.W.2d 385, 387 (Minn. 1947)* ("Injunctive relief is a remedy and not, in itself, a cause of action, and a cause of action must exist before injunctive relief may be granted").

A plaintiff has stated a claim when the well-pleaded facts "give the opposing party fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved." *Topchian v. JPMorgan Chase Bank, N.A., 760 F.3d 843, 848-49 (8th Cir. 2014)*. Under Minnesota's Uniform Declaratory Judgments Act ("MUDJA") courts may grant declaratory judgment where an actual justiciable controversy exists. *Weaveewood, 821 N.W.2d at 579* ("A Declaratory Judgment is a 'procedural device' through which a party's existing legal rights may be vindicated so long as a justiciable controversy exists").

The Minnesota Supreme Court has stated that an actual controversy arises where a claim: "(1) involves definite and concrete assertions of right that emanate from a legal source, (2) involves a genuine conflict in tangible interests between parties with adverse interests, and (3) is capable of specific resolution by judgment rather than presenting hypothetical facts that would form an advisory [*10] opinion." *McCaughtry v. City of Red Wing, 808 N.W.2d 331, 336 (Minn. 2011)*.

Plaintiffs assert that the Society violated state law by promulgating Rule 1.24 when doing so was preempted by *§ 471.633* and *§ 624.717*. However, Minnesota statutes do "not give rise to a civil cause of action unless the language of the statute is explicit or it can be determined by clear implication." *Halva v. Minnesota State Colleges & Universities, 953 N.W.2d 496, 504*

*(Minn. 2021)*. Moreover, courts "are generally reluctant to recognize causes of action when the language of the statute does not expressly provide one." *Id.* (citation omitted). Plaintiffs make no effort to show that either *§ 471.633* or *§ 624.717* give rise to a cause of action. Nor does the language of either statute expressly or impliedly create a private right of action. As such, the Plaintiffs fail to allege a substantive cause of action sufficient to support Declaratory Judgment under Minnesota law. Therefore, the Court will grant the Society's Motion to Dismiss the Plaintiffs' claim for Declaratory Judgment.

## C. *Section 1983* Claim

*Section 1983* provides a private right of action against a "person" who deprives a citizen of federal or statutory rights. *42 U.S.C. § 1983*. As such, Plaintiffs must show that the Society is a "person" under the meaning of *§ 1983*. The United States Supreme Court has held that states and entities which are "arms of the state" and traditionally protected [**11] by *Eleventh Amendment* immunity are not 'persons' liable to suit under *§ 1983*. *Will v. Mich. Dep't of State Police, 491 U.S. 58, 70-71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989)*.

Plaintiffs assert that the Society is an entity capable of being sued under *§ 1983* for two reasons: (1) the Society waived its *Eleventh Amendment* immunity by removing the case to federal court, and (2) the Society is a public corporation, and public corporations are municipalities under Minnesota's Municipal Tort Claims Act.

First, whether the Society waived its *Eleventh Amendment* immunity is irrelevant. In *Will*, the Supreme Court held that that the term "person" in *§ 1983* was not meant to include states or the arms of a state. *Will, 491 U.S. at 66-67*. While the Court used the *Eleventh Amendment* to support its conclusion, it explicitly stated that "[t]his does not mean . . . that we think that the scope of the *Eleventh Amendment* and the scope of *§ 1983* are not separate issues. Certainly, they are. But in deciphering congressional intent as to the scope of *§ 1983*, the scope of the *Eleventh Amendment* is a consideration." *Id.* The Society, as an arm of the State, is not a person within the meaning of *§ 1983*.

Second, the Plaintiffs provide no support for their argument that the Society is a municipality under *§ 1983* simply because it is a municipality for purposes of the Minnesota Municipal Tort Claims Act. A municipality can

---

[2] Whether this Court certifies is a matter of its discretion. *Lehman Bros. v. Schein, 416 U.S. 386, 391, 94 S. Ct. 1741, 40 L. Ed. 2d 215 (1974)*. Because the Court does not reach the question of the applicability of *Eide* to this case the Court will deny the Plaintiffs' Motion to Certify a Question to the Minnesota Supreme Court.

be held liable under *§ 1983*, where "official action pursuant to official [**12**] municipal policy of some nature causes a constitutional tort." *Monell v. Dep't of Soc. Servs. Of City of New York, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)*. It is true that "[f]or the purposes of [the Municipal Tort Claims Act], municipality means any city, . . . county, town, public authority, [or] public corporation" and that the Society is a public corporation. *Minn. Stat. 466.01*; *Minn. Stat. § 37.01*. However, it does not necessarily follow that because the Society is a municipality **for the purposes of** a state statute, it is a municipality within the meaning of *Monell*. Moreover, the Plaintiffs explicitly pled that the Society was an arm of the state which, under *Will*, is not an entity capable of being sued under *§ 1983*.

Regardless of whether the Society is a person subject to suit under *§ 1983*, the Plaintiffs' claim fails on the merits. If the Society is subject to suit under *§ 1983*, it may only be found liable when it caused a constitutional harm pursuant to an official policy. *Monell, 436 U.S. at 691*. Rule 1.24 is alleged to violate the *Second Amendment* because it is the Society's official policy that prevented the Plaintiffs from entering the State Fair while carrying firearms. But even applying strict scrutiny, Rule 1.24 passes constitutional muster.

Strict scrutiny requires the challenged law to be justified by a compelling government interest and narrowly tailored to achieve that interest. [**13**] *State v. Hatch, 962 N.W.2d 661, 664 (Minn. 2021)* (citing *Brown v. Ent. Merch. Ass'n, 564 U.S. 786, 799, 131 S. Ct. 2729, 180 L. Ed. 2d 708 (2011)*). The Society is charged with making rules for the "protection, health, safety and comfort of the public on the fairgrounds" and thus has a compelling interest in protecting the safety of its attendees. *Minn. Stat. § 37.16*; *See* 664 (the "compelling interest in protecting the general-public from gun violence is self-evident"); *State v. Paige, 256 N.W.2d 298, 303 (Minn. 1977)* (explaining the validity of a statute meant "to prevent the possession of firearms . . . in public places where their discharge may injure or kill intended or unintended victims."). During the State Fair, the Fairgrounds are a sensitive location with thousands of people and children present in often crowded conditions.[3] As such, protecting the fairground

from gunfire is a compelling interest. Further, certain limitations on the *Second Amendment*, such as the long-standing prohibitions on "the carrying of firearms in sensitive places such as schools and government buildings," are presumptively lawful. *United States v. Adams, 914 F.3d 602, 605 (8th Cir. 2019)* (citing *Heller, 554 U.S. at 626-27*). Rule 1.24 is narrowly tailored to achieve the Society's compelling interest in protecting its attendees. Rule 1.24 is geographically limited to primarily recreational and entertainment spaces. *See Minn. Stat. § 37.01*.

Plaintiffs proffer alternatives to Rule 1.24 such as using separate gates for gunholders [**14**] or setting up internal checkpoints to prevent guns from entering certain particularly high-risk places. However, "the narrow tailoring requirement 'does not require exhaustion of every conceivable . . . alternative, nor does it require a dramatic sacrifice of compelling interest at state.'" *See Hatch, 962 N.W.2d at 664*. Plaintiffs' proposals would impose a significant logistical and economic burden on the Society and require it to dramatically sacrifice its compelling interest by requiring it to set up separate areas in ingress and egress onto the Fairgrounds and by forcing it to permit firearms to be present during the State Fair. As such, Rule 1.24 is not overly broad and complies with the narrow tailoring requirement. The Court will grant the Society's Motion to Dismiss Plaintiffs' *§ 1983* claim.

### D. Breach of Contract

Lastly, the Plaintiffs allege that they entered into contracts with the Society by purchasing tickets to attend the State Fair. Consequently, the Society allegedly breached its contractual duty by refusing to grant the Plaintiffs entry on unlawful grounds—namely, the Plaintiffs were denied entry based on their legal possession of firearms. Whether a ticket is a contract is disputable. *See Bickett v. Buffalo Bills, Inc., 122 Misc. 2d 880, 472 N.Y.S.2d 245, 247 (N.Y. Sup. Ct. 1983)* ("A ticket is a [**15**] license and revocable so long as the

---

[3] Several district and appellate courts across the country have held that a place that gathers large crowds and has many children present is a sensitive place like a government building or school. *Bonidy v. United States Postal Service, 790 F.3d 1121, 1125 (10th Cir. 2015)* (stating that the outdoor parking

lot abutting a post office was part and parcel with the government building); *Nordyke v. King, 563 F.3d 439, 459 (9th Cir. 2009) vacated on other grounds by 611 F.3d 1015 (9th Cir. 2010)* (describing sensitive places as locations that are gathering places where high numbers of people might congregate); *Warden v. Nickels, 697 F.Supp.2d 1221, 1229 (W.D. Wash. 2010)* ("as with a government building or school, a city-owned park where children and youth recreate is a "sensitive place where it is permissible to ban possession of firearms").

2022 U.S. Dist. LEXIS 144159, *15

revocation is not based upon a discriminatory reason infringing upon a person's civil rights.") However, the Court will not engage in that analysis because the Plaintiffs' entire breach claim rests on the unsupported claim that Rule 1.24 is illegal. As noted, the Plaintiffs do not have a private right of action to challenge Rule 1.24. The Court will grant the Society's Motion to Dismiss the Plaintiffs' Breach of Contract claim.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that;

1. The Society's Motion to Dismiss [Docket No. 5] is **GRANTED**,

2. Plaintiffs' Motion to Certify a Question to the Minnesota Supreme Court [Docket No. 18] is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

DATED: August 12, 2022

at Minneapolis, Minnesota.

/s/ John R. Tunheim

JOHN R. TUNHEIM

District Judge

United States District Court

No *Shepard's* Signal™
As of: March 29, 2023 5:07 PM Z

## *United States v. Power*

United States District Court for the District of Maryland, Southern Division

January 9, 2023, Decided; January 9, 2023, Filed

Case No. 20-po-331-GLS

**Reporter**
2023 U.S. Dist. LEXIS 4226 *; 2023 WL 131050

United States of America, Plaintiff, v. Curtis Power, Defendant.

## Core Terms

places, NIH, regulation, firearms, Analogy, sentence, schools, campus, https, arms, college campus, weapons, carrying, visited, dicta, courts, longstanding, qualifies, asserts, possession of a firearm, performing, pertaining, relevantly, visitors, host, founding-era, Institutes, banning, historical record, defense motion

**Counsel:** **[*1]** Curtis D Power, Defendant, Pro se, Winchester, VA.

For Curtis D Power, Defendant: Rosana E Chavez, LEAD ATTORNEY, Office of the Federal Public Defender, Greenbelt, MD.

For USA, Plaintiff: Ellen E. Nazmy, LEAD ATTORNEY, US Attorneys Office, Greenbelt, MD; Jane F Nathan, LEAD ATTORNEY, Office of the US Attorney, Greenbelt, MD; Jason Daniel Medinger, LEAD ATTORNEY, Office of the United States Attorney, Baltimore, MD.

**Judges:** Honorable Gina L. Simms, United States Magistrate Judge.

**Opinion by:** Gina L. Simms

## Opinion

### MEMORANDUM OPINION

Defendant Curtis Power ("Defendant" or "Mr. Power") has been charged with an offense allegedly committed on the campus of the National Institutes of Health ("NIH"), the possession of a firearm, in violation of *45 C.F.R. § 3.42(g)*. (ECF No. 1).

Pending before the Court is the Defendant's "Motion to Dismiss Citation Under the *Second Amendment*" ("the Motion") (ECF No. 22). The issues have been fully briefed, *see also* ECF Nos. 27, 28, and this Court finds that no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2021). For the reasons set forth more fully below, Defendant's Motion is **DENIED**.

### I. FACTUAL BACKGROUND

On November 8, 2019, the Defendant drove his vehicle to the security checkpoint at the NIH campus and attempted to enter to make a delivery. **[*2]** When the Defendant entered the vehicle inspection lane, NIH security stopped his vehicle and conducted a search. During the search, NIH security discovered a weapon in the center console of the Defendant's vehicle. Thereafter, the Defendant was arrested, given a citation, and released.[1]

### II. PROCEDURAL BACKGROUND

On January 22, 2020, the Defendant appeared in court for his initial appearance. (ECF No. 2). On September 6, 2022, Defendant filed the Motion. On October 5, 2022, the government filed a "Response in Opposition to Defendant's Motion to Dismiss." (ECF No. 27) ("Opposition"). On November 9, 2022, the Defendant filed a Reply in support of his Motion. (ECF No. 28) ("Reply").

### III. MOTION TO DISMISS

In the Motion, the Defendant seeks dismissal of the possession of a firearm charge on the grounds that the

---

[1] The factual summary is drawn from ECF Nos. 1, 22, and 27. The facts do not appear to be in dispute.

citation violates his rights under the *Second Amendment of the United States Constitution*.

A Defendant may file a pretrial motion to dismiss the criminal charges pending against him, including in an instance where he alleges that there is "a defect in the institution of the prosecution."[2] *Fed. R. Crim. P. 12(b)(1)*, *(b)(3)(A)*; *see also United States v. Engle, 676 F.3d 405, 415 (4th Cir. 2012)*.

## IV. DISCUSSION

### A. The Regulation and the *Second Amendment*

According to *45 C.F.R. §3.42(g)*:

> No person [on the NIH campus] other than a specifically authorized police officer **[*3]** shall possess firearms, explosives, or other dangerous or deadly weapons or dangerous materials intended to be used as weapons either openly or concealed. Upon written request, the Director may permit possession in living quarters of antique firearms held for collection purposes, if the Director finds that the collection does not present any risk of harm.

*45 C.F.R. § 3.42(g)*.

The *Second Amendment* provides:
> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

*U.S. Const. amend. II*.

### B. Post-*Bruen*: History as a Guide to Firearm Regulation

The Defendant argues that *Section 3.42(g)* ("regulation at issue" or "*§ 3.42(g)*") is unconstitutional per the

---

[2] In addition, "a facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno, 481 U.S. 739, 745, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987)* (finding that respondents failed to shoulder "heavy burden" of demonstrating facial unconstitutionality of the *Bail Reform Act*).

Supreme Court's ruling in *New York State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022)*.

In *Bruen*, the Supreme Court found that "intermediate scrutiny" and "strict-scrutiny" balancing tests historically used by the circuit courts to determine the constitutionality of a law do not apply in the *Second Amendment* context. *Id. at 2127*. Thus, *Bruen* specifically abrogated the approaches taken by circuit courts across the nation. *See, e.g., Harley v. Wilkinson, 988 F.3d 766 (4th Cir. 2021)*; *Worman v. Healey, 922 F.3d 26 (1st Cir. 2019)*; *Kanter v. Barr, 919 F.3d 437 (7th Cir. 2019)*.

In particular, the *Bruen* majority held that the appropriate analysis when considering the constitutionality of firearm regulations is to determine whether the law bars conduct that the "plain **[*4]** text of the *Second Amendment*" protects. *142 S. Ct. at 2126*. If the plain text of a Constitutional Amendment protects the relevant conduct, then the government must demonstrate that the operative regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id. at 2130*. To do so, the government must point to historical evidence that the regulation is consistent with historical tradition. *Id*. If the regulation addresses a societal problem that existed at or about the time of this Country's founding, then historical evidence can include "distinctly similar" historical regulations addressing the founding-era societal problem *Id*. However, if no such regulations historically existed, or different regulations existed that addressed the same societal problem then the challenged regulation is likely unconstitutional. *Id*.

The *Bruen* majority also opined that if the challenged regulation seeks to address a societal problem "unimaginable" at the time of this Country's founding, then the government may rely on analogical reasoning and identify regulations that are "relevantly similar" to the one at issue. *Id. at 2132*. The Supreme Court identified the scope of appropriate analogical comparisons, finding that the government is only "require[d] to identify **[*5]** a well-established and representative historical analogue, not a historical twin." *Id*. In assessing analogical comparisons, the Supreme Court cautioned lower courts to neither uphold "every modern law that remotely resembles a historical analogue," nor reject every challenged regulation for not having a "historical twin." *Id. at 2133*.

Even while expanding upon this new test, the *Bruen*

majority reaffirmed the "longstanding" laws prohibiting the possession of firearms in "sensitive places," such as schools and government buildings. *Id.*; *see also District of Columbia v. Heller, 554 U.S. 570, 626, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008)*; *accord McDonald v. City of Chicago, 561 U.S. 742, 786, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010)*. While outlining its view on the relationship between analogical reasoning and "sensitive places," the Supreme Court held that courts "*can use analogies* to [historical] regulations of 'sensitive places' to determine if those modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." *Bruen at 2133* (emphasis added).

With this in mind, the Court analyzes *Bruen* and later the parties' arguments related to the regulation at issue.

## C. Argument

In his Motion, the Defendant advances three arguments. First, that *45 C.F.R. § 3.42(g)* violates "his *Second Amendment* right to keep and bear arms," as the plain text of that Amendment renders presumptively [*6] unconstitutional a total ban on firearm possession. Relatedly, the Defendant avers that the government "will be unable to rebut that presumption." Second, that "as of 1791" no "historical tradition" existed that completely prohibited "individuals from possessing firearms on all federal lands." Third, NIH does not "qualify as a 'sensitive place,'" as such a designation, to the extent that it existed at the time of the Country's founding, was limited to places where "core functions of government were performed." According to the Defendant, NIH is not one of those "sensitive places." (Motion, p. 10).

The government advances two arguments in defense of *45 C.F.R. § 3.42(g)*. The government asserts that the NIH campus is a "sensitive place," which, pursuant to *Bruen*, means that the regulation is constitutionally valid. Also, the government argues that the *Property Clause of the Constitution* gives it plenary authority to regulate conduct on federal property, preventing court intervention. (*See generally* Opposition).

The Court will address both of these arguments, starting first with the "sensitive places" doctrine.

### 1. "Sensitive Places" Doctrine

Regarding the sensitive places doctrine, the Defendant contends that: (1) the *Bruen* Court's discussion [*7] of "sensitive places" is dicta and not controlling law; and

(2) the NIH campus does not qualify as a sensitive place under *Bruen* as it does not host "core government functions" or "serve as a center of government deliberations." In its Opposition, the government asserts that *45 C.F.R. § 3.42(g)* is constitutional because the NIH is a "sensitive place."

### a. Sensitive Places Doctrine: A Longstanding Principle, Not Dicta

In *Bruen*, the Supreme Court reiterated its prior holdings in *Heller* and *McDonald*, in which the Supreme Court referred to the "longstanding" laws forbidding the carrying of firearms in "sensitive places such as schools and government buildings." *Bruen, 142 S. Ct. at 2133*; *Heller, 554 U.S. at 626*; *McDonald, 561 U.S. at 786* (repeating the "assurances" outlined in *Heller* regarding the constitutionality of "longstanding" laws forbidding firearms in sensitive places).

The government's first sensitive places argument is that the Supreme Court in *Bruen* and *Heller* categorically defined government buildings such as the NIH as sensitive places. (Opposition, pp. 9, 12). The Defendant asks this Court to ignore those portions of *Bruen* and *Heller*, arguing that the "sensitive places" language is legally unsupported dicta. (Motion, pp. 12-14). The Defendant correctly notes that lower courts are to "give great weight" [*8] to Supreme Court dicta. *See, e.g., N.L.R.B. v. Bluefield Hosp. Co., LLC, 821 F.3d 534, 541 n.6 (4th Cir. 2016)*. However, the Defendant suggests that the present dicta ought to be ignored because it is not accompanied by adequate analysis. (Motion, p. 13).

The Court finds the Defendant's argument unpersuasive. First, the Court finds that the "sensitive places" passage in *Bruen* is more than unreasoned dicta announcing a new proposition. Instead, the language pertaining to sensitive places appears as reinforcement for a longstanding principle, i.e., the Supreme Court opines on a history that is already "settled," and is not offering a new doctrine. *Bruen, at 142 S. Ct. at 2133-34*.

Alternatively, assuming that the language in *Bruen* and *Heller* is dicta, the Court finds that it constitutes the kind of dicta that is of great value to lower courts. *See Myers v. Loudoun Cty. Pub. Sch., 418 F.3d 395, 406 (4th Cir. 2005)* ("Although we are not bound by dicta or separate opinions of the Supreme Court, 'observations by the [Supreme] Court ... constitute the sort of dicta that has considerable persuasive value in the inferior courts'")

(quoting _Lambeth v. Bd. of Comm'rs, 407 F.3d 266, 271 (4th Cir. 2005)_). Not only does the _Bruen_ Court refer to the sensitive places doctrine as a "longstanding" tradition, but the Supreme Court also significantly analyzes or further expounds on the doctrine, removing it from the category of unreasoned [*9] dicta. _See Bruen, 142 S. Ct. at 2133-34_.

Accordingly, the Court will proceed with its analysis of whether NIH qualifies as a sensitive place.

_b. Analysis of the Sensitive Places Passage in Bruen_

The Defendant also argues that the NIH does not qualify as a sensitive place because it is not a "center for government deliberation" nor is it a place that hosts "core government operations." (Motion, pp. 18-20; Reply, pp. 14-15). In support, the Defendant directs the Court to the sources that the Supreme Court cited when discussing the sensitive places doctrine, suggesting that the analysis within those sources reflects the confines and limits of the doctrine. _See_ D. Kopel & J. Greenlee, _The "Sensitive Places" Doctrine_, _13 Charleston L. Rev. 205, 229-236, 244-247 (2018)_; _United States v. Bruen_, No. 20-843, Brief for Independent Institute as _Amicus Curiae_ 7. According to the Defendant, the historical record and the sources cited by the Supreme Court only support a definition of a "sensitive place" that includes facilities such as polling places, schools, legislative buildings, and courthouses. (Motion, pp. 18-20).

On the other side of the ledger, the government asserts that the "sensitive places" language in _Bruen_ plainly applies to the NIH, as it is a government building. [*10] Separately, the government asserts that the NIH is similar to relevant historical analogues. In particular, the government maintains that the _Bruen_ and _Heller_ opinions list "government buildings" as sensitive places, which means, by definition, the NIH qualifies as such, because it is a campus comprised of dozens of government buildings. (Opposition, pp. 10-12). Alternatively, the government's view of the sensitive places doctrine focuses on connecting, through analogy, the NIH to other places that have been historically regulated and where firearm bans were appropriate.

The dispute between the parties boils down largely to differences in how the plain text of _Bruen_ should be interpreted.

The pertinent language within _Bruen_ reads as follows:

Consider, for example, _Heller_'s discussion of "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." Although the historical record yields relatively few 18th-and 19th-century "sensitive places" where weapons were altogether prohibited—e.g., legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions. We therefore can assume [*11] it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the _Second Amendment_. And courts can use analogies to those historical regulations of "sensitive places" to determine those modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible.

_Bruen, 142 S. Ct. at 2133-34_ (internal citations omitted). Therefore, to ultimately resolve the Motion, the Court closely analyzed this "sensitive places" passage, sentence-by-sentence.

The first sentence reads:

Consider, for example, _Heller_'s discussion of "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings."

_Bruen, 142 S. Ct. at 2133-34_. In this sentence, the Supreme Court gives initial insight into how to define a sensitive place. The _Bruen_ Court does not explicitly define the phrase, opting instead to provide examples. Specifically, the Supreme Court identified sensitive places as places "such as" "schools" and "government buildings."[3] Notably, these examples are unqualified— the _Bruen_ Court did not narrow the applicability of these examples in any way. _Id.; see also Heller, 554 U.S. at 627, n. 26_ ("We identify these presumptively lawful regulatory measures only as examples; [*12] our list

---

[3] "Such as" is defined as: (1) for example; or (2) of a kind that; like. _See_ oxfordlearnersdictionaries.com, https://www.oxfordlearnersdictionaries.com/us/definition/english/such#such_idmg_ (last visited Nov. 28, 2022). Relatedly, as applicable here, "like" is defined as similar to somebody/something. _See_ oxfordlearnersdictionaries.com,https://www.oxfordlearnersdictionaries.com/us/definition/english/like_1?q=like (last visited Nov. 28, 2022). The first definition, "similar to somebody/something," demonstrates that the language used by the Supreme Court is not, syntactically, restrictive.

does not purport to be exhaustive"). Nowhere in this passage nor at any other point in the opinion does the *Bruen* Court hold, e.g., that only "elementary schools" or "middle schools" are sensitive places. The same is true for government buildings. Nowhere in *Bruen* (nor in *Heller*, for that matter) is the definition of "sensitive places" narrowed to government buildings devoted to, e.g., national security or the exercise of political functions. Put another way, schools and government buildings are presented as broadly as possible, allowing the reader to consider all possible subtypes that fall within those two examples. *See Bruen, 142 S. Ct. at 2133-34*. If the *Bruen* Court intended the first sentence to restrict the applicability of the "sensitive places" doctrine to, e.g., a small subset of government buildings, the Supreme Court could have explicitly made that limitation. In the absence of a clear limitation, the Court cannot accept a narrow interpretation of the first sentence.

The second sentence of the passage reads:

> Although the historical record yields relatively few 18th-and 19th-century "sensitive places" where weapons were altogether prohibited—e.g., legislative assemblies, polling places, and courthouses—we **[*13]** are also aware of no disputes regarding the lawfulness of such prohibitions.

*Bruen, 142 S. Ct. at 2133-34*. This sentence serves the limited purpose of demonstrating that there are few historical examples of sensitive places legislation that altogether prohibited carrying weapons in sensitive places. The Court does not interpret this second sentence to stand for the proposition that the scope of the sensitive places doctrine is limited to the set of examples that the Supreme Court identified. Such an interpretation does not make sense because the first sentence presented examples of sensitive places using expansive language ("such as"), allowing for examples that include or are "similar to" those provided. If the second sentence were intended to narrow the list of sensitive places, the first and second sentences would contradict each other. Thus, the Court reads the second sentence as holding: (1) that the doctrine can apply expansively; (2) the historical record does not yield many examples of legislators passing laws under this doctrine; and (3) the lawfulness of regulations pertaining to sensitive places has never been disputed.

In the third sentence, the *Bruen* Court refers back to the historical pedigree of **[*14]** the sensitive places

doctrine:

> We therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the *Second Amendment*.

*Bruen, supra, at 2133-34*. The Court finds that it is clear that this sentence merely serves to reinforce the notion that the sensitive places doctrine and the examples the Supreme Court provided are consistent with the *Second Amendment*.

The fourth and final sentence of the passage provides guidance on how analogies, if necessary, may be used to demonstrate that a location qualifies as a sensitive place:

> And courts can use analogies to those historical regulations of "sensitive places" to determine those modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible.

*Bruen, at 2133-34*. Here, the *Bruen* Court holds that analogical reasoning may be used to determine if a particular location qualifies as a sensitive place.[4] This

---

[4] The Defendant asserts that analogous reasoning is inappropriate because it may only be used when analyzing a societal problem that was "unimaginable" at the time of the founding. (Reply, p. 15). To support this argument, the Defendant cites to the following passages within *Bruen*:

> For instance, when a challenged regulation **[*15]** addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the *Second Amendment*. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. . . .

> Much like we use history to determine which modern "arms" are protected by the *Second Amendment*, so too does history guide our consideration of modern regulations that were unimaginable at the founding. When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations

gives the Court the formula for analyzing, if necessary, what constitutes a "sensitive place" in the present day, reinforcing that the examples listed in the first and second sentences can be used to identify other sensitive places which are "similar."

In sum, this Court reads *Bruen* as holding that: (1) schools and government buildings are examples of sensitive places, **[*16]** not the exhaustive list of what sensitive places are; (2) there are only a few Eighteenth-and Nineteenth-Century regulations that altogether prohibited weapons in sensitive places, which

------------------------------------------------------

are "relevantly similar."

The Defendant argues that the "unimaginable" requirement applies with equal force to this portion of the Supreme Court's discussion on "sensitive places." (Reply, p. 15). This belief is predicated on a misreading of the Supreme Court's opinion. As stated previously, when discussing sensitive places, the *Bruen* Court states that analogies may be used to identify "new and analogous" sensitive places. When generally discussing the use of analogies, the Supreme Court says that analogies are used when a regulation is intended to address a societal problem which was unimaginable at the time of the founding. *Bruen, 142 S. Ct. at 2132-33*. If the regulation at issue seeks to combat a societal problem that was not "unimaginable" at the time of the founding, the Supreme Court outlines a different process by which a court can determine constitutionality. *Id.* However, that limitation cannot be applied to regulations protecting sensitive places. First, sensitive places regulations have a purpose that is well-defined and was certainly familiar to early Americans at the time of the Country's founding—to protect a sensitive place. Such regulations do not implicate technological advancements unknown to early Americans, nor some type of societal problem that is unique. Sensitive places, generally, have always existed and always demanded protection. *See e.g.*, D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine, 13 Charleston L. Rev. 205, 229-236, 244-247 (2018)*. It is inconceivable that the Supreme Court would in one breath say that regulations intending to remedy known-societal problems cannot—under any circumstances—utilize analogies, and in another say that regulations of sensitive places can be upheld through the use of analogies. It cannot be the case that the Supreme Court intended to contradict itself; accordingly, the Court will not interpret the *Bruen* opinion in a way that would force such a contradiction.

In sum, the Court finds that the *Bruen* majority intended to outline a process that is used specifically in the context of assessing the constitutionality of a "sensitive places" regulation. As applied to the "longstanding" and accepted practice of regulating sensitive places, the Court finds that the *Bruen* opinion allows for the use of analogies when assessing regulations pertaining to sensitive places.

are also defined to include legislative assemblies, polling places, and courthouses; (3) banning weapons in sensitive places has a longstanding historical pedigree, which does not violate or run afoul of the *Second Amendment*; and (4) when necessary, the Court may use analogical reasoning to identify new sensitive places.

With that understanding, the Court first identifies what the NIH is before turning back to the parties' arguments.

*c. NIH: A Brief History*

To understand the NIH, the Court finds it helpful to track its history and its modern function.

In 1887, the NIH began as a small laboratory as part of the Marine Hospital Service, which preceded the United States Public Health Service. The original purpose of the organization was to provide medical care to sea bearing merchants. The NIH did not steer toward one of its most prominent modern responsibilities—disease research—until 1901 when Congress authorized $35,000 for the investigation of "infectious and contagious diseases and matters pertaining to the public health." **[*17]** Over the years, the research conducted by the agency has spanned across areas such as infectious diseases, vaccine development, military pilot capabilities (and ways to prevent pilots from losing consciousness at high altitudes), genome sequencing, and countless other areas. *See A Short Story of the National Institute of Health*, NIH, https://history.nih.gov/display/history/A+Short+History+o f+the+National+Institutes+of+Health (last visited Nov. 30, 2022).

Today, NIH operates under the Department of Health and Human Services ("HHS"). The NIH operates pursuant to congressional authorization to advance biomedical research to improve the health of the United States. Annually, the NIH receives nearly fifty billion dollars in funding and is led by the Director of the NIH ("Director"), who is appointed by the President of the United States and confirmed by the United States Senate. Nearly 19,000 employees work under the Director. *See NIH Reauthorization*, NIH, https://www.nih.gov/about-nih/who-we-are/nih-reauthorization (last visited Dec. 1, 2022); *NIH Workforce Profile*, NIH, https://www.edi.nih.gov/people/resources/advancing-racial-equity/nih-workforce-profile-fy21q02 (last visited Nov. 30, **[*18]** 2022); Cong. Resch. Serv., National Institutes of Health (NIH) Funding: FY1996-FY2023,

at 11-13 (2022), https://sgp.fas.org/crs/misc/R43341.pdf.

The NIH spans across 21 different institutes, all of which are devoted to some form of biomedical research. In addition, the NIH is home to libraries, a clinical center, and multiple auditoriums where the NIH hosts lectures. Notably, the NIH houses an immense database of genomic sequencing information and receives and ships hazardous materials such as nucleic acids, human pathogens, and infectious materials. *Institutes at NIH*, NIH, https://www.nih.gov/institutes-nih (last visited Nov. 20, 2022); *Biological Materials Shipping*, NIH, https://ors.od.nih.gov/sr/dohs/safety/laboratory/BioSafety/Pages/shipping_biological_material.as px (last visited Dec. 1, 2022). In part for that reason, the NIH is a highly secure, closed campus, which requires "all visitors [to] enter through the NIH Gateway Center." In addition, visitors must "submit to a vehicle or personal inspection." Visitor inspections are conducted by NIH police. *Campus Access and Security*, NIH, https://www.nih.gov/about-nih/visitor-information/campus-access-security (last visited Dec. 21, **[*19]** 2022).

Reflecting on the history and modern function of the NIH, the Court is able to extract a few core characteristics: the NIH is a secured, academically-oriented and government-directed institution with a particular focus devoted toward the advancement of scientific inquiry and treatment of patients.

Now that the Court has identified the core characteristics of the NIH, it turns back to the parties' arguments.

*d. The Court Rejects the Defendant's Narrow Definition of Sensitive Places*

As stated previously, Defendant's first argument is that the *Bruen* opinion limits sensitive places to "center[s] for government deliberation" or places that host "core government operations." (Motion, pp. 9, 12, 19). The Court finds that such a restriction is unsupported by the language of *Bruen*. As held previously, the *Bruen* Court identifies examples of sensitive places without any explicit limitation on the definition. In the absence of any qualifiers, any and all places which plainly fall within the categories the *Bruen* Court provided, schools and government buildings, are presumptively sensitive places. *See* Section IV.C.1.b, *supra*. As a result, this Court agrees with the government's argument that **[*20]**

the *Bruen* Court blanketly defines "government buildings," and other locations that are "similar to" government buildings, as sensitive places. (Opposition, p. 11, citing to *Bruen at 2133*).

The Court disagrees with Defendant's argument that the *Bruen* Court's citation to academic sources somehow implies that the *Bruen* Court intended its analysis to mirror be limited by the analysis in those sources. (Motion, pp. 18-19). Rather, the two citations occur in the same sentence in which the Supreme Court cites to examples of sensitive places. The citations are intended to point the reader to the examples that the *Bruen* Court could find existed historically, not indicate that those examples represent the entire universe of sensitive places. *Bruen, at 2133*. The Defendant's interpretation, if adopted, would directly contradict the *Bruen* Court's usage of the phrase "such as," and the instruction that courts can use analogical reasoning to identify "new and analogous sensitive places." *Id.* Thus, there is no basis to read *Bruen* as requiring a government building deemed a sensitive place to be one that is a "center for government deliberation" or a place that hosts "core government operations."

The Court further finds that **[*21]** neither *Heller* nor any other Supreme Court opinion issued to date holds that government buildings deemed sensitive places are limited to "center[s] for government deliberation" or places that host "core government operations."[5] It appears that the Defendant independently formulated that limitation.[6]

In sum, the Court finds Defendant's definition of what constitutes a "sensitive place" too narrow and not supported by the law. Per the textual analysis performed

_____

[5] Nor does the Defendant cite any case law stating that it is permissible to bring firearms onto federal property.

[6] Although there is little case law defining sensitive places, some courts have discussed the issue and identified sensitive places that go beyond places that host "core government operations." For example, in *United States v. Dorosan, Criminal Action No. 08-042, 2008 U.S. Dist. LEXIS 49628, 2008 WL 2622996 at *6 (E.D. La. June 30, 2008)*, the court upheld a firearm ban on property belonging to the United States Postal Service. *See also Bonidy v. United States Postal Serv., 790 F.3d 1121, 1125 (10th Cir. 2015)* (finding that a post office falls within the definition of a sensitive place as it is a government building). The *Dorosan* court found prohibitions on "federal and/or postal property" have a longstanding history and have been upheld. *Id.* Postal property certainly falls outside of the limitation described by the Defendant.

2023 U.S. Dist. LEXIS 4226, *21

by this Court, because the NIH is a government building(s), it is a sensitive place. Since there is a long historical tradition of banning weapons in sensitive places, _Section 3.42(g)_ does not violate the _Second Amendment_.

### e. Analogical Reasoning-NIH Can Prohibit Carrying Weapons on Its Campus

In the alternative, assuming _arguendo_ that the Court has read _Bruen's_ definition of sensitive places too expansively to include all government buildings without restriction, then the Court still finds that analogical reasoning supports the constitutionality of the regulation at issue.

The Defendant contends that the government may not rely upon analogical reasoning and, even assuming that analogical reasoning is appropriate, the government fails to demonstrate **[*22]** that its analogies are "relevantly similar." (Reply, p. 15).

As a preliminary matter, the Court has already explained that the _Bruen_ opinion allows for analogical reasoning when identifying sensitive places. So, to determine whether _Section 3.42(g)_ is consistent with historical regulations of sensitive places, the Court now considers if any of the analogies presented by the government adequately establish the NIH as a sensitive place.

The government attempts to analogize the NIH to: (1) Middle Age-era laws pertaining to officials under the Crown of England performing their duties; (2) founding-era statutes pertaining to public officials performing their duties; (3) property; and (4) college campuses. (Opposition, pp. 9-11). The Court finds Analogy No. 1 and Analogy No. 3 unconvincing and will address those analogies first.

To support Analogy No. 1, the government cites the Statutes of Northampton, enacted in 1328, which prohibited carrying firearms "before the King's justices" and "other of the King's ministers doing their office." 2 Edw. 3, c. 3 (1328). The government argues that NIH employees are government officials, akin to the "King's ministers" who go about performing their duties within **[*23]** the confines of the NIH campus. (Opposition, p. 10). In turn, since the Statutes of Northampton ("the Statutes") treated such locations as a sensitive place, limiting the carrying of firearms therein, the instant regulation is proper.

In analyzing the persuasive value of the Statutes, the

Court is inclined to agree with the Defendant's contention that the _Bruen_ majority found that the Statutes are not probative in terms of identifying the historical traditions at the time of the founding. In _Bruen_, when discussing the persuasive value of the Statutes the Supreme Court "cautioned that the English common law 'is not to be taken in all respects to be that of America'" and that "'[t]he language of the Constitution cannot be interpreted safely except by reference to the common law and to British institutions as they were when the instrument was framed and adopted' not as they existed in the Middle Ages." _Bruen, 142 S. Ct. at 2139_. Subsequently, after canvassing the historical record, the Supreme Court found that the Statutes did little to demonstrate a tradition of firearm regulation in early America. _Id. at 2139-40_. As a result, this Court will not credit the Statutes as authorities in support of the government's analogy.

In **[*24]** Analogy No. 3, the government analogizes the NIH to private property. The government asserts that founding-era laws prohibiting hunting on another person's property without permission is "relevantly similar" to the instant regulation where the government operates as a property owner. (Opposition, p. 11). The Defendant argues that these laws are not relevantly similar. (Reply, p. 21). On this matter, the Court agrees with the Defendant. As the Supreme Court cautioned, "'[e]verything is similar in infinite ways to everything else.'" _Bruen, 142 S. Ct. at 2132_. So, the Court must avoid finding that analogies are "relevantly similar" where the connection is overly superficial or general. In this case, not only does the Court find that the connection is superficial, but also finds that the express purpose of the laws cited by the government differs greatly from the regulation at issue. The cited laws were intended to limit hunting on private property. The instant regulation, however, has nothing to do with hunting. The Court cannot find the government's analogy sufficient to carry the government's burden without entirely undermining the analogical framework established in _Bruen_. Thus, the Court similarly finds that **[*25]** the government cannot carry its burden through use of this analogy.

Having dispensed of the unavailing arguments, the Court will now address Analogy No. 2 and Analogy No. 4. In Analogy No. 2, the government proposes that founding-era statutes treated locations where public officials performed their duties as sensitive places. (Opposition, p. 10, n. 2). The government identified the following statute from Virginia in 1786:

No man, great nor small, of what condition soever he be, except the Ministers of Justice in executing the precepts of the Courts of Justice, or in executing of their office, and such as be in their company assisting them, be so hardy to come before the Justices of any Court, or other of their Ministers of Justice, doing their office, with force and arms, on pain, to forfeit their armour to the Commonwealth, and thir [sic] bodies to prison, at the pleasure of a Court; nor go nor ride armed by night nor by day, in fair or markets, or in other places, in terror of the Country, upon pain of being arrested and committed to prison by any Justice on his own view, or proof of others, there to abide for so long a time as a Jury, to be sworn for that purpose by the said Justice **[\*26]** shall direct, and in like manner to forfeit his armour to the commonwealth; but no person shall be imprisoned for such offence by a longer space of time than one month.

Duke's Center for Firearm's Law, *1786 Va. Laws 33, ch. 21, An Act forbidding and punishing Affrays,* DUKELAW, https://firearmslaw.duke.edu/laws/1786-va-laws-33-ch-21-an-act-forbidding-and-punishing-affrays/ (last visited Dec. 1, 2022). In addition, the government observed the following statute in North Carolina in 1792, which incorporated the language of English law:

No man great nor small, of what condition soever he be, except the King's servants in his presence, and his Ministers in executing of the King's precepts, of their office, and such as be in their company assisting them, and also upon a cry made for arms to keep the peace, and the same in such places where such acts happen, be so hardy to come before the King's justices, or other of the King's Ministers doing their office with force and arms, nor bring no force in affray of peace, nor to go nor ride armed by night nor by day, in fairs, markets nor in the presence of the King's Justices, or other ministers, nor it [sic] no part elsewhere, upon pain to forfeit their armour to the King, and **[\*27]** their bodies to prison at the King's pleasure.

FRANCOIS XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH CAROLINA, 60-61 (1792). The Defendant addresses the Virginia statute in his Reply, stating that in *Bruen* the Supreme Court found that this statute sought to protect individuals against others bearing firearms in a way that spreads "fear" or "terror." (Reply,

p. 20). The Court agrees with this assessment but finds that the Supreme Court in *Bruen* discussed this statute while assessing a restriction on the right to public carry. The Supreme Court did not, however, address the statute in the context of a sensitive places analysis. *See Bruen, 142 S. Ct. at 2144-45*. Thus, the Supreme Court did not venture to address the portion of the statute that speaks directly to the prohibition on bringing "force and arms" before "ministers" "doing their office." The discussion in *Bruen* did not implicate that issue and the Court disagrees with the Defendant's assessment that the statute cannot be used to uphold a sensitive places-based regulation.

The North Carolina statute, according to the Defendant, also fails to support the government's argument because the court in *State v. Huntly, 25 N.C. 418 (1843),* held that the statute did not impose an offense merely for possessing a weapon. (Reply, p. 20). This point misses the mark because, again, **[\*28]** the court in *Huntly* is not addressing the part of the statute that refers to bringing "force and arms" in the presence of "ministers doing their office." Instead, the *Huntly* court is discussing the portion of the statute addressing the unlawful nature of carrying weapons while perpetuating an "affray." *Huntly, 25 N.C. at 421-22*. Similarly, the court's finding that "carrying of a gun per se constitutes no offence [sic] ... [f]or any lawful purpose—either of business or amusement—the citizen is at perfect liberty to carry his gun" does not disqualify the government's argument. *See Id. at 422-23*. Instead, it is a simple legal truism. Axiomatically, if an individual carries a firearm in compliance with the law, then there is no offense. However, carrying a firearm in violation of the law, for example, as described in the North Carolina statute, in a location where an official is performing his duty, is an offense.[7]

_____

[7] The Defendant also argues that even if the Court accepts the above-mentioned statutes as persuasive toward establishing the NIH as a sensitive place, the government must bring forward more statutes to satisfy its burden. On this argument, the Defendant cites the *Bruen* majority where it says, "we doubt that three colonial regulations could suffice to show a tradition of public-carry regulation." *Bruen, 142 S. Ct. at 2142*. The Court disagrees. Here, too, the Court finds that the Defendant's assertion is contextually inaccurate. In the quoted language, the *Bruen* majority is discussing an issue that is not relevant to this Court's consideration. In this case, the Court is assessing whether the NIH can be analogized to a sensitive

Accordingly, the Court finds that the NIH regulation, which limits the ability of individuals to bring firearms into areas where NIH employees are performing their duties is sufficiently analogous to the Virginia and North Carolina founding-era regulations banning "force **[*29]** and arms" in the presence of the "ministers" and "justices" performing their duties. On the NIH campus, the presidentially appointed Director has an office and performs his duties. Furthermore, thousands of public officials, funded by congressional authorization and under the authority of the Director perform their duties. Additionally, in both cases there is the logical interest of preventing the disruption of government vis a vis the introduction of firearms, potentially putting those executing government functions in harm's way. Therefore, under *Bruen*, the Court finds that the government can sustain its burden through this analogy.

Finally, in Analogy No. 4 the government relates the NIH to college campuses and founding-era restrictions that prevented firearms on college campuses. The government asserts that the NIH is a "research institution not unlike a university." (Opposition, pp. 11-12). Principally, the Defendant counters the government's argument by suggesting that the regulations prohibiting firearms on college campuses are not "relevantly similar" to the instant regulation. First, the Defendant says that the laws cited by the government only applied to students and did not **[*30]** present a comparable burden to the regulation at issue, which prohibits possession entirely. Second, the Defendant asserts that the government did not identify why the regulations were imposed and therefore failed to identify how the laws are "relevantly similar." (Reply, pp. 20-21).

First, the Court holds that Defendant's suggestion that *§ 3.42(g)* imposes a greater burden than firearm prohibitions on college campuses is overstated. Historical firearm regulations pertaining to college campuses represented blanket firearm bans, which

applied to every student. At the University of Georgia, where firearm restrictions were imposed in or about 1810, there were no exceptions, and it applied in "any case whatsoever." *The Minutes of the Senatus Academicus 1799-1842*, https://www.libs.uga.edu/hargrett/archives/senatus/sena tus%20academicus%201799-1811.pdf [https://perma.cc/7RJR-9JYR] (last visited Jan. 4, 2023). In places where there were exceptions, like the University of North Carolina and the University of Virginia, a student could use firearms "with the permission of [f]aculty." *See, e.g.*, LAWS OF THE UNIVERSITY OF NORTH CAROLINA 9 (1829) (stating that "no student shall keep a dog, or fire arms [sic], **[*31]** or gunpowder ... nor shall he use fire arms without permission from some member of the Faculty"); *University of Virginia Board of Visitors Minutes October 4-5, 1824*, ENCYCLOPEDIA VIRGINIA, https://encyclopediavirginia.org/entries/university-of-virginia-board-of-visitors-minutes-october-4-5-1824/ (last visited Jan. 4, 2023) (same). This sole exception further shows how the burden between these restrictions and *§ 3.42(g)* is comparable as a similar exception appears in *§ 3.42(g)*. If an individual wishes to possess a firearm on NIH property, an individual, upon written request, has a chance to obtain the permission of the Director under certain circumstances. Moreover, the Court finds that the burden of the regulation at issue is reduced by the fact that it pertains solely to a particularized parcel of federal land and operates as no more than a partial limitation on where an individual may carry a firearm.

Furthermore, the Court finds that the Defendant's argument is defeated by the plain language of the *Bruen* opinion. As discussed, the Supreme Court included "schools" as one of the categories to which the sensitive places doctrine applied. *Bruen, 142 S. Ct. at 2133*. This Court detailed *supra* how a textual analysis of the opinion **[*32]** forces the conclusion that the *Bruen* majority intended "government buildings" and "schools" to be interpreted broadly. Applying that finding here, the Court determines that a regulation centered on a "college campus" falls under "schools" and within the sensitive places doctrine. Thus, the Court's responsibility is determining if the NIH is analogous to a college campus.

The Court does find that the NIH is similar to a college campus. The NIH is an institution that is staffed largely by academics. Within NIH grounds, lectures are hosted, scientific areas are studied and researched, and there are things like libraries, auditoriums, and lecture halls. All of these elements are hallmarks of college

---

place. It is not, however, determining whether there is sufficient proof to find that a historical tradition of regulating sensitive places exists. This Court's textual analysis of *Bruen* is that the Supreme Court announced that the sensitive places doctrine is part of a "longstanding" and undisputed tradition. *See Bruen, 142 S. Ct. at 2133-34*. In contrast, the *Bruen* majority sought to determine if the *historical tradition itself* for public carry regulations existed. *Id. at 2142*. At no point did the *Bruen* majority claim that a certain quantity of historical examples was necessary when comparing a regulation to another that exists within an already established historical tradition.

campuses. The Court can identify similarities in terms of the population that tends to exist on both (academics), the activities that take place (research and lectures), and the buildings you will find (libraries, auditoriums, etc.). Security protocols, too, that are often present on college campuses are similar to NIH security protocols. Many college campuses have campus security or police, restrictions on visitor access, and designated areas where visitors must check-in prior to entry. *See,* [*33] *e.g., Visitor Policies,* DEPAUL HOUSING, https://offices.depaul.edu/housing/resident-resources/housing-facilities/Pages/visitor-policies.aspx (last visited Dec. 21, 2022); JOHN M. REID, CALIFORNIA STATE UNIVERSITY CAMPUS SECURITY STANDARDS, https://www.csuchico.edu/up/_assets/documents/security-standards.pdf; *Public Safety,* FORDHAM UNIV., https://www.fordham.edu/student-life/safety-health-and-wellness/public-safety/ (last visited Dec. 21, 2022). As a result, the government satisfies its burden through this analogy as well.

In sum, the Court finds that the NIH is a sensitive place and that *45 C.F.R. § 3.42(g)* properly regulates the carrying and possession of firearms on NIH grounds and does not violate the *Second Amendment.*[8]

_____

[8] The Court notes that the government also asserts that the *Second Amendment's* plain text does not cover the Defendant's conduct because he was in a "highly regulated, closely-scrutinized, heavily guarded government research facility," not in the "general public." (Opposition, p. 9). The Court finds, consistent with the textual analysis contained herein, the government's claim is not supported by *Bruen.* The *Bruen* court broadly defines what it means to be "in public," defining "in public" as "outside the home." *Bruen, 142 S. Ct. at 2122.* ("We too agree, and now hold, consistent with *Heller* and *McDonald,* that the *Second* and *Fourteenth Amendments* protect an individual's right to carry a handgun for self-defense *outside the home*") (emphasis added). In addition, the government errors by suggesting that an initial assessment of whether the *Second Amendment* covers the Defendant's conduct is the same as performing a sensitive places analysis. The Supreme Court, in reaffirming the sensitive places doctrine, did not assert that sensitive places were not "in public." *Id. at 2133.* Instead, the Supreme Court said that regulations of sensitive places are permissible because they are part of a longstanding tradition and consistent with history. *Id.* Accordingly, the fact that the Defendant was in a "heavily guarded government research facility" does not allow this Court to find that the *Second Amendment* does not cover the Defendant's conduct. However, as discussed *supra,* it does reinforce the conclusion that the regulation at issue is constitutional as it applies to a sensitive place.

2. Property Clause

The *Property Clause of the Constitution* provides that:
> the Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State.

*U.S. Const. art IV, § 3, cl. 2.*

The Defendant asserts that the authority granted to Congress by the *Property Clause* is limited by the other portions of the Constitution, including the *Second Amendment,* and [*34] any action taken on federal property must still comply with the *Bruen* opinion. (Reply, pp. 2-3).

According to the government, however, because the NIH exists on federal land and *Section 3.42(g)* specifically imposes regulations on individuals who possess firearms on federal land, the regulation at issue passes constitutional muster. Namely, consistent with the *Property Clause,* Section 3.42(g) is a "needful Rul[e] and Regulatio[n] respecting the territory or other Property belonging to the United States." (Opposition, pp. 4-5). In support of its argument, the government points to various cases where courts have described Congress' authority to regulate public lands as "plenary." *See, e.g., United States v. Masciandaro, 638 F.3d 458, 473 (4th Cir. 2011).*

It is true that some of the cases cited by the government do discuss the *Property Clause* in the context of firearm regulations. *See, e.g., United States v. Dorosan, supra, 2008 U.S. Dist. LEXIS 49628, 2008 WL 2622996, at *3.* In *Dorosan,* the district court denied the defendant's motion to dismiss the superseding bill of information on *Second Amendment* grounds, finding, in part, that the *Property Clause* provided the constitutional basis for a regulation prohibiting the possession of a firearm at a U.S. Post Office. The court found that "[b]eyond doubt, the *Property Clause* authorizes the enactment and enforcement of regulations which, like those at issue in this case, are [*35] designed to maintain safety and order on government property." *2008 U.S. Dist. LEXIS 49628, 2008 WL 2622996, at *3.*

However, this Court does not find that the *Property Clause* serves as an independent basis for upholding the regulation at issue. Rather, the majority of the *Property Clause* cases cited by the government, which

define Congress' authority under the _Property Clause_ as "plenary," relate to federalism disputes, a fact not present here. _See, e.g., Kleppe v. New Mexico, 426 U.S. 529, 96 S. Ct. 2285, 49 L. Ed. 2d 34 (1976); Utah Power & Light Co. v. United States, 243 U.S. 389, 405, 37 S. Ct. 387, 61 L. Ed. 791 (1917); United States v. City & Cty. of San Francisco, 310 U.S. 16, 18, 60 S. Ct. 749, 84 L. Ed. 1050 (1940)_. Alternatively, even if the Court found persuasive this Supreme Court jurisprudence, the authority that the _Property Clause_ gives to Congress is necessarily limited by the other parts of the Constitution, which includes the _Second Amendment_. _See United States. v. Comstock, 560 U.S. 126, 134-35, 130 S. Ct. 1949, 176 L. Ed. 2d 878 (2010)_ ("a federal statute, in addition to being authorized by _Art. I, § 8_, must also 'not [be] prohibited' by the Constitution") (citing _McCulloch v. Maryland, 17 U.S. 316, 421, 4 L. Ed. 579 (1819)_); _see also New York v. United States, 505 U.S. 144, 156, 112 S. Ct. 2408, 120 L. Ed. 2d 120 (1992)_ ("Congress exercises its conferred powers subject to the limitations contained in the Constitution. Thus, for example, under the _Commerce Clause_ Congress may regulate publishers engaged in interstate commerce, but Congress is constrained in the exercise of that power by the _First Amendment_"). Accordingly, even if the Court were to find that Congress is granted the authority to regulate conduct on the NIH campus through the _Property Clause_, that authority must withstand the _Second Amendment_ rubric set forth in _Bruen_.

In sum, the Court finds **[*36]** that the _Property Clause_ does not support the constitutionality of the regulation at issue.


## V. Conclusion

For the reasons set forth herein, the Court holds that _45 C.F.R. § 3.42(g)_ does not violate the _Second Amendment_ and that the Defendant's Motion, ECF No. 22, is **DENIED**.

A separate order will follow.

Dated: January 9, 2023

/s/ The Honorable Gina L. Simms

United States Magistrate Judge


**ORDER**

For the reasons set forth in the accompanying Memorandum Opinion, it is this 9th day of January, 2023, hereby **ORDERED** that:

1. Defendant's Motion to Dismiss Citation Under the _Second Amendment_ (ECF No. 22) is **DENIED**.

2. On January 5, 2023, the Plaintiff filed a "Consent Motion to Continue Trial Date," (ECF No. 35). That request is **GRANTED**. The new trial date is **May 16, 2023**.

/s/ The Honorable Gina L. Simms

United States Magistrate Judge

---

**End of Document**



Neutral
As of: March 29, 2023 4:42 PM Z

## *Frey v. Nigrelli*

United States District Court for the Southern District of New York

March 13, 2023, Decided; March 13, 2023, Filed

21 CV 05334 (NSR)

**Reporter**
2023 U.S. Dist. LEXIS 42067 *; 2023 WL 2473375

JASON FREY, BRIANNA FREY, JACK CHENG, and WILLIAM SAPPE, Plaintiffs, v. STEVEN NIGRELLI, Acting Superintendent of the New York State Police, in his official capacity, NEW YORK CITY, New York, and KEECHANT SEWELL, in her official capacity as NYPD Commissioner, Defendants.

**Prior History:** *Frey v. Bruen, 2022 U.S. Dist. LEXIS 31053, 2022 WL 522478 (S.D.N.Y., Feb. 22, 2022)*

## Core Terms

license, firearms, concealed, handgun, preliminary injunction, carrying, regulations, Plaintiffs', subway, guns, MTA, restrictions, arms, alleges, injunction, intend, standing to challenge, private property, Declaration, banning, rails, challenging, DENIES, courts, irreparable harm, self-defense, concrete, schools, places, travel

**Counsel:** **[*1]** For Jason Frey, Brianna Frey, Jack Cheng, William Sappe, Plaintiffs: Amy L Bellantoni, The Bellantoni Law Firm, LLP, Scarsdale, NY.

For Kevin P. Bruen, Acting Superintendent of the New York State Police, in his official capacity, Defendant: Ian Ramage, LEAD ATTORNEY, NYS Office of The Attorney General, Litigation Bureau, New York, NY; Neil Shevlin, LEAD ATTORNEY, New York State Office of the Attorney General (28 Liberty), New York, NY.

For New York City, New York, Dermot Shea, in his official capacity as NYPD Police Commissioner, Defendants: Rachel Kane Moston, LEAD ATTORNEY, New York City Law Department, New York, NY.

For AAG New York Attorney General's Office, Interested Party: Ian Ramage, NYS Office of The Attorney General, Litigation Bureau, New York, NY.

**Judges:** NELSON S. ROMÁN, United States District Judge.

**Opinion by:** NELSON S. ROMÁN

## Opinion

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

Plaintiffs Jason Frey, Brianna Frey, Jack Cheng, and William Sappe bring this action against the Acting Superintendent of the New York State Police, Steven Nigrelli ("Acting Superintendent" or "State Defendant"), and New York City and the NYPD Police Commissioner, Keechant Sewell (together, the "City Defendants"), **[*2]** alleging various violations of the *Second Amendment*. (ECF No. 47.) Presently before the Court is Plaintiffs Jason Frey, Brianna Frey, and William Sappe's (hereinafter, "Plaintiffs") motion for preliminary and permanent injunction seeking to enjoin the

enforcement of the following New York State and New York City gun laws: *N.Y. Penal Law §§ 400.00(6)*, *400.00(15)*, *265.01*, *265.01-b*, *265.01-d*, *265.01-e*, *265.03(3)*, and *NYC Admin. Code § 10-315*. (ECF No. 48.) For the following reasons, Plaintiffs' motion is DENIED in part and STAYED in part.

## BACKGROUND

## I. NEW YORK STATE AND NEW YORK CITY FIREARM LAWS

On September 1, 2022, the State of New York amended its existing gun laws via the Concealed Carry Improvement Act ("CCIA"). On July 1, 2022, the CCIA had been passed by the New York State Legislature in a special session, then promptly signed into law by Governor Kathy Hochul. The bill was designed "to align with the Supreme Court's recent decision in []*Bruen*" *See* Press Release, Governor Kathy Hochul, Governor Hochul Signs Landmark Legislation, https://on.ny.gov/3BM6Hz7 (July 1, 2022). The CCIA updated New York's licensing framework to eliminate the "proper cause" requirement that was held unconstitutional by *Bruen*, to clarify the requirement of "good moral character," and to establish additional requirements, **[*3]** as discussed below.

New York maintains a general prohibition on the possession of firearms without a license. *See* *N.Y. Penal Law §§ 265.01-265.04*, *265.20(a)(3)*. New York State's firearm licensing law is codified in *New York Penal Law § 400.00*. Aside from licenses connected to particular employment or professions, New York has two general types of licenses: a premises license for the home or place of business and a concealed carry license. *N.Y. Penal Law § 400.00(2)(a)-(b)*, *(c)-(f)*. Because New York permits concealed carry, it does not

permit the open carry of firearms. A violation of licensing restrictions is a Class A misdemeanor under *N.Y. Penal Law § 400.00(15)*.

All licensees must meet general eligibility requirements, including, *inter alia*, requirements that the licensee is over twenty-one years of age, "of good moral character," and has not been convicted of a felony or a serious offense. *N.Y. Penal Law § 400.00(1)*.

Licensing is a largely local process in New York State. *See* *Sibley v. Watches, 194 A.D.3d 1385, 1386, 148 N.Y.S.3d 574 (4th Dep't 2020)*. Applications for a license are adjudicated by local licensing officers, who are local judges throughout most of the State. *N.Y. Penal Law § 265.00(10)*. In New York City, Nassau County, and Suffolk County, local police officials serve as licensing officers. *Id.* The State Police formulate the application form throughout most of New York, and concealed carry licenses issued in New York are valid **[*4]** throughout the State, with the exception of New York City. Pursuant to *§§ 400.00(3)(a)* and *(7)*, New York City may devise its own licensing application, and it requires that any handgun owner seeking to conceal carry in the City obtain "a special permit . . . issued by the police commissioner." *N.Y. Penal Law § 400.00(6)*. New York City has its own regulations pertaining to the issuance of handgun licenses and provides for premises licenses and different forms of concealed carry licenses. *See* *38 RCNY §§ 5-01*, *5-02*.

Part of the CCIA enacted the new "Private Property Provision," which prohibits individuals from possessing "a firearm, rifle or shotgun" on private property without the express consent of the property owner or lessee. *N.Y. Penal Law § 265.01-d*. Additionally, *New York Penal Law § 265.01-e* enumerates a set of "sensitive locations" in which individuals may not

possess "a firearm, rifle or shotgun." As with the Private Property Provision, this section contains exceptions for police officers, registered security guards, active-duty military, and other designated persons.

## II. THE PLAINTIFFS

### A. Jason and Brianna Frey

Jason and Brianna Frey are both United States citizens who reside in Westchester County. (*See* ECF No. 47, Second Amended Complaint ("SAC") ¶¶ 12-13; Declaration of Jason Frey ("Jason Frey **[*5]** Decl.") ¶ 2, annexed as Exhibit ("Ex.") 1 to the Declaration of Amy L. Bellantoni in support of Plaintiffs' Motion for Preliminary Injunction ("Bellantoni Decl."); Declaration of Brianna Frey ("Brianna Frey Decl.") ¶ 2, annexed to the Bellantoni Decl. as Ex. 2). Before the *Bruen* decision, both Freys applied for and were granted concealed carry licenses by a Westchester County judge. (Brianna Frey Decl. ¶ 3; Jason Frey Decl. ¶ 3.) The licenses were restricted "sportsman" licenses, limiting possession of their handguns to the inside of their home, to and from target shooting, and during sporting activities. (Brianna Frey Decl. ¶ 6; Jason Frey Decl. ¶ 7.)

In 2019, both Freys applied for an amendment to allow for unrestricted concealed carry licenses. (Brianna Frey Decl. ¶ 7; Jason Frey Decl. ¶ 8.) The licensing officer denied the applications because neither Frey had met the governing "proper cause" standard. (Brianna Frey Decl. ¶ 7; Jason Frey Decl. ¶ 9.) The requirement that concealed carry license applicants show "proper cause" in order to be eligible to get a license was struck down by the Supreme Court on June 23, 2022 in a decision captioned *New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, 2156, 213 L. Ed. 2d 387 (2022)*.

Jason Frey does not allege that he applied **[*6]** for a concealed carry license after the *Bruen* decision, or after the enactment of the CCIA legislation, to obtain an unrestricted license to carry his handgun. Brianna Frey alleges that "[i]n July 2022, [she] applied to have the restrictions on her handgun license removed to allow for 'full carry', which was denied in September 2022." (SAC ¶ 54.) Brianna Frey does not allege that she appealed that decision through an Article 78 proceeding in New York State court. Neither Brianna or Jason Frey alleges that he or she sought to obtain a separate handgun license in New York City, and Jason Frey states that he is not going to apply for a separate handgun license to legally carry in New York City. (Jason Frey Decl. ¶ 26.)

As of October 14, 2022, Brianna Frey alleged that she intended "to carry her handgun concealed on her person on a daily basis for self-defense everywhere she goes, on public and private property, commercial and residential, where ordinary people travel, congregate, shop, fill up their cars with gas, and simply exist and she intends to continue such protected conduct on a regular basis until her natural death." (SAC ¶ 52.) As of the date of her declaration, on October 16, **[*7]** 2022, she continued to indicate that she intended on carrying a handgun outside of her licensing restrictions. (*See* Brianna Frey Decl. ¶¶ 11-13.) Mr. Frey declares that he has begun to "regularly carry a handgun concealed on [his] person in public—not only to and from target shooting or when [he is] engaging in sportsman activities like camping and hiking, for the protection of [him]self and [his] family—but during [his] everyday life...." (Jason Frey Decl. ¶ 14.) He also states that he "intend[s] to start carrying [his] handgun open and holstered . . . at times when [he is] not carrying the same handgun concealed." (*Id.* ¶ 21.) Mr.

Frey states that he carries his handgun to go shopping in shopping centers, restaurants subject to the alcohol and beverage control laws, movie theaters, various parks, and gas stations. (*Id.* ¶ 14.) Mr. Frey alleges that he travels to New York City in order to "get goodies at Junior's," travel to Murray's Bagel's on 8th Avenue, and visit friends in Williamsburg. (*Id.* ¶ 27.) Brianna Frey does not allege that she has traveled to, or intends to travel to, New York City.

### B. William Sappe

William Sappe is a resident of Orange County. *See* Declaration of William **[*8]** Sappe ("Sappe Decl."), ¶ 3, annexed to the Bellantoni Decl. as Ex. 3.) He is self-employed and alleges that his business involves transporting "substantial amounts of cash, diamonds, and jewelry for high-end jewelers . . . between the Diamond District and various locations in the 5 boroughs of New York City, throughout New York State, and to other states, including California and Nevada." (*Id.* ¶ 7.) Mr. Sappe is licensed as an Armed Guard in New York. (*Id.* ¶ 4.) He holds a valid license to carry a concealed handgun everywhere in New York State, with the exception of New York City, which was issued by a judicial licensing officer in Orange County. (*Id.* ¶ 3.)

Mr. Sappe states that he "previously applied to the NYPD Licensing Division to obtain a separate concealed carry license, as required by statute, and [his] application was denied." (*Id.* ¶ 9.) He does not allege when he applied for the license, when his license was denied, or the reason for the denial. Mr. Sappe has not alleged whether he has applied for a license to carry his handgun in New York City since the Supreme Court's decision in *Bruen*, or since the enactment of the CCIA.

Mr. Sappe alleges that "[b]eginning [on October 14, **[*9]** 2022], Mr. Sappe intends to carry his handgun open and exposed on his person for self-defense everywhere he goes, including New York City, every day that he does not otherwise carry his handgun concealed." (SAC ¶ 81.) Mr. Sappe alleges that he "intend[s] to begin carrying my handgun open and exposed on those days that [he is] not carrying a handgun concealed on my person, both inside New York City and throughout the state." (*See* Sappe Decl. ¶ 19.) Mr. Sappe also alleges that as part of his daily employment, he travels through Times Square. (*Id.* at ¶ 13.) He states that "I am going to carry my handgun in the Times Square area for self-protection." (*Id.*)

## III. PROCEDURAL BACKGROUND

Plaintiffs commenced this action on June 16, 2021. (ECF No. 1.) Plaintiffs requested leave to file a Motion for Preliminary Injunction, which was filed and fully briefed on September 21, 2021. (ECF No. 20.) On October 14, 2021, City Defendants filed their Answer while State Defendant filed a Motion to Dismiss on January 3, 2022. (ECF No. 31.) Oral arguments on the Preliminary Injunction were held on February 1, 2022, and the Court subsequently issued a decision denying the injunction on February 22, 2022. (ECF **[*10]** No. 37.)

On June 23, 2022, the Supreme Court issued its decision in *Bruen*, and on August 22, 2022, Plaintiffs requested permission to file a Second Motion for Preliminary Injunction based on the holding in *Bruen*. (ECF No. 42.) On September 1, 2022, the Court issued a Decision and Order denying Plaintiffs' request for a Second Preliminary Injunction and granted State Defendant's Motion to Dismiss as to them. (ECF No. 44.) Plaintiffs filed an Amended Complaint and a Second Amended Complaint on October 4 and October 14, 2022, respectively, along with a stipulation signed by

all parties agreeing to the filing of the amended complaints.[1] (*See* ECF Nos. 46 and 47.) Plaintiffs Jason Frey, Brianna Frey, and William Sappe filed the present motion on October 20, 2022, styling it as an "Emergency Order to Show Cause," but which the Court construed as a Third Motion for Preliminary Injunction.[2] (ECF No. 48.) The parties fully briefed their arguments on the Third Motion for Preliminary Injunction on December 15, 2022.

On March 20, 2023, the Court held oral argument on Plaintiff's challenge to *N.Y. Penal Law § 265.01-e* (banning guns in sensitive places), with a focus on *§ 265.01-e(2)(n)* which bans firearms in public transportation, including **[*11]** Metropolitan Transit Authority ("MTA") subway cars and train cars and *§ 265.01-e(2)(t)* which bans the carrying of firearms in the Times Square area.

## LEGAL STANDARD

## I. PRELIMINARY AND PERMANENT INJUNCTION STANDARD

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)*. A party seeking a preliminary injunction "must demonstrate that it will suffer irreparable harm absent injunctive relief and either (1) that it is likely to succeed on the

merits of the action, or (2) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, provided that the balance of hardships tips decidedly in favor of the moving party." *Mullins v. City of New York, 626 F.3d 47, 52-53 (2d Cir. 2010)* (citing *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 34-35 (2d Cir. 2010)*).

Where "a party seeks an injunction that will affect governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the plaintiff must typically show a likelihood of success on the merits—a serious question going to the merits is usually insufficient[.]" *Mullins, 626 F.3d at 53*. However, where a party seeks a mandatory injunction "altering, rather than maintaining, the status quo," such as in this case, that party "must meet [a] more rigorous standard." **[*12]** *Almontaser v. N. Y. City Dep't of Educ., 519 F.3d 505, 508 (2d Cir. 2008)* (internal alterations omitted); *see also Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 33 (2d Cir. 1995)* ("[W]e have required the movant to meet a higher standard where . . . an injunction will alter, rather than maintain, the status quo . . . ."). The moving party must establish "a clear showing that the moving party is entitled to the relief requested," or show that "extreme or very serious damage" would result in the absence of preliminary relief. *Tom Doherty Assocs., 60 F.3d at 34*.

## II. ANALYSIS FOR *SECOND AMENDMENT* CLAIMS POST-*BRUEN*

On June 23, 2022, the U.S. Supreme Court announced a new standard of review when evaluating whether a regulation violates the *Second Amendment*, and expressly rejected the previous approach widely used by federal courts. *See Bruen, 142 S. Ct. at 2126*.

---

[1] The Second Amended Complaint, which was filed 10 days after the First Amended Complaint was filed, replaces formerly named Defendant Kevin Bruen, the former Superintendent of the New York State Police, with Steven Nigrelli, the Acting Superintendent of the New York State Police, and adds a new count challenging *NYC Admin. Code 10-315* and NYPD rules promulgated thereunder. (SAC ¶¶ 245-48.)

[2] Plaintiff Jack Cheng is not a party to the instant preliminary injunction motion.

Finding that the second step was inconsistent with the principles articulated in *District of Columbia v. Heller, 554 U.S. 570, 635, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008)* and *McDonald v. City of Chicago, Ill., 561 U.S. 742, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010)*, the Court pronounced a new standard consistent with the approach used in Heller: (i) "[w]hen the *Second Amendment's* plain text covers an individual's conduct, the Constitution presumptively protects that conduct"; (ii) "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen, 142 S. Ct. at 2129-30*. In other words, at the second step, "the government must affirmatively prove that its firearms regulation is part of the **[*13]** historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id. at 2127*.

The "historical inquiry . . . will often involve reasoning by analogy . . ." *Bruen, 142 S. Ct. at 2132*. Such "analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id. at 2133*. Moreover, to "enabl[e] [courts] to assess which similarities are important and which are not" during this analogical inquiry, they must use at least "two metrics," which are "central" considerations to that inquiry: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen, 142 S. Ct. at 2132-33*. More specifically, courts must consider the following: (1) "whether modern and historical regulations impose a comparable burden on the right of armed self-defense"; and (2) "whether that [regulatory] burden is comparably justified." *Id. at 2133*.

In addition, when courts review historical sources, those that arose around when the *Second Amendment* was adopted (1791) and when the *Fourteen Amendment* was adopted (1868) are particularly instructive, whereas laws that **[*14]** long predated the adoption of the Constitution or long post-dated the enactment of the *Fourteenth Amendment* are given less weight, though courts may still consider them:

> "We categorize these historical sources because, when it comes to interpreting the Constitution, not all history is created equal. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them. The *Second Amendment* was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years. It is one thing for courts to reac[h] back to the 14th century for English practices that prevailed up to the period immediately before and after the framing of the Constitution. It is quite another to rely on an ancient practice that had become obsolete in England at the time of the adoption of the Constitution and never was acted upon or accepted in the colonies."

*Bruen, 142 S. Ct. at 2136* (internal quotations and citations omitted).

> "Similarly, we must also guard against giving post-enactment history more weight than it can rightly bear. It is true that in *Heller* we reiterated that evidence of how the *Second Amendment* was interpreted **[*15]** from immediately after its ratification through the end of the 19th century represented a critical tool of constitutional interpretation. We therefore examined "a variety of legal and other sources to determine *the public*

*understanding* of [the *Second Amendment*] after its . . . ratification. And, in other contexts, we have explained that a regular course of practice' can 'liquidate & settle the meaning of disputed or indeterminate 'terms & phrases in the Constitution.'"

*Id. at 2136* (internal quotations and citations omitted) (emphasis in original)

Lastly, "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Bruen, 142 S. Ct. at 2132*. This is because "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* Nonetheless, "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.*

## DISCUSSION [3]

Plaintiffs are requesting a preliminary and permanent injunction that will enjoin Defendants from enforcing *N.Y. Penal Law §§ 400.00(6)*, *400.00(15)*, *265.01*, *265.01-b*, *265.01-d*, *265.01-e*, *265.03(3)*, and *NYC Admin. Code § 10-315* against those who (i) possess a valid New York State handgun license and who carry a handgun **[*16]** open and exposed (holstered) on their person, and (ii) possess a valid unrestricted New York State concealed carry handgun license who carry a handgun concealed on their person within New York City. (*See* ECF No. 52 (Pls.' Br.) and ECF No. 74 (Pls.' Reply")). Defendants argue that Plaintiffs do not have standing to assert claims against several of the

statutes and have otherwise failed to satisfy their burden for a preliminary injunction. The Court will first examine Plaintiffs' standing, and then will discuss the merits of Plaintiffs' injunctive request.

## I. STANDING

The Supreme Court has called the doctrine of standing "perhaps the most important" of the case-or-controversy doctrines. *Allen v. Wright, 468 U.S. 737, 750, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984)*. The doctrine requires a plaintiff to have a "personal stake," in the outcome of the action. *Summers v. Earth Island Inst., 555 U.S. 488, 493, 129 S. Ct. 1142, 173 L. Ed. 2d 1 (2009)*. That is, a plaintiff must allege a "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen, 468 U.S. at 751*. "[T]he 'irreducible constitutional minimum' of standing consists of three elements[:] [t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to **[*17]** be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins, 578 U.S. 330, 338, 136 S. Ct. 1540, 194 L. Ed. 2d 635 (2016)* (quoting *Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)*). The party seeking to invoke federal jurisdiction has the burden of establishing each element. *Id. at 561*.

To have standing to seek injunctive relief, a plaintiff must establish a "real or immediate threat" of injury. *City of Los Angeles v. Lyons, 461 U.S. 95, 111, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983)*; *see also Nicosia v. Amazon.com, Inc., 834 F.3d 220, 239 (2d Cir. 2016)* ("Plaintiffs lack standing to pursue injunctive relief where they are unable to establish a 'real or immediate threat' of injury.").

---

[3] In addition to the parties' moving papers and accompanying exhibits, the Court has considered the amicus brief filed by Everytown for Gun Safety (ECF No. 72) as well as the Declaration of Dr. Brennan Rivas, a historian and independent scholar on behalf of defendant Nigrelli. (ECF No. 64.)

Mere "allegations of possible future injury are not sufficient"; the "injury must be certainly impending." *Izquierdo v. Panera Bread Co., 450 F.Supp.3d 453, 460 (S.D.N.Y. 2020)* (quoting *Daniel v. Tootsie Roll Indus., LLC, No. 17 CIV. 7541 (NRB), 2018 U.S. Dist. LEXIS 129143, 2018 WL 3650015, at *6 (S.D.N.Y. Aug. 1, 2018)*). Justiciable injury for purposes of Article III must be "real and immediate" and not purely speculative and abstract. *City of Los Angeles v. Lyons, 461 U.S. 95, 102, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983)*. Moreover, with respect to pre-enforcement challenges to statutes, a credible threat of prosecution cannot rest on fears that are "imaginary or speculative." *Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298, 99 S. Ct. 2301, 60 L. Ed. 2d 895 (1979)* (quoting *Younger v. Harris, 401 U.S. 37, 42, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971)*). That being said, "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Susan B. Anthony List v. Driehaus, 573 U.S. 149, 159, 134 S. Ct. 2334, 2342, 189 L. Ed. 2d 246 (2014)* (quoting *Babbitt, 442 U.S. at 298*). In addition, "courts are generally willing to presume that the government will enforce the law as long **[*18]** as the relevant statute is recent and not moribund." *Picard v. Magliano, 42 F.4th 89, 98 (2d Cir. 2022)* (citing *Cayuga Nation v. Tanner, 824 F.3d 321, 331 (2d Cir. 2016)* (quoting *Hedges v. Obama, 724 F.3d 170, 197 (2d Cir. 2013)*).

## A. Standing to raise a challenge against *N.Y. Penal Law §§ 265.01*, *265.01-b*, & *265.03(3)*

The City Defendants point out that Plaintiffs do not state why they seek an injunction against *NPYL §§ 265.01*, *265.03(3)*, and *265.01-b*, but

it appears that Plaintiffs do so because they seek to prevent enforcement of these laws against the following conduct: (i) carrying a handgun open and exposed; and (ii) carrying concealed firearms outside the restrictions placed on the licenses of Jason Frey and Brianna Frey. (ECF No. 63 ("City Defs.' Opp.") at 6.)

The Court finds, like it did in denying Plaintiff's first motion for preliminary injunction, that Plaintiffs continue to lack standing to challenge *N.Y. Penal Law §§ 265.01(1)*, *265.01-b*, and *265.03(3)* because they have not and cannot be injured by those statutes. These three provisions impose misdemeanor and felony penalties for the illegal carrying of firearms without a license. *See N.Y. Penal Law §§ 265.01(1)*; *265.01-b*; *265.03(3)*. For the reasons discussed below, the Court agrees and DENIES Plaintiffs' preliminary and permanent injunction motion as to their challenge against these three statutes.

The Court previously found that Plaintiffs failed to establish standing to challenge *N.Y. Penal Law §§265.01(1)*, *265.01-b*, and *265.03(3)* in its Order and Opinion on Plaintiff's first **[*19]** motion for preliminary injunction, dated February 22, 2022. *See Frey v. Bruen, No. 21 CV 05334 (NSR), 2022 U.S. Dist. LEXIS 31053, 2022 WL 522478, at *6 (S.D.N.Y. Feb. 22, 2022)*. There the Court reasoned that, *inter alia*, as "each Plaintiff has been issued such a license, they do not and will not face criminal liability under *Section 265*." *Id.* As previously discussed by the Court in the prior Order and Opinion, "*Section 265.20(a)(3)* explicitly states that these Sections 'shall not apply' to '[p]ossession of a pistol or revolver by a person to whom a license therefor has been issued as provided under *section 400.00* or *400.01*.'" *Id.* (citing *N.Y. Penal Law § 265.20(a)(3)*. "In addition, *Section 400.00(17)* states:

"[t]he provisions of article two hundred sixty-five of this chapter relating to illegal

2023 U.S. Dist. LEXIS 42067, *19

possession of a firearm, shall not apply to an offense which also constitutes a violation of this section by a person holding an otherwise valid license under the provisions of this section and such offense shall only be punishable as a class A misdemeanor pursuant to this section."

*N.Y. Penal Law § 400.00(17)*.

As each Plaintiff has been issued such a license, they do not and will not face criminal liability under *Section 265*." (*Id.* (citing *N.Y. Penal Law § 400.00(17)*).

That same reasoning continues to apply here in the instant motion for preliminary and permanent injunction. The Court agrees with the State Defendant that since neither Plaintiffs' circumstances, as **[*20]** expressed in their recent declarations, nor those statutes have changed since the Court's prior ruling on February 22, 2022, Plaintiffs still face no criminal penalties or threats of prosecution for violating *§§ 265.01*, *265.01-b*, and *265.03(3)*. (*See* State Def's Opposition at 12.).[4]

Plaintiffs fail to present any meaningful arguments to the contrary. In their opening brief, Plaintiffs merely argue that they have announced "their intention to carry a firearm in violation of the challenged laws sufficient to confer Article III standing," (Pls.' Br. at 6), but they fail to provide any arguments countering the State Defendant's point that those statutes will not apply to the Plaintiffs as firearms license holders. Nor do Plaintiffs satisfy their burden of establishing standing as to these

three statutory provisions in their reply brief. In their reply brief, Plaintiffs appear to argue that they only have standing to assert the constitutionality of all of the statutes, including *§§ 265.01*, *265.01-b*, and *265.03(3)*, with respect to the purported right to open carry, (Pls.' Reply at 17), and state that "[t]he ambiguity in the law, and risk of arrest, calls for a judicial declaration before finding that Plaintiffs do not have standing to challenge **[*21]** *Penal Law 265.00, et seq.*" (*Id.*) Plaintiffs fail to cite to any legal authorities for their statement. The Court therefore finds that Plaintiffs fail to satisfy their burden to establish standing to challenge *§§ 265.01*, *265.01-b*, and *265.03(3)*.

## B. Standing to raise a challenge against *N.Y. Penal Law §§ 265.01-d* and *265.01-e*

State Defendant concedes that the *N.Y. Penal Law § 265.20(a)(3)* exception does not apply to newly added a *N.Y. Penal Law §§ 265.01-d* and *N.Y. Penal Law §§ 265.01-e*, both of which did not apply at the time of the Court's prior ruling. (*See* ECF No. 66 ("State Def.'s Opp.") at 12 n.5). Therefore, the Court will assess whether Plaintiffs have standing to raise a challenge against *N.Y. Penal Law § 265.01-d* and *N.Y. Penal Law § 265.01-e*.

## 1. Standing to challenge *N.Y. Penal Law § 265.01-d*

The City Defendants argue that Plaintiffs do not have standing to assert a claim challenging *N.Y. Penal Law § 265.01-d*, which states that one shall not carry firearms onto private property without permission of the owner or lessee of that property. *N.Y. Penal Law § 265.01-d*. The City Defendants mainly argue that "[i]f Plaintiffs ask and obtain permission from private property owners and/or lessees, they would not be aggrieved by the statute."

---

[4] To the extent that Plaintiffs point to these statutes as possibly being enforced against them in the event that they open carry their firearms, Plaintiffs' concerns are misplaced. As discussed in the Court's previous Order and Opinion, "if Plaintiffs were to carry their weapons openly, they would at best be committing a violation of their handgun license restrictions, and subject to potential penalties under *N.Y. Penal Law Section 400.00(15)*." *Frey, 2022 U.S. Dist. LEXIS 31053, 2022 WL 522478, at *7*.

(City Defs.' Opp. at 13.)

However, recently, district courts have found standing to challenge *N.Y. Penal Law § 265.01-d* where plaintiffs, like Plaintiffs do here, state that they intend to carry arms into private property without obtaining permission. *See Christian v. Nigrelli, No. 22-CV-695 (JLS), 2022 U.S. Dist. LEXIS 211652, 2022 WL 17100631, at *4 (W.D.N.Y. Nov. 22, 2022)* (finding **[*22]** that individual with concealed carry license established standing where (i) he swore that he would typically bring his firearm on private property open to the public and to establishments that neither prohibit the carrying of firearms nor post signage consenting to the carry of firearms; and where (ii) New York Governor Kathy Hochul and Police Superintendent Nigrelli publicly announced enforcement action against gun law violations.). *Antonyuk v. Hochul, No. 122CV0986GTSCFH, 2022 U.S. Dist. LEXIS 201944, 2022 WL 16744700, at *39 (N.D.N.Y. Nov. 7, 2022)* ("Based on the fact that Plaintiffs Johnson and Leman have sworn that they have frequently carried concealed in privately owned, open-to-the-public locations and will do so again soon (regardless of the absence of CCIA signage), the Court finds they have asserted a sufficiently concrete and imminent intent to violate this provision of the CCIA.").

The Court finds that Plaintiffs Jason and Brianna Frey meet the injury-in-fact element of standing to challenge this particular statute. When challenging a law prior to its enforcement, "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat **[*23]** of prosecution thereunder.'" *Susan B. Anthony List, 573 U.S. at 158-59, 134 S.Ct. 2334*. (quoting *Babbitt v. United Farm Workers Nat. Union, 442 U.S. 289, 297, 99 S.Ct. 2301, 60 L.Ed.2d 895*

*(1979)*). Jason Frey states he will not "seek permission" or refrain from carrying because there is no "conspicuous signage" granting permission to carry. (Jason Frey Decl. ¶ 16.) Likewise, Brianna Frey declares that "I am not going to ask permission from the above locations, or from every property owner or lessee or refrain from going about in public to all of the places that members of the general public go — on public and private property, residential and commercial — just because there is no 'conspicuous sign' granting me permission to exercise my right to be armed for self-defense." (Brianna Frey Decl. ¶ 16.). In addition, as Plaintiffs discuss, both N.Y. Governor Hochul and First Deputy State Police Superintendent Steven Nigrelli (now Acting Superintendent and Defendant) announced a "zero tolerance" policy to violations of gun law violations, and indicated that New York State, troopers "are standing ready" to ensure that "all laws are enforced." (Pl.'s Br. at 10-11 (citing Governor Hochul's August 21, 2022 press conference at 38:00-25).[5] Therefore, the Court finds that there is a credible threat of prosecution regarding this statute. In addition, **[*24]** given the recency of the law and lack of any indication that it will be repealed, the Court is and should be "willing to presume that the government will enforce" it. *See Picard, 42 F.4th 89* (quoting *Cayuga Nation, 824 F.3d at 331*).

The Court notes that Mr. William Sappe fails to provide any statement like the Freys do indicating that he will not seek permission before carrying in a private property, so the Court finds that he fails to establish injury-in-fact as to his challenge of this statute. (*See generally*, Sappe Decl.).

With respect to the other two elements to

---

[5] "Governor Hochul Delivers a Press Conference on Gun Violence Prevention," (Aug. 31, 2022), available at https://www.youtube.com/watch?v=gC1L2rrztQs.

establish standing—traceability to the conduct of the Defendants and redressability—the Court finds that Plaintiffs Jason and Brianna Frey meet these elements, given that the named Defendants are specifically tasked with enforcing the gun laws. *See Antonyuk, No. 2022 U.S. Dist. LEXIS 201944, 2022 WL 16744700, at *39* (finding traceability and redressability against officials who "each has the specific duty to enforce [*N.Y. Penal Law § 265.01-d*].").

## 2. Standing to challenge *N.Y. Penal Law § 265.01-e*

Plaintiffs do not allege that they seek to carry their handguns in the vast majority of locations deemed "sensitive" under *Penal Law § 265.01-e(2)(a)-(t)* - *e.g.*, places of worship, zoos, nursery schools, etc. (City Defs.' Opp. at 10-11; State Def. Opp. at 23-24.) Plaintiffs therefore cannot demonstrate an injury-in-fact with a "fairly **[*25]** traceable connection" to the entirety of *Penal Law § 265.01-e*, *see Lujan, 504 U.S. at 560*; *Penal Law § 265.01-e(2)(a)-(t)*, but only those sensitive locations where they have alleged or sworn "sufficiently concrete intention to carry." *See Antonyuk v. Hochul, 2022 U.S. Dist. LEXIS 201944, 2022 WL 16744700, at *11* (denying preliminary injunction motion for lack of standing in challenge of *N.Y. Penal Law § 265.01-e(2)(a)* [prohibiting firearms "any place ... under the control of federal, state or local government, for the purpose of government administration . . . "] because plaintiffs failed to allege or assert a concrete intention to carry concealed on government property or in a government building in the immediate future.); *see 2022 U.S. Dist. LEXIS 201944, [WL] at *8* ("'someday' intentions—without any description of concrete plans, or indeed even any specification of when the 'someday' will be—do not support a finding of the 'actual or imminent' injury that our cases require.").

Per their declarations, Plaintiffs have only indicated that they currently have or plan on violating the current gun laws in parks, theaters, restaurants with on-premise alcohol consumption, the MTA subway and train cars, and Times Square. (Jason Frey Decl. ¶¶ 14-15, 18-19; Brianna Frey Decl. ¶¶ 12-14, 17-18; William Sappe Decl. ¶¶ 7, 13.). Therefore, they only have standing to challenge those specific sensitive locations. **[*26]** *See §§ 265.01-e(2)(d)* [public parks], *e(2)(p)* [theaters]; *e(2)(n)* [subway and Metro North train cars); *e(2)(o)* [restaurants with on-premises alcohol consumption; *e(2)(t)* [Times Square].

## C. Standing to Raise a Challenge Under *N.Y. Penal Law §§400.00(6)* and *400.00(15)*

## 1. Standing to Invalidate Restrictions Placed on the Concealed Carry Licenses Issued to Jason Frey and Brianna Frey

The City Defendants argue that Plaintiffs Jason and Brianna Frey do not have standing to challenge restrictions placed on their concealed licenses. (City Defs.' Opp. at 11-12.). A violation of the restrictions on the firearm licenses would derogate *N.Y. Penal Law § 400.00(15)*. Defendants mainly argue that the City and State Defendants cannot redress the alleged violations—in other words, the City and State Defendants cannot remove the restrictions given that they were put in place by Westchester County licensing officials, and Plaintiffs Jason and Brianna Frey should instead undergo the appropriate administrative process to seek to remove restrictions on their licenses (*i.e.* applying to upgrade their licenses and/or commencing an Article 78 proceeding in New York State Court to appeal a denial of a license upgrade. For the reasons stated below, the Court agrees and DENIES preliminary and **[*27]** permanent injunction to the extent that Plaintiffs Jason

and Brianna Frey seek to challenge restrictions placed on their concealed licenses.

Mr. Jason Frey, who was issued a New York State pistol license by a judicial licensing officer in Westchester County, fails to allege that he applied to the Westchester County licensing official to remove the restrictions on his license. (SAC ¶¶ 23, 25.) Brianna Frey, who holds a firearms license limited to sportsman activities that was issued by an officer in Westchester County, applied to remove restriction on her carry license to allow for full carry, but her application was denied in September 2022. (SAC ¶ 54.) The City Defendants argue that to the extent that these Plaintiffs challenge restrictions placed on their licenses under *Bruen*, they should apply to the applicable judicial licensing officers in Westchester County to upgrade their licenses. (City Defs.' Opp. at 12.) In addition, the City Defendants argue that Plaintiff Brianna Frey should challenge the Westchester County judicial licensing officer's determination denying her application in September 2022 in New York State Supreme Court, pursuant to *N.Y. C.P.L.R. 78*. (*Id.*)

The "case or controversy" limitation **[*28]** of Art. III of the Constitution requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court. *See Antonyuk, 2022 U.S. Dist. LEXIS 201944, 2022 WL 16744700, at *9*. Because the named Defendants cannot remove the licensing restrictions that were imposed pre-*Bruen*, and the Westchester County officials who are responsible for licensing are not named as defendants, Plaintiffs Brianna and Jason Frey therefore do not have standing with respect to this challenge.

## 2. Standing to Challenge *N.Y. Penal Law § 400.00(6)* and *400.00(15)* with respect to carrying in New York City

The Court finds, and Defendants do not contest, that Plaintiffs William Sappe and Jason Frey have standing to challenge *N.Y. Penal Law §§ 400.00(6)* (requiring a special permit in New York City) and *400.00(15)* (criminalizing carrying of firearms outside of licensing restrictions) with respect to carrying in New York City.[6] The Court finds that Plaintiffs William Sappe and Jason Frey have sufficiently alleged their concrete and imminent intention to carry their firearms in New York City based on their following statements:

> "Now that the *Bruen* case established a clear test for analyzing *Second Amendment* challenges, I intend to carry my handgun concealed **[*29]** in New York City for self-defense on a daily basis. I also intend to carry my handgun to work every day because the number of random incidents of violent criminal attacks in New York City have risen sharply. Based on my work, including its location in the Diamond District where I am coming in and out of high-end jewelry stores, and the merchandise and cash that I carry."

Sappe Decl. ¶ 10.

> "I am going to carry my handgun in the Times Square area for self-protection even though such constitutionally-protected activity had been made unlawful by New York State and New York City."

Sappe Decl. ¶ 13.

> I carry my handgun concealed when I travel to New York City. Whether alone or with my family, I take the Metro North Train into Grand Central and the number 4 train to Times Square to get goodies at Junior's,

_____

[6] In her declaration, Brianna Frey provides no indication that she has a concrete or imminent intention to carry her firearms in New York City. (*See generally*, Brianna Frey Decl.).

and sometimes to Murray's Bagels on 8th Avenue. I also visit friends in Williamsburg, taking the shuttle to the L train, then to the 14th Street stop. I intend to continue being armed when I travel to New York City for my own protection and my family's.

Jason Frey Decl. ¶ 27.

Because both Plaintiffs Jason Frey and William Sappe indicate that they have or plan to carry a handgun when **[*30]** in New York City, even though they do not have a permit allowing them to lawfully do so, the Court finds that they have alleged a sufficiently concrete and imminent intention of violating _N.Y. Penal Law §§ 400.00(6)_. See _Knife Rights, Inc. v. Vance, 802 F.3d 377, 386-87 (2d Cir. 2015)_ (finding standing for pre-enforcement challenge to statute banning certain types of knives where the plaintiffs alleged that "they have in the past carried, and wish again to carry, common folding knives")

For the reasons discussed above with respect to public announcements by relevant government officials that gun laws will be enforced, the Court finds that the Plaintiffs have established that there is a credible threat of prosecution. See _supra_. In addition, traceability and redressability are established here, given that the named Defendants are tasked with enforcing the gun laws. See _Antonyuk, No. 2022 U.S. Dist. LEXIS 201944, 2022 WL 16744700, at *39_.

### 3. Standing to Challenge _N.Y. Penal Law § 400.00(15)_ With Respect to Open Carry

Regarding Plaintiffs' challenge to _N.Y. Penal Law 400.00(15)_ with respect to open carry, the Court finds that Plaintiffs do not have standing. Brianna Frey provides no allegations that she has a concrete and imminent intention of carrying her firearm in an open manner. See _generally_, Brianna Frey Decl. While Jason

Frey and William Sappe allege an intention to open carry, they fail **[*31]** to allege that such intention is concrete and imminent, as required in pre-enforcement suits. _Lujan, 504 U.S. at 564_.

Jason Frey alleges as follows: "I intend to start carrying my handgun open and holstered at the above locations at times when I am not carrying the same handgun concealed." Jason Frey ¶ 21. William Sappe similarly alleges as follows: "("I intend to begin carrying my handgun open and exposed on those days that I am not carrying a handgun concealed on my person, both inside New York City and throughout the state." William Sappe Decl. ¶ 19

Their allegations are also slightly contradictory or at least they are unclear about their actual intentions to carry open. William Sappe, for example, states that he "intend[s] to carry [his] handgun _concealed_ in New York City for self-defense on a daily basis." (Sappe Decl. ¶ 10) (emphasis added). Sappe also states he regularly carries his handgun concealed while not in New York City, but he gives no concrete indication of when he plans to carry open. (Sappe Decl. ¶ 3). Jason Frey states he intends to carry open, but also states that "[t]he only reason I do not exercise the right to open carry in New York City is the fear of arrest, jail and the other criminal **[*32]** and civil penalties that will follow," (Jason Frey Decl. ¶ 31), and he otherwise gives no specific allegations regarding when he intends to carry open.

In any event, regarding Jason Frey's and William Sappe's statements that they "intend to" violate the open carry ban, such "'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury" that is required." _Lujan, 504 U.S. at 564_;

*see also* *San Diego Cty. Gun Rights Comm. v. Reno, 98 F.3d 1121, 1127 (9th Cir. 1996)* (holding the plaintiffs' assertions that they "wish and intend to engage in activities prohibited" by the Crime Control Act, which prohibited the manufacture, transfer or possession of semiautomatic assault weapons, was insufficient to establish a genuine threat of imminent prosecution); *see, c.f.* *Susan B. Anthony List v. Driehaus, 573 U.S. 149, 161, 134 S. Ct. 2334, 189 L. Ed. 2d 246 (2014)* (petitioners sufficiently alleged intention to violate law by pleading specific statements they intend to make in future election cycles).

Therefore, the Court DENIES Plaintiff's preliminary injunction motion challenging *N.Y. Penal Law 400.00(15)* with respect to open carry.

### D. Standing to raise a challenge under *NYC Admin. Code § 10-315* and the NYPD Rules promulgated thereunder

The City Defendants argue that Plaintiffs have no basis of challenging *NYC Admin. Code § 10-315* and rules **[*33]** promulgated thereunder because that law was repealed by operation of law when Local Law 91 became effective, and there are not any current rules implementing or expounding upon *Administrative Code § 10-315*. (*See* City Defs.' Opp. at 25 n.20.) In addition, as the City Defendant persuasively state, *Administrative Code § 10-315*, however, simply determined the boundaries of the area commonly known as Times Square, and Plaintiffs do not allege that the City improperly defined Times Square." (*Id.*) Plaintiff presents no arguments to the contrary and does not mention challenging *NYC Admin. Code 10-315* anywhere in their reply papers. Therefore, the Court determines that Plaintiff concedes to the City Defendant's argument. *Vann v. Persico,*

*No. 20-CV-628 (KMK), 2022 U.S. Dist. LEXIS 171104, 2022 WL 4368110, at *9 (S.D.N.Y. Sept. 20, 2022)* ("'[b]y failing to respond to that argument in its Reply Memorandum, [Riggs] concedes the point for purposes of [its Motion].'") (citing *Cornelius v. Macy's Retail Holdings, Inc., No. 18-CV-678, 2019 U.S. Dist. LEXIS 131907, 2019 WL 11816537, at *2 (W.D.N.Y. Aug. 5, 2019)* (collecting cases).

Accordingly, the Court DENIES Plaintiff's motion for preliminary injunction challenging *NYC Admin. Code § 10-315*.

## II. PRELIMINARY AND PERMANENT INJUNCTION

### A. Likelihood of Success on the Merits

### 1. Challenge to *N.Y. Penal Law § 400.00(6)*

Plaintiffs contest the constitutionality of *N.Y. Penal Law § 400.00(6)* under *Bruen*, arguing that the law is not consistent with the Nation's historical tradition of firearm regulation. (Pls.' Reply at 10.) In relevant part, *N.Y. Penal Law § 400.00(6)* states that "[a] license to **[*34]** carry or possess a pistol or revolver, or to purchase or take possession of a semiautomatic rifle, not otherwise limited as to place or time of possession, shall be effective throughout the state, except that the same shall not be valid within the city of New York unless a special permit granting validity is issued by the police commissioner of that city. *See N.Y. Penal Law § 400.00(6)*. At its core, Plaintiffs wish to possess a firearm in New York City without the need for a separate license from the NYPD. For the reasons discussed below, the Court denies Plaintiffs' preliminary injunction motion challenging *N.Y. Penal Law § 400.00(6)*.

First, Plaintiffs do not contest anything about

the requirements of obtaining a New York City gun permit, rather, they just complain that they have to get a permit in the first place. Nothing in *Bruen* suggested that the *Second Amendment* protects the right to carry a firearm without a license, and concurring opinions indicate the opposite. *See, e.g., Bruen, 142 S. Ct. at 2157* (Alito, J., concurring) (the holding "decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun . . . . Nor have we disturbed anything that we said in *[D.C. v. Heller, 554 U.S. 570, 595, 128 S. Ct. 2783, 2799, 171 L. Ed. 2d 637 (2008)]* or *McDonald v. Chicago, 561 U.S. 742, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010)*, about restrictions that may be imposed on the possession or carrying **[*35]** of guns."); *Bruen, 142 S. Ct. at 2157* (Kavanaugh, J., concurring) (Justice Kavanaugh wrote separately to "underscore . . . the Court's decision does not prohibit . . . the imposition of licensing requirements for carrying a handgun for self-defense.").

It is clear that governments can impose firearm restrictions so long as they are consistent with individuals' *Second Amendment* rights. *See Heller, 554 U.S. at 595* ("There seems to us no doubt, on the basis of both text and history, that the *Second Amendment* conferred an individual right to keep and bear arms. Of course the right was not unlimited, just as the *First Amendment's* right of free speech was not . . . . Thus, we do not read the *Second Amendment* to protect the right of citizens to carry arms for any sort of confrontation, just as we do not read the *First Amendment* to protect the right of citizens to speak for any purpose."); *Bruen, 142 S. Ct. at 2128* ("From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.") (quoting *Heller, 554 U.S. at 626*). Plaintiffs' attempt to dismantle that long-standing rule by

indicating that the City cannot impose its own permitting requirements goes too far.

In any event, the Court will also evaluate this issue under **[*36]** the *Bruen* analysis. At the first step, the Court finds that *N.Y. Penal Law § 400.00(6)* does implicate the text of the *Second Amendment* because it pertains to the right to keep and bears arms. Here, the law implicates the right to carry arms while in New York City. *See Bruen, 142 S.Ct. at 2134* ("As we explained in Heller, the "textual elements" of the *Second Amendment's* operative clause—"the right of the people to keep and bear Arms, shall not be infringed"—"guarantee the individual right to possess and carry weapons in case of confrontation.") (citing *Heller, 554 U.S. at 592*).

At the second step of the *Bruen* analysis, Defendants are able to establish in their papers that there is a historical tradition of firearm regulations, and in particular, firearm regulations at the municipal and town level. *See* ECF No. 65, Declaration of Suzanna Publicker Mettham (hereinafter "SPM Decl."), Exh. A at 2 (Brooklyn licensing ordinance, 1880); SPM Decl., Exh. B at 176-77 (Buffalo licensing ordinance, 1891); SPM Decl. Exh. C at 3 (Elmira licensing ordinance, 1892); SPM Decl. Exh. D at 243 (Syracuse licensing ordinance, 1892); SPM Decl. Exh. E at 425 (Troy licensing ordinance 1905); SPM Decl. Exh. F at 337 (Lockport licensing ordinance, 1909); and Albany, SPM Decl. Exh. G at 849-50 (Albany licensing ordinance, **[*37]** 1905); *see also* ECF No. 67, Ciappetta Decl., Exh. 3 (collecting laws from Pennsylvania in 1750, Tennessee in 1821, Virginia in 1847, Arizona in 1867, Texas in 1871, and North Carolina in 1899); *see also* Ciappetta Decl., Exh. 4 (collecting laws that regulated or empowered municipalities to regulate storage, sale, or transport of gunpowder from Pennsylvania in 1782, Connecticut in 1836, New Jersey in 1837, Florida in 1838, Iowa in 1846, and

Nebraska in 1867 and 1869); *see also* Ciappetta Decl., Exh. 5 (collecting laws prohibiting public carry in populated areas from Colorado in 1862; Montana in 1864; New Mexico in 1869; Maryland in 1872 addressing only the city of Annapolis; Wyoming in 1875; Kansas in 1881; Idaho in 1889). In addition, more than two dozen various municipalities required an individual to obtain written permission from the local mayor, town marshal, or other authority figure to carry a weapon between 1881 and 1910. *See* Patrick J. Charles, Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry 156 & n.219 (2018) (collecting ordinances from more than two dozen cities, passed between the mid-19th century and early 20th century, requiring a person **[*38]** to carry firearms in cities across the United States subject to the discretionary determination of a local official).

Plaintiffs argue that the examples provided by the Defendants showing city-based licensing regulations should be rejected because they do not reflect "founding-era tradition." (Pls.' Reply at 10.). Plaintiffs argue that the scope of *Second Amendment* protections are "pegged to the public understanding of the right when the *Bill of Rights* was adopted in 1791, not the mid-late 1800s and beyond." (*Id.* citing *Bruen, at 2137-38*)). However, Plaintiff's argument is overstated. The Supreme Court in *Bruen* indicated that while the Court "generally assumed" that the reference point should start at laws in 1791, there is also an "ongoing scholarly debate on whether courts should *primarily* rely on the prevailing understanding of an individual right when the *Fourteenth Amendment* was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Bruen, 142 S.Ct. at 2138* (emphasis added). In other words, as the City Defendants persuasively argue, the Supreme Court's language demonstrates that there is an open question

regarding how much importance to attribute to historical evidence from the *Fourteenth Amendment's* ratification period, and not whether **[*39]** that evidence deserves any weight. (City Defs.' Opp. at 16.). Therefore, the Court finds no issue in considering the abundance of examples provided by the Defendants regarding the existence of municipal gun regulations from 1750 to the late 19th century. *See also D.C. v. Heller, 554 U.S. 570, 605, 128 S. Ct. 2783, 2805, 171 L. Ed. 2d 637 (2008)* (indicating that post-enactment history that sheds light on "the public understanding of a legal text ... is a critical tool of constitutional interpretation.").

For the aforementioned reasons, the Court denies the preliminary injunction as to *N.Y. Penal Law § 400.00(6)*.

## 2. Challenge to *N.Y. Penal Law § 400.00(15)* Regarding Open Carry

In their preliminary injunction motion (and in their Second Amended Complaint), Plaintiffs want the Court to find that they have a right to open carry, and that the criminalization of open carry is unconstitutional. (*See* Pls.' Br. at 14-17.) As explained above, New York state prohibits open carry, though individuals may public carry as long as they carry their firearm in a concealed manner and if they have a valid gun permit.

As indicated above, *see*, Discussion I.C.3, *supra*, the Court finds that Plaintiffs do not have standing to challenge *N.Y. Penal Law § 400.00(15)* with respect to open carry. Even assuming, arguendo, that Plaintiffs had standing to bring this challenge and **[*40]** request a preliminary injunction, their request would be denied.

Undertaking the first step of the *Bruen* analysis, the Court agrees with Plaintiffs' point that the text of the *Second Amendment* does

plainly cover Plaintiffs' purported right to publicly carry, as indicated by the Court in the *Bruen* decision. *Bruen, 142 S.Ct. at 2135* ("The *Second Amendment's* plain text thus presumptively guarantees petitioners Koch and Nash a right to "bear" arms in public for self-defense."). While the text of the *Second Amendment* itself does not explicitly say anything about open or concealed carry, it is not difficult to find that the term "'bear' arms" means to cover either public concealed or public open carry. *See id.* (the *Second Amendment* guarantees a general right to public carry).

Regarding the second step of the *Bruen* analysis — a review of historical traditions, Plaintiffs argue that the manner of public carry was not regulated in 1791, and that "[i]t was not until "the early to mid-19th century, [that] some States began enacting laws that proscribed the concealed carry of pistols and other small weapons." (Pls.' Reply at 7-8.) However, as correctly pointed out by the Defendants, the Supreme Court has already stated that "[t]he historical evidence from antebellum America does demonstrate **[*41]** that the *manner* of public carry was subject to reasonable regulation . . . . State's could lawfully eliminate one kind of public carry — concealed carry — so long as they left open the option to carry openly." *Bruen, 142 S. Ct. at 2150* (emphasis in original). Because New York does allow concealed carry so long as the individual has a proper license, Plaintiffs cannot properly argue, as they try to do, that New York has no way to allow people to public carry. (*See* Pls. Br. at 18.) The fact that the manner in which New York allows public carry — concealed rather than open — is not to Plaintiffs' liking does not mean that enforcement against open carry is unconstitutional. Therefore, the Court finds that the Plaintiffs are unlikely to succeed on the merits with respect to their challenge to enforcement against open carry.

Accordingly, the Court denies Plaintiff's motion for preliminary injunction as to its challenge *N.Y. Penal Law § 400.00(15)* regarding open carry.

### 3. Challenge to *N.Y. Penal Law § 265.01-d*

Plaintiffs challenge *N.Y. Penal Law § 265.01-d* [the "Private Property Provision"], which covers the following two locations: (1) all privately owned property that is not open for business to the public (and that is not a "sensitive location" under *N.Y. Penal Law § 265.01-e*); and (2) all privately owned property **[*42]** that is open for business to the public (and that is not a "sensitive location" under *N.Y. Penal Law § 265.01-e*). The law criminalizes a license holders' entrance into, or remaining on, those retail commercial establishments in New York State that "(1) have not been deemed "sensitive locations" by [*N.Y. Penal Law § 265.01-e*], (2) operate on privately owned property, and (3) are unable for whatever reason (such as time constraints) to give express consent to each license holder on their doorstep other than by posting a sign containing a controversial message that must (by definition) be visible to all persons passing by (including potential "anti-gun" customers)." *Antonyuk, 2022 U.S. Dist. LEXIS 201944, 2022 WL 16744700, at \*78.*

It bears noting that two courts in this Circuit have already issued a preliminary injunction enjoining the enforcement of *N.Y. Penal Law § 265.01-d*. *Christian v. Nigrelli, No. 22-CV-695 (JLS), 2022 U.S. Dist. LEXIS 211652, 2022 WL 17100631, at \*12 (W.D.N.Y. Nov. 22, 2022)* ("Defendants and their officers, agents, servants, employees, and all persons in concert or participation with them who receive notice of this preliminary injunction, are enjoined, effective immediately, from enforcing all of *N.Y. Penal Law § 265.01-d* with respect to private property open to the public, and their

regulations, policies, and practices implementing it.")); _Antonyuk v. Hochul, 2022 U.S. Dist. LEXIS 201944, 2022 WL 16744700, at *86_ (enjoining prohibition on carrying in "the 'restricted locations' provision contained in Section 5 of the CCIA except for fenced-in **[*43]** farmland owned by another or fenced-in hunting ground owned by another).

Both cases are currently on appeal before the Second Circuit. _See Antonyuk et al., v. Hochul et al._, C.A. No. 22-2908 (2d Cir. filed Nov. 9, 2022); _Christian v. Nigrelli_, C.A. No. 22-2987 (2d Cir. filed Nov. 23, 2022). As of the date of this Opinion, the Second Circuit has stayed the Northern District of New York's injunction pending resolution of the appeal, which was affirmed by the Supreme Court. _See Antonyuk et al., C.A. No. 22-2908 at ECF No. 76, 2022 U.S. App. LEXIS 36240 (issued Dec. 7, 2022)_, _affirmed_, _598 U.S. ___, 143 S. Ct. 481, 214 L. Ed. 2d 381 (issued 2023)_ (No. 22A557).

Because the same issue regarding the constitutionality of _N.Y. Pen. L. § 265.01-d_ is currently being reviewed by the Second Circuit, the Court will STAY resolution of this portion of Plaintiffs' Motion for Preliminary injunction in the interests of judicial economy, pending resolution of the appeal in _Antonyuk_ and _Christian_ as to this issue. _See McCracken v. Verisma Sys. Inc., No. 6:14-CV-06248, 2018 U.S. Dist. LEXIS 152008, 2018 WL 4233703, at *2 (W.D.N.Y. Sept. 6, 2018)_ ("It is within the sound discretion of a district court to enter a stay pending the outcome of independent proceedings that are likely to affect a case on its calendar") (citations omitted); _see also Christian v. Nigrelli_, No. 22-CV-695 (JLS), ECF No. 60 (W.D.N.Y. Dec. 21, 2022) (staying resolution of portions of plaintiffs' motion for preliminary injunction pertaining to public parks and public transportation pending resolution by the Second Circuit in _Antonyuk v. Hochul_).

### 4. Challenge to specific portions of _N.Y. Penal Law § 265.01-e_

As indicated above, _see supra_, Plaintiffs have standing to challenge several provisions **[*44]** in _N.Y. Penal Law § 265.01-e_, which prohibits carrying in certain "sensitive locations," based on their allegations on where they have or intend to frequent. (_See_ Jason Frey Decl. ¶¶ 14-15, 18-19, 27; Brianna Frey Decl. ¶¶ 12-14, 17-18; William Sappe Decl. ¶¶ 7, 13.) Specifically, the Court will consider their challenge to the following provisions: (i) public parks, _§ 265.01-e(2)(d)_; (ii) theaters, _§ 265.01-e(2)(p)_; (iii) public transportation (MTA subway and train cars), _§ 265.01-e(2)(n)_; (iv) restaurants with on-premises alcohol consumption, _§ 265.01-e(2)(o)_; and (v) Times Square, _Penal Law § 265.01-e(2)(t)_.

Currently, in _Antonyuk et al., v. Hochul et al._, C.A. No. 22-2908 (2d Cir. filed Nov. 9, 2022), the Second Circuit is reviewing an appeal by the State Defendant and other officials that overlaps with issues presented in this subsection, namely and among other things, the injunction imposed by the court in _Antonyuk v. Hochul, No. 122CV0986GTSCFH, 2022 U.S. Dist. LEXIS 201944, 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022)_ against the enforcement of _§ 265.01-e(2)(d)_ [prohibiting guns in pubic parks]; _265.01-e(2)(o)_ [prohibiting guns in restaurants with on-premises alcohol consumption]; and _§ 265.01-e(2)(p)_ [prohibiting guns in theaters]. The Court will stay resolution of this portion of Plaintiffs' Motion for Preliminary injunction in the interests of judicial economy, pending resolution of the appeal in _Antonyuk_ with respect to these three provisions. It is worth noting that the Second Circuit has stayed the Northern District of New York's injunction **[*45]** against enforcement of the gun laws with respect to _§§ 265.01-e(2)(d)_, _(o)_, and _(p)_ pending resolution of the appeal, which was affirmed by the Supreme Court. _See_

*Antonyuk et al., C.A. No. 22-2908 at ECF No. 76, 2022 U.S. App. LEXIS 36240 (issued Dec. 7, 2022)*, affirmed, *598 U.S.    , 143 S. Ct. 481, 214 L. Ed. 2d 381 (issued 2023)* (No. 22A557).

Therefore, the only subsections that the Court will evaluate are *§ 265.01-e(2)(n)* which bans firearms in public transportation, including MTA subway cars and train cars and *§ 265.01-e(2)(t)* which bans the carrying of firearms in the Times Square area. For the foregoing reasons, the Court DENIES the preliminary and permanent injunction as to *§ 265.01-e(2)(n)* and *§ 265.01-e(2)(t)*.

### a. *N.Y. Penal Law § 265.01-e(2)(t)*: Times Square

On the first step of the *Bruen* analysis, the Court finds that Plaintiffs met their burden of showing that the prohibition against carrying arms in the Time Square area implicates the text of the *Second Amendment*. *See Bruen, 142 S.Ct. at 2134*.

Moving on to the second step of the *Bruen* analysis, the Court finds that Defendants have sufficiently met their burden of establishing that there is a historical tradition of banning firearms in regularly congested commercial areas. For this reason, the Court DENIES Plaintiffs' motion for preliminary and permanent injunction with respect to *N.Y. Penal Law § 265.01-e(2)(t)*.

Known to many as the "Crossroads of the World," the iconic Times Square is a major hub for commercial and cultural activities, known for its plentiful shopping, **[*46]** street vendors, entertainment, and displays of public art, which attracts residents and visitors alike. *See* https://www.timessquarenyc.org/locations/shopping and http://arts.timessquarenyc.org/times-square-arts/index.aspx (last visited November 21, 2022). Times Square is also recognized as an important space for public gatherings and is often highly congested—for example, in September 2022, there were an average of 312,611 daily visitors to Times Square (Ciappetta Decl., Exh. 17) and in 2021, Times Sq-42 St was the busiest of the 472 subway stations in New York City's transit system. *See* https://www.nyc.gov/site/cecm/permitting/times-square.page.[7]

The State and City Defendants present a number of laws between 1328 to 1903 that show a historical tradition of banning firearms in "fairs" or "markets" or areas that large crowds, which appears to address places with characteristics akin to those found in Times Square. First, Defendants point to a 1328 law from Northampton, England barring arms in "fairs, markets..." Statute of Northampton, 2 Edw. 3, ch. 3 (1328), reprinted in 1 THE STATUTES OF THE REALM 258 (*See* SMP, Exh. AA). A 1328 law from England is too remote from the relevant time period **[*47]** to shed light on the public understanding of the *Second Amendment* in 1791 and/or of the *Fourteenth Amendment* in 1868, *see Antonyuk, 2022 U.S. Dist. LEXIS 201944, 2022 WL 16744700, at *37 n.66*, but as the City Defendants point out, there are two additional laws—a 1786 law in Virginia and a 1792 law in North Carolina—which also contains a "fairs" and "markets" prohibition and that traces in relevant part the 1328 Northampton, England law with the same or similar language. (City Defs' Opp. at 25-26; Ciappetta Decl., Exh. 12.); *see also* 1786 Va. Laws 33, ch. 21, An Act Forbidding and Punishing Affrays ("[N]o man, great nor small, [shall] go nor ride armed by night nor by day, in fair or markets ... in terror of the

---

[7] The boundaries of Times Square are set forth in the emergency rules signed by New York City Mayor Eric Adams and NYPD Commissioner on Sewell on August 23, 2022, and published in The City Record on August 31, 2022 (Ciappetta Decl., Exh. 1.).

Country...."); Francois Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, 60-61 (Newbern 1792) ("[N]o man great nor small ... except the King's servants in his presence . . . be so hardy to . . . ride armed by night nor by day, in fairs [or] markets . . . ."). According to 1790 census data (*i.e.* from the founding era period), Virginia contained about 17.6% of the American population (691,737 people out of 3,929,214 people), and North Carolina contained about 11% (393, 751 out of 3,569,100 people). *See* Richard L. Forstall, Dep't of Commerce, Population **[*48]** of States and counties of the United States: 1790-1990, available at https://www2.census.gov/library/publications/decennial/1990/population-of-states-and-counties-us-1790-1990/population-of-states-and-counties-of-the-united-states-1790-1990.pdf. The fact that around 28.6 % (as estimated by this Court) of total American population in the founding era period "were governed by such laws regulating the carrying of firearms in 'fairs' or "markets' lends support to Defendants' arguments that the tradition of prohibiting arms in places resembling "markets" and "fairs" was sufficiently well-established and representative during the founding era. *See also Antonyuk, 2022 U.S. Dist. LEXIS 201944, 2022 WL 16744700, *37 n.66* ("The fact that 31.9 percent of Americans in 1791 were governed by such laws regulating the carrying of firearms in "fairs" or "markets" (albeit one of which was limited to terroristic behavior) would appear to shed some light on the public meaning of the words "keep and bear arms" in *Second Amendment* when it was adopted. ").

The Court also considers other laws from the latter half of the 19th Century that prohibited firearms involving instances where there are public gatherings engaged in recreational, entertainment, or expressive purposes. While not as **[*49]** persuasive as the founding era

laws described above (particularly those coming from the late 19th century), these laws support Defendants' arguments that there was an ongoing trend in American history of banning firearms in locations where people heavily congregate. For example, the Defendants point to an 1869 Tennessee law that prohibited both open and concealed carry at any "fair, racecourse, or other public assembly of the people...." (Ciappetta Decl., Exh. 13.) The City Defendants also present a similar 1870 Texas law that encompassed churches, schools, ballrooms, social parties, election sites, and the catchall language "other public assembly" (Ciappetta Decl., Exh. 14), and which also appears to have served as a model for other laws such as follows: Missouri (1883) (prohibiting concealed carry "where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary, or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other assemblage of persons met for any lawful purpose . . ."), Arizona (1889 and 1901), Oklahoma (1890), and Montana **[*50]** (1903). (*See* Ciappetta Decl., Exh. 15; *see also* SPM Decl. Exhs. V (1870 Texas law), X (1889 Arizona law), Y (1890 Oklahoma law). Lastly, the City Defendants provide copies of laws in Georgia (1879) and Idaho (1889), which adopted their own sensitive location statutes prohibiting firearms in places of public assembly or public gatherings. (Ciappetta Decl., Exhs. 5 and 16.)

The Court is therefore persuaded by the Defendants' argument that *N.Y. Penal Law § 265.01-e(2)(n)* is in line with the historical tradition of banning firearms in locations where large groups of people are congregated for commercial, social, and cultural activities. These laws appear to recognize that the presence of groups of people, often in confined spaces, renders a location uniquely

vulnerable to firearm violence.

During oral argument, Plaintiffs' counsel argued that _N.Y. Penal Law § 265.01-e(2)(n)_ is overly burdensome, and pointed to the fact that William Sappe often needs to drive through Times Square while employed as an armed guard for businesses in the New York City Diamond District (which falls just outside of Times Square), and that Sappe and similarly situated individuals would be at risk of facing felony charges. Putting aside the fact that Sappe did not allege in **[*51]** his declaration that he has attempted to secure a New York City gun permit at all since the enactment of the CCIA, the Court would not find it burdensome for similarly situated individuals who do have permission to carry guns in New York City to drive around the congested Times Square area in order to avoid running afoul of _§ 265.01-e(2)(n)_. The Court also notes that _N.Y. Penal Law § 265.01-e_ provides numerous exceptions for individuals who need to have guns on them in sensitive locations, including the following: (i) persons licensed under _N.Y. Penal Law § 400.00 2(c)_ ("have and carry concealed while so employed by a messenger employed by a banking institution or express company") while in the course of his or her official duty; and (ii) security guards as defined by and registered under article seven-A of the general business law, who have been granted a special armed registration card, while at the location of their employment and during heir work hours as such a security guard. _See N.Y. Penal Law § 265.01-e(3)(e)_ and _(g)_. While neither of the parties argued whether Sappe could fall under any of the exceptions had he carried a valid New York City gun permit, the fact that these exceptions exist belies Plaintiffs' argument that _N.Y. Penal Law § 265.01-e_ is overly burdensome. Therefore, the Court does not **[*52]** find that Plaintiffs have established a substantial likelihood of success on the merits to challenge _N.Y. Penal Law § 265.01-e(2)(n)_.

### b. _N.Y. Penal Law § 265.01-e(2)(n)_: Subway and Rails

The Court finds that the _Second Amendment's_ plain text covers the conduct in question (_i.e._ carrying a concealed handgun for self-defense in public in "subways" and "train cars"). _Bruen, 142 S.Ct. at 2134_. Therefore, under _Bruen_, Defendants must rebut the presumption of protection against the regulation by showing that the law is consistent with the Nation's historical tradition of firearm regulation.

As the City Defendants indicate, the New York City subway system consists of 6,455 subway cars, 665 miles of track and 472 stations, the most of any public transit subway system in the world. _See_ https://new.mta.info/agency/new-york-city-transit/subway-bus-ridership-2021 (last visited Nov. 28, 2022). The first stage of the New York City subway system opened in October 1904, with nine miles and twenty-eight stations. _See_ HISTORY, The Race to Construct the First Subway: The Engineering that Built the World (S1), at 05:22, YOUTUBE, https://www.youtube.com/watch?v=cVBhvKxw4ow. On an average weekday in 2019, the last year before the Covid-19 pandemic, the system's ridership was nearly 5.5 million, and in the same **[*53]** year, there were almost 1.7 billion total riders. _See id._

In summary, the Defendants argue that _N.Y. Penal Law § 265.01-e(2)(n)_ should be upheld as to the MTA subway system and train rails because: (i) the government has the right to control whether firearms are allowed on its property; (ii) there is historical support for firearm prohibition on trains; (iii) subways and the rails are also places where large crowds are gathered; and (iv) the MTA system plays an integral role in the school system and must be afforded the same protections as schools, which are paradigmatic sensitive places

because of the presence of children. (State Def.'s Opp. at 37-43; City Defs.' Opp. at 38-40.)

As discussed during oral argument, the City Defendants are correct that the MTA subway system and rails, which obviously did not exist during the founding era or during the enactment of the _Fourteenth Amendment_, presents an issue that implicates "unprecedented societal concerns or dramatic technological changes [that] require a more nuanced approach," _Bruen, 142 S. Ct. at 2132_. As indicated by the City Defendants, however, the Supreme Court did not explain what such an approach would entail. The City Defendants argue that the "nuanced approach" should entail "identify[ing] historical **[*54]** laws that have a similarity of purpose to the modern regulation, even if the historical analogue regulated a different subject. (City Defs.' Opp. at 37.) _See also_ _Antonyuk, 2022 U.S. Dist. LEXIS 201944, 2022 WL 16744700, at *41_ ("nuanced approach" "essentially mean[s] broaden its conception of what constitutes an "analogue" and focus its attention on the justification for, and burden imposed by, it"). As such, the Court will consider historical laws that are analogous in purpose.

### _Government-as-proprietor_

First, the State and City Defendants argue that just as it is well-established that the government has the power to exclude firearms from "government buildings" such as courthouses and legislative buildings, such right should also extend to the MTA's subway cars and rails, all of which are quasi-governmental. (_See_ Ciappetta, Exh. 23)[8] (City

Defs.' Opp. at 35.) _See_ _Heller, 128 S. Ct. at 2786_ ("The Court's opinion should not be taken to cast doubt on . . . laws forbidding the carrying of firearms in sensitive places such as . . . government buildings . . . ."); _Bruen, 142 S. Ct. at 2118_ ("courts can use analogies to "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" to determine whether modern regulations are constitutionally permissible."). **[*55]** The City Defendants aver that the application of _§ 265.01-e_ to relatively modern forms of public transportation, simply continues the longstanding tradition of allowing the government to regulate gun carrying on its own property.[9]

During oral argument, the State Defendant's counsel argued that "government buildings" should stretch to encompass the MTA's subways and rails. The State Defendant's counsel highlighted _Bonidy v. U.S. Postal Serv., 790 F.3d 1121, 1126 (10th Cir. 2015)_, where the Tenth Circuit found that the government could prohibit guns in a U.S. Postal Service building as a "government building." _Id. at 1125_. The State Defendant's counsel, moreover, emphasized that the Tenth Circuit had found that the government could also prohibit guns in the parking lot adjacent to the U.S. Postal Service building. _Id. at 1126_ ("the fact that the government is acting in a proprietary capacity, analogous to that of a person managing a private business, is often relevant to constitutional analysis. The government often has more flexibility to regulate when it is acting as a proprietor (such

---

[8] The New York City subway system is owned by the City of New York and leased to the New York City Transit Authority, a public-benefit corporation, to operate. This arrangement is pursuant to a lease that was first executed in 1953. (Ciappetta Decl., Exh. 23).

[9] The State Defendant makes similar arguments with respect to public parks, averring that because federal, state, and local governments have long prohibited deadly weapons in government-owned parks, and several statutes contain language covering public functions, that subways and rails should fall within that purview. As indicated, this issue is on appeal before the Second Circuit in _Antonyuk et al., v. Hochul et al.,_ C.A. No. 22-2908 (2d Cir. filed Nov. 9, 2022).

as when it manages a post office) than when it is acting as a sovereign (such as when it regulates private activity unconnected to a government service)."). Notably, however, the Tenth Circuit's finding **[\*56]** with respect to the building's adjacent parking lot was made under the pre-*Bruen* standard, *i.e.* an intermediate scrutiny analysis. *Id. at 1126*. In its opposition papers, the State Defendant also cites to *United States v. Class, 930 F.3d 460, 442 U.S. App. D.C. 257 (D.C. Cir. 2019)*, where the D.C. Circuit found that a federal statute prohibiting possession of firearms on U.S. Capital grounds, as applied to the facts of that case, did not violate *Second Amendment* rights, and stated that "as the owner of the Maryland Avenue lot, the government—like private property owners—has the power to regulate conduct on its property."). *Id. at 464*. The court came to that conclusion after finding, *inter alia*, that "Maryland Avenue lot has been set aside for the use of government employees, is in close proximity to the Capitol building, and is on land owned by the government," and therefore could "consider the lot as a single unit with the Capitol building, and conclude that the lot is a 'sensitive' place where firearms prohibitions are presumptively lawful." *Id. at 464*.

Two interesting questions arise: (i) whether the MTA subway and rail system should be considered a "government building" and therefore a *per se* a sensitive area; and (ii) whether post-*Bruen*, the government, as proprietor, can prohibit guns in any of its **[\*57]** property without regard to any historical tradition consideration and regardless of whether such property can be properly deemed a "government building." The Court, however, finds that neither question needs to be answered, because Defendants have established a sufficient historical tradition, in the specific context of the rail systems, showing that proprietors of rail systems had authority to lay out their own gun-carrying

restrictions within their train cars.

As discussed by the State Defendant's historian, there was no public transportation as such during the relevant time period; instead, train travel was provided by private transportation systems until the 20th century, sometimes operating under a government charter. (Rivas ¶¶ 13-17.). As indicated by Rivas, "carriage would have been would have been subject to any rules laid out by the private transportation company in question. Private companies would have had the authority to decide where and how legally transported weapons." (*Id.* ¶ 13.)

While admitting that the opportunity to conduct thorough historical research was limited due to the time constraints of a preliminary injunction schedule and the fact that certain of the historical **[\*58]** research involves in-person review of in paper archives, (State Def. Opp. at 43), the State Defendant and his expert historian, Brennan Rivas, provide examples of gun-carrying restrictions imposed by private rail companies against passengers on their trains. For example, the State Defendant's expert points to the North Pennsylvania Railroad's June 1875 "rules and regulations" which stated that that conductors must prevent passengers from taking "into the cars guns, dogs, valises, large bundles or baskets." (Rivas. ¶ 13.) Rivas also describes that rail companies tended to ship sporting firearms for hunters and treat them like baggage, therefore separating them from the passenger. (*Id.* ¶ 14.) Lastly, Rivas describes that several states, including Georgia, Ohio, and Pennsylvania, set out parameters in the late 19th century allowing railway personnel to possess and exercise powers of policemen or to employ their own police forces in order to enforce relevant laws, including laws regarding firearms, to ensure peace and safety of passengers in transit. (*Id.* ¶¶ 15-16.)

Taking the "nuanced approach" required in this context of the MTA subway and rails, the Court finds that an adequately analogy **[\*59]** could be made between (i) the fact that historically, the rail systems were privately owned and that "[p]rivate transportation companies possessed the power to create their own reasonable customer/passenger rules, which in at least some instances included prohibitions against the presence of guns in passenger cars" (Rivas ¶ 20) and (ii) the fact the MTA subway and rails are government owned and operated, and therefore the government as proprietor can impose its own restrictions on gun-carrying upon its passengers.[10]

Coupled with the indication, as discussed directly below, that there is a tradition of prohibiting firearms in highly congested settings presenting a high risk of violence (which undoubtedly describes the MTA subway system), the Court finds that a preliminary injunction is not warranted here with respect to _N.Y. Penal Law § 265.01-e(2)(n)_.

## **_Prohibition of Firearms in Congested Locations_**

---

[10] State Defendant and Rivas also point to several cases involving laws that prohibited carrying guns on one's person except for during long-distance travel. (State Def. Opp. at 41-42; Rivas ¶¶ 6-13.) The Court points out that two of the cases cited do not support the State Defendant's arguments that guns were completely prohibited while traveling short distances in certain jurisdictions. See _Willis v. State, 105 Ga. 633, 32 S.E. 155 (1898)_ ("Any person having or carrying about his person, unless in an open manner and fully exposed to view, any pistol, dirk, sword in a cane, spear, bowie-knife, or any other kind of knives manufactured and sold for the purpose of offense and defense, shall be guilty of a misdemeanor."); _Eslava v. State, 49 Ala. 355_ ("If the necessity existed only while he was travelling, then, if after he reached the city and had a reasonable opportunity of divesting himself of the weapon, or of changing the manner of carrying it so as not to offend the statute, he continued to bear it concealed about his person, he is guilty as charged).

The City Defendants argues that the Court should look at laws that regulated the presence of firearms in populated spaces, stating that doing so is more informative than trying to analogize this law with regulations concerning early forms of transportation such as trolleys, omnibuses, or horse carts. (City Defs.' Opp. at **[\*60]** 37.) The City Defendants aver that this approach "recognizes the unique nature of modern life and eliminates the need to make comparisons between things that only bear a superficial similarity (trolleys and subway cars)." (_Id._)

The State Defendants point to the same laws described above in the _N.Y. Penal Law § 265.01-e(2)(t)_: Times Square (Discussion II.A.4.a, _supra_), arguing that there is a historical tradition of banning firearms in highly crowded locations where the risk of violence is high. While those laws do not relate to public transportation, the Court does find persuasive Defendants' argument that _N.Y. Penal Law § 265.01-e(2)(n)_ is consistent with those laws, considering that a main concern animating the gun restrictions in the MTA subways and rails is the high amount of foot traffic and related safety issues. (City Defs.' Opp. at 37-38; State Def. Opp. at 31-33.)

## **_Subways as part of the school system_**

The Court is less persuaded by Defendant's argument that because the MTA public transportation system "plays an integral role in the school system," it "must be afforded the same protections as the school system." (State Def. Opp. at 39.) On one hand, schools are a paradigmatic sensitive place because of the presence of children. _See Class, 930 F.3d at 465_, _Heller, 554 U.S. at 626_; _McDonald, 561 U.S. at 786_. **[\*61]** Indeed, _Bruen_ "assume[d] it settled that" schools full of children "were 'sensitive places' where arms carrying could be prohibited consistent with the _Second_

*Amendment*." *142 S.Ct. at 2133*; *see also id. at 2157* (Alito, J., concurring).

In addition, Defendants present data indicating that New York City has over 1.1 million students at more than 1,800 schools, *see* Explore NYC Schools, N.Y. City Council, https://council.nyc.gov/data/school-explorer/ (last accessed on Nov. 29, 2022), and conjectures that "there could be over 1.1 million students traveling on the MTA system." (State Def.'s Opp. at 40.) The Court also recognizes that the MTA system plays an important indirect role in the school system. The Court is nonetheless not prepared to state the MTA subway and rails should be considered "sensitive places" just by virtue of its connection with the school system, particularly as Defendants do not show that the MTA subways and rails are "densely populated" by children the way schools are. *See, e.g., Antonyuk, 2022 U.S. Dist. LEXIS 201944, 2022 WL 16744700, at \*25* ("the State Defendants adduce no evidence that those shelters are as densely populated by children as are schools").

## B. Irreparable Harm

"A showing of irreparable harm is 'the single most important prerequisite for the issuance of a **[\*62]** preliminary injunction.'" *Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009)* (citing *Rodriguez v. DeBuono, 175 F.3d 227, 234 (2d Cir. 1999)*). "[T]o satisfy the irreparable harm requirement, [p]laintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id.* (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007)*). The "mere possibility of irreparable harm is insufficient to justify the

drastic remedy of a preliminary injunction." *Borey v. Nat'l Union Fire Ins. Co., 934 F.2d 30, 34 (2d Cir. 1991)*.

In addition, "[i]n the Second Circuit ... [the] presumption of irreparable harm arising from a constitutional deprivation is not automatic." *Joglo Realties, Inc. v. Seggos, 16-CV-1666 (ARR)(CLP), 2016 U.S. Dist. LEXIS 113057, 2016 WL 4491409, at \*16 (E.D.N.Y. Aug. 24, 2016)*. Instead, "[b]ecause the violation of a constitutional right is the irreparable harm asserted [ ], the two prongs of the preliminary injunction threshold merge into one" and "in order to show irreparable injury, plaintiff must show a likelihood of success on the merits." *Turley v. Giuliani, 86 F. Supp. 2d 291, 295 (S.D.N.Y. 2000)*. As the Second Circuit has held that it is "more appropriate to determine irreparable injury by considering what adverse factual consequences the plaintiff apprehends if an injunction is not issued, and then considering whether the infliction of those consequences is likely to violate any of the plaintiff's rights," **[\*63]** *Time Warner Cable v. Bloomberg L.P., 118 F.3d 917, 924 (2d Cir. 1997)*, the alleged violations of Plaintiffs' *Second Amendment* rights, by themselves, are not sufficient to show irreparable harm.

As discussed above, Plaintiff has failed to show a likelihood of success with respect to its challenges against *N.Y. Penal Law §§ 400.00(6)*, *400.00(15)*, *265.01*, *265.01-b*, *265.03(3)*, *§§ 265.01-e(2)(n)* and *265.01-e(2)(t)*, and *NYC Admin. Code § 10-315*, Plaintiff therefore fails to show that they will suffer irreparable harm without an injunction against those statutes.

## C. Balance of Hardships and Public Interest

Putting aside the issues which the Court stays its resolution on pending Second Circuit review in analogous cases, the Court otherwise finds

2023 U.S. Dist. LEXIS 42067, *63

that a preliminary injunction is not in the public interest.

When the Government is the opposing party, irreparable harm and public interest factors merge. *See Nken v. Holder, 556 U.S. 418, 435, 129 S. Ct. 1749, 1762, 173 L. Ed. 2d 550 (2009)*. As stated above, because Plaintiffs failed to show a likelihood of success of the merits with respect to the aforementioned statutes, Plaintiffs therefore cannot show that the balance of hardships tips in their interest.

## CONCLUSION

For the foregoing reason, Plaintiffs' motion for preliminary injunction is DENIED in part, and STAYED in part, as follows:

• The Court DENIES a preliminary injunction with respect to Plaintiffs' challenge of *N.Y. Penal Law §§ 400.00(6), 400.00(15)*, *265.01*, *265.01-b*, *265.03(3)*, and *NYC Admin. Code § 10-315*.

• The Court DENIES a preliminary injunction **[*64]** with respect to Plaintiffs' challenge of *N.Y. Penal Law §§ 265.01-e(2)(n)* (with regards to the MTA subway and rails) and *265.01-e(2)(t)*.

• The Court STAYS its decision on the preliminary injunction motion with respect to Plaintiff's challenge of *N.Y. Penal Law §§ 265.01-d*, *265.01-e(2)(d)*, *265.01-e(2)(p)*, and *265.01-e(2)(o)* pending resolution by the Second Circuit in *Antonyuk et al., v. Hochul et al.*, C.A. No. 22-2908 (2d Cir. filed Nov. 9, 2022).

The parties are DIRECTED to submit a letter to the Court once a resolution is reached in *Antonyuk et al., v. Hochul et al.*, C.A. No. 22-2908 (2d Cir. filed Nov. 9, 2022), which may impact the Court's resolution on the preliminary injunction motion with respect to

Plaintiff's challenge of *N.Y. Penal Law §§ 265.01-d*, *265.01-e(2)(d)*, *265.01-e(2)(p)*, and *265.01-e(2)(o)*.

Dated: March 13, 2023

White Plains, New York

SO ORDERED:

/s/ Nelson S. Román

NELSON S. ROMÁN

United States District Judge

---

**End of Document**

ⓘ Cited
As of: March 29, 2023 5:08 PM Z

# *United States v. Rowson*

United States District Court for the Southern District of New York

January 26, 2023, Decided; January 26, 2023, Filed

22 Cr. 310 (PAE)

**Reporter**

2023 U.S. Dist. LEXIS 13832 *; __ F.Supp.3d __; 2023 WL 431037

UNITED STATES OF AMERICA, -v- ISZAYAH ROWSON, Defendant.

## Core Terms

firearm, regulation, seatbelt, surety, armed, gun, felony, rights, reasonable suspicion, indictment, indictees, frisk, wearing, pants, camera, weapon, traffic stop, decisions, disarming, arrest, footage, window, analogues, passenger, colonial, courts, convicted felon, circumstances, self-defense, law-abiding

**Counsel:** **[1]** For Iszayah Rowson, also known as Sealed Defendant 1, also known as Zay Munna, also known as Zay, Defendant: John Baptist Signoriello, LEAD ATTORNEY, Lebedin Koffman, LLp, New York, NY.

For USA, Plaintiff: Elizabeth Anne Espinosa, LEAD ATTORNEY, New York, NY; James Alan Ligtenberg, LEAD ATTORNEY, U.S. Attorney's Office, SDNY (St Andw's), New York, NY; Ni Qian, LEAD ATTORNEY, New York, NY.

**Judges:** Paul A. Engelmayer, United States District Judge.

**Opinion by:** Paul A. Engelmayer

## Opinion

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This decision resolves two motions by defendant Iszayah Rowson. Rawson moves to suppress a firearm seized from him during a traffic stop on the grounds that the livery car in which he was a passenger was stopped, and he was thereafter frisked, in violation of the *Fourth Amendment*. Rowson also moves to dismiss the one-count Indictment, which charges him with receipt of a firearm in violation of *18 U.S.C. § 922(n)*, which makes it a crime for a person while under indictment for a crime punishable by imprisonment for a term exceeding one year to ship, transport, or receive a firearm that has travelled in interstate or foreign commerce. Drawing on *New York State Rifle & Pistol Association, Inc. v. Bruen, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022)*, Rowson argues that *§ 922(n)* is facially unconstitutional under the *Second Amendment*.

For the reasons that follow, **[2]** the Court denies both motions.

### I. Overview and Procedural History

On June 2, 2022, the Grand Jury returned the Indictment, charging Rowson with a single count of violating *§ 922(n)*, on or about March 5, 2022. Dkt. 11. The charges arose from a stop shortly after 9:45 p.m. that evening by two New York City Police Department ("NYPD") officers of an Uber livery car in the Bronx, on the ground that the backseat passenger, Rowson, was not wearing a seatbelt, as required by law. After an exchange with Rowson, and after he was asked to and did exit the vehicle, an officer patted down Rowson and found a firearm in the waistband of his pants. The gun had been stolen on February 8, 2022 in Virginia. Dkt. 8 ("Bail Hearing Tr.") at 6-7. At the time, Rowson was under indictment in New York State for criminal possession of a weapon in the second degree, in violation of *New York State Penal Law ("NYSPL") § 265.03(3)*, and criminal possession of a firearm, in violation of *NYSPL § 265.01-(b)(1)*. Did. 11. Both are felony offenses. See *NYSPL § 70.02*.

On November 15, 2022, Rowson moved to suppress the firearm and to dismiss the Indictment. Dkt. 32. In support, he filed a memorandum of law, Dkt. 33 ("Mem."), and exhibits. On December 2, 2022, the

Government filed an opposition brief. Dkt. 35 ("Opp."). **[\*3]** It opposed an evidentiary suppression hearing. *Id.* at 12. On December 6, 2022, the Court ordered that the hearing would proceed as scheduled. Dld. 36.

On December 12, 2022, the Court heard testimony from two police officers, received documentary and photographic evidence, and heard argument. At the close of the hearing, the Court invited supplemental briefing on the motion to dismiss. On December 23, 2022, the parties submitted supplemental briefs. Dkts. 41 ("Gov't Ltr. Br."), 42 ("Def. Ltr. Br.").

## II. Rowson's Suppression Motion

### A. Factual Findings

### I. Evidence Considered

Based on the evidence at the suppression hearing, the Court finds the following facts. The evidence consisted of the testimony of (1) Lieutenant Rafael Tosado, a 17-year NYPD veteran, *see* Suppression Hearing Transcript ("Tr.") 17; and (2) Officer[1] Eric Bernard, a seven-year NYPD veteran, Tr. 69. Tosado and Bernard (the "officers") conducted Rowson's traffic stop, frisk, and arrest. Unless otherwise indicated, the Court credits the testimony cited herein. The Court also received photographs of Rowson taken at the police station immediately after his arrest, GX8, GX11, GX12; photographs of signage posted on the Uber, GX9, **[\*4]** GX10; photographs of the gun and ammunition recovered from Rowson, GX6, and of the firearm itself, GX7; video footage from the officers' body-worn cameras, GX1 (Tosado), GX2 (Bernard); and a still image from the same footage, GX4. *See generally* Tr. 21 (GX2), 24 (GX11), 28 (GX1), 31 (GX9), 32 (GX10), 38 (GX12), 39 (GX8), 45 (GX6), 46 (GX7), 87 (GX4).

### 2. **Facts Established**[2]

---

[1] The Court here refers to the officers' roles and experience as of March 5, 2022.

[2] On a suppression motion, the Government bears the burden of proof by a preponderance of the evidence. *United States v. Echevarria, 692 F. Supp. 2d 322, 332 (S.D.N.Y. 2010)*.

### a. The Traffic Stop

On the night of March 5, 2022, the officers were patrolling the 46th precinct in the Bronx in an unmarked police car. Tr. 17-18, 70. Their purposes were to prevent crimes and to respond to crimes in progress. Tr. 17-18. Such patrols address all offenses, including vehicular offenses. *See* Tr. 69-70. Under New York law, vehicle passengers, including those in the back seat, are required to wear a seatbelt. Tr. 26; *see also N.Y. Vehicle & Traffic Law § 1229-c*.

Lieutenant Tosado was driving; Officer Bernard sat in the passenger seat. Tr. 18.[3] On numerous occasions, both officers had stopped cars based on the fact that a backseat passenger was not wearing a seatbelt. Tr. 26 (Tosado), 79 (Bernard). Both had received training in identifying concealed firearms and had experience conducting firearm-related arrests. Lieutenant Tosado had been trained **[\*5]** in recognizing the shape, sizes, and common methods of concealed carrying, and had participated in numerous gun arrests as part of a team focused on gun crimes. Tr. 46-47. Some of these arrests had arisen from observing bulges in clothing indicative of a firearm. Tr. 47. Officer Bernard had been trained in the concealment of firearms, and in common "characteristics," "body movements," and "demeanors" of a person carrying a concealed weapon. Tr. 90. He had participated in numerous gun arrests, including ones where the concealed firearm produced a bulge in the suspect's clothing. Tr. 90.

At 9:45 p.m., the officers were driving north along Webster Avenue, in the vicinity of East Tremont Avenue and East 178th Street. Tr. 18. Webster Avenue has four traffic lanes—two northbound and two southbound; one of which in each direction is a bus lane. Tr. 18-19,71. The officers were driving northbound in the bus lane, Tr. 19,22, at under 10 miles per hour, Tr. 74 (Bernard), and perhaps under five miles per hour, Tr. 23 (Tosado).

Both officers wore body cameras[4]; neither had

---

[3] At the time, Lieutenant Tosado oversaw the precinct's special operations, which included supervising the domestic violence unit, neighborhood coordination and safety officers, and public safety officers. Tr. 17. Officer Bernard was assigned to assist Lieutenant Tosado. Tr. 69.

[4] Body cameras do not continuously save all footage they record. Tr. 73-74 ("The body camera has a standby mode . . . [where] it's constantly recording and re-erasing the video and recording new video."). Instead, such cameras save both audio and visual footage beginning the moment of activation,

previously interacted with Rowson. Tr. 25 (Tosado), 75 (Bernard). As they approached a red light, the officers noticed a four-door **[*6]** Toyota Camry, Tr. 19,52, which they identified as a livery cab from its license plate. Tr. 72. The driver-side window of the officers' car was halfway down, giving them an unobstructed view. Tr. 23 (window was opened to "lower than my eye level"), 77. This portion of Webster Avenue was well lit by streetlights and ambient light from commercial and residential buildings. Tr. 18-19,28-29 (Tosado); 71-72 (Bernard). Lieutenant Tosado looked to his left, through his window, and into the Camry. Tr. 27, 75; GX2 00:05-:12. Its windows were untinted. Tr. 23, 75.

Lieutenant Tosado noticed that the Camry's rear passenger, later identified as Rowson, was not wearing a seatbelt. Tr. 23. Rowson was sitting on the right-hand side of the Camry, the side closest to the officers, and wearing a white shirt and light-washed denim jacket. Tr. 24 (Tosado), 78, (Bernard); *see also* GX11 (Rowson in clothes from March 5, 2022). Lieutenant Tosado testified that Rowson's light-colored clothing made it easier to spot the absence of a dark-colored seatbelt chest strap. Tr. 24. He also testified that the Camry was clearly visible for a couple of seconds while both cars were stopped at the red light. Tr. 51.

Officer **[*7]** Bernard testified that he also saw that Rowson was not wearing his seatbelt. Tr. 72,75-76. He could see into the Camry, despite being in the police car's passenger seat, because Lieutenant Tosado's window was lowered, and the Camry's windows were not tinted. Tr. 75; *see generally* Tr. 75-77. Officer Bernard testified that he also inferred that Rowson was not wearing a seatbelt from the absence of a dark-colored chest-strap against Rawson's light-colored clothing. Tr. 76-78.

The officers "wav[ed] the vehicle" past them to confine their "initial sight that the defendant was not wearing a seatbelt." Tr. 79; *see also* Tr. 26; GX2 00:29. Both testified that, before waving the Camry past, they had "already discussed that [they] were going to pull over" the Canny based on having observed Rowson not wearing a seatbelt. Tr. 79 (Bernard); *see also* Tr. 80 ("Q: So at that point, you had already discussed with Lieutenant Tosado that you were going to stop the vehicle? A: That's correct. Q: And that's why he waved it forward? A: Yes."), Tr. 26-27 ("Q: Why did you signal for

the Camry to go past you? A: Because we were going to pull over the Camry. Q: Why were you going to pull over the Canny? A: Because **[*8]** the rear passenger was not wearing his seatbelt."). As the Camry passed the police car, Officer Bernard saw, for a second time, that Rowson was not wearing a seatbelt. Tr. 80. Consistent with this, the body camera footage reflects that, after waving a car past, Lieutenant Tosado looked carefully out his window at a passing black sedan (the Camry). *See* GX2 00:29-:33.

The officers pulled over the Camry. GX1 1:00-:03; Tr. 30, 81. Lieutenant Tosado approached the Camry's driver and asked for his license, consistent with departmental policy for traffic stops. Tr. 33; GX1 1:03-:22. The driver told Lieutenant Tosado that he had asked Rowson to wear a seatbelt, but that Rowson had refused. Tr. 33. The Camry had two signs instructing passengers to wear their seatbelts. Tr. 30-32; GX9-10. Meanwhile, Officer Bernard approached Rowson on the Camry's rear, passenger side. Tr. 33, GX2 1:03-:15. Both officers testified that, as they approached the Camry, they again saw, through its untinted windows, that Rowson was not wearing a seatbelt. Tr. 30, 55 (Tosado); Tr. 82 (Bernard).

**b. The Frisk**

The area in which the officers stopped the Camry is a high-crime area, with "a lot of shootings, robberies, gun **[*9]** possession, a lot of violence, a lot of assaults, a lot of fights." Tr. 40 (Tosado), 93 (Bernard). The area of the stop was well lit. Tr. 30, 81. While Lieutenant Tosado spoke to the driver, Officer Bernard knocked on Rowson's window. Tr. 82; GX2 1:10. When Rowson rolled down his window, Officer Bernard said: "You got your I.D. on you? You're not wearing any seatbelt." GX2 1:12-:20; *see also* Tr. 39-40. *But see* Mem. at 2.[5] Rowson said, "I'm sorry," Tr. 82, and began scrolling through his phone to find a photo of his identification. GX2 at 1:23-:25; Tr. 84, 127. For approximately 20 seconds, while Rowson scrolled through his phone, Officer Bernard looked into the car at Rowson with his flashlight. GX2 1:25-:43. During this period, Officer Bernard asked Rowson for his name, which Rowson

---

and video footage beginning the minute before activation. Tr. 21 (explaining lack of audio in first minute of body camera footage); Tr. 73-74 (same).

---

[5] Rowson characterized Officer Bernard as having made this statement "with seeming surprise." Mem. at 2. The Court, on review of the body camera footage, did not perceive apparent surprise. *See* GX2 1:16-:18. As noted, the Court credits the officers' testimony that by this point, they had observed, multiple times, that Rowson was not wearing a seatbelt.

gave. GX2 1:25-:43.

Officer Bernard perceived Rawson as nervous, based on his heavy breathing and rising and falling chest. Tr. 84; *see also* Tr. 36-37 (Tosado: Rowson appeared nervous). Officer Bernard mouthed to Lieutenant Tosado over the roof of the car, "He's nervous." Tr. 35; GX1 1:30-:36. Officer Bernard testified that, at this point, he started to believe Rowson might be armed. Tr. 84. Officer Bernard's **[*10]** warning "caused [Lieutenant Tosado] to look into the rear passenger area where [Rowson] was seated," and shine his flashlight toward the rear of the car to better see Rowson, Tr. 35-36 (Tosado).

Turning back to Rowson, Officer Bernard said: "You alright? You're breathing very heavy." GX2 Rawson responded: "I got nothing on me, look. I just want to see why I was getting pulled over." GX2 1:40-:49; Tr. 85. Officer Bernard responded: "For wearing no seatbelt." GX2 1:48-:50. As he said, "I got nothing on me," Rowson opened the top of his denim jacket a few inches, seemingly to convey that nothing suspicious was on his person. Tr. 35, 56, 85.

Rawson was wearing tight skinny jeans, with a somewhat striated wash pattern, Tr. 108-09; his pants were well illuminated by ambient light and the officers' flashlights, Tr. 37; *see also* GX8, GX11, GX12 (Rowson's clothing night of the arrest). Officer Bernard testified that around this point, he observed "an object going down the left side of [Rowson's] leg, which is consistent with the barrel of a firearm," and "another object going just under the belt loops of his pants... that could be the handle of a firearm." Tr. 85. Officer Bernard noticed the **[*11]** object "pushing up on [Rowson's] pants," and causing his belt loops to project perpendicularly from his waist, rather than lying parallel to his frame, as they naturally would. Tr. 85-86. Lieutenant Tosado testified that, during this period, he did not notice a bulge in Rowson's pants from his vantage point, alongside the driver's window, Tr. 36-37, 57.

The Court credits Officer Bernard's important testimony. Although the body camera footage did not make such a bulge evident to the Court, given the officers' distance from the pants and the limitations of the body-camera medium, the footage was not inconsistent with Officer Bernard's observation. And both officers credibly testified that body camera footage sometimes does not pick up nuances visible to the naked eye, including based on the different distances and angles involved, and that the camera may not have focused on the same, precise part of a suspect's anatomy as did the officers. *See* Tr. 36 (Tosado: "I'm 6'2". But I usually kept my body-worn camera [on] my lower chest/upper stomach area just so that I can have a better view of things."). Body cameras can also sometimes make objects appear farther away, Tr. 36-37, and pick up **[*12]** reflective glare that would not impede the perceptions of an in-person observer, *see* Tr. 88-89 (Bernard, same).

Officer Bernard asked Rawson to exit the Camry. GX2 1:55-:58; Tr. 58. Officer Bernard was standing close to the Camry with his arms, for tactical reasons, in front of him. Tr. 117-18. At this point, the Camry door was wide open. Tr. 58 (no door separating Rowson and Officer Bernard); *see also* GX2 1:58. Officer Bernard testified that, as ROWSOD, stood from his seated position inside the vehicle, Rowson's left side bumped Officer Bernard's right arm. Tr. 92, 117; *see* GX 1:55-2:05. Officer Bernard felt an object he believed was a firearm. Tr. 92, 118.

Officer Bernard instructed Rowson to turn and put his hands on the vehicle; Rowson did not immediately comply, Tr. 40-41, 92; *see* GX1 2:14-:18. Lieutenant Tosado testified that, at this point, Rowson "appeared really nervous[,]" his "eyes were darting[, and i]t look[ed] like he was possibly thinking of running or fighting." Tr. 40. Officer Bernard testified that he believed Rowson was "looking for his opportunity to flee." Tr. 92-93. Officer Bernard repeatedly told Rowson to "relax." GX2 2:05-:30; *see also* GX1 2:00-:06. The body **[*13]** camera footage reflects that Rowson was still scrolling using his phone with his right hand, while Officer Bernard's arm was wrapped around Rowson's left side, as he repeatedly instructed Rowson to put his hands on the car. Rowson said: "Hold on, let me call my mom." GX1 2:13-:16. Both officers testified that, at this point, Rowson appeared to reach toward his waistband with his left hand, *see, e.g.*, Tr. 41, 44 (Tosado); Tr. 161 (Bernard), and would not raise that arm from his side, *see, e.g.*, GX1 2:04-:-:20. Lieutenant Tosado concluded that "based on [his] experience, [Rowson] was reaching for a weapon," Tr. 41; Tr. 43-44. The body camera footage reflects that Lieutenant Tosado then grabbed Rowson's left arm, and said, "Don't do that." Tr. 41 (Tosado), 98 (Bernard, discussing Tosado grabbing Rowson's aim); GX1 2:12-:20.

While Lieutenant Tosado held Rowson's left arm away from his body, *see* GX1 2:20-:25; Tr. 96, Officer Bernard frisked the outside of the front, left area of Rowson's

pants and felt an object resembling a firearm in shape and size. Tr. 94-95. Officer Bernard said: "92." GX1 2:22-:25; GX2 2:20-:22; Tr. 42. "92" refers to NYPD's radio code for executing an arrest; Lieutenant **[*14]** Tosado understood Officer Bernard to be asking him to handcuff Rowson. Tr. 42 (Tosado). Lieutenant Tosado placed Rowson's left wrist in a handcuff. Tr. 42; GX1 2:25-:30.

While the traffic stop was unfolding, an NYPD public safety car passed the Camry. Tr. 42. This timing was coincidental. Tr. 42 ("Q: So how did they end up there while you were handcuffing Rowson? A: Just timing, perfect timing."), 96 (Bernard) (same). The officers from the passing public safety vehicle "exited [their] vehicle to help [Lieutenant Tosado and Officer Bernard]." Tr. 32. Lieutenant Tosado said "92" to these officers. Tr. 33; GX1 2:25-:38. Officer Bernard said: "He has a gun." Tr. 43; GX1 2:38-:40.

Once Rowson's hands were handcuffed, Officer Bernard reached into his waistband with his right hand and removed the gun. Tr. 95. It was a loaded Taurus TX22 caliber pistol, taken from the front waistband of Rowson's pants.[6] Tr. 10, 44, 125. Officer Bernard stated: "I got the gun." GX2 2:38-:42; Tr. 44 ("I got it."). At the time it was recovered, the gun's barrel was pointing down Rowson's left leg, with the grip extended inward toward his groin. Tr. 10. The gun was approximately seven inches along the barrel, five **[*15]** inches along the grip, and one-to-two inches thick. Tr. 9-10. It had 13 rounds in the magazine. Tr. 100.

The entire encounter—from the officers exiting their vehicle, through Rowson's handcuffing and the recovery of the gun—lasted less than two minutes. *See* GX2 1:03-2:53.

## B. Discussion

Rowson's suppression presents, in sequence, two issues. The first is whether the officers had reasonable suspicion to justify the initial traffic stop, which, here, turns on whether the officers, in fact, observed Rowson riding in the Canary without a seatbelt. The second is whether the officers were justified in frisking Rowson. That turns on whether, based on specific facts perceived at the time, the officers had objectively

reasonable suspicion to believe that Rowson was armed and dangerous.

### 1. Applicable Legal Principles

Under *Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)*, and ensuing authority, "an investigatory stop (temporary detention) and frisk (patdown for weapons) may be conducted without violating the *Fourth Amendment's* ban on unreasonable searches and seizures." *Arizona v. Johnson, 555 U.S. 323, 326, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009)*. To satisfy the *Fourth Amendment*, two requirements must be met. *Id.*

First, the investigatory stop must be lawful. "[I]n a traffic-stop setting, the first *Terry* condition—a lawful investigatory stop—is met whenever it **[*16]** is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation." *Id. at 327*. The Second Circuit has "h[e]ld[] unambiguously" that it is lawful to make a traffic stop when officers have "reasonable suspicion of a traffic violation." *United States v. Stewart, 551 F.3d 187, 193 (2d Cir. 2009)*; *see also United States v. Foreste, 780 F.3d 518, 523 (2d Cir. 2015)* ("Traffic stops are presumptively reasonable under the *Fourth Amendment* if the officer has probable cause to believe that a traffic infraction has occurred."). In such circumstances, whether "reasonable suspicion exists is an objective inquiry; the 'actual motivations of the individual officers involved' in the stop 'play no role' in the analysis." *United States v. Gomez, 199 F. Supp. 3d 728, 741 (S.D.N.Y. 2016)* (citation omitted), *aff'd, 751 F. App'x 63 (2d Cir. 2018)*; *see also Foreste, 780 F.3d at 523* (same). During a stop, an officer may order the occupants of a vehicle to exit, or question them about matters unrelated to the stop, as long as the inquiries do not measurably extend the stop's duration. *Johnson, 555 U.S. at 331, 333*.

Second, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous. *Id. at 326-27*. In such instances, "after a vehicle is stopped, concerns regarding officer safety can justify frisking the vehicle's occupants for weapons." *United States v. Williams, No. 11 Cr. 228 (RWS), 2011 U.S. Dist. LEXIS 134352, 2011 WL 5843475, at *2 (S.D.N.Y. Nov. 21, 2011)*. Here, too, "[d]etermining whether reasonable suspicion exists is **[*17]** an objective inquiry," and is measured from "the objective perspective of a trained and experienced law enforcement officer." *2011 U.S. Dist. LEXIS 134352,*

---

[6] For the purposes only of the suppression motion, Rowson does not contest that he was, in fact, wearing no seatbelt and carrying a gun in his waistband. Tr. 142.

[WL] at *2-3. "A reasonable basis requires more than a 'hunch.'" *United States v. Bailey, 743 F.3d 322, 332 (2d Cir. 2014)* (quoting *Terry, 392 U.S. at 27*). It demands "specific and articulable facts which, taken together with rational inferences from those facts," *Terry, 392 U.S. at 21*, provide detaining officers with a "particularized and objective basis for suspecting wrongdoing," *United States v. Arvizu, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002)* (internal quotation marks omitted).[7]

"The Government bears the burden of proving, by a preponderance of the evidence, that reasonable suspicion existed for a stop." *United States v. Stewart, 604 F. Supp. 2d 676, 680 (S.D.N.Y. 2009)* (internal quotations omitted). "If the Government fails to satisfy this burden, any evidence obtained as a result of an improper seizure—that is, a stop or frisk that is not supported by reasonable suspicion—must be excluded from trial." *United States v. Bristol, 819 F. Supp. 2d 135, 142 (E.D.N.Y. 2011)*.

## 2. The Traffic Stop

The parties agree that the stop of the Camry was lawful if the officers, as they testified, observed Rowson riding in the Camry without a seatbelt before initiating the stop. *See* Mem. at 4; Opp. at 14-17; *see also Johnson, 555 U.S. at 327*. Rowson argues that the officers were not credible in so testifying. He disputes that, under the circumstances and conditions on the night in question, [*18] the officers could have observed Rowson not wearing a seatbelt. *See* Tr. 140-41 (Rowson's counsel: "It's a question of credibility [as] to whether or not the officers could have observed, under the circumstances and conditions on March 5 . . . Mr. Rowson without a seatbelt in the rear passenger seat of the Uber."). As noted above and as explained more fully

below, the Court finds the officers' testimony credible and reliable, and accordingly denies Rowson's challenge to the lawfulness of the stop.

The officers' pertinent testimony was consistent. Both credibly testified that they first noticed Rowson's lack of seatbelt as they approached a red light on Webster Avenue, *see* Tr. 28-29 (Tosado), 74-75 (Bernard); discussed pulling over the Camry for the seatbelt violation, Tr. 26 (Tosado: "We were going to pull over the Camry."), 79-80 (Bernard); waved the Camry by them, *see* Tr. 29 (Tosado), 79-80 (Bernard); and then observed Rowson's lack of a seatbelt a second time, *see* Tr. 27 (Tosado, turned to look into Camry), 80 (Bernard, saw no seatbelt again). The officers' statements were consistent as to the nature of the violation and when they detected it. And Officer Bernard's voice is contemporaneously [*19] captured on tape citing Rowson's seatbelt violation as the basis for stopping the Camry, GX2 1:12-:20 (Bernard, to Rowson), 1:48-:50 (same); *see also* Tr. 33-34 (Tosado, to driver); *cf. Stewart, 604 F. Supp. 2d at 682* (no reasonable suspicion where officers' testimony as to supposed violation and when they detected it was contradictory, and where they did not ask driver about violation after stopping vehicle). That Rawson was, in fact, not wearing a seatbelt—as both the driver's statement to Lieutenant Tosado, Tr. 33, and the body camera footage confirm, *see, e.g.*, GX2 1:38; GX4 (still from body camera footage)—supports the officers' claim to have observed just that.

Under these circumstances, the officers had every reason to conclude that Rowson was violating the seatbelt law. Far from merely inferring a violation of law, they had directly seen Rowson in violation of that law. Of course, "that an officer truly believed that he saw a violation does not necessarily make it reasonable for him to suspect that the violation occurred"; "a court must still assess the reasonableness of the officer's reliance on his observation, in light of any objective circumstances that might have led a reasonable officer to doubt the [*20] accuracy of what he believed he saw," *Stewart, 604 F. Supp. 2d at 682-83*. That is because, "[j]ust as it is unreasonable to suspect criminal activity on the basis of faulty deductions and inarticulable facts, it is also unreasonable to suspect a traffic violation on the basis of an unreliable underlying observation." *Id. at 683-84* (no reasonable suspicion where officers, who were distracted by cab's passenger, claimed to have observed that the cab was over the white line of a sidewalk by a "matter of inches" as they drove by the cab); *United States v. Jenkins, 324 F.*

---

[7] To fall within an officer's "narrowly drawn authority" to conduct searches pursuant to *Terry*, the search must also be "confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *See United States v. Casado, 303 F.3d 440, 444 (2d Cir. 2002)* (quoting *Terry, 392 U.S. at 27, 29*). The Court finds, and Rowson does not contest, that the patdown of the outside of Rowson's front left pocket—during which Officer Bernard felt a hard object consistent in size and shape with a firearm, Tr. 94—was permissibly confined in scope. *Id.; cf. Casado, 303 F.3d at 449* (unreasonable search where officer reached directly into defendant's pocket, rather than conducting patdown).

Supp, 2d 504, 510 (S.D.N.Y. 2004) (no reasonable suspicion where angle of windshield created a glare that made it appear tinted, but in a way that could apply to "virtually any vehicle, particularly at night"), *aff'd on other grounds, 452 F.3d 207 (2d Cir. 2006)*.

Here, however, there was no reasonable basis for the officers to wonder if their eyes were playing tricks on them. Unlike the examples above, there is no basis on which it can be credibly argued that the officers' observations were "frustrated by fleetingness, distractions, obstructions, or deceptive angles, glares, or shadows," *Stewart, 604 F. Supp. 2d at 683*. The assembled circumstances instead enabled an accurate observation. The officers were driving slowly at approximately five to 10 miles per hour, Tr. 23, 74, they had an **[*21]** unobstructed view into the Camry, Tr. 23 (Tosado's window open; Camry's windows untinted), 75 (Camry's windows untinted),[8] that lasted for several seconds, Tr. 51 (Rowson clearly visible while stopped at red light), and the area was well lit, Tr. 18-19, 28-29, 71-72. Rowson was sitting on the side of the Canny closest to the officers, and his light-colored clothing would have starkly contrasted with a dark seatbelt chest strap, had he been wearing one. Tr. 24, 78; GX11. The officers also saw Rowson twice, and from a variety of angles as the Camry passed. Tr. 79-80. For experienced officers focused on Rowson, a few seconds while driving at a low speed provided ample opportunity to note the absence of a black chest strap on a well-illuminated and—while at the red light, stationary—person. *See United States v. Hagood, No. 20 Cr. 656 (PAE), 2021 U.S. Dist. LEXIS 132085, 2021 WL 2982026, at *5, *14-*

---

[8] This assessment is particularly so as to Lieutenant Tosado; Officer Bernard's line of sight was more difficult insofar as he was on the opposite side of the police car from the Camry. *But see* Tr. 75-77 (Officer Bernard explaining that he could see the top part of Rowson's chest from his vantage point and noticed the absence of a dark seatbelt chest strap). The officers testified that they discussed Rowson's lack of seatbelt before the arrest, Tr. 26, 80, and the body camera footage captures them doing, *see, e.g.,* GX2 00:24—:40. Even if Lieutenant Tosado's testimony alone were credited, such would justify the stop as reasonable. Under the doctrine of collective knowledge, "[r]easonable suspicion can . . . be premised in whole or in part on the knowledge of the officer conveying the information"; Officer Bernard need not have himself seen "the specific facts which led [Lieutenant Tosado] to seek [his] assistance." *See United States v. Hussain, 835 F.3d 307, 316 n.8 (2d Cir. 2016)* (requiring evidence, as exists here, that viewing officer communicated his suspicion or relevant information to colleague).

*15 (S.D.N.Y. July 15, 2021)* (reasonable suspicion where experienced officers observed well-illuminated person with weighted bag across chest for a few seconds while passing at a low speed).

In sum, because they saw Rowson not wearing a seatbelt, the officers had reasonable suspicion to stop the Camry, and the traffic stop was lawful. Rowson's motion, to the extent directed to the traffic stop, is therefore **[*22]** denied. *See, e.g., Foreste, 780 F.3d at 523-27* (affirming denial of motion to suppress where officers observed vehicular infractions that were basis of underlying traffic stops); *United States v. Derverger, No. 07 Cr. 147 (NAM), 2008 U.S. Dist. LEXIS 22990, 2008 WL 819040, at *4 (N.D.N.Y. Mar. 24, 2008)* (denying suppression motion) ("A traffic stop is valid under the *Fourth Amendment* if, as here, it is based on an observed traffic violation."), *aff'd, 337 F. App'x 34 (2d Cir. 2009)*; *Gomez, 199 F. Supp. 3d at 741-42* (denying suppression motion where officers observed traffic violation); *see also United States v. Restrepo, 890 F. Supp. 180,192 (E.D.N.Y. 1995)* (traffic stop permissible if valid basis, even if pretextual).

### 3. The Frisk

As an alternative basis for suppression, Rowson argues that Officer Bernard lacked reasonable suspicion to frisk him. *See* Mem. at 5-6.

The Government argues that, taken together, the following articulated facts permitted an officer to reasonably suspect that Rowson was armed and dangerous, supporting a frisk of his front left pocket: (1) the traffic stop occurred in a high-crime area; (2) Rowson appeared visibly nervous in his dealings with Officer Bernard; (3) Rowson reflexively denied having anything on his person, notwithstanding that a question to this effect had not been put to him; (4) Officer Bernard observed a distortion in the belt loops of Rowson's pants consistent with the presence of a firearm around his waist and pocket area; (5) when **[*23]** Rowson bumped into him, Officer Bernard felt a hard object consistent with a firearm; and (6) Rowson thereafter was slow to comply with Officer Bernard's command to turn and place his hands on the vehicle. *See* Opp. at 17-20. The Court agrees. Viewing the circumstances in totality and from the perspective of a reasonable officer, there was an ample, and clearly reasonable, basis to conclude that Rowson was aimed and dangerous, and indeed specifically that his pants housed a firearm. *See United States v. Santillan, 902*

2023 U.S. Dist. LEXIS 13832, *23

*F.3d 49,56 (2d Cir. 2018)*.

The Court first considers the stop's high-crime location and Rowson's nervousness. *See* Opp. at 18-19. That context was permissibly considered by the officers. *Cf. Hagood, 2021 U.S. Dist. LEXIS 132085, 2021 WL 2982026, at \*14* (considering fact that stop occurred in a high-crime area and defendant's nervousness as contextual circumstances in a *Terry* analysis); *Holeman v. City of New London, 425 F.3d 184, 190 (2d Cir. 2005)* ("An 'individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime[, b]ut officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation.'" (quoting *Illinois v. Wardlow, 528 U.S. 119, 124, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000)*)). But under the circumstances [*24] of the stop here, these factors, without more, would fall well short of establishing reasonable suspicion. *See Hagood, 2021 U.S. Dist. LEXIS 132085, 2021 WL 2982026, at \*14*.

As to the location of the stop, the Camry was merely passing *through* a high-crime area. The officers had not been given any indication of an intent to stop within the area. *Cf. Hussain, 835 F.3d at 315 n.7* (fact that "*driving through* a high crime area does not alter [its] analysis," particularly where, as here, the officers referenced, but did not rely, on the area's dangerousness as justifying the frisk (emphasis in original)); *Holeman, 425 F.3d at 190* ("Mil the dead of night in a high crime neighborhood, it would be more suspicious to be on foot than in can"); *see, e.g.,* Tr. 40 (Tosado, describing crime levels generally); Tr. 93 (Bernard, describing neighborhood as a "busy area" with "multiple gangs" and firearm-related violence, but not specifically linking crime levels to frisk).

And as to Rowson's nervous demeanor, it contributes only modestly to the conclusion that he was dangerous. "Nervous, evasive behavior is a pertinent factor in determining reasonable suspicion," *Wardlow, 528 U.S. at 124.* But as described by the officers here, Rowson's demonstrated nervousness, at least while situated in the Camry, largely consisted of heavier than normal [*25] breathing. That observation was not so unusual, and did not so materially exceed the nervousness inherent in a nighttime stop by the police, to alone reasonably suggest dangerousness. *See United States v. Weaver, 9 F.4th 129, 147 (2d Cir. 2021)* ("*Unusual,* evasive, or furtive behavior, especially in the presence of law enforcement, is often a critical factor in the reasonable suspicion analysis." (emphasis added)). And, undermining the suggestion of danger, Rowson, while seated in the car, made eye contact with Officer Bernard and spoke steadily. *Compare Santillan, 902 F.3d at 53, 57* (avoidance of eye contact and shaky voices contributed to reasonable suspicion), *with* GX2 1:12—:16, 1:37—:40 (making eye contact with Officer Bernard). Rowson did not take any step to try to leave or flee. *See, e.g., Wardlow, 528 U.S. at 124* (citing suspect's "unprovoked flight" upon noticing the police); *cf. Dancy v. McGinley, 843 F.3d 93, 110 (2d Cir. 2016)* (no reasonable suspicion based on nervousness where defendant did not abruptly "change[] direction, r[u]n away, quicken[] [his] pace, or make furtive gestures"). The body camera footage reflects Rowson searching his phone responsively. The Court does credit Officer Bernard's testimony that Rowson was "visibly nervous," Tr. 83, a point the officer conveyed in real time to Lieutenant Tosado, as the body camera [*26] footage reflects. *See* GX1 1:30—:36 (depicting Officer Bernard stating, across car's roof, that "he's nervous"). And Lieutenant Tosado, who by then had his eyes on Rowson, similarly testified that Rowson was "nervous[l]y trembl[ing]" and "shaking," Tr. 36. He reasonably explained that body camera footage may not capture such behavior, *see* Tr. 35; *see also* Tr. 88-89 (Officer Bernard), as is the case here, *see* GX2 1:16—:36. Both officers also described Rowson's level of nervousness as increasing immediately before the frisk with Rowson's eyes "darting . . . like he was possibly thinking of running or fighting," Tr. 40 (Tosado), 154 (Bernard). In sum, Rowson's nervousness is supportive of a finding of reasonable suspicion of dangerousness, but does not establish it or close. The same nervousness could have been explained by other factors, including illegal conduct not indicative of present dangerousness (for example, possession of illegal narcotics).

But there was more. Officer Bernard credibly testified to observations that led him—and would lead a reasonable officer—to suspect that Rowson was armed and dangerous. In reaching such a conclusion, officers may "draw on their own experience [*27] and specialized training to make inferences from and deductions about the cumulative information to them that 'might well elude an untrained person.'" *Arvizu, 534 U.S. at 273* (quoting *United States v. Cortez, 449 U.S. 411, 418, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981)*). Here, in response to Officer Bernard's question, "You alright? You're breathing very heavy," GX2 1:40—:43, Rowson said, "I got nothing on me, look," and opened his jacket, GX2 1:40—:49; Tr. 85. This strange response to a question

about whether Rowson was "alright" was reasonably read by Officer Bernard as protesting too much—as suspicious, and a signal to scrutinize Rowson more carefully for a prohibited object. Officer Bernard had already explained that the stop was solely on account of Rowson's lack of seatbelt, and Rowson had apologized. GX2 1:12—:20; Tr. 82. Officer Bernard was within his rights, drawing on his training and experience, to decode Rowson's irregular response as suggesting something more serious than yet known to the officers was afoot. *See Weaver, 9 F.4th at 148* (reasonable suspicion where defendant reflexively denied having anything, despite hitching up his pants repeatedly); Tr. 84 (Bernard: "I'm starting to . . . believe that this person might be armed with a weapon.").

Most significant by far are Officer Bernard's credible **[*28]** testimony about his observations as to the shape and size of the bulge in Rowson's pants, and that he felt an object consistent with a firearm in Rowson's waistband when they bumped into each other. An observation of a generic "bulge" under a suspect's clothing is usually insufficient to supply reasonable suspicion that the item underneath is a form of contraband. *See Floyd v. City of New York, 959 F. Supp. 2d 540, 614 (S.D.N.Y. 2013)* ("[T]he outline of a commonly carried object such as a wallet or cell phone does not justify a stop or frisk, nor does feeling such an object during a frisk justify a search."). But where more is seen, the calculus changes, and an observation of "an outline [of a firearm] can significantly contribute to a finding of reasonable suspicion." *United States v. Dixon, No. 20 Cr. 368 (NSR), 2021 U.S. Dist. LEXIS 81131, 2021 WL 1662492, at *15 (S.D.N.Y. Apr. 28, 2021)* (collecting cases); *see also United States v. Black, 525 F.3d 359, 361-62, 365 (4th Cir. 2008)* (the shape of a "slide of a semi-automatic handgun" in defendant's pocket contributed to reasonable suspicion); *United States v. Price, No. 13 Cr. 216 (RRM), 2014 U.S. Dist. LEXIS 17155, 2014 WL 558674, at *9 (E.D.N.Y. Feb. 11, 2014)*; *Hagood, 2021 U.S. Dist. LEXIS 132085, 2021 WL 2982026, at *13* (outline of "an elongated, rigid, solid object" with a "line" that was "hard at the top" consistent with a gun, in light of officer's experience). Here, Officer Bernard observed more. He testified to the apparent shape and size of the object in Rowson's pants with sufficient specificity to make reasonable the inference that the pants held **[*29]** a gun. He testified that he had noticed a hard object "pushing up on [Rowson's] pants" and causing Rowson's belt loops to project perpendicularly from his waist, rather than lying parallel to his frame as they naturally would. Tr. 85-86; *see also* Tr. 107; GX4 (showing some distortion of belt

loops).[9] And Officer Bernard had ample time to observe Rowson's pants—which were form-fitting, so as to cast an object in greater relief. He also did so with the benefit of his flashlight's illumination. GX2 1:25—:43.

The Court recognizes that the observation made by Officer Bernard about the appearance of Rowson's pants does not rule out an innocent explanation. But given the officer's relevant experience and training, including with respect to concealed firearms, and his credible demeanor and the care with which he testified, the Court credits Officer Bernard's in-the-arena account that, in real time, he perceived the bulge to bespeak a gun's presence. *See* Tr. 90; *see, e.g., Hagood, 2021 U.S. Dist. LEXIS 132085, 2021 WL 2982026, at *14* (denying motion to suppress where officer drew on numerous instances seizing firearms found in fanny packs during *Terry* stops and searches incident to arrest); *see also United States v. Padilla, 548 F.3d 179,183 (2d Cir. 2007)* (affirming denial of suppression motion where, **[*30]** in officer's experience based on eight to 10 arrests of suspects with guns in waistbands, suspect's movements were "consistent with the adjustment of a gun lodged in one's waistband" but not with an innocent explanation); *United States v. Wiggan, 530 F. App'x 51,55-56 (2d Cir. 2013)* (summary order) (reasonable suspicion supported by defendant carrying gun in pocket, where officer testified that, in his experience, individuals in legal possession of firearms used a holster under a garment, while those illegally in possession carried them in pockets, waistbands, or inside coats); *United States v. Lucas, 68 F. App'x 265,267 (2d Cir. 2003)* (summary order) (officers

---

[9] At the hearing, the Government argued that the unnatural distortion of the belt loops on Rowson's jeans was evident in GX4—a still image drawn from Officer Bernard's body camera. *See* Tr. 156; *see also* Tr. 138 (Bernard, explaining how body cameras flatten images visible to the naked eye). Although some buckling of the belt loop is visible in the image, the image alone does not make crystal clear whether that distortion resulted from an object in the waistband or the tightness of Rowson's pants and the angle at which he was sitting. But, as noted, Officer Bernard's immediate view from a couple of feet away gave him a more revealing perspective than the body camera footage. And the Court credits Officer Bernard's account of what he saw. *See Arvizu, 534 U.S. at 273* (reasonable suspicion standard allows "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information to them that 'might well elude an untrained person'"); *Weaver, 9 F.4th at 149* (officer "need not rule out the possibility of innocent conduct" to have reasonable suspicion).

"entitled to draw on their experience that far more individuals who carry concealed handguns do not have licenses than do").

Critically, too, Officer Bernard testified that Rowson bumped into him upon exiting the Camry, with his waist making contact with the officer's hand, which revealed to the officer a hard object consistent with a firearm. This occurrence strongly reinforced Officer Bernard in believing, as soon proved the case upon recovery of the semiautomatic weapon, that Rowson had a gun inside the top of his pants, Tr. 92,117-18; *see* GX 1:55-2:05. *See, e.g., United States v. Davis, 111 F. Supp. 3d 323,329-30,338-339 (E.D.N.Y. 2015)* (reasonable suspicion where officers witnessed bulge and, during unintentional [*31] physical contact when attempting to stop a fleeing defendant, felt a hard bulge consistent with a firearm). The Court has carefully considered, and fully credits, that account. Apart from the overall credibility of Officer Bernard's testimony, his testimony on this point is corroborated by the body camera footage. It reveals Officer Bernard standing with his arms in front of him, with no door or object between him and Rowson, and a small space for Rowson to stand upon exiting the car, so as to make the officer's testimony about physical contact between Rowson's waist and the officer's hand quite credible. GX2 1:55-2:10; *see* Tr. 117-18 (Bernard); *cf.* Tr. 161-62 (discussing mechanics of encounter). To the extent reasonable suspicion might be argued to have been lacking prior to that moment, Officer Bernard's having come into tactile contact with the part of the pants housing the gun compellingly supported that Rowson's pants housed a firearm.

Under these circumstances, the accumulated information known to the officers, viewed in light of their experience and training, gave them reasonable suspicion—prior to the moment that Officer Bernard put his arm around Rowson and frisked him[10]—that [*32]

Rawson possessed an illegal firearm. It further reasonably supports that Rowson presented a danger to the safety of the police and public at that moment, justifying a frisk. *See, e.g., United States v. Williams, 526 F. App'x 29,32 (2d Cir. 2013)* (summary order) (after officers approached defendant in street, defendant's "hostile response" and officer's "observation of a 'bulge' on the right side of [defendant's] thigh" justified the subsequent frisk conducted to protect the officers' safety"); *Hagood, 2021 U.S. Dist. LEXIS 132085, 2021 WL 2982026, at *16* (officers had reasonable suspicion to search defendant where clear outline of gun was visible in tight-fitting fanny pack); *United States v. Watson, No. 20 Cr. 346 (JSR), 2021 U.S. Dist. LEXIS 27276, 2021 WL 535807, at *7 (S.D.N.Y. Feb. 11, 2021)* (officers had reasonable suspicion to frisk pedestrian with a "heavy-looking L-shaped object" in his fanny pack); *United States v. Monroe, No. 08 Cr. 609 (ENV), 2009 U.S. Dist. LEXIS 101776, 2009 WL 3614521, at *4-6 (E.D.N.Y. Nov. 2, 2009)* (officer justified in conducting protective patdown where "defendant turned his body in a way that revealed an L-shaped bulge in his back pocket"); *United States v. Rios, No. 09 Cr. 369 (CPS), 2009 U.S. Dist. LEXIS 74895, 2009 WL 2602202, at *6 (E.D.N.Y. Aug. 24, 2009)* (patdown was justified where officer saw an L-shaped item in defendant's pocket as defendant dismounted his bicycle).

The Court accordingly denies Rowson's motion to suppress, to the extent based on the claim of an unlawful frisk.

## III. Rowson's Motion to Dismiss

Rowson separately moves for dismissal of the Indictment on the ground that *18 U.S.C. § 922(n)*, evaluated [*33] under the framework for *Second*

---

[10] For avoidance of doubt, in reaching this determination, the Court has considered only facts known to the officers *before* Officer Bernard placed his arm around Rowson. *See* GX1 2:13—:16; *Weaver., 9 F.4th at 143-45* (officer may order passengers out of car, even without reason to search occupants, and order suspect to move to place hands on the vehicle without commencing a search under the *Fourth Amendment*). The Court has not considered the immediately ensuing events, including Rowson's delay in complying with the officer's command to place his hands on the car, *see* Opp. at 19 (arguing that delay in complying with command supports reasonable suspicion), or Rowson's arguably suspicious and

non-compliant movement of his left hand, Tr. 9 (same, as to Rowson reaching for weapon with left hand). That is because a search requiring a reasonable suspicion of danger under the *Fourth Amendment* may have been underway when Officer Bernard placed his arm around Rowson. *See* GX1 2:14—:16 (seeming to show Officer Bernard patting down Rawson with his right hand prior to the suspicious movement of Rowson's left hand); *see also Weaver, 9 F.4th at 142-45* (search begins with physical intrusion into a protected area). *But see id. at 144* (no search where defendant "was not forced to reveal anything that was not already exposed to the public"). Were these ensuing events considered, they would further bolster the reasonableness of the officers' perception of danger.

*Amendment* analysis used by the Supreme Court in *Bruen*, is unconstitutional.

## A. The *Second Amendment* Framework Under *Bruen*

In 2008, in *District of Columbia v. Heller*, the Supreme Court held that the *Second Amendment* protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *554 U.S. 570, 628-29, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008)*. It held that the District of Columbia's total ban on firearm possession in the home was unconstitutional. "[O]n the basis of both text and history," the Court held, this ban—which, "[flew laws in the history of our Nation have come close to . . . [in] sever[ity]" could not survive "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights." *Id.* But the Court emphasized that "the right secured by the *Second Amendment* is not unlimited." *Id. at 626*. Its decision, it stated, should not "be taken to cast doubt on longstanding prohibitions on possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id. at 626-27*.

Two years later, in *McDonald v. City of Chicago*, the Court held that the *Second Amendment* applies to the states, via incorporation [*34] through the *Due Process Clause of the Fourteenth Amendment*. *561 U.S. 742, 786, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010)*. The Court accordingly struck down a Chicago law that, similar to the ordinance in *Heller*, effectively banned handgun possession by almost all private citizens, including in their homes. *Id. at 750*. The Court reaffirmed that "individual self-defense is 'the *central component*' of the *Second Amendment* right" and "deeply rooted in this Nation's history and tradition," and that "'the need for defense of self, family, and property is most acute' in the home." *See id. at 767-68* (quoting, *inter cilia*, *Heller, 554 U.S. at 599, 628*) (emphasis in original). The Court in *McDonald* reiterated *Heller's* teaching that the right to keep and bear arms "is not 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose,'" and that its decision should not cast doubt on "longstanding regulatory measures" of the sorts identified in *Heller. Id. at 786* (quoting *Heller, 554 U.S. at 626*).

As the Second Circuit soon thereafter recognized, *Heller* and *McDonald*, confined as they were to ordinances

banning firearm possession in the home, "raise[d] more questions than [they] answer[ed]," including as to the extent to which the *Second Amendment* protects the right to bear arms outside the home, and the methodology by which the constitutionality of firearms laws would be evaluated. *Kachalsky v. Cnty. of Westchester, 701 F.3d 81, 88-89 (2d Cir. 2012)* ("This [*35] vast *'terra incognita'* has troubled courts since *Heller* was decided."); *see also Young v. Hawaii, 992 F.3d 765, 783 (9th Cir. 2021)*.

Following *Heller*, appellate courts—including the Second Circuit—coalesced around a two-step framework that "combine[d] history with means-end scrutiny." *Bruen, 142 S. Ct. at 2125*; *see Kachalsky, 701 F.3d at 91-101*; *see, e.g., United States v. Marzzarella, 614 F.3d 85, 89 (3d Cir. 2010)*; *United States v. Reese, 627 F.3d 792, 800-01 (10th Cir. 2010)*; *Heller v. District of Columbia (Heller II), 670 F.3d 1244, 1252-53, 399 U.S. App. D.C. 314 (D.C. Cir. 2011)*; *Ezell v. City of Chicago, 651 F.3d 684, 701-04 (7th Cir. 2011)*; *Nat'l Rifle Ass'n ofAm., Inc. v. Bureau of ATFE (NRA), 700 F.3d 185, 194-95 (5th Cir. 2012)*; *United States v. Greeno, 679 F.3d 510, 518 (6th Cir. 2012)*; *Woollard v. Gallagher, 712 F.3d 865, 874-75 (4th Cir. 2013)*; *Gould v. Morgan, 907 F.3d 659, 668 (1st Cir. 2018)* ("In the decade since *Heller* was decided, courts have adopted a two-step approach for analyzing claims that a statute, ordinance, or regulation infringes the *Second Amendment* right."); *Young, 992 F.3d at 783*. The first step inquired whether the challenged law regulated conduct within the *Second Amendment's* scope, based on an historical inquiry into "the scope the [*Second Amendment* was] understood to have when the people adopted [it]" in 1791. *See Heller, 554 U.S. at 634-45*; *see, e.g., Marzzarella, 614 F.3d at 89* (quoting *Heller*). If so, courts proceeded to the second, means-ends step and determined the appropriate level of scrutiny. *See N.Y. State Rifle & Pistol Ass 'n, Inc. v. City of N.Y., 883 F.3d 45, 55-56 (2d Cir. 2018)*, *vacated and remanded sub nom. NY State Rifle & Pistol Ass 'n, Inc. v. City of N.Y, N.Y., 140 S. Ct. 1525, 206 L. Ed. 2d 798 (2020)*. This inquiry considered two "interact[ing]" factors: (1) whether the law implicated a "core" *Second Amendment* right and (2) the severity of the law's burden on that right. *Id. at 56*. "Laws that place[d] substantial burdens on core rights [were] examined using strict scrutiny," whereas those that placed "either insubstantial burdens on conduct at the core of the *Second Amendment* or substantial burdens only on conduct [*36] outside the core" were examined under intermediate scrutiny. *Libertarian Party of Erie Cnty. v. Cuomo, 970 F.3d 106, 128 (2d Cir. 2020)* (internal quotation marks and

alterations omitted).[11]

The Supreme Court in *Bruen* put in place a different test to govern *Second Amendment* challenges. The *Bruen* test turns on textual and historical analysis alone. It eliminates the courts of appeals' means-ends inquiry into the proper level of scrutiny as informed by whether a "core" *Second Amendment* right is substantially burdened. *See Bruen, 142 S. Ct. at 2127* ("Despite the popularity of this two-step approach, it is one step too many.").

Under *Bruen*, a court considering a *Second Amendment* challenge must first determine whether the Amendment's "plain text covers an individual's conduct." *Id. at 2129-30*. If so, "the Constitution presumptively protects that conduct," and "the government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.; id. at 2126* ("To justify its regulation, the government may not simply posit that the regulation promotes an important interest."). **[*37]** *Bruen* offered the following guidance for this historical inquiry. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence," although not necessarily dispositive, "that the challenged regulation is inconsistent with the *Second Amendment*." *Id. at 2131*. Likewise, if "earlier generations addressed that same] societal problem, but did so through materially different means," such also weighs against a modern regulation's constitutionality. *Id.* However, the

---

[11] For examples of decisions using such analysis, *see Marzzarella, 614 F.3d at 89; Reese, 627 F.3d at 800-01; Heller II, 670 F.3d at 1252-53; Ezell, 651 F.3d at 701-04; Nat'l Rifle Assn of Am., Inc., 700 F.3d at 194; Greeno, 679 F.3d at 518; Woollard, 712 F.3d at 874-75; Gould, 907 F.3d at 668;* and *Kolbe v. Hogan, 849 F.3d 114, 139 (4th Cir. 2017).* In applying this methodology, many circuit courts assumed *arguendo* that the challenged law implicated the *Second Amendment* and proceeded to the means-end analysis. *See, e.g., Woollard, 712 F.3d at 875; Ass 'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J. 910 F.3d 106, 117 (3d Cir. 2018); Worman v. Healey, 922 F.3d 26, 30-31 (1st Cir. 2019)* (same), *cert. denied, 141 S. Ct. 109, 207 L. Ed. 2d 1050 (2020); Duncan v. Bonta, 19 F.4th 1087, 1103 (9th Cir. 2021), cert. granted, judgment vacated, 142 S. Ct. 2895, 213 L. Ed. 2d 1109 (2022),* and *vacated and remanded, 49 F.4th 1228 (9th Cir. 2022)* (same). The decisions in *Marzzarella, Reese, Nat'l Rifle Ass 'n of Am., Inc., Ass 'n of N.J Rifle & Pistol Clubs, Inc., Kachalsky, Young, Gould, Greeno, Worman,* and *Kolbe* have been abrogated by *Bruen*.

Court stated, the inquiry into historical analogues required by *Bruen's* second step is not a "regulatory straightjacket." *Id. at 2133*. It "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin.*" *Id.* (emphasis in original).

## B. Discussion

In arguing that *§ 922(n)* is unconstitutional under *Bruen*, Rowson argues that (1) "the people" whom the *Second Amendment* protects include the class subject to *§ 922(n)*—persons who, while facing pending felony charges punishable by imprisonment for more than one year, ship, transport, or receive a firearm; and (2) *§ 922(n)* is inconsistent with the nation's tradition **[*38]** of firearm regulation, which Rowson contends does not include similar prohibitions. *See* Mem. at 6-8; Def. Ltr. Br. 3-8. The Government takes the opposite position on each point. *See* Opp. at 28-40; Gov't Ltr. Br. at 3-5.

Before addressing those issues, the Court takes up two threshold questions.

The first is whether Rowson's challenge to *§ 922(n)* is facial only or also as-applied. At argument, Rowson stated that his was solely a facial challenge. *See* Tr. 174; *see also* Gov't Ltr. Br, at 1. In his post-argument letter, however, he stated, in passing, that the statute could not be constitutionally applied to his conduct. *See* Def. Ltr. Br. at 2,8-9. Rowson did not develop this argument or cite supporting case law. And the district court decision from the Western District of Texas, on which Rowson largely bases his claim that *§ 922(n)* is unconstitutional, found facial invalidity only. *See United States v. Quiroz, No. 22 Cr. 0104 (DC), 2022 U.S. Dist. LEXIS 168329, 2022 WL 4352482, at *13 n.119 (W.D. Tex. Sept. 19, 2022)* (declining to reach as-applied challenge). Accordingly, the Court considers Rowson's present challenge as facial only, without prejudice to Rowson's right to later pursue an as-applied challenge.[12]

---

[12] Given *Bruen's* recency, the case law has not yet developed the parameters of an as-applied *Second Amendment* challenge to a prosecution under *§ 922(n)*. Would that inquiry focus solely on the categorical nature of the felony charge pending against the defendant? Would the factual allegations underlying that charge also be germane? Could other facts relating to the threat the defendant posed to public safety be considered? In all events, it is premature here to determine definitively *§ 922(n)'s* constitutionality as applied to Rowson,

Second, the Government contends that the Court's analysis of § 922(n)'s constitutionality **[\*39]** should forego *Bruen*'s history-focused framework in favor of the due process framework used in *United States v. Salerno, 481 U.S. 739, 745, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987)*. The Supreme Court there upheld the 1984 *Bail Reform Act*'s provision for pretrial detention of arrestees found to pose dangers to the safety of the community over a *Fifth Amendment* due process challenge. *Id at 746-52*. The Government's interest in protecting the community, the *Salerno* Court held, outweighed the arrestees' liberty interests. *See id. at 748*.[13] The Government here argues that insofar as § 922(n) similarly applies to pretrial arrestees, so as to deny them the right to ship, transport, or receive firearms while subject to a felony indictment, *Salerno's* recognition that criminal defendants "may face substantial liberty restrictions as a result of the operation of our criminal justice system," *id. at 749*, should carry the day on Rowson's challenge. *See* Opp. at 23. The needs of the criminal justice system, the Government notes, have been held to justify numerous restrictions on a criminal defendant's *Fourth*, *Fifth*, and *Sixth Amendment* rights, *see id.* at 2324 (citations omitted), and these needs, it contends, "likewise justify the

―――――――――――

with the issue not briefed and the factual record—to the extent germane—undeveloped.

That said, on the facts known and proffered to date, it does not appear that, if § 922(n) is facially valid, Rowson would have a strong basis to claim to challenge its application to him, regardless of the parameters of that inquiry. The pending felony charge against Rowson on which the § 922(n) charge was based was for a quintessential crime of violence. *See People v. Nelson, 206 A.D.3d 1703, 169 N.Y.S.3d 771, 772, leave to appeal denied, 38 N.Y.3d 1152, 174 N.Y.S.3d 26, 194 N.E.3d 733 (2022)* (§ 265.03 is a violent felony). And the facts underlying that charge, as proffered, involve violent conduct implicating public safety. *See* Opp. at 3 ("police officers heard multiple gun shots coming from the courtyard of 2260 Crotona Avenue . . then saw Rowson run out [of the building] and drop a 9mm firea which they recovered" and which "was loaded with four rounds of ammunition"). Rowson's detention hearing in this case also adduced evidence of his gang affiliations and repeated firearms offenses, including while on pretrial release. These led the Court to order Rowson's pretrial detention, based on the danger he posed to the safety of the community. *See* Apr. 5, 2022 Tr. at 11-12, 41-42; *see also* Dkt. 16 (July 28, 2022 order, denying reconsideration of detention).

―――――――――――

[13] The Court in *Salerno* also rejected the argument that the statute violated the *Eighth Amendment's* excessive bail clause, *See 481 U.S. at 752-55*.

restriction of putative *Second Amendment* rights at issue here," *id. at 24*. That argument is unconvincing. Rowson here has not brought a due process challenge. And the Court in *Bruen* **[\*40]** pointedly rejected, for *Second Amendment* challenges, the means-end balancing framework, characteristic of due process analysis, that the Government espouses here. The Nation's history of restricting the liberties of a criminal defendant is germane under *Bruen*. But that is so because such may bear on whether the limitation of firearms rights of such persons at issue accords with the nation's historical tradition of firearm regulation, not because the statutory restriction at issue survives means-ends balancing.

The Court here accordingly applies *Bruen* on its terms. In considering both whether the persons covered by § 922(n) are protected by the *Second Amendment*, and, if so, whether there are historical analogues of firearm regulations, the Court has considered the several *post-Bruen* decisions to date resolving *Second Amendment* challenges to § 922(n). Three have upheld the provision: the Fifth Circuit, applying plain error review because the defendant had not brought a *Second Amendment* challenge below, *see United States v. Avila, No. 22-50088, 2022 U.S. App. LEXIS 35321, 2022 WL 17832287, at \*1-2 (5th Cir. Dec. 21, 2022)*; and district courts in Oklahoma, *United States v. Kays, No. 22 Cr. 40, 2022 U.S. Dist. LEXIS 154929, 2022 WL 3718519 (TDD), at \*4-5 (W.D. Okla. Aug. 29, 2022)*; and Tennessee, *United States v. Kelly, No. 22 Cr. 37 (AAT), 2022 U.S. Dist. LEXIS 215189, 2022 WL 17336578 (M.D. Tenn. Nov. 16, 2022)*. Four district courts (in Texas, Oklahoma, and Indiana) have held § 922(n) invalid. *See Quiroz, 2022 U.S. Dist. LEXIS 168329, 2022 WL 4352482* (finding § 922(n) unconstitutional); *United States v. Stambaugh, No. 22 Cr. 218 (PRW), 2022 U.S. Dist. LEXIS 206016, 2022 WL 16936043 (W.D. Okla. Nov. 14, 2022)* (same); *United States v. Holden, No. 22 Cr. 30 (RLM) (MGG), 2022 U.S. Dist. LEXIS 212835, 2022 WL 17103509 (N.D. Ind. Oct. 31, 2022)* (relying on *Quiroz), appeal docketed*, No. 22-3160 (Dec. 1, 2022); *United States v. Hicks, No. 21 Cr. 060 (ADA), 2023 WL 164170 (W.D. Tex. Jan. 9, 2023)* (same; not citing *Avila, 2022 U.S. App. LEXIS 35321, 2022 WL17832287*), *appeal docketed*, No. 23-50030 (Jan. 12, 2023). The Court has also considered, **[\*41]** as instructive, decisions resolving *post-Bruen* challenges to other federal firearms statutes and to New York state firearms laws.[14]

―――――――――――

[14] For challenges to *18 U.S.C. § 922(g)(1)*, which prohibits the

possession of firearms by convicted felons, see *United States v. Gonzalez, No. 22-1242, 2022 U.S. App. LEXIS 26532, 2022 WL 4376074, at \*2 (7th Cir. Sept. 22, 2022)* (*§ 922(g)(1)* constitutional as applied to violent felon); *Range v. Att'y Gen., 53 F.4th 262 (3d Cir. 2022)* (*§ 922(g)(1)* constitutional), *reh'g en banc granted, opinion vacated, 2023 U.S. App. LEXIS 1061, 2023 WL 118469 (3d Cir. Jan. 6, 2023)*; *Zherka v. Garland, 593 F. Supp. 3d 73, 80 (S.D.N.Y. 2022)* (*§ 922(g)(1)* constitutional, including as to persons convicted of non-violent financial felonies); *United States v. King, No. 21 Cr. 255 (NSR), 2022 U.S. Dist. LEXIS 183586, 2022 WL 5240928, at \*5 (S.D.N.Y. Oct. 6, 2022)* (*§ 922(g)(1)* constitutional facially and as-applied); *United States v. Carrero, No. 22 Cr. 0030 (RHC), 2022 U.S. Dist. LEXIS 188707, 2022 WL 9348792, at \*2-4 (D. Utah Oct. 14, 2022)* (same; *Bruen* did not supersede Tenth Circuit precedent holding *§ 922(g)(1)* constitutional); *United States v. Butts, No. Cr. 22 Cr. 33 (DWM), 2022 U.S. Dist. LEXIS 197925, 2022 WL 16553037, at \*3 (D. Mont. Oct. 31, 2022)* (*§ 922(g)(1)* constitutional); and *United States v. Garrett, No. 18 CR 880, 2023 U.S. Dist. LEXIS 4923, 2023 WL 157961, at \*2-3 (N.D. Ill. Jan. 11, 2023)* (same, noting that 58 other decisions had upheld *§ 922(n)* since *Bruen* as of the Government opposition brief).

For challenges to *18 U.S.C. § 922(g)(3)*, which prohibits the possession by unlawful "user[s] of or addict[s] to any controlled substance," see *United States v. Daniels, No. 22 Cr. 58 (LG), 2022 U.S. Dist. LEXIS 120556, 2022 WL 2654232, at \*4 (S.D. Miss. July 8, 2022)* (*§ 922(g)(3)* constitutional); *United States v. Sanchez, No. 21 Cr. 0213 (ADA), 2022 U.S. Dist. LEXIS 227508, 2022 WL 17815116, at \*3-4 (W.D. Tex. Dec. 19, 2022)* (same); and *United States v. Black, No. 22 Cr. 133-01, 2023 U.S. Dist. LEXIS 2781, 2023 WL 122920, at \*4 (W.D. La. Jan. 6, 2023)* (same).

For challenges to *18 U.S.C. § 922(g)(8)*, which prohibits persons subject to certain court-issued restraining orders from possessing a firearm, see *United States v. Haas, No. 22-5054, 2022 U.S. App. LEXIS 29911, 2022 WL 15048667, at \*2 & n.1 (10th Cir. Oct. 27, 2022)* (refuting argument that *§ 922(g)(8)* was unconstitutional, but not specifically deciding question); and *Kays, 2022 U.S. Dist. LEXIS 154929, 2022 WL 3718519, at \*3-4 (§ 922(g)(8)* constitutional after *Bruen*).

For challenges to *18 U.S.C. § 922(g)(9)*, which prohibits persons convicted of misdemeanor crimes of domestic violence from possessing firearms, see *United States v. Nutter, No. 21 Cr. 0142 (ICB), 2022 U.S. Dist. LEXIS 155038, 2022 WL 3718518, at \*8 (S.D. W.Va. Aug. 29, 2022)* (*§ 922(g)(9)* constitutional); and *United States v. Bernard, No. 22 Cr. 03 (CJW) (MAR), 2022 U.S. Dist. LEXIS 218378, 2022 WL 17416681, at \*8 (N.D. Iowa Dec. 5, 2022)* (same).

For challenges to New York state firearm laws, see *Antonyuk v. Bruen, No. 22 Civ. 0734 (GTS/CFH), 2022 U.S. Dist. LEXIS 157874, 2022 WL 3999791, at \*25-35 (N.D.N.Y. Aug. 31,*

## 1. Are Felony Indictees Within the Scope of "The People" Protected by the *Second Amendment*?

The initial *Bruen* inquiry is whether the *Second Amendment's* "plain text covers an individual's conduct." *142 S. Ct. at 2126.* The Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." *U.S. Const. amend. II.*

Rawson argues that, as a pretrial indictee who is an American citizen, he falls within the scope of "the people" covered by the Amendment. The Government seizes on an adjective in *Bruen* to argue the contrary. There, the Court, recapping its decisions in *Heller* and *McDonald*, stated that the Amendment "protect[s] the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense" and an "individual's right to carry a handgun for self-defense outside the home." *Bruen, 142 S. Ct. at 2122.* Drawing on the reference to "law-abiding citizen[s]," the Government argues that a felony indictee falls outside "the people" whom **[\*42]** the Amendment protects,

*2022)* (preliminarily enjoining *New York Concealed Carry Improvement Act* as, *inter alia*, likely to succeed on *Second Amendment* challenge); *Hardaway v. Nigrelli, No. 22 Cr. 771 (JLS), 2022 U.S. Dist. LEXIS 200813, 2022 WL 16646220, at \*15-17 (W.D.N.Y. Nov. 3, 2022)* (preliminarily enjoining statute prohibiting firearm possession in "sensitive places," including places of worship and religious observation, as *Second Amendment* challenge was likely to succeed), *appeal docketed No. 22-2933 (2d Cir. Nov. 15, 2022)*; and *Gazzola v. Hochul, No. 22 Civ. 1134 (BKS) (DJS), 2022 U.S. Dist. LEXIS 220168, 2022 WL 17485810, at \*13 (N.D.N.Y. Dec. 7, 2022)* (declining to preliminarily enjoin firearms statute requiring, *inter alia*, licenses for semi-automatic weapons and training courses for new firearms licenses; court found *Second Amendment* challenge to such laws unlikely to succeed).

The Court has also considered challenges to standard pretrial release conditions prohibiting possession of firearms under *18 U.S.C. § 3142(c). See, e.g., United States v. Perez-Garcia, No. 22 Cr. 01581 (GPC), 2022 U.S. Dist. LEXIS 172157, 2022 WL 4351967, at \*6 (S.D. Cal. Sept. 18, 2022)* (upholding pretrial release prohibition on gun possession); *United States v. Slye, No. 22 Mj. 144 (RAL), 2022 U.S. Dist. LEXIS 190502, 2022 WL 9728732, at \*1 (W.D. Pa. Oct. 6, 2022)* (same); *United States v. Fencl, No. 21 Cr. 3101 (JLS), 2022 U.S. Dist. LEXIS 220973, 2022 WL 17486363, at \*2-4 (S.D. Cal. Dec. 7, 2022)* (same), *appeal docketed, No. 22-50316 (9th Cir. Dec. 21, 2022)*; *United States v. Wendt, No. 22 Cr. 0199 (SHL) (HCA), 2023 U.S. Dist. LEXIS 7228, 2023 WL 166461, at \*4 (S.D. Iowa Jan. 11, 2023)* (same).

because, by definition, a showing of probable cause has been made that such a person violated a felony statute. Hence, it argues, such persons should not be viewed as "ordinary, law-abiding citizens" with rights under the *Second Amendment*. *See* Opp. at 28-32; *id* at 28 (header: "Rowson Falls Within a Class of Individuals Who the Supreme Court Has Determined Retain No *Second Amendment* Rights").

The Government's argument on this aspect of the *Bruen* framework is unpersuasive. None of the *post-Bruen* decisions addressing *§ 922(n)*—including the four finding *§ 922(n)* unconstitutional—have so held. Several have explicitly held that a person indicted for a felony remains among "the people" whom the *Second Amendment* covers. Those include decisions upholding *§ 922(n)*, *see, e.g., Kays, 2022 U.S. Dist. LEXIS 154929, 2022 WL 3718519, at *2*, and decisions invalidating it, *see, e.g., Stambaugh, 2022 U.S. Dist. LEXIS 206016, 2022 WL 16936043, at *2-3*.[15]

Nor, apart from the adjective "law-abiding," does any other aspect of the analysis in *Bruen* support the Government's argument at this step. On the contrary, the Court's focus on the "conduct" of the person challenging the law supports Rowson's argument. No doubt because the class of persons implicated by the mandatory New York gun licensing statute included all who sought to carry firearms outside the home, [*43] the Court's focus in *Bruen* was not on potentially disqualifying status characteristics of the challengers to the statute. It was instead on whether the Amendment's text covered the "*conduct*" the statute proscribed. *See Bruen, 142 S. Ct. at 2126, 2134-35*; *see also Kays, 2022 U.S. Dist. LEXIS 154929, 2022 WL 3718519, at *2* (*Bruen's* focus was "on an individual's conduct, rather than status, to decide if *Second Amendment* protection exists" ); *Quiroz, 2022 U.S. Dist. LEXIS 168329, 2022 WL 4352482, at *3* (same); *Holden, 2022 U.S. Dist. LEXIS 212835, 2022 WL 17103509, at *3* (same); *Stambaugh, 2022 U.S. Dist. LEXIS 206016, 2022 WL*

*16936043, at *3* (same); *Kelly, 2022 U.S. Dist. LEXIS 215189, 2022 WL 17336578, at *2-3* (same); *Hicks, 2023 WL 164170, at *2* (same). The Court recognized in *Bruen* that the conduct at issue there, possessing a firearm, was presumptively protected by the Amendment, so as to require that the challenged law be justified based on "the Nation's historical tradition of firearm regulation." *142 S. Ct. at 2130*. The same is so of the conduct to which *§ 922(n)* is addressed— shipping, receiving, or transporting a firearm—as the courts to consider that question have uniformly held. *See, e.g., Holden, 2022 U.S. Dist. LEXIS 212835, 2022 WL 17103509, at *3* ("Receiving a firearm is . . . presumptively protected by the *Second Amendment*"); *Stambaugh, 2022 U.S. Dist. LEXIS 206016, 2022 WL 16936043, at *3* (felony indictees are part of "the people" in the *Second Amendment* and *Second Amendment* covers receipt of handgun); *Kelly, 2022 U.S. Dist. LEXIS 215189, 2022 WL 17336578, at *2-3* (same); *Hicks, 2023 WL 164170, at *2* (same); *Quiroz, 2022 U.S. Dist. LEXIS 168329, 2022 WL 4352482, at *4* ("[D]oes the *Second Amendment's* plain text cover the conduct [of receiving a firearm]? Without a doubt the answer here is yes.").

To be sure, *Bruen* did not have occasion to address whether, as the Government posits, the threshold textual inquiry [*44] into the scope of the *Second Amendment's* coverage may also consider whether certain persons, by category, fall outside "the people" whom the Amendment covers. It is reasonable to assume that *Bruen* leaves room for that inquiry in an appropriate *case*. *See 142 S. Ct. at 2157* (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun."). But even if so, the Government does not offer a convincing basis to treat the broad and eclectic category of persons under any type of pending felony indictment as, *ex officio*, lacking all *Second Amendment* rights. *Pre-Bruen* decisions, in fact, had so inquired as to the *Second Amendment* rights of various persons by category. With limited exceptions, most declined to hold that the groups at issue were categorically without *Second Amendment* rights. These included convicted felons, *see, e.g., United States v. Woolsey, 759 F.3d 905, 909 (8th Cir. 2014)* (rejecting as-applied challenge to *18 U.S.C. § 922(g)(1)*); *Kanter v. Barr, 919 F.3d 437, 445-47 (7th Cir. 2019)* (assuming *arguendo* that felons are within "the people" under the Amendment), *abrogated by Bruen, 142 S. Ct. 2111.; see also Kanter, 919 F.3d at 453* (Barrett, J., dissenting) ("Neither felons nor the mentally ill are categorically excluded from our national

---

[15] Two decisions from the Southern District of California, upholding pretrial conditions imposed pursuant to *18 U.S.C. § 3142(c)(1)(B)(viii)* that prohibited the possession of firearms, have, however, held the contrary. *See Perez-Garcia, 2022 U.S. Dist. LEXIS 172157, 2022 WL 4351967, at *6* (stating that "a person who has been charged with a crime based on a finding of probable cause . . would not be considered a 'law-abiding' or responsible citizen, so he is outside the plain text of the *Second Amendment*"); *Fencl, 2022 U.S. Dist. LEXIS 220973, 2022 WL 17486363, at *2* (same, citing *Perez-Garcia*).

2023 U.S. Dist. LEXIS 13832, *44

community.")[16]; illegal aliens, *see, e.g., United States v. Meza-Rodriguez, 798 F.3d 664, 669-72 (7th Cir. 2015)* (illegal aliens are within "the people"); *see also United States v. Huitron-Guizar, 678 F.3d 1164, 1169 (10th Cir. 2012)* (assuming, without deciding, [*45] that illegal immigrants are within "the people"); *United States v. Torres, 911 F.3d 1253, 1257, 1261 (9th Cir. 2019)* (same); *United States v. Perez, 6 F.4th 448, 453 (2d Cir. 2021)* (same)[17]; persons dishonorably discharged from the United States Aimed Forces, *see, e.g., United States v. Jimenez, 895 F.3d 228, 233-34 (2d Cir. 2018)* (assuming *arguendo* that defendant could claim *Second Amendment* protections despite dishonorable discharge); persons subject to certain court orders, *see, e.g., United States v. Witcher, No. 20 Cr. 116 (KMW), 2021 U.S. Dist. LEXIS 238076, 2021 WL 5868172, at *4 (S.D.N.Y. Dec. 10, 2021)* (considering *§ 922(g)(8)*); and persons convicted of domestic violence misdemeanors, *see, e.g., United States v. Chester, 628 F.3d d 673, 680-82 (4th Cir. 2010)* (noting that Government had not argued and historical evidence did not support excluding persons convicted of domestic violence crimes from "the people"). Insofar as the scope of "the people" the Amendment covered presented an unresolved question before *Bruen*, the decision there did not address, let alone settle, that question.

Salient here, the two *pre-Bruen* decisions to consider the *Second Amendment* rights of indicted persons charged under *§ 922(n)* each rejected the argument that such persons lacked all *Second Amendment* rights. In the first, Judge Weinstein, although upholding *§ 922(n)*

facially and as applied, held that felony indictees "remain[] eligible for *Second Amendment* protections." *See United States v Laurent, 861 F. Supp. 2d 71, 102 (E.D.N.Y. 2011)*. He noted that, although *Heller* had described as "presumptively lawful" statutory prohibitions on gun possession by convicted felons, "it is assumed until [*46] conviction that the defendant is not guilty of the initial indictment triggering criminal liability." *Id.* "Thus, for purposes of construing the statute, a defendant under indictment but as-yet not convicted remains a law-abiding citizen.'" *Id.; see Bruen, 142 S. Ct. at 2122* (describing "the people" as "law-abiding citizens"); *Heller, 554 U.S. at 625* (same). The following year, a district court in Nevada reached the same conclusion, drawing upon the analysis in *Laurent. See United States v. Call, 874 F. Supp. 2d 969, 977 (D. Nev. 2012)*. The Government has not pointed to contrary authority.

The case law as to convicted felons is also instructive on this point. The *post-Bruen* decisions addressing the federal felon-in-possession statute, *18 U.S.C. § 922(g)(1)*, although uniformly upholding that statute, have divided on the analytic basis for doing so. Although some courts have treated convicted felons as lacking *Second Amendment* rights,[18] others have held otherwise, and have instead sustained *§ 922(g)(1)* at the second step of *Bruen* analysis, based on the statute's historical antecedents. *See, e.g., United States v. Price, No. 22 Cr. 097 (.11W), 2022 U.S. Dist. LEXIS 186571, 2022 WL 6968457, at *7, *8 & n.4 (S.D. W.Va. Oct. 12, 2022)* ("The plain text of the *Second Amendment* does not include 'a qualification that *Second Amendment* rights belong only to individuals

---

[16] *But see United States v. Vongxay, 594 F.3d 1111, 1118 (9th Cir. 2010)* (felons "categorically different from the individuals who have a fundamental right to bear arms"); *Hamilton v. Pallozzi, 848 F.3d 614, 625 (4th Cir. 2017)* ("[W]e simply hold that conviction of a felony necessarily removes one from the class of law-abiding, responsible citizens for the purposes of the *Second Amendment*[.]"); *see also Medina v. Whitaker, 913 F.3d 152, 160, 439 U.S. App. D.C. 294 (D.C. Cir. 2019)* ("We need not decide today if it is ever possible for a convicted felon to show that he may still count as a 'law-abiding, responsible citizen' because defendant failed to show "facts about his conviction that distinguish[] him from other convicted felons encompassed by the *§ 922 (g)(1)* prohibition").

[17] *But see United States v. Carpio-Leon, 701 F.3d 974, 982 (4th Cir. 2012)* (holding that illegal aliens are excluded from "the people" under the Amendment); *United States v. Portillo-Munoz, 643 F.3d 437, 442 (5th Cir. 2011)* (same); *United States v. Flores, 663 F.3d 1022 (8th Cir. 2011)* (per curiam) (citing *Portillo-Munoz*).

[18] *See, e.g., Range, 53 F.4th at 284 & n.32* (convicted felons outside the "people" under the *Second Amendment*); *United States v. Collette, No. 22 Cr. 0141 (DC), 2022 U.S. Dist. LEXIS 173822, 2022 WL 4476790, at *8 (W.D. Tex. Sept. 25, 2022)* (same); *United States v. Riley, No. 22 Cr. 163 (RDA), 2022 U.S. Dist. LEXIS 187709, 2022 WL 7610264, at *10 (E.D. Va. Oct. 13, 2022)* (same); *United States v. Hill, No. 22 Cr. 249 (JAP), 2022 U.S. Dist. LEXIS 208852, 2022 WL 17069855, at *4 (S.D. Tex. Nov. 17, 2022)* (same); *United States v. Grinage, No. 21 Cr. 0399 (JKP), 2022 U.S. Dist. LEXIS 218267, 2022 WL 17420390, at *4-7 (W.D. Tex. Dec. 5, 2022)* (same); *United States v. Spencer, No. 22 Cr. 106 (ALWA), 2022 U.S. Dist. LEXIS 223786, 2022 WL 17585782, at *4 (E.D. Va. Dec. 12, 2022)* ("Because *Bruen* cautions it does not displace *Heller*, instead focusing only on those areas of analysis requiring emphasis and clarification, it does not backtrack on *Heller's* upholding of statutes prohibiting possession of firearms by felons.").

2023 U.S. Dist. LEXIS 13832, *46

who have not violated any laws.' (quoting *United States v. Jackson, No. 22 Cr. 59 (TDD), 2022 U.S. Dist. LEXIS 148911, 2022 WL 3582504, at \*2 (W.D. Okla. Aug. 19, 2022)*)); *Carrero, 2022 U.S. Dist. LEXIS 188707, 2022 WL 9348792, at \*2* (convicted felons within "the people," but § 922(g)(1) is consistent with historical tradition); *United States v. Coombes, No. 22 Cr. 00189 (GKF), 2022 U.S. Dist. LEXIS 170323, 2022 WL 4367056, at \*IA (N.D. Okla. Sept. 21, 2022)* (same); *United States v. Gray, No. 22 Cr. 0247 (CNS), 2022 U.S. Dist. LEXIS 205149, 2022 WL 16855696, at \*2-4 (D. Colo. Nov. 10, 2022)* (same); **[\*47]** *Campiti v. Garland, No. 22 Civ. 177 (AWT), 2023 U.S. Dist. LEXIS 4042, 2023 WL 143173, at \*3 (D. Conn. Jan. 10, 2023)* (same); *see also United States v. Bernard, No. 22 Cr. 03 (CJW) (MAR), 2022 U.S. Dist. LEXIS 218378, 2022 WL 17416681, at \*7 (N.D. Iowa Dec. 5, 2022)* (same, as to § 922(g)(9)). To the extent that convicted felons have been held to be within the scope of "the people" whom the *Second Amendment* covers, it follows *a priori* that felony indictees are, too.

Most fundamentally, the Government's argument disqualifying felony indictees from any *Second Amendment* rights is in conflict with the Supreme Court's explanation in *Heller* of the meaning of the term "the people"—reasoning foundational to its landmark holding that *Second Amendment* protects individual rights. In his decision for the *Heller* majority, Justice Scalia equated that term as used in the *Second Amendment* to its use in other Amendments, including the *First Amendment's* assembly-and-petition clause and the *Fourth Amendment's* search-and-seizure clause:

> [I]n all six other provisions of the Constitution that mention "the people," the term unambiguously refers to all members of the political community, not an unspecified subset. As we said in *United States v. Verdugo-Urquidez, 494 U.S. 259, 265, 110 S. Ct. 1056, 108 L. Ed. 2d 222, (1990)*:
>
> > [T]he people' seems to have been a term of art employed in select parts of the Constitution . . . . [Its uses] sugges[t] that 'the people' protected by the *Fourth Amendment*, and by the *First* and *Second Amendments*, and to whom rights and powers are reserved in the *Ninth* and *Tenth Amendments*, refers to a class of persons who are part of a national community or **[\*48]** who have otherwise developed sufficient connection with this country to be considered part of that community.

This contrasts markedly with the phrase "the militia" in the prefatory clause. As we will describe below, the "militia" in colonial America consisted of a subset of "the people"—those who were male, able bodied, and within a certain age range. Reading the *Second Amendment* as protecting only the right to "keep and bear Arms" in an organized militia therefore fits poorly with the operative clause's description of the holder of that right as "the people."

We start therefore with a strong presumption that the *Second Amendment* right is exercised individually and belongs to all Americans.

*554 U.S. at 580-81*.

It is black letter law that even convicted felons retain rights under, *inter alia*, the *First* and *Fourth Amendments*. *See, e.g., Bell v. Wolfish, 441 U.S. 520, 545, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979)* ("[W]e have held that convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison.") (citing protections under the *First* and *Fourth Amendments*, among others); *Pell v. Procunier, 417 U.S. 817, 822, 94 S. Ct. 2800, 41 L. Ed. 2d 495 (1974)* ("[A] prison inmate retains those *First Amendment* rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."). That the rights of such persons may be burdened based **[\*49]** on their criminal records does not expunge these rights *in toto*. And unlike convicted felons, felony indictees do not stand to lose their political rights (for example, the right to vote) on account of a pending but as-yet-unadjudicated felony charge. *Cf Coombes, 2022 U.S. Dist. LEXIS 170323, 2022 WL 4367056, at \*4 & n.2* (noting same). The holding urged by the Government, under which felony indictees would be excluded altogether from "the people" as used in the *Second Amendment*, would therefore be inconsistent with both the breadth of the term, and its symmetrical use across amendments, noted in *Heller*,[19] *Cf Coombes, 2022 U.S.*

---

[19] Although not bearing on the scope of the *Second Amendment*, the Government's treatment of felony indictees as categorically without *Second Amendment* rights is also in tension with the state of federal statutory law, under which such persons retain substantial rights with respect to firearms. For example, as the Government acknowledged at argument, § 922(n) does not bar a felony indictee from *possessing* firearms he or she obtained pre-indictment. *See* Tr. 204-05;

2023 U.S. Dist. LEXIS 13832, *49

*Dist. LEXIS 170323, 2022 WL 4367056, at \*4* ("[I]t is clear that convicted felons fall within 'the people' as contemplated by the *First* and *Fourth Amendments*."); *Carrero, 2022 U.S. Dist. LEXIS 188707, 2022 WL 9348792, at \*2* (applying "presumption of consistent usage" to interpret convicted felons as within "the people"); *Campiti, 2023 U.S. Dist. LEXIS 4042, 2023 WL 143173, at \*3* (as to *§ 922(g)(1)*) ("[F]or purposes of the *Second Amendment*, the phrase 'the people' is interpreted consistently with the *First*, *Fourth*, *Ninth*, and *Tenth Amendments* . . . .").

The Court, joining all others to consider the question squarely *post-Bruen*, accordingly holds that felony indictees are within the scope of "the people" who have *Second Amendment* rights, and that the conduct regulated by *§ 922(n)* of shipping, receiving,\*5 or transporting firearms is also covered by the plain text of the *Second Amendment*. *See Kays, 2022 U.S. Dist. LEXIS 154929, 2022 WL 3718519, at \*2* ("This Court declines to read into *Bruen [\*50]* a qualification that *Second Amendment* rights belong only to individuals who have not been accused of violating any laws."); *Stambaugh, 2022 U.S. Dist. LEXIS 206016, 2022 WL 16936043, at \*2* ("neither [*Bruen* nor *Heller*] explicitly nor implicitly removes those merely *accused* of felony by a grand jury from 'the people' entitled to the protection of the *Second Amendment*" (emphasis in original)). Under *Bruen*, the burden is therefore on the Government to show that *§ 922(n)* is consistent with the Nation's historical tradition of firearm regulation. *See 142 S. Ct. at 2126*.

## 2. Is *§ 922(n)* Consistent with the Historical Tradition of Firearms Regulation?

*see also United States v. Adams, No. 11 Cr. 0046 (CB), 2011 U.S. Dist. LEXIS 41879, 2011 WL 1475978 (S.D. Ala. 2011)* (dismissing indictment under *§ 922(n)* that charged only possession); *Laurent, 861 F. Supp. 2d at 81* ("[T]he provision does not prohibit individuals under indictment from owning or possessing guns for the purposes of self-defense in the home, it restricts their ability to acquire a weapon until they are free of the indictment."); *Call, 874 F. Supp. 2d at 972-73* (statute does not reach firearms or ammunition received prior to indictment); *Khatib, 2012 U.S. Dist. LEXIS 173143, 2012 WL 6086862, at \*3* ("[A] person who is indicted for an offense does not run afoul of [*§ 922(n)*] simply by retaining a firearm he already possesses."); *United States v. Now, No. 22 Cr. 150 (WED), 2022 U.S. Dist. LEXIS 164672, 2022 WL 4182306, at \*1 (E.D. Wis. Sept. 13, 2022)* ("An indictment that alleges that a person unlawfully possessed a firearm while under indictment would not state a violation of *18 U.S.C. § 922(n)*.").

Had *Bruen's* inquiry into historical antecedents required locating an 18th-century replica of *§ 922(n)*, the statute would fail the *Second Amendment*. The Government has not identified any federal law, before 1938, that specifically targeted felony indictees. That year, *§ 2(e) of the Federal Firearms Act of 1938, Pub. L. No. 75-850, 52 Stat. 1250, 1251*, put in place *§ 922(n)*'s predecessor statute. *See Laurent, 861 F. Supp. 2d at 82-84* (tracing statute's history).[20] Nor has the Government or the Court located a colonial era state-law replica of *§ 922(n)*.[21]

The Supreme Court in *Bruen*, however, disclaimed the need to find an exact historical match. The proper inquiry, the Court stated, is whether the regulation "is consistent with the Nation's historical tradition of firearm regulation." *Bruen, 142 S. Ct. at 2126*. Where the

---

[20] As enacted, the Federal Firearms Act of 1938 applied to persons under indictment for crimes of violence—a term understood "to include only those offenses 'ordinarily committed with the aid of firearms,'" *Laurent, 861 F. Supp. 2d at 82*. Although the statute provided that "the possession of a firearm or ammunition by any such person shall be presumptive evidence that such firearm or ammunition was shipped or transported or received . . . in violation of this Act," the Supreme Court in 1943 invalidated this presumption as inconsistent with due process. *See Tot v. United States, 319 U.S. 463, 63 S. Ct. 1241, 87 L. Ed. 1519 (1943)* (quoting statute). In 1961, Congress expanded the statute's scope to encompass all persons under indictment, *see Act of Oct. 3,1961, Pub.L. No. 87-342,75 Stat. 757* (repealed). In 1968, Congress amended the statute to clarify that the term "indictment" included an information or indictment in "*any court*—state or federal—if the court had the power to prosecute any crime punishable by more than one year in prison." *Laurent, 861 F. Supp. at 83* (discussing *Gun Control Act of 1968, Pub. L. 90-618, 82 Stat. 1213* (codified at *18 U.S.C. §§ 921 et seq.*)). *Section 922(n)* took on substantially its present form as part of the *1986 Firearms Owners' Protection Act, Pub. L. 99-308,100 Stat 449 (1986)*, which amended *§ 922* to combine, in a single subsection, provisions of *§ 922(g)(1)* and *(h)(1)* that had related to indictees. *See Laurent, 861 F. Supp. 2d at 84*.

[21] The closest pre-1938 state-law historical analogue appears to be an 1892 Florida statute that authorized law enforcement "making any arrest" related to carrying concealed weapons or committing a criminal offense or disturbing the peace while armed to "take possession of any arms or weapons found upon the person arrested, and . . . retain the same until after the trial of such person, and if he be convicted, said arms or weapons shall be forfeited." Mem., Ex. C. (citing Fla. Act of Feb. 12,1885, chap. 3620, § 3 as codified in Fla. Rev. Stat., tit. 2, pt. 5 (1892) 2424).

2023 U.S. Dist. LEXIS 13832, *50

challenged law "addresses [*51] a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence" but it is not dispositive, *id. at 2131*. And the search for analogues is not intended to impose a "regulatory straightjacket." *Id. at 2133*. Rather, the historical inquiry "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin.*" *Id.* (emphasis in original). In conducting this inquiry, the Court inquires whether the antecedent laws and the law at issue "are 'relevantly similar'"—that is, "how and why the regulations burden" a citizen. *Id. at 2132-33*. The Court is also to focus on laws that reflect "the scope [that constitutional rights] were understood to have *when the people adopted them*"—that is, laws temporally proximate to 1791, when the *Second Amendment* was adopted, and, as potentially confirmative evidence, to 1868, when the *Fourteenth Amendment* was adopted. *See id. at 2136* (emphasis in original); *see also id. at 2138* (noting scholarly debate as to whether 1791 or 1868 is the more apt date for analysis). "[E]ven if a modern-day regulation is not a dead ringer ror historical precursors, it still may be analogous to pass constitutional muster." [*52] *Id. at 2133*.

Employing this historical inquiry, *post-Bruen* decisions have uniformly upheld, on the basis or historical antecedents, two federal laws with significant resemblances to *§ 922(n)*. The first set of decisions concerns *18 U.S.C. § 922(g)(1)*, which makes it a crime for a felon to possess a firearm that has traveled in interstate commerce. *See supra* note 14 (collecting decisions upholding this provision). As the sources collected in the Third Circuit's *Range* decision reflect,[22] firearm legislation in colonial America prohibited various categories of persons viewed at the time as dangerous, having violent propensities, and/or unfaithful to the sovereign and its laws from owning firearms. These included Native Americans, Black persons, and indentured servants. *See infra* (collecting secondary and primary sources); *see also* Michael A. Bellesiles, *Gun Laws in Early America: The Regulation of Firearms Ownership, 1607-1794*, *16 Law & Hist. Rev. 567, 575-*

*76 (1998)*. Revolutionary War statutes also disarmed even non-violent persons whose actions were transgressive so as to reflect a refusal to comply with developing social and legal norms. *See Range, 53 F.4th at 277-80* (collecting statutes, including Pennsylvania law disarming Quakers and Virginia law disarming persons who refused to swear "allegiance [*53] and fidelity" to the state). And some colonies (and, later, states) punished convicted felons with forfeiture of their estates, and/or authorized the seizure of firearms even from convicted misdemeanants. *Id. at 280-81* (collecting statutes).

The second set of decisions concerns *18 U.S.C. § 3142*, the statute at issue in *Salerno*, governing pretrial detention and conditions of pretrial release. *Post-Bruen* courts have upheld that statute's disarmament condition of release for persons charged with federal offenses, *18 U.S.C. § 3142(c)(1)(B)(viii)*. *See supra* note 14 (collecting decisions upholding this provision); *see also* Hermine Herta Meyer, *Constitutionality of Pretrial Detention*, 60 Geo. L.J. 1139 (May 1972) (history of bail practices). In considering historical analogues, these cases have emphasized that pretrial detention and other significant pretrial restrictions on defendants' constitutional rights—such as rights to speech and association—"have existed since the early days of the Republic" and that "the Constitution has never guaranteed a criminal defendant's right to pretrial release." *See Slye, 2022 U.S. Dist. LEXIS 190502, 2022 WL 9728732, at *2*. As a matter of reasonable analogy, these decisions have held, it would be illogical to view these antecedents authorizing "the temporary abridgement of numerous core constitutional rights" as not [*54] countenancing the modern statute authorizing a defendant's "release on bond with a firearms restriction." *Id.*

To be sure, the class of felony indictees covered by *§ 922(n)* only imperfectly maps the classes of persons subject to these two laws. Although *§ 922(n)* and *§ 922(g)(1)* both apply to persons charged with felonies, the former applies during the finite period between the return of the indictment and the disposition of the charge, whereas the latter applies from the point of conviction through (barring pardon or expungement) the balance of the convicted felon's life. And although *§ 922(n)* and *§ 3142(c)* both apply to criminal defendants before the charges against them are resolved, *§ 922(n)* in one respect sweeps more broadly than *§ 3142(c)*, in that it applies to all felony indictees, whereas *§ 3142(c)*'s firearm prohibition does not apply to those released on recognizance (that is, those as to whom a determination

---

[22] The Court draws upon the *Range* panel's collection of historical analogues, but because the decision has since been vacated in favor of *en banc* review, does not accord it precedential weight. *See 53 F.4th 262, vacated and rehearing en banc granted by 2023 U.S. App. LEXIS 1061, 2023 WL 118369 (3d Cir. Jan. 6, 2023)*.

of dangerousness, requiring the imposition of conditions of release, has not been made). *See id. § 3142(c)(1)*. But *§ 922(n)* in various respects is narrower than *§ 3142(c)*, in that it does not cover persons charged by means other than an indictment (for example, a complaint); it does not cover persons charged with misdemeanors; and, most significant, it precludes only **[*55]** the shipping, receipt, or transport of a firearm during the indictment period, leaving the felony indictee free to possess firearms. Nonetheless, notwithstanding these imperfect congruities, the considerable overlaps between these undisputedly constitutional provisions and *§ 922(n)* inform this Court's analysis of *§ 922(n)*'s constitutionality.

Here, utilizing the *Bruen* methodology, the Court finds two lines of historical regulation of firearms to supply analogues sufficiently apposite to sustain *§ 922(n)*. The first entails the Nation's long line of laws of disarming persons perceived as dangerous. *See Kelly, 2022 U.S. Dist. LEXIS 215189, 2022 WL 17336578, at \*5-6* (upholding *§ 922(n)* based on "common law tradition of gun regulation permitting the disarming of certain classes of individuals based on questions regarding whether those individuals had been 'peaceable' and/or 'law-abiding'"). The second consists of historical surety laws. *See Kays, 2022 U.S. Dist. LEXIS 154929, 2022 WL 3718519, at \*4-5* (upholding *§ 922(n)* based on analogy to surety laws). The Court develops these lines below.

### a. Laws Disarming Categories of Persons Perceived as Dangerous

A long line of statutes predating—and/or present at—the founding disarmed persons deemed inherently dangerous. These included many statutes that disarmed persons on bases other than a felony (or other) **[*56]** conviction. *See Range, 53 F.4th at 274-81* (canvassing authority); *Kelly, 2022 U.S. Dist. LEXIS 215189, 2022 WL 17336578, at \*5* (noting "the common law tradition of gun regulation [which] permitted the disarming of certain classes of individuals based on questions regarding whether those individuals had been 'peaceable' and/or 'law-abiding'); *see also* Opp. at 30, 32-39.

For example, in 1662, the British Parliament authorized Lieutenants to "seize all arms in the custody or possession of any person" deemed "dangerous to the Peace of the Kingdom." Opp. at 30 (citing Militia Act of 1662,13 & 14 Car. 2, c.3, § 13 (1662)); *see also* Militia

Act of 1662 ("[A]rms so seized may be restored to the owners again if the said Lieutenants or . . . their deputies or any two or more of them shall so think fit."). During the ratification period, a "highly influential," *Heller, 554 U.S. at 604*, proposal that circulated among delegates recognized that "people have a right to bear arms . . . *unless for crimes committed, or real danger of public injury,*" *id. at 658* (Stevens, J., dissenting) (emphasis added) (discussing "The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents").

There is also ample evidence of colonial and revolutionary-era laws that disarmed groups of people perceived as *per se* dangerous, on the basis of **[*57]** their religious, racial, and political identities. *See, e.g.*, Adam Winkler, Gunfight: THE BATTLE OVER THE RIGHT TO BEAR ARMS IN AMERICA 115-16 & accompanying notes (2013) (citing laws barring gun sales to Native Americans, due to fears of violence; free and enslaved Black or mixed-race persons, even where completely law-abiding, out of fear of revolution against white masters; and Catholics or Loyalists); Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & CONTEMPORARY PROBS. 55, 72 & nn.103-04 (2017) (citing examples of colonial and revolutionary era laws disarming those who expressed dangerous opinions or refused to swear loyalty to the new American government); *see also Samuel Cornell, A Well Regulated Right: The Early American Origins of Gun Control, 73 Fordham L. Rev. 487, 506-07 (2004)* (citing examples of laws disarming those who refused to swear loyalty oaths) ("The security of the community outweighed any right a person might have to possess a firearm."); *see also Waters v. State, 1 Gill 302,309 (Md. 1843)* (stating that, because free Black persons were treated as a "dangerous population," "laws have been passed to . . . make it unlawful for them to bear arms"). Both parties have collected examples of and/or authorities collecting such laws. *See* Mem., Ex. C at 40-42 (state laws as to Native Americans), 83-87 (state laws as to slaves); Opp. at 33-34 (collecting examples and secondary authorities).

It goes without saying that, in our **[*58]** modern era, a law that would disarm a group based on race, nationality, or political point of view—or on the assumption that these characteristics bespoke heightened dangerousness-would be anathema, and clearly unconstitutional. *See Drummond v. Robinson Twp., 9 F.4th 217, 228 n.8 (3d Cir. 2021)* (discussing such laws). But the *Second Amendment's* inquiry into historical analogues is not a normative one. Viewing

these laws in combination, the above historical laws bespeak a "public understanding of the [*Second Amendment*] right" in the period leading up to 1791 as permitting the denial of access to firearms to categories of persons based on their perceived dangerousness. *Bruen* and *Heller* recognized one such longstanding classification—on gun possession by felons, *See Bruen, 142 S. Ct. at 2137; Heller, 554 U.S. at 592; see also Medina, 913 F.3d at 159* (collecting cases evidencing that the scope of the *Second Amendment* was understood to permit the exclusion of dangerous categories of persons). And courts have recognized, based on historical evidence, the common law tradition of disarming classes of individuals based on judgments about whether they were "peaceable" or "law-abiding."[23]

In this historical context, a law such as *§ 922(n)* fits within the tradition of firearms regulation at the time of the nation's founding. *Section 922(n)* imposes a partial limit on the firearms [*59] rights of a group of persons defined by an objective characteristic that is a fair proxy for dangerousness: an indictment for a felony punishable by a year or more in prison. And the burden *§ 922(n)* imposes is limited in scope (barring the indictee from shipping, transporting, or receiving firearms, but not from possessing them) and time (expiring upon the disposition of the indictment). This aspect of historical firearms regulations is sufficient to sustain *§ 922(n)* against Rowson's challenge.

*b. Surety Statutes*

Surety laws supply another relevant set of analogues. These laws required persons deemed likely to breach the peace or otherwise transgressive to post a bond before publicly carrying a firearm. The majority of courts

---

[23] *See, e.g., Carpio-Leon, 701 F.3d at 982* (unlawfully present aliens); *United States v. Yancey, 621 F.3d 681, 685-86 (7th Cir. 2010)* (unlawful users of drugs); *Vongxay, 594 F.3d at 1118* (felons); *Medina, 913 F.3d at 159* (same). Although these decisions predated *Bruen*, "they included historical analyses that, while less central to *Second Amendment* caselaw at the time, addressed the same general inquiry." *Kelly, 2022 U.S. Dist. LEXIS 215189, 2022 WL 17336578, at *5*. The existence of shall-issue licensing regimes cited with approval in *Bruen*, under which authorities must deny licensees on the basis of certain disqualifying characteristics, *see 142 S. Ct. at 2123-24 & 2138 n.9*, also implicitly reflects the longstanding practice of disqualifying categories of persons based on a shared characteristics indicative of unsuitability to possess firearms (that is, dangerousness).

to have considered *§ 922(n)* following *Bruen* have treated such statutes as the most germane historical comparators for *§ 922(n)*. *See, e.g., Kays, 2022 U.S. Dist. LEXIS 154929, 2022 WL 3718519, at *4-5* (surety statutes sufficient to satisfy Government's burden to justify *§ 922(n)*); *Quiroz, 2022 U.S. Dist. LEXIS 168329, 2022 WL 4352482, at *8* (surety statutes insufficient analogue); *Stambaugh, 2022 U.S. Dist. LEXIS 206016, 2022 WL 16936043, at *3-5* (same); *Holden, 2022 U.S. Dist. LEXIS 212835, 2022 WL 17103509, at *4* (same); *Hicks, 2023 WL 164170, at *7* (same).

Colonial and American surety laws derived from a longstanding English tradition of authorizing government agents to seize arms from persons who had acted unlawfully or in a manner that threatened the public. *See, e.g. [*60]*, Robert Gardiner, THE COMPLEAT CONSTABLE 18 (3d ed. 1708) (directing justices of the peace to "arrest such persons as ride or go offensively Armed" and "seize and take away their Armour and Weapons, and have them apprized as forfeited to her majesty"); *Patrick J. Charles, The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review, 60 Cleveland State L. Rev. 1, 24 n.114 (2012)* (quoting Robert Gardiner, *The Complete Constable* 13 (6th ed, 1724) (stating that the constable may "stop all such Persons as go or ride unlawfully arm'd and take their Arms from them" for "preventing the Breach of the Peace")); *see also* Mem., Ex. C., at 18 (citing other English colonial-era authorities).[24] Consistent with this tradition, various colonial regulations confiscated weapons from people who were deemed dangerous or apt to disturb the peace. For example, in 1692, Massachusetts authorized "every justice of the peace" to arrest "all affrayers, rioters, disturbers or breakers of the peace" who, "upon [the] view of such justice," "ride, or go armed offensively" or cause "fear or affray of their majesties' liege people," and to "seize and take away his armour or weapons, and . . . cause them to be apprized and

---

[24] *Heller* and *Bruen* teach that, although colonial laws and practices are apt by far to be most relevant, English laws and practices may be considered as "historical background of the *Second Amendment*," *Heller, 554 U.S. at 592*, particularly where these were temporally proximate to ratification. *See Bruen, 142 S. Ct. at 2136* ("Historical evidence that long predates [1791 and 1868] may not illuminate the scope of the [*Second Amendment*] right."); *id. at 2139-40* (expressing skepticism as to, for example, the relevance of the Statute of Northampton of 1328); *Heller, 554 U.S. at 592-93* (looking to the English Declaration of Rights of 1689, *inter alia*, as bearing on *Second Amendment*).

answered to the king as forfeited." Acts and Laws Passed by the Great and General Court of Assembly of Their Majesties Province [*61] of the Massachusetts-Bay, 2d Sess., 52-53 (1692).[25] In 1759, New Hampshire enacted a substantially identical statute empowering justices of the peace to arrest "all affrayers, rioters, disturbers or breakers of the peace, or any other who shall go armed offensively, or put his Majesty's subjects in fear" and, "upon view of such justice," "cause the arms or weapons so used by the offender, to he taken away, which shall be forfeited and sold for his Majesty's use." Acts and Laws of His Majesty's Province of New-Hampshire in New-England 1-2 (1759).[26] These statutes authorized imprisonment "until [the perpetrator] find[s] sureties for the peace and good behavior"; they did not address the return of the confiscated weapons upon the payment of such surety. Most salient, although each statute provided that a confession or "legal proof of any such offense" could justify such confiscation, neither required a conviction as a predicate. Rather, as noted, the "view of such justice" was sufficient.

As *Bruen* recounted, other laws enacted in the years immediately before and after the Second Amendment's adoption also aimed to neutralize people who were armed in ways that could cause alarm. A 1786 Virginia statute, for example, provided that "no man . . [shall] go nor ride [*62] armed by night nor day, . . . in terror of the Country," Collection of All Such Acts of the General Assembly of Virginia ch. 21, p. 33 (1794)[27]; a 1795 Massachusetts statute required justices of the peace, "upon [the] view of such Justice," to arrest "all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth," 1795 Mass. Acts and Laws. Ch. 2, p. 436, in Laws of the Commonwealth of Massachusetts[28]; and an 1801 Tennessee statute required a "judge or justice, on his own view," to require a surety from anyone who "shall publicly ride or go armed to the terror of the people" or "privately carry any . . . pistol . . . to the fear or terror of any person," or, if "they fail to find securities, commit him or them to jail," *see* Bruen, 142 S. Ct. at 2144-45 (quoting 1801 Tenn. Laws 710, § 6). *See id.* (citing the same). Similarly, in 1821, a Maine statute provided that disturbers of the peace or "such as shall ride or go aimed offensively, to the fear or terror of the good citizens of this State" would be arrested and, "upon view of such Justice, confession of the delinquent or other legal conviction of any such offence," be required to "fund sureties to appear and answer for his offence." 1821 Me. Laws 285, ch. 76. Taken together, as *Bruen* synopsized, these statutes reflected the "by-now-familiar thread" of laws prohibiting [*63] "bearing firearms in a way that spreads 'fear' or 'terror' among the people." Bruen, 142 S. Ct. at 2145. Like their predecessors, these laws empowered justices of the peace to apprehend those who were publicly armed and presented offensively.

The Supreme Court considered these surety laws in *Bruen* but found them inapposite to the New York "proper cause" statute at issue, which conditioned the right to a license to carry a handgun in public on a showing of a "special need" for self-protection different

---

[25] The full texts of this and other early Massachusetts statues are in the electronic repository of the State Library of Massachusetts, in the section on Acts and Resolves. These can be found at https://archives.lib.state.ma.us/handle/2452/2. The link to the specific section cited above is at https://archives.lib.state.ma.us/bitstream/handle/2452/118706/1692acts0018.pdf?sequence=4&isAllowed-y.

[26] The Laws of New Hampshire may be found at https://archive.org/details/actsandlawshism02britgoog/page/n24/mode/2up.

[27] This statute "codified the existing common law in this regard." *Bruen*, 142 S. Ct. at 2144 n.14 (citing George Webb, The Office and Authority of a Justice of Peace 92 (1736) (explaining how a constable "may take away Arms from such who ride, or go, offensively armed, in Terror of the People").

[28] The 1795 statute stated in full:

> And it is further enacted by the authority aforesaid, That every Justice of the Peace, within the county for which he may be commissioned, may cause to be staid and arrested, all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth, or such others as may utter any menaces or threatening speeches, and upon view of such Justice, confession of the delinquent, or other legal conviction of any such offence, shall require of the offender to find sureties for his keeping the Peace, and being of the good behavior; and in want therof, to commit him to prison until he shall comply with such requisition; and may further punish the breach of the Peace in any person that shall assault or strike another, by fine to the Commonwealth, not exceeding twenty shillings, and require sureties as aforesaid, or bind the offender, to appear and answer for his offence, at the next [*64] Court of General Sessions of the Peace, as the nature or circumstances of the case may require.

1795 Mass. Acts and Laws. Ch. 2, p. 436, in Laws of the Commonwealth of Massachusetts.

from that of the general community. As the Court explained:

> Contrary to respondents' position, these [and other surety laws] in no way represented the "direct precursors" to New York's proper-cause requirement. While New York presumes that individuals have no public carry right without a showing of heightened need, the surety statutes presumed that individuals had a right to public carry [unless they did so in a way that inspired fear or terror.] . . . Thus, unlike New York's regime, a showing of special need was required only *after* an individual [had or] was reasonably accused of intending to injure another or breach the peace.

*Bruen*, 142 S. Ct. at 2148-49 (internal citation omitted) (emphasis in original).

In the different context presented here, however, the surety laws, considered collectively, are "relevantly similar" to *§ 922(n)*. *Id. at 2132*. That inquiry turns on "whether [*65] modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id. at 2133* (emphasis in original) (quoting *McDonald, 561 U.S. at 767*). As to the first question, the surety laws—like *§ 922(n)*, but unlike the New York "proper cause" law at issue in *Bruen*—presume that individuals have the right to bear arms. *Id. at 2148* (rejecting surety laws as analogues, in part, because, unlike the surety laws, "New York presumes that individuals have no public carry right without a showing of heightened need"). These laws imprisoned or otherwise restricted only those persons who had disturbed the peace or whose public possession of a firearm, as determined by a justice of the peace or other legal process, was otherwise likely to spread fear among the public. *Section 922(n)* similarly applies only to a subset of persons—felony indictees—as to whom probable cause has been found, by a grand jury or its prosecutorial equivalent in the context of a consented-to felony information, to have committed a serious crime. And they impose a burden with respect to the firearms that is comparable or, arguably, less. Unlike the surety laws, which deprived citizens of the right to possess firearms, *§ 922(n)* does [*66] not disturb the indictee's right to continued possession of a firearm; instead, it limits the ability of the indictee to ship, receive, or transfer firearms during the pendency of the indictment. As to the second question, there is comparable justification: the period in which an indictment pends is "a volatile period during which the stakes and stresses

of pending criminal charges often motivate defendants to do violence to themselves or to others," thereby reasonably giving rise to fear of threats or violence among the community. *Kays, 2022 U.S. Dist. LEXIS 154929, 2022 WL 3718519, at \*4* (quoting *United States v. Khatib, No. 12 Cr. 190 (AEG) (WCG), 2012 U.S. Dist. LEXIS 173143, 2012 WL 6086862, at \*4 (E.D. Wis. Dec. 6, 2012)*, *report and recommendation adopted*, *2012 U.S. Dist. LEXIS 181781, 2012 WL 6707199 (E.D. Wis. Dec. 26, 2012)*); *see Khatib, 2012 U.S. Dist. LEXIS 173143, 2012 WL 6086862, at \*4* ("It is not unreasonable to infer malevolent intent when an indictee finds it necessary to obtain a firearm during the narrow period during which an indictment is pending. . . ."); *see also Laurent, 861 F. Supp. 2d at 102* ("[I]f the individual only received a gun *after* indictment, this conduct raises the suspicion that his purpose is not self-defense in the home, but further crime." (emphasis added)).

The analogy to surety statutes has particular utility because the public safety threat posed by pretrial indictees was not, in the main, "a general societal problem" at the founding, *Bruen, 142 S. Ct. at 2131*. Such invites, as the Government rightly argues, a [*67] broader search for historical analogies. *See* Gov't Ltr. Br. at 4-5. That is because, at the time the *Second Amendment* was ratified, bail was not available for many crimes that were then treated as capital offenses but which today would be treated as felonies within *§ 922(n)*'s scope. Under English law through the time of ratification, bail generally was either unavailable for persons "clearly guilty or indicted" of certain violent crimes such as murder, or was discretionary for "thieves openly defamed and known; persons charged with other felonies . . . [or] accessories to felony under the same want of reputation." *See* Meyer, *Constitutionality of Pretrial Detention*, at 1157 (citing 4 Blackstone 298-99). A few colonies, such as Massachusetts, Pennsylvania, and New York, departed from English bail practices during the 17th century and required bail for non-capital offenses—although colonial New York's law specified that "person[s] taken in Execucon [sic] for debts" were not eligible for bail. *Id.* at 1162-63 & accompanying notes. Similarly, when the Continental Congress enacted the Northwest Territory Ordinance in 1787, it specified that "all persons shall be bailable *unless* for capital offences, where the proof shall be evident, or the presumption great." *See* An Ordinance for the Government of the Territory of the United States, North-West of the River Ohio, art. 2, 1787 (emphasis added). [*68] But even in such jurisdictions, the scope of capital offenses was far broader than today. For

example, in colonial Massachusetts, persons who practiced witchcraft, a "son over 16 rebelling against his parents," or a "child over 16 years old cursing or smiting his parent" all had committed capital crimes. *See* Meyer, *Constitutionality of Pretrial Detention*, at 1162 n.133 (citing The Lawes and Libertyes Concerning the Inhabitants of the Massachusetts 5 (M. Farrand ed. 1648)). The circumstances-the relative scarcity of non-detained felony indictees—likely explain the absence of a colonial-era statute like *§ 922(n)* addressed specifically to pretrial indictees. They reinforce this Court's conclusion that the surety statutes—as colonial and early American examples of statutes disarming (and imprisoning) persons charged with serious offenses, whereby their conduct threatened the public safety—are worthy comparators.

Courts invalidating *§ 922(n)* have discounted the surety laws, reasoning that, because some such laws had exceptions for the payment of a bond or self-defense, these imposed a "qualitatively different burden[]" on the accused's *Second Amendment* right. *Compare Quiroz, 2022 U.S. Dist. LEXIS 168329, 2022 WL 4352482, at *8* ("Rather than completely restrict the accused's constitutional **[*69]** right, surety laws permitted the accused to prove a special self-defense need. And if they couldn't, the accused needed only to post a money bond for no more than six months to keep their firearms."); *Stambaugh, 2022 U.S. Dist. LEXIS 206016, 2022 WL 16936043, at *3-5* ("[s]urety laws and *§ 922(n)* thus impose qualitatively different burdens on the 'central component' of the *Second Amendment* right" because surety laws had exceptions for self-defense or if person posted bond); *Holden, 2022 U.S. Dist. LEXIS 212835, 2022 WL 17103509, at *4* (same); *Hicks, 2023 WL 164170, at *7* (same) *with Kays, 2022 U.S. Dist. LEXIS 154929, 2022 WL 3718519, at *4-5* (Government's reliance on surety laws sufficient to satisfy its burden to justify *§ 922(n)*). In this Court's assessment, however, the surety laws, though an imperfect match, are informative and viable analogues. *See Kelly, 2022 U.S. Dist. LEXIS 215189, 2022 WL 17336578, at *3-6 & n.7* (upholding *§ 922(n)*, discussing challenge of applying *Bruen's* second step given the 18th century's different legal and social structures, and declining to "focus[] . . . on a minutely precise analogy to historical prohibitions"). That some surety laws permitted the accused to reclaim their firearm on the posting of a bond or a showing of self-defense does not destroy the analogy to *§ 922(n)*. On the contrary, *§ 922(n)* embeds its own mechanism for relief: resolution of the pending indictment (whether by dismissal, plea, acquittal, or conviction).

Further, to the extent that *Quiroz, Stambaugh, Holden* **[*70]** , and *Hicks* rely on the "self-defense exception" in some surety statutes, this exception developed materially after the founding. The first appears to have been enacted by Massachusetts in 1836. It provided that:

> If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

Mass Rev. Stat., ch. 134, § 16; *see Stambaugh, 2022 U.S. Dist. LEXIS 206016, 2022 WL 16936043, at *4*; *see also Bruen, 142 S. Ct. at 2148* (quoting same, and distinguishing 1795 statute).[29] Between 1836 and 1871, another 10 states adopted similar laws. *See Bruen, 142 S. Ct. at 2148 & n.23*. But as *Bruen* teaches, the more apt comparators are those in place at the time of the *Second Amendment's* ratification. The surety laws then in place did not provide for the retention of weapons upon a showing of self-defense, but instead applied upon the determination by a justice of the peace or other legal proceeding that a person's conduct made their possession of the weapon a heightened danger.[30]

_____

[29] *Quiroz, Holden*, and *Hicks* appear to conflate the 1795 Massachusetts statute, which did not discuss self-defense and the 1836 statute, which did. *Compare supra* note 28 (quoting 1795 statute), *with* Mass Rev. Stat., ch. 134, § 16 (quoting 1836 statute). *See Quiroz, 2022 U.S. Dist. LEXIS 168329, 2022 WL 4352482, at *7* (referencing 1795 statute, but stating that accused needed to "prove a special need for self-defense"); *Holden, 2022 U.S. Dist. LEXIS 212835, 2022 WL 17103509, at *4* (not specifying statute, but stating that surety laws could be overcome by showing an individual need for self-defense); *Hicks, 2023 WL 164170, at *7* (stating that 1795 surety law required a person "reasonably likely to breach the peace and who, standing accused, could not prove a special need for self-defense, to post a bond before publicly carrying a firearm"---language drawn from the 1836 statute).

[30] Contrary to the assessment of one court to hold *§ 922(n)* invalid, New Hampshire's 1759 statute is a proper historical analogue to *§ 922(n)*. That court distinguished that statute on the ground that it was "backward-looking" and punished persons "who had already gone 'armed offensively' and

2023 U.S. Dist. LEXIS 13832, *70

Such makes them **[\*71]** fair analogues to *§ 922(n)*.

Accordingly, the Government has satisfied its burden to justify *§ 922(n)* with reference to historical antecedents. *Section 922(n)*, the Court holds, is consistent with the Nation's history of firearms **[\*72]** regulation.

## CONCLUSION

For the foregoing reasons, the Court denies Rowson's motions to suppress and to dismiss the Indictment. The Clerk of Court is respectfully directed to terminate the motion pending at docket 32. Trial in this case remains scheduled to commence on February 21, 2023.

SO ORDERED.

/s/ Paul A. Engelmayer

Paul A. Engelmayer

United States District Judge

Dated: January 26, 2023

New York, New York

---

**End of Document**

---

allow[ing] for forfeiture of the weapon *used in that crime,"* in contrast to surety laws which disarmed persons on a "forward-looking" basis based on a "reasonable cause to fear an injury, or breach of the peace." *Stambaugh, 2022 U.S. Dist. LEXIS 206016, 2022 WL 16936043, at \*3 n.25* (emphasis in original). In fact, *§ 922(n)* is fairly viewed as both backward-and forward-looking, so as to make each version of the surety laws analogous. It is backward looking insofar as it applies to persons on the basis of an extant indictment for offenses of the requisite seriousness. It is forward-looking insofar as it is targeted to conduct (shipping, receiving, or transporting firearms) during the "volatile" indictment period that presents a heightened risk of violence. *Kays, 2022 U.S. Dist. LEXIS 154929, 2022 WL 3718519, at \*4*.

⚠️ Caution
As of: March 29, 2023 5:09 PM Z

## *Joglo Realties, Inc. v. Seggos*

United States District Court for the Eastern District of New York

August 23, 2016, Decided; August 24, 2016, Filed

16-CV-1666 (ARR)(CLP)

**Reporter**

2016 U.S. Dist. LEXIS 113057 *

JOGLO REALTIES, INC., and ROBERT TOUSSIE, Plaintiffs, -against- BASIL SEGGOS, ACTING COMMISSIONER OF THE NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION in his official capacity; and UDO DRESCHER in his individual capacity, Defendants.

**Notice:** Designated as not for publication on the slip opinion.

**Subsequent History:** Stay granted by *Joglo Realities, Inc. v. Dep't of Envtl. Conservation of N.Y., 2016 U.S. Dist. LEXIS 195745 (E.D.N.Y., Oct. 17, 2016)*

Dismissed by *Joglo Realties, Inc. v. Seggos, 229 F. Supp. 3d 146, 2017 U.S. Dist. LEXIS 118062 (E.D.N.Y., Jan. 4, 2017)*

## Core Terms

plaintiffs', administrative proceeding, selective enforcement, environmental, violations, property right, rights, repairs, substantive due process claim, similarly situated, seawall, allegations, neighbors, infringement, renovations, settlement, ownership, stones, administrative complaint, deprived, cases, fence, infer, preliminary injunction, relinquishing, procedural due process claim, substantive due process, adjudicated, regulations, Hurricane

**Counsel:** **[*1]** For Joglo Realities Inc., Robert Toussie, Plaintiffs: Kenneth J. Brown, LEAD ATTORNEY, Williams & Connolly LLP, Washington, DC; Eden Schiffmann, PRO HAC VICE, Williams & Connolly LLP, Washington, DC; Susan Mauro, Abrams, Fensterman, Fensterman, Eisman, Formato & Einiger, L, Lake Success, NY; Fredrick Paul Stern, Fredrick P. Stern P.C., Islip, NY.

For Udo Drescher, Basil Seggos, Acting Commissioner of the New York State Department of Environmental Conservation, Defendants: Yueh-ru Chu, LEAD

ATTORNEY, NYS Attorney General, New York, NY.

**Judges:** Allyne R. Ross, United States District Judge.

**Opinion by:** Allyne R. Ross

## Opinion

OPINION AND ORDER

ROSS, United States District Judge:

Plaintiffs, Robert Toussie and Joglo Realities, Inc.,[1] bring this action against the acting commissioner of the New York State Department of Environmental Conservation ("DEC") in his official capacity, and Udo Drescher, an attorney employed by the DEC, in his individual capacity. This case concerns a pending administrative action initiated by the DEC, with Drescher as its lead attorney, alleging that plaintiffs committed various environmental violations while repairing damage to their beachfront property following Hurricane Sandy. Plaintiffs allege **[*2]** that, through this administrative proceeding and other coercive conduct, Drescher has abused his power as an agent of the DEC to harass plaintiffs in an attempt to force them to surrender their private property to the public. Plaintiffs raise four claims pursuant to *42 U.S.C. § 1983* and seek a preliminary injunction to prevent the administrative proceeding from going forward. Defendants have moved to dismiss plaintiffs' amended complaint, and urge the court to

---

[1] For reasons irrelevant to this case, it is unclear whether Mr. Toussie individually, or Joglo Realities, Inc., a company founded and wholly owned by Mr. Toussie, is the owner of the real property that is the subject of this suit. See Pls.' Am. Compl. ("Am. Compl."), Dkt. #19, ¶ 9 n.1. For ease of explanation, I will refer to "plaintiffs" collectively as the owners of the property.

2016 U.S. Dist. LEXIS 113057, *2

deny their motion for a preliminary injunction. For the reasons set forth below, defendants' motion to dismiss is granted and plaintiffs' motion for a preliminary injunction is denied.

## BACKGROUND[2]

In 1977, plaintiffs purchased **[*3]** "the Esplanade," a 40 foot by 1,062 foot strip of oceanfront property located on top of the seawall protecting the southern end of Manhattan Beach, Brooklyn. Am. Compl. ¶ 9. The Esplanade is located a few feet south of six homes owned by plaintiff Toussie's family, and plaintiffs have spent millions of dollars maintaining and improving it over their forty years of ownership. Id.

On October 29, 2012, Hurricane Sandy ravaged Manhattan Beach, causing extensive damage to the seawall, the Esplanade, and Toussie's homes. Id. ¶ 10. Following the hurricane, plaintiffs sought emergency assistance from the DEC, the Army Corps of Engineers, and other New York City Agencies. Id. ¶ 13. Plaintiffs received "general permits" from the DEC, which authorized repairs to and reconstruction of their property damaged by the hurricane. Id. ¶ 15. During the next two years, plaintiffs performed numerous repairs to the seawall and the Esplanade. Id. ¶ 16. Plaintiffs contend that the newly repaired seawall is "the highest quality and most protective post-Sandy seawall in the area," id., and that, throughout the course of the reconstruction, the Army Corps of Engineers complimented their work as "sound, restorative, **[*4]** and very protective," id. ¶ 14.

Plaintiffs allege that, beginning in August 2013, defendant Drescher "embarked on a plan to take advantage of the work necessitated by Hurricane Sandy in order to extort Plaintiffs into relinquishing their ownership rights in the Esplanade." Id. ¶ 17. Plaintiffs believe that this scheme to coerce them into relinquishing their property has manifested in three ways.

First, plaintiffs allege they were baselessly threatened with criminal prosecution as a result of their repairs. On August 11, 2013, Drescher left a voicemail for plaintiff Toussie's lawyer threatening Toussie with criminal arrest as a result of purportedly unlawful construction

work occurring at the Esplanade. Id. ¶ 21. Despite this threat, Toussie was not arrested or otherwise criminally sanctioned for any work performed on his property. Id.

Second, plaintiffs contend that Drescher collaborated with plaintiffs' neighbors to undermine plaintiffs' property rights. Id. ¶ 22. This allegation is based on statements made in filings in two lawsuits between Toussie and his neighbors. In these lawsuits, both of plaintiffs' neighbors stated that they had been "advised by the New York State Department **[*5]** of Environmental Conservation that Plaintiffs do not own the land or under water lands located seaward of the [Esplanade] at the end of Ocean Avenue," land that plaintiffs assert is unquestionably their private property. Id. ¶ 23. Another member of the DEC, George Stadnik, acknowledged to plaintiffs' counsel that the DEC provided this information in response to complaints from the Toussies' neighbors who wished to use the Esplanade. Id.

Third, and most importantly, Drescher signed an administrative complaint against plaintiffs, and, plaintiffs allege, has used the pending proceeding as leverage in his efforts to force plaintiffs to allow public access to the Esplanade. Id. ¶¶ 17, 24.

The administrative complaint, DEC File No. R2-20130724-348, was filed on July 8, 2014, and asserts twenty-six causes of action resulting from plaintiffs' repairs from early 2013 to the present. See id. ¶¶ 24-25; DEC Administrative Compl. ("DEC Compl.") Ex. A to Decl. of Jessica Albin in Supp. of Defs.' Mot. to Dismiss, Dkt. #34-1 ¶¶ 55-164.[3] Although the administrative

---

[2] Except where otherwise noted, all facts are drawn from plaintiffs' amended complaint and are presumed to be true for the purposes of the pending motion.

[3] While ordinarily a court may consider only facts pled in a complaint or documents attached to the complaint, "[i]t is proper to take judicial notice of pleadings from other lawsuits attached to a defendant's motion to dismiss." *HSA Residential Mortg. Servs. of Tex. v. Casuccio, 350 F. Supp. 2d 352, 361 (E.D.N. Y. 2003)*. Moreover, courts in this district have "routinely" taken judicial notice of state administrative records. *Sahni v. Staff Attorneys Ass'n, No. 14-CV-9873, 2016 U.S. Dist. LEXIS 37940, 2016 WL 1241524, at *5 (S.D.N.Y. Mar. 23, 2016)*, recons. in part on other grounds, *No. 14-CV-9873, 2016 U.S. Dist. LEXIS 64053, 2016 WL 3766214 (S.D.N.Y. May 13, 2016)* (taking judicial notice of NLRB administrative record); see also *Evans v. N.Y. Botanical Garden, No. 02-CV-3591, 2002 U.S. Dist. LEXIS 16434, 2002 WL 31002814, at *4 (S.D.N.Y. Sept. 4, 2002)* ("A court may take judicial notice of the records of state administrative procedures, as these are public records, without **[*7]** converting a motion to dismiss to one for summary judgment.") Lastly, courts may also consider documents outside the pleadings when plaintiff "reli[ed] on the terms and effect of a document in drafting the complaint" and

complaint at one point refers to plaintiffs' deed to the Esplanade as their "purported deed," DEC Compl. ¶ 15, the complaint does not contest [*6] plaintiffs' private ownership of the property or allege that the property should be made available for public access. See generally DEC Compl. ¶¶ 55-164 (alleging numerous violations but making no allegation that plaintiffs do not actually own the Esplanade or cannot exclude the public from their property). As a result of the administrative complaint, however, plaintiffs have had to suspend their work on the Esplanade. Id. ¶ 41. Plaintiffs have been "repeatedly" burglarized and vandalized during this time, which they contend is a result of their inability to "properly secure the Esplanade" while the complaint against them is pending. Id.

Approximately one month after the administrative complaint was filed, plaintiffs' then-attorney met with Drescher and another representative of the DEC to discuss a potential settlement of the administrative action.[4] Am. Compl. ¶ 26. During this meeting, Drescher

they are "integral to the [] complaint" Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002). Plaintiffs' claims are largely based on the administrative proceeding the DEC has initiated against them, and make numerous explicit references to the administrative complaint and the violations it alleges. See Am. Compl. ¶¶ 24-25, 27, 31. Thus, consideration of the administrative complaint is appropriate for any of these stated reasons.

Plaintiffs do not dispute my taking judicial notice of the administrative pleadings, but argue that defendants are inappropriately asking the court to consider the pleadings for the truth of the matters asserted within them. See Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991) (allowing judicial notice of public record to determine "what statements it contained" but "not for the truth of the matters asserted" in those documents). I will consider the administrative complaint only to establish what statements are contained within it—i.e., to ascertain what charges have been brought against plaintiffs. I express no opinion as to whether plaintiffs in [*8] fact committed the underlying violations. See Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc., 969 F.2d 1384, 1389 (2d Cir. 1992) (distinguishing case where court took judicial notice of a public record to "ascertain the legal nature of the claim stated in that complaint" from case where court inappropriately took judicial notice of a public record to "support [a] factual determination in the subsequent litigation").

[4] Defendants suggest that Drescher's statements made during settlement discussions should not be considered because "the content of settlement discussions is generally treated as confidential and is not disclosed to the court without all parties' consent." Defs.' Mem. in Supp. of Mot. to Dismiss Am. Compl.

stated that there is an area of the Esplanade that plaintiffs do not own and that their deed to the land was fraudulently obtained. Id. ¶¶ 27-28.

When the parties began to discuss a potential settlement, Drescher made his first direct demand that plaintiffs relinquish their ownership rights to the Esplanade. Drescher stated that the lack of public access to the Esplanade was the "biggest issue" for the DEC and that having the Esplanade "restored for public access" under the control of the City Parks Department was "what the DEC is looking for" in order to reach a settlement with plaintiffs. Id. ¶¶ 28, 30. When plaintiffs' counsel responded that any ownership issue was irrelevant to the environmental proceeding, that Drescher was interfering with plaintiffs' property rights, and that Drescher was asking for concessions from plaintiffs that he could not receive in the context of an administrative hearing, Drescher "expressed no disagreement." Id. ¶¶ 27, 31, 33. Lastly, Drescher informed plaintiffs that while they could build an east-west fence protecting their immediate backyard, the DEC would not allow them [*10] to build a fence anywhere "in the Esplanade." Id. ¶ 31. When plaintiffs' counsel inquired as to whether this meant plaintiffs could not prevent members of the public from using the entire length of the Esplanade, Drescher "shrugged." Id.

Following this meeting, the parties agreed to stay the administrative proceeding in order to engage in further settlement discussions. Id. ¶ 39. During these discussions, Drescher maintained his position that "the ownership issues" are a problem and the parties were not able to reach an agreement.[5] Id. ¶ 40. On May 4,

("Defs.' Br."), Dkt. #33, at 29. Settlement negotiations may generally be confidential and are not admissible to show liability for the claim being settled, [*9] Fed. R. Evid. 408, but their disclosure must be allowed when the claim at issue arises from a "so-called (settlement) offer itself." Beechwood Restorative Care Ctr. v. Leeds, 856 F. Supp. 2d 580, 592 (W.D.N.Y. 2012); Norden v. Samper, 503 F. Supp. 2d 130, 158 (D.D.C. 2007) (rejecting "frivolous" argument that settlement offer that in itself violated the law was protected by Rule 408).

[5] Plaintiffs hypothesize that Drescher's conduct is motivated by a belief that the Esplanade should be open to the public (an opinion he has shared directly with plaintiffs) and, more broadly, a belief that beachfront property should not be privately owned. Id. ¶ 18. Plaintiffs also believe that his actions are in furtherance of the beliefs of Stadnik, his friend and colleague at the DEC. During meetings to discuss the pending DEC complaint, Stadnik informed plaintiffs that [*11] he has fond memories of growing up near the Esplanade, and that he

2016, the DEC refused to extend the stay as a result of this lawsuit, and the administrative proceeding became active for the first time since September 2014. Id. ¶ 39.

After the stay was dissolved, plaintiffs filed their answer to the administrative complaint on June 20, 2016. See Pls.' Answer to DEC Compl. ("Pls.' Answer"), Ex. B to Decl. of Jessica Albin in Supp. of Defs.' Mot. to Dismiss, Dkt. #34-2, at 27. The answer denied some of the conduct alleged in the complaint, but also admitted to much of the conduct, instead maintaining that many of plaintiffs' repairs were either authorized under a DEC permit or were outside the DEC's jurisdiction.[6] See id. ¶¶ 55-206.

Lastly, plaintiffs allege that regardless of whether they have **[*12]** committed the environmental violations of which they are accused, they have been improperly singled out by the DEC. Id. ¶ 34. Plaintiffs state that their repair efforts following Hurricane Sandy are "more protective and more legally compliant" than that of many other private landowners in Manhattan Beach, and that other property owners rebuilt their seawalls without the appropriate permits. Id. ¶¶ 35, 38. Plaintiffs specifically compare themselves to fellow Manhattan Beach residents Kingsborough Community College ("Kingsborough") and the Menorah Center for Rehabilitation and Nursing Care ("Menorah Center"). Id. ¶¶ 36-37. Plaintiffs assert that Kingsborough's seawall is shorter than plaintiffs' wall, uses smaller stones, and uses a "vastly inferior" material, while the Menorah Center's seawall was built with construction debris and refuse, making it "less protective" than plaintiffs' wall. Id. Despite their inferior seawalls, neither Kingsborough, nor the Menorah Center, nor the private residences with which plaintiff alleges familiarity have been cited for environmental violations by the DEC. Id. ¶¶ 34-38.

Plaintiffs' amended complaint states four causes of action under _Section 1983_. Plaintiffs **[*13]** allege that their rights to substantive due process, procedural due

---

believes that the Esplanade should be easily accessible to the public as it was during his youth. Id.

[6] As discussed above, the court will take judicial notice of the administrative record in the pending DEC proceeding. _Sahni, 2016 U.S. Dist. LEXIS 37940, 2016 WL 1241524, at *5._ Again, I will consider plaintiffs' answer to the administrative complaint only to ascertain what statements plaintiffs made therein (for example, whether plaintiffs denied the charges or asserted affirmative defenses), not for the truth of the underlying matters (whether plaintiffs actually committed any of the underlying environmental violations).

process, and equal protection under the law (under two different constitutional theories) have been violated by Drescher and the DEC. Id. ¶¶ 42-67. Plaintiffs seek declaratory and injunctive relief against all parties and monetary relief against Drescher. Id. ¶¶ 47, 54, 61, 66. Additionally, plaintiffs filed a separate motion for a preliminary injunction asking the court to enjoin the administrative proceeding because the DEC is using the proceeding as leverage to coerce plaintiffs into relinquishing their property rights. See Mem. ¶¶ Supp. of Pls.' Mot. for Prelim. Inj. ("Pls.' Mot. for Inj."), Dkt. #21.

## STANDARD OF REVIEW

To survive a motion to dismiss, plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face," _Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)_, and "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," _Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)_. At the pleading stage, the court must accept all factual allegations ¶¶ the complaint as true and draw all reasonable inferences ¶¶ favor of the plaintiff. _Twombly, 550 U.S. at 555-56_. However, the court is "not bound to accept as true a legal conclusion couched as a factual allegation," **[*14]** and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." _Iqbal, 556 U.S. at 678_.

## DISCUSSION

### A. Substantive Due Process

Plaintiffs first argue that Drescher's attempts to get them to allow public access to their land constitute a violation of their substantive due process rights under the _Fifth_ and _Fourteenth Amendments_. Id. ¶¶ 42-48. To state a substantive due process claim under _Section 1983_ on the basis of government infringement of a property right, plaintiffs must plead (1) that they have a valid property interest and (2) that defendants infringed on that interest ¶¶ an "arbitrary or irrational manner." _Cine SK8, Inc. v. Town of Henrietta, 507 F.3d 778, 784 (2d Cir. 2007)_ (citation omitted). When a substantive due process claim is brought against an executive branch actor, the infringement ¶¶ question must "shock the conscience" to meet the arbitrary and irrational standard. _Cty. of Sacramento v. Lewis, 523 U.S. 833, 846, 118 S. Ct._

1708, 140 L. Ed. 2d 1043 (1998). Substantive due process "does not forbid governmental actions that might fairly be deemed arbitrary or capricious and for that reason correctable ¶¶ a state court lawsuit." Natale v. Town of Ridgefield, 170 F.3d 258, 263 (2d Cir. 1999). "[Its] standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority." Id.

Here, it is undisputed that plaintiffs have a valid property [*15] interest as both sides acknowledge that plaintiffs "own" the Esplanade. See Defs.' Br. at 25 ("[plaintiffs] still own [the Esplanade], and the public has no access to any part of it"); Zahra v. Town of Southold, 48 F.3d 674, 680 (2d Cir. 1995) (stating that valid constitutionally protectable property interest exists ¶¶ property that is owned). Plaintiffs cannot satisfy the second part of the substantive due process inquiry, however, as they have not alleged facts that support a conclusion that there has been a conscience-shocking infringement on their property interests.

1. The Stop Work Order Imposed on Plaintiffs as a Result of the Administrative Proceeding

The only action Drescher or the DEC has taken that has restricted plaintiffs' ability to use their land is the suspension of plaintiffs' renovations as a result of the pending administrative proceeding. Plaintiffs do not allege that it is outside the DEC's authority to prohibit their repairs from continuing while the administrative proceeding is pending. Thus, ¶¶ order to state a substantive due process claim on the basis of their inability to continue renovating the Esplanade, plaintiffs must allege facts that give rise to the inference that the initiation of the proceeding was so meritless [*16] that it "shocks the conscience."

Plaintiffs cannot meet this standard. While plaintiffs question Drescher's and the DEC's motives ¶¶ bringing the proceeding, they do not plead facts that present a plausible inference that the DEC's complaint alleging numerous environmental violations is meritless. Plaintiffs have alleged that their renovations are, ¶¶ their opinion, extremely protective and environmentally friendly, but these opinions are not sufficient for the court to plausibly infer that the DEC's allegations are inaccurate—let alone a gross abuse of governmental authority.

Moreover, many of plaintiffs' defenses to the administrative complaint are based on highly technical determinations of environmental law. Plaintiffs do not allege that the DEC fabricated claims of illicit conduct solely for the purpose of bringing a proceeding against them. For example, if defendants alleged that plaintiffs had built fences illegally when, ¶¶ fact, plaintiffs had not built any fences at all, a court could reasonably infer that defendants were abusing their authority ¶¶ an outrageous manner.

The administrative answer, however, reveals that plaintiffs' defenses are based on subtler issues, such as [*17] the boundaries of the DEC's jurisdiction on the oceanfront and the type of work authorized under a DEC general work permit. See, e.g., Pls.' Answer ¶ 124 (acknowledging that plaintiffs constructed chain link fence but denying that it is within "tidal wetlands adjacent area"); id. ¶ 165 (stating that the area where much of the work ¶¶ question occurred is "outside of any DEC jurisdictional area" and that any activities occurring within the DEC's jurisdiction were "¶¶ compliance" with a DEC permit). Plaintiffs have not alleged any facts that provide a basis to infer that the DEC's determination of its own jurisdictional area or what is permitted under its own work permits is so outrageous that it could serve as the basis for a substantive due process violation.

2. Drescher's Conduct Outside of the Administrative Proceeding

While much of Drescher's other alleged conduct is troubling, plaintiffs retain full ownership rights over the Esplanade, and plaintiffs' allegations do not allow an inference that any infringement on plaintiffs' property rights has occurred. First, with respect to Drescher's alleged phone call threatening Toussie's arrest if he did not stop the construction work on the [*18] Esplanade, plaintiffs acknowledge that Toussie was not arrested or sanctioned in any way. Am. Compl. ¶ 21. Plaintiffs' allegation that Drescher and the DEC interfered in their litigation with their neighbors fares no better. Even if plaintiffs are correct that defendants' actions were motivated by a desire to undermine their property rights, plaintiffs have not alleged that their litigation with their neighbors had any adverse consequences on plaintiffs' ownership of the Esplanade.

Plaintiffs also argue that Drescher's conduct during settlement negotiations itself constitutes a substantive due process violation. Specifically, they maintain that even "taking all of the DEC's environmental allegations as true, Mr. Drescher's use of those allegations to extort Plaintiffs to relinquish their constitutional property rights is blatantly unconstitutional." Pls.' Mem. in Opp'n to Defs.' Mot. to Dismiss Pls.' Am. Compl. ("Pls.' Br."), Dkt. #39, at 35. Even assuming that plaintiffs are correct that

2016 U.S. Dist. LEXIS 113057, *18

Drescher's conduct in connection with settlement discussions itself is in some way unconstitutional, it cannot rise to the level of a substantive due process violation unless it caused an infringement **[*19]** on plaintiffs' property rights—a claim plaintiffs have not made, and cannot make.

*O'Connor v. Pierson, 426 F.3d 187 (2d Cir. 2005)*, is instructive on this point. ¶¶ O'Connor, a teacher was placed on paid medical leave and was not permitted to return to work until he completed a psychiatric evaluation. *Id. at 192*. The Second Circuit concluded the teacher had a constitutionally protected property interest ¶¶ his employment and that a reasonable jury could find that this interest was arbitrarily infringed by the school's demand that he complete a psychiatric evaluation. *Id. at 204*. Nevertheless, the court found that plaintiff could not state a substantive due process claim until his accumulated sick leave ran out. Absent that occurrence, the teacher had not been "deprived of a property right ¶¶ any meaningful sense" despite the school's ongoing unconstitutional conduct. *Id. at 200*.

O'Connor makes clear that unconstitutional conduct absent any adverse consequence does not give rise to a substantive due process claim. Just as the plaintiff ¶¶ *O'Connor* could not state a substantive due process claim until he ran out of paid sick days, so plaintiffs here cannot state a substantive due process claim until Drescher's allegedly unconstitutional demands have resulted ¶¶ **[*20]** an actual infringement of plaintiffs' property rights.

Plaintiffs' arguments to the contrary are unpersuasive. All of the cases on which plaintiffs rely for the proposition that "governmental extortion/coercion of this type," Pls.' Br. at 31, is sufficient to state a substantive due process claim are materially distinguishable. ¶¶ each case, the defendant state actor either conditioned the granting of a benefit to which plaintiff was otherwise entitled on plaintiffs relinquishing his or her property rights or denied plaintiff a benefit to which he or she was otherwise entitled for no rational reason. See *Nollan v. Cal. Coastal Comm'n, 483 U.S. 825, 828, 107 S. Ct. 3141, 97 L. Ed. 2d 677 (1987)* (conditioning the granting of a permit needed to rebuild home on plaintiffs' granting the town an easement across their beachfront property); *Walz v. Town of Smithtown, 46 F.3d 162, 165 (2d Cir. 1995)* (refusing to connect plaintiffs to the water supply unless they deeded property to the town); *Brady v. Town of Colchester, 863 F.2d 205, 215 (2d Cir. 1988)* (denying building permit and forbidding plaintiff from using property commercially despite its being zoned for

commercial use); *Ecotone Farm LLC v. Ward, 639 F. App'x 118, 122 (3d Cir. 2016)* (baselessly interfering with plaintiff's legal renovations due to personal animosity); *545 Halsey Lane Props., LLC v. Town of Southampton, 39 F. Supp. 3d 326, 341 (E.D.N.Y. 2014)*. recons on other grounds *No. 14-CV-800, 2015 U.S. Dist. LEXIS 45856, 2015 WL 1565487 (E.D.N.Y. Apr. 8, 2015)*, recons on other grounds *No. 14-CV-800, 2015 U.S. Dist. LEXIS 61176, 2015 WL 2213320 (E.D.N.Y. May 8, 2015)* (refusing building permits and requiring plaintiffs to remove improvements they were **[*21]** legally entitled to make unless they relinquished legal rights to certain equipment on their property); *Soundview Assocs.v. Town of Riverhead, 725 F. Supp. 2d 320, 334-35 (E.D.N.Y. 2010)* (arbitrarily revoking special permit to build health spa to which plaintiff had a vested right); *Garlasco v. Stuart, 602 F. Supp. 2d 396, 405-06 (D. Conn. 2009)* (ordering plaintiff off his property and then blocking access to the property with immovable boulders, stones, dirt, and snow in an attempt to compel plaintiff to sell his property); *Sloup v. Loeffler, No. 05-CV-1766, 2008 U.S. Dist. LEXIS 65545, 2008 WL 3978208, at *10 (E.D.N.Y. Aug. 21,2008)* (harming plaintiff's commercial fishing business by forcing plaintiff to remove legally placed fishing equipment from the water for no reason other than personal animosity); *T.S. Haulers. Inc. v. Town of Riverhead, 190 F. Supp. 2d 455, 462 (E.D.N.Y. 2002)* (denying special use permit that state law required town to issue); *Collier v. Town of Harvard, No. 95-CV-11652, 1997 U.S. Dist. LEXIS 23582, 1997 WL 33781338, at *3 (D. Mass. Mar. 28, 1997)* (denying permits because plaintiff would not grant an easement that would benefit a member of the town planning board).

In contrast to the circumstances in all of those cases, Drescher's conduct during settlement negotiations is not tantamount to withholding a benefit to which plaintiff was otherwise entitled. Unlike the plaintiffs in the enumerated cases, the plaintiffs here are not losing an otherwise valid permit or license nor are they being denied access to their property because they have not acquiesced to Drescher's demands. Rather, the only deprivation that **[*22]** can be inferred from plaintiffs' allegations as a result of Drescher's conduct is that they have not been able to settle the administrative proceeding,[7] yet, plaintiffs have no entitlement to such a

---

[7] As stated above, I have no reason to question the validity of the DEC proceeding as plaintiffs have not pled facts that allow me to infer that they did not actually commit the numerous technical environmental violations with which they are charged.

settlement. Drescher and the DEC could have refused to engage in settlement discussions in connection with the administrative proceeding and, had they done so, plaintiffs would be in no worse position than they are now. Thus, while Drescher's alleged insistence that plaintiffs relinquish their property rights in exchange for a settlement is unreasonable, this hollow demand cannot alone serve as the "infringement" necessary to state a substantive due process claim.

This is not to say, however, that the DEC's or Drescher's conduct could not rise to the level of a substantive due process violation in the future. For example, in their amended complaint plaintiffs allege that Drescher informed them, without any legal explanation, that the DEC would not [*23] allow them to build a fence anywhere on the Esplanade other than to protect their immediate backyard. Am. Compl. ¶ 31. If, once the administrative proceeding has been adjudicated and the stop work order is lifted, the DEC were to prevent plaintiffs from building a legally compliant fence to exclude the public from their private property, this arbitrary restriction could give rise to a substantive due process claim. Nevertheless, as plaintiffs have not alleged any infringement on their property rights as a result of Drescher's conduct outside of the administrative proceeding, plaintiffs' substantive due process claim must be dismissed.[8]

**B. Procedural Due Process**

Plaintiffs also claim that Drescher and the DEC have

---

[8] Moreover, even if Drescher's alleged conduct prior to the initiation of the administrative proceeding and during settlement negotiations supported an inference that he had infringed on plaintiffs' property rights, his threatening behavior alone would not rise to the "shocks the conscience" level necessary to state a substantive due process violation. See Cruz-Erazo v. Rivera-Montanez, 212 F.3d 617, 619-20, 624 (1st Cir. 2000) (holding that "continuing harassment" by police including multiple phone calls threatening physical violence and going to plaintiffs home and threateningly asking if his daughter was the "light of his [*24] life" did not constitute a substantive due process violation); Higazy v. Millennium Hotel & Resorts, 346 F. Supp. 2d 430, 451 (S.D.N.Y. 2004), aff'd in part, rev'd in part on other grounds, Higazy v. Templeton, 505 F.3d 161 (2d Cir. 2007) ("[Defendant's] alleged threats, whether intended to coax a confession or arbitrarily frighten, may be the subject of proper criticism, but they are not actionable under the Fifth Amendment's due process clause.").

violated their rights to procedural due process. In order to state a procedural due process claim, plaintiffs must allege (1) a property right protected under the Constitution and (2) that they were deprived of that right without due process of law. Looney v. Black, 702 F.3d 701, 706-07 (2d Cir. 2012).

For all of the reasons stated above in the context of plaintiffs' substantive due process claim, plaintiffs have not alleged that they have were deprived of their property rights without due process of law. The only current interference with plaintiffs' rights is result of the administrative proceeding, and plaintiffs will have numerous due process protections available to them at their hearing before an Administrative Law Judge. See N. Y. Comp. Codes R. & Regs. tit. 6, § 622 (detailing procedures for administrative hearing).

Because none of Drescher's conduct outside of the administrative [*25] proceeding caused any deprivation of plaintiffs' property rights, it cannot support a claimed violation of plaintiffs' procedural due process rights. Similarly to the authorities cited in support of their substantive due process claim, all of the cases plaintiffs rely on in support of their procedural due process claim are easily distinguishable, as the plaintiffs in those cases had alleged an actual deprivation of property or something else to which they would have otherwise been entitled. See Fasciana v. Cty. of Suffolk, 996 F. Supp. 2d 174, 178 (E.D.N. Y. 2014) (county seized plaintiff's vehicle); Lexjac, LLC v. Inc. Vill. of Muttontown, No. 07-CV-4614, 2011 U.S. Dist. LEXIS 28655, 2011 WL 1059122, at *2 (E.D.N.Y. Mar. 18, 2011) (town seized plaintiffs property); Soundview Assocs., 725 F. Supp. 2d at 334-35 (town arbitrarily revoked special permit to build health spa to which plaintiff had a vested right); Garlasco, 602 F. Supp. at 405 (state actor blocked access to plaintiffs property with immovable boulders, stones, dirt, and snow).

Accordingly, plaintiffs' procedural due process claim must be dismissed.

**C. Equal Protection—Selective Enforcement**

Plaintiffs state claims under the Equal Protection Clause of the Fourteenth Amendment under two distinct theories—a selective enforcement theory and a "class of one" theory. As to each of these theories, plaintiffs argue that they have stated two different equal protection claims. First, they argue that by initiating the administrative proceeding in question, [*26] the DEC

and Drescher "targeted [plaintiffs] for enforcement [of DEC environmental regulations] despite building a seawall that is higher quality and more legally complaint than those built by similarly situated property owners." Pls.' Br. at 40. Second, plaintiffs contend that Drescher's conduct outside of the administrative proceeding has caused them to be "extorted in an effort to coerce them into relinquishing their exclusive proper rights." Id. at 39.

1. Pleading Standard

To state a claim under a "class of one" theory, plaintiffs must plead facts that support a plausible inference that they "ha[ve] been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Vill. of Willowbrook v. Olech, 528 U.S. 562, 564, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000). Similarly, to state a selective enforcement claim, plaintiffs must plead facts that allow the court to infer that "(1) compared with others similarly situated, [they were] selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." LeClair v. Saunders, 627 F.2d 606, 609-10 (2d Cir. 1980). The first step in evaluating whether plaintiffs [*27] have stated a claim under either theory is ascertaining whether they have identified others "similarly situated" who were treated differently.

With respect to "class of one" claims, the pleading standard for the "similarly situated" requirement is well-defined. The Second Circuit has held that a plaintiff pleading a "class of one" claim must allege a specific comparator that is so similar that "no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy;" and "the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." Ruston v. Town Bd. for Town of Skaneateles, 610 F.3d 55, 60 (2d Cir. 2010) (quoting Clubside, Inc. v. Valentin, 468 F.3d 144, 159 (2d Cir. 2006)). In other words, plaintiffs and their comparators must be "prima facie identical." Neilson v. D'Angelis, 409 F.3d 100, 105 (2d Cir. 2005), overruled on other grounds by Appel v. Spiridon, 531 F.3d 138 (2d Cir. 2008).

There is disagreement among the district courts in this circuit as to whether this stringent standard articulated

by the circuit for "class of one" claims also applies to selective enforcement claims. See Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills, 815 F. Supp. 2d 679, 693 (S.D.N.Y. 2011) (collecting cases illustrating the disagreement among the courts). The courts applying a slightly [*28] more relaxed standard have asked whether plaintiffs and their comparators are "similarly situated in all material respects" Abel v. Morabito, No. 04-CV-7284, 2009 U.S. Dist. LEXIS 9631, 2009 WL 321007, at *4 (S.D.N.Y. Feb. 11, 2009) (quoting Estate of Morris v. Dapolito, 297 F. Supp. 2d 680, 686 (S.D.N.Y. 2004)). As one court explained:

> The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. Much as the lawyer's art of distinguishing cases, the "relevant aspects" are those factual elements which determine whether reasoned analogy supports, or demands, a like result. Exact correlation is neither likely [n]or necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.

T.S. Haulers, Inc., 190 F. Supp. 2d 455, 463 (E.D.N.Y. 2002) (quoting The Dartmouth Review v. Dartmouth Coll., 889 F.2d 13, 19 (1st Cir. 1989), overruled on other grounds by Educadores Puertorriquenos en Accion v. Hernandez, 367 F.3d 61 (1st Cir. 2004)).

I agree with those courts that have continued to apply the more relaxed standard to selective enforcement claims despite the Second Circuit's pronouncement of a stricter standard in "class of one" cases. The reason why such a strict standard is necessary for "class of one" claims is because a "class of one" claim is dependent on the lack of a "rational basis" for the difference in treatment in order to infer that plaintiff was being targeted by a state actor. In other words, a plaintiff is alleging that he is so virtually identical [*29] to someone else that there is no plausible explanation for the state actor's behavior besides discrimination. See Neilson, 409 F.3d at 105 (plaintiff must show that he "was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose—whether personal or otherwise—is all but certain.") Thus, if a plaintiff is not identical or nearly so to his chosen comparators, there is no basis for a fact finder to conclude that the difference in treatment was not based on an explainable governmental purpose.

This need for nearly identical comparators is not as

compelling in the context of a selective enforcement claim. A plaintiff asserting a selective enforcement claim is not asking a fact finder to infer discrimination based solely on the lack of any other explanation; he is attempting to show discrimination on the basis of membership in a protected class, retaliation for the exercise of a constitutional right, or personal animus. Under these circumstances, where the plaintiff must offer evidence supporting his explanation for the difference in the treatment (as opposed to showing that there is no explanation), it is not necessary that the comparator [*30] be "prima facie identical," so long as they are materially similar enough that class status, retaliation, or animus can be inferred as the basis for the differing treatment. See *Mosdos Chofetz Chaim, Inc., 815 F. Supp. 2d at 697* (reasoning that a slightly lower standard is warranted for selective enforcement claims because "[a]n extremely high level of similarity is required in the 'class of one' context because plaintiffs asserting those claims are attempting to prove that the government's treatment was arbitrary and irrational"); *Walker v. City of N.Y., No. 05-CV-1283, 2010 U.S. Dist. LEXIS 132801, 2010 WL 5186779, at *7 n.21 (E.D.N.Y. Dec. 15, 2010)* (finding that claim of selective treatment based on impermissible considerations did not require the same enhanced comparator requirement as "class of one" cases where plaintiffs are alleging that they are "being treated differently for no rational reason.").

2. The Initiation of the Administrative Proceeding

Nevertheless, even under the more flexible pleading standard, plaintiffs cannot allege that the administrative proceeding was the result of unconstitutional selective enforcement. While acknowledging that, "[a]s a general rule, whether items are similarly situated is a factual issue that should be submitted to the jury," *Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 n.2 (2d Cir. 2001)*, this rule is "not absolute," id., and courts have frequently dismissed claims where plaintiffs [*31] have not pled an adequate comparator.

While plaintiffs claim that the administrative proceeding is a result of the DEC's selective enforcement against them, plaintiffs have alleged nothing approaching a suitable comparator. Plaintiffs were served with a twenty-six count charge alleging numerous violations including raising the elevation of the surface at the Esplanade above its pre-Hurricane Sandy height (DEC Compl. ¶¶ 84-90), using undersized stones and concrete rubble debris as building material (id. ¶¶ 112-23), and constructing a concrete wall, chain link fence, retainer wall, metal gate, and cast-iron fence in the DEC regulated "tidal wetlands adjacent area" (id. ¶¶ 75-83,

96-103, 124-39, 155-64). Moreover, the administrative complaint alleges that virtually all of this work was either performed without a permit or was beyond the scope of a permit that the DEC issued. See id. ¶¶ 56, 60, 64, 68, 72, 76, 81, 85, 92, 97, 101, 105, 113, 117, 121, 125, 129, 133, 137, 141, 146, 157.

Despite the numerous violations that are brought against them, the only specific comparisons plaintiffs make to others similarly situated are that Kingsborough's wall is shorter than plaintiffs' wall, uses [*32] significantly smaller stones and is interspersed with concrete, Am. Compl. ¶ 36, and that the Menorah Center's wall was made using construction debris and refuse, id. ¶ 37. Plaintiffs also allege in conclusory fashion that there are "several" private landowners who have broken concrete in the core and armoring of their walls, and "some of which" also include no stone armoring or concrete slabs dumped in piles. Id. ¶ 38. Plaintiffs claim that all of these defects make the other unnamed private seawalls "less protective" and a "threat to the properties as they exist today." Id. Lastly, plaintiffs allege that the DEC did not issue permits for any of the work completed on other Manhattan Beach seawalls. Id. ¶ 35. These comparators fail for numerous reasons.

First, notably absent from any of plaintiffs' allegations is any reference to state environmental laws. Even if plaintiffs and their comparators are facially similar (i.e., they are both landowners in Manhattan Beach who rebuilt seawalls after damage caused by Hurricane Sandy), plaintiffs cannot plead a selective enforcement claim if they do not plead essential facts relevant to the laws they claim are being selectively enforced [*33] against them.

While plaintiffs make numerous sweeping allegations that their seawall is "more protective," "more legally compliant," and a "superlative example of shoreline protection," id. ¶ 35, they do not plead any facts that indicate that they were in compliance with state environmental regulations and their comparators were not. For example, while plaintiffs allege that Kingsborough's wall is "shorter" than plaintiffs' and uses "significantly smaller stones," id. ¶ 36, they do not allege how high the wall is, how high seawalls in the area are permitted to be, what kind of stone is used, or what kind of stone is permissible or impermissible for building. These are examples of facts that would be necessary for the court to infer that Kingsborough is equally liable as plaintiffs under state environmental law.

*Witt v. Village of Mamaroneck, No. 12-CV-8778, 2015 U.S. Dist. LEXIS 39669, 2015 WL 1427206 (S.D.N.Y. Mar. 27, 2015)*, aff'd sub nom. *Witt v. Village of Mamaroneck, N.Y., 639 F. App'x 44 (2d Cir. 2016)*, is helpful in demonstrating the inadequacy of plaintiffs' comparators. In *Witt*, plaintiffs' home was severely damaged by Hurricane Irene. *2015 U.S. Dist. LEXIS 39669, [WL] at *1*. Plaintiffs were originally granted a building permit to rebuild the damaged property, but then had a stop work order issued against them because the repair work they planned constituted a "substantial improvement," which, under **[*34]** a village code, required them to reconstruct and elevate the foundation of their home. Id. This requirement lead to numerous problems for plaintiffs that included plaintiffs' running out of money for repairs, defaulting on their mortgage, and having foreclosure proceedings initiated against them. Id.

Plaintiffs filed suit alleging that the other eleven homes on their block were also severely damaged, but did not have the village code requirements imposed on them when they made "substantial improvement" renovations to their homes. *2015 U.S. Dist. LEXIS 39669, [WL] at *2*. Applying the lower "similarly situated in all material respects" standard, the court dismissed the complaint. *2015 U.S. Dist. LEXIS 39669, [WL] at *6*. The court found that despite plaintiffs' allegation that all houses on their block were "similar in size, design, and value," that all houses on their block had suffered the same degree of damage, and that numerous other houses had also made "substantial improvements" as defined by the village code, plaintiffs had not alleged that their comparator houses had the same "relative dollar amount of repairs," or that their comparators had invested in alterations designed to prevent future flood damage rather than just repairing existing damage. Id. Because **[*35]** these facts were relevant to determine whether the section of village code in question applied to their comparator neighbors, the court dismissed plaintiffs' complaint, finding that, under the village code, plaintiffs' comparators were not "similarly situated in all material respects." Id.

The Second Circuit affirmed the district court's dismissal of plaintiff's selective enforcement claim "for substantially the reasons stated by the district court." *Witt, 639 F. App'x at 45*.

Just as the court in *Witt* could not infer that the village code in question was applicable to plaintiffs' comparators without knowing the cost of their repairs, plaintiffs' pleading here has provided no basis to infer

that Kingsborough is equally liable to have an environmental proceeding initiated against it simply because its wall is shorter than plaintiffs' and is made of smaller stones. Even if plaintiffs are right that these facts make their wall more "protective" than Kingsborough's, they do not support a conclusion that plaintiffs' renovations are more compliant with the laws and regulations in question. Plaintiffs' allegations regarding the Menorah Center and other private seawalls suffer from the same defect—they simply allege **[*36]** that these walls are in some way inferior to theirs without providing any facts that give rise to an inference that they are in violation of the same legal provisions as those under which plaintiff is being administratively charged.

Second, these comparators fail because plaintiffs do not allege that they committed anything approximating the number of violations that plaintiffs are charged with committing in the DEC'S administrative complaint. Even assuming that all of the conduct plaintiffs attribute to their comparators (the shorter wall, the smaller stones) are violations that the DEC has the authority to prosecute, they are nonetheless not comparable to the widespread violations that plaintiffs are charged with committing.

Here again, *Witt* is instructive. In rejecting the plaintiffs' comparators, the court in *Witt* found it relevant that the disputed chapter of the village code was only one of the reasons why a stop work order was issued to halt plaintiffs' rebuilding. *Witt, 2015 U.S. Dist. LEXIS 39669, 2015 WL 1427206, at *8*. The court found plaintiffs' admissions that they failed to file an additional necessary permit and performed additional repairs that required a New York State variance—factors that were not alleged with respect to **[*37]** their neighbors—further undermined their assertion that their neighbors were viable comparators. Id.

Similarly, in *Nemeth v. Village of Hancock, No. 3:10-CV-1161, 2011 U.S. Dist. LEXIS 1563, 2011 WL 56063 (N.D.N. Y. Jan. 7, 2011)*, plaintiffs brought a selective enforcement claim alleging that village zoning provisions were enforced against them, but not other members of the community. *2011 U.S. Dist. LEXIS 1563, [WL] at *2*. The court dismissed the claim because plaintiffs were charged with violating different provisions of the zoning code than those that they claimed their neighbors had violated. *2011 U.S. Dist. LEXIS 1563, [WL] at *5-6* The court held that by pleading comparators who, while perhaps in violation of some provision of the zoning code, were not in violation of the same provisions as

plaintiffs, plaintiffs had "compare[d] the proverbial apples with oranges" and could not state a selective enforcement claim. *2011 U.S. Dist. LEXIS 1563, [WL] at *6*.

Plaintiffs here, like the plaintiffs in Witt and Nemeth, have been accused of violating largely different provisions than their comparators. Plaintiffs do not allege that their comparators raised the elevation of their land higher than pre-Hurricane Sandy levels, or built any structures in the "tidal wetlands adjacent area," let alone five separate structures. Thus, even if we assume that plaintiffs and their comparators did commit [*38] a few of the same violations (building with undersized stones, performing post-Sandy work without a permit), they are still not viable comparators, as plaintiffs have committed vastly more violations. It is not unreasonable to think that the DEC would initiate a proceeding against a property owner who had committed twenty-six violations, but not against another who had committed only a handful of the same violations.

Plaintiffs' reliance on *Sloup v. Loeffler, No. 05-CV-1766, 2008 U.S. Dist. LEXIS 65545, 2008 WL 3978208 (E.D.N.Y. Aug. 21, 2008)* is misplaced. While plaintiffs are correct that Sloup stands for the proposition that "another regulated party act[ing] similarly but was not subject to enforcement, combined with evidence that [the] state actor had a particular interest in plaintiff," Pls.' Br. at 43, can be sufficient to support a selective enforcement claim, the plaintiff in Sloup alleged a far stronger comparator. In Sloup, plaintiff, a commercial fisherman, alleged that another fisherman, whom he identified, was "trapping" in the exact same area where plaintiff had been told to remove his traps with the warning that "equipment would be seized and summons issued if fishing occurred" in that area again. *2008 U.S. Dist. LEXIS 65545, [WL] at *13*. This claim of a comparator engaging in the identical conduct in the same location [*39] that plaintiff was barred from using is vastly more supportive of a selective enforcement claim than plaintiffs' current allegations.

Thus, even under the less strict "similarly situated in all material respects" standard, plaintiff has failed to allege an appropriate comparator to state a selective enforcement claim as a result of the DEC's administrative proceeding.

3. Drescher's Conduct Outside of the Administrative Proceeding

With respect to Drescher's behavior outside of the administrative proceeding, plaintiffs allege that they do not need a suitable comparator because Drescher's conduct is "selective enforcement per se." Pls.' Br. at 40. Plaintiffs argue that Drescher's behavior has been so obviously improper that it "could never be considered a legitimate exercise of governmental authority—regardless of any distinction between [plaintiffs] and any other." Id.

Plaintiffs rely on two Seventh Circuit cases in support of this argument. First, they point to *Geinosky v. City of Chicago, 675 F.3d 743 (7th Cir. 2012)*. In Geinosky, plaintiff had received twenty-four illegitimate parking tickets from the same police unit in a fourteen-month period, all of which were dismissed after plaintiff went to court seven times to defend himself. *Id. at 745*. The court [*40] allowed plaintiff's claim to move forward despite his not having alleged a similarly situated comparator, finding that the facts so clearly demonstrated harassment by state actors that to require a comparator would elevate "form over substance." *Id. at 748*. The Seventh Circuit found that requiring a comparator under these facts would serve no purpose because, as the court reasoned, "Are there people in Chicago who have not received more than a dozen bogus parking tickets from the same police unit in a short time? [Plaintiff] could find hundreds of those people on any page of the Chicago phone book." *Id. at 746* (emphasis in original).

To support their "selective enforcement pro se" argument, plaintiffs also rely on *Swanson v. City of Chetek, 719 F.3d 780 (7th Cir. 2013)*. In Swanson, the Mayor of the defendant city did not like how his next-door neighbor, plaintiff, was remodeling his home and used his position of power to harass him. *Id. at 781-82*. Plaintiff alleged that defendant told building inspectors not to issue a remodeling permit, delayed the grant of a fence permit for his building, told builders that he was a drug dealer who would not pay for the work provided and, most importantly, caused the city to prosecute plaintiff for the construction of a fence in violation [*41] of a setback requirement, a charge a municipal court judge determined to be baseless. Id. As in Geinosky, the Seventh Circuit found that it would be "oddly formalistic" to demand a similarly situated comparator given the "readily-apparent hostility" underlying defendant's actions. *Id. at 785*.

Plaintiffs argue that, as in *Geinosky* and *Swanson*, it is so apparent that Drescher's conduct—threatening Mr. Toussie with arrest, interfering in plaintiffs' private litigation with their neighbors, and using the administrative proceeding as leverage in settlement

negotiations—is motivated by animus that there is no practical purpose in requiring a similarly situated comparator. In other words, plaintiffs argue that because they could point to countless people who have not been threatened with arrest by a DEC attorney or have not had the DEC refuse to settle environmental violations with them unless they surrender their property rights, requiring a comparator would elevate form over substance. Even assuming that this "selective enforcement per se" theory is viable in this circuit,[9] plaintiffs still cannot state a selective enforcement claim because they have not suffered any injury as a result of Drescher's **[\*42]** conduct outside of the administrative proceeding.

Even under a "selective enforcement per se" theory, plaintiffs still must allege facts supporting the inference that their legal rights have been harmed by defendants' improper conduct. The *Fourteenth Amendment* requires "equal protection of the laws," U.S. Const. amend. XIV, § 1 (emphasis added), and the Second Circuit has held that the selective enforcement doctrine is intended to provide protection from "adverse governmental action" without a legitimate basis, *Bizzarro v. Miranda, 394 F.3d 82, 87 (2d Cir. 2005)*. In addition, the Seventh Circuit, the leading court to recognize plaintiffs' theory, has also found that a plaintiff cannot prevail on an equal protection claim without an allegation of some sort of harm caused by the state actor in question. See *Del Marcelle v. Brown Cty. Corp., 680 F.3d 887, 889 (7th Cir. 2012)* (en banc) (plurality opinion) (adopting standard that would require plaintiff to show, among other things "discriminatory intent and effect") (emphasis added); *id. at 913* (Wood, J., dissenting) (proposing alternative standard on behalf of the rest of the en banc panel requiring, among other things, that plaintiffs show they have been "injured by intentionally discriminatory treatment"). **[\*43]**

While Drescher's alleged behavior outside of the environmental proceeding may be sufficiently outrageous that a comparator is not necessary, it has not deprived plaintiffs of any of the legal rights that the *Equal Protection Clause* protects. As discussed above with respect to plaintiffs' substantive due process claim, the only harm plaintiffs have suffered as a result of Drescher's conduct is that they have been unable to settle the administrative proceeding—something to which they are not entitled. This lack of adverse legal

action is what distinguishes this case from *Geinosky* and *Swanson*.

In Geinosky, plaintiff had to go to court to defend himself seven times as a result of the numerous frivolous parking tickets he was given. In Swanson, plaintiff was both denied legal permits to which he would otherwise have been entitled and had to defend himself in frivolous litigation. This abusive use of legal process against plaintiffs deprived them of equal protection under the law. Drescher's conduct, while certainly distressing, has not had any actionable adverse effect on plaintiffs' legal rights.

Accordingly, plaintiffs' selective enforcement claim is dismissed.

### D. Equal Protection—"Class of One"

Plaintiffs' equal **[\*44]** protection claim under a "class of one" theory fails for the same reasons their selective enforcement claim fails. First, they do not state a claim that the administrative proceeding is the result of "class of one" discrimination because they have not stated an adequate comparator. As stated above, the Second Circuit has held that "class of one" claims require a "prima facie identical" comparator. *Neilson, 409 F.3d at 105*. As plaintiffs cannot meet the lesser "similarly situated in all material respects" standard for a comparator, they also cannot meet this higher standard necessary to state a "class of one" claim.[10]

Second, also as analyzed above, they cannot state a

---

[9] Plaintiffs do not cite, and the court has not located, any case in this circuit that adopts this theory.

[10] While it is not necessary in order to find plaintiffs' comparators inadequate in this case, I also note that multiple courts have held that properties being utilized for different purposes are inadequate comparators in the "class of one" context because they are frequently subject to different land use regulations. See, e.g., *Ruston, 610 F.3d at 60* (finding residential homes, a country club, a luxury spa, and a large commercial building inadequate comparators for plaintiffs' proposed 14-home development); *Costello v. Town of Huntington, No. 14-CV-2061, 2015 U.S. Dist. LEXIS 38059, 2015 WL 1396448, at \*8 (E.D.N.Y. Mar. 25, 2015)* (finding a "property [that] contains multiple structures, commercial spaces, dwellings, driveways, and uses" not **[\*45]** similarly situated as a matter of law to a single family home). Absent further factual allegations illustrating that Kingsborough and the Menorah Center are subject to, and in violation of, the same environmental provisions as plaintiffs, these cases cast further doubt on their viability as adequate comparators in the "class of one" context.

"class of one" claim as a result of Drescher's conduct outside of the administrative proceeding because they have suffered no legally cognizable injury as a result of his behavior.

Thus, plaintiffs' "class of one" claim is dismissed.[11]

## E. Leave to Amend

In both their amended complaint and their brief, plaintiffs request leave to amend their complaint if the court grants defendants' **[*46]** motion to dismiss. Am. Compl. at 21; Pls.' Br. at 55. I grant this request in part.

*Rule 15 of the Federal Rules of Civil Procedure* provides that the court "should freely give leave [to amend] when justice so requires." *Fed. R. Civ. P. 15(a)(2)*. Nevertheless, "motions to amend should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party." *Burch v. Pioneer Credit Recovery, Inc., 551 F.3d 122, 126 (2d Cir. 2008)*.

I deny plaintiffs' request for leave to amend their substantive and procedural due process claims, as any amendment to these claims would be futile. In order to state a substantive due process claim on the basis of the initiation of the administrative proceeding, plaintiffs would have to allege facts supporting the inference that the proceeding is so meritless that it "shocks the conscience." Nothing in either of plaintiffs' first two complaints suggests that they could plead facts supporting that necessary inference. In fact, plaintiffs' administrative answer establishes that they do not deny that they performed many of the renovations that the DEC charges were unlawful. Rather, they dispute the DEC's jurisdiction to regulate them in certain areas and the extent to which **[*47]** their repairs went beyond the scope of DEC permits. Such technical disputes cannot rise to the "conscience shocking" level necessary to state a substantive due process claim.

_____

[11] Because I find that plaintiffs have failed to state a claim under either equal protection theory, I do not address defendants' argument that *Engquist v. Oregon Department of Agriculture, 553 U.S. 591, 128 S. Ct. 2146, 170 L. Ed. 2d 975 (2008)*, bars plaintiffs' claim under a "class of one" theory. Also, because plaintiffs have failed to state any viable constitutional claim, I do not address defendants' argument that Drescher is entitled to absolute immunity for all of his actions taken in his capacity as an agency prosecutor.

Further, plaintiffs do not and could not allege that they will be deprived of due process protections during the administrative proceeding. Accordingly, they cannot state a procedural due process claim on the basis of that proceeding and any amendment to plaintiffs' substantive or procedural due process claims on this basis would be futile.

With respect to any claims that Drescher's conduct outside of the administrative proceeding gives rise to a substantive or procedural due process violation, these claims require an allegation that defendants infringed on plaintiffs' property rights. Because it is undisputed that plaintiffs have full ownership rights over the Esplanade and that, as plaintiffs acknowledge, their property rights have not been curtailed as a result of Drescher's conduct, plaintiffs cannot plead any facts that would support the necessary showing that Drescher's behavior has infringed on their ownership of the Esplanade. Accordingly, as plaintiffs' own factual allegations preclude success on these **[*48]** claims, any amendment to their substantive or procedural due process claims on the basis of Drescher's behavior outside of the administrative proceeding would also be futile.

Plaintiffs' equal protection claims, however, may be amended. While plaintiffs have not alleged adequate similarly-situated comparators in order to state a selective enforcement or "class of one" claim on the basis of the administrative proceeding, they also have not alleged any facts that preclude such a pleading. I therefore grant plaintiffs leave to re-plead these claims in conformity with the pleading standards set forth in this opinion.

## F. Motion for Preliminary Injunction

While dismissal of plaintiffs' complaint necessarily precludes their success on a motion for a preliminary injunction, even if plaintiffs could state a viable constitutional claim, their motion to enjoin the administrative proceeding would nonetheless fail. A plaintiff seeking a preliminary injunction must make four showings: 1) that he or she is likely to succeed on the merits of his claim, 2) that he or she is likely to suffer irreparable harm in the absence of preliminary relief, 3) that the balance of equities tips in his or her favor, **[*49]** and 4) that an injunction is in the public interest. *Winter v. Nat'l. Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)*. Irrespective of the merits of their claims, plaintiffs have not shown that they

are likely to suffer any irreparable harm as a result of the administrative proceeding that would warrant a preliminary injunction.[12]

"To establish irreparable harm, the movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995) (internal quotation marks and citation omitted). Plaintiffs contend that if an injunction is not granted, they will suffer irreparable harm in three ways.

First, they urge that irreparable harm is presumed because they allege a deprivation of a constitutional right. See Pls.' Mot. for Inj., at 33. In the Second Circuit, however, this presumption of irreparable harm arising from a constitutional deprivation is not automatic. See *Time Warner Cable of N.Y.C. v. Bloomberg L.P.*, 118 F.3d 917, 924 (2d Cir. 1997) ("[W]e think it often will be more appropriate to determine irreparable [*50] injury by considering what adverse factual consequences the plaintiff apprehends if an injunction is not issued, and then considering whether the infliction of those consequences is likely to violate any of the plaintiff's rights.") (internal citations and quotation marks omitted); *Smith v. Fredrico*, No. 12-CV-04408, 2013 U.S. Dist. LEXIS 3681, 2013 WL 122954, at *6 (E.D.N.Y. Jan. 8, 2013) (finding that "mere assertion of a constitutional injury is insufficient to automatically trigger a finding of irreparable harm" and that plaintiffs must convincingly show that the constitutional violation in question will result in non-compensable damages).

Even if such a presumption applied, however, plaintiffs have not alleged that they have suffered any constitutional injuries as a result of the administrative proceeding they seek to enjoin. At the outset, plaintiffs do not even contend that they will suffer any constitutional injury because of the DEC administrative proceeding. They have affirmatively disavowed any challenge to the "environmental allegations that form the substance of the administrative action or the relief formally sought in that action." Pls.' Reply in Supp. of Mot. for Prelim. Inj., Dkt. #44, at 14. They have also

explicitly acknowledged that because "Mr. Drescher's unconstitutional [*51] conduct is not occurring or being adjudicated in the administrative action, the outcome of that action cannot possibly . . . affect . . . plaintiffs' claims." Pls.' Br. at 19. Because plaintiffs contend that the source of their claimed injury is Drescher's behavior during settlement discussions and not any defect in the administrative proceeding, plaintiffs cannot enjoin a proceeding that is admittedly not the cause of any injury to them. Any other result would absolve plaintiffs of responsibility for environmental violations for reasons unrelated to the merits or fairness of the proceeding.

Second, plaintiffs argue that they are suffering an irreparable injury because the DEC proceeding has prevented them from exercising their property rights—specifically, in that it has impeded their ability to complete their repairs and renovations to the Esplanade. The argument is meritless, however, as plaintiffs do not challenge either the substance of the proceeding or the DEC's authority to halt their renovations during the pendency of the proceeding.

Plaintiffs have no constitutionally protected right to renovate their property in a way that violates state law or DEC regulations. To the extent [*52] they contend that their renovations to the Esplanade have not violated any laws or regulations, that is what will be adjudicated at the administrative proceeding. To hold that plaintiffs will be irreparably injured because the DEC is temporarily preventing them from completing renovations the agency believes to be illegal would effectively strip the DEC of its enforcement power. Under plaintiffs' theory, any enforcement proceeding that suspended illegal land use would be subject to an injunction.

Third, plaintiffs argue that forcing them to participate in the DEC proceeding will itself create irreparable injury because "the DEC undoubtedly will use [the findings from the proceeding] to undermine Plaintiffs' claims in this action outside of the purview of this Court." Pls.' Mot. for Inj. at 35. More specifically, plaintiffs contend that they may be compelled to testify in the DEC proceeding, and that any findings the agency makes "may be afforded preclusive effect" in this action. Id. at 35-36.

I reject this argument for two reasons. First, this claim of injury is entirely speculative. Plaintiffs do not know what the result of the proceeding will be and cannot assume that the administrative findings [*53] will be harmful to them, much less dispositive of any claim they may

---

[12] Because I find that plaintiffs cannot show that they would suffer any irreparable injury absent an injunction, I do not address defendants' argument that the court should abstain from intervening in the administrative proceeding pursuant to *Younger v. Harris*, 401 U.S. 37, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971).

assert in this court. Second, the proceeding will adjudicate only whether or not plaintiffs committed the various environmental claims alleged in the complaint—not whether plaintiffs own the Esplanade, whether Drescher has behaved appropriately or injuriously toward them, or whether plaintiffs' neighbors have also committed numerous environmental violations similar to those with which plaintiffs have been charged. Thus, even if the findings from the proceeding were afforded some form of preclusive effect, it is impossible to imagine how any DEC finding could in any way compromise plaintiffs' ownership rights to the Esplanade or limit plaintiffs' ability to pursue their federal constitutional claims.

While plaintiffs may be concerned that the DEC will exceed the scope of the administrative complaint by adjudicating their ownership rights in the Esplanade at the administrative proceeding, any findings by the agency are reviewable in an Article 78 proceeding in New York state court. See *N.Y. Envtl. Conserv. Law §§ 25-0404*, *15-0515*, *§ 34-0112* (providing Article 78 review for DEC determinations with respect to various regulations plaintiffs are accused of violating). Moreover, **[*54]** if the DEC were to make findings beyond the scope of the issues delineated in the administrative complaint, such findings would undoubtedly not be afforded preclusive effect by another tribunal.

Plaintiffs' reliance on *Schoolcraft v. City of New York, 955 F. Supp. 2d 192 (S.D.N.Y. 2013)* ("Schoolcraft II"), does not alter this analysis. In Schoolcraft II, a police officer brought a *Section 1983* action against the police department alleging that he was involuntarily hospitalized because he refused to follow the department's illegal quota policy. See *Schoolcraft v. City of New York, No. 10-CV-6005, 2011 U.S. Dist. LEXIS 48996, 2011 WL 1758635, at *1 (S.D.N.Y. May 6, 2011)*. The court enjoined a departmental disciplinary hearing against plaintiff, finding that the departmental proceeding would be adjudicating many of the same facts involving plaintiffs' hospitalization that would be necessary to resolve plaintiffs *Section 1983* claim. *Schoolcraft II at 199-200*. Because the court would have been required to give the department's findings of fact preclusive effect, the court reasoned that an injunction was needed to ensure that the facts essential to plaintiff's constitutional claims were not adjudicated "outside the bounds of the judicial process and on defendants' terms." *Id. at 194, 199* (internal quotation marks omitted). Here, unlike Schoolcraft II, the DEC will be adjudicating only technical environmental

violations—not facts that would **[*55]** be dispositive of plaintiffs' constitutional claims.

Thus, even if plaintiffs could plead viable constitutional claims, their motion for a preliminary injunction must be denied as they cannot show that they will suffer any actual, imminent, and irreparable injury as a result of their participation in the administrative proceeding.

CONCLUSION

For all of the reasons set forth above, defendants' motion to dismiss is granted and plaintiffs' motion for a preliminary injunction is denied. Plaintiffs' substantive and procedural due process claims are dismissed with prejudice. Plaintiffs' equal protection claims are dismissed without prejudice. If plaintiffs seek to amend their complaint to replead their equal protection claims, they must file an amended complaint by September 8, 2016.

SO ORDERED.

/s/ Allyne R Ross

Allyne R. Ross

United States District Judge

Dated: August 23, 2016

Brooklyn, New York

◆ Positive
As of: March 29, 2023 5:10 PM Z

## *Our Wicked Lady LLC v. Cuomo*

United States District Court for the Southern District of New York

March 9, 2021, Decided; March 9, 2021, Filed

21cv0165(DLC)

**Reporter**

2021 U.S. Dist. LEXIS 44505 *; 2021 WL 915033

OUR WICKED LADY LLC (d/b/a "Our Wicked Lady"), et al., Plaintiffs, -v- ANDREW CUOMO, in his official capacity as Governor of the State of New York; STATE OF NEW YORK; BILL de BLASIO, in his official capacity as Mayor of New York City; and THE CITY of NEW YORK, Defendants.

**Subsequent History:** Injunction denied by, As moot, Dismissed by *Our Wicked Lady LLC v. Cuomo, 2021 U.S. Dist. LEXIS 109974 (S.D.N.Y., June 11, 2021)*

## Core Terms

restaurants, indoor, limits, orders, irreparable harm, courts, government action, regulation, dining, spread, preliminary injunction, regulatory taking, challenged order, restrictions, plaintiffs', reopening, infected, rational basis review, fundamental rights, fitness center, injunction, announced, pandemic, succeed, merits, cases, virus

**Counsel:** **[*1]** For Plaintiffs: Kenneth Belkin, Kenneth Belkin, Esq., New York, NY.

For State Defendants: Matthew Conrad, New York State Office of the Attorney General, New York, NY.

For City Defendants: Kerri Devine, Samantha Schonfeld, NYC Law Department, New York, NY.

**Judges:** DENISE COTE, United States District Jduge.

**Opinion by:** DENISE COTE

## Opinion

OPINION AND ORDER

DENISE COTE, District Judge:

On January 8, 2021, the plaintiffs -- a group of 74 New York City business, 69 of which are bars and restaurants -- filed this action against New York City (the "City"), Mayor Bill de Blasio ("Mayor de Blasio"), New York State (the "State"), and Governor Andrew Cuomo ("Governor Cuomo"). On February 5, the plaintiffs moved to preliminarily enjoin enforcement of New York State Executive Order ("EO") No. 202.93, which permitted at that time indoor dining at 25% capacity in the City, and New York City EO No. 144, which prohibits the reopening of indoor group fitness classes in the City. The plaintiffs argue that the restrictions violate their rights under *federal* and *state Due Process*, *Equal Protection*, and *Takings Clauses*. For the reasons that follow, the plaintiffs' motion for a preliminary injunction is denied.

Background

The transmission of COVID-19 occurs **[*2]** through direct, indirect, or close contact with infected people through infected secretions such as saliva and respiratory secretions or their respiratory droplets, which are expelled when an infected person coughs, sneezes, talks, or sings. COVID-19 has an incubation period of up to 14 days, and individuals who are infected with COVID-19 but are asymptomatic can transmit the virus.

On March 11, 2020, the World Health Organization characterized COVID-19 as a pandemic. As of March 9, 2021, 2,604,487 people worldwide have been reported as dying of COVID-19, and 526,020 in the United States.[1] The City was an epicenter of the pandemic when it appeared in this country. The State announced

---

[1] See Johns Hopkins Coronavirus Resource Center, COVID-19 Dashboard, available at https://coronavirus.jhu.edu/map.html (last accessed March 9, 2021).

the first known case of COVID-19 in the City on March 1, 2020. As of March 9, 2021, the City had reported 755,261 positive cases of COVID-19, as well as 93,132 hospitalizations, 24,842 confirmed deaths, and 5,024 probable deaths stemming from the novel virus.[2]

I. Executive and City Orders

On March 7, 2020, Governor Cuomo issued EO 202, which declared a State of Emergency in the State based on the threat of COVID-19. On March 12, Mayor Blasio declared a state of emergency in [*3] the City.

Between March 15 and March 20, 2020, Governor Cuomo and Mayor de Blasio issued a series of orders that collectively suspended on-premises service of food and beverages in all bars and restaurants, closed all non-essential businesses, and prohibited non-essential gatherings of individuals of any size for any reason. Restaurants were deemed essential businesses only for the purpose of take-out and delivery. EO 202.3 permitted bars and restaurants to sell alcoholic beverages through take-out or delivery.

Beginning around May 11, Governor Cuomo announced a plan to begin reopening the State through a series of "phases." In regions of the State that entered "Phase 3," restaurants were permitted to resume indoor dining at 50% capacity beginning June 1. The City became a Phase 3 region on July 6 and a Phase 4 region on July 20.

On August 20, EO No. 202.57 permitted gyms and fitness centers -- which had been closed as of March 20 -- to reopen at 33% capacity beginning on August 24. City officials, however, were permitted to determine whether gyms and fitness centers in the City could reopen. On August 31, Mayor de Blasio issued New York City EO No. 144, which permitted the reopening of gyms [*4] and fitness centers but prohibited indoor group fitness classes.

On September 9, Governor Cuomo issued EO 202.61, which allowed "indoor food services and dining in New York City beginning September 30, 2020, as long as

---

Department of Health and any other applicable State-issued guidance is strictly adhered to." The New York State Department of Health subsequently issued guidance that allowed restaurants and bars in the City to open for indoor dining at 25% capacity.

From September to December, rates of COVID-19 in the State and the City rose dramatically. On December 11, Governor Cuomo issued EO 202.81, which suspended authorization of indoor dining at restaurants and bars in the City. These restrictions became effective on December 14.

On January 29, 2021, Governor Cuomo announced that indoor dining at restaurants and bars in the City could resume on February 14 at 25% capacity. This date was soon moved up to February 12. A 50% maximum occupancy requirement remains in effect in jurisdictions outside the City. On February 19, Governor Cuomo announced that the occupancy limits on restaurants and bars in the City would increase to 35%, effective February 26.[3]

II. Procedural History

On January [*5] 8, 2021, the plaintiffs initiated this action, alleging that the restrictions on food, drink, and indoor fitness establishments set forth in Executive and City Orders beginning March 7, 2020 violate the plaintiffs' rights under to the *Due Process*, *Equal Protection*, and *Takings Clauses of the U.S.* and *New York Constitutions*. On January 12, an initial pretrial conference was scheduled for February 26.

On February 5, 2021, the plaintiffs filed a motion to preliminarily enjoin enforcement of State EO 202.93, which limited indoor dining in the City to 25% capacity, and City EO No. 144, which prohibits the reopening of indoor group fitness classes the City. In support of their motion, they submitted declarations from a large number of plaintiffs. Pursuant to a schedule set during a telephone conference held on February 9, the defendants filed their opposition on February 23. A reply was to be submitted by February 26.

The State's opposition brief is supported by a declaration of Emily C. Lutterloh, M.D., MPH, the Acting Director of Epidemiology at the New York State Department of Health. The City submitted relevant State

---

[2] COVID-19: Data, New York City Health, available at https://www1.nyc.gov/site/doh/covid-19-data-totals.page (last accessed March 9, 2021). The Court may take judicial notice of "relevant matters of public record." See *Giraldo v. Kessler, 694 F.3d 161, 163 (2d Cir. 2012)*; see also *Rule 201(b), Fed. R. Evid.* (permitting judicial notice of facts "not subject to reasonable dispute"). Throughout this Opinion, the Court relies on public health statistics reported by the City.

[3] Indoor Dining Can Increase to 35% Capacity Next Week in New York City, CBS New York (Feb. 19, 2021), available at https://newyork.cbslocal.com/2021/02/19/indoor-dining-can-increase-to-35-capacity-next-week-in-new-york-city/.

and City Executive Orders.

The plaintiffs did not submit a reply on February 26, but did request **[\*6]** an opportunity to cross examine Dr. Lutterloh. Following a telephone conference on March 2, the plaintiffs filed a reply on March 5 and withdrew their request to cross examine Dr. Lutterloh.

## Discussion

When a preliminary injunction will "affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *Agudath Israel of Am. v. Cuomo, 983 F.3d 620, 631 (2d Cir. 2020)* (citation omitted). See also *New York v. United States Dep't of Homeland Sec., 969 F.3d 42, 58-59 (2d Cir. 2020)*. Additionally,

> where the movant is seeking to modify the status quo by virtue of a mandatory preliminary injunction (as opposed to seeking a prohibitory preliminary injunction to maintain the status quo) or where the injunction being sought will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits, the movant must also: (1) make a strong showing of irreparable harm, and (2) demonstrate a clear or substantial likelihood of success on the merits.

*Yang v. Kosinski, 960 F.3d 119, 127-28 (2d Cir. 2020)* (citation omitted). This more demanding standard applies here; the motion seeks a mandatory preliminary **[\*7]** injunction and, if granted, will obtain relief that cannot be undone.

I. Likelihood of Success on the Merits

Over a century ago, the U.S. Supreme Court stated that "a community has the right to protect itself against an epidemic of disease which threatens its members." *Jacobson v. Commonwealth of Massachusetts, 197 U.S. 11, 27, 25 S. Ct. 358, 49 L. Ed. 643 (1905)*. As a result, "the legislature has the right to pass laws which . . . are adapted to prevent the spread of contagious diseases." *Id. at 35*. In such times, judicial scrutiny is reserved for a measure that "has no real or substantial relation to" the object of protecting "the public health, the public morals, or the public safety," or is "beyond all question, a plain, palpable invasion of rights secured by

the fundamental law." *Id. at 31*.

When government officials "undertake to act in areas fraught with medical and scientific uncertainties, their latitude must be especially broad." *S. Bay United Pentecostal Church v. Newsom, 140 S. Ct. 1613, 1613, 207 L. Ed. 2d 154 (2020)* (Roberts, C.J., concurring) (citation omitted). See also *Marshall v. United States, 414 U.S. 417, 427, 94 S. Ct. 700, 38 L. Ed. 2d 618 (1974)*. As explained by the Supreme Court when confronted with a public health crisis, a "court would usurp the functions of another branch of government if it adjudged, as matter of law, that the mode adopted under the sanction of the state, to protect the people at large was arbitrary, and not justified by the **[\*8]** necessities of the case." *Jacobson, 197 U.S. at 28*.

Federal courts across the country have upheld state and local COVID-19 restrictions based upon the Supreme Court's analysis in Jacobson.[4] See *McCarthy v. Cuomo, No. 20-CV-2124 (ARR), 2020 U.S. Dist. LEXIS 107195, 2020 WL 3286530, at \*3 (E.D.N.Y. June 18, 2020)* (collecting cases). So to have federal courts in New York, see *Hopkins Hawley LLC v. Cuomo, No. 20-CV-10932 (PAC), 2021 U.S. Dist. LEXIS 24580, 2021 WL 465437, at \*4 (S.D.N.Y. Feb. 9, 2021)* (collecting cases), and state courts in New York State. See, e.g., *Bocelli Ristorante Inc. v. Cuomo, No. 151500/2020, 70 Misc. 3d 722, 139 N.Y.S.3d 481, 2020 N.Y. Misc. LEXIS 10213, 2020 WL 7038722 (N.Y. Sup. Ct. Nov. 6, 2020)* (restaurant owner challenging 25% capacity limits).[5] The plaintiffs have not shown a likelihood of success on the merits of any of their claims, much less a clear and substantial likelihood of success.

_____

[4] The applicability of Jacobson in the context of the *Free Exercise Clause of the First Amendment* has recently been called into question. See *Roman Catholic Diocese of Brooklyn v. Cuomo, 141 S. Ct. 63, 70, 208 L. Ed. 2d 206 (2020)* (Gorsuch, J, concurring).

[5] The guarantees under the *Due Process*, *Equal Protection*, and *Takings Clauses of the U.S. Constitution* and the *New York Constitution* are coextensive. See *Am. Econ. Ins. Co. v. State, 30 N.Y.3d 136, 157-58, 65 N.Y.S.3d 94, 87 N.E.3d 126 (2017)*; *Oneida Indian Nation of New York v. Madison Cty., 665 F.3d 408, 427 n.13 (2d Cir. 2011)*; *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, NY, 945 F.3d 83, 110 n.211 (2d Cir. 2019)*; *Seawall Associates v. New York, 74 N.Y.2d 92, 115-16, 542 N.E.2d 1059, 544 N.Y.S.2d 542 (1989)*. As a result, this Opinion merges the analysis of the plaintiffs' federal and state claims.

2021 U.S. Dist. LEXIS 44505, *8

A. Substantive Due Process

The *Due Process Clause of the Fourteenth Amendment* "embodies a substantive component that protects against certain government actions regardless of the fairness of the procedures used to implement them." *Bryant v. New York State Educ. Dep't, 692 F.3d 202, 217 (2d Cir. 2012)* (citation omitted). Substantive due process protects against government action that is "arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill advised." *Cunney v. Bd. of Trustees of Village of Grand View, N.Y., 660 F.3d 612, 626 (2d Cir. 2011)* (citation omitted).

"In examining whether a government rule or regulation infringes a substantive due process right, the first step is to determine whether the asserted right is fundamental." *Bryant, 692 F.3d at 217*. "[A] law that impermissibly **[*9]** interferes with the exercise of a fundamental right . . . is reviewed under the strict scrutiny standard." *Dandamudi v. Tisch, 686 F.3d 66, 72 (2d Cir. 2012)*. See also *Leebaert v. Harrington, 332 F.3d 134, 140 (2d Cir. 2003)*. A fundamental right is not implicated "every time a governmental regulation intrudes on an individual's liberty." *Immediato v. Rye Neck Sch. Dist., 73 F.3d 454, 463 (2d Cir. 1996)*. Indeed, "the right to conduct a business, or to pursue a calling, may be conditioned." *New Motor Vehicle Bd. of California v. Orrin W. Fox Co., 439 U.S. 96, 107, 99 S. Ct. 403, 58 L. Ed. 2d 361 (1978)* (citation omitted). See also *Conn v. Gabbert, 526 U.S. 286, 292, 119 S. Ct. 1292, 143 L. Ed. 2d 399 (1999)*; *Williamson v. Lee Optical of Oklahoma Inc., 348 U.S. 483, 488, 75 S. Ct. 461, 99 L. Ed. 563 (1955)*.

When the right asserted is not fundamental, courts consider whether the government action at issue is "rationally related to a legitimate state interest." *Grand River Enters. Six Nations v. Boughton, No. 20-1044-CV, 988 F.3d 114, 2021 U.S. App. LEXIS 3354, 2021 WL 416414, at *4 (2d Cir. Feb. 8, 2021)* (citation omitted). "Rational basis review is not a post-hoc test of the effectiveness of a legislative policy." *2021 U.S. App. LEXIS 3354, [WL] at *5*. Rather, courts examine "whether, at enactment, there is a rational link between the harm a statute is intended to remedy and the method by which a legislature chooses to address it." Id.

The plaintiffs have not asserted an infringement of a fundamental right. Under the State and City orders, the plaintiffs may continue to operate their businesses through in-person dining with certain capacity limits and may conduct other aspects of their business, including take-out and delivery services. Similarly, fitness centers may open but may not hold indoor fitness classes. The **[*10]** challenged orders are a temporary response to an evolving public health crisis. As a result, rational basis review applies to the challenged orders.

Applying rational basis review, the plaintiffs are unlikely to succeed in their substantive due process claims. They are unlikely to show that there is no rational link between limiting the number of people in enclosed spaces and the harm posed by the COVID-19 pandemic. COVID-19 is spread through close contact with infected individuals, including those who are asymptomatic. It is rational for the government to limit the number of individuals in close contact in enclosed spaces to avoid the spread of the virus. Under the rational basis review and Jacobson, courts must defer to the government's determination that at this particular stage of the pandemic only a particular density of people in an enclosed space is safe. This Court may not arbitrarily decide that 50% capacity limits are better today than the 25% challenged by this motion or the 35% limits now in effect for restaurants. Indeed, in defining the relief they seek -- 50% capacity limits -- the plaintiffs in effect acknowledge that these are extraordinary times, that the health crisis **[*11]** is serious, and that limits are necessary. The setting of the appropriate limits for the City is not up to the plaintiffs or a court -- it is up to the duly elected representatives of citizens.

The plaintiffs make several arguments in opposition. First, they argue that strict scrutiny applies to this inquiry because the right to pursue any lawful calling is fundamental. As explained above, the government may regulate businesses without triggering strict scrutiny of its regulations.

Additionally, the plaintiffs argue that the challenged orders are not rationally related to the harm the orders seek to remedy because areas outside of the City have higher capacity restrictions on restaurants. This fact does not suggest that the plaintiffs are likely to succeed in meeting their burden at trial. Different cities, counties, and states across the country employ unique standards to battle the spread of COVID-19. No national standard exists. And, as is evident in the regulations that have controlled capacity limits within the City, those standards shift over time. As a result, courts must defer to the government's determination of measures necessary in a particular locale at a particular time **[*12]** to combat the virus so long as those measures are rationally related to that goal.

Finally, the plaintiffs argue that the challenged orders are not rationally related to preventing the spread of COVID-19 because the most significant source of the spread of COVID-19 is unregulated gatherings inside people's homes. Even if this is true, a government's efforts to combat the spread of disease are not confined by law to only those efforts that are aimed at the most significant source of infection. A government may pursue multiple paths to curb transmission of the virus. The plaintiffs have not demonstrated a likelihood of demonstrating that capacity limits in restaurants are unrelated to reducing transmission of COVID-19.

B. Procedural Due Process

The *Due Process Clause* requires that "No state shall . . . deprive any person of . . . property, without due process of law." *U.S. Const. amend. XIV*. See also *N.Y. Const. art. I, § 6*. But "official action that is legislative in nature is not subject to the notice and hearing requirements of the *due process clause*." *Grand River Enterprises Six Nations, Ltd. v. Pryor, 425 F.3d 158, 174 (2d Cir. 2005)* (citation omitted). Government action is legislative in nature when it has "general application and look[s] to the future." *Interport Pilots Agency, Inc. v. Sammis, 14 F.3d 133, 143 (2d Cir. 1994)*. "The test for determining whether official action is adjudicative or legislative focuses **[*13]** on the function performed by the decisionmaker, not on the method of selecting the decisionmaker or on the form in which the decision is announced." *RR Vill. Ass'n, Inc. v. Denver Sewer Corp., 826 F.2d 1197, 1204-05 (2d Cir. 1987)*.

The plaintiffs have not shown that they are likely to succeed in their procedural due process claims. The challenged orders are legislative in nature because they apply prospectively to all restaurants and fitness centers in the City. As a result, the orders are not subject to the notice and hearing requirements that apply to adjudicative functions of government.

The plaintiffs argue that the orders are not legislative because they come from the executive branch. This is not the test to determine whether an official action is legislative in nature. See *RR Vill, 826 F.2d at 1205* (policy decision by executive agency is legislative in nature).

C. Equal Protection

The *Equal Protection Clause of the Fourteenth Amendment* states that "no state shall deny to any person within its jurisdiction the equal protection of the laws." *U.S. Const. Amend. XIV*. The *Equal Protection*

*Clause* "embodies a general rule that States must treat like cases alike, but may treat unlike cases accordingly." *Winston v. City of Syracuse, 887 F.3d 553, 560 (2d Cir. 2018)* (quoting *Vacco v. Quill, 521 U.S. 793, 799, 117 S. Ct. 2293, 138 L. Ed. 2d 834 (1997))*. "If a law neither burdens a fundamental right nor targets a suspect class, [courts] will uphold the legislative classification so long as it bears a rational relation to some **[*14]** legitimate end." *Id*. (citation omitted). "The party attacking a classification's rationality bears the burden to [negate] every conceivable basis which might support it." *Spavone v. New York State Dep't of Corr. Servs., 719 F.3d 127, 136 (2d Cir. 2013)* (citation omitted).

The challenged orders do not burden a fundamental right or target a suspect class. The rationale basis test applies, and, as explained, the orders bear a rational relationship to the goal of preventing the spread of COVID-19. The plaintiffs' arguments that the government singled them out based on their geographic location and deemed them "non-essential" does not change the analysis under rational basis review.

D. The *Takings Clause*

The *Fifth Amendment's Takings Clause* provides that private property shall not "be taken for public use, without just compensation." *U.S. Const. Amend. V*. "The law recognizes two species of takings: physical takings and regulatory takings." *Buffalo Teachers Fed'n v. Tobe, 464 F.3d 362, 374 (2d Cir. 2006)*. "Physical takings . . . occur when the government physically takes possession of an interest in property for some public purpose." Id.

"A regulatory taking . . . occurs where even absent a direct physical appropriation, governmental regulation of private property goes too far and is tantamount to a direct appropriation or ouster." *1256 Hertel Ave. Assocs., LLC v. Calloway, 761 F.3d 252, 263 (2d Cir. 2014)* (citation omitted). There are also two types of regulatory takings: **[*15]** categorical and non-categorical. *Sherman v. Town of Chester, 752 F.3d 554, 564 (2d Cir. 2014)*. A categorical taking occurs when "a regulation . . . denies all economically beneficial or productive use of land." *Murr v. Wisconsin, 137 S. Ct. 1933, 1937, 198 L. Ed. 2d 497, (2017)* (citation omitted). A non-categorical taking may result from "[a]nything less than a complete elimination of value, or a total loss." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency, 535 U.S. 302, 330, 122 S. Ct. 1465, 152 L. Ed. 2d 517 (2002)*. In that case, "a taking may be found based on a complex of factors, including (1) the economic impact of the regulation on the claimant; (2)

the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Murr, 137 S. Ct. at 1937* (citation omitted). Plaintiffs attempting to establish a regulatory taking bear a "heavy burden." *Buffalo Tchrs. Fed'n, 464 F.3d at 375*.

The plaintiffs have not shown that their *Takings Clause* claims are likely to succeed. The government has not physically occupied the plaintiffs' establishments. Additionally, the plaintiffs cannot establish a categorical taking because they may still operate their businesses at a limited capacity and through the take-out and delivery of food and beverage.

Finally, while the challenged orders have undoubtedly interfered greatly with the plaintiffs' financial expectations and taken an enormous economic toll, the character of the government **[*16]** action weighs heavily against finding a taking. The restrictions are temporary, see *Buffalo Tchrs. Fed'n, 464 F.3d at 375* (temporary nature of wage freeze weighed against finding it a regulatory taking), are negative restrictions, and are not "affirmative exploitation by the state." Id. The "nature of the state's action is uncharacteristic of a regulatory taking." Id. Finally, the interference with the plaintiffs' property rights "adjusts the benefits and burdens of economic life to promote the common good." *Connolly v. Pension Ben. Guar. Corp., 475 U.S. 211, 225, 106 S. Ct. 1018, 89 L. Ed. 2d 166 (1986)*. Actions like those taken through these orders, which are undertaken to address a global pandemic, do not constitute a regulatory taking.

II. Irreparable Harm

"Irreparable harm is injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *New York v. United States Dep't of Homeland Sec., 969 F.3d 42, 86 (2d Cir. 2020)* (citation omitted). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009)* (citation omitted). Irreparable harm may be found "where there is a threatened imminent loss that will be very difficult to quantify at trial." *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 38 (2d Cir. 1995)*. Loss of consumer goodwill can constitute irreparable harm. Id. But, where "the alleged loss of goodwill **[*17]** [i]s doubtful" and lost profits are calculable "by past sales of [a] product and of current and expected future

market conditions," courts will generally not find irreparable harm. Id. (citation omitted).

The plaintiffs have not made the necessary strong showing of irreparable harm. To fill this gap, the plaintiffs argue that there exists a presumption of irreparable harm where the violation of a constitutional right is alleged. See *Jolly v. Coughlin, 76 F.3d 468, 482 (2d Cir. 1996)*. But this Opinion holds that the plaintiffs are unlikely to succeed on their claims of constitutional violations. It should be noted again that current capacity limits are temporary; they have even shifted during the briefing of this motion. The plaintiffs may continue to operate their businesses under the evolving limits.

III. Balance of the Equities and Public Interest

"Where, as here, the government is a party to the suit, the final two factors [of the preliminary injunction standard] merge." *New York, 969 F.3d at 58-59*. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury[,]" particularly where there would be "an ongoing and concrete harm to . . . public safety interests." *Maryland v. King, 567 U.S. 1301, 1303, 133 S. Ct. 1, 183 L. Ed. 2d 667 (2012)* (citation **[*18]** omitted).

The balance of the equities and the public interest weigh heavily in the defendants' favor. The citizens of the City of New York face an unprecedented and ongoing threat to public safety. Granting this injunction would give the plaintiffs all the relief they seek at great risk to public health.

## Conclusion

The plaintiffs' February 5, 2021 motion for a preliminary injunction is denied.

Dated: New York, New York

March 9, 2021

/s/ Denise Cote

DENISE COTE

United States District Jduge

 Caution
As of: March 29, 2023 5:10 PM Z

## *Oakland Tactical Supply, LLC v. Howell Twp.*

United States District Court for the Eastern District of Michigan, Southern Division

February 17, 2023, Decided; February 17, 2023, Filed

Civil Action No. 18-cv-13443

**Reporter**
2023 U.S. Dist. LEXIS 27686 *; 2023 WL 2074298

OAKLAND TACTICAL SUPPLY, LLC, et al., Plaintiffs, vs. HOWELL TOWNSHIP, Defendant.

**Subsequent History:** Appeal filed, 03/01/2023

**Prior History:** *Oakland Tactical Supply LLC v. Howell Twp., 2020 U.S. Dist. LEXIS 165452, 2020 WL 5440048 ( E.D. Mich., Sept. 10, 2020)*

## Core Terms

Township, training, plain text, regulations, firearms, urge, shooting range, arms, outdoor, proposed course, self-defense, Zoning, individual rights, Ordinance's, construct, briefing

**Counsel:** [*1] For Oakland Tactical Supply, LLC, Jason Raines, Matthew Remenar, Scott Fresh, Plaintiffs: Martha A. Dean, Law Office of Martha A. Dean, LLC, Avon, CT; Roger L. Myers, Matthew M. Hagerty, Myers & Myers, PLLC, Howell, MI.

For Ronald Penrod, Edward Dimitroff, Plaintiffs: Martha A. Dean, Law Office of Martha A. Dean, LLC, Avon, CT; Roger L. Myers, Myers & Myers, PLLC, Howell, MI.

For Howell Township, Defendant: Christopher S. Patterson, Fahey Schultz Burzych Rhodes PLC, Okemos, MI; John S. Brennan, Fahey Schultz Burzych Rhodes PLCV, Okemos, MI; Thomas R. Meagher, Foster, Swift, Lansing, MI; William K. Fahey, Fahey Schultz Burzych Rhodes PLC, Okemos, MI.

For Michigan Municipal League, Amicus: Matthew J. Zalewski, Thomas R. Schultz, Rosati Schultz Joppich & Amtsbuechler, PC, Farmington Hills, MI.

**Judges:** Hon. Bernard A. Friedman, Senior United States District Judge.

**Opinion by:** Bernard A. Friedman

## Opinion

**OPINION AND ORDER ADDRESSING SUPPLEMENTAL BRIEFING AND GRANTING DEFENDANT'S MOTION TO DISMISS**

This matter is presently before the Court on remand following the Court of Appeals' August 5, 2022, opinion and judgment. (ECF No. 94). Consistent with the Court of Appeals' decision, on August 31, 2022, this Court ordered the parties **[*2]** to submit additional briefing regarding the plausibility of plaintiffs' claims in light of the Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022)*.[1] For the reasons stated below, the Court reaffirms its decision to grant the Township's motion to dismiss.

I. Background

This case involves a zoning dispute that, plaintiffs claim, implicates their *Second Amendment* rights. On September 10, 2020, the Court granted defendant Howell Township's motion to dismiss. (ECF No. 84). On February 9, 2021, the Court denied a motion for reconsideration filed by plaintiffs Oakland Tactical Supply, LLC, Jason Raines, Matthew Remenar, Scott Fresh, Ronald Penrod, and Edward Dimitroff. (ECF No. 91). Plaintiffs appealed, and on August 5, 2022, the Court of Appeals entered an opinion vacating and remanding "to allow [this Court] to consider the plausibility of Oakland Tactical's *Second Amendment* claim in light of the Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022)*." (ECF No. 94,

---

[1] Pursuant to *E.D. Mich. LR 7.1(f)(2)*, the Court shall decide this without a hearing.

PageID.2197). Accordingly, on August 31, 2022, this Court ordered Howell Township to submit, within 30 days,

> supplemental briefing in support of its motion to dismiss on (1) whether Oakland Tactical's proposed course of conduct is covered by the plain text of the *Second Amendment*; and (2) whether historical evidence--to **[\*3]** be produced by the Township in the first instance--demonstrates that the Howell Township Zoning Ordinance's shooting regulations are consistent with the nation's historical tradition of firearm regulation.

(ECF No. 96, PageID.2206) (cleaned up). Plaintiffs were ordered to submit a response brief within 14 days thereafter. (*Id.*).

On September 30, 2022, Howell Township filed its supplemental brief supporting entry of judgment for the township post-*Bruen*. (ECF No. 97). The Township's supplemental brief urges that Oakland Tactical's proposed course of conduct is not covered by the *Second Amendment*, but the brief does not address the second question posed by ECF No. 96, instead urging that the "Township need not yet provide analogous historical regulations to uphold the Township Zoning Ordinance, since there is no duty under *Bruen* to provide such evidence absent a right within the plain text of the *Second Amendment*." (*Id.*, PageID.2229). In their responsive supplemental brief, plaintiffs urge that the conduct at issue is covered by the plain text of the *Second Amendment*. (ECF No. 104, PageID.2468). Plaintiffs urge that the Township should not be given another opportunity to brief history in support of its motion, but urge that in any event **[\*4]** the Township could not "have found any other historical tradition of analogous regulation because no such tradition existed." (*Id.*, PageID.2481).

On November 22, 2022, this Court granted the Michigan Municipal League Legal Defense Fund and the Michigan Townships Association leave to file an amicus curiae brief. (ECF No. 109). The amicus curiae brief argues that the plain text of the *Second Amendment* does not cover the proposed conduct and further urges that if the Court reaches the second step of the *Bruen* test, there are several analogous regulations. (ECF No. 99-1, PageID.2290). Plaintiffs filed an initial objection to the proposed amicus brief, (ECF No. 106), and this Court provided plaintiffs an additional opportunity to more fully respond, (ECF No. 109). Plaintiffs did so, (ECF No. 112), and on December 12, 2022, this Court denied the Township's motion to reply to plaintiffs' response or file additional briefing, (ECF No. 114).

II. Analysis

Again, the questions now pending before the Court are:

> (1) whether Oakland Tactical's proposed course of conduct is covered by the plain text of the *Second Amendment*; and (2) whether historical evidence . . . demonstrates that the Howell Township Zoning Ordinance's shooting regulations **[\*5]** are consistent with the nation's historical tradition of firearm regulation.

(ECF No. 96, PageID.2206) (cleaned up).[2]

As a threshold matter, the Court must determine the nature and scope of the "proposed conduct." The Township urges that it is "operat[ion of] an outdoor, 1,000-yard shooting range on its property in the Agricultural-Residential District . . . of the Township." (ECF No. 97, PageID.2209) (cleaned up). Plaintiffs define it much more broadly as "training with firearms." (ECF No. 104, PageID.2468). On appeal, the Sixth Circuit acknowledged that plaintiffs' identification of the proposed course of conduct has shifted over time.

> We note that, although Oakland Tactical has alleged that the *Second Amendment* protects the right to train on "outdoor ranges appropriate for . . . common firearms," "shotgun and handgun ranges," and, more generally, "a shooting range," it most recently framed its proposed course of conduct as the right to train on "outdoor, long-distance shooting ranges."

(ECF No. 94, PageID.2200 n.3) (cleaned up).

---

[2] The Township urges that Zoning Ordinance Amendment 285 (adopted after this Court's Order granting the motion to dismiss) and further amendments to the Ordinance (proposed in September 2022) would not have any impact on the Court's prior opinion nor the claims now pending. (ECF No. 97, PageID.2212-14). Plaintiffs similarly urge that "even with the Township's recent changes to its zoning ordinance the zoning ordinance continues to violate their *Second Amendment* rights and that they continue to sustain damages." (ECF No. 104, PageID.2470 n.2). Because both parties appear to agree that the recent updates to the Zoning Ordinance should not impact this case on remand, the Court declines to analyze the existing and proposed amendments to the ordinance. Similarly, the Court declines plaintiffs' request to convert the present motion to dismiss under *Federal Rule of Civil Procedure 12(c)* into a motion for summary judgment under Rule 56. (*Id.*, PageID.2468).

In reviewing this matter the first time, this Court looked to the Second Amended Complaint and noted that Oakland Tactical

> alleges that it desires to construct "one or more **[*6]** outdoor shooting ranges to provide a safe location for residents in the area to practice target shooting for self-defense and other lawful purposes, including but not limited to a long distance (e.g. 1,000 yard) range for qualified shooters and public access rifle, shotgun and handgun ranges" on property it leases in Howell Township, Michigan.

(ECF No. 84, PageID.2084) (quoting ECF No. 44, PageID.1085-86, ¶ 6). "The five individual plaintiffs are gun owners who would use Oakland Tactical's proposed facility if it were to be constructed." (ECF No. 84, PageID.2084).

Collectively, the Court believes that the proposed conduct is best summarized as construction and use of "an outdoor, open-air, 1,000-[yard] shooting range." (*Id.*, PageID.2089). Having made this threshold determination, the Court next turns to the first question presented in its Order requiring supplemental briefing: whether the proposed course of conduct is covered by the plain text of the *Second Amendment*. (ECF No. 96, PageID.2206).

The Township urges that the textual elements of the *Second Amendment's* operative clause guarantee the individual right to possess and carry weapons in case of confrontation. (ECF No. 97, PageID.2216). And because "one cannot 'bear,' **[*7]** or carry an outdoor, 1,000-yard shooting range," the plain text does not include a right to construct such a range anywhere one chooses. (*Id.*, PageID.2219). The Township also urges that the history of the adoption of the *Second Amendment* shows that being "trained" was considered distinct from "keeping and bearing arms." (*Id.*, PageID.2220). More broadly, the Township argues that other Circuits have recognized ancillary rights under the *Second Amendment*, including a right to range training, but only to the extent such ancillary rights support the exercise of the core right of self-defense. (*Id.*, PageID.2223). The Township further differentiates these cases by noting that they were evaluating a functional ban of an individual right and "relied upon an analysis of the *Second Amendment* that was not consistent with the plain text as mandated post-*Bruen*." (*Id.*, PageID.2224-27).

Plaintiffs urge that "[t]he plain text of the *Second Amendment* covers training with firearms." (ECF No. 104, PageID.2474). Citing *Ezell v. City of Chicago, 651 F.3d 684, 704 (7th Cir. 2011)*, plaintiffs argue that because the *Second Amendment* encompasses an individual right to use firearms for lawful purposes, citizens must have the corresponding right to train with firearms because the right to use them "wouldn't mean much without the training and practice **[*8]** that makes it effective." (ECF No. 104, PageID.2474-75).[3] They also point to the prefatory clause of the Amendment, which, they say, promotes the existence of a "well regulated Militia." (*Id.*, PageID.2475). Noting that in *District of Columbia v. Heller, 554 U.S. 570, 597, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008)*, the Supreme Court held that a "well regulated Militia" meant "the body of the people, trained to arms," plaintiffs argue that a right cannot promote a people trained to arms without protecting training with arms. (*Id.*). Plaintiffs then cite to multiple cases in which, they assert, courts have recognized a right to train with arms. (*Id.*, PageID.2475-76). Plaintiffs urge that the founders rejected the addition of "training" language in the *Second Amendment* and other early documents because it would have been redundant, as training was already protected. (*Id.*, PageID.2476-78). Finally, plaintiffs assert that because under *Heller* and *Bruen* the *Second Amendment* protects the possession and use of weapons that are in common use, it follows that the *Second Amendment* protects training with *all* arms in common use, including rifles with an effective range extending to 1,000 yards. (*Id.*, PageID.2479).

Plaintiffs' mischaracterization of the scope of the proposed conduct undermines the majority of their argument. The proposed **[*9]** conduct could not be simply "training with firearms" because the zoning ordinance does not prohibit "training with firearms."[4] Rather, their proposed conduct is the construction and use of an outdoor, open-air 1,000-yard shooting range.

---

[3] This Court has already addressed the relevance of *Ezell*. (ECF No. 84, PageID.2089).

[4] Moreover, plaintiffs' position that the "proposed conduct" is "training with firearms" would lead to an absurd result. In any future case, any proposed conduct touching on any type of firearms training would be presumptively protected by the plain text of the *Second Amendment*. In order to regulate, *e.g.*, the location or restriction of such training if challenged in court, a municipality would be required to reach the second step of the *Bruen* analysis and demonstrate that the regulation is consistent with the nation's historical tradition of firearms regulation. *Bruen* changed the landscape of *Second Amendment* jurisprudence, but it did not change it that far.

And *that* conduct is clearly not covered by the plain text of the *Second Amendment*.

The *Second Amendment* reads in its entirety: "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." *U.S. Const. amend. II*. In *Heller*, the Supreme Court clarified that the operative clause "guarantee[s] the individual right to possess and carry weapons in case of confrontation" and that self-defense is the "central component" of the right. *554 U.S. at 592, 599* (emphasis omitted). *Bruen* reiterated that the *Second Amendment* "protect[s] the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense" as well as "to carry a handgun for self-defense outside the home." *142 S. Ct. at 2122*. And in applying the new standard, *Bruen* demonstrated how courts are to consider the "plain text."

> As we explained in *Heller*, the "textual elements" of the *Second Amendment's* operative clause—"the right of the people to keep and bear Arms, shall not be infringed"—"guarantee the individual right **[*10]** to possess and carry weapons in case of confrontation." *Heller* further confirmed that the right to "bear arms" refers to the right to "wear, bear, or carry ... upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person."

*Id. at 2134* (citations omitted).

So after *Bruen*, Courts must look to whether "the *Second Amendment's* *plain text* covers an individual's conduct." *Id. at 2129-30* (emphasis added). Even assuming that the *Second Amendment* offers ancillary or corollary protection for some forms of training, there is no way to read into the Amendment's "plain text" a right to use and construct a 1,000-yard shooting range. *Cf. Ezell, 651 F.3d at 708* (describing "the right to maintain proficiency in firearm use" as only "an important *corollary* to the meaningful exercise of the *core right* to possess firearms for self-defense") (emphasis added).

Here, the plain text of the Amendment says nothing about long-range firing or even, for that matter, training more broadly. And as this Court has already said:

> None of the cases plaintiffs cite, and none of which the Court is aware, suggest that a municipality must

permit a property owner (or a property lessee) to construct, and **[*11]** for interested gun owners to use, an outdoor, open-air, 1,000-foot shooting range, such as plaintiffs propose. Nor have plaintiffs cited a single case that suggests Howell Township must change its zoning ordinance to permit the construction and use of such a facility as a matter of right anywhere within the AR district, which in this case comprises fully two-thirds of the township's land. *The claimed right simply is not encompassed by the Second Amendment*.

(ECF No. 84, PageID.2089) (emphasis added).

Thus, the Court finds that the proposed course of conduct, construction and use of an outdoor, open-air 1,000-yard shooting range, is not covered by the plain text of the *Second Amendment*. The Court agrees with the Township that because this first question is answered in the negative, the Court need not reach the second (*i.e.* whether historical evidence demonstrates that the regulations are consistent with the nation's historical tradition of firearms regulation). *Bruen, 142 S. Ct. at 2129-30*; (ECF No. 94, PageID.2200-01). Accordingly,

IT IS ORDERED that the Township's motion to dismiss is again GRANTED.

**SO ORDERED**.

/s/ Bernard A. Friedman

Hon. Bernard A. Friedman

Senior United States District Judge

Dated: February 17, 2023

Detroit, Michigan

---

**End of Document**



Positive
As of: March 29, 2023 5:11 PM Z

# *United States v. Nevens*

United States District Court for the Central District of California

August 15, 2022, Decided; August 15, 2022, Filed

CR 19-774-DMG

**Reporter**
2022 U.S. Dist. LEXIS 222892 *; 2022 WL 17492196

UNITED STATES OF AMERICA, Plaintiff, v. Vertis Alvin Nevens, Defendant.

**Subsequent History:** Motion granted by, in part, Motion denied by, in part, Motion granted by, Motion denied by *United States v. Nevens, 2022 U.S. Dist. LEXIS 222773 (C.D. Cal., Aug. 17, 2022)*

## Core Terms

felons, firearm, arms, possession of a firearm, law-abiding, regulation, argues

**Counsel:  [*1]** For Vertis Alvin Nevens, Defendant: Deborah Elise Gonzalez, LEAD ATTORNEY, Seema Ahmad, Federal Public Defenders Office, Los Angeles, CA USA; Waseem Salahi, Office of the Federal Public Defender, Los Angeles, CA USA.

U.S. Attorneys: Alexander Su, Angela C. Makabali, Elia Herrera, Juan M. Rodriguez, Kevin B. Reidy, Samuel Jose Diaz, Office of US Attorney General Crimes Section, Los Angeles, CA USA; David Ransom Friedman, Office of US Attorney Ciminal Appeals Section, Los Angeles, CA USA; Elizabeth Suilin Pamela Douglas, Office of US Attorney, Los Angeles, CA USA.

**Judges:** DOLLY M. GEE, UNITED STATES DISTRICT JUDGE.

**Opinion by:** DOLLY M. GEE

## Opinion

**CRIMINAL MINUTES—GENERAL**

**Proceedings: [IN CHAMBERS] ORDER DENYING MOTION TO DISMISS [111]**

This matter is before the Court on Defendant Vertis Nevens' motion to dismiss counts two and three of the first superseding indictment ("FSI") as violating the *Second Amendment*.[1] Motion to Dismiss ("MTD") [Doc. # 111.] Defendant argues that following *New York State Rifle & Pistol Association, Inc. v. Bruen,    U.S.   , 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022)*, the charges against him of carrying a firearm in furtherance of a drug trafficking crime and being a felon in possession of a firearm run afoul of the *Second Amendment*. But Defendant overlooks that *Bruen* deals with restrictions on *law-abiding* citizens' right to bear arms—a **[*2]** circumstance not present here—and this Court's obligation to apply binding Ninth Circuit precedent upholding the criminal laws at issue against *Second Amendment* challenges consistently with Supreme Court authority. *See Fed'l Trade Comm'n v. Consumer Def., LLC., 926 F.3d 1208, 1213 (9th Cir. 2019)*. The Court **DENIES** the motion to dismiss.

## I. BACKGROUND

Defendant faces charges of possession with intent to distribute cocaine base (*21 U.S.C. § 841(a)(1)*), carrying a firearm during and in furtherance of a drug trafficking crime (*18 U.S.C. § 924(c)(1)(A)(i)*), and being a felon in possession of a firearm and ammunition (*18 U.S.C. § 922(g)*). FSI [Doc. # 37]. Defendant has multiple prior felony convictions and was arrested after a traffic stop revealed cocaine base, indicia of drug trafficking, and a semiautomatic pistol in his vehicle. *See* FSI.

On June 23, 2022, the Supreme Court decided *Bruen*, holding the *Second Amendment* protects the right to carry a handgun outside the home and New York's requirement that an individual show "proper cause" to

---

[1] The Government argues that the motion is untimely, but the Court exercises its discretion to reach the merits of Defendant's arguments.

obtain a concealed carry license violated the *Second Amendment*. *142 S. Ct. 2111, 213 L. Ed. 2d 387*. The Court declined to adopt circuit courts' two-step framework for analyzing *Second Amendment* challenges in this context.[2] *Id. at 2126*. Instead, the Court held that "when the *Second Amendment's* plain text covers an individual's conduct, the Constitution presumptively protects that conduct" and the Government must "demonstrate **[*3]** that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*

This motion followed.

## II. DEFENDANT'S MOTION TO DISMISS

Defendant argues that here, the plain text of the *Second Amendment* covers his conduct of carrying a firearm in his vehicle, outside his home, and that the Government cannot show that the statutes he is accused of violating are consistent with the United States' historical tradition of firearm regulation. MTD at 10.[3]

The *Bruen* Court dealt with the constitutionality of a law restricting the ability of "ordinary, law-abiding citizens" to carry handguns publicly for self-defense. *142 S. Ct. at 2122*. *Bruen* repeatedly confines its holding to the context of regulations that "burden a *law-abiding* citizen's right to armed self-defense." *E.g.*, *142 S. Ct. at 2133* (emphasis added). And the *Bruen* petitioners and respondents conceded that the right at issue was that of "ordinary, law-abiding citizens," contesting whether the contours of the right included carrying handguns publicly or merely at home. *Id. at 2122*; *see also id. at 2138 n.9* (explaining that nothing in the Court's analysis was meant to call into question licensing schemes that did not require a showing of an atypical need for armed self-defense because **[*4]** such schemes "are designed to ensure only that those bearing arms are, in fact, '*law abiding, responsible citizens*.'" (Emphasis added and internal citation removed)).

_____

[2] This test, which the *Bruen* opinion characterized as a "combin[ing] history with means-end scrutiny" looked to whether (1) the activity regulated fell outside the scope of the *Second Amendment* as originally understood and, if not, (2) whether the regulation passed either intermediate or strict scrutiny, depending on whether the regulation impacted the "core" of the *Second Amendment* and the severity of that impact. See *Bruen, 142 S. Ct. at 2126*.

[3] Citations are to the CM/ECF pagination.

Similarly, the Supreme Court's earlier decision in *District of Columbia v. Heller* described the core of the *Second Amendment* as the right of "*law-abiding*, responsible citizens to use arms. . . ." *554 U.S. 570, 635, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008)* (emphasis added). *Heller* explicitly cautioned that the Court was not casting doubt "on the longstanding prohibitions on the possession of firearms by felons and the mentally ill. . . ." *554 U.S. at 626-27*, *cited with approval in Bruen, 142 S. Ct. 2162* (J. Kavanaugh, concurring). Defendant argues that this language is *dictum* ([Doc. # 119 at 5]), but even so, *dicta* from the Supreme Court is "not something to be lightly cast aside." *Peterson v. BMI Refractories, 124 F.3d 1386, 1392 n.4 (11th Cir. 1997)*. Courts, including the Ninth Circuit, have relied on this language in *Heller* as affirming the constitutionality of prohibitions on firearm ownership by felons and have rejected challenges similar to Defendant's. *See, e.g., United States v. Massey, 849 F.3d 262, 265 (5th Cir. 2017)*; *United States v. Vongxay, 594 F.3d 1111, 1115 (9th Cir. 2010)*. The Court will not part ways with this authority.

Defendant is not a law-abiding citizen, and regulations governing *non-law abiding citizens'* use of firearms do not implicate *Bruen* and *Heller*. *Accord People v. Rodriguez, No. 71550/2022, 76 Misc. 3d 494, 171 N.Y.S.3d 802, 2022 WL 2797784, at *3 (N.Y. Sup. Ct. July 15, 2022)* ("Defendant misreads *Bruen* as eviscerating the police powers **[*5]** of the State to address criminality, or as applying to anyone other than law-abiding citizens."); *Pervez v. Becerra, CV 2:18-02793 KJM (KJN), 2022 U.S. Dist. LEXIS 113594, 2022 WL 2306962, at *2 n.2 (E.D. Cal. June 27, 2022)* (finding that *Bruen* did not affect a California law forbidding people who had been certified to be dangerous or gravely disabled as a result of a mental health disorder from possessing firearms for a five-year period). *Sections 922(g)(1)* and *924(c)(1)(A)(i)* both expressly refer to persons who have previously been convicted of a felony or who commit drug offenses in conjunction with their firearm possession. *Section 924(c)(1)(A)(i)* requires that a person be using or possessing a firearm during a "crime" and thus cannot include conviction of a "law abiding" citizen. By definition, these statutes cannot apply to a "law-abiding" citizen.

Thus read, *Bruen* does not overrule established Ninth Circuit case law upholding the statutes at issue. *See Vongxay, 594 F.3d at 1114* (upholding *§ 922(g)(1)*); *United States v. Potter, 630 F.3d 1260, 1261 (9th Cir. 2011)* (upholding *§ 924(c)(1)*). To adopt Defendant's

arguments would conflict with this Court's obligation to construe Ninth Circuit opinions in a manner consistent with Supreme Court precedent. *See* *Fed'l Trade Comm'n, 926 F.3d at 1213*.

Defendant argues that the plain text of the *Second Amendment* does not draw a "felon/non-felon distinction" and extends to "all people." [Doc. # 119 at 4 (citing *Heller, 554 U.S. at 580*).] But Defendant's argument overlooks that even after defining the **[*6]** *Second Amendment's* text as presumptively extending to "all Americans" because it extend to "the people," *Heller* drilled down, finding that the *Second Amendment* in fact protected a significantly smaller subset of people: "law-abiding, responsible citizens." *554 U.S. at 635*. Defendant cannot point to any Supreme Court authority holding that the *Second Amendment* protects felons' right to use firearms in the course of criminal activity.

Moreover, circuit courts have repeatedly engaged in historical analyses to reject challenges to statutes penalizing the use of a firearm in the course of a crime or the possession of a firearm by a felon.[4] *See, e.g., United States v. Greeno, 679 F.3d 510, 519-20 (6th Cir. 2012)* (tracing the history of laws separately penalizing or increasing the severity of punishment for crimes committed by individuals using weapons during the commission of the crime), *as overruled by Bruen, 142 S. Ct. 2111*; *United States v. Yancey, 621 F.3d 681, 684-85 (7th Cir. 2010)* ("[M]ost scholars of the *Second Amendment* agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" (Internal citation omitted)); *United States v. Emerson, 270 F.3d 203, 226 n.21 (5th Cir. 2001)* (discussing historical authority as early as the 18th century excluding felons from possessing firearms); *see also United States v. Daniels, ___ F. Supp. 3d ___, 2022 U.S. Dist. LEXIS 120556, 2022 WL 2654232, at *4 (S.D. Miss. 2022)* (applying *Bruen*, surveying pre-*Bruen* analysis of *§ 922(g)*, and ruling that *section 922(g)(3)* passes constitutional **[*7]** muster because there was a history of disarming persons considered a risk to

society, "whether felons or alcoholics"). Indeed, *Heller* itself noted that prohibitions on felons possessing firearms are "longstanding." *554 U.S. at 626*.

Defendant argues that there is no historical practice of barring *non-violent* felons from possessing firearms. [Doc. # 119 at 5.] But *Heller* did not draw a distinction between violent and non-violent felons. Defendant does not address the case law noted above, and the Court does not agree with Defendant's characterization of historical tradition in this regard. *See, e.g., Don B. Kates, Jr., Handgun Prohibition and the Original Meaning of the Second Amendment, 82 Mich. L. Rev. 204, 266 (1983)* ("Felons simply did not fall within the benefits of the common law right to possess arms. That law punished felons with automatic forfeiture of all goods, usually accompanied by death. We may presume that persons confined in gaols awaiting trial on criminal charges were also debarred from the possession of arms. Nor does it seem that the Founders considered felons within the common law right to arms or intended to confer any such right upon them. All the ratifying convention proposals which most explicitly detailed the recommended right-to-arms amendment excluded criminals **[*8]** and the violent."); *Saul Cornell & Nathan DeDino, A Well Regulated Right: The Early American Origins of Gun Control, 73 Fordham L. Rev. 487, 501 (2004)* (discussing the history of the right to keep and bear arms and explaining that, in the Founding Era, "justices of the peace, sheriffs, and constables were empowered to disarm individuals who ride about armed in terror of the peace").[5] In short, the Court also finds that historical practice allows statutes prohibiting felons from possessing firearms and criminalizing the use of a firearm in furtherance of drug trafficking.

## III. CONCLUSION

---

[4] Although *Bruen* criticized the circuit courts' use of "means-end scrutiny," *Bruen* nevertheless approved of the historical analyses that these courts used. *See Bruen, 142 S. Ct. at 2127* ("Step one of the predominant framework [used by the circuit courts before *Bruen*] is broadly consistent with *Heller*, which demands a test rooted in the *Second Amendment's* text, as informed by history."). Thus, *Bruen* does not call the cited analyses of historical practice into question.

---

[5] Indeed, Defendant acknowledges various jurisdictions' historical laws enhancing sentences for using a firearm. [*See* Doc. # 119 at 13 n.5.] He argues that these laws are distinguishable because they required proof that the firearm was brandished with a violent intention. But this is not necessarily the case. *See, e.g., Greeno, 679 F.3d at 519-20* (citing statutes). In any event, in this case, the inference that a reasonable jury can draw from the Government's evidence is that Defendant brought the weapon with him in furtherance of drug dealing, with the intent to use it to protect himself and his contraband, even though he knew that he was a prohibited person who could not possess a firearm.

2022 U.S. Dist. LEXIS 222892, *8

The motion to dismiss counts two and three of the FSI is respectfully **DENIED**.

**IT IS SO ORDERED**.

---

**End of Document**

ℹ Cited
As of: March 29, 2023 5:11 PM Z

# *United States v. Posey*

United States District Court for the Northern District of Indiana, Hammond Division

February 9, 2023, Decided; February 9, 2023, Filed

Case No. 2:22-CR-83 JD

**Reporter**
2023 U.S. Dist. LEXIS 22005 *; 2023 WL 1869095

UNITED STATES OF AMERICA v. VANESSA POSEY

## Core Terms

regulation, pardon, firearms, possession of a firearm, user, controlled substance, argues, marijuana, courts, drug user, intoxicated, habitual, felons, mentally ill, second prong, reasons, armed, facial challenge, as-applied, challenges, indictment, decisions, disarming, gun, restrictions, law-abiding, addicted, rights, uphold

**Counsel:** [*1] For Vanessa Posey, Defendant: Roxanne Mendez Johnson - FCD, LEAD ATTORNEY, Chad Pennington - FCD, Federal Community Defenders Inc - Ham/IN, Northern District of Indiana, Hammond, IN.

For United States of America, Plaintiff: Caitlin M Padula, LEAD ATTORNEY, US Attorney's Office - Ham/IN, Hammond, IN.

**Judges:** JON E. DEGUILIO, Chief United States District Judge.

**Opinion by:** JON E. DEGUILIO

## Opinion

### OPINION AND ORDER

The Defendant, Vanessa Posey, has moved for count three of the indictment against her to be dismissed (DE 17). Defendant argues this count should be dismissed as the statute underlying the charge, *18 U.S.C. § 922(g)(3)*, is unconstitutional in light of the Supreme Court's recent decision in *New York State Rifle & Pistol Association v. Bruen, 142 S.Ct. 2111, 213 L. Ed. 2d 387 (2022)*. Further, Defendant argues this statute is unconstitutional as applied to her in light of a pardon

issued by President Biden on October 6, 2022. For the following reasons, this motion will be denied.

### A. Factual Background

A federal grand jury returned a four-count indictment against Defendant in August 2022, charging her with a series of drug offenses and a firearm related offense. The count relevant to this motion is count three, the firearm offense, which charges Defendant with being an unlawful controlled substance user in possession of a firearm [*2] in violation of *18 U.S.C. § 922(g)(3)* on or about February 10, 2022 (DE 1 at 3). The alleged facts underlying this charge are that Defendant possessed multiple firearms while also being a user of marijuana, which is a Schedule I controlled substance. (DE 1 at 3; DE 17 at 2.)

For the limited purpose of adjudicating this motion, the Court assumes these alleged facts to be true. The Court will reiterate that Defendant remains presumed innocent of the charges against her, and the Court takes no position on the question of her guilt, or the veracity of any factual allegation presented by the Government.[1]

### B. Legal Standards

A defendant can move before trial to dismiss an indictment for failure to state an offense. *Fed. R. Crim. P. 12(b)(3)(B)*. A defendant can make such a motion on the basis that the charged offense is based on an unconstitutional statute. *United States v. Holden, 2022 U.S. Dist. LEXIS 212835, 2022 WL 17103509, *2 (N.D.*

---

[1] The Government's response proffered additional, more specific, facts about the underlying conduct for the charge. In her reply, Defendant strenuously objected to the Court considering these facts. This objection is moot as none of the additional proffered facts are necessary to adjudicate this motion.

*Ind. Oct. 31, 2022)* (internal citations omitted).

A constitutional challenge to a statute can be brought either as a facial challenge, or as an as-applied challenge. Defendant brings both types of challenges against *§ 922(g)(3)* in her motion. To succeed on a facial challenge to the constitutionality of a statute, the moving party must show that the statute is unconstitutional in all applications. *City of L.A. v. Patel, 576 U.S. 409, 415, 418, 135 S. Ct. 2443, 192 L. Ed. 2d 435 (2015).* To succeed on an as-applied **[*3]** challenge, the moving party must show it is unconstitutional because the way it was applied to the particular facts of their case. *See United States v. Phillips, 645 F.3d 859, 863 (7th Cir. 2011).*

**C. Discussion**

Defendant's motion challenges the constitutionality of *18 U.S.C. § 922(g)(3)*. This statute provides that "[i]t shall be unlawful for any person ... who is an unlawful user of or addicted to any controlled substance ... [to] possess in or affecting commerce, any firearm or ammunition." *18 U.S.C. § 922(g)(3)*. Defendant argues that "as applied to [her], *§ 922(g)(3)* is not a welldefined firearm restriction" because the government is attempting to criminalize her firearm possession based on her status as an unlawful user of marijuana, when marijuana use during the relevant period was no longer unlawful by effect of a presidential pardon. (DE 17 at 12-13.) Defendant's facial challenge is that *§ 922(g)(3)* violates the *Second Amendment*. The Court will address each argument in turn.

**(1)** *The Bruen standard for applying the Second Amendment*

Defendant argues that this case must be dismissed because *18 U.S.C. § 922(g)(3)* is unconstitutional under the *Second Amendment to the United States Constitution*. Therefore, the Court must analyze and apply the *Second Amendment* jurisprudence articulated by the Supreme Court.

The text of the *Second Amendment* states: "A well regulated Militia, being necessary to the security of a free State, the right of the people **[*4]** to keep and bear Arms, shall not be infringed." *U.S. Const. amend. II*. In *District of Columbia v. Heller*, the Supreme Court concluded that the *Second Amendment* confers "an individual right to keep and bear arms." *554 U.S. 570, 595, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008)*. In reaching this conclusion, the Court recognized that "[l]ike most rights, the right secured by the *Second Amendment* is not unlimited." *Id. at 626*. Relevant to this case, the Court also warned that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* In a footnote, the Court went on to classify these traditional restrictions on firearm possession as a non-exhaustive list of "presumptively lawful regulatory measures." *Id. at 627 n. 26*.

In *Bruen*, the Supreme Court built upon its prior holdings to further define the scope of the *Second Amendment* right. The Court described its earlier *Second Amendment* decisions as "recogniz[ing] ... the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense." *142 S.Ct. at 2122.* (citing *Heller, 554 U.S. 570*; *McDonald v. City of Chicago, 561 U.S. 742, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010)*). The *Bruen* Court went on to lay out the methodology lower courts should utilize in reviewing *Second Amendment* challenges.

Prior to *Bruen*, the various circuit courts had largely converged on a two-step framework for analyzing *Second Amendment* challenges. *Id. at 2126*. At the first step, the government could justify **[*5]** its regulation by establishing that the challenged law regulates activity falling outside the scope of the *Second Amendment* right as originally understood. *Id.* At the second step, the courts analyzed how close the law comes to the core of the *Second Amendment* right and the severity of the law's burden on that right. *Id.*

In *Bruen* the Court stated that this test was "one step too many." *Id. at 2127*. The Court held that the first step of this framework was broadly consistent with *Heller*, but the "means-end scrutiny" of step two was inconsistent with the *Second Amendment* and the appropriate methodology centers on the "constitutional text and history." *Id. at 2127-29*. The Court articulated that the proper standard is as follows:

> "In keeping with *Heller*, we hold that when the *Second Amendment's* plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the *Second Amendment's* 'unqualified command.'" *Id.*

at 2129-2130 (quoting Konigsberg v. State Bar of Cal., 366 U.S. 36, 50, 81 S. Ct. 997, 6 L. Ed. 2d 105, n.10 (1961)).

Phrased another way, this test is composed of two prongs. The first prong is determining whether the plaint text of the Second Amendment covers the [*6] conduct at issue. Id. at 2129, 2134-35. The second prong is determining whether the Government has established the regulation is consistent with the historical tradition of firearms regulation in the United States. Id. at 2129-30.

The Supreme Court stated that the second prong would require the use of "historical analogies" and reasoning by analogy as is commonly done by lawyers and judges. Id. at 2132. Consequently, in comparing a historical firearm regulation and a modern one, the key determination to be made is whether the two are "relevantly similar." Id.[2] The Bruen Court did not provide an exhaustive survey of the features that could render regulations relevantly similar but found that Heller and McDonald outlined at least two: "how and why the regulations burden a law-abiding citizen's right to armed self-defense" Id. at 2132-33.[3] Phrased differently, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are

---

[2] Bruen also stated that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." 142 S. Ct. at 2131 (emphasis added). Some courts have read this language as creating a more stringent standard of review for gun regulations aimed at societal ills dating to the Founding era, and Defendant implicitly urges this Court to do the same. See e.g. United States v. Holden, 2022 U.S. Dist. LEXIS 212835, 2022 WL 17103509, *3 (N.D. Ind. Oct. 31, 2022); United States v. Lewis, 2023 U.S. Dist. LEXIS 6541, 2023 WL 187582, *4-*5 (W.D. Okla. Jan. 13, 2023). But the Court does not need to decide this issue. To the extent there is a distinction between "distinctly similar" and "relevantly similar" it does not help Defendant's case. The strong historical analogues discussed later in this order would satisfy either of these standards.

[3] While grouped with the "relevantly similar" discussion, these are the only comparative features the Supreme Court mentioned in its decision and therefore this Court finds they would be the key inquiry in applying either the "distinctly similar" or "relevantly similar" standard (if these are indeed separate standards).

"'central'" considerations when engaging in an analogical inquiry." Id. at 2133 (quoting McDonald, 561 at 767 (itself quoting Heller, 554 U.S. at 599)).

The Court further noted that this analogical reasoning is "neither a regulatory straitjacket nor a regulatory blank check." [*7] Id. While warning courts to not "uphold every modern law that remotely resembles a historical analogue," the Court also clarified that the Government is only obligated to identify a "historical analogue, not a historical twin." Id. (internal citation omitted). Therefore, even if a modern regulation is not a "dead ringer" for a historical precursor, it may be sufficiently analogous to pass constitutional muster. Id.

### (2) Defendant's as-applied challenge fails as the presidential pardon is irrelevant to the charged offense in count three of the indictment

The Court will begin with Defendant's as-applied challenge. The Court finds that this argument is without merit.

Underlying this argument is the fact that on October 6, 2022, President Biden pardoned all individuals who committed the offense of simple possession of marijuana in violation of 21 U.S.C. § 844 or D.C. Code § 48-904.01(d)(1) on or before the date the pardon was issued. Granting Pardon for the Offense of Simple Possession of Marijuana, 87 Fed. Reg. 61441 (Oct. 12, 2022) (Pardon issued on October 6, 2022, and published in Federal Register on October 12).

Defendant argues that the presidential pardon extends to her alleged conduct of marijuana use and therefore dismissal is compelled because of the pardon's retroactive effect. In other words, Defendant argues that on February [*8] 10, 2022, she was no longer "an unlawful user" of a controlled substance. Therefore she cannot be legally culpable for the offense of being an unlawful user of a controlled substance in possession of a firearm. In support Defendant cites dicta from a Supreme Court decision issued over 100 years ago stating that a "pardon not merely releases the offender from the punishment described for the offence, but that it obliterates in legal contemplation the offense itself." (DE 17 at 12 (quoting Carlisle v. United States, 83 U.S. 147, 151, 21 L. Ed. 426, 8 Ct. Cl. 153 (1872)). Defendant also argues that this pardon implicated the Bruen analysis as the Government would not be able to offer a historically analogous regulation based on substance use which the sitting President has

proclaimed is no longer punishable conduct.

These arguments are without merit for several reasons. First, the text of the pardon itself precludes Defendant's arguments. President Biden's pardon expressly limits its effect to pardoning violations of *21 U.S.C. § 844* or *D.C. Code § 48-904.01(d)(1)*. *Pardon for the Offense of Simple Possession of Marijuana, 87 Fed. Reg. at 61441*. President Biden goes on to indicate that he does not intend for the pardon to be applicable to any other offense.

> "*My intent by this proclamation is to pardon only the offense of simple possession of marijuana* in violation of Federal law or in violation [*9] of *D.C. Code 48-904.01(d)(1)*, *and not any other offenses related to marijuana or other controlled substance*s. *No language herein shall be construed to pardon any person for any other offense*, ... ."
>
> *Id.* (emphasis added).

This express limitation on the legal effect of the pardon forecloses Defendant's as-applied challenge. Defendant has conceded as much by not responding to the Government's argument of this point in her reply. *See Cincinnati Ins. Co. v. Eastern Atlantic Ins. Co., 260 F.3d 742, 747 (7th Cir. 2001)* (acquiescence to opponent's nonfrivolous arguments operates as a waiver).

Second, Defendant's argument is contrary to the established body of law holding that pardons preclude further punishment for the pardoned offense but *do not* erase the underlying conduct of that offense. *Hirschberg v. Commodity Futures Trading Comm'n, 414 F.3d 679, 682-83 (7th Cir. 2005)* ("The question we must answer, then, is whether the CFTC's denial of Hirschberg's registration is impermissible punitive action *or simply a consequence of the conduct underlying the conviction that the pardon could not erase.*") (emphasis added); *United States v. Flynn, 507 F.Supp.3d 116, 136 (D.D.C. 2020)* (holding a pardon cannot "erase a judgment of conviction, or its underlying legal and factual findings.") (internal citations omitted); *United States v. McMichael, 358 F.Supp.2d 644, 647 (E.D. Mi. 2005)* ("A [presidential] pardon does not entail the expungement of judicial records or otherwise negate the facts of the underlying conviction.") [*10] (citing *United States v. Doe, 556 F.2d 391 (6th Cir. 1977)*).

Defendant's citation to *Carlisle* does not meaningfully challenge this understanding. Besides being non-binding dicta, the statement in *Carlisle* that a pardon

"obliterates in legal contemplation the offense itself" does *not* state that the facts underlying the offense are likewise obliterated. *83 U.S. at 151*. Moreover, *Carlisle* is bookended by Supreme Court decisions which are in line with the understanding that a pardon only precludes further punishment for the pardoned offense and does not erase the underlying facts. *See Carlesi v. New York, 233 U.S. 51, 34 S. Ct. 576, 58 L. Ed. 843, 31 N.Y. Cr. 153 (1914)* (Upholding a New York state court's use of a prior, pardoned, federal offense as a sentencing enchantment); *United States v. Wilson, 32 U.S. 150, 160, 8 L. Ed. 640 (1833)* (holding a pardon exempts the individuals from *punishment* for the offense committed).

Third, Defendant's characterization, in her motion, of count three being predicated on the conduct of "marijuana possession" is simply not a correct description of the law. *§ 922(g)(3)* criminalizes being a *user* of or *addicted to* a controlled substance in possession of a firearm, not being a *possessor* of a controlled substance and possessing a firearm. This is reflected in count three of the indictment which charges Defendant with being a *user*. (DE 1 at 3.) As previously discussed, the pardon's narrow limitation [*11] to two specific possession offenses makes it unavailing to Defendant here.

Defendant's second argument, that the existence of this pardon raises the Government's burden to offer a historical analogy of regulating firearms based on substance use which the President has proclaimed is no longer punishable, is incorrect for all the previously stated reasons. Further, as the Government rightly notes in their response, the pardon did not legalize marijuana and it remains a controlled substance. (DE 22 at 7.) Therefore it is inaccurate to claim that the President proclaimed marijuana use was no longer punishable conduct given the President only forgave two specific offenses related to marijuana possession. Moreover, the pardon did not attempt to effect any change upon the firearms laws of the United States and has no bearing on how the *Bruen* analysis is applied.

Therefore, the Court denies Defendant's as-applied challenge.

### (3) *Defendant's facial challenge to § 922(g)(3) also fails*

The Court will now apply the two-pronged analysis for *Second Amendment* challenges laid out in *Bruen* to assess Defendant's facial challenge.

(a) *The Court assumes, without deciding, Defendant's conduct is protected by the* Second Amendment

The first step of a Second Amendment challenge is **[\*12]** deciding whether the regulated conduct falls within the scope of the Second Amendment's plain text. Bruen, 142 S.Ct. at 2129-30. Therefore, the Court must determine whether Defendant, presumed for this motion to be an unlawful drug user as prohibited under § 922(g)(3), is among those protected by the Second Amendment.[4]

The Government argues that Defendant's conduct is unprotected as "the people" for the purposes of the Second Amendment only includes those who are law-abiding citizens. Some legal scholars have dubbed this the "civic virtue" theory of the Second Amendment. *See e.g.* Don B. Kates & Clayton E. Cramer, Second Amendment Limitations and Criminological Considerations, 60 Hastings L.J. 1339, 1360 (2008); Saul Cornell & Nathan DeDino, A Well Regulated Right: The Early American Origins of Gun Control, 73 Fordham L. Rev. 487, 492 (2004). The Court's research indicates that while several of our sister courts have endorsed this view, it is currently subject to a lively debate among federal jurists. *See* United States v. Black, 2023 U.S. Dist. LEXIS 2781, 2023 WL 122920, \*3 (W.D. La. Jan. 6, 2023) (collecting cases and helpfully summarizing holdings).

The Seventh Circuit has briefly engaged with this theory prior to Bruen, but it seems to be divided on the merits. In *United States v. Yancey*, the Seventh Circuit stated, "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" 621 F.3d 681, 684-85 (7th Cir. 2010) (internal citation omitted). The court went on to use that logic, **[\*13]** in part, to uphold the categorical disarmament of habitual drug users by § 922(g)(3). Id. at 685. However, five years later in *United States v. Meza-Rodriguez* the Seventh Circuit concluded that an unlawfully present noncitizen could invoke the Second Amendment. 798 F.3d 664, 672 (7th Cir. 2015) (reviewing a Second Amendment challenge to 18 U.S.C. § 922(g)(5)). The *Meza* court expressly declined to read *Heller*'s language of "law-abiding citizens" and "members of the political community" as

defining the scope of "the people" for Second Amendment purposes. Id. at 669-70. The Court instead concluded "the people" had the same meaning as in other parts of the Bill of Rights. *Id.* This conclusion would suggest the Seventh Circuit had rejected civic virtue theory as discussed in *Yancey*. However, despite citing to *Yancey*, for a different proposition of law, the *Meza* court never addressed the tension between these two decisions. Id. at 672.

Four years after *Meza*, in *Kanter v. Barr*, the Seventh Circuit indicated that *Meza* had not settled this question. 919 F.3d 437 (7th Cir. 2019) (reviewing a Second Amendment challenge to 18 U.S.C. § 922(g)(1)). In *Kanter*, the majority cited to both *Meza* and *Yancey* without reconciling the tension between the two in defining "the people" for purposes of the Second Amendment. Id. at 445-46. The *Kanter* court contemplated applying the civic virtue theory, stating "If, as we suggested in *Yancey* and as most scholars **[\*14]** have concluded, the founders conceived of the right to bear arms as belonging only to virtuous citizens, even nonviolent felons like Kanter would fall outside the scope of the Second Amendment." Id. at 446. However, the court ultimately demurred on reaching such a conclusion and resolved the case at the second step of the pre-Bruen Second Amendment framework.

It is tempting to embrace the conclusion in Meza as the most direct guidance on this question. However, the Court will decline to do so for three reasons. First, as previously discussed, *Kanter* suggests that *Meza* did not actually decide this issue and there is no binding precedent to be applied. *Id.* Second, individual panels of the Seventh Circuit cannot implicitly override prior panel decisions. Brooks v. Walls, 279 F.3d 518, 522 (7th Cir. 2002) ("One panel of this court cannot overrule another implicitly."). Therefore, to the extent *Yancey* made a holding on the scope of "the people" for Second Amendment purposes that decision could not be overridden implicitly by *Meza*. Or to the extent *Kanter* sought to overturn a holding in *Meza*, the same impediment applies. Third, the *Meza* court acknowledged its decision was in conflict with at least three other circuits at the time. 798 F.3d at 669 (citing Fourth, Fifth, and Eighth Circuit decisions). It is possible **[\*15]** that in light of Bruen, the Seventh Circuit would reach a different conclusion based on additional guidance provided in that case and subsequent developments in other circuits.[5]

---

[4] The parties do not dispute that the mere conduct of possessing a firearm would be protected by the Second Amendment.

[5] For example, Bruen used the phrase "law-abiding citizen" no

Case 3:23-cv-00056-JBA   Document 23-21   Filed 03/30/23   Page 203 of 226

Page 6 of 9
2023 U.S. Dist. LEXIS 22005, *15

As this case can be resolved on the second prong of *Bruen*, the Court will leave this question for the Seventh Circuit to resolve. The Court will assume, without deciding, that Defendant is part of "the people" and the possession of a firearm is protected by the *Second Amendment*. The Court will now advance to the second prong of the *Bruen* analysis.

(b) *The void for vagueness challenge Defendant raised in her reply brief is without merit*

Prior to engaging with the properly presented arguments on the second prong of the *Bruen* test, the Court will address the new argument Defendant raised for the first time in her reply brief. Defendant raises the argument that the term "user" in *§ 922(g)(3)* is not defined by statute and therefore is too vague to be considered "a well-defined or reasonable restriction on firearm possession as *Bruen* demands" (DE 27 at 6-7.) The Court will deny this argument for two reasons. First, this argument makes no appearance in the motion to dismiss and is therefore waived. *White v. United States, 8 F.4th 547, 552 (7th Cir. 2021)* ("[A]rguments raised for the first time **[\*16]** in [a] reply brief are waived because they leave no chance to respond." (internal citations omitted)).

Second, and in the alternative, the Court would reject this argument on the merits. Contrary to Defendant's assertion, the term "user" is defined. Specifically, there is a federal regulation implementing the statute which defines the term. *27 C.F.R. § 478.11*; *United States v. Seiwert, 2022 U.S. Dist. LEXIS 175417, 2022 WL 4534605, *2 n.2 (N.D. Ill. Sept. 28, 2022)* (noting that *27 C.F.R. § 478.11* provides a definition for user in *§ 922(g)(3)*). Further, in *United States v. Cook*, the Seventh Circuit rejected a challenge to *§ 922(g)(3)* predicated on the term "user" being unconstitutionally vague. *970 F.3d 866 (7th Cir. 2020)*. Reaffirming prior Circuit precedent on the question, the court held that the term "user" means "one who regularly or habitually

_____

fewer than fourteen times in describing the scope of the *Second Amendment* right. *Bruen, 142 S. Ct. at 2122, 2125, 2131, 2133-34, 2135 n.8, 2138 & n.9, 2150, 2156*. This includes in key contexts such as holding that two key metrics for determining whether a regulation is relevantly similar, as compelled by *Heller* and *McDonald*, is "how and why the regulations burden a *law-abiding citizen's* right to armed self-defense." *Id. at 2132-33.* (emphasis added). Further, at least one circuit court panel has fully endorsed the civic virtue theory of the *Second Amendment*. *See Range v. Att'y Gen. U.S., 53 F.4th 262 (3d Cir. 2022)* (vacated for rehearing en banc by 56 F.4th 992 (3d Cir. 2023)).

ingests a controlled substance in a manner other than prescribed by a physician." *Id. at 874* (citing *Yancey, 621 F.3d at 682*). Moreover, *Cook* expressly held that the statute is not "so indefinite as to inhibit the legitimate exercise of *Second Amendment* rights." *Id.*

The fact that *Cook* was decided prior to *Bruen* is of no consequence for two reasons. First, Defendant's only argument is the absence of a definition for "user" makes *§ 922(g)(3)* inconsistent with *Bruen*. She has presented no argument as to why *Cook* is incorrect in light of *Bruen*. Second, the Court discerns nothing about the *Bruen* decision which would **[\*17]** render *Cook's* reasoning infirm. In *Bruen* the Supreme Court clarified how lower courts should apply the *Second Amendment*, but it did not utter a word about how courts determine whether statutes are unconstitutionally vague. Absent further direction from the Supreme Court, this Court would find that their comment about *Second Amendment* restrictions needing to be "reasonable" and "well-defined" incorporates pre-existing precedent for interpreting statutes and did not seek to overturn the entire statutory construction apple cart. *Bruen, 142 S.Ct. at 2156*. This limited interpretation of *Bruen* is most in line with the Supreme Court's notation that its decision was consistent with, i.e. building upon without disrupting, its holdings in *Heller* and *McDonald*. *Id. at 2122*. Therefore this Court has no reason to doubt that *Cook's* holding that, at the time of *Heller*, *§ 922(g)(3)* was sufficiently well defined to pass constitutional muster remains good and binding precedent.

(c) *§ 922(g)(3) is consistent with the historical tradition of firearms regulation in the United States*

The Court now turns to the dispositive issue of this case, has the Government carried its burden on the second prong of *Bruen* to show that *§ 922(g)(3)* is consistent with historical firearms regulation in the United States? The Court finds **[\*18]** the answer is yes.

The Government concedes that the specific regulation contained in *§ 922(g)(3)*, prohibition on the possession of firearms by unlawful drug users, did not exist at the time the *Second Amendment* was enacted. The Government also concedes that this federal statute was enacted in 1968 and is therefore not a longstanding restriction itself. However, the Government argues two relevant historical regulations are sufficiently analogous to support *§ 922(g)(3)*'s constitutionality. The first is a history of state legislatures restricting the right of habitual drug users or alcoholics to possess or carry firearms. The second is a history of restrictions aimed at

preventing persons considered to be dangerous or untrustworthy from possessing and using firearms. The Court agrees that both are sufficiently analogous to uphold *§ 922(g)(3)*.

Regarding the first argument, the Government points to the Seventh Circuit's decision in *United States v. Yancey*, a pre-*Bruen* decision upholding *§ 922(g)(3)*. *621 F.3d 681 (7th Cir. 2010)*. *Yancey* recognized that while Congress had not barred habitual drug users from owning guns until 1968, this development did not occur in a vacuum. *Id. at 684*. Instead, contrary to Defendant's assertion that *§ 922(g)(3)* only reflects late 20th Century concerns, numerous state legislatures **[*19]** had "entrenched" regulations "restric[ing] the right of habitual drug users or alcoholics to possess or carry firearms." *Id. at 684* (collecting state statutes and cases). These regulations demonstrated that Congress was not alone in considering habitual drug users unfit to possess firearms and that the prohibition was "the latest incarnation of the states' unbroken history of regulating the possession and use of firearms dating back to the time of the amendment's ratification." *Id.*

The Government argues that *Yancey*'s historical analysis, showing similar regulations have long existed without question to their constitutionality, directs the Court to uphold *§922(g)(3)* in this case. The Court agrees. Defendant's only argument against *Yancey* is that it utilized the pre-*Bruen* test for *Second Amendment* claims. This is true, however, *Yancey*'s historical analysis, of state law disarming alcoholics and habitual drug users, at the first step of the old test was recognized as "broadly consistent with *Heller*" and remains valid. *Bruen, 142 S.Ct. at 2127-29*. Furthermore, the historical analysis in *Yancey* has been positively cited by our sister courts in rejecting *Bruen* challenges to *§ 922(g)(3)* which indicates its continued validity. *See e.g. United States v. Daniels, 2022 U.S. Dist. LEXIS 120556, 2022 WL 2654232, *3 (S.D. Miss. July 8, 2022)* (upholding *§ 922(g)(3)* in part based on the historical **[*20]** analysis in *Yancey* and other circuit court decisions); *United States v. Seiwert, 2022 U.S. Dist. LEXIS 175417, 2022 WL 4534605 (N.D. Ill. Sept. 28, 2022)* (upholding *§ 922(g)(3)* and citing to *Daniels*); *Black, 2023 U.S. Dist. LEXIS 2781, 2023 WL 122920 at *4* (upholding *§ 922(g)(3)* and citing to *Yancey*'s analysis).

Moreover, a sister court examining a *Bruen* challenge to *§ 922(g)(3)* recognized additional historical support for the statute in the form of early American intoxication laws. In *Fried v. Garland*, the court recognized a history

of statutes from the founding and reconstruction eras which restricted gun possession by the intoxicated. *2022 U.S. Dist. LEXIS 203136, 2022 WL 16731233, *7 (N.D. Fla. Nov. 4, 2022)* (describing a 1655 Virginia statute, a 1771 New York statute, and several from the era following the ratification of the *Fourteenth Amendment*). Some of these statutes prevented individuals from carrying firearms while intoxicated, and others prohibited individuals from firing a gun while intoxicated. *Id.* The Court finds these additional historical examples, of statutes regulating firearm possession and use by individuals using intoxicating substances, supplement and affirm the historical findings in *Yancey*.

Defendant's argument that the regulation in *§ 922(g)(3)* is of a "wholly recent vintage" is unpersuasive in light of the historical record indicating entrenched state provisions for regulating this type of behavior. (DE 17 at 11). The same holds true for her argument that **[*21]** the scope of this regulation, i.e. banning possession of a firearm at all by users or addicts, is without a historical analogue. Further, *Fried* nicely describes how the prohibition in *§ 922(g)(3)* can be analogized to the historical intoxication statutes. Under those historical regulations the intoxicated could not carry or use firearms, while under the modern regulation an *active drug user* cannot possess firearms. *2022 U.S. Dist. LEXIS 203136, 2022 WL 16731233 at *7*. So, for the duration of the period individuals are using intoxicating substances, their *Second Amendment* rights are impaired. *Id.; see also Yancey, 621 F.3d at 687* ("the gun ban [in *§ 922(g)(3)*] extends only so long as Yancey abuses drugs"). Both groups are then able to regain their *Second Amendment* rights by simply ending their substance use. *Fried, 2022 U.S. Dist. LEXIS 203136, 2022 WL 16731233 at *7*. These historical regulations may not be "dead ringer[s]" for *§ 922(g)(3)*, but they are not required to be and are nonetheless sufficiently analogous. *Bruen, 142 S.Ct. at 2133*. As such, the scope of *§ 922(g)(3)* is in line with these historical examples.

Defendant also argues that the modern restriction is overbroad because the definition of "user" in the implementing regulation does not require "[the drug use to be] on a particular day, or within a matter of days or weeks before, ... ." (DE 27 at 7 (quoting *27 C.F.R. § 478.11*)). In other words, Defendant argues that there **[*22]** is no historical analogue regulating firearm possession based on use of a controlled substance that occurred days or weeks before the firearm possession. First, this argument is non-responsive to the historical

2023 U.S. Dist. LEXIS 22005, *22

analysis in *Yancey* supporting such restrictions. Second, the bottom-line requirement of the regulation is "*that the unlawful use has occurred recently enough to indicate that the individual is actively engaged in such conduct.* ... ." *27 C.F.R. § 478.11* (emphasis added). This requirement that the individual is actively engaged in substance use is analogous to the historical regulations in *Yancey* and *Fried* which prevented possession of firearms by individuals during the course of their intoxicant use. This relatively flexible evidentiary requirement for determining whether a person is *actively engaged* comports with the definition in *Cook* that a user is "one who regularly or habitually ingests a controlled substance." *970 F.3d at 874*. Determining habitual or regular use inherently requires examining a broader time span to determine a pattern of behavior, and this does not implicate a *Second Amendment* issue. Additionally, as previously mentioned, *Cook* expressly held that this definition was compatible with the *Second Amendment*. *Id*. To the extent [*23] Defendant wants to argue her use was too far away in time to constitute "active use" that is an argument of fact to be made to the jury.

The historical record shows a tradition of regulating firearm possession by individuals using intoxicating substances which is analogous to *§ 922(g)(3)*. Therefore, the Court finds that Government has met its burden and concludes that *§ 922(g)(3)* is constitutional.

In the alternative, the Court would also uphold *§ 922(g)(3)* as it is analogous to historical regulations preventing dangerous persons, such as felons and the mentally ill, from possessing firearms.

While a judge on the Seventh Circuit, Justice Amy Coney Barrett made the keen observation that "[h]istory is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns." *Kanter, 919 F.3d at 451* (Barrett, J. dissenting). It is well established that there is a history and tradition in the United States of disarming persons who would pose a threat to public safety if allowed to possess firearms.[6] *See e.g. United States v.*

*Barber, 2023 U.S. Dist. LEXIS 14340, 2023 WL 1073667 (W.D. Tex. Jan. 27, 2023)* (summarizing historical record); *see also United States v. Rahimi, 2023 U.S. App. LEXIS 2693, 2023 WL 1459240, *8 (5th Cir. Feb. 2, 2023)* (noting historical examples of laws disarming classes or groups of people determined to be dangerous in order to preserve political and social [*24] order).[7] This tradition includes the long-standing, and presumptively valid, regulations of disarming felons and the mentally ill. *Heller, 554 U.S. at 626, 627 n. 26*; *Bruen, 142 S.Ct. at 2162* (Kavanaugh, J. concurring). Since *Bruen*, several sister courts have upheld *§ 922(g)(3)* by finding it is analogous to these regulations.[8] *See e.g. Fried, 2022 U.S. Dist. LEXIS 203136, 2022 WL 16731233 at *7-*8*; *Black, 2023 U.S. Dist. LEXIS 2781, 2023 WL 122920 at *3-*4*; *Daniels, 2022 U.S. Dist. LEXIS 120556, 2022 WL 2654232 at *3-*4*; *Seiwert, 2022 U.S. Dist. LEXIS 175417, 2022 WL 4534605 at *2*; *United States v. Sanchez, 2022 U.S. Dist. LEXIS 227508, 2022 WL 17815116, *3 (W.D. Tex. Dec. 19, 2022)*; *United States v. Lewis, 2023 U.S. Dist. LEXIS 6541, 2023 WL 187582, *4-*5 (W.D. Okla. Jan. 13, 2023)*; *but see United States v. Harrison, No. CR-22-328-PRW, 2023 U.S. Dist. LEXIS 18397 (W.D. Ok. Feb 3, 2023)* (striking down *§ 922(g)(3)* and finding it is not analogous to these historical regulations).[9] The

plethora of non-racially animated disarmament provisions, the Court need not consider any racially animated measures to conclude the above-described historical tradition of disarming individuals deemed to be dangerous exists. In addition to the examples in the body of this opinion, there are measures such as disarming Loyalists to the British Crown. *Id*.

[7] Defendant filed *Rahimi* as supplemental authority in this case, arguing it supports her position. The Court disagrees. *Rahimi* struck down *§ 922(g)(8)*, which is quite dissimilar from *§ 922(g)(3)*. *§ 922(g)(8)* prohibits firearm possession by individuals subject to domestic violence restraining orders based on their threat to a specific individual, and not a defined class of persons based on their danger to society writ large (such as the felon restriction). As noted above, *Rahimi* actually endorses the latter type of restrictions as consistent with the historical record. As *§ 922(g)(3)* resembles the latter type of restrictions, the findings in *Rahimi* support the constitutionality of the statute at issue in this case.

[8] While not dispositive to the Court's analysis, it would note that at least nine district courts have adjudicated *Bruen* based challenges to *§ 922(g)(3)* and all but one have upheld the statute.

[9] The Court is not persuaded by *Harrison* in part due to the weight of authority reaching the contrary conclusion, the

---

[6] The Government candidly acknowledges that *some* of these historical measures were motivated by racial animus. (DE 22 at 13.) *See e.g. Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 200 (5th Cir. 2012)*(identifying classes of individuals perceived to be dangerous and disarmed during the colonial era). Defendant in turn requests the Court excise any such history from its consideration. This request is moot. Given the

Court agrees with these courts and finds that *§ 922(g)(3)* is sufficiently similar to these long-standing regulations to pass constitutional muster.

As previously stated, the key inquiry is "whether modern and historical regulations impose a comparable burden on the right of [law-abiding citizens to] armed self-defense and whether that burden is comparably justified." *Bruen, 142 S.Ct. at 2133*. In terms of burden, *§ 922(g)(3)* prevents a certain, clearly defined, group of people from possessing a firearm. This is the same mechanism by which the bar on felons and the mentally ill from possessing firearms operates. In fact, *§ 922(g)(3)* is actually less onerous than the provisions regulating felons and the mentally ill. The burden imposed by *§ 922(g)(3)* only endures for as long as the individual is an unlawful user or addict, leaving them free to regain **[*25]** their full *Second Amendment* rights at any time. *Yancey, 621 F.3d at 687*; *Fried, 2022 U.S. Dist. LEXIS 203136, 2022 WL 16731233 at *7*. In contrast, the burden imposed upon convicted felons and the mentally ill is a lifelong one. *Yancey, 621 F.3d at 687*. Therefore, the Court finds that this, relatively lenient, burden placed on a defined group of persons is directly analogous to the burden placed on felons and the mentally ill.

In terms of justification, it is undisputed that Congress enacted the exclusions in *§ 922* to "keep guns out of the hands of presumptively risky people." *Yancey, 621 F.3d at 683*. Common sense and an empirical record support Congress' conclusion that individuals who unlawfully use, or are addicted to, controlled substances may be dangerous if they possess firearms. *Yancey, 621 F.3d at 685-86*. Defendant does not dispute this conclusion about dangerousness. Therefore, the negative implications for the maintenance of good social and political order posed by dangerous persons carrying firearms needs no further elaboration. As such, the Court finds that the exact same justification underlies *§ 922(g)(3)* and the well-established regulation of firearm

possession by felons and the mentally ill. Accordingly, the Court would alternatively find that *§ 922(g)(3)* is analogous to the historical firearms regulations which disarmed dangerous persons and the Government had **[*26]** carried its burden here as well.

The Court concludes that the government has established that the restrictions imposed by *§ 922(g)(3)* are consistent with the history and tradition of firearms regulation in the United States and that the Government has carried its burden on the second prong of the *Bruen* test. Therefore, the Court denies Defendant's facial challenge to the statute.

### D. Conclusion

Accordingly, for the reasons previously stated, Defendant's motion to dismiss count three of her indictment is DENIED (DE 17).

SO ORDERED.

ENTERED: February 9, 2023

/s/ JON E. DEGUILIO

Chief Judge

United States District Court

---

---

Court's own analysis of the arguments presented in this case, and disagreements with the analysis and conclusions reached by the court in *Harrison*. For example, the Court would note that *Harrison*'s reasoning distinguishing the tradition of disarming dangerous persons from *§ 922(g)(3)* seems reliant on reinterpreting those traditions based on pre-*Bruen* dissents from circuit decisions. *See e.g. Harrison, No. 2:22-cr-328 at *31-*32, 2023 U.S. Dist. LEXIS 18397*. The Court is not persuaded such a dramatic departure from existing precedent is required given *Bruen* established it was consistent with *Heller*, and the first step of the pre-*Bruen* test was also consistent with *Heller, Bruen, 142 S.Ct. at 2127-30*.

 Positive
As of: March 29, 2023 5:12 PM Z

## *United States v. Minter*

United States District Court for the Middle District of Pennsylvania

October 18, 2022, Filed

3:22-CR-135

**Reporter**
2022 U.S. Dist. LEXIS 190390 *; __ F.Supp.3d __; 2022 WL 10662252

UNITED STATES OF AMERICA, v. VICTORIOUS MINTER, Defendant.

## Core Terms

regulation, firearm, felons, possession of a firearm, courts, arms, prohibitions, self-defense, bear arms, longstanding, restrictions, challenges, cases, cast, gun, law-abiding, carrying, rights

**Counsel:** **[*1]** For Victorious Minter, Defendant: Brandon R. Reish, LEAD ATTORNEY, Federal Public Defender's Office, Scranton, PA.

For USA, Plaintiff: James Buchanan, LEAD ATTORNEY, USAO, Scranton, PA.

**Judges:** Robert D. Mariani, United States District Judge.

**Opinion by:** Robert D. Mariani

## Opinion

**MEMORANDUM OPINION**

**I. INTRODUCTION AND PROCEDURAL HISTORY**

On April 5, 2022, a federal grand jury returned a one-count Indictment charging Defendant Victorious Minter with being a Felon in Possession of Firearm, in violation of *18 U.S.C. § 922(g)(1)*.[1] Defendant Minter subsequently filed a Motion to Dismiss (Doc. 26) on

August 26, 2022, asserting that *§ 922(g)(1)* is now unconstitutional in light of the Supreme Court's June 23, 2022, decision in *New York State Rifle & Pistol Association, Inc. v. Bruen, 142 S.Ct. 2111, 213 L. Ed. 2d 387 (2022)*. Defendant requests that the Court "declare *§ 922(g)(1)* unconstitutional and dismiss the Indictment against him for failure to state an offense." (Doc. 26, at 3). The Government timely filed a Brief in Opposition to Minter's Motion to Dismiss (Doc. 28), to which Defendant filed a Reply Brief (Doc. 31). Defendant's Motion to Dismiss is now ripe for resolution.

For the reasons set forth herein, the Court will deny the Motion to Dismiss (Doc. 26).

**II. ANALYSIS**

The *Second Amendment of the U.S. Constitution* provides that "[a] well regulated Militia, being necessary to the security of a free State, **[*2]** the right of the people to keep and bear Arms, shall not be infringed." *U.S. Const. amend. II*. In *Bruen*, the Supreme Court, consistent with its precedent, re-affirmed that "the *Second* and *Fourteenth Amendments* protect an individual right to keep and bear arms for self-defense." *Bruen, 142 S.Ct. at 2125* (citing *District of Columbia v. Heller, 554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008)* and *McDonald v. Chicago, 561 U.S. 742, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010)*); *see also, id. at 2122* ("In [*Heller* and *McDonald*] we recognized that the *Second* and *Fourteenth Amendments* protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense.").

Although the *Second Amendment* confers an individual right to keep and bear arms, this right is "not unlimited". *Heller, 554 U.S. at 595, 626*. As the Supreme Court in *Heller* explained:

> Like most rights, the right secured by the *Second Amendment* is not unlimited. From Blackstone

---

[1] Defendant Minter had previously been convicted of Manufacture, Delivery, or Possession with Intent to Manufacture or Deliver a Controlled Substance, in violation of 35 Pa.C.S.A. § 780-113(a)(30). (Doc. 28, at 2).

through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. . . For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the *Second Amendment* or state analogues. . . . Although we do not undertake an exhaustive historical analysis today of the full scope of the *Second Amendment*, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms **[*3]** by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id. at 626-627* (internal citations omitted). *See also, McDonald, 561 U.S. at 786* ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.' We repeat those assurances here.") (internal citation omitted).[2]

In examining its precedent, the Supreme Court in *Bruen* set forth the appropriate test a Court must apply in determining whether a firearm regulation violates the *Second Amendment*:

In keeping with *Heller*, we hold that when the *Second Amendment's* plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is

consistent with this Nation's **[*4]** historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the *Second Amendment's* unqualified command.

*Bruen, 142 S.Ct. at 2126* (internal quotation marks omitted). *See id. at 2127* ("the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."); *id. at 2130* (re-iterating the standard for applying the *Second Amendment*). A Court must therefore first address the threshold question of whether the *Second Amendment's* plain text covers the individual's conduct at issue and, if it determines the conduct is covered, engage in an analysis of whether the Government has affirmatively demonstrated that the regulation at issue is consistent with this Nation's historical tradition of firearm regulation.

The *Bruen* Court provided guidance to aid courts in determining whether the Government has affirmatively demonstrated that the regulation at issue is consistent with this Nation's historical tradition of firearm regulation, explaining that "[i]n some cases," the inquiry that courts must undertake to assess whether modern firearms regulations are consistent with **[*5]** the *Second Amendment's* text and historical understanding "will be fairly straightforward", *Bruen, 142 S.Ct. at 2131*.

For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the *Second Amendment*. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id.*

Nonetheless, the Court in *Bruen* recognized that while some "historical analogies . . . are relatively simple to draw, other cases implicating unprecedented societal

---

[2] When setting forth the above-quoted "longtime prohibitions" and explicitly warning that nothing in its opinion "should be taken to cast doubt" on these longstanding prohibitions, the *Heller* Court titled these prohibitions as "*presumptively* lawful regulatory measures." *Heller, 554 U.S. at 627 n. 26* (emphasis added). Nonetheless, two years later in *McDonald*, the Supreme Court confirmed the continued validity of its statement in *Heller* as to the legality of the longtime prohibitions, without the re-iteration or inclusion of any qualifying language.

2022 U.S. Dist. LEXIS 190390, *5

concerns or dramatic technological changes may require a more nuanced approach." *Id. at 2132*. "The regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868. Fortunately, **[*6]** the Founders created a Constitution — and a *Second Amendment* — intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs. Although its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id. at 2132* (internal quotation marks and citations omitted). Thus,

> When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy — a commonplace task for any lawyer or judge. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are "relevantly similar." And because "[e]verything is similar in infinite ways to everything else," one needs "some metric enabling the analogizer to assess which similarities are important and which are not[.]"

*Bruen, 142 S.Ct. at 2132* (internal citations omitted). "[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id. at 2133* (italics in original). **[*7]** Further, the *Bruen* Court, while declining to "provide an exhaustive survey of the features that render regulations relevantly similar under the *Second Amendment*", reasoned that

> *Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense. As we stated in *Heller* and repeated in *McDonald*, "individual self-defense is 'the *central component*' of the *Second Amendment* right." *McDonald, 561 U.S. at 767, 130 S.Ct. 3020* (quoting *Heller, 554 U.S. at 599, 128 S.Ct. 2783*); *see also id., at 628, 128 S.Ct. 2783* ("the inherent right of self-defense has been central to the *Second Amendment* right"). Therefore, whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are "'central'" considerations when engaging in an analogical inquiry.

*Id. at 2132-2133* (italics in original).

Here, in light of the Supreme Court's decision in *Bruen*, Defendant Minter invites this Court to set aside over 10 years of Supreme Court and Circuit Court precedent and to examine, on a blank slate, the constitutionality of *§ 922(g)(1)*. However, *Bruen* does not, as Defendant suggests, invalidate or overturn the legal principles and analysis set forth in *Heller* and *McDonald*, and much of the legal reasoning in Circuit decisions since *Heller* remains intact. The Supreme Court's decision in *Bruen* did not alter **[*8]** the analyses set forth in *Heller* and *McDonald*, but instead, relying extensively on those two cases, clarified the appropriate test that must be applied in addressing *Second Amendment* challenges to firearms regulations. In *Bruen*, the Court rejected the "'two-step' framework for analyzing *Second Amendment* challenges that combines history with means-end scrutiny" that had been applied by the lower courts after *Heller* and *McDonald*, holding that the second-step — application of a "means-end" analysis — "is one step too many." *Bruen, 142 S.Ct. at 2126-2127*. In so doing, the Court emphasized that "[s]tep one of the predominant framework [determining whether regulated conduct falls beyond the *Second Amendment's* original scope] is broadly consistent with *Heller*, which demands a test rooted in the *Second Amendment's* text, as informed by history. But *Heller* and *McDonald* do not support applying means-end scrutiny in the *Second Amendment* context." *Id. at 2127*. The Supreme Court in *Bruen* took great effort to not undermine its prior decisions in *Heller* and McDonald and to repeatedly underscore the continued validity of those decisions. *See e.g., Bruen, 142 S.Ct. at 2131* ("The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the *Second Amendment's* text and historical understanding."); *id.* ("*Heller* itself exemplifies" the straight-forward inquiry into the **[*9]** *Second Amendment's* text and historical understanding); *id. at 2132-2133* ("*Heller* and *McDonald* point toward at least two metrics [to assess whether a historical regulation is a proper analogue for a modern firearm regulation]: how and why the regulations burden a law-abiding citizen's right to armed self-defense.").

Thus, the Court here need not engage in an original analysis of whether the *Second Amendment's* plain text covers the possession of a firearm by a felon, and if so, whether the Government has affirmatively demonstrated that *§ 922(g)(1)* is consistent with this Nation's historical tradition of firearm regulation, where the Supreme Court in *Bruen* has already signaled the answer to this

question.

The Court in _Heller_ made clear that the rights secured by the _Second Amendment_ are not unlimited, enumerating a number of examples including the "longstanding prohibitions on the possession of firearms by felons". _Heller, 554 U.S. at 626-627_.[3] Despite Defendant Minter's assertions to the contrary, the _Bruen_ Court's decision did not undermine _Heller_'s statement. _Bruen_, quoting _Heller_, re-iterated that "[t]he _Second Amendment_ is the very _product_ of an interest balancing by the people' and it 'surely elevates above all other interests the right of _law-abiding_, responsible citizens to use arms' for self-defense. It is this balance — struck by the traditions [*10] of the American people — that demands our unqualified deference." _Bruen, 142 S.Ct. at 2131_ (quoting _Heller, 554 U.S. at 635_) (italics in original; underline added).[4] The _Bruen_ Court further

---

[3] In addition to Minter's arguments set forth in the body of this memorandum opinion, Minter also urges this Court to reject _Heller_'s language addressing the presumptive lawfulness of certain longstanding prohibitions on the possession of firearms by felons, arguing that this language is dicta and nothing more than an "aside" by the Supreme Court (Doc. 31, at 7-8). The Third Circuit has squarely rejected the characterization of this language in _Heller_ as dicta. _See United States v. Huet, 665 F.3d 588, 600 n. 11 (3d Cir. 2012)_ ("Although some of our sister circuits have classified the 'presumptively lawful' language in _Heller_ as dicta, . . . we disagree."), _abrogated on other grounds by United States v. De Castro, 49 F.4th 836, 2022 U.S. App. LEXIS 26970, 2022 WL 4477327 (3d Cir. 2022)_. _See also, Binderup v. Att'y Gen., 836 F.3d 336, 359 n.3 (3d Cir. 2016)_ ("we have concluded that _Heller_'s list constitutes a limitation on the scope of its holding and does not qualify as dicta.") (Hardiman, J., concurring in part).

Even if this Court were to find the _Heller_ language to be dicta, the statement in _Heller_ remains highly persuasive where the Third Circuit has warned that "lower federal court[s] . . . are advised to follow the Supreme Court's 'considered dicta'", _Oyebanji v. Gonzales, 418 F.3d 260, 264-265 (3d Cir. 2005)_ (collecting cases) (Alito, J.). _See also, Surefoot LC v. Sure Foot Corp., 531 F.3d 1236, 1243 (10th Cir. 2008)_ (in analyzing issue of standing, explaining that "even if the [Supreme] Court's rejection of the reasonable apprehension test could be plausibly characterized as _dicta_, our job as a federal appellate court is to follow the Supreme Court's directions, not pick and choose among them as if ordering from a menu.") (Gorsuch, J.).

[4] In addition to the above-quoted statement in _Bruen_, when performing its analysis of the contours of the _Second Amendment_, the majority in _Bruen_ repeatedly, although not uniformly, used the words "law-abiding". _See e.g., Bruen, 142_

stated that "[t]hroughout modern Anglo-American history, the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms." _Id. at 2138_. This observation in _Bruen_ is entirely consistent with _Heller_'s recognition of the legality of the "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government building. . ." _Heller, 554 U.S. at 626-627_.[5]

---

_S.Ct. at 2122_ ("In [_Heller_] and [_McDonald_], we recognized that the _Second_ and _Fourteenth Amendments_ protect the right of an ordinary, _law-abiding_ citizen to possess a handgun in the home for self-defense. In this case, petitioners and respondents agree that ordinary, _law-abiding_ citizens have a similar right to carry handguns publicly for their self-defense."); _id. at 2124-2125_ (petitioners "are _law-abiding_, adult citizens of Rensselaer County, New York"); _id. at 2134_ (petitioners are "ordinary, _law-abiding_, adult citizens" and are "part of 'the people' whom the _Second Amendment_ protects."); _id. at 2132-2133_ ("While we do not now provide an exhaustive survey of the features that render regulations relevantly similar under the _Second Amendment_, we do think that those aspects of _Heller_ and _McDonald_ point toward at least two metrics: how and why the regulations burden a _law-abiding_ citizen's right to armed self-defense."); _id. at 2138, 2150, 2156_ (there is no "historical tradition limiting public carry only to those _law-abiding_ citizens who demonstrate a special need for self-defense."); _id. at 2156_ (holding that "New York's proper-cause requirement violates the _Fourteenth Amendment_ in that it prevents _law-abiding_ citizens with ordinary self-defense needs from exercising their right to keep and bear arms.") (underlines added). _See also, Heller, 554 U.S. at 635_ ("whatever else [the _Second Amendment_] leaves to future evaluation, it surely elevates above all other interests the right of _law-abiding_, responsible citizens to use arms in defense of hearth and home.") (underline added).

[5] Furthermore, the majority in _Bruen_'s express warning that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' shall-issue' licensing regimes" indicates a continued consensus that _Heller_'s stated-limitations remain outside the protection of the _Second Amendment_. As the _Bruen_ Court explained, without the need for historical analysis:

> Because these [shall-issue] licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent "law-abiding, responsible citizens" from exercising their _Second Amendment_ right to public carry. _District of Columbia v. Heller, 554 U.S. 570, 635, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008)_. Rather, it appears that these

The conclusion that *Bruen* does not disturb the prior analyses of *Heller* and *McDonald* is further supported by the concurrences and the dissent in *Bruen*. Justice Alito, in his concurrence, specifically noted the following:

> Our holding [in *Bruen*] decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun. Nor does it decide anything about the kinds of weapons that people may possess. Nor have we disturbed anything that we said in *Heller* or [*McDonald*] about restrictions that may be imposed on the possession or carrying of guns.

*Bruen*, 142 S.Ct. at 2157 (Alito, J., concurring) (underline added); *see also*, *id. at 2161* ("*Heller* correctly recognized that the *Second Amendment* codifies the right of ordinary law-abiding Americans to protect themselves from lethal violence by possessing and, if necessary, using a gun.") (underline added). Justice Kavanaugh, with whom Chief Justice Roberts joined, wrote separately "to underscore two important points about the limits of the Court's decision" in *Bruen*. The second point reads as follows:

> *Second*, **[*12]** as *Heller* and *McDonald* established and the Court today again explains, the *Second Amendment* "is neither a regulatory straightjacket nor a regulatory blank check." . . . Properly interpreted, the *Second Amendment* allows a

---

shall-issue regimes, which often require **[*11]** applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, "law-abiding, responsible citizens."

*Bruen*, 142 S.Ct. at 2138 n. 9. Although the Supreme Court clarified that "because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes", it set forth possible bases for such challenges as "where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Id.* The *Bruen* Court's general approval of the constitutionality and validity of "shall-issue" regulations, and its recognition that these regimes are often meant to ensure that only "law-abiding, responsible" citizens are permitted to possess firearms, suggests the continued validity of *Heller*'s enumerated limitations and the constitutionality of § 922(g)(1). This Court further notes that the *Bruen* Court broadly cited to "law-abiding" citizens, declining to signal any deficiency in a state's failure to draw a distinction between individuals who may be considered non-law-abiding due to violent, as opposed to non-violent, crimes.

"variety" of gun regulations. *Heller, 554 U.S. at 636, 128 S.Ct. 2783*. As Justice Scalia wrote in his opinion for the Court in *Heller*, and Justice ALITO reiterated in relevant part in the principal opinion in *McDonald*:

> "Like most rights, the right secured by the *Second Amendment* is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.... [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms. [Footnote 26: We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive.] . . .

*Bruen*, 142 S.Ct. at 2162 (Kavanaugh, J., concurring). Justice Breyer, in his dissenting opinion, agreed with Justice Kavanaugh, stating **[*13]** that "[l]ike Justice KAVANAUGH, I understand the Court's opinion today to cast no doubt on th[e] aspect of *Heller*'s holding" addressing presumptively lawful firearm restrictions, including the prohibition of the possession of a firearm by a felon, *id. at 2189* (Breyer, J., dissenting).[6]

---

[6] This Court also notes Justice Alito's dissent in *New York State Rifle & Pistol Association, Inc. v. City of New York, 140 S.Ct. 1525, 206 L. Ed. 2d 798 (2020)*, issued two years prior to *Bruen*. In that case, the Supreme Court vacated the judgment of the Second Circuit Court of Appeals and remanded the case for further proceedings where it deemed Petitioners' claim for injunctive relief against New York City moot because the city had altered its firearm licensing statute following the Supreme Court's grant of certiorari. In dissent, Justice Alito opined that the case was not moot and proceeded to an analysis of the merits of plaintiffs' claim that the city firearm ordinance violated the *Second Amendment*. Justice Alito began his analysis as follows:

> In *Heller*, we held that a District of Columbia rule that effectively prevented a law-abiding citizen from keeping a handgun in the home for purposes of self-defense constituted a core violation of the *Second Amendment*. *554 U.S. at 635, 128 S.Ct. 2783*. We based this decision

The concurrences and dissent in *Bruen* underscore that the Supreme Court foresaw the legal challenges which may arise as a result of *Bruen*, including the issue now raised in the present motion to dismiss by Minter. That Justices Kavanaugh, Roberts, and Alito each determined the need **[*14]** to highlight the particular language in *Heller* setting forth certain presumptively lawful "longstanding prohibitions" demonstrates a desire to make clear the limits of the Supreme Court's decision in *Bruen* and to emphasize the remaining viability of the Supreme Court's statements in *Heller* and its progeny as to specific conduct which falls outside of the protection of the *Second Amendment* and which may be properly curbed by gun regulations. Although this Court acknowledges the possible accuracy of Justice Breyer's statement in dissent that an apparent "disconnect" exists between the "presumptively lawful regulatory measures" identified in *Heller*, most of which arguably have clearer origins in the 20th century, and the Supreme Court's test requiring that a firearm regulation must be consistent with this Nation's historical tradition

---

on the scope of the right to keep and bear arms as it was understood at the time of the adoption of the *Second Amendment*. *Id., at 577-605, 628-629, 128 S.Ct. 2783*. We recognized that history supported the constitutionality of some laws limiting the right to possess a firearm, such as laws banning firearms from certain sensitive locations and prohibiting possession by felons and other dangerous individuals. *See id., at 626-627, 128 S.Ct. 2783*; *see also McDonald, 561 U.S. at 787, 904, 130 S.Ct. 3020*. But history provided no support for laws like the District's. *See 554 U.S. at 629-634, 128 S.Ct. 2783*.

*Id. at 1540-1541* (Alito, J., dissenting). Justice Alito's dissent concluded by foreshadowing the Supreme Court's eventual holding in *Bruen* rejecting the application "means-end" scrutiny. *Id. at 1544* ("We are told that the mode of review in this case is representative of the way *Heller* has been treated in the lower courts. If that is true, there is cause for concern."). Although Justice Kavanaugh concurred with the majority, he wrote separately, stating that while he agreed that the claim for injunctive relief was moot, he "agree[d] with Justice Alito's general analysis of *Heller* and *McDonald*" and "share[d] Justice Alito's concern that some federal and state courts may not be properly applying *Heller* and *McDonald*." *Id. at 1527* (Kavanaugh, J., concurring). Justices Alito and Kavanaugh's statements in this 2020 precursor to *Bruen* further support a finding that the Supreme Court did not intend anything in *Bruen* to be interpreted as overturning or modifying its decision in *Heller*, including *Heller*'s "recogni[tion] that history supported the constitutionality of some laws limiting the right to possess a firearm, such as laws . . . prohibiting possession by felons and other dangerous individuals", *id. at 1540-1541* (Alito, J., dissenting).

of firearm regulation in order to not violate the *Second Amendment* (*see Bruen, 142 S.Ct. at 2189* (Breyer, J., dissenting)), six Justices nonetheless warned that the *Bruen* decision should not be read as casting doubt on the validity of certain firearms regulations, including those identified in *Heller*. Specifically, Justices Alito, Kavanaugh, and Roberts, in concurring, all made explicit reference to *Heller*'s enumerated lawful firearm restrictions and **[*15]** emphasized that the decision in *Bruen* did not disturb this statement in *Heller*. Additionally, the dissent, Justices Breyer, Sotomayor, and Kagen, also noted agreement that the majority in *Bruen* did not "cast . . . doubt" on *Heller*'s identification of "presumptively lawful firearm" restrictions. *Cf. United States v. Gonzalez, 2022 U.S. App. LEXIS 26532, 2022 WL 4376074 (7th Cir., Sept. 22, 2022)* (acknowledging that "the historical evidence is mixed about barring *all* felons from possessing guns" but, citing to *Heller* and *Bruen*, noting that "the [Supreme Court Justices] have declined to question laws requiring background checks or barring felons from possessing firearms") (italics in original).

Where *Bruen* did not overturn, abrogate, or otherwise suggest that the longstanding prohibitions identified in *Heller*, including the prohibition of possession of firearms by felons, may no longer be lawful, this Court is bound by the Supreme Court's decision in *Heller*, its progeny, and the Third Circuit cases addressing the constitutionality of *§ 922(g)(1)*.

As the Third Circuit noted in 2020, "[s]ince *Heller*, we, along with every court to consider the issue, have rejected challenges to *§ 922(g)(1)* on its face violates the *Second Amendment*." *Folajtar v. Atty Gen., 980 F.3d 897, 901 (3d Cir. 2020)*. In *Folajtar*, although not "fully repeat[ing] the historical analysis in [its] precedents", the Third Circuit identified the history of restricting the **[*16]** possession of firearms by certain individuals, including those who lacked "virtuousness" or had committed a serious crime. *Id. at 907-909*. In so doing, the Third Circuit explained that "[w]hat concerned the Framers was that 'virtuous citizens' retain the right to bear arms. . . ; they had no interest in extending the same guarantee to those who act counter to society's welfare, whether by violent or non-violent acts." *Id. at 909* (internal citation omitted). Prior to *Folajtar*, in *Binderup v. Attorney General*, the Third Circuit "look[ed] to the historical justification for stripping felons, including those convicted of offenses meeting the traditional definition of a felony, of their *Second Amendment* rights," *836 F.3d 336, 348 (3d Cir. 2016)*. The Court noted that "[t]he view that anyone who commits a serious crime loses the right

to keep and bear arms dates back to our founding era" and concluded as "[t]he takeaway: persons who have committed serious crimes forfeit the right to possess firearms much the way they forfeit other civil liberties, including fundamental constitutional rights." *Id. at 349* (internal quotation marks omitted).

Defendant Minter cites to Judge Bibas' dissent in *Folajtar* and Judge Hardiman's partial concurrence in *Binderup* in support of his position that Judges in the **[*17]** Third Circuit "have noted the lack of relevant historical precedent for felon disarmament statutes like *§ 922(g)(1)*," (Doc. 27, at 12). Although Defendant's characterization of Judge Bibas and Judge Hardiman's opinions are correct, as is his citation to the opinions of other Circuit Court judges outside the Third Circuit, the District Court is nonetheless bound to follow the majority reasoning and holding in the cited opinions. Even assuming that the Third Circuit in *Folajtar* and *Binderup* incorrectly applied some form of means-end scrutiny, the majority in *Folajtar* and the plurality in *Binderup* nonetheless also engaged in an analysis of the historical tradition of preventing felons from possessing firearms. This Court is not free to set aside this historical analysis and reasoning.[7] *See Allegheny Gen. Hosp. v. N.L.R.B., 608 F.2d 965, 970 (3d Cir. 1979)* ("A decision by this court, not overruled by the United States Supreme Court, is a decision of the court of last resort in this federal judicial circuit."), *overruled on other grounds by St. Margaret Mem'l Hosp. v. N.L.R.B., 991 F.2d 1146 (3d Cir. 1993)*. Further, the Third Circuit's majority/plurality reasoning as to the historic basis for the enactment of firearm regulations prohibiting felons from possessing firearms is not unique — it finds support in the decisions of other Circuit Courts. *See Medina v. Whitaker, 913 F.3d 152, 159, 439 U.S. App. D.C. 294 (D.C. Cir. 2019)*.[8]

---

[7] Although in a different factual and legal context, this Court notes that post-Bruen, the Third Circuit has re-affirmed that "the government may confiscate guns from those who have been convicted of serious crimes or committed dangerous acts." *Frein v. Penn. State Police, 47 F.4th 247, 256 (3d Cir. 2022)* (citing *Binderup v. Att'y Gen., 836 F.3d 336, 349 (3d Cir. 2016)*).

[8] In *Medina*, the Court of Appeals for the District of Columbia held that individuals convicted of felonies "are not among those entitled to possess arms", *913 F.3d at 160*. In support of this holding, the D.C. Circuit Court looked to the historical rationales set forth in other Circuits:

A number **[*18]** of other circuits have also considered

Finally, although not binding on this Court, the Court notes that federal courts nationwide have, as of the date of this memorandum opinion, uniformly rejected facial and as-applied constitutional challenges to *§ 922(g)(1)* arising from the Supreme Court's decision in *Bruen*. *See e.g., United States v. Ingram, 2022 U.S. Dist. LEXIS 154011, 2022 WL 3691350 (D.S.C., Aug. 25, 2022)*; *United States v. Cockerham, 2022 U.S. Dist. LEXIS 164702, 2022 WL 4229314 (W.D. Miss., Sept. 13, 2022)*; *United States v. Jackson, 2022 U.S. Dist. LEXIS 164604, 2022 WL 4226229 (D. Minn., Sept. 13, 2022)*; *United States v. Hill, 2022 U.S. Dist. LEXIS 170214, 2022 WL 4361917 (S.D. Cal., Sept. 20, 2022)*; *United States v. Coombes, 2022 U.S. Dist. LEXIS 170323, 2022 WL 4367056 (N.D. Okla., Sept. 21, 2022)*; *United States v. Collette, 2022 U.S. Dist. LEXIS 173822, 2022*

---

this issue and have concluded that history and tradition support the disarmament of those who were not (or could not be) virtuous members of the community. At least four circuits have endorsed the view that "most scholars of the *Second Amendment* agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" *United States v. Yancey, 621 F.3d 681, 684-85 (7th Cir. 2010)*. *See also United States v. Vongxay, 594 F.3d 1111, 1118 (9th Cir. 2010)*; *Binderup v. Attorney General, 836 F.3d 336, 348 (3d Cir. 2016)*; *United States v. Carpio-Leon, 701 F.3d 974, 979 (4th Cir. 2012)*. The "virtuous citizen" theory is drawn from "classical republican political philosophy" and stresses that the "right to arms does not preclude laws disarming the unvirtuous (i.e. criminals) or those who, like children or the mentally imbalanced, are deemed incapable of virtue." *United States v. Rene E., 583 F.3d 8, 15 (1st Cir. 2009)* (quoting Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, *62 Tenn. L. Rev. 461, 480 (1995)*). Several circuits have relied on this theory to uphold the constitutionality of modern laws banning the possession of firearms by illegal aliens and juveniles — classes of people who might otherwise show, on a case-by-case basis, that they are not particularly dangerous. *See Carpio-Leon, 701 F.3d at 979-81*; *Rene E., 583 F.3d at 15*. In considering these decisions, we recognize that there is "an ongoing debate among historians about the extent to which the right to bear **[*19]** arms in the founding period turned on concerns about the possessor's virtue." *Rene E., 583 F.3d at 16*. While we need not accept this theory outright, its support among courts and scholars serves as persuasive evidence that the scope of the *Second Amendment* was understood to exclude more than just individually identifiable dangerous individuals.

*Id. at 159*.

2022 U.S. Dist. LEXIS 190390, *19

*WL 4476790 (W.D. Tex., Sept. 25, 2022)*; *United States v. Siddoway, 2022 U.S. Dist. LEXIS 178168, 2022 WL 4482739 (D. Idaho, Sept, 27, 2022)*; *United States v. Charles, 2022 U.S. Dist. LEXIS 180375, 2022 WL 4913900 (W.D. Tex. Oct. 3, 2022)*; *United States v. Price,    F.Supp.3d   , 2022 U.S. Dist. LEXIS 186571, 2022 WL 6968457 (S.D. W. Va., Oct. 12, 2022)*. *See also*, *United States v. Gonzalez, 2022 U.S. App. LEXIS 26532, 2022 WL 4376074 (7th Cir., Sept. 22, 2022)*.[9]

### III. CONCLUSION

For the reasons set forth herein, Defendant Minter's Motion to Dismiss (Doc. 26) will be denied. A separate Order follows.

/s/ Robert D. Mariani

Robert D. Mariani

United States District Judge

### ORDER

**AND NOW, THIS** 18th **DAY OF OCTOBER, 2022**, for the reasons set forth in this Court's accompanying memorandum opinion, **IT IS HEREBY ORDERED THAT** Defendant Minter's Motion to Dismiss (Doc. 26) is **DENIED**.

/s/ Robert D. Mariani

Robert D. Mariani

United States District Judge

**End of Document**

---

[9] As previously noted, *supra*, since *Heller*, the Third Circuit, "along with every court to consider the issue, have rejected challenges that *§ 922(g)(1)* on its face violates the *Second Amendment*." *Folajtar, 980 F.3d at 901*. However, the Third Circuit has "permit[ted] *Second Amendment* challenges to *§ 922(g)(1)* as applied to individuals. . . " *Id*. Here, although Minter's brief in support of his motion to dismiss asserts that "*§ 922(g)(1)* is unconstitutional, both facially and as applied to Mr. Minter" (Doc. 27, at 4), Defendant's supporting brief does not set forth with any particularity the basis for his as-applied challenge, separate from his arguments supporting his facial challenge. **[*20]** Defendant therefore has provided no basis for this Court to engage in any separate analysis as to the constitutionality of *§ 922(g)(1)* as-applied to Minter.

🛈 Cited
As of: March 29, 2023 5:12 PM Z

# *United States v. Hunter*

United States District Court for the Northern District of Alabama, Eastern Division

December 13, 2022, Decided; December 13, 2022, Filed

Case No.: 1:22-cr-84-RDP-NAD-1

**Reporter**
2022 U.S. Dist. LEXIS 224359 *; __ F.Supp.3d __; 2022 WL 17640254

UNITED STATES OF AMERICA, v. SANTINI BRYSHAD HUNTER, Defendant.

## Core Terms

regulation, dicta, law-abiding, indictment, means-end, firearm, felons, possession of a firearm, bear arms, prohibitions, reasons, motion to dismiss, self-defense, abrogation, two-step

**Counsel:** **[\*1]** For Santini Bryshad Hunter, Defendant: Kevin L Butler, LEAD ATTORNEY, FEDERAL PUBLIC DEFENDER, Northern District of Alabama, Birmingham, AL; John Francis Cockrell, FEDERAL PUBLIC DEFENDER'S OFFICE, Birmingham, AL; Katherine Pritchett Bounds, FEDERAL DEFENDER'S OFFICE, Northern District of Alabama, Birmingham, AL.

For USA, Plaintiff: Prim F. Escalona, US Attorney, LEAD ATTORNEY, US ATTORNEY'S OFFICE, Birmingham, AL; US Probation, LEAD ATTORNEY, UNITED STATES PROBATION OFFICE, Robert Vance Bldg., Birmingham, AL; USM, LEAD ATTORNEY, UNITED STATES MARSHAL, Birmingham, AL; Allison Garnett, LEAD ATTORNEY, USAO, Birmingham, AL; M Blake Milner, United States Attorney, Northern District of Alabama, Birmingham, AL.

**Judges:** R. DAVID PROCTOR, UNITED STATES DISTRICT JUDGE.

**Opinion by:** R. DAVID PROCTOR

## Opinion

### MEMORANDUM OPINION

This matter is before the court on Defendant Santini Bryshad Hunter's Motion to Dismiss the Indictment. (Doc. # 19). The Motion is fully briefed (Docs. # 19, 21,

22) and ripe for review. For the reasons discussed below, the Motion is due to be denied.

### I. Background

On March 29, 2022, a Northern District of Alabama grand jury returned an indictment charging Defendant Santini Bryshad Hunter with violating Title **[\*2]** *18, United States Code, Section 922(g)(1)*, which prohibits the possession of a firearm by anyone who has been convicted of a crime punishable by imprisonment for more than one year. *18 U.S.C. § 922(g)(1)*.[1] Defendant has filed a Motion to Dismiss the Indictment asserting that *§ 922(g)(1)* is unconstitutional under the *Second Amendment*. (Doc. # 19).

### II. Legal Standard

*Federal Rule of Criminal Procedure 12* allows a defendant to bring a pretrial motion challenging a criminal indictment. *Fed. R. Crim. P. 12(b)(3)*. A court may dismiss a criminal indictment that is legally insufficient. *See Fed. R. Crim. P. 12(b)(3)(B)*; *United States v. Durrett, 524 F. App'x 492, 494 (11th Cir. 2013)* (per curiam); *United States v. Schmitz, 634 F.3d 1247, 1260 (11th Cir. 2011)*; *United States v. Torkington, 812 F.2d 1347, 1354 (11th Cir. 1987)*. An indictment is defective if it alleges a violation of an unconstitutional statute. *United States v. Brown, 715 F. Supp. 2d 688, 689-90 (E.D. Va. 2010)*; *see United States, 109 U.S. 3,*

---

[1] On July 28, 2010, Defendant was convicted of Unlawful Distribution of a Controlled Substance in Talladega County Circuit Court, and on May 20, 2010, Defendant was convicted of Unlawful Possession of Marijuana, First Degree, in Talladega County Circuit Court. (Doc. # 1). Both of these are felony offenses, as they involve penalty schemes that subject a defendant to a term of imprisonment exceeding one year. (*Id.*).

*8-9, 3 S. Ct. 18, 27 L. Ed. 835 (1883)*.

### III. Discussion

Defendant moves to dismiss the indictment, arguing that *§ 922(g)(1)* is unconstitutional on its face because it violates the *Second Amendment* right to keep and bear arms.[2] (Doc. # 19). In *United States v. Rozier*, the Eleventh Circuit considered this very issue and rejected a *Second Amendment* challenge to *§ 922(g)(1)*. *598 F.3d 768 (11th Cir. 2010)* (per curiam). The question facing this court today is whether *Rozier* is still good law in light of the Supreme Court's recent ruling in *New York State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022)*. After careful review, the court concludes that it is. Because *Rozier* has not been clearly overruled or undermined to the point of abrogation, this court is bound by that decision's holding that *§ 922(g)(1)* does not violate the *Second Amendment*.

**A. In *Bruen* [*3] , the Supreme Court articulated a new standard for analyzing *Second Amendment* challenges to firearms regulations**.

The *Second Amendment* provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." *U.S. Const. amend. II*. In *District of Columbia v. Heller*, the Supreme Court held that the *Second Amendment* protects an individual's right to keep and bear arms for the purpose of self-defense. *554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008)* (per curiam) (striking down a D.C. statute banning handgun possession inside the home). Two years later, in *McDonald v. City of Chicago*, the Court held that the *Fourteenth Amendment's Due Process clause* incorporates the *Second Amendment* right recognized in *Heller*, making it fully enforceable against the states. *561 U.S. 742, 791, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010)*.

In the wake of these decisions, almost all the Courts of Appeals, including the Eleventh Circuit, employed a "two-step" framework for analyzing *Second Amendment* challenges to firearm regulations. *See, e.g., United States v. Focia, 869 F.3d 1269, 1285 (11th Cir. 2017)*.[3] Under this framework, a court first considers whether a challenged regulation burdens "conduct within the scope of the *Second Amendment* as historically understood[.]" *Id.* If the answer is yes, the second step is to "apply an appropriate form of means-end scrutiny[,]" which involves weighing the burden on the *Second Amendment* right against the government's interest [*4] in regulating the conduct. *Id.*

In *Bruen*, however, the Court rejected this approach, finding that the two-step framework is "one step too many." *142 S. Ct. at 2127*. The court held that:

> Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the *Second Amendment's* text, as informed by history. But *Heller* and *McDonald* do not support applying means-end scrutiny in the *Second Amendment* context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.

*Id.* In light of *Bruen*, when analyzing *Second Amendment* challenges to firearm regulations, courts must now first determine whether "the *Second Amendment's* plain text covers an individual's conduct[.]" *Id. at 2129-30*. If so, "the Constitution presumptively protects that conduct[,]" and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*

Importantly, although the Supreme Court rejected the predominant framework for analyzing *Second*

---

[2] "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno, 481 U.S. 739, 745, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987)*. The fact that *§ 922(g)(1)* "might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid[.]" *Id.*

[3] *See also Gould v. Morgan, 907 F.3d 659, 668 (1st Cir. 2018)*; *N.Y. State Rifle & Pistol Ass'n v. Cuomo, 804 F.3d 242, 253 (2d Cir. 2015)*; *United States v. Boyd, 999 F.3d 171, 185 (3d Cir. 2021)*; *Kolbe v. Hogan, 849 F.3d 114, 132 (4th Cir. 2017)* (en banc); *Nat'l Rifle Ass'n of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 194 (5th Cir. 2012)*; *United States v. Greeno, 679 F.3d 510, 518 (6th Cir. 2012)*; *Kanter v. Barr, 919 F.3d 437, 441 (7th Cir. 2019)*; *United States v. Chovan, 735 F.3d 1127, 1136 (9th Cir. 2013)*; *United States v. Reese, 627 F.3d 792, 801 (10th Cir. 2010)*; *Heller v. District of Columbia, 670 F.3d 1244, 1252, 399 U.S. App. D.C. 314 (D.C. Cir. 2011)* ("*Heller II*").

*Amendment* cases, it did not overrule *Heller* or *McDonald*. *See id. at 2127, 2129-30*. Rather, it found that the lower courts had misinterpreted those precedents when they applied means-end scrutiny in [*5] the *Second Amendment* context. *Id.* Indeed, in the Court's view, *Bruen* did not impose a *new* standard but rather *clarified* the standard already announced. *Id.* So, in its *Bruen* decision the Court emphasized that "*Heller* and *McDonald* expressly rejected the application of any 'judge-empowering interest-balancing inquiry that asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other governmental interests.'" *Id. at 2129* (quoting *Heller, 554 U.S. at 634*) (cleaned up). This analysis leads inexorably to the conclusion that, to the extent a pre-*Bruen* decision limits its holding to step one's historical analysis and avoids any prohibited means-end scrutiny, such a decision's validity is unaltered by *Bruen*.

**B. The *Rozier* decision upholding the constitutionality of *§ 922(g)(1)* remains good law after *Bruen*.**

Under the prior panel precedent rule, an Eleventh Circuit holding is binding "unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by [the Eleventh Circuit] sitting *en banc*." *United States v. Archer, 531 F.3d 1347, 1352 (11th Cir. 2008)*. In order to operate to overrule Eleventh Circuit precedent, a Supreme Court ruling must be "clearly on point." *Garrett v. Univ. of Ala. at Birmingham Bd. of Trs., 344 F.3d 1288, 1292 (11th Cir. 2003)* (per curiam); *NLRB v. Datapoint Corp., 642 F.2d 123, 129 (5th Cir. Unit A Apr. 1981)* ("Without a clearly contrary opinion of the [*6] Supreme Court or of this court sitting en banc, we cannot overrule a decision of a prior panel of this court").[4] Courts "are not at liberty to disregard binding case law that is so closely on point and has been only weakened, rather than directly overruled, by the Supreme Court." *Fla. League of Pro. Lobbyists, Inc. v. Meggs, 87 F.3d 457, 462 (11th Cir. 1996)*.

In *Rozier*, which was decided after *Heller* but before *Bruen*, the Eleventh Circuit rejected a *Second Amendment* Challenge to *§ 922(g)(1)*. *598 F.3d at 769-*

71. Defendant argues that *Rozier* was overruled by *Bruen*, and therefore he claims the Indictment must be dismissed because the government did not "demonstrate that [*§ 922(g)(1)*] is consistent with this Nation's historical tradition of firearm regulation." *Bruen, 142 S. Ct. at 2126*; (Doc. # 19). The court disagrees. For the reasons explained below, the court determines that *Rozier* was not "overruled or undermined to the point of abrogation" by *Bruen*, and therefore it is binding on this court. *See Archer, 531 F.3d at 1352*.

First, the Eleventh Circuit did not rely on means-end scrutiny to reach its holding in *Rozier*, nor did it apply the prohibited two-step analysis. *See Rozier, 598 F.3d at 769-71*. Nowhere in the opinion is the two-part test even mentioned. *See id.* In fact, the Eleventh Circuit did not formally adopt that now-rejected framework until two years later, in *GeorgiaCarry.Org, Inc. v. Georgia. 687 F.3d 1244, 1260 n.34 (11th Cir. 2012)* ("*GeorgiaCarry.Org I*") ("Like our sister [*7] circuits, we believe a two-step inquiry is appropriate."); *see GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs, 788 F.3d 1318, 1324 (11th Cir. 2015)* ("*GeorgiaCarry.Org II*") (noting that the Eleventh Circuit used the two-step inquiry for the first time in *GeorgiaCarry.Org I*).

Rather than applying means-end scrutiny, the *Rozier* panel relied on language in *Heller* limiting the *Second Amendment* right to "law-abiding citizens." *See Rozier, 598 F.3d at 770*. In *Rozier*, the court first pointed to *Heller*'s warning that, "[l]ike most rights, the right secured by the *Second Amendment* is not unlimited." *Id.* (quoting *Heller, 554 U.S. at 626*). It next observed that the Supreme Court qualified its holding in *Heller* by stating, "[a]ssuming that Heller *is not disqualified* from the exercise of *Second Amendment* rights, the District must permit him to register his handgun and must issue him a license to carry it in the home ." *Id.* (quoting *Heller, 554 U.S. at 635*) (emphasis added in *Rozier*). From this, the court readily concluded:

> This indicates that the first question to be asked is not whether the handgun is possessed for self-defense or whether it is contained within one's home, rather the initial question is whether one is *qualified* to possess a firearm. In Rozier's case, the most relevant matter, as to the question of qualification, is "felon."

*Id.* (emphasis in original).

Finally, the *Rozier* panel cited *Heller*'s clear admonition [*8] that "nothing in our opinion should be

---

[4] *See Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981)* (en banc) (holding that all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981 constitute binding precedent in the Eleventh Circuit).

taken to cast doubt on longstanding prohibitions on the possession of firearms by felons . . .". *Id. at 771* (quoting *Heller, 554 U.S. at 626*). As the Eleventh Circuit reasoned, "[t]his language suggests that statutes disqualifying felons from possessing a firearm under any and all circumstances do not offend the *Second Amendment*" and concluded that *§ 922(g)(1)* is constitutional. *Id.* ("Thus, statutory restrictions of firearm possession, such as *§ 922(g)(1)*, are a constitutional avenue to restrict the *Second Amendment* right of certain classes of people.").

Turning next to Defendant's arguments in this case, he contends that the *Rozier* decision "was grounded in the interest-balancing, means-ends analysis that has now been abrogated by *Bruen*." (Doc. # 22 at 12). Defendant hinges this argument on two sentences of the Rozier decision:

> Rozier's *Second Amendment* right to bear arms is not weighed in the same manner as that of a law-abiding citizen, such as the appellant in *Heller*. While felons do not forfeit their constitutional rights upon being convicted, their status as felons substantially affects the level of protection those rights are accorded.

*Rozier, 598 F.3d at 771*; (Doc. # 22 at 12). The court is not persuaded that these two sentences constitute means-end balancing, especially when **[*9]** they are viewed in proper context. Indeed, Defendant himself concedes that "the Rozier decision did not explicitly engage in interest-balancing." (Doc. # 22 at 12). If the *Rozier* decision did not explicitly engage in interest-balancing, then it was not clearly overruled by *Bruen*, and thus it remains binding on this court. *See Archer, 531 F.3d at 1352*.

Alternatively, Defendant argues that, even if the *Rozier* decision was not based on meansend scrutiny, it is nonetheless invalid because it relied exclusively on dicta from *Heller*. (Doc. # 22 at 2-8). Although the Court described prohibitions on the possession of firearms by felons as "presumptively lawful" in *Heller*, it acknowledged that it did "not undertake an exhaustive historical analysis . . . of the full scope of the *Second Amendment*[.]" *Heller, 554 U.S. at 626, 627 n.26*). According to Defendant, reliance on *Heller*'s dicta is no longer appropriate in light of *Bruen*'s command that "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen, 142 S. Ct. at 2127*; (Doc. # 19 at 4-5). Thus,

Defendant contends that *Bruen* "demands a fresh look at *18 U.S.C. § 922(g)(1)* through the lens of the *Second Amendment's* text, history, and tradition." (Doc. # 19 at 4-5). But this argument is unpersuasive **[*10]** for several reasons.

First, the Eleventh Circuit has explicitly sanctioned reliance on this portion of *Heller*. In *Rozier*, the court rejected the defendant's argument that it should disregard *Heller*'s "presumptively lawful" language as mere dicta, stating:

> First, to the extent that this portion of *Heller* limits the Court's opinion to the possession of firearms by *law-abiding* and *qualified* individuals, it is not dicta. Second, to the extent that this statement is superfluous to the central holding of *Heller*, we shall still give it considerable weight.

*Rozier, 598 F.3d at 771 n.6* (citations omitted).

Second, subsequent Supreme Court opinions, including *Bruen*, have indicated approval of the *Heller* dicta. For example, in *McDonald*, which was decided after *Rozier*, the Court reaffirmed *Heller*, stating: "We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as "prohibitions on the possession of firearms by felons . . . We repeat those assurances here." *McDonald, 561 U.S. at 786* (quoting *Heller, 554 U.S. at 626*).

This limiting language is echoed in *Bruen* as well. In the opening line of the *Bruen* opinion, the Court describes *Heller* and *McDonald* as recognizing "that the *Second* and *Fourteenth Amendments* protect the right of an ordinary, *law-abiding citizen* to possess a handgun in the home for self-defense." *Bruen, 142 S. Ct. at 2122* (emphasis **[*11]** added). Throughout its decision in *Bruen*, the Court confines its holding to law-abiding citizens. *See id.* Indeed, the Court mentions "law-abiding" citizens no less than eleven times in the majority opinion. *See, e.g., id. at 2131* ("The *Second Amendment* . . . 'surely elevates above all other interests the right of *law-abiding, responsible citizens* to use arms' for self-defense.") (emphasis added) (quoting *Heller, 554 U.S. at 635*); *id. at 2134* ("It is undisputed that petitioners Koch and Nash—two ordinary, *law-abiding, adult citizens*—are part of 'the people' whom the *Second Amendment* protects.") (emphasis added); *id. at 2156* ("New York's proper-cause requirement violates the *Fourteenth Amendment* in that it prevents *law-abiding citizens* with ordinary self-defense needs from exercising their right to keep and bear arms.")

(emphasis added).

Both of the *Bruen* concurrences also explicitly cite *Heller*'s limiting language. *Id. at 2157* (Alito, J., concurring) ("Nor have we disturbed anything that we said in *Heller* or [*McDonald*] about restrictions that may be imposed on the possession or carrying of guns."); *id. at 2161* (Alito, J., concurring) ("*Heller* correctly recognized that the *Second Amendment* codifies the right of ordinary, *law-abiding* Americans to protect themselves from lethal violence by possessing and, if necessary, using a gun.") (emphasis added); *id.* (Kavanaugh, **[*12]** J., concurring) (stating that "the *Second Amendment* allows a 'variety' of gun regulations" and quoting *Heller*'s statement that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons").

Finally, as the Eleventh Circuit acknowledged in *Rozier*, to the extent the limiting statements in *Heller*, *McDonald*, and *Bruen* are dicta, they are Supreme Court dicta and are entitled to substantial deference from this court. *See Rozier, 598 F.3d at 771 n.6* (citing *Peterson v. BMI Refractories, 124 F.3d 1386, 1392 n.4 (11th Cir. 1997)* ("[D]icta from the Supreme Court is not something to be lightly cast aside.")); *see also United States v. City of Hialeah, 140 F.3d 968, 974 (11th Cir. 1998)* ("Even though that statement by the Supreme Court . . . was dictum, it is of considerable persuasive value, especially because it interprets the Court's own precedent."); *United States v. Becton, 632 F.2d 1294, 1296 n.3 (5th Cir. 1980)*[5] ("We are not bound by dicta, even of our own court . . . Dicta of the Supreme Court are, of course, another matter."). *But see Reynolds v. Behrman Cap. IV L.P., 988 F.3d 1314, 1322 (11th Cir. 2021)* ("Giving the Supreme Court's dicta the respect and consideration it is due, . . . we choose to go in a different direction.").

Here, Defendant asks this court to disregard *Heller's* assurance that "longstanding prohibitions on the possession of firearms by felons" are "presumptively lawful," even though the Eleventh Circuit has given it **[*13]** "considerable weight," and the Supreme Court has cited it approvingly. *Heller, 554 U.S. at 626*; *see Rozier, 598 F.3d at 771 n.6*; *McDonald, 561 U.S. at 786*; *Bruen, 142 S. Ct. at 2161* (Kavanaugh, J., concurring). Defendant invites the court to interpret *Bruen* as condemning any reliance on *Heller*'s alleged dicta, in

spite of ample language in that decision limiting the scope of the *Second Amendment* right to "law abiding" citizens. *See Bruen, 142 S. Ct. at 2131-56*. That invitation clearly misses the mark. For the reasons discussed above, the *Bruen* decision did not overrule *Rozier*, nor did it undermine that decision to the point of abrogation. Thus, because the Eleventh Circuit decided that the *Heller* dictum is persuasive, it is for the Eleventh Circuit to decide whether to depart from that holding. *Rozier* is still good law, and this court must apply it. *Section § 922(g)(1)* is constitutional.

## IV. Conclusion

For the foregoing reasons, the Motion to Dismiss (Doc. # 19) is due to be denied. A corresponding Order will be entered.

**DONE** and **ORDERED** this December 13, 2022.

/s/ R. David Proctor

**R. DAVID PROCTOR**

UNITED STATES DISTRICT JUDGE

## ORDER

This matter is before the court on Defendant Santini Bryshad Hunter's Motion to Dismiss the Indictment. (Doc. # 19). For the reasons discussed in the court's Memorandum Opinion, the Motion (Doc. # 19) is **DENIED**. On or before **December 16, 2022 [*14]**, the parties **SHALL** inform the court as to the status of this matter.

**DONE** and **ORDERED** this December 13, 2022.

/s/ R. David Proctor

**R. DAVID PROCTOR**

UNITED STATES DISTRICT JUDGE

---

[5] *See supra* note 4.

Ⓐ Neutral

As of: March 29, 2023 5:13 PM Z

## *Briggs v. Bremby*

United States District Court for the District of Connecticut

March 24, 2014, Decided; March 24, 2014, Filed

CIVIL ACTION NO. 3:12-cv-00324 (VLB)

**Reporter**

2014 U.S. Dist. LEXIS 38204 *

JAMES BRIGGS, Plaintiff, Individually and on behalf of all other persons similarly situated, v. RODERICK BREMBY, in his official capacity as Commissioner of the State of Connecticut Department of Social Services, Defendant.

**Prior History:** *Briggs v. Bremby, 2012 U.S. Dist. LEXIS 172018 (D. Conn., Dec. 4, 2012)*

## Core Terms

households, eligible, benefits, state agency, food stamp, regulations, application process, injunction, argues, obligations, reconsideration motion, Amend, retroactive, processing, Centers, food, ineligible, completing, stamp, preliminary injunction, violations, expedited, deadline, eligibility determination, narrowly tailored, verification, compliance, interview, enjoined, promptly

**Counsel:** **[*1]** For James Briggs, Individually and on behalf of all other persons similarly situated, Plaintiff: Cecil Joseph Thomas, Gregory Lee Bass, Lucy Potter, LEAD ATTORNEYS, Greater Hartford Legal Aid, Hartford , CT; Marc Cohan, Mary R. Mannix, Petra T. Tasheff, LEAD ATTORNEYS, PRO HAC VICE, National Center for Law and Economic Justice, New York , NY.

For Roderick Bremby, in his official capacity as Commissioner of the State of Connecticut Department of Social Services, Defendant: Hugh Barber, LEAD ATTORNEY, Attorney General's Office, Health & Human Services, Hartford , CT; Jennifer L Callahan, Rosemary Miller McGovern, LEAD ATTORNEYS, Attorney General's Office - Elm St (Htfd), Hartford , CT.

**Judges:** Hon. Vanessa L. Bryant, United States District Judge.

**Opinion by:** Vanessa L. Bryant

## Opinion

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO ALTER AND AMEND AND MOTION FOR RECONSIDERATION [DKT. 84]

### I. Introduction

The Plaintiff brought this action on behalf of himself and all other persons similarly situated against the Defendant, in his official capacity as the Commissioner of the Department of Social Services, for failing to provide timely benefits in violation of the Food and Nutrition Act of 2008, formerly known **[*2]** as the Food Stamp Act, *7 U.S.C. § 2020* ("FSA").[1] The Court granted the Plaintiff's motion for a preliminary injunction pursuant to *Fed. R. Civ. P. 65*, thereby enjoining the Defendant from failing or refusing to process timely all applications for food stamps and to provide food stamps on a timely basis to all eligible households and individuals. [Dkt. 83]. After issuing the injunction, the Defendant filed this motion to alter and amend that order pursuant to *Fed. R. Civ. P. 59(e)* or to reconsider the order pursuant to *Local Rule 7(c)*. For the following reasons, the Defendant's motion is GRANTED IN PART and DENIED IN PART.

### II. Legal Standard

"A motion to alter or amend a judgment under *Rule 59* is decided under the same standard as a motion for reconsideration pursuant to *Rule 59*." *Country Club Assocs. v. Shaw's Supermarkets, Inc., 643 F. Supp. 2d 243, 245 (D. Conn. 2009)* **[*3]** (citing *Ass'n for Retarded*

---

[1] The Court notes that this statute was amended by the Agriculture Act of 2014, **PL 113-79, 128 Stat. 649 (Feb. 7, 2014)**. However, for purposes of this decision, references to the prior statute will be used as they correspond to the Preliminary Injunction Order at issue here and the relevant statutory provisions were not amended by the Agriculture Act of 2014 in any pertinent manner.

*Citizens of Conn., Inc. v. Thorne, 68 F.3d 547, 553 (2d Cir. 1995))*. The standard for granting a motion for reconsideration "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995)*. "A motion for reconsideration is justified only where the defendant identifies an intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Ayazi v. United Fed'n of Teachers Local 2, 487 F. App'x 680, 681 (2d Cir. 2012)* (internal citation and quotation marks omitted); *Ensign Yachts, Inc. v. Arrigoni, No. 3:09cv209(VLB), 2010 U.S. Dist. LEXIS 74267, 2010 WL 2976927, at *1 (D. Conn. July 23, 2010)* (same). A "motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided." *Shrader, 70 F.3d at 257*. Similarly, a "motion for reconsideration may not be used to plug gaps in an original argument or to argue in the alternative  **[*4]**  once a decision is made." *Lopez v. Smiley, 375 F. Supp. 2d 19, 21-22 (D. Conn. 2005)* (citations and internal quotation marks omitted). Further, Local Rule of Civil Procedure 7(c) requires parties seeking reconsideration to "set[ ] forth concisely the matters or controlling decisions which counsel believes the court overlooked in the initial decision or order." *D. Conn. Loc. Civ. R. 7(c)*.

III. <u>Discussion</u>

The Defendant argues that the Preliminary Injunction Order (the "Order") must be amended to correct a clear error and prevent manifest injustice as the Order, it alleges, is not sufficiently narrowly tailored to the violation at issue, and it contradicts other statutory obligations. [Dkt. 84, *Rule 59(e)* Motion to Alter and Amend and *Local Rule 7(c)* Motion for Reconsideration].

1. Narrowly Tailored

First, the Defendant argues that the preliminary injunction is not sufficiently narrowly tailored to the violation and imposes undue burdens on legal or discretionary activity. [Dkt. 84-1, Memorandum of Law in Support of Defendant's *Rule 59(e)* Motion to Alter and Amend and *Local Rule 7(c)* Motion for Reconsideration, p. 3-6]. The Plaintiff argues that the Order is tied closely to the violation  **[*5]**  that is occurring. [Dkt. 88, Plaintiffs' Opposition to Defendant's Motion to Alter and Amend and Motion for Reconsideration, p. 10-15].

"Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 15, 91 S. Ct. 1267, 28 L. Ed. 2d 554 (1971)*; *Forschner Grp., Inc. v. Arrow Trading Co., 124 F.3d 402, 406 (2d Cir. 1997)* ("A district court has a wide range of discretion in framing an injunction in terms it deems reasonable to prevent wrongful conduct.") (citations and internal quotation marks omitted). Even so, "[i]njunctive relief should be narrowly tailored to fit specific legal violations . . . [and] should not impose unnecessary burdens on lawful activity." *Waldman Pub. Corp. v. Landoll, Inc., 43 F.3d 775, 785 (2d Cir. 1994)* (citations and internal quotation marks omitted). Accordingly, the "scope of injunctive relief is dictated by the extent of the violation established." *Califano v. Yamasaki, 442 U.S. 682, 702, 99 S. Ct. 2545, 61 L. Ed. 2d 176 (1979)*.

The Defendant argues that the injunction ordered in this case is not sufficiently narrowly tailored to the violation  **[*6]**  found because it infringes on the state government's discretionary authority and, as will be discussed in the next section, creates rights for individuals not protected by the statute. [Dkt. 84-1, p. 3-6]. However, where systemic violations in complying with federal benefit statutes are found, courts have consistently ordered injunctions requiring complete compliance with the deadlines imposed by the statute and requiring the state to develop measures that would adequately track and report its compliance. *See Henrietta D. v. Bloomberg, 331 F.3d 261, 271-90 (2d Cir. 2003)* (affirming a preliminary injunction that required the defendant to comply with legally-mandated time frames for the delivery of benefits and services and to develop procedural reforms designed to provide clear recordkeeping when evidence of systemic failures to comply with federal law for timely processing and providing benefits to people with HIV or AIDS was found).

For example, in *Hess v. Hughes*, the district court found that Maryland's Department of Human Resources, the agency in charge of executing the federal food stamp program in effect at the time, was failing to determine eligibility to participate in the program  **[*7]**  and providing benefits to eligible households within the statutorily prescribed time frames. *Hess v. Hughes, 500 F. Supp. 1054, 1058-61 (D. Md. 1980)*. In granting the injunction, the court noted that the "obvious deleterious effect to the plaintiffs—the lack of food," substantially outweighs any administrative hardship created by the order. *Id. at*

*1059*. Recognizing that compliance with the statute was mandatory, the defendants were

> enjoined from failing to comply with the requirements of the federal Food Stamp regulations (1) as to the screening of Food Stamp applicants to identify those eligible for expedited service, (2) as to the provision of Food Stamps within three working days to those applicants determined eligible for expedited service, and (3) as to the provision of Food Stamps within 30 days to those applicants eligible for ordinary participation in the Food Stamp program.

*Id. at 1063*. In short, this injunction required the defendants to do what they are statutorily obligated to do. The Order issued by this Court has the same effect on the Defendant here.

More recently, in *Reynolds v. Giuliani*, the court granted the plaintiffs' request for an injunction requiring the defendants **[*8]** to "process all applications for food stamps, Medicaid, and cash assistance including applications for expedited food stamps and temporary pre-investigation grants, within the time-frames required by law" and enjoining the defendants "from converting any additional income support centers into job centers until the City makes a host of institutional reforms concerning how the City implements these programs." *Reynolds v. Giuliani, 35 F. Supp. 2d 331, 339 (S.D.N.Y. 1999)*. The court found that the evidence presented was indicative of systemic violations of failure to process timely applicants whose urgent needs were being overlooked. *Id. at 347*. The injunction, therefore, created several obligations, including that the "City defendants are directed to process all applications for expedited food stamps and temporary pre-investigation grants at Job Centers within the time frames required by law;" the "City defendants are directed to make eligibility determinations regarding food stamps and Medicaid applications at Job Centers separate from the eligibility determinations regarding cash assistance applications;" the "City defendants are directed to send plaintiffs and all persons applying **[*9]** for food stamps, Medicaid and cash assistance, including expedited food stamps and temporary pre-investigation grants at Job Centers, timely and adequate written notice of determinations of their eligibility for all benefits which they seek;" and the "City defendants are preliminarily enjoined from converting any Income Support Centers to Job Centers or opening any new Job Centers pending a hearing and determination on the adequacy of a corrective plan of training and procedures" for all centers. *Id. at 347-48*. It

further required the development of a corrective plan to address the systemic failures and dictated the elements to be addressed in that plan. *Id. at 348*.

The injunction issued in those cases provides for the same type of relief issued by this Court in the Order. Both of the injunctions discussed required the defendants to comply with the deadlines established by federal law and required the implementation of specific monitoring controls and corrective plans. These injunctions were ordered after a finding of systemic violations in which the plaintiffs' needs for essential benefits were being delayed because of state administrative incompetency, in clear violation of the implementing **[*10]** federal law. Here, the Order states that the Court found, and the Defendant admitted, that there are "systemic deficiencies in the manner in which it processes food stamps, including without limitation routine loss of applications, loss of verification documentation, and the failure to timely schedule interviews as required by the" FSA. [Dkt. 83, Preliminary Injunction Order, p. 1-2]. Therefore, the Court mandated that the Defendant comply with the deadlines imposed by the statute with respect to determining eligibility and providing benefits and required the implementation of monitoring controls and an informal review process. When compared to the terms of other injunctions, the imposition is no greater than those ordered by other courts in similar situations.

The Defendant relies on *Rizzo v. Goode* as support for its position. There, the Supreme Court held that the district court improperly "injected itself by injunctive decree into the internal disciplinary affairs of the state agency" in ordering the municipal police department to "draft, for the court's approval, 'a comprehensive program for dealing adequately with civilian complaints', to be formulated along . . . 'guidelines' **[*11]** suggested by the court." *Rizzo v. Goode, 423 U.S. 362, 369, 380, 96 S. Ct. 598, 46 L. Ed. 2d 561 (1976)*. At issue in that case was the Philadelphia Police Department's procedures for "handling citizen complaints alleging police misconduct." *Id. at 366*. The injunction "significantly revis[ed] the internal procedures of the Philadelphia police department, [and] was indisputably a sharp limitation on the department's 'latitude in the dispatch of its own internal affairs.'" *Id. at 379*. Unlike in this case, however, the Supreme Court expressed serious doubt as to whether there was a right that was being violated, the extent of the violation, and whether the plaintiffs even had standing to assert such a claim. Indeed, the Supreme Court noted that "there was no showing that the behavior of the Philadelphia police was

2014 U.S. Dist. LEXIS 38204, *11

different in kind or degree from that which exists elsewhere," and the district court even emphasized that "respondents had no constitutional right to improved police procedures for handling civilian complaints. But given that violations of constitutional rights of citizens occur in 'unacceptably' high numbers, and are likely to continue to occur, the court-mandated revision was a 'necessary first step' in **[*12]** attempting to prevent future abuses." *Id. at 370, 375*. *Rizzo* is inapposite and Defendant's reliance on it in this matter is misplaced.

Unlike in *Rizzo*, in this case the Plaintiffs do have a clearly established right to sustenance, which the Order directs the State to respect and honor. The regulations at issue, "which provide a deadline that specifically includes grants *and denials* of benefits, define the federal right that is at issue here: the right to a timely decision, regardless of eligibility" on an application for food stamps. *Robidoux v. Kitchel, 876 F. Supp. 575, 579 (D. Vt. 1995)* (emphasis in original). The state is "free not to participate in the 'scheme of cooperative federalism' established under the Food Stamp . . . Act[], but if it decides to join, 'it must comply with federal requirements'" in the act to continue receiving federal funds. *Reynolds v. Giuliani, 506 F.3d 183, 201-02 (2d Cir. 2007)* (quoting *Rothstein v. Wyman, 467 F.2d 226, 232 (2d Cir. 1972))*. This is not a case like *Rizzo*, where the court was imposing upon the State agency its idea of how best to manage itself; it is the Court telling the Defendant that its systemic failures in complying with a benefits **[*13]** statute enacted by Congress are unacceptable. In this circumstance, courts have routinely created identical obligations imposed by this Court's Order and enjoined the acting agencies from violating federal law. Accordingly, this Court finds that the Order is sufficiently and narrowly tied to the systemic violations of timely processing applications as required by the FSA. The Motion to Reconsider and/or to Amend and Alter the Order on this ground is DENIED.

2. Contradiction of Statutory Obligations

The Defendant argues that the Order must be altered because it conflicts with the current obligations created by the statute. Specifically, the Defendant argues that (1) it should not be required to provide benefits retroactively if the household is determined to be eligible to receive benefits; (2) eligibility must be a factor in the Order requiring prompt application processing; and (3) prompt processing of applications must only occur if the application process is timely completed. [Dkt. 89, Defendant's Reply Memorandum In Support of Defendant's *Rule 59(e)* Motion to Alter and Amend and *Local Rule 7(c)* Motion for Reconsideration, p. 2-9].

a. Retroactive Payment of Benefits

The Defendant argues **[*14]** that benefits must be restored retroactively to the month of application only if the household is determined to be eligible for assistance, and the fault for the delay is attributable to the State agency. [*Id.* at 9]. The Defendant takes issue with the following language in the Order: "7. Defendant shall process all applications for food stamps and provide food stamp benefits retroactive to the month of application to those households that have completed the application process and been determined eligible as required by *7 U.S.C. §§2020(e)(3)* and *(e)(9)*; *7 C.F.R. §273.2*," and "10. In each case in which Defendant is at fault for failing to make a timely eligibility determination, Defendant shall restore the household benefits retroactive as prescribed by *7 C.F.R. § 273.17*." The Court agrees with the Defendant that the regulations only require a payment of retroactive benefits to eligible households when it is found that the State agency was at fault for the delay. *See 7 C.F.R. § 273.2(h)*. Nothing in the Order is meant to require nor does it require the State to do otherwise. The uncontested issue here is that the state has long been derelict in its duty to make eligibility determinations **[*15]** timely and to maintain adequate records of applicant submissions made to establish eligibility.

Since the Defendant has raised concerns about possible misinterpretations of the Order, the Court GRANTS the motion to amend on this issue. Paragraph 10 of the Order is amended to state: "In each case in which Defendant is at fault for failing to make a timely eligibility determination, Defendant shall restore the household benefits retroactive as prescribed by *7 C.F.R. § 273.17(d)(1)(ii)* and *273.2(h)*." The reference to *§ 273.17* in Paragraph 6 is also amended to "*§ 273.17(d)(1)(ii)*." Since Paragraph 7 currently references the same regulation section, it remains unaltered. The Court also adds the following: "15. This order is not intended to and shall not be construed to require the state to pay benefits to applicants it demonstrates to be ineligible, including by virtue of an untimely application."

b. Eligibility and Timeliness in Application Processing

The Defendant's second and third points it wishes to amend address the same concern: the duty to process applications for ineligible applicants or those that are not timely completed. The Defendant argues that the Order improperly provides relief **[*16]** for households whose

Case 3:23-cv-00056-JBA    Document 23-21    Filed 03/30/23    Page 224 of 226

Page 5 of 7
2014 U.S. Dist. LEXIS 38204, *16

individual rights were not violated because they either are not eligible for assistance or because they did not fulfill their obligation to timely complete the application process. [Dkt. 89, p. 2-3]. The Defendant argues that the following paragraphs in the Order should be amended: "11. Defendant shall provide eligible households that complete the initial application process (including combined applications for food stamps, cash assistance, or other federal benefits) an opportunity to participate in the food stamp program as soon as possible, but no later than thirty calendar days following the date the application was filed . . . ," and "14. Within twelve (12) months of this Order, Defendant shall be in full compliance with all federal requirements to promptly determine the eligibility for food stamps of each applicant household so as to complete certification and provide assistance to all eligible households." The Defendant argues that the word "timely" should be added to both of these provisions to ensure that it must only process applications that are timely submitted. It also argues that the remainder of paragraph 14 should be amended to ensure that entitlement **[*17]** to prompt application processing is limited "only to eligible households;" accordingly, the paragraphs related to overall compliance must make an exception for households that fail "to comply with their responsibilities to timely complete the application process." [Dkt.84-1, p. 15-16]. The Defendant's reading of the Order and its obligations under the statute and regulations are incorrect.

Chapter _7 U.S.C. § 2020(e)(3)_ provides that

the State agency shall thereafter promptly determine the eligibility of each applicant household by way of verification of income other than that determined to be excluded . . . so as to complete certification of and provide an allotment retroactive to the period of application to any eligible household not later than thirty days following its filing of an application, and that the State agency shall provide each applicant household, at the time of application, a clear written statement explaining what acts the household must perform to cooperate in obtaining verification and otherwise completing the application process.

From the language of the statute, it is clear that the State agency has obligations and responsibilities that commence the moment the application **[*18]** is filed. The regulations clarify that the

State agency shall provide eligible households that complete the initial application process an opportunity to participate . . . as soon as possible,

but no later than 30 calendar days following the date the application was filed . . . . An application is filed the day the appropriate food stamp office receives an application containing the applicant's name and address, which is signed by either a responsible member of the household or the household's authorized representative.

_7 C.F.R. § 273.2(g)(1)_. To file an application, therefore, it is not required that the interview be completed or that the entire application process be finished; instead, the application is filed when the State agency receives the signed application containing the name and address of the applicant. It is from this date that the state has 30 days to provide eligible households that complete the application process benefits.

Even though the Defendant admits it has a duty to eligible households, it also has obligations and responsibilities to those households that are ineligible or fail to timely complete the application process.

Households that are found to be ineligible **[*19]** shall be sent a notice of denial as soon as possible but not later than 30 days following the date the application was filed. If the household has failed to appear for a scheduled interview and has made no subsequent contact with the State agency to express interest in pursuing the application, the State agency shall send the household a notice of denial on the 30th day following the date of application.

_7 C.F.R. § 273.2(g)(2)_. While the Defendant is correct that certain regulations require the Defendant to keep an application longer than 30 days, it is clear that the State agency has responsibilities and obligations to assist the applicant in completing the process. This assistance requires the state's prompt action to process and review the application and determine what other steps or other evidence are needed for the application process to be completed.

The Defendant argues that Paragraphs 11 and 14 of the Preliminary Injunction Order currently require it to perform certain actions that are not required by the statute and regulations. First, it argues that the word timely must be added to Paragraph 11, so that the paragraph will read: "Defendant shall provide eligible households **[*20]** that timely complete the initial application process . . . an opportunity to participate in the food stamp program as soon as possible, but no later than thirty calendar days following the date the

application was filed by *7 U.S.C. §2020(e)(3)*; *7 C.F.R. §273.2(g)*." [Dkt. 84-1, p. 14]. The Defendant argues that this modification is necessary to "clarify that the defendant's administrative obligation to timely process does not extend to situations where the household delays in completing the application process." [*Id.*]. Inexplicably, the Defendant makes this argument even though the language in the Order is a direct quote from the regulations. *See 7 C.F.R. § 273.2(g)(1)*. Therefore, adding the word "timely" will ultimately change what the regulations actually require, instead of correcting what the Defendant claims is an added obligation. As the Defendant correctly points out, this Court does not have the ability to change the obligations that are statutorily imposed; it only has the ability to ensure that the Defendant complies with the statutory requirements. Therefore, adding the word "timely" is inappropriate in light of the regulations.

Pursuant to the regulations and, therefore, **[*21]** the Order, the State is only required to provide to eligible households that complete the initial application process an opportunity to participate in the program. By definition the applicant is required to complete the application process to receive the benefits. The Court is unsure as to what the Defendant hopes to achieve by adding the word "timely" as it seems to be encompassed already by the language in the Order.

Moreover, the regulations require the state to issue a Notice of Denial to ineligible applicants and to those who fail to appear at their scheduled interview or show no further interest in the application process. After recipient of the applications and the supporting documentation required to apply for food stamps, the state has both the obligation and the ability to determine who is and who is not eligible. The Order imposes no obligations on the state to which it is not already subject.

The Defendant also requests adding the words "eligible" and "timely" in Paragraph 14 of the Order to ensure that it only needs to process applications for those households that are both eligible for assistance and timely complete the application process. [Dkt. 84-1, p. 15-16]. The Defendant **[*22]** argues that this is appropriate because the statute only requires that it process applications timely and provide benefits to eligible households, not ineligible ones. The Defendant appears to be confused of the definition of "processing applications" because it interprets that term as used in the Order to require the ultimate determination of eligibility. However, the regulations provide that

[t]he application process includes filing and completing an application form, being interviewed, and having certain information verified. The State agency must act promptly on all applications and provide food stamp benefits retroactive to the month of application to those households that have completed the application process and have been determined eligible. The State agency must make expedited service available to households in immediate need.

*7 C.F.R. § 273.2(a)(2)*. Clearly, the State agency has an obligation to "act promptly" in processing all applications, even for households who ultimately are determined to be ineligible. Process, therefore, does not mean determining eligibility, rather it requires the state to review the application and take additional steps as specified in the regulations. **[*23]** This reading of the regulations is confirmed by the statutory language which states that the "State agency shall provide each applicant household, at the time of application, a clear written statement explaining what acts the household must perform to cooperate in obtaining verification and otherwise completing the application process." *7 U.S.C. § 2020(e)(3)*. The notice that is provided "shall also inform the household of the State agency's responsibility to assist the household in obtaining required verification provided the household is cooperating with the State agency . . . ." *7 C.F.R. § 273.2(c)(5)*. Therefore, the terms of the Order are consistent with the understanding that the State agency is required to act promptly on all applications by processing them in the sense that the State agency reviews the information submitted and assists the applicant in timely completing the process. This is all the Order requires.

In addition to the fact that the terms of the Order mirror the obligations created by the statute and the regulations, it is worth noting that another court in this Circuit has also held that the regulations, "which provide a deadline that specifically includes grants **[*24]** *and denials* of benefits, define the federal right that is at issue here: the right to a timely decision, regardless of eligibility." *Robidoux, 876 F. Supp. at 579* (citing *7 C.F.R. § 273.2(g)*) (emphasis in the original). The court held that this must be the case because "[i]n establishing a processing deadline for all applications, the federal government recognized the interest of all applicants in a timely decision. Individuals deemed eligible for benefits need assistance quickly. Those who are found to be ineligible need to seek alternative resources, and potentially pursue an appeal, as soon as possible." *Id. at 580*. This analysis is persuasive and confirms this Court's understanding that the statute and

2014 U.S. Dist. LEXIS 38204, *24

the regulations require the state agency to act the moment an application is filed. The state has the responsibility to assist the applicant in timely completing the process and to determine quickly the applicant's eligibility. Given this, the Order is not overly broad and does not require the Defendant to perform any functions not otherwise prescribed in the statute. Furthermore, the Order is not intended to and shall not be read to require the Defendant to perform any functions **[*25]** not found in the statute or the regulations. Since the Defendant has failed to show that the Court has erred in issuing the Order as related to its processing obligations or created a manifest injustice, the motion is DENIED on these bases.

IV. <u>Conclusion</u>

The Defendant's motion to amend and alter or motion to reconsider is GRANTED IN PART and DENIED IN PART. The Order is amended as explained in Section III(2)(a), and the Defendant's motion is denied in all other respects.

IT IS SO ORDERED.

/s/ Hon. Vanessa L. Bryant

United States District Judge

Dated at Hartford, Connecticut: March 24, 2014