# Exhibit 104

**STATE PARK AND FOREST COMMISSION**

**STATE OF CONNECTICUT**

GEORGE C. WALDO, *Chairman*
Fairfield

EDWARD C. CHILDS, *Vice-Chairman*
Norfolk

JULIAN H. NORTON, *Treasurer*
Bristol

GEORGE A. GARRATT, Hamden

JOSEPH W. POWDRELL, Brooklyn

ARTHUR J. STANLEY, West Hartford



KEEP CONNECTICUT GREEN

165 CAPITOL AVENUE
Post Office Box 1558
HARTFORD

*Director-Secretary*
DONALD C. MATHEWS

ADDRESS ALL COMMUNICATIONS
TO THE COMMISSION

374

December 22, 1949

Honorable Winifred McDonald
Secretary of State
State Capitol
Hartford, Connecticut

My dear Mrs. McDonald:

Herewith is transmitted, in accordance with Section 281 of the 1949 General Statutes, three copies of the administrative rules and regulations of the State Park and Forest Commission concerning State parks and forest recreational areas which were adopted by unanimous vote at a meeting of the Commission when a quorum was present on December 14, 1949.

At the same meeting it was voted to supersede and abolish regulations now in force under the Connecticut departmental regulations adopted April 16, 1945 and published in the Connecticut departmental regulations under No. 153-2-1, which regulations cover use of State parks and use of State forests.

It is our understanding that under Section 282 of the General Statutes, Revision of 1949, one copy of these regulations will be presented to the Attorney General by you for approval.

Very truly yours,

Donald C Mathews

Donald C. Mathews
Director

DCM
MEH

12/28/49

# *State of Connecticut*

374

# **Rules and Regulations**

OF

State Park and Forest Commission

Concerning:

The Use of State Parks and State Forests

Rules and Regulations
Sections 153-2-1 to 153-2-5 inclusive, and Sections 153-3-1 to 153-3-23 inclusive, of the rules and regulations of the State Park and Forest Commission, concerning the use of State Parks and the use of State Forests respectively, together with the list of Connecticut State Parks as prepared for submission to the General Assembly by the editor of the Connecticut Law Journal, originally dated April 16, 1945 and filed with Secretary of State on April 16, 1945, are repealed and the following is substituted in lieu thereof.

## GENERAL RECREATIONAL AREAS

Sec. 153-2-1.  The State Parks and State Forest recreational areas shall be open to the general public daily between the hours of 8:00 A.M. and 9:30 P.M.  Campers and fishermen may, in posted areas, camp and fish, and may in addition camp and fish between 9:30 P.M. and 8:00 A.M.

Sec. 153-2-2.  No person shall deface, remove, destroy or otherwise injure in any manner whatsoever any structure, building, tree, flower, shrub, fern, moss, within recreation areas, nor shall any songbirds and their nests be molested or disturbed at any time.

Sec. 153-2-3.  Hunting or carrying of firearms is not permitted in any State Park or Forest recreational area except at predetermined times in such areas as set aside by the State Park and Forest Commission and when posted for such purposes and subject to the rules and regulations set forth by the Connecticut Board of Fisheries and Game.

Sec. 153-2-4.  The use of fireworks in any form is prohibited.

Sec. 153-2-5.  Fishing, except in restricted areas, is permitted in any State Park and Forest recreational area under the rules and regulations established by the Connecticut State Board of Fisheries and Game.

Sec. 153-2-6.  Dogs are permitted in recreational areas on leash only and under control of their owners and/or keepers in areas posted for that purpose.

Sec. 153-2-7.  No person shall erect or post any notice or sign upon State Park and Forest property except when notices or signs are authorized by the State Park and Forest Commission.

# Rules and Regulations

OF

**374**

State Park and Forest Commission

## (CONTINUED)

Sec. 153-2-8.  Gambling in any form on State Park or Forest property is prohibited.

Sec. 153-2-9.  The use of State Park and Forest lands or any improvements thereon for private gain or commercial purposes, except by concessionaires or vendors approved by the State Park and Forest Commission, is prohibited.  The sale, at any time, of alcoholic beverages in any form is prohibited on State Park and Forest property.

Sec. 153-2-10.  No political meetings, or signs endorsing any candidate for political office shall be held or placed on any State Park or Forest property.

Sec. 153-2-11.  No person shall leave paper, glass, or other refuse on the grounds, in the buildings or on the waters of the State Parks and Forests, but shall place such refuse in the receptacles provided thereof.

Sec. 153-2-12.  Dumping on any State Park and Forest property is prohibited.

Sec. 153-2-13.  Horse, motorcycle or bicycle riding, except as authorized by the State Park or Forest Ranger in charge, is prohibited on foot trails.

Sec. 153-2-14.  No boats of any kind shall be fastened to any State Park or Forest pier or anchored in any dock so as to prevent free access to such structure.

Sec. 153-2-15.  Disorderly conduct, intoxication, obscene or indecent behavior is prohibited.

Sec. 153-2-16.  Violations of any of the above regulations is sufficient cause for the State Park or Forest Ranger in charge to evict any or all offenders from the State Park or Forest.

## VEHICLE - TRAFFIC AND PARKING

Sec. 153-2-17.  Parking of any vehicle shall be limited to such places and hours as designated by signs posted by the State Park and Forest Commission.

Sec. 153-2-18.  The maximum speed of any vehicle in State Parks or Forests shall not exceed 20 miles per hour.

Sec. 153-2-19.  All posted traffic and parking regulations including those of designated speed, stop signs, one way traffic, slow signs, no parking, angular parking, DO NOT ENTER, except when directed by the State Park or Forest Ranger, shall be strictly observed.

Sec. 153-2-20.  No refuse shall be left on the ground of the parking area but shall be placed in containers provided for such purposes.

Sec. 153-2-21.  Ball playing or the playing of other games is prohibited on parking areas.

Sec. 153-2-22.  The changing of clothes, except in places provided for such purposes, is prohibited.

# Rules and Regulations    374

OF

State Park and Forest Commission

**(CONTINUED)**

Sec. 153-2-23.  Any violations of the above vehicle traffic and parking regulations shall be sufficient cause for eviction of the operator and vehicle from the State Park or Forest.

Sec. 153-2-24.  All travel on State Park and Forest roads is at the risk of the operator of the vehicle.

## CAMPING

Sec. 153-2-25.  Camping is limited to such places and time as designated by the State Park and Forest Commission.

Sec. 153-2-26.  All campers and camp visitors must secure a permit from the Park or Forest Ranger to enter a State Park or Forest camping area.

Sec. 153-2-27.  No camping permit shall be issued to any person under 16 years of age to camp on a State Park or Forest campsite without the written consent of his or her parent or guardian.

Sec. 153-2-28.  No person shall trespass on the camp lot leased to another.

Sec. 153-2-29.  Disorderly conduct, intoxication, obscene or indecent behavior is prohibited.

Sec. 153-2-30.  The use of public drinking water faucets for any washing purposes is prohibited.

Sec. 153-2-31.  All lights of the campers other than those needed for safety shall be extinguished by 11:00 P.M.

Sec. 153-2-32.  No person shall use cooking equipment of a hazardous type.  Outside fires are permitted, when approved by the State Park or Forest Ranger in charge.  No fire shall be left unattended or unextinguished.

Sec. 153-2-33.  The speed limit of vehicles in camping areas shall be 10 miles per hour.  Riding on outside of cars is prohibited.

Sec. 153-2-34.  Parking is restricted to designated parking areas.

Sec. 153-2-35.  No one shall use toilet buildings, bathhouse, or other buildings for any purpose other than that for which they were designed.

Sec. 153-2-36.  All garbage and trash shall be placed in the containers provided for such purposes.

Sec. 153-2-37.  Dogs shall be held on a leash at all times and walked in designated areas only.

Sec. 153-2-38.  No more than one pet is allowed per camp site.

Sec. 153-2-39.  Quiet, except on special occasions with permission of the State Park or Forest Ranger in charge, shall be observed between the hours of 11:00 P.M. and 6:00 A.M.

# Rules and Regulations

374

OF

State Park and Forest Commission

(CONTINUED)

Sec. 153-2-40.  Playing of baseball or other similar athletic games, except in designated places, is prohibited in the camping areas.

Sec. 153-2-41.  The sale of food, ice or other items in camping areas without a permit issued by the State Park and Forest Commission, is prohibited.

Sec. 153-2-42.  No camping equipment shall be used without approval of the Ranger in charge.

Sec. 153-2-43.  All equipment shall be removed from the camp ground or recreational area at end of camping season, by it's owner or his agent, and any equipment left without permission of the State Park or Forest Ranger shall be forfeited to the State of Connecticut.

Sec. 153-2-44.  The State Park and Forest Commission shall not be responsible for loss or theft of any article or equipment on any State Park or Forest.

Sec. 153-2-45.  Violation of any of the above regulations shall be sufficient cause for the local State Park and Forest Ranger to revoke the camping permit.

## PICNIC AREAS

Sec. 153-2-46.  Picnicking shall be limited to such places as designated by the State Park and Forest Commission.

Sec. 153-2-47.  Fires may be kindled at such time and place as may be designated by the State Park and Forest Ranger.

Sec. 153-2-48.  Tables are provided for eating purposes and shall not be used for storage.  Not more than one table shall be allowed to six people or less.

Sec. 153-2-49.  Dogs shall be held on a leash at all times.  Horses are not allowed in the picnic areas.

Sec. 153-2-50.  Beer kegs in picnic areas are prohibited.

Sec. 153-2-51.  Playing baseball or other similar athletic games, except in designated places, is prohibited in the picnic areas.

Sec. 153-2-52.  Garbage and other refuse shall be deposited in containers provided for such purposes.

Sec. 153-2-53.  No person shall deface, remove, destroy or otherwise injure in any manner whatsoever any structure, building, tree, flower, shrub, fern, moss, within recreation areas, nor shall any songbirds and their nests be molested or disturbed at any time.

Sec. 153-2-54.  Toilet facilities provided in picnic areas shall be used by all persons.

Sec. 153-2-55.  Violation of any of the above regulations shall be sufficient cause for the local State Park or Forest authority to evict any offender from the State Park or Forest.

# Rules and Regulations

OF

State Park and Forest Commission

**(CONTINUED)**

374

### BATHING AREAS

Sec. 153-2-56.  Bathing is restricted to places designated and posted by the State Park and Forest Commission.

Sec. 153-2-57.  The changing of clothes except in places provided for such purposes is prohibited.

Sec. 153-2-58.  Tents or full coverage screens is prohibited.

Sec. 153-2-59.  Ball playing is prohibited on the beach.

Sec. 153-2-60.  The use of crockery or glassware is prohibited on the beach.

Sec. 153-2-61.  Bathing without a bathing suit is prohibited.

Sec. 153-2-62.  Dogs and horses on the beach or in the water of the bathing area are prohibited.

Sec. 153-2-63.  Disorderly and all forms of rough play creating hazards to human safety are prohibited.

Sec. 153-2-64.  Fishing is permitted on areas posted for that purpose.  It is prohibited on swimming areas.

Sec. 153-2-65.  The use of boats on the beach or in the swimming area is prohibited.  Areas for boats will be so posted.

Sec. 153-2-66.  Swimming hours are from 8:30 A.M. until sunset.

Sec. 153-2-67.  Violations of any of the above regulations are sufficient causes for the State Park or Forest Rangers to evict any or all offenders from the State Park or Forest.

374

Strike out
when
inapplicable

Be it known that the within and foregoing rules and regulations are made and promulgated by the undersigned, pursuant to Section _____ of the Supplement to the    General Statutes, Public Act No. _____ of the Public Acts, as (an amendment to) the rules and regulations of his Department, pertaining to

In Witness Whereof, I have hereunto set my hand and seal this ___ day of _____ 19___ .

......................................................... L. S.

......................................................... 
(Title of Office)

Strike out
when
inapplicable

Be it known that the within and foregoing rules and regulations have been made, established and adopted by State Park & Forest Commission at a meeting held on the 14th day of December 19 49 , and are in promulgated, pursuant to Section 3431 of the Supplement to the General Statutes, Public Act No. Revision of the 1949 Public Acts, as in repeal and substitution (an amendment to) the rules and regulations of the said Board Commission and State Forests , pertaining to the use of State Parks

In Witness Whereof, I have hereunto set my hand and seal this 22 nd day of December 19 49 .

_O. E. Markew_
Secretary of DIRECTOR
CONNECTICUT
STATE PARK & FOREST COMMISSION

Received and filed in triplicate, this 28th day of December 19 49, in accordance with Cum. Suppl. 1947, Sec. 731.
Section 281, General Statutes
Revision 1949.

_Winifred McDonald_
Secretary of the State
By: _Louis J. Tapogna_

Approved: _William L. Hadden_
Attorney General

This is to certify that the within and foregoing rules and regulations have been published in the Connecticut Law Journal on the 17th day of January 1950 .

Attest: _John J. _____
Editor

0638

# 374

**Rules and Regulations**

OF

State Park and Forest Commission

CONCERNING

The Use of State Parks and State Forests

Received and filed in the office of the Secretary of the State

December 28 19 45

Approved by Attorney General

January 6 19 50

Published in Connecticut Law Journal

January 17 19 50

# Exhibit 105



Park Patrolman's Manual

STATE PARK & FOREST COMMISSION

# PATROLMAN'S MANUAL

## STATE PARK AND FOREST COMMISSIONERS

GEORGE A. GARRATT, *Chairman* ...... Hamden

EDWARD C. CHILDS, *Vice Chairman* Norfolk

JULIAN H. NORTON, *Treasurer* ........ Bristol

GEORGE C. WALDO ...................... Fairfield

JOSEPH W. POWDRELL ................. Brooklyn

ARTHUR J. STANLEY ............ West Hartford

DONALD C. MATHEWS ... *Director-Secretary*

**Keep Connecticut Green**

*Published By*

STATE PARK AND FOREST COMMISSION

PARK DIVISION

1951

# RULES AND REGULATIONS

## OF

## STATE PARK AND FOREST COMMISSION

Concerning:

## The Use of State Parks and State Forests

Sections 153-2-1 to 153-2-5 inclusive, and Sections 153-3-1 to 153-3-23 inclusive, of the rules and regulations of the State Park and Forest Commission, concerning the use of State Parks and the use of State Forests respectively, together with the list of Connecticut State Parks as prepared for submission to the General Assembly by the editor of the Connecticut Law Journal, originally dated April 16, 1945 and filed with Secretary of State on April 16, 1945, are repealed and the following is substituted in lieu thereof.

## GENERAL RECREATIONAL AREAS

Sec. 153-2-1. The State Park and State Forest recreational areas shall be open to the general public daily between the hours of 8:00 A. M. and one-half hour after sunset. Campers and fishermen may, in posted areas, camp and fish and may in addition camp and fish between one-half hour after sunset and 8:00 A. M. State Park and Forest rangers may close any portion of a park or forest or the use of its facilities when it appears that the capacity of the area has been filled or for any reason the use of the same would endanger the public safety.

Sec. 153-2.2. No person shall deface, remove, destroy or otherwise injure in any manner whatsoever any structure, building, tree, flower, shrub, fern, moss, within the recreation areas, nor shall any songbirds and their nests be molested or disturbed at any time.

Sec. 153-2-3. Hunting or carrying of firearms is not permitted in any State Park or Forest recreational area except at predetermined times in such areas set aside by the State Park and Forest Commission and when posted for such purposes and subject to the rules and regulations set forth by the Connecticut Board of Fisheries and Game.

Sec. 153-2-4. The use of fireworks in any form is prohibited.

Sec. 153-2-5. Fishing, except in restricted areas, is permitted in any State Park and State Forest recreational area under the rules and regulations established by the Connecticut State Board of Fisheries and Game.

Sec. 153-2-6. Dogs are permitted in recreational areas on leash only and under control of their owners and/or keepers in areas posted for that purpose.

Sec. 153-2-7. No person shall erect or post any notice or sign upon State Park and Forest property except when notices or signs are authorized by the State Park and Forest Commission.

Sec. 153-2-8. Gambling in any form on State Park or Forest property is prohibited.

# Exhibit 106

Recorded ...amden Land Records Decembe. 31, 1969 Vol. 561
Pages 325-328

SLEEPING GIANT STATE PARK - PARCEL NO. 126

TO ALL PEOPLE TO WHOM THESE PRESENTS SHALL COME, GREETING:

KNOW YE, That I, FRANK S. BUTTERWORTH, JR., of the Town of
Hamden, County of New Haven and State of Connecticut (hereinafter
called the "Releasor"), for the consideration of $1.00 and other
valuable considerations (but less than an aggregate value of
$100.00) received to my full satisfaction of the STATE OF
CONNECTICUT, do remise, release and forever quitclaim unto the
said State of Connecticut, and its successors and assigns forever,
all such right, title, interest, claim and demand whatsoever as
I, the said Releasor, have or ought to have in or to all that
certain piece or parcel of land situated on the northwest side of
Tuttle Avenue, and the north side of River Road, in the Town of
Hamden, County of New Haven and State of Connecticut and bounded
and described as follows:

Beginning at a point located on the North side of
said River Road, which point marks the southeast corner
of land now or formerly of the New Haven Water Company,
and running thence in a southeasterly direction along
said River Road a distance of 20', more or less, to the
southwest corner of land now or formerly of Anthony and
Antonette Delucia; thence in a northeasterly direction
along the land of said Delucia 225'; more or less, to
the northwest corner of land of Delucia; thence 241',
more or less, along the northerly boundary of land of
said Delucia and continuing 265', more or less, along
the Northerly boundary of adjoining land now or formerly
of Andrew and Rose D'Ambrosio to a point marking the
northeast corner of said land of D'Ambrosio, and to land
of the Grantor; thence proceeding in a southwesterly
direction a distance of 248'; more or less, along the
boundary line of said D'Ambrosio land and land of the
Grantor to said River Road; thence in a general easterly
and southeasterly direction along the northerly side of
said River Road a distance of 1300', more or less, to
the corner of said Tuttle Avenue; thence in a northeasterly
direction along the northwesterly side of Tuttle Avenue
a distance of 250', more or less, to a point marked by
the intersection of an old wire fence. Thence continuing
in a northwesterly direction, in a general prolongation
of the line of said fence a distance of 1100', more or
less, to a point marking the intersection of this line
with the high water mark of the east shore of a pond;
thence 800', more or less, in a general northeasterly
direction along the high water line of said pond to the
center-line of Butterworth Brook; thence 600', more or less,

in a general northeasterly direction along the centerline of
Butterworth Brook to a point, which point is 270', more or less,
in a general southwesterly direction as measured along Butterworth
Brook from the westerly foundation of an old bridge now or formerly
crossing Butterworth Brook; and from this point in a northwesterly
direction 700', more or less, in a line marked in part by an old
fence, to a point marked by the intersection of this old fence and
a stonewall; thence in a line marked by this stonewall, in a
northerly direction 250', more or less, to the intersection of
said stonewall with another stone wall; thence 1200', more or less
in a southwesterly direction along said other stone wall and the
straight extension thereof to a point marked by the intersection
of wire fences, which point also marks a northeast corner of land
now or formerly of The New Haven Water Co.; thence in a general
southwesterly direction a distance of 1200', more or less, along
said land of the New Haven Water Company to said River Road and
the point of beginning.

Being the same property as is shown on a map prepared
by the Connecticut State Park and Forest Commission and
entitled "An Addition to Sleeping Giant Park by Gift
From Frank Butterworth 46-1/2 Ac± Drawn by: R. H. Sinay
Area: Sleeping Giant Town Hamden Class D. Survey Scale:
1"= 100' ± Date: Nov. 1969", a copy of which map has been
filed in the Office of the Town Clerk of Hamden or is to
be filed therein at the time of the recording of this deed
on the Hamden Land Records. Together with all rights acquired
by the said Frank S. Butterworth, Jr., in an easement granted
By Andrew D'Ambrosio and Rose D'Ambrosio on May 29, 1961,
said easement being recorded in Volume 445, Page 3, of the
Hamden Land Records.

The above descriptions are subject to such corrections as may
be disclosed by a survey.

TO HAVE AND TO HOLD the said premises, with the appurtenances
thereof, unto the said Releasee, and its successors and assigns
to its and their proper use and behoof so that neither I, the said
Releasor, nor my heirs, nor any other person under me or them, shall
hereafter have any claim, right or title in or to said premises,
or any part thereof, but therefrom I am and they are by these
presents, forever barred and secluded.

By its acceptance hereof, the Releasee, for itself, and its
successors and assigns, covenants and agrees with the Releasor,
and his heirs, executors and administrators, as follows:

1. Said premises and all other properties in the area thereof
that may be conveyed by the Releasor to the Releasee by gift or
devise shall, after the Releasor's death, be designated as the
"Frank S. Butterworth Natural Reserve" and shall be used and
managed by the State of Connecticut, or its successors and assigns

- 2 -

0646

in such a way or ways as may be feasible to provide education in, and appreciation of, forestry, wildlife and general conservation among youth and adults on a State-wide basis.

2.  The use of firearms shall be forever prohibited thereon.

3.  No highways shall be constructed thereon, and access to, and passage through the area shall be confined to simple paths and trails in keeping with a non-gregarious public use and in keeping with the express intention of the Releasor to preserve a wooded area; except that parking facilities may be developed as necessary to the intended public use.

4.  Dogs and all other domestic pets shall be excluded from the area.

5.  Trapping shall be limited solely to the taking by employees of the State of Connecticut of such species of wildlife as may be necessary to the balancing of a natural community, for the control of a disease, or for scientific purposes.

6.  No building shall be constructed except those for use as necessary adjuncts to the operation of a nature center or similar study facility; and any and all buildings shall be of such designs and so constructed as to blend into the natural forest community of trees, plants, and wildlife.

7.  One or more shallow wildlife ponds may be created.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 29th day of _november_   A.D., 1969

Signed, Sealed and Delivered
in the Presence of:

_Ralph E. Sult_

    Ralph E. Sult..Delray Beach    _Frank S. Butterworth Jr._ (SEAL)

                            FRANK S. BUTTERWORTH, JR.

_Marjorie A. G. Pitts_

    Marjorie A. G. Pitts...Del ray Beach

STATE OF FLORIDA      )
COUNTY OF PALM BEACH  ) ss. Delray Beach

On this 29 day of _november_, 1969, before me JOHN L. Pitts, III, the undersigned officer, personally appeared FRANK S. BUTTERWORTH, JR., known to me (or satisfactorily proven) to be the person whose name is subscribed to the with instrument and acknowledged that he executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                     _John L. Pitts III_
                     John L. Pitts, III
My Commission Expires
                  NOTARY PUBLIC, STATE OF FLORIDA AT
                  MY COMMISSION EXPIRES OCT.  23,
                  BONDED THROUGH FRED W. BINYTELL

- 3 -

VOL. 561 PAGE 328

THE ABOVE DESCRIBED LAND IS A GIFT TO THE STATE AND IS HEREBY
APPROVED.

JOHN DEMPSEY, Governor

T. F. GILROY DALY, Attorney General

Received for record  DEC 31 1969

at 10 h 10 m A. M  at Hamden, Conn.

Thomas Racois  Town Clerk

- 4 -

0648

# Exhibit 107



# The Economic Impact of
# State Parks, Forests and Natural Resources under the
# Management of Department of Environmental Protection

June 15, 2011

Peter Gunther
Kathryn Parr
Marcello Graziano
Fred Carstensen

Connecticut Center for Economic Analysis
University of Connecticut
Storrs, CT 06269
Prof. Fred Carstensen, Director

## Executive Summary

The parks and state forests that the Department of Environmental Protection (DEP) manages deliver significant economic benefit to Connecticut residents and park visitors.  In 2010, resident and nonresident visitors to Connecticut's 107 State Parks and 32 Forests spent 8.5 million visitor-days touring within the state.  Of those days, at least 4.6 million days were spent partially at for-fee parks and forests managed by DEP.  DEP activities generate the following direct and indirect economic impacts:

➤ 8.8 thousand jobs currently, that in the absence of DEP managed parks and forests and activities would be reduced to 6.7 thousand in 2020 as personnel found alternative employment;

➤ $343 million in personal income growing in current dollars to $595 million in 2020;

➤ $253 in personal disposable income, that generates choices for citizens, increasing to $471 million by 2020; and,

➤ Net present value in state revenues over expenditures of $30 million in constant dollars.

In addition, owners of single residences in Connecticut derived amenity values of $270 million annually from overlooking DEP managed venues.  If not preserved, alienation of any of that green space from pestilence, such as Western North America has experienced from mountain spruce budworm, or harvesting of the forests and industrialization would erode those benefits.

In establishing the net benefits of DEP services, CCEA estimated the total number of visitor days, the value that these visitors placed on various key activities net of fees paid (measured as consumer surplus), the value adjacent property owners derived from their location, and the aggregate expenditures inclusive of direct, indirect and induced expenditures and employment that result from these activities.  These benefits are then aggregated into annual estimated benefits derived from DEP managed state venues[1].  As noted above, both the economic impact of expenditures and the economic value people derive from the parks, vastly exceeds the annual cost to the state of husbanding nature's assets for Connecticut citizens and out-of-state visitors.

In 2010 visitors to these venues spent an estimated $544 million in general tourism activities in Connecticut.  In addition, 189,000 sportspersons, holding 293,600 licenses and permits issued by DEP, spent additional funds to pursue their specific sporting activities:

○ $264 million for angling, of which 90% came from Connecticut residents;

○ $100 million for hunting, of which $95.1 million came from Connecticut residents;

○ $36.8 million for recreational boating, attributed to DEP-managed boat launches and training activities, net of anglers' boating expenditures;

○ $26.2 million for skiing and attending educational and other venues;

---

[1] "Venues," is used usually herein to refer to state parks and forests as well as those areas outside of the parks governed by DEP issued licenses for hunting, fishing, boating and any commutations and permutations thereof. Occasionally, the context will limited its meaning to state parks and forests.

2

o   **Participation in other sports located in the parks and forests or to attend them.**

 **Visitor fees at the parks and forests, including late day visitors, were in the $3.0 to $3.3 million dollar range from 2005 to 2009. Increasing rates in 2010 set the stage for an increase to $5.2 million in future years.  These same visitors are estimated to have spent $94 million in Connecticut.  DEP charges visitors: entrance, parking, and camping fees, cabin and pavilion rents, ice and firewood sales and related sales taxes.  These revenues all flow to Connecticut's General Fund.**

**Recreational activities also generated licensing and permit fees as well as training and educational revenues.  2010 revenues generated from DEP licensing and permitting of key activities included angling ($3.8 million), hunting ($2.3 million), and combined hunting and angling licenses ($1.6 million). Recreational boat training, testing, and licensing generated a further ($3.2 million.)[2].  Including camping and all activity fees, DEP collected $18.3 million from fees paid by participants and attracted $5.4 million in federal transfers from the federal Sport Fish Restoration (SFR) and Wildlife Restoration (WR) programs.  These direct revenues indicate that Connecticut residents, nonresidents and the Federal Government valued DEP managed state venues.  Before taking account of a one-time $1.1 million credit program to assist adjusting to the higher fees, direct revenues and transfers in 2010 covered all but $2.6 million of Connecticut state expenses of $26.3 million including parks, forest, and hatchery operations.  Property taxes stemming from vistas dependent on DEP managed venues added a $4.2 million to state revenues, more than sufficient to cover DEP operating and capital expenditures. In addition, indirect revenues from other taxable tourist and sporting expenditures further contributed to state revenues.**

**The well known downward slope of demand curves for each activity implies that all but the least enthusiastic person undertaking each activity derives quality of life benefits over and above expenses incurred, what economists refer to as "Consumer surplus".  CCEA has estimated consumer surpluses accruing to Connecticut citizens by major activities:**

o   **Camping ($124.1 million)**
o   **Hunting ($17.8 million)**
o   **Inland Angling ($67.4 million)**
o   **Marine Angling ($36.9 million)**
o   **Swimming at four parks ($570,000).**

**In addition to the $246.9 million accruing to residents in consumer surplus, out-of-state visitors undertaking these activities derived a further $25.1 million in consumer surplus, led by campers at $18.4 million.  Total estimated consumer surplus for campers at DEP venues is 26% of Connecticut tourism expenditures made by them.[3]  In-state estimates of consumer surplus remain modest due to the close proximity of venues to the population.   CCEA did not extrapolate its consumer surplus**

---

[2] These revenues were partially offset on a one-time credit totaling about $1.14 million.

[3] Charles H. Strauss and Lord, Bruce E. A. Case Study The economic impacts of a heritage tourism system, Journal of Retailing and Consumer Services 8 (2001) 199}204.

estimates for people using these parks for alternative purposes or accessing fee-free parks, such as non-developed ones.

Consumer surpluses in addition to their expenditures suggest that, in recent years, visitors to DEP managed venues derived more than $1.25 billion dollars in annual benefits.  CCEA's very conservative approach to estimating consumer surpluses underlines the significance of these estimates.

Another source of benefit is the value that owners of homes adjacent to the parks and forest derive. Connecticut residents overlooking the parks from single family dwellings realized annual amenity benefits most days of the year of a further $258 to $309 million.  Positive attributes of these residences, captured in the assessed value of their properties, generated $3.1 to $5.4 million annually in government revenues, but did not account for the value of the vistas of overlooking DEP managed parks and forests.  The expected long-term net present value of this possible revenue stream to the state discounted at 5% over 20 years is $390.2 to $679.7 million in 2010 dollars.  The net present value may also be viewed as placing a capital value on the assets that DEP maintains in its management of Connecticut parks and forests.  More fully assessing amenity values, from their currently unassessed status on 12-13% of properties overlooking green spaces, would significantly increase property tax revenues.

Because DEP operations and related government revenues already exist in the economy, the method for assessing their economic impact is to withdraw those activities.  That is, to assess the impacts of their hypothetical immediate cessation in 2012, and then to project longer term economic adjustments and reactions.  The resulting differences from the current case represent economic impacts of DEP-managed venues in Connecticut.  With closure of all DEP-managed facilities and elimination of all public access to DEP-managed forest and park lands, the resulting impacts would mean losses in employment and incomes, as well as losses in tax revenues.  As noted at the outset of this Executive Summary, the harshness of such losses in the near term is stark, but the dynamic elements of the economy which REMI captures adjust to the loss of those resources.  Over time, the economy adjusts and ameliorates, to a degree, economic impacts through emigration and some movement into alternative jobs.  Rather than depict these losses as negatives, this report treats these as the positive impacts that DEP operations have on the Connecticut economy.

0653

# Table of Contents

1.    Introduction ...................................................................................................................... 8

   1.1 Purpose .......................................................................................................................... 8

   1.2 Benefits ........................................................................................................................... 9

2.    Tourism Activities .............................................................................................................. 10

   2.1 Introduction .................................................................................................................... 10

   2.2 DEP Tourism Revenue Sources ..................................................................................... 10

   2.3 Park Related Tourism Expenditures .............................................................................. 12

   2.4 Extrapolations ................................................................................................................. 14

       2.4.1 Connecticut Expenditures by Visitors to State Parks ............................................. 14

       2.4.2 Expenditures in Connecticut by Visitors to State Forests ...................................... 15

       2.4.3 Visitor Expenditures ............................................................................................... 17

   2.5 Conclusions ..................................................................................................................... 17

3.    Other Direct Activities ...................................................................................................... 17

   3.1 Introduction and Overview ............................................................................................ 17

   3.2 Hunting ............................................................................................................................ 19

   3.3 Fishing ............................................................................................................................. 22

   3.4 Recreational Boaters ....................................................................................................... 26

       3.4.1 Introduction ............................................................................................................. 26

       3.4.2 Power Boats ............................................................................................................. 27

       3.4.3 Human Powered Boats ............................................................................................ 27

       3.4.4 Boating Conclusions ............................................................................................... 27

   3.5 Other DEP Activities ...................................................................................................... 28

       3.5.1 Introduction ............................................................................................................. 28

       3.5.2 Mohawk Mountain Ski Area ................................................................................... 28

       3.5.3 Harkness Memorial State Park ................................................................................ 29

       3.5.4 Enhanced Education ................................................................................................ 31

   3.6 Conclusions ..................................................................................................................... 31

4.    Consumer Surpluses ......................................................................................................... 31

   4.1 Introduction .................................................................................................................... 31

0654

4.2 Consumer Surplus ................................................................................................................. 32

4.3 Camping ................................................................................................................................ 33

4.4 Fishing .................................................................................................................................. 34

4.5 Hunting ................................................................................................................................. 35

4.6 Day Trippers ......................................................................................................................... 36

5.7 Conclusions .......................................................................................................................... 37

5. Amenity Benefits ........................................................................................................................ 38

5.1 Introduction ......................................................................................................................... 38

5.2 Number of Houses Overlooking Parks and State Forests ................................................... 38

5.3 Assessing "Green Space Bonus" for Residences Overlooking DEP Parks and Forests ..................... 39

5.4 Amenity Estimates ............................................................................................................... 41

5.5 Fiscal Implications ............................................................................................................... 43

5.6 Conclusions .......................................................................................................................... 43

6.    Total Expenditure Impacts .................................................................................................... 44

6.1 Introduction ......................................................................................................................... 44

6.2 Counterfactual ..................................................................................................................... 44

6.3 Direct Expenditures Dependent on DEP Park and Forests Related Activities .................... 45

6.4 Economic Impacts ................................................................................................................ 47

6.4.1 Introduction .................................................................................................................. 47

6.4.2 Population; DEP and the Quality of Life Matters ......................................................... 48

6.4.3 Jobs ............................................................................................................................... 49

6.4.4 Current Personal Income .............................................................................................. 51

6.4.5 Personal Disposable Income ........................................................................................ 52

6.4.6 Fiscal Impacts ............................................................................................................... 53

6.5 Conclusions .......................................................................................................................... 53

7.    Conclusions ............................................................................................................................ 53

Appendix A: Data ........................................................................................................................... 56

A-1. Background ......................................................................................................................... 56

A-2. Melding the Data Sets ........................................................................................................ 56

Appendix B: Campsites ................................................................................................................... 58

Appendix C: Technical Considerations:  Elasticities and Consumer Surplus ............................... 59

C.1 Consumers Surplus Definitions ........................................................................................... 59

6

C.2 Consumers Surplus Estimates ..................................................................................... 60

C.3 Statistical Findings ...................................................................................................... 63

C.4 Estimating Elasticities and Travel Time for Late Day Trippers .................................. 64

C.5 Literature ..................................................................................................................... 67

Appendix D:  Reasons for Excluding Some Residential Sales from Fair Market Prices ............................. 68

Appendix E:  Bibliography ..................................................................................................... 70

E-1: Texts ............................................................................................................................ 70

U.S. Fish and Wildlife Service, 2006 National Survey of Fishing Hunting and Wildlife-Associated Recreation, Connecticut E-2: Databases ..................................................................... 71

E-2: Databases .................................................................................................................... 72

0656

# 1.  Introduction

## 1.1 Purpose

This report documents the Connecticut Center for Economic Analysis (CCEA) analysis of the economic impact of parks, forests, and outdoor recreation licensing operations of the Connecticut Department of Environmental Protection (DEP).  This research investigated general tourism as well as specific key activities such as camping, angling, hunting, swimming, recreational marine, education, and accommodation activities at the Harkness Memorial State Park.  Aside from attendance data, this study does not cover other related activities such as hiking, bird watching, biking, horse-back riding, etc.  DEP collects entrance and various activity fees at 32 parks; it records the number of park visitors at 43 sites out of the 107 parks and 32 Connecticut state forests under its management.

CCEA's ability to project benefits from DEP data is most substantial when based on DEP data sets for the 32 parks with visitor days and activity fees paid by a large proportion of attendees, represented by the center of the circles in Chart 1.1.1.  Fees cover both venue access and some specific activities.  This core data set also includes park users who may be counted but avoid fees because they arrive during off-hours or out-of-season.  An additional component of this core data set includes zip codes for hunters, anglers, boaters and campers.  The middle-ring, checker-board surface represents park visitors to 12 sites where DEP maintains counts but does not charge for its services.  The external ring, polka-dot surface covers the remaining 63 parks where access may occur but is not measured.  Analysis of the two outer rings required developing assumptions with which to estimate annual visitor activities, and tourism expenditures in Connecticut.

**Chart 1.1.1 Data Quality and Extrapolations**



Not included in Chart 1.1.1 are the 32 state forests, where attendance data is collected at twelve and fees charged at four, to form quite a small database.  In this research, the park and forest venues are treated separately as are the Harkness Memorial State Park and DEP's three education venues.

8

Recreational boaters also benefit from 112 fee-free boat launch sites throughout the state, training and licensing.

CCEA has calculated the direct economic benefit of visitors to DEP-managed facilities from both recorded and extrapolated data.  The database differentiated major visitor activities by campers, hunters, anglers, and swimmers, in order to derive consumer surpluses for each group, providing an opportunity to allocate direct economic impacts for each user group.[4]   CCEA has exercised a fair amount of caution in developing its extrapolations, to avoid exaggerating the economic impacts of DEP-operated state parks and forests.  In addition, CCEA has assessed the amenity benefits accruing to owners of properties overlooking and adjacent to DEP-managed properties.

The next chapter focuses on DEP operations at State Parks and State Forests as they cater to residents and attract nonresidents to the state, particularly campers.  The third chapter examines benefits accruing within the state from specific recreational activities and other DEP operations including marine training seminars, leasing of Mohawk Mountain Ski Area, DEP operations at the Harkness Memorial State Park, and several educational venues.  The next two chapters concentrate on additional social benefits with the fourth chapter covering consumer surpluses accruing to visitors and the fifth, amenity benefits accruing to  property owners who overlook parks and forest green spaces via higher residential sales prices and the related impact on property assessments and taxes and therefore government revenues.  The penultimate chapter utilizes Regional Economic Analysis Inc's Model "REMI" to assess the total impacts and fiscal implications.  Direct and indirect impacts on state government revenues are also included within the REMI analysis.  The final chapter contains conclusions.

## 1.2 Benefits

 Benefits from DEP's State Park and Forest operations accrue to Connecticut from resident tourists staying within the state to camp and nonresidents who undertake other out-door recreational activities including many athletic endeavours offered by state parks and forests.  In addition, parks have been designed to appeal to tourists interested in history from ancient dinosaurs through to more up-to-date navy facilities.

In addition, residents overlooking vistas provided by state parks and forests reap amenity benefits.  Such benefits normally occur throughout the year and are captured through higher land prices for residential homes.  As such, the amenity benefits may be partially monetized through higher assessed and selling values that add to the Connecticut's property tax base.  These additions to the tax base create revenue flows for state and local governments.  A second major source of amenity benefits is the increased safety stemming from training and licensing of boaters resulting in reduced boating accidents[5].

---

[4] Sun, Ya-Yen, Wong, Kam-Fai, and Lai, Hsein-Chung, Statistical properties and survey design of tourism expenditures  using segmentation, Tourism Economics, 2010, 16(4), 807-832.
[5] In 2010, 150,000 recreational boaters resulted in 10 deaths in Connecticut.

0658

Other studies of larger jurisdictions have excluded resident participation in recreational activities from impacts on local economies on grounds that residents would undertake alternative activities within the area so that expenditures by residents are not incremental[6].  While there is some truth to such assertions they do not ring true for either residents of a relatively small state with ready access to similar venues in nearby states or avid sportspersons.  This study takes the opposite approach and includes all participation by residents in order to identify expenditures by residents and benefits accruing to citizens.  Without survey data to know alternative uses of funds currently allocated to activities at DEP-managed venues, it is left to the reader to mentally make such adjustments.


## 2.  Tourism Activities

### 2.1 Introduction

The Connecticut Center for Economic Analysis (CCEA) has derived tourism activities in DEP-operated Connecticut state parks and forests from visitor data provided by DEP and other sources.  Appendix A documents CCEA's estimating procedures carried out on these data.   The first section describes DEP revenues from fees and services charged by it and tourism expenditures at DEP for-fee venues.  The second expands these modest expenditures to cover the entire spending at venues where visitor counts are kept and then by park and forests users at DEP venues within the state.  The next chapter adds to the above by including activities where DEP licenses are deployed both within and outside of its parks and forests boundaries by using licensing data for hunting, angling, boating, skiing, educational activities, and special events at the Harkness Memorial State Park that contribute to DEP's economic impacts.

### 2.2 DEP Tourism Revenue Sources

Annual data are extrapolated from information by park on daily activities paid for by residents and nonresidents.  Full-day parking and campsite data apply to fee-paying **parties** of residents and nonresident whereas data on walk-in attendees apply to **individuals**.  To be additive, this mixture of parties and individuals were converted to estimates of individuals utilizing DEP venues by using average sizes of parties from the 2008 intercept survey[7] of 3.5 persons for resident parties and 4.2 persons for nonresident parties.  Utilizing these data CCEA attained estimates of the number of parties and people using each park.  Aggregated among the 29 state parks and 4 state forests included in the database, the annual number days visitors parked or camped is presented in Table 2.2.1 and is split between parks and forests in Appendix B.  Due to their exceptional roles, educational centers and the Harkness Memorial State Park are excluded and assessed elsewhere.  Outcomes are expressed as "Visitor days." This term is deployed because the same individual may park or camp several times within a year so that these data

[6] Bergstrom, John C. H. Cordell, Ken, Watson, Alan E.  and Ashley Gregory A. The Economic Impacts of State Parks on State Economies in the South, Southern Journal of Economics Dec. 1990.
[7] Witan Intelligence Strategies Inc**. Vision Intercept Study Connecticut edition 2008,** Table 5**.**

10

0659

do not count the number of individuals making use of DEP venues.  In total, by 2010 4.6 million visitor days were spent by fee paying customers in DEP parks and forests.

**Table 2.2.1 Park and Forests Paid Visitor Days: Camping, Parking both Full Day and Late Day (1,000s)**

|  | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Residents** | 3,132.5 | 2,842.8 | 3,262.2 | 3,735.1 | 3,143.7 | 3,331.7 | 3,797.2 | 3,635.6 | 3,876.1 | 3,525.2 | 3,451.3 | 3,522.8 |
| **Nonresidents** | 932.1 | 746.3 | 833.7 | 948.3 | 738.6 | 712.9 | 904.5 | 791.0 | 815.7 | 722.0 | 798.4 | 1,044.7 |
| **Walk-ins** | - | - | - | - | - | 1.1 | 22.7 | 28.0 | 32.1 | 27.7 | 21.5 | 23.3 |
| **Total** | 4,064.6 | 3,589.1 | 4,096.0 | 4,683.4 | 3,882.2 | 4,045.7 | 4,724.4 | 4,454.6 | 4,724.0 | 4,275.0 | 4,271.2 | 4,590.8 |
|  |  |  |  |  |  |  |  |  |  |  |  |  |

Source: CCEA estimates assessed on DEP records.

A special group of visitors included above are those who pay late fees, mostly for parking at beaches. Because the average distance travelled by residents paying late-day fees is short[8], their expenditures, over and above parking fees, are applied to transportation only.  Because they are half-day visitors rather than full-day ones, no expenses for meals in Connecticut have been included.

Late day fees were instituted in 2003 and have been a fixture since.  The estimate of visitor days by residents can be gained by multiplying the total residents paying late day fees by 3.5 the average occupancy of Connecticut vehicle from the intercept survey.  By the same token, half-days of use by nonresidents may be attained using a 4.2 occupancy rate.  Parties paying late parking fees are shown in Table 2.2.2 with total visitor days appearing in the last row in 1,000s of persons.  Comparing that line with the previous indicates that late day visitors comprise a small percentage of total visitor days.

**Table 2.2.2 Parties Paying Late Day Parking Fees 2003-2010**

| Residence and Timing | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|
| Resident Week Day | 6,071 | 5,959 | 4,819 | 5,140 | 6,071 | 5,959 | 4,819 | 5,140 |
| Resident Weekend | 7,545 | 7,695 | 7,222 | 6,890 | 7,545 | 7,695 | 7,222 | 6,890 |
| Nonresident Week Day | 1,533 | 1,040 | 1,427 | 1,662 | 1,533 | 1,040 | 1,427 | 1,662 |
| Nonresident Weekend | 1,615 | 1,678 | 1,879 | 1,735 | 1,615 | 1,678 | 1,879 | 1,735 |
| Total Resident | 13,616 | 13,654 | 12,041 | 12,030 | 13,616 | 13,654 | 12,041 | 12,030 |
| Total Nonresident | 3,148 | 2,718 | 3,306 | 3,397 | 3,148 | 2,718 | 3,306 | 3,397 |
| Grand Total Parties | 16,764 | 16,372 | 15,347 | 15,427 | 16,764 | 16,372 | 15,347 | 15,427 |
| Visitor Days (1,000s) | 60.9 | 59.2 | 56.0 | 56.4 | 65.1 | 66.2 | 79.6 | 78.3 |

Late Day attendees are concentrated among those utilizing beaches.  Given the natural warmth of the afternoon and optimal levels of exposure to the sun, these beach goers are treated as enjoying benefits similar to full day visitors.

Annual visitor fees at the parks, including late day visitors, were in the $3.0 to $3.3 million dollar range from 2005 to 2009. Fees have risen due to rate increases in 2009, and introduction of pavilion user fees. The rate and facilities changes have set the stage for annual revenue to rise to $5.2 million in future years.  Also note that DEP fees for parking, camping, occupying cabins and pavilions and consuming ice

---

[8] See chapter 5.

and firewood and related sales taxes are deposited in Connecticut's General Fund.   Chart 2.2.1 captures annual variations in these fees for visitors to state parks and forests.

**Chart 2.2.1 Annual Variations in Fees Paid by Visitors to DEP-managed Forests and Parks (Millions $)**



## 2.3 Park Related Tourism Expenditures

Estimates of DEP parks and forests related tourism expenditures are first derived for paying users at DEP's facilities.  Amounts for trip costs have been established by a 2008 intercept survey of Connecticut tourist established both average party sizes and average daily expenditures for each resident and nonresident.   The average size of a Connecticut tourism party in 2008 was 3.5 people with a daily spend per party of $233.45 inclusive of accommodation and $175.24 net of average payments for accommodations.  Parallel figures for daily tourist nonresidents for parties of 4.2 people were $230.34 and $183.99 net of their accommodation payments.  Because only five percent of visitors in the intercept survey utilized campgrounds and because overnight campground fees are lower than hotel or motel accommodations, that part of expenditures was adjusted downward for campers.

Based on expenditures by all fee paying customers inclusive of those paying late day fees and those travelling in buses, Chart 2.3.1 illustrates that DEP administered fees are a relatively small percentage of total expenditures by parks and forests visitors in Connecticut.  Fee-paying visitors spent $88.4 million to $97.7 million annually in Connecticut.  The lion's share of these annual expenditures, $74.3 million to $84.8 million for 2005 to 2010, was by Connecticut residents as illustrated by the burlap covered area in the Chart.  Walk-in visitor expenditures appear as the minutely thin green line at the top of the graph.

Valued in 2008 dollars, daily per capita expenditures have been in the low to mid $60 to $63 range per visitor per day throughout the period.  Substantiating evidence for the above per capita expenditures comes from a survey of overnight campers in U.S. national forests.  In 2004, their average daily expenditures were $66.68 and $58.67 for non-locals and locals respectively[9].

---

[9] Daniel J. Stynes and White D.J. **Spending Profiles of National Forest Visitors, NVUM Four Year Report,** 2006 pp. 12 and 34. http://www.fs.fed.us/recreation/programs/nvum/NVUM4YrSpending.pdf

0661

**Chart 2.3.1 Expenditures in Connecticut of Paying Visitors Who Utilize For-Fee State Parks and Forests (Millions 2008 $)**



Source: CCEA Based on DEP records and Witan Intelligence Strategies Inc. **Vision Intercept Study Connecticut edition 2008.**

While the recent recession led to a downturn in total expenditures by paying visitors to state parks and forests in 2008 and 2009, expenditures recovered in 2010 albeit insufficiently to regain 2007 levels. Reflecting the increased number of users in each of the last two years, total expenditures have been expanding.  Due to the opening additional parks and rising attendance and activity fees, expenditures at state parks and forests have more than doubled since 2002.  As a share of total trip expenditures by these travelers fees remain a relatively small – below 3%.

Table 2.3.1 breaks out tourism expenditures by those who paid fees collected by DEP for their accommodation and other expenditures with the other expenditures being allocated among Connecticut residents and nonresidents.  The preponderance of expenditures is clearly by Connecticut resident parties.

**Table 2.3.1: Total Annual Expenditures by Paying Visitors (Millions 2008 $)**

|  | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Accommodations | 19.3 | 17.4 | 20.0 | 22.9 | 18.9 | 19.8 | 23.1 | 21.9 | 23.2 | 20.9 | 15.2 | 16.6 |
| Non-Accommodations |  |  |  |  |  |  |  |  |  |  |  |  |
| Resident | 51.9 | 47.3 | 54.4 | 62.3 | 51.9 | 55.0 | 62.9 | 60.2 | 64.2 | 58.4 | 62.4 | 63.4 |
| Nonresident | 10.7 | 8.7 | 9.9 | 11.3 | 8.8 | 8.4 | 10.8 | 9.4 | 9.8 | 8.7 | 10.4 | 13.5 |
| Campers | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.4 | 0.5 | 0.6 | 0.5 | 0.5 | 0.4 | 0.4 |
| Sub-total | 62.6 | 56.0 | 64.2 | 73.6 | 60.7 | 63.5 | 74.1 | 70.1 | 74.6 | 67.6 | 73.2 | 77.4 |
| Total | 82.0 | 73.4 | 84.2 | 96.5 | 79.6 | 83.3 | 97.2 | 92.0 | 97.8 | 88.6 | 88.4 | 94.0 |

Source: CCEA Based on DEP records and Witan Intelligence Strategies Inc. **Vision Intercept Study Connecticut edition 2008.**

13

## 2.4 Extrapolations

CCEA has extrapolated the above in three stages.  Paying clients represent only a portion of park visitors. Out-of-season and off-hour visitors are captured in gate counts but did not pay.  For that reason the number of park visitors exceeded those who paid to use attributes of many for-fee parks.  This group of visitors is larger than the uninitiated reader might expect because some DEP venues charge only on weekends, so that weekday visitors to those facilities do not pay for parking. In addition, other parks and forests do not offer camping or established parking facilities and/or do not require fees but are included in the attendance counts.  There is then a second group of counted park visitors benefiting from the use of these other "fee-free" parks.  A third set of parks and forests while still under development offer activities and attract visitors.  DEP keeps no counts of this third set, albeit some of the activities offered require licenses discussed elsewhere in the analysis so that care has to be taken to avoid double counting.

### 2.4.1 Connecticut Expenditures by Visitors  to State Parks

Park visitors are assumed to spend the average amounts and experience the average length of stays for tourists in Connecticut dependent on their residency.  Because the sample coverage is better for those utilizing state parks rather than state forests, this analysis is broken out for parks and forests.

For 2005, CCEA estimates total visitors to be the 2004 total visitors from DEP's 2005 SCORP (Statewide Comprehensive Outdoor Recreation Plan) report assumed to grow at rate of growth in paying visitors 1999 to 2009[10]. This process adds 182.1 thousand visitors in 2005 in order to cover development parks devoid of visitor counts.  That benchmark is adjusted proportionately to known visitor counts annually out to 2010.

This level of adjustment for parks under development is justified by their numbers and available activities, not covered elsewhere.   The 39 fee-free state parks provide venues for 120 activities of which 49 are covered by licensing revenues and other estimated expenditures covered elsewhere in this report.  Table 2.4.1 outlines these and the remaining main activities are outlined in.  Of the 71 venues not covered elsewhere, 52 involve walking or jogging activities.  The number of venues provided at state forests was lower with the same emphasis on hunting and hiking and related activities.

---

[10] Gat counts covered 6,116 thousand visitors in 2005 compared to SCORPs 6,223 thousand in 1964 to all parks (SCORP p.16) in 2004 and 1,112 to State Forests compared to 1,759 (SCORP p.16).

**Table 2.4.1 Activity Venues Provided at Fee-Free State Parks**

| Activities Covered | State Parks Venues | State Forests Venues |
|---|---|---|
| Hunting | 13 | 8 |
| Angling | 21 | 3 |
| Boating | 6 | 1 |
| Boat Launching | 5 | 1 |
| Historic | 3 | 1 |
| Downhill Skiing | 0 | 1 |
| Group Youth Camps | 1 | 1 |
| **Total Covered before Adjusting Attendance Data** | **49** | **16** |
| **Activities x Venues Not Covered by Data** | **71** | **36** |
| Hiking | 34 | 13 |
| Biking | 8 | 5 |
| Bird Watching | 7 | 3 |
| Letterbox Guided | 11 | 7 |
| Other | 11 | 8 |
| **Total Activities x Venues** | **120** | **52** |

By 2010, visitor days at all state parks reached 6.8 million persons using this methodology.  This figure is extrapolated conservatively from 2009 at the average rate of growth 2005-2009, at a miniscule 0.76%.  In contrast, visitor days at State fee-charging parks 2009 to 2010 were up 5.59%.  By 2010, paid fees covered 1.5 million visitor days at state parks.  Another 3.6 million visits occurred in the same parks but these visitors did not pay fees another 1.6 million were counted at not-for-fee parks.  In addition, developing parks are estimated to have reached 182.1 thousand by 2010 undertaking activities not covered elsewhere.

Table 2.4.2 lays out the extrapolations for expenditures in Connecticut by visitors to state parks.  By 2010, expenditures in Connecticut by state park visitors reached $425.1 million in 2010 dollars, down $7.2 million from the recent peak in 2007.  This estimate assumes that non-paying visitors had similar average length trips and were divided in the same proportion of residents and nonresidents as were fee-paying visitors.  Accommodation expenses have been estimated conservatively by using rates paid by the average non-resident person.  Because both resident day-trippers who paid late fees and bus travelers are included in the base numbers, this process leads to lower than average lengths of stays for tourists captured in the intercept survey.  Expenditure estimates using the average length of stay for tourists would be $13.0 million higher than the above 2010 estimate.

## 2.4.2 Expenditures in Connecticut by Visitors to State Forests

Among nine state forests for which attendance is tracked, only three forests and the Pachaug Campground are included.  For this reason the sample is not as strong as it is for state parks, albeit there is little difference between the per capita expenditures between state park and state forest visitors.  That lack of difference engenders confidence in the forest data despite the small sample.  By 2010, 22.2 thousand

**Table 2.4.2 Extrapolated Connecticut Expenditures by Visitors to State Parks**

**(Millions 2008 $)**

| | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
| | | | | | | |
| **Fee-Paying Visitors** | | | | | | |
| Residents | 81.7 | 78.3 | 83.3 | 75.7 | 74.4 | 75.9 |
| Nonresidents | 13.4 | 11.6 | 12.1 | 10.8 | 12.5 | 16.1 |
| Camper Walk-in | 0.4 | 0.5 | 0.6 | 0.5 | 0.4 | 0.4 |
| Total Fee-Paying | 95.5 | 90.4 | 96.1 | 87.0 | 87.2 | 92.5 |
| **Out-of-Season & Off-Hour Visitor Days at Fee-Paying State Parks** | 201.0 | 233.2 | 232.1 | 216.8 | 226.5 | 222.3 |
| **Counted Visitors to Not-For-Fee State Parks** | 88.8 | 92.1 | 91.7 | 89.7 | 96.8 | 98.1 |
| **Visitors to Development State Parks** | 11.1 | 12.0 | 12.1 | 11.4 | 11.9 | 11.9 |
| **Direct Trip Expenditures** | 396.8 | 428.1 | 432.3 | 405.2 | 422.6 | 425.1 |

Source: Visitor days from DEP based on park gate records except for total for 2010 which is a log-linear extrapolation of the series.  Fee paying Visitors are from individual park records.

visitors paid attendance fees while 388.7 thousand accounted for unpaid attendance.  Based on the number of total forest visitors counted, augmented by 50% to capture visitors to DEP forests where no counting occurred including 14 development forests, and to be consistent with visitor data in SCORP visits to DEP forests, another 1,287.6 thousand visited not-for-fee state forests.  In total 1,669 thousand visited DEP forests.  Table 2.4.3 shows these visitors' trip expenditures amounted to $119.3 million down by $4.9 million from the previous year's peak in 2009.

**Table 2.4.3: Extrapolated Connecticut Expenditures by Visitors to State Forests**

**(Millions $)**

| | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
| | | | | | | |
| **Fee-Paying Visitors** | | | | | | |
| Residents | 1.4 | 1.3 | 1.5 | 1.3 | 0.9 | 1.2 |
| Nonresidents | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 |
| Walk-ins | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total Fee-Paying Days | 1.5 | 1.4 | 1.6 | 1.4 | 1.1 | 1.4 |
| **Out-of-Season & Off-Hour Visitor Days at Fee-Paying State Forests** | 31.8 | 32.4 | 31.2 | 31.5 | 29.5 | 27.3 |
| **Counted Visitors to Not-For-Fee Forests** | 46.5 | 47.4 | 49.7 | 44.0 | 52.1 | 50.7 |
| **Visitors to Development State Forests** | 40.0 | 40.6 | 41.4 | 38.6 | 41.4 | 39.8 |
| **Direct Trip Expenditures** | 119.9 | 121.8 | 123.9 | 115.6 | 124.2 | 119.3 |

Source: Visitor days from DEP based on park gate records except for total for 2010 which is a log-linear extrapolation of the series.  Fee paying Visitors are from individual park records.  Data on total visitor days at

16

forests was adjusted upwards to cover unlisted forests based on SCORP data.  These adjustments also impacted estimated expenditures of those visiting not-for-fee forests.

### 2.4.3 Visitor Expenditures

Total estimated direct expenditures for each type of visitor are the sum of the above appearing in Table 2.4.4.  Valued in 2008 dollars, 2010 trip expenditures by DEP-managed parks and forests generated $544.3 million in direct expenditures in Connecticut.

**Table 2.4.4: Extrapolated Connecticut Expenditures by Visitors to State Parks and Forests**

**(Millions 2008 $)**

|  | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
| **Fee-Paying Visitors** | 97.4 | 92.1 | 98.0 | 88.7 | 88.6 | 94.2 |
| **Out-of-Season & Off-Hour Visitor Days at Fee-Paying State Parks and Forests** | 232.8 | 265.6 | 263.3 | 248.3 | 256.0 | 249.6 |
| **Counted Visitors to Not-For-Fee State Parks and Forests** | 130.6 | 133.6 | 135.6 | 128.5 | 151.0 | 148.6 |
| **Visitors to Development State Parks** | 51.2 | 52.7 | 53.5 | 49.9 | 53.3 | 51.7 |
| **Direct Trip Expenditures** | 494.6 | 525.8 | 532.4 | 498.7 | 549.0 | 544.3 |

Sources: See notes to Table 5a and 5b

## 2.5 Conclusions

Combining the expenditures for the state parks and forests sizes the total direct tourism monies spent annually from 2001-2010.  During 8.5 million tourism days in 2010, visitors to DEP parks spent $544.3 million.  The vast majority of these expenditures were generated by visitors to state parks rather than to forests and by Connecticut residents rather than nonresidents.  The number of fee-paying visitors rose in 2010, while out-of-season visitors are estimated to have declined as did those visiting not-for-fee parks and forests in the last year.   Less conservative projections could inflate these results by close to three percent.  Of these expenses 17% to 18% were for accommodations including camping.

## 3.  Other Direct Activities

## 3.1 Introduction and Overview

In addition to general tourism captured in the previous chapter, DEP management facilitates specific activities both within parks and forests and externally to them.  Key among these activities are hunting, fishing and boating.  Licenses are awarded to both hunting and angling whereas permits are only for hunting.  The relative licensing effort devoted to hunting and fishing is clear from Table 3.1.1 below

17

provides basic data on the number of licenses and permits issued for the 2010 season starting on Dec 1, 2009, going through to December 31, 2010.  It excludes December 1 to December 31 sales for the 2011 season and therefore represents DEP revenues for the single season.  The vast majority of license and permit sales are to Connecticut residents.

**Table 3.1.1 DEP Sportspersons' Licenses and Permits Issued: 2010**

|  | Residents | Nonresidents | Total |
|---|---|---|---|
| Fishing | 154,907 | 14,445 | 169,352 |
| Hunting | 88,079 | 5,684 | 93,763 |
| Hunting & Fishing | 29,472 | 283 | 29,755 |
| Trapping | 750 | 2 | 752 |
| Total | 273,208 | 20,414 | 293,622 |

Because many of the licensees above hold more than one license and/or permit, there are fewer sportspersons than licenses and permits issued.  When holding of multiple licenses and permits is taken into account, the number of sportspersons is shown in Table 3.2.  The number of anglers' licensees is then the number of those with licenses strictly for angling plus the number of sportspersons holding a combination license allowing both hunting and fishing.  Of the 752 trapping licenses, all but 37 went to persons holding either a hunting, fishing or combination license.  For this reason hunting activities are broadened slightly to include trapping in the rest of this chapter.

**Table 3.1.2 DEP Sportspersons with Licenses: 2010**

|  | Residents | Nonresidents | Total |
|---|---|---|---|
| Fishing | 132,000 | 13,810 | 145,810 |
| Hunting | 17,916 | 2,543 | 20,459 |
| Hunting & Fishing | 22,073 | 214 | 22,287 |
| Trapping | 36 | 1 | 37 |
| Total | 172,025 | 16,568 | 188,593 |

Source: DEP licensing data with deletion of sequential same name and address deleted.

Contributing to the number of trips taken per hunter and per angler will be the number and diversity of licenses and permits held.  That topic is discussed in greater detail in the following sections.  The overlap is necessary because many anglers hold combination licenses or separate licenses covering multiple activities. Because the type of fishing, marine or inland, dramatically impacts costs of undertaking each activity inclusive of travel distances, marine and inland fishing are treated as two different but overlapping activities within the report.

18

## 3.2 Hunting

DEP contributes to the Connecticut hunts by both restocking and issuing licenses. In 2010 the DEP purchased a total of 15,775 pheasants based on revenues from the sale of pheasant stamps in 2009."[11] It also controlled the hunt by issuing licenses that are specific by species and technique and in time.

The difference between licenses and permits issued and the number of hunters underlines the multiplicity of licenses and permits held by hunters. It is clear that much of this multiplicity will involve frequent trips to exercise licenses and each related permit:

- Licenses are specific to equipment deployed (shotguns, firearms, muskets of various types, and bows and arrows);
- With the exception of Connecticut's Harvest Information Permits (HIP), permits are specific to certain game – migratory birds, deer etc.;
- Hunting techniques also differ among the types of hunts as illustrated by the blinds for migratory bird hunts versus tracking techniques for deer; and,
- Hunters hold permits for hunting in specific seasons, such as both a spring turkey and fall turkey hunting, requiring separate trips.

Table 3.2.1 reveals the size of the licensed hunting community in Connecticut. This enumeration of licensed hunters includes resident and nonresident hunters as well as the total. The first line indicates the number of permits, other than CT HIP. HIP aside, permits are for specific game and therefore time limited either by fiat or the seasonality of available game, each permit is likely to be matched by a trip for the permit holder. Because many licensed hunters hold in excess of one permit, it is necessary to establish the total number of hunting licenses, the sum of lines two and three of the table. The Bureau of the Census found that Connecticut hunters make 12.2 single day trips per resident licensee and three days for nonresident licensees.[12] Using this data facilitates estimating the number of hunting trips shown in the last line of Table 3.2.1.

**Table 3.2.1: Resident and Nonresident Licensed Hunters Holding Permits: 2010**

|  | Residents | Nonresidents | Total |
|---|---|---|---|
|  |  |  |  |
| Permits for Hunting | 59,365 | 2,816 | 62,181 |
| Hunting Licenses | 33,644 | 2,987 | 36,631 |
| Hunting & Fishing Licenses | 29,472 | 283 | 29,755 |
| Hunters and Hunting & Fishing Licenses | 63,116 | 3,267 | 66,386 |
| Number of Hunting Trips | 770,024 | 9,801 | 779,825 |

Source: DEP licensing data.

The 3,267 non-resident hunting licenses issued in 2010 included hunting 1,468 archery, 96 junior licenses and 284 combination licenses.

---

[11] http://www.ct.gov/dep/cwp/view.asp?a=2700&q=394896&depNav_GID=1633
[12] The only permit holders treated as equivalent to licensees were those holding archery permits for deer who did not appear to need a license involving any type of firearms.

Most nonresident hunters originate in Massachusetts and elsewhere in New England accompanied by a strong contingent from New York, as noted in Chart 3.2.1.  There is considerably less hunting in Connecticut by those originating in New Jersey, and Pennsylvania.

Chart 3.2.1: Origins of Nonresidents



Source: DEP Licensing Data.

An improved estimate of the number of trips comes from the average number of trips per hunter determined from a 2006 survey by the U.S. Fish and Wildlife Service.  It indicates that resident hunters averaged 12.2 trips and nonresidents 3.0 trips in Connecticut[13].  Based on 2010 hunting licensees, resident hunters undertook 770.0 thousand trips and nonresident hunters 9.8 thousand.  The resulting expenditures for those hunting in Connecticut are illustrated in Table 3.2.2.  Per trip expenditures were similar for both residents ($120.19) and nonresidents ($470.10).

**Table 3.2.2: Hunting Trips and Expenditures by Resident and Nonresident Hunting Licensees (1,000 s)**

|  | Resident | Nonresident | Total |
|---|---|---|---|
|  |  |  |  |
| Total Number of Trips (1,000s) | 768.1 | 9.8 | 777.9 |
| Total Expenditures in Connecticut (1,000s 2006 $) | 92,317 | 4,607 | 96,924 |

Source: DEP Licensing Data and average spending data from U.S. Fish and Wildlife Service.

The U.S. Fish and Wildlife Service also breaks out all expenditures on hunting in Connecticut as noted in Table 3.2.3.  That break out is shown in 2006, 2008 and 2010 dollars.  The 2008 dollar values are used in REMI simulations while 2010 values are more readily comprehended than their 2006 counterparts.  In all cases, the industry purchases have been adjusted through Consumer Price Indexes (CPIs) tailored to them.  The last item included licensing fees so the 2010 number has been adjusted to include DEP's rate

---

[13] U.S. Fish and Wildlife Service, 2006 National Survey of Fishing Hunting and Wildlife-Associated Recreation, Connecticut, Derived from Table 3.

0670

increases.  The small number of spenders indicates that many participating in the survey did not spend in all sectors and that the sample size is a little small.  The number purchasing books and recreational magazines is small and the expenditures based on residual estimators from the rest of the data.

**Table 3.2.3: Detailed Hunter Connecticut Expenditures by Licensees (1,000s $)**

|  | Spenders | 2006 $ | 2008 $ | 2010 $ |
|---|---|---|---|---|
|  |  |  |  |  |
| Food and Lodging | 40 | 2,520.3 | 2,751.7 | 2,801.5 |
| Transportation | 25 | 5,032.2 | 5,457.2 | 5,365.5 |
| Other Trip Costs | 32 | 920.7 | 1,105.2 | 993.8 |
| Hunting Equipment | 13 | 29,220.0 | 29,324.8 | 29,266.3 |
| Auxiliary Equipment | 30 | 5,886.4 | 5,860.1 | 5,773.8 |
| Special Equipment | 13 | 35,836.2 | 37,879.1 | 39,309.3 |
| Magazines and Books |  | 478.0 | 491.6 | 495.1 |
| Membership Dues and Contributions | 8 | 2,371.8 | 2,443.8 | 2,391.8 |
| Other | 7 | 14,658.1 | 15,102.9 | 22,898.4 |
| Total | 37 | 96,923.9 | 100,416.5 | 109,295.3 |

Source: (1) DEP 2010 Licensing data, (2) U.S. Fish and Wildlife Service Table 22 for the breakout of expenditures and (3) U.S. Bureau of Labor Statistics for CPI inflators.

The derived overall escalators for the hunting activity in 2008 and 2010 from the 2006 base are then 1.03 and 1.14 respectively.  Total expenditures in Connecticut are in 2010 dollars are impressive at $109.3 million in 2010 dollars.

## 3.3 Fishing

DEP supports both recreational and commercial fisheries by restocking lakes, ponds and rivers as well as controlling recreational fishing by licenses.  For the 2010 season DEP issued 169,352 licenses strictly for fishing and another 29,755 covering both fishing and hunting, so that it issued a total of 199,107 licenses for fishing.  There were three major types of fishing licenses – Marine, Inland Waters, and All Waters as shown in Table 3.2.

**Table 3.3.1 DEP Issued Licenses and Licensees by Type of Fishery: 2010**

|  | Marine | Inland | All Waters | Total |
|---|---|---|---|---|
|  |  |  |  |  |
| Licenses | 53,308 | 81,325 | 64,474 | 199,107 |
| Licensed to a Person Holding Another Specific Activity License | 204 | 494 | 165 | 863 |
| Licensees | 53,104 | 80,831 | 64,309 | 198,244 |

As with hunting some individuals hold multiple licenses for each type of activity.  Thus the 53,308 licenses classified as Marine only, were held by 53,204 licensees.  Similarly, the 81,325 licenses specifically issued for the inland fishery were held by 80,831 licensees.  Adding All Waters licenses and licensees to the fishery specific licenses and licensees means that 117,782 licenses for Marine fishing

were held by 117,413 licensees while 145,799 licenses issued for the inland fishery facilitated involvement of 145,140 licensees in inland waters.

For assessing travel distances and attribution of consumer surplus among anglers, it is useful to allocate both licenses and licensees between residents and nonresidents.  Table 3.3.2 contains the results. Connecticut residents clearly predominate in both the marine and inland fisheries.  Particularly in the inland fishery residents appear to have a better understanding of the licensing system than do nonresidents who hold the number of multiple licenses, especially for inland fishing.  As a share of their participation in fisheries activities, non-residents place slightly greater emphasis on the marine fishery rather than the inland one.

**Table 3.3.2 DEP Issued Licenses and Licensees by Type of Fishery, Residents and Nonresidents: 2010**

|  | Marine | Inland | All Waters | Total |
|---|---|---|---|---|
| **Residents** |  |  |  |  |
| Licenses Issued to Residents | 47,930 | 73,027 | 63,422 | 184,379 |
| Licensed Issued to Residents Already Holding an Activity License or Permit | 131 | 154 | 162 | 447 |
| Resident Licensees | 47,799 | 72,873 | 63,260 | 183,932 |
| **Nonresidents** |  |  |  |  |
| Licenses Issued | 5,378 | 8,298 | 1,052 | 14,728 |
| Licensed Issued to Nonresident Already Holding an Activity License or Permit | 73 | 340 | 3 | 416 |
| Nonresident Licensees | 5,305 | 7,958 | 1,049 | 14,312 |

Source: DEP, Licensing Data

As Chart 3.3.1 illustrates, the origins of nonresident anglers licensed by Connecticut was primarily from New England albeit, New Yorker licensees (2,612) are almost as prevalent in the inland fishery as nonresident New Englanders (2,741).  With relatively good access to their own marine waters, both New York and New Jersey residents showed stronger interest in Connecticut's inland fishery than its marine fishery.  There is reciprocity in the marine fishery for licensees from Connecticut, Massachusetts, and Rhode Island.  Connecticut's sale of marine angling license to Massachusetts's anglers is a surprise and may be because where Massachusetts's Western counties may find the Connecticut shore more accessible and /or appealing than the shoreline in their home state.   Visitors from other states, many of which are land-locked, are more heavily licensed to enter the inland fishery rather than the marine one.

Connecticut waters are generally recognized as being safe.  Among the 150,000 licensed personal watercraft licensees, operating 108,000 registered craft, there were 10 fatalities in 2009.[14]

---

[14] Data provided by DEP.

0672

**Chart 3.3.1 Origins of Licensees for Marine, Inland and all Water Fisheries: 2010**



In all cases the licensees constitute the base for estimating direct participation in each fishery.  The U.S. Fish and Wildlife Service's 2006 National Survey of Angling, Hunting and Wildlife-Associated Recreation identified more Anglers participating in the Connecticut fishery than are licensed by Connecticut to participate.  This outcome is understandable from the survey techniques deployed by the U.S. Fish and Wildlife Service.  A main determinant of Connecticut's nonresident licenses issued in the marine fishery is that licenses between Connecticut, Rhodes Island and Massachusetts are reciprocal so that licensees from those states are not required to be licensed by Connecticut.  Due to the reciprocity a Connecticut licensees have access to marine angling grounds in other participating states.  Reciprocity is the main reason for the ratios of nonresident participating anglers relative to CT licensees are particularly high.  The ratios of 2006 surveyed anglers to 2010 licensed ones in Table 3.3.3.

**Table 3.3.3: Ratio of Anglers in Connecticut 2006 to Connecticut Licensed Anglers in 2010**

|  | Marine Including  "All Waters" | Inland including "All Waters" |
|---|---|---|
|  |  |  |
| Resident | 1.09 | 1.31 |
| Nonresident | 5.67 | 2.89 |

Due to assembling data on the number of trips, the survey suggested more angling activity than do the minimums from the licensing data.  These higher trip figures would set angler participation at the levels appearing in Table 3.3.4.  Notice, the word "participation," is deployed here to capture both licensees and anglers unlicensed in Connecticut.  The first two columns cannot be added to get the total because those participating in both the Marine and Inland fishery would be double counted.

**Table 3.3.4: Fishery Participants in 2010**

|  | Marine Including  "All Waters" | Inland including "All Waters" |
|---|---|---|
| Resident | 121,000 | 178,000 |
| Nonresident | 36,000 | 26,000 |
| Total | 157,000 | 204,000 |

The inland fishery has a higher percentage of resident participants and the marine one a higher share of nonresident participants.  Given the reciprocal use of licenses this outcome is to be expected.

A component of estimating average expenditures per participant is the number of trips taken by the average participant as well as the total number of trips.  Not unexpectedly, residents make more trips to fish in Connecticut than do nonresidents.  These results appear in Table 3.3.5.

**Table 3.3.5: Trips per Participant 2010**

|  | Marine Including  "All Waters" | Inland including "All Waters" |
|---|---|---|
| Resident | 8.8 | 18.2 |
| Nonresident | 5.5 | 3.9 |

Bearing in mind that nonresidents visiting Connecticut will spend while en route and returning home as well as the smaller number of trips to Connecticut fisheries relative to residents, nonresidents can be expected to spend somewhat less per participant in Connecticut than its residents.  These lower expenditures by nonresidents are documented in Table 3.3.6.nonresident participants.  Per capita per day the average resident spends $35.60 and average nonresident $30.30.

**Table 3.3.6: Expenditures by Participants in the Connecticut Fishery 2010 (Millions 2006 $)**

|  | Marine | Inland | Total |
|---|---|---|---|
| Expenditures (Millions 2006 $) |  |  |  |
| Resident | 79.1 | 112.1 | 191.2 |
| Nonresident | 16.6 | 4.7 | 21.3 |
| Total | 95.7 | 116.8 | 212.5 |

The above expenditures cover only expenditures incurred in Connecticut to undertake angling activities, within DEP's sphere of influence.  They exclude expenditures in Connecticut to undertake angling activities elsewhere than in Connecticut.  The U. S. Fish and Wildlife Service provides a useful breakout of expenditures by industry for this larger expenditure inclusive of expenditures in Connecticut to pursue out-of-state angling.   The breakout of expenditures is shown in Table 3.3.7 in 2006, 2008 and 2010 dollars.  The 2008 dollar values are used in REMI simulations while the 2010 values are more readily comprehended than their 2006 counterparts.  In all cases, the industry purchases have been

25

adjusted through CPIs tailored to them.   The escalator applied to boat operations was the price of gasoline.  The last item included park fees so the 2010 number has been adjusted to include DEP's rate increases.  While there was significant escalation 2006 to 2008, there was a slight decrease for 2008 through 2010, despite the inclusion of DEP's fee increase.

**Table 3.3.7: All Angling Expenditures in Connecticut (1,000 $)**

| Purchases | Spenders | Expenditures | | |
|---|---|---|---|---|
| | | 2006 | 2008 | 2010 |
| Food | 199 | 32,505 | 35,615 | 36,555 |
| Lodging | 22 | 5,405 | 5,719 | 5,397 |
| Transportation | 201 | 30,819 | 33,422 | 32,860 |
| Privilege Fees | 43 | 9,224 | 9,504 | 9,302 |
| Boat Costs | 67 | 38,836 | 49,047 | 42,167 |
| Bait | 175 | 9,674 | 10,359 | 10,502 |
| Ice | 100 | 4,049 | 4,336 | 4,395 |
| Heating and Cooking Fuel | | 240 | 309 | 288 |
| Angling Equipment | 192 | 49,268 | 49,445 | 49,346 |
| Auxiliary Equipment (Tents and clothing) | 48 | 12,667 | 12,610 | 12,425 |
| Boats, Campers | | 41,044 | 43,384 | 45,022 |
| Magazines and Books | 52 | 1,696 | 1,744 | 1,756 |
| Memberships and Contributions | 27 | 1,269 | 1,308 | 1,280 |
| Other including Permits and Fees | 147 | 6,856 | 7,064 | 10,710 |
| Total Adjusted for Price Changes | 199 | 243,552 | 263,865 | 262,004 |

Source: (1) DEP 2010 Licensing data, (2) U.S. Fish and Wildlife Service Table 16 and 19 for the breakout of expenditures and (3) U.S. Bureau of Labor Statistics for CPI inflators.


Inflation was a more important factor from 2006 to 2008 than 2008-2010 with prices showing a slight decline over the last two-years despite DEP increasing fees.  This outcome reflects the minor role of licensing fees in the overall costs of angling.


## 3.4 Recreational Boaters

### 3.4.1 Introduction

DEP operates 112 boat launches of which 85 are for trailers.  It is assumed that recreational boats launched at sites providing trailer access operate under power or sail, hereafter referred to as "power boat launches" in contrast with the launches for human powered or small motor craft from car roof tops.  Further, of the 85 power boat launches 10 are on the coast and the rest on fresh water.  Usage of seagoing boats and freshwater ones will differ in that seagoing recreational boats are more apt to remain in the water for the season than are freshwater boats where boaters may visit several boat launches over the season ether for a variety of venues or for competitive events.   The purpose here is to estimate the expenditures from these activities utilizing DEP venues and human resources.  Estimates

of interest in assessing DEP park and forest activities do not cover the entire impact of the recreational activity throughout Connecticut, just by those using DEP facilities.

DEP provides training and operator licenses for recreational boaters.   Currently, DEP assists anglers by stocking state lakes, ponds and rivers.  There are currently 108,000 licensed recreational boats in Connecticut with at least 150,000 licensees holding safe boating personal watercraft certificates.

Due to higher fees, the PWCs licensing expenditures incurred by new licensees rose from $148,285 in 2009 to $288,500 in 2010.  In 2009, DEP issued a further 2,232 licenses and certificates worth $47,285 related to boat and boater safety and replacement of lost licenses.  Parallel figures for 2010 include 1,607 licenses and certificates at $37,465.

While anglers are involved in operating recreational boats not all recreational boaters are anglers and not all anglers are boaters.  Because various angler licensees are including the overall data set for DEP, licensed boaters have been estimated as the residual of the above licensing activities.

### 3.4.2 Power Boats

Assuming the costs of operating recreational power boats in Connecticut are roughly line with those on the Great Lakes[15], owners of Connecticut registered boats spend $472 million on recreational boating of which $173 million was spent on their crafts.  Of this amount anglers spent $43.4 million on their recreational boats so that amount in already included in the study leaving non angling recreational boats spending $130 million on their craft and $353 million in aggregate when their trip expenditures are included.  Remembering that boaters' expenditures are not all attributable to DEP operations, even ten percent of the $353 million or $35.3 million is not out of line with its 112 boat launches.

This estimate is likely low because it takes very little account of the proliferation of Personal Water Craft (PWCs) on freshwater lakes and rivers.

### 3.4.3 Human Powered Boats

The remaining boat launches cater to boats carried on car roof tops.  While some of these may involve the use of light electric motors (e.g. electrically driven trolling propellers) or even small easily portable outboards, they are treated here as human powered craft.  Generally human powered recreational boating activities such as canoeing, rowing and kayaking constitute about 2-3 percent of the expenditures of the power boat and sailing recreational marine[16].  Given the number of launch sites in Connecticut and the distances being driven to them, the resulting estimate of $1.5 million appears to be fairly conservative.

### 3.4.4 Boating Conclusions

The above data estimate expenditures on total boating activities in Connecticut.  They are conservative in that the sea going capabilities, the average length of boat in Connecticut is likely longer than on the Great Lakes.  In addition maintaining boats in freshwater is generally less expensive than in saltwater.

---

[15] Great Lakes Boating's economic punch, Great Lakes Commission des Grands Lacs, http://www.glc.org/recboat/pdf/rec-boating-final-small.pdf
[16] Goss Gilroy Inc.  Economic Analysis of Recreational Boating in Canada: 2001, Executive Summary. And

Nevertheless with DEP's emphasis on freshwater boat launches, the approximation based on 4.3 million Great Lakes recreational boats is reasonable.  In addition DEP generates amenity benefits to boaters through its training and licensing programs in order to save lives.

## 3.5 Other DEP Activities

### 3.5.1 Introduction

This section looks at three DEP operations targeting specific activities, - skiing at Mohawk Mountain Ski Area, the Harkness Memorial State Park with its 230 acre grounds, and educational activities at 5 venues.  These training venues are designed to assist both teachers and students in upgrading the quality of environmental education.

### 3.5.2 Mohawk Mountain Ski Area

Mohawk Mountain Ski Area attracts skiers from Connecticut and surrounding states.  Since 1986, Mohawk Mountain gross revenues after deducting receipts for ski rentals have risen from $1.7 million to $4.3 million.  By 2008 ski rentals amounted to $4,700.  While rentals have been added to gross revenues they are insufficient to notice after rounding.  Projecting 2009 at the average growth rates for 1986 to 2008, gross revenues annual for the entire year of 2008 reached $4.4 million with fees to DEP of $80,851. In setting these fees Mohawk Mountain Ski Area utilizes a complex rate schedule noted in Table 3.5.1.

**Table 3.5.1: Mohawk Daily Ski Pass Rates**

|  | Adult (16 & older) | Junior/Seniors (5-15 yrs / 65 yrs & up) | Child (4 & under) |
|---|---|---|---|
|  |  |  |  |
| **ALL DAY** 8:30 - 6pm or 1 - 10pm | $52 | $44 | $15 |
| **SUNDAY ALL DAY** 8:30 - 4pm | $52 | $44 | $15 |
| **MORNING** 8:30 - 1pm | $45 | $37 | $15 |
| **AFTERNOON** 1 - 6pm | $45 | $37 | $15 |
| **TWILIGHT** 4 - 10pm | $45 | $37 | $15 |
| **NIGHT FRI/SAT** 6 - 10pm | $24 | $24 | $15 |
| **SUNDAY SPECIAL** 1 - 4pm | $37 | $37 | $15 |

**Source: http://www.mohawkmtn.com/lift_tickets.html.**

This complexity is compounded by special ski packages, free ski lessons and veterans discounts[17].

Two studies provide breakouts of skiers' expenditures by activity that indicate about a quarter of their expenditures are for lift tickets as noted in Table 3.5.2.  Utilizing the more up-to-date of these two, skier expenditures from Mohawk skiing activities would amount to $13.8 million.

---

[17] http://www.mohawkmtn.com/lift_tickets.html.

**Table 3.5.2: Skiers' Expenditures by Activity (%)**

| Region | Midwest[2] | North Carolina[3] |
|---|---|---|
| Time | 1968-69 | 2002-2003 |
| Lodging & Meals | 28.3 | 37.5 |
| Lift Tickets | 24.1 | |
| Lift Tickets and Rentals | | 32.7 |
| After-Ski Entertainment | 8.5 | 1.7 |
| Transportation | 16.5 | 11.1 |
| Other[1] | 22.6 | 17.0 |

(1) For Midwest includes equipment rental and repairs, lessons, package plans, and, other miscellaneous items with rentals excluded for North Carolina. (2). W. A. Leushner and Herrington, R. B. The Skier: His Characteristics and Preferences. http://nrs.fs.fed.us/pubs/other/recsym/recreation_symposium_proceedings_135.pdf Table 10. (3) Steven W. Millsaps, Groothius, P. A. **The Economic Impact of the North Carolina Ski Areas on the Economy of North Carolina 2002-2003 Season,** Table 2 http://www.goskinc.com/economics/2002-2003/NCSAA-Economic-Impact.pdf.


### 3.5.3 Harkness Memorial State Park

The Harkness Memorial State Park on average hosted 65 events in the historic mansion, primarily weddings over the last three years.  The average group size was 130 implying 8,450 guests.  The average costs per capita at the site were $250, of which $175 is for food, beverages and accommodations and $75 for incidentals, primarily entertainment.  Of these guests about 75% used commercial accommodation for at least one night and immediate families of bridal parties two nights.  Because most weddings occur during peak season local accommodation prices average $175 per night.

There are a further 25 amphitheatre weddings a year at lower costs per capita and with fewer guests staying in commercial accommodations.  Amphitheatre costs are $375 per event and per capita costs about $25.  Their use of local accommodations is also lower at 25% of guests.

Additional costs for food then add to the total expenditures in Connecticut attracted by the Harkness Memorial State Park illustrated in Table 3.5.3.

The various food and beverage and off-site accommodation charges cover bridal parties and guests over one or two nights.  The entertainment costs are for bands and other entertainment the weddings.  The expenditures are significant because out-of-state wedding participants, particularly Boston and New York, dominate bookings at the Harkness Memorial State Park.

0678

**Table 3.5.3: Expenditures Attributable to Operations at the Harkness Memorial State Park**

| Activity | Expenditures |
|---|---|
| **Weddings Utilizing the Historic Mansion** | |
| Food, Beverages and Accommodation at the Site | 1,803,750 |
| Entertainment | 633,750 |
| Offsite Accommodations | 1,109,063 |
| Offsite Food | 380,250 |
| Travel | 117,696 |
| **Wedding Deploying the Amphitheatre** | |
| Food, Beverages and Accommodation at the Site | 71,250 |
| Entertainment | 126,750 |
| Offsite Accommodations | 82,013 |
| Offsite Food | 28,125 |
| Travel | 26,116 |
| **Other Wedding Parties (Pictures only)** | 3,750 |
| **General Admittance** | 159,929 |
| **Total Expenditures** | 4,542,460 |
| **Donation** | 347,170 |
| **Total** | 4,889,630 |

Source:  DEP staff.

Harkness accommodation fees are modest in per capita terms as noted from its fee schedule below;

*Weddings & Parties:*

*The rental fee of $4,450 includes exclusive use of the first floor of the mansion and south courtyard tent for 5 hours with an additional 2 ½ hours set up and breakdown. Purchase additional time for $875 per hour to the midnight curfew.*

*Day Use Fees:*

*Seminars, conferences, luncheons and meetings have a four hour base rate Tuesday - Friday, 8 a.m. to 4 p.m. (March 1 to Memorial Day and Columbus Day to December 23)*

- *Music Room: 80 guests maximum, base rate: $565, additional time $220 per hour*
- *Dining Room: 40 guests maximum, base rate: $440, additional time $160 per hour*
- *Breakfast Room: 30 guests maximum, base rate: $375, additional time $140 per hour.*

Visitors to its events however spend a considerable amount in Connecticut as noted in the table.  Staff is noticing increasing number of parties from out-of-state so that increasing shares of the revenues are attributable to its presence in Connecticut as opposed to locale couples getting married elsewhere in lieu of availability of the Harkness Memorial State Park.

### 3.5.4 Enhanced Education

Data are available on the educational and training activities undertaken at three of five educational centers.  Estimated expenditures in Connecticut by visitors to these centers are summarized in Table 3.5.4.  From 2005-2010 they have been in the $6.9 million to $7.5 million range.

**Table 3.5.4 Extrapolated Connecticut Expenditures by Visitors to DEP Managed Educational Centers**

**(Millions 2008 $)**

|  | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
| Accommodation | 1.8 | 1.7 | 1.8 | 1.7 | 1.8 | 1.7 |
| Expenses Other Than Accommodation | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total Paying Parties | 5.7 | 5.3 | 5.7 | 5.3 | 5.6 | 5.2 |
| Residents (PV FD) | 5.4 | 5.1 | 5.5 | 5.0 | 5.4 | 5.1 |
| Non-Residents (PV FD) | 0.3 | 0.2 | 0.2 | 0.3 | 0.2 | 0.2 |
| Camper Walk-in | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total Non Accommodation | 5.7 | 5.3 | 5.7 | 5.3 | 5.6 | 5.2 |
| Including Accommodations | 7.5 | 7.0 | 7.6 | 7.0 | 7.4 | 6.9 |

## 3.6 Conclusions

Connecticut visitors utilize DEP facilities to undertake a series of activities and in doing so create direct expenditures of at least $409 million over and above the general tourism activities from visits to state parks for camping and swimming.  This chapter has explored activities including boating, hunting, angling and skiing.  They are all significant in generating direct expenditures.  In addition DEP operates or licenses venues where additional activities occur such as special events, charity fundraisers, bird watching, hiking and horseback riding.  *Inclusive of their other activities in Connecticut, direct consumer expenditures in relationship to undertaking activities at DEP-managed parks and forests would approach a billion dollars annually.*

## 4.  Consumer Surpluses

## 4.1 Introduction

This chapter presents definitions for consumer surplus, a brief indication of the level of participation in key recreational activities covered in Connecticut and estimates consumer surpluses derived by participants.  The multiplicity of possible techniques for estimating these values rests on visitors' return costs of travel from origin to destination and returning.  Appendix C covers technical considerations for estimating consumer surplus concern for camping, angling, both in-land and marine, and camping as well as the resulting estimating equations and related statistical information.

Consumer surplus has also been derived for day trippers to beaches for this relative small user group described in considerably more detail than in the same appendix than in the following text in order to support and clarify the various approaches

## 4.2 Consumer Surplus

Consumers' surplus[18] is the benefit derived by visitors to parks over and above what they pay for accessing parks. .[19]   These benefits, sometimes called non-pecuniary benefits, are particularly germane to public resources like parks because visitors pay either no fee or only a nominal fee to use these services.   This follows from the unique characteristics of parks.   Parks may be consumed by many individuals at once, without reducing the benefits to others (non-rival consumption).   Also, it is generally costly to exclude individuals from using the good (non-excludability).[20]   Pricing for these types of goods typically do not capture their full benefits.    As the economist Frank Cesario stated over thirty years ago, "The Consumers' surplus criterion is gaining widespread acceptance as a way of estimating the primary economic benefits of outdoor recreation sites and facilities." (Cesario, 1976)   And, indeed, this approach remains the most widely utilized and accepted today.

When considering public spaces, measuring consumers' surplus follows one of two methods.   The first method uses a survey to elicit what people think they would be willing-to-pay to make the resource available.[21]   A second method is to estimate what people actually spend in order to access these resources in addition to any price they pay to enter.   This report follows the later approach; know as the travel cost method (TCM).   At a minimum, TCM estimates the costs associated with traveling to and from the park.   The assumption is that individuals must value the resource at least as much as they spend on traveling to and from the resource.   Some TCM analyses also additional non-pecuniary costs such as the time spent traveling to the park and the time spent at the park.   Often, TCM uses intercept surveys as is basis; asking individuals how far they have traveled, how long they spend at the park and how many times a year they come to the park.   Limitations to analyses are discussed in appendix C. Despite this, travel cost analysis remains our best tool for valuing the recreational experience.[22]

Even in the presence of comprehensive data, obtaining a reliable measurement of consumers' surplus can be challenging.   Other states have conducted intercept surveys to estimate the number of trips and travel time for park users (MD).   Survey data are not available for Connecticut, but Connecticut collects

---

[18] "Consumers' surplus" should not be confused with, or substituted for, "consumer's surplus"; the former is a measurement of benefit to one individual, while the latter represents the benefits to an entire group. See Mas-Colell, Winston, & Green (1995) for additional information.

[19] "[Consumers' surplus] measures the net benefits from consuming n units of the discrete good: the utility u(n) minus the reduction in the expenditure on consumption of the other good." (Varian, page 353)

[20] For example, consider the difference between a 'public good', like public open space and a 'market good', like a piece of gum, which lacks these characteristics.   Only one individual consumes gum at a time, whereas many people can simultaneously be in a park.   Gum is readily excludable as the physical barrier of being in someone's mouth.   Park benefits such as looking at natural vistas, preservation of biodiversity, etc. are available to all in proximity to the park.

[21] "Washington State Parks Centennial 2013 Survey,"  Responsive Management, (2006) http://www.parks.wa.gov/Centennial2013/2006%20Survey.pdf

[22] Haab, TC and KE McConnell (2002) Valuing Environmental and Natural Resources:  Econometrics of Non-Market Valuation USA:  Edward-Elgar Publishing.

0681

addresses for all individuals who reserve camp spaces and purchase licenses.  Using spatial analysis, distances can be measured using visitor addresses and geocoded parks data.  A small percent of visitor data were found to have invalid or "non-geocodable" addresses.  These instances were mostly for non-residents accessing Connecticut attractions.   Where addresses were obviously false, the information was deleted from the sample on which estimates were made but the numbers of omitted licensees reintegrated with the estimates based on the estimated averages in order to more fully capture consumer surpluses from these activities.

Individuals who are out of state can also purchase these licenses.  In the case of marine angling licenses, Rhode Island, Massachusetts and New York offer reciprocity.  CT residents may purchase marine angling licenses in other states and use them in Connecticut's Marine fishery and vice versa.  Because DEP's database is limited to Connecticut, using Connecticut license purchases *only* necessarily leads to a lower bound estimate of the consumer surplus derived from Connecticut's marine resources.  Ideally the exercise would be conducted among all members operating under reciprocity agreements.  The Connecticut data do not include addresses for individuals who attend parks for other sporting activities.  This omission underestimates of the true consumer surplus for Connecticut's state parks and forests.

Because DEP data contain only addresses of origin, exact distances traveled are unknown as are the potential for multiple destinations, number of people in each party, and the number of visits per person.  For individuals coming from farther away (such as Texas), exact travel costs can be difficult to measure accurately.  In addressing these issues the CCEA has remained conservative in its assumptions.  CCEA has assumed that people travel directly from their origins to their nearest destination offering the activity and return the same way.  This distance is 'as the crow flies' as opposed to road mileage.  All visitors go to the nearest DEP location that offers their particular activity.   Connecticut and its New England counterparts are physically smaller than most other states, leading to smaller distances traveled in-state to recreation facilities, and smaller travel costs.  Given the relatively small portion of visitors from very distant states, their travel distance is included.  Visitors not from the contiguous USA are excluded. This approach tends to understate local travel disproportionately to long-distance travel; thereby undervaluing Connecticut consumer surplus.  CCEA has assumed travel costs of $0.585 per mile and the average numbers of persons in parties for CT and the rest from the visitor's survey.  Where party sizes allow, it may be less expensive for more distant visitors to use alternative modes of transit.  These estimates are for people going to state parks and forests specifically for camping or licensed activities.  CCEA did not extrapolate its results to cover visitors going to other state parks and forests or visitors to the same state forests and parks for undertaking different activities.

## 4.3 Camping

In 2010, CCEA had complete data on 161,327 resident campers and 23,971 non-resident camper visitors who spent nights in DEP campgrounds.  In doing so, each experienced the ambience and communed with nature and fellow travelers in ways that campgrounds facilitate.  When the individual was gaining more satisfaction than he or she had paid for his or her trip that individual visitor was realizing consumer surplus.  Based on established travel-distance methods (Appendix C) for deriving consumer surplus, CCEA estimate for the consumer surplus accruing to resident campers is at least $124.1 million while

33

$18.4 million accrued visitors to the state.   The average consumer surplus per occupant was $769, in-line with the range of earlier studies after adjusting for higher transportation costs[23].

There are some confounders in this estimating process.  Individuals who travel from greater distances are more likely to have multiple destinations on their trip.  For these consumers, only part of their travel expenses can be reasonably allocated to Connecticut's parks.  Yet, without survey data, there is no basis to reasonably judge what percentage of their travel is based on their desire to engage in activities at Connecticut's parks.  The farther the distance away, the fewer individuals make these trips.  Statistically, they play only a small role in estimating consumer surplus.

Secondly, data are only available for individuals in parties who actually paid to attend parks.  This information gap is a problem when trying to estimate consumer surplus for individuals who might come to the parks for fee-free activities, simply drive through them or if park amenities change.  For this reason, the consumer estimates are limited to current conditions and those activities for which data is available.  By the same analogy, drive though traffic is unaccounted for and also excluded from the estimates.  These motorists may also be enjoying the scenic wonders of some of the parks.

## 4.4 Fishing

Because the costs of undertaking inland and marine fishing including travel are quite different a separate analysis has been undertaken on consumer surpluses for each group of anglers.  While holders of all waters licenses belong to both groups, the satisfaction derived from deep sea fishing as opposed to inland fishing may be quite different even for the same person.  In addition, the marine estimate is constrained.  The existence of reciprocity among many Eastern seaboard states for the sale and use of marine fishing licenses means that the sale of Connecticut licenses to out-of-state offshore anglers may not reflect distances traveled to participate in marine activities.  Taking these factors into consideration CCEA's sample included 98,264 resident and 8,825 nonresident inland anglers.  The more expensive marine fishery attracted 65,974 resident and 6,201 nonresident anglers.

Under these conditions the estimate of the consumer surplus in the inland fishery is understated at $67.4 million for residents with a further $3.3 million accruing to nonresidents.  Of those included in the estimate, this consumer surplus averaged $500 per license.  This estimate is high compared to the range of consumer surpluses summarized from the literature in the appendix at $26-$208 but consistent with the close proximity of housing to sites for angling that facilitates frequent use of licenses and higher fuel costs that underpin current rather than earlier estimates.

---

[23] With an average of 3 nights per stay per visitor, the average consumer surplus per night per visitor is $256. A similar study of camping in three Maryland parks found camping consumer surplus per night per visitor ranged between $194 to $350 (in US$2010) (Wienland and Horowitz, 2007).  Our estimate is roughly half-way between their lower and upper estimates for visitors per night. A study of an Australian recreational area estimated consumer surplus to be $158 per adult per visit per day (in US$2010) (Rolfe and Dyack, 2010).  Because this study did not differentiate between overnight and day visits, this value is lower than our camping value as expected, but supports the plausibility of this estimate.

Average distances used for estimating consumer surplus in this report for residents were eight miles with average distances expanding for non-residents coming from more distance states. Because fewer and fewer anglers travelled long distances, this process places less and less emphasis on them.

Earlier estimates suggest that CCEA distance assumptions are conservative. In their compilation of travel distance data collected from 1988-1995 at 85 sites on 53 streams located throughout the State of CT of 4,643 anglers Hagstrom *et al* found the average distance travelled by all inland anglers was 12.1 miles and that the 90% traveling the furthest drove 23.5 miles or more[24]. Because out-of-state anglers are apt to travel further than residents, and only 2% of fishing trips are undertaken by non-residents, this survey suggests but does not substantiate a tendency for CCEA's distances assumptions for residents to be downward biased. A second survey data of 3,138 anglers encompassing five different fishing areas on the Farmington River suggest that distances travelled ranged from 7.8 to 25.6 miles depending on the site and the season[25]. Average distance travelled to only one site in spring was lower than the eight miles assumed in this report indicating the report's travel distances for inland anglers are conservative as is the resulting estimate of consumer surplus.

Inland fisheries are assisted by DEP fish hatcheries through the restocking of lakes, ponds and rivers. In particular, the excitement of hooking and retaining a brown trout and other species on a line is fostered and perpetuated by their release. Inland angling has a faithful following of Connecticut residents who participate frequently as notes above. This level of participation drives up their collective consumer surplus derived from the marine fishery to $36.9 million for residents and $2.9 million for nonresidents. Consumer surplus estimates are for a modest $370 per license.

The bottom line is DEP managed venues contribute at least $104.3 million in consumer surplus to resident Connecticut anglers and a further $6.1 million to other North Americans, part of the magnet that attracts them to spend their sporting dollars in Connecticut.


## 4.5 Hunting

According to the U.S. Fish and Wildlife Services, Connecticut residents spend $100 million a year on hunting trips and related retail expenditures in the state. In addition, non-residents spend nearly another $5 million in the state. Aside from licenses limited to one or three days, there are good reasons to expect that hunting licenses will be used on multiple occasions:

---

[24] Hagstrom, N. T., M. Humphreys, W. A. Hyatt, and W. B. Gerrish. 1998. A survey of Connecticut stream and rivers. Federal Aid in Sport Fish Restoration , F-66-R Final Report, State of Connecticut Department of Environmental Protection, Hartford, CT. Table 32

[25] Hyatt, W. A. 1986, An angler survey and economic study of the Farmington River fishery resource. Federal Aid in Sport Fish Restoration , F-59-R Final Report, State of Connecticut Department of Environmental Protection, Hartford, CT. Table 13.

- The Bureau of the Census found that Connecticut hunters make 12 single day trips per resident licensee and three days for nonresident licensees[26];
- Seasons for types of game, e.g. spring and fall turkey shoots, are different; and,
- Hunting techniques vary – shotgun or bow and arrow – and many of the permits under the licenses are for different hunting techniques – using blinds in hunting migratory birds to tracking deer – a hunter holding all these permits and/or tags would undertake multiple trips.

CCEA's initial estimates of consumer surpluses among hunters are conservatively $17.8 million for residents and $566,000 for nonresidents or $268 per license.  To the extent that hunters travel to different venues and/or extend their trips beyond a day, the consumer surplus would be larger than estimated.

## 4.6 Day Trippers

Since 2003, it has been possible to pay late fees rather than full-day fees, particularly at beaches.  Such fees have been differentiated between residents and nonresidents and between weekday and weekend visitors.  The advantage of such fees for both resident and nonresident visitor groups is that they afford visitors choices based on price ranges.   Especially at beaches where characteristics derived from going to the beach may be quite similar for full day and half day visitors different behaviors may reveal their preferences.  Lower fees, the brevity of exposure to the sun, convenience, and enhanced warmth available to late day visitors may be preferable to some visitors relative to the full-day experience.  For others the length of time at the beach may be more important.  Consumer actions reveal visitor preferences among these choices.  Using this approach in lieu of data on distances traveled as well as linear approximation yield a relatively low assessment of $570,000 in consumer surplus accruing to Connecticut consumer benefit from four beaches and $80,000 to nonresidents.

In addition for resident day trippers, reverse engineering reveals estimates (See CC.5 in Appendix C) of the average distances traveled by various classes of visitors. The costs for late day resident parties visiting the beach are equal to their entrance fee and travel costs to get there and back.  These visitors do not generally face costs for either meals or accommodation.  They are simply driving to the beach from their points of origin and returning to them.  They may decide to diverge from their most direct route in order to undertake other activities along the way, but those travel costs can be allocated to those other activities.

This choice has facilitated estimating demand elasticities relative to fees charged and transportation expenditures involved both within a given year and among years for 2009 and 2010 as described in Appendix C.  CCEA estimated elasticities revealed by late day trippers for 2009 and 2010 as -0.98339 and -0.79571.  These results suggest further rate reduction for late day trippers would erode rather than enhance government revenues.

Yet all other things remaining equal, these estimates would be expected to be roughly similar between the years.  The response is that at all other things, including transportation costs were not similar.

---

[26] The only permit holders treated as equivalent to licensees were those holding archery permits for deer who did not appear to need a license involving any type of firearms.

These elasticities for residents are of particular interest because they can also be reverse engineered to provide a guide to distance driven. The difference in costs per mile is derived from a combination of government rates grant to employees per mile drive in 2009 of $0.585[27] with an escalator for personal travel in the Northeast that grew by 8.7 percent from 2009 to 2010 thereby causing an increase of $0.0509 per mile to move five cents a mile past the 2009 costs. This results in an estimated weighted round trip distance 6.4 miles. Using this distance to derive transportation expenditures per trip incurred in undertaking beach activities for residents and the estimate of 100 miles for nonresidents yields the transportation costs for this group. The results appear in Table 4.6.1.

**Table 4.6.1: Transportation Costs Related to Day Visitor Days (2010$)**

|  | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|
| Resident Week Day | 17,867 | 17,681 | 15,079 | 16,309 | 40,478 | 44,223 | 59,524 | 53,144 |
| Resident Weekend | 1,529 | 21,973 | 19,471 | 24,442 | 54,259 | 13,672 | 7,803 | 7,218 |
| Nonresident Week Day | 97,480 | 66,131 | 90,739 | 105,682 | 131,562 | 87,152 | 112,203 | 233,978 |
| Nonresident Weekend | 102,694 | 106,700 | 119,481 | 110,324 | 28,805 | 4,815 | 4,446 | 8,914 |
| Total Resident | 19,395 | 39,655 | 34,550 | 40,751 | 94,737 | 57,895 | 67,327 | 60,361 |
| Total Nonresident | 200,173 | 172,831 | 210,220 | 216,007 | 160,368 | 91,967 | 116,649 | 242,892 |
| Grand Total | 219,569 | 212,485 | 244,770 | 256,758 | 255,105 | 149,862 | 183,976 | 303,254 |

## 5.7 Conclusions

CCEA has estimated consumer surpluses accruing to Connecticut citizens by major activities:

- o   Camping (S124.1 million)
- o   Hunting ($17.8 million)
- o   Inland Angling ($67.4 million)
- o   Marine Angling ($36.9 million)
- o   Swimming/day use at four parks ($570,000).

In addition to the $246.9 million accruing to residents in consumer surplus, out-of-state visitors undertaking these activities derived a further $25.1 million, led by campers at $18.4 million. Total estimated consumer surplus for camping is 26% of tourism expenditures made by campers in Connecticut.[28] Had there been sufficient survey data available to justify extrapolating the estimates of consumer benefits to other DEP venues where less detailed records and other activities are undertaken, it is highly likely that those estimates would indicate that DEP operations provide significantly more benefits to citizens of the state. These estimates take no account of the amenity benefits accruing to residents overlooking the "permanent" green space created by the parks. That task is left to the next chapter.

---

[27] This rate is particularly researched. Employee unions insist on their members not being under reimbursed and Auditor Generals ensure that government coffers are not being plundered.

[28] Strauss, Charles H. and Lord, Bruce E. A. Case Study The economic impacts of a heritage tourism system, Journal of Retailing and Consumer Services 8 (2001) 199}204

0686

## 5. Amenity Benefits

### 5.1 Introduction

On Long Island the amenity value for overlooking green space is 12.8% relative to house values devoid of such vistas.  Due to the abundance of green space in Connecticut, expectations are for a lower green space bonus but such expectations can be offset by the quality of Connecticut's green space, breadth of vistas, and permanence offered by state parks and forests.  This chapter illustrates CCEA's derivation of this value and the total amenity values accruing to Connecticut residents overlooking DEP-managed parks and forests.  Like all property evaluations, they are subject to change.  Since 2007, the average value of housing permits in Connecticut has risen by 3.2517% while house prices have declined.

This green space bonus value has then been applied to CCEA's estimate of 6,158 residences overlooking state parks and forests.  This estimate is based on enumerating all single detached residences surrounding state parks and forests.  In purposeful samples of locales defined to be spread out across the state house selling prices were determined from OPM data for both those overlooking parks and the average selling prices in the same locale.  The results were also tested against an estimate of those backing onto green belts along state trails based on a sample of a 100 mile stretch of trail to see if there is a difference backing onto state parks or forests.  Of these sampled homes, 1,078 overlook parks and 1,024 state forests.

This process has involved identifying residences overlooking DEP-managed parks, forests and hiking trails using sophisticated GIS systems as well as any 2007 sales of both those houses and those in the same towns, thereby forming two sets of data.  The first allows residents to enjoy vistas while the latter on average contains few properties without such access.  Percentage differences in assessed values then provide an initial base for expecting residential selling prices to differ between residences overlooking DEP husbanded green spaces and those not overlooking them.  After adjusting for those expected differences, residences overlooking DEP-managed green spaces still attracted a 12.2% to 13.3% pricing bonus.

Sections of this chapter address the methodology to identify the number of residences overlooking DEP-managed venues, methodology for assessing green space bonuses, amenity estimates, fiscal implications, and conclusions.

### 5.2 Number of Houses Overlooking Parks and State Forests

CCEA assessed the total number of houses overlooking State parks and State forests using visual recognition from GIS sources.  CCEA research for residences with a direct access overlooking green spaces managed by the Connecticut DEP and designated as State Parks or State Forests.  Visual recognition may not be the best procedure, although in this particular case it has been considered the only viable way in order to include only single residential buildings while excluding multiple unit buildings and non-residential ones.

Current Geographic Information Systems (GIS) software (e.g. Imagine) are based on light reflection/refraction samplings are useful in identifying buildings but do little to differentiate between commercial (especially small business) and residential buildings.  These attributes are particularly germane for statewide studies.  Furthermore, the characteristic of directly overlooking particular green spaces needed to be addressed with care, because similar structures (e.g. other houses) may create barriers that sample-based techniques cannot overcome.  CCEA recognized residences by downloading the shapefile (.shp) provided by the DEP through its GIS on-line Data center[29].  This file "… contains property that comprises DEP facilities such as state forests, parks and wildlife management areas"[30], with a 1:24,000 scale, NAD 1983 StatePlane Connecticut FIPS 0600 Feet coordinate system, 01/12/2010 release.  CCEA then imported this file into ArcGIS 9.3.1, deployed for data preparation and selection.

DEP-managed state parks and state forests have been selected using the "Select by attribute" tool.  By creating an SQL to extract the desired features, CCEA generated a new layer to show only the desired properties.  The file has been subsequently transformed into KML (.kmz), using the Toolbox provided in to ArcGIS, thus creating overlapping files in Google Earth.  These overlapping files in Google Earth provide visible borders for the parks/forests as well as overlooking residences.  Finally, the recognition process facilitated counting the number of houses overlooking DEP-managed green spaces and recording the information in an Excel File for at each park/state forests.

## 5.3 Assessing "Green Space Bonus" for Residences Overlooking DEP Parks and Forests

The premium price assessed for directly overlooking of DEP's managed green spaces in the state has been based on the use of different sources.  The basic idea has been to extrapolate the additional price people are willing to pay for houses directly overlooking state parks and/or state forests and state trails.  The files/sources used are listed in the table below. A brief description of the data preparation methodology follows.

Using the ESRI-based geocoding file of the USA, previously clipped for the State of Connecticut[31] CCEA geocoded[32] 2007 residential sales.  Subsequently, the file showing town boundaries has been used to select and to extract data on towns which had sales of properties overlooking DEP parks and forests,

---

[29] http://www.ct.gov/dep/cwp/view.asp?a=2698&q=322898&depNav_GID=1707#Property

[30] http://www.cteco.uconn.edu/metadata/dep/document/DEP_PROPERTY_FGDC_Plus.htm

[31] The file was derived from the original ESRI database, although reconfigured in NAD 1983 StatePlane Connecticut FIPS 0600 Feet, thus showing distances in feet. Therefore, the new feature has been reconfigured with same coordinate system by ArcGIS.

[32] That is, ArcGIS has created a point feature for each of the properties listed, associating a geographical location

0688

| FILE NAME | SOURCE | CONTENT | JUSTIFICATION |
|---|---|---|---|
| Connecticut Towns for Clipping | DEP[33] | Towns' boundaries ready for clipping, shown as polygons. | Clipping areas of interest. Background for visual recognition. |
| 2007 Properties Transactions | Office of Policy and Management State of Connecticut[34] | Houses/buildings/land sales occurred in 2007 with addresses, assessed and sale prices. | Used to assess the amenity price as difference between direct overlooking single-family residential properties and not-overlooking properties. Both Assessed and Sale Price used.<br><br>As .dbf, Price recording and assessment at town level. |
| Connecticut Street | ESRI | Connecticut Streets and addresses | Geocoding and Street/Property matching |
| DEP Parks/Forests | DEP[35] | DEP properties | State parks and forests clipping and displaying for better visual recognition |

creating different .shp files, corresponding to the number of datasets used. Each of these datasets contains cities in different areas of the State, divided by a geographical region, as listed below:

- SOUTH: including East Haven, East Lyme, Groton, Westport;
- CENTRAL EAST: including Chaplin, Ellington, Marlborough, North Stonington, Voluntown, Portland;
- CENTRAL WEST: including Bethel, Easton, Kent, Plymouth, Thomaston, Torrington;
- COASTAL SOUTH: including Beacon Falls, Colchester, Oxford, Rocky Hill, Woodbridge, Woodbury; and,
- CENTRAL-SPARSED: including Columbia, Coventry, Hebron, Naugatuck.

These areas and towns had a good number of transactions, transactions occurred in properties close to parks, and do not have significant sources that would distort prices, such as universities.  Each of these .shp file has been used to clip (using the Clip tool in ArcGIS) the file containing the DEP state parks/forests and the transactions, thus showing only sales in towns where sales were also associated with residences overlooking parks and forests.

CCEA subsequently transformed files into KML (.kmz) files, and exported them to Google Earth for a visual recognition of transactions involving residential/single family properties directly overlooking state parks/state forests.   CCEA then created .dbf files associated with each clipped house set, renamed in order not to alter the spatial files.  For each set of towns, transaction values occurred at town and were sorted into properties directly overlooking DEP-managed green spaces (those of interest for the present

---

[33] http://www.ct.gov/dep/cwp/view.asp?a=2698&q=322898&depNav_GID=1707#PoliticalBoundaryCT
[34] http://ct.gov/opm/site/default.asp
[35] http://www.ct.gov/dep/cwp/view.asp?a=2698&q=322898&depNav_GID=1707#Property

0689

study) or not overlooking them.  Both the Assessed and the Sale Price have been used to make the comparison and evaluate the amenity price paid for properties overlooking state parks/forests.

## 5.4 Amenity Estimates

This section derives reasonable market assessments and selling prices of market values of average residences allocated into two groups – those overlooking DEP-managed venues and those not overlooking them.  For that reason apparent distressed sales and others influenced by non-market forces, documented by OPM,[36] were excluded from the analysis of either group of sales.  In its database on real estate OPM has tried to eliminate non-market factors by purging non-representative sales.  For a full list of OPM's reasons for purging non-market entries see Appendix D.  This process eliminated all sales where selling values were less than assessed values or where non-market considerations were known to influence prices.  The valuations were limited to single residences in order to maintain comparability between groups.

Table 5.4.1 contains the comparisons of assessed and selling prices not overlooking DEP-managed venues with those which overlook them.  While the overall averages indicate a significant green space bonus not all regions are positive.  In particular the two with the smallest samples are negative.  This outcome may arise from sampling problems or perceived negative characteristics outweighing the positive characteristics from the vistas afforded by DEP-managed venues.

**Table 5.4.1: Average Values of Single Residences Sold in 2007**

| Area | Not Overlooking DEP Parks and Forests | | Overlooking of DEP Parks and Forests | |
|---|---|---|---|---|
| | Assessed | Selling Price | Assessed | Selling Price |
| | | | | |
| South (N=7) | 308,470 | 467,290 | 448,943 | 798,000 |
| South Net of Westport (N=6) | 100,047 | 149,863 | 83,642 | 132,167 |
| Central East (N=22) | 180,098 | 268,095 | 203,842 | 318,160 |
| Central West (N=25) | 331,959 | 473,087 | 389,645 | 663,073 |
| Coastal South (N=4) | 206,408 | 328,127 | 142,525 | 227,750 |
| Central Sparse (N=7) | 166,095 | 268,111 | 141,767 | 227,863 |
| **Total (N=65)** | **252,442** | **372,086** | **291,242** | **487,206** |
| **Total Net of Westport (N=64)** | **232,027** | **340,840** | **254,531** | **419,928** |

Source OPM cleaned to exclude non-market and extraordinary market influences.  The "N"s are the numbers of 2007 sales of single residences overlooking DEP parks and forests.

These data, particularly those for South are heavily influenced by a high priced outlier in the high-end market of Westport.  For that reason the results are reported with and without that outlier. If anything

---

[36] Distressed sales can occur after fires or for quick recovery of assets by financial intermediaries following foreclosures that do not reflect true market values.  Other sales can be influenced by transactions within families, auctions etc.  Because CCEA utilizes the percentage differences between assessed and market values we have also purged sales which OPM has classified as involving significant improvement relative to assessed values.

these estimates are downward biased.  For residences not overlooking DEP parks and forests, assessed values are based on average values of $232,027 and selling prices of $340,840 compared to state average assessment of $334,556 and selling prices of $435,718[37]. In short, the assessment of the bonus is based on a downward biased sample.

While the overall results show a significant green space bonus, that conclusion does not hold in the South when the high-end property is eliminated.  In addition, assessed values are lower for residences overlooking DEP parks and forests in Coastal South and the South net of the Westport outlier.  In each of these the bonus for overlooking the parks and forests remains positive as noted in the next Table.

Table 5.4.2 captures the differences in average property values derived from the above.  Because actual market values of properties normally exceed assessed values the percentage green space bonus is based on the selling price of properties overlooking DEP green space less the average value of those not overlooking DEP green space adjusted for the average differences in the assessed values of the properties.  That process captures all the same characteristics off housing, but for the vistas.  Also, because properties are assessed by uniform criteria at roughly the same time within a locale, excluding green space as a characteristic this process takes other characteristics influencing property values are considered in the assessed values, leaving the characteristic of overlooking DEP green space as a major contributing factor to the remaining market differences.

**Table 5.4.2: Average Values of Single Residences Sold in 2007**

| Area | Differences (2007$) | | % Differences | | % Bonus |
|---|---|---|---|---|---|
| | Assessed | Selling Price | Assessed | Selling Price | |
| | | | | | |
| South (N=7) | 140,473 | 330,710 | 45.5 | 70.8 | 17.3 |
| South Net of Westport (N=6) | (16,405) | (17,697) | -16.4 | -11.8 | 5.5 |
| Central East (N=22) | 23,743 | 50,065 | 13.2 | 18.7 | 4.9 |
| Central West (N=25) | 57,686 | 189,986 | 17.4 | 40.2 | 19.4 |
| Coastal South (N=4) | (63,883) | (100,377) | -30.9 | -30.6 | 0.5 |
| Central Sparse (N=7) | (24,328) | (40,248) | -14.6 | -15.0 | -0.4 |
| Total (N=65) | 38,800 | 115,120 | 15.4 | 30.9 | 13.5 |
| Total Net of Westport (N=64) | 22,504 | 79,088 | 9.7 | 23.2 | 12.3 |

The sample outside of the parks does include the normal share of property sales overlooking other green spaces.  They may also be deriving similar amenities by deriving similar benefits. To the extent that happens, CCEA is understating the amenity values provided by DEP-managed resources.

By using the percentage bonus relative to the average selling price of residences not overlooking DEP-managed parks and forests, CCEA has a attained an average bonus of $41,961 to $50,124, depending on whether the high-end Westport property is included or not.  Based on the 6,158 residences, identified as overlooking of DEP parks, forests, and trails this bonus amenity value is $258.4 to $309.4 million valued

---

[37] Entire OPM single resident database for 2007 aside from exclusions for  non-market considerations and improved quality excluded from the assessed values.

in 2007 dollars. Adjusted to 2010 dollars based on the 3.2517% increase in housing permits, the bonus amenity values would increase to $266.8 million to $319.3 million. Because they are outside of the assessed value of the properties they accrue to the owners or, where previous sales have captured the amenity values, the former owners of the overlooking properties.

## 5.5 Fiscal Implications

The average assessed value of houses is higher than those not overlooking DEP-managed parks and forests. This tendency to build larger homes with more appealing features already adds $22,504 to $38,000 per residence overlooking DEP-managed venues to the property tax base of the state. Total estimates of the above average assessed values of residences overlooking DEP-managed venues to the states' property tax base are the $143.1 to $246.7 million. At current average property rates of 2.2%, this increase in assessed property values adds $3.1 to $5.4 million (2010$) in annual government revenues. Attributable to DEP's husbanding of and long-term commitment to parks and forests green spaces, the above average assessment values annually enhance state and local government revenues indirectly via the tax system.

Inflation aside, the expected long-term net present value of this revenue stream discounted at 5% over 20 years is $390.2 to $67.7 million in 2010 dollars. Any rebasing of property values to capture the currently uncaptured amenity values would further enhance DEP's contributions to government revenues. Attributable to DEP's husbanding of and long-term commitment to park and forests green spaces, this amenity value annually enhances state and local revenues indirectly via the tax system.

## 5.6 Conclusions

Assessed against selling 2007 prices adjusted to 2010 dollars for single residences either overlooking DEP parks and forests or not doing so, Connecticut residents reap amenity benefits of $258.1 million to $309.0 million in 2010 dollars. Residents tend to build relatively expensive homes overlooking green DEP venues that add another $141.1 million to $243.3 million to the assessed value of properties. The government shares in these revenues through property taxes in the range of $3.1 million to $5.4 million. The percentage increment estimates for these amenity values ranges between 12.3% to 13.5%, which is similar to the hedonically based estimate for Long Island of 12.8%. Given the greater availability of green space in Connecticut, initial expectations of lower percentage green space bonuses in Connecticut may not be warranted due to the vastness of Connecticut forests. Yet, that very vastness provides quality vistas complemented by the permanence of parks and forests and state trails under DEP management.

# 6.  Total Expenditure Impacts

## 6.1 Introduction

The purpose of this chapter is to establish the economic impacts of DEP parks and forests on the state economy.  Doing so depends critically on one's view of the appropriate counterfactual.  Essentially establishing the counterfactual depends on one's answer to the question of, "What would be lost to Connecticut if DEP parks and forests operations did not exist?"

## 6.2 Counterfactual

At the extreme, green spaces could be alienated due to out-break of a disease akin to the Spruce Mountain Budworm that is ravaging fir in the West and moving inland thereby accelerating lumber salvaging operations to minimize forest fires and/or blight.  Similarly, oil spills at seas are capable of adversely impacting marine recreational boating.  Residents and nonresidents would camp, hike and pursue other outdoor recreational activities elsewhere.  Further, recreational angling would be curtailed by eliminating hatcheries and the state's role in restocking the fishery.  The angling excitement of hooking and landing a brown trout could be eradicated and with it, Connecticut's appeal to anglers threatened.  Educational activities dependent on the parks and forests current physical resources would also be forced to relocate or be curtailed.

At a minimum, the perception of permanence related to DEP parks and forests would be eroded.  Risks related to humans misusing what is now green space, managed by DEP, would rise, and unmanaged hunting and angling would lead to over exploitation and eventual eradication of some species.

To assess these impacts CCEA has utilized REMI a large dynamic econometric model of the state. Because DEP's current activities are currently part of the economy, CCEA has modeled their cessation by deleting their direct expenditures noted above from the business as usual base case.  Readers may find this scenario overly dire, but it sets a benchmark for understanding the importance of DEP continuing to provide solid management of the states' parks, forests and other venues.

The impacts differ when the amenity values are included or not so that two scenarios are presented. The direr scenario assumes that there are catastrophic effects on forest and park land as described above and includes the alienation of amenity benefits on property owners and participant in all of the activities that have been shown to accrue to Connecticut participants.  The second assumes that benefits of overlooking forests and park land remain intact so that amenity benefits and government revenues stemming from them remain.

To the extent that DEP type operations were pursued by other parties, such as conservation societies and commercial fishery associations restocking the fisheries, these results would be somewhat ameliorated.  There is sufficient detail elsewhere in this report for readers to make judgments concerning such possibilities.

0693

## 6.3 Direct Expenditures Dependent on DEP Park and Forests Related Activities

Operation of the REMI model to simulate the economic impacts involves converting all the above direct expenditures to 2008 dollar values, summarized in Table 6.3.1 using normally expected escalators or deflators.  The economic impacts have been assessed initially with reference to the amenity benefits from consumer surpluses directly related to recreational activities attributable to DEP venues but not the larger ones related to land values.  It simulates a case in which the foliage in DEP-managed parks and forests remains.  The second scenario takes the land-based amenity benefits emanating from state parks and forests into account, by assuming that without DEP's husbanding they do not survive.  Adjusted to 2008 dollars, total expenditures by visitors to DEP venues for the activities are specified in Table 6.3.1. Once converted to 2008 dollars these expenditures exceed a billion dollars annually for each of 2009 and 2010 even without including any of the amenity values. The amenity values accruing to Connecticut residents note in the Executive Summary and the previous chapter generate annual benefits of $300 million annually.

In addition to operating costs, DEP capital costs amount to about $1.75 million annually.  They too are foregone in both cases.

The results of both scenarios have to be treated with care.  Without survey data CCEA has no ground on which to allocate visitor total trip expenditures to DEP-managed venues or other Connecticut attractions.  What is modeled here are the total expenditures which would be true if the expenditures were wholly attributable to DEP-managed venues.  To the extent that visitors come for other reasons – to see old friends and family, to tour New England beyond the realms of Connecticut and visit along the way – the results exaggerate impacts of the DEP-managed venues *per se*.  Based on estimates of other multipliers using similar techniques allocating about a sixth of the impacts to DEP would appear to be appropriate.  Yet if comparisons are being made to studies that claim a magnetic tourism site attracts more general spending, then the larger multipliers attained in the study are useful for comparison purposes.  But the point is that without survey data to legitimately distribute trip expenditures in Connecticut to activities tied to DEP's actions from other activities that are not, drawing the fine line of attribution is well nigh impossible.

The main source of recreational expenditures tied to DEP operations is clearly general tourism followed by fishing, hunting, and boating utilizing DEP launch sites.  Recreational boating is a major sporting activity in Connecticut but it is impossible to allocate all these expenditures to DEP, albeit it clearly plays a role in training in safe operations and licensing boaters and in facilitating recreational boat launches, and restocking the fishery.  Connecticut's safety record in water-based recreational venues is very good.

Impacts on government revenues, again converted to 2008 dollars, are summarized in Table 6.3.1.  The state government benefits from operating revenues generated both directly and via the tax system from DEP's undertakings.  Key operating activities clearly focus on angling and hunting licenses followed by the parks and forests operations.  The fee increases in 2010 have substantially increased revenues from those operations and are likely to continue to do so over the coming years.  While the figure for licensing revenue is indicative of revenues to the government in forthcoming years, the 2010 annual revenues used in the model net out the $1.2 million credit in operation until mid March of 2010.

**Table 6.3.1 Major Visitor Direct Operating Expenditures Attributable to DEP Parks, Forests and Other Venues (Millions 2008 $)**

|  | 2009 | 2010 |
|---|---|---|
|  |  |  |
| General Tourism Non-Accommodation | 451.8 | 446.5 |
| Accommodation | 95.1 | 97.8 |
| **Total General Tourism** | **546.9** | **544.3** |
| Hunting | 104.9 | 107.5 |
| Fishing | 278.3 | 282.5 |
| Boating | 57.6 | 54.0 |
| Skiing | 14.2 | 14.2 |
| Harkness Memorial State Park Accommodated Activities | 4.9 | 4.5 |
| Educational | 7.5 | 6.8 |
| **Total Activities** | **1,014.3** | **1,013.8** |
| Amenity Benefits Derived from Tourism and Recreation | 246.9 | 246.90 |
| Amenity Benefits from Vitas | 270.4 | 270.4 |
| Realized Government Revenues from Amenity Benefits | 4.2 | 4.2 |
| **Total** | **1,535.8** | **1,535.3** |

The values in the text have been normalized to millions of 2008 dollars by applying activity level price changes.  The boating adjustment is particularly large due to prices escalations on fuel.  The $1.75 million in DEP annual capital cost have to be added to the operating ones above.

The direr scenario differs from the more likely initial one in that the last two items in the above table are included albeit they are excluded in the initial scenario so that the initial one envisages the green space continuing whereas the dire one does not.

 Additions to the value of residential capital add more than a quarter of a billion dollars to those values. These numbers exclude incremental values on land overlooking DEP managed venues that is either unused or dedicated to use by other than single dwellings.  Due to the perceived permanence of state green spaces, there is a direct contribution to these assessed values by DEP's operations.  These enhanced assessments increase property taxes that flow annually to local and state revenues.  At current average property rates of 2.2%, this increase in assessed property values add another $3.1 to $5.4 million (2010$) in annual government revenues.  Both the amenity values of overlooking DEP managed venues and the resulting tax revenues are included the Table the mid points of their two estimates discussed in Chapter 5.

**Table 6.3.2 Revenues Accruing Directly to Connecticut's General Fund from DEP Managed Parks, Forests and Other Venues Including Amenity Related Property Tax Revenue Contributions**

**(Millions 2008 $)**

|  | 2009 | 2010 |
|---|---|---|
| **Operations** |  |  |
| Fees at Parks and Forests | 3.3 | 5.2 |
| Fishing and Hunting Licenses | 5.7 | 7.7 12.9 |
| Boating Licensing et al | 1.6 | 3.2 |
| Educational | 0.7 | 0.7 |
| Harkness Memorial State Park | 0.5 | 0.5 |
| **Total Operations** | **11.8** | **17.3 22.5** |
| Realized Government Revenues from Partial Amenity Benefits | 4.2 | 4.2 |
| **Total** | **16.0** | **21.5 26.7** |

From 2009 to 2010, annual contributions to the state revenues by DEP increased from $16.0 to $21.5 million. In the future, the credit program will no longer apply, further boosting revenues by $1.1 million. In addition, DEP activities were also supported by Federal Grants worth $5.4 million dollars.  The federal Sport Fish Restoration (SFR at $3.1 million) and Wildlife Restoration (WR at $2.3 million) programs contribute to the fish and wildlife funding stream.  The federal funding source is a user pay-user benefit program which collects excise tax revenue from manufacturers of hunting and fishing equipment (and other related sportsmen sources) and is deposited into a dedicated account.  The revenue is distributed back to the states to fund fish and wildlife restoration projects through SFR and WR grant programs administered by the U.S. Fish and Wildlife Service.  These are not federal appropriated monies from general taxpayers allocated through the typical budget process.  It is a permanent indefinite appropriation based on the collection of hunting and fishing equipment excise taxes, import duties, motorboat fuels tax and other revenues collected during the previous fiscal year and allocated back to the states through a formula based on land area, population and paid license holders.  These are revenues generated solely from users, the sportsmen buying the equipment.

## 6.4 Economic Impacts

### 6.4.1 Introduction

Since these activities are already including in the REMI business as usual bass case, their full economic impacts are assessed by deleting them from the base forecast.  To fully understand the dynamics of these impacts, all DEP activities are modeled by permanently deleting them from the economy.  That is the 2012 loss is extended out to 2040.

> **Readers are forewarned that to the extent that visitors come for other reasons – to see old friends and family, to tour New England beyond the realms beyond Connecticut and visit along the way – the results exaggerate impacts of the DEP managed venues *per se*.  Based on estimates of other multipliers using similar techniques allocating about a sixth of the impacts to DEP would appear to be appropriate.  Yet if comparisons are being made to studies that**

47

**claim a magnetic tourism site attracts more general spending, then the larger multipliers attained in the study are useful for those purposes.  Without survey data to legitimately distribute trip expenditures in Connecticut to activities tied to DEP's actions from other unrelated tourism activities, distinguishing that fine line of attribution is well nigh impossible**.

The impacted industries used to describe activities undertaken with in the parks and forests do not line-up precisely with those classified in REMI.  For these reasons the activities at the Harkness Memorial State Park are treated as accommodations.  As noted in the previous chapters only about 1% of park visitor expenditures occur at the parks per se.  That one percent of visitor expenditures is allocated to government revenues in REMI thereby directly reducing government revenues.  Other visitor activities are classified as recreational activities and withdrawn from the economy.  The incremental assessed value of properties overlooking the parks is treated as a loss to the residential capital base and that portion included in the assessed value of housing declining to further erode government revenues.  It too would disappear with the disappearance of the parks and forests.  Reasonably, this process leaves the losses in accommodation to be expensed by park visitors, hunters, anglers and boaters, wedding parties, and other participating visitors to be allocated indirectly out of their classification in "recreational activities".  Less reasonably, recreation activities in REMI include expenditures on gambling that may not be a large share of expenditures by anglers and hunters.  Advantageously, "Recreational activities" excludes attending spectator sports and by implication includes all active sports undertakings.  Similarly, other expenditures by hunters, anglers and boaters and skiers are all included in the impact assessment.

Since losses foregone by the discontinued operation of the parks delineate economic advantages of DEP continuing to operate them, the results are described positively as the economic impacts of DEP's state parks and forests operations.

DEP parks and forests operations have significant impacts on the economy, particularly employment, incomes, migration, and the state's fiscal operations.

### 6.4.2 Population; DEP and the Quality of Life Matters

Chart 6.4.2.1 illustrates that quality of life matters to Connecticut Citizens.  Operations at DEP sites and the resulting access to recreational locales and husbanding vistas of overlooking DEP managed venues were preserved, over the long term retains about 26,700 people in Connecticut.  Of these 10,400 are dependent of DEP's long-term husbanding of the vistas while the rest rely on the venues for sporting activities including camping and/or employment.

**Chart 6.4.2.1 Population and the Quality of Connecticut Life and DEP Managed Venues**

**(People)**



### 6.4.3 Jobs

As the previous chart suggests DEP not only provides direct jobs but also assists in generating  indirect and induced ones though retaining Connecticut tourists and attracting out-of-state tourists.  Both DEP expenditures and total expenditures by those tourists who attend DEP managed venues generate economic activity.  Jobs needed to meet these demands appear in Chart 6.4.3.1.  The dynamics behind this chart depict the levels of job creation attributable to those expenditures.  These impacts are larger immediately than over time since without DEP managed venues the economy would slowly adjust as people find alternative jobs and occupations, visitors pursue other activities within the state and other economic and demographic adjustments occur.

Chart 6.4.3.1: DEP and Related Expenditure Impacts on Connecticut Jobs



REMI results indicate that Connecticut jobs dependent directly and indirectly on DEP parks and forest operations and related tourist expenditures are 9.0 to 6.0 thousand. Most of the impact of this job creation is in the private sector. Albeit REMI estimates direct, indirect and induced short-term losses in the public sector are in the range of 900 to 1,000, including DEP jobs. These jobs are a mixture of full and part-time annual employment inclusive of those who serve DEP directly as well as those in other departments indirectly involved in meeting the needs of related tourists and sportspersons undertaking DEP related activities. Given seasonal hires for park and forest activities, the public sector job numbers are not unexpected. The dynamic elements of REMI, particularly DEP role in retaining the population all suggest that DEP's role is ongoing and positive.

As Chart 6.4.3.2 illustrates key sectors of the Connecticut economy are reliant on DEP's catalytic role in encouraging expenditures in Connecticut. Interestingly the dynamics are such that over time they do not recover particularly well. The recovery that does occur does so at differential rates with very little recovery in accommodations but slightly greater resilience in arts, entertainment and recreation.

**Chart 6.4.3.2: DEP and Related Expenditure Impacts on Connecticut Jobs by Key Sectors: Vistas Impacted**



### 6.4.4 Current Personal Income

Dependence on DEP parks and forests operating jobs as well as the population stability associated with DEP's operations also implies a positive role in income generation.  DEP's operations and participation in tourism activities enhanced by sporting activities generate significant personal income in current dollars as shown in Chart 6.4.4.1.  These values are in current dollars and rise over time on the strength of the stronger economy generated by those expenditures over time.

Exclusive of the amenity benefits attached to land values DEP's operations enhance personal incomes by $343 million in 2012 rising to $1.8 billion by 2040.  Inclusive of the amenity values attached to vistas attributable to DEP, Connecticut personal income is higher by $367 million in 2012 rising to $2.7 billion in 2040.

**Chart 6.4.4.1: Personal Income Generated by DEP's and Attracted Tourism Activities**

**(Millions of Current $)**



### 6.4.5 Personal Disposable Income

Personal Disposable Income is important because it expands the freedom of choice available to Connecticut consumers. Chart 6.4.5.1 illustrates that DEP operations and attracted tourism and sportspersons' expenditures stimulate that income stream.   While following the same general pattern as personal income, the incremental PDI values are smaller with DEP operations adding to $253 million in 2012 and $1.5 billion by 2040 exclusive of the decline in vistas.  Inclusive of the vista's DEPs preservations its impact on personal disposable income rises from $269 million to $2.3 billion across the years.

**Chart 6.4.5.1: Personal Income Generated by DEP's and Attracted Tourism Activities**

**(Millions of Current $)**



0701

### 6.4.6 Fiscal Impacts

Fiscal impacts work through a series of mechanisms on both government revenues and expenditures. DEP operations generate revenues for the state government and enhance revenues from the higher assessed value of properties overlooking DEP parks and forests.  Indirectly the state government also receives funds through various taxes on tourism expenditures and indirect and induced transactions and incomes related to the expenditures undertaken by visitors to DEP managed venues inclusive of taxes on incomes from personnel at DEP and who are employed indirectly in the supply of goods and services to DEP facilities.  The scenario that excludes DEP's husbanding of the states forests indicates that the net present value of DEP's revenues from 2012 to 2020 of $337 million against expenditures of $307 million for a net gain of $30 million.  These are not operating revenues and expenditures but the totality of direct, indirect, and induced impacts fiscal capacity.

The other scenario that includes the husbanding of vistas gives contrary results.  It indicates that the net present value of DEP's revenues from 2012 to 2020 of $628 million against expenditures of $420 million for a net loss of $208 million.  This later scenario is also picking up the lack of assessment on the amenity benefits from overlooking DEP managed parks and forests.  Assessing those values in the same proportions as market values are normally assessed elsewhere would more than reverse this finding.

Adverse impacts on government expenditures ebb as fraction of the initially unemployed find alternative employment and the population diminishes; thereby reducing unemployment and welfare expenses.

## 6.5 Conclusions

Leaving aside the amenity values of overlooking DEP's venues:

- **DEP managed venues initially generate the following direct and indirect economic impacts:**
    - **8.8 thousand jobs currently reduced to 6.7 thousand in 2020;**
    - **$343 million in personal income growing in current dollars to $595 million in 2020;**
    - **$253 in personal disposable income, that generates choices for citizens, increasing to $471 million by 2020; and,**
- **Net present value in state revenues over expenditures of $30 million is in constant dollars.**

## 7. Conclusions

**In 2010, resident and nonresident visitors to Connecticut's 107 State Parks and 32 Forests spent 8.5 million days touring within the state.  Of those days, at least 4.6 million days were spent partially at for-fee parks and forests managed by DEP.**

**In 2010 visitors to these venues spent an estimated $544 million in general tourism activities in Connecticut.  In addition, 189,000 sportspersons, holding 293,600 licenses and permits issued by DEP, expended additional funds to pursue their specific sporting activities:**

- **$264 million for fishing, of which 90% came from Connecticut residents;**

- $100 million for hunting, of which $95.1 million came from Connecticut residents;
- $36.8 million for recreational boating, attributed to DEP-managed boat launches and training activities, net of anglers' boating expenditures;
- $26.2 million for skiing and attending educational and other venues;
- Participation in other sports located in the parks and forests or to attend them.

Visitor fees at the parks and forests, including late day visitors, were in the $3.0 to $3.3 million dollar range from 2005 to 2009. Increasing rates in 2010 set the stage for an increase to $5.2 million in future years. These same visitors are estimated to have spent $94 million in Connecticut. DEP charges visitors: entrance, parking, and camping fees, cabin and pavilion rents, ice and firewood sales and related sales taxes. These revenues all flow to Connecticut's General Fund.

Recreational activities also generated licensing and permit fees as well as training and educational revenues. 2010 revenues generated from DEP licensing and permitting of key activities included angling ($3.8 million), hunting ($2.3 million), and combined hunting and angling licenses ($1.6 million). Recreational boat training, testing, and licensing generated a further ($3.2 million.)[38]. Including camping and all activity fees, DEP collected $18.3 million from fees paid by participants and attracted $5.4 million in federal transfers from the federal Sport Fish Restoration (SFR) and Wildlife Restoration (WR) programs. Before taking account of a one-time $1.1 million credit program to assist adjustment to the higher fees, 2010 direct revenues and transfers covered all but $2.6 million of Connecticut state expenses of $26.3 million including parks, forest and hatchery operations. Property taxes stemming from vistas dependent on DEP managed venues added a $4.2 million to state revenues, more than sufficient to cover DEP operating and capital expenditures. In addition, indirect revenues from other taxable tourist and sporting expenditures further contributed to state revenues.

The well known downward slope of demand curves for each activity implies that all but the least enthusiastic person undertaking each activity derives quality of life benefits over and above expenses incurred, what economists refer to as "Consumer surplus". CCEA has estimated consumer surpluses accruing to Connecticut citizens by major activities:

- Camping (S124.1 million)
- Hunting ($17.8 million)
- Inland Angling ($67.4 million)
- Marine Angling ($36.9 million)
- Swimming/day use at four parks ($570,000).

In addition to the $246.9 million accruing to residents in consumer surplus, out-of-state visitors undertaking these activities derived a further $25.1 million in consumer surplus, led by campers at $18.4 million. Total estimated consumer surplus for campers at DEP venues is 26% of Connecticut tourism expenditures made by them.[39] In-state estimates of consumer surplus remain modest due to

---

[38] These revenues were partially offset on a one-time credit totaling about $1.14 million.

[39] Strauss, Charles H. and Lord, Bruce E. A Case Study The economic impacts of a heritage tourism system, Journal of Retailing and Consumer Services 8 (2001) 199}204

the close proximity of venues to the population.   CCEA did not extrapolate its consumer surplus estimates for people using these parks for alternative purposes or accessing fee-free parks, such as non-developed ones.

Consumer surpluses in addition to their expenditures suggest that, in recent years, visitors to DEP managed venues derived more than $1.25 billion dollars in annual benefits.  CCEA's very conservative approach to estimating consumer surpluses underlines the significant of these estimates.

Another source of benefit is the value that owners of homes adjacent to the parks and forest derive. Connecticut residents overlooking the parks from single family dwellings realized annual amenity benefits most days of the year of a further $258 to $309 million.  Positive attributes of these residences, captured in the assessed value of their properties, generated $3.1 to $5.4 million annually in government revenues, but did not account for the value of the vistas of overlooking DEP managed parks and forests.  The expected long-term net present value of this possible revenue stream to the state discounted at 5% over 20 years is $390.2 to $679.7 million in 2010 dollars.  The net present value may also be viewed as placing a capital value on the assets that DEP maintains in its management of Connecticut parks and forests.  More fully assessing amenity values, from their currently unassessed status on 12-13% of properties overlooking green spaces, would significantly increase property tax revenues.

Because DEP operations and related government revenues already exist in the economy, the method for assessing their economic impact is to withdraw those activities.  That is, to assess the impacts of their hypothetical immediate cessation in 2012, and then to project longer term economic adjustments and reactions.  The resulting differences represent economic impacts of DEP-managed venues in Connecticut.  With closure of all DEP-managed facilities and elimination of all public access to DEP-managed forest and park lands, the resulting impacts would mean losses in employment and incomes, as well as losses in tax revenues.  The harshness of such losses in the near term is stark, but the dynamic elements of the economy which REMI captures adjust to the loss of those resources; thus the economy adjusts and ameliorates to a degree those economic impacts over time through by emigration or some and movement into alternative jobs for others.  Rather than depict these losses as negatives, this report treats them as the positive impacts that DEP operations have on the Connecticut economy.  Leaving aside the amenity values of $270 million annually for overlooking DEP's venues, DEP activities generate the following direct and indirect economic impacts:

> ➢  8.8 thousand jobs currently, reduced to 6.7 thousand in 2020;
> ➢  $343 million in personal income growing in current dollars to $595 million in 2020;
> ➢  $253 in personal disposable income, that generates choices for citizens, increasing to $471 million by 2020; and,
> ➢  Net present value in state revenues over expenditures of $30 million in constant dollars.

DEP managed venues create significant economic activity within Connecticut.

# Appendix A: Data

## A-1. Background

Three DEP data sets were the foundation for this research report:

1. Individual park users, rates and numbers of purchasers by activity – parking, camping or firewood or ice purchases, 1999 - 2010;
2. Total visitors by park, 2005 – 2009, including the above, plus out-of-season and off-hour visitors;
3. A 2008 survey of 3,000 tourists.

The objectives when analyzing available data are to discover per capita and total expenditures for those who visit Connecticut's parks.   The data are sufficiently granular to be able to attain this information for state residents and out-of-state visitors, for state parks and state forests. With expenses in park camping facilities significantly lower than accommodation costs in paid lodgings, total per diem expenditures for campground users are adjusted to take these savings into account.

In addition to the three primary data sets identified above, a further round of extrapolations was made to acknowledge activities in fee-free parks and forests where no or attendance counts are kept, and for parks and forests which are under development, which also lack attendance data.  In addition, explicit references are made to information from the Connecticut Statewide Comprehensive Outdoor Recreation Plan 2005-2010 (SCORP)[40].

## A-2. Melding the Data Sets

Data set elements and their treatment are outlined in Table 1.  The estimating procedures discussed in column one use both park User data and information from the intercept survey.  In the interests of clarification, the references to the intercept survey are in *italic*s. The resulting estimates and data appear in the text of the paper.

---

[40] DEP, Connecticut Statewide Comprehensive Outdoor Recreation Pan 2005-2010, 2006.

**Table A-1: Data Set Elements for Park Users Other than Anglers and Hunters**

| Park User Data by Parks 1999-2010 | Park Visitor Data 2005-2009 | Intercept Survey Data 2008 |
|---|---|---|
| **Number of Users and Expenditures** | **Number of Attendees** | **Visitor Information** |
| Days of Parking: Resident & Non-Resident | Total Gate Counts of Individuals | *Trip Length* or zip codes |
| Days of Camping: Resident & Non-Resident | | *Average Numbers in Party* |
| Days of Sales of Ice & Firewood | | *Expenditures by Type by Party* |
| Rental days for Cabins and Pavilions | | |
| **Coverage** | | |
| Each Included State Park (#=32) | Each State Park (#=43) | *Sample of 3,000 Tourist Parties of which 5% used campgrounds* |
| Each Included State Forest (#=4) | Each State Forest (#=12) | |
| Other[1]  (#=4) | | |
| **Enhanced Detail** | | |
| Parking and Camping Differed by Park, Vehicle Type – car, minibus, bus or Walk-Ins – over Weekdays and Weekends by Residents or Non-Residents.  It was assumed the purchases of seasonal passes were economically rational and visited at least 12 times per year, the annual frequency needed to justify having a season pass rather than paying for parking on each visit. | These data exceeded the numbers of people from the park user data for each park included there due to the inclusion of out-of-season and off-hours attendees.  Additional parks and state forests were also included. | *This data allowed us to separate accommodation and non-accommodation expenditures. There was separate information for residents and non-residents.DEP has confirmed that the information on, "Average/Spending /Party/Trip" is for average daily expenditures.* |
| **Melding** | | |
| Number of Residents Days = (Resident vehicles + Camping Parties)*(*Average occupants/Resident vehicle*)+ Walk-in campers+ Other resident | Additional visitors to the 36 parks and forests = the number of visitors to each park less those included in Column 1; assumed to be  the same proportion of residents and non-residents as in column 1. | |
| Number of Non-Residents from parallel equation. | Parallel to the above. | |
| Expenditures by Residents = (Number of Resident Parties)*(*Resident Expenditures by Party less Average Accommodations Expenditures* + Accommodation Expenditures for Camping) | Because out-of-season and off-hours resident attendees did not pay camping charges, the per capita costs from the data in column 1 less the accommodation charges were applied to those staying in the 36 parks or forests included in column 1. | |
| Expenditures by Non-Residents from parallel equation using non-resident data. | Expenditures by Non-Residents from parallel equation using non-resident data. | |
| The above were derived in aggregate and in per capita terms and for both state parks and state forests.  Because Pachaug is a state forest, state forests data include the three designated as state parks plus Mt Misery/Pachaug with the latter being deleted from the state park data. This approach is consistent with the Park Visitor data where Mt Misery is excluded. | Resident visitors to those parks excluded by the 36 included heretofore in camping and parking data, were treated similarly but with normal accommodation data included because these parks do not generally provide such facilities. | |
| | Non-resident data were treated as above. | |
| | Separate estimates were made by state parks and state forests. | |

1.   "Other" includes DEP operations of its Store & Conference Center, relatively minor items.

# Appendix B: Campsites

**Table B-1: Campsites**

| Park | Number of Campsites |
|---|---|
| **State Forests** | |
| American Legion | 30 |
| Pachaug | 40 |
| **Total State Forests** | **70** |
| **State Parks** | |
| Black Rock | 91 |
| Devil's Hopyard | 21 |
| Hammonasset | 550 |
| Hopeville | 80 |
| Housatonic Meadows | 95 |
| Kettletown | 68 |
| Lake Waramaug | 78 |
| Macedonia Brook | 51 |
| Mashamoquet Brook | 60 |
| Rocky Neck | 160 |
| Salt Rock | 71 |
| **Total State Parks** | 1325 |
| **Grand Total** | 1395 |

Source: DEP website

# Appendix C: Technical Considerations:  Elasticities and Consumer Surplus

This section will define consumer surplus and describe the appropriate method for applying it to our data.  We build the formula for defining the distance travelled by day trippers, an important component of consumer surplus for Connecticut parks and forests, and then describe, through the use of a proxy, how this relatively small user group benefits from this consumer surplus.

## C.1 Consumers Surplus Definitions

Quantifying the benefits to an individual or a group of a highly-differentiated, somewhat subjective good is a notoriously challenging task for economists.  Parks, recreation areas, and other similar venues are, to a considerable extent, such complex goods.  While we do have some empirical survey data that indicates visitors' willingness to pay park fees, the full range of consumer benefits depends on a myriad of variables.

Consumers' surplus[41] can be thought of simply as the benefits a visitor gets, in aggregate, from the use of some good or resource, in this case, recreation areas, beyond the payment required to obtain that benefit.[42]  That is why it is referred to as "Surplus".  As the economist Frank Cesario stated over thirty years ago, "The Consumers' surplus criterion is gaining widespread acceptance as a way of estimating the primary economic benefits of outdoor recreation sites and facilities." (Cesario, 1976)  This approach remains the most widely used and accepted methodology today.

Even in the presence of comprehensive data, obtaining a reliable measure of consumers' surplus can be challenging.  In an "ideal" world, an economist could/would simply calculate the appropriate portion of the area underneath a suitable demand function to obtain the desired value.[43]  Such an approach is not only accurate, but, depending on the functional form of the demand-function's equation, relatively easy to calculate.  However, working with real-world empirical data is not formulaic but quite challenging.

The foundation for a demand function lies with a consumer's (or several consumers') preferences.  However, as the economist and author Hal Varian correctly noted, "In real life, preferences are not directly observable."  Therefore, we must – again in Professor Varian's words – "discover people's preferences from observing their behaviors."[44]

---

[41] "Consumers' surplus" should not to be confused with, or substituted for, "consumer's surplus"; the former is a measurement of benefit to one individual, while the latter represents the benefits to an entire group. See Mas-Colell, Winston, & Green (1995) for additional information.

[42] "[Consumers' surplus] measures the net benefit from consuming $n$ units of the discrete good: the utility u($n$) minus the reduction in the expenditure on consumption of the other good." (Varian, page 353)

[43] "Calculation of the consumers' surplus associated with any recreation site involves measurement of a relevant portion under the demand curve for the services of the site."  (Cesario (1976))

[44] OpCit, p.535.

59

Most academic literature focuses on the "revealed preference approach", tracing its roots to the seminal 1938 *Economica* paper by Paul Samuelson.[45]  Since then, numerous authors have evaluated, augmented, and refined this approach.  The primary assumption is "that people are choosing the best things they can afford – that the choices they make are preferable to the choices that they could have made."[46]  Or, in slightly different language, the revealed-preference approach assumes each individual is making rational, consistent choices – decisions that reflect their practical wants and desires.

The revealed-preference approach relies, therefore, on extracting a generalized set of aggregate preference relationships from available data.[47]  There are two primary methods for collecting such observations: direct and indirect. (Smith, Desvousges, & Fisher (1986))  More specifically, the imputed demand curves for outdoor recreation are usually obtained via a "travel-cost technique"[48], by using survey data gathered from patrons[49], or by some combination thereof.  (Englin & Cameron (1996), Adamowicz, Louviere, & Williams (1994))

When choosing from the three aggregate preference measurements (travel-cost, survey, and a combination thereof) for parks, forests, or other venues, the general benefits and limitations are actively debated by academic researchers – as well as the appropriate use-cases for each.  (Smith, Desvousges, & Fisher (1986))  However, given the specific task at hand and the data available, we have chosen the travel-cost technique for this study.  And in doing so, we have extracted a generalized, aggregated demand function (or curve) for recreational services in the State of Connecticut.

## C.2 Consumers Surplus Estimates

Travel cost estimates of the value derived from outdoor recreation assume a *revealed preference* in the relationship between participants' costs of traveling to a site and the number of trips they make.  Individuals who live farther from a destination generally spend more time and money to visit the destination and typically make fewer trips than those in closer proximity.  In simple terms: if people are

---

[45] See Samuelson (1948) for additional treatment of this topic.

[46] Varian (pages 120, 121)

[47] It should be noted that such an approach is challenging to implement, even under the best of circumstances.  As such, considerable research has been done that highlights the practical issues underlying the estimate of a general demand function from empirical data.  See Brown & Nawas (1973), Smith & Kopp (1980), and Common, Bull, & Stoeckl (1999).

[48] The most widely utilized version of which – following the nomenclature employed by Cicchetti, Fisher, & Smith (1973) – is the "Hotelling-Clawson-Knetsch" approach, commonly abbreviated as simply the "HCK method."  Or, as Garrod & Willis (1991) state, "Consumer surplus for outdoor recreation has traditionally been estimated by a Clawson-Knetsch travel-cost method."  A more accessible, user-friendly, contemporary summary can be found of Professors' Dennis King (University of Maryland) and Marisa Mazzotta's (University of Rhode Island) website. (http://www.ecosystemvaluation.org/travel_costs.htm)

[49] The use of survey input/data is one of the most frequently utilized types of contingent valuation methods (CVM), particularly when analyzing outdoor recreation areas.  See, for instance, Mitchell & Carson's book. Additionally, Professors' King and Mazzotta's web site also provides information on this topic. (http://www.ecosystemvaluation.org/contingent_valuation.htm)

willing to spend $X per trip to visit and to visit a destination y times, they must be confident they are getting satisfaction worth at least y*$X from doing so.  The non-monetary value that visitors receive above direct expenditures is known as consumer surplus.

Several states (see section C.5, Literature, below) have conducted intercept surveys to estimate the travel time and number of trips for park users.  Although survey data are not available for Connecticut, the state does collect addresses for all individuals who reserve camp spaces and purchase licenses and permits for hunting, and marine and inland fishing.  Nonresidents can also purchase many of these licenses.  In the case of marine fishing licenses, Connecticut, Rhode Island, Massachusetts and New York offer reciprocity.   With DEP's database limited to Connecticut licensing, the estimate for consumer surplus results in lower values, particularly for the state's marine resources.  Ideally research would be conducted among all members operating under reciprocity agreements.  Connecticut DEP does not maintain addresses for individuals who engage in other activities than hunting and fishing. This management choice results in an underestimate of the full consumer surplus generated by Connecticut's state parks and forests.

To calculate the consumer surplus value, we start from auto fuel and vehicle costs.  Federal per mile reimbursement is $0.5865 per mile.  Other studies have estimated time costs associated with travel and park participation and other out-of-pocket costs. (Weiland and Horowitz, 2007).  <u>The impact of out-of-pocket costs are estimated in the previous analysis</u>,

Estimating the aggregate of non-pecuniary cost inputs, such as (a) time spent travelling and (b) enjoying park facilities, is problematic for two reasons.  First, methodologies are unclear for valuing an hour of leisure or travel time.  An opportunity cost approach would value that time at market wages, though recent discussions suggest leisure time should be valued at less than market rates.  Further, because we include non-residents travelling, in some cases from long distances, it is unclear what cost value can be assigned to their travel time.  For these reasons, only the cost of travel is included in this analysis.  In doing so CCEA likely understates derived consumer surpluses.

The distance traveled by each consumer holding either a DEP license or permit from residence to the appropriate facility was evaluated by several functions in ArcGIS 10.   DEP license data was organized into "CATEGORY" fields, whether a permit was for fishing (Marine or inland), hunting, trapping (counted with hunting), or the combo license, hunting and angling. Whenever a consumer purchased more than one permit belonging to the same category, we kept only one record in each category, to prevent double-counting for the same type of permit. Also, licenses issued to residents of Alaska and Hawaii, and to non-U.S. citizens were removed for the purpose of this project.  Connecticut residents and non-residents were kept separate for several reasons.

DEP supports Geographic Information System (GIS) processing, providing down-loadable shapefiles of all DEP properties in the state through its GIS clearing-house[50].   We selected those listed as State Forests and State Parks and others discussed in this report.   Using DEP web-site list of facilities, we

---

[50] http://www.ct.gov/dep/cwp/view.asp?a=2698&q=322898#Property

identified facilities that match our Category lists described above. Visitor addresses were geocoded, and Parks were selected using the "SELECT BY ATTRIBUTE" option in ArcGIS's Attribute Table.

CCEA's first attempt to extract a distance report as "miles traveled along roads", using the ArcGIS function, required changing the GIS basis from a vector to a raster file. CCEA's lesson was that a large data file does not process in this ArcGIS function. Please contact CCEA if you wish to learn the specifics of this roadblock. Next, CCEA tested the "NEAR" search function in ArcGIS, which matches each input feature (the consumer) to the "objective" (the DEP facilities of interest), providing output of the closest linear distance. Because a straight line is the closest distance possible, this approach is slightly conservative. Also, assuming the consumer attended the closest park adds another conservative component. This analysis uses a travel cost of $0.5865 per mile for each round trip; i.e. twice the estimated distance.

In an "ideal" world, an economist would next calculate the consumer surplus area underneath a suitable demand function to obtain the desired value.[51] Such an approach is not only accurate, but usually relatively easy to calculate, depending on the mathematical equation for the applicable demand-curve. However, as is virtually always true when working with real-world, empirical data, the research situation may be more challenging than the academic statement of the solution.

The foundation for a demand function lies with a consumer's (or several consumers') preferences. However, as the economist and author Hal Varian correctly notes, "In real life, preferences are not directly observable." Therefore, economists discover people's preferences from observing their behaviors.

The basic demand curve is estimated by variations on the following equation:

$$\ln q = \alpha C + \varepsilon$$

Where q is the number of trips, C is the travel cost and ε is the weighted error term. Consumer surplus is calculated by transforming

$$\ln b \leftarrow q \text{ (i.e. taking the exp {taking the natural logarithm or the log linear function})}$$

and integrating over C to estimate the area under the curve. The base function is an exponential functional form.

To estimate the consumer surplus, general linearized models (GLM) were fitted to each category of data. Models were tested as linear or quasi-linear, assuming underlying normal and Poisson distributions. In each instance, the quasi-linear normal model was either equivalent to the Poisson regression or superior based on ANOVA analysis. However, the quasi-linear models were adjusted for heteroskedasticity using iterative processes to develop weights. Because of the large data samples,

[51] "Calculation of the consumers' surplus associated with any recreation site involves measurement of a relevant portion under the demand curve for the services of the site." (Cesario (1976))

62

CCEA chose Maximum Likelihood Estimation (MLE) for reporting consumer surplus. MLE out performs least squares in efficiency in large samples. Statistical details are available at the end of this appendix.

There are some limitations to this analysis. First, individuals who travel greater distances are more likely to include multiple destinations in their travel. For these consumers, only a portion of their travel expenses should be allocated to Connecticut's parks. Without survey data on this concern, there is no basis for allocating the percentage of their travel within Connecticut's parks and forests, and outside the state's borders. The farther the distance away, the fewer individuals make these trips. Statistically, they play only a small role in this estimate of consumer surplus.

Secondly, data are only available on individuals who actually attended parks or purchased licenses. There are a large number of other park visitors. This is a problem when valuing consumer surplus for unlicensed/not-camping park visitors or when park amenities change. For this reason, the consumer estimates are limited to current activities for which data is available, as described above, rather than calculated against total visitor days.

Despite these limitations, travel cost analysis remains our best tool for valuing the recreational experience from available data (Haab and McConnell, 2002).

## C.3 Statistical Findings

**Table C-3.1: Consumer Surplus, Per Person, for State Residents and Out-of-State Visitors**

| Type | Per Person Consumer Surplus | Total In-State Consumer Surplus | Total Out-of-State Consumer Surplus | Total Consumer Surplus |
|---|---|---|---|---|
| Inland Fishing | $500 | $67,436,500 | $3,294,500 | $70,731,000 |
| Marine Fishing | $370 | $36,916,296 | $2,850,000 | $39,766,296 |
| Hunting | $286 | $17,829,429 | $565,714 | $18,395,143 |
| Camping | $769 | $124,097,692 | $18,439,231 | $142,536,923 |
| | | | | |
| Total | na | $246,279,917 | $25,149,445 | $271,429,362 |

Consumer Surplus estimates are per person rather than per trip. Licensees will utilize recreational facilities multiple times, while campers are assumed to camp only once per person. Camping and hunting consumer surpluses per person represents a per visit amount. The angling assessments include multiple visits per licensee.

0712

**Table C-3.2: Consumer Surplus – Calculated Intercept and Slope for our Licensed and Camp Reserved visitor groups**

| Statistical Slope and Y-Intercept, by Visitor Type | | | |
|---|---|---|---|
| Inland Fishing Licensees | | | |
|  | Estimate | P- value | R-squared |
| Intercept | 5.81 | <0.0001 | 0.49 |
| P | -0.0020 | <0.0001 | |
| Marine Fishing Licensees | | | |
|  | Estimate | P- value | R-squared |
| Intercept | 6.22 | <0.0001 | 0.65 |
| P | -0.0027 | <0.0001 | |
| Hunting Licensees | | | |
|  | Estimate | P- value | R-squared |
| Intercept | 6.75 | <0.0001 | 0.57 |
| P | -0.0035 | <0.0001 | |
| Camping Reservations | | | |
|  | Estimate | P- value | R-squared |
| Intercept | 6.32 | <0.0001 | 0.50 |
| P | -0.0013 | <0.0001 | |

## C.4 Estimating Elasticities and Travel Time for Late Day Trippers

Since 2003, it has been possible to pay late fees rather than full-day fees, particularly at beaches. Such fees have been differentiated between residents and nonresidents and between weekday and weekend visitors. The advantage of such fees for both resident and nonresident visitor groups is that they afford visitors choices based on price ranges. Especially at beaches where prolonged exposure to the sun is a concern, this choice is available over time periods that suggest a relatively similar experience. Lower fees, the brevity of exposure to the sun, and enhanced warmth available to late day visitors may be preferable to some visitors relative to the full-day experience. For others the length of time at the beach may be more important. Consumer actions reveal visitor preferences among these choices.

In addition for resident day trippers, reverse engineering reveals estimates of the average distances travelled by various classes of visitors. The costs for a late day resident party visiting the beach are equal to their entrance fee and travel costs to get there and back. These visitors do not generally face costs for meals or accommodation. They are simply driving to the beach from their homes and returning to them. They may decide to undertake other activities along the way, but those travel costs can be considered to be allocated to those other activities.

In short, day tripper's expenditures can be expressed as

c.4.1) $P_t = F_t + T_t$

Where by definition:

$P_t$ = Price paid by the visitor party per visit in time t;

$F_t$ = Park fees paid per party at time t; and,

$T_t$ = Round trip travel costs per party at time t express as miles travelled times the costs per mile of operating the average vehicle.  There are of course distributions around these costs dependent on the size, vintage, and condition of the vehicle being used, but we ignore such complications and use average costs per mile determined by mileage charges paid by the state to people travelling on its behalf adjusted for changes in those costs based on national pricing series for vehicle operations.

It follows immediately that their annual expenditures will be:

c.4.2) $E_t = P_t * V_t$

Where $V_t$ is the number of party visits in year t.

Totally differentiating this equation and setting $dE_t$, the change in $E_t$ equal to zero obtains point estimates of the elasticities in year t and applied slightly differently among years.  Using the average of travel costs within a given year as the estimate of travel costs within the year means that $dT_t$ =0 within any given year.  Yet between years, $dT$ will only equal zero if travel costs remain the same in both years.  These conditions are useful to our analysis in that elasticity estimates for any given year are given by the rate of change in the number of visits divided by the rate of change in prices.  For resident trippers elasticities within a year are expressed as:

c.4.3) $e_t$ = (Number of late day visitor parties)$_t$/number of day visitors)$_t$/($FD_t$-$LF_t$)/$FD_t$

Because all the variables on the right hand side of the equation are known, CCEA estimated elasticities revealed by late day trippers for 2009 and 2010 as -0.98339 and -0.79571.  Yet all other things remaining equal, we would expect these to be roughly similar between the years.  The response is that at all other things, including transportation costs were not similar.  Total differentiating  the inter temporal version of the equations and reverse engineering to force equality of elasticities on expenditures per trip in 2010 to equal those in 2009, yields the amount by which transportation costs would have had to change to maintain the equality of the elasticities as in:

c.4.4) $dT_{2010}$ = (($FD_{2010}*(LDV_{2010}/DV_{2010})/e_{2009})-(LF_{2010}-FD_{2010})$)

Where LDV is late day visitor parties and DV is number of day visitors.

Because people are unapt to move to adjust to higher costs of driving short distances to the beach,

c.4.5 $dT_{2009 \text{ to } 2010}$ =differences in cost per mile * miles driven.

The difference in costs per mile is derived from a combination of government rates grant to employees per mile drive in 2009 of \$0.585[52] with an escalator for personal travel in the Northeast that grew by 8.7

---

[52] This rate is particularly researched.  Employee unions insist on their members not being under reimbursed and Auditor Generals ensure that government coffers are not being plundered.

percent from 2009 to 2010 thereby causing an increase of $0.0509 per mile.  This results in an estimated weighted round trip distance 6.4 miles.  Using this distance to derive transportation expenditures per trip incurred in undertaking beach activities for residents and the estimate of 100 miles for nonresidents yields the transportation costs for this group.  The results appear in Table c.4.1

**Table C.4.1: Transportation Costs Related to Day Visitor Days (2010$)**

|  | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|
| Resident Week Day | 17,867 | 17,681 | 15,079 | 16,309 | 40,478 | 44,223 | 59,524 | 53,144 |
| Resident Weekend | 1,529 | 21,973 | 19,471 | 24,442 | 54,259 | 13,672 | 7,803 | 7,218 |
| Nonresident Week Day | 97,480 | 66,131 | 90,739 | 105,682 | 131,562 | 87,152 | 112,203 | 233,978 |
| Nonresident Weekend | 102,694 | 106,700 | 119,481 | 110,324 | 28,805 | 4,815 | 4,446 | 8,914 |
| Total Resident | 19,395 | 39,655 | 34,550 | 40,751 | 94,737 | 57,895 | 67,327 | 60,361 |
| Total Nonresident | 200,173 | 172,831 | 210,220 | 216,007 | 160,368 | 91,967 | 116,649 | 242,892 |
| Grand Total | 219,569 | 212,485 | 244,770 | 256,758 | 255,105 | 149,862 | 183,976 | 303,254 |

0715

## C.5 Literature

Very little literature has been published on the consumer surplus of American parks.  The table below summarizes the available literature.

| Reference, Author, Date | What's Being Measured | Method | Outcome |
|---|---|---|---|
| "Washington State Parks Centennial 2013 Survey," Responsive Management, 2006 | Use, opinions on management and funding, ratings, Funding for State Parks | Telephone Survey | "For the most part, they do not want less spending on parks, nor do they want some parks to close. Instead, they prefer a voluntary fee up to $10" per visit. Note: Do not favor paying for parking. |
| "Valuing Impacts of Forest Quality Change: Recreation and New York's Allegany State Park," James F. Booker, | Benefit per day | Benefit transfer methodology to arrive at baseline estimates | With 1.2 million visitors annually, Allegany State Park generates almost $20 million ('97 dollars) in non-priced benefits annually. |
| "The Economic Value of New Jersey State Parks and Forests", William J. Mates and Jorge L. Reyes, Revised 2006 Version. | Analysis of the Economic Benefits of New Jersey's State Parks | Total Economic Value (TEV): recreational services; direct and secondary economic activity; ecosystem services; property enhancements; consumption goods; and non-use values | New Jersey Economically Benefits between $953 million and $1.36 billion annually. Support and estimated 7,039 jobs. |
| "Estimating the Recreational Consumer Surplus at Maryland's State-owned Forests", Robert C. Wieland & Dr. John Horowitz, 2007. | Examine the recreational values of Maryland's State-owned forests. | Travel cost estimates derived from outdoor recreation that assume a revealed preference. | Estimated the average per-trip value for day visitors is $96. |

In addition, Weiland and Horowitz cited an unpublished manuscript by Kaval (2007).  Kaval performed a meta-analysis of U.S. studies (1,200 observations) and determined that an average day of recreation at a park yielded surplus of $60.50 per person per day (2006 dollars). For state parks, the figure was $53 per person per day.

# Appendix D:  Reasons for Excluding Some Residential Sales from Fair Market Prices

Non-usable codes established by OPM to avoid bias in estimating market prices and their relationships to assessed value have been established to purge sales characterized by:

01     FAMILY    Sale between members of the same family.

02     LOVE AND AFFECTION    Sale in which "Love and affection" are part of the sales price. This is stated in the deed.

03     INTER CORPORATION   Sales between a corporation and stockholder, subsidiary, affiliate or another corporation whose stock is in the ownership etc.

04     CORRECTING DEED    Transfers of convenience; for example sales for the sole purpose of correcting defects in the title (a correcting deed), a transfer for the purpose of creating a survivorship, etc.

05     DEED DATE    The date the deed was signed or date of agreement is more than six (6) months prior to the October 1st assessment date of the current sampling year. (That is, the deed date is prior to April 1st).

06     PORTION OF PROPERTY    Sales of property conveying only a portion of the property assessed as a unit. For example, a one-acre parcel sold out of a ten-acre tract     where the assessment is for a ten-acre tract- usually called a "split".

07     CHANGE IN PROPERTY    Sales of property substantially improved or changed subsequent to the assessment date (new construction, very poor condition, fire damage, additions, and property line changes).

08     PART INTEREST   Sales of an undivided or part interest in real property. For Co ops use this code.

09     Tax sale.

10     A WILL    Conveyances made in accordance with an article of the decedent's will, a grantee that is a devisee.

11     COURT ORDER    Judicial sale that is a sale from a court order.

12     NON BUILDABLE LOT    Sale of a non-buildable lot to an abutting owner.

13     BANKRUPCY    Sale in bankruptcy proceeding, receivership or assignment for the benefit of creditors, dissolutions, and liquidation sales.

14    FORECLOSURE    Sale of a foreclosed property.

15    GOVERNMENT AGENCY    Sale to or from a government agency (local, state or federal)

16    CHARITABLE GROUP    Sale to or from a charitable, educational, benevolent or religious organization.

17    TWO TOWNS    Sale of a parcel of real property assessed or located in more than one town or state.

18    IN LIEU OF FORECLOSURE    Transfer to banks, insurance companies, savings and loan associations, mortgage companies, or any other lien holder, when the transfer is made in lieu of a foreclosure.

19    EASEMENT      Sales, such as to or from public utility companies, electric, telephone, pipeline companies or individuals. (Right of way.)

20    CEMETERY      Sale of cemetery lot.

21    PERSONAL PROPERTY EXCHANGE      Sale of real property in exchange for any asset other than cash, such as other real estate, stocks or bonds, or other personal property.

22    MONEY AND PERSONAL PROPERTY    Sale of real property, which includes household furniture, machinery, fixtures, equipment, inventories or goodwill, when the cash value of such items is indeterminable. (Note: This category does not apply to appliances or 'built-in' units, which are normally included in the sale, for example, stove, dishwasher, wall to wall carpeting etc.)

23    ZONING    Sale of property, the value of which has been materially influenced by zoning changes effected since the last assessment date.

24    PLOTTAGE      Combining two or more sites under a single ownership when each is separately considered.

25    OTHER REASONS   Ratio is either way too high or way too low. Sale, which for some reason other than those categories enumerated above, is deemed not to be a transaction between a willing buyer (not compelled to buy) and/or a willing seller (not compelled to sell).  Explain under REMARKS.

26    REHABILITATION DEFERRED   (Section 12-65c to 12-65f C.G.S)

27    RESERVED FOR OPM USE ONLY

28    USE ASSESSMENT   Code 600    Sale of a property which is under a use assessment (farm, forest, open space: Section 12-107a-f).

29    RESERVED FOR OPM USE ONLY

30    AUCTION Sales of property at a public or private auction.

# Appendix E:  Bibliography

**E-1: Texts**

Adamowicz W., Louviere J. and Williams M. 1994, Combining Revealed and Stated Preference Methods for Valuing Environmental Amenities. *Journal of Environmental Economics and Management*, Volume 26, Issue 3, Pages 271-292

Boardman, A. E., Greenberg D. H., Vining A. R., Weimer, D. L. 2006. *Cost-Benefit Analysis: Concepts and Practice, 3rd Edition*. Upper Saddle River, New Jersey: Prentice Hall

Brown, W. G., Nawas, F. 1973, Impact of Aggregation on the Estimation of Outdoor Recreation Demand Functions. *American Journal of Agricultural Economics*, Vol. 55, No. 2, pp. 246-249, Article Stable URL: http://www.jstor.org/stable/1238448

Cesario, F. J. 1976, Value of Time in Recreation Benefit Studies. *Land Economics*, Vol. 52, No. 1, pp. 32-41, Article Stable URL: http://www.jstor.org/stable/3144984

Cicchetti, C. J., Fisher, A. C., Smith, V. K. 1973, Economic Models and Planning Outdoor Recreation. *Operations Research*, Vol. 21, No. 5, pp. 1104-1113, Article Stable URL: http://www.jstor.org/stable/168929

Common, M., Bull, T., Stoeckl, N. 1999. The Travel Cost Method: an Empirical Investigation of Randall's Difficulty. *Australian Journal of Agricultural and Resource Economics*, Volume 43, Issue 4, pages 457–477

Englin, J., Cameron, T. A. 1996. Augmenting travel cost models with contingent behavior data. *Environmental and Resource Economics*, Vol. 7, Nu. 2, pp. 133- 147

Garrod, G. D., Willis, K. G. 1991. An Individual Travel-Cost Method of Evaluating Forrest Recreation. *Journal of Agricultural Economics*, Vol. 42, Issue 1, pp 33–42

Hagstrom, N. T. Humphreys M.  Hyatt W. A. and Gerrish W. B. 1998, A survey of Connecticut stream and rivers. Federal Aid in Sport Fish Restoration, F-66-R Final Report, State of Connecticut Department of Environmental Protection, Hartford, CT

Heintz, James, Pollin, Robert, and Gerrertt-Peltier, Hiedi, The NYS Park System: An Economic Asset to the Empire State, Parks and Trails New York (2009)

Hicks, J. R. 1939, The Foundations of Welfare Economics. *The Economic Journal*, Vol. 49, No. 196, pp. 696-712, Article Stable URL: http://www.jstor.org/stable/2225023

----------. 1986. *A Revision of Demand Theory*. Oxford University Press, USA

Hyatt, W. A. 1986, An angler survey and economic study of the Farmington River fishery resource.  Federal Aid in Sport Fish Restoration, F-59-R Final Report, State of Connecticut Department of Environmental Protection, Hartford, CT

Mas-Colell, A. Whinston, M. D.; Green, J. R. 1995,  *Microeconomic Theory*. New York: Oxford University Press, New York

0719

Mitchell, R. C., Carson, R. T. 1989. *Using Surveys to Value Public Goods: The Contingent Valuation Method*. RFF Press; Ed. 1

Samuelson, P. A.  A Note on the Pure Theory of Consumer's Behaviour. *Economica*, New Series, Vol. 5, No. 17 (Feb., 1938), pp. 61-71, Article Stable URL: http://www.jstor.org/stable/2548836

----------. 1948. Consumption Theory in Terms of Revealed Preference. *Economica*, New Series, Vol. 5, No. 17 (Feb., 1938), pp. 61-71, Article Stable URL: http://www.jstor.org/stable/2548836

Smith, V. Kerry, and Kopp, Raymond J. 1980,  The Spatial Limits of the Travel Cost Recreation Demand Model. *Land Economics*, 56:60-74

Strauss, Charles H. and Lord, Bruce E. A. Case Study The economic impacts of a heritage tourism system, Journal of Retailing and Consumer Services 8 (2001) 199}204

Sun, Ya-Yen, Wong, Kam-Fai, and Lai, Hsein-Chung, Statistical properties and survey design of tourism expenditures using segmentation, Tourism Economics, 2010, 16(4), 807-832.

Willis, K. G.(2003) 'Pricing Public Parks', Journal of Environmental Planning and Management, 46: 1, 3— 17

U.S. Department of Commerce Economics and Statistics Administration U.S. CENSUS BUREAU, Quick Facts from the 2006 National Survey of Fishing, Hunting, and Wildlife-Associated Recreation 2007

Additional refs:

Booker, James F. "Valuing Impacts of Forest Quality Change: Recreation and New York's Allegany

  State Park," http://nrs.fs.fed.us/pubs/gtr/gtr_ne241/gtr_ne241_272.pdf

"Washington State Parks Cetennial 2013 Survey,"  Responsive Management, (2006) http://www.parks.wa.gov/Centennial2013/2006%20Survey.pdf

Mates, William J. & Jorge L. Reyes, "The Economic Value of New Jersey State Parks and Forests," (2006) http://nrs.fs.fed.us/pubs/gtr/gtr_ne241/gtr_ne241_272.pdf

Horowitz, Dr. John & Robert C. Wieland, "Estimating the Recreational Consumer Surplus at Maryland's State-owned Forests" (2007), http://www.mainstreeteconomics.com/documents/TravelCostfinal.pdf

Kaval, Pamela. 2007. "Recreation Benefits of U.S. Parks," Unpublished manuscript,

University of Waikato, New Zealand.

Haab, TC and KE McConnell (2002) Valuing Environmental and Natural Resources:  Econometrics of Non-Market Valuation USA:  Edward-Elgar Publishing.

Rolfe, J and B Dyack (2010) Valuing Recreation in the Coorong, Australia with Travel Cost and Contingent Behavior Models, *The Economic Record* (Dec).

U.S. Fish and Wildlife Service, **2006 National Survey of Fishing** Hunting and Wildlife-Associated Recreation, Connecticut

## E-2: Databases

OPM on assessed property values and selling process

DEP on information managed by them (Unaudited by CCEA).

Internet Sources as footnoted.

# Exhibit 108

# 2023
# Connecticut Hunting and Trapping Guide

## https://portal.ct.gov/DEEP-CT-Outdoor-Guides



**SCAN ME**

Find the information in this guide, as well as guides for fishing, hunting, trapping, and boating online and help save valuable dollars for fish and wildlife. Scan the QR code with your moblie device.

Encuentre en línea las regulaciones y guías de información en español para la pesca, la caza y atrapamiento (trabadura) escaneando el código QR con su dispositivo móvil o visite *https://portal.ct.gov/DEEP-CT-Outdoor-Guides*.



*The Connecticut Department of Energy and Environmental Protection is an Affirmative Action/Equal Opportunity Employer that is committed to complying with the requirements of the Americans with Disabilities Act. If you are seeking a communication aid or service, have limited proficiency in English, wish to file an ADA or Title VI discrimination complaint, or require some other accommodation, including equipment to facilitate virtual participation, please contact the DEEP Office of Diversity and Equity at 860-418-5910 or by email at deep.accommodations@ct.gov. Any person needing an accommodation for hearing impairment may call the State of Connecticut relay number - 711. In order to facilitate efforts to provide an accommodation, please request all accommodations as soon as possible following notice of any agency hearing, meeting, program or event.*

# 2023
# Connecticut Hunting and Trapping Guide

## State of Connecticut

### Department of Energy and Environmental Protection
Katie S. Dykes, *Commissioner*

### Bureau of Natural Resources
Andrew Fisk, *Chief*

### Wildlife Division
Jenny Dickson, *Director*

This guide is intended to provide a summary of the most pertinent laws and regulations concerning hunting and trapping, and to provide information on these opportunities in Connecticut. No attempt has been made to employ the exact wording of laws and regulations, nor to provide their complete listing. For legal purposes the Regulations of Connecticut State Agencies and the General Statutes of Connecticut must be consulted. A listing of the General Statutes of Connecticut can be found on the Connecticut General Assembly website at *https://cga.ct.gov/* and information on state regulations is at *https://eregulations.ct.gov*.

## Directory of Services

For additional information, the following DEEP offices may be contacted from 8:30 a.m. to 4:30 p.m. Please note that the DEEP – Licensing Permit Sales Office is open from 9:00 a.m. to 4:00 p.m. Note that the Sales Office closes at noon before major holidays and may close early during periods of severe weather.

Wildlife Division .................................................... 860-424-3011
Division of Env. Cons. Police ............................... 860-424-3012
Licensing and Revenue ........................................ 860-424-3105
Fisheries Division (Inland) .................................... 860-424-FISH
Fisheries Division (Marine) ................................... 860-434-6043
State Parks Division ............................................. 860-424-3200
Forestry Division .................................................. 860-424-3630
DEEP Home Page .............................. *https://portal.ct.gov/DEEP*
CT Fish and Wildlife Facebook Page ... *www.Facebook.com/CTFishandWildlife*

## Field Services

Questions concerning hunting, trapping, fishing, boating, camping, recreational use of state lands, forestry, and law enforcement may be directed to one of the following field offices (8:30 a.m. to 4:00 p.m.):

Eastern Area Headquarters ..................... 860-295-9523
Western Area Headquarters .................... 860-485-0226
Office of Boating Safety (Old Lyme) ........ 860-434-8638
Marine Patrol (Old Lyme)........................ 860-434-9840

## 24 Hour Emergency Numbers

Report a Violation .................................1-800-842-4357
DEEP-Emergency Dispatch ................... 860-424-3333

# Table of Contents

**Hunter Notes** ............................................................................................ 6
**Licenses and Permits** ............................................................................. 6
      Firearms Hunting Licenses
      Small Game and Deer Archery
      Deer Permits
      Resident Game Bird Conservation Stamp
      Migratory Bird Stamps
      Hunter Education Requirements
      Lost License
      License for Disabled Hunters
**Hunting Laws and Regulations** .......................................................11
      Definitions
      Closed Seasons
      Legal Firearms and Bows
      Fluorescent Orange
      Private Land Permission
      Hunter Harassment
      Hunting Opportunities for Persons with Disabilities
      State-managed Dog Training and Field Trial Areas
**Private Land Consent Form** ............................................................. 18
**Small Game and Migratory Bird Hunting** ..................................... 19
**Wild Turkey Hunting** ........................................................................ 23
**Deer Hunting** ..................................................................................... 27
**Public and Permit-Required Hunting Areas** ................................. 36
**Furbearer Trapping Seasons** .......................................................... 38
**Trapping on Private Land Consent Form** ..................................... 41

**Other Information**
Junior Hunter Training Days ................................................................. 3
Sunrise/Sunset Table ........................................................................... 42
Deer/Turkey Tagging and Reporting Requirements ......................... 44
Deer/Turkey Harvest Tags .................................................................. 44
List of Public Hunting Areas ............................................................... 48

**New to hunting? Check out our Hunting Roadmap at *https://portal.ct.gov/DEEP/Hunting/Roadmaps/Hunting-Roadmap* for information on how to get started.**

# Junior Hunter Training Days

| SEASON | SEASON DATES |
|---|---|
| Junior Spring Wild Turkey | April 15-22, 2023 (excluding Sunday) |
| Junior Waterfowl | Two Saturdays in fall (see the 2023-2024 Migratory Bird Hunting Guide for dates) |
| Junior Pheasant | October 14, 2023 |
| Junior Deer | Nov. 4-11, 2023 (excluding Sunday) |

# 2023 Summary of Hunting Season Dates

## GAME BIRDS (see pages 19 and 21-22 for limit information)

| SEASON | SEASON DATES |
|---|---|
| Pheasant [A] | Jan. 2 - Feb. 28<br>Oct. 21 - Dec. 30 |
| Chukar and Hungarian Partridge [A] | Jan. 2 - Feb. 28<br>Oct. 21 - Dec. 30 |
| Ruffed Grouse [A] | Oct. 21 - Nov. 30 |
| Quail [A]   *Extended season in some areas. See page 19* | Oct. 21 - Nov. 4 |
| Crow [B] | Jan. 14 – Mar. 25 (Mon. through Sat.)<br>Aug. 12 – Oct. 13 (Wed., Fri., Sat.)<br>Oct. 21 – Nov. 30 (Wed., Fri., Sat.) |
| Woodcock - Snipe - Rails [B] | See current Migratory Bird Hunting Guide; State stamp required. |
| Waterfowl [B]<br>(ducks, mergansers, geese, and coot) | See current Migratory Bird Hunting Guide; State and federal stamps required. |

[A]  Connecticut Resident Game Bird Conservation Stamp required.
[B]  Connecticut Migratory Bird Conservation Stamp required.

## SMALL GAME MAMMALS (see page 20 for limit information)

| SEASON | SEASON DATES |
|---|---|
| Gray Squirrel | Jan. 2 - Feb. 28<br>Sept. 1 - Dec. 30 |
| Cottontail Rabbit<br>European Hare | Jan. 2 - Feb. 28<br>Oct. 21 - Dec. 30 |
| Snowshoe Hare | Jan. 2 - Jan. 31<br>Nov. 18 - Dec. 30 |
| Woodchuck | March 15 - Nov. 15 |

## FURBEARERS (see page 20 for limit information)

See page 38 for trapping season information.

| SEASON | SEASON DATES |
|---|---|
| Coyote | Jan. 2 - Dec. 30 |
| Raccoon<br>Opossum | Jan. 2 - Jan. 21<br>Oct. 21 - Dec. 30 |
| Red and Gray Foxes | Jan. 2 - Feb. 28<br>Oct. 21 - Dec. 30 |

0726

## WILD TURKEY (see pages 23-25 for limit information)

| SEASON | SEASON DATES |
|--------|--------------|
| **Spring Turkey** | |
| State and Private Lands | April 26 - May 27 |
| **Fall Archery Turkey** | |
| Private Land (Zones 11 and 12) | Jan. 2 - Jan. 31 |
| Private Land (All Zones) | Sept. 15 - Dec. 30 |
| State Land Bowhunting Only Areas | Sept. 15 - Dec. 30 |
| State Land | Sept. 15 - Nov. 14<br>Dec. 20 - Dec. 30 |
| **Fall Turkey Firearms** | |
| State and Private Lands | Oct. 7 - Oct. 31 |

## WHITE-TAILED DEER (see pages 27-32 for limit information)

| SEASON | SEASON DATES |
|--------|--------------|
| **Deer Bowhunting** | |
| Private Land (Zones 11 and 12) | Jan. 1 - Jan. 31 |
| Private Land (All Zones) | Sept. 15 - Dec. 31 |
| State Land Bowhunting Only Areas | Sept. 15 - Dec. 30 |
| State Land | Sept. 15 - Nov. 14<br>Dec. 20 - Dec. 30 |
| **Deer Shotgun - State Controlled Areas** | |
| No Lottery Season | Nov. 15 - Dec. 5 |
| **Deer Lottery** | See pages 31-34 for more information. |
| Archery-Only Lottery | Sept. 15 - Dec. 30 |
| State Land Lottery "A" Season | Nov. 15 - Nov. 24 |
| State Land Lottery Regular Season | Nov. 15 - Dec. 5 |
| **Deer Shotgun/Rifle/Revolver** | |
| Private Lands | Nov. 15 - Dec. 5 |
| Landowner | Nov. 1 - Dec. 30 |
| **Deer Muzzleloader** | |
| Private Land | Dec. 6 - Dec. 30 |
| State Land | Dec. 6 - Dec. 19 |

# Hunter Notes

- Visit the DEEP website for any new updates or changes that occur throughout the year at *https://portal.ct.gov/DEEP/Hunting/2023-Connecticut-Hunting-and-Trapping-Guide/What-Is-New-for-2023*.

- When hunting at state areas, DO NOT park in front of gates. The gates need to be accessible to DEEP staff or in case of emergencies.

- Information on regulations regarding all-terrain vehicles and misuse can be found at *https://portal.ct.gov/DEEP/Hunting/Hunting-and-Trapping-Information#ATV*.

- Information on wildlife diseases, such as chronic wasting disease, epizootic hemorrhagic disease, COVID-19 in deer, and rabbit hemorrhagic disease (RHDV2) can be found at *https://portal.ct.gov/DEEP/Wildlife/Wildlife-Diseases*.

# Licenses, Permits, and Stamps

**Licenses, permits, and stamps can be purchased online 24/7 through Connecticut's Online Outdoor Licensing System (*https://portal.ct.gov/CTOutdoorLicenses*) and at participating town halls and outdoor equipment stores.** Licenses purchased through the Online Outdoor Licensing System are signed electronically at the time purchase, allowing hunters to keep a digitally signed copy on a smartphone instead of needing to have a signed, printed copy. Licenses purchased through a license agent location must still be printed and signed to be valid.

**Conservation ID Numbers:** Everyone issued a license is given a unique Conservation ID# that should be used every time and every year when purchasing licenses and permits. If you log on to the Online Outdoor Licensing System or go to a vendor for your licenses, always use your Conservation ID# as a means of identification. You should write your Conservation ID# down and keep it in a safe place. Your Conservation ID# is your license number. You can get a Conservation ID#, if you do not already have one, at *https://portal.ct.gov/getconid*.

**Hunter Education Requirements:** No hunting or trapping licenses will be issued to any person unless proof is provided that they have held a RESIDENT license in the respective discipline within the last 5 years OR the person has a certificate indicating successful completion of a Connecticut Conservation Education/Firearms Safety (CE/FS) course (or recognized equivalent) in the respective discipline for which they are applying. Hunter education coursework may have been completed online but MUST have been accompanied by a field day. "Apprentice" or "Mentored" hunting licenses issued in other states do not qualify. To become certified in firearms or bowhunting, a person must be 10 years or older. All bowhunters must show proof when purchasing a small game/deer archery permit that they have completed the CE/FS bowhunting course (since 1982) or its equivalent from another state or country. Certifications from another state or country must specify Bowhunter Education. If you have previously purchased a 2002 or later Connecticut bowhunting license, you have already provided such proof. Obtain course listings online at *https://portal.ct.gov/hunteredreg* or by contacting the CE/FS program at 860-424-3011.

**Printing Hunter Safety Certificates:** After successfully completing a hunter safety course, your certification will be uploaded to your online license profile and will print directly at the bottom of your hunting or fishing license (you may print your

certification without making a purchase). To print your certificate, go to *https:// portal.ct.gov/CTOutdoorLicenses.*

**Age 65+ Annual Licenses:** Firearms hunting and trapping licenses are issued free to residents who meet hunter and trapper education requirements. These licenses must be renewed annually.

**Hunting by Minors:** A person must be 12 years of age or older to hunt. Persons 12 through 15 years of age must be licensed and accompanied by a licensed hunter 18 years of age or older while hunting. A person may not supervise more than 2 minors at one time while hunting. Minors are entitled to their own bag limits. Junior license holders do not have to purchase a new license if they turn 16 years of age during the same calendar year.

**Trapping by Minors:** There is no minimum age requirement for trapping. Persons under age 16 must purchase a Junior Trapping License.

**Free License for Hunters with Disabilities:** A person who has loss of a limb or permanently lost the use of a limb may be issued a hunting or trapping license free-of-charge (permits and stamps not included). Non-residents are eligible for this free license if their state provides the same privilege to Connecticut residents. Verification of the disability, signed by a licensed physician, must be presented. These licenses are available at select DEEP offices, along with participating town clerk offices.

**Armed Forces:** Any active full-time member of the U.S. armed forces may purchase a Connecticut hunting, fishing, or trapping license for the same fees as a resident. Proof of full-time membership during the calendar year must be carried while using the license. These licenses are only issued at DEEP or town clerk offices.

**Lost License:** You can log on to the Online Outdoor Licensing System and print your license for free. You can also go to a licensing vendor or DEEP office to have your license reprinted.

**Hunting and Fishing Guide Registration**
Anyone providing fishing and hunting guide services in Connecticut needs to register annually with DEEP. Guides can register using DEEP's Outdoor Sportsmen Licensing System or in person at vendors where hunting and fishing licenses and permits are sold. There is a $100 fee for this registration.

**Propagated Game Birds for Shooting Preserves, Dog Training and Field Trials:** The taking of propagated game birds on regulated private shooting preserves, regulated dog training areas, approved pheasant exempt areas, and field trial areas requires that each bird taken be identified with a tag containing the permittee's name and date of taking. Handwritten tags are permitted or a full sheet of labels may be downloaded for printing from the DEEP website (*https://portal.ct.gov/-/media/DEEP/hunting_trapping/forms_applications/ GameBirdHarvestTagspdf.pdf*). Hunters wishing to hunt on state state-owned or state-managed lands stocked with pheasants should not have any pheasants in their possession that were harvested from a Shooting Preserve, Dog Training Area, approved exempt area, or Field Trial Area as those birds will be counted as part of the daily bag limit by Law Enforcement. Importation of game birds from another state requires a permit from the Department of Agriculture (860-713-2508).

**Three-day Out-of-state Bird Hunting License:** This license allows out of state

hunters to hunt migratory and resident (non-migratory) game birds, including wild turkeys, for 3 consecutive privilege days (Sundays not included). The $35 fee for this license goes into an account which is used for the purchase and management of game birds and their habitat. Out-of-state hunters still need to purchase a Connecticut Migratory Bird Conservation Stamp and/or a Connecticut Resident Game Bird Conservation Stamp, depending on what species they intend to hunt.

## Snapping Turtle Trapping Endorsement

- Required when using traps to catch snapping turtles. Available for free online or at DEEP offices.
- Season Dates: July 15 - September 30
- Bag Limits: Daily 5, Possession 10, Season 10
- Size Limit: Minimum 13" shell length
- More details and regulations can be found at *https://portal.ct.gov/DEEP/ Hunting/Snapping-Turtle-Regulations*.

## Bird Hunting Stamps

**Resident Game Bird Conservation Stamp** - Valid for calendar year. Current firearms hunting license or Small Game and Archery Deer Permit required. This stamp is required to hunt pheasant, ruffed grouse, quail, partridge, AND wild turkey. When purchased, authorization will be printed on your license. All revenues from Stamp sales go into an account used exclusively for game birds and their habitat.

**Connecticut Migratory Bird Conservation Stamp** - Valid for calendar year. This stamp has been merged with the $4 HIP permit into a single stamp, which is required for anyone, **including junior hunters**, hunting waterfowl, rails, snipe, woodcock, and crows. The state stamp no longer needs to be signed or carried while hunting. If you want a copy of the actual stamp mailed to you, answer "yes" to the prompt when selecting the stamp for purchase. Physical stamps can also be purchased by mailing a request with the enclosed fee to DEEP Licensing and Revenue, 79 Elm Street, Hartford, CT 06106.

If a Connecticut Migratory Bird Conservation Stamp is purchased through a license agent location (i.e., retail store, town clerk, etc.), the HIP certification that **is required to legally hunt migratory birds will not be valid until you either call 1-877-337-4868 or go to *https://ct.aspirafocus.com/hunterreporting* to complete the HIP survey.** Upon completion of the survey, you will be given a confirmation number. You can either write that number onto your existing license or go into the online system to reprint a new license.

| Bird Hunting Stamp | Adult Resident | 12-17 Year-old Resident | Non-resident 12 & Older |
|---|---|---|---|
| CT Resident Game Bird | $28 | $14 | $28 |
| CT Migratory Bird Conservation | $17 | $9 | $17 |

**Federal Migratory Bird Conservation Stamp** - Valid from July 1 through June 30. (Fees: $25 Resident $25 Non-resident). Available at most Post Offices. Also available by telephone and online. Stamp must be signed in ink across its face. Junior hunters ages 12-15 are exempt from purchasing the federal stamps.

Hunters who have encountered problems purchasing the federal Duck Stamp at

local post offices can purchase the Electronic Duck Stamp, or E-Stamp, online for immediate use. You may purchase the E-Stamp from another state as DEEP's online system currently is unable to process federal Duck Stamp purchases. The actual stamp will be mailed to you after purchase, but you will have an E-Stamp to use until you receive the actual stamp. Details on how to purchase an E-Stamp are on the U.S. Fish and Wildlife Service website at *https://www.fws.gov/service/buy-duck-stamp-or-e-stamp*.

## Archery Permit

**Small Game and Deer Archery Permit** - Valid for calendar year. Must show proof of completion of the CE/FS bowhunting course (since 1982) or its equivalent from another state or country when purchasing a small game/deer archery permit. A previous bowhunting license, permit, or stamp no longer qualifies. Photocopies of certificates will be accepted as proof of course completion. Do not send original certificates. This permit is required for all forms of archery hunting. It allows bowhunting for deer on both state and private land. Junior permits available for persons ages 12 to 15.

| Licenses | Adult Resident | 16 & 17 Year-old Resident | Non-resident 12 & Older |
|---|---|---|---|
| Firearms Hunting | $19 | $10 | $91 |
| Firearms Hunting and Inland Fishing | $38 | $19 | $110 |
| Firearms Hunting and All Waters Fishing | $40 | $20 | $120 |
| Firearms Hunting and Marine Waters Fishing | $25 | $13 | $94 |
| Archery Deer/Small Game | $41 | $21 | $135 |
| Archery Deer/Small Game and All Waters Fishing | $65 | $33 | --- |
| Trapping (Valid Nov. - March 31) | $34 | $17 | $250 |
| 3-day Out-of-state Bird Hunting License (Must also purchase a CT Resident Game Bird and/or CT Migratory Bird Conservation Stamp, depending on what species are being hunted.) | --- | --- | $35 |

## Junior Licenses and Permits -- Ages 12 to 15

| License | Resident Junior | Non-resident Junior |
|---|---|---|
| Junior Firearms Hunting | $11 | $11 |
| Junior Archery Deer/Small Game | $10 | $19 |
| Junior Trapping (Ages 15 and under) | $11 | --- |

## Age 65+ Licenses

| License | Adult Resident | Non-resident |
|---|---|---|
| Age 65+ Annual Hunting License | Free (Annual Renewal) | --- |
| Age 65+ Annual Trapping License | Free (Annual Renewal) | --- |

0731

## Firearms Deer Hunting Permits

- A current firearms hunting license is required to purchase firearms deer permits.
- Lottery permits can be applied for starting January 3, 2023, at 9:30 AM. See pages 31-34 for details.
- No one may purchase both a State Land Lottery Permit and a State Land No-Lottery Permit. If you are rejected for a lottery permit, you may still purchase a State Land No-Lottery Permit.

**Revolver Deer Endorsement:** Allows persons hunting with a Free Landowner Permit or Connecticut residents hunting with a Private Land Shotgun/Rifle Permit to use a revolver rather than a rifle or a shotgun to hunt deer on private lands of at least 10 acres in size. A person using a handgun for hunting must possess any required state/town permits to carry.

| Deer Permits | Resident | Resident 12 to 17 Year-olds | Non-resident | Info |
|---|---|---|---|---|
| State Land Lottery | $19 | $10 | $68 | Page 31 |
| State Land No-lottery | $19 | $10 | $68 | Page 29 |
| Private Land Shotgun/Rifle | $19 | $10 | $68 | Page 28 |
| Private Land Muzzleloader | $19 | $10 | $68 | Page 30 |
| State Land Muzzleloader | $19 | $10 | $68 | Page 30 |
| Revolver Deer Endorsement | $5 | --- | --- | --- |

## Landowner Hunting Permits
### (10 or more contiguous acres required)

Deer Landowner Permits and Landowner Resident Game Bird Stamps are free for resident and non-resident landowners who plan to hunt on 10 or more contiguous acres that they own in the State of Connecticut.

Turkey permits have been replaced by the Resident Game Bird Conservation Stamp. Landowners may take turkeys on their property (any season) with either a Free Landowner Resident Game Bird Conservation Stamp or a Resident Game Bird Conservation Stamp ($28). There is no additional bag limit for turkeys due to the free stamp.

| Landowner Permits | Resident | Non-resident |
|---|---|---|
| Deer (see page 29 for info) | Free | Free |
| Free Resident Game Bird Conservation Stamp (required for wild turkey, pheasant, quail, partridges, and ruffed grouse) (see pages 19 and 23-25 for info) | Free | Free |

# Hunting Laws and Regulations

The use and possession of firearms, ammunition, and bowhunting equipment is regulated in the interest of public safety and the conservation of wildlife. Hunters are also subject to any federal, state, or municipal firearms regulations. General restrictions on the use of firearms, air guns, and bowhunting equipment are described below. **New statutes and regulations related to hunting and trapping may be added during the calendar year or some may change. Stay up to date by:**

- Checking the DEEP website, especially before hunting seasons start, at *https://portal.ct.gov/DEEP/Hunting/Hunting-and-Trapping-Information*;
- Following the CT Fish and Wildlife Facebook page at *www.Facebook.com/CTFishandWildlife*;
- Subscribing to our free electronic newsletter **Hunter Highlights** at *https://portal.ct.gov/DEEP-Hunter-Highlights*.

## Hunting – General

**Sunday Hunting** - Possession of hunting implements in the open on Sunday is prima facie evidence of violation (except for archery deer hunters on private land). Sunday hunting is allowed on licensed private shooting preserves and regulated dog training areas when the operator has permission from the town. Hunting may also take place on Sunday at permitted field trial events.

Archery deer hunters can hunt on private land only on Sundays in ALL Deer Management Zones (see page 26). All archery deer hunting on Sundays must take place at least 40 yards away from blazed hiking trails.

**Deer Management Zone 2 and 4A Restriction** - During the Private Land Shotgun/Rifle and Private Land Muzzleloader seasons, the "Antlerless Only" tag is NOT valid in Deer Management Zones 2 and 4A. Only the "Either-sex" tag will be valid in Zones 2 and 4A.

**Prima Facie Evidence of Hunting** - Possession by any person of a loaded hunting implement while at or entering or leaving an area where a reasonable person would believe the objective was to take wildlife. Except that a person may, one hour before sunrise during the regulated deer and turkey firearms hunting seasons, be in possession of a loaded rifle or shotgun provided a live round is not in the chamber of the rifle or shotgun.

**Loaded Hunting Implement** - (A) a rifle or shotgun with a live round in the chamber or in a magazine which is attached to such rifle or shotgun, a muzzle-loaded firearm with the primer in place, or a flintlock firearm with powder in the pan, (B) a bow and arrow with an arrow notched on the bow, (C) a drawn crossbow with a bolt in place, or (D) a high velocity air gun that is charged with a projectile in the chamber or in a magazine that is attached to such air gun.

**Hunting While Under the Influence or Impaired** - No person shall engage in hunting while under the influence of intoxicating liquor or any drug, or both, or while impaired by the consumption of intoxicating liquor.

**Hunting Near Roads, Buildings, People, and Domestic Animals** - Hunting or shooting from or across the traveled portion of any public roadway is prohibited. Shooting toward any person, building, or domestic animal when within range is prohibited.

0733

**Motor Vehicle/ATV Use** - Hunting or shooting from a motor vehicle is prohibited. The use of all-terrain vehicles is prohibited on state land (see exceptions under Hunting Opportunities for the Disabled on page 16).

**Closed Season** - No hunting and no training of dogs from October 14 through 1/2-hour before sunrise, EDT, on October 21, 2023, except for the hunting of rails in marshes; waterfowl hunting; legal squirrel, deer, turkey, and coyote hunting; licensed private shooting preserves operating under the provisions of Sec. 26-48; field trials held under the provisions of Sec. 26-51 and Sec. 26-52; the training of hunting dogs under the provisions of Sec. 26-49 of the General Statutes; and the training of hunting dogs on any area approved by the department for this purpose.

**Electronic Calling Devices** - The use of electronic calling devices is prohibited when hunting wild turkeys and migratory birds (except crows). Electronic calling devices can be used when hunting crows, coyotes, other small game, and deer.

**Hunting Prohibited in Westport:** By special state regulation, hunting within the Westport town borders is prohibited.

**Public Shooting Ranges:** Trap or target shooting on any state property or public hunting area is prohibited unless the area is a designated shooting range. Four state-owned public shooting ranges are available for target shooting, patterning shotguns, and sighting in rifles. More information on these ranges is on the DEEP website at *https://portal.ct.gov/DEEP/Hunting/Public-Shooting-Opportunities*.

**For information on Falconry, visit the DEEP website at *https://portal.ct.gov/ DEEP/Hunting/Falconry-in-Connecticut*.**

# Firearms Hunting

The holder of a firearms hunting license may use rifles, shotguns, muzzleloaders, handguns, and high-velocity air guns subject to certain restrictions.

**500 Foot Zone** - **It is prohibited to hunt with, shoot, or carry a loaded firearm within 500 feet of any building occupied by people or domestic animals, or used for storage of flammable material, or within 250 feet of such buildings when waterfowl hunting in tidal areas from land shooting positions or from floating blinds anchored adjacent to land or from rock positions, unless written permission for lesser distances is obtained from the owner and carried. Landowners, their spouse, and lineal descendants are exempt from this restriction, providing any building involved is their own. The 500 foot zone does not apply to bowhunting.**

**Firearms in Vehicles** - It is prohibited to carry a loaded firearm in a vehicle. This does not apply to persons with handguns who have a valid Connecticut permit to carry pistols or revolvers.

**Rifles and Handguns** - Rifles or handguns using ammunition larger than .22 caliber rimfire are prohibited on state-owned land. Rifles or handguns of any caliber are prohibited on State-leased and Permit-Required Hunting Areas (see Permit-Required and State-Leased Hunting Area sections for exceptions). The use of rifles or handguns to hunt turkeys, waterfowl, or any other federally regulated migratory game bird (except crows) is prohibited. Hunting on private land with ammunition larger than .22 caliber rimfire long rifle during the private land shotgun/rifle deer season is prohibited unless the user has a valid private land deer season permit and landowner consent form. The use of rifles or revolvers to hunt deer is subject to additional restrictions (see Private Land

Shotgun/Rifle Season). The use of ammunition larger than .22 caliber rimfire to hunt raccoon or opossum at night is prohibited. A person using a handgun for hunting must possess any required state/town permits to carry. Note: It is legal to use .17 caliber rimfire firearms in all situations where it is legal to use .22 caliber rimfire firearms.

**Shotguns** - The possession of shotgun ammunition larger or heavier than #2 shot is prohibited on state-owned lands, state-leased lands, and Permit-Required Hunting Areas, at all times, and is prohibited on private lands during the Private Land Shotgun/Rifle Deer Season (see Permit-Required and State-Leased Hunting Area sections for exceptions). However, on any lands, waterfowlers hunting from a boat, blind, or stationary position may use up to and including size BB steel shot. The possession of lead shot while hunting waterfowl, rails, and coot is prohibited. The use of shotguns larger than 10-gauge for hunting waterfowl is prohibited. Shotguns must not be capable of holding more than 3 shells (2 in the magazine, 1 in the chamber) when hunting waterfowl, other migratory birds (except crows), deer on state lands, and turkey. The exception is that unplugged shotguns are legal to use during the September Canada goose season. The use of shotguns to hunt deer or turkey is subject to additional restrictions (see Deer Hunting and Turkey Hunting).

**Muzzleloaders** – Muzzleloaders are authorized for a number of different seasons with regulations as follows:

- To qualify as a muzzleloader, powder and projectile must be loaded from the muzzle.
- Shotgun converters and telescopic sights are legal.
- A muzzleloader with a percussion cap on the nipple, primer placed in the breach, powder in the pan, or battery connected is considered loaded.
- Deer seasons – A muzzleloader can be used in all situations a rifle or shotgun is legal in addition to muzzleloader season, provided it is a minimum of .45 caliber and uses a single projectile loaded from the muzzle.
- Small game and waterfowl seasons – Smoothbore muzzleloaders follow the same restrictions as shotguns, non-toxic shot required for waterfowl. Muzzleloading rifles may be used for small game with the same restrictions as rifles, except that on state-owned land, up to a .36 caliber muzzleloading rifle using round ball only is a legal implement.
- Turkey seasons – Smoothbore muzzleloaders with a .62 caliber minimum follow the same restrictions as shotguns, i.e. shot sizes restricted to 4, 5, 6, 7, or 7 1/2.

**High-Velocity Air Guns** - Are restricted to those that use a single ball or pellet-like projectile. Additional restrictions on the use of air guns are the same as those for rifles and handguns.

## Bowhunting

**Bowhunter Education** - All bowhunters must show proof when purchasing a small game/deer archery permit that they have completed the CE/FS bowhunting course (since 1982) or its equivalent from another state or country. If you have previously purchased a 2002, or later, Connecticut bowhunting license you have already provided such proof.

**Legal Bows and Arrows** - For the purposes of hunting deer and turkey, legal bows include long, recurved, or compound bows with a minimum draw weight of 40 pounds and crossbows. Mechanical string release devices are permitted. Projectiles coated with any drug, poison, or tranquilizing substance are prohibited.

- **Crossbows:** The use of crossbows for hunting deer, turkey, and all other species is permitted. Legal crossbows must have a minimum draw weight of 125 pounds and permanent fixed rifle type stock with a functional mechanical safety device. Adjustable crossbow stocks are permitted, but folding stocks are not. The bolt (arrow) length must be at least 18 inches, excluding the broadhead. Crossbows are considered loaded when fully drawn with a bolt in place. Telescopic sights are permitted.
- **Arrowheads:** Legal arrowheads for hunting deer and turkey must have at least two blades and be at least 7/8 inch wide at its widest point. Arrowheads that are designed to open on impact are legal provided they meet the above requirement.

**Possession of a Firearm** while archery hunting is prohibited.

## Definition of Bag Limits

- **Daily Limit** - the number of a particular species that may be taken by an individual during a day (from 12:01 A.M. to 12:00 midnight). While in the field, a hunter may not have in their possession more than the daily bag limit for a species.
- **Possession in Storage** - the number of a particular non-migratory game species kept in storage may not exceed the cumulative daily bag limits for that species since the season began, and at no time can it exceed the season limit. The possession in storage of migratory game species such as waterfowl, woodcock, snipe, coots and rail may not exceed the federally regulated possession limit.
- **Season Limit** - the total number of a particular species that may be taken during an open season.

## Fluorescent Orange Requirement

During the period September 1 through the last day of February, hunters (including persons hunting with deer damage permits) are required to wear at least 400 square inches of fluorescent orange clothing above the waist and visible from all sides. An orange hat, in addition to a coat or vest, is strongly recommended.

The following hunters are exempt from this requirement:

- **Archery Deer Hunters** hunting from September 15 to November 14 and from January 1 to January 31.
- **Archery Deer Hunters** hunting during the November 15 to December 31 time period may remove their fluorescent orange clothing when hunting from an elevated stand at least 10 feet above the ground.
- **Firearms and Archery Turkey Hunters**
- **Waterfowl Hunters** while hunting from boats, duck blinds, or other stationary positions.
- **Crow Hunters** while hunting from a blind or a stationary position.
- **Coyote and Fox Hunters** when hunting from a blind except during firearms deer seasons and fall firearms turkey seasons.
- **Raccoon and Opossum Hunters** when hunting from 1/2 hour after sunset until 1/2 hour before sunrise.

- **Landowners** while hunting deer only on their own property. Family members are still required to wear fluorescent orange.

## Private Land Permission

All hunters are required to have permission from the landowner when hunting on private lands. Verbal permission for the hunting of species other than deer and turkey is sufficient.

- **Deer Hunters and Turkey Hunters** - must have written permission of the landowner for the current season on official DEEP forms. Copies of the form must be carried while hunting. **Forms are available in this guide and on the DEEP website at *https://portal.ct.gov/DEEPHunting*.** The form must be dated for the current season, indicate the hunting implement types authorized by the landowner, and have the landowner's original signature. A landowner must have a minimum of 10 acres to authorize the use of a rifle or revolver for deer hunting. There is no minimum acreage requirement for using a shotgun, muzzleloader, or archery equipment.
- **Trappers** - must obtain, and have in possession, the written permission of the landowner when trapping on their land. WRITTEN PERMISSION MUST BE RENEWED ANNUALLY. Trappers have the option to use an official DEEP form to obtain written permission. **The form is available in this guide and on the DEEP website at *https://portal.ct.gov/DEEPHunting*.**
- **Landowners and Lineal Descendants** - are exempt from the requirement to carry written permission while hunting deer or turkey on their own land.

## Landowner Liability Release

Connecticut law (Section 52-557g) provides protection from liability to landowners who allow, without a fee, the recreational use of their property. Details on the regulations that protect landowners can be found on the DEEP website at *https://portal.ct.gov/DEEP/Hunting/2023-Connecticut-Hunting-and-Trapping-Guide/Hunting-Laws-and-Regulations*.

## License Suspensions Remedial Hunter Ed Requirement

In accordance with Connecticut General Statute 26-61, the payment of a fine, forfeiture of a bond, or a plea or judgment of guilty for fishing, hunting, and trapping violations may result in the suspension of all sport fishing, hunting, and trapping licenses and privileges.

To comply with the provisions of C.G.S. Section 26-31(g), any person having their hunting license suspended for specific safety violations will be required to complete a remedial hunter education course prior to reinstatement of such license following the suspension period. Completion of a CE/FS course is also required if the hunter under suspension has not been previously certified. Details on specific violations can be found on the DEEP website at *https://portal.ct.gov/DEEP/Hunting/2023-Connecticut-Hunting-and-Trapping-Guide/Hunting-Laws-and-Regulations*.

## Dealing with Harassment

All hunters, regardless of where they hunt, should be prepared for the possibility

of being harassed. Your behavior if you are harassed is extremely important. Maintain your composure and do not retaliate. If you are interviewed by the media, project a positive image. Connecticut has a hunter harassment law that protects the rights of sportsmen. If you decide to press charges, make sure you have a strong case by: (1) making it evident that the antagonists are following you by going in several directions; (2) asking your antagonists why they are harassing you; (3) being able to identify and describe the individuals; (4) taking the license numbers of their vehicles if possible; and (5) not responding with violence or threatening a protester with bodily harm.

# Hunting Opportunities for Persons with Disabilities

Connecticut laws provide special provisions for disabled hunters as do programs administered by the DEEP. Questions concerning special permits should be directed to the Wildlife Division at 860-424-3011 or *deep.wildlife@ct.gov*.

**CGS Sec. 26-29b:** provides a free hunting license (permits and stamps not included) to individuals who have permanently lost the use of a limb. These licenses are available at town clerk offices. Non-residents are eligible for this free license if their state provides the same privilege to Connecticut residents. Verification of the disability, signed by a licensed physician, must be presented.

**CGS Sec. 26-74:** allows a person to obtain a special permit to hunt legally from an all-terrain vehicle so long as they do not possess or shoot a loaded hunting implement while the vehicle is in motion. Note: 4-wheel drive trucks, vans, SUV's, etc. are not considered all-terrain vehicles. Eligible persons must be paraplegic or suffer from the loss of or the loss of the use of both lower extremities.

**State Land Access for Disabled Hunters:** Disabled hunters wanting to access state land with all-terrain vehicles (ATVs) or who have a question about free hunting licenses or shooting from an ATV should call the Wildlife Division at 860-424-3032 (western CT) or 860-424-4144 (eastern CT) for more information.

**Finding Places to Hunt:** Use the CT Interactive Hunting Area Map on the DEEP website (*https://portal.ct.gov/DEEP/Hunting/Public-Hunting-Areas*) to find areas where there is adequate access for persons with disabilities or see table on pages 48-58.

**MOU Between CT DEEP and MassWildlife:** The CT DEEP and MassWildlife have finalized a Memorandum of Understanding which establishes that both states (Connecticut and Massachusetts), pursuant to their respective authorities (Section 26-29b of the CGS and Massachusetts GL c 131 Subsection 11), agree to issue free inland fishing and hunting, or combination inland fishing and hunting licenses to a resident of the other state who is the holder of a valid hunting, fishing, or combination inland fishing and hunting license issued to them by their state of residency that specifies that said individual is paraplegic. The individual must, however, still purchase any necessary permits or stamps required by either Massachusetts or Connecticut.

# State-managed Dog Training and Field Trial Areas

Hunting is permitted on dog training and field trial areas when field trial events are not scheduled. During field trials, these areas are closed to all other uses. Check the list of scheduled events on the DEEP website at *https://portal.ct.gov/DEEP/Hunting/Field-Trial-Dates*.

0738

## State-managed Dog Training Areas

The following areas have been established as Dog Training Areas where hunting dogs may be trained with the use of live birds year-round. Game birds may not be shot on these areas except during the open hunting season. Only artificially propagated gamebirds (pheasants, chukar partridge, quail, ducks) and pigeons of either sex may be liberated. All birds liberated shall be full-winged and capable of maintaining normal flight. Birds should be free of disease and acquired from a NPIP-approved facility. All birds must be in a condition suitable to maintain themselves in the wild. No birds are to be shot except during the open season; use of blank cartridges will be permitted.

- Nod Brook Wildlife Management Area
- Flaherty Field Trial Area
- Pease Brook Wildlife Management Area

## Field Trial Areas

The following areas have been established as state-regulated Field Trial Areas. Field trial clubs sanctioned by AKC, NAVHDA, or CASDFTA may obtain permits to use these areas for field trials.

- Nod Brook Wildlife Management Area
- Flaherty Field Trial Area
- Mansfield Field Trial Area (State-leased)
- Sugarbrook Field Trial Area

Dates for state land and state-leased areas are scheduled in December of the preceding year. Any group wishing to use one of the above listed areas should contact Laurie Fortin l*aurie.fortin@ct.gov* in the month of December or earlier.

## Help Combat Illegal Wildlife Trade

Freshwater turtles are some of the most commonly trafficked species in the U.S. If you see or hear about suspicious behavior that may be connected to the poaching of reptiles, notify Connecticut's TIP hotline at 1-800-842-HELP (4357) or the U.S. Fish and Wildlife Service (USFWS) at 1-844-FWS-TIPS (397-8477) or email *FWS_ TIPS@FWS.GOV*. You can remain anonymous. Note the exact location, what happened, and who was involved (including vehicles). Take photos if it is safe to do so. Do NOT confront suspicious persons or try to stop the crime yourself. Leave that to law enforcement. The USFWS is authorized to pay rewards for information or assistance related to investigations. More information can be found at *https://portal.ct.gov/deep-Combat-Illegal-Wildlife-Trade*.

## Sportsmen's Dollars at Work

Wildlife management is largely funded through the Federal Aid in Wildlife Restoration Program, which was initiated by sportsmen and conservationists in the 1930s to provide states with funding for wildlife programs. Funds are derived from a federal excise tax on firearms, ammunition, and archery equipment. These funds are collected from the manufacturers by the Department of the Treasury and apportioned each year to the states for wildlife programs.

***The Wildlife and Sport Fish Restoration Program...Partnering to fund conservation and connect people with nature.***

# Private Land Consent Form

- All hunters are required to have landowner permission when hunting on private land.
- Private land deer and turkey hunters must carry the form below, signed and dated for the current season. This is required of both archery and firearms hunters.
- A landowner may sign a dated consent form before you purchase your license, permits, and stamps, but all required licenses, permits, and stamps must be purchased before you hunt.
- Landowners who allow, without fee, the recreational use of their property are protected from liability by Connecticut law (C.G.S. 52-557g).
- Properties must be at least 10 acres in size for rifle or revolver use to be authorized.
- Landowners must designate calendar year, seasons, and choice of hunting implements.
- Where baiting of deer is permitted, it is strongly recommended that individuals consult with landowners prior to placing bait.

**Photocopies of these forms may be used, but to be valid, must have original signatures and dates. Print forms from the DEEP website at *https://portal.ct.gov/DEEPHunting*.**

---

### CONSENT TO HUNT DEER OR TURKEY ON PRIVATE LAND DURING THE CALENDAR YEAR OF _____

State of Connecticut -- Department of Energy & Environmental Protection
Wildlife Division

| Names of all landowners listed on deed | Last | First | M.I. |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

| Location of Property | Street | Town | No. of Acres |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

| Hunter's Information (please print) | Name | First | M.I. |
|---|---|---|---|
| | Address | | |
| | Town | State | Zip Code |
| | Conservation ID Number | | |

| **Cross off hunting that is NOT authorized:** | **Cross off hunting implements NOT authorized:** |
|---|---|
| (1) Deer Hunting | (1) Bow and Arrow/Crossbow |
| (2) Spring Turkey Hunting | (2) Shotgun |
| (3) Fall Turkey Hunting | (3) Muzzleloader *(Deer Only)* |
| (4) Sunday Archery Deer Hunting | (4) Centerfire Rifle *(Deer Only)* |
| | (5) Revolver *(Deer Only)* |

I know and understand the boundaries of the above listed properties, and that this form is valid only during the calendar year for which it was signed by the landowner. I also understand that any person making a written false statement on this form shall be subject to arrest as provided for in Section 53A-157 of 1975 Rev. of C.G.S.

| Signature of Permittee | Date |
|---|---|

I hereby grant the person named above permission to hunt on my property during the calendar year indicated. I have also indicated the seasons and hunting implements that may be used.

| Signature of Landowner | Date |
|---|---|

---

# Small Game and Pheasant Hunting

Licensing and permit costs are listed on pages 6-10. Specific laws and regulations for each season are below. You must have verbal permission to hunt small game on private lands.

## Resident Game Bird Hunting Seasons

**Species:** Pheasant, Ruffed Grouse, Quail, Chukar, Hungarian Partridge, and Wild Turkey (see pages 23-26 for turkey hunting season information)

Stocking information for pheasants can be found on the DEEP website at *https://portal.ct.gov/DEEP/Hunting/Pheasant-Hunting*.

## Season Dates

| Species | Season Dates | Limits |
|---|---|---|
| Pheasant | Jan. 2 - Feb. 28 *and* Oct. 21 - Dec. 30 | Daily - 2; Season - 10 |
| Chukar and Hungarian Partridge | Jan. 2 - Feb. 28 *and* Oct. 21 - Dec. 30 | Daily - 2; Season - 10 |
| Quail | Oct. 21 - Nov. 4 | Daily - 2; Season - 10 |
| Ruffed Grouse* | Oct. 21 - Nov. 30 | Daily - 1; Season - 8 |

**Hunting Hours:** 1/2 hour before sunrise until 1/2 hour after sunset.

**License Requirements:** Firearms or Archery Hunting License and a Connecticut Resident Game Bird Conservation Stamp.

**Legal Firearms:** See firearms and ammunition regulations on pages 12-13.

**Special Conditions**

- ***Extended Quail Season*** - Quail may be hunted at the Nod Brook WMA and the Flaherty, Mansfield, and Sugarbrook Field Trial Areas from Jan. 2 - Feb. 28 and from Oct. 21 - Dec. 30.
- Landowners hunting game birds, such as pheasant or quail, must obtain the Free Landowner Resident Game Bird Stamp and are restricted to the state's daily and season bag limits. No game birds may be liberated on private land without a permit.
- **Junior Pheasant Hunter Training Day**: Saturday, October 14, 2023. Information on Junior Pheasant Hunter Training Events held at local sportsmen's clubs can be found at *https://portal.ct.gov/DEEP-Junior-Hunting*. "Hunt on Your Own" junior pheasant hunts are available at designated state-owned locations for licensed junior hunters accompanied by a licensed adult hunter. More details on pheasant stocking locations for Junior Pheasant Hunter Training Day can be found at *https://portal.ct.gov/DEEP/Hunting/Pheasant-Hunting#trainingday*.

\* The Wildlife Division is requesting grouse hunters voluntarily log their hunts and harvest. More information is at *https://portal.ct.gov/DEEP/Hunting/Ruffed-Grouse-Hunter-Log*.

# Saturday Pheasant and Small Game Hunting Permits

Saturday permits are required October 21 - November 11, 2023, at select areas listed below. These areas will be stocked the listed Saturday mornings and

afternoons and will only be open to hunters with a Saturday permit. Saturday permits for these areas will only become available on the Online Outdoor Licensing System the Monday preceding the Saturday hunts, starting at 7:00 AM. Specific details about these permits and pheasant hunting in general can be found on the Pheasant Hunting webpage at *https://portal.ct.gov/DEEP/Hunting/Pheasant-Hunting*. **Only 3 Saturday permits can be secured for the season. Once secured, permits cannot be canceled.**

**Special Permit-Required Saturday Pheasant Hunting Areas**
• Eversource Skiff Mountain Cooperative WMA
• Naugatuck State Forest (Hunter's Mtn. Block)
• Simsbury WMA
• Durham Meadows WMA

# Small Game Mammals

**Season Dates**

| Species | Season Dates | Limits |
|---------|--------------|--------|
| Gray Squirrel | Jan. 2 - Feb. 28 *and* Sept. 1 - Dec. 30 | Daily - 8; Season - 40 |
| Cottontail | Jan. 2 - Feb. 28 *and* Oct. 21 - Dec. 30 | Daily - 3; Season - 25 |
| European Hare | Jan. 2 - Feb. 28 *and* Oct. 21 - Dec. 30 | Daily - 1; Season - 10 |
| Snowshoe Hare | Jan. 2 - Jan. 31 *and* Nov. 18 - Dec. 30 | Daily - 2; Season - 10 |
| Woodchuck | March 15 - Nov. 15 | No limit |

**Hunting Hours:** 1/2 hour before sunrise until 1/2 hour after sunset.

**License Requirements:** Firearms or Archery Hunting License

**Legal Firearms:** See firearms and ammunition regulations on pages 12-13.

# Furbearer Hunting Seasons

**Season Dates**

| Species | Season Dates | Limits |
|---------|--------------|--------|
| Raccoon | Jan. 2 - Jan. 21 *and* Oct. 21 - Dec. 30 | Daily - 5; Season - no limit |
| Opossum | Jan. 2 - Jan. 21 *and* Oct. 21 - Dec. 30 | Daily and Season - no limit |
| Red and Gray Foxes | Jan. 2 - Feb. 28 *and* Oct. 21 - Dec. 30 | Daily: 3 combined; Season: 30 combined |
| Coyote | Jan. 2 - Dec. 30 | No limit |

**Hunting Hours**
• **Raccoon and Opossum:** No restrictions on state-owned lands open to

hunting and on private lands where landowners have given permission, except that hunting hours are 1/2 hour after sunset to 1/2 hour before sunrise during the shotgun deer hunting season November 15 to December 5. Hunting on Sundays is prohibted.

- **Foxes and Coyotes:** 1/2 hour before sunrise until 1/2 hour after sunset.

**License Requirements:** Firearms or Archery Hunting License

**Legal Firearms:** See firearms and ammunition regulations on pages 12-13.

**Special Conditions**

- **Raccoons and Opossums:** When hunting at night, rifles or handguns using ammunition larger than .22 caliber rimfire or shotgun shells larger than #2 shot may not be used. Note that rifles or handguns using .17 caliber rimfire ammunition are permitted for hunting at night.
- It is illegal to take raccoons or opossums with the use of a light from a motor vehicle.
- Foxes and Coyotes taken by hunting must be reported online (*https://ct.aspirafocus.com/hunterreporting/Login.aspx*) or by telephone (1-877-337-4868). Or, they can be pelt tagged. To be sold, all fox and coyote pelts must be tagged.

# Migratory Game Bird Hunting Seasons

## Crow Hunting

**Season Dates:** (hunting only on certain days)

Jan. 14 - March 25;   Monday through Saturday

Aug. 12 - Oct. 13:   Wednesdays, Fridays, and Saturdays

Oct. 21 - Nov. 30;   Wednesdays, Fridays, and Saturdays

**Bag Limit:** No limit

**Hunting Hours:** 1/2 hour before sunrise until 1/2 hour after sunset.

**License Requirements:** Firearms or Archery Hunting License and Connecticut Migratory Bird Conservation Stamp.

**Legal Firearms:** See firearms and ammunition regulations on pages 12-13.

**Special Conditions**

- While crow hunting from a stationary position a hunter is exempt from the fluorescent orange clothing regulation.
- In addition to Connecticut hunting laws, migratory bird hunters are subject to all Federal Laws and Regulations.

## Woodcock, Snipe, and Rail Hunting

**Season Dates, Bag Limits, and Hunting Hours:** *See current Migratory Bird Hunting Guide*

**License Requirements:** Firearms or Archery Hunting License and Connecticut Migratory Bird Conservation Stamp.

**Legal Firearms:** Shotguns are the only firearms which may be used. Shotguns must be capable of holding no more than 3 shells. See ammunition regulations for shotguns on page 13.

0743

**Special Conditions**

- **Federal Regulations:** In addition to Connecticut hunting laws, migratory bird hunters are subject to all Federal Laws and Regulations.
- **Non-toxic Shot:** Non-toxic shot is required for coot and rail hunting. The maximum size shot allowed for all migratory birds is BB for steel and #2 for other federally approved non-toxic shot types.

# Waterfowl Hunting

Species: Ducks, Mergansers, Geese, Brant

**Season Dates, Bag Limits, Hunting Hours:** *See current Migratory Bird Hunting Guide*

**License Requirements:** Firearms or Archery Hunting License and Connecticut Migratory Bird Conservation Stamp. All migratory game bird hunters, including junior hunters (ages 12-15), must obtain the Connecticut Migratory Bird Conservation Stamp. Federal Migratory Bird Conservation Stamp also required for hunters 16 years or older. Note: federal waterfowl stamps must be signed in ink on the face of the stamp.

**Legal Firearms:** Shotguns are the only firearms which may be used. Refer to the Migratory Bird Hunting Guide for regulations regarding the number of shells a shotgun may hold.

**Special Conditions**

- **Non-toxic Shot**: Non-toxic shot is required for hunting waterfowl, coot, and rails. The maximum size shot allowed for all migratory birds is BB for steel and #2 for other federally approved non-toxic shot types.
- **Possession of Lead Shot**: Possessing lead shot while waterfowl hunting is prohibited.
- **Federal Regulations**: In addition to Connecticut hunting laws, waterfowl hunters are subject to all Federal Laws and Regulations.
- **No Hunting Buffer Zone:** While hunting in tidal areas from land or from floating blinds anchored to land or rock positions, the no hunting buffer zone around permanent buildings is 250 feet.
- **Fluorescent Orange Clothing:** While hunting waterfowl from boats or stationary positions, a hunter is exempt from the fluorescent orange clothing regulation.
- **Junior Waterfowl Hunter Training Days:** Are usually two Saturdays in the fall. Dates are published in the current *Migratory Bird Hunting Guide*. Learn more at *https://portal.ct.gov/DEEP-Junior-Hunting*.

# Special Junior Hunter Events

DEEP's Conservation Education/Firearms Safety Program and several sportsmen's clubs offer free mentored pheasant hunts on Junior Pheasant Hunter Training Day (October 14, 2023) and additional dates in the fall for hunters between 12 and 15 years of age. Participants are coached on shooting clay targets on the trap or skeet field prior to participating in the hunt. Mentored hunts are staffed with Certified Volunteer Hunter Safety Instructors and experienced hunters, along with a well-trained bird dog and its handler. "Hunt on Your Own" junior pheasant hunts are also available at designated state-owned locations for licensed junior hunters accompanied by a licensed adult hunter. Check out the Junior Hunter webpage at *https://portal.ct.gov/DEEP-Junior-Hunting* to learn about special events and activities and obtain more information for junior hunters.

# Wild Turkey Hunting

Hunters may pursue wild turkeys during three separate seasons: Spring, Fall Archery, and Fall Firearms. Spring turkey archery and firearms hunting bag limits and season lengths are not separate; whereas fall archery and fall firearms are separate seasons with their own unique bag limits and season time-frames.

## Spring Turkey Season

### Season Dates
- April 26 - May 27   **State Land, Private Land, and Landowner**

**Bag Limit:** 5 bearded birds (on private land, state land, or a combination of both).

**Hunting Hours:** 1/2 hour before sunrise to sunset.

### License Requirements

- **CT Residents:** Firearms hunting license or Small Game and Deer Archery Permit and a Resident Game Bird Conservation Stamp.
- **Non-residents:** 3-day out-of-state bird hunting license or non-resident firearms hunting license or non-resident small game and deer archery permit **and** a Resident Game Bird Conservation Stamp.
- **Landowners** (who own 10 or more contiguous acres) must obtain a Free Landowner Resident Game Bird Conservation Stamp to hunt wild turkeys on their property. Landowners who wish to hunt on other private land or state land for wild turkeys must purchase the Resident Game Bird Conservation Stamp for $28. There is no additional bag limit for turkeys due to the Free Landowner Resident Game Bird Conservation Stamp.

**Legal Firearms:** Shotguns, 20 gauge or larger, with #4, 5, 6, 7, 7-1/2 shot, or any combination. Shotguns must not be capable of holding more than 3 shells.

**Legal Bows:** For the purposes of hunting deer and turkey, legal bows include long, recurved, or compound bows with a minimum draw weight of 40 pounds and crossbows. Mechanical string release devices are permitted. Projectiles coated with any drug, poison or tranquilizing substance are prohibited.

**Crossbows:** The use of crossbows for hunting deer, turkey and all other species is permitted. Legal crossbows must have a minimum draw weight of 125 pounds and permanent fixed rifle type stock with a functional mechanical safety device. Adjustable crossbow stocks are permitted, but folding stocks are not. The bolt (arrow) length must be at least 18 inches, excluding the broadhead. Crossbows are considered loaded when fully drawn with a bolt in place. Telescopic sights are permitted.

**Arrowheads:** Legal arrowheads for hunting deer and turkey must have at least two blades and must be at least 7/8 inch wide at its widest point. Arrowheads that are designed to open on impact are legal provided they meet the above requirement.

**Tagging and Reporting:** Immediately upon harvesting a turkey, complete and sign a Harvest Tag and keep it with the carcass at all times. The Harvest Tag must remain with the turkey until it is cut up for consumption. See requirements on page 44.

**Special Conditions**

- **State Land Hunting:** See tables on pages 48-58 for state lands open for spring turkey hunting.
- **Private Land Permission:** Signed written consent of the landowner on official forms for the current season must be carried while hunting (see page 18 for form).
- **Decoys:** Decoys may be used, but live decoys are prohibited.
- **Junior Turkey Hunter Training Days**: Saturday, April 15, through Saturday, April 22, 2023 (excluding Sunday). Learn more at *https://portal.ct.gov/DEEP-Junior-Hunting*.

# Fall Archery Turkey Seasons

**Season Dates**

- Jan. 2 - Jan. 31  **Private Land (Zones 11 and 12;** see zone map on page 26**)**
- Sept. 15 - Dec. 30  **Private Land (All Zones)**
- Sept. 15 - Nov. 14 *and* Dec. 20 - Dec. 30  **State Land**
- Sept. 15 - Dec. 30  **State Land Bowhunting Only Areas**

**Bag Limits:** 2 either sex (on private land, state land, or a combination of both)

**Hunting Hours:** 1/2 hour before sunrise until sunset

**License Requirements**

- **CT Residents:** Small Game and Deer Archery Permit and a Resident Game Bird Conservation Stamp.
- **Non-residents:** Non-resident small game and deer archery permit and a Resident Game Bird Conservation Stamp.
- **Landowners** (who own 10 or more contiguous acres) must obtain a Free Landowner Resident Game Bird Conservation Stamp to hunt wild turkeys on their property. Landowners who wish to hunt on other private land or state land for wild turkeys must purchase the Resident Game Bird Conservation Stamp for $28. There is no additional bag limit for turkeys due to the Free Landowner Resident Game Bird Conservation Stamp.

**Legal Bows:** For the purposes of hunting deer and turkey, legal bows include long, recurved, or compound bows with a minimum draw weight of 40 pounds and crossbows. Mechanical string release devices are permitted. Projectiles coated with any drug, poison or tranquilizing substance are prohibited.

**Crossbows:** The use of crossbows for hunting deer, turkey and all other species is permitted. Legal crossbows must have a minimum draw weight of 125 pounds and permanent fixed rifle type stock with a functional mechanical safety device. Adjustable crossbow stocks are permitted, but folding stocks are not. The bolt (arrow) length must be at least 18 inches, excluding the broadhead. Crossbows are considered loaded when fully drawn with a bolt in place. Telescopic sights are permitted.

**Arrowheads:** Legal arrowheads for hunting deer and turkey must have at least two blades and must be at least 7/8 inch wide at its widest point. Arrowheads that are designed to open on impact are legal provided they meet the above requirement.

**Tagging and Reporting:** Immediately upon harvesting a turkey, complete and

sign a Harvest Tag and keep it with the carcass at all times. The Harvest Tag must remain with the turkey until it is cut up for consumption. See requirements on page 44.

**Special Conditions**

- **State Land Hunting:** See the tables on pages 48-58 for a listing of areas that are open for fall bowhunting.
- **Private Land Permission:** Signed written consent of the landowner on official forms for the current season must be carried while hunting (see page 18 for form).
- **Decoys:** Decoys may be used, but live decoys are prohibited.
- **Fanning:** Use of a turkey fan to sneak in on turkeys is strongly discouraged.

## Fall Firearms Turkey Seasons

**Season Dates**

Oct. 7 - Oct. 31   **State Land, Private Land, and Landowner**

**Bag Limit:** 3 either sex (on private land, state land, or a combination of both).

**Hunting Hours:** 1/2 hour before sunrise to sunset.

**License Requirements**

- **CT Residents:** Firearms hunting license and Resident Game Bird Conservation Stamp.
- **Non-residents:** 3-day out-of-state bird hunting license or non-resident firearms hunting license and a Resident Game Bird Conservation Stamp.
- **Landowners** (who own 10 or more contiguous acres) must obtain a Free Landowner Resident Game Bird Conservation Stamp to hunt wild turkeys on their property. Landowners who wish to hunt on other private land or state land for wild turkeys must purchase the Resident Game Bird Conservation Stamp for $28. There is no additional bag limit for turkeys due to the Free Landowner Resident Game Bird Conservation Stamp.

**Legal Firearms:** Shotguns, 20 gauge or larger, with #4, 5, 6, 7, 7 1/2 shot, or any combination. Shotguns must not be capable of holding more than 3 shells.

**Tagging and Reporting:** Immediately upon harvesting a turkey, complete and sign a Harvest Tag and keep it with the carcass at all times. The Harvest Tag must remain with the turkey until it is cut up for consumption. See requirements on page 44.

**Special Conditions**

- **State Land Hunting:** See the tables on pages 48-58 for a listing of areas that are open for fall firearms turkey hunting.
- **Private Land Permission:** Signed written consent of the landowner on official forms for the current season must be carried while hunting (see page 18 for form).
- **Decoys:** Decoys may be used, but live decoys are prohibited.

## Turkey Hunting Prohibited Activities

- The use of bait, electronic calling devices, live decoys or animals (including dogs) to hunt wild turkeys is prohibited. Except that a dog may be used to

hunt turkey during the fall firearms season on private lands only.
- You may not call turkeys for another hunter. Exceptions – STATE LAND: If you have a current Resident Game Bird Conservation Stamp with or without unused tags remaining, you may call for another hunter on state land. PRIVATE LAND: If you have a current Resident Game Bird Conservation Stamp with or without unused tags remaining and a signed consent form for a private land parcel, you may call for another hunter hunting on that private land parcel.
- You may not attempt to take turkeys by participating in a cooperative drive.
- You may not shoot turkeys from a building or other permanent structure.
- You may not shoot turkeys roosting in trees.

# Deer and Turkey Management Zone Map

(Do not use this map for the deer lottery)



## Share Your Hunting and Trapping Photos with Us!

Help us highlight your successes and also those of youth and first-time hunters and trappers by submitting photographs to the CT DEEP Wildlife Division at *deep.ctwildlife@ct.gov* (high resolution photographs are best).The photos may be used (with written permission only and proper credit) in publications, Wildlife Highlights and Hunter Highlights E-newsletters, on the DEEP website, or on the CT Fish and Wildlife Facebook page (https://*www.Facebook.com/CTFishand-Wildlife*) and Instagram (*https://www.instagram.com/ctfishandwildlife*).

0748

# Deer Hunting
## Archery Deer Season

**Season Dates**
Jan. 1 - Jan. 31   **Private Land (Zones 11-12)**
Sept. 15 - Dec. 31   **Private Land (All zones)**
Sept. 15 - Nov. 14 *and* Dec. 20 - Dec. 30   **State Land**
Sept. 15 - Dec. 30   **State Land Bowhunting Only Areas**

**Bag Limits:** 2 either sex and 2 antlerless (4 total); additional bag of 1 either sex and 1 antlerless (2 total) during the Jan. 1-31 season on private lands in zones 11 and 12.

**Hunting Hours:** 1/2 hour before sunrise until sunset.

**License and Permits:** Small Game and Deer Archery Permit. Must show proof of completion of Connecticut's CE/FS bowhunting course (since 1982) or its equivalent from another state or country when purchasing a small game and deer archery permit. A previous Connecticut bowhunting permit purchased in 2002 or later also qualifies.

**Legal Bows:** For the purposes of hunting deer and turkey, legal bows include long, recurved, or compound bows with a minimum draw weight of 40 pounds and crossbows. Mechanical string release devices are permitted. Projectiles coated with any drug, poison or tranquilizing substance are prohibited.

**Crossbows:** The use of crossbows for hunting deer, turkey and all other species is permitted. Legal crossbows must have a minimum draw weight of 125 pounds and permanent fixed rifle type stock with a functional mechanical safety device. Adjustable crossbow stocks are permitted, but folding stocks are not. The bolt (arrow) length must be at least 18 inches, excluding the broadhead. Crossbows are considered loaded when fully drawn with a bolt in place. Telescopic sights are permitted.

**Arrowheads:** Legal arrowheads for hunting deer and turkey must have at least two blades and must be at least 7/8 inch wide at its widest point. Arrowheads that are designed to open on impact are legal provided they meet the above require-ment.

**Tagging and Reporting:** Immediately upon harvesting a deer, complete and sign a Harvest Tag and keep it with the carcass at all times. The Harvest Tag must remain with the deer until it is cut up for consumption. See requirements on page 44.

**Special Conditions**
- **Sunday Archery Deer Hunting:** Archery deer hunters (including landowners hunting with a bow during the Free Landowner Deer Season) can hunt on Sundays **on private land only** in **ALL** Deer Management Zones. All archery deer hunting on Sundays must take place at least 40 yards away from blazed hiking trails.
- **Possession of a Firearm:** Possession of a firearm while archery hunting is prohibited.
- **Minimum Acreage:** There is no minimum acreage requirement for bowhunting.

0749

- **Private Land Permission:** Signed written consent of the landowner on official forms for the current season must be carried while hunting.
- **State Land Hunting:** See tables on pages 48-58 for a listing of lands open to archery deer hunting. Certain state lands that do not allow firearms deer hunting are designated as bowhunting only areas. These lands are open to deer bowhunting during the state land shotgun and muzzleloader deer seasons (Nov. 15 - Dec. 19).
- **Fluorescent orange:** Bowhunters are required to wear 400 sq. in. of fluorescent orange from Nov. 15 - Dec. 30. Bowhunters may remove fluorescent orange clothing while in a tree stand at least 10 feet off the ground.
- **Decoys** may be used during the early and late archery deer seasons, but must be covered with 400 sq. in. of fluorescent orange during transport. Decoys cannot be used during the Nov. 15 - Dec. 30 time period.
- **Replacement Tags** are available for this permit type. See page 34 for details.
- **Notice:** Saturday, November 4 through Saturday, November 11, 2023 (excluding Sunday) are Junior Deer Hunter Training Days and junior hunters with firearms deer permits may be hunting with firearms. *Learn more at https://portal.ct.gov/DEEP-Junior-Hunting.*

## Private Land Shotgun/Rifle/Revolver Deer Hunting

**Season Dates:** Nov. 15 - Dec. 5

**Bag Limits: Statewide** (except Zones 2 and 4A): 1 either-sex and 1 antlerless; **Zones 2 and 4A:** 1 either sex ("Antlerless Only" tag NOT valid); **Zone 7:** 1 additional antlerless; **Zones 11 and 12:** 2 additional antlerless

**Hunting Hours:** 1/2 hour before sunrise until sunset.

**License and Permits:** Firearms hunting license and Private Land Shotgun/Rifle Deer permit. Note: Revolver Deer Endorsement is also required if using a revolver.

**Legal Firearms:** 12, 16, or 20 gauge breech loading shotgun loaded with single soft alloy projectile ammunition. Rifled or smoothbore barrels allowed. Centerfire rifle 6mm (.243 caliber) or larger or revolver .357 caliber or larger may be used if the landholding is 10 or more acres and the landowner has authorized use on the consent form. To use a revolver, you must also have Revolver Deer Endorsement for the current season. See muzzleloader section on page 13 for specific details. Telescopic sights and shotgun converters are permitted for muzzleloaders. No minimum acreage required for shotguns or muzzleloaders.

**Tagging and Reporting:** Immediately upon harvesting a deer, complete and sign a Harvest Tag and keep it with the carcass at all times. The Harvest Tag must remain with the deer until it is cut up for consumption. See requirements on page 44.

**Special Conditions**

- **Private Land Permission:** Signed written consent of the landowner on official forms for the current season must be carried while hunting (see page 18 for form).
- **Replacement Tags** are available for this permit type. See page 34 for details.
- **Junior Deer Hunter Training Days:** Saturday, November 4 through Saturday, November 11, 2023 (excluding Sunday) are Junior Deer Hunter

Training Days and junior hunters with firearms deer permits may be hunting with firearms. *Learn more at https://portal.ct.gov/DEEP-Junior-Hunting.*

## State Land No-Lottery Deer Hunting

**Season Dates:** Nov. 15 - Dec. 5

**Bag Limit:** 1 either sex

**Hunting Hours:** 1/2 hour before sunrise until sunset.

**License and Permits:** Firearms hunting license and a State Land No-Lottery Permit. You may buy only one type of State Land Shotgun Deer Permit. So, you should not purchase a State Land No-Lottery Permit if you plan on applying for a State Land Lottery Permit.

**Legal Firearms:** 12, 16, or 20 gauge breech loading shotgun loaded with single soft alloy projectile ammunition. Rifled or smoothbore barrels allowed. Shotgun must not be capable of holding more than 3 shells. See muzzleloader section on page 13 for specific details. Telescopic sights and shotgun converters are permitted for muzzleloaders.

**Tagging and Reporting:** Immediately upon harvesting a deer, complete and sign a Harvest Tag and keep it with the carcass at all times. The Harvest Tag must remain with the deer until it is cut up for consumption. See requirements on page 44.

**Special Conditions**

- **Open Areas:** See pages 48-58 for areas open to the No-Lottery Season.
- **Junior Deer Hunter Training Days:** Saturday, November 4 through Saturday, November 11, 2023 (excluding Sunday) are Junior Deer Hunter Training Days and junior hunters with firearms deer permits may be hunting with firearms. *Learn more at https://portal.ct.gov/DEEP-Junior-Hunting.*

## Free Landowner Deer Hunting

Available for persons owning 10 or more acres of land.

**Season Dates:** Nov. 1 - Dec. 30

**Bag Limit:** 2 deer; 1 either sex and 1 antlerless

**Hunting Hours:** 1/2 hour before sunrise until sunset.

**License and Permits:** Free Landowner Deer Permit. Appropriate hunting license required if landowner does not live on qualifying property. Note: Revolver Deer Endorsement is also required if using a revolver. For hunting with a bow or crossbow, landowners must have a certificate indicating successful completion of a Connecticut Conservation Education/Firearms Safety bowhunting course (or recognized equivalent).

**Legal Firearms:** 12, 16, or 20 gauge shotgun loaded with single soft alloy projectile ammunition. Rifled or smoothbore barrels allowed. Centerfire rifle 6mm (.243 caliber) or larger, revolver .357 caliber or larger, or muzzleloader (.45 caliber minimum). To use a revolver, you must also have Revolver Deer Endorsement for the current season.

**Legal Bows:** See page 13 for description of legal bows and arrows for deer hunting. Mechanical string release devices are permitted. Projectiles coated with

0751

any drug, poison, or tranquilizing substance are prohibited.

**Tagging and Reporting:** Immediately upon harvesting a deer, complete and sign a Harvest Tag and keep it with the carcass at all times. The Harvest Tag must remain with the deer until it is cut up for consumption. See requirements on page 44.

**Special Conditions**

Free Landowner Permits are available only to persons owning 10 or more contiguous acres of land. Additional permits are available for their spouses, lineal descendants, parents, grandparents, and siblings.

- **Fluorescent Orange:** Landowners hunting deer on their own land are not required to wear 400 square inches of fluorescent orange, but their spouses, lineal descendants, parents, grandparents, and siblings are required to do so.
- **Sunday Archery Deer Hunting:** Archery deer hunters (including landowners hunting with a bow during the Free Landowner Deer Season) can hunt on Sundays **on private land only** in **ALL** Deer Management Zones. All archery deer hunting on Sundays must take place at least 40 yards away from blazed hiking trails

## Private Land Deer Muzzleloader Hunting

**Season Dates:** Dec. 6 - Dec. 30

**Bag Limits: Statewide** (except Zones 2 and 4A): 1 either-sex and 1 antlerless; **Zones 2 and 4A:** 1 either sex ("Antlerless Only" tag not valid); **Zone 7:** 1 additional antlerless; **Zones 11 and 12:** 2 additional antlerless. (See zone map on page 26.)

**Hunting Hours:** 1/2 hour before sunrise until sunset.

**License and Permits:** Firearms hunting license and Private Land Muzzleloader Deer Permit.

**Legal Firearms:** See muzzleloader section on page 13 for specific details. Telescopic sights and shotgun converters are permitted for muzzleloaders. No minimum acreage required for muzzleloaders.

**Tagging and Reporting:** Immediately upon harvesting a deer, complete and sign a Harvest Tag and keep it with the carcass at all times. The Harvest Tag must remain with the deer until it is cut up for consumption. See requirements on page 44.

**Special Conditions**

- **Private Land Permission:** Signed written consent of the landowner on official forms for current season must be carried while hunting (see page 18).
- **Replacement Tags** are available for this permit type. See page 34 for details.

## State Land Deer Muzzleloader Hunting

**Season Dates:** Dec. 6 - Dec. 19

**Bag Limit:** 1 either sex

**Hunting Hours:** 1/2 hour before sunrise until sunset.

**License and Permits:** Firearms hunting license and State Land Muzzleloader Deer Permit.

0752

**Legal Firearms:** See muzzleloader section on page 13 for specific details. Telescopic sights and shotgun converters are permitted for muzzleloaders.

**Tagging and Reporting:** Immediately upon harvesting a deer, complete and sign a Harvest Tag and keep it with the carcass at all times. The Harvest Tag must remain with the deer until it is cut up for consumption. See requirements on page 44.

**State Land Hunting:** See pages 48-58 for a listing of state lands open to muzzleloader deer hunting.

## State Land Deer and Controlled Hunt Lottery

A lottery is conducted to award a limited number of permits for deer hunting on certain state lands and controlled hunt areas. To hunt these areas you must apply for a deer lottery permit.

**Season Dates:** Nov. 15 - Nov. 24   **Lottery "A" Season** (see page 33)

Nov. 15 - Dec. 5   **Lottery Regular Season** (see page 33)

**Bag Limits:** 1 either sex on state land areas; variable on controlled hunt areas.

**Hunting Hours:** ½ hour before sunrise to sunset.

**License and Permits:** Firearms hunting license and a state land lottery permit or a controlled hunt area lottery permit. Only one of these permit types may be bought each year. Lottery permits for state land and controlled hunt areas may be applied for starting **January 3, starting at 9:30 AM** on the Online Outdoor Licensing System (*https://portal.ct.gov/CTOutdoorLicenses*). Persons rejected for a lottery permit may obtain a state land no-lottery permit. However, you may buy only one type of state land shotgun deer permit. So, if you are selected for the deer lottery, you cannot purchase a state land no-lottery permit.

**Legal Firearms:** 12, 16, or 20 gauge breech loading shotgun loaded with single soft alloy projectile ammunition. Rifled or smoothbore barrels allowed. Shotgun must not be capable of holding more than 3 shells. See muzzleloader section on page 13 for specific details. Telescopic sights and shotgun converters are permitted for muzzleloaders.

**Tagging and Reporting:** Immediately upon harvesting a deer, complete and sign a Harvest Tag and keep it with the carcass at all times. The Harvest Tag must remain with the deer until it is cut up for consumption. See page 44 for requirements.

**Junior Deer Hunter Training Days:** Saturday, November 4 through Saturday, November 11, 2023 (excluding Sunday)

## Archery-only Deer Lottery

The Archery-only Lottery distributes a limited number of permits, providing access to new controlled hunt areas and allowing landowners to develop hunt programs that may consist of hunters attending a mandatory pre-hunt meeting and/or passing a background check. The archery-only lottery will not affect the hunter's ability to receive a firearms lottery permit nor will it impact the ability to bow hunt other state lands. In the future, when multiple archery-only lottery areas

are available, like the firearms lottery, bowhunters will only be allowed to receive one archery-only area permit.

Follow existing deer lottery application instructions for the archery-only controlled hunt lottery. The archery-only lottery will run through January 30 and no permits will be available to youth hunters 12 to 17 years old.

## 2023 Lottery Archery-only Area#

**Season Dates:** Sept. 15 – Dec. 30

| Area | Town(s) | Quota | Acres |
|---|---|---|---|
| Area 66  MDC Nepaug Reservoir, Sweetheart Mt. Block **^ | Canton* | 30 | 500 |

**#** *See footnotes under the 2023 Deer Lottery Regular Season Areas table on page 33.*

**Bag Limits:** 2 either-sex and 2 antlerless; hunters will use the archery deer permit tags.

**Hunting Hours:** ½ hour before sunrise to sunset.

**License and Permits:** Archery deer/small game License. Only one of this permit type may be received each year. Lottery permits for archery only controlled hunt areas may be applied for starting on **January 3, starting at 9:30 AM**. Persons rejected in the archery-only lottery may hunt any state or controlled hunt area that is open to bowhunting. The archery-only controlled hunt lottery is completely separate from the firearms deer lottery.

**Legal Bows:** See page 13 for a description of legal bows and arrows for deer hunting. Mechanical string release devices are permitted.

## Deer Lottery Instructions

**Starting January 3, 2023, at 9:30 AM,** lottery permit applications can be submitted online at *https://portal.ct.gov/DEEPOutdoorLicenses*.

ADULT licensed firearms hunters over the age of 17 can apply individually or as a group. The maximum number of hunters in a group is four. You may only apply as a group one time. Applicants may apply for up to six areas.

Upon submission of your application, you will know instantly whether you are successful. If successful, the permit for the area and season will automatically be added to your "shopping cart." If you apply as a group, the associated permit will also be added to each group member's "shopping cart." The permit may be purchased at the time of selection or at a later date. **Each group member is responsible for purchasing their own permit. All permits must be purchased by January 31.** If a permit is not purchased by that date, it will be **forfeited**.

YOUTH licensed firearms hunters (12 through 17 years old) can only apply individually. All youths will apply by means of a separate lottery program called Youth Lottery Permits. Applicants can apply and receive their area of choice, unless quotas are filled. Youth permits are purchased at the end of the transaction. We recommend that the adult hunter participate in the lottery first before purchasing

the Youth Lottery Permit. This will ensure that the youth and adult receive a permit for the same area.

All sales are final and DEEP is unable to switch hunting areas or refund fees.

**Reminder:** Select lottery permits not purchased by ***January 31*** will be made available on a first-come, first-serve basis starting March 15, at 9:30 AM. Unsold lottery permits can be purchased online or at select DEEP offices up until sold out. All unsold lottery permits must be purchased at the end of the transaction. Lottery questions? Email *andrew.labonte@ct.gov*.

## 2023 Deer Lottery "A" Season Area

**Season Dates:** Nov. 15 - Nov. 24

| Area | Town(s) | Quota | Acres |
|------|---------|-------|-------|
| Area 51  Yale-Myers Forest | Union* | 230 | 7,700 |

*No access during Junior Hunter Training Days. Harvest of coyotes and foxes prohibited. No deer driving during the shotgun deer lottery season.*

*Hunters selected for Area 51 will be required to attend one of the mandatory pre-hunt meetings held on September 13, 2023 (virtually on Zoom), or September 23, 2023, in person. If hunters cannot make a pre-hunt meeting, then please do not apply. Successful hunters will receive pre-hunt information by August 15. If notification is not received by this date, hunters must contact **andrew.labonte@ ct.gov**.*

## 2023 Deer Lottery Regular Season Areas

**Season Dates:** Nov. 15 - Dec. 5

SF = State Forest    WMA = Wildlife Management Area    SP = State Park

| Area | Town(s) | Quota | Acres |
|------|---------|-------|-------|
| Area 26  Trout Brook Valley SP | Easton | 15 | 330 |
| Area 28  Naugatuck SF Quillinan Reservoir Block | Ansonia | 25 | 511 |
| Area 52  Bristol Water Co. ^^ | Harwinton | 75 | 4,500 |
| Area 56  Centennial Watershed SF ^^ | Easton* | 170 | 3,450 |
| Area 58  MDC Nepaug Reservoir, Valentine/Pine Hill Block **^ | New Hartford* | 40 | 1,400 |
| Area 60  Tankerhoosen WMA | Vernon | 20 | 449 |
| Area 62  Aldo Leopold WMA | Southbury | 20 | 553 |
| Area 63  Mohawk SF, Ziegler/Johnson Tract | Cornwall* | 15 | 329 |
| Area 64  MDC Barkhamsted Reservoir, East Block **^ | Barkhamsted* | 40 | 4,282 |
| Area 67  MDC Barkhamsted Reservoir, West Block **^ | Barkhamsted* | 40 | 3,700 |
| Area 68  Bishop Swamp WMA | Andover* | 35 | 1,035 |

*\* and adjacent town or towns (footnotes continued next page)*

*\*\* Special Requirements: To apply for Areas 58, 64, 66, and 67, hunters must be at least 18 years of age. Hunters selected for the 4 MDC areas will be required to attend a mandatory pre-hunt meeting; pass a background check conducted by MDC; and sign a waiver of liability before receiving access for hunting. If a hunter cannot meet these requirements, please do not apply. Successful hunters will receive pre-hunt information by August 15. The pre-hunt meeting is scheduled for September 6, 2023, at Sessions Woods WMA in Burlington. If notification is not received by this date, hunters must contact **andrew.labonte@ct.gov**.*

*^ No access during Junior Hunter Training Days. Harvest of coyotes and foxes prohibited.*

*^^ No access during Junior Hunter Training Days, except for junior hunters and mentors who have both been awarded a permit for this area.*

# Additional Deer Hunting Information

**Definition of Antlerless Deer:** Some deer tags allow the harvest of antlerless deer only. An antlerless deer is defined as any deer which has no visible antlers. "Button bucks" are considered antlerless deer. Either-sex deer tags allow the harvest of antlered or antlerless deer.

**Replacement Tags:** In deer management zones 11 and 12, two types of supplemental tags are available: Replacement Antlerless Tags and Earn-a-buck Tags.

For a hunter to receive a replacement antlerless tag, they must go to one of several Vendor Replacement Tag Deer Check Stations. A current list of check stations is on the DEEP website at *https://portal.ct.gov/DEEP/Hunting/Deer-Check-Stations* or by calling the Wildlife Division at 860-424-3011. Hunters must complete the following:

- Report the deer harvest and obtain a confirmation number within 24 hours of harvest;
- Bring the antlerless deer carcass or head to a check station within 72 hours of harvest;
- Submit the deer harvest tag with a confirmation number to the vendor;
- Sign the replacement antlerless tag that is received from the vendor.

**"Earn-A-Buck" Tags:** If you register a total of 3 antlerless deer from private land during the same season, you may qualify for a replacement either-sex tag.

**Note:** Antlerless deer harvested in other zones may be brought to a check station for the purpose of receiving replacement tags; however, the replacement tags (both Antlerless and Earn-a-buck) may **ONLY be used in zones 11 or 12**. Replacement tags are available in zones 11 and 12 during the private land archery season, shotgun/rifle season, and muzzleloader season. Consult the Private Land Deer Management Zone Map for a description of zones (see page 26). All replacement tags will be issued in limited numbers based on a zone's deer population management goals.

### Deer Hunting Prohibited Activities

- Hunting with or allowing any dog in your charge to hunt, pursue, or kill deer.
- Hunting deer or any other wildlife while in or on a motor vehicle, snowmobile, or all-terrain vehicle (See Hunting Opportunities for Persons with Disabilities for special exemptions).
- Hunting deer by aid or use of a light.

- Taking or attempting to take any deer with the aid of real or artificial bait in Deer Management Zones 1 to 10, or on state land in Zones 11 and 12. (Any food, mineral, or chemical product designed to be eaten by deer is considered bait.)
- Use of a decoy during the shotgun/rifle and muzzleloader deer seasons.
- Taking of spotted fawns.
- All use of natural deer urine products is prohibited, particularly for the purposes of taking or attempting to take or attract deer, or for the surveillance or scouting of deer (see section below for more details).

**Baiting and Use of Attractants for Deer Hunting**
The following attractants may be used while hunting deer in Connecticut:
- Deer decoys during the early and late archery seasons only.
- Some types of scent attractants (i.e., tarsal glands, food smells, smoke pole) that provide no substance for deer to consume. **For the safety of Connecticut's deer herd, all use of natural deer urine products is prohibited. No person shall possess or use, for the purposes of taking or attempting to take or attract deer or for the surveillance or scouting of deer, any product bought or sold that is manufactured or refined that contains or purports to contain deer urine. Products labeled as "synthetic" may still be used. Products with vague descriptions about their contents are not recommended for use. Chronic wasting disease (CWD) can spread through exposure to infected deer urine.**
- All types of sound attractants (i.e., doe calls, buck calls, antler rattling, electronic calls).
- Hunting over planted fields where normal agricultural planting, harvesting, or post-harvest manipulation is used.

**I**n **addition to the attractants listed above, the following are allowed on PRIVATE LANDS ONLY while hunting deer in DEER MANAGEMENT ZONES 11 and 12.**
- Minerals or chemicals that may be safely consumed by deer (i.e., salt licks).
- Artificial or natural foods placed, scattered, distributed or deposited (i.e., hay, grains, fruit, nuts and other foods that may be safely consumed by deer).

**Note:** It is strongly recommended that individuals hunting on private lands in zones 11 and 12 consult with landowners prior to placing attractants on their property.

**Tree Stands on State Properties:** Avoid the construction or placement of permanent tree stands involving damage to any tree or shrub on state land. The use of portable tree stands (climber, ladder, or hang-on) is permissible. Hunters are encouraged to remove all tree stands from state properties at the conclusion of the hunting season. The use of a full-body safety harness when using a tree stand is strongly recommended.

0757

# Public and Permit-Required Hunting Areas

Access to Permit-Required Hunting Areas is regulated by agreement with private landowners, towns, state agencies, water companies, universities, non-profits, and cooperating sportsmen's clubs. Most Permit-Required Hunting Areas are open to the public from the third Saturday in October through the last day of February for small game and waterfowl hunting by special permit and are subject to certain restrictions. Hunting during any other period requires landowner permission unless specifically noted as open. Access to some DEEP-owned lands is also regulated through a permit system. Maps describing each Permit-Required Area are available on the DEEP website at *https://portal.ct.gov/DEEP/Hunting/Public-Hunting-Areas*. Permit-Required Hunting Areas are posted with yellow plastic signs designating the properties under agreement. A listing of Permit-Required Hunting Areas is on pages 48-58.

**Online Issuance of Daily Permits:** Daily permits can be obtained for free online on a first-come, first-serve basis at *https://portal.ct.gov/CTOutdoorLicenses*. Only one online permit can be obtained per selected hunting date.

**Firearms Restrictions**: Rifles of any caliber or shotgun ammunition larger or heavier than #2 shot and hunting with any pistol or revolver of any caliber are prohibited on permit-required hunting areas, except by landowners, lineal descendants, and regular employees. Waterfowlers hunting from a boat, blind, or stationary position may use up to and including BB size steel shot.

**Online permits Only.** Permits are available through the Online Outdoor Licensing System at *https://portal.ct.gov/CTOutdoorLicenses*.

## Western Connecticut

**Bristol Fish and Game Association** (1,397 acres; Harwinton, Plymouth) Open from the third Saturday in October until the Saturday after Thanksgiving Day for pheasant hunting ONLY.

**Centennial Watershed State Forest**, Garder Rd., Monroe Block (93 acres; Monroe) Permits for small game only through DEEP. Permits for archery deer hunting through Aquarion -- see page 53 for more details.

**Eversource Skiff Mountain Cooperative WMA** (732 acres; Sharon)

**Meriden Rod and Gun Club** (1,364 acres; Cheshire, Wallingford)

**Pequonnock Valley** (162 acres; Trumbull) Hunting on Mon., Wed., Fri., and Sat. only from Oct. 21, 2023, through the third Saturday in December.

**Sessions Woods WMA** (771 acres; Burlington) Waterfowl blind closed for repairs. Fall archery deer and turkey and spring and fall firearms turkey hunting allowed with a daily permit. Sessions Woods is open to junior hunters participating in the Spring Turkey Junior Hunter Training Days on April 15-22, excluding Sunday. Firearms hunting is permitted in the northern section only. Map is at *https://portal.ct.gov/DEEP/Hunting/Public-Hunting-Areas.*

0758

**Seymour Fish and Game Club** (91 acres; Oxford)

**Stanley Works Cooperative WMA** (1,464 acres; Kent, Cornwall)

**Suffield Sportsmen's Association** (240 acres; Suffield, East Granby)

**Trout Brook Valley** (300 acres; Easton)
Daily permits are issued for all hunting seasons except State Land Shotgun deer season. Prior to each season, call 860-424-3011 to obtain the combination code for the access gate. The area is open for wild turkey hunting during the Junior Hunter Training Days (April 15-22, excluding Sunday) and the regular spring turkey season (April 26-May 27). Hunter access to this area is by permit only, except during the shotgun deer season when a Deer Lottery Permit is required.

**Wallingford Town Owned Area** (823 acres; Wallingford)
Hunting on Mon., Wed., and Sat. only from Oct. 21, 2023, through Feb. 28, 2024, and Thanksgiving Day.

## Eastern Connecticut

**East Windsor-Enfield Area** (209 acres; East Windsor, Enfield)

**Hebron Area** (94 acres; Hebron)

**Lebanon Coop. Mgmt. Area** (212 acres; Lebanon, Colchester)
Goose Field Permits -- Goose field permittees may bring up to 2 guests. Permits will be issued after the corn fields are harvested.

**Lebanon Coop. Mgmt. Area Marsh Permits**
(Small game and waterfowl) Hunters with Marsh Permits should not be in the goose fields unless the goose season is closed.

**Norwich Fish and Game** (549 acres; Norwich)

**Sprague Town Land PR Area** (620 acres) -- Game bird, migratory bird, rabbit, and squirrel hunting only. Non-toxic shot must be used for all species. See hunting rules and regulations for the Town of Sprague at *https://portal.ct.gov/-/media/ DEEP/hunting_trapping/pdf_files/Sprague-hunting-rules-regulations-2022.pdf*.

**Yale-Meyers Forest** (7,700 acres; Eastford, Union, Ashford)
Area open for small game/waterfowl and wild turkey hunting by seasonal access permits. Parking passes are also required. **Permits are available on the Online Outdoor Licensing System starting December 1, 2022. However, Yale-Meyers Forest season permits will ONLY be issued until March 31, 2023, for the season. No permits will be issued after this time period.** Small game and turkey permits will be available through the Online Outdoor Licensing System. Yale University will contact hunters through the address email listed in their license profile to provide parking and access information. Night hunting and harvest of coyotes and foxes prohibited. Spring wild turkey hunting hours will be ½-hour before sunrise to 12:00 noon.

# Furbearer Trapping Seasons

Trapping licenses can be obtained 24/7 through Connecticut's Online Outdoor Licensing System or purchased at select outdoor equipment retailers and town halls that sell hunting and fishing licenses. Learn more at *https://portal.ct.gov/ DEEP/Hunting/Hunting-Licenses-and-Permits*.

| Species | Dates | Limits |
|---|---|---|
| River Otter* | Jan. 1 - March 15 *and* Nov. 5 - Dec. 31 | 8 |
| Beaver* | Jan. 1 - March 31 *and* Dec. 1 - Dec. 31 | No limit |
| Mink*, Muskrat, Weasel, Coyote*, Gray Fox*, Red Fox*, Raccoon, Opossum, and Skunk | Jan. 1 - March 15 *and* Nov. 5 - Dec. 31 | No limits |
| Fisher (Carcass collection mandatory) | Nov. 20 - Dec. 31 | 2 |

*ALL BEAVER, RIVER OTTER, RED FOX, GRAY FOX, WILD MINK, COYOTE, and FISHER PELTS must be properly tagged before they are sold, exchanged, given away, otherwise disposed of, or retained for personal use. These pelts must be tagged by the last scheduled tagging date of the season. Fur dealers are prohibited from buying or selling untagged pelts of these species. Foxes and coyotes taken by hunters, instead of being pelt tagged, should be reported online at *https://ct.aspirafocus.com/hunterreporting/Login.aspx* or by telephone (1-877-337-4868). If reported online or by telephone, pelts do not require pelt tags.

## 2023 Pelt Tagging Schedule

- Natchaug Forest Hdqtrs., Kingsbury Rd. Eastford -- **March 19**
- Southford Falls State Park, Rt. 188, Oxford -- **April 1**
- Franklin WMA, Rt. 32, North Franklin -- **April 2**
- Sessions Woods WMA, Rt. 69, Burlington -- **April 2**

Pelts will be tagged (at no cost) by DEEP representatives between **9:00 a.m. and 11:00 a.m.** at the locations and dates listed above. Pelts can be tagged at some DEEP field offices during weekdays by appointment. Call 860-424-3015 (Sessions Woods) or 860-418-5956 (Franklin) for weekday and other tagging options.

**Carcass Collections:** Trappers are required to submit fisher carcasses to the Wildlife Division for research purposes. The carcasses can be frozen and submitted prior to or during one of the listed pelt tagging dates. To make special arrangements for fisher carcass submission, call the Wildlife Division at 860-424-3011.

**Coyote Land Trapping:** From December 1 through January 31 there are special provisions for trapping coyotes on private land. Refer to padded metal trap restrictions for the requirements that must be met to trap coyotes on private land during this time period.

**Taxidermists:** Taxidermists can accept untagged animals or pelts, but are

0760

required to have them tagged by the next scheduled tagging date. Taxidermists must attach a paper tag to the animal or pelt listing the hunter or trapper's name, license number, town of harvest, and date of harvest.

**Pelts of Protected Species:** Any skin, pelt, or carcass of protected species, including bobcat and black bear, may not be sold, purchased, or possessed unless:

1. It was legally acquired AND,

2. In addition to any tag required by any other state or country, affixed with a separate tag bearing the following information: (a) Date acquired; (b) Name and address of the person from whom it was acquired; (c) Hunting or trapping license number under which it was harvested (if applicable); and (d) State and/or country from which it was acquired.

**State Land Trapping:** Permits for trapping on selected state-owned land can be purchased for $120.00 per unit. There are two units, one east and one west of the Connecticut River. **Permits are valid from November through March 31 (not for the calendar year).** The units include many of the state forests and wildlife management areas. Information on applying for permits, applicant requirements, and available properties can be obtained by contacting the Wildlife Division at 860-424-3011.

## Legal Traps and Methods

Furbearing animals for which there is an open trapping season may be taken by **Box Traps, Live Traps, Deadfalls, Padded and Unpadded Metal Traps, Smooth Wire Traps, and Species Specific Traps** subject to the following restrictions.

### Unpadded Metal Trap Restrictions

1. May only be used below the surface of the water in a pond, lake, stream, spring hole, or tidal water.

2. Opening greater than 5 3/4" is prohibited, except that traps with an opening of up to 7 1/2" may be set for beaver in waters frequented by beaver.

### Padded Metal Trap Restrictions

1. May only be used in the burrow of a wild animal or below the surface of the water in a pond, lake, stream, spring hole, or tidal water. Except that, any person who has completed a DEEP-approved coyote land trapping course (trapper must carry proof of course completion on their person) may use padded metal traps on or below ground from December 1 through January 31 for the taking of coyotes on private land parcels of at least 10 contiguous acres where the landowner has given written permission explicitly for the use of such traps. When trapping coyotes in this manner, no visible bait may be used, pan tension must be two pounds or greater, and traps must be securely anchored to the ground.

2. Opening greater than 5 15/16" is prohibited, except that traps with an opening of up to 7 1/2" may be set for beaver in waters frequented by beaver.

### Smooth Wire Trap Restrictions

1. May only be used below the surface of the water in a pond, lake, stream, spring hole, or tidal water. Except, smooth wire traps having an opening of 4

3/4" or less may extend above the surface of the water provided a portion of the trap frame remains in contact with the water.

2. Opening greater than 6 1/2" is prohibited, except that Conibears and similar smooth wire traps traps with an opening of up to 10" may be set for beaver in waters frequented by beaver.

**The following are prohibited:**

• The use of any type of snare.

• Traps placed, set, or tended within 10 feet of the waterline of a muskrat or beaver house.

• Traps with serrations or teeth.

**Trappers are required to:**

• Attach their name legibly to all traps.

• Tend all traps within a 24-hour period.

• Obtain, and have in possession, the written permission of the landowner when trapping on their land. WRITTEN PERMISSION MUST BE RENEWED ANNUALLY.

• Trappers have the option to use an official DEEP form to obtain written permission for trapping on private land (see page 41).

## Trap Definitions

**Padded Metal Trap:** A legal padded metal trap has all of the following features or characteristics:

1. Spring strength not exceeding 55 inch pounds with arms closed and 85 inch pounds with arms in the open position;

2. A gap between the arms of the trap in the closed position no less than 1/4 inch in width and no less than 4 inches in length;

3. Replaceable non-weather hardening, non-age hardening padding material not less than 3/32 inch thick covering the closing surfaces and securely affixed to the arms of the trap;

4. A chain no longer than 6 inches in length;

5. Swivels located at each end of the chain, and;

6. A shock absorbing spring incorporated into the anchoring chain.

**Species Specific Trap: A legal species specific trap has all of the following features or characteristics:**

1. Triggering and restraining mechanisms enclosed by a housing;

2. When set, triggering and restraining mechanism accessible only via a single opening;

3. An access opening measuring not greater than 2 inches in diameter or diagonally;

4. A triggering mechanism that can only be activated by a pulling force;

5. A swivel-mounted anchoring mechanism.

# Trapping on Private Land Consent Form

- All trappers are required to have landowner permission when trapping on private land.

- Written permission, signed and dated for the current season, must be carried on the person. The form below can be used to obtain permission.

- You may have a landowner sign a dated consent form before you purchase your trapping license, but you must purchase your license, before you trap.

- Landowners who allow, without fee, the recreational use of their property are protected from liability by Connecticut law (C.G.S. 52-557g).

- Trappers who have completed a DEEP-approved coyote land trapping course may use padded metal traps on or below the ground from December 1 through January 31 for the taking of coyotes on private land parcels of at least 10 contiguous acres where the landowner has given written permission explicitly for the use of such traps.

**Photocopies of this form may be used, but to be valid, must have original signatures and dates. Forms are also at *https://portal.ct.gov/DEEPHunting*.**

---

CONSENT TO TRAP ON PRIVATE LAND DURING THE PERIOD OF

_____

_____  Check if trapper is authorized to use padded metal traps for coyote land trapping.

State of Connecticut
DEEP—Wildlife Division

| Names of all landowners listed on deed | Last | First | M.I. |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

| Location of Property | Street | Town | No. of Acres |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

| Trapper's Information (please print) | Name | First | M.I. |
|---|---|---|---|
| | Address | | |
| | Town | State | Zip Code |
| | Conservation ID Number | | |

I know and understand the boundaries of the above listed properties, and that this form is valid only during the time period stated above for which it was signed by the landowner. I also understand that any person making a written false statement on this form shall be subject to arrest as provided for in Section 53A-157 of 1975 Rev. of C.G.S.

| Signature of Permittee | Date |
|---|---|

I hereby grant the person named above permission to trap on my property during the time period indicated. I have also indicated whether or not the trapper is authorized for coyote land trapping.

| Signature of Landowner | Date |
|---|---|

# Sunrise - Sunset for 2023

Eastern Standard Time approximate for Central Connecticut and
adjusted for Daylight Saving Time (**March 12 through Nov. 5**).
Source: NOAA Global Monitoring Laboratory  *https://gml.noaa.gov/grad/solcalc*
Location: Latitude 41.76323 Longitude -72.67873    Time Zone Offset: America/New_York -4.0

| Date | Jan AM | Jan PM | Feb AM | Feb PM | Mar AM | Mar PM | Apr AM | Apr PM | May AM | May PM | June AM | June PM | July AM | July PM | Aug AM | Aug PM | Sept AM | Sept PM | Oct AM | Oct PM | Nov AM | Nov PM | Dec AM | Dec PM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 7:18 | 4:31 | 7:03 | 5:06 | 6:26 | 5:41 | 6:34 | 7:16 | 5:47 | 7:49 | 5:19 | 8:19 | 5:20 | 8:29 | 5:45 | 8:09 | 6:16 | 7:24 | 6:47 | 6:33 | 7:23 | 5:45 | 6:58 | 4:21 |
| 2 | 7:18 | 4:31 | 7:02 | 5:07 | 6:24 | 5:42 | 6:32 | 7:17 | 5:46 | 7:50 | 5:18 | 8:20 | 5:20 | 8:29 | 5:46 | 8:08 | 6:17 | 7:23 | 6:48 | 6:31 | 7:24 | 5:44 | 6:59 | 4:21 |
| 3 | 7:18 | 4:32 | 7:01 | 5:08 | 6:23 | 5:43 | 6:31 | 7:18 | 5:45 | 7:51 | 5:18 | 8:20 | 5:21 | 8:29 | 5:47 | 8:07 | 6:18 | 7:21 | 6:49 | 6:29 | 7:25 | 5:43 | 7:00 | 4:20 |
| 4 | 7:18 | 4:33 | 7:00 | 5:10 | 6:21 | 5:44 | 6:29 | 7:19 | 5:44 | 7:52 | 5:17 | 8:21 | 5:21 | 8:29 | 5:48 | 8:05 | 6:19 | 7:19 | 6:51 | 6:28 | 7:26 | 5:42 | 7:01 | 4:20 |
| 5 | 7:18 | 4:34 | 6:59 | 5:11 | 6:19 | 5:46 | 6:27 | 7:20 | 5:42 | 7:53 | 5:17 | 8:22 | 5:22 | 8:28 | 5:49 | 8:04 | 6:20 | 7:18 | 6:52 | 6:26 | **6:27** | **4:40** | 7:02 | 4:20 |
| 6 | 7:18 | 4:35 | 6:58 | 5:12 | 6:18 | 5:47 | 6:26 | 7:21 | 5:41 | 7:54 | 5:17 | 8:22 | 5:22 | 8:28 | 5:50 | 8:03 | 6:21 | 7:16 | 6:53 | 6:24 | 6:29 | 4:39 | 7:03 | 4:20 |
| 7 | 7:18 | 4:36 | 6:57 | 5:13 | 6:16 | 5:48 | 6:24 | 7:23 | 5:40 | 7:55 | 5:16 | 8:23 | 5:23 | 8:28 | 5:51 | 8:02 | 6:22 | 7:14 | 6:54 | 6:23 | 6:30 | 4:38 | 7:04 | 4:20 |
| 8 | 7:18 | 4:37 | 6:55 | 5:15 | 6:15 | 5:49 | 6:22 | 7:24 | 5:39 | 7:56 | 5:16 | 8:24 | 5:24 | 8:27 | 5:52 | 8:00 | 6:24 | 7:13 | 6:55 | 6:21 | 6:31 | 4:37 | 7:05 | 4:20 |
| 9 | 7:18 | 4:38 | 6:54 | 5:16 | 6:13 | 5:50 | 6:21 | 7:25 | 5:38 | 7:57 | 5:16 | 8:24 | 5:24 | 8:27 | 5:53 | 7:59 | 6:25 | 7:11 | 6:56 | 6:19 | 6:32 | 4:36 | 7:06 | 4:20 |
| 10 | 7:17 | 4:39 | 6:53 | 5:17 | 6:11 | 5:51 | 6:19 | 7:26 | 5:36 | 7:58 | 5:16 | 8:25 | 5:25 | 8:27 | 5:54 | 7:58 | 6:26 | 7:09 | 6:57 | 6:18 | 6:34 | 4:35 | 7:07 | 4:20 |
| 11 | 7:17 | 4:40 | 6:52 | 5:19 | 6:10 | 5:52 | 6:17 | 7:27 | 5:35 | 8:00 | 5:16 | 8:25 | 5:26 | 8:26 | 5:55 | 7:56 | 6:27 | 7:07 | 6:58 | 6:16 | 6:35 | 4:34 | 7:08 | 4:20 |
| 12 | 7:17 | 4:41 | 6:50 | 5:20 | **7:08** | **6:54** | 6:16 | 7:28 | 5:34 | 8:01 | 5:15 | 8:26 | 5:27 | 8:26 | 5:56 | 7:55 | 6:28 | 7:06 | 6:59 | 6:14 | 6:36 | 4:33 | 7:09 | 4:20 |
| 13 | 7:16 | 4:43 | 6:49 | 5:21 | 7:06 | 6:55 | 6:14 | 7:29 | 5:33 | 8:02 | 5:15 | 8:26 | 5:27 | 8:25 | 5:57 | 7:54 | 6:29 | 7:04 | 7:00 | 6:13 | 6:37 | 4:32 | 7:09 | 4:20 |
| 14 | 7:16 | 4:44 | 6:48 | 5:22 | 7:05 | 6:56 | 6:13 | 7:30 | 5:32 | 8:03 | 5:15 | 8:27 | 5:28 | 8:25 | 5:58 | 7:52 | 6:30 | 7:02 | 7:02 | 6:11 | 6:39 | 4:31 | 7:10 | 4:20 |
| 15 | 7:16 | 4:45 | 6:47 | 5:24 | 7:03 | 6:57 | 6:11 | 7:31 | 5:31 | 8:04 | 5:15 | 8:27 | 5:29 | 8:24 | 5:59 | 7:51 | 6:31 | 7:00 | 7:03 | 6:10 | 6:40 | 4:30 | 7:11 | 4:21 |
| 16 | 7:15 | 4:46 | 6:45 | 5:25 | 7:01 | 6:58 | 6:09 | 7:32 | 5:30 | 8:05 | 5:15 | 8:28 | 5:30 | 8:23 | 6:00 | 7:49 | 6:32 | 6:59 | 7:04 | 6:08 | 6:41 | 4:29 | 7:11 | 4:21 |
| 17 | 7:15 | 4:47 | 6:44 | 5:26 | 6:59 | 6:59 | 6:08 | 7:34 | 5:29 | 8:06 | 5:15 | 8:28 | 5:31 | 8:23 | 6:01 | 7:48 | 6:33 | 6:57 | 7:05 | 6:07 | 6:42 | 4:29 | 7:12 | 4:21 |
| 18 | 7:14 | 4:48 | 6:42 | 5:27 | 6:58 | 7:00 | 6:06 | 7:35 | 5:28 | 8:07 | 5:16 | 8:28 | 5:31 | 8:22 | 6:02 | 7:47 | 6:34 | 6:55 | 7:06 | 6:05 | 6:43 | 4:28 | 7:13 | 4:22 |

| Day | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 19 | 4:22 | 7:13 | 4:27 | 6:45 | 6:03 | 7:07 | 6:54 | 6:35 | 7:45 | 6:03 | 8:21 | 5:32 | 8:29 | 5:16 | 8:08 | 5:27 | 7:36 | 6:05 | 7:02 | 6:56 | 5:29 | 6:41 | 7:14 | 4:50 |
| 20 | 4:23 | 7:14 | 4:26 | 6:46 | 6:02 | 7:08 | 6:52 | 6:36 | 7:44 | 6:04 | 8:20 | 5:33 | 8:29 | 5:16 | 8:09 | 5:26 | 7:37 | 6:03 | 7:03 | 6:54 | 5:30 | 6:40 | 7:13 | 4:51 |
| 21 | 4:23 | 7:14 | 4:26 | 6:47 | 6:00 | 7:10 | 6:50 | 6:37 | 7:42 | 6:05 | 8:20 | 5:34 | 8:29 | 5:16 | 8:10 | 5:26 | 7:38 | 6:02 | 7:04 | 6:53 | 5:31 | 6:38 | 7:12 | 4:52 |
| 22 | 4:23 | 7:15 | 4:25 | 6:48 | 5:59 | 7:11 | 6:48 | 6:38 | 7:40 | 6:06 | 8:19 | 5:35 | 8:29 | 5:16 | 8:10 | 5:25 | 7:39 | 6:00 | 7:05 | 6:51 | 5:32 | 6:37 | 7:12 | 4:53 |
| 23 | 4:24 | 7:15 | 4:24 | 6:49 | 5:58 | 7:12 | 6:47 | 6:39 | 7:39 | 6:07 | 8:18 | 5:36 | 8:29 | 5:17 | 8:11 | 5:24 | 7:40 | 5:59 | 7:06 | 6:49 | 5:34 | 6:35 | 7:11 | 4:54 |
| 24 | 4:25 | 7:16 | 4:24 | 6:50 | 5:56 | 7:13 | 6:45 | 6:40 | 7:37 | 6:08 | 8:17 | 5:37 | 8:30 | 5:17 | 8:12 | 5:23 | 7:41 | 5:57 | 7:07 | 6:48 | 5:35 | 6:34 | 7:10 | 4:56 |
| 25 | 4:25 | 7:16 | 4:23 | 6:52 | 5:55 | 7:14 | 6:43 | 6:41 | 7:36 | 6:09 | 8:16 | 5:38 | 8:30 | 5:17 | 8:13 | 5:23 | 7:42 | 5:56 | 7:08 | 6:46 | 5:36 | 6:32 | 7:09 | 4:57 |
| 26 | 4:26 | 7:17 | 4:23 | 6:53 | 5:53 | 7:15 | 6:41 | 6:42 | 7:34 | 6:10 | 8:15 | 5:39 | 8:30 | 5:17 | 8:14 | 5:22 | 7:43 | 5:54 | 7:09 | 6:44 | 5:37 | 6:31 | 7:09 | 4:58 |
| 27 | 4:27 | 7:17 | 4:22 | 6:54 | 5:52 | 7:17 | 6:40 | 6:43 | 7:33 | 6:11 | 8:14 | 5:40 | 8:30 | 5:18 | 8:15 | 5:21 | 7:44 | 5:53 | 7:10 | 6:42 | 5:38 | 6:29 | 7:08 | 5:00 |
| 28 | 4:27 | 7:17 | 4:22 | 6:55 | 5:51 | 7:18 | 6:38 | 6:44 | 7:31 | 6:12 | 8:13 | 5:41 | 8:30 | 5:18 | 8:16 | 5:20 | 7:46 | 5:52 | 7:12 | 6:41 | 5:40 | 6:27 | 7:07 | 5:01 |
| 29 | 4:28 | 7:17 | 4:21 | 6:56 | 5:49 | 7:19 | 6:36 | 6:45 | 7:29 | 6:13 | 8:12 | 5:42 | 8:30 | 5:19 | 8:17 | 5:20 | 7:47 | 5:50 | 7:13 | 6:39 | | | 7:06 | 5:02 |
| 30 | 4:29 | 7:18 | | 6:57 | 5:48 | 7:20 | 6:34 | 6:46 | 7:28 | 6:14 | 8:11 | 5:43 | 8:29 | 5:19 | 8:17 | 5:19 | 7:48 | 5:49 | 7:14 | 6:37 | | | 7:05 | 5:03 |
| 31 | 4:30 | 7:18 | | | 5:47 | 7:21 | | | 7:26 | 6:15 | 8:10 | 5:44 | | | 8:18 | | | | 7:15 | 6:36 | | | 7:04 | 5:05 |

0765

# Tagging and Reporting Instructions

Immediately upon making your harvest, complete a Deer/Turkey Harvest Tag. The Harvest Tag must be kept with your deer or turkey until it is processed for consumption. While transporting your harvest, you may keep the Harvest Tag in your pocket or wallet. However, if you leave the carcass, the completed Harvest Tag must remain with the animal.

Harvested deer and turkeys must be reported within 24 hours via the internet at *https://portal.ct.gov/DEEP-Report-Deer-Turkey-Harvest* or by telephone at the toll-free number, 1-877-337-4868 (1-877-DEP-HUNT).

To report your deer or turkey, you will need to know the 3-digit number code of the town in which the animal was harvested. The accompanying table lists Connecticut's 169 towns and their identifying numbers. If you harvested your deer or turkey on state land, you will also need to know the 3-digit number code of the public hunting area. The hunting area tables on pages 48-58 list the 3-digit number codes of Connecticut's public hunting areas.

---

## 2023     Connecticut Department of Energy & Environmental Protection     2023
### DEER/TURKEY HARVEST TAG

Conservation ID#: _____

Name: _____

Date of Kill: ___ / ___ / ___   Time: _____

Town of Kill: _____

**PERMIT / SEASON** (check the appropriate boxes)
Antlerless Tags cannot be used in Zones 2 and 4A during the Private Land Shotgun/Rifle/Revolver and Muzzleloader seasons.

**DEER**          ❏ Antlerless          ❏ Either Sex
❏ Private – Shotgun/Rifle/Revolver   ❏ State – Lottery
❏ Private – Muzzleloader             ❏ State – No Lottery
❏ Archery (Bow)                      ❏ State – Muzzleloader
❏ Landowner                          ❏ Archery-only Lottery

**SPRING TURKEY** – Bearded birds only
❏ Private Land       ❏ State Land       ❏ Landowner

**FALL TURKEY**
❏ Private – Firearms        ❏ Landowner – Firearms
❏ State – Firearms          ❏ Landowner – Archery (Bow)
❏ Archery (Bow)

Signature: _____

Harvested deer and turkeys must be reported within 24 hours via the internet at *https://portal.ct.gov/DEEP-Report-Deer-Turkey-Harvest* or by calling 1-877-337-4868. After reporting, you must write your report Confirmation Number below.

Confirmation #: _____

---

0766

# Harvest Report Information

Before reporting your harvest, use this checklist to make sure you have all of the information you need to accurately make your report.

| | |
|---|---|
| Number of Hours Hunted | _____ (# of hours) |
| Number of Deer Observed | ___ Fawns ___ Does ___ Bucks |
| Conservation ID#: | ____ ____ ____ ____ ____ ____<br>(5 or 6 digits on license) |
| 4-Digit Year of Your Birth: | ____ ____ ____ ____ (e.g. 1960) |
| Permit Type/Season: | _____<br>(e.g. Archery Deer, Spring Turkey, etc.) |
| 2-Digit Month of Harvest: | ____ ____ (01 to 12) |
| 2-Digit Day of Harvest: | ____ ____ (01 to 31) |
| 3-Digit Town Code: | ____ ____ ____ (see Town Code table on pages 46-47) |
| 3-Digit Public Hunting Area Code: | ____ ____ ____ if applicable<br>(see Hunting Area tables on pages 48-58) |
| Land Type: (private or state) | _____ |
| Tag Type: | _____<br>(e.g. Antlerless, Either Sex, etc.) |
| Type of Hunting Implement: | _____<br>(e.g. Rifle, Shotgun, Bow, etc.) |
| Age/Sex Description: | See Deer and Turkey Age/Sex Descriptions at *https://portal.ct.gov/DEEP-Report-Deer-Turkey-Harvest* for assistance. |
| Number of Points: | ____ ____ (00 to 24) if applicable |

## Town 3-digit Number Codes for Reporting Harvests

| No. | Town | No. | Town | No. | Town |
|---|---|---|---|---|---|
| 001 | Andover | 044 | East Haven | 087 | Morris |
| 002 | Ansonia | 045 | East Lyme | 088 | Naugatuck |
| 003 | Ashford | 046 | Easton | 089 | New Britain |
| 004 | Avon | 047 | East Windsor | 090 | New Canaan |
| 005 | Barkhamsted | 048 | Ellington | 091 | New Fairfield |
| 006 | Beacon Falls | 049 | Enfield | 092 | New Hartford |
| 007 | Berlin | 050 | Essex | 093 | New Haven |
| 008 | Bethany | 051 | Fairfield | 094 | Newington |
| 009 | Bethel | 052 | Farmington | 095 | New London |
| 010 | Bethlehem | 053 | Franklin | 096 | New Milford |
| 011 | Bloomfield | 054 | Glastonbury | 097 | Newtown |
| 012 | Bolton | 055 | Goshen | 098 | Norfolk |
| 013 | Bozrah | 056 | Granby | 099 | North Branford |
| 014 | Branford | 057 | Greenwich | 100 | North Canaan |
| 015 | Bridgeport | 058 | Griswold | 101 | North Haven |
| 016 | Bridgewater | 059 | Groton | 102 | North Stonington |
| 017 | Bristol | 060 | Guilford | 103 | Norwalk |
| 018 | Brookfield | 061 | Haddam | 104 | Norwich |
| 019 | Brooklyn | 062 | Hamden | 105 | Old Lyme |
| 020 | Burlington | 063 | Hampton | 106 | Old Saybrook |
| 021 | Canaan | 064 | Hartford | 107 | Orange |
| 022 | Canterbury | 065 | Hartland | 108 | Oxford |
| 023 | Canton | 066 | Harwinton | 109 | Plainfield |
| 024 | Chaplin | 067 | Hebron | 110 | Plainville |
| 025 | Cheshire | 068 | Kent | 111 | Plymouth |
| 026 | Chester | 069 | Killingly | 112 | Pomfret |
| 027 | Clinton | 070 | Killingworth | 113 | Portland |
| 028 | Colchester | 071 | Lebanon | 114 | Preston |
| 029 | Colebrook | 072 | Ledyard | 115 | Prospect |
| 030 | Columbia | 073 | Lisbon | 116 | Putnam |
| 031 | Cornwall | 074 | Litchfield | 117 | Redding |
| 032 | Coventry | 075 | Lyme | 118 | Ridgefield |
| 033 | Cromwell | 076 | Madison | 119 | Rocky Hill |
| 034 | Danbury | 077 | Manchester | 120 | Roxbury |
| 035 | Darien | 078 | Mansfield | 121 | Salem |
| 036 | Deep River | 079 | Marlborough | 122 | Salisbury |
| 037 | Derby | 080 | Meriden | 123 | Scotland |
| 038 | Durham | 081 | Middlebury | 124 | Seymour |
| 039 | Eastford | 082 | Middlefield | 125 | Sharon |
| 040 | East Granby | 083 | Middletown | 126 | Shelton |
| 041 | East Haddam | 084 | Milford | 127 | Sherman |
| 042 | East Hampton | 085 | Monroe | 128 | Simsbury |
| 043 | East Hartford | 086 | Montville | 129 | Somers |

## Town 3-digit Number Codes for Reporting Harvests

| No. | Town | No. | Town | No. | Town |
|-----|------|-----|------|-----|------|
| 130 | Southbury | 144 | Trumbull | 158 | Westport |
| 131 | Southington | 145 | Union | 159 | Wethersfield |
| 132 | South Windsor | 146 | Vernon | 160 | Willington |
| 133 | Sprague | 147 | Voluntown | 161 | Wilton |
| 134 | Stafford | 148 | Wallingford | 162 | Winchester |
| 135 | Stamford | 149 | Warren | 163 | Windham |
| 136 | Sterling | 150 | Washington | 164 | Windsor |
| 137 | Stonington | 151 | Waterbury | 165 | Windsor Locks |
| 138 | Stratford | 152 | Waterford | 166 | Wolcott |
| 139 | Suffield | 153 | Watertown | 167 | Woodbridge |
| 140 | Thomaston | 154 | Westbrook | 168 | Woodbury |
| 141 | Thompson | 155 | West Hartford | 169 | Woodstock |
| 142 | Tolland | 156 | West Haven | | |
| 143 | Torrington | 157 | Weston | | |

# What to Do When Approached by an Environmental Conservation Police Officer

Each year, Connecticut Environmental Conservation (EnCon) Police Officers check thousands of hunters, anglers, boaters, and visitors at our state parks, wildlife management areas, and forests. A compliance check by an EnCon Police Officer is an opportunity for outdoor enthusiasts to have positive interactions with officers while enjoying all the outdoor recreation opportunities Connecticut has to offer. EnCon Police Officers can help explain laws and also provide information about outdoor opportunities and conditions in your area.

EnCon Police Officers are concerned with enforcement of Connecticut laws and regulations that are intended to keep people safe, protect personal property, and conserve the State's natural resources. There are a few actions you can take to ensure your experience with an EnCon Officer is positive for both you and the officer.

The way hunters should handle their firearms when approached by a law enforcement officer differs from how they should handle them for safety purposes in other circumstances.

**When Hunting:**

EnCon Officers are concerned with firearms safety and compliance with hunting regulations when checking hunters. When approached by an officer, you are expected to follow all basic firearms handling rules.

• Control the muzzle - keep the firearm pointed in a safe direction.

• Do not attempt to load or unload your firearm while being approached by an EnCon Officer.

• Comply with all instructions directed to you by the EnCon Officer.

Connecticut's EnCon Police Officers want each interaction with an outdoor enthusiast to be a pleasant experience. Please be polite and courteous. By promptly complying with all requests as directed by the officer, you can help ensure a safe, pleasant, and productive experience. Take advantage of the opportunity to ask the officer questions. EnCon Officers are an excellent source of information about Connecticut laws and regulations, and the surrounding area. They can assist in making your outdoor experience in Connecticut more enjoyable.

0769

# Public Hunting Areas (An easier to read version is at:

*https://portal.ct.gov/-/media/DEEP/hunting_trapping/pdf_files/2023HuntingAreaList.pdf*

The following areas are open to public hunting. The key to the left specifies what type of hunting is permitted. Special stamps and permits are needed when hunting some species. Consult season descriptions for the species you are hunting. Consult page 12 for firearms restrictions. Some portions of these properties may be closed to hunting. Obey all postings. Maps for many of these areas are available on the DEEP website at *https://portal.ct.gov/DEEP-Public-Hunting-Areas*. It is recommended that you check the Public Hunting Area Map on the DEEP website for the most current hunting area information as changes or updates may occur after this guide is printed.

**Access:** Public hunting areas marked by an asterisk (*) have notes at the end of this section.

### Western Connecticut - Fairfield, Hartford, Litchfield, and New Haven Counties

- • Hunting Permitted
- ❖ Archery ONLY
- ✱ Special Conditions Apply
- ▲/• or ❖/• Some Sections Open to Archery ONLY (see maps online)
- (▲ and ❖ areas are open for archery deer hunting from September 15 to December 30, unless noted otherwise.)
- ▲ Archery Deer/Turkey Hunting
- F Fall Firearms Turkey Hunting ONLY
- ○ Daily/Season Permit Required (see page 36)

| Small Game | Waterfowl | Pheasants | Fall Deer/Turkey | Spring and Fall Firearms Turkey | Muzzleloader Deer | Deer Lottery Area | No-lottery Shotgun Deer | WILDLIFE MANAGEMENT AREAS, STATE FORESTS, & STATE PARKS | CODE | TOWN(S) | ACRES |
|---|---|---|---|---|---|---|---|---|---|---|---|
| • | • | • | • | • | • | 62 | | Aldo Leopold WMA | 308 | Southbury | 553 |
| • | • | • | • | • | • | | • | Algonquin State Forest | 201 | Colebrook | 1,198 |
| • | • | • | • | • | • | | • | American Legion State Forest | 202 | Barkhamsted | 1,303 |
| | | | ▲ | | | | | Barber Pond WMA | 203 | Bloomfield, Windsor | 70 |
| | • | | ▲ | | | | | Bennett's Pond State Park | 309 | Ridgefield | 460 |
| • | • | | ▲/• | • | • | | • | Camp Columbia State Forest | 207 | Morris | 600 |
| • | • | | ▲ | • | | | | Cedar Swamp WMA | 208 | New Hartford, Torrington | 268 |
| | | | •* | | | 56 | | Centennial Watershed State Forest* (Archery deer hunting allowed by permit when the shotgun deer lottery season is closed.) | 310 | Easton, Weston | 3,479 |
| • | • | | • | • | • | | • | Centennial Watershed State Forest (Wangum Lake Block) | 209 | Canaan | 164 |
| | • | | • | • | | | | Charles E. Wheeler WMA | 312 | Stratford, Milford, Orange | 750 |

0770

| No. | Site | Town | | | | | | | | | | | Acres |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 313 | Collis P. Huntington State Park* (Open to archery deer hunting ONLY) | Bethel, Newtown, Redding | | | | | | | | | | • | 1,040 |
| 314 | East River Marsh WMA | Guilford | | | ▲ | | | | • | | | • | 249 |
| 315 | East Swamp WMA | Bethel | | | | | ▲ | | • | | • | • | 76 |
| 211 | East Twin Lakes Water Access Area | Salisbury | | • | | | ▲ | | | | • | • | 99 |
| 332 | Enders State Forest (Morthen Parcel ONLY) | Granby | | | | | ▲ | | • | | • | • | 352 |
| 316 | George C. Waldo State Park | Southbury | | | | | ▲ | | | | | • | 149 |
| 213 | Goshen WMA | Goshen | • | | • | | | | • | • | • | • | 1,084 |
| 317 | Great Harbor WMA | Guilford | • | | | | | | • | • | | • | 176 |
| 215 | Housatonic River WMA | Kent | | | ▲ | | • | • | • | | • | • | 490 |
| 216 | Housatonic State Forest | Sharon, etc. | • | | • | | • | • | • | | • | • | 11,284 |
| 217 | John A. Minetto State Park ♿ | Torrington | | | ▲ | | • | | • | | • | • | 576 |
| 219 | Mattatuck State Forest | Watertown | • | | • | | • | | • | | • | • | 4,491 |
| 341 | Mohawk State Forest – Clark Pond Tract | Cornwall | ❖ | | ▲ | | • | | | | | • | 120 |
| 342 | Mohawk State Forest – Ziegler/Johnson Tract | Goshen | • | | • | 63 | • | | • | | • | • | 302 |
| 222 | Mount Riga State Park | Salisbury | | | ▲ | | | | • | | • | • | 301 |
| 223 | Nassahegon State Forest | Burlington | • | | • | | • | | • | | • | • | 1,140 |
| 319 | Naugatuck State Forest | Oxford, Beacon Falls, etc. | • | • | • | | • | | • | | • | • | 4,175 |
| 320 | Naugatuck State Forest (Great Hill Block) | Seymour | • | | ▲ | | • | | • | | • | • | 238 |
| 321 | Naugatuck State Forest*(Quillinan Reservoir Block) | Ansonia, Seymour | • | | ▲/• | 28 | • | • | • | | • | • | 581 |
| 224 | Nepaug State Forest | New Hartford | • | | | | • | • | • | | • | • | 1,364 |
| 225 | Newgate WMA | East Granby | • | | ▲ | | • | • | • | | • | • | 425 |
| 226 | Nod Brook WMA and Field Trial Area (Closed during field trials) | Avon, Simsbury | • | | | | | | • | | • | • | 125 |
| 229 | Paugnut State Forest | Torrington | • | | | | • | | • | | • | • | 1,960 |
| 322 | Paugussett State Forest (see map online) | Newtown | • | | ▲/• | | • | • | • | | • | • | 2,102 |
| 230 | Peoples State Forest | Barkhamsted | • | | • | | • | | • | | • | • | 3,108 |

0771

## Western Connecticut - Fairfield, Hartford, Litchfield, and New Haven Counties

- Hunting Permitted
▲ Archery Deer/Turkey Hunting
❖ Archery ONLY
F Fall Firearms Turkey Hunting ONLY
✱ Special Conditions Apply
○ Daily/Season Permit Required (see page 36)
▲/● or ❖/● Some Sections Open to Archery ONLY (see maps online)
(▲ and ❖ areas are open for archery deer hunting from September 15 to December 30, unless noted otherwise.)

### WILDLIFE MANAGEMENT AREAS, STATE FORESTS, & STATE PARKS

| | Small Game | Waterfowl | Pheasants | Fall Deer/Turkey | Spring and Fall Firearms Turkey | Muzzleloader Deer | Deer Lottery Area | No-lottery Shotgun Deer | CODE | TOWN(S) | ACRES |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Pootatuck State Forest | ● | ● | | ▲ | ● | ● | | ● | 324 | New Fairfield | 1,032 |
| Quinnipiac River Marsh WMA | | ● | | | | | | | 325 | North Haven | 655 |
| Quinnipiac River State Park | ● | ● | | ▲ | | | | | 326 | North Haven | 346 |
| Robbins Swamp WMA | ● | ● | ● | ● | ● | ● | | ● | 231 | Canaan | 1,638 |
| Roraback WMA | ● | ● | | ● | ● | ● | | ● | 232 | Harwinton | 2,100 |
| Simsbury WMA | ● | ● | | ▲ | ● | | | | 234 | Simsbury | 373 |
| Suffield WMA | ● | | ● | ▲ | ● | | | | 236 | Suffield | 265 |
| Sunnybrook State Park (west of Newfield Rd.) | ● | ● | ● | ▲ | ● | ● | | | 237 | Torrington | 447 |
| Topsmead State Forest (north and west of Rte. 118) | ● | ● | | ● | ● | ● | | ● | 239 | Litchfield | 193 |
| Tunxis State Forest | ● | ● | | ● | ● | ● | | ● | 240 | Hartland, etc. | 10,242 |
| Wooster Mountain State Park | ● | ● | | ▲ | F | ● | | ● | 328 | Danbury | 444 |
| Wyantenock State Forest | ● | ● | | ● | ● | ● | | ● | 243 | Cornwall, etc. | 4,118 |

### STATE-LEASED, FLOOD CONTROL, AND OTHER PUBLIC ACCESS AREAS

| | Small Game | Waterfowl | Pheasants | Fall Deer/Turkey | Spring and Fall Firearms Turkey | Muzzleloader Deer | Deer Lottery Area | No-lottery Shotgun Deer | CODE | TOWN(S) | ACRES |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Black Rock Lake (Army Corps)* Closed March 30-3rd Sat. Oct. | ✱ | ✱ | | ▲ | F* | | | | 204 | Thomaston, Watertown | 400 |
| Bloomfield Flood Control Area (Site 1) | ● | ● | ● | ▲ | ● | | | | 205 | Bloomfield | 285 |
| Bristol Water Company | | | | | | | 52 | | 329 | Bristol | 4,319 |
| Eversource Kings Island WMA | | ● | | | | | | | 262 | Enfield, Suffield | 174 |
| Eversource Newgate Cooperative WMA (borders Newgate WMA) | ● | ● | | ▲ | F | | | | 210 | East Granby | 207 |

0772

| Indicators | # | Area | CODE | TOWN(s) | ACRES |
|---|---|---|---|---|---|
| ❖/● ● | | Great Swamp Flood Control Area* (see map online) | 318 | Ridgefield | 383 |
| ✳ ● ● | | Hancock Brook Lake (Army Corps)* | 214 | Plymouth | 593 |
| ● ● ▲ ● | | Mad River Dam Flood Control Area | 218 | Winchester | 463 |
| ▲ | 64 | MDC Barkhamsted Reservoir – East Block | 343 | Barkhamsted, Hartland | 4,282 |
| ● ▲ | 67 | MDC Barkhamsted Reservoir – West Block | 346 | Barkhamsted, Hartland | 3,700 |
| ● ● ● ● | | MDC – Colebrook Reservoir/Hogback Dam | 220 | Colebrook, Hartland, etc. | 4,516 |
| ● ● ▲ | | MDC – Greenwoods Pond | 221 | New Hartford | 368 |
| ▲ | 58 | MDC Nepaug Reservoir - Valentine/Pine Hill Block | 330 | New Hartford | 1,488 |
| ● | | MDC – Lake McDonough* (archery hunting **only** during the archery season) | 349 | New Hartford, Barkhamsted | 780 |
| ▲ | 66 | MDC Nepaug Reservoir - Sweetheart Mt. Block - ❖ | 345 | Canton | 500 |
| ▲ | | Northfield Brook Lake (Army Corps) | 227 | Thomaston | 201 |
| ● ▲ ● | | Sucker Brook Flood Control Area | 235 | Winchester | 152 |
| ● ▲ F* ● | | Thomaston Dam (Army Corps)* | 238 | Thomaston, Harwinton, etc. | 850 |
| ● ▲ ● | | Whiting River Flood Control Area | 241 | North Canaan | 45 |
| ● ▲ ● | | Wood Creek Flood Control Area | 242 | Norfolk | 107 |

## PERMIT-REQUIRED AREAS (DAILY PERMIT REQUIRED)

| Indicators | Area | CODE | TOWN(s) | ACRES |
|---|---|---|---|---|
| ○ ○ | Bloomfield Flood Control Area (Site 2)* - Town Permit | 206 | Bloomfield | 365 |
| ○ ○ | Bristol Fish and Game - 3rd Sat. in Oct.–Sat. after Thanksgiving | 4 | Harwinton, Plymouth | 1,397 |
| ○ ○ ● ✳ | Eversource Skiff Mountain Cooperative WMA* | 228 | Sharon | 732 |
| ○* ○ | Centennial Watershed State Forest* (Permit required from Aquarion. Only open for archery DEER season, without an interruption during the shotgun lottery hunting season.) | 310 | Easton, Weston, etc. | 4,470 |
| ○* ○ | Centennial Watershed State Forest - Monroe Parcel (Garder Rd.)* Obtain daily permit from DEEP for small game hunting. | 311 | Monroe | 93 |
| ○ ○ | Meriden Rod and Gun Club* | 14 | Meriden, Cheshire | 1,364 |

0773

## Western Connecticut - Fairfield, Hartford, Litchfield, and New Haven Counties

- ● Hunting Permitted
- ❖ Archery ONLY
- ✳ Special Conditions Apply
- ▲ Archery Deer/Turkey Hunting
- F Fall Firearms Turkey Hunting ONLY
- ○ Daily/Season Permit Required (see page 36)
- ▲/● or ✳/● Some Sections Open to Archery ONLY (see maps online)

(▲ and ❖ areas are open for archery deer hunting from September 15 to December 30, unless noted otherwise.)

### PERMIT-REQUIRED AREAS (DAILY PERMIT REQUIRED)

| Small Game | Waterfowl | Pheasants | Fall Deer/Turkey | Spring and Fall Firearms Turkey | Muzzleloader Deer | Deer Lottery Area | No-lottery Shotgun Deer | Area | CODE | TOWN(S) | ACRES |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ○ | ○ | | | | | | | Pequonnock Valley WMA - Only open M/W/F/Sat. from 3rd Sat. in Oct.–Sat. before Christmas | 323 | Trumbull | 162 |
| | | | ○ | ○ | | | | Sessions Woods WMA - No waterfowl blind | 233 | Burlington | 771 |
| ○ | ○ | ○ | ○ | | | | | Seymour Fish & Game Club* | 19 | Oxford | 91 |
| | | | ○ | | | | | South Central CT Regional Water Authority)* Archery deer hunting ONLY | See page 53. | | 4,327 |
| ○ | ○ | | | | | | | Stanley Works Coop WMA* | 27 | Kent, Cornwall | 1,464 |
| ○ | ○ | | ❖ | | | | | Stewart B. McKinney NWR – Calf Island Unit* (also open to waterfowl hunting) | 350 | Greenwich | 26 |
| ○ | ○ | | ❖ | | | | | Stewart B. McKinney NWR – Great Meadows Marsh* (also open to waterfowl hunting) | 350 | Stratford | 165 |
| | ○ | | ❖ | | | | | Stewart B. McKinney NWR – Chimon/Sheffield Islands* (also open to waterfowl hunting) | 350 | Norwalk | 119 |
| | | | ❖ | | | | | Stewart B. McKinney NWR – Salt Meadow Unit* | 350 | Westbrook | 150 |
| ○ | ○ | ○ | | | | | | Suffield Sportsmen's Assoc.* | 22 | Suffield, East Granby | 240 |
| | | | ○ | ○ | ○ | 26 | | Trout Brook Valley State Park – Call 860-424-3011 for gate combo. | 327 | Easton | 300 |
| ○ | ○ | ○ | | | | | | Wallingford Town Owned Area* (Only open M/W/Sat.) | 24 | Wallingford | 823 |

0774

## Notes for Western Connecticut Hunting Area Table

**Black Rock Lake, Hancock Brook Lake, and Thomaston Dam:** Portions of area open to hunting through cooperation of the Army Corps of Engineers. Firearms hunting limited to shotgun ammunition only. Firearms hunting prohibited between March 30 and the third Saturday in October at Black Rock Lake and Thomaston Dam. Target or trap shooting prohibited.

**Bloomfield Flood Control Area Site 2:** Site 2 is leased to the town of Bloomfield and a special permit from the town clerk is required to hunt small game under special restrictions. Only open from the third Saturday in October until the end of February. Site 3 is no longer open to hunting.

**Meriden Rod & Gun Club, Eversource Skiff Mountain Cooperative WMA, Seymour Fish & Game Club, Stanley Works Coop. WMA, Suffield Sportsmen's Assoc., and Wallingford Town Owned Area:** All open for hunting on the third Saturday in October.

**Centennial Watershed State Forest:** Easton, Weston, Monroe, Newtown, Trumbull. Portions open to archery deer hunting by special access permits only. Access permits available from the Aquarion Water Company. Consult the DEEP's website (*https://portal.ct.gov/DEEP/Hunting/2023-Connecticut-Hunting-and-Trapping-Guide/Deer-Hunting#Aquarion*) in summer 2023 for updated information. **No turkey hunting allowed. Monroe Parcel (Garder Rd.):** Obtain daily permit from DEEP for small game hunting.

**Collis P. Huntington State Park:** Open to archery deer hunting ONLY. No turkey hunting allowed.

**Great Swamp Flood Control Area:** Open for firearms waterfowl hunting; stay south of Farmingville Rd.

**MDC Lake McDonough:** Archery hunting for deer and turkey **only** during the archery season. No archery hunting allowed during the firearms and muzzleloader seasons.

**Naugatuck State Forest – Quillinan Reservoir Block:** No access or parking from Deerfield Lane or Ansonia Nature Center property.

**South Central Connecticut Regional Water Authority:** Bowhunting for deer only is allowed each year on 3,233 acres in North Branford, 154 acres in Seymour and Ansonia, 420 acres in Prospect, and 520 acres in Bethany. Details on how to apply are at *https://www.rwater.com/learn-more/sustainable-solutions/our-water-resources*.

**Stewart B. McKinney NWR (Calf Island Unit, Great Meadows Unit, and Chimon and Sheffield Islands):** Waterfowl and archery deer hunting only. At the Great Meadows Unit, waterfowl may be hunted on Tuesday, Wednesday, and Saturday during the regular state season. After the close of the regular waterfowl season, Canada and snow goose hunting is permitted every day except Sunday. Hunters must have a signed USFWS Hunt Brochure at all times. Brochures, maps, and more detailed information is at: *https://www.fws.gov/refuge/stewart-b-mckinney/visit-us/activities/hunting*.

**Stewart B. McKinney NWR (Salt Meadow Unit):** Archery hunting for deer and turkey during the fall only. Hunters must have a signed USFWS Hunt Brochure at all times. The brochure, a map, and more detailed information is at: *https://www.fws.gov/refuge/stewart-b-mckinney/visit-us/activities/hunting*.

## Eastern Connecticut - Middlesex, New London, Tolland and Windham Counties

- • Hunting Permitted
- ❖ Archery ONLY
- ✳ Special Conditions Apply
- ▲/• or ✳/• Some Sections Open to Archery ONLY (see maps online)
- ▲ Archery Deer/Turkey Hunting
- F Fall Firearms Turkey Hunting ONLY
- ○ Daily/Season Permit Required (see page 36)

(▲ and ❖ areas are open for archery deer hunting from September 15 to December 30, unless noted otherwise.)

### WILDLIFE MANAGEMENT AREAS, STATE FORESTS, & STATE PARKS

| WILDLIFE MANAGEMENT AREAS, STATE FORESTS, & STATE PARKS | CODE | TOWN(S) | ACRES | Small Game | Waterfowl | Pheasants | Fall Deer/Turkey | Spring and Fall Firearms Turkey | Muzzleloader Deer | Deer Lottery Area | No-lottery Shotgun |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Assekonk Swamp WMA | 272 | North Stonington | 699 | • | • | | | • | • | | • |
| Babcock Pond WMA – Waterfowl Hunting Blind ♿ | 244 | East Haddam, Colchester | 1,513 | • | • | • | • | • | • | | • |
| Barn Island WMA | 273 | Stonington | 1,039 | • | • | • | • | • | • | | • |
| Bartlett Brook WMA (Incl. Deer Bowhunting Only areas - see map) | 274 | Lebanon | 727 | • | • | • | ▲/• | • | • | | • |
| Bear Hill WMA ♿ | 275 | Bozrah | 365 | • | • | | ▲ | • | • | | |
| Beaver Brook State Park | 276 | Windham | 372 | | | | ▲ | S | | | |
| Bigelow Hollow State Park | 277 | Union, etc. | 513 | | | | ▲ | | | | |
| Bishop Swamp WMA | 245 | Andover, Hebron | 1,035 | • | • | | • | • | • | 68 | |
| Black Pond WMA | 337 | Middlefield | 36 | • | • | | ▲ | • | | | |
| Candlewood Hill WMA | 347 | Groton | 199 | • | • | | | • | • | | • |
| Cockaponset State Forest (Incl. Deer Bowhunting Only areas - see map online) | 246 | Haddam, etc. | 16,456 | • | • | | ▲/• | • | • | | • |
| Cromwell Meadows WMA | 247 | Cromwell, Middletown | 548 | • | • | • | ▲ | • | | | |
| Durham Meadows WMA | 248 | Durham | 515 | • | • | • | ▲ | | | | |
| Eightmile River WMA | 249 | East Haddam, Lyme | 311 | • | • | • | • | • | • | | • |
| Dr. John E. Flaherty Field Trial Area and WMA | 212 | East Windsor | 506 | • | • | • | | | | | |
| Franklin Swamp WMA | 278 | North Franklin | 728 | • | • | • | • | • | • | | • |
| Higganum Meadows WMA | 251 | Haddam | 256 | • | • | • | ▲ | • | | | |

0776

| No. | Facility | Town | Acres | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 252 | Higganum Reservoir State Park | Haddam | 156 | | | | | | | | • |
| 281 | Killingly Pond State Park | Killingly | 174 | ▲ | | • | | | | | • |
| 253 | Kollar WMA & | Tolland | 941 | ▲ | | • | • | • | | | • |
| 254 | Larson Lot WMA | Colchester | 206 | • | | • | • | • | | • | • |
| 283 | Little River WMA | Hampton | 49 | ▲ | | • | • | | | | • |
| 284 | Lords Cove WMA | Lyme | 265 | | | | • | | | | • |
| 339 | Meadow Brook WMA | Colchester | 269 | • | ❖ | • | • | • | • | | • |
| 338 | Menunketesuck WMA | Clinton, Westbrook | 164 | ▲ | | • | | | | | ❖ |
| 257 | Meshomasic State Forest | Portland, etc. | 9,665 | • | | • | • | | | | • |
| 258 | Messerschmidt Pond WMA | Deep River, Westbrook | 439 | ▲ | | • | • | | | | • |
| 259 | Millers Pond State Park | Durham, Haddam | 265 | • | | • | • | | | | • |
| 285 | Mohegan State Forest | Scotland, etc. | 937 | • | | • | • | • | | | • |
| 260 | Mono Pond State Park | Columbia | 290 | ❖ | | • | • | | | | ❖ |
| 296 | Mooween State Park (Red Cedar Lake) | Lebanon | 593 | • | | • | • | | | | • |
| 286 | Natchaug State Forest (see map online) | Eastford, etc. | 12,596 | ▲/• | | • | • | | • | | • |
| 261 | Nathan Hale State Forest Mgmt. Area | Andover, Coventry | 1,560 | • | | • | | | • | | • |
| 287 | Nehantic State Forest (see map online) | East Lyme, etc. | 4,937 | ▲/• | | • | • | | • | | • |
| 288 | Nipmuck State Forest | Union, etc. | 9,546 | • | | • | • | | | | • |
| 289 | Nott Island WMA | Lyme | 80 | ▲ | | • | • | | | | |
| 264 | Nye Holman State Forest* | Tolland, etc. | 786 | ▲/• | | • | • | • | | | • |
| 290 | Pachaug State Forest (see map online) | Voluntown, etc. | 26,490 | ▲/• | | • | • | • | | | • |
| 291 | Pease Brook WMA | Lebanon | 213 | • | | • | • | • | | | • |
|  | Plum Bank Marsh WMA | Old Saybrook | 168 | | | | | | | • | |
| 292 | Pomeroy State Park | Lebanon | 334 | ▲ | | | | | | | |

0777

## Eastern Connecticut - Middlesex, New London, Tolland and Windham Counties

- Hunting Permitted
- ✤ Archery ONLY
- * Special Conditions Apply
- ▲/●/◆ or ✤/◇ Some Sections Open to Archery ONLY (see maps online)

▲ Archery Deer/Turkey Hunting
F Fall Firearms Turkey Hunting ONLY
◇ Daily/Season Permit Required (see page 36)
(▲ and ✤ areas are open for archery deer hunting from September 15 to December 30, unless noted otherwise.)

### WILDLIFE MANAGEMENT AREAS, STATE FORESTS, & STATE PARKS

| Area | Small Game | Waterfowl | Pheasants | Fall Deer/Turkey | Spring and Fall Firearms Turkey | Muzzleloader Deer | Deer Lottery Area | No-lottery Shotgun Deer | CODE | TOWN(S) | ACRES |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Quaddick State Forest | ● | ● | | ● | ● | ● | | ● | 293 | Thompson | 574 |
| Quinebaug WMA | ● | ● | ● | ● | ● | ● | | ● | 294 | Canterbury, Plainfield | 1,410 |
| Quinebaug WMA (Aspinook Pond) | | ● | ● | ▲ | | | | | 295 | Canterbury | 20 |
| Ragged Rock Creek Marsh WMA | ● | ● | | | | | | | 265 | Old Saybrook | 204 |
| Raymond Brook WMA | ● | ● | | | | | | | 266 | Hebron | 198 |
| Roger Tory Peterson WMA | | ● | | | | | | | 279 | Old Lyme | 625 |
| Rose Hill WMA | ● | ● | ● | ● | ● | ● | | ● | 297 | Preston, Ledyard | 874 |
| Ross Marsh WMA | ● | ● | ● | ▲ | ● | | | | 298 | Killingly, Sterling | 285 |
| Ross Pond State Park | | | | ▲ | | | | | 299 | Killingly | 372 |
| Salmon River Cove and Haddam Neck WMA | ● | ● | | ▲ | ● | | | ● | 267 | East Haddam, Haddam | 98 |
| Salmon River State Forest | ● | ● | | ● | ● | ● | | ● | 300 | Colchester, etc. | 7,017 |
| Scantic River State Park | ● | ● | | ▲ | | | | ● | 268 | East Windsor, etc. | 633 |
| Selden Neck State Park | | ● | | ● | | ● | | | 301 | Lyme | 563 |
| Shenipsit State Forest | ● | ● | | ● | ● | ● | | ● | 269 | Stafford, etc. | 7,170 |
| South Cove WMA | | ● | | | | | | | | Old Saybrook | 49 |
| James V. Spignesi, Jr. WMA | ● | ● | ● | ● | ● | ● | | ● | 302 | Scotland | 520 |
| Sugarbrook Field Trial Area (closed during field trials) | ● | ● | ● | ● | ● | ● | | ● | 303 | Plainfield | 192 |
| Talbot WMA | ● | ● | | ● | ● | ● | | ● | 304 | Scotland | 504 |

0778

| AREA | CODE | TOWN(S) | ACRES |
|------|------|---------|-------|
| Tankerhoosen WMA | | Vernon | 449 |
| Wangunk Meadows WMA | | Portland | 643 |
| Wopowog WMA | | East Hampton, Haddam | 465 |
| Zemko Pond WMA | | Salem | 457 |

## STATE-LEASED, FLOOD CONTROL, AND OTHER PUBLIC ACCESS AREAS

| AREA | CODE | TOWN(S) | ACRES |
|------|------|---------|-------|
| Ellithorpe Flood Control Area | 250 | Stafford | 438 |
| Eversource Maromas Cooperative WMA* | 263 | Middletown | 1,618 |
| Mansfield Hollow State-leased WMA (excluding State Park & Field Trial Area) | 255 | Mansfield, Chaplin, etc. | 2,017 |
| Mansfield Hollow State-Leased Field Trial Area (closed during field trials) | 256 | Mansfield | 236 |
| West Thompson Dam (Army Corps) | 305 | Thompson | 1,272 |

## PERMIT-REQUIRED AREAS (DAILY PERMIT REQUIRED)

| AREA | CODE | TOWN(S) | ACRES |
|------|------|---------|-------|
| East Windsor - Enfield Area* | 6 | East Windsor, Enfield | 209 |
| Harkness Memorial SP* (Verkade - Park permit) | 280 | Waterford | 154 |
| Hebron PR Area* | 11 | Hebron | 94 |
| Lebanon Coop Mgmt. Area* | 282 | Lebanon, Colchester | 212 |
| Norwich PR Area | 17 | Norwich | 549 |
| Silvio O. Conte NWR – Deadman's Swamp Unit* | 333 | Cromwell | 31 |
| Silvio O. Conte NWR – Roger Tory Peterson Unit* | 333 | Old Lyme | 56 |
| Silvio O. Conte NWR – Salmon River Division* | 333 | Haddam | 595 |
| Silvio O. Conte NWR – Whalebone Cove Division* | 333 | Lyme | 103 |
| Sprague Town Land PR Area* (Non-toxic shot only) | 20 | Sprague | 620 |
| Yale-Myers Forest* | 306 | Eastford, Union, Ashford | 8,404 |

0779

## Notes for Eastern Connecticut Hunting Area Table

**East Windsor-Enfield Area, Hebron and Norwich PR Areas, and Eversource Maromas Cooperative WMA:** All open for hunting on the third Saturday in October until the last day in February.

**Harkness Memorial State Park:** A portion of the park north of Rte. 213 (former Verkade property) is designated as a Deer Bowhunting Only area. Inquire at Park Manager's Office for special access permits.

**Lebanon Cooperative Management Area:** Hunting only in area located south of Old Rte. 2 (Norwich Ave.). Area owned by the Dept. of Agriculture and leased for farming.

**Nye Holman State Forest:** Sections adjacent to archery range in Tolland are designated as Deer Bowhunting Only areas. Youth camping area is closed to all hunting.

**Silvio O. Conte National Wildlife Refuge (4 parcels of federal land):** Information for the Conte NWR, including a map and hunt brochure to be carried while hunting on Refuge lands, can be found at: *https://www.fws.gov/refuge/silvio-o-conte/visit-us/activities/hunting*.

**Sprague Town Land Permit-Required Area:** Game bird, rabbit, squirrel, and migratory bird hunting only. Non-toxic shot must be used for all species. See Town of Sprague hunting rules and regulations at *https://portal.ct.gov/-/media/DEEP/ hunting_trapping/pdf_files/Sprague-hunting-rules-regulations-2022.pdf*.

**Yale-Myers Forest Permit-Required Area:** Area open for small game/waterfowl and wild turkey hunting by seasonal access permits. Parking passes are also required. **Permits are available on the Online Outdoor Licensing System starting December 1, 2022. However, Yale-Meyers Forest season permits will ONLY be issued until March 31, 2023, for the season. No permits will be issued after this time period.** Small game and turkey permits will be available through the Online Outdoor Licensing System. Yale University will contact hunters through the address email listed in their license profile to provide parking and access information. Night hunting and harvest of coyotes and foxes prohibited. Spring wild turkey hunting hours will be: ½-hour before sunrise to 12:00 noon. No deer driving during the shotgun deer lottery season.

## Tree Stand Safety Rules

A hunter who improperly uses a tree stand for hunting may suffer a serious injury or death. Follow these tree stand safety rules:

- Always use a full-body safety harness or fall-restraint system.
- Only use equipment that is in good condition.
- Avoid hunting from heights greater than 15 feet.
- Maintain a short tether between you and the tree.
- Always use a haul line to raise and lower your hunting equipment.

## Bowhunting Safety Tips

- Hunt and shoot within your own physical limitations.
- Only point the bow and arrow in a safe direction.

- Only nock an arrow when it is safe to shoot.
- Be sure of your target and what is in front of it, immediately behind it, and beyond it.
- Check the bowstring regularly, and replace it if it becomes worn or frayed.
- Prior to each use, check your bow for cracks, dents, breaks, separating laminates, peeling glass, and defects in mechanical parts.
- Handle arrows carefully. Protect yourself and the arrow points with a covered arrow quiver.
- Cross obstacles and rough terrain with an arrow securely stored in a quiveer.
- Use a haul line to raise and lower your bow; never climb a tree stand carrying a bow.

## Fundamental Rules for Safe Gun Handling

The most common causes of hunting-related shooting incidents are failure to identify the target, shooter swinging on game, and careless handling of a firearm. **ALWAYS** follow these rules for safe gun handling:

- Assume every firearm is a loaded firearm.
- Control the muzzle by always keeping it pointed in a safe direction.
- Keep your finger off the trigger until you are ready to shoot.
- Know your target and what lies beyond.

## The Hunter's Pledge

Hunting provides unique challenges and rewards. However, the future of this great tradition depends on each hunter being responsible and ethical.

**Therefore, as a hunter, I pledge to:**

- Show respect for the laws.
- Show respect for other hunters.
- Show respect toward landowners and always obtain permission to hunt on private land.
- Show respect for non-hunters.
- Show respect for the land and wildlife resources.
- Familiarize myself with the areas where I plan to hunt and know the activities that occur there.
- Wear at least 400 square inches of fluorescent orange when required for hunting.
- Dress appropriately and be prepared for any sudden weather changes.
- Call out "Hunter here!" loudly to make my location known if I see another hunter.
- Take responsibility for my actions while hunting.

# Tagging and Reporting Instructions

Immediately upon making your harvest, complete a Deer/Turkey Harvest Tag. The Harvest Tag must be kept with your deer or turkey until it is processed for consumption. While transporting your harvest, you may keep the Harvest Tag in your pocket or wallet. However, if you leave the carcass, the completed Harvest Tag must remain with the animal.

Harvested deer and turkeys must be reported within 24 hours via the internet at *https://portal.ct.gov/DEEP-Report-Deer-Turkey-Harvest* or by telephone at the toll-free number, 1-877-337-4868 (1-877-DEP-HUNT).

To report your deer or turkey, you will need to know the 3-digit number code of the town in which the animal was harvested. The accompanying table lists Connecticut's 169 towns and their identifying numbers. If you harvested your deer or turkey on state land, you will also need to know the 3-digit number code of the public hunting area. The hunting area tables on pages 48-58 list the 3-digit number codes of Connecticut's public hunting areas.

## 2023        Connecticut Department of Energy & Environmental Protection **DEER/TURKEY HARVEST TAG**        2023

Conservation ID#: _____

Name: _____

Date of Kill: ___ / ___ / ___   Time: _____

Town of Kill: _____

**PERMIT / SEASON** (check the appropriate boxes)
Antlerless Tags cannot be used in Zones 2 and 4A during the Private Land Shotgun/Rifle/Revolver and Muzzleloader seasons.

**DEER**        ❏ Antlerless        ❏ Either Sex
❏ Private – Shotgun/Rifle/Revolver   ❏ State – Lottery
❏ Private – Muzzleloader        ❏ State – No Lottery
❏ Archery (Bow)        ❏ State – Muzzleloader
❏ Landowner        ❏ Archery-only Lottery

**SPRING TURKEY** – Bearded birds only
❏ Private Land        ❏ State Land        ❏ Landowner

**FALL TURKEY**
❏ Private – Firearms        ❏ Landowner – Firearms
❏ State – Firearms        ❏ Landowner – Archery (Bow)
❏ Archery (Bow)

Signature: _____

Harvested deer and turkeys must be reported within 24 hours via the internet at *https://portal.ct.gov/DEEP-Report-Deer-Turkey-Harvest* or by calling 1-877-337-4868. After reporting, you must write your report Confirmation Number below.

Confirmation #: _____

0782

# Exhibit 109

Department of
Energy and Environmental Protection

Public Act 11-80, effective July 1, 2011, established the Department of Energy and Environmental Protection as the successor agency to the Department of Environmental Protection, the Department of Public Utility Control, and the energy group within the Office of Policy and Management.

### DIRECTIVE

**SUBJECT:** DEP Employees – Carrying of Personal Firearms

**PURPOSE:** To establish guidelines for DEP employees regarding the carrying of personal firearms on the job.

**POLICY:** Unless otherwise required by the nature of his or her job, no Department of Environmental Protection employee or volunteer shall carry on his or her person during working hours or when acting as an agent of the Department any firearm as defined by Connecticut General Statutes 53a-3, nor shall such employee or volunteer bring on or into State property , including land, buildings or vehicles, any such firearms during working hours or when acting as an agent of the Department.

_____

_____
**Issued by: /**S/ Commissioner Timothy R.E. Keeney
**Date:** August 26, 1992
**Special Instructions:** New
**Distribution:** All Supervisors, All Manual Holders

0784

# Exhibit 110



# Exhibit 111



CONNECTICUT

STATE PARKS

*A Centennial Overview*

*1913-2013*



**www.ct.gov/deep/stateparks**

## A State Park Centennial Message from
## Energy and Environmental Protection
## Commissioner Robert J. Klee

Dear Friends,

This year, we are celebrating the Centennial of the Connecticut State Parks system.

Marking the 100th anniversary of our parks is a fitting way to pay tribute to past conservation-minded leaders of our state, who had the foresight to begin setting aside important and scenic lands for public access and enjoyment.  It is also a perfect moment to commit ourselves to the future of our park system – and to providing first-class outdoor recreation opportunities for our residents and visitors well into the future.

Our park system had humble beginnings.  A six-member State Park Commission was formed by then Governor Simeon Baldwin in 1913.  One year later the Commission purchased its first land, about four acres in Westport for what would become Sherwood Island State Park.

Today, thanks to the dedication and commitment of many who have worked in the state park system over the last century, Connecticut boasts a park system of which we can all be proud.

This system includes 107 locations, meaning there is a park close to home no matter where you live. Our parks cover more than 32,500 acres and now host more than eight million visitors a year – and have hosted a remarkable total of more than 450 million visitors since we first began counting in 1919.

Looking beyond the statistics, our parks offer fantastic opportunities for families to spend time outdoors together.  They feature swimming, boating, hiking, picnicking, camping, fishing  – or simply the chance to enjoy the world of nature.

You can become part of the history of our state park system by making time to visit and enjoy our parks.  You can find out more about them online at www.ct.gov/deep/stateparks and you can read more about the State Parks Centennial at www.ct.gov/deep/stateparks100.

I hope to see you and your family at one of our state parks soon.

Sincerely,

0789

# CONNECTICUT
# STATE PARKS CENTENNIAL

## *An Historical Overview*

As the Connecticut State Park System reaches its milestone Centennial, we take a look back at how the parks developed over one hundred, sometimes wonderful, sometimes challenging, years.

To set the stage for the creation of the Park Commission and the first park land acquisition, we begin with an overview of what life was like in Connecticut in the 1910s, before there were any state parks.





0790



*A pre-1900 Connecticut map showing counties, city centers and major rail road routes of transportation.*

One hundred years ago Connecticut was a very different place than it is today. The 1910 census reported Connecticut's population at 1,114,756.  By 1913 it had grown by 85,244, or 7.2 percent, to 1,200,000.



Increasingly, this growing population was concentrating in the cities.



*Congested urban living conditions, ca. 1910.*

0791

2

Since the 1860s, city parks had been growing in popularity across the state. But many people needed relief from the cities, especially in the hot summer months.



*Colorful picture post cards from around the state depicted the wide variety of city parks in the early 1900s.*

 In 1913, Connecticut's mass transit system, the trolley, had grown to its greatest extent with 1,118 miles of track in service and became the most convenient way to move around the state.

*100 years ago trolley travel offered most city dwellers the opportunity to crisscross the state conveniently.*

0792

3

## *An Early Gift*

In 1911, the State of Connecticut received a gift of land atop Mount Tom in Washington, Connecticut specifically for use as a state park.



*The U.S. Geological Survey map shows the elevations and the photograph shows the celebrated view from the top of Mount Tom - the first gift to the state for use as a state park.*



*Simeon Baldwin was Connecticut Governor from 1911 to 1915.*

Unfortunately, though our three neighboring states had state park properties, Connecticut did not.  As a result, the land was assigned to Connecticut's existing State Forest Commission.

That gift gave impetus to a growing movement for a state park commission in Connecticut. As a result, Governor Simeon E. Baldwin assigned a temporary State Park Commission to study the feasibility of such an undertaking and report their findings to the General Assembly.

0793

Once the General Assembly received the report in the spring of 1913, they committed to creating a permanent State Park Commission.

The official act which established the State Park Commission in 1913 was:



*The 1913 report convinced the General Assembly that there was the need, desire and opportunity to begin a State Park Commission in Connecticut.*

**Chapter 230,
Public Acts of 1913**

**The Governor on or before July 1, 1913 shall appoint six persons, who shall constitute a board to be known as the State Park Commission. The members of this commission shall hold office … beginning with the first day of September, 1913.**

On September 29, 1913 the State Park Commission held its very first meeting at the New Haven County Court House in New Haven, CT.

The original six member Commission voted General Edward Bradley, whom it held in the highest esteem, as its Chair. He was joined by John Calhoun, John Fox, Edward Wilkins, Lucius Robinson and Herman Chapman.

*The first State Park Commission meeting took place in the old New Haven County Courthouse in September, 1913.*



0794

5



*The First Park Commissioners were (from left to right) by John Calhoun, John Fox, Edward Wilkins, Lucius Robinson, Chairman Edward Bradley and Herman Chapman.*

The six member State Park Commission was chosen to represent the primary geographic regions of the state: the eastern and western hills, the Connecticut River valley and the coastline.

*This shaded relief map of Connecticut depicts the diversity of the eastern and western hills, the central valley and the diverse coastline.*

Though anxious to get underway, the Park Commissioners knew that before any land was purchased a systematic examination of the state's entire landscape must be made. Within four months the Park Commission had the man for the job.

## Enter Albert M. Turner

Turner was a native of Litchfield, Connecticut and a Yale educated

6

0795



*Turner travelled the length of the Connecticut coast inspecting all beaches for state park potential. He photographed this view of Sherwood Island in Westport in spring of 1914.*

civil engineer. He, more than any other person, is the man who in his 28 years with Parks shaped the state park system into what we know and enjoy today.

The 46 year old Turner began his statewide investigation immediately. From the start, Turner was guided by one overriding quest - the nearly universal desire to be near the water, especially Long Island Sound.

Turner traversed the entire 254 mile Connecticut coast and recommended three locations easily recognizable to us today: Bluff Point in Groton, Hammonasset Beach in Madison, and Sherwood Island in Westport.

For the people in the northern tier of the state, Turner realized their waterfront of choice was along a lake shore. He compiled a list of 108 lakes forty acres in size and larger, culled it to 57, visited each of those and recommended 18 priorities.



0796

*Squantz Pond in New Fairfield, ca. 1914.*



*Selden Neck on the Connecticut River in Lyme, ca. 1914.*

Continuing his concentration on water locations, Turner next appraised the lower rivers in the state.

He reported that the Connecticut River has always been and will continue to be a priority, especially below Middletown; the Thames River was beautiful, but full with advanced development; the Housatonic River offered charming possibilities (there was not yet a north-south roadway built through the valley); and the then heavily industrialized and polluted Naugatuck River was a 'disgrace to our civilization.'

Once the priorities were known and agreed upon, the six commissioners could get to work laying the groundwork for assembling a system of state parks.

## The Acquisitions Begin

The first challenge that the new Park Commission faced was one of funding. The original Act allotted the State Park Commission $20,000 dollars for land acquisitions for their first two years.

But an acre of saltwater beach shorefront with buildable upland behind it was valued at $6,500 an acre.

A single factor was readily apparent: the shoreline should be the first to be preserved since its value was high and escalating rapidly.



*Once the first State Park Commissioners agreed to a plan of land acquisition they were ready to begin the business of acquiring land for a state park system.*

0797

With these factors in mind, on July 7, 1914, the Commissioners agreed to an option on " . . . a certain piece of land containing about four acres, located in



*Albert Turner was disappointed by the development along some portions of the coastline in his 1914 reconnaissance.*

the Town of Westport, which is about to be offered at public auction . . ." When the land-locked property was recorded in the in the Town of Westport records on December 22, 1914, the State Park Commission had its first real estate on what would become known as Sherwood Island State Park.

A week later, 427 acres in East Haddam were recorded as Hurd State Park and Connecticut's State Park system was truly underway.

The early state park acquisitions continued along those lines - by word of mouth and general affordability.  Mountain tops, upland brooks and Connecticut River properties dominated these first purchases.  Slowly, over the next four years, the park system grew.

0798

During the First World War, which ended in 1918, park properties had had little pressure on them since few visitors came.

But by end of the War, change was underway.  Henry Ford had incorporated



the assembly line into his automobile production in 1913 making cars affordable for nearly everyone. Times were changing.

The State Park Commission accommodated this increase in motoring by initiating a new kind of park, a wayside park.



Visiting motorists could fill their gas tanks, eat and camp free for one night. 1918 also brought a time for reflection about the Commission's first five years. There were now 15 parks in the system, and for Albert Turner it meant a time of critical review.



*Top: Haystack Mountain, Norfolk, circa 1900.*
*Middle: A transition time of auto travel and trolley tracks, circa 1920.*
*Bottom: Wharton Brook State Park opened for motorists in 1919.*

0799

At the State Park Commission meeting on December 10, a frustrated Turner spoke forcefully about the persistent, ongoing lack of a coastal park: "The greatest need for action continues to be along the shore of Long Island Sound."   It was time to obtain funds, purchase land and develop '. . . one large shoreline park so that the people can decide if it is good.'



With these comments, Turner set the wheels in motion for the single greatest feat of the early park system.

As a Civil Engineer, Turner knew that



*State Park Field Secretary Albert Turner first targeted Hammonasset Beach as a possible park in spring, 1914.*

the infrastructure necessary for the comfort and well-being of tens of thousands of park visitors would essentially be that of a small city. The challenges to building this infrastructure would be great.

0800

*11*



*Hammonasset Beach Pavilion as proposed in late 1919.*

He had visited Savin Rock Amusement Park in West Haven and observed that the problems of congestion from its 1.2 million annual visitors had become so acute that intervention of the State might be the only solution.



Turner noted that private industry's solution for managing the public was minimizing the space for people to move about, thus making it easier to control them.

But Turner had a different vision: 'The shoreline State Park must have breathing space for the multitudes, and the shore must be preserved essentially un-tarnished.'



With those words, Turner had motivated the Commission, and the Commission motivated the Connecticut General Assembly. When the next budget was released in June, 1919, the Park's new allocation was $365,000,

*The crowds at Savin Rock Park in West Haven inspired Turner to use an "open space" format for the predictably popular shoreline state parks.*



*The mostly hand-built, 310 foot long wood pavilion was completed in less that six months.*

up from the previous $20,000. The Commission's influence had been profound.

Work began immediately at the beach Turner had recommended and, thirteen months after the money was committed, in July 1920, the first Connecticut shoreline park available to the public opened at Hammonasset Beach in Madison.

In those thirteen months, land totaling nearly 500 acres was purchased, the infrastructure of water, sewer, roads, and electricity for 20,000 daily visitors was drawn up and laid out, plans for a 310 foot long, all-wood pavilion were finalized, materials ordered, labor contracted and construction completed.

Hammonasset Beach met with immediate success! Albert Turner was right.



*Hammonasset beaches and boardwalks attracted thousands.*

0802

13



*The Clamshed offered food and refreshments to thousands of beach goers every summer.*

Thousands came by car and trolley from the cities and rural communities to enjoy the fresh air and walk the boardwalks.

When the food service in the new Pavilion proved to be too small for the crowds, the Commissioners had a new structure built: The Clamshed.

It became the park eatery for literally thousands of visitors, and home to Park's own sandwich: the ten cent Hammonasset Special, and a namesake cigar: *the Hammonasset Beach Perfecto.*

The opening of Hammonasset Beach State Park in 1920 set the tone for the entire decade. Seventeen new additions to the park system during this decade brought the total to 38.

Notable among these, and thanks to the work of the Sleeping Giant Park Association and purchases by the Park Commission, 878 acres of the Giant were preserved in Hamden beginning in 1925.



*Sleeping Giant State Park in Hamden.*

0803





In 1929 a conflict of fashion occurred along the Connecticut shore as summer beach styles were trending towards uncovering the body – a sharp contrast from the ladies beach dresses and men's sleeveless shirts of just a few years previous.

The Park Commissioners knew Sun Back bathing suits were coming in 1929, a style that dared to reveal arms, legs and featured a low cut, open back!

*The early 1920's beachwear saw near-full body coverage for women and tee shirts for men.*

Most visitors accepted the fashion as the natural progression of beachwear. Some however, wrote letters objecting to such vulgarity and threatening to boycott the parks.

The angst was quelled by posting signs, but within a few years the style was common and the once heated issue had evaporated.

But by the end of October 1929, the prosperous decade had come to an end and a Great Depression set in.





*Top: The depressed economy often forced individuals and companies to sell land to raise much needed cash, but buyers needed cash at hand to close the deals.*

*Middle: Before Rocky Neck State Park opened as a beach, it had been privately owned and home to a fish processing plant.*

*Bottom: CCC boys waiting in line for chow at Camp Roosevelt in Killingworth, circa 1934.*

After the stock market collapsed, money for the State Park System became extremely limited.

But this created opportunities to add new properties to the park system for less expense than the previous decade.

The old fish factory and its accompanying half mile beach situated along the shore in East Lyme was purchased in June of 1931 for $55,000 . . . $21,000 below its price eight years earlier.



0805

*16*



Funding for state park staff became a challenge and President Roosevelt's Civilian Conservation Corps (CCC) and Works Progress Administration (WPA) programs helped fill the void.

These crews of young men did extensive work in state parks and forests and completed projects which we still benefit from today.   Examples include roads, bridges, dams, ponds, campgrounds, shelters and recreation areas.

From 1933 to 1942 twenty three CCC camps flourished across the state.



In the winter of 1934 WPA impressionist artist Harry Leith-Ross captured the CCCs at work  on State Forest lands in Torrington that, once completed, went on to become Burr Pond State Park.

*Impressionist artist Harry Leith-Ross captured the CCC boys at work in what would later become Burr Pond State Park in Torrington.*





*CCC projects included picnic shelters as above and tent encampments that were later converted to tar paper cabins.*

The construction of the new pavilion at Rocky Neck State Park was the largest State Park project of the 1930s.

Local vacations were the rule during the decade of the Depression and as a result state parks were becoming crowded places. Two million visitors enjoyed the Connecticut State Parks in 1932.



*Affordable labor was plentiful during the Great Depression and allowed for the completion of landmark park projects.*

*Below: Campgrounds filled up quickly at Hammonasset Beach in the summer of 1933.*



18





By 1938 park attendance had peaked at 2.8 million.

But by the early 1940s, the onset of World War II, gasoline rationing and military occupation of coastal parks brought such park visitation growth to an end.



*Top: These crowds at Stratton Brook State Park in Simsbury were typical of the popularity and convenience of the many local state parks around the state during the war years.*

*Middle:  In 1943 State Parks acquired actor William Gillette's "Castle"  and grounds with the help of longtime State Park friend, the Connecticut Forest and Park Association (CFPA).*

0808

*19*



Despite the War, 16 new parks were added. One unique purchase in Hadlyme met both the river frontage and historical acquisition priorities of the Commission - Gillette Castle.

Some of the continued growth in parks was planned, as with the addition of the Heublein Tower acreage to the existing Talcott Mountain State Park along the Simsbury-Bloomfield line.

*Top: The 1960 Acquisition of Silver Sands State Park in Milford continued the Park and Forest Commission tradition of providing recreational public access to the beaches at Long Island Sound.*

*Bottom: The 1966 Heublein Tower purchase brought hundreds of ridge-top acres to the existing Talcott Mountain State Park.*



0809







And other parts were surprises, as with the accidental discovery of the remarkable dinosaur trackway in Rocky Hill!

## *A New Era*

The whole nature of recreation in parks changed after World War II.  By the 1950s, leisure activities and leisure time jumpstarted the beginning of outdoor recreation as we know it today.

Camping, hiking, birding, skiing, fishing and the free time that came with the post war economy were all enjoyed in Connecticut State Parks.



*Bluff Point in Groton was the first property that field agent Albert Turner noted as desirable for a state park in his 1914 survey of the Connecticut coastline. It finally became a park in 1963.*

0810

Outdoor recreation continued to grow in popularity into the 1960s and, as a result, state parks increased its frontage on Long Island Sound by fifty percent with the addition of Silver Sands in Milford and Bluff Point in Groton.



*An historic discovery of dinosaur tracks on August 23, 1966 led to today's Dinosaur State Park.*



In September 1971, the Park and Forest Commission, which began in September 1913, came to an end as "Parks" became a Division of the newly formed Department of Environmental Protection.

Over time the DEP logo has evolved from oval to circle with the most recent change finding 'Parks' as a division of Department of Energy and Environmental Protection.

In the 1970s and '80s, local residents who were adamant about their neighboring parks took up advocacy that, over time, formalized into our many Friends groups.

0811

22

The Friends joined with Park's historic outdoor recreation and state ally, Connecticut Forest and Park Association (CFPA), to continue to help the parks enhance and enlarge the park visitors' experience.

Continued growth along the lines of education and interpretation of the natural environment combine with a variety of outdoor activities to better serve the growing and diverse visitor base.



*Today, Connecticut State Parks boasts 23 individual volunteer friends groups and an advocacy office which supports parks through education and public awareness.*

*The Connecticut Forest and Park Association began in 1895 and has been working cooperatively with state parks since Park's inception in 1913.*

But the acquisition of, and improvements to, state park properties has not ended. Connecticut continues its search to acquire special or unique park properties as the opportunities present themselves.

And today, vendors at many of our parks add to the visitor experience. Steam trains originate from Connecticut Valley Railroad State Park in Essex, riverboats dock at Eagle Landing State Park in East Haddam and canoe rentals available at Burr Pond, Lake Waramaug and Squantz Pond State Parks are just a few examples of the enjoyable opportunities available at a variety of Connecticut state parks around the state.

0812

## A Centennial

At the Connecticut State Park 100 year anniversary, the 107 state parks stand as a tribute to the earliest visionaries and to all the staff who have contributed their excellence since the start.



*In 2002 Fort Trumbull State Park, along the Thames River in New London, became one of the most unique historic properties in the state park system.*

*Eagle Landing State Park along the Connecticut River at Haddam provides access to the waterfront and beautiful views of the river valley.*



*The most recent addition to the state park system is Sunrise State Park in East Haddam. Overlooking the Salmon River and abutting Machimoodus State Park the two, in combination, offer 450 acres of hills, waterside, trails, meadows and ponds.*

0813

The 32,500 park acres have hosted 450 million visitors since counting began in 1919, and today everyone in the state is within a 15 minute drive of a park property.





0814

The State Park Centennial has provided the opportunity to reflect upon and commemorate the first 100 years of Connecticut State Parks .....

and now, it's *Onward  Ho!.....*

### *. . . to the next 100!*



0815

**Connecticut State Parks and Forests provide
outdoor recreation opportunities throughout the year.**

**Visit our Home Page at www.ct.gov/deep/stateparks
and search by keywords such as camping, hiking maps, fishing,
boating, swimming, mountain biking, earth caching, letter box-
ing, trails, disabled access and winter activities
for additional information.**



**www.facebook.com/CTStateParks**



Follow us on Twitter
Twitter.com/CTDEPoutdoorrec



0816

# *Today in Connecticut State Parks*

Connecticut State Parks are home to some of the best outdoor activities in the state. Here is a list of some of the best locations:

**Birding:** Devil's Hopyard State Park, East Haddam
George Dudley Seymour State Park, Haddam
Hammonasset Beach State Park, Madison
Osbornedale State Park, Derby
Rocky Neck State Park, East Lyme
Sherwood Island State Park, Westport

**Bicycling:** Airline State Park Trail, Hebron; Multi-town
Hammonasset Beach State Park, Madison
Hop River State Park, Bolton; Multi-town
Larkin State Park Trail, Southbury; Multi-town
Stratton Brook State Park, Simsbury

**History:** Dinosaur State Park, Rocky Hill
Fort Griswold State Park, Groton
Fort Trumbull State Park, New London
Gillette Castle State Park, East Haddam
Harkness Memorial State Park, Waterford
Osborne Homestead Museum, Derby
Putnam Memorial, Westport

**Hiking:** Bigelow Hollow State Park, Union
Gay City State Park, Hebron
Kettletown State Park, Southbury
Mashamoquet Brook State Park, Pomfret
Millers Pond State Park, Durham
Sleeping Giant State Park, Hamden

**Fishing:** Black Rock State Park, Watertown
Burr Pond State Park, Torrington
Chatfield Hollow State Park, Killingworth
Day Pond State Park, Colchester
Mansfield Hollow State Park, Mansfield
Quaddick State Park, Thompson
Mount Tom State Park, Litchfield

0817

**Canoeing &:** Bigelow Hollow State Park, Union
**Kayaking**   Bluff Point State Park, Groton
           Hopeville Pond State Park, Griswold
           Collis P. Huntington State Park, Redding
           Lake Waramaug State Park, Kent
           Mansfield Hollow State Park, Mansfield
           Mohawk Mountain State Park, Cornwall/Goshen
           Quaddick State Park, Thompson

**Swimming:**   Black Rock State Park, Watertown
           Burr Pond State Park, Torrington
           Hammonasset Beach State Park, Madison
           Indian Well State Park, Shelton
           Rocky Neck State Park, East Lyme
           Sherwood Island State Park, Westport
           Silver Sands State Park, Milford
           Squantz Pond State Park, New Fairfield
           Wadsworth Falls State Park, Middletown/Middlefield
           Wharton Brook State Park, Wallingford

**Camping:**   Black Rock State Park, Watertown
           Devil's Hopyard State Park, East Haddam
           Hammonasset Beach State Park, Madison
           Hopeville Pond State Park, Griswold
           Housatonic Meadows State Park, Sharon
           Kettletown State Park, Southbury
           Lake Waramaug State Park, Kent
           Macedonia Brook State Park, Kent
           Mashamoquet Brook State Park, Pomfret
           Rocky Neck State Park, East Lyme
           Salt Rock State Park Campground, Sprague

**Winter**    Fort Griswold State Park, New London, Sledding
**Activities**  George Dudley Seymour State Park, Haddam, X-country skiing
           Haddam Meadows State Park, Haddam, X-country skiing
           Collis P. Huntington State Park, Redding, X-country skiing
           Mansfield Hollow State Park, Mansfield, Haddam, X-country
           skiing
           Osbornedale State Park, Derby, Sledding and ice skating
           Southford Falls State Park, Southbury, Ice Skating

0818

At 100 Years old, Connecticut State Parks offer opportunities for relax-
ation, active recreation, history and culture from the shores of Long
Island Sound, up through the major river valleys and into the northwest
and northeast hills.



**Explore it all at: www.ct.gov/deep/stateparks OR, better yet, visit a state park near you soon!**



# No Child Left Inside®

Launched in 2006, No Child Left Inside® is a promise to introduce children



to the wonder of nature – for their own health and well-being, for the future of environmental conservation, and for the preservation of the beauty, character and communities of the great State of Connecticut. While today's children are often disconnected from nature – the No Child Left Inside® initiative provides the opportunity for them to unplug from technology and discover the vast opportunities that Connecticut's State Parks and Forests have to offer.

# The Great Park Pursuit

For nine years the Great Park Pursuit (GPP) has offered family based activities and the opportunity to explore state parks and forests around the state.



Exciting adventures take families on Saturday outings to discover the rich diversity of state parks and forests and open up the wonderful recreational opportunities they provide. Children, parents and grandparents continue to enjoy the GPP held each Saturday from May to mid-June. Get more information at NoChildLeftInside.org and keep the tradition alive!

0821

# CONNECTICUT DEPARTMENT
## of ENERGY and
# ENVIRONMENTAL PROTECTION

**ROBERT J. KLEE**
Commissioner

**SUSAN K. WHALEN**
Deputy Commissioner

**THOMAS J. TYLER**
Director, Connecticut State Parks

**DIANE CHISNALL JOY**
Assistant Director of State Parks
Education

**JOHN CIMOCHOWSKI**
Assistant Director of State Parks
Operations

**ALAN M. LEVERE**
Connecticut State Parks



JULY 2014

The Connecticut Department of Energy and Environmental Protection is an Affirmative Action/Equal
Opportunity Employer that is committed to complying with the requirements of the Americans with
Disabilities Act.  Please contact us at (860) 418-5910 or deep.accommodations@ct.gov if you: have a
disability and need a communication aid or service; have limited proficiency in English and may need
information in another language; or if you wish to file an ADA or Title VI discrimination complaint.



**DEPARTMENT OF ENERGY AND ENVIRONMENTAL PROTECTION**
**79 ELM STREET  HARTFORD, CT   06106-5127**
**860  424-3200**

# Exhibit 112



# Exhibit 113

*Regulations of Connecticut State Agencies*

TITLE 23. Parks, Forests & Public Shade Trees

*Agency*

**Department of Energy and Environmental Protection**

*Subject*

**State Park Rules**

*Inclusive Sections*

**§§ 23-4-1—23-4-35**

## CONTENTS

| | | |
|---|---|---|
| Sec. | 23-4-1. | General regulations |
| Sec. | 23-4-2. | Vehicles – traffic and parking regulations |
| Sec. | 23-4-3. | Camping regulations |
| Sec. | 23-4-4. | Bluff Point Coastal Reserve regulations |
| Sec. | 23-4-5. | Evictions and penalties |
| Sec. | 23-4-6. | Transferred |

**Use and Fee Structure of Certain State Park Facilities**

| | | |
|---|---|---|
| Sec. | 23-4-7. | Applicability |
| Sec. | 23-4-8. | Definitions |
| Sec. | 23-4-9. | Facilities available for rental |
| Sec. | 23-4-10. | Availability of premises |
| Sec. | 23-4-11. | Rental fees |
| Sec. | 23-4-12. | Parking |
| Sec. | 23-4-13. | Maximum occupancy |
| Sec. | 23-4-14. | Applications for rentals; cancellations; insurance |
| Sec. | 23-4-15. | Liabilities; commissioner's remedies |
| Sec. | 23-4-16. | Use of caterers' tents |
| Sec. | 23-4-17. | Catering |
| Sec. | 23-4-18. | Photography |
| Sec. | 23-4-19. | Music |
| Sec. | 23-4-20. | Flowers and other decorations |
| Sec. | 23-4-21. | Miscellaneous requirements |
| Sec. | 23-4-22. | Renter's responsibilities |

**State Park Rentals**

| | | |
|---|---|---|
| Sec. | 23-4-23. | Definitions |
| Sec. | 23-4-24. | Applicability |
| Sec. | 23-4-25. | Availability of picnic shelters for rental |
| Sec. | 23-4-26. | Use without rental |

*Regulations of Connecticut State Agencies*

TITLE 23. Parks, Forests & Public Shade Trees

Sec.  23-4-27.    Availability of rustic cabins for rental
Sec.  23-4-28.    Rental fees
Sec.  23-4-29.    Admission and parking fees
Sec.  23-4-30.    Applications for rentals. Cancellations
Sec.  23-4-31.    Liabilities. Commissioner's remedies
Sec.  23-4-32.    Catering
Sec.  23-4-33.    Use of tents
Sec.  23-4-34.    Miscellaneous requirements
Sec.  23-4-35.    Renter's responsibilities

*Regulations of Connecticut State Agencies*

TITLE 23. Parks, Forests & Public Shade Trees

*Department of Energy and Environmental Protection* §23-4-1

**State Park Rules**

**Sec. 23-4-1.   General regulations**

(a) **Hours of operation.**

State parks and state forest recreation areas shall be open for public use daily between sunrise and sunset. State parks shall be open to public vehicular traffic daily between the hours of 8:00 a.m. and sunset, except as otherwise specifically authorized by the Department of Energy and Environmental Protection. Other state forest areas shall be open between one hour before sunrise and one hour after sunset.

(b) **Vandalism and possession of food or beverage inside historic structures.**

(1)  No person shall deface, destroy, alter, remove or otherwise injure in any manner any structures, buildings, vegetation, earth or rock material, trees, or fuelwood, nor shall any wildlife be molested or disturbed except as authorized by the Department of Energy and Environmental Protection. The Commissioner may grant upon written application, permission to collect specimens, take samples and conduct other investigations for scientific or educational purposes. Such permission shall be in writing and shall be subject to such conditions as the Commissioner deems necessary.

(2)  No person shall possess food or beverage inside of historic structures unless permitted by the Department of Energy and Environmental Protection.

(c) **Hunting/weapons.**

Hunting or carrying of firearms, archery equipment or other weapons, including but not limited to air rifles and slingshots, is not permitted in any state park or forest except as authorized by the Department of Energy and  Environmental Protection. All carrying or use of weapons is subject to applicable provisions of the Connecticut General Statutes and regulations adopted thereunder.

(d) **Fishing**.

Fishing is permitted in all state parks and forests, except in designated swimming areas and other areas so posted. Fishing where permitted, is allowed from sunrise to sunset unless otherwise posted. All fishing is subject to the provisions of Chapter 490 of the General Statutes and regulations adopted thereunder.

(e) **Alcoholic beverages**.

(1)  The possession or consumption of alcoholic beverages in the following state parks and state forest recreation areas is prohibited:

(A)  Bigelow Hollow State Park;

(B)  Black Rock State Park and campground;

(C)  Burr Pond State Park;

(D)  Eagleville Dam;

(E)  Hopeville Pond State Park and campground;

(F)  Housatonic Meadows State Park and campground;

(G)  Indian Well State Park;

(H)  Kent Falls State Park;

(I)  Kettletown State Park and campground;

(J)  Macedonia Brook State Park and campground;

(K)  Mansfield Hollow State Park;

(L)  Mashamoquet Brook State Park, East Killingly Pond area;

(M)  Miller's Pond State Park;

(N)  Nepaug State Forest;

(O)  Osbornedale State Park;

(P)  Mt. Misery and Green Falls campgrounds in Pachaug State Forest;

(Q)  Scantic River State Park;

(R)  Silver Sands State Park;

(S)  Squantz Pond State Park; and

(T)  Sherwood Island State Park.

(2)  For any state park or state forest recreation area not listed in subdivision (1) of this subsection, the following requirements apply:

(A)  The possession or consumption of alcoholic beverages is prohibited on state park beaches, state forest recreation area beaches, boardwalks and other areas so posted.

(B)  The possession of beer in containers larger than one liter is prohibited.

(C)  The sale of alcoholic beverages is prohibited, unless authorized in writing by the commissioner.

(D)  The Commissioner shall have the authority to temporarily ban, for periods up to a maximum of ninety days, the possession or use of alcohol at specific recreation areas if its possession or consumption is creating public safety issues as determined by the Commissioner.

(E)  The possession or consumption of alcoholic beverages by a minor on lands under the Commissioner's control is prohibited.

(f)  **Pets and riding animals**.

(1)  Pets and riding animals are prohibited in Sherwood Island and Squantz Pond State Parks from April 15 to September 30, inclusive. Except as provided in subdivision (5) of this subsection, riding animals and pets shall be on a leash that is no longer than seven (7) feet in length, and must be under the control of their owner or keeper at all times.

(2)  Pets and riding animals, including, but not limited to dogs and horses, are prohibited in the following areas of state parks and forests at all times: all buildings, swimming areas and other areas so posted. No person shall allow any pet or riding animal under their control to enter a waterbody in which there is a Department of Energy and Environmental Protection designated swimming area from anywhere on Department of Energy and Environmental Protection property containing that swimming area from April 1 through September 30, inclusive.

(3)  In state forest campgrounds, no more than two pets shall be allowed per campsite. Pets are prohibited from state park campgrounds.

(4)  Trained service animals, required to perform a specific task and for the ongoing treatment of a disability or health condition, are permitted in all areas not closed to the public while accompanied by the person needing their assistance.

*Regulations of Connecticut State Agencies*

TITLE 23. Parks, Forests & Public Shade Trees

*Department of Energy and Environmental Protection*                                    *§23-4-1*

(5)  This subsection shall not apply to the proper use of dogs while in the act of hunting, training or deployment of certified search and rescue dogs or to Law Enforcement or Department of Energy and Environmental Protection personnel acting in the course of their employment.

(6)  Persons bringing pets or riding animals to state recreation picnic areas, athletic fields, man-made structures, paved surfaces, beaches where permitted and campgrounds, with the exception of horse camps, shall remove and properly dispose of pet waste (feces) left by the pet or riding animal under their control.

(g)  **Notices and signs.**

No person shall erect, post or distribute any notice or sign upon state park or forest property unless authorized by the Department of Energy and Environmental Protection manager in charge of such park or forest property.

(h)  **Commercial restrictions.**

The use of state park or forest lands or any improvements thereon for private gain or commercial purposes is prohibited, except by concessionaires or vendors with written permission of the Commissioner, or the Commissioner's designee, or by Special Use License issued by the Department of Energy and Environmental Protection.

(i)  **Meetings and proselytism.**

Political meetings and proselytism may be conducted only in areas and at times approved by the Commissioner of the Department of Energy and Environmental Protection or the Commissioner's designee. Such approval shall not be unreasonably withheld.

(j)  **Littering.**

No person shall dispose of any material in a state park or forest, except in receptacles provided for such disposal.

(k)  **Dumping.**

Disposing of any material in a state park or forest which was not accumulated during the use of such facilities is prohibited.

(*l*)  **Trails and roads.**

(1)  Trails are open to non-motorized, multiple use activities unless posted closed. Use of any trail, road or path posted as closed by the Department of Energy and Environmental Protection is prohibited.

(2)  Use of Connecticut Blue-Blazed Trails and the National Park Service Appalachian Trail crossing state property shall be limited to hiking except where Department of Energy and Environmental Protection blazed trails supporting other uses coincide.

(3)  Public roadways in state parks and forests are open to motor vehicles with a registration, as such terms are defined in Section 14-1 of the Connecticut General Statutes and other non-motorized multiple uses unless posted closed.

(4)  Service, logging and other roads closed to public use by motor vehicles are open to non-motorized multiple use activities unless posted closed.

(m)  **Boats.**

(1)  Boats shall be restricted to areas posted for boating by the Department of Energy and

*Regulations of Connecticut State Agencies*

TITLE 23. Parks, Forests & Public Shade Trees

§23-4-1                                    *Department of Energy and Environmental Protection*

Environmental Protection, and are prohibited in swimming areas.

(2)  No person shall fasten a boat to any state park or forest pier or anchor in any launching area so as to prevent free access to the pier or launching area.

(3)  Vessels launching from Squantz Pond State Boat Launch are prohibited from using a motor or combination of motors in excess of 25 horse power. Larger motors may be attached to such vessels but the propeller must be removed and the motor inclined out of the water or as high as possible. No motorized vessels may land or offload/unload passengers or equipment on Department of Energy and Environmental Protection owned property outside of the launch area.

(4)  Vessels launching from Lake Waramaug State Park are prohibited from using a motor or combination of motors in excess of 12 horse power.  Such motor boats may only be launched from the state park property if they can be carried by no more than two individuals into the water.  Prior to launching, all such motor boats shall be inspected for the presence of invasive plant material at the town of Washington boat ramp.

(n)  **Gambling.**

Gambling in any form on state park or forest property is prohibited.

(o)  **Disorderly conduct.**

Disorderly conduct, public nudity, intoxication, and obscene or indecent behavior are prohibited, and all forms of rough play, or activities or contests creating hazards to persons or property, including, but not limited to, the use of paintball guns or other similar devices, are prohibited.

(p)  **Picnicking.**

Picnicking is allowed unless otherwise posted by the Department of Energy and Environmental Protection.

(q)  **Fires.**

(1)  Fires may be kindled only in grills, stoves, fireplaces or other designated campfire facilities.

(2)  No person may kindle or maintain a fire within five (5) feet of any tree, building or shrub, except in those locations where the Department of Energy and Environmental Protection has provided fireplaces or grills.

(3)  Fire residue shall be properly disposed of in hot coal/ash receptacles, where provided.

(4)  Fire residue shall not be disposed of in a manner that may damage property or cause injury to a person.

(5)  No fire shall be left unattended.

(r)  **Athletics.**

The playing of baseball, football, soccer, golf or other athletic games is allowed unless otherwise restricted.

(s)  **Swimming.**

(1)  Swimming is allowed except where posted as prohibited by the Department of Energy and Environmental Protection.

(2)  All persons in swimming areas shall obey the lifeguards.

*Regulations of Connecticut State Agencies*

TITLE 23. Parks, Forests & Public Shade Trees

(3) Swimming hours are from sunrise to sunset.

(4) No person shall swim in long pants, a long-sleeved shirt, a skirt, a dress or other restrictive clothing.

(5) Washing of persons or articles in the waters of swimming areas is prohibited.

(t) **Glassware.**

The possession or use of glass on the beach or in swimming areas is prohibited.

(u) **Fireworks.**

The possession or use of all classes of fireworks in any state park or forest is prohibited except as authorized by the Commissioner of Energy and Environmental Protection. Such authorization shall be in writing and subject to the applicable provisions of the Connecticut General Statutes and regulations adopted thereunder and such conditions as the Commissioner deems necessary.

(v) **Swimming aids.**

(1) Inflatable or buoyant devices (including, but not limited to, inner tubes, ring buoys, balls, air mattresses and rafts) are prohibited in those areas at state swimming areas that are protected by on-duty lifeguards, except for U.S. Coast Guard approved personal flotation devices when worn by swimmers. The use of U.S. Coast Guard approved personal flotation devices may be required in certain areas as determined to be appropriate by the Department of Energy and Environmental Protection. These areas shall be designated by the posting of conspicuous signs notifying individuals of the required use of the U.S. Coast Guard approved personal flotation devices.

(2) Snorkels are prohibited in guarded swimming areas.

(3) Goggles, facemasks and flippers are permitted in swimming areas.

(w) **Under-water fishing devices.**

Under-water fishing devices are prohibited in designated swimming areas.

(x) **Noise.**

No person shall cause or allow any noise which infringes on the ability of others to enjoy state park or forest property, except as authorized by the Commissioner of the Department of Energy and Environmental Protection or the Commissioner's designee.

(y) **Avoidance of fees.**

The avoidance of fees established in accordance with Section 23-26 of the Connecticut General Statutes at the various state parks and forests is prohibited.

(z) **Buildings and structures.**

(1) No person shall use any building or structure for any purpose other than that for which it is designated.

(2) No person may attach any electrical extension cord to any electrical receptacle unless authorized by the Department of Energy and Environmental Protection manager in charge.

(aa) **Public water facilities.**

(1) The use of public drinking water facilities for the purpose of washing is prohibited.

(2) No person shall attach any item to a faucet without prior approval of the Department of Energy and Environmental Protection manager in charge.

(bb)  **Losses or theft.**

The state assumes no responsibility for the loss or theft of any article in any state park or forest.

(cc)  **Tents.**

(1)  Full coverage tents are not permitted in day-use areas, including, but not limited to, beaches, parking lots and picnic areas.

(2)  Rigid frame (event-type) tents are not permitted to be erected on state park or forest property except as authorized in writing by the Commissioner of Department of Energy and Environmental Protection or the Commissioner's designee.

(Effective July 13, 1993; Amended July 27, 2007; Amended July 7, 2014; Amended June 7, 2017)

**Sec. 23-4-2.   Vehicles – traffic and parking regulations**

(a)  **Parking**.

Parking of vehicles shall be limited to such places and hours as designated by markings, signs or postings. It shall be prima facie evidence that the registered owner of the vehicle was the operator at the time of any parking violation.

(b)  **Speed limit.**

Unless otherwise posted, the speed of any vehicle in state parks or forests shall not exceed twenty (20) miles per hour.

(c)  **Traffic signs.**

No person shall operate, park or stand any motor vehicle in a manner contrary to any traffic or parking sign.

(d)  **Motor vehicles, use restricted.**

Motor vehicles, including motorcycles and motorized bicycles, are restricted to operating on roads, parking lots, campsites and other areas posted for such, except as authorized by the Department of Environmental Protection. The use of all other motor vehicles, except motorized wheelchairs, is prohibited, except as authorized by the Department of Environmental Protection.

(e)  **All-terrain vehicles and snowmobiles, use restricted.**

No person shall use any all-terrain vehicle or snowmobile, as defined in Section 14-379 of the General Statutes on any state park or forest land except in areas posted for the use of such vehicles.

(Effective June 24, 1986; Amended July 27, 2007)

**Sec. 23-4-3.   Camping regulations**

(a)  **Campground areas.**

Camping is restricted to such places and times as are designated by the Department of Environmental Protection.

(b)  **Camping permit.**

(1)  Any person wishing to camp in a state park or forest campground area must secure a permit.

*Regulations of Connecticut State Agencies*

TITLE 23. Parks, Forests & Public Shade Trees

*Department of Energy and Environmental Protection*                                             *§23-4-3*

(2) A person must be eighteen years of age or older to secure a camping permit.

(3) The permittee is responsible for the campsite and the conduct of all members of the camping party and all visitors to the campsite.

(4) No one shall occupy a campsite prior to check-in time or stay past check-out time of the last day covered by the permit. Equipment left on the site after the date and time of expiration of the permit will be considered abandoned.

(c) **Camping equipment.**

(1) No person shall place any vehicle, camping or other equipment on any state park or forest campsite without a permit.

(2) Camping is restricted to camp trailers, tents and similar equipment except where otherwise designated by the Department of Environmental Protection manager in charge.

(3) Any and all camping equipment on a single campsite may not occupy a total of more than four hundred (400) square feet of ground area.

(4) Any unauthorized or abandoned vehicles, camping or other equipment may be removed by any law enforcement officer of the Department of Environmental Protection or by the Department of Environmental Protection manager in charge or his or her designee. Any fees or fines incurred or costs for removal, disposal or storage of equipment shall be the responsibility of the owner of the equipment.

(d) **Trespassing.**

No person shall trespass on the campsite of another.

(e) **Transfer of permit.**

No person shall transfer a camping permit to another.

(f) **Lights.**

All lights on a campsite, except those needed for safety, shall be extinguished by 11:00 P.M.

(g) **Campfires.**

No combustible material shall be added to campfires after 11:00 P.M.

(h) **Quiet hours.**

No person shall cause or allow any noise, which disturbs the tranquility of others between the hours of 10:00 p.m. and 7:00 a.m.

(i) **Campground parking.**

The maximum number of motor vehicles allowed per campsite is two (2) unless posted otherwise.

(j) **Campsite occupancy.**

The maximum number of occupants allowed per campsite is six. However, a parent or parents accompanied by any number of their children under the age of eighteen may occupy a single campsite irrespective of the six person limitation.

(k) **Visitors.**

Visitors shall park in designated visitor parking areas only and shall not otherwise drive or park within the campground. Visitors are permitted to enter state park or forest campgrounds between the hours of 8:00 A.M. and sunset, and must leave the campgrounds

*Regulations of Connecticut State Agencies*

TITLE 23. Parks, Forests & Public Shade Trees

§23-4-4                                          *Department of Energy and Environmental Protection*

by10:00 P.M.

(*l*)  **Permit forfeiture.**

A permit shall be forfeited if the permittee fails to occupy the campsite within the first twenty-four (24) hour period for which the permit has been granted.

(Effective June 24, 1986; Amended July 27, 2007)

**Sec. 23-4-4.   Bluff Point Coastal Reserve regulations**

(a)  This section shall be applicable to the Bluff Point Coastal Reserve, which is defined in Special Act 75-45, as amended. Sections 23-4-1 through 23-4-3 inclusive and 23-4-5 of the Regulations of Connecticut State Agencies, to the extent they do not conflict with this section, shall also be applicable to the Bluff Point Coastal Reserve.

(b)  **Hours of operation.**

(1)  Bluff Point Coastal Reserve shall be open to the public daily from sunrise until sunset, provided that fishing shall be allowed at any time. Except as is specifically provided for in subdivision (2) of this subsection, no person shall enter Bluff Point Coastal Reserve except when it is open.

(2)  The Commissioner shall close Bluff Point State Park and Bluff Point Coastal Reserve for the taking of deer pursuant to section 26-86a-11 of the Regulations of Connecticut State Agencies. During any such closure only persons employed by the Department of Environmental Protection whose employment requires them to do so or persons with specific written authorization from the Commissioner shall be allowed to enter Bluff Point State Park or Bluff Point Coastal Reserve during the days or hours designated by the Commissioner. To effect such closure the Commissioner shall post notices or signs or shall otherwise notify the public that Bluff Point State Park and Bluff Point Coastal Reserve are closed, including the hours or days that they will remain closed.

(c)  **Weapons.** Except for authorized law enforcement personnel or persons authorized pursuant to section 26-86a-11 of the Regulations of Connecticut State Agencies, no person shall discharge, possess or carry any firearm, archery equipment or other weapon, including but not limited to an air rifle or sling shot within Bluff Point Coastal Reserve.

(d)  **Pets.** Subsection (f) of section 23-4-1 of the Regulations of Connecticut State Agencies shall apply, provided that no pets or riding animals shall be allowed into any area so posted by the Commissioner.

(e)  **Notices and signs.** No person, other than the Commissioner, shall erect or post, or attempt to erect or post, any notice or sign in Bluff Point Coastal Reserve. The Commissioner may erect or post any sign or notice within Bluff Point Coastal Reserve consistent with Special Act 75-45, as amended.

(f)  **Improvements/structures and commercial restrictions.**

(1)  No person, other than the Commissioner, shall, temporarily or otherwise, make improvements to or erect structures on or in Bluff Point Coastal Reserve. The Commissioner may make improvements to or erect structures on or in Bluff Point Coastal Reserve consistent with Special Act 75-45, as amended.

0836

*Regulations of Connecticut State Agencies*

TITLE 23. Parks, Forests & Public Shade Trees

*Department of Energy and Environmental Protection*                    §23-4-4

(2)  Except with the advance written authorization of the Commissioner, no person shall use Bluff Point Coastal Reserve for private financial gain or for commercial purposes. Any such authorization granted by the Commissioner shall be for the purposes specified in Special Act 75-45, as amended.

(g)  **Waste disposal.** No person shall dispose of any waste material at Bluff Point Coastal Reserve except in a receptacle provided by the Commissioner for such purpose and provided that all such waste material was generated there as a normal incident to such person's lawful use of Bluff Point Coastal Reserve. If no receptacle is provided by the Commissioner, each person shall remove or carry out of Bluff Point Coastal Reserve all such waste material accumulated or generated there by such person during such person's use of Bluff Point Coastal Reserve. No person shall bring any waste material into Bluff Point Coastal Reserve for disposal therein.

(h)  **Fires.** No person shall light a fire at Bluff Point Coastal Reserve.

(i)  **Fireworks.** No person shall possess or use fireworks at Bluff Point Coastal Reserve.

(j)  **Use of motor vehicles and parking.**

(1)  Except as is specifically provided for in this subsection, no person shall use or operate any motor vehicle within, allow any motor vehicle to enter into, or park any motor vehicle within Bluff Point Coastal Reserve. Any such unauthorized vehicle within Bluff Point Coastal Reserve may be towed at the owner's expense. For purposes of this subsection, the term motor vehicle shall include any motor vehicle, motorcycle, motorized bicycle, camp trailer, camper, motor bus, mechanically driven mass conveyance, snowmobile, all-terrain vehicle, truck, trailer or tractor.

(2)  Only the following persons may use or park a motor vehicle, a battery-powered conveyance as described in subparagraph (C) of this subdivision, or a horse-drawn or electric-powered conveyance within Bluff Point Coastal Reserve:

(A)  Department of Environmental Protection employees using a motor vehicle within the course of their employment;

(B)  Persons responding to an emergency within Bluff Point Coastal Reserve;

(C)  Persons using battery-powered conveyances capable of carrying not more than two persons for use by the physically disabled or the elderly provided any such person receives advance written authorization from the Commissioner to operate or park a battery-powered conveyance within Bluff Point Coastal Reserve; or

(D)  Persons using horse-drawn or electric-powered conveyances, provided any such person receives advanced written authorization from the Commissioner to operate or park such conveyance within Bluff Point Coastal Reserve.

(3)  Any such motor vehicle or conveyance lawfully within Bluff Point Coastal Reserve shall only be used along established roadways therein, unless otherwise authorized by the Commissioner. Such authorization shall be consistent with Special Act 75-45, as amended.

(k)  **Camping.** No person shall camp at Bluff Point Coastal Reserve.

(Effective October 4, 1995; Amended July 27, 2007; Amended May 3, 2010)

**Sec. 23-4-5.   Evictions and penalties**

(a)  **Eviction.**

(1)  Violation of any provision of sections 23-4-1 through 23-4-4, inclusive, of the Regulations of Connecticut State Agencies shall be sufficient cause for eviction for a period of twenty-four hours.

(2)  No person evicted with written notice shall enter any state park or forest during the eviction period.

(b)  **Penalties.**

(1)  Any person who violates any provision of sections 23-4-1 through 23-4-4, inclusive, of the Regulations of Connecticut State Agencies shall have committed an infraction.

(2)  (A)  Any person who violates any provision of sections 23-4-1 to 23-4-4, inclusive, of these regulations shall pay a fine of thirty five-dollars ($35.00).

(B)  Any person who enters a state park or forest during an eviction period in violation of subsection (a) of this section shall pay a fine of seventy-five dollars ($75.00).

(Effective June 24, 1986; Amended July 27, 2007; Amended May 3, 2010)

**Sec. 23-4-6.   Transferred**

Transferred to Sec.  23-26,  September 8, 1998

**Use and Fee Structure of Certain State Park Facilities**

**Sec. 23-4-7.   Applicability**

Sections 23-4-7 through 23-4-22, inclusive, govern the rental of facilities at Harkness Memorial State Park, Rocky Neck State Park, Fort Trumbull State Park, Gillette Castle State Park and Putnam Memorial State Park. Violation of any provision of such sections shall be deemed an infraction and shall be punishable by a fine of up to $90 or by such higher fine as may be provided by law.

(Adopted effective July 26, 1999; Amended June 29, 2007)

**Sec. 23-4-8.   Definitions**

For the purposes of sections 23-4-7 through 23-4-22 inclusive:

(1)  "Alcoholic beverage" means an alcoholic beverage as defined by section 30-1 of the general statutes;

(2)  "Amphitheatre" means the open area with bench seating, south-west of the mansion at Harkness Memorial State Park;

(3)  "Columbus Day" means the second Monday in October;

(4)  "Commissioner" means the Commissioner of Environmental Protection or the Commissioner's representative;

(5)  "Conference Center" means the building west and north of the fort at Fort Trumbull State Park;

(6)  "Contractor" means a person retained, whether or not for compensation, by a renter in connection with an event, including but not limited to a caterer, bartender, photographer,

*Regulations of Connecticut State Agencies*

TITLE 23. Parks, Forests & Public Shade Trees

*Department of Energy and Environmental Protection* §23-4-8

musician, florist, or entertainer;

(7) "Department" means the Department of Environmental Protection;

(8) "Event" means a social, cultural, or business function, including but not limited to a party, reception, fund raiser, concert, conference or seminar. An event includes the primary event activity as well as set-up and take-down;

(9) "Fort" means the lower level interior courtyard excluding rooms on the western side and the rampart at Fort Trumbull State Park;

(10) "FT Visitor Center" means the building west and south of the Fort;

(11) "GC Visitors' Center" means the orientation room, central hall and veranda of the Visitors' Center at Gillette Castle State Park;

(12) "Individual Rooms" means any one or more of the rooms of the Mansion;

(13) "Mansion" means the first floor, bride's room and the south courtyard tent of the Mansion at Harkness Memorial State Park;

(14) "Memorial Day" means the last Monday of May;

(15) "Park" means Harkness Memorial State Park, Rocky Neck State Park, Fort Trumbull State Park, Gillette Castle State Park or Putnam Memorial State Park in the context of sections 23-4-7 through 23-4-22, inclusive, of the Regulations of Connecticut State Agencies;

(16) "Park Supervisor" means the Department employee stationed at the Park who has ultimate responsibility at that Park for operations thereof;

(17) "Pavilion" means the second floor of the Ellie Mitchell Pavilion at Rocky Neck State Park;

(18) "Pergola" means the arbor and tea room structure at the north end of the west garden of the Mansion;

(19) "Person" means person as defined by section 22a-2 of the general statutes;

(20) "PM Visitor's Center" means the historic building and visitors' center at Putnam Memorial State Park;

(21) "Premises" means the Mansion, the Amphitheatre, the Pergola, any of the Individual Rooms, the Pavilion, the Fort, Conference Center, FT Visitor Center, South Lawn or GC Visitors' Center and Veranda, and PM Visitor's Center and all structures and appurtenances thereof;

(22) "Primary event activity" or "primary activity" means the endeavor or endeavors which are the event's principal purpose and excludes set-up and take-down;

(23) "Rampart" means the upper tier of the Fort;

(24) "Rental or "rent" means the occupation, for the fees and under the conditions specified in Sections 23-4-7 through 23-4-22, inclusive, of any of the premises (a) for the purpose of holding an event, and (b) the exclusion of all persons other than the renter, his guests, his contractors, and representatives of the Department;

(25) "Renter" means a person who rents, as that term is defined in this section;

(26) "Set-up" means activities conducted in preparation for the primary event activity, including but not limited to: food preparation, decoration with flowers or other items, setting

*Regulations of Connecticut State Agencies*

TITLE 23. Parks, Forests & Public Shade Trees

§23-4-9                                    *Department of Energy and Environmental Protection*

up of tables and chairs, and delivery of equipment and supplies;

(27)  "South Lawn" means the lawn area south of the Fort;

(28)  "Take-down" means activities associated with cleaning up after the primary event activity, including but not limited to removing supplies and equipment, cleaning the premises, and removing waste generated by the event; and

(29)  "Terrace" means the outdoor area adjacent to and on the southwest side of Gillette Castle.

(Adopted effective July 26, 1999; Amended June 29, 2007)

**Sec. 23-4-9.   Facilities available for rental**

(a)  At Harkness Memorial State Park, the Mansion, Individual Rooms, and Amphitheatre may be rented singly or in combination for an event.

(b)  At Rocky Neck State Park, the Pavilion may be rented for an event.

(c)  At Fort Trumbull State Park, the South Lawn, Conference Center and Visitor Center may be rented singly or in combination with the Fort for an event.

(d)  At Gillette Castle State Park, only the Visitors' Center and the Veranda may be rented for an event. The Terrace may be rented for ceremonies only.

(e)  At Putnam Memorial State Park, the Pavilion may be rented for an event.

(Adopted effective July 26, 1999; Amended June 29, 2007)

**Sec. 23-4-10.   Availability of premises**

(a)  **Harkness Memorial State Park:**

(1)  Except as provided in subdivision (2) of this subsection, from March 1 through December 23, the Mansion, Pergola, and Amphitheatre may be rented for an event Tuesday through Sunday between 10:00 a.m. and midnight.

(2)  From Memorial Day through Columbus Day and on any day when the Mansion is open for public tours, an event may begin no earlier than 3:00 p.m. and the primary activity of such event may begin no earlier than 5:00 p.m.

(3)  Except as provided in subdivision (4) of this subsection, from March 1 through the Thursday preceding Memorial Day and from the day after Columbus Day through December 23, the Individual Rooms may be rented for a meeting, seminar or conference on Tuesday through Friday between 8:00 a.m. and 4:00 p.m.

(4)  A guest may not enter the rented premises until the primary event activity is scheduled to begin.

(b)  **Rocky Neck State Park:**

(1)  From Memorial Day through Columbus Day, the Pavilion may be rented for an event any day of the week until midnight, provided that (A) on Monday through Thursday an event may begin no earlier than 8:00 a.m. and the primary activity of such event may begin no earlier than 10:00 a.m., and (B) on Friday through Sunday such an event may begin no earlier than 3:00 p.m. and the primary activity of such an event may begin no earlier than 5:00 p.m.

*Regulations of Connecticut State Agencies*

TITLE 23. Parks, Forests & Public Shade Trees

*Department of Energy and Environmental Protection*                                            *§23-4-11*

(c) **Fort Trumbull State Park:**

(1) The Fort and South Lawn may only be rented on days when the facility is open for public visitation. From Columbus Day through Memorial Day, the South Lawn and Fort are not available for rental. The curfew at the park is 11:00 p.m.

(2) The FT Visitor Center and the Conference Center are available for rental, year round. From Columbus Day to Memorial Day, the buildings are not available for rental on Saturdays and Sundays;

(3) The Fort, South Lawn, FT Visitor Center and Conference are not available for rental on state or national holidays;

(4) A guest may not enter the rented premises until the event activity is scheduled to begin.

(d) **Gillette Castle State Park:**

1. The GC Visitors' Center is available for rental, year round. From Columbus Day to Memorial Day, the building is closed on Mondays. Events may not begin prior to 5:00 p.m. and they must conclude by 11:00 p.m.

2. A guest may not enter the rented premises until the primary event activity is scheduled to begin.

3. From June through September, excluding holiday weekends, the terrace is available for wedding ceremonies on Saturdays at 10:00 a.m. or 5:30 p.m. for a period of one-half hour.

4. The building is not available for rental on state or national holidays.

(e) **Putnam Memorial State Park:**

(2) The PM Pavilion is available for rental, year round. Events must conclude by 11:00 p.m.

(3) The pavilion is not available for rental on state or national holidays.

(f) The renter shall be liable for the failure of any guest or contractor to vacate the rented premises by the time the event is scheduled to end.

(Adopted effective July 26, 1999; Amended June 29, 2007)

**Sec. 23-4-11.   Rental fees**

Rental fees for events will be in effect until December 31, 2006. Starting in January 2007 and every three years thereafter, rental rates will be evaluated by the Commissioner. Based on the Consumer Price Index (CPI) of the previous 3 year period and rates at similar facilities within the southeastern and western Connecticut regions, the fees will be adjusted to reflect the current market. At no time will the rates increase by more than 3.3% in a given year or 10% for the next 3 year period. The fees will be rounded to the nearest $50 increment. Rental fees shall be charged as follows:

(a) **The Mansion:**

(1) First floor and bride's room and south courtyard tent for an event scheduled to last up to 7½ hours shall cost $4,200, provided that if the applicable contract between the Commissioner and renter provides for the event to last longer than 7½ hours, the rental fee

0841

*Regulations of Connecticut State Agencies*

TITLE 23. Parks, Forests & Public Shade Trees

§23-4-11                                    *Department of Energy and Environmental Protection*

shall include the $4,200 fee for the first 7½ hours plus $700 for each hour or fraction thereof thereafter until the scheduled end of the event.

(2) First floor, south courtyard tent, Amphitheatre, or Pergola, for an event scheduled on Tuesday, Wednesday, or Thursday to last for up to 6½ hours and scheduled to end no later than 11:00 p.m. shall cost $3,100.

(3) For each hour or fraction thereof beyond the time an event is scheduled the renter shall pay an additional fee of $1,000. Additionally, the Commissioner may be entitled to any damages or other amounts by virtue of the renter's failure, or that of his guests or contractors, to vacate the rented premises by the scheduled end of the event.

(b) **The Amphitheatre:**

(1) For every unit of two hours or fraction thereof the cost shall be $300, provided that if the Amphitheatre is used during an event for which the Mansion has been rented, there is no rental fee for the first two hours of such use.

(2) For each hour or fraction thereof beyond the time an event is scheduled to last and in addition to any damages or other amounts to which the Commissioner may lawfully be entitled by virtue of the renter's failure, or that of his guests or contractors, to vacate the rented premises by the scheduled end of the event, an additional cost of $350 shall be assessed.

(c) **The Pergola:**

(1) The Pergola may be rented only in conjunction with an event at the Mansion and then only for a period of no longer than two hours beginning at the scheduled commencement of such event.

(2) For an event scheduled to last up to two hours the cost shall be $400.

(3) For each hour or fraction thereof beyond two hours; any damages or other amounts to which the Commissioner may lawfully be entitled by virtue of the renter's failure, or that of his guests or contractors, to vacate the Pergola by the scheduled end of the event, an additional amount of $400 shall be assessed.

(d) **Individual Rooms:**

(1) Music Room: For an event scheduled to last up to four hours, the fee shall be $450, provided that if the applicable contract between the Commissioner and renter provides that the event will last longer than four hours, the rental fee shall be the applicable amount plus, for each hour or fraction thereof beyond four hours until the scheduled end of the event, $110.

(2) Dining Room: For an event scheduled to last up to four hours, the fee shall be $350; provided that if the applicable contract between the Commissioner and renter provides that the event will last longer than four hours, the rental fee shall be the applicable amount plus, for each hour or fraction thereof beyond four hours until the scheduled end of the event, $80.

(3) Breakfast Room: For an event scheduled to last up to four hours, the fee shall be $300, provided that if the applicable contract between the Commissioner and renter provides that the event will last longer than four hours, the rental fee shall be the applicable amount plus,

0842

*Regulations of Connecticut State Agencies*

TITLE 23. Parks, Forests & Public Shade Trees

*Department of Energy and Environmental Protection* §23-4-11

for each hour or fraction thereof beyond four hours until the scheduled end of the event, $70.

(4) For each hour or fraction thereof beyond the time an event is scheduled to last, a further fee of $500 shall be assessed. This amount is in addition to any damages or other amounts to which the Commissioner may lawfully be entitled by virtue of the renter's failure, or that of his guests or contractors, to vacate the rented premises by the scheduled end of the event, $500.

(e) **The Pavilion:**

(1) For an event of 250 people or less scheduled to last up to 7½ hours, the fee shall be $2,400, provided that if the applicable contract between the Commissioner and renter provides that the event will last more than 7½ hours, the rental fee shall be the applicable sum plus $575 for each hour or fraction thereof until the scheduled end of the event.

(2) For an event of over 250 people scheduled to last up to 7½ hours, the fee shall be $3,800, provided that if the applicable contract between the Commissioner and renter states that the event will last more than 7½ hours, the rental fee shall be the initial sum plus $675 for each hour or fraction thereof until the scheduled end of the event.

(3) For each hour or fraction thereof beyond the time an event is scheduled to last: In addition to any damages and other amounts to which the Commissioner may lawfully be entitled by virtue of the renter's failure, or that of his guests or contractors, to vacate the rented premises by the scheduled end of the event, an additional $750 fee shall be applicable.

(f) **The Fort:**

(1) The courtyard of the Fort and the Rampart may only be rented in conjunction with an event on the South Lawn, the Conference Center or the FT Visitor Center for a maximum of 2 hours. A fee of $1,320 shall be applicable, however, if the contract between the Commissioner and renter provides that the event will last more than 2 hours, the rental fee shall be the initial fee plus for each hour or fraction of an hour thereafter until the scheduled end of the event, an additional $650. Under no circumstances shall the Fort be rented for more than 4 hours.

(2) The South Lawn may be rented for an event scheduled to last up to 7½ hours for a fee of $3,300. If the applicable contract between the Commissioner and renter provided that the event last more than 7½ hours, the rental fee shall be the initial sum plus $650 for each hour or fraction thereof until the scheduled end of the event.

(i) The renter is responsible for providing sanitary facilities for the event; the quantity and location of the units shall be coordinated with the park supervisor.

(3) The fee for the Conference Center for an event scheduled to last no more that 4 hours, for a non-profit organization that is eligible for or complies with section 501(C)(3) of the Internal Revenue Code, shall be $110. The fee for an individual, a for-profit organization or company for an event scheduled to last no more than 4 hours shall be $550. The rental fee for each hour or fraction thereof beyond the time an event is scheduled to last shall be the original fee plus $140 for each hour or fraction thereof until the scheduled end of the event. No alcohol shall be served. A guided tour of the Fort with the rental is an additional

*Regulations of Connecticut State Agencies*

TITLE 23. Parks, Forests & Public Shade Trees

$110.

(4) The fee at the FT Visitor Center for an event scheduled to last no more than 4 hours is $1,100. A guided tour of the fort with the rental is an additional $275. In addition to any damages and other amounts to which the Commissioner may lawfully be entitled by virtue of the renter's failure, or that of his guests or contractors, to vacate the premises by the scheduled end of the event, for each hour or fraction thereof beyond the time an event is scheduled to last an additional fee of $575 shall be assessed.

(g) **GC Visitors' Center:**

(1) The rental for the GC Visitors' Center for an event scheduled to last no more than 4 hours is $1,600. For each hour or fraction thereof until the scheduled end of the event, an additional fee of $400 shall be assessed.

(2) The fee for the GC Visitors' Center for an event scheduled to last no more than 4 hours on a weekday morning for a non-profit organization, which is eligible for or complies with section 501(C)(3) of the Internal Revenue Code, is $300. The fee for an individual, a for-profit organization or company for an event scheduled to last no more than 4 hours is $550. For each hour or fraction thereof until the scheduled end of the event, a fee of $140 shall be assessed. The group is responsible for set-up and cleaning. No alcohol shall be served.

(3) The terrace is available for one-half (1/2) hour for ceremonies. The fee for use of the terrace is $225.

(4) In addition to any damages and other amounts to which the Commissioner may lawfully be entitled by virtue of the renter's failure or that of his guests or contractors to vacate the rented premises by the scheduled end of the event, a fee of $500 shall be assessed.

(h) **PM Pavilion:**

(1) The fee to rent the Pavilion for an event scheduled to last no more than 4 hours, for a non-profit organization, that is eligible for or complies with section 501(C)(3) of the Internal Revenue Code, is $110. The fee for an individual, a for-profit organization or company for an event scheduled to last no more than 4 hours is $550. The rental fee shall be applicable plus for each hour or fraction thereof until the scheduled end of the event, a fee of $140 shall be assessed.

(i) A person shall not be deemed eligible under section 23-26 of the general statutes to rent the premises without fee with respect to any event, including, but not limited to, a fundraiser or a garden sale, when such person sponsors or collaborates on the planning of the event with a person that is not so eligible.

(Adopted effective July 26, 1999; Amended June 29, 2007)

**Sec. 23-4-12.   Parking**

The rental fees specified in Section 23-4-11 covers parking in the Park's parking lot by the renter and his or her guests and contractors.

(Adopted effective July 26, 1999; Amended June 29, 2007)

*Regulations of Connecticut State Agencies*

TITLE 23. Parks, Forests & Public Shade Trees

*Department of Energy and Environmental Protection* *§23-4-14*

### Sec. 23-4-13.   Maximum occupancy

The maximum allowable number of individuals, excluding contractors and Department personnel, who may be present on the rented premises in connection with an event, is as follows:

(a)  The Mansion, regardless whether the Amphitheatre, Pergola, or Individual Rooms are rented in connection with an event in the Mansion: 150

(b)  The Amphitheatre: 125

(c)  The Pergola: 150

(d)  Breakfast Room: 30

(e)  Dining Room: 40

(f)  Music Room: 80

(g)  The Pavilion: 425

(h)  The Fort: Maximum based on what is rented in conjunction with the Fort.

(i)  South Lawn: 240

(j)  Conference Center: 60

(k)  FT Visitor Center: 100 standing

(*l*)  GC Visitors' Center: 126 standing, 48 seated

(m)  Terrace: 75

(n)  PM Pavilion: 75 standing

(Adopted effective July 26, 1999; Amended June 29, 2007)

### Sec. 23-4-14.   Applications for rentals; cancellations; insurance

(a)  An application for rental shall be made on a form furnished by the Commissioner and shall provide all of the information requested therein. The Commissioner shall not process an application that does not contain all such requested information.

(b)  For each date that the premises in question is available for rental under Section 23-4-10, the Commissioner shall process completed applications in the order in which they are received. The Commissioner may deny an application because the premises that the applicant wants to rent have already been rented or because the application is inconsistent with any provision of Sections 23-4-7 through 23-4-22, inclusive.

(c)  If the Commissioner approves an application, it shall be deemed granted on the date approved. An application approved by the Commissioner shall, with any approval deemed necessary by the Attorney General, be a binding contract between the applicant and the Commissioner. After the Commissioner has approved an application, the parties may amend its provisions in any manner not inconsistent with Sections 23-4-7 through 23-4-22, inclusive, or with any other pertinent law.

(d)  The Commissioner shall not approve an application for rental unless it is accompanied by a certified check, a bank check or other means approved by the Commissioner, payable to the Department in the amount of 50 per cent of the rental fee specified in Section 23-4-11.

(e)  Sixty days before a scheduled event, the renter shall deliver to the Department a

*Regulations of Connecticut State Agencies*

TITLE 23. Parks, Forests & Public Shade Trees

§23-4-15                                    *Department of Energy and Environmental Protection*

certified check, a bank check or other means approved by the Commissioner, in the amount of (1) 50 per cent of such rental fee plus (2) $500 to constitute security against damage to the rented premises or other portion of the Park resulting from the event. If the renter fails to deliver payment in accordance with this subsection the Department shall cancel the scheduled event and the renter shall not be entitled to a refund of any fees already paid.

(f)  If the renter cancels the rental in writing no later than 180 days before the scheduled event, the Department will return to the canceling renter 100 per cent of that portion of the rental fee which he or she has paid, less $200 for processing, and 100 per cent of any security against damage which he or she has paid. If the renter cancels the rental later than 180 days before the scheduled event, the Department will return to him or her 100 percent of any security against damage, which he or she has paid. If the Commissioner cancels the rental under Subsection 23-4-17 or for any other reason authorized by law, the Department will return to the renter 100 percent any damage deposit he or she has paid.

(Adopted effective July 26, 1999; Amended June 29, 2007)

**Sec. 23-4-15.   Liabilities; commissioner's remedies**

(a)  Nothing in Sections 23-4-7 through 23-4-22, inclusive, shall affect any obligation imposed by law on a renter to obtain any authorizations for activities in connection with an event, including without limitation a special use license under Section 23-11 of the General Statutes.

(b)  By renting any of the premises, the renter agrees to, and shall, indemnify and save harmless the State of Connecticut and the Department of Environmental Protection from any and all claims, damages, losses, litigation, or expenses arising out of any injury, including death, or claims, damages, losses, litigation, or expenses arising out of any injury, including death, or damage to property resulting from any act, omission, or neglect of the renter or any of his guests or contractors.

(c)  From the security against damage deposit paid under Section 23-4-14(f) the Commissioner may retain the following:

(1)  Any amount to cover damage resulting from the event to the rented premises or other portion of the park;

(2)  An amount to cover the rental fee specified under Section 23-4-11;

(3)  An amount to cover the Department's costs if the renter fails to restore the rented premises and any other portion of the Park affected by the event to their condition immediately prior to such event, or to undertake any other action required by Sections 23-4-7 through 23-4-22.

(d)  Before making a claim under the renter's or caterer's insurance policy for costs identified in subsection (c) of this section, the Commissioner shall retain amounts from, as applicable, the renter's or caterer's security against damage in accordance with such subsection. If such security does not fully cover such costs, the Commissioner shall, at his discretion, make a claim under said policy or take appropriate legal action.

(e)  Nothing in Sections 23-4-7 through 23-4-22 shall, unless otherwise provided therein,

*Regulations of Connecticut State Agencies*

TITLE 23. Parks, Forests & Public Shade Trees

*Department of Energy and Environmental Protection* §23-4-17

affect any rights or privileges of the Commissioner or members of the public. The remedies provided to the Commissioner under said sections are cumulative with any other remedies to which he is lawfully entitled.

(Adopted effective July 26, 1999; Amended June 29, 2007)

**Sec. 23-4-16.   Use of caterers' tents**

(a)  For the purpose of food preparation during an event, a caterer may install a tent in the service area of the Mansion, Pavilion or PM Pavilion (maximum 144 square feet). Tents are not allowed at the GC Visitors' Center. At Fort Trumbull State Park, a tent (maximum 200 square feet) may be set up outside of the fort proper. Such a tent may not be installed unless the location, date and time of its installation and removal has been approved by the Park Supervisor.

(b)  No truck or other vehicle shall be driven or parked on the Mansion's lawn in connection with installation or removal of a tent or delivery of supplies.

(c)  Except as provided in this section and section 23-4-21 (d) and 23-4-21(e), no tents may be installed in connection with an event at the Park.

(Adopted effective July 26, 1999; Amended June 29, 2007)

**Sec. 23-4-17.   Catering**

(a)  For any event at the Mansion or GC Visitors' Center where food is served, the renter shall retain a caterer to provide the food; such caterer shall be one that is listed on the Department's list of approved caterers.

(b)  A renter may not retain a caterer in connection with an event at the Pavilion, Fort or PM Pavilion unless, no later than 120 days before such event, the renter submits for the Commissioner's approval the name, address, and the phone number of such caterer and, if appropriate, the name of such caterer's contact person. The Commissioner may disapprove such caterer if the caterer has previously been retained for an event in either Park and at that time did not fully comply with the requirements of this section, did not restore the Kitchen, all areas where food or beverages were served, and any other areas of the rented premises or Park utilized by the caterer to their condition immediately prior to the event, or in any other way failed to demonstrate competence or regard for legal requirements.

(c)  No later than 90 days before an event, the caterer thereof shall deliver to the Commissioner a certificate of insurance executed by an insurance company licensed in Connecticut, stating that the caterer carries both

(1)  Commercial liability insurance including insurance for liquor liability, products and completed operations liability, contractual liability, and personal and advertising injury liability, providing for a total limit of $1,000,000 for all damages arising out of bodily injury to or death of all persons in any one accident or occurrence, and for all damages arising out of injury to or destruction of property in any one accident or occurrence; and stating further that, if such liability insurance is subject to an aggregate limit, the aggregate limit shall be no less than $2,000,000; and stating further that such liability insurance policy names the

*Regulations of Connecticut State Agencies*

TITLE 23. Parks, Forests & Public Shade Trees

§23-4-17                                    *Department of Energy and Environmental Protection*

State of Connecticut as an additional insured; and

(2)  Worker's compensation insurance and employers' liability insurance as required by section 3-291 and 3-284 of the general statutes, respectively, providing for a total limit of not less than $100,000 per occurrence, $100,000 for disease per employee, and $500,000 for disease in the aggregate; provided that a caterer need not obtain liquor liability insurance if alcoholic beverages, including wine, will not be served at the event. If the caterer does not comply with the requirements of this subsection, the Commissioner shall not allow food or beverages to be served at the event. By catering an event, the caterer agrees to, and shall, indemnify and hold the State of Connecticut and Department of Environmental Protection harmless from any and all claims, damages, losses, litigation, or expenses arising out of an injury, including death, or damage to property, resulting from any act, omission, or neglect of the caterer or any of his agents or contractors.

(d)  If caterer fails to comply with the requirements of subsection (c) of this section, the Commissioner may cancel the subject event.

(e)  The caterer is required to have a liquor permit issued pursuant to section 30-37j of the Connecticut General Statutes.

(f)  The caterer shall assure that:

(1)  The only type of food warmer used within the rented premises is an electric warmer or a Sterno warmer, and the only type of food cooker or warmer used outof-doors is propane or electric stove or an outdoor gas or charcoal grill. At Fort Trumbull, a charcoal grill may not be used in the confines of the Fort;

(2)  By the end of the event.

(A)  all waste generated by the event is properly disposed of;

(B)  all equipment and supplies brought into the premises in connection with the event are removed; and

(C)  the Kitchen, all areas where food or beverages were served, and any other areas of the rented premises or Park utilized by the caterer are restored to their condition immediately before the event;

(3)  Alcoholic beverages may only be served to guests by an individual under the control and supervision of the caterer or a licensed retailer;

(4)  Under no circumstance are guests allowed to serve an alcoholic beverages to themselves or any other individuals;

(5)  Kegs of beer are not present on the rented premises;

(6)  Alcoholic beverages are not served to any guest who appears to be intoxicated or who may be under 21 years of age and does not provide legal proof of age;

(7)  Alcoholic beverages served shall be free of charge, tipping a bartender or other server of alcoholic beverages is prohibited, and no bartender or other such server may solicit a tip; and

(8)  Service of alcoholic beverages will stop one-half (1/2) hour before the scheduled end of an event.

(Adopted effective July 26, 1999; Amended June 29, 2007)

*Regulations of Connecticut State Agencies*

TITLE 23. Parks, Forests & Public Shade Trees

*Department of Energy and Environmental Protection* §23-4-20

**Sec. 23-4-18.   Photography**

(a)  Within the rented premises, at Harkness, photography may be conducted only in a room specifically rented for the event. No person may, without the approval and supervision of Department personnel, move any furnishing at Harkness for the purpose of photography.

(b)  Photography shall be allowed at the Harkness gardens during all times when the gardens are open to the public, provided that photography shall not interfere with the public's enjoyment of the gardens.

(Adopted effective July 26, 1999; Amended June 29, 2007)

**Sec. 23-4-19.   Music**

(a)  Musical instruments or other equipment for providing music during an event shall be delivered to the Park only with the approval of the Park Supervisor, and as soon as delivery is completed the vehicle(s) delivering such equipment shall either be parked in the parking lot or removed from the Park.

(b)  A musician or disc jockey retained in connection with an event shall supply any equipment or furnishings he or she needs, including tables, table coverings, and extension cords; all such equipment and furnishings shall be approved prior to scheduled date of the event by the Park Supervisor.

(c)  At an event at the Mansion during which sound is electronically or otherwise amplified, sound shall not be allowed to exceed, on the east side of the south courtyard, 95dBA at the location six feet west of the amplifying equipment or device, and on the west side of the south courtyard in the open loggia, 85dBA at six feet east of the amplifying equipment or device. If the requirements of this subsection are violated, all sound amplification shall be terminated.

(d)  Musicians or disc jockeys are allowed one-half (1/2) hour to vacate the premises at the end of an event. Failure to do so will result in damages as outlined in section 23-4-11.

(Adopted effective July 26, 1999; Amended June 29, 2007)

**Sec. 23-4-20.   Flowers and other decorations**

(a)  No person shall use or allow the use of an open flame in a floral arrangement or other decoration at an event unless the flame is fully enclosed in a hurricane globe, chimney, or similar container.

(b)  Every floral arrangement and other decoration at an event shall be freestanding and shall not be attached by glue, tape, staples, tacks, or any other means to any wall, light fixture, or other appurtenance or furnishing in the rented premises, provided that fabric used as a component of a decoration may, with the approval and supervision of Department personnel, be draped over an appurtenance or furnishing in the rented premises.

(c)  Any container for flowers or plant used in the rented premises shall be watertight and shall, if placed upon or over an appurtenance or other furnishing in such premises, rest on or in a [waterlight] watertight material or object a size and configuration adequate to

§23-4-21                                    *Department of Energy and Environmental Protection*

capture any plant matter and any dripping liquid.

(Adopted effective July 26, 1999; Amended June 29, 2007)

**Sec. 23-4-21.   Miscellaneous requirements**

(a)  If the renter is an individual, he or she shall be present at the event from its scheduled commencement until its scheduled end. If the renter is other than an individual, such renter shall, no later than 60 days before the scheduled event, inform the Commissioner in writing of the name, title, and home and business telephone numbers of an employee or other agent designated by such renter as responsible for assuring compliance with the provisions of Sections 23-4-7 through 23-4-22; and such designee shall be present at the event from its scheduled commencement until its scheduled end.

(b)  No person may smoke in the rented premises.

(c)  No person may throw birdseed, confetti, rice, glitter or silly string at the rented premises.

(d)  In connection with an event, no tent other than a caterer's tent may be used at Rocky Neck State Park and no tent other than the caterer's tent and the south courtyard tent may be used at Harkness Memorial State Park.

(e)  No tents shall be allowed at the GC Visitors' Center or terrace at Gillette Castle State Park. In connection with an event at Fort Trumbull, no tent shall be allowed in the interior of the Fort. Tents may be erected on the south lawn with authorization of the park supervisor. At Putnam Memorial State Park, a caterer's tent (144 square foot maximum) may be set up on the west side of the building only; no other tent will be allowed.

(1)  Tents may be set up on the day of the event and shall be removed by the end of the following business day.

(f)  If alcoholic beverages are to be consumed during an event at Rocky Neck State Park, Fort Trumbull State Park or Putnam Memorial State Park but the renter has not retained a caterer to provide food, the following requirements shall apply:

(1)  The renter shall employ a bartender or other server to serve alcoholic beverages.

(2)  No later than 90 days before the event, the renter shall deliver to the Commissioner a valid certificate of insurance demonstrating that the renter is insured for liquor liability in the amount per individual of $750,000 and per occurrence of $1,500,000. If the renter does not comply with the requirements of this subsection, the Commissioner shall not allow alcoholic beverages to be served at the event and may cancel the event.

(3)  No guest shall bring an alcoholic beverage into the Pavilion, the Mansion, the Fort, Conference Center, FT Visitor Center, GC Visitors' Center or PM Pavilion.

(Adopted effective July 26, 1999; Amended June 29, 2007)

**Sec. 23-4-22.   Renter's responsibilities**

In connection with an event, the renter shall assure that all provisions of Sections 23-4-7 through 23-4-22 are complied with. This section shall not relieve any other person of his

*Regulations of Connecticut State Agencies*

TITLE 23. Parks, Forests & Public Shade Trees

*Department of Energy and Environmental Protection* §23-4-23

or her obligations under such sections.

(Adopted effective July 26, 1999; Amended June 29, 2007)

## State Park Rentals

### Sec. 23-4-23.    Definitions

As used in sections 23-4-23 to 23-4-35, inclusive, of the Regulations of Connecticut State Agencies:

(1) "Camp Day" means from the time of arrival (1:00 p.m. check-in) until 12:00 noon the next day;

(2) "Columbus Day" means the second Monday in October;

(4) "Commissioner" means the Commissioner of Environmental Protection or his representative;

(5) "Contractor" means a person retained, whether or not for compensation, by a renter in connection with an event, including without limitation a caterer, photographer, musician, or entertainer;

(6) "Department" means the Department of Environmental Protection;

(7) "Event" means a social, cultural, or business function, including without limitation a party, reception, fund raiser, conference, or seminar;

(8) "Memorial Day" means the last Monday of May;

(9) "Park" means any park, forest, or other recreational area managed by the Department;

(10) "Park supervisor" means the Department employee stationed at a park who has ultimate responsibility for operations thereof;

(11) "Person" means a person as defined by section 22a-2 of the Connecticut General Statutes;

(12) "Picnic shelter" means an open-air, roofed structure, of whatever size and configuration, located at a state park, forest, or other recreational area;

(13) "Rental" or "rent" means (a) for a picnic shelter: the occupation, for the fee and under the conditions specified in sections 23-4-23 to 23-4-35, inclusive, of the Regulations of Connecticut State Agencies, for the purpose of holding an event, and the exclusion from the picnic shelter of all persons other than the renter, the renter's guests or contractors, and representatives of the Department during a prescribed time; and (b) for rustic cabins for camping: the occupation, for the fee and under the conditions specified in sections 23-4-3 and 23-4-23 to 23-4-35, inclusive, of the Regulations of Connecticut State Agencies;

(14) "Rental fee" means a rental fee under section 23-4-28 of the Regulations of Connecticut State Agencies;

(15) "Renter" means person who or which rents, as that term is defined in this section; and

(16) "Rustic cabin" means a small log structure with a front porch, windows and door, bunk beds inside, no electricity or running water.

(Adopted effective January 31, 2003)

*Regulations of Connecticut State Agencies*

TITLE 23. Parks, Forests & Public Shade Trees

**Sec. 23-4-24.   Applicability**

Sections 23-4-23 to 23-4-35, inclusive, of the Regulations of Connecticut State Agencies, govern the use and rental of open-air picnic shelters in all state parks, forests and other recreational areas; and the rental of rustic cabins in state parks. Violation of any provision of such sections shall be an infraction and shall be punishable by a fine of up to $90 or by such higher fine as may be provided by law.

(Adopted effective January 31, 2003)

**Sec. 23-4-25.   Availability of picnic shelters for rental**

Picnic shelters are available for rental from the Friday before Memorial Day through Columbus Day from 8:00 a.m. to one-half hour before sunset.

(Adopted effective January 31, 2003)

**Sec. 23-4-26.   Use without rental**

Nothing in sections 23-4-25 to 23-4-35, inclusive, of the Regulations of Connecticut State Agencies, shall be construed to prevent any person from using a picnic shelter during times when it has not been rented by another.

(Adopted effective January 31, 2003)

**Sec. 23-4-27.   Availability of rustic cabins for rental**

Rustic cabins are available for rental during the official camping season in Connecticut State Parks.

(Adopted effective January 31, 2003)

**Sec. 23-4-28.   Rental fees**

(a) **Picnic shelters**

(1)  The rental fee for a picnic shelter is $125 per day through December 31, 2004; $150 per day from January 1, 2005 through December 31, 2007; and $175 per day from January 1, 2008 and thereafter.

(b) **Rustic cabins**

(1)  The rental fee for a rustic cabin is $35 per camp day and permits occupation of a maximum of six (6) persons, including children.

(Adopted effective January 31, 2003)

**Sec. 23-4-29.   Admission and parking fees**

(a) **Picnic shelters**

(1)  Payment of a rental fee does not relieve the renter, the renter's guests, or contractors from the obligation to pay any applicable admission or parking fee.

(b) **Rustic cabins**

(1)  Payment of a rental fee includes the admission of two (2) motor vehicles per cabin.

(Adopted effective January 31, 2003)

*Regulations of Connecticut State Agencies*

TITLE 23. Parks, Forests & Public Shade Trees

*Department of Energy and Environmental Protection* §23-4-32

**Sec. 23-4-30.   Applications for rentals. Cancellations**

(a) **Picnic shelters**

(1) Rentals are to be arranged through the campground reservation system.

(2) Cancellations made thirty (30) days or more prior to the event will be entitled to a full refund; cancellations made six (6) to twenty-nine (29) days prior to the event will entitle the renter to a refund of 80% of the fee; cancellations made within five (5) days of the event will result in forfeiture of the fee.

(3) The renter is responsible for any processing charge(s) from the reservation system, i.e. reservation, change of date or cancellation.

(b) **Rustic cabins**

(1) Rentals are to be arranged through the campground reservation system.

(2) Cancellations made eight or more days prior to the reservation will be entitled to a complete refund and a transaction fee will be assessed by the reservation system; cancellations made two to seven days prior to the reservation will be assessed a transaction fee by the reservation system and the renter will pay for one night; cancellations made less than two days prior to the reservation will be assessed a transaction fee by the reservation system and the renter will not be entitled to any refund.

(Adopted effective January 31, 2003)

**Sec. 23-4-31.   Liabilities. Commissioner's remedies**

(a) **Picnic shelters**

(1) Nothing in sections 23-4-23 to 23-4-35, inclusive, of the Regulations of Connecticut State Agencies, shall affect any obligation imposed by law on a renter to obtain any authorizations for activities in connection with an event, including, as applicable, a special use license under section 23-11 of the Connecticut General Statutes.

(2) By renting a picnic shelter, the renter agrees to, and shall, indemnify and save harmless the State of Connecticut and the Department from any and all claims, damages, losses, litigation, or expenses arising out of any injury, including death, or any damage to property resulting from any act, omission, or neglect of the renter or any of the renter's guests or contractors.

(3) Unless otherwise provided therein, nothing in sections 23-4-23 to 23-4-35, inclusive, of the Regulations of Connecticut State Agencies, shall affect any rights or privileges of the commissioner or members of the public. The remedies provided to the commissioner under said sections are cumulative with any other remedies to which he is lawfully entitled.

(Adopted effective January 31, 2003)

**Sec. 23-4-32.   Catering**

(a) **Picnic shelters**

If a renter wishes to retain a caterer in connection with an event at a picnic shelter, the renter shall no later than 30 days before such event submit to the park supervisor the name, address, and phone number of such caterer and the name of such caterer's contact person.

*Regulations of Connecticut State Agencies*

TITLE 23. Parks, Forests & Public Shade Trees

§23-4-33                                          *Department of Energy and Environmental Protection*

(1) Failure to submit the information within the specified time frame will result in a $50 processing fee. The park supervisor may disapprove a caterer if the caterer has previously been retained for an event in a park and failed to fully restore all areas where food or beverages were served to their condition immediately prior to the event.

(Adopted effective January 31, 2003)

### Sec. 23-4-33.   Use of tents
(a) **Picnic shelters**

(1) For the purpose of food preparation during an event, a renter or caterer may install a tent, with dimensions no greater than 400 square feet (unless otherwise approved by the park supervisor in writing, a charge of $2 per square foot will be levied for the additional square footage above the 400 square feet), adjacent to the picnic shelter, but only if the park supervisor has first approved the time, date and location of its installation and removal.

(2) Except as provided in this section and section 23-4-21(d) of the Regulations of Connecticut State Agencies, no person may otherwise install a tent anywhere at a park other than at a designated park campground and as authorized by the department.

(Adopted effective January 31, 2003)

### Sec. 23-4-34.   Miscellaneous requirements
(a) **Picnic shelters**

(1) The renter or renter's agent shall be present at the event from its scheduled commencement until its scheduled end. The renter or renter's agent shall, no later than ten days before the scheduled event, inform the Park Supervisor in writing of the name, title, and home and business telephone numbers of an employee or other agent designated by such renter as responsible for assuring compliance with the provisions of sections 23-4-33 through 23-4-35, inclusive, of the Regulations of Connecticut State Agencies.

(2) All food and beverages shall be served to the renter's guests free of charge.

(3) The only types of food cookers or warmers that may be used at a picnic shelter and associated tent are: sterno containers, propane or electric stoves, outdoor gas or charcoal grills.

(4) When a renter or a renter's agent vacates a picnic shelter, the renter or agent shall ensure that:

(A) all waste generated during the time the renter and any of the renter's guests or contractors used the picnic shelter and associated tent is properly disposed of;

(B) all equipment and supplies brought into the park in connection with the use of the picnic shelter and associated tent are removed; and

(C) all areas where food or beverages were served in connection with use of the picnic shelter and associated tent are restored to their original condition immediately after such use.

(5) No person may toss or otherwise disperse confetti, rice, or other scattering materials

0854

*Regulations of Connecticut State Agencies*

TITLE 23. Parks, Forests & Public Shade Trees

*Department of Energy and Environmental Protection* §23-4-35

in or around a picnic shelter.

(Adopted effective January 31, 2003)

### Sec. 23-4-35.   Renter's responsibilities

The renter shall ensure compliance with all the provisions of sections 23-4-23 to 23-4-35, inclusive, of the Regulations of Connecticut State Agencies. This section shall not relieve any other person of his or her obligations under any other sections of the Regulations of Connecticut State Agencies or the Connecticut General Statutes.

(Adopted effective January 31, 2003)

# Exhibit 114

## Staff Findings and Recommendations

# State Parks and Forests: Funding

### January 23, 2014

### Legislative Program Review
### and Investigations Committee

## Connecticut General Assembly

**2013-2014 Committee Members**

*Senate*

John A. Kissel, *Co-Chair*

John W. Fonfara
Steve Cassano
Eric D. Coleman
Anthony Guglielmo
Joe Markley

*House*

Mary M. Mushinsky, *Co-Chair*

Christie M. Carpino
Brian Becker
Marilyn Giuliano
Brenda L. Kupchick
Diana S. Urban

**Committee Staff on Project**

Brian Beisel, Principal Analyst
Eric Michael Gray, Associate Legislative Analyst

Legislative Program Review and Investigations Committee
Connecticut General Assembly
State Capitol Room 506
Hartford, CT  06106

(860) 240-0300          www.cga.ct.gov/pri/index.asp          PRI@cga.ct.gov



# PRI Staff Findings and Recommendations Highlights

**January 2014**

## State Parks and Forests: Funding

## Background

In June 2013, the program review committee authorized a study of Connecticut's state parks and forests. The study focuses on funding of the state park system, including a comparison of revenues and expenditures within the park system and an assessment of the adequacy of funding to support short- and long-term operational needs.

State parks were first established in Connecticut 100 years ago, under the supervision of the State Park Commission. Now under the Department of Energy and Environmental Protection (DEEP), there are 139 state parks and forests (255,000 acres) providing public outdoor recreation areas in the state. While several divisions and bureaus within DEEP are involved in parks, park operations are handled within the State Parks and Public Outreach Division (Parks Division) by a combination of park supervisors, maintainers, and seasonal employees.

The state park season runs from Memorial Day to Labor Day, though park operations extend beyond these months. During the season, 35 (of 139) parks charge fees for parking, admission, or camping. Fee levels are set by regulation and can vary by location, residency status, and time of day. The last fee change occurred in 2010. Prior to FY 10, a portion of the revenues from collection of park fees was used by the Parks Division through a non-lapsing special fund. Since FY 10, park-generated revenues have gone to the General Fund.

Committee staff used a variety of data collection methods to conduct the study, including a review of financial and informational documentation provided by DEEP and interviews with DEEP staff as well as knowledgeable persons and interested parties outside of DEEP. Nationwide state parks comparison data were reviewed and selected other states were interviewed.

## Main Staff Findings

**The Parks Division FY 13 budget expenditure level is comparable to the level of FY 06** using constant 2013 dollars. Although several funding sources exist, the system has become heavily reliant on the state's General Fund, with little directive or incentive to focus on revenue generating activities.

**Connecticut's state park fees are at or above other states in the region.** There has been a decrease in paid attendance following fee increases in FY 10. The percentage of use by residents (~80% of day use) was not impacted by the fee increase.

**Staffing levels are down and have reached a critical point regarding operations.** Several management units do not have permanent, full-time supervisors. Connecticut's use of seasonal workers exceeds the national average.

**Planning for the state park system has defaulted to "crisis management"** as the level of resources available to parks has decreased. Though there is some collection of data, information is not analyzed and park performance is not measured in meaningful ways to fully inform planning and resource allocation.

**Either an increase in funding and staffing or a decrease in services is necessary for continued adequate state park operations in the long-term.** It is possible the current service offerings can be maintained with new, lower levels of staffing and funding for a short while longer. However, it is unlikely the current situation can be maintained indefinitely as the current balance relies on deferring maintenance, which may lead to increased future costs.

## PRI Staff Recommendations

Staff makes recommendations throughout the report in support of the key improvement areas mentioned here. In order to enhance planning efforts, **the Parks Division should perform regular reviews of all park resources and annually track park performance through the development of a Results Based Accountability report card.**

Specific recommendations contribute to the recommended reviews and report card, including **requiring measurement of three key areas: attendance, safety, and customer satisfaction**. The major aspects of individual parks to be considered during each park review are: staffing needs; the use and level of fees; and the condition of existing facilities.

**A portion of park-generated revenues should be appropriated to the Parks Division, contingent upon demonstration of park performance through the RBA process**. The division must develop a plan for use and distribution of this increased funding. Any appropriated park-generated revenue should not supplant existing General Fund monies.

Legislative Program Review and Investigations Committee Staff Office
State Capitol * 210 Capitol Avenue * Room 506 * Hartford, CT 06106-1591
P: (860) 240-0300 * F: (860) 240-0327 * E-mail: PRI@cga.ct.gov

0859

# Acronyms

| | |
|---|---|
| AIX | National Association of State Park Directors Annual Information Exchange |
| ATV | All Terrain Vehicle |
| BESB | Bureau of Education and Services for the Blind |
| BOR | Bureau of Outdoor Recreation |
| DCS | Department of Construction Services |
| DEEP | Department of Energy and Environmental Protection |
| EC Fund | Environmental Conservation Fund |
| EnCon | Environmental Conservation Police Division |
| FTE | Full-time equivalent |
| OFA | Legislative Office of Fiscal Analysis |
| PRC | DEEP's Project Review Committee |
| RBA | Results Based Accountability |
| RTP | Recreation Trails Program |
| SCORP | State Comprehensive Outdoor Recreation Plan |

# Executive Summary

## State Parks and Forests: Funding

In 2013, Connecticut celebrated the hundredth anniversary of its state parks. Under the governance of the Department of Environmental Protection (DEEP), Connecticut's state park system consists of 107 parks and 32 forests covering over 255,000 acres. The purpose of state parks is to provide: outdoor recreation, including hiking, biking, boating, fishing, swimming, picnicking, and camping; protection of natural areas; and educational opportunities and programs.

In June 2013, the Legislative Program Review and Investigations Committee authorized a study of state parks and forests. Specifically, the study focused on funding for state parks and forests and whether it is "adequate" to support short- and long-term operational needs. The committee formally adopted the study scope on September 26, 2013.[1]

Within this report, committee staff provides information and analysis of resource trends for state parks, including expenditures (operational and capital), revenue, and staffing. To further help determine whether resources are adequate, the study examined three metrics of park use: attendance, safety, and customer satisfaction; additional information and analysis of park system performance measurement and planning are provided. Although this report examines funding for state parks and makes conclusions on resource levels, ultimately, the determination of whether state park funding is adequate is a public policy decision.

Connecticut's state park system provides a wide range of recreational services for residents and non-residents while also protecting the state's natural resources and heritage. The system is a network of land types and involves different programs across several bureaus within the Department of Energy and Environmental Protection for its overall operation. To keep the study scope manageable, and still allow for proper examination of state park system funding, a comprehensive review of the department's State Parks and Public Outreach Division (Parks Division) was made. The division has primary responsibility within DEEP for the operation of state parks, which is accomplished through a system of central and field-level programs.

Overall, committee staff found funding for state parks steadily increased during FYs 05-10, but has been on a downward trend since then. The funding level for FY 13, adjusted for inflation, is slightly below the FY 06 level. Connecticut is also more reliant on general fund support than most other states. Conversely, almost all other states have funding mechanisms allowing them to retain either all or a portion of the revenue they generate within their systems of state parks. Connecticut law currently allows some parks to retain revenues from renting facilities in special accounts, but the revenue generated through parking, admission, and camping fees – which is the vast majority of revenue – goes to the state's General Fund.

---

[1] The Connecticut state park system includes parks and forests. The remainder of this report will use the term "parks" to refer collectively to parks and forests.

Staffing levels within the park system are down since FY 08. Decreases in key field personnel, namely park maintainers and supervisors, have occurred generally since FY 09. This has resulted in some park management areas with maintenance staff levels below what would normally be considered functional and safe, given the types of work performed. In addition, there are not enough field supervisors to fill all current supervisory positions. As a result, the department has required staff to take on additional supervisory responsibilities, resulting in some supervisors working in a "temporary service in a higher class" capacity. In the final analysis, committee staff recommends a partial realignment of the funding mechanism for state parks intended to allow the system to regain a portion of the funding decreases over the last several years.

Park-generated revenues have exceeded $6 million annually since CY 11. After a spike in revenues in CY 10 due to an increase in fees (35 percent increase for residents and 50 percent increase for non-residents), both paid attendance and overall revenue have dipped and may be trending downward. Connecticut's fees are at or above regional and national averages for state parks, though fees are only collected at one-quarter of all parks and most fees are also limited to the peak park season between Memorial Day and Labor Day.

Operationally, planning within the park system is primarily "crisis" driven. The system lacks structured attention to performance-based measurement. Important performance data are undergathered and underutilized for analysis purposes. Further, budget cuts and the lack of position refill authority may hamper the division's efforts in these areas. At the same time, additional focus on overall system performance, based on accurate and adequate data is necessary. Committee staff recommends a Results Based Accountability (RBA) approach, including development of an RBA report card, as a streamlined way for the division to increase its performance-based analysis.

Taken together, the committee staff recommendations presented in this report are intended to provide a solid foundation for achieving a state park system funding mechanism that is better balanced with system needs, and operations and planning efforts that are more performance oriented.

**List of Recommendations**

1. **DEEP should fully develop and submit the necessary reports required under C.G.S. Sec. 23-15b(c), and ensure each report is available on the department's website for state parks in accordance with the statutory timeframes.**

2. **A portion of the proceeds, as determined by the Department of Energy and Environmental Protection on an annual basis, from renting cabins located within state parks or forests should be deposited within a Maintenance, Repair, and Improvement account for the specific park where such cabin(s) is located. The funds should be used to help offset maintenance costs of the cabins. If specific MRI accounts are not yet established for parks with cabins, they should be developed by DEEP.**

3. **The Department of Energy and Environmental Protection Parks Division should fully coordinate with Friends groups and other parks associations to ensure in-kind labor**

and financial resources provided by such groups are taken into consideration for budget and planning purposes.

4. The use of season and lifetime passes should be tracked by pass type when parks are otherwise charging for parking or admissions.

5. The Parks Division should create a Results Based Accountability-style report card regarding park performance in accordance with the guidelines established by the legislature's Appropriations Committee. The report card should include measures regarding park use (e.g., attendance, safety, and satisfaction), as well as measures of park operations (e.g., planning efforts) and park personnel. The division's first report card should be developed by January 1, 2015, and annually thereafter. The report cards should be provided to the legislative committees of cognizance and made available on the Parks Division website.

6. The Parks Division should develop an improved attendance estimation methodology that: 1) spreads responsibility for point-in-time counts; 2) requires the performance of focused counts every five years; 3) uses quantitative numbers already available via revenue collection; and 4) expands the use of car counters.

7. The Parks Division should review the use and level of fees for each park location not less than once every five years, as part of an overall park review.

8. The Department of Energy and Environmental Protection should use a portion of its bonding authorization for improving parks for purchasing car counters, such that vehicular traffic at all parks can be counted for weeklong or more portions of on- and off-season time periods by 2020, and during each subsequent five-year time period.

9. As part of its RBA report card, the Parks Division should develop formal metrics of safety within the state park system, including safety of the general public and division employees. The division should collect and analyze applicable safety-related data necessary to identify trends in the annual number and types of safety-related incidents on a system-wide basis.

10. The Parks Division should develop written criteria and procedures for project approval based on the division's system-wide priorities. This should be updated regularly and distributed to park unit supervisors and district managers upon revision. The status and evaluation of merit, based on fit with the established criteria and priorities, of all project applications that move beyond the district level should be communicated, in writing, to the park unit supervisor who first completed the application.

11. The Parks Division shall perform a formal review of a portion of the park system locations and resources therein on a rolling basis such that all park system locations are reviewed at least once by 2020. The review shall include an inventory and assessment of the condition of resources and facilities as well as an examination of the staffing needs of each location and shall be updated for each park location at least once throughout every subsequent five year period.

12. **The Department of Energy and Environmental Protection should involve field staff (i.e., district managers and unit supervisors) in the budget development and administration process for the Parks Division. Specifically, park unit budgets should be administered in coordination with the field staff throughout the fiscal year for non-personal service costs in a manner such that field personnel are aware of yearly budget limitations and allowed to retain some portion, as determined by the department, of any realized savings within the same park unit and/or district.**

13. **Between one quarter and one half of revenue generated in state parks shall be appropriated biennially to the Parks Division, with the specific proportion at the request of the Department of Energy and Environmental Protection and the approval of the Appropriations Committee. This appropriation shall be contingent upon the Parks Division's satisfactory participation in the Results Based Accountability process of the Appropriations Committee, or a similar performance-based measurement requested by the Appropriations Committee. The shared park-generated revenue shall not supplant the General Fund obligation to the Parks Division. The portion of park-generated revenues not appropriated to the Parks Division shall continue to support the General Fund.**

    **The Parks Division shall create a plan for use of park-generated revenue that balances the distribution of park revenue-based funds among the park or park units that generated the revenue and the needs of the entire system of parks and present such plan, along with the initial RBA-style report card, to the relevant Appropriations sub-committees, and the Environment Committee. The initial fund distribution plan should emphasize implementation of performance metrics and related data-gathering and analysis.**

---

# Introduction

## State Parks and Forests: Funding

A system of 107 state parks and 32 state forests covering over 255,000 acres exists in Connecticut. The purpose of state parks and forests is to provide: outdoor recreation, including hiking, biking, boating, fishing, swimming, picnicking, and camping; protection of natural areas; and educational opportunities and programs. The Department of Energy and Environmental Protection (DEEP) is charged with acquiring land for state parks and forests, and with overseeing and managing system operations.

### Scope of Study

In June 2013, the Legislative Program Review and Investigations Committee authorized a study of state parks and forests. Specifically, the study focused on funding for state parks and forest and whether it is "adequate" to support short- and long-term operational needs. The committee formally adopted the study scope on September 26, 2013.[2]

### Research Methods

Committee staff research began with understanding the organizational structure of the state park system, including a review of relevant state laws and policies. Additional research included compiling data on the park system's funding sources and levels, other states' park operations and funding, and performance measures within the division. As a primary information source for this study, committee staff interviewed central and field personnel of the Parks Division, other relevant parks-related program staff within DEEP, and non-governmental stakeholders. Specifically, program review staff met with:

- agency leadership, program managers, and staff within DEEP's Bureau of Outdoor Recreation (BOR), Bureau of Natural Resources, and Bureau of Financial and Support Services;
- a majority of field supervisors, individually or within larger focus groups;
- Connecticut Friends of State Parks, Friends of Gillette Castle State Park, and Connecticut Forest and Park Association; and
- the legislature's Office of Fiscal Analysis.

Committee staff visited the following state parks to gain a better understanding of the services they provide and their operations: Hammonasset Beach State Park; Harkness Memorial State Park; Gillette Castle State Park; Topsmead State Forest; and Penwood State Park. Supervisors at each of the parks were interviewed.

---

[2] The Connecticut state park system includes parks and forests. The remainder of this report will use the term "parks" to refer collectively to parks and forests.

On September 26, 2013, staff provided the committee a study update, which was followed by public hearing held by the committee. Materials from the hearing are available on the committee staff's website.

Several key data sources were analyzed by committee staff: all Parks Division budget expenditures for FYs 05-13; National Association of State Park Directors-Annual Information Exchange (AIX) statistical reports for FYs 08-12; Connecticut state park revenues and fees; and park system attendance reports. The information from these sources served as the primary data for analysis within this report. Committee staff encountered some challenges in gathering and analyzing accurate park use information for this study, as discussed more fully later in the report. PRI staff recognizes cuts in operating budgets and staff often impede collection and analysis of relevant park system data, yet accurate and timely data are vital for determining overall performance.

**Report Organization**

This report contains six chapters outlining committee staff's analysis, findings, and recommendations. The first chapter provides necessary background information about Connecticut's state park system to help provide overall context. The second chapter contains an analysis of the Park Division's expenditures. Chapter III provides an examination of park-generated revenue in Connecticut and nationally. A review of park staffing resources is provided in Chapter IV. Chapter V examines three key metrics of state park use, performance measurement, and planning. The final chapter presents operations and funding options and the potential impact of several scenarios on the state park system.

# Chapter I

## Background

State parks and forests have been part of Connecticut's heritage for the past century.  In 1913, the legislature created a six-member State Park Commission responsible for developing an inventory of land throughout the state.  The commission's priority was to understand the land available along Long Island Sound and the state's inland lakes and rivers, given the public's propensity to be near water. In 1921, the commission became known as the State Park and Forest Commission, to reflect its new authority over state forests.  In 1971, the commission was merged into the newly-created Department of Environmental Protection, now the Department of Energy and Environmental Protection.

DEEP is the state agency responsible for managing Connecticut's state park and forest resources. State law specifies the DEEP commissioner is charged with supervising "all lands acquired by the state, as public reservations, for the purposes of public recreation or the preservation of natural beauty or historic association."[3] The DEEP commissioner further has the authority to adopt regulations "for the maintenance of order, safety and sanitation upon the lands under the commissioner's control…."[4] These two statutes refer in large part to the state parks and forests system. While there are no statutory definitions of parks and forests, in the early years it was explained that state parks were primarily for recreation or conservation of natural scenic beauty, wildlife, and historic interest sites, while state forests were primarily for the provision of timber for economic purposes. Even in 1922, though, it was acknowledged they had many features in common,[5] and the similarities have increased. When used in this report, the term "parks" refers collectively to state parks and forests.

### Land Acquisition for State Park System

Connecticut's park system is state-protected open space consisting of a combination of land and water types. A map showing the location of state parks and forests, along with various other state-protected natural areas, is provided in Figure I-1. The dividing lines within the map are the designations used by DEEP for resource supervision purposes, as described in more detail later in this chapter.

---

[3] C.G.S. Sec. 23-5
[4] C.G.S. Sec. 23-4
[5] State Park and Forest Commission Report (1922).

**Figure I-1: State Park and Forest System.**



The Department of Energy and Environmental Protection administers the Recreation and Natural Heritage Trust Program to acquire state-owned open space for the state park and forest system.[6] The program is administered to meet the statutory goal of preserving 21 percent of the state's land as open space for recreational and natural resource conservation purposes.[7] The goal, set in 1997, calls for the state to protect 10 percent (320,576 acres) of Connecticut's land, while municipalities and other stakeholders preserve the remaining 11 percent.[8]

According to DEEP, the state has acquired almost 80 percent of its share of the goal, or just over 255,000 acres within its state system of park, forest, wildlife, fishery, and natural resource management areas.[9] The following types of land have been preserved under the state's portion of the Open Space program:

- State Park: 36,630 acres;
- State Forest: 160,243 acres;
- Wildlife Management Area: 31,880 acres;
- Water Access: 6,172 acres;
- Flood Control: 3,821 acres; and
- Other (including easements/restrictions): 16,279 acres.

**State Park Inventory**

According to DEEP, the mission of the Connecticut state park system is to *provide natural resource-based public recreational opportunities and educational opportunities through a system of state park and forest recreation areas, environmental centers and nature centers which provide an understanding of, access to, and enjoyment of the state's historic, cultural, and natural resources.* The mission is achieved through the 107 state parks and 32 state forests statewide. The park system provides: outdoor recreation, including hiking, biking, boating, fishing, swimming, picnicking, and camping; protection of natural areas; and educational opportunities and programs provided at several state parks. A full listing of state parks and forests, and the activities available within each park, is provided in Appendix A.

**Growth over time.** The number of individual state parks has increased over time, as has the size of the overall park system. According to DEEP, there was growth in the designation of state parks through the 1920s, followed by a slowdown during the Depression era (although the Pavilion at Rocky Neck State Park, one of the shoreline's largest structures, was built in the mid-1930s.) The system again saw steady growth over the next several decades, until another period

---

[6] For additional information on state open space, see: Open Space Acquisition, Legislative Program Review and Investigations Committee, 1998.

[7] C.G.S. Sec. 23-8(b)

[8] DEEP also manages the Open Space and Watershed Land Acquisition Grant Program. The program offers grants to municipalities, non-profit land conservation organizations, and water companies (i.e., partners of the state) to acquire open space. This acquisition is intended to help meet the statutory goal of 11 percent (352,634 acres) of the state's land under non-state control.

[9] DEEP estimates that nonprofit land conservation organizations, municipalities, and water companies own just under 239,000 acres, or 68 percent of their targeted open space goal.

of decline in the 1970s and 80s, before resuming in late 1990s. In recent years, there has not been much open space acquisition; the department is focusing its efforts on maintaining the current open space inventory, including gathering more accurate boundary lines and enforcing encroachment laws.[10] It is important to note that land purchases over time also consist of adding to already existing parcels within the park system, which does not increase the total number of parks but allows for expansion of overall park acreage.

**Park System Organization**

As noted above, the state park system is managed by the Department of Energy and Environmental Protection. Figure I-2 shows three bureaus within DEEP have primary responsibility for overseeing the operations of state parks and forests: Bureau of Outdoor Recreation (parks, environmental police, and boating divisions),[11] Bureau of Natural Resources (forestry, fisheries, and wildlife divisions), and Bureau of Financial and Support Services (budget and project management.) Although the bulk of the state park system operations falls under the purview of the BOR's State Parks and Public Outreach Division (Parks Division), several divisions within the natural resources bureau administer programs affecting the state park system, including forestry, fishery, and wildlife programs. As PRI staff noted at the September update with the committee, this study focuses on the functions within BOR's Parks Division, since the division has operational responsibility for the state park system.

**Figure I-2. Department of Energy and Environmental Protection: Bureaus with State Parks and Forests Responsibilities.**



---

[10] The most recent addition of a state park to the system was made in 2008, when the state purchased the 146-acre Sunrise Resort property and designated it a state park.

[11] The Bureau of Outdoor Recreation is without a bureau chief; a deputy commissioner serves as the bureau chief in addition to her other responsibilities. The department reports it is in the process of filling the position.

In addition to the Parks Division, two other divisions exist within BOR with responsibility for the park system. The Environmental Conservation Police Division (EnCon Police) provides the bulk of the security and public protection services within state parks. Environmental conservation officers are trained municipal police officers appointed by the commissioner to enforce the state's fish and game, boating, recreational vehicle, and state park and forest laws and regulations. The division provides public education and prevention services, and the officers have full police powers on all DEEP-owned lands and within department facilities. The bureau's Boating Division offers a variety of boating-related services, including safety and education programs, boater certification and registration, and oversight for the construction, operation, and maintenance of the 118 state-owned boat launches.

**State Parks and Public Outreach Division**

Figure I-3 shows the units within the Parks Division, which has primary responsibility for the management and oversight of the state park system. A description of the units within the division and their roles regarding the park system follows.

**Figure I-3. State Parks and Public Outreach Division**



**Operations and Park Management**. The bulk of the division's responsibility for the state's park system falls within the Operations and Park Management unit. The unit is overseen by an assistant division director who reports to the division director. For FY 13, a total of 88 employees staffed the division, with most staff located at the field level.

Within the operations section, DEEP has divided the state into two districts: Eastern and Western, each overseen by a district manager. The district managers are responsible for overseeing supervisors located within each district, setting district priorities, and supervising development and maintenance projects. The two district managers report to the assistant division director.

The two districts are further divided into management units, each overseen by a supervisor (see Figure I-1 above). There are 12 units in the Western District and 11 units in the Eastern District. Within each management unit's boundaries is a collection of state parks, forests, boat launches, and wildlife management areas. The management unit supervisor is accountable for the supervision and operations of the parks and forests recreational areas within the unit. The management units provide the daily grounds-keeping, maintenance, and overall cleanliness of such resources. Unit supervisors are classified as a Supervisor 1, 2, or 3, based on their experience levels, with a Supervisor 3 being the most experienced. For FY 13, there were 17 supervisors for the 23 management units (including two supervisors at Hammonasset Beach State Park.)[12]

Besides supervisors, the staff positions within the management units are mostly maintainers. Similar to supervisors, maintainer positions are classified as Maintainer 1, 2, or 3, with a Maintainer 3 being the highest classification. Maintainers perform a variety of duties, including general maintenance of park grounds and buildings, carpentry, painting, road and trail maintenance, and some minor electrical work. Maintainers also help ensure park cleanliness and safety, as well as assist in job planning, daily project oversight, and supervision of seasonal workers. For FY 13, there were 51 full-time maintainers for the 23 management units.

In addition to full-time staff, seasonal workers help perform many functions within the park system mainly during peak visitation months of April-September. Seasonal workers, including maintenance staff, life guards, fee collectors, campground supervisors, interpretive guides, office assistants, and park rangers augment the full-time park staff. Seasonal workers with experience also may work in a supervisory capacity. As discussed later in Chapter IV, various rules and requirements are in place regarding seasonal workers. The division annually averages approximately 500 seasonal workers during peak operating months for parks.

**Operations Planning and Grants Management**. This unit is primarily responsible for coordinating planning functions for recreational trails and greenways, water safety and lifeguards, and alternative use permits within the state park system. The unit also administers several outdoor recreation grants. Key among those grants is the federal Recreational Trails Program (RTP), which provides funds to states to distribute for developing and maintaining recreational trails and trail-related facilities for nonmotorized and motorized recreational trail

---

[12] Dinosaur State Park is considered a management unit. The park supervisor's title is Environmental Education Coordinator, not Environmental Protection Supervisor as in the other units, and is not included in the total of 17 supervisors.

uses, as well as competitive grants provided to non-profit agencies and municipalities for trail maintenance and improvements. Five employees staffed the unit during FY 13.

**Infrastructure Planning and Project Management**. The Infrastructure Planning and Project Management unit is currently not staffed due to recent retirements and no approval to refill the positions. The unit was responsible for planning and oversight of construction projects within the state park system. The unit also served a liaison function between DEEP and the Department of Construction Services (DCS) for major state parks capital projects under the purview of DCS. The liaison and oversight functions are currently performed through DEEP's Agency Support Services Division (Field Support Unit).

**State Parks Public Outreach**. This unit offers a variety of programs to engage public use of the state park system. The unit helps develop and implement education programs provided at various state parks, including Goodwin State Forest and Conservation Education Center, Osborne Homestead Museum, Dinosaur State Park, Gillette Castle State Park, and Fort Trumbull State Park. A key set of programs administered by the unit is No Child Left Inside, which focuses on connecting children with the natural resources of state parks. For FY 13, there were five full-time employees in this division.

## Services

The state park system offers numerous activities and services for visitors. In addition to outdoor recreational activities, such as hiking, swimming, biking, camping, bird-watching, water-related sports, and educational activities, parks offer rental of several of its facilities. This includes:

- 21 open air picnic shelters at 17 different parks, which can typically hold between 50-100 people;
- a 230-acre estate and 42-room mansion at Harkness Memorial State Park for weddings, receptions, seminars, and conferences;
- the Pavilion at Rocky Neck State Park with a capacity of 300 people; and
- 28 rustic cabin rentals within six parks, with intention to build up to 100 cabins in total.

**Fees**. Although a majority of the activities provided within the state park system are free to the public, one-quarter of the parks and forests (35 of 139) charge fees for parking, admission, or camping. Fee levels are set by regulation and vary by residence status and time and day (i.e., weekend or weekday) of entrance. In many cases, the fees are assessed from April through October, although parks are open year-round. A full listing of the current fees is provided in Appendix B, and fees and revenues are discussed in more detail later in the report.

**Attendance**. Attendance figures from state parks are collected by the Parks Division. As provided in more detail in Chapter V, attendance data are not wholly reliable, and the division does not collect attendance information from every state park. Moreover, of the parks submitting data, often the figures are based on estimates made by park supervisors. In total, DEEP estimates state park attendance during 2012 of roughly 8 million visitors.

**Operating and Capital Expenditures**

Although a detailed analysis of expenditures is provided in the next chapter, FY 13 expenditures for the state Parks Division totaled $12.8 million. Of the total expenditures, $11.2 million was from the state General Fund, while the remaining $2 million was from other funding sources, including the federal government, private contributions and donations, such as trusts for individual parks, and restricted revenue (i.e., facility rental fees kept by certain parks). In addition, bond funding is available to support parks.

**Revenue**. For calendar year 2012, state parks generated $6.7 million in revenue. Revenue sources include parking fees, camping fees, proceeds from park passes, and sales of miscellaneous items (e.g., firewood). A full analysis of revenue generated through the park system is provided in Chapter III.

# Chapter II

## Park System Expenditures

Funding for state parks depends on various factors. The main cost drivers for ongoing operations of state parks are staffing, what the state classifies as "other expenses," and capital expenses. Funding available to support park operations also comes from various sources, with the state General Fund serving as the primary funding source. Over time, however, several mechanisms have been implemented to fund operations of state parks.

This chapter analyzes budget expenditures of the Parks Division as they relate to state park operations to provide an overall understanding of park system resource trends.

**Key Findings**

- *In constant 2013 dollars, the Parks Division's operating expenditures for FY 13 were slightly lower than in FY 06.*
- *State parks expenditures steadily increased during FYs 05-10 followed by a three-year decline since then.*
- *On average, 80 percent of the division's expenditures were funded from the state's General Fund for FYs 05-13; it was 87 percent in FY 13; Connecticut also relies more heavily on general fund contributions than most other states.*
- *Seasonal worker expenditures increased for FY 05-12, followed by a slight decrease in FY 13.*
- *There has been an upward trend in capital expenditures for parks-related projects since FY 11, although FY 11 expenditures were the lowest for the period analyzed (FYs 10-13).*
- *In-kind contributions to state parks are substantial, yet the division does not fully recognize and incorporate them it its overall budget planning process.*

In addition to identifying the functions and services provided in state parks, as summarized in Chapter I, an important step in trying to determine whether funding for parks is adequate is to understand: 1) how the state park system is funded; 2) the current level of resources expended to operate parks; and 3) how present funding compares with previous years. Although several divisions and units within DEEP have some role in the overall system of state parks, the Parks Division provides the bulk of the daily operation of state parks and forests.[13] As such, the expenditure information provided below is for the division.

---

[13] Other areas within DEEP contributing to the overall parks system include the Bureau of Fiscal and Support Services, the Bureau of Natural Resources, the Bureau of Outdoor Recreation's Boating and Environmental Conservation Police divisions, and the Open Space Acquisition program. Given the BOR and BNR bureaus include multiple programs partially related to the state's park system but also to other services, it is difficult to fully isolate their direct parks-related expenses. The FY 12 budgets for the natural resources and fiscal and support services bureaus totaled $18 million and $27 million respectively. Within BOR, the Boating Division's FY 13 budget was $778,000, and the environmental police division's budget was $4.7 million.

**Trends.** Using data provided by DEEP,[14] Figure II-1 shows yearly expenditure levels for the Parks Division from all non-capital funding sources for FYs 05-13.[15] The figure provides actual expenditures as well as expenditures adjusted for inflation using FY 13 as the base year. *The overall trend in actual expenditures for state parks steadily increased from FYs 05-10 followed by a relatively sharp three-year decline. The average annual actual expenditure level for state parks for FYs 05-13 was $12.7 million.*



Figure II-1. State Parks Division: Operation Expenditures FYs 2005-2013

Note: Expenditures from the federal Recreational Trails Program only includes the portion attributed to the Parks Division.
Source of data: DEEP

As the figure shows, for FYs 05-10, total actual expenditures steadily increased from $10.1 million to a nine-year high of $14.9 million, for a cumulative increase of 49 percent (there was a relatively small decrease in FY 08). The largest single-year growth period occurred in FY 09, when expenditures rose 15.4 percent from the previous fiscal year. Another noticeable increase occurred in FY 06, when funding increased just over 11 percent from the year before.

The growth in expenditures for state parks over the nine-year period analyzed began to decline in FY 11. During FYs 11-13, the cumulative drop in expenditures was just under $2.1 million, or 14.2 percent. Specifically, expenditures fell over eight percent in FY 11 from the previous year, to $13.7 million, followed by a 5 percent drop in FY 12, and a 1.6 percent decline in FY 13, which was the Park Division's lowest level since FY 08 in actual dollars. Overall, the division's expenditures increased 27 percent, from $10.1 million (FY 05) to $12.8 million (FY 13.) For context, the department's total operating budget for FYs 06-12 increased roughly 43 percent, from $130 million to $186 million.[16]

Another way of examining funding is to compare expenditure levels adjusted for inflation. This type of analysis does not fully determine whether adequate funding exists from an overall perspective, yet it provides a sharper examination of expenditures in real dollars, or

---

[14] DEEP's expenditure database provided to committee staff included over three million pieces of information for FYs 05-13.
[15] Given the state's conversion to CORE-CT (centralized financial and administrative automated systems) in the early 2000s, DEEP provided expenditure data to PRI staff using FY 05 as the base year, when applicable information was fully automated and available in CORE.
[16] Information derived from Governor's budgets.

buying power. Using FY 13 as the constant year, when adjusted for inflation, expenditures rose 33 percent overall from FY 05 through FY 10, followed by a 20 percent decline in FYs 11-13. *In constant dollars, Parks Division expenditures for FY 13 ($12.8 million) were slightly lower than in FY 06 ($12.9 million.) Overall, for FYs 05-13, there was a 6.5 percent increase in the division's operations expenditures when adjusted for inflation, compared to an unadjusted increase of 27 percent.*

**Funding sources**. Funding for the operation of state parks currently comes from four sources: the state General Fund; the federal government; contributions/donations made to the park system, including private trust funds; and revenue generated by individual state parks that is restricted for use by those parks per state law. The specific funding sources and their expenditure amounts (not adjusted for inflation) since FY 05 are provided in Figure II-2 and described below. The figure does not include capital expenditures, which are examined separately in this chapter, or fringe benefit costs, except in association with special funds given DEEP was responsible for such costs. In addition, actual revenues generated by user fees are discussed in Chapter III.



**Figure II-2. State Parks Operations Expenditures by Fund Source FYs 2005-2013**

* Expenditures from federal sources considered "pass through to non-state entities" - mainly from the federal Recreational Trails Program - are not included in the figure. Funding for DEEP-incurred expenses under this grant program are included.

Source of data: DEEP

*General Fund*: Expenses associated with the state General Fund consist of personal services (e.g., full-time and seasonal staff salaries and wages) and other expenses (e.g., maintenance supplies and services, utilities, motor fuel, heating oil). Since FY 05, General Fund expenditures for the Parks Division have ranged between $8.1 million (FY 06) and $12.5 million (FY 10), and averaged $10.2 million a year.

*DEEP data show 80 percent of the state's park system expenditures came from the General Fund for FYs 05-13.* Beginning in FY 10, this percentage is even higher, when the division's funding mechanism was changed and special funds from park-generated revenue were no longer a source of funding for the state park system. The funding lost from special funds was initially replaced with additional General Fund monies. In FY 13, the most recent year examined,

the General Fund supported 85 percent of the division's expenditures, up from 67 percent in FY 09, the last year special funds existed.

*Special Funds*: Special funds within the state budget are earmarked for specific purposes and funded outside the General Fund. The Parks Division received a relatively sizable portion of its funding from special funds prior to FY 10. At that time, due in part to the state's budget crisis, special funds were absorbed within the General Fund and no longer available as a funding source for numerous programs, including state parks. *At the highest point of their use before being eliminated as a funding source for the Parks Division, special funds accounted for 26 percent of the division's overall budget in FYs 07 and 09.*

The Environmental Conservation Fund (EC) was the primary funding source for DEEP's State Park, EnCon police, Boating, Fisheries, Wildlife and Forestry programs. EC funding was derived from a variety of sources, including parking and camping fees collected at state parks, hunting, trapping, and fishing licenses collected mainly through the department's online licensing system, and boat registration fees. A portion of the revenue generated by parks was maintained in an EC non-lapsing account to help offset expenses, while the remaining share went to the General Fund. As such, the Parks Division typically generated more in revenue from park and camping fees than it received from the Environmental Conservation Fund.

The department also maintained a reserve in EC funding from year to year to ensure expenses were covered during years when revenue collection was low. Given the seasonal nature of outdoor recreational activities and the impact events such as natural disasters can have on the public's outdoor recreational habits and DEEP's facilities, it was essential to maintain a robust carry-over balance to be able to finance existing salaries and ongoing expenses when revenue collections fluctuated. Revenue generated by state parks is greatly influenced by weather and annual receipts can dramatically fluctuate due in large part to inclement weather during peak admission periods.

The Parks Division's EC funding totaled $11.4 million for FYs 05-09, or 80 percent of the division's special fund-sourced expenditures for those years. Annual EC funding ranged from $1.1 million in FY 05, to $3 million in FY 09, and averaged almost $2.3 million a year. Committee staff was told by DEEP that the Environmental Conservation Fund supported personal services expenses (including fringe benefit costs) for approximately 13 positions in the Parks Division, along with other expenses.

Several special funds in addition to the Environmental Conservation Fund helped support the Parks Division before their elimination. The next largest fund was the Maintenance, Repair, and Improvement (MRI) account. The MRI account was established along the lines of a statewide revolving fund for use by all parks. The fund was sustained through revenue generated from the rental of specific facilities at various parks, including pavilion and wedding event rentals, and used for specific projects within parks. Overall, the account averaged $400,000 in annual expenses before it was eliminated as a special fund beginning FY 11.

State parks generating revenue through park-specific initiatives, such as sales of firewood and ice, were permitted to retain the revenue in individual park "enterprise" accounts. The money was used to help offset miscellaneous park expenses. During the years the accounts were

available, they averaged $53,000 annually. An interesting project arising from the use of enterprise funds was the construction of two cabins at Hammonasset Beach State Park in 2009, which started the department's initiative to build cabins on state land.[17] The cabins have been rented to the public with the original thought that the park's enterprise account would support the upkeep of the cabins. With the loss of the enterprise account, such costs are now part of the park's operating budget. Prior to their elimination, other parks used enterprise accounts for new equipment purchases, to replace/repair current equipment, or to complete minor capital repairs. Having funds available meant a park did not have to request extra funding.

*Federal government*: The Parks Division received a total of $7.4 million in federal funding for FYs 05-13. In reality, only $2.7 million was for division-related services, with the remainder distributed (i.e., passed through) to municipalities and non-profit organizations mainly via the federal Recreational Trails Program (RTP) grant program. The program is overseen by the Federal Highway Administration and provides funding to develop and maintain recreational trails and trail-related facilities for nonmotorized and motorized recreational uses.

RTP represented the bulk of federal funding for the Parks Division for FYs 05-13, at $6.3 million. Of this total, $1.5 million (25 percent) was available to the division, mostly to help offset its costs to administer the grant program and for some of its own smaller trails projects. (Note: the federal funding portion of Figure II-2 above, as it relates to RTP, only includes the $2.6 million attributed to the Parks Division and not the remaining amount distributed through the division via grants.)

In addition to RTP, almost $900,000 in federal funding was provided through two federal programs: Land and Water Conservation (grants to states for the acquisition and development of public outdoor recreation areas and facilities) and Nonpoint Source Implementation grants to help manage nonpoint source pollution caused by rainfall or snowmelt collecting natural and human-made pollutants and depositing them into bodies of water. *In total, federal funding accounted for 2.3 percent of the division's expenditures for FYs 05-13.*

*Contributions/donations*: Non-government sources provide contributions for state parks with expenses incurred against those contributions. Trust funds established for individual state parks account for a sizable portion of this funding source. For example, since FY 05, three prominent trust funds have contributed over $2 million to fund state parks: the Kellogg Conservation Program ($1.5 million), Topsmead ($469,000) and Harkness Memorial State Park ($381,000). This funding category offers certain parks the ability to augment their state General Fund monies, although the funding from trusts generally comes with restrictions on how it may be spent. *Overall, funding from contributions/donations totaled $3.4 million for FYs 05-13, or 3 percent of the division's total funding for that nine-year period, and has averaged just over $382,000 a year.*

*Restricted revenue*: As noted above, some state parks generate revenue through fees from renting park facilities and use the revenue in part to help offset expenses associated with facility rentals. After special funds, including the MRI fund, were eliminated, P.A. 10-3, effective April 2010, created a separate *General Fund* Maintenance, Repair, and Improvement account,

---

[17] To date, 28 cabins in six parks have been built, with a total of 100 planned.

mirroring the MRI special fund as far as the purpose of the account. The public act transferred $1 million from the EC special fund to the new General Fund MRI account. Subaccounts for 17 specific parks have been established. In essence, the legislation created a separate fund for certain parks to use to help mitigate costs associated with renting their facilities, even though the new fund is within the General Fund. *Restricted revenue accounted for 2 percent of the division's budget for FYs 05-13, or $2.1 million.*

The act allows the subaccounts to also receive funds from other private and public sources, including federal and municipal funds, and does not prevent use of funds from sources outside the MRI account to maintain and improve state park property and buildings. Parks with MRI accounts may use their funds to help offset property maintenance, repair, and improvement expenses, and to build new structures. MRI accounts are non-lapsing and cannot be used by other parks.

MRI funds may not replace state appropriations for general park operations, but may be used for personnel expenses such as park staff overtime related to rentals, repairs, and upkeep incurred with facility rentals. The purposes for which MRI funds may be used are up to individual park managers. *To date, 10 out of 17 parks have incurred expenses against their MRI accounts since accounts were established in FY 11. MRI expenditures for FYs 11-13 totaled $1.1 million, with 85 percent of those expenditures attributed to Harkness Memorial State Park.*

Semi-annual expense reports must be submitted by DEEP to the legislature's Office of Fiscal Analysis (OFA) and made available on the department's website.[18] The reports are intended to serve as a public accounting of how MRI funds are used and help the public to more easily track state park projects and expenses associated with the MRI accounts. However, the reports have not been developed routinely, resulting in only some reports submitted and put online.

**Recommendation**

1. **DEEP should fully develop and submit the necessary reports required under C.G.S. Sec. 23-15b(c), and ensure each report is available on the department's website for state parks in accordance with the statutory timeframes.**

As noted above, a 2009 initiative by the department was implemented to build and rent 100 cabins in several state parks in celebration of the park system's current 100th anniversary. The initiative is financed through a $3 million bond authorization.

At first, the revenue generated from a park's enterprise activities, including revenue from the newly-build cabins, was used to help maintain the cabins. Given the enterprise funds no longer exist for individual parks, maintenance costs have been transferred to the General Fund. As a result, each park is now responsible for the upkeep of the cabins through its operating budget, which unit supervisors told committee staff they are already underfunded for current service. PRI staff believes cabin rentals should be considered in a similar way as rental of other park facilities, such as pavilions, with a portion of the proceeds going to the park's MRI account.

---

[18] C.G.S. Sec. 23-15b(c).

The parks should be able to use the account to help offset some of the additional maintenance costs associated with cabins.

**Recommendation**

>   2.  **A portion of the proceeds, as determined by the Department of Energy and Environmental Protection on an annual basis, from renting cabins located within state parks or forests should be deposited within a Maintenance, Repair, and Improvement account for the specific park where such cabin(s) is located. The funds should be used to help offset maintenance costs of the cabins. If specific MRI accounts are not yet established for parks with cabins, they should be developed by DEEP.**

*In-kind contributions.* Not reflected in any funding information for the state park system are the in-kind contributions made to the system by volunteers. For example, there are 23 various state parks "Friends" groups statewide and several additional parks associations. Combined, these organizations donate labor, including gardening, general maintenance, operating gift shops, and guiding tours, to help maintain the state parks with which they are associated. The groups also make financial donations to specific park programs. For example, the Friends group of Harkness Memorial State Park is contributing $500,000 to help refurbish the park's historic greenhouse. In addition, half the salary of the seasonal interpreter at the Meigs Point Nature Center at Hammonasset Beach State Park is paid for by that park's Friends group.

*According to the Friends of Connecticut State Parks, Friends groups statewide total approximately 6,900 members who donate 79,000 hours of volunteer time worth $2.2 million annually.*[19] The number of hours of donated labor equates to roughly 38 full-time staff. In short, the Friends groups of Connecticut's park system provide a level of labor and financial resources that the state has come to rely on, intentionally or not. Without these additional resources, and those provided by other park-related associations, the state park system either would have to fund the financial and labor shortfalls in some manner, or do without the in-kind contributions provided to maintain park resources, which is unlikely if maintaining current service levels is expected. Moreover, Friends groups have indicated their efforts and contributions have reached their limit, as has the groups' willingness to have their contributions supplant state funding.

**Recommendation**

>   3.  **The Department of Energy and Environmental Protection Parks Division should fully coordinate with Friends groups and other parks associations to ensure in-kind labor and financial resources provided by such groups are taken into consideration for budget and planning purposes.**

**Comparative national data**. Nationwide, state park operations are funded through a combination of park-generated revenues, general funds, and other dedicated funds. There has been a nationwide shift away from reliance on general fund monies for state park operations, as

---

[19] These figures were provided to committee staff by Friends of Connecticut State Parks, and have not been independently confirmed by staff. Further, Connecticut's Statewide Comprehensive Outdoor Recreation Plan references the in-kind contributions made by Friends groups and provides general numbers.

shown in Figure II-3. Collectively, state park operations have become more reliant on park-generated revenues and other dedicated sources. However, *Connecticut relies more heavily on general fund monies than almost all other states, does not use park-generated revenue to fund park operations, and has recently moved toward greater reliance on the General Fund.* Appendix C provides additional information on the use of various funding source types nationally.



Figure II-3. Nationwide State Park Funding Source Amounts

Source: National Association of State Parks Directors, Annual Information Exchange

**Key State Park Cost Drivers**

Each funding source discussed above helps support staffing-related costs and the remaining expenses necessary to operate Connecticut state parks. Figure II-4 provides the breakdown of funding sources used to operate the park system for FYs 05-13. As previously noted, the General Fund supports the bulk of park operations, averaging 80 percent of funding over the nine-year period examined. Special funds, before eliminated as a funding source, accounted for 13 percent, followed by "other" sources (5 percent), and federal funding (2 percent).



Figure II-4. State Parks Division: Connecticut Total Expenditures by Fund Source: FYs 05-13

Source of data: DEEP

**Personnel**. Costs associated with staffing are the largest expense category of the state park system. Such costs mainly include salaries and wages of full-time and part-time staff. Taking into account all funding sources, *personnel expenditures as a percent of total expenses averaged 73 percent for FYs 05-13*. When looking at individual funding sources, the General Fund accounted for 92 percent of all personal services expenditures.

Figure II-5 shows the level of personnel expenditures for FYs 05-13. Overall, such expenditures increased 15 percent for FYs 05-13, from $8 million to $9.2 million, and remained relatively flat since FY 09, with only slight increases and decreases. Specifically, after steady increases beginning in FY 05, personal services expenses decreased four percent in FY 10 ($395,000), followed by a 3.8 percent ($365,000) combined increase in FYs 11-12. Since then, however, there was a seven percent drop in FY 13, from just over $9.9 million to $9.2 million.[20]



Source of data: DEEP

A component of personnel costs is overtime. Overtime expenses were relatively minor in relation to total staffing expenditures, accounting for 3.2 percent of staff expenditures for the period analyzed. As shown in Figure II-6, annual overtime expenditures for the Parks Division averaged just over $300,000. There is no clear overall trend in overtime expenses, although FYs 08 and 12 show high overtime expenditures in relation to the other years. Not including the two outlying years, overtime expenses decreased 10



Source of data: DEEP

[20] Additional analysis is needed to more fully determine the reasons for the fluctuations in personnel services expenses, particularly since division's total staffing level steadily decreased since FY 08.

percent ($26,000) for FYs 05-07 and increase 18 percent ($44,000) for FYs 09-11. The increase since FY 09 could be attributed to a steady decrease in park maintainers and supervisors, as discussed more later in the report. Park staff have also noted that overtime has occurred due to clean-up after heavy storms, which could be a plausible explanation for the increase in FY 12. It was during that fiscal year (August 2011) that Hurricane Irene hit the state, dramatically impacting parks during the parks season, namely the shoreline parks.

**Other expenses**. Beyond personnel services, the other key cost driver within state park operations is "other" expenses (non-capital) necessary for overall sustainability and betterment of state parks. This broad expense category incorporates over 250 types of expenses in CORE-CT. Of those, approximately 150 are associated with park operations, such as utilities, maintenance services, maintenance supplies, and waste removal. Examining these expenses provides a greater understanding of how much money is spent operating state parks and the specific categories in which the expenditures occur.

On average, other expenses accounted for 27 percent of all Park Division non-capital expenses for FYs 05-13. The primary funding source for other expenses during FYs 05-09 was special funds (62 percent), mainly the Environmental Conservation Fund. For FYs 10-13, the General Fund supported 71 percent of other expenses. Over the nine-year period analyzed, the General Fund funded 49 percent of the division's other expenses, special funds (31 percent), restricted revenue (5 percent), contribution/donations (7 percent), and federal funds (8 percent). Again, the reason for the increase in General Fund support beginning in FY 10 was a result of the elimination of special funds as a funding source.

Figure II-7 highlights the trend in other expenses for the Parks Division for FYs 05-13. Overall, expenditures increased 74 percent, from $2.1 million to $3.6 million. Other expenditures almost doubled between FYs 08-10, from $2.7 million to $5.3 million, followed by a 43 percent decline in FYs 11 and 12, to just over $3 million. In FY 13, other expenses increased 17 percent, to $3.6 million.



*By funding source.* Analysis of DEEP expenditure data shows increases in other expenses under each funding source, specifically for FYs 09-10. For example, in FY 09, special funds increased 54 percent, to $2.3 million, General Fund expenditures rose 14 percent to $1.1 million,

and federal funds increased 180 percent, to just under $400,000. Regarding specific types of expenditures that year, there was a marked increase for premises repair and maintenance services (i.e., oil burners, furnaces, sewer lines, sewage pumps, and heating and ventilation systems). In addition, other expenses for the division's Public Outreach function ($345,000) began showing up in CORE-CT that year after it was reorganized into the Parks Division from the department's centralized communications division, which contributed to the overall rise in FY 09.

Other expenses continued to increase in FY 10, up 27 percent from FY 09, which could be a result of deferred maintenance. The largest percentage increases occurred within federal funds and contributions/donations. Federal funding increased almost threefold, to $1 million, mainly due to a one-time inflow of $782,000 to fund expenses associated with government buildings. Other expenses funded through contributions/donations more than tripled, to $537,000, primarily for premises repair/maintenance services. As discussed in more detail below, maintenance-related expenses more than doubled in FY 10, to $2.1 million.[21]

A two-year decline in other expenditures started in FY 11, mainly due to decreases in federal funding (86 percent) and the General Fund (26 percent). As far as specific expenditure cutbacks, two of the more prevalent decreases occurred in premises repair/maintenance supplies (42 percent), and premises repair/maintenance services (84 percent) – among the park system's largest expenditure categories.

*Fixed or discretionary expenditures*. Other expenses are categorized either as "fixed" or "discretionary." Fixed expenses are recurring expenses an agency or program must account for within its annual budget, including utilities, motor fuel, heating oil/gas, waste/trash removal, and cellular communication services. Discretionary expenses are important to the overall operation of a program in any given year, and include maintenance and repair supplies and services, office supplies, motor vehicle maintenance and repairs, and premises cleaning services.

Figure II-8 show the overall trend in fixed and discretionary expenditures for FYs 05-13. Fixed expenditures increased steadily from FYs 05-09, due in large part to increases in utilities (e.g., electricity costs rose 62 percent.) Since then, fixed costs decreased in FYs 10-12, followed by a slight increase in FY 13. For the overall time-period examined, fixed costs rose 38 percent.

Discretionary expenditures increased overall between FYs 05-13. The dramatic increase in FY 10 is mostly due to a large increase in repair/maintenance services. In general, committee staff was told there was a large expense as part of the greenhouse restoration project at Harkness Memorial State Park,[22] and there was an initiative in both FY 09 and FY 10 for roof replacement at many facilities. Additional park-specific expenses for maintenance services during FY 10 show Rocky Neck State Park experienced a large increase, from $13,000 to $465,000, due to a major project to replace the Bride Brook culvert, and maintenance services at Hammonasset State Park increased from $37,000 to just under $150,000 for various projects, including an electrical upgrade project and a beach sand restoration project. The increase in expenses for FY

---

[21] Maintenance-related expenses, as defined by DEEP, primarily include maintenance supplies, maintenance services, and motor vehicle repair/maintenance.

[22] A joint effort between is being made between DEEP and the Friends of Harkness to refurbish the historic greenhouse complex at Harkness State Park. The Friends group has contributed approximately $500,000, or one-half of the project cost.

13 is most likely due to repairs beginning after hurricanes Irene (August 2011) and Sandy (October 2012).



Figure II-8. Park Division Fixed and Discretionary Expenditure Totals FYs 05-13

Within fixed and discretionary expenses, committee staff identified the five expenditures with the highest total costs for FYs 05-13, as highlighted in Figure II-9. The categories include, from highest to lowest: 1) electricity (fixed); 2) repair/maintenance supplies (discretionary); 3) repair/ maintenance services (discretionary); 4) waste/trash services (fixed); and 5) motor vehicle fuel/gasoline (fixed).  The overall trends within each of the five expenditure categories are mixed, with all but repair/maintenance services having overall upward movement in expenditures from FY 12 to FY 13. Even after expenditures increased in FY 13, most are at or below the nine-year average before inflation.



Figure II-9. State Parks Other Expenses - Top Five Categories: FYs 05-13

Source of data: DEEP

A consistent theme among Parks Division field staff is that funding for property maintenance, supplies, and minor repairs has decreased over time. The two expenditure categories accounting for the largest maintenance-related expenses are premises repair and maintenance *supplies*, and premises repair and maintenance *services*. These are broad expense categories covering various types of maintenance-related costs. For example, expenses for maintenance supplies cover items such as nuts and bolts, stone, concrete, lumber, toilet tissue, and other general maintenance and building-related supplies. As noted above, repair/maintenance services include work on oil burners, furnaces, sewer lines, sewage pumps, and heating/ventilation systems. The two expense categories totaled $7.3 million, or just under half of all discretionary expenses for FYs 05-13.

Figure II-9 above shows overall, repair/maintenance services experienced a dramatic two-year spike in FYs 09-10.  There was a concerted effort on part of the state to address several large maintenance-related projects, including the examples cited above. *In FY 13, however, funding for maintenance services was at its lowest level since FY 06 before accounting for inflation*. Also shown in the figure, the trend in maintenance supplies expenses steadily increased during FYs 05-09, until a relatively sharp jump in FY 10, again most likely due to supplies for specific projects occurring that year. Supplies expenditures decreased again in FY 12, followed by another increase in FY 13 to their highest level since FY 05, at just under $900,000.

## Expenditures by Management Unit

Using the DEEP expenditure database, personnel and other expenses at the management unit level were analyzed. As discussed in Chapter I, the state park system is organized according to 23 management units statewide, with each unit responsible for a collection of state parks. Supervisors oversee the daily operations of the units, including scheduling maintainers, deciding daily project priorities, managing seasonal staff, and tracking capital projects. As such, funding for park operations is based on the management unit structure, and each unit is budgeted funding by the department's central fiscal office.

Table II-1 provides a general overview of the personnel and other expenses by management unit for FY 13. Appendix D shows a broader summary of management unit expenditures for FY 05-13. (A detailed examination of actual expenditures at the management unit level to determine where increases or decreases occurred in any fiscal year is not part of this analysis.) The department is starting to attribute personnel and other expenses to individual parks, and has told committee staff additional work is necessary before it is fully able to determine exact resources dedicated to each park. At the same time, some analysis is currently done at the park level, but strictly for capital expenditures. Committee staff encourages the department to continue examining expenses at the park level. This information could be an important element for analyzing overall park performance and whether to adjust resources among parks within a management unit or determining resources are no longer necessary within a particular park.

## Seasonal Employee Expenditures

A key staffing resource used by the parks system is seasonal workers. Budgets for seasonal staff are determined through the department's fiscal services bureau in conjunction with

the Parks Division. Each management unit supervisor then receives a seasonal worker budget. Unlike general budgets, unit supervisors have some flexibility to determine the specific allocations within their seasonal worker budgets (additional discussion about seasonal staffing, including limits on seasonal budgets, is provided later in this report).

| Unit* | Personal Services $ | % of Unit Total Expenses | Other Expenses $ | % of Total Unit Expenses |
|---|---|---|---|---|
| **Table II-1. Parks Division Expenditures: FY 13.** | | | | |
| Burr Pond | 204,606 | 88.2 | 27,333 | 11.8 |
| Cockaponsett | 346,669 | 78.1 | 97,037 | 21.9 |
| Dinosaur | 277,131 | 80.5 | 67,137 | 19.5 |
| Ft. Trumbull | 278,956 | 66.0 | 143,846 | 34.0 |
| Gillette Castle | 397,185 | 74.9 | 133,091 | 25.1 |
| Hammonasset | 941,753 | 69.0 | 422,852 | 31.0 |
| Harkness | 528,916 | 39.8 | 798,541 | 60.2 |
| Lake Waramaug | 160,667 | 75.7 | 51,597 | 24.3 |
| Macedonia | 169,096 | 58.9 | 117,790 | 41.1 |
| Mashamoquet | 308,015 | 77.9 | 87,235 | 22.1 |
| Osborndale | 359,151 | 83.0 | 73,752 | 17.0 |
| Pauchaug/Hopeville | 487,748 | 74.7 | 165,032 | 25.3 |
| Penwood | 315,203 | 81.9 | 69,857 | 18.1 |
| Peoples | 182,052 | 77.8 | 51,974 | 22.2 |
| Putnam | 413,184 | 81.5 | 94,096 | 18.5 |
| Rocky Neck | 606,684 | 78.2 | 168,963 | 21.8 |
| Salmon River | 264,617 | 78.4 | 73,088 | 21.6 |
| Shenipsit | 96,611 | 70.3 | 40,735 | 29.7 |
| Sherwood Island | 453,020 | 72.7 | 169,788 | 27.3 |
| Sleeping Giant | 336,856 | 81.5 | 76,497 | 18.5 |
| Squantz Pond | 221,471 | 77.0 | 66,315 | 23.0 |
| Topsmead | 401,073 | 77.0 | 120,033 | 23.0 |
| Director* | 608,969 | 73.8 | 216,676 | 26.2 |
| East Distr HQ* | 97,727 | 93.1 | 7,198 | 6.9 |
| Kellogg,Osborne,Goodwin* | 343,780 | 74.4 | 118,002 | 25.6 |
| Public Outreach* | 278,416 | 95.6 | 12,797 | 4.4 |
| West Distr HQ* | 152,557 | 58.9 | 106,274 | 41.1 |
| Grand Total | 9,232,113 | 72.1 | 3,577,536 | 27.9 |
| *Budgeted areas within the Parks Division beyond park management units, which were included to show total expenditures for the division. | | | | |
| Source of data: DEEP | | | | |

Figure II-10 shows Parks Division expenditures for seasonal workers for FYs 05-13. For the period analyzed, the division experienced steady annual growth in its seasonal worker expenditures each year except FY 13. Overall, seasonal worker expenditures increased 39 percent for the nine-year period analyzed, from $2.3 million to $3.1 million. Expenditures ranged from a low of $2.2 million in FY 05, to $3.3 million in FY 12. The decline in FY 13 from the previous year was $175,000, or just over 5 percent. On average, the Parks Division expended $2.9 million on seasonal staff since FY 05. In addition, seasonal worker expenditures were highest at the three main shoreline parks (Hammonasset, Rocky Neck, and Sherwood Island.)



Figure II-10. State Park Seasonal Worker Expenditures: FYs 05-13

**Capital Expenditures**

In 1997, following years of park closures, the legislature announced that it would bond $114 million to help repair and improve the state park system. Known as the 2010 Plan, the initiative was established to begin rebuilding the infrastructure of Connecticut's parks that was curtailed in earlier years. An outside completion date of 2010 was given to complete the projects.

As a way to help DEEP assess state park capital inventory needs, an independent consultant was hired to conduct a review within 51 of the most used state parks. The 2003 report provided a detailed listing of the capital infrastructure needs within state parks, costs of the recommended improvements, and the staff levels necessary to adequately maintain the system. The study estimated the improvements would cost $187 million over a ten-year time horizon. In addition, the report stated 204 full-time staff and 1,943 seasonal staff would be needed for system-wide operations and maintenance.

To date, roughly half of the $114 million cost of the 2010 Plan has been allocated by the state bond commission for state park infrastructure capital improvements. Given the 2010 completion date has passed, DEEP has rolled the 2010 Plan for state parks into a department-wide 2020 Plan, which incorporates all of the department's capital improvement plans, not just those associated with state parks.

There are other bond authorizations for park system projects. The department selects capital projects for which to seek funding for from the bond commission. Within those authorizations, the department has allocations for different projects. The department has several holding accounts for projects fitting under broader funding categories, including minor capital repairs, health/safety, demolition, or paving. As discussed below, there is a process in place to determine funding levels, and management, of projects based on overall cost. Table II-2 provides a summary of the requirements of the various thresholds (post-bond commission approval.)

| Table II-2. Capital Repairs and Improvements Review Process | |
|---|---|
| **Project Cost Threshold** | **Review Process** |
| < $2,500 | Considered minor capital repairs. Individual park management units may use their discretionary budgets or a statewide minor capital repair fund for such repairs or improvements. Park supervisors have "P-Cards" (i.e., credit cards) available to make purchases up to varying amounts per transaction based on park units, with a maximum of three transactions per month, for discretionary expenses. |
| $2,500-$500,000 | Must receive approval from DEEP project review committee if the funding is shared between bureaus (typically the case unless a specific bond authorization is made for a particular park project). DEEP has individual bond fund holding accounts for different types of projects (e.g. health and safety, demolition, paving.) Projects using site-specific trust funds are not subject to committee review, but are tracked centrally. |
| $500,000-$1 million | DEEP must receive approval from the state Department of Construction Services to proceed with managing projects within this dollar threshold. The construction department may decide to manage the project or allow DEEP to manage the project. If DEEP manages the project, the Field Support Unit is the project manager. |
| > $1 million | DCS is the project manager for all capital projects over $1 million on behalf of DEEP. |
| Source: PRI staff. | |

**Minor capital repairs**. Management unit supervisors have authority to undertake capital projects or make capital equipment purchases less than $2,500. Funding for such projects/purchases may come for the unit's discretionary budget or through a statewide minor capital repairs/improvement fund maintained for parks by DEEP. The fund is allocated a certain level of money (generally $50,000 in any given period) through bond authorizations for park repairs and improvements. The fund is overseen by the field support unit, which has responsibility for providing support services to the full department, not just parks. Supervisors' projects go through the two district managers, who make the requests for funding. Projects may be completed using individual management unit staff, private contractors, or field support staff, which includes several quality craft workers (e.g., electricians, carpenters, plumbers) available to complete projects. If an individual management unit uses field support staff for projects, the unit is responsible for project material costs, while field support is responsible for the labor costs.

Units were recently given the autonomy to complete their own minor capital repairs outside their discretionary budgets without first receiving approval from the parks central office. Committee staff believes this process provides units the necessary flexibility to complete projects in a timely manner, yet maintains oversight at the district level.

**Project review committee**. Projects costing $2,500-$500,000 and using shared funding sources must go through a formal review process within DEEP before approval. The Project Review Committee (PRC) reviews such projects. The committee consists of a blend of department staff, including administrators, program staff, field support staff, and financial services staff. The purpose of the committee is to approve or disapprove of projects, decide funding amounts for projects with shared funding sources department-wide, and provide a level of checks and balances on capital expenditures.

At times, capital projects across DEEP bureaus can be classified within the same broad category. For example, the Parks Division, along with other divisions, will request PRC approval for funding based on these broad categories, including minor capital repairs, health/safety repairs, storm damage repair, or demolition. As noted, there are individual holding accounts

within DEEP's broader bond authorizations for the various categories. The holding accounts are common funding sources for projects across several bureaus within DEEP. As such, there needs to be a mechanism to formally decide which projects receive funding and how much; the committee serves this purpose.

Within the parks system, unit supervisors and district managers confer about capital projects. Once a project is decided upon, a request form is completed and reviewed in advance of the PRC meeting (held quarterly) by all the relevant bureaus, including financial services and field support. The committee uses the forms as guidance for project scope and cost, and to decide whether to approve, deny, or modify a project. Whenever funds from specific holding accounts are drawn down, a new request from the bond commission is made. The committee does not get involved when bond authorizations are for a project at a specific location, since previous review and justification were completed, namely through the bond commission.

A criticism by some within DEEP of the project review committee process is that various programs, including parks, will request funding for projects without fully analyzing whether the project is the most efficient way to solve a problem given limited resources. Some also question whether enough planning occurs prior to requesting project funding to determine if the project fits into a larger, more strategic plan for capital expenditures or if the project is vital to the overall parks system.

Committee staff attended one PRC meeting. Several projects before the committee were questioned on its necessity by members as to their expense and overall purpose within a viable, long-term parks system. One particular project proposed by the Parks Division was questioned whether it was necessary, given attendance at the specific park where the project would occur was sparse at best. Although this is only a single event within one PRC meeting, committee staff, through its observations at the meeting combined with information from its broader interviews with department staff, believes it is indicative of a more systemic issue: the lack of proper long-term facilities planning, as discussed in Chapter V.

**Major capital projects**. The Department of Construction Services has specific teams of architects, engineers, and construction specialists to provide capital project planning and management services for any state construction project over $500,000 (not including the transportation department or University of Connecticut projects.) A DCS project manager will develop an agency's project concept from inception through project delivery, including scope development, creation of a project budget, formal selection for a design professional, oversight of the design process, recommendation and award of a construction contract, oversight and enforcement of the construction process, and project completion and turnover of the final product to the client agency. The project teams also provide technical assistance and troubleshoot various facility problems when requested from the client agency. For projects over $1 million, DCS takes responsibility for overall project management and delivery, while projects between $500,000 and $1 million may include coordinated efforts between DCS and DEEP staff.

**Capital expenditure trends**. DEEP provided capital expenditure information for FYs 10-13. Prior to FY 10, capital projects over $1 million did not show up as a DEEP expense on its general ledger. Instead, the expense was considered a DCS expense since that department was responsible for the overall management of such projects. A change was made to ensure expenses

for all capital projects – regardless of which department managed the projects – would show up on DEEP's general ledger. To get a truer picture of capital expenses, therefore, only information for FY 10 and after was examined. Figure II-11 shows the results.



**Figure II-11. State Parks - Capital Project Expenditures: FYs 10-13**

Source of data: DEEP

The *overall trend in expenditures for parks-related capital projects shows an increase since FY 11, although expenses that fiscal year were their lowest of the four years examined. Capital expenditures for FY 13 were the highest of all four years.* Annual expenditures for capital parks projects for FYs 10-13 averaged $2.3 million, and ranged from $1.5 million in FY 11, to $3.2 million in FY 13. In addition, the number of capital projects within state parks ranged from 28 (FY 11) to 81 (FY 10). On average, 57 projects occurred annually. Examples of the most expensive projects incurring capital expenses during FYs 10-13 include: Silver Sands Walnut Beach Boardwalk ($909,000); Hammonasset beach stabilization ($478,000); Peoples State Forest new toilet building and other improvements ($406,000); and Harkness paving ($357,000).

# Chapter III

## Park-Generated Revenue

This chapter discusses various revenue-generation sources within state parks nationally and in Connecticut.

### Key Findings

- *Connecticut relies more heavily on day use fees than do other states.*
- *Connecticut does not provide several common revenue-generating services through its state parks (e.g., golf courses, swimming pools, lodges or inns).*
- *Three-quarters of park-generated revenues in Connecticut come from six of the 139 parks.*
- *Connecticut's fees are generally at or above other states in the region.*

### State Park Revenues

Nationally, parks generate revenue in a variety of ways, most commonly through user fees. Table III-1 shows the percentage of park-generated revenue from the most common sources for all states and for Connecticut specifically. Nationwide totals show fees for overnight stays (i.e., camping, cabins, lodges, and inns) approach half of total revenues, and day-use fees account for a quarter of all park-generated revenue. A variety of other sources make up roughly one-third of total revenues. Generally, state parks capture revenues through fees for a wide range of activities and services. Twenty-eight states (just over

| Table III-1. State Park Revenues by Source (FY 12) | | |
|---|---|---|
| | **Total of All States** | **Connecticut** |
| **Entrance Fees** | 24% | 62% |
| **Overnight Stays/Camping** | 43% | 33% |
| **Restaurants** | 4% | 0% |
| **Concessions** | 7% | 2% |
| **Beaches/Pools** | 1% | 0% |
| **Golf Courses** | 5% | 0% |
| **Other** | 16% | 4% |
| Source: AIX | | |

half) report park-generated revenue for five or more of the categories in Table III-1, while Connecticut is one of 22 states getting revenue in four or fewer of the categories.

**Connecticut's park-generated revenue.** Almost two-thirds (62 percent) of Connecticut's park-generated revenue in FY 12 came through day-use fees, with most of the remainder coming from camping and cabin rentals (33 percent). Park-generated revenue in Connecticut ranked at or near the bottom 10 nationally for total revenues and for three of the four types of revenue the state collects (camping, concessions, and other). Connecticut was above average in collection of entrance fees (ranked 16 of 42 states that collect entrance fees).


Figure III-1 shows total park-generated revenues in constant 2013 dollars for CYs 05-13.[23]



Figure III-1. Connecticut State Park Revenues (CYs 05-13)

Source: DEEP revenue data

In 2013 dollars, total revenues were relatively stable around $5 million annually during CYs 05-08, before increasing past the $6 million annual threshold for CYs 09-13, with the exception of a 38 percent jump from CY 09 to CY 10, which preceded a 20 percent drop from CY 10 to CY 11. While the graph shows something of a plateau for CYs 11-13, there may be a steadier decline from CY 10 to the present once the hurricane-based losses of CY 11 are considered.[24]

*Fee increase.* Connecticut's state parks fees were changed twice in the last six years. First, the fees were doubled over their FY 09 values effective October 1, 2009 as part of implementation of the state's operating budget that increased all of the fees in the state (not just parks' fees). Fee levels in state parks were subsequently reduced from the doubled rates to current figures (135 percent of FY 09 levels for residents and 150 percent of FY 09 for non-residents) as part of a broader deficit mitigation package in April 2010. Because of the timing of the initial doubling of fees and subsequent reductions, the doubled fee levels were only charged at a handful of parks with ongoing paid activities in October 2009. Table III-2 shows a summary of the timing and amount of the fee increases relative the fee levels in place in FY 09. Also included is one example (weekend fees at Hammonasset) of the actual fee values in each time frame.

---

[23] All CY 13 numbers were preliminary through November 2013. Park-generated revenue figures do not include revenues from concessions agreements, which were less than $150,000 in FY 12 and are administered at the Parks Division central office.

[24] Hurricane Irene hit Connecticut in late August 2011, greatly limiting park access for at least two weekends, including the normally busy Labor Day weekend.

| Table III-2. Summary of changes to state park fees since 2009 | | | | |
|---|---|---|---|---|
| | % of FY 09 fee level | | Example: Hammonasset weekend fee | |
| Time period | Resident | Non-Resident | Resident | Non-Resident |
| January 2007 - September 2009 | 100% | 100% | $10 | $15 |
| October 2009 - March 2010 | 200% | 200% | $20 | $30 |
| April 2010 - present | 135% | 150% | $13 | $22 |
| Source: DEEP | | | | |

The changes in revenue in CY 10 were likely driven by a significant fee increase in CY 10, as the number of paid visitors (shown as the top line in Figure III-2) remained steady from CY 09 to CY 10. The drop in visitors and revenue in CY 11 seems largely due to the late summer hurricane that made many parks unusable for prime weekends (late August and Labor Day).



Figure III-2. Connecticut State Park Revenues by Activity Type (CYs 09-13)

Source: DEEP revenue data

Without more accurate attendance data for times/days when fees are not collected, it is not possible to fully determine how the changes in fee levels affected park use and visitor behavior. The spike in CY 10 for paid visits and overall revenue seems anomalous as paid attendance returned to near CY 09 levels in CYs 12 and 13. However, overall revenues for CYs 12 and 13 were up only 14 to 18 percent over 2009 levels. This suggests that the 35 percent and 50 percent increase in fee levels produced a temporary boost in revenue, but led to a smaller increase in revenue in the long-term. The revenue per-visit amount grew from approximately $10 per single-day use fee in CY 09 to $13 per single-day use fee in CY 10 and remained at the

higher level in subsequent years, so the drop in revenues since CY 10 appears to be due to a drop in paid attendance.

*Revenue generation by residency status.* As discussed further in Chapter V, Connecticut residents accounted for over 80 percent of single-day paid day use visits and 96-97 percent of day-use season passes since CY 09. However, day use revenues are disproportionately paid by non-residents because many park fees are higher for non-residents. Figure III-3 shows the percentage of day-use revenue (single day and season passes combined) by residency status. Two-thirds of all day-use revenues come from residents, - well below the percentage of visits from residents - 22 percent of day-use revenues came from non-Connecticut residents, and 11 percent came from admissions fees, which, unlike parking fees, do not charge differently based on residency status. *It does not appear the fee changes that went into effect for the 2010 parks season led to a substantial change in the proportion of residents to non-residents using state parks.*



**Figure III-3. Percentage of Day Use Revenue by Residency Status (CYs 09-13)**

Source: DEEP revenue data

*Revenue generating parks in Connecticut.* Parallel to attendance, most revenue generated in parks comes from only six of the 139 parks. Hammonasset, which accounts for roughly one-quarter to one-third of all paid visitors in the state, generates over one-third of all park revenues (37 percent, Figure III-4). The next biggest revenue generators were three of the other shoreline parks. While Rocky Neck and Sherwood Island generate most of the revenue through parking fees, the majority (70 percent) of revenue generated at Harkness comes through rentals of the Harkness mansion for weddings and other special events. Gillette, the remaining park with over $200,000 annually in revenue generation, regularly generates more than 90 percent of its revenue through admissions to the castle. Dinosaur, admissions-based like Gillette, is at the top of a tier of 13 parks that have generated between $50,000 and $150,000.[25] An additional 17 parks generated between $10,000 and $50,000 each, while 6 parks generated between $300 and $1,600 in CY 13.

---

[25] Dinosaur State Park is the only park that is open year round and should see CY 13 revenues increase when revenue from December is added into the final totals. Similarly, Gillette's revenue and visit totals will increase for CY 13, as the park is open for a select few weekends between Thanksgiving and New Year's Eve.



Figure III-4. Revenues by Park (CY 13)

Hammonasset, $2,256,292, 37%
Rocky Neck, $944,724, 15%
Sherwood Island, $607,030, 10%
Harkness, $480,334, 8%
Gillette Castle, $262,320, 4%
Dinosaur, $131,560, 2%
Other (35 parks), $1,512,204, 24%

Source: DEEP revenue data

**Entrance fees.** Entrance fees (parking or admission) were collected in state parks in 42 states in FY 12. These fees account for nearly a quarter of total state park revenues nationwide. Fee levels vary widely by state, activity/location, and residency status.

*Parking fees.* Parking fees are the most common entrance fee for all states and for Connecticut. A summary of passenger vehicle fees nationwide is shown in Table III-3.[26] Altogether, 32 states charge fees for passenger vehicle admission or parking, ranging from $0.50 to $30 per car, with most states being near the $5-7 per resident passenger vehicle and $6-10 per non-resident passenger vehicle ranges. Where and how often per vehicle fees are assessed varies, as slightly more than a third of the states that charge for parking at any of their state parks charge at fewer than 25 percent of their parks, another third charge at between 25 and 75 percent of parks, and slightly under a third charge at over 75 percent of parks (including 10 states that charge at all parks).

| Table III-3. Summary of Passenger Vehicle Entrance/Parking Fees (FY 12) | | | | | |
|---|---|---|---|---|---|
| | % of park locations charging for entrance | Resident Min | Resident Max | Non-Resident Min | Non-Resident Max |
| High | 100% | $15.00 | $30.00 | $20.00 | $30.00 |
| Median | 49% | $5.00 | $5.50 | $5.00 | $6.00 |
| Average | 47% | $5.34 | $8.71 | $6.01 | $9.65 |
| Low (non-zero) | 1% | $0.50 | $3.00 | $0.50 | $3.00 |
| Connecticut | 19% | $6.00 | $13.00 | $10.00 | $22.00 |
| 32 states charge passenger vehicle entrance or parking fees. Table does not include 18 states without vehicle fees in analysis. Source: AIX. | | | | | |

[26] This table looks only at passenger vehicle entrance/parking. Some states without per vehicle charges charge per person. Many states have separate fees for busses at higher rates.

*Connecticut's parking fees.* Connecticut charges parking for part of the year at 26 parks, though there is wide variation in whether and when paid admission is required on weekdays during the park season, while there are no parking fees at any park during the winter.[27] A summary of Connecticut's parking fees is shown in Table III-4. (Appendix B provides summaries of all Connecticut park fees.) The resident vehicle parking rate range is from $6 to $13 while the non-resident range is $10-22. Connecticut charges more per vehicle than the nationwide median, regardless of residency status, but does not charge for parking at most of the

| Table III-4. Parking Fees in Connecticut | | | |
|---|---|---|---|
| | Number of parks | Residents | Non-Residents |
| Weekend | 26 | $9-13 | $15-22 |
| Weekday | 11 | $6-9 | $10-15 |
| Late-day (after 4 pm) | 10 | $5-6 | $6-7 |
| None | 113 | - | - |

Note: Number of parks for each category is non-exclusive of other categories. The group of parks charging for weekend parking is inclusive of the sub-groups that charge for weekday or late-day admissions.
Source: DEEP (2013)

parks in the state. *Regionally, Connecticut's parking fees are higher than those in Massachusetts and New York ($2-10 per vehicle), but in line with those in New Jersey and Rhode Island ($5-28 per vehicle).*

Fewer than half of all states report charging a separate bus or group fee, which ranges from $5 to $150 per bus or group. Connecticut's bus fee is the highest reported at $100 for residents and $150 for non-residents, compared to the median group/bus fee of $20-25.

*Individual admission.* Twenty-eight states charge individual admission to some state parks, though individual admission is more scarcely used than per vehicle admission. More than half (15) of the 28 states that charge some individual admission are doing so at less than one-third of the parks in those states. The range of admission fees is $1 per adult resident to $36 for adult residents. Only three states have a maximum individual charge greater than $10 per visitor.

Connecticut charges $2 to $6 admission at three sites (Gillette Castle, Dinosaur, and Fort Trumbull State Parks) for specific building entry, but does not charge for parking at those state parks. Connecticut also offers the Heritage Season Pass specifically for these three sites, at a cost of $67 per year per family (two adults and up to four children).

*Entrance passes.* Almost all states that charge parking or admission offer annual passes. The pricing of these passes is such that a park visitor will be better off having bought a pass for unlimited visits than paying per visit in as few as one to two visits to as many as twenty visits. The median number of visits necessary to have equal value between paying for individual visits and paying for a season pass is seven.[28]

Connecticut charges $67 for resident season passes and $112 for non-resident season passes, which provide unlimited parking for one vehicle only. To get a full pass's worth of visits from a season pass, pass-holders would need to enter state parks when fees are being charged for

---

[27] Generally, the season is Memorial Day to Labor Day, though some parks begin charging for parking in April and continue until October.
[28] Season passes work differently in different states. It is possible some state season passes include non-entrance based benefits, including discounts on camping fees or concessions.

parking at least five to 10 times, depending on days visited (i.e., weekdays or weekends) and the specific parks visited. *Regionally, Connecticut's season pass costs are similar to resident passes in New York ($65 resident), Rhode Island ($60 resident, $120 non-resident), and New Jersey ($50), but higher than Massachusetts ($35-45) and higher than New Jersey's non-resident pass ($75).*

The number of season passes sold (including Heritage Passes) has been between 8,400 and 8,700 since CY 10, a noticeable drop-off from CY 09 when 9,600 passes were sold, as shown in Figure III-5. The price of a season pass increased from $50 for residents and $75 for non-residents in CY 09 to $67 for residents and $112 for non-residents since CY 10. Revenues from season passes increased from $510,000 in CY 09 to $600,000 or more in CYs 10-13, an increase of 17 to 22 percent. Though the number of visits for value remained the same, it is likely the increase in overall price is partially responsible for the decrease in season passes.



Connecticut also offers two lifetime passes free of charge, the Charter Oak Pass for Connecticut residents 65 and older and another pass for disabled veterans who are Connecticut residents. Parks Division staff estimates that over 100,000 Charter Oak passes have been distributed since the beginning of the program in 1992, with approximately 50,000 Charter Oak passes still active. Between 2,300 and 4,200 Charter Oak Passes have been distributed annually since 2009. There are far fewer disabled veterans passes in circulation, with just over 600 distributed in 2012 and under 200 in 2013.

*Connecticut does not track the number of times a season or lifetime pass is used*, so, aside from comparisons to other states, it is not currently possible to determine the impact of the passes on park revenue generation. More data on use of these passes would assist in creating

better attendance estimates and inform the Parks Division on the relationship between revenues, attendance, and fee levels, in part to determine if the fee levels for passes should be altered.

**Recommendation**

4. **The use of season and lifetime passes should be tracked by pass type when parks are otherwise charging for parking or admissions.**

This responsibility should be little to no added burden for park staff, especially in parks with electronic registers. In preparing to collect pass use totals, the Parks Division should determine where it is currently possible to track individual pass use and make an effort to track individual pass use for at least the shoreline parks.

Some states offer season passes via non-park venues. For example, in 2011, Michigan instituted a program to make season passes available as part of the car registration process. This approach is different than using a portion of registration fees for park operations, as the program is entirely voluntary and includes several ways to opt out.

If, from the data collected about season passes, the Parks Division determines that selling additional season passes would be beneficial to the parks system or parks visitors, it should explore new ways of marketing and selling season passes, including in collaboration with the Department of Motor Vehicles.

**Overnight stays.** Nationwide, 43 percent of park-generated revenues comes from overnight stays compared to 33 percent in Connecticut. All states generate revenue through camping and all but one state have cabins available for rent. Twenty-nine states also have lodges available in state parks as another overnight visit option. Campsite fees range from $2-60 for primitive or non-improved sites to $6-80 for improved sites.[29] The median cost of sites is between $10-30, depending on the amenities. Connecticut appears near the median for non-improved ($14-30) or primitive ($5) sites, and just slightly above average for improved sites ($33-52). Likewise, Connecticut is near the median price for cabin rentals ($70 versus a median minimum of $50).

Nationwide, over two-thirds of all overnight stay revenue came from camping ($307 million of $452 million total), with cabins ($86 million) and lodges ($55 million) contributing most of the rest. In Connecticut, almost all of the $2.1 million in overnight state revenue came from campsite rental, with less than $14,000 for cabin rentals in FY 12. The revenue from cabin rentals is likely to increase as more cabins are built around the state, especially from cabins at campsites that are already at or near capacity at peak times.

**Concessions.** Nationwide, the biggest revenue generator outside of entrance fees and overnight stays is concessions, which accounted for 7 percent ($72 million) of total state park revenues in FY 12. Almost every state reported generating money through concessions (48 states). Concessions include a wide range of goods and services, including food service, camp stores, and recreation rentals (e.g., jet-ski rental, canoe rental). From conversations with state parks personnel in other states, it appears that concessions are perhaps the most commonly

---

[29] "Improved sites" typically have one, some, or all of electricity, water, or sewage hookups.

privatized parks element, with all case study states reporting a mix of state and private provision of concession services.[30]

For FY 12, Connecticut reported $144,000 in concessions revenue, up from $109,000 in FY 08. Connecticut's concession total ranks 39 of the 48 states generating concessions revenue. Connecticut's percentage of revenue from concessions (2 percent) is less than one-third the national average (7 percent).

Currently, several of the state's busiest parks have concessions controlled by the Bureau of Education and Services for the Blind (BESB). Through statutory authority,[31] BESB has the right of first refusal for concessions service provision at all state agencies. While other service providers provide either a flat or revenue-based fee to parks for the right to operate in state parks, BESB operators pay no such fee. As BESB has no reporting requirement to parks, the extent of the lost revenues for parks is not evident.

It is possible BESB operations of a limited number of concessions opportunities impacts overall service provision in state parks in indirect ways. For instance, a contractor may be willing to operate on a limited basis in multiple parks, but not willing to operate in lesser-used parks without a highly-attended park as a home base or anchor for the operation. If the Park Division would like to provide more contracted services at a wider range of parks, it might explore requiring the bundling of minimum service provision levels across multiple parks in future requests-for-proposals.

**Other revenue-generating services.** Nationwide, some state parks generate revenue through restaurants (19 states), golf courses (17 states), and swimming pools (23 states). Combined, these three types of activities account for 10 percent of nationwide state park revenues, with another 16 percent of nationwide revenues labeled under a broader "other" category. Connecticut does not provide any of the three services and collects no revenue in this area, aside from the revenue derived from parking and camping at swimming areas (i.e., beaches, lakes, and ponds). If the Parks Division seeks to generate additional revenue, it should explore the viability of providing these resource- and location-based services, either internally by the division or through contracts with private vendors. Possibilities for increased revenue generation are discussed in greater detail in Chapter VI.

*Special use licenses.* In some instances, Connecticut grants special use licenses to organizations for events at state parks that would otherwise be outside the rules or guidelines of parks. These events are often meetings or fundraisers for private organizations or governmental groups. Generally, groups are charged a fee to apply for a special permit ($50 for non-profits, $625 for for-profits) and then are responsible for fully covering the other staff and resource costs necessary to hold the events. Over the last 5 years, there has been a declining number of special use licenses issued annually, with the application fees totaling approximately $10,000 or less annually during this timeframe. Estimates of the number of special use licenses issued and the application fees are provided in Figure III-6. A new tracking system for special use licenses was enacted in CY 09. The figures for CYs 03-09 represent the educated guesses of Parks Division staff.

---

[30] Committee staff  interviewed state parks personnel in select other states, as discussed in Appendix E.
[31] C.G.S. Sec. 10-298b.



**Figure III-6. Special Use Licenses (CYs 03-13)**

Source: DEEP estimates. Missing data is possible, especially for CYs 03-08.

The state recoups the actual expenses incurred by the event (e.g., staff overtime), but does not gain revenue from special permits beyond the application fee. There is some concern among park personnel and Friends groups that the general wear and tear from the special events, especially those with large numbers of people in attendance, is not accounted for within the cost reimbursement. The Parks Division does not use special permits as a significant revenue source, but it may be worthwhile for the division to determine whether long-term costs of maintenance should be considered as part of special use license cost reimbursements.

*Donations and sponsorships.* Both donations and sponsorships are funding sources with the potential to enhance parks and the underlying revenues. Donations may come in the form of cash, equipment, or in-kind service provision, as can sponsorship arrangements. Through interviews with parks personnel in other states, staff determined there was general agreement that these funding sources can be helpful in broadening or enhancing parks and programs, but are not necessarily reliable ongoing funding sources.

There are varying thoughts among park directors in other states on the proper use and allowance of donations and, more particularly, of sponsorships. Some states support limiting sponsorship arrangements to organizations with preservation or outdoor recreation goals similar to those of a state's park system. Other states can be more lenient about sharing goals, so long as the efforts of the sponsoring company are not at cross purposes to the goals of parks. But because of other factors unique to each state, there is little evident agreement on what constitutes goal conflict. For instance, it would likely be more difficult to limit sponsorships in states that otherwise lease park land for energy production purposes.

As mentioned in Chapter II, state parks in Connecticut are assisted by arrangements with and donations from non-profit parks assistance groups. The state also allows sponsorships in particular instances. Most notably, some of the programs put on by the Parks Division are implemented to some degree with sponsors. These sponsors generally provide equipment or

personnel for particular programs. Additionally, there is now a Connecticut state parks app for mobile devices that was created at no cost to the state through a sponsorship agreement with the app designers. Generally, Connecticut is deliberate in pursuit and use of sponsorships arrangements. It may be possible for the state to find additional ways for sponsorships to be helpful for state parks' programs, but it is likely program offerings would need to be expanded to realize greater funding in this area.

# Chapter IV

## Staffing

As discussed in Chapter II, the bulk of expenditures for state parks are for personnel costs. Full-time staff within the Parks Division either are field staff (maintainers, supervisors, and district managers) within the 23 park units divided across two districts statewide, or central office staff (division director and assistant director, analysts, and public outreach staff).

**Key Findings**

- *Between FYs 06-13, staffing levels reached a high of 110 in FY 08. In FY 13, staffing was down 19 percent, to 88 staff, the lowest level in the past eight fiscal years.*

- *Staffing levels for key park operations staff - park maintainers and supervisors – is at or near their lowest levels since FY 06.*

- *There are an inadequate number of supervisors at appropriate levels to fill the needs of the current 23 management units - several management units do not have full-time supervisors, are supervised with supervisors or maintainers temporarily serving in a higher class, or are overseen by supervisors from other units.*

Daily operations within state parks are performed by the following types of staff:

- Maintainer - responsible for overall operations of state parks. Major responsibilities include: landscaping; skilled labor (carpentry, masonry, roofing, minor electrical repairs); painting; road and trail maintenance; general maintenance on buildings, dams, and other DEEP-owned facilities; hand and power tool use and repair (mowing equipment, tractors, trucks, chainsaws, and firefighting equipment); and supervising seasonal staff.

- Supervisor - schedules, assigns, oversees, and reviews staff work; provides staff training and assistance; conducts performance evaluations; plans and prioritizes daily work or unit staff; acts as liaison with other units, central office, and other agencies; establishes and maintains unit procedures; manages unit business activities, including purchase requisitions, inventories, revenue deposits, and time and attendance reports; participates in fire suppression crews and boundary maintenance; interacts with park visitors and Friends groups; and prioritizes, assigns, and supervises maintenance projects; hires and trains seasonal staff.

- Operations supervisor (i.e., district manager) – provides many of the same duties and responsibilities of unit supervisors, but on a district-wide basis, schedules, assigns, oversees, and reviews work of staff within district; coordinates and provides staff training and assistance; conducts performance

evaluations of unit supervisors; determines and plans area work; analyzes maintenance operations and programs; oversees special area programs; may assist in preparation of land acquisition, use, and development plans; and coordinates with central office regarding district staff and projects.

- Seasonal staff - includes maintenance staff, life guards, park rangers, campground supervisors, and ticket booth attendees. Seasonal staff assist permanent staff in most park operations, including projects and ongoing maintenance.

In addition to field staff, staff in the central office provide overall coordination with field staff, implementing federal grant programs, such as the Recreational Trails Program, ensuring proper hiring, scheduling, and certification of lifeguards, and performing public outreach activities, including the No Child Left Inside initiative.

Staffing levels within the Parks Division have fluctuated over time, as have certain requirements associated with parks personnel. In addition, there is a relatively large number of staff eligible to retire and, if authority is not given to refill those positions, the operations within state parks will need to be adjusted accordingly.

**Overall staffing levels**. Figure IV-1 shows the trend in staffing levels for the Parks Division. Overall, *the number of full-time staff within the division for FY 13 is almost the same as its FY 06 level.* The division had 88 full-time staff in FY 13, and 91 staff in FY 06 (not including vacancies). Throughout the intervening years, however, there were several fluctuations in the total number of staff. For example, staffing increased by 19 positions between FY 06 and its overall high in FY 08. Since that time, the number of staff steadily decreased to 88 positions in FY 13.



**Figure IV-1. Parks Division Full Time Staffing Levels: FYs 06-13**

Source of data: DEEP

A closer look at various types of staff within the division and the staffing levels associated with those positions shows several trends. Namely, both field staff (i.e., maintainers

and supervisors) and administration staff increased increase from FYs 05-08, though the drop since FY 08 has been mainly in field staff.

**Maintainers and supervisors.** As shown in Figure IV-2, the number of maintainers – employees who provide the bulk of park operations – decreased from 54 to 51 (6 percent) during FYs 06-13, after reaching a high of 63 in FY 09. (The Parks Division also notes, since FY 03, maintenance staffing levels have decreased 23 percent, due mainly to an early retirement incentive program in 2003 and a subsequent hiring freeze.)



**Figure IV-2. Parks Division Maintenance Staffing Levels: FYs 06-13**

Source of data: DEEP

Maintainers are classified either as Maintainer 1, 2, or 3, with Maintainer 3 being the highest level (i.e., most experienced with the most responsibilities.) The number of Maintainer 3 staff within the Parks Division decreased from 45 in FY 06, to 34 in FY 13 – almost a 25 percent decline. At the same time, there was a doubling of Maintainer 2 staff, from 8 to 17. Moreover, there has not been any Maintainer 1 staff within the Parks Division since FY 10. The increase in Maintainer 2 staff and lack of Maintainer 1 staff are likely due to hiring freezes. New maintainers are not being hired at the Maintainer 1 level, and current Maintainer 2 staff are not being promoted as Maintainer 3 staff leave.

As illustrated in Figure IV-3, there was a downward trend in the number of supervisors within management units for FYs 08-12, from 21 to 16, with an increase of one supervisor in FY 13. Similar to maintainers, supervisors are classified as Supervisor 1 (fewest responsibilities), Supervisor 2, or Supervisor 3 (most responsibilities).[32]

---

[32] The official title of the person heading the Dinosaur State Park management unit is Environmental Education Coordinator, which has supervisory responsibilities but is not within the Environmental Protection Supervisor classification as all the other supervisor positions. As such, it is not included as part of the supervisor position analysis. For context, the position at Dinosaur has been filled since FY 06.



**Figure IV-3. Parks Division Field Unit Supervisor Staffing: FYs 06-13**

Source of data: DEEP

In addition to overall trends in maintainer and supervisor staffing levels, acres per staff person was examined. Table IV-1 shows the results.

| Table IV-1. Yearly Acreage per Parks Division Supervisor/Maintainer: FYs 06-13. | | | | | |
|---|---|---|---|---|---|
| Year | Total Acreage | # Supervisors | Acres/Supv. | # Maintainers | Acres/Maint. |
| 2006 | 250,684 | 21 | 11,937 | 54 | 4,642 |
| 2007 | 251,539 | 21 | 11,978 | 55 | 4,573 |
| 2008 | 252,840 | 21 | 12,040 | 62 | 4,078 |
| 2009 | 252,958 | 19 | 13,314 | 63 | 4,015 |
| 2010 | 253,022 | 17 | 14,884 | 60 | 4,217 |
| 2011 | 253,580 | 17 | 14,916 | 58 | 4,372 |
| 2012 | 253,921 | 16 | 15,870 | 56 | 4,534 |
| 2013 | 255,025 | 17 | 15,001 | 51 | 5,000 |
| Source of data: DEEP | | | | | |

Overall, *the number of acres each supervisor is responsible for increased almost 26 percent from 2006-13 to 15,001.* There was a steady increase in each year except 2012. For maintainers, the acres per maintainer increased just under 8 percent, from 4,642 acres to 5,000 acres. The trend for maintainers, however, was somewhat different than supervisors. While there was a steady increase in the total acres per supervisor, acres per maintainer actually decreased from 2006 to 2009, before steadily increasing each year thereafter, reaching the highest ratio in 2013, similar to supervisors.

At some point in time, the growth in responsibilities for supervisors and maintainers, including the total amount of land they are responsible for, becomes too much for a single person to manage effectively. According to DEEP, that time has come given the overall responsibilities within the areas it supervises. The Parks Division recently drafted a proposal to restructure the current model of state park unit management, citing that the present system is unsustainable. In short, six of the 23 management units either are supervised by supervisors also overseeing another unit, someone working Temporary Service in a Higher Class (TSHC), or not supervised at all. Given the TSHC appointments are set to expire and employees supervising more than one

management unit cannot do so effectively, several options have been presented by the department:

1) reconfigure the current management units for a more manageable structure for the current number of supervisors to reduce distances traveled among parks/forests with a unit, increase oversight and/or supervision of seasonal workers, and decrease response time for emergencies;

2) reduce public services available at parks where no supervision is available;

3) find a new corps of employees to serve in a TSHC capacity similar to now; or

4) have the two district supervisors begin supervising management units and risk reducing their ability to manage statewide projects. A more detailed discussion about minimum staffing both for supervisors and maintainers is provided later in this chapter.

**Park unit point evaluation system**. Another staffing-related issue within the Parks Division is how to determine the overall boundary lines of park management units (see Figure I-1 in Chapter I) and, more specifically, the supervisor classification level (i.e., Supervisor 1, 2, or 3) necessary to oversee the management unit. Each of the division's management units is diverse in its overall characteristics. As such, their boundary lines and the corresponding level of supervisor should be based on objective criteria.

The Parks Division created a system to evaluate management unit characteristics in early 1993 and revised it in late 2012. The revised system has 28 different criteria upon which to base the management unit boundaries, and the subsequent level of supervisor required within the unit. The criteria include high and low use acreage, public use buildings and other physical plant characteristics, attendance, trails, paved/unpaved roads, campsites, and facility rentals. Each criterion is given a score and the total score determines the overall category of management unit – small, medium, or large. The corresponding supervisor levels are Supervisor 1 (small management unit), Supervisor 2 (medium management unit), and Supervisor 3 (large management unit).

The revised point system has not been implemented. This is due in large part to the ramifications of the shift and work location provision of the NP-5 union contract that impacts park supervisors and maintainers.[33] The Parks Division has said it is apprehensive about applying results of the revised point system given several of the criteria used in the system could change as a result of possible transfers every two years, impacting the overall staffing resources of the units. Another reason the appropriate supervisor levels have not been assigned to each management unit is due to the recent hiring freeze. *There are not an adequate number of supervisors at appropriate levels to fill the needs of the current 23 management units.* As a result, the supervisor structure within management units is not in accordance with the division's point evaluation system.

---

[33] The collective bargaining group is the Protective Services Employee Coalition IUPA/IAFF, AFL-CIO. The term of the current collective bargaining agreement is July 1, 2008 through June 30, 2012, with an extension through June 30, 2016.

**Shift bid and location clause**. Parks Division maintainers, management unit supervisors, and district operations supervisors (known as district managers) all belong to the same NP-5 collective bargaining unit, along with all other DEEP employees working in the same job classifications. Beginning the mid-2000s, the collective bargaining agreement contained the biennial posting of shift and location assignments. This provision requires DEEP, including the Parks Division and all other department divisions with similarly classified employees, to open its maintainer and supervisor positions every two years for lateral transfers.[34] Seniority is the governing factor to decide any transfer, provided the person making the transfer is qualified for the position.

*In short, every two years, maintainers and supervisors within their particular classifications (e.g., Maintainer 2 or Supervisor 3) are given the opportunity to decide where they want to work. This includes maintainer and supervisor positions within other DEEP areas, namely the Fisheries and Wildlife Management Divisions and the Field Support Services unit.* The process begins as soon as one person decides to change locations and "bump" a person of lower seniority. Given this structure, it is unclear how many positions could be affected in any round of transfers until the process plays itself out and no other transfers occur.

Three rounds of transfers have occurred since the contract provision for shift and location bidding was first fully implemented within DEEP. Committee staff was told by Parks Division staff there were some transfers during the first two rounds in 2009 and 2011. Although these transfers caused some consternation among supervisors and managers, the overall number of moves was considered relatively minor by the division in comparison with the latest changes. In the most recent round in November, *24 maintainers– a full one-third – of the 71 eligible maintainer positions just within the Parks Division transferred to other positions:* 18 (25 percent) transferred to other parks within the division and 6 (8 percent) to other divisions within either natural resources or fiscal and support services bureaus. These transfers are shown in Table IV-2, which also shows that no one at the Parks Division supervisor level transferred in the most recent round, meaning all management unit supervisors and district supervisors stayed at the same locations as in 2011.

As the table shows, all of the transfers occurred within the maintainer job classification. Regarding Park Division employees, of the 34 Maintainer 3 staff within the division, nine (26 percent) transferred to another park location, while 4 (12 percent) transferred from a park to another division within another bureau (3 transferred to Fisheries, and 1 transferred to Field Support Services.) At the Maintainer 2 level, half of the 18 maintainers relocated to another park, and an additional 2 maintainers (11 percent) were transferred to another area outside of the Parks Division (i.e., Fisheries, Wildlife Management, and Field Support Services).

---

[34] This is because the position of Environmental Protection Maintainer, for example, is a broad job classification intended to be applicable experience-wise  across multiple program divisions within DEEP.

| Table IV-2. Parks Division Employee Transfers Per NP-5 Shift Bid and Location Provision: November 2013 | | | | |
|---|---|---|---|---|
| **Position** | **Total Eligible** | **Did not relocate** | **Park to Other Park** | **Park to Other Division** |
| District Supervisor | 2 | 2 | 0 | 0 |
| Supervisor 3 | 10 | 10 | 0 | 0 |
| Supervisor 2 | 5 | 5 | 0 | 0 |
| Supervisor 1 | 2 | 2 | 0 | 0 |
| Maintainer 3 | 34 | 21 | 9 | 4 |
| Maintainer 2 | 18 | 7 | 9 | 2 |
| Maintainer 1 | 0 | 0 | 0 | 0 |
| Totals | 71 | 47 (66%) | 18 (25%) | 6 (8%) |

Note: The official title of the person heading the Dinosaur State Park management unit is Environmental Education Coordinator, which is not within the Environmental Protection Supervisor classification and, thus, is not included as part of the supervisor positions in the table. The maintainer level at Dinosaur State Park is reflected in the table.

Source of data: DEEP

Regarding non-Parks Division employees, that is, those classified as DEEP maintainers but not working as park employees, six such maintainers (four Maintainer 3 and two Maintainer 2 staff) transferred into state parks from other areas within DEEP. Given the overall impact of the contract provision allowing shift bidding affects more than just the Parks Division, it is clear the division bears the bulk of the changes—18 maintainer staff moved around the park system, 6 moved out, and 6 moved in.

Figure IV-4 shows how the division's management units were affected by transfers resulting from the latest work location changes for maintenance staff only (since no supervisors were affected). Specifically, the figure shows whether units gained maintenance staff, lost staff, or remained at the same level. Eighteen of the units experienced no overall change in the number of maintenance staff. Three of the units had a net gain of one maintainer each, while two units had a net loss of one maintainer each.



Figure IV-4.Outcome of Lateral Transfers by Park Management Unit (Nov. 2013)

18 (78%)

3 (13%)

2 (9%)

■ Net Gain ■ Net Loss ■ No Gain/Loss

Source: DEEP

Despite the fact 21 (92 percent) of the management units were not negatively affected by the most recent transfers in terms of the overall number of maintainers within the unit, the changes are not without impact. In meetings with Parks Division staff, there was tremendous trepidation and frustration expressed as to the results of the most recent round of transfers.

Although the position of Environmental Protection Maintainer is considered a broad job classification with the ability to apply experience across multiple program divisions within

DEEP, park supervisors and managers disagree. This has led to uncertainty among supervisors as to the overall impact the transfers will have on park operations. They say many maintainers (and possibly supervisors in the future) who have been working at their particular park for a relatively long period time and gained the necessary, and oftentimes unique, knowledge that goes into maintaining (and supervising) the specific park unit, have been involuntarily transferred to another park unit due to the contract provision allowing such transfers.

As a result of the large number of recent transfers, there is an experience void that may or may not be filled by the incoming maintainers, or may take time to overcome. The division's main concern is that without a change in the contract provisions for DEEP maintainers/supervisors, the changes will not stop, resulting in disrupted park operations every two years.

At the same time, there is strong consensus among park supervisors, district supervisors, and central office managers within the Parks Division that changes to the NP-5 contract language, at least regarding DEEP staff, are necessary to ensure stable and consistent park operations. Committee staff understands the division's concerns regarding the possible impact of the current contract language. The department should work within the appropriate channels/timeframe toward modifying the necessary NP-5 contract regarding the shift and work location provision with the end result of consistent and adequate state park operations.

**Retirement eligible**. Table IV-3 shows the number of park supervisors and maintainers by their length of state service within particular ranges. Employees with at least 25 years of service are eligible to retire at any time, as long as they meet the minimum age range (employees' age information was not examined as part of this analysis).

As the table shows, almost two-thirds of the 18 *supervisors* have 25 years or more years of state service, meaning they are technically eligible to retire based on length of service. Sixteen *maintainers* - almost a third - have 25 or more years of service. Of all supervisors and maintainers, 28 percent of supervisors have 30 or more years of services, and 6 percent of maintains are at that threshold.

| Table IV-3. Length of State Service for Park Unit Supervisors and Maintainers (as of 11/23/13) | | | | |
|---|---|---|---|---|
| | **Supervisors** | **% of Total\*** | **Maintainers** | **% of Total** |
| < 10 | 1 | 6% | 16 | 32% |
| 10-19 | 5 | 28% | 13 | 26% |
| 20-24 | 1 | 6% | 5 | 10% |
| 25-29 | 6 | 33% | 13 | 26% |
| 30 or more | 5 | 28% | 3 | 6% |
| Totals | 18 | | 50 | |
| * Totals may add up to more than 100 percent due to rounding. Source of data: DEEP | | | | |

It is important for the Parks Division to track employees' length of service as it relates to the overall ability of the division to staff its management units. Proper forethought is necessary as to how impending retirements may affect management units, particularly the number and size of management units if fewer supervisory positions can be filled due to hiring restrictions. The

division has told committee staff it is aware of employees' length of service and takes that factor into consideration when examining supervisor positions and the overall configuration of park management units.

**Minimum supervisor and maintainer staffing**. Many routine tasks require two maintainers to be present to perform safely (notably, using chainsaws, working with heavy equipment, or performing construction activities). Assuming the number of park management units should not be lower than the current 23 (including Dinosaur State Park), perhaps the simplest way to determine minimum staffing would be to assign one park management unit supervisor (to oversee general operation of the park unit and be available for weekend supervision of seasonal employees) and two maintainers (for daily operations and safety reasons).

With the current 23 park units, this would require 23 park unit managers (5 more than current employment given Hammonasset has 2 supervisors and Dinosaur has a supervisory education coordinator) and 46 maintainers (5 less than current employment). However, this situation is unlikely to be practical because of the increased responsibilities and duties for those in the busiest parks. In short, different management units have different minimum staffing requirements to maintain current services and safety. Throughout the recent hiring freeze and resultant loss of staff due to attrition, the Parks Division has put priority on having more than two full-time maintainers in a few park units, even at the expense of having one or none at other park units.

A more realistic estimate of system-wide minimum staffing would not reassign positions away from units with more than two maintainers or one supervisor. Eleven park units have more than two full-time maintainers and six units are at the minimum level of two, leaving six units with only one maintainer. Keeping the current second supervisor in place at Hammonasset (and supervisory position at Dinosaur), there are six units without supervisors.[35] Under this scenario, the parks division would need 12 new hires (6 unit supervisors and 6 maintainers) in order to come back to an acceptable, ongoing staffing level for full-time employees under the current 23 park management unit organization. The minimum ongoing staff level of 80 full-time maintainer and supervisor positions (up 12 positions from the current total of 68) would still leave the Parks Division at a slightly lower level than in FY 08 (84 positions).

Since several of the parks units without a dedicated supervisor are currently being overseen by a high-level maintainer working temporarily out of class and because the majority of current supervisors are former maintainers, it is likely that most of the supervisor positions will be filled from the maintainer ranks. Adding staff positions, in general, may help boost morale, which seems generally low based on committee staff interviews with DEEP field personnel. More specifically, the additional 6 to 12 refilled or new positions available at various locations across the state would be offered first as internal transfers, which could go a long way towards addressing the side-effects of the shift-bidding relocations, as discussed earlier. A full recommendation on the overall funding mechanism for state parks, that incorporates funding for staffing, is provided in Chapter VI.

---

[35] According to the Parks Division, the following units are covered by a supervisor from another unit or have employees working temporarily in a higher class: Lake Waramaug; Macedonia; Sleeping Giant; Peoples; Mashamoquet; and Pachaug.

**Seasonal staff**. The Parks Division relies on seasonal workers to augment its full-time operations staff. Seasonal workers include maintenance staff, campground managers, life guards, park rangers, and maintenance supervisors. The budget for seasonal staff accounts for roughly one-third of the overall personal services budget for the division.

Table IV-4 shows the overall trends in the number of seasonal staff as well as the number of workers converted to full-time equivalents (FTEs). The FTE comparison is made to better understand the overall trend in seasonal workers, given they are not full-time. The table also provides information on the number of seasonal staff hired for the first time in a given year and those rehired from the previous year.

| Table IV-4. Seasonal Staff Totals and Original or Rehire: FYs 08-13 | | | | |
|---|---|---|---|---|
| | **Total Seasonal Staff** | **Full-Time Equivalent** | **Original Hire** | **Rehire** |
| FY 08 | 636 | 266.8 | 281 (44%) | 355 (56%) |
| FY 09 | 567 | 278.3 | 199 (35%) | 368 (65%) |
| FY 10 | 649 | 294.5 | 235 (36%) | 414 (64%) |
| FY 11 | 553 | 283.8 | 137 (25%) | 416 (75%) |
| FY 12 | 583 | 279.3 | 186 (32%) | 397 (68%) |
| FY 13 | 554 | Data not available | 181 (33%) | 373 (67%) |
| Source of data: DEEP | | | | |

Three main issues were raised by the Parks Division regarding recent requirements placed on seasonal staff: 1) the maximum number of hours seasonal staff may work during a given year of 1,040 hours (26 weeks) per person, with a required three-month break in service between periods of employment, is too rigid for the most effective use of seasonal staff; 2) changes made in 2009 for retired state employees who participate in the temporary worker retiree program (i.e., works up to 120 days a year following retirement), which includes parks seasonal staff,[36] establish a maximum of two periods that a retired employee may participate in the program and do not allow for the rehire of experienced state employees who work as seasonal staff;[37] and 3) the current pay scales for seasonal staff are too low to consistently attract employees.

The first and second issues above are state policies that would require statewide changes unless the department was able to get a special exemption for its seasonal staff. Regarding the pay scale issue, if using the percent of rehires as a benchmark, as shown in Table IV-4 above, there does not seem to be a problem attracting seasonal workers from year to year: a full two-thirds of seasonal workers are rehires from the previous year. Additional analysis is needed, however, to determine if specific seasonal positions are difficult to fill.

**Seasonal staffing compared to full-time staffing**. In FY 12, according to national data, Connecticut had 99 full-time staff compared to 523 seasonal employees,[38] for a ratio of 5.28 seasonal staff to full-time staff. This puts Connecticut among the most dependent on seasonal staff (ranked 6th according to National Association of State Parks Directors FY 12 data for

---

[36] See Executive Order 27-A, October 2009.
[37] Any Parks Division seasonal worker who is a retired state employee may only work a maximum 960 hours per year, instead of the 1,040 hours per year as other seasonal workers.
[38] AIX data show that Connecticut reported 99 full-time staff for FY 12, which differs from the 92 full-time staff count provided to committee staff by the Parks Division.

highest number of seasonal to full-time), well above the national average of 1.65 full-time to seasonal staff. Including Connecticut, twelve states had more than 3 seasonal employees per full-time staff, with 14 states having more full-time staff than seasonal (leading to a ratio less than 1).

While Connecticut's ratio is quite high, the comparison may not be valid as some states report this information to AIX as full-time equivalents (FTEs) rather than total number of staff. In FY 12, Connecticut had 279 FTE of seasonal staff, or a 2.8 full-time staff to seasonal FTE ratio. This would mean the state ranks 12th highest rather than 6th - on the high side of average, but no longer among the very highest users of seasonal staff.

Without a major influx of funding specifically for adding full-time staff, it seems implausible there would be a significant shift away from the current reliance on seasonal staff to a higher degree than all but five other states. However, if the Parks Division is given more flexibility on hiring full-time staff in place of some seasonal staff (which are currently budgeted independent of each other), it is likely the state's relatively high dependence on seasonal staff would begin to move towards the national norm.

An important caveat for national comparisons regarding seasonal staff is that the employment rules and responsibilities of seasonal staff can differ considerably between states. Connecticut's seasonal staff is capped at 1,040 hours per person for the year, meaning a 40-hour per week seasonal employee can work 26 weeks, with a minimum layoff period of three months between periods of employment.

Other states may have similar requirements, but the differences can have a significant impact on park operations and planning. For example, most seasonal employees in the Pennsylvania park system are nine-month full-time employees with a three month discharge period before rehire. The extra three months allow Pennsylvania parks to have full staffing for the months in preparation for the busiest periods and a mostly full allotment of staff to help close the park after the busiest season, with most seasonal staff absent for only the least used months in the winter. The longer-duration seasonal contract may also allow long-time seasonal employees greater stability. Staff in Pennsylvania indicated there were many returning seasonal staff who had other season-appropriate jobs in the winter.

Some other states, including Missouri, have approximately the same 1,040 hour annual limit, but have the flexibility to hire someone for those hours spread over the entire year. This means the individual parks can decide if a person is 6 months full-time, 12 months part time, or some combination of the two, depending on the needs of the park.

# Chapter V

## Park Use, Performance Measurement, and Planning

The state park system has different meanings and uses to different people; therefore determining whether service provision, and thus funding, is "adequate" depends on how the term is defined and who is defining it. Some view state parks as a way to provide outdoor recreation for the state's citizens, while others view parks as a way to protect natural spaces and/or preserve the state's heritage. Still others see the park system as a means of employment, while others may not use state park resources, but know their tax dollars support the system.

Adequacy of state park resources means finding the balance between the public's goals for parks and policymakers' willingness to fund a park system to meet those goals. For purposes of this study, committee staff examines three key measures of use as they relate to the overall adequacy of funding for state parks: attendance; safety; and customer satisfaction. Committee staff also assessed the collection, analysis, and use of performance measures related to the key areas.

### Key Findings

- *The Parks Division methodology to collect accurate attendance statistics is flawed, and the current estimate is likely well off the actual number (probably undercounted). Although used in public discussion of the state's park system, attendance is not formally considered for planning or performance purposes.*

- *There is currently not enough full-time maintenance and supervisory staff to cover necessary park operation responsibilities within adequate safety guidelines; full-time park law enforcement officer levels are down, and the trend in public safety incidents within parks is mixed over the past five years.*

- *Ad hoc attempts have been made to collect customer feedback, yet no ongoing centralized system exists to collect and analyze such information.*

- *Short-term planning for the state park system has defaulted to attrition-based "crisis management" as the level of resources available to parks has decreased. Though various long-term planning documents have been created, there is little evidence suggesting these documents are used systematically.*

- *The Parks Division budget is based on previous expenditure levels rather than system needs. Field personnel are not involved in budget administration, which may lead to increased costs.*

**Park Use Measurement**

DEEP personnel at multiple organizational levels were asked how they measure park performance. The prevailing answers include examining attendance levels, safety information (of the public and of staff), and overall customer satisfaction (including cleanliness of parks and availability of varying programs and experiences). These areas were also the most commonly cited measurement areas by state park personnel in other states. Despite there being a system-wide emphasis on these key areas of performance, there was little evidence that data regarding these areas were analyzed by the Parks Division.

This chapter includes further discussion of the information currently collected by DEEP, an assessment of the methodologies in place to obtain park-use data, and an examination of how such data is, and might be, used to inform the division's planning efforts. From an overarching perspective, there is a lack of reliable aggregate information about park performance, and there is a "crisis management" nature regarding short- and long-term planning efforts. As such, it is apparent *the Parks Division does not engage in measurement of park performance to guide management decisions and resource allocations. Further, the division does not collect information on park use in a reliable, accurate manner such that the measure of use trends is currently possible.*

**Recommendation**

> **5.  The Parks Division should create a Results Based Accountability-style report card regarding park performance in accordance with the guidelines established by the legislature's Appropriations Committee. The report card should include measures regarding park use (e.g., attendance, safety, and satisfaction), as well as measures of park operations (e.g., planning efforts) and park personnel. The division's first report card should be developed by January 1, 2015, and annually thereafter. The report cards should be provided to the legislative committees of cognizance and made available on the Parks Division website.**

Creating the report card on an annual basis will assist the Parks Division in assessing, and attempting to meet, the needs of the public. It is expected that the regular reviews of park locations will play an important role in the report card development, especially with regard to individual park or park unit status and improvements. To further the implementation of the above recommendation, DEEP will need to first develop a Quality of Life statement, in RBA terms, to help guide the necessary data collection and performance measurement efforts to create its RBA report card(s). As an agency, DEEP has familiarity with Results Based Accountability, and has previously created report cards for its forestry and solid waste programs, which should aid in developing a state park system report card.

While committee staff attempt to describe state park use within this chapter, the Parks Division does not possess adequate information to accurately describe park use trends in a comprehensive manner. What follows are descriptions of park use given the scarce and sometimes inaccurate information currently available, along with analysis of the department's current use information-gathering methodology for the key areas of attendance, safety, and customer satisfaction.

**Attendance**

The Parks Division cites attendance information on a regular basis. Official presentations and budget requests often include the division's overall estimate that approximately 8 million visitors, or more accurately visitor days, occur in Connecticut parks annually. However, the accuracy of the overall system-wide attendance estimate and of many individual park estimates is suspect. Inaccurate attendance information may lead to misallocation of scarce resources to or within the Parks Division that, in turn, may lead to declines in safety or customer satisfaction. The following are key findings regarding park attendance:

- *Attendance estimates and paid attendance records show park use has held relatively stable over the last decade.*
- *While the Parks Division has a formal policy on creating daily attendance estimates, the methodology has several flaws and is not currently followed in a consistent manner.*
- *The current attendance estimate methodology is overly burdensome to park supervisors, especially given the unreliable results it produces.*
- *The Parks Division is not using the reliable attendance data (i.e., numbers from paid day use and camping fees) already being collected in a meaningful way.*

There are several components of park use that, in aggregate, should lead to overall attendance figures for state parks, including day use receipts (parking and/or admission), camping fees, and estimates of use during non-fee days or hours. Park supervisors are asked to estimate day use (fee-based and non) and camping numbers daily and report those numbers to the Parks Division office. Figure V-1 shows overall estimated attendance for CYs 03-12, along with the attendance estimates for the eight most attended parks, which collectively account for roughly half of the overall park attendance.

Total park attendance has been reported by DEEP as fairly steady, with between 7 and 8 million visitors per year within the past decade. Hammonasset, shown by the top line in the figure below, accounts for over a quarter of overall statewide attendance, so it is not surprising that total attendance trends mirror those at Hammonasset and vice versa. Rocky Neck and Sherwood Island form the second tier of highest attendance, each accounting for between 5-10 percent of the state's total. Aside from those three, no other park represents more than 5 percent of the total.

**Attendance methodology.** The Parks Division has a formal methodology for estimating the attendance at individual state parks. The individual park estimates are then aggregated to come up with an estimate of total statewide visits. The attendance methodology relies on park supervisors recording daily attendance estimates for some of the most-used parks in the state, based on the number of vehicles observed in the park. These daily estimates are recorded in a centralized database accessible to the unit supervisors and to Parks Division staff in the central administrative office. In total, estimates are required at 55 parks, inclusive of the 29 parks that charge for parking or admission.



Figure V-1. Overall Attendance Estimates and the Most-used Individual Park Attendance Estimates (CYs 03-12)

Source: DEEP attendance estimates

Methodological problems with creating the attendance estimates largely prevent these numbers from being valid or useful. In particular, there are three major issues affecting the overall estimate of attendance.

*First*, attendance estimates are only recorded for 55 of the state's 139 parks and forests. Without any information regarding the attendance in the 84 parks and forests that are not among the 55 where an estimate is supposed to be provided, it is not possible to determine if the 55 parks that are part of the attendance estimate represent: 1) the most-used of all 139 parks (in which case the overall attendance numbers would slightly increase if the other parks are included); 2) a majority of the most-used parks (whereby there may be a noticeable increase in overall park attendance estimates), or 3) a random sample of parks (which may lead to a sizeable increase in the attendance estimates).

Parks Division personnel indicate the list of 55 parks is used in order to maintain comparability to previous estimates, dating back decades, that also limited the estimates to the

same parks. While it is unlikely that any single park of the remaining 84 accounts for a large difference in overall attendance, there should be some estimate given for these parks, even if only collectively. From this factor alone, it would appear the attendance estimates underrepresent overall park attendance.

*Second*, the division is not fully administering the methodology it has in place. In some instances, the designated parks are in park management units that do not currently have a park supervisor or are overseen by a park supervisor who is temporarily overseeing multiple units. For CY 12, there were attendance estimates for 49 of the 55 designated areas, with the number falling to 40 parks with any reported attendance for CY 13 by December of that year. Even within the parks that reported some amount of attendance for CYs 12-13, there are visible gaps for weeks or months when examining the daily attendance logs. Some of these data gaps are created because a supervisor is recording a month, or even a year, of attendance data in one day and leaving the rest of the days blank, while many of the gaps are because no information is entered for days, weeks, or even years at a time. Like the limitation to 55 parks, addressing the issue of non- or underreporting would increase the overall attendance estimate.

*Third*, the estimates themselves have large potential for error. Attendance estimates are calculated by counting the number of cars in parking areas at the designated parks each day and extrapolated for how many cars there were the entire day and then by how many visitors present in each car. Each factor of this process of estimation is subject to error (under- or over-reporting), which is multiplied by errors in the extrapolation process. It is unlikely that all park supervisors, especially those in geographically large units with multiple parks, are able to get to each park each day and further unlikely that they will be able to get to each individual parking area, if there are multiple entry points for a single park. Frequency of visits by park personnel for attendance estimates is lessened for those park units without a park supervisor assigned or with a supervisor who is temporarily overseeing multiple units.

Little, if any, uniform guidance has been given to the park supervisors on how to estimate a full day's worth of cars based on point in time observations. Per the attendance methodology, supervisors are given instruction to estimate four visitors per car, but multiple parks staff relayed that the number can and does vary by park and/or supervisor, sometimes with a higher than six or eight visitor per car factor. The attendance methodology does allow for variation in the visitor per car factor with the consent of the Parks Division director. It seems likely that the number of visitors per car will systematically differ among parks, but there should be some record or justification for the change as part of the formal methodology.

Further issues around the subjectivity of the current estimates include some park supervisors having incentive (even if subconsciously) to overstate their park's attendance to help secure additional resources for the park and/or better a unit's standing in the points system (discussed in Chapter IV). Additionally, it is understandably difficult to measure the attendance of walk-in visitors, especially for large parks with relatively easy walk-in access. As such, the issues with the subjectivity of park supervisor estimates of attendance may be leading to under- and/or over-reporting.

Taken together, *the flaws in the current attendance estimates suggest that the approximately 8 million visitor estimate the Parks Division uses in describing the park system is*

*likely underrepresenting the true number of visitors to state parks.* However, given the issues described above, it is not currently possible to know if the true attendance is more than double or less than half the current estimate, or anywhere in between.[39]

*Improving attendance estimates.* There are several less subjective and less labor intensive ways to develop an attendance estimate that are more accurate and representative than the current methodology. Variations of solid attendance estimation methodologies are used in many other states and by the National Park Service. Recording the exact number of visitors is near impossible and expensive, so a more reasonable goal is determining an estimate that is reliable, not labor intensive, and useful. More accurate overall and individual park attendance estimates should allow for better long-term allocation of resources for relatively little on-going cost outside current responsibilities. *Connecticut's current attendance estimation methods can and should be improved.*

**Recommendation**

6. **The Parks Division should develop an improved attendance estimation methodology that: 1) spreads responsibility for point-in-time counts; 2) requires the performance of focused counts every five years; 3) uses quantitative numbers already available via revenue collection, and 4) expands the use of car counters.**

The first two components of the recommendation would relieve supervisors of the need to attempt to be everywhere every day. Instead of asking supervisors for full, extrapolated estimates in 55 areas each day, multiple employees can be asked to provide point-in-time observations in the course of their current responsibilities (e.g., supervisors, maintainers, and perhaps EnCon police may be asked to log the number of cars in a parking lot when they arrive at particular locations). Daily attendance would not be tracked each day, but the number of more accurate samples coming in would more than make up for this.

Next, each park should have a comprehensive count of visitors performed for at least one week in-season and one out-of-season on a rotating basis, in an attempt to look at complete attendance for these time periods. A major purpose of these counts will be to review and reestablish various extrapolation factors, such as determining the number of individuals per car and the relationship between total attendance for a day and point-in-time vehicle visitation. These comprehensive counts should be performed for each park at least once every five years, to reassess the extrapolation factors on a regular basis.

*Fee-based attendance information.* As previously mentioned, DEEP already collects public use data at 29 parks via collection of user fees. Park supervisors of units with parking and/or admissions fees are instructed to use the quantities of paid entrances as part of their overall attendance estimates. Looking simply at day-use fees (parking and admissions) can help capture overall attendance trends. Figure V-2 shows the growth in the overall attendance

---

[39] The counts of day-use fees show over 300,000 vehicles paying for parking at state parks annually, which can be extrapolated to over 1 million paid visitors each year using a factor of 3 to 4 people per vehicle. Since there are no parking fees outside the parks season and relatively few parks charge for parking (and those that do charge often do not charge for weekday admissions), it is reasonable to conclude that even conservative estimates of attendance are likely to push the number of total visitors to well above the number of visitors who paid for entrance.

estimate and the growth in the paid-visitor numbers compared to CY 03. It appears that the day use totals show more extreme jumps year-to-year, while it takes longer for these trends to be noticed and included by the park supervisors in the estimates they provide.



**Figure V-2. Changes in Attendance Estimates and in Fee-based Attendance (CYs 03-12)**

Source: DEEP attendance estimate and DEEP revenue data

Based on park-by-park comparisons, it is not clear that the places charging day use fees are the most-attended parks. Of the 15 parks with estimated attendance of over 100,000 visitors for CY 11, only 10 charged parking fees at any point.[40] Table V-1 compares the number of parks by CY 11 overall attendance range to the number of parks charging admission in each attendance category.

| Table V-1.  Attendance ranges and entrance fees (CY 11) | | |
|---|---|---|
| Attendance range | # parks with estimated attendance levels | # of parks per attendance level with entrance fees |
| 0-50,000 | 13 | 5 |
| 50,001 - 100,000 | 27 | 14 |
| 100,001 -200,000 | 7 | 4 |
| Over 200,000 | 8 | 6 |
| Source: DEEP attendance estimates and DEEP revenue data | | |

Besides not charging for parking at several of the most highly-used parks (or at least most highly-estimated-use parks), parking fees are only being charged at fewer than half of the medium-use parks (between 50,000 and 100,000 visitors a year).[41]

Unfortunately, with attendance estimates varying widely year-to-year for certain parks (including having estimates provided some years but not others), it is not possible to discern

---

[40]One park with high attendance estimates not currently charging for parking, Silver Sands, is being prepared for charge for parking in the near future.
[41] Full discussion of park fees is in Chapter III.

whether the above analysis shows that there is misalignment between park use and parking fees or whether the analysis further indicates the range of error in attendance estimates. However, the previously recommended regular park reviews and use of improved attendance estimates should allow the Parks Division to better understand and align fees and public use.

**Recommendation**

> **7.  The Parks Division should review the use and level of fees for each park location not less than once every five years, as part of an overall park review.**

For those parks that have been charging day-use fees, Figure V-3 shows overall paid day-use visitors as well as the paid day-use visitors for the top nine attended parks in CY 11.[42] Overall paid attendance has been approximately 20 percent of the total attendance estimate since 1999. The figure shows paid entrance to the state's most-used parks (Hammonasset, Rocky Neck, and Sherwood Island), which strongly mirrors the overall attendance estimate in that Hammonasset accounts for between one-quarter and one-third of all paid day use with the next two accounting for more than 5 percent of the total paid day use amount in a given year.



Source: DEEP Revenue Data. Assumes 4 visitors per vehicle.
Parks with fewer than 20,000 paid vehicles in CY 13 are not shown individually, but are included in the total.

---

[42] Estimates in the figure include admissions and parking and assumes four visitors per vehicle, which is notably low for buses and mini-buses.

The correlation between overall paid day use and the day use specifically in Hammonasset is demonstrated by the parallel trends in the figure (i.e., each peak or valley in Hammonasset day use is accompanied by a similar peak or valley in the statewide day use numbers for the same year). Rocky Neck and Sherwood Island had very similar numbers of paid day use attendance for CYs 99-08. Rocky Neck then saw a jump in paid day use for CYs 09-13, while Sherwood Island has overseen a slow but steady decline in paid day use in the same timeframe.

It is possible the current system of charging admission wastes resources in parks that do not warrant staffing a ticket booth as often or at all. Beyond this, better attendance estimates at parks currently charging may yield additional net revenues as more and better information is available on when vehicles are entering parks when those parks are not charging (i.e., after hours, weekdays, out of season). (More discussion on fees and revenues is provided in Chapter III.)

*Connecticut resident use of state parks.* Based on paid day-use data, residents have accounted for 82 percent of all single day entrance fees (parking or admission) since CY 09. As shown in Figure V-4, there has been very little fluctuation in the percentage of resident to non-resident use in the past five years. Season passes are purchased almost exclusively by Connecticut residents, who have accounted for 96-97 percent of season pass sales annual since CY 09.



Source: DEEP revenue data

*Use of traffic counters.* To help calculate attendance, the state currently has a single traffic counter, used in Sherwood Island.[43] The best practice from other states in estimating attendance and in helping to identify shifts in use of individual parks is to employ a network of traffic counters at park entrances. Ideally, each park entrance in the state would have a traffic counter permanently in place, though having a set of permanent counters at a broad sample of entrances or rotating sets of portable counters throughout the park system would also be preferable to Connecticut's current system for counting traffic in parks.

**Recommendation**

8. **The Department of Energy and Environmental Protection should use a portion of its bonding authorization for improving parks for purchasing car counters, such that vehicular traffic at all parks can be counted for weeklong or more portions of on- and off-season time periods by 2020, and during each subsequent five-year time period.**

Reasonably priced options are available for temporarily or permanently placing such counters at parks with and without electricity available at park entrances. Some of the parks in other states are employing technology that will record not just numbers between manual checks of the counter, but can also automate the population of a database of attendance information with counts within specific time ranges. The Parks Division should consider using technology to minimize the need for manual checking of the counts at physical locations where possible. Program review staff, through interviews with park personnel in other states, estimates the costs of car counters can range from less than $500 per temporary counter to several thousand dollars for permanent installation.

**Safety**

In addition to attendance, an indicator of state park system performance - and possibly determining whether resources are adequate for state parks - is safety. Although safety has different meanings and can be analyzed in multiple ways, the analysis presented below is based on various measures of visitor safety (focusing on incidents involving law enforcement response) and park employee safety. The key findings show:

- *the Parks Division understands park safety is important and coordinates with district managers and department law enforcement when safety issues arise;*

- *although adequate incident data exists, the Parks Division has not established formal park safety metrics, precluding it from systematically analyzing data to identify safety-related trends within the parks system;*

- *the trend in the total number of incidents, and several specific types of incidents, at state parks responded to by EnCon police is mixed since FY 08,*

---

[43] Traffic counters, or car counters, are devices placed at vehicular park entrances that record vehicle movement into and out of parks. They may be mobile/temporary or permanently placed. A wide range of technological options, at varying levels of sophistication, are available to assist in automated counts of vehicle traffic.

*although numbers may be indicative of changes in law enforcement staffing rather than changes in the actual number of incidents.*

- *the number of full-time and seasonal law enforcement officers patrolling the state parks system decreased almost 10 percent since 2008;*

- *no grievances have been filed for employee safety issues in the last five years, and the trend in workers' compensation claims has remained relatively flat.*

During committee staff's interviews with various DEEP employees and outside stakeholders, it became clear the department views safety as one of its primary responsibilities regarding operation of the state's park system. As a way to begin examining safety within state parks, committee staff inquired of the Parks Division how it measures safety in general. Although the division views safety as a key component of park operations, there is no aggregate analysis of incident data, including responses by law enforcement and accident/injury reports filed by lifeguards, by the division to determine system-wide trends in park safety. Instead, the division is focused on handling day-to-day issues as they arise. There also was agreement among the division's field staff interviewed that there is not enough focus on overall safety trends or system-wide planning.

At the same time, division management does contact the division's two district managers and park unit supervisors at times as a way to understand what safety-related issues are occurring. The division also is in communication with the environmental police (i.e., EnCon Police) division as a way to identify where resources are needed, namely on busy days in the summer months. (The police division has primary law enforcement jurisdiction within state parks.)

Despite this interaction, *the Parks Division does not regularly collect or analyze safety-related trend data, nor has it established safety performance measures.* Committee staff believes the Parks Division should begin monitoring overall safety trends to more fully understand what safety and incident trends are occurring on a macro level through a more proactive approach to safety data analysis.

**Recommendation**

**9. As part of its RBA report card, the Parks Division should develop formal metrics of safety within the state park system, including safety of the general public and division employees. The division should collect and analyze applicable safety-related data necessary to identify trends in the annual number and types of safety-related incidents on a system-wide basis.**

**Park Incidents**

The state park system offers a variety of recreational opportunities across a range of outdoor resources, including swimming, hiking, boating, and camping. Providing adequate safety within those vast resources is challenging. EnCon Police has primary law enforcement jurisdiction within state parks and forests, as conservation duties. The division provides patrol services through a combination of full-time police officers and seasonal officers.

Committee staff examined park safety in two ways: visitor safety and park staff safety. Given the Parks Division does not track aggregate safety measures, visitor safety was measured by the number of incidents occurring at state parks responded to by EnCon Police. Although a formal review of the EnCon Police division was not a part of this study, committee staff obtained incident data from the division.[44] Safety of park staff was made by examining workers' compensation claims and safety-related grievances.

Incidents occurring at parks are wide-ranging and include motor vehicle and parking violations, fish/game regulation enforcement, dog violations, alcohol violations, and domestic violence situations. There are times when safety issues within the park system involve the EnCon police, state police, municipal police, or other first responders, as well as non-police staff, namely lifeguards and seasonal park rangers, though the percent responded to by EnCon is unknown.

Incident information provided by EnCon was analyzed as one way to describe park safety. Figure V-5 shows the number of incidents on an annual basis and the trend in incidents for FYs 08-13. An incident is defined as any time an EnCon officer (full-time or seasonal) responded to a call for service or self-initiated an enforcement activity.



The figure includes all types of incidents occurring at state parks and forests. *The overall trend in incidents at state parks responded to by park law enforcement is mixed.* For FYs 09-11, the total number of incidents at parks and forests decreased from 2,989 to 2,813. The number

---

[44] The Legislative Program Review and Investigations Committee conducted a full study of the State Environmental Conservation Police in 2006.

then increased to 3,254 in FY 12, before decreasing again to 3,024 in FY 13. As expected, incidents occurring at the three main shoreline parks accounted for a large percentage of incidents in comparison with the other parks. In addition, it is important to note that the number of reported incidents may be influenced by attendance and police other than EnCon responded to incidents.

**Types of incidents**. There are dozens of types of incidents occurring at state parks that EnCon responds to and tracks, including motor vehicle law enforcement, enforcement of alcohol rules, disorderly conduct/breach of peace, dog regulation enforcement, and trespassing enforcement. Although all types of incidents may affect a visitor's overall enjoyment of a state park, the vast majority of incidents are non-violent and do not appear to directly impact visitor safety, namely parking violations, which are among the highest of all incidents. At the same time, there are certain



categories of incidents that could impact safety within parks or a person's perception of whether parks are safe.

Committee staff examined the following relevant categories to identify whether trends exists: 1) disorderly conduct/breach of peace; 2) enforcement of alcohol violations; 3) larceny; and 4) enforcement of motor vehicles laws (e.g. speeding). Figure V-6 shows the number of such incidents since FY 09. In short, the highest number of incidents occurred within the category motor vehicle enforcement, which increased since FY 11. Alcohol violations have been on a downward trend, while disorderly conduct/breach of peace showed an upward swing since FY 10, but decreased somewhat in FY 13. Incidents involving larceny remained relatively steady over the five years examined.

**EnCon staffing**. The EnCon police division's staffing levels were examined to identify any possible trends related to safety resources.[45] Figure V-7 shows the total number of conservation officers (i.e., full-time) and the full-time equivalent special conservation officers (i.e., seasonal officers).[46] Staffing levels ranged from a high of 73.6 in FY 09, to a low of 62.2 in FY 13. There has been an overall decrease of 11.4 (15 percent) full-time and seasonal staff over the five-year period examined. Specifically, full-time staffing decreased from 56 to 47, while

---

[45] An obvious measure of safety within state parks is determining whether adequate police coverage is available to meet their needs. Ultimately, the level of safety within state parks is predicated in large part upon annual policy decisions to fund a certain number of environmental conservation officer positions to patrol state parks. The allocation of EnCon officers by location and shift as they relate to state parks was not reviewed in this study.

[46] Seasonal EnCon officers receive the same training as municipal police officers throughout the state.

seasonal staff fell from 17.6 to 15.2. A statistical correlation between incidents and number of staff was not determined for this study.



**Figure V-7. EnCon Police Staffing: FYs 08-13**

Source: DEEP

**Coordination between parks and EnCon police divisions.** During the months three shoreline parks are open (Hammonasset, Rocky Neck, and Sherwood Island), each has an EnCon field office. This provides police presence at these parks for each day and evening shift (8:00 a.m.-1:00 a.m.) to cover increased daily activity and camping. In addition, the division directors from Parks and EnCon Police meet weekly to discuss police services for state parks. District EnCon captains and sergeants also meet with park supervisors and district managers. As mentioned above, however, there is little analysis of aggregate police activity data by the Parks Division on a consistent basis to identify system-wide trends. Committee staff believes this is important as a way to help establish pro-active initiatives to deal with safety issues rather than on a reactive basis.

**Park supervisor authority.** Park supervisors used to be certified municipal police officers with the same law enforcement powers as conservation officers. Although supervisors no longer have this authority, several supervisors expressed interest in regaining the ability to issue simple infractions (i.e., parking tickets) to help rectify certain nuisance issues arising at parks and affecting park operations. Other supervisors, however, believe their time is severely limited with their current responsibilities and adding another function, especially one that requires ongoing training, would only serve to decrease time devoted to their present duties. Those same supervisors also discussed that even issuing a "simple" infraction may escalate an issue that otherwise either would have been ignored or dealt with through direct conversation, not to mention adding administrative duties they do not have time to fulfill.

Committee staff understands both sides of this issue. With proper training park supervisors might benefit from the authority to issue infractions, particularly for parking violations, which consistently rank among the top incidents responded to by EnCon. Such ability could add a level of operational control and visitor safety to state parks, and has the potential to free up conservation officers to provide more proactive police services. At the same time, there

are administrative and training responsibilities that park supervisors and EnCon police may not have the resources to fulfill.

**Employee safety**. As discussed earlier, having a minimum staffing level of two maintainers per park unit for safety reasons is not met within some units. The possibility of decreasing employee safety, therefore, exists in those units. To more fully examine overall employee safety within the parks system, committee staff examined two indicators relative to safety: 1) the trend in the number of workers' compensation claims filed by maintainers and supervisors; and 2) the number of safety-related grievances filed by maintainers or supervisors, or their union. Any increases in these areas could be an indication of decreased employee safety within state parks.

Park supervisors and maintainers receive initial and periodic health and safety training through the DEEP Office of Health and Safety, and on-the-job training at the management unit level. The annual number of workers' compensation claims for FYs 10-13 ranged from 12 to 23. Although there was an increase in the number of claims filed in FY 13, committee staff cannot draw any definitive conclusions with respect to the overall number of claims. That claims remained relatively constant, except for FY 13, suggests there was nothing extraordinary in any of the previous years as far as overall employee safety is concerned.

According to DEEP, there were no safety-related grievances filed for FYs 09-13 by maintainers, supervisors, or their union. On one level, this indicates workplace safety is satisfactory among field employees. On another level, there are many reasons why union grievances either are or are not filed, which would need additional analysis to fully determine.

## Customer Satisfaction

People use state parks for different purposes and have different experiences based on multiple factors. As a way to understand visitors' satisfaction with park operations, committee staff examined whether the Parks Division has a structured system in place to measure customer satisfaction, the measures used within that system to determine performance, and the overall performance of parks. The key findings show:

- *Various methods exist to collect customer feedback, yet no customer satisfaction metrics have been developed; no aggregate review of customer satisfaction data exists to determine systemic problem areas, or areas where performance is positive.*
- *Results from an online survey conducted by the Parks Division shows the public is satisfied with their state park experience, yet some improvements should be made.*
- *Parks serve a wide cross-section of the public with varied interests, yet park supervisors say conflicting park uses do not cause many problems within the parks system; one issue of consistent debate, however, is the use of all-terrain vehicles on park land.*

As highlighted in the main recommendation at the start of this chapter, committee staff proposes the department use customer satisfaction measures to help determine the overall performance of the state park system. Similar to measurement of attendance and park safety, the development and measurement of customer satisfaction should be geared toward the department answering the three primary RBA questions of "how much did we do?" "how well did we do it?" and "is anyone better off?" as they relate to the overall results statement (i.e., Quality of Life in RBA terms) developed for the state park system and necessary for completion of the recommended RBA report card.

Several methods to collect customer feedback have been implemented by the Parks Division with varying degrees of success toward a system-wide understanding of customer satisfaction. Two formal methods for park attendees to rate their satisfaction and indicate areas for improvement are an online survey developed by the division and implemented in 2008, and postcards available at park unit and district offices. Both methods have been helpful to the division to understanding issues at individual parks, yet *there is no formal aggregate review of customer satisfaction data to identify areas systematically in need of improvement based on specific performance measures. The division recognizes its analysis of customer service information is more on a reactive basis than proactive.* For example, there is no "customer satisfaction" database for the postcard information, and the online survey is examined on a case-by-case basis without analysis of overall themes or trends. This is not to say the customer feedback information is not used, but a system-wide analysis could make it more useful. At the same time, the division notes the vast majority of park customers simply provide their feedback directly to park staff, which is difficult to quantify, but still important for park operations.

**DEEP online survey results**. Customer feedback information from the division's online survey was examined by committee staff. The survey consists of 20 questions about a variety of topics. Responses to several of the more relevant issues to this study are summarized below.  The results are aggregate (i.e., not by fiscal year), and include all 1,450 responses received by the division since mid-2008.

- 92 percent said they enjoyed their visit (n=1,416).
- 78 percent said staff were helpful (n=869).
- When asked to rate the conditions/use of 22 different factors of the park they visited, the top three responses receiving the most number "excellent" or "good" ratings were (in order):[47] Parking area (n=988); Highway signs to locate park/forest (n=971); Buildings/grounds (n=846).
- When asked to rate the conditions/use of 22 different factors of the park they visited, the bottom three responses receiving the most number "fair" or "poor" ratings were (in order): Restrooms (n=233); Informational signs within park/forest (n=166); Trail maps (n=162).
- 55 percent said the parking fee does not deter them from visiting a Connecticut state park/forest; 45 percent said it does. (n=1,332)

---

[47] The rating scale used for each factor was "excellent," "good," "average," "fair," "poor," and N/A.

Using the survey results above, it is clear that most people enjoyed their visit to a Connecticut state park/forest.[48] The results also show areas where customers rated parks services well and areas where improvement seems to be necessary. Committee staff understands there are caveats with the survey and its results, particularly given the low number of responses in relation to the overall number of visitors over the timespan examined. The overall results, however, show mostly positive customer satisfaction with state parks and forests.

Another area of interest to the committee regarding state park use is the overall accessibility within parks. The department is cognizant of making parks, to the extent feasible within their overall natural condition, accessible to visitors of all physical capacities. For example, all capital projects associated with physical structures are completed in compliance with federal and state accessibility requirements. The department's park system website lists all the amenities that are accessible for park visitors with physical challenges.[49] For example, accessible parking and picnic tables are available at all park and forest recreation areas, and most of its public buildings and restrooms are accessible. There are accessible campsites, fishing piers, and swimming areas/beach surf chairs at various state parks and forests. One trail (Saugatuck Universal Access Trail in Redding) is wheelchair-accessible with a platform overlooking the Saugatuck Reservoir.

**Conflicting uses**. The consensus among park supervisors during this study was despite public perception at times, there are relatively few conflicts with regard to how parks are used (e.g., hiking, bird watching, beach-going, horseback riding), and that the general public seems satisfied. The supervisors referenced some parties have isolated issues with people using parks in ways that conflict with their own, but from a system-wide perspective the issues are usually relatively minor and resolved quickly.

It should be noted that conflicting uses is not the same as whether or not adequate opportunities exist for a particular category of use or users. For example, even though customer satisfaction is relatively high, based on the information provided above, users of Connecticut's park system may not believe enough of a certain type of use is available.

One such issue area that receives frequent attention is the use of all-terrain vehicles (ATVs) on state park and forest lands.[50] Within the statutory language governing state parks and forests, ATV operation is prohibited on state land without first obtaining a certificate from the DEEP commissioner and unless the vehicle is properly registered.[51]

State law also requires DEEP to evaluate the properties under its jurisdiction and the jurisdiction of other state agencies for potential use by ATV operators, and must make available some of the properties for ATV use.[52] In making the properties available, the

---

[48] At least of those who have selected to find and complete the online survey.
[49] http://www.ct.gov/deep/cwp/view.asp?a=2716&q=325078&deepNav_GID=1650
[50] C.G.S. Sec. 23-26a defines an all-terrain vehicle as a motorized vehicle, not suitable for operation on a highway that (1) is not more than fifty inches in width, (2) has a dry weight of not more than six hundred pounds, (3) travels on two or more tires specifically designed for unimproved terrain, (4) has a seat or saddle designed to be straddled by the operator, and (5) has an engine with a piston displacement of more than fifty cubic centimeters.
[51] C.G.S. Sec. 23-26b.
[52] C.G.S Sec. 23-26c.

department must consider minimizing the impact of all-terrain vehicles on the environment. Before making any property available that is under the jurisdiction of another state agency, the department must consult with such agency. The department is also required to adopt regulations, in consultation with the motor vehicle department, to: 1) establish standards and procedures for ATV operator certification and the use of all-terrain vehicles on state land; 2) setting a fee sufficient to cover the cost of implementing the certification program; and 3) establishing safety requirements for the operation of all-terrain vehicles on state land.

To date, no regulations have been adopted as required by statute regarding an ATV certification program for use on state land. DEEP, however, has developed a set of internal guidelines governing the certification process for ATV use on state land.[53] A procedure has been established for DEEP's review of any organization proposing an ATV facility on state land. Among other requirements, the organization must be a corporation registered with the state, and be able to demonstrate it has the resources and capacity to fully develop, operate, and maintain an off-road vehicle facility.

There is a two-step review process within DEEP, including a public meeting with the municipality where the proposed facility would be located, to examine ATV facility proposals. The key factor guiding the proposal process is the organization proposing the facility must show the facility is compatible with protection of the natural resources within the site. Any organization with an approved proposal must then enter into a concession agreement with the department for the ATV facility site's development, operation, and maintenance. At the same time, however, DEEP's position on its ATV policy and procedures is that they require additional legislation to become effective.

Given increased attention to use state land for off-road vehicle use, DEEP commissioned an evaluation of possible areas to operate ATV facilities in 2010.  The study developed criteria for siting an ATV facility, and identified six state forests that should be evaluated against those criteria to determine if such parks could contain ATV facilities based on the criteria.[54] The study also recommended a second study phase to actually do the evaluation, which has yet to begin.

Public Act 13-237 required DEEP to implement its 2002 ATV facility proposals. The public act, however, was vetoed by the governor. In his veto message, the governor cited that any new legislation regarding ATV use be a balanced approach, which he believed the act did not. The governor also urged all parties interested in changing policies for ATV use on state land to craft legislation that would support creation of sustainable ATV trails. The current procedures developed by DEEP remain unimplemented.

---

[53] See: State of Connecticut, Department of Environmental Protection, All TerrainVehicle Policy and Procedures, November 2002.

[54] These criteria are based upon similar criteria adopted by Massachusetts Department Conservation and Recreation; field observations during part one of the evaluation, a review of existing documents on the effects of ATVs, informal interviews with ATV users throughout the United States, and knowledge of State environmental laws and regulations (see: Connecticut Department of Environmental Protection: All Terrain Vehicle Facility Siting Study, *Baystate Environmental Consultants, Inc. (A GZA Company), May 2010*

Practices in several surrounding states show Rhode Island does not specifically designate trails in state forests for off-road vehicles, including ATVs (all-terrain vehicles cannot be legally registered in the state). The state does allow legally registered motorcycles (including off-road motorcycles) to ride along dirt roads within state forests as long as the rider holds a valid motorcycle license. In Massachusetts, ATV trails have been designated in eight state forests. Special permits are required to ride in three of those forests and there is a cap on the number of riders per day in those three parks. In New York, the state bans ATVs (and other off-road vehicles) from state parks and forests.

## Planning

Another piece of examining park use and performance measurement is determining the extent to which the Parks Division uses the available data to make informed decision for short- and long-term planning. The key findings in this area include:

- *Parks system planning is "crisis" driven.*
- *Park operations and planning are not performance-based, with data under-gathered and under-used.*
- *It is not clear whether current resources are optimized; budget cuts and the lack of position refill authority may hamper these efforts.*
- *Budgeting for parks is based on a top-down approach that requires the division to do as much as possible given a resource level, rather than being based upon the amount of resources required to efficiently operate the park system.*

Planning for state parks is performed in several ways and at multiple organizational levels within DEEP. As previously mentioned, capital projects in parks are subject to normal bond reviews, with smaller capital projects (under $500,000) subject to specific review by DEEP's project review committee.

**Statewide Comprehensive Outdoor Recreation Plan.** A formal planning document, the Statewide Comprehensive Outdoor Recreation Plan (SCORP), is produced by DEEP every five years as part of a federal requirement for fund appropriation. Creation of the SCORP allows the state to continue to receive an annual apportionment of the federal Land and Water Conservation Fund. The most recent SCORP for Connecticut was created by DEEP in 2011 and runs through 2016. As the title suggests, the SCORP focuses on outdoor recreation provision, the primary responsibility of the Parks Division and its parent Bureau of Outdoor Recreation. Within the current SCORP, the plan is described as "a planning document that identifies outdoor recreation issues of statewide significance and evaluates the supply of and the demand for outdoor recreation resources and facilities in Connecticut."

The department conducted surveys about park use for the 2005 version of the plan, but, because of Connecticut's broader budget issues at the time, the 2011 plan was created to be an update to the more comprehensive 2005 plan. The division asked users to give preferences for a variety of outdoor activities and related facilities. The SCORP also includes a number of major goals, and accompanying sub-goals, for the department. Most of the stated goals include some

parks division involvement, but also require broader cooperation within the agency, especially with the Bureau of Natural Resources (BNR). Three of the plan's six goals appear particularly relevant to the parks division:

- Connecticut will maximize public access to outdoor recreation resources.
- Connecticut will maximize the variety of outdoor recreation resources.
- Connecticut will engage in public outreach to better inform residents and visitors about the availability of outdoor recreation resources and of the many personal and community benefits of participation.

Each of the goals is accompanied by a detailed list of recent accomplishments, ongoing initiatives, challenges in meeting the goal, and objectives to overcome those challenges. The plan does provide a good overview of the current system and attempts to quantify user demand (including changes in use). However, beyond listing objectives for each goal, the plan does not specifically prioritize those objectives or outline specific steps to enact the listed objectives. Further, *while the SCORP is recognized as the parks planning document of record throughout the relevant bureaus and divisions of DEEP, no formal or systematic use of the plan was evident for either system-wide budgeting purposes or day-to-day operations decisions.*

**2003 Infrastructure Conditions Assessment.** As discussed in Chapter II, the 2003 Clough, Harbor and Associates (CHA) Infrastructure Conditions Assessment provided a detailed inventory of the parks system's most-used areas and resources while giving estimates of the personnel and other resources necessary to maintain all of the parks and related facilities on an ongoing basis. The estimates of the resources necessary were large increases over the 2003 staff and budget levels, which would be even larger increases today given the declines in staff since that time. However, the CHA document may have represented more of a best-case scenario for park operations than a minimum baseline. The CHA report did provide useful budget estimates for repairs and capital improvements, but such estimates seemingly did not account for scenarios in which under- or unused resources are removed from the system. However, the report provided tools and information with which DEEP could prioritize projects within individual parks and across the state park system (see Appendix E), but, a decade later, there is not evidence these tools have been used recently.

There are now significant issues with reliance on the document going forward. The document is over 10 years old. Park resources have changed through additions and subtractions to the system since the time of the report, but the underlying inventory and conditions of the park infrastructure have not been consistently updated. Additionally, because the budget and personnel allotted to parks never matched the amounts listed in the report, it is likely any prioritization efforts at the time the report was introduced were mostly limited to projects deemed urgent and/or health or safety related. The result is a large backlog of projects that were not listed as urgent at the time.

**Parks Division planning.** Overall, there is evidence of planning at all levels of the parks division, but the group of plans does not appear to be systematic or guided by overarching division-wide priorities. Further, while projects proposed by park unit supervisors are vetted by several levels of administration before they are implemented, *there is not sufficient guidance*

*given from the management levels to the district and park supervisors on project priorities.* Additionally, there is not clear communication to park unit supervisors regarding rejected or non-approved project proposals for at least those proposals put before the Project Review Committee, so that such proposals may be modified for future consideration.

Projects may be efficiently implemented in individual parks, park management units, or within the Eastern and Western Districts. However, without guidance on division-wide priorities, *it is likely that there is duplication of effort across park units or districts or even projects implemented that work at cross purposes.*

**Recommendation**

10. **The Parks Division should develop written criteria and procedures for project approval based on the division's system-wide priorities. This should be updated regularly and distributed to park unit supervisors and district managers upon revision. The status and evaluation of merit, based on fit with the established criteria and priorities, of all project applications that move beyond the district level should be communicated, in writing, to the park unit supervisor who first completed the application.**

This recommendation should help ensure the limited resources available to the department, including the time and effort to develop project proposals, are devoted to those projects that fit into the division's system-wide priorities. Additionally, these changes should inform park unit supervisors as to whether non-approved projects are worth resubmitting for consideration.

**Budgeting process.** The current budgeting process for the state park system, like most state agencies, is a top-down approach and one that is based, in large part, on current services and reductions, where possible or when requested as part of the statewide budget. Development of the Parks Division budget is no exception.

At present, DEEP's Financial and Support Services Bureau, which develops the budget for the entirety of DEEP, examines individual park management unit expenditures from the previous year, including full-time and seasonal staff expenditures, fixed expenses, and discretionary expenses. This budgeting process is not unique to parks or DEEP. Like most state agencies, much of the budget for parks is been determined by factors outside the department's control, including personnel costs for full-time employees (i.e., through collective bargaining restrictions and the recent state employee concession agreements) and the fixed costs associated with each park unit (e.g., utilities). After applying any department-wide reduction budget directives from the Office of Policy and Management, a Parks Division budget is set.

Very little of the budget, if any, is determined by park personnel at the field level explaining to DEEP management the financial needs of an efficiently run park. Rather, the Parks Division is given a level of financial resources and asked to do as much as possible while keeping public services available. This has led to a disconnect within the budgeting process for state parks. *Neither the two district managers nor park unit managers are substantially involved*

*in the budgeting process and do not provide input on budget matters. As a result, true budgetary needs, at the management unit level or in aggregate for state parks, are not fully considered.*

**Recommendation**

11. **The Parks Division shall perform a formal review of a portion of the park system locations and resources therein on a rolling basis such that all park system locations are reviewed at least once by 2020. The review shall include an inventory and assessment of the condition of resources and facilities as well as an examination of the staffing needs of each location and shall be updated for each park location at least once throughout every subsequent five year period.**

The timing of these reviews is such that the results should inform the department in developing future SCORPs. The reviews should aid the budgeting and planning process by creating a regularly updated list of the maintenance status and financial needs of the entire inventory of park's facilities and other resources. Having this complete list and keeping it current is crucial towards long-term planning goals and should allow for greater coordination of effort between park units, districts, and other park-related divisions of DEEP. Also, these reviews can serve as a time to take stock of current uses and offerings of particular parks to determine if and how public needs for outdoor recreation are being met and to reiterate how each park might best meet the outdoor recreation goals of the state, as outlined in the SCORP.

*Field staff's role in the budgeting process.* Field staff are only formally involved in the administration of the budget for seasonal employees. The overall state park seasonal employee budget is divided into management unit shares by DEEP's Financial Services unit in consultation with Parks Division management. Each park unit supervisor is given a lump sum budget for seasonal employees for his or her particular park unit near the beginning of the parks season.[55] Park unit supervisors are expected to meet the personnel needs within the total and under the restrictions detailed in Chapter IV. Though unit supervisors have control and responsibility for managing their unit's seasonal budgets, the seasonal budget amount for each unit is typically based on prior budgets, minus any reductions, and not necessarily on unit supervisor or district manager input.

Prior to the elimination of the Environmental Conservation Fund in FY 10, park unit supervisors retained a small portion of park-generated revenue through the use of park unit specific enterprise funds (i.e., revenue from sale of firewood and ice), which could be used for minor projects or new equipment at the unit supervisors' discretion. With that source of funding no longer available to the unit supervisors, there is no direct control of park unit discretionary budgets by unit supervisors.

*Non-seasonal budget responsibility for field staff.* Park unit supervisors do not have, and did not previously have, budget responsibility for the wider category of discretionary spending beyond the enterprise funds. Instead, each park unit supervisor is given a spending card with a

---

[55] There are some issues with parks budgeting for a calendar year season that crosses two state fiscal years. Parks division staff reported that unexpected changes in budget because of changes in the state budget at the fiscal year is more of a problem now that the Parks Division no longer has control of the non-lapsing funds from park-generated revenue.

daily and monthly maximum specific to each unit. The monthly limit amounts to a spending cap, but the overall discretionary budget is less than twelve months' worth of the monthly limit. Park unit supervisors and district managers are not part of the process to develop the annual discretionary budget limits, except insomuch as spending in one year guides the budget in the next.

In general, park unit supervisors would like more input and control regarding discretionary spending. Some reported that absent knowledge of and accountability to the park unit discretionary budget, it is likely that spending in a unit is higher than would be absolutely necessary. Also, they are sometimes put in a position to purchase inefficiently. For example, because of the spending limits, they may buy an item every other week, rather than in bulk every other month or once for the season. Or they may spend more purchasing a collection of cheaper items day-to-day rather than requesting a single item that is above the daily limit.

Beyond the knowledge, involvement, and control of park unit supervisors over a park unit's seasonal employee costs, *there is no financial incentive for park unit directors to be aware of and minimize discretionary or fixed costs.* Giving park unit supervisors greater budgetary discretion and control could create an incentive to find savings in the fixed and discretionary budgets if some portion of future savings remains within the park system. This is not to suggest that park unit supervisors are not currently looking for ways to improve the parks they oversee. Instead, there may be added benefit to the units, and through them the public, if there is more flexibility afforded to the unit supervisors regarding budget control. Likewise, if district managers have greater budgetary awareness and responsibility, regional funding efficiencies may be discovered.

**Recommendation**

12. **The Department of Energy and Environmental Protection should involve field staff (i.e., district managers and unit supervisors) in the budget development and administration process for the Parks Division. Specifically, park unit budgets should be administered in coordination with the field staff throughout the fiscal year for non-personal service costs in a manner such that field personnel are aware of yearly budget limitations and allowed to retain some portion, as determined by the department, of any realized savings within the same park unit and/or district.**

# Chapter VI

## Operations and Funding Options

This chapter presents an overview of the potential impact of a number of possible courses of action regarding state park operations and funding and a recommendation.

**Key Findings**

- *Closing parks is a complicated proposition because of the state's statutory open space goal and the general desire by the Parks Division to preserve existing resources.*
- *Current resources may be adequate for maintaining current service provision levels in the short-term, but either an increase in funding and staffing or a decrease in services is necessary for continued adequate state park operations in the long-term.*
- *Increased revenues may be available if desired, but would likely need an initial investment to realize.*

The information presented throughout this report shows financial and staff resources are both down from previous levels and the major cuts to each have come primarily through attrition rather than targeted, purposeful cuts to programmatic offerings. The Parks Division is under pressure to maintain or expand publicly-visible services and park offerings (e.g., keeping less frequently used parks open, keeping busier parks relatively clean) despite the downward trend in resources for operations.

In response to declining staff numbers and available funding, the Parks Division has made a series of cuts to service and operations, but has done so under the guideline that decreases in service that are obvious to the public should be avoided. These cuts have taken many forms, including less frequent regular upkeep (e.g., lawns are mowed less often, bathrooms are checked and cleaned less often), less availability of parks staff for educational or outreach purposes, and decreased presence of park staff who would otherwise be available for informational, customer service, or safety reasons. *Though the Parks Division has made efforts to limit the public exposure of these decreases in service, committee staff finds the current levels of service are at or below the point where cuts can be made without a decline in the public perception of the availability or quality of service provided.*

Even under the current budget constraints, the lack of data and its analysis regarding park performance has likely led to less than optimal allocation of increasingly scarce resources within the Parks Division. The sub-optimal allocation has been amplified by the decline in staffing and funding to the point where it is unlikely there is an overabundance of resources in any particular park given current service and programmatic offerings. Taken further, *even with improved planning and priorities, current resources are inadequate to maintain current service levels indefinitely.*

**Possible Changes to Operations and Funding**

There are numerous ways to address the disconnect between expected service provision and current resource levels. Discussed here are a few possible options, their relative merits, and the viability of their implementation.

**Option One: Reduced Services:** One approach is to scale back service levels to realign current resources with adequate service provision. There are several ways to approach a significant reduction in park offerings but all of them seem to be unpopular to the point of infeasibility. The biggest obstacle to closing parks en masse may revolve around the state's statutory open space goal to acquire a certain amount of land for outdoor recreation and conservation.[56] It is not clear what would be done with much of the existing park land if it is still owned by the state for open space purposes but not managed by the Parks Division.[57] Still, it is worth describing the various ways the number of parks and park services may be reduced to allow for adequate long-term resources of the remaining parks under the current service levels.

Instead of redistributing all current parks, services, and staff to 17 park units instead of 23 (as described in Chapter IV), this approach would be to close 6 units' worth of parks entirely across the state. Even when looking to close the smallest, least used parks, there are multiple issues that must be considered. There is a baseline of care or maintenance for all state lands, so not all personnel and money currently going to any possibly-closed parks could be transferred to the remaining locations. There also comes a time where severely limited maintenance once or twice a year will take more time and resources in the future than regular upkeep.[58]

Location of closures would also be an important consideration. While it may be tempting to simply close all the parks in an existing park management unit, especially in those with no supervisor and limited other staffing, closing an entire park unit will greatly decrease the access local residents may have to state parks, which specifically goes against the public access priority of the Parks Division as set out in the state recreation plan. If several parks are closed across a geographical region, the remaining park management unit is likely to be geographically large – meaning some of the time saved from closing parks will now be devoted to travel between more distant parks.

Another consideration is that the smallest parks are also generally not consuming significant portions of the budget. Closing the 35 smallest or least-used parks (25 percent of the park total) is unlikely to make up for a 25 percent decrease in staffing. Rather, it would take disproportionately more closures of the least-used parks to make current staffing and budget resources align with service offerings.

**Option Two: Optimal Staffing.** Another way to match services and financial and personnel resources would be to restore financial and staffing levels back to the early 2000 levels or even use the 2003 CHA study optimal levels of over 200 full-time employees and 1,900

---

[56] C.G.S. Sec. 23-8
[57] In some instances, other states have turned to municipal operation of state-owned parks to reduce state costs.
[58] DEEP personnel indicate the park closures of the early 1990s required investment well beyond the temporarily avoided maintenance costs in order to reopen years later (e.g., Gillette Castle required extensive renovations before it was reopened in 2002).

seasonal staff. As approaching these levels of staffing would involve a sizable ongoing increase in the Parks Division budget, it seems an unlikely option, even if it meant significant expansion of programs and services (and increased revenues would be expected, as well). Given Connecticut's recent budget issues, this option does not seem viable.

**Option Three: Continuation.** The default option is to leave the current pieces unchanged. The drop to current budget and staff levels has been accompanied by few obvious and visible cuts to park capacity or use. *It is possible the current service offerings can be maintained with new, relatively low levels of staffing and funding for a short while. However, it is unlikely that the current situation can be maintained indefinitely, even absent additional cuts.* At this point, it appears that virtually any reallocation of current resources to enhance service in one location can only be made at the expense of service(s) at other locations.

Future staffing is also a concern, as mentioned in Chapter IV, since a large portion of the work force is at or nearing retirement eligibility. Even if vacancies from future retirees are refilled in their entirety, outgoing long-time employees have institutional knowledge that may allow them to stretch limited resources further than newly hired employees. Some of this institutional loss may be mitigated by hiring new employees to train with the veteran staff, but this seems impractical to expect given the level of current resources.

Another issue with continuing the status quo revolves around deferred maintenance of the capital infrastructure. It is likely that some resources that are currently available for use will need repair in the near future. Likewise, some repairs and maintenance have undoubtedly been delayed due to the recent budget issues. Besides becoming completely unusable at some point, aging facilities in various states of disrepair may lead to declining opinions of parks among the public and eventually to decreased use.

**Option Four: Performance Contingent Increases.** A more balanced approach would restore staffing to a minimal but sustainable amount (i.e., the 12 additional staff proposed earlier in Chapter IV) while giving incentives for demonstrating high-level performance and measurable gains. A system with dynamic funding and flexibility for innovation could help ensure future staff and funding levels are adequate for existing (or otherwise appropriate) service levels.

As discussed earlier, linking the state parks' budget back to park-generated revenues in some way should give incentives to the Parks Division to grow revenue generating activities and services within the park system, deemphasize parks and locations with less or decreasing use, and potentially provide some additional revenues to the state in the long-term (albeit with additional funding, at least to start).

In order to enact something like a long-term break-even scenario, additional funding to the department would need to be appropriated based on performance. One avenue to aid performance measurement and give direct incentive to parks to generate more revenue would be installing a mechanism to return a portion of annual park-generated revenue to the park system through an appropriation system. Logistically, all park revenues would continue to go to the General Fund, but some portion of the revenues would be earmarked for appropriation to the Parks Division contingent upon demonstration of measured performance.

In this scenario there would be no need for mass park closures and there would be natural incentives for the Parks Division to reallocate resources to services and areas with the greatest public use. Further, additional funding would potentially be available as new programs and services are developed and park-generated revenues increased. While an initial funding commitment is necessary to make implementing this option reasonable, it appears some additional funding is necessary to avoid long-term service reduction and this balanced approach builds in performance-based incentives to more effectively operate state parks.

**Recommendation**

> **13. Between one quarter and one half of revenue generated in state parks shall be appropriated biennially to the Parks Division, with the specific proportion at the request of the Department of Energy and Environmental Protection and the approval of the Appropriations Committee. This appropriation shall be contingent upon the Parks Division's satisfactory participation in the Results Based Accountability process of the Appropriations Committee, or a similar performance-based measurement requested by the Appropriations Committee. The shared park-generated revenue shall not supplant the General Fund obligation to the Parks Division. The portion of park-generated revenues not appropriated to the Parks Division shall continue to support the General Fund.**
>
> **The Parks Division shall create a plan for use of park-generated revenue that balances the distribution of park revenue-based funds among the park or park units that generated the revenue and the needs of the entire system of parks and present such plan, along with the initial RBA-style report card, to the relevant Appropriations sub-committees, and the Environment Committee. The initial fund distribution plan should emphasize implementation of performance metrics and related data-gathering and analysis.**

Excepting the relatively minor revenues going to park-specific MRI accounts, Connecticut's current funding mechanism for state parks does not include the use of park-generated revenue, which is at odds with the national norm for state park funding and removes incentives for increased revenue generation. Appropriating some amount of park-generated revenue gives the Parks Division access to increased funding, but in return requires increased accountability regarding park performance. Legislative appropriation of park-generated revenue does not require the creation of an additional special fund outside the General Fund. This model is similar to other states, such as Missouri and Minnesota, in that park-generated revenues are available to state parks, but must go through the legislative appropriation process (though both of those states recapture 100 percent of park-generated revenues, rather than the 25 to 50 percent recommended here). Like those states and New York, Connecticut's state park funding would move towards being based on demonstrated performance.

**Increasing revenue generation.** Connecticut ranked 39th in overall park revenue generation in FY 12, five spots lower than its overall operating budget rank of 34th. As previously mentioned, while self-sufficiency is not necessarily an attainable goal, Connecticut was lower than average (ranked 36th in FY 12) when comparing park-generated revenue to operating expenses. This could suggest that revenues are where they should be and the operating

budget is too high. However, given the relatively low standing of both the operating budget and lower standing of the revenue collected, it appears any perceived imbalance between operating costs and park-generated revenues is more the fault of the latter being low.

Nationwide, state parks agencies are asked to generate revenue to help support overall park programming and as a way of passing the costs of park service provision on to those who use them most. There is always a balance involved between keeping prices at such a level they remain affordable for the public, but high enough to ensure the services continue to be provided. As discussed in Chapter III, states approach revenue generation in a wide variety of ways, with some states charging for entrance at all parks, others (like Connecticut) charging at a select number of parks, and still others not charging for entrance anywhere. All three models have endless variations and every state raises revenue through parks in some manner.

It may be that Connecticut's revenues are comparatively low because the state has already made a policy choice to make services and resources free to the public when possible and to avoid user fees generally. However, the revenues generated in Connecticut state parks are relatively low even in comparison to states that collect no parking or entrance fees. Given Connecticut's seemingly low levels of revenue production and the incentive to increase revenue through the recommendations in this report, the Parks Division will likely need to find ways to increase revenue generation.

If increased revenue generation is desired, there are several ways in which revenues may be enhanced. First, given the current staffing limitations, it is possible not all ticket booths are able to be staffed at all appropriate times (i.e., when use is sufficient to pay for at least the cost of ticket taking). This situation may occur because parks that currently charge fees are unable to charge at the correct times or because some of the most-used parks are not charging entrance fees at all. Second, other states, including New York, are exploring automating parking fees, especially in parks with regular use that do not otherwise warrant a regularly staffed ticket booth.[59] Connecticut does not use automated technology for parking fees, but could potentially increase revenues and/or decrease staffing costs through automation in this area. Third, revenues may increase through an increase in attendance, either through an increase in programmatic offerings or expanded marketing of parks.

If parks are expected to increase revenue generation, it is likely they will need additional resources to do so. Similarly, in order to give the Parks Division increased incentive to raise revenue levels, revenue generation levels should be tied directly to the Parks Division budget. It is possible that increasing the parks budget through recapture of some of the revenue will increase total revenue generation and may lead to either a win-win scenario (parks and the state receive greater revenues) or at least a break-even scenario where parks are more adequately and consistently funded at little or no greater cost to the state.

For example, the national median revenue generation rate compared to parks' operating budgets is 48 percent versus Connecticut's rate of 36 percent. If Connecticut's $17.8 million parks operations budget (including benefits) were increased to $21 million, the revenue generation might be expected to increase from $6.5 million (36 percent of $17.8 million) to $10

---

[59] Automated parking can be accomplished through automated gates or through the use of parking meters.

million (48 percent of $21 million), meaning a $3.5 million increase in revenue for a $3.2 million increase in expenses. This is only one scenario under many that are possible, many of which would not involve recouping additional funding through increased revenue. Even under this scenario, an influx of additional funding would need to happen before any additional revenues might be realized.

**APPENDICES**

# Appendix A

## List of State Parks and Forests

### Table A-1. List of State Parks and Forests

| Name | Mng Unit | Town(s) | Acres | Facilities* |
|------|----------|---------|-------|-------------|
| Beckley Furnace | Burr Pond | North Canaan | 12 | |
| Satan's Kingdom | Peoples | New Hartford | 1 | h,b,x |
| Above All | Lake Waramaug | Warren/Litchfield | 31 | h |
| Airline Trail | Mashamoquet/ Salmon River | Colchester, Columbia, East Hampton, Hebron, Lebanon, Pomfret, Putnam, Willimantic, Windham | 40 | bk,h,w,y |
| Algonquin | Burr Pond/Peoples | Colebrook | 2987 | |
| American Legion | Peoples | Barkhamsted | 893 | f,h,j,w,bk,b |
| Beaver Brook | Mashamoquet | Windham | 401 | h |
| Becket Hill | Rocky Neck | Lyme | 260 | h,p,f,o |
| Bigelow Hollow | Shenipsit | Union | 516 | b,f,h,p,w |
| Black Rock | Topsmead | Watertown | 444 | f,h,p,s,x |
| Bluff Point | Fort Trumbull | Groton | 806 | f,h,bk |
| Bolton Notch | Salmon River | Bolton | 95 | h |
| Brainard Homestead | Gillette | East Haddam | 25 | h |
| Burr Pond | Burr Pond | Torrington | 438 | b,f,h,l,p,s,w,x |
| Campbell Falls | Burr Pond | Norfolk | 102 | f,h,p |
| Chatfield Hollow | Cockaponset | Killingworth | 412 | f,h,l,p,s,w |
| Cockaponset | Cockaponset | Deep River, Durham, Haddam, Killingworth, Westbrook | 17186 | |
| Valley Railroad | Cockaponset | Chester, Deep River, Essex, Middletown, Old Saybrook | 332 | m,o,x |
| Dart Island | Cockaponset | Middletown | 19 | b,f |
| Day Pond | Salmon River | Colchester | 180 | f,h,l,p,s |
| Dennis Hill | Burr Pond | Norfolk | 240 | h,l,p |
| Devil's Hopyard | Gillette | East Haddam | 1000 | f,h,l,p |
| Dinosaur | Dinosaur | Rocky Hill | 80 | h,m,p |
| Enders | Peoples | Barkhamsted, Granby | 2105 | |
| Farm River | Sleeping Giant | East Haven | 62 | b,h,bk |
| Forster Pond | Cockaponset | Killingworth | 218 | h |
| Fort Griswold Battlefield | Fort Trumbull | Groton | 17 | m,o,p |
| Fort Trumbull | Fort Trumbull | New London | 16 | f,o,p |
| Gardner Lake | Gillette | Salem | 10 | b,f,s,p |
| Gay City | Salmon River | Bolton, Hebron | 1569 | f,h,p,s,w,bk |
| George D. Seymour | Salmon River | Haddam | 222 | f,h,j,w |
| Gillette Castle | Gillette | Hadlyme | 185 | h,l,m,o,p,x |
| James L. Goodwin | Mashamoquet | Hampton | 2003 | |

| | | | | |
|---|---|---|---|---|
| Haddam Island | Cockaponset | Haddam | 14 | b,f |
| Haddam Meadows | Cockaponset | Haddam | 175 | b,f,p,w |
| Haley Farm | Fort Trumbull | Groton | 267 | h,bk |
| Hammonasset Beach | Hammonasset | Clinton, Madison | 936 | f,l,p,s,x |
| Harkness Memorial | Harkness Memorial | Waterford | 304 | f,o,p |
| Haystack Mt. | Burr Pond | Norfolk | 292 | h,p |
| Higganum Reservoir | Cockaponset | Haddam | 147 | f,h,j,b |
| Hopemead | Gillette | Bozrah/Montville | 70 | f,h |
| Hopeville Pond | Hopeville Pond | Griswold | 554 | b,f,h,p,s,bk |
| Housatonic Meadows | Macedonia | Sharon | 452 | f,h,p,b |
| Housatonic | Macedonia | Canaan, Cornwall, North Canaan, Sharon | 10894 | |
| Humaston Brook | Topsmead | Litchfield | 141 | h,f |
| Collis P. Huntington | Putnam Memorial | Bethel | 883 | f,h,w |
| Hurd Park | Salmon River | East Hampton | 991 | f,h,l,p |
| Indian Well | Osbornedale | Shelton | 153 | b,f,h,l,p,s,x |
| Ivy Mt. | Topsmead | Goshen | 50 | |
| Kent Falls | Macedonia | Kent | 307 | f,h,p |
| Kettletown | Putnam Memorial | Southbury | 599 | f,h,p,s |
| Killingly Pond | Mashamoquet | Killingly | 162 | b,f,h |
| Lake Waramaug | Lake Waramaug | Kent | 95 | f,p,s,x,b |
| Lamentation Mt. | Sleeping Giant | Berlin | 47 | h |
| Larkin State Park Trail | Putnam Memorial | Middlebury, Naugatuck, Oxford, Southbury | 110 | bk, h, w, y |
| Lovers Leap | Squantz Pond | New Milford | 127 | h |
| Macedonia Brook | Macedonia | Kent | 2302 | f,h,l,o,p |
| Mansfield Hollow (Federal Lease) | Mashamoquet | Mansfield | 251 | b,f,h,p,w,bk |
| Mashamoquet Brook | Mashamoquet | Pomfret | 917 | f,h,l,o,p,s |
| Massacoe | Penwood | Simsbury | 503 | |
| Mattatuck | Topsmead | Watertown | 4673 | |
| Meshomasic | Salmon River | Bolton, East Hampton, Glastonbury, Hebron, Portland | 9026 | |
| Mianus River | Sherwood Island | Stamford | 527 | h,b,f,y |
| Miller's Pond | Cockaponset | Durham | 280 | f,h,bk |
| John A. Minetto | Burr Pond | Torrington | 715 | f,h,p,w |
| Minnie Island | Gillette | Bozrah/Montville | 1 | b,h,p |
| Mohawk Mountain | Topsmead | Cornwall | 273 | h,l,p,w,f |
| Mohawk | Topsmead | Cornwall, Goshen | 3743 | h,l,p,w,f |
| Mohegan | Hopeville Pond | Scotland | 956 | |
| Mooween | Gillette | Lebanon | 577 | f,h,b |
| Mt. Bushnell | Lake Waramaug | Washington | 214 | h |
| Mt. Riga | Macedonia | Salisbury | 276 | h |
| Mt. Tom | Lake Waramaug | Litchfield | 231 | f,h,p,s,x,b |

| Nassahegon | Peoples | Burlington | 1227 | |
| Natchaug | Mashamoquet | Ashford, Chaplin, Eastford, Hampton, Pomfret, Windham | 13438 | |
| Nathan Hale | Salmon River | Andover, Coventry | 1455 | |
| Naugatuck | Sleeping Giant | Beacon Falls, Naugatuck | 4153 | |
| Nehantic | Rocky Neck | East Lyme, Lyme, Salem | 5062 | |
| Nepaug | Peoples | Canton, New Hartford | 1373 | |
| Nipmuck | Shenipsit | Ashford, Stafford, Union, Woodstock | 9209 | |
| Nye-Holman | Shenipsit | Tolland | 787 | |
| Old Furnace | Mashamoquet | Killingly | 367 | f,h,b,j |
| Osbornedale | Osbornedale | Derby | 417 | f,h,l,m,p,w |
| Pachaug | Pachaug | Voluntown, Plainfield, Griswold, North Stonington | 28804 | b,f,h,j,p,s,w |
| Paugnut | Burr Pond | Torrington, Winchester | 1644 | |
| Paugussett | Putnam Memorial | Newtown | 1947 | |
| Penwood | Penwood | Bloomfield | 787 | h,l,p,w |
| Peoples | Peoples | Barkhamsted | 3059 | |
| Seth Low Pierrepont | Putnam Memorial | Ridgefield | 305 | h,b,f |
| Platt Hill | Burr Pond | Winchester | 159 | h,p |
| Pomeroy | Mashamoquet | Lebanon | 200 | h,j |
| Pootatuck | Squantz Pond | New Fairfield | 1103 | |
| Putnam Memorial | Putnam Memorial | Redding | 183 | h,o,p,f,w |
| Quaddick State Forest | Mashamoquet | Thompson | 1109 | |
| Quaddick State Park | Mashamoquet | Putnam, Thompson | 116 | b,f,l,p,s,x,w |
| Quinebaug Lake | Mashamoquet | Killingly | 181 | b,f |
| Quinnipiac River | Sleeping Giant | North Haven | 323 | h,j,b,j |
| River Highlands | Dinosaur | Cromwell | 177 | h |
| Rocky Glen | Putnam Memorial | Newtown | 46 | h |
| Rocky Neck | Rocky Neck | East Lyme | 708 | f,h,l,p,s,x |
| Ross Pond | Mashamoquet | Killingly | 314 | b,f,h,j |
| Salmon River | Salmon River | Colchester, Hebron, Marlborough | 6905 | |
| Scantic River | Shenipsit | East Windsor, Enfield, Somers | 784 | f,h,j |
| Selden Neck | Gillette | Lyme | 607 | b,e,f,j |
| Shenipsit | Shenipsit | Ellington, Somers, Stafford | 6962 | |
| Sherwood Island | Sherwood Island | Westport | 238 | f,l,p,s,x |
| Silver Sands | Osbornedale | Milford | 297 | f,s |
| Sleeping Giant | Sleeping Giant | Hamden | 1465 | f,h,l,p |
| Southford Falls | Putnam Memorial | Oxford | 126 | f,h,p,w |
| Squantz Pond | Squantz Pond | New Fairfield | 172 | b,f,h,p,s,w |
| Stillwater Pond | Burr Pond | Torrington | 226 | f,b |
| Stoddard Hill | Pachaug | Ledyard | 55 | b,f,h |
| Stratton Brook | Penwood | Simsbury | 145 | f,h,l,p,s,w,bk |

A-3

| Sunnybrook | Burr Pond | Torrington | 464 | h,f,p,j |
| Sunset Rock | Peoples | Plainville | 15 | h |
| Talcott Mt. | Penwood | Avon, Bloomfield, Simsbury | 574 | h,l,o,p |
| Topsmead | Topsmead | Litchfield | 615 | |
| Tri - Mountain | Sleeping Giant | Durham, Wallingford | 157 | h |
| Tunxis | Peoples | Barkhamsted, Granby, Hartland | 5519 | |
| Wadsworth Falls | Cockaponset | Middlefield | 285 | f,h,p,s,w |
| George C. Waldo | Putnam Memorial | Southbury | 150 | h,f,y,j |
| West Rock Ridge | Sleeping Giant | Bethany, Hamden, New Haven | 1691 | f,h,l,o,p,w,b,bk,j,l |
| Wharton Brook | Sleeping Giant | Wallingford | 96 | f,h,l,p,s |
| Whittemore-Larkin Bridle Trail | Putnam Memorial | Middlebury, Naugatuck, Oxford, Southbury | 242 | h,y |
| Windsor Meadow | Penwood | Hartford, Windsor | 132 | h,bk,b,p,f |
| Wooster Mt. | Putnam Memorial | Danbury | 444 | Skeet, J |
| Wyantenock | Lake Waramaug/Macedonia | Cornwall, Warren | 4083 | |
| Bennett's Pond | Putnam Memorial | Ridgefield | 460 | bk,f,h,j |
| Camp Columbia Forest | Lake Waramaug | Morris | 591 | |
| Camp Columbia Park | Lake Waramaug | Morris | 10 | h,o |
| Centennial Watershed Forest | Putnam Memorial | Canaan, Easton, Fairfield, Monroe, Newtown, Redding, Ridgefield, Shelton, Stamford, Trumbull, Weston, Westport | 15370 | |
| Eagle Landing | Cockaponset | Haddam | 17 | f,p |
| Hop River Trail | Salmon River | Andover, Bolton, Columbia, Coventry, Manchester, Vernon | 50 | h,bk,w,y |
| Horse Guard | Penwood | Avon | 105 | h |
| Machimoodus | Gillette | East Haddam | 300 | f,h,p,y |
| Mono Pond Reserve | Salmon River | Columbia | 218 | f,h,b,w,p,j |
| Salt Rock | Hopeville Pond | Sprague | 93 | f,h,x |
| Sunrise Resort | Gillette | East Haddam | 143 | h |
| Trout Brook Valley | Putnam Memorial | Easton | 300 | h,j |
| Source: DEEP | | | | |

| (*) Facility Abbreviations | | bk. biking |
| l. shelter (picnic) | s. swimming |
| f. fishing | m. museum | w. winter sports |
| h. hiking | o. historic | x. concession |
| j. hunting | p. picnicking | y. horseback |

A-4

# Appendix B

## State Park Fees Summary

Tables B-1 through B-4 show summaries of various fee types in state parks. The source for all tables in this Appendix is DEEP.

| Table B-1. Parking Fees | | | |
|---|---|---|---|
| | **Number of parks** | **Residents** | **Non-Residents** |
| Weekend | 26 | $9-13 | $15-22 |
| Weekday | 11 | $6-9 | $10-15 |
| Late-day (after 4 pm) | 10 | $5-6 | $6-7 |
| None | 113 | - | - |

Note: Number of parks for each category is non-exclusive of other categories. The group of parks charging for weekend parking is inclusive of the sub-groups that charge for weekday or late-day admissions.

| Table B-2. Camping Fees (per site per night) | | | |
|---|---|---|---|
| | **Number of parks** | **Residents** | **Non-Residents** |
| Basic Campsite | 13 | $14-20 | $24-30 |
| Sites w/electricity, water, or sewer | 2 | $33-40 | $45-52 |
| Primitive Riverside Camping | 4 | $5 per person | |
| Rustic Cabins | 5 | $50-70 | $60-80 |

•Parks may offer more than one type of camping/campsite.
•14 parks have non-primitive campgrounds.

| Table B-3. Historic Site & Museum Admissions | | | |
|---|---|---|---|
| | **Age 13+** | **Ages 6-12** | **Ages 5 and under** |
| Dinosaur State Park | $6 | $2 | Free |
| Fort Trumbull State Park | $6 | $2 | Free |
| Gillette Castle State Park | $6 | $2 | Free |

| Table B-4. Special Passes | | | |
|---|---|---|---|
| | **Eligibility** | **Use** | **Cost** |
| Charter Oak Pass | CT Residents 65 and over | Lifetime Parking and Admission | Free |
| Disabled Veteran Pass | CT Resident Veterans with Service Related Disability | Lifetime Parking and Admission | Free |
| Heritage Passport | One year of unlimited access to Gillette, Dinosaur, Ft. Trumbull for a family | | $67 |
| Season Pass | Unlimited parking for one car for one calendar year | | $67 (CT) $112 (non) |

0953

0954

# Appendix C

## Other States Information

Information is provided in this appendix regarding nationwide state park funding sources and the methodology used to compare Connecticut to other states. The latter includes a description of the Annual Information Exchange (AIX) data, along with its limitations, and a discussion of case study states used throughout the report. (All 50-state comparison information comes via the FYs 08-12 Annual Information Exchange of the National Association of State Parks Directors, which relies on self-reported data from the states.)

**Nationwide Trends in State Park Funding**

States use a few major options to fund state park operations. Committee staff examined state parks data from all 50 states; operations funding is primarily driven by returning park-generated revenues to the park system and by using general fund monies. The use of dedicated funds from sources outside park user fees is also relatively common. Operating expenditures for the 50 state park systems was largely flat from FY 2008 through FY 2012. As seen in Figure C-1, the total operating expenses for the 50 state park systems remained within the $2.2 to $2.3 billion range for the five-year period.



Funding sources can be grouped together into five broad categories: park generated revenue, general fund monies, dedicated funds outside of park-generated revenue, federal funds, and all other sources. Park-generated revenue comes mainly from user fees (e.g., parking, admissions, camping). Dedicated funds are typically sourced from a percentage of taxes or fees not directly related to park operations (e.g., motor vehicle registrations or a state sales tax). Other sources of revenue can include non-profit/philanthropic endeavors or revenue derived from lease of land or other contractual agreements.

0955

The two most common funding sources for park operations are park-generated revenues and general fund monies. For example, the two sources combined accounted for three-quarters of all funding for state park operations in FY 12, the most recent year available for analysis. Figure C-2 shows the percentage reliance on each type of funding source given the amount of operating expenditures per year. In the last five years, park-generated revenue has gone from the second highest source of state park operating funds by amount (37 percent) to the highest source (42 percent), while use of general fund monies for state parks has declined from 43 percent of all park operating funds to 33 percent. The third highest funding source was dedicated funds, which rose from 15 percent to 18 percent of all operating funding.



The growing reliance by states on park generated monies over general fund monies has occurred due to an overall increase in park generated revenue combined with a decrease in general fund spending on state park operations. Figure C-3 shows the overall amount of funding by type per year. The noticeable decrease in general fund monies has largely been replaced by park-generated revenue and a rise in monies from dedicated funds.



Figure C-3. Nationwide State Park Funding Source Amounts

Source: AIX

**General fund financing.** In FY 12, five states relied on general fund monies for over 75 percent of state park operating expenses. Among those five were three states, including Connecticut,[60] that relied exclusively on general fund monies for operating expenses, according to the AIX data.[61] There were 10 states that used no general fund monies for operating expenses in FY 2012. In total, 37 states (74 percent) received half or less of their operating expense funding from a general fund. Table C-1 shows

| Table C-1. States' Reliance on General Fund | | |
|---|---|---|
| % reliance on general fund for operating budget | FY 12 | FY 08 |
| 0% | 10 | 7 |
| 1-25% | 9 | 7 |
| 26-50% | 18 | 16 |
| 51-75% | 8 | 13 |
| 76-100% | 5 | 7 |
| Source: AIX | | |

states' reliance on general fund contributions in FY 2012 and FY 2008. (Table C-4 includes funding source information for all 50 states.)

As noted above, the amount of funding for state parks that comes from states' general funds has gone down in aggregate in the last several years. This is mirrored by a decrease in the number of states receiving more than half of operating funding from general funds, from 20 states in FY 2008 to 13 in FY 2012. Similarly, the number of states receiving no contribution

---

[60] Though the breakdown of operations funding sources in Chapter II of this report (using data provided by DEEP) indicates funding outside the General Fund, this was not indicated in the information Connecticut sent to the AIX report.
[61] Connecticut, Rhode Island, and Wyoming report operations funding exclusively from general funds. Massachusetts and Maine received 85 percent and 82 percent of funding from general funds, respectively.

from the general fund rose from seven to 10. The majority of states maintained or slightly decreased reliance on general fund monies for operating expenses.[62] Eight states saw decreases in reliance over 25 percentage points.

*Connecticut's General Fund use.* From FY 11 to the present, Connecticut has relied exclusively on general fund monies for state park operating expenses, according to AIX data. Even under the previous funding mechanism which included the use of special funds (FY 10 and prior), Connecticut's reliance on general fund monies was among the 10 highest ranging from 65 to 70 percent. *Connecticut relies more heavily on general fund monies for state park operating expenses than most states. Further, Connecticut was the only state that dramatically increased systematic reliance on general fund monies between FY 08 and the present.* This was due to the elimination of the Environmental Conservation Fund and the movement of parks-related expenditures and revenues from the Environmental Conservation Fund to the General Fund , as discussed in Chapter II.

**Park-generated revenue.** State parks can generate revenues through user fees, but there are trade-offs involved in deciding fee structures (i.e., when, where, and how much), as well as determining how much, if any, of park-generated revenue should be used to fund park operations. The overall shift towards greater reliance on park-generated revenues as a funding source has been accompanied by most states having little or no change in the percentage reliance and a few states (17) seeing increases of over 10 percentage points. This movement is largely the inverse of the movement away from general funding reliance, but

| Table C-2. States' Reliance on Park-Generated Revenue | | |
|---|---|---|
| % reliance on park-generated revenues for operating budget | **FY 12** | **FY 08** |
| 0% | 4 | 3 |
| 1-25% | 8 | 10 |
| 26-50% | 19 | 20 |
| 51-75% | 14 | 14 |
| 76-100% | 5 | 3 |
| Source: AIX | | |

the changes in park-generated revenues have generally been within the quartiles of use, shown in Table C-2.

There is some variation in the percentage of park-generated revenue that is used for park operating expenses. In 32 instances, state parks kept more than 90 percent of park-generated revenue, with another 12 states keeping between 50 and 90 percent of park-generated revenues. Four states' park systems kept no revenue, with only 2 states keeping some amount, but less than half, of park-generated revenue. Connecticut is among the four states not using park-generated revenue for state parks operations.

*Self-sustainability.* Few state park systems generate enough revenue through user-fees to fund all operating expenditures without other funding mechanisms augmenting the money. For FYs 08-12, only New Hampshire relied solely on park-generated revenue without an alternative funding source through general funds or dedicated funds. However, other states generated enough revenue to pay for operating costs fully, but continue to use a variety of funding sources.

---

[62] 27 states had general fund reliance changes less than 10 percentage points and another 13 states saw percentage point decreases between 11 and 25 percent. No states increased general fund reliance over 10 percentage points and less than 30 percentage points (Connecticut's increase). Texas had an increase of 33 percentage points due to a one-year change in their dedicated revenue policy in FY 2008, but this change was not systemic or ongoing.

| Table C-3. Operating Costs Compared to Overall Park-Generated Revenues | |
|---|---|
| % of operating costs capable of being funding by current revenue levels | Number of states |
| 0-25% | 7 |
| 26-50% | 21 |
| 51-75% | 13 |
| 76-95% | 5 |
| 96-100%+ | 4 |
| Source: AIX | |

In total, four state park systems, including New Hampshire, generate revenue sufficient to completely cover operating expenditures in FY 12, with another five parks at revenue levels of 80 to 90 percent of operations. Twenty-two states generate revenue sufficient to fund over half of operating expenses (28 states were at less than half). Table C-3 shows the number of states with park-generated revenue to operations expenditures at various levels.

Program review staff examined whether the nine states with the highest revenues compared to operating costs were systematically different from other states. There is no perceived regional distinction, as there are potentially self-sufficient states all over the country. These nine states are all in the top half in amount of revenue generated,[63] but causation between self-sufficiency and revenue generation amount may go in either direction (i.e., it may be that states are asked to be self-sufficient because other factors have already led to high-revenue generation levels or that states are asked to be self-sufficient which leads to higher revenue-generation). The self-sufficient states vary to either side of average in terms of state park acreage, with no states from this group in the top 10 and only one state in the bottom ten. Three of these states have top fifteen attendance overall (ranks 10, 14, and 15 in FY 12), and two states are among the top five for overnight (i.e., camping) attendance. All of the potentially self-sufficient states were able to use 50 percent or more of park-generated revenues towards park operation expenditures, with five of the nine states retaining more than 80 percent of park-generated revenues in FY 12.

There is no clear explanation for what factors make self-sufficiency from user fees alone possible for state parks and, likewise, it is not evident what impacts, positive or negative, self-sufficiency may have on state park service provision.

*Connecticut's park-generated revenue use.* Prior to FY 10, part of Connecticut's park-generated revenue was captured within the non-lapsing Environmental Conservation Fund and used for roughly 30 percent of overall park operating expenses. In FY 08, Connecticut ranked 31 (slightly below average) in reliance on park generated revenue. Since the Environmental Conversation Fund was absorbed into the state's General Fund as part of broader statewide deficit mitigation efforts, state park-generated revenue has been used within the general fund. In FY 12, Connecticut was one of four states to not use park-generated revenue to fund state park system operating expenses, based on national data.

Given that Connecticut's park-generated revenue covers less than a third of the Parks Division's operating costs[64] and the relative scarcity of other states that generate revenue sufficient to pay for all operating costs, it is unlikely Connecticut's state park system is capable of self-sufficient funding without drastic changes to service provision, amount of acres

---

[63] Looking only at total gross revenue without adjustments for state wealth or cost of living.
[64] Including fringe costs for personnel.

0959

maintained, and/or wholesale changes in fee structure. Park-generated revenues will be discussed further later in this chapter.

**Dedicated funding sources.** Dedicated funding sources outside of park-generated revenue is the third highest type of funding source by amount nationwide. These most commonly include dedicating a portion of a state's sales tax or excise tax (e.g., fuel tax) towards park operations or charging an additional fee for revenue generation. The funding source may be broad (e.g., a portion of a statewide sales tax) or narrow (e.g., a portion of sales tax on sporting goods in the state). Altogether, 36 states receive funding for state park operations through dedicated funding sources.

Unlike the larger funding sources, no state relies solely on dedicated (non-park generated) revenues. Five states get the majority of funding from a dedicated source, but none relies on a dedicated fund for more than 80 percent of operation expenses. Besides the 14 states that do not receive funding from a dedicated source, 21 states receive less than 20 percent of operations spending from a dedicated source.

Of the 20 states that receive 10 percent or more of their funding from a dedicated source, 17 states also keep most or all park-generated revenue. Only one state with a dedicated revenue source does not keep any park-generated revenue. Connecticut does not have a dedicated revenue stream for parks.

Like park-generated revenues, reliance on and use of a dedicated revenue source typically leads to general fund contributions being supplanted. This makes sense on a statewide level, as absent parks getting a portion of a revenue stream, the money raised in a particular revenue stream is likely to be going towards the general fund. Table C-4 shows percentage of operations expenditures were paid in each state using the major funding source types for FY 12 and FY 08.

| Table C-4. Park Operations Funding Source Percentage by State | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Park Generated Revenue | | General Fund | | Dedicated Source | | Other | |
| **States** | **2012** | **2008** | **2012** | **2008** | **2012** | **2008** | **2012** | **2008** |
| Total | 42% | 37% | 33% | 43% | 18% | 15% | 8% | 5% |
| Alabama | 83% | 63% | 0% | 0% | 10% | 7% | 7% | 30% |
| Alaska | 24% | 29% | 59% | 63% | 1% | 2% | 16% | 7% |
| Arizona | 55% | 35% | 0% | 31% | 40% | 31% | 5% | 3% |
| Arkansas | 47% | 33% | 27% | 30% | 26% | 37% | 0% | 0% |
| California | 27% | 25% | 31% | 41% | 34% | 26% | 8% | 8% |
| Colorado | 46% | 54% | 0% | 17% | 18% | 0% | 35% | 29% |
| Connecticut | 0% | 30% | 100% | 70% | 0% | 0% | 0% | 0% |
| Delaware | 56% | 56% | 35% | 40% | 2% | 2% | 6% | 2% |
| Florida | 66% | 55% | 0% | 0% | 33% | 44% | 1% | 1% |
| Georgia | 65% | 56% | 27% | 38% | 2% | 4% | 7% | 2% |
| Hawaii | 42% | 26% | 44% | 61% | 7% | 0% | 7% | 13% |

0960

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Idaho | 40% | 25% | 8% | 43% | 41% | 23% | 11% | 8% |
| Illinois | 22% | 41% | 24% | 38% | 54% | 21% | 0% | 0% |
| Indiana | 83% | 76% | 16% | 22% | 0% | 0% | 1% | 2% |
| Iowa | 28% | 25% | 41% | 53% | 22% | 17% | 9% | 5% |
| Kansas | 52% | 45% | 29% | 44% | 9% | 1% | 10% | 11% |
| Kentucky | 62% | 69% | 38% | 31% | 0% | 0% | 0% | 0% |
| Louisiana | 4% | 1% | 68% | 94% | 28% | 0% | 0% | 5% |
| Maine | 0% | 0% | 82% | 80% | 17% | 18% | 1% | 2% |
| Maryland | 34% | 49% | 1% | 48% | 62% | 0% | 3% | 2% |
| Massachusetts | 12% | 9% | 85% | 89% | 0% | 0% | 2% | 2% |
| Michigan | 74% | 75% | 0% | 0% | 26% | 25% | 0% | 0% |
| Minnesota | 19% | 29% | 22% | 59% | 58% | 11% | 1% | 0% |
| Mississippi | 64% | 52% | 36% | 48% | 0% | 0% | 0% | 0% |
| Missouri | 25% | 18% | 0% | 5% | 70% | 76% | 5% | 2% |
| Montana | 50% | 36% | 0% | 0% | 41% | 57% | 10% | 7% |
| Nebraska | 67% | 66% | 31% | 31% | 1% | 3% | 1% | 0% |
| Nevada | 42% | 23% | 30% | 59% | 14% | 10% | 14% | 7% |
| New Hampshire | 100% | 100% | 0% | 0% | 0% | 0% | 0% | 0% |
| New Jersey | 32% | 11% | 68% | 89% | 0% | 0% | 0% | 0% |
| New Mexico | 31% | 17% | 51% | 48% | 2% | 1% | 15% | 34% |
| New York | 41% | 28% | 56% | 66% | 1% | 4% | 2% | 1% |
| North Carolina | 19% | 14% | 66% | 74% | 0% | 2% | 14% | 10% |
| North Dakota | 39% | 40% | 56% | 59% | 0% | 0% | 5% | 1% |
| Ohio | 46% | 41% | 47% | 54% | 7% | 5% | 0% | 0% |
| Oklahoma | 54% | 53% | 38% | 42% | 8% | 1% | 0% | 4% |
| Oregon | 37% | 36% | 0% | 0% | 31% | 56% | 33% | 8% |
| Pennsylvania | 24% | 20% | 41% | 75% | 4% | 5% | 32% | 0% |
| Rhode Island | 0% | 0% | 100% | 100% | 0% | 0% | 0% | 0% |
| South Carolina | 84% | 63% | 0% | 0% | 0% | 0% | 16% | 37% |
| South Dakota | 66% | 62% | 14% | 22% | 8% | 4% | 13% | 12% |
| Tennessee | 42% | 44% | 55% | 54% | 0% | 1% | 4% | 0% |
| Texas | 25% | 33% | 34% | 2% | 39% | 64% | 1% | 2% |
| Utah | 66% | 30% | 25% | 38% | 2% | 19% | 7% | 12% |
| Vermont | 48% | 87% | 2% | 12% | 0% | 0% | 50% | 0% |
| Virginia | 52% | 35% | 48% | 65% | 0% | 0% | 0% | 0% |
| Washington | 40% | 23% | 15% | 70% | 6% | 5% | 39% | 2% |
| West Virginia | 58% | 56% | 30% | 26% | 12% | 18% | 0% | 0% |
| Wisconsin | 85% | 70% | 11% | 24% | 1% | 0% | 4% | 7% |
| Wyoming | 0% | 0% | 100% | 100% | 0% | 0% | 0% | 0% |
| Source: AIX | | | | | | | | |

**OTHER STATES: METHODOLOGY**

**Annual Information Exchange**

Program review staff relied primarily on the National Association of State Park Directors Annual Information Exchange (AIX) data for national information and interstate comparisons. While extremely helpful in putting Connecticut's parks into context, there are a number of flaws in the data, as described below.

The AIX report is based on self-reported data from each of the 50 states. Extensive information is sought in seven areas: inventory, facilities, attendance, land, revenue, personnel, groups. The data is gathered annually for a time period covering July 1 of one year through June 30 of the next. There may be reporting issues due to the timeframe as states use alternative fiscal years – for instance, though the timeframe coincides with Connecticut's fiscal year, much of the information collected by the Parks Division is based on the calendar year. Other states may face similar issues in reporting precisely for the time period listed. This should not be a large concern for overall trends, but may lead to unexpected problems in any given year.

While AIX seeks data about many specific resources, there is not an industry standard for parks operations or administrative organization, so states may vary in naming conventions of particular features. For instance, though parks and forests are referred to mostly in combination and interchangeably in Connecticut and in this report, operations for these two types of public land are sometimes controlled by distinct divisions, bureaus, or even by different agencies entirely in other states. As such, comparing the parks (i.e., parks and forests combined) of Connecticut to the parks (excluding forests) of other states is complicated. Another example of disparities in reporting comes regarding counts of seasonal employees. As mentioned in Chapter II, staff learned that some states report a full count of individuals as the number of seasonal employees, while other states report the full-time equivalent of seasonal work, regardless of the number of individuals hired.

Committee staff was in position to compare state park data from DEEP with the information reported to AIX regarding Connecticut. One major discrepancy is the inclusion of fringe costs in the total operational costs reported to AIX whereas most operation costs descriptions from DEEP exclude fringe costs. Both depictions are accurate, but, short of surveying all fifty states, it is not possible to determine whether fringe costs are included or excluded from operating costs elsewhere.

There are also instances were DEEP is overgeneralizing or misreporting data for the AIX reports. As an example, AIX reports for years before DEEP's Environmental Conservation Fund was eliminated indicate that 100 percent of park-generated revenue was used as a funding source for operations, when, as discussed in Chapter II, actual expense information shows that a bit less than half of park-generated revenue was going back to the Parks Division, with some portion going to the General Fund and the rest going to a variety of related expenses within the Environmental Conservation Fund. This issue is not limited to Connecticut, as there are some instances where another state mislabels funding or revenue within the catchall "other" categories, rather than in a more appropriate named category. As with most collections of raw data,

representations of broad characteristics for the entire data set, in this case the nationwide data, are likely to be less error-prone than specific, direct comparisons between states.

## Case Studies

As a supplement to the AIX information, committee staff interviewed state parks personnel in Missouri, Minnesota, New York, and Pennsylvania, as well as conducting email correspondence with personnel in Massachusetts. These parks were selected for further study because of their similarity to Connecticut's parks in some respect (including size and number of parks), their proximity to Connecticut, or being mentioned in national literature as successful and notable organizations (though no state matched all three criteria areas). Table C-5 provides a summary of some key points about the state park system in each case study state. Total park acreage was considered in narrowing the list of comparable states before the discrepancies surrounding reporting of forest acres was established. Committee staff contacted at least one state per funding group except New Hampshire, as the study found Connecticut is unlikely to be able to operate parks purely from park-generated revenues.

| Table C-5. Summary of Key Indicators of Selected Other States | | | | | | | |
|---|---|---|---|---|---|---|---|
| Possible Comparable States | Park Acres Total | Park Revenue | General Fund | Dedicated Fund | Other | Total Operating Funds | Operations $ /acre |
| New Hampshire | 233,071 | 100% | 0% | 0% | 0% | $15,224,193 | $65 |
| Michigan | 292,721 | 74% | 0% | 26% | 0% | $55,403,403 | $189 |
| Missouri | 204,331 | 25% | 0% | 70% | 5% | $28,871,747 | $141 |
| Minnesota | 284,131 | 19% | 22% | 58% | 1% | $76,400,000 | $269 |
| Pennsylvania | 297,055 | 24% | 41% | 4% | 32% | $84,839,000 | $286 |
| New Mexico | 196,677 | 31% | 51% | 2% | 15% | $18,027,806 | $92 |
| Tennessee | 190,144 | 42% | 55% | 0% | 4% | $80,893,200 | $425 |
| New York | 1,351,569 | 41% | 56% | 1% | 2% | $214,266,000 | $159 |
| North Carolina | 215,404 | 19% | 66% | 0% | 14% | $33,764,282 | $157 |
| New Jersey | 441,110 | 32% | 68% | 0% | 0% | $28,609,930 | $65 |
| Massachusetts | 353,889 | 12% | 85% | 0% | 2% | $61,069,895 | $173 |
| Connecticut | 206,633 | 0% | 100% | 0% | 0% | $17,756,210 | $86 |

Source: AIX FY 12.
Notes: Colors in the first six columns group states with similar distributions of funding sources.
Colors in the last two columns show funding amounts relative to all fifty states, with the highest funding in bright green, the lowest funding in bright red, and average funding in yellow.

Additional states were considered for further study because of particular features or funding mechanisms, including several that warranted more extensive web research, such as Texas and Washington.

Table C-6 shows some staff and park size comparisons between Connecticut and selected case study states. As discussed in Chapter IV, some states reported number of seasonal staff by individuals and others by full time equivalent, so comparisons are difficult to interpret absence definitive knowledge of the way in which states reported.

| Table C-6. Selected Comparisons to Case Study States | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Acres Per Total Staff (full-time and seasonal) | | Seasonal and Part Time Staff Per Full Time Staff | | Visitors Per Total Staff (full-time and seasonal) | | Acres Per Park |
| STATE | # | Ranking | # | Ranking | # | Ranking | # | Ranking |
| Connecticut | 332 | 12 | 5.29 | 6 | 12,009 | 26 | 1497 | 29 |
| Massachusetts | 225 | 22 | 2.00 | 25 | 19,314 | 13 | 1044 | 34 |
| Minnesota | 274 | 17 | 2.55 | 17 | 7,895 | 38 | 159 | 49 |
| Missouri | 310 | 14 | 0.21 | 46 | 29,299 | 9 | 2404 | 17 |
| New York | 216 | 23 | 2.53 | 18 | 9,326 | 34 | 952 | 36 |
| Pennsylvania | 213 | 24 | 1.41 | 32 | 27,661 | 10 | 2475 | 16 |
| Source: AIX | | | | | | | |

While particular features of case study states are mentioned throughout the report, Table C-7 summarizes some key factors of the funding mechanisms in case study states.

| Table C-7. Funding Mechanism Comparisons with Case Study States | | | | |
|---|---|---|---|---|
| STATE | Charges Entrance Fee | Keeps Park-Generated Revenue | Non-Park Dedicated Revenue | Notes |
| Connecticut | Y | N | N | Eliminated EC Fund in 2009 |
| Massachusetts | Y | Y | N | Highest General Fund Reliance of states that use some portion of park-generated revenue for park operations |
| Minnesota | Y | Y | Sales Tax | Legacy Sales Tax source added in 2008 |
| Missouri | N | Y | Sales Tax | Sales tax is Constitutional and up for re-approval every 10 years |
| New York | Y | Y | N | Recent implementation of performance measurement |
| Pennsylvania | N | Y | Energy Lease | Used to retain 25% of revenue for capital expenses in non-lapsing fund, but fund was swept. Now all park revenue is appropriated for operations. |
| Source: AIX and PRI Staff Interviews with State Park Personnel | | | | |

# Appendix D

## Park Management Unit Expenses

| Table D-1. Parks Division Expenditures by Unit* (FY 13) | | | | | | |
|---|---|---|---|---|---|---|
| Mgt Unit | TOTAL | Payroll | % of Unit Expenses | Other | % of Unit Expenses | % of Parks Division Expenses |
| Burr Pond | $231,939 | $204,606 | 88% | $27,333 | 12% | 2% |
| Cockaponsett | $443,706 | $346,669 | 78% | $97,037 | 22% | 3% |
| Dinosaur | $344,268 | $277,131 | 80% | $67,137 | 20% | 3% |
| Director | $825,645 | $608,969 | 74% | $216,676 | 26% | 6% |
| East Distr HQ | $104,925 | $97,727 | 93% | $7,198 | 7% | 1% |
| Ft. Trumbull | $422,802 | $278,956 | 66% | $143,846 | 34% | 3% |
| Gillette Castle | $530,276 | $397,185 | 75% | $133,091 | 25% | 4% |
| Hammonasset | $1,364,605 | $941,753 | 69% | $422,852 | 31% | 11% |
| Harkness | $1,327,457 | $528,916 | 40% | $798,541 | 60% | 10% |
| Kellogg,Osborne& Goodwin | $461,782 | $343,780 | 74% | $118,002 | 26% | 4% |
| Lake Waramaug | $212,264 | $160,667 | 76% | $51,597 | 24% | 2% |
| Macedonia | $286,886 | $169,096 | 59% | $117,790 | 41% | 2% |
| Mashamoquet | $395,250 | $308,015 | 78% | $87,235 | 22% | 3% |
| Osborndale | $432,903 | $359,151 | 83% | $73,752 | 17% | 3% |
| Pauchaug | $652,780 | $487,748 | 75% | $165,032 | 25% | 5% |
| Penwood | $385,060 | $315,203 | 82% | $69,857 | 18% | 3% |
| Peoples | $234,026 | $182,052 | 78% | $51,974 | 22% | 2% |
| Public Outreach | $291,213 | $278,416 | 96% | $12,797 | 4% | 2% |
| Putnam | $507,280 | $413,184 | 81% | $94,096 | 19% | 4% |
| Rocky Neck | $775,647 | $606,684 | 78% | $168,963 | 22% | 6% |
| Salmon River | $337,705 | $264,617 | 78% | $73,088 | 22% | 3% |
| Shenipsit | $137,346 | $96,611 | 70% | $40,735 | 30% | 1% |
| Sherwood Island | $622,808 | $453,020 | 73% | $169,788 | 27% | 5% |
| Sleeping Giant | $413,353 | $336,856 | 81% | $76,497 | 19% | 3% |
| Squantz Pond | $287,786 | $221,471 | 77% | $66,315 | 23% | 2% |
| Topsmead | $521,106 | $401,073 | 77% | $120,033 | 23% | 4% |
| West Distr HQ | $258,831 | $152,557 | 59% | $106,274 | 41% | 2% |
| Grand Total | $12,809,649 | $9,232,113 | 72% | $3,577,536 | 28% | 100% |
| Source: DEEP | | | | | | |
| *Includes sub-divisions other than 23 park management units. | | | | | | |

| Table D-2. Select information on Park Units | | | |
|---|---|---|---|
| Park Unit | Number of Attendance Areas | Number of Paid Day Use Areas | Number of Parks with Camping Areas |
| Burr Pond | 1 | 1 | 0 |
| Cockaponset | 4 | 3 | 0 |
| Dinosaur | 1 | 1 | 0 |
| Fort Trumbull | 4 | 2 | 0 |
| Gillette Castle | 2 | 1 | 2 |
| Hammonasset | 1 | 1 | 1 |
| Harkness | 1 | 1 | 0 |
| Hopeville | 2 | 1 | 2 |
| Lake Waramaug | 2 | 2 | 1 |
| Macedonia | 3 | 1 | 2 |
| Mashamoquet | 4 | 2 | 1 |
| Osbornedale | 3 | 1 | 0 |
| Pachaug | 1 | 1 | 2 |
| Penwood | 3 | 1 | 0 |
| Peoples | 2 | 1 | 1 |
| Putnam Memorial | 4 | 1 | 1 |
| Rocky Neck | 2 | 1 | 1 |
| Salmon River | 5 | 1 | 0 |
| Shenipsit | 3 | 1 | 0 |
| Sherwood Island | 1 | 1 | 0 |
| Sleeping Giant | 3 | 2 | 0 |
| Squantz Pond | 1 | 1 | 0 |
| Topsmead | 2 | 1 | 1 |
| Total | 55 | 29 | 14 |
| Source: DEEP | | | |

# Appendix E

**CHA's Infrastructure Conditions Assessment Prioritization Criteria**

The Clough, Harbour and Associate's Infrastructure Conditions Assessment prioritization criteria was one part of a project prioritization tool provided to the Parks Division at the conclusion of the study. The following shows the criteria summary:

| Project Priorities Column | Project Performance Goals | Priority Value for Each Category |
|---|---|---|
| A | Would alleviate or eliminate a potential or real threat to the health, safety and welfare of the public/staff. | 100 |
| B | Would result in more efficient maintenance and / or operation of the park or park facility. | 80 |
| C | Project will protect natural resources(s). | 90 |
| D | Project will protect a historic/archaeological resource | 70 |
| E | Project enhances park patron's interaction with the environment. | 60 |
| F | Project addresses issues of importance not described by other criteria | 50 |
| G | Preserve or enhance a park activity | 40 |
| H | | |
| I | | |

| Urgency Identifiers: | Description of Urgency | Value of Multiplier |
|---|---|---|
| I ("Urgent!") | The problems this Project resolves are very serious.  This Project needs immediate attention as soon as possible. | 1.5 |
| II ("In one year") | The problems this Project resolves are somewhat serious.  This Project needs attention within one year. | 1.2 |
| III ("In three years") | The problems this Project resolves are slightly more serious than others of the same description in other similar structures in the park system. | 1.1 |

0967

# Exhibit 115



# Exhibit 116

MANUAL CODE **2612.8**
D **1**

Department of
Energy and Environmental Protection

Public Act 11-80, effective July 1, 2011, established the Department of Energy and Environmental Protection as the successor agency to the Department of Environmental Protection, the Department of Public Utility Control, and the energy group within the Office of Policy and Management.

## DIRECTIVE

**SUBJECT:** General Policy - Park & Recreation Law Enforcement

**PURPOSE:** To Establish The State Parks Division Law Enforcement Policy

**POLICY:** It is the policy of the State Parks Division to emphasize the "park ranger" image and apply a strict law enforcement profile only as dictated by the situation at hand. Employees should consciously avoid an overly aggressive approach to law enforcement. When appropriate, the employee should explain the relevant regulation and the reasons for the regulation. In this way officers may instill in the visitor an understanding and appreciation for the value of recreational areas, the proper use of recreational areas and respect for other visitors. This policy, however, is not intended to restrict the employee's use of discretion and judgment in taking whatever steps are necessary to enforce the law. The goal of recreation law enforcement actions must be the safety of the visitor and protection of the resource. Enforcement of laws and regulations is a method to achieve the goals of park and recreation management and not a goal unto itself.

---

**Issued By:** /S/ Commissioner Sidney J. Holbrook

**Date:** October 1996

**Special Instructions:** Replaces Directive 2612.8 D1 dated 12/7/81

**Distribution:** All Manual Holders, Park & Recreation Supervisors, C&P Bureau Chiefs, C&P Division Directors

# Exhibit 117



0973

