UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DAVID J. NASTRI, ESQ., | : | |
| | : | DKT No.: 3:23-cv-00056-JBA |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| KATIE DYKES, in her official capacity only, | : | |
| | : | |
| Defendant. | : | APRIL 14, 2023 |

**PLAINTIFF'S REPLY MEMORANDUM OF LAW IN SUPPORT OF HIS AMENDED EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND, IN THE ALTERNATIVE, TO CONSOLIDATE THE PRELIMINARY INJUNCTION HEARING WITH THE TRIAL ON THE MERITS**

The Defendant, Katie Dykes, concedes that she cannot identify any Founding Era analogues to Connecticut's ban on firearm possession in state parks and forests. That concession alone is a sufficient basis for the Court to grant Plaintiff David Nastri's motion for a preliminary injunction regarding Conn. Agencies Regs. § 23-4-1(c).

Insofar as Dykes unleashes an avalanche of technical and procedural arguments, none of her arguments prohibit the Court from reaching the Second Amendment merits on Nastri's motion for a preliminary injunction. Thus, the Court should grant Nastri's motion for a preliminary injunction or render a final judgment on the merits.

**I.   A Heightened Standard Is Inappropriate Because Nastri Seeks A Prohibitory Injunction, Not A Mandatory One.**

Defendant Dykes argues that the Court must require Nastri to show a "clear or substantial likelihood of success" on his Second Amendment claim because she argues that he is seeking a mandatory injunction or an injunction that will disturb the status quo. Dkt. 23, pp. 9-10. Her sole analysis of the issue, however, is limited to a single phrase:

1

"because Plaintiff's motion seeks to upset rather than preserve the status quo by enjoining a longstanding firearm prohibition." *Id*. at p. 9. Her argument sorely misses the mark.

The Second Circuit has drawn a distinction between the standards used for prohibitory injunctions and mandatory injunctions, and it applies a heightened standard to decide mandatory injunctions:

> In distinguishing between prohibitory and mandatory injunctions, we have noted that "[t]he typical preliminary injunction is prohibitory and generally seeks only to maintain the status quo pending a trial on the merits. A mandatory injunction, in contrast, is said to alter the status quo *by commanding some positive act* ... [and] thus alters the traditional formula by requiring that the movant demonstrate a greater likelihood of success."

*Mastrovincenzo v. City of New York*, 435 F.3d. 78, 89 (2d Cir. 2006) (internal citations omitted; alterations and emphasis in original).

The Second Circuit's cases are instructive. Dykes relies entirely on *Libertarian Party v. Lamont*, 977 F.3d 173 (2d Cir. 2020) for her arguments. *Lamont* found that the Libertarian Party had applied for a mandatory injunction because it sought an order directing Connecticut officials to place all nominated Libertarian Party candidates on the November 2020 ballot. *Id*. at 175. Likewise, *Wright v. Giuliani*, 230 F.3d 543 (2d Cir. 2000) found that five homeless individuals diagnosed with HIV or AIDs were seeking a mandatory injunction directing New York City officials to provide them with certain housing accommodations, maintain property security, and implement training for their personnel.[1]

Conversely, *Mastrovincenzo* held that a First Amendment challenge to a longstanding New York City law regarding the street vending of art sought a prohibitory

---

[1] *Lamont* relies on *Wright* for the proposition that an injunction that disturbs the status quo is a mandatory injunction. *See Lamont*, 977 F.3d at 177.

2

injunction because it asked the district court to enjoin enforcement of the law rather than commanding city officials to take some positive act. 435 F.3d at 89-90.

The preliminary injunction that Nastri seeks is largely analogous to the one issued in *Mastrovincenzo*. He has asked the Court to enjoin enforcement of Conn. Agencies Regs. § 23-4-1(c). Dkt. 14. He has not asked the Court to command Dykes to take any positive action. The age of the regulation and its predecessors has no bearing on whether an injunction is mandatory or prohibitory. Thus, the Court should reject Dykes' invitation to hold Nastri to a heightened standard.

