```
 1               UNITED STATES DISTRICT COURT
                    DISTRICT OF CONNECTICUT
 2

 3   _____ )
     DAVID NASTRI,                    )
 4                                    ) No. 23-cv-00056 -JBA
                    Plaintiff,        )
 5                                    ) May 9, 2023
     v.                               )
 6                                    ) 10:15 a.m.
                                      )
 7   KATIE DYKES,                     ) 141 Church Street
                                      ) New Haven, Connecticut
 8                   Defendant.       )
     _____ )
 9


10

11            PRELIMINARY INJUNCTION HEARING

12   B E F O R E:

13        THE HONORABLE JANET BOND ARTERTON, U.S.D.J.

14

15   A P P E A R A N C E S:

16   For the Plaintiff:

17        ATKINSON LAW, LLC
                122 Litchfield Road
18              P.O. Box 340
                Harwinton, CT 06791
19              (203) 677-0782
                E-mail: catkinson@atkinsonlawfirm.com
20        BY:  CAMERON LEE ATKINSON, ESQ.

21

22   (Continued)

23

24              Corinne Thomas, RPR
                Official Court Reporter
25                 (203) 809-0848
```

```
1    For the Defendant:

2          OFFICE OF THE ATTORNEY GENERAL
                 165 Capitol Avenue
3                Hartford, CT 06106
                 (860) 808-5296
4                E-mail:  blake.sullivan@ct.gov
                          thadius.bochain@ct.gov
5                          timothy.holzman@ct.gov
           BY:  BLAKE THOMAS SULLIVAN, ESQ.
6                THADIUS LATIMER BOCHAIN, ESQ.
                 TIMOTHY J. HOLZMAN, ESQ.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    I N D E X

2     WITNESS:  PROFESSOR SAUL CORNELL        PAGE

3

4     Direct Examination By Mr. Atkinson      12

5     Cross Examination by Mr. Sullivan       71

6     Redirect Examination by Mr. Atkinson    106

7     Recross Examination by Mr. Sullivan     125

8

9     WITNESS:  DAVID NASTRI                  PAGE

10    Direct Examination by Mr. Atkinson      130

11    Cross Examination by Mr. Bochain        174

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    (Call to Order, 10:15 a.m.)

2            THE COURT:  Good morning, counsel, ladies and

3       gentlemen.  Please be seated.

4            We are here for the hearing on the

5       preliminary injunction sought in Nastri v. Dykes,

6       23-cv-56.

7            May I please have appearances of counsel, and

8       at any time if you are the speaker, you may remove

9       your mask.

10            MR. ATKINSON:  Thank you, Your Honor.  Good

11       morning.

12            Cameron Atkinson on behalf of the plaintiff,

13       David Nastri, who's to my right at counsel's table.

14            THE COURT:  Good morning.

15            Good morning, Mr. Nastri.

16            MR. BOCHAIN:  Good morning, Your Honor.

17            Thadius Bochain, Assistant Attorney General.

18       I'm joined at counsel table by my colleagues

19       Blake Sullivan, who is to my left here, and

20       Timothy Holzman, at the far end on the left there,

21       and we represent the defendant, Commissioner Katie

22       Dykes.  And also joining us today is Section Chief

23       Maura Murphy Osborne of the special litigation

24       section and one of our colleagues, Keyla Rivera,

25       who's also in the courtroom today.
```

1          THE COURT:  They're over there?

2          MR. BOCHAIN:  Correct.

3          THE COURT:  You've relegated the women to the

4    back bench.

5          MR. BOCHAIN:  No, Your Honor.  That was not

6    deliberate.

7          THE COURT:  All right then.  There are a

8    number of issues that we need to get through.  We

9    have a hard stop at four o'clock today and we will

10   continue tomorrow.  I'd like to start, if you don't

11   mind -- well, let me ask you if there's anything that

12   you want to update or clarify or advise of agreements

13   on.

14         MR. BOCHAIN:  Yes, Your Honor.

15         THE COURT:  Mr. Bochain.

16         MR. BOCHAIN:  I'm sorry?

17         THE COURT:  I said Mr. Bochain.

18         MR. BOCHAIN:  Thank you, Your Honor.

19         So there are a few housekeeping matters that

20   I think we would like to put on the record.  The

21   first is there has been agreement between the parties

22   with respect to various exhibits that are going to be

23   entered into evidence and so we had provided the

24   Court with copies of those.  And so Defense

25   Exhibits 1 through 132, those are going to be --

 1   Attorney Atkinson has agreed that those can come in.

 2   Additionally --

 3          THE COURT:  Okay.  I'm going to stop you

 4   there.  The agreement of counsel that they are

 5   unobjected to doesn't admit them.  So you need to

 6   identify what you're admitting; otherwise, I get

 7   broad swaths of exhibits that, in fact, were not

 8   admitted or relied on.  Okay?

 9          MR. BOCHAIN:  Okay.  Certainly, Your Honor.

10   So I guess I would defer to Your Honor, how you would

11   like me to go about that.

12          THE COURT:  Just as you get to the exhibits

13   that you would want or perhaps at the end of the day

14   if you want to collectively say which ones you

15   believe relate to the testimony that was given.

16          MR. BOCHAIN:  Okay.

17          THE COURT:  I don't mean to make an obstacle

18   here, but from my standpoint, I don't want a lot of

19   extraneous exhibits in the record.  I just want the

20   ones that you think are directed to any of the

21   issues.

22          MR. BOCHAIN:  The issues in the case, Your

23   Honor, or to the testimony that you're going to hear

24   today?

25          THE COURT:  You can -- we can sort this out,

1    but 1 through 132 of the defendant's exhibits have no

2    objection.  What else?

3         MR. BOCHAIN:  That's correct, Your Honor.

4    Defense Exhibits 133 through 140, those are

5    declarations by various witnesses, some of which are

6    expert witnesses.  Those are not going to be objected

7    to either.

8         THE COURT:  Will the experts testify?

9         MR. BOCHAIN:  We have -- so it's my

10   understanding that Attorney Atkinson will be calling

11   one of those experts today.

12        THE COURT:  Okay.

13        MR. BOCHAIN:  And that's Professor Saul

14   Cornell.  Attorney Atkinson has also agreed -- has --

15   is not objecting to and has agreed to the

16   qualifications of those experts as well.

17        And additionally, Your Honor, there is -- we

18   have provided the Court with an updated exhibit and

19   witness list.  And incorporated within that, there

20   are a few additional exhibits from the defense and

21   that's 141 through 143.  It's my understanding that

22   Attorney Atkinson is not objecting to those as well.

23        And just on the point about the updated

24   exhibit list, I believe we did provide the Court with

25   an updated copy this morning.  It's updated -- it has

1    updated the one that we submitted last night.

2    There's been one addition and a minor change.  So I

3    just wanted to put that on the record as well.

4         THE COURT:  All right.  Thank you.  Anything

5    else from the defendant side.

6         MR. BOCHAIN:  Nothing at this time.

7         THE COURT:  All right.  Mr. Atkinson,

8    anything from your side.

9         MR. ATKINSON:  Yes.  A few things.  First of

10   all, I did -- I do believe I supplied your clerk with

11   a courtesy copy of what we're marking as Exhibit 17

12   today.  That was not included in the bench book I

13   delivered earlier this week.  We have 17 exhibits

14   right now.  I only anticipate entering 9, 10 and 17

15   as full exhibits.  The rest are for ID purposes in

16   the course of the proceedings today.  My

17   understanding is that the defendant is not objecting

18   to the admissibility of 9, 10 and 17.

19        THE COURT:  Okay.

20        MR. ATKINSON:  Your Honor, we also had

21   discussions yesterday about streamlining some of the

22   proceedings.  We did prepare and did file last night

23   a proposed stipulation.  I have a copy here if

24   Your Honor would like me to hand it up to you.  It's

25   at ECF 35.

1          THE COURT:  Okay.

2          MR. ATKINSON:  From my perspective, Your

3    Honor, if that stipulation is adopted, those are all

4    of the housekeeping matters that I would have.

5          THE COURT:  Okay.  One of the concerns that I

6    want to make sure that we address is that Bruen

7    requires consideration of sufficient statutes to

8    demonstrate the history and tradition that is argued

9    to be supportive of the regulation.  And so even if

10   there are only references to those in testimony,

11   would you make sure our record has the regulation or

12   whatever is the actual document?

13         MR. ATKINSON:  Understood.

14         THE COURT:  I can't believe this record does

15   not have them all, but just make sure that we have

16   that.  Okay?

17         MR. ATKINSON:  I will review my brief and I

18   will see if I can locate as many of the originals

19   that are referenced in that brief, Your Honor.

20         THE COURT:  Okay.  It's really with respect

21   to the testimony of people who are -- no, I suppose

22   it's not, is it?

23         Okay.  All right.  Let's just make sure that

24   we are traveling precisely down the path we should.

25         Yes, Mr. Sullivan.

```
1              MR. SULLIVAN:  Thank you, Your Honor.

2              So to your point about the building the

3      record of the relevant statutes and ordinances,

4      that's what we're referring to and essentially that

5      the -- there has been a stipulation in place as to

6      the vast swath of those, and that we intend to enter

7      them in full for the Court's consideration in

8      connection with the preliminary injunction motion.

9              There will be a few within there that we may

10     ask, you know, the witnesses about and we will direct

11     their attention to those at the time.

12             THE COURT:  That's fine.

13             MR. SULLIVAN:  But they were all submitted in

14     our opposition to the preliminary injunction motion

15     and that's true of the declarations as well,

16     Your Honor.

17             THE COURT:  All right.  So if that is all

18     that you have preliminarily to bring us up to date,

19     I'd like to propose that we start, if it does not

20     disrupt your intended sequence, with testimony

21     evidence on standing since standing is jurisdictional

22     and therefore required to be established.

23             All right.  Mr. Atkinson, would you care to

24     begin?

25             MR. ATKINSON:  Your Honor, I actually had
```

```
 1   intended to call Mr. Nastri, my only witness as to
 2   standing last, primarily because of discussions I had
 3   with my colleagues about Professor Cornell being --
 4          THE COURT:  The scheduling, okay.
 5          MR. ATKINSON:  Yes.
 6          THE COURT:  All right.  Is Professor Cornell
 7   here now?
 8          MR. ATKINSON:  Yes.  Your Honor.
 9          THE COURT:  You may proceed then and I will
10   expect to hear from Mr. Nastri when you have finished
11   with exhibits -- witnesses who have come here and
12   done so anticipating they'll be called today.
13          MR. ATKINSON:  Thank you, Your Honor.
14          THE COURT:  Okay.
15          MR. ATKINSON:  Would Your Honor prefer me to
16   use the podium?
17          THE COURT:  Yes, please.
18          MR. ATKINSON:  Thank you.  Plaintiff calls
19   Professor Saul Cornell to the stand, please.
20          THE COURT:  All right.  Sir, if you would
21   kindly stand, raise your right hand, the oath will be
22   administered to you.
23          (Professor Saul Cornell, sworn.)
24          THE WITNESS:  Yes, I do.
25          THE CLERK:  Please be seated, state your name
```

1    for the record, please spell your last name and state

2    your town of residence.

3             THE WITNESS:  Yes.  My name is Saul Cornell,

4    S-A-U-L, C-O-R-N-E-L-L.

5             THE COURT:  You may proceed.

6             MR. ATKINSON:  Thank you, Your Honor.

7      DIRECT EXAMINATION OF PROFESSOR SAUL CORNELL

8    BY MR. ATKINSON:

9      Q.    Good morning, Professor Cornell, and thank

10   you for being here with us.  I'd like to start by,

11   can you tell us what your employment is?

12     A.    Yes.  I am a Paul and Diane Guenther chair in

13   American history at Fordham University, and I am an

14   adjunct professor of law at Fordham Law School.

15     Q.    And you are here today because you were

16   retained as an expert by the defendant in this case?

17     A.    That's correct.

18     Q.    With respect to the Paul and Diane Guenther

19   chair in American history, is that a -- do you teach

20   in that role?

21     A.    So the Guenther chair is one of three endowed

22   professorships in the history department and one of

23   maybe -- I don't know -- half a dozen endowed

24   professorships in the humanities at Fordham, and it

25   comes with a reduced teaching load, some research

1    support, and the definition of the job position was

2    constitutional history.

3        Q.    Okay.  So help me understand your testimony.

4    Do you teach constitutional history right now?

5        A.    I do.

6        Q.    Okay.  And concurrently with that in your

7    role as holding this endowed chair, you conduct

8    research, correct?

9        A.    That is correct.

10       Q.    And the research you conduct is on

11   constitutional history?

12       A.    That is one of several areas that I would

13   work in.  I've also authored a popular American

14   history textbook for college-level American history

15   classes.

16       Q.    Understood.  Do you -- what level do you

17   typically teach, undergraduate?

18       A.    Yes.  I suppose you might say 13th grade

19   through 17th grade, so everything from freshman to

20   graduate students to law students.

21       Q.    Would teaching law students be part of your

22   role as the Guenther chair or more in terms of your

23   role as an adjunct law professor?

24       A.    Well, that's an interesting question because

25   the purpose of the Guenther chair was to hire in

1    constitutional history and Fordham Law School has a

2    well-respected tradition in the field of

3    constitutional history.  So I think it was implicit

4    when I was hired that I would build bridges to the

5    law school.

6        Q.    Understood.  Have you taught at any other

7    places during your employment at Fordham?

8        A.    During my employment at Fordham, let me just

9    think.  I've been a visiting research scholar, but

10   that did not have teaching duties.

11       Q.    What would those duties involve?

12       A.    So I was a senior research scholar at Yale

13   Law School, at the University of Connecticut Law

14   School, and I was a fellow at the Floersheimer Center

15   for Constitutional Democracy at Cardoza Law School.

16       Q.    When you say that you weren't a -- those

17   didn't involve teaching responsibilities, what did --

18   what does the position of the visiting research

19   scholar entail?

20       A.    So being a visiting research scholar is nice

21   work if you can get it.  It's involves no teaching,

22   but you have access to all of the intellectual

23   activities, which at a place like Yale or UConn are

24   quite lively.

25            And so you would go to seminars, you would

1    participate in brown bag lunches, conferences, and of

2    course you have access to the law library, which for

3    me was particularly important.

4        Q.    Do you receive -- did you receive any

5    compensation for positions as a visiting research

6    scholar?

7        A.    So those were all done while I was on

8    sabbatical, and one of the perks of the Guenther

9    chair is that it has a very generous sabbatical

10   policy.

11       Q.    Maybe I didn't phrase my question clearly

12   enough.  So, for instance, I believe you mentioned

13   earlier that you were a visiting research scholar at

14   Yale Law School.

15            Did you receive any compensation from Yale

16   Law School in that role?

17       A.    No.

18       Q.    And that would be largely true for every

19   other place you served as --

20       A.    Right.

21       Q.    Let's talk about your education.  You -- do

22   you have a PhD right now?

23       A.    I do.

24       Q.    Where did you receive your PhD from?

25       A.    My PhD is from the University of

1  Pennsylvania.

2      Q.    When did you receive that?

3      A.    1991.  Hold on.  Sorry.  1989.

4      Q.    I understand.  It was a long time ago.

5      A.    Yeah.

6      Q.    What was your PhD, for lack of a better term,

7  major in?

8      A.    So I was trained as an early American

9  political historian and I wrote my first book about

10  the anti-federalist who were the original opponents

11  of the Constitution and who are sometimes credited

12  with being the driving force behind the Bill of

13  Rights.

14      Q.    I'm a bit confused.  You wrote your first

15  book or were you -- did you mean your dissertation on

16  the anti-federalist?

17      A.    So typically, the typical career path of a

18  history professor would be you write a dissertation

19  which you might sort of view as the rough draft of a

20  book, and success in the field almost always requires

21  turning the dissertation into a published book, which

22  I did.

23      Q.    Congratulations.

24      A.    Well, thank you very much.

25      Q.    And what was the title of your dissertation

1    slash book?

2    A.    So the title of the dissertation was "The

3    Political Thought and Culture of the

4    Anti-Federalist."  And the book version, which was

5    published by the Institute of Early American History

6    and Culture, had to be a bit more snappy.  So that

7    was called *The Other Founders:  Anti-Federalism and*

8    *the Dissenting Tradition in America, 1788 to 1828.*

9    Q.    Prior to receiving a PhD from the University

10   of Penn, did you receive a master's degree?

11   A.    Yes.  Typically if you survive a PhD program,

12   they give you a master's along way to give you some

13   hope that the end is in sight.

14   Q.    Okay.  So it's your testimony you obtained

15   your master's degree from Penn as well?

16   A.    Yeah.  So sometimes you have to do exams.

17   Sometimes just doing -- writing a seminar paper.

18   Each university has a slightly different -- so at

19   Penn, it was a combination of passing your oral exams

20   and completing the required research seminars.

21   Q.    Understood.  You also received -- did you

22   also receive a bachelor's degree?

23   A.    Yes.  I got my BA from Amherst College and I

24   graduated magna cum laude.

25   Q.    Were all of these degrees in the area of

1  history?

2      A.    Yes.

3      Q.    Did you ever study internationally?

4      A.    So yes.  I spent a year at the University of

5  Sussex in England studying English and American

6  history.

7      Q.    Did you earn a degree from that --

8      A.    No.  I did actually find my wife, though.

9      Q.    Well, that seems like better than a degree.

10            But since you've obtained your PhD in 1989,

11  have you always -- withdrawn.

12            After you obtained your PhD in 1989, what was

13  your first employment?

14      A.    So my first job was at the College of William

15  & Mary and I had a post doc at the Institute of Early

16  American History and Culture, which is generally

17  regarded as kind of the premier post doc in my field.

18  It actually came with a book contract for my

19  dissertation and I spent two lovely years teaching at

20  William & Mary, which is a beautiful place to teach

21  and a great place to study early American history.

22      Q.    As a professor, were you expected to publish?

23      A.    Yes.

24      Q.    And when I say "publish," can you describe

25  for us what that expectation typically looked like?

1    A.    So typically to gain tenure, one would

2    typically publish a book, several articles and

3    present papers at suitably prestigious and selective

4    conferences.  So I published one book and about 30

5    articles by the time I had tenure.

6    Q.    And how long did it take you to achieve

7    tenure?

8    A.    So typically, tenure is a seven-year process

9    and I don't -- I was on track.  So I assume I would

10   have done it there my seventh year at Ohio State

11   where I -- was my next job after William & Mary.

12   Q.    What was the general theme of your research

13   at William & Mary?

14   A.    So at William & Mary, I focused primarily on

15   aspects of my work on the anti-federalist.  So I

16   published an article in the *Journal of American*

17   *History* which is the leading journal of American

18   history appropriately enough, published something in

19   the *William & Mary Quarterly* which is generally

20   considered to be the leading journal in early

21   American history, published in the *Law and History*

22   *Review* which is the leading journal in legal history,

23   the *Northwestern University Law Review* which at the

24   time was a little bit out of my normal publishing

25   venue because historians don't typically publish in

1   law reviews.  And they were all on various aspects of

2   Anti-Federalism.

3   Q.    Okay.  And when you say, "various aspects of

4   Anti-Federalism," can you give us an idea of what

5   aspects you wrote about?

6   A.    Happily.  So the *Journal of American History*

7   article was a study of how ordinary Americans who

8   opposed the Constitution, how they understood the

9   Constitution and why they opposed it, and it focused

10  on back country Pennsylvania where there's a good

11  deal of agitation around the Constitution.

12       The *Northwestern Law Review* article charted

13  the history of how Anti-Federalism was interpreted

14  from sort of the moment of ratification until the

15  Reagan years, because one of the interesting things

16  where there is a lot of writing about Anti-Federalism

17  during the Reagan years, they were sort of

18  rediscovered.  So I wrote about that.

19  Q.    So would it be a fair characterization of

20  your research during this time that you were

21  commenting generally on the -- for lack of a better

22  term, the political -- the general political culture

23  at the time?

24  A.    Yes.  I was focused on the political thought,

25  political culture, and I was also interested in some

1    constitutional ideas, but the main focus was on

2    political thought and political culture.

3        Q.    Right.  At that time, what constitutional

4    ideas were you interested in?

5        A.    Well, I was very interested in federalism

6    because the anti-federalist were very interested in

7    federalism.

8        Q.    So just to help me understand, you were --

9    were you interested in the general structure of the

10   Constitution or a specific provision?

11       A.    Well, I was interested in it all really.  I

12   was interested in both the sort of macro-level

13   analysis of how the Constitution fit into Anglo

14   American political and constitutional development.  I

15   was interested in the specific dynamics of why

16   particular parts of the Constitution took the form

17   they did, and I was interested in the early debates

18   over the meaning of the Constitution.

19       Q.    What inspired you as a person to become a

20   historian?

21       A.    Well, that's a great question.  Well, you

22   know, I will tell you a story.  So many people in New

23   York City get false IDs so they can go into bars, but

24   I actually got a false ID so I could go to the New

25   York Public Library and do college-level research for

1  AP history and I kind of got hooked on the history as

2  kind of a great intellectual puzzle.

3      Q.    And what inspired you to select the

4  Anti-Federalist's influence on the constitutional

5  adoption process as your research focus at this

6  point?

7      A.    Well, I think the anti-federalist were sort

8  of like the Brooklyn Dodgers of American political

9  history.  They are sort of the lovable losers who had

10 heart, but didn't quite make it to the pennant.

11     Q.    Understood.  So it appealed to you as an

12 underdog?

13     A.    Yes.  I mean, they were the underdogs, so

14 that appealed to me, yeah.

15     Q.    At some point did you become interested in

16 studying and writing about the Second Amendment?

17     A.    Yes, I did.  The reason I was drawn to the

18 Second Amendment had very little to do with modern

19 debates over guns.  It was almost entirely a function

20 of the fact that I noticed there was a resurgence of

21 interest in Anti-Federalism and a huge part of that

22 resurgence focused on the Second Amendment and I was

23 puzzled by it.

24     Q.    Let's break that down.  When did you first

25 notice that resurgence?

1    A.    So when I was teaching at William & Mary, I

2    lived around the corner from the Marshall-Wythe Law

3    School and I spent a lot of time in the law library

4    reading law review articles, and I noticed that there

5    was a remarkable amount of attention to the

6    anti-federalist in recent law review articles.  This

7    would have been in the '80s.  This would have been

8    also at the time that sort of the jurisprudence of

9    original intent emerged during the Reagan years.  And

10   low and behold, Anti-Federalist texts that I had

11   spent the last ten years studying were suddenly being

12   cited as being highly relevant in the Second

13   Amendment debate.

14   Q.    And so would it be fair to say that something

15   clicked for you and you said I can make another area

16   of research out of this?

17   A.    Well, I sort of backed into it.  I didn't

18   really think I was going to end up spending very much

19   time on it.  I just thought it would be sort of a

20   fun -- I was supposed to be writing a book about

21   Jefferson and Monticello and this was supposed to be

22   kind of a quick, side detour and 25 years later, I'm

23   still working on it.

24   Q.    At what point did you realize you had gotten

25   yourself lost down the rabbit hole of the Second

1    Amendment?

2        A.    Well, that's a good question.  I suppose I

3    was sent a manuscript to read by the University of

4    Virginia Press and I told them it had potential.  It

5    was on the Second Amendment, but it needed some more

6    work.  And I wrote a somewhat detailed report, which

7    is typical of academic publishing.  And the editor

8    said, "I don't want to publish their book, but I want

9    you to turn your reader's report into a book for me."

10   So I said, "Oh, that's interesting."

11       Q.    And when about did this occur?

12       A.    That was about 1999.

13       Q.    So if I'm understanding you correctly, the

14   first piece of literature that you published on the

15   Second Amendment was 1999 or thereabouts?

16       A.    Yes.  It was an article in the *Journal of*

17   *Constitutional Commentary*.

18       Q.    Okay.  And since then, you've published books

19   about the Second Amendment?

20       A.    Yes.  I have published one monograph and two

21   edited volumes on the Second Amendment.

22       Q.    Just for my purposes, because I might be too

23   young to understand what a monograph is, what is a

24   monograph?

25       A.    I'm sorry.  A monograph is the standard term

1    that academics use to describe a book that is

2    primarily driven by primary source research and makes

3    an original contribution to an academic debate as

4    opposed to a work of synthesis or a textbook or in

5    the case of law, a case book.

6        Q.    Okay.  So let's talk about the monograph for

7    a second then.  What was the subject of the

8    monograph?

9        A.    So it was a study of the changing meaning of

10   the Second Amendment in American constitutional law

11   between the 18th century and the New Deal.

12       Q.    To write that book, what sources did you

13   consult?

14       A.    Well, I had to -- I looked at what might be

15   called all the usual sources.  So I looked at

16   statutes, cases, treatises, but I also delved into

17   places that hadn't been looked at.

18             So I looked at, for instance, justice of the

19   peace manuals.  I looked at some sensational cases

20   that left unusually detailed trial records, but did

21   not generate appellate decisions, so they are not

22   typically available on Westlaw or Lexus.

23       Q.    At any point did your -- in your research,

24   did you look at legislative history?

25       A.    So what modern lawyers would call legislative

1    history generally doesn't exist for really old

2    statutes in most cases.  You don't have committees.

3    You don't have the kind of deep back sources.

4    Sometimes all you have is records of votes.

5        Q.    Let me take a step back, Professor.  With

6    respect -- let's switch gears for a second.  With

7    respect to the ratification of the United States

8    Constitution, am I correct in understanding that

9    there are no transcriptions of those debates?

10       A.    So, no.  In this case -- so the Constitution,

11   of course, is not a statute.  So -- and the

12   Constitution was ratified by what at the time was a

13   unique process, popularly elected ratification

14   conventions.  And those ratification conventions did

15   generate both newspaper coverage and in some cases

16   there were reporters hired, although interestingly,

17   the reporters hired tended to be Federalists who

18   curiously somehow managed to lose some of the

19   Anti-Federalist debates when they were editing.

20       Q.    Understood.  And the Bill of Rights was

21   ratified by Congress, correct?

22       A.    So, yes.  The Bill of Rights was a product of

23   post-ratification and we have detailed debates within

24   the House, but no records of the Senate's

25   deliberations.

