# Exhibit A

```
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT
 2

    _____
 3                               )
    DAVID NASTRI,                )
 4                               ) No. 23-cv-00056 -JBA
                Plaintiff,       )
 5                               ) May 9, 2023
    v.                           )
 6                               ) 10:15 a.m.
                                 )
 7  KATIE DYKES,                 ) 141 Church Street
                                 ) New Haven, Connecticut
 8              Defendant.       )
    _____)
 9

10
              PRELIMINARY INJUNCTION HEARING
11

12  B E F O R E:

13      THE HONORABLE JANET BOND ARTERTON, U.S.D.J.

14

15  A P P E A R A N C E S:

16  For the Plaintiff:

17      ATKINSON LAW, LLC
              122 Litchfield Road
18            P.O. Box 340
              Harwinton, CT 06791
19            (203) 677-0782
              E-mail:  catkinson@atkinsonlawfirm.com
20      BY:  CAMERON LEE ATKINSON, ESQ.

21

22  (Continued)

23

24              Corinne Thomas, RPR
              Official Court Reporter
25                 (203) 809-0848
```

```
 1   For the Defendant:

 2         OFFICE OF THE ATTORNEY GENERAL
               165 Capitol Avenue
 3             Hartford, CT 06106
               (860) 808-5296
 4             E-mail:  blake.sullivan@ct.gov
                        thadius.bochain@ct.gov
 5                      timothy.holzman@ct.gov
           BY: BLAKE THOMAS SULLIVAN, ESQ.
 6             THADIUS LATIMER BOCHAIN, ESQ.
               TIMOTHY J. HOLZMAN, ESQ.
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1  going to hand him my copy of that.  I accidentally
2  handed him somebody else's declaration and I
3  apologize.  I apologize, Professor.
4          THE WITNESS:  It was interesting reading.
5          Yes.  This looks more familiar.
6  BY MR. ATKINSON:
7     Q.   Okay.  Professor, I've just handed you what
8  has been admitted as Defendant's Exhibit 135.  Do you
9  recognize that?
10    A.   That's this thing?
11    Q.   Correct.
12    A.   That's my declaration.
13    Q.   We were discussing the Boston Common and the
14 year.  Would you look at page 16 of that exhibit,
15 paragraph 30, please?
16    A.   Sorry.  I was off by four years, 1634.
17    Q.   Just so the record is clear, the year 1634 is
18 when the Boston Common was established?
19    A.   Yes.
20    Q.   You also -- in your affidavit, you listed --
21 did you list what the common uses of the Boston
22 Common were?
23    A.   Yes.
24    Q.   Okay.  What were those common uses?
25    A.   So the Common was used as a pasture, a place

```
 1   of execution, site for militia musters and drills.
 2       Q.    Apart from what you listed in your affidavit
 3   or your declaration, are you aware of any other uses
 4   for the Boston Commons in that initial 1634 period?
 5       A.    I'm sure people strolled on the Boston
 6   Common.
 7       Q.    If we fast-forwarded to 1791, would you be
 8   aware of any other uses apart from the ones that you
 9   listed in your affidavit and the one that you just
10   gave to us?
11       A.    Well, I have not made a careful study of the
12   changing uses of the Boston Common.  So I would be
13   hesitant to offer an opinion under oath about what
14   activities were going on in it without further
15   research.
16       Q.    Understood. Fair enough.  But you also just
17   testified that you're sure people strolled on the
18   Boston Common, correct?
19       A.    Well, I'm guessing they did.  I'm making an
20   educated guess.
21       Q.    Okay.  What would be the basis for making an
22   educated guess like that?
23       A.    Well, it's hard to pasture an animal without
24   you walking occasionally and checking on the animal.
25   I grew up in Brooklyn, so I'm not going to present
```

1  myself as an expert on farming or sheep grazing.
2      Q.    I was just about to go there, but thank you.
3      A.    I'm sorry.
4      Q.    No, I'm joking.
5            Would you characterize strolling as
6  recreational?
7      A.    That would be one context in which you would
8  stroll.
9      Q.    What would other contexts of strolling be?
10     A.    Well, I'm speculating here.  If my dog ran
11 away, I'd probably stroll after it.
12     Q.    Would you run after it?
13     A.    Are we talking me now or me in my blazing
14 youth?
15     Q.    I'm not going hold you to that.  Let's move
16 on.
17           You also stated that, quote, even when used
18 for militia purposes, these public spaces were
19 tightly regulated, correct?
20     A.    Yes.  You couldn't actually come to muster
21 with a loaded firearm or discharge it.
22     Q.    Do you know the purpose of that law?
23     A.    That is a public safety measure.
24     Q.    What basis do you rely on for your opinion
25 that it's a public safety measure?

