```
1              UNITED STATES DISTRICT COURT
                 DISTRICT OF CONNECTICUT
2

3    _____ )
4    DAVID NASTRI,                   )
                                     ) No. 3:23-cv-00056-JBA
5             Plaintiff,             )
                                     ) May 10, 2023
6    v.                              )
                                     ) 10:06 a.m.
7                                    )
     KATIE DYKES,                    ) 141 Church Street
8                                    ) New Haven, Connecticut
              Defendant.            )
9    _____)

10

11          PRELIMINARY INJUNCTION HEARING
                      VOLUME II
12

13   B E F O R E:

14       THE HONORABLE JANET BOND ARTERTON, U.S.D.J.

15

16   A P P E A R A N C E S:

17   For the Plaintiff:

18       ATKINSON LAW, LLC
                122 Litchfield Road
19              P.O. Box 340
                Harwinton, CT 06791
20              (203) 677-0782
                E-mail:  catkinson@atkinsonlawfirm.com
21       BY:  CAMERON LEE ATKINSON, ESQ.

22

23   (Continued)

24
                     Corinne Thomas, RPR
25               Official Court Reporter
                      (203) 809-0848
```

```
 1   For the Defendant:

 2         OFFICE OF THE ATTORNEY GENERAL
                165 Capitol Avenue
 3              Hartford, CT 06106
                (860) 808-5296
 4              E-mail:  blake.sullivan@ct.gov
                         thadius.bochain@ct.gov
 5                       timothy.holzman@ct.gov
         BY:  BLAKE THOMAS SULLIVAN, ESQ.
 6            THADIUS LATIMER BOCHAIN, ESQ.
              TIMOTHY J. HOLZMAN, ESQ.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2   WITNESS:  DAVID NASTRI                    PAGE

 3   Continued Cross Examination by Mr. Bochain    214

 4   Redirect Examination by Mr. Atkinson          221

 5   Recross Examination by Mr. Bochain            235

 6

 7   WITNESS:  CHRISTOPHER LEWIS                PAGE

 8   Direct Examination by Mr. Atkinson            240

 9   Cross-Examination by Mr. Bochain              291

10   Redirect Examination by Mr. Atkinson          332

11   Recross-Examination by Mr. Bochain            345

12   Further Direct Examination by Mr. Atkinson    348

13   Further Cross-Examination by Mr. Bochain      349

14

15

16

17

18

19

20

21

22

23

24

25
```

1              (Call to Order, 10:06 a.m.)

2         THE COURT:  Good morning, counsel, ladies and

3    gentlemen.  Please be seated.  We are ready to resume

4    our hearing in *Nastri v. Dykes*, 23-cv-56.

5              And I will invite Mr. Nastri to return to the

6    stand for further cross-examination recalling, sir,

7    that you are under oath.

8              All right.  Mr. Bochain, you may proceed.

9    I've jumped right into this because I didn't -- I

10   didn't ask if you have what you call housekeeping

11   issue.  Do you have housekeeping issues?

12        MR. BOCHAIN:  I don't believe we have any

13   housekeeping issues, but I will defer if we do.

14        MR. ATKINSON:  I will just note that it was

15   not said on the record before we closed yesterday,

16   but after we adjourned, I did advise Mr. Nastri not

17   that he was -- that he was still under oath and not

18   to discuss his testimony while he was still under

19   oath with anybody.  So I just wanted to make the

20   Court aware that even though that wasn't admitted on

21   the record, he did get that advisement from me.

22        THE COURT:  Thank you very much.

23        CONTINUED CROSS-EXAMINATION OF DAVID NASTRI

24   BY MR. BOCHAIN:

25   Q.   Good morning, again, Mr. Nastri.

1    A.    Good morning.

2    Q.    Again, it's Thadius Bochain on behalf of

3    commissioner Katie Dykes.  So I just wanted to go

4    over, kind of a refresher of where we left off

5    yesterday in case you forgot.  So what we were

6    talking about, where we ended was various locations

7    in the Connecticut state park and forest system that

8    you do not go to.  Do you recall that?

9    A.    I do.

10    Q.    And you recall that you testified that you do

11    not carry your gun in various locations, right?

12    A.    I do.

13    Q.    And you recall that one of those locations

14    was -- you don't carry it in a state park or forest,

15    correct?

16    A.    That is correct.

17    Q.    And you wouldn't carry it in a state park or

18    forest, correct?

19    A.    Correct.

20    Q.    And so what I'd like do, I had asked you some

21    questions about parks that you had visited within the

22    past 12 months and I think I had asked you the

23    question of whether or not you had any specific plans

24    to go to any of the state parks or forests that were

25    on -- that was on the list that I had showed you

```
 1    yesterday at some point in the future.  Do you recall

 2    that testimony?

 3       A.    The specific parks that you pointed out, not

 4    the ones that I have already identified.

 5            MR. BOCHAIN:  Let's do it this way.  If I can

 6    just approach the witness, Your Honor.

 7            THE COURT:  You may.

 8    BY MR. BOCHAIN:

 9       Q.    I'm showing you what has been -- if you just

10    turn to Defense Exhibit 141, please.

11       A.    Yes.

12       Q.    All right.  And so yesterday, I had asked

13    you -- I want to make sure you get there.  Do you see

14    it?

15       A.    Yes, I do.

16       Q.    So I had asked you some questions about --

17    there's quite a few parks on this list, correct?

18       A.    Yes.

19       Q.    And we had been discussing three particular

20    parks:  Naugatuck State Forest, Sleeping Giant State

21    Park and Farmington Canal, correct?

22       A.    Yes.

23       Q.    I had also asked you some questions about all

24    of the other parks on this list, right?

25       A.    Yes.
```

1     Q.    All right.  And so you recall testifying that

2   you have no plans in the future to visit any of these

3   other state parks or forests on that list at some

4   point in the future, correct?

5     A.    That is correct, yes.

6     Q.    And I just wanted to clarify a couple of

7   points on that, if I may.

8         And so at the time that you filed this

9   complaint -- the complaint in this lawsuit, you had

10   no specific plans to visit any of those other state

11   parks and forests, correct?

12     A.    That is correct.

13     Q.    And today, you have no specific plans to

14   visit any of those state parks and forests, correct?

15     A.    That is also correct.

16     Q.    All right.  Now, I'd like to, if I could

17   just, circle back to the Farmington Canal State Park

18   Trail.  And you testified that you go jogging on that

19   trail, correct?

20     A.    Yes.

21     Q.    And you do that about three to four times a

22   week, right?

23     A.    Yes.

24     Q.    And isn't it also true that you tend to avoid

25   the Farmington Canal Trail when it gets crowded?

1    A.    Yes.

2    Q.    And it gets crowded pretty frequently in the

3    summer months, correct?

4    A.    Yes.

5    Q.    And so you avoid it at that time, correct?

6    A.    When it's crowded, yes.

7    Q.    Now, I believe you testified on direct

8    examination yesterday that you learned of the

9    existence of Section 23-4-1(c), which is the

10   regulation at issue in this case, you testified that

11   you learned of the existence of that regulation on

12   November 16th or November 17, 2022; is that not

13   correct?

14   A.    Yes.

15   Q.    But since learning of that regulation's

16   existence, you've continued to use the Farmington

17   Canal Trail, right?

18   A.    Yes.

19   Q.    And in fact, you've used it in the week of

20   your deposition, which would have been April 24,

21   2023, you used it a few times, correct?

22   A.    I believe I did, yes.

23   Q.    Do you recall?

24   A.    I know I used it.  I don't remember what the

25   dates are.

1      Q.     But you recall that you had used it a few

2  times at the time?

3      A.     Yes.

4      Q.     Or that week of the deposition, correct?

5      A.     I do, yes.

6      Q.     Now, I believe you testified during direct

7  examination that -- Attorney Atkinson had asked you

8  some questions about whether you had planned visits

9  on your calendar.  Do you remember that?

10      A.     Say that again.

11      Q.     Do you recall that Attorney Atkinson

12  yesterday during direct examination asked you some

13  questions about whether you planned visits and put

14  them on your calendar for Farmington Canal Trail.  Do

15  you remember that?

16      A.     Yes.

17      Q.     And you testified, correct, that you don't

18  have any specific plans on your calendar, correct?

19      A.     That is also correct.

20      Q.     And he also asked you some questions --

21  similar question about planned visits to Sleeping

22  Giant State Park, correct?

23      A.     Yes.

24      Q.     And you testified that you do not have any

25  specific plans to visit Sleeping Giant State Park,

1    correct?

2       A.   Yes.

3       Q.   And I think he also asked you a similar

4    question about Naugatuck State Forest.   Do you

5    remember that?

6       A.   I do.

7       Q.   And you testified that you do not have any

8    specific plans to visit Naugatuck State Forest in the

9    future, correct?

10      A.   Also correct.

11      Q.   Yesterday you testified -- I believe you

12   testified that you -- do you recall testifying about

13   a U4 report in connection with your employment as a

14   wealth advisor?   Do you recall that testimony?

15      A.   Yes, I do.

16      Q.   And I believe you testified that that report

17   documents violations of certain kind, correct?

18      A.   It is a full record of your employment

19   licenses you hold, but it does include violations and

20   complaints.

21      Q.   Okay.   And I believe you testified on direct

22   examination that you feared that a violation of

23   Section 23-4-1(c) might show up on that U4 form,

24   correct?

25      A.   It would be reportable, yes.

```
 1      Q.    But isn't it true that you have no plans to
 2   bring a gun to a state park or forest?
 3      A.    That is correct.
 4      Q.    So it's really a hypothetical that that would
 5   show up on a form, correct?
 6      A.    It's not hypothetical that --
 7      Q.    Yes or no, please.
 8      A.    If I was found in violation, that it would go
 9   on my U4.
10      Q.    But you're never going to bring a gun to a
11   state park or forest, correct?
12      A.    I will not do so as long as this prohibition
13   is in place.
14            MR. BOCHAIN:  If I can just have one moment,
15   Your Honor.
16            THE COURT:  Yes.
17            MR. BOCHAIN:  Nothing further at this time,
18   Your Honor.
19            THE COURT:  Redirect.
20            MR. ATKINSON:  Yes, Your Honor.
21         REDIRECT EXAMINATION OF DAVID NASTRI
22   BY MR. ATKINSON:
23      Q.    Good morning, Mr. Nastri.
24      A.    Good morning.
25      Q.    Do you recall yesterday Attorney Bochain
```

```
 1   asking you some questions about leaving your gun at
 2   home when you go to the VA?
 3       A.   I do.
 4       Q.   And do you also recall explaining why you
 5   left -- leave your gun at home when you go to the VA?
 6       A.   I do, yes.
 7       Q.   Can you repeat that reason for us?
 8       A.   Having a firearm on VA property is a
 9   violation, so I can't even lock it in my car.  I have
10   to leave it at home.
11       Q.   And just to make the record clear that the
12   parking lot at the VA, is that considered part of the
13   VA premises?
14       A.   Yes, it is.
15       Q.   And your understanding is you're not
16   permitted to have a firearm on that property?
17       A.   That is correct.
18       Q.   When you go to another place where a firearm
19   is not permitted, another building per se, do you
20   always leave your firearm at home?
21       A.   No.
22       Q.   If you're aware that you're going into a
23   building where a firearm is not permitted, what do
24   you do with your firearm?
25       A.   I lock it in a gun safe in my vehicle.
```

1    Q.    When you -- you've also testified that you've

2    visited three state parks, the Farmington River Canal

3    Trail, the Sleeping Giant State Park, and the

4    Naugatuck State Forest.

5          When you visited the Sleeping Giant State

6    Park over the past year, did you see any signs at the

7    state park saying no guns?

8    A.    I did.

9    Q.    When did you see that sign?

10   A.    I believe it was on a visit in March of this

11   year.  We had gone for a hike and I specifically was

12   searching for some notice that firearms were not

13   permitted in the park.

14   Q.    And that's -- just so the record's clear,

15   when you say, "March," that's March of this year,

16   2023?

17   A.    That's correct.

18   Q.    Prior to noticing it in March of 2023, had

19   you ever noticed it at Sleeping Giant State Park?

20   A.    No.

21   Q.    Where did you find the sign?

22   A.    There was posted regulations on the back side

23   of the sign that has the maps for the trails in the

24   park.

25   Q.    Where is the sign that has the maps for the

1    trails in the park?

2       A.    It is on the north side of the parking lot as

3    you come into the park.

4       Q.    Would it be fair to describe that sign as

5    being located at what's known as a trail head?

6            MR. BOCHAIN:   Objection, Your Honor.

7    Leading.

8            MR. ATKINSON:   I can rephrase, Your Honor.

9    BY MR. ATKINSON:

10      Q.    Where is that sign located more specifically,

11   Mr. Nastri?

12      A.    There are two parking lots when you enter the

13   park.  The first one is in the -- I'm trying to think

14   of the cardinal direction.  It would be on the south

15   side of the park.  And from there, there's a road

16   that goes up into a larger parking lot and then up to

17   the northeast is where the trails begin, and this

18   sign is between that first parking lot and when the

19   trails begin.

20      Q.    So if I'm understanding your testimony

21   correctly, you -- would you go in and you would park

22   your vehicle first?

23      A.    Yes.

24      Q.    And then would you go -- would you start

25   walking to where the attractions would be?

```
 1     A.    Yes.

 2     Q.    And as you're walking to where the

 3  attractions would be?

 4         THE COURT:  I'm sorry.  What's a "traction"?

 5         MR. ATKINSON:  I'll piece that out, Your

 6  Honor.

 7  BY MR. ATKINSON:

 8     Q.    Mr. Nastri, we just talked about the

 9  attractions.  What is your understanding of the

10  activities that you may pursue at Sleeping Giant

11  State Park?

12         THE COURT:  You were saying "attraction."  Is

13  that the word you were using, "attraction"?

14         MR. ATKINSON:  I'm sorry.

15         THE COURT:  I thought you were just saying

16  "traction" and I did not recognize that word.  Go

17  ahead.

18         MR. ATKINSON:  Do you need me to flush it

19  out?

20         THE COURT:  No.  I got it.

21         MR. BOCHAIN:  Your Honor, I do have an

22  objection.  I've given a little bit of leeway here

23  but this is going outside the scope of

24  cross-examination.

25         THE COURT:  What is your claim as to its
```

1  relationship to cross-examination?

2        MR. ATKINSON:  There has been testimony

3  elicited when Mr. Nastri first became aware of the

4  regulations at issue in this case.  He had been

5  visiting state parks and forests for quite some time

6  and he's been asked repeatedly of when he learned

7  about the regulation.  So I'm simply exploring where

8  the times that he could have learned of the

9  regulations and the state didn't make it available to

10 him.

11       MR. BOCHAIN:  Your Honor, and I believe -- if

12 I may, I believe that has -- he's already testified

13 as to when he became aware of that.

14       THE COURT:  He became aware on November 26,

15 '22.  Is your question how did he become aware?

16       MR. ATKINSON:  My question, I believe he's

17 testified to how he became aware of it yesterday.

18 What I'm trying to explore is why he didn't become

19 aware of it sooner.

20       THE COURT:  I'll permit it.  Go ahead.

21       MR. ATKINSON:  Thank you.

22 BY MR. ATKINSON:

23   Q.    So Mr. Nastri, we were discussing where the

24 exact location of the sign was at Sleeping Giant

25 State Park and you had testified, if I understand you

1    correctly, is it was on the way as you were walking

2    from the parking lot to the attractions in the park,

3    correct?

4        A.   Yes.

5        Q.   Approximately how far a -- how far of a walk

6    is it from the parking lot that you -- the parking

7    lots that you described to that sign?

8        A.   No more than maybe 25 meters.

9        Q.   And for those of us who aren't familiar with

10   the metric system, can you give that to us in yards?

11       A.   Approximately 25 yards.

12       Q.   Okay.  Can you describe what the sign looks

13   like to us?

14       A.   Yes.  It's a sign that's mounted on posts.

15   It's approximately, I would say maybe, four by six,

16   four high, six wide.

17       Q.   When you say, "four by six," are you meaning

18   feet?

19       A.   Yes.

20       Q.   Okay.  Continue, please.

21       A.   And on the side that's facing the parking lot

22   is a map of all the trails in the park.

23       Q.   And -- withdrawn.

24            When you previously went to -- when you went

25   to Sleeping Giant State Park, did you ever look at

 1   the back of that sign?

 2      A.    Not until that day I just mentioned in March.

 3      Q.    When you're leaving, when you're walking back

 4   to the parking lot at Sleeping Giant State Park, can

 5   you see the back of that sign as you're walking back

 6   to the parking lot?

 7      A.    Yes.

 8      Q.    Okay.  Prior to the day you went around and

 9   looked at that sign, had you ever looked at the back

10   of that sign as you were leaving Sleeping Giant State

11   Park?

12      A.    No.

13      Q.    You also testified yesterday that you access

14   Naugatuck State Forest by hiking through a municipal

15   park known as Roaring Brook State Park.  Do you

16   recall that testimony?

17      A.    I do.

18      Q.    When you enter Naugatuck State Forest from

19   Roaring Brook Municipal Park, are there any signs

20   posted at that point where you enter at saying no

21   guns allowed?

22      A.    No.

23      Q.    You also testified yesterday that you enter

24   the Farmington River Canal Trail down the street from

25   your house or a short distance from your house.  Do

1    you recall that?

2        A.    I do.

3        Q.    Can you describe for us what the entry point

4    that you use to enter the Farmington River Canal

5    trail looks like?

6        A.    Yes.  There are two and they're both

7    virtually identical but on different streets.

8    There's a crosswalk painted on the street.  There are

9    some barriers to prevent vehicles from the traveling

10   down the trail.  There are benches at each corner.

11   There is a distance marker at each location.  I'm not

12   actually sure what that makes reference to.  It never

13   quite made sense to me.  So it must be from some

14   certain point on the trail that delineates how far

15   you've gone.  That's pretty much it.

16       Q.    Are there any signs posted at those two entry

17   points that you've described?

18       A.    No.

19       Q.    And that -- does that absence of signs that

20   you just stated, that absence, does that absence of

21   signs include the absence of a sign saying no guns

22   allowed?

23       A.    It -- yes.  That is also included in what's

24   not there.

25       Q.    Yesterday you were asked if you were familiar

1    with the EnCon Police.  Do you recall that testimony?

2        A.    I do.

3        Q.    And you also testified that you're familiar

4    with what a -- withdrawn.

5              How long have you been using Connecticut

6    state parks and forests?

7              MR. BOCHAIN:  Objection Your Honor.  That's

8    been asked and answered.

9              THE COURT:  It has been.  Sustained.

10   BY MR. ATKINSON:

11       Q.    Mr. Nastri, in the time that you've been

12   using Connecticut state parks and forests, have you

13   ever encountered an EnCon police officer?

14       A.    No.

15       Q.    Yesterday Attorney Bochain asked you about a

16   list of state parks.  Do you recall that?

17       A.    I do.

18       Q.    And do you also recall him asking you about

19   specific state parks on that list?

20       A.    I do.

21       Q.    Do you still have State's Exhibit 141 in

22   front of you, Mr. Nastri?

23       A.    I do.

24       Q.    Do you recall Attorney Bochain asking you

25   about Bigelow Hollow State Park?

1      A.     I think so.  I don't remember exactly which
2   ones he mentioned.
3      Q.     Okay.  Do you see Bigelow State Park on --
4   Bigelow Hollow State Park on Exhibit 141 in front of
5   you right now?
6      A.     I do.
7      Q.     What town does that list indicate Bigelow
8   Hollow State Park is located in?
9      A.     Union, Connecticut.
10      Q.     Do you know where Union, Connecticut is,
11   Mr. Nastri?
12      A.     I would guess -- I don't specifically know.
13   I think it's up by UConn in that area, but I don't
14   know.
15      Q.     Have you ever been to Union, Connecticut?
16      A.     Not that I can recall.
17      Q.     Do you recall Mr. Bochain asking you about
18   Dinosaur State Park yesterday?
19      A.     I do.
20      Q.     Do you see -- do you -- what town on State's
21   Exhibit 141 is Dinosaur State Park located in?
22      A.     In Rocky Hill.
23      Q.     Do you know where Rocky Hill is?
24      A.     I do.
25      Q.     How far in relation to where you live is

```
 1   Rocky Hill away from you?
 2       A.    It's approximately a 35-minute drive.
 3       Q.    Do you recall Attorney Bochain asking you
 4   about Fort Griswold State Park yesterday?
 5       A.    I do.
 6       Q.    Do you see Fort Griswold State Park on
 7   State's Exhibit 141 in front of you?
 8       A.    I do.
 9       Q.    What town does that -- does State's
10   Exhibit 141 list Fort Griswold State Park as being
11   in?
12       A.    Groton, Connecticut.
13       Q.    Do you know where Groton, Connecticut is?
14       A.    I do.
15       Q.    How far in relation to where you live away is
16   Groton from you?
17       A.    Approximately an hour and 15 minutes.
18       Q.    Do you recall Attorney Bochain asking you
19   about Fort Trumbull State Park yesterday?
20       A.    I do.
21       Q.    Do see you Fort Trumbull State Park on
22   State's 141?
23       A.    I do.
24       Q.    What town does it indicate state -- Fort
25   Trumbull State Park as being located in?
```

1    A.    New London.

2    Q.    Do you know where New London is, Mr. Nastri?

3    A.    I do.

4    Q.    How far is New London from where you live,

5  approximately?

6    A.    I believe about the same as Groton, about an

7  hour and 15 minutes.

8    Q.    Do you recall Attorney Bochain asking you

9  yesterday about Hammonasset Beach State Park?

10    A.    I do.

11    Q.    Do you see Hammonasset Beach State Park on

12  State's 141?

13    A.    I do.

14    Q.    What town does State's 141 indicate

15  Hammonasset Beach State Park as being located in?

16    A.    Madison.

17    Q.    Do you know where Madison is, Mr. Nastri?

18    A.    I do.

19    Q.    How far away from where you live is Madison,

20  approximately?

21    A.    Approximately 45 minutes.

22    Q.    Do you recall Attorney Bochain asking you

23  about Harkness Memorial State Park yesterday?

24    A.    I do.

25    Q.    Do you see Harkness Memorial State Park on

```
 1   State's 141?
 2      A.   Yes.
 3      Q.   Where does State's 141 indicate that Harkness
 4   Memorial State Park is located?
 5      A.   In Waterford.
 6      Q.   Do you know where Waterford is, Mr. Nastri?
 7      A.   Yes.
 8      Q.   Where is Waterford located?
 9      A.   It's down in the same area as New London and
10   Groton.
11      Q.   Approximately how far away from where you
12   live is Waterford?
13      A.   Approximately an hour and 15 minutes.
14      Q.   Do you recall Attorney Bochain asking you
15   about all of the parks we listed and asking you if
16   you had specific plans to go there?
17      A.   Yes.
18      Q.   Do you recall your answer to those questions?
19      A.   Yes.
20      Q.   What was your -- in your -- withdrawn.
21           And I believe your testimony was that you had
22   no specific plans to go there?
23           MR. BOCHAIN:  Objection Your Honor, it's been
24   asked and answered.
25           THE COURT:  It has been.  You know, when
```

 1   you're repeating back what was asked him, it is asked

 2   and answered.  So let's move on.

 3            MR. ATKINSON:  I apologize, Your Honor.

 4   BY MR. ATKINSON:

 5     Q.    Why do you have no specific plans to visit

 6   those state parks, Mr. Nastri?

 7     A.    My visits to state parks, as I testified, are

 8   impromptu and generally limited to the ones that I've

 9   identified as where I go to regularly.

10     Q.    What informs your decision as to what parks

11   you go to regularly?

12     A.    Their proximity primarily.

13     Q.    Do you recall Attorney Bochain asking you

14   about your plans to bring a gun to a state park in

15   the future?

16     A.    I do.

17     Q.    Why won't you bring a gun to a state park in

18   the future?

19     A.    Because it's currently against the law to do

20   so.

21            MR. ATKINSON:  No further questions, Your

22   Honor.

23            THE COURT:  Any recross?

24            MR. BOCHAIN:  Very briefly, Your Honor.

25            RECROSS EXAMINATION OF DAVID NASTRI

BY MR. BOCHAIN:

Q.    Mr. Nastri, you comply with the gun laws that
you know about, correct?

A.    I do.

Q.    You also comply with signs that prohibit guns
on certain locations, correct?

A.    Yes.

Q.    There's testimony and there's questions about
whether you knew EnCon.  You've never been arrested
by an EnCon officer, correct?

A.    Correct.

Q.    And you've never been threatened with
enforcement of the particular regulation at issue in
this case by an EnCon officer, correct?

A.    Also correct.

Q.    And you've never been threatened with
enforcement of the regulation by any police officer,
correct?

A.    Correct.

MR. BOCHAIN:  Nothing further at this time,
Your Honor.

THE COURT:  I have one question referring
back to U4 reporting responsibilities.  The
regulation at issue provides for certain sanctions,
although I'm not actually seeing it in the regulation

 1    itself but somewhere it exists.

 2           MR. ATKINSON:  Your Honor, if I may, if

 3    you're referring to Connecticut agencies, the

 4    prohibition regulation, and it would be helpful, I do

 5    believe we laid out the punishment in paragraph 14 of

 6    Plaintiff's Exhibit 1 and we provided a citation to

 7    the statute that's the penalty.

 8           THE COURT:  Okay.  So my question is:  The

 9    sanctions or consequences of being apprehended with a

10    firearm in a Connecticut state park or forest is a

11    fine, a 24-hour ban, a longer ban, are those

12    reportable under your U4.

13           THE WITNESS:  In the annual compliance

14    questionnaire that I'm required to fill out, the

15    questions are, I think, purposely overbroad and --

16           THE COURT:  Let's -- don't -- my question is:

17    From your standpoint if you got a fine for carrying a

18    firearm in a state park, would that be a reportable

19    event on your U4?

20           THE WITNESS:  It is.

21           THE COURT:  If you get a parking ticket?

22           THE WITNESS:  No.  Not a parking ticket.

23           THE COURT:  If you get a traffic summons?

24           THE WITNESS:  Specifically those are not

25    reportable.

```
 1              THE COURT:  Are you aware yourself of anybody
 2    who has had this regulation enforced against them.
 3              THE WITNESS:  No, I'm not.
 4              THE COURT:  Thank you.
 5              Questions on my question.
 6              MR. ATKINSON:  None from the plaintiff, Your
 7    Honor.
 8              MR. BOCHAIN:  Nothing from the defense, Your
 9    Honor.
10              THE COURT:  Okay.  Thank you very much then.
11    You may step down.  You are excused.
12              MR. ATKINSON:  Your Honor, may I have a
13    moment to confer with Attorney Bochain, please.
14              THE COURT:  Sure.
15              MR. ATKINSON:  Your Honor, my discussion with
16    Attorney Bochain was about the stipulation that I
17    filed prior to beginning yesterday that was located
18    at ECF 35.  I had asked you to adopt it at this time
19    prior to me calling Colonel Lewis because I do intend
20    to use it in my questioning of Mr. Lewis.
21              THE COURT:  All right.  So the parties'
22    proposed stipulation for this hearing relates to the
23    number of firearm hunting licenses issued since
24    January 2017 by year and the statistic for 2022 of
25    DEEP's harvest tagging system documenting that
```

 1  hunters harvested 611 deer and -- during the 2022

 2  hunting season, and 257 turkeys on that land during

 3  the fall and spring hunting seasons.  All right.  We

 4  can adopt that as facts not in dispute.

