# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

MARYLAND SHALL ISSUE, INC.,
ENGAGE ARMAMENT, LLC,
ANDREW RAYMOND,
CARLOS RABANALES,
BRANDON FERRELL,
DERYCK WEAVER,
JOSHUA EDGAR,
I.C.E. FIREARMS & DEFENSIVE
TRAINING, LLC,
RONALD DAVID,
NANCY DAVID and
ELIYAHU SHEMONY,

Civil Action No. TDC-21-1736

Plaintiffs,

v.

MONTGOMERY COUNTY, MARYLAND,

Defendant.

## MEMORANDUM OPINION

Plaintiffs Maryland Shall Issue, Inc. ("MSI"), Engage Armament, LLC, I.C.E. Firearms &

Defensive Training, LLC, and eight individuals ("the Individual Plaintiffs") have filed suit against

Defendant Montgomery County, Maryland ("the County") challenging recent amendments to

Chapter 57 of the Montgomery County Code ("Chapter 57"), which imposes regulations and

restrictions relating to the possession and use of weapons in the County. Presently pending before

the Court is Plaintiffs' Motion for a Temporary Restraining Order and a Preliminary Injunction,

which is fully briefed. On February 6, 2023, the Court held a hearing on the Motion. For the

reasons set forth below, the Motion will be DENIED.

## BACKGROUND

Prior relevant factual background and procedural history is set forth in the Court's February 7, 2022 Memorandum Opinion on Plaintiffs' Motion to Sever and Remand All State Law Claims and to Hold in Abeyance, and the Court's May 5, 2023 Memorandum Opinion on the County's Motion to Remand Counts I, II, and III and Stay Counts IV through VIII, which are incorporated by reference. *Md. Shall Issue, Inc. v. Montgomery Cnty.*, No. TDC-21-1736, 2022 WL 375461 (D. Md. Feb. 7, 2022) ("*MSI I*"); *Md. Shall Issue, Inc. v. Montgomery Cnty.*, No. TDC-21-1736, 2023 WL 3276497 (D. Md. May 5, 2023). Additional facts and procedural history are provided below as necessary.

On May 28, 2021, Plaintiffs filed the original Complaint in this case in the Circuit Court for Montgomery County, Maryland ("the Circuit Court") challenging Bill No. 4-21, a provision to amend Chapter 57 that was passed by the Montgomery County Council in April 2021. Among other amendments, Bill No. 4-21 added provisions to regulate ghost guns, undetectable guns, 3D-printed guns, and major components of such guns. Bill No. 4-21 also expanded the definition of "place of public assembly," which identifies locations at which it is unlawful to "sell, transfer, possess, or transport" firearms. Montgomery Cnty. Code, § 57-11(a) (2022); Bill No. 4-21 at 4, Second Am. Compl. ("SAC") Ex. A, ECF No. 49-1. While the prior definition consisted of a specific list of locations, including a "government owned park," a "place of worship," an "elementary or secondary school," a "public library," a "government-owned or -operated recreational facility," and a "multipurpose exhibition facility, such as fairgrounds or a conference center," the new definition generally included any "place where the public may assemble, whether the place is publicly or privately owned" and listed as examples "a park; place of worship; school; library; recreational facility; hospital; community health center; long-term facility; or multi-

2

purpose exhibition facility." Bill No. 4-21 at 4–5.  Bill No. 4-21 also expanded the area at or near

a place of public assembly in which firearm possession is restricted to include areas "within 100

yards of a place of public assembly." *Id.* at 4.

Plaintiffs alleged four counts, numbered as follows:  (I) that by expanding the "place of

public assembly" definition, the County exceeded its authority under Article XI-E of the Maryland

Constitution to enact local laws; (II) that Bill No. 4-21's amendments are inconsistent with and

preempted by existing state law, in violation of the Maryland Express Powers Act, Md. Code Ann.,

Local Gov't § 10–206 (LexisNexis 2013); (III) that Bill No. 4-21 violates the Takings Clause of

the Maryland Constitution, Md. Const. art. III, § 40 ("the Maryland Takings Clause"), and the Due

Process Clause in Article 24 of the Maryland Declaration of Rights ("the Maryland Due Process

Clause") by depriving gun owners of property without legal process or compensation; and (IV)

that Bill No. 4-21's definitions of "place of public assembly," "ghost gun," "major component,"

and other terms are unconstitutionally vague, in violation of the Maryland Due Process Clause and

the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

On July 12, 2021, the County removed the case to this Court.  On February 7, 2022, the

Court granted in part and denied in part Plaintiffs' Motion to Sever and Remand in that it severed

and remanded the state law claims in Counts I–III to the Circuit Court and stayed Count IV.  *MSI

I*, 2022 WL 375461, at *6.  On June 23, 2022, the United States Supreme Court issued its opinion

in *New York State Rifle and Pistol Association v. Bruen,* 142 S. Ct. 2111 (2022), which found

unconstitutional a New York statute requiring a showing of a special need to obtain a license to

carry firearms.  *Id.* at 2122.  On July 22, 2022, Plaintiffs filed a First Amended Complaint in the

Circuit Court, which added Count V, a claim in which they alleged that, in light of *Bruen*, the

provisions of Section 57-11 of the Montgomery County Code ("Section 57-11") restricting the

carrying of firearms in places of public assembly violate the Second Amendment to the United

States Constitution. On August 8, 2022, the County removed the First Amended Complaint to this

Court, which was docketed as Civil Action No. 22-1967. On September 1, 2022, this Court

consolidated that newly removed case with the original case, No. 21-1736, which remained with

this Court for resolution of the federal claim.

On November 15, 2022, in response to *Bruen*, the Montgomery County Council passed

Bill No. 21-22E, signed into law by the County Executive on November 28, 2022, which further

amended Chapter 57's firearm restrictions that were the subject of the original Complaint. As

relevant here, Bill No. 21-22E returned the definition of a "place of public assembly" to an

enumerated list of facilities, which now consists of:

> (1) a publicly or privately owned (A) park; (B) place of worship; (C) school; (D)
> library; (E) recreational facility; (F) hospital; (G) community health center,
> including any health care facility or community-based program licensed by the
> Maryland Department of Health; (H) long-term facility; including any licensed
> nursing home, group home, or care home; (I) multipurpose exhibition facility,
> such as a fairgrounds or conference center; or (J) childcare facility.
>
> (2) government building, including any place owned by or under the control of the
> County;
>
> (3) polling place;
>
> (4) courthouse;
>
> (5) legislative assembly; or
>
> (6) a gathering of individuals to collectively express their constitutional right to
> protest or assemble.

Bill No. 21-22E at 3–4, SAC Ex. B, ECF No. 49-2; Montgomery Cnty. Code § 57-1. A "place of

public assembly" includes "all property associated with the place, such as a parking lot or grounds

of a building." Bill No. 21-22E at 4; Montgomery Cnty. Code § 57-1. Bill No. 21-22E retained

Bill No. 4-21's provision restricting firearm possession within 100 yards of a "place of public assembly," such that the present prohibition contained in Section 57-11 states that:

> (a) In or within 100 yards of a place of public assembly, a person must not:
>
> > (1) sell, transfer, possess, or transport a ghost gun, undetectable gun, handgun, rifle, or shotgun, or ammunition or major component for these firearms; or
> >
> > (2) sell, transfer, possess, or transport a firearm created through a 3D printing process.

Montgomery Cnty. Code § 57-11(a).

In light of *Bruen*'s holding that state firearm permits generally must be issued without requiring a showing of "special need," *see Bruen*, 142 S. Ct. at 2138, which effectively invalidated Maryland's prior permit regime which required applicants to make such a showing, *see* Md. Code Ann., Pub. Safety § 5–306(a)(6)(ii) (LexisNexis 2018), Bill No. 21-22E also removed a provision that had previously exempted from the prohibition on firearm possession within 100 yards of a "place of public assembly" "the possession of a handgun by a person who has received a permit to carry the handgun under State law." Bill No. 21-22E at 5. The effective date of Bill No. 21-22E was November 28, 2022.

