# Exhibit B

```
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT
 2

 3   _____
                                 )
 4   DAVID NASTRI,               )
                                 ) No. 3:23-cv-00056-JBA
 5              Plaintiff,       )
                                 ) May 10, 2023
 6   v.                          )
                                 ) 10:06 a.m.
 7                               )
     KATIE DYKES,                ) 141 Church Street
 8                               ) New Haven, Connecticut
                Defendant.       )
 9   _____)

10

11          PRELIMINARY INJUNCTION HEARING
                      VOLUME II
12

13   B E F O R E:

14        THE HONORABLE JANET BOND ARTERTON, U.S.D.J.

15

16   A P P E A R A N C E S:

17   For the Plaintiff:

18        ATKINSON LAW, LLC
             122 Litchfield Road
19           P.O. Box 340
             Harwinton, CT 06791
20           (203) 677-0782
             E-mail:  catkinson@atkinsonlawfirm.com
21        BY:  CAMERON LEE ATKINSON, ESQ.

22

23   (Continued)

24
                    Corinne Thomas, RPR
25                 Official Court Reporter
                       (203) 809-0848
```

```
 1   For the Defendant:

 2        OFFICE OF THE ATTORNEY GENERAL
             165 Capitol Avenue
 3           Hartford, CT 06106
             (860) 808-5296
 4           E-mail:  blake.sullivan@ct.gov
                      thadius.bochain@ct.gov
 5                    timothy.holzman@ct.gov
          BY:  BLAKE THOMAS SULLIVAN, ESQ.
 6             THADIUS LATIMER BOCHAIN, ESQ.
               TIMOTHY J. HOLZMAN, ESQ.
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1             I N D E X

2  WITNESS:  DAVID NASTRI                                PAGE

3  Continued Cross Examination by Mr. Bochain            214

4  Redirect Examination by Mr. Atkinson                  221

5  Recross Examination by Mr. Bochain                    235

6

7  WITNESS:  CHRISTOPHER LEWIS                           PAGE

8  Direct Examination by Mr. Atkinson                    240

9  Cross-Examination by Mr. Bochain                      291

10 Redirect Examination by Mr. Atkinson                  332

11 Recross-Examination by Mr. Bochain                    345

12 Further Direct Examination by Mr. Atkinson            348

13 Further Cross-Examination by Mr. Bochain              349

1   A.   Yes.
2   Q.   All right.  And one of the questions he asked
3   was whether you would expect to a see a firearm on a
4   public street.  Do you recall that?
5   A.   Yes.
6   Q.   Can you just explain why you wouldn't expect
7   to see that on a public street, say in Connecticut?
8   A.   Yeah.  So I wouldn't expect to see one
9   because there's not a purpose to have one.  I would
10  not expect to see someone target shooting or hunting
11  on a public street.
12  Q.   And as an average citizen, would you expect
13  to see a firearm in a Connecticut state park, let's
14  say with a handgun or a pistol?
15  A.   No.
16  Q.   And why is that?
17  A.   Because it hasn't been, it's not allowed
18  currently, and it's a state park.
19  Q.   I think I just want to make sure I heard your
20  testimony correctly.  So since you've taken -- you
21  were in charge of EnCon in 2019.  Has EnCon ever
22  received calls about the presence of a firearm in a
23  state park or forest?
24  A.   Yes, we have.
25  Q.   Has EnCon responded to those calls?

1      A.    Yes.
2      Q.    And what would that response look like?
3      A.    We would try to send a minimum of two
4  officers or more if there's more officers available.
5      Q.    You said a minimum of two officers?
6      A.    Yes.
7      Q.    All right.  And you said if more were
8  available, you would send more?
9      A.    Yes.  Until we knew what the situation was.
10     Q.    Okay.  So there's a possibility that you
11 could send more -- when you say -- how many could you
12 send?
13     A.    So on -- say, one sector has four officers
14 working at that time and they're all available, we
15 would send all four.
16     Q.    You would send all four?
17     A.    Yes.
18     Q.    When you say, "sector," what do you mean by
19 "sector"?
20     A.    Each district is divided into two sectors.
21 So we have -- like, for the east, we have a north
22 sector and the south sector, kind of a quarter of the
23 state.
24     Q.    Okay.  And so presently if EnCon received a
25 call about the presence of a firearm, there's a

