# Exhibit B

```
1                   UNITED STATES DISTRICT COURT
                        DISTRICT OF CONNECTICUT
2


3    _____ )
4    DAVID NASTRI,                )
                                  ) No. 3:23-cv-00056-JBA
5                  Plaintiff,     )
                                  ) May 10, 2023
6    v.                           )
                                  ) 10:06 a.m.
7                                  )
     KATIE DYKES,                 ) 141 Church Street
8                                 ) New Haven, Connecticut
                   Defendant.     )
9    _____ )


10


11             PRELIMINARY INJUNCTION HEARING
                         VOLUME II
12


13   B E F O R E:


14        THE HONORABLE JANET BOND ARTERTON, U.S.D.J.


15


16   A P P E A R A N C E S:


17   For the Plaintiff:


18        ATKINSON LAW, LLC
               122 Litchfield Road
19             P.O. Box 340
               Harwinton, CT 06791
20             (203) 677-0782
               E-mail:  catkinson@atkinsonlawfirm.com
21        BY:  CAMERON LEE ATKINSON, ESQ.


22


23   (Continued)


24

                    Corinne Thomas, RPR
25             Official Court Reporter
                    (203) 809-0848
```

```
 1   For the Defendant:

 2        OFFICE OF THE ATTORNEY GENERAL
               165 Capitol Avenue
 3             Hartford, CT 06106
               (860) 808-5296
 4             E-mail:  blake.sullivan@ct.gov
                        thadius.bochain@ct.gov
 5                      timothy.holzman@ct.gov
          BY:  BLAKE THOMAS SULLIVAN, ESQ.
 6             THADIUS LATIMER BOCHAIN, ESQ.
               TIMOTHY J. HOLZMAN, ESQ.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2   WITNESS:   DAVID NASTRI                          PAGE

 3   Continued Cross Examination by Mr. Bochain       214

 4   Redirect Examination by Mr. Atkinson             221

 5   Recross Examination by Mr. Bochain               235

 6

 7   WITNESS:   CHRISTOPHER LEWIS                      PAGE

 8   Direct Examination by Mr. Atkinson               240

 9   Cross-Examination by Mr. Bochain                 291

10   Redirect Examination by Mr. Atkinson             332

11   Recross-Examination by Mr. Bochain               345

12   Further Direct Examination by Mr. Atkinson       348

13   Further Cross-Examination by Mr. Bochain         349

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        A.    Yes.

 2        Q.    All right.  And one of the questions he asked

 3   was whether you would expect to a see a firearm on a

 4   public street.  Do you recall that?

 5        A.    Yes.

 6        Q.    Can you just explain why you wouldn't expect

 7   to see that on a public street, say in Connecticut?

 8        A.    Yeah.  So I wouldn't expect to see one

 9   because there's not a purpose to have one.  I would

10   not expect to see someone target shooting or hunting

11   on a public street.

12        Q.    And as an average citizen, would you expect

13   to see a firearm in a Connecticut state park, let's

14   say with a handgun or a pistol?

15        A.    No.

16        Q.    And why is that?

17        A.    Because it hasn't been, it's not allowed

18   currently, and it's a state park.

19        Q.    I think I just want to make sure I heard your

20   testimony correctly.  So since you've taken -- you

21   were in charge of EnCon in 2019.  Has EnCon ever

22   received calls about the presence of a firearm in a

23   state park or forest?

24        A.    Yes, we have.

25        Q.    Has EnCon responded to those calls?
```

1       A.      Yes.

2       Q.      And what would that response look like?

3       A.      We would try to send a minimum of two

4   officers or more if there's more officers available.

5       Q.      You said a minimum of two officers?

6       A.      Yes.

7       Q.      All right.  And you said if more were

8   available, you would send more?

9       A.      Yes.  Until we knew what the situation was.

10      Q.      Okay.  So there's a possibility that you

11  could send more -- when you say -- how many could you

12  send?

13      A.      So on -- say, one sector has four officers

14  working at that time and they're all available, we

15  would send all four.

16      Q.      You would send all four?

17      A.      Yes.

18      Q.      When you say, "sector," what do you mean by

19  "sector"?

20      A.      Each district is divided into two sectors.

21  So we have -- like, for the east, we have a north

22  sector and the south sector, kind of a quarter of the

23  state.

24      Q.      Okay.  And so presently if EnCon received a

25  call about the presence of a firearm, there's a

1   possibility you could send all four officers in one

2   sector to respond to that call?

3       A.   Yes.

4       Q.   Now, in your declaration, I'm going to have

5   you take a look again, it's page 6 again,

6   paragraph 16, subparagraph A, the portion -- it's the

7   second sentence dealing with the risk of conflict

8   that could be increased.  Do you see that?  It's the

9   second sentence in subparagraph A.

10      A.   Yes.

11      Q.   All right.  And are there any safety concerns

12  that go along with the risk of conflict?

13      A.   Well, the risk of a firearm being present

14  during a conflict increases the chance that that

15  firearm may be used.

