# Exhibit D

```
 1                  UNITED STATES DISTRICT COURT
                       DISTRICT OF CONNECTICUT
 2

 3   _____
                                 )
 4   DAVID NASTRI,               )
                                 ) No. 3:23-cv-00056-JBA
 5              Plaintiff,       )
                                 ) May 10, 2023
 6   v.                          )
                                 ) 10:06 a.m.
 7                               )
     KATIE DYKES,                ) 141 Church Street
 8                               ) New Haven, Connecticut
                Defendant.       )
 9   _____)

10

11            PRELIMINARY INJUNCTION HEARING
                        VOLUME II
12

13   B E F O R E:

14        THE HONORABLE JANET BOND ARTERTON, U.S.D.J.

15

16   A P P E A R A N C E S:

17   For the Plaintiff:

18        ATKINSON LAW, LLC
              122 Litchfield Road
19            P.O. Box 340
              Harwinton, CT 06791
20            (203) 677-0782
              E-mail:  catkinson@atkinsonlawfirm.com
21        BY:  CAMERON LEE ATKINSON, ESQ.

22


23   (Continued)

24
                     Corinne Thomas, RPR
25                  Official Court Reporter
                       (203) 809-0848
```

```
 1  For the Defendant:

 2        OFFICE OF THE ATTORNEY GENERAL
              165 Capitol Avenue
 3            Hartford, CT 06106
              (860) 808-5296
 4            E-mail:  blake.sullivan@ct.gov
                       thadius.bochain@ct.gov
 5                     timothy.holzman@ct.gov
          BY: BLAKE THOMAS SULLIVAN, ESQ.
 6            THADIUS LATIMER BOCHAIN, ESQ.
              TIMOTHY J. HOLZMAN, ESQ.
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              I N D E X
 2    WITNESS:   DAVID NASTRI                               PAGE
 3    Continued Cross Examination by Mr. Bochain             214
 4    Redirect Examination by Mr. Atkinson                   221
 5    Recross Examination by Mr. Bochain                     235
 6
 7    WITNESS:   CHRISTOPHER LEWIS                          PAGE
 8    Direct Examination by Mr. Atkinson                     240
 9    Cross-Examination by Mr. Bochain                       291
10    Redirect Examination by Mr. Atkinson                   332
11    Recross-Examination by Mr. Bochain                     345
12    Further Direct Examination by Mr. Atkinson             348
13    Further Cross-Examination by Mr. Bochain               349
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1   affected by someone carrying a concealed firearm?
 2        A.    If it's concealed and not noticed, no.
 3        Q.    Going back to hunting for a minute, is it
 4   your understanding that -- let me ask it this way --
 5   withdrawn.
 6              DEEP currently permits hunters to use
 7   22-caliber rimfire handguns in some state parks and
 8   forests to hunt certain types of game, correct?
 9        A.    For small game hunting where authorized, yes.
10        Q.    Would a 22 -- withdrawn.
11              Would a 22-caliber handgun cause the same
12   risk of confusion as someone carrying -- withdrawn.
13              Would a 22-caliber handgun carried by a
14   hunter for purposes of hunting cause the same risk of
15   confusion as someone carrying a concealed handgun in
16   a state park or forest?
17              MR. BOCHAIN:  Objection, Your Honor.
18   Speculation.
19              THE COURT:  I'm going to ask you to revise
20   your question to --
21              MR. ATKINSON:  Okay, Your Honor.
22              THE COURT:  -- his knowledge and/or
23   experience.
24              MR. ATKINSON:  I will, Your Honor.
25   BY MR. ATKINSON:
```

```
 1      Q.   Colonel Lewis, have you had experience with
 2   the confusion that could arise when someone notices
 3   another person carrying a firearm in state parks and
 4   forests?
 5      A.   Do I have personal experience, you're asking?
 6      Q.   Yes.
 7      A.   No, I do not.
 8      Q.   By virtue of your position in -- as director
 9   of the EnCon Police, do you have professional
10   experience in the confusion that could result from
11   someone noticing someone carrying a firearm in state
12   parks and forests?
13      A.   Yes.
14      Q.   Does your professional experience in that
15   regard extend to the confusion over someone carrying
16   a handgun in state parks and forests?
17      A.   Can you repeat the question.
18      Q.   Sure.  Does your professional experience with
19   the confusion that could result from someone noticing
20   someone carrying a firearm in state parks and
21   forests, does that professional experience also
22   include experience with the confusion that could
23   arise from someone carrying a 22-caliber handgun --
24   withdrawn -- someone carrying a handgun in state
25   parks and forests?
```

1       A.      Yes.

2       Q.      Okay.  How would you describe the confusion

3  that you have encountered in your professional

4  experience over someone carrying a handgun in state

5  parks and forests?

6       A.      It's not been allowed, to my knowledge, since

7  state parks have been in existence and it's not

8  expected, so we receive calls to our dispatch center

9  for -- requesting calls for service because someone

10 has a firearm or someone hears shooting in a state

11 park or forest.

