**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| DAVID J. NASTRI, ESQ., | : | |
| | : | DKT No.: 3:23-cv-00056-JAM |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| KATIE DYKES, in her official capacity only, | : | |
| | : | |
| Defendant. | : | November 15, 2024 |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND FOR A PERMANENT INJUNCTION

Pursuant to Fed. R. Civ. P. 56 and the applicable local rules of this Court, the Plaintiff David Nastri submits this memorandum of law in support of his motion for summary judgment and for a permanent injunction.

Summary judgment is appropriate here because there are no genuine disputes of material facts, and Nastri demonstrates that the Second Amendment unequivocally protects his right to carry a handgun for self-defense in Connecticut state parks and forests. Nothing in our nation's history or tradition justifies Conn. Agencies Regs. § 23-4-1(c)'s prohibition on him peacefully doing.

Nastri, therefore, respectfully requests that the Court grant his motion for summary judgment, declare Conn. Agencies Regs. § 23-4-1(c)'s prohibition on carrying firearms for self-defense in Connecticut state parks and forests unconstitutional, and enter a permanent injunction enjoining the Defendant from enforcing it.

## BACKGROUND

### I.    Factual Background

The Plaintiff, David Nastri, was born and raised in Cheshire, Connecticut. **L.R. 56(a)(1) Statement Of Undisputed Material Facts, ¶ 1** (hereinafter "L.R. 56"). After graduating high school and spending a short time in college, Nastri served one year in the United States Army in approximately 1980. *Id*. at ¶ 2. After working odd jobs for approximately 20 years, Nastri obtained an M.B.A. in 2001 and became a financial advisor in 2006. *Id*. at ¶ 3. He continues to enjoy a clean disciplinary record as a financial advisor. *Id*. at ¶ 4.

Nastri joined the Army National Guard in 2003, and he served until his honorable discharge in March 2012, holding the rank of staff sergeant. *Id*., at ¶ 5. He deployed to Afghanistan in 2010 where he saw combat. *Id*. at ¶ 6. During his National Guard service, Nastri received training on the use of firearms, including handguns, and he passed tests where he demonstrated proficiency with firearms, including handguns. *Id*. at ¶ 7.

Nastri also has held a Connecticut pistol permit for over 30 years and currently holds it. *Id*. at ¶ 10. To obtain his pistol permit, Nastri completed a class at a local police department and demonstrated proficiency by shooting at targets. *Id*. at ¶ 11.

Nastri obtained his law degree in 2018, and he provides pro-bono legal services in his spare time for veterans with compensation claims before the Veterans Administration. *Id*. at ¶¶ 8-9.

As he has done for over thirty years, Nastri carries a handgun for self-defense when he goes out in public. *Id*. at ¶¶ 12-13. He complies with the laws of which he is aware regulate how he may carry his handgun in public. *Id*. at ¶ 14.

For over 40 years, Nastri has used Connecticut state parks for recreation on a regular basis. *Id*. at ¶¶ 15-21. Prior to learning of Conn. Agencies Regs. § 23-4-1(c), Nastri carried his handgun for self-defense into the Connecticut state parks and forests that he often used - Sleeping Giant State Park, Naugatuck State Forest, and the Farmington River Canal Trail. *Id*. at ¶ 22.

Conn. Agencies Regs. § 23-4-1(c) prohibits private individuals from carrying handguns into Connecticut state parks and forests unless given permission to do so by Defendant Katie Dykes. *Id*. at ¶ 32. After Nastri learned of this prohibition, he made efforts to find out whether he could obtain Defendant Dykes' permission to carry a handgun for self-defense in Connecticut state parks and forests. *Id*. at ¶ 33. His efforts and the information that he acquired forced Nastri to stop carrying his handgun into Connecticut state parks and forests because he feared the consequences of violating Conn. Agencies Regs. § 23-4-1(c), which could have impacted his career as a financial advisor. *Id*. at ¶¶ 34-35.

Additional facts will be discussed throughout this memorandum.

## II.    Procedural History

Nastri filed this case on January 14, 2024. Dkt. 1. He moved for emergency and preliminary injunctive relief on January 17, 2024. Dkt. 8. The Court (Arterton, J.) held a telephonic scheduling conference on January 27, 2023 and denied Nastri's emergency motion for a temporary restraining order during that hearing. Dkt. 15.

The Defendant filed a motion to dismiss attacking Nastri's standing on March 30, 2023. Dkt. 22.

The Court (Arterton, J.) then held a preliminary injunction hearing on May 9-10, 2023 during which it considered both Nastri's standing and his motion for a preliminary injunction. Dkt. 38-39. On July 12, 2024, the Court (Arterton, J.) granted the Defendant's motion to dismiss for lack of standing and denied Nastri's motion for a preliminary injunction as moot. Dkt. 46.

Nastri filed a notice of appeal on July 12, 2024. Dkt. 47. He also filed a motion for reconsideration, which was denied on August 16, 2023. Dkt. 56. Nastri amended his notice of appeal on August 28, 2023. Dkt. 58.

The Second Circuit reversed the district court's dismissal of this action on March 29, 2024. Dkt. 60.

Nastri filed an amended complaint on August 27, 2024, and the parties completed discovery on October 11, 2024. Dkt. 70.

This motion for summary judgment follows.

## **LEGAL STANDARD**

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. Rule 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A court must grant summary judgment "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact.'" *Miner v. City of Glens Falls*, 999 F.2d 655, 661 (2d Cir.1993) (citation omitted). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992)

4

(quoting *Anderson*, 477 U.S. at 248). After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Courts resolve "all ambiguities and draw all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich*, 963 F.2d at 523. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir.1992).

> According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

"The party requesting permanent injunctive relief must demonstrate (1) irreparable harm (here, a constitutional violation) and (2) actual success on the merits." *Ognibene v. Parkes*, 671 F.3d 174, 182 (2d Cir. 2011). "The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 546 n.12 (1987).

## **ARGUMENT**

The Plaintiff, David Nastri demonstrates that he is entitled to a permanent injunction. He shows that he is currently, and will incur, irreparable harm due to the loss

of his constitutional rights. He shows that the public interest and the balance of hardships weigh in his favor. Finally and most importantly, he shows that he actually prevails on the merits under *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (2022).

## I.    Nastri Succeeds On The Merits.

*New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (2022) replaced traditional means-end scrutiny in Second Amendment cases with a two-part test focused on text, history, and tradition. At the first step, the Plaintiffs bear a burden to show that the Second Amendment's plain text covers their conduct. "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S.Ct. at 2126.

At the second step, the Defendants bear a burden to demonstrate that their regulation is consistent with our nation's history and tradition. *Id*. at 2126 ("[T]he government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation"). This second step requires courts to assess "whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding" through "reasoning by analogy —a commonplace task for any lawyer or judge." *Id*. at 2131-32. At the same time, it is not the Court's obligation "to sift the historical materials for evidence to sustain [the government's] statute." *Id*. at 2150; *see also id*. at 2127 ("the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms").

*Bruen* contemplated two types of cases in this second step: straightforward cases and "other cases implicating unprecedent societal concerns or dramatic technological changes." *Id*. at 2131-32. It described straightforward cases as follows:

> For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id*. at 2131.

