## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DAVID J. NASTRI, ESQ., | : | No. 3:23-cv-00056-JAM |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | |
| KATIE DYKES, in her official | : | |
| capacity only, | : | |
| *Defendant.* | : | DECEMBER 31, 2024 |

**Defendant's Memorandum of Law in Support of Her Combined Cross-Motion for
Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................... 3

   I.   Modern Public Parks First Emerged During the Mid-1800s in Response to Rapid
       Social Changes and They Uniformly Banned Firearms at Inception ................................. 3

   II.  Connecticut's State Parks and Forests Grew out of the Modern Parks and
       Conservation Movements and Restricted Firearms since Inception ................................. 5

   III. Connecticut's State Parks and Forests Continue to be Places for Respite, Recreation,
       and Tranquility that are Often Crowded and Frequented by Children ............................. 5

PROCEDURAL BACKGROUND ....................................................................................... 7

ARGUMENT ....................................................................................................................... 8

   I.   Legal Principles ............................................................................................................... 8

       A.   Summary judgment standard ...................................................................................... 8

       B.   *Bruen*, *Rahimi*, and their progeny permit firearms restrictions ................................. 8

   II.  Section 23-4-1(c) is Facially Constitutional .................................................................. 10

       A.   Plaintiff's facial challenge fails because § 23-4-1(c) has lawful applications ........... 10

       B.   Plaintiff's facial challenge fails because he did not carry his burden at *Bruen*'s
            first step to show that the Second Amendment applies to carrying firearms into
            State parks and forests over DEEP's objection ......................................................... 12

       C.   Section 23-4-1(c) is consistent with the Nation's history and tradition of firearm
            regulation ................................................................................................................. 15

       D.   Plaintiff's arguments regarding "sensitive places" or crowded locations fail ........... 45

   III. Plaintiff Cannot Prevail on his As-Applied Challenges ................................................. 49

       A.   Plaintiff lacks standing to pursue an as-applied challenge to Naugatuck State
            Forest ........................................................................................................................ 50

    B.   Section 23-4-1(c) is constitutional as-applied to Sleeping Giant State Park, Naugatuck State Forest, and the Farmington Canal Greenway State Park ................ 52

IV.  Plaintiff is not Entitled to a Statewide Permanent Injunction ............................................ 53

CONCLUSION ................................................................................................................ 55

Certificate of Service ................................................................................................ 57

## INTRODUCTION

Connecticut's prohibition on carrying firearms in State parks and forests is deeply rooted in this Nation's history and tradition of regulating firearms. The prohibition is not only aligned with Founding-era firearm regulations and those existing around enactment of the Fourteenth Amendment, but it also addressed societal concerns that Founding generations could not have fathomed—society's need for places in nature for respite, recreation, and tranquility to alleviate harms that arose through rapid urbanization and industrialization. Today, this prohibition maintains State parks and forests as places of respite, recreation, and tranquility, and protects the millions of yearly visitors to such locations, many of which are vulnerable children.

For over 100 years, Connecticut's parks and forests have provided children, families, and others with places to relax, socialize, and recreate together. This was by design, as these discrete locations principally trace their roots to the parks movement that began in the mid-nineteenth century—a movement that sought to combat the perils of industrialization, strengthen community bonds, and improve society through recreation in nature. And to ensure that parks and similar government-controlled outdoor spaces born from this movement lived up to their intended purposes, governments across the Nation banned firearms from such locations at inception. That was because the unauthorized presence of guns—even if passively carried for self-defense—was thought to undermine the key purpose of such locations as society-improving devices since guns risked interfering with all people's ability to recreate in natural scenery peacefully and without alarming (and potentially life-threatening) distractions.

Section 23-4-1(c) of the Regulations of Connecticut State Agencies is part of that same enduring and unbroken regulatory tradition of prohibiting firearms in parks and similar government-controlled outdoor spaces. Plaintiff seeks to break with that history and tradition. He relies on *N.Y. State Rifle & Pistol Assn. v. Bruen*, 142 S. Ct. 2111 (2022), to claim that § 23-4-1(c)

is unconstitutional both facially and as-applied to two State parks and one State forest. His contentions not only ignore the purposes of the parks movement, but they also demand a departure from binding precedent. This Court should reject them for several reasons.

*First*, Plaintiff cannot prevail on his facial challenge to § 23-4-1(c) because the regulation has lawful applications including, for example, the fact that it prohibits individuals from carrying on State property non-firearm weapons like large knives, spears, swords, axes, and maces, and other unusually dangerous weapons such as military-style assault rifles.

*Second*, he cannot prevail because he has not demonstrated—as is his burden at step one of *Bruen*'s two-step inquiry—that the Second Amendment covers the specific conduct that he seeks to engage in. That conduct is not simply carrying a firearm in public generally but, rather, carrying a firearm into locations against the landowner's express wishes. Here, Plaintiff offered no historical evidence demonstrating that the Second Amendment gives him the right to disregard a landowner's desire to prohibit carrying firearms onto their lands absent consent.

*Third*, even if Plaintiff had carried his burden at *Bruen*'s first step—which he has not—he is wrong about § 23-4-1(c) being inconsistent with the Second Amendment. Section 23-4-1(c) fully aligns with the Nation's tradition of regulating firearms. *See generally United States v. Rahimi*, 144 S. Ct. 1889 (2024); *Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024) ("*Antonyuk II*"). To start, State parks and forests within the ambit of § 23-4-1(c) were established in response to unprecedented societal concern during an era of rapid industrialization and urbanization in the United States, which requires that this Court apply a more nuanced approach to comparing § 23-4-1(c) to historical analogues. And even though dead ringers are not needed to demonstrate the challenged regulation's constitutionality, § 23-4-1(c) is nearly identical to more than 100 ordinances, regulations, and laws enacted by municipalities, the federal government, and states

regarding similar parks and government-controlled outdoor spaces.  But § 23-4-1(c)'s strong roots in history and tradition do not end there.  It is also consistent with at least five other categories of laws and comports with principles underlying them.

*Fourth*, Plaintiff cannot prevail on his as-applied challenge to the prohibition on carrying firearms in Naugatuck State Forest because he has only gone there on a few occasions in the past and offers nothing more than a some-day intention to visit that location again at some unspecified point in the future.  And in any event, his as-applied challenges fail on their merits because § 23-4-1(c) comports with principles underpinning our Nation's history of firearms regulation.

*Finally*, Plaintiff seeks a sweeping permanent injunction, urging this Court to enjoin § 23-4-1(c)'s enforcement in all State parks and forests.  Because Plaintiff has not demonstrated that § 23-4-1(c) is actually unconstitutional, he is not entitled to any injunctive relief.  But in any event, he is not entitled to a statewide permanent injunction because that plainly would be inequitable.

## **FACTUAL BACKGROUND**

### I.     Modern Public Parks First Emerged During the Mid-1800s in Response to Rapid Social Changes and They Uniformly Banned Firearms at Inception

At the time of the Founding, public parks as we know them today did not exist.  Defendant's Local Rule 56(a)(1) Statement ("SOF") ¶¶ 1.  That was principally because colonists had little desire or need for publicly owned outdoor spaces.  *Id.* ¶ 2.  And although places like the Boston Common or other greenspaces existed, such locations were simply used for grazing, military exercises, public executions, and dumping grounds for discarded items.  *Id.* ¶¶ 3-4.

Things changed by the mid-1800s as people began seeking refuge from inner-city life brought about by rapid industrialization.  *Id.* ¶ 6.  At that time, people considered cities to be socially degraded, noisy, polluted, and crime ridden.  *Id.* ¶ 7.  And in response to these trends, the parks movement launched in the 1850s, drawing on the idea that urban society was flawed and

that parks could repair and reform society. *Id.* ¶ 8. The philosophy behind the movement was parks contained natural scenery that, when quietly and passively contemplated, could improve mental and physical health, and thus improve society. *Id.* ¶ 9. This modern idea of parks as places of relaxation, repose, and recreation inspired individuals to embark upon a new set of policies that led to the creation of parks across the Nation. *Id.* ¶ 10. Created by Frederick Law Olmsted in 1858, New York City's Central Park was among the first and most influential. *Id.* ¶ 11.

Although public parks were initially situated in urban areas, by the late 1800s, demand for these natural landscapes grew and national and state parks proliferated. *Id.* ¶ 13. Olmstedian ideals of peace, relaxation, and quiet enjoyment lay at the foundation of these national and state parks, which grew out of the same parks movement that created urban parks. *Id.* ¶¶ 14-15. Such parks were also inspired by the conservation movement and the need to regulate hunting and preserve game and wildlife, which emerged in the latter half of the 1800s. *Id.* ¶¶ 16-17.

From their inception, firearms were prohibited in public parks and similar government-controlled outdoor spaces because people thought that the presence of guns in such locations—even if passively carried for self-defense—did not reflect proper behavior or decorum and risked interfering with all people's ability to recreate peacefully in natural scenery. *Id.* ¶¶ 18-26. People believed that the unauthorized carrying of guns constituted conduct that threatened to undermine such locations' key purpose of functioning as society-improving devices where all could strengthen their mind and body without alarming and potentially life-threatening interruptions (like the presence of a gun) that would distract them from nature's tranquil haven. *See id.* ¶¶ 18-26. Central Park, for example, stated clearly in its 1858 rules: "All persons are forbidden . . . [t]o carry fire-arms." *Id.* ¶ 19; Ex. 1. Dozens more such prohibitions followed—at the local, national, and state levels—as public parks rapidly emerged over the ensuing decades. SOF ¶¶ 20-21, 25.

4

## II.  Connecticut's State Parks and Forests Grew out of the Modern Parks and Conservation Movements and Restricted Firearms since Inception

The parks movement firmly took root in Connecticut by the early-1900s, and, in 1913, the State legislature formed the State Park Commission ("Commission") to begin acquiring properties to be set aside for public enjoyment.  *Id.* ¶¶ 28-29.  Embracing Olmsted's romantic vision, Park Commission Field Secretary Albert Turner "emphasize[d] a state park's purpose as one of public mental health, an essential refuge from the stresses of modern urban life." *Id.* ¶ 31.  In the Park Commission's first report in 1914, Turner wrote that State parks were necessary because "the city sights and sounds and pavements become unbearable, and a rest and contrast become as necessary as sleep at night." *Id.* (quoting Ex. 57 at Bates # 0327).

In his 1914 report, Turner urged the Commission to adopt "rules and regulations" prohibiting visitors from engaging in conduct that "interfere[s] with the rights or enjoyment of others," which "would involve the prohibition of firearms." *Id.* ¶ 36 (quoting Ex. 57 at Bates # 0332).  In 1918, the Park Commission formally banned firearms in State parks *Id.* ¶ 37; Ex. 63 at Bates # 0365.  Although the Park Commission eventually became the Department of Energy and Environmental Protection ("DEEP"), its 1918 firearm ban remained substantively unchanged and is now contained in § 23-4-1(c), which provides in relevant part:  "Hunting or carrying of firearms, archery equipment or other weapons, including but not limited to air rifles and slingshots, is not permitted in any state park or forest except as authorized by [DEEP]."  SOF ¶¶ 39-40.

## III.  Connecticut's State Parks and Forests Continue to be Places for Respite, Recreation, and Tranquility that are Often Crowded and Frequented by Children

Today, there are 142 locations in Connecticut's parks and forests system (110 parks and 32 forests).  *Id.* ¶ 33.  Most locations have multiple uses and contain a combination of beaches, camping grounds, picnicking areas, historic sites and other attractions, hiking trails, and forested areas.  *Id.* ¶ 48.  Such locations are some of the State's most popular recreational destinations,

particularly among children, families, and schools. *Id.* ¶¶ 50, 74-75, 84-85. Notably, the number of annual visitors recently "skyrocketed," from an estimated 9-10 million in 2019 to 17 million in 2022. *Id.* ¶ 51.

Considering their popularity, many locations become densely crowded, especially during summer months. *Id.* ¶ 53. Designated swimming areas, for example, can get so crowded as to be almost shoulder to shoulder. *Id.* ¶¶ 62-64; *see also* Exs. 115, 146-149 (photographs of crowding at designated swimming areas). Even some of the larger-acreage locations become crowded when visitors congregate at a scenic structure or historic site. SOF ¶¶ 55-56. And it is not uncommon for various locations to reach capacity. *Id.* ¶¶ 59-61. Managing these crowds, parking overflow, and unruly behavior in certain locations is an ongoing issue for DEEP. *Id.* ¶ 57.

Several locations within the parks and forest system also attract crowds because they are popular for special events like weddings, private parties, and conferences. *Id.* ¶ 65. DEEP specifically advertises State parks and forests to the public as ideal locations for special events. *Id.* ¶ 66. People have also used certain locations for political activities—such as a State Senate campaign kick-off event at Hammonasset Beach State Park—and youth sporting events like high school and college cross-country meets. *Id.* ¶¶ 68-69. Photographs show how crowded special events can get. *Id.* ¶¶ 70, 95, 117; *see* Exs. 152, 154-156.

Additionally, a "core mission" of the State park and forest system "is to encourage communities, families, and younger generations of adults and children to come together through a shared appreciation of nature and the environment." SOF ¶ 72. Indeed, families are *the* target audience of marketing and programming for State parks and forests. *Id.* ¶ 74. Millions of children visit State parks and forests each year. *Id.* ¶ 75. And more granular details further reflect that vulnerable children frequent such locations. For example, Dinosaur State Park attracted tens of

thousands of children each year for the past two years. *Id.* ¶¶ 114-115. In 2023, approximately 42 percent of the visitors admitted to Dinosaur State Park's visitor center were reportedly aged twelve and under, and approximately 54 percent of its visitors were reportedly aged thirteen and older—datapoints reflecting that a large percentage of visitors to Dinosaur State Park's visitor center are minor children or individuals accompanied by children. *Id.* ¶ 114. Moreover, schools frequently utilize State parks and forests for field trips and as part of the curriculum. *Id.* ¶¶ 84-85.

Consistent with their century-old purpose, State parks and forests continue to serve as welcoming places of respite and quiet enjoyment, where all people, particularly children and families, can reconnect with nature and escape modern life. *Id.* ¶ 42. To this end, the Environmental Conservation Police ("EnCon")—DEEP's law enforcement arm—emphasizes the "park ranger" image, rather than a traditional police officer, as a way to avoid confrontational interactions with patrons and maintain the relaxing, peaceful atmosphere of State parks and forests. *Id.* ¶¶ 44-45.

## PROCEDURAL BACKGROUND

Plaintiff commenced this action pursuant to 42 U.S.C. § 1983, claiming that § 23-4-1(c) violated the Second Amendment and moved for a preliminary injunction. *See* ECF Nos. 1, 13, and 14. Following a two-day preliminary injunction hearing, the Court (Arterton, J.) dismissed the amended complaint for lack of standing and denied Plaintiff's motion for preliminary injunction as moot. *See* ECF Nos. 22-23, 38-39, 46. Plaintiff appealed. *See* ECF Nos. 47 and 58. After the Second Circuit reversed and remanded for further proceedings; *see Nastri v. Dykes*, 2024 U.S. App. Lexis 7445 (2d Cir. 2024) (summary order); this matter was reassigned to this Court (Meyer, J.). ECF No. 63. On August 27, 2024, Plaintiff filed the operative, second amended complaint claiming that § 23-4-1(c) is unconstitutional facially and as-applied to Sleeping Giant State Park, Naugatuck State Forest, and the Farmington Canal Greenway State Park, to which

Defendant filed an answer.  *See* ECF Nos. 68 and 71.  Plaintiff later moved for summary judgment.  *See* ECF No. 75.

