# Exhibit 133

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| DAVID J. NASTRI, ESQ. | : | No. 3:23-cv-00056 (JBA) |
| *Plaintiff*, | : | |
| | : | |
| v. | : | |
| | : | |
| KATIE DYKES, *in her official capacity*, | : | |
| *Defendant*. | : | |

**<u>DECLARATION OF PROFESSOR LEAH GLASER</u>**

I, Leah Glaser, declare as follows:

**<u>Background</u>**

1.     I am a citizen of the United States and a Resident of Connecticut.

2.     I am over 21 years of age.

3.     I am a tenured, full Professor of History at Central Connecticut State University and coordinator of the Public History program. For the last 20 years, I have taught college-level courses on American History, the history of the American West, Public History, and, more recently Environmental History, for which I focus on historic preservation. I have taught students and supervised over 40 capstone projects on topics primarily related to Connecticut history.

4.     I earned a PhD in American History, the American West and Public History from Arizona State University, where I also earned a Master's degree in Public History. During and since my 8 years in the West, I worked for several entities whose mission addresses public land use and resource management, including the Salt River Project, the United States Bureau of Reclamation (USBR), for the National Park Service (NPS) in Alaska and Pennsylvania, and as a consultant for the cities of Tucson and Tempe. This included a deposition for the City of Tucson in front of the Court of Appeals: US WEST COMMUNICATIONS INC v. CITY OF TUCSON (2000) testifying that the City of Tucson owns its

1

1113

streets. (A copy of my complete CV is attached as Attachment 1.)

5.    Since 2009, I have also been a leader in encouraging environmental issues as a central component in the field of Public History, editing an issue of the professional journal and as a theme for two national conferences, one in Hartford in 2019. From 2010-2013, I conducted extensive research into Connecticut forests and parks in anticipation of the centennial of the Connecticut Park and Forest Commission. I presented conference papers (see CV), and published on the topic for connecticuthistory.org (Connecticut Humanities), and I edited an issue of *Connecticut Explored*, the popular history magazine of the state, on the relationship between Connecticut and the American West, including the state's influence on national public land policy and the activities of Samuel Colt involving mining investment. I am currently co-editing a book on the cultural significance of trees in American history, for which I wrote an essay that focuses on forestry in Connecticut.

6.    I am currently contracted with the National Council on Public History (NCPH) and the National Park Service to conduct a Historic Resource Survey of the soon to be established Coltsville National Historic Park in Hartford, Connecticut.

7.    I currently serve on the Connecticut State Historic Preservation Council, and the Boards of Connecticut Preservation Action and on the Advisory Board of Wesleyan University's Center for the Study of Guns and Society, the first academic center in the U.S. dedicated to interdisciplinary humanities study and teaching on the social and cultural history of firearms.

8.    I am aware of this lawsuit, have reviewed the Amended Complaint ("Complaint") filed by David Nastri ("Plaintiff") in this matter, and am familiar with the claims and allegations of the Complaint.

9.    I am being compensated for services performed in the above-entitled case at an hourly rate of $100 for reviewing materials and preparing reports; and $150 per hour for depositions and court appearances.  My compensation is not contingent on the results of my analysis or the substance of any

2

testimony.

10.      The testimony in this Declaration is based upon a combination of my professional training, research, and work experiences in my various academic roles; from personally reviewing relevant documents, rules, regulations, and historical sources of information regarding the State's parks and forests.  Any information I obtained from those outside sources is consistent with my own understanding.

11.      This Declaration is a presented in a form that is much different from academic writings. It reflects an accurate recounting of my research and conclusions regarding this historical period and the subject matter discussed. However, given the time constraints at issue in this case, as well as the fact is it prepared in connection to a pending lawsuit, it is not drafted at the level of depth, nor with the historical context and discussion of scholarship that would be expected for academic writing. Thus, I reserve the opportunity to supplement this declaration to reflect any additional research or context that may be necessary.

**Summary of Declaration**

12.      The idea of setting aside land expressly for public parks (primarily municipal and national) began as a mid-19th century movement in response to the rapid urbanization and industrialization of the East as well as the American West. The state park movement, based on similar ideals, expanded primarily in the twentieth century when city parks grew insufficient and workers gained access to automobiles allowing them to leave the city for less manicured and more "natural" and meditative spaces.

13.      The development of the state park system emerged through national and municipal efforts, led by Progressive era ideologies, particularly notions of reserving certain lands "the greatest good for the greatest number of people." A great number of thinkers whose ideas helped define public land use and management at all levels, hailed from Connecticut, one of the most industrialized states in the country

3

in the 19th and 20th centuries. These included urban park designer Frederick Law Olmsted and his firm, the first two Chiefs of the U.S. Forest Service, Gifford Pinchot and Henry Graves who introduced and promoted scientific forestry in America, their protégé and Connecticut's state forester, National Park Service Directors Stephen Mather and Conrad Wirth, and finally, Austin Hawes, and the State Park Commission's field secretary, Albert Turner. The "park-builders" based their ideas about use and purpose on philosophies of natural resource conservation, land preservation, and health, mental and physical. These ideas and practices reflected anxious responses to the rapid changes that new technology, brought by urbanization, the industrial economy, and western expansion.

14. Scientific forestry heavily influenced the management of Connecticut's public lands, but the recreational needs and desires of the public in the industrial state eventually demanded all public lands serve multiple uses, regardless of whether lands were designated as "forests" or "parks". While in the West, most lands remained in the public domain, that was not the case in the original thirteen colonies where land remained largely under private ownership. The state park system gained momentum with the increase in leisure time, urban density, increased recreational access, and the proliferation of the automobile, which allowed more people of all socioeconomic backgrounds, to escape the city for short periods of time. However, the federal government, and each state, interpreted the management of their natural resources and the uses of public lands differently.

15. Today, there are 110 state parks (c. 32,000 acres) and 32 state forests (c. 175,000 acres) in Connecticut. Reports and correspondence regarding Connecticut's state parks and forests since the State Park (and Forest) Commission was formed in 1914 only refer to firearms in the context of hunting, usually as one of the few examples of something the Commission should actually regulate and prohibit in parks. As a general matter, the references to firearms in these sources are limited to outright prohibition of carrying firearms in parks, or allowing carry for firearms for limited recreational purposes like hunting. This prohibition was formalized in 1918 and posted on standard signage throughout the park system.

4

From the beginning, primary function of state forests was always around the idea of public resource conservation, particularly of trees for lumber, for the benefit of the greatest number of people.

### Open Space Preservation in 18th and 19th Century New England

16.    As a site of early English settlement, Connecticut is steeped in Puritan tradition and work ethic, famously anathema to the concept of "idleness," or leisure. As Englishmen, they brought with them the belief that property was a "natural right," and land ownership equated to independence and self-sufficiency. However, early New England towns featured centralized public land, known as commons, or greens, for planting and shared grazing, around which many built their homes. According to some, the tradition dates back to medieval England to protect livestock from wild animals, for use by commoners who did not own much land, or for public markets and fairs, but that is still highly debated. English colonists of the Connecticut Colony established a green as a central feature in the nation's oldest planned city of New Haven, Connecticut.[1]

17.    As the primary public space in the community, "town greens" served as public gathering spaces, particularly religious, and many historic churches continue to occupy prominent spaces adjacent to these public spaces today. They also became sites for military exercises, public executions, and sometimes dumping grounds for discarded household items. It was not until after the Revolutionary War, in the 19th century, when improvements in roads allowed some people to move further away from the town center, that the green became more of a commercial and civic center.

18.    The landscaping and manicured, or "parklike," maintenance of the green corresponded with a larger movement, beginning shortly before the Civil War, to find way to beautify the increasingly industrialized cities.

### Western Expansion, Industrialization, and Urbanization

---

[1] Rob Shirley, *Village Greens of England: a Study in Historical Geography*, Durham theses, Durham University, 11-12, 21 (1994). Available at Durham E-Theses Online: http://etheses.dur.ac.uk/6120/

5

1117

19.     After the Civil War, the proliferation of the railroad and technology spurred settlement out west. The urbanization of the agrarian nation, and the realization that not every part of arid western lands could be farmed, became important factors in the federal government setting aside other lands for public use. The modern notion of parks, which had begun in the years before the Civil War, evolved out of a sense of anxiety over profound social and economic changes of "modern" life.

20.     In 1872, Congress reserved and established the first national park in Yellowstone "for the benefit and enjoyment of the people."  To "provide timber for the purposes of western agrarian settlement," the Department of Agriculture created a Division of Forestry in 1881, eventually becoming the U.S. Forest Service in 1901.[2] Both public forests and parks served to protect natural resources, but forests followed the progressive idea of efficient resource use for the "greatest good" of the most people. Parks served to preserve natural resources for the enjoyment and benefit of present and future generations.

**The Progressive Era:  Conservation vs Preservation**

21.     Conservation and development seem like opposing inclinations, but Connecticut residents redefined this complex relationship over time and influenced our nation's perception of those terms as well. In 1910, Gifford Pinchot of Simsbury, the first chief of the United States Forest Service (and the founder of scientific forestry in the United States), asserted that, "The first principle of conservation is development, the use of natural resources now existing on this continent for the benefit of the people who live here now. There may be just as much waste in neglecting the development and use of certain natural resources as there is in their destruction."[3] His ideas reflected the Progressive Era, a time when the proliferation of technology spurred an industrial economy. Reformers protested against corruption and the

---

[2] Harold K. Steen, *The U.S. Forest Service: A Centennial* History (Seattle, WA: University of Washington Press), 3-21.

[3] Gifford Pinchot, "The Fight for Conservation," 1910. (University of Washington Press, 1967), reprint, 42-43.

6

consolidation of wealth, which compromised the values of equality in the United States. For many, like Pinchot, this imbalanced allocation of resources included natural resources. Pinchot found a like mind in President Theodore Roosevelt, a well-known supporter of progressive reforms. Both embraced a conservationist philosophy that discouraged waste and advocated the scientifically planned development of natural resources, particularly forests, for the benefit of the public good- "the greatest good to the greatest number of people for the longest time"— often, but not always, defined in economic terms.

### Parks in America: National, Municipal, and State

22.    Neither the public, nor Congress, trusted the Forest Service to protect cherished sites of natural beauty, but both Pinchot and Henry Graves, Dean of the Yale School of Forestry and a Chief of the USFS, insisted that creating a park board, in addition to the Forest Service, was "No more needed than two tails to a cat."[4] Congress dismissed their view by establishing the National Park Service (NPS) within the Department of the Interior in 1916 to protect exceptional lands for "public enjoyment."

23.    Distraught over the idea of two agencies with overlapping resources operating in two different agencies, Graves argued that the Forest Service was not anti-park, but they were different in purpose, not administration. Forestland produced lumber and public forests served as demonstration areas of scientific forest management. The nation could preserve park resources, but only until the citizens needed them.[5] Graves insisted that forests were multi-use: Recreation was compatible with commodity uses like water resource protection, timber, mining, and grazing in the national forests, which created conditions for "settlement, mining, timbering, grazing, and summer homes."[6] He increased recreational options in the forests and pushed to craft some kind of cooperative agreement in forest management with NPS Director Stephen Mather.[7]

---

[4] Steen, 113-114
[5] Steen, 115-116, 119.
[6] Steen, 118.
[7] Steen 120-122.

7

24.     At the same time, Graves encouraged states to establish permanent state forests with objectives suitable to their economic needs. However, his ideas about state forests ironically carried less weight in his home of the Northeast than the West or South, recipients of more government land grants.[8]

**Frederick Law Olmstead and Municipal Parks**.

25.     This philosophical and rhetorical struggle over the proper use and administration of parks and forests on the national level had roots in local, municipal responses to its industrial and urban development in the Northeast particularly. In the East, industrialization heightened the desire and need for parks. Municipal parks proliferated throughout the region since the 1850s, shaping public perceptions of state parks and forests. Not so different from the agrarian ideals that pulled 1840s Americans westward and shaped western land policy, New England's brand of conservation also fused agrarianism with "newer Romantic, urban-based visions of the forest."[9]

26.     Cities looked to set aside nature for the enjoyment of urban workers and in the 1870s, Frederick Law Olmsted, who was designing New York City's Central Park by the 1850s, and was instrumental in designing Hartford's park system, began work on Walnut Hill Park in New Britain, Connecticut. Municipal park design essentially began with the Hartford-born Olmsted, who witnessed how growth of Connecticut cities and industry had transformed the state's rural landscapes and homogenous population, not to mention the nation's incorporation of over half the lands in today's American West through migration and war.  In all, the state commissioned almost 300 jobs from Olmsted and his firm over the course of a century.

27.     Olmsted's parks echo the aesthetic of the Hudson River Valley (HRV) school of painters he surely viewed as they later translated their naturalistic landscape vision to western lands depicting vast

---

[8] Henry S. Graves, "A Policy for Forestry for the Nation," Washington, DC: United States Department of Agriculture, Circular 148, Office of the Secretary, December 1919, 5.

[9] Richard William Judd, *Common Lands, Common People: The Origins of Conservation in Northern New England* (Cambridge: Harvard University Press, 2000), 91; Ney C. Landrum, *The State Park Movement in America: A Critical Review* (Columbia, MO: University of Missouri Press, 2004), 15-20.

fields and vistas, majestic mountains, and calming lakes and streams, where man was inconsequential, luring out thousands of explorers and homesteaders. Hartford's Frederic Church, the founder of the HRV painting school, was an early advocate of national parks, particularly Niagara Falls in New York, now the nation's oldest state park in 1885.[10] These images convinced many Americans that nature was important to physical, emotional, and mental health, but defined the spiritual core of a newer nation, the equivalent of the cathedrals of Europe. They inspired the government to establish its first preserve in Yellowstone National Park in 1872. Like the popular HRV School and other nineteenth century landscape painters, Olmsted advocated the park as a pastoral and naturalistic landscape, where urban residents could feel invigorated and escape the harsh realities of industrial work without losing the comforts of the city.

28.     Hartford influenced Olmsted, who in turn influenced land use and the development of parks in Connecticut. In addition to his own experience as a child growing up in pre-industrial Central Connecticut River Valley, Olmsted also developed his philosophy about the influence of natural beauty on moral and social behavior from close family friend and spiritual advisor, Reverend Horace Bushnell. Bushnell's sermons, in "Unconscious Influence," and others in the Transcendentalist movement (Ralph Waldo Emerson and Henry David Thoreau) of the 1820s and 30s surely inspired young Olmsted's ideas about nature and "public parks as instruments of moral influence and reform and the value of passive recreation and unconscious mental and spiritual refreshment…" as well as communal well-being as way of coping with and healing from the stresses of industrial New England's industrial revolution.[11] In Hartford, Bushnell Park became the nation's oldest publicly funded park in the country, conceived by the Reverend Bushnell in the mid-1850s, prior to Olmsted's work on Central Park in New York City.

---

[10] California first designated Yosemite a state park, but Congress later designated it as the second national park behind Yellowstone.

[11] "Olmsted in Connecticut: Landscape Documentation Project, Statewide Context and Survey Report (September 2022), 20-25, 58-59; George Scheper. "The Reformist Vision of Frederick Law Olmsted and the Poetics of Park Design," *The New England Quarterly* 62: 3 (1989), 378.

29.    After New York's Central Park, Connecticut's cites of Hartford, New Haven, Stamford, Bridgeport, Waterbury, Norwich, New Britain, Meriden, and New London began establishing parks in 1860s, joined by Chicago in 1869, Boston in 1893, and Providence, Rhode Island in 1904. As in the West, anxiousness about urbanization overtaking rural and "natural" places and the proliferation of urban power helped create support to establish national parks. Worker volatility contributed to support for urban parks. However, people disagreed as to whether parks served a therapeutic role or that of amusement and/or activity.[12]

30.    Not everyone seemed to understand the concept and the use of a park in the same way. Socioeconomic interpreted recreation in different ways. Genteel ideas about recreation like that of Bushnell and Olmsted, stressed receptive (or passive) recreation (arts, music) to restore the soul.

31.    Conrad Wirth, who served as NPS Director in the 1950s, began his memoir quoting Transcendentalist Henry David Thoreau. He then wrote, "The importance of reserving space for what we have come to call recreation has long been understood."[13] So, it is not coincidental that like other New England states, Connecticut's approach to designing a park system evolved out the same urbanization conditions as the national and urban parks, but as the birthplace for ideas about American conservation forestry, Connecticut itself greatly influenced by the 1920s national and state park movement.

**Conservation in Connecticut**

32.    Urban development strained the state's natural resources and prominent, concerned citizens found ways to set aside certain places for preservation without significant opposition. As a center of the country's industrialization and manufacturing, Connecticut naturally became a leader in public park

---

[12] Roy Rosenzweig, *Eight Hours for What We Will: Workers and Leisure in an Industrial City, 1870-1920*, Interdisciplinary Perspectives on Modern History. Cambridge; New York: Cambridge University Press, 1985); Alexander Von Hoffman, *Local Attachments: The Making of an American Urban Neighborhood, 1850 to 1920* (Johns Hopkins Paperbacks Ed., 1996. ed. Creating the North American Landscape. Baltimore: Johns Hopkins University Press, 1996); Stephen Hardy, "Parks for the People: Reforming the Boston Park System,1870-1915," *Journal of Sport History* 7:3 (Winter 1980), 5-24. 18

[13] Conrad Wirth, *Parks, Politics, and the People* (Norman: University of Oklahoma Press, 1980), 3-5.

10

development. The state's growing population pushed for large areas for recreation that would be protected from any development and accessible by the increasing popular and affordable automobile transportation and expanded roads. Those desires would challenge the conservationists' approaches to managing large acres of forests, their watersheds, and undeveloped, open spaces in Connecticut. State policy had to balance economic development with the nurturing and protection of natural resources.

33.    Into the 1920s, some of the nation's most prominent foresters and conservationists, particularly Gifford Pinchot, Henry Graves, and their protégé, longtime Connecticut State forester and fellow Yale alumni Austin Hawes and Park Commission Field Secretary Albert Turner, influenced the design of an administrative structure for managing the state's natural resources in both forests and parks within the conservationist philosophy of managed use and public benefit. Those preserves were, ironically, not primarily for preservation and recreation, but for conservation (protection, controlled development, and equitable economic use).

34.    The state established a Board of Agriculture as early as 1866 and opened Agricultural Experiment Stations, research centers associated with land-grant universities in Middletown, New Haven, and Storrs, but by the 1890s, citizens feared for Connecticut's natural resources.

35.    In 1901, private citizens, particular the Connecticut Forest and Parks Association, lobbied the state's General Assembly to develop a forest policy, appoint a state forester and town tree wardens placing the public tree planting, especially by the roadside, under public supervision. The group also successfully lobbied to use state funds to purchase land for the establishment of state forests. Connecticut was the first state to establish a State Forester and to purchase state forests.

36.    Meanwhile, as municipal parks and the national parks grew in popularity, and three years before the establishment of the National Park Service, cities could not meet the demand.  As access to cars allowed more people to travel out of the city as a further escape valve for the congested urban cores. National Parks were primarily located in the West, beyond the means of most Connecticut workers. New

11

York had established Niagara Falls (to join the forest preserves of the Adirondacks and the Catskills). In 1911, the General Assembly of Connecticut appointed three State Park Commissioners, Morton Plant, Edward Bradley, and Lucius Robinson, to explore the park idea. Only the Wisconsin State Park commission and Massachusetts Board of Trustees of Public Reservations (1891) convened earlier.

37.    At first, the Commissioners saw their role only as one of reconnaissance: assessing the need and most desired locations for state reservations and balancing recreation with the conservationist needs of forests. The report predicted Connecticut's parks would be managed on the model of the national ones: leasing camps, cottages, and other accommodations, and regulating hunting and fishing activities "with certain restrictions." Notably, the state forester would still manage all timber lands. "In this way, if properly managed, such parks would soon pay for themselves." They recommended the establishment of a permanent Commission of five members, empowered to have staff to accept gifts, purchase, and administer properties. James Goodwin of Hartford, a recent graduate of the Yale School of Forestry, served as the first Field Secretary through whom the commission surveyed town officials. Target areas included seaside parks not under the jurisdiction of large cities.[14] Upon the Commission's recommendation, the General Assembly passed legislation for a permanent commission of 5-7 commissioners, with the state forester as *ex-officio*.

38.    The Commission also defined the relationship between state parks and forests: "The relationship between state parks and state forests is close and they have many features in common, although their essential purposes are quite distinct and should not be confused. State parks are primarily for public recreation, or for the conservation of natural scenic beauty, wildlife and sites of historic interest. Logically they must be game sanctuaries, but fishing may well be encouraged. The practice of forestry and the production of timber, when not inconsistent with its main purpose, may be included in the

---

[14] *Report of the State Park Commission: Commission Appointed by the General Assembly of 1911: Report Presented to the General Assembly of 1913.*, 1913. Connecticut State Library, Hartford, CT., 14-21;

12

park program. State forests, however, have for their primary object the production of timber as an economic proposition, which involves the systematic management of large areas of forest land for long periods of time. Such land may have little of park quality at the time of acquisition, but with the growth of timber it will gain in scenic beauty and perhaps in recreational value. Recreational use of state forests may, therefore, become an important secondary purpose which should not be overlooked. And later, "Timber lands should be under the care of the state forester and no trees should be cut, except with his permission." "… if properly managed, such parks would soon pay for themselves."[15]

39.    According to the first state report (1913), the rationale for the establishment of the Commission rested heavily on the perception that modernity had destroyed leisure and family time and the worker was in desperate need for outlets of recreation. This idea seemed to rely heavily on the "American Park Idea" as articulated by Horace McFarland, President of the American Civic Association and a key figure in the City Beautiful Movement.  In his 1910 convention speech, McFarland argued that like the ideas for municipal parks in the 1850s, county and state parks could also serve a broader purpose that fell somewhere in between the city park and the national park. "If, when a natural wonder is found to be of national importance and to need national protection, it may properly be controlled by the nation, surely a location or opportunity too large for local or municipal control may as properly be controlled by the state."  In line with other proponents, he agreed that state parks "must be unmistakenly beautiful, they must present to the enjoyment of all some consistent unspoiled type of landscape."  He added that they should be accessible by the public and ideally connected by parkways—so he sees the park system and recreation as integrated and consistent with to auto transportation through parkways criss-crossing the state. They should lie no more than a day's travel to industrial populations. Ideally, a state should hold and ace of land per 1000 population. "Trees," he added, "are almost essential…The relation of State Parks

---

[15] *Report of the State Park Commission: Commission Appointed by the General Assembly of 1911: Report Presented to the General Assembly of 1913.*, 1913. Connecticut State Library, Hartford, CT.

13

1125

to State Forests is not mine to discuss." But he pressed for recreation in both and shared the suspicions of many post-Hetch Hetchy conservationists: "As yet, State parks are not safe in the unguarded custody of the forester, and if we have worthwhile state parks, they must be administered as such." Seemingly as an afterthought, he added that another characteristic of the state park "may well be the inclusion of historical sites, to be suitably and permanently marked so that in a sense of life of the state as man has dealt with it is preserved for future generations, as well as the natural features of the state as Nature made them. Not infrequently both of these characters may be combined to advantage in one state."[16]

40.    The establishing legislation granted the all-volunteer Commission power to acquire public open spaces by purchase, gift, or devise, lands or right – for the purposes of public recreation or the preservation of natural beauty or historical association and, among other authority, "to have charge and supervision of such lands, or to cooperate with various specified local authorities in such care," "to have large powers over the care and regulation of all tracts within their jurisdiction and over the use of the same by the public," and notably "to have power to accept in behalf of the state any unconditional gifts of tracts, which in its judgment would be desirable for state reservation…"[17] Upon hire of field secretary Albert Turner, the Commission first looked to the shoreline and other water sites, complicated by the numerous privately owned summer cottages, many owned by out-of-state residents. The survey identified only five possible shoreline sites, purchasing its first property in Westport (now Sherwood Island State Park). Other purchases include land along the bank of the Connecticut River in Chatham, and lakefront in Litchfield and Washington. These provided the first (historic-based) parks. In the case of Sleeping Giant State Park in Hamden, a private group of citizens worked for years to end quarrying and to secure the

---

[16] J. Horace McFarland, President, American Civic Association, "A Brief Discussion of the Later Development of the Recreation Movement" by J. Horace McFarland, President, American Civic Association, Washington Convention, December 14, 1910, SFPC, Wilkins, Documents 1909-1915, State Archives; McFarland, "State Park- Their size and character" Parks and Recreation, volume 5, p. 471. 1921-22.

[17] *Report of the State Park Commission: Commission Appointed by the General Assembly of 1911: Report Presented to the General Assembly of 1913.*, 1913. (Connecticut State Library, Hartford, CT), 31-31.

lands for preservation, turning it all over to the state in 1924. Alain Campbell White, with his sister May, established the White Memorial Foundation and began buying large parcels of land for conservation and preservation in memory of their parents. White would later serve as President of the Connecticut Forest and Park Association. In a speech to the Garden Clubs of America in December of 1920, he discussed the Connecticut's parks and forests, he listed recreative opportunities, including camping, motoring, boating, swimming, climbing and fishing, noting that the Commission hoped to make as few restrictions as possible. However, he then noted that "hunting is not allowed," and the largest park, Macedonia Brook, is patrolled, anticipating that others would also be patrolled with additional funding.[18]

41.    State Park Commission Secretary Field Secretary Albert Turner saw the definition of parks as fluid, but consistently stressed the conservationist philosophy that conceived parks and forests as shared, public spaces set aside for the "greatest good for the greatest number of people." As far as the "proposed rules and regulations for use of the State Parks," he asked that Commission "to make the rules as few and simple as is consistent with the preservation of the public property and individual freedom. In general, that measure of freedom may be permitted which does not interfere with the rights or enjoyment of others, pollute the waters, or injure the forest-growth. This would involve the prohibition of firearms, but not the gathering of nuts, berries, or wild flowers…."[19] In 1918, the Commission adopted a general "form of notice," to be posted in all parks addressed "To the Citizens of Connecticut," explaining that the state park "belongs to you," the general public.  It stated that "there is a reason for every rule and regulation made… It is desired that this park shall be used for picnic parties, camping, and outdoor life by the people of Connecticut, provided the park is used in a wholesome and reasonable way, and the trees, shrubs, and plants are not injured, and all rubbish is placed in receptacles prepared for it, or buried, or burned.  The People using this state park should not monopolize it, nor disturb, nor unpleasantly intrude

---

[18] Alain White, for Garden Clubs of American, Dec 1920. Series 2, Box 3, Folder 1, RG 079:017 State Park and Forest Commission, Connecticut State Archives, Hartford, CT.
[19] Annual Report, Report of State Park Commission, 1914, 29.

15

upon other parties using it." Fires outside of stone fireplaces were prohibited, and "the use of firearms or having then in your possession is forbidden, also the killing or disturbing of wild animals, birds, or birds' nests." [20]

### The Connecticut State Park (and Forest) System

42.    In order to protect the exclusiveness of the National Park designation, National Park Service Director and Connecticut-native Stephen Mather organized the first meeting of the National Association of Parks in Des Moines, Iowa in 1921. This National Conference on (State) Parks grew out of the National Park movement.[21] Its stated objective was "to urge upon our governments, local, county, State, and National, the acquisition of additional land and water areas suitable for recreation, for the study of natural history and its scientific aspects, and the preservation of wild life, as a form of the conservation of our natural resources, until there shall be public parks, forests, and…."[22]

43.    The definition of a park, however, varied by state, and Mather believed each state should determine its own park development. As Historian Rebecca Conard observed, "A common vision of parks as special places, whether they be they valued for their scenic quality, their recreational amenities, their scientific attributes, or their educational potential, makes it incumbent that public land management agencies serve as society's fulcrum to balance demands of 'the public' who would enjoy parks to environmental ruin with those of 'the public' who would unnecessarily limit access to them."[23]

44.    Albert M. Turner, the Field Secretary Connecticut's State Park Commission hired in 1914, served on the organization's executive committee. That same year, Turner implored the newly

---

[20] Report of the State Park Commission, State of Connecticut (1918), 30-31.

[21] Ney C. Landrum, *The State Park Movement in America a Critical Review*, 2004; State Park Anthology: Rebecca Conard, "The National Conference on State Parks: Reflections of Organizational Genealogy," *George Wright Forum* 14:4 (1997), 47-93.

[22] Conard, 35.

[23] Conard, 40; Stephen Mather to Albert Turner, February 6, 1922. Series 2, Box 3, Folder 1, RG 079:017 State Park and Forest Commission, Connecticut State Archives, Hartford, CT.

founded National Conference on State Parks to distinguish forests and parks.  "We have supposed the Park to be first of all for recreation, and the Forest for economic purposes- to wit, namely to grow timber. This subtle distinction seems to be confined almost entirely to the old Nutmeg state…"[24] That distinction worked because when the Commission acquired administrative oversight of state forests, starting with the privately donated 4,000-acre Peoples' Forest, it allowed the new state forester, Austin Hawes, to practice scientific forestry for economic development essentially independently for over twenty years, while a superintendent managed the parks for aesthetic and recreational enjoyment. Even the private Connecticut State Forest *Association* added "and park" to their name, thus including recreation in their mission of scientific forest management (a move that divided association members).[25]

45.      As Douglas McDonald also observed in his 1969 dissertation on the multi-use forest, "The State Forester, Hawes, stressed recreation as a subsidiary benefit of the state forests. Although he claimed that state forests should serve the interests of all classes of people, he made sure that as small a portion of the forestry appropriation as possible was spent on objectives *other* than timber production. For this reason, he emphasized extensive forms of recreation which did not hinder timber and required only a low development cost." He stressed that forests must be "maintained in a wild condition without any of the attractions to draw a crowd, and the true measure of their value for recreation is the number of acres per person rather than the number of people who use them."[26]

46.      Field Secretary Albert Turner, who trained at Yale like the state's foresters, was an intellectual at heart, but he was far more confused about what was driving his charge for reviewing and acquiring lands, and he wrote about extensively and exhaustively. In his first report, later published in an

---

[24] Turner to Miss Harlean James, December 31, 1921, Series 2, Box 3, Folder 1, RG 079:017 State Park and Forest Commission, Connecticut State Archives, Hartford, CT.

[25] "Report of the Sub-Committee of State Forests 1943-45, Box 1, Folder 26, MS 637, Austin Foster Hawes Papers; George McLean Milne, *Connecticut Woodlands: A Century's Story of the Connecticut Forest and Park Association* (Connecticut Forest and Park Association, 1995), 15, 23.

[26] McDonald, 99-100.

17

anthology by the National Conference on State Parks, he candidly complained about the pace of private land acquisition for parks in the state. Due to the lack of public lands, he lamented, "… the state park remains an idea only." He argued that "At the end of a week or a month or a year, or in some cases possibly a lifetime, the city sights and sounds and pavements become unbearable, and a rest and contrast become necessary to sleep at night…The public park reservation, or open place, (and the old word "common" seems perhaps best of all) is the natural solution of these new troubles, and the people of New York and Massachusetts have evidently discovered this about a generation ahead of us." [27]

47.     Turner laid out his "system" approach, which other state park officials would cite as a model for other states, as well- stressing such factors as natural suitability, beauty, fitness; historical or traditional association; distribution with regards to centers of population, size, accessibility, and level of development of park properties. Finally, he stipulated that such places should have low agricultural value, but recognized that the fact that Connecticut was increasingly more industrial than agricultural was the reason for parks in the first place.[28]

48.     Unlike many of his peers, Turner's ideas about public land use aligned with the Yale-trained foresters and he wrote prolifically about those ideas in letters, reports, and speeches.  He believed that state parks had a specific purpose quite different from city parks, which were more art than science, more "museum-like" than natural. State parks provided a more natural, less landscaped aesthetic to the controlled movement and limited recreative options in the Olmstedian city parks, without departing from those basic values. "Let the formal museum stay in the city where it is now, and have field study in the field," wrote Turner. Turner wrote State Park Commissioner Herman H. Chapman, also President of the Society of Foresters and Yale faculty, that he approved the appointment for the State Park Superintendent, Hartford's Park Superintendent and the aptly named George Parker, because he drew a clear distinction

---

[27] Annual Report, Report of State Park Commission, 1914, 21-23.
[28] Annual Report, Report of State Park Commission, 1914, 23-20.

18

between a state and city park.[29] Furthermore, Turner wrote that, "The State Park is much more closely allied to the idea of a National Park and the [Connecticut] Act of 1913 repeatedly enumerates the purposes of recreation, preservation of natural beauty, or historic association, and for the purposes of recreation..."[30]

49.    By the end of 1920, the state boasted four public forests, with another on the way, almost 4500 acres. The Commission had acquired 25 parks totaling just over 5000 acres.  The 1920 annual report continued to debate the purposes of state parks: public recreation, historical association, and/or natural and scenic beauty. Turner began to emphasize a state park's purpose as one of public mental health, an essential refuge from the stresses of modern urban life, and he decried the carrying and use of firearms as an example of something to be avoided in parks, even for a recreative activity like hunting:

> Why do we issue hunting licenses by tens of thousands to "sportsmen" who frequently tramp the woods all day without getting a legitimate shot at a moving thing? Must we forever be condemned to carry a gun as an excuse for the pleasure of walking in the woods? Of course, just to walk in the woods for pleasure would be idleness pure and simple- conspicuous and unashamed idleness, and not to be seriously thought of or condoned in New England. It is respectable to be idle only when Nature finally rebels and the doctor, for a consideration, send us to the sanitarium- a healthy place for the unhealthy, if we go to the root of this lovely word.[31]

50.    The recreational demands of the 1920s further shifted Connecticut's conservation efforts from private activism to public responsibility. Unlike management at the national level, where different Departments, that of Agriculture and the Interior, respectively, administered the forests and parks, Connecticut developed a single body for oversight of its natural and historic resources. In 1921, the State Park Commission became the State Park *and Forest* Commission and assumed responsibility for appointing the Superintendent of Park and State Forester, who would head separate operation

---

[29] Turner to Chapman, February 10, 1917, Series 2, Box 1, Folder 1B, RG 079:017 State Park and Forest Commission, Connecticut State Archives, Hartford, CT.

[30] Obituary, A.M. Turner, 76, Dies in Litchfield, *The Hartford Daily Courant*, June 29, 1944. He received the Pugsley Medal in 1933 for his service, American Scenic and HP society awarded at Conference.  Turner later named Director to the Board in 1936 in Hartford.

[31] Report of the State Park Commission to the Governor, 1920, 23. Connecticut Digital Archive,  http://hdl.handle.net/11134/30002:21895214.

1131

administrations. To separate interests and expertise.[32] Unlike forest and park management at the national level, where the Departments of Agriculture and the Interior respectively administered the lands (an issue of great dismay for conservationists Pinchot and Graves), Connecticut developed a single body for oversight of all natural and cultural resources, specifically because both addressed recreational needs.

51.     In addition to forming a clear definition of purpose, a preponderance of privately owned land in the state proved a challenge for public land acquisition. Whereas most of the lands in the American West were largely still under federal ownership, Connecticut mostly had to acquire its public lands from private gifts or fund for purchase. The 1914 report stipulated that the Commission should be permitted reasonable latitude for the use of such funds. In some cases, private citizens' groups worked to achieve state protection for valuable recreational sites. For example, the Sleeping Giant Park Association successfully lobbied to protect the Mount Carmel site against quarry operations through park designation. Similar local groups in Stamford (Laddin's Rock) and Westport (Sherwood Island) worked with the Connecticut Forest & Park Association (CF&PA), a nonprofit, non-governmental group active since 1895, to establish conservation areas. Such partnerships brought the conservation-minded organization, which had previously focused on the preservation, restoration, and scientific maintenance of forests, into the realm of recreational development.

**Depression-era Programs Advance Conservation Projects**

52.     The Great Depression provided additional opportunity for state conservation efforts through the Civilian Conservation Corps (CCC), initiated in 1933 and one of the flagship work programs of President Franklin Delano Roosevelt's New Deal.

53.     The Great Depression was therefore a boon for its recreational and economic forest development. Under Hawes, Connecticut's 21 CCC crews built hundreds of miles of hiking trails, access

---

[32] See *Wooden Nutmeg XIX* (December 1943), 10. Connecticut Digital Archive, http://hdl.handle.net/11134/30002:720539080.

roads, sawmills, dams, picnic areas, trails, swimming ponds, and fire towers throughout the forests. In addition to creating accessible preserves, Connecticut's CCC helped the state revive a commercial forest products' business by helping to build wood treatment plants, charcoal kilns, and a state sawmill. They even harvested ice from state forest ponds for commercial sale. The CCC also developed a state trail system, passing through public and some private lands, with miles of hiking, bridle, and ski trails marked by blue paint (the Connecticut Blue Blazed Trail System, now 700 miles).[33]

54.     Yet of this activity further confused the role of forests and parks in a rapidly industrializing state. Opposing philosophies of nature—one advocating carefully managed resource use and the other promoting preservation and recreation—inevitably encountered conflicts. Indeed, the increased access allowed more interest on recreational use. Hawes reluctantly admitted that, "There is evidently a relationship between the recreational use of the forests and economic conditions. The use of the forests for this purpose has at least doubled during the past two years. This is partly due to improved facilities and more widespread knowledge of the forests, and partly to the need of the public for cheap recreation."[34]

**Park Use and the Triumph of Recreation**

55.     The developments in the 1930s combined with rising popularity and access of the car, increased recreational demand. This meant more visitors, fewer appropriations for acquiring additional lands.[35] The 1935 report examined recreation on public lands called vehemently for money to further develop and acquire parks or else cause bigger problems, and outlined five recreational divisions in the state: parks, forests, fisheries and game, historic sites and monuments, state highways. Only the parks had

---

[33] "An account of my last visit with Gifford Pinchot written immediately afterwards," Box 1, folder 24, Austin Foster Hawes Papers.

[34] Report of the State Forester, 1932. Tenth Biennial Report of the State Park and Forest Commission to the Governor, 1932. State of Connecticut; Public Document No. 60), 106.

[35] The Development of State Provision for Recreation in CT, 1935. CT State Planning Board, 5-6.

21

1133

recreation as a primary purpose. The report argued that recreation served as state priority, and expert-endorsed "… solution to the mental and physical damage of growing city/ urban lifestyles." It claimed that "we live in a time when the functions of government are constantly being added," but the report argued that care of the "insane and other mental defectives" demanded General Assembly attention to alleviate mental disorders.[36]

56.    In 1944, the SPFC had begun pushing for a more social purpose, than an economic mission for public lands, particularly forests which had previously focused more on environmental and economic purpose. This meant increased recreational opportunity in state forests: " The controlling over-all policy of the (Park and Forest) Commission in the discharge of its duties is the proper utilization of all lands under its supervision, including both forests and parks, and to provide the maximum practical recreational facilities for the greatest number of Connecticut residents, consistent with the conservation of natural resources on such lands...In providing recreational facilities, aesthetic as well as practical considerations will govern. The immediate objective of the Forestry Division shall be the restoration of natural resources, the reclamation of eroded, cut-over, or abandoned lands, the providing of greatly increased opportunity for outdoor recreation and the protection and enhancement of the natural beauty of the state."[37]

57.    After the war, post-war housing and commercial building, the proliferation of the automobile, and demand for local leisure opportunities positioned conservation efforts as the foe, rather than a partner, of development. The automobile raised demand for local leisure opportunities by the general public, nationally and in the state. While Connecticut's industries expanded and spurred urban development, forests increasingly became multi-use.[38]

---

[36] The Development of State Provision for Recreation in CT, 1935. CT State Planning Board, 5-6.

[37] Sixteenth Biennial Report of State Park and Forest Commission to the Governor, June 30, 1944 (1-2, 7).

[38] MacDonald, R. Douglas S. "Multiple Use Forestry in Megalopolis: A Case Study of the Evolution of Forest Policies and Programs in Connecticut," (New Haven: Yale University, 1968), 5.

58.     Although there was profound disagreement over the particular uses of forests and parks, use of firearms was not part of this schism. The Commission continued its ban on firearms in the parks, and allowed hunting and other "exertive recreation" in most forests with limitations.

59.     Upon the request of the Commission, an independent group evaluated the Commission in 1946 consulted with governor's office, interested groups around the state, advisors. It concluded that the statutory authority of the Commission over the acquisition, maintenance, and control of Parks recreational, scenic or historical lands, was "both clear and broad." It recommended that statutes and policy "all responsibility and authority for parks and forests" the Commission, which should act as an "operating" body, rather than just an advisory one.[39] In 1949, the Department of Natural Resources eliminated any administrative distinction between forests and parks. [40]

60.     This Declaration is based on my previous research of State Park and Forest Commission reports and correspondence. In initially conducting this research, however, I was not looking specifically for references to firearms and hunting. In reviewing that research for the purposes of this Declaration, I have combed through hundreds of documents discussing and debating the purpose and use of parks, searching for definitions of parks and forests, and this time, also for references to firearms.  There may some more explicit discussion of prohibition or regulation in documents like land deeds that may include provisions beyond maintenance, or patrolling reports, that could imply something more specific about the regulations. There are also likely additional resources such as sermons, other literary writings, and correspondence that provide evidence of intent for these public land reservations, or further insight into the values and definitions around recreation, including additional evidence regarding public attitudes towards firearms in these spaces.

---

[39] General Survey, Connecticut State Park and Forest Commission, Barrington Associates, 17. Connecticut State Library, Hartford Connecticut.

[40] McDonald, 206.

23

Pursuant to 28 U.S.C. § 1746, I, Leah Glaser, state under penalty of perjury that the foregoing declaration is true and accurate to the best of my knowledge, information, and belief.

Executed: ___March 29___, 2023

_____

Leah Glaser

24

# Attachment 1

# Leah S. Glaser, PhD

Department of History, Central Connecticut State University
1615 Stanley Street, PO Box 4010
New Britain, CT  06050-4010
860-832-2825, glaserles@ccsu.edu

## EDUCATION

**Arizona State University**, Tempe, AZ                                        May 2002
*Doctor of Philosophy* in American History
*Fields*: Public History, U.S. History from 1865, American West
*Dissertation*: "Rural Electrification to Multiethnic Arizona: A Study in Power, Urbanization, and Change."

Advisors: Jannelle Warren-Findley, Peter Iverson, Robert Trennert, Vicki Ruiz

*Master of Arts* in Public History: Historic Preservation emphasis.                     December 1996
*Thesis*: "The Story of Guadalupe, Arizona: The Survival and Preservation of a Yaqui Indian Community."

**Tufts University**, Medford, MA
*Bachelor of Arts* in History and Art History.                                   May 1992

**Syracuse University**, Florence, Italy                                        Fall 1990

## TEACHING

**Central Connecticut State University**, New Britain, CT
*Coordinator, Public History Program*                            Spring 2014- *present*
*Professor of History*                                          Fall 2017-*present*
*Associate Professor of History* (tenured)                       Fall 2011-Spring 2017
*Acting Coordinator, Public History Program*                     Fall 2009- Spring 2010
*Assistant Professor of History*                                 Fall 2006

HIST 511: Historic Resource Preservation and Planning (Graduate)

HIST 510: Seminar in Public History (Graduate)

HIST 502: Historiography: American West (Graduate /team-taught)

HIST 405/505/LTN 470: Local History and Community Development (Undergraduate/ Graduate)

HIST 492: Public History Intern Experience (Undergraduate)

HIST 302: Introduction to Public History (Undergraduate)

HIST/LTN 316: History of the American West to 1890 (Undergraduate)

HIST/LTN 317: History of the from 1890 (Undergraduate)

HIST 305: Connecticut and the Nation (Undergraduate online)

HIST 301: The Historical Imagination: Immigration/ Mexican Immigration and Labor/
American West/ Borderlands/ Japanese Internment/The 60s (Undergraduate)

HIST 162: History of American Life II (Undergraduate /classroom and online)

***Supervise internships for MA in Public History (2-4 annually)***

***Supervise capstone projects for MA in Public History (39 to completion)***

1. Valerie Chase, "A Study of House Museums and Why Reinterpretation is Vital," Program, w/ Prudence Crandall Museum, Canterbury, CT, 2022.
2. Ryan Cafaro, "Industrial Valley: The Story of Industrialization and Deindustrialization in the Lower Naugatuck Valley," Exhibit, w/ Derby Historical Society, Derby, CT, 2022.
3. Eric Ott, "Invisible Legacies: The Past and Present of Hartford's Potsdam Worker House Community in Coltsville, A Potsdam Worker Houses Historic Resources Survey," Historic Resource Survey w/ Coltsville National Historical Park, Hartford, CT, 2022.
4. Christina Volpe, Amendment to National Register Nomination of the Cass Gilbert National Register Historic District, Waterbury, Connecticut w/ *State Historic Preservation Office*, Hartford, Connecticut, 2021.

Glaser                                                                                                    2

5.  Elizabeth Correia, Draft, National Register Nomination of Congregation Mishkan Israel, w/ *Congregation Mishkan Israel*, Hamden, Connecticut, 2019.

6.  Gabriel Benjamin, "A Story of Survival: A History Harvest within the Golden Hill Paugussett Tribal Nation," in association with the *Institute for American Indian Studies* in Washington, Connecticut, 2019.

7.  Regan Miner, "Village Districts: Placemaking through Preservation: Design Guidelines for Norwich, CT," *City of Norwich*, Connecticut, 2018.

8.  Sarajane Cedrone, Administrative History of the Harriet Beecher Stowe Center, Hartford, CT, *Harriet Beecher Stowe Center*, 2018.

9.  Chelsea Farrell, National Register Nomination of Lindsey Farm, North Branford w/ *Connecticut Trust for Historic Preservation*, 2018.

10. Anthony Vinci, Exhibit on "Urban Renewal in New Britain," New Britain Visitor's Center, New Britain, 2018.

11. Ira Hessmer, National Register Nomination of the Burnside Ice Company, Hartford, 2017.

12. Shaun Winton, "Historic Preservation in the Model City: New Haven Preservation Trust and a Half-Century of Activism and Advocacy," *New Haven Preservation Trust* (*in process*).

13. Zachary Keith, National Register Nomination of Waterbury Clock Case Shop, Waterbury, CT for *Crosskey Architects*, 2017.

14. Sally Givens, State Register Nomination of Saint Paul's Universalist Church, Meriden, CT, 2017.

15. Garrett Coady, National Register Nomination of J.H. Sessions and Son Company, Bristol, CT, for *Crosskey Architects* 2017.

16. Brianna Dunlap, "The Tobacco Valley of Connecticut," *The History* Press, 2016.

17. Kathleen Von Jena, National Register Nomination of Swedish Congregational Covenant Church w/ *Town of Weston*, Weston, CT, 2016.

18. Aileen Bastos Zylman, State Register Nomination of the Raphael Building, New Britain, CT w/ *Connecticut Main Street Center*, 2015.

19. Sabastian Holquist, Film Documentary of Roger Tory Peterson, *Fish and Wildlife Service*, State of Connecticut, 2015.

20. Timothy Adams, National Register Nomination of "Simon Lake Laboratory," w/ *Milford Preservation Trust*, Milford, CT, 2015.

21. Austin Sullivan, "Voices from Vietnam" Exhibit, w/ *Veterans History Project*, CCSU/ New England Air Museum, East Granby, 2015.

22. John Mooney, Connecticut Humanities Council Grant for Exhibit, *City of Bristol*, Bristol, CT, 2015.

23. Whitney Ceremicoli, HABS Report of the Hatch Building, w/ *City of New Britain*, New Britain, CT, 2014.

24. Owen Rogers, "Oral History of Modernist Architects in New Haven," *New Haven Preservation Trust*, 2014.

25. Erin Marchitto, "Connecticut Shoreline Historic Context Study," *State Historic Preservation Office*, 2014.

26. Lindsey Steward, "The Women of Stanley-Whitman," *Teaching with Historic Places* curriculum, *Stanley-Whitman House*, 2014.

27. Kira Holmes, "Circus Collection," Finding Aid and Guide, *New Britain Youth Museum*, 2014.

28.  Jordan Sorenson, National Register Nomination of Good Hill Farm w/ *Connecticut Trust for Historic Preservation*, Woodbury, 2013.

29. Sarah A. Hill, Cultural Landscape Report, w/ *Wethersfield Land Trust*, Wethersfield, 2013.

30. Caitlin Sjaarda, Painting Sites Trail Guide, Weir Fram National Historic Site, *National Park Service*, Wilton, CT, 2012 (Winner of 2014 NCPH Graduate Student Project Award).

31. Alison Golomb, Digital Burying Ground Project, Wethersfield, w/ *Wethersfield Historical Society*, Wethersfield, CT, 2012.

32. Rachel St. Onge, National Register Nomination of Goodwin Park, Hartford, CT w/ *Hartford Preservation Alliance*, 2012.

33. Amy Gagnon, National Register Nomination of Temple Street Garage, *New Haven Preservation Trust*, New Haven, CT, 2012.

Glaser                                                                                                            3

34. Cheryl LeBeau, "Dark Tourism," w/ *Cedar Hill Cemetery*, Hartford, CT, 2011.

35. Todd Jones, National Register Nomination of Keney Park, Hartford w/ *Hartford Preservation Alliance*, Hartford, CT, 2011.

36. Michelle Malinowski, National Register Nomination of "Stanley-Quarter Subdivision," w/ *City of New Britain*, New Britain, CT,  2011.

37. Diana Sheil, National Register Nomination of Martin Luther King Elementary School, Hartford w/ *Hartford Preservation Alliance*, Hartford, CT, 2010.

38. Katherine Parlato, Glebe House Museum, Woodbury w/ Teaching with Historic Places curriculum, Woodbury, CT, 2009.

39. Lucas Karmazinas, National Register Nomination of Underwood Typewriter Factory, Hartford w/ *Hartford Preservation Alliance*, Hartford, CT, 2008.

### *Supervise theses for MA in History (2 to completion)*

Michael Marinaro, "Reviving the Public Memory of the USS Monitor: From Faded Legend to Historical Monument," 2010.

Daniel R. Morisse-Corsetti, "At the Doorstep of the Model City: New Haven, Urban Renewal, and the Oak Street Project," 2009.

### *Class Projects*:

"Rooted in History:" Connecticut Tree Stories, *Grating the Nutmeg*, podcast, HIST 405/505, Spring 2021.

"Pandemic in Perspective," Online Exhibit, CCSU Burritt Library, HIST 302, Fall 2020.

Women's Suffrage Transcription Project, Connecticut State Archives, HIST 302, Fall 2019.

Latino History Harvest, HIST 405/505, Spring 2017-2018.

Iwo Jima Biography Project, HIST 302, Fall 2014-2018.

"Historic Structure Reports," Coltsville National Historic Park, Hartford, CT, HIST 511, Fall 2016 and Spring 2017.

New Britain Industrial Museum Visitors' Survey, HIST 302, Fall 2016.

"Triumph Through Adversity: The Borinqueneers," Exhibit, New Britain Visitors' Center Gallery, New Britain, CT, HIST 302, Fall 2015.

"Voices from Vietnam," Veterans History Project, CCSU, HIST 302, Fall 2014.

"The History of Homelessness in New Britain," HIST 405/505, Spring 2012.

**Quinnipiac University,** Hamden, CT
*Adjunct Assistant Professor of History*                                                        Fall 2003- Spring 2006
Introduction to Public History
The Gilded Age and Progressive Era
The West in American History to 1900
United States History (to 1877 and from 1877)

**Arizona State University,** Tempe, AZ
*Faculty Associate*                                                                                          Fall 1999-Fall 2001
American Cultural History from 1865 to Present
United States History Survey (to 1877 and from 1865)

**Maricopa County Community Colleges,** Maricopa County, AZ
*Adjunct Faculty*                                                                                            Fall 1998-Spring 2002
Chandler-Gilbert Community College, Chandler, AZ
    United States History Survey (to 1877 and from 1865)
South Mountain Community College, Phoenix, AZ
    Yaqui Indian History and Culture (designed, developed and co-taught)

**Arizona State University,** Tempe, AZ
*Research Graduate Assistant,* Center for Indian Education                          Fall 1995-Fall 2001
*Teaching and Research Graduate Assistant,* History Department             Fall 1994-Fall 1996; 1998

Glaser                                                                                                    4

# PUBLICATIONS

**Books**

w/ Philip Levy, eds. *Branching Out: The Public History of Trees*. Amherst, MA: University of Massachusetts Press (Public History in Historical Perspective series), *under contract*.

*Interpreting Energy at Museums and Historic Sites*. Lanham, MD: American Association of State and Local History (AASLH)/ Rowman and Littlefield (Interpreting History series), 2023.

*Electrifying the Rural American West: Stories of Power, People, and Place.* Lincoln, NE: University of Nebraska Press, 2009.
> Favorably reviewed in 13 prominent and prestigious academic journals including the *American Historical Review, Journal of American History, Western Historical Quarterly,* the *Pacific Historical Review*, and the *Montana, The Magazine of Western History.*

*The History, Values, and Visions of Carollo Engineers*. Walnut Creek, CA: Carollo Engineers, 2003.

Linenberger, Toni Rae and Leah S. Glaser, *Dams, Dynamos, and Development: The Bureau of Reclamation's Power Program and Electrification of the West.* Washington, DC: US Government Printing Office, 2002.

**Book Chapter**

"When a Tree Falls…: Listening to and Managing Connecticut's Historic Landscape," in *Branching Out: The Public History of Trees*. University of Massachusetts Press (Public History in Historical Perspective series), *under contract*.

" 'An Absolute Paragon of Paradoxes:' Native American Power and the Electrification of Arizona's Reservations," in Sherry L. Smith and Brian Frehner, eds. *Indians and Energy: Exploitation and Opportunity in the American Southwest.* Santa Fe, NM: School of Advanced Research Press, 2010.

**Edited Journal**

Glaser, Leah S., Guest Editor (theme issue), "Public History and Environmental Sustainability," *The Public Historian* 36:3 (August 2014).

**Articles in Academic Journals**

"Hidden Gems: Hopewell Furnace National Historic Site," *Pennsylvania Magazine of History and Biography*, Special Issue on Energy (October 2015), 353-355.

w/ Nicholas Thomas, "Sam Colt's Arizona: Investing in the West," *Journal of Arizona History* 56:1 (Spring 2015), 29-52.

"Identifying and Defining Issues of Environmental Sustainability in Public History" *The Public Historian* 36:3 (August 2014), 10-16.

"Let's Sustain This!" *The Public Historian* 36:3 (August 2014), 130-144.

"Beyond the Boom/Bust Cycle: Locating Enduring Stories in the Cultural Resources of the West," in Field Notes, *Western Historical Quarterly* 41 (Summer 2010): 218-226.

"Nice Towers, eh? Evaluating a Transmission Line in Arizona," *CRM: Cultural Resource Management* 20:14, U.S. Department of the Interior, National Park Service (1997): 23-24.

"Working for Community: The Yaqui Indians at the Salt River Project," *Journal of Arizona History* 37: 4 (Winter 1996):  337-356.

**Articles in Popular Magazines, Newspapers**

"Trees as Memorials and Witnesses to History," *Connecticut Explored* (Spring 2021): 14-19.

"Readers Respond to Removal of Christopher Columbus Statues," *Hartford Courant* (June 26, 2020).

"Historic Preservation Checks a Lot of Boxes," *Connecticut Preservation News* (January/February 2019): 4-5.

"Taking Away Conservation Funds Hurts the State," editorial, *Hartford Courant* (June 20, 2017).

Guest Editor (theme issue), "Connecticut in the West," *Connecticut Explored* (Winter 2017).

- "Sam Colt Mines the Arizona Territory." *Connecticut Explored* (Winter 2017).

- "Western Ideas for Eastern Lands," *Connecticut Explored* (Winter 2017).

**Reports (peer-reviewed)**

Glaser                                                                                                 5

w/ Elizabeth Correia. National Register of Historic Places, "Congregation Mishkan Israel," Hamden, New Haven County, Connecticut, *approved by Connecticut State Historic Preservation Review Board, March 2021*.

National Register of Historic Places, "New Haven Armory," New Haven, New Haven County, Connecticut, *approved by Connecticut State Historic Preservation Review Board, December 4, 2020*.

Glaser, Leah S. *et.al.* National Register of Historic Places, "Downtown New Britain," New Britain, Hartford County, Connecticut, National Register #93000771. Reviewed/approved by Connecticut State Preservation Board, December 7, 2015. Submitted to National Park Service February 2016. Listed May 3, 2016.

Glaser, Leah S. (chair) with Maren Bzdek, Priya Chhaya, Rebecca Conard, David Glassberg, William Ippen, Melinda Jetté, and Angela Sirna (National Council on Public History Task Force on Environmental Sustainability), "Public History and Environmental Sustainability: A Role for the National Council on Public History," White Paper, submitted to the NCPH Board in September, 2014.

Connecticut State Register of Historic Places, "1631 Chapel Street," New Haven, New Haven County, Connecticut, Reviewed/approved by Connecticut Historic Preservation Council, 2006.

Connecticut State Register of Historic Places, "Short Beach Union Chapel," New Haven, New Haven County, Connecticut, Reviewed/approved by Connecticut Historic Preservation Council, 2006.

National Register of Historic Places, "Ball's Oyster Dock," Branford, New Haven County, Connecticut, Reviewed/approved by Connecticut State Preservation Board, 2006.

National Register of Historic Places, "Perry Avenue Bridge," Norwalk, Fairfield County, Connecticut, Reviewed/approved by Connecticut State Preservation Board, 2006.

National Register of Historic Places, *"*Westville Village Historic District (Boundary Increase)," Reviewed/approved by Connecticut State Preservation Board, 2005.

National Register of Historic Places, "Knickerbocker Golf Club," New Haven, New Haven County, Connecticut, Reviewed/approved by Connecticut State Preservation Board, 2005.

 "An Industrial Place in a Rural Space: The Administrative History of Hopewell Furnace National Historic Site," Philadelphia. PA: Northeast Regional Office/ National Park Service/ Bloomington, IN: Organization of American Historians, August 2005.

"The Navajo Indian Irrigation Project," Bureau of Reclamation History Program, Denver, CO, 1998.

"The San Juan-Chama Project," Bureau of Reclamation History Program, Denver, CO, 1998.

 "The EMA Transmission Line," No. AZ-6- B. Historic American Engineering Record (HAER), National Park Service, Western Region, 1996.

## Encyclopedia Entries

 "Dynamic Tensions: Conservation and Development in Connecticut to 1920s," *ConnecticutHistory.org.* Connecticut Humanities Council, September 2012.

 "A Public Responsibility: Conservation and Development in Connecticut in the Twentieth Century," *ConnecticutHistory.org.* Connecticut Humanities Council, September 2012.

 "Hopewell Furnace National Historic Site," *United States Geography* Database. ABC-CLIO, Santa Barbara, CA. (posted August 2011).

## Blog and Newsletter Publications

"Guidelines for Historic Tree Preservation," *History@Work* in "Public Historians in our Climate Emergency" series. www.ncph.org (October 5, 2021).

"From the Desk of Leah Glaser: Hey Texas! Read my Electricity Book," UNP Guest Blog, University of Nebraska Press, March 1, 2021.

Michelle McClellan, Carolyn Barske Crawford, and Leah Glaser, "Repairing National Register Nominations: Educational Institutions and The National Register Process," *History@Work*, The NCPH Blog, www.ncph.org, July 28, 2020.

"Public History and Sustainability: An Overview and Invitation," *History@Work*, www.ncph.org,  (June 7, 2013).

"A Point Paper from the Public Historians and Sustainability Working Group," *History@Work*, www.ncph.org, (July 20, 2012).

Glaser                                                                                                        6

w/ Will Ippen. "Public History and Sustainability," *Public History News* 32:4 (September 2012), 11.

"Public Historians Take on Climate Change," *History@Work* (April 29, 2012).

w/ Jannelle Warren-Findley, "Negotiating Histories: Perspectives on Public History,"
   *Perspectives: A Newsletter of the American Historical Association* (May 1999).

**Reviews**

Book Review of Debra Reid and David Vail, *Interpreting the Environment at Museums and Historic Sites*. Lanham,
   MD: AASLH/Rowan and Littlefield, 2019 in *The Public Historian* 43:2, (May 2021), 167-169.

Book Review of Casey P. Cater, *Regenerating Dixie: Electric Energy and the Modern South*. (History of the Urban
   Environment.) Pittsburgh, Pa.: University of Pittsburgh Press, 2019 in *American Historical Review* 126:1
   (March 2021), 352-353.

Book Review of Marisa Elena Duarte, *Network Sovereignty: Building the Internet Across Indian Country*. Seattle,
   WA: University of Washington Press, 2017 in *Pacific Historical Review* (2018), 43-44.

Exhibit Review of "Rising Tides: Fairfield's Coast: Past to Future," Fairfield Museum and History Center, Fairfield,
   CT in *The Public Historian* 39:2 (May 2017), 91.

Book Review of James Robert Allison, III, *Sovereignty for Survival: American Energy Development and Indian Self-
   Determination*. New Haven, CT: Yale University Press, 2015 in *Journal of American History* 103: 3
   (December 2016), 841-842..

Book Review of David B. Danbom, ed. *Bridging the Distance: Common Issues of the Rural West*. Forward by David
   M. Kennedy. Salt Lake City, UT: University of Utah Press, 2015 in *Western Historical Quarterly* 21 (July
   2016), 488-489.

Book Review of Don E. Albrecht, *Rethinking Rural: Global Community and Economic Development in the Small
   Town West*, Pullman: University of Washington Press, 2014 in *Environment, Space, Place* (Fall 2015).

Book Review of Greg Gordon, *When Money Grew on Trees: A.B. Hammond and the Age of the Timber Baron*.
   Norman: University of Oklahoma Press, 2014 in *Journal of American History* 101:4 (2015), 1287-1288.

Book Review of Diane Barthel-Bouchier, *Cultural Heritage and the Challenge of Sustainability.* Walnut Creek, CA:
   New Left Press, 2013 in *H-Environment, H-Net Reviews* (June 2014).

Book Review of Paul Hirt, *The Wired Northwest: The History of Electric Power, 1870s–1970s*. Lawrence, KS:
   University Press of Kansas, 2012 in *Western Historical Quarterly* 44 (Autumn 2013), 355-356.

Book Review of Mary S. Melcher, *Pregnancy, Motherhood, and Choice in Twentieth Century Arizona*. Tucson, AZ:
   University of Arizona Press, 2012 in *Journal of Arizona History* 54:3 (Autumn 2013), 349-530.

Book Review of Ronald M. James*, Virginia City: Secrets of a Western Past.* Historical Archaeology of the American
   West Series. Lincoln: University of Nebraska Press and the Society for Historical Archeology, 2012 in
   *Western Historical Quarterly* 43:4 (Winter 2012), 526-527.

Exhibit Review of "Making Connecticut," Connecticut Historical Society Museum in *Connecticut History* 51:1
   (Spring 2012), 103-107.

Book Review of Brian Q. Cannon, *Reopening the Frontier: Homesteading in the Modern West*.  Lawrence: University
   Press of Kansas, 2009 in *American Historical Review* 116: 2 (April 2011), 484.

Book Review of Marsha Weisiger, *Dreaming of Sheep in Navajo Country*. Seattle: University of Washington Press,
   2010 in *Agricultural History* 85:2 (Spring 2011), 261-2.

Book Review of David Grayson Allen, *The Olmsted National Historic Site and the Growth of Historic Landscape
   Preservation*. Boston: Northeastern University Press, 2007 in *Connecticut History* 47:1 (Spring 2008),
   174-176.

Exhibit Review of "Remembering Our History: The Chinese American Presence in Phoenix," Phoenix Museum of
   History in *The Public Historian* 24:3 (Summer 2002), 86-88.


## CONFERENCE Participation

*Chair, *"Telling a Revolving American Story: Museums and Firearms History,"     October 14, 2022
   "Current Perspectives on the History of Guns and Society,"
    **Center for the Study of Guns and Society, Wesleyan University**, Middletown, CT

Glaser                                                                                                7

*Organizer and Participant,* "Environmental Stewardship and Storytelling through the Humanities,"    May 19, 2021
  **Campuses for Environmental Stewardship 2021 Summit,** Maine Campus Compact (virtual).
  http://mainecompact.org/ces-summit-2021/

*Participant,* **National Council on Public History,** "The Presence and Persistence of Stories,"    March 2021
  Salt Lake City, UT (virtual)

*Participant,* Working Group: "Public Historians in our Climate Emergency"    March 2020
  **National Council on Public History,** "Threads of Change," Atlanta, GA (virtual)

*Co-Chair, Local Arrangements Committee,*    April 2018- March 2019
*Member, Program Committee*,
  **National Council on Public History,** "Repair Work," Hartford, CT

*Planner/ Coordinator*, Public Plenary, "Considering Coltsville: A Revolving Story," Center Church, Hartford
  **National Council on Public History,** "Repair Work," Hartford, CT    March 2019
  A conversation with community leaders and local gun safety advocates about the future of
  Coltsville in Hartford, a city facing serious concerns about gun violence.  What role will the park play in
  communities most affected?

*Participant,* Structured Conversation: "Trees, Preservations, and Public Historians:
  Challenges and Opportunities"
  **National Council on Public History,** "Repair Work," Hartford, CT    March 2019

*Participant,* Working Group: "Repairing National Register Nominations,"
  **National Council on Public History,** "Repair Work," Hartford, CT    March 2019

*Co-Chair,* "History on the Fly: Gun Violence, Gun Safety, and Gun Rights,"    April 2018
  **National Council on Public History,** "Power Lines," Las Vegas, NV

*Co-Chair*, Local Arrangements Committee, Planning and Presentation (Awards Breakfast Presentation)    April 2018
  for Annual NCPH Conference 2019, "See You in Hartford"
  **National Council on Public History,** "Power Lines," Las Vegas, NV

*Participant,* Structured Conversation: "Resources and Best Practices for Public History Education    April 2018
  and Training and Environmental Sustainability"
  **National Council on Public History,** "Power Lines," Las Vegas, NV

*Participant,* Working Group: "Public History Education and Sustainability,"    April 2017
  **National Council on Public History,** "In the Middle," Indianapolis, IN

*Paper*, "Urban Tree Preservation in this Era of Climate Change,"    March 2016
  **National Council on Public History,** "Challenging the Exclusive Past," Baltimore, MD

*Invited Panelist,* "Old Roots, New Routes," **Connecticut Trust for Historic Preservation**,    October 2015
  Hartford, CT

*Panelist*, "Sustaining Historic Preservation as a Cultural Practice: A Structured Conversation"    April 2015
  **National Council on Public History,** "On the Edge," Nashville, TN

*Co-facilitator*, "Memorials and Violence and the American West" Discussion,    May 2014
  **Western Historians in the Northeast Region**, Yale University, New Haven, CT

*Invited Panelist*, "Sustaining Public History in a Changing Climate- A State of the Field Roundtable,"    April 2014
  **New England Historical Association**, Springfield College, Springfield, MA

*Co-Chair*, Program Committee
  **National Council on Public History**, "Sustainable Public History," Monterey, CA    March 2014

*Co-Moderator*, Public Plenary, A Conversation with Keynote Speaker Richard Heinberg, "The End of Growth,"
  **National Council on Public History**, "Sustainable Public History," Monterey, CA    March 2014

*Chair, "*Public History and Environmental Sustainability Task Force White Paper: Feedback,"
  **National Council on Public History**, "Sustainable Public History," Monterey, CA    March 2014

Glaser                                                                                                              8

*Discussant,* "Beyond Saving: Achieving Sustainability in Historic Preservation" Working Group
    **National Council on Public History**, "Sustainable Public History," Monterey, CA    March 2014

*Paper*, "Choo, Choo (Cough, Cough): Interpreting and Preserving Western Scenic Railroads    October 2013
    in the Era of Sustainability," **Western History Association**, "Vital Signs," Tucson, AZ

*Co-Chair*, Program Committee, Planning for Annual NCPH Conference 2014.    April 2013
    **National Council on Public History,** Ottawa, ON, Canada

*Paper,* "Western Ideas for Eastern Lands: The Influence of Western Environmental Policies    October 2012
    on Connecticut's State Parks and Forests, 1913-1943,"
    **Western History Association**, "Boundary Markers and Border Crossings," Denver, CO

*Paper,* "'Now, That's the Smell of History!' Addressing Environmental Sustainability    September 2012
    in Historic Preservation," **Preservation Education: Best Practices**, Providence, RI

*Organizer, Co-facilitator*, Working Group: "Public History and Sustainability,"    April 2012
    **National Council on Public History/ Organization of American Historians**, Milwaukee, WI

*Organizer, Chair, Panelist*, "Public History and Sustainability" Roundtable,    April 2011
    **American Society for Environmental History**, Phoenix, AZ

*Chair*, "Many Languages, Cultures, and Wests: Contestation of American Education    October 2010
    in the Southwest and the United States." **Western History Association**, "Many Wests," Lake Tahoe, NV

*Organizer and Chair,* "Green Planning: Green Jobs for Liberal Arts Majors,"    April 2010
    **Global Environmental Sustainability Symposium,** "A Green Economy for a Sustainable Future,"
    Central Connecticut State University, New Britain, CT

*Organizer, Chair, Panelist*, "History in the Balance: Reconciling the Management    March 2010
    of Natural and Cultural Resources in the National Parks" Roundtable,
    **National Council on Public History/ American Society for Environmental History**, Portland, OR

*Organizer, Co-facilitator*, Working Group: "Recycling Buildings? Reframing Historic Preservation    March 2010
    in the Language of Sustainability and the Green Economy,"
    **National Council on Public History/ American Society for Environmental History**, Portland, OR

*Panelist,* "The Electric West" Roundtable    October 2009
    **Western History Association**, "The Wired West," Denver, CO

*Co-Organizer*, "Memory and the American West" Discussion,    May 2009
    **Western Historians in the New England Region**, Amherst, MA

*Discussant,* "So You're Teaching in a Public History Program," Working Group    April 2009
    **National Council for Public History**, Providence, RI

*Organizer,* "Recycling Buildings: Historic Preservation and Embodied Energy"    April 2009
    **Global Environmental Sustainability Symposium:** Renewable Energy and Carbon Neutrality**,**
    Central Connecticut State University, New Britain, CT

*Chair*, "Learning the Hard Way: A Century of National Park Planning,"    January 2009
    **American Historical Association**, New York, NY

*Organizer and Chair,* Roundtable: "Historic Preservation IS Smart Growth,"    November 2008
    **Statewide Smart Growth Conference**, New Haven, CT

*Paper,* "Power to the Indians: The Production and Use of Electricity    September 2007/ April 2008
    on Arizona's Reservations," **Indians and Energy: Exploitation and Opportunity**
    **in the American Southwest Symposium and Conference** at the School of American Research, Santa Fe,
    New Mexico (September 2007) and at Clements Center for Southwestern Studies, Southern Methodist
    University, Dallas, TX (April 2008), respectively.

*Panelist,* "Environmental History and Changes at Hopewell,"    August 2003
    **Hopewell Furnace National Historic Site Natural Resources Roundtable,** Birdsboro, PA
    Sponsored by the National Park Service

*Panelist*, "The Founding Legislation and Intent of Hopewell Furnace National Historic Site,"    June 2003
    **Hopewell Furnace National Historic Site Natural Resources Roundtable,** Birdsboro, PA
    Sponsored by the National Park Service

Glaser                                                                                                              9

*Paper,* "Power Through Diversity: Rural Electrification to Arizona's White Mountains,"         April 2001
    **Arizona History Convention**, Pinetop/Lakeside, AZ

*Paper,* "Native American Power: The Navajo Tribal Utility Authority,"                          October 1999
    **Western History Association**, Portland, OR

*Paper,* "Surviving Across the Border: Yaqui Immigration to the United States, 1880-1940,"      June 1998
    **National Association for Chicano and Chicana Studies,** Mexico City, Mexico

*Paper,* "Guadalupe's Current Problems and Past Issues,"                                        May 1997
    **National Council for Public History,** Albany, NY

*Paper,* "Working for Community: The Yaqui Indians at the Salt River Project,"                  April 1996
    **Arizona History Convention**, Sierra Vista, AZ

## HONORS and AWARDS

*Excellence in Teaching Honor Roll*, Central Connecticut State University,
2008-9, 2016-17, 2017-18, 2018-19, 2019-20, 2020-21, 2021-22.

State of Connecticut Board of Regents for Higher Education,
*Connecticut State University* <u>*System-Wide*</u> *Norton Mezvinsky Research Award*, 2012.

State of Connecticut Board of Regents for Higher Education,
*Central Connecticut State University-Level Norton Mezvinsky Research Award*, 2012.

*Best Graduate Student Paper*, "Working for Community: The Yaqui Indians at the Salt River Project,"
    Arizona Historical Convention*, 1996.

## GRANTS

Consultant, Institute of Museums and Library Services w/ Connecticut Historical Society, Hartford, CT, "Community
    Historian Project," 2021. < $200K

Participant/ Consultant, National Park Service Battlefield Preservation Interpretation Grant, "Forgotten Voices of the
    Revolutionary War," w/ CRIS Radio, Windsor, CT. October 2021-May 2023.

Sabbatical Leave, "Love and War: Climate and Trees," Spring 2020.

*Campuses for Environmental Stewardship Grant*, (awarded with Dr. Charles Button, *et. al.*). 2019. $7000

*National Endowment for the Humanities/ American Library Association Grant*, Host on-campus screenings of PBS'
    *Latino Americans* (awarded with Heather Rodriguez (Sociology) for Latino Studies). Recruited and booked
    up guest speakers. Involved students through class projects (see load credit), 2015-16. $10,000

Sabbatical Leave, "Public History and Sustainability," Spring 2013.

*Faculty Development Grant,* "The National Council on Public History 2014 Conference: Making CCSU a Leader in
    Public History Education, 2013-14 (awarded with Professor Heather Prescott). $1350

*Faculty Development Grant*, "Public History and Sustainability," 2010-2011. $900

*CCSU Community Engagement Grant*, "Local History and Community Development: Homelessness and Affordable
    Housing in New Britain," 2011-2012. $1000

*CCSU Community Engagement Grant*, "Sustainability Education Programs for the CCSU Community and Beyond,"
    2010-2011. $1000

*Dean's Research Initiative Grant,* College of Arts and Sciences*, Central Connecticut State University, 2008. $900.

*Associated Students of Arizona State University (ASASU) Graduate Research Grant,* 2000.

*Charles Redd Center for Western Studies Upper Division and Graduate Student Summer Research Award,* 2000.

*Max Millett Family Fund Summer Research Award,* 2000.

## OTHER PROFESSIONAL WORK EXPERIENCE

**Connecticut Department of Energy and Environmental Protection**              October 2021-*present*
*Historical Consultant*
Drafted text for an interpretative panel with Dr. Stephen Amerman and Ms. Rachel Sayet, MA (Mohegan) on Native
use and connections for Sleeping Giant State Park, in Hamden.

Glaser                                                                                                          10

**Arcadis, Inc.**                                                                          August 2019-March 2021
*Historical Consultant*
National Register nomination for Goffe Street Armory and text for an interpretative panel for 71 Shelton Street, both in the City of New Haven.

**Department of Public Works**, New Britain, CT                                     January 2014-*present*
*Writer, Contributor, and Content Development* for Downtown Way-finding and Historic Signage project

**New Britain Historic District Commission,** New Britain, CT                   January 2014-December 2015
*Historical Consultant*
Worked with Commission and State Historic Preservation Office to revise a draft, develop, further research, document, write, and submit the New Britain Downtown Historic District for listing on the National Register of Historic Places.

**Morgan, Angel, and Associates,** Washington, DC                                2004-2012 (*intermittent*)
*Historical Consultant*

**Wild and Scenic River, Lower Farmington River and**                                            Fall 2009
**Salmon Brook Study Committee**, **National Park Service,** Simsbury, CT
*Lead Consultant* of Cultural Landscape Study. Senior researcher for reviewing and documenting the cultural landscape of the lower Farmington River and Salmon Brook for proposal to Congress to designate the river as a National Wild and Scenic River.  Worked with Public History MA students (one former and one current as my co-consultants).

**New Haven Preservation Trust**, New Haven, CT                              October 2004-September 2007
*Historical Consultant, Secretary/ Recorder for New Haven Historic District Commission, and Volunteer*

**Greater New Haven Holocaust Memory, Inc.**  New Haven, CT                   October 2005- May 2007
*Curriculum Committee*
Consulted on the development of grade school curriculum to examine the role and function of memorials and memory.

**Virginia Center for Digital History,** University of Virginia, Charlottesville, VA          April-August 2004
*Contract Historian*
Identified online primary documents for and wrote bibliographic summaries on several topics in American History corresponding to Virginia Standards of Learning. Teachers in Virginia use these essays to help guide development of eleventh grade curriculum.

**National Park Service/ Organization of American Historians**, Philadelphia, PA        July 2002-June 2004
*Contract Historian*
Researched and wrote administrative history of Hopewell Furnace National Historic Site in Pennsylvania to inform park's general management plan regarding the management and preservation of the park's resources.

**Carollo Engineers,** Walnut Creek, CA                                         March 2002-December 2003
*Contract Historian*
Researched, documented, and wrote published corporate history of a sanitary engineering company. Also authored script for company training video.

**City of Tucson,** Tucson, AZ
*Litigation Consultant*                                                           December 1999-July 2000
Provided historical research support for law firm representing Tucson in unresolved court case regarding telephone utilities and property issues. Provided information for opposing council in formal deposition.

**National Park Service**, Anchorage, AK
*Cultural Landscape Historian*, GS-170-7/9                                        June 1-August 11, 1999
Compiled data, explored sites, assessed historical and cultural significance, and developed inventories, maps, and histories for cultural landscapes (CLIs) in accordance with federal preservation regulations for Alaska parks.

**United States Bureau of Reclamation**, Lands, Recreation, and Cultural Resources Office, Lakewood, CO
*Historian*, GS-170-5/7                                                          May 28-September 30, 1998
Co-authored 100+ page draft describing the development of Reclamation's hydroelectric power program
(see publications).  Conducted primary research and drafted historical studies of historic Reclamation projects.

**Salt River Project Archives**, Phoenix, AZ
*Research Historian*                                                             June 1995-November 1996
Conducted historical research and analysis for water and power corporation.

Glaser                                                                                                    11

**EPS (Electronic Publishing Services)**, Boston, MA                      December 1993-June 1994
*Graphic Designer*

**City Marketing, Inc.**, Boston, MA                                         February 1993-November 1994
*Graphic Designer*

*The Improper Bostonian*, Brookline, MA                                      March 1993-June 1994
*Advertisement Designer*

## CONFERENCES/WORKSHOPS/ PROFESSIONAL DEVELOPMENT, TRAINING and SKILLS

"Connecticut's Sites of Conscience," **CT Humanities/State Historic Preservation Office**   August 8, 2022
Mashantucket Pequot Museum, Mashantucket/Ledyard, CT

"The Presence and Persistence of Stories," **National Council on Public History,**   March 2021
Salt Lake City, UT (virtual)

Certified Interpretative Guide Training, **National Association for Interpretation**,   January 6-9, 2021
Fort Collin, CO (virtual).

**Past Forward Online,** a conference of the **National Trust for Historic Preservation** (virtual) October 27-30, 2020

"Migrations, Meeting Grounds, and Memory," **Western History Association** (virtual)   October 12-17, 2020

"Dismantle Preservation Unconference." (virtual)                                 July 28, 2020

"Coltsville in Context: Presentation and Public Discussion Scholars"             March 26, 2019
Roundtable for Coltsville National Historic Park, Church of the Good Shepherd, Hartford, CT

"Preservation in a Changing Environment," **Connecticut State Historic**          May 18, 2017
**Preservation Office**, Storrs, CT

"Olmsted Parks in Transition," **Connecticut Chapter of the American Society**    April 28, 2017
**of Landscape Architects**, Hartford, CT

The Future of the Past in Connecticut: The National Historic Preservation Act at 50,"   October 29, 2016
**New Haven Preservation Trust/ CT Trust for Historic Preservation/ State Historic Preservation Office**,
New Haven, CT

"Preserving Diverse Communities: Making Historic Tax Credits Work,"              October 7, 2016
**Connecticut Preservation Action** Symposium, Mashantucket, CT

"Keeping History Above Water: A Conference on Sea-level Rise and Historic Preservation,"
**Newport Restoration Foundation**, et. al., Newport, RI                         April 11, 2016

"Connecticut Preservation Now! Challenges and Opportunities in Funding"          November 2015
**Connecticut Preservation Action** Symposium, Bridgeport, CT

**Connecticut Main Street Center**, 2015 Awards Gala, New Britain, CT            June 8, 2015

"Precision Valley Symposium," **Springfield Armory National Historic Site**      May 2015
and **Springfield Technical Community College**, Springfield, MA

"Where There's a Mill, There's a Way! Effective Strategies for Restoring,        May 2015
Repurposing, and Redeveloping Connecticut's Historic Mills and Factories."
**Torrington Historic Preservation Trust**, Warner Theater, Torrington, CT

Advocacy Day for History, Preservation, and the Humanities.                      April 2015
**Connecticut League of History Organizations**

"New Money for Old Places: Revenue Sources for Gap Funding: A Seminar for Developers,   January 2012
Contractors, Architects, and Historic Preservationists," **Connecticut Preservation Action** Symposium,
Bloomfield, CT

"New Money for Old Places: Historic Preservation Incentives for the Economy,"    September 2010
**Connecticut Preservation Action** Symposium, Hartford, CT

Short Course on *Historic Preservation: Sustainability,*
*"Green Building: Tools and Strategies for Sustainable Reuse"*                    June 2008
**Cornell University Historic Preservation Planning Program**, Cornell AAP Center, New York, NY

1148

Glaser                                                                                                    12

*New Faculty Meetings with Provost: College Teaching*                               Fall 2006
**Central Connecticut State University**, New Britain, CT

*Summer Technology Institute*
**Chandler Gilbert Community College,** Chandler, AZ                   June 2000, May 2001
Training in technology for teaching and curriculum development.

*Teaching Tools Workshop*                                                              Fall 1999
**Arizona State University**, Tempe, AZ

*Automating Processing Practices and Finding Aids*                              February 1996
**Society of American Archivists**

*Identification and Management of Traditional Cultural Places*                   Spring 1997
**National Preservation Institute**

*Oral History Workshop*                                                                Fall 1996
**Southwest Oral History Association**

## PROFESSIONAL ACTIVITY

### Professional Affiliations, past and present
National Council on Public History; Western History Association, Western Historians in the Northeast Region; American Society of Environmental History, American Association of State and Local History

### Service to Professional Organizations

*Panelist/Reviewer*, "Public Humanities Projects; Exhibitions and Historic Sites" grants        October 28, 2021
**National Endowment for the Humanities**.

*Presenter*, "Talking About Preservation: Future Preservationists," **Preservation Connecticut**    September 23, 2020
Invited to speak for lunchtime series on historic preservation in Connecticut.

*Panelist Reviewer*, "Public Humanities Projects: Humanities Discussions grants,"        November 15, 2019
**National Endowment for the Humanities**
"A More Perfect Union: NEW Special Initiative Advancing Civic Education and Celebrating the Nation's 250th Anniversary."

*Chair*, **Local Arrangements Committee**, "Repair Work"                      March 2017-March 2019
**National Council on Public History,** Hartford, CT
Directing 15-person committee on arranging field trips, off-site sessions, and working with program committee on 2019 National Council of Public History Conference in Hartford.

*Member,* **Sustainability Standing Committee**, **National Council on Public History**        2017-*present*
Established as a result of recommendation from a white paper, we will advise the NCPH Board on matters of environmental sustainability around conferences and the development of the profession.

*Chair*, **Sustainability Standing Committee**, **National Council on Public History**        2015-2017
Established as a result of recommendation from a white paper, we will advise the NCPH Board on matters of environmental sustainability around conferences and the development of the profession.

*Chair*, **Sustainability Task Force**, **National Council on Public History**              2013-2015
Proposed and led the production of a white paper to NCPH Board with suggestions to the organization for addressing the obligations of the organization toward environmental issues.

*Co-Chair*, **Program Committee**, "Sustainable Public History,"                          March 2014
**National Council on Public History Annual Conference**, Monterey, CA
Conceived, organized, and set the program for the conference, which at the time became had the highest number of participants of any previous NCPH conference.

*Local Arrangements Committee,*                                                          April 2009
**National Council for Public History Annual Conference**, Providence, RI

### Peer Review
*Peer reviewer, **Journal of Transport History***                                    November 2020
"Environmental Control: Charting a Course for the Navajo Nation through Road Planning, 1945-1978."

*Editorial Board*, ***Journal of Arizona History***                                   2014- 2019

Glaser                                                                                             13

*Peer reviewer,* **Technology and Culture Journal**                      April 2016 & February 2018
(Society of the History of Technology, Johns Hopkins University Press)
""Not Quite So Freely as Air": The Political Economy of Rural Electrification in the United States and Canada."

*Peer reviewer,* **University of Massachusetts Press**                                August 2015
Max Page and Marla Miller, *Bending the Future: 50 Ideas for the Next 50 Years of Historic Preservation*

*Peer reviewer, **International Social Science Review**,*                              Summer 2012
"Stimulating Profits, Providing Jobs, and Relieving Drudgery:
Businessmen, Politicians, and Progressives Tackling Rural Electrification."

*Peer reviewer, **Sustainability*** (online peer-reviewed journal),                    Summer 2011
Ryan Shelby, Yael Perez, Alice Agogino, "Partnering with the Pinoleville Pomo Nation: Co-Design Methodology:
Case Study for Creating Sustainable, Culturally Inspired Renewable Energy Systems and Infrastructure," Article
submitted to special issue: Changing the Energy System to Renewable Energy Self-Sufficiency (RESS) - Selected
Papers from the RESS Conference, 15-16 September 2011, Freiburg, Germany

*Peer reviewer, **The Public Historian***, "Roundtable on Ken Burns' National Park Series:          Fall 2010
'America's Best Idea.'"

*Peer reviewer*, **Western Historical Quarterly**,                                    Spring 2009
"Tranquil and Troubled Waters: The Responses of Drowned Towns to Cold War Consensus" (Manuscript)

**Invited Presentations**
*Panelist,* "Your First Book: Producing It, Publicizing It, Teaching It,"              October 2012
sponsored by the Library of Congress and the Committee on Teaching and Publication,
**Western History Association** Conference, "Boundary Markers and Border Crossings," Denver, CO

*Panelist*, "Scholarship Direct to the Classroom Luncheon:                            October 14, 2010
Authors share their work with K-12 teachers of Western History." Sponsored by the
Committee on Teaching and Publication, **Western History Association** Conference, Lake Tahoe, NV

*Participant*, Roundtable Luncheon                                                    January 5, 2009
Invitation-only *roundtable discussion* about water issues with seven other "water" historians by Charles Vörösmarty
Professor, Civil Engineering and Director, CUNY Environmental Cross-Roads Initiative regarding a **National Science
Foundation** grant for a project entitled, **"Hydrology and the 500-Year Challenge:** Pilot Synthesis Studies on an
Evolving Human-Water System in Northeast United States."

"Examples of Historical Thinking," National History Education Clearinghouse.         January 5, 2009
**George Mason University Center for History and New Media** and
**Stanford University School of Education**, Fairfax, VA
Recorded 20-minute segment for a central interactive website where K-12 American History teachers can find,
resources, research, advice and support to enhance their teaching, including history content, lesson plans,
and video for classroom teaching in action.
https://teachinghistory.org/best-practices/examples-of-historical-thinking/23420

## SERVICE to the Community

*Council Member,* **Connecticut Historic Preservation Council**, Hartford, CT          June 2016- *present*
        State appointment by the Governor.

Invited Speaker, "The Goffe Street Armory: Putting History in Historic Preservation,"   February 21, 2021
        John Herzan Lecture Series, **New Haven Preservation Trust**

Invited Speaker, "Talking About Preservation: Future Preservationists,"                September 18, 2020
        **Preservation Connecticut**

Invited Speaker, "Colleague Circle: Digital Internships," **CT League of History Organizations**   June 19, 2020

Member, **Spring Forward** *(A Task Force for Housing Equity)* in Hamden, CT           September 3, 2020- *present*

Member, **Desegregate Connecticut**                                                   July 2020-*present*

Guest, "Through Local History: A Stronger Sense of Place,"                             February 13, 2018
*Where We Live* w/ Lucy Nalpathanchil, **WNPR,** Hartford, CT

Glaser                                                                                           14

"Iwo Jima Biography Project at CCSU,"                              November 7, 2015; May 27, 2017
Interview on **WTIC News- Talk 1080** with Steve Parker, CBS Connecticut.

"Tour of Walnut Hill Park," New Britain, CT for "Olmsted Parks in Transition,"         April 29, 2017
**Connecticut Chapter of the American Society of Landscape Architects**

*Panelist,* "Salon at Stowe," **Harriet Beecher Stowe Center**, Hartford, CT                April 2017

Invited Speaker, "Sam Colt Mines the West," *Grating the Nutmeg*/ *Connecticut Explored*    February 28, 2017

*Board Member*, **Whitneyville Cultural Commons**, Hamden, CT                       January 2016-*present*
    Helped oversee the creation of this non-profit, non-denominational community center located in a historic
    church and parish that serves to develop, preserve, and maintain the aesthetic, spiritual, and social center
    of the neighborhood, while envisioning a future where every community has valuable resources
    preserved for perpetual public use, with just and equitable access to enhance the quality of life for all.

*President,* **Connecticut Preservation Action,** Hamden, CT                      June 2015- *July 2018*
    "Taking Away Conservation Funds Hurts the State," *Hartford Courant*                July 20, 2017
    "Testimony Regarding SB90: An Act Regarding Responsible Development,"            February 19, 2016
    **Committee of Planning and Redevelopment**, Connecticut Legislature, Hartford, CT
    Host, "Preserving Diverse Communities: Making Historic Tax Credits Work,"          October 7, 2016
    **Connecticut Preservation Action** Symposium, Mashantucket, CT
    "Connecticut Preservation Now! Challenges and Opportunities in Funding"           November 2015
    **Connecticut Preservation Action** Symposium, Bridgeport, CT

*Board Member*, **Connecticut Preservation Action,** Hartford, CT       February 2010- June 2015, July 2018-*present*
    Work with Connecticut state legislature to preserve funding for historic
    preservation in Connecticut. Set monthly meeting agendas, testify to legislature. Plan symposia.
    "Testimony Regarding Elimination of the Community Investment Act,"                  March 9, 2015
    **Finance, Revenue and Bonding Committee**, Connecticut Legislature, Hartford, CT

*Board of Directors,* **Jewish Historical Society of New Haven,** New Haven, CT             2016-*present*
    Archives Committee

*Board of Trustees*, **Jewish Historical Society of New Haven,** New Haven, CT               2014-2016

*Invited Panelist,* "Surviving Academic Motherhood,"                                   April 15, 2016
    **Southern Connecticut State University**, New Haven, CT

"Testimony Regarding HB 5150: An Act Concerning Tree Wardens'                       February 19, 2016
    Notices on Trees and Shrubs Prior to Removal, Tree Removal along State Highways
    and Clean-up by Public Utility Corporations following Certain Tree Removal,"
    **Environment Committee**, Connecticut Legislature, Hartford, CT

*Invited Participant,* "Imagining the Future of Parks," *Next Parks*, Coltsville Workshops,    December 7, 2015
    **National Park Service** and **Van Allen Institute**, Hartford, CT                November 16, 2015
    The two workshops brought together key stakeholders- NPS staff, historians, local residents, designers,
    government officials, social programs- to brainstorm and develop ideas for innovative visitor experiences,
    partnerships, and stories to guide future planning and programming of the new Coltsville National Historic
    Park. Invited to give part of tour on "Coltsville National Historic Park and Sustainability."

*Grant Advisory Committee*, "Come Home to Downtown,"                           February 2014-Summer 2015
    **Connecticut Main Street Program**, New Britain, CT

*Advisor/ Consultant*, Way-Finding and Historic Signage Project                    January 2014-*present*
    **Department of Public Works**, City of New Britain, CT

*Invited Speaker,* "The Downtown New Britain National Register Historic District: A Proposal"     October 2014
    *Trinity-on-Main*, **New Britain Historic Preservation Commission**, New Britain, CT

*Invited Keynote Speaker,* "The History and Architecture of the Knickerbocker Golf Clubhouse,"    September 2014
    *Knickerbocker Golf Club 70th Anniversary Gala*, **Knickerbocker Golf Club**, New Haven, CT

Glaser                                                                                          15

*Workshop Leader,* "Western Expansion," **American Voices**, **Teaching American History**,                January 2011
    Central Connecticut State University, New Britain, CT

*Panelist,* "Making Use of Old Buildings,"                                                      September 16, 2010
    *Where We Live* with John Dankowsky, **WNPR**, Hartford, CT

*Lecture,* "The Role of Art in Western History,"                                                November 2, 2009
    **New Britain Museum of American Art**, New Britain, CT

*Lecture and Workshop,*
    "Energy and the Development of Natural Resources in the West"                       July 24, 2009
    "Technology and the West"                                                           April 30, 2009
    **Teaching American History** Grant, Capitol Region Education Council (CERC), Hartford, CT

"Researching Your Historic House," **Fair Haven Homeowner's Association**,                       April 5, 2008
    Fair Haven Public Library, New Haven, CT

"Water Rights in the City of Tempe: Past and Present."                                          April 2002
    **Moving Waters: The Colorado River and the West,** Lecture Series, Tempe Public Library, Tempe, AZ

## SERVICE to Central Connecticut State University

| | |
|---|---|
| CCSU Foundation Grant Advisory Committee | Fall 2022-Spring 2024 |
| Asian-American/ Pacific Islander Studies Advisory Board | Fall 2021-*present* |
| Graduate Studies Committee | Fall 2012, Fall 2016-2021 |
| CCSU Global Environmental Sustainability Action Committee (GESAC) Board | 2008-*present* |

    Co-Organizer, **Annual GESAC Sustainability Symposium**                          April 14, 2016
    "Building Sustainability: Historic Preservation, Reuse, and Green Building."

Latino and Puerto Rican Studies (LPR) Advisory Board                                            2009-*present*
    Co-recipient of $10,000 grant from the National Endowment for the Humanities and the American Library Association for 2015-16. Co-organized six film screenings including reception and discussion; Recruited and organized lecture by National Humanities Award Winner **Dr. Vicki L. Ruiz** and OAH Distinguished Scholar **Dr. Lorrin Thomas**.

| | |
|---|---|
| Search Committee for Diversity Associate, Office Equity and Inclusion | Fall 2019, Spring 2019 |
| President's Task Force on Events (*appointed* by Dr. Zulma Toro, President) | May 2018-January 2019 |
| Committee for the Concerns of Women | 2007- Spring 2021 |

    Co-chair, Work-Life Balance Sub-Committee

Community is Central Planning Committee, Chair                                                  May 2017-Fall 2018
    Fall 2018 Lecture Series with **Dr. Nicholas Long** and **Dr. Timothy Eatman**

| | |
|---|---|
| Promotion and Tenure Committee | 2014-2016 |
| Retention and Graduation Council | 2008-2014 |
|     Chair, Attendance Sub-Committee | Fall 2012 |
| Child Care Task Force, Faculty Senate, Co-chair | 2009-2013 |
| University-Museum-Community Collaborative Steering Committee | 2007-2012 |
| *Invited Panelist*, Sabbatical Leave Workshop, Academic Affairs | May 4, 2012 |
| Tourism-Hospitality Studies Advisory Committee | 2006-2010 |

## SERVICE to History Department, Central Connecticut State University

| | |
|---|---|
| Department Evaluation Committee (DEC) | 2012- 2015, 2015-2016 (served as Chair), 2020-22 |
| Graduate Committee | Spring 2009- Fall 2012, Spring 2014-*present* |

    Admissions, planning (including orientation events, grants, marketing, recruitment)

| | |
|---|---|
| *Chair,* Public History Advisory Committee | 2006-*present* |
| Academic Advising (undergraduate and graduate) | 2006-*present* |
| Search Committee for Assistant Professor in Latinx/o/a History | Spring 2019 |

Glaser                                                                                          16

*Chair*, Search Committee for Assistant Professor in Public History                  Fall 2014-Spring 2015
    and African-American History
    Included attendance at **American Historical Association**, New York, NY (January 2 & 4, 2015)

Planning and Personnel Committee                                          2011-2012; 2014-2015

Nominating Committee                                                             2009-2012

Screening Committee, Social Studies Program                                      2007-2010

Co-Coordinator, *Phi Alpha Theta*                                                2008-2010

Recording Secretary                                                       2006-2007, 2018-19

# Exhibit 134

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

DAVID J. NASTRI, ESQ.                             :          No. 3:23-cv-00056 (JBA)
    *Plaintiff*,                                :
                               :
        v.                                  :
                               :
KATIE DYKES, *in her official capacity*,          :
    *Defendant*.                               :

## DECLARATION OF PROFESSOR TERENCE YOUNG

I, Terence Young, declare as follows:

### Background

1.     I am a citizen of the United States and resident of California.

2.     I am over 21 years of age.

3.     Since fall 2020, I am Emeritus Professor of Geography in the Department of Geography & Anthropology, California Polytechnic State University, Pomona.

4.     I was an Assistant, Associate, and full Professor of Geography, Department of Geography & Anthropology, California Polytechnic State University, Pomona between fall 2002 and spring 2020. During the same period, I was also an adjunct in the university's Regenerative Studies program. Before fall 2002, I held academic positions as a geographer at California State University, Long Beach, University of Southern California, UCLA, Clemson University, George Washington University, and Mary Washington University. In 1996-1997, I was Acting Director of Studies in Landscape Architecture, Dumbarton Oaks Library and Research Center, Harvard University, Washington, DC.

1

5. I earned a Bachelor of Arts in Anthropology at UC Berkeley (1973), a Master of Arts in Geography at UCLA (1987), and a Ph.D. in Geography at UCLA (1991).[1]

6. As a scholar, I have studied the history an historical geography of the American park movement, including from its earliest years, the meanings, purposes, developments, designs, and usages of various types of protected areas since I began work on my doctoral degree in fall 1987. In my professional capacity, I authored award-winning scholarly books, book chapters, and journal articles concerning American protected areas and the American park movement. These publications have been cited by authors in multiple disciplines, including history, geography, anthropology, natural resources management, and more.

7. I am aware of this lawsuit, have reviewed the Amended Complaint ("Complaint") filed by David Nastri ("Plaintiff") in this matter, and am familiar with the claims and allegations of the Complaint.

8. I am being compensated for services performed in the above-entitled case at an hourly rate of $200 for reviewing materials and preparing reports; and $400 per hour for depositions and court appearances. My compensation is not contingent on the results of my analysis or the substance of any testimony.

9. The testimony in this Declaration is based upon a combination of my professional training, research, and work experiences in my various academic roles; from personally reviewing relevant documents, rules, regulations, and historical sources of information regarding the public parks and forests. Any information I obtained from those outside sources is consistent

---

[1] For a copy of my full CV, please see Attachment 1 to this Declaration.

2

with my own understanding.[2]

## Overview of Opinions

10.     When the American park movement launched in the 1850s, it drew on the idea that American urban society was flawed and that urban parks could repair and reform it. Specifically, urban parks would foster a healthier, wealthier, more democratic, and less criminal urban society. Backed by a Romantic ideology, this social transformation occurred because parks contained natural scenery, which when quietly and passively contemplated, was thought to improve someone's mind and body, and thus society. Any features or actions in a park that interfered with natural scenery contemplation were excluded from a park. In keeping with a park's purpose and its function as a society-improving device, firearms were specifically prohibited.

11.     Near the end of the nineteenth century, a rationalistic ideology joined the earlier Romantic one. The new ideology emphasized such active recreation in parks as baseball and bicycling because these were also thought to lead to a healthier, wealthier, more democratic and less criminal society. However, the new ideology did not eliminate the passive contemplation of natural scenery. Instead, urban parks were re-designed to provide separate spaces for active play and for quiet contemplation. These two uses of public urban parks continue to this day, each with its own spaces.

12.     In the late nineteenth and early twentieth centuries, America's natural national parks were also created to protect landscape of natural scenery. Like their urban counterparts, they ere romantic places for quiet and passive contemplation in order to improve urban society.

---

[2] For the list of the specific sources relied upon for preparing this Declaration, see Attachment 2.

3

Later, national parks also became places for active recreation, but it was never as important as in the urban parks. Today's national parks remain places for the contemplation of natural scenery and for active play.

13. At roughly the same time that national parks were being created, state parks appeared. Like urban and national parks, they were protected to be places for contemplating natural scenery and for active play. They remain so to this day.

## Growth of the 19th Century Parks Movement

### Urban Parks

14. The development of the American park system and the park movement evolved over decades and centuries in response to new societal concerns and circumstances as they came into existence.

15. During the early American Republic, dedicated greenspaces in urban areas were limited and where they existed they did not exceed three square miles. The early American greenspaces usually took the form of public squares in places like Philadelphia and Savannah or commons agricultural spaces like the Boston Common.

16. As cities developed into primary engines of commerce in the American economy their populations necessarily grew. For example, from 1830 to 1860, the population of New Haven grew from 10,000 to 39,000, Boston from 61,000 to 178,000, Philadelphia from 80,000 to 566,000, and New York from 203,000 to 814,000.

17. The push for larger greenspaces in cities began in earnest in the pre-Civil War years as increasing numbers of Americans chose to live in cities. Early proponents of expanded urban greenspace drew upon the example of the recently popular "rural" cemeteries. America's

4

earliest cemeteries were undesigned graveyards and churchyards. The first designed cemetery was New Haven's New Burying Ground of 1796, but it, unlike its successors, was gridded and rectilinear. In 1831, the Massachusetts Horticultural Society created the first of and prototype for the many subsequent "rural" cemeteries – Boston's Mount Auburn. These cemeteries, which were romantic in design, incorporated extensive tracts of suburban land with lawns, hills, woods, water features, and scenic vistas. By the mid-nineteenth century, these cemeteries were popular tourist attractions drawing thousands each year (Linden-Ward, 1989).

18.    Rural cemeteries, however, inadequately addressed the societal concerns of the pre-Civil war era arising from increased urbanization because they were privately owned, did not permit full public access, and being suburban were inaccessible to many city dwellers due to their distance. Moreover, they were inaccessible to most working people. In the 1840s and 1850s, urban greenspace proponents applied the lessons of cemeteries when arguing for large publicly owned parks.

19.    New York's Central Park was the first major attempt to achieve this goal and was based on an 1858 design by Frederick Law Olmsted and Calvert Vaux. Before the Nineteenth Century ended, America's best-known urban parks had appeared, including Boston's Franklin Park, Brooklyn's Prospect Park, Philadelphia's Fairmount Park, Chicago's Washington and Jackson Parks, San Francisco's Golden Gate Park, Los Angeles's Griffith Park, and San Diego's Balboa Park. The initiation and development of each park was unique, but they occurred where supported by a significant portion of the population, were all relatively large in area, generally over 500 acres, and shared a common purpose – the improvement of American society (Schuyler, 1986; Young, 2004).

5

1159

20.    The creation of large urban parks began at this time and in these locations for cultural reasons that go back to the early Republic. A national mistrust of and suspicion about urban life. Thomas Jefferson, for example, had argued in 1787's *Notes on the State of Virginia* that the ideal society would flourish where the economy was agricultural and the settlements small and dispersed. Invoking a geographic contrast, Jefferson promulgated a valorized rural-urban imaginary that regarded the former as healthy and positive while casting the latter as damaging and negative. Farmers, he insisted, were the backbone of America. "Those who labor in the earth are the chosen people of God, if ever he had a chosen people, whose breasts he has made his peculiar deposite (sic) for substantial and genuine virtue." Manufacturing and cities, in contrast, were sources of vice. Drawing a particularly repulsive word picture, Jefferson suggested that "The mobs of great cities add just so much to the support of pure government, as sores do to the strength of the human body." The roots of the republican nation, urged Jefferson, lay in the rejection of urban life (Jefferson, 1829, 171-173; Young, 2022).

21.    Until the middle of the Nineteenth Century, the vast majority of Americans lived in rural settings, but in the immediate pre-Civil War years, industrialization increased rapidly, surface transportation encouraged urban spreading, and cities grew in area and population numbers. This concentration of people accentuated social problems, making them more obvious to more people. Cities became increasingly perceived as socially degraded places in contrast to virtuous rural America. In line with this perception, cities were condemned as unhealthy, impoverished, undemocratic, and crime ridden. A range of solutions were proposed to remedy these urban vices (Boyer, 1978), including municipal parks. In a large park, urban residents could "retreat" from the city to be back in touch with nature, which would lead to social reform

6

1160

and improvement. Parks, proponents and supporters argued, would produce a virtuous society characterized by health, wealth, equality, and little crime (Young, 2004).

22.    Park proponents believed that society's characteristics were strongly shaped by its physical environments. Urban environments of noise, traffic, pollution, crowding and ugly buildings lead to a vicious society while an urban park's "natural" environment, in contrast, would lead to a virtuous one. Urban vice did not occur because society was evil by nature but because its members were out of touch with nature, a source of goodness. Public urban parks were devices for social reform. They succeeded best where urban environments and urban ways of life were excluded from the greenspace (Young, 2004). For example, according to an 1867 Newark, New Jersey park report, a park was designed to produce "a certain [positive] effect upon the mind and the character of those who approach it" (Schuyler and Turner Censer, 1992, 211). Forty years later, Charles Mulford Robinson, made a similar link between society and its surroundings. A leader in the "City Beautiful" movement that sought visible expressions to Progressive Era reforms aimed at revitalizing public life and instilling civic awareness, Robinson argued for the creation of public flower beds, new parks, and street trees because "Social problems are to a large degree problems of the environment." Create parks where adults and children can find "brightness, entertainment, and fellowship without throwing them into temptation… and many of sociology's hardest problems will be solved" (Robinson, 1909, 245).

23.    The foundation for the ideology of the early urban park proponents and supporters lies in Romanticism and the Romantic Movement. While the philosophy and movement had diverse expressions, it can be broadly recognized by a rejection of rationalism, a regard for history and a focus on perception and beauty, particularly that of nature. Moreover, the

7

movement embraced the belief that a group of people's character or nationality grew organically and emerged over a long period of time. In addition, Romanticism contributed to the growth of democracies, to a belief in progress and to the more open societies that are common features of modern life (Barzun 1961). Romantic park supporters, like many contemporary artists and scientists (Novak 1995), saw nature as an interrelated world of mind, body, and being, an organic whole that included God, people, and the physical world. Social problems resulted from the physical disjunction that developed between nature and people in any city large enough to be dominated by streets and buildings. Ignoring the benefits from urban life, they viewed the city as a dangerous environmental aberration that could lead to the dissolution of society. Parks were the necessary corrective because they brought nature, which was God's handiwork, balanced and inherently good, back into cities. As the minister Henry Ward Beecher enunciated in 1869, for "the multitude," natural beauty was a gift of God "without price." It could "confer pleasure and profit from merely the looking at it" (Beecher, 281-284).

24.    Nature was not a simple, unconsidered object in this era. Park designers and their supporters believed it could occur in three landscape art categories or "genres" on park landscapes: the "Beautiful" (also called the "Pastoral" by Frederick Law Olmsted), the "Picturesque," and the "Sublime." Each was yoked to a set of unique attributes. Smallness, roundness, smoothness, delicacy, and color best captured the Beautiful, making it the preferred genre for parks with extensive lawns or water features bordered by shrubs and trees. The Sublime countered the Beautiful, being linked to terror, obscurity, difficulty, power, vastness, majesty, and infinity, but it remained beyond the ability of urban park designers because their landscapes were too restricted to create it. However, it informed the selection of and lay behind

8

1162

the drive for national parks. The Picturesque mediated the two extremes, expressing the pleasure gained by abrupt, unexpected, or rude forms and textures, as well as the roughness that could exist at any scale. Many large urban parks incorporated picturesque elements as a stimulating contrast to beautiful ones, but picturesque rarely dominated (Novak, 1995; Young 2004).

25.    And, like some landscape scene in a painting, a municipal park's "naturalistic" landscape was intended to support only pastoral and picturesque activities. As built, large urban parks were places for "passive recreation," which meant sitting, strolling, slow horse riding, and other quiet activities while contemplating the scenery. Activities that were fast moving, active, boisterous, or worse ran counter to a park's purpose. In support of these aesthetics, Parade Grounds were isolated from the park proper in both Olmsted and Vaux's Prospect Park and in Olmsted's unbuilt 1866 plan for San Francisco (Graff 1985; Young 2018). Places for military exercises and displays, Parade Grounds were spaces "for citizens to demonstrate their commitment to defense of their government" (Rosenzweig and Blackmar, 1992, 143). According to Olmsted (1990b, 532), these places were necessary, but they should not conflict with "the safety or the quiet of those not interested in them." That is, a park's visitors. Consequently, Parade Grounds were closed off or moved away from a park proper. They were, argued Schuyler (1986, 131), "locations for functions that, while essential in a city, would be antithetical to the tranquility of a naturalistic landscape."

26.    Moreover, in March 1858, one month before Central Park's first Commissioners (1858, 166) awarded a plan for the new park, they adopted a set of rules and regulations that forbade "all persons" from carrying "fire-arms" in the park. The public did not necessarily know how to behave in their new park so the commissioners adopted rules to prompt proper behavior

9

and decorum. Aligned with these rules and regulations, and as a practical matter, they also created a force of Park Keepers in 1859 to control activities deemed inappropriate. "A woods shared by 'thousands' demanded a different kind of care than woods visited by a few," noted David Thacher before quoting the *New York Times* of February 21, 1859: "Nature in the neighborhood of large towns needs rules and regulations to enable her to do herself justice, just as certainly as in the country she does better without them" (Thacher, 2015, 591). Proponents and supporters of large urban parks understood that the heavy use of the nature in a park that would result from its being easily accessible, necessarily mandated rules and regulations to control and direct visitors in order to allow nature to reform society.

27.    Beginning in the 1880s and 1890s, an increasing number of American urban park advocates and supporters embraced a new rationale for municipal parks, what I term "rationalistic" parks. American cities continued to be plagued by poverty, disease, undemocratic acts, and crime, but these new park proponents did not abandon the idea of urban social improvement through parks. Instead, they stepped back from the romantic idea that scenic park landscapes alone reformed society and also embraced a more Darwinian and mechanistic view of nature. As their perspective grew in importance, the value of nature contemplation somewhat retreated, and parks were re-imagined as favored settings for organized play and other leisure-time activities. Flower gardens, museums, baseball diamonds, and children's playgrounds became common parks features as rationalistic park proponents pursued their formula for encouraging the good society. These advocates saw romantically designed parks as underdeveloped rather than mis-designed, so they did not seek to remove and replace the features of romantic-era parks. Instead, they wished to share space in the large parks by introducing the

10

1164

features they believed would reform society. In addition, municipal park authorities created numerous, generally smaller greenspaces throughout cities in order to bring the reforming abilities of parks into neighborhoods. Visitors would no longer have to travel long distances to the large parks. These small parks utilized both romantic and rationalistic characteristics and were more tools in the effort to improve urban society (Young, 2004).

28.     Today, the romantic and rationalistic ideals still thrive in America's urban parks.

29.     At no point did my research reveal any evidence that supported the passive carrying fire-arms for self-defense in these urban parks. Such encouragement would have been inconsistent with romantic and rationalistic ideals and antithetical to the social purpose of urban parks as promoted by those ideals.

**National Parks**

30.     The emergence and development of America's national parks followed an ideological arc quite similar to urban parks and for much the same purpose – the improvement of American society. Like urban parks, national park advocates and supporters initially embraced Romanticism. The creation of American national parks and state parks (see below) began in 1864 when President Lincoln signed legislation ceding the Yosemite Valley and Mariposa Big Tree Grove to the state of California for "public use, resort, and recreation; [and] inalienable for all time" (Dilsaver, 2016a, 4). Frederick Law Olmsted, who lived in California at the time, was appointed a commissioner on the new park's board and supervised the creation of the report for its administration. In addition to this "skillful" plan for the park's administration, "he advocated a policy of establishing national parks across the nation and laid the foundation for our current national park system" (Freeman, 1989, 172).

11

1165

31.    For Olmsted, the creation of national parks was not a gift but a duty. "It is the main duty of government, if it is not the sole duty of government, to provide means of protection for all its citizens in the pursuit of happiness" (Olmsted, 1990a, 502). Where Romantic urban parks had employed the Beautiful and the Picturesque, California's Yosemite Park improved society through a blend of the Beautiful and the Sublime. The new park was, argued Olmsted, a "union of the deepest sublimity with the deepest beauty of nature, not in one feature or another, not in one part or one scene or another, not any landscape that can be framed by itself, but all around and wherever the visitor goes, constitutes the Yo Semite the greatest glory of nature" (Olmsted, 1990a, 500). Immersed in the park's natural beauty, visitors were improved through passive interaction with the scenery. "[T]he enjoyment of scenery," stated Olmsted, "employs the mind without fatigue and yet exercises it, tranquilizes it and yet enlivens it; and thus, through the influence of the mind over the body, gives the effect of refreshing rest and reinvigoration to the whole system" (Olmsted, 1990a, 504). Consequently, Olmsted thought the principal duty of the park's commissioners was "to give every advantage practicable to the mass of the people to benefit by that which is peculiar to this ground" (Olmsted, 1990a, 506). At the same time, he cautioned that constraints had to be applied to the "mass" of visitors in order for the park to benefit society both in the present and in the future. "[I]t should be remembered that in permitting the sacrifice of anything that would be of the slightest value to future visitors to the convenience, bad taste, playfulness, carelessness, or wanton destructiveness of present visitors, we probably yield in each case the interest of uncounted millions to the selfishness of a few individuals" (Olmsted, 1990a, 507). Finally, he pointed to the uniqueness that had "caused Congress to treat [Yosemite Valley and Mariposa Big Tree Grove] differently from other parts of

12

the public domain" and to that which would guide the creation of subsequent national parks. "This peculiarity consists wholly in its natural scenery" (Olmsted, 1990a, 506).

32.    In less than a decade, the first, officially designated "national park" was created in 1872: Yellowstone. A large, protected area of approximately 2.2 million acres, its origin lay in the Romantic path of scenery identified by Olmsted. "Yellowstone's awesome natural phenomena had inspired a political phenomenon" (Sellars, 1997, 7). In the authorizing act, the park was "hereby reserved and withdrawn from settlement, occupancy or sale… and dedicated and set apart as a public park or pleasuring ground for the benefit and enjoyment of the people." Placed under the Interior Secretary, the act directed the Secretary "to make and publish such rules and regulations as he may deem necessary or proper for the care and management of the same." Among these, the Secretary "shall provide against the wanton destruction of the fish and game found within said park" and he "generally shall be authorized to take all such measures as shall be necessary or proper to fully carry out the objects and purposes of this act" (Dilsaver, 2016b, 20-21). Over the next 40 years, Congress and the President designated (and sometimes transferred) numerous natural preserves under federal jurisdiction, including Sequoia, Yosemite, Mount Rainier, Glacier, and Rocky Mountain National Parks. Like the original Yosemite cession and Yellowstone National Park, these subsequent parks were large, relatively distant from most of America's population because they were out west while the people were back east, and "preserved largely for their aesthetic qualities," which like urban parks, were thought to improve society (Mackintosh, 2005, 14).

33.    The rationalistic rationale began to inform national park features and usage toward the end of the Nineteenth and the beginning of the Twentieth Centuries. As the public,

13

which increasingly lived in America's cities, came to expect urban parks to be both scenic and places for museums, bicycling, and other forms of active play, they also came to see county, state, and national parks as serving the same purpose. Consequently, Interior Secretary Franklin K. Lane (Dilsaver, 2016c, 37) instructed Stephen T. Mather that "All outdoor sports which may be maintained consistently with the observation of the safeguards thrown around the national parks be law will be heartily endorsed and aided wherever possible. Mountain climbing, horseback riding, walking, motoring, swimming, boating, and fishing will ever be the favorite sports. Wintersports will be developed in the parks that are accessible throughout the year." In contrast, however, "Hunting will not be permitted in any national park."

34.    The American Civic Association (ACA), a private, eastern-based organization that had originated in the nineteenth century and promoted the creation of all parks as social reforming devices,  incorporated all types of parks—municipal, county, state, or national—in their reform agenda because they believed that any given park comprised the local expression of a more durable concept, that all parks were socially impactful when they shared three important features: nature, scenery, and play, which when combined properly, created the ideal of the park. According to the ACA's president, J. Horace McFarland (1912, 3), this park performed a valuable social function; it "act[s] immediately and favorably on the health and the orderliness of the community, and consequently increase[s] materially the average of individual efficiency. In other words, they pay dividends in humanity." That is, such parks at every geographic scale reformed a rapidly urbanizing America. National parks, like urban parks, would foster a virtuous society characterized by health and wealth. The ACA further claimed that national parks would foster democracy and patriotism among Americans (Young, 1996).

14

1168

35.    Today, the same rationales applicable to urban parks guide the public's expectations and inform the actions of national park proponents and supporters.

36.    Again, at no point in my research did I discover any evidence of support for the passive carrying of fire-arms for self-defense in national parks. Such encouragement would have been inconsistent with romantic and rationalistic ideals and antithetical to the social purpose of national parks as promoted by those ideals.

**State Parks**

37.    America's state parks today appear in every state and in types that vary from state to state and sometimes even within a single state. The history of their designation and development reveals a halting and uneven pattern, but it nonetheless followed the same ideological arc that guided the unfolding of urban and national parks, and for much the same purpose – the improvement of society. Like national park advocates and supporters, state park activists thought striking scenic places would lead to a society that was healthier, wealthier, more democratic and more socially coherent.

38.    Before California eventually returned Yosemite valley and grove to the federal government in 1906 for inclusion in Yosemite National Park, it had inspired such scenic state parks as Palisades and Watkins Glen in New York and Mount Mitchell in North Carolina, as well as "sites uniquely worth preserving" in Connecticut, Indiana, Iowa, and Wisconsin (Cutler, 1989, 195). Most state parks, however, did not appear until the Twentieth Century when, as J. Horace McFarland (1910, 9) noted, they came to be seen as the logical extension between city or county parks and national parks. "If, when a natural wonder is found to be of national importance and to need national protection, it may properly be controlled by the nation, surely a

15

1169

location or opportunity too large for local or municipal control may as properly be controlled by the state." During the first quarter of the Twentieth Century, state parks came to incorporate both romantic and rationalistic features as people increasingly saw them as places for the passive admiration of the scenery and for play. Nevertheless, state parks were not common.

39.    After the 1921 conference the pace of state park creation increased. Park proponents kept recommending new sites for designation, but they often did so to the new National Park Service. The Park Service recognized that many of these recommendations had merit, but they did not rise to the level of national significance so instead of just rejecting the recommendations, it organized the National Conference on Parks to facilitate the designation of these sites protected by the states. The conference transformed the state park movement, stimulating more widespread interest in their creation.

40.    Furthermore, the National Park Service developed a plan during the Great Depression to create "a healthier and happier citizenry by developing a nationwide system of state parks. The goal was to 'cure the ills of society' by constructing a park within fifty to one hundred miles" of the American populace. And, since a rationalistic park ideology was premier by the 1930s, "one of the primary principles of the plan was to place recreational parks within the reach of every citizen" (Smith, 2013, 207). Working with the Civilian Conservation Corps, the Park Service dramatically increased the number of state parks by building 800 between 1933 and 1942.

41.    For the third time, at no point in my research did I discover any evidence of support for the passive carrying of fire-arms for self-defense in state parks. Such encouragement

16

would have been inconsistent with romantic and rationalistic ideals and antithetical to the social purpose of state parks as promoted by those ideals.

42.    This Declaration is a presented in a form that is much different from academic writings. It reflects an accurate recounting of my research and conclusions regarding this historical period and the subject matter discussed. However, given the time constraints at issue in this case, as well as the fact it was prepared in connection to a pending lawsuit, it is not drafted at the level of depth that would be expected for academic writing. This declaration was prepared in approximately one week, so the research was limited to my own office bookshelves and short searches on the internet. If I had more time to travel to libraries and to more thoroughly review primary documents, I would likely be able to frame a more focused case with greater detail. Thus, I reserve the opportunity to supplement this declaration to reflect any additional research or context that may be necessary as this case proceeds.

Pursuant to 28 U.S.C. § 1746, I, Terence Young, state under penalty of perjury that the foregoing declaration is true and accurate to the best of my knowledge, information, and belief.

Executed: March 29, 2023

Terence Young

17

# Attachment 1

# CURRICULUM VITAE

Terence George Young
570 Croyden Lane
Cambria, CA 93428
626-716-5927 (cell)
tgyoung@cpp.edu
www.cpp.edu/~tgyoung

## POSITIONS HELD

### Academic

**2020 – present** – Professor Emeritus of Geography, Department of Geography & Anthropology, California State Polytechnic University, Pomona, California 91768

**2011 – 2020** – Professor of Geography, Department of Geography & Anthropology (and Adjunct Professor, Lyle Center for Regenerative Studies through 2013), California State Polytechnic University, Pomona, California 91768

**2006 – 2011 -** Associate Professor of Geography, Department of Geography & Anthropology and Adjunct Associate Professor, Lyle Center for Regenerative Studies, California State Polytechnic University, Pomona, California 91768

**2002 – 2006 -** Assistant Professor of Geography, Department of Geography & Anthropology and Adjunct Assistant Professor, Lyle Center for Regenerative Studies, California State Polytechnic University, Pomona, California 91768

**2001 – 2002** - Visiting Assistant Professor, Department of Geography, California State University, Long Beach, California 90840 (renewable)

**2001 – 2002** - Research Assistant Professor, Department of Geography, University of Southern California, Los Angeles, California 90089

**2000 – 2001** - Visiting Lecturer, Department of Geography, University of California, Los Angeles, California, 90095 (Spring Quarter each year)

**1999 – 2000** - Visiting Lecturer, Department of Geography, University of Southern California, Los Angeles, California 90089 (Fall Semester each year)

**1992 – 1999** - Assistant Professor of Geography, Department of History and Adjunct Assistant Professor, Department of Parks, Recreation, and Tourism Management, Clemson University, South Carolina 29634 (On leave 1995-1997)

**1998** - Visiting Lecturer, Departments of Geography, George Washington University, Washington, D.C. 20052 and Mary Washington College, Fredericksburg, Virginia 22401

**1992** - Visiting Lecturer, Department of Geography, University of California, Los Angeles 90095

### Research

**2000 – 2001** - Research Associate, Sustainable Cities Program, University of Southern California, Los Angeles

1

1173

Administration

**2001 – 2002** - Project Manager, Sustainable Cities Program, University of Southern California, Los Angeles

**1996 – 1997** - Acting Director, Studies in Landscape Architecture, Dumbarton Oaks Library and Research Center, Harvard University, Washington, DC 20007

Consulting

**2013 – 2015** – "Geographies of Wonder: Americans and the National Park Idea," an exhibit celebrating the centennial of the US National Park Service, Peter Blodgett, curator, Huntington Library & Collections, San Marino, CA

**2008 – Present** - "City of White Gold," A documentary on San Francisco in the Silver Age, Geordie Lynch, independent filmmaker, 218 Larkspur Plaza Drive, Larkspur, CA 94939 (A trailer and more information is available at: http://www.cityofwhitegold.com)

**1999 – 2000** - California League of Conservation Voters-Education Fund, 10780 Santa Monica Blvd., Suite 210, Los Angeles, CA 90025

**EDUCATION**

**Ph.D.** - University of California, Los Angeles, 1991 (Cultural-Historical Geography)
**M.A.** - University of California, Los Angeles, 1987 (Biogeography)
**B.A.** - University of California, Berkeley, 1973 (Anthropology)

**PUBLICATIONS**

Periodicals – In Print

**2021** – "From Competition to Cooperation: A History of Canada-US National Park Relations" *Environment and History* 27(4): 607-634 (co-authored with Alan MacEachern and Lary Dilsaver)

**2018** – "Murray's Rush: The Adirondack Beginning of American Camping" *NY Archives Magazine* 18(1): 11-17

**2014** – "The End of Camping: Coming Home to the City" *BOOM: A Journal of California* 4(3): 70-75

– "'Green and Shady Camps': E.P. Meinecke and the Restoration of America's Public Campgrounds" *The George Wright Forum* 31(1): 69-76

**2011** – "Collecting and Diffusing 'the World's Best Thought': International Cooperation by the National Park Service" *The George Wright Forum* 28(3): 269-278 (co-authored with Lary Dilsaver)

**2010** – "On Camping and Its Equipment" *Environmental History* 15(1, January 2010): 120-128

**2009** – "'A Contradiction in Democratic Government': W.J. Trent, Jr. and the Struggle for Non-Segregated National Park Campgrounds" *Environmental History* 14(4, October 2009): 651-682

**2008** – "Four Visions of Nature in American Protected Areas" *Past Place* 16(2, Spring/Summer): 8-10 (Newsletter of the Historical Geography Specialty Group, Association of American Geographers)

**2007** – "U.S. Parks and Protected Areas: Origins, Meanings and Management" *Historical Geography* 35:

2

5-9 (co-authored with Lary Dilsaver)

**2006** – "German Influences on San Francisco's Nineteenth-Century Greenspace" *Die Gartenkunst* 18(1): 69-80

**2006** – "False, Cheap and Degraded: When History, Economy, and Environment Collided at Cades Cove, Great Smoky Mountains National Park" *Journal of Historical Geography* 32(1): 169-189

**2001** - "Place Matters" *Annals of the Association of American Geographers* 91(4): 681-682 (This is the introduction to a "Forum" of papers I originally organized at the 1998 meeting of the Association of American Geographers in Boston.)

    - "Moral Order, Language, and the Failure of the 1930 Recreation Plan for Los Angeles County" *Planning Perspectives* 16(4): 333-356

**2000** - "Belonging not Containing: The Vision of Bioregionalism" *Landscape Journal* 19(1): 46-49

**2000** - "Camping In America: From 1869 to the Present" *Arroyo View* 12(2): 9

**1998** - "From Manure to Steam: The Transformation of Greenhouse Heating In the United States, 1870-1900" *Agricultural History* 72(3): 574-596

**1996** - "Social Reform Through Parks: The American Civic Association's Program for a Better America" *Journal of Historical Geography* 22(4): 460-472

**1995** - "Modern Urban parks" *Geographical Review* 85(4): 544-560

    - "`I am my own authority': the landscape gardening of William Frederick Poppey" *Journal of Garden History* 15(4): 226-230

    - "Modern Cities and Nature" *The Society for Philosophy and Geography Newsletter* 1(2): 4-5

**1994** - "Trees, The Park, and Moral Order: The Significance of Golden Gate Park's First Plantings" *Journal of Garden History* 14(3): 158-170

**1993** - "San Francisco's Golden Gate Park and the Search for a Good Society, 1865-1880" *Forest and Conservation History* 37(1): 4-13

Periodicals – Online

**2022** – "Outdoor Imaginaries: The Emergence of Camping in Modern America" *Mondes du Tourisme* 21: http://journals.openedition.org/tourisme/4790

**2020** – "Pandemics & Public Lands" *National Parks Traveler* (August 26): https://www.nationalparkstraveler.org/2020/08/essay-pandemics-public-lands

**2018** – "E.P. Meinecke and the Development of the Modern Auto Campground" *IdeAs - Idées d'Amériques* 12(Automne/Hiver): https://journals.openedition.org/ideas/3502

    – "Why Americans Invented the RV" in *What It Means to be American*: *A Conversation Hosted by the Smithsonian and Arizona State University* (September 4). Available at: http://www.zocalopublicsquare.org/2018/09/04/americans-invented-rv/ideas/essay/

**2017** – "The Religious Roots of America's Love for Camping" *What It Means to be American*: *A*

3

*Conversation Hosted by the Smithsonian and Arizona State University* (October 12).  Available at: http://www.whatitmeanstobeamerican.org/encounters/the-religious-roots-of-americas-love-for-camping/

**2003** – "It's Not As Complicated As People Think*" LA Forum for Architecture and Urban Design Online Newsletter 5: Constructing Nature* (Spring 2003).  Available at: http://www.laforum.org/programs/pub/forum_issue_5_parks

Periodical – Special Issue Edited

**2007** – "US Parks and Protected Areas" for *Historical Geography* 35: 5-213 (co-edited with Lary Dilsaver)

**2000** - "Bioregionalism and Its Influence in Europe and the United States" for *Landscape Journal* 19(1, Spring): 46-88

Books – Authored

**2017** – *Heading Out: A History of American Camping*, Cornell University Press (Winner of the American Association of Geographers' J.B. Jackson Prize for 2018; Winner of the Western History Association's Hal K. Rothman Prize for 2018)

**2004 –** *Building San Francisco's Parks: 1850-1930,* The Johns Hopkins University Press

Books – Edited

**2002 -** *The Landscapes of Theme Parks: Antecedents and Variations*, Terence Young and Robert Riley, eds., Dumbarton Oaks Library and Research Center Press

Reports – Authored

**2000** - *Creating Community Greenspace: A Handbook for Developing Sustainable Open Spaces in Central Cities*, The California League of Conservation Voters-Education Fund: Los Angeles, CA

Book Chapters

**2018** – "Frederick Law Olmsted's Abandoned San Francisco Park Plan" in *The American Environment Revisited: Environmental Historical Geographies of the U.S.* (Lanham: Rowman & Littlefield), 145-160

**2014** – "The Passionate Geographer" in *North American Odyssey: Historical Geographies for the Twenty-first Century* (Lanham: Rowman & Littlefield), 315

**2008** – "Urban Parks, Leisure and the Good Society" in *Loisir et Liberté en Amérique du Nord*, P. Lagayette, Editor (Paris: Université Paris-Sorbonne, Paris IV), 59-71

**2006** – "Four Visions of Nature Conservation and Democracy in the United States" in *Naturschutz und Demokratie!?*, J. Wolschke-Bulmahn and G. Groening, Editors (Hannover, Germany: Centre of Garden Art + Landscape Architecture), pp. 215-220

**2004** - 'Historical Geography of the Environment' in *Geography in America at the Dawn of the 21st Century*, C. Wilmott and G. Gaile, Editors (NY: Oxford University Press), pp. 153-154

**2002** - "Grounding the Myth: Theme Park Landscapes in an Era of Commerce and Nationalism" in *The Landscapes of Theme Parks: Antecedents and Variations,* T. Young and R. Riley, Editors. (Washington: Dumbarton Oaks Library and Research Center), pp. 1-10

**2002** - "Virtue and Irony in a U.S. National Park" in *The Landscapes of Theme Parks: Antecedents and*

4

*Variations,* T. Young and R. Riley, Editors. (Washington: Dumbarton Oaks Library and Research Center), pp. 155-179

**1999** - "Confronting Sustainability" in *Sustainable Landscape Design In Arid Climates*, William O'Reilly, Ed. (Geneva: The Aga Khan Trust for Culture), pp. 6-9
Encyclopedia Entries:

**2001** -"Urban Parks" in *The Oxford Companion to United States History*, P. Boyer, Editor In Chief (New York: Oxford University Press), p. 582

**1998** - "Golden Gate Park" in *Encyclopedia of Urban America: Cities and Suburbs*, Two Volumes, N.L. Shumsky, editor (ABC-Clio Publishing), p. 328

Book Reviews:

**2021** – *Camping Grounds: Public Nature in American Life from the Civil War to the Occupy Movement* by Phoebe S.K. Young for H-Environment, URL: https://www.h-net.org/reviews/showrev.php?id=56824

**2018** – *On the Trail: A History of American Hiking* by Silas Chamberlin for *Agricultural History* 92(3): 439-440

**2017** – *Trout Culture: How Fly Fishing Forever Changed the Rocky Mountain West* by Jen Corrinne Brown for *Environmental History* 22: 180-182

**2015** – *Inventing Stanley Park: An Environmental History* by Sean Kheraj for *Pacific Historical Review* 84: 97-98

**2014 –** *Vacationland: Tourism and Environment in the Colorado High Country* by William Philpott for *Environmental History* 19: 589-590

**2013** – *Observation Points: The Visual Poetics of National Parks* by Thomas Patin, Ed. for *Journal of Historical Geography* 42: 220

**2011** – *Campsite: Architecture of Duration and Place* by Charlie Hailey for *Geographical Review* 101(3): 467-469

    – *Pilgrims of the Vertical: Yosemite Rock Climbers and Nature at Risk* by Joseph E. Taylor III for *Journal of Historical Geography* 37: 511-512

**2010** – *A Marvelous Hundred Square Miles: Black Hills Tourism, 1880-1941* by Suzanne Barta Julin for *Environmental History* 15(4): 788-789

**2008** – *National Park, City Playground: Mount Rainier National Park in the Twentieth Century* by Theodore Catton for *Environmental History* 13(2): 376-377

**2007** – *The Invention of the Park: From the Garden of Eden to Disney's Magic Kingdom* by Karen R. Jones and John Wills for *Journal of Cultural Geography* 24(2): 113-114

**2006** – *Cumberland Island National Seashore: A History of Conservation Conflict* by Lary M. Dilsaver for *Geographical Review* 96(2): 322-325.

**2004** – *Republic of Shade: New England and the American Elm* by Thomas J. Campanella for *Environmental History* 9(4): 741-2

**2001** - *Enduring Roots: Encounters with Trees, History, and the American Landscape* by Gayle

5

1177

Brandow Samuels for *Planning Perspectives* 16(4): 409-410

**2001**- *The Los Angeles River: Its Life, Death, and Possible Rebirth* by Blake Gumprecht for *Technology and Culture* 42(2): 361-363

- *How the Canyon Became Grand* by Stephen Pyne for *Professional Geographer* 53(1): 132-134

**2000** - *The World of André Le Nôtre* by Thierry Mariage for *Geographical Review* 90(3): 133-34

**1997** - *Invented Cities* by Mona Domosh for *Annals of the Association of American Geographers* 87(3): 539-540

**1996** - *Southern California Gardens* by Victoria Padilla for *Journal of Garden History* 16(3): 225-226

**1995** - *The American Environment: Interpretations of Past Geographies*, edited by Lary M. Dilsaver and Craig E. Colten for *Journal of Historical Geography* 21(1): 105-107

- *The Ecological City: Preserving and Restoring Biodiversity*, edited by Rutherford H. Platt, Rowan A. Rowntree, and Pamela C. Muick for *The Annals of the Association of American Geographers* 85(2): 395-397

- *Geography and the Human Spirit* by Anne Buttimer for *Environment and Planning A* 27(11): 1865-1866

**1993** - *Hard Places: Reading the Landscape of America's Historic Mining Districts* by Richard V. Francaviglia for *Technology and Culture* 34: 422-424

Websites-Co-authored:

**2004** – "Pomona Valley: Assessing Natural Boundaries and Greenspace" by Montgomery McIntosh, Terence Young, and Richard Worthington at http://www.csupomona.edu/~tgyoung/Pomona_valley/pvindex.htm

## EXHIBITS CURATED

**1997** - "Urban Parks in America" Studies In Landscape Architecture, Dumbarton Oaks, Washington DC

**1996** - "Le Jardin d'Anglais" Studies In Landscape Architecture, Dumbarton Oaks, Washington DC

## TELEVISION APPEARANCES

**2000** - "Camping Technology" on *Modern Marvels*, The History Channel, June 5.

## RADIO APPEARANCES

**2011** – Discussant about "The Parks of San Francisco: What's in Store for our Urban Oases" on "City Visions Radio" at KALW – 91.7 FM, San Francisco, California, January 24

## PODCASTS

**2021** – "William Coffin Coleman and The History of the Coleman Company" on The RV Atlas, June 25, available at: https://thervatlas.com/podcast/william-coffin-coleman-and-the-history-of-the-coleman-company/

**2020** – "Pandemics & the National Parks" on National Parks Traveler, August 23, available at:

6

https://www.nationalparkstraveler.org/podcast/2020-08-23-national-parks-traveler-episode-80-pandemics-and-national-parks

**2019** – "Heading Out: A History of American Camping" on Writing Westward Podcast, March 8, available at: http://reddcenter.byu.edu/Blogs/redd-center-blog/Post/writing-westward-podcast-episode-007---terenc

**2017** – "Heading Out: The History of Camping" on The Art of Manliness, August 3, available at: http://www.artofmanliness.com/2017/08/03/podcast-327-heading-history-camping/

## ADMINISTRATION

**2000-2002** - Project Manager, Environmental Sciences, Policy and Engineering Sustainable Cities Program, University of Southern California, Los Angeles.  I was responsible for the administration and timely completion of "Toward a Sustainable Los Angeles: 'A Nature Services' Approach," a $380,000 grant to investigate the applicability of an environmental GIS (CITYgreen) to the urbanized landscape of Southern California as well as its usefulness as a tool in Public Participation Planning in an older, densely populated, ethnically diverse neighborhood.  Funding came from the Haynes Foundation of Los Angeles.

**1996-1997** - Acting Director, Studies in Landscape Architecture, Dumbarton Oaks, Harvard University. This research program is one of three at Dumbarton Oaks.  It is international in scope with its focus on the critical and historical study of landscape.  I was responsible for the department to Dumbarton Oaks's Director.  Among other things, my duties included public and professional contacts, supervising a staff of four (two librarians, an administrative assistant, and a departmental assistant), selecting and supervising research fellows, public and professional outreach, budgeting, purchase of more than 900 rare and contemporary monographs, treatises, prints, and journals, developing museum exhibitions, organizing and moderating four one-day conferences (one in collaboration with the National Gallery and the Aga Khan Trust for Culture, and one with the American Institute for Contemporary German Studies) and one two-day conference, and editing a scholarly monograph of the presentations at the two-day conference.

## TEACHING

Undergraduate:
Biogeography
California
Cultural Geography
Cultural Geography of the Environment
Ethnicity in the American City
Environmental Geography
Geographical Foundations (History and Philosophy of Geography)
Geography of Cultural and Historical Landscapes
Geography of US and Canada
Geography of World Cities
Historical Geography (Upper-Division introductory course)
Historical Geography: Diffusion of Europeans and their Environments
Introduction to Geography (Physical and Human)
Introduction to Human Geography
Introduction to Cultural Geography
Introduction to Physical Geography
Parks and Protected Areas
Protected Areas in a Regenerative World (Regenerative Studies Program)
Tourism in a Globalizing World
Urban Geography
World Regional Geography

7

Graduate:
Historical Geography of the United States
Protected Areas in a Regenerative World (Regenerative Studies Program)
Regenerative Concepts and Social Practices (Regenerative Studies Program)
Topics in Geography: Camping in America
Urban Geography: Utopianism in American Urban Planning

Post-graduate:
US National Parks, Forests and other protected areas – An Overview
Social & Legislative Aspects of US National Parks & Forests

**2005** – "Sustainable Tourism" at School for Hospitality and Tourism, Bulawayo Polytechnic University, Bulawayo, Zimbabwe, May 2-4

**AWARDS & GRANTS**

Awards

**2018** – J.B. Jackson Prize from the American Association of Geographers for *Heading Out: A History of American Camping* published by Cornell University Press

- Hal K. Rothman Prize from the Western History Association for *Heading Out: A History of American Camping* published by Cornell University Press

Fellowships

**2005-2006** – Lyle Center Faculty Fellowship, California State Polytechnic University, Pomona ($4,500)

**2001** - Huntington Fellowship, The Huntington Library, Art Collections, and Botanical Gardens, San Marino, CA (five months @ $2,000/mo.)

**1999** - W. M. Keck Foundation and Andrew W. Mellon Foundation Fellow, The Huntington Library, Art Collections, and Botanical Gardens, San Marino, CA (two months @$2,300/mo.)

**1995-1996** - Postdoctoral fellow, National Museum of American History, Smithsonian Institution, Washington, DC (twelve months)

**1991-1992** - Postdoctoral fellow, Dumbarton Oaks Library and Research Center, Harvard University, Washington, DC (Fall Semester)

Grants

**2021** – California State University Emeritus and Retired Faculty & Staff Association, Research Grant of $600.00 for Travel to Washington, DC.  Title: "The African Student Program, 1961-1969."

**2013** – Association of American Geographers, Research Grant of $1,000.00 for travel to Washington, DC and Yellowstone National Park.  Title: "US National Park Service Cooperation with Canada and In Africa."

**2008 – 2018 –** US National Park Service, Park History Program, Washington, DC – Volunteers in Parks Program – $4,600.00 and continuing for travel and research expenses.  Titles: "International Cooperation and the National Park Service" and "Yosemite State Park and the US National Parks"

**2008-2009** - California State Polytechnic University – Pomona, Research, Scholarship, and Creative Activities Grant of $4,736.00 for one course release to compose a scholarly article for a journal *Environmental History*. Title: "The Smooth Way to Rough It: Pilgrimage, McDonaldization and the Evolution of

8

Camping Equipment."

**2008-2009** - California State Polytechnic University – Pomona, Faculty Professional Development Mini-grant of $400.00 to travel to a conference: American Society for Environmental History, Presentation title: "'A Clearer Picture of this Country': Airstream Trailers and the (Re)Discovery of America"

**2007-2008** – California State Polytechnic University – Pomona, International Center Faculty Travel Grant of $1,000.00 to travel to a conference: Common Ground, Converging Gazes: Integrating the Social and Environmental in History in Paris, France, Presentation title: "Going Home to Wilderness: Nature, Camping and American Sustainability"

**2007-2008** - California State Polytechnic University – Pomona, Faculty Professional Development Mini-grant of $600.00 to travel to a conference: Designing the Parks, Presentation title: "E.P. Meinecke and the Modernization of Autocamping"

**2005-06** - California State Polytechnic University – Pomona, Faculty Professional Development Mini-grant of $1,250.00 to support research travel, Title: "William J. Trent, jr. and The Struggle to Eliminate Segregated Campgrounds in U.S. National Parks."

**2006** – Benson Ford Research Center, The Henry Ford, Dearborn, MI – Clark Travel to Collections Grant of $1,200.00 to support travel to and research at the Research Center.

**2005** – The Adirondack Museum, Blue Mountain Lake, NY – Warder and Julia Cadbury Research Grant of $1,500.00 and housing to support travel to and research at the museum.

**2004-05** - California State Polytechnic University – Pomona, Faculty Professional Development Mini-grant of $2,000.00 to support research travel, Title: "William H.H. Murray and the origins of American camping."

**2004-05** - California State Polytechnic University – Pomona, Research, Scholarship, and Creative Activities Mini-grant of $4,276.00, Title: "The Garage in the Forest: E.P. Meinecke and the Origin of the Auto Campground."

**2003-04** - California State Polytechnic University – Pomona, Faculty Professional Development Mini-grant of $800.00 to support research travel, Title: "E.P. Meinecke's Modern Auto Campground"

**2002-03** - California State Polytechnic University – Pomona, Faculty Professional Development Mini-grant of $560.00 to support research travel, Title: "A Campground Policy: E.P. Meinecke and the Development of the American Campground"

**2002-03** - California State Polytechnic University – Pomona, Academic Affairs Research Mini-grant of $3,568.00, Title: "Culture, History, & Environmental Management in a U.S. National Park"

**2003** – Pomona College – Mellon Professional Activities Grant of $2,900.00, Title: "Pomona Valley Greenspace"

**1999** - Association of American Geographers Research Grant of $500.00 for field photographs.  Title: "Camping in America."

**1998** - An Association of American Geographers Annual Meeting Enrichment Grant of $400.00 to defray the participation expenses of Professor Edward Casey (Philosophy, SUNY-Stony Brook) in the Annual Meeting of the AAG in Boston, Massachusetts

    - A Cultural Geography Specialty Group (AAG) Grant of $250.00 to defray the participation expenses of Professor Edward Casey (Philosophy, SUNY-Stony Brook) in the Annual Meeting of the AAG in Boston, Massachusetts

9

- An Historical Geography Specialty Group (AAG) Grant of $250.00 to defray the participation expenses of Professor Edward Casey (Philosophy, SUNY-Stony Brook) in the Annual Meeting of the AAG in Boston, Massachusetts

**1997** - A Graham Foundation Grant of $5,875.00 for travel, map production, photo reproduction, and permissions in preparation for the publication of *Building San Francisco's Parks, 1850-1930*

**1994** - A National Endowment for the Humanities Faculty Development Grant of $544.00 for travel to present a paper at the biannual meeting of the American Society for Environmental History in Las Vegas, Nevada

- Association of American Geographers Research Grant of $500.00 for travel to collections and photo reproductions.  Title: "The American Civic Association and the U.S. National Parks, 1900-1940"

**1993** - A National Endowment for the Humanities Faculty Development Grant of $1,000.00 for electronic database searches, photo reproductions and travel to collections.  Title: "The American Civic Association and the U.S. National Park Service, 1900-1940"

- A National Endowment for the Humanities Faculty Development Grant of $1,527.00 to travel to collections.  Title: "Country for the City: The Urban Motivations for National Parks"

- Clemson University Teaching Award Grant of $1,860.00 to purchase equipment for Geography laboratories

**1992** - Clemson University Library Grant of $1,200.00 for Humanities Acquisitions in Geography

Sabbatical Leave

**2013-2014** – California State Polytechnic University, Pomona to research and write three professional articles about wilderness and international cooperation

**2006-2007** – California State Polytechnic University, Pomona to research and write *Heading Out: American Camping Since 1869*

**CONFERENCES ORGANIZED**

**1998** - "Environmentalism in Landscape Architecture," a two-day symposium at Dumbarton Oaks, Washington DC

- "Designing Nature: Landscape Architecture in the U.S. National Parks" a one-day conference at Dumbarton Oaks, Washington, DC

- "Modernism and the Pastoral" a one-day conference at Dumbarton Oaks, Washington, DC

**1997** - "Perspectives on the Study of Garden History," a two-day symposium at Dumbarton Oaks, Washington DC

- "The Landscapes of Suburbia" a one-day conference at Dumbarton Oaks, Washington, DC

- "Bioregionalism and Its Influence in Europe and the United States" a one-day conference at Dumbarton Oaks, Washington, DC (co-organized with the American Institute for Contemporary German Studies, Washington, DC)

-"Landscape Architecture and the Health of the Public" a one-day conference at Dumbarton Oaks,

10

Washington, DC

**1996** - "Sustainable Landscape Design in Arid Climates" a one-day roundtable at Dumbarton Oaks, Washington, DC (co-organized with The Center for Advanced Studies in the Visual Arts/National Gallery of Arts, Washington, DC and the Aga Khan Trust for Culture, Geneva, Switzerland)

**PRESENTATIONS**

Papers:

**2022** – Annual Meeting of the Association of Pacific Coast Geographers, Bellingham, WA, ?????: AFRICAN STUDENT PROGRAM OUTCOMES?  WHO AFFECTED…

– Annual Meeting of the European Society for Environmental History, Bristol, UK, July 4: "'Nature is not something optional': Essentialism and the History of American Urban Greening" (presented via Zoom)

– Annual Meeting of the American Society for Environmental History, Eugene, OR, March 26: "An Appreciation for Conservation and Wildlife Management": The National Park Service's African Student Program, 1961-1965"

– Annual Meeting of the American Association of Geographers, New York, NY, February 25: "The Potential African Leaders of Tomorrow": The National Park Service's African Student Program, 1961-1965 (presented via Zoom)

**2021** – Annual Meeting of the American Association of Geographers, Seattle, WA, April 8: "Essential Nature: Biophilia and the Greening of American Cities" (presented via Zoom)

**2019** – Annual Meeting of the Western History Association, Las Vegas, Nevada, Friday, October 18: "'To Keep in Touch with the Real America': The Wally Byam Foundation's Trailer-Camping Program of National Discovery and Re-Discovery"

**2018** – Annual meeting of the American Association of Geographers, New Orleans, LA, April 10: "'Nature is not something optional': Biophilia, Essentialism, and the Greening of American Cities"

– Annual meeting of the American Society for Environmental History, Riverside, CA, March 17: "'Nature is not something optional': Biophilia, Essentialism, and the Greening of American Cities"

**2017** – Annual meeting of the Association of Pacific Coast Geographers, Chico, CA, October 27: "'The Most Elaborate and Valuable Apparatus': Transnational Politics and the Linking of Canadian and American Park Agencies"

– Annual meeting of the American Association of Geographers, Boston, MA, April 7: Roundtable in honor of Nicholas Entrikin

– Annual meeting of the American Association of Geographers, Boston, MA, April 7: "For what did Lavoy Finicum die?"

– Biennial meeting of the George Wright Society, Norfolk, VA, April 3: "Yosemite and the Origins of America's National Parks"

**2016** – Annual meeting of the Association of Pacific Coast Geographers, Portland, OR, October 7: "Yosemite and the Origins of America's National Parks"

– Annual meeting of the American Association of Geographers, San Francisco, CA, April 1: "*In*

11

1183

*Media Res*: California as National Park-State Park Intersection"

**2015** – Annual meeting of the Association of Pacific Coast Geographers, Palm Springs, CA, October 23: "Christian Nationalism and the Antimodern Origins of the Pacific Crest Trail"

– Triennial meeting of the International Conference of Historical Geographers, London, United Kingdom, July 6: "Frederick Law Olmsted's Abandoned San Francisco Park Plan"

– Biennial meeting of the George Wright Society, Oakland, CA, March 30: "Renewing Our Faith and Ideals: Christian Nationalism and the Origins of the Pacific Crest Trail"

– Annual meeting of the American Society for Environmental History, Washington, DC, March 21: "'An Outstanding Feature of Our Relations': The Melding of Canadian and US Park Management after World War II"

**2013** – Annual meeting of the Association of American Geographers, Los Angeles, CA, April 9: "'To Think and Feel and Become Sanctified': Camping as American Pilgrimage"
– Biennial meeting of the George Wright Society, Denver, CO, March 11: "'The Illusion of Wildness' in America's Automobile Campgrounds"

**2012** – Annual meeting of the Association of American Geographers, New York, NY, February 25: "'The Cord that Binds the Necklace': The Development and Meaning of the Pacific Crest Trail"

**2011** – Annual meeting of the Association of Pacific Coast Geographers, San Francisco, CA, October 1: "Renewing Our Faith and Ideals: Pacific Crest Trail as Sacred Path"

– Biennial meeting of the European Society for Environmental History, Turku, Finland, June 28: "Exporting Yellowstone: The Office of International Affairs and the US National Park Service's Diffusion of Park Management around the World"

– Annual meeting of the American Society for Environmental History, Phoenix, AZ, April 17: "'I Am Especially Interested in Yellowstone and Glacier': NPS Interactions with Canada and the World"

– Annual meeting of the Association of American Geographers, Seattle, WA, April 13: "'I Am Especially Interested in Yellowstone and Glacier': Diffusing America's National Park Management to Canada and the World"

– Biennial meeting of the George Wright Society, New Orleans, LA, March 15: "Exporting Yellowstone: The Office of International Affairs and the US National Park Service's Diffusion of Park Management around the World"

**2010** – Annual meeting of the Association of American Geographers, Washington, DC, April 16: "The Authenticity of Backpacking"

– Annual meeting of the American Society for Environmental History, Portland, OR, March 11: "Backpacking as Authentic Reconnection to Nature"

**2009** – Annual meeting of the Social Science History Association, Long Beach, CA, November 12: "Smoothing Out the Roughness: McDonaldization and the Evolution of Camping Equipment"

– Faculty Seminar in Regenerative Studies, John T. Lyle Center for Regenerative Studies, California Polytechnic State University – Pomona, November 7: "In Gaia's Garden: Reflections on John Lyle's Approach to Protected Areas"

– Annual meeting of the Association of Pacific Coast Geographers, San Diego, CA, October 2: "Smoothing Out the Roughness: Modernity and the Development of Camping Equipment"

12

1184

– Annual meeting of the Association of American Geographers, Las Vegas, NV, March 24: "'A Clearer Picture of this Country': Trailering to (Re)Discover America"

– Annual meeting of the American Society for Environmental History, Tallahassee, FL, February 26: "'A Clearer Picture of this Country': Airstream Trailers and the (Re)Discovery of America"

**2008** – Common Ground, Converging Gazes: Integrating the Social and Environmental in History, École des Haute Études en Sciences Sociales, Paris, France, September 12: "Going Home to Wilderness: Parks, Camping and a Sustainable American Society"

– Annual meeting of the Association of American Geographers, Boston, MA, April 18: "'A Contradiction in Democratic Government': W.J. Trent and the Struggle to Desegregate National Park Campgrounds"

– Annual meeting of the American Society for Environmental History, Boise, ID, March 14: "Liberalizing Local Society: W.J. Trent, Jr. and the Fight to Desegregate National Park Campgrounds"

**2007** – Annual meeting of the Association of Pacific Coast Geographers, Long Beach, CA, October 20: "Seeing God in the Original: William H.H. Murray and the Origin of American Camping"

**2006** – Trienniel meeting of the International Conference of Historical Geographers, Hamburg, Germany, August  22: "To See God in the Original: William H.H. Murray and the Origins of American Camping"

– Annual meeting of the Association of American Geographers, Chicago, IL, March 10: "Practical Pilgrimage: How W.H.H. Murray Opened the Adirondacks to Tourism"

**2005** – Annual Meeting of the American Society for Environmental History, Houston, TX, March 19: "Going 'Home' to Wilderness: The Logic of American Camping"

**2004** – Nature Conservation and Democracy?!, Zentrum fur Gartenkunst + Landschaftsarchitektur, Universitat Hannover, Konigswinter, Germany, November 19: "Scene, Setting, System, and Story: Four Visions of Nature Conservation and Democracy in the United States"

- Leisure and Liberty, Universite Paris Sorbonne, Paris France, November 13: "Urban Parks, Leisure and the Good Society"

- Annual Meeting of the American Society for Environmental History, Victoria, BC, April 2: "The Garage in the Forest: E.P. Meinecke and the Modern Auto Campground"

- Annual Meeting of the Association of American Geographers, Philadelphia, PA, March 19: "E.P. Meinecke and the Modern Auto Campground"

**2003** – Annual Meeting of the Association of American Geographers, New Orleans, LA, March 5: "Camping, A Pilgrimage to Nature"

**2002** – Annual Meeting of the Association of Pacific Coast Geographers, San Bernardino, California, October 5: "Nature's Pilgrims: American Camping From 1869 to the 1990s"

- Convivial Design in a Remote-Controlled World, Pomona College, Claremont, CA: "Parks, Playgrounds and Beaches for the Millions"

- Annual Meeting of the Association of American Geographers, Los Angeles, CA: "GIS and Public Participation Planning: Recommendations from Hollywood, California"

13

- Annual Meeting of the American Society for Environmental History, Denver, CO: "Nature's Pilgrims: American Camping from 1869 to 1940"

**2001** - Annual Meeting of the American Society for Environmental History, Durham, NC: "Culture, History, and the Environmental Management of Cades Cove"

**1999** - Biennial Meeting of the Society for American City and Regional Planning History, Washington, DC: "Moral Order, Language, and the Failure of the 1930 Los Angeles Recreation Plan"

**1998** - Roundtable on Landscape Architecture and the National Parks, Studies in Landscape Architecture, Dumbarton Oaks, Washington, DC: "Ritual and Campgrounds in U.S. National Parks"

- Annual Meeting of the Association of American Geographers (AAG), Boston, MA: "Parks, Playgrounds, and Beaches: The Plan for a Healthy and Prosperous Los Angeles"

**1997** - Annual Symposium, Studies in Landscape Architecture, Dumbarton Oaks, Harvard University, Washington, DC: "Down the Garden Past"

- Annual Meeting of the AAG, Fort Worth, TX: "The Ritual of American Camping"

- Biennial Meeting of the American Society for Environmental History (ASEH), Baltimore, MD: "Imagining the Profitable Greenhouse: Heating Adoption and the Florification of the American Urban Landscape"

**1996** - Annual Conference on DC Historical Studies, Washington DC: "The Message of Landscape"

- Annual Meeting of the AAG, Charlotte, NC: "Administration, Development, and Access: The American Civic Association's Motivations for a National Park Service"

- Annual Meeting of the AAG, Charlotte, NC: "Nature as a Source of Goodness" (Panel)

- Annual Symposium, Studies in Landscape Architecture, Dumbarton Oaks, Harvard University, Washington, DC: "Virtue and Irony at Cades Cove"

**1995** - Annual Meeting of the AAG, Chicago, IL: "The American Civic Association and the National Park Service"

- Biennial Meeting of the ASEH, Las Vegas, NV: "Moral Order and the Origins of the National Park Service"

**1993** - Annual Meeting of the AAG, Atlanta, GA: "Viewing the Wilderness, or Recognizing Determinism in Two Environmental Movements"

**1992** - Annual Meeting of the AAG, San Diego, CA: "Creating Nature: The Use of Succession as a Technological Practice"

- Moderator and presenter at a colloquium on the nursery business and landscape architecture presented by Studies in Landscape Architecture, Dumbarton Oaks, Harvard University, Washington, DC. Presentation title: "The Historic Relationship between the Business of Ornamental Horticulture and the Art of Landscape Architecture"

**1991** - Annual Meeting of the AAG, Miami, FL: "From Local to National Parks: The Changing Scale of an American Interpretation of Nature"

14

- Fellows' Series at Dumbarton Oaks, Harvard University, Washington, DC: "`To Recognize the Good in the New:' Technology and Landscape in Nineteenth Century California"

<u>Invited Lectures & colloquia:</u>

**2020** – Keynote Speaker – "Outdoor Imaginaries: Camping in Modern America," Tourist Imaginaries and Mobility in the United States Conference, American Studies Program, University of Versailles Saint-Quentin-en-Yvelines, Versailles, France, February 6

**2019** – "'Roughing It Smoothly': American Autocamping in the Early Twentieth Century," Ohio University, Athens, OH, November 5

   – "Modernity & Nature in America," Dumbarton Oaks Graduate Seminar, Washington, DC, May 21

   – "Heading Out: To Walk in the Woods" at the Huntington Westerners, Pasadena, CA, May 4

**2018** – "'Roughing It Smoothly': The Appeal and Aftereffects of American Autocamping" at Montana State University, November 1

   – "'Roughing It Smoothly': The Appeal and Aftereffects of American Autocamping" at Idaho State University, October 30

   – "To Feel at Home in the Wild: E.P. Meinecke's Modern Autocampground" at Dumbarton Oaks, Washington, DC, October 17

   – "Heading Out: To Walk in the Woods" at the Historical Society of Crescenta Valley, La Crescenta, CA, August 20

   – "Heading Out: To Walk in the Woods" at the Pasadena Museum of History's At Home Series, May 22

   – "Three California Connections" at Flintridge Bookstore, La Canada-Flintridge, CA, March 22

**2017** – "Values, Conflicts and America's Protected Lands" at Department of Geography and Environmental Studies, California State University San Bernardino, November 16 (for Geography Awareness Week)

   – "The Value of Parks" in the District Planning and Compliance Course, California State Parks at the California Citrus Historic State Park, Riverside, CA, October 9

   – "Fashionable Twaddle": Murray's Rush and America's First Camping Controversy" at the Kelly Adirondack Center, Union College, Schenectady, NY, August 9

   – "Fashionable Twaddle": Murray's Rush and America's First Camping Controversy" for the public lecture series of the Adirondack Experience, Blue Mountain Lake, NY, August 7

   – "Smoothing Out the Roughness: The Evolution of Camping Gear," National Museum of American History, Smithsonian Institution, Washington, DC, August 1

**2014** – "Swept Up in 'Murray's Rush': The Adirondack Beginnings of Camping in America" for the public lecture series of the Adirondack Museum, Blue Mountain Lake, NY, July 28

**2010** – "Camping: Between 'Roughing It' and Comfort" for Ontario Museum of History and Art, Ontario, CA, July 8

15

**2008** – "The Meaning of Golden Gate Park" for the Studio for Urban Projects, San Francisco, CA, October 18

- "Into the Wild: William H.H. Murray and the Beginning of American Camping" for the public lecture series of the Adirondack Museum, Blue Mountain Lake, NY, July 21

– "The Garage in the Forest: E.P. Meinecke's Modern Campground Program" for the Western History Workshop, Autry Center for the American West, Los Angeles, CA, February 7

**2007** – "Sequoias, Cars and the Transformation of Camping" for the California Historical Society, San Francisco, CA, December 6

– "Into the Wild" for the North American Environmental History Seminar, Huntington Library, San Marino, CA, March 10

**2006** – "Camping as American Palliative" for John Lyle Center for Regenerative Studies, Cal Poly Pomona, May 25

– "'A Recreation Ground for the Citizens': Frederick Law Olmsted's Abandoned San Francisco Park Plan" for California Studies Association, UC Berkeley, CA, April 20

- "A Park System for National Reform" for Pilgrim Congregational Church, Pomona, CA, February 7

**2005** – "German Influences on the Nineteenth-Century Greenspace of San Francisco" for the German Historical Institute and Bavarian American Academy, Munich, Germany, June 17

– "A Park System for National Reform" for Ontario Museum of History and Art, Ontario, CA, May 25

**2004** – "Building San Francisco's Parks" for Strybing Arboretum at the Conservatory of Flowers, Golden Gate Park, San Francisco, March 4

**2003** – "Liberty, Nature, and Public Places in the Writings of Alexis de Tocqueville and Frederick Law Olmsted", a Liberty Fund colloquia, Oak Park, Illinois, October 23-26, which came with a $900.00 stipend and all expenses paid.

- "Historical Geography of San Francisco's Parks" for California Council for the Humanities, San Francisco, CA, June 25

- "How Did We Get Here?: A Brief History of American Park Design" in Going Native: Planning and Maintaining Parks for a Changing Los Angeles, a conference organized by the USC Center for Sustainable Cities for the Los Angeles Department of Recreation and Parks, May 14

**2001** – San Gabriel Valley Council of Governments, Industry, CA

- Sierra Club, Angeles Chapter, West Los Angeles Group

**2000** - Department of Geography, University of Southern California

- Interdisciplinary Studies, California State University-Dominguez Hills

- Sierra Club, Angeles Chapter, Pasadena Group

- Sierra Club, Angeles Chapter, Palos Verdes/South Bay Group

16

- Historic Preservation Program, University of Southern California

**1999** - University of California, Los Angeles, California Geographic Alliance, Institute for Teaching Advanced Placement Human Geography

- California State University-Hayward, Department of Geography

- Texas A&M University, College Station, Department of Geography

- Clemson University, Department of Parks, Recreation and Tourism Management

**1998** - San Francisco State University, Department of Geography and Human Environmental Studies

**1997** - Louisiana State University, Baton Rouge, Department of Geography and Anthropology

**1996** - University of Delaware, Newark, History Workshop in Technology, Society, and Culture

- Smithsonian Institution, Washington, DC, National Museum of American History

- University of Maryland, College Park, Department of Geography

**1995** - University of Tennessee, Knoxville, Department of Geography

- Clemson University/Tri-County Technical College, Anderson, SC, SCUREF Program in Environmental Education

**1994** - Smithsonian Institution, Washington, DC, National Museum of American History

- University of South Carolina, Spartanburg, Department of Psychology

**1993** - University of South Carolina, Columbia, Department of Geography

- Clemson University, Department of Parks, Recreation, and Tourism Management

**1992** - University of Wisconsin, Madison, Department of Geography

**1991** - University of California, Los Angeles, Folklore and Mythology Program

- University of California, Los Angeles, Department of Geography

Commenter/Discussant

**2019** – Session Title: ""Getting Here: Travel, Capitalism, and Leisure in the Evolving West," Annual Meeting of the Western History Association, Las Vegas, NV, October 18

**2014** – Discussant concerning "925,000 Campsites," an exhibit by Martin Hogue, SUNY-Syracuse at WUHO, Woodbury University's Hollywood Art Gallery, Los Angeles, California, October 5

**2013** – Session Title: "Down and Out in Parks and Protected Areas: Social, Cultural and Historical Approaches," Annual Meeting of the Association of American Geographers, Los Angeles, California, April 10

**2007** – Session Title: "Constructed Nature: Urban Parks as Public Space/Civic Culture – Historical Perspectives," Annual Meeting of the Association of American Geographers, San Francisco, California, April 20

17

**2003** – Session Title: "Prehistoric Landscapes and Finite Resources," Haynes Foundation Conference: A Sustainable Future? Environmental Patterns and the Los Angeles Past, California Institute of Technology, Pasadena, California, September 19.  Available on the web at: http://today.caltech.edu/theater/03_04/la_sustainability/

**2000** - Session Title: "Playing Out-of-Doors between the Wars: The Role of Outdoor Recreation in Re-creating American Nature, 1919-1945," Annual Meeting of the American Historical Association, Chicago, Illinois

**1999** - Session Title: "When You Went to See Nature, What Did You See?," Annual Meeting of the American Society for Environmental History, Tucson, Arizona

Scholarly Fieldtrips

**2007** – "Los Angeles Against the Mountains" at the annual meeting of the Association of Pacific Coast Geographers, Long Beach, California, October 18

  - "The Great Sand Waste: An Historical Look at Golden Gate Park" at the annual meeting of the Association of American Geographers, San Francisco, California, April 19

**SERVICE**

Departmental Assignments

**2010 – 2013** – Departmental Website Administrator

Departmental Committees

**2019** – DRTP member

**2014 – 2020** – Chair, Faculty Presentations

**2014 – 2019** – Chair, Temporary Faculty RTP

**2007- 2009** – Policies and Procedures

**2002-2007** – Computer Lab Committee

**2002-2003** – Ad Hoc Committee on Combining GEO 200 and GEO 461

College Committees

**2012 – 2013, 2014 - 2015** – CLASS RTP Committee

**2003-2006, 2007- 2010** – Curriculum (co-member from our department with Michael Reibel in 2003-04)

**2004-2006** – International Education Committee

University Committees

**2002-2006, 2007 - 2013** – Course Grade Appeals

**2003-2005** – Faculty/Staff Affairs

18

1190

**2002-2003** – Outstanding Staff Awards

Ph.D. Committees

Robert Dye, Department of Parks, Recreation and Tourism Management, Clemson University, Clemson, SC

Kathleen Mengak, Department of Parks, Recreation and Tourism Management, Clemson University, Clemson, SC

M.A./M.S./M.L.A. Committees

Angelica Rocha, Regenerative Studies Program, California State Polytechnic University – Pomona (Co-chair of committee) (MS awarded 2019)

Norma Saldana, Regenerative Studies Program, California State Polytechnic University – Pomona (MS awarded 2019)

Crystal Weintrub, Regenerative Studies Program, California State Polytechnic University – Pomona (MS awarded 2014)

Rachel Boldt (nee Camp), Regenerative Studies Program, California State Polytechnic University – Pomona (Chair of committee) (MS awarded 2012)

April Garbat, Department of Landscape Architecture, California Polytechnic State University – Pomona (MLA awarded 2011)

Jacob Feldman, Regenerative Studies Program, California State Polytechnic University – Pomona (MS awarded 2011)

Martin Hogue, Department of Landscape Architecture, University of Toronto (MLA degree awarded 2010)

Leslie Johnson, Department of Art, California State University – Long Beach (MA degree awarded 2007)

Doug Kent, Regenerative Studies Program, California State Polytechnic University – Pomona (MS degree awarded 2006)

Keith Miller, Department of Geography, California State University – Long Beach (MA degree awarded 2003)

Undergraduate Support

McNair Scholars Program, California State Polytechnic University – Pomona, Advisor for Jennifer Stevens, 2004-2005

McNair Scholars Program, California State Polytechnic University - Pomona, Advisor for Stephanie Marley, 2003-2004

Presentations Organized:

Individuals:

**2017** - Professor Gert Gröning from the Institute for the History and Theory of Design, University of the

19

Arts, Berlin, Germany to present a public lecture at California State Polytechnic University – Pomona entitled "Aspects of the Creation of the Prince Pűckler Estate at Bad Muskau, Germany – A UNESCO World Heritage Site"

   - Professor Brian Pompeii from the California Polytechnic State University, San Luis Obispo to present a public lecture at California State Polytechnic University – Pomona entitled "Unmet needs in a creeping hazard:  The Great California Drought in Tulare County"

**2015** - Professor Gert Gröning from the Institute for the History and Theory of Design, University of the Arts, Berlin, Germany to present a public lecture at California State Polytechnic University – Pomona entitled "Allotment Gardens in Germany"
   - Professor Lary Dilsaver from the University of South Alabama, Mobile, AL to present a public lecture at California State Polytechnic University – Pomona entitled "The Evolving Perception of Arid Lands and the Management of Joshua Tree National Park"

**2003** – Professor Gert Gröning from the Institute for the History and Theory of Design, University of the Arts, Berlin, Germany to present a public lecture at California State Polytechnic University – Pomona entitled, "Nazism and Landscape Architecture, A Strange Connection" as well as studios in the Landscape Architecture Department.  Co-organized with Professor Joan Woodward, Department of Landscape Architecture.

**1998** - Professor Edward Casey from the Department of Philosophy, State University of New York, Stony Brook to give a lecture at the Annual Meeting of the Association of American Geographers, Boston, MA. Professors J. Nicholas Entrikin (Geography, UCLA), Edward Relph (Geography, University of Toronto), and Edward Soja (Urban Planning, UCLA) responded.

**1994** - Professor Gert Groening from the Fachbereich Architektur, Hochschule der Kuenste Berlin, Germany to give a lecture at Clemson University on Nazi ideology and landscape architecture.

Series:

**2010** – "Sustainability and …", An eight week series of speakers during spring quarter for the John T. Lyle Center for Regenerative Studies, California Polytechnic University – Pomona

Group:

**2017** – "People, Politics, and Place in the Historic Shaping of America's Western National Parks" (One session of four speakers and a discussant) at the biennial meeting of the George Wright Society, Norfolk, VA, April 3

**2015** – "The Many Consequences of Seeing 'Nature'" (One session of five speakers) at the biennial meeting of the George Wright Society, Oakland, CA, March 30

**2015** – "The Internationalization of Nature Protection in North America" (One session of four speakers and a discussant) at the annual meeting of the American Society for Environmental History, Washington, DC, March 21

**2013** – "Bargaining with Distant Places: Historical and Cultural Aspects of Real and Virtual Travel" (One session of 4 speakers and a discussant) at the annual meeting of the Association of American Geographers, Los Angeles, CA, April

**2011** – "Seeing the Park in the Trees: Historical Approaches to Parks and Protected Areas" (One session of 5 speakers) co-organized with Yolonda Youngs, Oklahoma State University) at the annual meeting of the Association of American Geographers, Seattle, WA, April 13

20

**2010** – "To Protect and Serve: Explorations into the Nature-Culture Dialectic in America" (Four sessions of 16 speakers co-organized with Yolonda Youngs, Oklahoma State University and Geoff Buckley, Ohio University) at the annual meeting of the Association of American Geographers, Washington, DC, April 16

**2009** – "Parks Gone Wild: Exploring the Boundaries of Nature Protection" (Two sessions of 8 speakers co-organized with Yolonda Youngs, Arizona State University) at the annual meeting of the Association of American Geographers, Las Vegas, NV, March 24

**2008** – "Conversations with the Arch Amenity" (Three sessions of 12 speakers co-organized with Yolonda Youngs, Arizona State University) at the annual meeting of the Association of American Geographers, Boston, MA, April 18
   – "The Shifting Good of National Parks" at the annual meeting of the American Society for Environmental History, Boise, ID, March 14

**2007** – "Going Wild, Going Out of Bounds: Reshaping the American Encounter with Wilderness" (co-organized with Yolonda Youngs, Arizona State University) at the annual meeting of the Association of Pacific Coast Geographers, Long Beach, CA, October 20

   - "North American Parks and Protected Areas" (Three sessions of 12 speakers co-organized with Yolonda Youngs, Arizona State University) at the annual meeting of the Association of American Geographers, San Francisco, California, April 21

**2005** – "Ideology and Recreational Environments" at the annual meeting of the American Society for Environmental History, Houston, Texas, March 19.

**2004** – "Natural Camps, Natural Scenes and Naturists: Popular Environmentalism in the 1930s and Beyond" at the annual meeting of the American Society for Environmental History, Victoria, BC, April 2.

**2003** – "Desire, Escape, Identity, and Relevance: The Allure and (Ab)use of Tourist and Recreational Environments" at the Annual Meeting of the Association of American Geographers, New Orleans, LA, March 5.

**2002** – "Suburbanization in Southern California" at the Annual Meeting of the California Studies Association, San Juan Capistrano, CA

**2002** - "Managing the Rivers and Coast of Southern California" at the Annual Meeting of the California Studies Association, San Juan Capistrano, CA

**2002** - "Toward a Sustainable Los Angeles: A 'Nature's Services' Approach" at the Annual Meeting of the Association of American Geographers, Los Angeles, CA

**1996** - "Accessing America's Parks" at the Annual Meeting of the Association of American Geographers (AAG), Charlotte, NC

**1996** - "The Uses of Nature" at the Annual Meeting of the AAG, Charlotte, NC

**1993** - "Rethinking Environmental Determinism: New Perspectives on a Geographical Taboo" at the Annual Meeting of the AAG, Atlanta, GA

Manuscripts and proposals reviewed for:

*Agricultural History*
*Association of Pacific Coast Geographers Yearbook*
*California History*
Center for American Places/University of Chicago Press

21

*cultural geographies*
*Ecumene*
*Environmental History*
*Gender, Place and Culture*
*Geographical Review*
*GeoJournal*
*Historical Geography*
*Journal of Cultural Geography*
*Journal of Historical Geography*
*Journal of Planning History*
*Journal of Urban Design*
*Land Use Policy*
*Landscape Journal*
*Landscape Research*
Louisiana State University Press
National Science Foundation
*Pacific Historical Review*
*Park Stewardship Forum*
*Philosophy and Geography*
*Society and Space*
*Studies in the History of Gardens and Designed Landscapes*
US National Park Service
University of Massachusetts Press
University of Virginia Press
*Western Historical Quarterly*

Other

**2021-present** – Member, Publications Committee, George Wright Society

**2020-present** –  Vice Chair, Protected Areas Specialty Group, American Association of Geographers

**2013-2017** – Member, Editorial Board, *Environmental History*

**2013-2014** – Local Arrangements Committee for American Society for Environmental History's 2014 annual meeting in San Francisco, CA

**2012-2013** – Local Arrangements Committee for Association of American Geographers 2013 annual meeting in Los Angeles, CA

**2008-2011** – Publications Committee, Association of American Geographers

**2006-2007** – WINGS Advisory Board, Earth Science and Anthropology Department, Los Angeles Valley College, Valley Glen, CA (Project funded by USDA)

**2003-2004** – Program Committee for the 2004 meeting of the California Studies Association, Loyola Marymount University, Westchester, California

**2002-2006** – Steering Committee, California Studies Association

**2002** - Program Committee for the annual meeting of the Association of American Geographers, Los Angeles, California

**2002** - Program Committee for the annual meeting of the California Studies Association, Orange County, California

22

**2001** - Member, Technical Advisors, World of Ecology Exhibition, Los Angeles County Museum of Natural History

**2001** - Program Committee for the annual meeting of the American Society for Environmental History, Durham, North Carolina

**1999 to 2008** - Editorial Board, *Historical Geography*

**1995 to 1999** - Book Review Editor, *Historical Geography*

**1996** - Member, Teller Committee, Association of American Geographers

**1994 to 1998** - Director & Awards Committee Chair, AAG-Cultural Geography Specialty Group

**1993 to 1995** - Bibliographic compiler for the AAG-Historical Geography Specialty Group newsletter, *Past Place*

**1993-1994** - Judge for the AAG-Historical Geography Specialty Group student paper competition

**1993-1994** - Judge for the AAG-Cultural Geography Specialty Group student paper competition

**PROFESSIONAL MEMBERSHIPS**

American Society for Environmental History
American Association of Geographers
Association of Pacific Coast Geographers
European Society for Environmental History
George Wright Society

23

# Attachment 2

Citations

Barzun, Jacques. 1961. Classic, Romantic and Modern, 2nd Ed., Boston: Little, Brown & Co.

Beecher, Henry Ward. 1869. Eyes and Ears, Boston: Fields, Osgood, and Co.

Board of Commissioners. 1858. Minutes of the Proceedings of the Board of Commissioners of the Central Park, for the Year Ending April 30, 1858, New York: Wm. C. Bryant & Co.

Boyer, Paul. 1978. Urban Masses and Moral Order in America, 1820-1920, Cambridge: Harvard University Press.

Cranz, Galen. 2004. "Defining the Sustainable Park: A Fifth Model for Urban Parks" Landscape Journal 23(2): 102-120.

Cutler, Phoebe. 1989. "State Parks" in American Landscape Architecture: Designers and Places, Washington, DC: Preservation Press, 194-199.

Dilsaver, Lary M. 2016a. "An Act Authorizing a Grant to the State of California of the 'Yo-Semite Valley,' and of the land Embracing the 'Mariposa Big Tree Grove." Approved June 30, 1864 (13 Stat. 325)" in America's National Park System: The Critical Documents, 2nd Ed. Lanham: Rowman and Littlefield, 4-5.

1

Dilsaver, Lary M. 2016b. "An Act to Set Apart a Certain Tract of Land Lying Near the Headwaters of the Yellowstone River as a Public Park, Approved March 1, 1872 (17 Stat. 32)" in America's National Park System: The Critical Documents, 2nd Ed. Lanham: Rowman and Littlefield, 20-21.

Dilsaver, Lary M. 2016c. "Secretary Lane's Letter on National Park Management, May 13, 1918" in America's National Park System: The Critical Documents, 2nd Ed. Lanham: Rowman and Littlefield, 35-39.

Engbeck Jr., Joseph H. 1980. State Parks of California, from 1864 to the Present, Portland: C.H. Belding.

Freeman, Raymond L. 1989. "National Parks" in American Landscape Architecture: Designers and Places, Washington, DC: Preservation Press, 172-175.

Graff, M.M. 1985. Central Park-Prospect Park: A New Perspective, New York: Greensward Foundation.

Jefferson, Thomas. 1829 (1787). Notes on the State of Virginia, Boston: Wells & Lilly.

Landrum, Ney. 2004. The State Park Movement in America: A Critical Review, Columbia: University of Missouri Press.

Linden-Ward, Blanche. 1989. "Cemeteries" in American Landscape Architecture: Designers and Places, Washington, DC: Preservation Press, 120-125.

2

Lyle, John Tillman. 1994. Regenerative Design for Sustainable Development, New York: Wiley.

Mackintosh, Barry. 2005. The National Parks: Shaping the System, Rev. Ed., Harpers Ferry: Harpers Ferry Center.

McFarland, J. Horace. 1910. "Are State Parks Worth While?" typed manuscript, J. Horace McFarland Papers, Pennsylvania Historical and Museum Commission, Harrisburg.

McFarland, J. Horace. 1912. "Are National Parks Worth While?" typed manuscript, J. Horace McFarland Papers, Pennsylvania Historical and Museum Commission, Harrisburg.

Novak, Barbara. 1995. Nature and Culture: American Landscape and Painting, 1825-1875, Rev. Ed., New York: Oxford.

Olmsted, Frederick Law. 1990a (1865). "Preliminary Report upon the Yosemite and Big Tree Grove" in The Papers of Frederick Law Olmsted, Volume V: The California Frontier, 1863-1865, VP Ranney, GJ Rauluk, and CF Hoffman, Eds. Baltimore: The Johns Hopkins University Press, 488-516.

Olmsted, Frederick Law. 1990b (1865). "Preliminary Report in Regard to a Plan of Public Pleasure Grounds for the City of San Francisco" in The Papers of Frederick Law Olmsted, Volume V: The California Frontier, 1863-1865, VP Ranney, GJ Rauluk, and CF Hoffman, Eds. Baltimore: The Johns Hopkins University Press, 518-546.

3

Robinson, Charles Mulford. 1909. Modern Civic Art; or, The City Made Beautiful, 3rd Ed., New York: G.P. Putnam's Sons.

Rosenzweig, Roy and Elizabeth Blackmar. 1992. The Park and the People: A History of Central Park, Ithaca: Cornell University Press.

Schuyler, David. 1986. The New Urban Landscape: The Redefinition of City Form in Nineteenth-Century America, Baltimore: The Johns Hopkins University Press.

Schuyler, David and Censer, Jane Turner, Eds. 1992. The Papers of Frederick Law Olmsted, Volume VI: The Years of Olmsted, Vaux & Company, 1865-1874, Baltimore: The Johns Hopkins University Press.

Sellars, Richard West. 1997. Preserving Nature in the National Parks, A History, New Haven: Yale University Press.

Smith, Langdon. 2013. "Democratizing Nature Through State Park Development" Historical Geography 41: 207-223.

Spirn, Anne Whiston. 1984. The Granite Garden: Urban Nature and Human Design, New York: Basic Books.

Thacher, D. 2015. "Olmsted's police" Law and History Review 33(3): 577-620.

Young, Terence. 1996. "Social Reform Through Parks: The American Civic Association's Program for a Better America" Journal of Historical Geography 22(4): 460-472.

4

Young, Terence. 2004. Building San Francisco's Parks, 1850-1930, Baltimore: The Johns Hopkins University Press.

Young, Terence. 2018. "Frederick Law Olmsted's Abandoned San Francisco Park Plan" in The American Environment Revisited, Geoffrey L. Buckley and Yolonda Youngs, Eds. Lanham: Rowman & Littlefield, 145-160.

Young, Terence. 2022. "Outdoor Imaginaries: The Emergence of Camping in Modern America" *Mondes du Tourisme* 21: http://journals.openedition.org/tourisme/4790

5

# Exhibit 135

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

DAVID J. NASTRI, ESQ.     :    3:23-CV-00056 (JBA)
 *Plaintiff,*        :
             :
    v.       :
             :
KATIE DYKES, in her official capacity, :
 *Defendant*       :

**<u>DECLARATION OF SAUL CORNELL</u>**

I, Saul Cornell, declare that the following is true and correct:

1.  I have been asked by the Office of the Attorney General for the State of Connecticut to provide an expert opinion on the history of firearms regulation in the Anglo-American legal tradition, with a particular focus on how the Founding era understood the right to bear arms, as well as the understanding of the right to bear arms held at the time of the ratification of the Fourteenth Amendment to the United States Constitution. In *N.Y. State Rifle & Pistol Association, Inc. v. Bruen*, the U.S. Supreme Court underscored that text, history, and tradition are the foundation of modern Second Amendment jurisprudence. This modality of constitutional analysis requires that courts analyze history and evaluate the connections between modern gun laws and earlier approaches to firearms regulation in the American past. This declaration explores these issues in some detail. Finally, I have been asked to evaluate the law at issue in this case, § 23-4-1 of the Regulations of Connecticut State agencies, particularly regarding its connection to the tradition of firearms regulation in American legal history.

1203

2.      This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

**BACKGROUND AND QUALIFICATIONS**

3.      I am the Paul and Diane Guenther Chair in American History at Fordham University.  The Guenther Chair is one of three endowed chairs in the history department at Fordham and the only one in American history.  In addition to teaching constitutional history at Fordham University to undergraduates and graduate students, I teach constitutional law at Fordham Law School.  I have been a Senior Visiting research scholar on the faculty of Yale Law School, the University of Connecticut Law School, and Benjamin Cardozo Law School.  I have given invited lectures, presented papers at faculty workshops, and participated in conferences on the topic of the Second Amendment and the history of gun regulation at Yale Law School, Harvard Law School, Stanford Law School, UCLA Law School, the University of Pennsylvania Law School, Columbia Law School, Duke Law School, Pembroke College Oxford, Robinson College, Cambridge, Leiden University, and McGill University.[1]

4.      My writings on the Second Amendment and gun regulation have been widely cited by state and federal courts, including the majority and dissenting opinions in *Bruen*.[2]  My scholarship on this topic has appeared in leading law reviews and top peer-reviewed legal history journals.  I authored the chapter on the right to bear arms in *The Oxford Handbook of the U.S. Constitution* and co-authored the chapter in *The Cambridge History of Law in America* on the Founding era and the Marshall Court, the period that includes the adoption of the Constitution and the

---

[1] For a full *curriculum vitae* listing relevant invited and scholarly presentations, *see* Attachment 1 to this declaration.

[2] *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).

1204

Second Amendment.[3] Thus, my expertise not only includes the history of gun regulation and the right to keep and bear arms, but also extends to American legal and constitutional history broadly defined. I have provided expert witness testimony in *Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, No. 14-cv-02850 (D. Colo.); *Chambers, v. City of Boulder*, No. 2018 CV 30581 (Colo. D. Ct., Boulder Cty.), *Zeleny v. Newsom*, No. 14-cv-02850 (N.D. Cal.), and *Miller v. Smith*, No. 2018-cv-3085 (C.D. Ill.); *Jones v. Bonta*, 3:19-cv-01226-L-AHG (S.D. Cal.); *Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.); *Worth v. Harrington,* No. 21-cv-1348 (D. Minn.); *Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB (S.D. Cal.); *Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB (S.D. Cal.). *Renna v. Bonta*, No. 20-cv-2190 (S.D. Cal.); *Boland v. Bonta*, No. 8:22-cv-1421-CJC-ADS (C.D. Cal.); *Rupp v. Bonta*, No. 8:17-cv-746-JLS-JDE (C.D. Cal.); *B&L Productions, Inc. v. Newsom,* No. 21-cv-1718-AJB-DDL (S.D. Cal.); *NAGR v. Campbell*, No. 1:22-cv-11431-FDS (D. Mass.); *NAGR v. Lamont*, No. 3:22-cv-0118 (D. Conn.).

**RETENTION AND COMPENSATION**

5.    I am being compensated for services performed in the above-entitled case at an hourly rate of $750 per hour for reviewing materials, participating in meetings, and preparing reports; $1000 per hour for depositions and court appearances; and a flat fee of $500 per day for travel. My compensation is not contingent on the results of my analysis or the substance of any testimony.

**BASIS FOR OPINION AND MATERIALS CONSIDERED**

6.    The opinion I provide in this report is based on my review of the amended complaint filed in this lawsuit, my review of the law at issue in this lawsuit,

---

[3] Saul Cornell, *The Right to Bear Arms*, in THE OXFORD HANDBOOK OF THE U.S. CONSTITUTION 739–759 (Mark Tushnet, Sanford Levinson & Mark Graber eds., 2015); Saul Cornell & Gerald Leonard, *Chapter 15: The Consolidation of the Early Federal System*, *in* 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 518–544 (Christopher Tomlins & Michael Grossberg eds., 2008).

my education, expertise, and research in the field of legal history. The opinions contained herein are made pursuant to a reasonable degree of professional certainty.

7.    A review of the relevant history demonstrates that firearms have been extensively regulated in modern American parks for as long as these public spaces have existed. The goals of repose, relaxation, and recreation were the defining feature of modern American parks. In contrast to earlier public spaces, including the Boston Common (America's first public park) modern-style parks only merged in the middle of the nineteenth century. Beginning with New York's Central Park, American municipalities, states, and eventually the federal government itself, set aside park lands for  purposes that made it necessary to exclude firearms. Nothing about the subsequent history of these places has changed this fundamental fact. Accordingly, Connecticut's rules prohibiting guns in parks is consistent with the long history of gun regulation in America.

**THE HISTORICAL INQUIRY**

8.    Justice Kavanaugh underscored a key holding of *Heller* in his *Bruen* concurrence: "Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."

9.    One overarching principle regarding firearms regulation does emerge from this period and it reflects not only the common law assumptions familiar to the Founding generation, but it is hard-wired into the Second Amendment itself. As Justice Scalia noted in *Heller*, and Justice Thomas reiterated in *Bruen*, the original Second Amendment was a result of interest balancing undertaken by the people themselves in framing the federal Constitution and the Bill of Rights. Although "freestanding balancing"  by judges is precluded by *Heller*, the plain meaning of the text

4

recognizes a role for regulation explicitly and further asserts that actions inimical to the "security of a free state" fall outside of the scope of the right instantiated in the text.[4]  Thus, from its outset the Second Amendment recognizes both the right to keep and bear arms and the right of the people to regulate arms to promote the goals of preserving a free state.  An exclusive focus on rights and a disparagement of regulation is thus antithetical to the plain meaning of the text of the Second Amendment.  Although rights and regulation are often cast as antithetical in the modern gun debate, the Founding generation saw the two goals as complimentary.

10.    Comparing the language of the Constitution's first two amendments and their different structures and word choice makes this point crystal clear.  The First Amendment prohibits "abridging" the rights it protects.  In standard American English in the Founding era, to "abridge" meant to "reduce."  Thus, the First Amendment prohibits a diminishment of the rights it protects.  The Second Amendment's language employs a very different term, requiring that the right to bear arms not be "infringed."[5]  As explained below, in Founding-era American English, the word "infringement" meant to "violate" or "destroy."  In short, when read with the Founding era's interpretive assumptions and legal definitions in mind, the two Amendments set up radically different frameworks for evaluating the rights they enshrined in constitutional text.  Members of the Founding generation would have understood that the legislature could regulate the *conduct* protected by the Second

---

[4]  *Heller* at 597.

[5] The distinction emerges clearly in a discussion of natural law and the law of nations in an influential treatise on international law much esteemed by the Founding generation:  "Princes who infringe the law of nations, commit as great a crime as private people, who violate the law of nature," J.J. BURLAMAQUI, THE PRINCIPLES OF NATURAL LAW (Thomas Nugent trans., 1753) at 201.  This book was among those included in the list of important texts Congress needed to procure, *see* Report on Books for Congress, [23 January] 1783," *Founders Online,* National Archives, https://founders.archives.gov/documents/Madison/01-06-02-0031.

5

Amendment and comparable state arms bearing provisions as long such regulations did not destroy the underlying *right*.

11.     John Burn, author of an influential eighteenth-century legal dictionary, illustrated the concept of infringement in the context of his discussion of violations of rights protected by the common law.  Liberty, according to Burns, was not identical to that "wild and savage liberty" of the state of nature.  True liberty, by contrast, only existed when individuals created civil society and enacted laws and regulations that promoted *ordered* liberty.  Regulation was the indispensable correlate of rights in Founding era constitutionalism.[6]

12.     Similarly, Nathan Bailey's *Dictionarium Britannicum* (1730) defined "abridge" as to "shorten," while "infringe" was defined as to "break a law."[7]  And his 1763 *New Universal Dictionary* repeats the definition of "abridge" as "shorten" and "infringe" as "to break a law, custom, or privilege."[8]  Samuel Johnson's *Dictionary of the English Language* (1755) defines "infringe" as "to violate; to break laws or contracts" or "to destroy; to hinder."[9]  Johnson's definition of "abridge" was "to shorten" and "to diminish" or "to deprive of."[10]   And Noah Webster's *An American Dictionary of the English Language* (1828) largely repeats Johnson's definitions of "infringe" and "abridge."[11]  Although today these two terms are  conflated by some, the meanings of abridge and infringe were and remain distinct concepts. The

---

[6] *Liberty,*  A NEW LAW DICTIONARY (1792) *See also,* Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 LAW & CONTEMP. PROBS. 31, 32–33 (2020)

[7] *Abridge*, DICTIONARIUM BRITANNICUM (1730).

[8] *Abridge*, NEW UNIVERSAL DICTIONARY (1763).

[9] *Infringe*, DICTIONARY OF THE ENGLISH LANGUAGE (1755).

[10] *Abridge*, DICTIONARY OF THE ENGLISH LANGUAGE (1755).

[11] *Abridge*, *Infringe*, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828).

Founding generation was far more nuanced in distinguishing between the differences between these two terms and modern efforts to recover the original meaning of the scope of the Second Amendment must acknowledge this basic principle rooted in constitutional text.

13.    For the framers, ratifiers, and other relevant legal actors in the Founding era, regulation, including robust laws, was not understood to be an "infringement" of the right to bear arms, but rather the necessary foundation for the proper exercise of that right as required by the concept of ordered liberty.[12]

**CHANGE AND CONTINUITY IN EARLY AMERICAN FIREARMS REGULATION**

14.    Guns have been regulated from the dawn of American history.[13]  At the time *Heller* was decided, there was little scholarship on the history of gun regulation and a paucity of quality scholarship on early American gun culture.[14]  Fortunately, a burgeoning body of scholarship has illuminated both topics, deepening scholarly understanding of the relevant contexts needed to implement *Bruen*'s framework.[15] The common law that Americans inherited from England always acknowledged that the right of self-defense was not unlimited but existed within a well-delineated jurisprudential framework.  The entire body of the common law was designed to

---

[12] Dan Edelstein, *Early-Modern Rights Regimes: A Genealogy of Revolutionary Rights*, 3 CRITICAL ANALYSIS L. 221, 233–34 (2016).  *See generally* GERALD LEONARD & SAUL CORNELL, THE PARTISAN REPUBLIC: DEMOCRACY, EXCLUSION, AND THE FALL OF THE FOUNDERS' CONSTITUTION, 1780s–1830s, at 2; Victoria Kahn, *Early Modern Rights Talk*, 13 YALE J.L. & HUMAN. 391 (2001) (discussing how the early modern language of rights incorporated aspects of natural rights and other philosophical traditions); Joseph Postell, *Regulation During the American Founding: Achieving Liberalism and Republicanism*, 5 AM. POL. THOUGHT 80 (2016) (examining the importance of regulation to Founding political and constitutional thought).

[13] Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & CONTEMP. PROBS. 55 (2017).

[14] *Id.*

[15] Ruben & Miller, *supra* note 19, at 1.

7

preserve the peace and the right of self-defense existed within this larger framework.[16]  Statutory law, both in England and America functioned to further secure the peace and public safety.  Given these indisputable facts, the right to keep and bear arms was never understood to prevent government from enacting a broad range of regulations to promote the peace and maintain public safety.

15.    The response of states  in the early Republic to the emergence of new firearms that threatened the peace was a plethora of new laws.  In short, when faced with changes in technology, consumer behavior, and faced with novel threats to public safety, the individual states enacted laws to address these problems.  In every instance apart from a few outlier cases in the Slave South, courts upheld such limits on the unfettered exercise a right to keep and bear arms.  The primary limit identified by courts in evaluating such laws was the threshold question about infringement: did the law negate the ability to act in self-defense.[17]  In keeping with the clear imperative hard-wired into the Second Amendment, states singled out weapons that posed a particular danger for regulation or prohibition.  Responding in this fashion was entirely consistent with Founding-era conceptions of ordered liberty and the Second Amendment.

16.    The metric used by early American courts drew on the plain meaning of the text of the Second Amendment and its many state analogs.[18]  Regulation and limits were permissible as long as they did not render the right nugatory. Moreover, limits on guns in areas that were sensitive continued to define firearms regulation.

---

[16] Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 L. & CONTEMP. PROBS. 11 (2017).

[17] On southern gun rights exceptionalism, see Eric M. Ruben & Saul Cornell, *Firearms Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J. F. 121, 128 (2015).

[18] *State* v. *Reid,* 1 Ala. 612, 612 (1840).

**THE POLICE POWER AND FIREARMS REGULATION**

17.    The 1776 Pennsylvania Constitution, the first revolutionary constitution to assert a right to bear arms, preceded the assertion of this right by affirming a more basic rights claim: "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same."[19]  The phrase "internal police" had already become common, particularly in laws establishing towns and defining the scope of their legislative authority.[20]  By the early nineteenth century, the term "police" was a fixture in American law.[21]  Thus, an 1832 American encyclopedia confidently asserted that police, "in the common acceptation of the word, in the U. States and England, is applied to the municipal rules, institutions and officers provided for maintaining order, cleanliness &c."[22]  The Founding era's conception of a basic police right located in legislatures was transmuted during the Marshall Court's era into the judicial doctrine of the police power and would become a fixture in American law.

18.    The power to regulate firearms and gunpowder has always been central to the police power and historically was shared among states, local municipalities, and the federal government when it was legislating conduct on federal land and in

---

[19] PA. CONST. OF 1776, Ch. I, art iii.

[20] For other examples of constitutional language similar to Pennsylvania's provision, N.C. CONST. OF 1776, DECLARATION OF RIGHTS, art. II; VT. CONST. OF 1777, DECLARATION OF RIGHTS, art. IV.  For other examples of this usage, *see* An Act Incorporating the residents residing within limits therein mentioned, *in* 2 NEW YORK LAWS 158 (1785) (establishing the town of Hudson, NY); An Act to incorporate the Town of Marietta, *in* LAWS PASSED IN THE TERRITORY NORTHWEST OF THE RIVER OHIO 29 (1791).  For later examples, *see* 1 STATUTES OF THE STATE OF NEW JERSEY 561 (rev. ed. 1847); 1 SUPPLEMENTS TO THE REVISED STATUTES. LAWS OF THE COMMONWEALTH OF MASSACHUSETTS, PASSED SUBSEQUENTLY TO THE REVISED STATUTES: 1836 TO 1849, INCLUSIVE 413 (Theron Metcalf & Luther S. Cushing, eds. 1849).

[21] ERNST FREUND, THE POLICE POWER: PUBLIC POLICY AND CONSTITUTIONAL RIGHTS 2, n.2 (1904).

[22] 10 ENCYCLOPEDIA AMERICANA 214 new edition (Francis Lieber ed.).

buildings.[23]  The adoption of the Constitution and the Bill of Rights did not deprive states of their police powers.  Indeed, if it had, the Constitution would not have been ratified and there would be no Second Amendment today.  Ratification was only possible because Federalists offered Anti-Federalists strong assurances that nothing about the new government threatened the traditional scope of the individual state's police power authority, including the authority to regulate guns and gun powder.[24]

19.    Federalists and Anti-Federalists bitterly disagreed over many legal issues, but this one point of accord was incontrovertible.  Brutus, a leading Anti-Federalist, emphatically declared that "[I]t ought to be left to the state governments to provide for the protection and defense [sic]of the citizen against the hand of private violence, and the wrongs done or attempted by individuals to each other . . . ."[25]  Federalist Tench Coxe concurred, asserting that: "[t]he states will regulate and administer the criminal law, exclusively of Congress."  States, he assured the American people during ratification, would continue to legislate on all matters related to the police power "such as unlicensed public houses, nuisances, and many other things of the like nature."[26]  State police power authority was at its pinnacle in matters relating to guns or gun powder.[27]

---

[23] Harry N. Scheiber, *State Police Power*, in 4 ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 1744 (Leonard W. Levy et al. eds., 1986).

[24] Saul Cornell, THE OTHER FOUNDERS: ANTIFEDERALISM AND THE DISSENTING TRADITION IN AMERICA, 1788-1828 (1999).

[25] Brutus, *Essays of Brutus VII*, reprinted in 2 THE COMPLETE ANTIFEDERALIST 358, 400–05 (Herbert J. Storing ed., 1981).

[26] Tench Coxe, A Freeman, *Pa. Gazette*, Jan. 23, 1788, reprinted in FRIENDS OF THE CONSTITUTION: WRITINGS OF THE "OTHER" FEDERALISTS 82 (Colleen A. Sheehan & Gary L. McDowell eds., 1998).

[27] CORNELL, *supra* note 33.

RECONSTRUCTION AND THE EXPANSION OF STATE POLICE POWER TO REGULATE FIREARMS (1863-1877)

20.    Founding-era constitutions treated the right of the people to regulate their internal police separately from the equally important right of the people to bear arms.  These two rights were separate in the Founding era but were mutually reinforcing:  both rights were exercised in a manner that furthered the goal of ordered liberty.  Reconstruction-era constitutions adopted a new textual formulation of the connection between these two formerly distinct rights, fusing the two together as one single constitutional principle.  This change reflected two profound transformations in American politics and law between 1776 and 1868.  First, the judicial concept of police power gradually usurped the older notion of a police right grounded in the idea of popular sovereignty.  As a result, state constitutions no longer included positive affirmations of a police right.  Secondly, the constitutional "mischief to be remedied" had changed as well.  Constitution writers in the era of the American Revolution feared powerful standing armies and sought to entrench civilian control of the military.  By contrast, constitution writers in the era of the Fourteenth Amendment were no longer haunted by the specter of tyrannical Stuart Kings using their standing army to oppress American colonists.  In place of these ancient fears, a new apprehension stalked Americans:  the proliferation of especially dangerous weapons and the societal harms they caused.

21.    The new language state constitutions employed to describe the right to bear arms enacted during Reconstruction responded to these changed circumstances by adopting a new formulation of the venerable right codified in 1776, linking the right to bear arms inextricably with the states broad police power to regulate conduct to promote health and public safety.[28]  For example, the 1868 Texas Constitution

---

[28] Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America,* 55 U.C. DAVIS L. REV. 65 (2022).

11

included new language that underscored the indissoluble connection that Anglo-American law had long recognized between the right to keep and bear arms and regulation of guns. "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the government, under such regulations as the Legislature may prescribe."[29] Nor was Texas an outlier in this regard. Sixteen state constitutions adopted during this period employed similarly expansive language.[30] Millions of Americans living in the newly organized western states and newly reconstructed states of the former confederacy adopted constitutional provisions that reflected this new formulation of the right to bear arms. Thus, millions of Americans were living under constitutional regimes that acknowledged that the individual states' police power authority over firearms was at its apogee when regulating guns.[31]

22.    This expansion of regulation was entirely consistent with the Fourteenth Amendment's emphasis on the protection of rights and the need to regulate conduct that threatened the hard-won freedoms of recently free people of the South and their Republican allies.

23.    Indeed, the passage of the Fourteenth Amendment was premised on the notion that the individual states would not lose their police power authority to the federal government. The author of Section One of the Fourteenth Amendment, John

---

[29] TEX. CONST. OF 1868, Art. I, § 13; for similarly expansive constitutional provision enacted after the Civil War, *see* IDAHO CONST. OF 1889, art. I, § 11 ("The people have the right to bear arms for their security and defense; but the legislature shall regulate the exercise of this right by law."); UTAH CONST OF 1896, art. I, § 6 ("[T]he people have the right to bear arms for their security and defense, but the legislature may regulate the exercise of this right by law.").

[30] Cornell, *supra* note 28, at 75–76.

[31] Andrew Willinger, *The Territories Under Text, History, and Tradition*, 101 WASH. U. L. REV. (forthcoming, 2023); Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America,* 55 U.C. DAVIS L. REV. ONLINE 65  (2021).

12

Bingham, reassured voters that the states would continue to bear the primary responsibility for "local administration and personal security."[32]

24.    It would be difficult to understate the impact of this new paradigm for gun regulation on post-Civil War legislation.  Across the nation legislatures took advantage of the new formulation of the right to bear arms included in state constitutions and enacted a staggering range of new laws to regulate arms.  Indeed, the number of laws enacted skyrocketed, increasing by over four hundred percent from antebellum levels.[33]  Not only did the number of laws increase, but the number of states and localities passing such laws also expanded.[34]

25.    Henry Campbell Black, the author of *Black's Law Dictionary*, described the police power as "inalienable" and echoed the view of a long line of jurists who noted that the scope of the power was not easily defined and the determination of its limits was best left to courts on a case-by-case basis.[35]  Indeed, even the most ardent critics of the police power, such as conservative legal scholar Christopher G. Tiedeman, acknowledged that "police power of the State extends to the protection of the lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the State."[36]

---

[32] John Bingham, *Speech*, CINCINNATI DAILY GAZETTE (Sept. 2, 1867), as quoted in Saul Cornell and Justin Florence, *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation*, 50 SANTA CLARA L. REV. 1043, 1058 (2010).

[33] *See* Spitzer, *supra* note 37, at 59–61 tbl. 1.

[34] *Id.*

[35] HENRY CAMPBELL BLACK, HANDBOOK OF CONSTITUTIONAL LAW, 334–344 (2d ed., 1897).

[36] CHRISTOPHER G. TIEDEMAN, A TREATISE ON THE LIMITATIONS OF THE POLICE POWER IN THE UNITED STATES 4–5 (1886) (citing *Thorpe v. Rutland R.R.*, 27 Vt. 140, 149-50 (1854)).

13

26.    The laws enacted during Reconstruction underscore the fact that robust regulation of firearms during Reconstruction was not a novel application of the police power, but an expansion and continuation of antebellum practices. Moreover, these efforts illustrated a point beyond dispute: the flexibility inherent in police power regulations of guns.    American states had regulated arms since the dawn of the republic and Reconstruction simply renewed America's commitment to the idea of well-regulated liberty.

## *IN TERROREM*: LIMITS ON PUBLIC CARRY:  FROM THE FOUNDING ERA TO RECONSTRUCTION

27.    In1795, Massachusetts enacted its own version of the ancient English Statute of Northampton. The law forbade anyone who "shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth."[37] This was a common gloss on the Statute of Northampton used in many of the popular English Justice of the Peace manuals of the previous century. It framed the prohibition in terms of traveling with offensive weapons. As was true for all criminal acts in the eighteenth century there was no modern *mens rea* requirement to establish evil intent. The mere act of carrying the prohibited item evidenced the necessary intent needed to prove criminality.  The Massachusetts law invoked the concept of *in terrorem populi*. The terror requirement under Anglo-American law was also shaped by the same common law assumptions.  There was no need to demonstrate that a particular act or actor created a subjective experience of terror, the appropriate legal standard in this period of history was inferred from the prohibited act itself. By violating the King's Peace, and later after the American Revolution, the people's peace, the criminal act inspired terror.[38]

---

[37] Asahel Stearns & Lemuel Shaw, THE GENERAL LAWS OF MASSACHUSETTS 454 (Theron Metcalf ed., 1823).
[38] Cornell, *supra* note 38.

14

28.     The terror requirement under common law, including American common law, has often been read with a modern bias, leading some to assert, erroneously, that only action with specific evil intent was prohibited. This reading is neither consistent with the text of the Statute of Northampton nor later American variants of it.  When read in the context of criminal law norms appropriate to the eighteenth century, the meaning of this legal term of art does not support the modern subjective psychological model of *mens rea* and its focus on actual intent. The notion of intent undergirding criminal law in this period was objective, not subjective. Intent was inferred from the illegal act.  These were crimes against the peace and as such the mere act of arming was the cause of the terror.[39]

29.     In his influential treatise on criminal law, Joe Prentis Bishop summarized the strong continuities between English and American law regarding dangerous weapons. "The same thing has, moreover has been very properly held in the United States; and so here, whether we receive the English statute or not, we hold criminal by our common law the going or riding about armed, with unusual and dangerous weapons, to the terror of the people."[40] The key determinant of legality

---

[39] Mark Anthony Frassetto, *To the Terror of the People: Public Disorder Crimes the Original Public Understanding of the Second Amendment*, 43 S. ILL. U.L. J. 61, 79 (2018).  *See* George Fletcher, RETHINKING CRIMINAL LAW 208 (1978); Guyora Binder, *supra* note 12, at 139–42. Many discussions of the terror requirement read backward from the 19th century subjective standard that eventually emerged and replaced the earlier objective view of *mens rea. See, e.g.*, Eugene Volokh, *The First and Second Amendments*, 109 COLUM. L. REV. SIDEBAR 97, 101 (2009) (erroneously taking the holding in *State v. Huntley*, 25 N.C. 418, 423 (1843), as dispositive of earlier Anglo-American criminal law, using a method that essentially reads history backwards. *Huntley* was part of a broader movement away from this earlier tradition and therefore does not illuminate Founding era ideas.).

[40]    Joel Prentis Bishop, 2 COMMENTARIES ON CRIMINAL LAW 2nd ed. (1859) at 678; John Bouvier 1 A LEGAL DICTIONARY 2nd ed., (1843) at 660. The term dangerous and unusual was not conjunctive, but a Latinate construction familiar to early American lawyers, hendiadys. Thus, the best rendering of the term

according to this view was the probability that a particular weapon would provoke a terror and undermine the peace.

## FIREARM REGULATIONS IN PUBLIC PARKS

30.    There were no modern-style parks in the era of the Second Amendment. The oldest urban public space in America, the Boston Common (1634), was used primarily as a pasture, a place of execution, and site for the militia to muster and drill.[41]  Yet, even when used for militia purposes these public spaces were tightly regulated. Massachusetts prohibited coming to muster with a loaded firearm.[42]

31.    The  Boston commons and  other similar urban spaces during the Founding era shared little with modern parks. There was no need in the sparsely settled colonies to set aside areas for preservation or recreation given that the population of the colonies was expanding rapidly and remained largely hemmed in by various Indian nations reluctant to cede any further territory to Europeans. Moreover, by the time of the adoption of the Second Amendment the nation was still 90% rural and majority of the population was engaged in some type of agricultural pursuit.[43]

---

would be unusually dangerous. For the importance of this concept to Founding era law, see  Bray *supra* note 10.

[41] Steven R.  Pendery, *Probing the Boston Common*  43 ARCHAEOLOGY (1990) at  42–47; Suzanne Scheld et. al,  RETHINKING URBAN PARKS: PUBLIC SPACE AND CULTURAL DIVERSITY (2009) at 19-20; Michael Rawson, . EDEN ON THE CHARLES: THE MAKING OF BOSTON ( 2014) at 73.

[42]  RECORDS  OF  THE  GOVERNOR  AND  COMPANY  OF  THE MASSACHUSETTS BAY IN NEW ENGLAND (1853) at 98 and 1866 Mass. Acts 197, An Act Concerning The Militia, § 120. The prohibition on bringing a loaded gun to muster stretches from 1632 to 1866.

[43] Forrest McDonald, E PLURIBUS UNUM: THE FORMATION OF THE AMERICAN REPUBLIC, 1776-1790, (1965) at 72; Peter C. Mancall, *Economic History of the United States: Precolonial and Colonial Periods* OXFORD RESEARCH ENCYCLOPEDIA OF ECONOMICS AND FINANCE. 26 Apr. 2021; Accessed                24                Mar.                2023.

16

32.    The creation of parks as we now know them began in the middle of the nineteenth century and was influenced by the slow impact of romanticism and the Transcendentalist ideas of visionaries such as Henry David Thoreau.  Parks emerged along side other changes in American society, including urbanization and industrialization. The modern conception of parks as places of relaxation, repose, and recreation gradually inspired a new attitude toward nature and public spaces.  This new  vision inspired urban planners, landscape architects, and government officials to embark upon an ambitious set of policies that led to the creation of new parks across much of the nation.

33.    By the middle of the nineteenth century these new public spaces, best exemplified by New  York's  Central Park,  had become places of refuge from the congestion, grime, and stresses of city life. The creation of large urban public parks in the 1850s posed new challenges for those eager to preserve the peace and public safety: among the pressing issues were  the regulation of firearms.[44]  The expansion of urban parks, the creation of new state parks, and eventually the involvement of the federal government in land preservation intensified in the post-Civil period. All of these ventures drew inspiration from visionaries, most notably Frederick Olmstead, a pioneering American landscape architect, journalist, social critic, and public administrator.[45]

34.    As Table One makes clear millions of Americans, including the entire population of the nation's five largest cities, lived  under a firearms regulatory regime that prohibited firearms in parks.  During the era of the Fourteenth Amendment

---

https://oxfordre.com/economics/view/10.1093/acrefore/9780190625979.001.0001/acrefore-9780190625979-e-480.

[44] Galen Cranz, *The Politics of Park Design: A History of Urban Parks in America* (1989) at 19.

[45] Witold Rybczynski, A CLEARING IN THE DISTANCE: FREDERICK LAW OLMSTED AND AMERICA IN THE NINETEENTH CENTURY (1999).

17

there was little disagreement that state and local governments had the authority under the police power to regulate and prohibit guns in parks.

Table One:  Post Civil War Limits on Public Carry in the Nation's Five Largest Cities:

| Rank | City | Population (1900)[46] | Date of Law | Gun Prohibition in Parks |
|---|---|---|---|---|
| 1 | N.Y. | 3,437,202 | 1858 | X |
| 2 | Chicago | 1,698,575 | 1873 | X |
| 3 | Phila. | 1,293,697 | 1868 | X |
| 4 | St. Louis | 575,238 | 1881 | X |
| 5 | Boston | 560,892 | 1886 | X |

35.     Nor were such bans limited to the nation's largest municipalities.[47]  For example, by 1872, San Francisco had enacted an ordinance prohibiting guns in its parks  in the city of Boulder and St. Paul.[48] Statutes prohibiting possession of arms in these important public spaces were enacted in major urban areas of every region of the nation. As Table One vividly illustrates, limits on arms in public parks was the norm in America in the era of the Fourteenth Amendment.

36.     There was a close connection between the urban park movement and the rise of state parks. Frederick Olmsted, the primary architect behind New York's Central Park,  also took a leading role in the creation of  California's Yosemite State

---

46 1 U.S. CENSUS OFF., CENSUS REPORTS 1xix tbl. XXII (1901).

47 *See, e.g.*, A Digest of the Laws and Ordinances of the City of Philadelphia from the Year 1701 to the 21 Day of June, 1887. (1887) at 513; The Revised Municipal Code of Ohio (1899) at 196;  Report of the Board of Park Commissioners of the City of Rochester, N.Y.: 1888 to 1898. (1898) at 98; The Municipal Code of the City of Spokane, Washington: Comprising the Ordinances of the City ... Revised to October 22, 1896  (1896) at 316;; Annual Report of the Park Commissioners of the City of Lynn for the Year Ending (1893) at 45; Charter and Ordinances of the City of New Haven: Together with Legislative Acts Affecting Said City (1898) at 293; A Digest of the Acts of Assembly Relating to and the General Ordinances of the City  Pittsburgh (1897) at 496; The Revised Ordinances of the City of Danville (1883);   Law and Ordinances governing the Village of Hyde Park (1875). The Municipal Code of Chicago (1881) at 391.

48 San Francisco Municipal Reports  (1874) at 499; Ordinances of the City of Boulder, 157, (1899); Proceedings of the Common Council of the City of Saint Paul (1892)  at 133.

1220

Park in the 1860s. Although Congress ceded the land to the state, persistent problems with managing it led to the state to return control of the park to the federal government several decades later. The federal government's decision to create Yellowstone in 1872 added yet another type of park to the America's roster of public spaces.[49]

37.    The federal government also passed laws limiting firearms in its parks. Such regulations are especially important because federal lands were indisputably governed by the Second Amendment, irrespective of the incorporation doctrine.[50] In 1893, the Secretary of the Interior underscored the danger posed by firearms in parks when he wrote this about Yellowstone, an "Absolute prohibition of firearms in the park is recommended."[51] The federal government decision to adopt this approach is especially important because federal lands were indisputably governed by the Second Amendment irrespective of incorporation doctrine.[52]

38.    During the same period a variety of other laws aimed at limiting arms in polling places, schools, and other important public venues where people gathered were also enacted by Reconstruction era governments.[53] The aim of these laws was to preserve the peace and enable civil society to function in the South.

---

[49] Ney C. Landrum, THE STATE PARK MOVEMENT IN AMERICA: A CRITICAL REVIEW ( 2013). On the creation of Yellowstone, see https://www.loc.gov/collections/national-parks-maps/articles-and-essays/yellowstone-the-first-national-park/

[50] Report of the Department of the Interior ... [with Accompanying Documents](1899) at 499 and Report of the Secretary of the Interior for the Fiscal Year (1900) at 125.

[51] The Abridgment: Containing Messages of the President of the United States to the Two Houses of Congress with Reports of Departments and Selections from Accompanying Papers (1893) at 618.

[52]  *Supra* Willinger, note 31.

[53] *See, e.g.*, 1890 Okla. Laws 495, art. 47, sec. 7 ("It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or

1221

**CONCLUSION**

39.    The emergence of modern style parks in the middle of the nineteenth century was response to profound changes in American society, particularly urbanization. These places of rest, repose, and recreation were designed to offer Americans places to escape the increasingly chaotic world they encountered in the expanding cities of the nineteenth century.

40.    From the outset the regulations governing these spaces prohibited firearms.   State parks were motivated by similar impulses.   Indeed, Frederick Olmsted, one of the leading landscape architects of the period  who took a prominent rule in designing urban parks also took an active part  in helping to create early state and federal parks.  When the federal government organized the first national parks, it carried forward this tradition, and tightly regulated the carriage of arms in public lands.

41.    Given that arms have been extensively regulated, and in many instances prohibited in parks since their creation, Connecticut's statutes limiting guns in parks are well within the long historical tradition of firearms regulation in America.

---

public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.").

20

Pursuant to 28 U.S.C. § 1746, I, Saul Cornell, state under penalty of perjury that the foregoing declaration is true and accurate to the best of my knowledge, information, and belief.

Executed:  March 29, 2023
Redding, CT

_Saul Cornell_

_____
Saul Cornell

21

# Attachment 1

# Saul Cornell

Paul and Diane Guenther Chair in American History
Department of History
Fordham University
441 East Fordham Road ∗ Bronx, NY 10458 ∗ 203 826-6608 (c) ∗ scornell1@fordham.edu

| Education | | | |
|---|---|---|---|
| 1989 | University of Pennsylvania | Ph.D. | Dissertation: "The Political Thought and Culture of the Anti-Federalists" |
| 1985 | University of Pennsylvania | MA | History |
| 1982 | Amherst College | BA | History - Magna Cum Laude |
| 1980-81 | University of Sussex, Brighton, England | | |

| Teaching Experience | | |
|---|---|---|
| 2009-2020 | Guenther Chair in American History | Fordham University |
| 2011-2022 | Adjunct Professor of Law | Fordham Law School |
| 2005-2008 | Professor of History | The Ohio State University |
| 1997-2005 | Associate Professor, History | The Ohio State University |
| 1995 | Thomas Jefferson Chair | University of Leiden, The Netherlands |
| 1991-1997 | Assistant Professor, History | The Ohio State University |
| 1989-1991 | Assistant Professor, History | College of William and Mary |

## Fellowships and Grants

- 2019-2020 The Gilder Lehrman Center for the Study of Slavery, Resistance, and Abolition, Yale University
- 2018-2019 Senior Research Scholar in Residence, Floersheimer Center for Constitutional Democracy, Cardozo Law School
- 2014 Senior Research Scholar in Residence, University of Connecticut Law School
- 2011 Senior Research Scholar in Residence, Yale Law School
- 2003-2008 Joyce Foundation, Second Amendment Center Grant, $575,000
- 2003-2004 NEH Fellowship
- 2002-2005 Department of Education, Teaching American History Grant, Historyworks, $2,000,000
- 2002 Gilder-Lehrman Fellowship
- 2001-2002 Joyce Foundation Planning Grant, $40,000
- 2001 American Council of Learned Societies (ACLS)
- 1999-2000 Betha Grant, Batelle Memorial Endowment, Ohio Teaching Institute, $100,000
- 1998 Thomas Jefferson Memorial Foundation, Research Fellowship
- 1995 Thomas Jefferson Chair in American Studies, Fulbright Lecturing Award
- 1994 Ohio State University Seed Grant
- 1993 Ohio State University Special Research Assignment
- 1992 Ohio State University Grant-In-Aid
- 1989-1991 NEH Post-Doctoral Fellow, Institute of Early American History and Culture

## Prizes and Awards

- 2006 Langum Prize in Legal History 2006
- 2006 History News Network, Book of the Month
- 2006 History News Network, Top Young Historian
- 2001 Society of the Cincinnati, History Book Prize, a Triennial Award for the Best Book on the American Revolutionary Era
- 2000 Choice Outstanding Academic Book

## Book Publications

The Partisan Republic:  Democracy, Exclusion, and the Fall of the Founders Constitution
*New Histories of American Law*, series eds., Michael Grossberg and Christopher Tomlins (Cambridge
  University Press, 2019)  [With Gerald Leonard]

The Second Amendment On Trial:  Critical Essays on District of Columbia v. Heller
(University of Massachusetts Press,  2013) [with Nathan Kozuskanich]

Visions of America: A History of the United States [co-authored with  Jennifer Keene and Ed O'Donnell]
  (First edition, 2009),( second edition 2013) (third edition, 2016)

"A Well Regulated Militia": The Founding Fathers and the Origins of Gun Control (Oxford University
  Press, 2006) (paperback edition  2008)

Whose Right to Bear Arms Did the Second Amendment Protect?  (Bedford/St. Martins Press, 2000)
  (Paperback 2000)

The Other Founders:  Anti-Federalism and the Dissenting Tradition in America, 1788-1828  (Institute of
  Early American History and Culture, University of North Carolina Press, 1999)  (paperback edition
  2001)

Editor, Retrieving the American Past:  Documents and Essays on American History, (Pearson, 1994-
  2008)

### Scholarly Articles, Book Chapters, and  Essays:

"History and Tradition or Fantasy  and Fiction: Which Version of the Past  Will the Supreme
 Court Choose in NYSRPA  v. Bruen?," 49 *Hastings Constitutional  Law Quarterly*
 (2022): 145-177.

"The Long Arc of Arms Regulation in Public: From Surety to Permitting,1328–1928,"
 55  University  of California, Davis Law Review  (2022): 2545-2602

"'Infants' and Arms Bearing in the Era of the Second Amendment:  Making Sense of the
 Historical Record," 40 Yale Law & Policy Review Inter Alia 1 (2021)

"The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause
  Permit Schemes in Post-Civil War America" *55*  University of California, Davis Law Review Online
  (2021): 65-90.

"President Madison's Living Constitution: Fixation, Liquidation, and Constitutional Politics in the Jeffersonian Era", 89 Fordham Law Review  (2021): 1761-1781.

"History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel Under Anglo-American Law, 1688–1868," 83 Law and Contemporary Problems (2020): 73-95

"Reading the Constitution, 1787–91: History, Originalism, and Constitutional Meaning." Law and History Review 37 (2019): 821–45

"Constitutional Mythology and the  Future of Second Amendment Jurisprudence after Heller," in Firearms and Freedom: The Second Amendment in the Twenty-First Century Controversies in American Constitutional Law Series (Routledge, 2017): 8-24

"The Right to Keep and Carry Arms in Anglo-American Law, Preserving Liberty and

Keeping the Peace,"  80 Law and Contemporary Problems (2017): 11-54

"Half Cocked':  The Persistence of Anachronism and Presentism in the Academic Debate over the Second Amendment,"  107 Northwestern Journal of Criminal Law  107 (2017): 203-218

"The  1790 Naturalization Act and the Original Meaning of the Natural Born Citizen Clause: A Short Primer on Historical Method and the Limits of Originalism," Wisconsin Law Review Forward  92 (2016)

"Constitutional Meaning and Semantic Instability: Federalists and Anti-Federalists on the Nature of Constitutional  Language," in special issue on "The Future of Legal History,"  American Journal of Legal History 56 (2016): 21-29

"Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context," Yale Law Journal  Forum  125(2015-16):121-135 [with Eric Ruben]

"Originalism As Thin Description: An Interdisciplinary Critique" Fordham Law Review Res Gestae  84 (2015):  1-10

"The Right to Bear Arms," The Oxford Handbook of the US Constitution,  eds., Mark Tushnet, Sanford Levinson, and Mark Graber (2015): 739-759

"Conflict, Consensus & Constitutional Meaning: The Enduring Legacy of Charles Beard" Constitutional Commentary 29 (2014): 383-409

"Meaning and Understanding in  the History of Constitutional  Ideas: the Intellectual History Alternative to Originalism"  Fordham Law Review 82  (2013): 721-755

"The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities"  Fordham Urban Law Journal 39 (2012): 1695-1726

"Evidence, Explanation, and the Ghost of Charles Beard" William & Mary  Quarterly 69 (2012): 393-4

"Idiocy, Illiteracy, and the Forgotten Voices of Popular Constitutionalism: Ratification and the Ideology of Originalism" William & Mary Quarterly 69 (2012): 365-368

"The People's Constitution v. The Lawyer's Constitution: Popular Constitutionalism and the Original Debate Over Originalism," Yale Journal of Law and the Humanities 23 (2011): 295-337

"St. George Tucker's Lecture Notes, The Second Amendment, and Originalist Methodology: A Critical Comment," Northwestern University Law Review 103 (2009): 406-416

"Heller, New Originalism, and Law Office History: 'Meet the New Boss, Same as the Old Boss'" UCLA Law Journal  56  (2009): 1095 -1125

"Originalism on Trial: The Use and Abuse of History in District of Columbia v. Heller" Ohio-State Law Journal  69 (2008): 625-640

"Consolidation of the Early Federal System," Chapter 10 of the Cambridge History of  A merican Law (Cambridge University Press, 2008) [With Gerry Leonard]

"The Ironic Second Amendment"  Albany Government Law  Review  2 (2008): 292-311.

"The Original Meaning of Original Understanding: A Neo-Blackstonian Critique,"  Maryland Law Review  (2008): 101-115

"Mobs, Militias, and Magistrates:  Popular Constitutionalism During the Whiskey Rebellion,"  Chicago-Kent Law Review  (2007): 883-903

"The Second Amendment and Early American Gun Regulation:  a Closer Look at the Evidence," Law and History Review  (2007): 197-204

"St. George Tucker and the Second Amendment: Original Understandings and Modern Misunderstandings," William and Mary Law Review  47 (2006): 1123-55

"The Early American Origins of  the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, the Lessons of History,"  Stanford Law and Policy Review  (2006): 571-596

"Well Regulated: The Early American Origins of Gun Control,"  Fordham Law Review 73 (2004):  487-528 [With Nathan DeDino]

"Beyond the Myth of Consensus: The Struggle to Define the Right to Bear Arms in the Early Republic," in Beyond the Founders: New Essays on the Political History of the Early Republic (UNC Press, 2005)

"A New Paradigm for the Second Amendment," Law and History Review 22 (2004): 161-7

"Gun Laws and Policies:  A Dialogue," Focus on Law Studies: Teaching about Law in the Liberal Arts (American Bar Association, 2003)

"The Militia Movement," Oxford Companion to American Law (Oxford University Press, 2002)

"Don't Know Much About History: The Current Crisis in  Second Amendment Scholarship," Northern Kentucky Law Review (2003)

"A Right to Bear Quills or Kill Bears? A Critical Commentary on the Linkage between the 1st and 2nd Amendment in Recent Constitutional Theory," in The Limits of Freedom in A Democratic Society (Kent State University Press, 2001)

"The Irony of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional History," in American Law Ways and Folkways (Odense University Press, Denmark 2001)

"Commonplace or Anachronism: The Standard Model, The Second Amendment, and the Problem of History in Contemporary Constitutional Theory," Constitutional Commentary (1999): 221-246

"Mere Parchment Barriers?  Anti-Federalists, the Bill of Rights, and the Question of Rights Consciousness," in Government Proscribed:  The Bill of Rights (University of Virginia Press, 1998): 175-208

"Moving Beyond the Great Story: Post-Modern Prospects, Post-Modern Problems, A Forum on Robert Berkhofer, Jr. Beyond the Great Story" American Quarterly (1998): 349-357

"The Anti-Federalists," in  The Blackwell Companion to American Thought, eds.,  James Kloppenberg (London, 1995)

"The Bill of Rights," in The Blackwell Companion to American Thought, eds., James Kloppenberg (London, 1995)

"Splitting the Difference: Textualism, Contexualism, and Post-Modern History," American Studies (1995): 57-80

"Canon Wars II:  The Return of  the Founders,"  Reviews in American History 22 (1994): 413-417

"Moving Beyond the Canon of Traditional Constitutional History: Anti-Federalists, the Bill of Rights and the Promise of Post-Modern Historiography," Law and History Review (1994): 1-28

"Early American History in a Post-Modern Age," William and Mary Quarterly 50 (1993): 329-341

"Liberal Republicans, Republican Liberals?:   The Political Thought of the Founders Reconsidered," Reviews in American History 21 (1993):  26-30

"Politics of the Middling Sort:  The Bourgeois Radicalism of Abraham Yates, Melancton  Smith, and the New York Anti-Federalists," in New York in the Age of the Constitution (New York Historical Society, 1992): 151-175

"Aristocracy Assailed:  Back-Country Opposition to the Constitution and the Problem of Anti-Federalist Ideology," Journal of American History (1990): 1148-1172

"The Changing Historical Fortunes of the Anti-Federalists," Northwestern University Law Review (1989): 39-73

"Reflections on the `Late Remarkable Revolution in Government,' Aedanus Burke and Samuel Bryan's Unpublished History of  the Ratification of the Federal Constitution," The Pennsylvania Magazine of History and Biography (1988): 103-130

## Book Reviews:

- Journal of American History
- William and Mary Quarterly
- American Studies Journal of the Early Republic
- Pennsylvania Magazine of History and Biography
- American Quarterly
- American Journal of Legal History
- Law and History Review

## Journal Manuscript Referee:

- Journal of American History
- William and Mary Quarterly
- Diplomatic History
- Pennsylvania Magazine of History and Biography
- Law and History Review
- Harvard Law Review

- <u>Stanford Law Review</u>
- <u>Yale Law Journal</u>

## **<u>Book Manuscript Reviewer:</u>**

- University Press of Virginia
- University of North Carolina Press
- Stanford University Press
- University of Massachusetts Press
- Oxford University Press
- Cambridge University Press
- University of Michigan Press
- Harvard University Press

## **<u>Invited Lectures:</u>**

"Race, Regulation, and Guns: The Battleground in the Debate Over the Second Amendment," Haber/Edelman Lecture:  University of Vermont,  Fall 2021

"Second Amendment Myths and Realities," University of Tampa, Honors College Symposium, November 30, 2018.

"The Common Law and Gun Regulation: Neglected Aspects of the Second Amendment Debate,"  Guns in Law, Amherst College, Law Justice and Society (2016)

"The New Movement to End Gun Violence." UCLA Hammer Museum (2016)

"No Person May Go Armed": A Forgotten Chapter in the History of Gun Regulation" The Elizabeth Battelle Clark Legal History Series, Boston University College of Law, 2016

Legacy Speaker Series:  "Guns in the United States," University of Connecticut (2016) "How does the Second Amendment Apply to Today?"

American Constitution Society/ Federalist Society Debate, Tulane Law School, New Orleans (2016)

"The Second Amendment and The Future of Gun Regulation: Forgotten Lessons From U.S. History," Constitution Day Lecture, Goucher College, (2015)

Keynote Lecture: "The Second Amendment and American Cultural Anxieties:  From Standing Armies to the Zombie Apocalypse" Firearms and Freedom: The Relevance of the Second Amendment in the Twenty First Century, Eccles Center, British Library (Spring 2015)

"Narratives of Fear and Narratives of Freedom:  A Short Cultural History of the Second Amendment," Comparing Civil Gun Cultures: Do Emotions Make a Difference? Max Plank Institute, Berlin (2014)

"History and Mythology in the Second Amendment Debate," Kollman Memorial Lecture, Cornell College, Iowa (Spring, 2013)

"Will the Real Founding Fathers Please Stand Up or Why are so few Historians Originalists" Constitution Day Lecture, Lehman College, Fall 2011

"Lawyers, Guns, and Historians: The Second Amendment Goes to Court," SHEAR/HSP Public Lecture, Philadelphia, July, 2008

The Robert H. and Alma J. Wade Endowment Lecture, Kentucky Wesleyan University, "The Early American Origins of Gun Control" (2006)

"Jefferson, Mason, and Beccaria:  Three Visions of the Right to Bear Arms in the Founding Era," Bill of Rights Lecture, Gunston Hall Plantation, Fairfax, VA   (2003)

"A New Paradigm for the Second Amendment," Finlay Memorial Lecture, George Mason University, (2001)

"Academic Gunsmoke:  The Use and Abuse of History in the Second Amendment Debate," Cadenhead Memorial Lecture, University of Tulsa, (2000)

"Why the Losers Won: The Rediscovery of Anti-Federalism in the Reagan Years," Thomas Jefferson Inaugural Lecture, University of Leiden, Netherlands, (1995)

## Presentations:

"From Ideology to Empiricism: Second Amendment Scholarship After Heller, " Hastings Constitutional Law Quarterly Symposium, Heller at Ten, January 18, 2019

"Firearms and the Common Law Tradition,"  Aspen Institute, Washington, DC (2016)

"The Original Debate over Original Meaning Revisited, " British Group in EarlyAmerican History, Annual Meeting,  Cambridge, England (2016)

"Second Amendment Historicism and Philosophy"  The Second Generation of Second Amendment Scholarship" Brennan Center, NYU 2016

"The Reception of the Statute of Northampton in Early America:  Regionalism and the Evolution of Common Law Constitutionalism" OIEAHC and the USC/Huntington Library Early Modern Studies Institute May 29–30, 2015

"The Right to Travel Armed in Early America: From English Restrictions to Southern Rights," British Group in Early American History, Annual Conference Edinburgh, Scotland (2014)

"Progressives, Originalists, and Pragmatists:   The New Constitutional Historicism and the Enduring Legacy of Charles Beard," Charles Beard, Economic Interpretation and History, Rothmere Center, Oxford University (2012)

CUNY Early American Seminar, "The People's Constitution v. the Lawyer's Constitution," 2011

Roundtable : "The Work of J.R. Pole," SHEAR ,  Philadelphia, Pennsylvania 2011)

"The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?" Bearing Arms, Policy, Policing, and Incorporation After Heller, Santa Clara Law School (2010)

"Re-envisioning Early American History,"  American Historical Association Annual Meeting, San Diego (2010)

"The Ironic Second Amendment"  Firearms, the Militia, and Safe Cities: Merging History, Constitutional Law and Public Policy,  Albany Law School ( 2007)

"*District of Columbia* v. *Heller*  and the Problem of Originalism,"  University of Pennsylvania Constitutional Law Workshop, Philadelphia ( 2007)

"Progressives and the Gun Control Debate,"  American Constitution Society, Harvard Law School, (2006)

"The Problem of Popular Constitutionalism in Early American Constitutional Theory," American Association of Law Schools, Annual Conference (2006)

"Popular Constitutionalism and the Whiskey Rebellion," Symposium on Larry Kramer's The People Themselves, Chicago-Kent Law School  (2005)

Roundtable Discussion on the Second Amendment and Gun Regulation,  NRA/ GMU Student's For the Second Amendment Symposium  (2005)

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History,"  Gun Control: Old Problems, New Problems, Joint Conference Sponsored by the John Glenn Institute and Stanford Law School (2005)

"Original Rules for Originalists?"  University of Minnesota Law School (2005)

"The Fourteenth Amendment and the Origins of the Modern Gun Debate," UCLA, Legal History Workshop (2004)

"Beyond Consensus, Beyond Embarrassment: The Use and Abuse of History in the Second Amendment Debate," American Society of Legal History, Austin, TX  (2004)

"Armed in the Holy Cause of Liberty: Guns and the American Constitution," NYU Legal History Colloquium (2004)

"Digital Searches and  Early American History,"  SHEAR  Brown University  (2004)

"Well Regulated: The Early American Origins of Gun Control," The Second Amendment and the Future of Gun Regulation," Joint Conference Sponsored by the John Glenn Institute and Fordham Law School, New York (2004)

"Minuteman, Mobs, and Murder: Forgotten Contexts of the Second Amendment," Department of History, University of California Berkeley (2003)

"History vs. Originalism in the Second Amendment Debate,"  Federalist Society/ American Constitution Society, George Washington University Law School, Washington D.C.  (2003)

"Self-defense, Public Defense, and the Politics of Honor in the Early Republic," Lake Champlain Early American Seminar, Montreal (2003)

"The Ironic Second Amendment"  "Gun Control:  Controversy, Social Values, and Policy," University of Delaware Legal Studies Conference, Newark, Delaware (2003)

"Individuals, Militias, and the Right to Bear Arms:  The Antebellum Debate Over Guns," Institute for Legal Studies, University of Wisconsin School of Law (2004)

"Guns in the British Atlantic World: New Research, New Directions" Society for the Historians of the Early American Republic, Ohio State University (2003)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment," American Bar Foundation, Chicago (2003)

"The Changing Meaning of the Armed Citizen in American History," "Americanism Conference," Georgetown University  (2003)

"A New Paradigm for the Second Amendment?"  Supreme Court Historical Society, Washington, D.C. (2002)

"Constitutional History as Cultural History: The Case of the Second Amendment" European American Studies Association, Bordeaux,  France (2002)

"Don't Know Much About History: The Current Crises in Second Amendment Scholarship," Salmon P. Chase College of Law, Symposium, "The Second Amendment Today," (2002)

"History, Public Policy, and the Cyber-Age: Gun Control Policy after the Emerson Decision," Sanford Institute of Public Policy, Duke University (2002)

"Constitutional History After the New Cultural History: The Curious Case of the Second Amendment," Society of the Historians of the Early American Republic, Baltimore (2001)

Roundtable Discussion, "The State of Second Amendment Scholarship," American Historical Association (2001)

"Armed in the Holy Cause of Liberty: Critical Reflections on the Second Amendment Debate," Vanderbilt University Law School (2001)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment,"  Boston University Law School, (2000)

"The Current State of Second Amendment Scholarship," National Press Club Washington, D.C. American Bar Association,  (2000)

"Taking the Hype out of Hyper-Text, Or What Should Textbook Companies Being Doing for us on the Web," OAH  St. Louis, Missouri (1999)

"The Ironies of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional Theory," European American Studies Association, Lisbon, Portugal (1998)

"Deconstructing the Canon of American Constitutional History" American Society of Legal History, Seattle, Washington (1998)

"Beyond Meta-narrative: The Promise of Hypertext," American Studies Association, Seattle, Washington (1998)

"Text, Context, Hypertext," American Historical Association, Washington D.C. (1998)

"Jefferson and Enlightenment," International Center for Jefferson Studies, Charlottesville, VA, (1998)

"Copley's Watson and the Shark: Interpreting Visual Texts with Multi-media Technology," American Studies Association, Washington, D.C. (1997)

"Multi-Media and Post-Modernism," H-Net Conference, Technology and the Future of History, East Lansing, Michigan (1997)

Comment on Jack Rakove's <u>Original Meanings</u>, Society of the Historians of the Early Republic, State College, PA (1997)

"Teaching with Multi-Media Technology," Indiana University, spring 1997 "Constitutional History from the Bottom Up:  The Second Amendment as a Test Case," McGill University, Montreal, Canada (1996)

"Just Because You Are Paranoid, Does Not Mean the Federalists Are Not Out to Get You:  Freedom of the Press in Pennsylvania," University of Pennsylvania (1995)

"Multi-Media and Post-Modernism: The Future of American Studies?" Lecture, Erasmus University, Rotterdam, Netherlands (1995)

"Post-Modern American History?  Ratification as a Test Case," St. Cross College, Oxford University, Oxford, England (1994)

"The Other Founders,"  NYU Legal History Seminar," NYU Law School (1994)

"Reading the Rhetoric of Ratification,"  paper presented at "Possible Pasts:  Critical Encounters in Early America," Philadelphia Center for Early American Studies, Philadelphia, PA (1994)

"American Historiography and Post-Modernism," Organization of  American Historians, Atlanta, GA (1994)

"The Anti-Federalist Origins of Jeffersonianism,"  Columbia  Seminar on Early American History (1994)

"American History in a Post-Modern Age?" American Historical Association, San Francisco, CA (1994)

"Post-Modern Constitutional History?"  Indiana University School of Law,  Bloomington, IN (1993)

Participant, Institute of Early American History and Culture, planning conference, "New Approaches to Early American History," Williamsburg, VA (1992)

"Mere Parchment Barriers?  Federalists, Anti-Federalists and the Problem of Rights Consciousness," American Studies Association, Baltimore, MD (1991)

"James Madison and the Bill of Rights:  a comment on papers by Jack Rakove, Ralph Ketcham and Max Mintz," Organization of American Historians and Center for the Study of the Presidency Conference, "America's Bill of Rights at 200 Years,"  Richmond, VA, (1991)

Symposium participant, "Algernon Sidney and John Locke:  Brothers in Liberty?" Liberty  Fund Conference, Houston, TX  (1991)

"Mere Parchment Barriers?  Antifederalists, the Bill of Rights and the Question of Rights Consciousness," Capitol Historical Society, Washington, D.C. (1991)

"Anti-Federalism and the American Political Tradition," Institute of Early American History and Culture Symposium, Williamsburg, VA  (1989)

**Interviews, Editorials, Essays, Podcasts:**

- "Clarence Thomas' Latest Guns Decision Is Ahistorical and Anti-Originalist"
  SLATE June 24, 2022

- Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions*," SCOTUSblog (Jun. 27, 2022, 5:05 PM),

- "The Right Found a New Way to Not Talk About a School Shooting," SLATE May 25, 2022
- "The Horror in New York Shows the Madness of the Supreme Court's Looming Gun Decision," *Slate* May 19, 2022
- "Guns, Guns Everywhere: Last week's subway Shooting was Horrifying. If the Supreme Court Creates a National Right to Carry, the Future will be Worse," New York Daily News Apr 17, 2022
- "The Supreme Court's Latest Gun Case Made a Mockery of Originalism" *Slate* November 10, 2021
- "'Originalism' Only Gives the Conservative Justices One Option On a Key Gun Case," *Washington Post,* November 3, 2021
- "Neither British Nor Early American History Support the Nearly Unfettered Right to Carry Arms," *Slate* November 02, 2021
- "Will the Supreme Court Create Universal Concealed Carry Based on Fantasy Originalism?" *Slate* November 1, 2021
- "Biden was Wrong About Cannons, but Right About the Second Amendment," *Slate* June 29, 2021
- "Barrett and Gorsuch Have to Choose Between Originalism and Expanding Gun Rights," *Slate* April 29, 2021 Slate
- "What Today's Second Amendment Gun Activists Forget: The Right Not to Bear Arms," *Washington Post*, January 18, 2021
- "Could America's Founders Have Imagined This?" *The New Republic*, December 20, 2019
- "Don't Embrace Originalism to Defend Trump's Impeachment" *The New Republic*, December 5, 2019
- "The Second-Amendment Case for Gun Control" *The New Republic*, August 4, 2019
- "The Lessons of a School Shooting—in 1853" *Politico*, March 24, 2018.
- "Originalism and the Second Amendment in *District of Columbia v. Heller*," *University of Chicago Law Review*, Podcast, Briefly 1.9, Wed, 04/11/2018
- "Sandy Hook and the Original Meaning of the Second Amendment," *Time* December, 2017
- "The State of the Second Amendment," National Constitution Center, Podcast October, 2017
- "Gun Anarchy and the Unfree State: The Real History of the Second Amendment," *The Baffler On-line* October 2017
- "Five Types of Gun Laws the Founding Fathers Loved*" Salon* October 22, 2017
- "Half Cocked," *Book Forum* April 2016
- "Let's Make an Honest Man of Ted Cruz. Here's how we Resolve his "Birther" Dilemma with Integrity" *Salon* January 23, 2016
- "Guns Have Always Been Regulated," *The Atlantic Online* December 17, 2015
- "The Slave-State Origins of Modern Gun Rights" *The Atlantic Online* 30, 2015 [with Eric Ruben]
- PBS, "Need to Know: 'Debating the Second Amendment: Roundtable'" April 26, 2013
- "All Guns are not Created Equal" Jan 28, 2013 *Chronicle of Higher Education* [with Kevin Sweeney]

- "What the 'Right to Bear Arms' Really Means" *Salon* January 15, 2011 "Elena Kagan and the Case for an Elitist Supreme Court," *Christian Science Monitor* May 20, 2010
- "Gun Points," *Slate*, March 8, 2010  (With Justin Florence, and Matt Shors)
- "What's Happening to Gun Control,"   To the Point, NPR. March 11, 2010
- "Getting History Right," *National Law Journal*, March 1, 2010
- "History and the Second Amendment," *The Kojo Nnamdi Show* , WAMU (NPR) March 17, 2008
- "The Court and the Second Amendment," *On Point* with Tom Ashbrook, WBUR (NPR)  March 17, 2008
- "Aim for Sensible Improvements to Gun Regulations," *Detroit Free Press,* April 29, 2007
- "A Well Regulated Militia," *The Diane Rehm Show*, WAMU (NPR)  Broadcast on Book TV ( 2006)
- "Taking a Bite out of the Second Amendment," *History News Network*, January 30, 2005
- "Gun Control," Odyssey, Chicago NPR September 8, 2004
- "Loaded Questions," *Washington Post Book World*  February 2, 2003
- "The Right to Bear Arms," Interview *The Newshour,* PBS  May 8, 2002
- "Real and Imagined," *New York Times*, June 24, 1999

## Other Professional Activities

- Editorial Board, Constitutional Study, University of Wisconsin Press (2014-present)
- Advisory Council,  Society of Historians of the Early American Republic  (SHEAR) (2007-2009)
- Program Committee, Annual Conference, Society of the Historians of the Early American Republic,  Philadelphia, PA 2008
- Editorial Board, American Quarterly (2004-2007)
- Director, Second Amendment Research Center, John Glenn Institute for Public Service and Public Policy, 2002- 2007
- Fellow, Center for Law, Policy, and Social Science,  Moritz College of Law, Ohio State University 2001- 2004
- Local Arrangements Committee, Annual Conference, Society of the Historians of the Early American Republic, Columbus, OH 2003
- Project Gutenberg Prize Committee, American Historical Association, 2004,  2002
- Program Committee, Annual Conference, Society of the Historians of the Early Republic, 2001
- Co-Founder Ohio Early American Studies Seminar
- NEH Fellowship Evaluator, New Media Projects, Television Projects
- Multi-media Consultant and Evaluator, National Endowment for the Humanities, Special, Projects, Division of Public Programs, Grants Review Committee (1999)

## Court Citations, Amicus Briefs and Expert Witness Reports

### US Supreme Court:

N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. __, 50 2022 U.S. Lexis 3055 (2022)

N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. __, 26, 28, 45, 47 2022 U.S. Lexis 3055 (2022) (Breyer, J. dissenting)

McDonald v. City of Chicago, Ill., 561 U.S. 742, 900, 901 n.44  (2010) (Stevens, J., dissenting).

McDonald v. City of Chicago, Ill., 561 U.S. 742, 914, 933 (2010) (Breyer, J., dissenting).

D.C. v. Heller, 554 U.S. 570, 666 n.32, 671, 685 (2008) (Stevens, J., dissenting).

**Federal Courts:**

Jones v. Bonta, United States Court of Appeals, Ninth Circuit. May 11, 2022 --- F.4th ---- 2022 WL 1485187.

Duncan v. Bonta, United States Court of Appeals, Ninth Circuit. November 30, 2021 19 F.4th 1087 2021

Young v. Hawaii, 992 F.3d 765, 785-86 (9th Cir. 2021) (en banc).

Kanter v. Barr, 919 F.3d 437, 446 n.6, 457, 462, 464 (7th Cir. 2019) (Barrett, J., dissenting).

Medina v. Whitaker, 913 F.3d 152, 159 (D.C. Cir.), cert. denied sub nom. Medina v. Barr, 140 S. Ct. 645 (2019).

Young v. Hawaii, 896 F.3d 1044, 1066 (9th Cir. 2018), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Young v. Hawaii, 896 F.3d 1044, 1077 (9th Cir. 2018) (Clifton, J., dissenting), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Teixeira v. Cty. of Alameda, 873 F.3d 670, 684–85 (9th Cir. 2017).

Kolbe v. Hogan, 813 F.3d 160, 175 (4th Cir. 2016), on reh'g en banc, 849 F.3d 114 (4th Cir. 2017).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 348 (3d Cir. 2016).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 370–71, 371 n.17, 372 n.19 (3d Cir. 2016) (Hardiman, J., concurring).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 389 n.85, 405 n.187 (3d Cir. 2016) (Fuentes, J., concurring).

Peruta v. Cty. of San Diego, 824 F.3d 919, 935 (9th Cir. 2016).

Peruta v. Cty. of San Diego, 742 F.3d 1144, 1185, 1188 (9th Cir. 2014) (Thomas, J., dissenting).

Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 714 F.3d 334, 342 n.19, 343 n.23 (5th Cir. 2013) (Jones, J., dissenting).

Kachalsky v. Cty. of Westchester, 701 F.3d 81, 95 & n.21 (2d Cir. 2012).

Moore v. Madigan, 702 F.3d 933, 935 (7th Cir. 2012).

Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 200, 202–03 (5th Cir. 2012).

United States v. Carpio-Leon, 701 F.3d 974, 980 (4th Cir. 2012).

United States v. Greeno, 679 F.3d 510, 519 (6th Cir. 2012).

United States v. Yancey, 621 F.3d 681, 684 (7th Cir. 2010).

United States v. Rene E., 583 F.3d 8, 12, 15–16 (1st Cir. 2009).

Miller v. Sessions, 356 F. Supp. 3d 472, 481 (E.D. Pa. 2019).

Grace v. D.C., 187 F. Supp. 3d 124, 138 n.11 (D.D.C. 2016).

Powell v. Tompkins, 926 F. Supp. 2d 367, 386 (D. Mass. 2013), aff'd, 783 F.3d 332 (1st Cir. 2015).

United States v. Tooley, 717 F. Supp. 2d 580, 589–591 (S.D.W. Va. 2010), aff'd, 468 F. App'x 357 (4th Cir. 2012).

United States v. Boffil-Rivera, No. 08-20437-CR, 2008 WL 8853354, 6 (S.D. Fla. Aug. 12, 2008), report and recommendation adopted sub nom.

United States v. Gonzales-Rodriguez, No. 08-20437-CR, 2008 WL 11409410 (S.D. Fla. Sept. 22, 2008), aff'd sub nom.

United States v. Boffil-Rivera, 607 F.3d 736 (11th Cir. 2010).

**State Courts:**

Norman v. State, 215 So. 3d 18, 30 & nn.11–12 (Fla. 2017).

Posey v. Com., 185 S.W.3d 170, 179–180 (Ky. 2006).

Posey v. Com., 185 S.W.3d 170, 185 n.3 (Ky. 2006) (Scott, J., concurring).

State v. Craig, 826 N.W.2d 789, 796 (Minn. 2013).

People v. Handsome, 846 N.Y.S.2d 852, 858 (N.Y. Crim. Ct. 2007).

Zaatari v. City of Austin, No. 03-17-00812-CV, 2019 WL 6336186, 22 (Tex. App. Nov. 27, 2019) (Kelly, J., dissenting).

State v. Roundtree, 2021 WI 1, 395 Wis. 2d 94, 952 N.W.2d 765

State v. Christen, 2021 WI 39, 958 N.W.2d 746

Amicus Briefs:

Amicus Brief, Harper v. Moore, No. 21-1271 (U.S. Supreme Court, 2022) [ISLT and Gerrymandering]

Amicus Brief KOX V. STATE OF GEORGIA, SUPREME COURT STATE OF GEORGIA Case No. S23A0167 [Second Amendment and Campus Carry]

Amicus Brief, *NYSRPA v. Bruen*, No. 20-843 (U.S. Supreme Court, 2021) [2nd Amendment]

Amicus Brief, *Young v. State of Hawaii* N O . 12-17808 (9th Cir. 2020) [2nd Amendment]

Amicus Brief, *Gould v. Morgan*, No. 17-2202 (1st Cir. 2018) [2nd Amendment]

Amicus Brief, *Flanagan vs. Becerra*, Central District of California Case (2018) [2nd Amendment]

Amicus Brief, *Gill* v. *Whitford* (US Supreme Court, 2017) [Partisan Gerrymandering]

Amicus Brief, *Woollard v Gallagher*, (4th Cir. 2013) [Second Amendment]

Amicus Brief *Heller v. District of Columbia* [Heller II] (US Court of Appeals for D.C.) (2010) [2nd Amendment]

Amicus Brief, *McDonald* v. *City of Chicago* (US Supreme Court,2010) [14th Amendment]

Amicus Brief, *District of Columbia* v. *Heller* (US Supreme Court 2008) [2nd Amendment]

Amicus Brief, *Silvera* v. *Lockyer*, case on appeal( 9th Circuit 2003) [2nd Amendment]

Amicus Brief, *Emerson* v. *U.S.* case on appeal (5th Circuit 1999) [2nd Amendment]

Pro-bono Historical Consultant State of Ohio, *McIntyre* v. *Ohio*, (U.S. Supreme Court, 1995) [1st Amendment]

## Expert Witness Reports

*Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, 14-cv-02850 (D. Colo.).
*Chambers, et al., v. City of Boulder*, 2018 CV 30581 (Colo. D. Ct. City of Boulder, filed June 14, 2018).
*Zeleny v. Newsom*, 14-cv-02850 (N.D. Cal.).
*Miller, et al v. Smith, et al.*, 2018 cv 3085 (C.D. Ill.).
*Jones v. Bonta United States* Court of Appeals, --- F.4th ---- , 2022 WL 1485187 (9th Cir., May 11, 2022).
*Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.).
*Worth v. Harrington,* 21-cv-1348 (D. Minn.).

## Law Review Symposia Organized

### Second Amendment:

 "The Second Amendment and the Future of Gun Regulation: Historical, Legal, Policy, and Cultural Perspectives," 73 *Fordham L. Rev*. 487 (2004).
"Gun Control: Old Problems, New Paradigms" 17 *Stan. L. & Pol'y Rev*. 671 (2006).
"A Symposium on Firearms, the Militia and Safe Cities: Merging History, Constitutional Law and Public Policy," 1 *Alb. Gov't L. Rev.* 292 (2008).
"The 2nd Amendment at the Supreme Court: "700 Years of History" and the Modern Effects of Guns in Public," 55 *U.C. Davis L. Rev.* 2545 (2022).

### New Originalism:

"The New Originalism" 82 *Fordham L. Rev.* 721 (2013).
"Historians and the New Originalism: Contextualism, Historicism, and Constitutional Meaning"84 *Fordham L. Rev.* 915 (2015).

# Exhibit 136

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DAVID J. NASTRI, ESQ., | : | No. 3:23-cv-00056 (JBA) |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| KATIE DYKES, | : | |
| *Defendant* | : | |

**DECLARATION OF COLONEL CHRIS LEWIS**

I, Colonel Chris Lewis, declare as follows:

## I.    Background

1. I am the Director of Law Enforcement for the Environmental Conservation Police ("EnCon"), which is a division within the Bureau of Outdoor Recreation within the Connecticut Department of Energy and Environmental Protection ("DEEP"). I have held that position for approximately three years. Prior to joining DEEP, I held various positions in law enforcement for over twenty years in the state of Alabama.

2. EnCon provides the majority of the security and public protection services within State parks and forests. EnCon officers are trained police officers appointed by the Commissioner of DEEP to enforce the State and Federal laws and regulations pertaining to conservation, fish and game, boating, recreational activities, and State parks and forests. Additionally, EnCon officers have the authority to enforce various other criminal laws, and

1

broadly speaking, they have the same general enforcement powers as other police officers. *See* Conn. Gen. Stat. § 26-6.

3. As the Director of EnCon and head of the command staff, I am responsible for the overall command and supervision of EnCon personnel, equipment procurement, hiring of personnel, implementing law enforcement policies and procedures, and coordinating with other divisions within DEEP and other law enforcement agencies as necessary.

4. I am familiar with EnCon's organization, mission, personnel, and law enforcement policies and procedures, and the laws and regulations that apply in the State parks and forests system, including the regulations concerning hunting and the carrying and use of firearms.

5. The testimony in this Declaration is based upon my personal knowledge, which I have obtained through a combination of my training, observations, and work experience; from reviewing relevant documents, rules, and regulations regarding DEEP, EnCon, and the State's parks and forests, and in speaking with colleagues within and outside DEEP who themselves are knowledgeable about the subjects discussed herein. Any information I obtained from those outside sources is consistent with my own understanding.

## II.    EnCon personnel and resources

6. There are currently 52 EnCon officers stationed in three geographical districts in Connecticut: West, East, and Marine. The Marine district covers

2

the towns along Long Island Sound, with 16 EnCon Officers assigned to this district. The West district generally covers the inland towns west of the Connecticut River and has 17 officers. The East district covers the towns east of the river and has 15 officers. There are an additional four officers assigned to Headquarters located at 79 Elm Street in Hartford, who perform office administration work.

7. In addition to the permanent officers described above, EnCon annually hires 20-30 temporary seasonal employees, referred to as "EnCon Rangers," that are stationed in various parks and forests during peak seasons, most of whom serve during the busy summer months. The rangers can issue infractions for violations of park and forest regulations, and function essentially like a security patrol. If an incident requiring law enforcement intervention beyond a warning or infraction for a park regulation were to take place, the ranger would contact an EnCon officer.

8. EnCon officers are highly trained and carry firearms within the course and scope of their employment.

9. EnCon Rangers are unarmed. Carrying firearms would require the rangers to obtain additional certification, and undergo additional background checks and polygraph, psychological and drug testing, which would be time consuming and costly, would make the hiring process more burdensome, and would likely make recruitment much more difficult. Carrying firearms would

3

also require the rangers to wear body cameras, which would also be very costly.

10. Pursuant to a Directive dated August 26, 1992, which remains in effect, all DEEP employees are prohibited from carrying firearms unless otherwise required by his or her job. A true and accurate copy of that Directive is included as Exhibit 109.

11. EnCon's resources in terms of personnel are extremely limited, especially considering the breadth of responsibilities EnCon has over locations spread across the State. EnCon is actively seeking to hire new officer positions, but those hires are unlikely to be finalized until next year. EnCon's hiring authorization is currently capped at fifty-nine officers.

12. Despite its relatively small staff, EnCon is charged with enforcing the conservation laws related to hunting, fishing, trapping, wildlife, as well as enforcing the boating laws, laws related to All Terrain Vehicles and snowmobiles, and the park and forest rules and regulations, in more than 100 locations across Connecticut. In addition, EnCon is responsible for fielding and responding to reports from visitors and others about a wide range of matters, including complaints of violations of laws or regulations or other incidents that require the attention of law enforcement. EnCon has a phone line where anyone can call to report an incident. In February 2023, EnCon received approximately 1400 calls. In busier summer months, EnCon may receive approximately 2000 calls per month. For instance, in June 2022,

4

EnCon received approximately 1900 calls. The subject of the calls ranges widely, from complaints of violations of rules or regulations to bear sightings. Many of the calls receive an immediate response from EnCon.

13. Given its limited personnel and breadth of responsibilities, in order to best achieve its mission, EnCon must carefully allocate its personnel based on the season and activity. For example, during spring hunting season, EnCon increases its presence in areas where hunting is permitted in order to monitor those activities and the potential safety and conservation issues that may arise. During summer months, EnCon increases its presence in the State parks and forests, particularly beaches and designated swimming areas, which can become extremely crowded.

14. If EnCon were to receive a report that required an immediate response, and the report pertained to a location where no EnCon officer was stationed at the time, an officer would need to leave their post and travel to that location, sometimes traveling long distances. That would pull EnCon officers from their duties—e.g., monitoring hunting activities during hunting season—to respond to those incidents.

## III. Impact of removing the prohibition on carrying firearms in State parks and forests.

15. I am familiar with the firearms prohibition in State parks and forests, which is set forth in § 23-4-1 of the Regulations of Connecticut State Agencies. I am

5

also familiar with the hunting regulations, which are set forth in the 2023 Connecticut Hunting and Trapping Guide ("2023 Guide").

16. The firearm prohibition in parks and forests serves several purposes.

    a. First, it protects the safety of visitors and any DEEP employees who may be working on site. The presence of firearms, particularly if alcohol is involved, increases the risk of confusion, alarm, and conflict among visitors. There is substantial risk that discharging a firearm, even in self-defense, would strike a bystander unintentionally, particular in many of our parks that can become very crowded during the summer months. Further, in many of our parks and forests, including beaches and swimming areas, there are no locations for proper storage of the firearm.

    b. Second, the firearm prohibition serves EnCon's conservation and environmental goals. Hunting on state lands is only permitted in a handful of carefully circumscribed locations, and within those locations is subject to additional regulations. The firearm prohibition helps to enforce the hunting regulations. If a visitor is prohibited from carrying a firearm, it is more difficult for him or her to hunt in an unauthorized location or out of season without being detected by EnCon or reported by another visitor. Being able to better enforce the hunting restrictions serves the State's conservation goals by ensuring that animals are not overhunted, and that their populations can continue

6

sustaining themselves into the future.  It also enhances the overall park experience because when there is no hunting in unauthorized locations, the wildlife in those locations are generally more trusting and interactive with visitors, which enhances wildlife viewing and the visitors' overall experience.

c.  Third, prohibiting firearms enables DEEP to maintain the parks and forests as places of peace, relaxation, and quiet enjoyment for individuals and families.  Consistent with those ideals, EnCon, although a law enforcement entity, does not conduct itself as an ordinary police force and is not viewed by visitors as such.  Instead, EnCon officers are often referred to as "game wardens," and are utilized to provide information and assistance to visitors, and to generally help visitors use and enjoy the locations within our jurisdiction.  Indeed, the 2023 Guide, in the section entitled "what to do when approached by an [EnCon] officer," states that EnCon officers "can help explain laws and also provide information about outdoor opportunities and conditions in your area," and that "[t]hey can assist in making your outdoor experience in Connecticut more enjoyable." Exhibit 108 at 47.  Further, a DEEP Policy Directive issued in October, 1996 ("1996 Directive"), which still remains in effect, states: "It is the policy of the State Parks Division to emphasize the 'park ranger' image and apply a strict law enforcement profile only as dictated by the

7

situation at hand. Employees should consciously avoid an overly aggressive approach to law enforcement." Instead, the 1996 Directive required park police to provide information to visitors about applicable regulations to "instill in the visitor an understanding and appreciation for the value of recreational areas, the proper use of recreational areas and respect for other visitors." A true and accurate copy of the 1996 Directive is included as Exhibit 116. Though the park police were consolidated with EnCon and the 1996 state parks directive is not directly applicable to EnCon, EnCon shares in that philosophy and has always sought an education-first perspective when performing recreational law enforcement.

17. If visitors were able to carry firearms in State parks and forests, it would undermine the important interests set forth above. In particular, it would raise substantial safety concerns, particularly in our more crowded parks and forests. It may make it more difficult to enforce the hunting and anti-poaching regulations. It would also alter the nature of our parks, and the way visitors view them as places of peace and inclusion. It could also impact the nature of the relationship that EnCon has deliberately cultivated with visitors as the image of conservation officers or game wardens providing information and facilitating visitors' use and enjoyment of our parks and forests, and more frequently require EnCon to take a more guarded approach

8

to public contacts or what may be viewed as an aggressive approach to law enforcement if people are frequently carrying firearms.

18. In addition, given that EnCon's personnel and resources are limited, permitting firearms could burden EnCon's ability to carry out its mission and responsibility of enforcing hunting laws and ensuring safety in our locations across the State. For example, there is no doubt that if people could carry arms in State parks and forests, EnCon would receive many calls and reports from visitors regarding firearms they had observed, or other firearms-related incidents. EnCon would respond to a call investigating a complaint about a firearm, which may require EnCon officers to leave their posts where they are needed—i.e., monitoring hunting activity during hunting season—to travel to the location to investigate. EnCon is already short staffed, and permitting the carrying of arms would place an even greater burden on its personnel, and make it more difficult for EnCon to ensure the safety and enjoyment of the parks and forests.

19. Removing the firearm prohibition on an immediate basis, without permitting EnCon and DEEP an opportunity to plan for how to accommodate that new right to carry, may be especially problematic in the short-term. Since the firearm prohibition was in place for many years, DEEP and EnCon will need to consider making changes to existing rules and regulations that were created on the assumption that firearms were prohibited, and will also need to consider implementing additional security rules and regulations to

9

accommodate the new right to carry. It would take time to formulate and implement such changes, and could not be completed by peak summer months this year when people will be congregating in our parks and forests and the safety concerns around firearms are most acute.

20. Lastly, if the firearm prohibition were removed at this preliminary injunction stage, but then reimposed at a later date—i.e., following a trial on the merits—it would result in enormous confusion among visitors as to the state of the law, and whether firearms are or are not prohibited in State parks and forests.

Pursuant to 28 U.S.C. § 1746, I, Chris Lewis, state under penalty of perjury that the foregoing declaration is true and accurate to the best of my knowledge, information, and belief.

Executed: March 30, 2023

*Chris Lewis*

Chris Lewis

10

1250

# Exhibit 137

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| DAVID J. NASTRI, ESQ., | : | No. 3:23-cv-00056 (JBA) |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| KATIE DYKES, | : | |
| *Defendant* | : | |

**DECLARATION OF THOMAS TYLER**

I, Thomas Tyler, declare as follows:

**I.      Background**

1. I have been an employee of the Connecticut Department of Energy and Environmental Protection ("DEEP") for approximately 30 years.

2. Currently, I am the Director of DEEP's Division of State Parks and Public Outreach ("Parks Division"). I have held that position since 2009. The Parks Division has primary operational authority over the State's park and forest system.

3. In the capacity as Director for the Parks Division, I am responsible for the day to day management of all aspects of our system of state parks and state forest recreation areas, including staffing, budgeting, operations oversight, and other facets of the Division's programs. I have supervisory authority over several subdivisions within the Parks Division, including the public outreach programs designed to increase community engagement with our forest and park system, and 83 full-time employees, plus between 500 and 600 seasonal employees each year.

1

1252

4. Prior to becoming Director of the Parks Division, I worked from 2007 to 2009 as Director of DEEP's Office of Constituent Affairs and Land Management. In that capacity, I oversaw and was involved in a number of agency programs, including all aspects of the state's open space acquisition and property management programs, including extensive involvement with review, analysis and negotiations related to all real property transactions, records, deed restrictions and other related documents

5. From 1997 to 2007, I worked as a Legislative Program Manager in the DEEP (then the DEP) Commissioner's Office. In that capacity, I worked closely with the past five Commissioners and represented the agency before the General Assembly on a wide range of issues and policy initiatives relating to DEEP, including the State's environmental and conservation efforts, and State parks and forests.

6. From 1987 to 1997, I worked in the private sector with a government relations firm, serving as a lobbyist and association manager for a wide range of clients.

7. From 1982 to 1987, I worked for DEP as a State Park Patrolman in several parks in the greater Hartford area.

8. Throughout my 30 years of experience with DEEP, I have become familiar with DEEP's organization, mission, and personnel. I have also become familiar with the nature, characteristics, and history of our State park and forest system, as well as the rules, regulations, and policies that are in place

1253

to ensure that our parks and forests are safe, functioning, and enjoyable for all members of the public and their families.

9. I have also become familiar with, and have overseen, several of DEEP's family outreach programs related to the park and forest system, including the very successful No Child Left Inside® Program; the ParkConneCT program in conjunction with CT Department of Transportation; First Day Hikes in collaboration with the National Association of State Park Directors; the Great Park Pursuit program; the Sky's the Limit family hiking program, and many others.

10. I have experience related to policies involving our state park and forest system, including advocacy for change and new initiatives, including the creation of the Passport to the Parks program, and the discussions that led to the successful effort to amend our state's Constitution to better protect State open space lands, among other initiatives.

11. I am aware of this lawsuit, have reviewed the Amended Complaint ("Complaint") filed by David Nastri ("Plaintiff") in this matter, and am familiar with the claims and allegations of the Complaint.

12. The testimony in this Declaration is based upon my personal knowledge, which I have obtained through a combination of my training, observations, and work experiences in my various positions with DEEP; from reviewing relevant documents, rules, regulations, and historical sources of information regarding DEEP and the State's parks and forests, and in speaking with

3

colleagues within and outside DEEP who themselves are knowledgeable about the subjects discussed herein.  Any information I obtained from those outside sources is consistent with my own understanding.

## II.    DEEP

### A.    Organization

13. DEEP is a Connecticut State Agency that was established on July 1, 2011, with the consolidation of the Department of Environmental Protection, the Department of Public Utility Control, and various energy policy staff from other areas of state government.  *See* https://portal.ct.gov/DEEP/About/About-Us.

14. DEEP has statutory authority to acquire and set aside lands for public use, and to control and manage our State park and forest system.  *See e.g.* Conn. Gen. Stat. §§ 23-4, 23-5, and 23-8.

15. Three bureaus within DEEP have a role in  overseeing the operations of State parks and forests. The Bureau of Outdoor Recreation (BOR) has primary responsibility for their management, while the Bureau of Natural Resources and the Bureau of Financial and Support Services also have responsibility for some aspects of their management.

16. BOR has three divisions, the Parks Division, of which I am Director, the Environmental Conservation Police Division ("EnCon"), and the Boating Division.

4

1255

17. The Parks Division has operational responsibility over the State park and forest system, and is responsible for the majority of the park and forest system's operations.

18. EnCon provides the majority of the security and public protection services within State parks and forests. EnCon officers are trained police officers appointed by the Commissioner of DEEP to enforce the state's fish and game, boating, recreational vehicle, and state park and forest laws and regulations. Additionally, EnCon officers have the authority to enforce various other criminal laws and have the same general enforcement powers as other police officers. *See e.g.* Conn. Gen. Stat. § 26-6.

## B.    DEEP's mission

19. DEEP's mission, among other things, is to conserve, improve, and protect the natural resources and environment of the State of Connecticut, and to foster Connecticut's economy and create jobs. *See* https://portal.ct.gov/DEEP/About/About-Us.

20. DEEP operates on the recognition that Connecticut has a proud legacy of leadership in natural resource conservation and environmental protection, which provides both a high quality of life for residents and a strategic advantage for Connecticut's economic future. DEEP continually strives to build on that proud legacy by strengthening the economic advantages our State enjoys through, among other things, abundant natural resources, first-

5

1256

class outdoor recreation opportunities, and a healthy environment. *See* https://portal.ct.gov/DEEP/About/DEEP-Strategic-Goals.

21. In furtherance of these missions, DEEP has established five "strategic goals" to guide the agency's work. Those strategic goals include: (1) Safeguarding, enhancing, and promoting Connecticut's environment and natural resources in order to support our quality of life, stewardship responsibilities, and long-term economic competitiveness; (2) promoting environmental justice by applying principles of equity, diversity, and inclusion to our policy development and implementation; and (3) investing in staff to continue delivering on our mission during a time of significant anticipated staff attrition. *See* https://portal.ct.gov/DEEP/About/DEEP-Strategic-Goals.

22. As discussed in greater detail below, our State parks and forests are an indispensable part of DEEP's strategic goals.

## III.   CONNECTICUT'S STATE PARKS AND FORESTS

### A.   History of State park and forest system

23. In 2013, in celebration of the 100 year anniversary of the State's park and forest system, DEEP published "Connecticut State Parks, A Centennial Overview 1913-2013" (hereinafter, "Centennial Overview"). I led the Centennial Committee that was created to implement strategies to highlight the history of our State park and forest system and worked closely with the author of the Centennial Overview to develop its content. The Centennial Overview describes the history and development of Connecticut's park and

6

forest system. A true and accurate copy of the Centennial Overview is included as Exhibit 111.

24. The Centennial Overview accurately describes the history of the State park and forest system.

25. Since the 1860s, city parks had been growing in popularity across Connecticut, as residents increasingly sought reprieve from the inner-city lifestyle, but at that time there were no State-owned parks or forests. *See Centennial Overview* at p. 3.

26. In 1913, with authorization from the Connecticut General Assembly, the Governor appointed a State Park Commission to facilitate the acquisition of State park properties. A copy of the enabling legislation that created the State Park Commission—Chapter 230 of the 1913 Public Acts ("An Act establishing a State Park Commission")—is included as Exhibit 131.

27. In 1914, the State Park Commission acquired its first land, approximately 4 acres in Westport, Connecticut, which would become Sherwood Island State Park.

28. In 1921, the State Park Commission became known as the State Park and Forest Commission ("Commission"), to reflect its authority over state forests.

29. Over the ensuing decades, the Commission acquired more properties, through a series of acquisitions and donations, and the State park and forest system continued growing. *Id.* at 19-21.

7

30. In 1971, the Commission was merged into the newly created Department of Environmental Protection, which is now DEEP.

31. As of 2013 when DEEP published the Centennial Overview, 450 million people had visited Connecticut's State parks since 1919 when counting began, and every person in Connecticut was within a 15 minute drive of a park property. *See Centennial Overview* at 25.

32. Many of the properties the State acquired as part of the park and forest system were granted or donated by private entities. Many of those land grants conditioned the transfer on the State's agreement to certain terms, including using the land for particular purposes, or prohibiting certain uses. Significant time and resources would need to be invested to research all of these many grants and donations to determine if the possession of firearms is prohibited based on the constraints of the donation.

33. As an example, the State acquired a parcel of land in 1969 as a gift from Frank S. Butterworth, which became part of Sleeping Giant State Park. The deed conditions the gift on the State's agreement to a number of conditions, including that "[t]he use of firearms shall be forever prohibited thereon." The deed is publicly available on the Hamden land records. A true and accurate copy of the 1969 deed is included as Exhibit 106.

34. DEEP is bound by any conditions or restrictions imposed on land grants to the State.

**B.      Current State park and forest system, and general uses.**

8

1259

35. Currently, Connecticut is home to 110 State parks and 32 State forests.  A full list is available on DEEP's website at:  https://portal.ct.gov/DEEP/State-Parks/Listing-of-State-Parks.

36. The total acreage of Connecticut's State park and forest system is approximately 255,000 acres (approximately 35,000 acres for state parks and approximately 220,000 acres for state forests).  Connecticut itself is over 3.5 million acres.

37. The State parks and forest system is owned by the State, with some exceptions, and the State holds and operates the properties in trust for the benefit of the public, as required by law.  *See e.g.* Conn. Gen. Stat. §§ 23-4 and 23-5.

38. The parks and forest are located in all areas of the State.  The Commission did that by design so that every Connecticut resident could access one or more of these locations without traveling long distances, enhancing accessibility and quality of life.  Exhibit 110 is a map of Connecticut's parks and forests.  It is available on DEEP's website at: https://ctdeep.maps.arcgis.com/apps/webappviewer/index.html?id=950da678b13b458ba4cbe5687e902c19&ncliNav=|.

39. The current mission of the Connecticut State park system is to provide natural resource-based public recreational opportunities and education opportunities to the public by providing a system of recreation areas, environmental centers, and nature centers that provide access to and

1260

understanding of Connecticut's historic and cultural heritage and natural resources.  In addition, the mission of our park and forest system includes preserving the natural beauty of Connecticut lands, and encouraging communities and families to come together through a shared appreciation of nature and the environment.

40. With respect to the nature and uses of our State parks and forests, it varies substantially by location, and it would be impracticable to discuss each location in detail in this Declaration.  Certain individual State parks or forests are discussed in greater detail below.  Most State parks and forests are situated for multiple uses and often contain some combination of beaches, camping grounds, picnicking areas, hiking trails, forested areas, historic sites, and other attractions.

41. Most of the State parks and forests include some form of structure.  DEEP manages roughly 1000 buildings across the State park and forest system.  Although it varies widely depending on location, the structures include bathrooms, pavilions, camp offices, nature centers, gift shops, indoor exhibits, and many others.  Some locations also contain historic structures, including but not limited to Gillette Castle (Gillette Castle State Park), the Heublein Tower (Talcott Mountain State Park), the Ellie Mitchell Pavilion (Rocky Neck State Park), the Eolia Mansion (Harkness Memorial State Park), and the observation tower (Sleeping Giant State Park).

1261

42. Of the State's parks and forests, 22 locations include designated swimming areas. A list of the designated swimming areas is available on DEEP's website at: https://portal.ct.gov/DEEP/State-Parks/Recreation-Information/Swimming---CT-State-Parks-and-Forests.

43. In terms of the activities people engage in at our State parks and forests, it again varies widely by location, and cannot feasibly be detailed in full in this Declaration. Broadly speaking, the activities include, but are not limited to, sightseeing, hiking, picnicking and grilling, swimming, sunbathing, special events including weddings, bird watching and various scientific and educational activities, skiing, hunting, biking, fishing, and scuba diving.

44. Our parks and forests serve a variety of education purposes and programs that are utilized by families, children, teachers, and schools across the state, as detailed further below.

45. Individuals have also used our State parks and forests to engage in political activities. For instance, a State Senate Candidate held a campaign kick-off event at one of the rental pavilions at Hammonasset Beach State Park.

46. Youth sporting event are held in State parks and forests. For instance, there are a number of high school and collegiate cross-country meets held across the state.

C.    Attendance

11

1262

47. Our State parks and forests are among Connecticut's most popular attractions and recreational destinations for both in-state and out-of-state residents.

48. The Parks Division includes the State Parks Public Outreach unit ("Public Outreach"), which offers a variety of programs to encourage public use of our State parks and forests. Public Outreach also helps develop and implement education programs provided at various State parks and forests. Certain of those programs are discussed in greater detail below.

49. DEEP estimates that, in 2022, approximately 17 million people visited Connecticut's State parks and forests.

50. That estimation is based upon a number of factors. Certain parks, such as Hammonasset Beach State Park, collect data points that contribute to the estimate, including vehicle counters in the roadway and camper registration information. Other locations provide estimates based upon the observations of the park supervisor. Other, smaller facilities are not included in the estimate.

51. Millions of people visit Connecticut parks and forests from other states. DEEP estimates that roughly 20% of visitors are from out of state.

52. The number of estimated State park and forest visitors in 2022 has increased dramatically, approximately 75%, from recent years, from approximately 9 to 10 million in 2019 to roughly 17 million today.

1263

53. Recent census data from 2022 approximates Connecticut's population to be 3.6 million. *See*

https://www.census.gov/quickfacts/fact/table/CT/PST045222#PST045222.

54. State parks and forests can become very crowded, particularly in summer months. In fact, some locations reach capacity limits on certain days. How crowded it gets varies widely by location, season, and numerous other factors, and is often difficult to predict. The most densely populated parks are generally beaches and designated swimming areas, including Hammonasset Beach State Park, Gardner Lake State Park, Squantz Pond State Park, Rocky Neck State Park, and Sherwood Island State Park.

55. It is not uncommon during summer months that certain of our more popular locations will have to close down for exceeding capacity, and not accept more visitors. Examples include Hammonasset Beach State Park, which is discussed in further detail below, and various other designated swimming areas.

56. Even parks and forests that cover vast acreages of land frequently become crowded because visitors tend to congregate in isolated areas that are most scenic or popular. For instance, even though Sleeping Giant State Park contains a vast network of land and hiking trails, it is common for the Looking Tower to become crowded because of its location and the scenic benefits, sometimes shoulder to shoulder distance. The same is true of numerous other State parks and forests that contain particular areas where

13

visitors tend to congregate, including Scantic River State Park, Dinosaur State Park, Harkness Memorial State Park, Rocky Neck State Park, Squantz Pond State Park, Millers Pond State Park, Cockaponset State Forest, Wadsworth Falls State Park, Mount Tom State Park and many others.

57. Although DEEP does not keep statistics of our visitors' demographics, a substantial portion of the visitors to our parks and forests are families. Millions of children visit our State parks and forests every year.

58. Service to families and children is integral to DEEP's mission. Families and children are the target audience of our State parks and forests. Marketing efforts and programming are often promoted and targeted toward children and families. To provide only a few examples:

   a. In 2006, DEEP launched the No Child Left Inside Program ("NCLI"). NCLI "is a promise to introduce children to the wonder of nature," to increase their own health and well-being, foster appreciation for environmental conservation, and preserve the beauty of Connecticut. DEEP describes NCLI and its purpose and ideals on its website, accessible at: https://portal.ct.gov/NCLI/About-NCLI/Our-Mission. Part of the premise of NCLI is that "[t]oday's children have become disconnected from nature," and instead of enjoying nature are often "playing video games, surfing the web, watching TV and texting. [NCLI] provides the necessary opportunity for children to unplug from technology and unearth the vast opportunities that Connecticut's State

14

Parks and Forests have to offer." DEEP welcomes all residents to "take the [NCLI] pledge," which includes: "I pledge to defend the right of all children and every family to play in a safe outdoor environment. I will encourage and support opportunities for them to exercise their right . . . ." NCLI is described on DEEP's webpage at: https://portal.ct.gov/NCLI/About-NCLI/Our-Mission.

b. NCLI is comprised of several programs, including the Great Park Pursuit Family Adventure Program, which "encourages families to get back outside and explore" with multiple weeks of guided family trips to different state parks and forests, including nature centers, museums, and historic buildings. *See* https://portal.ct.gov/NCLI/Great-Park-Pursuit/GPP-Landing-Page. Countless families participate in these programs.

c. NCLI includes numerous other programs for children and families that involve state parks and forests. Those programs are described on DEEP's website at: https://portal.ct.gov/NCLI/About-NCLI/Our-Programs.

d. In furtherance of NCLI's mission to encourage family and youth utilization of our parks and forests, NCLI also includes an annual program that provides day passes at the main library branch of each town in Connecticut. Those day passes waive entrance fees for two adults and up to 4 children aged 12 and under for any centers or

15

historical buildings located in a State park of forest, with certain exceptions. The program is described on DEEP's website located at: https://portal.ct.gov/NCLI/Parks/No-Child-Left-Inside-Library-Pass.

e. Nature centers are another feature of State parks and forests that are focused on enrichment for children and families in safe and comfortable environment. For example, Meigs Point Nature Center (Hammonasset Beach State Park) and Dinosaur State Park have nature centers that cater to thousands of children each year.

f. There are hundreds of school field trips to State parks and forests each year. DEEP encourages such school field trips and provides resources to schools on its website to encourage and facilitate those trips, including at: https://portal.ct.gov/DEEP/Education/Field-Trip-Sites, and https://portal.ct.gov/DEEP/Education/Education. There were more than 200 bus permits granted to various locations in 2022, most of which were for school groups. However, that estimate only captures permits for buses with seating capacity of 30 or more passengers, and at those locations and times of the year when permits are required. Mini buses (between 12 and 30 passengers) are not required to obtain a bus permit before arriving at park or forest, and therefore are not accounted for in that estimate. Groups visiting by bus must secure a permit at least 14 days prior to the visit, but groups may secure a permit up to 11 months in advance of the visit, and often secure their

16

permit several months in advance.  DEEP's bus permitting policies are set forth on its website at: https://portal.ct.gov/DEEP/State-Parks/Bus-Permits-and-Fees#:~:text=Requests%20for%20a%20bus%20permit,the%20State%20Parks%20Division%20office.&text=Saturday%20and%20Sunday%3A%209%20am%20%2D%2012%20pm.

g. DEEP also offers a Youth Group Camping Program to non-profit organizations that are sponsored by or affiliated with a school, church, or recognized youth organization, and that have a demonstrated interest in work with youth, generally aged 18 and under.  The program is described on DEEP's website at: https://portal.ct.gov/DEEP/State-Parks/Camping/Youth-Group-Camping---CT-State-Parks-and-Forests.

## D. Revenue generated by State parks and forests

59. The public image of State parks and forests helps the system draw visitors and in turn support the system's programming and maintenance.

60. State parks and forests generate revenue in a number of different ways, including but not limited to:  (1) camping fees; (2) special events including weddings; (3) licenses; (4) parking fees; (5) admission fees and concessions; (6) special use permits, such as film productions; (7) rental fees; and (8) bus permits.

17

61. Revenue is also generated through the Passport to the Parks program ("Passport program"), which began in 2018.  *See* Conn. Gen. Stat. § 23-15. Under the Passport program, people who arrive at any State park or forest in a vehicle registered in Connecticut are no longer required to pay any parking fees.  In exchange, the General Assembly passed a law increasing the cost of motor vehicle registration fees for every resident by $5 per year.  Out-of-state visitors are still required to pay parking fees, and visitors with Connecticut registrations are still required to pay admissions or other non-parking fees charged by the particular location.  The purpose of the Passport program is to make State parks and forests more accessible to Connecticut residents, to encourage residents to use them and to provide a more stable funding mechanism for the operation of our State parks and forests.  The Passport program is described on DEEP's website, available at: https://portal.ct.gov/DEEP/State-Parks/Passport-to-the-Parks.

62. The State's authority to generate revenue from parks and forests is established by statute and regulation.  *See e.g.* Conn. State Agency Regs., §§ 23-4-7 *et seq.*; Conn. Gen. Stat. § 23-15, *et seq.*

63. Last year, the State generated roughly $4.5 million from parking, camping, admission, and other fees.  That reflects approximately 21% of the Parks Division's $21 million budget.  Another approximately 60% of our budget comes from the additional registration fees charged as part of the Passport

18

1269

program, and the remaining approximately 20% comes from the General Fund.

64. Our State park and forest system is also a critical component of the State's overall marketing and tourism efforts. DEEP has a large online presence, which it uses to provide information to the public and build enthusiasm for our parks and forests, including Facebook, Instagram, Twitter, and YouTube pages devoted to our parks and forests. DEEP also works with the Office of Tourism, which is part of the Connecticut Department of Economic and Community Development, to further these marketing and tourism efforts through commercials and advertisements on television and other means. Many of our State's Tourism promotions feature our State parks and forests. In 2011, the University of Connecticut conducted a study of the economic benefits of the State's park and forest system. A true and accurate copy of the report generated from that study is included as Exhibit 107.

**E.    Staffing and funding of the State parks and forest system**

65. In order to organize the State's operations of its parks and forests, DEEP has divided the State into two districts: Eastern and Western. Both districts consist of a district supervisor and several underlying park and forest supervisors. The park and forest supervisors are each responsible for a management unit. Within each management unit's boundaries are a collection of State parks and forests. The frontline employees in each management unit provide the daily grounds-keeping and maintenance of the

19

parks and forests, and are responsible for ensuring the overall cleanliness , safety and efficient operation of their management unit properties.

66. The Parks Division currently has 83 full-time employees.  That is a substantial decrease over the past approximately 40 years, when the Parks Division had more than 200 employees.  DEEP  also hires many temporary seasonal workers, especially during peak attendance months, during the summer.

67. Over that same 40-year time period, annual attendance has increased dramatically, from roughly an estimated 6 million annual visitors to an estimated 17 million today.

68. Lack of adequate staffing and resources has been an ongoing issue at DEEP and in our State park and forest system.  As noted above, one of DEEP's strategic goals is to continue delivering on our mission despite anticipated staff attrition.

69. As Director of the Parks Division, I regard current, and potential future, staffing and funding shortages as the biggest challenge that DEEP faces in terms of managing our parks and forests and keeping them functioning, clean, and safe.

70. Recent changes to the budget and management of the State park and forest system have increased the need for the system to be competitive in a crowded recreation marketing space, and to be economically prudent and financially self-sustaining.

20

71. In 2013, the Legislative Program Review and Investigations Committee of the Connecticut General Assembly authorized a study of the State's park and forest system with a focus on funding of the state park system, its revenues and expenditures, and the adequacy of funding to support short term and long term goals.  The Committee issued its report on January 23, 2014 ("2014 Committee Report").  A true and accurate copy of that report is included as Exhibit 114.

72. Among other things, the 2014 Committee Report found (1) that the State parks and forests system had "become heavily reliant on the state's General Fund, with little directive or incentive to focus on revenue generating activities," (2) that there had been decreases in paid attendance, (3) that "[s]taffing levels are down and have reached a critical point regarding operations," (4) that "[p]lanning for the state park system has defaulted to 'crisis management,'" and (5) that "[e]ither an increase in funding and staffing or a decrease in services is necessary for continued adequate park operations in the long term."  *Id.* at 1.

73. I am familiar with the 2014 Committee Report and the above findings, and believe that those findings accurately conveyed the issues in our park and forest system as they existed at that time.

74. At the time of the 2014 Committee Report, the State's parks and forests were, for the most part, reliant upon General Fund money.  Generally, State parks and forests did not retain the revenue that they generated; the money instead

21

went into the General Fund.  Certain individual locations were permitted to retain revenues generated from renting special event facilities, but the vast majority of the revenue generated went into the General Fund.

75. The staffing and funding shortages remain issues today, although certain actions have been taken to help alleviate the funding deficit.  First, DEEP now receives the revenue that State parks and forests generate from their various sources, which are discussed below.  Second, the Passport program began in 2018.

76. Currently, the revenue generated by parks and forests, as well as the additional registration fees under Passport, goes into the Passport account, and those funds are used to pay the large majority of all of the expenses of our park and forest system.  *See* Conn. Gen. Stat. § 23-15.  Approximately 80% of expenses are paid from the Passport program account funds.  The remainder of expenses is paid from the General Fund.

77. Therefore, the more revenue generated by our parks and forests, the more capacity the Parks Division will have for expenses, and to maintain the quality of our parks and forests.  If the revenue generated were to decrease, that could have an impact on our ability to maintain our parks and forests.

E.    **Regulations of use of state parks and forests**

1.    **Firearms**

22

78. Conn. Gen. Stat. § 23-4(a) authorizes the DEEP Commissioner to adopt regulations, in accordance with chapter 54, for the maintenance of order, safety and sanitation upon the lands under the Commissioner's control.

79. Pursuant to that authorization, the Commissioner has adopted § 23-4-1 of the Regulations of Connecticut State Agencies. Section 23-4-1 contains many of the regulations and restrictions for use of the State parks and forests.

80. DEEP's firearm regulation is contained in subsection (c) of § 23-4-1, which provides: "Hunting or carrying of firearms, archery equipment or other weapons, including but not limited to air rifles and slingshots, is not permitted in any state park or forest except as authorized by [DEEP]. All carrying or use of weapons is subject to applicable provisions of the Connecticut General Statutes and regulations adopted thereunder."

81. DEEP's rules and regulations relating to firearm use are published annually in the Connecticut Hunting and Trapping Guide. A true and accurate copy of the 2023 version of the Guide ("2023 Guide") is included as Exhibit 108. Other than certain permitted uses of firearms related to hunting and target shooting, which are discussed in further detail below, and which are themselves subject to numerous locational and other restrictions, DEEP does not permit visitors to carry firearms in State parks or forests absent specific authorization. The only instances that I am aware of where DEEP permitted individuals to carry firearms into a State Park occurred during Revolutionary and Civil War reenactments at Putnam Memorial, Fort Trumbull and Fort

23

Griswold Battlefield State Parks.  Individuals participating in those reenactments had black powder period reproduction firearms  and cannons, but DEEP did not authorize the live firing of the weapons and were subject to various safety rules.

82. The public is put on notice of these restrictions regarding the ability to use and/or carry firearms in State parks and forests.  The regulations are available online, including through DEEP's website.  *See* https://portal.ct.gov/DEEP/Hunting/2023-Connecticut-Hunting-and-Trapping-Guide.  The Hunting and Trapping Guide is also published annually and made available on DEEP's website.  *See id.*  In addition, there are kiosks positioned on-site at  locations throughout our State park and forest system that list the applicable regulations, including the firearm prohibition.

83. I have searched historical records for the history of the State's regulation of firearms in its parks and forests, and discovered a 1924 version of the "Guide to Connecticut State Parks and Forests" (hereinafter, "1924 Guide"), published by the State Park and Forest Commission, which at that time had legal authority over State parks and forests.  The 1924 Guide states in relevant part:  "The use of firearms or having them in possession is forbidden . . . ."  A true and accurate copy of the relevant portions of the 1924 Guide are included as Exhibit 68.

84. The Commission, at that time, had operational authority over the State parks and forests and in the regulation of conduct at those locations.  Therefore, the

24

1924 Guide reflects the State-wide policy concerning firearms in State parks and forests.

85. Although the 1924 Guide is thus far the earliest evidence of a State-wide firearm prohibition in parks and forests that I have been able to find, it is possible that additional research will reveal similar restrictions being in effect as early as 1914, when the Commission completed its first acquisition.

86. In 1902, Hartford passed an ordinance making it unlawful "[t]o discharge or carry firearms" in parks that it owned or that were under its control. *See* Exhibit 34.

87. The 1924 Guide was not available online or through an electronic source. Instead, I searched for the physical copy in our historical archives and photocopied the relevant pages.

88. Further, my research has not disclosed any evidence that the firearm prohibition in the 1924 Guide was not in place continuously. For example, I have discovered copies of regulations passed by the Commission in 1949, which provide in § 153-2-3 that "[h]unting or carrying of firearms is not permitted in any State Park or Forest recreational area except at predetermined times in such areas as set aside by the State Park and Forest Commission and when posted for such purposes and subject to the rules and regulations set forth by the Connecticut Board of Fisheries and Game." That same regulation is reflected in a 1951 version of the Park Patrolman's

1276

Manual.  True and accurate copies of the 1949 regulations and the 1951 manual are included as Exhibits 104 and 105.

89. DEEP's prohibition on the carrying of firearms serves multiple different purposes.

    a. First, giving individuals a general right to carry handguns into state parks and forests would raise a number of general safety concerns. Those safety concerns are heightened depending on the particular location, and certain individual locations are discussed in greater detail below.  Generally speaking, our parks and forests can get crowded, particularly in the summer months.  Discharging a firearm, even for self-defense purposes, in a State park or forest outside a designated hunting area would create a safety hazard for other parkgoers.  Furthermore, the safety concerns are further heightened considering the presence of alcohol at many of our locations, the potential conflict, confusion, or outrage that seeing a firearm could cause among visitors, and the inability at many of our locations— particularly our beaches and designed swimming areas—to properly store firearms while using the park.

    b. Second, giving individuals a general right to carry firearms may change the way people view our parks and forests.  Our locations have always been understood to be  places of peace and quiet enjoyment, where individuals, families, and children can go to enjoy the outdoors.

26

Our parks and forests are also designed to foster a sense of community, bring people together around a shared history and pride in our state's natural beauty, and provide numerous educational benefits for children and surrounding schools. Generally prohibiting the carrying of firearms subject to very limited exceptions, as detailed below, gives our visitors peace of mind and makes them secure in knowing that our parks and forests are safe and welcoming to all.

c. Third, DEEP's general prohibition on firearms supports its ability to enforce its regulations on hunting. Restricting the use and carrying of firearms for specified hunting purposes during certain seasons furthers EnCon's ability to enforce laws and regulations pertaining to the lawful killing and protection of animals in our State parks and forests. Authorizing a general right to carry a handgun in a state park or forest could adversely impact EnCon's ability to enforce the laws and regulations pertaining to the lawful killing or protection of animals, especially due to staff shortages within that Division of DEEP.

## 2.    DEEP's other regulations of use

90. Hunting is permitted only in select few locations, and is strictly regulated:

a. Similar to the firearm restriction, § 23-4-1(c) prohibits hunting in all state parks or forests except as authorized by DEEP.

b. DEEP permits hunting only in certain specific parks and forests. A list of the parks and forests where some form of hunting is permitted is

27

contained on DEEP's website, accessible at:

https://portal.ct.gov/DEEP/State-Parks/Explore/Hunting.

c. However, even in the locations where hunting is permitted, hunting is subject to numerous regulations, which are location dependent. Generally, there are restrictions as to the particular season when hunting can take place, the particular areas of a park of forest where hunting may take place, the type of game that may be hunted, and the kind of weapons that may be used for the hunting.  Hunters must also have any appropriate firearms registrations and licenses, and hunting licenses, as required by Connecticut law.

d. A comprehensive listing of all hunting seasons and pertinent regulations is published annually, currently contained in the 2023 Guide.

e. There are some general restrictions that apply to all hunting.  For instance, it is strictly prohibited to hunt with, to shoot, or to carry a loaded firearm, within 500 feet of any building occupied by people or domestic animals, or used for storage of flammable material.  *Id.* at 12.

f. Rifles and handguns using ammunition larger than .22 caliber rimfire is prohibited in all State-owned parks and forests.  *Id.*

g. There are numerous other rules and restrictions DEEP has imposed related to hunting, which are all set forth in the 2023 Guide.

91. Alcohol:

28

1. Under § 23-4-1(e), alcohol is prohibited in any beach and boardwalk area of all State parks and forests.  As to other areas, alcohol is generally permitted, except for the locations specifically listed in § 23-4-1(e) where alcohol is banned in the entire park.  Naugatuck State Forest, Sleeping Giant State Park, Dinosaur State Park, or Hammonasset Beach State Park, which are discussed in greater detail below, are not among the locations where alcohol is entirely prohibited.

2. Because DEEP does not have the staff or capacity to generally oversee or regulate consumption in those places where alcohol is permitted, it is possible that individuals may consume large amounts of alcohol.  That is most frequently the case in those locations that provide for picnicking and also in camping areas.

3. DEEP has many incidents of individuals consuming alcohol and becoming disorderly, including in locations where alcohol is prohibited.

92. Target shooting:

   a. Trap or target shooting on any State property or public hunting area is strictly prohibited unless that area is a designated shooting range.

   b. There are 4 State-owned public shooting ranges:

      i. Glastonbury Public Shooting Range (Meshomasic State Forest, in Glastonbury, CT)

      ii. High Rock Cooperative Shooting Range (Naugatuck State Forest, in Naugatuck, CT)

29

1280

      iii.  Wooster Mountain State Park Cooperative Shooting Range

          (Wooster Mountain State Park, in Danbury, CT)

      iv.  Nye Holman Field Archery Range (Nye Holman State Forest, in

          Tolland, CT)

  c.  Shooting ranges are subject to numerous safety and other restrictions. One example of safety range rules is set forth on DEEP's website and is accessible at: https://portal.ct.gov/DEEP/Hunting/Glastonbury-Shooting-Range

## IV. IMPACT OF PERMITTING PARK AND FORESTS VISITORS TO CARRY FIREARMS

93. Permitting park and forest visitors to carry firearms would have a negative impact on our park and forest system operations.

94. First, permitting visitors to carry handguns in our parks and forests would cause immense safety concerns throughout our system of State parks and forests. Often, our beaches, campgrounds, nature centers, and historic locations, among many others, become crowded. Increased visitation in recent years has only led to them becoming more crowded. Many of our visitors are families and children. Allowing firearms in these locations would create many challenges for ensuring that firearms were safely stored, and could lead to confusion, conflict, and/or outrage between guests when they see someone with a firearm. The mere sight of a gun by visitors could ultimately lead to chaotic circumstances or hysteria among park or forest guests, and the potential for confusion and conflict is exacerbated because in the large

30

majority of our parks and forests, visitors are permitted to consume alcohol. *See* Conn. State Agency Regs. § 23-4-1(e). Given the many people who visit our parks and forests, discharging a firearm in those locations would be a safety hazard for those around because, unlike in the designated hunting zones where sufficient space is guaranteed, it is very possible a shot that missed the intended target could strike another person or multiple people.

95. Second, permitting visitors to carry handguns on their person inside State parks and forests will alter the nature of our parks and forests and the way people view them. Our parks and forests are meant to provide people and their families with places they can go to enjoy the outdoors and socialize and congregate together in peace, with the knowledge that people are not carrying firearms. In addition, DEEP's current firearm prohibition aligns with the policy of many other of Connecticut's large tourist attractions, and once word got around that firearms were generally permitted in State parks and forests, visitors may be less likely to come to our locations. That would detract from DEEP's mission of encouraging public engagement with our parks and forests, and could diminish the revenue that our parks and forests generate, which could in turn contribute further to already-existing resources and staffing issues.

96. Third, if visitors were permitted to carry firearms, DEEP and the Parks Division would have to consider changes to other rules and regulations in order to accommodate the safety concerns created by the carrying rule. We

31

would have to consider altering the regulation generally permitting alcohol consumption in our parks and forests. We would also have to consider promulgating new regulations regarding storage, carry limitations in particular locations or buildings. Personnel would also be an issue. We currently have only 52 EnCon officers stationed in three geographical districts across the State, and may require additional security if firearms were permitted, and make alterations to the standard training they and any seasonal employees receive to include additional safety and active shooter training.

97. There are many other alterations to rules and regulations that DEEP/Parks Division may have to consider.

98. Implementing such changes would not be possible overnight and would require substantial lead time. Additionally, it would be difficult if not impossible to effectively complete these changes on a State-wide basis, particularly given the limited staff that Parks Division and EnCon has. Indeed, some of the changes we would need to consider—like altering the alcohol rules, for example—would require formal regulatory rulemaking, which can be a lengthy process. Similarly, undoing or altering any changes to DEEP's rules and/or regulations could not happen overnight.

99. Permitting firearms in our State parks and forests would also likely violate deed restrictions imposed on the State as a condition for acquiring the properties to begin with. As noted above, at least one grant document

32

relating to a parcel in Sleeping Giant State Park provides that "[t]he use of firearms shall be forever prohibited thereon." If individuals were generally allowed to carry firearms in State parks or forests, DEEP would need to search through all records pertaining to deed restrictions imposed upon the state to assess whether such a general right to carry a firearm would violate other deed restrictions like the one specifically addressing Sleeping Giant State Park. That process would require considerable time and resources, and it would be unclear how or if DEEP and the State would be able to comply with such deed restrictions. Such inability or impracticability to comply with such deed restrictions could result in subsequent litigation addressing the designated use of the State parks or forests subject to such deed restrictions, which, in turn, could result in additional costs or burdens to the State.

100. I am also concerned that permitting visitors to carry handguns will impact our ability to retain existing employees, and to recruit and hire new employees. A general right to carry in parks and forests may influence someone's willingness to work in that environment.

101. The State does not own every location within the State park and forest system. For example, the Windsor Locks Canal State Park Trail is owned by the Windsor Locks Canal Co., and it is leased to the State for public use. A true and accurate copy of that lease agreement is included as Exhibit 130.

## V.    INDIVIDUAL PARK CONSIDERATIONS

### A.    Sleeping Giant State Park

33

102.     Sleeping Giant State Park ("Sleeping Giant") is one of the State's most popular State parks.  It is adjacent to Quinnipiac University—one of Connecticut's well-known private universities.

103.     A 1.5 mile hiking trail leads to a stone observation tower, which is on the top of Mt. Carmel.  The observation tower provides a scenic view of Long Island Sound.  Visitors may freely walk into the observation tower.

104.     A true and accurate copy of the observation tower is included as Exhibit 112.

105.     Because of the scenic view from the observation tower, it is a location in Sleeping Giant that tends to attract the most visitors, and during a peak season, people can be almost shoulder to shoulder.

106.     Sleeping Giant is a popular destination for families, children, and students from Quinnipiac University and other school children under the age of 18, as is the observation tower.

107.     Sleeping Giant also contains a campground, as it is one of the locations of the Youth Group Camping program, discussed above.

108.     Permitting firearms would create a safety hazard in Sleeping Giant, or portions thereof, given its popularity with children, families, and schools, particularly in the close quarters of the observation tower.

**B.     Naugatuck State Forest**

109.     Naugatuck State Forest ("Naugatuck") is a forested area that is popular for its multi-use trails.

34

110.    Because of its scenic hiking and its youth group campground, Naugatuck is a popular destination for children and families.

C.    **Hammonasset Beach State Park**

111.    Hammonasset Beach State Park ("Hammonasset")  consists of over two miles of beach, a boardwalk, concessions, the Meigs Point Nature Center, picnic shelters, large camping grounds, and other facilities.

112.    Hammonasset Beach State Park ("Hammonasset") is the most visited location in our State park and forest system and—with the exception of casinos—is generally regarded as the largest tourist attraction in the State.

113.    Approximately 3 million people come each year to Hammonasset.

114.    Hammonasset frequently gets very crowded, particularly during summer months.  A photograph that fairly and accurately depicts Hammonasset on a crowded day is included as Exhibit 115.  It is not uncommon for Hammonasset to become that crowded, particularly during peak summer months, and for the beach to reach visitor capacity at times.

115.    The Meigs Point Nature Center is located within the park and is available free of charge.  The nature center includes a large building consisting of four main rooms of exhibits, each with their own theme: beach, water, air, and woods.  It consists of numerous live exhibits of animals from those locations, including turtles, snakes, frogs, salamanders, birds, butterflies and moths, fresh and saltwater tanks.  The nature center also contains a large outdoor garden.

35

116.    The nature center is extremely popular for families, children, and school field trips.  The nature center is often used for children's birthday parties, and there are various educational and other children's programs that take place there.

117.    Permitting firearms in Hammonasset Beach State Park would create considerable safety risks.  The park is frequently crowded, including with families, children, and school groups.  In addition, the beach would present unique security concerns because people are frequently leaving their belongings to go into the water and engage in other beach-related activities.  That could result in people leaving their firearms unattended, perhaps in plain view, and perhaps not properly stored.  This could cause confusion, conflict, and outrage among guests, and various calls to 911.  Additionally, alcohol is permitted at Hammonasset Beach State Park, which exacerbates the risks of that occurring.

**D.    Dinosaur State Park**

118.    Dinosaur State Park consists of two miles of nature trails and the Exhibit Center, a large building consisting of numerous prehistoric exhibits, as well as a giftshop, including one of the largest tracks of fossilized dinosaur footprints in North America.  The tracks are believed to have been made by Dilophosaurus.

119.    Dinosaur State Park charges an admission fee in order to enter the Exhibit Center.

36

120.     Dinosaur State Park is frequently visited by families, children, and school field trips.

121.     Additional information about Dinosaur State Park is available here: Dinosaur State Park (ct.gov).  A true and accurate photograph depicting the Exhibit Center is included as Exhibit 132.

### E.     Harkness Memorial State Park

122.     Harkness Memorial State Park ("Harkness") contains the historic Eolia Mansion, which is a popular destination for weddings, private parties, seminars, conferences, and other functions.  Additional information about Harkness Memorial State Park is available here: https://www.harkness.org/about-the-park/.

123.     Individuals may rent the mansion by paying a fee.

### F.     Gillette Castle State Park

124.     Gillette Castle State Park is a popular destination that contains hiking trails, camp grounds, picnicking areas, and the historic Gillette Castle.

125.     Visitors pay to purchase tickets to tour the castle.

126.     Gillette Castle State Park is a popular destination for events including weddings.

127.     Gillette Castle State Park is frequently visited by families, children, and school field trips.

### G.     Fort Griswold Battlefield State Park & Fort Trumbull State Park

37

128.     Fort Griswold, situated on the Thames River in Groton, CT, is the site of the historic Battle of Groton Heights, where British Forces during the American Revolutionary War, commanded by Benedict Arnold, captured the Fort and massacred 88 of the Fort's defenders.  It is a tourist destination for various individuals and occasionally the location for school field trips.

129.     Fort Trumbull State Park, situated on the Thames River in New London, CT, served as a location for various military forts, schools, and research facilities for various branches of the United States Military and was first built to protect New London Harbor from attacks from the British.  The Fort later became part of our Nation's coastal defense system.  Today, the site holds a visitor center, depicts over 225 years of military history and technological advances from the Revolutionary War to the Cold War, and it is visited frequently by tourists and school field trips, among others.  True and accurate copies of photographs of the Fort Trumbull location are included as Exhibit 117.

1289

Pursuant to 28 U.S.C. § 1746, I, Thomas Tyler, state under penalty of perjury that the foregoing declaration is true and accurate to the best of my knowledge, information, and belief.

Executed: _Mar. 30_, 2023

_Thomas J. Tyler_
Thomas Tyler

# Exhibit 138

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

DAVID J. NASTRI, ESQ.                    :        No. 3:23-cv-00056 (JBA)
    *Plaintiff*                          :
                                            :

        v.                               :

KATIE DYKES, *in her official capacity,*   :
    *Defendant*                          :

## DECLARATION OF ANTHONY ANTHONY

I, Anthony Anthony, declare as follows:

## Personal Background

1. I am the Chief Marketing Officer at the Connecticut Department of Economic and Community Development ("DECD").

2. As the Chief Marketing Officer at DECD, I am responsible for overseeing all marketing strategy, public facing messaging and narratives, and tactical initiatives across the agency, including the Office of Tourism.

3. As the Chief Marketing Officer at DECD, I am familiar with DECD's marketing and public communication efforts. Additionally, I am familiar with such efforts from my time working in the governor's office, where I was employed from May 2021 through March 2023. During this time, I served on the communications staff, including five months as director of communications and two months as special advisor to the governor, a strategic communications role taking on special projects to market the

1

1292

governor's policy positions and the state. As director of communications, I was part of the governor's senior staff who helped administer and execute policy, including working with agencies like the Connecticut Department of Energy and Environmental Protection to market State parks and forests to Connecticut residents and visitors. Based on my experiences, I believe they are an integral part of Connecticut's extraordinary quality of life, something that not every state offers.

4.    I am aware that a federal lawsuit in the above captioned case challenges a regulation in the State of Connecticut ("State") that generally prohibits individuals from carrying guns in State parks and forests.

5.    The testimony in this Declaration is based upon my personal knowledge, which I have obtained through a combination of my training, observations, work experience, from reviewing relevant documents, and in speaking with colleagues within and outside DECD who themselves are knowledgeable about the subjects discussed herein. Any information I obtained from those outside sources is consistent with my own understanding of the subjects discussed herein.

**Background on DECD and the Office of Tourism**

6.    DECD is the State's lead agency responsible for strengthening the State's competitive position in the rapidly changing global economy. Among other

2

initiatives, DECD works to make tourism a leading economic contributor and a source of pride for the State.

7.    The Office of Tourism is a department within DECD. As Chief Marketing Officer at DECD, I oversee all efforts to market the state, including the Office of Tourism.

8.    Broadly speaking, the Office of Tourism promotes and markets what the State has to offer prospective tourists, as well as strengthening State pride within our current community of residents.

9.    Through various initiatives and strategic partnerships with the business community and others, the Office of Tourism works to make tourism a leading economic contributor and source of pride for the State, strives to position the State as a prime destination for leisure and business travelers, and seeks to encourage strategic investment in the State. Such efforts are also designed to market the State as an attractive destination to live for future residents.

10.    In furtherance of these overarching objectives, DECD and the Office of Tourism create television advertisements, operate several social media channels, publish e-Newsletters, and manage the CTVisit.com website.

11.    By viewing and/or accessing the information provided across these various mediums, individuals can see, read, and/or hear what the State has to offer to prospective tourists and residents.

3

12. To help carry out its objectives and assess the impact of tourist visitation on the State, the Office of Tourism works closely with Adams & Knight, Inc., a third-party agency, to market the State, track analytical data captured through surveys, and conduct relevant research regarding visitation and public sentiment in order to market the State's assets more effectively.

## Tourism in Connecticut Generally

13. Recent data illustrates that tourism is an important contributor to the State's economy. For example, in 2022, tourist spending generated $17 billion for State businesses, led to $1.1 billion in State and local tax proceeds (excluding casino revenue), grossed $1.3 billion in lodging income, and supported approximately 120,000 jobs. In 2021, tourist spending generated $15.4 billion for State businesses, grossed $892 million in lodging profits, and supported approximately 111,000 jobs.

14. In 2022, approximately 66.6 million tourists visited the State. In 2021, approximately 64.8 million tourists visited the State.

15. In 2022, approximately 7.1 million users accessed CTVisit.com. In 2021, approximately 7 million users accessed CTVisit.com.

## State Parks and Forests Play a Key Role in Connecticut's Tourism Efforts

16. The State's parks and forests are a key part of the State's efforts to promote and market what the State has to offer prospective tourists and residents.

4

1295

17. For example, State parks and forests are marketed or promoted in some form in approximately 90% of our marketing efforts.

18. Additionally, many of the articles marketing and advertising the State on CTVisit.com leverage the State's parks and forests and promote activities commonly experienced in such locations like hiking, biking, kayaking, going to the beach, walking a dog, viewing fall foliage, and viewing waterfalls. Just last year, more than 5 million individuals read such articles that were posted on CTVisit.com.

19. CTVisit.com also has pages dedicated to "Parks & Forests,"[1] "Hiking & Biking,"[2] "Beaches,"[3] and "Nature & Outdoors."[4] Each of these pages promote the State's parks and forests, at least in part, in an effort to attract tourist visitation to the State.

20. CTVisit.com also posts various stories, such as "Instagrammable CT: On the Water at Connecticut's State Parks,"[5] "6 Parks Kids will Love,"[6] "Favorite Park Closed? Here Are Others to Try,"[7] and "Connecticut's Best Swimming Holes!"[8] Each of these stories are additional examples of the State's

---

[1] *See* https://www.ctvisit.com/interest/parks-forests.
[2] *See* https://www.ctvisit.com/interest/hiking-biking.
[3] *See* https://www.ctvisit.com/interest/beaches.
[4] *See* https://www.ctvisit.com/interest/nature-outdoors.
[5] *See* https://ctvisit.com/articles/instagrammable-ct-water-connecticuts-state-parks.
[6] *See* https://ctvisit.com/articles/6-parks-kids-will-love.
[7] *See* https://ctvisit.com/articles/favorite-park-closed-here-are-others-try.
[8] *See* https://ctvisit.com/articles/connecticuts-best-swimming-holes.

5

marketing content that promotes various State parks and what they have to offer prospective tourists and in-state residents.

21.    Currently, 156 articles on the CTVisit.com website specifically promote at least one State park or forest by name.  And during the height of the COVID-19 pandemic, approximately 100% of the Office of Tourism's messaging efforts focused on promoting State parks and forests.

22.    Many of the television advertisements organized by DECD and the Office of Tourism similarly showcase the outdoor activities that tourists can enjoy in places like State parks and forests.[9]

23.    State parks and forests are a huge attraction for both in-state and out-of-state visitors because of the diverse offerings that people can experience at such locations like hiking, water activities, beautiful scenery, and countless other experiences.  The State capitalizes on such offerings in some capacity in most of its efforts to market and promote the State, and such marketing and promotional materials seek to portray State parks and forests as locations that are beautiful, scenic, peaceful, leisurely, and inclusive for people and families of all walks of life.

---

[9] A link to the Office of Tourism's current television advertising campaign, which shows some of the activities that people can enjoy in State parks and forests as part of the diverse array of activities that people can enjoy in the State, is available here: https://we.tl/t-E33HQYlZFt.

6

## The Presence of Firearms in State Parks and Forests Could Impact the State's Marketing Efforts

24.    If guns were generally allowed in State parks and forests, that could impact the State's marketing efforts in various ways.  Among other things:

a.    If an incident occurred involving the discharge or display of a firearm in a State park or forest, that would likely have a huge impact on individuals wanting to engage in activities like hiking in the woods, bringing their children to such locations, or otherwise visiting a State park or forest. And such an incident would cause the State to consider stopping any marketing efforts in State parks or forests until public discourse about the incident settled down.

b.    Similarly, an incident involving the discharge or display of a firearm in a State park or forest could lead to an increase in the State's marketing or promotional expenses because our marketing efforts might need to change in order to put people at ease about visiting State parks and forests—some of the State's most important marketing assets.

c.    We have made progress in recent years in promoting and marketing Connecticut, seeing an improvement in how residents and visitors feel about the state's reputation and offerings. If an incident involving the discharge or display of a firearm occurred, it would set back the progress and good will we have built up. Additionally, it would require a dramatic shift in our strategies, budgeting, and tactical planning for the future as

7

1298

reputation management is a key part of DECD's communications strategy,

which goes hand in hand with our marketing initiatives.

Pursuant to 28 U.S.C. § 1746, I, Anthony Anthony, state under penalty of perjury that the foregoing declaration is true and accurate to the best of my knowledge, information, and belief.

Executed: March 28, 2023

_____
Anthony Anthony

8

# Exhibit 139

1300

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

DAVID J. NASTRI, ESQ.                    :           No. 3:23-cv-00056 (JBA)
    *Plaintiff,*                          :
                                        :

v.                                       :

KATIE DYKES, *in her official capacity*, :
    *Defendant.*                          :

## DECLARATION OF GARY HIGHSMITH

I, Gary Highsmith, declare as follows:

## Professional Background

1.     I am the Superintendent of Hamden Public Schools. I have held this position since September of 2022.

2.     From 1995 to 2000, I was a Social Studies Teacher at Troup Magnet Academy of Science in New Haven, CT.

3.     From 2000-2002, I was an Assistant Principal at East Rock Global Magnet School in New Haven, CT.

4.     From 2002-2006, I was Principal of L.W. Beecher Elementary School in New Haven, CT.

5.     From 2006-2015, I was Principal of Hamden High School in Hamden, CT.

6.     From 2015-2021, I was Director of Human Resources for Hamden Public Schools in Hamden, CT.

1

1301

7. From 2021-2022, I was Assistant Superintendent for Human Resources and Administration for Hamden Public Schools in Hamden, CT.

8. I have a Bachelor of Arts Degree in American History from Southern Connecticut State University (SCSU, 1989).

9. I have a Masters of Science Degree in American History from SCSU (1995).

10. I have a Sixth Year Degree in Educational Leadership from SCSU (2001).

11. I have a valid State of Connecticut Teaching Certificate in 7-12 Social Studies (since 1995).

12. I have a valid Sixth Year Certificate in Administrative Leadership (since 2000).

13. I have a valid State of Connecticut Superintendent's Certificate (since 2017).

14. As Superintendent, I serve as the chief executive officer of the Hamden Board of Education. In harmony with the policies of the Hamden Board of Education and state law, I have executive authority over the school system and I am responsible for the day-to-day operations and supervision of the school district. I have the general authority to act at my discretion, subject to later approval by the Board of Education,

2

upon all emergency matters and those as to which my powers and duties are not expressly limited or are not particularly set forth. I advise the Board on policies and plans that the Board takes under consideration, and I take the initiative in presenting to the Board policy and planning issues for the Board's attention.

15. I am responsible for final decisions regarding personnel, and maintain the authority to direct other administrators in the district to serve as my designee when appropriate in matters related to personnel.

16. I am also responsible for academic programming from grades K-12. For field trips, final approval rests with me or my designee as appropriate.

17. It is my understanding that the above-captioned case involves the permissibility of individuals to carry firearms in any State Park or Forest in Connecticut.

18. The testimony in this declaration is based upon my personal knowledge, which I have obtained through a combination of my training, observations, work experience, employment history, review of relevant documents, and in speaking with colleagues within and outside of the Hamden Public Schools system who themselves are knowledgeable about the subjects discussed herein. Any information I

3

obtained from those outside sources is consistent with my own understanding of the subjects discussed herein.

## Background on Hamden Public Schools

19. As of March 24, 2023, The Hamden Public School District enrolls 5,479 students district-wide.

20. The Hamden Public School District consists of eight elementary schools, one middle school, one high school, one secondary alternative program (The Hamden Collaborative Learning Center) and one special education Pre-K school (The Alice Peck Learning Center).

21. The names of all Hamden Public Schools (and programs) are as follows, with student population listed parenthetically:

| | |
|---|---|
| **Alice Peck Learning Center** | **(132)** |
| **Bear Path Elementary School** | **(433)** |
| **Church Street Elementary School** | **(293)** |
| **Dunbar Hill Elementary School** | **(302)** |
| **Helen Street Elementary School** | **(364)** |
| **Ridge Hill Elementary School** | **(313)** |
| **Shepherd Glen Elementary School** | **(288)** |
| **Spring Glen Elementary School** | **(380)** |
| **West Woods Elementary School** | **(317)** |
| **Hamden Middle School** | **(832)** |

4

**Hamden High School**                                     **(1687)**

**Hamden Collaborative Learning Center**          **(61)**

**Wintergreen (Special Ed. Elementary classes) (77)**

## The Impact of the Presence of Guns in State Parks and Forests

22. The Town of Hamden currently has three State Parks: 1) Sleeping Giant State Park; 2) West Rock Ridge State Park; and 3) Farmington Canal Greenway State Park (shared by Hamden and Cheshire). It is worth noting here that Quinnipiac River State Park is in North Haven, CT and is, therefore, contiguous to the Town of Hamden, as is Lighthouse Point Park in New Haven, CT.

23. In May/June of 2022, primarily sophomore Hamden High School students participated in the Quinnipiac University Advancing Diversity in Science (QUADS) Program that took place at Sleeping Giant State Park. The QUADS Program is designed to engage Connecticut high school students in developing science skills and knowledge through a place-based science educational experience. The QUADS Program was based in Sleeping Giant State Park for team building and hiking. Students participating in this program visited Sleeping Giant State Park daily for a four-week period.

24. If individuals were allowed to carry firearms in State Parks and Forests, and the QUADS Program was again based at Sleeping Giant

5

1305

State Park, I would not allow our students to participate due to safety concerns. Similarly, if the QUADS program were to take place at another State Park or Forest, I would not allow our students to participate due to the same safety concerns.

25. If individuals were allowed to carry firearms in State Parks and Forests that would, in effect, deny our students an opportunity to take advantage of any educational program taking place in any such State Parks or Forests.

26. It is my understanding that organizers of the QUADS Program have had preliminary discussions about going back to Sleeping Giant State Park in the Spring of 2023, but that decision has not been finalized yet.

27. In prior years, other classes throughout Hamden Public Schools have gone to Sleeping Giant State Park for the purposes of utilizing the nature trails, for plant identification, and to learn about some of its geological history. These trips were for school field trips.

28. In prior years, teachers in Hamden Public Schools have taken their students to Lighthouse Point Park for the purposes of doing low-tide collections and subsequent plant and animal identification, and also to engage in beach studies (i.e. transect and erosion studies). These were also school sponsored field trips.

6

1306

29.  A Hamden High School Science Teacher is currently planning a trip to Sleeping Giant State Park for the Spring 2023 as an incentive for students who have made the honor roll.

30.  If individuals were allowed to carry firearms in State Parks and Forests, I would immediately notify all of the district's parents and guardians of the change in the law.  I can say with full confidence that our parents and guardians would be extremely concerned about their child being in a State Park or Forest if people are allowed to carry guns there.  I also believe that parents would, if made aware a change in the law such that individuals could carry firearms in State Parks and Forests, not allow their children to attend any school-sponsored trips to State Parks or Forests due to safety concerns.

31.  Relatedly, if individuals were allowed to carry firearms in State Parks and Forests, I would consider not allowing our students to participate in such school-sponsored field trips to such locations due to safety concerns.

32.  It is my understanding that The Town of Hamden offers summer programming through the Town of Hamden's Recreation Department for children ages 3½ years old to 14/15 years old. It is my understanding that hundreds of Campers in that summer program have gone to Sleeping Giant State Park.

7

1307

33. If individuals were allowed to carry firearms in State Parks or Forests, I would urge the Mayor's Administration to reconsider allowing Campers participating in the summer program to visit Sleeping Giant State Park. Similarly, if Campers from the summer program were to visit other State Parks or Forests, I would urge the Mayor's Administration to reconsider allowing campers to visit such State Parks or Forests due to the same safety concerns.

34. It is my understanding that the pending lawsuit implicates State Parks and Forests, but I would have a concern about the lawsuit's applicability to parks in general.

35. In that regard, it is important to note here that over the years, we have received reports of students using social media in order to arrange fights in the park in the Town of Hamden.

36. My concern regarding the lawsuit's potential impact on all parks would be that someone (whether connected to the prearranged physical altercations or not) would be carrying a gun and use the gun to either break up the fight (i.e. vigilantism) or use the gun to harm an adversary.

37. To reiterate, if individuals were allowed to carry firearms in State Parks and Forests, it would have a chilling effect on our students'

8

1308

attendance at such locations within the context of school-sponsored activities.

38. As with any school-sponsored activity occurring off school grounds, there are numerous general safety concerns. Allowing firearms in State Parks and Forests would add an additional layer of concern that our students and staff should not have to worry about, and which would impact my decision-making regarding whether to allow our students to participate in such school-sponsored activities in State Parks and Forests.

Pursuant to 28 U.S.C. § 1746, I, Gary Highsmith, state under penalty of perjury that the foregoing declaration is true and accurate to the best of my knowledge, information, and belief.

Executed: March 28, 2023

Gary Highsmith

9

# Exhibit 140

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DAVID J. NASTRI, ESQ. | : | No. 3:23-cv-00056 (JBA) |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | |
| KATIE DYKES, *in her official capacity,* | : | |
| *Defendant.* | : | |

## DECLARATION OF MARK BENIGNI, Ed.D.

I, Mark Benigni, Ed.D., declare as follows:

## Background

1. I am the superintendent of the Meriden Public Schools, where I have served since 2010. Prior to that, I was the principal of Cromwell High School and an adjunct professor of Educational Leadership at Southern Connecticut State University.

2. I obtained my Ed.D. from the University of Hartford in 2001 and my Master's in Education in 1996.

3. I am the co-author of two books published by Rowman & Littlefield Education. I have also authored over 30 articles in various educational journals and publications.

4. My most recent book, *The Great Equalizer: Six Strategies to Make Public Education Work in America,* was published in 2022.

5. I am aware that a federal lawsuit in Connecticut in the above captioned case challenges a state regulation that generally prohibits individuals from carrying guns in state parks and forests.

6. The testimony in this Declaration is based upon my personal knowledge, which I have obtained through a combination of my training, observations, work experience, employment history, review of relevant documents, and in speaking with colleagues within and outside of the Meriden Public Schools system who themselves are knowledgeable about the subjects discussed

1

1311

herein. Any information I obtained from those outside sources is consistent with my own understanding of the subjects discussed herein.

## District Profile

7.  Meriden Public Schools has 13 schools (8 elementary, three middle, and two high schools), three programs, and over 8,700 students.

8.  75% of our students identify as students of color.
    a.  3% identify as American Indian.
    b.  2% identify as Asian.
    c.  16% identify as Black.
    d.  46% identify as Hispanic/Latino.
    e.  10% identify as Multiple Ethnicities.
    f.  22% identify as White.

9.  77% of our students qualify for free/reduced-price meals; however, we provide universal free breakfast and lunch.

10.  19% of our students are in special education.

11.  17% of our students identify as Multilingual learners.

12.  As superintendent of schools, my primary responsibility is to provide a safe, engaging learning environment for all our students. Our goal is to ensure that all of our learners leave our schools prepared for college, career, and civic life.

## School Field Trips

13.  Our schools visit state parks and forests a few times a year and have done so for a number of years.

14.  Parks and forests recently visited over the past few years by our schools include Hammonasset Beach State Park, Indian Rock Nature Center, Dinosaur State Park, and Sleeping Giant State Park. Examples of those visits are listed in the attached table, which provides a true and accurate reflection of our schools' trips to state

2

1312

parks and forests (Attachment 1).[1]

15. These state parks and forests were visited by all levels of our schools, elementary, middle, and high school.

16. Field trips to state parks and forests are cost-effective ways to enhance course curricula, our schools have frequently used them in the past, and I expect that they will continue to do so in the future.

17. Our schools organize field trips months in advance, including arranging transportation and having parents complete permission slips.

18. I anticipate that plans by our schools to go on more field trips, including visits to state parks and forests, will increase as restrictions and concerns surrounding the COVID-19 pandemic continue to subside.

19. Principals at each school provide initial approval of any field trips that are in Connecticut, including to state parks and forests.

20. Ultimately, the superintendent and assistant superintendents in our district's Central Office determine the acceptability of any field trip.

## Impact of the Presence of Guns at State Parks and Forests

21. If individuals were permitted to carry guns in state parks and forests, that would impact our schools' plans to visit such locations in the following ways:

    a. It might eliminate the location as a field trip option for our students.

    b. It will likely require additional information to be shared with parents and other language in the permission slips shared with them.

---

[1] The locations bolded in Attachment 1 correspond with state parks and forests and similar locations visited by Meriden Public Schools in recent years. The names of our schools that visited such locations, or their acronyms, are listed directly below the bolded locations.

3

1313

c. If state park and forest rules change, and individuals were allowed to carry guns in those locations, we would undoubtedly notify parents before having them complete a permission slip.

d. If parents were informed that individuals were allowed to carry guns in state parks and forests, I am confident that such information would be received with mixed emotions and would influence parents' decisions to let their children participate in field trips to state parks and forests. I suspect that some, if not many, parents would not want to send their children on field trips to state parks and forests if they were informed that individuals were allowed to carry guns in those locations.

e. It might impact our schools' staffing and programming. For example, if parents did not want to send their children on a planned field trip to a state park or forest due to the possible presence of guns, that would require us to hire substitute teachers to supervise students who are not attending the field trip.

f. It might result in parent volunteers accompanying our students on field trips to state parks and forests requesting to carry their own guns with them. If that were to happen, that would create various complications for our schools.

g. We might consider sending the School Resource Officer (SRO), who is a police officer that works in a school setting, on the field trip to the state park or forest. Having police officers with a weapon might make some parents more comfortable sending their children on the trip. However, the trip might need to be canceled if the SRO is unavailable.

h. The uncertainties of this environment and caution for potential safety risks may result in pressure from students, staff, and families to eliminate onsite trips. Instead, we may need to consider having state park and forest representatives visiting our schools rather than our students experiencing the state parks and forests for themselves.

22. In short, the ability for individuals to lawfully carry guns in state parks and forests will require our district's Central Office to consider various factors before deeming it acceptable to send our students on

4

field trips to such locations.

23.   Current law supports utilizing our state parks and forests for student field trips.

24.   Allowing the presence of guns could jeopardize state parks and forest usage for our students going forward.

Pursuant to 28 U.S.C. § 1746, I, Mark Benigni, Ed.D., state under penalty of perjury that the foregoing declaration is true and accurate to the best of my knowledge, information, and belief.

Executed: March 28, 2023

Mark Benigni, Ed.D.

5

1315

# Attachment 1

| Meriden Public Schools | | | |
|---|---|---|---|
| **Facility** | Dates | | |
| **Dinosaur State Park** | | | |
| Ben Franklin | 11/17/2021 | | |
| N. Hale | 5/29/2019 | | |
| **Hammonasset/ Meigs Point** | | | |
| N. Hale | 2019 | | |
| WMS | 5/17/2019 | 5/21/2019 | |
| MHS | Once per year every spring pre-Covid | | |
| PHS | 5/10/2022 | | |
| **Indian Rock Nature Center** | | | |
| John Barry | 4/20/2022 | | |
| N. Hale | 5/23/2022 | | |
| Hanover | 5/8/2018 | | |
| Putnam | 4/2015 | 4/25/2018 | 6/20/2022 |
| **Sleeping Giant** | | | |
| PHS | 5/27/2022 | | |

# Exhibit 141



Connecticut's Official
State Website

Search Connecticut Government...    🔍    Language + Settings

Connecticut
# Department of Energy & Environmental Protection

CT.gov Home  /  Department of Energy & Environmental Protection  /  State Parks  /  Listing of State Parks

| State Parks & Forests Main Page | › |
| General Information | › |
| Camping | › |
| Facilities Rental | › |
| Find a Park | › |
| Fees | › |
| Park & Forest Maps | › |
| Recreation Info | › |
| Main Menu | › |

**Search Department of Energy & Environmental Protection**

by Keyword    🔍

# All State Parks



Whether you are looking for a rigorous outdoor activity, a leisurely stroll or a peek into history, Connecticut's parks and forests have something to offer you year round.  With 139 state parks and forests statewide, you're sure to find one close to home or just a short trip away.

Above All State Park, Warren/Litchfield
Air Line State Park Trail, Multi-Town
Algonquin State Forest, Colebrook
American Legion State Forest, Barkhamsted
Beaver Brook State Park, Windham/Chaplin
Becket Hill State Park, Old Lyme
Beckley Furnace State Park, North Canaan
Bennett's Ponds State Park, Ridgefield
Bigelow Hollow State Park, Union
Black Rock State Park, Watertown

1319

Black Rock State Park, Watertown

Bluff Point State Park, Groton

Bolton Notch State Park, Bolton

Brainard Homestead State Park, East Haddam

Burr Pond State Park, Torrington

C.P. Huntington State Park, Redding/Bethel/Newtown

Camp Columbia State Park, Morris

Camp Columbia State Forest, Morris

Campbell Falls State Park, Norfolk

Centennial State Forest, Fairfield

Chatfield Hollow State Park, Killingworth

Cockaponset State Forest, Haddam/Chester

Connecticut Valley Railroad State Park, Essex

Dart Island State Park, Middletown

Day Pond State Park, Colchester

Dennis Hill State Park, Norfolk

Devil's Hopyard State Park, East Haddam

Dinosaur State Park, Rocky Hill

Eagle Landing State Park, Haddam

Enders State Forest, Granby/Barkhamsted

Farm River State Park, East Haven

Farmington Canal Greenway State Park, Cheshire/Hamden

Fort Griswold State Park, Groton

Fort Trumbull State Park, New London

Gardner Lake State Park, Salem

Gay City State Park, Hebron

George Dudley Seymour State Park, Haddam

George Waldo State Park, Southbury

Gillette Castle State Park, East Haddam

Green Falls State Campground, Voluntown

Haddam Island State Park, Haddam

Haddam Meadows State Park, Haddam

Haley Farm State Park, Groton

Hammonasset Beach State Park, Madison

Harkness Memorial State Park, Waterford

Haystack Mountain State Park, Norfolk

Higganum Reservoir State Park, Higganum

Hop River State Park, Multi-Town

Hopemead State Park, Montville/Bozrah

Hopeville Pond State Park, Griswold

Horse Guard State Park, Avon

Housatonic Meadows State Park, Sharon

Housatonic Meadows State Forest, Sharon

Humaston Brook State Park. Litchfield

1320

Humaston Brook State Park, Litchfield

Hurd State Park, East Hampton

Indian Well State Park, Shelton

J.A. Minetto State Park, Torrington

James L Goodwin State Forests Forest, Hampton

Kent Falls State Park, Kent

Kettletown State Park, Southbury

Killingly Pond State Park, Killingly

Lake Waramaug State Park, Kent

Lamentation Mountain State Park, Berlin

Larkin State Park Trail, Southbury/Naugatuck/Oxford/Middlebury

Lovers Leap State Park, New Milford

Macedonia Brook State Park, Kent

Machimoodus State Park, East Haddam

Mansfield Hollow State Park, Mansfield

Mashamoquet State Park, Pomfret

Massacoe State Forest, Simsbury/Canton

Mattatuck State Forest, Multi-Town

Meshomasic State Forest, East Hampton/Glastonbury/Portland

Mianus River State Park, Stamford

Millers Pond State Park, Haddam

Minnie Island State Park, Bozrah, Montville

Mohawk State Forest/ Mohawk Mountain State Park, Goshen/Cornwall

Mohegan State Forest, Scotland

Mono Pond State Park, Columbia

Mooween State Park, Lebanon

Mount Bushnell State Park, Washington

Mount Riga State Park, Salisbury

Mount Tom State Park, Litchfield

Nassahegon State Forest, Burlington

Natchaug State Forest, Eastford

Nathan Hale State Forest, Coventry/Andover

Naugatuck State Forest, Naugatuck/Oxford/Beacon Falls

Nehantic State Forest, Lyme

Nepaug State Forest, New Hartford

Nipmuck State Forest, Union

Nye-Holman State Forest, Tolland

Old Furnace State Park, Killingly

Osbornedale State Park, Derby

Pachaug State Forest, Voluntown

Pattaconk Lake Recreation Area, Chester/Haddam

Paugnut State Forest, Torrington/Winchester

Paugussett State Forest, Newtown

Penwood State Park, Bloomfield

1321

Penwood State Park, Bloomfield
Peoples State Forest, Barkhamsted
Platt Hill State Park, Winchester
Pomeroy State Park, Lebanon
Pootatuck State Forest, New Fairfield
Putnam Memorial State Park, Redding
Quaddick State Park, Thompson
Quaddick State Forest, Thompson
Quinebaug Lake State Park, Killingly
Quinnipiac River State Park, North Haven
River Highlands State Park, Cromwell
Rocky Glen State Park, Newtown
Rocky Neck State Park, East Lyme
Ross Pond State Park, Killingly
S.L. Pierrepont State Park, Ridgefield
Salmon River Sate Forest, Colchester
Salt Rock State Campground, Sprague
Satan's Kingdom State Park, New Hartford
Scantic River State Park, Enfield/East Windsor/Somers
Seaside State Park, Waterford
Selden Neck State Park, Lyme
Shenipsit State Forest, Stafford/Somers/Ellington
Sherwood Island State Park, Westport
Silver Sands State Park, Milford
Sleeping Giant State Park, Hamden
Southford Falls State Park, Southbury
Squantz Pond State Park, New Fairfield
Stillwater Pond State Park, Torrington
Stoddard Hill State Park, Ledyard
Stratton Brook State Park, Simsbury
Sunnybrook State Park, Torrington
Sunrise State Park, East Haddam
Talcott Mountain State Park, Simsbury
Topsmead State Forest, Litchfield
Tri-Mountain State Park, Durham/Wallingford
Trout Brook Valley State Park, Easton
Tunxis State Forest, Granby/Barkhamsted/Hartland
Wadsworth Falls State Park, Middlefield/Middletown
West Rock Ridge State Park, Hamden/New Haven
Wharton Brook State Park, Wallingford
Whittemore Glen State Park, Naugatuck/Middlebury
Windsor Locks Canal State Park, Windsor Locks
Windsor Meadows State Park, Windsor
Wooster Mountain State Park, Danbury
Wyantenock State Forest, Cornwall

*Content updated June 2021*

# Exhibit 142

# ACTS AND RESOLVES

### OF

## MASSACHUSETTS.

### 1794-95.

[PUBLISHED BY THE SECRETARY OF THE COMMONWEALTH, UNDER
AUTHORITY OF CHAPTER 104, RESOLVES OF 1889.]

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

# ACTS

AND

# LAWS

OF THE

# COMMONWEALTH

OF

# MASSACHUSETTS. *Laws.*
*statutes, etc.*

---

## BOSTON:

Printed at the STATE PRESS, by ADAMS & LARKIN,
Printers to the GENERAL COURT.
M,DCC,XCIV.

---

Reprinted by WRIGHT & POTTER PRINTING COMPANY, State Printers.
1896.

Digitized by Google          Original from
UNIVERSITY OF MICHIGAN

66

## ACTS, 1794. — CHAPTER 26.

in the bounds following, *viz.* beginning at Trap-hole Brook so called, in the land of Nathaniel Sumner Esqr. where the fence now stands which divides said Sumner's upland from his meadow, & running southerly on said fence till it comes to the land improved by George Sumner, then through said land nearly the same course, till it comes to the Southwest corner of said George Sumner's home Meadow so called; then turning and running Easterly in said Meadow, as the ditch which forms the fence is made, till it comes to the south end of Benjamin Hawes's Meadow; then in the line between said Hawse's meadow & the land of William Richards; then in the line between said Richards' home-lot & the meadow lots, till it comes to Cumming's brook so called; thence on said brook till it comes to the line between Stoughton & Sharon; thence on said line till it comes to Neponset River; thence Westerly on said River till it comes to Trap-hole brook; thence on said Brook, till it comes to the bounds first mentioned, — Shall be considered as one Common & General Field; And that the Proprietors of said Lands, their Heirs & Successors be, and they hereby are incorporated & invested with all the powers & privileges which the Proprietors of Common & General Fields by Law are invested with.   *Approved January 22, 1795.*

---

### 1794. — Chapter 26.

[January Session, ch. 2.]

AN ACT FOR REPEALING AN ACT, MADE & PASSED IN THE YEAR OF OUR LORD, ONE THOUSAND SIX HUNDRED AND NINETY TWO, INTITLED "AN ACT FOR PUNISHING CRIMINAL OFFEND-ERS" AND FOR RE-ENACTING CERTAIN PROVISIONS THEREIN.

*Be it Enacted by the Senate and House of Representa-tives in General Court assembled, and by the authority of*

Act repealed.

*the same,* that the said Act be, and hereby is repealed, and made wholly null and void.

*And be it further Enacted by the authority aforesaid,*

Justices of the Peace empow-ered.

that every Justice of the peace, within the County for which he may be commissioned, may cause to be staid and arrested all affrayers, rioters, disturbers or breakers of the peace, and such as shall ride or go armed offen-sively, to the fear or terror of the good citizens of this Commonwealth, or such others as may utter any menaces or threatening speeches, and upon view of such Justice, confession of the delinquent, or other legal conviction of

1326

Digitized by Google       Original from UNIVERSITY OF MICHIGAN

any such offence, shall require of the offender to find
sureties for his keeping the peace, and being of the good
behaviour; & in want thereof to commit him to prison,
untill he shall comply with such requisition: And may
further punish the breach of the peace in any person that
shall assault or strike another, by fine to the Common-
wealth not exceeding twenty shillings, and require sureties
as aforesaid, or bind the offender to appear and answer
for his offence, at the next Court of General Sessions of
the Peace, as the nature or circumstances of the case may
require.                      *Approved January 29, 1795.*

## 1794. — Chapter 27.

[January Session, ch. 3.]

AN ACT TO SET OFF WILLIAM GOODSPEED WITH HIS ESTATE,
FROM THE TOWN OF WASHINGTON IN THE COUNTY OF BERK-
SHIRE, AND ANNEX HIM AND HIS ESTATE TO THE TOWN OF
LENOX, IN THE SAME COUNTY.

*Be it Enacted by the Senate and House of Representa-
tives, in General Court assembled, and by the authority
of the same*, that William Goodspeed with his estate be,
and he hereby is set off from the town of Washington, in
the County of Berkshire, and annexed to the town of
Lenox, in the same County.

*Approved January 31, 1795.*

## 1794. — Chapter 28.

[January Session, ch. 4.]

AN ACT TO INCORPORATE VALENTINE RATHBURN AND OTHERS,
INHABITANTS OF THE TOWN OF PITTSFIELD, INTO A RELI-
GIOUS SOCIETY, BY THE NAME OF THE BAPTIST RELIGIOUS
SOCIETY IN THE TOWN OF PITTSFIELD.

*Be it Enacted By the Senate and House of Representa-
tives in General Court assembled, and by the authority of
the same*, that Valentine Rathburn, Daniel Rathburn, Persons incor-
John Baker, John Remington, Jonathan Kingsley, John porated.
Bryant & others, inhabitants of said town of Pittsfield,
members of the said Religious Society; together with
their polls and estates be, and they hereby are incor-
porated by the name of The Baptist Religious Society in
Pittsfield, with all the priviledges, powers, and immunities,
to which other religious Societies in this Commonwealth
are by Law intitled.

Digitized by Google          Original from
UNIVERSITY OF MICHIGAN

# Exhibit 143

D90115A
T90115A

1 of 10



63.

At a meeting of the Visitors of the University, at the University on Monday the 4th. of October 1824. at which were present Thomas Jefferson. James Madison, James Breckenridge, John H. Cocke, George Loyall and Joseph C. Cabell.

Resolved that the board ratify two purchases of land in front of the Rotunda purchased of Daniel A. Piper, and Mary A.F. his wife.

Resolved that permission be given to Francis W. Gilmer, now on his mission to Great Britain for the purpose of engaging Professors for the University, to use for his expences six or seven hundred dollars of the 6000. D. put into his hands for the purchase of books and apparatus.

Resolved that it is the opinion of the board that if the arrearages of subscription should not be sufficient to pay for the articles of marble contracted for in Italy, it will be proper to supply the deficiency from the annuity of the year 1825.

Resolved that the Bursar be authorised to enter into negociation with any one of the banks for the purpose of procuring an advance of the sperate part of the arrears of subscription, with an understanding that the University shall not be called on for the reimbursement of the monies till such time as they shall be paid by the subscribers, or within such other time as shall be reasonable.

Resolved that the rent for the hotels be fixed at 200. D. per annum.

The board then proceeding to consider of the regulations necessary for constituting, governing and conducting the institution in addition to those passed at their last session, agreed to the following supple- mentary enactments.

Each of the schools of the University shall be held two hours of every other day of the week: and that every student may be enabled to attend those of his choice, let their sessions be so arranged, as to days and hours that no two

Original manuscript in the Thomas Jefferson Papers, Albert and Shirley Small Special Collections Library, University of Virginia

D90115A
T90115A

of them shall be holden at the same time. therefore.

The school of Antient languages shall occupy from 7-30 to 9-30 a.m

on Mondays, Wednesdays and Fridays -----

That of Modern languages shall occupy the same hours

on Tuesdays, Thursdays and Saturdays

That of Mathematics shall occupy from 9-30 to 11-30 a.m.

on Mondays, Wednesdays and Fridays

That of Natural Philosophy the same hours

on Tuesdays, Thursdays, and Saturdays

That of Natural history shall occupy from 11-30 a.m. to 1-30. P.m.

on Mondays, Wednesdays, and Fridays.

That of Anatomy and Medicine the same hours

on Tuesdays, Thursdays, and Saturdays.

That of Moral Philosophy shall occupy from 1-30. To 3-30. P.m.

on Mondays, Wednesdays, and Fridays.

That of Law the same hours

on Tuesdays, Thursdays, and Saturdays.

| M. | Tu. | W. | Th. | F | Sa. | |
|---|---|---|---|---|---|---|
| 7-30 9-30 | | 7-30 9-30 | | 7-30 9-30 | | Antient languages |
| | 7-30 9-30 | | 7-30 9-30 | | 7-30 9-30 | Modern languages |
| 9-30 11-30 | | 9-30 11-30 | | 9-30 11-30 | | Mathematics |
| | 9-30 11-30 | | 9-30 11-30 | | 9-30 11-30 | Natural Philosophy |
| 11-30 1-30 | | 11-30 1-30 | | 11-30 1-30 | | Natural History |
| | 11-30 1-30 | | 11-30 1-30 | | 11-30 1-30 | Anatomy Medicine |
| 1-30 3-30 | | 1-30 3-30 | | 1-30 3-30 | | Moral Philosophy |
| | 1-30 3-30 | | 1-30 3-30 | | 1-30 3-30 | Law |

The Visitors of the University shall be free, severally or together, to attend occasionally any school, during it's session, as Inspectors and judges of the mode in which it is conducted.

Where the instruction is by lessons, and the class too numerous for a single instructor, assistant tutors may be employed, to be chosen by the Professor, to have the use of two adjacent dormitories each, rent-free, and to divide with the Professor the tuition fees, as shall be agreed between them.

The Professors, tutors, and all officers of the University shall reside constantly in the apartments of the University, or of it's precincts, assigned to them.

At meetings of the Faculty of the Professors, on matters within their functions, one of them shall preside, by rotation, for the term of one year each. a majority of the members shall make a Quorum for business. they may appoint a Secretary of their own body, or otherwise, who shall keep a journal of their proceedings, and lay the same before the board of Visitors at their first ensuing meeting, and whenever else required.

Original manuscript in the Thomas Jefferson Papers, Albert and Shirley Small Special Collections Library, University of Virginia

D90115A
T90115A

65.

the compensation to such Secretary shall be 50.D. yearly, payable from the funds of the University.

Meetings of the Faculty may be called by the presiding member of the year, or by any three of the Professors, to be held in an apartment of the Rotunda, and the object of the call shall be expressed in the written notification to be served by the Janitor. but, when assembled, other business also may be transacted.

The Faculty may appoint a Janitor, who shall attend it's meetings, their several schools while in session, and the meetings of the Visitors; and shall per -form necessary menial offices for them, for which he shall recieve 150. Dollars yearly from the funds of the University, and be furnished with a lodging room.

No student is to be recieved under 16. years of age, rigorously proved. none to be admitted into the Mathematical school, or that of Natural philosophy, who is not an adept in all the branches of numerical arithmetic; and none into the school of antient languages, unless qualified, in the judgment of the professor, to commence reading the higher Latin classics; nor to recieve instruction in Greek, unless qualified in the same degree in that language.

No one shall enter as a Student of the University, either at the beginning, or during the progress of the session, but as for the whole session, ending on the 15th day of December, and paying as for the whole.

The Dormitories shall be occupied by two Students each, and no more, at 16.D. yearly rent to be paid to the Proctor at or before the end of the session, one half by each occupant, or the whole by one, if there be only one. and every student, within the same term, shall pay to the Proctor, also, for the University, 15.D. annually for his participation in the use of the public apartments, during the session.

The Students shall be free to diet themselves in any of the Hotels of the Univer -sity, at their choice, or elsewhere, other than in taverns, as shall suit themselves. but not more than 50. shall be allowed to diet at the same Hotel.

No keeper of any of the Hotels of the University shall require or recieve more than 100.D. for dieting any student and for performing the necessary offices of his Dormitory, during the session of ten months and an half, nor shall suffer ardent

Original manuscript in the Thomas Jefferson Papers, Albert and Shirley Small Special Collections Library, University of Virginia

D90115A
T90115A

64

spirits or wine mixed or unmixed to be drank within his tenement, on pain of an immediate determination of his lease, and removal by the Faculty; nor shall any person boarding elsewhere than with their parents, in any house, and using wine or ardent spirits, mixed or unmixed, within such house, or it's tenement, or paying more than 120 Dollars, for diet, lodging, and other offices and acco- modation of the house and tenement, during a like term, be admitted to any school of the University.

Every student shall be free to attend the schools of his choice, and no other than he chuses.

There shall be one vacation only in the year, and that shall be from the 15th day of December to the last day of January.

Examinations of the candidates for honorary distinctions shall be held in the presence of all the Professors and Students, in the week preceding the commence- ment of the vacation. at these examinations shall be given, to the highly meritorious only, and by the vote of a majority of the Professors, Diplomas, or premiums of medals or books, to be provided by the University, to wit, Diplomas to those of the highest qualifi- cations, medals of more or less value, to those of a 2d grade of acquisition, and books of more or less values to those of a 3d. these Diplomas shall be of two degrees; the highest of Doctor, the second of Graduate. and the Diploma of each shall express the parti- cular school or schools in which the Candidate shall have been declared eminent, and shall be subscribed by the particular professors approving it. but no Diploma shall be given to any one who has not passed such an examination in the Latin lan- guage as shall have proved him able to read the highest classics in that language with ease, thorough understanding, and just quantity. and if he be also a proficient in the Greek, let that too be stated in his Diploma. the intention being that the re- putation of the University shall not be committed but to those who, to an eminence in some one or more of the sciences taught in it, add a proficiency in these langua- ges which constitute the basis of good education, and are indispensable to fill up the character of a 'well educated man.'

Original manuscript in the Thomas Jefferson Papers, Albert and Shirley Small Special Collections Library, University of Virginia

Punishments for major offences shall be Expulsion, temporary suspension, or Interdiction of residence or appearance within the precincts of the University. the Minor punishments shall be Restraint within those Precincts, within their own chamber, or in diet. Reproof, by a Professor privately, or in presence of the school of the offender, or of all the schools, a seat of degradation in his schoolroom of longer or shorter duration, Removal to a lower class, Dismission from the schoolroom for the day, imposition of a task, and insubordination to these sentences shall be deemed & punished as Contumacy.

Contumacy shall be liable to any of the minor punishments.

The Precincts of the University are to be understood as co-extensive with the lot or parcel of it's own grounds on which it is situated.

The major punishments of expulsion from the University, temporary suspension of attendance and presence there, or interdiction of residence or appearance within it's precincts, shall be decreed by the professors themselves. Minor cases may be referred to a board of six Censors, to be named by the Faculty, from among the most discreet of the Students, whose duty it shall be, sitting as a Board, to enquire into the facts, propose the minor punishment which they think proportioned to the offence, and to make report thereof to the Professors for their approbation, or their commutation of the penalty, if it be beyond the grade of the offence. these Censors shall hold their offices until the end of the session of their appointment, if not sooner revoked by the Faculty.

Inattendance on school, inattention to the exercises prescribed, and misbehavior or indecorum in school shall be subject to any of the minor punishments; and the professor of the school may singly reprove, impose a task, or dismiss from the room for the day.

Habits of expence, of dissoluteness, dissipation, or of playing at games of chance, being obstructive to the acquisition of science by the student himself and injurious by example to others, shall be subject, in the first instance, to admonition and reproof to the offender, and to communication & warning to the parent or guardian; and if not satisfactorily corrected, to a refusal of further continuance at the University.

Original manuscript in the Thomas Jefferson Papers, Albert and Shirley Small Special Collections Library, University of Virginia

D90115A
T90115A

68    No Student shall make any festive entertainment within the precincts of the University, nor contribute to, or be present at them there or elsewhere, but with the consent of each of the Professors whose school he attends, on pain of a minor punishment.

No Student shall admit any disturbing noises in his room, or make them any where within the precincts of the University, or fire a gun or pistol within the same, on pain of such minor sentence as the faculty shall decree or approve. but the proper use of musical instruments, shall be freely allowed in their rooms, and in that appropriated for instruction in music.

Riotous, disorderly, intemperate or indecent conduct of any student within the precincts shall be punished by interdiction of a residence within the precincts, and repetitions of such offences, by expulsion from the University.

Fighting with weapons which may inflict death, or a challenge to such fight, given or accepted, shall be punished by instant expulsion from the University, not remissible by the Faculty; and it shall be the duty of the Proctor to give information thereof to the civil magistrate, that the parties may be dealt with according to law.

Offences cognisable by the laws of the land shall be left to the cognisance of the civil magistrate, if claimed by him, or otherwise to the judgment of the Faculty: all others to that of the Faculty. and such of these as are not specially designated in the enactments of the Visitors may be subjected by the Faculty to any of the minor punishments permitted by these enactments.

Sentences of expulsion from the University (except in the case of challenge or combat with arms) shall not be final until approved by the board of Visitors or, when they are not in session, by a majority of them, separately consulted. but residence within the precincts, and attendance on the schools may be suspended in the mean time.

No Student shall, within the precincts of the University, introduce, keep or use any spirituous or vinous liquors, keep or use weapons or arms of any kind,

Original manuscript in the Thomas Jefferson Papers, Albert and Shirley Small Special Collections Library, University of Virginia

D90115A
T90115A

69.

or gunpowder, keep a servant, horse or dog, appear in school with a stick, or any weapon, nor, while in school, be covered without permission of the Professor, nor use tobacco by smoking or chewing, on pain of any of the minor punishments at the discretion of the Faculty, or of the board of Censors, approved by the Faculty.

All damages done to instruments, books, buildings, or other property of the University by any student, shall be made good at his expence; and wilful injury to any tree, shrub, or other plant, within the precincts, shall be punished by fine, not exceeding ten dollars, at the discretion of the Faculty.

When a Professor knocks at the door of a student's room, any person being within, and announces himself, it shall be opened, on pain of a minor punishment; and the Professor may, if refused, have the door broken open; and the expences of repair shall be levied on the Student, or Students within.

At the hour appointed for the meeting of every school, the roll of the school shall be called over, the absentees, and those appearing tardily, shall be noted, and if no sufficient cause be offered, at the rising of the school, to the satisfaction of the Professor, the notation shall stand confirmed, and shall be given in to the Faculty, the presiding member of which for the time being shall, on the 15th. days of May, August and December, or as soon after each of these days as may be, transmit by mail a list of these notations to the parent or guardian of each delinquent.

When testimony is required from a Student, it shall be voluntary, and not on oath. and the obligation to give it shall be left to his own sense of right.

Should the religious sects of this state, or any of them, according to the invitation held out to them, establish within, or adjacent to, the precincts of the University, schools for instruction in the religion of their sect, the students of the University will be free, and expected to attend religious worship at the establishment of their respec-tive sects, in the morning, and in time to meet their school in the University at it's stated hour.

Original manuscript in the Thomas Jefferson Papers, Albert and Shirley Small Special Collections Library, University of Virginia

7º

The Students of such religious school, if they attend any school of the University, shall be considered as Students of the University, subject to the same regulations, and entitled to the same rights and privileges.

The room provided for a schoolroom in every Pavilion shall be used for the school of it's occupant Professor, and shall be furnished by the University with necessary benches and tables.

The upper circular room of the Rotunda shall be reserved for a library.

One of it's larger elliptical rooms on it's middle floor shall be used for annual examinations, for lectures to such schools as are too numerous for their ordinary school-rooms, and for religious worship, under the regulations allowed to be prescribed by law. the other rooms on the same floor may be used by schools of instruction in draw-ing, music, or any other of the innocent and ornamental accomplishments of life; but under such instructors only as shall be approved and licensed by the Faculty.

The rooms in the Basement story of the Rotunda shall be, one of them for a Che-mical laboratory; and the others for any necessary purpose to which they may be adapted.

The two open apartments, adjacent to the same story of the Rotunda, shall be ap-propriated to the Gymnastic exercises and games of the Students, among which shall be reckoned military exercises.

√ A military Instructor shall be provided at the expence of the University, to be appointed by the Faculty, who shall attend on every Saturday from half after one aclock, to half after three P.M. and shall instruct the Students in the Manual exercise, in field evo-lutions, manœuvres and encampments. the Students shall attend these exercises, and shall be obedient to the military orders of their Instructor. the roll shall be regularly cal-led over by him at the hour of meeting, absences and insubordinations shall be noted, and the list of the delinquents shall be delivered to the presiding member of the Faculty for the time being, to be animadverted on by the Faculty. and such minor punishments imposed as each case shall, in their discretion, require. the school of modern lan-guages shall be pretermitted on the days of actual military exercise.

Original manuscript in the Thomas Jefferson Papers, Albert and Shirley Small Special Collections Library, University of Virginia

71.

Substitutes in the form of arms shall be provided by the Proctor, at the expence of the University; they shall be distinguished by numbers, delivered out, recieved in and deposited under the care and responsibility of the Instructor, in a proper de- -pository to be furnished him; and all injuries to them by a student shall be repaired at the expence of such Student.

Work-shops shall be provided, whenever convenient, at the expence of the University, wherein the Students, who chuse, may exercise themselves in the use of tools, and such mechanical practices as it is convenient and useful for every person to understand, and occasionally to practice. These shops may be let, rent-free to such skilful and orderly Mechanics as shall be approved by the Faculty, on the condition that they will permit the use of their tools, instruments and implements, within the shop, to such students as shall desire and use the per- -mission discreetly, and under a liability for any injury they may do them; and on the further condition, if necessary, of such Mechanic's recieving instruction gratis in the mechanical and philosophical principles of his art, so far as taught in any of the schools.

The Board then proceeded to consider the draught of a Report to be made, as required by law, to the President and Directors of the Literary fund, and before concluding it finally they adjourned to tomorrow morning.

Tuesday October 5th. 1824.

The board met pursuant to adjournment. present Thomas Jefferson. James Breckenridge, John H. Cocke, and Joseph C. Cabell.

On motion, Resolved that the Proctor be authorised and required, after the 15th day of November next, to lease the Hotels of the University to such per- -sons, offering, of worthy and proper character, as he shall approve; that the leases shall not be of a longer term than one year: and that he cause to be inserted therein such covenants as he shall deem necessary as to the preservation of the houses, incl -sures, and appurtenances of the tenements, and observance of the preceding regulations

Original manuscript in the Thomas Jefferson Papers, Albert and Shirley Small Special Collections Library, University of Virginia

D90115A
T90115A



72.
and that this be published without delay, that all persons may have notice who may desire to apply.

And the Board, having concluded, and agreed to the Report to be made to the President and Directors of the Literary fund, adjourned without day

October 5th. 1824.                                    Th. Jefferson Rector.


Which Report is in the words following.

To the President and Directors of the literary fund.

In obedience to the law requiring that the Rector and Visitors of the University of Virginia should make report annually to the President and Directors of the literary fund (to be laid before the legislature at their next succeeding session) embracing a full account of the disbursements, the funds on hand, and a general statement of the condition of the sd University, the sd Rector and Visitors make the following                    Report.

Original manuscript in the Thomas Jefferson Papers, Albert and Shirley Small Special Collections Library, University of Virginia

# Exhibit 144



Encyclopedia Virginia
VIRGINIA HUMANITIES

PRIMARY DOCUMENT

# University of Virginia Board of Visitors Minutes (October 4–5, 1824)

ORIGINAL IMAGES

    

[https://encyclopediavirginia.org/6638-5f4f5acfe666733b368e5a667f8452ff/] [https://encyclopediavirginia.org/6639-ffofc27abf8b9f01974b376cc90af1b9e50c/]

    

[https://encyclopediavirginia.org/6633-c75c0cb14d37556b7f12784b01687761f53aa5f85/] [https://encyclopediavirginia.org/6634-d66eb1e812b28a2d97bcebddc0/]

    

[https://encyclopediavirginia.org/6649-0cc9556c71b1c98a0a13b85e8340c0c647cf500426720626c22a3af02b4104a813/] [https://encyclopediavirginia.org/6650-...]

CONTEXT

At its meeting of October 4–5, 1824, the University of Virginia board of visitors discusses a number of issues, including what professors to hire and the regulations that would govern student life at the new university, including right of students to bring **personal slaves** [https://encyclopediavirginia.org/entries/slavery-at-the-university-of-virginia/] onto Grounds.

*Author:* **University of Virginia Board of Visitors**

*Transcription Source:* University of Virginia Board of Visitors Minutes, October 4–5, 1824, Thomas Jefferson Papers, Albert and Shirley Small Special Collections Library, University of Virginia.

FULL TEXT

At a meeting of the Visitors of the University, at the University on Monday the 4th. of October 1824. at which were present **Thomas Jefferson** [https://encyclopediavirginia.org/entries/jefferson-thomas-1743-1826/], **James Madison** [https://encyclopediavirginia.org/entries/madison-james-1751-1836/], **James Breckenridge** [https://encyclopediavirginia.org/entries/breckinridge-james-1763-1833/], **John H. Cocke** [https://encyclopediavirginia.org/entries/cocke-john-hartwell-1780-1866/], George Loyall and **Joseph C. Cabell** [https://encyclopediavirginia.org/entries/cabell-joseph-c-1778-1856/].

Resolved that the board ratify two purchases of land in front of the **Rotunda** [https://encyclopediavirginia.org/entries/university-of-virginia-the-architecture-of-the/] purchased of Daniel A. Piper, and Mary A. F. his wife.

University of Virginia Board of Visitors Minutes (October 4—5, 1824), Page 1

Resolved that permission be given to Francis W. Gilmer, now on his mission to Great Britain for the purpose of engaging Professors for the University, to use for his expences six or seven hundred dollars of the 6000.D. put into his hands for the purchase of books and apparatus.

Resolved that it is the opinion of the board that if the arrearages of subscription should not be sufficient to pay for the articles of marble contracted for in Italy, it will be proper to supply the deficiency from the annuity of the year 1825.

Resolved that the Bursar be authorised to enter into negociation with any one of the banks for the purpose of procuring an advance of the sperate part of the arrears of subscription, with an understanding that the University shall not be called on for the reimbursement of the monies till such time as they shall be paid by subscribers, or within  such other time as shall be reasonable.

Resolved that the rent for the hotels be fixed at 200.D. per annum.

The board then proceeding to consider of the regulations necessary for constituting, governing and conducting the Institution in addition to those passed at their last session, agreed to the following supplementory enactments.

Each of the schools of the University shall be held two hours of every other day of the week: and that every student may be enabled to attend those of his choice, let their sessions be so arranged, as to days and hours that no two

— page 2 —

of them shall be holden at the same time.  therefore

M. Tu. W. Th. F Sa. H H H 7–30 7–30 7–30 Antient

languages 9–30 9–30 9–30 H H H 7–30 7–30 7–30

Modern languages 9–30 9–30 9–30 9–30 9–30 9–30

Mathematics. 11–30 11–30 11–30 9–30 9–30 9–30

Natural Philosophy 11–30 11–30 11–30 11–30 11–30 11–

30 Natural History 1–30 1–30 1–30 11–30 11–30 11–30

Anatomy Medecine 1–30 1–30 1–30 1–30 1–30 1–30

Moral Philosophy 3–30 3–30 3–30 1–30 1–30 1–30 Law

3–30 3–30 3–30



University of Virginia Board of Visitors Minutes
(October 4—5, 1824), Page 2

The school of Antient languages shall occupy from H 7–30 to H 9–30 A.M on Mondays, Wednesdays and Fridays …

… … …

That of Modern languages shall occupy the same hours on Tuesdays, Thursdays and Saturdays.

That of Mathematics shall occupy from H 9–30 to H 11–30 A.M. on Mondays, Wednesdays and Fridays

That of Natural Philosophy the same hours on Tuesdays, Thursdays,  and Saturdays

That of Natural history shall occupy from H 11–30. AM. to H 1–30. P.M.  on Mondays, Wednesdays, and Fridays.

That of Anatomy and Medicine the same hours on Tuesdays, Thursdays,  and Saturdays.

That of Moral Philosophy shall occupy from H 1–30. to H 3–30. P.M. on  Mondays, Wednesdays, and Fridays.

That of Law the same hours on Tuesdays, Thursdays, and Saturdays.

The Visitors of the University shall be free, severally or together, to attend occasionally any school, during it's session, as Inspectors and judges of the mode in which it is conducted.

Where the instruction is by lessons, and the class too numerous for a single instructor, Assistant tutors may be employed, to be chosen by the Professor, to have the use of two adjacent dormitories each, rent-free, and to divide with the Professor the tuition fees, as shall be agreed between them.

The Professors, tutors, and all officers of the University shall reside constantly in the apartments of the University, or of it's precincts, assigned to them.

At meetings of the Faculty of Professors, on matters within their functions, one of them shall preside, by rotation, for the term of one year each. a majority of the members shall make a Quorum for business. they may appoint a Secretary of their own body, or otherwise, who shall keep a journal of their proceedings, and lay the same before the board of Visitors at their first ensuing meeting, and whenever else required.

— page 3 —

The compensation to such Secretary shall be 50.D. yearly, payable from the funds of the University.

Meetings of the Faculty may be called by the presiding member of the year, or by any three of the Professors, to be held in an apartment of the Rotunda, and the object of the call shall be expressed in the written notification to be served by the Janitor. but, when assembled, other business also may be transacted.

The Faculty may appoint a Janitor, who shall attend it's meetings, their several schools while in session, and the meetings of the Visitors; and shall perform necessary menial offices for them, for which he shall recieve 150. Dollars yearly from the funds of the University, and be furnished with a lodging room.

No student is to be recieved under 16. years of age, rigorously proved. None to be admitted into the Mathematical school, or that of Natural philosophy, who is not an adept in all the branches of numerical arithmetic; and none into the school of antient languages, unless qualified, in the judgment of the professor, to commence reading the higher Latin classics; nor to recieve instruction in Greek, unless qualified in the same degree in that language.

No one shall enter as a Student of the University, either at the beginning, or during the progress of the session, but as for the whole session, ending on the 15th day of December, and paying as for the whole.

The **Dormitories** [https://encyclopediavirginia.org/entries/dorm-life-an-excerpt-fromhistory-of-the-university-of-virginia-1819-1919by-philip-alexander-bruce-1920-1922/] shall be occupied by two Students each, and no more, at 15.D. yearly rent to be paid to the Proctor at or before the end of the session, one half by each occupant, or the whole by

**University of Virginia Board of Visitors Minutes (October 4—5, 1824), Page 3**

one, if there be only one. and every student, within the same term, shall pay to the Proctor, also, for the University, 15.D. annually for his participation in the use of the public apartments, during the session.

The Students shall be free to diet themselves in any of the Hotels of the University, at their choice, or elsewhere, other than in taverns, as shall suit themselves. but not more than 50. shall be allowed to diet at the same Hotel.

No keeper of any of the Hotels of the University shall require or recieve more than 100.D. for dieting any student and for performing the necessary offices of his Dormitory, during the session of ten months and an half, nor shall suffer ardent

— page 4 —

spirits or wine mixed or unmixed, to be drank within his tenement, on pain of an immediate determination of his lease, and removal by the Faculty; nor shall any person boarding elsewhere than with their parents, in any house, and using wine or ardent spirits, mixed or unmixed, within such house, or it's tenement, or paying more than 120 Dollars, for diet, lodging, and other offices and accomodations of the house and tenement, during a like term, be admitted to any school of the University.

Every student shall be free to attend the schools of his choice, and no other than he chuses.

There shall be one vacation only in the year, and that shall be from the 15th. day of December to the last day of January.

Examinations of the candidates for honorary distinctions shall be held in the presence of all the Professors and Students, in the week preceding the

**University of Virginia Board of Visitors Minutes (October 4—5, 1824), Page 4**

commencement of the vacation. at these examinations shall be given, to the highly meritorious only, and by the vote of a majority of the Professors, Diplomas, or premiums of Medals or books, to be provided by the University, to wit, Diplomas to those of the highest qualifications, medals of more or less value, to those of a 2d. grade of acquisition, and books of more or less value to those of a 3d. these Diplomas shall be of two degrees; the highest of Doctor,  the second of Graduate, and the Diploma of each shall express the particular school or schools in which the Candidate shall have been declared eminent, and shall be subscribed by the particular professors approving it. but no Diploma shall be given to any one who has not passed such an examination in the Latin language as shall have proved him able to read the highest

classics in that language with ease, thorough understanding, and just quantity. and if he be also a proficient in the Greek, let that too be stated in his Diploma. the intention being that the reputation of the University shall not be committed but to those who, to an eminence in some one or more of the sciences taught in it, and a proficiency in these languages which constitute the basis of good education, and are indispensable to fill up the character of a 'well educated man.'

— page 5 —

Punishments for major offences shall be Expulsion, temporary suspension, or Interdiction of residence or appearance within the precincts of the University. the Minor punishments shall be Restraint within those Precincts, within their own chamber, or in diet; Reproof, by a Professor privately, or in presence of the school of the offender, or of all the schools, a seat of degradation in his schoolroom of longer or shorter duration, Removal to a lower class, Dismission from the schoolroom for the day, imposition of a task, and insubordination to these sentences shall be deemed & punished as Contumacy.

Contumacy shall be liable to any of the minor punishments.

The Precincts of the University are to be understood as co-extensive with the lot or parcel of it's own grounds on which it is situated.

**University of Virginia Board of Visitors Minutes (October 4—5, 1824), Page 5**

The major punishments of expulsion from the University, temporary suspension of attendance and presence there, or interdiction of residence or appearance within it's precincts, shall be decreed by the professors themselves. Minor cases may be referred to a board of six Censors, to be named by the Faculty, from among the most discreet of the Students, whose duty it shall be, sitting as a Board, to enquire into the facts, propose the minor punishment which they think proportioned to the offence, and to make report thereof to the Professors for their approbation, or their commutation of the penalty, if it be beyond the grade of the offence. these Censors shall hold their offices until the end of the session of their appointment, if not sooner revoked by the Faculty.

In attendance on school, inattention to the exercises prescribed, and misbehavior or indecorum in school shall be subject to any of the minor punishments; and the professor of the school may singly reprove, impose a task, or dismiss

from the room for the day.

Habits of expence, of dissoluteness, dissipation, or of playing at games of chance, being obtructive to the acquisition of science by the student himself and injurious, by example to others, shall be subject, in the first instance, to admonition and reproof to the offender, and to communication & warning to the parent or guardian; and, if not satisfactorily corrected, to a refusal of further continuance at the University.

— page 6 —

No Student shall make any festive entertainment within the precincts of the University, nor contribute to, or be present at them there or elsewhere, but with the consent of each of the Professors whose school he attends, on pain of a minor punishment.

No Student shall admit any disturbing noises in his room, or make them any where within the precincts of the University, or fire a gun or pistol within the same, on pain of such minor sentence as the faculty shall decree or approve. but the proper use of musical instruments, shall be allowed in their rooms, and in that appropriated for instruction in music.

Riotous, disorderly, intemperate or indecent conduct of any student within the precincts shall be punished by interdiction of a residence within the precincts; and repetitions of such offences, by expulsion from the University.

**University of Virginia Board of Visitors Minutes (October 4—5, 1824), Page 6**

Fighting with weapons which may inflict death, or a challenge to such fight, given or accepted, shall be punished by instant expulsion from the University, not remissible by the Faculty; and it shall be the duty of the Proctor to give information thereof to the civil magistrate, that the parties may be dealt with according to law.

Offences cognisable by the laws of the land shall be left to the cognisance of the civil magistrate, if claimed by him, or otherwise to the judgment of the Faculty: all others to that of the Faculty. and such of these as are not specially designated in the enactments of the Visitors may be subjected by the Faculty to any of the minor punishments permitted by these enactments.

Sentences of expulsion from the University (except in the case of challenge or combat with arms) shall not be final until approved by the board of Visitors or, when they are not in session, by a majority of them, separately consulted. but

1346

residence within the precincts, and attendance on the schools may be suspended in the mean time.

No Student shall, within the precincts of the University, introduce, keep or use any spirituous or vinous liquors, keep or use weapons or arms of any kind,

— page 7 —

or gunpowder, keep a servant, horse or dog, appear in school with a stick, or any weapon, nor, while in school, be covered without permission of the Professor, nor use tobacco by smoking or chewing, on pain of any of the minor punishments, at the discretion of the Faculty, or of the board of Censors, approved by the Faculty.

All damages done to instruments, books, buildings, or other property of the University by any student, shall be made good at his expence; and wilful injury to any tree, shrub, or other plant, within the precincts, shall be punished by fine, not exceeding ten dollars, at the discretion of the Faculty.

When a Professor knocks at the door of a student's room, any person being within, and announces himself, it shall be opened, on pain of a minor punishment; and the Professor may, if refused, have the door broken open; and the expences of repair shall be levied on the Student, or Students within.

University of Virginia Board of Visitors Minutes (October 4—5, 1824), Page 7

At the hour appointed for the meeting of every school, the roll of the school shall be called over, the absentees, and those appearing tardily, shall be noted, and if no sufficient cause be offered, at the rising of the school, to the satisfaction of the Professor, the notation shall stand confirmed, and shall be given in to the Faculty, the presiding  member of which for the time being shall, on the 15th. days of May, August, and December, or as soon after each of these days as may be, transmit by mail a list of these notations to the parent or guardian of each delinquent.

When testimony is required from a Student, it shall be voluntary, and not on oath. and the obligation to give it shall be left to his own sense of right.

Should the religious sects of this state, or any of them, according to the invitation held out to them, establish within, or adjacent to, the precincts of the University, schools for instruction in the religion of their sect, the students of the

1347

University will be free, and expected to attend religious worship at the establishment of their respective sects, in the morning, and in time to meet their school in the University at it's stated hour.

— page 8 —

The Students of such religious school, if they attend any school of the University, shall be considered as Students of the University, subject to the same regulations, and entitled to the same rights and privileges.

The room provided for a schoolroom in every Pavilion shall be used for the school of it's occupant Professor, and shall be furnished by the University with necessary benches and tables.

The upper circular room of the Rotunda shall be reserved for a Library.

One of it's larger elliptical rooms on it's middle floor shall be used for annual examinations, for lectures to such schools as are too numerous for their ordinary schoolrooms, and for religion worship, under the regulations allowed to be prescribed by law. the other rooms on the same floor may be used by schools of

University of Virginia Board of Visitors Minutes (October 4—5, 1824), Page 8

instruction in drawing,  music, or any other of the innocent and ornamental accomplishments of life; but under such instructors only as shall be approved and licensed by the Faculty.

The rooms in the Basement story of the Rotunda shall be, one of them for a Chemical laboratory; and the others for any necessary purpose to which they may be adapted.

The two open apartments, adjacent to the same story of the Rotunda, shall be appropriated to the Gymnastic exercises and games of the Students, among which shall be reckoned military exercises.

A military Instructor shall be provided at the expence of the University, to be appointed by the Faculty, who shall attend on every Saturday from half after one oclock, to half after three P.M. and shall instruct the Students in the Manual exercise, in field evolutions, maneuvres and encampments. the Students shall attend these exercises, and  shall be obedient to the military orders of their Instructor. the roll shall be regularly called over by him at the hour of meeting, absences and insubordinations shall be noted, and the list of the delinquents shall be delivered to the presiding member of the Faculty for the time being, to be animadverted on by the Faculty, and such minor punishments imposed

as each case shall, in their discretion, require. the school of Modern languages shall be pretermitted on the days of actual military exercise.

— page 9 —

Substitutes in the form of arms shall be provided by the Proctor, at the expence of the University; they shall be distinguished by numbers, delivered out, received in and deposited under the care and responsibility of the Instructor, in a proper depository to be furnished him; and all injuries to them by a student shall be repaired at the expence of such Student.

Work-shops shall be provided, whenever convenient, at the expence of the University, wherein the Students, who chuse, may exercise themselves in the use of tools, and such mechanical practices as it is convenient and useful for every person to understand, and occasionally to practice. these shops may be let, rent-free, to such skilful and orderly Mechanics as shall be approved by the Faculty, on the condition that they will permit the use of their tools, instruments and implements, within the shop, to such students as shall desire and use the



University of Virginia Board of Visitors Minutes (October 4—5, 1824), Page 9

permission discreetly, and under a liability for any injury they may do them; and on the further condition, if necessary, of such Mechanic's recieving instruction gratis in the mechanical and philosophical principles of his art, so far as taught in any of the schools.

The Board then proceeded to consider the draught of a Report to be made, as required by law, to the President and Directors of the Literary fund, and before concluding it finally they adjourned to tomorrow morning.

Tuesday October 5th 1824.

The board met pursuant to adjournment. present Thomas Jefferson, James Breckenridge, John H. Cocke, and Joseph C. Cabell.

On motion, Resolved that the Proctor be authorised and required. after the 15th. day of November next, to lease the Hotels of the University to such persons, offering, of worthy and proper character, as he shall approve; that the leases shall not be of a longer term than one year; and that he cause to be inserted therein such covenants as he shall deem

necessary as to the preservation of the houses, inclosures, and appurtenances of the tenements, and observance of the preceding regulations

— page 10 —

and that this be published without delay, that all persons may have notice who may desire to apply.

And the Board, having concluded, and agreed to the Report to be made to the President and Directors of the Literary fund, adjourned without day

October 5th. 1824.

TH: JEFFERSON Rector.

Which Report is in the words following.

To the President and Directors of the Literary fund.

In obedience to the law requiring that the Rector and Visitors of the University of Virginia should make report annually to the President and Directors of the Literary fund (to be laid before the legislature at their next succeeding session) embracing a full account of the disbursements, the funds on hand, and a general



University of Virginia Board of Visitors Minutes (October 4—5, 1824), Page 10