## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DAVID J. NASTRI, ESQ., | : | No. 3:23-cv-00056-VAB |
| *Plaintiff*, | : | |
| | : | |
| v. | : | |
| | : | |
| KATIE DYKES, in her official | : | |
| capacity only, | : | |
| *Defendant*. | : | MARCH 20, 2025 |

### <u>Defendant's Reply in Support of her Cross-Motion for Summary Judgment</u>

Defendant Katie Dykes respectfully submits this reply in support of her prior briefing and in response to Plaintiff's opposition.  *See* ECF Nos. 81-1 and 83.

### I.    Plaintiff's Facial Challenge Fails because § 23-4-1(c) has Lawful Applications

Plaintiff argues that he prevails on his facial challenge because: (1) § 23-4-1(c) is only a locational restriction, so its prohibition on more than handguns does not demonstrate any legitimate constitutional application; *see* ECF No. 83 at 7-9; and (2) the doctrines of overbreadth or severance save his facial challenge.  *See id.* at 7, 9-11.  His arguments fail.

A demanding standard applies to Plaintiff's claim that § 23-4-1(c) facially violates the Second Amendment, not a more "challenge-friendly standard" applicable to First Amendment claims.  *See Community Housing Improvement Program v. City of New York*, 59 F.4th 540, 549 (2d Cir.), *cert. denied*, 144 S. Ct. 264 (2023); *accord Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024).  To prevail, he must "'establish that no set of circumstances exists under which the [§ 23-4-1(c)] would be valid.'"  *United States v. Rahimi*, 602 U.S. 680, 693 (2024) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)) (alteration added).

Plaintiff has not carried his heavy burden.  He contends that this Court should ignore § 23-4-1(c)'s prohibition on carrying various firearms or weapons that fall outside of the Second Amendment's protections because the regulation is a locational restriction, "not a prohibition on

1

the carrying of *specific* weapons."[1]  ECF No. 83 at 8 (emphasis added).  Plaintiff "misses the point" of his facial challenge, which fails with "even one constitutional application[.]"  *Schoenthal v. Raoul*, 2024 U.S. Dist. LEXIS 156436, at *26 n.26 (N.D. Ill. Aug. 30, 2024), *appeal filed*, No. 24-2643 (7th Cir.) (filed Sept. 20, 2024).  That § 23-4-1(c) does not categorically specify what firearms or weapons are prohibited is beside the point.  What matters is that the regulation prohibits individuals from "carrying" (absent authorization) in State parks and forests "firearms" or "other weapons[.]"  Regs. Conn. State Agencies § 23-4-1(c).  The prohibition encompasses not just handguns, but things like sawed-off shotguns and military-style firearms—unusually dangerous weapons that Plaintiff does not dispute are unprotected by the Second Amendment.  *See* ECF No. 81-1 at 12-13; ECF No. 83 at 8; *see also* Conn. Gen. Stat. §§ 53-202a (defining "[a]ssault weapon'") and 53a-3(19) (defining "'[f]irearm'" as including "sawed-off shotgun, machine gun . . . pistol, revolver, or other weapon . . . from which a shot may be discharged").  Facial challenges focus on what the challenged regulation actually prohibits, and § 23-4-1(c) has constitutional application based on what it actually does: prohibiting, among other things, individuals from carrying firearms or weapons that are not protected by the Second Amendment.[2]  *See City of Los Angeles v. Patel*, 576 U.S. 409, 418-19 (2015).  So Defendant's contention is neither a "sleight-of-hand justification" nor "pure gamesmanship"; ECF No. 83 at 7, 9; rather, it describes the law

---

[1] Although Defendant focuses on Plaintiff's argument regarding § 23-4-1(c)'s prohibition on firearms or weapons that the Second Amendment does not protect, she maintains that § 23-4-1(c) is facially constitutional because it aligns with principles underpinning our Nation's regulatory tradition reflecting that all firearms—including handguns—can lawfully be prohibited in State parks and forests or areas *within* such locations. *See, e.g.,* ECF No. 81-1 at 13-14. Because § 23-4-1(c) lawfully applies to Plaintiff's proposed conduct of carrying a handgun, his facial challenge fails. *See United States v. Rahimi*, 602 U.S. 680, 700 (2024); *United States v. Decastro*, 682 F.3d 160, 163 (2d Cir. 2012), *cert. denied*, 568 U.S. 1092 (2013), *abrogated on other grounds by Bruen*; *see also Kane v. De Blasio*, 19 F.4th 152, 174 (2d Cir. 2021) (court may consider as-applied challenge before addressing facial challenge).

[2] Plaintiff mistakenly relies on statutes prohibiting "possession" of certain firearms by not focusing on what § 23-4-1(c) actually does. *See City of Los Angeles v. Patel*, 576 U.S. 409, 418-19 (2015); ECF No. 83 at 9. Regardless, the statutes he cites pertain to different circumstances, and a violation of § 23-4-1(c) can exist independent from other criminal offenses, especially considering a prosecutorial official's charging discretion. *See, e.g., Massameno v. Statewide Grievance Committee*, 234 Conn. 539, 575-76 (1995); *In re Nesbitt*, 124 Conn. App. 400, 410-11, *cert. denied*, 299 Conn. 917 (2010).

governing "disfavored" facial challenges and Plaintiff's heavy burden, which he cannot carry.

