# Attachment 2
# to Defendant's Reply

# To KEEP and BEAR ARMS

## The Origins of an Anglo-American Right

### JOYCE LEE MALCOLM

# To Keep and Bear Arms

## The Origins of an Anglo-American Right



## JOYCE LEE MALCOLM

HARVARD UNIVERSITY PRESS
Cambridge, Massachusetts
London, England
1994

CONNECTICUT
STATE LIBRARY

APR 2 2 1994

HARTFORD
CONNECTICUT

KF
4558
2nd
.M35
1994

## A People Armed

It is apparent that the regulations in effect before 1640 did not interfere with the basic duty of the English people to keep arms for the defence of themselves, their neighbours, or the realm. The Crown, through its exclusive right to make saltpetre and gunpowder, retained the potential for limiting the supply. But not until the reign of Charles I, when distrust of the King was increasing and monopolists had made gunpowder scarce and expensive, did this seem a real danger. And when it did, Parliament was quick to act.

Although the general public was free to have arms, because there was no *right* to have weapons the government always had the power to disarm any individual or class of individuals it considered dangerous to the peace of the realm. This was the case with English and Welsh Catholics, who had been regarded as potential subversives since the English Reformation and suffered a variety of civil liabilities. Like other subjects, they were assessed for a contribution of arms for the militia, but they were not always permitted to keep these weapons in their homes. Nevertheless, Catholic families were presumed to have weapons on hand for their self-defence. During periods of extreme religious tension or imminent invasion, the purchase of weapons by Catholics was viewed with suspicion. But it was the stockpiling of arms, even the rumour of stockpiling, rather than the possession of weapons for self-defence, that caused their neighbours' anxiety.[43] What is significant and ominous in the arms restrictions imposed on Catholics is not that they put a large group at a disadvantage, but that they set a precedent by singling out a section of the community as *potentially* dangerous and legally disarming them.

There were reasons other than those of state for restricting the use of firearms. Chief among these was the protection of that pastime dear to the hearts of the English aristocracy and to the stomachs of the rural population, the pursuit of game. Although it forms a very separate thread in the fabric of English arms use, it was a strand that was to become thoroughly and purposely entangled in the effort during the Restoration period to disarm the greater part of the English population. For that reason the impact of the hunt upon the use of firearms, and its distinct and lively history, must be examined.

To Samuel Johnson it seemed remarkable that "hunting was the labour of the savages of North America, but the amusement of the Gentlemen of England."[44] In truth, hunting would have been the labour of ordinary Englishmen no less than North American "savages" had not the English aristocracy demanded exclusive rights to the sport. Far more was at stake for the aristocracy than a selfish desire to monopolize their favourite

amusement. They viewed common folk armed to keep the peace as an unfortunate necessity, but common folk armed to hunt as an unnecessary, unacceptable menace. Thus, the upper classes sought exclusive rights to the sport not only, as they claimed, to preserve game animals but to curtail the opportunity for common men to go about armed. This was achieved through the passage of game acts that imposed a property qualification on hunting and prohibited those who failed to meet it from using, and in some instances even owning, hunting equipment.

Justification for such blatantly inequitable legislation involved a carefully nurtured double standard, according to which the local squirarchy in pursuit of a hare were practicing "a Recreation for Kings and Noblemen," healthy and honourable in every way, whereas local labourers in pursuit of the same small beast were "very bad Christians . . . of little or no Worth . . . loose, idle, disorderly and dissolute Persons" destined to ruin themselves and their families by neglecting useful employment and likely to turn to highway robbery and burglary.[45]

The subject would be of only passing interest were it not for the fact that in 1671, in the guise of an act to protect wildlife, Parliament passed the first law in English history that took from the majority of Englishmen the privilege of having firearms. The lengths to which the upper classes were prepared to go, ostensibly to guard their hunting prerogative, and the drastic impact of their efforts on the right of Englishmen to possess arms, make plain that far more was involved than what William Blackstone regarded as "a most Princely diversion and exercise."[46]

The mixed motives for passage of game laws were recognized by William Holdsworth in his classic compilation, *A History of English Law*. Holdsworth pointed out that game legislation proceeded on many different bases, one of which was "the principle that assemblies for the purposes of hunting and sport gave opportunities for riot and disorder."[47] William Blackstone listed four chief grounds for passage of game laws:

