## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DAVID J. NASTRI,
*Plaintiff,*

v.

No. 3:23-cv-00056 (VAB)

KATIE S. DYKES, *in her official capacity,*
*Defendant.*

### RULING AND ORDER ON THE PENDING MOTIONS

David J. Nastri ("Mr. Nastri" or "Plaintiff") filed this lawsuit against Katie S. Dykes

("Commissioner Dykes" or "Defendant"), the Commissioner of the Connecticut Department of

Energy and Environment Protection ("DEEP") in her official capacity, alleging that § 23-4-1(c)

of the Regulations of Connecticut State Agencies ("§ 23-4-1(c)") violates the Second and

Fourteenth Amendments to the United States Constitution, both facially and as-applied to

Sleeping Giant State Park, Naugatuck State Forest, and Farmington Canal Greenway State Park.

2nd Am. Compl. ¶¶ 52–67, ECF No. 68 (Aug. 27, 2024) ("2nd Am. Compl.").

On November 15, 2024, Mr. Nastri moved for summary judgment on the single count of

his Amended Complaint and moved for the Court to issue a permanent injunction barring

Commissioner Dykes from enforcing § 23-4-1(c)'s prohibition on the carrying of handguns in

Connecticut State parks and forests. He moved, in the alternative, for the Court to enter a

permanent injunction barring Commissioner Dykes from enforcing § 23-4-1(c)'s prohibition

against him when he carries a handgun for purpose of self-defense in Sleeping Giant State Park,

Naugatuck State Forest, and the Farmington River Canal Trail. *See* Pl.'s Mot. for Summ. J. and

for a Permanent Inj., ECF No. 74 (Nov. 15, 2024) ("Pl.'s Mot."); Pl.'s Mem. of Law in Supp. of

Mot. for Summ. J. and for a Permanent Inj., ECF No. 74-1 (Nov. 15, 2024) ("Pl.'s Mem.").

On December 21, 2024, Commissioner Dykes cross-moved for summary judgment on Mr. Nastri's single Count and opposed Mr. Nastri's motion for summary judgment. *See* Def.'s Combined Cross-Mot. for Summ. J. and Opp. to Pl.'s Mot. for Summ. J., ECF No. 81 (Dec. 31, 2024) ("Def.'s Mot."); Def.'s Mem. of Law in Supp. of Her Combined Cross-Mot. for Summ. J. and Opp. to Pl.'s Mot. for Summ. J., ECF No. 81-1 (Dec. 31, 2024) ("Def.'s Mem.").

For the following reasons, Plaintiff's motion for summary judgment is **DENIED**. Defendant's cross-motion for summary judgment is **GRANTED**, and Plaintiff's motion for permanent injunctive relief is **DENIED**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background[1]

#### 1.  The Early Park Movement

There were no modern style parks around 1791 when the Second Amendment was adopted. Local Rule 56(a)(1) Statement of Undisputed Facts ¶ 1, ECF No. 81-2 (Dec. 31, 2024) ("Def.'s SOF").[2] At that time, colonies had no need to set aside lands for preservation or

---

[1] The facts are taken from Commissioner Dykes's Local Rule 56(a) Statement, Mr. Nastri's Local Rule 56(a) Statement, and supporting exhibits filed by all parties. *See* D. Conn. L. Civ. R. 56(a)(1) ("Each material fact set forth in the Local Rule 56(a)(1) Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)(2) Statement required to be filed and served by the opposing party in accordance with this Local Rule, or the Court sustains an objection to the fact."). Local Rule 56(a)(2) requires the party opposing summary judgment to submit a Local Rule 56(a)(2) Statement which contains separately numbered paragraphs corresponding to the Local Rule 56(a)(1) Statement and indicates whether the opposing party admits or denies the facts set forth by the moving party. Each admission or denial must include a citation to an affidavit or other admissible evidence. D. Conn. L. Civ. R. 56(a)(2), 56(a)(3).

[2] Mr. Nastri disputes this, saying that "[p]arks existed well before the Second Amendment was adopted in 1791 and endured both through the 1791 time period when it was adopted and well after its adoption." Local Rule 56(a)2 Statement of Facts in Opp. to Summ. J. ¶ 1, ECF No. 84 (Jan. 29, 2025) ("Pl.'s Resp. to Def.'s SOF"). Mr. Nastri cites only, however, to the list of "The 150 Largest City Parks," *see* Ex. N at 1–2, ECF No. 86. His Exhibit N also includes a list of "The Oldest City Parks," *id.* at 6–8. That list provides no detail comparing the parks that existed before and at the time of the Founding to the more modern parks described in the Commissioner's supporting exhibits. *See, e.g.*, Def.'s Mot., Ex. 135 ¶¶ 30–33, ("Cornell Decl.") (comparing the public spaces that existed prior to and at the Founding to those modern parks); Def.'s Mot., Ex. 134 ¶ 15, ("Young Decl.") ("During the early

recreation because the growing colonies were largely hemmed in by various tribal nations reluctant to cede further territory, and the nation was still 90 percent rural with most of the population engaged in some kind of agricultural pursuit. *Id.* ¶ 2.[3] Instead, existing public spaces at the nation's founding took the form of public squares, common, and greenspaces. *Id.* ¶ 3. Those Founding Era greenspaces, such as the Boston Common, were used primary for religious gatherings, military exercises, public executions, grazing, and dumping grounds for discarded household items, and shared little in common with modern parks. *Id.* ¶ 4.[4] The term "park," however, was used to refer to public land since before the nation's founding. Local Rule 56(a)2 Statement of Facts in Opp. to Summ. J. ¶ 5, ECF No. 84 (Jan. 29, 2025) ("Pl.'s Resp. to Def.'s SOF").

During the early to mid-1800s, industrialization and urbanization began to occur, and the populations of many American cities increased rapidly. Def.'s SOF ¶ 6. This influx and concentration of people resulted in cities becoming increasingly perceived as socially degraded

---

American Republic, dedicated greenspaces in urban areas were limited and where they existed they did not exceed three miles. The early American greenspaces usually took the form of public squares in places like Philadelphia or Savannah or commons agricultural spaces like Boston Common."). Accordingly, the Court does not consider this to be a genuine dispute of material fact.

[3] Mr. Nastri disputes this fact, but he once again fails to cite to materials which create a genuine dispute of material fact. Pl.'s Resp. to Def.'s SOF ¶ 1. First, he cites to the list of America's oldest and largest parks, which does not provide meaningful details on the nature of those "parks." Ex. N. Second, he cites to a portion of Professor Saul Cornell's testimony in the preliminary injunction hearing, but does not dispute or contradict the Commissioner's factual assertion. *See* Pl.'s Ex. O at 8–9, ECF No. 86-1. Finally, his citation to an article by Anne Beamish in the *Landscape Journal* entitled "Before Parks: Public Landscapes in Seventeenth- and Eighteenth- Century Boston, New York, and Philadelphia," supports rather than refutes Defendant's overall assertion that the purpose of public parks changed dramatically from the Founding to the middle of the nineteenth century. *See* Pl.'s Ex. P at 3–6.

[4] Mr. Nastri does not dispute that Founding Era greenspaces were used for those purposes, but he does dispute that "those were the primary public purposes or that Founding Era greenspaces shared little in common with modern parks." Pl.'s Resp. to Def.'s SOF ¶ 4. He once again offers the article from Professor Beamish, which provides further support for the Defendant's position, *id.*, and the other exhibit he cites appears to be irrelevant responses by the Commissioner to Mr. Nastri's interrogatories, *see* Pl.'s Ex. C at 3–6, ECF No. 86-2. Furthermore, Mr. Nastri cites to two online resources from the National Park's websites and New York City's government website, which both support the Commissioner's position. *See The Earliest New York City Parks*, N.Y. City Dep't of Parks & Recreation, https://www.nycgovparks.org/about/history/earliest-parks (chronicling the transformation of public lands in New York City from village greens and mustering grounds to modern public parks); *Boston Common*, Nat'l Park Serv., (https://www.nps.gov/places/boston-common-ma.htm) (same re Boston Commons). Thus, he does not present genuine disputes of material facts.

places, in contrast to rural America. *Id.* ¶ 7. In response to these trends, the American park movement began in the 1850s, drawing on the idea that American urban society was flawed and that urban parks could repair and reform it. *Id.* ¶ 8.[5] The philosophy behind the park movement was that parks contain natural scenery, which when quietly and passively contemplated, would improve someone's mind and body, and thus society. *Id.* ¶ 9.

This modern conception of parks as places of relaxation and recreation inspired urban planners, landscape architects, and government officials to embark upon a new set of policies that led to the creation of new parks across much of the nation. *Id.* ¶ 10. Curated by Frederick Law Olmstead in 1858, New York City's Central Park was the first major urban public park. *Id.* ¶ 11.[6] By the late-1800s, public parks had opened in some of the largest cities in America. *Id.* ¶ 12. Although public parks were initially situated in urban areas, by the late-1800s, demand for these natural landscapes grew, and national and state parks began proliferating across the country. *Id.* ¶ 13. Like their urban counterparts, national and state parks were seen as romantic places for quiet and passive contemplation of natural scenery. *Id.* ¶ 14. Olmstedian ideals of peace, relaxation, and quiet enjoyment lay at the foundation of these national and state parks, which grew out of the same parks movement that created urban parks. *Id.* ¶ 15. National and State parks were also inspired by the conservation movement that emerged in the latter half of the 1800s. *Id.* ¶ 16.

---

[5] Mr. Nastri disputes this fact in so far as he asserts that parks existed before 1791; however, he offers the same exhibits as the Court as previously described. *Supra* ns. 2–4. Accordingly, he does not offer a genuine dispute of material fact.
[6] Mr. Nastri disputes this fact in so far as he asserts that parks existed before 1791; however, he offers the same exhibits as the Court as previously described. *Supra* ns. 2–4. Accordingly, he does not offer a genuine dispute of material fact.

Additionally, the idea of reserving land for conservation of game, wildlife, and natural resources, as well as outdoor recreation, was conceived by a club of American Hunting Riflemen in the 1880s who feared poaching would deplete natural resources, including big game. *Id.* ¶ 17.

## 2. The History of Firearms Restrictions in Urban, National, and State Parks

From the outset of the park movement in the 1850s, the regulations governing these spaces prohibited firearms. *Id.* ¶ 18. For example, in March 1858, Central Park's commissioners adopted rules and regulations banning firearms in the park to prompt proper behavior and decorum. *Id.* ¶ 19. As urban parks continued emerging in cities across the country throughout the late-1800s and through the early-1900s, lawmakers banned firearms there. *Id.* ¶ 20. When the federal government organized the first national parks in the late-1800s, it carried forward this tradition and tightly regulated the carriage of arms in those lands. *Id.* ¶ 21.

In 1872, the federal government designated Yellowstone as the first national park. It encompassed 2.2 million acres, and in the authorizing act, the park was "hereby reserved and withdrawn from settlement, occupancy or sale . . . and dedicated and set apart as a public park or pleasuring ground for the benefit and enjoyment of the people." *Id.* ¶ 22 (citing Def.'s Mot., Ex. 134 ¶ 15 ("Young Decl.")). Yellowstone and other national parks "were large, relatively distant from most of America's population[.]" *Id.* (citing Young Decl. ¶ 32). In 1893, the Secretary of the Interior recommended "an [a]bsolute prohibition of firearms" in Yellowstone, and in 1897, firearms were officially banned there absent permission. *Id.* ¶ 23.

In 1936, firearms were banned in all national parks nation-wide. *Id.* ¶ 24. States also banned firearms in state parks as they emerged throughout the early-1900s. *Id.* ¶ 25. Lawmakers banned firearms in urban, national, and state parks, in part, due to a belief that firearms interfered

with natural scenery contemplation, the parks' purpose and function as places that improve mental health and society, and with the romantic ideals that inspired the park movement. *Id.* ¶ 26. Land conservation purposes, including to preserve game by preventing or deterring unauthorized or excessive hunting, also prompted the prohibition of firearms in these locations. *Id.* ¶ 27.

### 3. The History of Connecticut's State Parks and Forest System

Beginning in the 1860s, city parks grew in popularity across Connecticut, as residents "increasingly sought reprieve from the inner-city lifestyle." *Id.* ¶ 28. In 1913, the Connecticut legislature created the State Park Commission to acquire State park properties. *Id.* ¶ 29. In a 1913 report, State Park Commissioners began assessing the need and most desired locations for state reservations and balancing recreating with the conservationist needs of forests. The report sought to model Connecticut's parks on national ones: leasing camps, cottages, and other accommodations, and regulating hunting and fishing activities "with certain restrictions." *Id.* ¶ 30.