Finally, two additional considerations should factor into the Court's standard of review. First, *Bruen* places the substantive burden on Dykes to prove that Conn. Agencies Regs. § 23-4-1(c) has a well-established and representative historical analogue after Nastri shows that the right he claims is protected by the Second Amendment's text. Dykes cannot meet that burden and seeks to escape it by raising the procedural bar for Nastri. Second, Nastri asked the Court to consolidate the preliminary injunction with a full trial on the merits and expedite it. Dkt. 14. Dykes opposed that course of action. Nastri has demonstrated actual success on the merits in preparation for such a consolidation, and the Court should not allow Dykes to escape the consequences of her failure to carry her burden under *Bruen* by impermissibly shifting the substantive burden wholly to Nastri.

## II. The Second Circuit Has Invalidated Discrete Portions Of Gun Control Statutes Subject To Pre-Enforcement Challenges Under The Severability Doctrine. Alternatively, The Court Should Apply The Overbreadth Doctrine.

Defendant Dykes argues that Nastri's motion for a preliminary injunction must fail because it only states a facial challenge, requiring him to demonstrate that "no set of circumstances exists under which [it] would be valid." Dkt. 23, pp. 10-11. Nastri has two

3

responses to Dykes' contention: (1) the Second Circuit has previously invalidated discrete provisions of gun control statutes in pre-enforcement challenges under the severability doctrine and the provision of Conn. Agencies Regs. § 23-4-1(c) that Nastri challenges is unconstitutional in all of its applications, and (2) in the alternative, the Court should apply the overbreadth doctrine from First Amendment jurisprudence.

### A. The Second Circuit has previously invalidated discrete provisions of gun control statutes in pre-enforcement challenges.

It is well-established that, if a provision of a law is found to be unconstitutional, there is a presumption that the unconstitutional provision is severable from the rest of the law. *See Regan v. Time, Inc.*, 468 U.S. 641, 653 (1984). Thus, "[u]nless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Id*. at 653 (internal citations and quotation marks omitted). The Second Circuit has, in pre-enforcement cases, used severability to declare certain words in a statute unconstitutional based on their operative effect while upholding the rest of the statute. *See Carlin Communications, Inc. v. F.C.C.*, 837 F.2d 546, 560-61 (2d Cir. 1988).

Severability is a necessary counterbalance to the facial challenge standard.[2] Many provisions of the Bill of Rights – particularly the First and Second Amendments – are rights against rules. Without severability, the state could enact or promulgate unconstitutional laws at will if it included enough constitutional provisions so as to give them limited constitutional application. The end result would be a complete derogation of the Bill of Rights through prior restraints on conduct or speech that is presumptively

---

[2] To succeed on a facial challenge, "the challenger must establish that no set of circumstances exists under which the [law] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

protected by the Bill of Rights and which could only be challenged by an individual foolhardy enough to risk criminal prosecution. The Supreme Court has repeatedly emphasized that citizens "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Susan B. Anthony List v. Driehaus*, 134 S.Ct. 2334, 2343 (2014) (internal quotation marks and citations omitted). Even though it has not linked this principle of Article III standing to facial challenges and severability, the Supreme Court has, through its exposition of policy underlying pre-enforcement standing, has aligned these concepts sufficiently for the Court to apply them here.

The Second Circuit has not limited severability to First Amendment cases such as *Carlin Communications*. *New York State Rifle and Pistol Ass'n, Inc. v. Cuomo* characterized challenges to sweeping New York and Connecticut gun control statutes as being pre-enforcement facial challenges: "Because plaintiffs pursue this pre-enforcement appeal before they have been charged with any violation of law, it constitutes a facial, rather than as-applied, challenge." 804 F.3d 242, 265 (2d Cir. 2015) (internal quotation marks omitted). While *Cuomo* did not discuss this characterization until it reached the plaintiffs' vagueness challenge at the end of its opinion, its characterization still applied with equal force to the analysis it conducted of the plaintiffs' Second Amendment claims.