1    Q.    Did you -- in writing the book we just talked

2    about, did you consult those debate -- the notes of

3    those debates?

4    A.    Yes, I did.

5    Q.    Okay.  Apart from the notes of those debates,

6    did you consult any literature, such as diaries

7    written by the congressional members who were

8    involved in those debates?

9    A.    To the extent that there were other sources

10   that shed light on it, yeah, sometimes letters.

11   There is actually a very, very famous diary by

12   William Maclay that is an important source for the

13   period, but there aren't a lot of diaries.

14   Q.    Understood.  How about contemporary

15   commentary, did you look at that?

16   A.    Sure.  I spent a lot of hours over microfilm

17   machines reading microfilm because those things were

18   not digitized and they were not searchable through

19   digital means.  You had to actually read everything.

20   Q.    Okay.  In 2002, you wrote a law review

21   article entitled, "Don't Know Much About History, the

22   Current Crisis in Second Amendment Scholarship."  Do

23   you recall that article?

24   A.    Yes.  I couldn't cite it to you verbatim, but

25   I do recall writing it.

1    Q.    Okay.  And do you recall opening that article

2  by characterizing the historical evidence regarding

3  the meaning of the Second Amendment's right to bear

4  arms as complex?

5    A.    That -- you'd have to show me the text for me

6  to give you a precise answer.  That sounds plausible,

7  but since I'm under oath, I'd want to actually take a

8  look.

9    Q.    That's fair.  That's fair.  I don't have that

10  article with me today, but let me ask it this way:

11  Based on your lifetime of research, your scholarship

12  on the Second Amendment, is it fair to say that the

13  historical evidence regarding the right to bear arms

14  guaranteed by the Second Amendment is complex?

15    A.    Yes.  I think that would be a fair statement.

16    Q.    As a scholar, were you at the time and are

17  you still aware of dominant approaches to

18  interpreting the Second Amendment?

19    A.    I guess I'm not sure what you mean by

20  "dominant."  Dominant in what sense?

21    Q.    Dominant in the sense that most people would

22  espouse one view or the other?

23    A.    Sorry.  Who are the people we're discussing?

24    Q.    Academics, for instance.

25    A.    Well, you'd have to be precise because are we

1    talking historians, political scientists, law
2    professors?
3        Q.    Let me take a step back.  Are you familiar
4    with the collective rights model interpretation of
5    the Second Amendment?
6        A.    Yes.
7        Q.    Are you familiar with the individual rights
8    model interpretation of the Second Amendment?
9        A.    Yes.
10        Q.    Would you characterize those as being popular
11    views of how to interpret the Second Amendment?
12        A.    Well, considering most of the data we have
13    about the average knowledge of the Constitution and
14    the Bill of Rights of the average American on the
15    street, I don't think "popular" would be the word I
16    would choose.
17        Q.    Let me take a step back.  Within academia,
18    would those be the two -- would those be popular
19    interpretations of the Second Amendment?
20        A.    So I would say among legal scholars, but
21    among historians, there was a considerable amount of
22    dissatisfaction with that simple dichotomy.
23        Q.    Do you share that dissatisfaction, Professor?
24        A.    Yes, I do.  I do believe that if you're going
25    to call something an individual right, it might be

1    useful to define what one means by that.  And of

2    course, that hasn't really happened in the Second

3    Amendment debate.  People just sort of assume

4    everyone knows what an individual right is, but I

5    think most historians would argue that our conception

6    of rights has evolved considerably since the 18th

7    century.  So we need to be historically precise when

8    you use terms like "individual right."

9         Q.    What could be done to make the definition of

10   "individual right" more precise in your opinion?

11             MR. SULLIVAN:  Object.  Outside the scope of

12   his opinions.

13             THE COURT:  Your claim, Mr. Atkinson?

14             MR. ATKINSON:  Pardon me?

15             THE COURT:  Your claim?  I have his

16   affidavit.  I don't recall that within that was his

17   preferred opinion on the right definition.  Tell me

18   what you're offering this for.

19             MR. ATKINSON:  Your Honor, I was simply

20   seeking to get clarification.  I'm not going to claim

21   it.  I'll move on.

22             THE COURT:  Okay.

23             MR. ATKINSON:  Thank you, Your Honor.

24             THE COURT:  Let me ask you this:  Are you

25   asking that as a demonstration of witness bias or

1    inclination or are we moving on?

2         MR. ATKINSON:  I'm moving on, Your Honor.  I

3    just wanted clarification for my own purposes.

4    BY MR. ATKINSON:

5    Q.   Professor, in addition to the -- in addition

6    to the scholar research that you have written and

7    published, have you published your views on the

8    Second Amendment in any other setting?

9    A.   So, yes.  I wear several hats.  I have

10   published popular journalistic venues.  I have

11   participated as a niche in front-of-the-court

12   filings.  I've been interviewed by, you know, the

13   media in various contexts from here and abroad.  I've

14   done podcasts.

15        Yes.  So I have opined in many forums, you

16   know, with many different hats as it were, as

17   scholar, as an individual, as a historian, citizen,

18   all kinds of things.

19   Q.   When you opine in a nonacademic setting, do

20   you write the same way or talk the same way that you

21   would in an academic paper?

22   A.   No.  I don't think I'd get anything published

23   if I did that.

24   Q.   How would -- withdrawn.

25        Can you give us an example of a journalistic

1  forum in which you've published which was not

2  academia?

3    A.    Sure.  I've published in the *Washington Post,*

4  *The New York Times, The New Republic, The Atlantic,*

5  *The Nation, Salon, Slate.*  Those are the ones that

6  come to mind most readily.

7    Q.    By publishing in those forums, do you

8  understand yourself to be engaging in a political

9  dialogue?

10    A.    So in those forums, I consider myself to be a

11  public intellectual and I see myself as trying to

12  bring the perspective of a student of early American

13  history to a wider audience.

14    Q.    Okay.  Professor, have you ever attended a

15  political protest?

16        MR. SULLIVAN:  Objection as to relevance.

17        MR. ATKINSON:  I believe I have the

18  ability --

19        THE COURT:  I'm going to permit the question.

20  You may go ahead.  I think that they have bearing on

21  the weight.

22  BY MR. ATKINSON:

23    Q.    Professor, have you ever attended a political

24  protest?

25    A.    Of -- well, my first act was to put up

1    McGovern for president stickers when I was 12.  So I
2    would certainly view that as a political act.
3        Q.   How about a protest as in people coming
4    together to voice their opinions?
5        A.   So I walked a picket line with my mom when I
6    was in high school.  That would certainly be
7    political.
8        Q.   How about in your adult life?
9        A.   In my adult life, that's a good question.  I
10   guess it sort of depends what you mean by political
11   protest.  I'm trying to think.
12       Q.   Let me help you.  Have you ever attended a
13   political protest in support of gun control?
14       A.   So I live one town over from Newtown and I
15   have -- I was asked by the Newtown Action Alliance to
16   speak -- I don't know if you call that -- what you
17   would call that.
18       Q.   All right.  Well, let's break that down.
19            When did you speak at that event?
20       A.   So that was about a year after the Sandy Hook
21   massacre.
22       Q.   Okay.  Was that event a memorial service?
23       A.   It was -- no.  It wasn't a memorial service,
24   but it was a discussion of, you know, what the
25   current state of the debate over gun policy was and

 1    what the historical traditions of gun regulation in

 2    America were.

 3        Q.    Have you ever donated money to an

 4    organization that advocates for gun control?

 5        A.    So I don't donate money to any political

 6    organization, although I'm sure my wife has.

 7        Q.    Well, your wife's an independent person.

 8        A.    Okay.  She would certainly agree with that

 9    characterization.

10        Q.    You have -- have you submitted -- going back

11    to something you said earlier.  Have you submitted

12    amicus briefs to the U.S. Supreme Court in Second

13    Amendment cases?

14        A.    Yes.  I participated in Heller, McDonald and

15    Bruen.

16        Q.    Okay.  Were you alone on those briefs?

17        A.    No.  All of those briefs were collective

18    efforts on the part of, I would say, an elite group

19    of historical -- legal historical scholars.

20        Q.    Were these all people that you knew -- know

21    fairly well professionally?

22        A.    Yes.

23        Q.    Okay.  Who's -- withdrawn.

24              Let's talk about Heller for a second.  When

25    you submitted -- this group of professors submits the

1    brief in Heller, whose idea was it to have that brief

2    submitted, if you recall?

3        A.    So the lead author on that brief was

4    Jack Rakove of Stanford, who is a Pulitzer

5    Prize-winning historian.  And my recollection is Jack

6    said, "I'm doing a brief.  Do you want to

7    participate?"

8        Q.    Okay.  When you say, "participate," what was

9    that nature of your participation in preparing that

10   brief?

11       A.    Well, that's an interesting question because

12   Jack has a policy where when he -- he'll only sign

13   briefs that he writes.  So he took the lead in

14   writing it and he sent it to all of us and said,

15   "Given your subfields of expertise, do you think the

16   argument, you know, is cogent?  How would you suggest

17   I alter it?  Are there sources I should be citing?"

18   So it was that kind of thing.

19       Q.    Okay.  Do you recall making any suggestions

20   about the content of that brief?

21       A.    Yes.  I remember saying that I think we

22   should have a section on the police power and Jack

23   said, "Nah, we don't need to do that, everyone knows

24   about the police power."

25       Q.    Did you win that discussion with Jack?

1    A.    I don't think I've ever won a discussion with

2    Jack.  He outranks me.

3    Q.    Understood.  What would you characterize as

4    the argument made by that brief?

5    A.    So that brief, of course, and I think it's a

6    general principle among amicus briefs, that in

7    contrast to something you might write for a magazine

8    or even a scholarly article, when you write as a

9    friend of the Court, you're operating within the

10   confines of what the existing legal doctrine is.  So

11   that was a brief that was written with Miller as the

12   controlling precedent.

13        So the substance of that argument was that

14   Miller was more right than it was wrong and the Court

15   ought to adhere to the Miller precedent.

16   Q.    Do you recall the brief arguing that private

17   aspects of the ownership of firearms never crossed

18   the threshold into being constitutionally significant

19   in the founding era?

20   A.    So my recollection is that -- let me think

21   about that for a moment.  So my recollection is there

22   was broad agreement among the signers that the right

23   of individual self-defense was well-established under

24   common law, but that the right instantiated in the

25   Second Amendment was primarily about the allocation

1   of power between the states and the federal

2   government.  And so those two different rights, which

3   we now see as one right in the 18th century, were

4   distinct.

5       Q.    When you say that it was more about the power

6   dynamic between the state and the federal

7   governments, are you referring to the right for

8   states to maintain a militia?

9       A.    So I suppose that's one way of characterizing

10  it.

11      Q.    How would you characterize it?

12      A.    So I would characterize the right is the

13  dominant understanding in the 18th century was that

14  it was a right of the people to keep and bear arms so

15  that it would be possible to maintain a

16  well-regulated militia and the panoply of other

17  rights, such as the right of self-defense, were part

18  of the background of that, but were not at the center

19  of the congressional debates over the structure of

20  the Second Amendment.

21      Q.    Understood.  Let's move to Bruen.  Did you

22  have any -- I believe you testified earlier that you

23  submitted an amicus brief in Bruen as well, correct?

24      A.    Yes.  So the Bruen amicus brief -- so if the

25  Heller amicus brief started with the assumption that

```
 1    Miller was the controlling precedent, the Bruen brief

 2    started with the assumption that Heller and McDonald

 3    were the controlling precedents.  So you know, the

 4    task before us was to marshal historical evidence to

 5    help guide the Court and to do so within the

 6    framework set out by Heller and McDonald.

 7        Q.    Okay.  And were you alone on that brief?

 8        A.    No.  I also participated with another group

 9    of impressive academics.

10        Q.    And were these all personal -- were all of

11    these academics professionally known to you?

12        A.    Yes.

13        Q.    Similar to what I asked you earlier, whose

14    idea was it to have the brief submitted?

15        A.    So in that case, my standing in the

16    profession had risen a bit.  So I actually initiated

17    that one and asked Jack if he would sign it.

18        Q.    Okay.  Did you take the Jack approach and

19    write the brief yourself?

20        A.    No.  I'm much more of a collaborative author.

21    So I asked people to take a pretty active role in

22    helping to draft it.

23        Q.    Who did you ask to take an active role in

24    drafting it?

25        A.    Everyone who signed it read multiple drafts.
```

1    Q.    Were those drafts prepared by attorneys?

2    A.    So the typical process in drafting an amicus

3    brief, which I think I've gotten better at, I usually

4    or a group of scholars will sort of draft a memo.

5    Then we usually seek outside counsel because it's

6    expensive to file amicus briefs and things like blue

7    booking can be quite, you know, arduous, as I'm sure

8    you know.

9          So typically we would do a memo.  Based on

10   the memo, they would then do a draft sort of both

11   formatting it in the correct form for the Supreme

12   Court and, you know, making advice -- offering advice

13   about, you know, phrasing and, you know, what needed

14   to be below the line in the footnotes, what needed to

15   be in the text, sort of those strategic kind of

16   things that lawyers are much better at than

17   historians.

18   Q.    Understood.  So somebody had to start this

19   project.  Were you the one who started the initial

20   memo?

21   A.    Yes.

22   Q.    And then if I'm understanding you correctly,

23   everybody else who signed the brief worked on

24   multiple drafts of it?

25   A.    Yes.

1    Q.    Okay.  Do you recall making the argument that

2  neither English nor American history supported a

3  broad right Second Amendment right to carry firearms

4  or other dangerous weapons in public based on a

5  generic interest in self-defense?

6    A.    So the argument of that brief was there was a

7  long history of limits on public carry under Anglo

8  American law.

9    Q.    Do you think the Supreme Court agreed with

10  you in its Bruen decision?

11        MR. SULLIVAN:  Just object to the extent it

12  calls for a legal conclusion just as phrased.

13        THE COURT:  Well, I assume you are referring

14  to the text of Bruen and whether or not that contains

15  a reflection of whether the premises of their amicus

16  was adopted, rejected or ignored.

17        MR. ATKINSON:  I'm simply asking him for his

18  perception of that, Your Honor.  I understand what

19  Bruen says is the province of the court to decide.

20  I'm simply asking him what his perception was of

21  Bruen.

22        THE COURT:  I'll permit that.  Go ahead.

23        MR. ATKINSON:  Thank you.

24  BY MR. ATKINSON:

25    Q.    So Professor, I'll ask it again for you, do

1    you think the Supreme Court agreed with you in its

2    Bruen decision?

3        A.    So I think there are aspects of the Court's

4    decision that are consistent with our brief and there

5    are aspects of it that are not.

6        Q.    All right.  Can you describe to us what

7    aspects you think are consistent with your brief?

8        A.    So our brief looked at the history and

9    tradition of firearms regulation and the framework

10   that the Bruen court decided to implement was a

11   history text tradition framework.  So

12   methodologically, there was substantial agreement.

13           MR. ATKINSON:  May I have a moment, Your

14   Honor?

15           THE COURT:  Yes.

16           MR. ATKINSON:  Thank you.

17   BY MR. ATKINSON:

18       Q.    What aspects of Bruen do you think the

19   Supreme Court didn't agree with you on?

20       A.    Sorry.  Did or didn't?

21       Q.    Didn't.

22       A.    Did not.

23       Q.    The negative, yes.

24       A.    The negative, thank you.  Well, I think that

25   in our brief, we produced evidence from the

```
 1    territories from Texas, from most of the major cities
 2    of restrictions similar in nature to New York's
 3    Sullivan law, and the Supreme Court decided that they
 4    were outliers.  So they didn't dispute our
 5    characterization of laws; they disputed how to weigh
 6    them.
 7        Q.    Are you familiar with a journalistic outlet
 8    known as SCOTUSblog?
 9        A.    Yes.  SCOTUSblog is the top of the heap in
10    terms of Supreme Court punditry.
11        Q.    Okay.  After Bruen, did SCOTUSblog, to your
12    knowledge, did they hold a symposium asking for
13    commentary on Bruen?
14        A.    Yes.  They asked me and several other people
15    to contribute.
16        Q.    Did you contribute?
17        A.    I did.
18        Q.    Okay.  Do you recall the name of the piece
19    you submitted to SCOTUSblog?
20        A.    Well, I don't think I've memorized it, but,
21    you know, I have a vague recollection of the title I
22    came up with.
23        Q.    If I showed you the article, do you think
24    you'd recognize it?
25        A.    Oh, of course.
```

```
 1            MR. ATKINSON:  Your Honor, may I approach the
 2   witness to show him what is marked as Plaintiff's
 3   Exhibit 14 for ID only?  And I'm going to show it to
 4   my colleagues first before I approach him.
 5   BY MR. ATKINSON:
 6       Q.    Do you recognize that, Professor?
 7       A.    Yes.  That is the genuine article.
 8       Q.    Okay.  What is the title of that article?
 9       A.    So the title is "Cherry-Picked History and
10   Ideology-Driven Outcomes:  Bruen's Originalists
11   Distortions."
12       Q.    Okay.  Would it be -- let me ask you this:
13   Were you disappointed in the Bruen decision,
14   Professor?
15       A.    No.  I don't think I was because I wasn't
16   surprised.  I think to be disappointed, you'd have to
17   be surprised.
18       Q.    Okay.  But you were -- were you critical of
19   the interpretive methodology that was applied?
20       A.    Yes.  So this particular piece, of course, is
21   by definition not written within the Bruen framework.
22   It was written in opposition to the Bruen framework.
23       Q.    And is it true that you characterized the
24   Bruen test as, quote, fiction, fantasy and mythology?
25       A.    That is correct.
```

```
 1            MR. ATKINSON:  May I approach the witness
 2   again, Your Honor?
 3            THE COURT:  You may.
 4            MR. ATKINSON:  I'm going to take that back.
 5   BY MR. ATKINSON:
 6     Q.    Professor, let's turn to your testimony or
 7   your opinion you supplied in this case.  Do you
 8   recall submitting an affidavit to the Court or --
 9   withdrawn.
10            Do you recall providing an affidavit at the
11   request of the defendant in this case?
12     A.    Yes.
13     Q.    And you understood you were being called to
14   provide an expert opinion?
15     A.    Yes.
16     Q.    And did you provide that expert opinion?
17     A.    I did.
18     Q.    Okay.  Prior to taking the stand to testify
19   today, did you review that affidavit?
20     A.    I did.
21     Q.    Okay.  Do you recall stating in your
22   affidavit, and I quote, "there were no modern style
23   parks in the era of the Second Amendment"?
24     A.    Yes.
25     Q.    By "the era of the Second Amendment," do you
```

```
 1    mean the time around the year 1791?
 2        A.    Yes.
 3        Q.    You did -- did you reference urban --
 4    withdrawn.
 5             Did you reference urban public spaces
 6    throughout your affidavit?
 7        A.    I discussed both urban, state-controlled and
 8    federal parks.
 9        Q.    Okay.  But you did reference urban public
10    spaces throughout your affidavit?
11        A.    I did.
12        Q.    All right.  And in particular, you
13    mentioned -- did you -- withdrawn.
14             In particular, did you mention the Boston
15    Common?
16        A.    Yes.  I did discuss the Boston Common.
17        Q.    Okay.  Did you describe the Boston Common as
18    the oldest public space in America?
19        A.    I did.
20        Q.    As you sit here today, what is your
21    recollection of the year the Boston Common was
22    established?
23        A.    I'd have to check my declaration.  I vaguely
24    recall it might have been 1638.
25             MR. ATKINSON:  I will -- if I may, Your
```

1    Honor, approach the witness again?

2         THE COURT:  You may.

3         MR. ATKINSON:  Thank you.

4         I am showing my colleagues and for the

5    Court's convenience, I am showing what's been marked

6    as Exhibit -- Plaintiff's Exhibit 4, which is also a

7    full exhibit without -- without objection on the

8    defendant's list, Your Honor.  I'm unaware of the

9    number off the top of my head.

10   BY MR. ATKINSON:

11     Q.    Professor, I've just placed what's been

12   marked as Plaintiff's Exhibit 4 for identification in

13   front of you.  Please take some time to review that.

14        THE COURT:  You're offering this as a full

15   exhibit?

16        MR. ATKINSON:  I was just using it for ID.  I

17   believe the defendants have it as a full exhibit on

18   their exhibit list, but I don't have that in front of

19   me right now.  I'll check.

20        THE COURT:  So is that --

21        MR. ATKINSON:  Your Honor, on the list that

22   we have, it's marked as Defendant's Exhibit -- full

23   exhibit.

24        THE COURT:  Is it 11?

25        MR. ATKINSON:  135.  For us, it's Plaintiff's

```
1    Exhibit 4 for ID.  We did not object to the state
2    offering or the defendant offering it as a full
3    exhibit.
4            MR. SULLIVAN:  Your Honor, if we can just
5    clarify the numbers.  I think there is some
6    confusion.
7            THE COURT:  So I have 135 as Professor
8    Cornell's declaration on the defendants, and then I
9    have --
10           MR. ATKINSON:  Your Honor, I apologize.  I
11   just -- I believe I gave Mr. Cornell the wrong
12   exhibit and I apologize.  May I approach him?
13           THE COURT:  Are you talking about Professor
14   Cornell's declaration?
15           MR. ATKINSON:  Yes.  That's what I attempted
16   to hand him.
17           THE COURT:  Shall we just use the designation
18   of 135?
19           MR. ATKINSON:  That's fine with me, Your
20   Honor.
21           THE COURT:  Let's do that and that's a full
22   exhibit without objection.
23           MR. SULLIVAN:  Yes, Your Honor.  No
24   objection.
25           MR. ATKINSON:  Correct.  Your Honor, I'm
```

```
 1   going to hand him my copy of that.  I accidentally
 2   handed him somebody else's declaration and I
 3   apologize.  I apologize, Professor.
 4            THE WITNESS:  It was interesting reading.
 5            Yes.  This looks more familiar.
 6   BY MR. ATKINSON:
 7       Q.   Okay.  Professor, I've just handed you what
 8   has been admitted as Defendant's Exhibit 135.  Do you
 9   recognize that?
10       A.   That's this thing?
11       Q.   Correct.
12       A.   That's my declaration.
13       Q.   We were discussing the Boston Common and the
14   year.  Would you look at page 16 of that exhibit,
15   paragraph 30, please?
16       A.   Sorry.  I was off by four years, 1634.
17       Q.   Just so the record is clear, the year 1634 is
18   when the Boston Common was established?
19       A.   Yes.
20       Q.   You also -- in your affidavit, you listed --
21   did you list what the common uses of the Boston
22   Common were?
23       A.   Yes.
24       Q.   Okay.  What were those common uses?
25       A.   So the Common was used as a pasture, a place
```

```
 1   of execution, site for militia musters and drills.
 2       Q.    Apart from what you listed in your affidavit
 3   or your declaration, are you aware of any other uses
 4   for the Boston Commons in that initial 1634 period?
 5       A.    I'm sure people strolled on the Boston
 6   Common.
 7       Q.    If we fast-forwarded to 1791, would you be
 8   aware of any other uses apart from the ones that you
 9   listed in your affidavit and the one that you just
10   gave to us?
11       A.    Well, I have not made a careful study of the
12   changing uses of the Boston Common.  So I would be
13   hesitant to offer an opinion under oath about what
14   activities were going on in it without further
15   research.
16       Q.    Understood.  Fair enough.  But you also just
17   testified that you're sure people strolled on the
18   Boston Common, correct?
19       A.    Well, I'm guessing they did.  I'm making an
20   educated guess.
21       Q.    Okay.  What would be the basis for making an
22   educated guess like that?
23       A.    Well, it's hard to pasture an animal without
24   you walking occasionally and checking on the animal.
25   I grew up in Brooklyn, so I'm not going to present
```

1  myself as an expert on farming or sheep grazing.

2      Q.    I was just about to go there, but thank you.

3      A.    I'm sorry.

4      Q.    No, I'm joking.

5            Would you characterize strolling as

6  recreational?

7      A.    That would be one context in which you would

8  stroll.

9      Q.    What would other contexts of strolling be?

10     A.    Well, I'm speculating here.  If my dog ran

11 away, I'd probably stroll after it.

12     Q.    Would you run after it?

13     A.    Are we talking me now or me in my blazing

14 youth?

15     Q.    I'm not going hold you to that.  Let's move

16 on.

17           You also stated that, quote, even when used

18 for militia purposes, these public spaces were

19 tightly regulated, correct?

20     A.    Yes.  You couldn't actually come to muster

21 with a loaded firearm or discharge it.

22     Q.    Do you know the purpose of that law?

23     A.    That is a public safety measure.

24     Q.    What basis do you rely on for your opinion

25 that it's a public safety measure?

1    A.    Well, having read the statute, I don't have

2    the statute in front of me, but the statute clearly

3    was -- the goal was to facilitate militia training,

4    but to do so in a safe manner, so ergo public safety.

5    Q.    And that was a law -- was that law passed by

6    the Massachusetts legislature to your understanding?

7    A.    Yes.

8    Q.    Okay.  Outside of that law from the period of

9    1634 to 1834, are you familiar with any other law

10   that prohibited the carrying of firearms on the

11   Boston Common?

12   A.    Well, there were general laws in the state of

13   Massachusetts that prohibited public carry.

14   Q.    Can you give us an example of those?

15   A.    Yes.  So in 1834, I believe, Massachusetts

16   thoroughly revised its criminal code as part of a

17   broader process called codification where common law

18   was transformed into statutory law and the

19   Massachusetts statute or series of statutes enacted

20   in 1834 prohibited carrying firearms in public.

21        I've also done some research on the

22   enforcement of that by the Boston Police and we have

23   a really quite remarkable case where two individuals

24   were prosecuted for carrying a gun in public.  So I

25   feel pretty confident that you could not do that in

 1   19th century pre-Civil War Boston.

 2      Q.   When you say carrying in public, do you mean

 3   in a -- withdrawn.

 4           When you say carrying in public -- withdrawn

 5   again.

 6           Are you familiar with the Statute of

 7   Northampton, Professor?

 8      A.   I am indeed.

 9      Q.   Okay.   The law, the 1834 law you just

10   described and the codification, did it bear any

11   similarities to the Statute of Northampton?