```
 1      A.    Well, having read the statute, I don't have
 2   the statute in front of me, but the statute clearly
 3   was -- the goal was to facilitate militia training,
 4   but to do so in a safe manner, so ergo public safety.
 5      Q.    And that was a law -- was that law passed by
 6   the Massachusetts legislature to your understanding?
 7      A.    Yes.
 8      Q.    Okay.  Outside of that law from the period of
 9   1634 to 1834, are you familiar with any other law
10   that prohibited the carrying of firearms on the
11   Boston Common?
12      A.    Well, there were general laws in the state of
13   Massachusetts that prohibited public carry.
14      Q.    Can you give us an example of those?
15      A.    Yes.  So in 1834, I believe, Massachusetts
16   thoroughly revised its criminal code as part of a
17   broader process called codification where common law
18   was transformed into statutory law and the
19   Massachusetts statute or series of statutes enacted
20   in 1834 prohibited carrying firearms in public.
21            I've also done some research on the
22   enforcement of that by the Boston Police and we have
23   a really quite remarkable case where two individuals
24   were prosecuted for carrying a gun in public.  So I
25   feel pretty confident that you could not do that in
```

```
 1   19th century pre-Civil War Boston.
 2       Q.    When you say carrying in public, do you mean
 3   in a -- withdrawn.
 4           When you say carrying in public -- withdrawn
 5   again.
 6           Are you familiar with the Statute of
 7   Northampton, Professor?
 8       A.    I am indeed.
 9       Q.    Okay.  The law, the 1834 law you just
10   described and the codification, did it bear any
11   similarities to the Statute of Northampton?
12       A.    So the Statute of Northampton, which was
13   enacted in 1328, was the foundation for several laws
14   enacted in the era of the Second Amendment, notably
15   Virginia and North Carolina.  The Massachusetts'
16   statute, which was enacted in 1794, three years --
17   the first version of the statute three years after
18   the Second Amendment departed in its language from
19   the Statute of Northampton.
20           I'd have to have the two in front of me to
21   give you the exact differences between the two, but
22   it was part of a process that we call the
23   Americanization of the common law where aspects of
24   English common law were adapted and we enacted either
25   by legislatures or by court decisions and
```

```
 1  firearms?
 2     A.    Well, unlike modern firearms, it takes quite
 3  a bit of skill to learn how to load and fire black
 4  powder, you know, muzzle-loading weapon.
 5     Q.    Okay.  Given the time that it took to -- and
 6  the skill that it took to load a black powder musket
 7  as you describe, would you agree with me that a unit,
 8  a militia unit that could load relatively quickly had
 9  an advantage in combat?
10           MR. SULLIVAN:  I just object again to
11  relevance.  We're getting outside the scope of the
12  declaration.
13           THE COURT:  It is outside the scope of the
14  declaration.  So tell me what your purpose is.
15           MR. ATKINSON:  What I am attempting to do is
16  to establish the importance of the militia drilling,
17  and in this context, the reason why they were being
18  required to come to muster without muskets -- without
19  loaded muskets would defeat some of the purpose of
20  drilling.
21           THE COURT:  That's not what your question
22  sounded like to me.  Do you want to rephrase?
23           MR. ATKINSON:  I will attempt to do so and if
24  I can't, Your Honor, I'll move on.
25  BY MR. ATKINSON:
```

1     Q.    Professor, are you aware of any way to unload
2 a black powder musket in the founding era?
3     A.    Well, discharging it would be the most direct
4 way of doing that.
5     Q.    Are there any other ways that you're aware
6 of?
7     A.    Well, again, we're sort of stretching my
8 expertise, but there are these auger things where you
9 can actually remove a musket ball if you had to.
10 It's somewhat dangerous and cumbersome, but if it had
11 to be done, you could do it.
12     Q.    And by saying "cumbersome," do you mean that
13 it would take time?
14     A.    Yes.
15     Q.    I am ready to move on.
16     I want to go back to your characterization of
17 the Boston Common as an urban space.  Was it
18 prototypical in the founding era for large cities to
19 have space similar to the Boston Common?
20     A.    So it really depended on what region of
21 American you were in.  If you were in the back
22 country, you wouldn't have had need for anything like
23 the Boston Common.  In the South, you don't have
24 nucleated villages, so you wouldn't have had commons.
25 So the idea of a common is a distinctively

1   New England form of land use.
2       Q.   Okay.  By the term "urban space," the term
3   that you used, "urban space," did you also mean to
4   encompass what we would refer to now as a town green?
5       A.   Yes.  That -- but the town green is something
6   you associate with nucleated villages in New England.
7   You don't have town greens in Virginia or South
8   Carolina.
9       Q.   Okay.  The founding era, based on your
10  research, et cetera, would smaller communities have
11  public spaces -- smaller New England towns actually,
12  would they have public spaces similar to the Boston
13  Common but smaller in size?
14      A.   In New England where you had nucleated
15  villages, yes.
16      Q.   And the purposes for those public spaces
17  were -- would they be largely similar to the purposes
18  that you've outlined for the Boston Common?
19      A.   Yes.
20      Q.   In your affidavit, you -- withdrawn.
21           In terms of common public spaces, are you
22  familiar with founding era taverns?
23      A.   Yes.  I lived in Colonial Williamsburg and
24  spent a good deal of time in several of those.
25      Q.   Would you agree with me that those taverns

1  existed in the colonial and the founding era?
2     A.   Yes.  Certainly taverns are a venerable part
3  of the American tradition.
4     Q.   Would you also agree with me that they were
5  places of recreation in the founding era?
6     A.   Well, of course they were, but taverns were
7  privately owned.
8     Q.   Are you aware of any government laws that
9  prohibited the carrying of firearms in taverns during
10 the founding era?
11    A.   Typically you don't get government
12 regulations of how people can use their private
13 spaces.
14    Q.   In the founding era --
15    A.   No.  As a general rule under Anglo American
16 law, private property is pretty esteemed value, and
17 typically people have considerable autonomy over
18 their lands and property.  So you do, for instance,
19 in Boston have a -- have a law that says you can't
20 have a loaded firearm in your -- any domestic
21 dwelling in the city.
22    Q.   What era was that law?
23    A.   1786.
24    Q.   Okay.  Let's move on.
25         You also stated in your affidavit that the