 5          MR. ATKINSON:  Thank you, Your Honor.

 6          MR. BOCHAIN:  Correct, Your Honor.

 7          MR. ATKINSON:  Can we also have that document

 8  marked as Plaintiff's 18 for identification only?

 9          THE COURT:  But it's not identification, is

10  it?

11          MR. ATKINSON:  I was doing that just for

12  logistical purposes of being able to put that in

13  front of Colonel Lewis as he was testifying.  I can

14  just hand him an ECF stamp.

15          THE COURT:  I thought I just adopted this

16  document which we would call a joint exhibit.

17          MR. ATKINSON:  Okay.

18          THE COURT:  All right.  It will be joint

19  Exhibit A.

20          Okay.  And is Colonel Lewis ready?

21          MR. ATKINSON:  Yes, Your Honor.

22          THE COURT:  Are you calling him or are you

23  resting?

24          MR. ATKINSON:  I'm calling him, Your Honor.

25  I would also ask for permission to clear the exhibits

```
 1   off the witness --
 2          THE COURT:  Good idea.
 3          All right.  Sir, if you raise your right
 4   hand, you will be sworn.
 5          (Christopher Lewis, sworn.)
 6          THE WITNESS:  I do.
 7          THE CLERK:  Please be seated, state your name
 8   for the record spelling your last name and please
 9   state the town of your residence.
10          THE WITNESS:  Christopher Lewis, town of
11   residence Avon, Connecticut.
12          THE COURT:  You may proceed.
13          MR. ATKINSON:  Thank you, Your Honor.
14          DIRECT EXAMINATION OF CHRISTOPHER LEWIS
15   BY MR. ATKINSON:
16     Q.    Good morning, Colonel Lewis.  How are you?
17     A.    Good.  Good morning.
18     Q.    Have we met before?
19     A.    Yes.
20     Q.    Where did we meet?
21     A.    Attorney General's office during deposition.
22     Q.    Okay.  When approximately was that?
23     A.    I can't recall.  It's been recent.
24     Q.    Fair enough.  Fair enough.  Can you state for
25   the record who your employer is?
```

1    A.    Yes.   It's State of Connecticut Department of

2  Energy and Environmental Protection.

3    Q.    And what is your position?

4    A.    I'm the division director for the

5  Environmental Conservation Police Division.

6    Q.    Are you familiar with the defendant in this

7  action?

8    A.    No.

9    Q.    Do you know who she is?

10    A.    I'm sorry.   The defendant, yes, the

11  commissioner.

12    Q.    What's her name?

13    A.    Katie Dykes.

14    Q.    And who is Katie Dykes to you?

15    A.    She is commissioner to the Department of

16  Energy and Environmental Protection.   She's our

17  appointed authority.

18    Q.    Would it be a fair characterization to

19  describe her as your boss?

20    A.    Yes.

21    Q.    Okay.   You've served as director of the

22  Environmental Conservation Police since approximately

23  November '19, correct?

24    A.    Correct.

25    Q.    And prior to serving in that position, you

```
1   worked for the Alabama Wildlife Freshwater Fisheries?
2      A.   Correct.
3      Q.   And you held a variety of positions there,
4   didn't you?
5      A.   Yes.
6      Q.   Okay.  You were a conservation officer first?
7      A.   Yes.
8      Q.   Approximately how long were you a
9   conservation officer?
10     A.   Five years.
11     Q.   And at some point, did you -- were you
12  promoted?
13     A.   Yes.
14     Q.   And what were you promoted to?
15     A.   Conservation enforcement officer sergeant.
16     Q.   How long did you hold that position?
17     A.   Approximately five years.
18     Q.   And were you promoted again?
19     A.   Yes.
20     Q.   What were you promoted to?
21     A.   Lieutenant conservation enforcement officer
22  lieutenant.
23     Q.   And how long did you hold that position?
24     A.   Approximately four years.
25     Q.   And were you promoted again?
```

```
 1        A.    Yes.

 2        Q.    And what were you promoted to?

 3        A.    District captain conservation enforcement

 4   officer.

 5        Q.    How long did you hold that position?

 6        A.    Approximately two years.

 7        Q.    And were you promoted again?

 8        A.    Yes.

 9        Q.    And what were you promoted to?

10        A.    Assistant chief of enforcement for wildlife

11   freshwater fisheries.

12        Q.    And all of these positions were within the

13   Alabama Wildlife Freshwater Fisheries, correct?

14        A.    Yes.

15        Q.    And how long did you hold your position as

16   assistant chief?

17        A.    Approximately five years.

18        Q.    And you left that position to take your

19   current position now, correct?

20        A.    Correct.

21        Q.    And throughout all of the positions that

22   you've held, your responsibilities were basically to

23   enforce conservation laws, correct?

24        A.    Correct.

25        Q.    In these positions, the conservation laws
```

1    that you were responsible for enforcing included game

2    laws?

3        A.    Yes.

4        Q.    And by "game laws," do you mean hunting laws?

5        A.    Yes.   Hunting, trapping.

6        Q.    And you were also responsible in these

7    positions to enforce state law or park laws in

8    Alabama too, correct?

9        A.    Correct.

10       Q.    And during that -- those positions and your

11   experience in those positions, you were responsible

12   for interacting with members of the public, correct?

13       A.    Correct.

14       Q.    And those members of the public included

15   members of the public who were carrying firearms too,

16   correct?

17       A.    Yes.

18       Q.    Did those responsibilities change in any

19   substantial way when you obtained your current

20   position?

21       A.    No.

22       Q.    Were you familiar with Connecticut agency's

23   regulation 23-4-1?

24       A.    Yes.

25       Q.    Did Alabama have a similar prohibition --

1    withdrawn.

2         What is your understanding of Connecticut

3    Agency's Regulation 23-4-1?

4    A.    It governs behavior and actions in state

5    parks and forest.

6    Q.    Is your understanding of it that it also

7    prohibits the carrying of firearms in state parks and

8    forests?

9    A.    Yes.

10   Q.    Did Alabama have a similar prohibition on

11   carrying firearms in state parks and forests in your

12   understanding while you were working there as a

13   conservation officer?

14        MR. BOCHAIN:  Objection, Your Honor.

15   Relevance.

16        THE COURT:  What is the relevance?

17        MR. ATKINSON:  Your Honor, I'm attempting to

18   basically establish whether he had prior

19   experience --

20        THE COURT:  Why is that relevant?

21        MR. ATKINSON:  I think in terms of the issues

22   in this case, if he had prior experience in enforcing

23   this type of law in Alabama, some of the questions I

24   intend to ask him later that go to how he enforced --

25   how he enforces that law to hunters, this prior

 1   experience would be relevant.

 2        THE COURT:  Why would it be relevant?

 3        MR. ATKINSON:  Well, in terms of how he would

 4   approach that person, we do have an exhibit, his

 5   declaration here in which he makes statements that

 6   the ban -- the Connecticut's ban not being in place

 7   would change the way Connecticut's Environmental

 8   Conservation Police interact with members of the

 9   public.

10        THE COURT:  I think we should stick to

11   Connecticut.

12        MR. ATKINSON:  I will, Your Honor.

13        THE COURT:  Okay.

14   BY MR. ATKINSON:

15     Q.    Colonel, DEEP employs law enforcement

16   officers, current?

17     A.    Yes.

18     Q.    Those law enforcement officers are referred

19   to as EnCon officers, correct?

20        MR. BOCHAIN:  Your Honor, objection.  I've

21   given Attorney Atkinson some leeway.  It's a lot of

22   leading questions here.

23        MR. ATKINSON:  Your Honor, may I be heard as

24   to that?  Under Federal Rule of Evidence 611, I think

25   I've established that Colonel Lewis is an employee of

```
 1    DEEP, is sufficiently identified with an adverse
 2    party such that it's within Your Honor's discretion
 3    to allow me to ask leading questions.
 4         THE COURT:  All right.  I'm hopeful that that
 5    might actually facilitate the testimony.  You are,
 6    however, proposing that he be described as a hostile
 7    witness because he is an officer of, an employee of
 8    the defendant; is that correct?
 9         MR. ATKINSON:  I'm not sure I read the rule
10    that way, Your Honor.  The case law that I had
11    researched on it and the actual text of the rule
12    seemed to draw a distinction between a witness who
13    was hostile as in they were being uncooperative on
14    the stand and a party who was simply sufficiently
15    identified with an adverse party.  I'm not making a
16    claim that Colonel Lewis --
17         THE COURT:  I thought you were, that that was
18    why you were --
19         MR. ATKINSON:  So I am --
20         THE COURT:  -- citing 611.
21         MR. ATKINSON:  Specifically for 611, Your
22    Honor, I'm referring to (c)(2).
23         THE COURT:  Which is when you call a hostile
24    witness, which is why I asked you whether you are
25    designating Colonel Lewis as a hostile witness.
```

```
 1            MR. ATKINSON:  I will, Your Honor.  I will
 2    then.
 3            MR. BOCHAIN:  Your Honor, the one thing I'll
 4    just note is Colonel Lewis is here voluntarily.  He's
 5    not here by subpoena.  He's here voluntarily.
 6            THE COURT:  All right.  Well, I'm going to
 7    permit for now leading questions in as much as
 8    Colonel Lewis is a witness identified with an adverse
 9    party, that is Commissioner Dykes.  Go ahead.
10            MR. ATKINSON:  Thank you, Your Honor.
11            Can we have the last question read back,
12    madame court reporter, please?
13            THE COURT:  Yes.
14            (Record read by the Court Reporter.)
15            THE WITNESS:  Yes, that's correct.
16    BY MR. ATKINSON:
17       Q.   Those officers wear uniforms, Colonel?
18       A.   Yes.
19       Q.   And as part of their uniform, they carry
20    handguns, correct?
21       A.   Yes.
22       Q.   And DEEP employs approximately -- well, DEEP
23    employs approximately 52 of these officers including
24    you, correct?
25       A.   Correct.
```

1    Q.    DEP also employs approximately 30 park

2  rangers, correct?

3    A.    I don't know exactly how many park rangers

4  DEEP employees.  It's more than my department.

5          THE COURT:  Can you speak into the

6  microphone.

7          THE WITNESS:  I don't know how many park

8  rangers DEEP employs.

9  BY MR. ATKINSON:

10    Q.    What is your -- withdrawn.

11          The park rangers that DEEP -- withdrawn.

12          What are EnCon rangers?

13    A.    EnCon rangers are seasonal employees that we

14  hire during the summer months.

15    Q.    Okay.  And those EnCon rangers, they're

16  unarmed, correct?

17    A.    Correct.

18    Q.    But they do wear uniform shirts?

19    A.    Yes.

20    Q.    And where are they typically assigned?

21    A.    Our shoreline parks and then select inland

22  parks.

23    Q.    Is there any criteria for assigning them to

24  specific parks?

25    A.    Visitation levels, campgrounds, past history.

1    Q.    And within that -- withdrawn.

2          You mentioned visitation levels.  What's the

3    criteria for making an assignment on a visitation

4    level basis?

5          MR. BOCHAIN:  Objection, Your Honor.  That's

6    a little ambiguous.

7          THE COURT:  Do you understand the question?

8    When you say that you assign rangers based on the

9    visitation level, does that mean the number of people

10   who come to the park?

11         THE WITNESS:  Yes.

12         THE COURT:  Okay.  Next question.

13   BY MR. ATKINSON:

14   Q.    You also mentioned about past history,

15   Colonel.  Can you describe for us what you meant by

16   that?

17   A.    Where we've identified parks that we have a

18   continuous problem or where we need to increase our

19   presence due to -- just where we've identified where

20   we need to increase our presence.

21   Q.    When you say, "problem," what do you mean by

22   that?

23   A.    The park is overcrowded, we have parking

24   outside of the park trying to gain entry once the

25   park closes routinely, we have quality of life from

 1    neighbors, maybe loud music.

 2        Q.    EnCon rangers have the authority to write

 3    tickets for low-level -- withdrawn.

 4              EnCon rangers have the authority to write

 5    tickets for infractions, correct?

 6              MR. BOCHAIN:   Objection, Your Honor.

 7    Foundation.

 8              THE COURT:   Sustained.

 9    BY MR. ATKINSON:

10        Q.    Colonel Lewis, do EnCon rangers have the

11    authority to enforce state park rules?

12        A.    Yes.

13        Q.    What rules do they have the authority to

14    enforce?

15        A.    Twenty-three regulations of state parks and

16    forests.

17        Q.    Pardon me?

18        A.    The 23 regulations for state parks and

19    forest.

20        Q.    Does the -- do the regulations that they have

21    the authority to enforce include the prohibition on

22    carrying a handgun in -- carrying a firearm in state

23    parks and forests without permission to do so?

24        A.    Yes.

25        Q.    So if I understand your testimony correctly,

1    if an EnCon ranger came across a person carrying an

2    unauthorized firearm in a state park or forest, they

3    could write that person a -- they could enforce the

4    park rule against that person?

5        A.    They could.

6        Q.    Do they typically -- and to your knowledge,

7    do they typically enforce that rule against such a

8    person?

9        A.    To my knowledge, no.

10       Q.    Why don't they enforce that rule against a

11   person under those circumstances?

12       A.    I can't recall it happening since I've known

13   them.

14       Q.    Pardon me?

15       A.    I can't recall that charge coming up since

16   they -- since the program's -- since I've been here

17   with the program.

18       Q.    Understood.  Do you know how many state parks

19   and forests Connecticut has?

20       A.    Not exactly.

21       Q.    If I may show you what's been marked as

22   Defendant's Exhibit 141.

23             Colonel, have you reviewed Defendant's

24   Exhibit 141?

25       A.    Yes.

```
 1      Q.    Would it be helpful for you to move the mic a

 2 little closer if that's okay and that might make it

 3 easier.

 4      A.    Thank you.

 5      Q.    Thank you.

 6            What is that, Colonel?

 7      A.    It appears to be a printout of our state park

 8 web page listing the state parks.

 9      Q.    Do you see the first paragraph above the

10 list?

11      A.    Yes.

12      Q.    Have you read that paragraph?

13      A.    Yes.

14      Q.    I'll ask you again, based on that, how many

15 state parks does Connecticut have, approximately?

16      A.    139 state parks and forests.

17      Q.    Thank you.  Is it possible for you to assign

18 an EnCon officer to every park in the state at all

19 times?

20            MR. BOCHAIN:  Objection, Your Honor.

21 Argumentative.

22            MR. ATKINSON:  I've simply --

23            THE COURT:  I'm going to sustain the

24 objection because you can lead but you can't argue.

25 The concept that is suggested in your question is
```

```
 1   there's so many state parks and forests they
 2   couldn't.  Why don't you just ask him how many of
 3   these 139 state parks and forests have EnCon officers
 4   assigned to them and does that include rangers.
 5            MR. ATKINSON:  Not -- I was trying not to ask
 6   a compound question, Your Honor.
 7            THE COURT:  Let's get straight at this.
 8   BY MR. ATKINSON:
 9   Q.    Colonel, how many parks have an EnCon officer
10   assigned to them?
11   A.    How do you mean assigned to them?  It's hard
12   for me to answer that question like that.
13   Q.    Well, let me ask it this way, do you assign
14   EnCon officers to specific state parks and forests?
15   A.    To only a state park?
16   Q.    Correct.
17   A.    To a specific park, no, they are not assigned
18   to a specific state park.
19   Q.    Do you assign EnCon rangers to a specific
20   state park?
21   A.    Rangers, yes, are assigned to a specific
22   state park.
23   Q.    In the assignment of a ranger to a specific
24   state park, is a ranger assigned to just one state
25   park?
```

1    A.    Generally speaking, yes.  There are a couple

2   of exceptions.

3    Q.    Let's talk about the exceptions.  Can you

4   describe those for us, please?

5    A.    So an exception would be we typically staff,

6   we call it a unit in state parks, a management unit

7   under state park's division.  So we'll staff that

8   with a ranger or two rangers in that unit and that

9   unit may contain three, four, five different state

10  parks or forests within that management unit.

11   Q.    Okay.  Does DEEP have any technology that

12  would assist its human employees in monitoring state

13  parks and forests?

14   A.    Not to my knowledge.

15   Q.    Do other Connecticut law enforcement agencies

16  have the authority to enforce the firearms

17  prohibition in Connecticut state parks and forests?

18   A.    They do.

19   Q.    Do those other law enforcement agencies

20  include the state police?

21   A.    Yes.

22   Q.    Do those other law enforcement agencies

23  include local police departments?

24   A.    Yes.

25   Q.    Does DEEP take any steps to coordinate how to

```
 1    enforce that prohibition with local law enforcement
 2    officials?
 3           MR. BOCHAIN:  Objection, Your Honor.
 4    Relevance.
 5           THE COURT:  What is the relevance?
 6           MR. ATKINSON:  Your Honor, he's just
 7    testified that other -- other law enforcement
 8    agencies have the ability to enforce that --
 9           THE COURT:  I understand that, but what's the
10    relevance?
11           MR. ATKINSON:  What I'm getting at is
12    somewhat to the standing issues, Your Honor, when
13    Mr. Nastri was asked earlier whether a local law
14    enforcement officer had ever -- or police officer had
15    ever asked -- threatened to enforce the law
16    against --
17           THE COURT:  And he said no.
18           MR. ATKINSON:  Correct.  And I'm simply
19    completing the loop that they have that authority and
20    that DEEP -- this also goes to my broader argument of
21    how DEEP has not informed the public of this
22    prohibition and it has chosen not to take steps to
23    the lack of --
24           THE COURT:  I don't think that this question
25    gets at all to that, so I'm going to sustain the
```

1  objection.

2  BY MR. ATKINSON:

3    Q.    Colonel Lewis, you submitted an affidavit in

4  this case, correct?

5    A.    Yes.

6    Q.    Would you know that affidavit or recognize

7  that affidavit if I showed it to you?

8    A.    Yes.

9         MR. ATKINSON:  I am going -- may I approach

10  the witness, Your Honor?

11        THE COURT:  Yes.

12  BY MR. ATKINSON:

13    Q.    I am going to show you, after I show counsel,

14  what's been marked as Plaintiff's Exhibit 4 --

15        MR. ATKINSON:  Actually, Your Honor, I'm

16  going to use Defense 136, which I understand is

17  already in the binder there in front of him.

18        THE COURT:  Is it the same thing?

19        MR. ATKINSON:  Yes, Your Honor.

20        THE COURT:  So the declaration of Colonel

21  Chris Lewis is going to be marked as Defendant's 136?

22        MR. ATKINSON:  Correct.

23        MR. BOCHAIN:  It's already introduced into

24  evidence, Your Honor.  It's a full exhibit.

25        THE COURT:  That may be.  I want to make sure

```
 1    we got the right number on it, that's all.

 2             MR. BOCHAIN:  I'm sorry.  It is Defense

 3    Exhibit 136, Your Honor.

 4    BY MR. ATKINSON:

 5       Q.    Have you had a chance to review that, Colonel

 6    Lewis?

 7       A.    Yes.

 8       Q.    Is that your affidavit?

 9       A.    Yes.

10       Q.    Can I turn your attention to what is ECF

11    stamped page 6 and a paragraph 16.

12       A.    Okay.

13       Q.    In that -- your affidavit, Colonel Lewis, you

14    gave a number of reasons for the prohibition on

15    carrying firearms in state parks and forests without

16    state permission, correct?

17       A.    Yes.

18       Q.    And the first reason that you listed was that

19    the presence of firearms particularly if alcohol is

20    involved increases the risk of confusion, alarm and

21    conflict among visitors, correct?

22       A.    Correct.

23       Q.    Are you familiar with Connecticut General

24    Statute 54-206d?

25       A.    Say the statute again, please.
```

```
 1      Q.    Sure.   Connecticut General Statute 54-206d?

 2      A.    I'd have to review it.

 3            MR. ATKINSON:  Okay.  If I may, Your Honor,

 4   approach the witness to show him what's been marked

 5   as Plaintiff's Exhibit 7 for identification.

 6            THE COURT:  You may.

 7            MR. ATKINSON:  Just to correct, Your Honor, I

 8   did misspeak, that's 53-206d is the statute.

 9   BY MR. ATKINSON:

10      Q.    Have you had a chance to review that,

11   Colonel?

12      A.    Yes.

13            MR. ATKINSON:  What is -- well, I'm going to

14   do it this way, Your Honor.  I would ask since what

15   I've handed Colonel Lewis is the Westlaw printout of

16   that statute, I would ask Your Honor to take judicial

17   notice of the content of that statute.

18            THE COURT:  Any objection?

19            MR. BOCHAIN:  No, Your Honor.  But I may have

20   objections based on his line of questioning that

21   might be coming up but I don't have objection to that

22   right now.

23            THE COURT:  All right.  We have admitted

24   53-206d.

25            MR. ATKINSON:  Correct, Your Honor.
```

1          THE COURT:  As Plaintiff's 7.

2          MR. ATKINSON:  May I proceed, Your Honor?

3          THE COURT:  Yes.

4    BY MR. ATKINSON:

5      Q.    Is your understanding of that statute,

6    Colonel, that it prohibits individuals from carrying

7    a firearm while under the influence of alcohol?

8      A.    Correct.

9      Q.    Is it also your understanding that it

10   prohibits individuals from carrying a firearm while

11   under the influence of another intoxicant?

12     A.    Yes.

13     Q.    Is it your understanding also that it

14   prohibits an individual from carrying a firearm while

15   under the influence of alcohol in a state park or

16   forest?

17         MR. BOCHAIN:  Objection, Your Honor.  I'm

18   going to ask for the relevance at this point.

19         MR. ATKINSON:  Your Honor, he states in his

20   declaration that one of the reasons for the agency

21   regulation at issue in this action is that it reduces

22   -- as I read it, it reduces the risk of confusion,

23   alarm, conflict, particularly for people with

24   alcohol, and I'm simply demonstrating that there are

25   other applicable laws.  So I think it's highly

 1    relevant.

 2           THE COURT:  I'm sorry.  Because there are

 3    other applicable laws, his testimony that this is his

 4    objective is not credible.  What is the issue you are

 5    getting at?

 6           MR. ATKINSON:  I am simply trying to show

 7    that there are other laws that are tailored to

 8    accomplish the purpose that he's claiming for 23-4.

 9           THE COURT:  All right.  You may proceed.

10    BY MR. ATKINSON:

11      Q.   Colonel, I'll ask my question again.  Is it

12    your understanding that this prohibition on

13    individuals carrying a firearm under the influence of

14    alcohol also applies to individuals carrying it under

15    the influence of alcohol in a state park or forest?

16      A.   Yes.

17      Q.   Is that the same -- is your understanding the

18    same when it comes to a person carrying a firearm

19    under the influence of another intoxicant in a state

20    park or forest?

21      A.   Yes.

22      Q.   Do EnCon officers receive training?

23      A.   Yes.

24      Q.   What type of training do they receive?

25      A.   Basic police academy training followed by

1   field training officer program.

2   Q.   Okay.  When you say, "basic field academy

3   training," are you referring to POSTC training?

4   A.   Yes.  It's POSTC-approved academy.

5   Q.   What is Post-approved education?

6   A.   Police Officer Standards Training Commission,

7   they're the governing body for police officers, state

8   of Connecticut.  So they designate what training,

9   what hours and what classes is held at a basic police

10   academy.

11   Q.   As part of a POSTC-approved training, would

12   officers receive training to enforce Connecticut

13   General Statute 53-206d?

14   A.   I don't know.

15   Q.   Could DEEP -- could DEEP itself provide them

16   training on the enforcement of 53-206d?

17   A.   Yes.

18   Q.   Does DEEP currently provide them with

19   training on the enforcement of 53-206d?

20   A.   I don't know.

21   Q.   Does DEEP provide training to EnCon rangers

22   on the enforcement of 53-206d?

23   A.   No.

24   Q.   If I may have the Exhibit 7 back from you,

25   Colonel, please.

1    A.    Yup.

2          MR. ATKINSON:  May I have a moment to go to

3    counsel's table, Your Honor?

4    BY MR. ATKINSON:

5    Q.    Thank you for bearing with me, Colonel Lewis.

6    We were discussing about the reasons you stated

7    for -- we were discussing the reasons you stated for

8    the prohibition on carrying firearms in state parks

9    and you stated that the -- the carrying a firearm

10   in -- the reason for the prohibition was that it

11   prevents an increase in the risk of confusion from

12   somebody carrying a firearm in a state park, correct?

13   A.    Correct.

14   Q.    Do you recall telling me previously that you

15   believe that the mere presence of a firearm in a

16   place can increase the risk of confusion?

17         MR. BOCHAIN:  Objection, Your Honor.  Asked

18   and answered.

19         THE COURT:  I'm going to permit it.

20         THE WITNESS:  Can you state the question

21   again?

22   BY MR. ATKINSON:

23   Q.    Sure.  Do you recall previously telling me

24   that you believe that the mere presence of firearms

25   in a place can increase the risk of confusion?

1    A.    Yes.

2    Q.    Do you recall previously telling me that you

3  believe the mere presence of a firearm in a place can

4  increase the risk of alarm?

5    A.    Yes.

6    Q.    Do you recall previously telling me that you

7  believe the mere presence of firearms in a place can

8  increase the risk of conflict?

9    A.    I don't recall that.

10   Q.    Okay.  Do you recall that you also stated

11 that people are generally confused if they saw a

12 firearm where they're not expecting to see one?

13   A.    Yes.

14   Q.    What do you base that opinion on?

15   A.    It's personal experience, professional

16 experience.

17   Q.    Okay.  Can you describe the personal

18 experience that you base that opinion on to us?

19   A.    So personal experience, so someone -- I've

20 been places, someone is paying for something and

21 they're fishing out a wallet and they pull out a gun

22 and throw it on the counter and people -- at a store

23 and people kind of got shocked by it, like what's

24 going on, stepping back.  So that was a confusing

25 moment.