On November 29, 2022, Plaintiffs filed a Second Amended Complaint in the present case to add challenges to the provisions of Bill No. 21-22E. Generally, Counts I, II, and III continue to assert the same state law claims as in the earlier complaints, consisting of challenges under the Maryland Constitution, the Express Powers Act, and the Maryland Takings Clause and Maryland Due Process Clause, respectively, but they have been expanded to apply also to the provisions of Bill No. 21-22E. Count IV of the Second Amended Complaint asserts that certain terms used in Chapter 57's definition of "place of public assembly," including the terms "library," "recreational facility," "community health center," "school," "park," and "long-term facility" are

unconstitutionally vague in violation of the federal and state constitutional rights to due process of law. Count V alleges that the restrictions relating to "major components" of firearms violate due process rights because they are arbitrary, irrational, and fail to serve a legitimate governmental objective. Count VI asserts that certain provisions in Bill No. 4-21 and Bill No. 21-22E that restrict activities relating to firearms in the presence of a minor or in locations accessible to minors violate the due process rights of parents of minor children to care for their children and to instruct them in the safe use and handling of firearms and components, in violation of the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights. Count VII alleges that the restrictions in Bill No. 4-21 and Bill No. 21-22E, particularly those prohibiting the carrying of firearms in or near places of public assembly, unconstitutionally infringe on the Second Amendment right to armed self-defense in public as articulated in *Bruen*. Finally, Count VIII asserts that the restrictions on ghost guns and privately made firearms and components infringe on Plaintiffs' Second Amendment rights.

## DISCUSSION

Plaintiffs have now filed a Motion for a Temporary Restraining Order and a Preliminary Injunction in which they request that the County be preliminarily enjoined from enforcing the ban on handgun possession at or within 100 yards of a place of public assembly against individuals who have been issued permits to carry a handgun by the Maryland State Police, specifically, as to the prohibition on carrying a handgun within 100 yards of a private school, public institution of higher education, childcare facility, place of worship, library, park, recreational facility, multipurpose exhibition facility, hospital, community health center, or long-term facility. Plaintiffs assert that in light of *Bruen*, these provisions violate their Second Amendment right to

6

carry a firearm in public for self-defense purposes, and that they face an imminent likelihood of irreparable harm in the absence of a preliminary injunction.

In opposing the Motion, the County argues that (1) Plaintiffs lack standing to assert their claims; (2) Plaintiffs have not demonstrated a likelihood of success on the merits of their claim that the prohibition on carrying a firearm at or within 100 yards of a place of public assembly, as set forth in Section 57-11 as amended by Bill No. 4-21 and Bill No. 21-22E, violates the Second Amendment; (3) Plaintiffs will not suffer irreparable harm if the Court does not issue an injunction; and (4) the balance of equities and the public interest are not in Plaintiffs' favor.

In considering the Motion, the Court construes all of the identified "places of public assembly" to be locations modified by that term itself. Specifically, while Plaintiffs argue that Section 57-11 prohibits the carrying of a firearm in purely private locations because a backyard pool could be construed as a "recreational facility," or an in-house library at Engage Armament LLC or a room with books in a private home could be construed as a "library," the Court disagrees. Based on the plain language of Bill No. 21-22E and Section 57-11, all identified locations, even those that are privately owned, necessarily are modified by the term "place of public assembly," so privately owned libraries, recreational facilities, and other locations referenced in the definition of "place of public assembly" meet the definition only if they are actually open to members of the public. The Court therefore need not and does not address the claim that Section 57-11 infringes on the right to armed self-defense by prohibiting carrying firearms in such purely private locations, or that it is unconstitutionally vague because it arguably could include such locations.

## I.      Legal Standard

To obtain a preliminary injunction, moving parties must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary

relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011). A moving party must satisfy each requirement as articulated. *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013). Because a preliminary injunction is "an extraordinary remedy," it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

## II.    Standing

As a threshold matter, the County argues that Plaintiffs lack standing to assert their claims primarily because they have not shown that there is a sufficiently "credible threat of imminent prosecution." Opp'n Mot. Preliminary Inj. ("Opp'n") at 10, ECF No. 59-2. Because Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies," plaintiffs in federal civil actions must demonstrate standing to assert their claims. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The "irreducible constitutional minimum" requirements of standing consist of three elements: (1) the plaintiff must have suffered an "injury in fact"; (2) the injury must be fairly traceable to the actions of the defendant; and (3) it must be "likely" that the injury will be "redressed by a favorable decision." *Id.* at 560–61 (citations omitted). An injury in fact must be "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). Standing must be established for each claim and form of relief sought. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). For purposes of the Motion, the claims at issue are the Second Amendment claims asserted in Count VII. When there are multiple plaintiffs, the Court need only determine that there is at least one plaintiff with standing

8

for a particular claim in order to consider the claim. *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017).

In asserting a concrete injury necessary to establish standing to assert the Second Amendment claims in Count VII, Plaintiffs allege that because most of the Individual Plaintiffs have Maryland firearm permits and regularly travel to, or come within 100 yards of, one or more of the "places of public assembly" while carrying a firearm, they face a risk of prosecution during such activities, in violation of their Second Amendment right to carry a firearm for self-defense. The County, however, argues that there is no injury in fact because Plaintiffs have not demonstrated a likelihood that they would actually be prosecuted for carrying a firearm in or within 100 yards of a place of public assembly.

A plaintiff may challenge the prospective operation of a statute when there is "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). When challenging a criminal statute, it is not necessary that the plaintiff first be exposed "to actual arrest or prosecution to be entitled to challenge [the] statute" that the plaintiff "claims deters the exercise of . . . constitutional rights." *Id.* (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)). A plaintiff can satisfy the injury-in-fact requirement by alleging "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt*, 442 U.S. at 298.

The County argues that there is no credible threat of prosecution because Plaintiffs have not actually been threatened with prosecution, and they have not established that anyone else has been prosecuted for violations of the amendments to Section 57-11. Although courts have found

9

standing when there was an actual threat of prosecution, they have not required such a threat. *See,*
*e.g., Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (finding standing to challenge a criminal
trespass law as violating First Amendment rights where the plaintiff was warned that he would
likely be prosecuted if he continued to distribute handbills at a shopping center). Rather, in
*Babbitt*, the Supreme Court held only that "[w]hen plaintiffs do not claim that they have ever been
threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely
possible" they have failed to "allege a dispute susceptible to resolution by a federal court." *Babbitt*,
442 U.S. at 298-99. Thus, a plaintiff whose prosecution is at least "remotely possible," and whose
fear of prosecution is not "imaginary or speculative," can demonstrate a credible threat of
prosecution. *Id.*

In *Virginia v. American Booksellers Association, Inc.*, 484 U.S. 383 (1988), several
organizations of booksellers brought a First Amendment challenge to a Virginia law prohibiting
the commercial display of sexually explicit material that is "harmful to juveniles." *Id.* at 386. The
Supreme Court held that the booksellers established an injury in fact for purposes of standing even
in the absence of any specific threat to prosecute the plaintiffs or anyone else, because the Virginia
law was aimed directly at the booksellers, and they would either have to take significant and costly
compliance measures or risk criminal prosecution. *Id.* at 392. Moreover, where the state
government did not suggest that the newly enacted law would not be enforced, the plaintiffs had a
"well-founded fear that the law will be enforced against them." *Id.* at 393.

Likewise, the firearm restrictions in Section 57-11 relating to places of public assembly are
plainly targeted at gun owners who, like Plaintiffs, must either forgo the asserted constitutional
right to carry a firearm in such locations or risk criminal prosecution. Plaintiffs have stated that
their past conduct would violate the present version of Section 57-11 and have expressed a concrete

intention to continue to engage in conduct that would violate Section 57-11. *Cf. Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 218 (4th Cir. 2020) (finding a lack of a credible threat of prosecution where the state had not threatened prosecution, there was no evidence of the law being enforced as feared, *and* the plaintiffs had not alleged any "concrete intention" to take actions to violate the law at issue). Notably, at the hearing on the Motion, counsel for the County declined to commit to refraining from prosecuting Plaintiffs or others for violations of these restrictions. Indeed, the County has not explained why it would enact firearms laws such as Section 57-11 if it does not intend to enforce them. Where, as in *American Booksellers Association*, the Individual Plaintiffs have alleged that in the course of their regular activities they will take actions that would violate Section 57-11, and the relevant governmental authority has not disavowed prosecuting them for such a violation, Plaintiffs have sufficiently alleged "an actual and well-founded fear that the law will be enforced against them" and thus an imminent, impending injury based on a reasonable fear of prosecution. *See Am. Booksellers Ass'n*, 484 U.S. at 393.