```
 1   possibility you could send all four officers in one
 2   sector to respond to that call?
 3       A.    Yes.
 4       Q.    Now, in your declaration, I'm going to have
 5   you take a look again, it's page 6 again,
 6   paragraph 16, subparagraph A, the portion -- it's the
 7   second sentence dealing with the risk of conflict
 8   that could be increased.  Do you see that?  It's the
 9   second sentence in subparagraph A.
10       A.    Yes.
11       Q.    All right.  And are there any safety concerns
12   that go along with the risk of conflict?
13       A.    Well, the risk of a firearm being present
14   during a conflict increases the chance that that
15   firearm may be used.
16       Q.    And let's just assume for a second that
17   someone -- you know, someone sees a gun, they make a
18   call to EnCon, how would that -- unpack it a little
19   bit more.  How would that impact EnCon's focus in a
20   particular season?
21       A.    So depending what the officers are focusing
22   on, they're going to be -- even if they're on a call,
23   if it's not a public safety emergency call, like a
24   gun, like a person with a gun, unknown situation,
25   then they'll be pulled from that call and sent to the
```

1   other call.
2       Q.   All right.  So let's talk about the summer
3   for a moment.  And remind me again what the focus for
4   -- let's stick with the marine division for a minute.
5   What's the focus of the marine division or marine
6   sector in the summer?
7       A.   So marine sector, it's the parks, park
8   enforcement, park patrol, boating patrol, and then
9   fisheries enforcement.
10      Q.   And so that's what they're focused on
11  currently in, like, in the summer, right?
12      A.   Yes.
13      Q.   All right.  And so if a call came in about
14  the presence of a gun in the summer, am I hearing you
15  correctly that that could pull perhaps four officers
16  or more from their focus to respond to that one call?
17      A.   Yes.
18      Q.   Now, I believe Attorney Atkinson also asked
19  you some questions about concerns that you might have
20  about proper storage of a firearm.  Do you recall
21  that?
22      A.   Yes.
23      Q.   All right.  And I think he asked you a
24  question about Hammonasset Beach State Park not
25  having facilities for proper storage, correct?

```
 1      A.    Yes.
 2      Q.    All right.  To your knowledge, does any
 3  facility across the state park and forest system have
 4  what you would consider to be adequate facilities for
 5  properly storing a firearm?
 6      A.    No.
 7      Q.    And can you just explain a little bit more
 8  the risks that you see in your current -- based on
 9  your experience about the unattended firearm?  Like,
10  what are those risks that you see?
11      A.    It could be stolen.  It could be picked up by
12  a child, so there's a risk there.  It can be picked
13  up by a good Samaritan who is not familiar with
14  firearms and could have a negligent discharge.
15      Q.    I'm sorry.  What was the last thing you said?
16      A.    Could be picked up by a good Samaritan and if
17  they're not familiar with firearms, they could
18  accidentally discharge it.
19      Q.    Now, Attorney Atkinson also asked you some
20  questions about the conservation and environmental
21  goals that are furthered by this particular
22  regulation that we're talking about.  Do you recall
23  that?
24      A.    Yes.
25      Q.    All right.  Can you just help explain to the
```

```
 1  forests, right?
 2     A.   Correct.
 3          MR. BOCHAIN:  No further question, Your
 4  Honor.
 5          THE COURT:  So this is perhaps a rather naive
 6  question, but you've been describing with respect to
 7  the hunting season, for instance the spring turkey,
 8  where people are authorized to use ten-gauge
 9  shotguns, and my question is:  Are handguns
10  authorized for use for hunting in Connecticut parks
11  and forests?
12          THE WITNESS:  Handgun hunting is only
13  authorized on private land.  Let me correct myself.
14  For small game yes, but for anything else, it's only
15  private lands and it's an additional permit.
16          THE COURT:  So when you say handgun hunting
17  is authorized for small game --
18          THE WITNESS:  Yes.  Small game only.
19          THE COURT:  Small game consists of what?
20          THE WITNESS:  Squirrel, fox, so coyote,
21  rabbit.  And then -- sorry.  Raccoon and possum also.
22  Sorry.  I forgot those two.
23          THE COURT:  So for instance, what kind of
24  hunting would a Glock 42 be authorized for?
25          THE WITNESS:  I don't know what caliber that
```

1  Glock 42 is, but for handgun hunting, it has to be a
2  357, larger for deer on private land.
3          THE COURT:  Three feet what?
4          THE WITNESS:  So if it's for deer hunting, a
5  revolver has -- a pistol revolver deer permit
6  regulation for hunting in Connecticut is private land
7  only and it has to be a 357 or larger caliber.
8          THE COURT:  And do you have in front of you
9  that list by year, it's Exhibit 10, and it's the
10 NIBRS Agency Crime Overview?  Would you put that in
11 front of him?
12         THE WITNESS:  Thank you.
13         THE COURT:  Second from the bottom of each of
14 the pages is something called "weapon law
15 violations."  Do you know what's included in that?
16         THE WITNESS:  So those are other -- so those
17 are other offenses against society.  So that's a
18 stolen handgun, an altered handgun, possession
19 without a permit, those will be -- it's not a crime
20 against a person.  It's not a crime against property.
21 So it would be one of those other.  So possessing a
22 pistol without a permit would be an other weapons law
23 violation or a felon in possession of a handgun or a
24 firearm would be another one.
25         THE COURT:  And would it always involve a

1   firearm of some type or does it include other
2   weapons?
3              THE WITNESS:  It can include other dangerous
4   weapons.  So certain knives, gravity knives,
5   switchblades knives, brass knuckles, those could be
6   included in weapon laws.
7              THE COURT:  So you had some testimony that
8   I'm a little unclear about.  When you get calls
9   regarding firearms, do you or do you not enforce the
10  regulations prohibiting firearms in the parks and
11  forests or do you only give warnings?
12             THE WITNESS:  If we find someone carrying a
13  weapon in the state park, we typically charge
14  them with -- if there's no other extenuating
15  circumstances, it's the 23-4-1c charge of possession
16  with a weapon in a state park.  If there's other
17  issues going on, we may have other charges.
18             THE COURT:  Thank you.  Any questions on my
19  questions?
20             MR. ATKINSON:  I have a few, Your Honor.
21   FURTHER DIRECT EXAMINATION OF CHRISTOPHER LEWIS
22  BY MR. ATKINSON:
23    Q.   Colonel Lewis, on state land in -- on state
24  land, state forests and parks, a person can use a
25  22-caliber rimfire handgun to hunt coyote?

1    A.    Yes.
2          MR. ATKINSON:  No further questions, Your
3    Honor.
4          MR. BOCHAIN:  Just very briefly, Your Honor.
5              FURTHER CROSS-EXAMINATION
6    BY MR. BOCHAIN:
7    Q.    Can you just explain what rimfire means?
8    A.    Rimfire is a type of ammunition where center
9    fire, which the primer is in the center of the case.
10   And then rimfire, the primer is on the rim or outside
11   of the case and the powder is there in a -- it's a
12   smaller, traditionally lower power projectile.  You
13   don't see them much bigger than 22.
14   Q.    So for the small game hunting that we've been
15   discussing, the only thing that's authorized would be
16   22-caliber rimfire hunting, right?
17   A.    For small game?
18   Q.    For small game which we have been referring
19   to.
20   A.    Certain shot sizes and shotguns would be
21   permissible, like a seven or eight shot.
22   Q.    But in terms of handguns?
23   A.    Handguns would just be the 22-caliber or
24   smaller then a 22-caliber.
25   Q.    And again, that's only for certain animal