16      Q.   And let's just assume for a second that

17  someone -- you know, someone sees a gun, they make a

18  call to EnCon, how would that -- unpack it a little

19  bit more.  How would that impact EnCon's focus in a

20  particular season?

21      A.   So depending what the officers are focusing

22  on, they're going to be -- even if they're on a call,

23  if it's not a public safety emergency call, like a

24  gun, like a person with a gun, unknown situation,

25  then they'll be pulled from that call and sent to the

1    other call.

2        Q.    All right.  So let's talk about the summer

3    for a moment.  And remind me again what the focus for

4    -- let's stick with the marine division for a minute.

5    What's the focus of the marine division or marine

6    sector in the summer?

7        A.    So marine sector, it's the parks, park

8    enforcement, park patrol, boating patrol, and then

9    fisheries enforcement.

10       Q.    And so that's what they're focused on

11   currently in, like, in the summer, right?

12       A.    Yes.

13       Q.    All right.  And so if a call came in about

14   the presence of a gun in the summer, am I hearing you

15   correctly that that could pull perhaps four officers

16   or more from their focus to respond to that one call?

17       A.    Yes.

18       Q.    Now, I believe Attorney Atkinson also asked

19   you some questions about concerns that you might have

20   about proper storage of a firearm.  Do you recall

21   that?

22       A.    Yes.

23       Q.    All right.  And I think he asked you a

24   question about Hammonasset Beach State Park not

25   having facilities for proper storage, correct?

1     A.    Yes.

2     Q.    All right.  To your knowledge, does any

3  facility across the state park and forest system have

4  what you would consider to be adequate facilities for

5  properly storing a firearm?

6     A.    No.

7     Q.    And can you just explain a little bit more

8  the risks that you see in your current -- based on

9  your experience about the unattended firearm?  Like,

10  what are those risks that you see?

11     A.    It could be stolen.  It could be picked up by

12  a child, so there's a risk there.  It can be picked

13  up by a good Samaritan who is not familiar with

14  firearms and could have a negligent discharge.

15     Q.    I'm sorry.  What was the last thing you said?

16     A.    Could be picked up by a good Samaritan and if

17  they're not familiar with firearms, they could

18  accidentally discharge it.

19     Q.    Now, Attorney Atkinson also asked you some

20  questions about the conservation and environmental

21  goals that are furthered by this particular

22  regulation that we're talking about.  Do you recall

23  that?