12      Q.      Colonel, a person can become the victim of a

13 crime almost anywhere, correct?

14      A.      Correct.

15      Q.      And that includes becoming the victim of a

16 violent crime, correct?

17      A.      Correct.

18      Q.      And that would include that someone could

19 become a victim of a crime in a Connecticut state

20 park or forest, correct?

21      A.      Correct.

22      MR. ATKINSON:  Your Honor, if I may approach

23 Colonel Lewis to show him what's been marked as

24 Plaintiff's Exhibit 10 to which I believe we agreed

25 to admit this as a full exhibit.

```
 1              THE COURT:  All right.
 2              THE WITNESS:  Okay.
 3   BY MR. ATKINSON:
 4       Q.    Colonel, do you recognize that exhibit?
 5       A.    It appears to be a blurry copy of a NIBRS
 6   report for past couple of years from our agency.
 7       Q.    I apologize for the blurriness.  So if we
 8   need to slow down at any point, just let me know and
 9   we'll take our time with that.  All right?
10       A.    Yes.
11       Q.    What does the term "NIBRS" stand for?
12       A.    To the best of my knowledge, National
13   Incident Based Reporting System.
14       Q.    What do you understand this exhibit to
15   depict?
16       A.    This is what we report to FBI Department of
17   Justice for our annual crime statistics for
18   misdemeanor felony arrests from our division.
19       Q.    So just to be clear, the data that is shown
20   in this exhibit is only -- only applies to matters
21   handled by the EnCon Police Department?
22       A.    Yes.  If I can clarify, I said, "arrested."
23   I mean crimes reported to us that we investigated,
24   but they don't all necessarily end in an arrest.
25       Q.    Thank you.
```

1    A.    But yes, our division only.
2    Q.    If I may direct your attention, and we can
3    stick to the first page of this, to the right side
4    where there's the column that says, "reported,"
5    underneath "offenses," do you see that?
6    A.    Yes.
7    Q.    What does the term "reported" mean in this
8    context?
9    A.    So that would be in our case management
10   system, that means one of these categories of crimes
11   was reported either officer initiated or received a
12   report from another agency or the public, got
13   referred to us somehow, so we -- an officer is
14   assigned a case that contained one of these elements.
15   Q.    Do you see a column next to that with the
16   label "cleared"?
17   A.    Yes.
18   Q.    What does the term "cleared" stand for in
19   this context?
20   A.    So in our system, that means -- so it's the
21   case is either open under investigation or it's
22   cleared.  So "cleared" can mean by -- it can be
23   cleared by arrest, it can be cleared by warrant, it
24   can be cleared by other means.  So it can be cleared
25   by no criminal action or no criminal aspect.  It just

1  example that I kind of gave you a minute ago which is
2  would a person who is open carrying a firearm on a
3  beach be in violation of this statute?
4     A.   No.
5     Q.   Would a person who is open carrying in any
6  state park or forest be in violation of that statute?
7     A.   No.
8     Q.   And in those circumstances, could that again
9  result in confusion, alarm in your experience?
10    A.   Yes.
11    Q.   Now, I'm going to ask you to turn to -- I
12 think it's Plaintiff's Exhibit 5, which is General
13 Statute 53-21, the risk of injury statute. Let me
14 know when you get there.
15    A.   I got it.
16    Q.   Okay. Now, are the reasons why that
17 particular statute would not sufficiently address the
18 concerns you identified in your declaration?
19    A.   Yes.
20    Q.   And what are those reasons?
21    A.   Well, this is a larger statute, first of all,
22 it covers several items, but the primary issue is,
23 you know, did you place a minor at risk of a
24 situation where life or limb of a child is in danger.
25 The statute also further goes on to impair the morals

1   of a child, sale of children.  So it's a large --
2   covers a large area, but none of those would apply.
3       Q.    Now, I believe you testified that there are
4   risks associated with an unattended firearm?
5       A.    Yes.
6       Q.    All right.  Are those just limited to
7   children?
8       A.    No.  They're to anybody.
9       Q.    So anybody could have -- there could be a
10  risk for anyone who is in the presence of an
11  unattended firearm?
12      A.    Yes.
13      Q.    All right.  Now, I believe Attorney Atkinson
14  had asked you some questions about concealed carried
15  and its impact.  Do you recall that?
16      A.    Yes.
17      Q.    Can you just explain just for the record what
18  open carry means?
19      A.    Open carry means carrying a handgun on one's
20  person visible, usually outside the clothing, a
21  holster or physically carrying it in their hand.
22      Q.    And can you explain just for the record what
23  concealed carry means?
24      A.    Concealed carry is where the handgun is
25  concealed under clothing, under a jacket, in, like, a