When a court considers "modern regulations that were unimaginable at the founding," however, *Bruen* requires the Defendants to identify "a well-established and representative historical analogue" to its modern regulations. *Id*. at 2133. To determine whether the analogue is representative and "relevantly similar under the Second Amendment," *Bruen* provides courts with "at least two metrics" that "are [the] *central* considerations when engaging in an analogical inquiry" from *Heller* and *McDonald*: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. at 2132-33 (cleaned up) (emphasis in original).

### A. Nastri Carries His Textual Burden By Showing That He Intends To Carry A Handgun For Self-Defense In Public.

Nastri carries his textual burden with ease. *Bruen* clearly established that the Second Amendment's plain text presumptively guarantees Americans the "right to 'bear' arms in public for self defense." *Bruen*, 142 S.Ct. at 2135; *see also id*. at 2134 (turning to "whether the plain text of the Second Amendment protects Koch's and Nash's proposed

7

course of conduct – carrying handguns publicly for self-defense. We have little difficulty concluding that it does").

Under *Bruen*'s textual analysis, there is no dispute that Nastri is among the people protected by the Second Amendment. *District of Columbia v. Heller*, 554 U.S. 570, 580 (2008) (holding that the Second Amendment right "belongs to all Americans" under a textual analysis). He is an American citizen, a veteran, and a law-abiding member of the bar. **L.R. 56, ¶¶ 1-9** He has passed numerous professional background checks, and he has held his Connecticut pistol permit for over thirty years. *Id*. at ¶ 10.

There is also no dispute that Nastri's proposed course of conduct fits comfortably within *Bruen*'s textual holding that the Second Amendment's plain text guarantees a right to carry handguns in public for self-defense. Connecticut state parks and forests are unequivocally public places and are generally open to the public year-round with little to no restrictions on who may access them. *Id*. at ¶¶ 36-42 Nastri proposes to carry a handgun for self-defense in Connecticut state parks and forests just as he does almost every other public place he goes and just like he did before Defendant Dykes' subordinate, Mason Trumble, left him with no choice but to stop carrying his handgun for self-defense in Connecticut state parks and forests. *Id*. at ¶¶ 22, 34. Because Connecticut state parks and forests are public places, the Second Amendment's plain text presumptively guarantees Nastri's right to bear arms within their confines for the purpose of self-defense.

**B. Defendant Dykes Fails To Carry Her Burden To Show That Conn. Agencies Regs. § 23-4-1(c) Is Justified By Our Nation's History And Tradition.**

The burden now shifts to Defendant Dykes to demonstrate that Conn. Agencies Regs. § 23-4-1(c) is consistent with our nation's history and tradition. She fails to make the necessary showing.

Nastri anticipates that Defendant Dykes will advance three claims of a historical exception to the Second Amendment to justify Conn. Agencies Regs. § 23-4-1(c).[1] First, he anticipates that she will claim that there is a generalized state-property owner exception to the Second Amendment. Second, he anticipates that Dykes will claim that state parks are "sensitive places." Third, Nastri anticipates that Dykes will argue that state parks and forests are either "urban parks" or "quintessential crowded areas or public forums" where the Second Amendment does not protect the public carry of firearms for self-defense.

Supreme Court precedent directly forecloses Dykes' first argument. As discussed below, government's status as a property owner only permits them to categorically prohibit the exercise of constitutional rights in extremely limited circumstances.

The analysis of Dykes' second and third arguments would be straightforward if *Bruen* were the only decision that the Court had to consider, but *Antonyuk v. James*, 2023 WL 11963034 (2d Cir. Oct. 24, 2024) muddies the historical analysis based on New York's historical showing regarding public parks at the preliminary injunction hearing stage. Because *Antonuyk* issued its decision at a preliminary stage and historical analysis under

---

[1] Dykes already advanced all of these claims in some fashion at the preliminary injunction stage.

*Bruen* turns on the parties' presentation,[2] Nastri submits that its holdings as to historical tradition do not inescapably bind the Court. In fact, *Antonyuk* itself recognized that its decision was only preliminary and did not determine the ultimate merits. *Antonyuk*, 2023 WL 11963034, at *79. Thus, the Court is free to reach a different conclusion than *Antonyuk* did if the historical record points to one.

Nastri addresses Dykes' arguments in two ways. First, he offers the Court an independent analysis of the historical tradition of "sensitive places" restrictions that demonstrates a different historical tradition than the one presented in *Antonyuk*. Nastri demonstrates that, historically, "sensitive places" had two inescapable commonalities: (1) they were places where deliberative self-government occurred, and (2) governments provided comprehensive security at the place in question.

Second, he works within *Antonyuk*'s framework to demonstrate that the three state parks that he most often visits are not "urban parks" or "quintessential crowded areas or public forums." Instead, he demonstrates that they bear more of a resemblance to places where the Second Amendment protects his right to carry a handgun for self-defense – e.g., the sidewalk of any street in America.

### 1.    There is no generalized state-proprietor exception to the Second Amendment.

Dykes' first attempt to advance her state-proprietor exception to the Second Amendment did not rely on any well-established and representative historical analogues. Dkt. 23, pp. 19-30. Instead, it cobbled together First Amendment doctrine and pre-*Bruen* Second Amendment cases that held that the general right to bear arms for self-defense

---

[2] *Bruen*, 142 S.Ct. at 2130 n.6 (holding that courts are entitled to decide Second Amendment cases based on the historical record compiled by the parties).

does not extend to government lands held open for a public purpose. Dykes also attempted to argue that state leases of land for state parks would prohibit it from permitting firearms on those portions of land.

Dykes' anticipated arguments, however, cannot carry the day under *Bruen*. First, generally speaking, Dykes did not supply any historical analysis in her original round of arguments – as required by *Bruen* – to justify her argument for a generalized state-proprietor exception to the Second Amendment. That failure alone requires the rejection of her argument. Even if she had though, such a historical analysis could not have squared with the evidence of the founding generation's awareness and rejection of the over-expansive nature of English gaming laws, which used proprietorship and the threat of poaching as an excuse to disarm the populace. *See, e.g.*, St. George Tucker, View of the Constitution of the United States, in 1 ST. GEORGE TUCKER, BLACKSTONE'S COMMENTARIES: WITH NOTES OF REFERENCE, TO THE CONSTITUTION AND LAWS, OF THE FEDERAL GOVERNMENT OF THE UNITED STATES; AND OF THE COMMONWEALTH OF VIRGINIA at 300 n.2 (William Young Birch & Abraham Small, 1803); William Rawle, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA, at 122 (Philadelphia, H.C. Carey &I. Lea 1825).

Second, neither First Amendment decisions nor pre-*Bruen* Second Amendment decisions supply adequate precedential authority on which the Court could base a recognition of a generalized government proprietorship exception sufficient to categorically prohibit the peaceful carry of handguns for self-defense on all government-owned property. Both First Amendment decisions and pre-*Bruen* decisions all employed the means-end scrutiny that *Bruen* prohibits courts from using in Second Amendment

cases. *Bruen*, 142 S.Ct. at 2129. None of those decisions employed any historical analysis consistent with *Bruen*'s framework. For that reason, they fall far short of carrying precedential weight necessary to control this case.