## ARGUMENT

### I.    Legal Principles

#### A.    Summary judgment standard

Summary judgment is appropriate "when, viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact and the movant[s] [are] entitled to judgment as a matter of law."  *Romano v. Ulrich*, 49 F.4th 148, 152 (2d Cir. 2022) (citing Fed. R. Civ. P. 56(a)).  "Material facts are those which 'might affect the outcome of the suit under the governing law,' and a dispute is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Coppola v. Bear Stearns & Co.*, 499 F.3d 144, 148 (2d Cir. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

#### B.    *Bruen*, *Rahimi*, and their progeny permit firearms restrictions

The Second Amendment does not permit individuals "to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008).  Because the Second Amendment is "not unlimited"; *id.*; *Bruen* imposed a "two-step framework" for assessing the constitutionality of a firearms regulation.  *Antonyuk II*, 120 F.4th at 964.

At step one, Plaintiff concedes he bears the burden to demonstrate that "the Second Amendment's plain text covers" the *specific* conduct that he seeks to engage in.  *Bruen*, 597 U.S. at 24; *see Antonyuk II*, 120 F.4th at 981; *Vermont Federation of Sportsmen's Clubs v. Birmingham*, 2024 U.S. Dist. Lexis 126857, *18 (D. Vt. July 18, 2024); *United States v. Reyna*, 2022 U.S. Dist. Lexis 225896, *9 (N.D. Ind. Dec. 15, 2022), *on appeal*, No. 23-1231 (7th Cir.) (filed Feb. 7, 2023); ECF No. 74-1 at 6-8.  The Second Amendment's text "cannot be read in a vacuum," though,

because it "must be interpreted against its historical and legal backdrop." *Bianchi v. Brown*, 111 F.4th 438, 447-48 (4th Cir. 2024) (en banc), *pet. cert. filed*, No. 24-203 (filed Aug. 21, 2024); *see United States v. Price*, 111 F.4th 392, 401 (4th Cir. 2024) (en banc), *pet. cert. filed*, No. 24-5937 (filed Nov. 4, 2024). If Plaintiff establishes that his specific conduct is covered by the Second Amendment's plain text, the conduct is "presumptively protect[ed]," and only then will the Court proceed to the next step. *See Bruen*, 597 U.S. at 24; *Bianchi*, 111 F.4th at 446.

Defendant bears the burden at step two to demonstrate that the challenged regulation "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. To meet this burden, Defendant need not identify "'a dead ringer' or a 'historical twin.'" *Rahimi*, 144 S. Ct. at 1898 (quoting *Bruen*, 597 U.S. at 30). Rather, a challenged regulation is lawful under *Bruen* if "'relevantly similar'" laws exist in our Nation's regulatory tradition. *See id.* (quoting *Bruen*, 597 U.S. at 29). "Why and how the regulation burdens the right are central to this inquiry." *Id.* And under *Bruen*, a challenged law survives attack if it imposes a "*comparable* burden on the right of armed self-defense and . . . that burden is *comparably* justified" when compared to historical analogues. 597 U.S. at 29 (emphasis added). *Rahimi* further teaches that Defendant prevails if the challenged regulation is "consistent with the *principles* that underpin our regulatory tradition." 144 S. Ct. at 1898 (emphasis added); *see Antonyuk II*, 120 F.4th at 967. So "even where historical analogues are not close matches to the challenged law, they may evince principles underpinning our Nation's regulatory tradition, and it is sufficient for the government to show that its law is consistent with those principles." *Wolford v. Lopez*, 116 F.4th 959, 978 (9th Cir. 2024).

Finally, the absence of legal challenges to historical analogues is strong evidence of their constitutionality. *Bruen*, for example, "assume[d] it settled" that firearms could be prohibited in sensitive places despite "relatively few" historical regulations because there were "no disputes

9

regarding the lawfulness of such prohibitions." 597 U.S. at 30. So if firearm restrictions were "viewed as non-controversial," *Bruen* dictates that "a small number of laws, even localized laws, can suffice" to show that a modern regulation is lawful. *Wolford*, 116 F.4th at 980. Notably, *Antonyuk II* relied on this principle in upholding a regulation prohibiting firearms in parks. *See* 120 F.4th at 1022-23.

## II.    Section 23-4-1(c) is Facially Constitutional

Plaintiff brings pre-enforcement, facial and as-applied challenges to § 23-4-1(c). ECF No. 68 ¶ 67. Plaintiff's facial challenge fails for three reasons. *First*, the regulation has lawful applications. *Second*, the Second Amendment does not presumptively cover the *specific* conduct Plaintiff seeks to engage in—carrying a handgun into a State park or forest without DEEP's permission—and thus fails *Bruen*'s first step. *Third*, even if Plaintiff had met his burden, § 23-4-1(c) is consistent with principles that underpin our Nation's tradition of firearms regulation.

### A. Plaintiff's facial challenge fails because § 23-4-1(c) has lawful applications

"[F]acial challenges are the most difficult to mount successfully." *Antonyuk II*, 120 F.4th at 983 (internal quotation marks omitted). To prevail, Plaintiff "must establish that no set of circumstances exists under which [§ 23-4-1(c)] would be valid, or show that the law lacks a plainly legitimate sweep." *Id.* (internal quotation marks omitted). So long as § 23-4-1(c) is constitutional in some of its applications, Plaintiff cannot prevail. *See Rahimi*, 144 S. Ct. at 1898.

Plaintiff's facial challenge fails because § 23-4-1(c) has constitutional applications for several reasons. *First*, § 23-4-1(c) broadly prohibits "firearms" and "other weapons"—a prohibition encompassing things like swords, brass knuckles, or dirk knives; *see* Conn. Gen. Stat. § 53-206; and other unusually dangerous weapons that the Second Amendment does not protect, including sawed-off shotguns, assault weapons, and military-style firearms like the M-16 or AR-15. *See Bianchi*, 111 F.4th at 441-42, 446-52; *Bevis v. City of Naperville*, 85 F.4th 1175, 1194-97

(7th Cir. 2023), *cert. denied sub nom. Harrel v. Raoul*, 114 S. Ct. 2491 (2024); *NAGR v. Lamont*, 685 F. Supp. 3d 63, 103 (D. Conn. 2023) (Arterton, J.), *on appeal*, No. 23-1162 (2d Cir.) (argued October 16, 2024). Section 23-4-1(c) constitutionally applies to those kinds of weapons.

*Second*, as discussed in greater detail below, § 23-4-1(c) lawfully applies to locations that are typically crowded or frequented by children. *See* Parts II.C.3-4 and III.B, below (arguments demonstrating history and tradition of prohibiting firearms in locations that are typically crowded or frequented by children). Various locations within § 23-4-1(c)'s scope, including but not limited to Hammonasset Beach State Park, Dinosaur State Park, Sleeping Giant State Park, and the Farmington Canal Greenway State Park, are often crowded or frequented by groups of people, including children, for recreational, scientific, and/or educational purposes. What is more, locations *within* State parks and forests—particularly buildings, structures, or other areas that are scenic or popular—are often crowded or frequented by groups of people, including children, for recreational, scientific, political, and/or educational purposes. Section § 23-4-1(c) therefore aligns with a well-established history and tradition of regulating firearms in (1) typically crowded areas; *see Antonyuk II*, 120 F.4th at 1019-26; and (2) locations frequented by children. *See id.* at 1026-27; *LaFave v. County of Fairfax*, 2024 U.S. Dist. Lexis 152000, at *33-39 (E.D. Va. Aug. 23, 2024), *on appeal*, No. 24-1886 (4th Cir.) (filed Sept. 16, 2024); *Mintz v. Chiumento*, 2024 U.S. Dist. Lexis 61699, at *48-52 (N.D.N.Y. March 20, 2024).

*Third*, as discussed in greater detail below, § 23-4-1(c) aligns with various other principles underpinning our Nation's regulatory tradition, including those associated with firearms prohibitions in parks and other government-controlled outdoor spaces set aside for the public's peaceful and quiet enjoyment, laws recognizing a landowner's right to exclude, and laws advancing conservation goals. *See, e.g.,* Parts II.C.2 and II.C.5-6, below. Notably, courts have

recently rejected Second Amendment challenges to firearms prohibitions in public parks based on similar arguments. *See LaFave*, 2024 U.S. Dist. Lexis 152000, at *26-31; *Kipke v. Moore*, 695 F. Supp. 3d 638, 654-55 (D. Md. 2023), *appeal filed*, No. 24-1799 (4th Cir.) (filed Aug. 22, 2024).

B. Plaintiff's facial challenge fails because he did not carry his burden at *Bruen*'s first step to show that the Second Amendment applies to carrying firearms into State parks and forests over DEEP's objection

Plaintiff argues that he met his threshold burden of establishing that the Second Amendment applies to his specific conduct simply because he intends to publicly carry a handgun for self-defense. ECF No. 74-1 at 7-8. His argument fails because the Second Amendment, as informed by the historical and legal backdrop integral to understanding its plain text, does not establish an individual's right to carry firearms into lands against the landowner's wishes, even when a government entity is the landowner.

Plaintiff's burden at *Bruen*'s first step is not weightless, and this Court should closely examine whether he met it. Plaintiff must "establish[] that the Second Amendment's explicit text, 'as informed by history,' encompasses the conduct [he] seek[s] to engage in." *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 113 (10th Cir. 2024) (quoting *Bruen*, 597 U.S. at 17, 19). If a plaintiff failed to do that, the "inquiry ends[.]" *Id.* at 114.

Section 23-4-1(c) only applies to State parks and forests, which DEEP manages and maintains. *See* Conn. Gen. Stat. § 23-4(a). Plaintiff's claims therefore implicate the State's proprietary rights to prohibit firearms on its own lands. So properly understood, Plaintiff's proposed course of conduct is not merely carrying a gun onto lands open to the public, but carrying a gun on such lands *against the wishes of the landowner*.

Plaintiff does not meaningfully attempt to demonstrate that the Second Amendment covers that specific conduct. *See* ECF No. at 7-8. For starters, he frames his proposed conduct too broadly because § 23-4-1(c) prohibits carrying a firearm in discrete locations, not public more generally.

*See Reyna*, 2022 U.S. Dist. Lexis 225896, at \*9. *Bruen* does not hold that the Second Amendment confers a right to disregard a landowner's objection to guns being carried on their property. *Cf.* ECF No. 74-1 at 8. And Plaintiff cites no historical sources or evidence to support his claim that he may carry a firearm onto property against a landowner's wishes.

The Second Amendment does not give Plaintiff the right to carry arms into State parks and forests over DEEP's objection. "[T]he pre-existing right codified in the Second Amendment does not include protection for a right to carry a firearm in a place against the owner's wishes" because the right to carry is circumscribed by the landowner's pre-existing property right "to exclude others, including those bearing arms." *Wolford*, 116 F.4th at 994. That principle extends to government-proprietors who have the same right to dominion over their lands as any private landowner. *See Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018); *Wolford*, 116 F.4th at 970-71, 1000; *see also Camfield v. United States*, 167 U.S. 518, 524 (1874) ("the government has, with respect to its own lands, the rights of an ordinary proprietor . . . precisely as a private individual"); *United States* v. *Class*, 930 F.3d 460, 464 (D.C. Cir. 2019) (rejecting Second Amendment challenge and noting that, "as the owner of the Maryland Avenue lot, the government—like private property owners—has the power to regulate conduct on its property"), *overruled in part on other grounds by Bruen*; *Bonidy v. U.S. Postal Service*, 790 F.3d 1121, 1126 (10th Cir. 2015) (rejecting Second Amendment challenge and noting that, "[a]s a government-owned business acting as a proprietor rather than as a sovereign, the USPS has broad discretion to govern its business operations according to the rules it deems appropriate"), *cert. denied*, 577 U.S. 1216 (2016), *overruled in part on other grounds by Bruen*; *United States v. Dorosan*, 350 Fed. Appx. 874, 875 (5th Cir. 2009) (per curiam) (rejecting Second Amendment challenge in part because "the Postal Service owned the parking lot where Dorosan's handgun was found, and its

restrictions on guns stemmed from its constitutional authority as the property owner"), *cert. denied*, 559 U.S. 983 (2010), *overruled in part on other grounds by Bruen*. The Second Amendment's plain text "must be interpreted against its historical and legal backdrop." *Bianchi*, 111 F.4th at 447-48; *see Rocky Mountain Gun Owners*, 121 F.4th at 113-14. So the fact that those with control over property—like DEEP's control over State parks and forests—have a pre-existing right to determine what happens on their land must inform the Second Amendment's scope.[1]

Here, DEEP promulgated § 23-4-1(c) under its authority to manage and maintain the State park and forest system in a manner consistent with their purpose and, more broadly, to attract visitors to Connecticut. And as discussed in greater detail below, DEEP operates that system in part like a government run business, which generates funds to sustain State parks and forests. *See* Part II.C.5, below (arguing that § 23-4-1(c) is constitutional under *Bruen*'s second step in part because DEEP and State operate State parks and forests like profit-generating business). So this is not a case where the State, as a sovereign lawmaker, told people what can or cannot happen on *their* lands. Rather, DEEP exercised its proprietary right to exclude individuals from carrying weapons within *its* lands. That makes this case different from cases holding that the Second Amendment's text presumptively protects carrying firearms onto private property held open to the public when the state, *as a sovereign lawmaker*, passed a law that effectively determined how private landowners could use their land by making large portions of New York "a default no-carriage zone." *See Antonyuk II*, 120 F.4th at 1044-45; *Antonyuk v. Chiumento*, 89 F.4th 271, 383-84 (2d Cir. 2023) ("*Antonyuk I*"); *see also Enquist v. Oregon Dept. of Agriculture*, 553 U.S. 591,

---

[1] Defendant submits that the pre-existing proprietorship right to exclude informs the meaning of the Second Amendment at *Bruen*'s first step, thus implicating whether Plaintiff's course of conduct is presumptively protected, but the pre-existing proprietorship right to exclude also applies to Defendant's contention that § 23-4-1(c) is consistent with principles underpinning our Nation's regulatory tradition at *Bruen*'s second step. *See* Part II.C.5, below. Regardless of which step that this argument is more properly considered, § 23-4-1(c) passes constitutional muster because DEEP exercised a pre-existing proprietorship right to exclude firearms from property it controls.

598 (2008) ("[T]here is a crucial difference, with respect to constitutional analysis, between the government exercising the power to regulate or license, as lawmaker, and the government acting as proprietor, to manage [its] internal operation.") (internal quotation marks omitted). Because § 23-4-1(c) expresses DEEP's wish, as a landowner, to exclude firearms absent its permission, Plaintiff failed to carry his preliminary burden at *Bruen*'s first step.

Finally, this Court should reject Plaintiff's attempt to erase the State's interest in regulating conduct on its property, especially since State parks and forests are profit-generating commodities. *First*, Plaintiff wrongly contends that § 23-4-1(c) implicates the Second Amendment merely because State parks and forests are "generally open to the public[.]" ECF No. 74-1 at 8. That inquiry is not dispositive. Land being publicly accessible is only determinative if the landowner has not expressly objected to firearms being carried there. *Cf. Antonyuk II*, 120 F.4th at 1044-45; *Kipke*, 695 F. Supp. 3d at 658 n.9. *Second*, Plaintiff incorrectly suggests that Defendant's argument would "categorically prohibit the peaceful carry of handguns for self-defense on all government-owned property." ECF No. 74-1 at 11. Defendant is not claiming the authority to ban firearms on all government property open to the public, but simply the authority to manage the internal operation of the State park and forest system, which is operated much like a government-run business. *See, e.g., Class*, 930 F.3d at 464; *Bonidy*, 790 F.3d at 1126.