This Court should also reject Plaintiff's attempt to invoke overbreadth or severance. Overbreadth is, broadly speaking, "an exception to the general rule against third-party standing" and permits an individual to contend that a statute "would violate the First Amendment rights of hypothetical third parties if applied to them." *United States v. Smith*, 945 F.3d 729, 736 (2d Cir. 2019) (internal quotation marks omitted). It does not apply outside of the First Amendment. *See, e.g., Salerno*, 481 U.S. at 745. Notably, *Rahimi* foreclosed Plaintiff's reliance on overbreadth when it concluded that the lower court "erred" in addressing a facial challenge by "focus[ing] on hypothetical scenarios where Section 922(g)(8) might raise constitutional concerns[,]" rather than "considering circumstances in which [that statute] was most likely constitutional[.]" 602 U.S. at 701. That approach aligns with numerous courts that have not extended overbreadth to the Second Amendment. *See, e.g., United States v. Adams*, 914 F.3d 602, 607 (8th Cir. 2019); *United States v. Chester*, 514 Fed. Appx. 393, 395 (4th Cir. 2013) (per curiam), *abrogated on other grounds by Bruen*; *United States v. Nelson*, 2025 U.S. Dist. LEXIS 31733, at *6 (E.D. Mich. Feb. 21, 2025); *see also Ollie v. Univ. of Connecticut*, 364 F. Supp. 3d 143, 151 (D. Conn. 2019) (Dooley, J.) (collecting cases and noting that "courts have repeatedly declined to apply the chilling doctrine" outside of First Amendment). Here, because Plaintiff only brings a Second Amendment challenge, the usual *Salerno* standard applies—not a more "challenge-friendly standard" applicable to First Amendment claims. *See Community Housing Improvement Program*, 59 F.4th at 549. But even if overbreadth applied—which it does not—Plaintiff cannot prevail because § 23-4-1(c) lawfully applies to his proposed conduct. *See United States v. Decastro*, 682 F.3d 160, 169 (2d Cir. 2012), *cert. denied*, 568 U.S. 1092 (2013), *abrogated on other grounds by Bruen*.

Lastly, this Court should reject Plaintiff's passing assertion about severance. *See* ECF No.

83 at 7-8.  Plaintiff's argument is merely "perfunctory" and lacks any "developed argumentation" explaining how that doctrine applies or saves his facial challenge.  *See In re Philip Morris Int'l Inc.*, 89 F.4th 408, 428 (2d Cir. 2023) (internal quotation marks omitted).  Plaintiff cites to no Connecticut authority addressing severance of regulations or otherwise, despite severance being a matter of state law.  *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) (per curiam).  Nor does he attempt to explain how unusually dangerous weapons like sawed-off shotguns or military-style firearms are not "firearms" within the meaning of § 23-4-1(c), just like handguns.  There is no dispute that such unusually dangerous weapons constitute "firearms" within the regulation's scope; *see, e.g.,* Conn. Gen. Stat. §§ 53-202a and 53a-3(19); and § 23-4-1(c) lawfully prohibits individuals from carrying them because they fall outside of the Second Amendment's reach.  So there is nothing to sever because "firearms" has an undisputed constitutional application.  Regardless, if this Court concludes that § 23-4-1(c) has any unconstitutional provision—which it should not—such provision is severable based on the regulation's "use of the disjunctive 'or'"; *State v. Sul*, 146 Conn. 78, 89 (1958); and because the other portions of § 23-4-1(c) can operate independently from the invalid portion.  *See State v. Bell*, 303 Conn. 246, 260-61 (2011); *Langer v. Planning & Zoning Commission*, 163 Conn. 453, 459 (1972).

## II.    Plaintiff Failed to Carry his Textual Burden at *Bruen*'s First Step

Among other things, Plaintiff contends that he does not bear the burden of establishing that his specific course of conduct is covered by the Second Amendment's text because DEEP's property rights are simply a "potential justification" for regulating firearms, which should only be considered at *Bruen*'s second step.  *See* ECF No. 83 at 11-15.  Plaintiff is incorrect for the below reasons and those set forth in Defendant's earlier briefing.  *See* ECF No. 81-1 at 14-17.

Although historical "limitations on the scope of the right" to bear arms; ECF No. 83 at 13; are undeniably relevant at *Bruen*'s second step, history also plays a key role at *Bruen*'s first step.

4

*See, e.g., Rahimi*, 602 U.S. at 717-23 (*Kavanaugh, J.*, concurring); *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 113-14, 120 (10th Cir. 2024). Because history matters at *Bruen*'s first step, Courts have concluded that plaintiffs failed to carry their textual burden of demonstrating that unusually dangerous weapons are "arms"; *see, e.g., Bianchi v. Brown*, 111 F.4th 438, 448-61 (4th Cir. 2024) (en banc), *pet. cert. filed*, No. 24-203 (filed Aug. 21, 2024); or that selling and purchasing firearms under certain conditions and inconsistent with presumptively lawful regulations falls within the meaning of "keep and bear" arms. *See Rocky Mountain Gun Owners*, 121 F.4th at 127-28. Whether Plaintiff's specific course of conduct[3] fits within the meaning of "bear arms" should be no different, and *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012), *cert. denied*, 568 U.S. 1088 (2013), *overruled on other grounds by Bruen*, is instructive. There, the plaintiffs necessarily took the position that their right to bear arms "trumps a private property owner's right to exclusively control who, and under what circumstances, is allowed on his or her own premises." *Id.* at 1261. The Court rejected plaintiffs' facial challenge because the historical backdrop illustrated that individuals did not have the right to bring a gun into a location against a private landowner's wishes.[4] *See id.* at 1261-66. Thus, this Court should consider the historical backdrop pertaining to pre-existing proprietary rights at *Bruen*'s first step.

Additionally, precedent does not foreclose Defendant's contention. *Bruen*'s statement that "'bear' naturally encompasses public carry" is not dispositive of whether plaintiff's specific conduct here is presumptively protected. 597 U.S. at 32; *see* ECF No. 83 at 12-14. Although

---

[3] Plaintiff's specific course of conduct is carrying a handgun for self-defense without DEEP's permission into lands held open to the public that DEEP manages, maintains, and operates much like a government run business. *See* ECF No. 81-1 at 14-17; *see also Schoenthal*, 2024 U.S. Dist. LEXIS 156436, at *25 (defining course of conduct as "the licensed concealed carrying of handguns for self-defense on public transportation and associated facilities").