1. encouragement of agriculture and improvement of lands

2. preservation of several species

3. prevention of idleness and dissipation in husbandmen

4. prevention of popular insurrections and resistance to the government by disarming the bulk of the people

The last was, he conceded, "a reason oftener meant than avowed by the makers of Forest or Game Laws."[48]

## A People Armed

The very first game act to set a property qualification upon hunting was passed in 1389 in response to the great social uprising of that time. According to the act, all laymen having an annual income from land of less than 40s., and clergymen having less than £10 per year, were forbidden to hunt or to keep hunting dogs and hunting equipment. Its preamble admitted that it was meant to hinder "divers artificers, labourers, and servants" from assembling under pretence of hunting to conspire against their superiors. When Henry VII came to the throne after years of civil turmoil, one of the measures he employed to maintain quiet in the countryside was a severe game act. This act made deer hunting with disguises or at night a felony. Coke, in the *Institutes*, expressed outrage at "this new and ill penned Law" that was at odds with the old forest statutes, "by which no man might lose either life or limb for killing a wild beast."[49] By Queen Elizabeth's reign humane judgments had reduced her grandfather's law to a nullity.

Because the English legal and military system required the general public to assume a variety of police and military functions, no game act until that of 1671 actually removed from the common people the privilege of owning arms. Rather, these acts simply prohibited the use of weapons for hunting.

With the accession in 1603 of James I, there was a dramatic change in the hunting laws and in the rigor with which they were enforced. Within the first six years of his reign—in 1604, 1605, and 1609—no less than three new game acts were passed. These acts altered the property qualification needed to hunt far more materially than any act in the preceding two centuries; made it illegal for unqualified persons to keep coursing dogs, sell game, use guns, crossbows, or other devices to take game; and brought some poaching cases before the kingdom's highest courts, including the Court of Star Chamber.[50] The law of 1609 also empowered officials with a warrant to enter homes and barns to search for dogs, nets, and prohibited hunting devices.

James demanded strict enforcement of the game laws and, as a study of the Stuart "game prerogative" makes clear, "had taken into his own hands the task of providing for a strict preservation of the game throughout the country."[51] From the time he arrived in England, he began to appoint aristocrats as his gamekeepers, granting them broad powers to enforce the law.[52] In many cases these powers went beyond the bounds of the statutes, as the royal gamekeepers were given jurisdiction over large areas of private property and even entire counties. James's motives were undoubtedly mixed: he was not only a hunting zealot but a man obsessed by fear of a violent attack upon his person.

Charles I was just as suspicious of his subjects as his father had been

 C H A P T E R   F O U R

# The Gentleman's Game

THREATS to freedom sometimes come from unexpected quarters. For seventeenth-century Englishmen the King was *the* expected quarter, and their defences were aimed at protecting their liberties from the Crown. As a shrewd eighteenth-century observer explained, however, though it is "absolutely necessary, for securing the Constitution of a State, to restrain the Executive power . . . it is still more necessary to restrain the Legislative. What the former can only do by successive steps (I mean subvert the laws) and through a longer or shorter train of enterprizes, the latter does in a moment. As its bare will can give being to the laws; so its bare will can also annihilate them: and, if I may be permitted the expression,—the Legislative power can change the Constitution, as God created the light."[1]

Charles II regarded armed subjects as a danger to be contained "by successive steps" and through a "train of enterprizes." But it was the representatives of the people assembled in Parliament on their own initiative who annihilated the privilege of most Englishmen to have weapons and changed centuries of custom almost as suddenly "as God created the light."

It is clear how Parliament accomplished this, but the records are stubbornly silent about why it was done. To grasp why members of Parliament passed the Game Act of 1671, which eliminated that time-honoured privilege, one must place the Game Act in its immediate context and, through a re-creation of members' views of government and society, tease from the tangle of events clues to their motives.

It must have been with immense relief that royalists turned their thoughts from the King's restoration to their own. Exiles back from an impoverished residence on the Continent and victims of dispossession or merely humiliation shared a single-minded zeal to return to the good

## The Gentleman's Game

life, to refurbish their estates, to get on with improvement schemes abandoned years earlier, and above all to resume their domination of the social, economic, and political life of the countryside. For a while this passion to recoup their economic and social status seemed to obliterate all else, most notably any uneasiness about their political liberties. Every warning that political restraints should be imposed upon the new king as a condition of his return was met with rough impatience and cavalierly swept aside in a wave of fervent loyalty. Even the seemingly unobjectionable attempt a week before the King's arrival to enact a bill for "maintaining the just Rights and Privileges of Parliament and confirming the fundamental Laws" received only one reading before Charles's return and was later quietly shelved by the House of Lords.