Albert Turner, field secretary of the State Park Commission, "emphasize[d] a state park's purpose as one of public mental health, an essential refuge from the stresses of modern urban life." *Id.* ¶ 31 (citing Def.'s Mot., Ex. 131 ¶ 49 ("Glaser Decl.")). In advocating for creating State parks, Turner relied upon the successes of urban public parks in the mid-1800s, such as those in New York City, Chicago, and Boston, and emphasized that urban parks were insufficient to meet the needs of people who could not access them. *Id.* ¶ 32. After establishing the Park Commission, the State acquired many properties over the ensuing decades, and today the State Park and Forest System consists of 110 parks and 32 forests. *Id.* ¶ 33. Each State park and forest is owned by the State, with few exceptions, and the State holds and operates the properties in

trust for the benefit of the public, as required by law. *Id.* ¶ 34. The total acreage of the State park and forest system is 255,000 acres (35,000 for parks, and 220,000 for forests). *Id.* ¶ 35.

### 4. The History of Firearms Restrictions in Connecticut State Parks and Forests

In his 1914 report, Park Commission Field Secretary Turner urged the Park Commission to adopt "rules and regulations" prohibiting visitors from engaging in conduct that "interfere[s] with the rights or enjoyment of others," which "would involve the prohibition of firearms." *Id.* ¶ 36 (citing Glaser Decl. ¶ 41). The Park Commission formally banned firearms in State parks as early as 1918, in a notice stating, among other things, that people should neither "disturb nor unpleasantly intrude upon other parties using" a park and that "[t]he use of firearms or having them in possession is forbidden, also the killing or disturbing of wild animals, birds or birds' nests." *Id.* ¶ 37. That initial prohibition on firearms was also motivated, at least in part, by a desire to curb unauthorized or excessive hunting. *Id.* ¶ 38. To DEEP's knowledge, the 1918 prohibition on firearms in parks has remained in place ever since. *Id.* ¶ 39.

The firearm prohibition is now codified in Connecticut Agency Regulation § 23-4-1(c), which provides in relevant part: "Hunting or carrying of firearms, archery equipment or other weapons, including but not limited to air rifles and slingshots, is not permitted in any state park or forest except as authorized by [DEEP]." *Id.* ¶ 40.

Today, the rationale behind the firearm restriction in § 23-4-1(c) is several-fold, including to alleviate safety concerns, since many State park and forest properties become very crowded; because alcohol is permitted in many locations, which heightens safety concerns surrounding the presence of a gun; and because there are generally no places to safely store firearms while engaging in activities (e.g., swimming). *Id.* ¶ 41. Additionally, Connecticut's General Statutes

provide a means by which the state addresses gun-related safety concerns, including Conn. Gen. Stat. § 29-35(a)(2), which prohibits the open carrying of a firearm anywhere in public in Connecticut; Conn. Gen. Stat. § 53-206d, which prohibits anyone from carrying a firearm while under the influence or alcohol or drugs; Conn. Gen. Stat. § 29-37i, which requires individuals to store firearms securely when they are not on his or her person; and Conn. Gen. Stat. § 29-38g, which provides guidance and requirements on how individuals must store firearms in motor vehicles that they can park at state park. Pl's Resp. to Def.'s SOF ¶ 41.

State parks and forests have always been understood to be places of peace and quiet enjoyment where individuals, families, and children can go to enjoy nature and a sense of community. *Id.* ¶ 42. One of DEEP's goals in prohibiting firearms is to give visitors peace of mind in knowing that parks and forests are safe and welcoming. Def.'s Mot., Ex. 137 ¶ 89(c). Individuals who carry weapons concealed—as opposed to openly—can inadvertently display their firearm, which can result in those around them who see the firearm experiencing feelings of alarm. *See* Pl's Resp. to Def.'s SOF ¶ 41.

Consistent with the ideals of peace and inclusion, the Environmental Conservation Police ("EnCon")—DEEP's law enforcement arm—avoids conducting itself as an ordinary police force or employing an overly aggressive approach to law enforcement. Def.'s SOF ¶ 44.

Instead, under a DEEP policy directive, EnCon officers foster the "park ranger" image to assist visitors in safely utilizing and enjoying parks and forests and apply a strict law enforcement profile only when necessary. *Id.* ¶ 45. The firearm restriction also supports DEEP's ability to enforce hunting restrictions, thereby serving conservation goals, because prohibiting the carrying of firearms makes it more difficult for individuals to engage in unauthorized hunting without being detected. *Id.* ¶ 46.

Section 23-4-1(c) serves as EnCon's "main" hunting regulation that makes it "easier to stop poaching activity" because the prohibition on firearms allows EnCon officers to prevent unlawful hunting before it happens. *Id.* ¶ 47.

DEEP permits any member of the public to enter a Connecticut State park or forest within its typical hours of operation; however, it reserves the right to prohibit anyone from entering who has been evicted for violating any of the provisions of §§ 23-4-1 through 23-4-5 during the pendency of the eviction. Def.'s Local Rule 56(a)(2) Statement of Facts ¶ 37, ECF No. 81-3 ("Def.'s Resp. to Pl.'s SOF").

DEEP does not post anyone to guard the entrances of most Connecticut state parks and forest, Pl.'s Local Rule 56(a)(1) Statement of Undisputed Material Facts ¶ 38, ECF No. 75 ("Pl.'s SOF"), with the limited exceptions of posting guards in order to enforce parking restrictions, *id.* ¶ 39; inspect coolers and bags at a small number[7] of State parks and forest to prevent alcohol from being brought into the park, *id.* ¶ 40; or to inspect a person's "gear or cooler" for the purpose of enforcing hunting or fishing law," *id.* ¶ 41. DEEP typically enforces its hunting and fishing laws through cooler and gear inspections when someone is leaving a Connecticut state park or forest. *Id.* ¶ 42. DEEP employs approximately fifty-two armed, uniformed, law enforcement officers known as EnCon officers. *Id.* ¶ 42.

If DEEP receives a call about the presence of a firearm in a state park or forest, it tries to send a minimum of two armed officers to investigate the report. *Id.* ¶ 45. If DEEP finds someone carrying a weapon in a State park or forest in violation of § 23-4-1(c), *i.e.*, without permission from DEEP, it typically charges them with a violation of § 23-4-1(c), absent extenuating circumstances. Def.'s Resp. to Pl.'s SOF ¶ 46.

---

[7] DEEP employs approximately 20–30 temporary seasonal employees, referred to as EnCon rangers, that are stationed in various parks and forests during peak seasons. Def.'s Resp. to Pl.'s SOF ¶ 44.

### 5.   The General Uses of Connecticut State Parks and Forests

The nature and uses of Connecticut State parks and forests vary widely by location. Most are situated for multiple uses, and contain some combination of beaches, camping grounds, picnicking areas, hiking trails, forested areas, historic sites, and other attractions. Def.'s SOF ¶ 48. Most locations contain some form of structure. DEEP manages roughly 1000 buildings across the State Park and Forest System, including bathrooms, pavilions, camp offices, nature centers, gift shops, indoor exhibits, and many others, and also contain historic structures, including but not limited to Gillette Castle (Gillette Castle State Park), the Heublein Tower (Talcott Mountain State Park), the Ellie Mitchell Pavilion (Rocky Neck State Park), the Eolia Mansion (Harkness Memorial State Park), and the observation tower (Sleeping Giant State Park). *Id.* ¶ 49.

Connecticut's State parks and forests are among its most popular attractions and recreational destinations for both in-state and out-of-state residents. *Id.* ¶ 50. The number of annual visitors to State parks and forests has risen dramatically in recent years, from an estimated 9–10 million in 2019 to an estimated 17 million in 2022. *Id.* ¶ 51. DEEP continues to roll out new programs to increase use of parks and forests, such as the Passport to the Parks Program, which waives parking fees for Connecticut vehicles, and the ParkConneCT Program, which provides transportation from train/bus stops to several popular locations—including Sleeping Giant State Park—during peak months, i.e., from Memorial Day through Labor Day. *Id.* ¶ 52.

Many locations within the park and forest system become densely crowded, particularly during peak summer months, and it is not uncommon that several of the locations will reach capacity and close down for additional visitors. *Id.* ¶ 53. The frequency and extent of the crowding depends on a number of factors—including location, special attractions or events,

season, and weather—but has increased in recent years as more and more people utilize the parks. *Id.* ¶ 54. Even parks and forests covering larger acreages of land frequently become crowded because visitors tend to congregate in isolated areas that are most scenic or popular or that contain historic sites. *Id.* ¶ 55.

Locations with popular areas where visitors congregate include, among many others, Sleeping Giant State Park, Scantic River State Park, Dinosaur State Park, Harkness Memorial State Park, Rocky Neck State Park, Squantz Pond State Park, Millers Pond State Park, Cockaponset State Forest, Wadsworth Falls State Park, and Mount Tom State Park. *Id.* ¶ 56. The State government has taken steps to manage crowds, parking overflow, and unruly behavior, such as by promulgating regulations establishing capacity limits, and banning alcohol in certain locations. *Id.* ¶ 57.

DEEP also has an internal policy establishing capacity limits for numerous State parks and forests, based on the physical size of the parking areas and/or carrying capacity of the location itself, *id.* ¶ 58; and, not infrequently locations with higher-vehicle capacities will reach their capacity limit and require DEEP to prohibit additional vehicles from entering, *id.* ¶ 59. In 2022, summertime crowds resulted in parks closing to additional vehicles 89 times; 119 times in 2023; and 120 times between January and August 11, 2024. *Id.* ¶ 60.

From January to August, 2024, Hammonasset Beach State Park closed three times due to reaching its 6000-vehicle capacity; Rocky Neck State Park reached its 2000-vehicle capacity eight times; Harkness Memorial State Park reached its 600-vehicle capacity 4 times; and Silver Sands reached its 650-vehicle capacity five times. *Id.* ¶ 61. Several parks and forests, such as Rocky Neck State Park, Harkness Memorial State Park, and Gillette Castle State Park, attract large crowds because they are popular for special events such as weddings, private parties,

seminars, and conferences. *Id.* ¶ 65. In fact, DEEP advertises State parks and forests to the public as ideal locations for special events like weddings, private parties, and other gatherings. *Id.* ¶ 66. Fort Griswold State Park and Fort Trumbull State Park also attract large crowds, including school field trips, because they contain historic military displays. *Id.* ¶ 67. People also use State parks and forests for political activities, such as when a candidate held a campaign kick-off event at Hammonasset Beach State Park. *Id.* ¶ 68. Youth sporting events, such as high school and college cross-country meets, are held in State parks and forests. *Id.* ¶ 69.

### 6.  The Specific Use of State Parks and Forests by Children and Families[8]

A core mission of the State park and forest system is to encourage communities, families, and younger generations of adults and children to come together through a shared appreciation of nature and the environment. *Id.* ¶ 72. In furtherance of that mission, State parks and forests provide a variety of educational programs utilized by families, children, teachers, and schools, *id.* ¶ 73, and families and children are the target audience of State parks and forests, and marketing efforts and programming are often directed towards such individuals, *id.* ¶ 74. Millions of children visit the State parks and forests every year. *Id.* ¶ 75.

DEEP continually seeks to expand programming directed towards children, families, and schools to increase their engagement with State parks and forests. *Id.* ¶ 76. The No Child Left Inside Program ("NCLI") is among the most recognizable of Connecticut State parks and forest programming directed towards children. *Id.* ¶ 77. NCLI includes dozens of events every year at various State parks and forests that entail environmental-themed activities such as fishing,

---

[8] Mr. Nastri disputes a number of facts Commissioner Dykes alleges regarding how the presence of handguns might impact usage of Connecticut's State parks and forests. *See* Pl.'s Resp. to Def.'s SOF ¶¶ 86, 88, 134. The Court will examine these disputes if and when they become material to the arguments advances in the motion and cross-motion for summary judgment.

boating, wildlife, hiking, visiting nature centers and historic buildings, and family days in the park. *Id.* ¶ 78. In 2023, more than 6,000 participants enjoyed NCLI events, and the outreach team reached approximately 54,000 participants. *Id.* ¶ 80. In furtherance of NCLI's mission to encourage family and youth utilization of State parks and forests, NCLI also includes an annual program that provides day passes, which waive entrance fees for two adults and up to four children aged 12 and under for any centers or historical buildings located in a State park or forest. *Id.* ¶ 81. Nature centers are another feature of State parks and forests that focus on enriching children and families in safe and comfortable environments. *Id.* ¶ 82. For example, nature centers in Hammonasset Beach State Park (Meigs Point Nature Center) and Dinosaur State Park cater to thousands of children every year. *Id.* ¶ 83.