*Cuomo*'s analysis of the plaintiffs' Second Amendment claims indisputably adhered to severability even though it never discussed it or its relationship to facial challenges. *Cuomo* found one provision in each of New York's and Connecticut's statutory schemes to be unconstitutional: New York's seven-round load limit and Connecticut's specific prohibition on the possession of Remington 7615 rifles. *Id*. at 269. Instead of denying the plaintiffs relief as to those two provisions because they had brought

5

pre-enforcement facial challenges to New York's and Connecticut's statutory schemes, *Cuomo* implicitly adhered to the doctrine of severability by striking the specific provisions down while upholding the rest of the statutes.

The Court should take a similar approach to Nastri's challenge to Conn. Agencies Regs. § 23-4-1(c), which reads: "Hunting or carrying of firearms, archery equipment, or other weapons, including but not limited to air rifles and slingshots, is not permitted in any state park or forest except as authorized by the Department of Energy and Environmental Protection." Properly read, this regulation contains four distinct provisions: (1) hunting is not permitted, (2) the carrying of firearms is not permitted, (3) the carrying of archery equipment is not permitted, and (4) the carrying of other weapons, including but not limited to air rifles and slingshots, is not permitted. Since Nastri is challenging the firearms prohibition, the Court may, and should under the doctrine of severability, examine and strike down that provision while preserving the rest of the regulation.

Defendant Dykes provides no argument at this stage to rebut the presumption of severability. In fact, she does not even present an argument that the prohibition on carrying firearms covers "dangerous and unusual" weapons, claiming instead that the prohibition on carrying other weapons would cover them. Dkt. 23, pp. 10-11. Even if she did make such an argument, § 23-4-1(c)'s text would make such an argument immaterial because it requires those who do carry and use weapons in state parks or forests to comply with any applicable Connecticut laws and regulations. Since Connecticut has separate laws for what it claims are "dangerous and unusual" weapons,[3] there are no

---

[3] *See, e.g.*, Conn. Gen. Stat. §§ 53-202a-c.

circumstances under which § 23-4-1(c)'s absolute prohibition of carrying firearms without permission would apply to prohibit such weapons by itself. Thus, it is unconstitutional.

### B. In the alternative, the Court should apply the overbreadth doctrine from First Amendment jurisprudence to Conn. Agencies Regs. § 23-4-1(c).

If the Court finds that severability is inapplicable to Conn. Agencies Regs. § 23-4-1(c) or that the specific provision Nastri challenges somehow survives his facial challenge, the Court should still enjoin it under the overbreadth doctrine employed in First Amendment jurisprudence. While Nastri acknowledges that the Supreme Court has not applied the overbreadth doctrine outside the First Amendment context and the Second Circuit has avoided the question of whether it applies in Second Amendment cases – *see Kachalsky v. County of Westchester*, 701 F.3d 81, 101 (2d Cir. 2012), its application is particularly appropriate in the Second Amendment context for the same reasons that it is a well-established First Amendment doctrine.

In the First Amendment context, the Supreme Court has recognized a type of facial challenge "whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (internal citations and quotation marks omitted). It has described this overbreadth doctrine as striking a balance between competing social costs:

> On the one hand, the threat of enforcement of an overbroad law deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas. On the other hand, invalidating a law that in some of its applications is perfectly constitutional—particularly a law directed at conduct so antisocial that it has been made criminal—has obvious harmful effects.

*United States v. Williams*, 553 U.S. 285, 293 (2008).

7

Strong similarities exist between the First and Second Amendments. The First Amendment guarantees a right to free speech. The state may only limit that right within narrow categories of First Amendment exceptions, and the Supreme Court has recognized that the right can only be enjoyed when it can be freely exercised without fear of punishment. *Secretary of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956 (1984) (recognizing the chilling doctrine on the basis that people will refrain from engaging in protected speech if they might be punished for it). Likewise, the Supreme Court has recognized that the Second Amendment guarantees an individual right to bear arms that is presumptively protected unless the state limits it within narrow categories of Second Amendment exceptions. *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111, 2126 (2022). Just like the right to free speech, the right to bear arms cannot be enjoyed when it cannot be freely exercised without fear of punishment. Thus, when a state regulation chills the exercise of the Second Amendment right to bear arms, application of the overbreadth doctrine is appropriate.