12      A.   So the Statute of Northampton, which was

13   enacted in 1328, was the foundation for several laws

14   enacted in the era of the Second Amendment, notably

15   Virginia and North Carolina.   The Massachusetts'

16   statute, which was enacted in 1794, three years --

17   the first version of the statute three years after

18   the Second Amendment departed in its language from

19   the Statute of Northampton.

20           I'd have to have the two in front of me to

21   give you the exact differences between the two, but

22   it was part of a process that we call the

23   Americanization of the common law where aspects of

24   English common law were adapted and we enacted either

25   by legislatures or by court decisions and

1    incorporated into the law of the individual states.

2      Q.    So understanding that you don't have the

3    statute in front of you, is your understanding as you

4    sit here today -- I'm not trying to pin you down on

5    this is an absolute.  I'm just asking about your

6    understanding today.  Is your understanding today

7    that it -- that Massachusetts law in 1834 was a

8    general prohibition on the carrying of firearms in

9    public?

10     A.    So it was a prohibition, but it had certain

11   exceptions for imminent threat.

12     Q.    We talked about five minutes ago about the

13   purpose of the law prohibiting men from coming to

14   militia muster with loaded firearms.  Are you

15   generally familiar with the type of firearms in use

16   around 1791?

17     A.    Although I wouldn't claim to be a firearms

18   expert, I do have some knowledge of the relevant

19   types of firearms that were common in the 18th and

20   19th century.

21     Q.    Okay.  Do you have any knowledge of what a

22   militiaman would typically be expected to carry?

23     A.    Yes.  The standard weapon of a militiaman

24   would have been a Brown Bess musket which would have

25   had to have been capable of taking a bayonet.  It

1    would have also included a ramrod lading for the

2    bullets, a cartridge box, gun powder and a powder

3    horn.

4        Q.    Are you familiar with how that Brown Bess

5    musket was loaded?

6        A.    Yes.  It was a rather cumbersome process.

7        Q.    Okay.  Can you describe your understanding of

8    that process to us?

9            MR. SULLIVAN:  I would just object as to

10   relevance and also he had earlier testified that he's

11   not a firearms expert.

12           MR. ATKINSON:  Your Honor --

13           THE COURT:  Well, so he did say that.  He

14   itemized what he would assume was the standard

15   carrying -- standard equipment carried by a militia

16   person.  What is your question and its purpose of

17   cumbersomeness?

18           MR. ATKINSON:  Your Honor, we were -- the

19   line of questioning that I was pursuing was as to the

20   purpose of the law prohibiting a man from coming to

21   militia muster with a loaded firearm.  He did testify

22   earlier that it also went to the safety of how

23   militia drilled, if I recollect correctly.

24           What I'm getting at in terms of the -- him,

25   one, saying that it was cumbersome to load implies he

1    has some knowledge of the process of how it was

2    loaded, and what I'm trying to do is get at how

3    militia drilled in that time and whether there was

4    another purpose for the law prohibiting someone to

5    come to militia apart from -- with a loaded firearm

6    apart from a public safety.

7            THE COURT:  Why don't we focus the question

8    on that.  Okay?

9            MR. ATKINSON:  Okay.

10   BY MR. ATKINSON:

11   Q.    Professor, you -- you're familiar that

12   militias typically drilled in the founding era,

13   correct?

14   A.    Yes.

15   Q.    Given the cumbersomeness of loading a

16   founding era Brown Bess musket, was it important for

17   militias at the time to drill loading their muskets?

18   A.    It was.  And also we know from newspaper

19   reports that people do get shot on muster days.  So

20   the state having laws that said you can't travel to

21   muster or you can't discharge your firearm until

22   ordered by an officer would have been consistent with

23   public safety.

24   Q.    Okay.  What is your understanding on why

25   militias drilled regularly by practicing loading

1    firearms?

2        A.    Well, unlike modern firearms, it takes quite

3    a bit of skill to learn how to load and fire black

4    powder, you know, muzzle-loading weapon.

5        Q.    Okay.  Given the time that it took to -- and

6    the skill that it took to load a black powder musket

7    as you describe, would you agree with me that a unit,

8    a militia unit that could load relatively quickly had

9    an advantage in combat?

10            MR. SULLIVAN:  I just object again to

11   relevance.  We're getting outside the scope of the

12   declaration.

13            THE COURT:  It is outside the scope of the

14   declaration.  So tell me what your purpose is.

15            MR. ATKINSON:  What I am attempting to do is

16   to establish the importance of the militia drilling,

17   and in this context, the reason why they were being

18   required to come to muster without muskets -- without

19   loaded muskets would defeat some of the purpose of

20   drilling.

21            THE COURT:  That's not what your question

22   sounded like to me.  Do you want to rephrase?

23            MR. ATKINSON:  I will attempt to do so and if

24   I can't, Your Honor, I'll move on.

25   BY MR. ATKINSON:

1    Q.    Professor, are you aware of any way to unload

2    a black powder musket in the founding era?

3    A.    Well, discharging it would be the most direct

4    way of doing that.

5    Q.    Are there any other ways that you're aware

6    of?

7    A.    Well, again, we're sort of stretching my

8    expertise, but there are these auger things where you

9    can actually remove a musket ball if you had to.

10   It's somewhat dangerous and cumbersome, but if it had

11   to be done, you could do it.

12   Q.    And by saying "cumbersome," do you mean that

13   it would take time?

14   A.    Yes.

15   Q.    I am ready to move on.

16          I want to go back to your characterization of

17   the Boston Common as an urban space.  Was it

18   prototypical in the founding era for large cities to

19   have space similar to the Boston Common?

20   A.    So it really depended on what region of

21   American you were in.  If you were in the back

22   country, you wouldn't have had need for anything like

23   the Boston Common.  In the South, you don't have

24   nucleated villages, so you wouldn't have had commons.

25   So the idea of a common is a distinctively

1    New England form of land use.

2        Q.    Okay.  By the term "urban space," the term

3    that you used, "urban space," did you also mean to

4    encompass what we would refer to now as a town green?

5        A.    Yes.  That -- but the town green is something

6    you associate with nucleated villages in New England.

7    You don't have town greens in Virginia or South

8    Carolina.

9        Q.    Okay.  The founding era, based on your

10   research, et cetera, would smaller communities have

11   public spaces -- smaller New England towns actually,

12   would they have public spaces similar to the Boston

13   Common but smaller in size?

14       A.    In New England where you had nucleated

15   villages, yes.

16       Q.    And the purposes for those public spaces

17   were -- would they be largely similar to the purposes

18   that you've outlined for the Boston Common?

19       A.    Yes.

20       Q.    In your affidavit, you -- withdrawn.

21             In terms of common public spaces, are you

22   familiar with founding era taverns?

23       A.    Yes.  I lived in Colonial Williamsburg and

24   spent a good deal of time in several of those.

25       Q.    Would you agree with me that those taverns

1   existed in the colonial and the founding era?

2      A.    Yes.  Certainly taverns are a venerable part

3   of the American tradition.

4      Q.    Would you also agree with me that they were

5   places of recreation in the founding era?

6      A.    Well, of course they were, but taverns were

7   privately owned.

8      Q.    Are you aware of any government laws that

9   prohibited the carrying of firearms in taverns during

10  the founding era?

11     A.    Typically you don't get government

12  regulations of how people can use their private

13  spaces.

14     Q.    In the founding era --

15     A.    No.  As a general rule under Anglo American

16  law, private property is pretty esteemed value, and

17  typically people have considerable autonomy over

18  their lands and property.  So you do, for instance,

19  in Boston have a -- have a law that says you can't

20  have a loaded firearm in your -- any domestic

21  dwelling in the city.

22     Q.    What era was that law?

23     A.    1786.

24     Q.    Okay.  Let's move on.

25            You also stated in your affidavit that the

```
 1   creation of modern parks as we know them today began
 2   in the middle of the 19th century, correct?
 3       A.    Correct.
 4       Q.    If I recall correctly, you also stated that
 5   Henry David Thoreau was a primary influence in that
 6   creation, correct?
 7       A.    So what we call modern parks were certainly
 8   influenced by both romanticism and transcendentalist,
 9   and Thoreau is certainly one of the leading
10   transcendentalists luminaries.
11       Q.    And in pursuant of various romanticized and
12   transcendentalist ideals, you also stated that urban
13   planners, architects and government officials began
14   to look towards creating state parks, right?
15       A.    That's right.  We have -- the earliest parks
16   are municipal, but then state and federal parks
17   follow somewhat later.
18       Q.    Okay.  I understand.  I misspoke there and
19   thank you for clearing me up.
20             What was the first American municipal park,
21   to your knowledge?
22       A.    New York Central Park, 1858.
23       Q.    Okay.  To your knowledge, was Central Park
24   open for business before the Civil War?
25       A.    So I would have to confirm that.  I don't
```

1    recall whether 1858 is when they broke ground or when

2    it was opened to the public.  So I'd have to confirm

3    that before I could swear to it.

4        Q.    That's fair.  That's fair.  And from the --

5    in your understanding, from the start, Central Park

6    had a prohibition on carrying firearms in it?

7        A.    Yes.  Virtually all of the major parks in

8    America from their inception had such prohibitions.

9        Q.    Let's just focus on Central Park for now.

10       A.    Okay.

11       Q.    Who created the Central Park rule?

12       A.    So, well, the -- the person who designed

13   Central Park is Frederick Law Olmsted.  New York City

14   created Central Park.

15       Q.    And they also created the law that prohibited

16   carrying firearms in it, correct?

17       A.    Correct.

18       Q.    And when about did they create that law?

19       A.    It was part of the earliest regulations of

20   the use of the park.

21       Q.    Do you have a recollection as you sit here

22   today when those earliest regulations were

23   promulgated?

24       A.    1858.

25       Q.    After New York creates Central Park, is it

1  your understanding that other major cities followed

2  suit fairly quickly thereafter?

3     A.    Yes.  Within about a decade, you had a number

4  of other parks created.

5     Q.    Okay.  Do you recall, as you sit here today,

6  which cities created other parks?

7     A.    So in my declaration I have a table that

8  lists the earliest -- well, sorry.  The creation of

9  parks in the nation's five largest cities and whether

10  or not they had gun prohibitions.  And in the

11  footnote, I list a number of other early parks also

12  from the sort of era of reconstruction.

13     Q.    Let's focus on the table for a second.

14     A.    Yes.

15     Q.    The first city that you list is Chicago after

16  New York, actually.  And when did Chicago create a

17  public park, if you recall?

18     A.    1873.

19     Q.    At the time they created a public park, was

20  the first time they promulgated a regulation that

21  functionally said thou shall not carry a firearm in a

22  public park?

23          MR. SULLIVAN:  I would just object to the

24  characterization to the extent that's --

25          MR. ATKINSON:  I'll rephrase, Your Honor.

1          THE COURT:  All right.  The affidavit talks

2     about gun prohibition in parks.  When did Chicago

3     have a gun prohibition in its park, started in 1873.

4          MR. ATKINSON:  Correct.

5     BY MR. ATKINSON:

6     Q.    To the best of your knowledge, Professor,

7     Chicago's first gun prohibition in a park was 1873?

8     A.    I believe so, yes.

9     Q.    Philadelphia is the third one you list there.

10    When did it create its first public park?

11    A.    I would have to -- I don't know if I actually

12    listed that in my report.  So I'd have to confirm

13    that.

14    Q.    Okay.  But you do have on the table that they

15    imposed a prohibition on carrying a firearm in a

16    public park in 1868, correct?

17    A.    Yes.  The table focuses on post-Civil War

18    reconstruction era given Bruen's emphasis on that as

19    an important date in understanding the scope of the

20    legitimate regulation.

21    Q.    Perhaps we can simplify this.  Apart from New

22    York's Central Park prior to the Civil War, are you

23    aware of any other public parks being created prior

24    to the Civil War?

25    A.    You know, I -- I could not tell you without

doing some further research.  I didn't focus on the
founding date of all the parks.

Q.    Okay.  That's fair enough.  I'll move on.

      To this point, we've been talking about
municipalities and their regulations.  Based on your
research, when was the -- when -- which statement --
withdrawn.

      Based on your research, do you recollect, as
you sit here today, which state government was the
first one to impose a similar prohibition on carrying
firearms in public parks?

A.    So Olmsted took a leading role in
establishing the first state park in California, but
California had problems funding the maintenance.  So
the park was turned over to federal control and under
federal control, a similar prohibition was enacted.

Q.    So I understand what you're testifying there.
What I'm asking you is very specific.

      What -- as you sit here today, do you have a
recollection of which state was the first one to
follow through with imposing a similar prohibition?

A.    So I did not examine that question in detail
because state parks were not common in this period.

Q.    Okay.  To your knowledge, when did they
become common?

1    A.    State parks are more of an early 20th century

2    phenomenon.

3    Q.    When you say, "early 20th century

4    phenomenon," can you be more precise in term of years

5    or decades?

6    A.    Well, again, without doing some additional

7    research, it's more of a progressive era, Teddy

8    Roosevelt era development than it is a reconstruction

9    era development.

10   Q.    Fair enough.  Let's go back to the laws that

11   were enacted around the time of the Civil War and

12   thereafter.

13         Are you aware, based on your research of

14   those laws, of any legal challenges to them that

15   relied on the Second Amendment as a basis for

16   challenging them?

17   A.    I'm sorry.  Legal challenges to --

18   Q.    I'll rephrase the question for you.

19         For laws that -- prohibitions on carrying

20   firearms in state parks before the Civil War and

21   thereafter, are you aware of any legal challenges to

22   those laws that relied on the Second Amendment to

23   state the legal challenge?

24   A.    Well, the Second Amendment would not have

25   applied to the states in pre-Civil War America

1    because of the Supreme Court's ruling in *Barron v.*
2    *Baltimore*.   So there would have been no foundation
3    under American law to make a Second Amendment claim
4    against a state regulation.

5        Q.    How about after the Fourteenth Amendment was
6    adopted?

7        A.    Well, of course, it takes a while for
8    incorporation doctrine to work itself out, but I'm
9    not aware of any challenges to parks in the era of
10   the Fourteenth Amendment.

11       Q.    Okay.   In the pre-Civil War era, are you
12   aware of any legal challenges to prohibition such as
13   the Central Park prohibition that relied on a state
14   constitutional provision that was similar to the
15   Second Amendment?

16       A.    Not as it pertains to parks, no.

17       Q.    Okay.   How about after the Civil War, are you
18   aware of any such challenges?

19       A.    Not from the era of the Fourteenth Amendment.

20       Q.    How about the early 1900s, are you aware of
21   any challenges in that era?

22       A.    Well, I did not look at that period because
23   Bruen gives less attention to that.

24            MR. ATKINSON:   Your Honor, may I have a
25   moment to confer with Mr. Nastri, please?

1          THE COURT:  Yes.

2          MR. ATKINSON:  Thank you, Your Honor.

3    BY MR. ATKINSON:

4    Q.    I have one more line of questioning,

5    Professor.  Going back to what we discussed earlier

6    regarding the Boston Common law about the discharge

7    of -- or regarding coming to muster with a loaded

8    firearm, are you aware of -- withdrawn.

9          To the best of your knowledge, do you know

10   when -- if the militia was drilling on the Boston

11   Common, for instance, they would discharge their

12   firearms in the course of drilling?

13   A.    I must confess that I don't recall.  I do

14   know, obviously, in many militia musters there would

15   be discharge of firearms when ordered to do so.  But

16   I don't remember specifically looking at what the

17   practice was of the muster militia in the city of

18   Boston.

19   Q.    Understood.

20         MR. ATKINSON:  No further questions, Your

21   Honor.

22         THE COURT:  All right.  Do you want to begin

23   cross-examination?  Do you want to take an early and

24   brief lunch break?  What's your pleasure?

25         MR. ATKINSON:  I'll defer to my colleagues,

1   Your Honor.

2          MR. SULLIVAN:  Your Honor, we'd be open to a

3   break, a short lunch break.

4          THE COURT:  Let's take a short break in which

5   it will be assumed that you have something to eat and

6   we will be back -- is half an hour enough?

7          MR. SULLIVAN:  Half an hour, thank you.

8          THE COURT:  Half an hour.  Thank you very

9   much.

10          I'll ask our witness, Professor Cornell,

11   please don't discuss your testimony with anyone until

12   you are back on the stand.  Thank you very much.

13          We stand in recess.

14          (Recess taken.)

15          (Call to Order, 12:36 p.m.)

16          THE COURT:  Please be seated, counsel.

17          Mr. Nastri, would you mind checking and

18   seeing if Mr. Atkinson --

19          MR. ATKINSON:  I apologize, Your Honor, if I

20   kept everybody waiting.

21          THE COURT:  Not very long.  All right.  We

22   need Professor Cornell.

23          MR. SULLIVAN:  We can check the hallway for

24   him, Your Honor.

25          MR. BOCHAIN:  Your Honor, can I just have one

1    moment with Attorney Atkinson?

2         THE COURT:  Yes.

3         Okay.  Professor Cornell, if you would kindly

4    return to the stand and recall that you are under

5    oath.

6         MR. ATKINSON:  Your Honor, as a brief

7    housekeeping matter, can I get Exhibit 14 back from

8    Professor Cornell, please?

9         THE COURT:  Have you stolen Exhibit 14?

10        MR. ATKINSON:  I instructed him to leave it

11   there.

12        THE COURT:  All right.  We're all set?

13        MR. ATKINSON:  Yes, Your Honor.

14        MR. BOCHAIN:  Actually, Your Honor, if we

15   could just have one other quick housekeeping matter,

16   I know earlier this morning there was a brief

17   discussion about exhibits, and perhaps there was a

18   misunderstanding on my end and I just want to clarify

19   the record if I may.

20        So Exhibits 100 through 143, the ones that I

21   had referenced this morning, we are offering them

22   today in connection with the preliminary injunction

23   hearing for your consideration.  And so Exhibits 1

24   through 132 we had submitted in connection with the

25   preliminary injunction opposition that we had filed,

1   and we had discussion with counsel and I believe with

2   Your Honor regarding these exhibits.

3        So I guess I'm looking for a little bit of

4   clarity from Your Honor how you would like to proceed

5   with this, because it's my understanding that there's

6   no objection for Exhibits 1 through 143 coming into

7   evidence, and we would be offering those for

8   consideration for Your Honor in connection with the

9   preliminary injunction hearing.

10       So I guess I'm just looking for a little bit

11  of clarity from Your Honor how you would like us to

12  go forward with that and the declarations, but those

13  are part of the exhibits that I just referenced, Your

14  Honor.

15       THE COURT:  We can do it this way:  Why don't

16  we proceed assuming that 1 through 143 will be a part

17  of the record without objection.  At the end of the

18  hearing, you will call out the exhibits you did not

19  use or do not need.

20       MR. BOCHAIN:  I believe -- we can proceed

21  like that, Your Honor, but I'm -- I just am telling

22  the Court that we do intend to rely on all of those.

23       THE COURT:  Okay.

24       MR. BOCHAIN:  And so would you like me to

25  still proceed in that fashion or can we say that it's

1    admitted today at this time?

2         THE COURT:  We can say that 1 through 143 are

3    admitted without objection and will that clarify our

4    proceeding?

5         MR. ATKINSON:  Yes, Your Honor.

6         THE COURT:  All right.  Let's proceed.

7         I'm sorry.  Are you finished, Mr. Atkinson,

8    with your examination?

9         MR. ATKINSON:  Yes, Your Honor.  If the

10   record didn't reflect that, I apologize.

11        THE COURT:  Cross-examination.

12      CROSS-EXAMINATION OF PROFESSOR SAUL CORNELL

13   BY MR. SULLIVAN:

14   Q.    Good afternoon, Professor Cornell.

15   A.    Good afternoon.

16   Q.    How was your lunch?

17   A.    I love New Haven, good coffee, good eats.

18   It's awesome.

19        THE COURT:  You can come back any time.

20        MR. SULLIVAN:  We'll try to get done with you

21   today at least.  So just as we were -- actually, Your

22   Honor, if I may have some leeway to go outside the

23   scope of plaintiff's examination.

24        THE COURT:  That's fine.  He's being offered

25   by both sides, perhaps not for completely congruent

```
 1    reasons.  So yes is the answer.
 2          MR. SULLIVAN:  Thank you, Your Honor.
 3          Furthermore, although he's been separately
 4    recognized by myself and plaintiff's counsel as an
 5    expert in his field, I would like to, in light of his
 6    testimony directed to plaintiff's counsel on
 7    examination, I would like to tender him as an expert
 8    witness under Rule 702 as a legal and constitutional
 9    historian.
10          THE COURT:  He certainly seems to be that
11    expert.  I will certainly certify him as an expert
12    under -- for constitutional history; is that the
13    offer.
14          MR. SULLIVAN:  That's the offer, Your Honor.
15          THE COURT:  Thank you.
16    BY MR. SULLIVAN:
17      Q.   Now, Professor Cornell, as we begin, I'd like
18    to just take a moment and clarify, you're not a
19    lawyer, are you?
20      A.   I am not a lawyer, no.
21      Q.   You never attended law school?
22      A.   No, I did not.
23      Q.   But you are a constitutional legal historian,
24    correct?
25      A.   Yes, I am.
```

1    Q.    So as we are here today in a courtroom, what

2    do you understand your role to be as a witness

3    offering opinions as a constitutional and legal

4    historian?

5    A.    Sure.  My role as an expert witness is to

6    give the state my expert opinion about the relevant

7    history of gun regulation and the relevant context to

8    understand those regulations consistent with Bruen's

9    history, text and tradition framework.

10   Q.    And on plaintiff's examination, you were

11   asked about your work in other fields, which I

12   believe you had -- in your response, you

13   characterized as, you know, work as a public

14   intellectual, work as an academic, and then work more

15   directed to legal work; is that correct?

16   A.    Yes.  And I often tell my students that for

17   any given constitutional question or constitutional

18   text, you can ask what a particular text meant at a

19   particular moment in American history, you can ask

20   what does it mean in American culture today, and then

21   you can ask what does it mean as a matter of law, and

22   then, of course, the latter one is shaped by the

23   decisions of the Supreme Court.

24   Q.    All right.  And when you were writing in more

25   popular media, for instance, the SCOTUSblog venue,

1   what did -- in what capacity were you writing for

2   that article?

3       A.    So there I was acting as a public

4   intellectual unconstrained by the decisions of the

5   Court, offering my own views as a historically

6   informed private citizen.

7       Q.    And do you understand there to be constraints

8   on your testimony today?

9       A.    Oh, absolutely.  There are arguments that are

10  simply taken off the table by Heller, McDonald and

11  Bruen.  I'm quite aware of that.

12      Q.    All right.  Now, just before we get to the

13  specifics of your opinion in this matter, I'd like to

14  step back and get a sense of your general practices

15  as an academic historian.

16      A.    Sure.

17      Q.    Now, are there standards that govern the

18  practice of historians in your field?

19      A.    Yes.  There are best practices, well-accepted

20  methodological precepts, rules about evidence, rules

21  about argumentation, rules about style, and perhaps

22  the best place to see those would be in the recent

23  three-volume Cambridge History of Law in America

24  which I think is recognized as kind of the standard

25  history of American law, and I wrote the chapter in

1    that on the Bill of Rights and the Marshall Court

2    era.  I'm sorry, cowrote it.

3        Q.    All right.  And how are those academic

4    standards enforced in your field?

5        A.    So those academic standards require you to

6    not cherry-pick evidence, but to actually immerse

7    yourself in the full range of sources that one can

8    identify as relevant to any particular historical or

9    constitutional topic.

10            So when I do my research, I try to cast as

11   wide a net as possible both in terms of primary

12   sources, but also in terms of secondary sources so

13   that, for instance, I would look at the history of

14   material culture to understand something about

15   firearms, military history, social history, all of

16   these fields which don't speak directly to the Second

17   Amendment, but I think are important to understand

18   what Americans thought they were doing when they

19   passed various pieces of legislature or why various

20   pieces of legislation might not have been on their

21   minds.

22       Q.    And when you are reviewing the history and

23   those sources, do you do so with any preconceived

24   notions about, as you identify those sources, which

25   ones may be relevant and which ones may be

```
 1    irrelevant?

 2       A.    Well, no.  In fact, the most remarkable thing

 3    about this whole process of being an expert witness

 4    is there's really no reason given my scholarly focus

 5    to have looked at the history of gun regulations in

 6    parks, it wouldn't have come up, but obviously the

 7    facts of this case meant that that was relevant.  So

 8    I had to dig into the history of parks, the history

 9    of the regulation of parks, and the history of

10    firearms regulation in parks.

11       Q.    All right.  As you're identifying those

12    sources, how do you as a historian weigh them in

13    arriving at a conclusion about their impact on

14    constitutional history?

15       A.    Sure.  Well, the -- one of the most important

16    things you do as a historian is you try and

17    understand why a particular text was written, who

18    authored it, what the intended audience for the text

19    was, how different groups in society might have read

20    that text, and particularly important, the limits of

21    the archive.

22          Not every -- not every situation gets

23    recorded.  Not every piece of evidence gets saved.

24    And it's sort of maddening as a historian, but you

25    are stuck with what people decided to save.  And not
```

1    surprisingly, we know an awful lot of about what

2    Thomas Jefferson did almost every moment of his day.

3    We know a lot less about what was going on, you know,

4    if you were, you know, a young woman living in rural

5    New England, although we know a lot about that, much

6    more than we used to know about that, but still the

7    papers of Jefferson fill many, many, many shelves in

8    the library.

9       Q.   So does the absence of a primary source or

10   contemporary source regarding -- that may touch on a

11   given topic prevent you from performing an analysis

12   of the scope of constitutional history surrounding

13   that topic?

14      A.   Well, it depends on the particular topic and

15   how much other material is available.  The one thing

16   you have to be very careful about is not interpreting

17   silence beyond what the silence will suggest.  Like

18   for instance, at any given moment, legislatures will

19   not enact laws if there is no pressing social need

20   for a law.

21          So the fact that you don't legislate in any

22   particular moment may tell us something or it may

23   tell us nothing about what is the state of the law at

24   a particular moment in American history.  So that is

25   among the most complicated judgments I think you have

1    to make as a historian.

2    Q.    You mentioned earlier that there are laws

3    about constitutional provisions for which a

4    legislature history does not exist; is that correct?