```
 1   creation of modern parks as we know them today began
 2   in the middle of the 19th century, correct?
 3       A.   Correct.
 4       Q.   If I recall correctly, you also stated that
 5   Henry David Thoreau was a primary influence in that
 6   creation, correct?
 7       A.   So what we call modern parks were certainly
 8   influenced by both romanticism and transcendentalist,
 9   and Thoreau is certainly one of the leading
10   transcendentalists luminaries.
11       Q.   And in pursuant of various romanticized and
12   transcendentalist ideals, you also stated that urban
13   planners, architects and government officials began
14   to look towards creating state parks, right?
15       A.   That's right.  We have -- the earliest parks
16   are municipal, but then state and federal parks
17   follow somewhat later.
18       Q.   Okay.  I understand.  I misspoke there and
19   thank you for clearing me up.
20            What was the first American municipal park,
21   to your knowledge?
22       A.   New York Central Park, 1858.
23       Q.   Okay.  To your knowledge, was Central Park
24   open for business before the Civil War?
25       A.   So I would have to confirm that.  I don't
```

1  recall whether 1858 is when they broke ground or when
2  it was opened to the public.  So I'd have to confirm
3  that before I could swear to it.
4      Q.    That's fair.  That's fair.  And from the --
5  in your understanding, from the start, Central Park
6  had a prohibition on carrying firearms in it?
7      A.    Yes.  Virtually all of the major parks in
8  America from their inception had such prohibitions.
9      Q.    Let's just focus on Central Park for now.
10     A.    Okay.
11     Q.    Who created the Central Park rule?
12     A.    So, well, the -- the person who designed
13 Central Park is Frederick Law Olmsted.  New York City
14 created Central Park.
15     Q.    And they also created the law that prohibited
16 carrying firearms in it, correct?
17     A.    Correct.
18     Q.    And when about did they create that law?
19     A.    It was part of the earliest regulations of
20 the use of the park.
21     Q.    Do you have a recollection as you sit here
22 today when those earliest regulations were
23 promulgated?
24     A.    1858.
25     Q.    After New York creates Central Park, is it

1  your understanding that other major cities followed
2  suit fairly quickly thereafter?
3     A.    Yes.  Within about a decade, you had a number
4  of other parks created.
5     Q.    Okay.  Do you recall, as you sit here today,
6  which cities created other parks?
7     A.    So in my declaration I have a table that
8  lists the earliest -- well, sorry.  The creation of
9  parks in the nation's five largest cities and whether
10 or not they had gun prohibitions.  And in the
11 footnote, I list a number of other early parks also
12 from the sort of era of reconstruction.
13    Q.    Let's focus on the table for a second.
14    A.    Yes.
15    Q.    The first city that you list is Chicago after
16 New York, actually.  And when did Chicago create a
17 public park, if you recall?
18    A.    1873.
19    Q.    At the time they created a public park, was
20 the first time they promulgated a regulation that
21 functionally said thou shall not carry a firearm in a
22 public park?
23          MR. SULLIVAN:  I would just object to the
24 characterization to the extent that's --
25          MR. ATKINSON:  I'll rephrase, Your Honor.