1    Q.    You also spoke about your professional
2  experience that you based your -- that opinion on.
3  Can you describe your -- what professional
4  experiences you've had that gave rise to your
5  opinion?
6    A.    Answer calls where someone is seen with a
7  firearm in a place where it would not be allowed or
8  just being seen with a firearm period in public
9  whether it's allowed or not.  They receive 9-1-1
10  calls and answered those.
11    Q.    Did you also previously tell me that --
12  did -- withdrawn.
13        Do you recall us previously discussing
14  where you'd expect to see a firearm is?
15    A.    Yes.
16        MR. BOCHAIN:  Objection, Your Honor.
17  Foundation.  I'm trying to understand that.
18        THE COURT:  I'm going to sustain that.  If
19  what you're doing is asking him a question, he either
20  answers contrarily or needs his recollection
21  refreshed from the deposition, that's fine, but not
22  this indirect essentially parroting of his deposition
23  testimony.  Ask him straight out the question.  If it
24  differs from what he said in his deposition, you can
25  show him his deposition, and if he wishes to adjust

 1    his testimony, he can.

 2            MR. ATKINSON:   Okay.

 3    BY MR. ATKINSON:

 4        Q.    Colonel Lewis, do you expect to see a firearm

 5    at a gun store?

 6        A.    Yes.

 7        Q.    At a shooting range?

 8        A.    Yes.

 9        Q.    At a fish and game hunting area?

10        A.    Yes.

11        Q.    Do you expect to see a firearm at a gas

12    station?

13        A.    No.

14        Q.    Do you expect to see a firearm at a

15    restaurant?

16        A.    No.

17        Q.    Do you expect to see a firearm on the street?

18        A.    I -- professionally, I would look for it.   I

19    would not expect to see one laying in the street,

20    though.

21        Q.    Would you expect to see a person carrying a

22    firearm on the street?

23        A.    No.

24        Q.    Does a person carrying a firearm concealed

25    reduce the risk of confusion over a firearm being

```
 1   present in a place?
 2          MR. BOCHAIN:  Objection, Your Honor.
 3   Argumentative.
 4          MR. ATKINSON:  Let me rephrase that, Your
 5   Honor.
 6          THE COURT:  So are you asking him whether his
 7   paragraph 16 in his affidavit related to presence of
 8   firearms is related to public or concealed carry?
 9   Maybe you should clarify.
10          MR. ATKINSON:  I don't think he drew that
11   distinction.
12          THE COURT:  I'm wondering if your question is
13   attempting to do that.
14          MR. ATKINSON:  Yes.  I am attempting to do
15   that.
16          THE COURT:  Go ahead.
17   BY MR. ATKINSON:
18     Q.    Colonel Lewis, would you agree with me that
19   somebody open carrying a firearm is highly likely to
20   cause confusion in a certain place?
21     A.    Yes.
22     Q.    Would you agree with me that someone carrying
23   a firearm concealed is less likely to cause the risk
24   of confusion in a place?
25          MR. BOCHAIN:  Objection, Your Honor.
```

```
 1   Argumentative and speculation.

 2          THE COURT:  Overruled.

 3          THE WITNESS:  If it was carry concealed, less

 4   risk, yes.

 5   BY MR. ATKINSON:

 6     Q.    Why does -- withdrawn.

 7          Does -- would you agree with me that someone

 8   carrying a firearm was more likely to -- carrying a

 9   firearm openly is more likely to cause alarm to other

10   people?

11     A.    Carrying openly?

12     Q.    Correct.

13     A.    Yes, that's correct.

14     Q.    Would you agree with me that a person

15   carrying a firearm concealed is less likely to cause

16   alarm to people?

17     A.    Yes.

18     Q.    Going back to your affidavit for a second,

19   why does a firearm increase the risk of conflict by

20   its mere presence?

21     A.    So if a fight breaks out and there's a

22   firearm present, the opportunity for a gun fight or

23   gun to be involved increases dramatically because

24   there's actually a gun there versus when there's no

25   gun there, a fight breaks out, there's not going to
```

 1   be a gun involved.

 2       Q.    But there would have to be a fight first?

 3       A.    Fight, conflict, verbal, any type -- when I

 4   say, "fight," I'm not saying physical fight.  A

 5   conflict could be verbal in nature.

 6       Q.    Understood.  Do you -- the second reason you

 7   gave -- withdrawn.

 8           The second reason that you gave for the

 9   firearms prohibition in state parks and forests is

10   that there's a substantial risk that discharging a

11   firearm even in self-defense would strike a bystander

12   unintentionally particularly in the middle of many

13   parks that can become crowded in the summer months,

14   correct?

15       A.    Correct.

16       Q.    Are you familiar with Connecticut General

17   Statute 53-203?

18       A.    I'd have to review it to be 100 percent.

19           MR. ATKINSON:  Your Honor, if I may, I'd like

20   to show Colonel Lewis what's been marked as

21   Plaintiff's Exhibit 6 for identification.

22           While Colonel Lewis is reviewing that, Your

23   Honor, I'd also ask you to take judicial notice of

24   the content of Connecticut General Statute

25   Section 53-203.

```
 1              THE COURT:  All right.  And you've marked
 2    this as?
 3              MR. ATKINSON:  As Plaintiff's Exhibit 6, Your
 4    Honor.
 5              THE COURT:  It's in evidence.
 6              MR. ATKINSON:  For identification only.
 7              THE COURT:  Is it not in evidence?  Are you
 8    offering it?
 9              MR. ATKINSON:  So what I'm doing is because
10    these are Westlaw printouts based on discussions I
11    had with the state, we decided the best way to
12    proceed was to ask you to take judicial notice rather
13    than entering it into evidence as a full exhibit.
14              THE COURT:  So the judicial notice is that
15    there exists a statute denominated Connecticut
16    General Statute 53-203 captioned "Unlawful Discharge
17    of Firearms."  Go ahead.
18              MR. ATKINSON:  Thank you, Your Honor.
19    BY MR. ATKINSON:
20       Q.    Colonel Lewis, have you had a chance to
21    review what's been marked as Plaintiff's Exhibit 6?
22       A.    I have.
23       Q.    What is that, Colonel Lewis?
24       A.    It's a state law for unlawful discharge of
25    firearms.
```

1    Q.    Can you read for us what that copy says?

2    A.    Sure.  The statute, "Any person who

3    intentionally, negligently or carelessly discharges

4    any firearm in such a manner as to be likely to cause

5    bodily injury or death to persons or domestic

6    animals, or the wanton destruction of property, shall

7    be guilty of a Class C misdemeanor."

8    Q.    As part of the EnCon officer's POSTC-approved

9    training that you mentioned earlier, do officers

10   receive training to enforce 53-203?

11   A.    I don't know.

12   Q.    Does the same risk of striking a bystander

13   with an errant shot apply to a hunter?

14   A.    Yes.

15   Q.    Is that same risk present on a crowded

16   street?

17   A.    Yes.

18   Q.    How about a movie theater?

19   A.    Yes.

20   Q.    A restaurant?

21   A.    Yes.

22   Q.    A gas station?

23   A.    Yes.

24         MR. ATKINSON:  If I may I approach Colonel

25   Lewis to take back Exhibit 6, Your Honor.

 1              THE COURT:  You may.

 2    BY MR. ATKINSON:

 3       Q.    The third reason you gave in your affidavit

 4    for the prohibition on carrying a firearm in state

 5    parks was that there are no areas in many state parks

 6    and forests including beaches and swimming areas to

 7    properly store firearms, correct?

 8       A.    Correct.

 9       Q.    And would you be able to give us, as you sit

10    here today, an example of a park where that concern

11    would be present?

12       A.    Hammonasset Beach State Park.

13       Q.    What is the primary basis for this concern,

14    Colonel?

15       A.    That if someone was going to Hammonasset

16    Beach State Park, the primary proper use is going to

17    the beach, swimming, wading in the beach, sunbathing,

18    and then carrying concealed while wearing a bathing

19    suit does not -- is very difficult.

20       Q.    Do you also have a concern that a child could

21    gain access to an unattended firearm in such a

22    situation?

23       A.    If a person chose to leave the firearm

24    unattended because they went swimming, yes.

25              MR. ATKINSON:  If I may, Your Honor, I'd like

1    to show Colonel Lewis what has been marked as

2    Plaintiff's Exhibit 5.

3            MR. BOCHAIN:  Your Honor, just for

4    expediency, we wouldn't object to this coming in.

5            THE COURT:  After we finish this exhibit,

6    we'll take a brief recess.

7    BY MR. ATKINSON:

8    Q.    And have you reviewed that, Colonel?

9    A.    Yes.

10   Q.    What is it?

11   A.    It's a state -- state law 53-21 which is

12   injury or risk of injury to or impairing morals of

13   children and sale of children.

14   Q.    And according to your understanding, what

15   does that law prohibit?

16   A.    Endangering a child or allowing -- or as the

17   guardian or parent of a child, allowing that child to

18   be placed in danger.

19   Q.    And based on your understanding of that law,

20   leaving a firearm on a beach unattended where a child

21   could access it would pose a risk of injury to a

22   minor, wouldn't it, correct?

23   A.    If the minor retrieved the gun.

24   Q.    Do you know as a part of the POSTC education

25   you mentioned earlier, if EnCon officers receive

```
 1    training to enforce Section 53-21?

 2        A.    I do not know.

 3            MR. ATKINSON:  Your Honor, that's all the

 4    questions I have as to that exhibit.

 5            THE COURT:  Let's take a five-minute recess.

 6            (Recess taken.)

 7            (Call to Order, 11:46 a.m.)

 8            THE COURT:  Please be seated.  Continue

 9    direct examination of Colonel Lewis.

10            MR. ATKINSON:  Thank you, Your Honor.

11    BY MR. ATKINSON:

12        Q.    Colonel, do you recall that before the break,

13    we were talking about your concern about the proper

14    storage of firearms in state parks and forests?

15        A.    Yes.

16        Q.    To the best of your knowledge, is there --

17    has DEEP enacted any rule that would prohibit people

18    from leaving firearms unattended in a state park or

19    forest?

20        A.    No.

21        Q.    To the best of your knowledge, does DEEP post

22    a notification at a state park or forest warning

23    people not to leave firearms unattended?

24        A.    No.

25        Q.    To the best of your knowledge, is there
```

```
 1   anything that would prevent DEEP from posting a sign

 2   at the entrance to a state park or forest telling

 3   people not to leave firearms unattended?

 4      A.   No.

 5      Q.   Going back to your affidavit, the fourth

 6   reason that you gave for the prohibition on the

 7   carrying of firearms in state parks and forests was

 8   that it serves DEEP's conservation goals particularly

 9   with respect to hunting, correct?

10      A.   Correct.

11      Q.   There are laws -- to your knowledge, are

12   there laws in Connecticut that prohibit out-of-season

13   hunting in Connecticut state parks and forests?

14      A.   Yes.

15      Q.   As you sit here today, do you know how many

16   state parks and forests Connecticut permits hunting

17   in?

18      A.   No.

19           MR. ATKINSON:  Your Honor, if I may show

20   Colonel Lewis what has been marked as Plaintiff's

21   Exhibit 17 which I believe's a full exhibit to which

22   no objection was made.

23           THE COURT:  You may.

24   BY MR. ATKINSON:

25      Q.   Colonel, have you had a chance to review
```

 1   Plaintiff's Exhibit 17?

 2      A.   Yes.

 3      Q.   What is that?

 4      A.   It's a -- appears to be a list from one of

 5   our web pages where -- listing state parks where some

 6   hunting may occur at, yeah.

 7      Q.   Okay.  Pardon me.

 8           Can you count for us the number of parks that

 9   are listed on that exhibit, Colonel?

10           MR. BOCHAIN:  Your Honor, objection.  The

11   document speaks for itself.

12           MR. ATKINSON:  I'll move on, Your Honor.

13   BY MR. ATKINSON:

14      Q.   Colonel, is it your understanding that

15   Connecticut permits hunting year-round for coyote?

16      A.   Generally speaking, yes.

17      Q.   Is it also your understanding that hunters

18   can use firearms to hunt for coyote year-round?

19      A.   Yes.

20      Q.   Going back to your affidavit, another reason

21   that you give for the firearms prohibition is it

22   helps DEEP to maintain parks and forests as places of

23   peace, relaxation and quiet enjoyment, correct?

24      A.   Correct.

25      Q.   Would those objectives be substantially

```
1   affected by someone carrying a concealed firearm?
2       A.    If it's concealed and not noticed, no.
3       Q.    Going back to hunting for a minute, is it
4   your understanding that -- let me ask it this way --
5   withdrawn.
6            DEEP currently permits hunters to use
7   22-caliber rimfire handguns in some state parks and
8   forests to hunt certain types of game, correct?
9       A.    For small game hunting where authorized, yes.
10      Q.    Would a 22 -- withdrawn.
11           Would a 22-caliber handgun cause the same
12  risk of confusion as someone carrying -- withdrawn.
13           Would a 22-caliber handgun carried by a
14  hunter for purposes of hunting cause the same risk of
15  confusion as someone carrying a concealed handgun in
16  a state park or forest?
17           MR. BOCHAIN:  Objection, Your Honor.
18  Speculation.
19           THE COURT:  I'm going to ask you to revise
20  your question to --
21           MR. ATKINSON:  Okay, Your Honor.
22           THE COURT:  -- his knowledge and/or
23  experience.
24           MR. ATKINSON:  I will, Your Honor.
25  BY MR. ATKINSON:
```

1    Q.    Colonel Lewis, have you had experience with

2   the confusion that could arise when someone notices

3   another person carrying a firearm in state parks and

4   forests?

5    A.    Do I have personal experience, you're asking?

6    Q.    Yes.

7    A.    No, I do not.

8    Q.    By virtue of your position in -- as director

9   of the EnCon Police, do you have professional

10   experience in the confusion that could result from

11   someone noticing someone carrying a firearm in state

12   parks and forests?

13    A.    Yes.

14    Q.    Does your professional experience in that

15   regard extend to the confusion over someone carrying

16   a handgun in state parks and forests?

17    A.    Can you repeat the question.

18    Q.    Sure.  Does your professional experience with

19   the confusion that could result from someone noticing

20   someone carrying a firearm in state parks and

21   forests, does that professional experience also

22   include experience with the confusion that could

23   arise from someone carrying a 22-caliber handgun --

24   withdrawn -- someone carrying a handgun in state

25   parks and forests?

1    A.    Yes.

2    Q.    Okay.  How would you describe the confusion

3    that you have encountered in your professional

4    experience over someone carrying a handgun in state

5    parks and forests?

6    A.    It's not been allowed, to my knowledge, since

7    state parks have been in existence and it's not

8    expected, so we receive calls to our dispatch center

9    for -- requesting calls for service because someone

10   has a firearm or someone hears shooting in a state

11   park or forest.

12   Q.    Colonel, a person can become the victim of a

13   crime almost anywhere, correct?

14   A.    Correct.

15   Q.    And that includes becoming the victim of a

16   violent crime, correct?

17   A.    Correct.

18   Q.    And that would include that someone could

19   become a victim of a crime in a Connecticut state

20   park or forest, correct?

21   A.    Correct.

22        MR. ATKINSON:  Your Honor, if I may approach

23   Colonel Lewis to show him what's been marked as

24   Plaintiff's Exhibit 10 to which I believe we agreed

25   to admit this as a full exhibit.

1          THE COURT:  All right.

2          THE WITNESS:  Okay.

3   BY MR. ATKINSON:

4     Q.    Colonel, do you recognize that exhibit?

5     A.    It appears to be a blurry copy of a NIBRS

6   report for past couple of years from our agency.

7     Q.    I apologize for the blurriness.  So if we

8   need to slow down at any point, just let me know and

9   we'll take our time with that.  All right?

10    A.    Yes.

11    Q.    What does the term "NIBRS" stand for?

12    A.    To the best of my knowledge, National

13  Incident Based Reporting System.

14    Q.    What do you understand this exhibit to

15  depict?

16    A.    This is what we report to FBI Department of

17  Justice for our annual crime statistics for

18  misdemeanor felony arrests from our division.

19    Q.    So just to be clear, the data that is shown

20  in this exhibit is only -- only applies to matters

21  handled by the EnCon Police Department?

22    A.    Yes.  If I can clarify, I said, "arrested."

23  I mean crimes reported to us that we investigated,

24  but they don't all necessarily end in an arrest.

25    Q.    Thank you.

1    A.    But yes, our division only.

2    Q.    If I may direct your attention, and we can

3    stick to the first page of this, to the right side

4    where there's the column that says, "reported,"

5    underneath "offenses," do you see that?

6    A.    Yes.

7    Q.    What does the term "reported" mean in this

8    context?

9    A.    So that would be in our case management

10   system, that means one of these categories of crimes

11   was reported either officer initiated or received a

12   report from another agency or the public, got

13   referred to us somehow, so we -- an officer is

14   assigned a case that contained one of these elements.

15   Q.    Do you see a column next to that with the

16   label "cleared"?

17   A.    Yes.

18   Q.    What does the term "cleared" stand for in

19   this context?

20   A.    So in our system, that means -- so it's the

21   case is either open under investigation or it's

22   cleared.  So "cleared" can mean by -- it can be

23   cleared by arrest, it can be cleared by warrant, it

24   can be cleared by other means.  So it can be cleared

25   by no criminal action or no criminal aspect.  It just

1   means that it's not under -- the case is closed,

2   we're not currently investigating it.

3       Q.   So just so we're clear, none of the crimes

4   that are reported on this list were handled by the

5   state police?

6       A.   I can't say that 100 percent.

7       Q.   Let's go to the page that depicts the 2019

8   printout.

9       A.   Okay.

10      Q.   Do you see any crimes on there that in your

11  professional experience you believe a person might

12  have benefitted from having a handgun to protect him

13  or herself with?

14          MR. BOCHAIN:  Objection, Your Honor.

15  Speculation.

16          THE COURT:  I don't understand that question.

17          MR. ATKINSON:  So, Your Honor, I'm basically

18  asking him if --

19          THE COURT:  You want him to look at these

20  numbers and opine whether having a handgun would have

21  prevented these crimes.

22          MR. ATKINSON:  So I have asked him generally.

23  I can get more specific.  I didn't ask him whether it

24  would have prevented the crime.  I asked him whether

25  a person might have benefitted.  I have not asked

 1   him --

 2            THE COURT:  I think that's speculative.

 3   You're going to have to find another way to ask that

 4   that will relate to these statistics and what is

 5   known about the circumstances.

 6            MR. ATKINSON:  Understood, Your Honor.  I

 7   will move on.

 8   BY MR. ATKINSON:

 9     Q.    Colonel, were you in the courtroom earlier

10   when my colleagues and I stipulated to certain facts

11   being accurate?

12     A.    Yes.

13            MR. ATKINSON:  I believe we marked that as

14   Joint Exhibit A, Your Honor.  I would like to place

15   that in front of Colonel Lewis at this time.

16   BY MR. ATKINSON:

17     Q.    Can I have Exhibit 17 back?

18     A.    Seventeen is here and 10 is right there.

19            MR. ATKINSON:  Your Honor, if the record

20   could just reflect, I did take Exhibits 10 and 17

21   back from Colonel Lewis.

22            THE COURT:  Eventually counsel will have to

23   put all the exhibits that were used or admitted in

24   the hands of Ms. Barry.

25            MR. ATKINSON:  I will coordinate that with

 1   her.

 2   BY MR. ATKINSON:

 3      Q.    Colonel Lewis, have you had a chance to

 4   review the content of that stipulation?

 5      A.    Yes.

 6      Q.    What is your understanding of a firearms

 7   hunting license?

 8      A.    It's a hunting license that allows people to

 9   hunt with a firearm.  It's the base license and

10   there's other permits that people can purchase for

11   additional privileges.

12      Q.    Does a firearm -- withdrawn.

13          A firearms hunting license, to your

14   understanding, does that constitute permission to

15   carry a firearm into a state park or forest?

16          MR. BOCHAIN:  Objection, Your Honor.

17   Relevance.

18          THE COURT:  Overruled.

19          THE WITNESS:  Repeat the question, please.

20   BY MR. ATKINSON:

21      Q.    Yes.  To your understanding, does a firearm

22   hunting license constitute permission by DEEP to

23   carry a firearm into a state park or forest?

24      A.    Only under certain conditions in an area, so

25   generally, no.

1    Q.    What conditions would be placed on that in an

2  area?  Can you give us an example?

3    A.    The area would have to be listed as

4  designated acreage open to -- as a public hunting

5  area and designated for a species that would infer --

6  for a firearm hunting season species, like small

7  game, shotgun deer; in spring, firearms turkey, you

8  know, those seasons species.  So when we designate

9  our seasons in public lands, we get very -- very in

10  the minutia in Connecticut.

11        So one parcel of public hand could only be

12  open to archery hunting.  Another parcel of land can

13  be open to small game with firearms, shotgun deer,

14  archery deer, spring turkey, fall turkey.  It depends

15  on the individual, individual property.

16    Q.    Okay.  Let's talk about a -- so withdrawn.

17        There are state parks and forests that permit

18  hunting deer with firearms, correct?

19    A.    Yes.

20    Q.    And they permit that within certain seasons,

21  correct?

22    A.    For the state land shotgun season, yes.

23    Q.    A firearms hunting license gives a person

24  permission to carry a firearm into those state parks

25  during hunting season, correct?

1    A.    So shotgun deer season, public land, a

2    firearms hunting license by itself is not enough.

3    Q.    What else does a person need to have in

4    shotgun hunting season for deer to carry a firearm

5    onto -- into that area?

6    A.    They would need the public land shotgun no

7    lottery permit license.

8    Q.    Would the combination of the firearms hunting

9    license and the shotgun no lottery deer hunting

10   license together give a person permission to carry a

11   firearm into that specific area during that specific

12   season?

13   A.    So then you have to go under the hunting

14   regulations, what is the allowable firearms and

15   ammunition.  So that's restricted to ten-gauge or

16   smaller, no basically slugs, no buckshot allowed.

17   Q.    So --

18   A.    And no rifles, sorry.

19   Q.    The combination of the deer hunting license

20   that you described, the firearms hunting license,

21   give a person permission to carry a shotgun that's

22   compliant with the regulations onto a state park land

23   within a specific season for hunting deer, correct?

24   A.    Yes.

25   Q.    Colonel, do you also see on the stipulation

1    the portion where we referred to -- paragraph 2 is

2    what I'm referring to.  Have you had a chance to

3    review that?

4        A.    Our harvest report?

5        Q.    Yes.

6        A.    Yes.

7        Q.    What is your understanding of the DEEP's

8    harvest tagging system?

9        A.    It's a self-reporting system.  So hunters

10   while they're deer hunting, they're required to have

11   a harvest record on their person.  They harvest the

12   deer, they immediately fill out that harvest

13   information, and then they have to call and report it

14   to DEEP within 24 or 72, I can't remember the exact

15   hours, but there's a short deadline they have to

16   actually report it to DEEP.  That can be through the

17   website or telephone-based system where then we enter

18   that data into pour departmental harvest report data

19   system.

20       Q.    As you sit here today, do you know what

21   information needs to be reported on, I believe you

22   said, that harvest record?

23       A.    So your harvest record, to the best of my

24   knowledge, it's the conservation ID number that

25   belongs to the person, it's the town location where

1     it's at, state land, public land, method of take, if

2     it's deer, the section of the deer, and there's a

3     couple other questions that filter off of the deer,

4     sex of the deer.

5         Q.    When you reference "method of take," can you

6     explain to us what you mean by "method of take"?

7         A.    Firearms, archery, muzzleloader.

8         Q.    Does that require a hunter to list the

9     specific firearm that they used?

10        A.    Not to my knowledge.

11        Q.    Would the same reporting requirements apply

12    for a hunter harvesting turkey?

13        A.    Yes.  Very similar for turkey.

14        Q.    To harvest a deer, a hunter would have to

15    kill it, correct?

16        A.    Yes.

17        Q.    And if a hunter was using a firearm, he'd

18    have to discharge that firearm at a deer to kill it,

19    correct?

20        A.    Correct.

21        Q.    And the same thing would apply for a turkey

22    hunter?

23        A.    Yes.

24              MR. ATKINSON:  May I have a moment to confer

25    with Mr. Nastri, Your Honor?

```
1            No further questions for Colonel Lewis, Your

2    Honor.

3            THE COURT:  Thank you.  Cross-examination.

4            MR. BOCHAIN:  Your Honor, while Attorney

5    Atkinson is just organizing his things, I see it's

6    about 12:15.  I'll ask what Your Honor's preference

7    is if we want to take an early lunch.

8            THE COURT:  I'll turn it around and ask was

9    your preference is.

10            MR. BOCHAIN:  I can always eat and I'm a

11    little hungry.

12            THE COURT:  Why don't we take a lunch until

13    one.  And is Colonel Lewis our last witness?

14            MR. ATKINSON:  From the plaintiff's

15    perspective, yes.

16            THE COURT:  From the defendants?

17            MR. BOCHAIN:  I believe that will be the

18    case, Your Honor.  I'm going to confer with my

19    colleagues, but I believe that's going to be the

20    case.

21            THE COURT:  And then when he is finished,

22    will we be moving into argument?

23            MR. ATKINSON:  That would be our preference,

24    Your Honor.

25            MR. BOCHAIN:  The only thing I would request
```

1    is as soon as we're done with examination, just maybe

2    a brief recess so we could confer with one another.

3            THE COURT:  Sure.  That's fine.  Let's be

4    back at one.

5            (Recess taken.)

6            (Call to Order, 1:06 p.m.)

7            THE COURT:  Please be seated.  And Colonel

8    Lewis, you remain under oath.

9            THE WITNESS:  Yes.

10           THE COURT:  All right.  Examination of

11   Colonel Lewis.

12          MR. BOCHAIN:  All right.  And, Your Honor,

13   before I begin, I would just ask the Court's

14   permission, he is one of our witnesses.  So I would

15   ask permission to just go a little bit beyond the

16   scope of examination.

17          THE COURT:  We like to have witnesses called

18   only once and so -- so the answer to your question is

19   yes.  I don't know whether you can divide that up,

20   but as if he were being presented by you versus

21   cross-examination, but we would like to hear

22   everything from Colonel Lewis.

23          MR. ATKINSON:  Your Honor, perhaps to make it

24   a little bit easier, I recognize that he is also the

25   state's witness but this is cross.  I will not raise

1    leading question objections, so if that makes it

2    easier for Attorney Bochain.

3           THE COURT:  He doesn't get to lead no matter

4    what.

5           MR. BOCHAIN:  Without objection, Your Honor.

6    I appreciate that, Attorney Atkinson.

7    BY MR. BOCHAIN:

8       Q.   Colonel, if I could just ask you what

9    documents do you have in front of you currently?

10          MR. BOCHAIN:  May I approach the witness,

11   Your Honor?

12          THE COURT:  Yes.

13          THE WITNESS:  That's the hunting license

14   report.

15          MR. BOCHAIN:  So I'm just going to return the

16   part -- it's the stipulation, Your Honor, I'm just

17   going to return that back to Attorney Atkinson.