The County, however, has also argued that Plaintiffs have not alleged sufficient facts to assert standing for the Second Amendment challenges to firearm restrictions relating to specific categories of places of public assembly. Because, as discussed below, the challenge to a particular location category requires a different legal analysis, the Court construes each such challenge to be a separate claim for which standing must be established. *DaimlerChrysler Corp.*, 547 U.S. at 352. Indeed, courts considering similar Second Amendment challenges to firearm restrictions on specific sensitive places or places of public assembly have conducted a standing analysis relating to each specific location category. *See Antonyuk v. Hochul*, No. 22-0986(GTS/CFH), 2022 WL 16744700, at *11–*37 (N.D.N.Y. Nov. 7, 2022); *Koons v. Platkin*, No. 22-7463(RMB/AMD), 2023 WL 3478604, at *44–*48 (D.N.J. May 16, 2023). Considering the categories of places of

11

public assembly referenced in Chapter 57-11, Plaintiffs have specifically alleged facts demonstrating that an Individual Plaintiff would regularly carry a firearm in some of the identified locations in the future, which in turn supports standing to challenge the restriction on carrying at or near those locations.

As to private schools and public libraries, the Second Amended Complaint alleges that Plaintiff Eliyahu Shemony regularly carries a firearm with him and intends to continue doing so while "going to and inside a public library" and while "picking up minor children at their private school." SAC ¶ 74. As to places of worship, MSI members David Sussman and Allan Barall submitted declarations stating that they serve as volunteer armed security personnel for their synagogues and that they previously obtained Maryland permits to carry a firearm in order to provide such security. As to places of worship, recreational facilities, and multipurpose exhibition facilities, the Second Amended Complaint alleges that Plaintiff Ronald David regularly carries a firearm with him and intends to continue doing so while at his place of worship, recreational facilities, and fairgrounds, which are part of the definition of "multipurpose exhibition facility." SAC ¶ 72. Although these allegations do not identify the specific locations that David intends to visit, for purposes of the Motion the Court finds them sufficient. Based on multiple allegations that certain Plaintiffs regularly travel within 100 yards of a "place of public assembly," they have also alleged facts sufficient to challenge the part of the definition of "place of public assembly" that includes such a buffer zone.

In contrast, however, the Court finds that Plaintiffs have failed to allege facts demonstrating standing to challenge the firearm restrictions relating to public institutions of higher education, such as colleges and universities. The Second Amended Complaint lacks allegations that any Plaintiff intends to visit a college or university in Montgomery County while carrying a firearm.

12

Plaintiffs therefore have failed to allege an injury in fact sufficient to challenge the application of Section 57-11 to institutions of higher education. Likewise, the allegations are insufficient to establish standing to challenge restrictions on private libraries. While the Second Amended Complaint references libraries on multiple occasions, and on some occasions specifically references public libraries, it does not assert that a Plaintiff regularly carries a firearm in a privately owned library, by name or otherwise. Where public libraries are prevalent in Montgomery County, and Plaintiffs have not even identified any specific private library in Montgomery County, much less one regularly visited by a Plaintiff, the Court will not stretch the general allegations relating to libraries beyond the breaking point to establish an injury in fact relating to carrying firearms in a private library. The Court therefore finds that Plaintiffs have not established standing to challenge the restriction on carrying firearms in private libraries.

As to public and private parks, David asserts that he regularly carries a loaded firearm with him "at a park within the County" and intends to continue to do so. SAC ¶ 72. Neither this allegation nor any other allegations in the Second Amended Complaint identifies any particular park, and while some allegations specifically reference public parks, none asserts that a Plaintiff regularly carries a firearm in a privately owned park, by name or otherwise. Where the term "park" ordinarily refers to public parks, which are prevalent in Montgomery County, and Plaintiffs have not even identified any specific private park in Montgomery County, much less one regularly visited by a Plaintiff, the Court will not unreasonably stretch the general allegations relating to parks to establish an injury in fact relating to carrying firearms in a private park, particularly when the analysis relating to private parks differs from that relating to public parks to the point that it effectively relates to a different claim. *See infra* Part III.E. The Court therefore finds that Plaintiffs

13

have established standing to challenge the restrictions on carrying firearms in public parks, but not those relating to private parks.

As to hospitals, community health centers, and long-term care facilities such as a "licensed nursing home, group home, or care home," Bill No. 21-22E at 3-4, there are no allegations that a Plaintiff regularly visits or intends to visit a hospital or other identified health care facility while carrying a firearm. Indeed, there are no references of any kind in the Second Amended Complaint to community health centers or facilities licensed by the Maryland Department of Health. *See Antonyuk*, 2022 WL 16744700, at \*23, \*25 (finding a lack of standing to challenge New York firearm restrictions relating to "[t]he location of any program licensed, regulated, certified, operated, or funded by the office for people with developmental disabilities" and relating to "[r]esidential settings licensed, certified, regulated, funded, or operated by the department of health"). While the Second Amended Complaint generally references visits to "health care facilities" and mentions travel near facilities for "assisted living," *e.g.*, SAC ¶¶ 59, 62, Plaintiffs do not identify any specific facilities, and the Court does not construe these general terms to fall within the categories referenced in Bill No. 21-22E, which consist of licensed community health centers or the equivalent and long-term care facilities akin to licensed nursing homes, group homes, or care homes, not assisted living facilities which typically do not involve communal living and do not necessarily include the provision of health care. *See Koons*, 2023 WL 3478604, at \*47 (finding that allegations that the plaintiffs frequented certain specific types of health care facilities did not establish standing to challenge firearm restrictions relating to numerous other types of health care facilities). Accordingly, the Court finds that Plaintiffs have not provided sufficient allegations to establish standing to challenge the restrictions on carrying firearms at these types of facilities.

14

The Second Amended Complaint contains a single reference to a hospital: Plaintiff Carlos Rabanales alleges that he carries a loaded firearm and intends to continue doing so on his daily commute to work, during which he passes within 100 yards of a hospital, and that there is no practical way for him to avoid coming within 100 yards of a hospital during his commute. Rabanales does not identify the hospital at issue and does not allege that he has carried or will likely carry a firearm into a hospital. This allegation arguably could establish that Rabanales faces a concrete injury relating to the prohibition on carrying firearms within a 100-yard buffer zone around a "place of public assembly," Montgomery Cnty. Code § 57-11, but it does not support standing to challenge the bar on carrying a firearm inside a hospital itself and thus could not provide a basis to support an injunction against enforcement of that ban. Nevertheless, because Rabanales's potential injury from the 100-yard buffer zone may indirectly derive from the bar on carrying a firearm in a hospital, the Court will address the likelihood of success on the merits of the challenge to that provision as implicated by proximity to a hospital.

As for the remaining requirements for standing, Plaintiffs have sufficiently alleged that the injury is fairly traceable to the actions of the County, in the form of potential prosecution by the County, and that the injury would be redressable through the injunctive relief sought. The Court therefore finds standing as to the Second Amendment claims relating to the prohibitions on carrying a firearm at a private school, a childcare facility, a place of worship, a public park, a recreational facility or multipurpose exhibition facility, a public library, and within 100 yards of any place of public assembly. Montgomery Cnty. Code § 57-11. It does not find standing as to the claims relating to the rest of the identified locations.

15

### III.   Likelihood of Success on the Merits

The first requirement for a preliminary injunction is that the moving party demonstrate a likelihood of success on the merits of its claims, which for purposes of the Motion, and based on the Court's findings relating to standing, consist of the Second Amendment challenge to the prohibition on Maryland firearm permit holders carrying a firearm in the following "places of public assembly":  a private school, a childcare facility, a place of worship, a public park, a recreational facility or multipurpose exhibition facility, a public library, and within 100 yards of a place of public assembly.  The Court will analyze each of these categories separately.

### A.   Legal Standards

In *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court held that the Second Amendment protects "an individual's right to carry a handgun for self-defense outside the home."  *Id.* at 2122.  However, "the right secured by the Second Amendment is not unlimited."  *Id.* at 2128 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)).