```
 1  species, right?
 2     A.   Yes, correct.
 3     Q.   And those are less common in terms of what
 4  people would hunt than the other things that we've
 5  discussed, correct?
 6     A.   Correct.
 7     Q.   And so from where people can hunt, that's
 8  only for certain locations within the state parks and
 9  forests, right?
10     A.   Yes.
11     Q.   So it's not the whole state park or forest,
12  right?
13     A.   No.  It will be spelled out and then our
14  website has like a GIS map that actually delineates,
15  you know, the zones that hunting is allowed.
16     Q.   So it's discrete locations?
17     A.   Yes.
18          MR. BOCHAIN:  Nothing further, Your Honor.
19          THE COURT:  So when you say that handguns may
20  be used for hunting only if authorized on private
21  land and you went on to describe the small game, I'm
22  a little confused on what DEEP's jurisdiction is over
23  private land.
24          THE WITNESS:  So for hunting, hunting and
25  fishing, so anywhere the wildlife goes, we have
```

```
 1   jurisdiction to manage the populations.
 2             THE COURT:  You follow the fish.
 3             THE WITNESS:  Yeah.  Or the deer or the
 4   turkey, yes.
 5             THE COURT:  In the list that we have in the
 6   stipulation of the number of firearm hunting licenses
 7   issued, what kind of animals require a firearm
 8   hunting license?
 9             THE WITNESS:  So generally, every game
10   species if one chooses to use a shotgun or a rifle to
11   hunt those would need the firearms license.  So
12   that's the basic license to use a firearm to hunt.
13   There's also archery licenses and we have additional
14   species specific licenses/permits.
15             THE COURT:  So if you're going to use a rifle
16   or a shotgun to hunt anything, you have to have a
17   firearms hunting license?
18             THE WITNESS:  Yes.  With the asterisk if
19   you're a landowner, you can get a free one, landowner
20   permit.
21             THE COURT:  And then you have a harvest
22   tagging system?
23             THE WITNESS:  Yes.
24             THE COURT:  That documents turkeys.  Do you
25   document harvesting hunting of -- killing any other
```

```
 1            And I believe that's all I have, Your Honor.
 2   Thank you.
 3            THE COURT:  All right.  I want to thank
 4   counsel for your tour de force in taking -- in
 5   developing a record in the area of the sensitive
 6   places in part but all the other arguments that
 7   you've made that means that the hard work that you've
 8   done is over for the time being; it's now mine.  All
 9   right.  I thank you very much and we will stand in
10   recess.
11            (Proceedings adjourned, 4:52 p.m.)
12
13                    C E R T I F I C A T E
14
15       RE:   DAVID J. NASTRI v. KATIE DYKES
                  No. 3:23-cv-00056-JBA
16
17            I hereby certify that the within and
18   foregoing is a true and accurate transcript taken in
19   the aforementioned matter to the best of my skill and
20   ability.
21
22                  /s/ Corinne T. Thomas
23                  CORINNE T. THOMAS, RPR
                     Official Court Reporter
24                 United States District Court
                       141 Church Street
25              New Haven, Connecticut 06510
                       (203) 809-0848
```