24     A.    Yes.

25     Q.    All right.  Can you just help explain to the

```
 1   forests, right?

 2      A.   Correct.

 3           MR. BOCHAIN:  No further question, Your

 4   Honor.

 5           THE COURT:  So this is perhaps a rather naive

 6   question, but you've been describing with respect to

 7   the hunting season, for instance the spring turkey,

 8   where people are authorized to use ten-gauge

 9   shotguns, and my question is:  Are handguns

10   authorized for use for hunting in Connecticut parks

11   and forests?

12           THE WITNESS:  Handgun hunting is only

13   authorized on private land.  Let me correct myself.

14   For small game yes, but for anything else, it's only

15   private lands and it's an additional permit.

16           THE COURT:  So when you say handgun hunting

17   is authorized for small game --

18           THE WITNESS:  Yes.  Small game only.

19           THE COURT:  Small game consists of what?

20           THE WITNESS:  Squirrel, fox, so coyote,

21   rabbit.  And then -- sorry.  Raccoon and possum also.

22   Sorry.  I forgot those two.

23           THE COURT:  So for instance, what kind of

24   hunting would a Glock 42 be authorized for?

25           THE WITNESS:  I don't know what caliber that
```

```
 1   Glock 42 is, but for handgun hunting, it has to be a
 2   357, larger for deer on private land.
 3             THE COURT:  Three feet what?
 4             THE WITNESS:  So if it's for deer hunting, a
 5   revolver has -- a pistol revolver deer permit
 6   regulation for hunting in Connecticut is private land
 7   only and it has to be a 357 or larger caliber.
 8             THE COURT:  And do you have in front of you
 9   that list by year, it's Exhibit 10, and it's the
10   NIBRS Agency Crime Overview?  Would you put that in
11   front of him?
12             THE WITNESS:  Thank you.
13             THE COURT:  Second from the bottom of each of
14   the pages is something called "weapon law
15   violations."  Do you know what's included in that?
16             THE WITNESS:  So those are other -- so those
17   are other offenses against society.  So that's a
18   stolen handgun, an altered handgun, possession
19   without a permit, those will be -- it's not a crime
20   against a person.  It's not a crime against property.
21   So it would be one of those other.  So possessing a
22   pistol without a permit would be an other weapons law
23   violation or a felon in possession of a handgun or a
24   firearm would be another one.
25             THE COURT:  And would it always involve a
```

```
 1   firearm of some type or does it include other

 2   weapons?

 3          THE WITNESS:  It can include other dangerous

 4   weapons.  So certain knives, gravity knives,

 5   switchblades knives, brass knuckles, those could be

 6   included in weapon laws.

 7          THE COURT:  So you had some testimony that

 8   I'm a little unclear about.  When you get calls

 9   regarding firearms, do you or do you not enforce the

10   regulations prohibiting firearms in the parks and

11   forests or do you only give warnings?

12          THE WITNESS:  If we find someone carrying a

13   weapon in the state park, we typically charge

14   them with -- if there's no other extenuating

15   circumstances, it's the 23-4-1c charge of possession

16   with a weapon in a state park.  If there's other

17   issues going on, we may have other charges.

18          THE COURT:  Thank you.  Any questions on my

19   questions?

20          MR. ATKINSON:  I have a few, Your Honor.

21    FURTHER DIRECT EXAMINATION OF CHRISTOPHER LEWIS

22   BY MR. ATKINSON:

23     Q.   Colonel Lewis, on state land in -- on state

24   land, state forests and parks, a person can use a

25   22-caliber rimfire handgun to hunt coyote?
```

```
 1       A.    Yes.

 2             MR. ATKINSON:  No further questions, Your

 3    Honor.

 4             MR. BOCHAIN:  Just very briefly, Your Honor.

 5                  FURTHER CROSS-EXAMINATION

 6    BY MR. BOCHAIN:

 7       Q.    Can you just explain what rimfire means?

 8       A.    Rimfire is a type of ammunition where center

 9    fire, which the primer is in the center of the case.

10    And then rimfire, the primer is on the rim or outside

11    of the case and the powder is there in a -- it's a

12    smaller, traditionally lower power projectile.  You

13    don't see them much bigger than 22.

14       Q.    So for the small game hunting that we've been

15    discussing, the only thing that's authorized would be

16    22-caliber rimfire hunting, right?

17       A.    For small game?

18       Q.    For small game which we have been referring

19    to.

20       A.    Certain shot sizes and shotguns would be

21    permissible, like a seven or eight shot.

22       Q.    But in terms of handguns?

23       A.    Handguns would just be the 22-caliber or

24    smaller then a 22-caliber.

25       Q.    And again, that's only for certain animal
```

```
 1   species, right?

 2      A.   Yes, correct.

 3      Q.   And those are less common in terms of what

 4   people would hunt than the other things that we've

 5   discussed, correct?

 6      A.   Correct.

 7      Q.   And so from where people can hunt, that's

 8   only for certain locations within the state parks and

 9   forests, right?

10      A.   Yes.

11      Q.   So it's not the whole state park or forest,

12   right?

13      A.   No.  It will be spelled out and then our

14   website has like a GIS map that actually delineates,

15   you know, the zones that hunting is allowed.

16      Q.   So it's discrete locations?

17      A.   Yes.

18           MR. BOCHAIN:  Nothing further, Your Honor.

19           THE COURT:  So when you say that handguns may

20   be used for hunting only if authorized on private

21   land and you went on to describe the small game, I'm

22   a little confused on what DEEP's jurisdiction is over

23   private land.

24           THE WITNESS:  So for hunting, hunting and

25   fishing, so anywhere the wildlife goes, we have
```

```
 1   jurisdiction to manage the populations.

 2              THE COURT:  You follow the fish.

 3              THE WITNESS:  Yeah.  Or the deer or the

 4   turkey, yes.

 5              THE COURT:  In the list that we have in the

 6   stipulation of the number of firearm hunting licenses

 7   issued, what kind of animals require a firearm

 8   hunting license?

 9              THE WITNESS:  So generally, every game

10   species if one chooses to use a shotgun or a rifle to

11   hunt those would need the firearms license.  So

12   that's the basic license to use a firearm to hunt.

13   There's also archery licenses and we have additional

14   species specific licenses/permits.

15              THE COURT:  So if you're going to use a rifle

16   or a shotgun to hunt anything, you have to have a

17   firearms hunting license?

18              THE WITNESS:  Yes.  With the asterisk if

19   you're a landowner, you can get a free one, landowner

20   permit.

21              THE COURT:  And then you have a harvest

22   tagging system?

23              THE WITNESS:  Yes.

24              THE COURT:  That documents turkeys.  Do you

25   document harvesting hunting of -- killing any other
```

1          And I believe that's all I have, Your Honor.

2  Thank you.

3          THE COURT:  All right.  I want to thank

4  counsel for your tour de force in taking -- in

5  developing a record in the area of the sensitive

6  places in part but all the other arguments that

7  you've made that means that the hard work that you've

8  done is over for the time being; it's now mine.  All

9  right.  I thank you very much and we will stand in

10  recess.

11          (Proceedings adjourned, 4:52 p.m.)

12

13               C E R T I F I C A T E

14

15       RE:  DAVID J. NASTRI v. KATIE DYKES
                No. 3:23-cv-00056-JBA

16

17          I hereby certify that the within and

18  foregoing is a true and accurate transcript taken in

19  the aforementioned matter to the best of my skill and

20  ability.

21

22               /s/ Corinne T. Thomas

23               CORINNE T. THOMAS, RPR
                 Official Court Reporter
24               United States District Court
                 141 Church Street
25               New Haven, Connecticut 06510
                     (203) 809-0848