1  fanny pack or a purse.
2      Q.   To your knowledge, does Connecticut draw a
3  distinction between open carrying and concealed
4  carrying?
5      A.   No.
6      Q.   And so does that mean that a person -- let's
7  say somebody has a concealed pistol permit or a
8  pistol permit in Connecticut, does that particular
9  person have the ability to open carry in Connecticut?
10     A.   Yes.  With the pistol, Connecticut Pistol
11 Permit.
12     Q.   And so does that mean they have the choice to
13 then conceal carry in Connecticut?
14     A.   Yes.
15     Q.   So they can do -- they can do either/or?
16     A.   Correct.
17     Q.   Now, I believe Attorney Atkinson had asked
18 you some questions about how concealed carrying might
19 reduce some of the risks that you had identified in
20 your declaration.  Do you recall that?
21     A.   Yes.
22     Q.   Are there still -- is concealed carry always
23 perfect?
24     A.   No.
25     Q.   And can you just explain why it's not?

1    A.    Inadvertently, even though it's concealed
2  carry, people move a certain way, clothing shifts and
3  the presence of the firearm is revealed to bystanders
4  or others.
5    Q.    In your professional experience, have you
6  seen that sort of inadvertent display before?
7    A.    Yes.
8    Q.    Approximately how many times?
9    A.    While working, probably less than six.
10   Q.    How about in your, personal life, because you
11 said, "while working"?  Have you seen it in your
12 personal life?
13   A.    Yes.  While off duty, I have.
14   Q.    All right.  How many times have you seen
15 that?
16   A.    Around five, five or six.
17   Q.    All right.  So combined, maybe 10 or 11
18 times?
19   A.    Possibly, yeah, around there.
20   Q.    When's the most -- the last time you saw that
21 sort of thing happen?
22   A.    Last month during my school -- my child's
23 school spring break traveling back from a trip.
24   Q.    Can you just explain a little bit more?
25 Where was that?

1   A.   It was in Virginia.  We were traveling back
2   from Tennessee to Connecticut.
3   Q.   Can you just explain the circumstances a
4   little bit more, how you saw that inadvertently?
5   A.   Sure.  Stopped at -- me and my son were
6   driving back.  We stopped at a convenience store to
7   get gas, drinks, snacks.  While entering the store, a
8   gentleman, a nice gentleman, got out of the car in
9   front of me, got out, and held the door open for us
10  so we could go in.  When he did that, by moving his
11  thing, his shirt lifted a little bit and you could
12  see he had a pistol that he had kind of in the inside
13  waistband of his pants.
14  Q.   When you said move the thing, is that the
15  door?
16  A.   Yeah.  He was holding the door open for us.
17  Q.   He was holding the door open and he was
18  holding the door open and it showed --
19  A.   Yeah.  He had a T-shirt on and -- kind of a
20  short T-shirt and it kind of raised up and you could
21  see the belt and his pistol inside his waistband.
22  Q.   Okay.  So before he moved his arm in that
23  certain way, you hadn't seen the firearm?
24  A.   No.
25  Q.   Is that the reason why you thought he was

```
 1  trying to conceal it?
 2      A.    Yes.
 3      Q.    And so again, you've seen that sort of thing
 4  happen 10 to 11 times in your career?
 5      A.    Yes.
 6      Q.    Professional life and personal life?
 7      A.    Uh-huh.
 8      Q.    And I think you had testified during Attorney
 9  Atkinson's questioning that people can be shocked by
10  seeing a firearm.  Can you just explain a little bit
11  more about that?
12      A.    So when they're not expecting to see a gun,
13  it interrupts their process, you know.  People's
14  brains think differently.  Their -- their brain is
15  programmed to expect something.  I'm in a courtroom;
16  I'm expecting to see a courtroom.  I'm not expecting
17  to see, like, a pink gorilla march across the room,
18  but research has shown you can have a pink gorilla
19  march across the room and nobody will pay attention
20  to it because they're focused on that, but oftentimes
21  people do -- if you do see that pink gorilla and
22  you're not expecting that situation, it triggers
23  alarm bells in people's brains.
24      Q.    Okay.  And in this circumstance, the alarm
25  bells in that they wouldn't expect to see the
```

1       And I believe that's all I have, Your Honor.
2  Thank you.
3       THE COURT:  All right.  I want to thank
4  counsel for your tour de force in taking -- in
5  developing a record in the area of the sensitive
6  places in part but all the other arguments that
7  you've made that means that the hard work that you've
8  done is over for the time being; it's now mine.  All
9  right.  I thank you very much and we will stand in
10 recess.
11      (Proceedings adjourned, 4:52 p.m.)
12
13              C E R T I F I C A T E
14
15      RE:  DAVID J. NASTRI v. KATIE DYKES
             No. 3:23-cv-00056-JBA
16
17      I hereby certify that the within and
18 foregoing is a true and accurate transcript taken in
19 the aforementioned matter to the best of my skill and
20 ability.
21
22            /s/ Corinne T. Thomas
23            CORINNE T. THOMAS, RPR
              Official Court Reporter
24            United States District Court
              141 Church Street
25            New Haven, Connecticut 06510
                  (203) 809-0848