Third, to the extent that Dykes has already reached back into post-Founding Era cases regarding public property, Dkt. 23, pp. 23-30, none of her authorities consider the question of whether the Second Amendment guarantees a right to peacefully carry a handgun for self-defense on public land. Instead, all of her anticipated authorities affirm the general authority of government to administer its property, but not to categorically foreclose citizens' constitutional rights on property generally open for public use. Dykes authorities simply do not extend as far as she would like them to, and they do not provide the well-established and representative historical analogues required by *Bruen*.

Finally, to the extent that Dykes claims that the leases of land from private individuals prohibit Connecticut from permitting firearms on those portions of state parks and forests, Supreme Court precedent forecloses her argument. *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961) held that racial discrimination by a private restaurant operating on state land violated the Fourteenth Amendment. *Shelley v. Kraemer*, 334 U.S. 1 (1948) held that judicial enforcement of private restrictive housing covenants that were racially discriminatory violated the Fourteenth Amendment. Simply put, the state cannot avoid the Second Amendment simply by claiming to be a lessee or a lessor. It must respect the Second Amendment at all times.

## 2. State parks and forests are not "sensitive places."

Defendant Dykes also cannot carry her burden to show that Connecticut state parks and forests are "sensitive places." Historically, "sensitive places" had two

inescapable commonalities: (1) they were places where deliberative self-government occurred, and (2) governments provided comprehensive security at the place in question. Connecticut state parks and forests do not have one of these commonalities, let alone both. To the contrary, Defendant Dykes actually permits substantial uses of firearms within the confines of many Connecticut state parks and forests for hunting and target shooting – something that would be laughable in an actual "sensitive place."

Nastri rebuts what he anticipates will be Dykes' presentation in three ways. First, he provides a wealth of historical evidence demonstrating that "sensitive places" must align with the two commonalities described above. Second, he demonstrates that history and tradition does not support a free-standing exception to the Second Amendment with respect to public parks. THird, he provides rebuttal evidence to show that New York's presentation of a historical tradition of prohibiting carrying of arms in "urban parks" and "quintessential crowded areas or public forums" in *Antonyuk* requires historical cherry-picking of discreet portions of ancient statutes instead of reading them faithfully as continuing the common-law tradition of prohibiting the carrying of arms to cause an affray.

### a)  *Bruen*'s methodology: history, how, and why.

Prior to reaching the merits of his rebuttal, Nastri addresses two methodological considerations.

First, the Second Circuit has stated that courts should look to both 1791 and 1868 to determine the prevailing understanding of the right to bear arms. *Antonyuk*, 2023 WL 11963034, at *17. Nastri respects that *Antonyuk* may bind the Court on this point, but, at the very least, he must preserve, by presenting it, his argument that the public

understanding of the Second Amendment in 1791 controls and that 1868 history is only relevant to the extent it confirms the 1791 understanding.

*Bruen* acknowledged an academic debate over whether courts should rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868. *Bruen*, 142 S.Ct. at 2138. *Bruen* declined to resolve this question though because the public understanding of the Second Amendment was the same in both 1791 and 1868 with respect to public carry. *Id*. at 2138. *Bruen*, however, did note that Supreme Court precedent universally pegs the scope of the protection of the Bill of Rights, including the Second Amendment, to the public understanding of the right in 1791. *Id*. at 2137-38 (compiling precedents).

*Heller* and *Bruen*, therefore, did not treat all history as equal. In particular, *Heller* stated that post-Civil War discussions of the right to keep and bear arms "took place 75 years after ratification of the Second amendment, they do not provide as much insight into its original meaning as earlier sources." *Bruen*, 142 S.Ct. at 2137 (quoting *Heller*, 554 U.S. at 614). In other words, the Supreme Court has treated history from around the time of the Civil War "as mere confirmation of what the Court thought had already been established." *Id*. at 2137 (quoting *Gamble v. United States*, 139 S.Ct. 1960, 1975-76 (2019).

Thus, 1791 and 1868 history do not stand as historical equals. 1868 history may only be used to confirm the 1791 historical understanding of the Second Amendment.

This approach also best matches the historical context of the Second Amendment. *Barron ex rel. Tiernan v. Mayor of Baltimore*, 32 U.S. 243 (1833) established that the Bill of Rights did not apply to the states, thus immunizing many state laws from post-Founding

Era challenges that could have illuminated the Second Amendment's scope. While the framers of the Fourteenth Amendment intended to incorporate the Bill of Rights against the states, the Supreme Court declined to do so in *United States v. Cruikshank*, 82 U.S. 542 (1875) – a case directly involving the Second Amendment. Thus, state laws and regulations that implicated the Second Amendment flourished virtually unchallenged from 1833 to 2010 when the Supreme Court finally incorporated the Second Amendment against the states. *See McDonald v. City of Chicago*, 561 U.S. 742 (2010).

A historical tradition of limiting the Second Amendment from new laws arising well after the 1791 era is no historical tradition at all because the Second Amendment had no role in the development of those laws. Instead, as illustrated by many of the parks regulations discussed below, laws categorically prohibiting the exercise of Second Amendment rights arose from flights of Romantic and Transcendentalist philosophy, not considered legal judgments that considered or valued the Second Amendment.

Second, *Bruen* instructed courts to examine "how and why the regulations burden a law-abiding citizen's right to armed self-defense…" when comparing modern laws to analogous historical regulations. *Id*. at 2132-33 (cleaned up) (emphasis in original). *Bruen* never required government defendants to identify a "dead ringer" or a "historical twin." *United States v. Rahimi*, 144 S.Ct. 1889, 1898 (Jun. 21, 2024) (quoting *Bruen*, 144 S.Ct. at 2132-33). Instead, governments must show that its challenged regulation "impose[s] a comparable burden on the right of armed self-defense" and "whether the regulatory burden is comparably justified." *Bruen*, 142 S.Ct. at 2133.

During this principled inquiry though, neither the Court nor Defendants Dykes may disregard *Bruen*'s instruction that, "when a challenged regulation addresses a general

societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id*. at 2131

### b) Connecticut state parks and forests are not "sensitive places."

The Supreme Court has given limited guidance as to what constitutes a "sensitive place." *Heller* assumed, in dicta, that "schools and government buildings" were "sensitive places." 554 U.S. at 626. *Bruen* assumed "it settled" that "legislative assemblies, polling places, and courthouses" were "sensitive places" and instructed courts to analogize to those places "to determine [whether] modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." 142 S.Ct. at 2133. While *Bruen* cautioned that it did not "comprehensively define 'sensitive places,'" it also rejected New York's argument that would have expanded the category of "sensitive places" to "all places of public congregation that are not isolated from law enforcement." *Id*. at 2133-34. *Bruen* explained that endorsing such a broad definition of "sensitive places" "would eviscerate the general right to public carry arms for self-defense…." *Id*. at 2134.

*Bruen*'s identification of "legislative assemblies, polling places, and courthouses" serves as a natural starting point for a definition of what constitutes a "sensitive place." Nastri starts with discussing "why" categorical prohibitions on carrying firearms in those places were constitutionally justified.