C. Section 23-4-1(c) is consistent with the Nation's history and tradition of firearm regulation

Even if Plaintiff had met his burden at *Bruen*'s first step—which he has not—§ 23-4-1(c) is facially constitutional because it aligns with principles underpinning our Nation's history of firearms regulation. To begin, binding precedent requires consideration of a relatively expansive historical timeline at step two. Although the time of drafting the Second Amendment is a relevant historical period, Plaintiff incorrectly suggests that 1791 is the only relevant point in history. The time of the Fourteenth Amendment's enactment is also relevant in assessing § 23-4-1(c)'s

constitutionality. *Antonyuk II*, 120 F.4th at 974. And beyond those two historical reference points, there is a third historical determination that this Court may consider, namely, whether intervening changes in societal conditions arose after 1791 or 1868 that justify a firearm regulation. *See id.* at 970. This third historical inquiry also supports § 23-4-1(c)'s constitutionality. Here, Plaintiff does not meaningfully dispute that State parks and forests grew out of "unprecedented societal concerns," so "a more nuanced approach" is required to assess § 23-4-1(c)'s constitutionality. *Bruen*, 597 U.S. at 27; *see Antonyuk II*, 120 F.4th at 970, 1022 n.86. And under the "more nuanced approach," this Court properly may reason by analogy to determine whether § 23-4-1(c) passes constitutional muster because it is "relevantly similar" to historical analogues since it imposes a "*comparable* burden on the right of armed self-defense" that is "*comparably* justified[.]" *Antonyuk II*, 120 F.4th at 970 (emphasis added; internal quotation marks omitted).

Consistent with the nuanced methodology, § 23-4-1(c) fits comfortably within our Nation's history of firearms regulation. Defendant has submitted more than 100 ordinances, regulations, and laws prohibiting firearms in municipal, federal, and state parks of various shapes and sizes— all reflecting an unbroken and unchallenged regulatory tradition that began in 1858 and extended into the early-twentieth century. Standing on their own, those regulations are dispositive because they are relevantly similar to § 23-4-1(c)—if not dead ringers—since they restrict firearms in the same way and for the same reasons. But even if those were not enough, at least five additional categories of laws illustrate § 23-4-1(c)'s constitutionality, including laws prohibiting: (1) individuals from carrying firearms in crowded locations; (2) firearms in locations frequented by vulnerable populations like children; (3) individuals from carrying firearms onto another's property without consent; (4) unauthorized hunting or poaching; and (5) individuals from "going armed" in certain locations. Each category illustrates that § 23-4-1(c) is constitutional. And woven

16

together, this unbroken regulatory history illuminates various principles that § 23-4-1(c) aligns with. *See Rahimi*, 144 S. Ct. 1898; *see also Wolford*, 116 F.4th at 986 (reading laws "in conjunction" with other firearms regulations).

1. *Binding precedent mandates that this Court, at Bruen's second step, apply a nuanced approach based on the expansive historical record*

This Court must reject Plaintiff's assertion that 1791 "controls" the relevant time period for assessing historical analogues. ECF No. 74-1 at 14. Although 1791 is relevant to the historical inquiry, it does not "control" that inquiry to the exclusion of other relevant time periods. Rather, this Court should examine the totality of the record and not just the time-period around 1791.

Plaintiff concedes—as he must—that *Antonyuk II* "stated that courts should look to both 1791 and 1868" at step two. *Id.* at 13. But his concession covers only part of *Antonyuk II's* holding on this point. *Antonyuk II* held that "1791 and 1868 are both fertile ground, and the adjacent and intervening periods are likewise places in the historical record to seek evidence of our national tradition of firearms regulation." 120 F.4th at 974; *see also id.* at 988 n.36 ("The period of relevance extends past 1868."). Moreover, *Rahimi* made clear that "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." 144 S. Ct. at 1897-98. Indeed, post-enactment regulatory practices can "liquidate [and] settle" the contours of Second Amendment rights. *Bruen*, 597 U.S. at 35 (internal quotation marks omitted); *see also Rahimi*, 144 S. Ct. at 1916 (Kavanaugh, J., concurring) (noting that post-ratification history "can provide good guidance for a judge who is trying to interpret that same text decades or centuries later"). That approach is particularly appropriate here because the parks and forests movements— from which the locations within the ambit of § 23-4-1(c) emerged—did not fully take root until after 1868, which "mak[es] consideration of later history particularly crucial." *LaFave*, 2024 U.S. App. Lexis 152000, at *18 (citing *McCullen v. Coakley*, 573 U.S. 464, 481 (2014)); *see Wolford*,

116 F.4th at 980-85. What is more, "the relative novelty of public parks as institutions also justifies a flexible" and nuanced approach in assessing whether § 23-4-1(c) is relevantly similar to historical analogues. *Antonyuk II*, 120 F.4th at 1022 n.86. Thus, binding precedent requires this Court to consider the totality of the record under a nuanced methodology.

> 2. *There is an unbroken history and tradition of regulating firearms in "modern" parks and similar government-controlled outdoor spaces set aside for the public's peaceful and quiet enjoyment*

This Court can—and should—uphold § 23-4-1(c) as facially constitutional because it aligns with a well-established and unbroken tradition of regulating firearms in modern parks and similar government-controlled locations that grew out of the parks and forests movements. More than 100 ordinances, regulations, and laws pertaining to parks and other government-controlled outdoor spaces set aside for the public's peaceful and quiet enjoyment demonstrate this point. Additionally, this Court should reject Plaintiff's attempts to compare State parks and forests to "the sidewalk"; ECF No. 74-1 at 10; Founding-era urban green spaces; *id.* at 30-32; or a "wilderness park" like Adirondack Park in New York. *See id.* at 34-35.

There can be no reasonable dispute that parks and forests are places established for distinct purposes, and that government authority within those spaces is different from sidewalks or other unspecified public areas. "The modern idea of the park emerged in the nineteenth century"; *Antonyuk II*, 120 F.4th at 1024 (internal quotation marks omitted); due to unprecedented societal concerns of needing to create locations of "natural scenery" and "active recreation" to essentially save society from the perils of industrialization. Ex. 134 (Young Decl.) ¶¶ 10-11; *see id.* ¶¶ 17-19, 21; Ex. 133 (Glaser Decl.) ¶¶ 19, 39, 55. Modern parks as we understand them today first emerged in urban cities, then expanded to large open-spaced national parks under federal control, and then states created state-controlled parks. *See, e.g.,* Ex. 134 ¶¶ 14-41. And as the parks movement developed, a similar movement emerged that primarily focused on forested lands. *See*

Ex. 133 ¶¶ 25, 32-38.  Despite the two movements having some differences—one focused on parks, the other forests—both were linked, and locations growing out of both movements often shared physical characteristics.  *See, e.g., id.* ¶¶ 25, 38; Ex. 114 at Bates # 0867.  Ultimately, the outdoor government-controlled spaces that grew out of both movements sought to remedy the same social evils through relaxation, tranquility, and passive and active recreation.  *See* Ex. 133 ¶¶ 23, 38-40; Ex. 134 ¶¶ 25, 30-35, 37.

Against this backdrop, this Court should look to our Nation's regulatory tradition around 1868 and thereafter to find § 23-4-1(c) constitutional.  *See Antonyuk II*, 120 F.4th at 974.  Between 1858 and 1888, at least fourteen municipalities categorically prohibited guns in public parks.[2]  *See id.* at 988 n.36.  Significantly, such restrictions applied to "the entire population of the nation's five largest cities" around that time.[3]   Ex. 135 (Cornell Decl.) ¶ 34 (referring to New York City, Chicago, Philadelphia, St. Louis, and Boston); *see Antonyuk II*, 120 F.4th at 1023.  This trend of prohibiting guns in public parks continued, with twenty-one more cities doing so in the 1890s,[4]

---

[2] *See* Ex. 1 (Central Park, NY; 1858); Ex. 2 (Prospect Park, Brooklyn, NY; 1866); Ex. 3 (Fairmount Park, Philadelphia, PA; 1868); Ex. 6 (Golden Gate and Buena Vista Parks, San Francisco, CA; 1872); Ex. 7 (Chicago, IL; 1873); Ex. 201 (Buffalo, NY; 1874); Ex. 8 (South Park, Hyde Park, IL; 1875); Ex. 9 (Reeves Park, Phoenixville, PA; 1878); Exs. 11, 13 (all parks, St. Louis, MO; 1881 and 1883); Ex. 12 (Danville, IL; 1883); Ex. 14 (Boston, MA; 1886); Ex. 15 (Reading, PA; 1887); Ex. 16 (Salt Lake City, UT; 1888); Ex. 17 (St. Paul, MN; 1888-89).

[3] Plaintiff attempts to dismiss local ordinances out of hand by claiming that they "only applied to individual parks" and "also were often coupled" with hunting restrictions.  *See* ECF No. 74-1 at 32-33.  Section 23-4-1(c) plainly applies to hunting, so Plaintiff effectively concedes that its hunting prohibition is constitutional.  Regardless, Plaintiff makes the same mistake that the district court in *Antonyuk II* made—overreading *Bruen* to purportedly mandate dismissal of local level laws.  *See* 120 F.4th at 1022-23.  And to be clear, Defendant does not present a "scattering of municipal laws."  ECF No. 74-1 at 33.  Rather, as in *Antonyuk II*, the ordinances presented reflect an "enduring" and unchallenged practice by municipal, federal, and state governments across the country.  *See* 120 F.4th at 1022-23.

[4] *See* Ex. 18 (Trenton, NJ); Ex. 19 (Williamsport, PA); Ex. 20 (Grand Rapids, MI); Ex. 21 (Lynn, MA); Ex. 22 (Springfield, MA); Ex. 23 (Peoria, IL); Ex. 24 (Spokane, WA); Ex. 25 (Pittsburgh, PA); Ex. 26 (Wilmington, DE); Ex. 27 (Canton, IL); Ex. 28 (Detroit, MI); Ex. 29 (Indianapolis, IN); Ex. 30 (Rochester, NY); Ex. 31 (Kansas City, MO); Ex. 33 (Boulder, CO); Ex. 205 (Berlin, WI); Ex. 206 (Milwaukee, WI); Ex. 207 (Cincinnati, OH);  Ex. 208 (St. Paul, MN); Ex. 209 (Centralia, IL); Ex. 212 (New Haven, CT).

twenty more in the 1900s,[5] and many others throughout the 1910s and 1920s.[6]

And the trend was not limited to urban parks—it extended to rural, forested parks once they began being set aside for recreational use in the late-1800s. *See, e.g., Kipke*, 695 F. Supp. 3d at 655 (noting that "rural, more isolated state parks were not established in significant numbers until after the ratification of the Fourteenth Amendment, and thus the Court will not infer a lack of regulation from the absence of laws governing rural state parks at the time"). For instance, when the federal government—which unquestionably was constrained by the Second Amendment—began creating national parks that "were large, relatively distant from most of America's population"; Ex. 134 ¶ 32; guns were prohibited in those locations. In 1872, the federal government designated Yellowstone National Park—spanning "approximately 2.2 million acres"—as the first national park. *Id.* By 1893, the Secretary of the Interior recommended "an [a]bsolute prohibition of firearms" in Yellowstone and, only a few years later, firearms were officially banned there absent permission. Ex. 135 ¶ 37 (internal quotation marks omitted); *see* Ex. 69 at Bates # 0399; Exs. 210-11. So too in Crater Lake National Park (1902), Sequoia National Park (1902), General Grant National Park (1902), Yosemite National Park (1902), Mount Rainier National Park (1903), Mesa Verde National Park (1908), and many other national parks in the years that followed. Ex. 69 at Bates ## 0407, 0413, 0423, 0426, 0431; Exs. 215-18, 223; *see generally* Ex. 69 (compilation of firearms regulations in national parks). Moreover, the District of Columbia and states around this time prohibited guns in city and state parks.[7] By the 1930s, at

---

[5] *See* Ex. 34 (Hartford, CT); Ex. 35 (New Bedford, MA); Ex. 36 (Lowell, MA); Ex. 37 (New York, NY); Ex. 38 (Troy, NY); Ex. 39 (Houston, TX); Ex. 40 (Neligh, NE); Ex. 41 (Pueblo, CO); Ex. 42 (Harrisburg, PA); Ex. 43 (Haverhill, MA); Ex. 45 (Saginaw, MI); Ex. 47 (Denver, CO); Ex. 48 (Los Angeles, CA); Ex. 49 (Olean, NY); Ex. 50 (Seattle, WA); Ex. 51 (Memphis, TN); Ex. 52 (Oakland, CA); Ex. 53 (Paducah, KY); Ex. 219 (Pasadena, CA); Ex. 221 (Portland, OR); Ex. 222 (Oil City, PA).

[6] *See* Exs. 54-63 and 225-27 (1910s); Exs. 64-70 and 230 (1920s).

[7] *See, e.g.,* Ex. 3 (1868 Pennsylvania); Exs. 44, 213, and 231 (1901, 1905, and 1925 Minnesota); Ex. 220 (1907 District of Columbia); Exs. 228 and 234 (1917 and 1927 Maryland); Exs. 62, 229, and 239 (1917 and 1933 Wisconsin); Ex. 66 (1921 North Carolina); Ex. 232 and 237 (1926 and 1929 Washington); Ex. 233 (1927 Indiana);

least nineteen states had laws or regulations prohibiting firearms in parks and similar government-controlled outdoor spaces set aside for the public's peaceful and quiet enjoyment. *See generally* Exs. 241-43 (1936 compilation of laws relating to state parks).

Municipalities, the federal government, and states prohibited guns in such discrete locations largely because the presence of guns—even if passively carried for self-defense—did not reflect proper behavior or decorum in such locations and threatened to undermine their key purpose of functioning as society-improving devices where all could strengthen their mind and body without alarming and potentially life-threatening interruptions (like the presence of a gun) that would distract people from nature's tranquil haven. *See* Ex. 134 ¶¶ 10-11, 25-29, 31, 36-37, 41. And despite the numerosity and breadth of these firearm restrictions, many of which applied to some of the most populous and influential cities in America, there is no evidence that anyone questioned their constitutionality for (at least) 150 years since Central Park banned guns in 1858. These restrictions were thus "not merely adopted by legislative bodies . . . in which they applied—they were apparently accepted without any constitutional objection by anyone." *Antonyuk II*, 120 F.4th at 1022. That is strong evidence of their constitutionality because *Bruen* dictates that when a locational firearm restriction was "viewed as non-controversial," only "a small number of laws, even localized laws, can suffice[.]" *Wolford*, 116 F.4th at 980.

Here, the dozens of ordinances, regulations, and laws throughout the Nation prohibiting guns in public parks and similar outdoor government-controlled spaces set aside for the public's peaceful and quiet enjoyment, including geographically vast national parks, reflect a practice that "liquidate[d] [and] settle[d]" the understanding that firearms can be prohibited in such locations. *See Bruen*, 597 U.S. at 35 (internal quotation marks omitted); *see also Antonyuk II*, 120 F.4th at

---

Ex. 235 (1927 South Dakota); Ex. 236 (1928 Michigan); Ex. 238 (1930 Kansas); Ex. 240 (1935 New Jersey).