[4] *GeorgiaCarry.org, Inc.* was decided on the pre-*Bruen* framework's first step, which assessed whether "the restricted activity is protected by the Second Amendment in the first place[.]" 687 F.3d at 1260 n.34. The decision is still good law because *Bruen* endorsed step one of the former framework as "broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." 597 U.S. at 19.

courts have held that the right to bear arms presumptively extends to "private property open to the public"; *Antonyuk v. James*, 120 F.4th 941, 1044 (2d Cir. 2024) ("*Antonyuk II*"), *pet. cert. filed*, No. 24-795 (Jan. 22, 2025); *Bruen* did not confront Defendant's proprietorship argument.  *See Kipke v. Moore*, 695 F. Supp. 3d 638, 654 (D. Md. 2023). Moreover, *Antonyuk II* involved default presumptions against public carry where (1) the landowner had not first affirmatively objected to firearms and (2) the state acted as a sovereign lawmaker, rather than exercising its own pre-existing proprietary rights over lands that it manages, controls, and operates like a government-run business.  *See* 120 F.4th at 1044-45; *Wolford v. Lopez*, 116 F.4th 959, 971-73 (9th Cir. 2024).

## III.    This Court should not Follow Plaintiff's Flawed Methodology at *Bruen*'s Second Step

Plaintiff's arguments at *Bruen*'s second step have four methodological flaws that binding precedent rejects.  He evidently disagrees with the analytical rubric that *Antonyuk II* articulated, preferring instead to follow his own cramped reading of *Bruen*.  *See, e.g.,* ECF No. 83 at 18 n.2, 23-25, 27-28.  But this Court cannot disregard the methodology that *Antonyuk II* requires.  *See Christian v. James*, 2025 U.S. Dist. LEXIS 3940, at *2-3 (W.D.N.Y. Jan. 8, 2025) (concluding that *Antonyuk II* required it to reject challenge to firearms prohibition in parks despite disagreeing with that decision).  Nor can it ignore *Rahimi*—a decision that Plaintiff does not cite to once in his opposition despite the fact that it "clarified" *Bruen*.  *Antonyuk II*, 120 F.4th at 955.

*First*, Plaintiff maintains that 1791 is the primary (and dispositive) focal point for determining whether § 23-4-1(c) is constitutional.  *See, e.g.,* ECF No. 83 at 17-19, 21, 30. *Antonyuk II* requires that this Court not look exclusively to 1791 or otherwise treat the Founding Era as dispositive.  *See id.* at 972-74.  Because § 23-4-1(c) is a state prohibition on firearms, this Court can—and should—look to the time period around and after 1868.  *Id.* at 974.  *Antonyuk II* applied that approach in rejecting a challenge to New York's firearm licensing scheme by first looking to statutes enacted "immediately following" the Fourteenth Amendment's ratification in

1868.  *See id.* at 987-88.  The Court noted that such Reconstruction Era evidence was "at least as relevant as evidence from the Founding Era"; *id.* at 988 n.36; and looked to similar "discretionary licensing" schemes in "cities and states" that were passed in "the early-twentieth century and beyond."  *Id.* at 989.  Notably, the Court opined that twentieth-century evidence—while not "as probative as nineteenth-century evidence because it is less proximate" to 1868—is "not weightless" and "remain[s] probative as to the existence of an American tradition of regulation" when such evidence aligns with nineteenth-century provisions.  *Id.* at 989 n.41. The Court followed a similar approach when it considered a parks prohibition, relying on a handful of laws (enacted between 1869-1890) and municipal ordinances (enacted between 1861-1897), in addition to the Statute of Northampton and Founding Era counterparts, to conclude that New York's prohibition aligned with history and tradition.  *See id.* at 1019-24.  *Antonyuk II* therefore rejects any notion that 1791 controls.  And what that means here is this:  this Court can, among other things, uphold § 23-4-1(c) as constitutional solely based on the unbroken regulatory tradition of prohibiting firearms in urban and rural parks and similar government-controlled outdoor spaces that began in 1858, extended through ratification of the Fourteenth Amendment, and continued into the early-twentieth century at municipal, state, and federal levels.  *See* ECF No. 81-1 at 20-26.

*Second*, Plaintiff contends that this case should not be analyzed under a nuanced approach because parks are not "novel."  *See* ECF No. 83 at 16-17.  Again, *Antonyuk II* is dispositive: "the relative novelty of public parks as institutions . . . justifies a flexible approach under *Bruen*."  120 F.4th at 1022 n.86.  But even if *Antonyuk II* was not dispositive—which it is—Plaintiff's assertion fails because he misconstrues the nature of the unprecedented societal concern justifying a nuanced approach.  The primary "societal problem" that firearms prohibitions tethered to the parks and conservation movements sought to address stems from the perils of industrialization—a point in

American history that Plaintiff admits began in the early- to mid-1800s.  *See, e.g.*, ECF No. 84 (Plaintiff's Local Rule 56(a)2 Statement) at ¶¶ 6-10, 13-17; *Antonyuk II*, 120 F.4th at 969 (noting that court "must identify the 'societal problem' that the challenged regulation seeks to address") (quoting *Bruen*, 597 U.S. at 26-27).  Cities then were "socially degraded . . . unhealthy, impoverished, undemocratic, and crime ridden[.]"  ECF No. 84 at ¶ 7.  Parks and similar government-controlled outdoor spaces—both urban and rural—became the remedy.  *See id.* at ¶¶ 9-10, 14-15, 22.  Lawmakers banned the unauthorized presence of firearms in such locations because guns threatened to undermine their key purpose: functioning as peaceful, serene, and welcoming society-improving devices designed to counter industrialization's evils.  *See id.* at ¶ 26.  Such a concern necessarily presents a distinct societal problem that was unimaginable at the Founding.  *See Antonyuk II*, 120 F.4th at 969-70, 1022.  Parks and similar government-controlled outdoor spaces that sprang from the parks and conservation movements were therefore principally designed to serve a different purpose than Founding Era greenspaces.  *See* ECF No. 84 at ¶ 4; *Antonyuk II*, 120 F.4th at 1024-25; *see also Wolford*, 116 F.4th at 982 (noting that record lacked "evidence of any other public green space akin in use *and purpose* to a modern park") (emphasis added).  The unprecedented societal concern is not simply that "parks are novel" or now used for recreation.  *See* ECF No. 83 at 16-17.  Rather, firearms prohibitions in *modern* parks and similar government-controlled outdoor spaces addressed a distinct societal problem that did not emerge until industrialization.  *See, e.g., LaFave v. County of Fairfax*, 2024 U.S. Dist. LEXIS 152000, at *26, 31-32 (E.D. Va. Aug. 23, 2024), *on appeal*, No. 24-1886 (4th Cir.) (filed Sept. 16, 2024).