In stark contrast, considerable attention was lavished upon a bill to ensure that the Long Parliament's abolition of the hated Court of Wards and Liveries and of knight service remained permanent. In exchange for the proceeds from wardship and knight service, members agreed to grant the King the revenues of an excise tax estimated to be worth some £100,000 per year. The fiscal effect of the new arrangement, as one historian points out, was that "in place of income derived from landowners holding of the Crown, there was substituted an additional tax on beer, cider, and tea, falling on rich and poor alike."[2] This measure, which removed the last vestiges of the aristocracy's feudal obligations to the Crown, sped through the two houses of Parliament. Nothing could more clearly illustrate the priorities of the royalist aristocracy than the different fates of these two measures.

Human nature being what it is, perhaps royalist concerns, heavily skewed toward personal betterment, were only to be expected. After all, not only were their estates and pocketbooks in need of replenishment, but after nearly twenty years every privilege and public office in the gift of the Crown seemed "up for grabs." Decorum as well as political caution fell victim to an unseemly stampede for royal favours. Since much of this scramble for royal gifts had as its object the renewal or enhancement of country privileges, it is not surprising that high on the list of offices to be garnered and projects to be tackled were those relating to the hunt. Above all else, hunting symbolized the life of leisure and privilege the aristocracy had so sorely missed. Moreover, since it was by means of a game act that Parliament prohibited the possession of firearms, the approach of the restored king and his followers toward the re-creation of their favourite pastime is of great consequence.

The King shared the general royalist eagerness to return the princely sport to its former luster, and he was aware that, because a game park could be "disparked" when "all the deer etc. are destroyed," both ani-

introduced a bill into Parliament which alleged that gunpowder had become scarce because it had been "embezzled and transported beyond the seas." The new act intended that "every man that had any gunpowder to sell . . . bring it to the officers of the King's Ordinance and Arms, and that no man should sell any but by a licence first had from them."[56] Members of Parliament generally disliked the bill and were not reassured by the Crown's claim that this new restraint "was not proposed to be general or perpetual, but only when there was a war either at land or sea." They put the bill aside "until there was some better expedient found out to prevent the embezzling and purloining [of] the powder."

Parliament was just as protective of civilian entitlement to arms when it was contending with internal lawlessness. A veritable epidemic of highway robbery made it necessary to devise some means to ensure the safety of travellers.[57] A list of suggestions was drawn up, one of which was "that none ride with firearms." A committee was selected to consider the suggestions and draft a bill. When the bill was reported, the suggested ban on riding armed had been dropped, although members had been assured that no soldier would be permitted to travel with firearms.

From 1667 until April 1671 customary civilian entitlement to weapons remained unchanged. Then quite suddenly, in the spring of 1671, Parliament enacted a game law that altered the hunting restrictions and in so doing deprived the great majority of the community of all legal right to have firearms. It is difficult to wrest from surviving records an explanation for this change of policy. Careful investigation has failed to turn up either personal or official explanations other than the preamble of the act itself. The measure moved swiftly through both houses of Parliament with little dissent. The immediate context, viewed against increasing political tensions, offers some insight. The powers within the new law must provide the rest.

The years immediately preceding that in which the Game Act was passed gave no hint of what was to come. Indeed, there was a strange calm in 1668 and 1669, as if the nation was exhausted after the traumatic years of the Second Dutch War. In February 1669/70 Charles felt sufficiently confident of his popularity to open a new session of Parliament accompanied by his guards, "which," a contemporary remarked, "is the first instance we meet with in history, of the sovereign's entering upon the exercise of his legislative power, under the awe and influence of the sword."[58] A month later Andrew Marvell wrote, "It is . . . my Opinion that the King was never since his coming in, nay, all Things considered, no King since the Conquest, so absolutely powerful at Home,

## The Gentleman's Game

It "was timely prevented by the prudence of the Lord Mayor," and the government backed down.[75]