Schools across the State routinely organize field trips to State parks and forests, including but not limited to Fort Griswold State Park, Fort Trumbull State Park, Hammonasset Beach State Park, Sleeping Giant State Park, and Dinosaur State Park, and use such locations as cost-effective ways to enhance course curricula. *Id.* ¶ 84. There are hundreds of school field trips to State parks and forests each year. *Id.* ¶ 85.

### 7. The Sleeping Giant State Park ("Sleeping Giant")

Sleeping Giant State Park covers approximately 1,439 acres. *Id.* ¶ 89. It is one of the State's most popular State parks, located adjacent to Quinnipiac University. *Id.* ¶ 90. A 1.5 mile hiking trail leads to a stone observation tower on top of Mt. Carmel, which provides a scenic view of Long Island Sound. *Id.* ¶ 91. During peak season, the observation tower can become so densely crowded with visitors that people almost must stand shoulder-to-shoulder. *Id.* ¶ 93. Sleeping Giant State Park has a 200-vehicle capacity limit and reached that limit thirteen times in 2022, eleven times in 2023, and six times from January to June, 2024. *Id.* ¶ 95. Sleeping Giant

State Park also contains campgrounds utilized by the Youth Group Camping program. *Id.* ¶ 96. In 2022, students from Hamden Public Schools participated in a daily, four-week program held at Sleeping Giant State Park that provided a "place-based science educational experience." *Id.* ¶ 97. Permitting individuals to carry firearms in State parks and forests would impact schools' plans to continue visiting places like Sleeping Giant State Park, including school administrators not allowing students to visit such locations for school-sponsored events. *Id.* ¶ 98.

### 8. The Farmington Canal Greenway State Park ("Farmington Canal Trail")

The Farmington Canal Trail is a 25-mile multi-use trail that runs between Hamden and Cheshire, Connecticut. *Id.* ¶ 100. It is a portion of the larger, 56-mile Farmington Canal Heritage Trail, which runs from New Haven to Suffield, Connecticut, and into Massachusetts. *Id.* ¶ 101. The Farmington Canal Trail becomes crowded during peak summer months, and with good weather, thousands of people use it every day for walking, hiking, biking, jogging, and other uses. *Id.* ¶ 102. Mr. Nastri avoids using the Farmington Canal Trail to go jogging when it gets too crowded, which often occurs during the summer, because that requires "bobbing and weaving" when he jogs the trail. *Id.* ¶ 103.

The Connecticut Trial Census program ("CTTC") tracks the number of uses on Connecticut trails—including the Farmington Canal Trail—using infrared pedestrian counters ("IRPCs") set up along the trails. *Id.* ¶ 104. In 2023, the IRPCs recorded average daily uses of 407.15 (Hamden) and 479.99 (Cheshire). *Id.* ¶ 108. Those usages were heavily weighted toward summer months. For example, the IRPC in Cheshire recorded over 20,000 total uses each month from May through August, 2023, including 24,890 uses in the month of August, an average of more than 800 uses per day. *Id.* ¶ 109. The average daily uses recorded by the IRPCs in Cheshire

and Hamden were also significantly higher on weekends than on weekdays, and approximately 79% of all uses occurred between 9:00 a.m. and 6:00 p.m. *Id.* ¶ 110.

### 9. The Naugatuck State Forest ("Naugatuck")

Naugatuck covers approximately 5,000 acres. *Id.* ¶ 111. Naugatuck is a popular destination for children and families because of its scenic hiking and youth group campground. *Id.* ¶ 112. It is located in Cheshire, Hamden, Naugatuck, Oxford, and Beacon Falls, Connecticut. Pl.'s SOF ¶ 58. Hiking, fishing, mountain biking, and snowmobiling are permitted in Naugatuck State Forest. *Id.* ¶ 59. In addition, hunting is permitted in one section of the forest and is subject to restrictions on the type of game, type of weapon, particular season, and other restrictions such as the prohibitions on hunting within 500 feet of any building or use of a firearm with larger than .22 caliber rimfire ammunition. Def.'s Resp. to Pl.'s SOF ¶ 59. Target shooting is permitted in the forest but only inside the designated shooting range, High Rock Cooperative Shooting Range, which is subject to numerous safety restrictions. *Id.*

### 10. The Dinosaur State Park

Dinosaur State Park consists of two miles of nature trails and a visitor center—a large building containing numerous prehistoric exhibits, including one of the largest tracks of fossilized dinosaur footprints in North America. Def.'s SOF ¶ 113. In 2023, Dinosaur State Park's visitor center admitted 51,142 total visitors, with 27,691 being aged 13 and older (54% of total visitors), 21,771 were aged 12 and under (42% of total visitors), and 1,680 were not identified by age. Def.'s Mot., Ex. 163 ¶ 30. Thus, a large percentage of visitors to Dinosaur State Park's visitor center in 2023 were minor children or individuals accompanied by children. Def.'s SOF ¶ 114. In 2024 (through August), Dinosaur State Park's visitor center admitted 32,685 total visitors, with 17,666 being aged 13 and older (54 percent of total visitors), 14,832

15

were aged 12 and younger (45 percent of total visitors), and 187 were not identified by age. *Id.* ¶ 115. Thus, a large percentage of visitors to Dinosaur State Park's visitor center through August 2024 were minor children or individuals accompanied by children. *Id.* One event in 2024— Dinosaur Day—"attracted over two thousand people" on a single day. *Id.* ¶ 116.

### 11.   The Hammonasset Beach State Park ("Hammonasset")

Hammonasset consists of over two miles of beach, a boardwalk, concessions, the Meigs Point Nature Center, picnic shelters, large camping grounds, and other facilities. *Id.* ¶ 118. Hammonasset is the most visited location in the State park and forest system, generally regarded as the largest tourist attraction in the State (except for casinos), and frequented by school children for school field trips. *Id.* ¶ 119. Approximately 3 million people visit Hammonasset each year. *Id.* ¶ 120. The Meigs Point Nature Center is available free of charge, includes a large building with live animal exhibits, is extremely popular for families, children, school field trips, and birthday parties, and is a site for children's educational programs. *Id.* ¶ 122.

### 12.   The State Operation of the Park and Forest System in a Proprietary Capacity

By the turn of the twentieth century, State forests had a key purpose of timber production—something that had economic value, *id.* ¶ 124; and, today, state parks and forests generate revenue in numerous ways, including fees for camping, special events/weddings, licenses, parking, admission, bus permits, and special use permits, *id.* ¶ 126. As of 2013, State parks and forests generally did not retain that revenue but were funded almost entirely out of the State's general fund. *Id.* ¶ 127. In 2013, a legislative investigation concluded that the Parks Division's funding and staffing levels were insufficient to maintain operations in State parks and forests over the long term. *Id.* ¶ 128.

To alleviate the funding issues, the General Assembly created the Passport to the Parks Program ("PPP"), under which the Parks Division retains the revenue generated by State parks and forests and from an additional registration fee charged to Connecticut residents—revenue that is used to pay for about 80% of all park and forest expenses. *Id.* ¶ 129. In 2022, the State generated $4.5 million in revenue from its parks and forests—approximately 21 percent of the Parks Division's $21 million budget. *Id.* ¶ 130. DEEP also generates significant revenue for the State through hunting, fishing, and trapping licenses. *Id.* ¶ 131. The more revenue generated by State parks and forests means that DEEP has more capacity to maintain them, while decreases in revenue could impact DEEP's ability to maintain such locations. *Id.* ¶ 133.

The State park and forest system is also a critical component of the State's overall marketing and tourism efforts. *Id.* ¶ 135. DEEP has a large online presence, which it uses to provide information to the public and build enthusiasm for State parks and forests. *Id.* ¶ 136. DEEP also works with the Office of Tourism, part of the Connecticut Department of Economic and Community Development, to further these marketing efforts through commercials and advertisement on television and other means. *Id.* ¶ 137. In 2022, about 66.6 million tourists visited the State, generating $17 billion for State businesses, which led to $1.1 billion in tax revenue, and supporting approximately 120,000 jobs. *Id.* ¶ 141.

### 13.  The Permitted Firearms in Connecticut's State Parks and Forests

Hunting is permitted in only select locations within the State park and forest system and, even where authorized, is subject to various rules and restrictions, which are published annually in the Connecticut Hunting and Trapping Guide. *Id.* ¶ 146. Connecticut issues firearms hunting licenses that permit people to carry firearms in some Connecticut state parks and forests under certain conditions. Pl.'s SOF ¶ 48. The State permits the hunting of coyotes in some State parks

and forests on a year-round basis. *Id.* ¶ 49. Connecticut permits hunters in some Connecticut

state parks and forests to use .22 caliber handguns to hunt small game, including coyotes. *Id.* ¶

50. Furthermore, the State owns four public shooting ranges located within Connecticut state

parks and forests. *Id.* ¶ 51. In 2022, DEEP issued a special use license for a Civil War

reenactment in a state party, which included participants carrying unloaded Civil War-era

firearms for use as part of the reenactment, subject to numerous other conditions. *Id.* ¶ 52.

The annual total number of arrests or citations that DEEP made or issued for violating

§ 23-4-1(c) are as follows:

| Year | Citations or Arrests for Violating § 23-4-1(c) |
|:---:|:---:|
| 2016 | 6 |
| 2017 | 10 |
| 2018 | 5 |
| 2019 | 1 |
| 2020 | 10 |
| 2021 | 7 |
| 2022 | 6 |
| 2022 | 4 |
| 2023 | 6 |
| 2024 (through 9/12/24) | 6 |

*Id.* ¶ 53.

Additionally, DEEP has issued the following number of hunting licenses annually since January 1, 2017:

| Year | Hunting Licenses Issued Annually |
|---|---|
| 2017 | 46,336 |
| 2018 | 44,294 |
| 2019 | 42,356 |
| 2020 | 42,438 |
| 2021 | 40,298 |
| 2022 | 39,126 |
| 2023 (from 12/1/22) | 40,692 |
| 2024 (from 12/1/23 – 9/24/24) | 47,046 |

*Id.* ¶ 54.

### 14.  Mr. Nastri and His Use of Parks

Born and raised in Cheshire, Connecticut, *id.* ¶ 1, Mr. Nastri joined the U.S. Army around 1980 for one year, *id.* ¶ 2. Mr. Nastri obtained his M.B.A. in 2001 and became a financial advisor in 2006. *Id.* ¶ 3. He has a clear disciplinary record as a financial advisor. *Id.* ¶ 4. Mr. Nastri joined the Army National Guard in 2003 and served until he was honorably discharged in March of 2012, holding the rank of staff sergeant. *Id.* ¶ 5. He saw combat during a deployment to Afghanistan in 2010. *Id.* ¶ 6.

During his service with the National Guard, Mr. Nastri was trained on the use of firearms, including handguns, and he was required to pass tests demonstrating proficiency with firearms, including handguns, which he did. *Id.* ¶ 7.

In 2018, he obtained his law degree. *Id.* ¶ 8. He currently holds a Connecticut state pistol permit and has held it for at least 30 years. *Id.* ¶ 9. To obtain his pistol permit, Mr. Nastri completed a class at a local police department and demonstrated proficiency by shooting at targets. *Id.* ¶ 11. Mr. Nastri generally carries a handgun when he goes out into public for self-defense. Def.'s Resp. to Pl.'s SOF ¶ 12. Over the last 30 years, he has typically—but not always—carried a handgun in public for self-defense. *Id.* ¶ 13. Mr. Nastri complies with the laws of which he is aware that regulate how he may carry his handgun in public. Pl.'s SOF ¶ 14.

After Mr. Nastri learned of § 23-4-1(c), he reached out to DEEP to obtain clarification about whether carrying handguns was prohibited under the regulation. Def.'s Resp. to Pl.'s SOF ¶ 33; *see also* 2nd Am. Compl., Ex. M, ECF No. 68-13 (correspondence between Mr. Nastri and DEEP). After corresponding with Mason Trumble, Deputy Commissioner of DEEP, Mr. Nastri decided to stop carrying a handgun in State parks and forest so as not to violate § 23-4-1(c). Def.'s Resp. to Pl.'s SOF ¶ 34; *see also* 2nd Am. Compl., Ex. M, ECF No. 68-13 (correspondence between Mr. Nastri and DEEP). Mr. Nastri also stopped carrying a handgun in Connecticut state parks and forests because, as he understood the professional requirements of a financial advisory, he would have to report any violations of § 23-4-1(c). Def.'s Resp. to Pl.'s SOF ¶ 35.