Nastri does not suggest that the Court should depart from the framework that the Supreme Court established for First Amendment overbreadth analyses. That framework starts with defining the conduct the law covers. *Stevens*, 559 U.S. at 474. Here, Conn. Agencies Regs. § 23-4-1(c)'s plain text is definitive. It establishes an absolute prohibition on hunting and the carrying of firearms, archery equipment, and other weapons in state parks and forests unless a person first obtains state permission. It contains no specific prohibitions as to specific types of weapons or conduct that an individual must avoid. Instead, it requires individuals to adhere to other Connecticut laws and regulations when the state gives them permission to carry a weapon in a state park or forest. Thus, the only

conduct that § 23-4-1(c) covers is the carrying of weapons. In other words, it is an absolute prohibition that has no purpose other than to prevent the carrying of weapons.

Assuming that it does have a valid application other than the absolute prohibition that it establishes though, the state cannot dispute that § 23-4-1(c)'s primary application is to prohibit the carrying of weapons in state parks and forests and that its primary application to thousands of park- and forest-goers in derogation of their right to bear arms for self-defense far outnumbers any other application that it might put forth. Thus, the Court should hold it unconstitutional under the overbreadth doctrine.

### III. *Bruen* Recognized That The Second Amendment Contains A Broad Textual Right To Bear Arms.

Defendant Dykes argues that Nastri has failed to meet his burden to show that the Second Amendment's plain text covers his proposed course of conduct. Dkt. 23, pp. 13-15. Her argument, however, seeks to impose a heightened textual burden on Nastri that is inconsistent with *Bruen* and *Heller* by requiring Nastri to show that it protects his right to carry firearms into state parks and forests. *Id*. at p. 14. To the extent that she attempts to merge her "state-property owner" argument with this analysis, she errs because this argument is an exception to the general rule established by the Second Amendment and she bears the burden of showing historical support to obtain judicial recognition of it.

Neither *Heller* nor *Bruen* imposed a granular textual burden on plaintiffs. Both *Heller* and *Bruen* held that the Second Amendment's plain text "guarantee[s] the individual right to possess and carry weapons in case of confrontation that does not depend on service in the militia." *Bruen*, 142 S.Ct. at 2127 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008)) (internal quotation marks omitted). Both used strong language to establish this plain textual meaning, stating that they found "no doubt, on the

basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms." *Id*. at 2127 (quoting *Heller*, 554 U.S. at 595) (internal quotation marks omitted). This language "naturally encompasses public carry" and "a right to bear arms in public for self-defense." *Id*. at 2134-35. Thus, Nastri's textual burden is to show that the conduct he seeks to engage in falls under the right to bear arms in public for self-defense. He has met that burden by showing that he seeks to carry a handgun into publicly-owned places or spaces open for public use. *See* Dkt. 13, ¶¶ 18-40.

Dykes, however, invites the Court to interpret the Second Amendment's plain text more narrowly than *Heller* and *Bruen* did by requiring Nastri to demonstrate that it protects a right to carry firearms on state-owned lands. She cites no controlling appellate precedent for her proposition, and her attempt to distinguish *Heller* and *Bruen* as jurisdictional-wide cases is inconsistent with *Heller* and *Bruen*'s definition of the Second Amendment's plain language.[4] *See Bruen*, 142 S.Ct. at 2130 (describing the Second Amendment's textual command as "unqualified"). The post-*Bruen* district court decisions that Dykes relies on to support a more particularized textual standard conflate the textual analysis with government's burden to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130. The Court should avoid committing this error, especially in view of *Bruen*'s plain command.