5    A.    I'm sorry.  Can you just say that again?

6    Q.    I believe you testified earlier that there

7    are legislative histories that do not exist for

8    particular laws and constitutional provisions; is

9    that correct?

10   A.    Yes.  I think, you know, the closer you get

11   to the modern period, the biggest problem historians

12   have is figuring out what not to read, and the bigger

13   problem you have when you go further back in time is

14   trying to find something to read.

15   Q.    So in light of the absence, there may be

16   certain legislative histories that were not available

17   or were not available to you as you conduct your

18   research, does that prevent you from understanding --

19   historical understanding -- the common historical

20   understanding of a given constitutional provision?

21   A.    So fortunately, in the context of this case,

22   I didn't know what I would find when I set out, but I

23   was really surprised in some sense and really quite

24   pleased that there was such detailed historical

25   documentation of what the regulations were in these

1    early parks.

2         We have a very detailed set of historical

3    documents about the regulations of early parks.  And

4    if you had asked me without having looked at the

5    sources did I think I would find anything, I would

6    have said I really don't know, we could find a

7    treasure trove or we could find a real dearth of

8    sources.  So we actually found quite a lot, which I

9    was quite happy about.

10   Q.    All right.  So in light of the work you did

11   in this case and developing your opinions that you're

12   being -- that are being offered today, can you please

13   describe your methodology that you engaged in when

14   you were conducting your academic analysis given the

15   Supreme Court's holding in Bruen?

16   A.    Sure.  Well, Bruen makes it quite clear that

17   history texts and tradition are the proper framework

18   for evaluating the history of the -- evaluating the

19   constitutionality of contemporary gun laws.

20        And so the role of the historian in this is

21   to help courts find what is the documentary record,

22   give some sense of why certain things are well

23   represented in documentary record, and why certain

24   things might be underrepresented, and how to weight

25   and contextualize those sources so that you're

1    reading them with some understanding of the very

2    different world that our Americans of an earlier

3    generation lived in.

4        Q.    And did you engage in that analysis despite

5    disagreeing with portions of the Bruen decision?

6        A.    Yes.  You know, it's interesting because the

7    final paper for my students this term is to actually

8    adjudicate a live case in the aftermath of Bruen.

9    And I told them quite expressly that obviously you

10   have to follow Bruen's framework, but you may find

11   that the outcome is one that you don't personally

12   agree with and interestingly, you may also find that

13   you can make the best argument for something that you

14   don't necessarily agree with.

15           So what your personal views are and what

16   arguments the sources and doctrine will allow you to

17   make don't always line up perfectly.  And I tell them

18   if you want to be a lawyer, you better get used to

19   that.

20       Q.    And is that true if you want to be a

21   historian as well?

22       A.    Well, yeah.  I mean, if you want to be a

23   historian, you have to get used to that too, but I

24   don't think historians typically feel as invested

25   necessarily.  I mean, for me it's a big intellectual

1   puzzle.  I work on this topic not so much because of

2   any political -- as I suggested in my earlier

3   testimony, any political commitments, although like

4   any American, I have my views on public policy.  I do

5   it because I just love doing history.  I suppose

6   lawyers love doing law.  So maybe we're not that

7   different.

8      Q.    So can you give me a sense of the types of

9   primary sources that you looked at in arriving at

10  your opinions in this case?

11     A.    Sure.  So really the sources that turned out

12  to be most relevant were the regulations of early

13  parks.  And of course in order to understand why

14  those sources come into the historical record in the

15  middle of the 19th century, I had to figure out

16  something about the history of parks.

17          And it's very clear that at the time of the

18  Second Amendment, you don't have these modern-style

19  parks which are really created because America is

20  losing the kind of wilderness that the first

21  generations of Americans encountered.  I mean, you

22  don't really have a need for a park if you're living

23  in a forest or if you're living in -- you know, in a

24  situation where there are very few urban areas.

25          So as is often the case, you have to sort

1    of -- you know, you do some research, something

2    becomes clear to you, then you have to ask the

3    question, well, now I need to know something about

4    the history of parks to understand why all these

5    sources date to this period and not to an earlier

6    period.

7        Q.    So when you're engaging in this analysis

8    regarding the Second Amendment and the framework set

9    forth by the Bruen Court, would you be doing that

10   without any reference to any other constitutional

11   doctrine?

12       A.    Well, no.  Because, of course, all the

13   Constitution matters and one of the -- one of the

14   bodies of law that's highly relevant to understanding

15   the issues in this case were issues about the

16   understanding of private property, understanding

17   about trespass, and I think American legal history

18   going back to the very earliest days of America,

19   indeed going back to sort of the Anglo American roots

20   of our law, there's this strong Lockean tradition of

21   sort of life, liberty and property, which, of course,

22   gets reframed in the Declaration as life, liberty and

23   the pursuit of happiness.

24            And so in the process of looking at these

25   things, I went back and looked at Blackstone and his

1    discussion of trespass, which, you know, I had done

2    in the past, but hadn't done recently.  And, of

3    course, it just made it clear how significant and how

4    powerful the rights of private property are, and then

5    I started to look at some First Amendment scholarship

6    to understand the difference between sort of the

7    application of the First Amendment when government's

8    a proprietor versus when it's just a private citizen.

9         And so, you know, looking at that body of

10   scholarship made me realize, oh, I need to go back

11   and I need to really understand 18th century property

12   law a little bit better than I did when I began this

13   enterprise.

14   Q.    All right.  So I'd like to just take a moment

15   to frame the time periods that were identified by the

16   Court in Bruen.  And so first of all, in the Bruen

17   decision, there's a discussion of, you know, laws

18   that were in existence in medieval to modern England;

19   is that correct?

20   A.    Right.  So obviously, America doesn't really

21   enter the game until the 17th century and the Boston

22   Common and the rules governing it would probably be

23   the oldest kinds of statutes that I encountered.

24   Q.    And just in terms of the framework of what

25   years we're talking about, so at what point does the

1    kind of time line when we're looking at the medieval

2    to modern English laws and as you understand it in

3    the Bruen framework?

4       A.    Well, in the most technical sense, obviously

5    July 4, 1776, marks a pretty clear break with certain

6    aspects of Anglo American law, although virtually

7    every one of the new states in one form or another

8    either by judicial decision, by express act in the

9    Constitution or by a statute absorbs those aspects of

10   the common law that were in force in the colonies at

11   the moment that independence was declared.

12        So knowing what the common law was in the

13   14th century is not all that relevant, but knowing

14   what the common law, how it was understood in

15   Virginia 1774 is actually somewhat relevant.

16      Q.    All right.  On that note again just in terms

17   of framing the time period, what is your

18   understanding of the dates that the time -- the Court

19   is looking at when it's talking about laws that

20   existed during the American colonies and early

21   republic?

22      A.    Right.  So it's interesting that the Court

23   did fuse together the colonial period and the

24   revolutionary period.  Those are typically treated as

25   interconnected, but distinct because the revolution

     1    does -- for one thing, we get rid of monarchy and

     2    aristocracy, which is really two parts of the British

     3    mix constitution almost overnight.

     4          So there are some profound changes, but they

     5    offer profound continuity.  So those are both clear

     6    within the 18th century.

     7    Q.    And again, just for the benefit of the Court,

     8    can you just give the years that you would give to

     9    that period?

    10    A.    Sure.  So as I said, most historians would

    11    divide that in two.  That period would include the

    12    period under what we call the imperial crisis which

    13    is once parliament starts heavily regulating the

    14    colonies in the late 1750s through 1760s and would

    15    probably go up to Jefferson's election in 1800.

    16    Q.    All right.  And what is the time period as

    17    you understand it as being referred to when the

    18    Supreme Court is talking about Antebellum America?

    19    A.    So again, you know, historians love to dice

    20    and slice things in quite precise terms.  So

    21    typically we talk about a Jeffersonian era, a

    22    Jacksonian period, and sort of a sectional conflict

    23    leading up to the Civil War.  I think the Court sort

    24    of put all those distinct periods together and so

    25    that would roughly go 1800 to the firing on Fort

1    Sumter in 1861.

2        Q.    All right.  And on that line, what is the

3    period that you would describe as reconstruction?

4        A.    So reconstruction is a pretty hotly debated

5    topic in terms -- and the chronology gets debated as

6    well.  I think everyone agree that the period between

7    the Fourteenth Amendment in 1868 and the withdrawal

8    of northern troops in 1876 is clearly covered by

9    reconstruction, but many scholars today would say

10   that reconstruction extended through the 1890s

11   because all of the important Supreme Court decisions

12   on the meaning of the Fourteenth Amendment date to

13   that sort of period from the 1870s to the 1890s.

14        So scholars make their money, if there is any

15   money to be made, by disagreeing and by redefining

16   fields.  So there's a little bit of that going on.

17        Q.    All right.  And just kind of marching through

18   the time line, how would you describe the

19   significance of the periods of law that are being

20   enacted like those parks laws that were coming into

21   existence in the late 19th century and early 20th

22   century?

23        A.    Well, of course, what becomes clear when you

24   look at this story is that there's very little need

25   for -- you know, when Thomas Jefferson decides he

wants to go experience nature, he just walks out his
door and he can walk for about 5,000 acres until he
finds his nearest neighbor.  I dare say that very few
people in Boston in the 1860s would have the same
experience.

So what we call the sort of parks movement is
a result of the fact that more Americans live in a
situation similar to that Bostonian and fewer and
fewer Americans are living in that situation similar
to Jefferson in the 1780s.

Q.   And so that said, those parks regulations
prohibiting firearms that you came across that may
have been implemented in the late 19th, early 20th
century, do they still have relevance to you when
you're reaching an opinion regarding the application
of the Bruen analysis in the case?

A.   Yes.  Well, Bruen very clearly, although it's
complicated, makes the period of reconstruction
relevant.  There is some -- you know, there's the
concurrence of Justice Barrett which raises some
interesting theoretical questions about how you would
weight, you know, 1868 versus 1791.

I think in general, there is a recognition
that 1868 is very important, and in particular, if
it's a new problem that didn't exist in 1791 and

1    there is evidence from 1868, it makes that evidence

2    highly probative.

3    Q.    So you had mentioned, I think this -- the

4    Lockean conceptions of property rights.

5          How did those Lockean concepts -- how are

6    they understood by the founders when they were

7    implementing regulations or guiding the course of

8    conduct on government property?

9    A.    Sure.  Well, to me, one of the most

10   interesting illustrations of that is Thomas Jefferson

11   who offered his own alternative to the Virginia

12   Constitution, very in keeping with Jefferson's

13   personality rewrote the Bible to exclude the things

14   he thought were not appropriate to the Bible which is

15   a very Jeffersonian concede, I suppose.  So his

16   provision on arms bearing actually cabins the right

17   to one's lands and tenements.  So, you know, that's

18   very interesting I think.

19         If you look at the general order -- the

20   general orders issued by General Sickles as a prelude

21   to the Fourteenth Amendment, this is a set of orders

22   responding to the black codes in South Carolina, he

23   very clearly talks about the need to protect the

24   right to keep and bear arms of African Americans, but

25   he also goes on to say that protecting that right

1   should not be understood to prohibit regulation of

2   firearms in public, nor should it be understood to

3   allow individuals to carry guns on other people's

4   property.

5           So, you know, a very robust understanding of

6   the right to keep and bear arms I think has always

7   coexisted with a fairly robust view of regulation.

8   Q.   All right.  And I believe earlier you gave as

9   an example the Massachusetts Acts and Resolves of

10  1794 as indicating a regulation of the right to carry

11  in public; is that correct?

12  A.   Yes.

13  Q.   And that's been entered in evidence as

14  Defense No. 142.

15          Now, I believe you also testified the

16  Massachusetts Acts and Resolves of 1794 were part of

17  a lineage of cases from the Statute of Northampton in

18  England; is that correct?

19  A.   Right.  Not so much cases, but yes, of

20  regulations.

21  Q.   All right.  And in your opinion, does that

22  evidence an ability and intent of the State of

23  Massachusetts to regulate the carry of firearms on

24  public lands?

25  A.   I think there's very strong evidence that

1    Massachusetts carried forward that a conception

2    implicit in the Statute of Northampton that there

3    were certain places in public that one had to

4    exercise greater regulatory control over arms,

5    because the Statute of Northampton expressly mentions

6    fairs and markets, for instance.

7        Q.    And so are you aware of the Supreme Court's

8    discussion and treatment of the Statute of

9    Northampton and its opinion in Bruen?

10       A.    Yes.  I have to say there are very few

11   statutes from the era of Richard III that have

12   received the same attention.

13       Q.    All right.  And so did you understand the

14   Court to be dismissing the Statute of Northampton

15   outright or merely discussing its relevance as it

16   weighed in on the problem of public carry in the law

17   as was issued in Bruen?

18       A.    Right.  I think the focus was certainly on

19   public carry, and the one thing that is clear is

20   that -- both from Heller and Bruen is that the

21   sensitive places doctrine, which of course is a

22   modern gloss on the ability to regulate firearms in

23   certain public locations, clearly emerges in part out

24   of that tradition in the Statute of Northampton.

25            The question of what counts as a sensitive

1    place is obviously something that courts are now

2    wrestling with, but the idea that there are such

3    places and one can regulate firearms pretty robustly

4    in them I don't think is in dispute.

5        Q.    All right.   So the fact that that statute

6    kind of retained the ability to regulate firearms in

7    specific locations is still relevant to your opinions

8    as a historian in this case?

9        A.    Yes.

10       Q.    All right.   So generally speaking, what types

11   of public lands existed at the time of the founding?

12       A.    So the number of -- excuse me.   There were a

13   number of different examples of public land.   We've

14   already talked about the Boston Common.   In some

15   states, you had colleges such as University of

16   Virginia, University of Georgia, University of North

17   Carolina, all of which date -- well, Virginia is the

18   early 19th century.   The other two are founding era.

19   And obviously, you do have, you know, places like --

20   what's the name of the one down the street -- Yale,

21   right, so...

22       Q.    And how would you describe from a

23   constitutional perspective what the -- what power the

24   government was relying on when it was regulating the

25   use of those lands?

 1     A.    So clearly, I mean, the case of University of

 2   Virginia is fascinating because, of course, Jefferson

 3   and Madison are both on the board of overseers and

 4   they are deeply involved in crafting every aspect

 5   down to literally Jefferson was involved in

 6   everything from the curriculum to hiring the

 7   professors, and he viewed the University of Virginia,

 8   and it's one of three things he actually puts on his

 9   tombstone as part of his epithet.  He doesn't mention

10   being president, but he does mention being the

11   founder of the University of Virginia.  And clearly,

12   he viewed the University of Virginia as a place the

13   government needed to exercise a fairly strong hand in

14   regulating.

15          MR. SULLIVAN:  So if I may, I'd like to

16   approach the witness with what's been marked and

17   entered in full as Exhibit 143.  First of all, I'll

18   show that to counsel.

19          THE WITNESS:  Thank you.

20   BY MR. SULLIVAN:

21     Q.    Professor, can you take a moment to read that

22   document or to review that document?

23          MR. SULLIVAN:  Your Honor, just as a

24   housekeeping matter, I have a transcription of the

25   document as well that was taken from the same digital

1   archive that the handwritten document was downloaded.

2   If it's easier perhaps to the Court and the witness,

3   I'd be happy to provide a copy of that transcription

4   as plaintiff has an opportunity to review.

5           THE COURT:  Sure.

6           MR. ATKINSON:  Your Honor, may I be heard as

7   to the transcription, please?

8           THE COURT:  Do you need to be heard as to the

9   transcription right now or shall we let the witness

10  testify from the original?

11          MR. ATKINSON:  My preference would be for the

12  witness to testify to the original primarily because

13  I have not had -- while I concede that this original

14  is difficult to read, I've not had an opportunity to

15  compare the transcription versus what I can make out

16  for the original.

17          THE COURT:  Let's proceed with the original

18  and then when Mr. Atkinson has had a chance to

19  compare the two, then this can be submitted which

20  will be of -- could be of assistance to the Court.

21          MR. ATKINSON:  Thank you, Your Honor.

22          MR. SULLIVAN:  May I approach the bench?  At

23  this time, I'd like to mark this for ID as

24  Exhibit 144.

25          THE COURT:  Yes.

1    BY MR. SULLIVAN:

2       Q.    Professor Cornell, have you completed your

3    review of the --

4       A.    Yes.

5       Q.    Were you able to read the handwritten

6    exhibit?

7       A.    Yeah, yeah.

8       Q.    With adequate clarity?

9       A.    Yeah.

10      Q.    So first, can you tell me what Exhibit 142

11   is?

12      A.    So --

13      Q.    I'm sorry.  Strike that.  143.  I'm referring

14   to Exhibit 143.

15            Can you describe for me what is Exhibit 143?

16      A.    Sure.  So these are the rules for the

17   University of Virginia that the visitors of the

18   university, which would be like the board of trustees

19   for a university today, drafted.

20            And present at the meeting were Thomas

21   Jefferson, James Madison, James Breckinridge, John

22   Cook, George Loyall and Joseph Cable.  And although

23   we're obviously familiar with Jefferson and Madison,

24   those are all the important political figures in the

25   state of Virginia at the time.

1    Q.    And certainly as to Jefferson and Madison,

2  they'd been involved in the founding period?

3    A.    I think everyone would concede those guys

4  count as founders.

5    Q.    And can you describe the types of rules that

6  these boards -- that the board of visitors' minutes

7  are setting forth?

8    A.    So --

9    Q.    Just as a general matter.

10    A.    Sure.  It's everything from whether or not

11  you can consume spiritus liquors, engage in riotous,

12  disorderly, intemperate, and indecent conduct.  It

13  bans fighting with any weapons that are capable of

14  inflicting death.  It includes a fairly broad

15  recognition that any offenses cognizable by the laws

16  of the land will be left to the -- the civil

17  magistrate.

18        So being a student at the University of

19  Virginia is not a get-out-of-jail card for law in the

20  state of Virginia.  And finally, no student shall

21  within the precincts of the university introduce,

22  keep or use any spiritus or -- that one is a little

23  hard to read, liquors, some kind of liquors, or keep

24  or use weapons of any kind.

25    Q.    And Professor Cornell, just for the sake of

1    clarity, we're looking at the bottom of page 6 of

2    Exhibit 143; is that correct?

3        A.    Right.  So yes, they take a very

4    uncompromising view of weapons on campus.

5        Q.    All right.  And does that sentence continue

6    onto page 7?

7        A.    Yes.  Also, obviously, gun powder is

8    prohibited, any stick or any weapon --

9        Q.    I think that's sufficient.  Thank you,

10   Professor.

11           So to be clear at the time, were the lands --

12   were these regulations and these limits on the carry

13   of firearms implemented to regulate conduct on the

14   lands of the University of Virginia?

15       A.    Yes.

16       Q.    And were those public lands?

17       A.    Yes.

18       Q.    And was the University of Virginia a state

19   school?

20       A.    Yes.

21       Q.    So if your -- so in your opinion, does this

22   reflect an exercise of government power to regulate

23   the conduct on its own lands?

24       A.    Yes.

25       Q.    And that conduct here was prohibiting the

1    carrying of firearms?

2        A.    Yes.

3        Q.    Is there any significance in your opinion to

4    the fact that private schools, like Harvard or Yale,

5    prohibited the carry of firearms during the period of

6    the founding?

7        A.    Yes.  I mean, I think it speaks to issues

8    about the scope of legitimate regulation of arms on

9    private property.  It speaks to the view of the

10   founding generation that outside of supervised

11   context, young people having arms could be

12   potentially problematic.  So there was a big

13   difference between being an 18-year-old in the

14   militia and being an 18-year-old Harvard student

15   carrying a gun.

16            MR. SULLIVAN:  All right.  And so, Your

17   Honor, it's been marked for admission as Defendant's

18   Exhibit 118, the 1655 Laws of Harvard College.

19   BY MR. SULLIVAN:

20       Q.    Professor Cornell, are you generally familiar

21   with those laws?

22       A.    Yes.  In an article I wrote for the *Yale*

23   *Journal of Law and Policy*, I discuss these early

24   statutes of the various universities in some detail.

25       Q.    All right.  And so are you also familiar with

```
 1   the 1745 laws of Yale College?
 2       A.   Yes.
 3            MR. SULLIVAN:   I'll submit that that's been
 4   marked as a full exhibit as Defendant's 119.
 5   BY MR. SULLIVAN:
 6       Q.   And so in your opinion, those laws are
 7   examples of public regulation and prohibition of
 8   firearms on property in the time of the founding?
 9       A.   So again, I would distinguish the situation
10   where the legislature or an entity created by the
11   legislature would write the regulations for a public
12   university and the relevant body at Harvard or Yale
13   that would have written the regulation, although both
14   Harvard and Yale have charters by the state, so they
15   are complicated semipublic, semiprivate institutions
16   in this period.
17       Q.   Did Harvard and Yale have the ability to
18   regulate conduct on their own lands at that time?
19       A.   Yes.
20       Q.   All right.   So moving into the Antebellum
21   period, Professor, what, if any, relevance would
22   Antebellum juris prudence on, say, police powers have
23   on your understanding of the legitimate scope of the
24   government's regulation of firearms?
25       A.   Well, the first cases we have challenging
```

1    regulations of firearms are all from the Antebellum

2    period, mostly from the slave south.  And the

3    dominant paradigm, if you will, the dominant model

4    that courts employ is the new doctrine, of course now

5    it's not new, it's one of the most fundamental

6    doctrines in American law, is the police power.  And

7    the police power comes into American juris prudence

8    in Antebellum case decided by John Marshall about

9    regulation of gun powder.

10         And the basic framing is consistent with the

11   text of the Second Amendment which talks about

12   infringement.  And infringement, let's say in

13   contradistinction to the language of the First

14   Amendment which uses the phrase "abridgment," abridge

15   in 18th century English of course means to lessen,

16   whereas "infringe" means to destroy.

17         So the police power framing in the Antebellum

18   period is legitimate exercises of regulation are

19   permissible as long as they don't destroy the right.

20   Q.    So can you point to examples apart from maybe

21   the cases that you mentioned that the government's

22   exercise of that power through legislature?

23   A.    Yes.  Well, again, one of the places that

24   I've looked at most closely is Massachusetts.  And

25   clearly in Massachusetts, people are being prosecuted

1   for violating that 1336 revision of the 1794 law for

2   carrying arms, what they might have described

3   promiscuously or habitually.

4       Q.   And I believe you testified that there are

5   parks ordinances that began to appear even as applied

6   to modern parks in what we would consider to be the

7   Antebellum period?

8       A.    Yes.  The Antebellum period, you start to see

9   the beginnings of this concern that America is

10  becoming industrialized, that we're losing connection

11  with our -- you know, the primitive beauty that

12  always defined American esthetics.  That's where sort

13  of Thoreau and the transcendentalists come in.

14  That's where you get the first great -- you know,

15  things like nonurban cemetery, you know, of course

16  Thoreau writes Walden which is a great ode to the

17  sort of redemptive power of the wilderness.  And in a

18  way, Central Park is the result of that -- those two

19  movements and the recognition that New York really

20  needs some nature to sort of recivilize it

21  inhabitants.

22      Q.    All right.  So I mean -- and the ordinance

23  governing the prohibition of firearms in Central Park

24  in 1858 has been entered into evidence as Exhibit 1.

25  And so that's consistent with the government's --

1    A.    Yes.

2    Q.    -- powers at the time; is that correct?

3          You were asked earlier about state exercises

4    of powers banning the carry of firearms in public

5    parks.  Do you recall that line of questioning by

6    plaintiff's counsel?

7    A.    Yes.  It's not surprising that urban areas

8    are the first places where there's really compelling

9    perception that the public needs -- that governments

10   need to create these spaces.  If you were living in

11   almost anywhere in Connecticut outside of New Haven

12   in the 19th century, you would only be a few minutes

13   away from some kind of green space.

14         So, you know, the idea of a state park in the

15   Antebellum period doesn't make quite as much sense,

16   whereas I think anyone who was in downtown New York

17   or downtown Boston would pretty much say there's not

18   a lot of green around here.

19   Q.    Are you familiar with the 1868 Pennsylvania

20   laws governing parks?

21   A.    Yeah.  So what's interesting about that, I

22   mean, one of the great 19th century parks besides New

23   York's Central Park is Fairmount Park in

24   Philadelphia, but because of the structure of

25   Pennsylvania government, the legislation governing

```
1   Fairmount Park was done by the state legislature, not

2   by ordinance by the Philadelphia local government.

3          You'd have to be more of a student of the

4   history of local government to know why New York's

5   structure of authority was so different from

6   Pennsylvania's, but clearly they were because two

7   different entities were responsible for regulating

8   the parks.

9   Q.   All right.  And so the 1868 Pennsylvania laws

10  that have been entered into evidence as

11  Defendant's 3, is that an example then of the state

12  legislature acting to approve a firearms ban --

13  A.   Yes.  From a legal point of view, it's a

14  state acting.  You know, from a geographical point of

15  view, I suppose you might argue it's still an urban

16  area they're regulating.  But from a legal point of

17  view, clearly it's the state who is the actor.

18  Q.   It's an exercise of power at the state level;

19  is that fair to say?

20  A.   Yes.

21  Q.   Now, there's been some discussion about

22  municipal ordinances versus state-level legislation.

23  So as a historian, how would you weigh the

24  significance of a municipal ordinance versus a state

25  legislature as evidence of the government's
```

1   regulation of conduct on its lands?

2       A.   Sure.  Well, what's interesting about

3   Antebellum police power doctrine is it doesn't really

4   make much of a distinction between the exercise of

5   that power by both the state or the locality.  One of

6   the really interesting things is that almost any town

7   our -- that gets incorporated will have a provision

8   that essentially says that whatever the legislative

9   body of the town, whether it's a town council or

10  something, enjoys full police power authority within

11  that locale.

12          So the state grants the locality or cedes

13  part of its police power to the locality and it's not

14  until much later where you start to see any effort to

15  curtail that.

16      Q.   All right.  So is there any reason to

17  disregard the significance of a local ordinance as

18  evidence of regulation of conduct on public lands in

19  your opinion as a historian?

20      A.   No.  I think it was understood to be

21  consistent with state regulation and in some cases

22  expressly delegated authority by the state.