18      CROSS-EXAMINATION OF CHRISTOPHER LEWIS

19   BY MR. BOCHAIN:

20      Q.   Good afternoon, Colonel.

21      A.   Good afternoon.

22      Q.   How are you?

23      A.   Good.

24      Q.   So I believe Attorney Atkinson asked you some

25   questions about your professional experience, but I

1    just want to take it one step back, if I could, just

2    to give some better context.

3          Can you tell us where you're from originally?

4    A.    Born in Columbus, Ohio, moved around there a

5    little bit, went to Tennessee, graduated high school

6    in Tennessee, and then college, went to Auburn.

7    Q.    Auburn and where is that?

8    A.    University in Alabama.

9    Q.    And when did you graduate?

10   A.    Graduated there in '97.

11   Q.    And did you have a particular major?

12   A.    Wildlife science.

13   Q.    Okay.  And you graduated, you said, in '98 or

14   '97?

15   A.    '97, yes.

16   Q.    All right.  And then after that, is that when

17   you started working in Alabama as a conservation

18   officer?

19   A.    Shortly thereafter, I started in Alabama in

20   January of 1998.

21   Q.    Okay.  And that's where you stayed for, it

22   seemed like, 15, 20 years or so?

23   A.    About 22 years.

24   Q.    Twenty-two years.  And then after that, you

25   assumed the role that you're currently in?

1    A.    Correct.

2    Q.    And that was in November 2019?

3    A.    2019, yes.

4    Q.    And can you just describe your role -- what

5  is your current role again?

6    A.    So I'm the division director for

7  environmental conservation police division.

8    Q.    Is that within a particular department?

9    A.    It is within the Department of Energy and

10  Environmental Protection.

11    Q.    Can you just describe your role for the Court

12  a little bit?

13    A.    Overseeing the environmental conservation

14  police division, responsible for enforcement,

15  regulating hunting, fishing, boating, ATV use, state

16  lands and state park forest patrols and enforcement.

17    Q.    And I think on examination you had mentioned

18  -- how many staff do you oversee?

19    A.    There's -- I oversee 51 officers and

20  approximately 10 civilian non-sworn staff.

21    Q.    And those non-civilian sworn staff, what are

22  their roles?

23    A.    Eight are dispatchers, two are administrative

24  assistants.

25    Q.    Okay.  So the 51 officers, are those EnCon

1   officers?

2      A.    Yes.

3      Q.    And are they all in the same location?

4      A.    No.   We're -- we divide up our state by

5   district.   So each geographical region of the state

6   is a separate district and we have a headquarters

7   sector.

8      Q.    How many districts is that?

9      A.    We divide up the state ourselves in three

10  districts.

11     Q.    All right.   And where are those districts?

12     A.    Marine district which is every town along the

13  coast of Long Island Sound, and then we have a

14  western district which is, generally speaking, those

15  towns above the marine district west of the

16  Connecticut River, and eastern district is the towns

17  east of the Connecticut River above the marine zone

18  district.

19     Q.    All right.   And are there a certain number of

20  officers in each district?

21     A.    Yes.

22     Q.    All right.   How many are in the west

23  district?

24     A.    The west district is 17 officers currently.

25     Q.    All right.   How about the marine district?

1    A.    Marine district will be 16 officers right
2    now.
3    Q.    All right.  And how about the east district?
4    A.    Fifteen officers.
5    Q.    All right.  And so if my math is correct, and
6    I know my math yesterday wasn't really correct, but
7    if my math is correct, that adds up to 48.  Does that
8    sound about right?
9    A.    Yes.
10   Q.    So is there -- it sounds like there's 33
11   others.  Where are they located?
12   A.    Our headquarters in Hartford.
13   Q.    Okay.  And do those individuals in Hartford
14   serve in a particular capacity?
15   A.    One is an assistant director which is a rank
16   of major, and then I have a training sergeant, a
17   sergeant that's responsible for our training, and
18   then I have an administrative sergeant that handles
19   various administrative duties, purchasing equipment,
20   that type of stuff.
21   Q.    And you are in that office as well?
22   A.    Yes.  And myself in the office.
23   Q.    All right.  So the four of you serve in an
24   administrative capacity?
25   A.    Yes.  Administrative capacity.

1 Q. Now, I'd like you to turn, if you could,

2 there's an exhibit binder in front of you, to

3 Defendant's 136 which is in evidence.  I would just

4 ask you to turn to that if you could.

5 A. Okay.

6 Q. You have that in front of you?

7 A. Yes.

8 Q. I'd ask you to turn to page 4, the

9 paragraph 12.

10 A. Okay.

11 Q. All right.  And so I'm going to direct your

12 attention to three lines from the bottom to the

13 sentence beginning with, "In February 2023."  Do you

14 see that there?

15 A. Yes.

16 Q. All right.  And so it says, "In

17 February 2023," which is few months ago, you received

18 approximately 1400 -- EnCon received approximately

19 1,400 calls.  Can you just explain what you mean by

20 "calls" there?

21 A. Calls for service or individual -- in our

22 records management system, we -- CSF numbers are

23 calls for service.  So that can be a call we received

24 from the public through our dispatch line, a call

25 that's transferred from a 9-1-1 answering service, or

1    it could be an officer-initiated call.

2        Q.    All right.  So those calls get routed through

3    dispatch?

4        A.    Yes.  Even the officer initiated calls get

5    reported to dispatch.

6        Q.    So once a call comes in, what's EnCon's

7    response to that?

8        A.    So the dispatcher determines what the nature

9    of the call is, complaint, what service it needs, and

10   if it requires an officer response, then dispatch

11   will dispatch it to the closest available officer.

12       Q.    All right.  And then are those calls, would

13   they come from across the state?

14       A.    Yes.

15       Q.    All right.  And going -- again, if my math is

16   correct, so we had 1,400 calls for February 2023, if

17   my math is correct, that's about 350 calls per week.

18   Does that sound about right?

19       A.    It sounds about right.

20       Q.    And again, you have 48 officers in the field,

21   so to speak, for EnCon?

22       A.    Yes.

23       Q.    Now, if you look a little bit further, again,

24   on page 4 of the document in front of you, the

25   sentence that says, "In busier" -- it's two

1    sentences, "In busier summer months, EnCon may

2    receive approximately 2,000 calls per month."  And

3    then it continues, for instance, "In June 2022, EnCon

4    received approximately 1,900 calls."  Do you see

5    that?

6        A.    Yes.

7        Q.    And again, if my math is correct, that's

8    about 475 calls per week?

9        A.    It sounds about right.

10       Q.    Can things get rather busy for EnCon?

11       A.    Yes.

12       Q.    Is there a particular month -- a particular

13   season that gets really busy for you?

14       A.    It would be our summer season.

15       Q.    Why is that?

16       A.    Calls for service increase, we have more

17   visitors to the outdoors during the summer months.

18   It's more activity.  We're juggling our tasks between

19   state parks, state forests, boat, fishing.  In

20   Connecticut, the summers are nice, people are

21   outside.

22       Q.    And can you maybe explain, give some context

23   to the Court as to maybe the day-to-day operations

24   for, let's just start with the east district.

25       A.    Okay.  Depending on what time of year it is,

 1    it can vary greatly.  So our focus in the spring will

 2    be completely different in the summer.  Springtime,

 3    we're working on spring fishing season.  Fishing

 4    typically opens February, March.  We're focusing on

 5    that, fishing enforcement.  Transition to turkey

 6    hunting season in the spring.  Then we roll into the

 7    summer months which is what we call our recreation

 8    season.  Our campgrounds open.  Visitors come into

 9    our swimming areas, our beaches, our parks.  That

10    rolls through nowadays past Labor Day.

11          And then once we get to end of September, the

12    beginning of fall, we transition to our fall hunting

13    season which is focused on, you know, we start out

14    with like, our pheasant hunting, archery hunting,

15    rolling into November or December where we get into

16    our bulk of our deer hunting season.  And then we go

17    into the winter which is a little bit slower, but we

18    have ice fishing, then some snowmobile depending on

19    the year, and then we also continue, the archery

20    season rolls through January.

21    Q.    All right.  So a couple of times you

22    mentioned "focus."  And so is it fair to say that the

23    focus of EnCon ebbs and flows with the particular

24    season?

25    A.    Yes.

1    Q.    So I had asked questions about day-to-day

2  operations for the east district.  Would that be the

3  same for the western district?

4    A.    Yes.

5    Q.    All right.  And is there any difference in

6  terms of day-to-day operations for the marine

7  district?

8    A.    No.  But the marine district has additional

9  responsibilities for federal fisheries enforcement on

10 Long Island Sound.  So that requires additional work

11 for those officers to complete those tasks as well.

12 So that's a year-round commercial fisheries, they

13 work on.

14    Q.    So that's a year-round focus?

15    A.    Yeah.

16    Q.    All right.  And just so I'm clear, though,

17 the focus -- the EnCon focuses on certain things in

18 certain seasons?

19    A.    Yes.

20    Q.    Now, I can't recall if you had mentioned this

21 on direct from Attorney Atkinson's questions, but are

22 EnCon officers trained police officers?

23    A.    Yes.

24    Q.    All right.  Does EnCon conduct itself as a

25 traditional police force?

1      A.     No.

2      Q.     Can you please explain that?

3      A.     So traditionally, conservation officers,

4   really around the country, really historically, like,

5   the oldest state law enforcement agency, pretty much

6   every agency, because you had hunting and fishing

7   before you had cars and driving.  So conservation

8   enforcement has been around for, you know, hundreds

9   of years.  Within that, so it started out and it's

10  still that way.  It's one officer in a community or

11  several communities that's responsible for

12  interacting with the community, being the ambassador

13  to the outdoors, working with the sportsmen, the

14  sporting club, the landowners, to kind of achieve a

15  common mission which kind of the North American

16  wildlife model where the user pays, the user supports

17  the overall conservation of the species.

18          So the goal is to conserve and protect our

19  natural resources.  So just by enforcement only

20  doesn't get that done.  We're far more effective

21  through education and outreach.  So that's kind of

22  the goal of our officers is serve as ambassadors to

23  the outdoors, educate people, do outreach, make those

24  contacts with the public.

25     Q.     All right.  So let me ask a follow-up

 1    question, two questions about the education.  Can you

 2    just unpack that a little bit?  What do you mean by

 3    "education"?

 4       A.   So education can be as simple as speaking to

 5    a sporting group, you know, go to a sporting group

 6    club, they want to hear about a concern or something

 7    that's interesting, like currently black bears are

 8    very -- a popular topic in Connecticut.  So we might

 9    get requests to speak on black bears or how do we

10    live with black bears.

11            Other education can be just as we contact

12    people individually, it can be as simple as, say,

13    someone is fishing, we can offer them advice, we can

14    advise the creel limits.  Some bodies of water have

15    certain gear restrictions.  So we can provide that

16    education at that point.  That's on a one-on-one

17    basis.

18       Q.   How would you describe the approach that

19    EnCon officers take in interacting with people

20    within -- let me back up.  Withdrawn.

21            Does EnCon have jurisdiction over state parks

22    and forests?

23       A.   Yes.

24       Q.   How would you describe the approach that

25    EnCon takes when interacting with members of the

1    public in a state park and forest?

2        A.    Within a state park, forests, so we kind of

3    take on the traditional park ranger model, the park

4    police model of, like, a customer service, you know,

5    guide to the outdoors-type interaction, you know,

6    contacting someone, ensuring their enjoying their

7    time in the outdoors and that they're comfortable and

8    do they need any assistance to take advantage of the

9    resources we have.

10       Q.    Since you've been in charge, since 2019 when

11   you've been in charge, has that been the approach

12   that EnCon has taken?

13       A.    Yes.  With the exception of the 2020 COVID.

14       Q.    Okay.  Let's put 2020 COVID aside.  So to

15   your knowledge, has EnCon always taken that approach

16   to its functions?

17       A.    Yes.

18       Q.    All right.  How would you describe -- is that

19   different in any way from a traditional police

20   officer?

21       A.    In my opinion yes.  So we're contacting

22   people not looking -- not actually responding to a

23   crime in progress, not responding to a call for

24   service.  We initiate contacts to assist people to

25   try to see if there's something we can do to make it

```
 1   better, more customer service-type interaction versus
 2   traditional officer dispatched to a call for service.
 3   If someone's in trouble, someone's in crisis, someone
 4   needs arrested, that's a completely different
 5   approach.
 6       Q.    So in carrying out that approach, does EnCon
 7   actively take steps to portray a certain image to
 8   members of the public?
 9       A.    Yes, we do.
10       Q.    Can you describe that?
11       A.    We try to take a non-confrontational
12   approach.  We try to take a conversational approach
13   to engage people in conversation, less command
14   presence, if you will, more try to get the image of,
15   you know, I'm your neighbor, I'm your friend, I'm in
16   the community, we know each other, how you doing type
17   of stuff.
18       Q.    So an informal approach?
19       A.    Yes.  Very informal.
20       Q.    To your knowledge, has EnCon always taken
21   that approach?
22       A.    Yes, to my knowledge.
23       Q.    Let me rephrase that.  Has EnCon always
24   sought to portray that image to members of the
25   public?
```

1    A.    Yes.

2    Q.    Now, Attorney Atkinson had asked you some

3    questions about your knowledge pertaining to

4    Section 23-4-1c of the Connecticut State Regulations.

5    Do you recall that?

6    A.    Yes.

7    Q.    All right.  I'm going to ask you to turn --

8    take, again, a look at page -- Defendant's 136 which

9    is in front of you and turn to page 6, paragraph 16,

10   subparagraph A.  Let me know when you get there.

11   A.    I'm here.

12   Q.    All right.  So I believe Attorney Atkinson

13   had asked you some questions about certain statements

14   here.  I'm not going to go through every single one

15   but I was hoping we could get some clarity on a few

16   of them.

17        So I believe he asked you some questions

18   about in your experience as an officer, why the

19   presence of alcohol and firearms could lead to

20   confusion and alarm.  Do you recall that?

21   A.    Yes.

22   Q.    Can you just unpack that a little bit more?

23   Why you have come to that conclusion?

24   A.    Definitely when alcohol is involved, it

25   impairs people's judgment, people will act as they

1   would not normally act.  So oftentimes firearms

2   involved where a normal, you know, average person,

3   even though they did have a firearm, would not pull

4   the firearm or handle the firearm, sometimes alcohol

5   is involved, people will want to handle a firearm and

6   they can act irresponsibly because they're under the

7   influence.

8       Q.    And when you say, "act irresponsibly," does

9   that mean escalate the situation?

10      A.    Escalate situations, you know, act in a

11  reckless manner, you know, shooting in the air,

12  shooting just to be shooting, where, you know, in my

13  experience, that can be attributed to being under the

14  influence of alcohol.

15      Q.    All right.  Could the risk of confusion and

16  alarm still exist just by the mere presence of a gun

17  putting aside alcohol?  Could the presence of a

18  firearm lead to those things that you just mentioned?

19      A.    Confusion and alarm, yes, someone sees a gun.

20  In our parks, we don't allow people to have guns,

21  generally speaking, in parks.  So that causes alarm

22  and generates calls to our dispatch and 9-1-1.

23      Q.    And I believe Attorney Atkinson asked you

24  some questions about where you might expect to see a

25  firearm.  Do you recall that?

1     A.    Yes.

2     Q.    All right.  And one of the questions he asked

3  was whether you would expect to a see a firearm on a

4  public street.  Do you recall that?

5     A.    Yes.

6     Q.    Can you just explain why you wouldn't expect

7  to see that on a public street, say in Connecticut?

8     A.    Yeah.  So I wouldn't expect to see one

9  because there's not a purpose to have one.  I would

10 not expect to see someone target shooting or hunting

11 on a public street.

12    Q.    And as an average citizen, would you expect

13 to see a firearm in a Connecticut state park, let's

14 say with a handgun or a pistol?

15    A.    No.

16    Q.    And why is that?

17    A.    Because it hasn't been, it's not allowed

18 currently, and it's a state park.

19    Q.    I think I just want to make sure I heard your

20 testimony correctly.  So since you've taken -- you

21 were in charge of EnCon in 2019.  Has EnCon ever

22 received calls about the presence of a firearm in a

23 state park or forest?

24    A.    Yes, we have.

25    Q.    Has EnCon responded to those calls?

1    A.    Yes.

2    Q.    And what would that response look like?

3    A.    We would try to send a minimum of two

4  officers or more if there's more officers available.

5    Q.    You said a minimum of two officers?

6    A.    Yes.

7    Q.    All right.  And you said if more were

8  available, you would send more?

9    A.    Yes.  Until we knew what the situation was.

10   Q.    Okay.  So there's a possibility that you

11 could send more -- when you say -- how many could you

12 send?

13   A.    So on -- say, one sector has four officers

14 working at that time and they're all available, we

15 would send all four.

16   Q.    You would send all four?

17   A.    Yes.

18   Q.    When you say, "sector," what do you mean by

19 "sector"?

20   A.    Each district is divided into two sectors.

21 So we have -- like, for the east, we have a north

22 sector and the south sector, kind of a quarter of the

23 state.

24   Q.    Okay.  And so presently if EnCon received a

25 call about the presence of a firearm, there's a

1   possibility you could send all four officers in one

2   sector to respond to that call?

3       A.    Yes.

4       Q.    Now, in your declaration, I'm going to have

5   you take a look again, it's page 6 again,

6   paragraph 16, subparagraph A, the portion -- it's the

7   second sentence dealing with the risk of conflict

8   that could be increased.  Do you see that?  It's the

9   second sentence in subparagraph A.

10      A.    Yes.

11      Q.    All right.  And are there any safety concerns

12  that go along with the risk of conflict?

13      A.    Well, the risk of a firearm being present

14  during a conflict increases the chance that that

15  firearm may be used.

16      Q.    And let's just assume for a second that

17  someone -- you know, someone sees a gun, they make a

18  call to EnCon, how would that -- unpack it a little

19  bit more.  How would that impact EnCon's focus in a

20  particular season?

21      A.    So depending what the officers are focusing

22  on, they're going to be -- even if they're on a call,

23  if it's not a public safety emergency call, like a

24  gun, like a person with a gun, unknown situation,

25  then they'll be pulled from that call and sent to the

 1   other call.

 2       Q.    All right.  So let's talk about the summer

 3   for a moment.  And remind me again what the focus for

 4   -- let's stick with the marine division for a minute.

 5   What's the focus of the marine division or marine

 6   sector in the summer?

 7       A.    So marine sector, it's the parks, park

 8   enforcement, park patrol, boating patrol, and then

 9   fisheries enforcement.

10       Q.    And so that's what they're focused on

11   currently in, like, in the summer, right?

12       A.    Yes.

13       Q.    All right.  And so if a call came in about

14   the presence of a gun in the summer, am I hearing you

15   correctly that that could pull perhaps four officers

16   or more from their focus to respond to that one call?

17       A.    Yes.

18       Q.    Now, I believe Attorney Atkinson also asked

19   you some questions about concerns that you might have

20   about proper storage of a firearm.  Do you recall

21   that?

22       A.    Yes.

23       Q.    All right.  And I think he asked you a

24   question about Hammonasset Beach State Park not

25   having facilities for proper storage, correct?

1    A.    Yes.

2    Q.    All right.  To your knowledge, does any

3    facility across the state park and forest system have

4    what you would consider to be adequate facilities for

5    properly storing a firearm?

6    A.    No.

7    Q.    And can you just explain a little bit more

8    the risks that you see in your current -- based on

9    your experience about the unattended firearm?  Like,

10   what are those risks that you see?

11   A.    It could be stolen.  It could be picked up by

12   a child, so there's a risk there.  It can be picked

13   up by a good Samaritan who is not familiar with

14   firearms and could have a negligent discharge.

15   Q.    I'm sorry.  What was the last thing you said?

16   A.    Could be picked up by a good Samaritan and if

17   they're not familiar with firearms, they could

18   accidentally discharge it.

19   Q.    Now, Attorney Atkinson also asked you some

20   questions about the conservation and environmental

21   goals that are furthered by this particular

22   regulation that we're talking about.  Do you recall

23   that?

24   A.    Yes.

25   Q.    All right.  Can you just help explain to the

```
1    Court a little bit more as to how this particular

2    regulation furthers EnCon's conservation goals?

3        A.   This is our main regulation that says you

4    don't hunt in state parks.  So, you know, the actual

5    regulation starts hunting or carrying a firearm in

6    the state parks are prohibited except, and then we

7    carve out certain areas where we can allow hunting

8    within, you know, limited areas, limited different

9    means.

10       Q.   All right.  So I'm going to ask you some more

11   questions about hunting in a moment, but when you

12   said this particular regulation is the primary

13   regulation that you use to enforce those conservation

14   goals, so when you -- why is that?  Why is this the

15   primary one?

16       A.   So we have seasons for hunting, and so, like,

17   if it's private property, it's easier to enforce

18   private property because you have to have permission

19   from the landowner.  So state parks are public

20   property, anybody can be there, and so because of the

21   use of the land, it doesn't -- most parks don't

22   support hunting, so we don't allow hunting there.  So

23   even though there's a season within that area

24   elsewhere within -- as the property owner, the state

25   owns the property, manages the wildlife, does not
```

```
1    close the seasons and does not allow hunting on that
2    property, even though if the season is in, it could
3    be hunted outside of the property.
4            And then furthermore, just for officers
5    enforcing the hunting or what we would call poaching,
6    hunting illegally, it's easier to stop poaching
7    activity, like, in a state park if there's no
8    firearms allowed.  If it's treated as a wildlife
9    sanctuary, no weapons capable of taking game animals
10   are allowed or supposed to be present, that's easy to
11   enforce because if someone is hiking and they see a
12   poacher/hunter with a firearm in that area, they're
13   going to report that because they know that's not
14   something they're expecting to see.  So that kind of
15   furthers our conservation mission.
16   Q.    And can you just explain a little bit more as
17   to how the presence, the general right to have
18   firearms, a handgun or a pistol, in a state park or
19   forest might impact EnCon's ability to enforce or
20   carry out its conservation and environmental goals?
21   A.    So can you rephrase the question or try that
22   again?  I didn't quite get all that.
23   Q.    Sure.  And I stumbled a little bit there and
24   that's my mistake.
25            So can you just explain to the Court how the
```

```
 1    presence of firearms, the general presence of
 2    allowing someone to have a handgun or a pistol in a
 3    state park or forest might make it more difficult for
 4    EnCon to advance its environmental or conservation
 5    goals?
 6        A.   Because where we have areas we don't allow
 7    hunting, it's easier to enforce the antihunting when
 8    we can also start out from the get-go saying there's
 9    no weapons allowed in that area.  So that's an easier
10    metric to enforce.  We don't have to wait for someone
11    to take the action of taking an animal to enforce
12    that.  We can stop that action before an animal is
13    taken.
14        Q.   Now, I want to switch gears slightly and
15    follow up on some of the questions that Attorney
16    Atkinson had asked you about several statutes.
17             And do you recall some questions about
18    General Statute 53-206d?
19        A.   Yes.
20        Q.   All right.  And if I can show you what has
21    been marked as -- it's Plaintiff's -- I think it's 7.
22             MR. BOCHAIN:  May I approach the witness,
23    Your Honor?
24             THE COURT:  You may.
25             THE WITNESS:  Okay.
```

BY MR. BOCHAIN:

Q.    Is that the -- I've showed you, it's General
Statute 53-206d?

A.    Yes.

Q.    Now, are there reasons why that particular
statute might not sufficiently address your concerns
that you identified in your declaration?

A.    Because as an enforcement officer, we would
use this statute in addition to other charges.  This
means someone has already been injured, there's
already been a negligent discharge, there's already
been a domestic animal, you know, shot negligently.
So the damage is already done at this point.

Q.    And -- well, let me ask you this:  So this
statute is carrying under the influence?

A.    Yes.

Q.    And so --

A.    Oh, I'm sorry.  Yes.

Q.    Yeah.  So maybe you can explain why this
particular statute wouldn't necessarily address the
concerns that you had identified.

A.    So yeah.  So it's kind of the same answer.
So this is something -- the carry under the influence
is something we typically use like it's an additional
charge.  So they drew attention -- someone drew

1    attention to themselves in some way to be contacted

2    to figure out, A, they're intoxicated, and B, they

3    have a firearm.  So some action has already occurred

4    for typically this going.

5          The common thing in -- you see this in is if

6    someone's driving under the influence and they have a

7    weapon on them, then that's usually an additional

8    charge because, A, they're not supposed to be driving

9    under the influence, and then B, they're not supposed

10   to have a firearm while they're intoxicated.  We --

11   EnCon uses this particular statute, there's

12   additional penalty for hunting under the influence,

13   so if we contact somebody for hunting, they are

14   involved in a hunting accident, they negligently shot

15   someone while hunting, and then in the course of that

16   investigation, we determine they're under the

17   influence, this would be an additional charge that we

18   would use.

19      Q.    Okay.  So it's an after the fact?

20      A.    Yes.

21      Q.    Okay.  Now, I'd like to ask you some

22   questions based on your experience as a trained law

23   enforcement officer and particularly I want to ask

24   you some questions about the statute's applicability.

25          And so would this particular statute in your

1  experience apply to a situation where an unarmed

2  drunk person starts screaming and pushing another

3  person who is sober but that sober person has a gun

4  on them?  Would this statute apply to the conduct of

5  the drunk person who starts pushing and shoving a

6  person to their particular conduct?

7     A.    No.

8     Q.    Why is that?

9     A.    Intoxication and carrying a pistol or

10 revolver, so I would have to -- the drunk person has

11 to have the weapon.

12    Q.    Right.  So okay.  So how about let's take a

13 sober individual who's walking on the beach and

14 they're open carrying.  Okay.  Would this particular

15 statute apply to that conduct?

16    A.    No.

17    Q.    Why is that?

18    A.    You don't have the element of intoxication or

19 under the influence.

20    Q.    All right.  So based on your experience, if

21 you had a sober person who is walking on the beach

22 open carrying, would that result, in your opinion, in

23 a phone call to EnCon?

24    A.    Yes.

25    Q.    And is that because there's a -- it's

1  confusion, alarm, that kind of thing?

2     A.   Yes.

3     Q.   Now, I'm going to ask you to turn to, I

4  believe it's Plaintiff's 6 which is General Statute

5  53-203.  Do you see that?

6     A.   Yes.

7     Q.   All right.  And I think this was what you

8  were getting at before.  So can you just explain

9  again the reasons why this particular statute

10  wouldn't sufficiently address the concerns you

11  identified in your declaration?

12     A.   Yeah.  It's an add-on charge.  The -- there's

13  already been an action taken.  There could have

14  already been a violation.  This could be the only

15  violation, but there's already been an action taken,

16  the firearm has been discharged.  In my professional

17  experience, we do this at EnCon, we have hunters

18  shoot domestic animals inadvertently or on purpose

19  and that's a charge that we use.  So we will also

20  typically dive into that, we'll have other

21  hunting-related charges in addition to this charge.