In *Bruen*, the Supreme Court considered the two-step test that Courts of Appeals had generally adopted for assessing Second Amendment claims after *District of Columbia v. Heller*, 554 U.S. 570 (2008).  At the first step, the Government could justify a firearm regulation by showing that the challenged law regulates activity outside the scope of the Second Amendment right as originally understood, and if it successfully does so, "then the analysis can stop there; the regulated activity is categorically unprotected."  *Bruen*, 142 S. Ct. at 2126.  At the second step, courts engaged in a means-end analysis, applying either strict or intermediate scrutiny to assess whether the governmental interest underlying the law justified the restriction.  *Id.*

16

The *Bruen* Court generally reaffirmed the first step by stating that it "is broadly consistent with *Heller*," but it rejected the means-end second step. *Id.* at 2127. It then adopted a Second Amendment test of considering, first, whether the "Second Amendment's plain text covers an individual's conduct," and if so, "the Constitution presumptively protects that conduct." *Id.* at 2129–30. Notably, the Supreme Court identified certain "sensitive places," including schools, government buildings, legislative assembles, polling places, and courthouses, for which it is "settled" that "arms carrying could be prohibited consistent with the Second Amendment," even in the absence of a significant historical record from the 1700s or 1800s of such restrictions. *Id.* at 2133. If the regulation covers Second Amendment conduct, rather than engaging in a means-end inquiry, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. This historical inquiry considers whether there is "historical precedent" from before, during, and after the enactment of the Second Amendment that "evinces a comparable tradition of regulation" in the same manner as the present day restriction. *Id.* at 2131–32.

Present-day firearm regulations that were "unimaginable at the founding," such as those that relate to "unprecedented societal concerns or dramatic technological changes," may still be upheld as consistent with the historical tradition of firearm regulation based on "reasoning by analogy." *Id.* at 2130, 2132. The Supreme Court stated that two primary metrics are relevant for determining whether such a modern regulation is "relevantly similar" to a historical regulation: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33. "[C]entral" to this inquiry is "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* "[A]nalogical reasoning under the Second Amendment is neither a regulatory

17

straightjacket nor a regulatory blank check." *Id.* at 2133. Although "courts should not 'uphold

every modern law that remotely resembles a historical analogue,' . . . analogical reasoning requires

only that the government identify a well-established and representative historical *analogue*, not a

historical *twin*." *Id.* (quoting *Drummond v. Robinson*, 9 F.4th 217, 226 (3d Cir. 2021)). "So even

if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous

enough to pass constitutional muster." *Id.*

In addressing the types of historical sources to be considered when analyzing this second

prong in relation to a state law restriction on firearms, the Supreme Court "acknowledge[d] that

there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing

understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when

defining its scope." *Id.* at 2138. However, the Court declined to take a position on this issue and

thus left open the question whether courts may consider only historical sources from the time

period of the ratification of the Second Amendment in 1791, or whether they may, and perhaps

should primarily consider, historical sources from the time period of the ratification of the

Fourteenth Amendment in 1868, at which point the protections of the Second Amendment became

applicable to state firearm restrictions. *Id.*

Upon consideration of this issue, the Court concludes that historical sources from the time

period of the ratification of the Fourteenth Amendment are equally if not more probative of the

scope of the Second Amendment's right to bear arms as applied to the states by the Fourteenth

Amendment. "[T]he Second Amendment[] originally applied only to the Federal Government."

*McDonald v. City of Chicago*, 561 U.S. 742, 754 (2010). Indeed, in 1833, the Supreme Court so

held and rejected the proposition that the first eight constitutional amendments operated as

limitations on the States. *See Barron ex rel. Tiernan v. Mayor of Balt.*, 32 U.S. (7 Pet.) 243, 250–

18

51 (1833). However, after the ratification of the Fourteenth Amendment, the Court "eventually incorporated almost all of the provisions of the Bill of Rights" as applying to the States. *McDonald*, 561 U.S. at 764. In *McDonald*, the Supreme Court held that the Fourteenth Amendment makes the Second Amendment right to keep and bear arms fully applicable to the States. *Id.* at 750. Thus, as the *Bruen* Court noted, "[s]trictly speaking," states are "bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." *Bruen*, 142 S. Ct. at 2137.

Relying in part on this point, the United States Court of Appeals for the Eleventh Circuit recently held that "[h]istorical sources from the Reconstruction Era are more probative of the Second Amendment's scope than those from the Founding Era" when considering state law firearm restrictions. *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1322 (11th Cir. 2023). The court reasoned that "because the Fourteenth Amendment is what caused the Second Amendment to apply to the States, the Reconstruction Era understanding of the right to bear arms—that is, the understanding that prevailed when the States adopted the Fourteenth Amendment—is what matters." *Id.* This conclusion is necessary "to be faithful to the principle that '[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*,'" because "it makes no sense to suggest that the States would have bound themselves to an understanding of the Bill of Rights—including that of the Second Amendment—that they did not share when they ratified the Fourteenth Amendment." *Id.* at 1323–24 (quoting *Bruen*, 142 S. Ct. at 2136). The Court agrees with the Eleventh Circuit's reasoning and will consider historical sources from the time period of the ratification of the Fourteenth Amendment.

**B.    Schools**

Plaintiffs challenge certain aspects of Section 57-11's prohibition on the carrying of firearms at "schools" within the County.  Montgomery Cnty. Code §§ 57-1, 57-11.  Where the Supreme Court has specifically deemed "schools" and "government buildings" to be "sensitive places" at which the carrying of firearms could be prohibited consistent with the Second Amendment, *Bruen*, 142 S. Ct. at 2133, Plaintiffs do not challenge the restriction relating to public elementary and secondary schools.  Rather, they assert that private schools or public institutions of higher education are not "sensitive places" under *Bruen*, such that to the extent that the firearm restrictions relating to schools apply to those locations, they are barred by the Second Amendment.

The Court finds that Plaintiffs' challenge on this point is unlikely to succeed.  *Bruen* did not distinguish between public schools and private schools or limit the term "schools" based on the age of the students.  *See Bruen*, 142 S. Ct. at 2133.  Nor did *Heller*, which first designated "schools" as "sensitive places" for purposes of the Second Amendment.  *Heller*, 554 U.S. at 626. Particularly where public school education was not mandatory in a single state until 1852 or throughout the country until 1918, *see* Michael S. Katz, *A History of Compulsory Education Laws* 5 (Donald W. Robinson ed. 1976), to limit schools deemed to be "sensitive places" to public schools is likely inconsistent with the relevant history that underlies Second Amendment analysis. Where no distinction between different kinds of schools exists in *Bruen*, and where Plaintiffs have pointed to no authority warranting such a distinction, the Court declines to create one and finds that Plaintiffs are unlikely to succeed on their challenge to Section 57-11's restriction on the carrying of firearms in "schools" as applied to private schools.  *Cf. Antonyuk*, 2022 WL 16744700, at *68 (finding that restrictions on carrying arms in nursery schools and preschools were permissible in light of historical analogues to laws forbidding arms in schools).

20

As for public institutions of higher education, as discussed above, Plaintiffs lack standing to challenge the restriction as applied to such institutions. *See supra* part II. Even if the Court were to consider the merits of this issue, it would also find that Plaintiffs are unlikely to succeed on the merits because *Bruen* made no distinction among schools based on the age of the students, a restriction relating to a public college is analogous to the undisputedly lawful prohibitions on carrying firearms at public elementary or secondary schools, and the only institutions of higher education in the County—Montgomery College and the Universities at Shady Grove, which is part the University System of Maryland—are public institutions consisting of government buildings which are themselves "sensitive places" under *Bruen* and *Heller*. *Bruen*, 142 S. Ct. at 2133; *Heller*, 554 U.S. at 626. Finally, as discussed below, restrictions on carrying firearms in such an institution are also consistent with the historical tradition of firearm regulations in places of learning. *See infra* part III.F.

## C.    Childcare Facilities

Although childcare facilities are not listed among the "sensitive places" identified in *Bruen*, the Court finds that they are properly deemed to be sensitive places because they are analogous to schools. In *Bruen*, the Supreme Court instructed that "courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Bruen*, 142 S. Ct. at 2133. Although childcare facilities likely did not exist in any significant numbers at the time of the ratification of the Second and Fourteenth Amendments, the facilities are sufficiently analogous to schools to be deemed sensitive places for purposes of Second Amendment analysis. First, the burden imposed on the right to self-defense is the same between prohibitions on carrying firearms into schools and prohibitions on carrying arms into childcare facilities. Second, the

21

burdens are comparably justified, because schools, like childcare facilities, are tasked with providing education and socialization to attendees, purposes furthered by prohibitions on bringing firearms into those locations. Moreover, prohibitions on firearms in both schools and childcare facilities are meant to protect the same or similar vulnerable populations, consisting of students and children. Indeed, childcare facilities often provide care for school-age children immediately before or after the school day, or they provide care for children below school age. Under these circumstances, the Court finds that childcare facilities are "sensitive places" by analogy to schools, such that restrictions on carrying firearms in childcare facilities are consistent with the Second Amendment. *See Antonyuk*, 2022 WL 16744700, at *68 (finding that restrictions on carrying arms in nursery schools and preschools were permissible in light of historical analogues to laws forbidding arms in schools). Plaintiffs are therefore unlikely to succeed on the merits of their challenge to Section 57-11 as it relates to childcare facilities.