The obvious starting point for analyzing "why" is that "legislative assemblies, polling places, and courthouses" served, and still serve, as the critical forums where the core decisional processes of our republic's institutions take place. They represented, and

still represent, the locations housing the three pillars of American self-government: the election of representatives to make laws, the making of laws by the people's representatives, and the people's enforcement of the rule of law through fair judicial proceedings. Each place created, and still creates, the forum necessary to engage in considered and independent decision-making regarding matters of self-government. Independent decision-making could not, and still cannot, reliably occur if the decisionmakers are not secure from the possibility of violence while they deliberate – the incidents of January 6, 2021 being a recent poignant reminder.

This rationale for "why" has remained largely consistent since Parliament adopted the Statute of Northampton in 1328 to prevent anyone from appearing armed before the King's justices or ministers during their performance of their duties. 2 Edw. 3 (1328).

Conn. Agencies Regs. § 23-4-1(c) bears little, if any, resemblance to the "why" underlying prohibitions on carrying weapons in legislative assemblies, polling places, and courthouses. No functions of deliberative self-government occur in Connecticut state parks and forests. To the extent that government employees conduct business in Connecticut state parks and forests, they interact with the public much the same way that a police officer or any other government employee would interact with them on the streets of New Haven where carrying handguns for self-defense is unquestionably constitutionally protected. In other words, the "why" underlying Conn. Agencies Regs. § 23-4-1(c) does not align in a relevantly similar way with the "why" underlying constitutionally permissible "sensitive places" regulations, thus failing a central component of the *Bruen* historical analysis.

The second point of the *Bruen* historical analysis looks at how the government regulation at issue burdens the Second Amendment right compared with how analogous historical regulations burden the Second Amendment right. Again, Connecticut state parks and forests bear little, if any, similarity to legislative assemblies, polling places, and courthouses.

Legislative assemblies, polling places, and courthouses all constituted, and still constitute, enclosed, securable locations at the time of the Founding. To enforce the prohibition on carrying weapons within, virtually every state in the Founding Era adopted some sort of law that enforced the categorical prohibition on carrying arms within through government-provided, comprehensive security. *See Hardaway v. Nigrelli*, 636 F.Supp.3d 329, 346 (W.D.N.Y. 2022) (noting that these locations were not places of frequent concourse by the general public, and "uniform lack of firearms is generally a condition of entry").

Founding Era examples of comprehensive security in these locations abound. Start with laws pertaining to legislatures. Rhode Island, Delaware, Pennsylvania, South Carolina, New York, Georgia, New Jersey, Virginia, and Vermont all enacted statutes compensating law enforcement to attend and provide security at their legislatures. See THE PUBLIC LAWS OF RHODE ISLAND 220, 222 (1798) (providing fees for sheriffs, town sergeants, and constables to attend the general assembly); LAWS OF DELAWARE vol 2., pp. 1100, 1118 (1797) (similar); PENNSYLVANIA STATUTES AT LARGE, Volume X: 1779-81, 378 (Stanley Ray ed., 1904) (referencing sergeant-at-arms and door-keeper for legislature); PUBLIC LAWS OF SOUTH CAROLINA 426, 427 (1790) (providing for payment of door-keepers for the legislature); 1 LAWS OF NEW YORK 532 (2d ed. 1807)

(similar); A COMPILATION OF THE LAWS OF GEORGIA 373–73 (1812) (similar); JOURNAL OF THE VOTES AND PROCEEDINGS OF THE PROVINCIAL CONGRESS OF NEW JERSEY 239, 240 (1835) (similar); JOURNAL OF THE HOUSE OF DELEGATES OF THE COMMONWEALTH OF VIRGINIA 77 (1828) (similar); THE LAWS OF VERMONT 382, 387 (1808) (similar).[3]

Consider laws pertaining to courthouses next. South Carolina, Virginia, Delaware, New Jersey, New York, and Pennsylvania by statute required law enforcement officials to attend court. See THE PUBLIC LAWS OF SOUTH CAROLINA 271 (Grimke, ed. 1790) ("The Said sheriffs shall by themselves, or their lawful deputies respectively, attend all the courts hereby appointed, or directed to be held, within their respective districts"); A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA 69–71 (1803) (similar); LAWS OF DELAWARE vol. 2 1088, 1091 (1797) (similar); LAWS OF NEW JERSEY 49, 50, 58 (Joseph Bloomfield 1811) (similar); 1 LAWS OF NEW YORK 176 (2nd ed., Albany: Websters & Skinner 1807) (requiring during court "all justices of the peace, coroners, bailiffs, and constables within their respective counties, that they be then and there in their own persons. . . . And the said respective sheriffs and their officers shall then and there attend in their own proper persons."); THE STATUTES AT LARGE OF PENNSYLVANIA vol. X p. 57 (1904) (similar). Beyond these statutory requirements, the legislative record in other states indicates that law enforcement officials were compensated for attending judicial proceedings. See ACTS AND LAWS OF THE STATE OF CONNECTICUT 63–65 (1784); A DIGEST OF THE LAWS OF GEORGIA 471, 473–

---

[3] Nastri has attached copies of these sources in **Attachment A** to this memorandum of law for the Court's and their opposing colleagues' convenience.

74, 478 (1800); THE LAWS OF MARYLAND (1799) (1799 law); ACTS AND RESOLVES OF MASSACHUSETTS 235 (1893) (1786 law); LAWS OF NEW HAMPSHIRE 112–16 (1797); A MANUAL OF THE LAWS OF NORTH CAROLINA 190–91, 196 (3d ed. 1814); THE PUBLIC LAWS OF THE STATE OF RHODE ISLAND 220, 220 (1798); LAWS OF VERMONT 382, 287 (1808) (1798 law). [4]

Finally, examine laws pertaining to polling places. Georgia, Virginia, New Jersey, Maryland, Delaware, and South Carolina all enacted laws to provide security at polling places. See A DIGEST OF THE LAWS OF GEORGIA, 1800 Ga. Laws 611 (Watkins ed., 1800) ("[T]he sheriff of each county or his deputy, is required to attend at such elections, for the purpose of enforcing the orders of the presiding magistrates in preserving good order."); ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA 325 (1796) (similar); MD. CONST. art. 1 §§ 3, 14 (1776) (similar); 1 LAWS OF NEW JERSEY 36 (Bloomfield ed., 1811) (providing security at polling places); 2 LAWS OF DELAWARE 984 (Samuel & John Adams, eds., 1797) (similar); THE PUBLIC LAWS OF THE STATE OF SOUTH CAROLINA 386–88 (1790) (table of fees includes payment to sheriffs for polling-place-related duties). [5]

In other words, governments' treatment of legislative assemblies, polling places, and courthouses in the Founding Era and ever since[6] – the "how" of the *Bruen* historical

---

[4] Nastri has attached copies of these sources in **Attachment A** to this memorandum of law for the Court's and their opposing colleagues' convenience.

[5] Nastri has attached copies of these sources in **Attachment A** to this memorandum of law for the Court's and their opposing colleagues' convenience.