990 (noting that "[t]he geographical breadth of licensing schemes . . . demonstrate[d] their place in our whole experience as a Nation") (internal quotation marks omitted). Notably, despite Defendant having relied on such analogues in opposing Plaintiff's motion for a preliminary injunction in April 2023; *see, e.g.,* ECF Nos. 23-5 and 24; Plaintiff failed to point to any authority demonstrating that such regulations were even challenged, much less found unconstitutional.[8] *See LaFave*, 2024 U.S. Dist. Lexis 152000, at *30. And that is because history and tradition leave no doubt that the Nation understood that firearms could be banned in public parks and similar government-controlled outdoor spaces set aside for the public's peaceful and quiet enjoyment consistent with the Second Amendment.

Section 23-4-1(c) aligns with the above history and tradition because it imposes a comparable burden that is comparably justified: it bans unauthorized firearms from public parks and other government-controlled outdoor spaces that, by design, are intended to be places of relaxation, tranquility, and recreation (i.e., the "how") because the unauthorized presence of guns threatens to undermine those foundational ideals since they can create alarming and potentially life-threatening distractions that risk deterring people from using such society-building safe havens (i.e., the "why"). *See Antonyuk II*, 120 F.4th at 1023-24; *LaFave*, 2024 U.S. Dist. Lexis 152000, at *28-30; Ex. 133 ¶ 15; Ex 134 ¶¶ 29, 36, 41.

The record here underscores § 23-4-1(c)'s alignment with the above history and tradition.

---

[8] The pre-*Bruen* cases Plaintiff cites for the proposition that State parks and forests are not "sensitive places"; ECF No. 74-1 at 32; are inapt with respect to Defendant's argument on this point because they turned on state administrative and constitutional law that conferred greater protections than the Second Amendment; *see Bridgeville Rifle & Pistol Club Ltd. v. Small*, 176 A.3d 632, 636-44, 661-62 (Del. 2017); improperly focused on 1791; *see Solomon v. Cook County Board of Commissioners*, 559 F. Supp. 3d 675, 689-92 (N.D. Ill. 2021); or otherwise applied a pre-*Bruen* framework that did not address the enduring regulatory tradition of prohibiting guns in public parks and similar government-controlled outdoor spaces. *See id.* at 698-703; *Morris v. Army Corps of Engineers*, 60 F. Supp. 3d 1120, 1122-25 (D. Idaho 2014), *appeal dismissed*, 2017 U.S. App. Lexis 26751 (2017); *People v. Chairez*, 2018 IL 121417, at ¶¶ 45-56 (2018); *see also DiGiacinto v. Rector & Visitors of George Mason Univ.*, 281 Va. 127, 136-37 (2011) (holding that public university was sensitive place).

Millions of children and adults utilize State parks and forests for social, educational, and other purposes, as they are intended to be used. *See, e.g.,* Ex. 137 (Tyler Decl.) ¶¶ 39, 47, 49, 53-54, 57-58, 112-13, 122-27; Ex. 139 (Highsmith Decl.) ¶¶ 27-28; Ex. 140 (Benigni Decl.) ¶¶ 13-16; Ex. 163 ¶¶ 10, 28. But the presence of guns in such locations would increase the risk of alarm and life-threatening conflict among visitors to State parks and forests; *see, e.g.,* Exs. 136 (Col. Lewis Decl.) ¶ 16(a) and 137 ¶ 94; "alter the nature of [State] parks and forests and the way people view them"; Ex. 137 ¶ 95; and threaten to chill children and adults alike from using such educational and community-building havens. *See, e.g.*, Ex. 139 ¶¶ 30, 31, and 33; Ex. 140 ¶¶ 21-24; Ex. 164 (Filindra Report) ¶¶ 16, 75-80. That plainly would undermine State parks and forests' purpose of being devices to bring people together and to better society through peaceful recreation. *See, e.g.,* Ex. 134 ¶¶ 10-11, 25-29, 31, 36-37, 41. What is more, § 23-4-1(c) seeks to maintain order and safety. Ex. 137 ¶¶ 78-79. Here, as in *LaFave*, § 23-4-1(c) is constitutional because State parks and forests "are intended to serve as havens for [Connecticut] residents." 2024 U.S. Dist. Lexis 152000, at *29. And similar to *Kipke*, § 23-4-1(c) is constitutional because it is "comparably justified by the need for public safety" in public parks and similar government-controlled outdoor spaces.[9] 695 F. Supp. 3d at 654-55; *see also Maryland Shall Issue, Inc. v. Montgomery County*, 680 F. Supp. 3d 567, 587 (D. Md. 2023) (holding that firearm regulation applicable to recreational facilities was relevantly similar to analogues prohibiting firearms in places where individuals "gather for recreation or social activities" that "protect[ed] individuals engaged in these

---

[9] Notably, the Court in *Kipke* rejected a constitutional challenge to firearms prohibitions in Maryland that pertained to State Parks, State Forests, and Chesapeake Forest Lands, with the forested lands totaling approximately 274,000 acres. *See* COMAR 08.01.07.02(D); Maryland Department of Natural Resources, Forest Service, Maryland's State Forest, *available at* https://dnr.maryland.gov/forests/pages/mdforests.aspx#:~:text=%E2%80%8B%E2%80%8B%E2%80%8BThe%20 Maryland,a%20number%20of%20recreational%20opportunities. (last visited Nov. 29, 2024). This Court properly may take judicial notice of material contained on government websites. *See* Fed. R. Evid. 201(b); *Brokamp v. James*, 66 F.4th 374, 381 n.3 (2d Cir. 2023), *cert. denied*, 114 S. Ct. 1095 (2024); *NOSAJ Entertainment v. Tristate & Beyond, LLC*, 2024 U.S. Dist. Lexis 173692, at *12 n.2 (S.D.N.Y. Sept. 24, 2024).

recreational and social activities from confrontations and encounters involving firearms or other dangerous weapons"), *appeal held in abeyance*, 2024 U.S. App. Lexis 4132 (4th Cir. 2024).

Plaintiff makes three contrary arguments relating to this enduring tradition of prohibiting guns in parks and similar government-controlled outdoor spaces. All three fail.

*First*, Plaintiff's passing assertion that State parks and forests are akin to sidewalks or public streets is incorrect. *See* ECF No. 74-1 at 10, 35. State parks and forests are not thoroughfares used to get from one location to another. They are discrete destinations that people—Plaintiff included—visit voluntarily for recreation. Moreover, Plaintiff ignores the fact that State parks and forests are materially different from anything that existed in the Founding-era and emerged in response to the unprecedented concerns stemming from rapid urbanization of the antebellum period. *See generally* Exs. 133, 134, and 135. Because Founding generations could not have imagined such concerns, other courts have correctly applied *Bruen*'s nuanced approach in assessing firearms regulations in parks and forests, which necessarily means that they are unlike sidewalks or public streets.[10] *See, e.g., Antonyuk II*, 120 F.4th at 1022 n.86.

*Second*, Plaintiff recycles an argument that courts have rejected, namely, modern parks are like Founding-era urban greens spaces, commons, or parks. *See* ECF No. 74-1 at 30-32. The record here, as in *Antonyuk II*, demonstrates that the Boston Common, New York's City Hall Park, and Founding-era urban spaces like them were not comparable to today's parks and forests. *See* 120 F.4th at 1024-25; *Kipke*, 695 F. Supp. 3d at 654; Ex. 133 ¶¶ 15-19; Ex. 135 ¶¶ 30-33. Additionally, Plaintiff's argument invites this Court to mistakenly infer that the lack of firearms

---

[10] Plaintiff also failed to offer anything to support his assertion that State parks and forests are like sidewalks. That assertion not only conflicts with the evidentiary record before this Court, but also the common law principle that lands dedicated to one public use cannot be subjected to a conflicting public use. *See Evergreen Cemetery Asso. v. New Haven*, 43 Conn. 234, 243 (1875); *see also Vill. of Riverside v. MacLain*, 210 Ill. 308, 324 (1904) (citing cases from Kansas, Massachusetts, Minnesota, and Missouri in support of holding that "[w]here such a tract has been dedicated, and accepted as a public park, and adjudicated to be such, the municipality has no power to convert any portion of it into a public highway, because such use is inconsistent with and destructive of its use as a park").

prohibitions in such dissimilar, Founding-era urban spaces means that Founding generations would have perceived such restrictions as repugnant to the Second Amendment. *See* ECF No. 74-1 at 31-32. That inference impermissibly asks for "a law trapped in amber." *Rahimi*, 144 S. Ct. at 1897. And *Bruen*, *Rahimi*, and their progeny do not impose that sort of regulatory straitjacket, especially not when Founding-era legislators could not have fathomed the need to create dedicated natural spaces as a way to save society from industrialization. *See Antonyuk II*, 120 F.4th at 969; Ex. 135 ¶ 31; Ex. 165 (Glaser Supp. Decl.) ¶ 45.

*Third*, Plaintiff attempts to make much out of *Antonyuk II*'s statement that "rural parks" appeared to be more similar to "'commons' and 'wilderness areas.'" 120 F.4th at 1025; *see* ECF No. 74-1 at 34-35. Plaintiff's argument is unavailing. Preliminarily, the passage in *Antonyuk II* he relies on is pure dicta. Moreover, *Antonyuk II* emphasized that its observation was only based on the preliminary injunction record before that Court. *See* 120 F. 4th at 1025-26. The record in *Antonyuk II* did not contain historical regulations of firearms in rural parks or national parks and lacked expert analysis explaining that the more rural parks that emerged in the late-1800s (and the firearm restrictions that followed) grew out of the same movements and arose from the same ideals that inspired the restrictions in the urban parks of the 1850s. *See id.* at 1021-26. The record in *Antonyuk II* was therefore less developed than the record here. And the present record demonstrates that the State parks and forests that grew out of the parks and forests movements (and especially those in Connecticut) were linked at the hip and ultimately shared the same foundational principles justifying firearms prohibitions. *Kipke* addressed a record similar to the present one and had no trouble upholding a park restriction and rejecting the distinction between urban and rural parks. *See* 695 F. Supp. 3d at 655; *cf. id.* at 655 n.7 ("[E]ven isolated parks can draw large crowds, and the public safety justification remains the same."). Unlike in *Antonyuk II*,

Defendant's evidence here also demonstrates that large government-controlled outdoor spaces—just like urban parks—sought to save society from the perils of industrialization and prohibited firearms in geographically vast locations largely removed from modern civilization for the same reasons that urban parks did. *See, e.g.,* Ex. 134 ¶¶ 19, 24-25, 31-32, 36.

*Antonyuk II* also made its statements about rural parks in reference to New York's Adirondack State Park. But it cannot reasonably be disputed that places like Sleeping Giant State Park (approximately 1,439 acres), Naugatuck State Forest (approximately 5,000 acres), and the Farmington Canal Greenway State Park (approximately 25 miles in Connecticut) are not comparable to the vastness of Adirondack State Park, which constitutes "one-third of the total land area of New York State" and spans approximately 2.6 million acres of state-controlled land.[11] *Antonyuk II*, 120 F.4th at 1025 (internal quotation marks omitted); *see* Ex. 108 at Bates # 0771; Ex. 162 (Budris Decl.) ¶ 8; CTParks, Sleeping Giant State Park, available at https://ctparks.com/parks/sleeping-giant-state-park#:~:text=And%20with%20its%20many%20 scenic,and%20often%20fills%20to%20capacity. By way of example, Naugatuck State Forest is approximately .002 percent of the size of state-controlled land in Adirondack State Park. Places within the ambit of § 23-4-1(c) simply are not "vast forests" or "towns and villages"—some of Adirondack State Park's characteristics. *Antonyuk II*, 120 F.4th at 1025 (internal quotation marks omitted); *see* Ex. 137 ¶¶ 36, 102-107, 109-10.

3. *Section 23-4-1(c) is consistent with our Nation's well-established history and tradition of prohibiting firearms in crowded locations*

Section 23-4-1(c) aligns with another principle running through our Nation's history and

---

[11] New York owns approximately 2.6 million acres of Adirondack Park. *See* Adirondack Map and Guide, available at https://dec.ny.gov/sites/default/files/adkmaponly.pdf; The Adirondack Park, available at https://visitadirondacks.com/about/adirondack-park. In total, Adirondack Park is approximately "6 million acres" and is "the largest National Historic Landmark in the United States, covering an area larger than Yellowstone, Yosemite, Grand Canyon, Glacier, and the Great Smokies National Parks *combined*." The Adirondack Park, available at https://visitadirondacks.com/about/adirondack-park (emphasis added).

tradition of firearms regulation: guns can be banned in discrete locations where people gather—often in large crowds—for educational, social, recreational, and other purposes.

*Antonyuk II* repeatedly recognized a "well-established tradition" of regulating firearms in such places when it addressed firearms prohibitions in various locations. *See* 120 F.4th at 1019-24 (public parks); *id.* at 1026 (zoos); *id.* at 1031 (premises licensed for alcohol consumption); *id.* 1037-38 (theaters). To reach that conclusion, the Court relied on: (1) Founding-era "going armed" laws in Virginia (1786) and North Carolina (1792); (2) three Reconstruction-era laws in Tennessee (1869), Texas (1870), and Missouri (1883); and (3) two laws from territories of Arizona (1889) and Oklahoma (1890). *See id.* at 1019-21.

Notably, the Second Circuit opined that the Founding-era laws in Virginia and North Carolina—and their English predecessor, the Statute of Northampton—can be appropriate analogues for firearms restrictions that apply to discrete, often crowded locations. *See Antonyuk II*, 120 F.4th at 1020 n.82. The Court also correctly noted that, notwithstanding "the Virginia law's 'in terror of the county' language," the trend in our Nation's history of firearms regulation with respect to guns in crowded locations did not "require a conduct element" (i.e., laws subsequent to Virginia's law in 1786 pertaining to crowded locations did not require firearms possession accompanied by terrorizing conduct or a similar mens rea). *Id.* And the Second Circuit found it significant that the state Supreme Courts in Texas, Tennessee, and Missouri upheld as constitutional provisions in those states that banned firearms in public assemblies. *See id.* at 1021 (discussing *English v. State*, 35 Tex. 473, 478-79 (1872), *Andrews v. State*, 50 Tenn. 165, 181-82 (1871), and *State v. Shelby*, 90 Mo. 302, 305 (1886)).

Defendant relies on these same authorities to demonstrate a well-established tradition of banning firearms in locations where crowds gather for social, recreational, educational, civic, and

other purposes. *See* Exs. 78, 80, 83, 86, 95, 97, and 245. But even if those authorities were not enough—which they are—Defendant has made a stronger showing than the record in *Antonyuk II*. For example, in 1870, Georgia prohibited individuals from carrying "about his or her person . . . any pistol or revolver . . . to . . . any other public gathering in this State, except militia muster-grounds." Ex. 84. Four years later, Texas still prohibited individuals from carrying weapons like "six shooter[s], gun[s], or pistol[s] of any kind" in various locations, including those for "educational, literary, or scientific purposes . . . or other social gathering . . . or any other public assembly[.]" Ex. 89; *cf.* Exs. 88, 91, 102, and 103 (enactments in Missouri and Montana in 1874, 1879, 1903, and 1907 prohibiting concealed or partially concealed firearms in places of recreation, education, socialization, or public assembly).