Relatedly, the foregoing underscores Plaintiff's third methodological flaw—i.e., giving virtually dispositive weight to the absence of "distinctly similar" Founding Era laws in places like commons and greenspaces.  *Bruen*, 597 U.S. at 26; *see* ECF No. 83 at 16-17.  Firearms prohibitions

like § 23-4-1(c) addressed a distinct societal problem that had not existed since the Founding, and that alone demonstrates that Plaintiff is incorrect (as discussed above).  Regardless, *Antonyuk II* cautioned against doing what Plaintiff contends is appropriate here—reading too much into the absence of relevantly similar historical analogues during the Founding Era.  *See, e.g.,* 120 F.4th at 969-70, 1038 n.112.  Inferring that § 23-4-1(c) conflicts with history and tradition based on "historical silence" is "not commanded by *Bruen*, nor is it sound."  *Id.* at 991.  And for concerns that emerged due to nineteenth century urbanization—like the undisputed concerns at the root of the parks and conservation movements—common sense explains why relevantly similar historical analogues from the Founding Era would not exist and illustrates why such analogues first arose in cities, where the concerns began.  *See id.* at 992-94 (finding it understandable that licensing schemes first emerged in cities after Civil War because such schemes were "the result of changes in American society in the nineteenth century, including urbanization and concomitant shifts in norms of governance").  Here, the record establishes that the urban and rural locations created during the parks and conservation movements sought to remedy nineteenth and twentieth century concerns and that firearms prohibitions in such locations first emerged at the municipal level.  *See* ECF No. 84 at ¶¶ 9-10, 13-16, 28-33, 36-37; ECF No. 81-14 (Def. Ex. 134) at ¶¶ 14-41 (Young Decl.); ECF No. 81-15 (Def. Ex. 165) at ¶¶ 6-10 (Glaser. Supp. Decl.).  Thus, the lack of Founding Era firearms prohibitions in parks and outdoor greenspaces does not demonstrate that § 23-4-1(c) conflicts with history and tradition, especially because evidence about societal concerns that emerged after 1791 must be factored into the historical analysis.  *See Antonyuk II*, 120 F.4th at 992-94; *Kipke*, 695 F. Supp. 3d at 655; *see also Kipke v. Moore*, 2024 U.S. Dist. LEXIS 137003, at *14-16 (D. Md. Aug. 2, 2024) (granting summary judgment in favor of defendants on challenge to firearms prohibition in public and state parks), *appeal filed*, No. 24-1799 (4th Cir.) (filed Aug.

22, 2024).

*Finally*, binding precedent forecloses Plaintiff's fourth methodological flaw—i.e., *Bruen* requires Defendant to establish concrete "connection[s]" between historical analogues and § 23-4-1(c). *See, e.g.,* ECF No. 83 at 17-20, 29.  Plaintiff essentially contends that Defendant prevails only if she identifies a "dead ringer . . . or a historical twin" for § 23-4-1(c).  *Rahimi*, 602 U.S. at 692 (internal quotation marks omitted).  *Rahimi* unequivocally rejected any requirement for a perfect match between a challenged regulation and proffered historical analogues.  *See id.* at 691-92.  Defendant need only demonstrate that § 23-4-1(c) "impose[s] a *comparable* burden" that is "*comparably* justified" when compared to historical analogues.  *Bruen*, 597 U.S. at 29 (emphasis added).  Comparable does not mean identical.  *See Antonyuk*, 120 F.4th at 997-98.  Furthermore, *Rahimi* teaches that "what matters in the search for historical antecedents of modern firearms regulations is the *substance* of the regulation, rather than the *form*."  *Id.* at 997 (emphasis in original).  Binding precedent therefore dictates that § 23-4-1(c) passes constitutional muster based on a higher level of generality when compared to its precursors, not based on identifying a "historical twin" like Plaintiff demands.  And what that means here is this: this Court can, for example, conclude that § 23-4-1(c) is relevantly similar to laws (1) respecting a private landowner's right to exclude or (2) promoting conservation goals even though many, but not all, of those laws pertained to private property.  *See* ECF No. 81-1 at 35-44; ECF No. 83 at 29-30.  That is because § 23-4-1(c) is relevantly similar to such precursors based on their analogous "substance" (i.e., not dependent on whether the laws pertained to public property) and comparable burdens on the right to bear arms.  *See Antonyuk II*, 120 F.4th 997-98; *id.* at 970-71.

## IV.    Section 23-4-1(c) Aligns with our Nation's History of Regulating Firearms

For the reasons that follow, Plaintiff incorrectly contends that Defendant did not carry her burden at *Bruen*'s second step.  *See* ECF No. 83 at 16-30; ECF No. 81-1 at 20-47, 54-55.

A. Plaintiff failed to refute the well-established and unbroken tradition of prohibiting firearms in "modern" parks and similar government-controlled outdoor spaces

Plaintiff makes several unavailing arguments why § 23-4-1(c) is not relevantly similar to more than 100 ordinances, regulations, and laws stretching from 1858 into the twentieth century prohibiting firearms in urban and rural parks and similar government controlled-outdoor spaces.