In the midst of this anger at the Crown over the outrageous use of the royal guards, the wanton behaviour of the Court, demands for yet higher taxation, and its unwillingness to stop the growth of Catholicism, a measure was introduced in the House of Commons for the preservation of game and alteration of the qualification needed to hunt. "A Bill to prevent the Destruction of Coneys [rabbits], and other Game" was first read on March 14 and given a second reading the next morning. It was then sent to committee for consideration and amendment. The committee appointed to deal with the bill had 46 named members in addition to all the members from seven counties, for a total of some 184 men. This group acted quickly and a week later brought the bill back before the Commons with several amendments and a clause added for the protection of fish.[76] When questions arose about distress of the goods of offenders and provision for appeal, the bill was returned to committee. On April 4 a final draft was approved by the House of Commons and the measure was sent the same day to the Lords. A fortnight later it returned from the Lords with several amendments, which were read and approved. With the King's assent, the Game Act of 1671, "An Act for the better Preservation of the Game, and for Securing Warrens not Inclosed, and the several Fishings of this Realm," became law.

It had taken slightly longer than a month to pass both houses—certainly an easy passage. In light of the great rush of business on what seem more important bills, the attention bestowed upon this measure is remarkable. When Parliament recessed on May 2, six "considerable bills"—for foreign excise, against conventicles, against papists, for "better observation" of the Lord's Day, to prohibit export of wool, and a general pardon—had not been completed and were lost. Yet precious time had been devoted to the creation of a game act when there were already numerous game acts on the statute books. Although the unanimity of members and the consequent absence of recorded debate make it especially hard to understand their thinking, members obviously regarded the new game act as a vital measure.

A careful reading of the Game Act of 1671 makes it clear that this was not a typical game statute. By way of preamble, it claimed: "Divers Disorderly persons, laying aside their Lawfull Trades and Imployments, do betake themselves to the Stealing, Taking, and Killing of Conies, Hares, Phesants, Partriges, and other Game, intended to be

## To Keep and Bear Arms

Preserved by former Laws, with Guns, Doggs, Tramels, Lowbels, hayes, and other Nets, Snares, hare-pipes, and other Engines, to the great Damage of this Realm, and prejudice of Noblemen, Gentlemen, and Lords of Manors, and others, Owners of Warrens."[77]

This opening was not unusual. A typical game act passed in 1661, "An Act to Prevent the Unlawful Coursing, Hunting, or Killing of deer," had also complained of "many idle, loose, and disorderly persons."[78] A section of the new act extended protection to rabbits in warrens that were not enclosed—often the village common—while another section protected fish in private ponds, pools, and "other several waters."

The act of 1671 then proceeded to create a new structure of law enforcement. All "lords of manors or other royalties not under degree of an esquire" were empowered "by writing under their hands and seals" to appoint one or more gamekeepers to enforce the Game Act on their own estates. Hitherto only the King had created gamekeepers, and it was the responsibility of JPs, constables, and town officials to enforce the game acts on private property. One study of the Stuart game laws has suggested that Charles II was annoyed at the expense of paying gamekeepers and was therefore pleased to see the responsibility shared.[79] But, since local justices, constables, and officials already had responsibility for enforcing the game acts, this duty was already shared. This new class of gentry-appointed officials placed the task of game preservation directly in the hands of the gentry, and could be seen as extending their own power over the sport. It gave them a "kind of private game police."[80]

The act specified the duties of these new gamekeepers. "They may take and seize all such Guns, Bowes, Greyhounds, Setting-doggs, Lurchers, or other Doggs to kill hares . . . ferrets, Tramels . . . Snares, or other Engines, for the taking and killing of Conies . . . or other Game, as within the Precincts of such respective Manors, shall be used by any person or persons, *who by this act are Prohibited to keep or use the same.*"[81] In earlier acts all devices *used* in the act of poaching could be seized, while others designed exclusively for hunting were illegal *per se.* Now all these were illegal *per se.*

The gamekeeper "or any other person or persons, authorized by a warrant from a justice of the peace," could "in the day-time Search the houses, Outhouses, or other places" of any such person or persons the act prohibited from keeping or using these devices. Of course there had to be good ground to suspect that such unqualified persons had or kept in their custody "any Guns, Bowes, Greyhounds," and so forth. Any prohibited equipment discovered during such a search could be kept by the lord of the manor where they were found or "cut in pieces" and

The Gentleman's Game

destroyed "as things by this Act Prohibited to be kept by persons of their degree."