Around May 2023, Mr. Nastri used Sleeping Giant State Park approximately once a month during the course of the year for hiking. Pl.'s SOF ¶ 16. He has used Sleeping Giant State Park in some fashion since he was 15 years old. *Id.* ¶ 17. Around May 2023, Mr. Nastri used the

Farmington River Canal Trail approximately four to five times per week for running and walking. *Id.* ¶ 20. Before learning of Conn. Agencies Regs. § 23-4-1(c), Mr. Nastri carried his handgun into Sleeping Giant State Park, Naugatuck State Forest, and the Farmington River Canal Trail for the purpose of self-defense each time he visited those parks. *Id.* ¶ 22. He felt a particular need to carry a handgun for self-defense on the Farmington River Canal Trail because of what he heard regarding assaults on the Farmington River Canal Trail, including an assault on a Yale Law School student. *Id.* ¶ 23. Mr. Nastri makes Farmington River Canal Trail part of his regular running route. *Id.* ¶ 27.

Between May 10, 2023, and August 20, 2024, Mr. Nastri believes he visited Sleeping Giant State Park for hiking and relaxation two or three times. *Id.* ¶ 28. He visited Sleeping Giant State Park on August 20, 2024, September 22, 2024, and September 30, 2024, for the purposes of hiking and relaxation. *Id.* ¶ 29. During this same period, he believes that he visited the Farmington River Canal Trail approximately 15 to 30 times for the purposes of walking or exercising. *Id.* ¶ 30. His use of the Farmington River Canal Trail decreased in the period following May 10, 2023, due to his recovering from a knee injury. *Id.* ¶ 31.

Mr. Nastri has visited Naugatuck State Forest only once or twice per year in the past. Def.'s SOF ¶ 141. He testified at the preliminary injunction hearing in May 2023 that he could not recall visiting Naugatuck State Forest once in the previous twelve months. *Id.* ¶ 142.

As of May 2023, Mr. Nastri has no specific plans to visit Naugatuck State Forest in the future. *Id.* ¶ 143. Furthermore, he does not believe he visited Naugatuck State Forest once between May 10, 2023, and August 20, 2024. *Id.* ¶ 144. As of August 20, 2024, Mr. Nastri did not have any specific future plans to visit Naugatuck State Forest, aside from a general plan to go turkey hunting there between October 5 and October 31, 2024. *Id.* ¶ 145.

**B.  Procedural History**

On January 28, 2023, Mr. Nastri filed his First Amended Complaint against Commissioner Dykes under 42 U.S.C. § 1983 for violation of his rights under the Second and Fourteenth Amendments to the United States Constitution. Verified Am. Compl., ECF No. 13 (Jan. 28, 2023). He also filed an emergency motion for a preliminary injunction. Pl.'s Am. Emergency Mot. for a TRO and Prelim. Injunct. and, in the Alternative, to Consolidate the Prelim. Inj. Hr'g with the Trial on Merits, ECF No. 14 (Jan. 28, 2023).

On March 30, 2023, Commissioner Dykes filed a motion to dismiss for lack of jurisdiction. Mot. to Dismiss, ECF No. 22 (Mar. 30, 2023). Defendant also filed a memorandum in opposition to the emergency motion for preliminary injunction. Opp'n for Mot. for Prelim. Injunct., ECF No. 23 (Mar. 30, 2023).

On April 14, 2023, Mr. Nastri filed a memorandum in opposition to Defendant's motion to dismiss. Pl.'s Mem. of Law in Opp'n to Def.'s Mot. to Dismiss, ECF No. 27 (Apr. 14, 2023). Plaintiff also filed a reply to the opposition to the motion for preliminary injunction. Pl.'s Reply Mem. of Law in Supp. to his Amend. Emergency Mot. for a TRO and Prelim. Inj., and in the Alterative, to Consolidate the Prelim. Inj. Hr'g with the Trial on the Merits, ECF No. 28 (Apr. 14, 2023).

On April 23, 2023, the case was reassigned to the Honorable Judge Jeffrey Alker Meyer.

On May 3, 2023, Commissioner Dykes filed a response to Plaintiff's memorandum in opposition to her motion to dismiss. Reply to Pl.'s Opp'n to Mot. to Dismiss, ECF No. 33 (May 3, 2023).

From May 9, 2023, until May 10, 2023, the Honorable Judge Janet Bond Arterton held a hearing on the emergency motion for a preliminary injunction. *See* Minute Entry, ECF No. 38 (May 9, 2023); Minute Entry, ECF No. 39 (May 10, 2023).

On July 12, 2023, Judge Arterton denied Mr. Nastri's motion for preliminary injunction and his motion for a temporary restraining order, and granted Defendant's motion to dismiss for lack of jurisdiction. *See* Order, ECF No. 46 (Jul. 12, 2023).

On July 12, 2023, Mr. Nastri filed a notice of appeal as to the court's Order, ECF No. 46. *See* Notice of App., ECF No. 47 (Jul. 12, 2023).

On March 29, 2024, the Second Circuit vacated and remanded the ruling, denying Mr. Nastri's motion for a preliminary injunction and granting Commissioner Dykes's motion to dismiss in light of intervening Second Circuit law regarding standing in pre-enforcement challenges brought under the Second Amendment. *See* Summary Order at 4–6, ECF No. 60 (Mar. 29, 2024); *see also* Mandate of USCA, ECF No. 61 (Apr. 19, 2024).

On August 27, 2024, Mr. Nastri filed a Second Amended Complaint against Commissioner Dykes under 42 U.S.C. § 1983 for violation of his rights under the Second and Fourteenth Amendments to the United States Constitution. 2nd Am. Compl., ECF No. 68 (Aug. 27, 2024).

On November 4, 2024, Commissioner Dykes filed an Answer to Plaintiff's second amended complaint. Def.'s Answer to Pl.'s 2nd Am. Compl., ECF No. 71 (Nov. 4, 2024).

On November 15, 2024, Mr. Nastri filed a motion for summary judgment on his sole claim against Commissioner Dykes, along with an accompanying memorandum. Pl.'s Mot. for Summ. J. and for a Permanent Inj., ECF No. 74 (Nov. 15, 2024); Pl.'s Mem. of Law in Supp. of

Mot. for Summ. J. and for a Permanent Inj., ECF No, 74-1 (Nov. 15, 2024) ("Pl.'s Mem."). Mr. Nastri also filed his Rule 56(a)(1) statement of facts. Pl.'s SOF.

On December 31, 2024, Commissioner Dykes filed a cross-motion for summary judgment on Mr. Nastri's sole claim, along with an accompanying memorandum. Def. Mot.; Def.'s Mem. Commissioner Dykes also filed her Rule 56(a)(1) statement of facts and her Rule 56(a)(2) statement in response to Mr. Nastri's statement of facts, Pl.'s SOF. *See* Def.'s SOF; Def.'s Resp. to Pl.'s SOF.

On January 17, 2025, following the tragic death of Judge Meyer, the case was transferred to this Court. Order of Transfer, ECF No. 82 (Jan. 17, 2025).

On January 29, 2025, Mr. Nastri filed a memorandum in opposition to the Defendant's cross-motion for summary judgment, along with his Rule 56(a)(2) statement in response to Commissioner Dykes's statement of facts. Pl.'s Mem. of Law in Opp. and Reply to Def.'s Combined Cross Mot. for Summ. J. and Opp. to Pl.'s Mot. for Summ. J., ECF No. 83 (Jan. 29, 2025) ("Pl.'s Opp'n"); Pl.'s Resp. to Def.'s SOF.

On March 20, 2025, Commissioner Dykes filed a response to Plaintiff's opposition to her cross-motion for summary judgment, along with an opposition to his motion for summary judgment. Def.'s Reply in Supp. of Her Cross-Mot. for Summ. J., ECF No. 92 (Mar. 20, 2025).

## II.    STANDARD OF REVIEW

### A.  The Summary Judgment Standard

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party may

defeat the motion by producing sufficient evidence to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48.

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal quotation marks omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* (internal quotation marks omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (first citing *Dombrowski v.*

*Eastland*, 387 U.S. 82, 87 (1967); and then *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

A court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *See Dufort v. City of New York*, 874 F.3d 338, 343, 347 (2d Cir. 2017) ("On a motion for summary judgment, the court must 'resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'" (quoting *Estate of Gustafson* ex rel. *Reginella v. Target Corp.*, 819 F.3d 673, 675 (2d Cir. 2016)). A court will not draw an inference of a genuine dispute of material fact from conclusory allegations or denials, *see Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011), and will grant summary judgment only "if, under the governing law, there can be but one reasonable conclusion as to the verdict," *Anderson*, 477 U.S. at 250.

### B. The Permanent Injunction Standard

The standard for a permanent injunction is similar to the standard for a preliminary injunction, except that the moving party must show actual success on the merits, rather than a likelihood of success. *Marriott v. County of Montgomery*, 426 F. Supp. 2d 1, 11 (N.D.N.Y. 2006) (quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987)). A prevailing party must additionally satisfy the following four-factor test before a court may grant a permanent injunction:

> (1) [T]hat it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court. *Id.*

### III.    DISCUSSION

The Second Amendment provides: "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held for the first time that the right to "keep and bear Arms" guarantees and "individual right to possess and carry weapons" in self-defense whether or not a person is associated with an organized militia. 554 U.S. at 592 ("[A]nother member of Parliament referred to 'the right of bearing arms for personal defence,' making clear that no special military meaning for 'keep and bear arms' was intended in that discussions. Putting all of these textual elements together, we find that they guarantee the individual right to possess and carry weapons in case of confrontation." (citation omitted) (quoting 49 *The London Magazine or Gentleman's Monthly Intelligencer* 467 (1780))).

The Supreme Court twice cautioned, however, that this right is not "unlimited." *See id.* at 595 ("There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms. Of course the right was not unlimited . . . ."); *id.* at 626 ("Like most rights, the right secured by the Second Amendment is not unlimited."). The Second Amendment does not confer a "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *id.*, nor has the right ever been understood to "protect those weapons not typically possessed by law-abiding citizens for lawful purposes," *id.* at 625.

The Supreme Court explained that, instead, the Second Amendment protects the individual right to keep and bear "the sorts of weapons" that are "'in common use,'" a "limitation [that] is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). It further emphasized that, "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27. While such "regulatory measures" were "presumptively lawful," the Court noted that those "examples" were not an "exhaustive" list of constitutional regulations governing firearms. *Id.* at 627 n.26 ("We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive.").

In *Heller*, the Court did not have an occasion to "undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment," *id.* at 626, nor provide lower courts with a precise standard by which to analyze Second Amendment claims, *see id.* at 635 ("But since this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field . . . . And there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us.").

Two years later in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Supreme Court held that the Second Amendment is "fully applicable to the States." 561 U.S. at 750. "In the wake of *Heller* and *McDonald*, this Circuit, as well as every other regional circuit, employed a two-part test to address Second Amendment challenges." *Antonyuk v. James*, 120 F.4th 941,

963 (2d Cir. 2024) (footnote omitted) (collecting cases and citing *Libertarian Party of Erie Cnty v. Cuomo*, 970 F.3d 106, 118 (2d Cir. 2020)).

At step one, courts must determine "whether a challenged law burdened conduct that fell within the scope of the Second Amendment." *Id.* If it did, courts proceeded to step two, to assess "whether the challenged law burdened the core of the Second Amendment, defined by *Heller* as self-defense in the home." *Id.* If the burden on the core of the right was *de minimis*, courts would apply intermediate scrutiny, and if the burden was "substantial and affected the core of the right, the law was subject to strict scrutiny." *Id.* (citing *Libertarian Party*, 970 F.3d at 119, 128).

In *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), the Supreme Court abrogated the two-step framework adopted by the regional circuits in the wake of *Heller* and *McDonald. See* 597 U.S. at 19 ("Despite the popularity of this two-step approach, it is one step too many. Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.").

*Bruen* set out a new two-part test by which lower courts could ensure that a firearms regulation is consistent with "the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* At step one, a court must assess whether "the Second Amendment's plain text covers an individual's conduct" that is burdened by the regulation. *Id.* at 24. If so, "the Constitution presumptively protects that conduct." *Id.* To overcome that presumption, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* That is, "the government must

29

affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19.

The Supreme Court gave further guidance to lower courts in *United States v. Rahimi*, 602 U.S. 680 (2024), reiterating that the Second Amendment does not confer a "right to keep and carry any weapon whatsoever in any manner whatsoever for whatever purpose." 602 U.S. at 691 (quoting *Heller*, 554 U.S. at 626). It clarified that "the Second Amendment permits more than just regulations identical to ones that could be found in 1791," *id.* at 691–92, adding that, by emphasizing the historical tradition of American firearms regulation, it had not meant to suggest the Second Amendment was "a law trapped in amber," *id.* at 691. "Holding otherwise," the Court warned, "would be as mistaken as applying the protections of the right only to muskets and sabers." *Id.* at 692.