---

[4] *Bruen* demonstrated that this approach is consistent with the Supreme Court's First Amendment jurisprudence. The First Amendment establishes a general prohibition against government's regulation of speech's content, and government bears the burden of showing from history and tradition that its regulation is constitutionally permissible through a First Amendment exception. *Bruen*, 142 S.Ct. at 2130.

## IV. Defendant Dykes Has Failed To Supply The Well-Established And Representative Historical Analogues Required By *Bruen*.

### A. Dykes fails to identify any analogues for a generalized state-property owner exception for Second Amendment cases. Alternatively, the public forum doctrine weighs against applying such an exception in this case.

Defendant Dykes first claims a generalized state-property owner exception to the Second Amendment.[5] Dkt. 23, pp. 18-30. Her claim, however, lacks sufficient historical support and ignores the public forum doctrine. She claims that state has the same right to regulate conduct on public lands dedicated for a public purpose as private property owners do, claiming that the state is operating a business much like a private enterprise. Dkt. 23, pp. 18-23. She, however, cites no well-established and representative historical analogues for this proposition, relying instead on broad grants of authority to states and the federal government to regulate their property. Dykes' inability to identify a well-established and representative historical analogue is fatal to her claim.

Also missing from Dykes' analysis is any discussion of the legal status that public parks have held in American law. The Supreme Court recognized that "[w]herever the title of streets and parks may rest, they have immemorially been held in trust of the use of the public and, time out of mind, have been used purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. Committee for Indus. Organization*, 307 U.S. 496, 515 (1939). The Connecticut Supreme Court has described Connecticut's state parks as being open to public use in much the same way:

---

[5] Dykes launches a four-pronged attack in support of this claim. Nastri addresses the first prong here. Dykes' argument that the state can enforce unconstitutional private restrictions on land that it leases from private individuals for the purpose of opening to the public defies the principles that the Supreme Court established in *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961) (holding that racial discrimination by a private restaurant operating on state land violated the Fourteenth Amendment) and *Shelley v. Kraemer*, 334 U.S. 1 (1948) (holding that judicial enforcement of private restrictive housing covenants that were racially discriminatory violated the Fourteenth Amendment). The state cannot avoid constitutional commands by virtue of being a lessee or a lessor.

"[f]rom time immemorial, the state's uninhabited and undeveloped land traditionally has been used for hiking, picnicking, camping, hunting, trapping and fishing." *State v. Ball*, 260 Conn. 275, 284 (2002). To borrow a First Amendment term, state parks and forests have long been traditional public fora open to the public for many uses, and courts have never treated them as places where the state operates an enterprise akin to a private business. Since state parks and forests have long been open to the public and the state does not regulate who may access them, the state lacks the power to prevent the public from carrying firearms for the purpose of self-defense within their confines.

**B. State parks and forests are not "sensitive places."**

Defendant Dykes next argues that state parks and forests are sensitive places, and she advocates for a far broader standard than the one Nastri has proposed. Dkt. 23, pp. 31-34; *compare same with* Dkt. 14-1, pp. 18-29. The standard that she advances is inconsistent with *Bruen* and invites the Court to engage in the very interest-balancing inquiry that *Bruen* expressly forbids. 142 S.Ct. at 2131.

Dykes also fails to establish a well-representative and historical analogue. After submitting nearly a thousand pages of documents, her own expert, Professor Saul Cornell, deals the most telling blow to her "sensitive places" argument: "There were no modern-style parks in the era of the Second Amendment." Dkt. 23-14, ¶ 30. Professor Cornell continues: "The Boston commons and other similar urban spaces during the Founding era shared little with modern parks." *Id*. at ¶ 31. Instead, Professor Cornell explains that modern-style parks arose in the middle of the 19th century along with their corresponding prohibitions on the carrying of firearms. *Id*. at ¶¶ 32-33. Although Cornell does not address the issue, the legal treatment of public parks and land was largely

consistent with the modern treatment: "[w]herever the title of streets and parks may rest, they have immemorially been held in trust of the use of the public and, time out of mind, have been used purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague*, 307 U.S. at 515. Thus, Dykes concedes through her own expert that she cannot supply a well-established and representative historical analogue to Conn. Agencies Regs. § 23-4-1(c) from 1791 and its immediate aftermath.