23      Q.   All right.  And entering into the

24  reconstruction period, did that understanding change?

25      A.   It only changed when some states decided to

1    develop something called the home rule doctrine which

2    is associated with Dillon's law, which you may

3    remember from law school, is this principle about how

4    much authority localities have, and that happens in

5    the late 19th century and it's part of the evolving

6    struggle over federalism between states and

7    localities.

8        Q.    So would you -- would you consider those to

9    be relevant evidence of demonstrating a historical

10   tradition of the regulation of firearms on public

11   lands?

12       A.    Yeah, absolutely.

13       Q.    Now, we've discussed the history of firearms

14   regulation in this case.  Have you had an opportunity

15   to review the regulation at issue which is

16   Connecticut Agency Regulation Section 23-4-1(c)?

17       A.    Yes.

18       Q.    All right.  And have you reviewed its

19   predecessor regulations pertaining to Connecticut

20   state parks and forests?

21       A.    Yes.

22       Q.    All right.  And applying the methodology

23   required by Bruen, have you concluded whether

24   Connecticut Agency Regulation Section 23-4-1(c) is

25   consistent with the nation's historical tradition of

1    firearms regulation?

2         MR. ATKINSON:  Objection, Your Honor.  That's

3    an opinion on an ultimate issue.

4         MR. SULLIVAN:  Your Honor, he's been --

5         THE COURT:  Well, have you concluded means is

6    it your opinion whether the Connecticut agency does

7    what.  I think that's certainly what expert witnesses

8    do.  So I'm going to overrule that objection whether

9    it is an ultimate question for the Court or not.

10        MR. SULLIVAN:  Thank you, Your Honor.

11   BY MR. SULLIVAN:

12   Q.    Do you recall the question?

13   A.    Yes.  So I would say that based on my

14   expertise, I concluded that the Connecticut

15   regulations are consistent with the history of

16   regulation, but I didn't make any conclusion about

17   its current legality under Bruen because that's

18   obviously the job of the Court.

19   Q.    In your opinion as an expert historian, is it

20   analogous to laws that existed at the time of

21   reconstruction?

22   A.    Yes.

23   Q.    And it's analogous to laws that existed at

24   the time of -- in the Antebellum period?

25   A.    Yes.

1    Q.    And is it analogous to laws or government

2  practices that may have existed at the time of the

3  founding?

4    A.    Yes.

5          THE COURT:  Time what?

6          MR. SULLIVAN:  Of the founding.

7          That's all the questions I have at this time.

8  Thank you, Professor.

9          THE COURT:  Any redirect?

10         MR. ATKINSON:  Yes, Your Honor.

11   REDIRECT EXAMINATION OF PROFESSOR SAUL CORNELL

12 BY MR. ATKINSON:

13   Q.    Good afternoon, Professor Cornell.  You

14 testified on cross-examination that you employ a

15 methodology as a historian, correct?

16   A.    Correct.

17   Q.    And part of that -- the purpose of that

18 methodology is to give you structure to conduct a

19 historical inquiry, correct?

20   A.    So structures, I suppose you can frame it

21 that way.  So the -- maybe if you rephrase the

22 question I can sort of have a better sense of what

23 you're trying to --

24   Q.    Sure.  You were approached in this case to

25 offer an expert opinion about history, correct?

1    A.    Yes.  That's correct.

2    Q.    And you understood the purpose of that expert

3    opinion to be focused towards private property

4    ownership, regulation of private property?

5    A.    So I was asked about the history of firearms

6    regulations as they would illuminate Connecticut's

7    laws governing firearms in parks.  And I concluded

8    that in addition to looking at the regulation of

9    firearms in parks, it would be important to look at

10   regulation of firearms on private property because

11   government sometimes acts as a property owner or

12   proprietor and, therefore, the relevant body of law

13   would at least -- I should say the relevant

14   regulations, history of regulation, would be drawn

15   from regulations of private property.

16   Q.    So bottom line, you were given a question,

17   correct?

18   A.    Well -- I was given -- yes.  I mean, to

19   evaluate the history of firearms regulations as they

20   pertained to the issues in this case.

21   Q.    And to answer that question, you just didn't

22   go running off into whatever history book you could

23   lay your hands on, you followed a methodology,

24   correct?

25   A.    Right.  Although I would say that I was very

1    deliberate.  I wouldn't describe it as running off.

2        Q.    Correct.

3        A.    But I acidulously and diligently formulated

4    research strategy, implemented it, and gathered the

5    relevant sources and then interpreted them.

6        Q.    And the way you formulated your research

7    strategy was informed by the professional standards

8    of your methodology?

9        A.    Yes.

10       Q.    And it was also informed by what you

11   described as your understanding of the rules set

12   forth by a Supreme Court precedence, correct?

13       A.    Yes.

14       Q.    And that includes Bruen?

15       A.    Yes.

16       Q.    You also mentioned earlier that there are

17   rules about argumentation for historians.  Can you

18   describe what that principle means, please?

19       A.    Sure.  So, for instance, it's a pretty

20   well-accepted historical practice that if you're

21   going to quote a historical source, it should be

22   accurate, you should to the best of your ability

23   identify who wrote it if it's possible and why they

24   wrote it, know something about who might have had

25   access to it beyond the author, and if it's possible,

1    though sometimes it's the most difficult thing for a

2    historian to reconstruct, how others in that society

3    beyond the author of a particular text might have

4    understood that text or document.

5    Q.    Is that -- is that evaluation objective or

6    subjective?

7    A.    Well, this may be one of the oldest debates

8    among historians about whether history is more art or

9    social science and I think it's a little bit of both.

10    Q.    And you've heard the expression I believe

11    attributed to Napoleon that history is a pack of lies

12    agreed upon?

13    A.    I've heard so many different quips and

14    altruisms about history, but that is certainly --

15    that is certainly one that I've come across at some

16    point or another.

17    Q.    So when you're looking at history, in reality

18    when you're taking your own look at history, you have

19    to make judgments about what to credit, correct?

20    A.    Well, so I think -- I think what historians

21    do is really beautifully captured by sort of John

22    Dewey's theory of knowledge.  So Dewey's theory of

23    knowledge basically says we have, you know, groups

24    and communities that are credentialed, they formulate

25    rules, those rules are then enforced by that

1   community.  Critics of the rules emerge occasionally

2   saying that rule is flawed, that rule unfairly

3   excludes certain kinds of things, and then the rules

4   are revised and that's how knowledge is produced in

5   our world.

6       Q.    Within the community of historians and the

7   rules that they have developed either implicitly and

8   explicitly, would you characterize yourself as

9   somebody who generally follows those rules?

10      A.    Yes.  I would say I definitely try to follow

11  those rules.

12      Q.    Have you ever been a critic to those rules?

13      A.    Have I ever criticized those rules?

14      Q.    Yes.

15      A.    That's a very interesting question.  I would

16  have to really sit and think about that for a while.

17  I mean, I've certainly criticized some particular

18  pieces of scholarship.  I'm trying to think if I've

19  ever written sort of a wholesale critique of the

20  historical profession.  I don't think I have.

21      Q.    Have you written piecemeal criticisms of the

22  profession?

23      A.    Well, I've certainly criticized some

24  interpretations of things.

25      Q.    You also, I believe, testified earlier about

 1    not cherry-picking sources, correct?

 2        A.    Yes.   That is one of our cardinal rules.

 3        Q.    And from your personal perspective, you're

 4    super careful about that, correct?

 5        A.    I am -- I am extremely aware of the dangers

 6    of confirmation bias and something called

 7    availability risk where you tend to go to the sources

 8    you're most familiar with and not necessarily the

 9    best sources to answer the questions.   So I'm very

10    self-conscious about that, yes.

11        Q.    Are you -- withdrawn.

12              Is it possible for you as one single

13    individual human being to know every possible source

14    in existence?

15        A.    I don't think I've ever claimed I'm -- and I

16    don't think any historian that I know has.

17        Q.    And the limitations on your ability to -- on

18    your awareness of what sources are in existence,

19    you'd agree with me are informed by a number of

20    considerations, correct?

21        A.    Yes.   I think by definition that would have

22    to be true, that --

23        Q.    And so that would be time, correct?

24        A.    Time is certainly one of the constraints on

25    research, sure.

```
1    Q.    Human energy, your personal human energy?

2    A.    That certainly is also another constraint.

3    Q.    The archives that are available to you?

4    A.    Also a constraint.

5    Q.    When you received the question -- withdrawn.

6          When you -- withdrawn.

7          You testified, if I heard you correctly,

8    earlier that prior to being asked to take the role of

9    an expert in this case, you had never really studied

10   state parks firearm regulation.  Did I hear you

11   correctly?

12   A.    That specific question, no.  I mean, because

13   I -- because I wrote this American history textbook,

14   for instance, I -- I did include a pretty detailed

15   discussion of the transcendentalist movement, you

16   know, the parks, the development of parks, like

17   Central Park, and other things, but I never thought

18   to look at firearms regulations in them, in that

19   context.

20   Q.    So basically, if I'm understanding you

21   correctly, you had a prior reserve of knowledge that

22   might have been -- that was in your mind related a

23   little bit to the subject but wasn't exactly on

24   point?

25   A.    Yeah.  I think it's fair to say I wasn't a
```

```
 1    historian of American parks.

 2       Q.    Okay.  Approximately when were you contacted

 3    to be an expert for this case?

 4       A.    That's a good question.  I'd have to check my

 5    e-mail.  Sometime in the fall or the summer I'm

 6    guessing, but I'd have to check my e-mail.  I'm sure

 7    counsel could fill us in.

 8       Q.    Let me see if I can assist you with that.

 9    It's currently May 2023, correct?

10       A.    Right.

11       Q.    And did you review documents in this case?

12       A.    When?

13       Q.    Since you've been retained as an expert.

14       A.    Yes.

15       Q.    Did you review the -- did you review the

16    amended complaint in this matter?

17       A.    Yes, I did.

18       Q.    Would you recognize that if I showed it to

19    you?

20       A.    You know, if you showed it to me, yes, I

21    think I would.

22            MR. ATKINSON:  May I have a moment, Your

23    Honor?

24            THE COURT:  Yeah.  Are we getting a little

25    beyond cross-examination?
```

1            MR. SULLIVAN:  Your Honor, I'll make the

2    objection.  We're going outside the scope of cross.

3    I can wait for a question if you'd like.

4            MR. ATKINSON:  Your Honor, rethinking this a

5    little bit, I will withdraw that last line of

6    questioning and I'll see if I can do this somewhat

7    simpler.

8            THE COURT:  Okay.

9    BY MR. ATKINSON:

10    Q.    Professor, regardless of whether you remember

11    the exact date when you were contacted to be a

12    witness for this case, were you given to understand

13    in this case that it was -- the case was proceeding

14    on an accelerated time period?

15    A.    God, I must confess, I'm involved in so many

16    cases now, I don't recall that -- you know, those

17    kind of procedural issues are very lawyerly.  So I

18    don't tend to pay attention to them.

19    Q.    Understood.  I guess what I'm getting at is

20    were you ever given the impression that you needed to

21    provide an opinion sooner rather than later in this

22    case?

23    A.    I never felt rushed, if that's what you're

24    getting at.

25    Q.    Okay.  Would you have liked more time to

```
 1   research this -- the history that underlies your

 2   opinion?

 3           MR. SULLIVAN:  I'll object that we're beyond

 4   the scope.

 5           THE COURT:  Sustained.

 6   BY MR. ATKINSON:

 7     Q.    Would you -- withdrawn.

 8           I believe you testified earlier that you

 9   don't enter a historical inquiry with preconceived

10   notions, correct?

11     A.    Yes.  To the best of my ability as a person

12   who undoubtedly has been shaped by all of his

13   experiences, education, I try to set aside whatever

14   preconceived notions I'm aware of, yeah.

15     Q.    But to guide your search, you did use the

16   rules established by Bruen, correct?

17           MR. SULLIVAN:  I'll just object.  This has

18   been asked and answered.

19           THE COURT:  Sustained.

20           MR. ATKINSON:  I'll move on.

21   BY MR. ATKINSON:

22     Q.    If I remember your testimony correctly from

23   earlier during your cross, you stated that you looked

24   at First Amendment precedence to inform your study of

25   your research in this case?
```

1    A.    Yes.

2    Q.    Okay.  What First Amendment precedence did

3  you look at?

4    A.    Well, Second Amendment juris prudence which

5  is evolving and relatively young oftentimes

6  references First Amendment cases.  So I have over the

7  course of researching it looked at a number of First

8  Amendment cases and the question of government as a

9  proprietor was one of the cases.  I also looked at

10  *Konigsburg v. California* because it's actually

11  mentioned in Bruen.

12    Q.    When you looked at First Amendment

13  precedence, did you look into the law regarding

14  forums?

15    A.    That is part of the -- that is part of the

16  body of case law that sort of relates to government

17  as proprietor and its use of speech, yeah.

18    Q.    Did you -- did you apply your understanding

19  of what the forum doctrines were to your -- giving

20  your opinion in this case?

21         MR. SULLIVAN:  Objection, Your Honor.  That's

22  outside the scope.

23         MR. ATKINSON:  Your Honor, if I may, he

24  testified that he looked at this.  I'm trying to

25  probe what he looked at and how he applied it here.

1   That testimony was elicited on direct and I'd like to

2   explore it -- on cross-exam, my apologies.

3            THE COURT:  You're actually on redirect.

4            MR. ATKINSON:  Yes.  I got turned around for

5   a second there.  It was brought out on

6   cross-examination that he looked at First Amendment

7   precedent.  He's just testified that he looked at

8   forum, the forum doctrine.  I'd like to explore what

9   he looked at and how he applied it.

10           THE COURT:  The how he applied it is of

11  greater interest than whether he looked at it, but I

12  suppose one follows from the other.  I'm going to

13  permit that, but I didn't quite understand the basis

14  for your objection.

15           MR. SULLIVAN:  Your Honor, recognizing that

16  he mentioned the First Amendment in his

17  cross-examination, this is, I believe is beginning

18  discursive.  It wasn't a broad inquiry into the First

19  Amendment.  So I think exploring the contours of that

20  doctrine is frankly beyond the scope of his

21  declaration.

22           THE COURT:  I'm going to overrule you.  I am

23  overruling him and you may proceed.

24  BY MR. ATKINSON:

25    Q.    Professor, did you apply what you understood

1    from First Amendment precedence regarding the forum

2    doctrine to giving your opinion in this case?

3        A.    No.   What I did was I sort of looked at the

4    First Amendment doctrine sort of at a very high level

5    of generality to sort of think about is there a sense

6    in which you can talk about Second Amendment

7    regulation by the government as having some analogy

8    to First Amendment regulation.   So therefore, I

9    needed to understand what the history of the

10   regulation of guns on property that the government

11   controlled.

12          So it wasn't really applying doctrine.   It

13   was like reading the doctrine to say is there another

14   body of sources I need to dig into to illuminate

15   this.

16       Q.    Understood.   You testified that -- you

17   testified about the University of Virginia and if I

18   recollect, you stated that was a public college,

19   correct?

20       A.    Yes.

21       Q.    Do you know, as you sit here today, what body

22   was responsible for governing the University of

23   Virginia?

24       A.    So the -- again, I'll preface this by saying

25   I'm not a historian in the University of Virginia or

```
 1    of higher education, but the University of Virginia
 2    was created by the State of Virginia and the document
 3    that we talked about establishes certain regulations
 4    for students, faculty, and the grounds that the
 5    university is on.  It also makes clear that the
 6    university is not exempt from laws generally
 7    applicable in the state of Virginia.
 8            So it's a good example of sort of a hybrid
 9    space where there are certain aspects of life on the
10    University of Virginia in which it is in total
11    control of the regulations and certain aspects where
12    it's subject to the laws of the State of Virginia.
13    Q.    Would you agree with me that the University
14    of Virginia had a specific purpose?
15    A.    It had, I suppose, a specific general
16    purpose, yes.
17    Q.    And what was that purpose?
18    A.    To educate the citizens of the state of the
19    Virginia.
20    Q.    To your knowledge, were there any other
21    purposes for the University of Virginia?
22            MR. SULLIVAN:  Object.  It calls for
23    speculation.
24            THE COURT:  Presumably from his research if
25    he has found any.  Overruled.
```

1            THE WITNESS:  Well, they were quite

2   interested in shaping the character of Virginians.

3   BY MR. ATKINSON:

4       Q.    Would that be part and parcel of education?

5       A.    I think Jefferson had a very capacious view

6   of education which would include character formation.

7       Q.    I'm not sure that I heard your -- every

8   aspect of your testimony earlier regarding Fairmount

9   Park.  Do you recall testifying about that earlier?

10      A.    Yes.

11      Q.    And if I recollect, you testified that the

12  Pennsylvania legislature enacted the firearms

13  prohibition for Fairmount Park, correct?

14      A.    Yes.

15      Q.    To your knowledge, why did the legislature

16  enact that instead of a municipality?

17            MR. SULLIVAN:  Object.  It's been asked and

18  answered.

19            THE COURT:  I don't remember the answer, so

20  you can go ahead.

21            MR. ATKINSON:  I don't remember it either,

22  Your Honor.

23  BY MR. ATKINSON:

24      Q.    Can you please, Professor?

25      A.    Yes.  So the division of authority between

 1    states and municipalities was different in every

 2    state because the specific constitutional tradition

 3    and the specific regulatory history of different

 4    states meant that some things were within the sphere

 5    of the municipalities and some things were retained

 6    by the state.

 7            So, you know, Pennsylvania and Ohio

 8    localities were subject to fairly extensive

 9    regulation by the state, but New York and

10    particularly New York City had a fairly robust

11    tradition of local self-rule from its earliest

12    settlement.

13    Q.    Do you know if Fairmount Park at the time of

14    this prohibition being passed was owned by the State

15    of Pennsylvania?

16    A.    You know, I don't know.  I don't know that.

17    Q.    Okay.  To the best of your knowledge as you

18    sit here today, was the Central Park prohibition on

19    the carrying of firearms the only prohibition that

20    you're aware of prior to the Civil War?

21    A.    In a park?

22    Q.    Correct.

23    A.    I guess what makes it difficult to answer is

24    I'm trying to think what other parks existed that --

25    I mean, Central Park is the first of modern-style

1  parks.  So there couldn't have been any regulation of

2  modern-style parks before there were modern-style

3  parks.

4     Q.    Understood.

5          MR. ATKINSON:  No further questions, Your

6  Honor.

7          THE COURT:  Is there any recross?

8          MR. SULLIVAN:  Just one moment, Your Honor.

9          Your Honor, no further questions from the

10  state.

11          THE COURT:  The original regulation of our

12  banning of firearms from parks or commons or that

13  kind of public land, was that an exercise -- a

14  conscious exercise of police powers or what was that?

15          THE WITNESS:  I do think it would have been

16  understood as a core exercise of police power, yes.

17          THE COURT:  And is there a difference, a

18  material difference, that we should understand

19  between a commons or green or modern park for the

20  purposes of understanding exercise of authority to

21  ban firearms in those spaces?

22          THE WITNESS:  Well, I think the -- I think

23  the -- in trying to understand what defines a

24  category of, quote, a sensitive place, the question

25  of what kind of public activity occurs in that place

and what is the societal value of that activity and
why that particular activity might be adversely
affected by what in the 19th century they would call
habitual or promiscuous carry of firearms, that's the
key aspect of why parks are different because they
have a specific role to play in American society and
American culture, and the belief was that it was
important to restrict firearms so that parks could
function the way they were understood that they
needed to function to sort of promote the civil
virtues and values that society wanted to cultivate
in its citizens, if that's clear.

      THE COURT:  And you've also discussed the
states as proprietors, states owning the land, and
compared that at least in part to the proprietor's
right to control the use of their land.

      Where, if at all, do those two -- did those
two overlap before we got to modern parks and then
after?

      THE WITNESS:  So I think there is a long
tradition of robust authority of proprietors of
property to control who can enter them and what kind
of activity could be engaged.  For instance, you
couldn't hunt on somebody else's land.  You had to
ask for permission.  So there is that long-standing

1    tradition.

2           And then there's been a recognition that

3    there are certain spaces that because of what

4    transpires in them, that firearms are -- ought to be

5    excluded.  For instance, there's a long tradition of

6    excluding them from around polling places because of

7    a concern that they might intimidate the exercise of

8    suffrage.

9           You know, the Statute of Northampton which

10   talks about fairs and markets, fairs and markets are

11   also places of commerce, places where people go to

12   congregate, you know, it's a place where

13   entertainment occurs, places where public notices

14   would have been posted, so it has a civic function.

15          So I think there's always been a recognition

16   that there can be important values that the state

17   needs to protect, and that regulating firearms to

18   protect those values and create the kind of spaces

19   where those values can flourish is deeply rooted in

20   our tradition.

21          THE COURT:  Any questions on my questions?

22          MR. ATKINSON:  None from the plaintiffs, Your

23   Honor.

24          MR. SULLIVAN:  Just briefly.

25

 1    RECROSS-EXAMINATION OF PROFESSOR SAUL CORNELL

 2  BY MR. SULLIVAN:

 3    Q.    So Professor Cornell, just to be clear, when

 4  looking at the founders' understanding of their

 5  power, as well as the -- looking at the founders'

 6  understanding of their powers, did their conception

 7  of the states' rights as a proprietor factor into

 8  their regulation of public spaces?

 9    A.    I think, yes, I think it did.  And I also

10  think that the entire success of the Constitution

11  rests on an assumption that state police power would

12  not be unduly cabined by the new federal constitution

13  that if there had been a perception that the adoption

14  of the Constitution would have eviscerated state

15  police power, we wouldn't have a Constitution.

16    Q.    All right.

17    A.    Or Bill of Rights for that matter.

18        MR. SULLIVAN:  That's all I have.  Thank you.

19        THE COURT:  Thank you very much, Professor

20  Cornell.  This has been very interesting and you may

21  step down and you are excused.

22        THE WITNESS:  Thank you very much.  Should I

23  leave the exhibit for someone to collect?

24        THE COURT:  Yes, please.

25        Let me ask who the next witness will be.

```
 1            MR. ATKINSON:  May I have a moment to
 2   confer --
 3            THE COURT:  I'm going invite us to take a
 4   five-minute recess.
 5            MR. ATKINSON:  Thank you, Your Honor.
 6            (Recess taken.)
 7            THE COURT:  All right.  Are we ready to
 8   proceed?
 9            MR. ATKINSON:  Yes, Your Honor.  May I
10   address a couple of housekeeping matters first?  With
11   respect to the -- to the transcript of the
12   defendant's exhibit, I did have a chance to compare
13   that.  What I would ask -- what we -- we would have
14   no objection to it being submitted in as an
15   evidentiary exhibit, but to the extent there are any
16   discrepancies between the transcription and --
17            THE COURT:  The original prevails.
18            MR. ATKINSON:  Correct.
19            THE COURT:  So that's 143.
20            MR. SULLIVAN:  Your Honor, I'll just make a
21   brief note that the transcription is Exhibit 144.  So
22   Exhibit 133 of the -- the actual document, that's
23   pages 1 through 10 of the actual document, this
24   transcription actually goes to pages 1 through 15.
25   We hadn't taken it out.  So I would say in fairness,
```

```
1   the transcription from where it discusses pages 11
2   onwards should probably not be considered at all.
3           THE COURT:  Why don't you cut it out?
4           MR. SULLIVAN:  I'd be happy to do so, Your
5   Honor.
6           THE COURT:  Okay.  Let's do that so the
7   transcription will correlate with the original and
8   just be pages 1 through 10.  Good.
9           MR. ATKINSON:  Also, Your Honor, I do intend
10  to call Mr. Nastri next to get to the standing
11  matter.  I believe that my conversations with my
12  colleagues, we do have Colonel Lewis from the
13  Department of Energy and Environmental Protection
14  here.  We'd ask that he be excused because we don't
15  anticipate getting to him for the rest of the day.
16          THE COURT:  Is there any possibility of
17  finishing him today if we did get to him?
18          MR. ATKINSON:  We could possibly finish
19  Colonel Lewis today, Your Honor, but I think the
20  discussion we were having is whether we could
21  prioritize the standing issues based on what Your
22  Honor said at the start of proceedings today.
23          So we honored that Professor Cornell
24  needed -- was on a tighter schedule.  My
25  understanding is that the same -- neither of the same
```

1  constraints apply to either Mr. Nastri or Colonel

2  Lewis.  So we were prioritizing getting to the

3  jurisdictional issues first.

4      I'm happy and prepared to go forward with

5  either Mr. Nastri or Colonel Lewis.  It's Your

6  Honor's preference.

7      THE COURT:  Is there any reason to choose one

8  over the other?

9      MR. BOCHAIN:  I don't believe so, Your Honor.

10  I know Your Honor is interested in addressing the

11  standing issue.  Colonel Lewis is available.

12      THE COURT:  Well, eventually that will be in

13  the analysis.

14      MR. BOCHAIN:  Colonel Lewis is available

15  tomorrow.  And in speaking with Attorney Atkinson, it

16  appears either way which we address today, it's going

17  to run over until tomorrow most likely.  So I believe

18  we'd be asking to go in the order that he is

19  suggesting.

20      THE COURT:  And we will be able to finish by

21  four o'clock tomorrow?

22      MR. BOCHAIN:  Yes.  With the testimony, I

23  believe that's correct.

24      THE COURT:  With this hearing.

25      MR. ATKINSON:  I believe my estimate right

1    now is we'll finish testimony somewhere around noon

2    to one o'clock, Your Honor, maybe two o'clock.  And

3    if we want to take a break and then prepare for oral

4    argument, we would be able to complete oral argument

5    by four o'clock tomorrow.

6            THE COURT:  We have to.  Okay?

7            MR. BOCHAIN:  If I can just have one moment,

8    Your Honor.

9            Your Honor, I believe that's fine.  The only

10   thing I would note, I think we can get all this done

11   in the time frame that you've just laid out.  The

12   only point that I would raise that in the event that

13   something does arise, we would like to have the

14   opportunity to call someone back in our own case.

15           THE COURT:  All right.  You might be doing

16   that in two weeks, though.

17           MR. BOCHAIN:  Understood, Your Honor.

18           THE COURT:  That's fine.  All right.  Then I

19   guess we'll start with Mr. Nastri.