22     Q.   All right.  And again, this is an after the

23  fact?

24     A.   Yes.

25     Q.   Okay.  And I'm going to give you the same

```
 1    example that I kind of gave you a minute ago which is
 2    would a person who is open carrying a firearm on a
 3    beach be in violation of this statute?
 4         A.   No.
 5         Q.   Would a person who is open carrying in any
 6    state park or forest be in violation of that statute?
 7         A.   No.
 8         Q.   And in those circumstances, could that again
 9    result in confusion, alarm in your experience?
10         A.   Yes.
11         Q.   Now, I'm going to ask you to turn to -- I
12    think it's Plaintiff's Exhibit 5, which is General
13    Statute 53-21, the risk of injury statute.  Let me
14    know when you get there.
15         A.   I got it.
16         Q.   Okay.  Now, are the reasons why that
17    particular statute would not sufficiently address the
18    concerns you identified in your declaration?
19         A.   Yes.
20         Q.   And what are those reasons?
21         A.   Well, this is a larger statute, first of all,
22    it covers several items, but the primary issue is,
23    you know, did you place a minor at risk of a
24    situation where life or limb of a child is in danger.
25    The statute also further goes on to impair the morals
```

 1    of a child, sale of children.  So it's a large --

 2    covers a large area, but none of those would apply.

 3         Q.    Now, I believe you testified that there are

 4    risks associated with an unattended firearm?

 5         A.    Yes.

 6         Q.    All right.  Are those just limited to

 7    children?

 8         A.    No.  They're to anybody.

 9         Q.    So anybody could have -- there could be a

10    risk for anyone who is in the presence of an

11    unattended firearm?

12         A.    Yes.

13         Q.    All right.  Now, I believe Attorney Atkinson

14    had asked you some questions about concealed carried

15    and its impact.  Do you recall that?

16         A.    Yes.

17         Q.    Can you just explain just for the record what

18    open carry means?

19         A.    Open carry means carrying a handgun on one's

20    person visible, usually outside the clothing, a

21    holster or physically carrying it in their hand.

22         Q.    And can you explain just for the record what

23    concealed carry means?

24         A.    Concealed carry is where the handgun is

25    concealed under clothing, under a jacket, in, like, a

 1   fanny pack or a purse.

 2      Q.   To your knowledge, does Connecticut draw a

 3   distinction between open carrying and concealed

 4   carrying?

 5      A.   No.

 6      Q.   And so does that mean that a person -- let's

 7   say somebody has a concealed pistol permit or a

 8   pistol permit in Connecticut, does that particular

 9   person have the ability to open carry in Connecticut?

10      A.   Yes.  With the pistol, Connecticut Pistol

11   Permit.

12      Q.   And so does that mean they have the choice to

13   then conceal carry in Connecticut?

14      A.   Yes.

15      Q.   So they can do -- they can do either/or?

16      A.   Correct.

17      Q.   Now, I believe Attorney Atkinson had asked

18   you some questions about how concealed carrying might

19   reduce some of the risks that you had identified in

20   your declaration.  Do you recall that?

21      A.   Yes.

22      Q.   Are there still -- is concealed carry always

23   perfect?

24      A.   No.

25      Q.   And can you just explain why it's not?

 1    A.    Inadvertently, even though it's concealed

 2  carry, people move a certain way, clothing shifts and

 3  the presence of the firearm is revealed to bystanders

 4  or others.

 5    Q.    In your professional experience, have you

 6  seen that sort of inadvertent display before?

 7    A.    Yes.

 8    Q.    Approximately how many times?

 9    A.    While working, probably less than six.

10    Q.    How about in your, personal life, because you

11  said, "while working"?  Have you seen it in your

12  personal life?

13    A.    Yes.  While off duty, I have.

14    Q.    All right.  How many times have you seen

15  that?

16    A.    Around five, five or six.

17    Q.    All right.  So combined, maybe 10 or 11

18  times?

19    A.    Possibly, yeah, around there.

20    Q.    When's the most -- the last time you saw that

21  sort of thing happen?

22    A.    Last month during my school -- my child's

23  school spring break traveling back from a trip.

24    Q.    Can you just explain a little bit more?

25  Where was that?

1    A.    It was in Virginia.  We were traveling back

2  from Tennessee to Connecticut.

3    Q.    Can you just explain the circumstances a

4  little bit more, how you saw that inadvertently?

5    A.    Sure.  Stopped at -- me and my son were

6  driving back.  We stopped at a convenience store to

7  get gas, drinks, snacks.  While entering the store, a

8  gentleman, a nice gentleman, got out of the car in

9  front of me, got out, and held the door open for us

10  so we could go in.  When he did that, by moving his

11  thing, his shirt lifted a little bit and you could

12  see he had a pistol that he had kind of in the inside

13  waistband of his pants.

14    Q.    When you said move the thing, is that the

15  door?

16    A.    Yeah.  He was holding the door open for us.

17    Q.    He was holding the door open and he was

18  holding the door open and it showed --

19    A.    Yeah.  He had a T-shirt on and -- kind of a

20  short T-shirt and it kind of raised up and you could

21  see the belt and his pistol inside his waistband.

22    Q.    Okay.  So before he moved his arm in that

23  certain way, you hadn't seen the firearm?

24    A.    No.

25    Q.    Is that the reason why you thought he was

 1    trying to conceal it?

 2        A.    Yes.

 3        Q.    And so again, you've seen that sort of thing

 4    happen 10 to 11 times in your career?

 5        A.    Yes.

 6        Q.    Professional life and personal life?

 7        A.    Uh-huh.

 8        Q.    And I think you had testified during Attorney

 9    Atkinson's questioning that people can be shocked by

10    seeing a firearm.  Can you just explain a little bit

11    more about that?

12        A.    So when they're not expecting to see a gun,

13    it interrupts their process, you know.  People's

14    brains think differently.  Their -- their brain is

15    programmed to expect something.  I'm in a courtroom;

16    I'm expecting to see a courtroom.  I'm not expecting

17    to see, like, a pink gorilla march across the room,

18    but research has shown you can have a pink gorilla

19    march across the room and nobody will pay attention

20    to it because they're focused on that, but oftentimes

21    people do -- if you do see that pink gorilla and

22    you're not expecting that situation, it triggers

23    alarm bells in people's brains.

24        Q.    Okay.  And in this circumstance, the alarm

25    bells in that they wouldn't expect to see the

```
 1   firearm?

 2       A.    Yes.

 3       Q.    Now, I want to go back to, if I can, a little

 4   bit about -- talk a little bit more about EnCon

 5   patrols.  I think Attorney Atkinson had asked you

 6   some questions about that.  Do you recall that?

 7       A.    Yes.

 8       Q.    So are EnCon officers, do they patrol certain

 9   areas?

10       A.    So I think I mentioned they're assigned to

11   sectors which are half a district, and within those

12   sectors, they have a set of towns that -- that

13   they're responsible for patrolling.  So they are the

14   primary officer for those sets of towns.

15       Q.    And by "towns," do you mean state parks and

16   forests in those towns?

17       A.    I mean towns in Connecticut.  So an officer

18   might have five towns, he's the primary responsible

19   for those towns.  He's the officer for those towns.

20   Other officers will work those towns, but those are

21   his or her town.

22       Q.    I see.  Does local law enforcement ever

23   patrol state parks and forests?

24       A.    To my knowledge, just occasionally.  I would

25   say rarely.
```

1    Q.    Okay.  But some of them do?

2    A.    Yes.

3    Q.    All right.  If a 9-1-1 call came in at a

4    state park or forest, who would respond first?

5    A.    It depends on the nature of the call.  If

6    it's a serious public safety call, the closest

7    available officer will respond.

8    Q.    And by "closest available officer," what do

9    you mean by that?

10   A.    I mean any officer that hears the dispatch,

11   so if the 9-1-1 call, that 9-1-1 dispatch center will

12   notify us, but they will also send it out to their

13   agencies they're dispatching for.

14        MR. BOCHAIN:  If I can just have one moment,

15   Your Honor.

16   BY MR. BOCHAIN:

17   Q.    I want to follow up on some questions about

18   just hunting briefly.  There was some questions about

19   coyote hunting.  Do you recall?

20   A.    Yes.

21   Q.    Is coyote hunting common?

22   A.    No.

23   Q.    What are the most common animals that people

24   hunt?

25   A.    Pheasant is very popular, then deer, turkey.

1    Q.    And are they for particular seasons?

2    A.    Are they what?

3    Q.    Do those animals -- are they hunted in

4    certain seasons?

5    A.    Yeah.  Each has a set season.

6    Q.    Is hunting allowed in all locations across

7    the state park and forest system?

8    A.    No.

9    Q.    And I think there was some questions about

10   the ability to hunt small game with 22 rimfire

11   weapon.  Do you recall that?

12   A.    Yes.

13   Q.    Is that the only instance when a 22 can be

14   used?

15   A.    On state parks or forests?

16   Q.    Correct, yeah.

17   A.    Yes.

18   Q.    And so is there a particular small game

19   season?

20   A.    Yes.

21   Q.    Is that all year-round?

22   A.    No.  It depends on the species.  So it goes

23   back to what is the animal being hunted.

24   Q.    Okay.  So but the animal that's being hunted

25   has a particular season?

1    A.    Yes.

2    Q.    All right.  If I can turn just a little bit

3    more about how the presence of firearms would impact

4    EnCon operations.  So can you just explain if

5    individuals were allowed to carry handguns or pistols

6    in state parks or forests, how that would impact

7    EnCon's operations?

8    A.    It would -- we would have to take a more

9    proactive approach and presence in our state parks

10   than we currently do.

11   Q.    Can you just explain?  When you said,

12   "proactive approach," what do you mean?

13   A.    We would increase our officers' presence in

14   our state parks.  So by if we're being somewhere

15   here, if we're staying in the state parks, then that

16   means we're less available for boating patrols, we're

17   less available to do fishing enforcement, less

18   available for patrolling private property for hunting

19   enforcement.

20   Q.    Anything else?

21   A.    I'm sure there's stuff but I can't think of

22   it right now.

23   Q.    Let me ask this question:  Would EnCon

24   consider implementing any responsive measures to this

25   new change?

1    A.    We would do in-house training.  So we would

2    have to educate officers on the change that, you

3    know, people can carry in state parks.  Then as a

4    department, there would be discussions on what type

5    of outreach and education we need to do to our

6    visitors to inform people of this change.

7    Q.    How long would that kind of -- how long might

8    that kind of thing take to roll out?

9    A.    It's hard to say.  I can speak to my

10   division, in-house training could take, you know, two

11   weeks to four weeks depending on scheduling.

12   Q.    Let's talk about the approach that EnCon

13   takes to -- when an EnCon officer interacts with an

14   average member of the public.  Would the presence of

15   firearms in state parks or forests impact how EnCon

16   has always approached members of the public?

17   A.    I believe it would, yes.

18   Q.    Can you explain?

19   A.    In those situations, I think we're almost

20   pushing ourselves into more of the traditional police

21   officer role where we -- there's a chance people are

22   going to be armed, and so even though that chance is

23   always out there, we would expect it to be more

24   prevalent, and then it changes our communication with

25   our visitors.  It's -- you know, in that traditional

1    -- a little bit more traditional role, it pushes more

2    towards a response to we're going to respond to calls

3    for service, we're going to wait until we get a

4    complaint of a conflict before we respond.

5           It's going to limit our voluntary, cordial

6    interactions with our visitors, like, hey, how are

7    you doing today type of stuff.  It will push us more

8    towards the security side of the business, which we

9    do, but we try to tamper that with more -- currently

10   with more outreach.

11   Q.    All right.  How might that shift impact how

12   people look at parks?

13   A.    So conservation officers, we try really hard

14   to put forth the approachable image.  We don't want

15   to be a standoffish person with the badge and a gun

16   where we're just a police officer.  We want to be,

17   hey, this is, you know -- this is the game warden,

18   this is Officer Smith, he's my game warden or he's my

19   officer in my area, but that's done over time with

20   constant interaction, engaging the community, talking

21   to visitors, talking to people using the outdoors.

22          They see the same person again and again and

23   they get to know that person versus if we shift more

24   towards traditional policing where, you know, it's --

25   we have a different role as conservation officers, so

```
 1   we're trying to protect our natural resource and
 2   support that, and within that mission, we ensure
 3   public safety on our state parks, but focusing more
 4   public safety state parks with the firearms, which
 5   this change would dictate, puts us more in a
 6   traditional police officer mindset where we're solely
 7   focused on public safety and less on the community
 8   engagement.
 9        MR. BOCHAIN:  Can I just have one moment,
10   Your Honor?
11        THE COURT:  Yes.
12   BY MR. BOCHAIN:
13     Q.   Attorney Atkinson had asked you some
14   questions about the NIBRS data.  Do you recall that?
15     A.   Yes.
16     Q.   I think he had asked the question about
17   whether crime happens in state parks or forests.  Do
18   you remember that?
19     A.   Yes.
20     Q.   Crime happens everywhere, right?
21     A.   Correct.
22     Q.   Would you say that crime in state parks and
23   forests is less common than just in the general
24   community?
25     A.   Yes.
```

1          MR. BOCHAIN:  Your Honor, I have no further

2    questions at this time.

3          THE COURT:  All right.  Is there redirect?

4          MR. ATKINSON:  Yes, Your Honor.

5          REDIRECT EXAMINATION OF CHRISTOPHER LEWIS

6    BY MR. ATKINSON:

7    Q.    Good afternoon, Colonel Lewis.

8    A.    Good afternoon.

9    Q.    Attorney Bochain just asked you whether crime

10   was lower in -- less common in state parks and

11   forests than it is in other places, correct?

12   A.    Correct.

13   Q.    How would you know that?

14   A.    Just professional experience and personal

15   experience.  So our reportable misdemeanors and

16   felonies are rare.  My officers might do one domestic

17   violence call a year, where a municipal officer might

18   do one a week or multiple, you know, one or two a

19   day.

20   Q.    When you gave your answer to Attorney Bochain

21   to that question and he asked you in public, can you

22   tell us what your understanding of the term in public

23   or other places meant as you answered that question?

24   A.    For crime report --

25   Q.    So when you were answering Attorney Bochain's

```
 1   question and he said -- he asked you more crime
 2   occurred -- withdrawn.
 3        When you were answering Attorney Bochain's
 4   question and he asked you is crime less common in
 5   state parks and forests as opposed to other places,
 6   what I'm asking you to explain to us is when he said
 7   other places, what was your understanding of what he
 8   was referring to by other places?
 9   A.   Other jurisdictions and other areas in the
10   state.
11   Q.   So that would include a house, for instance,
12   a private house?
13   A.   Yeah.  If it was outside the state parks,
14   yes.
15   Q.   Okay.  When he discussed the NIBRS data
16   prior, you testified that it was only for the
17   incidents that EnCon dealt with, correct?
18   A.   Yes.
19   Q.   Apart from that data, do you have any other
20   data -- do you have access to any other data
21   regarding crimes that occur in state parks and
22   forests that are handled by another law enforcement
23   agency?
24   A.   Not that I can think of.
25   Q.   You testified earlier state parks are public
```

1   property and anyone can be there, correct?

2       A.    Yeah.   Within -- yeah.   We have hours of

3   operations, but yes, they're open to the public.

4       Q.    What's the typical hours of operation for a

5   state park or forest?

6       A.    Daylight hours, morning to sunset.

7       Q.    And just to give us a rough approximation of

8   when that would be, that could ebb and flow with the

9   season, correct?

10      A.    Correct.

11      Q.    So it would -- just so the record's clear,

12  that could be longer in the summer and shorter in the

13  fall and the spring?

14      A.    Yes.

15      Q.    During the time that state parks are open to

16  the public, is there anyone guarding the entrance to

17  the state parks who decides who gets in and who is

18  not let in?

19          MR. BOCHAIN:   Objection, Your Honor.

20  Relevance.

21          THE COURT:   Your claim?

22          MR. ATKINSON:   My claim, Your Honor, is he

23  testified that anyone can get in.   What I'm

24  attempting to establish is there's little or no

25  control over who walks in and who doesn't.

 1            THE COURT:  And what relevance does that

 2    have?

 3            MR. ATKINSON:  It goes to the sensitive

 4    places doctrine, Your Honor.

 5            THE COURT:  In what way?

 6            MR. ATKINSON:  We're standing in a courthouse

 7    right now.  I have to go through the metal detector

 8    out front.  It's a characteristic of a sensitive

 9    place that they're --

10            THE COURT:  Are you saying if it doesn't have

11    some kind of guarding, it's not a sensitive place?

12            MR. ATKINSON:  I'll leave that for legal

13    argument, Your Honor, but as to the relevance of the

14    question I'm asking, I'm getting --

15            THE COURT:  Go ahead.

16    BY MR. ATKINSON:

17      Q.   So Colonel Lewis, I'll ask the question

18    again.  Is there anyone who stands guard outside the

19    entrance to a state park or forest who decides who

20    gets in and who doesn't?

21      A.   So we have -- some parks have gatehouses with

22    attendants, but I guess who gets in and who doesn't

23    get in, if you -- for those that need to pay to park,

24    they get in; if they don't choose to pay to park,

25    they don't get in.

1    Q.    So there is a parking restriction?

2    A.    For some parks, yes.

3    Q.    If I chose to park on the street outside a

4    state park and then walk in, would I be able to get

5    in one of those areas?

6    A.    Yes.

7    Q.    Apart from the parking enforcement, are there

8    any other criteria that some -- a DEEP employee

9    guarding a park would use to either tell someone they

10   can't come in or that they can come in?

11   A.    By foot?

12   Q.    Yes.

13   A.    No.  If it's within hours, no.

14   Q.    Is there anyone at the entrance to a state

15   park or forest who inspects what a person might bring

16   into a state park or forest?

17   A.    In certain areas in certain times, yes.

18   Q.    Okay.  According to your understanding of

19   that, what would such an inspection look like?

20   A.    We do -- in some areas, our officers or

21   seasonal rangers do inspections of coolers and gear

22   bags.

23   Q.    Why do you do inspections of coolers and gear

24   bags?

25   A.    To -- primary alcohol enforcement.  We have

1  prohibited areas where alcohol possession is

2  prohibited, so we try to stop that at the gate.

3      Q.    How common are those areas where alcohol is

4  prohibited?

5      A.    Out of 139 state parks and forests, it's a

6  small handful of them.

7      Q.    Barring -- putting the places where alcohol

8  is prohibited out of the question, in those areas,

9  putting those out of this question, are there any

10  other areas in which -- withdrawn.

11          Putting the alcohol out of the equation,

12  those areas out of the equation, what other reasons

13  would an EnCon officer inspect somebody's gear or

14  cooler?

15      A.    The only reason we would inspect someone's

16  gear or cooler would be if it was involved in hunting

17  or fishing enforcement.

18      Q.    And why would you do that?

19      A.    Just if we had just suspicion that someone

20  was hunting or fishing or transporting game or fish,

21  then that would be part of our compliance check

22  because there's creel limits, size limits that we

23  regulate when someone fishes.  So that's why we would

24  check those areas.

25      Q.    Would you do that when somebody's entering a

1   park?

2     A.    No.

3     Q.    So it would be more so when they're leaving a

4   park?

5     A.    With the caveat if we had suspicion that they

6   were fishing or transporting fish or game.

7     Q.    So just to make sure I'm understanding you

8   correctly, it's not like we're lining up to a ticket

9   booth and give me your ticket, I'm going to inspect

10  it, you have to have a suspicion in order to go ahead

11  and search those?

12    A.    Yes.

13    Q.    I was a bit confused by some of your

14  testimony earlier relating to the dispatch system.

15  If someone -- so withdrawn.

16          If I want to report -- or withdrawn.

17          Do you have any knowledge as to how a report

18  from a state park or forest gets to your dispatchers?

19    A.    Yes.

20    Q.    All right.  What would that process typically

21  look like?

22    A.    Typically it takes one of three different

23  paths.  The first path would be a call to 9-1-1 which

24  goes to a public safety answering point within that

25  region geographically, you know, their cell phone

```
 1    transmission goes to the closest one.  The second
 2    path would be they call our dispatch directly.  We do
 3    post our dispatch numbers around.  Still some people
 4    have that direct number.  And then third would be
 5    employee notification like another -- like another
 6    officer or a park employee or any of our DEEP
 7    employees.
 8        Q.   If a report came into your dispatch center
 9    saying there's somebody out in the middle of a state
10    park carrying a firearm, do you have any knowledge of
11    how a dispatcher would react to that report?
12             MR. BOCHAIN:  Objection, Your Honor.
13    Speculation.
14             THE COURT:  This is his job.  This is his
15    work.  Go ahead.
16    BY MR. ATKINSON:
17        Q.   Colonel, do you need that read back?
18        A.   No.  So how dispatchers would react, they
19    would categorize that as a public safety call,
20    unknown person with a weapon, and they would start
21    dispatching officers to it.
22        Q.   Would a dispatcher attempt to gather as much
23    information as possible from the reporting caller?
24        A.   Yes.  But they would do that with every call.
25        Q.   Okay.  Are dispatchers trained to triage
```

 1    calls of reports?

 2        A.    Yes.

 3        Q.    And can you define the term "triage" for us?

 4        A.    They rank them in order of importance or

 5    urgency.  So less important stuff gets put on hold to

 6    deal with the more urgent calls.

 7        Q.    Would they triage certain -- would they

 8    triage reports of a firearm?

 9        A.    They would -- as far as triage, they would

10    elevate that.  If it's a public safety call, that

11    goes to the top of our list.

12        Q.    Okay.  You've testified a lot today about the

13    storage of firearms and the adequacy of storage

14    facilities at DEEP state parks and forests.  In your

15    professional experience, do you believe that storing

16    a firearm in a motor vehicle constitutes adequate

17    storage?

18        A.    Within the parameter of the law, so locked

19    safe or unloaded outside the passenger compartment.

20        Q.    Do you recall Attorney Bochain asking you

21    about your usage or application, I should say, of

22    Connecticut General Statute 206d.

23        A.    Yes.

24        Q.    Do you have discretion to enforce that law,

25    Colonel?

1    A.    Yes.

2    Q.    Let's talk about the man you testified to

3    that you saw have -- having a firearm in Virginia.

4    Did you expect to see him holding a firearm in the

5    place you encountered him?

6    A.    No.

7    Q.    Did his carrying of a firearm in that place

8    make you uncomfortable?

9    A.    It did not make me uncomfortable.

10   Q.    You -- I didn't quite get everything you said

11   when you testified about this during Attorney

12   Bochain's examination of you, but can you please

13   repeat for me what you consider to be the most -- the

14   most animals folks hunt in state parks and forests?

15   A.    In state parks and forests?

16   Q.    Yes.

17   A.    Probably the most common in state parks and

18   forests, probably going to be, to the best of my

19   knowledge, I'm going to say deer, turkey and water

20   fowl within state parks and forests.

21   Q.    May I approach, Colonel Lewis?  I'm going to

22   show you what's been marked as Plaintiff's Exhibit

23   Number 9.

24         MR. ATKINSON:  Your Honor, I'm going to take

25   the other exhibits.

```
 1              THE COURT:  That's fine.
 2    BY MR. ATKINSON:
 3       Q.    Colonel, have you had a chance to look at
 4    that again?
 5       A.    Yes.
 6       Q.    Okay.  There's a section on the right side of
 7    that entitled "White-Tailed Deer."  Do you see that?
 8       A.    Yes.
 9       Q.    And I believe it's in the second column, the
10    second box down, the second row, there's a section
11    entitled, "Deer Shotgun State Controlled Areas."  Do
12    you see that?
13       A.    Yes.
14       Q.    And there's a sub row under that that says,
15    "No Lottery Season."  Do you see that?
16       A.    Yes.
17       Q.    What is the no lottery deer season?
18       A.    So those are areas you don't have to apply
19    for the lottery for the permit for the -- versus our
20    lottery season has limited tags or permits for those
21    lands and you have to enter a lottery to be selected
22    for one of those tags.
23       Q.    What are the dates listed for the hunting
24    season for deer shotgun in state-controlled areas?
25       A.    On this, it's November 16th through
```

 1   December 8th -- my eyes fail me -- or 6th.

 2      Q.   It's close enough.  The document will speak

 3   for itself.

 4           I want you to go to the last row in that

 5   section.  Do you see where it says, "Deer Muzzle

 6   Loader"?

 7      A.   Yes.

 8      Q.   And then there's a sub row that says, "State

 9   Land," correct?

10      A.   Yes.

11      Q.   What's the sub row for state land say?

12      A.   State land December 7th through the 20th of

13   December.

14      Q.   I am now going to direct your attention up to

15   April -- withdrawn.

16           I'm going to direct your attention to the top

17   of that same right hand of the page under the section

18   that says, "Wild Turkeys."  Do you see that?

19      A.   Yes.

20      Q.   Do you see a row there, the first row that

21   says, "Spring Turkey"?

22      A.   Yes.  "Spring Turkey."

23      Q.   And a subrow under that that says, "State and

24   Private Lands," correct?

25      A.   Yes.

1    Q.    What's the season for spring turkey?

2    A.    This was April 27th through May 28th.

3    Q.    Do you know if hunting for spring turkey

4  during spring turkey season permits individuals to

5  hunt turkeys with firearms?

6    A.    With shotguns, with -- number ten --

7  ten-gauge or smaller and then there's some more

8  ammunition restrictions, basically size, that's a

9  number two to number six, something like that, off

10  the top of my head.

11    Q.    Moving down to the last row in that section,

12  do you see the row that's entitled, "Fall Turkey

13  Firearms"?

14    A.    Yes.

15    Q.    And the subrow that says, "State and Private

16  Lands"?

17    A.    Yes.

18    Q.    What's the season there?

19    A.    It's October 1st through October 31st.

20    Q.    What is your understanding of what the

21  seasons are for water fowl?

22    A.    Water fowl will start -- depending on the

23  season, it's kind of all over the map.  They are set

24  by the federal government.  So we don't publish those

25  the same time we publish these, but you could have an

 1    earlier goose season in September, but generally

 2    speaking, duck hunting is December and going right up

 3    to January.  So it's just primarily in the winter.

 4            MR. ATKINSON:  Okay.  May I have a moment to

 5    confer with Mr. Nastri, Your Honor?

 6            THE COURT:  Yes.

 7            MR. ATKINSON:  No further questions at this

 8    time, Your Honor, or no further questions period.

 9            MR. BOCHAIN:  Can I just have one brief

10    moment, Your Honor?

11            THE COURT:  Yes.

12            MR. BOCHAIN:  Just very briefly, Your Honor.

13       RECROSS-EXAMINATION OF CHRISTOPHER LEWIS

14    BY MR. BOCHAIN:

15     Q.    With respect to hunting, Colonel Lewis, so

16    when is the busiest time again for EnCon?