### D.     Places of Worship

Plaintiffs are not likely to succeed on the merits of their claim that the County's restriction on carrying a firearm at a place of worship violates the Second Amendment. The historical record in the years following the ratification of the Fourteenth Amendment, as presented by the County, demonstrates a well-established and representative number of statutes that prohibited firearms in places of worship.

For example, in 1870, only two years after the ratification, Georgia enacted an amendment to the Georgia Penal Code that prohibited a person from carrying "any dirk, bowie-knife, pistol or revolver, or any kind of deadly weapon" to "any . . . place of public worship." 1870 Ga. Acts & Resolutions, tit. XVI, § 1, Opp'n Ex. 18, ECF No. 59-22. Also in 1870, Texas enacted a statute that prohibited any person from going "into any church or religious assembly" while having "about

22

his person . . . fire-arms, whether known as a six shooter, gun or pistol of any kind." 1870 Tex.

Gen. Laws, ch. XLVI, § 1, Opp'n Ex. 21, ECF No. 59-25. In 1875, Missouri prohibited individuals

from "go[ing] into any church or place where people have assembled for religious worship" while

"having upon or about his person any kind of fire arms." 1875 Missouri Gen. and Local Laws at

50, § 1, Opp'n Ex. 23, ECF No. 59-27. In 1878, Virginia prohibited "carrying any gun, pistol . . .

or other dangerous weapon" to "any place of worship while a meeting for religious purposes is

being held at such place." 1878 Va. Acts and Joint Resolutions, ch. VII, § 21, Opp'n Ex. 24, ECF

No. 59-28. In 1889, the Territory of Arizona prohibited the carrying in "any church or religious

assembly" of "a pistol or other firearm." 1889 Ariz. Session Laws of the Fifteenth Legislative

Assembly of the Territory of Arizona at 17, § 3, ECF No. 59-38. In 1890, in Columbia, Missouri,

an ordinance was adopted which prohibited any person who enters "any church, or place where

people have assembled for religious worship" from carrying "any fire arms or other deadly or

dangerous weapon." 1890 Columbia, Mo. Gen. Ordinances, ch. XV11, § 163, Opp'n Ex. 35, ECF

No. 59-39. In 1890, the Territory of Oklahoma banned the carrying of a "pistol" or "revolver," or

certain other dangerous weapons, "into any church or religious assembly." 1890 Okla. Statutes,

art. 47, §§ 1–2, 7, ECF No. 59-40. Finally, in 1894, the City of Huntsville, Missouri prohibited

the carrying of "any kind of fire-arms" into "any church or place where people have assembled for

religious worship." 1894 Huntsville, Mo. Revised Ordinances at 58–59, § 1, Opp'n Ex. 42, ECF

No. 59-46.

These historical statutes and ordinances demonstrate that there is "historical precedent"

from the time period of the ratification of the Fourteenth Amendment that "evinces a comparable

tradition of regulation" of firearms at places of worship. *Bruen*, 142 S. Ct. at 2131–32. Where the

historical record provides a strong basis upon which to conclude that Section 57-11's bar on

carrying a firearm in a place of worship is "consistent with the Nation's historical tradition of firearm regulation," *id.* at 2130, the Court finds that Plaintiffs are not likely to succeed on the merits of their Second Amendment claim relating to the carrying of firearms in places of worship.

### E.    Public Parks, Recreational Facilities, and Multipurpose Exhibition Facilities

In considering Plaintiffs' challenge to Section 57-11's restrictions on carrying firearms in public parks, recreational facilities, and multipurpose exhibition facilities, the Court finds that the historical record provided by the County demonstrates a history of restricting firearm possession and carrying in public parks and at locations where large numbers of people engaged in recreation.

As to public parks, numerous historical statutes and ordinances from the time period before and following the ratification of the Fourteenth Amendment imposed such restrictions in relation to parks. First, during that time period, numerous local governments similarly situated to Montgomery County, in states all over the United States, prohibited firearms in parks. These restrictions included prohibitions on carrying firearms in parks in major American cities, such as an 1857 ordinance stating that "[a]ll persons are forbidden . . . [t]o carry firearms or to throw stones or other missiles" within Central Park in New York City, *see* First Annual Report on the Improvement of the Central Park, New York at 106 (1857), Opp'n Ex. 13, ECF No. 59-17; an 1870 law enacted by the Commonwealth of Pennsylvania stating that "[n]o persons shall carry fire-arms" in Fairmount Park in Philadelphia, Pennsylvania, *see* Acts of Assembly Relating to Fairmount Park at 18, § 21.II (1870), Opp'n Ex. 20, ECF No. 59-24; an 1895 Michigan state law providing that "No person shall fire or discharge any gun or pistol or carry firearms, or throw stones or other missiles" within a park in the City of Detroit, *see* 1895 Mich. Local Acts at 596, § 44, Opp'n Ex. 43, ECF No. 59-47; and a 1905 ordinance in Chicago, Illinois stating that "all persons are forbidden to carry firearms or to throw stones or other missiles within any of the Parks

24

. . . of the City," 1905 Chi. Revised Mun. Code, ch. XLV, art. I, § 1562, Opp'n Ex. 49, ECF No.

59-53. Similar restrictions were enacted to bar the carrying of firearms in (1) Saint Paul,

Minnesota, *see* Annual Reports of the City Officers and City Boards of the City of Saint Paul at

689 (1888), Opp'n Ex. 32, ECF No. 59-36; (2) Williamsport, Pennsylvania, *see* 1891

Williamsport, Pa. Laws and Ordinances at 141, § 1, Opp'n Ex. 37, ECF No. 59-41; (3) Wilmington,

Delaware, *see* 1893 Wilmington, Del. Charter, Part VII, § 7, Opp'n Ex. 39, ECF No. 59-43; (4)

Reading, Pennsylvania, *see* A Digest of the Laws and Ordinances for the Government of the

Municipal Corporation of the City of Reading, Pennsylvania at 240, § 20(8) (1897), Opp'n Ex. 44,

ECF No. 59-48; (5) Boulder, Colorado, *see* 1899 Boulder, Colo. Revised Ordinances at 157, §

511, Opp'n Ex. 45, ECF No. 59-49; (6) Trenton, New Jersey, *see* 1903 Trenton, N.J. Charter and

Ordinances at 390, Opp'n Ex. 48, ECF No. 59-52; (7) Phoenixville, Pennsylvania, *see* A Digest of

the Ordinances of Town Council of the Borough of Phoenixville at 135, § 1 (1906), Opp'n Ex. 52,

ECF No. 59-56; (8) Oakland, California, *see* 1909 Oakland, Cal. Gen. Mun. Ordinances at 15, §

9, Opp'n Ex. 53, ECF No. 59-57; (9) Staunton, Virginia, *see* 1910 Staunton, Va. Code, ch. II, §

135, Opp'n Ex. 54, ECF No. 59-58; and (10) Birmingham, Alabama, *see* 1917 Birmingham, Ala.

Code, ch. XLIV, § 1544, Opp'n Ex. 55, ECF No. 59-59.

On a state level, in 1905, Minnesota prohibited the possession of firearms within state parks

unless they were unloaded and sealed by a park commissioner. 1905 Minn. Laws, ch. 344, § 53,

Opp'n Ex. 50, ECF No. 59-54. In 1917, Wisconsin prohibited bringing a "gun or rifle" into any

"wild life refuge, state park, or state fish hatchery lands" unless it was unloaded and in a carrying

case. 1917 Wis. Sess. Laws, ch. 668, § 29.57(4), Opp'n Ex. 56, ECF No. 59-60. In 1921, North

Carolina enacted a law prohibiting the carrying of firearms in both private and public parks without

the permission of the owner or manager of that park. *See* 1921 N.C. Sess. Laws 53–54, Pub. Laws Extra Sess., ch. 6, §§ 1, 3, Opp'n Ex. 57, ECF No. 59-61.