[6] For example, at the last time that the undersigned appeared physically before this Court, the Court's security officers required him and all other members of the public to empty their pockets, remove their belts, and surrender their files for security screening for weapons prior to them permitting him to enter the remainder of the courthouse. Similar

analysis – has always been a critical indicator of whether a location is a "sensitive place" or not. The uniting features of historical regulations prohibiting the carrying of firearms into legislative assemblies, polling places, and courthouses are twofold: (1) the prohibitions were absolute and categorical, and (2) government's enforcement of the prohibitions required comprehensive security.

The record in this case yields a far different story as to Conn. Agencies Regs. § 23-4-1(c) and Dykes' enforcement of it.

First, Conn. Agencies Regs. § 23-4-1(c) is not absolute like prohibitions on carrying firearms into legislative assemblies, polling places, and courthouses. It states: "Hunting or carrying of firearms, archery equipment or other weapons, including but not limited to air rifles and slingshots, is not permitted in any state park or forest except as authorized by the Department of Energy and Environmental Protection." Conn. Agencies Regs. § 23-4-1(c). In other words, Dykes retains authority to grant private individuals permission to carry weapons, including handguns, into Connecticut state parks and forests for any reason.

Second, Dykes' enforcement of Conn. Agencies Regs. § 23-4-1(c) falls far short of the security requirements that are necessary to render a place "sensitive" consistent with historically "sensitive places."

For starters, Dykes does not post anyone to guard the entrances of most Connecticut state parks and forests. **L.R. 56**, **¶ 38**. When she does, the uncontradicted evidence shows that she only does so to enforce parking restrictions or alcohol

---

measures exists at every Connecticut courthouse that the undersigned appears in on a near-daily basis.

prohibitions. *Id*. at ¶¶ 39-40. To the extent that her subordinates do conduct random inspections of people's belongings, they only do so to enforce hunting and fishing laws. *Id*. at ¶ 41. Furthermore, they typically only do so when someone is leaving a Connecticut state park or forest, not when they are entering it. *Id*. at ¶ 42.

The only way that Dykes attempts to enforce the firearms prohibition is through public reports of firearms in state parks or forests. *Id*. at ¶ 45. If her subordinates catch a violator, her subordinates typically charge them with violating Conn. Agencies Regs. § 23-4-1(c) unless there are extenuating circumstances. *Id*. at ¶ 46.

Defendant Dykes' failure to secure Connecticut's state parks and forests deprives them of one of the critical historical elements that characterized a "sensitive place:" comprehensive, government-provided security. That alone prevents Dykes from being able to carry her burden to show that Conn. Agencies Regs. § 23-4-1(c) is similar to historical analogues of "sensitive places" on the "how" prong of *Bruen*'s inquiry.

Her failure on the "how" prong does not stop there though. As discussed previously, historical "sensitive places" imposed absolute and categorical prohibitions on the carrying of firearms within their confines. Defendant Dykes, however, has, and exercises, broad discretion of whether to permit firearms in Connecticut state parks and forests for a variety of purposes. For instance, she permits hunting with firearms in some Connecticut state parks and forests, including year-round hunting of coyotes with .22 caliber handguns. *Id*. at ¶¶ 47, 49, 50. From December 1, 2023 until September 24, 2024, Defendant Dykes issued 47,046 hunting licenses allowing individuals to carry weapons in Connecticut state parks and forests. *Id*. at ¶ 54. Similar numbers exist back to 2017. *Id*. at ¶ 54. Additionally, Connecticut owns four state public shooting ranges in Connecticut

state parks and forests, which the public may freely use for target shooting. *Id*. at ¶ 51. One of these shooting ranges is located in the Naugatuck State Forest, which Nastri has previously used for 40 years. *Id*. at ¶¶ 18-19, 59-60. Finally, Dykes permitted Civil War reenactors to carry unloaded Civil War-era firearms into a Connecticut state park for use in their reenactment. *Id*. at ¶ 52.

These numerous and widespread loopholes demonstrate that Conn. Agencies Regs. § 23-4-1(c) is not similar to historical "sensitive places" restrictions because it establishes a system of categorical and individualized exceptions that recognize numerous other lawful purposes for carrying a firearm in Connecticut state parks and forests, but excludes self-defense – the central component of the Second Amendment right. *Heller*, 554 U.S. at 599. That is a far cry from the absolute and categorical prohibitions characterizing historical "sensitive places."

For these reasons, the Court should find that Conn. Agencies Regs. § 23-4-1(c) and Connecticut state parks and forests do not bear any resemblance to historical "sensitive places" and the firearms prohibitions accompanying them.

### c) History and tradition do not support expanding the definition of "sensitive places" to "quintessential crowded areas or public forums.

At first glance, *Antonyuk v. James*, 2023 WL 11963034, at *55 (2d Cir. Oct. 24, 2024) found a historical tradition of "regulating firearms in quintessentially crowded areas and public forums…." It declared decisively that there is "a well-established, representative, and longstanding tradition of regulating firearms in places that serve as public forums and, as a result, tend to be crowded." *Id*. at *58. These decisive pronouncements, however, do not prohibit the Court from reaching a different conclusion

after a thorough historical presentation because *Antonyuk* itself acknowledge that it was not "a full merits decision" and only addressed the "*likelihood* of success on the merits" at a preliminary injunction stage – "a very early stage of this litigation." *Id*. at *79 n.126. The Court now confronts a case at a late stage of litigation where the full merits are before it and where it can conduct a much more thorough historical analysis than the record permitted the Second Circuit to conduct in *Antonyuk*.

*Antonyuk*, however, provides a useful contrast for Nastri's historical presentation.

Start with where it located the origin of its historical tradition of prohibiting firearms in "quintessentially crowded areas and public forums" – the Statute of Northampton. *Id*. at *55-56. The Statute of Northampton forbade men "to come before the King's justices, or other of the King's ministers doing their office with force and arms, nor bring no force in affray of the peace. Nor to go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere." 2 Edw. 3, c. 3 (1328). While this language may appear to establish a locational restriction by its text, Nastri's history expert – Prof. Joyce Malcolm[7] – explains that this language is "cumbersome" and that King Edward III clarified the Statute of Northampton's scope in 1328 and 1332. **Exhibit A – Declaration of Prof. Joyce Malcolm, ¶¶ 15-16.** King Edward III's clarifications instructed Northumberland County officials to enforce the statutes against "all persons riding or going armed to disturb the peace." *Id*. at ¶ 16.

Professor Malcolm further explains that later commentators – English and American – explained that the Statute of Northampton did not prohibit the wearing of arms

---

[7] The Supreme Court has repeatedly and approvingly cited Professor Malcolm's work on English history and the Second Amendment's history. *See McDonald v. City of Chicago*, 561 U.S. 742, 769 (2010); *District of Columbia v. Heller*, 554 U.S. 570, 592-93 (2008).

in fairs, markets, and other places unless they were borne in such a manner as to terrify the people. *Id.* at ¶¶ 17-21. Sir Edward Coke and Richard explained in their commentators that "no wearing of arms; is within the meaning of this statute, unless it be accompanied with; such circumstances as are apt to terrify the people." *Id.* at ¶ 17 (quoting Sir Edward Coke, *Institutes of the Lawes of England*, 1628 (3 Inst. 158); Richard Burn, *The Justice of the Peace and Parish Officer*, pp. 17-18 (16th ed. 1788)). Richard Wingate explained in his collection of English statutes that the Statute of Northampton prohibited "go[ing] or rid[ing] Armed in affray of Peace." *Id.* at ¶ 18 (quoting Richard Wingate, *An Exact Abridgment of all Statutes in Force and Use From the Beginning of Magna Charta, until 1641*, p. 23 (1684)). Serjeant William Hawkins directly addressed the statute of Northampton in his influential treatise: "no wearing of Arms is within the meaning of the [Statute of Northampton] unless it be accompanied with such Circumstances as are apt to terrify the people." *Id.* at ¶ 21 (quoting Serjeant William Hawkins, 1 *A Treatise of Pleas of the Crown, or a System of the Principal Matters relating to that Subject, Digest Under Proper Heads*, p. 136 (1716)).