Arizona and Oklahoma were also not the only territories to prohibit firearms in locations where people gather—the territory of Idaho did too, making it unlawful in 1889 for anyone other than specified security personnel or government officials "to carry, exhibit or flourish . . . any pistol, gun, or other deadly weapons . . . in any public assembly of Idaho Territory." Ex. 96; *see* Ex. 100 (1893 Oklahoma); Ex. 101 (1901 Arizona). Additionally, when New Orleans, Louisiana had approximately 216,000 inhabitants in 1882, that city prohibited any person from "carry[ing] a dangerous weapon, concealed or otherwise, into any theatre, public hall, tavern, pic-nic ground . . . or other place for public entertainment or amusement." Ex. 93; *see also* Ex. 82 (New Orleans ordinance from 1831); Census.gov, *Louisiana, New Orleans*, page 213 available at https://www2.census.gov/prod2/decennial/documents/1880a_v19-04.pdf (last visited Nov. 27, 2024) (listing aggregate population in New Orleans in 1880 as "216,090"). Many of these statutes—and others too—also prohibited guns in discrete locations, such as election or polling places, that typically would be crowded for momentary times of year. *See, e.g.,* Ex. 83 (1869

Tennessee law prohibiting "attending any election in this State" with pistol); Ex. 84 (1870 Georgia law prohibiting carrying "pistol or revolver . . . to any . . . election ground or precinct").[12]

All told, Defendant's sources bolster what the Second Circuit said:  our Nation's history of firearms regulation reflects a "long, unbroken line . . . of regulating firearms in often-crowded" locations like public forums or typically crowded places, especially those associated with social, recreational, educational, or related purposes.  *Antonyuk II*, 120 F.4th at 1021 (citation and internal quotation marks omitted).  Section 23-4-1(c) is a continuation of this history and tradition.

Modern parks and forests sought to create places of recreation as a way to save society.  *See, e.g.,* Ex. 133 ¶ 25; Ex. 134 ¶¶ 11, 19, 21, 25, 27, 33.  These places also had "scientific attributes, or . . . educational potential[.]"  Ex. 133 ¶ 43 (internal quotation marks omitted).  Moreover, Connecticut's parks and forests grew out of the linked parks and forests movements, and the creators of such locations similarly believed that industrialization and "modernity had destroyed leisure and family time[,]" so individuals needed a recreational outlet.  Ex. 133 ¶ 39; *see id.* ¶ 42.  State parks and forests were therefore created to be places where individuals could socialize and recreate together.  *See id.* ¶¶ 38-41, 48, 50, 54, 56; Ex. 63 at Bates ## 0364-65.

The same is true today.  In 2022, DEEP estimated that approximately 17 million people visited State parks and forests, yet Connecticut only had approximately 3.6 million citizens at that time.  Ex. 137 ¶¶ 49, 53.  Such figures underscore that State parks and forests are often crowded or frequented by large groups of people, including children, for recreational, social, educational, and other purposes.  *See, e.g., id.* ¶¶ 39, 47, 54, 58(f).  For instance, Hammonasset Beach State

---

[12] *See also* Ex. 77 (1776 Delaware constitution prohibiting "com[ing] armed" to elections); Ex. 79 (1787 New York law prohibiting individuals from hindering elections "by force of arms"); Ex. 85 (1870 Louisiana law deeming it unlawful "for any person to carry any gun, pistol, or other dangerous weapon, concealed or unconcealed," within one-half mile of election polls or place of registration); Ex. 86 (1870 Texas law prohibiting individuals from carrying guns or pistols "to any election precinct on the day or days of any election"); Exs. 87 and 94 (1874 and 1886 Maryland laws prohibiting carrying of guns or pistols on election days in certain locations).

Park is "generally regarded as the largest tourist attraction" in Connecticut (besides casinos), and attracts "[a]pproximately 3 million" people each year. *Id.* ¶¶ 112-13. It is "frequently . . . very crowded, particularly during summer months." *Id.* ¶ 114. And a photograph of Hammonasset Beach State Park leaves no doubt that it is a quintessentially crowded location. *See* Ex. 115. Other designated swimming areas can become just as crowded during summer months. *See, e.g.,* SOF ¶¶ 62-64. And Dinosaur State Park is a commonly crowded location, with tens of thousands of children visiting it each year over the past two years, and one event in 2024—Dinosaur Day— "attracted over two thousand people" on a single day. Ex. 163 (Lambert Decl.) ¶ 10; *see id.* ¶ 30. Because State parks and forests are such popular locations, DEEP has ongoing issues managing crowds and sometimes needs to close parks due to capacity limits. *See* SOF ¶ 57, 59-61.

What is more, locations *within* various State parks and forests—particularly buildings, structures, or other areas that are scenic or popular—are often crowded or frequented by groups of people, including children, for recreational, scientific, political, and/or educational purposes. For example, people have weddings at places like Harkness Memorial State Park's Eolia Mansion or Gillette Castle State Park. *See* Ex. 137 ¶¶ 122-27. Indeed, DEEP advertises State parks and forests for special events like weddings or private parties. *See* SOF ¶¶ 65-66. And "Meigs Point Nature Center (Hammonasset Beach State Park) and Dinosaur State Park have nature centers that cater to thousands of children each year." Ex. 137 ¶ 58(e); *see id.* ¶ 115-16.

Put simply, the record contains substantial evidence demonstrating that locations within the ambit of § 23-4-1(c) are often crowded by large groups for social, recreational, educational, and other purposes.[13] Section 23-4-1(c) partially serves to maintain safety and order. *See* Conn.

---

[13] *See, e.g.,* Ex. 137 ¶ 41 (noting that most parks and forests have "some form of structure" including, for example, "nature centers," "indoor exhibits," and "historic structures" like "Gillette Castle . . . Heublein Tower . . . Ellie Mitchell Pavilion . . . [and] the Eolia Mansion"); *id.* ¶ 43 (noting that activities people engage in at State parks and forests include, for example, "special events including weddings" and "various scientific and educational

Gen. Stat. § 23-4(a); Ex. 136 ¶ 16(a); Ex. 137 ¶¶ 78-79, 89(a).  As in *Antonyuk II*, then, § 23-4-1(c) imposes a comparable burden on the right to self-defense that is comparably justified when compared to historical analogues because it establishes an outright firearms prohibition in discrete locations without any exception for self-defense (i.e., the "how") as a way to maintain order and peaceable assembly in often crowded, heavily trafficked locations (i.e., the "why").  *See* 120 F.4th at 1024, 1027, 1031, 1038; *Maryland Shall Issue, Inc.*, 680 F. Supp. 3d at 587.

### 4. Our Nation has a well-established tradition of prohibiting firearms in locations frequented by vulnerable populations like children

Another principle that § 23-4-1(c) aligns with in our Nation's history of firearms regulation is that guns can be banned from discrete locations frequented by vulnerable populations like children, especially when such locations provide educational or scientific opportunities.

*Antonyuk II* unequivocally stated that "the tradition of regulating firearms in spaces frequented by children is also well-established and representative." *Antonyuk II*, 120 F.4th at 1026 (citing *Bruen*, 597 U.S. at 30); *see Heller*, 554 U.S. at 626.  *Antonyuk II* relied on such precedent in addition to laws prohibiting firearms in spaces "hosting educational and scientific opportunities" in concluding that New York "ha[d] demonstrated that prohibiting firearms at zoos" aligned with history and tradition.  *Id.* at 1026-27.

Defendant's showing here substantially mirrors the record in *Antonyuk II*.  *See id.* at 1027 (discussing laws in Texas (1870), Tennessee (1869), Missouri (1883), Arizona (1889), Oklahoma (1890)); Exs. 83, 86, 95, 97, and 245.  But Defendant also builds on it, further underscoring that

---

activities"); *id.* ¶ 45 (noting that State parks and forests have been used for "political activities" including one at a "rental pavilion[] at Hammonasset Beach State Park"); *id.* ¶ 56 (noting that particular areas in "Dinosaur State Park" and "Harkness Memorial State Park," among others, can become crowded); *id.* ¶ 94 (noting that "beaches, campgrounds, nature centers, and historic locations, among many others, become crowded"); *id.* ¶¶ 111-29 (discussing various popular State parks that are often crowded and visited by children for various purposes, including education); Ex. 163 ¶¶ 18-20 (discussing swimming areas that can be "densely populated" and locations that can "attract large crowds" because of special events, like weddings).

firearms can lawfully be prohibited in locations where children may be found and especially in places providing educational or scientific opportunities.[14]

Section 23-4-1(c) aligns with such history and tradition. To begin, children and families are "*the* target audience" for State parks and forests; Ex. 137 ¶ 58 (emphasis added); and this ultimately leads to "[m]illions of children visit[ing]" such locations each year. *Id.* ¶ 57. So State parks and forests are heavily geared towards children. *Cf. Kipke*, 695 F. Supp. 3d at 654 (holding that state defendants failed to demonstrate that parks were "sensitive place[s]" in part because they did "not allege that the parks are *primarily geared* towards children and any vulnerable population") (emphasis added). And more granular details further underscore this point. For instance, Dinosaur State Park attracted tens of thousands of children each year for the past two years. Ex. 163 ¶ 30. In 2023, approximately 42 percent of the visitors admitted to Dinosaur State Park's visitor center were reportedly aged twelve and under, and approximately 54 percent of visitors to that location were reportedly aged thirteen and older—datapoints reflecting that a large percentage of visitors to Dinosaur State Park's visitor center are minor children or individuals "accompanied by children." *Antonyuk*, 120 F.4th at 1026; *see* Ex. 163 ¶ 30. Similar numbers were reported from January to August, 2024. *See* Ex. 163 ¶ 30. Additionally, in 2023, most of the "106 reservations for full-sized bus permits to State parks and forests" were for children. *Id.* ¶ 28. And because the discrete locations within the ambit of § 23-4-1(c) provide "cost-effective ways to enhance course curricula"; Ex. 140 ¶ 16; *see* Ex. 139 ¶ 27-28; schools across the State routinely organize field trips to State parks and forests, including but not limited to Fort Griswold, Fort Trumbull, Hammonasset Beach State Park, and Dinosaur State Park. *See* Ex. 163 ¶ 28; Ex. 137

---

[14] *See, e.g.,* Exs. 88 (1874 Missouri), 89 (1874 Texas), 90 (1878 Mississippi), 91 (1879 Missouri), 92 (1880 Mississippi), 98 (1892 Mississippi), 99 (1892 Vermont), 100 (1893 Oklahoma), 101 (1901 Arizona), 102 (1903 Montana), and 103 (1907 Montana); *see also* Exs. 118-124 (university regulations between 1655 and 1838 prohibiting firearms).

¶¶ 58(f), 128-29; Ex. 140 ¶ 13-16.  What is more, DEEP operates the NCLI program for children and families that is geared towards "environmental-themed activities" in State parks and forests. Ex. 163 ¶ 26.  Put simply, there can be no reasonable dispute that State parks and forests are frequented by millions of children each year.

As in *Antonyuk II*, then, § 23-4-1(c) imposes a comparable burden on the right to self-defense that is comparably justified when compared to the above historical analogues: it establishes an outright firearms prohibition in discrete locations without any exception for self-defense (i.e., the "how") as a way to protect vulnerable segments of the population, especially in spaces that provide educational or scientific opportunities where the presence of firearms would disrupt such opportunities (i.e., the "why").  *See* 120 F.4th at 1011-12, 1026-27; *Mintz*, 2024 U.S. Dist. Lexis 61699, at *46-52; *Maryland Shall Issue, Inc.*, 680 F. Supp. 3d at 588.

> 5.  *Landowners have always had a pre-existing right to determine what happens on their land, including prohibiting individuals from carrying firearms onto it without consent*

Our Nation's history of firearms regulation reflects another principle that § 23-4-1(c) aligns with:  landowners can prohibit guns on their land based on a pre-existing right entitling them to determine what happens on their land, including whether someone may hunt on their lands or under want circumstances they may carry a gun onto it.

As discussed above, property owners had pre-existing rights that inform the scope of Plaintiff's Second Amendment rights.  *See Bruen*, 597 U.S. at 26; Part II.B, above.  "The right to exclude is one of the most treasured rights of property ownership. . . . and is one of the most essential sticks in the bundle of rights[.]"  *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149-50 (2021) (citations and internal quotation marks omitted).  Private landowners—even those "who open their private property to the public"—have the right to regulate firearms possession on their premises.  *Wolford*, 116 F.4th at 994; *see GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1265

(11th Cir. 2012), *cert. denied*, 568 U.S. 1088 (2013), *overruled on other grounds by Bruen*. The State has the same rights regarding property that it owns or controls, and especially when that property is operated like a business. *See Wolford*, 116 F.4th at 970-71, 1000; *Class*, 930 F.3d at 464; *Bonidy*, 790 F.3d at 1126; *see also Enquist*, 553 U.S. at 598 (noting that "there is a crucial difference, with respect to constitutional analysis, between the government exercising the power to regulate or license, as lawmaker, and the government acting as proprietor, to manage its internal operation").

Our Nation's history and tradition contains numerous statutes reflecting that property owners have the right to determine if, how, and when an individual may hunt on their land.[15] Additionally, laws often required that individuals first obtain a landowner's permission before they could carry a gun into another's property. For instance, in 1763, New York prohibited individuals from "carry[ing] . . . any Mu[s]ket, Fowling-Piece, or other Fire-Arm what[s]oever, into, upon, or through any Orchard, Garden, Corn-Field, or other inclo[s]ed Land . . . within the City of New-York, or the Liberties thereof" absent landowner consent. Ex. 176. Similar laws existed throughout our Nation's history.[16] Plus, the Framers understood the need for strong governmental property rights. The Property Clause of Art. IV, § 3, provides that "Congress shall have Power to

---

[15] *E.g.,* Exs. 167, 172, 174 (Virginia 1710, 1738, and 1748); Exs. 71, 175 (Pennsylvania 1721 and 1760); Exs. 72 and 73 (New Jersey 1722 and 1771); Ex. 176 (New York 1763); Ex. 178 (North Carolina 1784); Ex. 180 (Connecticut 1796); Ex. 181 (Kentucky 1834); Exs. 184 and 186 (Florida 1853 and 1865); Ex 74 (Louisiana 1865); Ex. 187 (Delaware 1873); Ex. 189 (Iowa 1894); Ex. 193 (North Carolina 1909).

[16] *See, e.g.,* Exs. 72-73 (New Jersey 1722 and 1771; each prohibiting, among other things, "carry[ing] any [g]un" into another's lands absent consent); Ex. 175 (Pennsylvania 1760; deeming unlawful to "carry any gun or hunt" on someone else's property "unless he shall have license or permission from the owner of such lands"); Ex. 179 (Massachusetts 1790; prohibiting individuals being "[s]een with any gun" on islands absent landowner consent); Ex. 186 (Florida 1865; deeming unlawful to "range with a gun within enclosed land or premises of another without permission of the owner, tenant, or person having control thereof"); Ex. 74 (Louisiana 1865; deeming unlawful "carry[ing] firearms" on another's property absent consent); Ex. 187 (Delaware 1873; making it unlawful for person to "enter upon any lands not owned by himself . . . with gun alone, for the purpose of shooting . . . birds or game" absent landowner's consent); Ex. 253 (Oregon 1893; deeming unlawful for person "being armed with a gun, pistol, or other firearm, to go or trespass upon any enclosed premises or lands" absent consent); Ex. 66 (North Carolina 1921; deeming unlawful for person to "carry a pistol, revolver, or gun in any park or reservation . . . without having first obtained the written permission of the owner").

dispose of and make *all needful Rules and Regulations* respecting the Territory or other Property belonging to the United States . . . ." (emphasis added). Courts have described that clause as a grant of authority over federal lands that is "without limitations" and "plenary." *Kleppe v. New Mexico*, 426 U.S. 529, 539 (1976); *Cal. Coastal Com v. Granite Rock Co.*, 480 U.S. 572, 593 (1987); *see also Dorosan*, 350 Fed. Appx. at 875 (partially relying on Property Clause in rejecting Second Amendment challenge). History and tradition therefore teach that individuals wishing to carry a firearm onto another's lands did not have a *right* to do so absent a landowner's consent.