*First*, he contends that Defendant attempts to establish "a new and, as yet, unrecognized limitation" on Second Amendment rights. ECF No. 83 at 17. Several courts post-*Bruen*, including *Antonyuk II*, have noted that firearms prohibitions in parks and similar government-controlled outdoor spaces set aside for the public's peaceful and quiet enjoyment align with history and tradition. *See, e.g.,* 120 F.4th at 1019-26; *LaFave*, 2024 U.S. Dist. LEXIS 152000, at *27-30; *Kipke*, 680 F. Supp. 3d at 654-55. Those courts demonstrate that § 23-4-1(c) is part of an unbroken regulatory tradition, so Defendant's position does not ask this Court to break new ground.

*Second*, Plaintiff asserts that firearms prohibitions in state parks and similar government-controlled outdoor spaces are not probative because individuals could not challenge them as violating the right to bear arms before *McDonald v. City of Chicago*, 561 U.S. 742 (2010). *See* ECF No. 83 at 18-19. Notably, the Second Amendment applied to the federal government before *McDonald*, but Plaintiff ignores that Defendant relied on firearms prohibition in geographically vast federal parks to demonstrate § 23-4-1(c)'s constitutionality. *See* ECF No. 84 at ¶¶ 21-24; ECF No. 81-17 at 47, 52, 71, 76-77, 84, 91 (Def. Exs. 210-11, 215-18). Additionally, many states have their own state constitutional provisions relating to the right to bear arms and had them long before *McDonald*. *See, e.g., District of Columbia v. Heller*, 554 U.S. 570, 585 and n.8 (2008); E. Volokh, State Constitutional Rights to Keep and Bear Arms, 11 Tex. Rev. L. & Politics 191 (2006). Prior to *McDonald*, individuals could have challenged local ordinances or state laws prohibiting firearms in parks or similar government-controlled outdoor spaces as violating their

11

right to bear arms under state constitutional provisions. *See, e.g., Wolford*, 116 F.4th at 987-88; *Kachalsky v. County of Westchester*, 701 F.3d 81, 90-91 (2d Cir. 2012), *cert. denied*, 569 U.S. 918 (2013), *abrogated on other grounds by Bruen*. How people understood such state constitutional provisions informs the Second Amendment's meaning. *See Heller*, 554 U.S. at 600-601; *Rahimi*, 602 U.S. at 719-20 (*Kavanaugh, J.*, concurring). So Plaintiff's failure to present any authority challenging firearms prohibitions in parks and similar government-controlled government outdoor spaces owned by municipalities, states, or the federal government reflects a liquidated and settled understanding that such prohibitions were constitutional.[5] *See Antonyuk II*, 120 F.4th at 990, 1022.

*Third*, Plaintiff argues that Defendant's contentions fail because she "makes no effort to connect § 23-4-1(c) to any sensitive place laws." ECF No. 83 at 20. Defendant drew a connection to various historical sources, including those pertaining to crowded locations and where children gather, much like New York did in *Antonyuk II*. *See* 120 F.4th at 1022-24; ECF No. 81 at 23-26, 28-35. Regardless, § 23-4-1(c)'s constitutionality does not hinge on it being aligned with the principles underpinning laws indisputably falling within the "sensitive place" heartland. Defendant need only identify "relevantly similar" analogues, which can—but need not—be laws pertaining to sensitive places. *See Bruen*, 597 U.S. at 30. Here, Plaintiff has not (and cannot) sidestep the extensive list of ordinances, regulations, and laws specifically prohibiting firearms in parks and similar government-controlled outdoor spaces. Those provisions are essentially dead ringers to § 23-4-1(c) and reflect a settled understanding that such enactments were constitutional. *See, e.g., Wolford*, 116 F.4th at 983; *LaFave*, 2024 U.S. Dist. LEXIS 152000, at *30.

*Fourth*, Plaintiff reiterates that State parks and forests within the ambit of § 23-4-1(c) are

---

[5] For example, in 1790, Pennsylvania had a state constitutional provision securing for individuals the right to "bear arms in defence of themselves[.]" *See* PA. CONST. art 1, § 21. In 1868, Pennsylvania passed one of the earliest laws prohibiting firearms in a public park. *See* ECF No. 81-6 at 14 (Def. Ex. 3). Plaintiff failed to offer anything demonstrating that Pennsylvania's 1868 firearm prohibition was ever challenged or held unconstitutional.

(1) akin to Founding Era commons and greenspaces and (2) more "rural," making them unlike the "urban" parks at issue in *Antonyuk II*. *See* ECF No. 83 at 21-22. As argued above and in Defendant's prior briefing, "modern" parks and similar government-controlled outdoor spaces— i.e., locations like the State parks and forests within the ambit of § 23-4-1(c)—were principally designed to address a distinct societal problem that did not emerge until industrialization. *See Antonyuk II*, 120 F.4th at 1024-25; *Wolford*, 116 F.4th at 982; ECF No. 81-1 at 26-27. Such distinct purpose is what principally sets them apart from Founding Era commons and greenspaces, not simply the fact that people used (and continue to use) modern parks and similar government-controlled outdoor spaces for recreation. *See, e.g., LaFave*, 2024 U.S. Dist. LEXIS 152000, at *27-31. In other words, the undisputed industrialization-driven reasons *why* people needed (and society created) safe, serene, and welcoming places to passively contemplate nature and recreate together as a means to repair and reform society is what principally sets such locations apart from Founding Era commons or greenspaces. *See, e.g.,* ECF No. 84 at ¶¶ 8-10, 13-16. That Founding Era commons and greenspaces were primarily used for things like military exercises, grazing, and dumping grounds for waste simply reinforces why they are different *in form and purpose* to modern parks and similar government-controlled outdoor spaces. *See id.* at ¶ 4; *cf.* ECF No. 83 at 21 (Plaintiff arguing that individuals could recreate in Founding Era commons and greenspaces).