Prior legislation authorized any constable or "headborough" of a county, city, or town armed with a warrant signed by two justices of the peace to enter and search the premises of suspects. The new act permitted a single gamekeeper or, indeed, "any other person or persons" authorized by a warrant from a single justice of the peace—who might be the property owner himself—to search the home and property of a suspect.

Next came the crucial definition of who qualified to hunt, as well as a list of prohibited weapons and other devices. The entire paragraph was in the negative. According to the new law, "all and every person and persons, not having lands and Tenements or some other Estate of Inheritance, in his own or his Wife's right, of the clear yearly value of One hundred pounds per Annum," or long-term leases of a clear yearly value of £150, other than the heir of an Esquire "or other person of higher degree," were declared "to be persons by the Laws of this Realm, not allowed to have or keep for themselves, or any other person or persons, any Guns, Bowes, Greyhounds, Setting-doggs, ferrets . . . or other Engines aforesaid; But shall be, and are hereby Prohibited to have, keep, or use the same."

This was a break with the past in two respects. The Game Act of 1609, in effect until this act, had required a would-be hunter to have income from land of at least £40 a year, or a life estate of £80, or personal property worth £400. That basic requirement had now increased from £40 to £100 income from land, from £80 to £150 in leases on land, and the category of those who had insufficient income from land but at least £400 in personal property had been abolished. Wealthy merchants, prosperous lawyers, and others who had a goodly amount of personal wealth but insufficient income from land were instantly deprived of their right to hunt and grouped together with those defined in the law as "idle and disorderly." Not only had the category of those qualified to hunt been made narrower than at any time in the past, but, as the great jurist William Blackstone later pointed out, the property qualification needed to hunt was now fifty times the amount needed to permit a man to vote.[82]

It has been argued that sixty years of inflation necessitated this adjustment in order to keep hunting as exclusive as the earlier act had intended. There had certainly been inflation in the course of six decades, and with it, an increase in the number of those permitted to hunt. Now, however, all those whose incomes from land had crept up to the £40 mark were deprived of what they had come to expect as their right; and the new

· 71 ·

## To Keep and Bear Arms

minimum had been lifted to a height they were unlikely to reach. The new act instantly deprived all those with landed income of from £40 to £99 of the right to hunt. These greatly increased minimum incomes must have been especially galling if, as Lord Lucas and others complained, many in the countryside had not prospered in the years prior to the act. The immediate result was that less than 1 percent of those living on the land were entitled to hunt game, even on their own property. Well-to-do yeomen were lumped with their day labourers and wealthy merchants as men unfit to engage in the sport.

The second departure from previous game acts, the list of prohibited "engines," was even more startling and extended the act from the domain of game conservation into that of arms control and public disarmament. The earliest game law to set a property qualification had prohibited laymen who had less than 40s. a year from keeping "any greyhound, hound, nor other dog to hunt" and forbade them from using "ferrets, nets . . . and other engines" for taking game. Only hunting dogs were prohibited per se.[83] A similar distinction between things illegal per se and those that were legal but were not to be used for hunting was made in game acts passed during the reign of James I.[84] The first of these, passed in 1604, stated that unqualified persons could not keep hunting dogs "or net or nets" to take game birds. This list was expanded the following year to prohibit unqualified persons from keeping "any buck-stalls or engine-hayes, gate-nets, purse-nets, ferrets or coney-dogs." These were devices and animals specifically designed for hunting. Guns, bows, and crossbows as devices having other, legitimate purposes, however, however, were not prohibited per se. This basic distinction, in effect when the Game Act of 1671 was drafted, was intended to permit the general population to have and keep guns, bows, pikes, and other weapons necessary for their self-defence, their police duties, and for the militia. The Game Act of 1671 made it no longer necessary to prove that guns and bows had been illegally used; it simply included them in the list of prohibited devices, thus depriving nearly the entire population of a legal right to own them.

There can be no doubt that this change was intentional. The authors of the act repeat the prohibition three times; first empowering the new gamekeepers to "take and seize" all guns, bows, greyhounds, and so on "within the precincts" of their employer's property; second, authorizing gamekeepers to search the houses, barns, "or other places" of any person "by this Act Prohibited to keep or use the same" if they had grounds to suspect that the person in question had or kept "any Guns, Bowes, Greyhounds, etc."; finally, they state unequivocally in the passage cited above that all persons unqualified to hunt are declared persons "not