Instead, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* (citing *Bruen*, 597 U.S. at 26–31). To accomplish this, a court must assess whether the challenged regulation is "'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Id.* (quoting *Bruen*, 597 U.S. at 29) (alterations in original). "*Why* and *how* the regulation burdens the [Second Amendment] right are central to [the 'relevantly similar'] inquiry." *Id.* (emphasis added). In conducting this analysis, the Supreme Court specified that, in order to withstand the *Bruen-Rahimi* test, a law "must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" *Id.* (quoting *Bruen*, 597 U.S. at 30).

In sum, to assess whether a challenged firearms regulation is consistent with the Second Amendment, a court must, first, assess whether the conduct burdened by the regulation is

protected by the plain text of the Second Amendment. If so, a court must then determine whether the challenged regulation is "relevantly similar" to firearms laws that are definitively consistent with that tradition. To assess relevant similarity, a court need not look for identical laws, but instead look for analogies based on why and how the regulation burdens the Second Amendment right to bear arms.

In moving for summary judgment and a permanent injunction, Mr. Nastri argues that there is no genuine dispute of material fact as to whether "the Second Amendment unequivocally protects his right to carry a handgun for self-defense in Connecticut state parks and forests," and that "[n]othing in our nation's history or tradition justifies [] § 23-4- 1(c)'s prohibition on him peacefully doing [so]." Pl.'s Mem. at 1. He challenges the regulation on its face and, in the alternative, "requests that the Court enter a permanent injunction barring the Defendant from enforcing [] § 23-4-1(c)'s prohibition against him when he carries a handgun for the purposes of self-defense in Sleeping Giant State Park, Naugatuck State Forest, and the Farmington River Canal Trail." Pl.'s Mot. at 1.

Commissioner Dykes responds that there is no genuine dispute of material fact, thus entitling her to summary judgment, "because § 23-4-1(c) is facially constitutional, Plaintiff lacks standing to pursue his as-applied challenge to Naugatuck State Forest, and, in any event, § 23-4-1(c) lawfully applies to the two State parks and one State forest at issue in this case." Def.'s Mot. at 1.

The Court will first address Mr. Nastri's pre-enforcement facial challenge and then turn to his as-applied challenge to § 23-4-1(c).

### A.  The Facial Challenge

"A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications. So classifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated and the corresponding 'breadth of the remedy . . . .'" *Bucklew v. Precythe*, 587 U.S 119, 138 (2019) (citing *Citizen United v. Fed. Elec. Comm'n*, 558 U.S. 310, 331 (2010)). "To mount a successful facial challenge, the plaintiff 'must establish that no set of circumstances exists under which the [law] would be valid or show that the law lacks a plainly legitimate sweep.'" *Antonyuk*, 120 F.4th at 983 (alterations in original) (citation modified) (citing *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021)). "For this reason, facial challenges are 'the most difficult to mount successfully.'" *Id.* at 983 (citing *City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015)).

Mr. Nastri argues that, when evaluating § 23-4-1(c) under the *Bruen-Rahimi* test, there is no dispute of material fact as to whether the plain text of the Second Amendment covers the conduct burdened by the regulation: law-abiding citizens carrying handguns in state parks and forests for self-defense. He also argues that there is no application of the regulation that could be justified by the nation's history and tradition of firearms regulation. Pl.'s Mem. at 8–9.

Commissioner Dykes responds that Mr. Nastri's pre-enforcement facial challenge fails because it has lawful applications; the Second Amendment does not presumptively cover the specific conduct Mr. Nastri seeks to engage in; and, even if Mr. Nastri demonstrates that the Second Amendment presumptively covers his desired conduct, § 23-4-1(c) "is consistent with principles that underpin our Nation's tradition of firearms regulation." Def.'s Mem. at 12.[9]

The Court will address both arguments under the two-pronged *Bruen-Rahimi* test.

---

[9] Where ECF pagination conflicts with an individual document's pagination, the Court will refer to the ECF pagination.

### 1.   The Plain Text of the Second Amendment

The Court must first determine whether "the Second Amendment's plain text covers" the conduct prohibited by § 23-4-1(c). *See Bruen*, 597 U.S. at 17 ("In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.").

Mr. Nastri argues that he easily meets his burden to demonstrate that the conduct regulated by § 23-4-1(c) is covered by the Second Amendment. He argues that he is a law-abiding citizen, who wishes to carry a legally registered pistol for self-defense in a public park, and that this conduct is squarely within the plain text of the Second Amendment as explained in *Bruen*. *See* Pl.'s Mem. at 7–8 (citing *Bruen*, 597 U.S. at 31–32; *Heller*, 554 U.S. at 580).

Commissioner Dykes argues that Mr. Nastri does not meet his burden because the challenged regulation "only applies to State parks and forests, which DEEP manages and maintains." Def.'s Mem. at 14. She argues that, therefore, as "properly understood, Plaintiff's proposed course of conduct is not merely carrying a gun onto lands open to the public, but carrying a gun on such lands *against the wishes of the landowner*." *Id.*

In the Commissioner's view, there is no pre-existing right for an individual to carry a firearm on private property against the wishes of the landowner and that this "principle extends to government-proprietors who have the same right to dominion over their lands as any private landowner." *Id.* at 15. This is different, Defendant argues, "from cases holding that the Second Amendment's test presumptively protects carrying firearms onto private property held open to the public when the state, *as sovereign lawmaker*, passed a law that effectively determined how private landowners could use their land." *Id.* at 16 (citing *Antonyuk*, 120 F.4th at 1044–45) (additional citations omitted).

The Court disagrees.

Commissioner Dykes cites to no post-*Bruen* binding precedent treating the government as a private landowner for purposes of evaluating the plain text of the Second Amendment. Furthermore, the only post-*Bruen* case cited in support of her position, *see id.* at 15 (citing *Wolford v. Lopez*, 116 F.4th 959, 970–71 (9th Cir. 2024)), refers to the notion of treating the government as a private landowner in *dicta* before proceeding to evaluate challenges to a Hawaii and a California law banning firearms on certain types of private property, *Wolford*, 116 F.4th at 970–71 ("[I]f a State operates a bank, the State, too, may exercise its proprietary right to exclude, just as a private property owner may.").

To consider whether the Second Amendment clearly covers an individual's conduct, *see Bruen*, 597 U.S. at 19, a court must "consider three issues: whether the conduct at issue is protected, whether the weapon concerned is 'in common use,' and whether the affected individuals are 'ordinary, law-abiding, adult citizens' and thus 'part of the people whom the Second Amendment protects.'" *Antonyuk*, 120 F.4th at 981 (citing *Bruen*, 597 U.S. at 31–32).

In *Bruen*, the Supreme Court had "little difficulty concluding" that the plain text of the Second Amendment presumptively protected the rights of "two ordinary, law-abiding, adult citizens," who sought to publicly carry handguns, a weapon "in common use," for self-defense. *See Bruen*, 597 U.S. at 31–32; *cf. Antonyuk*, 120 F.4th at 1019–18 (proceeding to step two of the *Bruen-Rahimi* test in evaluating a ban on firearms in public parks).

Here, the parties do not dispute that Mr. Nastri is a law-abiding adult who holds a Connecticut state pistol permit, and "generally carries a handgun in public for self-defense." *See* Def.'s Resp. to Pl.'s SOF ¶¶ 2–14. Furthermore, DEEP permits any member of the public to enter a Connecticut state park or forest—although it has the authority to prohibit "[a]ny member

34

of the public who have been evicted [from a State park or forest] for violating any of the provisions of §§ 23-4-1 through 23-4-5 . . . during the pendency of the eviction." *Id.* ¶ 37. DEEP does not post anyone to guard the entrances of most Connecticut state parks and forest, with the limited exceptions of posting guards in order to enforce parking restrictions, inspect coolers and bags at a small number of State parks and forest to prevent alcohol from being brought into the park, or to inspect a person's "gear or cooler" for the purpose of enforcing hunting or fishing law. *Id.* ¶¶ 37–41.

As a result, there is no dispute of material fact that Mr. Nastri is a law-abiding, adult citizen who seeks to carry a weapon that is in common use in public for the purposes of self-defense.

Accordingly, Mr. Nastri has met his burden at step one of the *Bruen-Rahimi* test and demonstrated that his conduct is presumptively protected under the Second Amendment.

### 2.    The History and Tradition of Firearms Regulation

Because Mr. Nastri has met his burden at step one, the Court proceeds to step two, and analyzes whether § 23-4-1(c) "is consistent with this Nation's historical tradition of firearms regulation, as 'that delimits the outer bounds of the right to keep and bear arms.'" *Antonyuk*, 120 F.4th at 968 (quoting *Bruen*, 597 U.S. at 19). In analyzing *Heller*, *McDonald*, *Bruen*, and *Rahimi*, the Second Circuit explained that this "history and tradition" inquiry assists courts in understanding what limitations were included in the "'pre-existing right' to keep and bear arms" as codified in the Second Amendment. *Id.* (quoting *Bruen*, 597 U.S. at 25). Understanding the "history and tradition" inquiry as an exercise in delimiting a pre-existing right, the Second Circuit laid down seven principles to guide lower courts in carrying out this inquiry. *Id.* at 969.

First, when interpreting text, "'not all history is created equal.'" *Id.* (quoting *Bruen*, 597 U.S. at 34). That is, "historical practices that long predate or postdate codification of the relevant constitutional provision may not have much bearing on the provision's scope if the practices were obsolete or anomalous." *Id.* Courts must also balance contradicting historical practice—"a one-off and short-lived territorial law . . . while no doubt relevant, will not carry the day if it contradicts the overwhelming weight of other evidence." *Id.* (citing *Bruen*, 597 U.S. at 63 n.26, 67–68). "What matters is 'our whole experience as a Nation.'" *Id.* (quoting *Chiafalo v. Washington*, 591 U.S. 578, 583 (2020)).

Second, "a court must identify the 'societal problem' that the challenged regulation seeks to address." *Id.* (quoting *Bruen* 597 U.S. 26–27). After identifying the targeted societal problem, a court must determine "'whether the challenged regulation is consistent with the principles that underpin our regulatory tradition' for firearms." *Id.* (quoting *Rahimi*, 602 U.S. at 692).

"Third, the absence of a distinctly similar historical regulation in the presented record, though undoubtedly relevant, can only prove so much." *Id.* The Second Circuit cautions that, "[t]he paucity of eighteenth century gun control laws might have reflected a lack of political demand rather than constitutional limitations." *Id.* at 970 (alterations in original) (quoting *Binderup v. Att'y Gen. U.S.*, 836 F.3d 336, 369 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part and concurring in the judgment)).

"Fourth, courts must be particularly attuned to the reality that the issues we face today are different than those faced in medieval England, the Founding Era, the Antebellum Era, and Reconstruction. . . . Thus, the lack of a distinctly similar historical regulation, though (again) no doubt relevant, may not be reliably dispositive in Second Amendment challenges to laws addressing modern concerns." *Id.* at 970. The Second Circuit directed that "'[a] more nuanced

approach' will often be necessary in cases . . . concerning 'new circumstances' or 'modern regulations that were unimaginable at the founding,' such as regulations addressing 'unprecedented societal concerns or dramatic technological changes.'" *Id.* (quoting *Bruen*, 597 U.S. at 27–28).

Fifth, under this "more nuanced approach, the 'historical inquiry that courts must conduct will often involve reasoning by analogy.'" *Id.* (quoting *Bruen*, 597 U.S. at 28). It is at this point that a court must conduct the "relevantly similar" inquiry through drawing analogies based on "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* (quoting *Bruen*, 597 U.S. at 29). Here, the Second Circuit emphasized the Supreme Court's warnings that "'analogical reasoning . . . is neither a regulatory straightjacket nor a regulatory blank check,'" that "a court should not search in vain for a 'historical *twin*'" because "'well-established and representative historical *analogue*,' is sufficient," and that a modern-day regulation need not be a "'dead ringer for historical precursors'" to "be analogous enough to pass constitutional muster.'" *Id.* at 971 (alteration in original) (quoting *Bruen*, 597 U.S. at 30).