Dykes seeks to overcome this hurdle by supplying analogues from the 1850s forward. She encounters two insurmountable problems. First, *Bruen* held that mid-to-late 19th century laws and court decisions are only treated "as mere confirmation" of the Second Amendment's original meaning. *Bruen*, 142 S.Ct. at 2137. Thus, courts cannot assign controlling weight to "post-ratification adoption or acceptance of laws that are inconsistent" with the Second Amendment's original meaning.[6] *Id*. at 2137 (internal quotation marks and citations omitted). As Nastri has previously discussed, classifying state parks, forests, or unsettled land as "sensitive places" contradicts the original understanding of the Second Amendment, which was a direct response to the overreach of English gaming laws. Dkt. 14-1, pp. 30-33. Dykes' failure to supply any laws classifying state parks, forests, or unsettled land as "sensitive places" prior to the 1850s – as acknowledged by Professor Cornell – is dispositive in Nastri's favor under *Bruen*.

Second, the analogues that Dykes supplies from 1850 to 1872 are not part of any well-established constitutional or common law tradition. As her own experts – particularly

---

[6] *Bruen* acknowledged an academic debate over whether the Fourteenth Amendment incorporated the Bill of Rights as it was understood in 1791 or as it was understood in 1868, *see* 142 S.Ct. at 2138, but it also stated that the Supreme Court has adhered to the original public understanding of the rights in 1791. *Id*. at 2137. Dykes presents no argument at all on why the Court should adhere to a reshaped 1868 meaning rather than the 1791 meaning of the Second Amendment. Thus, the Court should apply the 1791 meaning.

Professor Cornell – explain, modern-style public parks were the creation of romanticized and transcendentalist idealism – in other words, quintessential interest-balancing with no regard for constitutional interest balancing. Dkt. 23-14, ¶¶ 32-33. The six state park and forest analogues that Dykes identifies between 1858 and 1872 were all municipal enactments in large cities. Dkt. 23-2, pp. 1-2. She identifies no statewide enactments and no caselaw opining on their constitutionality.[7] In other words, the six analogues that Dykes identifies were localized outliers in their own time even though they were the first signs of a growing trend protected from constitutional scrutiny by the Supreme Court's failure to incorporate the Bill of Rights against the states. *Bruen* specifically rejected an attempt to establish a well-established and representative historical analogue using localized restrictions. *Bruen*, 142 S.Ct. at 2154 (discussing localized territorial laws as being most unlikely to reflect the "origins and continuing significance of the Second Amendment" and the lack of judicial scrutiny as rendering them unhelpful).

Thus, the Court should decline to declare Connecticut state parks and forests "sensitive places."

## CONCLUSION

For the foregoing reasons and those stated in his original moving papers, the Plaintiff, David Nastri, respectfully requests that the Court grant his motion for a preliminary injunction as to Conn. Agencies. § 23-4-1(c).

---

[7] Dykes' failure to identify caselaw is not surprising. *Barron v. Baltimore*, 32 U.S. 243 (1833) declined to apply the Bill of Rights to the states, and the Supreme Court did not incorporate the Second Amendment against the states until *McDonald v. City of Chicago*, 561 U.S. 742 (2010). Dykes, however, has not supplied any state caselaw upholding these laws against challenges under state constitutional protections for the right to bear arms.

The Plaintiff,

By: /s/ Cameron L. Atkinson /s/
Cameron L. Atkinson, Esq. (ct31219)
ATKINSON LAW, LLC
122 Litchfield Rd., Ste. 2
P.O. Box 340
Harwinton, CT 06791
Telephone: 203.677.0782
Email: catkinson@atkinsonlawfirm.com

## CERTIFICATION OF SERVICE

The undersigned hereby certifies that, on the foregoing date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties and counsel of record who have appeared by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

/s/ Cameron L. Atkinson /s/