20           MR. ATKINSON:  Yes, Your Honor.

21           THE COURT:  Okay.  Remain standing and raise

22   your right hand, please.

23           (David Nastri, sworn.)

24           THE CLERK:  Please be seated.  State your

25   name for the record and spell your last name.

```
 1              THE WITNESS:  My name is David Nastri.  My
 2   last name is spelled N-A-S-T-R-I.
 3              THE COURT:  And your town of residence?
 4              THE WITNESS:  I'm sorry, Your Honor?
 5              THE COURT:  Your town or city of residence?
 6              THE WITNESS:  Cheshire, Connecticut.
 7              THE COURT:  Thank you.  You may proceed.
 8              MR. ATKINSON:  Thank you, Your Honor.
 9              DIRECT EXAMINATION OF DAVID NASTRI
10   BY MR. ATKINSON:
11     Q.    Good afternoon, Mr. Nastri.  Please tell the
12   Court where you were born.
13     A.    I was born in Cheshire, Connecticut.
14     Q.    Where did you grow up?
15     A.    I as a small child lived in Waterbury and
16   then we returned to Cheshire, Connecticut and I grew
17   up there.
18     Q.    Where did you go to school as a child?
19     A.    Elementary school in Cheshire and high school
20   also in Cheshire.
21     Q.    When did you graduate high school?
22     A.    1979.
23     Q.    Okay.  What did you do after you graduated
24   high school?
25     A.    I spent a very brief amount of time in
```

1   college and then I joined the Army.

2       Q.    Where did you go to college?

3       A.    I started at Central Connecticut State

4   University.

5       Q.    Okay.  And what was your reason for leaving

6   Central State -- Central Connecticut State?

7       A.    I was not focused on school, so I sought

8   something else.

9       Q.    Okay.  And what prompted you to join the

10  Army?

11      A.    It seemed like a better option than going to

12  college.  My father had been a soldier during the

13  Korean War.  So I think probably both of those things

14  factored in.

15      Q.    Okay.  How long did you serve in the Army?

16      A.    I was on active duty for a little bit less

17  than a year.

18      Q.    Okay.  And when did you leave the Army?

19      A.    Approximately, I'm going to say, sometime

20  around September of 1981.

21      Q.    Okay.  Why did you leave the Army?

22      A.    I was medically discharged.

23      Q.    Okay.  What did you do after you were

24  discharged from the Army?

25      A.    I worked.  I got jobs.  I went to school

1    sporadically and did that for quite a long time.

2       Q.    Okay.  What jobs did you pursue at that time?

3       A.    Owned a liquor store at one point.  I worked

4    for a property management company.  I went into sales

5    for an answering service company, made furniture.

6    There were a lot of jobs.

7       Q.    So sort of a jack-of-all-trades, basically?

8       A.    Yes.

9       Q.    You just testified that you went back to

10   school sporadically.  When did you start going back

11   to school?

12      A.    So I probably went on and off from the early

13   '80s and then ultimately got a bachelor's degree and

14   an MBA.

15      Q.    Let's talk about your bachelor's degree.

16   Where did you get your bachelor's degree from?

17      A.    From Quinnipiac University.

18      Q.    And what year, approximately?

19      A.    I believe it was 1990.

20      Q.    Okay.  What year did you get your MBA?

21      A.    I believe that was 2001.

22      Q.    In the interim between 1990 and 2001, what

23   did you do in that period?

24      A.    My employment at that time was working for

25   the answering service company and I believe making

1    furniture also.

2        Q.    At some point did you -- withdrawn.

3              At some point did you join the national --

4    the Army National Guard?

5        A.    I did.  I joined the Army National Guard in

6    2003.

7        Q.    Why did you join the National Guard?

8        A.    Well, we had -- we were at war and I felt I

9    had an obligation to my country.

10       Q.    What was your job in the National Guard?

11       A.    I was an infantry soldier.  I'm sorry.  Full

12   disclosure, I was an infantry soldier as a primary

13   military occupational specialty, and my secondary was

14   forward observer for artillery.

15       Q.    Is the National Guard a full-time job?

16       A.    It is not.

17       Q.    What did you do -- withdrawn.

18             You had the -- did you have the ability to

19   maintain another job concurrent with your service in

20   the National Guard?

21       A.    I did.

22       Q.    And at that time in 2003, what was your

23   occupation at that point?

24       A.    In 2003, I think I was making furniture at

25   that point.  I may also have had a job with an

1    insurance company in there.  It's a little jumbled as

2    far as the time frame goes.

3        Q.    What's your occupation now?

4        A.    I'm a financial adviser.

5        Q.    When approximately did you start that

6    occupation?

7        A.    I started in this particular role in 2006.

8    Before that, I was working for Mass Mutual.

9        Q.    And that was -- the Mass Mutual job was the

10   insurance job, just to be clear?

11       A.    That is correct.

12       Q.    And what type of job was that with Mass

13   Mutual?

14       A.    Insurance sales.

15       Q.    At some point did you deploy overseas as part

16   of the National Guard?

17       A.    I did.

18       Q.    When was that?

19       A.    Our activation was the fall of 2009 and we

20   got in country in January of 2010.

21       Q.    When you say "in country," does that mean

22   returning to the United States or deploying overseas?

23       A.    No.  That means arrival in Afghanistan.

24       Q.    Where were you deployed in Afghanistan?

25       A.    I was on a forward operating base called

1    Metherlon (phonetic).  We were in a region called RC

2    East.  We were generally on the eastern side of the

3    country not too far from the Pakistan border.

4        Q.    Okay.  What was your rank when you deployed

5    to Afghanistan?

6        A.    I was a staff sergeant.

7        Q.    What were your responsibilities?

8        A.    At that point, my responsibility was as the

9    personal security detail for our battalion commander.

10       Q.    Can you describe for us briefly what that

11   involved?

12       A.    I was responsible for his personal safety.

13       Q.    As part of your service with the National

14   Guard, were you ever trained on the use of firearms?

15       A.    I was.

16       Q.    What firearms were you trained on the use of?

17       A.    My primary weapon was an M4 carbine and my

18   secondary weapon was an M9 handgun.

19       Q.    Okay.  You were trained on both, correct?

20       A.    Correct.

21       Q.    Did you have to pass tests to demonstrate

22   proficiency with the M4 carbine?

23       A.    Yes.

24       Q.    Did you have to pass a test to show

25   proficiency with the nine-millimeter handgun?

1    A.    I did.

2    Q.    Did you pass those tests?

3    A.    I did.

4    Q.    During your service in Afghanistan, did you

5    see enemy action?

6    A.    I did.

7    Q.    Did you ever fire your weapon at another

8    person in an enemy action?

9    A.    No.

10   Q.    Did there come a time where you were

11   evacuated from Afghanistan?

12   A.    I was, yes.

13   Q.    Why were you evacuated from Afghanistan?

14   A.    It was medical evacuation for a noncombat

15   injury.

16   Q.    Where were you evacuated to?

17   A.    Initially to -- started Bagrum Airfield, a

18   hospital there, and then to Landstuhl, Germany.

19   Q.    What was the nature of your noncombat injury?

20   A.    My kidney failed.

21   Q.    Did you pursue your recovery in Germany or

22   were you returned to the United States?

23   A.    No.  I was returned to the United States and

24   stationed at West Point.

25   Q.    How long did it take you to recover?

```
 1      A.      Approximately six months.

 2      Q.      Were you discharged as a result of your

 3  injury?

 4      A.      I was not.

 5      Q.      When did you complete your service with the

 6  National Guard?

 7      A.      March of 2012.

 8      Q.      Were you discharged?

 9      A.      I'm sorry?

10      Q.      Were you discharged?

11      A.      I was.

12      Q.      Was it honorable?

13      A.      It was.

14      Q.      After you left the National Guard, did you

15  continue your career as a financial adviser?

16      A.      I did.

17      Q.      Did you pursue any further education?

18      A.      I did.

19      Q.      What education did you pursue?

20      A.      I went to law school.

21      Q.      Okay.  When did you -- did you obtain a law

22  degree?

23      A.      I did.

24      Q.      When did you obtain your law degree?

25      A.      2018.
```

```
1    Q.    Are you still a financial adviser today?
2    A.    Yes.
3    Q.    Do you practice law at all?
4    A.    My practice of law is limited to acting as an
5    attorney for veterans who are seeking compensation
6    claims before the Veterans Administration.
7    Q.    Do you accept compensation for that practice
8    of law?
9    A.    I don't.
10   Q.    Approximately how many hours a week do you do
11   that?
12   A.    It's probably hours a month, maybe two hours
13   a month.
14   Q.    Fair enough.  Do you currently hold a
15   Connecticut State Pistol Permit?
16   A.    I do.
17   Q.    When did you first obtain that pistol permit?
18   A.    I don't recall when it was, but it was at
19   least 30 years ago.
20   Q.    Have you held it consistently since then?
21   A.    I have.
22   Q.    You've kept up with the annual renewals?
23   A.    Yes.  Though I --
24   Q.    The regular renewals?
25   A.    Yes.
```

1    Q.    Does a Connecticut Pistol Permit allow you to

2  purchase firearms?

3    A.    It does.

4    Q.    Does it allow you to purchase ammunition?

5    A.    Yes.

6    Q.    Does it permit you to carry a handgun in

7  public?

8    A.    It does.

9    Q.    Do you own a handgun?

10    A.    I do.

11    Q.    Do you own more than one handgun?

12    A.    I do.

13    Q.    What handguns do you own?

14    A.    I own a Glock 17, a Glock 19, a Glock 48, a

15  Glock 42, a Smith & Wesson Model 659, a Ruger Mark 2,

16  a Beretta 950 and a Taurus 85.

17    Q.    Of all those firearms that you just

18  described, are all of those pistols?

19    A.    They are.  One is a revolver.

20    Q.    Do you carry a handgun when you venture into

21  public?

22    A.    I do.

23        MR. BOCHAIN:  Your Honor, if I may, I have

24  given Attorney Atkinson quite a bit of leeway here.

25  A lot of these questions are leading.  These are

```
 1   preliminary matters, so I'd ask that the form of the
 2   question be rephrased.
 3           THE COURT:  Do you carry a handgun when you
 4   venture into public is not a leading question, but be
 5   aware that you should not lead your witness after
 6   this.  Okay?
 7           MR. ATKINSON:  Understood, Your Honor.
 8           THE COURT:  Okay.  So the question that's
 9   pending is do you carry a handgun when you venture
10   into public.
11           THE WITNESS:  I do.
12   BY MR. ATKINSON:
13     Q.    The handgun that you carry into public, is it
14   one of the handguns that you've previously listed
15   here today?
16     A.    Yes.
17     Q.    Of the handgun that -- of the handguns you
18   listed, do you have a preferred one to carry in
19   public?
20     A.    Yes.
21     Q.    Which handgun is that?
22     A.    The Glock 42.
23     Q.    Why do you prefer to carry that handgun in
24   public?
25     A.    It's a combination of concealibility and I
```

```
 1    think effectiveness is -- it's better with that than

 2    any of the others.

 3         Q.    How often do you carry that Glock 42 into

 4    public?

 5         A.    Daily.

 6         Q.    Why do you carry that Glock 42 daily in

 7    public?

 8         A.    For self-defense.

 9         Q.    In the entire time -- withdrawn.

10               Prior to obtaining a Connecticut Pistol

11    Permit, did you own a handgun?

12         A.    I'm sorry.  I don't think I heard your

13    question.

14         Q.    I apologize.  Prior to obtaining a

15    Connecticut Pistol Permit, did you own a handgun?

16         A.    No.

17         Q.    After you acquired a Connecticut Pistol

18    Permit, did you acquire a handgun?

19         A.    I did.

20         Q.    Have you consistently owned a handgun since

21    you -- withdrawn.

22               When did you -- when approximately did you

23    acquire the handgun after you obtained your pistol

24    permit?

25         A.    It would have been shortly thereafter.  I
```

```
 1    mentioned the Smith & Wesson Model 659 which I
 2    believe was the first pistol that I purchased, and it
 3    would have been right around the same time I got the
 4    permit.
 5         Q.   So more than 30 years ago?
 6         A.   More than 30 years ago, yes.
 7         Q.   Okay.  And in those 30 years, have you
 8    owned -- have you always owned a handgun during that
 9    time?
10         A.   Yes.
11         Q.   During those 30 years where you've owned a
12    handgun, have you typically carried your handgun into
13    public?
14         A.   Yes.
15         Q.   During the times that you've -- during that
16    period, that 30-year period we've been discussing,
17    have you ever been -- have you ever had to use your
18    firearm -- your handgun in self-defense?
19         A.   No.
20         Q.   Have you ever had to make a showing of your
21    handgun for the purposes of self-defense?
22         A.   No.
23         Q.   When you carry your handgun in public, do you
24    try to obey laws regulating how you may carry it?
25              MR. BOCHAIN:  Objection, Your Honor.
```

```
 1    Leading.
 2            THE COURT:  Sustained.
 3    BY MR. ATKINSON:
 4      Q.    Mr. Nastri, when you -- are you aware that --
 5    withdrawn.
 6            Mr. Nastri, as part of obtaining your pistol
 7    permit, did you have to undergo any -- any
 8    educational classes?
 9            MR. BOCHAIN:  Objection, Your Honor.
10    Leading.
11            THE COURT:  Overruled.
12            THE WITNESS:  It was a long time ago and I do
13    remember attending a class at the police department
14    and then demonstrating proficiency by shooting at
15    targets.
16    BY MR. ATKINSON:
17      Q.    If you recall as you sit here today, what did
18    the class at the police department entail?
19      A.    I have no recollection of it.
20      Q.    Since you obtained your pistol permit and
21    took that initial class, have you taken any other
22    class or have you taken any classes with respect to
23    handguns?
24      A.    Not outside of the military.
25      Q.    If -- withdrawn.
```

1          With respect to carrying your handgun in
2    public, are you aware of whether there are any laws
3    that govern how you may carry it?
4        A.    I am.
5        Q.    Okay.  What laws are you aware of on -- that
6    regulate how you may carry your handgun in public?
7        A.    I think the statute is silent on whether it
8    is carried concealed or open, but I believe it
9    references that you may not carry it in such a way as
10    to cause alarm to another person.
11        Q.    Are you aware of any other laws besides that
12    one that you just described to us?
13        A.    As far as carrying, I can't think of one.
14    You have to have your permit with you when you carry.
15    Then there are storage requirements if you're not
16    able to carry it on your person.
17        Q.    Do you comply with the laws that you are
18    aware of regulating how you may carry your handgun in
19    public?
20        A.    I do.
21        Q.    Are you aware of any laws in the state of
22    Connecticut that regulate where you may carry your
23    handgun in public?
24        A.    I am.
25        Q.    What laws are you aware of?

```
 1    A.    There are restrictions about certain
 2   locations such as courthouses, schools, polling
 3   places, and then I became aware last year of the
 4   restriction on state parks and forests.
 5    Q.    How did you become aware of these laws?
 6    A.    I had gotten a hunting license and I was
 7   reading the regulations about where you can hunt, for
 8   what, with what and when, and I came across the
 9   regulation that prohibits firearms in state parks and
10   forests.
11    Q.    And just so the record is clear, the
12   regulation that you are referring to, can you provide
13   us the number if you're aware of it?
14    A.    I can't remember what the number is.
15         MR. ATKINSON:  Your Honor, if I may show
16   Mr. Nastri what's been marked as Plaintiff's Exhibit
17   No. 1, the amended complaint.
18         THE COURT:  You may.  So Number 1 says
19   ordinances and laws about parks, 1858 Central Park.
20   Do we have the right one?
21         MR. ATKINSON:  Plaintiff's Exhibit 1 for ID.
22         THE COURT:  Yeah.
23         MR. ATKINSON:  Are you looking at the
24   combined exhibit list?  Because what you just
25   described sounds like the state's first exhibit.
```

```
 1            THE COURT:  You're correct.  Let me go to
 2   yours.  I have Number 1 has an amended complaint.
 3   BY MR. ATKINSON:
 4     Q.     Mr. Nastri, do you recognize the document I
 5   just handed you?
 6     A.     I do.  It's the verified amended complaint.
 7     Q.     Okay.  What is your understanding of a
 8   verified complaint?
 9     A.     As -- I think it's the last and complete
10   complaint that's filed in this action.
11     Q.     Well, did you -- do you recall signing it in
12   front of a notary public -- well, withdrawn.
13            May I direct your attention, Mr. Nastri, to
14   the final page of the complaint that bears the ECF
15   stamp Document 13, page 15 of 16?
16     A.     Yes.  I do see that.
17     Q.     What is that, Mr. Nastri?
18     A.     That is the verification that I signed and
19   had notarized.
20     Q.     What do you understand that verification to
21   be?
22     A.     It means that I verified the truth of the
23   allegations in the complaint.
24     Q.     Did you do so under oath?
25     A.     I did.
```

1      Q.    If I may now direct your attention to the
2    fourth page on the ECF stamp for Document 13,
3    paragraph 13.
4      A.    I see that.
5      Q.    After reviewing that paragraph, you -- you
6    recall the number of the reg- -- the state regulation
7    that prohibits you from carrying a firearm in state
8    parks that you referenced earlier?
9      A.    I do.  It's Section 23-4-1(c).
10      Q.    When did you become aware of that regulation?
11      A.    After I had received my hunting permit and I
12    was reading the regulations on the DEEP website about
13    where hunting is permitted, for what and when.
14      Q.    When did you receive your hunting permit?
15      A.    I think it was -- it was definitely in 2022,
16    sometime in the summer, I think.
17      Q.    Why did you obtain a hunting permit?
18      A.    I had a nephew who asked me to go bird
19    hunting with him a few years ago and I obviously
20    needed a hunting license to do that.
21      Q.    Had you ever been -- withdrawn.
22          Had you ever held a Connecticut hunting
23    license prior to that occasion?
24      A.    No.
25      Q.    Prior to obtaining your hunting license, did

```
1    you use state parks and forests?
2        A.    I did.
3        Q.    Which state parks and forests did you use
4    prior to obtaining your hunting license?
5        A.    Sleeping Giant State Park in Hamden, the
6    Farmington Canal Trail which is through most towns in
7    the state but primarily in Cheshire, and then
8    Naugatuck State Forest.
9        Q.    Do you still use those same parks today?
10       A.    I do.
11       Q.    How often do you use Sleeping Giant State
12   Park?
13       A.    I probably would say on average, once a month
14   during the course of the year.
15       Q.    For what purpose do you use Sleeping Giant
16   State Park?
17       A.    Hiking.
18       Q.    Pardon me?
19       A.    Hiking.
20       Q.    How often do you use Naugatuck State Forest?
21       A.    Probably once or twice a year.
22       Q.    What do you use Naugatuck State Forest for?
23       A.    Hiking.
24       Q.    How often do use the Farmington River Canal
25   Trail?
```

```
 1     A.     Probably on average, three times a week.  I'm
 2   sorry.  Let me qualify that.  Probably four or five
 3   times a week total.
 4     Q.     What do use the Farmington River Canal Trail
 5   for?
 6     A.     I run on it and I then also walk on it.
 7     Q.     For each of the parks listed,
 8   approximately -- well, pardon me.  Withdrawn.
 9            For Sleeping Giant State Park, how long
10   approximately have you been using it?
11     A.     Since I was 15 years old probably.
12     Q.     For Naugatuck State Forest, how long
13   approximately have you been using it?
14     A.     Probably 40 years.
15     Q.     For the Farmington River Canal Trail,
16   approximately how long have you been using it?
17     A.     I would say at least ten.
18     Q.     I'm not sure if I asked you this yet, but for
19   what purpose do you use the Farmington River Canal
20   Trail?
21     A.     For both running and then also for walking.
22     Q.     How often do you use it for running?
23     A.     Probably three to four times a week.
24     Q.     How often do you use it for walking?
25     A.     Probably two to three times a week.
```

```
 1    Q.    You testified earlier that you only became
 2  aware of the prohibition established by 23-4-1 when
 3  you -- after you obtained your hunting license.
 4         Prior to learning of that regulation, did you
 5  carry a handgun into state parks and forests?
 6    A.    Yes, I did.
 7    Q.    Which state parks and forests did you carry
 8  your handgun into?
 9    A.    Sleeping Giant, the Naugatuck State Forest
10  and the Farmington Canal Trail.
11    Q.    Approximately how many times did you carry
12  your handgun into Sleeping Giant State Park?
13    A.    Every time I went there.
14    Q.    Approximately how many times did you carry
15  your handgun into Naugatuck State Forest?
16    A.    Every time I went there.
17    Q.    Approximately how many times did you carry
18  your handgun into -- on the Farmington River Canal
19  Trail?
20    A.    Approximately three times a week when I was
21  walking on it.
22    Q.    After you became aware of the regulation that
23  prohibited you from carrying a firearm in state parks
24  and forests, did you stop carrying a firearm in state
25  parks and forests?
```

```
 1      A.    I did.  But that was only after inquiring of
 2   the commissioner of the DEEP if there was some other
 3   regulation that permitted people with firearm's
 4   permits to carry them in state forests.
 5      Q.    Let's hold that thought for a second and I
 6   want to circle back to something.
 7            Prior to the learning of the regulation for
 8   why you -- that prohibited you from carrying firearms
 9   in state parks and forests, why did you carry a
10   handgun in Sleeping Giant State Park?
11      A.    For self-defense.
12      Q.    Why did you carry a firearm for the -- based
13   on the same time period in Naugatuck State Forest?
14      A.    Self-defense.
15      Q.    And the same for Farmington River Canal
16   Trail?
17      A.    Also self-defense, yes.
18      Q.    Did you have any specific reason to believe
19   that you would need to carry a firearm in Sleeping
20   Giant State Park?
21      A.    No.
22      Q.    Did you have any specific reason to believe
23   that you would need to carry a firearm for
24   self-defense in Naugatuck State Forest?
25      A.    No.
```

1    Q.    Did you have any specific reason that you

2  would feel the need to carry a firearm for

3  self-defense on the Farmington River Canal Trail?

4    A.    Yes.

5    Q.    What was that reason?

6    A.    I know that there are -- there's a lot of

7  criminal activity on the canal.  I'm aware of sexual

8  assaults that have taken place.  There was one

9  particularly egregious event with a Yale law student

10  who was assaulted on the Canal Trail.

11    Q.    How did you become aware of those incidents?

12    A.    Some of them --

13        MR. BOCHAIN:   Objection, Your Honor.  Calls

14  for hearsay.

15        MR. ATKINSON:   Your Honor, I'm not

16  offering --

17        THE COURT:   Does it matter?

18        MR. ATKINSON:   It's going to his impression

19  of why he need -- why he felt the need to carry for

20  self-defense on the Farmington --

21        THE COURT:   I'll permit the question.  Go

22  ahead.

23  BY MR. ATKINSON:

24    Q.    Do you need me to ask the question again,

25  Mr. Nastri?

 1      A.     Yeah, please.

 2      Q.     Now I've lost my train of thought.

 3             THE COURT:  Let me ask Ms. Thomas to read

 4      that back.

 5             (Record read by the Court Reporter.)

 6             THE WITNESS:  So some of them I was made

 7      aware by my brother who is a police officer in

 8      Cheshire, investigations that he had been a part of.

 9      Some were in discussions with you about criminal

10      background on -- or criminal events on the Farmington

11      Canal Trail.

12      BY MR. ATKINSON:

13      Q.     Okay.  What effect did those -- what effect

14      did hearing those stories have on you?

15      A.     I think it would be a fair statement to say

16      that it made me more committed to be able to defend

17      myself in those areas.

18      Q.     You -- let's circle back to what you

19      referenced earlier about contacting, I believe you

20      testified you contacted Commissioner Katie Dykes, the

21      defendant in this action, to see if there was another

22      regulation or law that permitted you to carry a

23      handgun in state parks and forests?

24      A.     That's correct.  When I saw the 23-4-1, I did

25      research to try and find some other counterpart to

 1   that regulation which made an exception to that rule

 2   for people who had pistol permits and I couldn't find

 3   one.  So I e-mailed Commissioner Dykes and asked if I

 4   was just missing it or if, in fact, it was the case

 5   that no one was allowed to carry firearms in state

 6   parks and forests.

 7       Q.    When approximately did you e-mail

 8   Commissioner Dykes?

 9       A.    I don't remember the exact date.  I think it

10   was in the fall.

11       Q.    Okay.  One second, please.  You still have in

12   front of you what's marked as Plaintiff's Exhibit 1,

13   the verified amended complaint.  I would direct your

14   attention to paragraph 19 on page -- the page bearing

15   the ECF stamp 4 of 16 and then that runs over onto

16   page 5 of 16.

17       A.    I see that.

18       Q.    Okay.  Have you read that paragraph?

19       A.    Yes.

20       Q.    Does that refresh your recollection on when

21   you sent that or when you made that inquiry with

22   Commissioner Dykes?

23       A.    Yes.  I did it on November 18, 2022.

24       Q.    Do you recall if Commissioner Dykes ever

25   responded to you?

```
 1      A.    Commissioner Dykes did not respond to me.  A
 2   deputy commissioner did.
 3      Q.    Who was the deputy commissioner who responded
 4   to you?
 5      A.    Deputy Commissioner Mason Trumble.
 6      Q.    What was the content of his response as you
 7   understood it?
 8            MR. BOCHAIN:  Objection, Your Honor.  Calls
 9   for hearsay.
10            THE COURT:  Sustained.
11   BY MR. ATKINSON:
12      Q.    Mr. Nastri, did you -- withdrawn.
13            Mr. Nastri, you received responses from
14   Commissioner Trumble, correct?
15      A.    Yes.
16      Q.    And on the basis of those responses, did you
17   form a conclusion about whether carrying a handgun in
18   a Connecticut state park or forest was permitted?
19      A.    I did.
20      Q.    What was your conclusion based on your
21   conversation with Mr. Trumble?
22            MR. BOCHAIN:  Objection, Your Honor.  That's
23   hearsay.
24            THE COURT:  Overruled.  It's his state of
25   mind.
```

1          THE WITNESS:  In his response, I received an

2     attachment which was a link to an Office of

3     Legislative Research report about firearms in state

4     parks and forests.