17     A.    Summer recreation season.

18     Q.    And does the hunting season sort of

19    correspond with the busiest time of year?  In other

20    words, hunting doesn't occur during the busiest time

21    of year?

22     A.    Correct, yes.

23     Q.    And hunting is very regulated, right?

24     A.    Yes.

25     Q.    And it's not across all state parks and

```
 1    forests, right?

 2      A.    Correct.

 3            MR. BOCHAIN:  No further question, Your

 4    Honor.

 5            THE COURT:  So this is perhaps a rather naive

 6    question, but you've been describing with respect to

 7    the hunting season, for instance the spring turkey,

 8    where people are authorized to use ten-gauge

 9    shotguns, and my question is:  Are handguns

10    authorized for use for hunting in Connecticut parks

11    and forests?

12            THE WITNESS:  Handgun hunting is only

13    authorized on private land.  Let me correct myself.

14    For small game yes, but for anything else, it's only

15    private lands and it's an additional permit.

16            THE COURT:  So when you say handgun hunting

17    is authorized for small game --

18            THE WITNESS:  Yes.  Small game only.

19            THE COURT:  Small game consists of what?

20            THE WITNESS:  Squirrel, fox, so coyote,

21    rabbit.  And then -- sorry.  Raccoon and possum also.

22    Sorry.  I forgot those two.

23            THE COURT:  So for instance, what kind of

24    hunting would a Glock 42 be authorized for?

25            THE WITNESS:  I don't know what caliber that
```

```
 1    Glock 42 is, but for handgun hunting, it has to be a
 2    357, larger for deer on private land.
 3            THE COURT:  Three feet what?
 4            THE WITNESS:  So if it's for deer hunting, a
 5    revolver has -- a pistol revolver deer permit
 6    regulation for hunting in Connecticut is private land
 7    only and it has to be a 357 or larger caliber.
 8            THE COURT:  And do you have in front of you
 9    that list by year, it's Exhibit 10, and it's the
10    NIBRS Agency Crime Overview?  Would you put that in
11    front of him?
12            THE WITNESS:  Thank you.
13            THE COURT:  Second from the bottom of each of
14    the pages is something called "weapon law
15    violations."  Do you know what's included in that?
16            THE WITNESS:  So those are other -- so those
17    are other offenses against society.  So that's a
18    stolen handgun, an altered handgun, possession
19    without a permit, those will be -- it's not a crime
20    against a person.  It's not a crime against property.
21    So it would be one of those other.  So possessing a
22    pistol without a permit would be an other weapons law
23    violation or a felon in possession of a handgun or a
24    firearm would be another one.
25            THE COURT:  And would it always involve a
```

1   firearm of some type or does it include other

2   weapons?

3          THE WITNESS:  It can include other dangerous

4   weapons.  So certain knives, gravity knives,

5   switchblades knives, brass knuckles, those could be

6   included in weapon laws.

7          THE COURT:  So you had some testimony that

8   I'm a little unclear about.  When you get calls

9   regarding firearms, do you or do you not enforce the

10  regulations prohibiting firearms in the parks and

11  forests or do you only give warnings?

12         THE WITNESS:  If we find someone carrying a

13  weapon in the state park, we typically charge

14  them with -- if there's no other extenuating

15  circumstances, it's the 23-4-1c charge of possession

16  with a weapon in a state park.  If there's other

17  issues going on, we may have other charges.

18         THE COURT:  Thank you.  Any questions on my

19  questions?

20         MR. ATKINSON:  I have a few, Your Honor.

21   FURTHER DIRECT EXAMINATION OF CHRISTOPHER LEWIS

22  BY MR. ATKINSON:

23    Q.   Colonel Lewis, on state land in -- on state

24  land, state forests and parks, a person can use a

25  22-caliber rimfire handgun to hunt coyote?

1    A.    Yes.

2          MR. ATKINSON:  No further questions, Your

3    Honor.

4          MR. BOCHAIN:  Just very briefly, Your Honor.

5                FURTHER CROSS-EXAMINATION

6    BY MR. BOCHAIN:

7    Q.    Can you just explain what rimfire means?

8    A.    Rimfire is a type of ammunition where center

9    fire, which the primer is in the center of the case.

10   And then rimfire, the primer is on the rim or outside

11   of the case and the powder is there in a -- it's a

12   smaller, traditionally lower power projectile.  You

13   don't see them much bigger than 22.

14   Q.    So for the small game hunting that we've been

15   discussing, the only thing that's authorized would be

16   22-caliber rimfire hunting, right?

17   A.    For small game?

18   Q.    For small game which we have been referring

19   to.

20   A.    Certain shot sizes and shotguns would be

21   permissible, like a seven or eight shot.

22   Q.    But in terms of handguns?

23   A.    Handguns would just be the 22-caliber or

24   smaller then a 22-caliber.

25   Q.    And again, that's only for certain animal

1    species, right?

2        A.    Yes, correct.

3        Q.    And those are less common in terms of what

4    people would hunt than the other things that we've

5    discussed, correct?

6        A.    Correct.

7        Q.    And so from where people can hunt, that's

8    only for certain locations within the state parks and

9    forests, right?

10       A.    Yes.

11       Q.    So it's not the whole state park or forest,

12   right?

13       A.    No.   It will be spelled out and then our

14   website has like a GIS map that actually delineates,

15   you know, the zones that hunting is allowed.

16       Q.    So it's discrete locations?

17       A.    Yes.

18            MR. BOCHAIN:   Nothing further, Your Honor.

19            THE COURT:   So when you say that handguns may

20   be used for hunting only if authorized on private

21   land and you went on to describe the small game, I'm

22   a little confused on what DEEP's jurisdiction is over

23   private land.

24            THE WITNESS:   So for hunting, hunting and

25   fishing, so anywhere the wildlife goes, we have

1    jurisdiction to manage the populations.

2            THE COURT:  You follow the fish.

3            THE WITNESS:  Yeah.  Or the deer or the

4    turkey, yes.

5            THE COURT:  In the list that we have in the

6    stipulation of the number of firearm hunting licenses

7    issued, what kind of animals require a firearm

8    hunting license?

9            THE WITNESS:  So generally, every game

10   species if one chooses to use a shotgun or a rifle to

11   hunt those would need the firearms license.  So

12   that's the basic license to use a firearm to hunt.

13   There's also archery licenses and we have additional

14   species specific licenses/permits.

15           THE COURT:  So if you're going to use a rifle

16   or a shotgun to hunt anything, you have to have a

17   firearms hunting license?

18           THE WITNESS:  Yes.  With the asterisk if

19   you're a landowner, you can get a free one, landowner

20   permit.

21           THE COURT:  And then you have a harvest

22   tagging system?

23           THE WITNESS:  Yes.

24           THE COURT:  That documents turkeys.  Do you

25   document harvesting hunting of -- killing any other

1  animals?

2          THE WITNESS:  We report deer and turkey and

3  then we have a fur bearers report.  So fur bearers

4  would be our fur-bearing species, so skunk, raccoon,

5  coyote, mink, anything that's a fur bearer that can

6  be hunted or trapped, we also track those numbers as

7  well.

8          THE COURT:  And is that also a self-reporting

9  system?

10          THE WITNESS:  Yes.  And then we also have a

11  requirement where our DEEP employees will physically

12  tag some of those animals with CITES tags.

13  Threatened or endangered species animals, if they

14  look like a certain animal that might be threatened

15  or endangered, we have to tag them to verify that

16  it's not that species, it came from Connecticut

17  legally.  So we would tag those.

18          THE COURT:  How would you get them to tag

19  them?

20          THE WITNESS:  They'll come to our offices, or

21  if it's a trapper that has several, they'll make an

22  appointment with a biologist or an officer and

23  they'll actually go to their location and tag them.

24          THE COURT:  All right.  Anything further?

25          MR. ATKINSON:  Nothing from me, Your Honor.

```
 1          THE COURT:  All right then.  We will excuse

 2   you, Colonel Lewis.  Thank you very much.  You may

 3   step down.

 4          All right.  We are in great shape time-wise.

 5   How much time would you like to collect your thoughts

 6   for your final argument and presentation?

 7          MR. ATKINSON:  I would suggest 15 minutes,

 8   Your Honor, primarily because, as you can see, I have

 9   a lot.

10          THE COURT:  You can have more than 15 minutes

11   to get organized.  How about a half an hour?

12          MR. ATKINSON:  I would greatly, greatly

13   appreciate that.

14          THE COURT:  Will that be enough?

15          MR. ATKINSON:  Yes, Your Honor.

16          THE COURT:  Is that enough?

17          MR. BOCHAIN:  Yes, Your Honor.

18          THE COURT:  Then we'll be back at three.

19   Thank you.

20          (Recess taken.)

21          (Call to Order, 3:03 p.m.)

22          THE COURT:  Please be seated, counsel.  I'll

23   hear you then on standing and I will invite

24   Mr. Atkinson to begin.

25          MR. ATKINSON:  Thank you, Your Honor.  And
```

1    before I begin, I'd certainly like to express my

2    appreciation to the Court staff for their courtesy

3    and graciousness over the past two days as well as to

4    Your Honor.

5         With respect to the defendant's motion to

6    dismiss, my reading of the briefs, Your Honor, seem

7    to be teeing -- this issue seems to be teed up for a

8    battle between the *Lujan* case and *Steffel v.*

9    *Thompson*, 415 U.S. 4452.  We understand the

10   defendant's claim to be that Mr. Nastri's future

11   visits to Connecticut state parks are not adequately

12   pled, they're not adequately expressed, particularly

13   on the point of his intention to both visit state

14   parks and to carry a handgun into state parks

15   without -- in violation of the regulation at issue

16   here.

17        We believe *Steffel* is most accurate and most

18   applicable to this case based on the testimony that's

19   been educed before Your Honor today and the

20   pleadings.  Just to set the context of *Steffel*, in

21   *Steffel*, the Supreme Court held that a plaintiff had

22   sufficient standing to bring a pre-enforcement

23   challenge when he was protesting and police

24   threatened him with arrest and he seized protesting

25   and he waked away because he didn't want to be

1    arrested.  And our understanding of the *Steffel*

2    holding was that a cessation or a ceasing of desired

3    conduct based on a threat of prosecution was

4    sufficient.

5        We recognize that nobody -- there's no

6    testimony to the effect that Mr. Nastri was

7    approached by a police officer or an EnCon officer

8    saying if you carry a handgun in state parks, we're

9    going to prosecute you, but the statute itself, the

10   accompanying counts of the regulation itself, the

11   accompanying consequences of that regulation are

12   sufficient notice to Mr. Nastri that he does face a

13   threat of prosecution if he carries his handgun into

14   a state park or forest in violation of that

15   regulation.

16       THE COURT:  So if that's the regulation that

17   he's challenging, are you saying that he doesn't

18   actually need to state that he intends to violate the

19   regulation in order to show an intent to engage in

20   proscribed conduct under the *Susan B. Anthony List*?

21       MR. ATKINSON:  I think he does not need to be

22   held to saying the exact words I intend to violate

23   it.  My understanding of *Susan B. Anthony* is a

24   continued desire to engage in that conduct even

25   though he testified truthfully today that while the

```
 1    law exists, he has no intention of violating it.  But
 2    he also testified today that this is his continued
 3    desire to do that, that is his intention to do that
 4    provided he can do that legally and without the
 5    consequences to his career as a financial adviser
 6    without the consequences of having this regulation
 7    enforced against him.
 8              THE COURT:  How does this differentiate him
 9    from anyone with a generalized grievance against a
10    law or a regulation who say I would act differently
11    if the law were different?
12              MR. ATKINSON:  That's why we believe *Steffel*
13    is analogous here, Your Honor.  Like *Steffel*, we're
14    dealing with a situation where prior to becoming
15    aware of that regulation, Mr. Nastri was engaged in
16    the very conduct that it prohibits and that he could
17    be punished for.  He testified that he had carried
18    his handgun into Sleeping Giant State Park, onto the
19    Farmington River Canal trail.  He was engaged in the
20    conduct that -- the prohibited conduct right up until
21    the moment he learned that there was a credible
22    threat of prosecution.
23              We believe that under *Steffel*, that
24    engagement in a conduct and then ceasing of that
25    conduct as soon as one learns of a threat of
```

```
 1    prosecution, a threat of enforcement, is sufficient

 2    to confer standing.

 3            In terms of his intent, Your Honor, I think

 4    Mr. Nastri in one of the interesting components of

 5    the standing doctrine is he finds himself in a tough

 6    position today between conflicting and imperatives.

 7    Under one imperative, he's compelled to testify

 8    truthfully which basically amounts to as long as I

 9    don't want to be prosecuted, I don't intend to carry

10    a handgun into a state park while this regulation is

11    at issue, and on the other hand, there are the --

12    there is -- there are cases like *Susan B. Anthony*

13    *List* that seem to imply that he has a duty to say I

14    intend to violate the law.

15            We believe that a reading like that would put

16    plaintiffs in an untenable position between

17    committing perjury and having standing to bring a

18    case.  We don't think the Supreme Court intended do

19    that.  We think *Steffel* itself describes

20    circumstances under which plaintiffs like Mr. Nastri

21    can bring claims like this and have standing.

22            With respect to *Lujan*, Your Honor, this is

23    not an obstruction like *Lujan*.  Mr. Nastri testified

24    that he lives in incredible close proximity to parks,

25    one, in fact, down the street from him.  He can
```

1    access it virtually at will.  He testifies to a

2    regular habit of accessing that park, whereas *Lujan*,

3    we had two residents of the United States talking

4    about safaris in Sri Lanka and Egypt and safaris

5    naturally require sufficient planning, require

6    preparation to travel overseas.  They're not

7    something that you can wake up and say, yeah, this

8    morning I want do that.  There's stuff that you have

9    to plan out.  They require money.  They require

10   expenses, et cetera.

11        None of that is present here.  Mr. Nastri

12   just has to get up as he's been doing for the last

13   number of years and go for a run or go for a walk and

14   we believe that his pattern and practice of doing

15   that is sufficiently concrete to confer him standing.

16        So on those bases, we would ask Your Honor to

17   deny the motion to dismiss.  Thank you.

18        MR. SULLIVAN:  Your Honor, if it's all right,

19   I'll take this from the podium so my notes are a

20   little closer.

21        THE COURT:  That's fine.  You may proceed.

22        MR. SULLIVAN:  Thank you.  And good

23   afternoon, Your Honor.  To begin, there's not a

24   disagreement between *Lujan* and *Steffel* in this

25   matter.  *Lujan* is the standard that applies

1   particularly with respect to a preliminary injunction

2   where the plaintiff bears the burden of establishing

3   standing in all instances of his complaint and in

4   this instance is obligated to show some basis or some

5   level of evidence sufficient to grant him the relief

6   that he's seeking here.

7        He can't simply rely on these generalized

8   allegations of an intent or a desire to carry which

9   ultimately is what he's advocating here for by merely

10  pointing to his allegations in the complaint.  That

11  would be more towards, I think, the *Warth v. Seldin*

12  case which was cited in plaintiff's opposition brief

13  to the motion to dismiss which is again irrelevant in

14  the preliminary injunction contention.

15       The plaintiff -- despite the fact that the

16  plaintiff may disagree with Connecticut Agency

17  Regulation Section 24 -- 23-4-1c, he still observes

18  it, and for that reason, and I think it's been

19  demonstrated at great length, and frankly, initially

20  from plaintiff's verified complaint, from his

21  deposition testimony that was attached to the

22  defendant's reply brief on the motion to dismiss, and

23  now for two days as he's been testifying to his

24  conduct and the way he actually uses Connecticut

25  state parks, it is very clear that is has not alleged

 1    a concrete and particularized injury sufficient to

 2    grant him standing under the Second Amendment to

 3    challenge the statute because he has been, again,

 4    abundantly clear that he will not carry his pistol or

 5    revolver in Connecticut state parks while

 6    Section 23-4-1c is in effect.

 7          He said it at least five times and that's

 8    consistent with his testimony, frankly, with every

 9    other location where he understands that a law is --

10    prohibits the carry of firearm on that location.  It

11    is his practice as a law-abiding citizen not to carry

12    that and that, frankly, is admirable, the fact that

13    he intends to follow those laws and comports himself

14    in the way he does so, and it's what's expected of

15    what, I would say, all citizens.  And for that

16    reason, it doesn't get past the generalized grievance

17    that he is now claiming on behalf of the public at

18    large who may have some interest in carrying when

19    they go to a Connecticut state park or forest despite

20    the fact they intend to obey the laws at all times.

21          Furthermore, because, frankly, plaintiff has

22    not alleged any intent or demonstrated any evidence

23    of an actual intent to engage in the conduct, which,

24    again, is not just visiting state parks but actually

25    carrying a pistol in those state parks, there's

1    really no reason to even get to the second prong of

2    what he's required to demonstrate for standing which

3    would been an actual or imminent, not a conjectural

4    or hypothetical injury leading to a threat of

5    prosecution.

6        THE COURT:  Before you get to threat of

7    prosecution, I want to understand how you are

8    regarding the Second Circuit's knife rights when the

9    plaintiffs there had done something in the past,

10   carried a knife, wished to carry again, why isn't

11   this like Mr. Nastri who has carried in the past in

12   the parks and wishes to do it again?  Why is that not

13   enough to show he has an intent to engage in what

14   would currently be prohibited conduct?

15       MR. SULLIVAN:  Well, Your Honor, this

16   question, at least in terms of Second Circuit

17   precedent, had been addressed in two other district

18   court decisions in New York -- at least two other

19   district court decisions in New York, *Antonyuk v.*

20   *Bruen*, which is *Antonyuk I*, and *Antonyuk v. Hochul,*

21   which is *Antonyuk II*, where the Court, particularly

22   in the first *Antonyuk* case, was branded with the very

23   question of an individual who wished or desired to

24   engage in this conduct but wouldn't do so because he

25   similarly wished to remain himself a law-abiding

citizen, that was not enough to establish the injury

that was necessary for standing to bring a Second

Amendment challenge under *Bruen*.

That stands, I would say, in kind of good

comparison with what that Court in that later

decision in *Antonyuk II* found was necessary where a

group of plaintiffs, again, essentially tried to

bring those same claims as to a number of places that

were subject to the New York state statute and that

prohibited the carrying of arms in those places and

the Court in that decision walked through each

plaintiff as their stated interests applied to each

place and found that for the majority of them, the

mere intent to carry in those places or the wish or

desire to carry in those places absent some

demonstrable specific and concrete intent to do so

was not enough to establish standing.

THE COURT:  That's my question.  Why hasn't

the plaintiff demonstrated from his past carrying in

the parks and forests sufficiently alleged that

intent?  I wonder if you could help me understand

where *Holder v. Humanitarian Project* fits into this.

MR. SULLIVAN:  With apologies, I'm not sure I

could specifically address *Holder* on this point,

which, again, I mean, this is why I tend to be

 1    looking to the more recent decisions in the *Antonyuk*

 2    cases.  And the way -- in the *Antonyuk II* case where

 3    the Court did find that certain defendants -- or

 4    certain plaintiffs, rather, had sufficiently alleged

 5    intent, it was based on the fact that they -- there

 6    was a likelihood that they would actually carry their

 7    pistols in those parks and particularly in Catskills

 8    -- I think in Catskills State Park in New York there

 9    where a volunteer firefighter had credibly stated

10    that he would be carrying his pistol in that park

11    despite the law was in effect and he understood that

12    conduct to be illegal, and also for an outdoorsman

13    who had concrete plans to visit a park within the

14    next several months of his declaration where he would

15    be carrying his pistol while he did so.

16         The other plaintiffs who did not have such

17    concrete plans or anything more than a generalized

18    interest were not found to have sufficiently alleged

19    that intent under -- at least according to

20    *Antonyuk II*.

21         So in this sense, the plaintiff is like

22    Mr. Antonyuk in *Antonyuk I* and simply hasn't even

23    reached the point where we can make any assessment of

24    what was credible threat of prosecution would be.  If

25    he's not engaging in the conduct, it is by definition

1    a remote possibility, I would say more than remote

2    possibility, that he could ever actually be concerned

3    about a threat of prosecution here particularly

4    where, as was demonstrated in today's testimony that

5    the -- EnCon's ability to police and enforce the

6    regulations is limited by circumstance in large part

7    and they don't have a constant presence in these

8    places and can only respond to calls as they come in.

9         So I think it becomes very attenuated and

10   speculative to say that the mere carry in a park

11   particularly if it were concealed is likely to invite

12   any sort -- any credible threat of prosecution under

13   this particular regulation.

14        THE COURT:  So why should it be insufficient

15   if it's an open carry in the park, another citizen in

16   the park sees it, calls it in, isn't it -- wasn't it

17   DEEP's testimony that they would send out one of

18   their enforcement officers?

19        MR. SULLIVAN:  Yes.  That was their

20   testimony, Your Honor, but I think it's still in

21   terms -- and I would -- I won't push back too hard on

22   it, but I think ultimately it's still speculative as

23   to whether the interaction is going to lead to

24   arrest.  I suppose it assumes that the report leads

25   to an actual interaction with the person who's being

1    reported and there's not clear evidence that that's

2    likely to happen here.

3         Your Honor, I'd also briefly like to address,

4    I think what plaintiff the was getting at in

5    referencing what apparently is a First Amendment case

6    and perhaps the exercise of the chilling doctrine as

7    grounds for claiming standing to bring a Second

8    Amendment challenge.  There's no Court that's applied

9    the chilling doctrine to a Second Amendment case and

10   that was again -- the notion that that would be

11   enough here, I think, runs again counter to frankly

12   the actual regulation which gives very clear notice

13   of where it is in effect which is the boundary lines

14   surrounding Connecticut state parks and forests.

15        Additionally, it's -- in light of -- I think

16   there's no record here that would support, I think,

17   the expansion of the chilling doctrine into the

18   Second Amendment in the way that the plaintiff

19   apparently is advocating for and certainly not in a

20   way that should lead this Court to disregard the

21   existing standing doctrine with respect to Lujan.  I

22   would note there are existing district court

23   decisions particularly in *Oliver v. University of*

24   *Connecticut* out of the District of Connecticut where

25   that Court noted and cited to circuit courts from

```
 1    several other jurisdictions that chilling is really a
 2    First Amendment doctrine and is not generally applied
 3    outside that and I would argue that it should not be
 4    here particularly where -- it's very clear where the
 5    government regulation applies and what conduct the
 6    government regulation is intended to prevent or
 7    enforce against and that is simply carrying within
 8    the lines of Connecticut state parks and forests.  So
 9    there are none of the vagueness or overbreadth
10    concerns that may -- would normally be attendant in a
11    classic First Amendment scenario.
12            I would just add that the plaintiff's
13    argument, again, that -- I think it's been clear that
14    the Supreme Court in Carney v. Adams recognizes that
15    disagreeing with a statute, even one he believes to
16    be unconstitutional, is not enough to challenge that
17    statute in court.  The plaintiff testified that he
18    believes that as an officer of the court, he has some
19    constitutional obligation to see that the laws, I
20    suppose, are interpreted in accordance with his --
21    what I take to be his understanding of what the
22    Constitution says.
23            Again, that would -- if followed, that would
24    run strongly against the directives that the Supreme
25    Court has given and limits that the Supreme Court has
```

1    set on the Court's jurisdiction, you know, where it's

2    been observed that courts are not roving commissions

3    assigned to pass judgment on the validity of the

4    nation's laws and that's a concept that was -- has

5    been adopted in the '70s that has been continued all

6    the way on through up to, you know, recent precedent

7    including, frankly, most recently or somewhat

8    recently in a Justice Thomas concurrence in *United*

9    *States v. Sineneng-Smith* where he, again, was also

10   casting doubt on the application of the First

11   Amendment chilling doctrines in other constitutional

12   conducts as an excuse to expand the Court's

13   jurisdiction and in his opinion, he came down firmly

14   against it.

15        So I would be skeptical and I would frankly

16   reject any claim that Second Amendment doctrine

17   particularly under *Bruen*, whatever affect *Bruen* may

18   have had on constitutional law is -- was one that

19   would permit the plaintiff to bring a claim in this

20   manner.

21        And finally, I would just direct the Court

22   and perhaps maybe to the plaintiff's argument, again,

23   to his concept that there's a perception of

24   unconstitutionality is enough to challenge a law.

25   That was also addressed in the Southern District of

```
 1    New York in the recent Tavares decision which was

 2    cited in our briefs.

 3              So with that, Your Honor, for those reasons,

 4    plaintiff simply has not alleged the intent to engage

 5    in the conduct sufficient to claim an injury or any

 6    credible threat of prosecution here and his claim

 7    should be dismissed.

 8              THE COURT:  Mr. Atkinson, do you wish to

 9    respond?

10              MR. ATKINSON:  Yes, please, Your Honor.

11              Mr. Nastri would be thrilled if the rule was

12    carry until you're caught.  I think the testimony

13    shows otherwise --

14              THE COURT:  I'm sorry.  Why would he be

15    thrilled by that?

16              MR. ATKINSON:  Because it would essentially

17    be I can go out and carry and unless somebody bothers

18    me and there's nobody out there to bother me, I can

19    carry it.  That would give him more freedom than he

20    currently has.

21              THE COURT:  It assumes the regulation is not

22    in effect?

23              MR. ATKINSON:  Correct.  But where we stand

24    right now is Colonel Lewis testified, obviously, to

25    calls coming in, an increased risk of confusion, and
```

those calls stemming from that confusion in coming in
because someone saw a firearm in a place they didn't
expect it and he virtually went down a list of every
place he wouldn't expect to see a firearm including
state parks.  And he testified that they send
officers to respond and he testified they would issue
citations and enforce the regulation at issue here.

        With respect to Mr. Nastri's actions, he just
didn't learn of the law and stop.  His complaint
indicates, and that is sworn testimony, again, I
would bring to Your Honor's attention, he went to
Defendant Dykes and he asked -- sent her an e-mail
and he said is my understanding of the law right and
why did he do that, because he still wanted to keep
engaging in the same conduct that he had been
engaging up until -- up to and to that point and the
response he got back led him to conclude that it was
no longer permitted.

        He may -- he didn't -- he just didn't stop,
Your Honor.  He made efforts to continue what he was
doing, to continue to engage in the course of conduct
that he was pursuing.  Again, I will reiterate, he
has testified that this is his desire to do so.  He
stated that in his complaint.  He stated that when
the regulation no longer poses the risk of a

1    consequence upon him, he's going to go back to doing

2    what he was doing before.  That's more than

3    sufficient to confer him standing and we would ask

4    you to find that he has standing.

5           THE COURT:  With respect to the requirement

6    that he show that there is a risk of enforcement, et

7    cetera, he talks about the regulation never having

8    been enforced against him, although he has carried

9    firearms in the parks before, I wasn't quite clear

10   whether his deposition said knowing he was not

11   permitted to but saying he is not aware of it ever

12   having been enforced against anyone.  So where is the

13   credible threat of prosecution or enforcement

14   required to show standing?