These laws which, like Section 57-11, categorically bar the carrying of firearms in parks, demonstrate that there is "historical precedent" from before, during, and after the ratification of the Fourteenth Amendment that "evinces a comparable tradition of regulation" of firearms in parks. *See Bruen*, 142 S. Ct. at 2131–32. Although Plaintiffs argue that some of these historical statutes should be discounted because their purpose may have been to protect waterfowl or wildlife, this argument is unpersuasive for two reasons. First, the considerations of "how and why" historical regulations burden rights relating to firearms are applicable not when there is clear historical example of the exact same type of regulation—in this instance, restrictions on carrying firearms in parks—but are instead applicable only when the Court is asked to reason by analogy in order to uphold a new form of restriction that did not exist at the time of the ratification. *See Bruen*, 142 S. Ct. at 2132–33. Second, even if these considerations must be examined, these provisions restrict the carrying of firearms in the exact same way, by barring the carrying of a firearm in a park regardless of what self-defense concerns might exist, and they do so for apparently similar reasons. Though some of the historical statutes may have prohibited firearms from parks in order to protect wildlife and property, many plainly served to advance public safety and the peaceful enjoyment of parks, such as those that also prohibited the throwing of objects in parks, including the laws that applied to parks in densely populated urban areas, such as New York, Philadelphia, Detroit, and Chicago. The Court therefore finds that Plaintiffs are unlikely to succeed on the merits of their challenge to Section 57-11's restriction on carrying firearms in parks in Montgomery County, which is also a densely populated area.

26

As for Section 57-11's restriction on carrying firearms in recreational facilities and multipurpose exhibition facilities, the historical statutes applicable to parks are fairly deemed to be well-established and representative historical analogues because such facilities, like parks, are locations at which large numbers of people gather to engage in recreation. In addition, there are historical statutes and regulations from states and territories that directly restricted the carrying of firearms in recreational facilities and multipurpose exhibition facilities. In the early 1800s, New Orleans, Louisiana prohibited individuals from entering "into a public ballroom with any cane, stick, sword, or any other weapon." General Digest of the Ordinances and Resolutions of the Corporation of New Orleans at 371, art. 1 (1831), Opp'n Ex. 7, ECF No. 59-11. Similarly, in 1852, the Territory of New Mexico prohibited firearms or other deadly weapons at balls or dances. 1852 N.M. Laws at 67–68, § 3, Opp'n Ex. 12, ECF No. 59-16. In 1870, Tennessee prohibited the carrying of a pistol or other "deadly or dangerous weapon" at "any fair, race course, or other public assembly of the people." 1870 Tenn. Acts, ch. XXII, § 2, Opp'n Ex. 17, ECF No. 59-21. In 1870, Texas prohibited firearms, including "a six shooter, gun or pistol of any kind" in "a ball room, social party or other social gathering composed of ladies and gentlemen." 1870 Tex. Gen. Laws, ch. XLVI, § 1. In 1889, the Territory of Arizona banned firearms in any "place where persons are assembled for amusement . . . or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering." 1889 Ariz. Session Laws at 17 § 3. In 1890, the Territory of Oklahoma prohibited arms in any "place where persons are assembled . . . for amusement . . . or any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering." Okla. Statutes, art. 47, § 7 (1890).

Whether viewed as direct historical precedent or historical analogues, these statutes and ordinances demonstrate a historical tradition of restricting the carrying of firearms in places where

27

individuals gather for recreation or social activities such as the recreational facilities and multipurpose exhibition facilities covered by Section 57-11. Because these provisions, like Section 57-11, generally prohibit the carrying of firearms in these locations, with no exception relating to possible self-defense needs, they impose a comparable burden on the right to bear arms as Section 57-11. The reasons for these historical restrictions, which appear to be to protect individuals engaged in these recreational and social activities from confrontations and encounters involving firearms or other dangerous weapons, are comparable to the reason for the prohibitions of Section 57-11, which is to address possible gun violence in or near places of public assembly. *See* Legislative Request Report, Opp'n Ex. 2 at 17, ECF No. 59-6.

Where there is a distinct foundation of historical precedent demonstrating that prohibitions on carrying firearms in public parks, places of recreation, and social gatherings are part of the "Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2130, the Court finds that Plaintiffs are not likely to succeed on the merits of their challenges to Section 57-11's prohibitions on carrying firearms in public parks, recreational facilities, and multipurpose exhibition facilities.

**F.    Public Libraries**

Plaintiffs are also not likely to succeed on the merits of their claim as to public libraries. First, all public libraries in Montgomery County are in government buildings, which are "sensitive places" where arms carrying can be prohibited consistent with the Second Amendment. *Bruen*, 142 S. Ct. 2133. Second, as presented by the County, there is a representative number of historical statutes that demonstrate a historical tradition of firearm regulation in places of gathering for literary or educational purposes, including public libraries.

For example, in 1870, Texas enacted a law prohibiting the carrying of firearms in "any school room or other place where persons are assembled for educational, literary or scientific

28

purposes." 1870 Tex. Gen. Laws, ch. XLVI, § 1. In 1879, Missouri prohibited the carrying on one's person of "any kind of firearms" in "any school room or place where people are assembled for educational, literary or social purposes." 1879 Mo. Revised Statutes, ch. 24, art. II, § 1274, Opp'n Ex. 25, ECF No. 59-29. In 1889, the Territory of Arizona prohibited the carrying of a "pistol or other firearm" into any "place where persons are assembled for . . . educational or scientific purposes." 1889 Ariz. Session Laws at 17, § 3. Similarly, in 1893, the Territory of Oklahoma outlawed bringing a pistol, revolver, or any other instrument manufactured "for the purpose of defense" into any "place where persons are assembled for . . . educational or scientific purposes." 1893 Okla. Statutes, ch. 25, art. 45, § 7, Opp'n Ex. 40, ECF No. 59-44. Finally, in 1903 Montana prohibited the carrying of "a pistol or other firearm" in "any school room or other place where persons are assembled for . . . educational or scientific purposes." 1903 Mont. Gen. Laws, ch. XXXV, § 3, Opp'n Ex. 47, ECF No. 59-51. Based on a straightforward reading of the language of these provisions, they necessarily apply to public libraries. Although the Court has found a lack of standing to challenge firearm restrictions relating to private libraries, the Court notes that none of these laws limits its prohibitions to public facilities where people were assembled for educational, literary, or scientific purposes, so they also demonstrate a historical tradition of firearm regulation in privately operated libraries open to the public.

These historical provisions imposed comparable burdens on the right to bear arms as Section 57-11's restriction on carrying firearms in a library. Where these historical laws apparently were aimed at preventing disruption of educational and literary activities and ensuring safety during those activities, the burdens imposed by them and by Section 57-11 are comparably justified. Accordingly, the Court finds that Plaintiffs are unlikely to succeed on the merits of their challenge to Section 57-11 as to libraries.

Finally, the Court notes that while it has found that Plaintiffs lack standing to challenge to Section 57-11 as applied to public institutions of higher education, to the extent that it were to consider the merits of that challenge, the same historical examples, based on their plain language, encompass restrictions on carrying firearms at such institutions and thus provide a basis to find a lack of a likelihood of success on that claim.

### G.    100-Yard Buffer Zones

Finally, as to all of the specific locations constituting "places of public assembly," Plaintiffs argue that Section 57-11's prohibition on carrying a firearm within 100 yards of a place of public assembly violates the Second Amendment right to bear arms for self-defense. Because the definition of "place of public assembly" includes "all property associated with the place, such as a parking lot or grounds of a building," Bill No. 21-22E at 4; Montgomery Cnty. Code § 57-1, the 100-yard buffer zone necessarily includes land outside the boundary of a parking lot or grounds associated with a school, library, or other place of public assembly.

The historical record provided by the County includes numerous examples of laws prohibiting firearms in buffer zones of a certain distance around a "sensitive place" or other location at which the government could prohibit the carrying of firearms. For example, in the years following the ratification of the Fourteenth Amendment, Maryland prohibited the carrying of a gun or pistol within 300 yards of polling places in Calvert County and in any location on Election Day in Kent County, Queen Anne's County, and Montgomery County. 1886 Md. Laws, ch. 189, § 1 (Calvert County), Opp'n Ex. 30, ECF No. 59-34; 1874 Md. Laws, ch. 250, § 1 (Kent, Queen Anne's, and Montgomery Counties), Opp'n Ex. 22, ECF No. 59-26. Similarly, in 1870, Louisiana prohibited the carrying of any gun, pistol, or other dangerous weapon within "one-half mile of any place of registration" for elections. 1870 La. Acts, No. 100, § 73, Opp'n Ex. 19, ECF

No. 59-23.  In Mississippi, an 1892 law prohibited students from carrying, bringing, receiving, owning, or having a concealed weapon "within two miles" of "any university, college, or school." 1892 Miss. Code Ann. at 327, § 1030, Opp'n Ex. 38, ECF No. 59-42.