William Blackstone gave a similar construction of the Statute of Northampton: "The offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land; and is particularly prohibited by Statute of Northampton." *Id.* at ¶ 25 (quoting Blackstone, *Commentaries on the Laws of England 1765-1769*, vol. 4 pp. 148-49).

Guides for justices of the peace set forth the same understanding of the statute of Northampton. Michael Dalton stated that the statute prohibited people from riding or go armed offensively "in fairs, Markets, or elsewhere (by night or by day) in Affray of the

Kings people." *Id*. at ¶ 19 (quoting Michael Dalton, *The Country Justice*, p.7 (1690)). John Bond agreed that the Statute of Northampton prohibited the carrying of "offensive Weapons in Fairs, Markets or elsewhere in Affray of the King's People." *Id*. at ¶ 20 (quoting John Bond, *A Compleat Guide for Justices of the Peace* (Bond, 3rd ed. 1707)). So did Richard Burn: "Where a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people, which is said to have been always an offense at the common law, and is strictly prohibited by statute." *Id*. at ¶ 24 (quoting Richard Burn, *The Justice of the Peace and Parish Officer*, p. 17 (16th Ed. 1788).

English case law took the same view. In Sir John Knight's case, King James II charged Sir John Knight under the Statute of Northampton on an allegation that he went into a church at the time of service "with a gun to terrify the King's Subjects." *Id*. at ¶ 22 (quoting *Rex v. Knight*, 87 Eng. Rep. 75, 76 (KB) (1686)). The judge questioned whether the Statute of Northampton was in abeyance, and the jury acquitted Knight, with the jury recognizing that his mere presence in the church was not a violation of the Statute of Northampton and the judge recognizing a "general connivance to Gentlemen to ride armed for their security." *Id*. at ¶ 22 (*Rex v. Knight*, 87 Eng. Rep. 75, 76 (KB) (1686)).

Likewise, *Rex v. Dewhurst* considered whether a crowd carrying arms to a protest gathering violated English law. The Court agreed that "weapons could be carried to a public meeting with one exception, 'persons are not warranted in carrying arms to a public meeting if they are calculated to create terror and alarm." *Id*. at ¶ 26 (quoting *Rex v. George Dewhurst and Others*, John Macdonell, ed., *Reports of State Trials*, new ser., vol. 1, pp. 529-608 (1820)).

Thus, English history lacked any tradition of a prohibition against peacefully carrying a firearm into towns, crowded areas, parks, or anywhere else. *Id*. at ¶ 27.

The colonial and early American laws supplied in *Antonyuk* were not inconsistent with the English history. *Antonyuk* cited three laws similar to the Statute of Northampton: 1786 Virginia law, a 1792 North Carolina law, and a 1816 District of Columbia law. *Antonyuk*, 2023 WL 11963034, at *55. Its own recitation of the text of the Virginia and District of Columbia laws showed statutory language that limited their scope to the offense of affray that prevailed in English law: (1) 1786 Va. Acts 35, Ch. 49 prohibited "going or riding "armed by night [ ]or by day, in fairs or markets, ... in terror of the county") and (2) An Act for Punishment of Crimes and Offences, within the District of Columbia, § 40 (1816) prohibited "going or riding "armed by night nor day, in fairs or markets, or in other places, in terror of the county." *Antonyuk*, 2023 WL 11963034 at *55 & n.81 (cleaned up). Both of these laws were consistent with the English tradition that did not prohibit the carrying of firearms in locations, but rather conduct with the carrying of firearms that would cause a breach of peace.

The 1792 North Carolina law textually prohibited people "to go nor ride armed by night nor by day, in fairs, markets" *Antonyuk*, 2023 WL 11963034 at *55 (quoting Collection of Statutes of the Parliament of England in Force in the State of North Carolina, pp. 60–61, ch. 3 (F. Martin Ed. 1792)). *Antonyuk*, however, overlooked how it was treated shortly after the compilation was assembled.

In *State v. Huntly*, 3 Ired. 418, 25 N.C. 418, 420 (1843), the North Carolina Supreme Court acknowledged a question of whether the Statute of Northampton had ever been in effect in North Carolina, but stated that, regardless of the answer, it certainly had

not been since January 1, 1838 when the North Carolina formally repealed all statutes of England or Great Britain in effect. The North Carolina Supreme Court went a step further too. It described the Statute of Northampton as only punishing "the office of riding or going about armed with unusual and dangerous weapons, to the terror of the people." *Huntly*, 25 N.C. at 420. In reaching this conclusion, *Huntly* reviewed many of the sources Professor Malcolm has compiled and Nastri now presents to the Court. *Id*. at 420-22.

Thus, the North Carolina statute did not stand for the proposition that *Antonyuk* thought it did.

Founding Era history also demonstrates a different tradition – one that required people to bring their weapons to public forums and quintessentially crowded areas. **Exhibit A**, ¶ 29. For example, a 1619 Virginia statute required everyone to attend church on Sunday and bring their weapons on the pain of a three-shilling fine. *Id*. at ¶ 29(a) (quoting Lyon G. Tyle, ed., *Narratives of Early Virginia, 1606-1625*, p. 273). A 1636-1637 Massachusetts law required every person older than 18 to bring firearms to all public assemblies or be fined. *Id*. at ¶ 29(b) (quoting 1 Records Of The Governor And Company of The Massachusetts Bay In New England 190 (1853)). The New Haven Colony, in 1646, required every male between 16 and 60 bring their arms to church and recorded fines imposed on men who failed to do so. *Id*. at ¶ 29(c) (quoting *Records Of The Colony And Plantation of New Haven, From 1638 To 1649*, 486 (1857)).

In other words, Founding Era history lacks any prohibitions on citizens carrying their firearms in public forums or where people gathered. Instead, it contains numerous examples demonstrating that the carrying of firearms was required at public forums and quintessentially crowded places.

*Antonyuk*'s last effort on this front was to examine three Reconstruction laws from the states of Missouri, Texas, and Tennessee that prohibited carrying firearms in various assemblies. *Antonyuk*, 2023 WL 11963034 at *56. It also included two territorial laws from Oklahoma and Arizona. *Id*. at *56. Not only do these three isolated laws fail to establish the well-established and representative historical analogue required by *Bruen* because they were isolated and rare, but they are also too late in time. *Bruen* is clear that Reconstruction history may only be "treated as mere confirmation" of Founding Era history. *Bruen*, 142 S.Ct. at 2137.