Section 23-4-1(c) is relevantly similar to the above history and tradition. Except for rare circumstances where the State leases land from a third party, the State owns all property within the State parks and forests system, and DEEP has authority over such locations. *See* Ex. 137 ¶¶ 37, 101; Conn. Gen. Stat. §§ 23-4 and 23-5. DEEP promulgated § 23-4-1(c) under its authority to manage and maintain the State park and forest system. That DEEP and the State—similar to any other private entity leveraging a profitable commodity—operate State parks and forests with an eye towards revenue generation underscores DEEP's proprietary right to exclude people from carrying weapons within *its* lands. *See, e.g., Bonidy*, 790 F.3d at 1126. State parks and forests generate millions of dollars each year from things like fees for parking, admission, events, movie productions, and many others. SOF ¶¶ 126-30. In 2022, for example, State parks and forests directly generated approximately $4.5 million, equating to roughly twenty-one percent of the Parks Division's overall budget—profits that DEEP retained to remain financially self-sustaining.[17] *See* Conn. Gen. Stat. § 23-15; SOF ¶¶ 130, 132-33; Ex. 137 ¶ 63, 75-77. Moreover, State parks and

---

[17] Contemporary revenue generation from State parks and forests aligns with Connecticut's historical treatment of such locations as profitable commodities. For example, by the turn of the twentieth century, State forests had a key purpose of timber production—something that had economic value. *See, e.g.,* Ex. 133 ¶¶ 38, 44. And with the growth of the Civilian Conservation Corps ("CCC") across the Nation, "Connecticut's CCC helped the state revive commercial forest products' business by helping to build wood treatment plants, charcoal kilns, and a state sawmill. They even harvested ice from state forest ponds for commercial use." Ex. 133 ¶ 53; *see* Ex. 165 ¶ 32.

forests represent key marketable assets that the State leverages to attract tourists to the State—an "important contributor to the State's economy"—beyond the fees paid directly to DEEP. Ex. 138 (Anthony Decl.) ¶ 13; *see id.* at ¶¶ 8-23. Notably, in 2023, approximately "90%" of the State's advertising efforts "marketed or promoted" State parks and forests in some form; *id.* ¶ 17; and "capitalize[d]" on what such places offer "to market and promote the State" to prospective tourists. *Id.* at ¶ 23. Furthermore, DEEP regulates hunting on properties within its jurisdiction, including the types of weapons that may be used to hunt wild game. *See generally* Ex. 108. That is consistent with individuals not being allowed to hunt or carry firearms "except as authorized" by DEEP. Conn. Regs. State. Agencies § 23-4-1(c). And DEEP's permitting system regulating hunting throughout the State, including State parks and forests, generates significant revenue for the State. SOF ¶ 131.

Notably, "when the State acts as a market participant and proprietor by operating a business, it typically has the same rights as a private proprietor to manage its internal affairs." *Kipke*, 695 F. Supp. 3d at 653; *see also Selevan v. N.Y. Thruway Authority*, 584 F.3d 82, 93 (2d Cir. 2009) (generally discussing market participant doctrine). "*Bruen* did not opine on a State's right as a property owner to exclude firearms[.]" *Kipke*, 695 F. Supp. 3d at 654. *Kipke* rejected a proprietorship argument mainly because the government defendants failed to show that "Maryland acts as a proprietor in regulating firearms in its parks[.]" But here, Defendant has made that showing.

Here, DEEP simply exercised its proprietary right to exclude firearms from locations that it controls, markets, and profits from—just like any private landowner could do. *See Wolford*, 116 F.4th at 970-71; *see also Lehman v. Shaker Heights*, 418 U.S. 298, 302 (1980) (plurality) (First Amendment did not require city to allow political advertisements on buses because the "[r]evenue

earned from long-term commercial advertising could be jeopardized"). Section 23-4-1(c) is therefore relevantly similar to historical analogues because DEEP, as the entity with control over State parks and forests, exercised property rights that pre-existed at the time of the Founding by excluding the unauthorized carrying of firearms or hunting. *See* Ex. 165 ¶ 8. Moreover, § 23-4-1(c) imposes a comparable burden on Second Amendment rights that is comparably justified: it requires that individuals first obtain DEEP's permission before they may hunt on, or otherwise carry a firearm into, outdoor spaces owned or controlled by another entity (i.e., the "how"). The regulation permits DEEP to decide—just like any other landowner can—what may occur in outdoor spaces that it controls (i.e., the "why"). And because State parks and forests are not thoroughfares like roads or sidewalks but, rather, discrete locations that people visit voluntarily, restricting guns in such locations does not destroy the general right to public carry. *See Voisine v. United States*, 579 U.S. 686, 714 (2016) (Thomas, J., dissenting); *Class*, 930 F.3d at 465; *GeorgiaCarry.Org, Inc. v. United States Army Corps of Engineers*, 212 F. Supp. 3d 1348, 1364-65 (N.D. Ga. 2016).

Finally, how DEEP regulates carrying firearms in State parks and forests is proportionate to its goals and the tradition of firearm regulation. Notably, Defendant need not point to historical laws specifically reflecting that *the government*, as opposed to private parties, had the authority to determine what can or cannot happen on its land. *See Rahimi*, 144 S. Ct. 1898. Reasoning by analogy does not impose that sort of "'regulatory straitjacket.'" *See id.* at 1925 (Barrett, J., concurring) (quoting *Bruen*, 597 U.S. at 30). Rather, Defendant can—and does—rely on the principle underpinning our Nation's history and tradition recognizing the pre-existing right that landowners or those with control over property, including DEEP, get to determine what can or cannot happen on their land, even when it comes to the Second Amendment. *See id.* at 1898;

*Antonyuk II*, 120 F. 4th at 971.

   6. *Our Nation has a well-established tradition of prohibiting unauthorized hunting and carrying of firearms in various locations to promote conservation goals*

Section 23-4-1(c)'s prohibition on carrying firearms absent DEEP's consent aligns with a principle that guns can be prohibited in locations as a way to preserve deer and other animals ("conservation goals").  Moreover, as discussed below, § 23-4-1(c) imposes a comparable burden on Second Amendment rights that is comparably justified when compared to historical analogues. It circumscribes the ability to carry firearms in a manner similar to laws that required a landowner's permission before an individual could hunt on another's land and other laws establishing a presumption that an individual was engaged in unlawful hunting by simply possessing a gun at an unauthorized place or time (i.e., the "how").  And it does so as a way to advance conservation goals by reducing the risk of unauthorized hunting before it happens (i.e., the "why").

There can be no dispute that hunting regulations existed in England.  *See* Ex. 166 (excerpts from J. Malcolm, To Keep and Bear Arms: The Origins of an Anglo-American Right).  Founding-era hunting laws existed in America too, like Connecticut's 1796 law restricting hunting to certain times of year and prohibiting, among other things, killing or hunting deer on another's land absent landowner consent.  Ex. 180.  Such Founding-era laws sought to preserve deer and wild game for the public's benefit.  For instance, Connecticut's 1796 law regulated hunting because "the killing of Deer at un[s]ea[s]nable Times . . . is *very Prejudicial to the public good*[.]"  *Id.* (emphasis added).  And although the law partially prohibited hunting deer in a "[p]ark or [i]nclo[s]ure" absent a landowner's consent, the law made clear that people "[had] erected Parks or Inclo[s]ures for keeping and pre[s]erving deer, *which is likely to be for the Public Good*[.]"  *Id.* (emphasis added). Thus, promoting conservation goals was key to Founding-era hunting laws.[18]  *See* Ex. 165 (Glaser

_____

[18] Massachusetts (1717), Pennsylvania (1721 and 1760), New Jersey (1722 and 1771), Virginia (1710, 1738,

38

Supp. Decl.) ¶¶ 7, 13, 23, 30, 34; *Geer v. Connecticut*, 161 U.S. 519, 528-29 (1896), *overruled on other grounds by Hughes v. Oklahoma*, 441 U.S. 322 (1979).

This trend of enacting hunting laws to promote conservation goals in various locations—including public parks—continued leading up to 1868 and post-reconstruction,[19] including states enacting laws that *presumed* an individual was unlawfully hunting *simply because they possessed a gun* at an unauthorized place or time. For instance, in 1790, Massachusetts made it unlawful to "'be seen with any gun or guns'" absent permission in order to protect animals on certain islands.[20] *Christian v. James*, 2024 U.S. Dist. Lexis 185551, at *38 (W.D.N.Y. Oct. 10, 2024) (quoting *Koons v. Platkin*, 673 F. Supp. 3d 515, 620 (D.N.J. 2023), *appeal filed*, No. 23-1900 (3d Cir.) (argued October 25, 2023)); *see* Ex. 179. In 1838, Maryland passed a law "for the preservation of Wild Fowl" that deemed possession of a "gun, fowling piece or pistol" in particular locations "*prima facie evidence* of intent to shoot or molest said wild fowls" and subjected offenders to a fine. Ex. 182 (emphasis added). Merely possessing a gun at unauthorized places or times constituted "prima facie" evidence of unlawful hunting in a subsequent Maryland law too, which imposed "thirty jails" imprisonment if violators failed to pay the proscribed fines. *See* Ex. 190. By the early-twentieth century, various states had created default presumptions of unlawful hunting by merely possessing a gun at unauthorized times or locations.[21]

---

1748, and 1772), and North Carolina (1784) had provisions similar to Connecticut's 1796 law that were aimed at better preserving deer and wild game. *See* Exs. 71-73, 167, 170, 172, 174-75, 177-78; *see also* Exs. 169, 171, 173 (similar acts in Connecticut in 1717, 1733, and 1739).

[19] *See, e.g.* Ex. 181 (1834 Kentucky); Ex. 183 and 185 (1849 and 1853 Virginia); Ex. 184 (1853 Florida); Ex. 190 (1894 Yellowstone National Park); Ex. 196 (1916 Crater Lake National Park); Ex. 197 (1916 Mount Rainer National Park); Ex. 229 (1917 Wisconsin); Ex. 198 (1920 Yosemite, Sequoia, and General Grant National Parks); Ex. 200 (1924 Mississippi); Ex. 201 (1927 Indiana).

[20] The Court in *Christian* referenced a "1780 Massachusetts enactment," but the law was passed in 1790. *Compare* 2024 U.S. Dist. Lexis 185551, at *38, *with* Ex. 179.

[21] *See, e.g.* Ex. 75 (Kentucky 1866) (making it unlawful to "enter or go upon the land of another person" on "Sabbath day" to shoot animals and noting that "any such person having in his possession a gun at that time . . . shall, upon proof, be guilty"); Ex. 76 (North Carolina 1869) (similar to Kentucky 1866); Ex. 193 (1909 North Carolina; "if any person shall go upon the lands of another with a gun it shall be *prima facie* evidence that such person is hunting"); Ex. 194 (1909 West Virginia; carrying any "uncased gun in any of the fields or woods of this state . . . shall . . . other

*Antonyuk II* considered only a handful of the above laws, characterizing the laws in that case as "deterring unlicensed hunting" and "aimed at preventing the 'damages and inconveniences' caused 'by persons carrying guns and *presuming to hunt* on other people's land.'" 120 F.4th at 1046 (emphasis in original) (quoting statutes from Pennsylvania (1721), New Jersey (1722), and New York (1763)); *see* Exs. 71-72, 176. As Professor Leah Glaser testifies, firearms possession was "limited or completely prohibited" by the late-nineteenth and early-twentieth centuries in "modern parks and forests, in part to serve conservation goals of managing natural resources such as game and wildlife[.]" Ex. 165 ¶ 10(a); *see id.* ¶ 24. People even "endorsed" such restrictions in national parks. *Id.* ¶ 27. The above laws and tradition thus reflect a "liquidate[d] [and] settle[d]" understanding that firearms can be prohibited in various locations to advance conservation goals and that, to advance such goals, the Nation embraced laws imposing default presumptions of unlawful hunting by mere possession of any gun at unauthorized times or locations. *See Bruen*, 597 U.S. at 35 (internal quotation marks omitted); *Antonyuk II*, 120 F.4th at 969, 1010.

Section 23-4-1(c) is part of and continues this tradition. Ex. 165 ¶ 51. "Connecticut has long operated its parks and forests to protect fish, game, and wildlife, and to curb unauthorized or excessive hunting." *Id.* ¶ 30. Notably, the Park Commission's initial firearms prohibition was partially motivated by "a desire to prevent or limit unauthorized or excessive hunting." *Id.* ¶ 34. Today, § 23-4-1(c)'s firearm restriction still advances those same conservation goals because, "[i]f a visitor is prohibited from carrying a firearm, it is more difficult for him or her to hunt in an

---

than the *bona fide* owner . . . of such woods or fields . . . be deemed *prima facie* evidence of a violation of this section"); Ex. 195 (1915 New Mexico; "The presence of any person in any open field, prairie or forest, whether enclosed or not, with . . . gun or any other weapon for hunting [without a hunting license], shall be prima facie evidence of the violation of this section."); Ex. 199 (1923 Connecticut; prohibiting Sunday hunting and deeming "possession in the open air . . . . . any implement for hunting" to be "prima facie evidence of hunting in violation" of provision); Ex. 200 (1924 Mississippi; "any person found with gun or dog on or within such prescribed limits, shall be prima facie presumed to be hunting in violation of this act"); *cf.* Ex. 188 (1893 Connecticut; "[a]ny person found with dog and gun upon the land of another . . . shall be deemed *prima facie* to be there for the purpose of hunting").

unauthorized location or out of season without being detected by EnCon or reported by another visitor." Ex. 136 ¶ 16(b); see Ex. 137 ¶ 89(c). Thus, "it's easier to stop poaching activity" before it happens if firearms are generally prohibited in State parks and forests. Ex. 159 (Col. Lewis, T:5/10/23 at 313). Moreover, if guns are generally prohibited from such locations, individuals are more likely to report the sight of a gun to EnCon because possession of a gun could suggest unlawful hunting, and such a report "furthers [EnCon's] conservation mission" to protect wildlife. *See id.*

Other hunting laws in Connecticut underscore § 23-4-1(c)'s alignment with advancing conservation goals. For example, individuals may only hunt deer on "private land" between "November first to December thirty-first" with a "revolver," which includes "any firearm having a barrel less than twelve inches in length," that is ".357 caliber or larger[.]"[22] *See* Conn. Gen. Stat. §§ 26-82a and 29-27; Ex. 159 (T:5/10/23 at 346-47); Ex. 108 at Bates ## 0732, 0750. DEEP authorizes the use of certain handguns capable of firing .22 caliber rounds to shoot small game in limited circumstances, but does not allow individuals to hunt deer with a handgun in any State park or forest. *See* Ex. 159 (T:5/10/23 at 277, 346-50). Poachers and unauthorized hunters could easily skirt hunting laws, including those that only permit hunting deer with a revolver on "private land" for two months out of the year, in State parks and forests by using pistols or handguns of various calibers to shoot wild game.[23] That plainly would contravene the conservation goals that underly § 23-4-1(c)'s foundation and the locations within its scope. Section 23-4-1(c)'s firearm prohibition aims to prevent that from happening. And it is simply one way that DEEP protects

---

[22] Two of the handguns that Plaintiff carries most often—a Glock 42 and Taurus 85—are .38 caliber. *See* Ex. 160 (Plaintiff's Deposition, T:4/27/23 at 134, 137-40, 144-46).