Plaintiff's contention about State parks and forests being "rural" and, thus, not linked to history and tradition fares no better. Rural and more isolated state parks did not emerge "in significant numbers" until after 1868, so this Court should "not infer a lack of regulation from the absence of laws governing rural state parks at that time." *Kipke*, 695 F. Supp. 3d at 655; *see Schoenthal*, 2024 U.S. Dist. LEXIS 156436, at *46-48. Additionally, *Antonyuk II* did not have before it evidence of firearms regulations in geographically vast federal parks that were "relatively

distant from most of America's population"—i.e., rural by any metric.  ECF No. 84 at ¶ 22; *see* 120 F.4th at 1022, 1025-26; ECF No. 84 at ¶¶ 13-15, 21-25.  That is a significant difference between the present record and the eight municipal ordinances that *Antonyuk II* considered.  *See* 120 F.4th at 1022.  What is more, Plaintiff admits that the firearms prohibitions in state and national parks served the same purposes that firearms prohibitions in urban parks did.  *See* ECF No. 84 at ¶ 26.  Thus, there is no dispute on this record that firearms prohibitions in urban and rural parks and similar government controlled outdoor spaces served the same underlying purposes, which also distinguishes this case from *Antonyuk II*.  *See* 120 F.4th at 1025-26; ECF No. 81-1 at 27-28.

B.  Plaintiff admits that State parks and forests are crowded and frequented by children

Broadly speaking, Plaintiff's primary response to Defendant's contention that § 23-4-1(c) is consistent with firearms prohibitions in crowded locations or in locations frequented by children is that this Court should follow his reading of *Bruen* or historical analogues and not treat *Antonyuk II* as controlling.  *See* ECF No. 83 at 22-29.  Suffice it to say, *Antonyuk II* repeatedly stated that firearms prohibitions in crowded locations or areas frequented by children were well-established and can be proper analogues.  *See Antonyuk II*, 120 F.4th at 1019-24, 1026, 1031.

Defendant will not repeat her prior arguments; *see* ECF No. 81-1 at 28-35; but will highlight various admissions by Plaintiff that are relevant to Defendant's contentions.  For example, he admits that State parks and forests—including Sleeping Giant State Park and the Farmington Canal Greenway State Park—can become "densely crowded," especially during busy summer months, and in particular places within such locations.  ECF No. 84 at ¶ 53; *see id.* at ¶¶ 55-67, 93-94, 102-110, 119-21.  He admits that people use State parks and forests "for political activities[.]"  *Id.* at ¶ 68.  And he admits that schools often use such locations for educational purposes.  *See, e.g., id.* at ¶¶ 67, 84, 97, 119.  Thus, there is no genuine dispute of fact that State parks and forests are discrete, public forum locations where people gather, often in large crowds,

for educational, recreational, political, and other purposes.  *See Antonyuk II*, 120 F.4th at 1023-25.

Regarding children, plaintiff admits that a "large percentage" of visitors to Dinosaur State Park's visitor's center in 2023 and through August 2024 "were minor children or individuals accompanied by children."  ECF No. 84 at ¶¶ 114-15.  Standing alone, such admissions dispose of Plaintiff's facial challenge because they reflect that § 23-4-1(c) lawfully applies to a location within its scope.  *See Antonyuk*, 120 F.4th at 1026-27.  Among other things, Plaintiff also admits that: (1) Sleeping Giant State Park has a youth campground, is often used for summer programming, and the Hamden Public Schools used that location for a four-week educational program; *see* ECF No. 84 at ¶¶ 96-98; (2) State parks and forests "provide a variety of educational opportunities" for children, families, and schools; *id.* at ¶ 73; (3) schools organize field trips to State parks and forests to enhance course curricula; *see id.* at ¶¶ 84-85; (4) "[f]amilies and children are *the target* audience of State parks and forests"; *id.* at ¶ 74 (emphasis added); (5) millions of children visit State parks and forests every year; *id.* at ¶ 75; (6) DEEP has programming geared towards children and families; *see id.* at ¶¶ 76-81; and (7) Naugatuck State Forest is a popular destination for children and families.  *Id.* at ¶ 112.  Thus, there is no dispute of fact that State parks and forests are places of educational and scientific opportunity and frequented by children.  *See Antonyuk II*, 120 F.4th at 1026-27; *LaFave*, 2024 U.S. Dist. LEXIS 152000, at *37-38.

C.  Section 23-4-1(c) is relevantly similar to historical analogues pertaining to proprietorship interests and advancing conservation goals

Plaintiff contends that Defendant mistakenly relies on laws permitting landowners to determine what happens on their land or that advanced conservation goals because: (1) such analogues principally pertained to private, rather than public, lands; and (2) conservation laws cannot be used to disarm the general populace.  ECF No. 83 at 29-30.  His contentions fail.

As noted above, Defendant need not identify dead ringers but, rather, can—and does—rely

on the underlying principles (i.e., the "substance") of historical analogues to demonstrate that §

23-4-1(c) imposes a comparable burden that is comparably justified. *See Rahimi*, 602 U.S. at 691-

92; *Antonyuk II*, 120 F.4th at 997-98. Thus, it is not dispositive that many, but not all, of the

historical analogues that Defendant relies on pertain to private property.[6] What matters is that

DEEP, as an entity with control over land, has proprietary interests just like a private landowner

and that there is a well-established tradition of laws promoting conservation goals, regardless of

where poaching or unauthorized hunting was prohibited. *See* ECF No. 81 at 35-44.

Additionally, Plaintiff mistakenly cites to the ancient English monarchy's pretextual use of

game laws to effectuate "widespread disarmament" of the people. ECF No. 83 at 30. Seventeenth

century English game laws sought to, among other things, completely disarm large portions of the

population as a means to suppress resistance to the government. *See, e.g.,* J. Malcolm, TO KEEP

AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT at 12-13, 55, 65, 69-72; 1 St.