Sixth, just as regulatory silence is not dispositive, neither are large numbers of analogous regulations. *Id.* There is an exception to this rule, however, if a regulation in one state is "contradic[ted] [by] the overwhelming weight of other, more contemporaneous historical evidence." *Id.* at 971–72 (citation modified) (quoting *Bruen*, 597 U.S. at 67–68). Additionally, if an analogous regulation is "rejected on constitutional grounds," that is "probative . . . of constitutionality." *Id.* at 972 (citing *Bruen*, at 597 U.S. at 27). The *lack* of disputes regarding the constitutionality of an analogous regulation, however, "may lead to the inference that it was 'settled' that states could prohibit or regulate arms in that manner 'consistent with the Second Amendment.'" *Id.* (quoting *Bruen*, 597 U.S. at 30).

Seventh, because the right to keep and bear arms is applicable to the States through the Fourteenth Amendment, *see id.* (citing *McDonald*, 561 U.S. at 750), when evaluating challenged state laws, "the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of [] analysis." *Id.* Furthermore, "sources from the time periods close around those dates 'illuminat[e] the understanding of those steeped in the contemporary understanding of a constitutional provision.'" *Id.* at 973 (alteration in original) (citing *Duncan v. Bonta*, 83 F.4th 803, 819 (9th Cir. 2023) (Butamay, J., dissenting)); *see also id.* at 973–75 ("We therefore agree with the decisions of our sister circuits—emphasizing 'the understanding that prevailed when the States adopted the Fourteenth Amendment'—is, along with the understanding of that right held by the founders in 1791, a relevant consideration." (collecting cases)).

With those seven principles in mind, the Court will consider the parties' arguments as to whether § 23-4-1(c) comports with history and tradition of firearms regulation. At this prong, Commissioner Dykes bears the burden of demonstrating that the challenged regulation is "relevantly similar" to historical analogues. *See id.* at 964 ("Thus, a court must now consider whether 'the Second Amendment's plain text covers an individual's conduct.' If so, 'the Constitution presumptively protects that conduct.' To overcome that presumption, '[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.'" (alteration in original) (citations omitted) (quoting *Bruen*, 597 U.S. at 24)). To successfully mount a facial challenge to § 23-4-1(c), however, Mr. Nastri must demonstrate that § 23-4-1(c) is "unconstitutional in all [of] its applications." *Bucklew*, 587 U.S. at 138; *see also Antonyuk*, 120 F.4th at 983 ("[F]acial challenges are 'the most difficult to mount successfully.'" (quoting *Patel*, 576 U.S. at 415)).

The Court will consider the parties' arguments as to whether § 23-4-1(c) merits the "more nuanced," "relevant[] similar[ity]" analysis under *Bruen-Rahimi*.

a. *The "More Nuanced Approach" and* Antonyuk v. James

Commissioner Dykes argues that, since the development of State "parks and forests grew out of 'unprecedented societal concerns'" that emerged in the mid-nineteenth century, "'a more nuanced approach' is required to assess § 23-4-1(c)'s constitutionality." *See* Def.'s Mem. at 18 (first quoting *Bruen*, 597 U.S. at 27; and then *Antonyuk*, 120 F.4th at 970, 1022 n.86). "[U]nder the 'more nuanced approach,'" Commissioner Dykes argues that there is ample evidence of "relevantly similar" historical, analogous regulations that impose "'*comparable* burden[s] on the right of armed self-defense' that [are] '*comparably* justified.'" *Id.* (quoting *Antonyuk*, 120 F.4th at 970). Commissioner Dykes argues that the constitutionality of the regulation is supported by "more than 100 ordinances, regulations, and laws prohibiting firearms in municipal, federal, and state parks of various shapes and sizes—all reflecting an unbroken and unchallenged regulatory tradition that began in 1858 and extended into the early-twentieth century." *Id.*

In the Commissioner's view—while those ordinances on their own would be sufficient to find § 23-4-1(c) "relevantly similar" to historical analogues—"at least five additional categories of laws illustrate § 23-4-1(c)'s constitutionality, including laws prohibiting: (1) individuals from carrying firearms in crowded locations; (2) firearms in locations frequented by vulnerable populations like children; (3) individuals from carrying firearms onto another's property without consent; (4) unauthorized hunting or poaching; and (5) individuals from 'going armed' in certain locations." *Id.*

Mr. Nastri responds that Commissioner Dykes is not entitled to the "more nuanced approach," because "colonial reservations of public land for the public's enjoyment have

predated the Founding by more than a century." Pl.'s Opp'n at 17. In moving for summary judgment, Mr. Nastri acknowledged that he is offering the Court an "independent analysis of the historical tradition . . . than the one presented in *Antonyuk*." Pl.'s Mem. at 10. He argues that the Second Circuit's holdings as to historical tradition in *Antonyuk* "do not inescapably bind the Court," as "*Antonyuk* itself recognized that its decision was only preliminary and did not determine the ultimate merits." *Id.* (citing *Antonyuk*, 120 F.4th at 1048).

      The Court disagrees.

      In *Antonyuk*, 120 F.4th 941 (2d Cir. 2024)—as relevant to Mr. Nastri's and Commissioner Dykes's motions for summary judgment—the Second Circuit vacated a district court's preliminary injunction of New York Penal Law § 265.01-e(d), which criminalized the possession of a firearm in "sensitive location[s]," including "libraries, public playgrounds, public parks, and zoos." N.Y. Penal. L. § 265.01-e(d); *see Antonyuk*, 120 F.4th at 1026 ("As § 265.01-e(2)(d) applies to urban parks, the State has carried its burden by placing the regulation within a national tradition of regulating firearms in often-crowded public squares, including, specifically, city parks. Accordingly, we **VACATE** the district court's preliminary injunction as to § 265.01-e(2)(d).").

      A year later, in evaluating the denial of a preliminary injunction in a separate challenge to the law at issue in *Antonyuk*, the Second Circuit noted:

> "[O]rdinarily, findings of fact and conclusions of law made in a preliminary injunction proceeding do not preclude reexamination of the merits at a subsequent trial." *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 644 (2d Cir. 1998). However, even in the preliminary injunction posture (as in *Antonyuk* [*v. James*, 120 F.4th 941 (2d Cir. 2024)]), a well-considered conclusion of law by a panel of this Court in a published opinion, which addresses a pure issue of law that cannot be impacted by further development of the record, is **binding** precedent, as with any other published decision. *See Ranchers Cattlemen Action Legal Fund United*

*Stockgrowers of Am. v. U.S. Dep't of Agr.*, 499 F.3d 1108, 1114 (9th Cir. 2007) (explaining that, while "the district court should abide by 'the general rule' that our decisions at the preliminary injunction phase do not constitute the law of the case . . . [a]ny of our conclusions on pure issues of law . . . are **binding**" (citation omitted)); *see also Roe v. Alabama*, 68 F.3d 404, 408 (11th Cir. 1995) (per curiam) (applying the law-of-the-case doctrine and concluding that "[a]lthough the law established by the prior panel was announced in a preliminary injunction posture, . . . the principle of law adopted was clear"); *Nat'l Airlines, Inc. v. Int'l Ass'n. of Machinists & Aerospace Workers*, 430 F.2d 957, 960 (5th Cir. 1970) (recognizing that the law-of-the-case doctrine applies to preliminary injunctions and stating that "[t]he exception to law of the case where evidence on a subsequent trial is substantially different is inapplicable where by the prior appeal the issue is not left open for decision" (internal punctuation and citations omitted)); 18 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4478.5 (2002) ("A fully considered appellate ruling on an issue of law made on a preliminary injunction appeal ... become[s] the law of the case for further proceedings in the trial court on remand and in any subsequent appeal.") (collecting cases).

*Giambalvo v. Suffolk Cnty.*, 23-208-cv, 2025 WL 2627368, at *6 n.4 (2d Cir. Sept. 12, 2025) (alterations in original).

This Court thus is bound by and will rely on the Second Circuit's decision in *Antonyuk*, to the extent necessary. *See United States v. Wong*, 40 F.3d 1347, 1373 (2d Cir. 1994) ("That is, until the Supreme Court rules otherwise, the district court would be obliged to follow [ ] precedent . . . .").

To evaluate the prohibition on carrying firearms in urban public parks, the Second Circuit applied the "more nuanced approach" of evaluating whether § 265.01-e(d) was "relevantly similar" to historical traditions of firearms regulation. *Antonyuk*, 120 F.4th at 1024 ("Whether § 265.01-e's prohibition on firearms in urban parks is consistent with this Nation's tradition is a straightforward inquiry. It is obvious that § 265.01-e burdens Second Amendment rights in a distinctly similar way (*i.e.*, by prohibiting carriage) and for a distinctly similar reason

41

(*i.e.*, maintaining order in often-crowded public squares) as do the plethora of regulations

provided by the State, many of which specifically applied to urban public parks. This

demonstrates § 265.01-e's consistency with the Second Amendment." (footnote omitted) (citing

*Rahimi*, 602 U.S. at 698)).

The necessity of applying the "more nuanced approach" to evaluating the regulation of

firearms in what the Second Circuit deemed "urban public parks" was "straightforward" because

the "'modern idea of the park emerged in the nineteenth century.'" *Id.* (quoting Nadav Shoked,

*Property Law's Search for a Public*, 97 Wash. U. L. Rev. 1517, 1556– 57 (2020)); *accord* Glaser

Decl.; Young Decl.; Def.'s Ex. 135 ¶ 31, Decl. Saul Cornell ("Cornell Decl.").

The Second Circuit found that "the State ha[d] made a robust showing of a well-

established and representative tradition of regulating firearms in public forums and

quintessentially crowded places, enduring from medieval England to Reconstruction America

and beyond." *Id.* at 1019. The court also noted that, "[i]nsofar as the State relies on the tradition

of regulating firearms in places frequented by children as an analogue for § 265.01-e(2)(d),

*Bruen* tells us that tradition is well-established and representative." *Id.* at 1019 n.80 (citing

*Bruen*, 597 U.S. at 30). It also observed that "the national tradition of regulating firearms in

quintessentially crowded places" did not "require a conduct element." *Id.* at 1020 n.82. This

tradition "of regulating firearms in quintessentially crowded places was continued throughout the

history of our Nation." *Id.* at 1020 (citing 1870 Tex. Gen. Laws 63, ch. 46; 1869 Tenn. Pub. Acts

23; 1883 Mo. Sess. Laws 76; 1889 Ariz. Sess. Laws 17; 1890 Okla. Terr. Stats., Art. 47, § 7).

The Second Circuit ultimately held that a "long, unbroken line," *id.* at 1021 (quoting

*Bruen*, 597 U.S. at 35), of firearms regulation—"beginning from medieval England and

extending beyond Reconstruction,"—indicated "that the tradition of regulating firearms in often-

crowded public forums is 'part of the immemorial custom' of this Nation." *Id.* (quoting Darrell A. H. Miller, *Constitutional Conflict and Sensitive Places*, 28 Wm. & Mary Bill Rts. J. 459, 476 (2019)).[10] The Second Circuit added that, as "cities across the United States began building parks to meet recreational needs of residents," *see id.* at 1022 (citing David Schuyler, *Summary of Parks in Urban America*, Oxford Research Encyclopedia of American History (Nov. 3, 2015)), "cities continued the tradition of regulating firearms in historical public forums, such as fairs and markets, to likewise keep these new public spaces, urban parks, peaceable," *id.*; *accord* Def.'s Mot., Exs. 1–70 (ordinances and laws banning firearms in urban parks enacted nationwide between 1858 and 1936). These ordinances, noted the Second Circuit, "were apparently accepted without any constitutional objection by anyone." *Id.*

The Second Circuit held that the urban public parks that proliferated throughout the latter half of the nineteenth century, and that were described as quintessentially crowded public forums, were not analogous to the types of public parks and commons that existed at the time of the Founding, and was "unconvinced by the Plaintiffs' argument that the former use of Boston Common and similar spaces as gathering grounds for the militia undermines a tradition of regulating firearms in urban public parks." *Id.* at 1024. The Court cautioned that, "[t]o today's minds, commons, greens, and public parks may seem alike; but . . . our 18th century forebears would have considered commons and greens to be public grazing areas and not places of social recreation." [11] *Id.* at 1025 (citing Shoked, *supra*, at 1556–57); *accord* Cornll Decl. ("The Boston commons and other similar urban spaces during the Founding era shared little with modern

---

[10] *See Antonyuk*, 120 F.4th at 1019–25 (detailing the Second Circuit's detailed and extensive legal analysis that led to the conclusion that regulating firearms in "quintessentially crowed" public fora is consistent with our Nation's tradition of firearms regulation).