5          THE COURT:  The question is what was your

6     conclusion based on your conversation.

7          MR. ATKINSON:  Your Honor, will it be helpful

8     if I rephrase the question.

9     BY MR. ATKINSON:

10     Q.    Mr. Nastri, did you reach a conclusion based

11     on your conversation with Mr. Trumble on whether

12     carrying a firearm in a state park or forest was

13     permissible?

14     A.    I did.

15     Q.    What was your conclusion?

16     A.    Based on our communication, it is not

17     permitted to carry firearms in state parks and

18     forests.

19          MR. BOCHAIN:  Objection, Your Honor.  I have

20     to raise the hearsay objection again.  It's based on

21     the content of an e-mail that he's forming an

22     opinion.

23          THE COURT:  The e-mail may say something

24     else.  His opinion is this.

25          MR. BOCHAIN:  I think it still goes to the

```
1    substance.  I maintain my objection.
2         THE COURT:  If somebody wants to put the
3    e-mail in, that's fine, to show that his opinion is
4    different from or modified by the e-mail, but for the
5    time being, he thinks that was not permitted to carry
6    firearms in state parks or forests.  Go ahead.
7    BY MR. ATKINSON:
8    Q.    Mr. Nastri, can I direct your attention to
9    the document labeled 13 dash 13 on the ECF stamp in
10   the exhibit -- Plaintiff's Exhibit 1 that you have in
11   front you and it consists of four pages beginning
12   with one bearing the cover exhibit M.  Do you see
13   that?
14   A.    I'm sorry.  Exhibit 1 what?
15   Q.    Exhibit M.
16   A.    M, yes.
17   Q.    Can you review that, please, Mr. Nastri?
18   A.    Yes.
19   Q.    What is that document, Mr. Nastri?
20   A.    This is -- these are copies of the e-mails
21   that I -- the e-mail I sent to Commissioner Dykes,
22   Deputy Commissioner Trumble's response and my
23   response to Deputy Commissioner Trumble as well as
24   the legislative research report on carrying handguns
25   in state parks -- Connecticut parks and forests.
```

1      Q.    Are those copies true and accurate copies of

2    the e-mails between you and Mr. Trumble?

3      A.    Yes.

4           MR. ATKINSON:  Your Honor, I did not

5    previously mark these but I would offer them as a

6    full --

7           THE COURT:  Are they attached to the

8    complaint?

9           MR. ATKINSON:  Yes.  Which was marked as

10   Plaintiff's Exhibit 1.

11          THE COURT:  All right.  I think they're

12   included in that then already.

13          MR. ATKINSON:  Thank you, Your Honor.

14          MR. BOCHAIN:  Your Honor, if I could just

15   clarify the record briefly.  I don't believe

16   Plaintiff's Exhibit 1 is in evidence at this time.

17   It was offered for identification.  I think the

18   record should be clear on that.

19          THE COURT:  I thought that you told me --

20          MR. ATKINSON:  I would concur with

21   Attorney --

22          THE COURT:  I think that's right, that we

23   have 17, 19, 10, and -- 9, 10 and 17 without

24   objection.  All right.  The verified complaint is

25   Exhibit 1.

1              MR. ATKINSON:  Correct, Your Honor.

2              THE COURT:  Can't I take judicial notice of

3      this as a document filed in the Court by the

4      plaintiff?  I don't know where that goes in terms of

5      the treatment of its exhibits, but why is -- why can

6      I not take judicial notice of this as a document

7      filed at the Court.

8              MR. BOCHAIN:  I believe the Court could take

9      judicial notice of it, Your Honor.  The only thing I

10     would say is -- there's still this allegation in the

11     complaint which we have not submitted an answer to

12     yet.  So to the extent the Court is going to rely on

13     that as evidence, I would just note again it's

14     allegations at this point.

15             THE COURT:  Right.  And when we take judicial

16     notice, it has nothing to do with acceptance of the

17     contents.  It's just noting that it was filed, but I

18     don't think that's your purpose.

19             MR. ATKINSON:  Your Honor, I -- I was

20     attempting to just put the Exhibit M into --

21             THE COURT:  Is there an objection to

22     Exhibit M?

23             MR. ATKINSON:  Can I finish, Your Honor,

24     please?  What I would also note is this is -- this

25     complaint was made under oath.  This is a sworn

1    statement that was deliberately prepared in that form

2    in order to -- in order to support his preliminary

3    injunction and temporary restraining order paperwork.

4    I think at least my understanding would be that it's

5    already properly in the record for your consideration

6    on the overall merits of the preliminary injunction.

7         The fact that it was marked just for ID today

8    was a logistical thing.  I think it's clearly already

9    been submitted to you as evidence.

10        THE COURT:  All right.  It's been verified?

11        MR. BOCHAIN:  Correct.

12        THE COURT:  You can cross-examine on it.

13   What more do we need to consider about this?

14        MR. BOCHAIN:  The only thing I would note is

15   I would have no objection to Exhibit M which I think

16   is the e-mail that he's referring to which I think is

17   what he had been asking Mr. Nastri about.

18        THE COURT:  All right.  Recognizing M is part

19   of the verified amended complaint, should we

20   separately admit it as an exhibit?

21        MR. ATKINSON:  I have no objection to that,

22   Your Honor.

23        THE COURT:  We'll call it A sub 1 -- I mean 1

24   sub A.

25        MR. ATKINSON:  That works for me.

```
1              THE COURT:  And then it will be M and it will
2    be thoroughly confused.  Okay.  One -- Exhibit 1A,
3    Plaintiff's Exhibit 1A is Exhibit M to the verified
4    compliant.  Okay.  Let's go.
5              MR. ATKINSON:  Thank you, Your Honor.
6    BY MR. ATKINSON:
7       Q.    Mr. Nastri, in the e-mails that you exchanged
8    with Mr. Trumble, what was the purpose of those
9    e-mails?
10      A.    The purpose, as I stated in my original
11   e-mail, was to clarify the regulation and to find out
12   if there was another regulation that allowed the
13   carrying of firearms in the state parks and forests.
14      Q.    Why did you seek that clarification,
15   Mr. Nastri?
16      A.    Because I had a hard time believing that a
17   restriction on the ability to carry arms in public
18   could be on the books in such a manner.
19      Q.    Personally -- withdrawn.
20            Did you have a personal -- did you have a
21   personal interest in that answer?
22      A.    I'm not clear what you mean by "personal
23   interest."  Is it my background?  Do I understand
24   something about it?
25      Q.    Were you looking to do something as the
```

1    result of that answer?

2            MR. BOCHAIN:  Objection, Your Honor.

3    Leading.

4            THE COURT:  Sustained.

5            MR. ATKINSON:  Let me rephrase or attempt to

6    at least.

7    BY MR. ATKINSON:

8       Q.   Prior to you sending that e-mail to

9    Commissioner Dykes and then hearing back from

10   Mr. Trumble, you had -- did you carry your firearms

11   into state parks and forests?

12      A.   I did.

13      Q.   Were you looking to continue to carry your

14   firearms into state parks and forests?

15           MR. BOCHAIN:  Objection, Your Honor.

16   Leading.

17           THE COURT:  Sustained.

18           I'm going to change my mind on that.  It does

19   not suggest its own answer.  You may ask that

20   question.

21           MR. ATKINSON:  Thank you.  Can the court

22   reporter please read it back.  Thank you.

23           (Record read by the Court Reporter.)

24           THE WITNESS:  Yes.  When I discovered this

25   regulation and inquired about, for lack of a better

```
 1   term, a corollary regulation that would allow pistol
 2   permit holders to carry firearms in state parks and
 3   forests and based on Mr. Trumble's response, seeing
 4   that there was no corollary that would allow that and
 5   that, in fact, there is a prohibition on firearms in
 6   state parks and forests outside of the very specific
 7   permitted activities, it was my intent with my final
 8   response to Mr. Trumble to draw his attention to
 9   Supreme Court decisions that clarified that we have a
10   right to carry firearms in state parks and forests
11   and I directed him to the Bruen decision and asked
12   that he ask Commissioner Dykes to amend that
13   regulation so that it's in compliance with the Bruen
14   decision.
15   BY MR. ATKINSON:
16      Q.    After your conversation with Mr. Trumble, did
17   you stop carrying your handgun in state parks and
18   forests?
19      A.    As a result of the communication that I had
20   with Mr. Trumble and discovering that, in fact, there
21   is no allowance for pistol permit holders to carry
22   them in state parks and forests, I did stop carrying
23   them in state parks and forests.
24      Q.    Why did you stop carrying them?
25      A.    Because I wasn't going to violate a law.
```

1    Q.    Okay.  At that time did you have any

2    knowledge that there would be consequences for

3    violating that law?

4    A.    I was aware that carrying a firearm in a

5    state park or forest carried a $35 fine.  I believe

6    there's a continuum of punishments to include being

7    banned from state parks and forests for 24 hours and

8    also up to a year you can be banned from state parks

9    and forests.  In addition to those, a violation of

10   this type I thought could potentially jeopardize my

11   pistol permit.

12         It conceivably could go on -- any --

13   actually, it's not conceivable.  If I had received

14   any of those penalties, I would have had to report

15   those to the regulators in my industry and that would

16   go on my U4 which is our version of a permanent

17   record.

18   Q.    Just to clarify, by your industry and U4 for

19   a second, could you clarify those two terms?

20   A.    So in my industry, our regulatory body is

21   called FINRA.

22   Q.    So can I stop you for a second?

23   A.    Yes.

24   Q.    What industry are you referring to?

25   A.    In the financial services industry.

1    Q.    Continue, please.

2    A.    So FINRA is the Financial Institution

3    Regulatory Authority and it's called an SR,

4    self-regulatory authority, and it is under the

5    auspices of the Securities and Exchange Commission

6    and they are the agency which is charged with

7    compliance and making sure that we are operating

8    within the regulations of our industry.

9    Q.    And what is the U4 that you referred to?

10   A.    U4 is your permanent record.  It contains

11   lists of licenses, employers, complaints that have

12   been filed against you, arrests, you know, things of

13   that nature.

14   Q.    Does it also contain a disciplinary history?

15   A.    It does.

16   Q.    As you sit here today, have you ever been

17   disciplined as a financial adviser?

18   A.    I have not been disciplined.  I have one

19   complaint on my record, but I was not disciplined for

20   it.

21   Q.    How was that complaint resolved?

22   A.    It was denied.

23   Q.    What does denied mean?

24   A.    It means that -- so this takes a little bit

25   of background.  So I work for Webster Investments.

1  Webster Investments hires a firm called a broker

2  dealer and the broker dealer is essentially the

3  platform on which all of our investments are

4  maintained.  They are also our immediate compliance

5  authority.  So they would do audits.  They would

6  investigate complaints.

7       They are sort of an arm of FINRA in that

8  regard to make sure that we are in compliance with

9  all the regulations that we are subject to and when a

10 complaint is made, it goes to several levels.  One is

11 internally at Webster and then it goes to the

12 compliance department at LPL, and then that is

13 investigated.  They usually bring in an attorney to

14 do an investigation.  And a determination is made as

15 to the truth of the allegation and they make a

16 decision about whether they are going to deny the

17 complaint or settle the complaint or forward it for

18 further adjudication.

19 Q.   In making your decision not to carry a

20 handgun in state parks and forests because of this

21 law and the possibility that you might need to report

22 this to FINRA and the other proper authorities, did

23 you contemplate the effect that such a violation

24 would have on your career?

25       MR. BOCHAIN:  Objection, Your Honor.

1    Leading.

2          THE COURT:   I'm going to sustain that because

3    it assumes there would be such an effect.

4          MR. ATKINSON:   Okay, Your Honor.   Thank you.

5    BY MR. ATKINSON:

6    Q.    Mr. Nastri, if you -- if you were to violate

7    the state parks prohibition on carrying firearms in a

8    state park or forest and you received punishment or

9    discipline for that, would you have to report that to

10   the regulatory bodies that oversee you as a financial

11   adviser?

12   A.    Yes.   I have an annual compliance

13   questionnaire that I'm obligated to fill out and

14   there are questions on there about arrests, charges,

15   penalties, et cetera.

16   Q.    And can you remind us how long you've been a

17   financial adviser?

18   A.    I have been in the role for 17 years.

19   Q.    Based on your knowledge of -- withdrawn.

20         Based on the length of time that you have

21   been a financial adviser, have you acquired a

22   knowledge of the disciplinary system that oversees

23   financial advisers?

24   A.    I have.

25   Q.    Have you encountered or have you acquired a

1    knowledge of what certain consequences could look

2    like -- what certain discipline could look like if

3    imposed on a financial adviser?

4        A.    I am.   I'm aware of people who had violated

5    various different rules in our industry, broken laws

6    relative to our industry, and licenses can be

7    suspended and I am aware of people who have had that

8    happen.   We just had an adviser resign after

9    allegations that he committed a very egregious

10   violation which he admitted to.   So a complaint of

11   this type or an incident of this type would go on my

12   U4 and it could lead to my discharge.

13       Q.    You -- withdrawn.

14            MR. ATKINSON:   May I have a moment, Your

15   Honor?

16            THE COURT:   Yes.

17            MR. ATKINSON:   Thank you.

18   BY MR. ATKINSON:

19       Q.    Based on your belief that these consequences

20   might result from a violation of the state park

21   prohibition on carrying in state parks and forests,

22   do you intend to carry a handgun in state parks and

23   forests in the future?

24            MR. BOCHAIN:   Objection, Your Honor.

25   Leading.

1            THE COURT:  Do you want to break that into

2    two things?

3            MR. ATKINSON:  I can try, Your Honor.

4            THE COURT:  Because otherwise, you have put

5    it together as a question that suggests its answer.

6            MR. ATKINSON:  I'll try to break that apart,

7    Your Honor.

8    BY MR. ATKINSON:

9    Q.   Mr. Nastri, when you concluded that carrying

10   a handgun into state parks and forests was no longer

11   permissible in your understanding of the law, did you

12   contemplate the consequences that would result from

13   that?

14   A.   Yes.  I think certainly I would be subject

15   some kind of discipline professionally.  I think my

16   law license might be in jeopardy at that point and

17   made a determination that I was going to obey that

18   law for as long as it stayed on the books and that's

19   what led to filing this action, that until such time

20   that this regulation is overturned, that I will not

21   carry a firearm in a state park or forest.  I'm an

22   officer of the court.  I will not willfully disobey a

23   law, but as an officer of the court, it is my

24   obligation to make sure that the laws that are on the

25   books are constitutionally sound, and when this one

1    is repealed, then I will carry firearms in state

2    parks and forests again.

3       Q.    Why would you -- withdrawn.

4             In -- withdrawn.

5             You testified earlier that you researched a

6    lot about the laws pertaining to firearms and you

7    also testified about your interactions with

8    Commissioner Dykes and Commissioner Trumble.

9             Are you aware based on -- or do you have any

10   knowledge based on any research you did or any

11   conversations you had whether there's a way that you

12   could get permission to carry a handgun in state

13   parks for self-defense?

14      A.    I am aware that there is a procedure where

15   you can request permission to carry firearms into a

16   state park or forest.  I believe the context is

17   normally not self-defense.  I think that context --

18   the one incident I read about was a reenactment

19   group, a civil war reenactment group, that wanted to

20   bring Civil war era weapons into a state park or

21   forest.  I am not aware that it's something you can

22   ask to carry a firearm for self-defense.

23      Q.    Okay.  Do you have any knowledge of how a

24   process for making such an application as that

25   would -- what that process would look like?

1    A.    I believe there's a form that you submit

2  identifying what you want to do and bring it to the

3  park.

4    Q.    Have you ever seen that form?

5    A.    I recollect seeing one in maybe one of these

6  exhibits.

7    Q.    Do you know where you could find such a form?

8    A.    I don't.

9         MR. ATKINSON:  May I have a moment, Your

10 Honor?  I think I'm close to wrapping up.

11 BY MR. ATKINSON:

12   Q.    Mr. Nastri, you testified that you regularly

13 used Farmington River Canal Trail, correct?

14   A.    Yes.

15   Q.    Where do you do access the Farmington River

16 Canal Trail?

17   A.    I can walk to the trail from my home.  I can

18 walk to one end of my street and the canal intersects

19 with a road called Higgins Road.  I can take a right

20 out of my driveway and access it on North Brooksvale

21 in Cheshire.

22   Q.    Do you typically access it by foot?

23   A.    Yes.

24   Q.    And just to circle back to your testimony

25 earlier, when you access it, it's typically for

1    walking or jogging?

2           MR. BOCHAIN:   Objection, Your Honor.   This

3    has been asked and answered.

4           THE COURT:   Sustained.

5           MR. ATKINSON:   Withdrawn.   I'll move on.

6    BY MR. ATKINSON:

7       Q.   Do you schedule when you're going to go to a

8    state park or forest, Mr. Nastri?

9       A.   No.

10      Q.   Do you have a calendar that you keep track of

11   when you go?

12      A.   No.

13      Q.   How far is Sleeping Giant State Park from

14   your house?

15      A.   Sleeping Giant is probably three miles from

16   my house.

17      Q.   How do you typically go to Sleeping Giant

18   State Park?

19      A.   I would drive there.

20      Q.   Do you have any knowledge of how long

21   approximately it would take you to drive from your

22   house to Sleeping Giant State Park?

23      A.   I want to amend my earlier answer.   It may be

24   more than three miles.   It's a five- or ten-minute

25   ride.

1    Q.    Do you plan -- do you put a date on a

2    calendar when you're going to go to Sleeping Giant

3    State Park?

4    A.    No.

5    Q.    How far is Naugatuck State Forest from your

6    house?

7    A.    Approximately a mile.

8    Q.    How long -- how do you typically access

9    Naugatuck State Forest?

10   A.    I would drive down the street and there is a

11   town park calling Roaring Brook and I would hike up

12   to the top of Roaring Brook and once you get to the

13   top, you're in the Naugatuck State Forest.

14   Q.    Approximately how long does it take you to

15   get from your house to Roaring Brook state park?

16   A.    Less than a minute.

17   Q.    How long does it take you to hike from the

18   entrance to Roaring Brook state park to where you

19   enter Naugatuck State Forest?

20   A.    Fifteen minutes.  It's a steep hill that you

21   have to climb up.

22   Q.    Do you plan or mark your visits to Naugatuck

23   State Forest on a calendar?

24   A.    No.

25   Q.    Do you feel that you live close enough to

1   Sleeping Giant State Park that you could visit at any

2   time you get a hunch to?

3      A.    Yes.  It's always impromptu.  If we have a

4   gap in our afternoon and we're looking to fill it,

5   that's a good way to do it.

6      Q.    With respect to Farmington Valley --

7   withdrawn.

8           With respect to the Farmington River Canal

9   Trail, do you typically plan when you're going to go

10  to visit?

11     A.    No.  I would say it's more than impromptu

12  because it's part of my running route.  So there's

13  regularity with that.  And then it's the same thing

14  as far as walking, you know, we have a block of time

15  and decide to go for a stroll.  You know, I did it

16  yesterday afternoon.  I did actually both.  I ran and

17  then I took a cool-down walk.

18          MR. ATKINSON:  I have no further questions at

19  this time, Your Honor.

20          THE COURT:  Okay.  Thank you.

21          Cross-examination.

22          MR. BOCHAIN:  If I can have one quick moment,

23  Your Honor.

24          CROSS-EXAMINATION OF DAVID NASTRI

25  BY MR. BOCHAIN:

```
1      Q.    Hi, Mr. Nastri.

2      A.    How are you?

3      Q.    Good.  How are you?

4      A.    Thanks.

5      Q.    My name is Thadius Bochain.  I represent the

6   defendant, Commissioner Katie Dykes, along with my

7   colleagues.

8            Have we met before?

9      A.    Yes.

10     Q.    Was that at your deposition on April 27th of

11  this year?

12     A.    Yes, it was.

13     Q.    It's nice to see you again.  As you know,

14  your lawyer just asked you some questions.  It's

15  going to be my turn to ask you some questions.  I

16  hope my questions will be clear, but I'm human.  So

17  if I say something you don't understand, just let me

18  know and I'll try to rephrase it.  Okay?

19     A.    Okay.

20     Q.    Now, there were some questions during direct

21  that you served in the military, right?

22     A.    That is true, yup.

23     Q.    And you started in the Army around 1980, did

24  I hear that correctly?

25     A.    That is correct.
```

1    Q.    And after that, you served for a period of

2    time in the Army National Guard, correct?

3    A.    Yes.

4    Q.    And was that approximately 2003 when you

5    started?

6    A.    Yes?

7    Q.    And you were discharged, right, in about

8    2012?

9    A.    Yes.

10   Q.    And I think I heard correctly that you served

11   overseas for a period of time when you were in the

12   Army National Guard; is that right?

13   A.    Yes.

14   Q.    Isn't it true that when you're in the

15   military, there's quite a few rules and regulations

16   that you need to follow?

17   A.    Yes.

18   Q.    And when you were also deployed overseas for

19   a period of time, it was about year, did I hear that

20   correctly?

21   A.    It was less than a year, but yes.

22   Q.    Less than a year.  And when you were there,

23   did you follow all the rules and regulations while

24   you were overseas?

25   A.    When I was overseas, yes.

1    Q.    Okay.  And for a period of time, you served

2    in the Army National Guard, you came back to the

3    states, correct?

4    A.    Yes.

5    Q.    And did you serve -- you served for a period

6    of time in the United States while you were in the

7    Army National Guard, correct?

8    A.    Yes.

9    Q.    And while you were there, isn't it true that

10   you followed all of the rules and regulations while

11   you were in the Army National Guard?

12   A.    Are you referring to when I came back from

13   overseas?

14   Q.    When you came back from overseas, we'll start

15   with that.

16   A.    Yes.

17   Q.    And so when you were overseas, though, you

18   still followed all the rules and regulations when you

19   were there?

20   A.    Yes.

21   Q.    And while you're in the military, you're

22   issued orders from your superiors, correct?

23   A.    Yes.

24   Q.    And you had followed all of those orders,

25   correct?

1    A.    Yes.

2    Q.    Now, believe I heard some testimony about --

3 I don't know if I heard this but you work for

4 Financial Resources Group; is that right?

5    A.    That is correct.

6    Q.    And they are -- there is a location here in

7 Connecticut and the office is in a Webster Bank; is

8 that not right?

9    A.    That is correct.

10    Q.    And I think heard correctly that you're a

11 wealth adviser?

12    A.    Correct.

13    Q.    And that's -- you manage people's

14 investments, correct?

15    A.    Yes.

16    Q.    And as part of that job, you have continuing

17 education requirements; is that right?

18    A.    Yes.

19    Q.    And you have always been in compliance with

20 those continuing education requirements, correct?

21    A.    Yes.

22    Q.    Now, I think I also heard on direct

23 examination that you've never been disciplined by

24 your current employer, the Financial Resources Group,

25 right?

```
 1      A.    Yes.

 2      Q.    And you've never been disciplined by any

 3   employer in the past, correct?

 4      A.    That's correct.  So our current --

 5      Q.    That's a yes or no.

 6      A.    Okay.

 7      Q.    Thank you.

 8            And I think I heard during direct that you

 9   said you're a law-abiding citizen, correct?

10      A.    Yes.

11      Q.    And you've never been convicted of a felony,

12   right?

13      A.    Correct.

14      Q.    You've never been convicted of a misdemeanor,

15   right?

16      A.    Correct.

17      Q.    And you've never been arrested before, right?

18      A.    Correct.

19      Q.    Now, I think I also heard that you have a

20   pistol permit, correct?

21      A.    Yes.

22      Q.    All right.  And I don't know if this came out

23   on direct, but you have 13 firearms, right?

24      A.    I believe that's the correct number.

25      Q.    And so you would consider yourself fairly
```

```
 1   knowledgeable about firearms laws here in
 2   Connecticut, right?
 3       A.    Reasonably so.
 4       Q.    Would you consider yourself more
 5   knowledgeable than most, correct?
 6       A.    Yes.
 7       Q.    So you're generally familiar with the laws
 8   regarding gun ownership, correct?
 9       A.    Yes.
10       Q.    And I think I heard you say you're also
11   familiar with the law requiring that you have to have
12   your pistol permit on you when you're carrying a
13   firearm, correct?
14       A.    Correct.
15       Q.    So you're familiar then with the laws
16   regarding the possession of firearms, right?
17       A.    Yes.
18       Q.    And you abide by all of those laws that you
19   know of, correct?
20       A.    Yes.
21       Q.    And I think I also heard that you know that
22   there's a law requiring the safe storage of a firearm
23   in a motor vehicle, correct, here in Connecticut?
24       A.    I don't think that came up today but I am
25   generally aware of it.
```

1    Q.    I'll rephrase that.

2          You are aware that there's a law in

3    Connecticut, right, regarding the safe storage of a

4    firearm in a motor vehicle, correct?

5    A.    Yes.

6    Q.    Isn't it also true that you actively try to

7    ensure that you're complying with gun laws here in

8    Connecticut?

9    A.    I'm sorry.  Can you ask that again?

10   Q.    Isn't it true that you actively try to ensure

11   that you are compliant with gun laws here in

12   Connecticut?

13   A.    Yes.

14   Q.    So for example, when you discover that your

15   conduct might implicate a gun law here in

16   Connecticut, you conduct research to ensure that

17   you're compliant with that law, correct?

18   A.    I did in this particular instance, yes.

19   Q.    Are you familiar -- you're familiar with the

20   assault weapons ban, correct?

21   A.    Yes.

22   Q.    So when you became -- do you own a weapon --

23   you own a weapon that would fall within the assault

24   weapons ban in Connecticut, right?

25   A.    I do.

1    Q.    So when you became aware of the assault

2  weapons ban in Connecticut, didn't you research that

3  issue to ensure that you were compliant with that

4  law?

5    A.    I didn't actually need to do research.  When

6  the law was passed, you were required to register

7  anything that fell into that category.

8    Q.    When you became aware of that law, you

9  actively took steps to comply it with, right?

10    A.    That is correct.

11    Q.    And you do not have any intent to violate any

12  law in the future; is that right?

13    A.    That is correct.

14    Q.    Now, I'd like to switch gears slightly if I

15  could and ask about where you actually carry a

16  firearm.