15          MR. ATKINSON:  I think we get that from

16   Colonel Lewis' testimony which I recollect being that

17   if he went out and he responded to a report of an

18   individual carrying similar to Mr. Nastri, that they

19   would enforce the law on that.  Given the unique

20   staffing shortages, for a lack of a better term, that

21   Colonel Lewis described, the lack of reporting data

22   that he has as to local law enforcement, state

23   police, et cetera, we simply don't know the universe

24   of how other law enforcement agencies have enforced

25   this law, but what is clear from Colonel Lewis's

```
1    testimony is that the law will be enforced and we
2    believe that is sufficient.
3           THE COURT:  Why is that different from any
4    other entity or person charged with enforcing the
5    law?  Would you expect any different testimony other
6    than we will enforce the law?
7           MR. ATKINSON:  I go back to a similar thing
8    that I asked Professor Cornell in his testimony about
9    not having knowledge of every individual's knowledge
10   in the universe, all the facts in the universe, and
11   going -- and would respond to Your Honor that I
12   simply don't know which police officer has enforced
13   the law at this juncture, but we do know it's been
14   enforced.  From Colonel Lewis' testimony, we do know
15   that it will be enforced going forward, and that if
16   Mr. Nastri violates the law and he's caught doing so,
17   it's going to be enforced against him.
18           I don't think --
19           THE COURT:  But doesn't that risk have to be
20   more particularized to Mr. Nastri?
21           MR. ATKINSON:  I think it's sufficiently
22   particularized right now if he violates the law and
23   he's caught doing so, the law is going to be enforced
24   against him.
25           THE COURT:  As it would be against anyone
```

1   acting similarly, right?

2          MR. ATKINSON:  Correct.  And we're also

3   looking at the standing doctrine saying it needs to

4   be a credible threat, not that it has to be enforced

5   against him.  I think Colonel Lewis' testimony

6   clearly establishes that the threat to Mr. Nastri if

7   he violated this law, was caught doing it, it's

8   credible, it's going to happen, and he is going to

9   face consequences for it.

10          THE COURT:  We have no evidence of any call

11   and we have no evidence of anybody responding to that

12   call.  Why is he any different from anybody else who

13   just is in the park either not carrying or carrying

14   but the regulation will be applied to that other

15   person similarly to Mr. Nastri?

16          MR. ATKINSON:  I think that goes back to what

17   his track record of prior conduct was, he had been

18   carrying for the purpose of self-defense in state

19   parks and his expressed intent desire to do so if he

20   doesn't face consequences for it, his efforts to find

21   out if he could, bottom line, he was doing this, that

22   he -- that's such evidence in our view that going

23   forward if he didn't face consequences, he would do

24   it.

25          This gets back to what I said when I first

1    stood up, carry until you're caught.  I don't think

2    the state can tease it' way out of answering a Second

3    Amendment challenge in this context simply because it

4    claims it never caught anybody.  The threat is there.

5    The threat is particularized to Mr. Nastri because of

6    his past conduct and --

7           THE COURT:  And you say because of his past

8    conduct, how do you get to the imminent threat from

9    his past conduct that they -- that DEEP doesn't know

10   about?

11          MR. ATKINSON:  Well, DEEP does know about it

12   as of today, but leaving that aside, it's from my

13   reading of the case law, he's -- he's shown that a

14   credible threat of that prosecution if he goes into a

15   state park carrying a handgun and somebody spots him

16   and an officer responds, he's going to face

17   consequences by Colonel Lewis' testimony.

18          Our view is that we have to accept that

19   testimony at face value.  There's nobody out there

20   patrolling consistently and it would frustrate the

21   purposes of our judicial system if the state could

22   simply wiggle out of meeting a Second Amendment

23   challenge on its face because there's just not enough

24   officers out there actively patrolling it, there's

25   nobody in there checking your ticket on the door as

```
 1    you come in and saying do you have a firearm.  The
 2    state shouldn't be allowed to slip out of that.  We
 3    don't think current standing doctrine allows them to.
 4          THE COURT:  So you were relying on Steffel
 5    which was a man who was handbilling with antiwar
 6    stuff.  Do I have the right case?
 7          MR. ATKINSON:  Yes, Your Honor.
 8          THE COURT:  And he had twice been warned not
 9    to do that.  Isn't that rather a distinguishing
10    feature than in this case?
11          MR. ATKINSON:  We think Mr. Nastri got
12    similar warnings, the first being he went and read
13    the statutes which are the -- the regulations which
14    in of themselves serve as a warning, don't do that.
15    Then he contacted Defendant Dykes and he asked for
16    clarification, as his testimony indicates, I
17    wanted -- basically, he said I wanted to go and see
18    if there was another provision of the Connecticut law
19    that allowed me to do what I want to do and the
20    answer he got back was essentially confirming the
21    warning the law itself gave him.  We think those are
22    analogous enough to the warnings in Steffel, thou
23    shalt not do this, and he complied.
24          THE COURT:  So if you're a taxpayer and you
25    disagree that a particular provision of the code
```

 1   applies to you or should be enforced against you, is

 2   that enough to show imminent injury through threat of

 3   enforcement?

 4        MR. ATKINSON:  Your Honor, I am doing my best

 5   to follow your question here.

 6        THE COURT:  That might be difficult.  So I'm

 7   really back to this question of how Mr. Nastri is

 8   different from John Q. Public, Jane Q. Public, who

 9   wants to carry their handguns in the parks and knows

10   they can't do it, defers doing it because it is

11   illegal.  What's different about Mr. Nastri's

12   situation that would allow him to bring the challenge

13   as opposed to anyone who has a desire to carry

14   firearms in the park and can't?

15        MR. ATKINSON:  Well, I think that starts with

16   past conduct, the efforts he made, again, to continue

17   that conduct and his testimony that he intends to do

18   so when the law is lifted but doesn't because of the

19   consequences.  With respect to John Q. Public, I'm

20   not sure we would have that past conduct.  The other

21   issue I think in that instance that may be a -- John

22   Q. Public may be under an obligation under the

23   standing precedence to allege that they intend to

24   violate the regulation despite it being there, but I

25   think the case law provides for people who are in

 1   Mr. Nastri's circumstances and that's sufficient to

 2   cover him.

 3        THE COURT:  Anything further on standing from

 4   the defendant?

 5        MR. SULLIVAN:  Your Honor, just briefly, and

 6   I think that your question touched on it, the fact

 7   that there may have been some past conduct that

 8   violated the statute does not bear on the question of

 9   imminence.  There is no imminence of enforcement if

10   Mr. Nastri is not engaging in the conduct.

11        I'd add that I think that the

12   characterization that the e-mail is somehow

13   sufficient to establish standing here also falls

14   short.  Plaintiff's -- the e-mail that plaintiff

15   sent, which I believe is in evidence at 1A, to DEEP

16   is just one more example of a general inquiry

17   regarding whether a law -- whether a law is enforced

18   in a manner that he can't carry his firearm there.

19        The inquiry -- his e-mail was not identifying

20   any particular state park, it was not identifying any

21   future intent of his to visit any state parks.  It

22   was merely an open question of whether he could carry

23   there and whether there was any statute that allowed

24   him to do so, followed up by a request that DEEP

25   amend the regulation to come in line with the

1    plaintiff's understanding of what the Constitution

2    required under *Bruen* and that is simply not

3    sufficient to establish any imminence or certainly

4    not to seek the broad relief that plaintiff is

5    seeking here in a facia challenge where he is arguing

6    -- the effect would be striking down this law as to

7    all parks.

8            THE COURT:  So you don't think inferentially

9    when he says that he wants to bring *Bruen* to the

10   commissioner's attention because it demonstrates the

11   unconstitutionality of this regulation evinces some

12   kind of intent on his part?

13           MR. SULLIVAN:  I don't see it as different

14   from requesting legislature for -- that the law ought

15   to be changed for a reason that, again, he may

16   believe to be the case or not.  It's -- and in any

17   case, it's, I think, putting this Court in the

18   position where it would be the ultimate arbiter of

19   whether simply being able to kind of decide a

20   constitutional question as plaintiff seems to have

21   taken it upon himself to do which is simply not

22   appropriate in these cases and so there should be no

23   standing here.

24           THE COURT:  You're not claiming that his

25   correspondence with the defendant and her staff is --

 1   includes an expression of an intent to engage in that

 2   conduct; is that right?

 3         MR. SULLIVAN:  Your Honor, if I understand

 4   your question --

 5         THE COURT:  I'm trying to understand how far

 6   you are going with what is inferable from Mr.

 7   Nastri's communications to DEEP about this regulation

 8   and its constitutionality.

 9         MR. SULLIVAN:  I don't think it can go any

10   further than the fact that he would like to see the

11   law change and that's not the type of conduct that

12   would be sufficient to establish standing.

13         Your Honor, I'd just add that's especially

14   true at the preliminary injunction level where we

15   can't simply rely on, I think, the more favorable

16   inferences that one might be entitled to on a

17   12(b)(1) motion to dismiss when it's just on the

18   pleadings.

19         THE COURT:  All right.  Let's move to the

20   merits and that implicating the substantial

21   likelihood of success on the merits.  Mr. Atkinson.

22         MR. ATKINSON:  Thank you, Your Honor.

23         I don't think there's any dispute that we all

24   understand that the *Bruen's* history test is where we

25   need to start here and our view is that test is

relatively straightforward in this case.  I'd like to start with what Professor Cornell testified that particularly the efforts to enact broad public carry restrictions that follows the Statute of Northampton model were made both pre-1791 and post-1791, as I recall his testimony, but that *Bruen* itself found those efforts to lack a more well-established historical foundation.

And with that context in mind, we believe that the Connecticut Supreme Court's decision in *State v. Ball*, which is 260 Conn 275, it's a 2002 case, Your Honor, takes on a unique importance in this case because that case, the Connecticut Supreme Court found, and I quote as narrowly as I can from tying in memorial, The State's uninhabited and undeveloped land traditionally has been used for hiking, picnicking, camping, hunting, trapping and fishing, end quote, and even though the management of those lands has shifted to the State of Connecticut, we don't think that changes anything about this equation.

What the historical record we believe is in front of you shows that at least in Connecticut under the Connecticut history, there were simply no restrictions on the carrying of firearms on

1  inhabited, undeveloped lands at the time referred to

2  as the woods from the Founding Era until our

3  calculation being 1924 based on the Entry 68 in the

4  excerpted statutes that the state supplied at ECF

5  23-2.

6         We also believe that particularly telling in

7  Professor Cornell's testimony was that there were no

8  modern-style parks in the Founding Era, but what we

9  derived from his testimony is that there were --

10  there was a tradition at least in the New England

11  area of reserving common spaces for specific --

12  various specific purposes and that would have

13  occurred in the Colonial and Founding Era, and the

14  only law that Professor Cornell, as I recollect,

15  could testify to restricting the carry of firearms in

16  those spaces was they -- the law pertaining to

17  bringing a loaded musket to militia muster and I do

18  believe I asked him if he could identify any laws

19  from the Colonial or Founding Era that prohibited the

20  carrying of firearms in those areas and he couldn't

21  and I'm not aware of any such general restrictions in

22  the record that's been presented to you.

23         Our position is that the reservation of those

24  public spaces in the Colonial and Founding Era is

25  directly analogous to the public spaces that were

reserved today particularly in light of the *Ball*
decision that we've already referenced.  And we would
submit that the absence of such regulations for those
spaces in the Founding and the Colonial Eras is
dispositive of this case under *Bruen* primarily
because of Bruen's treatment of history, the rules of
weight as Professor Cornell described them.  I
recollect a passage from *Bruen* saying the further
away we get from the time of the adoption of the
Second Amendment and the less weight needs -- can be
given to history, it's like a decreasing sliding
scale and one of the things that strikes me from the
*Bruen* decision is it's looking for an enduring and
representative tradition.

          THE COURT:  But doesn't that purpose have
difficulty of application where the item to be
regulated doesn't exist at that time?  I mean, that's
what I thought Professor Cornell was talking about,
that ever since Connecticut had state parks, that the
modern park movement which started in 1850, that
there has been regulation or that the parks have been
used as forums to -- for the exercise of other kinds
of constitutional rights, assembly, free speech,
exercise of religion, et cetera.

          So is there a conflict between someone's

 1   Second Amendment right being exercised in a park

 2   that's been used for that purpose?  How should the

 3   Court be looking at that, resolving that conflict?

 4        MR. ATKINSON:  The conflict between

 5   somebody's Second Amendment right and their First

 6   Amendment right?

 7        THE COURT:  That someone seeking to exercise

 8   his or her Second Amendment right in a place which

 9   has been long recognized as a place where other

10   constitutional rights are exercised by people.

11        MR. ATKINSON:  If I understand your question

12   properly, Your Honor, I think the *Bruen* analysis

13   looks -- doesn't factor that into play as much.  I

14   think what it's doing is it's kind of streamlining

15   the analysis into is there an enduring tradition of

16   prohibitions on firearms in these places and then the

17   key thing that we believe *Bruen* focuses on is where

18   is the starting point for that, where does the

19   starting point have to be for that in order for it to

20   be relevant, and we think that's particularly

21   appropriate from *Bruen* in light of the Supreme

22   Court's lack -- for lack of a better way of putting

23   it, how slow they were as to the incorporation

24   doctrine with the Second Amendment not being

25   incorporated until 2010, in my understanding.

 1           So we believe the starting point is relevant.

 2    If something started in the early 1900s, there's no

 3    Second Amendment scrutiny.  There's no tradition of

 4    it stretching back to the Founding and the Colonial

 5    Era.  We believe that's a situation where *Bruen's*

 6    instruction is to look to analogs, and so that is

 7    what I mean by analogizing to spaces reserved like

 8    the town greens that Professor Cornell described.

 9    The town commons that Professor Cornell described.

10           These were spaces set apart for some of the

11    things that Your Honor mentioned in your question of

12    right to assembly, right to free speech, et cetera.

13    These were all places where it was encompassed and

14    there were -- in the historical record before you at

15    the time of the Founding, in most of the antebellum

16    period, neither Professor Cornell nor the record

17    that's in front of you supplies any examples of a ban

18    on -- a wholesale ban on thou shalt not carry a

19    firearm in these spaces.  The one example -- the one

20    restriction on firearms carrying that I believe was

21    supplied to you again was bringing a musket loaded to

22    militia practice.

23           So in terms of drawing that analog with that

24    starting point and *Bruen's* rules of construction and

25    looking for an enduring constitutional tradition that

1  stretches back to the Founding Era, et cetera, there

2  simply is none.  And so we believe in all relevant

3  characteristics that town commons, town greens are

4  relevantly similar to modern-style state parks in

5  that regard.

6          THE COURT:  So I have a further question, if

7  you don't mind.

8          MR. ATKINSON:  Sure.

9          THE COURT:  I take it you have not a made

10 challenge to the state's ability to prohibit firearms

11 in their attorney general's office.  It was the

12 testimony that he didn't bring it there because he

13 knew it was prohibited.

14         MR. ATKINSON:  We do not have a challenge to

15 that, Your Honor.  We view that as a sensitive place.

16 It's a government --

17         THE COURT:  All right.  So then you have

18 *Bruen* recognizing that there may not be a tradition

19 of a particular type of regulation since the Founding

20 since it's a response to a more modern problem.

21 Aren't public parks a response to urbanization,

22 modern congestion, all the things that Professor

23 Cornell was talking about?

24         MR. ATKINSON:  Well, we read that passage of

25 *Bruen* slightly differently, Your Honor.  When we

1   understand what *Bruen* was referring to as a response

2   to a modern problem to be a regulation that restricts

3   the Second Amendment right that's in response to

4   something that popped up in the Modern Era.  We do

5   not believe that passage of *Bruen* encompasses we're

6   going to address some other social problem and that

7   means a new set of rules et, cetera.  We believe

8   particularly in this context that there has to be an

9   analog to something that was in place and well

10  established and representative back and was an

11  enduring tradition from the Founding Era.  That's

12  what we believe from *Bruen*, if that answers your

13  question.

14          THE COURT:  So we have a long history of what

15  the open space that has become the parks is used for.

16  We then have what -- I'm sorry.  This is just getting

17  funky here.

18          I take it you don't disagree that defendant

19  has shown there's a tradition of prohibiting firearms

20  in parks since the modern parks movement began.  Is

21  that a fair statement?

22          MR. ATKINSON:  I'd qualify that, Your Honor,

23  in the sense of I believe Professor Cornell said that

24  the parks movement started with the first park in

25  1858.  Then there were parks that were developed

after the Civil War but they were still popping up in
isolated instances.

So for purposes of *Bruen*, we would not agree
that they have established an enduring tradition from
the start.  These were experiments at the time.  We
view they should be treated as experiments.  And they
were municipal experiments.  They were not state
experiments.  These were isolated experiments on a
small scale.  They did not reach the level of
being -- of covering an entire state.  They weren't
necessarily widespread at the time.  And then going
back to my argument as to *Bruen* requiring them to be
well established, by my count there were only seven
municipal parks by the year 1878 that had the
prohibition.

We think the fact that they were municipal,
they were small scale experiments doesn't meet the
definition of representative and well established by
*Bruen*.  I take your point, though, that it has been
going on for a long time.  We just don't think that
at the time the history was most relevant to
understanding the meaning of the Second Amendment
that it was well established enough for anyone to
conclude that they established what *Bruen* is
referring to is that well-established and

1  representative historical analog or tradition.

2      THE COURT:  How can you establish an enduring

3  tradition of regulating modern parks if they only

4  just are recent and popped up?

5      MR. ATKINSON:  I think *Bruen* instructs us to

6  go to analogs which is why I opened my argument with

7  the analog to the reserved spaces, such as the Boston

8  Common that Professor Cornell testified about, the

9  town greens that Professor Cornell testified about,

10  and our position is the absence of regulation there

11  shows that there is no such well-established

12  historical analog.

13      And then circling back to my point about

14  incorporation and Professor Cornell's testimony that

15  he was not aware of any state constitutional

16  challenges to these laws in any courts and personally

17  as an officer of the court representing that I've

18  been unable the find any as well, we think the

19  historical records bare of any scrutiny under a

20  state's arms bearing provision or a state -- or the

21  Second Amendment and that would be probative that

22  this is not a well-established tradition.

23      THE COURT:  So can you have a sensitive place

24  that's broader than what are the examples that *Bruen*

25  or *Heller* set out?

1          MR. ATKINSON:  So we did contemplate this,

2     Your Honor.  I believe the examples that *Bruen* set

3     out were schools, voting places, government buildings

4     and courthouses.

5          THE COURT:  Legislative assemblies, yes?

6          MR. ATKINSON:  Correct.  And I apologize for

7     missing that one, but we see a common theme running

8     in all of these.  These are places where core

9     government functions are performed, and I know I have

10    a little bit of explaining to do as to the schools,

11    but understanding the history of schools in America

12    and that being a community responsibility as far as

13    back as the ye Old Deluder Satan law in

14    Massachusetts, we believe that fits immediately in

15    there.  So the definition we're proposing for

16    sensitive places is where a core functions of

17    government take place and that includes

18    self-government which would cover voting places.

19          With respect to -- one of the examples that I

20    thought about in order to expecting this hypothetical

21    is the post office and we understand that there's the

22    authority to establish a postal system in Article I

23    of the United States Constitution.  We believe that

24    the placement of a responsibility in the United

25    States Constitution is sufficient enough to say

```
1    that's a core government function.
2          So we don't see any inconsistency with
3    Supreme Court precedent or the nature of the
4    sensitive places doctrine if the Court chooses to
5    adopt the core government functions test for the
6    sensitive places and we would urge the Court to adopt
7    that.
8          Under that test, I go specifically to Colonel
9    Lewis' testimony today where he testified largely
10   that the same concerns about firearms that would be
11   present in the state park are virtually present
12   everywhere.  He also testified that there are laws in
13   place, and we walked through some of them, that
14   protect the state's interest without barring them
15   from carrying firearms completely.  And I would also
16   note his testimony that there's no gateway, there's
17   nothing to monitor somebody of are you carrying a
18   firearm there, et cetera.  We've had argument today
19   about the actual extent to which DEEP goes to enforce
20   these laws.  He's testified about the -- the limited
21   resources that he has, et cetera.
22         We believe that state parks and forests do
23   not meet the definition of sensitive places and we go
24   back to our argument about State v. Ball, that these
25   are undeveloped lands.  These are the woods.  This is
```

 1    the wild.  Stuff happens in the wild.

 2         THE COURT:  But they're not the wild once

 3    they have been recognized and used as parks and

 4    places where people are going to be tranquil and in

 5    harmony with nature, et cetera, or to publicly

 6    assemble for the purpose of exchanging of political

 7    views or the other purposes.  So that's what I'm

 8    having a hard time understanding is why the

 9    historical analog of the wild, it seems that you are

10    using it as a regulatory straightjacket.

11         MR. ATKINSON:  We wouldn't just limit

12    ourselves to the historical analog of the wild and

13    the woods as they were referred to back then.  We

14    would also make the comparison to -- back again to

15    the sensitive places we've already discussed that are

16    well established and we would also compare state

17    parks and forests to the rest of the world,

18    restaurants where people go to eat, to be

19    entertained, movie theaters.

20         THE COURT:  But doesn't that just blur the

21    whole concept of sensitive spaces, sensitive places,

22    if you're going to say, oh, it's like a restaurant or

23    it's like a movie house or something like that?

24    Don't we have to look at how -- what it is being used

25    for?  I mean, even *State V. Ball* talked about state

1  parks and forests being used for Native American

2  celebrations, for historical reenactments, and some

3  other things, not just that the purpose of the parks

4  was to be wild.

5  MR. ATKINSON:  Well, Your Honor, I would -- I

6  don't think it blurs the distinctions.  I think what

7  it shows is there is no distinction even though the

8  purposes are different.  People are gathering there;

9  they're using them for purposes of recreation whether

10  that's getting out in nature or not.  I think Colonel

11  Lewis' testimony clearly demonstrates that while the

12  parks are open for business, there's no restriction

13  on who can come in there.

14  You just walk in and there's a few checks

15  here and there as to alcohol, et cetera.  There's a

16  check as to fishing gear when you're leaving, et

17  cetera, game limits, et cetera.  But there is really

18  no restrictions on come in and use.  That's like

19  walking down the street, for lack of a better way of

20  putting it, and then that also -- the purpose

21  question leads me to a brief detour, Your Honor, as

22  to what I believe the state advance is a state

23  property theory.

24  As Your Honor is familiar with in First

25  Amendment case law, there's a doctrine of forums.

1    There are quintessential public forums.  There are

2    limited purpose public forums which is forums that

3    would otherwise be private but are opened up to

4    specific kinds of speech.  We don't -- we think that

5    state parks are closer to -- this is a public forum

6    because there's an absence of restrictions or very

7    few restrictions on what you can do there.  It's open

8    for business.

9         And we would point to purpose-driven

10   discrimination on the carrying of firearms is much

11   like a content regulation on speech.  It gets

12   exacting scrutiny under the First Amendment, it's

13   presumptively unconstitutional, and the record that

14   we have here is that the state permits quite a

15   substantial number of people, according to the

16   stipulation that we have, gives them permission to

17   carry firearms by way of firearms hunting licenses,

18   we have Colonel Lewis' testimony that you can use

19   22-caliber handguns to hunt coyotes and his further

20   testimony that you can use them year-round in certain

21   state parks and forests.

22        Handguns, the most popular self-defense

23   weapon in America according to *Heller*, are already in

24   state parks and forests, and in some of them, they're

25   permitted to be there year-round.  Just because

1    Mr. Nastri wants to carry in a firearm for purposes

2    of self-defense as opposed to hunting, that's what we

3    would characterize as purpose-driven discrimination.

4    It's not appropriate especially when you have the

5    allowance of firearms in state parks and forests

6    already which circling back to the sensitive places

7    laws, the public is typically not allowed into

8    sensitive places with firearms.  That's been the

9    tradition at polling places, schools, et cetera, and

10   it's been the tradition for quite a substantial

11   amount of time.

12        So we think the very presence of firearms for

13   any purpose defeats a conclusion that it is -- that

14   it is a sensitive place.

15        THE COURT:  Isn't that a little bit circular?

16        MR. ATKINSON:  I think in terms of making

17   analogs, we're certainly looking for relevant

18   considerations.  We don't -- I don't necessarily view

19   that as circular, Your Honor.  I think we have

20   relevant characteristics of well-established and

21   recognized sensitive places that modern-style parks

22   simply don't have in this case.  They're permitting

23   firearms in for hunting.

24        THE COURT:  You said you would touch on

25   education.

1          MR. ATKINSON:  Yes, Your Honor.  I believe I
2    spoke about the Old Deluder Satan law in
3    Massachusetts.  I do know in our briefs we reference
4    the constitutionalization of education here in
5    Connecticut as a core government function, et cetera.
6    Again, schools fit well within the confines of what
7    we've understood sensitive places to be in our
8    nation's history.  We believe with respect to
9    education, that's on a firm footing in sensitive
10   places doctrine.  We just don't think there are any
11   relevant analogs there to modern state parks and
12   forests.
13          And if I may address the affidavits of the
14   two school principals who want -- who were speaking
15   as to the effect on field trips in state parks and
16   forests, et cetera, first of all, we believe that the
17   interjection of that into this case would -- in a
18   broader context would be impermissible interest
19   balancing that's prohibited by *Bruen*.
20          Second, with respect to that, we see nothing
21   by law, logic or reason or common sense that the
22   state can simply coordinate with the schools if
23   you're coming in to do some education with students,
24   let's help -- we understand you're bringing the
25   classroom out into the woods, let's secure that as a

1     sensitive place for a day.  Colonel Lewis already --

2     either Colonel Lewis or Mr. Nastri already testified

3     as to Civil War reenactments being done.  We would

4     point the state to that process as to that concern.

5            If I may move on, Your Honor, and I'm

6     reaching -- and I'm reaching the end here.  Another

7     thing that I would like to point out to Your Honor is

8     in Mr. Nastri's verified amended complaint at

9     paragraphs 41 through 47, there's sworn testimony or

10    allegations there that have not been contradicted in

11    these proceedings at all that law enforcement would

12    face a significant response time to respond to

13    someone who's being made the victim of a crime out in

14    a state park or forest and our view is that those

15    response -- and couple that with Colonel Lewis'

16    testimony that the EnCon officer may be coming from a

17    different location to render assistance there, our

18    view is that those circumstances defeat the

19    characterization of those places as sensitive places

20    because there's simply very little regulation or

21    enforced regulation out there and it creates a

22    situation where you're a victim before law

23    enforcement ever gets there.

24           With respect to closing, Your Honor, I'd like

25    to discuss Mr. Nastri for a second.  He's a

 1   law-abiding citizen.  He served his community and his

 2   country for a long, long time.  He has an ample --

 3   what I would characterize as an ample nature of

 4   common sense.  Nothing in his testimony today or the

 5   record shows that he would pose a risk of harm to

 6   anyone by carrying a firearm.