Similarly, many municipalities prohibited the carrying of firearms within 50 or 100 yards of their parks, squares, or common areas, including:  (1) Philadelphia, Pennsylvania, *see* Acts of Assembly Relating to Fairmount Park at 18, § 21.II (1870) (50 yards); (2) St. Paul, Minnesota, *see* Annual Reports of the City Officers and City Boards of the City of Saint Paul at 689 (1888) (50 yards); (3) Pittsburgh, Pennsylvania, *see* A Digest of the Acts of Assembly Relating to and the General Ordinances of the City of Pittsburgh, from 1804 to Jan. 1, 1897, at 496, § 5 (1893), Opp'n Ex. 41, ECF No. 59-45 (100 yards); (4) Reading, Pennsylvania, *see* A Digest of the Laws and Ordinances for the Government of the Municipal Corporation of the City of Reading, Pennsylvania at 240, § 20(8) (1897) (50 yards); and (5) Trenton, New Jersey, *see* 1903 Trenton, N.J. Charter and Ordinances at 390 (50 yards).  There is thus a historical tradition of firearm regulation consisting of restrictions on carrying a firearm within a certain reasonable buffer zone around "sensitive places" and other locations at which firearms could be restricted.

Plaintiffs argue that these historical buffer zone laws are not relevantly similar historical analogues because they were not necessarily enacted to restrict the right to self-defense.  In particular, they reference buffer zones around parks, which they argue were enacted to protect wildfowl and other wildlife.  This argument is unpersuasive for two reasons.  First, as noted above, many of the buffer zone statutes cited by the County focused on increasing the restricted area around sensitive places or other places at which the carrying of firearms was prohibited that have nothing to do with hunting, such as those relating to polling places, election registration locations, and schools.  Such restrictions were plainly enacted to further presumptively valid restrictions on

the right to self-defense in the area immediately adjacent to such locations for purposes of public

safety and to allow the activity at issue, such as voting or the education of children, to occur without

concern for violence or other interruption. They are therefore "comparably justified" to Section

57-11's 100-yard buffer zone. *Bruen*, 142 S. Ct. at 2133.

Second, the Court disagrees that the laws restricting the carrying of firearms in parks, and

the corresponding buffer zone provisions, were enacted solely to prevent poaching or hunting.

Where several apply to parks in distinctly urban settings, and many specifically refer to

prohibitions on both carrying a firearm and throwing any projectile or missile without regard to

whether the action endangers birds or wildlife, it is clear that these laws were enacted in whole or

in part to promote public safety and the ability of visitors to use the park for recreation without the

potential for violence or other disturbances. *See, e.g.*, Acts of Assembly Relating to Fairmount

Park (Philadelphia) at 18, § 21.II (1870); Annual Reports of the City Officers and City Boards of

the City of Saint Paul at 689 (1888); A Digest of the Laws and Ordinances for the Government of

the Municipal Corporation of the City of Reading, Pennsylvania at 240, § 20(8) (1897);  1903

Trenton, N.J. Charter and Ordinances at 390. Thus, "why" the buffer zones burden the right to

armed self-defense is similar. *Bruen*, 142 S. Ct. at 2133. Finally, beyond the purpose of the

statutes, these restrictions impose a "comparable burden" in that "how" they burden the right to

armed self-defense is the same. *Id.* Under the plain language of these statutes, individuals were

prohibited from bringing a firearm into a park or carrying one within the identified buffer zone

distance regardless of whether they had any intention to hunt or poach in the park, so they, like

Section 57-11, imposed absolute restrictions on the right to carry a firearm for self-defense in such

areas. Thus, where numerous historical examples of buffer zone statutes exist, and where they

impose the same burden on Second Amendment rights and are comparably justified, the Court

finds that Plaintiffs are unlikely to succeed on the merits of their challenge to Section 57-11's 100-yard buffer zones.

### H. Buffer Zones Near Hospitals

Finally, to the extent that Plaintiffs' argument relating to the buffer zones may include a claim that restrictions on firearms within 100 yards of a hospital fail not because of the existence of a buffer zone, but because of a lack of a basis to restrict firearms from the hospitals on which the buffer zone is based, the Court finds that the County has sufficiently demonstrated a historical basis for such restrictions. While the County has not presented historical examples of specific restrictions on the carrying of firearms at hospitals, that fact is not remarkable, because hospitals did not exist in their modern form at the time of the ratification of the Second or Fourteenth Amendments. As noted in *Bruen*, "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced" historical analysis. *Bruen*, 142 S. Ct. at 2132. It was not until the late nineteenth century, "as society became increasingly industrialized and mobile and as medical practices grew in their sophistication and complexity," that there was a shift from the norm of medical care at home to "the professionalization of health care practices that eventually included the development of a full and competitive commercial market for medical services that increasingly took place in hospitals." Barbra Mann Wall, *History of Hospitals*, Univ. of Pa. School of Nursing, https://www.nursing.upenn.edu/nhhc/nurses-institutions-caring/history-of-hospitals/ (last visited July 5, 2023). "Between 1865 and 1925 in all regions of the United States, hospitals transformed into expensive, modern hospitals of science and technology." *Id.* Thus, hospitals were only beginning to become prevalent at the time of the ratification of the Fourteenth Amendment, developed because of advances in modern medicine, and did not resemble

33

their modern counterparts until the twentieth century. The Court thus considers whether there are historical analogues for firearm regulation at hospitals.

The County has identified historical statutes demonstrating a history of firearm restrictions at locations operated for scientific purposes. For example, in 1870, two years after the ratification of the Fourteenth Amendment, Texas enacted a statute prohibiting the carrying of firearms into "any school room or other place where persons are assembled for educational, literary or scientific purposes." 1870 Tex. Gen. Laws, ch. XLVI, § 1. In 1890, the Territory of Oklahoma prohibited carrying a pistol or firearm into "any school room or other place where persons are assembled for . . . educational or scientific purposes." 1890 Okla. Statutes, ch. 25, art. 47, § 7. In 1901, the Territory of Arizona similarly prohibited carrying a firearm into "any school room, or other place where persons are assembled for . . . educational or scientific purposes." 1901 Arizona Revised Statutes, tit. 11, § 387, Opp'n Ex. 46, ECF No. 59-50. Finally, in 1903, the state of Montana prohibited the carrying of firearms into "any school room or other place where persons are assembled . . . for educational or scientific purposes." 1903 Mont. Gen. Laws, ch. XXXV, § 3. These almost identical laws passed in the years following the ratification of the Fourteenth Amendment imposed bans on the carrying of firearms in both schools and places of scientific activity.

Although not a "historical twin" or a "dead ringer," these statutes can be fairly construed as providing "historical analogue[s]" for Section 57-11's restrictions on the possession of firearms at hospitals. *Bruen*, 142 S. Ct. at 2133. Hospitals are certainly locations at which people are engaged in scientific activities, including medical care. Moreover, specifically as to Montgomery County, most of the hospitals in the County are also involved in teaching or clinical research that constitutes educational or scientific activities, including the National Institutes of Health Clinical

34

Center, which conducts clinical research, *see* Welcome from the Clinical Center, NIH Clinical Center, https://clinicalcenter.nih.gov/welcome.html (last visited June 27, 2023); Suburban Hospital, which is a member of Johns Hopkins Medicine and has a "vibrant and growing research program," *see* Research and Discovery at Suburban Hospital, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/suburban_hospital/research/index.html (last visited June 27, 2023); Walter Reed National Military Medical Center, which engages in medical research, *see* Department of Research Programs, Walter Reed National Military Medical Center, https://walterreed.tricare.mil/About-Us/Department-of-Research-Programs (last visited June 27, 2023); MedStar Montgomery Medical Center, which is engaged in clinical trials and research studies, *see* At a Glance, MedStar Montgomery Medical Center, https://www.medstarhealth.org/-/media/project/mho/medstar/pdf/at-a-glance-flyer_022822.pdf (last visited June 27, 2023) ("Our culture encourages clinicians and associates to test new ideas to improve care and experiences [and] to participate in clinical trials and research studies . . . ."); and Holy Cross Health and Holy Cross Germantown Hospital, which have academic partnerships and a location on Montgomery College's Germantown campus for the purposes of educational training and development, *see* About Us, Holy Cross Health, https://www.holycrosshealth.org/about-us/ (last visited June 27, 2023) ("With a commitment to education, Holy Cross Health has numerous academic partnerships and Holy Cross Germantown Hospital is the first hospital in the nation located on a community college campus to advance educational training and development.").