The five laws from three states and two territories do not confirm any Founding Era history or tradition. They adopt limitations on the right to bear arms that are inconsistent with the Second Amendment's original public understanding at the time of its adoption in 1791 or the Founding Era tradition of requiring people to carry arms in public forums and quintessentially crowded places. They also adopt limitations that are inconsistent with more than 500 years of common law dating back to King Edward III's clarification of the Statute of Northampton.  Relying on them to find a well-established and representative historical tradition would neglect the 500 years of historical silence on prohibiting the carrying of firearms and the Founding Era tradition that required the carrying of arms in public forums and quintessentially crowded places.

*Bruen* and *Heller* do not permit such a means-end cherry picking of history. In fact, *Bruen* warned against this exact expansion of the "sensitive places" doctrine when it quickly dispensed of New York's "sensitive places" argument that sought to define "sensitive places" as all "places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." *Bruen*,

142 S.Ct. at 2133-34. *Bruen* clearly stated that "expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly." *Id*. at 2134. If the Court accepts Dykes' advancement of New York's theory in *Antonyuk*, it lets the same fox that *Bruen* ejected from the barnyard back into the chicken coop because it is dressed up differently. The Court should reject that invitation.

There is no historical tradition of prohibiting the carrying of arms in public forums and quintessentially crowded places.

> **d) History and tradition do not support a free-standing historical tradition of prohibiting the carry of firearms at public parks.**

Defendant Dykes has already attempted, in this case, to cast public parks as a new phenomenon that first appeared in the second half of the nineteenth century. In her view, that would justify treating them as "modern regulations that were unimaginable at the founding." *Bruen*, 142 S.Ct. at 2133. That is simply not correct. There is nothing new about public parks, and there is nothing new about potential violence in public parks or in public green spaces more generally.

Many public parks existed before 1800, including the National Mall in Washington, D.C., Boston Common in Massachusetts, Battery and Duane Parks in New York, and more. *See, e.g.*, Trust for Public Land, *The 150 Largest City Parks*[8] (hereinafter "*Largest City Parks*"); Margaret Walls, *Parks & Recreation in the U.S.: Local Park Systems*, RESOURCES FOR THE FUTURE (June 2009)[9] (hereinafter "Walls"). Several dozen

---

[8] https://bit.ly/47VJw1Q (last visited Nov. 15, 2024).
[9] http://tinyurl.com/bdfs4hd2 (last visited Nov. 15, 2024).

more parks were created in the years preceding the Fourteenth Amendment's ratification. *See Largest City Parks*.

For example, Boston Common, established in 1634, is considered "the nation's first city park." Walls at p. 1; *accord Koons v. Platkin*, 673 F.Supp.3d 515, 640 (D.N.J. 2023). It was far from a gun-free zone. Instead, the space was commonly used for militia purposes, including training with firearms. *See* Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 LANDSCAPE J. 1, 3–6 (2021). "The Common also served as a site for informal socializing and recreation" including "[s]trolling," "[h]orse- and carriage-riding," "sports," "entertainment," and "raucous celebrations."[10] *Id.*; *see also Boston Common*, Nat'l Park Serv.[11] ("[T]he Common was a place for recreation as early as the 1660s.").

In New York, City Hall Park began as a "public common" in the 17th century. T*he Earliest New York City Parks*, N.Y. City Dep't of Parks & Recreation.[12] New York's Bowling Green Park was established in 1733. *Id.* Nearby Duane Park was also the first open space purchased "specifically for use as a public park" in 1797. *Duane Park*, The Hist. Marker Database.[13] Other examples abound throughout the colonies and early Republic. *See, e.g., Largest City Parks* at 5–6.

Despite the existence of parks at the Founding, there is no analogous historical tradition of banning firearm carry there by private citizens. To the contrary, had the

---

[10] This squarely cuts against *Antonyuk*'s conclusion that "our 18th century forebears would have considered commons and greens to be public grazing areas and not places of social recreation." *Antonyuk*, 2023 WL 11963034, at *59.

[11] https://bit.ly/3SGumtc (last visited Nov. 15, 2024).

[12] https://on.nyc.gov/3hBZXfe (last visited Nov. 15, 2024).

[13] http://tinyurl.com/2t96nykf (last visited Nov. 15, 2024).

colonists left their muskets at home when they mustered on the Lexington Common (also known as the Lexington Battle Green) in April of 1775, Americans might still be British subjects. Thus, Defendant Dykes has never, and cannot now, point to a historical tradition of banning firearms at such locations during the Founding Era.

In fact, even before *Bruen*, courts had rejected attempts to characterize such locations as "sensitive places." *See, e.g., Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632, 658 (Del. 2017) (holding that State parks and State forests were not "sensitive places" and that the County's ban on firearms in such places was unconstitutional under Delaware's version of the Second Amendment); *People v. Chairez*, 104 N.E.3d 1158, 1176 (Ill. 2018) (holding that an Illinois statute that banned possession of firearms within 1,000 feet of a public park violated the Second Amendment and rejecting argument that that area was a "sensitive" place); *Morris v. Army Corps of Eng'rs*, 60 F. Supp. 3d 1120, 1123–25 (D. Idaho 2014), appeal dismissed, 2017 WL 11676289 (9th Cir. Dec. 15, 2017) (rejecting argument that U.S. Army Corps of Engineers' outdoor recreation sites were sensitive places); *Solomon v. Cook Cnty. Bd. of Comm'rs*, 559 F. Supp. 3d 675, 690–96 (N.D. Ill. 2021) (finding that a forest preserve district was not a "sensitive place"); *DiGiacinto v. Rector & Visitors of George Mason Univ.*, 704 S.E.2d 365, 370 (Va. 2011) (contrasting "a public street or park" with sensitive places).

Dykes, however, may attempt to continue to justify Conn. Agencies Regs. § 23-4-1(c) by reference to municipal parks laws shortly before and after the Civil War. Those, however, are not sufficient to carry the day.

Municipal laws often only applied to individual parks. *See, e.g.*, PA. SESS. LAWS § 1 (1868) (referencing Fairmount Park); CITY OF READING, PA. LAWS &

ORDINANCES ch. II § 20 (1897) (referencing Penn's Common park). They also were often coupled with restrictions on shooting animals. *See, e.g.*, PA. ACTS OF ASSEMBLY § 21 (1870) ("No persons shall carry fire-arms, or shoot birds in [Fairmount] Park[.]"); ANN. REPORTS OF THE CITY OF ST. PAUL § 6 (1888) ("No person shall carry firearms or shoot birds in any Park or within fifty yards thereof[.]"). Thus, because they are more akin to game laws than bans on public carry, they are not relevantly similar to Conn. Agencies Regs. § 23-4-1(c) in "how" and "why" they burden Nastri's Second Amendment rights.