[23] Such a risk is not unfathomable. A 1903 Report of the Secretary of the Interior regarding Sequoia National Park described one instance involving an individual unlawfully attempting to shoot a deer with a revolver after being "given permission to carry a revolver for self-protection in the park." Ex. 254.

and conserves wildlife, a natural resource in Connecticut. *See Hughes*, 441 U.S. at 338; *Reeves, Inc. v. Stake*, 447 U.S. 429, 443 (1980); *State v. Ball*, 260 Conn. 275, 284-85 (2002).

All told, § 23-4-1(c) aligns with our Nation's firearms regulation. It circumscribes the right to carry a firearm similar to laws that required permission before an individual could hunt on another's land and other laws establishing a presumption that an individual was engaged in unlawful hunting by simply possessing a gun at an unauthorized place or time (i.e., the "how"). And it does so as a way to advance conservation goals by reducing the risk of unauthorized hunting before it happens (i.e., the "why"). *See Bruen*, 597 U.S. at 29; *Antonyuk II*, 120 F.4th at 1046-47.

*7. Individuals can lawfully be banned from going armed in public to the people's terror*

English and Founding-era American laws illustrate one final principle that § 23-4-1(c) aligns with: individuals cannot publicly arm themselves in locations to the people's terror. The evidence in the record here unequivocally demonstrates the frequent crowding of locations within the State park and forest system and that patrons, many of whom are children, would be terrorized by the presence of firearms in places like beaches, nature centers, and walking trails.

As *Antonyuk II* observed, "going armed" laws in our Nation's history trended away from requiring a "conduct" element. 120 F.4th at 1020 n.82. Thus, such laws are proper analogues even without accompanying conduct that would terrify or alarm others. *See id.*; *see also* Ex. 135 ¶¶ 27-29 (noting that in terrorem laws effectively inferred individual's intent to terrify others simply by carrying prohibited weapon). Even if such "terror" conduct were required, though, § 23-4-1(c) is still relevantly similar to such "going armed" laws.

For centuries, "firearms regulations have included provisions barring people from misusing weapons to harm *or menace* others." *Rahimi*, 144 S. Ct. at 1899 (emphasis added). Such firearms restrictions trace their roots to the Statute of Northampton and other laws dealing with "affrays," which "encompass the offense of 'arm[ing]' oneself [to the Terror of the People[.]'" *Id.* at 1901

(quoting T. Barlow, The Justice of the Peace: A Treatise 11 (1745)). The Statute of Northampton, early colonial enactments, and Founding-era laws authorized the arrest of (or otherwise prohibited) individuals who went armed offensively. *See* 2 Edw. 3, 258, ch.3 (1328); Ex. 246 (1692 Massachusetts); Ex. 247 (1741 North Carolina); Ex. 248 (1771 New Hampshire); Ex. 78 (1786 Virginia); Ex. 80 (1792 North Carolina); Ex. 249 (1795 Massachusetts); *Bruen*, 597 U.S. at 40-41; *see* Ex. 135 ¶¶ 27-29. The trend continued into the nineteenth century with states passing similar laws. For example, in 1801, Tennessee criminalized "rid[ing] or go[ing] armed to the terror of the people, or privately carry[ing] any . . . pi[s]tol or any dangerous weapon, to the fear or terror of the people[.]" Ex. 250; *see also* Ex. 251 (1837 Georgia; generally prohibiting individuals from "keep[ing], or hav[ing] about their person or elsewhere" Bowie knives as "arms of offence or defen[s]e," and noting that "pistols [except horseman's pistols] . . . shall also be contemplated in this act"); Ex. 252 (1875 Wyoming; generally prohibiting the carrying of "any fire arm" in "any city, town or village"). Such laws often contained harsh penalties, including imprisonment or forfeiting weapons or armor. *See, e.g.,* Exs. 78, 80, 248.

*Bruen* noted that the general throughline for such laws was that "[t]hey prohibit bearing arms in a way that spreads 'fear' or 'terror' among the people." 597 U.S. at 50. *Rahimi* relied on these laws in upholding a law prohibiting individuals from possessing a firearm while subject to a domestic violence restraining order. *See* 144 S. Ct. at 1901-1902. *Antonyuk* relied on them too in concluding that they represented analogues for certain provisions of the challenged New York Law prohibiting firearms *in specific locations*. *See* 120 F.4th at 1019-20, 1037-38; *id.* at 1020 n.82.

These going armed laws are appropriate analogues to § 23-4-1(c). Ample evidence demonstrates that individuals visiting State parks and forests would be afraid if they saw someone carrying a firearm in these discrete locations, particularly because firearms are inconsistent with

the ideals of tranquility, respite, and recreation underpinning their existence, not to mention the education of school children. *See, e.g.,* Ex. 164 ¶¶ 13, 14, 16, 75-80; Ex. 134 ¶¶ 29, 36, 41; Ex. 136 ¶¶ 16-17; Ex. 137 ¶¶ 89(a), 94; Ex. 159 (T:5/10/24 at 263-64, 306). Moreover, individuals who carry concealed—as opposed to openly—can inadvertently display a firearm simply by their physical movement, resulting in those around them who see the firearm experiencing the same feelings of alarm or fear. *See* Ex. 159 (T:5/10/24 at 321-25). Thus, the evidentiary record before this Court is different than in *Bruen*. *Cf.* 597 U.S. at 45 (faulting respondents for not "offer[ing] any evidence showing that, in the early 18th century *or after*, the mere public carrying of a handgun would terrify people") (emphasis added). And the analogy between § 23-4-1(c) and "going armed" laws is simple: each prohibit carrying firearms to prevent fear, terror, and alarm from spreading among individuals who would not expect to see weapons in discrete locations. *See LaFave*, 2024 U.S. Dist. Lexis 152000, at *35-36.

  8. *The above historical analogues illustrate that § 23-4-1(c) is facially constitutional and reveal that the Second Amendment permits discrete, location-based restrictions that preserve an undiminished right of self-defense in public*

  To summarize: the above six historical analogues reflect that the principles underpinning our Nation's history of firearms regulation permit discrete, location-based firearms restrictions. Section 23-4-1(c) continues the history and tradition of those regulation because it is founded in the ideals of the parks and forests movements, protects vulnerable individuals or large crowds, respects and preserves a landowner's pre-existing property rights, and promotes conservation goals. Moreover, its infringement or burden on lawful gunowner's Second Amendment rights is negligible because it only applies to a sliver of the State (approximately seven percent of Connecticut) and does not prohibit individuals from exercising their right to carry elsewhere

throughout the State.[24] *See Maryland Shall Issue, Inc. v. Moore*, 116 F. 4th 211, 220-23 (4th Cir. 2024), *pet. cert. field*, No. 24-373 (filed Sept. 27, 2024); *LaFave*, 2024 U.S. Dist. Lexis 152000, at *34; *Wrenn v. District of Columbia*, 864 F.3d 650, 662 and 663 n.5 (D.C. Cir. 2017); *GeorgiaCarry.Org, Inc.*, 212 F. Supp. 3d at 1364-65; Conn. Gen. Stat. §§ 29-28(b) and 29-35(a); Ex. 135 ¶¶ 10, 15-16; Ex. 137 ¶ 36; *cf. Voisine*, 579 U.S. at 714 (Thomas, J., dissenting) (observing that sensitive place restrictions are "narrow restrictions" that "neither prohibit nor broadly frustrate any individual from generally exercising his right to bear arms"); *Antonyuk II*, 120 F.4th at 1047 (noting that restriction effectively created "a universal default presumption" that "*seriously burden[ed]* lawful gun owners' Second Amendment rights") (emphasis added). Accordingly, § 23-4-1(c) is facially constitutional.

D. Plaintiff's arguments regarding "sensitive places" or crowded locations fail

Plaintiff makes several additional arguments in attempting to demonstrate that § 23-4-1(c) does not fit within the Nation's history and tradition of firearms regulation. His arguments fail.

*First*, his definition of sensitive places as those having two "inescapable commonalities: (1) they [are] places where deliberative self-government occur[s][;] *and* (2) governments provide[] comprehensive security at the place in question"; ECF No. 74-1 at 10, 12-13 (alterations and emphasis added); is too narrow and has no basis in law. *Second*, he ignores the overwhelming historical evidence contrary to his position in the hopes that this Court will too. Plaintiff effectively asks this Court to disregard *Antonyuk II*'s consideration of the Statute of Northampton and other Founding-era "going armed" laws because, according to him, the Second Circuit misunderstood

---

[24] With respect to the three locations that Plaintiff focuses on in his as-applied challenges, this figure is even smaller. Naugatuck State Forest is approximately .001 percent of the State. *See* Ex. 108 at Bates # 0771; Ex. 137 ¶ 36. Sleeping Giant State Park is approximately .0004 percent of the State. *See* Ex. 137 ¶ 36; CTParks, Sleeping Giant State Park, available at https://ctparks.com/parks/sleeping-giant-state-park#:~:text=And%20with%20its%20many%20scenic,and%20often%20fills%20to%20capacity. And the Farmington Canal Greenway State Park stretches only approximately 25 miles in Connecticut. Ex. 162 ¶ 8.

them. *See id.* at 24-28. This Court is bound by *Antonyuk II* and should follow it. *Third*, Plaintiff mistakenly relies on early-seventeenth century colonial enactments requiring people to bring firearms to certain locations in contending that firearms could not be banned in places where people gather. *See id.* at 28-29. Such laws long predate 1791 or 1868, contradict the overwhelming weight of other evidence, and are not relevantly similar to § 23-4-1(c).

With respect to Plaintiff's first argument, this Court need not conclusively define what constitutes a sensitive place. Rather, Defendant and this Court properly may compare § 23-4-1(c) to the "relatively few" laws pertaining to sensitive places; *Bruen*, 597 U.S. at 30-31; to establish that the regulation is consistent with principles underpinning laws prohibiting guns in recognized sensitive locations. *See Antonyuk II*, 120 F.4th at 1024, 1026. Defendant has done that by demonstrating, among other things, that State parks and forests are typically crowded and frequented by children. *See* Parts II.C.3-4, above; *see also LaFave*, 2024 U.S. Dist. Lexis 152000, at *37-39 (observing that county parks were analogous to schools and other sensitive places); *Warden v. Nickels*, 697 F. Supp. 2d 1221, 1229 (W.D. Wa. 2010) (stating that "a city-owned park where children and youth recreate is a 'sensitive' place"). Moreover, regulations categorically banning firearms in parks and similar government-controlled outdoor spaces that arose during the parks and forests movements are "akin" to laws prohibiting firearms in established sensitive places because such regulations went unchallenged, which reflects a public understanding that such locations became accepted "'sensitive place[s].'" *Wolford*, 116 F.4th at 970-71; *see id.* at 980-81; *see also Bruen*, 597 U.S. at 30 (assuming it settled that various locations were "sensitive places" because Court was "aware of no disputes regarding the lawfulness of such prohibitions"). So, then, this Court need not define what constitutes a sensitive location.

In any event, a location is "sensitive" simply based on "the people found there or the

activities that take place there." *Class*, 930 F.3d at 465 (internal quotation marks omitted). This Court should therefore reject Plaintiff's definition because it is a "strained reading of the sensitive-places doctrine" that various courts have correctly and very recently rejected. *Kipke*, 695 F. Supp. 3d at 650; *see Wolford*, 116 F.4th at 981; *LaFave*, 2024 U.S. Dist. Lexis 15200, at *38; *We the Patriots, Inc. v. Grisham*, 697 F. Supp. 3d 1222, 1237-38 (D.N.M. 2023), *appeal dismissed*, 119 F.4th 1253 (10th Cir. 2024). What is more, Plaintiff's formulaic approach ignores government buildings and schools—established sensitive places, even according to Plaintiff's expert, Professor Joyce Malcolm.[25] *See*, e.g., *Bruen*, 597 U.S. at 30; *Class*, 930 F.3d at 465; Ex. 161 (Professor Malcolm's Depo.; T:10/11/24 at 122-23). That schools have always had "few security measures" illustrates that Plaintiff's definition lacks merit. *Wolford*, 116 F.4th at 981; *see also Schoenthal v. Raoul*, 2024 U.S. Dist. Lexis 156436, at *50-51 (N.D. Ill. Aug. 30, 2024) (noting that "[p]olling places and legislative assemblies lack such security, but the Supreme Court has nevertheless deemed them to be sensitive places"), *appeal filed*, No. 24-2643 (7th Cir.) (filed Sept. 20, 2024). Plaintiff also fails to explain how government buildings or schools were (or are) places creating "the forum necessary to engage in considered and independent decision-making regarding matters of self-government." ECF No. 74-1 at 17. Nor does Plaintiff articulate what he means by "comprehensive security"; ECF No. 74-1 at 18; and the laws he cites (to the extent even relevant) fail to demonstrate how simply compensating doorkeepers, sheriffs, or others to attend court sessions, for example, reflects "comprehensive security" at such locations. *See, e.g.*, ECF No. 74-3 at 6-7, 11, 18, 24, 34-35, 40, 53, 64-65, 68. Plaintiff also fails to grapple with the fact that State

---

[25] Plaintiff relies on *Hardaway v. Nigrelli*, 636 F. Supp. 3d 329, 346 (W.D.N.Y. 2022), which also ignores government buildings and schools in concluding that places of worship were not sensitive places. *See* ECF No. 74-1 at 18; *see also Christian v. James*, 2024 U.S. Dist. Lexis 185551, at *44 n.22 (W.D.N.Y. Oct. 10, 2024) (same judge in *Hardaway* focusing only on legislative assemblies, polling places, and courthouses in stating that locations at issue were not analogous to sensitive places).

parks and forests are sometimes used as remote school classrooms by thousands of school children. At bottom, Plaintiff's definition of sensitive places is both overinclusive and underinclusive because some clearly recognized sensitive places lack both of the "inescapable commonalities" Plaintiff claims that they must possess.  ECF No. 74-1 at 10, 13.

Plaintiff's second argument about *Antonyuk II* misinterpreting the Statute of Northampton and other Founding-era laws fails too.  To begin, the argument rests atop the faulty premise that English practice and 1791 are the only relevant time periods.  Binding precedent rejects that premise.  *See Rahimi*, 144 S. Ct. at 1897-98; *Antonyuk II*, 120 F.4th at 974, 988 n.36.  Because regulations enacted after the Founding-era inform the scope of the right to bear arms, *Antonyuk II* correctly observed that, regardless of what "conduct" the Statute of Northampton or similar Founding-era going armed laws required, our Nation's history and tradition trended towards categorically prohibiting firearms in places where people gathered for social, recreational, and educational purposes without reference to the gunowner's intent or conduct.  *See* 120 F.4th at 1020 and n.82; Part II.C.3, above.  Moreover, Plaintiff cannot find safe harbor in Professor Malcolm's disagreement with binding precedent like *Antonyuk II*.  *See* ECF No. 74-1 at 24-25; ECF No. 74-2 ¶¶ 31-43.  Notably, Professor Malcolm concedes that laws can be constitutional regardless of alignment with the Statute of Northampton.  Ex. 161 (T:10/11/24 at 127, 131-32).  And her disagreement with *Antonyuk II* is partially based on her opinion that the locational component of the Statute of Northampton (i.e., prohibiting weapons in places like fairs and markets) is superfluous to the broader prohibition on going armed to the people's terror.  *See* Ex. 161 (T:10/11/24 at 119-20); ECF No. 74-2 ¶¶ 27, 30; *see also Seife v. United States FDA*, 43 F.4th 231, 239 (2d Cir. 2022) (statutes should be interpreted to give effect to every clause and word).  Finally, even if the Statute of Northampton and similar Founding-era laws required terrifying

conduct, patrons to State parks and forests would be afraid if they saw a firearm in such locations, like on the beach blanket next to them, on the person passing them on a walking trail, or in a nature center learning space.  *See* Part II.C.7, above.