George Tucker, Blackstone's Commentaries: With Notes of Reference, to the Constitution and

Laws, of the Federal Government of the United States; and of the Commonwealth of Virginia at

300 n.2 (William Young Birch & Abraham Small, 1803). Such pretextual game laws are not

probative because: (1) they "long predate" 1791 or 1868; *see Antonyuk II*, 120 F.4th at 969; and

(2) are not relevantly similar to § 23-4-1(c) or other laws that Defendant relies on because English

laws called for total disarmament and only allowed people to hunt if they owned enough property.

*See* TO KEEP AND BEAR ARMS at 12-13, 55, 65, 69-72. Defendant relies on American historical

analogues that did not completely disarm people but, rather, promoted conservation goals by

---

[6] Not all of the historical analogues Defendant submitted pertained to private property. For example, hunting laws in Maryland (1838 and 1900), Virginia (1909), and New Mexico (1915) presumed that an individual was unlawfully hunting simply because they possessed a gun at unauthorized places and times in non-privately owned fields, woods, and other areas. *See* ECF No. 81-16 at 115-16, 169-70, 188-89, 208 (Def. Exs. 182, 191, 194, 195). Such laws aligned with enactments pertaining to private property. *See* ECF No. 81-1 at 40-44.

16

allowing hunting only at authorized times or places, which aligns with § 23-4-1(c)'s firearms prohibition. *See* ECF No. 81-1 at 40-44.

Finally, Plaintiff makes several other important admissions. For example, he admits that DEEP manages, maintains, and operates State parks and forests much like a government run business and that they generate revenue. *See* ECF No. 84 at ¶¶ 124-40. Additionally, he admits that (1) firearms prohibitions in urban, national, and state parks promoted conservation goals, (2) Connecticut's initial firearms prohibition in State parks was motivated in part by a desire to curb unauthorized hunting, and (3) § 23-4-1(c)'s firearm prohibition presently serves conservation goals by making it more difficult for individuals to engage in unauthorized hunting. *See id.* at ¶¶ 27, 38, 46-47. Through these admissions, Plaintiff effectively concedes that § 23-4-1(c) is relevantly similar to the historical analogues that Defendant relies on. *See* ECF No. 81-1 at 35-44.

## V.    Plaintiff's As-Applied Challenge to Naugatuck State Forest is Not Justiciable

Plaintiff's as-applied challenge to Naugatuck State Forest is not justiciable due to a lack of standing or mootness. *See Antonyuk II*, 120 F.4th at 1032-35. Defendant previously argued that Plaintiff lacked standing; *see* ECF No. 81-1 at 52-54; which "bears close affinity to the question of mootness[.]" *Antonyuk II*, 120 F.4th at 1033 (internal quotation marks omitted). Plaintiff argues that he has standing based on a planned visit in October 2024. *See* ECF No. 83 at 33. Although Plaintiff planned to visit Naugatuck State Forest for turkey hunting; ECF No. 84 at ¶ 145; he offered no evidence that he actually went there in October 2024. *See Antonyuk II*, 120 F.4th at 1033. "A past but unfulfilled intention to violate the law does not support pre-enforcement standing[.]" *Id.* Nor did Plaintiff present evidence that he was deterred from visiting Naugatuck State Forest or from carrying his handgun during his planned turkey hunting visit. What is more, October 2024 has come and gone, and Plaintiff offers nothing more than a some-day intention to visit Naugatuck State Forest. *See* ECF No. 81-1 at 52-53. His claim is therefore moot because a

live case or controversy cannot be based on speculation. *See Antonyuk II*, 120 F.4th at 1034-1035.

## VI.    Plaintiff's Evidentiary Objections Fail

Plaintiff raises several unavailing objections to paragraphs in Defendant's Local Rule 56(a)1 Statement. *See* ECF No. 83 at 4-7.

Plaintiff first challenges a portion of paragraph 42 stating that "prohibiting firearms gives visitors peace of mind in knowing that parks and forests are safe and welcoming to all" because neither Colonel Chris Lewis nor Thomas Tyler are experts, and both lack personal knowledge to support the assertion. ECF No. 84 at 4; *see* Fed. R. Evid. 602 and 701. Both Colonel Lewis and Tyler attested that their affidavits were based on, among other things, their personal knowledge or review of relevant documents. *See* ECF No. 81-14 at 131 ¶ 5; *id.* at 143 ¶ 12. Plaintiff's argument therefore fails because he essentially challenges the credibility of such assertions, an issue that "must be reserved for the trier of fact, not the judge." *McCrae v. H.N.S. Mgmt. Co.*, 2024 U.S. Dist. LEXIS 81032, *6 (D. Conn. May 3, 2024) (*Garcia, M.J.*). Regardless, Colonel Lewis and Tyler have the requisite personal knowledge based on their personal and professional experiences that: (1) 23-4-1(c) maintains safety; ECF No. 84 at ¶ 41; (2) the presence of firearms increases the risk of confusion, alarm, and conflict; *see* 5/10/23 Tr. at 258, 263-69, 305-306; ECF No. 81-14 at 135-36 ¶ 16(a) and (c); and (3) EnCon has received calls about the presence of a firearm. *See* 5/10/23 Tr. at 278-79, 293, 306-308, 339. Such experiences permit "commonsensical inferences" that the presence of firearms generates feelings of less safety and that prohibiting them helps people feel safer to visit a State park or forest. *See McCrae*, 2024 U.S. Dist. LEXIS 81032, at *12 (internal quotation marks omitted); *Wistron Neweb Corp. v. Genesis Networks Telecom Services, LLC*, 2023 U.S. Dist. LEXIS 120262, at *35 (S.D.N.Y. July 12, 2023), *appeal dismissed*, No. 23-1155 (ECF No. 58) (Jan. 8, 2024). But in any event, Professor Alexandra Filindra's unchallenged expert opinion reiterates the same points of Colonel Lewis and Tyler and demonstrates that people

would feel less safe, have greater fear, and would be less likely to visit State parks and forests if firearms were permitted in such locations.[7]  *See, e.g.,* ECF No. 81-15 at 196, 222-23 ¶¶ 16, 80.