[11] Mr. Nastri attempts to advance the same argument that the Second Circuit found "unconvincing." *See* Pl.'s Mem. at 31 ("The Common also served as a site for informal socializing and recreation including strolling, horse- and carriage-riding, sports, entertainment, and raucous celebrations." (citation modified)).

parks."); Glaser Decl. ("[E]arly New England towns featured centralized public land, known as

commons, or greens, for planting and shared grazing, around which many built their homes.");

Pl.'s Ex. P at 2, ECF No. 86-2 ("The very modest utilitarian village green, common space, and

parade ground are the unsung ancestors of public parks[,] [a]lthough they usually did not begin

as places for leisure . . . .").

In *Antonyuk*, the court drew a distinction between urban parks—"*i.e.* quintessential and

often-crowded public spaces," 120 F.4th at 1025—and "rural parks," *id.* "[B]ased on the record

before" the Second Circuit in *Antonyuk*, the court noted that "the more proper analogue for rural

parks . . . appears to be 'commons' and 'wilderness areas.'" *Id.* As an example of a "rural park,"

the Second Circuit pointed to New York's description of Adirondack Park, "which encompasses

'one-third of the total land area of New York State,' as containing 'vast forests, rolling

farmlands, towns and villages, mountains and valleys, lakes, ponds, and free-flowing rivers,

private lands and public forest.'" *Id.* (quoting Parks, Recreation and Historic Preservation,

*Adirondack Region*, New York State, https://parks.ny.gov/regions/adirondack/default.aspx

[https:// perma.cc/ZNZ2-Z97B]). The Second Circuit added that New York's description of the

Adirondacks "echoes that of the 'New England commons . . . spaces held by the community for

shared utilitarian purposes,' much more than it does the 'communal spaces' and 'quintessentially

public space[s]' embodied by urban parks." *Id.* (alteration in original) (footnotes omitted)

(quoting first Roy Rosenzweig & Elizabeth Blackmar, *The Park and the People: A History of

Central Park* 4 (1992); then David Schuyler, *The New Urban Landscape: The Redefinition of

City Form in Nineteenth-Century America* 1–8 (1988); and then Shoked, *supra*, at 1556–57).

But the Second Circuit was not required to "resolve this line-drawing" issue between

rural parks—typified by "'spaces held by the community for shared utilitarian purposes'"—and

44

urban parks—typified by "'communal spaces' and 'quintessentially public space[s]'"—on a facial challenge. *See id.* That § 265.01-e(2)(d) was constitutional as it applied to urban parks was sufficient to vacate the district court's preliminary injunction. *Id.* at 1026.

b.   *The Application of Antonyuk to § 23-4-1(c)*

Given the Second Circuit's decision in *Antonyuk*, Commissioner Dykes would be entitled to summary judgment as to Mr. Nastri's facial challenge to § 23-4-1(c), if there is no genuine dispute of material fact that at least one application of the regulation would fall within the "well-established . . . tradition of firearm regulation in often-crowded public squares such as urban parks." *Id.* at 1025–26. On this record, the Commissioner can.

Urban parks grew in popularity across Connecticut, as it did in New York, as the park movement's response to growing industrialization and urbanization. *See* Def.'s SOF ¶¶ 18–21, 28; *Antonyuk*, 120 F.4th at 1023 ("With the rise of urban America, cities continued this tradition and began regulating firearms in a newly emerging public forum: the urban park."). The Connecticut State Park Commission, established in 1913, was raised in conversation with the boarder park movement, *see* Def.'s SOF ¶ 31, and its field secretary, Albert Turner, "emphasize[d] a state park's purpose as one of public mental health, an essential refuge from the stresses of modern urban life," Def.'s SOF ¶ 31 (alteration in original). Furthermore, as in urban and state parks across the country, *see Antonyuk*, 120 F.4th at 1022 ("As urban public parks took root as a new type of public forum, cities continued the tradition of regulating firearms in historical public forums, such as fairs and markets, to likewise keep these new public spaces, urban parks, peaceable."), firearms were banned in Connecticut state parks, Def.'s SOF ¶¶ 37–39. Field Secretary Turner had advocated as early as 1914 that "prohibiting visitors from

45

engaging in conduct that 'interfere[s] with the rights or enjoyment of others,' which 'would involve the prohibition of firearms.'" Def.'s Mot. at 36 (alteration in original).

Connecticut State parks and forests thus grew out of the same historical and regulatory contexts as the urban parks at issue in *Antonyuk*. Prohibitions on firearms in such parks, the Second Circuit held, are part of "a well-established and representative tradition of firearm regulation in often-crowded public squares such as urban parks." *Antonyuk*, 120 F.4th at 1025–26; *see also id.* at 1022 n.86 ("[T]he relative novelty of public parks as institutions . . . justifies a flexible approach under *Bruen* (citing *Bruen*, 597 U.S. at 27)).

While the Second Circuit did not engage in specific "line-drawing" as to what constitutes an urban park and what constitutes a "rural park," *see id.* at 1025, its ruling offered specific guidance on how to evaluate whether a park is more like the urban park, placing it within the tradition of "'sensitive places' where arms carrying could be prohibited," *Bruen*, 597 U.S. at 30, or more like a rural park, that arguably falls outside that tradition, *see id.* ("[W]e doubt that the evidence presently in the record could set forth a well-established tradition of prohibiting firearm carriage in rural parks . . . .").

So-called "urban parks" are "quintessentially crowded places," that can be analogized to "assemblies for 'educational, literary, or scientific purposes, or into a ball room, social party or other social gathering." *See id.* at 1020 ("The tradition of regulating firearms in quintessentially crowded places was continued throughout the history of our Nation. In Reconstruction, three states (Texas, Missouri, and Tennessee) passed laws prohibiting weapons in public forums and crowded places such as assemblies for 'educational, literary or scientific purposes, or into a ball room, social party or other social gathering.'" (quoting 1870 Tex. Gen. Laws 63, ch. 46)); *see also id.* at 1021 ("[T]he Nation not only tolerated the regulation of firearms in public forums and

46

crowded spaces, but also found it aberrational that a state would be unable to regulate firearms to protect 'the duties and proprieties of social life' in such spaces." (citing Miller, *supra,* at 475)). The parks that constitute a "sensitive place" for purposes of the *Bruen-Rahimi* step-two analysis also "serve as public forums and, as a result, tend to be crowded." *Id.* at 1023.

On this record, there is no dispute of material fact that, at least some of Connecticut's State parks and forests, are "quintessentially crowded places," that serve as "assemblies for education, literary or scientific purposes," and also serve as venues for "social part[ies] or other social gatherings." *See id.* at 1021 (citations omitted).

First, regarding the crowds in Connecticut's State parks and forests, these sites are among the most popular attractions and recreational destinations for both in-state and out-of-state residents. Def.'s SOF ¶ 50. The number of annual visitors to State parks and forests has skyrocketed over recent years, from an estimated 9–10 million in 2019 to an estimated 17 million in 2022. *Id.* ¶ 51. It is not disputed that many locations within the park and forest system become densely crowded, particularly during peak summer months, and it is not uncommon that several of the locations will reach capacity and close down for additional visitors. *Id.* ¶ 53. Indeed, in 2022, summertime crowds resulted in parks closing to additional vehicles 89 times; 119 times in 2023; and 120 times between January and August 11, 2024. *Id.* ¶ 60.

More recently, from January to August 2024, Hammonasset Beach State Park—which hosts approximately 3 million visitors per year, *id.* ¶ 120—closed three times due to reaching its 6000-vehicle capacity; Rocky Neck State Park reached its 2000-vehicle capacity eight times; Harkness Memorial State Park reached its 600-vehicle capacity 4 times; and Silver Sands reached its 650-vehicle capacity five times. *Id.* ¶ 61.

Second, at least some State parks and forests serve as "assemblies for education, literary or scientific purposes." *Antonyuk*, 120 F.4th at 1021 (citation modified). For instance, Fort Griswold State Park and Fort Trumbull State Park attract large crowds, including school field trips, because they contain historic military displays. Def.'s SOF ¶ 67. In 2022, students from Hamden Public Schools participated in a daily, four-week program held at Sleeping Giant State Park that provided a "place-based science educational experience." *Id.* ¶ 97. And schools across Connecticut routinely organize field trips to State parks and forests, including but not limited to Fort Griswold State Park, Fort Trumbull State Park, Hammonasset Beach State Park, Sleeping Giant State Park, and Dinosaur State Park, and use such locations as cost-effective ways to enhance course curricula. *Id.* ¶ 84. There are hundreds of school field trips to State parks and forests each year. *Id.* ¶ 85.

Third, multiple State parks and forests serve as venues for "social part[ies] or other social gatherings." *See Antonyuk*, 120 F.4th at 1021 (citations omitted). For example, several parks and forests, such as Rocky Neck State Park, Harkness Memorial State Park, and Gillette Castle State Park, attract large crowds because they are popular for special events such as weddings, private parties, seminars, and conferences. Def.'s SOF ¶ 65. DEEP, in fact, advertises State parks and forests to the public as ideal locations for special events like weddings, private parties, and other gatherings. *Id.* ¶ 66.

Additionally, "the tradition of regulating firearms in places frequented by children . . . is well-established and representative." *Antonyuk*, 120 F.4th at 1019 n.80 (citing *Bruen*, 597 U.S. at 30). The Second Circuit in *Antonyuk* did not "rely on the tradition of regulating firearms in the places frequented by children" because the State's burden was supported by "the tradition of regulating firearms in often-crowded public squares." *Id.* at 1024 n.92. But there is no dispute of

material fact that, at least some State parks and forests, are places frequented by children. A core mission of the State park and forest system is to encourage families and younger generations of adults and children to come together through a shared appreciation of nature and the environment. Def.'s SPF ¶ 72. In furtherance of that mission, State parks and forests provide a variety of educational programs utilized by families, children, teachers, and schools, *id.* ¶ 73, and families and children are the target audience of State parks and forests, *id.* ¶ 74. Millions of children visit Connecticut's parks and forests every year, *id.* ¶ 74, including on "hundreds of school field trips," *id.* ¶ 85.

And DEEP continually works to expand programming directed towards children, families, and schools to increase their engagement with State parks and forests. *Id.* ¶ 76. NCLI is among the most recognizable of Connecticut State parks and forests programming directed towards children. *Id.* ¶ 77. NCLI includes dozens of events every year at various State parks and forests that entail environmental-themed activities such as fishing, boating, wildlife, hiking, visiting nature centers and historic buildings, and family days in the park. *Id.* ¶ 78. In 2023, more than 6,000 participants enjoyed NCLI events, and the outreach team reached approximately 54,000 participants. *Id.* ¶ 80.

That at least one application of § 23-4-1(c) is supported by "the tradition of regulating firearms in places frequented by children," *Antonyuk*, 120 F.4th at 1019 n.80 (citing *Bruen*, 597 U.S. at 30), is borne out by the Dinosaur State Park visitor center records. In 2023, Dinosaur State Park's visitor center admitted 51,142 total visitors, with 27,691 being aged 13 and older (54% of total visitors), 21,771 were aged 12 and under (42% of total visitors), and 1,680 were not identified by age. Def.'s SOF ¶ 114. In 2024 (through August), Dinosaur State Park's visitor center admitted 32,685 total visitors, with 17,666 being aged 13 and older (54 percent of total

visitors), 14,832 were aged 12 and younger (45 percent of total visitors), and 187 were not identified by age. *Id.* ¶ 115. Thus, a large percentage of visitors to the Dinosaur State Park's visitors center in both 2023 and 2024, through August, were either minor children or individuals accompanied by children. *See id.* ¶¶ 114–15.

Commissioner Dykes thus has carried her burden that there is no dispute of a genuine issue of material fact that at least some applications of § 23-4-1(c) fall within the well-established tradition of regulating firearms in "often-crowded public squares such as urban parks," *Antonyuk*, 120 F.4th at 1025–26, and that there are applications of § 23-4-1(c) that fall within the "tradition of regulating firearms in places frequented by children," *see id.* at 1019 n.80; *cf. id.* at 1024 ("It is obvious that § 265.01-e burdens Second Amendment rights in a distinctly similar way (i.e., by prohibiting carriage) and for a distinctly similar reason (i.e., maintaining order in often-crowded public squares) as do the plethora of regulations provided by the State, many of which specifically applied to urban public parks. This demonstrates § 265.01-e's consistency with the Second Amendment.").

Accordingly, Commissioner Dykes's cross-motion for summary judgment as to Mr. Nastri's pre-enforcement, facial challenge to § 23-4-1(c) will be granted, and Mr. Nastri's motion for summary judgment will be denied.