17          Isn't it true that there's times where you

18  live -- that you leave your house and you do not

19  carry a firearm with you?

20    A.    Yeah.

21    Q.    All right.  So I think I heard on direct

22  examination that you carry a firearm with you every

23  day, right?

24    A.    Yes.

25    Q.    But there are times when you leave your house

1    and you do not carry a firearm, correct?

2       A.    That is correct.

3       Q.    Okay.  And so you're a military veteran,

4    right?

5       A.    Yes.

6       Q.    All right.  And you receive your health care

7    through the Veteran's Affairs Hospital otherwise

8    known as the VA here in Connecticut; is that not

9    right?

10      A.    Yes.

11      Q.    And so isn't it true that when you go to the

12   VA here in Connecticut, you leave your firearm at

13   home?

14      A.    I do.

15      Q.    And the reason you do that is because you

16   cannot carry on your person a firearm in the VA

17   hospital, right?

18      A.    You're not permitted to have a firearm on the

19   property.

20      Q.    The property meaning the parking lot,

21   correct?

22      A.    Correct.  Anything that falls into that

23   envelope of VA property.

24      Q.    So when you leave your home to go to the VA

25   Hospital, you leave your firearm at home, correct?

```
1        A.    Yes.

2        Q.    Now, we discussed very briefly at the

3   beginning here that you had a deposition in

4   connection with this case and at that -- that

5   deposition took place in Hartford at the Office of

6   the Attorney General, correct?

7        A.    Yes.

8        Q.    And isn't it true that when you left your

9   home that day, you left your firearm at home?

10       A.    I did.

11       Q.    And do you recall without speculating the

12   specific reasons why you stated that you left your

13   firearm at home when you attend the deposition?

14       A.    I'm not sure exactly what I said during the

15   deposition, but --

16       Q.    Let me stop you right there.  So the question

17   was without speculating, do you know?

18       A.    You are going to have to start over because

19   I've lost track of what you're asking me.

20       Q.    Sure.  I can ask the question again.

21            So do you recall without speculating the

22   specific reasons that you stated as to why you left

23   your firearms at home when you attended your

24   deposition on April 27, 2023?

25       A.    I would say no, I can't.
```

1           MR. BOCHAIN:  May I approach the witness,

2    Your Honor?

3           THE COURT:  You may.

4    BY MR. BOCHAIN:

5      Q.    I'm showing you what has been marked as

6    Plaintiff's Exhibit 15.  Can you just take a moment

7    to look at that?

8           Have you had a moment to look at that?

9      A.    Well --

10     Q.    Just look at the first page and let me know.

11     A.    It's my deposition.

12     Q.    So you're familiar with what that document

13   is?

14     A.    Yes.

15     Q.    Now, I'm going to ask you to turn to

16   page 149, lines 20 to 25, and it's also going to go

17   onto page 150, lines 1 to 2?

18     A.    Okay.

19     Q.    All right.  Did you have a moment to review

20   those lines?

21     A.    You said 22?

22     Q.    So page 149.

23     A.    Yup.

24     Q.    And then it's lines 20 through 25 on 149 and

25   then onto page 150 lines 1 and 2.

1    A.    Yes.

2    Q.    So does that refresh your recollection?

3    A.    It does.

4    Q.    So isn't it true that the first -- you gave

5    two reasons as to why you left your firearm at home;

6    is that not right?

7    A.    Well, I think of it as one, but you can call

8    it two.

9    Q.    So we'll just say it's two.  The first reason

10   then that you left your firearm at home when you

11   traveled to your deposition was because firearms are

12   prohibited at the Office of the Attorney General,

13   correct?

14   A.    Correct.

15   Q.    And the second reason that you left your

16   firearm at home is really because you didn't know two

17   things, first, if you were going to be parking at the

18   Office of the Attorney General premises, and the

19   second thing is whether that premises where you'd be

20   parking is a location where firearms are prohibited,

21   correct?

22   A.    Yeah.  I see that.  That's what I said.

23   Q.    All right.  So you left your guns at home

24   because you were unsure whether firearms were

25   prohibited at the Office of the Attorney General

```
 1   premises where you'd be parking your car on the date
 2   of your deposition, correct?
 3       A.   Yes.
 4       Q.   You can keep that in front of you but you can
 5   just close that for now.
 6            Now, let me ask this:  So at your deposition,
 7   you were represented by Attorney Atkinson, right?
 8       A.   Yes.
 9       Q.   And he was with you at all times during the
10   deposition?
11       A.   Yes.
12       Q.   And you were placed under oath much like you
13   were today at that deposition, right?
14       A.   Yes.
15       Q.   And at the start of the deposition, I asked
16   -- you were asked whether you were under the
17   influence of any drugs, correct?
18       A.   Yes.
19       Q.   And you were asked whether you were under the
20   influence of any alcohol, correct?
21       A.   Yes.
22       Q.   And there was nothing that would have
23   prohibited your ability to think clearly, correct?
24       A.   That's correct.
25       Q.   And you testified truthfully in that
```

```
 1   deposition, right?
 2      A.    I did.
 3      Q.    Now, earlier you testify that you have a
 4   Connecticut Pistol Permit and you carry that in your
 5   wallet, right?
 6      A.    Yes.
 7      Q.    And that's the only place that you keep it,
 8   right?
 9      A.    Yes.
10      Q.    Now, there are times, though, that you do not
11   carry your wallet on your person, right?
12      A.    Yes.
13      Q.    And so for example, when you go for a run,
14   you do not carry your wallet with you, right?
15      A.    That is correct.
16      Q.    And I think I heard you go for a run about
17   three to four times per week; is that right?
18      A.    Yes.
19      Q.    And when you go for a run, it's around your
20   neighborhood, correct?
21      A.    Yes.
22      Q.    And I think you mentioned the Farmington
23   Canal Trail, it's very close to your house, isn't it?
24      A.    It is.
25      Q.    And you go for runs on the Farmington Canal
```

1   Trail, right?

2       A.   Yes.

3       Q.   And the reasons that you run -- go for a run

4   on the Farmington Canal Trail is because of the

5   proximity to where you live and it's visually pretty,

6   correct?

7       A.   Correct.

8       Q.   So you don't need to run there, you just

9   chose to do so because of those reasons, correct?

10      A.   Correct.

11      Q.   And isn't it true that you do not carry your

12  firearm on your person when you do not have your

13  pistol permit on you?

14      A.   Yes.  That is correct.

15      Q.   So you do not carry it when you have your --

16  when you don't have a pistol permit on you, right?  I

17  just want to be clear about that?

18      A.   Which one are you referring to, the gun or

19  the pistol permit?

20      Q.   You do not carry a firearm on your person

21  when you do not have your pistol permit on you,

22  right?

23      A.   That is correct.

24      Q.   And isn't it also true that you never carry a

25  firearm on your person when you go for a run?

1    A.    That is correct.

2    Q.    In fact, it's never been your practice to

3  carry a firearm on your person when you go for a run?

4    A.    Correct.

5    Q.    Now, isn't it also true that there's other

6  places that you go to that you don't carry your

7  firearm?

8    A.    Yes.

9    Q.    All right.  In fact, as a gun owner, you

10 sometimes choose not to carry a firearm on your

11 person because there are certain places where you

12 can't have a firearm; isn't that right?

13   A.    That is correct.

14   Q.    So for example, at Financial Resources Group,

15 you don't bring a gun to Webster Bank, correct?

16   A.    That is correct.

17   Q.    And you go into that office five times per

18 week, right?

19   A.    Generally, yes.

20   Q.    I'm going to ask you to take a look at

21 deposition -- your transcript in front of you there,

22 page 27 to 28.

23   A.    All right.  I'm on that page.

24   Q.    Lines 2 to 3, isn't it true that you go into

25 the office five days per week?

1    A.    What page are you referring to?

2    Q.    Page 28.  I'm sorry.

3    A.    Twenty-eight, okay.  Yes.

4    Q.    All right.  So -- and that's what you

5  testified in your deposition?

6    A.    Yeah.

7    Q.    So it's five days per week you go into the

8  office?

9    A.    Yes.

10    Q.    And you never carry your gun when you go into

11  the office, right?

12    A.    That is correct.

13    Q.    And the reason for that is Webster Bank

14  prohibits firearms on their premises, right?

15    A.    That is correct.

16    Q.    And Webster Bank had a holiday party in

17  December 2002 at a brewery in Southington, correct?

18    A.    Yes.

19    Q.    And you didn't carry your firearm to that

20  holiday party, correct?

21    A.    I didn't carry it inside, no.

22    Q.    I'm sorry?

23    A.    I did not carry it inside, no.

24    Q.    And the reason you didn't carry it is because

25  Webster Bank prohibits you from carrying a firearm at

1    their functions, correct?

2       A.    That is correct.

3       Q.    Now, you have two brothers; is that not

4    right?

5       A.    I do.

6       Q.    And they both live in Hamden, Connecticut,

7    right?

8       A.    Yes.

9       Q.    And you visit the home of one of those

10   brothers once per month, correct?

11      A.    Yes.

12      Q.    And when you go to that brother's house, the

13   one that you visit once per month, isn't it true you

14   don't carry a firearm into that house?

15      A.    That is correct.

16      Q.    And the reason you don't carry a firearm into

17   that house is because your sister-in-law, so your

18   brother's wife, prohibits guns in their house, right?

19      A.    That is correct.

20      Q.    And you always honor that request, don't you?

21      A.    I do.

22      Q.    And you have a girlfriend, do you not?

23      A.    Yes.

24      Q.    Her first name is Colleen, right?

25      A.    Yes.

1    Q.    And she has a son, correct?

2    A.    Yes.

3    Q.    Now, you -- when you go to pick up the son at

4    school, you don't bring your gun there, correct?

5    A.    That is correct.

6    Q.    And isn't -- and Colleen has family down in

7    Florida, right?

8    A.    Yes.

9    Q.    And you visit her family occasionally, do you

10   not?

11   A.    Yes.

12   Q.    And you leave your gun at home when you go

13   visit the family, correct?

14   A.    I do.

15   Q.    I think you also mentioned on the direct

16   there's certain places that you don't go to with your

17   gun.  I can't recall.  But you don't take your gun to

18   a post office, right?

19   A.    No.

20   Q.    When you go to vote, you don't bring a gun,

21   correct?

22   A.    Correct.

23   Q.    And when you visited your brother at a

24   courthouse in the past, you haven't brought a gun

25   there, correct?

 1    A.    That is correct.

 2    Q.    And that's because you can't bring a gun into

 3  a courthouse, right?

 4    A.    Correct.

 5    Q.    And in the past, you've seen signs in various

 6  places that say no guns allowed, right?

 7    A.    Yes.

 8    Q.    And so when you've seen those signs, you

 9  comply with them, don't you?

10    A.    Yes.

11    Q.    Now, I want to circle back, if I can to

12  social -- let me ask it this way -- withdrawn.

13        When you go visit your brother, it's for

14  social gatherings, right?

15    A.    Yes.

16    Q.    And so you're familiar with a family with the

17  last name Greens, right?

18    A.    Yes.

19    Q.    They're friends of yours, right?

20    A.    Yes.

21    Q.    And you occasionally go to their house for

22  dinner, don't you?

23    A.    Yes.

24    Q.    But you bring your gun to their house, don't

25  you?

```
 1      A.     I do.

 2      Q.     Now, if the Greens were to ask you not to

 3  carry a gun in their house, you would not do so,

 4  isn't that right?

 5      A.     That is correct.

 6      Q.     And you would not bring a gun into their

 7  house because you want to respect their request,

 8  don't you?

 9      A.     That is correct.

10      Q.     And if you brought a gun into their house

11  against their wishes, that would be trespassing,

12  wouldn't it?

13      A.     It would.

14      Q.     It would?

15      A.     It would be trespassing.  Well, once they ask

16  me to leave, I believe that would be the trespass.

17      Q.     I'm going to ask you to take a look at

18  page 159 of your deposition, please.

19      A.     159?

20      Q.     159, correct.

21      A.     Line 7?

22      Q.     Correct.  So isn't it true that you testified

23  -- well, does that refresh your recollection of what

24  you said in response to that question at your

25  deposition?
```

1      A.    It does.

2      Q.    All right.  So isn't it true that you said

3  that would be trespassing if you brought a gun into

4  their house, correct, against their wishes?

5      A.    I did say that.

6      Q.    If you went to a restaurant while you were

7  carrying a firearm and the restaurant's owner told

8  you that there were no guns allowed, isn't it true

9  that you wouldn't bring your firearm to that

10  restaurant?

11      A.    That is correct.

12      Q.    In fact, you'd leave your firearm in the car

13  under those circumstances, wouldn't you?

14      A.    Yes.

15      Q.    And if that restaurant owner saw you with a

16  gun and asked you to leave because they said no guns

17  allowed on the premises, you would leave, wouldn't

18  you?

19      A.    I would.

20      Q.    Now, do you recall being asked a similar

21  question during your deposition about why you would

22  leave your firearm in the car if that restaurant's

23  owner told you that no guns were allowed?

24      A.    I don't recall that question, no.

25            THE COURT:  I'm sorry.  What was your answer?

1          THE WITNESS:  I don't recall that.

2     BY MR. BOCHAIN:

3          Q.    All right.  If you can look at your

4     deposition transcript there, I'm going to ask you to

5     turn to page 159 again, lines 22 to 25, and then it's

6     going to carry onto 160 to line 1.  Let me know when

7     you've had a chance to review that.

8          A.    So again, we're on page 159?

9          Q.    Yeah.  159, lines -- let's go 22 to 25 and

10    then onto line 1 on page 160.

11         A.    Okay.

12         Q.    Okay.  Have you had a chance to review that?

13         A.    Yes.

14         Q.    All right.  Does that refresh your

15    recollection as to why you said you wouldn't bring

16    it?  And I'll ask the follow-up question.  I'm just

17    asking if that refreshes your recollection.

18         A.    It does.

19         Q.    Okay.  So isn't it true that the reasons

20    you'd leave your firearm in your car under those

21    circumstances is because it's the restaurant owner's

22    property and if you wanted to stay, you would have to

23    follow his rules?

24         A.    Yes.  That's correct.

25         Q.    I think I heard you say this on direct, but

1    isn't it true would you not carry a firearm or

2    handgun, a handgun or a pistol, into any Connecticut

3    state park or forest?

4              MR. ATKINSON:  Objection, Your Honor.  It

5    seems very vague of a question to me.

6              THE COURT:  Why don't you ask the question

7    straight out.  If the deposition is inconsistent with

8    it, you can use that to --

9              MR. BOCHAIN:  I was actually -- I can ask it

10   into two questions, Your Honor.

11   BY MR. BOCHAIN:

12      Q.    So isn't it true that you would not carry a

13   handgun or pistol into a Connecticut state park or

14   forest?

15      A.    It is true --

16      Q.    Yes or no?

17      A.    That is true.

18      Q.    And didn't you testify on direct examination

19   that you made a determination that you will not bring

20   a gun into any state park or forest while the

21   regulation is on the books?

22      A.    Correct.

23      Q.    So you don't carry a firearm on your person

24   when you go to a post office, right?

25      A.    Correct.

1    Q.    You don't carry a firearm when you go to a
2  school, right?
3    A.    Right.
4    Q.    You don't carry a firearm when you go to a
5  government building, right?
6    A.    Correct.
7    Q.    You wouldn't carry a firearm on your person
8  into a restaurant if the restaurant's owner said that
9  firearms are prohibited, right?
10   A.    That is correct.
11   Q.    You'd also leave the restaurant if the
12 restaurant's owner asked you to leave the
13 establishment because you had a gun, right?
14   A.    Correct.
15   Q.    You don't carry a firearm when you go to work
16 in your office which is located in Webster Bank,
17 right?
18   A.    When I go into the office, that's correct.
19   Q.    You don't carry a firearm when you go to work
20 functions, correct?
21   A.    When I what?
22   Q.    You do not carry a firearm when you go to
23 work functions hosted by Webster Bank, right?
24   A.    I don't carry them in those function.
25   Q.    That's because Webster Bank has a prohibition

1    about bringing guns --

2        A.    Yes.

3        Q.    Thank you.

4              You don't carry a firearm at your brother's

5    house, right?

6        A.    Correct.

7        Q.    And isn't it true that you would not carry a

8    firearm and you don't carry a firearm into

9    Connecticut state parks and forests, correct?

10       A.    Correct.

11       Q.    And isn't it true that you would not carry a

12   firearm in any of those locations I just mentioned?

13       A.    Correct.

14       Q.    Now, I want to switch gears if I can.  I know

15   there was some discussion about the regulation at

16   issue here which is Section 23-4-1(c).  That

17   regulation has never been enforced against you,

18   correct?

19       A.    Correct.

20       Q.    And you're familiar with the Environmental

21   Conservation Police, correct?

22       A.    I am.

23       Q.    And you're aware that they are the law

24   enforcement arm of the Department of Energy and

25   Environmental Protection, right?

1      A.    Yes.

2      Q.    And they had never threatened you with

3   enforcement of that regulation, correct?

4      A.    Correct.

5      Q.    No police officer has threatened you with

6   enforcement of that regulation, correct?

7      A.    Correct.

8      Q.    Now, there was some discussion about the

9   state parks and forests that -- two state parks that

10  you go to and one state forest, the two state parks,

11  Sleeping Giant State Park and the Farmington Canal

12  Trail, right?

13     A.    Yes.

14     Q.    And the third is the Naugatuck State Forest,

15  right?

16     A.    Yes.

17     Q.    Okay.  Over the past 12 months, you have not

18  visited the Naugatuck State Forest, isn't that

19  correct?

20     A.    I don't believe so.

21     Q.    The answer is no?

22     A.    To the best of my recollection, I don't think

23  in the last 12 months.

24     Q.    Okay.  If I showed you something, would that

25  refresh your recollection?

1     A.    It would.

2     Q.    Okay.  If you could turn to page 181 on the

3  deposition transcript there and lines 11 through 13.

4     A.    I see that, yes.

5     Q.    So isn't it true that you have not visited

6  the Naugatuck State Forest within the past 12 months?

7     A.    Yes.

8     Q.    Now, I think I heard you correctly, over the

9  past two years, you visited Sleeping Giant State Park

10  approximately, you said, once a month; is that

11  correct?

12     A.    I believe that's correct.

13     Q.    So would it be about eight -- 10 to 12 times

14  maybe in a two-year period, past two years?

15     A.    I think I missed the math on that.

16         THE COURT:  Once a month for a two-year

17  period is a lot more than 10 to 12.

18         MR. BOCHAIN:  I'm not greatest at math, Your

19  Honor.  I apologize.

20         THE COURT:  There are 12 months in a year.

21         MR. BOCHAIN:  Yeah.  I apologize, Your Honor.

22  BY MR. BOCHAIN:

23     Q.    Let me ask it this way:  You visited Sleeping

24  Giant approximately 12 times in 2023, correct?

25     A.    Correct.

```
 1        Q.    And isn't it true that visited Sleeping Giant
 2   State Park approximately eight times in 2022?
 3        A.    I think that's correct.
 4        Q.    And I think I heard correctly on direct, but
 5   you don't have any plans, specific plans to visit
 6   Sleeping Giant State Park, correct, in the future,
 7   correct?
 8        A.    That is correct, yup.
 9        Q.    And you visited the Farmington Canal Trail
10   approximately -- is it two to four times per week?
11   Is that you said?
12        A.    That is correct, yes.
13        Q.    Now, I'd like to draw your attention to
14   Defendant's Exhibit 141 which is --
15             MR. BOCHAIN:  If I can just approach the
16   witness, Your Honor.
17             THE COURT:  You may.
18             MR. BOCHAIN:  Your Honor, I see we're coming
19   up on four o'clock.  I've been trying to move quickly
20   for Your Honor.
21             THE COURT:  Thank you.  We really are going
22   to stop at four o'clock.
23             MR. BOCHAIN:  I understand, Your Honor.
24             THE COURT:  And we can go till five tomorrow.
25   The calendar is okay if you need it.
```

```
 1            MR. BOCHAIN:  Okay.  If I needed some more
 2    time?
 3            THE COURT:  Yes.  If you need time, you'll
 4    get it tomorrow.
 5            MR. BOCHAIN:  Thank you, Your Honor.  I'm
 6    trying to move quickly here.
 7    BY MR. BOCHAIN:
 8      Q.    Have you had a -- Exhibit 141 in that binder,
 9    if you can just turn to it.
10      A.    Yes.  I have it.
11      Q.    All right.  And that has been admitted as a
12    full exhibit just for the Court's convenience.
13            Are you familiar with that document?
14      A.    Yes.
15      Q.    Okay.  And what is it?
16      A.    It is a list of all state parks in
17    Connecticut.
18      Q.    So you're familiar with that, correct?
19      A.    Yes.
20      Q.    Now, you see it's in alphabetical order and
21    so you see the Farmington Canal State Park Trail, the
22    Naugatuck State Forest, and Sleeping Giant State Park
23    on that list?
24      A.    Yes.
25      Q.    Do you see Bigelow Hollow State Park in Union
```

1    on that list?  It's in alphabetical order.

2        A.    Yes.

3        Q.    You've never been there before, right?

4        A.    No.

5        Q.    Isn't it true you have no specific plans to

6    go there this summer?

7        A.    That is correct.

8        Q.    You also don't have any specific plans to go

9    there in the future; isn't that right?

10        A.    Correct.

11        Q.    And at the time you filed in this case, you

12    did not have any specific plans to visit Bigelow

13    Hollow State Park, correct?

14        A.    Correct.

15        Q.    Do you see Dinosaur State Park on that list

16    in Rocky Hill?

17        A.    I do.

18        Q.    And you haven't visited that location within

19    the past ten years, right?

20        A.    That one was the one I wasn't sure about.

21        Q.    I'm going to have you turn to page 192.  You

22    also have your deposition transcript in front of you

23    and I'm going to ask you to take a look at that.

24        A.    Yeah.  I do see that.

25        Q.    So isn't it true that you haven't visited

```
 1    that location in the past ten years?
 2        A.    That is true, yeah.
 3        Q.    Isn't it true that you have no specific plans
 4    to go there this summer?
 5        A.    That is true.
 6        Q.    You also don't have any specific plans to go
 7    there in the future; isn't that correct?
 8        A.    That is true.
 9        Q.    At the time you filed your complaint in this
10    case, you did not have any specific plans to visit
11    Dinosaur State Park, right?
12        A.    That is correct.
13        Q.    All right.  Do you see Fort Griswold on that
14    list in Groton?
15        A.    I do.
16        Q.    You have not visited that location in the
17    past ten years either, right?
18        A.    Correct.
19        Q.    And isn't it true that you have no specific
20    plans to go there this summer?
21        A.    Correct.
22        Q.    You don't have any specific plans to go there
23    in the future; isn't that right?
24        A.    Correct.
25        Q.    And at the time you filed your complaint in
```

```
 1    this case, you did not have any specific plan to
 2    visit Fort Griswold, right?
 3        A.    That is correct.
 4        Q.    Do you see Fort Trumbull in New London on
 5    that list?
 6        A.    I do.
 7        Q.    And you have no recollection of going there
 8    before, right?
 9        A.    That's correct.
10        Q.    Isn't it true that you have no specific plans
11    to go there this summer?
12        A.    That is correct.
13        Q.    And you also don't have any specific plans to
14    go there in the future; isn't that right?
15        A.    That is correct.
16        Q.    And at the time you filed your complaint in
17    this case, you did not have any specific plans to
18    visit Fort Trumbull, right?
19        A.    That is correct.
20        Q.    Do you see  Hammonasset Beach State Park on
21    that list in Madison?
22        A.    Yes.
23        Q.    And you have not visited Hammonasset Beach
24    State Park in more than ten years; isn't that right?
25        A.    I don't believe so.
```

 1    Q.    The answer is yes or no?

 2    A.    No.

 3    Q.    So you haven't been there in more than ten

 4   years?

 5    A.    Correct.

 6    Q.    Isn't it true that you have no specific plans

 7   to go there this summer?

 8    A.    That is true.

 9    Q.    And you don't have any specific plans to go

10   there in the future; isn't that right?

11    A.    That is correct.

12    Q.    You -- at the time you filed your complaint

13   in this case, you did not have any specific plans to

14   visit Hammonasset Beach State Park, right?

15    A.    That is correct.

16    Q.    Do you see Harkness Memorial State Park in

17   Waterford, Connecticut on this list?

18    A.    I do.

19    Q.    You've never been to Harkness Memorial State

20   Park before; isn't that right?

21    A.    Correct.

22    Q.    Isn't it true that you have no specific plans

23   to go there this summer?

24    A.    That is correct.

25    Q.    And you also don't have any specific plans to

1    go there in the future; isn't that right?

2       A.   That is correct.

3       Q.   And at the time you filed your complaint in

4    the case, you did not have any specific plans to

5    visit Harkness Memorial State Park, correct?

6       A.   That is correct.

7       Q.   So let's put aside Farmington Canal State

8    Park, Naugatuck State Forest and Sleeping Giant State

9    Park, the locations we have discussed.  Isn't it true

10   that within the past 12 months, you have not visited

11   any of the other location on the list?

12      A.   That is correct.

13      Q.   Isn't it true that you have no specific plans

14   to visit any of those locations other than the three

15   that we just mentioned?

16      A.   That is correct.

17      Q.   So you have no intention of visiting any of

18   those other state parks or forests, correct?

19      A.   Yes.

20           THE COURT:  Are you going to a new subject?

21           MR. BOCHAIN:  It might be a good time to

22   break.

23           THE COURT:  Very good.  I'll see you tomorrow

24   then at ten o'clock.  Thank you.

25           (Proceedings adjourned, 3:59 p.m.)

```
1                    C E R T I F I C A T E

2

3         RE:  DAVID J. NASTRI v. KATIE DYKES
                   No. 3:23-cv-00056-JBA
4

5              I hereby certify that the within and

6    foregoing is a true and accurate transcript taken in

7    the aforementioned matter to the best of my skill and

8    ability.

9

10                    /s/ Corinne T. Thomas

11                  CORINNE T. THOMAS, RPR
                    Official Court Reporter
12               United States District Court
                    141 Church Street
13              New Haven, Connecticut 06510
                     (203) 809-0848
14

15

16

17

18

19

20

21

22

23

24

25
```