 7        All he simply wants in this case is to

 8   peacefully carry a handgun for purposes of

 9   self-defense.  If he has to conceal it, that's where

10   he will.  As he grows over -- older, his physical

11   strength, his physical abilities are going to

12   decrease and he's going to become more vulnerable.  I

13   think Mr. Nastri's going the way of every person in

14   life and we'd submit the right to self-defense is

15   older than America.  *Heller* recognizes that handguns

16   are the most popular tool to engage in self-defense.

17        The regulation at issue here denies

18   Mr. Nastri the tools to defend himself in state

19   parks.  We'd ask that you issue a preliminary

20   injunction enjoining its enforcement and restore to

21   Mr. Nastri the means to avoid becoming a victim of a

22   crime in a place where law enforcement can't prevent

23   it.  Thank you, Your Honor.

24        THE COURT:  Thank you.

25        MR. HOLZMAN:  Good afternoon, Your Honor.

```
1    Unless the Court has a preference, I was planning on
2    just starting at the top if that's okay.
3              THE COURT:  That's fine.
4              MR. HOLZMAN:  So, Your Honor, we're asking
5    the Court deny plaintiff's motion for a preliminary
6    injunction and preserve the status quo in this case.
7    We have worked pretty hard to give the Court a full
8    historical and factual record that it needs to decide
9    these issues.  This firearm restriction is more than
10   a century old and it's part of the essential
11   character of our parks and forests.
12             The plaintiff hasn't shown any of the
13   requirements necessary to get a preliminary
14   injunction.  He hasn't shown that he has a right to
15   carry in these locations.  The restriction is well
16   supported by the history and tradition of firearm
17   regulation in this country and he hasn't come
18   anywhere close to meeting his burden of showing the
19   equities weigh in his favor.
20             If I can address a couple preliminary issues,
21   Your Honor.  The burden that the plaintiff has to
22   carry on the likelihood of success prong, it is the
23   higher burden because this is something that would
24   upset rather than preserve the status quo.  So it is
25   a mandatory injunction.
```

1          Colonel Lewis has testified today as well as

2    in his declaration about certain affirmative actions

3    that would likely be taken, as has Tom Tyler as well.

4    So but in any event, Your Honor, it would be subject

5    to the higher standard for the independent reason

6    that it seeks to enjoin government action and that's

7    this Court's -- Your Honor's decision in *Lawrence &*

8    *Memorial Hospital* which is 986 F. Supp 2d 124 at page

9    131.

10          And the other preliminary point, Your Honor,

11   is that this claim is a facia challenge.  That's how

12   he's framed it in his complaint, in his motion, in

13   his reply brief.  He acknowledges that he's seeking

14   to enjoin this regulation as to all state parks and

15   forests, and moreover, this is a pre-enforcement

16   claim which means that it has to be a facia claim and

17   the Eleventh Circuit addressed that in the

18   *GeorgiaCarry I* decision which we cite which is 687

19   F.3d 1244 at 1260.  So in other words, he bears the

20   extraordinary burden of showing that in all of its

21   applications, this regulation is unconstitutional and

22   he hasn't met that burden.

23          Turning to prong one of *Bruen*, Your Honor,

24   first of all, plaintiff acknowledges on page 3 of his

25   reply brief that it his burden of showing that the

Second Amendment covers the proposed course of
conduct, but he doesn't really do anything at all to
meet that burden.  He basically just says that he
wants to carry in public for self-defense which *Bruen*
concludes is covered conduct.  That's completely
insufficient to meet his burden, Your Honor, because,
first of all, it misstates what the conduct at issue
even is.  The conduct isn't carrying in public for
self-defense because you can do that in Connecticut.
General Statute 29-28b permits you to engage in that
conduct.

        This regulation, all it applies to is a
specific discrete locations that plaintiff himself
has testified that he goes only for recreational
purposes.  And I would point the Court to what Judge
Posner wrote in *Moore v. Madigan* which is that when a
state bans guns merely in particular places, a person
can preserve an undiminished right of self-defense by
not entering those places.

        So in *Bruen*, it was a completely different
case because that case involved a jurisdiction-wide
ban and so the issue in front of the Supreme Court
was whether the Second Amendment covered a general
right to carry in public.

        Here, the Court -- the question before this

1     Court is very different.  The question here is

2     whether it covers the specific act of bringing guns

3     into these locations, namely state parks and forests,

4     and that raises a number of different considerations

5     that *Bruen* had no occasion to address in that case,

6     namely the distinction between when the government is

7     acting as a proprietor rather than as a regulator and

8     also sensitive places.  And I don't -- we set out

9     these points in our brief, Your Honor.

10          THE COURT:  So are you arguing that the state

11    can ban firearms, carrying of firearms on any

12    property it owns or manages?

13          MR. HOLZMAN:  No.  We're not arguing that it

14    can ban firearms on any property.  I wouldn't be

15    making this argument in the context of a state-owned

16    road, for example, because that would be a

17    thoroughfare that would probably implicate *Bruen's*

18    conclusion that you have a right to carry in public

19    generally because if you can't carry on the road, you

20    wouldn't be able to bring it out of the house.

21          THE COURT:  So what's your limiting principle

22    on what kind of government property the state could

23    ban firearms on?

24          MR. HOLZMAN:  So the limiting principle is

25    when there's a historical tradition of a public use

1    that this type of land has been dedicated for that is

2    inconsistent with the carrying of firearms, and so

3    that principle has been applied in a number of

4    contexts, in particular the First Amendment context

5    where the Supreme Court has said that in that limited

6    type of circumstance, the state has the same property

7    rights as private owners do to regulate the conduct

8    on their property which -- even if the conduct might

9    otherwise be constitutionally protected, and that's

10   *Greer v. Spock* as well where the Court upheld a ban

11   on distributing political leaflets of public property

12   because it was owned by the United States Army and

13   traditionally it hadn't been dedicated for that type

14   of public use.

15        THE COURT:  So if legislative assemblies and

16   courthouses and polling places and so forth which

17   serve very specific functions are permitted without

18   challenge here to prohibit firearms, what is your

19   argument that parks that can be used for all sorts of

20   things from quiet hikes to political rallies?  How do

21   you -- what's the issue that defines a park as a

22   category of sensitive place given this variety of

23   things that happen in a park?

24        MR. HOLZMAN:  So just to be clear, the

25   proprietary argument, Your Honor, that's different

from sensitive places.  So those are two different

reasons why the conduct would not be protected.  But

the reason that parks are sensitive places, Your

Honor, is -- so what the courts have recognized after

*Heller* identified sensitive places as a place where

firearms could be prohibited was that it essentially

depends on, to use the words of *United States v.*

*Class,* which is a D.C. Circuit decision that we cite

in our brief, places are sensitive because of the

people found there or the activities that take place

there.

　　　　　And we've found a number of cases, Your

Honor, that have held that public parks that serve

similar functions are sensitive places.  If you look

at *Nordyke I*, which is a Ninth Circuit decision, 563

F.3d at 460, it upheld a prohibition county-owned

parks and recreation areas and said that they were

sensitive places because they were gathering places

where high numbers of people might congregate, they

host high numbers of events, and they, therefore,

quote, Fit comfortably in the definition of sensitive

places.

　　　　　THE COURT:  But aren't those cases largely

pre-*Bruen*?

　　　　　MR. HOLZMAN:  So those sensitive places cases

1    are pre-*Bruen,* but *Bruen* doesn't do anything to limit

2    or abrogate the sensitive places analysis.  If

3    anything, *Bruen* expands it because was it does is,

4    first of all, it adds those two additional examples

5    of sensitive places.  I think it adds polling places

6    and legislative offices.  But then it has the

7    explicit language where it encourages quotes -- to

8    identify, quote, New and analogous sensitive places,

9    and that's at page 2133 in *Bruen.*

10           THE COURT:  So that leaves us out of *Bruen,*

11   right?

12           MR. HOLZMAN:  No.  I don't think so.  I think

13   it's perfectly acceptable for the Court to rely on

14   the pre-*Bruen* cases that analyze sensitive places and

15   those cases have concluded that these types of parks

16   are sensitive places because of the events held

17   there, the children that go there, schools, high

18   gatherings, crowds of people.

19           THE COURT:  What do you do about the Statute

20   of Northampton that you rely on that *Bruen* did not?

21           MR. HOLZMAN:  That's prong two, Your Honor.

22   So sensitive places is -- just to be clear, *Bruen*

23   wasn't clear about whether sensitive places are prong

24   one or prong two.  We think it's more properly

25   recognized as a prong one issue as the D.C. Circuit

1    concluded in Class.

2         But -- so we can talk about prong two, Your

3    Honor.  So the Statute of Northampton in 1328, so it

4    generally prohibits -- and I'm paraphrasing here, but

5    it prohibits people from going armed and it uses

6    fairs and markets.  So the Supreme Court didn't find

7    it persuasive in *Bruen* because the law at issue in

8    *Bruen* was completely different.  The law at issue in

9    *Bruen* was a general jurisdiction-wide prohibition on

10   carrying in public absent a showing of an

11   individualized need.

12        So when you engage in the historical analysis

13   that *Bruen* requires which is the -- it requires you

14   to look at how the regular -- how burdensome the

15   regulation was, and number two, what was the

16   justification for it when you're looking at whether

17   it's similar.  Given how different the law at issue

18   in *Bruen* is, how *Bruen* treated the historical

19   evidence in that case really doesn't have any bearing

20   at all in this case because of how different the law

21   is in this case, and so the quote, unquote, how and

22   why analysis under *Bruen* is going to come out

23   completely different.

24        And so that's exactly why the D.C. -- the

25   district court in *Frey v. Nigrelli* when -- similar to

 1    this case -- it did have restrictions that were

 2    cabined to specific locations, that it was on public

 3    transportation, it was in Times Square and parks as

 4    well, but they stayed that part of the analysis

 5    because of the pending *Antonyuk* decision.  But that

 6    Court relied on the Statute of Northampton as well as

 7    the Virginia and North Carolina laws from 1786 and

 8    1792, the ones that basically adopt the Statute of

 9    Northampton and kind of codify it into their law.

10         The Court said about those laws in that

11    context that it shows a historical tradition of

12    banning firearms in locations where large groups of

13    people are congregated for commercial, social and

14    cultural activities, and that's page 149 of the *Frey*

15    decision.

16         And so that shows that when you're looking at

17    a historical comparison involving very different

18    laws, one of which is cabined to a specific location,

19    how significant the historical evidence is, it's

20    completely different.  And Professor Cornell

21    testified in person just yesterday about the Statute

22    of Northampton and those two statutes and conclude

23    that they provided strong evidence that these park

24    regulations, even though they were very, very

25    different, that it's part of this overarching history

1     of the state regulating firearms in discrete

2     locations where large people gather for education and

3     social and cultural purposes.

4          And that's shown also if you go -- and I want

5     to get to the park stuff in a second, Your Honor, but

6     if you look beyond those Founding Era North Carolina,

7     Virginia laws and you start going into antebellum

8     which at this point we have the urbanization that

9     starts taking place, more and more people start

10    flocking to cities, Professor Young and Professor

11    Glazer testified about that dynamic in their

12    affidavits in this case, you get more and more states

13    banning firearms in all kinds of locations that are

14    similar to that.

15         So you've got Louisiana and ballrooms.

16    You've got 1869 Tennessee and fairs, race courses,

17    other public assemblies; 1870 Texas, places where any

18    public gathering -- has this very broad language of

19    any public gathering.  And then you keep going on --

20    and these are all in evidence, Your Honor.  These are

21    Exhibits 82 through 88.

22         And so if you just go based on that tradition

23    alone, that in and of itself would arguably justify

24    DEEP's park firearm restriction in this case because

25    similar to those, they are used for social and

 1    education purpose.  I mean, we have in Mr. Tyler's
 2    declaration, he talks about the large crowds, 17
 3    million people visited in 2022, and it's only going
 4    up.  You have a substantial portion are children and
 5    families at paragraph 57 of his declaration.  Schools
 6    use them all the time as places to go on field trips
 7    and for educational purposes, he talks about that at
 8    length at paragraph 58 where he lays out all the
 9    bussing permits that had been granted last year, the
10    hundreds of them, and the different kinds of programs
11    that are specifically tailored towards children and
12    families.
13         THE COURT:  The cases that you were talking
14    about before, the pre-*Bruen* cases, aren't those cases
15    focused on the function of those places as opposed to
16    any historical analog for permitting that kind of
17    regulation?
18         MR. HOLZMAN:  The sensitive places cases,
19    Your Honor?  Yes, that's correct, but I think that's
20    how that analysis should go under *Bruen*.  I think all
21    that *Bruen* did was determine that there is a
22    historical tradition of regulating firearms in
23    sensitive places.  The only question is it a
24    sensitive places.  And so you look at the facts and
25    characteristics about those locations and that's what

1    allows you to determine whether it's sufficiently

2    similar to be considered a sensitive place and that's

3    how those cases very frequently had done it, Your

4    Honor, and there's nothing in *Bruen* that calls that

5    analysis into question.

6         And there's good reason for that also, Your

7    Honor, because if it was based entirely on a

8    historical analysis, the sensitive places and the

9    historical analog under prong two, they would

10   basically merge and be indistinguishable, but *Bruen*

11   recognizes them as distinct concepts and so that's

12   how they should be treated.

13        All right.  So I talked about some of the

14   older Statute of Northampton and the public gathering

15   laws going all the way up through the Reconstruction

16   Era.  So with respect to parks, Your Honor, so they

17   emerge kind of right in the middle of that for the

18   first time in around 1858 and the record in this case

19   establishes that they were completely new and

20   different.  That's what the record shows.  It was --

21   to use Professor Young's words in paragraph 10 of his

22   declaration, "The American park movement launched in

23   the 1850s."

24        I mean, these were places, they were

25   basically viewed as kind of these sanctuary-type

1  places.  They were supposed to be serene where people

2  could go for peace and quiet enjoyment and escape

3  from city life.  There had been no places in

4  existence prior to that.

5          They -- so this is exactly the kind of

6  unprecedented societal concern that *Bruen* is talking

7  and that requires a more nuanced approach from this

8  Court when conducting prong two and what that means

9  is that when you have a context for prohibiting

10  firearms that didn't exist at the founding, the Court

11  can substantially broaden the types of historical

12  evidence that it will consider sufficient.

13          And so I already talked about the Statute of

14  Northampton and the old Texas statutes and how they

15  would encompass this situation, but this Court can

16  view them even more broadly, so even more compelling

17  examples of historical analogs.  And so after Olmsted

18  opened New York Central Park in 1858 which is ten

19  years before the Fourteenth Amendment, you have these

20  low -- they were local issues, and so local

21  governments, for the most part, had control over them

22  and they were -- and so they were predominantly the

23  ones that imposed these firearm restrictions, but as

24  we've shown, as these parks emerged, the firearms

25  restrictions followed and that's what Professor

1    Cornell testified to clearly in his declaration and

2    in his testimony yesterday and we've submitted more

3    than 60 of them, Your Honor.  They're Exhibits 1

4    through 69.  There's a few additional ones in there

5    from cities at various points.

6         So between 1858 and 1886, you have 11 cities

7    that had banned guns in their parks, some of the most

8    populous cities in the country, and Professor Cornell

9    lays that out in his declaration.  By 1900, we've got

10   regulations that cover -- as parks were expanding and

11   popping up in more and more places, we have

12   regulations in more than 60 cities across almost two

13   dozen states.

14        As I mentioned, these were primarily local

15   issues, but, Your Honor, but I want to point out that

16   in 1868 which is the year the Fourteenth Amendment

17   was adopted, and this is Exhibit 3, the Pennsylvania

18   state legislature passed a statute that prohibited

19   the firearms in Fairmount Park.  So there you have a

20   situation where the restriction wasn't local; it was

21   state imposed.  You had elected representatives from

22   the entire state that had all agreed that there

23   shouldn't be any firearms in those parks.

24        And I want to talk about the local -- I think

25   counsel made an argument that they should basically

be disregarded because they were imposed by local
government bodies rather than states.  I just
mentioned there was one state right at the time the
Fourteenth Amendment was adopted, but there's nothing
wrong at all with considering local restrictions, and
again, *Frey v. Negrelli*, it upheld a restriction
based entirely on local restrictions and it's
important to keep in mind when looking in this
particular case in this park movement that these
local state actors were operating in full view of
their legislatures.

So often you had these local commissions that
were established with legislative approval, so
they're acting pursuant to legislative authority.
That was the case in New York and that was the case
in Connecticut as well.  And these parks were -- I
mean, they were incredibly well-known and
influential.  I mean, it was -- as Professor Young
testified, it was a movement and it was expensive.
They had to find the money for it.  So the state
governments, everybody knew what was going on.  They
were all well aware of it and they all acquiesced and
agreed with those restrictions.

And then in early 1900s, as Young testifies
in his declaration, paragraph 38, it starts to get

 1   widespread enough where states actually start getting

 2   involved.  So there we see Minnesota banning guns in

 3   all of its parks in 1905, Wisconsin in 1917, and

 4   these are all in our exhibits, Your Honor.

 5   Connecticut did it in 1918; North Carolina 1921.

 6        So national parks, same trend, Your Honor.

 7   1897, they were banned in Yellowstone.  A bunch of

 8   other individual parks followed and eventually they

 9   were banned -- as soon as they had a national body to

10   impose a nationwide regulatory scheme, they were

11   banned nationally in 1936.

12        And the last point I want to say on that,

13   Your Honor, is that nobody challenged these.  Nobody

14   disputed the constitutional authority of the state to

15   impose these restrictions.  We have more than

16   150 years that passed since Olmstead opened -- or

17   designed and New York City opened Central Park and

18   there were no challenges.  The federal nationwide ban

19   was in place for 70 years from 1936 to 2010, and

20   what's interesting about that actually, Your Honor,

21   is that in 2008 when Congress went to repeal that ban

22   to allow the individual states to determine whether

23   you can carry firearms in their respective national

24   parks, that repeal was challenged in court and far

25   from suggesting that the repeal was constitutionally

 1   required, the Court actually enjoined it and

 2   prohibited them from repealing the nationwide firearm

 3   ban and that's the *Brady v. Salizar* ban and we cite

 4   that in footnote four of our brief.

 5          So taking it back to *Bruen*, Your Honor, that

 6   is very, very strong evidence because if you look at

 7   *Bruen*, and I'm talking about page 2133, it's talking

 8   about sensitive places and historical analysis and it

 9   says that it acknowledges that there was relatively

10   few records from the 18th and 19th century about

11   sensitive places, but then stated that since we are

12   aware of no disputes regarding the lawfulness of such

13   prohibitions, we therefore can assume it settled, end

14   quote, that such prohibitions are valid.  So the

15   absence of a dispute can be strong evidence that

16   everybody knew and believed and nobody questioned the

17   constitutionality of that kind of regulation and so

18   that exact same logic applies in this case.

19          Sorry.  I'm jumping around a little bit, Your

20   Honor.  I think we're getting a little short of time.

21   So the other thing I just wanted to emphasize with

22   some -- I wanted to emphasize here is the

23   restrictions on hunting that we submitted, Your

24   Honor, those restrictions go all the way back from

25   the Founding Era through reconstruction and we

 1    submitted laws from five states from 1721

 2    through 1869 and those hunting laws, I think, provide

 3    a completely independent basis for affirming this

 4    regulation under prong two of *Bruen* because a number

 5    of those restrictions, they basically prohibit

 6    carrying on lands that are not your own and in woods

 7    or other enclosed lands without the land owner's

 8    permission and that would certainly encompass -- even

 9    though the state owned kind of lands at that time,

10    that would encompass them if they had.  I mean, it's

11    lands not their own and they prohibited carrying in

12    the case of the New Jersey and Louisiana laws.

13            And so that's comparable to this case because

14    one of the original justifications of Connecticut's

15    ban of firearms in state parks and forests is that it

16    assists in the conservation goals and regulating

17    poaching and the proper hunting, and Professor Glazer

18    testified about that in paragraph 15 of her

19    declaration.  And Tom Tyler and Colonel Lewis also

20    testify about how that restriction that remains in

21    place continues to serve that purpose and that's

22    Mr. Tyler's declaration at paragraph 89 and Lewis at

23    paragraph 18.

24            So the last thing I wanted to just mention

25    about that -- about prong two of *Bruen*, Your Honor,

 1    before I move on is just that -- and the Court

 2    mentioned this earlier -- *Bruen* made very clear that

 3    the standard that it was announcing wasn't intended

 4    to be a regulatory straightjacket and it leaves room

 5    for numerous kinds of firearm restrictions, Your

 6    Honor, and I do not see -- based on the record that

 7    we've presented, I don't see how this Court could

 8    enjoin this century-old law in this preliminary

 9    posture without saying that *Bruen* essentially imposes

10    a regulatory straightjacket.

11          That's not what *Bruen* is and it stills leaves

12    room for regulation that is supported by history and

13    tradition and we're asking the Court to recognize

14    that in this case.

15          So with respect to balance of the equities,

16    Your Honor, I don't have a ton to say beyond what's

17    in our brief, but I did just want to highlight a

18    couple of things.  So on the one hand, Your Honor, if

19    you're looking at the harm that the plaintiff would

20    sustain in this case if the injunction were denied

21    and the case were allowed to proceed to trial , the

22    harm would not be substantial because these are not

23    restrictions that impose upon his general right to

24    carry in public.  These are places that he goes

25    voluntarily.

1          As Judge Posner said, when locational

2    restrictions are cabined to schools, for example, it

3    doesn't impede on the right of self-defense because

4    you can simply avoid it easily and fully exercise

5    your right of self-defense simply by not going there.

6    And so that's relevant to that and that's -- and

7    Judge Posner made that observation with respect to

8    schools which are more, I guess you would say,

9    essential to everyday life, whereas here, this is

10   purely a recreational location.

11          So at the very least what we have, Your

12   Honor, is that even if the plaintiff were to prevail

13   at a full trial, the most harm that would befall him

14   is that he'd be temporarily unable to carry arms in

15   these parks when he goes hiking or whatever, engages

16   in whatever recreational activity he's engaging in,

17   but that harm pales in comparison to the harm the

18   state would sustain if this Court were to enjoin this

19   century=old regulation on this preliminary basis.

20          First of all, Your Honor, I mean, it's just

21   true as a matter of law that when the state is

22   enjoined from enforcing its laws, that's considered

23   irreparable harm and that is especially true where it

24   implicates the state's public safety interests which

25   certainly this law does here.  And what has to be

noted is that we are in May now, Your Honor.  We have
summertime approaching when a lot of these locations
and parks reach their peak capacity, you have people
flocking to the beaches and to Sleeping Giant and
hiking trails, and enjoining this at this stage, it
would be a big problem and it wouldn't leave DEEP or
EnCon with sufficient time to plan for it to make the
necessary changes they would need to make to
accommodate a right to carry.

        And so I guess the point that I want to
emphasize, Your Honor, is that this isn't a new
restriction.  This has been in place for 100 years.
And when that happens, you have all these other
things that develop around it in reliance on that
restriction being in place.  And so when you simply
remove it and join it on a preliminary basis, it's
going to cause all kinds of collateral damage to
other people and other areas of law.

        So for example, Mr. Tyler testified about
that it was likely that if there was a right to
carry, DEEP would have to make changes to other
aspects of law including the regulation that
prohibits alcohol or that -- sorry, that permits
alcohol in most locations.  There may have to be some
new regulation about safe storage or any enumerable

     1    other safety restrictions that would have to
     2    accompany a general right to carry in these 142 state
     3    parks and forests.  And so --
     4         THE COURT:  I think in the time remaining, we
     5    should give Mr. Atkinson a chance to respond to all
     6    of your arguments.  Is there anything that you feel
     7    compelled to bring up that's new?
     8         MR. HOLZMAN:  You're asking me, Your Honor?
     9         THE COURT:  I am.
    10         MR. HOLZMAN:  No, Your Honor.  I'll just end
    11    by saying that we'd ask that the plaintiff's motion
    12    be denied.  He'll have an opportunity to prove his
    13    case at trial, but he's not entitled to the
    14    preliminary relief that he's seeking.  Thank you.
    15         THE COURT:  Thank you.
    16         All right.  Mr. Atkinson.
    17         MR. ATKINSON:  Thank you, Your Honor.  I only
    18    have a few points in rebuttal.
    19         First, *Bruen* specifically rejected the highly
    20    populated area rational as a basis for justifying a
    21    restriction on carry.  With respect to the textual
    22    right established by the combination of *Bruen*,
    23    *McDonald* and *Heller*, our understanding is it didn't
    24    cabin us to forcing plaintiffs like Mr. Nastri to
    25    find a textual right to carry just in state parks or

 1      something of that or specific places.  The Second

 2      Amendment's plain text as recognized by *Heller* and

 3      *Bruen* and *McDonald* is a general right to carry in

 4      public.  We have testimony from Colonel Lewis that

 5      the parks are generally open to the public within

 6      their normal business hours.  They are a public

 7      place.  It is the definition of public.

 8              With respect to pre-*Bruen* cases, we would

 9      sound a cautionary trumpet or a tuba if necessary.

10      All of those cases were typically interest-balancing

11      cases either down a strict scrutiny line or an

12      intermediate scrutiny line.  *Bruen* forbids the

13      interest balancing.  As I said earlier, this is a

14      case that demands an independent historical analysis

15      under *Bruen*.

16              With respect to English history and the

17      Statute of Northampton in particular, *Bruen* rejected

18      the -- or cautioned courts against the use of English

19      history that wasn't adopted in the colonies in the

20      Founding Era.  My understanding of the record before

21      the Court is we only have two states or two colonies

22      that adopted some version of the Statute of

23      Northampton in some fashion or another.  Two simply

24      isn't enough to establish the well-established and

25      representative historical analog required by *Bruen*.

1        And I believe that's all I have, Your Honor.

2   Thank you.

3        THE COURT:  All right.  I want to thank

4   counsel for your tour de force in taking -- in

5   developing a record in the area of the sensitive

6   places in part but all the other arguments that

7   you've made that means that the hard work that you've

8   done is over for the time being; it's now mine.  All

9   right.  I thank you very much and we will stand in

10  recess.

11        (Proceedings adjourned, 4:52 p.m.)

12

13            C E R T I F I C A T E

14

15        RE:  DAVID J. NASTRI v. KATIE DYKES
                No. 3:23-cv-00056-JBA

16

17        I hereby certify that the within and

18  foregoing is a true and accurate transcript taken in

19  the aforementioned matter to the best of my skill and

20  ability.

21

22            /s/ Corinne T. Thomas

23            CORINNE T. THOMAS, RPR
               Official Court Reporter
24          United States District Court
                141 Church Street
25          New Haven, Connecticut 06510
                 (203) 809-0848