Where the historical laws generally prohibited firearms at locations used for educational or scientific purposes, they imposed an equal burden on the right to bear arms as does Section 57-11 in relation to these hospitals. They are also "relevantly similar" to Section 57-11 because they all apparently "burden a law-abiding citizen's right to armed self-defense" for the same reason:

providing public safety so as to allow significant scientific activity to be conducted properly and successfully. *Bruen*, 142 S. Ct. at 2132–33. Section 57-11's prohibition of firearms in hospitals is therefore analogous to historical statutes prohibiting arms in locations of scientific activity.

Lastly, the Court notes that some of the hospitals in Montgomery County, such as Walter Reed National Military Medical Center and the National Institutes of Health Clinical Center, are public facilities located in government buildings and therefore also qualify as "sensitive places." *Bruen*, 142 S. Ct. at 2133.

Because there are persuasive arguments that Section 57-11's restriction on carrying firearms at hospitals is consistent with the Nation's historical tradition of firearm regulations, the Court cannot conclude at this early stage that Plaintiffs' challenge to the 100-yard buffer zone restriction as applied to areas within that distance of a hospital is likely to succeed on the merits of that particular claim.

## I.    Sufficiency of the Historical Record

As to all of the locations, in response to the County's arguments based on the historical record it has submitted, Plaintiffs argue that the County has not identified a sufficient number of historical statutes in support of its argument, and that the statutes come from states or territories that encompass a low percentage of the total population of the United States. As to the number of statutes cited, *Bruen* did not establish a minimum threshold for the number of statutes that must be identified as part of the historical analysis to support the conclusion that a present firearm restriction is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. C.t at 2130. Indeed, the Supreme Court has acknowledged that certain locations are properly construed as "sensitive places" at which the carrying of firearms may be prohibited based on only a limited number of historical examples. As to legislative assemblies, identified in *Bruen* as

"sensitive places," the Supreme Court acknowledged that there are "relatively few" relevant historical statutes, *id.* at 2133, and the secondary source upon which it relied includes citations to only two laws, both from the same state. *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 235 (2019). Similarly, the sources cited by the Supreme Court to support the designation of courthouses as "sensitive places" include only two state statutes, one from Georgia and one from Virginia. *See id.* at 246 (Georgia statute); Brief of *Amicus Curiae* the Independent Institute in Support of Petitioners at 12, *Bruen*, 142 S. Ct. 2111 (No. 20-843) (Virginia statute). Under these circumstances, and where the Court's analysis as to many of the "places of public assembly" covered by Section 57-11 is whether they are, or are analogous to, "sensitive places," the Court concludes that the number of statutes and ordinances identified by the County is sufficient.

Moreover, the *Bruen* Court, while discussing the breadth of the historical examples and their reach and disfavoring the historical examples presented in that case that came from territories rather than states, *Bruen*, 142 S. Ct. at 2154–55, did not impose any specific requirement that the historical statutes considered must have applied to a certain number of states or a certain percentage of the relevant population. Notably, its criticism of the limited number of statutes presented and of territorial statutes was based in part on its conclusion that the proffered examples were countered by the weight of historical evidence. Here, the examples from territories merely reinforce and supplement the historical tradition based on laws from the states, and the record does not demonstrate that the examples cited by the County are outliers or contradicted by a more substantial historical record. The only location on which Plaintiffs offer meaningful counterexamples is places of worship, as to which Plaintiffs cited an article referencing pre-Second Amendment laws requiring individuals to carry firearms in places of worship or to public meetings.

*See* Kopel & Greenlee, *supra*, at 233 & n. 108. However, the only specific statutes referenced in that article were from states—Virginia and Georgia—which later changed their laws around the time of the ratification of Fourteenth Amendment to prohibit firearms at places of worship. *See id.* at 249 (stating that "Virginia in 1877 . . . forbade all arms carrying at places of worship where religious meetings were being conducted"); *see supra* part III.D (1870 Georgia statute). Finally, the Court notes that the record lacks any evidence that during the relevant historical time period, restrictions or proposed restrictions on carrying firearms such as those cited by the County were "rejected on constitutional grounds." *Bruen*, 142 S. Ct. at 2131.

Accordingly, the Court finds that Plaintiffs have not established a likelihood of success on the merits of the claims at issue on the Motion.

## IV.     Remaining Factors

Because the Court does not find a likelihood of success on the merits of Plaintiffs' claims relating to the Motion, the Court need not address the remaining factors. *See Pashby*, 709 F.3d at 320. The Court notes that even if they were considered, the remaining factors collectively weigh against a preliminary injunction. As to the likelihood of irreparable harm, Plaintiffs correctly assert that as a legal matter, the denial of a constitutional right, if established, would qualify as irreparable harm. *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) (finding that infringement on a First Amendment right, even for "minimal periods of time, unquestionably constitutes irreparable injury"). However, the likelihood of irreparable harm on this basis is dependent on the likelihood of success on the merits of the claim. *See Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022).

Plaintiffs have not shown that the other asserted forms of irreparable harm are likely to occur. To establish irreparable harm, a plaintiff "must make a 'clear showing' that it will suffer

harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline,*
*LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Direx Israel, Ltd. v.*
*Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)). Though an arrest and conviction
for a felony firearm offense may permanently prevent a plaintiff from possessing a firearm,
Plaintiffs have not shown a likelihood of this outcome. While the Court has found a sufficient
possibility that the County would enforce Chapter 57 to establish standing, Plaintiffs have not
provided any examples of prosecutions against permit holders for possessing a firearm in the
scenarios they have referenced, such as a prosecution for possessing a firearm on a public street or
area that happens to be within 100 yards of a place of public assembly, or for carrying a firearm at
a place of worship with the permission of the leadership of that institution. Nor have they
established that a specific incident of violence for which a firearm would be necessary for self-
defense is imminent or likely.

Even to the extent that the irreparable harm prong could be deemed to be satisfied, the
Court finds that the balance of the equities and the public interest weigh against a preliminary
injunction. When one party is the Government, these two factors merge and are properly
considered together. *Nken v. Holder*, 556 U.S. 418, 435 (2009). *Bruen* expressly prevents a Court
from considering the public interest, including considerations such as the sharp increase in the
number of mass shootings in American communities, in assessing whether a firearm restriction is
unconstitutional under the Second Amendment. *Bruen*, 142 S. Ct. at 2129–30. Whether a
preliminary injunction should be entered relating to the time period before a final determination
on constitutionality is made, however, is a different question for which the public interest must
expressly be considered. *See Winter*, 555 U.S. at 20, 26. Here, the County argues that the
amendments in Bill No. 21-22E serve the public interest of reducing the risk of gun violence in

39

places where vulnerable populations are found and cites statistics demonstrating that deaths from gun violence in 2020 were the highest of any year with recorded data, and that gun violence in the County increased significantly from 2021 to 2022. Opp'n at 42. Thus, there is a public interest in not prematurely enjoining Section 57-11 before a final determination on constitutionality is made.

Although Plaintiffs allege that there is a particular need at the present time for individual members of religious congregations to carry firearms while attending services to protect against attacks based on religious discrimination, Section 57-11 does not prohibit the carrying of firearms by security guards at places of worship, nor does it limit the number of security guards that a place of worship may have. Plaintiffs also have not persuasively demonstrated how the Second Amendment right to armed self-defense extends to a right to act as an armed security guard for private institutions. Thus, in considering the balance of the equities and the public interest, the Court finds that these factors weigh against a preliminary injunction, as the County's interest in protecting public safety warrants permitting the relevant parts of Section 57-11 to remain in effect until a final determination is made on their constitutionality.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion for a Temporary Restraining Order and a Preliminary Injunction, ECF No. 54, will be DENIED. A separate Order shall issue.

Date:   July 6, 2023

THEODORE D. CHUANG
United States District Judge