Municipal laws also deserve skeptical treatment for other reasons. They often barred the exercise of other constitutional rights, such as freedom of speech or assembly, rendering them poor models of constitutionality. For example, a regulation restricting firearms in Central Park from 1858 barred "conversing with construction workers." MINUTES OF PROCEEDINGS OF THE BD. OF COMM'RS OF CENTRAL PARK (1858). And Brooklyn's Prospect Park in 1868 restricted "indecent language." RULES & REGULATIONS, PROSPECT PARK, BROOKLYN (1868). A regulation from the same year governing Fairmount Park in Pennsylvania similarly barred "indecent language" and public gatherings or meetings for political purposes. LAWS OF THE GENERAL ASSEMBLY OF PENNSYLVANIA (1868). Laws permeated with constitutional violations are likely not probative of the Second Amendment's meaning in a historical analysis.

In any event, these laws cannot establish the broad and enduring national tradition of restricting carrying of firearms in public parks that is required by *Bruen*. A scattering of municipal laws enacted more than 50 years after the adoption of the Second Amendment cannot provide a shred of guidance as to the meaning of the Second Amendment. *Bruen*

is clear that Reconstruction history may only be "treated as mere confirmation" of Founding Era history. *Bruen*, 142 S.Ct. at 2137.

Since Defendant Dykes cannot establish that there is a well-established and representative historical tradition through relevantly similar analogues, the Court should declare Conn. Agencies Regs. § 23-4-1(c) unconstitutional.

### C. In the alternative, Defendant Dykes fails to show that Sleeping Giant State Park, Naugatuck State Forest, and the Farmington River Canal Trail are "urban parks" or "quintessential crowded areas or public forums."

If the Court disagrees with Nastri's previous arguments or considers itself bound by *Antonyuk*, the Court should still find that Conn. Agencies Regs. § 23-4-1(c) violates Nastri's Second Amendment rights insofar as it prohibits him from carrying a handgun for self-defense in Sleeping Giant State Park, Naugatuck State Forest, or the Farmington River Canal Trail.

*Antonyuk* clearly indicates that "rural parks" are more akin to "commons" and "wilderness areas." *Antonyuk*, 2023 WL 11963034, at *60. It used Adirondack Park and its "vast forests, rolling farmlands, towns and villages, mountains and valleys, lakes, ponds and free-flowing rivers, private lands and public forest" as an example that echoes "New England commons… spaces held by the community for shared utilitarian purposes." *Id*. at *60. Sleeping Giant State Park, Naugatuck State Forest, or the Farmington River Canal Trail are akin to Adirondack Park.

Start with Sleeping Giant State Park. Sleeping Giant State Park is a 32-mile backcountry trail system. **L.R. 56, ¶ 55.** A person hiking its trails will quickly find themselves more than a mile away from the nearest public access point. *Id*. at ¶¶ 56-57.

In other words, it is a quintessential wilderness park, and its trails bear a striking, but more rugged, resemblance to public streets.

Naugatuck State Forest covers multiple towns and is, by definition, a forested area like Adirondack Park. *Id*. at ¶ 58. It is open to the public to engage in a variety of wilderness activities that would not be associated with a public forum: fishing, hiking, mountain biking, snowmobiling, target shooting, and hunting. *Id*. at ¶ 59. It also encompasses one of Connecticut's four state owned shooting ranges. *Id*. at ¶ 60. Like Sleeping Giant State park, a person will quickly find themselves more than a mile away from the nearest public access point. *Id*. at ¶ 61.

Finally, the Farmington River Canal Trail is a "greenway" – a simple trail – that runs the length of Connecticut along the Farmington Canal and an old rail line. *Id*. at ¶ 62. It is more akin to a public street than it is to a quintessential public forum that draws a crowd.

Each of these parks is not a public forum or a quintessentially crowded place where activities similar to a public forum occur. They are wilderness parks open to a variety of activities that would be intolerable in a public forum – shooting, hunting, snowmobiling. Permitting Nastri to carry his handgun peaceably for self-defense within these locations will be no more disruptive, and actually far less disruptive, to their activities than a hunter discharging his shotgun, a target shooter firing at a target with a rifle, or someone racing around on a snowmobile. This is especially true since Connecticut has prohibited open carrying of handguns in public. Conn. Gen. Stat. § 29-35(a)(2).

For these reasons, the Court should find that Conn. Agencies Regs. § 23-4-1(c) violates Nastri's Second Amendment right to carry in Sleeping Giant State Park, Naugatuck State Forest, and the Farmington River Canal Trail.

**II.    Nastri Demonstrates Irreparable Harm And That The Balance Of Hardships And The Public Interest Favor The Issuance Of A Permanent Injunction.**

Irreparable harm exists when there is no adequate remedy at law, such as money damages. *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) Courts, however, also find that a movant has established irreparable harm when the movant's claim involves the alleged deprivation of a constitutional right. *Am. Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury").

Nastri shows irreparable harm. First, a violation of a constitutional right always satisfies the irreparable harm factor.  *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996). As discussed at length below, Conn. Agencies Regs. § 23-4-1(c) violates Nastri's Second Amendment rights by prohibiting him from carrying a handgun for self-defense in Connecticut state parks and forests.

Second, no other adequate remedy exists at law. As long as Conn. Agencies Regs. § 23-4-1(c) remain un-enjoined, Nastri is subject to penalties for violating it, which could permanently impact his career as a financial advisor. **L.R. 56, ¶¶ 34-35.** It is usually impossible to adequately compensate a constitutional injury monetarily. Jolly, 76 F.3d at 482.

Third, Nastri shows actual irreparable harm. Every day that passes where Conn. Agencies Regs. § 23-4-1(c) and the threat of its enforcement prohibit Nastri from carrying firearms for the purpose of self-defense in Connecticut state parks and forests is an injury that money cannot remedy. The days on which he has lost the right to exercise his Second Amendment rights are gone forever.

Turning to the remaining factors, the public interest and the balance of hardships factors "merge when the Government is the opposing party." *Haller v. U.S. Dep't of Health & Hum. Servs.*, 621 F. Supp. 3d 343, 361 n.12 (E.D.N.Y. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). These two elements always favor the plaintiff who establishes a constitutional violation. *See J.S.R. by & through J.S.G. v. Sessions*, 330 F. Supp. 3d 731, 743 (D. Conn. 2018) ("As with irreparable injury, when a plaintiff establishes a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiffs have also established that both the public interest and the balance of the equities favor a preliminary injunction") (cleaned up). Because Nastri has demonstrated a violation of his Second Amendment rights, he has demonstrated that both the public interest and the balance of the equities favor the issuance of permanent injunction.

## CONCLUSION

For the foregoing reasons, the Plaintiff, David Nastri, respectfully asks the Court to grant his motion for summary judgment, declare Conn. Agencies Regs. § 23-4-1(c)'s prohibition on carrying firearms for self-defense in Connecticut state parks and forests unconstitutional, and enter a permanent injunction enjoining the Defendant from enforcing it.

The Plaintiff,

By: /s/ Cameron L. Atkinson /s/
Cameron L. Atkinson, Esq.
(ct31219)
ATKINSON LAW, LLC
122 Litchfield Rd., Ste. 2
P.O. Box 340
Harwinton, CT 06791
Telephone: 203.677.0782
Email: catkinson@atkinsonlawfirm.com

## **CERTIFICATION OF SERVICE**

The undersigned hereby certifies that, on the foregoing date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties and counsel of record who have appeared by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

/s/ Cameron L. Atkinson /s/