Plaintiff's third argument—that our Nation has a history of requiring people to bring guns to places where they gather—fares no better.  For starters, the three colonial provisions Plaintiff relies on—Virginia (1619), Massachusetts (1636-37), and New Haven (1646)—"long predate" 1791 or 1868, so they do "not have much bearing" here, especially because they "contradict[] the overwhelming weight" of our Nation's history of prohibiting firearms in places where people gather for social, recreational, or educational purposes.  *See Antonyuk II*, 120 F.4th at 969; ECF No. 74-1 at 28.  At any rate, those historical laws required that people bring guns to locations where they gathered in order to protect colonists from raids or ambushes by Native Americans or others.  *See Wolford*, 116 F.4th at 997; *GeorgiaCarry.Org, Inc.*, 687 F.3d at 1264 n.42; ECF No. 74-2 ¶ 29; Ex. 161 (T:10/11/24 at 115, 195-96).  Thus, they are irrelevant as to the historical understanding of the government's ability to restrict carrying arms in discrete locations it owns, operates, and markets to the public for recreation, respite, and educational purposes.

## III.     **Plaintiff Cannot Prevail on his As-Applied Challenges**

Plaintiff's facial challenge to § 23-4-1(c) fails for the above reasons.  This Court should also reject Plaintiff's as-applied challenges.  *See* ECF Nos. 68 ¶ 67 and 74-1 at 34-35.  Preliminarily, Plaintiff lacks standing to assert an as-applied challenge to Naugatuck State Forest because his future plans to visit that location are, at best, speculative some-day intentions.  In any event, § 23-4-1(c) constitutionally applies to Plaintiff visiting Sleeping Giant State Park, Naugatuck State Forest, and the Farmington Canal Greenway State Park for the same reasons that his facial challenge fails.  *See* Part II, above.

A. <u>Plaintiff lacks standing to pursue an as-applied challenge to Naugatuck State Forest</u>

Plaintiff claims that § 23-4-1(c) is unconstitutional as-applied to Sleeping Giant State Park, Naugatuck State Forest, and the Farmington Canal Greenway State Park. *See* ECF Nos. 68 at 15 ¶ D (prayer for relief) and 74-1 at 34-35. Plaintiff's as-applied challenge to Naugatuck State Forest fails because the evidence he introduced shows nothing more than a some-day intention to visit that location. That simply is not enough to establish standing.

Plaintiff must establish Article III standing for *each* claim and form of relief he seeks. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021). To do that, any injury with respect to him visiting Naugatuck State Forest "must be concrete and particularized and actual or imminent, not conjectural or hypothetical." *Gazzola v. Hochul*, 88 F.4th 186, 202 (2d Cir. 2023) (per curiam) (citations and internal quotation marks omitted), *cert. denied*, 144 S. Ct. 2659 (2024). "'[S]ome day' intentions" generally "do not support a finding of the 'actual or imminent' injury" to establish standing. *Id.* at 203 n.9 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992). Additionally, Plaintiff's burden on this issue "increases as the suit proceeds." *Carter v. HealthPort Technologies, LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (internal quotation marks omitted). Now, at summary judgment, he "must 'set forth by affidavit or other evidence 'specific facts'" to establish his standing. *Id.* (quoting *Lujan*, 504 U.S. at 561).

Unlike Sleeping Giant State Park and the Farmington Canal Greenway State Park, which Plaintiff visits regularly, Plaintiff only visited Naugatuck State Forest once or twice per year in the past. *See* Ex. 158 (T:5/9/23 at 148-50). Moreover, when Plaintiff testified at the preliminary injunction hearing in May 2023, he could not recall visiting Naugatuck State Forest once in the prior twelve months. *Id.* at 201-202. He also had no specific plans to visit Naugatuck State Forest in the future. *See id.* at 220. And between May 10, 2023, and August 20, 2024, Plaintiff did not visit Naugatuck State Forest a single time. *See* ECF No. 75-6 at 7, 9 (interrogatory responses Nos.

5 and 10). On this record, then, the risk that Plaintiff will be deterred from carrying his handgun into Naugatuck State Forest is conjectural. Merely "profess[ing] . . . an intent to return" to a place where an injury would be realized "is simply not enough." *Lujan*, 504 U.S. at 564; *see Gazzola*, 88 F.4th at 203 n.9.

Although Article III's requirements do "not necessarily require specification of the date and time [a plaintiff] plans to do something of constitutional magnitude"; *Vitagliano v. County of Westchester*, 71 F.4th 130, 137 (2d Cir. 2023); Plaintiff must present *some* evidence of an imminent risk of enforcement against him. Plaintiff was therefore required to adduce evidence that he will visit Naugatuck State Forest and be chilled from carrying his handgun when he does. *See id.* Here, Plaintiff has not presented evidence that he has refrained from visiting Naugatuck State Forest or that he is chilled from carrying his handgun if he were to visit that location, so he lacks standing to bring an as-applied challenge to Naugatuck State Forest. *See id.*; *cf. Antonyuk II*, 120 F.4th at 1034-35 (noting that "[a] gun owner who alleges a prior visit to a venue, a reason or wish to visit again, and *either a plan to do so* (thereby subjecting himself to arrest) *or a decision to forgo doing so* for fear of prosecution will likely have adequately pled standing to seek a pre-enforcement injunction") (emphasis added).

Finally, *Nastri v. Dykes*, 2024 U.S. App. Lexis 7445 (2d Cir. 2024) (summary order) does not control this issue. When the Second Circuit addressed Judge Arterton's order of dismissal for lack of standing, Plaintiff had only alleged a facial challenge. To demonstrate standing at that time, Plaintiff could establish an imminent injury based on the frequency he visited Sleeping Giant or the Farmington Canal Greenway State Park. The Second Circuit had no occasion to determine whether Plaintiff visited Naugatuck State Forest with sufficient frequency to separately establish standing at that location. Instead, the Second Circuit only addressed whether Plaintiff's decision

to refrain from carrying his handgun was objectively reasonable based on a credible threat that § 23-4-1(c) would be enforced against him if he did carry in State parks and forests generally. *See id.*, at \*4-7. Thus, the Second Circuit's decision in *Nastri* does not control.

B. <u>Section 23-4-1(c) is constitutional as-applied to Sleeping Giant State Park, Naugatuck State Forest, and the Farmington Canal Greenway State Park</u>

Each of the above arguments demonstrating that § 23-4-1(c) is facially constitutional apply equally to Plaintiff's three as-applied challenges. *See* Part II, above. The facts regarding the use and characteristics of Sleeping Giant State Park, Naugatuck State Forest, and the Farmington Canal Greenway State Park simply underscore § 23-4-1(c)'s constitutionality.

Take Sleeping Giant State Park, which is directly adjacent to Quinnipiac University and is one of the "most popular State parks." Ex. 137 ¶ 102. Given its popularity, Sleeping Giant State Park reached its "200-vehicle capacity" on numerous occasions over the past three years—datapoints illustrating that large groups of people often congregate there to socialize and recreate together. *See* Ex. 163 ¶¶ 16, 31; *see also* Ex. 152 (photo of First Day Hike in January 2024 at Sleeping Giant State Park). The "Looking Tower" at Sleeping Giant State Park commonly "become[s] crowded because of its location and the scenic benefits, sometimes shoulder to shoulder distance." Ex. 137 ¶ 56; *see id.* ¶ 105. In 2022, students from Hamden Public Schools participated in a daily, four-week program held at Sleeping Giant State Park that provided a "place-based science educational experience[.]" Ex. 139 ¶ 23. Moreover, the Town of Hamden offers summer programing to children between the ages of three and fifteen years old, who have visited Sleeping Giant State Park. Ex. 139 ¶ 32; *see also* Ex. 137 ¶ 107 (noting that Sleeping Giant State Park has a "campground" that is utilized by "the Youth Group Camping program"). Thus, Sleeping Giant is typically crowded and frequented by children. *See* Part II.C.3-4, above.

Naugatuck State Forest is also "a popular destination for children and families"

because of its "scenic hiking and youth group campground[.]" Ex. 137 ¶ 110. So it too is frequented by vulnerable children. *See* Part II.C.4, above.

As for the Farmington Canal Greenway State Park, "thousands of people make use of it every day" during good weather. Ex. 163 ¶ 22; *see also* Ex. 162 ¶¶ 13-15 (data depicting average daily use). And with respect to crowding, Plaintiff said it best himself: during summer months, the Farmington Canal Greenway State Park often gets "physically crowded" with "too many people[,]" requiring "bobbing and weaving" when he jogs that trail, so at times he will "try and avoid" jogging on it because it gets too crowded, even for him. *See* Ex. 160 (T:4/27/23 at 183-84); Ex. 159 (T:5/10/23 at 217-18). Such facts underscore that the Farmington Canal Greenway State Park is a typically crowded location. *See* Part II.C.3, above.

## IV.     Plaintiff is not Entitled to a Statewide Permanent Injunction

Plaintiff seeks an order permanently enjoining enforcement of § 23-4-1(c) in every location across the State. ECF No. 68 at 15 ¶ C; ECF No. 74-1 at 1. This Court should deny Plaintiff's sweeping request because, as argued above, § 23-4-1(c) is constitutional both facially and as applied to Sleeping Giant State Park, Naugatuck State Forest, and the Farmington Canal Greenway State Park. Plaintiff has therefore failed to demonstrate he is entitled to a judgment on the merits, something he must do before this Court can grant permanent injunctive relief. And it cannot reasonably be disputed that Plaintiff has failed to demonstrate that his Second Amendment rights are implicated to a degree that would require a statewide permanent injunction. At most, Plaintiff is only seeking an injunction as to the three locations at issue in his as-applied challenges.

Before this Court can grant extraordinary, injunctive relief, Plaintiff must demonstrate: "(1) that [he] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the

public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-157 (2010) (internal quotation marks omitted); *see also New York Civil Liberties Union v. New York City Transit Authority*, 684 F.3d 286, 294 (2d Cir. 2011) ("The requirements for a permanent injunction are essentially the same as for a preliminary injunction, except that the moving party must demonstrate actual success on the merits.") (internal quotation marks omitted). "An injunction should issue only if the traditional four-factor test is satisfied"; *Monsanto Co.*, 561 U.S. at 158; because it "is a drastic and extraordinary remedy[.]" *Id.* at 165. These same principles apply even though Plaintiff alleges a constitutional violation. *See Alliance for Open Society International, Inc. v. United States Agency for International Development*, 911 F.3d 104, 109 n.2 (2d Cir. 2018), *rev'd on other grounds*, 140 S. Ct. 2082 (2020); *Cornelio v. Connecticut*, 691 F. Supp. 3d 529, 546 (D. Conn. 2023) (Meyer, J.). Finally, permanent injunctions should also be limited in scope because "'[e]quitable remedies . . . are meant to redress the injuries sustained by a particular plaintiff in a particular lawsuit[.]'" *Cornelio*, 691 F. Supp. 3d at 546 (quoting *Dept. of Homeland Security v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring in the grant of stay)).

Here, Plaintiff only claims an injury as to three discrete locations, not to all State parks and forests. There is therefore no basis to grant relief to nonparties or locations that Plaintiff does not visit. *See Cornelio*, 691 F. Supp. 3d at 546-47. Plaintiff's evidence narrowly focused on Sleeping Giant State Park, Naugatuck State Forest, and the Farmington Canal Greenway State Park, so he cannot plausibly claim injury from the regulation's enforcement in other State parks and forests. *See* ECF No. 74-1 at 34-35; ECF No. 75 ¶¶ 15-21. In fact, Plaintiff previously testified that he has no plans to visit any other State parks or forests. *See* Ex. 158 (T:5/9/23 at 204-208); Ex. 159 (T:5/10/23 at 216-17). Moreover, Plaintiff failed to offer any evidence regarding the

characteristics or uses of any other State parks and forests that would permit this Court to assess any injuries flowing from § 23-4-1(c)'s enforcement against nonparties who use the State parks and forests that Plaintiff does not visit. *See* ECF No. 75 ¶¶ 55-62. So permanent injunctive relief— if any—should not be statewide.[26]

What is more, Defendant's showing demonstrates that the balance of the hardships and public interest weigh heavily in favor of a narrow permanent injunction, if any, that would be limited to Plaintiff and the particular locations at issue in Plaintiff's as-applied challenge for which he demonstrated § 23-4-1(c) cannot lawfully apply. *See Monsanto Co.*, 561 U.S. at 156-157. Connecticut's State parks and forests are ecologically diverse and serve a multitude of uses, all of which are for the public's benefit and enjoyment. *See, e.g.,* Ex. 137 ¶¶ 40-46. The presence of firearms in State parks and forests would severely disrupt the public's ability to enjoy such locations, including school children who visit them because of their unique educational opportunities. *See generally* Exs. 138-40, 164. Those interests, when balanced against the ill-defined harms to Plaintiff and nonparties, weigh strongly against a statewide injunction.

## **CONCLUSION**

For these reasons, this Court should deny Plaintiff's motion for summary judgment and, instead, grant Defendant's cross-motion for summary judgment and enter judgment for Defendant.

---

[26] Section 23-4-1(c) prohibits unauthorized hunting, not just unauthorized possession of weapons. Although Plaintiff does not intend to violate any hunting or conservation laws; *see* ECF No. 68 ¶¶ 39-40; he seeks an order from this Court enjoining § 23-4-1(c) it its entirety. *Id.* at 15 ¶ C; see ECF No. 74-1 at 1, 37. Moreover, Plaintiff's claims are based on his desire to carry a "handgun" for self-defense, not any other weapons. See ECF. 68 at 15-16. Because Plaintiff does not dispute the regulation's lawful prohibition on hunting and only seeks to carry a "handgun" for self-defense, it plainly would be inequitable to enjoin enforcement of the regulation it its entirety.

Respectfully submitted,

DEFENDANT-COMMISSIONER
KATIE DYKES

WILLIAM TONG
ATTORNEY GENERAL

BY: /s/ *Thadius L. Bochain*
Timothy J. Holzman (ct30420)
Blake T. Sullivan (ct30289)
Thadius L. Bochain (ct31367)
Assistant Attorneys General
Attorney General's Office
165 Capitol Avenue
Hartford, CT 06106
860-808-5020 (phone)
860-808-5347 (fax)
Timothy.Holzman@ct.gov
Blake.Sullivan@ct.gov
Thadius.Bochain@ct.gov

**<u>Certificate of Service</u>**

The undersigned hereby certifies that, on the foregoing date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties and counsel of record who have appeared by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

*/s/ Thadius Bochain*
Thadius Bochain
Assistant Attorney General