Plaintiff also objects to paragraph 43 based on Fed. R. Evid. 602, claiming that Colonel Lewis lacks personal knowledge that the inadvertent display of a concealed firearm can result in people feeling alarmed by the sight of a gun.  *See* ECF No. 83 at 5.  Colonel Lewis has sufficient personal knowledge based on his preliminary injunction hearing testimony that (1) he has seen individuals inadvertently display a concealed firearm in his personal and professional capacities, (2) people can be shocked and alarmed at the sight of a gun, (3) he did not expect to see a concealed firearm on at least one occasion, and (4) the presence of firearms increases the risk of confusion, alarm, and conflict.  *See* 5/10/23 Tr. at 258, 263-69, 305-306, 321-24.  Thus, his personal and professional experiences permit the commonsense inference that the inadvertent display of a concealed firearm can result in feelings of alarm.  *See* Fed. R. Evid. 602; *McCrae*, 2024 U.S. Dist. LEXIS 81032, at *12; *Wistron Neweb Corp.*, 2023 U.S. Dist. LEXIS 120262, at *35.

Finally, Plaintiff also objects to paragraph 134 in its entirety.  ECF No. 83 at 6-7.  Defendant disagrees insofar as Plaintiff objects to individuals being "less likely to visit State parks and forests" if guns were permitted there and how decreased visitor attendance "could diminish revenue generation and contribute to the already-existing funding issues" for DEEP.  In Professor Filindra's unchallenged expert opinion, individuals would be chilled from visiting State parks and forests if guns were allowed in such locations.  *See* Fed. R. Evid. 702; ECF No. 81-15 at 196, 222-23 ¶¶ 16, 80. Additionally, Tyler was Director of DEEP's Park's Division, had extensive experience working for DEEP, and had knowledge about DEEP's budgetary constraints and

---

[7] Paragraph 42 in Defendant's Local Rule 56(a)1 Statement only cited to two subsections in the affidavits by Colonel Lewis and Tyler, but this Court can consider additional record evidence before it.  *See* Fed. R. Civ. P. 56(c)(3); *McCrae v. H.N.S. Mgmt. Co.*, 2024 U.S. Dist. LEXIS 81032, *6 (D. Conn. May 3, 2024) (*Garcia, M.J.*).

revenue generation. *See* ECF No. 81-14 at 141-43, 157-62 ¶¶ 2-10, 60-77. Considering Tyler's position, he could provide lay testimony about potential lost profits based on decreased visitor attendance. *See* Fed. R. Evid. 701; *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 265 (2d Cir. 1995), *cert. denied,* 516 U.S. 1114 (1996); *Saye v. Old Hill Partners, Inc.*, 478 F. Supp. 2d 248, 272 (D. Conn. 2007).

**VII.    This Court Should Sustain Defendant's Evidentiary Objections**

Defendant objects to Plaintiff's reliance on unauthenticated documents or hearsay.[8] *See* Fed. R. Evid. 802; Fed. R. Evid. 901. Plaintiff relies on such inadmissible material by relying on (1) a website printout from the "Sleeping Giant Park Association" in support of paragraphs 55 and 56 in his Local Rule 56(a)1 Statement, and (2) a website printout from "Trust for Public Land" in his Local Rule 56(a)2 Statement. *See* ECF No. 81-3 at ¶¶ 55-56; ECF No. 84 at ¶¶ 1-3, 5, 209, 211-12. Such materials are inadmissible because they are unauthenticated, constitute hearsay, and are not from a government website. *See Brokamp v. James*, 66 F.4th 374, 381 n.3 (2d Cir. 2023), *cert. denied*, 114 S. Ct. 1095 (2024); *Hui Wang v. Omni Hotels Mgmt. Corp.*, 2025 U.S. Dist. LEXIS 40304, at *6-7 and 15 n.10 (D. Conn. March 6, 2025) (*Haight, J.*); *Loussier v. Universal Music Group, Inc.*, 2005 U.S. Dist. LEXIS 37545, at *11-12 (S.D.N.Y. July 15, 2005).

<u>**CONCLUSION**</u>

For these reasons and those set forth in Defendant's prior briefing, this Court should deny Plaintiff's motion for summary judgment, grant Defendant's cross-motion for summary judgment, and enter judgment for Defendant.

---

[8] Defendant did not previously brief evidentiary objections, instead asserting them in her Local Rule 56(a)2 Statement. *See* ECF No. 83 at 1-4; D. Conn. L. R. 56(a)2(i). Nonetheless, this Court may consider them now, especially because Defendant would not oppose Plaintiff having the opportunity to file a sur-reply limited to addressing Defendant's evidentiary objections raised in one paragraph in this reply. *See Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 252 (2d Cir. 2005); *Wilmington Savings Fund Society, FSB v. Universitas Education*, LLC, 164 F. Supp. 3d 273, 292 (D. Conn. 2016) (*Bryant, J.*).

Respectfully submitted,

DEFENDANT
COMMISSIONER
KATIE DYKES

WILLIAM TONG
ATTORNEY GENERAL

BY: /s/ *Thadius L. Bochain*
Timothy J. Holzman (ct30420)
Blake T. Sullivan (ct30289)
Thadius L. Bochain (ct31367)
Assistant Attorneys General
Attorney General's Office
165 Capitol Avenue
Hartford, CT 06106
860-808-5020 (phone)
860-808-5347 (fax)
Timothy.Holzman@ct.gov
Blake.Sullivan@ct.gov
Thadius.Bochain@ct.gov

## **Certificate of Service**

The undersigned hereby certifies that, on the foregoing date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties and counsel of record who have appeared by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

*/s/ Thadius Bochain*
Thadius Bochain
Assistant Attorney General