### B.  The As-Applied Challenge

Mr. Nastri argues that even if the Court "considers itself bound by *Antonyuk*, the Court should still find that § 23-4-1(c) violates [his] Second Amendment rights insofar as it prohibits him from carrying a handgun for self-defense" in Naugatuck State Forest, Sleeping Giant State Park, and the Farmington River Canal Trail. Pl.'s Mem. at 34.

Commissioner Dykes argues that Mr. Nastri lacks standing to pursue his as-applied challenge to § 23-4-1(c) as it applies to Naugatuck State Forest, and that, even if he has standing, § 23-4-1(c) constitutionally applies to Mr. Nastri vising all three DEEP locations. Def.'s Mem. at 49.

The Court will address arguments for each park in turn.

  1. *Naugatuck State Forest*

Commissioner Dykes argues that Mr. Nastri cannot establish standing for his as-applied challenge to § 23-4-1(c)'s enforcement in Naugatuck State Forest because he did not introduce evidence of injury beyond "a some-day intention to visit" the park, which "is not enough to establish standing." Def.'s Mem. at 52. Commissioner Dykes argues that the Second Circuit's decision regarding Mr. Nastri's standing does not control the issue because its analysis only applied to Mr. Nastri's facial challenge. *Id.* at 53 (citing *Nastri v. Dykes*, No. 23-1023, 2024 WL 1338778 (2d Cir. Mar. 29, 2024) (summary order)).

The Court agrees.

Article III of the Constitution provides federal courts with power that "extends only to 'Cases' and 'Controversies.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016) (quoting Art. III § 2). The doctrine of standing is "rooted in the traditional understanding of a case or controversy." *Id.* at 338. To establish standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Kearns v. Cuomo*, 981 F.3d 200, 207 (2d Cir. 2020) (quoting *Spokeo, Inc.*, 578 U.S. at 338).

*Antonyuk* is once again instructive. There, the Second Circuit held that a plaintiff could not establish he had been injured for purposes of a pre-enforcement, as-applied challenge to

§ 265.01-e's prohibition on carrying firearms in conference centers and banquet halls. *Antonyuk*,

120 F.4th at 1032–33. The Court wrote:

> Terrille's alleged injury-in-fact was a threatened prosecution for carrying a gun at a specific conference center/banquet hall on a specific date. But October 8–9 came and went, and there is no record as to whether the gun show took place, let alone whether Terrille attended it while armed. A past but unfulfilled intention to violate the law does not support pre-enforcement standing, and nothing in the record here . . . shows that Terrille followed through on his intention to violate § 265.01-e(2)(p) in October 2022.
>
>     Nor did Terrille allege a future intention to visit a banquet hall or conference center while armed—for a gun show or otherwise. . . . . We do not see in that averment—or anywhere else—the supposedly "evident" indicia that Terrille regularly visits banquet halls or conference centers while armed. In contrast, Plaintiff Johnson makes precisely such an assertion in discussing his interest in zoos, by stating that his and his wife's plans to visit the zoo in the coming fall is part of their regular practice of visiting the zoo "at least once or twice every fall."

*Id.* at 1033–34 (citations omitted).

Here, as in *Antonyuk*, Mr. Nastri's alleged injury is the threat of future enforcement under

§ 23-4-1(c) and the impact that enforcement would have on his background record in the

financial services industry. Def.'s Resp. to Pl.'s SOF ¶ 35. Mr. Nastri, like Mr. Terrille, had no

"specific future plans to visit Naugatuck State Forest, aside from a general plan to go turkey

hunting there between October 5 and October 31, 2024." Def.'s SOF ¶ 145. "But October [5]–

[31] came and went, and there is no record" of Mr. Nastri's trip to Naugatuck State Forest. *See*

*Antonyuk*, 120 F.4th at 1033. Rather, in his Rule 56(a)(2) statement, submitted on January 29,

2025, Mr. Nastri admitted that he has only visited Naugatuck State Forest "once or twice" a year

in the past, Pl.'s Resp. to Def.'s SOF ¶ 141; that, during the preliminary injunction hearing in

May 2023, he could not recall visiting Naugatuck State Forest once in the previous twelve

months, *id.* ¶ 142, nor did he have future plans to do so, *id.* ¶ 143; and that he does not believe he visited Naugatuck State Forest once between May 10, 2023, and August 20, 2024, *id.* ¶ 144.

As of January 29, 2025, Mr. Nastri alleges no further future intentions to visit Naugatuck State Forest—armed or otherwise. *See Antonyuk*, 120 F.4th at 1033; *see also id.* ("We do not see in that averment—or anywhere else—the supposedly 'evident' indicia that Terrille regularly visits banquet halls or conference centers while armed."). A "live controversy is not maintained by speculation that the party might in the future be prevented from conducting an activity that it currently asserts no plan to [conduct]." *Id.* at 1034 (alteration in original) (quoting *Conn. Citizens Def. League, Inc., v. Lamont*, 6 F.4th 439, 445 (2d Cir. 2021).

In evaluating standing in claims involving judicial review of state statutes, the Second Circuit cautioned:

> Though a request for judicial review does not actually modify the requirements for justiciability, we reiterate that a court must be confident that it is deciding a true "case or controversy"—rather than issuing an advisory opinion—when asked to invalidate the action of a co-ordinate branch or of a state. In such circumstances, courts should be reluctant to draw tenuous inferences from sparse declarations.

*Id.*

Accordingly, Mr. Nastri lacks standing to bring an as-applied challenge to the enforcement of § 23-4-1(c) in Naugatuck State Forest, and this Court therefore lacks jurisdiction to evaluate the merits of this particular claim. *See id.* at 1036 ("Given the mootness of Terrille's challenge to the banquet hall provision, the district court lacked jurisdiction to enjoin enforcement of § 265.01-e(2)(p) with respect to banquet halls . . . .")

### 2. *Sleeping Giant State Park & Farmington Canal Greenway State Park*

Defendant argues that each of the arguments that demonstrate § 23-4-1(c)'s facial constitutionality apply to his as-applied challenges to enforcement of § 23-4-1(c) in Sleeping

Giant State Park and on the Farmington Canal Greenway. Def.'s Mem. at 54. That is, the

prohibition of firearms in both parks passes constitutional muster because the prohibition is

within the well-established tradition and history of regulating firearms in sensitive places due to

their quintessentially crowded nature and the fact that they are frequented by children. *Id.* at 54–

55.

 The Court agrees.

 In *Antonyuk*, the Second Circuit held that, at least in some parks, the regulation of

firearms—even when carried by law-abiding citizens for the purpose of self-defense—is

consistent with a well-established and representative tradition of regulating firearms in

"quintessentially crowded places," places that may serve as "assemblies for 'education, literary

or scientific purposes,'" and places that may also serve as venues for "social part[ies] or other

social gatherings." 120 F.4th at 1021.

 Sleeping Giant State Park covers approximately 1,439 acres. Def.'s SOF ¶ 89. It is one of

the State's most popular parks, located adjacent to Quinnipiac University. *Id.* ¶ 90. A 1.5 mile

hiking trail leads to a stone observation tower on top of Mt. Carmel, which provides a scenic

view of Long Island Sound. *Id.* ¶ 91. During peak season, the observation tower can become so

densely crowded with visitors that people almost must stand shoulder-to-shoulder. *Id.* ¶ 93.

Sleeping Giant State Park has a 200-vehicle capacity limit and reached that limit thirteen times in

2022, eleven times in 2023, and six times from January to June, 2024. *Id.* ¶ 95. The park also

contains campgrounds utilized by the Youth Group Camping program. *Id.* ¶ 96. In 2022, students

from Hamden Public Schools participated in a daily, four-week program held at Sleeping Giant

State Park that provided a "place-based science educational experience." *Id.* ¶ 97. Permitting

individuals to carry firearms in State parks and forests would impact schools' plans to continue

visiting places like Sleeping Giant State Park, including school administrators not allowing students to visit such locations for school-sponsored events. *Id.* ¶ 98.

Mr. Nastri does not dispute that Sleeping Giant State Park's observation tower can become "densely crowded during peak season," Pl.'s Resp. to Def.'s SOF ¶ 93, and that the 200-vehicle capacity limit was reached multiple times from 2022-2024, *id.* ¶ 94. Nor does he dispute that educational programs have occurred at the Park. *Id.* ¶ 97. Thus, on this record, there is no genuine dispute that the Park is "quintessentially crowded" and may serve as "assemblies for 'education, literary or scientific purposes.'" *Antonyuk,* 120 F.4th at 1021. Mr. Nastri also does not dispute that "[t]he Town of Hamden offers summer programing to children between the ages of three and fifteen" at Sleeping Giant State Park. Pl.'s Resp. to Def.'s SOF ¶ 98. Regulating firearms in Sleeping Giant State Park therefore would not fall outside "the tradition of regulating firearms in places frequented by children," which is a tradition that is "well-established and representative." *Id.* at 1019 n.80 (citing *Bruen*, 597 U.S. at 30).

The Farmington Canal Trail is a 25-mile multi-use trail that runs between Hamden and Cheshire, Connecticut. Def.'s SOF ¶ 100. It is a portion of the larger, 56-mile Farmington Canal Heritage Trail, which runs from New Haven to Suffield, Connecticut, and into Massachusetts. *Id.* ¶ 101. The Farmington Canal Trail becomes crowded during peak summer months, and with good weather, thousands of people use it every day for walking, hiking, biking, jogging, and other uses. *Id.* ¶ 102. Mr. Nastri avoids using the Farmington Canal Trail to go jogging when it gets too crowded, which often occurs during the summer, because that requires "bobbing and weaving" when he jogs the trail. *Id.* ¶ 103.

CTTC tracks the number of uses on Connecticut trails—including the Farmington Canal Trail—using IRPCs set up along the trails. *Id.* ¶ 104. In 2023, the IRPCs recorded average daily

uses of 407.15 (Hamden) and 479.99 (Cheshire). *Id.* ¶ 108. Those usages were heavily weighted

toward summer months. For example, the IRPC in Cheshire recorded over 20,000 total uses each

month from May through August, 2023, including 24,890 uses in the month of August, an

average of more than 800 uses per day. *Id.* ¶ 109. The average daily uses recorded by the IRPCs

in Cheshire and Hamden were also significantly higher on weekends than on weekdays, and

approximately 79% of all uses occurred between 9:00 a.m. and 6:00 p.m. *Id.* ¶ 110.

Here, Mr. Nastri again does not dispute that the Farmington Canal Trail "gets crowded."

Pl.'s Resp. to Def.'s SOF ¶ 102. Thus, on this record, Mr. Nastri does not dispute that the

Farmington Canal Trail is a "quintessentially crowded" urban park in which regulating firearms

would fall within our Nation's well-established tradition. Indeed, Mr. Nastri affirmed that he

sometimes avoids the trial because it is so crowded. *Id.* ¶ 103.

Thus, there is no genuine dispute of material fact as to whether Sleeping Giant State Park

and the Farmington Canal Tail fall within the ambit of "quintessentially crowded places," and

there is no dispute of material fact as to whether Sleeping Giant State Park also serves as a place

of assembly for "education, literary or scientific purposes" and is a place "frequented by

children." *Antonyuk*, 120 F.4th at 1021, 1019 n.80 (citing *Bruen*, 597 U.S. at 30).

As a result, there is no dispute of material fact as to whether regulating firearms in

Sleeping Giant State Park and the Farmington Canal Trail is consistent with well-established

traditions of firearms regulation delimiting "the outer bounds of the right to keep and bear arms."

*See Bruen*, 597 U.S. at 24.

Accordingly, § 23-4-1(c) as applied to the two state parks is consistent with the Second

Amendment "right of the people to keep and bear Arms." *See* U.S. Const. amend. II.

Commissioner Dykes's cross-motion for summary judgment as to Mr. Nastri's as-applied challenges will be granted, and Mr. Nastri's motion for summary judgment will be denied.

### C.  The Permanent Injunction

"[A] plaintiff must show actual success on the merits to obtain permanent injunctive relief." *Murdock v. Rosen*, 3:23-cv-00063 (JAM), 2023 WL 3006808, at *2 (D. Conn. April 19, 2023) (citing *N.Y.C.L. Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012)). Because summary judgment has been granted against Mr. Nastri on both his facial and as-applied challenges to § 23-4-1(c), he is not entitled to permanent injunctive relief.

Accordingly, Mr. Nastri's motion for a preliminary injunction will be denied.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is **DENIED**. Defendant's cross-motion for summary judgment is **GRANTED**, and Plaintiff's motion for permanent injunctive relief is **DENIED**.

**SO ORDERED** at New Haven, Connecticut, this 30th day of September, 2025.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE